## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, P.A., | |
| *Plaintiff,* | Case No. |
| v. | MAC Docket No.: M-24-1294 |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary, United States Department of Health and Human Services, | ALJ Appeal No.: 3-12683356911 |
| *Defendant.* | |

## COMPLAINT FOR JUDICIAL REVIEW

Plaintiff, Advanced Dermatology and Skin Cancer Center, P.A. (Advanced Dermatology), brings this action for judicial review of final agency action against Defendant, Robert F. Kennedy, Jr., in his official capacity as Secretary of the United States Department of Health and Human Services.

### Parties

1.    Plaintiff Advanced Dermatology is a professional dermatological practice with six offices in Kansas. Advanced Dermatology's principal office is in Manhattan, Kansas. In the relevant timeframe, Advanced Dermatology also performed services for Medicare beneficiaries in Nebraska.

2.    Defendant Robert F. Kennedy, Jr. is the Secretary of the United States Department of Health and Human Services (HHS). He is named in his official capacity.

**Jurisdiction and Venue**

3.      This is a complaint for judicial review of HHS's final denial of claims that Advanced Dermatology submitted to Medicare. This Court has jurisdiction under 42 U.S.C. § 1395ff(b), which incorporates 42 U.S.C. § 405(g), the judicial-review provision of the Social Security Act. The amount in controversy is more than $1,900. *See* Adjustment to the Amount in Controversy Threshold Amounts for Calendar Year 2025, 89 Fed. Reg. 79294, 79295-96 (Sept. 27, 2024).

4.      Venue is appropriate in the District of Kansas under 42 U.S.C. § 405(g) because Advanced Dermatology resides in Kansas.

**Exhaustion**

5.      Before a party may seek judicial review of HHS's final action, it must exhaust its administrative remedies through HHS's Medicare Appeals Council (the Council). *See* 42 U.S.C. § 405(g).

6.      Exhaustion requires that a party seek: (1) redetermination of the decision, *see* 42 U.S.C. § 1395ff(a)(3)(A); 42 C.F.R. § 405.940; (2) reconsideration of the redetermination decision, *see* 42 U.S.C. § 1395ff(b), (c); 42 C.F.R. § 405.960; (3) review of the reconsideration decision before an administrative-law judge (ALJ), *see* 42 U.S.C. § 1395ff(d); 42 C.F.R. § 405.1000; and (4) final review of the ALJ's decision from the Council, *see* 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. § 405.1100.

7.      The Council's decision is "final and binding on all parties unless a Federal district court issues a decision modifying the Council's decision." 42 C.F.R. § 405.1130.

8.      Where, as here, the Council fails to issue a decision within the statutory time limit, parties may request that the Council give them permission to escalate their claims to federal district court. 42 C.F.R. § 405.1132(a). If the Council cannot take timely action, it must give the party notice of its inability to do so. *Id.* § 405.1132(a)(2). After the Council gives notice that it cannot take timely action, a party has 60 days to file an action in federal district court. *Id.* § 405.1132(b).

9.      When the Council grants a party's request for escalation without taking action on the party's appeal, courts treat the ALJ's decision as the Secretary's final decision. *See, e.g.*, *Fla. Med. Ctr. of Clearwater, Inc. v. Sebelius*, 614 F.3d 1276, 1280 (11th Cir. 2010); *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).

10.     This action arises out of a post-payment audit of 55 claims that Advanced Dermatology submitted to Medicare for 22 beneficiaries. The Unified Program Integrity Contractor (UPIC) who conducted the audit, CoventBridge Group, did so under 42 C.F.R. § 405.929(a).

11.     Before CoventBridge Group conducted the audit, the Medicare Administrative Contactor (MAC), Wisconsin Physician Services (WPS), reimbursed each claim that Advanced Dermatology submitted.

12.     CoventBridge Group, however, determined that the claims it reviewed were not reasonable and necessary, and therefore overpayments.

