DHHS, DEPARTMENTAL APPEALS BOARD
MEDICARE OPERATIONS DIVISION

**TRANSMITTAL OF CERTIFIED RECORD**

| |
|---|
| DATE: October 27, 2025 |
| TO:  AUSA and Assistant Regional Counsel |
| FROM: Departmental Appeals Board, MS 6127<br>      Medicare Operations Division<br>      330 Independence Avenue<br>      Cohen Building Room G-644<br>      Washington, DC   20201 |
| ***NOTE: THIS RECORD CONTAINS CONFIDENTIAL PERSONAL MEDICAL INFORMATION AND, IN THE ABSENCE OF A PROTECTIVE ORDER, MAY REQUIRE REDACTION BY THE RECIPIENTS PRIOR TO FILING WITH THE COURT.*** |
| **Court Case:** United States District Court for the District of Kansas<br>Civil Action No. 2:25-cv-02250<br>ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, P.A. v. ROBERT F. KENNEDY, JR.,SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES |
| Attachment:<br>     Certified copy of administrative record |
| **PLEASE NOTE THAT FURTHER ACTION MAY BE NECESSARY:**<br><br>If the court remands this case for further proceedings pursuant to sentence four or sentence six of section 205(g) of the Social Security Act, **PLEASE FURNISH US WITH A DATED COPY OF THE COURT'S FINAL DISPOSITION <u>AS SOON AS POSSIBLE</u> so that we may effectuate the court's order.  We will also need a copy of the complete administrative record as augmented by the court.**<br><br>**Courts direct remands using a variety of terms:**<br>·      to the Secretary of HHS<br>·      to the Departmental Appeals Board<br>·      to the Medicare Appeals Council<br>·      to an Administrative Law Judge<br>**In all instances, furnish the remand and record to the Medicare Operations Division of the DAB at the address listed above, attention Division Director.**  The Medicare Appeals Council will act on the court's order or, if necessary, remand the case to an Administrative Law Judge. |



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

Washington, D.C. 20201

## MAR - 5 1992

TO:        Chair, Departmental
      Appeals Board

FROM:      Terrence J.  Tychan *Terrence J Tychan*
      Acting Deputy Assistant Secretary for
      Management and Acquisition

SUBJECT:   Authority to Certify True Copies and Affix the
      Department Seal


Under the authority vested in the Deputy Assistant Secretary for
Management and Acquisition on November 14. 1991 (attached) to
certify true copies and affix the Department Seal for the Office
of the Secretary, I hereby redelegate to the Chair of the
Departmental Appeals Board:

1.   The authority to certify true copies of any books, records,
     papers, or other documents on file within the Department, or
     extracts from such, to certify that true copies are true
     copies of the entire file of the Department, to certify the
     complete original record, or to certify the nonexistence of
     records on file within the Department, and to cause the Seal
     of the Department to be affixed to such certifications.

2.   The authority to cause the Seal to be Affixed to agreements,
     awards, citations, diplomas, and similar documents.

3.   These authorities may be redelegated.

4.   This redelegation supersedes all previous redelegations of
     authorities to the Chair of the Departmental Appeals Board
     relating to this subject. Further redelegations made under
     previous redelegations of authority shall remain in effect
     until appropriate new redelegations are made.

Attachment



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

---

Departmental Appeals Board
Room G-644, MS 6127
330 Independence Avenue, SW
Washington, D.C.  20201

<u>**MEMORANDUM**</u>

TO:         Cristina Prelle, Administrative Appeals Judge
            Executive Director, Medicare Operations Division
            Departmental Appeals Board

FROM:       Constance B. Tobias
            Chair, Departmental Appeals Board

DATE:       September 27, 2023

RE:         Delegation of Authority to Assign Cases to Administrative Appeals Judges
            and to Certify Records

<u>Authority Delegated</u>

I hereby delegate to the Executive Director of the Medicare Operations Division, Cristina
Prelle, my authority as Chair of the Departmental Appeals Board to assign cases to
Administrative Appeals Judges.

In addition, I hereby delegate to the Executive Director of the Medicare Operations
Division, my authority, to certify true copies of administrative records developed within
the Medicare Operations Division.

<u>Effective Date</u>

This delegation is effective October 2, 2023.

                                    Chair, Departmental Appeals Board

# United States of America

Department of Health and Human Services

# CERTIFICATION OF TRUE COPY

Pursuant to the provisions of 42 U.S.C. 3505 and the authority vested in me by delegation from the Secretary (See attached), I hereby certify that the annexed are true copies of the documents on file in the Department of Health and Human Services.

IN WITNESS WHEREOF, I have set my hand and caused the seal of the Department of Health and Human Services to be affixed, on this 27th day of October, 2025.



Cristina Prelle
Executive Director and
Administrative Appeals Judge

**UNITED STATES**
**DISTRICT COURT**
**FOR THE DISTRICT**
**OF KANSAS**

ADVANCED DERMATOLOGY AND
SKIN CANCER CENTER, P.A.,
                                )
          Plaintiff             )
                                )
                   v.           )          Civil Action Number:
                                )             2:25-cv-02250
ROBERT F. KENNEDY, JR.,         )
SECRETARY of the                )
UNITED STATES DEPARTMENT        )
OF HEALTH AND HUMAN             )
SERVICES,                       )
                 Defendant.     )


<u>**ADMINISTRATIVE RECORD**</u>

**<u>Advanced Dermatology and Skin Cancer Center, P.A.</u>**
**Appellant**

**<u>Multiple</u>**
**Beneficiaries**

**<u>3-12683356811</u>**
**OMHA Appeal Number**

**Advanced Dermatology and Skin Cancer Center, P.A.,**
**Plaintiff**

**v.**

**Robert F. Kennedy, Jr., Secretary of the United States Department of Health and Human Services,**
**Defendant.**

**Court Identification Number: 2:25-cv-02250**

**<u>Index</u>**

| ***<u>Volume 1</u>*** | ***<u>Pages</u>*** |
|---|---|
| | |
| Beneficiary Correspondence to Medicare Appeals Council (Council) | 1-3 |
| Council Order Granting Escalation to Federal Court[1] | 4-7 |
| Appellant's Request for Escalation to Federal Court | 8-59 |
| Appellant's Request for Review and Attached Documents | 60-153 |
| Administrative Law Judge (ALJ) Decision | 154-199 |
| ALJ Exhibit List | 200-223 |
| ALJ File #1 | 224-9459 |
| ALJ File #2 | 9460-9466 |
| ALJ File #3 | 9467-9485 |
| ALJ File #4 | 9486-9648 |

| ***<u>Volume 2</u>*** | |
|---|---|
| ALJ File #5 | 1-10 |
| ALJ File #6 | 11-20 |
| ALJ File #7 | 21-23 |
| ALJ File #8 | 24-27 |
| ALJ File #9 | 28-29 |
| ALJ File #10 | 30-34 |

---

[1] The Council's Order Granting Escalation to Federal Court, issued on March 7, 2025, contains a typographical error, identifying the Council docket number as M-22-2031 rather than M-24-1294.

| | |
|---|---|
| ALJ File #11 | 35-72 |
| ALJ File #12 | 73-91 |
| ALJ File #13 | 92-2617 |
| ALJ File #14 | 2618-2708 |
| ALJ File #15 | 2709-11282 |

| ***Volume 3*** | |
|---|---|
| ALJ File #16 | 1-7664 |
| ALJ File #17 | 7665-16611 |

| ***Volume 4*** | |
|---|---|
| ALJ File #18 | 1-8980 |
| ALJ File #19 | 8981 |
| ALJ File #20 | 8982-8983 |
| ALJ File #21 | 8984-8994 |
| ALJ File #22 | ALJ Hearing Audio |
| ALJ File #23 | ALJ Hearing Audio |
| ALJ File #24 | 8995-9398 |
| ALJ File #25 | 9399-9410 |
| Non-Exhibited Record Documents | 9411-9814 |
| ALJ Hearing Transcript: October 11, 2023 | 9815-9972 |

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 1

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
**Medicare Appeals Council**
**Docket No. M-22-2031**

Advanced Dermatology and Skin Cancer Center, P.A., Appellant
ALJ Appeal No. 3-12683356911

## ORDER OF MEDICARE APPEALS COUNCIL
## GRANTING REQUEST FOR ESCALATION

The Medicare Appeals Council (Council) received your request to escalate the above appeal to Federal district court dated March 5, 2025. The Council grants your request for escalation.

The 90-day time frame for the Council to issue a decision, dismissal, or remand order has expired. *See* 42 C.F.R. § 405.1100(c). Due to the large number of pending appeals, the Council is unable to issue a decision, dismissal, or remand order within five calendar days of your request to escalate to Federal district court. 42 C.F.R. § 405.1132(a)(1). Under these circumstances, the regulations permit you to bypass Council review and seek review of the Administrative Law Judge's (ALJ's) decision in Federal district court. 42 C.F.R. § 405.1132(a)(2).

In order to escalate, you must file an action in Federal district court within 60 calendar days after you receive this notice and the amount in controversy must be $1,840 or more. 42 C.F.R. §§ 405.1132(b), 405.1136(a)(1); 88 Fed. Reg. 67297 (Sept. 29, 2023). If you cannot file your complaint within 60 days, you may ask the Council to extend the time in which you may begin a civil action. However, the Council will only extend the time if you provide a good reason for not meeting the deadline. Your reason must be set forth clearly in your request. 42 C.F.R. § 405.1134. If you do not file an action in Federal district court, then your appeals will remain before the Council. 42 C.F.R. § 405.1136(a)(2).

If a civil action is commenced, the complaint should name the Secretary of Health and Human Services as the defendant and should include the Council's docket number and ALJ appeal number shown at the top of this notice. 42 C.F.R. § 405.1136(d). The Secretary must be served by sending a copy of the summons and complaint by registered or certified mail to the General Counsel, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201.

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 3



**DEPARTMENT OF HEALTH & HUMAN SERVICES**    Office of the Secretary

Departmental Appeals Board, MS 6127
Medicare Appeals Council
330 Independence Avenue
Cohen Building, Room G-644
Washington, DC  20201
(202)565-0100/Toll Free:1-866-365-8204

Docket Number:  M-24-1294
ALJ Appeal Number:  3- 12683356911

Foulston Siefkin LLP
Attn: Amanda M. Wilwert
7500 College Boulevard
Ste 1400
Overland Park, KS 66210

NOTICE AND ORDER OF MEDICARE APPEALS COUNCIL

<u>What This Notice Means</u>

Enclosed is an order of the Medicare Appeals Council.

This notice and enclosed order were mailed on: <u>March 7, 2025 </u>.

Enclosure

 cc: Advanced Dermatology and Skin Cancer Center, P.A.
   Beneficiaries
   Q2A AdQIC Records Management

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
**Medicare Appeals Council**
**Docket No. M-22-2031**

Advanced Dermatology and Skin Cancer Center, P.A., Appellant
ALJ Appeal No. 3-12683356911

## ORDER OF MEDICARE APPEALS COUNCIL
## GRANTING REQUEST FOR ESCALATION

The Medicare Appeals Council (Council) received your request to escalate the above appeal to Federal district court dated March 5, 2025. The Council grants your request for escalation.

The 90-day time frame for the Council to issue a decision, dismissal, or remand order has expired. *See* 42 C.F.R. § 405.1100(c). Due to the large number of pending appeals, the Council is unable to issue a decision, dismissal, or remand order within five calendar days of your request to escalate to Federal district court. 42 C.F.R. § 405.1132(a)(1). Under these circumstances, the regulations permit you to bypass Council review and seek review of the Administrative Law Judge's (ALJ's) decision in Federal district court. 42 C.F.R. § 405.1132(a)(2).

In order to escalate, you must file an action in Federal district court within 60 calendar days after you receive this notice <u>and</u> the amount in controversy must be $1,840 or more. 42 C.F.R. §§ 405.1132(b), 405.1136(a)(1); 88 Fed. Reg. 67297 (Sept. 29, 2023). If you cannot file your complaint within 60 days, you may ask the Council to extend the time in which you may begin a civil action. However, the Council will only extend the time if you provide a good reason for not meeting the deadline. Your reason must be set forth clearly in your request. 42 C.F.R. § 405.1134. If you do not file an action in Federal district court, then your appeals will remain before the Council. 42 C.F.R. § 405.1136(a)(2).

If a civil action is commenced, the complaint should name the Secretary of Health and Human Services as the defendant and should include the Council's docket number and ALJ appeal number shown at the top of this notice. 42 C.F.R. § 405.1136(d). The Secretary must be served by sending a copy of the summons and complaint by registered or certified mail to the General Counsel, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201.

In addition, you must serve the United States Attorney for the district in which you file your complaint and the Attorney General of the United States. *See* rules 4(c) and (i) of the Federal Rules of Civil Procedure and 45 C.F.R. § 4.1.

**MEDICARE APPEALS COUNCIL**

_____
Cristina M. Prelle
Administrative Appeals Judge

Date:  March 7, 2025

**ATTACHMENT A**
**Master Beneficiary List**

**Advanced Dermatology and Skin Cancer Center, P.A.**
**ALJ Appeal Number:  3- 12683356911**
**Docket Number:  M-24-1294**

| Beneficiary Initials | Dates of Service |
|---|---|
| E.A. | 05/02/22; 05/16/22 |
| C.B. | 01/21/22; 01/29/22; 02/05/22; 02/12/22 |
| B.B. | 01/24/22; 02/16/22 |
| L.B. | 05/10/2022 |
| W.C. | 04/04/22; 05/02/22 |
| R.E. | 04/25/22; 05/09/22 |
| M.F. | 01/28/22; 02/04/22; 02/11/22; 02/17/22; 03/02/22; 03/09/22; 03/16/22; 03/23/22; 04/01/22 |
| R.G. | 01/22/22; 01/29/22; 02/05/22; 02/12/22 |
| D.G. | 02/05/22 |
| J.G. | 02/23/22; 05/09/22 |
| G.H. | 01/25/22; 02/24/22 |
| V.M. | 05/13/22 |
| N.M. | 05/18/22 |
| J.M. | 02/10/22; 03/07/22 |
| G.M. | 04/04/22; 04/19/22 |
| D.N. | 03/17/22 |
| H.O. | 03/28/22; 05/11/22 |
| R.P. | 05/23/22; 04/07/22 |
| G.P. | 04/11/22; 05/03/22 |
| T.T. | 02/22/22; 03/01/22;03/08/22; 03/15/22 03/22/22; 03/31/22 |
| L.T. | 03/21/22; 05/17/22 |
| W.W. | 01/24/22; 03/23/22 |

# FOULSTON

ATTORNEYS AT LAW

7500 COLLEGE BOULEVARD, SUITE 1400
OVERLAND PARK, KS 66210-4041

Amanda M. Wilwert

awilwert@foulston.com
Phone: 913.253.2181
Fax: 913.498.2101

March 5, 2025

Department of Health & Human Services
Department Appeals Board, MS 6127
Medicare Operations Division
330 Independence Ave., S.W.
Cohen Building, Room G-644
Washington, DC 20201

Re:    Request for Escalation
       MAC Appeal No.: M-24-1294
       MAC Appeal Date: January 3, 2024
       Appellant: Advanced Dermatology and Skin Cancer Center, P.A.
       Beneficiaries: Multiple (See Enclosure 1)
       OMHA/ALJ Appeal No.: 3-12683356911
       Administrative Law Judge: Jamie Mendelson
       ALJ Decision Date: October 30, 2023

Dear Medicare Appeals Council,

       The above-captioned Medicare appeal has been pending for more than 90 days. Accordingly, the appellant, Advanced Dermatology and Skin Cancer Center, P.A., requests escalation of its appeal to a federal United States District Court under 42 C.F.R. § 405.1132. Please take relevant action in this appeal under 42 C.F.R. § 405.1132(a)(1), or give Advanced Dermatology and Skin Cancer Center, P.A. notice that the Council is not able to take the requested action within the statutory time frame, *id.* § 405.1132(a)(2).

Sincerely,

FOULSTON SIEFKIN LLP

Amanda M. Wilwert

AMW/sjw

Page 2

Enclosures:
1 – Beneficiary List
2 – MAC Request for Appeal
3 – Form DAB-101 Attachment – Appointment of Representative
4 – ALJ Decision

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 10

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD     Form DAB-101 (12/19)

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| 1. APPELLANT (the party requesting review)<br>Advanced Dermatology and Skin Cancer Center, PA | 2. ALJ APPEAL NUMBER (on the decision or dismissal)<br>3-12683356911 |
|---|---|
| 3. BENEFICIARY*<br><br>Multiple, see attachment. | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))*<br>Multiple, see attachment. |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER<br>Advanced Dermatology and Skin Cancer Center, PA | 6. SPECIFIC ITEM(S) OR SERVICE(S)<br><br>Multiple, see attachment |
|---|---|

7. Medicare claim type: ☐ Part A     ☒ Part B     ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan     ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes     If Yes, skip to Block 9.
☒ No     If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate?     ☐ Yes     ☒ No

I request that the Medicare Appeals Council review the ALJ's  ☒ decision or  ☐ dismissal order [check one] dated October 30, 2023            . I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

  Please see attached.

(Attach additional sheets if you need more space)

## PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| DATE<br>1/3/2024 | DATE<br>1/3/2024 |
|---|---|
| APPELLANT'S NAME (the party requesting review)<br>Advanced Dermatology and Skin Cancer Center, PA | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted)<br>*Amanda M. Wilwert*<br>Amanda M. Wilwert |
| ADDRESS<br>2735 Pembrook Place | ADDRESS<br>7500 College Blvd |
| CITY, STATE, ZIP CODE<br>Manhattan, KS 66502 | CITY, STATE, ZIP CODE<br>Overland Park, KS 66210 |

| TELEPHONE NUMBER<br>785-537-4990 | FAX NUMBER | E-MAIL | TELEPHONE NUMBER<br>913-253-2181 | FAX NUMBER | E-MAIL<br>awilwert@fouston.com |
|---|---|---|---|---|---|

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C.  20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim.  Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

Department of Health and Human Services
Centers for Medicare & Medicaid Services

Form Approved OMB No.0938-0950

## Appointment of Representative

| Name of Party | Medicare Number (beneficiary as party) or National Provider Identifier (provider or supplier as party) |
|---|---|
| Advanced Dermatology and Skin Cancer Center, P.A. | 1124094867 |

## Section 1: Appointment of Representative

**To be completed by the party seeking representation (i.e., the Medicare beneficiary, the provider or the supplier):**

I appoint this individual, Amanda M. Wilwert _____, to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the Act) and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my claim, appeal, grievance or request wholly in my stead. I understand that personal medical information related to my request may be disclosed to the representative indicated below.

| Signature of Party Seeking Representation | | Date 04/27/2022 |
|---|---|---|
| Street Address 2735 Pembrook Pl | | Phone Number (with Area Code) (785) 537-4990 |
| City Manhattan | State KS | Zip Code 66502 |
| Email Address (optional) | | |

## Section 2: Acceptance of Appointment

**To be completed by the representative:**

I, Amanda M. Wilwert _____, hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services (HHS); that I am not, as a current or former employee of the United States, disqualified from acting as the party's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.

I am a / an attorney with Foulston Siefkin LLP and the firm has been engaged to represent Advanced Dermatology and Skin Cancer Center P.A. in the appeals process

(Professional status or relationship to the party, e.g. attorney, relative, etc.)

| Signature of Representative | Date 5/3/22 |
|---|---|
| Street Address 7500 College Blvd Ste. 1400 | Phone Number (with Area Code) 913-253-2181 |
| City Overland Park | State KS | Zip Code 66210 |
| Email Address (optional) awilwert@foulston.com | | |

## Section 3: Waiver of Fee for Representation

**Instructions: This section must be completed if the representative is required to, or chooses to, waive their fee for representation.** (Note that providers or suppliers that are representing a beneficiary and furnished the items or services may not charge a fee for representation and **must** complete this section.)

I waive my right to charge and collect a fee for representing _____ before the Secretary of HHS.

| Signature | Date |
|---|---|
| | |

## Section 4: Waiver of Payment for Items or Services at Issue

**Instructions: Providers or suppliers serving as a representative for a beneficiary to whom they provided items or services must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act.** (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, or could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.) I waive my right to collect payment from the beneficiary for the items or services at issue in this appeal if a determination of liability under §1879(a)(2) of the Act is at issue.

| Signature | Date |
|---|---|
| | |



Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Denver Satellite Office
1 Denver Federal Ctr Bld 25,
Room 1840, P.O. Box 25167
Denver, CO 80225-0167
720-462-7900
(216) 462-4171 (Direct)
303-231-5154 (Fax)
833-921-0393 (Toll Free)

October 30, 2023

FOULSTON SIEFKIN LLP
ATTN: AMANDA WILWERT
7500 COLLEGE BLVD STE 1400
OVERLAND PARK, KS 66210

<div align="center">

**NOTICE OF DECISION**

</div>

Appellant: ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA
OMHA Appeal Number: 3-12683356911

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

**What if I disagree with the decision?**

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

**How much time do I have to file an appeal?**

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

**How do I file an appeal?**

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:
- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C.  20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:
1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**.  You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:
1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form.  You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision.  All documents should be submitted in Portable Document Format (PDF) whenever possible.  Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:
1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:
> QIC - C2C B North
> 301 W Bay Street
> Ste. 1110
> Jacksonville, FL 32202

[IF MULTIPLE BENEFICIARY APPEAL ONLY INPUT: To protect beneficiary privacy, names and addresses of other individuals have been removed from your copy of this notice.]

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List
Attachment A



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Denver, CO

| | | | |
|---|---|---|---|
| Appeal of: | ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA | OMHA Appeal No.: | 3-12683356911 |
| Beneficiary: | Multiple (See Attachment A) | Medicare Part: B | |
| Medicare No.: | Multiple (See Attachment A) | Before: | Jamie Mendelson Administrative Law Judge |

## DECISION

After considering the evidence and arguments presented in the record, I enter a **PARTIALLY FAVORABLE** decision. The one unit of Negative Pressure Wound Therapy (NPWT) (CPT® code 97608) billed in claim number 3322320900392 for beneficiary M.F. with a date of service of April 1, 2022, is covered by Medicare. However, the remainder of all other line items and claims at issue, which include the application of skin substitute grafts (Current Procedural Terminology® (CPT®) codes 15271, 15272, 15275, and 15276), outpatient office visits (CPT® code 99212), ceftriaxone sodium injection (HCPCS[1] code J0696), and amniotic allografts (HCPCS codes Q4186 and Q4169), provided to multiple beneficiaries with dates of service from January 21, 2022 through May 23, 2022, are not covered by Medicare. The appellant is responsible for the non-covered costs.

## PROCEDURAL HISTORY

The appellant submitted 55 claims to Medicare for physician's services it furnished to 22 beneficiaries on the dates of service at issue. (File 13, pp. 95-102). The claims were initially reimbursed by the Medicare Administrative Contractor (MAC) as billed by the appellant. (*Id.*) However, CoventBridge Group, a Unified Program Integrity Contractor (UPIC), later performed a post-payment review of the claims and determined the claims had been improperly reimbursed by Medicare because the record did not support the services at issue were medically reasonable and necessary for the beneficiaries' treatment. (File 13, pp. 95-102; File 24). The MAC then sought to recoup the overpayment from the appellant. (*Id.* at 49-93).

The appellant, through an appointed representative, requested redetermination from the MAC. (File 14, pp. 8-10). The MAC issued an unfavorable redetermination. (File 13, pp. 16-23). In its redetermination, the MAC denied reimbursement for the amniotic allografts (HCPCS codes Q4186 and Q4169) at issue because it found the amniotic allografts were provided in a manner not explicitly approved by the FDA, and because the medical record did not support the services

---

[1] The Healthcare Common Procedure Coding System (HCPCS) has been developed by the Centers for Medicare and Medicaid Servicees (CMS) for processing, screening, identifying, and paying Medicare claims. See 42 C.F.R. § 414.2 and 414.40.

were medically reasonable and necessary for the beneficiaries' treatment. (*Id*. at 20). The MAC denied reimbursement for the outpatient office visits (CPT® code 99212) because it found the medical record did not support additional medical services, separately billable from the allograft procedures at issue, were performed by the treating practitioner. (*Id*. at 20-21). The MAC denied reimbursement for one claim for NPWT (CPT® code 97608) because it found Medicare's coverage requirements for NPWT had not been satisfied. (*Id*. at 21). Finally, the MAC found that the application of skin substitute grafts and ceftriaxone sodium injections at issue (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696) were not covered because those services were related to the amniotic allografts at issue in this appeal, which the MAC had determined were not medically reasonable and necessary. (*Id*. at 21).

The appellant's appointed representative then requested reconsideration from the Qualified Independent Contractor (QIC). (File 13, pp. 1-15, 33-44). In its request for reconsideration, the appellant argued that the amniotic allografts and related services were provided in a manner consistent with FDA approval and Medicare coverage criteria, that the application of amniotic allografts to repair surgical wounds is supported by medical studies, and the applications of the amniotic allografts at issue in this appeal were medically reasonable and necessary for the individual beneficiaries' treatment. (*Id*.) The QIC performed an independent review of the claims and issued an unfavorable reconsideration on June 9, 2023. (File 3). In its reconsideration, the QIC found the claims at issue were not covered by Medicare on the same bases articulated by the MAC at redetermination. (*Id*.) The QIC further found the appellant was liable for the non-covered costs. (*Id*.)

On August 8, 2023, the appellant's representative filed a request for a hearing before an Administrative Law Judge (ALJ). (File 4). With its request for hearing, the appellant submitted a prehearing brief outlining its arguments on appeal, which was added to the record. (*Id*. at 28-33). The appellant also appended other records, including procedural documents from the lower levels of review and ALJ decisions from other Medicare claims appeals involving the appellant. (*Id*. at 34-163). Because these documents are not considered new evidence, as they have no evidentiary value in this appeal, the documents were admitted to the record without a finding of good cause. *See* 42 C.F.R. § 405.1028 (requiring, as a general matter, a finding of good cause before new evidence may be submitted at the ALJ level of review). Prior to hearing, the UPIC notified my office of its intent to participate by submitting a position paper, which was also added to the record. (File 9; File 21; File 24).

I conducted a telephone hearing on October 11, 2023. (Hearing Recording (Oct. 11, 2023)). The following individuals appeared on behalf of the appellant: Amanda Willwert, attorney and the appellant's appointed representative; Dr. John Adams, owner of the appellant professional corporation and the treating practitioner; and Nancy Neusick, who appeared in an observational capacity only.

## ISSUES

Whether there is Medicare coverage and reimbursement for the physician's services, CPT® codes 15271, 15272, 15275, 15276, 97608, 99212, and HCPCs codes J0696, Q4186, Q4169, the appellant provided to the beneficiaries on the dates of service at issue. If the services are not covered, and an overpayment remains, who is responsible for the non-covered costs.

## APPLICABLE LAW AND POLICY

Section 1832(a)(2)(B) of Title XVIII of the Social Security Act (the Act) allows Medicare to pay for "medical and other services" under Part B. Section 1861(s)(1) of the Act defines "medical and other services" to include "physician's services," which is further defined under section 1861(q) of the Act as professional services performed by a physician.

An ALJ conducts a *de novo* review and issues a decision based on the administrative record, including any hearing record. 42 C.F.R. § 405.1000(d). The issues before an ALJ on appeal "include all the issues for the claims or appealed matter specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's favor." 42 C.F.R. § 405.1032(a).

The provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment. 42. C.F.R. § 424.5(a)(6).

Guidance for determining whether a service or item is reasonable and medically necessary in the absence of official guidance, such as a National Coverage Determination (NCD) or Local Coverage Determination (LCD), are outlined in chapter three, section 3.6.2.2 of the *Medicare Program Integrity Manual (MPIM)*.

Medicare does not cover "services 'related to' non-covered services. . .including services related to follow-up care and complications of non-covered services which require treatment." *MBPM*, ch. 16, § 180.

The MAC with jurisdiction has issued Local Coverage Determinations (LCDs), which are determinations on whether a particular item or service is medically reasonable and necessary and covered by Medicare. Act § 1869(f)(2)(B). Relevant here, the MAC with jurisdiction issued LCD L37228: Wound Care (LCD L37228) (effective Feb. 2022) with respect to Medicare coverage of NPWT. LCD L35494: Mohs Micrographic Surgery (LCD L35494) (effective Dec. 2020), and Local Coverage Article A57477: Billing and Coding: Mohs Micrographic Surgery (Article A57477) (effective Dec. 2020) provide Medicare coverage criteria and billing guidelines for Mohs surgery. An ALJ must give substantial deference to the guidance in an LCD. 42 C.F.R § 405.1062.

Notwithstanding any other provision of the Act, no payment may be made by Medicare for any expenses incurred for items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Act § 1862(a)(1)(A). If a medical service or item is denied coverage based on section 1862(a)(1) (A) of the Act, the limitations on liability provisions, set forth in section 1879 of the Act, may be applied to potentially limit a party's liability for the costs of the non-covered claim. Where there is an overpayment, section 1870 of the Act also provides for waiver of the overpayment only where an individual is "without fault" and where such recoupment "would be against equity."

## FINDINGS OF FACT AND ANALYSIS

The appellant seeks Medicare coverage and reimbursement for the physician's services it furnished to 22 beneficiaries on the dates of service at issue. (File 4, pp. 18-22, 28-33; Hearing

Recording). At the lower levels of review, the Medicare contractors found the amniotic allografts (HCPCS codes Q4186 and Q4169) at issue were not covered by Medicare because the allografts were provided in a manner not explicitly approved by the FDA and the medical record did not support the allografts, as administered by the appellant, were medically reasonable and necessary for the beneficiaries' treatment. (File 3; File 13, pp. 16-23; File 21; File 24). The Medicare contractors denied coverage and reimbursement for the outpatient office visits (CPT® code 99212) because they found the medical record did not support additional medical services, separately billable from the allograft procedures at issue, were performed by the treating practitioner. (*Id.*) The Medicare contactors denied coverage and reimbursement for one claim for NPWT (CPT® code 97608) because they found Medicare's coverage requirements for NPWT had not been satisfied. (*Id.*) Finally, the Medicare contractors found that the application of skin substitute grafts and ceftriaxone sodium injections at issue (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696) were not covered because those services were billed in conjunction with the amniotic allografts at issue in this appeal, which the Medicare contractors had determined were not medically reasonable and necessary. (*Id.*)

The Medicare contractors' bases for denying coverage and reimbursement for the amniotic allografts at issue, and the services related to the application of those allografts, were not beneficiary specific. In other words, the contractors did not deny coverage of those services for reasons that were specific to each beneficiary. The remaining services at issue, outpatient offices visits, and one claim for NPWT require an individual consideration of the relevant beneficiaries' medical records, as the Medicare contractors' bases of denial for those claims were specific to the individual claims filed by the appellant.

Because the Medicare contractors' bases of denial for the amniotic allografts and related services were for general applicability, this decision will first address whether those services are covered by Medicare. The remaining services at issue will then be addressed separately.

## I. Global Discussion Pertaining to Medicare Coverage of the Amniotic Allografts and Related Services (HCPCS codes Q4186, Q4169, J0696, and CPT® codes 15271, 15272, 15275, and 15276)

The appellant performs Mohs surgery, "a complex excision technique for the removal of high risk for recurrence skin cancers." (File 4, p. 29). The appellant states Mohs surgery provides a very high cure rate while also preserving the maximum amount of non-cancerous tissue possible. (File 4, p. 29; Hearing Recording). The appellant further states that, for each beneficiary in this appeal, the beneficiary required repair with amniotic allograft of a wound created during the performance of Mohs surgery. (*Id.*)

The Medicare contractors found the appellant's use of amniotic allografts to repair surgical incisions secondary to the treatment of skin lesions was not medically necessary under Medicare coverage criteria as outlined in section 3.6.2.2 of the *MPIM*. (*Id.*) The contractors also found that the appellant's medical records, as a general matter, demonstrated the appellant billed for excessive amounts of amniotic allograft, and that the appellant used cloned records, *i.e.* the same language, to justify the use of the amniotic allografts for each beneficiary. (*Id.*) Finally, the Medicare contractors found the physician's applications of the amniotic allografts were not reimbursable by Medicare because the amniotic allografts themselves were not reimbursable by Medicare. (*Id.*)

For Medicare to cover any item or service, it must be medically reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body

member. Act § 1862(a)(1)(A). When there is no controlling national coverage determination (NCD) or LCD, a medical service or procedure is considered medically reasonable and necessary only if the coverage criteria outlined in chapter 3, section 3.6.2.2 of the *MPIM* has been satisfied.

First, the appellant argues that the generalized coverage criteria contained in chapter 3, section 3.6.2.2 of the *MPIM* is not applicable in this appeal, as it contends the Medicare coverage criteria outlined in LCD L35494 and Article A57477, which provide coverage criteria for Mohs surgery, also encompass the amniotic allografts administered by the appellant. (File 4, pp. 29-31). Specifically, the appellant points to certain language in Article A57477 pertaining to documentation requirements, which state a provider's documentation in support of coverage for Mohs surgery should include:

11. Measurement of the primary lesion necessitating [Mohs surgery (MMS)] and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:
    - Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).
    - Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
    - It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.
12. When the surgical defect created by MMS requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.

Article A57477; (File 4, pp. 29-30).

However, LCD L35494 and Article A57477 deal with Medicare's coverage criteria for Mohs surgery, which, although the procedure that created the beneficiaries' wounds that were repaired by the appellant with amniotic allograft, is not among the services denied reimbursement by the Medicare contractors at the lower levels of review. LCD L35494 and Article A57477 do not explicitly address coverage criteria for any specific type of reconstructive technique. Although the guidance in Article A57477 states that providers should include sufficient documentation to support that the reconstructive technique performed by the provider was an appropriate choice, it does not provide any guidance on the use of the amniotic allografts utilized by the appellant, or any other type of reconstructive technique performed after Mohs surgery.

LCD L35494 and Article A57477, therefore, are not controlling in this appeal. Even if they were, however, it would remain necessary to determine whether the amniotic allografts used by the appellant would be considered an "appropriate choice to preserve [the beneficiaries'] functional capabilities and to restore [the beneficiaries'] physical appearance." Article A57477. Thus, it would still be necessary to determine whether the amniotic allografts were medically reasonable

and necessary for the beneficiaries' treatment. Because there is no published NCD or LCD providing coverage criteria for amniotic allografts, I find that the general Medicare coverage criteria outlined in chapter 3, section 3.6.2.2 of the *MPIM* is applicable in this appeal.

At the lower levels of review, the Medicare contractors found that the amniotic allografts did not satisfy the generalized coverage criteria contained in chapter 3, section 3.6.2.2 of the *MPIM* primarily on the basis that the FDA has approved amniotic membrane products, such as the amniotic allografts at issue, only for homologous use; and using an amniotic allograft to promote wound healing, as opposed to solely creating a permeable wound barrier, is not homologous use as defined by the FDA.[2] (File 3; File 13, pp. 16-23; File 21; File 24).

However, as pointed out by the appellant in its position paper and at oral argument, the FDA does not have authority to regulate how a physician practices medicine. (File 4, pp. 28-33; Hearing Recording). Furthermore, there is no statute, regulation, or sub-regulatory guidance that prohibits Medicare from covering a drug, biological, or other FDA regulated product administered by a physician for a purpose that has not been explicitly approved by the FDA.

Indeed, the UPIC acknowledges in its position paper that non-homologous use of amniotic allograft may be covered and reimbursed by Medicare when the coverage criteria outlined in chapter 3, section 3.6.2.2 of the *MPIM* has been satisfied. (File 21, p. 3). Thus, the Medicare contractors' reliance on the FDA's regulatory classification and approved uses of amniotic allograft is not dispositive in this appeal. Nor is it persuasive, as it is an almost meaningless distinction from a clinical perspective to differentiate between when an amniotic allograft is administered solely to provide a wound barrier (which necessarily promotes wound healing), and when it has been administered solely to promote wound healing irrespective of its capacity to provide a protective barrier between the wound and the outside environment.

Notwithstanding the above discussion, the Medicare contractors ultimately determined that the amniotic allografts at issue in this appeal where not reimbursable by Medicare because the coverage criteria contained in chapter 3, section 3.6.2.2 were not satisfied. (File 3; File 13, pp. 16-23; File 21; File 24). Thus, it remains necessary to determine whether the record supports that the amniotic allografts, in the manner they were administered by the appellant, were:

1. safe and effective;

2. not experimental or investigational; and

3. appropriate, including the duration and frequency in terms of whether the service or item is:

   - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
   - Furnished in a setting appropriate to the beneficiary's medical needs and condition;
   - Ordered and furnished by qualified personnel; and,
   - One that meets, but does not exceed, the beneficiary's medical need.

*MPIM*, ch. 3, § 3.6.2.2.

---

[2] *See* <u>Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use</u>, U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download (outlining FDAs nonbinding recommendations on homologous use of amniotic allografts).

In support of coverage, the appellant argues that the applications of the amniotic allografts at issue in this appeal were "based on established clinical criteria, community standards of care, guidelines from peer-reviewed medical journals, and internal review processes," and the use of amniotic allografts to treat the beneficiaries' wounds was, therefore, medically "reasonable and necessary and appropriately documented." (File 4, p. 28).

The appellant states there are generally three different options for wound repair after Mohs surgery: (1) leaving the wound open to heal without sutures or dressings (secondary intention); (2) primary side-to-side repair with sutures; or (3) reconstructive surgery, which includes grafts and flaps, and which may or may not involve sutures depending on the type of graft or flap used. (File 4, p. 29; Hearing Recording). When performing reconstructive repair of a patient that requires a graft, Dr. Adams testified that he only uses amniotic allografts to perform the repair due to the fact that amniotic allografts are superior to autografts (using a patients own skin), or other types of allografts. (Hearing Recording). Dr. Adams further testified that application of amniotic allographs is considered the standard of care in Kansas, where Dr. Adams practices medicine. (*Id.*)

The appellant cites to a peer reviewed study, as well as the coverage policy of a private insurance company, it argues establish the amniotic allografts at issue were not experimental or investigational as applied, and demonstrate the allografts were furnished in accordance with accepted standards of medical practice. (Hearing Recording; File 4, pp. 28-33; File 13, pp. 157-162, 169-253).

The peer reviewed study: Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane, published in the journal of Facial Plastic Surgery and Aesthetic Medicine in 2021, was coauthored by Dr. Adams himself. (File 13, pp. 157-162; Hearing Recording).  Dr. Adams testified at hearing that all the participants included in the study were treated by him in his practice. (Hearing Recording). Notably, the study acknowledges that incisional repair utilizing autologous tissue such as local flaps and full-thickness skin grafts is the "mainstay of reconstructive techniques" after Mohs surgery. (File 13, p. 157). The purpose of the study was to demonstrate that placental allografts are a feasible alternative to incisional repair post-Mohs surgery. (*Id.* at 158).

The study population consisted of 286 individuals who were sorted into 143 matched pairs based upon propensity score. (File 13, pp.158-162). One half of the matched pairs received a full thickness autograft or flap repair after undergoing Mohs surgery, the other received a placental allograft. (*Id.*) Only three of the patients who received a placental allograft suffered from a post-operative complication, which under the study's design included infection, bleeding or hematoma, wound dehiscence, surgical reintervention, nonhealing wound, poor scar cosmesis, and scar revision. (*Id.* 158-159). Forty-one of the patients who received a full thickness autograft or flap repair experienced some type of complication as defined by the study, though the severity of the individual complications is not noted. (*Id.*)

Ultimately, the study found that placental allografts are a "safe and effective tool for repairing [Mohs surgery] defects of candidates who are not good candidates for traditional methods of autologous tissue reconstruction." (*Id.* at 161). However, the reliability of the study is limited by the fact that it was a retrospective study, composed of a relatively small and demographically homologous sample, where the results relied entirely upon the accuracy and thoroughness of the participant patient's medical records, which consisted entirely of patients of Dr. Adams, the owner of the appellant corporation. (*Id.* at 161; Hearing Recording). Thus, the results of the

study were dependent largely upon the professional judgment of one treating practitioner, who is also the appellant in this case. The study also does not attempt to compare the clinical benefit of amniotic allografts to other standard treatments, such as secondary intention, primary side-to-side repair, or other types of skin substitutes.

When read in a light most favorable to the appellant, the study appears to demonstrate that amniotic allografts can provide a superior clinical outcome to incisional repair. However, the results of one study does not establish that the amniotic allografts at issue were not experimental or investigational as defined under chapter 3, section 3.6.2.2 of the *MPIM*. The study explicitly acknowledges that amniotic allografts are not a standard of medical practice for the treatment of Mohs surgery defects as a general matter. (*See id.* at 157 (local flaps and full-thickness skin grafts are the "mainstay of reconstructive techniques")). The study also fails to demonstrate that amniotic allografts meet, but do not exceed, a patient's medical need, as the study does not compare the effectiveness of amniotic allografts against other types of skin substitutes or other types of non-incisional repairs.

The insurance coverage policy cited by the appellant was published by a private medical insurance provider, BlueCross BlueShield of Kansas, which is the state where the appellant is located. (*Id.* at 169-253). The policy outlines the provider's coverage policy for amniotic membrane and amniotic fluid. (*Id.*) The policy states that BlueCross BlueShield will cover amniotic grafts only for certain ophthalmic indications and non-healing diabetic lower extremity ulcers, and states that the use amniotic allografts for any other purpose is considered experimental or investigational and not covered by the insurer. (*Id.* at 174-175). The policy discusses the use of amniotic membranes for repair following Mohs surgery and cites to the study authored by Dr. Adams. (*Id.* at 209-213). However, BlueCross BlueShield determined the study was flawed for many of the reasons discussed in the previous paragraphs and found that additional evidence from well-designed prospective studies were required before there would be sufficient evidence to support that amniotic allografts for wound repair following Mohs surgery were medically reasonable and necessary and would be covered by the insurer. (*Id.*) Thus, the insurance coverage policy cited by the appellant fails to substantiate that the use of amniotic allographs to repair Mohs surgery defects is not experimental or investigational, or that it is appropriate, as described in chapter 3, section 3.6.2.2 of the *MPIM*.

The Medicare contractors also found that the appellant's medical records, as a general matter, demonstrated the appellant billed for excessive amounts of amniotic allograft, and that the appellant used cloned records, *i.e.* the same language, to justify the use of the amniotic allografts for the beneficiaries. (File 3; File 13, pp. 16-23; File 21; File 24). For those reasons, the Medicare contractors found that the appellant's medical records did not support that the amniotic allografts at issue were administered in an appropriate manner as defined in chapter 3, section 3.6.2.2 of the *MPIM*. (*Id.*) I concur with the contractors' finding that the appellant's medical records are replete with boilerplate language that should not be afforded significant weight, as the language does not specifically address the unique circumstances of the individual beneficiaries. (*See* File 13, pp. 387-2526). Dr. Adams also testified at hearing that he frequently uses and bills for more amniotic allograft than necessary to treat a patient because he is only able to obtain the allografts in certain sizes, and so it is Dr. Adams' practice to use and bill for all allograft contained in a package in the size he has on hand, even if the amount of allograft in the package is more than required to treat a particular wound. (Hearing Recording).

Based on the foregoing discussion, I find that the record available for my review does not establish that Medicare's generalized coverage criteria, as outlined in chapter 3, section 3.6.2.2 of the *MPIM*, has been satisfied. The use of amniotic allografts to repair Mohs surgery defects

has not been adequately studied. Thus, the use of amniotic allografts as administered by the appellant is still experimental or investigational. The record also does not support that the use of amniotic allografts to repair Mohs surgery defects is appropriate, as the record does not establish the use is in accordance with accepted standards of medical practice or one that meets, but does not exceed, a patient's medical need. Thus, the record does not support the amniotic allografts at issue were administered in a manner that was reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member as required under section 1862(a)(1)(A) of the Act, and the allografts are not covered or reimbursable by Medicare. Because the allografts (HCPCS codes Q4186 and Q4169) are not covered by Medicare, the appellant's application of those allografts and the ceftriaxone sodium injections (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696), are also not covered or reimbursable be Medicare. *MBPM*, ch. 16, § 180.

## II. Individual Claim Discussion Pertaining to Medicare Coverage for NPWT (CPT® code 97608) and Outpatient Office Visits (CPT® code 99212).

The Medicare contractors denied coverage and reimbursement for certain outpatient office visits billed by the appellant because the contractors found the medical record did not support that additional medical services, separately billable from the allograft procedures at issue, were performed by Dr. Adams. (File 3; File 13, pp. 16-23; File 21; File 24). The Medicare contractors denied coverage and reimbursement for one unit of NPWT because they found Medicare's coverage requirements for NPWT had not been satisfied. (*Id*)

### A. NPWT

The Medicare contractors denied one unit of NPWT, billed in claim number 3322320900392, which was provided to beneficiary M.F. with a date of service of April 1, 2022. (File 3, p. 14). The appellant did not provide any argument as to why the Medicare contractors' unfavorable determination was erroneous in its written brief or at the oral hearing. (File 4, pp. 28-33; Hearing Recording).

The MAC with jurisdiction offers limited coverage criteria for the application of NPWT by a physician during an office visit. LCD L37228 states, in relevant part, that:

> [NPWT] utilizing either durable or disposable medical equipment, involves the application of controlled or intermittent negative pressure to a properly dressed wound cavity. Suction (negative pressure) is applied under airtight wound dressings to promote the healing of open wounds **resistant to prior treatments**;

and

> There is moderate evidence in the peer-reviewed published literature to indicate that NPWT using a powered device approved by the U.S. Food and Drug Administration (FDA) is effective for a specific subgroup of patients who have failed a comprehensive, conventional wound therapy program that includes all reasonable, well-established alternative medical treatments. There is also moderate evidence to support the use of this therapy as an alternative to surgery. There is insufficient evidence to support the routine use of NPWT.

*Id.* (emphasis in original).

Beneficiary M.F. first began being treated by the appellant on October 1, 2021, for skin lesions on the beneficiary's scalp. (File 13, pp. 2089-2244). At that time, the beneficiary was diagnosed with squamous cell carcinoma on three separate locations on the

beneficiary's scalp. (*Id.* at 2089-2100). On January 7, 2022, Mohs surgery was performed by the appellant to remove two of the cancerous lesions. (*Id.* at 2104-2116). The appellant then provided wound care, consisting of the application of amniotic allografts through February 4, 2022. (*Id.* at 2117-2137). On that date, another Mohs procedure was performed to excise the third cancerous lesion, which was located on the beneficiary's right central frontal scalp. (*Id.* at 2141-2153).

The appellant then continued to treat the beneficiary's wounds with amniotic allograft on a weekly basis through the date of service at issue. (*Id.* at 2154-2224). On April 1, 2022, NPWT was used to help close the Mohs defect from the Mohs procedure previously performed on February 4, 2022. (*Id.* at 2225). At the time NPWT was initiated, the beneficiary's wound measured 6.5cm long, 5.7cm wide, and .3cm deep. (*Id.* at 2225). The wound measured 6.5cm deep, 5.5cm wide, and .8cm deep immediately after Mohs surgery was performed on February 4, 2022. (*Id.* at 2144).

Thus, contrary to the Medicare contractors' determinations at the lower levels of review, I find that the record supports that the NPWT was appropriate for the beneficiary. The medical record establishes the beneficiary's wounds had been resistant to previous treatment as required under LCD L37228. Although the record does not support that the beneficiary failed a "conventional wound therapy regime" when treating the wound, as the appellant exclusively used amniotic allografts to dress the wound prior to implementing NPWT, I find that that large size of the wound and the delayed wound healing as documented in the record warranted NPWT in this specific case. (*Id.*) Thus, the medical record supports that the NPWT provided to the beneficiary was medically reasonable and necessary pursuant to section 1862(a)(1)(A) of the Act, and the one unit of NPWT (CPT® code 97608), billed in claim number 3322320900392 with a date of service of April 1, 2022, is covered and reimbursable by Medicare.


### B. Outpatient Office Visits

The Medicare contractors found that four outpatient office visits (CPT® code 99212) rendered to three separate beneficiaries did not satisfy Medicare coverage criteria. (File 3; File 13, pp. 16-23; File 21; File 24). Specifically, the Medicare contractors found that two outpatient office visits provided to beneficiary W.C. on April 4, 2022, and May 2, 2022, one office visit provided to beneficiary L.T. on May 17, 2022, and one office visit provided to beneficiary W.H. on Mar 23, 2022, were not covered by Medicare. (*Id.*)

The Medicare contractors denied coverage and reimbursement for these office visits because the contractors found the medical record did not support additional medical services, separately billable from the allograft procedures at issue, were performed by the treating practitioner. (*Id.*) However, Dr. Adams testified at hearing that it is his practice to assess other lesions, as appropriate, when his patients are being seen during Mohs surgery follow-up appointments. (Hearing Recording). Dr. Adams stated that it is his practice to bill separately for the periodic assessment of skin lesions, that these assessments are distinct and separate medical services from the application of amniotic allografts, and the documentation contained in the beneficiaries' medical records establish that he performed assessments of the beneficiary that were separately billable to Medicare. (*Id.*)

However, the medical records from the dates of service at issue do not substantiate that Dr. Adams performed any assessment services that would warrant additional payment from Medicare. (*See* File 13, pp. 659-688, 736-755, 1877-1883, 2000-2008). For example, the exam notes for beneficiary W.C. on May 2, 2022, state that the beneficiary was being seen by Dr. Adams only for a follow-up encounter for postoperative wound closure. (*Id.* at 736-755). The notes indicate that a general examination of the beneficiary's "scalp (including hair inspection), head (including face), neck, right upper extremity, left upper extremity, right lower extremity, and left lower extremity" was performed by Dr. Adams. (*Id.*) However, this cursory examination, or one very similar, was performed each time Dr. Adams assessed and dressed the beneficiary's surgical wounds. (*Id.* at 605-773). The record does not include any notation Dr. Adams was assessing any new skin lesions or was performing any medical services outside of post-operative wound care. (*Id.* at 736-755). The medical records from the other beneficiaries on the relevant dates of service at issue also fail to substantiate that Dr. Adams rendered assessment or evaluation services that were not included in the wound care services also billed by Dr. Adams. (*Id.* at 659-688, 1877-1883, 2000-2008).

The provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment. 42. C.F.R. § 424.5(a)(6). In light of the foregoing discussion, I find that the appellant has failed to provide sufficient documentation establishing that medically reasonable and necessary, and separately billable, assessment services were provided by Dr. Adams on the dates of service at issue. Thus, the record does not support the office visits at issue are covered by Medicare pursuant to section 1862(a)(1)(A) of the Act.

## III.   Liability and Waiver of Overpayment

Since Medicare does not cover the denied services because the record does not establish that the services satisfied Medicare coverage criteria pursuant to section 1862(a)(1)(A) of the Act, I must now address who is liable for the non-covered costs. Where Medicare coverage requirements have not been met, waiver of liability pursuant to section 1879 of the Act may apply. The record contains no evidence that the beneficiary knew, or reasonably should have been expected to know, that Medicare would not cover the claim at issue. However, as a provider of Medicare services, the appellant is presumed to have had notice of the applicable statutes, regulations, and CMS coverage guidelines prior to billing for the services at issue. *See* 42 C.F.R. § 411.406(e). I find no evidence in the record to rebut that presumption. As a result, there is no limitation of liability for appellant under section 1879 of the Act, and the appellant is responsible for the non-covered costs.

The issue still remains whether waiver of the overpayment is appropriate. Where there is an overpayment, such as the case here, section 1870 of the Act prohibits recovery of Medicare overpayment from an individual who is without fault and when recovery would be against equity. Here, the appellant is a supplier of health care services, and as a participant in the Medicare program, had access to pertinent statutes, laws, rules, local coverage determinations, coding rules, and Medicare manuals, which contain the requirements for reimbursement under the Medicare program. I find the appellant is not without fault in causing or accepting the overpayment as the appellant should have known the services it provided were excluded from Medicare coverage. Medicare may, therefore, recoup the overpayment. Accordingly, pursuant to section 1870(b) of the Act, recovery of the overpayment from the appellant is not waived, and the appellant is financially liable for the overpayments at issue in this appeal.

OMHA Appeal No.3-12683356911

### CONCLUSIONS OF LAW

I enter a **PARTIALLY FAVORABLE** decision. The one unit of Negative Pressure Wound Therapy (NPWT) (CPT® code 97608) billed in claim number 3322320900392 for beneficiary M.F. with a date of service of April 1, 2022, is covered by Medicare. However, the remainder of all other line items and claims at issue, which include the application of skin substitute grafts (Current Procedural Terminology® (CPT®) codes 15271, 15272, 15275, and 15276), outpatient office visits (CPT® code 99212), ceftriaxone sodium injection (HCPCS code J0696), and amniotic allografts (HCPCS codes Q4186 and Q4169), provided to multiple beneficiaries with dates of service from January 21, 2022 through May 23, 2022, are not covered by Medicare.  The appellant is responsible for the non-covered costs.

### ORDER

For the reasons discussed above, this decision is **PARTIALLY FAVORABLE**. I direct the MAC to process the claims in accordance with this decision.

**SO ORDERED**

_____

Jamie Mendelson
Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD    Form DAB-101 (12/19)

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7. Medicare claim type: ☐ Part A    ☐ Part B    ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan    ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes    If Yes, skip to Block 9.
☐ No    If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate?    ☐ Yes    ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated_____. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

_____
_____
_____
_____

(Attach additional sheets if you need more space)

## PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| DATE | | | DATE | | |
|---|---|---|---|---|---|
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C.  20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. *You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.*

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

### PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim.  Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Denver, CO**

| | | | |
|---|---|---|---|
| Appeal of: | **ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA** | OMHA Appeal No.: | **3-12683356911** |
| Beneficiary: | **Multiple** | Medicare Part: | **B** |
| Medicare No.: | **Multiple** | Before: | **Jamie Mendelson** |
| | | | Administrative Law Judge |

Index of the Administrative Record and Exhibit List

**Exhibit Record**        **Administrative**
                          **File Reference**

| | File Name | | Page Range |
|---|---|---|---|
| Medical & Related: General | File 1 | 10 | : 896 |
| Medical & Related: General | File 1 | 907 | : 1396 |
| Medical & Related: General | File 1 | 1408 | : 1896 |
| Medical & Related: General | File 1 | 1908 | : 2407 |
| Medical & Related: General | File 1 | 2419 | : 2918 |
| Medical & Related: General | File 1 | 2930 | : 3687 |
| Medical & Related: General | File 1 | 3699 | : 4198 |
| Medical & Related: General | File 1 | 4210 | : 4410 |
| Medical & Related: General | File 1 | 4442 | : 4910 |
| Medical & Related: General | File 1 | 4922 | : 5421 |
| Medical & Related: General | File 1 | 5424 | : 5736 |
| Medical & Related: General | File 1 | 5748 | : 6236 |
| Medical & Related: General | File 1 | 6246 | : 6736 |
| Medical & Related: General | File 1 | 6746 | : 7236 |
| Medical & Related: General | File 1 | 7246 | : 7736 |
| Medical & Related: General | File 1 | 7747 | : 8236 |
| Medical & Related: General | File 1 | 8247 | : 8736 |
| Medical & Related: General | File 1 | 8747 | : 9236 |
| Medical & Related: Medical Records | File 13 | 388 | : 474 |
| Medical & Related: Medical Records | File 13 | 475 | : 538 |
| Medical & Related: Medical Records | File 13 | 539 | : 605 |
| Medical & Related: Medical Records | File 13 | 606 | : 775 |
| Medical & Related: Medical Records | File 13 | 776 | : 832 |
| Medical & Related: Medical Records | File 13 | 831 | : 973 |
| Medical & Related: Medical Records | File 13 | 974 | : 1040 |
| Medical & Related: Medical Records | File 13 | 1041 | : 1129 |
| Medical & Related: Medical Records | File 13 | 1130 | : 1213 |
| Medical & Related: Medical Records | File 13 | 1214 | : 1315 |
| Medical & Related: Medical Records | File 13 | 1316 | : 1449 |
| Medical & Related: Medical Records | File 13 | 1450 | : 1544 |
| Medical & Related: Medical Records | File 13 | 1545 | : 1598 |

Index of the Administrative Record and Exhibit List

| | | | | |
|---|---|---|---|---|
| Medical & Related: Medical Records | File 13 | 1599 | : | 1715 |
| Medical & Related: Medical Records | File 13 | 1716 | : | 1774 |
| Medical & Related: Medical Records | File 13 | 1775 | : | 1909 |
| Medical & Related: Medical Records | File 13 | 1910 | : | 2042 |
| Medical & Related: Medical Records | File 13 | 2043 | : | 2092 |
| Medical & Related: Medical Records | File 13 | 2091 | : | 2246 |
| Medical & Related: Medical Records | File 13 | 2247 | : | 2323 |
| Medical & Related: Medical Records | File 13 | 2324 | : | 2376 |
| Medical & Related: Medical Records | File 13 | 2377 | : | 2526 |
| Guidance: CMS publication and Medical Literature: All Beneficiaries | File 13 | 104 | : | 387 |
| Position Statements: General All Beneficiaries | File 21 | 1 | : | 11 |
| Position Statements: Post Pay Expert Report: All Beneficiaries | File 24 | 1 | : | 404 |
| Procedural - CMS Levels: Post Payment Medical Records: All | File 1 | 1 | : | 9 |
| Procedural - CMS Levels: QIC Acknowledgement Letter: All | File 10 | 1 | : | 5 |
| Procedural - CMS Levels: Request for Reconsideration: All | File 11 | 1 | : | 38 |
| Procedural - CMS Levels: Request for Reconsideration: Pt 1 All | File 13 | 1 | : | 15 |
| Procedural - CMS Levels: Redetermination: All Beneficiaries | File 13 | 16 | : | 45 |
| Procedural - CMS Levels: Rebuttal to Overpayment: All | File 13 | 46 | : | 48 |
| Procedural - CMS Levels: Overpayment Demand Letter: All | File 13 | 49 | : | 93 |
| Procedural - CMS Levels: Post Payment Review Results: All | File 13 | 94 | : | 103 |
| Procedural - CMS Levels: Request for Overpayment | File 14 | 1 | : | 91 |
| Procedural - CMS Levels: Post Payment Records Request: | File 15 | 1 | : | 8574 |
| Procedural - CMS Levels: Reconsideration: All Beneficiaries | File 3 | 1 | : | 19 |
| Procedural - OMHA Level: Passphrase Letter: All Beneficiaries | File 19 | 1 | : | 1 |
| Procedural - OMHA Level: Response to Notice of Hrg: amended/All | File 20 | 1 | : | 2 |
| Procedural - OMHA Level: Signed Decision: All Beneficiaries | File 25 | 1 | : | 12 |
| Procedural - OMHA Level: Request for ALJ Hearing: All Beneficiaries | File 4 | 1 | : | 163 |
| Procedural - OMHA Level: Notice of Hearing: All Beneficiaries | File 5 | 1 | : | 10 |
| Procedural - OMHA Level: Notice of Rescheduled Hearing: All | File 6 | 1 | : | 10 |
| Procedural - OMHA Level: Request for Reschedule: All Beneficiaries | File 7 | 1 | : | 3 |
| Procedural - OMHA Level: Request for Record: All Beneficiaries | File 8 | 1 | : | 4 |
| Procedural - OMHA Level: NOI CoventBridge UPIC MW: To submit | File 9 | 1 | : | 2 |
| Proceeding (Audios): Hearing audio: 2 of 2 All Benes | File 22 | 1 | : | 1 |
| Proceeding (Audios): Hearing audio: 1 of 2 All Benes | File 23 | 1 | : | 1 |

**Non-Exhibit Record**       **Administrative**
**File Reference**

| | | File Name | Page Range | | |
|---|---|---|---|---|---|
| Records not considered: General | | File 1 | 897 | : | 906 |
| Records not considered: General | | File 1 | 1397 | : | 1407 |
| Records not considered: General | | File 1 | 1897 | : | 1907 |
| Records not considered: General | | File 1 | 2408 | : | 2418 |
| Records not considered: General | | File 1 | 2919 | : | 2929 |
| Records not considered: General | | File 1 | 3688 | : | 3698 |

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 36-59

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD      Form DAB-101 (12/19)

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| | |
|---|---|
| 1. APPELLANT (the party requesting review)<br>Advanced Dermatology and Skin Cancer Center, PA | 2. ALJ APPEAL NUMBER (on the decision or dismissal)<br><br>3-12683356911 |
| 3.  BENEFICIARY*<br><br>Multiple, see attachment. | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))*<br><br>Multiple, see attachment. |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| | |
|---|---|
| 5. PROVIDER, PRACTITIONER, OR SUPPLIER<br><br> Advanced Dermatology and Skin Cancer Center, PA | 6. SPECIFIC ITEM(S) OR SERVICE(S)<br><br>Multiple, see attachment |

7.  Medicare claim type: ☐ Part A    ☒ Part B    ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan    ☐ Entitlement/enrollment for Part A or Part B

8.  Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes      If Yes, skip to Block 9.
☒ No       If No, Specific Dates of Service:

9.  If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate?    ☐ Yes    ☒ No

I request that the Medicare Appeals Council review the ALJ's ☒ decision or ☐ dismissal order [check one] dated October 30, 2023 . I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

 Please see attached.

(Attach additional sheets if you need more space)

## PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| DATE<br>1/3/2024 | DATE<br>1/3/2024 |
|---|---|
| APPELLANT'S NAME (the party requesting review)<br>Advanced Dermatology and Skin Cancer Center, PA | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted)<br><br>*Amanda M. Wilwert* |
| ADDRESS<br>2735 Pembrook Place | ADDRESS<br> 7500 College Blvd |
| CITY, STATE, ZIP CODE<br>Manhattan, KS 66502 | CITY, STATE, ZIP CODE<br> Overland Park, KS 66210 |

| TELEPHONE NUMBER<br>785-537-4990 | FAX NUMBER | E-MAIL | TELEPHONE NUMBER<br> 913-253-2181 | FAX NUMBER | E-MAIL<br>awilwert@fousto<br>n.com |
|---|---|---|---|---|---|

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C.  20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim.  Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 62-65

# FOULSTON

ATTORNEYS AT LAW

Amanda M. Wilwert

awilwert@foulston.com
Phone: 913.253.2181
Fax: 913.498.2101

7500 COLLEGE BOULEVARD, SUITE 1400
OVERLAND PARK, KS 66210-4041

January 3, 2024

***Submitted via electronic filing***

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

      Re:   Advanced Dermatology and Skin Cancer Center PA
              OMHA Appeal No. 3-12683356911
              Request for Medicare Appeals Council Review

Dear Medicare Appeals Council:

This firm represents Advanced Dermatology and Skin Cancer Center PA ("Advanced Dermatology"). Advanced Dermatology requests review of the ALJ Decision in OMHA Appeal Number 3-12683356911. Enclosed please find the following:

- Request for Review, Form DAB-101
- Beneficiary List
- Appointment of Representative Form, OMB Form 0938-0950
- A copy of the Administrative Law Judge decision
- Written Statement in support of appeal

Copies of this request for review have been sent to the other parties identified on the ALJ Decision and the individual beneficiaries identified on the beneficiary list attached to the Request for Review.

Please contact me at 913-253-2181 or awilwert@foulston.com if you have any questions.

Sincerely,

FOULSTON SIEFKIN LLP

Amanda M. Wilwert

Page 2

Enclosures

Cc:     Office of Medicare Hearings and Appeals
        Denver Satellite Office
        1 Denver Federal Ctr Bld 25
        Room 1840, P.O. Box 25167
        Denver, Co 80225-0167

        QIC – C2C B North
        301 W Bay Street
        Ste. 1110
        Jacksonville, FL 32202

        Multiple Beneficiaries as identified on the beneficiary list attached to the Request for Review.  To protect beneficiary privacy, names and addresses have been removed from the beneficiary's copy of the request for review.

Appeal of: Advanced Dermatology and Skin Cancer Center, PA

Beneficiary: Multiple (See Attachment)

Medicare No.: Multiple (See Attachment)

OMHA Appeal No.: 3-12683356911

Administrative Law Judge: Jamie Mendelson

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE MEDICARE DECISION

On October 30, 2023, Administrative Law Judge Jamie Mendelson ("ALJ") issued a partially favorable decision about Advanced Dermatology and Skin Cancer Center, PA's ("Advanced Dermatology") request for ALJ review in the above-referenced appeal. The ALJ found in Advanced Dermatology's favor on one item; Advanced Dermatology does not dispute the ALJ's favorable finding. But the ALJ's decision concluded that the rest of the claims should continue to be denied as not medically necessary. *See* ALJ Decision, at 9, 11.

Advanced Dermatology requests that the Medicare Appeals Council ("Council") review the ALJ's decision. Advanced Dermatology disagrees with the ALJ's decision because it does not conform to applicable standards in statute, regulations, and CMS policies. The ALJ decided—for the first time in this appeal—that the care Advanced Dermatology supplied was not medically necessary because it was "experimental and/or investigative." At no point in this appeal process has any entity raised that concern as a denial reason.

For the period applicable to this denial, Advanced Dermatology maintained processes and procedures for deciding the clinically appropriate care. These procedures were based on established clinical criteria, community standards of care, guidelines from peer-reviewed medical journals, and internal review processes. Advanced Dermatology is confident that the denied claims in the above referenced appeal were billed correctly per the applicable Medicare regulations. Put simply, the care Advanced Dermatology provided was reasonable and medically necessary.

## I.     Background

Dr. John Adams is a board-certified dermatologist and an accredited Mohs surgeon who has practiced in the Manhattan, Kansas area at Advanced Dermatology since 1998. Dr. Adams expanded his dermatology practice to Nebraska  in 2020. From 2013 to 2016, Dr. Adams served on the Board of Directors for the American Society for Mohs Surgery. Since 2014, Dr. Adams has served as a Clinical Assistant Professor at the University of Kansas School Medicine. In 2016, Dr. Adams served as the President of the Kansas Society for Dermatology and Dermatologic Surgery. Also in 2016, Dr. Adams was recognized for his significant contribution to the specialty of dermatology and his dedication to patient care and received the 2017 American Academy of Dermatology's Presidential Citation Award.

Advanced Dermatology focuses on Mohs Micrographic Surgery ("MMS" or "Mohs"). Mohs Surgery is a complex excision technique for the removal of high risk for recurrence skin cancers. Mohs surgery provides the highest cure rate (99%) while sparing the maximal amount of

normal non-cancerous tissue. The resulting wound is repaired through true reconstructive techniques, including but not limited to flaps and grafts (allografts). The majority of Mohs surgeons in the state of Kansas have been applying allografts to post Mohs surgery wounds (acute wounds) since at least 2020; hence allograft application subsequent to Mohs surgery is appropriate and in accordance with accepted standards of medical practice for the treatment of the patient's condition or to improve the function of a malformed body member.

This appeal relates to a set of beneficiaries who all received amniotic allografts as part of their post-Mohs surgical wound repair. Advanced Dermatology was subjected to several similar audits, all of which resulted in post-payment denial of services provided by Advanced Dermatology. Advanced Dermatology appealed the results of the other audits and recently received positive outcomes at the ALJ appeal level. *See* Notice of Decision, OMHA Appeal No. 3-12053117987, File 4[1] at 102-162 (concluding that amniotic allograft use in post-Mohs surgical repair was medically necessary for the majority of appealed dates of service); Notice of Decision, OMHA Appeal No. 3-12053235227, File 4 at 69-101 (concluding that that amniotic allograft use in post-Mohs surgical repair was medically necessary for all the appealed dates of service); Notice of Decision, OMHA Appeal No. 3-12053235157, File 4 at 34-68 (concluding that amniotic allograft use in post-Mohs surgical repair was medically necessary for the many of the appealed dates of service).

These other ALJ decisions are in stark contrast to the one Advanced Dermatology appeals here. Highly summarized, the other ALJ decisions took a beneficiary-by-beneficiary approach, acknowledged the evidence that Advanced Dermatology had submitted in the record concerning medical necessity, and made findings accordingly. But here, the ALJ has gone her own way. She concluded that Advanced Dermatology's care was not medically necessary because it was using experimental and/or investigational items or services. Notably, this is the first time that <u>anyone</u> has even hinted at experimental and/or investigational being a denial reason for the claims.

## II.    Procedural History

Advanced Dermatology responded to a Unified Program Integrity Contractor ("UPIC") request for medical records for 55 claims involving 22 beneficiaries. All of the requested records involved a patient who received Mohs surgery and received a skin substitute allograft as part of the repair procedure. The UPIC notified Advanced Dermatology that its audit concluded Advanced Dermatology had received an overpayment for certain services that were being denied. The auditor denied services for the following reasons:

(1)    Services not reasonable and necessary
   a.    Documentation did not indicate that a qualifying skin graft substitute was applied; instead Advanced Dermatology used a biological dressing.
   b.    Documentation did not address why an expensive advanced wound dressing was used instead of conservative management.
   c.    Skin graft was not used in a "homologous manner."

---

[1] Advanced Dermatology obtained a copy of the appeal file before the ALJ. Throughout this written statement, Advanced Dermatology provide citations to the appeal file by indicating the file number and page number for convenience.

2

        d.  Skin graft exceeded beneficiary's medical need and was used outside the standard of medical practice for a non-chronic wound.

(2) Services not rendered as billed.

(3) Required elements not documented.

(4) Servies related to a non-covered or denied primary service.

In short, the auditor believed that Advanced Dermatology's use of amniotic allografts to repair post-Mohs surgical wounds was not medically necessary. The Medicare Administrative Contractor ("MAC") issued its overpayment notice.

Advanced Dermatology appealed, requesting a redetermination from the MAC. The MAC's redetermination decision upheld the original overpayment decision for reasons identical to the auditor's rationale. Advanced Dermatology appealed the MAC's finding to the Qualified Independent Contractor ("QIC").

The QIC reversed some of the auditor's findings, but concluded that:

(1) Amniotic skin substitute allografts were not medically necessary because the products "cannot be used for wound healing" per the FDA.

(2) The skin substitute allografts were not used in a "homologous" manner.

(3) The skin substitute allografts were not the appropriate choice, given that less expensive options are more commonly used.

Advanced Dermatology timely appealed the QIC's denial decision to an Administrative Law Judge.

The ALJ conducted a hearing on October 11, 2023. However, the ALJ did not allow Advanced Dermatology to offer testimony about individual beneficiaries. Instead, the ALJ informed Advanced Dermatology—in the middle of the hearing—that it would not accept any more testimony and cut off Advanced Dermatology's presentation after only a few hours of global testimony. The ALJ did not allow Advanced Dermatology to present beneficiary-specific testimony for all of the affected beneficiaries. The ALJ issued her decision on October 30, 2023.

## III.    Standard of Review

The Council reviews the ALJ's decision de novo. 42 C.F.R. 401.1110(c). In conducting its review, the Council must review all the evidence in the record and may adopt, modify, or reverse the ALJ's decision. 42 C.F.R. 401.1128. But the Council limits its review to the issues raised in the request for review. 42 C.F.R. 401.1112(c).

## IV.    ALJ's Decision

In her decision, the ALJ made several findings that were in Advanced Dermatology's favor. Specifically, the ALJ concluded that the auditor and QIC were wrong to find that the use of amniotic allografts was not medically necessary because of issues with FDA regulations or homologous use. The ALJ correctly noted that "the FDA does not have authority to regulate how a physician practices medicine." Decision at 6. And, "there is no statute, regulation, or sub-regulatory guidance that prohibits Medicare from covering a drug, biological, or other FDA

3

regulated product administered by a physician for a purpose that has not been explicitly approved by the FDA." *Id.* The ALJ criticizes the UPIC's conclusions about homologous use as "almost meaningless." *Id.* To be clear, Advanced Dermatology does not dispute this favorable finding.

But the ALJ goes on to decide whether the amniotic allografts were medically necessary under the applicable criteria. And her decision about medical necessity is simply wrong. First, the ALJ wrongfully raised new issues that had never been raised in the proceedings. Second, the ALJ did not allow Advanced Dermatology to present evidence about the individual beneficiaries and the care provided. And, finally, Advanced Dermatology's care was medically necessary. Each reason is explained in more detail, below.

A.    **The ALJ wrongfully decided issues that were not before her.**

Although an ALJ's review is de novo (42 C.F.R. 405.1000(d)), 42 C.F.R. 405.1032(a) provides that an ALJ may only consider "all the issues for the claims or appealed matter specified in the request for hearing that were brought in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's favor." This means that an ALJ should confine its review to only those issues that have been raised at some point in the proceedings and have not been decided in favor of appellant.

Here, the ALJ's decision inexplicably finds that the procedures employed by Advanced Dermatology were experimental and investigative. At no point during the underlying audit, reconsideration, or redetermination was there ever any suggestion that any services were experimental or investigational. *Supra*, Section II. So, Advanced Dermatology did not submit evidence on this point because it was not an issue before the ALJ.

The ALJ's decision also misinterprets the materials that Advanced Dermatology submitted as part of the evidentiary record in this appeal. For example, the ALJ's decision devotes a page and a half to review of a peer-reviewed study concerning Mohs surgery. But, the ALJ misapprehended that no one, not the auditor, MAC, or QIC, ever identified that anything Advanced Dermatology did was experimental or investigational. Advanced Dermatology did not submit this study as evidence that its treatment was not experimental or investigational; it did not need to, as the issue was never raised during the audit. Advanced Dermatology submitted the article and the accompanying Blue Cross and Blue Shield policy to counter the auditor's and QIC's finding that the skin substitute grafts were not a biological dressing, cannot be used for wound healing, and not used in a homologous manner.[2]

In short, the ALJ raised a new denial reason without any notice to Advanced Dermatology or any basis in the record. Advanced Dermatology asks the Council to overturn the ALJ's decision on medical necessity.

B.    **The ALJ wrongfully cut-off Advanced Dermatology's evidence at the hearing.**

---

[2] As noted below, there are numerous studies that address the use of amniotic allografts in post-Mohs surgical repair.

Advanced Dermatology had a right to a hearing before an ALJ. 42 C.F.R. 405.1002. Yet, the ALJ did not allow Advanced Dermatology to justify the care that was provided at the hearing. Instead, the ALJ cut off Advanced Dermatology after only a few hours of global testimony. And, when Advanced Dermatology indicated that it had information to provide on each beneficiary, the ALJ still decided to end the hearing over Advanced Dermatology's objection.

### C. Advanced Dermatology's care was reasonable and medically necessary.

The ALJ concluded that the general medical necessity criteria found in the Medicare Program Integrity Manual ("PIM") applies to the claims at issue in this appeal. Advanced Dermatology agrees that there is no applicable guidance from CMS that applies specifically to use of a skin substitute allograft in a post-Mohs surgical repair. For a service to be medically necessary, it must: (1) be safe and effective, (2) not be experimental or investigational, and (3) be appropriate under applicable medical standards and for the affected beneficiary. Thus, Advanced Dermatology has set out its arguments for why the care it supplied was medically necessary under the PIM's criteria.

To be clear, the ALJ only raised two of these elements in her decision. She concluded that Advanced Dermatology's services were experimental and/or investigational because using "amniotic allografts to repair Mohns surgery defects has not been adequately studied." Decision at 8-9. She also concluded that the services were not medically necessary because "the record does not establish the use is in accord with accepted standard of medical practice or one that meets, but does not exceed, a patient's medical need. Decision at 9. It does not appear that the ALJ challenged whether the amniotic allografts uses were safe and effective.

As outlined below, Advanced Dermatology believes that it supplied medically necessary care to all affected beneficiaries. Advanced Dermatology has set out its global position on why its care was medically necessary under the PIM criteria, below. But, it has also prepared an appendix that describes the medical necessity of using the allograft for each affected beneficiary. *See* Appendix A.

#### 1. Amnionic Allografts are Safe and Effective

As noted above, the ALJ did not say that the amnionic allografts were not safe and effective. And it is difficult to discern what safety concerns could exist for these products. The FDA has approved all of the allografts that were used by Advanced Dermatology. And the safety or efficacy of allografts was not questioned by the auditor, QIC, or ALJ. Accordingly, this issue should be decided in Advanced Dermatology's favor.

#### 2. Amnionic Allografts are Not Experimental or Investigational

Using amniotic allografts to aid in post-Mohs surgical repair is not experimental or investigational. The FDA has approved amnionic allografts as a wound covering in various surgical procedures, including Mohs surgical wounds. File 13 at 145-150. The amniotic allografts were used in accord with their package inserts. Ample scientific research supports their use in post-Mohs repair. And, their use in this context is consistent with other CMS guidance related to Mohs surgery.

5

a. *When using allografts, Advanced Dermatology followed the FDA-approved package instructions.*

As noted by the auditors, all of the allograft products that Advanced Dermatology used for patients have been approved by the FDA. These products include EpiFix and Artacent. Advanced Dermatology used the products as outlined in the FDA approved package inserts. The package insert for EpiFix indicates that it is appropriate to use it for surgical repair and as a barrier to treat acute and chronic wounds. The Artacent package insert also provides that the product may be used as a wound covering in various surgical procedures. File 13 at 106-118 (EpiFix); File 13 at 134-138 (Artacent). In short, both allografts have been approved as a wound covering by the FDA.

The ALJ decision does not contest the FDA-approval of these products. And it acknowledges that the FDA's approved use of the allografts is not dispositive in the appeal. This is because the FDA does not regulate the practice of medicine, nor does it limit a physician's ability to use an FDA-approved product for a use that was not contemplated by the FDA, i.e., off-label use. Here, Advanced Dermatology used the allografts as a wound covering, which is the purpose for which the FDA approved the allografts.

b. *Relevant scientific research promotes allograft use in Mohs repair.*

The ALJ wrongfully inferred from the evidence that there is only one study that has examined whether amniotic allografts are appropriate for use in post-Mohs surgical repair. In truth, there are many studies that have concluded that allografts are appropriate for use in Mohs repair. In fact, Advanced Dermatology submitted at least three articles discussing studies examining the use of amniotic allografts on post-Mohs surgical wounds. *See* File 13 at 151-168. Ultimately, there are too many articles to catalogue here. And many of the studies are publicly available. But, to aid the Council, Advanced Dermatology has prepared the enclosed appendix of relevant research studies that apply to the beneficiaries in this appeal. Appendix B. Advanced Dermatology can supply more studies upon request.

c. *Post-Mohs allograft use in repairing surgical defects is consistent with other accepted sources from CMS.*

Although there is no CMS guidance for using allografts for Mohs repairs, Advanced Dermatology provided care and documentation to all patients consistent with WPS Local Coverage Determinations ("LCD") and Local Coverage Articles ("LCA") related to Mohs procedures and repairs. In addition to covering the Mohs procedure, WPS LCA 57477 (Mohs Micrographic Surgery) also outlines coverage guidelines for the repair of the post Mohs surgical wound. WPS LCA 57477 provides that, to support medical necessity, the patient's medical record should include:

> 11. Measurement of the primary lesion necessitating MMS and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:

6

- Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).

- Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).

- It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.

12. When the surgical defect created by MMS requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.

In other words, using an allograft as a post-Mohs reconstructive technique is at least covered in part by LCA 57477. Every case at issue in this appeal involved a surgical defect created by the removal of a skin cancer via MMS. Each case also required a reconstructive repair after the Mohns surgery. Advanced Dermatology documented each repair and the rational that using a reconstructive technique was the proper choice to preserve functional capabilities and restore physical appearance consistent with LCA 57477's documentation requirements.[3]    Further, Advanced Dermatology documented in the patient's medical record the measurements of the defect and included a photograph.

### 3. Amniotic Allografts Were used Appropriately, in Terms of Duration and Frequency.

The ALJ appears to have also decided that allografts exceeded the relevant beneficiaries' needs. Decision at 9. But it is difficult to discern what concerned the ALJ because she did not include any other information to support her conclusion.[4] As explained above, Advanced Dermatology's use of amniotic allografts meets the medical necessity criteria under the PIM. Advanced Dermatology has prepared an appendix summarizing the relevant medical records and care provided to the affected beneficiaries in this proceeding. Appendix A. This Appendix sets out

---

[3] The ALJ relied on a Blue Cross and Blue Shield policy related to allografts. This policy is not binding on CMS, nor should it be relied on as a justification for denial. Also, as noted above, the ALJ misapprehended the purposes for which Advanced Dermatology submitted the Blue Cross policy. It was submitted as evidence to counter the auditor's statements about homologous use and biological dressings.

[4] Also, the ALJ did not allow Advanced Dermatology to present evidence about all of the affected beneficiaries at the hearing.

why the allografts were right for each patient. However, there are a few sub criteria that can be addressed at a global level, as noted below.

> *a. Allografts were furnished in accordance with accepted standards of medical practice for diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member.*

As noted by the ALJ, Dr. Adams testified that using amniotic allografts after Mohs surgery is considered the standard of care in Kansas. Decision at 7. And, in all cases, the allografts were used in covering postsurgical Mohs wounds. More details for each affected beneficiary may be found in the attached Appendix A. Additionally, the enclosed research appendix shows that using allografts for post-Mohs repair is consistent with accepted standards of medical practice. *See* Appendix B.

Moreover, the use of amniotic allografts in post Mohs repairs is within the standard practice of dermatologists both in Kansas and nationally. The Medicare Public Use File provides public access to 2021 Medicare claims data and can be broken down by specialty and procedure codes. When the Medicare Public Use File is distilled down to the specialty of dermatology and skin substitute codes such as the two codes at issue in this appeal, Q4186 and Q4169, the data shows that the use of these codes by dermatologists is common. In 2021, dermatologists in the state of Kansas billed Medicare for the use of Q-coded skin substitutes in 4,808 claims. At a national level, dermatologists billed Medicare for Q-coded skin substitutes in 222,401 claims. This publicly available data demonstrates that the use of amniotic allografts by dermatologists is within the accepted standards of medical practice for the treatment of surgical wounds post-Mohs.

> *b. Allografts were furnished in an appropriate setting.*

All of the allografts were applied in Advanced Dermatology's office, which is the appropriate setting for Mohs procedures and reconstructive repairs of surgical defects.

> *c. Allografts were ordered and furnished by qualified personnel.*

The allografts were all ordered and applied by Dr. Adams, who is a licensed professional, board-certified dermatologist, and accredited Mohs surgeon and qualified to perform the procedure.

> *d. Allograft meets but does not exceed the beneficiary's medical need.*

Detailed information about each beneficiary may be found in the enclosed Appendix A.

## V.    Conclusion

For the reasons explained above, Advanced Dermatology respectfully requests that the Council overturn the ALJ's Decision and find that Advanced Dermatology provided medically necessary care to all affected beneficiaries.

## VI.    Request for Briefing Schedule

Under 42 C.F.R. 405.1120, Advanced Dermatology respectfully requests the Council allow the parties to file briefs about the facts and law relevant to the case and asks that the Council set a briefing schedule for the parties.

9

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

**Beneficiary E.A.[1]**

The auditor denied CPT codes 15271, 15275, and Q4169 for date of service, May 2, 2022,[2] and CPT codes 15271, 15275, and Q1486 for date of service May 16, 2022.[3]

On May 2, 2022, the beneficiary, an 84-year-old female, presented to John Adams, M.D. for Mohs surgery of the squamous cell carcinoma on the left distal pretibial region and the left radial dorsal hand. The Mohs surgery was completed without complications in both locations. After the Mohs surgery, the beneficiary had postoperative wounds on the pretibial region and left hand that had to be repaired.  The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications:  Age- greater than 60 years old, atrophic skin, scarred tissue, leg (for the pretibial region) and hand/digit (for the left hand). Pre and post operative photos were taken of the wounds which can be found in File 13 at 431.

The postoperative wound on the pretibial region measured: 1.2 cm in length x 1.0 cm in width x 0.4 cm in depth.  Prior to the repair, various methods of closure were considered and discussed with the beneficiary, including secondary intention and full thickness skin graft.  Secondary intention however adds a significant increase to the rate of infection in complex/high-risk locations such as the leg. The wound was also tested to see if side to side repair was possible, but Dr. Adams found that it was not amenable to that type of repair and concluded that it had to be repaired by reconstruction.  Further, the patient had attenuated, relatively inelastic, atrophic tissue surrounding the wound making it sub-optimal for a flap or tissue bed for an autograft. Dr. Adams documented that due to its size, nature, and complex and high-risk location, amniotic skin substitute allograft is the most appropriate choice of repair and medically indicated. Legs are an area where there is decreased oxygenation because of decreased circulation to the area, and therefore, sub-optimal for flaps or grafts. One 4-unit (2 cm x 2 cm) allograft was applied to the total wound surface area of 2.96 cm$^2$.[4]

The post operative wound on the left radial dorsal hand measured:  1.5 cm in length x 1.2 cm in width x 0.4 cm in depth.  Prior to the repair, various methods of closure were considered and discussed with the beneficiary, including secondary intention and full thickness skin graft. Secondary intention however adds a significant increase to the rate of infection in complex/high-risk locations such as the hand, particularly because hands are most utilized and traumatized areas on the human body due to daily physical activities. The wound was also tested to see if side to side repair was possible, but Dr. Adams found that it was not amenable to that type of repair and concluded that it had to be repaired by reconstruction.  Further, the patient had attenuated,

---

[1] For a complete set of the beneficiary's medical records please see File 13 at 388-473.  Please also note that the use of amniotic allografts on this beneficiary was determined to be medically reasonable and necessary in OMHA Appeal No. 3-12053117987.
[2] File 13 at 417-431.
[3] File 13 at 455-465.
[4] The smallest Artacent product available for private office use is a 2-unit 15 mm disc which only covers 1.77 cm$^2$.

1

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

relatively inelastic, atrophic tissue surrounding the wound making it sub-optimal for a flap or tissue bed for an autograft. Dr. Adams documented that due to its size, nature, and complex and high-risk location, amniotic skin substitute allograft is the most appropriate choice of repair and medically indicated. One 4-unit (2 cm x 2 cm) allograft was applied to the total wound surface area of 3.96 cm$^2$.

The beneficiary returned on May 16, 2022, for a third[5] application of the amniotic allograft consistent with the manufacturer's package insert. The left distal pretibial region measured: 1.1 cm in length x 0.9 cm in width x 0.1 cm in depth. The left radial dorsal hand measured: 1.5 cm in length x 1.1 cm in width x 0.2 cm in depth. These measurements indicated progress in the wound healing process in both locations. Pictures were also taken to document the wound healing process. *See* File 13 at 464. One 11-unit, 4.0 cm x 4.5 cm (10.2 cm2) allograft was divided: 6 units applied to the hand (with a total wound surface area of 3.21 cm$^2$) and 5 units to the left distal pre-tibial region (with a total wound surface area of 1.79 cm$^2$).

**Beneficiary C.B.[6]**
The auditor denied CPT codes 15275 and Q4169 for four dates of service, January 21, 2022,[7] January 29, 2022,[8] February 5, 2022,[9] and February 12, 2022.[10]

On January 21, 2022, the beneficiary, an 87-year-old male, underwent a Mohs surgical procedure to remove a squamous cell carcinoma located on the right inferior curs of antihelix (ear). After the Mohs surgery was completed, the beneficiary had a postoperative wound that measured: 1.5 cm in length x 1.3 cm in width x 0.2 cm in depth. The wound required repair. Prior to the repair of the post operative wound, various methods of closure were considered by the treating physician Dr. Adams and discussed with the beneficiary. The medical records document the following comorbidities and medical conditions that made the beneficiary's wound more susceptible to significant wound healing complications: free margin-ear; atrophic skin; scarred tissue; blood thinners; cartilage; and age-greater than 60 years old.

beneficiary had a significant amount of scar tissue in this complex/high risk area from previous surgeries: therefore, the wound bed was sub-optimal for placement of an autograft. Healing via secondary intention with exposed cartilage would not be an appropriate choice, due to necrosis and ensuing infection. The patient is also on blood thinners which increases the risks for post op hematoma and potential necrosis of any repair. Due to the location and relatively large size of the

---

[5] A second application occurred on May 9, 2022, but was not included as a denied claim by the auditor.
[6] For a complete set of the beneficiary's medical records please see File 13 at 2043-2088. Please also note that the use of amniotic allografts on this beneficiary was determined to be medically reasonable and necessary in OMHA Appeal No. 3-12053235227.
[7] File 13 at 2057-2064.
[8] File 13 at 2065-2069.
[9] File 13 at 2070-2074.
[10] File 13 at 2075-2081.

2

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

wound in addition to the patient's comorbidities, reconstructive repair with an amniotic allograft was appropriate. Dr. Adams documented that the use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. One 2-unit, 15 mm disc (total of 1.77 cm$^2$) allograft was applied to the total wound surface area of 3.07 cm$^2$. The treating provider utilized the most appropriate size of allograft in stock, which was smaller than the most optimal size given the total surface wound area. Pre and post operative photos were taken of the wounds which can be found in File 13 at 2064.

The beneficiary returned on January 29, 2022, for a second application the amniotic allograft consistent with the manufacturer's package insert. The wound measured: 1.5 cm in length x 1.1 cm in width x 0.1 cm in depth. The measurements indicated progress in the wound healing process. Pictures were also taken to document the wound healing process. *See* File 13 at 2069. One 2-unit, 15 mm disc (total of 1.77 cm$^2$) allograft was applied to the total wound surface area of 2.34 cm$^2$. The treating provider utilized the most appropriate size of allograft in stock, which was smaller than the most optimal size given the total surface wound area.

The beneficiary returned on February 5, 2022, for a third application the amniotic allograft consistent with the manufacturer's package insert. The wound measured: 1.4 cm in length x 1.0 cm in width x 0.1 cm in depth. The measurements indicated progress in the wound healing process. Pictures were also taken to document the wound healing process. *See* File 13 at 2069. One 4-unit, 2.0 cm x. 2.0 cm (total of 4 cm$^2$) allograft was applied to the total wound surface area of 1.88 cm$^2$.

The beneficiary returned on February 12, 2022, for a fourth application the amniotic allograft consistent with the manufacturer's package insert. The wound measured: 1.4 cm in length x 0.5 cm in width x 0.1 cm in depth. The measurements indicated progress in the wound healing process. Pictures were also taken to document the wound healing process. *See* File 13 at 2081. One 4-unit, 2.0 cm x. 2.0 cm (total of 4 cm$^2$) allograft was applied to the total wound surface area of 1.08 cm$^2$.

**Beneficiary B.B.**[11]
The auditor denied CPT codes 15275, and Q4169 for two dates of service, January 24, 2022,[12] and February 16, 2022.[13]

---

[11] For a complete set of the beneficiary's medical records please see File 13 at 475-536. Please also note that the use of amniotic allografts on this beneficiary was determined to be medically reasonable and necessary in OMHA Appeal No. 3-12053117987.
[12] File 13 at 497-501.
[13] File 13 at 519-523.

3

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

On January 17, 2022, the beneficiary, a 74-year-old male, had Mohs surgery performed on a squamous cell carcinoma located on the left inferior lateral forehead. After the surgery was completed, the beneficiary had a defect that was 3.8 cm in length x 3.4 cm in width x 0.4 cm in depth. After discussing risk, benefits, and alternative defect repair options, the defect was repaired using skin substitute allograft. has a long history of skin cancers, to include a Merkle Cell carcinoma, which have been surgically excised from areas including this area leading to scarring in this area. Due to the size, nature and location of this wound, reconstructive surgery is an appropriate choice. This particular cancer is considered very large (3.0 cm or more) relative to the left temple region of the face, which it comprises a great deal of its area. When wounds are 3.0 cm or larger in high- risk complex locations such as the: head, neck, hands and per-tibial legs, flaps and grafts each have their limitations; grafts do not take as well due to lack of imbibition and flaps tend to run short of peripheral local tissue. This situation with BF is a good example of these types of constraints. Considering this location, attempts at flaps would have a significant risk of distortion of the eyebrow region, as well as frank failure and subsequent necrosis and ensuing infection. The risk of infection if allowed to heal via secondary intention after a large defect has been created subsequent to Mohs surgery, is significantly increased. The risk of infection is also increased due to the significant scar tissue present in the wound bed. Secondary intention would not be an appropriate choice in this situation due to potential disfigurement and extensive scarring. The immune system in scar tissue is sub-optimal at best, this may perhaps be why cancers that develop in scar tissue tend to be of a more aggressive nature and scar tissue tends to develop more skin cancers than non-scarred skin, again most likely due to its poor immune system, so to avoid causing extensive disfiguring scar tissue is a sagacious choice. Studies have also shown that healing via allograft vs via secondary intention healing have had significantly faster healing times. When patients have large lesions such as this, in these high-risk complex locations, it has been shown that the complication rate of allograft vs flaps and grafts is 3% vs 27% respectively, with infection being the number one complication. Moreover, considering that secondary intention has a significantly higher rate of infection when compared to repair via flap or grafts, it would be wise to consider the very real possibility of a post op infection if secondary intention was pursued. This is the rational for allograft as the most appropriate choice over flaps and grafts. Dr. Adams applied one 11 unit of 4.0 cm x 4.5 cm of EpiFix for the post operative wound closure. A picture of the pre and post operative wound is located at File 13 at 496.

On January 24, 2022, the beneficiary presented for a second application of EpiFix to the post operative surgical defect consistent with the product package insert. This is the first date of service denied by the auditor. The wound measured: 3.4 cm in length by 3.3 cm in width by 0.2 cm in depth. The wound showed progression in healing. See photo of progress in File 13 at 501. Dr. Adams applied one 11 unit of 4.0 cm x 4.5 cm of EpiFix for the post operative wound closure.

4

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

On February 16, 2022, the beneficiary presented for a fourth[14] application of EpiFix to the post operative surgical defect consistent with the product package insert. The wound measured: 2.5 cm in length by 2.3 cm in width by 0.05 cm in depth. The wound showed progression in healing. See photo of progress in File 13 at 523. Dr. Adams applied one 11 units, 4.0 cm x 4.5 cm, EpiFix for the post operative wound closure.

**Beneficiary L.B.[15]**
The auditor denied CPT codes 15275 and Q4169 for date of service, May 10, 2022.[16]

The beneficiary, a 90-year-old male, presented on May 10, 2022, for a Mohs surgical procedure located on the nasal tip. After the surgical procedure, the defect compromised the nasal tip and supra-tip of the nose and measured: 2.8 cm in length by 1.8 cm in width by 0.5 cm in depth. Due to the location, nature and large size of the wound, reconstructive surgery was appropriate. LB also has a history of COPD (chronic obstructive pulmonary disease), patient not getting enough oxygen, which makes flaps and grafts sub-optimal choices in this relatively hypoxic situation due to the increased chance for flap or graft necrosis and ensuing infection which would not only affect the primary defect, but also the secondary defect covering the entire area of the repair. Healing via secondary intention with exposed cartilage would be ill advised as cartilage is avascular and tends to necrose, followed by infection, leading to disfigurement if not covered. Free margin of the nose is involved, and secondary intention is not recommended in these areas due to contraction, leading to functional impediments, in addition to severe disfigurement. Due to the reasons above repair via allograft was the most appropriate choice. Pre and post operative photos of the defect can be found in File 13 at 563. Dr. Adams applied two, 4-unit, 2.0 cm x 2.0 cm,[17] allograft to the defect as a wound covering.

**Beneficiary W.C.[18]**
The auditor denied CPT codes 15271, 15275, and Q4169 for two dates of service, April 4, 2022[19] and May 2, 2022.[20]

Dr. Adams has known this known this beneficiary, a 81-year-old male, for over 25 years. After the death of the beneficiary's wife, the beneficiary stopped regular skin checks for a period of time. However, when he returned for skin checks, several of his cancers were quite advanced and large. The beneficiary requested that all five of his skin cancers be removed in one setting, thus, all five Mohs surgical procedures were performed on the same day, April 4, 2022. Photos can be found in File 13 at 687-688.

---

[14] A third application occurred on February 9, 2022, but was not included as a denied claim by the auditor.
[15] For a complete set of the beneficiary's medical records please see File 13 at 539-604.
[16] File 13 at 554-563.
[17] The auditor made a comment regarding a 2x3 cm allograft product made by Artacent, however, that size is not available to provides in private practice offices.
[18] For a complete set of the beneficiary's medical records please see File 13 at 606-773.
[19] File 13 at 662-688.
[20] File 13 at 736-755.

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

**LEGS:** Two of this patient's post Mohs surgery defects were located on his legs and they were both large defects, > 3.0 cm. Secondary intention is associated with a significantly increased rate of infection in post Mohs surgery wounds, especially on the legs. The patient has a history of Diabetes; therefore, healing via secondary healing is not recommended, due the increased risk for infection in diabetics. Also, significant pain can be associated with healing via secondary intention on the leg. Furthermore, legs are hypoxic by nature (location) and therefore, sub-optimal for flaps or grafts, which require optimal vascularization for optimal outcomes to be achieved. Also, these are very large defects, which are greater than 3.0 cm in diameter which indicates that autografts will not be able to achieve adequate imbibition and take; and flaps tend to do less favorably when defects of this size and in these locations are repaired with them. In performing 5 Mohs surgeries in one sitting lidocaine toxicity becomes a very real issue, which we must take into consideration for the patient's safety. Furthermore, daily dressing changes and wound cleaning associated with healing via secondary intention would be very challenging for this patient to perform; especially for the wounds on his scalp and ear not to mention having to perform 5 separate wound changes on a daily basis; alternatively the patient may require home care assistance for daily dressing changes and wound care if he feels overwhelmed or just cannot reach the areas of the ear and scalp.  The reasons above are why an allograft was selected as the most appropriate choice over an autograft, flap or secondary intention.  The wound defect to the Left Distal Pre-Tibial measured: 4.0 cm in length x 3.2 cm in width x 0.5 cm in depth.  Dr. Adams two, 4-unit, 2.0 cm x 2.0 cm allograft to the post-surgical wound.  The wound defect to the Right Anterior Distal Thigh measured: 3.2 cm in length x 2.4 cm in width x 0.6 cm in depth. Dr. Adams two, 4-unit, 2.0 cm x 2.0 cm allograft to the post-surgical wound.

**RIGHT EAR**: Due to the large size, nature and complex high-risk location of the defect on the right superior helix of the ear, reconstructive surgery was appropriate. Healing via secondary intention with exposed cartilage would not be advisable due to necrosis and ensuing infection, as the cartilage is avascular. The patient has a history of diabetes; therefore, healing via secondary healing is not recommended, as those with diabetes have an increased risk for infection. The patient is also on blood thinners which increases the risks for post op hematoma and potential necrosis of any incisional type of repair. This is a very large defect on the patient's ear, so a local (ATT) flap would not be feasible. Due to the reasons above repair via allograft was the most appropriate choice.  The post Mosh surgical wound to the Right Superior Helix measured: 2.8 cm in length x 1.4 cm in width x 0.3 cm in depth. Dr. Adams applied one 4-unit, 2.0 cm x 2.0 cm allograft to the post-surgical wound.

**SCALP**
Due to the size, nature and complex/high risk location of the wound on the scalp it was in need of reconstructive repair. Secondary intention has a significant increase in the rate of infection when compared with Standard repairs in post Mohs and wide local excision patients; this patient also is a diabetic which would significantly add to the risk for infection associated with healing via secondary intention. Allografts have also been shown to speed the healing process when

6

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

compared to healing via secondary intention. Furthermore, daily dressing changes and wound cleaning associated with healing via secondary intention would be very challenging for this patient to perform due to the locations of the wounds on his scalp and ear not to mention having to perform 5 separate wound changes on a daily basis; alternatively the patient may require home care assistance for daily dressing changes and wound care if he feels overwhelmed or just cannot reach the areas of the ear and scalp (for men just cutting one's hairs from their ears is quite challenging). The patient's scalp was atrophic and scarred and have a tendency to heal extremely slowly, some taking one to two years or more, sometimes they can even remain in a permanent state of just not quite being able to completely heal. In performing 5 Mohs surgeries in one sitting lidocaine toxicity becomes a very real issue, which we must take into consideration for the patients safety. This patient also is a diabetic which would significantly add to the risk for infection associated with healing via secondary intention.  The post-surgical wound to the Right Superior Parietal Scalp measured:  1.9 cm in length x 1.6 cm in width x 0.4 cm in depth.  Dr. Adams applied one 4-unit, 2.0 cm x 2.0 cm allograft to the post-surgical wound.

**LEFT CHEEK**
Due to the size, nature and complex/high risk location of the wound on the left cheek (ear) it was in need of reconstructive repair. Secondary intention has a significant increase in the rate of infection when compared with Standard repairs in post Mohs and wide local excision patients; this patient also is a diabetic which would significantly add to the risk for infection associated with healing via secondary intention. Allografts have also been shown to speed the healing process when compared to healing via secondary intention. The patient was noted to have significant scar tissue in the area secondary to previous cancer removals, the patient was also noted to have significant atrophic skin damage in the surrounding area as well. Placing a full thickness graft into a bed of scar tissue is sub-optimal; furthermore, flaps performed in areas with scar tissue is a sub-optimal scenario. In performing 5 Mohs surgeries in one sitting lidocaine toxicity becomes a very real issue, which we must take into consideration for the patient's safety. Furthermore, daily dressing changes and wound cleaning associated with healing via secondary intention would be very challenging for this patient to perform due to the locations of the wounds on his scalp and ear not to mention having to perform 5 separate wound changes on a daily basis; alternatively the patient may require home care assistance for daily dressing changes and wound care if he feels overwhelmed or just cannot reach the areas of the ear and scalp (for men just cutting one's hairs from their ears is quite challenging). The surgical defect to the Left Superior Pre-Auricular Cheek measured 2.0 cm in length x 1.5 cm in width x 0.3 in depth.  One 4-unit, 2.0 cm x 2.0 cm allograft was applied to the post-surgical wound.

The beneficiary presented on May 2, 2022, for the fourth[21] application of allograft to his post-surgical wounds consistent with manufacturer guidelines.  All wounds showed healing progress.

---

[21] Second and third applications occurred on April 11, 2022, and April 19, 2022.  This dates of service were not included as denial dates by the auditor.

7

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

The Left Distal Pre-Tibial wound measured: 3.4 cm in length x 2.4 cm in width x 0.2 cm in depth. Two, 4.0-unit, 2.0 cm x 2.0 cm, allograft were applied. The Right Anterior Distal Thigh wound measured: 1.7 cm in length x 1.3 cm in width x 0.1 cm in depth. One 4 unit, 2.0 cm x 2.0 cm, was applied. The Right Superior Parietal Scalp wound measured: 1.9 cm in length x 1.6 cm in width x 0.4 cm in depth. One, 4-unit, 2.0 cm x 2.0 cm, allograft was applied. The Left Superior Pre-Auricular Cheek wound measured: 2.0 cm in length x 1.5 cm in width x 0.3 cm in depth. One, 4.0-unit, 2.0 cm x 2.0 cm, allograft was applied. The Right Superior Helix (ear) wound measured: 1.4 cm in length x 0.8 cm in width x 0.05 cm in depth. One, 4.0-unit, 2.0 cm x 2.0 cm allograft was applied. Photos of all wounds can be found in File 13 at 753-754.

**Beneficiary R.E.**[22]
The auditor denied CPT codes 15275 and Q4169 for two dates of service, April 25, 2022[23] and May 9, 2022.[24]

The beneficiary, a 64-year-old male, presented on April 25, 2022, for Mohs surgery to his right radial dorsal hand. The Mohs surgical procedure created a significant defect measuring: 2.4 cm in length x 1.4cm in width x 0.3 cm in depth. A photo of the post-surgical wound can be found in File 13 at 799. The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications: hand/digit, atrophic skin, and age greater than 60 years old. Due to the size, nature and complex/high risk location of the wound on the right radial dorsal hand; it was in need of reconstructive repair. Healing via Secondary Intention has a significant increase in the rate of infection when compared with standard repairs in post Mohs and wide local excision patients; in areas where the skin is scarred or atrophic the risks for infection are also increased. The hand is prone to perhaps more trauma than any other part of the body. The patient's surrounding skin is atrophic and attenuated and has suffered from sun damage. The wound involves the metacarpophalangeal joint of the hand which can make grafts and flaps more likely to fail. The most important thing to enhance a graft to take is no motion in the area; therefore, placement of an autograft or a flap in this dynamic location would be sub-optimal. Furthermore, daily dressing changes and wound cleaning associated with healing via secondary intention would be very challenging for this patient to perform due to the location of the wound on their hand, now considering the wound is on the hand, the patient would then be forced to perform these tasks one-handed; alternatively, the patient may require home care assistance for daily dressing changes and wound care if they are overwhelmed or just cannot reach the wound areas (for men just cutting one's hairs from their ears can be quite challenging). Allografts have also been shown to speed the healing process when compared to healing via secondary intention. One, 4-unit, 2.0 cm x 2.0 cm allograft was applied.

The beneficiary returned on May 9, 2022, for the third[25] application of Artacent allograft consistent with manufacturer recommendations. On this date of service, the surgical wound

---

[22] For a complete set of the beneficiary's medical records please see File 13 at 776-828.
[23] File 13 at 792-799.
[24] File 13 at 806-811.
[25] A second application occurred on May 2, 2022, which was not identified as a denied claim by the auditor.

8

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

measured: 1.9 cm in length x 1.2cm in width x 0.2 cm in depth.  One, 4-unit, 2.0 cm x 2.0 cm, allograph was applied to the wound as a wound covering.

**Beneficiary M.F.[26]**
The auditor denied CPT codes 15275, 15276, and Q4186 for eight dates of service, January 28, 2022,[27] February 4, 2022,[28] February 11, 2022,[29] February 17, 2022,[30] March 2, 2022,[31] March 9, 2022,[32] March 16, 2022,[33] and March 23, 2022.[34]

This one patient had three post Mohs surgery wounds on his scalp, removed and treated all at the same time, all of which were relatively large wounds, which extended to the bone; therefore, this one summary will apply to all three wounds on the scalp of this one patient; what does change from visit to visit are the wounds measurements, math, allograph numbers and the photographs.

Due to the size, nature and complex/high risk location of the wound on the scalp it was in need of reconstructive repair. Secondary intention has a significant increase in the rate of infection when compared with Standard repairs in post Mohs and wide local excision patients; this patient was also immunosuppressed which would significantly add to the risk for infection associated with healing via secondary intention; allografts have also been shown to speed the healing process when compared to healing via secondary intention; furthermore, daily dressing changes and wound cleaning associated with healing via secondary intention would be virtually impossible for this patient to perform himself due to its location, alternatively the patient may require home care assistance for daily dressing changes and wound care. With bone, pain can be a significant issue due to nerve fibers which are not generally exposed to the outer environment, this pain is relieved in part via the protective cover which allografts provide. An allograft was selected over an autograft or flap due to the extremely scared and atrophic, virtually inelastic tissue on the scalp which made local repair not a viable option; additionally, the scarred atrophic tissue made for a sub-optimal tissue bed for the viability of autografts. Finally, when scalps which are atrophic and scarred, have relatively deep wounds secondary to tumor extirpation via Mohs surgery, they have a tendency to heal extremely slowly, one to two years or more, sometimes even remain in a permanent state of just not quite completely healing.

On January 28, 2022, the Left Occipital wound measured 2.2 cm in length x 2.1 cm in width x 0.5 cm in depth. The Mid Crown wound measured 2.1 cm in length x 1.6 cm in width x 0.4 cm in depth. One, 11-unit, 4.0cm x 4.5 cm (10.2cm2) allograft was divided: 7 units to the Left Occipital wound and 4 units to the Mid Crown wound.

---

[26] For a complete set of the beneficiary's medical records please see File 13 at 776-828.
[27] File 13 at 2125-2136.
[28] File 13 at 2141-2153.
[29] File 13 at 2154-2163.
[30] File 13 at 2164-2174.
[31] File 13 at 2179-2190.
[32] File 13 at 2191-2203.
[33] File 13 at 2204-2213.
[34] File 13 at 2214-2224.

9

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

On February 4, 2022, the Left Occipital wound measured 2.1 cm in length x 2.0 cm in width x 0.4 cm in depth. The Mid Crown wound measured 2.0 cm in length x 1.5 cm in width x 0.4 cm in depth. One 11-unit, 4.0cm x 4.5 cm (10.2cm2) allograft was divided: 7 units were applied to the Left Occipital, 4 units applied to the Mid Crown.

Also on February 4, 2022, a Mohs surgical procedure was performed on the Right Central Frontal Scalp. The post-surgical wound measured:  6.5 cm in length x 5.5 cm in width x 0.8 cm in depth.  A photo of the wound can be found in File 13 at 2153. Two, 11-unit, 4.0 cm x 4.5 cm (20.4 cm2) allografts applied to the wound.
On February 11, 2022, the beneficiary returned for additional allograft applications as indicated by manufacturer product inserts.  All wounds showed healing progression. The Left occipital wound measured 2.5 cm in length x 2.0 cm in width x 0.4 cm in depth. The Mid Crown wound measured: 2.1 cm in length x 1.5 cm in width x 0.4 cm in depth. One, 11-unit, 4.0cm x 4.5 cm, allograft was divided: 7 units were applied Left Occipital wound, 4 units were applied to the Mid Crown wound. The Right Central Frontal Scalp wound measured 5.9 cm in length x 5.8 cm in width x 0.4 cm in depth. Two, 11-unit, 4.0cm x 4.5 cm (22 units & 20.4 cm2) allografts were applied to the wound for complete coverage.

On February 17, 2022, the beneficiary returned for additional allograft applications as indicated by manufacturer product inserts.  All wounds showed healing progression. The Left occipital wound measured 2.5 cm in length x 2.0 cm in width x 0.3 cm in depth. The Mid Crown wound measured: 2.0 cm in length x 1.5 cm in width x 0.3 cm in depth. One, 11-unit, 4.0cm x 4.5 cm, allograft was divided: 7 units were applied Left Occipital wound, 4 units were applied to the Mid Crown wound. The Right Central Frontal Scalp wound measured 5.5 cm in length x 5.5 cm in width x 0.4 cm in depth. Two, 11-unit, 4.0cm x 4.5 cm (22 units & 20.4 cm2) allografts were applied to the wound for complete coverage.

On March 2, 2022, the beneficiary returned for additional allograft applications as indicated by manufacturer product inserts.  The Left occipital wound measured 2.2 cm in length x 1.9 cm in width x 0.3 cm in depth. The Mid Crown wound measured: 2.0 cm in length x 1.8 cm in width x 0.3 cm in depth. One, 11-unit, 4.0cm x 4.5 cm, allograft was divided: 7 units were applied Left Occipital wound, 4 units were applied to the Mid Crown wound. The Right Central Frontal Scalp wound measured 5.5 cm in length x 5.5 cm in width x 0.4 cm in depth. Two, 11-unit, 4.0cm x 4.5 cm (22 units & 20.4 cm2) allografts were applied to the wound for complete coverage.

On March 9, 2022, the beneficiary returned for additional allograft applications as indicated by manufacturer product inserts.  The Left occipital wound measured 2.3 cm in length x 1.8 cm in width x 0.3 cm in depth. The Mid Crown wound measured: 1.9 cm in length x 1.5 cm in width x 0.4 cm in depth. One, 11-unit, 4.0cm x 4.5 cm, allograft was divided: 7 units were applied Left Occipital wound, 4 units were applied to the Mid Crown wound. The Right Central Frontal Scalp wound measured 5.5 cm in length x 5.5 cm in width x 0.3 cm in depth. Two, 11-unit, 4.0cm x 4.5 cm (22 units & 20.4 cm2) allografts were applied to the wound for complete coverage.

10

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

On March 16, 2022, the beneficiary returned for additional allograft applications as indicated by manufacturer product inserts.  The Left occipital wound measured 2.2 cm in length x 1.7 cm in width x 0.2 cm in depth. The Mid Crown wound measured: 1.9 cm in length x 1.5 cm in width x 0.2 cm in depth. One, 11-unit, 4.0cm x 4.5 cm, allograft was divided: 7 units were applied Left Occipital wound, 4 units were applied to the Mid Crown wound. The Right Central Frontal Scalp wound measured 6.0 cm in length x 6.0 cm in width x 0.3 cm in depth. Two, 11-unit, 4.0cm x 4.5 cm (22 units & 20.4 cm2) allografts were applied to the wound for complete coverage.

On March 23, 2022, the beneficiary returned for additional allograft applications as indicated by manufacturer product inserts.  All wounds showed healing progression. The Left occipital wound measured 1.9 cm in length x 1.8 cm in width x 0.2 cm in depth. The Mid Crown wound measured: 1.7 cm in length x 1.4 cm in width x 0.2 cm in depth. One, 11-unit, 4.0cm x 4.5 cm, allograft was divided: 7 units were applied Left Occipital wound, 4 units were applied to the Mid Crown wound. The Right Central Frontal Scalp wound measured 6.2 cm in length x 6.0 cm in width x 0.3 cm in depth. Two, 11-unit, 4.0cm x 4.5 cm (22 units & 20.4 cm2) allografts were applied to the wound for complete coverage.

**Beneficiary R.G.[35]**
The auditor denied CPT codes 15275 and Q4186 for four dates of service, January 22, 2022,[36] January 29, 2022,[37] February 5, 2022,[38] and February 12, 2022.[39]

The beneficiary, a 91-year-old male, presented on January 21, 2022, for Mohs surgery to his right inferior central forehead.  The Mohs surgical procedure created a significant defect measuring: 3.5 cm in length x 3.2 cm in width x 0.3 cm in depth. A photo of the post-surgical wound can be found in File 13 at 2266 and 2275.  The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications:  temporal nerve, fixed structures (eyebrows), atrophic skin, blood thinners, and age-greater than 60 years old.

This beneficiary has a long history of skin cancers on complex/high risk location on the temple region of the head (right inferior central forehead). This patient's defect post extirpation via Mohs surgery cancer was > 3.0 cm. When wounds are 3.0 cm or larger in high-risk complex locations such as the: head, neck, hands and per-tibial legs; flaps and grafts each have their limitations in that grafts do not take as well due to the relative lack of imbibition and flaps tend to run short of peripheral local tissue, as well as being relatively limited in terms of pedicle vascular supply which is diminished proportionate to the size of the defect and consequently the larger flaps. Due to the size, nature and complex/high risk location of the wound on the scalp it was in need of reconstructive repair. Secondary intention has a significant increase in the rate of infection when compared with Standard repairs in post Mohs and wide local excision patients

---

[35] For a complete set of the beneficiary's medical records please see File 13 at 2247-2322.
[36] File 13 at 2270-2275.
[37] File 13 at 2276-2282.
[38] File 13 at 2283-2289.
[39] File 13 at 2294-2303.

11

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

and this patient is 93 years old and on prednisone. A recent study also showed that allografts speed the healing process when compared to healing via secondary intention.

Importantly, daily dressing changes and wound cleaning associated with healing via secondary intention would not be feasible for the patient to perform himself due to his age and physical condition (hand tremors) and the location of the defect itself, alternatively the patient may require home care assistance for daily dressing changes and wound care associated with daily wound care.

A recent, large, first of its kind peer reviewed study showed that when patients have "large defects" [not relatively large] (>3 cm2 [1.8 cm x 1.7 cm = 3.06 cm2]) in high-risk complex locations, as defined by the Mohs LCD 57477, such as the: head, neck, hands, shins. A recent peer reviewed study showed that the complication rate of allograft vs (flaps & autografts) was 2.1% vs 28.7% respectively, with infection being the number one complication. This patient's wound is large, > 3 cm2 (eg 1.8 cm x 1.7 cm = 3.06 cm2). Moreover, considering that secondary intention has a significantly higher rate of infection when compared to repair via flap or grafts, in the general population, it would be appear to be ill advised to pursue secondary intention or flap and graft repair in this situation.

When wounds are 3.0 cm or larger in high- risk complex locations such as the: head, neck, hands and per-tibial legs, flaps and grafts each have their limitations; grafts do not take as well due to the relative lack of imbibition and flaps tend to run short of peripheral local tissue also pedicle vascular supply is diminished proportionate to the size of the defect and consequently the flap - this patient's cancer is > 3.0 cm. The risk of infection if allowed to heal via secondary intention after a large defect has been created subsequent to Mohs surgery, is significantly increased. Secondary intention would not be an appropriate choice in this situation due to potential infection, disfigurement and extensive scarring. The patient is The immune system in scar tissue is sub-optimal at best, this may perhaps be why cancers that develop in scar tissue tend to be of a more aggressive nature and why scar tissue tends to develop more skin cancers than normal skin, again most likely due to its poor immune system; therefore, the avoidance of excess scar tissue is to restore/maintain the skins function as per the Mohs LCA 57477. These are some of the justifications for allografts, as the most appropriate choice over flaps, grafts and secondary intentions for the beneficiary.

On January 22, 2022, one, 11-unit, 4.0 cm x 4.5 cm allograft was applied to the post-Mohs surgical wound that measured 17.9 cm$^2$ in total wound surface area. The patient returned on January 29, 2022, for a second application of the allograft consistent with manufacturer product instructions. The right inferior central forehead wound measured 3.0 cm in length x 2.7 cm in width x 0.2 cm in depth. The wound showed healing progression. One 11-unit, 4.0cm x 4.5 cm, allograft was applied to the wound.[40]

---

[40] The auditor suggested that smaller sizes of EpiFix are available from the manufacturer, such as a 3 cm x 3 cm allograft. However, this size has not been sold by the manufacturer and was not in stock with the provider on the date of service.

12

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

The patient returned on February 5, 2022, for a third application of the allograft consistent with manufacturer product instructions. The right inferior central forehead wound measured 2.8 cm in length x 2.7 cm in width x 0.2 cm in depth. The wound showed healing progression. One 11-unit, 4.0cm x 4.5 cm, allograft was applied to the wound.

The patient returned on February 12, 2022, for a fourth application of the allograft consistent with manufacturer product instructions. The right inferior central forehead wound measured 2.1 cm in length x 2.0 cm in width x 0.2 cm in depth. The wound showed healing progression. One 11-unit, 4.0cm x 4.5 cm, allograft was applied to the wound.

**Beneficiary D.G.**[41]
The auditor denied CPT codes 15275 and Q4186 for one date of service, February 5, 2022.[42]

The beneficiary, a 71-year-old male, presented on February 4, 2022, for Mohs surgery to right inferior crus of anthelix and right ear. The Mohs surgical procedure created a significant defect measuring: 3.5 cm in length x 3.4 cm in width x 0.4 cm in depth. A photo of the post-surgical wound can be found in File 13 at 2353. On the date of service denied, one, 11-unit, 4.0 cm x 4.5 cm allograft was applied to the wound. The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications: sleep apnea, diabetes, scarred tissue, cartilage, and age-greater than 60 years old.

The beneficiary had a larger post Mohs wound which was comprised of the pre-auricular region, the tragus, conchal bowl and had exposed cartilage. Healing via secondary intention with exposed cartilage would be a sub-optimal choice, due to the high potential for cartilage necrosis and ensuing infection. The patient has a history of diabetes and would therefore not be a good candidate for healing via secondary intention. Sleep apnea can be associated with lower O2 levels which makes flaps and autografts sub-optimal choices. The beneficiary's post Mohs defect was > 3.0 cm; wounds which are 3.0 cm or larger have their limitations in that grafts do not take as well due to their relative lack of imbibition and flaps tend to run short of peripheral local tissue, as well as being relatively limited in terms of pedicle vascular supply which is diminished proportionate to the size of the defect and inversely to decreased pedicle width and increased pedicle length; consequently larger flaps are not as viable.

Due to the large size, nature and complex/high risk location of this wound on the scalp it was in need of reconstructive repair. Secondary intention has a significant increase in the rate of infection when compared with Standard repairs in post Mohs and wide local excision patients; also this patient is a diabetic, and finally wounds in the internal ear have a higher rate of infection primarily due to pseudomonas infection (swimmer's ear in children). Furthermore, daily dressing changes and wound cleaning associated with healing via secondary intention would be very challenging for this patient to perform due to the location of the wound on his ear vs. weekly office visits for virtually pain-free wound care; alternatively, the patient may require

---

[41] For a complete set of the beneficiary's medical records please see File 13 at 2360-2369.
[42] File 13 at 2270-2275.

13

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

home care assistance for daily dressing changes and wound care if they felt overwhelmed, for older men just trimming the hairs from one's ears can be quite challenging.

A recent, large, first of its kind peer reviewed study showed that when patients have "large defects" [not relatively large] (>3 cm2 [1.8 cm x 1.7 cm = 3.06 cm2]) in high-risk complex locations, as defined by the Mohs LCD 57477, such as the: head, neck, hands & shins; the complication rate of allograft when compared to (flaps & autografts) was 2.1% vs 28.7% respectively, with infection being the number one complication. This patient's wound is large, > 3 cm2 (e.g. 1.8 cm x 1.7 cm = 3.06 cm2). Moreover, considering that secondary intention has a significantly higher rate of infection when compared to repair via flap or grafts, in the general population, it would appear to be ill advised to pursue secondary intention, flap or graft repair in this situation in the ear. The risk of infection if allowed to heal via secondary intention after a large defect has been created subsequent to Mohs surgery, is significantly increased, especially in the ear and considering the patient's age, diabetes and potential disfigurement and extensive scarring. The immune system in scar tissue is sub-optimal at best, this may perhaps be why cancers that develop in scar tissue tend to be of a more aggressive nature and why scar tissue tends to develop more skin cancers than normal skin, again most likely due to its poor immune system; therefore, the avoidance of developing excess scar tissue is to restore/maintain the skins function in terms of its immune function as per the Mohs LCA 57477. These are some of the justifications for allografts, as the most appropriate choice over flaps, grafts and secondary intentions for the beneficiary. Due to the reasons above, repair via allograft was the most appropriate choice.

## Beneficiary J.G.[43]

The auditor denied CPT codes 15275 and Q1486 for two dates of service February 23, 2022,[44] and May 16, 2022.[45]

The beneficiary, a 74-year-old male, is well known to Dr. Adams and has received numerous Mohs surgeries over the years. The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications: hand/digit, immunocompromised, diabetes, scarred tissue, age-greater than 60 years old. Dr. Adams has known this patient for over 20 years, he has a history of a kidney transplant and he takes the immunosuppressive medications which prevent his kidney from being rejected, yet they also make him susceptible to a myriad of skin cancers. The beneficiary has the most severe co-morbidities in the entire clinic; he has had well over 50 skin cancers, which Dr. Adams have successfully treated through the years.

The patient is not just immunosuppressed from his anti-rejection meds, but also by a history of diabetes; therefore, secondary intention would be sub-optimal. This patient has extensive areas of

---

[43] For a complete set of the beneficiary's medical records please see File 13 at 831-971. Please also note that the use of amniotic allografts on this beneficiary was determined to be medically reasonable and necessary in OMHA Appeal No. 3-12053117987.
[44] File 13 at 847-857.
[45] File 13 at 938-946.

14

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

scar tissue throughout the sun exposed areas of his body from previous skin cancers and concomitant surgical procedures. This is a complex patient in terms of his co-morbidities, in addition to having a defect in a high-risk area for repair. Flaps and grafts would be sub-optimal in outlined scenarios; therefore, the most appropriate choice for the patient was an allograft and that is in fact what the patient opted for repair.

On February 23, 2022, the beneficiary presented for a Mohs procedure to his left proximal dorsal ring finger. The post surgical wound measured 2.0 cm x 1.5 cm x 0.3 cm. Due to the large size, nature and complex/high risk location of the wound on the left proximal dorsal ring finger; it was in need of reconstructive repair. The hand is perhaps more prone to trauma than any other part of the body, also this defect is adjacent to the metacarpophalangeal joint of the hand which is a highly dynamic aspect of the hand/finger, and the number one determinant of autograft survival is graft immobility; therefore, autograft is suboptimal for repair. Direct flaps would not be feasible here due to a lack of excess tissue immediately around the defect. The patient is immunocompromised and has a history of diabetes; therefore, secondary intention would be ill-advised.

Furthermore, daily dressing changes and wound cleaning associated with healing via secondary intention would be extremely challenging for this patient to perform, in large part due to the location of the wound on the patient's hand, now considering the wound is on the hand, the patient would then be forced to perform these tasks literally one-handed; alternatively, the patient may require home care assistance for daily dressing changes and wound care if they were overwhelmed or just cannot perform the task. Allografts have also been shown to speed the healing process when compared to healing via secondary intention. One 11-unit, 4.0cm x 4.5 cm, allograft was applied to the left proximal dorsal ring finger.

On May 9, 2022, the beneficiary presented for a Mohs procedure to his right superior forehead. The wound measured 1.7 cm x 1.2 cm x 0.4 cm. One 11-unit, 4.0cm x 4.5 cm, allograft was applied to cover the wound.

**Beneficiary G.H.[46]**
The auditor denied CPT codes 15275 and Q1486 for two dates of service January 25, 2022,[47] and February 24, 2022.[48]

The beneficiary, a 80-year-old male, presented for a Mohs surgical procedure to his left superior parietal scalp on January 25, 2022. The post-surgical wound measured: 3.2 cm in length x 2.2 cm in width x 0.8 cm in depth. A photo of the wound can be found in File 13 at 997. The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications: immunocompromised, blood thinners, atrophic skin, scarred tissue, age-greater than 60 years old.

---

[46] For a complete set of the beneficiary's medical records please see File 13 at 974-1039.
[47] File 13 at 990-997.
[48] File 13 at 1024-1028.

15

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

Due to the size, nature and complex/high risk location of the wound on the scalp it was in need of reconstructive repair. Secondary intention has a significant increase in the rate of infection when compared with Standard repairs in post Mohs and wide local excision patients, this is especially true in for wounds found in the scalp. This patient was also immunosuppressed which would significantly add to the risk for post op infection. Of all modes of repair only allografts have inherent anti-bacterial activity which optimally fends off infection, which is why in those who are immunocompromised as this patient is allograft is superior to all other repairs in that respect.

A recent study also showed that allografts speed the healing process when compared to healing via secondary intention. Importantly, daily dressing changes and wound cleaning associated with healing via secondary intention would be virtually impossible for this patient to perform himself due to its location, alternatively the patient may require home care assistance for daily dressing changes and wound care.  A recent, large, first of its kind peer reviewed study showed that when patients have large defects (>3 cm2 [1.8cm x 1.7 cm = 3.06 cm2]) in high-risk complex locations head neck hands, shins, a recent peer reviewed study showed that the complication rate of allograft vs flaps and grafts was 2.1% vs 28.7% respectively, with infection being the number one complication. This patient's wound is large and >3 cm2 (eg 1.8 cm x 1.7 cm = 3.06 cm2). Moreover, considering that secondary intention has a significantly higher rate of infection when compared to repair via flap or grafts, in the general population, it would be ill advised to pursue secondary intention or flap and graft repair in this situation. This is one of the justifications for allografts, as the most appropriate choice over flaps, grafts and secondary intentions.

When wounds are 3.0 cm or larger in high- risk complex locations such as the: head, neck, hands and per-tibial legs, flaps and grafts each have their limitations; grafts do not take as well due to the relative lack of imbibition and flaps tend to run short of peripheral local tissue also pedicle vascular supply is diminished proportionate to the size of the defect and consequently the flap - this patient's cancer is > 3.0 cm. The risk of infection if allowed to heal via secondary intention after a large defect has been created subsequent to Mohs surgery, is significantly increased. Secondary intention would not be an appropriate choice in this situation due to potential infection, disfigurement and extensive scarring. The immune system in scar tissue is sub-optimal at best, this may perhaps be why cancers that develop in scar tissue tend to be of a more aggressive nature and why scar tissue tends to develop more skin cancers than normal skin, again most likely due to its poor immune system; therefore, the avoidance of excess scar tissue is to restore/maintain the skins function as per the Mohs LCA 57477.  On January 24, 2022, one 11-unit, 4.0 cm x 4.5 cm allograft was applied to the wound with a total surface wound area of 16.76 cm².

On February 24, 2022, the beneficiary presented for the fourth[49] application of allograft to the left superior parietal scalp wound. The Left superior parietal scalp wound measured 2.0 cm x 1.7 cm x 0.2 cm.  These measurements indicated healing progress. One 11-unit, 4.0cm x 4.5 cm allograft was applied to the wound.

---

[49] Second and third applications occurred on February 10, 2022 and February 16, 2022. These dates of service were not denied by the auditor.

16

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

**Beneficiary V.M.**[50]
The auditor denied CPT codes 15275 and Q1486 for date of service May 13, 2022.[51]

The beneficiary, a 68-year-old female, presented for a Mohs surgical procedure to her left superior lateral malar check on May 3, 2022.  The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications:  smokes cigarettes, COPD, age-greater than 60 years old. The beneficiary has a history of skin cancer and she is an everyday smoker, with COPD. She had a cancer removed a few months prior to this one on her left inferior eyelid/(Left medial malar cheek). The patient was extremely apprehensive about the procedure, as the prior procedure and repair left her with an elevated superior lip. At the conclusion of the Mohs procedure the patient was noted to have a relatively large post Mohs defect in the high-risk complex area of the left inferior eyelid/cheek region; therefore, reconstructive repair was indicated. The patient has a history of smoking & COPD both of which are relative contraindications for autografts or flaps. If this wound were allowed to heal via secondary intention it would most likely have a catastrophic outcome, in that an ectropion would most likely develop which would need to have an oculoplastic physician repair it at an ambulatory surgery center which is no small task. If the ectropion is not repaired, the sequence is generally from a red, sore, painful draining eye to more inflammation, keratinization of the mucus membranes with the end result of blindness. It is imperative that these types of wounds are treated to complete re-epithelialization, to avoid ectropion.

On the date of service denied, May 13, 2022, the beneficiary presented for a second EpiFix application to the post-surgical wound located on the Left medial malar cheek (inferior eyelid) and measuring 1.9 cm x 1.3 cm x 0.2 cm. The wound was showing healing progress (initial post-surgical wound size was 2.4 cm x 2.3 cm x 0.3 cm). One 11-unit, 4.0cm x 4.5 cm, allograft was applied to the wound.

**Beneficiary N.M.**[52]
The auditor denied CPT codes 15275 and Q1486 for date of service May 18, 2022.[53]

The beneficiary, a 93-year-old female, presented for a Mohs surgical procedure to her left lateral distal pretibial region on April 12, 2022.  The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications:  peroneal nerve, leg, atrophic skin, scarred tissue, blood thinners, and age-greater than 60 years old. Due to the size, nature and location of the wound on the left lateral distal pre-tibial region reconstruction was indicated. Secondary intention is associated with a significantly increased rate of infection, especially when attempted on the legs. Also, significant pain can be associated with healing via secondary

---

[50] For a complete set of the beneficiary's medical records please see File 13 at 1041-1127.
[51] File 13 at 1091-1097.
[52] For a complete set of the beneficiary's medical records please see File 13 at 1130-1121.
[53] File 13 at 1191-1197.

17

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

intention on the leg; this is likely due to an already borderline situation in terms of low oxygen status which elicits pain as a symptom of hypoxia and micro necrosis due to the hypoxia at the wound site. Furthermore, legs are hypoxic by nature (location) and therefore, sub-optimal for flaps or grafts, which require optimal vascularization. A recent peer reviewed study found that Wounds greater than 3.0 cm2 can be treated safely and effectively with amniotic membrane allografts. The reasons above are why an allograft was selected as the most appropriate choice to restore function and appearance over an autograft, flap or secondary intention.

On the date of service denied, May 18, 2022, the beneficiary presented for the fifth EpiFix allograft application to the post-surgical Mohs wound located at the left lateral distal pre-tibial region.  The wound was showing healing progress and on the date of service measured: 2.0 cm x 1.6 cm x 0.1 cm.  One 11-unit, 4.0cm x 4.5 cm, allograft was applied to the wound.


**Beneficiary J.M.**[54]
The auditor denied CPT codes 15275 and Q1486 for two dates of service February 10, 2022,[55] and March 7, 2022.[56]

The beneficiary, a 74-year-old male, presented for a Mohs surgical procedure to his right superior parietal scalp on December 8, 2021.  The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications:  bone, scarred tissue, blood thinners, and age-greater than 60 years old.  Due to the size, nature and complex/high risk location of the wound on the right superior parietal scalp, it was in need of reconstructive repair. Secondary intention carries a significant increase in the rate of infection when compared with Standard repairs in post Mohs and wide local excision patients; this increase in infections is most prevalent in the legs. Moreover, daily dressing changes and wound cleaning associated with healing via secondary intention would be virtually impossible for this patient to perform himself due to its location on the scalp. Additionally, the patient may require home care assistance for daily dressing changes and wound care with healing via secondary intention. Studies have shown that Allografts do indeed speed the healing process when compared to healing via secondary intention, which further lends support for allografts over secondary intention. In patients with exposed bone pain can be a significant issue due to periosteal nerve fibers which are not generally exposed to the outer environment, this pain is relieved in part via the protective cover which allografts provide. At the time of the Mohs procedure which caused this wound the defect measured 4.5 cm x 3.0 cm x 1.0 cm.  Defects which are greater than 3.0 cm are sub-optimal candidates for repair via autografts. Defects of this size on the scalp are relatively sub-optimal for repair via flaps due to lack of local tissue availability and sub-optimal pedicle function. Secondary healing maximizes the amount of final scar tissue present; scar tissue's immune

---

[54] For a complete set of the beneficiary's medical records please see File 13 at 1316-1448.  Please also note that the use of amniotic allografts on this beneficiary was determined to be medically reasonable and necessary in OMHA Appeal No. 3-12053117987
[55] File 13 at 1393-1400.
[56] File 13 at 1422-1428.

18

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

system is inferior to its normal immune system proficiency. Scarred tissue is more apt to become infected, develop skin cancers in and the skin cancers that develop within scarred tissue tend to be of a more aggressive nature. Scalp wounds, much like leg wounds have a tendency to heal extremely slowly, often times taking one to two years or more to heal or sometimes they can even remain in a permanent state of "not completely healed" which is another place where allografts make the difference. Due to the rational above repair via allograft was concluded to be the most appropriate choice to restore function and appearance as set forth in the Mohs LCA 57477 documentation requirements for all post Mohs repairs in order to complete the MMS.

On the denied date of service, February 10, 2022, the beneficiary presented for the seventh EpiFix application consistent with the manufacturer's product insert. The postoperative wound measured: 2.0 cm x 1.6 cm x 0.4 cm, a significant improvement from the initial postoperative wound size of 4.5 cm x 3.0 cm x 1.0 cm.  One 11-unit, 4.0cm x 4.5 cm, EpiFix allograft was applied to the wound as a wound covering.

On the second denied date of service, March 7, 2022, the beneficiary presented for the tenth[57] EpiFix application consistent with the manufacturer's product guidelines.  The wound continued to show significant improvement and measured 1.1 cm x 1.0 cm x 0.1 cm. One 11-unit, 4.0cm x 4.5 cm, EpiFix allograft was applied to the wound.

**Beneficiary G.M.[58]**
The auditor denied CPT codes 15271, 15275, and Q1469 for date of service April 4, 2022,[59] and CPT codes 15271 and Q4169 for April 19, 2022.[60]

The beneficiary, a 74-year-old male, presented for a Mohs surgical procedure to his left radial dorsal hand and left dorsal wrist on April 4, 2022.  The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications:  supplemental oxygen, sleep apnea, COPD, hand/digit, blood thinners, atrophic scarred tissue, and age-greater than 60 years old.

The patient had two skin cancers removed via Mohs surgery from high-risk areas on the left hand and left wrist, on the same day, and were now in need of repair. The patient had a history of needing supplemental oxygen, chronic obstructive pulmonary disease (COPD) and sleep apnea; all of which indicate that the patient is in a chronic state of hypoxia; therefore, healing via secondary intention, flaps or autografts; would all be relatively contraindicated. Therefore, the only two options left were allograft or side by side repair. The wounds were not amenable to side by side repair as they were in very close proximity to one another and the patient is extremely hypoxic which makes the concern that if repaired, the intervening tissue between the repairs may be compromised due to decreased vascularization, ie, oxygen, hypoxia, with the potential for

---

[57] Eighth and nineth applications occurred on February 21, 2022, and February 28, 2022.  These dates of service were not denied by the auditor.
[58] For a complete set of the beneficiary's medical records please see File 13 at 1214-1312.
[59] File 13 at 1393-1400.
[60] File 13 at 1422-1428.

19

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

development of tissue necrosis and ensuing infection of the intervening tissue. The surrounding skin is atrophic relatively inelastic and attenuated making the intervening area of tissue even more susceptible to tissue damage basically due to the skin being thinner and less resilient in this area due to chronic sun damage. This issue is also further exacerbated by the patient's age. Furthermore, secondary intention, if pursued, would entail daily dressing changes and wound cleaning and would be tremendously more difficult considering the wound is on the hand, so the patient would be forced to perform these tasks literally one-handed; which may lead to the need for home care assistance. Studies have shown that Allografts do indeed speed the healing process when compared to healing via secondary intention, which further lends support for allografts. For the reasons above repair via allograft was the most appropriate choice.

After the Mohs surgery was completed, the Left radial dorsal hand wound measured 1.2 cm x 1.1cm x 0.2 cm.  One, 4.0-unit, 2.0 cm x 2.0 cm allograft was applied to create a natural barrier with a skin substitute allograft. The Left dorsal wrist wound measured 1.0 cm x 1.0 cm x 0.2 cm and One, 4.0-unit, 2.0 cm x 2.0 cm allograft was applied for repair and as a wound covering.

On April 19, 2022, the beneficiary presented for a third[61] application to the left dorsal wrist consistent with the Artacent package insert. The Left dorsal wrist wound measured 0.8 cm x 0.5 cm x 0.1 cm, indicating marked improvement. One, 4.0-unit, 2.0 cm x 2.0 cm, allograft was applied as a wound covering. On this date of service, the wound to the left dorsal wrist was healing within normal limits and an Aquaphor and telfa dressing was applied.

**Beneficiary D.N.[62]**

The auditor denied CPT codes 15275 and Q1469 for date of service March 17, 2022.[63]

The beneficiary, a 84-year-old female, presented for a Mohs surgical procedure to her right central temple on March 14, 2022.  The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications:  fixed structure (eyebrow), blood thinners, temporal nerve, atrophic skin, scarred tissue, and age-greater than 60 years old.

This beneficiary's defect post extirpation via Mohs surgery cancer on the right central forehead was 3.0 cm x 2.4 cm x 0.6 cm. See File 13 at 1513. When wounds are 3.0 cm or larger in high-risk complex locations such as the: head, neck, hands and per-tibial legs; flaps and grafts each have their limitations in that grafts do not take as well due to the relative lack of imbibition and flaps tend to run short of peripheral local tissue, as well as being relatively limited in terms of their pedicle's vascular capacity. Secondary intention has a significant increase in the rate of infection when compared with standard repairs in post Mohs and wide local excision patients, especially considering the very large size of this wound.

---

[61] A second Artacent application occurred to the left radial dorsal hand on April 11, 2022.  This date of service was not denied by the auditor.
[62] For a complete set of the beneficiary's medical records please see File 13 at 1450-1543.
[63] File 13 at 1509-1513.

20

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

Importantly, daily dressing changes and wound cleaning associated with healing via secondary intention may not be feasible for the patient to perform himself due to their age and physical condition and the location of the defect itself, alternatively the patient may require home care assistance for daily dressing changes would require wound care for daily wound care.

A recent, large, peer reviewed study showed that when patients have "large defects" (3 cm2 [1.8 cm x 1.7 cm = 3.06 cm2]) in high-risk complex locations, as defined by the Mohs LCD 57477, such as the: head, neck, hands, shins, that these defects can be safely and effectively repaired with amniotic allografts. A recent peer reviewed study showed that the complication rate of allograft vs (flaps & autografts) was 2.1% vs 28.7% respectively. This patient's wound is large, moreover, considering that secondary intention has a significantly higher rate of infection when compared to repair via flap or grafts, in the general population, it would be ill advised to pursue secondary intention or flap and graft repair in this situation.

Due to the size, nature and complex/high risk location of the wound on the scalp it was in need of reconstructive repair. The risk of infection if allowed to heal via secondary intention after a large defect has been created subsequent to Mohs surgery, is significantly increased. Furthermore, secondary intention would not be an appropriate choice in this situation due to potential increased risk for infection due to the size of the defect and the fact that secondary in intention has an increased risk for infection over standard repairs. The immune system in scar tissue is sub-optimal at best, this may perhaps be why cancers that develop in scar tissue tend to be of a more aggressive nature and why scar tissue tends to develop more skin cancers than normal skin, again most likely due to its poor immune system; therefore, the avoidance of excess scar tissue is to restore/maintain the skins function as per the Mohs LCA 57477 is of paramount importance. These are some of the justifications for allografts, as the most appropriate choice over flaps, grafts and secondary intentions for the beneficiary. Thus, two 4-unit, 2.0 cm x 2.0 cm allografts were applied.

**Beneficiary H.O.**[64]
The auditor denied CPT codes 15275 and Q1469 for two dates of service, March 28, 2022,[65] and May 11, 2022.[66]

The beneficiary, a 78-year-old female, presented for a Mohs surgical procedure to her right scapha on March 28, 2022. The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications: free margin ear, blood thinners, diabetes, cartilage, and age-greater than 60 years old.

After the Mohs surgery was completed, the beneficiary had a postoperative wound that measured 1.5 cm x 1.2 cm x 0.3 cm and required repair. Due to the relatively large size, nature and complex high-risk location of the defect on the right superior helix of the ear, reconstructive

---

[64] For a complete set of the beneficiary's medical records please see File 13 at 1545-1599.
[65] File 13 at 1565-1573.
[66] File 13 at 1589-1597.

21

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

surgery was appropriate. Healing via secondary intention with exposed cartilage would not be advisable due to necrosis and ensuing infection, as the cartilage is avascular. The patient has a history of diabetes; therefore, healing via secondary healing is not recommended, as those with diabetes have an increased risk for infection and exposed cartilage already is at high risk for necrosis and infection if secondary intention were pursued. A flap would not be feasible due to a lack of adequate surrounding local tissue. The patient is also on blood thinners which increases the risks for post op hematoma and potential necrosis of any incisional type of repair. Due to the reasons above repair via allograft was the most appropriate choice. Thus, one 4-unit, 2.0 cm x 2.0 cm, allograft was applied as a wound covering.

On May 11, 2022, the beneficiary presented for the fourth and final application of Artacent to the post operative wound located on the right scapha. The wound measured 0.4 cm x 0.4 cm x 0.1 cm, indicating marked wound healing. One, 4.0-unit, 2.0 cm x 2.0 cm, allograft, the smallest allograft available from the manufacturer, was applied to cover the wound.

**Beneficiary R.P.[67]**
The auditor denied CPT codes 15275 and Q1486 for two dates of service, April 7, 2022,[68] and May 23, 2022.[69]

The beneficiary, a 74-year-old male, presented for a Mohs surgical procedure to left superior occipital scalp on March 21, 2022. The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications: bone, atrophic skin, scarred tissue, and age-greater than 60 years old.

After the Mohs procedure, the beneficiary had a postsurgical wound to the left superior occipital scalp measuring 3.2 cm x 2.5 cm x 0.9 cm. Due to the large size, nature and complex/high risk location of the wound on the scalp it was in need of reconstructive repair. Secondary intention has a significant increase in the rate of infection when compared with Standard repairs in post Mohs and wide local excision patients; this patient was also the age of 60, which would significantly add to the risk for complications associated with any form of healing. Studies have shown that allografts have been shown to speed the healing process when compared to healing via secondary intention.

Furthermore, daily dressing changes and wound cleaning associated with healing via secondary intention would be virtually impossible for this patient to perform himself due to the wound's location on the scalp. Alternatively, the patient may require home care assistance for daily dressing changes and wound care.

---

[67] For a complete set of the beneficiary's medical records please see File 13 at 1599-1716.
[68] File 13 at 1632-1636.
[69] File 13 at 1675-1683.

22

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

Exposed bone can have significant pain associated with it and is most likely due to the periosteal nerve fibers which are not generally exposed to the outer environment. This pain is relieved in part via the protective cover which allografts provide.

Defects which are greater than 3.0 cm are sub-optimal candidates for repair via autografts. Defects of this size on the scalp are relatively sub-optimal for repair via flaps due to lack of local tissue availability and sub-optimal pedicle function. Secondary healing maximizes the amount of final scar tissue present; scar tissue's immune system is inferior to its normal immune system proficiency. Scarred tissue is more apt to become infected, develop skin cancers in and the skin cancers that develop within scarred tissue tend to be of a more aggressive nature. Scalp wounds, much like leg wounds have a tendency to heal extremely slowly, often times taking one to two years or more to heal or sometimes they can even remain in a permanent state of "not completely healed" which is another place where allografts make the difference. Due to the rational above repair via allograft was concluded to be the most appropriate choice to restore function and appearance as set forth in the Mohs LCA 57477 documentation requirements for all post Mohs repairs in order to complete the MMS.

Due to the rationale as presented above an allograft was selected over an autograft or flap as the most appropriate choice for repair. One 11-unit, 4.0cm x 4.5 cm, allograft was applied as a wound covering.

On May 23, 2022, the beneficiary presented for a Mohs surgical procedure to the right occipital. After the Mohs surgery, the postoperative wound measured 3.8 cm x 3.2 cm x 0.8 cm. The wound required repair and various methos of closure were considered by the treating physician. An amniotic skin substitute allograft was identified as the most appropriate choice, required and medically indicated as the beneficiary's comorbidities making him more susceptible to significant wound healing complications were still present as identified above.  Thus, one 11-unit, 4.0 cm x 4.5 cm, allograft was applied as a natural barrier or wound covering.

### Beneficiary G.P.[70]
The auditor denied CPT codes 15275 and Q1469 for two dates of service, April 11, 2022,[71] and May 3, 2022.[72]

The beneficiary, a 81-year-old male, presented for a Mohs surgical procedure to right superior crus of antihelix on April 11, 2022.  The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications:  cartilage, free margin ear, immunocompromised, atrophic skin, blood thinners, and age-greater than 60 years old.

---

[70] For a complete set of the beneficiary's medical records please see File 13 at 1716-1772.
[71] File 13 at 1731-1738.
[72] File 13 at 1751-1758.

23

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

After the Mohs surgery, the beneficiary had a postsurgical wound on the right superior crus of antihelix (ear/cartilage) measuring 1.0 cm x 0.9 cm x 0.2 cm. Healing via secondary intention with exposed cartilage would not be advisable due to necrosis and ensuing infection, as the cartilage is avascular. The patient is immunocompromised; therefore, healing via secondary intention is not recommended as those who are immunocompromised have an increased risk for infection and exposed cartilage is already at high risk for necrosis and infection if secondary intention were pursued. A flap would not be feasible due to a lack of adequate surrounding local tissue. The patient is also on blood thinners which increases the risks for post op hematoma and potential necrosis of any incisional type of repair. Due to the relatively large size, nature and complex high-risk location of the defect on the right superior crux of antihelix, reconstructive surgery was appropriate. Due to the reasons above repair via allograft was the most appropriate choice. One 4.0-unit, 2.0 cm x 2.0 cm, allograft was applied to the wound as a natural barrier and wound covering.

On May 3, 2022, the beneficiary presented for the third[73] allograft application to the right superior crus of antihelix. The wound measured 0.7 cm x 0.3 cm x 0.1 cm, and was healing well with granulation tissue progressing to normal limits. One, 4.0-unit, 2.0 cm x 2.0 cm, allograft was applied to continue providing a wound covering and promote healing.

**Beneficiary T.T.[74]**
The auditor denied CPT codes 15275 and Q1486 for seven dates of service, February 22, 2022,[75] March 1, 2022,[76] March 8, 2022,[77] March 15, 2022,[78] March 22, 2022,[79] March 31, 2022,[80] and April 9, 2022.[81]

The beneficiary, a 66-year-old male, presented for a Mohs surgical procedure to the right superior crus of antihelix and right triangular fossa on January 21, 2022. The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications: smokes cigarettes, cartilage, free margin ear, scarred tissue, blood thinners, and age-greater than 60 years old.

This beneficiary has a long history of skin cancer. Dr. Adams first saw the beneficiary for an extensive recurrent skin cancer which comprised most of the superior half of the lateral aspect of the ear. It was well known that the beneficiary was a two pack a day smoker; therefore, standard flaps and grafts were relatively contradicted. Healing via secondary intention was not an

---

[73] A second allograft application occurred on April 19, 2022. This date of service was not denied by the auditors.
[74] For a complete set of the beneficiary's medical records please see File 13 at 2377-2523.
[75] File 13 at 2445-2453.
[76] File 13 at 2458-2466.
[77] File 13 at 2472-2480.
[78] File 13 at 2485-2490.
[79] File 13 at 2495-2499.
[80] File 13 at 2505-2509.
[81] File 13 at 2510-2514.

24

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

appropriate option as extensive exposed cartilage was present and to do so would lead to necrosis, infection, severe pain and potential loss of the entire ear. He also had a history of blood thinners which also increase the risk of post op hematoma from any incisional type of repair. This defect also involved the free margin of the ear; therefore, any secondary intention healing would lead to severe disfigurement. After much consideration and discussion with the patient, we decided to utilize an allograft; unfortunately, the beneficiary's insurance did not authorize the use of allografts for him at the time of the Mohs surgery and initial repair on January 21, 2022. Therefore, we did the only thing that we could do and that was to perform a relatively complex post auricularly based, direct interpolation flap (DIP), which was then successfully executed. The beneficiary was educated to quit smoking for a couple of weeks or more or at least cut back, to which he said, he would try.

A picture is worth a thousand words, and the series of photos for this beneficiary's treatment demonstrate the risks associated in utilizing flaps in patients with large post Mohs surgical wounds with significant comorbidities. This case series of photos will initially depict a post auricular derived DIP flap placed onto the defect. File 13 at 2402. Shortly thereafter, we see that the flap fully necrosed. File 13 at 2410, 2414, 2418, 2422, When the patient returned to clinic he told us he had changed his insurance, so we re-applied for pre-authorization of allografts and they were now approved. So, now we see what happens when allografts are applied, all pain is gone, the ear is saved and everyone is happy. File 13 at 2452, 2465, 2479, 2484, 2490, 2499, 2509, 2526. Due to the location, nature and large size of the wound reconstructive surgery was appropriate.

A recent, large, peer reviewed study showed that when patients have "large defects" [not relatively large] (>3 cm2 [1.8 cm x 1.7 cm = 3.06 cm2]) in high-risk complex locations, as defined by the Mohs LCD 57477, such as the: head, neck, hands & shins; the complication rate of allograft when compared to (flaps & autografts) was 2.1% vs 28.7% respectively (as was the case here with TT). This patient's wound is large, > 3 cm2 (e.g. 1.8 cm x 1.7 cm = 3.06 cm2). Moreover, considering that secondary intention has a significantly higher rate of infection when compared to repair via flap or grafts, in the general population, it would appear to be ill advised to pursue secondary intention, flap or graft repair in this situation in the ear. The risk of infection if allowed to heal via secondary intention after a large defect has been created subsequent to Mohs surgery, is significantly increased, especially in the ear and considering the patient's age, diabetes and potential disfigurement and extensive scarring. The immune system in scar tissue is sub-optimal at best, this may perhaps be why cancers that develop in scar tissue tend to be of a more aggressive nature and why scar tissue tends to develop more skin cancers than normal skin, again most likely due to its poor immune system; therefore, the avoidance of developing excess scar tissue is to restore/maintain the skins function in terms of its immune function as per the Mohs LCA 57477. These are some of the justifications for allografts, as the most appropriate choice over flaps, grafts and secondary intentions for the beneficiary.

25

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

Once insurance approved the application of an allograft, an EpiFix allograft was applied to the right antihelix and left external auditory canal on February 22, 2022. On this date of service, the wound to the right antihelix measured 3.2 cm x 2.4 cm x 0.2 cm. The left external auditory canal wound measured 1.5 cm x 1.3 cm x 0.2 cm. One 11-unit, 4.0cm x 4.5 cm, allograft was divided and 7 units were applied to the right antihelix, 4 units to the left external auditory canal.

On March 1, 2022, the beneficiary presented for a second allograft application to the right antihelix and left external auditory canal. The right antihelix (ear) wound measured 2.0 cm x 1.8 cm x 0.2 cm, a significant improvement from the initial allograft application. The left external auditory canal wound measured 1.5 cm x 0.7 cm x 0.2 cm, also showing signs of improvement. One 11-unit, 4.0 cm x 4.5 cm allograft was divided, and 7 units were applied to the Right antihelix wound and 4 units were applied to the left external auditory canal wound.

On March 8, 2022, the beneficiary presented for a third allograft application to the right antihelix and left external auditory canal consistent with the manufacturer's FDA approved package insert recommending that allografts are applied weekly until wound epithelialization is achieved. The right antihelix (ear) wound measured 1.8 cm x 1.6 cm x 0.1 cm, a continued improvement from the initial allograft application. The left external auditory canal wound measured 1.2 cm x 0.7 cm x 0.2 cm, also showing signs of improvement. One 11-unit, 4.0 cm x 4.5 cm allograft was divided, and 7 units were applied to the Right antihelix wound and 4 units were applied to the left external auditory canal wound.

On March 15, 2022, the beneficiary presented for a fourth allograft application to the right antihelix consistent with the manufacturer's guidelines. The right antihelix (ear) wound measured 1.6 cm x 1.3 cm x 0.1 cm, a continued improvement. The left external auditory canal wound had achieved wound epithelialization. Thus, one 11-unit, 4.0 cm x 4.5 cm, allograft was applied to the right antihelix wound.

On March 22, 2022, the beneficiary presented for a fifth allograft application to the right antihelix. The right antihelix (ear) wound measured 1.5 cm x 1.3 cm x 0.1 cm, and continued to show signs of healing. One 11-unit, 4.0 cm x 4.5 cm allograft was applied to the right antihelix wound.

On March 31, 2022, the beneficiary presented for the sixth allograft application as indicated by the manufacturer's package insert. The right antihelix (ear) wound measured 1.5 cm x 0.7 cm x 0.1 cm, a continued improvement. One 11-unit, 4.0 cm x 4.5 cm, allograft was applied to the right antihelix wound.

On April 9, 2022, the beneficiary presented for the seventh allograft application as indicated. The right antihelix (ear) wound measured 1.0 cm x 0.9 cm x 0.1 cm, a continued improvement. One 11-unit, 4.0 cm x 4.5 cm, allograft was applied to the right antihelix wound.

26

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

**Beneficiary L.T.[82]**

The auditor denied CPT codes 15275 and Q1486 for two dates of service, March 21, 2022,[83] and
May 17, 2022.[84]

The beneficiary, a 89-year-old male, presented for a Mohs surgical procedure to the right medial
frontal scalp on March 21, 2022. The medical records indicated the following comorbidities and
medical conditions that made the beneficiary's postoperative wound more susceptible to
significant wound healing complications: atrophic skin, scarred tissue, blood thinners, diabetes,
and age-greater than 60 years old.

After the Mohs procedure, the beneficiary had a postoperative wound to the right medial frontal
scalp of 3.0 cm x 2.4 cm x 0.7 cm. Due to the large size, nature and complex/high risk location
of the wound on the scalp it was in need of reconstructive repair. A wound had recently been
repaired adjacent to this wound. If we were to perform any type of incisional type of repair, I
would have concern regarding maintaining the normal physiology and wellbeing of the
intervening tissue between the recent repair and the current large wound and possible repair. The
patient has a history of diabetes and healing via secondary intention is impeded by this.
Secondary intention has a significant increase in the rate of infection when compared with
Standard repairs in post Mohs and wide local excision patients; this is especially true on the scalp
and legs which significantly adds to the risk for complications associated with any form of
secondary intention healing. Defects which are greater than 3.0 cm are sub-optimal candidates
for repair via autografts. Defects of this size on the scalp are relatively sub-optimal for repair via
flaps due to lack of readily available local tissue and sub-optimal pedicle function. Scalp
wounds, much like leg wounds have a tendency to heal extremely slowly, often times taking one
to two years or more to heal. Due to the rational above repair via allograft was decided to be the
most appropriate choice to restore function and appearance as set forth in the Mohs LCA 57477
documentation requirements for all post Mohs repairs in order to complete the MMS procedure.

On March 21, 2022, an EpiFix allograft was applied to the postoperative scalp wound as a
wound covering. One 11-unit, 4.0 cm x 4.5 cm EpiFix allograft was used. This size of allograft
was the most appropriate size for the total wound surface area of 15.84 cm$^2$ that Advanced
Dermatology had in stock. One 11-unit 4.0 cm x 4.5 cm generally covers 10.2 cm$^2$.

On the next denied date of service, May 17, 2022, the beneficiary presented to follow up on
several wounds. First, the beneficiary had continued to receive wound care related to the post
Mohs surgical wound located on the right medial frontal scalp. The beneficiary had continued to
receive EpiFix applications on a weekly basis as indicated by manufacturer guidelines. On May

---

[82] For a complete set of the beneficiary's medical records please see File 13 at 1775-1907.
[83] File 13 at 1800-1807.
[84] File 13 at 1877-1883.

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

17, 2022 it was determined that the wound have achieved wound epithelialization. Thus, Aquaphor and telfa dressing was applied.

The beneficiary was also seen for a fifth application of an allograft to a post Mohs surgical wound to the left superior helix. The Mohs surgical procedure occurred on April 18, 2022, and the patient was responding well to the use of the EpiFix allograft as a wound covering. The wound size post Mohs was 6.1 cm x 5.4 cm x 0.3 cm. On the date of service denied, the wound was 5.0 cm x 3.7 cm x 0.1 cm, a significant improvement. Thus, one 11-unit, 4.0cm x 4.5 cm, EpiFix allograft was applied as a wound covering consistent with the manufacturer's FDA package insert.

**Beneficiary W.W.[85]**
The auditor denied CPT codes 15271, 15272 and Q1486 for date of service, January 24, 2022,[86] and CPT codes 15275 and Q1486 for date of service March 23, 2022.[87]

The beneficiary, a 89-year-old male, presented for a Mohs surgical procedure to the left distal dorsal forearm on January 24, 2022. The medical records indicated the following comorbidities and medical conditions that made the beneficiary's postoperative wound more susceptible to significant wound healing complications: hand/digit, atrophic skin, scarred tissue, blood thinners, and age-greater than 60 years old.

After the Mohs surgery, the beneficiary had a post operative wound to the left distal dorsal forearm that measured, 5.6 cm x 5.0 cm x 0.4 cm. Due to the large size, high risk location, nature of the defect and the photograph of the left distal dorsal forearm (wrist), reconstructive surgery was medically indicated. Defects which are greater than 3.0 cm are sub-optimal candidates for repair via autografts due to a relative lack of imbibition and flaps due to lack of readily available local tissue and relatively sub-optimal pedicle function. Secondary intention carries with it a substantial rate of infection, especially in such a large defect as this which exceeds 5.0 cm. Two 11-unit, 4.0 cm x 4.5 cm, EpiFix allograft was applied to the wound.

On March 23, 2022, the beneficiary presented for treatment related to several post Mohs surgical wounds. The wound to the left distal dorsal forearm responded well to the EpiFix applications over the previous weeks and was determined to have achieved wound epithelialization.

The beneficiary also presented for a fourth application of an allograft to his left superior helix wound. On February 28, 2022, the beneficiary underwent a Mohs procedure to his left superior helix. The resulting postoperative wound measured 4.1 cm x 3.0 cm x 0.7 cm. Healing via secondary intention is not an appropriate option when cartilage is exposed was present and to do so would most likely lead to necrosis, infection, severe pain and potential loss of the entire ear, if left without immediate medical intervention. He also had a history of blood thinners which also

---

[85] For a complete set of the beneficiary's medical records please see File 13 at 1910-2040.
[86] File 13 at 1944-1951.
[87] File 13 at 2000-2008.

28

APPENDIX A
Beneficiary Case Summaries
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

increase the risk of post op hematoma from any incisional type of repair. The risk of infection after a large defect has been created subsequent to Mohs surgery, is significantly increased; especially considering that the defect is intermixed with scar tissue from previous surgeries. The immune system in scar tissue is sub-optimal at best, this may perhaps be why cancers that develop in scar tissue tend to be of a more aggressive nature and why scar tissue tends to develop more skin cancers than normal skin, again most likely due to its poor immune system; therefore, the avoidance of developing excess scar tissue is to restore/maintain the skins function in terms of its immune function as per the Mohs LCA 57477. Due to the bed of scar tissue and the size of 2.9 cm combined and the wounds overlapping onto the ear make this a sub-optimal situation for repairs via grafts, flaps or secondary intention. Due to the relatively large size, nature and complex high-risk location of the defect on the right superior crux of antihelix, reconstructive surgery was appropriate. Due to the reasons above repair via allograft was the most appropriate choice and the beneficiary had been receiving weekly EpiFix applications since the date of the Mohs procedure, consistent with manufacturer's guidelines. On March 23, 2022, the his left superior helix wound measured 2.9 cm x 1.7 cm x 0.3 cm, indicating improvement since the initial date of the Mohs procedure. One 11-unit, 4.0 cm x 4.5 cm, EpiFix allograft was applied to the wound.

APPENDIX B
Journal Articles and Case Studies
Appeal of Advanced Dermatology and Skin Cancer Center, PA
OMHA Appeal No.: 3-12683356911

| Title | Authors | Publish Date |
|---|---|---|
| Case Series: The use of a dehydrated human amnion/chorion membrane allograft to enhance healing in the repair of lower eyelid defects after Mohs micrographic surgery | Oliver J. Wisco, DO, FAAD, FACMS | July 2016 |
| • https://pubmed.ncbi.nlm.nih.gov/27504483/ | | |
| Dehydrated human amnion/chorion membrane allograft as an aid for wound healing in patients with full-thickness scalp defects after Mohs micrographic surgery | Alexis B. Lyons, MD, Lisa K. Chipps MD, FAAD, Ronald L. May MD, Jennifer L. Herrmann MD, FAAD | August 2018 |
| • https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6098201/#:~:text=Dehydrated%20human%2 0amnion%2Fchorion%20membrane%20(dHACM)%20allografts%20are%20skin,need%20for %20meticulous%20wound%20care. | | |
| Incidence of Surgical Site Infections in Second Intention Healing After Dermatologic Surgery | Joshua Schimmel, BS; Matthew Belcher, MD; Carlos Vieira, BS; Naomi Lawrence, MD; and Ashley Decker, MD. | 2020 |
| • File 13 at 151-156 | | |
| Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane | Julia Toman, MD; Georgina M. Michael, MSN, FNP-BC, Oliver J. Wisco, DO, FAAD, FACMS; John R. Adams, MD; and Brandon S. Hubbs, MS, MA. | 2021 |
| • File 13 at 157-162 | | |
| Use of Amniotic Tissue-Derived Allografts Post-Mohs Micrographic Surgery: A Preliminary Study Assessing Wound Closure Rate | Kayleen Seaton, Dustin Mullens, Jason Barr, Elizabeth Hull, Richard Averitte | July 2021 |
| • https://www.hmpgloballearningnetwork.com/site/wounds/original-research/use-amniotic-tissue-derived-allografts-post-mohs-micrographic-surgery#:~:text=Amniotic%20tissue%E2%80%93derived%20allograft%20(ATDA,have%20u ndergone%20Mohs%20micrographic%20surgery. | | |
| Wound Grafts | Anna Elseth; Omar Nunez Lopez. | October 2022 |
| • File 13 at 163-168 | | |
| Dehydrated Human Amnion/Chorion Membrane Allograft for Postoperative Wounds Following Mohs Micrographic Surgery: A Retrospective Comparative Evaluation | Sadaf Moradi, BS; Ana Ormaza, MD; and Navid Ezra, MD. | July 2023 |
| • https://www.hmpgloballearningnetwork.com/site/wounds/original-research/dehydrated-human-amnionchorion-membrane-allograft-postoperative | | |

Department of Health and Human Services
Centers for Medicare & Medicaid Services

Form Approved OMB No.0938-0950

# Appointment of Representative

| Name of Party | Medicare Number (beneficiary as party) or National Provider Identifier (provider or supplier as party) |
|---|---|
| Advanced Dermatology and Skin Cancer Center, P.A. | 1124094867 |

## Section 1: Appointment of Representative

**To be completed by the party seeking representation (i.e., the Medicare beneficiary, the provider or the supplier):**

I appoint this individual, Amanda M. Wilwert , to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the Act) and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my claim, appeal, grievance or request wholly in my stead. I understand that personal medical information related to my request may be disclosed to the representative indicated below.

| Signature of Party Seeking Representation | Date 04/27/2022 |
|---|---|
| Street Address 2735 Pembrook Pl | Phone Number (with Area Code) (785)537-4990 |

| City Manhattan | State KS | Zip Code 66502 |
|---|---|---|

| Email Address (optional) |
|---|

## Section 2: Acceptance of Appointment

**To be completed by the representative:**

I, Amanda M. Wilwert , hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services (HHS); that I am not, as a current or former employee of the United States, disqualified from acting as the party's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.

I am a / an attorney with Foulston Siefkin LLP and the firm has been engaged to represent Advanced Dermatology and Skin Cancer Center P.A. in the appeals process

(Professional status or relationship to the party, e.g. attorney, relative, etc.)

| Signature of Representative | Date 5/3/22 |
|---|---|
| Street Address 7500 College Blvd Ste. 1400 | Phone Number (with Area Code) 913-253-2181 |

| City Overland Park | State KS | Zip Code 66210 |
|---|---|---|

| Email Address (optional) awilwert@foulston.com |
|---|

## Section 3: Waiver of Fee for Representation

**Instructions: This section must be completed if the representative is required to, or chooses to, waive their fee for representation.** (Note that providers or suppliers that are representing a beneficiary and furnished the items or services may not charge a fee for representation and **must** complete this section.)

I waive my right to charge and collect a fee for representing _____ before the Secretary of HHS.

| Signature | Date |
|---|---|

## Section 4: Waiver of Payment for Items or Services at Issue

**Instructions: Providers or suppliers serving as a representative for a beneficiary to whom they provided items or services must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act.** (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, or could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.) I waive my right to collect payment from the beneficiary for the items or services at issue in this appeal if a determination of liability under §1879(a)(2) of the Act is at issue.

| Signature | Date |
|---|---|



Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Denver Satellite Office
1 Denver Federal Ctr Bld 25,
Room 1840, P.O. Box 25167
Denver, CO 80225-0167
720-462-7900
(216) 462-4171 (Direct)
303-231-5154 (Fax)
833-921-0393 (Toll Free)

October 30, 2023

FOULSTON SIEFKIN LLP
ATTN: AMANDA WILWERT
7500 COLLEGE BLVD STE 1400
OVERLAND PARK, KS 66210

<div align="center">

**NOTICE OF DECISION**

</div>

Appellant: ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA
OMHA Appeal Number: 3-12683356911

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

<u>**What if I disagree with the decision?**</u>

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

## How much time do I have to file an appeal?

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

## How do I file an appeal?

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:
- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C.  20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:
1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.


You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:
1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.


At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

      QIC - C2C B North
      301 W Bay Street
      Ste. 1110
      Jacksonville, FL 32202

[IF MULTIPLE BENEFICIARY APPEAL ONLY INPUT: To protect beneficiary privacy, names and addresses of other individuals have been removed from your copy of this notice.]

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List
Attachment A



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Denver, CO

| | | | |
|---|---|---|---|
| Appeal of: | ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA | OMHA Appeal No.: | 3-12683356911 |
| Beneficiary: | Multiple (See Attachment A) | Medicare Part: B | |
| Medicare No.: | Multiple (See Attachment A) | Before: | Jamie Mendelson Administrative Law Judge |

## DECISION

After considering the evidence and arguments presented in the record, I enter a **PARTIALLY FAVORABLE** decision. The one unit of Negative Pressure Wound Therapy (NPWT) (CPT® code 97608) billed in claim number 3322320900392 for beneficiary M.F. with a date of service of April 1, 2022, is covered by Medicare. However, the remainder of all other line items and claims at issue, which include the application of skin substitute grafts (Current Procedural Terminology® (CPT®) codes 15271, 15272, 15275, and 15276), outpatient office visits (CPT® code 99212), ceftriaxone sodium injection (HCPCS[1] code J0696), and amniotic allografts (HCPCS codes Q4186 and Q4169), provided to multiple beneficiaries with dates of service from January 21, 2022 through May 23, 2022, are not covered by Medicare. The appellant is responsible for the non-covered costs.

## PROCEDURAL HISTORY

The appellant submitted 55 claims to Medicare for physician's services it furnished to 22 beneficiaries on the dates of service at issue. (File 13, pp. 95-102). The claims were initially reimbursed by the Medicare Administrative Contractor (MAC) as billed by the appellant. (*Id*.) However, CoventBridge Group, a Unified Program Integrity Contractor (UPIC), later performed a post-payment review of the claims and determined the claims had been improperly reimbursed by Medicare because the record did not support the services at issue were medically reasonable and necessary for the beneficiaries' treatment. (File 13, pp. 95-102; File 24). The MAC then sought to recoup the overpayment from the appellant. (*Id*. at 49-93).

The appellant, through an appointed representative, requested redetermination from the MAC. (File 14, pp. 8-10). The MAC issued an unfavorable redetermination. (File 13, pp. 16-23). In its redetermination, the MAC denied reimbursement for the amniotic allografts (HCPCS codes Q4186 and Q4169) at issue because it found the amniotic allografts were provided in a manner not explicitly approved by the FDA, and because the medical record did not support the services

---

[1] The Healthcare Common Procedure Coding System (HCPCS) has been developed by the Centers for Medicare and Medicaid Servicees (CMS) for processing, screening, identifying, and paying Medicare claims. See 42 C.F.R. § 414.2 and 414.40.

were medically reasonable and necessary for the beneficiaries' treatment. (*Id*. at 20). The MAC denied reimbursement for the outpatient office visits (CPT® code 99212) because it found the medical record did not support additional medical services, separately billable from the allograft procedures at issue, were performed by the treating practitioner. (*Id*. at 20-21). The MAC denied reimbursement for one claim for NPWT (CPT® code 97608) because it found Medicare's coverage requirements for NPWT had not been satisfied. (*Id*. at 21). Finally, the MAC found that the application of skin substitute grafts and ceftriaxone sodium injections at issue (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696) were not covered because those services were related to the amniotic allografts at issue in this appeal, which the MAC had determined were not medically reasonable and necessary. (*Id*. at 21).

The appellant's appointed representative then requested reconsideration from the Qualified Independent Contractor (QIC). (File 13, pp. 1-15, 33-44). In its request for reconsideration, the appellant argued that the amniotic allografts and related services were provided in a manner consistent with FDA approval and Medicare coverage criteria, that the application of amniotic allografts to repair surgical wounds is supported by medical studies, and the applications of the amniotic allografts at issue in this appeal were medically reasonable and necessary for the individual beneficiaries' treatment. (*Id*.) The QIC performed an independent review of the claims and issued an unfavorable reconsideration on June 9, 2023. (File 3). In its reconsideration, the QIC found the claims at issue were not covered by Medicare on the same bases articulated by the MAC at redetermination. (*Id*.) The QIC further found the appellant was liable for the non-covered costs. (*Id*.)

On August 8, 2023, the appellant's representative filed a request for a hearing before an Administrative Law Judge (ALJ). (File 4). With its request for hearing, the appellant submitted a prehearing brief outlining its arguments on appeal, which was added to the record. (*Id*. at 28-33). The appellant also appended other records, including procedural documents from the lower levels of review and ALJ decisions from other Medicare claims appeals involving the appellant. (*Id*. at 34-163). Because these documents are not considered new evidence, as they have no evidentiary value in this appeal, the documents were admitted to the record without a finding of good cause. *See* 42 C.F.R. § 405.1028 (requiring, as a general matter, a finding of good cause before new evidence may be submitted at the ALJ level of review). Prior to hearing, the UPIC notified my office of its intent to participate by submitting a position paper, which was also added to the record. (File 9; File 21; File 24).

I conducted a telephone hearing on October 11, 2023. (Hearing Recording (Oct. 11, 2023)). The following individuals appeared on behalf of the appellant: Amanda Willwert, attorney and the appellant's appointed representative; Dr. John Adams, owner of the appellant professional corporation and the treating practitioner; and Nancy Neusick, who appeared in an observational capacity only.

## ISSUES

Whether there is Medicare coverage and reimbursement for the physician's services, CPT® codes 15271, 15272, 15275, 15276, 97608, 99212, and HCPCs codes J0696, Q4186, Q4169, the appellant provided to the beneficiaries on the dates of service at issue. If the services are not covered, and an overpayment remains, who is responsible for the non-covered costs.

## APPLICABLE LAW AND POLICY

Section 1832(a)(2)(B) of Title XVIII of the Social Security Act (the Act) allows Medicare to pay for "medical and other services" under Part B. Section 1861(s)(1) of the Act defines "medical and other services" to include "physician's services," which is further defined under section 1861(q) of the Act as professional services performed by a physician.

An ALJ conducts a *de novo* review and issues a decision based on the administrative record, including any hearing record. 42 C.F.R. § 405.1000(d). The issues before an ALJ on appeal "include all the issues for the claims or appealed matter specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's favor." 42 C.F.R. § 405.1032(a).

The provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment. 42. C.F.R. § 424.5(a)(6).

Guidance for determining whether a service or item is reasonable and medically necessary in the absence of official guidance, such as a National Coverage Determination (NCD) or Local Coverage Determination (LCD), are outlined in chapter three, section 3.6.2.2 of the *Medicare Program Integrity Manual (MPIM)*.

Medicare does not cover "services 'related to' non-covered services. . .including services related to follow-up care and complications of non-covered services which require treatment." *MBPM*, ch. 16, § 180.

The MAC with jurisdiction has issued Local Coverage Determinations (LCDs), which are determinations on whether a particular item or service is medically reasonable and necessary and covered by Medicare. Act § 1869(f)(2)(B). Relevant here, the MAC with jurisdiction issued LCD L37228: Wound Care (LCD L37228) (effective Feb. 2022) with respect to Medicare coverage of NPWT. LCD L35494: Mohs Micrographic Surgery (LCD L35494) (effective Dec. 2020), and Local Coverage Article A57477: Billing and Coding: Mohs Micrographic Surgery (Article A57477) (effective Dec. 2020) provide Medicare coverage criteria and billing guidelines for Mohs surgery. An ALJ must give substantial deference to the guidance in an LCD. 42 C.F.R § 405.1062.

Notwithstanding any other provision of the Act, no payment may be made by Medicare for any expenses incurred for items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Act § 1862(a)(1)(A). If a medical service or item is denied coverage based on section 1862(a)(1) (A) of the Act, the limitations on liability provisions, set forth in section 1879 of the Act, may be applied to potentially limit a party's liability for the costs of the non-covered claim. Where there is an overpayment, section 1870 of the Act also provides for waiver of the overpayment only where an individual is "without fault" and where such recoupment "would be against equity."

## FINDINGS OF FACT AND ANALYSIS

The appellant seeks Medicare coverage and reimbursement for the physician's services it furnished to 22 beneficiaries on the dates of service at issue. (File 4, pp. 18-22, 28-33; Hearing

Recording). At the lower levels of review, the Medicare contractors found the amniotic allografts (HCPCS codes Q4186 and Q4169) at issue were not covered by Medicare because the allografts were provided in a manner not explicitly approved by the FDA and the medical record did not support the allografts, as administered by the appellant, were medically reasonable and necessary for the beneficiaries' treatment. (File 3; File 13, pp. 16-23; File 21; File 24). The Medicare contractors denied coverage and reimbursement for the outpatient office visits (CPT® code 99212) because they found the medical record did not support additional medical services, separately billable from the allograft procedures at issue, were performed by the treating practitioner. (*Id.*) The Medicare contactors denied coverage and reimbursement for one claim for NPWT (CPT® code 97608) because they found Medicare's coverage requirements for NPWT had not been satisfied. (*Id.*) Finally, the Medicare contractors found that the application of skin substitute grafts and ceftriaxone sodium injections at issue (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696) were not covered because those services were billed in conjunction with the amniotic allografts at issue in this appeal, which the Medicare contractors had determined were not medically reasonable and necessary. (*Id.*)

The Medicare contractors' bases for denying coverage and reimbursement for the amniotic allografts at issue, and the services related to the application of those allografts, were not beneficiary specific. In other words, the contractors did not deny coverage of those services for reasons that were specific to each beneficiary. The remaining services at issue, outpatient offices visits, and one claim for NPWT require an individual consideration of the relevant beneficiaries' medical records, as the Medicare contractors' bases of denial for those claims were specific to the individual claims filed by the appellant.

Because the Medicare contractors' bases of denial for the amniotic allografts and related services were of general applicability, this decision will first address whether those services are covered by Medicare. The remaining services at issue will then be addressed separately.

I.    **Global Discussion Pertaining to Medicare Coverage of the Amniotic Allografts and Related Services (HCPCS codes Q4186, Q4169, J0696, and CPT® codes 15271, 15272, 15275, and 15276)**

The appellant performs Mohs surgery, "a complex excision technique for the removal of high risk for recurrence skin cancers." (File 4, p. 29). The appellant states Mohs surgery provides a very high cure rate while also preserving the maximum amount of non-cancerous tissue possible. (File 4, p. 29; Hearing Recording). The appellant further states that, for each beneficiary in this appeal, the beneficiary required repair with amniotic allograft of a wound created during the performance of Mohs surgery. (*Id.*)

The Medicare contractors found the appellant's use of amniotic allografts to repair surgical incisions secondary to the treatment of skin lesions was not medically necessary under Medicare coverage criteria as outlined in section 3.6.2.2 of the *MPIM*. (*Id.*) The contractors also found that the appellant's medical records, as a general matter, demonstrated the appellant billed for excessive amounts of amniotic allograft, and that the appellant used cloned records, *i.e.* the same language, to justify the use of the amniotic allografts for each beneficiary. (*Id.*) Finally, the Medicare contractors found the physician's applications of the amniotic allografts were not reimbursable by Medicare because the amniotic allografts themselves were not reimbursable by Medicare. (*Id.*)

For Medicare to cover any item or service, it must be medically reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body

member. Act § 1862(a)(1)(A). When there is no controlling national coverage determination (NCD) or LCD, a medical service or procedure is considered medically reasonable and necessary only if the coverage criteria outlined in chapter 3, section 3.6.2.2 of the *MPIM* has been satisfied.

First, the appellant argues that the generalized coverage criteria contained in chapter 3, section 3.6.2.2 of the *MPIM* is not applicable in this appeal, as it contends the Medicare coverage criteria outlined in LCD L35494 and Article A57477, which provide coverage criteria for Mohs surgery, also encompass the amniotic allografts administered by the appellant. (File 4, pp. 29-31). Specifically, the appellant points to certain language in Article A57477 pertaining to documentation requirements, which state a provider's documentation in support of coverage for Mohs surgery should include:

> 11. Measurement of the primary lesion necessitating [Mohs surgery (MMS)] and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:
>
> > • Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).
> >
> > • Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
> >
> > • It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.
>
> 12. When the surgical defect created by MMS requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.

Article A57477; (File 4, pp. 29-30).

However, LCD L35494 and Article A57477 deal with Medicare's coverage criteria for Mohs surgery, which, although the procedure that created the beneficiaries' wounds that were repaired by the appellant with amniotic allograft, is not among the services denied reimbursement by the Medicare contractors at the lower levels of review. LCD L35494 and Article A57477 do not explicitly address coverage criteria for any specific type of reconstructive technique. Although the guidance in Article A57477 states that providers should include sufficient documentation to support that the reconstructive technique performed by the provider was an appropriate choice, it does not provide any guidance on the use of the amniotic allografts utilized by the appellant, or any other type of reconstructive technique performed after Mohs surgery.

LCD L35494 and Article A57477, therefore, are not controlling in this appeal. Even if they were, however, it would remain necessary to determine whether the amniotic allografts used by the appellant would be considered an "appropriate choice to preserve [the beneficiaries'] functional capabilities and to restore [the beneficiaries'] physical appearance." Article A57477. Thus, it would still be necessary to determine whether the amniotic allografts were medically reasonable

and necessary for the beneficiaries' treatment. Because there is no published NCD or LCD providing coverage criteria for amniotic allografts, I find that the general Medicare coverage criteria outlined in chapter 3, section 3.6.2.2 of the *MPIM* is applicable in this appeal.

At the lower levels of review, the Medicare contractors found that the amniotic allografts did not satisfy the generalized coverage criteria contained in chapter 3, section 3.6.2.2 of the *MPIM* primarily on the basis that the FDA has approved amniotic membrane products, such as the amniotic allografts at issue, only for homologous use; and using an amniotic allograft to promote wound healing, as opposed to solely creating a permeable wound barrier, is not homologous use as defined by the FDA.[2] (File 3; File 13, pp. 16-23; File 21; File 24).

However, as pointed out by the appellant in its position paper and at oral argument, the FDA does not have authority to regulate how a physician practices medicine. (File 4, pp. 28-33; Hearing Recording). Furthermore, there is no statute, regulation, or sub-regulatory guidance that prohibits Medicare from covering a drug, biological, or other FDA regulated product administered by a physician for a purpose that has not been explicitly approved by the FDA.

Indeed, the UPIC acknowledges in its position paper that non-homologous use of amniotic allograft may be covered and reimbursed by Medicare when the coverage criteria outlined in chapter 3, section 3.6.2.2 of the *MPIM* has been satisfied. (File 21, p. 3). Thus, the Medicare contractors' reliance on the FDA's regulatory classification and approved uses of amniotic allograft is not dispositive in this appeal. Nor is it persuasive, as it is an almost meaningless distinction from a clinical perspective to differentiate between when an amniotic allograft is administered solely to provide a wound barrier (which necessarily promotes wound healing), and when it has been administered solely to promote wound healing irrespective of its capacity to provide a protective barrier between the wound and the outside environment.

Notwithstanding the above discussion, the Medicare contractors ultimately determined that the amniotic allografts at issue in this appeal where not reimbursable by Medicare because the coverage criteria contained in chapter 3, section 3.6.2.2 were not satisfied. (File 3; File 13, pp. 16-23; File 21; File 24). Thus, it remains necessary to determine whether the record supports that the amniotic allografts, in the manner they were administered by the appellant, were:

1. safe and effective;

2. not experimental or investigational; and

3. appropriate, including the duration and frequency in terms of whether the service or item is:

   - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
   - Furnished in a setting appropriate to the beneficiary's medical needs and condition;
   - Ordered and furnished by qualified personnel; and,
   - One that meets, but does not exceed, the beneficiary's medical need.

*MPIM*, ch. 3, § 3.6.2.2.

---

[2] *See* <u>Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use</u>, U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download (outlining FDAs nonbinding recommendations on homologous use of amniotic allografts).

In support of coverage, the appellant argues that the applications of the amniotic allografts at issue in this appeal were "based on established clinical criteria, community standards of care, guidelines from peer-reviewed medical journals, and internal review processes," and the use of amniotic allografts to treat the beneficiaries' wounds was, therefore, medically "reasonable and necessary and appropriately documented." (File 4, p. 28).

The appellant states there are generally three different options for wound repair after Mohs surgery: (1) leaving the wound open to heal without sutures or dressings (secondary intention); (2) primary side-to-side repair with sutures; or (3) reconstructive surgery, which includes grafts and flaps, and which may or may not involve sutures depending on the type of graft or flap used. (File 4, p. 29; Hearing Recording). When performing reconstructive repair of a patient that requires a graft, Dr. Adams testified that he only uses amniotic allografts to perform the repair due to the fact that amniotic allografts are superior to autografts (using a patients own skin), or other types of allografts. (Hearing Recording). Dr. Adams further testified that application of amniotic allographs is considered the standard of care in Kansas, where Dr. Adams practices medicine. (*Id*.)

The appellant cites to a peer reviewed study, as well as the coverage policy of a private insurance company, it argues establish the amniotic allografts at issue were not experimental or investigational as applied, and demonstrate the allografts were furnished in accordance with accepted standards of medical practice. (Hearing Recording; File 4, pp. 28-33; File 13, pp. 157-162, 169-253).

The peer reviewed study: Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane, published in the journal of Facial Plastic Surgery and Aesthetic Medicine in 2021, was coauthored by Dr. Adams himself. (File 13, pp. 157-162; Hearing Recording). Dr. Adams testified at hearing that all the participants included in the study were treated by him in his practice. (Hearing Recording). Notably, the study acknowledges that incisional repair utilizing autologous tissue such as local flaps and full-thickness skin grafts is the "mainstay of reconstructive techniques" after Mohs surgery. (File 13, p. 157). The purpose of the study was to demonstrate that placental allografts are a feasible alternative to incisional repair post-Mohs surgery. (*Id*. at 158).

The study population consisted of 286 individuals who were sorted into 143 matched pairs based upon propensity score. (File 13, pp.158-162). One half of the matched pairs received a full thickness autograft or flap repair after undergoing Mohs surgery, the other received a placental allograft. (*Id*.) Only three of the patients who received a placental allograft suffered from a post-operative complication, which under the study's design included infection, bleeding or hematoma, wound dehiscence, surgical reintervention, nonhealing wound, poor scar cosmesis, and scar revision. (*Id*. 158-159). Forty-one of the patients who received a full thickness autograft or flap repair experienced some type of complication as defined by the study, though the severity of the individual complications is not noted. (*Id*.)

Ultimately, the study found that placental allografts are a "safe and effective tool for repairing [Mohs surgery] defects of candidates who are not good candidates for traditional methods of autologous tissue reconstruction." (*Id*. at 161). However, the reliability of the study is limited by the fact that it was a retrospective study, composed of a relatively small and demographically homologous sample, where the results relied entirely upon the accuracy and thoroughness of the participant patient's medical records, which consisted entirely of patients of Dr. Adams, the owner of the appellant corporation. (*Id*. at 161; Hearing Recording). Thus, the results of the

study were dependent largely upon the professional judgment of one treating practitioner, who is also the appellant in this case. The study also does not attempt to compare the clinical benefit of amniotic allografts to other standard treatments, such as secondary intention, primary side-to-side repair, or other types of skin substitutes.

When read in a light most favorable to the appellant, the study appears to demonstrate that amniotic allografts can provide a superior clinical outcome to incisional repair. However, the results of one study does not establish that the amniotic allografts at issue were not experimental or investigational as defined under chapter 3, section 3.6.2.2 of the *MPIM*. The study explicitly acknowledges that amniotic allografts are not a standard of medical practice for the treatment of Mohs surgery defects as a general matter. (*See id.* at 157 (local flaps and full-thickness skin grafts are the "mainstay of reconstructive techniques")). The study also fails to demonstrate that amniotic allografts meet, but do not exceed, a patient's medical need, as the study does not compare the effectiveness of amniotic allografts against other types of skin substitutes or other types of non-incisional repairs.

The insurance coverage policy cited by the appellant was published by a private medical insurance provider, BlueCross BlueShield of Kansas, which is the state where the appellant is located. (*Id.* at 169-253). The policy outlines the provider's coverage policy for amniotic membrane and amniotic fluid. (*Id.*) The policy states that BlueCross BlueShield will cover amniotic grafts only for certain ophthalmic indications and non-healing diabetic lower extremity ulcers, and states that the use amniotic allografts for any other purpose is considered experimental or investigational and not covered by the insurer. (*Id.* at 174-175). The policy discusses the use of amniotic membranes for repair following Mohs surgery and cites to the study authored by Dr. Adams. (*Id.* at 209-213). However, BlueCross BlueShield determined the study was flawed for many of the reasons discussed in the previous paragraphs and found that additional evidence from well-designed prospective studies were required before there would be sufficient evidence to support that amniotic allografts for wound repair following Mohs surgery were medically reasonable and necessary and would be covered by the insurer. (*Id.*) Thus, the insurance coverage policy cited by the appellant fails to substantiate that the use of amniotic allographs to repair Mohs surgery defects is not experimental or investigational, or that it is appropriate, as described in chapter 3, section 3.6.2.2 of the *MPIM*.

The Medicare contractors also found that the appellant's medical records, as a general matter, demonstrated the appellant billed for excessive amounts of amniotic allograft, and that the appellant used cloned records, *i.e.* the same language, to justify the use of the amniotic allografts for the beneficiaries. (File 3; File 13, pp. 16-23; File 21; File 24). For those reasons, the Medicare contractors found that the appellant's medical records did not support that the amniotic allografts at issue were administered in an appropriate manner as defined in chapter 3, section 3.6.2.2 of the *MPIM*. (*Id.*) I concur with the contractors' finding that the appellant's medical records are replete with boilerplate language that should not be afforded significant weight, as the language does not specifically address the unique circumstances of the individual beneficiaries. (*See* File 13, pp. 387-2526). Dr. Adams also testified at hearing that he frequently uses and bills for more amniotic allograft than necessary to treat a patient because he is only able to obtain the allografts in certain sizes, and so it is Dr. Adams' practice to use and bill for all allograft contained in a package in the size he has on hand, even if the amount of allograft in the package is more than required to treat a particular wound. (Hearing Recording).

Based on the foregoing discussion, I find that the record available for my review does not establish that Medicare's generalized coverage criteria, as outlined in chapter 3, section 3.6.2.2 of the *MPIM*, has been satisfied. The use of amniotic allografts to repair Mohs surgery defects

has not been adequately studied. Thus, the use of amniotic allografts as administered by the appellant is still experimental or investigational. The record also does not support that the use of amniotic allografts to repair Mohs surgery defects is appropriate, as the record does not establish the use is in accordance with accepted standards of medical practice or one that meets, but does not exceed, a patient's medical need. Thus, the record does not support the amniotic allografts at issue were administered in a manner that was reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member as required under section 1862(a)(1)(A) of the Act, and the allografts are not covered or reimbursable by Medicare. Because the allografts (HCPCS codes Q4186 and Q4169) are not covered by Medicare, the appellant's application of those allografts and the ceftriaxone sodium injections (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696), are also not covered or reimbursable be Medicare. *MBPM*, ch. 16, § 180.

## II.    Individual Claim Discussion Pertaining to Medicare Coverage for NPWT (CPT® code 97608) and Outpatient Office Visits (CPT® code 99212).

The Medicare contractors denied coverage and reimbursement for certain outpatient office visits billed by the appellant because the contractors found the medical record did not support that additional medical services, separately billable from the allograft procedures at issue, were performed by Dr. Adams. (File 3; File 13, pp. 16-23; File 21; File 24). The Medicare contractors denied coverage and reimbursement for one unit of NPWT because they found Medicare's coverage requirements for NPWT had not been satisfied. (*Id*)

### A. NPWT

The Medicare contractors denied one unit of NPWT, billed in claim number 3322320900392, which was provided to beneficiary M.F. with a date of service of April 1, 2022. (File 3, p. 14). The appellant did not provide any argument as to why the Medicare contractors' unfavorable determination was erroneous in its written brief or at the oral hearing. (File 4, pp. 28-33; Hearing Recording).

The MAC with jurisdiction offers limited coverage criteria for the application of NPWT by a physician during an office visit. LCD L37228 states, in relevant part, that:

> [NPWT] utilizing either durable or disposable medical equipment, involves the application of controlled or intermittent negative pressure to a properly dressed wound cavity. Suction (negative pressure) is applied under airtight wound dressings to promote the healing of open wounds **resistant to prior treatments**;

and

> There is moderate evidence in the peer-reviewed published literature to indicate that NPWT using a powered device approved by the U.S. Food and Drug Administration (FDA) is effective for a specific subgroup of patients who have failed a comprehensive, conventional wound therapy program that includes all reasonable, well-established alternative medical treatments. There is also moderate evidence to support the use of this therapy as an alternative to surgery. There is insufficient evidence to support the routine use of NPWT.

*Id*. (emphasis in original).

Beneficiary M.F. first began being treated by the appellant on October 1, 2021, for skin lesions on the beneficiary's scalp. (File 13, pp. 2089-2244). At that time, the beneficiary was diagnosed with squamous cell carcinoma on three separate locations on the

beneficiary's scalp. (*Id.* at 2089-2100). On January 7, 2022, Mohs surgery was performed by the appellant to remove two of the cancerous lesions. (*Id.* at 2104-2116). The appellant then provided wound care, consisting of the application of amniotic allografts through February 4, 2022. (*Id.* at 2117-2137). On that date, another Mohs procedure was performed to excise the third cancerous lesion, which was located on the beneficiary's right central frontal scalp. (*Id.* at 2141-2153).

The appellant then continued to treat the beneficiary's wounds with amniotic allograft on a weekly basis through the date of service at issue. (*Id.* at 2154-2224). On April 1, 2022, NPWT was used to help close the Mohs defect from the Mohs procedure previously performed on February 4, 2022. (*Id.* at 2225). At the time NPWT was initiated, the beneficiary's wound measured 6.5cm long, 5.7cm wide, and .3cm deep. (*Id.* at 2225). The wound measured 6.5cm deep, 5.5cm wide, and .8cm deep immediately after Mohs surgery was performed on February 4, 2022. (*Id.* at 2144).

Thus, contrary to the Medicare contractors' determinations at the lower levels of review, I find that the record supports that the NPWT was appropriate for the beneficiary. The medical record establishes the beneficiary's wounds had been resistant to previous treatment as required under LCD L37228. Although the record does not support that the beneficiary failed a "conventional wound therapy regime" when treating the wound, as the appellant exclusively used amniotic allografts to dress the wound prior to implementing NPWT, I find that that large size of the wound and the delayed wound healing as documented in the record warranted NPWT in this specific case. (*Id.*) Thus, the medical record supports that the NPWT provided to the beneficiary was medically reasonable and necessary pursuant to section 1862(a)(1)(A) of the Act, and the one unit of NPWT (CPT® code 97608), billed in claim number 3322320900392 with a date of service of April 1, 2022, is covered and reimbursable by Medicare.


### B. Outpatient Office Visits

The Medicare contractors found that four outpatient office visits (CPT® code 99212) rendered to three separate beneficiaries did not satisfy Medicare coverage criteria. (File 3; File 13, pp. 16-23; File 21; File 24). Specifically, the Medicare contractors found that two outpatient office visits provided to beneficiary W.C. on April 4, 2022, and May 2, 2022, one office visit provided to beneficiary L.T. on May 17, 2022, and one office visit provided to beneficiary W.H. on Mar 23, 2022, were not covered by Medicare. (*Id.*)

The Medicare contractors denied coverage and reimbursement for these office visits because the contractors found the medical record did not support additional medical services, separately billable from the allograft procedures at issue, were performed by the treating practitioner. (*Id.*) However, Dr. Adams testified at hearing that it is his practice to assess other lesions, as appropriate, when his patients are being seen during Mohs surgery follow-up appointments. (Hearing Recording). Dr. Adams stated that it is his practice to bill separately for the periodic assessment of skin lesions, that these assessments are distinct and separate medical services from the application of amniotic allografts, and the documentation contained in the beneficiaries' medical records establish that he performed assessments of the beneficiary that were separately billable to Medicare. (*Id.*)

However, the medical records from the dates of service at issue do not substantiate that Dr. Adams performed any assessment services that would warrant additional payment from Medicare. (*See* File 13, pp. 659-688, 736-755, 1877-1883, 2000-2008). For example, the exam notes for beneficiary W.C. on May 2, 2022, state that the beneficiary was being seen by Dr. Adams only for a follow-up encounter for postoperative wound closure. (*Id*. at 736-755). The notes indicate that a general examination of the beneficiary's "scalp (including hair inspection), head (including face), neck, right upper extremity, left upper extremity, right lower extremity, and left lower extremity" was performed by Dr. Adams. (*Id*.) However, this cursory examination, or one very similar, was performed each time Dr. Adams assessed and dressed the beneficiary's surgical wounds. (*Id*. at 605-773). The record does not include any notation Dr. Adams was assessing any new skin lesions or was performing any medical services outside of post-operative wound care. (*Id*. at 736-755). The medical records from the other beneficiaries on the relevant dates of service at issue also fail to substantiate that Dr. Adams rendered assessment or evaluation services that were not included in the wound care services also billed by Dr. Adams. (*Id*. at 659-688, 1877-1883, 2000-2008).

The provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment. 42. C.F.R. § 424.5(a)(6). In light of the foregoing discussion, I find that the appellant has failed to provide sufficient documentation establishing that medically reasonable and necessary, and separately billable, assessment services were provided by Dr. Adams on the dates of service at issue. Thus, the record does not support the office visits at issue are covered by Medicare pursuant to section 1862(a)(1)(A) of the Act.

## III.    Liability and Waiver of Overpayment

Since Medicare does not cover the denied services because the record does not establish that the services satisfied Medicare coverage criteria pursuant to section 1862(a)(1)(A) of the Act, I must now address who is liable for the non-covered costs. Where Medicare coverage requirements have not been met, waiver of liability pursuant to section 1879 of the Act may apply. The record contains no evidence that the beneficiary knew, or reasonably should have been expected to know, that Medicare would not cover the claim at issue. However, as a provider of Medicare services, the appellant is presumed to have had notice of the applicable statutes, regulations, and CMS coverage guidelines prior to billing for the services at issue. *See* 42 C.F.R. § 411.406(e). I find no evidence in the record to rebut that presumption. As a result, there is no limitation of liability for appellant under section 1879 of the Act, and the appellant is responsible for the non-covered costs.

The issue still remains whether waiver of the overpayment is appropriate. Where there is an overpayment, such as the case here, section 1870 of the Act prohibits recovery of Medicare overpayment from an individual who is without fault and when recovery would be against equity. Here, the appellant is a supplier of health care services, and as a participant in the Medicare program, had access to pertinent statutes, laws, rules, local coverage determinations, coding rules, and Medicare manuals, which contain the requirements for reimbursement under the Medicare program. I find the appellant is not without fault in causing or accepting the overpayment as the appellant should have known the services it provided were excluded from Medicare coverage. Medicare may, therefore, recoup the overpayment. Accordingly, pursuant to section 1870(b) of the Act, recovery of the overpayment from the appellant is not waived, and the appellant is financially liable for the overpayments at issue in this appeal.

OMHA Appeal No. 3-12683356911

## CONCLUSIONS OF LAW

I enter a **PARTIALLY FAVORABLE** decision. The one unit of Negative Pressure Wound Therapy (NPWT) (CPT® code 97608) billed in claim number 3322320900392 for beneficiary M.F. with a date of service of April 1, 2022, is covered by Medicare. However, the remainder of all other line items and claims at issue, which include the application of skin substitute grafts (Current Procedural Terminology® (CPT®) codes 15271, 15272, 15275, and 15276), outpatient office visits (CPT® code 99212), ceftriaxone sodium injection (HCPCS code J0696), and amniotic allografts (HCPCS codes Q4186 and Q4169), provided to multiple beneficiaries with dates of service from January 21, 2022 through May 23, 2022, are not covered by Medicare. The appellant is responsible for the non-covered costs.

## ORDER

For the reasons discussed above, this decision is **PARTIALLY FAVORABLE**. I direct the MAC to process the claims in accordance with this decision.

### SO ORDERED

_____

Jamie Mendelson
Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD    Form DAB-101 (12/19)

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7. Medicare claim type: ☐ Part A    ☐ Part B    ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan    ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes    If Yes, skip to Block 9.
☐ No    If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate?    ☐ Yes    ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated_____. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

_____
_____
_____
_____

(Attach additional sheets if you need more space)

### PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| DATE | | | DATE | | |
|---|---|---|---|---|---|
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C.  20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim.  Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Denver, CO**

| | | | |
|---|---|---|---|
| Appeal of: | **ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA** | OMHA Appeal No.: | **3-12683356911** |
| Beneficiary: | **Multiple** | Medicare Part: | **B** |
| Medicare No.: | **Multiple** | Before: | **Jamie Mendelson** |
| | | | Administrative Law Judge |

Index of the Administrative Record and Exhibit List

**Exhibit Record**                                   **Administrative**
                                                      **File Reference**

|  |  | File Name | | Page Range |
|---|---|---|---|---|
| Medical & Related: General | | File 1 | 10 | : 896 |
| Medical & Related: General | | File 1 | 907 | : 1396 |
| Medical & Related: General | | File 1 | 1408 | : 1896 |
| Medical & Related: General | | File 1 | 1908 | : 2407 |
| Medical & Related: General | | File 1 | 2419 | : 2918 |
| Medical & Related: General | | File 1 | 2930 | : 3687 |
| Medical & Related: General | | File 1 | 3699 | : 4198 |
| Medical & Related: General | | File 1 | 4210 | : 4410 |
| Medical & Related: General | | File 1 | 4442 | : 4910 |
| Medical & Related: General | | File 1 | 4922 | : 5421 |
| Medical & Related: General | | File 1 | 5424 | : 5736 |
| Medical & Related: General | | File 1 | 5748 | : 6236 |
| Medical & Related: General | | File 1 | 6246 | : 6736 |
| Medical & Related: General | | File 1 | 6746 | : 7236 |
| Medical & Related: General | | File 1 | 7246 | : 7736 |
| Medical & Related: General | | File 1 | 7747 | : 8236 |
| Medical & Related: General | | File 1 | 8247 | : 8736 |
| Medical & Related: General | | File 1 | 8747 | : 9236 |
| Medical & Related: Medical Records | | File 13 | 388 | : 474 |
| Medical & Related: Medical Records | | File 13 | 475 | : 538 |
| Medical & Related: Medical Records | | File 13 | 539 | : 605 |
| Medical & Related: Medical Records | | File 13 | 606 | : 775 |
| Medical & Related: Medical Records | | File 13 | 776 | : 832 |
| Medical & Related: Medical Records | | File 13 | 831 | : 973 |
| Medical & Related: Medical Records | | File 13 | 974 | : 1040 |
| Medical & Related: Medical Records | | File 13 | 1041 | : 1129 |
| Medical & Related: Medical Records | | File 13 | 1130 | : 1213 |
| Medical & Related: Medical Records | | File 13 | 1214 | : 1315 |
| Medical & Related: Medical Records | | File 13 | 1316 | : 1449 |
| Medical & Related: Medical Records | | File 13 | 1450 | : 1544 |
| Medical & Related: Medical Records | | File 13 | 1545 | : 1598 |

OMHA-156

Index of the Administrative Record and Exhibit List

| | | | | |
|---|---|---|---|---|
| Medical & Related: Medical Records | File 13 | 1599 | : | 1715 |
| Medical & Related: Medical Records | File 13 | 1716 | : | 1774 |
| Medical & Related: Medical Records | File 13 | 1775 | : | 1909 |
| Medical & Related: Medical Records | File 13 | 1910 | : | 2042 |
| Medical & Related: Medical Records | File 13 | 2043 | : | 2092 |
| Medical & Related: Medical Records | File 13 | 2091 | : | 2246 |
| Medical & Related: Medical Records | File 13 | 2247 | : | 2323 |
| Medical & Related: Medical Records | File 13 | 2324 | : | 2376 |
| Medical & Related: Medical Records | File 13 | 2377 | : | 2526 |
| Guidance: CMS publication and Medical Literature: All Beneficiaries | File 13 | 104 | : | 387 |
| Position Statements: General All Beneficiaries | File 21 | 1 | : | 11 |
| Position Statements: Post Pay Expert Report: All Beneficiaries | File 24 | 1 | : | 404 |
| Procedural - CMS Levels: Post Payment Medical Records: All | File 1 | 1 | : | 9 |
| Procedural - CMS Levels: QIC Acknowledgement Letter: All | File 10 | 1 | : | 5 |
| Procedural - CMS Levels: Request for Reconsideration: All | File 11 | 1 | : | 38 |
| Procedural - CMS Levels: Request for Reconsideration: Pt 1 All | File 13 | 1 | : | 15 |
| Procedural - CMS Levels: Redetermination: All Beneficiaries | File 13 | 16 | : | 45 |
| Procedural - CMS Levels: Rebuttal to Overpayment: All | File 13 | 46 | : | 48 |
| Procedural - CMS Levels: Overpayment Demand Letter: All | File 13 | 49 | : | 93 |
| Procedural - CMS Levels: Post Payment Review Results: All | File 13 | 94 | : | 103 |
| Procedural - CMS Levels: Request for Overpayment | File 14 | 1 | : | 91 |
| Procedural - CMS Levels: Post Payment Records Request: | File 15 | 1 | : | 8574 |
| Procedural - CMS Levels: Reconsideration: All Beneficiaries | File 3 | 1 | : | 19 |
| Procedural - OMHA Level: Passphrase Letter: All Beneficiaries | File 19 | 1 | : | 1 |
| Procedural - OMHA Level: Response to Notice of Hrg: amended/All | File 20 | 1 | : | 2 |
| Procedural - OMHA Level: Signed Decision: All Beneficiaries | File 25 | 1 | : | 12 |
| Procedural - OMHA Level: Request for ALJ Hearing: All Beneficiaries | File 4 | 1 | : | 163 |
| Procedural - OMHA Level: Notice of Hearing: All Beneficiaries | File 5 | 1 | : | 10 |
| Procedural - OMHA Level: Notice of Rescheduled Hearing: All | File 6 | 1 | : | 10 |
| Procedural - OMHA Level: Request for Reschedule: All Beneficiaries | File 7 | 1 | : | 3 |
| Procedural - OMHA Level: Request for Record: All Beneficiaries | File 8 | 1 | : | 4 |
| Procedural - OMHA Level: NOI CoventBridge UPIC MW: To submit | File 9 | 1 | : | 2 |
| Proceeding (Audios): Hearing audio: 2 of 2 All Benes | File 22 | 1 | : | 1 |
| Proceeding (Audios): Hearing audio: 1 of 2 All Benes | File 23 | 1 | : | 1 |

**Non-Exhibit Record**

**Administrative**
**File Reference**

| | File Name | Page Range | | |
|---|---|---|---|---|
| Records not considered: General | File 1 | 897 | : | 906 |
| Records not considered: General | File 1 | 1397 | : | 1407 |
| Records not considered: General | File 1 | 1897 | : | 1907 |
| Records not considered: General | File 1 | 2408 | : | 2418 |
| Records not considered: General | File 1 | 2919 | : | 2929 |
| Records not considered: General | File 1 | 3688 | : | 3698 |

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 130-153

Department of Health and Human Services
Office of the Secretary

## OFFICE OF MEDICARE HEARINGS AND APPEALS

Denver Satellite Office
1 Denver Federal Ctr Bld 25,
Room 1840, P.O. Box 25167
Denver, CO 80225-0167
720-462-7900
(216) 462-4171 (Direct)
303-231-5154 (Fax)
833-921-0393 (Toll Free)

October 30, 2023

FOULSTON SIEFKIN LLP
ATTN: AMANDA WILWERT
7500 COLLEGE BLVD STE 1400
OVERLAND PARK, KS 66210

**NOTICE OF DECISION**

Appellant: ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA
OMHA Appeal Number: 3-1268335911

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

**What if I disagree with the decision?**

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

**How much time do I have to file an appeal?**

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice.  The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

**How do I file an appeal?**

To appeal, you must ask the Medicare Appeals Council to review the decision.  Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below.  Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods:  mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:
- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C.  20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:
1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.


You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**.  You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative.  You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:
1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form.  You are required to provide information and documents marked with an asterisk.


At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision.  All documents should be submitted in Portable Document Format (PDF) whenever possible.  Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:
1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

      QIC - C2C B North
      301 W Bay Street
      Ste. 1110
      Jacksonville, FL 32202

[IF MULTIPLE BENEFICIARY APPEAL ONLY INPUT: To protect beneficiary privacy, names and addresses of other individuals have been removed from your copy of this notice.]

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List
Attachment A



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Denver, CO

| | | | |
|---|---|---|---|
| Appeal of: | ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA | OMHA Appeal No.: | 3-12683356911 |
| Beneficiary: | Multiple (See Attachment A) | Medicare Part: B | |
| Medicare No.: | Multiple (See Attachment A) | Before:  Jamie Mendelson Administrative Law Judge | |

## DECISION

After considering the evidence and arguments presented in the record, I enter a **PARTIALLY FAVORABLE** decision. The one unit of Negative Pressure Wound Therapy (NPWT) (CPT® code 97608) billed in claim number 3322320900392 for beneficiary M.F. with a date of service of April 1, 2022, is covered by Medicare. However, the remainder of all other line items and claims at issue, which include the application of skin substitute grafts (Current Procedural Terminology® (CPT®) codes 15271, 15272, 15275, and 15276), outpatient office visits (CPT® code 99212), ceftriaxone sodium injection (HCPCS[1] code J0696), and amniotic allografts (HCPCS codes Q4186 and Q4169), provided to multiple beneficiaries with dates of service from January 21, 2022 through May 23, 2022, are not covered by Medicare. The appellant is responsible for the non-covered costs.

## PROCEDURAL HISTORY

The appellant submitted 55 claims to Medicare for physician's services it furnished to 22 beneficiaries on the dates of service at issue. (File 13, pp. 95-102). The claims were initially reimbursed by the Medicare Administrative Contractor (MAC) as billed by the appellant. (*Id.*) However, CoventBridge Group, a Unified Program Integrity Contractor (UPIC), later performed a post-payment review of the claims and determined the claims had been improperly reimbursed by Medicare because the record did not support the services at issue were medically reasonable and necessary for the beneficiaries' treatment. (File 13, pp. 95-102; File 24). The MAC then sought to recoup the overpayment from the appellant. (*Id.* at 49-93).

The appellant, through an appointed representative, requested redetermination from the MAC. (File 14, pp. 8-10). The MAC issued an unfavorable redetermination. (File 13, pp. 16-23). In its redetermination, the MAC denied reimbursement for the amniotic allografts (HCPCS codes Q4186 and Q4169) at issue because it found the amniotic allografts were provided in a manner not explicitly approved by the FDA, and because the medical record did not support the services

---

[1] The Healthcare Common Procedure Coding System (HCPCS) has been developed by the Centers for Medicare and Medicaid Serviceses (CMS) for processing, screening, identifying, and paying Medicare claims. See 42 C.F.R. § 414.2 and 414.40.

were medically reasonable and necessary for the beneficiaries' treatment. (*Id*. at 20). The MAC denied reimbursement for the outpatient office visits (CPT® code 99212) because it found the medical record did not support additional medical services, separately billable from the allograft procedures at issue, were performed by the treating practitioner. (*Id*. at 20-21). The MAC denied reimbursement for one claim for NPWT (CPT® code 97608) because it found Medicare's coverage requirements for NPWT had not been satisfied. (*Id*. at 21). Finally, the MAC found that the application of skin substitute grafts and ceftriaxone sodium injections at issue (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696) were not covered because those services were related to the amniotic allografts at issue in this appeal, which the MAC had determined were not medically reasonable and necessary. (*Id*. at 21).

The appellant's appointed representative then requested reconsideration from the Qualified Independent Contractor (QIC). (File 13, pp. 1-15, 33-44). In its request for reconsideration, the appellant argued that the amniotic allografts and related services were provided in a manner consistent with FDA approval and Medicare coverage criteria, that the application of amniotic allografts to repair surgical wounds is supported by medical studies, and the applications of the amniotic allografts at issue in this appeal were medically reasonable and necessary for the individual beneficiaries' treatment. (*Id*.) The QIC performed an independent review of the claims and issued an unfavorable reconsideration on June 9, 2023. (File 3). In its reconsideration, the QIC found the claims at issue were not covered by Medicare on the same bases articulated by the MAC at redetermination. (*Id*.) The QIC further found the appellant was liable for the non-covered costs. (*Id*.)

On August 8, 2023, the appellant's representative filed a request for a hearing before an Administrative Law Judge (ALJ). (File 4). With its request for hearing, the appellant submitted a prehearing brief outlining its arguments on appeal, which was added to the record. (*Id*. at 28-33). The appellant also appended other records, including procedural documents from the lower levels of review and ALJ decisions from other Medicare claims appeals involving the appellant. (*Id*. at 34-163). Because these documents are not considered new evidence, as they have no evidentiary value in this appeal, the documents were admitted to the record without a finding of good cause. *See* 42 C.F.R. § 405.1028 (requiring, as a general matter, a finding of good cause before new evidence may be submitted at the ALJ level of review). Prior to hearing, the UPIC notified my office of its intent to participate by submitting a position paper, which was also added to the record. (File 9; File 21; File 24).

I conducted a telephone hearing on October 11, 2023. (Hearing Recording (Oct. 11, 2023)). The following individuals appeared on behalf of the appellant: Amanda Willwert, attorney and the appellant's appointed representative; Dr. John Adams, owner of the appellant professional corporation and the treating practitioner; and Nancy Neusick, who appeared in an observational capacity only.

## ISSUES

Whether there is Medicare coverage and reimbursement for the physician's services, CPT® codes 15271, 15272, 15275, 15276, 97608, 99212, and HCPCs codes J0696, Q4186, Q4169, the appellant provided to the beneficiaries on the dates of service at issue. If the services are not covered, and an overpayment remains, who is responsible for the non-covered costs.

## APPLICABLE LAW AND POLICY

Section 1832(a)(2)(B) of Title XVIII of the Social Security Act (the Act) allows Medicare to pay for "medical and other services" under Part B. Section 1861(s)(1) of the Act defines "medical and other services" to include "physician's services," which is further defined under section 1861(q) of the Act as professional services performed by a physician.

An ALJ conducts a *de novo* review and issues a decision based on the administrative record, including any hearing record. 42 C.F.R. § 405.1000(d). The issues before an ALJ on appeal "include all the issues for the claims or appealed matter specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's favor." 42 C.F.R. § 405.1032(a).

The provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment. 42. C.F.R. § 424.5(a)(6).

Guidance for determining whether a service or item is reasonable and medically necessary in the absence of official guidance, such as a National Coverage Determination (NCD) or Local Coverage Determination (LCD), are outlined in chapter three, section 3.6.2.2 of the *Medicare Program Integrity Manual (MPIM)*.

Medicare does not cover "services 'related to' non-covered services. . .including services related to follow-up care and complications of non-covered services which require treatment." *MBPM*, ch. 16, § 180.

The MAC with jurisdiction has issued Local Coverage Determinations (LCDs), which are determinations on whether a particular item or service is medically reasonable and necessary and covered by Medicare. Act § 1869(f)(2)(B). Relevant here, the MAC with jurisdiction issued LCD L37228: Wound Care (LCD L37228) (effective Feb. 2022) with respect to Medicare coverage of NPWT. LCD L35494: Mohs Micrographic Surgery (LCD L35494) (effective Dec. 2020), and Local Coverage Article A57477: Billing and Coding: Mohs Micrographic Surgery (Article A57477) (effective Dec. 2020) provide Medicare coverage criteria and billing guidelines for Mohs surgery. An ALJ must give substantial deference to the guidance in an LCD. 42 C.F.R § 405.1062.

Notwithstanding any other provision of the Act, no payment may be made by Medicare for any expenses incurred for items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Act § 1862(a)(1)(A). If a medical service or item is denied coverage based on section 1862(a)(1)(A) of the Act, the limitations on liability provisions, set forth in section 1879 of the Act, may be applied to potentially limit a party's liability for the costs of the non-covered claim. Where there is an overpayment, section 1870 of the Act also provides for waiver of the overpayment only where an individual is "without fault" and where such recoupment "would be against equity."

## FINDINGS OF FACT AND ANALYSIS

The appellant seeks Medicare coverage and reimbursement for the physician's services it furnished to 22 beneficiaries on the dates of service at issue. (File 4, pp. 18-22, 28-33; Hearing

Recording). At the lower levels of review, the Medicare contractors found the amniotic allografts (HCPCS codes Q4186 and Q4169) at issue were not covered by Medicare because the allografts were provided in a manner not explicitly approved by the FDA and the medical record did not support the allografts, as administered by the appellant, were medically reasonable and necessary for the beneficiaries' treatment. (File 3; File 13, pp. 16-23; File 21; File 24). The Medicare contractors denied coverage and reimbursement for the outpatient office visits (CPT® code 99212) because they found the medical record did not support additional medical services, separately billable from the allograft procedures at issue, were performed by the treating practitioner. (*Id.*) The Medicare contactors denied coverage and reimbursement for one claim for NPWT (CPT® code 97608) because they found Medicare's coverage requirements for NPWT had not been satisfied. (*Id.*) Finally, the Medicare contractors found that the application of skin substitute grafts and ceftriaxone sodium injections at issue (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696) were not covered because those services were billed in conjunction with the amniotic allografts at issue in this appeal, which the Medicare contractors had determined were not medically reasonable and necessary. (*Id.*)

The Medicare contractors' bases for denying coverage and reimbursement for the amniotic allografts at issue, and the services related to the application of those allografts, were not beneficiary specific. In other words, the contractors did not deny coverage of those services for reasons that were specific to each beneficiary. The remaining services at issue, outpatient offices visits, and one claim for NPWT require an individual consideration of the relevant beneficiaries' medical records, as the Medicare contractors' bases of denial for those claims were specific to the individual claims filed by the appellant.

Because the Medicare contractors' bases of denial for the amniotic allografts and related services were of general applicability, this decision will first address whether those services are covered by Medicare. The remaining services at issue will then be addressed separately.

## I.    Global Discussion Pertaining to Medicare Coverage of the Amniotic Allografts and Related Services (HCPCS codes Q4186, Q4169, J0696, and CPT® codes 15271, 15272, 15275, and 15276)

The appellant performs Mohs surgery, "a complex excision technique for the removal of high risk for recurrence skin cancers." (File 4, p. 29). The appellant states Mohs surgery provides a very high cure rate while also preserving the maximum amount of non-cancerous tissue possible. (File 4, p. 29; Hearing Recording). The appellant further states that, for each beneficiary in this appeal, the beneficiary required repair with amniotic allograft of a wound created during the performance of Mohs surgery. (*Id.*)

The Medicare contractors found the appellant's use of amniotic allografts to repair surgical incisions secondary to the treatment of skin lesions was not medically necessary under Medicare coverage criteria as outlined in section 3.6.2.2 of the *MPIM*. (*Id.*) The contractors also found that the appellant's medical records, as a general matter, demonstrated the appellant billed for excessive amounts of amniotic allograft, and that the appellant used cloned records, *i.e.* the same language, to justify the use of the amniotic allografts for each beneficiary. (*Id.*) Finally, the Medicare contractors found the physician's applications of the amniotic allografts were not reimbursable by Medicare because the amniotic allografts themselves were not reimbursable by Medicare. (*Id.*)

For Medicare to cover any item or service, it must be medically reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body

member. Act § 1862(a)(1)(A). When there is no controlling national coverage determination (NCD) or LCD, a medical service or procedure is considered medically reasonable and necessary only if the coverage criteria outlined in chapter 3, section 3.6.2.2 of the *MPIM* has been satisfied.

First, the appellant argues that the generalized coverage criteria contained in chapter 3, section 3.6.2.2 of the *MPIM* is not applicable in this appeal, as it contends the Medicare coverage criteria outlined in LCD L35494 and Article A57477, which provide coverage criteria for Mohs surgery, also encompass the amniotic allografts administered by the appellant. (File 4, pp. 29-31). Specifically, the appellant points to certain language in Article A57477 pertaining to documentation requirements, which state a provider's documentation in support of coverage for Mohs surgery should include:

> 11. Measurement of the primary lesion necessitating [Mohs surgery (MMS)] and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:
>
>> • Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).
>>
>> • Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
>>
>> • It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.
>
> 12. When the surgical defect created by MMS requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.

Article A57477; (File 4, pp. 29-30).

However, LCD L35494 and Article A57477 deal with Medicare's coverage criteria for Mohs surgery, which, although the procedure that created the beneficiaries' wounds that were repaired by the appellant with amniotic allograft, is not among the services denied reimbursement by the Medicare contractors at the lower levels of review. LCD L35494 and Article A57477 do not explicitly address coverage criteria for any specific type of reconstructive technique. Although the guidance in Article A57477 states that providers should include sufficient documentation to support that the reconstructive technique performed by the provider was an appropriate choice, it does not provide any guidance on the use of the amniotic allografts utilized by the appellant, or any other type of reconstructive technique performed after Mohs surgery.

LCD L35494 and Article A57477, therefore, are not controlling in this appeal. Even if they were, however, it would remain necessary to determine whether the amniotic allografts used by the appellant would be considered an "appropriate choice to preserve [the beneficiaries'] functional capabilities and to restore [the beneficiaries'] physical appearance." Article A57477. Thus, it would still be necessary to determine whether the amniotic allografts were medically reasonable

and necessary for the beneficiaries' treatment. Because there is no published NCD or LCD providing coverage criteria for amniotic allografts, I find that the general Medicare coverage criteria outlined in chapter 3, section 3.6.2.2 of the *MPIM* is applicable in this appeal.

At the lower levels of review, the Medicare contractors found that the amniotic allografts did not satisfy the generalized coverage criteria contained in chapter 3, section 3.6.2.2 of the *MPIM* primarily on the basis that the FDA has approved amniotic membrane products, such as the amniotic allografts at issue, only for homologous use; and using an amniotic allograft to promote wound healing, as opposed to solely creating a permeable wound barrier, is not homologous use as defined by the FDA.[2] (File 3; File 13, pp. 16-23; File 21; File 24).

However, as pointed out by the appellant in its position paper and at oral argument, the FDA does not have authority to regulate how a physician practices medicine. (File 4, pp. 28-33; Hearing Recording). Furthermore, there is no statute, regulation, or sub-regulatory guidance that prohibits Medicare from covering a drug, biological, or other FDA regulated product administered by a physician for a purpose that has not been explicitly approved by the FDA.

Indeed, the UPIC acknowledges in its position paper that non-homologous use of amniotic allograft may be covered and reimbursed by Medicare when the coverage criteria outlined in chapter 3, section 3.6.2.2 of the *MPIM* has been satisfied. (File 21, p. 3). Thus, the Medicare contractors' reliance on the FDA's regulatory classification and approved uses of amniotic allograft is not dispositive in this appeal. Nor is it persuasive, as it is an almost meaningless distinction from a clinical perspective to differentiate between when an amniotic allograft is administered solely to provide a wound barrier (which necessarily promotes wound healing), and when it has been administered solely to promote wound healing irrespective of its capacity to provide a protective barrier between the wound and the outside environment.

Notwithstanding the above discussion, the Medicare contractors ultimately determined that the amniotic allografts at issue in this appeal where not reimbursable by Medicare because the coverage criteria contained in chapter 3, section 3.6.2.2 were not satisfied. (File 3; File 13, pp. 16-23; File 21; File 24). Thus, it remains necessary to determine whether the record supports that the amniotic allografts, in the manner they were administered by the appellant, were:

1. safe and effective;

2. not experimental or investigational; and

3. appropriate, including the duration and frequency in terms of whether the service or item is:

   - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
   - Furnished in a setting appropriate to the beneficiary's medical needs and condition;
   - Ordered and furnished by qualified personnel; and,
   - One that meets, but does not exceed, the beneficiary's medical need.

*MPIM*, ch. 3, § 3.6.2.2.

---

[2] *See* Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use, U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download (outlining FDAs nonbinding recommendations on homologous use of amniotic allografts).

In support of coverage, the appellant argues that the applications of the amniotic allografts at issue in this appeal were "based on established clinical criteria, community standards of care, guidelines from peer-reviewed medical journals, and internal review processes," and the use of amniotic allografts to treat the beneficiaries' wounds was, therefore, medically "reasonable and necessary and appropriately documented." (File 4, p. 28).

The appellant states there are generally three different options for wound repair after Mohs surgery: (1) leaving the wound open to heal without sutures or dressings (secondary intention); (2) primary side-to-side repair with sutures; or (3) reconstructive surgery, which includes grafts and flaps, and which may or may not involve sutures depending on the type of graft or flap used. (File 4, p. 29; Hearing Recording). When performing reconstructive repair of a patient that requires a graft, Dr. Adams testified that he only uses amniotic allografts to perform the repair due to the fact that amniotic allografts are superior to autografts (using a patients own skin), or other types of allografts. (Hearing Recording). Dr. Adams further testified that application of amniotic allographs is considered the standard of care in Kansas, where Dr. Adams practices medicine. (*Id*.)

The appellant cites to a peer reviewed study, as well as the coverage policy of a private insurance company, it argues establish the amniotic allografts at issue were not experimental or investigational as applied, and demonstrate the allografts were furnished in accordance with accepted standards of medical practice. (Hearing Recording; File 4, pp. 28-33; File 13, pp. 157-162, 169-253).

The peer reviewed study: Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane, published in the journal of Facial Plastic Surgery and Aesthetic Medicine in 2021, was coauthored by Dr. Adams himself. (File 13, pp. 157-162; Hearing Recording).  Dr. Adams testified at hearing that all the participants included in the study were treated by him in his practice. (Hearing Recording). Notably, the study acknowledges that incisional repair utilizing autologous tissue such as local flaps and full-thickness skin grafts is the "mainstay of reconstructive techniques" after Mohs surgery. (File 13, p. 157). The purpose of the study was to demonstrate that placental allografts are a feasible alternative to incisional repair post-Mohs surgery. (*Id*. at 158).

The study population consisted of 286 individuals who were sorted into 143 matched pairs based upon propensity score. (File 13, pp.158-162). One half of the matched pairs received a full thickness autograft or flap repair after undergoing Mohs surgery, the other received a placental allograft. (*Id*.) Only three of the patients who received a placental allograft suffered from a post-operative complication, which under the study's design included infection, bleeding or hematoma, wound dehiscence, surgical reintervention, nonhealing wound, poor scar cosmesis, and scar revision. (*Id*. 158-159). Forty-one of the patients who received a full thickness autograft or flap repair experienced some type of complication as defined by the study, though the severity of the individual complications is not noted. (*Id*.)

Ultimately, the study found that placental allografts are a "safe and effective tool for repairing [Mohs surgery] defects of candidates who are not good candidates for traditional methods of autologous tissue reconstruction." (*Id*. at 161). However, the reliability of the study is limited by the fact that it was a retrospective study, composed of a relatively small and demographically homologous sample, where the results relied entirely upon the accuracy and thoroughness of the participant patient's medical records, which consisted entirely of patients of Dr. Adams, the owner of the appellant corporation. (*Id*. at 161; Hearing Recording). Thus, the results of the

study were dependent largely upon the professional judgment of one treating practitioner, who is also the appellant in this case. The study also does not attempt to compare the clinical benefit of amniotic allografts to other standard treatments, such as secondary intention, primary side-to-side repair, or other types of skin substitutes.

When read in a light most favorable to the appellant, the study appears to demonstrate that amniotic allografts can provide a superior clinical outcome to incisional repair. However, the results of one study does not establish that the amniotic allografts at issue were not experimental or investigational as defined under chapter 3, section 3.6.2.2 of the *MPIM*. The study explicitly acknowledges that amniotic allografts are not a standard of medical practice for the treatment of Mohs surgery defects as a general matter. (*See id*. at 157 (local flaps and full-thickness skin grafts are the "mainstay of reconstructive techniques")). The study also fails to demonstrate that amniotic allografts meet, but do not exceed, a patient's medical need, as the study does not compare the effectiveness of amniotic allografts against other types of skin substitutes or other types of non-incisional repairs.

The insurance coverage policy cited by the appellant was published by a private medical insurance provider, BlueCross BlueShield of Kansas, which is the state where the appellant is located. (*Id*. at 169-253). The policy outlines the provider's coverage policy for amniotic membrane and amniotic fluid. (*Id*.) The policy states that BlueCross BlueShield will cover amniotic grafts only for certain ophthalmic indications and non-healing diabetic lower extremity ulcers, and states that the use amniotic allografts for any other purpose is considered experimental or investigational and not covered by the insurer. (*Id*. at 174-175). The policy discusses the use of amniotic membranes for repair following Mohs surgery and cites to the study authored by Dr. Adams. (*Id*. at 209-213). However, BlueCross BlueShield determined the study was flawed for many of the reasons discussed in the previous paragraphs and found that additional evidence from well-designed prospective studies were required before there would be sufficient evidence to support that amniotic allografts for wound repair following Mohs surgery were medically reasonable and necessary and would be covered by the insurer. (*Id*.) Thus, the insurance coverage policy cited by the appellant fails to substantiate that the use of amniotic allographs to repair Mohs surgery defects is not experimental or investigational, or that it is appropriate, as described in chapter 3, section 3.6.2.2 of the *MPIM*.

The Medicare contractors also found that the appellant's medical records, as a general matter, demonstrated the appellant billed for excessive amounts of amniotic allograft, and that the appellant used cloned records, *i.e.* the same language, to justify the use of the amniotic allografts for the beneficiaries. (File 3; File 13, pp. 16-23; File 21; File 24). For those reasons, the Medicare contractors found that the appellant's medical records did not support that the amniotic allografts at issue were administered in an appropriate manner as defined in chapter 3, section 3.6.2.2 of the *MPIM*. (*Id*.) I concur with the contractors' finding that the appellant's medical records are replete with boilerplate language that should not be afforded significant weight, as the language does not specifically address the unique circumstances of the individual beneficiaries. (*See* File 13, pp. 387-2526). Dr. Adams also testified at hearing that he frequently uses and bills for more amniotic allograft than necessary to treat a patient because he is only able to obtain the allografts in certain sizes, and so it is Dr. Adams' practice to use and bill for all allograft contained in a package in the size he has on hand, even if the amount of allograft in the package is more than required to treat a particular wound. (Hearing Recording).

Based on the foregoing discussion, I find that the record available for my review does not establish that Medicare's generalized coverage criteria, as outlined in chapter 3, section 3.6.2.2 of the *MPIM*, has been satisfied. The use of amniotic allografts to repair Mohs surgery defects

has not been adequately studied. Thus, the use of amniotic allografts as administered by the appellant is still experimental or investigational. The record also does not support that the use of amniotic allografts to repair Mohs surgery defects is appropriate, as the record does not establish the use is in accordance with accepted standards of medical practice or one that meets, but does not exceed, a patient's medical need. Thus, the record does not support the amniotic allografts at issue were administered in a manner that was reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member as required under section 1862(a)(1)(A) of the Act, and the allografts are not covered or reimbursable by Medicare. Because the allografts (HCPCS codes Q4186 and Q4169) are not covered by Medicare, the appellant's application of those allografts and the ceftriaxone sodium injections (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696), are also not covered or reimbursable be Medicare. *MBPM*, ch. 16, § 180.

## II.  Individual Claim Discussion Pertaining to Medicare Coverage for NPWT (CPT® code 97608) and Outpatient Office Visits (CPT® code 99212).

The Medicare contractors denied coverage and reimbursement for certain outpatient office visits billed by the appellant because the contractors found the medical record did not support that additional medical services, separately billable from the allograft procedures at issue, were performed by Dr. Adams. (File 3; File 13, pp. 16-23; File 21; File 24). The Medicare contactors denied coverage and reimbursement for one unit of NPWT because they found Medicare's coverage requirements for NPWT had not been satisfied. (*Id*)

### A. NPWT

The Medicare contractors denied one unit of NPWT, billed in claim number 3322320900392, which was provided to beneficiary M.F. with a date of service of April 1, 2022. (File 3, p. 14). The appellant did not provide any argument as to why the Medicare contractors' unfavorable determination was erroneous in its written brief or at the oral hearing. (File 4, pp. 28-33; Hearing Recording).

The MAC with jurisdiction offers limited coverage criteria for the application of NPWT by a physician during an office visit. LCD L37228 states, in relevant part, that:

> [NPWT] utilizing either durable or disposable medical equipment, involves the application of controlled or intermittent negative pressure to a properly dressed wound cavity. Suction (negative pressure) is applied under airtight wound dressings to promote the healing of open wounds **resistant to prior treatments**;

and

> There is moderate evidence in the peer-reviewed published literature to indicate that NPWT using a powered device approved by the U.S. Food and Drug Administration (FDA) is effective for a specific subgroup of patients who have failed a comprehensive, conventional wound therapy program that includes all reasonable, well-established alternative medical treatments. There is also moderate evidence to support the use of this therapy as an alternative to surgery. There is insufficient evidence to support the routine use of NPWT.

*Id*. (emphasis in original).

Beneficiary M.F. first began being treated by the appellant on October 1, 2021, for skin lesions on the beneficiary's scalp. (File 13, pp. 2089-2244). At that time, the beneficiary was diagnosed with squamous cell carcinoma on three separate locations on the

beneficiary's scalp. (*Id*. at 2089-2100). On January 7, 2022, Mohs surgery was performed by the appellant to remove two of the cancerous lesions. (*Id*. at 2104-2116). The appellant then provided wound care, consisting of the application of amniotic allografts through February 4, 2022. (*Id*. at 2117-2137). On that date, another Mohs procedure was performed to excise the third cancerous lesion, which was located on the beneficiary's right central frontal scalp. (*Id*. at 2141-2153).

The appellant then continued to treat the beneficiary's wounds with amniotic allograft on a weekly basis through the date of service at issue. (*Id*. at 2154-2224). On April 1, 2022, NPWT was used to help close the Mohs defect from the Mohs procedure previously performed on February 4, 2022. (*Id*. at 2225). At the time NPWT was initiated, the beneficiary's wound measured 6.5cm long, 5.7cm wide, and .3cm deep. (*Id*. at 2225). The wound measured 6.5cm deep, 5.5cm wide, and .8cm deep immediately after Mohs surgery was performed on February 4, 2022. (*Id*. at 2144).

Thus, contrary to the Medicare contractors' determinations at the lower levels of review, I find that the record supports that the NPWT was appropriate for the beneficiary. The medical record establishes the beneficiary's wounds had been resistant to previous treatment as required under LCD L37228. Although the record does not support that the beneficiary failed a "conventional wound therapy regime" when treating the wound, as the appellant exclusively used amniotic allografts to dress the wound prior to implementing NPWT, I find that that large size of the wound and the delayed wound healing as documented in the record warranted NPWT in this specific case. (*Id*.) Thus, the medical record supports that the NPWT provided to the beneficiary was medically reasonable and necessary pursuant to section 1862(a)(1)(A) of the Act, and the one unit of NPWT (CPT® code 97608), billed in claim number 3322320900392 with a date of service of April 1, 2022, is covered and reimbursable by Medicare.

### B. Outpatient Office Visits

The Medicare contractors found that four outpatient office visits (CPT® code 99212) rendered to three separate beneficiaries did not satisfy Medicare coverage criteria. (File 3; File 13, pp. 16-23; File 21; File 24). Specifically, the Medicare contractors found that two outpatient office visits provided to beneficiary W.C. on April 4, 2022, and May 2, 2022, one office visit provided to beneficiary L.T. on May 17, 2022, and one office visit provided to beneficiary W.H. on Mar 23, 2022, were not covered by Medicare. (*Id*.)

The Medicare contractors denied coverage and reimbursement for these office visits because the contractors found the medical record did not support additional medical services, separately billable from the allograft procedures at issue, were performed by the treating practitioner. (*Id*.) However, Dr. Adams testified at hearing that it is his practice to assess other lesions, as appropriate, when his patients are being seen during Mohs surgery follow-up appointments. (Hearing Recording). Dr. Adams stated that it is his practice to bill separately for the periodic assessment of skin lesions, that these assessments are distinct and separate medical services from the application of amniotic allografts, and the documentation contained in the beneficiaries' medical records establish that he performed assessments of the beneficiary that were separately billable to Medicare. (*Id*.)

However, the medical records from the dates of service at issue do not substantiate that Dr. Adams performed any assessment services that would warrant additional payment from Medicare. (*See* File 13, pp. 659-688, 736-755, 1877-1883, 2000-2008). For example, the exam notes for beneficiary W.C. on May 2, 2022, state that the beneficiary was being seen by Dr. Adams only for a follow-up encounter for postoperative wound closure. (*Id*. at 736-755). The notes indicate that a general examination of the beneficiary's "scalp (including hair inspection), head (including face), neck, right upper extremity, left upper extremity, right lower extremity, and left lower extremity" was performed by Dr. Adams. (*Id*.) However, this cursory examination, or one very similar, was performed each time Dr. Adams assessed and dressed the beneficiary's surgical wounds. (*Id*. at 605-773). The record does not include any notation Dr. Adams was assessing any new skin lesions or was performing any medical services outside of post-operative wound care. (*Id*. at 736-755). The medical records from the other beneficiaries on the relevant dates of service at issue also fail to substantiate that Dr. Adams rendered assessment or evaluation services that were not included in the wound care services also billed by Dr. Adams. (*Id*. at 659-688, 1877-1883, 2000-2008).

The provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment. 42. C.F.R. § 424.5(a)(6). In light of the foregoing discussion, I find that the appellant has failed to provide sufficient documentation establishing that medically reasonable and necessary, and separately billable, assessment services were provided by Dr. Adams on the dates of service at issue. Thus, the record does not support the office visits at issue are covered by Medicare pursuant to section 1862(a)(1)(A) of the Act.

## III.    Liability and Waiver of Overpayment

Since Medicare does not cover the denied services because the record does not establish that the services satisfied Medicare coverage criteria pursuant to section 1862(a)(1)(A) of the Act, I must now address who is liable for the non-covered costs. Where Medicare coverage requirements have not been met, waiver of liability pursuant to section 1879 of the Act may apply. The record contains no evidence that the beneficiary knew, or reasonably should have been expected to know, that Medicare would not cover the claim at issue. However, as a provider of Medicare services, the appellant is presumed to have had notice of the applicable statutes, regulations, and CMS coverage guidelines prior to billing for the services at issue. *See* 42 C.F.R. § 411.406(e). I find no evidence in the record to rebut that presumption. As a result, there is no limitation of liability for appellant under section 1879 of the Act, and the appellant is responsible for the non-covered costs.

The issue still remains whether waiver of the overpayment is appropriate. Where there is an overpayment, such as the case here, section 1870 of the Act prohibits recovery of Medicare overpayment from an individual who is without fault and when recovery would be against equity. Here, the appellant is a supplier of health care services, and as a participant in the Medicare program, had access to pertinent statutes, laws, rules, local coverage determinations, coding rules, and Medicare manuals, which contain the requirements for reimbursement under the Medicare program. I find the appellant is not without fault in causing or accepting the overpayment as the appellant should have known the services it provided were excluded from Medicare coverage. Medicare may, therefore, recoup the overpayment. Accordingly, pursuant to section 1870(b) of the Act, recovery of the overpayment from the appellant is not waived, and the appellant is financially liable for the overpayments at issue in this appeal.

## CONCLUSIONS OF LAW

I enter a **PARTIALLY FAVORABLE** decision. The one unit of Negative Pressure Wound Therapy (NPWT) (CPT® code 97608) billed in claim number 3322320900392 for beneficiary M.F. with a date of service of April 1, 2022, is covered by Medicare. However, the remainder of all other line items and claims at issue, which include the application of skin substitute grafts (Current Procedural Terminology® (CPT®) codes 15271, 15272, 15275, and 15276), outpatient office visits (CPT® code 99212), ceftriaxone sodium injection (HCPCS code J0696), and amniotic allografts (HCPCS codes Q4186 and Q4169), provided to multiple beneficiaries with dates of service from January 21, 2022 through May 23, 2022, are not covered by Medicare. The appellant is responsible for the non-covered costs.

## ORDER

For the reasons discussed above, this decision is **PARTIALLY FAVORABLE**. I direct the MAC to process the claims in accordance with this decision.

**SO ORDERED**

_____

Jamie Mendelson
Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD    Form DAB-101 (12/19)

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3.  BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7.  Medicare claim type: ☐ Part A    ☐ Part B    ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan    ☐ Entitlement/enrollment for Part A or Part B

8.  Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes    If Yes, skip to Block 9.
☐ No    If No, Specific Dates of Service:

9.  If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate?    ☐ Yes    ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated_____.  I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

_____

_____

_____

_____

(Attach additional sheets if you need more space)

**PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.**

| DATE | DATE |
|---|---|
| APPELLANT'S NAME (the party requesting review) | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) |
| ADDRESS | ADDRESS |
| CITY, STATE, ZIP CODE | CITY, STATE, ZIP CODE |

| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |
|---|---|---|---|---|---|

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C.  20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim.  Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Denver, CO**

| | |
|---|---|
| Appeal of: **ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA** | OMHA Appeal No.: **3-12683356911** |
| Beneficiary: **Multiple** | Medicare Part: **B** |
| Medicare No.: **Multiple** | Before: **Jamie Mendelson** Administrative Law Judge |

Index of the Administrative Record and Exhibit List

| Exhibit Record | Administrative File Reference | | |
|---|---|---|---|
| | File Name | Page Range | |
| Medical & Related: General | File 1 | 10 : 896 | |
| Medical & Related: General | File 1 | 907 : 1396 | |
| Medical & Related: General | File 1 | 1408 : 1896 | |
| Medical & Related: General | File 1 | 1908 : 2407 | |
| Medical & Related: General | File 1 | 2419 : 2918 | |
| Medical & Related: General | File 1 | 2930 : 3687 | |
| Medical & Related: General | File 1 | 3699 : 4198 | |
| Medical & Related: General | File 1 | 4210 : 4410 | |
| Medical & Related: General | File 1 | 4442 : 4910 | |
| Medical & Related: General | File 1 | 4922 : 5421 | |
| Medical & Related: General | File 1 | 5424 : 5736 | |
| Medical & Related: General | File 1 | 5748 : 6236 | |
| Medical & Related: General | File 1 | 6246 : 6736 | |
| Medical & Related: General | File 1 | 6746 : 7236 | |
| Medical & Related: General | File 1 | 7246 : 7736 | |
| Medical & Related: General | File 1 | 7747 : 8236 | |
| Medical & Related: General | File 1 | 8247 : 8736 | |
| Medical & Related: General | File 1 | 8747 : 9236 | |
| Medical & Related: Medical Records | File 13 | 388 : 474 | |
| Medical & Related: Medical Records | File 13 | 475 : 538 | |
| Medical & Related: Medical Records | File 13 | 539 : 605 | |
| Medical & Related: Medical Records | File 13 | 606 : 775 | |
| Medical & Related: Medical Records | File 13 | 776 : 832 | |
| Medical & Related: Medical Records | File 13 | 831 : 973 | |
| Medical & Related: Medical Records | File 13 | 974 : 1040 | |
| Medical & Related: Medical Records | File 13 | 1041 : 1129 | |
| Medical & Related: Medical Records | File 13 | 1130 : 1213 | |
| Medical & Related: Medical Records | File 13 | 1214 : 1315 | |
| Medical & Related: Medical Records | File 13 | 1316 : 1449 | |
| Medical & Related: Medical Records | File 13 | 1450 : 1544 | |
| Medical & Related: Medical Records | File 13 | 1545 : 1598 | |

Index of the Administrative Record and Exhibit List

| | | | | |
|---|---|---|---|---|
| Medical & Related: Medical Records | File 13 | 1599 | : | 1715 |
| Medical & Related: Medical Records | File 13 | 1716 | : | 1774 |
| Medical & Related: Medical Records | File 13 | 1775 | : | 1909 |
| Medical & Related: Medical Records | File 13 | 1910 | : | 2042 |
| Medical & Related: Medical Records | File 13 | 2043 | : | 2092 |
| Medical & Related: Medical Records | File 13 | 2091 | : | 2246 |
| Medical & Related: Medical Records | File 13 | 2247 | : | 2323 |
| Medical & Related: Medical Records | File 13 | 2324 | : | 2376 |
| Medical & Related: Medical Records | File 13 | 2377 | : | 2526 |
| Guidance: CMS publication and Medical Literature: All Beneficiaries | File 13 | 104 | : | 387 |
| Position Statements: General All Beneficiaries | File 21 | 1 | : | 11 |
| Position Statements: Post Pay Expert Report: All Beneficiaries | File 24 | 1 | : | 404 |
| Procedural - CMS Levels: Post Payment Medical Records: All | File 1 | 1 | : | 9 |
| Procedural - CMS Levels: QIC Acknowledgement Letter: All | File 10 | 1 | : | 5 |
| Procedural - CMS Levels: Request for Reconsideration: All | File 11 | 1 | : | 38 |
| Procedural - CMS Levels: Request for Reconsideration: Pt 1 All | File 13 | 1 | : | 15 |
| Procedural - CMS Levels: Redetermination: All Beneficiaries | File 13 | 16 | : | 45 |
| Procedural - CMS Levels: Rebuttal to Overpayment: All | File 13 | 46 | : | 48 |
| Procedural - CMS Levels: Overpayment Demand Letter: All | File 13 | 49 | : | 93 |
| Procedural - CMS Levels: Post Payment Review Results: All | File 13 | 94 | : | 103 |
| Procedural - CMS Levels: Request for Overpayment | File 14 | 1 | : | 91 |
| Procedural - CMS Levels: Post Payment Records Request: | File 15 | 1 | : | 8574 |
| Procedural - CMS Levels: Reconsideration: All Beneficiaries | File 3 | 1 | : | 19 |
| Procedural - OMHA Level: Passphrase Letter: All Beneficiaries | File 19 | 1 | : | 1 |
| Procedural - OMHA Level: Response to Notice of Hrg: amended/All | File 20 | 1 | : | 2 |
| Procedural - OMHA Level: Signed Decision: All Beneficiaries | File 25 | 1 | : | 12 |
| Procedural - OMHA Level: Request for ALJ Hearing: All Beneficiaries | File 4 | 1 | : | 163 |
| Procedural - OMHA Level: Notice of Hearing: All Beneficiaries | File 5 | 1 | : | 10 |
| Procedural - OMHA Level: Notice of Rescheduled Hearing: All | File 6 | 1 | : | 10 |
| Procedural - OMHA Level: Request for Reschedule: All Beneficiaries | File 7 | 1 | : | 3 |
| Procedural - OMHA Level: Request for Record: All Beneficiaries | File 8 | 1 | : | 4 |
| Procedural - OMHA Level: NOI CoventBridge UPIC MW: To submit | File 9 | 1 | : | 2 |
| Proceeding (Audios): Hearing audio: 2 of 2 All Benes | File 22 | 1 | : | 1 |
| Proceeding (Audios): Hearing audio: 1 of 2 All Benes | File 23 | 1 | : | 1 |

| **Non-Exhibit Record** | **Administrative** | | | |
|---|---|---|---|---|
| | **File Reference** | | | |
| | File Name | | Page Range | |
| Records not considered: General | File 1 | 897 | : | 906 |
| Records not considered: General | File 1 | 1397 | : | 1407 |
| Records not considered: General | File 1 | 1897 | : | 1907 |
| Records not considered: General | File 1 | 2408 | : | 2418 |
| Records not considered: General | File 1 | 2919 | : | 2929 |
| Records not considered: General | File 1 | 3688 | : | 3698 |

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 176-199



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Denver, CO**

| | |
|---|---|
| Appeal of: **ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA** | OMHA Appeal No.: **3-12683356911** |
| Beneficiary: **Multiple** | Medicare Part: **B** |
| Medicare No.: **Multiple** | Before: **Jamie Mendelson** Administrative Law Judge |

Index of the Administrative Record and Exhibit List

**Exhibit Record**

**Administrative File Reference**

| | File Name | Page Range | |
|---|---|---|---|
| Medical & Related: General | File 1 | 10 | : 896 |
| Medical & Related: General | File 1 | 907 | : 1396 |
| Medical & Related: General | File 1 | 1408 | : 1896 |
| Medical & Related: General | File 1 | 1908 | : 2407 |
| Medical & Related: General | File 1 | 2419 | : 2918 |
| Medical & Related: General | File 1 | 2930 | : 3687 |
| Medical & Related: General | File 1 | 3699 | : 4198 |
| Medical & Related: General | File 1 | 4210 | : 4410 |
| Medical & Related: General | File 1 | 4442 | : 4910 |
| Medical & Related: General | File 1 | 4922 | : 5421 |
| Medical & Related: General | File 1 | 5424 | : 5736 |
| Medical & Related: General | File 1 | 5748 | : 6236 |
| Medical & Related: General | File 1 | 6246 | : 6736 |
| Medical & Related: General | File 1 | 6746 | : 7236 |
| Medical & Related: General | File 1 | 7246 | : 7736 |
| Medical & Related: General | File 1 | 7747 | : 8236 |
| Medical & Related: General | File 1 | 8247 | : 8736 |
| Medical & Related: General | File 1 | 8747 | : 9236 |
| Medical & Related: Medical Records | File 13 | 388 | : 474 |
| Medical & Related: Medical Records | File 13 | 475 | : 538 |
| Medical & Related: Medical Records | File 13 | 539 | : 605 |
| Medical & Related: Medical Records | File 13 | 606 | : 775 |
| Medical & Related: Medical Records | File 13 | 776 | : 832 |
| Medical & Related: Medical Records | File 13 | 831 | : 973 |
| Medical & Related: Medical Records | File 13 | 974 | : 1040 |
| Medical & Related: Medical Records | File 13 | 1041 | : 1129 |
| Medical & Related: Medical Records | File 13 | 1130 | : 1213 |
| Medical & Related: Medical Records | File 13 | 1214 | : 1315 |
| Medical & Related: Medical Records | File 13 | 1316 | : 1449 |
| Medical & Related: Medical Records | File 13 | 1450 | : 1544 |
| Medical & Related: Medical Records | File 13 | 1545 | : 1598 |

OMHA-156 VOL. I
Dated: 2023-10-27

Index of the Administrative Record and Exhibit List

| | | | | |
|---|---|---|---|---|
| Medical & Related: Medical Records | File 13 | 1599 | : | 1715 |
| Medical & Related: Medical Records | File 13 | 1716 | : | 1774 |
| Medical & Related: Medical Records | File 13 | 1775 | : | 1909 |
| Medical & Related: Medical Records | File 13 | 1910 | : | 2042 |
| Medical & Related: Medical Records | File 13 | 2043 | : | 2092 |
| Medical & Related: Medical Records | File 13 | 2091 | : | 2246 |
| Medical & Related: Medical Records | File 13 | 2247 | : | 2323 |
| Medical & Related: Medical Records | File 13 | 2324 | : | 2376 |
| Medical & Related: Medical Records | File 13 | 2377 | : | 2526 |
| Guidance: CMS publication and Medical Literature: All Beneficiaries | File 13 | 104 | : | 387 |
| Position Statements: General All Beneficiaries | File 21 | 1 | : | 11 |
| Position Statements: Post Pay Expert Report: All Beneficiaries | File 24 | 1 | : | 404 |
| Procedural - CMS Levels: Post Payment Medical Records: All | File 1 | 1 | : | 9 |
| Procedural - CMS Levels: QIC Acknowledgement Letter: All | File 10 | 1 | : | 5 |
| Procedural - CMS Levels: Request for Reconsideration: All | File 11 | 1 | : | 38 |
| Procedural - CMS Levels: Request for Reconsideration: Pt 1 All | File 13 | 1 | : | 15 |
| Procedural - CMS Levels: Redetermination: All Beneficiaries | File 13 | 16 | : | 45 |
| Procedural - CMS Levels: Rebuttal to Overpayment: All | File 13 | 46 | : | 48 |
| Procedural - CMS Levels: Overpayment Demand Letter: All | File 13 | 49 | : | 93 |
| Procedural - CMS Levels: Post Payment Review Results: All | File 13 | 94 | : | 103 |
| Procedural - CMS Levels: Request for Overpayment | File 14 | 1 | : | 91 |
| Procedural - CMS Levels: Post Payment Records Request: | File 15 | 1 | : | 8574 |
| Procedural - CMS Levels: Reconsideration: All Beneficiaries | File 3 | 1 | : | 19 |
| Procedural - OMHA Level: Passphrase Letter: All Beneficiaries | File 19 | 1 | : | 1 |
| Procedural - OMHA Level: Response to Notice of Hrg: amended/All | File 20 | 1 | : | 2 |
| Procedural - OMHA Level: Signed Decision: All Beneficiaries | File 25 | 1 | : | 12 |
| Procedural - OMHA Level: Request for ALJ Hearing: All Beneficiaries | File 4 | 1 | : | 163 |
| Procedural - OMHA Level: Notice of Hearing: All Beneficiaries | File 5 | 1 | : | 10 |
| Procedural - OMHA Level: Notice of Rescheduled Hearing: All | File 6 | 1 | : | 10 |
| Procedural - OMHA Level: Request for Reschedule: All Beneficiaries | File 7 | 1 | : | 3 |
| Procedural - OMHA Level: Request for Record: All Beneficiaries | File 8 | 1 | : | 4 |
| Procedural - OMHA Level: NOI CoventBridge UPIC MW: To submit | File 9 | 1 | : | 2 |
| Proceeding (Audios): Hearing audio: 2 of 2 All Benes | File 22 | 1 | : | 1 |
| Proceeding (Audios): Hearing audio: 1 of 2 All Benes | File 23 | 1 | : | 1 |

| **Non-Exhibit Record** | | **Administrative** | | |
|---|---|---|---|---|
| | | **File Reference** | | |
| | | | | |
| | | File Name | | Page Range |

| | | | | |
|---|---|---|---|---|
| Records not considered: General | | File 1 | 897 | : | 906 |
| Records not considered: General | | File 1 | 1397 | : | 1407 |
| Records not considered: General | | File 1 | 1897 | : | 1907 |
| Records not considered: General | | File 1 | 2408 | : | 2418 |
| Records not considered: General | | File 1 | 2919 | : | 2929 |
| Records not considered: General | | File 1 | 3688 | : | 3698 |

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 202-223

**COVENTBRIDGE**
GROUP
THINK TRUTH



July 8, 2022

COVENTBRIDGE
THINK TRUTH

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:    **Post Payment Medical Records Request (Kansas)**
       **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
       **110568010**
       **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

    A contractor may reopen and revise its initial determination or redetermination on its own motion–-

        1)   Within one year from the date of the initial determination or redetermination for any reason.

        2)   Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when-

        1) There is new and material evidence that--

            i) Was not available or known at the time of the determination or decision; and

            ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

### For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10)  *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f)  *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——

(A)  Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B)  Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)  A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——

(A)  Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B)  Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

</div>

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 229

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo  Co-office Manager
Custodian of records and Job Title        (Print)

Elizabeth Robledo
Custodian of records               (Signature)          8/19/2022
                                                       (Date)

John R. Adams M.D
Physician/Supplier          (Print)

                                                       8/19/2022
Physician/Supplier          (Signature)                (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 233-723




July 8, 2022

COVENTBRIDGE

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:    **Post Payment Medical Records Request (Kansas)**
       **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
       **110568010**
       **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment. We are requesting additional information to properly evaluate these
claims. Please review the directions and information in this letter. **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own
> motion--
>
>   1)  Within one year from the date of the initial determination or
>       redetermination for any reason.
>   2)  Within four years from the date of the initial determination or
>       redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I                                                                              724

File 1 pdf - Page 501 of 9236

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:
 a) Establishing good cause. Good cause may be established when–
  1) There is new and material evidence that––
   i) Was not available or known at the time of the determination or decision; and
   ii) May result in a different conclusion ...

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——

(A)    Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B)    Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——

(A)    Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B)    Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

</div>

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 729

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)


_Elizabeth Robledo_                                    _8/19/2022_
Custodian of records            (Signature)                    (Date)


_John R. Adams M.D_
Physician/Supplier            (Print)


_[signature]_                                          _8/19/2022_
Physician/Supplier            (Signature)                    (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - o **Consent forms**
  - o **Intra-operative or Intra-procedural notes**
  - o **Anesthesia notes**
  - o **Nursing notes**
  - o **Post-anesthesia care notes**
  - o **Operative or procedural reports**
  - o **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 733-1119

  

July 8, 2022

COVENTBRIDGE

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:     **Post Payment Medical Records Request (Kansas)**
        **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and
        110568010**
        **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment.  We are requesting additional information to properly evaluate these
claims.  Please review the directions and information in this letter.  **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program.  Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1].  As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b).  Regarding timeframes, the regulation provides:
        A contractor may reopen and revise its initial determination or redetermination on its own
        motion--
                1)   Within one year from the date of the initial determination or
                redetermination for any reason.
                2)   Within four years from the date of the initial determination or
                redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio  43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com          UPIC Midwestern Jurisdiction

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

  a) Establishing good cause. Good cause may be established when—

    1) There is new and material evidence that--

      i) Was not available or known at the time of the determination or decision; and

      ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10)   *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f)   *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to-----

(A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)   A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to-----

(A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<center>

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

</center>

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 1125

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Robledo Co-office Manager_
Custodian of records and Job Title        (Print)

_Elizabeth Robledo_                                          _8/19/2022_
Custodian of records        (Signature)                    (Date)

_John R. Adams M.D._
Physician/Supplier        (Print)

_(signature)_                                              _8/19/2022_
Physician/Supplier        (Signature)                      (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2381 | http://coventbridge.com                          UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

Post Payment Medical Records Request                                    Page 9 of 9

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 1129-1619

**COVENTBRIDGE** GROUP

THINK TRUTH



July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:     **Post Payment Medical Records Request (Nebraska)**
        **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
        **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:
        A contractor may reopen and revise its initial determination or redetermination on its own motion—
                1)   Within one year from the date of the initial determination or redetermination for any reason.
                2)   Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1]  UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:
- a) Establishing good cause. Good cause may be established when—
  - 1) There is new and material evidence that—
    - i) Was not available or known at the time of the determination or decision; and
    - ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD/. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

2118 Southwest Boulevard | Grove City, Ohio 43123                Contract HHSM-500-2016-00079i/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                        UPIC Midwestern Jurisdiction

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

Post Payment Medical Records Request                                                      Page 5 of 10

10)  *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f)  *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

   (A)  Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

   (B)  Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

      (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

   (2)(i)  A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

      (A)  Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

      (B)  Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

   (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

</div>

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) -782-6071 and/or Latonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 1626

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_____
Custodian of records and Job Title     (Print)


_____          _____
Custodian of records          (Signature)                          (Date)


_____
Physician/Supplier          (Print)


_____          _____
Physician/Supplier          (Signature)                          (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                              UPIC Midwestern Jurisdiction

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that *Advanced Dermatology and Skin Cancer Center PA* provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo   Co-office Manager
Custodian of records and Job Title        (Print)


Elizabeth Robledo _____          8/19/2022
Custodian of records            (Signature)                 (Date)


John R. Adams M.D. _____
Physician/Supplier              (Print)


_____          8/19/2022
Physician/Supplier              (Signature)                 (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2381 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 1631-2119

# COVENTBRIDGE GROUP
## THINK TRUTH



July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:     **Post Payment Medical Records Request (Nebraska)**
        **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
        **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

    A contractor may reopen and revise its initial determination or redetermination on its own motion—

        1)  Within one year from the date of the initial determination or redetermination for any reason.
        2)  Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—
        1) There is new and material evidence that—
            i)     Was not available or known at the time of the determination or decision; and
            ii)    May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation*. CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)   A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614)-782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 2126

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_____
Custodian of records and Job Title        (Print)


_____          _____
Custodian of records                (Signature)               (Date)


_____
Physician/Supplier                (Print)


_____          _____
Physician/Supplier                (Signature)               (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio  43123        Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

<u>Acknowledgement of Completion</u>

Upon fulfilling the request for records, I certify that *Advanced Dermatology and Skin Cancer Center PA* provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

*Elizabeth Robledo  Co-office Manager*
Custodian of records and Job Title          (Print)

*Elizabeth Robledo*                                          *8/19/2022*
Custodian of records              (Signature)                     (Date)

*John R. Adams M.D*
Physician/Supplier                (Print)

*[signature]*                                              *8/19/2022*
Physician/Supplier                (Signature)                     (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - o **Consent forms**
  - o **Intra-operative or Intra-procedural notes**
  - o **Anesthesia notes**
  - o **Nursing notes**
  - o **Post-anesthesia care notes**
  - o **Operative or procedural reports**
  - o **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
- 

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://covenbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I                                                                                          2129

File 1.pdf - Page 1906 of 9236

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 2131-2328

month
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I                                                                                                            2337

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I                                                                                              2351

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

VOL. I

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

VOL. I

2500

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 2506-2630

 

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:    **Post Payment Medical Records Request (Nebraska)**
       **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
       **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

A contractor may reopen and revise its initial determination or redetermination on its own motion—

1) Within one year from the date of the initial determination or redetermination for any reason.

2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                UPIC Midwestern Jurisdiction

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—

        1) There is new and material evidence that—

            i)      Was not available or known at the time of the determination or decision; and

            ii)     May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10)  *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f)  *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—
(A)  Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and
(B)  Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).
   (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)  A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—
(A)  Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and
(B)  Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).
   (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<center>
CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123
</center>

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 2637

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_____
Custodian of records and Job Title      (Print)


_____                    _____
Custodian of records            (Signature)                    (Date)


_____
Physician/Supplier              (Print)


_____                    _____
Physician/Supplier              (Signature)                    (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center, PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title       (Print)

_Elizabeth Robledo_                          _8/19/2022_
Custodian of records          (Signature)        (Date)

_JOHN R. ADAMS M.D._
Physician/Supplier             (Print)

_[signature]_                                _8/19/2022_
Physician/Supplier            (Signature)        (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2301 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I                                                                          2641

File 1 pdf - Page 2418 of 9236

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 2642-3053

month

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

 

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:     **Post Payment Medical Records Request (Nebraska)**
        **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
        **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion—
>
> > 1) Within one year from the date of the initial determination or redetermination for any reason.
> > 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

      a) Establishing good cause. Good cause may be established when—

          1) There is new and material evidence that—

               i)     Was not available or known at the time of the determination or decision; and

               ii)    May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I                                                                                                    3143

File 1.pdf - Page 2920 of 9236

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com
Contract HHSM-500-2016-00079U/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I                                                                                 3145

File 1 pdf - Page 2922 of 9236

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—
   (A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and
   (B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).
      (ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—
      (A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and
      (B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).
   (ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614)-782-6071 and/or Latonya.Johnson@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 3148

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided
all existing medical records and supporting documentation to substantiate payment of the Medicare claims
within the list attached to this request by CoventBridge.


_____
Custodian of records and Job Title        (Print)


_____               _____
Custodian of records             (Signature)                  (Date)


_____
Physician/Supplier               (Print)


_____               _____
Physician/Supplier               (Signature)                  (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post
Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment,
  treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123                Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                        UPIC Midwestern Jurisdiction

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Roblero  Co-office Manager_
Custodian of records and Job Title        (Print)


_Elizabeth Roblero_                                    _8/19/2022_
Custodian of records              (Signature)                    (Date)


_JOHN R. ADAMS, M.D._
Physician/Supplier                        (Print)


_(signature)_                                    _8/19/2022_
Physician/Supplier              (Signature)                    (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - o **Consent forms**
  - o **Intra-operative or Intra-procedural notes**
  - o **Anesthesia notes**
  - o **Nursing notes**
  - o **Post-anesthesia care notes**
  - o **Operative or procedural reports**
  - o **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com
Contract HHSM-500-2018-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I                                                                3152
File 1 pdf - Page 2929 of 9236

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 3153-3172

month
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

VOL. I

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 3316-3351

month

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 3364-3375

month
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 3380-3394

month
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6

 

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:     **Post Payment Medical Records Request (Nebraska)**
        **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
        **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion—
>
> > 1)   Within one year from the date of the initial determination or redetermination for any reason.
> > 2)   Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1]  UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—
        1) There is new and material evidence that—
            i)    Was not available or known at the time of the determination or decision; and
            ii)    May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

2118 Southwest Boulevard | Grove City, Ohio 43123       Contract HHSM-500-2016-00079i/HHSM-500-T0001
ph 614.801.6495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

  (A)  Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

  (B)  Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

    (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

  (A)  Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

  (B)  Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

    (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

</div>

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 3406

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_____
Custodian of records and Job Title      (Print)

_____          _____
Custodian of records         (Signature)                (Date)

_____
Physician/Supplier          (Print)

_____          _____
Physician/Supplier          (Signature)                (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced dermatology and Skin Cancer center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)

_Elizabeth Robledo_                          _8/19/2022_
Custodian of records            (Signature)                    (Date)

_John R. Adams M.D_
Physician/Supplier              (Print)

_[signature]_                               _8/19/2022_
Physician/Supplier              (Signature)                    (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 3502-3910

 

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:  **Post Payment Medical Records Request (Nebraska)**
**Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
**Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth in 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

A contractor may reopen and revise its initial determination or redetermination on its own motion—

1)  Within one year from the date of the initial determination or redetermination for any reason.
2)  Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—

       1) There is new and material evidence that—

         i)     Was not available or known at the time of the determination or decision; and

         ii)    May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079i/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

**If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]**

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

   a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

   (A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

   (B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

      (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

   (2)(i)   A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

      (A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

      (B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

   (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge

UPIC Midwestern

2118 Southwest Boulevard

Grove City, Ohio 43123

</div>

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 3917

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_____
Custodian of records and Job Title        (Print)

_____                    _____
Custodian of records           (Signature)                       (Date)

_____
Physician/Supplier              (Print)

_____                    _____
Physician/Supplier             (Signature)                       (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center, PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)

_Elizabeth Robledo_                        _8/19/2022_
Custodian of records          (Signature)              (Date)

_John R. Adams M.D_
Physician/Supplier              (Print)

_(signature)_                              _8/19/2022_
Physician/Supplier             (Signature)             (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123           Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - o **Consent forms**
  - o **Intra-operative or Intra-procedural notes**
  - o **Anesthesia notes**
  - o **Nursing notes**
  - o **Post-anesthesia care notes**
  - o **Operative or procedural reports**
  - o **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 3922-4112

month

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 4195-4359

month
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 4415-4421

 

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:     **Post Payment Medical Records Request (Nebraska)**
        **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
        **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth in 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:
> A contractor may reopen and revise its initial determination or redetermination on its own motion—
> > 1) Within one year from the date of the initial determination or redetermination for any reason.
> > 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:
   a) Establishing good cause. Good cause may be established when—
      1) There is new and material evidence that—
         i)    Was not available or known at the time of the determination or decision; and
         ii)   May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079i/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com          UPIC Midwestern Jurisdiction

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

  a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10)   *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f)  *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—
   (A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and
   (B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).
      (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)   A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—
   (A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and
   (B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).
   (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

</div>

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or Latonya.Johnson@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 4428

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_____
Custodian of records and Job Title      (Print)


_____                _____
Custodian of records              (Signature)                    (Date)


_____
Physician/Supplier                (Print)


_____                _____
Physician/Supplier                (Signature)                    (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-G0079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                UPIC Midwestern Jurisdiction

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that *Advanced Dermatology and Skin Cancer Center PA* provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Roblero  Co-office Manager
Custodian of records and Job Title          (Print)

Elizabeth Roblero _____          8/19/2022
Custodian of records                    (Signature)              (Date)

John R. Adams M.D _____
Physician/Supplier                  (Print)

_____          8/19/2022
Physician/Supplier                  (Signature)              (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 4433-4542

month

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4
4

4
4
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

VOL. I

4579

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 4582-4611

month
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5
5

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 4622-4630

month
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6
6

 

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:    **Post Payment Medical Records Request (Nebraska)**
       **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
       **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

A contractor may reopen and revise its initial determination or redetermination on its own motion—

1) Within one year from the date of the initial determination or redetermination for any reason.
2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—

        1) There is new and material evidence that—

            i)      Was not available or known at the time of the determination or decision; and

            ii)     May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

> *CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—
   (A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and
   (B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).
      (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—
   (A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and
   (B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).
      (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">
CoventBridge<br>
UPIC Midwestern<br>
2118 Southwest Boulevard<br>
Grove City, Ohio  43123
</div>

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnson@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 4640

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided
all existing medical records and supporting documentation to substantiate payment of the Medicare claims
within the list attached to this request by CoventBridge.

_____
Custodian of records and Job Title         (Print)

_____              _____
Custodian of records              (Signature)                          (Date)

_____
Physician/Supplier                (Print)

_____              _____
Physician/Supplier               (Signature)                          (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post
Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment,
  treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2115 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)

_Elizabeth Robledo_ _____        _8/19/2022_
Custodian of records                (Signature)            (Date)

_John R. Adams MD_
Physician/Supplier                (Print)

_(signature)_ _____        _8/19/2022_
Physician/Supplier                (Signature)            (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123       Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I                                                                4644

File 1 pdf - Page 4421 of 9236

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 4645-5133

 

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:    **Post Payment Medical Records Request (Nebraska)**
**Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
**Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

A contractor may reopen and revise its initial determination or redetermination on its own motion—

1) Within one year from the date of the initial determination or redetermination for any reason.
2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—

        1) There is new and material evidence that—

            i)      Was not available or known at the time of the determination or decision; and

            ii)     May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

    (A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

    (B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

        (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

    (2)(i)  A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

        (A)  Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

        (B)  Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

    (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

</div>

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614)-782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

Post Payment Medical Records Request                                        Page 6 of 10

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 5140

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_____
Custodian of records and Job Title        (Print)


_____          _____
Custodian of records              (Signature)              (Date)


_____
Physician/Supplier                 (Print)


_____          _____
Physician/Supplier                (Signature)              (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center, PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_Elizabeth Roblero  Co-office Manager_
Custodian of records and Job Title        (Print)


_Elizabeth Roblero_                                    _8/19/2022_
Custodian of records             (Signature)              (Date)


_John R. Adams M.D_
Physician/Supplier                  (Print)


_[signature]_                                          _8/19/2022_
Physician/Supplier               (Signature)             (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2381 | http://coventbridge.com                  UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - o **Consent forms**
  - o **Intra-operative or Intra-procedural notes**
  - o **Anesthesia notes**
  - o **Nursing notes**
  - o **Post-anesthesia care notes**
  - o **Operative or procedural reports**
  - o **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2018-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I                                                                      5144

File 1 pdf - Page 4921 of 9236

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 5145-5375

month
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I                                                                    5380

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I                                                                                                      5385

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I                                                                                                    5397

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I

5401

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I

5419

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I

5440

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I                                                                                              5447

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I                                                                                    5474

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I                                                                                                            5482

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

File 1.pdf - Page 5272 of 9236

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 5590-5644

# COVENTBRIDGE GROUP
### THINK TRUTH



July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:     **Post Payment Medical Records Request (Nebraska)**
        **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
        **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

    A contractor may reopen and revise its initial determination or redetermination on its own motion—

            1) Within one year from the date of the initial determination or redetermination for any reason.
            2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com          UPIC Midwestern Jurisdiction

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:
        a) Establishing good cause. Good cause may be established when—
              1) There is new and material evidence that—
                      i)     Was not available or known at the time of the determination or decision; and
                      ii)    May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

2118 Southwest Boulevard | Grove City, Ohio 43123      Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com      UPIC Midwestern Jurisdiction

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

**If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]**

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—
   (A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and
   (B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).
      (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—
      (A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and
      (B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).
   (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

</div>

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614)-782-6071 and/or Latonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079i/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 5651

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_____
Custodian of records and Job Title        (Print)

_____          _____
Custodian of records          (Signature)                    (Date)

_____
Physician/Supplier          (Print)

_____          _____
Physician/Supplier          (Signature)                    (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123            Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center, PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_Elizabeth Roblero  Co-office Manager_
Custodian of records and Job Title        (Print)


_Elizabeth Roblero_                    _8/19/2022_
Custodian of records        (Signature)                (Date)


_John R. Adams M.D_
Physician/Supplier        (Print)


_(signature)_                    _8/19/2022_
Physician/Supplier        (Signature)                (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - o **Consent forms**
  - o **Intra-operative or Intra-procedural notes**
  - o **Anesthesia notes**
  - o **Nursing notes**
  - o **Post-anesthesia care notes**
  - o **Operative or procedural reports**
  - o **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2018-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I                                                                                   5655

File 1 pdf - Page 5432 of 9236

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 5656-5726

month
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

File 1.pdf - Page 5504 of 9236

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I                                                                                                          5730

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I

5731

VOL. I

5732

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I                                                                                           5758

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. I                                                                                                    5760

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

File 1.pdf - Page 5591 of 9236

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 5896-5919

month
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 5928-5958

month

6

# COVENTBRIDGE GROUP
## THINK TRUTH



July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:     **Post Payment Medical Records Request (Nebraska)**
        **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
        **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion—
>> 1)  Within one year from the date of the initial determination or redetermination for any reason.
>> 2)  Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

      a) Establishing good cause. Good cause may be established when—

            1) There is new and material evidence that—

                  i)    Was not available or known at the time of the determination or decision; and

                  ii)   May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

**If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]**

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

    (A)    Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

    (B)    Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

        (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

    (A)    Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

    (B)    Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

    (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

</div>

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614)-782-6071 and/or LaTonya.Johnson@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 5966

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_____
Custodian of records and Job Title        (Print)


_____          _____
Custodian of records          (Signature)          (Date)


_____
Physician/Supplier          (Print)


_____          _____
Physician/Supplier          (Signature)          (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that *Advanced Dermatology and Skin Cancer Center PA* provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

*Elizabeth Robledo  Co-office Manager*
Custodian of records and Job Title          (Print)

*Elizabeth Robledo*                                              *8/19/2022*
Custodian of records                    (Signature)                    (Date)

*John R. Adams M D*
Physician/Supplier                      (Print)

*[signature]*                                              *8/19/2022*
Physician/Supplier                      (Signature)                    (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123           Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                      UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 5971-6459



July 8, 2022

COVENTBRIDGE
THINK TRUTH

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943

Re:    **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and
110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment. We are requesting additional information to properly evaluate these
claims. Please review the directions and information in this letter. **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own
> motion--
>
> > 1) Within one year from the date of the initial determination or
> > redetermination for any reason.
> > 2) Within four years from the date of the initial determination or
> > redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I

6460

File 1 pdf - Page 6237 of 9236

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—

        1) There is new and material evidence that--

            i) Was not available or known at the time of the determination or decision; and

            ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to-----

   (A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

   (B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

     (ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to-----

   (A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

   (B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

   (ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

</div>

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 6465

Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo  Co-office Manager
Custodian of records and Job Title        (Print)

Elizabeth Robledo _____          8/19/2022
Custodian of records                (Signature)              (Date)

John R. Adams M.D. _____
Physician/Supplier                    (Print)

_____          8/19/2022
Physician/Supplier                (Signature)              (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123         Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                         UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com
Contract HHSM-500-2016-00078/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I                                                                6467

File 1.pdf - Page 6244 of 9236

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 6469-6959

 

July 8, 2022

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:     **Post Payment Medical Records Request (Kansas)**
        **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
        **110568010**
        **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment.  We are requesting additional information to properly evaluate these
claims.  Please review the directions and information in this letter.  **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program.  Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1].  As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b).  Regarding timeframes, the regulation provides:
        A contractor may reopen and revise its initial determination or redetermination on its own
        motion--
                1)  Within one year from the date of the initial determination or
                redetermination for any reason.
                2)  Within four years from the date of the initial determination or
                redetermination for good cause as defined in § 405.986…

---

[1]  UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when–

        1) There is new and material evidence that--

           i) Was not available or known at the time of the determination or decision; and

           ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/eMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge

UPIC Midwestern

2118 Southwest Boulevard

Grove City, Ohio  43123

</div>

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 6965

Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Roberto  Co-office Manager_
Custodian of records and Job Title       (Print)

_Elizabeth Roberto_ _____        _8/19/2022_
Custodian of records          (Signature)               (Date)

_John R. Adams, M.D._
Physician/Supplier         (Print)

_(signature)_ _____        _8/19/2022_
Physician/Supplier         (Signature)               (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

Post Payment Medical Records Request                                    Page 9 of 9

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 6969-7459




July 8, 2022

COVENTBRIDGE
THINK TRUTH

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:    **Post Payment Medical Records Request (Kansas)**
       **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
       **110568010**
       **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment. We are requesting additional information to properly evaluate these
claims. Please review the directions and information in this letter. **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:
    A contractor may reopen and revise its initial determination or redetermination on its own
    motion—
        1)  Within one year from the date of the initial determination or
        redetermination for any reason.
        2)  Within four years from the date of the initial determination or
        redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a)  Establishing good cause. Good cause may be established when–

        1)  There is new and material evidence that--

            i)  Was not available or known at the time of the determination or decision; and

            ii)  May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see* http://www.cms.gov/esMD. *Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——
   (A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and
   (B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).
       (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)   A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——
   (A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and
   (B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).
(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

</div>

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 7465

Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title          (Print)

_Elizabeth Robledo_ _____          _8/19/2022_
Custodian of records             (Signature)                    (Date)

_John R. Adams M.D_ _____
Physician/Supplier                (Print)

_(signature)_ _____          _8/19/2022_
Physician/Supplier              (Signature)                    (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com          UPIC Midwestern Jurisdiction

Post Payment Medical Records Request                                    Page 8 of 9

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 7469-7959




July 8, 2022

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943

Re:   **Post Payment Medical Records Request (Kansas)**
      **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
      **110568010**
      **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
      **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

   A contractor may reopen and revise its initial determination or redetermination on its own motion--

       1)  Within one year from the date of the initial determination or redetermination for any reason.
       2)  Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I                                                                                                    7960

File 1 pdf - Page 7737 of 9236

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:
  a) Establishing good cause. Good cause may be established when--
     1) There is new and material evidence that--
        i)   Was not available or known at the time of the determination or decision; and
        ii)  May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  o **Consent forms**
  o **Intra-operative or Intra-procedural notes**
  o **Anesthesia notes**
  o **Nursing notes**
  o **Post-anesthesia care notes**
  o **Operative or procedural reports**
  o **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

> *If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*
>
> *If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

   a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

    (A)    Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

    (B)    Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

        (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

    (A)    Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

    (B)    Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

    (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

</div>

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 7965

Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_Elizabeth Robledo   Co-office Manager_
Custodian of records and Job Title        (Print)


_Elizabeth Robledo_                                    _8/19/2022_
Custodian of records                (Signature)              (Date)


_JOHN R. ADAMS M.D_
Physician/Supplier              (Print)


_[signature]_                                    _8/19/2022_
Physician/Supplier              (Signature)              (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio  43123          Contract HHSM-500-2018-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

Post Payment Medical Records Request                                          Page 8 of 9

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 7969-8459

 

July 8, 2022

COVENTBRIDGE
THINK TRUTH

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943

Re:    **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
**110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment.  We are requesting additional information to properly evaluate these
claims.  Please review the directions and information in this letter.  **It is critically important that you**
**include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program.  Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1].  As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b).  Regarding timeframes, the regulation provides:
    A contractor may reopen and revise its initial determination or redetermination on its own
    motion--
            1)    Within one year from the date of the initial determination or
            redetermination for any reason.
            2)    Within four years from the date of the initial determination or
            redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio  43123                Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                        UPIC Midwestern Jurisdiction

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when–

        1) There is new and material evidence that––

            i)   Was not available or known at the time of the determination or decision; and

            ii)  May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——

(A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)   A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——

(A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

<div align="center">
CoventBridge<br>
UPIC Midwestern<br>
2118 Southwest Boulevard<br>
Grove City, Ohio 43123
</div>

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 8465

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo  Co-office Manager
Custodian of records and Job Title        (Print)

Elizabeth Robledo _____          8/19/2022 _____
Custodian of records            (Signature)                           (Date)

JOHN R. ADAMS M.D. _____
Physician/Supplier             (Print)

_____                                  8/19/2022 _____
Physician/Supplier            (Signature)                            (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

Post Payment Medical Records Request                                          Page 8 of 9

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

Post Payment Medical Records Request

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2018-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. I

8468

File 1.pdf - Page 8245 of 9236

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 8469-8959

 

July 8, 2022

COVENTBRIDGE
THINK TRUTH

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:     **Post Payment Medical Records Request (Kansas)**
          **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
          **110568010**
          **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
          **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment. We are requesting additional information to properly evaluate these
claims. Please review the directions and information in this letter. **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:
          A contractor may reopen and revise its initial determination or redetermination on its own
          motion--
                    1)   Within one year from the date of the initial determination or
                    redetermination for any reason.
                    2)   Within four years from the date of the initial determination or
                    redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com          UPIC Midwestern Jurisdiction

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when--

        1) There is new and material evidence that--

            i) Was not available or known at the time of the determination or decision; and

            ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

    (A)    Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

    (B)    Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

        (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)    A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

    (A)    Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

    (B)    Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

    (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 8965

#### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center, PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)


_Elizabeth Robledo_                          _8/19/2022_
Custodian of records            (Signature)              (Date)


_John R. Adams M.D_
Physician/Supplier               (Print)


_[signature]_                                _8/19/2022_
Physician/Supplier             (Signature)                (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

Post Payment Medical Records Request                                    Page 8 of 9

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

### For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 8969-9459

# Redetermination Case File Request/Transmittal Form

| 1. Joint File Request Type | X  QIC Request | **Misfiled** | **Misrouted** |
|---|---|---|---|
| ☐ **Supplemental File Request/Basis for Request** | | | |

| 2. QIC Reconsideration # | 1-12683356911 | Reconsideration Request Date | April 11, 2023 |
|---|---|---|---|

| 3. AC Name / Number | **Wisconsin Physician Service Insurance Corporation(05202)** |
|---|---|

| 4. Claim Type | ☒ Part B    ☐ DME    Redetermination #    **Multiple** |
|---|---|

| 4a. Overpayments | ☐ RAC                      ☐ PSC/ZPIC<br>☐ AC/MAC MR Probe    ☐ Overpayment-other |
|---|---|

| 5. * Beneficiary Name<br>**Multiple** | Bene HIC#<br>**Multiple** | Provider # | Redet. Date<br>**Multiple** | DOS **Multiple** |
|---|---|---|---|---|
| Claim # or CPT/HCPCS Codes at issue: | **Multiple** | | | |

* Use Redetermination Request Continuation Sheet for multiple beneficiaries

| AC Acknowledgement:<br>Return to Name and QIC Fax # | **F7A6** |
|---|---|
| AC Receipt Date & Signature | |

**Exhibits List:** Label exhibits with the letters provided below, and place them in order by letter. Refer to Exhibit List Quick Guide in JOA for detailed description of exhibits.

| Procedural Documents | ☐ A. Claims and System Screens<br>☐ B. MSN or RA<br>☐ C. Redetermination Request | ☐ D. Redetermination Notice<br>☐ E. Appointment of Rep.<br>☐ F. Other |
|---|---|---|
| Evidentiary Documents | ☐ G. Medical Records<br>☐ H. Referral to/from Contractor Med. Staff<br>☐ I. Contractor Medical Policies<br>☐ L. Other | ☐ J. Regs/CMS Rulings/NCDs, etc.<br>☐ K. Overpayment Extrapolation<br>    Materials |

**Comments (discrepancies, no redetermination, other comments):**

☐ No redetermination  ☐ Claim fully paid  ☐ Incorrect HICN  ☐ Other _____ _____

☐ Complete case previously sent to _____ (QIC) on (date)  . No additional appellant information.

☐ RAC  ☐ PSC/ZPIC  ☐ AC/MAC MR Probe  ☐ Overpayment _____

**Interest in ALJ Participation:**  ☐ Yes  ☐ No

**Position Paper Enclosed:**  ☐ Yes  ☐ No

| Form Completed By | |
|---|---|
| Name of Contact Person | Contact Phone # |

QIC Case File Transmittal Form                                      Revision Date 10/14/2010

Version 4

01/05/06
9460

VOL. I

File 2.pdf - Page 1 of 7

| Date Sent | | # of Boxes | |
|---|---|---|---|
| QIC Acknowledgement – AC Fax # | | | |
| QIC Receipt Date & Signature | | | |

**This fax contains sensitive information including PHI or PII information**

QIC Case File Transmittal Form

Revision Date 10/14/2010

Version 4

01/05/06
9461

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 9462-9466

<div style="border:1px solid black;">

**Medicare Appeal
Number:
1-12683356911**

</div>

**JUNE 9, 2023**

**FOULSTON ATTORNEYS AT LAW
7500 COLLEGE BLVD STE 1400
OVERLAND PARK KS 66210**

**Medicare Reconsideration Decision**

RE:
      BENEFICIARIES: SEE ATTACHED LIST
      MED ID#: SEE ATTACHED LIST
      APPELLANT: ADVANCED DERMATOLOGY AND SKIN
      CANCER CENTER, PA

Dear A. Wilert, Esq.:

This letter is to inform you of the decision on your Medicare appeal. An appeal is
a new and independent review of a claim. You are receiving this letter because
you requested an appeal for the services shown under the *Analysis* section.

The appeal decision is UNFAVORABLE. The Qualified Independent
Contractor's (QIC's) decision is that Medicare will make no additional
payment. More information on the decision is provided on the next pages. You
are not required to take any action. If you disagree with the decision, you may
appeal to an Administrative Law Judge (ALJ). You must file your appeal, in
writing, within 60 days of receipt of this letter. For more information on how to
appeal, see the page entitled "Important Information About Your Appeal
Rights." The amount still in dispute is estimated to be equal to or over $180.
However, the ALJ will determine if your appeal case meets the $180 amount in
controversy requirement for an ALJ hearing.

If this appeal is partially favorable or unfavorable, and it originated from an
overpayment, the Medicare Administrative Contractor (MAC) is responsible
for processing this determination in accordance with standard Medicare
methodologies. Any outstanding debts, prior coverage, and prior

---

**Contact
Information**

If you have
questions, write or
call:

***C2C Innovative
Solutions, Inc.***
Medicare Part B
North
QIC Contractor
P.O. Box 45258
Jacksonville, FL
32232-5258

*Telephone:*
904-224-7426

Who we are:
We are a Qualified
Independent
Contractor (QIC).
Medicare has
contracted with us to
review your file and
make an independent
decision.

---

reimbursement will be taken into account when processing this decision. The MAC will issue a demand letter containing information regarding the collection process, interest accrual, and requesting an extended repayment schedule (ERS).

A copy of this letter was also sent to the parties shown below. C2C Innovative Solutions, Inc. (C2C) was contracted by Medicare to review your appeal.

Sincerely,

R. S. Marcus, M.D.
Medical Director

CC:    Wisconsin Physician Service Insurance Corporation
       Advanced Dermatology and Skin Cancer Center, PA

<div style="border:1px solid;">

**Summary of Facts**

</div>

Artacent and Epifix products and their related applications, as well as evaluation and management (E/M) services were provided by Advanced Dermatology and Skin Cancer Center, PA from January 21, 2022, through May 23, 2022. The appellant submitted claims for these services to Wisconsin Physician Service Insurance Corporation (WPS), the Medicare Administrative Contractor (MAC). The MAC initially paid the claims in full. Subsequently, CoventBridge Group, the Unified Program Integrity Contractor (UPIC), then conducted a post-payment review.

On July 8, 2022, the UPIC sent the appellant a request for medical records needed to conduct a post-payment review of claims. A second request for medical records was sent to the appellant on August 8, 2022. The UPIC's review was prompted by data analysis which suggested your practice improperly billed Medicare for services. Specifically, the UPIC reviewed a 55-claim sample involving 163 services. The UPIC denied the services for the following reasons:
- The services were not reasonable and necessary:
  - The services were not used in a homologous fashion;
  - The provider did not apply a true graft;
  - The provider billed and used larger sized products than necessary;
  - Cloned documentation;
- The services were not rendered as billed; and/or,
- The services were related to non-covered/denied primary services.

Using that sample of claims, the UPIC discovered an overpayment amount of $116,450.65. The appellant was notified of the total overpayment amount on November 10, 2022.

From November 21, 2022, through November 23, 2022, the MAC issued overpayment notification letters (demand letters) to the appellant.

On December 13, 2022, A. M. Wilwert, Esq., of Foulston, Attorneys at Law (also referred to as appellant) submitted a redetermination request to the MAC. The MAC issued a redetermination decision on February 6, 2023, which upheld the overpayment determination. Specifically, the MAC denied the services for the following reasons:
- The documentation failed to support the services were not reasonable and necessary, ordered as billed and rendered as billed; and/or,
- The documentation did not support the E/M services were a separate service from the procedures billed.

On April 11, 2023, C2C Innovative Solutions, Inc. (C2C), the Qualified Independent Contractor (QIC), received a reconsideration request dated April 7, 2023, for eight units of Current Procedural Terminology (CPT) code 15271; one unit of CPT code 15272; 52 units of CPT code 15275; seven units of CPT code 15276; one unit of CPT code 97608; four units of CPT code 99212; one unit of Healthcare Common Procedure Coding System (HCPCS) code J0696; 120 units of HCPCS code Q4169; and 572 units of HCPCS code Q4186. An Appointment of Representative form dated May 3, 2022, was submitted with the reconsideration request.

3

The QIC review is a *de novo* review of the case based on the information provided from all prior levels of review and the appellant. The responsibilities of the QIC include rendering a decision only on the coverage or payment issues raised by the review request and the QIC's scope of review.

Key records contained in the case file included:
- Appointment of Representative Form dated May 3, 2022
- Reconsideration Request dated April 7, 2023
- MAC Redetermination Decision Letter dated February 6, 2023
- Redetermination Request dated December 13, 2022
- MAC Overpayment Notification Letters dated November 21, 2022, through November 23, 2022
- UPIC Post-payment Review Results and Overpayment Determination dated November 10, 2022
- UPIC Request for Medical Records dated July 8, 2022, and August 8, 2022
- Medical Records

| **Decision** |
| --- |

A panel of licensed health care professionals, including a physician, reviewed the documentation in this case and made these decisions.

The decision on your appeal is shown in the table (*Conclusion* section) below.

We have determined the provider is responsible for the denied charges.

| **Explanation of the Decision** |
| --- |

**Laws, Regulations, and Applicable Policies**

The QIC performs reconsideration review in accordance with Medicare rules and regulations. The laws, regulations, and policies pertaining to this case are identified below. Findings and the decision rendered will follow in the QIC's *Claim Review* section.

**Medical Necessity**

Medicare provides coverage for items and services that are reasonable and necessary to diagnose or treat an illness or injury or to improve a malformed body member. Payment is excluded if the medical necessity for the service cannot be substantiated. [Section 1862(a)(1)(A) of the Social Security Act (the Act) and the Centers for Medicare & Medicaid Services (CMS) Internet-Only Manual (IOM), Publication (Pub.) 100-02, Medicare Benefit Policy Manual (MBPM), Chapter 16, Section 20]

**Documentation Requirements**

4

Medicare guidelines place the burden upon the provider to furnish information that may be necessary to determine if payment is due. The service rendered to the patient must be documented in a clear and understandable fashion. The information must be clearly displayed in the medical records. [Section 1833(e) of the Act and Title 42 Code of Federal Regulations (42 CFR) Section 424.5(a)(6)]

**Scope of Review**

QICs generally have discretion while conducting appeals to develop new issues and review all aspects of coverage and payment related to a claim or claim line. However, for reconsiderations of claims denied following a complex pre-payment review, a complex post-payment review or an automated post-payment review by a contractor, QICs are required to limit their review to the reason(s) the claim or line item at issue was initially denied.

If a QIC conducts a reconsideration where the line item or claim was denied on pre or post-payment review for lack of documentation, the QIC will review all applicable coverage and payment requirements for the item or service at issue, including whether the item or service was medically reasonable and necessary. This limitation on scope of review is effective for all reconsideration requests received on or after April 18, 2016. [Medicare Learning Network (MLN) Matters Number SE 1521]

**Human Cellular and Tissue based Products (HCT/Ps)**

<u>Are my HCT/Ps regulated solely under Section 361 of the Public Health Service (PHS) Act and the regulations in this part, and if so what must I do?</u>

    (a) An HCT/P is regulated solely under Section 361 of the PHS Act and the regulations in this part if it meets all of the following criteria:

        (1) The HCT/P is minimally manipulated;

        (2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;

        (3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and

        (4) Either:

            (i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or

            (ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:

                (a) Is for autologous use;

                (b) Is for allogeneic use in a first-degree or second-degree blood relative; or

                (c) Is for reproductive use. [Title 21 CFR Section 1271.10]

<u>How does the Food and Drug Administration (FDA) define important terms in this part?</u>

    (a) Autologous use means the implantation, transplantation, infusion, or transfer of human cells or tissue back into the individual from whom the cells or tissue were recovered.

5

(c) Homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor.

(d) HCT/Ps means articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient. [21 CFR Section 1271.3]

FDA acceptance of an establishment registration and HCT/P listing form does not constitute a determination that an establishment is in compliance with applicable rules and regulations or that the HCT/P is licensed or approved by FDA. [21 CFR Part 1271.27(b)]

**Particular Services Excluded from Coverage**

The following services are excluded from coverage: Any services that are not reasonable and necessary for one of the following purposes: For the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. [42 CFR Section 411.15(k)(1)]

**Related Services**

Medical and hospital services are sometimes required to treat a condition that arises as a result of services that are not covered because they are determined to be not reasonable and necessary or because they are excluded from coverage for other reasons. Services "related to" non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services "not related to" non-covered services are covered under Medicare. [CMS IOM, Pub. 100-02, MBPM, Chapter 16, Section 180]

**CPT Modifier "-25" - Significant E/M Service by Same Physician on Date of Global Procedure**

Medicare requires that CPT modifier -25 should only be used on claims for E/M services, and only when these services are provided by the same physician (or same qualified nonphysician practitioner [NPP]) to the same patient on the same day as another procedure or other service. A/B MACs (B) pay for an E/M service provided on the day of a procedure with a global fee period if the physician indicates that the service is for a significant, separately identifiable E/M service that is above and beyond the usual pre- and post-operative work of the procedure. Different diagnoses are not required for reporting the E/M service on the same date as the procedure or other service. Modifier "-25" is added to the E/M code on the claim. Both the medically necessary E/M service and the procedure must be appropriately and sufficiently documented by the physician or qualified NPP in the patient's medical record to support the claim for these services, even though the documentation is not required to be submitted with the claim. [CMS IOM, Pub. 100-04, Medicare Claims Processing Manual (MCPM), Chapter 12, Section 30.6.6(B)]

**Reasonable and Necessary Criteria**

CMS issues national coverage determinations (NCDs) that specify whether certain items, services, procedures or technologies are reasonable and necessary under Section 1862(a)(l)(A) of the Act. In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no local coverage determination (LCD) exists for a particular item or

6

service, the MACs, Comprehensive Error Rate Testing (CERT), Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
  - o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
  - o Furnished in a setting appropriate to the beneficiary's medical needs and condition;
  - o Ordered and furnished by qualified personnel; and,
  - o One that meets, but does not exceed, the beneficiary's medical need.

There are several exceptions to the requirement that a service be reasonable and necessary for diagnosis or treatment of illness or injury in order to be considered for payment. The exceptions appear in the full text of Section 1862(a)(l)(A) of the Act. See also Medicare Program Integrity Manual (MPIM) Chapters 13, Section 5.1 and 7.1. [CMS IOM, Pub. 100-08, MPIM, Chapter 3, Section 3.6.2.2]

## Wound Care

### Negative Pressure Wound Therapy (NPWT)

NPWT, utilizing either durable or disposable medical equipment, involves the application of controlled or intermittent negative pressure to a properly dressed wound cavity. Suction (negative pressure) is applied under airtight wound dressings to promote the healing of open wounds resistant to prior treatments. Coverage of traditional NPWT (tNPWT) device/unit/type, or supplies is under DME and providers should consult their DME LCD for specific coverage, parameters, and guidelines.

### Utilization Guidelines

The number of debridements and NPWT for a wound within the context of a palliative treatment plan (i.e., when wounds are not expected to heal or when patients are in an end-of-life situation) would be expected to be of a limited frequency and duration consistent with that of palliative care.

The extent and number of services provided should be medically necessary and reasonable based on the documented medical evaluation of the patient's condition, diagnosis, and plan. [Local Coverage Determination (LCD) L37228]

## Overpayments

Overpayments are Medicare payments a provider or beneficiary has received in excess of amounts due and payable under the statute and regulations. Once a determination of an overpayment has been made, the amount is a debt owed by the debtor to the United States (U.S.) Government.

Under the Federal Claims Collection Act of 1966, as amended, each agency of the Federal Government (pursuant to regulations jointly promulgated by the Attorney General and the Comptroller General of the U.S.) must attempt collection of claims of the Federal Government for money arising out of the activities of the agency. The Fiscal Intermediary (FI) or carrier will not be liable for overpayments it

7

makes to debtors in the absence of fraud or gross negligence on its part, however once an intermediary or carrier determines an overpayment has been made it must attempt recovery of overpayments in accordance with CMS regulations.

The Federal Claims Collection Act requires timely and aggressive efforts to recover overpayments, including efforts to locate the debtor where necessary, demands for repayment, and establishment of repayment schedules, suspension of interim payments by intermediaries to institutional providers, and recoupment or setoff, where appropriate.

In addition, The Debt Collection Improvement Act of 1996 requires Federal agencies to refer eligible delinquent debt to a Treasury designated Debt Collection Center (DCC) for cross servicing and offset. CMS is mandated to refer all eligible debt over 180 days delinquent for cross servicing and offset. [CMS IOM, Pub. 100-06, Medicare Financial Management Manual (MFMM), Chapter 3, Section 10]

<u>Analysis</u>

The following services are at issue for reconsideration:

- **15271** Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 square centimeter (sq cm); first 25 sq cm or less wound surface area

- **15272** Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure)

- **15275** Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

- **15276** Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure)

- **97608** Negative pressure wound therapy, (e.g., vacuum assisted drainage collection), utilizing disposable, non-durable medical equipment including provision of exudate management collection system, topical application(s), wound assessment, and instructions for ongoing care, per session; total wound(s) surface area greater than 50 square centimeters

- **99212** Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and straightforward medical decision making. When using time for code selection, 10-19 minutes of total time is spent on the date of the encounter.

- **J0696** Injection, ceftriaxone sodium, per 250 mg

- **Q4169** Artacent wound, per sq cm

- **Q4186** Epifix, per sq cm

**Appellant Arguments and QIC Responses**

Below are the points made by the appellant within the reconsideration appeal:

8

**Appellant Argument 1:** The claims were billed correctly in accordance with the applicable Medicare regulations, reasonable and necessary and appropriately documented. The appellant cites Local Coverage Article (LCA) A57477 to support the medical necessity of the grafts after Mohs surgery. In addition, the appellant states the package inserts for both the Artacent and MiMedx allographs used for the surgical repair indicate that an appropriate use is as a barrier for use in the treatment of acute and chronic wounds, providing a protective environment to support the healing process. Thus, the appellant was using allografts consistent with the use indicated on the labels. A peer review journal article and references to insurance company policies were included in the appellant rebuttal to support the necessity of the services.

> **The QIC's Response:** Medical necessity is an essential element in determining if payment for a service(s) is appropriate. Medicare has established guidelines which state that medical necessity must be documented in the medical record in order for a service to be reimbursed. The QIC review is a *de novo* review, within the scope of review requirements, of the case based on the provided information from all prior levels of review and the appellant. The responsibilities of the QIC include rendering a decision only on the coverage or payment issues raised by the review request and within the QIC's scope of review. Further information regarding the QIC's detailed review is located under the section titled *Claim Review.*

> In addition, LCA A57477 is not relevant to the services at issue in this appeal as Mohs surgeries (codes 17311 through 17315) are not part of the UPIC and MAC's denials and are not being appealed.

**Appellant Argument 2:** The UPIC's findings were based on articles and guidance documents that are not applicable to the services provided.

> **The QIC's Response:** The QIC finds that any flawed rationale used by the UPIC or MAC in the redetermination decision is cured by the QIC reconsideration.

**Claim Review**

The issue is whether payment can be made for the Artacent and Epifix products and their related applications, as well as the E/M services billed. The UPIC and MAC denied the services for the following reasons:
- The services were not reasonable and necessary:
    - The services were not used in a homologous fashion;
    - The provider did not apply a true graft;
    - The provider billed and used larger sized products than necessary;
    - Cloned documentation;
- The services were not rendered as billed; and/or,
- The services were related to non-covered/denied primary services

The QIC will provide a detailed reconsideration review by section below.

Skin Substitute Allografts

The 21 CFR Section 1271 states a HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent. Additionally, the FDA

provided regulatory considerations for HCT/Ps in July 2020. The FDA provided specific information regarding amniotic membranes. Example 19-4(b) and (c) of the FDA's regulatory considerations states, "An amniotic membrane product is used for wound healing and/or to reduce scarring and inflammation. This is not homologous use because wound healing and reduction of scarring and inflammation are not basic functions of amniotic membrane. An amniotic membrane product is applied to the surface of the eye to cover or offer protection from the surrounding environment in-ocular repair and reconstruction procedures. This is homologous use because serving as a covering and offering protection from the surrounding environment are basic functions of amniotic membrane." [*Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use*, U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download, accessed 07 June 2023]

The QIC has determined that the amniotic skin substitute allografts are denied as not medically reasonable and necessary under Section 1862(a)(1)(A) of the Act and the MPIM, Chapter 3, Section 3.6.2.2, as these products cannot be used for wound healing per the CFR and FDA. In every instance where EpiFix and Artacent were billed, the documentation contains the same entries which state, "Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amendable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair associated with "true reconstruction" (flaps & grafts) of the Primary defect…Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated for repair and wound healing of the wound/defect in order to: avoid the risks, complications and trauma associated with incisional reconstruction; and optimize skin function and cosmesis; create a natural barrier with a skin substitute allograft, minimize scar tissue formation, minimize pain, minimize disfigurement and dysfunction associated with unwanted contraction; reduce the risk of infection and to decrease the time and demands which the patient is required to devote to wound care."

The provider is not utilizing the products in a homologous manner as outlined in the preceding paragraph. Specifically, the documentation supports that the amniotic skin substitute allografts are being utilized for wound healing which is not homologous use. In addition, the provider documents that EpiFix and Artacent were applied to post-Mohs wounds due to the size and nature of the wounds and stated that wounds were not amenable to primary side to side repair. It is noted that oftentimes, the provider billed for an excessive amount of the product for wounds measuring much less. For instance, for Internal Control Number (ICN) 2322320303170, the medical records support that the beneficiary presented for Mohs to remove a squamous cell cancer on the right superior crus of the antihelix. The post-operative measurements of the wound measured 1.0 cm x 0.9 cm (0.9sqcm) but four units of the allograft were utilized with no units discarded and no indication of stacking the product in the wound. Thus, the provider is utilizing an excessive amount of the product that exceeds the needs of the beneficiary. The provider also documents that the skin substitute allografts were the most appropriate choice. However, the documentation does not support why the acute wounds required an expensive dressing and why the product was medically necessary over dressings more commonly utilized after Mohs Micrographic Surgery (MMS). This can be seen for Internal Control Number (ICN) 2322320900366. As such, payment must remain denied. This decision has been made in accordance with Section 1862(a)(1)(A) of the Act, 21 CFR Section 1271.3; 42 CFR Section 411.15(k)(1); CMS IOM, Pub. 100-02, MBPM Chapter 16, Section 20 and the MPIM, Chapter 3, Section 3.6.2.2.

In addition, services "related to" non-covered services, including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. For CPT codes 15271 through 15275, the QIC has determined that the services must remain denied as they are related to non-covered/primary services. Moreover, the QIC notes that contrary to the UPIC and MAC's denials, the documentation did support that the services were rendered as billed. Specifically, application of skin substitute grafts, not biological dressings, were applied to wounds. However, the services must remain denied for the reasons stated previously in accordance with CMS IOM, Pub. 100-02, MBPM, Chapter 16, Section 180.

E/M Services

During the prior levels of review, both the UPIC and MAC denied the E/M services because the documentation did not support that a significant and separately identifiable E/M service was performed on the same day as procedure. Modifier "-25" should only be used for E/M services when the services if the physician indicates that the service is for a significant, separately identifiable E/M service that is above and beyond the usual pre- and post-operative work of the procedure.

In every instance, the documentation does not support that the E/M service billed was separate from the procedure(s) performed on the same day. This can be seen for ICN 2322320303150. As such, payment cannot be made in accordance with the MCPM, Chapter 12, Section 30.6.6(B).

NPWT

LCD L37228 contains coverage guidelines for wound care, including NPWT. The LCD states NPWT, utilizing either durable or disposable medical equipment, involves the application of controlled or intermittent negative pressure to a properly dressed wound cavity. Suction (negative pressure) is applied under airtight wound dressings to promote the healing of open wounds resistant to prior treatments. The extent and number of services provided should be medically necessary and reasonable based on the documented medical evaluation of the patient's condition, diagnosis, and plan.

The UPIC and MAC denied this service and stated that the documentation did not support that wound vacuum was part of a plan of care, the documentation did not support the reason for the wound vacuum application and the documentation lacked an examination of the wound on the date of service at issue. The QIC has reviewed the documentation and has determined that the service associated with ICN 3322320900392 must remain denied for not meeting these requirements. While the documentation supports that a vacuum assisted closure was initiated to a wound located on the right central frontal scalp, there is no indication that vacuum assisted closure was part of the plan, there is no examination of the wound and there is no documented reason to state why the wound vacuum was chosen. As such, in accordance with LCD L37228, payment must remain denied.

**Conclusion**

The decision of the QIC is unfavorable and finds the services do not meet the Medicare requirements for payment. After careful consideration, QIC finds an overpayment was made. The provider is responsible to return the overpaid amount.

C2C Innovative Solutions, Inc.
P.O. Box 45258, Jacksonville, Florida 32232-5258

9477

File 3.pdf - Page 11 of 19

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 9478-9482

## Who is Responsible for the Bill?

When services are denied as not medically reasonable and necessary under the Medicare program, the QIC must also determine if the provider or beneficiary is liable for payment. Section 1879(a)-(g) of the Act, also referred to as "the limitation on liability provision," spells out how to arrive at this decision.

Medicare regulations, 42 CFR Part 424, require providers to be familiar with Medicare rules and regulations. In addition, 42 CFR Section 411.406 provides criteria for determining when a provider is responsible for payment for the services considered not reasonable and necessary. This regulation states that providers are presumed to have knowledge of published Medicare coverage rules and regulations, CMS Rulings, Medicare coverage policies in WPS bulletins or websites, and acceptable standards within the local community. The QIC finds that Advanced Dermatology and Skin Cancer Center, PA is liable for the denied charges and found at fault in causing an overpayment for the denied services. The records do not support the beneficiaries were notified in advance that Medicare would likely deny payment for the service(s) at issue. The beneficiaries cannot be charged for these service(s). [Section 1870 of the Act]

## Other Important Information

If you appeal this decision the Administrative Law Judge (ALJ) will not consider new evidence unless you show good cause for not presenting the evidence to the QIC. This requirement does not apply to beneficiaries, unless a provider or supplier represents the beneficiary.

For information on how to appeal this decision, refer to the page titled "Important Information about Your Appeal Rights." If you need more information or have any questions, please call 1-800-Medicare (1-800-633-4227) [TTY/TDD: 1-800-486-2048] or the phone number listed on page one.

You can receive copies of statutes, regulations, policies, and/or manual instructions we used to arrive at this decision. For instructions on how to do this, please see 'Other Important Information' on the page entitled "Important Information about Your Appeal Rights." The request must be submitted in writing to this office.

## IMPORTANT INFORMATION ABOUT YOUR APPEAL RIGHTS

### Your Right to Appeal this Decision

If you do not agree with this decision, you may file an appeal. The next level of appeal is an ALJ Hearing at the Office of Medicare Hearings and Appeals (OMHA). At this hearing, you or your representative may present your case to an ALJ.

*As of January 1, 2021, you must have $180.00 in dispute to appeal to an ALJ.* A claim can be combined ("aggregated") with others to reach this amount if: (1) the other claims have also been decided or dismissed by a QIC; (2) all of the claims are listed on your request for review; (3) your request for review is filed within 60 days of receipt of all of the QIC dismissals being appealed; and (4) you explain why you believe the claims involve similar or related services.

You can find more information about your right to an ALJ hearing at www.hhs.gov/omha or by calling 1-855-556-8475. This is a toll free call.

### How to Appeal

To exercise your right to appeal, you must file a written request for an ALJ hearing within **60 days** of receiving this letter.

When preparing your request for hearing, please use **Form CMS-20034 A/B**, available at:
www.hhs.gov/omha/forms/index.html

If you do not use the form, your request for hearing must include the following:

1. The Beneficiary's name, address, and Medicare health insurance claim number;
2. The name and address of the person appealing, if the person is not the beneficiary;
3. The representative's name and address, if any;
4. The Medicare appeal number listed on the front page of this reconsideration notice;
5. The dates of service for the claims at issue;
6. The reasons why you disagree with the QIC's reconsideration; and
7. A statement of any additional evidence to be submitted and the date it will be submitted.

Please **do not attach evidence to your hearing request**. If you have evidence to submit, please submit the evidence directly to the ALJ when your case is assigned.
Mail your hearing request to (tracked mail is suggested):

**HHS OMHA Central Operations**
**1001 Lakeside Avenue, Suite 930**
**Cleveland, OH 44114-1158**

If you are a Medicare Beneficiary filing a request for an ALJ hearing, please also include "**Attn: Beneficiary Mail Stop**" in the address above.

If your request for hearing is being filed late, you must explain why your request is being filed late.

The ALJ will require proof that you sent a copy of the request for hearing to the other parties who received a copy of the QIC reconsideration (for example, the Beneficiary or provider/supplier). Please **do not** send a copy of your hearing request to the QIC that issued the reconsideration or to the Medicare Administrative Contractor that issued the redetermination.

Please **do not** submit multiple requests for hearing for the same QIC reconsideration.

For additional filing tips, go to www.hhs.gov/omha or call 1-855-556-8475 for a copy.

### Who May File an Appeal

You or someone you name to act for you (your **appointed representative**) may file an appeal. You can name a relative, friend, advocate, attorney, doctor, or someone else to act for you.

If you want someone to act for you, you and your appointed representative must sign and date a statement naming that person to act for you and send it with your request for hearing. Call 1-800-MEDICARE (1-800-633-4227) to learn more about how to name a representative.

### Help With Your Appeal

You can have a friend or someone else help you with your appeal. If you have any questions about payment denials or appeals, you can also contact your State Health Insurance Assistance Program (SHIP). For information on contacting your local SHIP, call 1-800-MEDICARE (1-800-633-4227). Information about the ALJ hearing process can also be found at www.hhs.gov/omha or by calling 1-855-556-8475.

### Other Important Information

If you want copies of statutes, regulations, and/or policies we used to arrive at this decision, please write to us and attach a copy of this letter, at:

**C2C Innovative Solutions, Inc.**
A Medicare Contractor
P.O. Box 45258
Jacksonville FL 32232-5258

If you have questions, please call us at the phone number provided on the front of this notice.

### Other Resources To Help You

1-800-MEDICARE (1-800-633-4227),
TTY/TDD: 1-800-486-2048

18

**IMPORTANT INFORMATION ABOUT YOUR APPEAL RIGHTS**

ECAPE SCANNING SHEET
Information attached contains Personally Identifiable Information

If Found Return to:
OMHA Central Operations
1001 Lakeside Avenue, Suite 930
Cleveland, OH 44114



S-1000161086

File 4.pdf - Page 1 of 163



**DEPARTMENT OF HEALTH AND HUMAN SERVICES** OMHA/Central Operations
**Office of Medicare Hearings and Appeals**
**REQUEST FOR ADMINISTRATIVE LAW JUDGE (ALJ)**
**HEARING OR REVIEW OF DISMISSAL**

AUG 0 8 2023

RECEIVED

### Section 1: Which Medicare Part are you appealing (if known)? *(Check one)*

☐ Part A    ☒ Part B    ☐ Part C *(Medicare Advantage)* or Medicare Cost Plan    ☐ Part D *(Prescription Drug Plan)*

### Section 2: Which party are you, or which party are you representing? *(Check one)*

☐ The Medicare beneficiary or enrollee, or a successor (such as an estate), who received or requested the items or services being appealed, or is appealing a Medicare Secondary Payer issue.

☒ The provider or supplier that furnished the items or services to the Medicare beneficiary or enrollee, a Medicaid State agency, or an applicable plan appealing a Medicare Secondary Payer issue.

☐ Other. *Please explain:*

### Section 3: What is your (the appealing party's) information? *(Representative information in next section)*

| Name *(First, Middle Initial, Last)* | Firm or Organization *(if applicable)* |
|---|---|
| | Advanced Dermatology and Skin Cancer Center, PA |

| Address where appeals correspondence should be sent | City | State | ZIP Code |
|---|---|---|---|
| 2735 Pembrook Pl | Manhattan | KS | 66502 |

| Telephone Number | Fax Number | E-Mail |
|---|---|---|
| (785) 537-4990 | | |

### Section 4: What is the representative's information? *(Skip if you do not have a representative)*

| Name | Firm or Organization *(if applicable)* |
|---|---|
| Amanda M. Wilwert | Foulston Siefkin LLP |

| Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| 7500 College Blvd. Ste. 1400 | Overland Park | KS | 66210 |

| Telephone Number | Fax Number | E-Mail |
|---|---|---|
| (913) 253-2181 | | awilwert@foulston.com |

Did you file an appointment of representation (form CMS-1696) or other documents authorizing your representation at a prior level of appeal?

☐ No. *Please file the document(s) with this request.*
☒ Yes

### Section 5: What is being appealed? *Submit a separate request for each Reconsideration or Dismissal that you wish to appeal. If the appeal involves multiple beneficiaries or enrollees, use the multiple claim attachment (OMHA-100A).*

| Name of entity that issued the Reconsideration or Dismissal *(or attach a copy of the Reconsideration or Dismissal)* | Reconsideration (Medicare Appeal or Case) Number *(or attach a copy of the Reconsideration or Dismissal)* |
|---|---|
| C2C Innovative Solutions, Inc. | 1-12683356911 |

| Beneficiary or Enrollee Name | Health Insurance Claim Number |
|---|---|
| Multiple, see attached. | |

| Beneficiary or Enrollee Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| | | | |

| What item(s) or service(s) are you appealing? *(N/A if appealing a Dismissal)* | Date(s) of service being appealed *(if applicable)* |
|---|---|
| Q4186; Q4169; 15271; 15272; 15275; 15276; 97608; 99212; J0696 | 01/21/2022 to 05/123/2022 |

| Supplier or Provider Name *(N/A for Part D appeals)* | Supplier or Provider Telephone Number *(N/A for Part D appeals)* |
|---|---|
| Advanced Dermatology and Skin Cancer Center, PA | (785) 537-4990 |

| Supplier or Provider Mailing Address *(N/A for Part D appeals)* | City | State | ZIP Code |
|---|---|---|---|
| 2735 Pembrook Pl | Manhattan | KS | 66502 |

### Section 6: For appeals of prescription drugs ONLY *(Skip for all other appeals)*

| Part D Prescription Drug Plan Name | What drug(s) are you appealing? |
|---|---|
| | |

Are you requesting an expedited hearing? *(An expedited hearing is only available if your appeal is not solely related to payment (for example, you do not have the drug) and applying the standard time frame for a decision (90 days) may jeopardize your health, life, or ability to regain maximum function)*

☒ No.    ☐ Yes. *On a separate sheet, please explain or have your prescriber explain why applying the standard time frame for a decision (90 days) may jeopardize your health, life, or ability to regain maximum function.*

---

**Section 7: Why do you disagree with the Reconsideration or Dismissal being appealed?** (*Attach a continuation sheet if necessary*)

See attached.

---

**Section 8: Are you submitting evidence with this request, or do you plan to submit evidence?**

- [ ] I am not planning to submit evidence at this time. (*Skip to Section 9, below*)
- [ ] I am submitting evidence with this request.
- [x] I plan to submit evidence. Indicate what you plan to submit and when you plan to submit it: See attached

| | |
|---|---|
| Was the evidence already submitted for the matter that you are appealing? | [x] No. *Part A and Part B appeals only. If you are a provider or supplier, or a provider or supplier that is representing a beneficiary, you must include a statement explaining why the evidence is being submitted for the first time and was not submitted previously.*<br>[ ] Yes. |

---

**Section 9: Is there other information about your appeal that we should know?**

| | | |
|---|---|---|
| Are you aggregating claims to meet the amount in controversy requirement? (*If yes, attach your aggregation request. See 42 C.F.R. § 405.1006(e) and (f), and 423.1970(c) for request requirements.*) | [x] No | [ ] Yes |
| Are you waiving the oral hearing before an ALJ and requesting a decision based on the record? (*If yes, attach a completed form OMHA-104 or other explanation. N/A if requesting review of a dismissal.*) | [x] No | [ ] Yes |
| Does the request involve claims that were part of a statistical sample? (*If yes, please explain the status of any appeals for claims in the sample that are not included in this request.*) | [x] No | [ ] Yes |

---

**Section 10: Certification of copies sent to other parties** (*Part A and Part B appeals only*)

| | |
|---|---|
| If another party to the claim or issue that you are appealing was sent a copy of the Reconsideration or Dismissal, you must send a copy of your request for an ALJ hearing or review of dismissal to that party.<br><br>Indicate the party (or their representative) to whom and address where you are sending a copy of the request, and when the copy will be sent (*attach a continuation sheet if there are multiple parties*). | Name of Recipient<br>Wisconsin Physician Service Insurance Corporation |

| | | |
|---|---|---|
| Mailing Address<br>P.O. Box 1787 | | |
| City<br>Madison | State<br>WI | ZIP Code<br>53701 |
| Date of Mailing<br>April 25, 2023 | | |

- [ ] Check here if no other parties were sent a copy of the Reconsideration or Dismissal.

---

**Section 11: Filing instructions**

Your appealed claim must meet the current amount in controversy requirement to file an appeal. See the Reconsideration or Dismissal or visit www.hhs.gov/omha for information on the current amount in controversy. Send this request form to the entity in the appeal instructions that came with your reconsideration (for example, requests for hearing following a Part C reconsideration are generally sent to the entity that conducted the reconsideration). If instructed to send to OMHA, use the addresses below.

| Beneficiaries and enrollees, send your request to: | For expedited Part D appeals, send your request to: | All other appellants, send your request to: |
|---|---|---|
| OMHA Central Operations<br>Attn: Beneficiary Mail Stop<br>1001 Lakeside Ave., Suite 930<br>Cleveland, Ohio 44114-1158 | OMHA Central Operations<br>Attn: Expedited Part D Mail Stop<br>1001 Lakeside Ave., Suite 930<br>Cleveland, Ohio 44114-1158 | OMHA Central Operations<br>1001 Lakeside Ave., Suite 930<br>Cleveland, Ohio 44114-1158 |

We must receive this request within 60 calendar days after you received the Reconsideration or Dismissal that you are appealing. We will assume that you received the Reconsideration or Dismissal 5 calendar days after the date of the Reconsideration or Dismissal, unless you provide evidence to the contrary. *If you are filing this request late, attach a completed form OMHA-103 or other explanation for the late filing.*

## PRIVACY ACT STATEMENT

The legal authority for the collection of information on this form is authorized by the Social Security Act (section 1155 of Title XI and sections 1852(g)(5), 1860D-4(h)(1), 1869(b)(1), and 1876 of Title XVIII). The information provided will be used to further document your appeal. Submission of the information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your appeal. Information you furnish on this form may be disclosed by the Office of Medicare Hearings and Appeals to another person or governmental agency only with respect to the Medicare Program and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services and other agencies.

---

# If you need large print or assistance, please call 1-855-556-8475

**SECTION 4**
**Appointment of Representation**
**Form CMS -1696**

(copy attached)

Department of Health and Human Services
Centers for Medicare & Medicaid Services

Form Approved OMB No.0938-0950

## Appointment of Representative

| Name of Party | Medicare Number (beneficiary as party) or National Provider Identifier (provider or supplier as party) |
|---|---|
| Advanced Dermatology and Skin Cancer Center, P.A. | 1124094867 |

## Section 1: Appointment of Representative
**To be completed by the party seeking representation (i.e., the Medicare beneficiary, the provider or the supplier):**
I appoint this individual, Amanda M. Wilwert, to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the Act) and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my claim, appeal, grievance or request wholly in my stead. I understand that personal medical information related to my request may be disclosed to the representative indicated below.

| Signature of Party Seeking Representation | Date 04/27/2022 |
|---|---|
| Street Address 2735 Pembrook Pl | Phone Number (with Area Code) (785) 537-4990 |
| City Manhattan | State KS | Zip Code 66502 |
| Email Address (optional) | |

## Section 2: Acceptance of Appointment
**To be completed by the representative:**
I, Amanda M. Wilwert, hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services (HHS); that I am not, as a current or former employee of the United States, disqualified from acting as the party's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.
I am a / an attorney with Foulston Siefkin LLP and the firm has been engaged to represent Advanced Dermatology and Skin Cancer Center P.A. in the appeals process
*(Professional status or relationship to the party, e.g. attorney, relative, etc.)*

| Signature of Representative | Date 5/3/22 |
|---|---|
| Street Address 7500 College Blvd Ste. 1400 | Phone Number (with Area Code) 913-253-2181 |
| City Overland Park | State KS | Zip Code 66210 |
| Email Address (optional) awilwert@foulston.com | |

## Section 3: Waiver of Fee for Representation
**Instructions:** This section must be completed if the representative is required to, or chooses to, waive their fee for representation. (Note that providers or suppliers that are representing a beneficiary and furnished the items or services may not charge a fee for representation and **must** complete this section.)
I waive my right to charge and collect a fee for representing _____ before the Secretary of HHS.

| Signature | Date |
|---|---|
| | |

## Section 4: Waiver of Payment for Items or Services at Issue
**Instructions:** Providers or suppliers serving as a representative for a beneficiary to whom they provided items or services must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act. (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, or could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.) I waive my right to collect payment from the beneficiary for the items or services at issue in this appeal if a determination of liability under §1879(a)(2) of the Act is at issue.

| Signature | Date |
|---|---|
| | |

VOL. I

9490

**SECTION 5**
**Medicare Reconsideration Decision**

(copy attached)

<div style="border:1px solid;">

**Medicare Appeal
Number:
1-12683356911**

</div>

JUNE 9, 2023

FOULSTON ATTORNEYS AT LAW
7500 COLLEGE BLVD STE 1400
OVERLAND PARK KS 66210

**Medicare Reconsideration Decision**

RE:
BENEFICIARIES: SEE ATTACHED LIST
MED ID#: SEE ATTACHED LIST
APPELLANT: ADVANCED DERMATOLOGY AND SKIN
CANCER CENTER, PA

Dear A. Wilert, Esq.:

This letter is to inform you of the decision on your Medicare appeal. An appeal is
a new and independent review of a claim. You are receiving this letter because
you requested an appeal for the services shown under the *Analysis* section.

The appeal decision is UNFAVORABLE. The Qualified Independent
Contractor's (QIC's) decision is that Medicare will make no additional
payment. More information on the decision is provided on the next pages. You
are not required to take any action. If you disagree with the decision, you may
appeal to an Administrative Law Judge (ALJ). You must file your appeal, in
writing, within 60 days of receipt of this letter. For more information on how to
appeal, see the page entitled "Important Information About Your Appeal
Rights." The amount still in dispute is estimated to be equal to or over $180.
However, the ALJ will determine if your appeal case meets the $180 amount in
controversy requirement for an ALJ hearing.

If this appeal is partially favorable or unfavorable, and it originated from an
overpayment, the Medicare Administrative Contractor (MAC) is responsible
for processing this determination in accordance with standard Medicare
methodologies. Any outstanding debts, prior coverage, and prior
reimbursement will be taken into account when processing this decision. The

<div style="border:1px solid;">

**Contact
Information**

If you have
questions, write or
call:

*C2C Innovative
Solutions, Inc.*
Medicare Part B
North
QIC Contractor
P.O. Box 45258
Jacksonville, FL
32232-5258

*Telephone:*
904-224-7426

Who we are:
We are a Qualified
Independent
Contractor (QIC).
Medicare has
contracted with us to
review your file and
make an independent
decision.

</div>

MAC will issue a demand letter containing information regarding the collection process, interest accrual, and requesting an extended repayment schedule (ERS).

A copy of this letter was also sent to the parties shown below. C2C Innovative Solutions, Inc. (C2C) was contracted by Medicare to review your appeal.

Sincerely,

R. S. Marcus, M.D.
Medical Director

CC:     Wisconsin Physician Service Insurance Corporation
        Advanced Dermatology and Skin Cancer Center, PA

> ### Summary of Facts

Artacent and Epifix products and their related applications, as well as evaluation and management (E/M) services were provided by Advanced Dermatology and Skin Cancer Center, PA from January 21, 2022, through May 23, 2022. The appellant submitted claims for these services to Wisconsin Physician Service Insurance Corporation (WPS), the Medicare Administrative Contractor (MAC). The MAC initially paid the claims in full. Subsequently, CoventBridge Group, the Unified Program Integrity Contractor (UPIC), then conducted a post-payment review.

On July 8, 2022, the UPIC sent the appellant a request for medical records needed to conduct a post-payment review of claims. A second request for medical records was sent to the appellant on August 8, 2022. The UPIC's review was prompted by data analysis which suggested your practice improperly billed Medicare for services. Specifically, the UPIC reviewed a 55-claim sample involving 163 services. The UPIC denied the services for the following reasons:
- The services were not reasonable and necessary:
    - The services were not used in a homologous fashion;
    - The provider did not apply a true graft;
    - The provider billed and used larger sized products than necessary;
    - Cloned documentation;
- The services were not rendered as billed; and/or,
- The services were related to non-covered/denied primary services.

Using that sample of claims, the UPIC discovered an overpayment amount of $116,450.65. The appellant was notified of the total overpayment amount on November 10, 2022.

From November 21, 2022, through November 23, 2022, the MAC issued overpayment notification letters (demand letters) to the appellant.

On December 13, 2022, A. M. Wilwert, Esq., of Foulston, Attorneys at Law (also referred to as appellant) submitted a redetermination request to the MAC. The MAC issued a redetermination decision on February 6, 2023, which upheld the overpayment determination. Specifically, the MAC denied the services for the following reasons:
- The documentation failed to support the services were not reasonable and necessary, ordered as billed and rendered as billed; and/or,
- The documentation did not support the E/M services were a separate service from the procedures billed.

On April 11, 2023, C2C Innovative Solutions, Inc. (C2C), the Qualified Independent Contractor (QIC), received a reconsideration request dated April 7, 2023, for eight units of Current Procedural Terminology (CPT) code 15271; one unit of CPT code 15272; 52 units of CPT code 15275; seven units of CPT code 15276; one unit of CPT code 97608; four units of CPT code 99212; one unit of Healthcare Common Procedure Coding System (HCPCS) code J0696; 120 units of HCPCS code Q4169; and 572 units of HCPCS code Q4186. An Appointment of Representative form dated May 3, 2022, was submitted with the reconsideration request.

3

The QIC review is a *de novo* review of the case based on the information provided from all prior levels of review and the appellant. The responsibilities of the QIC include rendering a decision only on the coverage or payment issues raised by the review request and the QIC's scope of review.

Key records contained in the case file included:
- Appointment of Representative Form dated May 3, 2022
- Reconsideration Request dated April 7, 2023
- MAC Redetermination Decision Letter dated February 6, 2023
- Redetermination Request dated December 13, 2022
- MAC Overpayment Notification Letters dated November 21, 2022, through November 23, 2022
- UPIC Post-payment Review Results and Overpayment Determination dated November 10, 2022
- UPIC Request for Medical Records dated July 8, 2022, and August 8, 2022
- Medical Records

<div style="border:1px solid black; text-align:center; font-weight:bold;">

**Decision**

</div>



A panel of licensed health care professionals, including a physician, reviewed the documentation in this case and made these decisions.

The decision on your appeal is shown in the table (*Conclusion* section) below.

We have determined the provider is responsible for the denied charges.

<div style="border:1px solid black; text-align:center; font-weight:bold;">

**Explanation of the Decision**

</div>

### Laws, Regulations, and Applicable Policies

The QIC performs reconsideration review in accordance with Medicare rules and regulations. The laws, regulations, and policies pertaining to this case are identified below. Findings and the decision rendered will follow in the QIC's *Claim Review* section.

**Medical Necessity**

Medicare provides coverage for items and services that are reasonable and necessary to diagnose or treat an illness or injury or to improve a malformed body member. Payment is excluded if the medical necessity for the service cannot be substantiated. [Section 1862(a)(1)(A) of the Social Security Act (the Act) and the Centers for Medicare & Medicaid Services (CMS) Internet-Only Manual (IOM), Publication (Pub.) 100-02, Medicare Benefit Policy Manual (MBPM), Chapter 16, Section 20]

**Documentation Requirements**

Medicare guidelines place the burden upon the provider to furnish information that may be necessary to determine if payment is due. The service rendered to the patient must be documented in a clear and

4

understandable fashion. The information must be clearly displayed in the medical records. [Section 1833(e) of the Act and Title 42 Code of Federal Regulations (42 CFR) Section 424.5(a)(6)]

**Scope of Review**

QICs generally have discretion while conducting appeals to develop new issues and review all aspects of coverage and payment related to a claim or claim line. However, for reconsiderations of claims denied following a complex pre-payment review, a complex post-payment review or an automated post-payment review by a contractor, QICs are required to limit their review to the reason(s) the claim or line item at issue was initially denied.

If a QIC conducts a reconsideration where the line item or claim was denied on pre or post-payment review for lack of documentation, the QIC will review all applicable coverage and payment requirements for the item or service at issue, including whether the item or service was medically reasonable and necessary. This limitation on scope of review is effective for all reconsideration requests received on or after April 18, 2016. [Medicare Learning Network (MLN) Matters Number SE 1521]

**Human Cellular and Tissue based Products (HCT/Ps)**

Are my HCT/Ps regulated solely under Section 361 of the Public Health Service (PHS) Act and the regulations in this part, and if so what must I do?
    (a) An HCT/P is regulated solely under Section 361 of the PHS Act and the regulations in this part if it meets all of the following criteria:
        (1) The HCT/P is minimally manipulated;
        (2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
        (3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
        (4) Either:
            (i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
            (ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
                (a) Is for autologous use;
                (b) Is for allogeneic use in a first-degree or second-degree blood relative; or
                (c) Is for reproductive use. [Title 21 CFR Section 1271.10]

How does the Food and Drug Administration (FDA) define important terms in this part?

    (a) Autologous use means the implantation, transplantation, infusion, or transfer of human cells or tissue back into the individual from whom the cells or tissue were recovered.
    (c) Homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor.

5

(d) HCT/Ps means articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient. [21 CFR Section 1271.3]

FDA acceptance of an establishment registration and HCT/P listing form does not constitute a determination that an establishment is in compliance with applicable rules and regulations or that the HCT/P is licensed or approved by FDA. [21 CFR Part 1271.27(b)]

**Particular Services Excluded from Coverage**

The following services are excluded from coverage: Any services that are not reasonable and necessary for one of the following purposes: For the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. [42 CFR Section 411.15(k)(1)]

**Related Services**

Medical and hospital services are sometimes required to treat a condition that arises as a result of services that are not covered because they are determined to be not reasonable and necessary or because they are excluded from coverage for other reasons. Services "related to" non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services "not related to" non-covered services are covered under Medicare. [CMS IOM, Pub. 100-02, MBPM, Chapter 16, Section 180]

**CPT Modifier "-25" - Significant E/M Service by Same Physician on Date of Global Procedure**

Medicare requires that CPT modifier -25 should only be used on claims for E/M services, and only when these services are provided by the same physician (or same qualified nonphysician practitioner [NPP]) to the same patient on the same day as another procedure or other service. A/B MACs (B) pay for an E/M service provided on the day of a procedure with a global fee period if the physician indicates that the service is for a significant, separately identifiable E/M service that is above and beyond the usual pre- and post-operative work of the procedure. Different diagnoses are not required for reporting the E/M service on the same date as the procedure or other service. Modifier "-25" is added to the E/M code on the claim. Both the medically necessary E/M service and the procedure must be appropriately and sufficiently documented by the physician or qualified NPP in the patient's medical record to support the claim for these services, even though the documentation is not required to be submitted with the claim. [CMS IOM, Pub. 100-04, Medicare Claims Processing Manual (MCPM), Chapter 12, Section 30.6.6(B)]

**Reasonable and Necessary Criteria**

CMS issues national coverage determinations (NCDs) that specify whether certain items, services, procedures or technologies are reasonable and necessary under Section 1862(a)(l)(A) of the Act. In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no local coverage determination (LCD) exists for a particular item or service, the MACs, Comprehensive Error Rate Testing (CERT), Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:

6

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
  o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
  o Furnished in a setting appropriate to the beneficiary's medical needs and condition;
  o Ordered and furnished by qualified personnel; and,
  o One that meets, but does not exceed, the beneficiary's medical need.

There are several exceptions to the requirement that a service be reasonable and necessary for diagnosis or treatment of illness or injury in order to be considered for payment. The exceptions appear in the full text of Section 1862(a)(l)(A) of the Act. See also Medicare Program Integrity Manual (MPIM) Chapters 13, Section 5.1 and 7.1. [CMS IOM, Pub. 100-08, MPIM, Chapter 3, Section 3.6.2.2]

**Wound Care**

Negative Pressure Wound Therapy (NPWT)

NPWT, utilizing either durable or disposable medical equipment, involves the application of controlled or intermittent negative pressure to a properly dressed wound cavity. Suction (negative pressure) is applied under airtight wound dressings to promote the healing of open wounds resistant to prior treatments. Coverage of traditional NPWT (tNPWT) device/unit/type, or supplies is under DME and providers should consult their DME LCD for specific coverage, parameters, and guidelines.

Utilization Guidelines

The number of debridements and NPWT for a wound within the context of a palliative treatment plan (i.e., when wounds are not expected to heal or when patients are in an end-of-life situation) would be expected to be of a limited frequency and duration consistent with that of palliative care.

The extent and number of services provided should be medically necessary and reasonable based on the documented medical evaluation of the patient's condition, diagnosis, and plan. [Local Coverage Determination (LCD) L37228]

**Overpayments**

Overpayments are Medicare payments a provider or beneficiary has received in excess of amounts due and payable under the statute and regulations. Once a determination of an overpayment has been made, the amount is a debt owed by the debtor to the United States (U.S.) Government.

Under the Federal Claims Collection Act of 1966, as amended, each agency of the Federal Government (pursuant to regulations jointly promulgated by the Attorney General and the Comptroller General of the U.S.) must attempt collection of claims of the Federal Government for money arising out of the activities of the agency. The Fiscal Intermediary (FI) or carrier will not be liable for overpayments it makes to debtors in the absence of fraud or gross negligence on its part, however once an intermediary or carrier determines an overpayment has been made it must attempt recovery of overpayments in accordance with CMS regulations.

7

The Federal Claims Collection Act requires timely and aggressive efforts to recover overpayments, including efforts to locate the debtor where necessary, demands for repayment, and establishment of repayment schedules, suspension of interim payments by intermediaries to institutional providers, and recoupment or setoff, where appropriate.

In addition, The Debt Collection Improvement Act of 1996 requires Federal agencies to refer eligible delinquent debt to a Treasury designated Debt Collection Center (DCC) for cross servicing and offset. CMS is mandated to refer all eligible debt over 180 days delinquent for cross servicing and offset. [CMS IOM, Pub. 100-06, Medicare Financial Management Manual (MFMM), Chapter 3, Section 10]

## Analysis

The following services are at issue for reconsideration:

- **15271** Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 square centimeter (sq cm); first 25 sq cm or less wound surface area

- **15272** Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure)

- **15275** Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

- **15276** Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure)

- **97608** Negative pressure wound therapy, (e.g., vacuum assisted drainage collection), utilizing disposable, non-durable medical equipment including provision of exudate management collection system, topical application(s), wound assessment, and instructions for ongoing care, per session; total wound(s) surface area greater than 50 square centimeters

- **99212** Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and straightforward medical decision making. When using time for code selection, 10-19 minutes of total time is spent on the date of the encounter.

- **J0696** Injection, ceftriaxone sodium, per 250 mg

- **Q4169** Artacent wound, per sq cm

- **Q4186** Epifix, per sq cm

## Appellant Arguments and QIC Responses

Below are the points made by the appellant within the reconsideration appeal:

**Appellant Argument 1:** The claims were billed correctly in accordance with the applicable Medicare regulations, reasonable and necessary and appropriately documented. The appellant cites Local

8

Coverage Article (LCA) A57477 to support the medical necessity of the grafts after Mohs surgery. In addition, the appellant states the package inserts for both the Artacent and MiMedx allografts used for the surgical repair indicate that an appropriate use is as a barrier for use in the treatment of acute and chronic wounds, providing a protective environment to support the healing process. Thus, the appellant was using allografts consistent with the use indicated on the labels. A peer review journal article and references to insurance company policies were included in the appellant rebuttal to support the necessity of the services.

> **The QIC's Response:** Medical necessity is an essential element in determining if payment for a service(s) is appropriate. Medicare has established guidelines which state that medical necessity must be documented in the medical record in order for a service to be reimbursed. The QIC review is a *de novo* review, within the scope of review requirements, of the case based on the provided information from all prior levels of review and the appellant. The responsibilities of the QIC include rendering a decision only on the coverage or payment issues raised by the review request and within the QIC's scope of review. Further information regarding the QIC's detailed review is located under the section titled *Claim Review*.
>
> In addition, LCA A57477 is not relevant to the services at issue in this appeal as Mohs surgeries (codes 17311 through 17315) are not part of the UPIC and MAC's denials and are not being appealed.

**Appellant Argument 2:** The UPIC's findings were based on articles and guidance documents that are not applicable to the services provided.

> **The QIC's Response:** The QIC finds that any flawed rationale used by the UPIC or MAC in the redetermination decision is cured by the QIC reconsideration.

## Claim Review

The issue is whether payment can be made for the Artacent and Epifix products and their related applications, as well as the E/M services billed. The UPIC and MAC denied the services for the following reasons:

- The services were not reasonable and necessary:
  - The services were not used in a homologous fashion;
  - The provider did not apply a true graft;
  - The provider billed and used larger sized products than necessary;
  - Cloned documentation;
- The services were not rendered as billed; and/or,
- The services were related to non-covered/denied primary services

The QIC will provide a detailed reconsideration review by section below.

Skin Substitute Allografts

The 21 CFR Section 1271 states a HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent. Additionally, the FDA provided regulatory considerations for HCT/Ps in July 2020. The FDA provided specific information regarding amniotic membranes. Example 19-4(b) and (c) of the FDA's regulatory considerations states,

9

"An amniotic membrane product is used for wound healing and/or to reduce scarring and inflammation. This is not homologous use because wound healing and reduction of scarring and inflammation are not basic functions of amniotic membrane. An amniotic membrane product is applied to the surface of the eye to cover or offer protection from the surrounding environment in-ocular repair and reconstruction procedures. This is homologous use because serving as a covering and offering protection from the surrounding environment are basic functions of amniotic membrane." [*Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use*, U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download, accessed 07 June 2023]

The QIC has determined that the amniotic skin substitute allografts are denied as not medically reasonable and necessary under Section 1862(a)(1)(A) of the Act and the MPIM, Chapter 3, Section 3.6.2.2, as these products cannot be used for wound healing per the CFR and FDA. In every instance where EpiFix and Artacent were billed, the documentation contains the same entries which state, "Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amendable to Primary to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair associated with "true reconstruction" (flaps & grafts) of the Primary defect...Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated for repair and wound healing of the wound/defect in order to: avoid the risks, complications and trauma associated with incisional reconstruction; and optimize skin function and cosmesis; create a natural barrier with a skin substitute allograft, minimize scar tissue formation, minimize pain, minimize disfigurement and dysfunction associated with unwanted contraction; reduce the risk of infection and to decrease the time and demands which the patient is required to devote to wound care."

The provider is not utilizing the products in a homologous manner as outlined in the preceding paragraph. Specifically, the documentation supports that the amniotic skin substitute allografts are being utilized for wound healing which is not homologous use. In addition, the provider documents that EpiFix and Artacent were applied to post-Mohs wounds due to the size and nature of the wounds and stated that wounds were not amenable to primary side to side repair. It is noted that oftentimes, the provider billed for an excessive amount of the product for wounds measuring much less. For instance, for Internal Control Number (ICN) 2322320303170, the medical records support that the beneficiary presented for Mohs to remove a squamous cell cancer on the right superior crus of the antihelix. The post-operative measurements of the wound measured 1.0 cm x 0.9 cm (0.9sqcm) but four units of the allograft were utilized with no units discarded and no indication of stacking the product in the wound. Thus, the provider is utilizing an excessive amount of the product that exceeds the needs of the beneficiary. The provider also documents that the skin substitute allografts were the most appropriate choice. However, the documentation does not support why the acute wounds required an expensive dressing and why the product was medically necessary over dressings more commonly utilized after Mohs Micrographic Surgery (MMS). This can be seen for Internal Control Number (ICN) 2322320900366. As such, payment must remain denied. This decision has been made in accordance with Section 1862(a)(1)(A) of the Act, 21 CFR Section 1271.3; 42 CFR Section 411.15(k)(1); CMS IOM, Pub. 100-02, MBPM Chapter 16, Section 20 and the MPIM, Chapter 3, Section 3.6.2.2.

In addition, services "related to" non-covered services, including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. For CPT codes 15271 through

10

15275, the QIC has determined that the services must remain denied as they are related to non-covered/primary services. Moreover, the QIC notes that contrary to the UPIC and MAC's denials, the documentation did support that the services were rendered as billed. Specifically, application of skin substitute grafts, not biological dressings, were applied to wounds. However, the services must remain denied for the reasons stated previously in accordance with CMS IOM, Pub. 100-02, MBPM, Chapter 16, Section 180.

E/M Services

During the prior levels of review, both the UPIC and MAC denied the E/M services because the documentation did not support that a significant and separately identifiable E/M service was performed on the same day as procedure. Modifier "-25" should only be used for E/M services when the services if the physician indicates that the service is for a significant, separately identifiable E/M service that is above and beyond the usual pre- and post-operative work of the procedure.

In every instance, the documentation does not support that the E/M service billed was separate from the procedure(s) performed on the same day. This can be seen for ICN 2322320303150. As such, payment cannot be made in accordance with the MCPM, Chapter 12, Section 30.6.6(B).

NPWT

LCD L37228 contains coverage guidelines for wound care, including NPWT. The LCD states NPWT, utilizing either durable or disposable medical equipment, involves the application of controlled or intermittent negative pressure to a properly dressed wound cavity. Suction (negative pressure) is applied under airtight wound dressings to promote the healing of open wounds resistant to prior treatments. The extent and number of services provided should be medically necessary and reasonable based on the documented medical evaluation of the patient's condition, diagnosis, and plan.

The UPIC and MAC denied this service and stated that the documentation did not support that wound vacuum was part of a plan of care, the documentation did not support the reason for the wound vacuum application and the documentation lacked an examination of the wound on the date of service at issue. The QIC has reviewed the documentation and has determined that the service associated with ICN 3322320900392 must remain denied for not meeting these requirements. While the documentation supports that a vacuum assisted closure was initiated to a wound located on the right central frontal scalp, there is no indication that vacuum assisted closure was part of the plan, there is no examination of the wound and there is no documented reason to state why the wound vacuum was chosen. As such, in accordance with LCD L37228, payment must remain denied.

**Conclusion**

The decision of the QIC is unfavorable and finds the services do not meet the Medicare requirements for payment. After careful consideration, QIC finds an overpayment was made. The provider is responsible to return the overpaid amount.

C2C Innovative Solutions, Inc.
P.O. Box 45268, Jacksonville, Florida 32232-5258
VOL. I                                                                                                      9502

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 9503-9507

## Who is Responsible for the Bill?

When services are denied as not medically reasonable and necessary under the Medicare program, the QIC must also determine if the provider or beneficiary is liable for payment. Section 1879(a)-(g) of the Act, also referred to as "the limitation on liability provision," spells out how to arrive at this decision.

Medicare regulations, 42 CFR Part 424, require providers to be familiar with Medicare rules and regulations. In addition, 42 CFR Section 411.406 provides criteria for determining when a provider is responsible for payment for the services considered not reasonable and necessary. This regulation states that providers are presumed to have knowledge of published Medicare coverage rules and regulations, CMS Rulings, Medicare coverage policies in WPS bulletins or websites, and acceptable standards within the local community. The QIC finds that Advanced Dermatology and Skin Cancer Center, PA is liable for the denied charges and found at fault in causing an overpayment for the denied services. The records do not support the beneficiaries were notified in advance that Medicare would likely deny payment for the service(s) at issue. The beneficiaries cannot be charged for these service(s). [Section 1870 of the Act]

## Other Important Information

If you appeal this decision the Administrative Law Judge (ALJ) will not consider new evidence unless you show good cause for not presenting the evidence to the QIC. This requirement does not apply to beneficiaries, unless a provider or supplier represents the beneficiary.

For information on how to appeal this decision, refer to the page titled "Important Information about Your Appeal Rights." If you need more information or have any questions, please call 1-800-Medicare (1-800-633-4227) [TTY/TDD: 1-800-486-2048] or the phone number listed on page one.

You can receive copies of statutes, regulations, policies, and/or manual instructions we used to arrive at this decision. For instructions on how to do this, please see 'Other Important Information' on the page entitled "Important Information about Your Appeal Rights." The request must be submitted in writing to this office.

## IMPORTANT INFORMATION ABOUT YOUR APPEAL RIGHTS

### Your Right to Appeal this Decision

If you do not agree with this decision, you may file an appeal. The next level of appeal is an ALJ Hearing at the Office of Medicare Hearings and Appeals (OMHA). At this hearing, you or your representative may present your case to an ALJ.

*As of January 1, 2021, you must have $180.00 in dispute to appeal to an ALJ.* A claim can be combined ("aggregated") with others to reach this amount if: (1) the other claims have also been decided or dismissed by a QIC; (2) all of the claims are listed on your request for review; (3) your request for review is filed within 60 days of receipt of all of the QIC dismissals being appealed; and (4) you explain why you believe the claims involve similar or related services.

You can find more information about your right to an ALJ hearing at www.hhs.gov/omha or by calling 1-855-556-8475. This is a toll free call.

### How to Appeal

To exercise your right to appeal, you must file a written request for an ALJ hearing within **60 days** of receiving this letter.

When preparing your request for hearing, please use **Form CMS-20034 A/B**, available at: www.hhs.gov/omha/forms/index.html

If you do not use the form, your request for hearing must include the following:

1.  The Beneficiary's name, address, and Medicare health insurance claim number;
2.  The name and address of the person appealing, if the person is not the beneficiary;
3.  The representative's name and address, if any;
4.  The Medicare appeal number listed on the front page of this reconsideration notice;
5.  The dates of service for the claims at issue;
6.  The reasons why you disagree with the QIC's reconsideration; and
7.  A statement of any additional evidence to be submitted and the date it will be submitted.

Please **do not attach evidence to your hearing request**. If you have evidence to submit, please submit the evidence directly to the ALJ when your case is assigned.
Mail your hearing request to (tracked mail is suggested):

**HHS OMHA Central Operations**
**1001 Lakeside Avenue, Suite 930**
**Cleveland, OH 44114-1158**

If you are a Medicare Beneficiary filing a request for an ALJ hearing, please also include **"Attn: Beneficiary Mail Stop"** in the address above.

If your request for hearing is being filed late, you must explain why your request is being filed late.

The ALJ will require proof that you sent a copy of the request for hearing to the other parties who received a copy of the QIC reconsideration (for example, the Beneficiary or provider/supplier). Please **do not** send a copy of your hearing request to the QIC that issued the reconsideration or to the Medicare Administrative Contractor that issued the redetermination.

Please **do not** submit multiple requests for hearing for the same QIC reconsideration.

For additional filing tips, go to www.hhs.gov/omha or call 1-855-556-8475 for a copy.

### Who May File an Appeal

You or someone you name to act for you (your **appointed representative**) may file an appeal. You can name a relative, friend, advocate, attorney, doctor, or someone else to act for you.

If you want someone to act for you, you and your appointed representative must sign and date a statement naming that person to act for you and send it with your request for hearing. Call 1-800-MEDICARE (1-800-633-4227) to learn more about how to name a representative.

### Help With Your Appeal

You can have a friend or someone else help you with your appeal. If you have any questions about payment denials or appeals, you can also contact your State Health Insurance Assistance Program (SHIP). For information on contacting your local SHIP, call 1-800-MEDICARE (1-800-633-4227). Information about the ALJ hearing process can also be found at www.hhs.gov/omha or by calling 1-855-556-8475.

### Other Important Information

If you want copies of statutes, regulations, and/or policies we used to arrive at this decision, please write to us and attach a copy of this letter, at:

**C2C Innovative Solutions, Inc.**
A Medicare Contractor
P.O. Box 45258
Jacksonville FL 32232-5258

If you have questions, please call us at the phone number provided on the front of this notice.

### Other Resources To Help You

1-800-MEDICARE (1-800-633-4227),
TTY/TDD: 1-800-486-2048

18

**SECTION 5
Multiple Claim Attachment
OMHA-100A**

(see attached)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGE 9511

# SECTION 7

## Statement of Disagreement with Reconsideration Decision

(see attached)

# FOULSTON

ATTORNEYS AT LAW

Amanda M. Wilwert

awilwert@foulston.com
Phone: 913.253.2181
Fax: 913.498.2101

7500 COLLEGE BOULEVARD, SUITE 1400
OVERLAND PARK, KS 66210-4041

August 7, 2022

## REQUEST FOR ADMINISTRATIVE LAW JUDGE HEARING
### (LEVEL 3 APPEAL)

OMHA Central Operations
1001 Lakeside Ave., Suite 930
Cleveland, Ohio 44114-1158

   Re:  Advanced Dermatology and Skin Cancer Center
       Medicare Appeals Number: 1-12683356911

To Whom It May Concern:

  On or about June 9, 2023, C2C Innovative Solutions, Inc., the Qualified Independent Contractor ("QIC"), notified Advanced Dermatology and Skin Cancer Center PA ("Advanced Dermatology") that it received an unfavorable appeal decision on Advanced Dermatology's request for reconsideration in the above-referenced appeal.

  The QIC denied several claims on the grounds that (1) the documentation does not support that the allograft was medically necessary per accepted standards of medical practice; (2) the documentation is related to a non-covered/primary service; and (3) the documentation does not support that the service was rendered as billed. We disagree with the QIC's unfavorable findings. We are writing to request and administrative law judge hearing of the denied claims. The denied claims include: application of skin substitute graft (procedure codes 15271, 15272, 15275; and 15276); Artacent wound (procedure code Q4169); Epifix (procedure code Q4186); negative pressure wound therapy (procedure code 97608); office or other outpatient visit for the evaluation and management of an established patient (procedure code 99212); and injection, ceftriaxone sodium (procedure code J0696).

  For the timeframe applicable to this denial, Advanced Dermatology maintained processes and procedures for determining the clinically appropriate level of care. These procedures were based on established clinical criteria, community standards of care, guidelines from peer-reviewed medical journals, and internal review processes. Advanced Dermatology is confident that the above referenced claims were billed correctly in accordance with the applicable Medicare regulations. Put simply, the care Advanced Dermatology provided was reasonable and necessary and appropriately documented.

  Advanced Dermatology recently concluded an Administrative Law Judge ("ALJ") appeal in which the QIC denied the same type of claims (procedure codes 15271; 15272; 15273; 15274; Q4169; and Q4186) on the same grounds. The ALJ found in Advanced

VOL. I   FOULSTON SIEFKIN LLP | KANSAS CITY · TOPEKA · WICHITA | FOULSTON.COM   9513

File 4.pdf - Page 28 of 163

Page 2

Dermatology's favor on several of the claims. Those ALJ decisions are attached to this request and are the new evidence Advanced Dermatology submits in this appeal. Those decisions are dated July 24, 2023, and were not available during the lower levels of appeal.

### Background on Mohs Micrographic Surgery and Allografts

Dr. John Adams is a board-certified dermatologist and an accredited Mohs surgeon who has practiced in the Manhattan, Kansas area at Advanced Dermatology since 1998. Dr. Adams expanded his dermatology practice to Nebraska and Missouri in 2020. From 2013 to 2016, Dr. Adams served on the Board of Directors for the American Society for Mohs Surgery. Since 2014, Dr. Adams has served as a Clinical Assistant Professor at the University of Kansas School Medicine. In 2016, Dr. Adams served as the President of the Kansas Society for Dermatology and Dermatologic Surgery. Also in 2016, Dr. Adams was recognized for his significant contribution to the specialty of dermatology and his dedication to patient care and received the 2017 American Academy of Dermatology's Presidential Citation Award.

Advanced Dermatology focuses on Mohs Micrographic Surgery ("MMS" or "Mohs"). Mohs Surgery is a complex excision technique for the removal of high risk for recurrence skin cancers. Mohs surgery provides the highest cure rate (99%) while sparing the maximal amount of normal non-cancerous tissue. The resulting wound is repaired through true reconstructive techniques, including but not limited to flaps and grafts (allografts). The majority of Mohs surgeons in the state of Kansas have been applying allografts to post Mohs surgery wounds (acute wounds) since at least 2020; hence allograft application subsequent to Mohs surgery is appropriate and in accordance with accepted standards of medical practice for the treatment of the patient's condition or to improve the function of a malformed body member.

### LCA 57477

While the wound from a Mohs procedure is less than those from other surgical excisions, a Mohs surgical wound can be extensive and require repair. Thus, there are generally three options for repairs after a Mohs procedure depending on the extent of the surgical wound: (1) secondary intention, which allows the surgical wound to heal on its own; (2) primary side to side repairs, which involve suturing the skin edges together; and (3) "true reconstructive surgery" including, but not limited to flaps and grafts (allografts).

Advanced Dermatology provided care and documentation to all patients consistent with WPS Local Coverage Determinations ("LCD") and Local Coverage Articles ("LCA") related to Mohs procedures and repairs. In addition to covering the Mohs procedure, WPS LCA 57477 (Mohs Micrographic Surgery) also provides coverage guidelines for the repair of the post Mohs surgical wound. WPS LCA 57477 provides that, *to support medical necessity, the patient's medical record should include*:

11. Measurement of the primary lesion necessitating MMS and measurements in support of repair or related procedures (such as but not

Page 3

limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:

- Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).
- Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
- It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.

12. When the surgical defect created by MMS requires reconstruction, *it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.*

In other words, the documentation requirements for *any repair* subsequent to Mohs surgery are set forth in the Mohs LCA 57477, thus *"completing the MMS procedure".* One of the keys to LCA 57477 documentation requirements for repair are photos. Therefore, we composed a fully bookmarked PDF which contains clinical photos and all of the medical indications associated with that specific patient which are vital to justify application of allograft over repair via flaps, other types of grafts or secondary intention.

Every case reviewed by the UPIC was a surgical defect created by the removal of a skin cancer via MMS, which was then in need of repair via true reconstructive surgery. The documentation in the patient's medical record included measurements, photos and the *rational that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance* as per the documentation requirements set forth in Mohs LCA 57477.

In fact, the article *Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane*, published in the peer review journal, *Facial Plastic Surgery & Aesthetic Medicine*, provides information on allografts and their use in post Mohs defects and compared repair via allograft vs. repair via flaps or grafts in a propensity matched (similar patients and cancers in both groups) study. The article includes medical indications, guidelines and allograft utilization in a large, involving 1,550 patients, study. The study included patients with a diagnosis of basal or squamous cell carcinoma and a post Mohs surgery defect. The key findings of the article are: "the incidence of infection and all-cause postoperative morbidity in placental allograft repairs was significantly lower than observed with autologous tissue [flaps and grafts]." The significance was a remarkable 28.7% complication rate for the flap and graft group vs. only 2.1% complication rate for the allograft group. The disparity of these two groups and the egregious rate of complications in the flap and graft group underscore the fact that

Page 4

most of the patients who we offer allografts to as an option for repair tend to be our most complex cases in terms of cancer size, location and patient co-morbidities. In sum, this article provides solid evidence that repairs via allograft, in cases such as those in this audit, provided needed care; such that, the patient's medical needs were met yet not exceeded.

Surgical wounds which are relatively large and are in locations such as the head, neck, hand, and feet; and which have serious co-morbidities, can be safely and effectively repaired via allograft. In early April 2022, Blue Cross Blue Shield of Kansas issued a medical policy update for Amniotic Membrane and Amniotic Fluid which cites this, *peer reviewed first of its kind*, article and its findings for its policy guidance. A copy of the Blue Cross Blue Shield of Kansas medical policy for Amniotic Membrane and Amniotic Fluid is attached for your convenience. Further, MiMedx (EpiFix) the largest manufacture of allografts has recently also cited this article in its new brochure regarding Mohs surgery closures.

In the reviewed records, skin substitute allografts, including both EpiFix (MiMedx manufacturer) and Artacent (Tides Medical manufacturer), were applied to wounds created as a consequence of the removal of a skin cancer via Mohs surgery. Advanced Dermatology followed FDA approved manufacturer's package inserts, CMS's Mohs LCA 57477 and Artacent's and EpiFix's manufacturer's guidelines with reference to the utilization, application and documentation of all allograft applications. The manufacturer's guidelines, via the FDA approved package insert, were followed with reference to the utilization and application of amniotic skin substitute allografts. Moreover, the two primary skin substitutes allografts utilized by Dr. Adams, Artacent Tides and EpiFix MiMedx provided letters and records in part from their legal departments, in support of Dr. Adam's use of the skin substitutes and the erroneous nature of the auditor's findings. Those support letters and documentation are included in the supporting documents submitted for consideration.

Moreover, Dr. Adams provided extensive rationale in his additional medical indications as to why "other options" were not feasible in these instances in the patient's medical record. It was reasonable and justified for the physician to utilize the application of Artacent or EpiFix. The patients opted for repair via allograft and consequently declined to accept the other alternatives provided and there is no documentation requirement that requires a provider document the specific reasons why a patient declined other treatment alternatives.

It is easy to get distracted by the auditor's references and reliance to other LCDs, LCA, and articles regarding skin substitutes. However, upon in depth review, these sources are not applicable to the claims on review and the auditor's reliance on such is improper. To be clear, each denied claim *deals exclusively with acute wounds secondary to the removal of skin cancer via Mohs micrographic surgery which are in need of reconstructive surgery (including but not limited to flaps, grafts [allografts] and more).* Thus, the only applicable guideline is LCA 57477 and Advanced Dermatology followed this guideline in documenting the medically necessary repair of a post Mohs surgical wound.

Page 5

## QIC Claim Review

In the audit and lower levels of appeal, a significant amount of weight was put on FDA regulations related to Human Cellular and Tissue Based Products (HCT/Ps). In fact, the QIC quoted from 21 C.F.R. 1271.10 at length as the basis for denying the claims. However, the use of the FDA regulations is erroneous.

The purpose and scope of the FDA regulations relied on by the QIC to deny the claims related to skin substitutes can be found at 21 C.F.R. 1271.1. The purpose and scope of 21 C.F.R. 1271 *et seq.* is to "create an electronic registration and listing system for establishments *that manufacture* human cells, tissues, and cellular and tissue-based products (HCT/P's) and to establish donor-eligibility, current good tissue practice, and other procedures to prevent the introduction, transmission, and spread of communicable diseases by HCT/P's." 21 C.F.R. 1271.1(a). In other words, the regulation relied on by the QIC to deny claims related to the application of skin substitutes, 21 C.F.R. 1271.10, applies *ONLY* to manufacturers. Advanced Dermatology is a provider, it is not a manufacturer. To apply 21 C.F.R. 1271 *et seq.* to Advanced Dermatology and to use the regulation to deny claims on the grounds of medical necessity is unconscionable.

The FDA and its regulations related to manufacturers and approval of skin substitutes have no place in this appeal. The FDA does not have authority to regulate physician's practice. Advanced Dermatology is not a manufacturer seeking FDA approval of a product. Advanced Dermatology is a provider utilizing an already FDA approved product. In fact, Advanced Dermatology utilized the skin substitutes as outlined in the FDA approved package inserts. This tribunal must correct the error made by the QIC in using the FDA regulations to determine medical necessity.

To the extent FDA guidance is applicable, although not conceding that it is, the 2020 guidance document relied on by the reviewers is not an all or nothing document as they suggest. In the 2020 guidance document, the FDA states that homologous use of an amniotic membrane product is application to the surface to cover or offer protection from the surrounding environment. But, the FDA understood that other potential clinical effects, i.e., reducing scarring, angiogenesis, inflammation, etc., will occur when skin substitutes are used. Specifically, _FDA's Guidance for Industry and Food and Drug Administration Staff_ states:
>    Page 19: Foot note: *Reducing scarring, angiogenesis, inflammation,*
>    *contraction, pain, risk of infection and the promotion of the wound healing*
>    *cascade are all _potential clinical effects_; i.e., consequences in the recipient*
>    *but are not basic functions of amniotic membrane in the donor; therefore, they*
>    *are not considered homologous uses of amniotic membrane.*

Advanced Dermatology's medical records thoroughly document both the homologous use, as well as the potential clinical effects. Generally, the medical records state: "our goals are also to: minimize pain, stimulate neo-vascularization, stimulate cell growth, decrease

Page 6

inflammation, minimize scar tissue formation, minimize undesirable wound concentration, enhance soft tissue healing, and create a natural barrier with a skin substitute allograft." The provider is using the product for homologous use, i.e., as a covering and offering protection from the surrounding environment, i.e., creating a natural barrier, as well as for the other potential clinical effects.

Further, Advanced Dermatology utilized the products as outlined in the FDA approved package inserts. The package inserts for MiMedx EpiFix allograft used for surgical repair indicate that an appropriate use is **as a barrier** for use in the treatment of acute and chronic wounds, providing a protective environment to *support the healing process*. The package insert for Artacent states that, This allograft may be used as a wound covering in various surgical procedures. Thus, Dr. Adams was using allografts consistent with the use indicated on the FDA approved package inserts. Please note that the most recent ALJ decisions find that the QIC's reliance on the DFA regulations is misplaced and that Dr. Adams use of the allografts constitutes a homologous use.

## CONCLUSION

Every beneficiary involved in this overpayment determination involved Mohs surgery with allograft reconstruction.   As the records demonstrate, Advanced Dermatology competently documented the medical indications and options and in conjunction with the photos establish care was medically necessary and appropriate for every beneficiary. The claims denied involved patients with extensive post Mohs surgery defects in high risk locations with significant co-morbidities; such as, immunocompromised, smoking, COPD (chronic obstructive pulmonary disease), diabetes, etc.  The skin substitute allografts utilized in the denied claims are scientifically supported, in coding guidance, and medically indicated.

The claims submitted were medically necessary.  Therefore, WPS' and CoventBridge's unfavorable determination should be reversed.

Sincerely,

FOULSTON SIEFKIN LLP

Amanda M. Wilwert



Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Seattle Field Office
700 Stewart Street
Suite 11101
Seattle, WA 98101-4440
(206) 539-5300
(206) 539-5369 (Direct)
(206) 553-0122 (Fax)

July 24, 2023

FOULSTON SIEFKIN LLP
ATTN: AMANDA WILWERT
7500 COLLEGE BLVD STE 1400
OVERLAND PARK, KS 66210

## NOTICE OF DECISION

Appellant: ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA
OMHA Appeal Number: 3-12053235157

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

**What if I disagree with the decision?**

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

**How much time do I have to file an appeal?**

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

### How do I file an appeal?

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:
- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**
Mail your appeal and a copy of the enclosed decision to:
> Department of Health and Human Services
> Departmental Appeals Board
> Medicare Appeals Council, MS 6127
> Cohen Building Room G-644
> 330 Independence Ave., S.W.
> Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:
1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:
1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:
1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

<u>**How will the Medicare Appeals Council respond to my appeal?**</u>

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

<u>**Questions?**</u>

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:
      QIC - C2C B North
      P.O. Box 44006
      Jacksonville, FL 32231-4006

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List
Attachment A



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Seattle, WA

| | | | |
|---|---|---|---|
| Appeal of: | ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA | OMHA Appeal No.: | 3-12053235157 |
| Beneficiary: | Multiple (See Attachment A) | Medicare Part: | B |
| Medicare No.: | Multiple (See Attachment A) | Before: | Lori L. May Administrative Law Judge |

## DECISION

After considering the evidence and arguments presented in the record, I enter a **PARTIALLY FAVORABLE** decision in the appeal of Advanced Dermatology and Skin Cancer, P.A. (Appellant). For the reasons set forth below, the record supports claims relating to Beneficiaries K.L. and J.S. are FAVORABLE as the services the Appellant furnished to them were medically reasonable and necessary. Medicare will cover these services. However, claims relating to Beneficiaries L.B. and S.W. are UNFAVORABLE as the services the Appellant provided to them do not meet Medicare coverage criteria. Therefore, the Appellant received an overpayment for non-covered services, and the recovery of the overpayment is not waived.

## PROCEDURAL HISTORY

The Appellant submitted claims to Medicare for the following services it provided to multiple beneficiaries from February 10, 2021 to June 9, 2021 (dates of service), listed in Attachment A:

- CPT code 15275 (Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area)
- CPT code 17311 (Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s), of the head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels; first stage, up to five tissue blocks)
- CPT code 17312 (Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (e.g., hematoxylin and eosin, toluidine blue),

head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels; each additional stage after the first stage, up to five tissue blocks)

- CPT code 99212 (Office or other outpatient visit for the evaluation/management (E/M) of an established patient, which requires a medically appropriate history and/or examination and straightforward medical decision making)
- CPT code Q4169 (Artacent wound, per sq cm)

The Medicare Administrative Contractor (MAC) initially allowed payment for the services. (File 4, p. 3). A Unified Program Integrity Contractor (UPIC) conducted a post-payment review and determined that an overpayment was assessed. (File 8, pp. 11–18). Upon redetermination review, the MAC upheld the overpayment determination. (File 10, pp. 11–17). Upon reconsideration review, the Qualified Independent Contractor (QIC) issued a partially favorable decision, determining that Medicare would make partial payment for some of the services claimed, but still finding that an overpayment was made for services that were denied coverage and that the Appellant was responsible for returning the overpaid amount. (File 4).

On April 26, 2023, the Appellant timely filed a request for an Administrative Law Judge (ALJ) hearing. (File 1). Pursuant to proper notice, on June 12, 2023, I held a consolidated hearing by telephone. (File 11; Hearing Audio). The Appellant appeared at the hearing through its appointed representative, Amanda Wilwert, an attorney of Foulston Siefkin, LLP. (File 1, p. 9; Hearing Audio). John Adams, M.D., owner of and treating physician for the Appellant, appeared at the hearing and provided testimony under oath. (Hearing Audio).

After the hearing, the Appellant filed new evidence, consisting of a pathology report that was corrected on April 12, 2023 and a June 8, 2021 visit note that was corrected on June 5, 2023. (File 16, pp. 5–26). Since the QIC's reconsideration decision was the Appellant's first notice of there being a typographical error on the previously submitted records for Beneficiary K.L., I find that there is good cause for submitting this documentation at this later stage in the appeal proceedings in accordance with 42 C.F.R. § 405.1018(c)(1). The new evidence is therefore also admitted into the administrative record and is considered in rendering this decision

The files listed as exhibit records on the Index of the Administrative Record and Exhibit List are admitted to the administrative record without objection. (Hearing Audio).

<u>ISSUES</u>

Whether the application of skin substitute grafts (CPT code 15275), Artacent wound (CPT code Q4169), and Mohs micrographic surgery (CPT codes 17311 and 17312) services provided to multiple beneficiaries on the dates of service were medically reasonable and necessary under Medicare Part B. If the services at issue are not covered by Medicare, an additional issue arises regarding who is financially liable for the non-covered charges and resulting overpayment.

## APPLICABLE LAW AND POLICY

Medicare Part B provides coverage to eligible beneficiaries for all or part of the cost of medical and other health services. Social Security Act (Act). § 1832(a). "Medical and other health services" is defined to include physicians' services, and services and supplies furnished as an incident to a physician's professional service. Act § 1861(s). The services, however, must be reasonable and necessary for the diagnosis or treatment of an illness or injury, or to improve the functioning of a malformed body member. Act § 1862(a)(1)(A); 42 C.F.R. § 411.15(k)(1).

Section 1833(e) of the Act and 42 C.F.R. § 424.5(a)(6) provide that payment will not be made unless sufficient information exists to determine whether payment is due, and the amount that should be paid. The regulations also make clear that it is the responsibility of the appellant to furnish sufficient information to enable the contractor to determine whether payment is due and the amount of the payment. 42 C.F.R. § 424.5(a)(6). Thus, the appellant has the burden to provide sufficient documentation, evidence, and testimony that indicates the services provided are covered by Medicare.

When Medicare coverage is precluded under section 1862(a)(1) or (a)(9) of the Act because services were not reasonable and necessary or were custodial in nature, payment may nevertheless be made when neither the beneficiary nor the Provider knew, or could reasonably be expected to know, that an item or service would not be covered. This provision is commonly referred to as the limitation on liability provision. Act § 1879; 42 C.F.R. § 411.400.

In the event that services are excluded from coverage and payment has already been made to a provider, recovery of the overpayment from the provider may be waived if the provider was not at fault in creating the overpayment. Act § 1870(b).

ALJs are bound by the statutory and regulatory provisions that govern Medicare benefits. 42 C.F.R. § 405.1063(a). Unless promulgated as a regulation by the Centers for Medicare and Medicaid Services (CMS), no rule, requirement, or statement of policy other than a national coverage determination (NCD) can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. Act, § 1871(a)(2). However, as part of the coverage determination process, CMS and its contractors have issued policy guidance, in the form of CMS Rulings, local coverage determinations (LCDs), manuals and policy articles, that establish criteria for coverage of selected types of medical items and services. ALJs are bound by NCDs and CMS Rulings but are not bound by other CMS program guidance. 42 C.F.R. § 405.1062(a) and 1063(b). An ALJ will give substantial deference to these policies if they are applicable to a particular case. 42 C.F.R. § 405.1062(a). If an ALJ declines to follow an applicable policy, the ALJ decision must explain the reasons why the policy was not followed. 42 C.F.R. § 405.1062(b). An ALJ's determination not to follow an applicable policy applies only to the specific claim being considered and does not have precedential effect. 42 C.F.R. § 405.1062(b).

There is no NCD nor Medicare manual guidance specifically addressing the criteria for coverage of amniotic tissue allografts. In the absence of specific guidance, the CMS has provided guidance in the *Medicare Program Integrity Manual (MPIM)* to assist contractors, and in

appropriate circumstances ALJs, in making determinations as to medical reasonableness and necessity. Under the *MPIM* criteria, an item or service is medically reasonable and necessary if:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
    - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
    - Furnished in a setting appropriate to the beneficiary's medical needs and condition;
    - Ordered and furnished by qualified personnel; and,
    - One that meets, but does not exceed, the beneficiary's medical need.

*Medicare Program Integrity Manual (MPIM)*, pub. 100-08, ch. 3, § 3.6.2.2 (Effective Aug. 2020).

Medical and hospital services are sometimes required to treat a condition that arises as a result of services that are not covered because they are determined to be not reasonable and necessary or because they are excluded from coverage for other reasons. Services "related to" non-covered services (e.g., cosmetic surgery, non-covered organ transplants, non-covered artificial organ implants, etc.), including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services "not related to" non covered services are covered under Medicare. *Medicare Benefit Policy Manual (MBPM)*, pub. 100-08, ch. 16, § 180 (Effective May 2014).

LCD L35494 provides the indications and limitations of coverage for Mohs Micrograph Surgery (MMS) as guidance regarding the medical necessity of MMS. Local Coverage Determination L35494: Mohs Micrographic Surgery (LCD L35494) (Dec. 2020). The LCD states that Mohs Micrographic Surgery (MMS) is a technique for the removal of complex or ill-defined skin cancer with histologic examination of 100% of the surgical margins. This LCD addresses the reasonable and necessary threshold for coverage of MMS based on three requirements: (1) qualifications of the physician and office/facility team; (2) characteristics of the lesion pre-procedure; and (3) documentation of the medical necessity for the Mohs micrographic technique and associated plans for the repair, as outlined in the documentation requirements provided in Article A57477. The LCD provides a list of indications and anatomic locations for which Medicare will consider reimbursement of MMS. The list provided includes requirements associated with diagnoses of basal cell carcinoma and squamous cell carcinoma. *See* LCD L35494.

Article A57477 provides the following documentation requirements for establishing the medical necessity for the MMS and associated plans for the repair:

1. All documentation must be maintained in the patient's medical record and made available to the contractor upon request.

2. Every page of the record must be legible and include appropriate patient identification information (e.g., complete name, dates of service[s]). The documentation must include the legible signature of the physician or non-physician practitioner responsible for and providing the care to the patient.

3. The submitted medical record must support the use of the selected ICD-10-CM code(s).

4. The submitted CPT/HCPCS code must describe the service performed. The medical record documentation must support the medical necessity of the services as stated in this policy.

5. Procedures that exceed the medical need are not reasonable and necessary (not a Medicare covered service), therefore, documentation (pre-procedure E/M note and/or post-procedure operative notes) must address (a) why the lesion will not be (was not) managed by standard excision or destruction technique and (when applicable) (b) why (when utilized or referred to a plastic surgeon) procedures for complex repair, adjacent tissue transfer or rearrangement, flap, or graft codes are employed.

6. The physician must document in the patient's medical record that the diagnosis is appropriate for MMS and that MMS is an appropriate choice as the treatment of the particular lesion. The options for care (both the primary procedure options and repair options) must be discussed with the patient and clearly noted in the pre-procedure (or post procedure as appropriate) documentation. In summary, the minimal medical record documentation entails that the beneficiary was informed of their treatment options and explained the risks/benefits of the MMS technique and associated repair.

7. Though complexity of the lesion (poorly defined borders, suspected deep invasion, recurrent lesion, prior radiation), lesion size/location, and maximum conservation of healthy tissue are to be addressed in the preoperative medical record, the surgeon must document why the lesion will not be (was not) managed by excision or destruction technique.

8. Operative notes and pathology documentation in the patient's medical record should clearly document that MMS was performed using accepted MMS technique, in which the physician acts in two integrated and distinct capacities: surgeon and pathologist (therefore confirming that the procedure meets the definition of the CPT code[s]).

9. Operative documentation should note: location, number, and size of the lesion(s); number of stages performed; number of specimens per stage.

10. Histology documentation must include the following:
    • First stage: if tumor present, depth of invasion; pathological pattern of the tumor; cell morphology; if present, note perineural invasion of scar tissue.
    • Subsequent stages: if the tumor characteristics are the same as in the first stage, note this fact only. If the tumor characteristics are different from the first stage, describe the differences.

11. Measurement of the primary lesion necessitating MMS and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:

- Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage(using a centimeter ruler or relation of size by another anatomic structure).
- Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
- It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.

12. When the surgical defect created by MMS requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.

Local Coverage Article A57477: Billing and Coding: Mohs Micrographic Surgery – Policy Article (Article A57477) (Dec. 2020); *see also* LCD L35494.

Medical and hospital services are sometimes required to treat a condition that arises as a result of services that are not covered because they are determined to be not reasonable and necessary or because they are excluded from coverage for other reasons. Services "related to" non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services "not related to" non-covered services are covered under Medicare. *MBPM*, pub. 100-02, ch. 16, § 180 (Effective May 2014).

In the event the services at issue are found to be not medically reasonable and necessary under section 1862(a)(1) the Social Security Act (Act), section 1879 of the Act may limit liability for payment of the services. Specifically, section 1879 of the Act provides that when items or services are denied coverage under section 1862(a)(1) of the Act, payment may nevertheless be made for the items or services if neither the beneficiary, provider, nor supplier knew or could not reasonably have been expected to know that the items or services would not be covered or payable by Medicare.

Section 1870 of the Act allows for the waiver of Medicare's right to recoup overpayments where the provider causing the overpayment was without fault. A provider is without fault if it exercised reasonable care in billing and accepting the overpayment. *See Medicare Financial Management Manual (MFMM)*, pub. 100-06, ch. 3, § 90 (Effective Feb. 2004). This is shown by the provider having made full disclosure of all material facts and by having had either a reasonable basis for assuming that the payment was correct or having had reason to question the payment and promptly raising that question to the fiscal intermediary or carrier's attention. *Id.* By contrast, a provider is at fault if it should have known the services were not covered, i.e., constructive notice. *See MFMM*, ch. 3, § 90.1.H (Effective Feb. 2004). If the provider is at fault in causing the overpayment, recovery of the overpayment from the provider must proceed. *See MFMM*, ch. 3, § 90.

## FINDINGS OF FACT AND ANALYSIS

*Findings of Fact (Applicable to All Beneficiaries)*

The record contains a copy of the Artacent wound package insert. The insert describes Artacent as a dual-layer dehydrated amniotic membrane allograft that is processed and distributed in accordance with FDA requirements for HCT/P under 21 C.F.R. part 1271, state regulations, and the guidelines of the American Association of Tissue Banks. The insert states that allografts may be used as a wound covering in various surgical procedures and may be used independently or in combination with autologous tissue or other forms of allograft tissue. (File 7, p. 85). The insert further states that dehydrated amnion allografts should not be implanted into (1) areas of active or latent infection; and/or (2) into a patient with a disorder that would create an unacceptable risk of postoperative complications. Moreover, additional contraindications for the use of Artacent shall be determined by a licensed practitioner. (File 7, p. 86).

The Appellant submitted a peer-reviewed article to support that the use of placental allografts after Mohs surgery is medically reasonable and necessary. (File 7, pp. 95–100). The study found that in the case of older adults, larger cutaneous Mohs-related defects of the face, head, and hands of adults over 60 years old were effectively reconstructed with a placental allograft. (File 7, pp. 96, 99). The study also found that compared to autologous tissue, placental allograft cases were associated with significantly lower risks for infection, poor scar cosmesis, scar revision, and reoperation. (File 7, pp. 95, 97–99).

At the hearing, the Appellant stated that there are various options for post-surgical repair of wounds and explained the size and depth of surgical wounds is critical in deciding the options a patient has for repair of the wounds (or lesions) resulting from MMS, including secondary intention (which is allowing the wound heals on its own), side to side repair (where the physician closes the lips of the wound), reconstructive procedures (flaps, grafts, and allografts). The Appellant contended that the use of flaps and grafts are much more likely to fail if the size of a patient's wound is three centimeters or more. The risk of failure is also higher if the patient has a comorbidity that results in them having a deficiency in oxygen, such as requiring supplemental oxygen or having chronic obstructive pulmonary disease. Dr. Adams testified that for all wound repairs, before proceeding with reconstruction using flaps or grafts, he always performs a side-to-side test to see if wound closure by that method is possible. If the wound does not close readily, then he proceeds with reconstruction. Dr. Adams also stated that he only used allografts when patients presented with lesions over two centimeters[2] and when the wounds presented as complex repairs. Dr. Adams also stated that for his practice, the complication rate with the use of flaps or grafts on high-risk patients was roughly 30%. These complications consisted of infections, needing to reform the flap, needing to do reconstruction, or developing hematoma or necrosis of the flap. In comparison, the complication rate when an allograft was used was only 2%. Dr. Adams further stated that using allografts sped up the healing process by 70%, for example a reducing the healing time of a wound that that took eight weeks to heal down to three weeks. (Hearing Audio).

*Finding of Fact Specific to L.B.*

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes for Service(s) at Issue | ALJ Disposition |
|---|---|---|---|---|
| L.B.<br>HICN: *****539A | 1321357303080 | 04/13/2021 | 15275 | Unfavorable |
| | | | Q4169 | Unfavorable |
| | 1321357303090 | 04/28/2021 | 15275 | Unfavorable |
| | | | Q4169 | Unfavorable |
| | 1321357303100 | 05/12/2021 | 15275 | Unfavorable |
| | | | Q4169 | Unfavorable |

On February 10, 2021, the Beneficiary, 74-years-old on the dates of service at issue, had a biopsy performed that revealed the Beneficiary had a superficial and infiltrative basal cell carcinoma (tumor) on the right medical frontal scalp. (File 7, p. 348). Dr. Adams concluded that MMS was indicated for the tumor, but that removal of the tumor was complicated by the clinical area being critical for tissue conservation and the tumor being in an area of high recurrence. (*Id.*).

On April 13, 2021, the Beneficiary underwent MMS. The pre-operative size of the tumor on the right medical frontal scalp was 1.8 cm in length and 1.4 cm in width. (File 7, p. 348). After the MMS was completed, the postoperative wound size was 2.1 cm in length and 1.9 cm in width (surface area of 3.99 cm$^2$) and had a depth of 0.4 cm. (File 7, p. 349). Prior to the repair of the postoperative wound, the various methods of closure were discussed with the Beneficiary and considered, including healing by secondary intention, primary side to side repair, full thickness skin graft, non-axial adjacent tissue transfers, skin substitute allograft, interpolation flap, axial myocutaneous transposition repair, delayed repair, and repair by another physician. (File 7, p. 350). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect. The patient was made fully aware of the potential need for multiple applications of the allograft and the time, trouble, and inconvenience of coming into the office to have the allograft re-applied would incur.

(File 7, p. 350). Dr. Adams wrote that use of a skin substitute graft was most appropriate due to the location and shape of the wound, and the wound's proximity to free margins. (*Id.*). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). After being presented the options, the Beneficiary chose to undergo repair and wound healing using a skin substitute allograft. (*Id.*).

The medical records submitted include pre- and post-MMS photographs of the Beneficiary's right medial frontal scalp taken on April 13, 2021, which confirms the clinical border of the tumor and that the Beneficiary had an open wound after the Mohs surgery was completed. (File 7, p. 352).

The notes for wound closure treatment completed on the April 13, 2021 document that four units of Artacent wound (allograft), measuring 2 cm x 2 cm, were applied to the Beneficiary's wound. (File 7, p. 349).

On April 28, 2021, the Beneficiary saw Dr. Adams for visit regarding a would check of the postoperative wound closure she underwent on April 13, 2021. (File 7, pp. 353–354).  On April 28, 2021, the postoperative wound was measured to have a length of 2.0 cm and width of 1.8 cm (surface area of 3.6 cm2), and a depth of 0.4 cm. (File 7, p. 353). The rationale, risks, benefits, and treatment options for the wound were discussed with the Beneficiary. (File 7, pp. 353–354). Dr. Adams determined given the location of the wound, shape of the wound, and the wound's proximity to free margins, the use of an amniotic skin substitute allograft was required and medically indicated for repair of the Beneficiary's scalp wound, and the Beneficiary consented and opted for repair of the wound by application of an allograft. (File 7, p. 354). Four allograft units were opened and applied to the Beneficiary's wound. (File 7, p. 357).

On May 12, 2021, the Beneficiary again saw Dr. Adams for evaluation and management of the postoperative wound closure on her right medial frontal scalp. (File 7, pp. 353–354).  On this date, the postoperative wound was 2.0 cm in length and 1.7 cm in width (surface area of 3.4 cm$^2$) and had a depth of 0.4 cm. (File 7, p. 357). The rationale, risks, benefits, and treatment options for the wound were discussed with the Beneficiary. (File 7, pp. 357–358). Dr. Adams determined that given the location of the wound, shape of the wound, and the wound's proximity to free margins, the use of an amniotic skin substitute allograft was required and medically indicated for repair of the Beneficiary's scalp wound. The Beneficiary consented and opted for repair of the wound by application of an allograft. (File 7, p. 358). Four allograft units were opened and applied to the Beneficiary's wound. (File 7, p. 357).

The *MBPM* directs that services "related to" non-covered services are not covered services under Medicare. *MBPM*, ch. 16, § 180.  Since the use of Artacent wound is determined to not be reasonable and necessary for the Beneficiary, the application of the skin substitute service is considered to be a service that is related to a non-covered service. Therefore, Medicare coverage is not available for the application of the skin substitute the Appellant provided to Beneficiary.

*Analysis*

Upon reconsideration review, the QIC concluded that the Mohs micrographic surgeries (CPT codes 17311 and 17312) were covered by Medicare. Thus, at issue in this appeal are claims the Appellant submitted for application of skin substitute grafts (CPT code 15275) and the use of Artacent wound (CPT code Q4169), an amniotic skin substitute graft. Upon reconsideration review, the QIC concluded that the use of Artacent wound and application of the skin substitute services were not medically reasonable and necessary for treatment of the beneficiaries. The reconsideration decision issued by the QIC provides an explanation for the bases of the QIC's determination. (File 4, pp. 11–12).

At the hearing, Dr. Adams stated that the Beneficiary an extensive lesion of over two centimeters in length and 0.4 cm in depth, and that side-to-side repair of the wound was not an option. However, Dr. Adams also confirmed that secondary intention, in which the wound was left to heal on its own, was an option for treatment, and that application of Artacent wound was based on the size of the wound and the Beneficiary's choice. Dr. Adams also stressed in comparison to secondary intention, allografts increased the speed of wound healing and reduced the amount of time patients had to deal with managing postoperative wounds. (Hearing Audio).

First, I note that in the issued reconsideration decision, the QIC relies upon FDA regulations and guidance for determining whether use of Artacent wound was medically reasonable and necessary. *See* File 4, pp. 11–12; 21 C.F.R. part 1271; *Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use*, U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download (last accessed July 18, 2023). However, the FDA is not authorized to regulate the practice of medicine. Additionally, 21 C.F.R. section 1271.1 clearly states that of 21 C.F.R. part 1271 only applies to establishments that manufacture HCT/Ps. As such, the FDA regulations and guidance only serve as references and are not determinative factors for deciding Medicare coverage. Even if the FDA regulations and guidance were applied, the record contains a letter written by the FDA that confirms when Artacent wound is used as a wound covering, it meets the criteria for regulation under section 361 of the PHS Act and the regulations in 21 C.F.R. part 1271. (File 7, p. 83). This statement by the FDA confirms that since one of the documented purposes for using the allografts at issue was to create a natural barrier, a use that is equivalent to that of a wound covering, the use of the allografts for the beneficiaries is consistent with FDA requirements and constitutes a homologous use.

Despite the use of Artacent wound meeting the definition of homologous use, I find that the record does not support that the application of Artacent wound was medically reasonable and necessary treatment for the Beneficiary's postoperative wound. I acknowledge that the Beneficiary had a wound that had a surface area of 3.99 cm$^2$ after the Mohs surgery was performed, and that Dr. Adams confirmed in the visit notes for all of the dates of service at issue that the postoperative wound was not amenable to primary side to side repair. (File 7, pp. 349, 350, 354, 357). The record also contains a peer-reviewed article that found that use of placental allografts is effective in reconstructing larger cutaneous Mohs-related defects of the face, head, and hands of adults over 60 and significantly lowered patients' risk for infection, poor scar cosmesis, poor scar revision, and reoperation. However, at the hearing, Dr. Adams confirmed that secondary intention (letting the wound heal on its own without applying other materials) was a viable option for treating the Beneficiary's wound, and that the Beneficiary did not have any comorbidities or specific personal risks that resulted in the standard treatments for post-Mohs defects being unreasonable. He further confirmed that the application of Artacent wound to the Beneficiary's post-Mohs defect was not only due to the size of the wound, but also because the Beneficiary chose to do the allograft treatment option. (Hearing Audio). Since the postoperative wound was determined to be treatable by secondary intention, and there is no information in the record that indicates doing secondary intention was harmful to the Beneficiary or increased her risk for post-surgical complications, the record does not support that it was medically necessary to use allografts over standard dressings commonly utilized after MMS. Rather, the record suggests that the application of the allograft was done to comply with

the Beneficiary's choice. While using allografts may reduce the healing time of a wound and allografts have been found to be effective in repairing surgical wounds, such factors on their own are insufficient for establishing that the application of allografts was medically necessary and did not exceed the Beneficiary's needs for treating the Beneficiary's postoperative wound.

*Findings of Fact Specific to K.L.*

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes for Service(s) at Issue | ALJ Disposition |
|---|---|---|---|---|
| K.L.<br>HICN: *****733A | 1321357303110 | 06/08/2021 | 17311 | Favorable |
| | | | 17312 | Favorable |
| | | | 15275 | Favorable |
| | | | Q4169 | Favorable |

On April 28, 2021, the Beneficiary, 89-years-old, was seen by Dr. Adams for a chief complaint of skin lesions. She was documented to have neoplasms of unspecified behavior on the nasal supratip, the nasal dorsum, and the left anterior shoulder and biopsies were obtained at these sites. (File 7, pp. 375–376). On May 8, 2021, a pathology report was issued that confirmed the Beneficiary had superficial basal cell carcinomas on the nasal dorsum and left anterior shoulder, and a superficial and nodular basal cell carcinoma on the nasal supratip. (File 7, p. 382).

On June 8, 2021, the Beneficiary saw Dr. Adams for a follow up visit regarding the neoplasms of unspecified behavior that were previously evaluated on April 28, 2021. (File 7, pp. 384–385). During the visit, Dr. Adams documented that the Beneficiary had mixed superficial and nodular basal cell carcinoma on the Beneficiary's right ala of the nose and that removal of the tumor was complicated by location of the tumor being in an area that was critical for tissue conservation and that she was immunocompromised due to being on systemic immunosuppressant medication. (File 7, p. 384). Dr. Adams concluded that Mohs surgery was indicated for the tumor, but that removal of the tumor was complicated by the clinical area being critical for tissue conservation and the tumor being in an area of high recurrence. (*Id.*). On this date, the Beneficiary received MMS for treatment of the right ala basal cell carcinoma. (File 7, pp. 384–385). The pre-operative size of the lesion was 1 cm x 0.6 cm. (File 7, p. 384).

Prior to the repair of the postoperative wound, the various methods of closure were discussed with the Beneficiary and considered, including healing by secondary intention, primary side to side repair, full thickness skin graft, non-axial adjacent tissue transfers, skin substitute allograft, interpolation flap, axial myocutaneous transposition repair, delayed repair, and repair by another physician. (File 7, p. 386). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(*Id.*). Dr. Adams wrote that use of a skin substitute graft was most appropriate due to the location and shape of the wound, and the wound's proximity to free margins. (*Id.*). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). Dr. Adams noted that the Beneficiary's postoperative defect was located in an area where the skin was significantly scarred, which made repair using adjacent tissue not possible, and that performing a flap or graft within an area which is comprised of significant scar tissue increased the probability of flap or graft failure and consequently necrosis. (File 7, pp. 386–387). Dr. Adams further noted that exposed cartilage was present after the tumor removal and that due to its lack of a sovereign vascular supply which caused a lack of oxygen, tissue necrosis was a significant concern in the Beneficiary's hand was a concern, as flap or graft necrosis could lead to additional inflammation and ensuing increased scar tissue formation. (File 7, p. 387). After being presented the options, the Beneficiary chose to undergo repair and wound healing using a skin substitute allograft. (File 7, p. 386).

The medical records submitted include pre- and post-Mohs surgery photographs of the Beneficiary's nose taken on April 28, 2021 and June 8, 2021. The photographs confirm the clinical borders of the tumors, that the Beneficiary had tumors on the right ala and nasal dorsum, and that she had an open wound after the Mohs surgery was completed. (File 7, p. 352).

The size of postoperative wound following the Mohs surgery was 2.0 cm in length, 1.8 cm in width, and 0.4 cm in depth. (File 7, p. 385). The notes for wound closure treatment completed on the April 13, 2021 document that four units of Artacent wound (allograft), measuring 2 cm x 2 cm, were applied to the Beneficiary's wound. (File 7, p. 386).

After the hearing, the Appellant submitted supplemental medical records which show that the pathology report was replaced with a corrected version on April 12, 2023. (File 16, pp. 13–16). The correction made to the pathology report was changing the entry that the Beneficiary had a superficial and nodular basal cell carcinoma on the nasal supratip to show she had a superficial and nodular basal cell carcinoma on the right ala. (*Id.*).

*Analysis*

*CPT codes 17311 and 17211*

Upon reconsideration review, the QIC denied coverage of the Mohs micrographic surgeries (CPT codes 17311 and 17312) on the basis that the documentation submitted did not support the service was rendered as billed. The QIC explained that the provider performed MMS to the Beneficiary's right nasal ala, but that there were no biopsy results submitted for this location. The QIC noted that biopsy results were submitted for a lesion of the Beneficiary's nasal supratip, but that the documentation did support that MMS was performed to the supratip. As a result, the documentation was insufficient to support that the service was medically necessary.

At the hearing, Dr. Adams stated that the pathology report had a typographical error regarding the location of one of the nasal biopsies, which resulted in the biopsy report not matching the operative notes for the Mohs surgery. Dr. Adams explained that he corrected the location for the nasal basal cell carcinoma from the right supratip to the right ala in the June 8, 2021 surgical

note and that photos were provided in the submitted medical records that confirmed the sites where the Mohs surgeries were performed, but that he did not amend the original pathology report and visit note. (File 16, p. 4; Hearing Audio).

In this case, the record supports that the MMS of the Beneficiary's right ala of the nose was medically necessary. Although the original pathology report does not document pathology results of any neoplasms biopsied on the right nasal ala, photographs taken on April 28, 2021, the date that the biopsies were obtained, show the Beneficiary did not have a biopsy taken on the nasal supratip as noted on the title of the photograph, but rather the biopsy specimen was obtained from the right nasal ala. (File 7, p. 380). Photographs taken on June 8, 2021, the date that the MMS was performed, corroborate that the Beneficiary had the basal cell carcinoma in the same location shown in the photograph taken on April 28, 2021. (File 7, p. 392). In addition, supplemental medical records were provided by the Appellant which show that on April 12, 2023, the dermatology report was corrected to change the biopsy location of the superficial and nodular basal cell carcinoma to the right nasal ala, rather than the nasal supratip. (File 16, p. 13–16). Since the record contains photographic evidence and a corrected pathology report that corroborate that the MMS was performed on the same location that the Beneficiary had a basal cell carcinoma, the record is sufficient to support that the MMS services were medically necessary and were rendered as billed.

The record also supports that the documentation requirements for the MMS services were met, as set forth in LCD L35494 and Article A57477. Here, the Beneficiary received MMS for the treatment of a mixed superficial and nodular basal cell carcinoma that was 1.0 cm x 0.6cm in size and located on the Beneficiary's right ala of the nose. The June 8, 2021 surgery notes, Dr. Adams also noted that the Beneficiary was immunocompromised due to being on systemic immunosuppressant medication. (File 7, p. 384). The size, type, and location of the lesion constitute a qualifying indication under sections I.D. and I.F. of LCD L35494. The June 8, 2021 surgery notes also include the physician's detailed description of the characteristics of the lesion, pre-procedure pathology results, and a statement from the physician that indicates that all alternative treatments were discussed with the Beneficiary. This information supports that MMS was chosen due to the complexity of the Beneficiary's condition, and the size and location of the lesion. Although the Beneficiary's care options and the appropriateness of MMS could have been documented in more detail, the LCD L35494 nor Article A57477 do not provide instruction on the level of specificity required to sustain these criteria. Based on my review of the record, the information contained in the medical record is minimally sufficient to demonstrate that the Beneficiary was informed of their treatment options, the risks and/or benefits regarding the MMS technique, and that the size of the lesion on the right ala meets the size and location requirements to qualify for Medicare coverage of MMS. Consequently, the Appellant demonstrates by a preponderance of the evidence that the MMS services provided on June 8, 2021 were reasonable and necessary, and that Medicare coverage of the MMS services is therefore appropriate.

### CPT codes 15275 and Q4169

Also at issue in this appeal is the claim the Appellant submitted for application of skin substitute grafts (CPT code 15275) and the use of Artacent wound (CPT code Q4169), an amniotic skin

substitute graft. Upon reconsideration review, the QIC concluded that the use of Artacent wound and application of the skin substitute services were not medically reasonable and necessary for treatment of the beneficiaries. The reconsideration decision issued by the QIC provides an explanation for the bases of the QIC's determination. (File 4, pp. 11–12).

I note that in the issued reconsideration decision, the QIC relies upon FDA regulations and guidance for determining whether use of Artacent wound was medically reasonable and necessary. *See* File 4, pp. 11–12; 21 C.F.R. part 1271; *Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use*, U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download (last accessed July 18, 2023). However, the FDA is not authorized to regulate the practice of medicine. Additionally, 21 C.F.R. section 1271.1 clearly states that of 21 C.F.R. part 1271 only applies to establishments that manufacture HCT/Ps. As such, the FDA regulations and guidance only serve as references and are not determinative factors for deciding Medicare coverage. Even if the FDA regulations and guidance were applied, the record contains a letter written by the FDA that confirms when Artacent wound is used as a wound covering, it meets the criteria for regulation under section 361 of the PHS Act and the regulations in 21 C.F.R. part 1271. (File 7, p. 83). This statement by the FDA confirms that since one of the documented purposes for using the allografts at issue was to create a natural barrier, a use that is equivalent to that of a wound covering, the use of the allografts for the beneficiaries is consistent with FDA requirements and constitutes a homologous use.

In this case, I find that the record supports that the application of Artacent wound was medically reasonable and necessary treatment for the Beneficiary's postoperative wound. Prior to the repair of the right ala postoperative wound, Dr. Adams and the Beneficiary discussed the repair options, as well as the risks and benefits associated with the options, and the reasons why Dr. Adams determined that the use of amniotic skin substitute allograft was the most appropriate choice for treating the Beneficiary's postoperative wound. (File 7, pp. 384–385). Thus, the record confirms that documentation requirements outlined in Article A57455 and referred to in LCD L35494 were met. The medical records also clearly document that the Beneficiary was 89-years old, was diagnosed to have a basal cell carcinoma, and had a large postoperative wound with a surface area of 3.99 cm$^2$ on her right nasal ala that required repair. (File 7, pp. 348–349). The peer-reviewed article submitted found that larger cutaneous Mohs-related defects of the face, head, and hands of older adults were effectively reconstructed with a placental allograft, and that in comparison to autologous tissue, placental allograft cases were associated with significantly lower risk for infection, poor scar cosmesis, scar revision, or reoperation. (File 7, pp. 95–100). Thus, the article supports the use of the Artacent wound allograft for the Beneficiary. Dr. Adams also testified that based on his years of experience in performing Mohs surgeries, the complication rate when an allograft was used to repair a postoperative wound was significantly lower than when flaps or grafts repair was done. (Hearing Audio). In addition, the Artacent wound package insert and the FDA's letter regarding Artacent wound corroborates that the allograft was utilized for its intended use of serving as a wound covering after a surgical procedure. (File 7, pp. 83, 85). The medical literature in combination with the Beneficiary's treating physician's experience in handling post-MMS wound repairs, as well as the Artacent wound being used in a manner that is consistent with FDA's definition of homologous use, validates that using Artacent wound to repair the Beneficiary's postoperative wound was

medically reasonable and necessary treatment. Therefore, Medicare coverage of the skin substitute graft services (CPT codes 15275 and Q4169) furnished to the Beneficiary on the above noted dates of service is appropriate.

*Findings of Fact Specific to J.S.*

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes for Service(s) at Issue | ALJ Disposition |
|---|---|---|---|---|
| J.S. HICN: *****396A | 1321357303070 | 02/10/2021 | 15275 | Favorable |
| | | | Q4169 | Favorable |

On January 13, 2021, the Beneficiary, 72-years-old on the date of service, was seen by Dr. Adams for an above the waist skin check. (File 7, pp. 436–441). During the visit, the Beneficiary was found to have a neoplasm on the third web space of his left hand, and a biopsy sample was obtained. (File 7, p. 437). On January 21, 2021, a pathology report showed that the diagnosis of the specimen obtained from the third webspace of the left hand was superficially invasive squamous cell carcinoma. (File 7, p. 431).

On February 10, 2021, the Beneficiary saw Dr. Adams for MMS of squamous cell carcinoma located on the third webspace of the left hand. (File 7, pp. 448–454). Dr. Adams concluded that MMS was indicated for the tumor due to tissue conservation being critical in the hand. Dr. Adams also noted that the removal of the tumor was complicated by the tumor's large size and the tumor being in an area of high recurrence. (File 7, p. 448). After all treatment options were discussed with the Beneficiary, the Beneficiary consented to MMS on the third webspace of the left hand and the surgery was completed without complications. (File 7, pp. 448–449). The surgical notes show that the pre-operative size of the tumor was 2 cm x 1.8 cm. (File 7, p. 448). After the MMS, the wound was 2.4 cm in length and 2.2 cm in width (5.28 cm$^2$), and it had a depth of 0.5 cm. (File 7, p. 449).

Prior to the repair of the postoperative wound, the various methods of closure were discussed with the Beneficiary and considered, including healing by secondary intention, primary side to side repair, full thickness skin graft, non-axial adjacent tissue transfers, skin substitute allograft, interpolation flap, axial myocutaneous transposition repair, delayed repair, and repair by another physician. (File 7, p. 450). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(File 7, p. 450). Dr. Adams wrote that use of a skin substitute graft was most appropriate due to the location and shape of the wound, and the wound's proximity to free margins. (*Id.*). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including

creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). Dr. Adams also noted that the Beneficiary was on blood thinning medication, which made him more susceptible to hematoma formation, which could then lead to tissue necrosis, infection , increased scarring, and functional impairment and disfigurement of the primary and secondary defects. (*Id.*). Dr. Adams further noted that the Beneficiary had diabetes, which made him more susceptible to infection, longer wound healing time, and increased scar tissue formation that could result in impaired skin function and cosmesis. (*Id.*).

The medical records submitted include pre- and post-MMS photographs of the Beneficiary's left hand taken on January 13, 2021 and February 10, 2021. (File 7, pp. 441, 454). The photographs confirm the clinical borders of the tumors, that the Beneficiary had tumors on the third webspace of the left hand, and that he had an open wound after the Mohs surgery was completed. (*Id.*).

*Analysis*

Upon reconsideration review, the QIC concluded that the E/M visit and Mohs micrographic surgery (CPT code 17311) were covered by Medicare. Thus, at issue in this appeal is the claim the Appellant submitted for application of skin substitute grafts (CPT code 15275) and the use of Artacent wound (CPT code Q4169), an amniotic skin substitute graft. The QIC concluded that the use of Artacent wound and application of the skin substitute services were not medically reasonable and necessary for treatment of the beneficiaries for the following reasons: (1) the documentation was not strong enough to support why the acute wounds required expensive dressing and why the product was medically necessary over dressings more commonly utilized after MMS; and (2) there is insufficient data showing that the use of allografts after undergoing MMS has significant improved outcome in closure rate compared to standard approaches. (File 4, pp. 11–12).

At the hearing, Dr. Adams stated that the Beneficiary had a significantly sized lesion and that the size of the lesion made it difficult to get a flap over the postoperative wound. Dr. Adams also stated that the Beneficiary being on blood thinners made him more likely to develop hematoma, and that him having diabetes increased his risk for infection, especially if the wound was allowed to heal on its own. He also confirmed that due to the location of the wound and the Beneficiary's comorbidities, secondary intention and side to side repair were not treatment options. Moreover, due to the size of the wound, flap and graft repair was not optimal. Thus, Dr. Adams stated that allograft was the most appropriate treatment option for the Beneficiary. (Hearing Audio).

I note that in the issued reconsideration decision, the QIC relies upon FDA regulations and guidance for determining whether use of Artacent wound was medically reasonable and necessary. *See* File 4, pp. 11–12; 21 C.F.R. part 1271; *Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use,* U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download (last accessed July 18, 2023). However, the FDA is not authorized to regulate the practice of medicine. Additionally, 21 C.F.R. section 1271.1 clearly states that of 21 C.F.R. part 1271 only applies to establishments that manufacture HCT/Ps. As such, the FDA regulations and guidance only serve as references and are not determinative factors for deciding Medicare coverage. Even if the FDA regulations

and guidance were applied, the record contains a letter written by the FDA that confirms when Artacent wound is used as a wound covering, it meets the criteria for regulation under section 361 of the PHS Act and the regulations in 21 C.F.R. part 1271. (File 7, p. 83). This statement by the FDA confirms that since one of the documented purposes for using the allografts at issue was to create a natural barrier, a use that is equivalent to that of a wound covering, the use of the allografts for the beneficiaries is consistent with FDA requirements and constitutes a homologous use.

In this case, I find that the record supports that the application of Artacent wound was medically reasonable and necessary treatment for the Beneficiary's postoperative wound. Prior to the repair of the postoperative wound, Dr. Adams and the Beneficiary discussed the repair options, as well as the risks and benefits associated with the options, and the reasons why Dr. Adams determined that the use of amniotic skin substitute allograft was the most appropriate choice for treating the Beneficiary's postoperative wound. (File 7, pp. 448–450). Thus, the record confirms that documentation requirements outlined in Article A57455 and referred to in LCD L35494 were met. The medical records also clearly document that the Beneficiary was 72-years-old, was diagnosed to have a squamous cell carcinoma, and had a large postoperative wound with a surface area of 5.28 cm$^2$ on his left hand that required repair. (File 7, pp. 348–349). The peer-reviewed article submitted found that larger cutaneous Mohs-related defects of the face, head, and hands of adults over 60 years old were effectively reconstructed with a placental allograft, and that in comparison to autologous tissue, placental allograft cases were associated with significantly lower risk for infection, poor scar cosmesis, scar revision, or reoperation. (File 7, pp. 95–100). Thus, the article supports the use of the Artacent wound allograft for the Beneficiary. Dr. Adams also testified that based on his years of experience in performing Mohs surgeries, the complication rate when an allograft was used to repair a postoperative wound was significantly lower than when flaps or grafts repair was done. (Hearing Audio). In addition, the Artacent wound package insert and the FDA's letter regarding Artacent wound corroborates that the allograft was utilized for its intended use of serving as a wound covering after a surgical procedure. (File 7, pp. 83, 85). Furthermore, the Beneficiary had a wound that made side to side repair, flap, and graft repair not possible or not likely to work, and he had comorbidities of being on blood thinners and having diabetes, which increased his risk of experiencing complications if the postoperative wound was not optimally treated. The medical literature in combination with the Beneficiary's medical condition and treating physician's experience in handling post-MMS wound repairs, as well as the Artacent being used as the manufacturer instructs, validates that using Artacent wound to repair the Beneficiary's postoperative wound was medically reasonable and necessary treatment. Therefore, Medicare coverage of the skin substitute graft services (CPT codes 15275 and Q4169) furnished to the Beneficiary on the above noted dates of service is appropriate.

*Findings of Fact Specific to S.W.*

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes for Service(s) at Issue | ALJ Disposition |
|---|---|---|---|---|
| S.W.<br>HICN: *****121A | 1321357303130 | 06/09/2021 | 15275 | Unfavorable |
| | | | Q4169 | Unfavorable |

On December 23, 2021, the Beneficiary, 86-years-old on the date of service, had a biopsy performed that revealed she had a squamous cell carcinoma in situ on the right hand. (File 7, pp. 473, 479). On June 9, 2021, the Beneficiary was seen for a follow up for the squamous cell carcinoma. Dr. Adams stated that Mohs surgery was indicated for the tumor due to it being located in an area of the body where tissue conservation is critical. Dr. Adams also noted that removal of the tumor was complicated by the tumor being located in an area of high recurrence. (File 7, p. 485).

On June 9, 2021, the Beneficiary underwent MMS. The pre-operative size of the squamous cell carcinoma in situ on the right dorsal hand was 0.9 cm x 0.5 cm. (*Id.*). After the MMS was completed, the postoperative wound size was 1.1 cm in length and 1.0 cm in width (surface area of 1.1 cm$^2$) and had a depth of 0.2 cm. (File 7, p. 486). Prior to the repair of the postoperative wound, the various methods of closure were discussed with the Beneficiary and considered, including healing by secondary intention, primary side to side repair, full thickness skin graft, non-axial adjacent tissue transfers, skin substitute allograft, interpolation flap, axial myocutaneous transposition repair, delayed repair, and repair by another physician. (File 7, p. 486–487). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> As Primary side to side repair is not possible, Allograft skin substitute is medically indicated for repair and wound healing of the defect on the hand or digits; in order to: minimize scar tissue formation, expedite healing and optimize skin function in this dynamic, highly mobile and trauma prone area. Scar tissue formation is critical to minimize in this highly mobile and flexible area. The most important factor for a graft to take, is graft immobility. This is due to the fact that tiny, fragile vessels are developing in order to supply the graft with an ample, well oxygenated supply of blood from the recipient wound/defect (primary defect). The hands and digits are one of the most commonly utilized and traumatized areas on the human body, as we use our hands and digits in almost every physical activity we perform.

(File 7, p. 487). Dr. Adams further noted that the postoperative defect was located on an area where the skin is significantly atrophic (thinned) secondary to extensive solar damage, which resulted in the area being more susceptible to infection, longer wound healing time, increased probability of flap or graft necrosis, increased inflammation or disfigurement, increased impairment of skin function. The location of the defect was also in an area where the skin is significantly scarred, which made repair using adjacent tissue not possible, and performing a flap or graft within an area which is comprised of significant scar tissue increased the probability of flap or graft failure and consequently necrosis. (*Id.*). After being presented the options, the Beneficiary chose to undergo repair and wound healing using a skin substitute allograft. (*Id.*).

The notes for wound closure treatment completed on the June 9, 2021, document that four units of Artacent wound (allograft), measuring 2 cm x 2 cm, were applied to the Beneficiary's wound. (File 7, p. 486).

*Analysis*

Upon reconsideration review, the QIC concluded that the E/M visit and Mohs micrographic surgery (CPT code 17311) were covered by Medicare. Thus, at issue in this appeal is the claim the Appellant submitted for application of skin substitute grafts (CPT code 15275) and the use of Artacent wound (CPT code Q4169), an amniotic skin substitute graft. The QIC concluded that the use of Artacent wound and application of the skin substitute services were not medically reasonable and necessary for treatment of the beneficiaries. The reconsideration decision issued by the QIC provides an explanation for the bases of the QIC's determination. (File 4, pp. 11–12).

First, I note that in the issued reconsideration decision, the QIC relies upon FDA regulations and guidance for determining whether use of Artacent wound was medically reasonable and necessary. *See* File 4, pp. 11–12; 21 C.F.R. part 1271; *Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use*, U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download (last accessed July 18, 2023). However, the FDA is not authorized to regulate the practice of medicine. Additionally, 21 C.F.R. section 1271.1 clearly states that of 21 C.F.R. part 1271 only applies to establishments that manufacture HCT/Ps. As such, the FDA regulations and guidance only serve as references and are not determinative factors for deciding Medicare coverage. Even if the FDA regulations and guidance were applied, the record contains a letter written by the FDA that confirms when Artacent wound is used as a wound covering, it meets the criteria for regulation under section 361 of the PHS Act and the regulations in 21 C.F.R. part 1271. (File 7, p. 83). This statement by the FDA confirms that since one of the documented purposes for using the allografts at issue was to create a natural barrier, a use that is equivalent to that of a wound covering, the use of the allografts for the beneficiaries is consistent with FDA requirements and constitutes a homologous use.

Despite the use of Artacent wound meeting the definition of homologous use, I find that the record does not support that the application of Artacent wound was medically reasonable and necessary treatment for the Beneficiary's postoperative wound. The record contains a peer-reviewed article that found that use of placental allografts was effective in reconstructing larger cutaneous Mohs-related defects of the face, head, and hands that measure more than 3 cm² in adults over 60 and significantly lowered patients' risk for infection, poor scar cosmesis, poor scar revision, and reoperation. However, the record documents that the Beneficiary had a postoperative wound that measured only 1.1 cm². As a result, the medical literature does not support the safety and effectiveness of using an allograft for this Beneficiary. In the June 9, 2021 surgery notes, Dr. Adams stated that use of allograft skin substitute was medically indicated because the Beneficiary's postoperative defect was located on an area where the skin is significantly atrophic which made the defect more susceptible to postoperative complications that included infection, longer periods of wound healing, increased risk of flap or graft necrosis, and increased disfigurement and/or impairment of the skin function. The defect was also located on an area where the skin is significantly scarred, which made repair of the wound with adjacent tissue not possible. Nevertheless, at the hearing, Dr. Adams stated that the Beneficiary could have had the defect treated with flap repair, adding a graft, or by application of an allograft, and that any of these three treatment options would have been acceptable. Dr. Adams further confirmed that the reason an allograft was used was because the Beneficiary opted for the

allograft at that time. Since the postoperative wound was determined to be treatable by flap or graft, the Appellant has not shown by a preponderance of the evidence that the use of the Artacent wound was medically necessary for the Beneficiary. Rather, the information provided indicates that the application of the allograft was done to comply with the Beneficiary's choice. While using allografts may reduce the healing time of a wound and allografts have been found to be effective in repairing surgical wounds, such factors on their own are insufficient for establishing that the application of allografts was medically necessary and did not exceed the Beneficiary's needs for treating the Beneficiary's postoperative wound.

The *MBPM* directs that services "related to" non-covered services are not covered services under Medicare. *MBPM*, ch. 16, § 180. Since the use of Artacent wound is determined to not be reasonable and necessary for the Beneficiary, the application of the skin substitute service is considered to be a service that is related to a non-covered service. Therefore, Medicare coverage is not available for the application of the skin substitute service the Appellant provided to Beneficiary.

*Liability*

The application of skin substitute graft (CPT code 15275) and the Artacent wound (CPT code Q4169) services provided by the Appellant to Beneficiary L.B. and Beneficiary S.W. were not reasonable and necessary, and are therefore not covered, pursuant to section 1862(a)(1)(A) of the Act. Because the claims are not covered under Medicare guidelines, the limitation on liability provision of section 1879 of the Act is considered. Here, there is no evidence in the record that the Beneficiary knew, or reasonably could have known, that Medicare would not pay for the services furnished to each of them on the Dates of Service. Therefore, the Beneficiary is not liable for payment. However, the Appellant in this case is a provider and is presumed to have knowledge of published Medicare coverage criteria through rulings, regulations, policies, bulletins, manuals, written guidance, directives, websites, and acceptable standards of practice within the local medical community. This presumption is based on the widely published CMS manuals and readily available regulations. *See* CMS (formerly Health Care Financing Administration (HCFA)) Ruling 95-1; 42 C.F.R. § 411.406. The Appellant presented no evidence to rebut the presumption of knowledge. Therefore, the Appellant is not entitled to a limitation on liability under section 1879 of the Act and remains liable for all non-covered charges.

Another consideration is section 1870 of the Act, which allows for the waiver of Medicare's right to recoup overpayments under certain conditions where a provider is without fault. The Appellant is a provider of health care services and a participant in the Medicare program. As discussed above, the Appellant had access to the pertinent statutes, regulations, coverage determinations, coding rules, and Medicare manuals that set out the requirements for reimbursement under the Medicare program. Its failure to apply the guidance properly means that it is not without fault; therefore, the Appellant does not meet the statutory requirement to avoid recoupment of the overpayment, and the recovery of the overpayment is not waived.

OMHA Appeal No. 3-12053235157

## CONCLUSIONS OF LAW

The record supports that the Artacent wound (CPT code Q4169) and application of skin substitute services (CPT code 15275) the Appellant furnished to Beneficiaries K.L. and J.S. were medically reasonable and necessary. The record also supports that Mohs micrographic surgery services the Appellant provided to Beneficiary K.L. were medically reasonable and necessary. The Appellant is therefore entitled to Medicare coverage of these services. However, the Artacent wound and application of skin substitute services the Appellant provided to Beneficiaries L.B. and S.W do not meet Medicare coverage criteria, Medicare is therefore entitled to recover payments it made for the non-covered services.

## ORDER

For the reasons discussed above, this decision is **PARTIALLY FAVORABLE**. I direct the Medicare contractor to process the claim in accordance with this decision.

SO ORDERED

_Lori L. May_

_____

Lori L. May
Administrative Law Judge

OMHA Appeal No. 3-12053235157

**APPENDIX A -- Claims and ALJ Dispositions**

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes | ALJ Disposition |
|---|---|---|---|---|
| L.B.<br>HICN: *****539A | 1321357303080 | 04/13/2021 | 17311 | Not at issue |
| | | | 17312 | Not at issue |
| | | | 15275 | Unfavorable |
| | | | Q4169 | Unfavorable |
| | 1321357303090 | 04/28/2021 | 15275 | Unfavorable |
| | | | Q4169 | Unfavorable |
| | 1321357303100 | 05/12/2021 | 15275 | Unfavorable |
| | | | Q4169 | Unfavorable |
| K.L.<br>HICN: *****733A | 1321357303110 | 06/08/2021 | 17311 | Favorable |
| | | | 17312 | Favorable |
| | | | 15275 | Favorable |
| | | | Q4169 | Favorable |
| D.S.<br>HICN: *****470A | 1321357303120 | 06/09/2021 | 17311 | Not at issue |
| J.S.<br>HICN: *****396A | 1321357303070 | 02/10/2021 | 99212 | Not at issue |
| | | | 17311 | Not at issue |
| | | | 15275 | Favorable |
| | | | Q4169 | Favorable |
| S.W.<br>HICN: *****121A | 1321357303130 | 06/09/2021 | 17311 | Not at issue |
| | | | 15275 | Unfavorable |
| | | | Q4169 | Unfavorable |

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD    Form DAB-101 (12/19)

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7. Medicare claim type: ☐ Part A    ☐ Part B    ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan    ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes    If Yes, skip to Block 9.
☐ No    If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate?    ☐ Yes    ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated_____. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

_____

_____

_____

(Attach additional sheets if you need more space)

## PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| DATE | DATE |
|---|---|
| APPELLANT'S NAME (the party requesting review) | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) |
| ADDRESS | ADDRESS |
| CITY, STATE, ZIP CODE | CITY, STATE, ZIP CODE |

| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |
|---|---|---|---|---|---|

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C.  20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. *You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.*

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim.  Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.



Department of Health and Human Services
OFFICE OF MEDICARE HEARINGS AND APPEALS
Seattle, WA

| | | | |
|---|---|---|---|
| Appeal of: | **ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA** | OMHA Appeal No.: | **3-12053235157** |
| Beneficiary: | **Multiple** | Medicare Part: | **B** |
| Medicare No.: | **Multiple** | Before: | **Lori L. May** Administrative Law Judge |

Index of the Administrative Record and Exhibit List

**Exhibit Record**

Administrative
File Reference

| | File Name | | Page Range |
|---|---|---|---|
| Medical & Related: Supplemental Records | File 16 | 1 | : 26 |
| Medical & Related: Medical Records | File 9 | 1 | : 450 |
| Procedural - CMS Levels: Request for Reconsideration w AOR | File 10 | 1 | : 37 |
| Procedural - CMS Levels: Reconsideration Effectuation Notice | File 2 | 1 | : 2 |
| Procedural - CMS Levels: Redetermination Case File Req | File 3 | 1 | : 4 |
| Procedural - CMS Levels: Reconsideration | File 4 | 1 | : 18 |
| Procedural - CMS Levels: Reconsideration | File 5 | 1 | : 18 |
| Procedural - CMS Levels: Acknowledgement Letter | File 6 | 1 | : 3 |
| Procedural - CMS Levels: Request for Reconsideration | File 7 | 1 | : 490 |
| Procedural - CMS Levels: Claim Information | File 8 | 1 | : 18439 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 1 | 1 | : 34 |
| Procedural - OMHA Level: Notice of Hearing | File 11 | 1 | : 15 |
| Procedural - OMHA Level: Response to Notice of Hrg | File 12 | 1 | : 2 |
| Procedural - OMHA Level: Request for case file | File 13 | 1 | : 10 |
| Procedural - OMHA Level: Encrypted letter | File 14 | 1 | : 1 |
| Procedural - OMHA Level: Passphrase letter | File 15 | 1 | : 1 |
| Proceeding (Audios): Hearing audio | File 17 | 1 | : 1 |
| Proceeding (Audios): Hearing audio | File 18 | 1 | : 1 |

OMHA-156
Dated: 2023-07-24
VOL. I

Page 1 of 6

9547

File 4.pdf - Page 62 of 163

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 9548-9553



Department of Health and Human Services
Office of the Secretary

_____

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Seattle Field Office
700 Stewart Street
Suite 11101
Seattle, WA 98101-4440
(206) 539-5300
(206) 539-5369 (Direct)
(206) 553-0122 (Fax)

July 24, 2023

FOULSTON SIEFKIN LLP
ATTN: AMANDA WILWERT
7500 COLLEGE BLVD STE 1400
OVERLAND PARK, KS 66210

## NOTICE OF DECISION

Appellant: ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA
OMHA Appeal Number: 3-12053235227

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

### What if I disagree with the decision?

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

.

## How much time do I have to file an appeal?

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

## How do I file an appeal?

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:
- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

OMHA-1051T, Notice of Decision    2 of 6
VOL. I                                                                                      9555
File 4 pdf - Page 70 of 163

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C.  20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:
1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:
1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:
1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:
C2C Innovative Solutions, Inc. QIC B North
Part B North C2C
P.O. Box 44006
Jacksonville, FL 32231-4006

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List
Attachment A

OMHA-1051T, Notice of Decision                6 of 6
VOL. I                                                                              9559
File 4 pdf - Page 74 of 163



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Seattle, WA

| Appeal of: | ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA | OMHA Appeal No.:   3-12053235227 |
| --- | --- | --- |
| Beneficiary: | Multiple (See Attachment A) | Medicare Part:  B |
| Medicare No.: | Multiple (See Attachment A) | Before:   Lori L. May<br>Administrative Law Judge |

## DECISION

After considering the evidence and arguments presented in the record, I enter a **FAVORABLE** decision in the appeal of Advanced Dermatology and Skin Cancer Center, P.A. (Appellant). The claims at issue are covered according to the dispositions listed in Appendix A at the end of this decision. The Appellant is entitled to Medicare coverage for the claims marked as Favorable in Appendix A because the record supports that the services associated with these claims were medically reasonable and necessary.

## PROCEDURAL HISTORY

The Appellant submitted a claim to Medicare for skin substitute grafts, Mohs micrographic surgeries (MMS), and evaluation and management (E/M) services it provided to multiple beneficiaries from February 3, 2021 to June 16, 2021. The Medicare Administrative Contractor (MAC) initially allowed payment for the services. (File 11, p. 3). A Unified Program Integrity Contractor (UPIC) conducted a post-payment review and determined that an overpayment was assessed for the services. (*Id.*; File 2, pp. 33-40). Upon redetermination review, the MAC upheld the overpayment determination. (File 2, pp. 5–16). Upon reconsideration review, the Qualified Independent Contractor (QIC) issued a partially favorable decision, determining that Medicare would make payment for the MMS surgeries (17311, 17312) and E/M (99212, 99213) services provided, but the QIC upheld the denial of coverage and overpayment determination for the skin substitute graft services (Q4169, 15275). (File 11).

On April 26, 2023, the Appellant timely filed a request for an Administrative Law Judge (ALJ) hearing. (File 1). Pursuant to proper notice, on June 12, 2023, I held a consolidated hearing by telephone. (File 13; File 18). The Appellant appeared at the hearing through its appointed representative, Amanda Wilwert, an attorney of Foulston Siefkin, LLP. (File 1, p. 9; File 18; File 19). John R. Adams, M.D., owner of and treating physician for the Appellant testified. The files listed as exhibit records on the Index of the Administrative Record and Exhibit List, with the exception of files marked as records not considered, are admitted to the administrative record without objection. (File 18).

## ISSUES

Whether the application of skin substitute grafts (CPT code 15275), Artacent wound (CPT code Q4169) services provided to multiple beneficiaries on the dates of service were medically reasonable and necessary under Medicare Part B. If the services at issue are not covered by Medicare, an additional issue arises regarding who is financially liable for the non-covered charges and resulting overpayment.

## APPLICABLE LAW AND POLICY

Medicare Part B provides coverage to eligible beneficiaries for all or part of the cost of medical and other health services. Social Security Act (Act). § 1832(a). "Medical and other health services" is defined to include physicians' services, and services and supplies furnished as an incident to a physician's professional service. Act § 1861(s). The services, however, must be reasonable and necessary for the diagnosis or treatment of an illness or injury, or to improve the functioning of a malformed body member. Act § 1862(a)(1)(A); 42 C.F.R. § 411.15(k)(1).

Section 1833(e) of the Act and 42 C.F.R. § 424.5(a)(6) provide that payment will not be made unless sufficient information exists to determine whether payment is due, and the amount that should be paid. The regulations also make clear that it is the responsibility of the appellant to furnish sufficient information to enable the contractor to determine whether payment is due and the amount of the payment. 42 C.F.R. § 424.5(a)(6). Thus, the appellant has the burden to provide sufficient documentation, evidence, and testimony that indicates the services provided are covered by Medicare.

When Medicare coverage is precluded under section 1862(a)(1) or (a)(9) of the Act because services were not reasonable and necessary or were custodial in nature, payment may nevertheless be made when neither the beneficiary nor the Provider knew, or could reasonably be expected to know, that an item or service would not be covered. This provision is commonly referred to as the limitation on liability provision. Act § 1879; 42 C.F.R. § 411.400.

In the event that services are excluded from coverage and payment has already been made to a provider, recovery of the overpayment from the provider may be waived if the provider was not at fault in creating the overpayment. Act § 1870(b).

ALJs are bound by the statutory and regulatory provisions that govern Medicare benefits. 42 C.F.R. § 405.1063(a). Unless promulgated as a regulation by the Centers for Medicare and Medicaid Services (CMS), no rule, requirement, or statement of policy other than a national coverage determination (NCD) can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. Act, § 1871(a)(2). However, as part of the coverage determination process, CMS and its contractors have issued policy guidance, in the form of CMS Rulings, local coverage determinations (LCDs), manuals and policy articles, that establish criteria for coverage of selected types of medical items and services. ALJs are bound by NCDs and CMS Rulings but are not bound by other CMS program guidance. 42 C.F.R. § 405.1062(a) and 1063(b). An ALJ will give substantial deference to these policies if they are applicable to a particular case. 42 C.F. R. § 405.1062(a). If an ALJ declines to follow an applicable policy, the ALJ decision must explain the reasons why the policy was not

followed. 42 C.F.R. § 405.1062(b). An ALJ's determination not to follow an applicable policy applies only to the specific claim being considered and does not have precedential effect. 42 C.F.R. § 405.1062(b).

There is no NCD nor Medicare manual guidance specifically addressing the criteria for coverage of amniotic tissue allografts. In the absence of specific guidance, the CMS has provided guidance in the *Medicare Program Integrity Manual (MPIM)* to assist contractors, and in appropriate circumstances ALJs, in making determinations as to medical reasonableness and necessity. Under the *MPIM* criteria, an item or service is medically reasonable and necessary if:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
    - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
    - Furnished in a setting appropriate to the beneficiary's medical needs and condition;
    - Ordered and furnished by qualified personnel; and,
    - One that meets, but does not exceed, the beneficiary's medical need.

*Medicare Program Integrity Manual (MPIM)*, pub. 100-08, ch. 3, § 3.6.2.2 (Effective Aug. 2020).

Medical and hospital services are sometimes required to treat a condition that arises as a result of services that are not covered because they are determined to be not reasonable and necessary or because they are excluded from coverage for other reasons. Services "related to" non-covered services (e.g., cosmetic surgery, non-covered organ transplants, non-covered artificial organ implants, etc.), including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services "not related to" non-covered services are covered under Medicare. *Medicare Benefit Policy Manual (MBPM)*, pub. 100-08, ch. 16, § 180 (Effective May 2014).

LCD L35494 provides the indications and limitations of coverage for Mohs Micrograph Surgery (MMS) as guidance regarding the medical necessity of MMS. Local Coverage Determination L35494: Mohs Micrographic Surgery (LCD L35494) (Dec. 2020). The LCD states that Mohs Micrographic Surgery (MMS) is a technique for the removal of complex or ill-defined skin cancer with histologic examination of 100% of the surgical margins. This LCD addresses the reasonable and necessary threshold for coverage of MMS based on three requirements: (1) qualifications of the physician and office/facility team; (2) characteristics of the lesion pre-procedure; and (3) documentation of the medical necessity for the Mohs micrographic technique and associated plans for the repair, as outlined in the documentation requirements provided in Article A57477. The LCD provides a list of indications and anatomic locations for which Medicare will consider reimbursement of MMS. The list provided includes requirements associated with diagnoses of basal cell carcinoma and squamous cell carcinoma. *See* LCD L35494.

Article A57477 provides the following documentation requirements for establishing the medical necessity for the MMS and associated plans for the repair:

1. All documentation must be maintained in the patient's medical record and made available to the contractor upon request.
2. Every page of the record must be legible and include appropriate patient identification information (e.g., complete name, dates of service[s]). The documentation must include the legible signature of the physician or non-physician practitioner responsible for and providing the care to the patient.
3. The submitted medical record must support the use of the selected ICD-10-CM code(s).
4. The submitted CPT/HCPCS code must describe the service performed. The medical record documentation must support the medical necessity of the services as stated in this policy.
5. Procedures that exceed the medical need are not reasonable and necessary (not a Medicare covered service), therefore, documentation (pre-procedure E/M note and/or post-procedure operative notes) must address (a) why the lesion will not be (was not) managed by standard excision or destruction technique and (when applicable) (b) why (when utilized or referred to a plastic surgeon) procedures for complex repair, adjacent tissue transfer or rearrangement, flap, or graft codes are employed.
6. The physician must document in the patient's medical record that the diagnosis is appropriate for MMS and that MMS is an appropriate choice as the treatment of the particular lesion. The options for care (both the primary procedure options and repair options) must be discussed with the patient and clearly noted in the pre-procedure (or post procedure as appropriate) documentation. In summary, the minimal medical record documentation entails that the beneficiary was informed of their treatment options and explained the risks/benefits of the MMS technique and associated repair.
7. Though complexity of the lesion (poorly defined borders, suspected deep invasion, recurrent lesion, prior radiation), lesion size/location, and maximum conservation of healthy tissue are to be addressed in the preoperative medical record, the surgeon must document why the lesion will not be (was not) managed by excision or destruction technique.
8. Operative notes and pathology documentation in the patient's medical record should clearly document that MMS was performed using accepted MMS technique, in which the physician acts in two integrated and distinct capacities: surgeon and pathologist (therefore confirming that the procedure meets the definition of the CPT code[s]).
9. Operative documentation should note: location, number, and size of the lesion(s); number of stages performed; number of specimens per stage.
10. Histology documentation must include the following:
    - First stage: if tumor present, depth of invasion; pathological pattern of the tumor; cell morphology; if present, note perineural invasion of scar tissue.
    - Subsequent stages: if the tumor characteristics are the same as in the first stage, note this fact only. If the tumor characteristics are different from the first stage, describe the differences.

11. Measurement of the primary lesion necessitating MMS and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:
- Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage(using a centimeter ruler or relation of size by another anatomic structure).
- Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
- It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.
12. When the surgical defect created by MMS requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.

Local Coverage Article A57477: Billing and Coding: Mohs Micrographic Surgery – Policy Article (Article A57477) (Dec. 2020); *see also* LCD L35494.

Medical and hospital services are sometimes required to treat a condition that arises as a result of services that are not covered because they are determined to be not reasonable and necessary or because they are excluded from coverage for other reasons. Services "related to" non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services "not related to" non-covered services are covered under Medicare. *MBPM*, pub. 100-02, ch. 16, § 180 (Effective May 2014).

In the event the services at issue are found to be not medically reasonable and necessary under section 1862(a)(1) the Social Security Act (Act), section 1879 of the Act may limit liability for payment of the services. Specifically, section 1879 of the Act provides that when items or services are denied coverage under section 1862(a)(1) of the Act, payment may nevertheless be made for the items or services if neither the beneficiary, provider, nor supplier knew or could not reasonably have been expected to know that the items or services would not be covered or payable by Medicare.

Section 1870 of the Act allows for the waiver of Medicare's right to recoup overpayments where the provider causing the overpayment was without fault. A provider is without fault if it exercised reasonable care in billing and accepting the overpayment. *See Medicare Financial Management Manual (MFMM)*, pub. 100-06, ch. 3, § 90 (Effective Feb. 2004). This is shown by the provider having made full disclosure of all material facts and by having had either a reasonable basis for assuming that the payment was correct or having had reason to question the payment and promptly raising that question to the fiscal intermediary or carrier's attention. *Id.* By contrast, a provider is at fault if it should have known the services were not covered, i.e., constructive notice. *See MFMM*, ch. 3, § 90.1.H (Effective Feb. 2004). If the provider is at fault in causing the overpayment, recovery of the overpayment from the provider must proceed. *See MFMM*, ch. 3, § 90.

## FINDINGS OF FACT AND ANALYSIS

### I.    Findings of Fact

The record contains a copy of the Artacent wound package insert. The insert describes Artacent as a dual-layer dehydrated amniotic membrane allograft that is processed and distributed in accordance with FDA requirements for HCT/P under 21 C.F.R. part 1271, state regulations, and the guidelines of the American Association of Tissue Banks. The insert states that allografts may be used as a wound covering in various surgical procedures and may be used independently or in combination with autologous tissue or other forms of allograft tissue. (File 7, p. 85). The insert further states that dehydrated amnion allografts should not be implanted into (1) areas of active or latent infection; and/or (2) into a patient with a disorder that would create an unacceptable risk of post-operative complications. Moreover, additional contraindications for the use of Artacent shall be determined by a licensed practitioner. (File 7, p. 86).

The Appellant submitted a peer-reviewed article to support that the use of placental allografts after Mohs surgery is medically reasonable and necessary. (File 7, pp. 95–100). The study found that in the case of older adults, larger cutaneous Mohs-related defects of the face, head, and hands of older adults were effectively reconstructed with a placental allograft. (File 7, pp. 96, 99). The study also found that compared to autologous tissue, placental allograft cases were associated with significantly lower risk for infection, poor scar cosmesis, scar revision, or reoperation. (File 7, pp. 95, 97–99).

At the hearing, Dr. Adams stated that he has been performing Mohs surgeries since around 1993 and has done over 20,000 Mohs surgeries. He stated that allografts were used for only the most complex cases, which tended to where patients had the most significant wounds and faced multiple comorbidities. He stated that patients that undergo Mohs surgeries first have a biopsy completed to determine if their lesion is cancerous. If the patient has cancer and it is located in areas like the head, neck or feet, they are contacted for an appointment. The Mohs surgery procedure then involves removing the cancer and having the tissue that is removed looked at under a microscope. After the surgery is completed, would repair options are discussed and then the repair of the wound is done. Dr. Adams explained that there are various options for repairing postoperative wounds/defects resulting from MMS, including secondary intention (the wound heals on its own), side to side repair (closure of the lips of the wound), reconstructive procedures (such as flap and grafts, and allografts). He stated that the size and depth of surgical wounds is critical in deciding which treatment option to do. The Appellant contended that the use of flaps and grafts is much more tenuous and much more likely to fail if a patient's wound is three centimeters or more and if the patient has a comorbidity that results in them having a deficiency in oxygen, such as requiring supplemental oxygen or having chronic obstructive pulmonary disease. Dr. Adams testified that he only used allografts when patients presented with lesions that were two centimeters or more, and which presented as complex repairs. Dr. Adams also stated that for his practice, the complication rate with the use of flaps or grafts on high risk patients, like the beneficiaries involved in this case, was roughly 30%, and that the complications consisted of infections, needing to reform the flap, needing to do reconstruction, or developing hematoma or necrosis of the flap. In comparison, the complication rate when an allograft was used was only 2%. Dr. Adams also explained that when using a flap, other areas around the

wound are affected. Thus, if the area becomes necrotic it results in an area twice the size of the initial defect becoming necrotic since the initial defect along with the flap used are affected. Dr. Adams stated that using allografts sped up the healing process by 70%, for example a reducing the healing time of a wound that that took eight weeks to heal down to three weeks. Dr. Adams also stated that the location of the wound is a factor that is considered. For example, he stated that leg wounds have an infection rate that supersedes 10% if they are left open, even if the patient does not have any comorbidities. As a result, secondary intention in not the preferred treatment for leg wounds. (Hearing Audio).

| BENEFICIARY | Internal Control Number (ICN) | Dates of Service | CPT Codes | ALJ Disposition |
|---|---|---|---|---|
| C.B.<br>HICN: *****AU08 | 3321357303030 | 06/03/2021 | 15275 | Favorable |
| | | | Q4169 | Favorable |

*Findings of Fact for C.B.*

On June 3, 2021, the Beneficiary underwent MMS to remove a squamous cell carcinoma located on the right central malar cheek. (File 2, pp. 364–367). After the MMS was completed, the Beneficiary had a postoperative wound that had a surface area of 7.5 cm$^2$ (3.0 cm in length x 2.5 cm in width) and had a depth of 0.5 cm. (File 2, p. 365). The wound required repair. Prior to the repair of the postoperative wound, the various methods of closure, were discussed with the Beneficiary and considered. (File 2, pp. 366–367). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(File 2, p. 366). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records document the following comorbidities and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to wound repairs other than the application of allograft:

- The surgical defect was located on an area where the skin is significantly atrophic (thinned) secondary to extensive solar damage, as a result the skin in this area suffered from inadequate circulation of blood and was therefore deficient in terms of its oxygenation;
- The surgical defect was located in an area where the skin was significantly scarred, which meant the area suffered from inadequate circulation of blood and was deficient in terms of its oxygenation, and resulted in the defect being even more susceptible to infection and longer wound healing time; and

- The Beneficiary was on blood thinning medication, and was therefore more susceptible to hematoma formation, which can lead to tissue necrosis, infection, increased scarring, functional impairment, and disfigurement of both the primary and secondary defects;
- The wound was located on the peri-ocular region, where a free skin margin exists and is an area where contraction was a concern as it could cause severe disfigurement and impair function in the areas surrounding the free skin margins and lead to dry eye and eventual blindness.

(File 2, pp. 366–367).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 8, p. 366). The notes for wound closure treatment document that 4 units of Artacent wound (allograft), measuring 2 cm x 2 cm, were applied to the Beneficiary's surgical defect. (*Id.*).

The record includes a face diagram that was used to identify the location of the wound closure on the Beneficiary's body. (File 2, p. 368). The record also has a copy of a photograph taken of the Beneficiary's face on June 3, 2021, which shows the surgery site before and after the MMS was performed. (File 2, p. 369).

At the hearing, Dr. Adams explained that when MMS is performed in the areas of the eyelids, nose or lips, lesions that are 1 cm in size or greater is considered relatively large. Dr. Adams confirmed that the Beneficiary had skin with scar tissue, the Beneficiary was on blood thinning medication, and that the postoperative wound/defect was located near the free margins of the eye. Dr. Adams stated that treatment by secondary intention, graft, or flap were not optimal, as secondary intention would likely result in atrophy and pulling down of the skin, the damage to the skin in the area of treatment made grafting difficult, and flap treatment would require the involvement of a larger sized flap and put the Beneficiary at risk for hematoma, which could result in cutting off the blood supply and necrosis. (Hearing Audio).

| BENEFICIARY | Internal Control Number (ICN) | Dates of Service | CPT Codes | ALJ Disposition |
|---|---|---|---|---|
| M.H. HICN: *****KG29 | 3321357303020 | 03/12/2021 | Q4169 | Favorable |

*Findings of Fact for M.H.*

On March 3, 2021, the Beneficiary underwent MMS to remove tumors, which included the removal of a nodular basal cell carcinoma on the left conchal bowl. (File 2, p. 445). After the MMS was completed, the Beneficiary's postoperative wound on the left conchal bowl that required repair, which measured 1.4 cm in length, 1.2 cm in width, and 0.3 cm in depth. (File 2, p. 446).

Prior to the repair of the postoperative wound, the various methods of closure, were discussed with the Beneficiary and considered. (File 8, pp. 447–448). Dr. Adams documented the

following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(File 2, p. 447). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records document the following comorbidities and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to wound repairs other than the application of allograft:

- The Beneficiary had a history of sleep apnea, which causes hypoxia and can result in wounds being more susceptible to infection, longer wound healing time, and increased scar tissue formation;
- The surgical defect was located on an area where the skin was significantly atrophic (thinned) secondary to extensive solar damage, which made it suffer from inadequate circulation of blood, deficient in terms of its oxygenation, and more susceptible to infection, necrosis, hypoxia of tissue, increased disfigurement, and increased impairment of skin function;
- The surgical defect was located in an area where the skin was significantly scarred, which meant the area suffered from inadequate circulation of blood and was deficient in terms of its oxygenation, and resulted in the defect being even more susceptible to infection and longer wound healing time;
- The Beneficiary was taking blood thinning medication, which made him more susceptible to hematoma formation, which could then lead to tissue necrosis, infection, increased scarring, functional impairment, and disfigurement of both the primary and secondary defects; and
- There was exposed cartilage at the site of the postoperative wound, which was of concern due to its lack of a sovereign vascular supply and consequent lack of oxygen that made tissue necrosis a significant concern.

(File 2, pp. 447–448).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 2, p. 447). On March 3, 2021, Artacent wound was applied to the surgical defect on the Beneficiary's left conchal bowl. Four units of Artacent wound, measuring 2 cm x 2 cm, were applied to the surgical defect on the Beneficiary's right central frontal scalp. (File 2, p. 446).

The record also has a copy of photographs of the Beneficiary's ear taken on March 3, 2021, which confirms MMS was performed on the Beneficiary's left conchal bowl. (File 2, p. 453).

On March 6, 2021, the Beneficiary was seen by Dr. Adams for services that included a planned postoperative wound closure of the wound found on the Beneficiary's left conchal bowl. (File 2, p. 454–457). The postoperative wound measured 1.3 cm in length, 1.2 cm in width, and 0.3 cm in depth. (File 2, p. 454). Prior to the repair of the postoperative wounds, the same various methods of closure, as well as the associated risks and benefits for the methods, were discussed with the Beneficiary. (File 2, pp. 454–456). After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 2, p. 455). On March 6, 2021, the Beneficiary underwent the second application of Artacent wound on the surgical defect. Two units of Artacent wound measuring 15mm, were applied to the surgical defect on the Beneficiary's left conchal bowl. (File 2, p. 454).

On March 12, 2021, the Beneficiary was seen by Dr. Adams for services that included another planned postoperative wound closure of the wound found on the Beneficiary's left conchal bowl. (File 2, p. 462–464). The postoperative wound measured 1.2 cm in length, 1.1 cm in width, and 0.2 cm in depth. (File 2, p. 462). Prior to the repair of the postoperative wounds, the same various methods of closure, as well as the associated risks and benefits for the methods, were discussed with the Beneficiary. (File 2, pp. 463–464). After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 2, p. 463). On March 12, 2021, the Beneficiary underwent the second application of Artacent wound on the surgical defect. Two units of Artacent wound measuring 15mm, were applied to the surgical defect on the Beneficiary's left conchal bowl. (File 2, p. 462).

At the hearing, Dr. Adams stated that the services at issue addressed a lesion that the Beneficiary had inside his ear, in an area that is before the ear canal. Dr. Adams also confirmed that the Beneficiary had comorbidities that made treatment by secondary intention or repair by flap unlikely to work. Dr. Adams also noted that the Beneficiary had dementia, which was a comorbidity of concern because it could result in him tearing the flap wrap off. (Hearing Audio).

| BENEFICIARY | Internal Control Number (ICN) | Dates of Service | CPT Codes | ALJ Disposition |
|---|---|---|---|---|
| O.M. HICN: *****DE44 | 3321357303000 | 02/03/2021 | 15275 | Favorable |
| | | | Q4169 | Favorable |
| | 3321357303010 | 02/12/2021 | Q4169 | Favorable |
| | | | 15275 | Favorable |

*Findings of Fact for O.M.*

On February 3, 2021, the Beneficiary underwent MMS to remove squamous cell carcinomas located on her left superior nasal cheek and inferior eyelid. (File 2, pp. 489–490). After the MMS was completed, the Beneficiary's postoperative wound required repair, and measured 3.7 cm in length, 2.5 cm in width, and 1.2 cm in depth. (File 2, p. 490).

Prior to the repair of the postoperative wound, the various methods of closure, were discussed with the Beneficiary and considered. (File 2, pp. 491–492). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

Amniotic skin substitute allograft is medically indicated due to the relatively large
size and nature of the wound/defect and that the defect is not amenable to Primary
side to side repair. Amniotic skin substitute allograft is the most appropriate
choice, required and medically indicated as the patient declined to accept the
risks, complications and trauma associated with incisional types of repair for
reconstruction of the Primary defect.

(File 2, p. 491). Dr. Adams also documented that use of the amniotic skin substitute had several
purposes, including creating a natural barrier, optimizing skin function and cosmesis, and
minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records
document the following comorbidities and medical conditions that made the Beneficiary's
wound more susceptible to significant wound healing complications and unlikely to respond to
wound repairs other than the application of allograft:

- The surgical defect was located on an area where the skin was significantly atrophic
  (thinned) secondary to extensive solar damage, which made it suffer from inadequate
  circulation of blood, deficient in terms of its oxygenation, and more susceptible to
  infection, necrosis, hypoxia of tissue, increased disfigurement, and increased
  impairment of skin function;
- The surgical defect was located on the peri-ocular region, where a free skin margin
  exists and is an area where contraction was a concern as it could cause severe
  disfigurement and impair function in the areas surrounding the free skin margins and
  lead to dry eye and eventual blindness.
- The surgical defect had exposed post-septal fat and due to its compartmentalized
  location, which is contiguous with the orbit, tissue necrosis and/or infection was an
  extremely significant concern.

(File 2, pp. 491–492).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted
for repair and wound healing using the skin substitute allograft. (File 2, p. 491). On February 3,
2021, 12 units of Artacent wound, measuring 2 cm x 2 cm, were applied to the Beneficiary's
postoperative wounds. (File 2, pp. 490–491).

The record has a face diagram and copy of photographs of the Beneficiary's face that were taken
February 3, 2021, which confirms MMS was performed on the Beneficiary's left superior nasal
cheek. (File 2, pp. 493–494).

On February 12, 2021, the Beneficiary was seen by Dr. Adams for a postoperative wound check
of the wound located on her left superior nasal cheek. (File 2, pp. 498–500). On this date, the
postoperative wound measured 2.0 cm in length, 1.5 cm in width, and 0.6 cm in depth, and was
determined to require repair. (File 2, p. 498). Prior to the repair of the postoperative wounds, the
same various methods of closure, as well as the associated risks and benefits for the methods,
previously discussed with the Beneficiary on February 3, 2021 were again discussed with the
Beneficiary on this date. (File 2, pp. 499–500). After discussing the risks and benefits associated
with the repair options, the Beneficiary opted for repair and wound healing using the skin
substitute allograft. (File 2, p. 499). The medical records document the following comorbidities

and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to wound repairs other than the application of allograft:

- The surgical defect was located on an area where the skin was significantly atrophic (thinned) secondary to extensive solar damage, which made it suffer from inadequate circulation of blood, deficient in terms of its oxygenation, and more susceptible to infection, necrosis, hypoxia of tissue, increased disfigurement, and increased impairment of skin function;
- The Beneficiary had exposed bone present after the post repair procedure. Due to its lack of a sovereign vascular supply and lack of oxygen, it made tissue necrosis a significant concern.
- The surgical defect was located on the peri-ocular region, where a free skin margin exists and is an area where contraction was a concern as it could cause severe disfigurement and impair function in the areas surrounding the free skin margins and lead to dry eye and eventual blindness.

(File 2, pp. 499–450).

On February 12, 2021, the Beneficiary underwent the second application of Artacent wound on the left superior nasal cheek. Four units of Artacent wound, measuring 2 cm x 2 cm, were applied to the surgical defect. (File 2, p. 498).

At the hearing, Dr. Adams stated that the Beneficiary had three stages of MMS, which is considered relatively extensive. Dr. Adams further stated that when the Beneficiary returned for the second application of allograft on February 12, 2021, the surgical defect had closed a significant amount, as defect decreased from 11.1 cm$^3$ on February 3, 2021 down to 1.8cm$^3$ on February 12, 2021. (Hearing Audio).

| BENEFICIARY | Internal Control Number (ICN) | Dates of Service | CPT Codes | ALJ Disposition |
|---|---|---|---|---|
| W.W. HICN: *****EG75 | 3321357303040 | 06/10/2021 | Q4169 | Favorable |
| | | | 15275 | Favorable |

*Findings of Fact for W.W.*

On June 3, 2021, the Beneficiary underwent MMS to remove a squamous cell carcinoma located on the left central malar cheek. (File 2, pp. 525–526). After the MMS was completed, the Beneficiary had postoperative wound that required repair, and which measured 2.5 cm in length, 1.5 cm in width, and 1.0 cm in depth. (File 2, p. 526).

Prior to the repair of the postoperative wound, the various methods of closure, were discussed with the Beneficiary and considered. (File 2, pp. 527–528). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large
> size and nature of the wound/defect and that the defect is not amenable to Primary
> side to side repair. Amniotic skin substitute allograft is the most appropriate
> choice, required and medically indicated as the patient declined to accept the
> risks, complications and trauma associated with incisional types of repair for
> reconstruction of the Primary defect.

(File 2, p. 527). Dr. Adams also documented that use of the amniotic skin substitute had several
purposes, including creating a natural barrier, optimizing skin function and cosmesis, and
minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records
document the following comorbidities and medical conditions that made the Beneficiary's
wound was more susceptible to significant wound healing complications and unlikely to respond
to wound repairs other than the application of allograft:

- The surgical defect was located in an area where the skin was significantly scarred,
  which meant the area suffered from inadequate circulation of blood and was deficient
  in terms of its oxygenation, and resulted in the defect being even more susceptible to
  infection and longer wound healing time;
- The Beneficiary was taking blood thinning medication, which made him more
  susceptible to hematoma formation, which could then lead to tissue necrosis,
  infection, increased scarring, functional impairment, and disfigurement of both the
  primary and secondary defects; and
- The surgical defect was located on the peri-ocular region, where a free skin margin
  exists and is an area where contraction was a concern as it could cause severe
  disfigurement and impair function in the areas surrounding the free skin margins and
  lead to dry eye and eventual blindness.

(File 2, pp. 527–528).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted
for repair and wound healing using the skin substitute allograft. (File 2, p. 527). On June 3, 2021,
Artacent wound was applied to the surgical defect on the Beneficiary's left central malar cheek.
Eight units of Artacent wound, measuring 2 cm x 2 cm, were applied to the surgical defect on the
Beneficiary's right central frontal scalp. (File 2, p. 526).

The record has a face diagram and photographs of the Beneficiary's face taken on June 3, 2021,
which confirms MMS was performed on the Beneficiary's left central malar cheek. (File 2, pp.
529–530).

On March 6, 2021, the Beneficiary was seen by Dr. Adams for services that included a planned
postoperative wound closure of the wound found on the Beneficiary's left conchal bowl. (File 2,
p. 454–457). The postoperative wound measured 1.3 cm in length, 1.2 cm in width, and 0.3 cm
in depth. (File 2, p. 454). Prior to the repair of the postoperative wounds, the same various
methods of closure, as well as the associated risks and benefits for the methods, were discussed
with the Beneficiary. (File 2, pp. 454–456). After discussing the risks and benefits associated
with the repair options, the Beneficiary opted for repair and wound healing using the skin

substitute allograft. (File 2, p. 455). On March 6, 2021, the Beneficiary underwent the second application of Artacent wound on the surgical defect. Two units of Artacent wound measuring 15mm, were applied to the surgical defect on the Beneficiary's left choncal bowl. (File 2, p. 454).

On June 10, 2021, the Beneficiary was seen by Dr. Adams for services a planned postoperative wound closure of the wound found on the Beneficiary's left central malar cheek (File 2, pp. 531–532). The postoperative wound measured 2.5 cm in length, 2.0 cm in width, and 0.7 cm in depth. (File 2, p. 531). Prior to the repair of the postoperative wounds, the same various methods of closure, as well as the associated risks and benefits for the methods, were discussed with the Beneficiary. (File 2, p. 532). After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (Id.). On March 12, 2021, the Beneficiary underwent the second application of Artacent wound on the surgical defect. Six units of Artacent wound measuring 2 cm x 2 cm, were applied to the surgical defect on the Beneficiary's wound. (File 2, p. 531).

At the hearing, Dr. Adams stated that the Beneficiary's surgical defect was significant due its large size and it being located near the eyelid and nose. He confirmed that the application of allograft was warranted because the Beneficiary had scar tissue at the site of the wound, the Beneficiary was on blood thinners, and that there was free skin margin at the site of the wound. (Hearing Testimony).

## II.    Analysis

*Application(s) of Skin Substitute (CPT code 15275), and Skin Substitute Grafts (Artacent Wound, per square centimeter (CPT code Q4169)*

Claims for CPT codes 15275and Q4169 were denied at the prior level of appeal because the QIC found that the Appellant was not utilizing the skin substitute allografts (Artacent wound) in a homologous manner as outlined in 21 C.F.R. section 1271 and the FDA's guidelines provided in *Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use,* U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download (last accessed July 18, 2023). guidelines. The QIC also determined that the documentation was not strong enough to support why the acute wounds required an expensive dressing and why the product was medically necessary over dressings more commonly utilized after MMS. The QIC also acknowledged that the Appellant's contentions that not applying allografts would be against the beneficiaries' wishes and that relatively large surgical wounds on the head, neck, hand, and feet can be safely and effectively repaired via allograft, however the QIC stated that these rationales do not make the application of skin substitute grafts medically reasonable and necessary. In addition, the QIC determined that the application of skin substitute services (CPT code 15275) had to remain denied because they are services related to the non-covered service of using Artacent wound. (File 11, pp. 11–12).

At the hearing, for each Beneficiary where skin substitute grafts and the application of these items were at issue, Dr. Adams explained that the beneficiaries had a surgical wound/defect that was the result of removal of skin cancer by MMS, and that repair of the defects by secondary intension or side to side repair was not appropriate or would not offer optimal results. Dr. Adams contended that each of the Beneficiaries had comorbidities and medical conditions that put them at higher risk of wound healing complications (i.e., infection, necrosis, hematoma, longer wound

healing times, and postoperative morbidity) and/or had their defects in locations of the body that made side to side repair or the use of skin grafts and interpolation flaps not possible. For all of the beneficiaries, Dr. Adams also confirmed that application of allograft was the most appropriate treatment to preserve functional capabilities and restore physical appearance, effective, not experimental or investigative, was furnished in accordance with accepted standards of care, was furnished by a qualified physician, and that its use met, but did not exceed each beneficiary's need. (Hearing Audio).

I note that in the issued reconsideration decision, the QIC relies upon FDA regulations and guidance for determining whether use of Artacent wound was medically reasonable and necessary. *See* File 4, pp. 11–12; 21 C.F.R. part 1271; *Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use*, U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download (last accessed July 18, 2023). However, the FDA is not authorized to regulate the practice of medicine. Additionally, 21 C.F.R. section 1271.1 clearly states that of 21 C.F.R. part 1271 only applies to establishments that manufacture HCT/Ps. As such, the FDA regulations and guidance only serve as references and are not determinative factors for deciding Medicare coverage. Even if the FDA regulations and guidance were applied, the record contains a letter written by the FDA that confirms when Artacent wound is used as a wound covering, it meets the criteria for regulation under section 361 of the PHS Act and the regulations in 21 C.F.R. part 1271. (File 7, p. 83). This statement by the FDA confirms that since one of the documented purposes for using the allografts at issue was to create a natural barrier, a use that is equivalent to that of a wound covering, the use of the allografts for the beneficiaries is consistent with FDA requirements and constitutes a homologous use.

In this case, I find the record supports that the application of Artacent wound was a medically reasonable and necessary treatment for the surgical defects of each of the beneficiaries. Prior to the repair of the surgical defect, Dr. Adams discussed with each beneficiary the repair options, as well as the risks and benefits associated with the options, and the reasons why the use of amniotic skin substitute allograft was the most appropriate choice for treating the Beneficiary's post-operative wound. Thus, the record confirms that documentation requirements outlined in Article A57455 and referred to in LCD L35494 were met. The medical records also clearly document all of the beneficiaries were over 60 years old, were diagnosed with basal cell carcinoma or squamous cell carcinoma, and each had large postoperative defects after undergoing MMS which required repair. The peer-reviewed article submitted found that MMS-related defects of the face, head, and hands of older adults that had surface areas over 3cm$^2$ were effectively reconstructed with a placental allograft, and that in comparison to autologous tissue, placental allograft cases were associated with significantly lower risk for infection, poor scar cosmesis, scar revision, or reoperation. Thus, the article supports the use of allografts for the beneficiaries. Dr. Adams also testified that based on his years of experience in performing Mohs surgeries, the complication rate when an allograft was used to repair a postoperative wound was significantly lower than when flaps or grafts repair was done. In addition, the Artacent wound package insert and the FDA's letter regarding Artacent wound corroborates that the allograft was utilized for its intended use of serving as a wound covering after a surgical procedure.

Furthermore, the each of the beneficiaries had a wound that made side to side repair, flap, and graft repair not possible or unlikely to work, and each beneficiary had comorbidities which increased his or her risk of experiencing complications if the postoperative wound was not optimally treated.  The medical literature in combination with the Beneficiary's medical condition and treating physician's experience in handling post-MMS wound repairs, as well as the Artacent being used as the manufacturer instructs, validates that using Artacent wound to repair the surgical defects of each beneficiary was medically reasonable and necessary treatment. Therefore, Medicare coverage of the skin substitute graft services (CPT codes 15275 and Q4169) furnished to the each of the beneficiaries is appropriate.[1]

The *MBPM* directs that services "not related to" non-covered services are covered under Medicare are covered under Medicare. Since the Artacent wound allografts (CPT code Q4169) are deemed covered under Medicare, the claims for application of skin substitute services (CPT code 15275) are considered not related to non-covered services. Therefore, Medicare coverage is appropriate for the application of the skin substitute services it provided to the Beneficiaries.

## CONCLUSIONS OF LAW

The Artacent allograft (CPT code Q4169) and application of skin substitute services (CPT code 15275) provided to the Beneficiaries on the various dates of service at issue satisfy Medicare coverage criteria.

## ORDER

For the reasons discussed above, this decision is **FULLY FAVORABLE.** The Medicare Contractor is directed to process this claim in accordance with this Decision.

SO ORDERED

Lori L. May
Administrative Law Judge

---

[1] See Appendix A for a list summarizing the ALJ dispositions for the claims at issue in this appeal.

OMHA Appeal No.3-12053235227

**APPENDIX A – Claims and ALJ Dispositions**

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes | ALJ Disposition |
|---|---|---|---|---|
| W.A.<br>HICN: *****TF98 | 3321357303050 | 06/16/2021 | 99213 | Not at issue |
| C.B.<br>HICN: *****AU08 | 3321357303030 | 06/03/2021 | 17312 | Not at issue |
|  |  |  | 15275 | Favorable |
|  |  |  | Q4169 | Favorable |
|  |  |  | 17311 | Not at issue |
| L.F.<br>HICN: *****TT57 | 3321357303060 | 06/16/2021 | 99212 | Not at issue |
| M.H.<br>HICN: *****KG29 | 3321357303020 | 03/12/2021 | Q4169 | Favorable |
| O.M.<br>HICN: *****DE44 | 3321357303000 | 02/03/2021 | 17311 | Not at issue |
|  |  |  | 17312 | Not at issue |
|  |  |  | 15275 | Favorable |
|  |  |  | Q4169 | Favorable |
|  | 3321357303010 | 02/12/2021 | Q4169 | Favorable |
|  |  |  | 15275 | Favorable |
| W.W.<br>HICN: *****EG75 | 3321357303040 | 06/10/2021 | Q4169 | Favorable |
|  |  |  | 15275 | Favorable |

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD    Form DAB-101 (12/19)

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7. Medicare claim type: ☐ Part A    ☐ Part B    ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan    ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes    If Yes, skip to Block 9.
☐ No    If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate?    ☐ Yes    ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated_____. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

_____

_____

_____

_____

(Attach additional sheets if you need more space)

### PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| DATE | DATE |
|---|---|
| APPELLANT'S NAME (the party requesting review) | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) |
| ADDRESS | ADDRESS |
| CITY, STATE, ZIP CODE | CITY, STATE, ZIP CODE |

| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |
|---|---|---|---|---|---|

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

---

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C.  20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. *You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.*

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim.  Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Seattle, WA**

| | | | |
|---|---|---|---|
| Appeal of: | **ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA** | OMHA Appeal No.: | **3-12053235227** |
| Beneficiary: | **Multiple** | Medicare Part: | **B** |
| Medicare No.: | **Multiple** | Before: | **Lori L. May** Administrative Law Judge |

Index of the Administrative Record and Exhibit List

| Exhibit Record | File Name | Administrative File Reference | Page Range |
|---|---|---|---|
| Medical & Related: General | File 3 | 1 | : 10800 |
| Medical & Related: General | File 4 | 1 | : 10745 |
| Procedural - CMS Levels: Claim information | File 10 | 1 | : 2 |
| Procedural - CMS Levels: Reconsideration | File 11 | 1 | : 17 |
| Procedural - CMS Levels: Reconsideration | File 12 | 1 | : 17 |
| Procedural - CMS Levels: Request Reconsideration w/MER | File 2 | 1 | : 535 |
| Procedural - CMS Levels: Reconsideration Effectuation | File 5 | 1 | : 2 |
| Procedural - CMS Levels: QIC Acknowledgement Letter | File 7 | 1 | : 3 |
| Procedural - CMS Levels: Request for Reconsideration | File 8 | 1 | : 36 |
| Procedural - CMS Levels: Request Redetermination w/MER | File 9 | 1 | : 495 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 1 | 1 | : 33 |
| Procedural - OMHA Level: Notice of Hearing | File 13 | 1 | : 16 |
| Procedural - OMHA Level: Response to Notice of Hrg | File 14 | 1 | : 2 |
| Procedural - OMHA Level: Request for copy of file. | File 15 | 1 | : 10 |
| Procedural - OMHA Level: Passphrase letter | File 16 | 1 | : 1 |
| Procedural - OMHA Level: Encrypted letter | File 17 | 1 | : 1 |
| Proceeding (Audios): Hearing audio | File 18 | 1 | : 1 |
| Proceeding (Audios): Hearing audio | File 19 | 1 | : 1 |

| Non-Exhibit Record | File Name | Administrative File Reference | Page Range |
|---|---|---|---|
| Records not considered: Transmittal | File 6 | 1 | : 4 |

OMHA-156
Dated: 2023-07-24
VOL. I

Page 1 of 7

9579

File 4.pdf - Page 94 of 163

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 9580-9586

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Seattle Field Office
700 Stewart Street
Suite 11101
Seattle, WA 98101-4440
(206) 539-5300
(206) 539-5369 (Direct)
(206) 553-0122 (Fax)

July 24, 2023

FOULSTON SIEFKIN LLP
ATTN: AMANDA WILWERT
7500 COLLEGE BLVD STE 1400
OVERLAND PARK, KS 66210

## NOTICE OF DECISION

Appellant: ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA
OMHA Appeal Number: 3-12053117987

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

### What if I disagree with the decision?

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

### How much time do I have to file an appeal?

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

**How do I file an appeal?**

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:
- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**
Mail your appeal and a copy of the enclosed decision to:
> Department of Health and Human Services
> Departmental Appeals Board
> Medicare Appeals Council, MS 6127
> Cohen Building Room G-644
> 330 Independence Ave., S.W.
> Washington, D.C. 20201

OMHA-1051T, Notice of Decision          2 of 5
VOL. I                                                                              9588
File 4.pdf - Page 103 of 163

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:
1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new.** You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:
1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:
1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

<u>**How will the Medicare Appeals Council respond to my appeal?**</u>

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

<u>**Questions?**</u>

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

.

cc:

      QIC - C2C B North
      P.O. Box 44006
      Jacksonville, FL 32231-4006

Enclosures:



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Seattle, WA

| | | | |
|---|---|---|---|
| Appeal of: | ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA | OMHA Appeal No.: | 3-12053117987 |
| Beneficiary: | Multiple (See Attachment A) | Medicare Part: B | |
| Medicare No.: | Multiple (See Attachment A) | Before: | Lori L. May Administrative Law Judge |

## DECISION

After considering the evidence and arguments presented in the record, I enter a **PARTIALLY FAVORABLE** decision in the appeal of Advanced Dermatology and Skin Cancer, P.A. (Appellant). For the reasons set forth below, the record supports that the claims at issue are covered according to the dispositions listed in Appendix A at the end of this decision. The Appellant is entitled to Medicare coverage for the claims marked as Favorable in Appendix A because the record supports that the services associated with these claims were medically reasonable and necessary. Medicare is entitled to recover payments it made for the claims marked as Unfavorable in Appendix A because the Medicare coverage criteria for these claims were not met, and the Appellant received an overpayment which cannot be waived.

## PROCEDURAL HISTORY

The Appellant submitted claims to Medicare for the following services it provided to multiple beneficiaries from March 15, 2021 to June 14, 2021:

- Mohs micrographic surgeries (CPT codes 17311–17314);
- Complex repair (CPT code 13132);
- Surgical pathology service(s) (CPT code 88305);
- Negative pressure wound therapy (NPWT) (CPT code 97608);
- Application(s) of skin substitute (CPT codes 15271–15275); and
- Skin substitute grafts (Artacent wound, per square centimeter (CPT code Q4169) and Epifix, per square centimeter (CPT code Q4186))

The Medicare Administrative Contractor (MAC) initially allowed payment for the services. (File 5, p. 3). A Unified Program Integrity Contractor (UPIC) conducted a post-payment review and determined that an overpayment was assessed. (File 8, pp. 34–44). Upon redetermination review, the MAC upheld the overpayment determination. (File 8, pp. 7–13). Upon

OMHA-152, Decision

DAB-101, Request for Review

OMHA-156, Exhibit List

Attachment A

reconsideration review, the Qualified Independent Contractor (QIC) issued a partially favorable decision, determining that Medicare would make partial payment for some of the services claimed, but still finding that an overpayment was made for services that were denied coverage and that the Appellant was responsible for returning the overpaid amount. (File 5).

On April 26, 2023, the Appellant timely filed a request for an Administrative Law Judge (ALJ) hearing. (File 1). Pursuant to proper notice, on June 12, 2023, I held a consolidated hearing by telephone. (File 11; Hearing Audio). The Appellant appeared at the hearing through its appointed representative, Amanda Wilwert, an attorney of Foulston Siefkin, LLP. (File 1, p. 9; Hearing Audio). John Adams, M.D., owner of and treating physician for the Appellant, appeared at the hearing, and provided testimony under oath. (Hearing Audio). The files listed as exhibit records on the Index of the Administrative Record and Exhibit List, with the exception of the file marked as records not considered, are admitted to the administrative record without objection. (Hearing Audio).

## ISSUES

Whether the Mohs micrographic surgeries (CPT codes 17311–17314), surgical pathology service (CPT code 88305), applications of skin substitute (CPT codes 15271–15275), and skin substitute grafts (Artacent wound, per square centimeter (CPT code Q4169) and Epifix, per square centimeter (CPT code Q4186)) the Appellant provided to multiple Medicare beneficiaries from March 15, 2021 to June 14, 2021 were medically reasonable and necessary under Medicare Part B. If the services at issue are not covered by Medicare, an additional issue arises regarding who is financially liable for the non-covered charges and resulting overpayment.

## APPLICABLE LAW AND POLICY

Medicare Part B provides coverage to eligible beneficiaries for all or part of the cost of medical and other health services. Social Security Act (Act). § 1832(a). "Medical and other health services" is defined to include physicians' services, and services and supplies furnished as an incident to a physician's professional service. Act § 1861(s). The services, however, must be reasonable and necessary for the diagnosis or treatment of an illness or injury, or to improve the functioning of a malformed body member. Act § 1862(a)(1)(A); 42 C.F.R. § 411.15(k)(1).

Section 1833(e) of the Act and 42 C.F.R. § 424.5(a)(6) provide that payment will not be made unless sufficient information exists to determine whether payment is due, and the amount that should be paid. The regulations also make clear that it is the responsibility of the appellant to furnish sufficient information to enable the contractor to determine whether payment is due and the amount of the payment. 42 C.F.R. § 424.5(a)(6). Thus, the appellant has the burden to provide sufficient documentation, evidence, and testimony that indicates the services provided are covered by Medicare.

When Medicare coverage is precluded under section 1862(a)(1) or (a)(9) of the Act because services were not reasonable and necessary or were custodial in nature, payment may nevertheless be made when neither the beneficiary nor the Provider knew, or could reasonably be expected to know, that an item or service would not be covered. This provision is commonly referred to as the limitation on liability provision. Act § 1879; 42 C.F.R. § 411.400.

In the event that services are excluded from coverage and payment has already been made to a provider, recovery of the overpayment from the provider may be waived if the provider was not at fault in creating the overpayment. Act § 1870(b).

ALJs are bound by the statutory and regulatory provisions that govern Medicare benefits. 42 C.F.R. § 405.1063(a). Unless promulgated as a regulation by the Centers for Medicare and Medicaid Services (CMS), no rule, requirement, or statement of policy other than a national coverage determination (NCD) can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. Act, § 1871(a)(2). However, as part of the coverage determination process, CMS and its contractors have issued policy guidance, in the form of CMS Rulings, local coverage determinations (LCDs), manuals and policy articles, that establish criteria for coverage of selected types of medical items and services. ALJs are bound by NCDs and CMS Rulings but are not bound by other CMS program guidance. 42 C.F.R. § 405.1062(a) and 1063(b). An ALJ will give substantial deference to these policies if they are applicable to a particular case. 42 C.F.R. § 405.1062(a). If an ALJ declines to follow an applicable policy, the ALJ decision must explain the reasons why the policy was not followed. 42 C.F.R. § 405.1062(b). An ALJ's determination not to follow an applicable policy applies only to the specific claim being considered and does not have precedential effect. 42 C.F.R. § 405.1062(b).

There is no NCD nor Medicare manual guidance specifically addressing the criteria for coverage of amniotic tissue allografts. In the absence of specific guidance, the CMS has provided guidance in the *Medicare Program Integrity Manual (MPIM)* to assist contractors, and in appropriate circumstances ALJs, in making determinations as to medical reasonableness and necessity. Under the *MPIM* criteria, an item or service is considered medically reasonable and necessary if:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
  - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
  - Furnished in a setting appropriate to the beneficiary's medical needs and condition;
  - Ordered and furnished by qualified personnel; and,
  - One that meets, but does not exceed, the beneficiary's medical need.

*Medicare Program Integrity Manual (MPIM)*, pub. 100-08, ch. 3, § 3.6.2.2 (Effective Aug. 2020).

Medical and hospital services are sometimes required to treat a condition that arises as a result of services that are not covered because they are determined to be not reasonable and necessary or because they are excluded from coverage for other reasons. Services "related to" non-covered services (e.g., cosmetic surgery, non-covered organ transplants, non-covered artificial organ implants, etc.), including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was

performed, are not covered services under Medicare. Services "not related to" non-covered services are covered under Medicare. *Medicare Benefit Policy Manual (MBPM)*, pub. 100-08, ch. 16, § 180 (Effective May 2014).

LCD L35494 provides the indications and limitations of coverage for Mohs Micrograph Surgery (MMS) as guidance regarding the medical necessity of MMS. Local Coverage Determination L35494: Mohs Micrographic Surgery (LCD L35494) (Dec. 2020). The LCD states that Mohs Micrographic Surgery (MMS) is a technique for the removal of complex or ill-defined skin cancer with histologic examination of 100% of the surgical margins. This LCD addresses the reasonable and necessary threshold for coverage of MMS based on three requirements: (1) qualifications of the physician and office/facility team; (2) characteristics of the lesion pre-procedure; and (3) documentation of the medical necessity for the Mohs micrographic technique and associated plans for the repair, as outlined in the documentation requirements provided in Article A57477. The LCD provides a list of indications and anatomic locations for which Medicare will consider for reimbursement of MMS. The list provided includes requirements associated with diagnoses of basal cell carcinoma and squamous cell carcinoma. *See* LCD L35494.

Article A57477 provides the following documentation requirements for establishing the medical necessity for the MMS and associated plans for the repair:

1. All documentation must be maintained in the patient's medical record and made available to the contractor upon request.
2. Every page of the record must be legible and include appropriate patient identification information (e.g., complete name, dates of service[s]). The documentation must include the legible signature of the physician or non-physician practitioner responsible for and providing the care to the patient.
3. The submitted medical record must support the use of the selected ICD-10-CM code(s).
4. The submitted CPT/HCPCS code must describe the service performed. The medical record documentation must support the medical necessity of the services as stated in this policy.
5. Procedures that exceed the medical need are not reasonable and necessary (not a Medicare covered service), therefore, documentation (pre-procedure E/M note and/or post-procedure operative notes) must address (a) why the lesion will not be (was not) managed by standard excision or destruction technique and (when applicable) (b) why (when utilized or referred to a plastic surgeon) procedures for complex repair, adjacent tissue transfer or rearrangement, flap, or graft codes are employed.
6. The physician must document in the patient's medical record that the diagnosis is appropriate for MMS and that MMS is an appropriate choice as the treatment of the particular lesion. The options for care (both the primary procedure options and repair options) must be discussed with the patient and clearly noted in the pre-procedure (or post procedure as appropriate) documentation. In summary, the minimal medical record documentation entails that the beneficiary was informed of their treatment options and explained the risks/benefits of the MMS technique and associated repair.

7. Though complexity of the lesion (poorly defined borders, suspected deep invasion, recurrent lesion, prior radiation), lesion size/location, and maximum conservation of healthy tissue are to be addressed in the preoperative medical record, the surgeon must document why the lesion will not be (was not) managed by excision or destruction technique.
8. Operative notes and pathology documentation in the patient's medical record should clearly document that MMS was performed using accepted MMS technique, in which the physician acts in two integrated and distinct capacities: surgeon and pathologist (therefore confirming that the procedure meets the definition of the CPT code[s]).
9. Operative documentation should note: location, number, and size of the lesion(s); number of stages performed; number of specimens per stage.
10. Histology documentation must include the following:
    • First stage: if tumor present, depth of invasion; pathological pattern of the tumor; cell morphology; if present, note perineural invasion of scar tissue.
    • Subsequent stages: if the tumor characteristics are the same as in the first stage, note this fact only. If the tumor characteristics are different from the first stage, describe the differences.
11. Measurement of the primary lesion necessitating MMS and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:
    • Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).
    • Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
    • It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.
12. When the surgical defect created by MMS requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.

Local Coverage Article A57477: Billing and Coding: Mohs Micrographic Surgery – Policy Article (Article A57477) (Dec. 2020); *see also* LCD L35494.

Medical and hospital services are sometimes required to treat a condition that arises as a result of services that are not covered because they are determined to be not reasonable and necessary or because they are excluded from coverage for other reasons. Services "related to" non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services "not related to" non-covered services are covered under Medicare. *MBPM*, pub. 100-02, ch. 16, § 180 (Effective May 2014).

In the event the services at issue are found to be not medically reasonable and necessary under section 1862(a)(1) the Social Security Act (Act), section 1879 of the Act may limit liability for

payment of the services. Specifically, section 1879 of the Act provides that when items or services are denied coverage under section 1862(a)(1) of the Act, payment may nevertheless be made for the items or services if neither the beneficiary, provider, nor supplier knew or could not reasonably have been expected to know that the items or services would not be covered or payable by Medicare.

Section 1870 of the Act allows for the waiver of Medicare's right to recoup overpayments where the provider causing the overpayment was without fault. A provider is without fault if it exercised reasonable care in billing and accepting the overpayment. *See Medicare Financial Management Manual (MFMM)*, pub. 100-06, ch. 3, § 90 (Effective Feb. 2004). This is shown by the provider having made full disclosure of all material facts and by having had either a reasonable basis for assuming that the payment was correct or having had reason to question the payment and promptly raising that question to the fiscal intermediary or carrier's attention. *Id.* By contrast, a provider is at fault if it should have known the services were not covered, i.e., constructive notice. *See MFMM*, ch. 3, § 90.1.H (Effective Feb. 2004). If the provider is at fault in causing the overpayment, recovery of the overpayment from the provider must proceed. *See MFMM*, ch. 3, § 90.

## FINDINGS OF FACT AND ANALYSIS

I.    **Findings of Fact**

The record contains a copy of the Artacent wound package insert. The insert describes Artacent as a dual-layer dehydrated amniotic membrane allograft that is processed and distributed in accordance with FDA requirements for HCT/P under 21 C.F.R. part 1271, state regulations, and the guidelines of the American Association of Tissue Banks. The insert states that allografts may be used as a wound covering in various surgical procedures and may be used independently or in combination with autologous tissue or other forms of allograft tissue. (File 7, p. 85). The insert further states that dehydrated amnion allografts should not be implanted into (1) areas of active or latent infection; and/or (2) into a patient with a disorder that would create an unacceptable risk of post-operative complications. Moreover, additional contraindications for the use of Artacent shall be determined by a licensed practitioner. (File 7, p. 86).

The Appellant submitted a peer-reviewed article to support that the use of placental allografts after Mohs surgery is medically reasonable and necessary. (File 7, pp. 95–100). The study found that in the case of older adults, larger cutaneous Mohs-related defects of the face, head, and hands of older adults were effectively reconstructed with a placental allograft. (File 7, pp. 96, 99). The study also found that compared to autologous tissue, placental allograft cases were associated with significantly lower risk for infection, poor scar cosmesis, scar revision, or reoperation. (File 7, pp. 95, 97–99).

At the hearing, Dr. Adams stated that he has been performing Mohs surgeries since around 1993 and has done over 20,000 Mohs surgeries. He stated that allografts were used for only the most complex cases, which tended to where patients had the most significant wounds and faced multiple comorbidities. He stated that patients that undergo Mohs surgeries first have a biopsy completed to determine if their lesion is cancerous. If the patient has cancer and it is located in areas like the head, neck or feet, they are contacted for an appointment. The Mohs surgery procedure then involves removing the cancer and having the tissue that is removed looked at

under a microscope. After the surgery is completed, would repair options are discussed and then the repair of the wound is done. Dr. Adams explained that there are various options for repairing postoperative wounds/defects resulting from MMS, including secondary intention (the wound heals on its own), side to side repair (closure of the lips of the wound), reconstructive procedures (such as flap and grafts, and allografts). He stated that the size and depth of surgical wounds is critical in deciding which treatment option to do. The Appellant contended that the use of flaps and grafts is much more tenuous and much more likely to fail if a patient's wound is three centimeters or more and if the patient has a comorbidity that results in them having a deficiency in oxygen, such as requiring supplemental oxygen or having chronic obstructive pulmonary disease. Dr. Adams testified that he only used allografts when patients presented with lesions that were two centimeters or more, and which presented as complex repairs. Dr. Adams also stated that for his practice, the complication rate with the use of flaps or grafts on high risk patients, like the beneficiaries involved in this case, was roughly 30%, and that the complications consisted of infections, needing to reform the flap, needing to do reconstruction, or developing hematoma or necrosis of the flap. In comparison, the complication rate when an allograft was used was only 2%. Dr. Adams also explained that when using a flap, other areas around the wound are affected. Thus, if the area becomes necrotic it results in an area twice the size of the initial defect becoming necrotic since the initial defect along with the flap used are affected. Dr. Adams stated that using allografts sped up the healing process by 70%, for example a reducing the healing time of a wound that that took eight weeks to heal down to three weeks. Dr. Adams also stated that the location of the wound is a factor that is considered. For example, he stated that leg wounds have an infection rate that supersedes 10% if they are left open, even if the patient does not have any comorbidities. As a result, secondary intention in not the preferred treatment for leg wounds. (Hearing Audio).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| E.A. HICN: *****AE9A | 2321357303260 | 05/24/2021 | 15271 | Favorable |
| | | | Q4169 | Favorable |

*Findings of Fact Specific to E.A.*

On April 13, 2021, the Beneficiary, 84-years-old, was seen by Brenna Gibson, APRN-C regarding skin lesions on the right pretibial region, left forehead, as well as a postoperative wound check on the right distal pretibial region. (File 8, pp. 598–602). The Beneficiary's diagnoses included that she had a neoplasm of unspecified behavior on the right proximal pretibial region. The neoplasm was biopsied, and on April 15, 2021, a pathology report regarding the specimen obtained revealed that the Beneficiary had a moderately differentiated squamous cell carcinoma. (File 8, pp. 598–599, 603).

On May 24, 2021, the Beneficiary saw John Adams, M.D. for Mohs micrographic surgery (MMS) of the squamous cell carcinoma on the right proximal pretibial region of her leg. (File 8, pp. 615–618). Dr. Adams documented that MMS was indicated for the tumor due to its anatomic location and it was in an area critical for tissue conservation, and the tumor's removal was complicated by it being a moderately differentiated tumor. (File 8, p. 615). After all treatment options were discussed, the Beneficiary consented to MMS and the surgery was completed without complications. (File 8, pp. 615–616). The surgical notes show that the pre-operative size

of the tumor was 0.9 cm x 0.7 cm. (File 8, p. 615). After the MMS, the Beneficiary had a
postoperative wound that had to be repaired. The postoperative wound had a surface area of 1.82
cm² (1.4 cm in length and 1.3 cm in width) and it had a depth of 0.5 cm. (File 8, p. 416).

Prior to the repair of the post-operative wound, the various methods of closure were discussed
with the Beneficiary and considered, including healing by secondary intention, primary side to
side repair, full thickness skin graft, non-axial adjacent tissue transfers, skin substitute allograft,
interpolation flap, axial myocutaneous transposition repair, delayed repair, and repair by another
physician. (File 8, pp. 616–617). Dr. Adams documented the following information to explain
the medical indication for using an amniotic skin substitute for the post-operative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large
> size and nature of the wound/defect and that the defect is not amenable to Primary
> side to side repair. Amniotic skin substitute allograft is the most appropriate
> choice, required and medically indicated as the patient declined to accept the
> risks, complications and trauma associated with incisional types of repair for
> reconstruction of the Primary defect.

(File 8, p. 617). Dr. Adams further noted several purposes of using the skin substitute allograft,
including that it created a natural barrier. (*Id.*). The medical records also documented
comorbidities and medical conditions that made the Beneficiary's wound more susceptible to
wound healing complications, such as the wound being located on the leg, an area of the body
that had the poorest circulation of blood, the wound being located in an area where the skin was
significantly atrophic, and the Beneficiary taking blood thinning medication. (*Id.*).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted
for repair and wound healing using the skin substitute allograft. (*Id.*). Notes for the wound
closure document that 2 units of 15 mm Artacent discs were applied to the wound and that the
Beneficiary tolerated the procedure well. (File 8, pp. 617–618).

The record includes a body diagram that was used to identify the location of the wound closure
on the Beneficiary's body. (File 8, p. 619). The record also has a copy of a photograph taken on
May 24, 2021 of the Beneficiary's lower right leg that shows the surgery site after the MMS was
performed, but before the allograft was applied. (File 8, p. 620; Hearing Audio).

The medical records provided for Beneficiary E.A. show that she had a previous history of
undergoing removal of a squamous cell carcinoma in her left leg 2018 through MMS and
associated repair of the postoperative wound using Epifix allografts. (File 8, pp. 384–438). In
December 2020, the Beneficiary also underwent MMS to remove a squamous cell carcinoma
from the right distal pretibial region of her right leg and required multiple applications of
allograft to repair postoperative wound. (File 8, pp. 543-561).

At the hearing, Dr. Adams explained that the legs are an area where there is decreased
oxygenation because of decreased circulation to the area. Dr. Adams also confirmed that the
postoperative wound was tested to see if side to side repair was possible, but he found that it was
not amenable to that type of repair and thus concluded that it had to be repaired by
reconstruction. He further explained that with regards to secondary intention in legs, there is an

infection rate of over 10% even if a patient did not have any comorbidities. Moreover, Dr. Adams noted that Beneficiary E.A. had a long treatment history with him and had outbreaks in the past, so even though he presented her with the other treatment options she chose to proceed repair by allograft. (Hearing Audio).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| B.B. | 2321357303170 | 03/22/2021 | 15271 | Favorable |
| HICN: *****AU05 | | | Q4169 | Favorable |

*Findings of Fact Specific to B.B.*

On March 15, 2021, the Beneficiary, 73-years-old, had Mohs surgery performed on a squamous cell carcinoma located on the left central forehead. (File 8, p. 1014–1015). After the surgery was completed, the Beneficiary had a defect that was 2 cm in length, 1.9 cm in width, and 0.3 cm in depth. (File 8, p. 1015). After discussing the risks, benefit, and alternative defect repair options, the Beneficiary opted to repair the defect using skin substitute allograft. (File 8, p. 1016). Dr. Adamas used 4 units of 2cm x 2cm Artacent wound for the postoperative wound closure. (File 8, p. 1015).

On March 22, 2021, the Beneficiary was seen for a postoperative wound check of the wound on the left central forehead. (File 8, pp. 1023–1024). The Beneficiary's defect slightly reduced in size, measuring 2.0 cm in length and 1.5 cm in width (3cm$^2$), and 0.2 cm in depth. (File 8, p. 1023). The Beneficiary required a second allograft application.

Prior to the repair of the post-operative wound, the various methods of closure were discussed with the Beneficiary and considered, including healing by secondary intention, primary side to side repair, full thickness skin graft, non-axial adjacent tissue transfers, skin substitute allograft, interpolation flap, axial myocutaneous transposition repair, delayed repair, and repair by another physician. (File 8, pp. 1023–1024). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the post-operative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(File 8, p. 1024). Dr. Adams further noted several purposes of using the skin substitute allograft, including that it created a natural barrier. (*Id.*). The medical records document the following comorbidities and medical conditions that made the Beneficiary's postoperative wound more susceptible to significant wound healing complications and unlikely to respond to reconstructive wound repairs other than the application of allograft:

- The surgical defect was located in an area where the skin was significantly scarred, which meant the area suffered from inadequate circulation of blood and was deficient in terms of its oxygenation, and resulted in the defect being even more susceptible to infection and longer wound healing time;
- The surgical defect was located in the temple, which is considered a danger zone for damage to the temporal branch of the facial nerve and ensuing paralysis of the Frontalis muscle which would lead to significant disfigurement and functional impairment; and
- The surgical defect was located in a region proximal to a fixed structure on the face, which put the Beneficiary at risk for disfigurement if the fixed structure contracted and formed significant scar tissue.

(File 8, p. 1016).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 8, p. 1024). Notes for the wound closure document that 4 units of 2 cm x 2cm Artacent wound were applied to the wound and that the Beneficiary tolerated the procedure well. (File 8, pp. 1023–1024).

The record includes a body diagram that was used to identify the location of the wound check and repair completed for the Beneficiary on March 22, 2021. (File 8, p. 1025). The record also has a copy of a photograph taken on March 22, 2021 of the Beneficiary's left side of the forehead that shows how wound site looked during the wound check. (File 8, p. 1026).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| A.B. HICN: *****EJ42 | 2321357303210 | 04/20/2021 | 15275 | Favorable |
| | | | Q4169 | Favorable |

*Findings of Fact Specific to B.B.*

On April 6, 2021, the Beneficiary, 98-years-old, had Mohs surgery performed on an infiltrative basal cell carcinoma located on the left nasal ala. (File 8, p. 1055–1056). After the surgery was completed, the Beneficiary had a defect that was 3.8 cm in length, 2.8 cm in width, and 1.3 cm in depth. (File 8, p. 1056). After discussing the risks, benefit, and alternative defect repair options, the Beneficiary opted to repair the defect using skin substitute allograft. ((File 8, pp. 1056–1057). Dr. Adamas used 4 units of 2cm x 2cm Artacent wound for the postoperative wound closure. (File 8, p. 1056).

On April 20, 2021, the Beneficiary was seen for a postoperative wound check of the wound on the left nasal ala. (File 8, pp. 1061–1063). The Beneficiary's defect slightly reduced in size, measuring 3.3 cm in length and 2.4 cm in width (3cm²), and 0.9 cm in depth, and the Beneficiary was determined to require a second allograft application. (File 8, p. 1061). Prior to the repair of the post-operative wound, the various methods of closure were discussed with the Beneficiary and considered, including healing by secondary intention, primary side to side repair, full thickness skin graft, non-axial adjacent tissue transfers, skin substitute allograft, interpolation

flap, axial myocutaneous transposition repair, delayed repair, and repair by another physician. (File 8, pp. 1061–1062). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the post-operative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(File 8, p. 1062). Dr. Adams further noted several purposes of using the skin substitute allograft, including that it created a natural barrier. (*Id.*). The medical records also documented comorbidities and medical conditions that made the Beneficiary's wound more susceptible to wound healing complications, such as the wound being located in an area where the skin was significantly scarred, the Beneficiary had bone exposed at the site of the wound, and the Beneficiary was on blood thinning medication. (File 8, p. 1062).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (*Id.*). Notes for the wound closure document that 4 units of 2 cm x 2cm Artacent wound were applied to the wound and that the Beneficiary tolerated the procedure well. (File 8, pp. 1061–1063).

The record includes a face diagram that was used to identify the location of the wound check and repair completed for the Beneficiary on April 20, 2021. (File 8, p. 1064). The record also has a copy of a photograph taken on April 20, 2021 of the Beneficiary's left side of the face that shows how wound site looked at the time of the wound check. (File 8, p. 1026).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| M.G. HICN: *****JW58 | 2321357303350 | 06/09/2021 | 88305 | Unfavorable |

*Findings of Fact Specific to M.G.*

On June 9, 2021, the Beneficiary was seen for the evaluation and management of a skin lesion on his left dorsal foot. The medical records document that a biopsy by shave method was performed for diagnostic purposes. (File 8, pp. 1101–1102). The record includes a foot diagram, which documents the location that the biopsy was performed. (File 8, p. 1102). The record also contains photographs of the lesion on the Beneficiary's left foot that were before and after the biopsy was completed, which confirms the location of the lesion. (File 8, p. 1103). Upon my review of the medical records submitted for the Beneficiary, the record does not contain a copy of the pathology results for the biopsy performed on June 9, 2021. (File 8, pp. 1095–1103).

At the hearing, the Appellant confirmed that a pathology report for the biopsy done of the Beneficiary's left dorsal foot was not submitted to the lower level contractors. The Appellant explained that it believed the reason that a surgical pathology report was not found in the records

was because it was received outside of the timeframe that the records were requested by the UPIC. The Appellant further confirmed that it did not submit a copy of the pathology report after receiving the lower level contractor's notice of the denial of coverage. (Hearing Audio).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| J.G.<br>HICN: *****CT44 | 2321357303180 | 03/22/2021 | 15272 | Favorable |
|  |  |  | Q4186 | Favorable |
|  |  |  | 15271 | Favorable |
|  | 2321357303270 | 05/24/2021 | 15274 | Favorable |
|  |  |  | Q4186 | Favorable |
|  |  |  | 15273 | Favorable |

*Findings of Fact Specific to J.G.*

On March 22, 2021, the Beneficiary, 73-years-old, saw Dr. Adams for a fourth allograft application to a postoperative defect he had on the right superior posterior shoulder, and for a fifth allograft application to a postoperative defect he had on the right superior upper back. (File 8, pp. 1982–1998). When the Beneficiary came in, the size of the right superior posterior shoulder wound was 7.6 cm in length, 5.3 cm in width, and 0.9 cm in depth, having a total volume of 36.252 cm$^3$ as compared to it being 41.760 cm$^3$ at the previous visit he had a week prior, on March 15, 2021. (File 8, p. 1982). The measurements of the right superior upper back wound were that it was 4.0 cm in length, 1.0 cm in width, 0.2 cm in depth, and had a total volume of 0.8 cm$^3$. At the prior visit the Beneficiary had the week prior, the volume of the right superior upper back wound was 1.35cm$^3$. (File 8, p. 1984).

Prior to the repair of the post-operative wounds, the risks, benefits, and alternatives to therapy were discussed in detail, the rationale for the repair was explained to the Beneficiary, and consent was obtained. (File 8, p. 1983). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the post-operative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(File 8, p. 1983). Dr. Adams further noted that several purposes of using the skin substitute allograft, including that it created a natural barrier. (*Id.*). The medical records also documented comorbidities and medical conditions that made the Beneficiary's wound more susceptible to wound healing complications and infection, such as the wound being located in an area where the skin was significantly atrophic and scarred, the Beneficiary being immunosuppressed, and the Beneficiary having diabetes. (File 8, p. 1984).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 8, pp. 1983, 1985). Notes

for the wound closure document that 28 units of 4 cm x 4.5 cm Epifix skin substitute were applied to the right superior posterior shoulder, and that five units of Epifix were used for the wound located on the Beneficiary's right superior upper back. (File 8, p. 1984).

The record includes body diagrams that identify the location of the wound checks and repair completed for the Beneficiary on April 20, 2021. (File 8, pp. 1987–1989).

On May 24, 2021, the Beneficiary again saw Dr. Adams for a planned postoperative wound closure. On this date, the wound on the right posterior shoulder had a surface area of 162.5 cm$^2$ (13 cm in length, 12.5 cm in width) and 0.6 cm in depth. This wound was treated by SNAP and VAC therapy. (File 8, p. 2089).

On May 24, 2021, Beneficiary also still had a postoperative wound on the right posterior shoulder that had a surface area of 163.75 cm$^2$ (13.1 cm in length, 12.5 cm in width) and 0.6 cm in depth. In comparison to the measurements of the Beneficiary's previous visit, the total volume of the wound decreased from 164.025 cm$^3$ down to 97.50 cm$^3$.

Prior to the repair of the post-operative wounds, the risks, benefits, and alternatives to therapy were discussed in detail, the rationale for the repair was explained to the Beneficiary, and consent was obtained. (File 8, p. 2090). Dr. Adams again noted that amniotic skin substitute allograft was medically indicated for the Beneficiary due to the relatively large size and nature of the wound/deft and that the defect was not amenable to primary side to side repair. Dr. Adams again noted the comorbidities and medical conditions that made the Beneficiary's wound more susceptible to wound healing complications and infection, such as the wound being located in an area where the skin was significantly atrophic and scarred, the Beneficiary being immunosuppressed, and the Beneficiary having diabetes. (File 8, p. 2091).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 8, pp. 2090–2091). Dr. Adams treated the wound by applying 33 units of 4 x 4 cm Epifix skin substitutes. (File 8, p. 2090). Dr. Adams documented the purposes of using the amniotic skin substitute allograft included that it created a natural barrier. (File 8, p. 2090).

The record includes a body diagram that identifies the location of the postoperative wound closure completed for the Beneficiary on May 24, 2021. (File 8, pp. 2093). The record also has photographs of the Beneficiary's right shoulder which show how the Beneficiary's postoperative wound looked on May 24, 2021. (File 8, p. 2094).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| E.H. | 2321357303230 | 05/17/2021 | 15275 | Favorable |
| HICN: *****PD72 | | | Q4169 | Favorable |

*Findings of Fact Specific to E.H.*

On May 17, 2021, the Beneficiary underwent MMS to remove a nodular basal cell carcinoma located on the inferior medical malar cheek. (File 8, pp. 2342–2243). After the MMS was

completed, the Beneficiary had a postoperative wound that required repair. The wound had a surface area of 12.6 cm$^2$ (4.2 cm in length x 3.0 cm in width) and had a depth of 0.9 cm. (File 8, p. 2243). Prior to the repair of the postoperative wound, the various methods of closure were discussed with the Beneficiary and considered. (File 8, p. 2244–2245). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(*Id.*). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records document the following comorbidities and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to wound repairs other than the application of allograft:

- The surgical defect was located in the peri-ocular, peri-alar, and peri-oral regions, where free skin margin exists, thus there was a need to minimize skin contraction, as it could cause severe disfigurement and impaired function in the areas surrounding the free skin margins;
- The Beneficiary had sleep apnea, which caused hypoxia (reduced blood oxygen), which made wound more susceptible to infection, longer wound healing ties, and increased scar tissue formation;
- The surgical defect was located in an area where the skin was significantly scarred, which meant the area suffered from inadequate circulation of blood and was deficient in terms of its oxygenation, and resulted in the defect being even more susceptible to infection and longer wound healing time; and
- The Beneficiary was taking blood thinning medication, which made him more susceptible to hematoma formation, which could then lead to tissue necrosis, infection, increased scarring, functional impairment, and disfigurement of both the primary and secondary defects.

(File 8, p. 2244–2245).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 8, p. 2244.). On the May 17, 2021, 12 units of Artacent wound (allograft), each unit measuring 2 cm x 2 cm were applied to the Beneficiary's surgical defect. (File 8, p. 2243).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| L.H.<br>HICN: *****WK95 | 2321357303250 | 05/17/2021 | Q4169 | Favorable |
|  |  |  | 15275 | Favorable |

*Findings of Fact Specific to L.H.*

On May 10, 2021, the Beneficiary underwent MMS to remove a keratoacanthoma type squamous cell carcinoma located on the scapha of the right ear. (File 8, pp. 2360–2361). After the MMS was completed, the Beneficiary had a postoperative wound that required repair. The wound had a surface area of 1.68 cm² (1.4 cm in length x 1.2 cm in width) and had a depth of 0.3 cm. (File 8, pp. 2361). Prior to the repair of the postoperative wound, the various methods of closure were discussed with the Beneficiary and considered. (File 8, p. 2362). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(*Id.*). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records document the following comorbidities and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to wound repairs other than the application of allograft:

- The surgical defect was located in an area where the skin was significantly scarred, which meant the area suffered from inadequate circulation of blood and was deficient in terms of its oxygenation, and resulted in the defect being even more susceptible to infection and longer wound healing time;
- The Beneficiary was immunocompromised, and thus was more susceptible to infection, longer wound healing, and increased scar tissue formation;
- The Beneficiary was taking blood thinning medication, which made him more susceptible to hematoma formation, which could then lead to tissue necrosis, infection, increased scarring, functional impairment, and disfigurement of both the primary and secondary defects; and
- There was exposed cartilage at the site of the postoperative wound, which was of concern due to its lack of a sovereign vascular supply and consequent lack of oxygen that made tissue necrosis a significant concern.

(File 8, p. 2362).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (*Id.*). On the May 10, 2021, 2 units of Artacent wound (allograft), consisting of 15mm disc, were applied to the Beneficiary's surgical defect. (File 8, p. 2361).

On May 17, 2021, the Beneficiary was seen for a planned postoperative wound closure of the surgical defect on the right scapha. (File 8, pp. 2366–2368). The surgical defect had a surface area of 1.68 cm$^2$ (1.4 cm in length and 1.2 cm in width) and a depth of 0.3 cm. (File 8, p. 2366). The Beneficiary underwent a second allograft application. (*Id.*). Dr. Adams documented the same medical indications for doing the allograft application on this date as he provided when the previous allograft applications were done on May 17, 2021. (File 8, pp. 3262–2363, 2366–2368). The Beneficiary tolerated the procedure well. (File 8, p. 2368). On May 17, 2021, 2 units of Artacent wound, consisting of 15 mm discs, were applied to the Beneficiary's surgical defect. (File 8, p. 2366).

The record includes an ear diagram that was used to identify the location of the wound closure done on May 17, 2021 on the Beneficiary's body. (File 8, p. 2369). The record also has a copy of a photograph taken on May 17, 2021 of the Beneficiary's right ear that shows the site of the surgical defect. (File 8, p. 2370).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| R.K. | 2321357303190 | 03/15/2021 | Q4169 | Favorable |
| HICN: *****AD88 | | | 15275 | Favorable |

### *Findings of Fact Specific to R.K.*

On March 8, 2021, the Beneficiary underwent MMS to remove two tumors on his head: a squamous cell carcinoma located on the right central frontal scalp and a squamous cell carcinoma on the left superior central forehead. (File 8, pp. 2787–2788, 2790–2791). After the MMS was completed, the Beneficiary had postoperative wounds that required repair. The wound on the right central frontal scalp and had a surface area of 3.68 cm$^2$ (2.3 cm in length x 1.6 cm in width) and had a depth of 0.4 cm. (File 8, p. 2788). The wound on the left superior central forehead had a surface area of 1.8 cm$^2$ (1.5 cm length x 1.2 cm in width).

Prior to the repair of the postoperative wounds, the various methods of closure, were discussed with the Beneficiary and considered. (File 8, pp. 2788–2790, 2791–2793 ). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(File 8, pp. 2789, 2792). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id*.). The medical records document the following comorbidities and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to wound repairs other than the application of allograft:

- The Beneficiary had chronic obstructive pulmonary disease (COPD, which reduced his blood oxygen and resulted in his wounds being more susceptible to infection, longer hearing periods, and increased scar tissue formation;
- The surgical defect was located on an area where the skin was significantly atrophic (thinned) secondary to extensive solar damage, which made it suffer from inadequate circulation of blood, deficient in terms of its oxygenation, and more susceptible to infection, necrosis, hypoxia of tissue, increased disfigurement, and increased impairment of skin function;
- The surgical defect was located in an area where the skin was significantly scarred, which meant the area suffered from inadequate circulation of blood and was deficient in terms of its oxygenation, and resulted in the defect being even more susceptible to infection and longer wound healing time;
- The Beneficiary was immunocompromised, and thus was more susceptible to infection, longer wound healing, and increased scar tissue formation.
- The Beneficiary was taking blood thinning medication, which made him more susceptible to hematoma formation, which could then lead to tissue necrosis, infection, increased scarring, functional impairment, and disfigurement of both the primary and secondary defects;

(File 8, pp. 2789–2790, 2792–2793).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 8, p. 2789, 2792). On March 8, 2021, Artacent wound was applied to the surgical defects on the Beneficiary's right central frontal scalp and the left superior central forehead. Four units of Artacent wound, measuring 2 cm x 2 cm, were applied to the surgical defect on the Beneficiary's right central frontal scalp. (File 8, p. 2788). Two units of Artacent wound (allograft), 15mm discs, were applied to the Beneficiary's surgical defect on the left superior central forehead. (File 8, p. 2791).

The record includes a head diagram that was used to identify the location of the wound closure done on March 8, 2021 on the Beneficiary's body. (File 8, p. 2794). The record also has a copy of a photograph taken on March 8, 2021 of the Beneficiary's head that shows the surgery site on the date that the Artacent wound (allograft) was applied. (File 8, p. 2873).

On March 15, 2021, the Beneficiary was seen by Dr. Adams for planned postoperative wound closures of the wounds found on the Beneficiary's right central frontal scalp and the left superior central forehead . (File 8, p. 2796–2800). Prior to the repair of the postoperative wounds, the same various methods of closure, as well as the associated risks and benefits for the methods, were discussed with the Beneficiary. (File 8, pp. 2797–2800.). After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing

using the skin substitute allograft. (File 8, pp. 2797, 2799). On March 15, 2021, underwent the second application of Artacent wound on the surgical defects. On this date, the defect on the right central frontal scalp had a surface area of 2.8 cm$^2$ (2.0 cm in length x 1.4 cm in width) and 0.4 cm in depth. (File 8, p. 2796). Four units of Artacent wound, measuring 2 cm x 2 cm, were applied to the surgical defect on the Beneficiary's right central frontal scalp. (File 8, p. 2796). The defect on the left superior central forehead had a surface area of 1.1 cm2 (1.1 cm in length x 1.0 cm in width). (File 8, p. 2798). Two units of Artacent wound (allograft), 15mm discs, were applied to the Beneficiary's surgical defect on the left superior central forehead. (File 8, p. 2798).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| R.L.L. HICN: *****PM21 | 2321357303300 | 06/01/2021 | 15275 | Favorable |
| | | | Q4169 | Favorable |

*Findings of Fact Specific to R.L.L.*

On June 1, 2021, the Beneficiary underwent MMS to remove a nodular basal cell carcinoma located on the left nasal ala. (File 8, pp. 2836–2837). After the MMS was completed, the Beneficiary had a postoperative wound that required repair. The surgical wound had a surface area of 2.47 cm$^2$ (1.9 cm in length x 1.3 cm in width) and had a depth of 0.7 cm. (File 8, pp. 2867, 2870). (File 8, p. 2837).

Prior to the repair of the postoperative wound, the various methods of closure, were discussed with the Beneficiary and considered. (File 8, p. 2838). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(*Id.*). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records document the following comorbidities and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to wound repairs other than the application of allograft:

- The wound was located on the peri-alar region, where a free skin margin exists, where contraction was a concern as it could cause severe disfigurement and impair function in the areas surrounding the free skin margins and lead to significantly impaired respiration;

- The surgical defect was located in an area where the skin was significantly scarred, which meant the area suffered from inadequate circulation of blood and was deficient in terms of its oxygenation, and resulted in the defect being even more susceptible to infection and longer wound healing time;
- Beneficiary was on blood thinning medication, and was therefore more susceptible to hematoma formation, which can lead to tissue necrosis, infection, increased scarring, functional impairment, and disfigurement of both the primary and secondary defects;
- The Beneficiary had diabetes, and was therefore more susceptible to infection, longer wound healing time, and increased scar tissue formation that could lead to impaired skin function and cosmesis; and
- There was exposed cartilage at the site of the postoperative wound, which was of concern due to its lack of a sovereign vascular supply and consequent lack of oxygen that made tissue necrosis a significant concern.

(File 8, p. 2828–2829).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 8, p. 2838). The notes for wound closure treatment document that 4 units of Artacent wound (allograft), measuring 2 cm x 2 cm, were applied to the Beneficiary's surgical defect. (File 8, p. 2837).

The record includes a face diagram that was used to identify the location of the wound closure on the Beneficiary's body. (File 8, p. 2840). The record also has a copy of a photograph taken of the Beneficiary's nose on June 1, 2021, that shows the surgery site before and after the MMS was completed. (File 8, p. 2841).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| J.L. HICN: *****HM97 | 2321357303220 | 05/11/2021 | Q4169 | Unfavorable |
|  |  |  | 15275 | Unfavorable |

*Findings of Fact Specific to J.L.*

On May 10, 2021, the Beneficiary underwent MMS to remove a basosquamous cell carcinoma located on the nasal root. (File 8, pp. 2866–2867). After the MMS was completed, the Beneficiary had a postoperative wound that had a surface area of 1.43cm$^2$ (1.3 cm in length x 1.1 cm in width) and had a depth of 0.3 cm. (File 8, pp. 2867, 2870). The wound required repair, but repair was delayed to the next day to there not being enough time to perform the type of require the Beneficiary required. (File 8, p. 2867).

On May 11, 2021, the Beneficiary was seen for a planned postoperative wound closure. (File 8, pp. 2870–2871). Prior to the repair of the postoperative wound, the various methods of closure, were discussed with the Beneficiary and considered. (*Id.*). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(File 8, p. 2871). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records document the following comorbidities and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to would repairs other than the application of allograft:

- The Beneficiary was on blood thinning medication, and was therefore more susceptible to hematoma formation, which can lead to tissue necrosis, infection, increased scarring, functional impairment, and disfigurement of both the primary and secondary defects; and

(File 8, p. 2781).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (*Id.*). The notes for wound closure treatment document that 2 units of Artacent wound (allograft), consisting of 15 mm discs, were applied to the Beneficiary's surgical defect. (File 8, p. 2870).

The record includes a face diagram that was used to identify the location of the wound closure on the Beneficiary's body. (File 8, p. 2872). The record also has a copy of a photograph taken on of the Beneficiary's nose May 11, 2021, which shows the surgery site on the date that the Artacent wound (allograft) was applied. (File 8, p. 2873).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| R.C.L. HICN: *****KG27 | 2321357303200 | 04/05/2021 | 15275 | Favorable |
|  |  |  | Q4169 | Favorable |

*Findings of Fact Specific to R.C.L.*

On April 5, 2021, the Beneficiary underwent MMS to remove a well differentiated squamous cell carcinoma located on the left radical dorsal hand. (File 8, pp. 3170–3173). After the MMS was completed, the Beneficiary had a postoperative wound that had a surface area of 4.0 cm$^2$ (2.0 cm in length x 2.0 cm in width) and had a depth of 0.3 cm. (File 8, pp. 3171). The wound required repair. Prior to the repair of the postoperative wound, the various methods of closure, were discussed with the Beneficiary and considered. (File 8, p. 3171–3173). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(File 8, p. 3172). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records document the following comorbidities and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to wound repairs other than the application of allograft:

- The Beneficiary smoked cigarettes, which caused hypoxia and resulted in him having reduced blood oxygen, which in turn made him more susceptible to infection, impaired/slow wound healing, and increased scar tissue formation;
- The surgical defect was located on the hand, which was an area where scar tissue formation had to be minimized due to the hand being highly mobile and flexible;
- The surgical defect was located on an area where the skin is significantly atrophic (thinned) secondary to extensive solar damage, as a result the skin in this area suffered from inadequate circulation of blood and was therefore deficient in terms of its oxygenation;
- The surgical defect was located in an area where the skin was significantly scarred, which meant the area suffered from inadequate circulation of blood and was deficient in terms of its oxygenation, and resulted in the defect being even more susceptible to infection and longer wound healing time; and
- The Beneficiary was on blood thinning medication, and was therefore more susceptible to hematoma formation, which can lead to tissue necrosis, infection, increased scarring, functional impairment, and disfigurement of both the primary and secondary defects;

(File 8, p. 3172–3173).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 8, p. 3172). The notes for wound closure treatment document that 4 units of Artacent wound (allograft), measuring 2 cm x 2 cm, were applied to the Beneficiary's surgical defect. (File 8, p. 3171).

The record includes a body diagram that was used to identify the location of the wound closure on the Beneficiary's body. (File 8, p. 3175). The record also has a copy of a photograph taken of the Beneficiary's left hand on April 5, 2021, which shows the surgery site before and after the MMS was performed. (File 8, p. 3176).

OMHA Appeal No. 3-12053117987

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| C.L. HICN: *****HC80 | 2321357303280 | 05/24/2021 | Q4169 | Favorable |
|  |  |  | 15275 | Favorable |

*Findings of Fact Specific to C.L.*

On May 17, 2021, the Beneficiary underwent MMS to remove well differentiated squamous cell carcinoma located on the right nasal sidewall. (File 8, pp. 3267–3885). After the MMS was completed, the Beneficiary had a postoperative wound that had a surface area of 5.0 cm² (3.0 cm in length x 2.0 cm in width) and had a depth of 0.6 cm. (File 8, pp. 3268). The wound required repair. Prior to the repair of the postoperative wound, the various methods of closure were discussed with the Beneficiary and considered. (File 8, p. 3269). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(*Id.*). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records document the following comorbidities and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to wound repairs other than the application of allograft:

- The surgical defect was located in an area where the skin was significantly scarred, which meant the area suffered from inadequate circulation of blood and was deficient in terms of its oxygenation, and resulted in the defect being even more susceptible to infection and longer wound healing time;
- The Beneficiary was on blood thinning medication, and was therefore more susceptible to hematoma formation, which can lead to tissue necrosis, infection, increased scarring, functional impairment, and disfigurement of both the primary and secondary defects;
- The Beneficiary had exposed bone present after the post repair procedure. Due to its lack of a sovereign vascular supply and lack of oxygen, it made tissue necrosis a significant concern.
- The surgical defect was located in the peri-ocular region where a free skin margin existed.

(File 8, p. 3269–3270).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 8, p. 3269). The notes for wound closure treatment completed on the May 17, 2021, document that 8 units of Artacent wound (allograft), measuring 2 cm x 2 cm, were applied to the Beneficiary's surgical defect. (File 8, p. 3268).

On May 24, 2021, the Beneficiary was seen for a planned postoperative wound closure of the surgical defect on the left posterior ear. (File 8, pp. 3277–3379). The surgical defect had a surface area of 4.25 cm² (2.5 cm in length and 1.7 cm in width) and a depth of 0.3 cm. (File 8, p. 3377). The Beneficiary underwent a second allograft application. (*Id.*). Dr. Adams documented the same medical indications for doing the allograft application on this date as he provided when the previous allograft applications were done on May 17, 2021. (File 8, pp. 3269–3270, 3278–3279). The Beneficiary tolerated the procedure well. (File 8, p. 3270). On the May 24, 2021, 8 units of Artacent wound (allograft) discs, measuring 2 cm x 2 cm, were applied to the Beneficiary's surgical defect. (File 8, p. 3371).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| M.M. | 2321357303320 | 06/08/2021 | Q4169 | Favorable |
| HICN: *****FY96 | | | 15275 | Favorable |

### Findings of Fact Specific to M.M.

On May 24, 2021, the Beneficiary underwent MMS to remove an infiltrative basal cell carcinoma located on the left posterior ear. (File 8, pp. 3355–3358). After the MMS was completed, the Beneficiary had a postoperative wound that required repair. The wound had a surface area of 3.23 cm² (1.9 cm in length x 1.7 cm in width) and had a depth of 0.4 cm. (File 8, pp. 3356). The wound required repair. Prior to the repair of the postoperative wound, the various methods of closure were discussed with the Beneficiary and considered. (File 8, p. 3357). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(*Id.*). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records document the following comorbidities and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to would repairs other than the application of allograft:

- The surgical defect was located in the auricular region where free skin margin exists;
- The Beneficiary required supplemental oxygen, which resulted in him having hypoxic tissue that was more susceptible to infection, prolonged wound healing, and increased scar tissue formation;
- The Beneficiary had a history of sleep apnea, which causes hypoxia and can result in wounds being more susceptible to infection, longer wound healing time, and increased scar tissue formation;
- The Beneficiary was on blood thinning medication, and was therefore more susceptible to hematoma formation, which can lead to tissue necrosis, infection, increased scarring, functional impairment, and disfigurement of both the primary and secondary defects; and
- There was exposed cartilage present after the tumor extirpation. Due to its lack of a sovereign vascular supply and lack of oxygen, it made tissue necrosis a significant concern.

(File 8, p. 3357–3358).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 8, p. 3357). The notes for wound closure treatment completed on the May 24, 2021, document that 4 units of Artacent wound (allograft), measuring 2 cm x 2 cm were applied to the Beneficiary's surgical defect. (File 8, p. 3356).

On June 1, 2021, the Beneficiary was seen for a planned postoperative wound closure of the surgical defect on the left posterior ear. (File 8, pp. 3364–3366). On this date, the surgical defect had a surface area of 2.47 cm$^2$ (1.9 cm in length and 1.3 cm in width) and a depth of 0.4 cm. (File 8, p. 3364). The Beneficiary underwent a second allograft application. Dr. Adams documented the same medical indications for doing the allograft application on this date as he provided when the first allograft application was done on May 24, 2021. The Beneficiary tolerated the procedure well. (File 8, pp. 3364–3366.).

On June 8, 2021, the Beneficiary was seen for another planned postoperative wound closure of the surgical defect on the left posterior ear. (File 8, pp. 3371–3373). The surgical defect had a surface area of 1.5 cm$^2$ (1.5 cm in length and 1.0 cm in width) and a depth of 0.3 cm. (File 8, p. 3371). The Beneficiary underwent a third allograft application. Dr. Adams documented the same medical indications for doing the allograft application on this date as he provided when the previous allograft applications were done on May 24, 2021 and June 1, 2021. (File 8, pp. 3357–3358, 3365–3366, 3371–3373). The Beneficiary tolerated the procedure well. (File 8, p. 3358). The notes for wound closure treatment completed on the June 8, 2021, document that 2 units of Artacent wound (allograft) discs, measuring 15 mm, were applied to the Beneficiary's surgical defect. (File 8, p. 3371).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| K.M. HICN: *****PA56 | 2321357303240 | 05/17/2021 | 15271 | Favorable |
| | | | Q4169 | Favorable |

*Findings of Fact Specific to K.M.*

On May 17, 2021, the Beneficiary underwent MMS to remove a squamous cell carcinoma in situ located on the right lateral lower leg. (File 8, pp. 3523–3526). The pre-operative size of the squamous cell carcinoma was 2.2 cm in length and 1.5 cm in width (surface area of 3.3 cm²) (File 8, p. 3393). After the MMS was completed, the Beneficiary had a postoperative wound that required repair. The size of the wound was 2.6 cm in length and 1.8 cm in width (surface area of 4.68 cm²) and had a depth of 0.5 cm. (File 8, p. 3394).

Prior to the repair of the postoperative wound, the various methods of closure were discussed with the Beneficiary and considered, including healing by secondary intention, primary side to side repair, full thickness skin graft, non-axial adjacent tissue transfers, skin substitute allograft, interpolation flap, axial myocutaneous transposition repair, delayed repair, and repair by another physician. (*Id.*). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(File 8, p. 3395). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records document the following comorbidities and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to would repairs other than the application of allograft:

- The surgical defect was located in the leg, which had the poorest circulation of blood and consequently the lower tissue oxygenation relative to anywhere else on the body;
- The surgical defect was located in the region of the lateral calf which is a danger zone for damage to the peroneal nerve and result in potentially debilitating pain and paresthesias;
- The Beneficiary was on blood thinning medication, and was therefore more susceptible to hematoma formation, which can lead to tissue necrosis, infection, increased scarring, functional impairment, and disfigurement of both the primary and secondary defects.
- The Beneficiary had diabetes, and was therefore more susceptible to infection, longer wound healing time, and increased scar tissue formation that could lead to impaired skin function and cosmesis.

(File 8, p. 3395).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 8, p. 3395). The notes for wound closure treatment completed on the June 17, 2021, document that 4 units of Artacent wound (allograft), measuring 2 cm x 2 cm, and 2 units of Artacent wound discs, measuring 15mm, were applied to the Beneficiary's surgical defect. (File 8, p. 3394).

| BENEFICIARY | Internal Claim | Dates of | CPT Codes | ALJ Disposition |
|-------------|----------------|----------|-----------|-----------------|
| J.M. | 2321357303330 | 06/14/2021 | 15275 | Favorable |
| HICN: *****NF34 | | | Q4169 | Favorable |

*Findings of Fact Specific to J.M.*

On June 14, 2021, the Beneficiary underwent MMS to remove a squamous cell carcinoma in situ located on the right superior central forehead. (File 8, pp. 3523–3526). The pre-operative size of the squamous cell carcinoma was 1.3 cm in length and 1.0 cm in width (surface area of 1.3 cm$^2$) (File 8, p. 3523). After the MMS was completed, the Beneficiary had postoperative wound that require repair. The size of the wound was 3.0 cm in length and 2.8 cm in width (surface area of 8.4 cm$^2$) and had a depth of 0.7 cm. (File 8, p. 3524).

Prior to the repair of the postoperative wound, the various methods of closure were discussed with the Beneficiary and considered, including healing by secondary intention, primary side to side repair, full thickness skin graft, non-axial adjacent tissue transfers, skin substitute allograft, interpolation flap, axial myocutaneous transposition repair, delayed repair, and repair by another physician. (File 8, p. 3525). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the postoperative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(*Id.*). Dr. Adams also documented that use of the amniotic skin substitute had several purposes, including creating a natural barrier, optimizing skin function and cosmesis, and minimizing scar tissue formation, disfigurement, and dysfunction. (*Id.*). The medical records document the following comorbidities and medical conditions that made the Beneficiary's wound more susceptible to significant wound healing complications and unlikely to respond to would repairs other than the application of allograft:

- The surgical defect was located in an area where the skin was significantly atrophic (thinned) secondary to extensive solar damage;
- The Beneficiary was immunocompromised; and

- The Beneficiary was on blood thinning medication, the Beneficiary had diabetes.

(File 8, pp. 3525–3526).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (File 8, p. 3525). The notes for wound closure treatment completed on the June 14, 2021, document that 4 units of Artacent wound (allograft), measuring 2 cm x 2 cm, and 2 units of Artacent wound discs, measuring 15mm, were applied to the Beneficiary's surgical defect. (File 8, p. 3524).

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes at Issue | ALJ Disposition |
|---|---|---|---|---|
| R.S. HICN: *****TH96 | 2321357303290 | 06/01/2021 | Q4169 | Favorable |
| | | | 15275 | Favorable |

*Findings of Fact Specific to R.S.*

On June 1, 2021, the Beneficiary was seen for a postoperative wound check of the surgical defect he had resulting from MMS completed on May 24, 2021 of a basal cell carcinoma located on his nasal dorsum. (File 8, pp. 3855–3858, 3865–3867). The Beneficiary's defect slightly reduced in size, measuring 1.6 cm in length and 1.5 cm in width (2.4cm²) and 0.25 cm in depth. (File 8, p. 3865). The Beneficiary was found to require a second allograft application. (*Id.*). Dr. Adams documented the following information to explain the medical indication for using an amniotic skin substitute for the post-operative wound:

> Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair for reconstruction of the Primary defect.

(File 8, pp. 3865–3866). Dr. Adams further noted several purposes of using the skin substitute allograft, including that it created a natural barrier. (File 8, p. 3866). The medical records document the comorbidities and medical conditions that made the Beneficiary's wound more susceptible to wound healing complications, the surgical defect was located in an area where the skin was significantly scarred, the Beneficiary was immunocompromised, the Beneficiary was taking blood thinners, the Beneficiary had diabetes, and the Beneficiary had exposed bone at the site of the surgical defect. such as the wound being located in an area of the body that had the poorest circulation of blood, the wound being located in an area where the skin was significantly atrophic, and the Beneficiary taking blood thinning medication. (*Id.*).

After discussing the risks and benefits associated with the repair options, the Beneficiary opted for repair and wound healing using the skin substitute allograft. (*Id.*). The notes for the wound closure document that 4 units of 2 cm x 2 cm Artacent wound were applied to the wound and that the Beneficiary tolerated the procedure well. (File 8, pp. 3865, 3867).

The record includes a face diagram that was used to identify the location of the postoperative wound closure on the Beneficiary's body. (File 8, p. 3868). The record also has a copy of a photograph taken on June 1, 2021 of the Beneficiary's nose that shows the surgery site after the postoperative wound closure was performed. (File 8, p. 3869).

## II.    Analysis

*Application(s) of Skin Substitute (CPT codes 15271, 15272, 15273, 15274, and 15275), and Skin Substitute Grafts (Artacent Wound, per square centimeter (CPT code Q4169) and Epifix, per square centimeter (CPT code Q4186))*

Claims for CPT codes 15271, 15272, 15273, 15274, and 15275, Q4169 and Q4186 were denied at the prior level of appeal because the QIC found that the Appellant was not utilizing the skin substitute allografts (Artacent wound and Epifix) in a homologous manner as outlined in 21 C.F.R. section 1271 and the FDA's guidelines provided in *Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use,* U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download (last accessed July 18, 2023). guidelines. The QIC also determined that the documentation was not strong enough to support why the acute wounds required an expensive dressing and why the product was medically necessary over dressings more commonly utilized after MMS. The QIC also acknowledged that the Appellant's contentions that not applying allografts would be against the beneficiaries' wishes and that relatively large surgical wounds on the head, neck, hand, and feet can be safely and effectively repaired via allograft, however the QIC stated that these rationales do not make the application of skin substitute grafts medically reasonable and necessary. In addition, the QIC determined that the application of skin substitute services (CPT code 15275) had to remain denied because they are services related to the non-covered service of using Artacent wound. (File 4, pp. 11–12).

At the hearing, for each Beneficiary where skin substitute grafts and the application of these items were at issue, Dr. Adams explained that the beneficiaries had a surgical wound/defect that was the result of removal of skin cancer by MMS, and that repair of the defects by secondary intension or side to side repair was not appropriate or would not offer optimal results. Dr. Adams contended that each of the Beneficiaries had comorbidities and medical conditions that put them at higher risk of wound healing complications (i.e., infection, necrosis, hematoma, longer wound healing times, and postoperative morbidity) and/or had their defects in locations of the body that made side to side repair or the use of skin grafts and interpolation flaps not possible. For all of the beneficiaries, Dr. Adams also confirmed that application of allograft was the most appropriate treatment to preserve functional capabilities and restore physical appearance, effective, not experimental or investigative, was furnished in accordance with accepted standards of care, was furnished by a qualified physician, and that its use met, but did not exceed each of the beneficiaries' need. (Hearing Audio).

I note that in the issued reconsideration decision, the QIC relies upon FDA regulations and guidance for determining whether use of Artacent wound was medically reasonable and necessary. *See* File 4, pp. 11–12; 21 C.F.R. part 1271; *Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation*

*and Homologous Use,* U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download (last accessed July 18, 2023). However, the FDA is not authorized to regulate the practice of medicine. Additionally, 21 C.F.R. section 1271.1 clearly states that of 21 C.F.R. part 1271 only applies to establishments that manufacture HCT/Ps. As such, the FDA regulations and guidance only serve as references and are not determinative factors for deciding Medicare coverage. Even if the FDA regulations and guidance were applied, the record contains a letter written by the FDA that confirms when Artacent wound is used as a wound covering, it meets the criteria for regulation under section 361 of the PHS Act and the regulations in 21 C.F.R. part 1271. (File 7, p. 83). This statement by the FDA confirms that since one of the documented purposes for using the allografts at issue was to create a natural barrier, a use that is equivalent to that of a wound covering, the use of the allografts for the beneficiaries is consistent with FDA requirements and constitutes a homologous use.

Here, with the exception of the claim for Beneficiary J.L., I find the record supports that the application of Artacent wound or Epifix was a medically reasonable and necessary treatment for the surgical defect(s) of each of the beneficiaries. Prior to the repair of the surgical defect, Dr. Adams discussed with each beneficiary the repair options, as well as the risks and benefits associated with the options, and the reasons why the use of amniotic skin substitute allograft was the most appropriate choice for treating the Beneficiary's post-operative wound. (File 7, pp. 384–385). Thus, the record confirms that documentation requirements outlined in Article A57455 and referred to in LCD L35494 were met. The medical records also clearly document all of the beneficiaries were over 60 years old, were diagnosed with basal cell carcinoma or squamous cell carcinoma, and each had large postoperative defects after undergoing MMS which required repair. The peer-reviewed article submitted found that larger cutaneous Mohs-related defects of the face, head, and hands of older adults were effectively reconstructed with a placental allograft, and that in comparison to autologous tissue, placental allograft cases were associated with significantly lower risk for infection, poor scar cosmesis, scar revision, or reoperation. (File 8, pp. 97–102). Thus, the article supports the use of allografts for the beneficiaries. Dr. Adams also testified that based on his years of experience in performing Mohs surgeries, the complication rate when an allograft was used to repair a postoperative wound was significantly lower than when flaps or grafts repair was done. (File 17). In addition, the package inserts for Artacent wound and Epifix corroborate that the allografts were utilized for their intended use of serving as a wound covering after a surgical procedure or a protective environment to support the healing process. (File 8, pp. 87, 188). Furthermore, the each of the beneficiaries had a wound that made side to side repair, flap, and graft repair not possible or unlikely to work, and each beneficiary had comorbidities which increased his or her risk of experiencing complications if the postoperative wound was not optimally treated. The medical literature in combination with the Beneficiary's medical condition and treating physician's experience in handling post-MMS wound repairs, as well as the Artacent being used as the manufacturer instructs, validates that using Artacent wound or Epifix to repair the surgical defects of each beneficiary was medically reasonable and necessary treatment. Therefore, Medicare coverage of the skin substitute graft services (CPT codes 15275 and Q4169) furnished to the each of the beneficiaries.[1]

---

[1] See Appendix A for a list summarizing the ALJ dispositions for the claims at issue in this appeal.

I also note that the surface areas of the surgical defects of Beneficiaries E.A., E.H., and R.L.L. on the dates of service at issue had surface areas that were under 3cm². The submitted peer-reviewed article assesses allograft use for wounds over 3 cm², therefore the article is not directly applicable to the surgical defects of Beneficiaries E.A., E.H., and R.L.L. However, the record documents that Beneficiaries E.A., E.H., and R.L.L. each had multiple comorbidities that increased their risk of postoperative complications and resulted in the application of allograft being medically reasonable and necessary. E.A. had a long history of having lesions in her legs, had a postoperative wound on her leg, which had the poor circulation in the body, the wound was in an area where there was atrophic skin, and was on blood thinning medications. L.H.'s wound was in an area where a free skin margin existed, which could result in her suffering disfigurement or becoming functionally impaired if the skin in the region contracted, the skin was significantly scarred, there was cartilage exposed at the site of the wound, and the L.H. was immunocompromised and on blood thinning medication. R.L.L.'s surgical defect was in an area where free skin margin existed that could be disfigured or become impaired functionally if the skin in the region contracted, the area of the defect was significantly scarred, and made the Beneficiary more susceptible to infection and requiring a lengthier time to heal. R.L.L. was also on blood thinning medication, had diabetes, and had exposed cartilage at the side of the wound. Since there is no guidance that establishes a minimum size that a patient's postoperative wound/defect must be to qualify for allograft use, I find that their surgical defects measuring under 3 cm² does not outright disqualify the services from Medicare coverage. Since the record confirms that Beneficiaries E.A, E.H., and R.L.L. had significant comorbidities and medical conditions that made the secondary intention, side to side repair, and the use of flaps and grafts inappropriate for treating their postoperative wounds, I find the record supports that skin substitute allografts were medically reasonable and necessary for treating the postoperative wounds of Beneficiaries E.A, E.H, and R.L.L.

The *MBPM* directs that services "not related to" non-covered services are covered under Medicare are covered under Medicare. Since the Artacent wound and Epifix allografts (CPT codes Q4169 and Q4186) are deemed covered under Medicare, the claims for application of skin substitute services (CPT codes 15771–15275) are considered not related to non-covered services. Therefore, with the exception of the services at issue that the Appellant provided to Beneficiary J.L. (further discussed in the analysis below), Medicare coverage is appropriate for the application of the skin substitute services it provided to the Beneficiaries.

In the case of Beneficiary J.L., I find that the record does not support that the application of Artacent wound was medically reasonable and necessary treatment for the Beneficiary's postoperative wound. As mentioned above, the submitted peer-reviewed article found that use of placental allografts were effective in reconstructing larger cutaneous Mohs-related defects of the face, head, and hands that measure more than 3 cm² in adults over 60 and significantly lowered patients' risk for infection, poor scar cosmesis, poor scar revision, and reoperation. However, the record documents that the Beneficiary had a postoperative wound that measured only 1.43 cm². As a result, the medical literature does not support the safety and effectiveness of using an allograft for this Beneficiary. Additionally, at the hearing, Dr. Adams stated that originally the Beneficiary's post-MMS defect was planned to be repaired by flapper graft, but that he did not have enough time to complete the repair on the same date the MMS was done. Dr. Adams further explained that when Beneficiary J.L came in for the reconstructive repair the next day, they reviewed the treatment options again and after doing so, Beneficiary J.L expressed that he

really did not want to have any more surgical intervention in terms of needs and scalpels. As a result, Beneficiary J.L. opted to do the allograft repair. (Hearing Audio). Based on this information, the Appellant has not shown by a preponderance of the evidence that the use of the Artacent wound was medically necessary for the Beneficiary. Dr. Adams testimony makes clear that the postoperative wound was determined to be treatable by flap or graft and that use of Artacent was only to comply with the Beneficiary's change treatment preferences. While using allografts may reduce the healing time of a wound and allografts have been found to be effective in repairing surgical wounds, such factors on their own are insufficient for establishing that the application of Artacent wound was medically necessary and did not exceed the Beneficiary's needs for treating the Beneficiary's postoperative wound.

Since the use of Artacent wound is determined to not be reasonable and necessary for Beneficiary J.L., the application of the skin substitute service is considered to be a service that is related to a non-covered service. The *MBPM* directs that services "related to" non-covered services are not covered services under Medicare. *MBPM*, ch. 16, § 180. Since the application of the skin substitute service is related to the non-covered service of the Artacent wound, Medicare coverage is not available for the application of the skin substitute service the Appellant provided to Beneficiary J.L.

*Surgical Pathology Service (CPT code 88305)*

At issue in this appeal is the claim the Appellant submitted for the surgical pathology service (CPT code 88305) the Appellant provided to the Beneficiary M.G. on June 9, 2021. The UPIC, MAC, and QIC denied coverage of the surgical pathology service because a pathology report was not submitted to corroborate that the service was rendered as billed. (File 5, p. 14).

Section 1833(e) of the Act and 42 C.F.R. § 424.5(a)(6) provide that payment will not be made unless sufficient information exists to determine whether payment is due, and the amount that should be paid.

At the hearing, the Appellant contended that the reason that a surgical pathology report was not found in the records was because it was received outside of the timeframe that the records were requested. The Appellant also confirmed that it did not submit any additional records after receiving the lower level contractor's notice of the denial of coverage. (Hearing Audio).

In this case, the record does not contain a copy of the pathology report associated with the biopsy specimen obtained on June 9, 2021. Without the provision of the pathology report, there is nothing in the record to verify that the surgical procedure was rendered as the Appellant billed. Even if the pathology report was received after the after the UPIC requested medical records, the Appellant had sufficient time to provide a copy of the pathology report. Since the record does not contain the pathology report for the biopsy performed, the record does not support that the service was rendered as billed. Therefore, Medicare coverage is not appropriate and payment cannot be made.

*Liability*

The application of skin substitute graft (CPT code 15275) and the Artacent wound (CPT code Q4169) services provided by the Appellant to Beneficiary J.L. and the surgical pathology service (CPT code 88305) it provided to Beneficiary M.G. were not reasonable and necessary, and are therefore not covered, pursuant to section 1862(a)(1)(A) of the Act. Because the claims are not covered under Medicare guidelines, the limitation on liability provision of section 1879 of the Act is considered. Here, there is no evidence in the record that the Beneficiary knew, or reasonably could have known, that Medicare would not pay for the services furnished to each of them on the Dates of Service. Therefore, the Beneficiary is not liable for payment. However, the Appellant in this case is a provider and is presumed to have knowledge of published Medicare coverage criteria through rulings, regulations, policies, bulletins, manuals, written guidance, directives, websites, and acceptable standards of practice within the local medical community. This presumption is based on the widely published CMS manuals and readily available regulations. *See* CMS (formerly Health Care Financing Administration (HCFA)) Ruling 95-1; 42 C.F.R. § 411.406. The Appellant presented no evidence to rebut the presumption of knowledge. Therefore, the Appellant is not entitled to a limitation on liability under section 1879 of the Act and remains liable for all non-covered charges.

Another consideration is section 1870 of the Act, which allows for the waiver of Medicare's right to recoup overpayments under certain conditions where a provider is without fault. The Appellant is a provider of health care services and a participant in the Medicare program. As discussed above, the Appellant had access to the pertinent statutes, regulations, coverage determinations, coding rules, and Medicare manuals that set out the requirements for reimbursement under the Medicare program. Its failure to apply the guidance properly means that it is not without fault; therefore, the Appellant does not meet the statutory requirement to avoid recoupment of the overpayment, and the recovery of the overpayment is not waived.

## CONCLUSIONS OF LAW

With the exception of claim for the services provided to Beneficiary J.L., the record supports that the Artacent wound (CPT code Q4169), Epifix (CPT code Q4186) and application of skin substitute services (CPT codes 15271–15275) the Appellant furnished to the Beneficiaries from March 15, 2021 to June 14, 2021 were medically reasonable and necessary. However, the Artacent wound (CPT code Q4169) and application of skin substitute service (CPT code 15275) the Appellant provided to Beneficiary J.L. and the surgical pathology service (CPT code 88305) it provided to Beneficiary M.G. do not meet Medicare coverage criteria. Therefore, Medicare is entitled to recover payments it made for the non-covered services.

OMHA Appeal No. 3-12053117987

## ORDER

For the reasons discussed above, this decision is **PARTIALLY FAVORABLE**. I direct the Medicare contractor to process the claim in accordance with this decision.

SO ORDERED

_____
Lori L. May
Administrative Law Judge

OMHA Appeal No.3-12053117987

### APPENDIX A — Claims and ALJ Dispositions

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes | ALJ Disposition |
|---|---|---|---|---|
| E.A.<br>HICN: *****AE9A | 2321357303260 | 05/24/2021 | 17314 | Not at issue |
| | | | 15271 | Favorable |
| | | | Q4169 | Favorable |
| | | | 17313 | Not at issue |
| B.B.<br>HICN: *****AU05 | 2321357303170 | 03/22/2021 | 15271 | Favorable |
| | | | Q4169 | Favorable |
| A.B.<br>HICN: *****EJ42 | 2321357303210 | 04/20/2021 | 15275 | Favorable |
| | | | Q4169 | Favorable |
| T.B.<br>HICN: *****RV48 | 2321357303310 | 06/09/2021 | 13132 | Not at issue |
| | | | 17311 | Not at issue |
| M.G.<br>HICN: *****JW58 | 2321357303350 | 06/09/2021 | 88305 | Unfavorable |
| J.G.<br>HICN: *****CT44 | 2321357303180 | 03/22/2021 | 15272 | Favorable |
| | | | Q4186 | Favorable |
| | | | 15271 | Favorable |
| | 2321357303270 | 05/24/2021 | 15274 | Favorable |
| | | | 97608 | Not at issue |
| | | | Q4186 | Favorable |
| | | | 15273 | Favorable |
| E.H.<br>HICN: *****PD72 | 2321357303230 | 05/17/2021 | 15275 | Favorable |
| | | | 17312 | Not at issue |
| | | | Q4169 | Favorable |
| | | | 17311 | Not at issue |
| L.H.<br>HICN: *****WK95 | 2321357303250 | 05/17/2021 | Q4169 | Favorable |
| | | | 15275 | Favorable |
| R.K.<br>HICN: *****AD88 | 2321357303190 | 03/15/2021 | Q4169 | Favorable |
| | | | 15275 | Favorable |
| R.L.-1<br>HICN: *****PM21 | 2321357303300 | 06/01/2021 | 17312 | Not at issue |
| | | | 15275 | Favorable |
| | | | Q4169 | Favorable |
| | | | 17311 | Not at issue |
| J.L.<br>HICN: *****HM97 | 2321357303220 | 05/11/2021 | Q4169 | Unfavorable |
| | | | 15275 | Unfavorable |
| R.L.-2<br>HICN: *****KG27 | 2321357303200 | 04/05/2021 | 17312 | Not at issue |
| | | | 15275 | Favorable |
| | | | Q4169 | Favorable |
| | | | 17311 | Not at issue |
| C.L.<br>HICN: *****HC80 | 2321357303280 | 05/24/2021 | Q4169 | Favorable |
| | | | 15275 | Favorable |
| M.M.<br>HICN: *****FY96 | 2321357303320 | 06/08/2021 | Q4169 | Favorable |
| | | | 15275 | Favorable |
| K.M. | 2321357303240 | 05/17/2021 | 15271 | Favorable |
| | | | Q4169 | Favorable |

9625

OMHA Appeal No.3-12053117987

| BENEFICIARY | Internal Claim Number (ICN) | Dates of Service | CPT Codes | ALJ Disposition |
|---|---|---|---|---|
| HICN: *****PA56 | | | 17313 | Not at issue |
| J.M. HICN: *****NF34 | 2321357303330 | 06/14/2021 | 17312 | Not at issue |
| | | | 15275 | Favorable |
| | | | Q4169 | Favorable |
| | | | 17311 | Not at issue |
| R.S. HICN: *****TH96 | 2321357303290 | 06/01/2021 | Q4169 | Favorable |
| | | | 15275 | Favorable |

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD    Form DAB-101 (12/19)

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| | |
|---|---|
| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| | |
|---|---|
| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |

7. Medicare claim type: ☐ Part A    ☐ Part B    ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan    ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes    If Yes, skip to Block 9.
☐ No    If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate?    ☐ Yes    ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated_____. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

_____

_____

_____

(Attach additional sheets if you need more space)

## PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.

| DATE | DATE |
|---|---|
| APPELLANT'S NAME (the party requesting review) | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) |
| ADDRESS | ADDRESS |
| CITY, STATE, ZIP CODE | CITY, STATE, ZIP CODE |

| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |
|---|---|---|---|---|---|

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C.  20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review.*** *For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.*

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

### PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim.  Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Seattle, WA

| | |
|---|---|
| Appeal of: **ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA** | OMHA Appeal No.: **3-12053117987** |
| Beneficiary: **Multiple** | Medicare Part: **B** |
| Medicare No.: **Multiple** | Before: **Lori L. May** |
| | Administrative Law Judge |

Index of the Administrative Record and Exhibit List

| Exhibit Record | Administrative File Reference | | |
|---|---|---|---|
| | File Name | | Page Range |
| Medical & Related: Part 1 | File 10 | 1 | : 8200 |
| Medical & Related: Part 2 | File 2 | 1 | : 8200 |
| Medical & Related: Part 3 | File 7 | 1 | : 7956 |
| Procedural - CMS Levels: Request for Reconsideration | File 11 | 1 | : 39 |
| Procedural - CMS Levels: Request for Redetermination | File 13 | 1 | : 95 |
| Procedural - CMS Levels: Reconsideration Effectuation | File 3 | 1 | : 22 |
| Procedural - CMS Levels: Reconsideration | File 5 | 1 | : 20 |
| Procedural - CMS Levels: Reconsideration | File 6 | 1 | : 20 |
| Procedural - CMS Levels: Request Reconsideration w/MER | File 8 | 1 | : 3885 |
| Procedural - CMS Levels: QIC Acknowledgement Letter | File 9 | 1 | : 4 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 1 | 1 | : 36 |
| Procedural - OMHA Level: Notice of Hearing | File 14 | 1 | : 27 |
| Procedural - OMHA Level: Response to Notice of Hrg | File 15 | 1 | : 2 |
| Procedural - OMHA Level: Passphrase letter | File 16 | 1 | : 1 |
| Procedural - OMHA Level: Encrypted letter | File 17 | 1 | : 1 |
| Procedural - OMHA Level: Request for case file | File 18 | 1 | : 10 |
| Proceeding (Audios): Hearing audio | File 19 | 1 | : 1 |
| Proceeding (Audios): Hearing audio | File 20 | 1 | : 1 |

| Non-Exhibit Record | Administrative File Reference | | |
|---|---|---|---|
| | File Name | | Page Range |
| Records not considered: | File 12 | 1 | : 3 |
| Records not considered: Transmittal | File 4 | 1 | : 4 |

OMHA-156
Dated: 2023-07-24
VOL. I

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. I, PAGES 9630-9647

VOL. I

File 4.pdf - Page 165 of 165



XN BKLA

7729 7215 8938

TRK# 0201

TUE - 08 AUG 10:30A
PRIORITY OVERNIGHT

OH-US CLE

44114

CLE

ORIGIN ID:MOA          (913) 498-2100
SHEA RIGGENBACH
FOULSTON SIEFKIN
7500 COLLEGE BLVD
SUITE 1400
OVERLAND PARK KS 66210
UNITED STATES US

TO OMHA CENTRAL OPERATIONS

1001 LAKESIDE AVE., SUITE 9300 OMHA/Central Operations

CLEVELAND OH 44114

(913) 252-2108
INV:
PO:                    REF: 11716-01

DEPT:

BILL SENDER

SHIP DATE: 07AUG23
ACTWGT: 0.50 LB
CAD: 105585928/INET4535

AUG 0 8 2023

FedEx
Express

E

J233123072S01uv                        583J3/1A1409AE3

After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on
fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage,
delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document
your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from
FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and
other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized
declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g.
jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed
within strict time limits, see current FedEx Service Guide.

9648