13.     Advanced Dermatology requested redetermination of CoventBridge's decisions to WPS under 42 C.F.R. § 405.940. WPS issued an unfavorable redetermination.

14.     Advanced Dermatology next requested reconsideration from a Qualified Independent Contractor (QIC), C2C Innovative Solutions, Inc., under 42 C.F.R. § 405.960. C2C issued an unfavorable decision.

15.    Advanced Dermatology appealed C2C's unfavorable decision to an ALJ in the office of Medicare Hearings and Appeals (OMHA) under 42 C.F.R. § 405.1000. The OMHA Docket Number for Advanced Dermatology's appeal was 3-12683356911. The ALJ entered a partially favorable decision.

16.    Advanced Dermatology appealed the ALJ's unfavorable decisions to the Medicare Appeals Council under 42 C.F.R. § 405.1100. The Council's Docket Number for Advanced Dermatology's appeal was M-24-1294.

17.    On March 5, 2025, after the Council's time to take action on Advanced Dermatology's appeal expired, *see* 42 C.F.R. § 405.1100, Advanced Dermatology requested the right to escalate its appeal to federal district court under 42 C.F.R. § 405.1132(a)(1).

18.    On March 7, 2025, the Council entered an order that notified Advanced Dermatology of its inability to take action on Advanced Dermatology's appeal and granted Advanced Dermatology's escalation request. *See* 42 C.F.R. § 405.1132(b) (allowing a party 60 days to "file an action in a Federal district court . . . after the date it receives the Council's notice that the Council is not able to issue a final decision").

19.    Having exhausted its administrative remedies, this timely action followed.

### General Allegations

#### *The Medicare Program*

20.    Congress established the Medicare Program as part of the Social Security Amendments of 1965. *See* 42 U.S.C. § 1395, *et seq.* Among other populations, the Medicare Program provides health insurance primarily to individuals 65 years of age and older.

21.     The Medicare Program has four parts—Parts A, B, C, and D. Relevant here, Medicare Part B covers pertinent "medical and other services," including "physician services," *see* 42 U.S.C. § 1395x(s)(1), that are "reasonable and necessary," 42 U.S.C. 1395y(a)(1)(A).

22.     For many services, CMS gives providers guidance on what services are "reasonable and necessary" through National Coverage Determinations (NCDs) that are specific to the service. CMS's regional MACs also have authority to give guidance to providers within their respective regions through Local Coverage Determinations (LCDs), which are also specific to the service.

23.     When neither CMS nor a MAC has issued a coverage decision for a particular medical procedure or service, CMS has issued the following guidance to determine whether a service is reasonable and necessary, and therefore covered by Medicare:

- It is safe and effective;

- It is not experimental or investigational; and

- It is appropriate, including the duration and frequency in terms of whether the service or item is:

  - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;

  - Furnished in a setting appropriate to the beneficiary's medical needs and condition;

  - Ordered and furnished by qualified personnel; and,

  - One that meets, but does not exceed, the beneficiary's medical need.

*Medicare Program Integrity Manual* Ch. 3, § 3.6.2.2 (Eff. Aug. 27, 2020).

24.     When a physician furnishes services to a Medicare beneficiary, it must submit a claim for payment to Medicare through the regional MAC. *See* 42 U.S.C. § 1395w-4(g)(4); *id.* § 1395kk-1(a)(4). Among other responsibilities, the MAC is responsible in the first instance for

determining whether and in what amount a provider's Medicare claim is reimbursable, and for making the payment to the provider. *Id.* § 1395kk-1(a)(4)(A), (B).

25.     When providers bill Medicare for services they perform, they do so by reference to a Healthcare Common Procedure Coding System (HCPCS). The HCPCS has two levels.

26.     At Level I, CMS relies on the Current Procedural Terminology (CPT) coding system maintained by the American Medical Association (AMA). These codes are used primarily to identify medical services and procedures furnished by physicians to bill both public and private health insurance programs. A CPT code has five numeric digits.

27.     Relevant here, Advanced Dermatology submitted claims to Medicare for the service of furnishing "Skin Substitute Grafts" under established CPT Codes 15271, 15272, 15275, and 15276.

28.     At Level II, the Secretary has delegated CMS authority to establish "uniform national definitions of services, codes to represent services, and payment modifiers to the codes." 42 C.F.R. § 414.40(a). These codes primarily identify products, supplies, and services not included in the CPT codes. An HCPCS Level II code includes a single letter followed by four numeric digits.

29.     Relevant here, Advanced Dermatology submitted claims to Medicare to reimburse the skin substitute allografts it applied to Medicare beneficiaries under the codes Q4186 and Q4169. The HCPCS code Q4186 is the code for "EpiFix 1 sq cm" skin substitute allograft. The HCPCS code Q4169 is the code for "Artacent wound, per sq cm" skin substitute allograft.

### *Mohs Micrographic Surgery*

30.     The claims at issue in this case all involve wound repairs that Advanced Dermatology performed following a surgical procedure called Mohs Micrographic Surgery.

31.     Mohs surgery is a surgical technique where a surgeon removes a patient's cancerous skin tissue without removing any more skin tissue than necessary.

32.     Mohs surgery combines (1) the removal of cancerous skin tissue; and (2) histological examination and interpretation of the removed skin tissue for cancerous cells; with (3) reconstruction of the post-surgery wound, all in a one-day visit to a physician's office that can be performed under local anesthesia.

33.     To perform the surgery, the surgeon begins by removing small slices of cancerous tissue from the patient. The surgeon then examines the margins of the tissue for cancer and continues removing and examining small slices of tissue until all the patient's cancerous skin tissue has been removed.

### *Mohs Surgery Wound Repair*

34.     Because a physician performing Mohs surgery removes and analyzes skin tissue in small stages, the resulting surgical wound is typically smaller than a wound that would otherwise result from traditional surgical excision. In a traditional surgical excision, the surgeon will evaluate the amount of tissue to remove based on the patient's clinical data and then also remove a relatively large, standardized margin of non-cancerous tissue around the perimeter of the cancerous tissue removed.

35.     While the surgical wound that results from a Mohs procedure is ordinarily smaller than that of a standard surgical excision, a resulting Mohs surgical wound can still be extensive.

36.     Depending on the size, surgeons generally have three options to repair the wound: (1) secondary intention, which allows the wound to heal on its own; (2) primary side-to-side repairs, which involves suturing the skin edges around the wound together; and (3) flap or graft repairs, which are considered true reconstructive surgery.

7

37.     When a surgical wound is deep or large enough, neither secondary intention nor side-to-side repairs may be available. In addition—and particularly for older adults who are Medicare beneficiaries—a surgeon cannot perform a traditional skin graft due to the patient's thin, fragile skin or for other patient-specific comorbidities.

38.     When a flap or graft is necessary, most dermatologists refer patients to a plastic surgeon. But Advanced Dermatology's dermatologist, Dr. John Adams, has the training and experience to perform virtually all of Advanced Dermatology's flap or graft repairs.

39.     Dr. Adams is a board-certified dermatologist and an accredited board-certified Mohs surgeon. Among other honors, Dr. Adams has served on the Board of Directors for the American Society for Mohs Surgery, as the President of the Kansas Society for Dermatology and Dermatologic Surgery, and is a recipient of the 2017 American Academy of Dermatology's Presidential Citation Award.

*Allografts and Skin Substitutes in Surgical Wound Reconstruction*

40.     Since 2016, Dr. Adams has used skin-substitute allografts as an option, when medically necessary, to repair Mohs surgical wounds.

41.     Allografts are made from voluntarily donated human tissues and act as a wound covering or protective barrier and to facilitate the healing process.

42.     The U.S. Food and Drug Administration regulates the processing and distribution of allografts generally and has confirmed that the manufacturers of the allografts at issue in this case specifically processed and distributed the allografts in accordance with FDA requirements for human cellular and tissue-based products.

43.     While the FDA regulates the processing and distribution of allografts, it does not regulate the way medical professionals use allografts or have authority to do so.

44. Allograft manufacturers package allografts individually in sterile packaging and predetermined sizes. Thus, when a provider opens a package to use an allograft, it often must cut and shape the allograft from the package into the appropriate wound size and cannot reuse any remaining parts of the allograft.

45. Dr. Adams has co-authored numerous dermatological articles in peer-reviewed journals, including articles on allograft repairs for Mohs surgical wounds.

46. One article that Dr. Adams co-authored was published in January 2022 in the peer-reviewed journal Facial Plastic Surgery & Aesthetic Medicine, titled *Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane*. *See* Julia Toman, *et al.*, *Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane*, Facial Plastic Surgery & Aesthetic Medicine (Jan. 2022).

47. Aside from studies that Dr. Adams has co-authored, other medical professionals have extensively studied the use of allografts for post-surgical wound repairs.

48. As the physician who performs both the Mohs surgery and the consequent wound repair, Dr. Adams has the actual and best understanding of each patient's appropriate treatment options.

49. Neither CMS nor WPS has issued guidance specific to the use of allograft repairs for post-Mohs surgical patients.

50. WPS has, however, issued both an LCD and a Local Coverage Article (LCA) for Mohs surgery.[1] In relevant part, WPS's LCA 57477 says that, to support the medical necessity of Mohs surgery, the patient's record should include:

---

[1] WPS, Article A57477: *Billing and Coding: Mohs Micrographic Surgery* (Eff. 10/31/2019), https://www.cms.gov/medicare-coverage database/view/article.aspx?articleid=57477&ver=12&=.

11. Measurement of the primary lesion necessitating MMS and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:

- Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).

- Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (*i.e.*, tip of the iceberg phenomenon).

- It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.

51.    WPS further explains: "12. When the surgical defect created by [Mohs surgery] requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance."

52.    In the absence of more specific guidance from CMS or WPS on their use in post-Mohs surgical procedures, Dr. Adams relies on the following guidelines to determine when allografts are necessary and incorporates them into his notes for each patient whose wound he must repair with an allograft:

a.    Relatively large size of primary wound/defect post Mohs surgery.

b.    The wound/defect is not amenable to primary side to side repair; *i.e.*, no simple, intermediate, or complex repair is feasible; which would indicate that grafts and flaps would be medically indicated.

c.    The wound/defect is not appropriate for secondary intention; *e.g.*, inferior eyelid defect, exposed cartilage, exposed bone, patient is immunosuppressed, etc.

d.    The patient does not opt for secondary intention.

10

e.  The patient is made fully aware of the potential need for multiple applications of the allograft with each and every allograft application and has consented to multiple applications as indicated.

f.  After discussing their options, as well as the risks and benefits of the repairs, the patient opted for repair via allograft.

g.  Photos required with every application and re-application.

h.  The nominal size for "true reconstruction" flaps, grafts & allografts is:

   i.  More than 0.5 cm in high-risk areas: nose, eyelid, ear, lip, fingers, toes;

   ii.  More than 1.0 cm in moderate to high-risk areas: head, neck, hands, feet and pre-tibial shin; and

   iii.  More than 2.0 cm in diameter for low-risk areas; trunk, arms, and legs.

i.  The allograft size is commensurate with that of the post-Mohs surgery wound to include wound depth to as great a degree as possible, which can from time to time be dependent upon allografts available at the time of application.

### *The Claims*

53.  Dr. Adams performed Mohs surgery on the 22 beneficiaries at issue between January 21 and May 23, 2022.

54.  In each case, Dr. Adams followed the criteria above and applied either an Artacent or EpiFix skin allograft. Thus, in each patient's records, Dr. Adams documented, including with pictures, the width, length, and depth of the wound throughout the treatment process to show the wound's healing process; that the wound was not amenable to side-to-side repair; that the wound was not appropriate for secondary intention; that the patient did not opt for secondary intention; that the patient was made aware of the potential for multiple applications of the allograft; that the risks and benefits of the allograft were discussed; and that the patient consented to allograft wound repair.

55.  In each case, Dr. Adams followed the manufacturer's guidelines for use and application of the allograft.

56.     When Advanced Dermatology first submitted claims to WPS for reimbursement of the allograft repairs, WPS reimbursed Advanced Dermatology's claims.

### The CoventBridge Audit

57.     In July and August of 2022, CoventBridge Group sent Advanced Dermatology a request for medical records in conjunction with an audit of claims that Advanced Dermatology submitted from January through June of 2022.

58.     Each of the claims for which CoventBridge Group requested medical records were related to a post-Mohs surgical wound treatment that Advanced Dermatology had performed.

59.     In November 2022, CoventBridge Group sent Advanced Dermatology a letter explaining that it reviewed 55 claims that included 163 services. Based on its review, CoventBridge Group claimed that Advanced Dermatology had received more than $116,000 in overpayments from Medicare.

60.     As to Advanced Dermatology's use of allografts, CoventBridge Group first asserted that Advanced Dermatology was incorrectly using them for "wound healing, which is not their homologous use." [2] In full:

> Patients/Medicare were billed for human cellular and tissue product (HCT/P), which is approved as a wound covering, but not as a skin substitute graft per the CPT Codebook and the FDA. Although provider was billing using the skin graft code, they called the product in the documentation a "Repair: Skin Substitute". Documentation supported grafts were being used for wound healing and regeneration of skin growth which is not the product's homologous use per the Food and Drug Administration (FDA)/Code of Federal Regulations (CFR). Provider is also using this product to decrease the risk of infection, reduce pain, minimize inflammation, decrease scar formation and disfigurement (cosmetic reasons), minimize pain, as well as for numerous other reasons.

---

[2] The FDA defines "homologous use" as "the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with [a human cellular and tissue product] that performs the same basic function or functions in the recipient as the donor." 21 C.F.R. § 1271.3(c).

61.     As noted above, while the FDA regulates the manufacture and distribution of allografts, it has never claimed to regulate the medical necessity or a physician's use of allografts.

62.     CoventBridge Group similarly asserted that Advanced Dermatology was "not applying a true graft." In full:

> The provider applied a product defined by the manufacturer and the FDA as a wound covering, not a "graft" as per the definition in the Current Procedural Terminology (CPT) Codebook for CPT 15271-15276. Provider also had the patient return sometimes week after week to have another application of skin substitute placed, which is further confirmation that this product was not the type of item or service covered under codes 15271-15276.

> Code 15271-15276 are associated with the application/implantation of skin, or a biological substance intended to remain in the person for the purpose of helping the person's own skin cells to grow back. The CPT Codebook specifically states, "[a]pplication of non-graft [i.e., something intended to be removed] wound dressings is not separately reportable."

63.     Finally, CoventBridge asserted that Advanced Dermatology "bill[ed] and us[ed] larger sized products than necessary." In full:

> The provider billing/applying larger sized amniotic product than necessary according to the wound dimensions documented in the medical record, despite smaller and more appropriate sizes being available from the manufacturer. The provider documented a cloned statement saying if the correct sized amniotic product was not in stock, they would use the closest graft in stock that would allow for total wound coverage. This is also a concern for waste and abuse.

64.     In its audit findings, CoventBridge Group never asserted that Advanced Dermatology had received an overpayment arising from its use of allografts because they were experimental or investigational.

### *Redetermination*

65.     Advanced Dermatology sought a redetermination of CoventBridge Group's audit from its MAC, WPS.

66.     As to the allografts at issue, WPS acknowledged that the "documentation supported the services were provided as billed," and that "the records did support off label-use." It denied

Advanced Dermatology's claim, however, because the records "did not contain medical literature to support the medical necessity of the services billed."

### *Reconsideration*

67.     Advanced Dermatology sought reconsideration from the QIC, C2C Innovative Solutions.

68.     In response to WPS's concerns about medical literature supporting its use of allografts, Advanced Dermatology included and C2C noted that "[a] peer review journal article and reference to insurance company policies were included in the appellant rebuttal to support the necessity of the services."

69.     In its review, however, C2C ignored WPS's references to medical literature and narrowed the reasonable-and-necessary issues to whether: (1) The services were not used in a homologous fashion; (2) The provider did not apply a true graft; (3) The provider billed and used larger sized products than necessary; and (4) Cloned documentation.

70.     Separately, C2C stated expressly that "any flawed rationale used by the UPIC or MAC in the redetermination decision is cured by the QIC reconsideration."

71.     C2C then went on to explain that Advanced Dermatology did not use the allografts for "homologous use only" as the FDA had directed. In its view, Medicare could not reimburse the allografts because "these products cannot be used for wound healing per the CFR and FDA."

72.      In its decisions as to specific claims, C2C thus limited its unfavorable determinations as to the allografts to the following statement: "The documentation does not support that the allograft was medically necessary per accepted standards of medical practice. The product was not utilized in a homologous fashion."

*ALJ Review*

73.    Advanced Dermatology sought review of C2C's decision before an ALJ.

74.    Advanced Dermatology's request for ALJ review did not raise the issue of the investigative or experimental nature of the allografts at issue because none of the lower-level contractors had decided that issue against Advanced Dermatology.

75.    Rather, in its request for review, Advanced Dermatology emphasized that its documentation clearly supported the need for the reconstructive technique and that, consistent with WPS's LCA, the "reconstructive technique was an appropriate choice to preserve functional capabilities and to restore physical appearance" following the Mohs surgery.

76.    In support of that point, Advanced Dermatology referred to and described the peer-reviewed article, *Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane*, as well as Blue Cross Blue Shield of Kansas's updated medical guidance for amniotic membrane and amniotic fluid.

77.    In addition, Advanced Dermatology attached three separate ALJ decisions to its request for hearing where the ALJ made favorable findings as to Advanced Dermatology's use of allografts. Those decisions are part of the administrative record. In one decision, on substantially the same fact patterns, the ALJ held squarely: "The Artacent allograft . . . and application of skin substitute services . . . provided to the Beneficiaries on the various dates of service at issue satisfy Medicare coverage criteria."

78.    In the other two decisions, the ALJ only entered unfavorable decisions on Advanced Dermatology's use of allografts where Dr. Adams conceded that a lesser alternative might have been appropriate or for other unrelated reasons. Otherwise, the ALJ held that Advanced Dermatology's use of allografts satisfied Medicare coverage criteria.

79.     Further, because adjudicators at the lower level of review continued to harp on the FDA's guidance as dispositive, Advanced Dermatology asserted that the FDA's regulations did not apply to Advanced Dermatology and could not control the question whether Medicare covered the allografts at issue.

80.     Finally, because C2C purported to "cure" any "flawed rationale" in the lower-level adjudicators' reasoning, Advanced Dermatology did not seek to submit new or additional evidence on the body of medical literature that supports the use of allografts.

81.     Notably, CoventBridge Group also submitted a position paper to the ALJ. But not even CoventBridge Group, who first asserted and maintained that the allograft claims were not reasonable or necessary, said that the allografts were experimental and investigational.

82.     Instead, CoventBridge's position paper restated its homologous-use argument. In addition, CoventBridge's position paper included factual errors and referred to at least one patient and claim that were not subject to the appeal and who was not even an Advanced Dermatology patient.

83.     The ALJ held a hearing on Advanced Dermatology's appeal on October 11, 2023. The ALJ, however, did not allow Advanced Dermatology to offer testimony about individual beneficiaries. Rather—in the middle of the hearing—the ALJ cut Advanced Dermatology's testimony off and said it would not accept any more testimony after a specific time.

84.     The ALJ issued her decision on October 30, 2023. In that decision, the ALJ correctly held that the lower-level adjudicators' reliance on FDA regulations was misplaced.

85.     Notwithstanding that ruling, the ALJ went on to hold that the allografts were not reasonable and necessary because they were experimental or investigational—an issue that no one on either side raised at the hearing or at any time before the hearing.

86.    In doing so, the ALJ recast the study and insurance guidance that Advanced Dermatology had presented in support of its point that allografts were a safe and effective reconstructive technique into evidence that allografts had not been adequately studied.

87.    In addition, the ALJ discounted the value of the study because the patients involved in the study were Advanced Dermatology's patients.

88.    The ALJ further ignored several other studies in the record that refer to and describe the use of allografts for post-surgical repair. Had the ALJ notified Advanced Dermatology of its concern, Advanced Dermatology could have pointed to dozens of additional studies supporting the use of allografts generally and in post-Mohs surgery specifically. Thus, like the ALJ's refusal to entertain beneficiary-specific evidence, Advanced Dermatology also prepared a list of peer-reviewed journal articles and submitted that list to the Council.

89.    Similarly, had the ALJ told the parties that it was concerned with the investigational nature of the allografts, Advanced Dermatology could have pointed to CMS's own publicly available data of general acceptance in the medical community. Indeed, in 2021 alone, dermatologists in Kansas billed Medicare for the use of Q-coded skin substitutes in 4,808 claims. Based on the same data, dermatologists nationally billed Medicare in 2021 for the use of Q-coded skin substitutes in 222,401 claims.

90.    In addition, the ALJ held that Advanced Dermatology billed for excessive amounts of allografts and relied on "cloned" records to support its claims.

91.    The ALJ, however, applied these holdings globally without identifying which claims or beneficiaries they applied to. Moreover, because the ALJ barred Dr. Adams from offering beneficiary-specific testimony, it never gave Advanced Dermatology the chance to address any of the ALJ's specific concerns.

### Council Review

92.     Advanced Dermatology appealed the ALJ's decision to the Council in December 2023.

93.     In light of the ALJ's refusal to admit more beneficiary-specific information, Advanced Dermatology prepared and submitted to the Council a more detailed description of each beneficiary's case and reasons for allograft repair.

94.     On March 5, 2025, while Advanced Dermatology's appeal was pending but after the Council's time to act expired, Advanced Dermatology requested to escalate its appeal to federal court.

95.     Two days later, the Council granted Advanced Dermatology's escalation request.

### Claims for Relief

### <u>Count I</u>
***The Secretary's decision is arbitrary, capricious, and not supported by substantial evidence***
**42 U.S.C. § 405(g); 5 U.S.C. § 706(2)(A)**

96.     Advanced Dermatology incorporates the preceding allegations of its complaint into this count.

97.     The ALJ's holding that Advanced Dermatology's use of allografts was experimental or investigational is arbitrary, capricious, and not supported by substantial evidence.

98.     The ALJ's holding ignores substantial evidence in the record that the skin substitutes Advanced Dermatology used are not experimental or investigational.

99.     The ALJ's global holding that Advanced Dermatology's services could not be covered because it used "cloned" records to document its services is not supported by substantial evidence and is arbitrary and capricious.

## Count II
### The Secretary failed to follow appropriate procedures
### 42 U.S.C. § 405(g); 5 U.S.C. § 706(2)(D)

100.    Advanced Dermatology incorporates the preceding allegations of its complaint into this count.

101.    Under 42 C.F.R. § 405.1032(a), "[t]he issues before the ALJ . . . include all the issues for the claims or appealed matter specified in the *request* for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's favor." (emphasis added).

102.    In its request for hearing, Advanced Dermatology did not raise the issue of the investigative or experimental nature of the allografts at issue. Likewise, the investigative or experimental nature of the allografts at issue were not decided against Advanced Dermatology in the initial determination, redetermination, or reconsideration.

103.    Under 42 C.F.R. § 405.1032(b)(2), the ALJ may only "consider a new issue at the hearing if he or she notifies the parties that were . . . sent the notice of hearing about the new issue before the start of the hearing."

104.    The ALJ did not give Advanced Dermatology notice of the new issue before the start of the hearing.

105.    Under 42 C.F.R. § 405.103(b)(3), parties must have the opportunity "to submit evidence regarding the issue."

106.    The ALJ did not give Advanced Dermatology an opportunity to submit new evidence regarding the issue.

107.    Had the ALJ given Advanced Dermatology notice of the new issue, Advanced Dermatology would have submitted additional evidence proving that the allografts were neither experimental nor investigational.

**Count III**

***The Secretary's application of the term "experimental or investigative" is arbitrary and capricious***
**42 U.S.C. § 405(g); 5 U.S.C. § 706(2)(A)**

108.    Advanced Dermatology incorporates the preceding allegations of its complaint into this count.

109.    In its decision, the ALJ's application of the term "experimental or investigative" was arbitrary and capricious.

110.    The ALJ's opinion applied Section 3.6.2.2 of the Medicare Program Integrity Manual (MPIM) to determine whether the services were "reasonable and necessary," and therefore covered by Medicare.

111.    In relevant part, Section 3.6.2.2 of the MPIM excludes from Medicare coverage services that are "experimental or investigational."

112.    The ALJ did not cite or purport to apply any existing standard to distinguish services that the Secretary would find "experimental or investigative" from services that the Secretary would find are not "experimental or investigative."

113.    As the Tenth Circuit has acknowledged, the words "experimental" and "investigational" do not "have definite meanings in the medical community." *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1190-91 (10th Cir. 2007) (emphasis omitted); *see also id.* at 1195 ("To say that the partial-joint prosthesis is *experimental* and *investigational* is thus to say that there is 'inadequate evidence' supporting the device's safety and effectiveness. . . . As noted above, whether one considers evidence to be adequate is a matter of individual taste.").

114.    The ALJ's application of the "experimental or investigative" standard was arbitrary and capricious because it imposed on Advanced Dermatology a standard that is so indeterminate

and unclear that it is capricious by definition and leaves no method by which Advanced Dermatology could gauge its conduct.

## Prayer for Relief

115.    For the above reasons, Advanced Dermatology prays for Judgment against the Secretary for the following:

      a.   An order invalidating the Secretary's final decision;

      b.   An order invalidating the Secretary's recoupment of the denied claims;

      c.   Prejudgment and post-judgment interest;

      d.   Reasonable attorney's fees and costs of the suit; and

      e.   Other and further relief as the Court may deem just and proper under law.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas, as the place of trial of this cause of action.

Dated: May 6, 2025                 Respectfully submitted,

                         *s/Samuel J. Walenz*
                         Samuel J. Walenz, KS #29114
                         FOULSTON SIEFKIN LLP
                         1551 N. Waterfront Parkway, Suite 100
                         Wichita, Kansas 67206-4466
                         (P) 316.291.9713 | (F) 316.267.6345
                         swalenz@foulston.com

                         Amanda M. Wilwert, KS #25075
                         FOULSTON SIEFKIN LLP
                         7500 College Boulevard, Suite 1400
                         Overland Park, KS 66210-4041
                         (P) 913.253.2181 | (F) 913.498.2101
                         awilwert@foulston.com

                         *Attorneys for Plaintiff*