

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Denver Satellite Office
1 Denver Federal Ctr Bld 25,
Room 1840, P.O. Box 25167
Denver, CO 80225-0167
720-462-7900
(505) 407-3845 (Direct)
303-231-5154 (Fax)
833-921-0393 (Toll Free)

08/23/2023

FOULSTON SIEFKIN LLP
ATTN: AMANDA WILWERT
7500 COLLEGE BLVD STE 1400
OVERLAND PARK, KS 66210

NOTICE OF HEARING

| | |
|---|---|
| Appellant | ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA |
| Beneficiary | [Multiple] |
| Medicare No. | [Multiple] |
| Date(s) of Service | 01/21/2022 - 05/23/2022 |
| OMHA Appeal Number | 3-12683356911 |
| Administrative Law Judge | Jamie Mendelson |

A hearing in the above appeal is scheduled for:

Hearing Date:  TUESDAY, 9/26/2023
Hearing Time:  09:30 AM Mountain Time

You are scheduled to appear by:

- ☑ Telephone
- ☐ Video-Teleconference (VTC)
- ☐ In-Person

You are instructed to call our office on the hearing date at the time indicated above. Please call (833) 419-1926 and enter 1995338559 when asked for a passcode or collaboration code. Failure to call at the scheduled time will be considered a failure to appear for the hearing.

The following parties, participants, and/or witnesses are also scheduled to appear at the hearing:

| Name | Role | Appearing by |
|------|------|--------------|
| Wisconsin Physicians Service | | |
| QIC - C2C B North | | |

## **What do I do next?**

You must respond to this notice within 5 calendar days of receipt. You are encouraged, but not required, to use the enclosed *Response to Notice of Hearing* (form OMHA-102) when responding. If you are a party to the appeal, your response must indicate whether you plan to attend the scheduled hearing, or whether you object to the proposed time and/or place of the hearing.  If applicable, you must specify who else from your organization or entity plans to attend the hearing and in what capacity, and list any witnesses who will be providing testimony. If you are an employee of CMS or a CMS contractor and wish to attend the hearing as a participant, your response must indicate that you plan to attend the hearing and specify each individual who plans to attend.

## **What if I object to the type of hearing?**

If you are a party to the appeal and you object to the type of hearing scheduled, please complete section 6 of the enclosed *Response to Notice of Hearing*, and indicate what type of hearing you would prefer (if you are also requesting to change the time of your scheduled hearing, see the section below titled "What if I can't attend my scheduled hearing?").  No explanation is required if you are an unrepresented beneficiary or enrollee requesting to appear by VTC.  For all other requests for a VTC hearing, and any requests for an in-person hearing, you must explain why you object to the type of hearing scheduled.  If the Administrative Law Judge changes the type of hearing, an amended notice of hearing will be sent to the parties and any potential participants who were sent a copy of this notice.

## **What if I can't attend my scheduled hearing?**

If you are a party to the appeal and you cannot attend the hearing at the scheduled time and place, please call our office immediately at the direct dial phone number at the top of this notice. Please _also_ complete section 4 of the enclosed *Response to Notice of Hearing* and explain why you are unable to attend the hearing at the scheduled time and place. If the Administrative Law Judge finds good cause to reschedule the hearing, an amended notice of hearing will be sent to the parties and any potential participants who were sent a copy of this notice.

**What if I don't attend my scheduled hearing?**

If you are the appellant and neither you nor your representative appears at the scheduled hearing, the Administrative Law Judge may dismiss your request for hearing unless good cause for the failure to appear is found. If you respond to this notice of hearing and fail to appear, you must contact the Administrative Law Judge within 10 calendar days after the hearing and provide a good cause reason for not appearing. If you do not respond to this notice of hearing and fail to appear, the Administrative Law Judge will send you a notice asking why you did not appear, and you will have 10 calendar days to respond. If you do not respond to the Administrative Law Judge's notice within 10 calendar days, or you do respond and the Administrative Law Judge determines you did not have good cause for failing to appear, your request for hearing will be dismissed. If the Administrative Law Judge determines that good cause exists, the hearing will be rescheduled and the time between the originally scheduled hearing date and new hearing date will not count toward the adjudication period.

**What if I don't want a hearing?**

If you are a party to the appeal, you have a right to appear at the hearing to present arguments in favor of your position, and offer testimony and evidence to the Administrative Law Judge. However, if you do not wish to present your case at a hearing, you may request a decision based on the written and other evidence in the record. To do so, please complete section 4 of the enclosed *Response to Notice of Hearing*. Please also complete and submit a *Waiver of Right to an Administrative Law Judge (ALJ) Hearing* (form OMHA-104). You can find a copy of this form online at www.hhs.gov/omha, or you may contact our office to receive a copy. Please note that your waiver does not affect the right of other parties to participate in the hearing and even if all parties waive the hearing, the Administrative Law Judge may still decide to conduct a hearing if it is necessary to decide the case. If a hearing is conducted and you do not attend, you may still offer written evidence to the Administrative Law Judge. Please see below for additional information regarding the submission of evidence.

**What if I no longer wish to pursue this appeal?**

If you decide that you no longer wish to pursue this appeal, you may withdraw your request for hearing in writing. You may do this by letter or by completing and submitting a *Withdrawal of Request for an Administrative Law Judge Hearing* (form OMHA-119). You can find a copy of

this form online at www.hhs.gov/omha, or you may contact our office to receive a copy.  If you submit a written request for withdrawal and no other party has filed a valid request for hearing, your appeal will be dismissed.  Your request to withdraw will not be honored if a decision, dismissal or remand has already been issued.

**What issues will be addressed at the hearing?**

The issues before the Administrative Law Judge include all of the issues brought out in the initial determination, coverage determination, or organization determination; redetermination; or reconsideration that were not decided entirely in a party's favor, for the claims or other appealed matters specified in the request for hearing.

**What if I object to the issues listed above?**

If you are a party and you object to the issues, you must notify the Administrative Law Judge in writing at the earliest possible opportunity before the time set for the hearing and explain your objections.  You can either do this in section 6 of the enclosed *Response to Notice of Hearing* or at a later time, but no later than 5 calendar days before the date of your scheduled hearing.  You must send a copy of your objections to all the parties who were sent a copy of this notice and to CMS or any CMS contractor that has elected to be a party to the hearing.  The Administrative Law Judge will make a decision on your objections either in writing, at a prehearing conference, or at the hearing.

**Can I have a representative?**

Yes.  You have the right to have a representative attend the hearing on your behalf or attend the hearing with you.  You can be represented by an attorney or other person.  If you have a representative and have not completed and submitted an *Appointment of Representative* (form CMS-1696), which can be found online at www.hhs.gov/omha, or other written statement authorizing your representative to act on your behalf, please call our office as soon as possible.

**Can I request a copy of the case file?**

Yes.  If you would like a copy of all or part of your file before the date of the hearing, please contact our office for further instructions.

**Can I submit additional evidence?**

If you want to submit additional written or other evidence, please complete and submit a *Filing of New Evidence* (form OMHA-115).  You can find a copy of this form online at www.hhs.gov/omha, or you may contact our office to receive a copy.  Unless you are an unrepresented beneficiary or enrollee, you must submit all evidence by the date (if any) you have

specified in your request for hearing, or within 10 calendar days of receiving this notice.  If evidence is submitted more than 10 calendar days after receiving this notice, any applicable adjudication period will be extended by the number of calendar days in the period between 10 calendar days after receipt of this notice and the day the evidence is received.  Please note that although the 10-day submission time frame does not apply to unrepresented beneficiaries and enrollees, they may wish to submit any additional evidence as soon as possible to allow the Administrative Law Judge more time to consider the evidence before the hearing.

If you are a provider or supplier, or a beneficiary represented by a provider or supplier, and you are appealing a reconsideration issued by a Medicare Part A or Part B Qualified Independent Contractor (QIC), you must also submit a statement explaining why the evidence was not submitted prior to the issuance of the QIC's reconsideration.  The Administrative Law Judge will determine whether you have good cause for submitting the evidence for the first time at the OMHA level of appeal.

## Will any experts participate or testify at the hearing?

No experts are scheduled to testify at your hearing.

## What happens at the hearing?

- The Administrative Law Judge will open the hearing and ask the parties, participants and any representatives to identify themselves and any witnesses they may be calling;
- The Administrative Law Judge will ask you and any other witnesses to take an oath or to affirm that the testimony is true;
- You will have the opportunity to present facts and arguments;
- If you are a party, you or your representative may present witnesses and may cross-examine the witnesses of the other parties;
- The Administrative Law Judge may question you and any other witnesses about the facts and issues;
- The Administrative Law Judge may allow you to submit additional written statements and affidavits about the matter in lieu of testimony or argument at the hearing. You must submit the additional statements and affidavits within the time frame designated by the Administrative Law Judge and provide a copy of them to the other parties to your hearing, if any, at the same time you submit them to the Administrative Law Judge;
- The Administrative Law Judge will review the issue(s) and entire record of your claim, independent of any determinations previously made on your claim; and
- The Administrative Law Judge will make an audio recording of the hearing.

## How will I know the result of my case?

File 5.pdf - Page 5 of 10

After the hearing, the Administrative Law Judge will issue a written decision, which will be mailed to all parties to the appeal, the relevant QIC or Independent Review Entity, and the Part D plan sponsor if you are appealing a Part D coverage determination. The decision will include findings of fact, conclusions of law, and the reasons for the decision. The Administrative Law Judge will base the decision on the evidence of record, including the testimony at the hearing.

**Whom do I contact with other questions about my hearing?**

If you have any questions about your hearing, please call or write our office. A direct dial phone number and mailing address are at the top of this notice. Please provide the Administrative Law Judge name and OMHA appeal number if you write to the office, or have the information available if you call the office.


cc:
    Q2A



Enclosures:
Attachment A
OMHA-102 Response to NOH

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 7-8



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Office of Medicare Hearings and Appeals

### RESPONSE TO NOTICE OF HEARING

**Instructions:** Complete sections 2 through 8 below, as applicable, and return this form to the assigned Administrative Law Judge (ALJ) **within 5 days of receiving the notice of hearing**. For expedited Part D hearings, contact the ALJ at the telephone number provided at the top of the notice of hearing **or** complete and return this form to the assigned ALJ **within 2 days of receiving the notice of hearing.** The return mailing address and fax number are at the top of the notice of hearing. You do not need to include the notice of hearing with your response.

Please note that only a party to the hearing may call witnesses; object to the time, place, or type of hearing; object to the statement of issues to be decided at the hearing; or object to the assigned ALJ (sections 4 through 6 below). Non-party participants are not permitted to call witnesses and may not file objections.

| Section 1: Hearing information. [TO BE COMPLETED BY THE OFFICE OF MEDICARE HEARINGS AND APPEALS] |
|---|

| OMHA Appeal Number | Appellant |
|---|---|
| 3-12683356911 | ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA |

| Type of Hearing | | | Assigned ALJ |
|---|---|---|---|
| ☒ Telephone | ☐ Video-Teleconference (VTC) | ☐ In-Person | Mendelson |

| Hearing Day of Week | Hearing Date | Hearing Time |
|---|---|---|
| TUESDAY | 09/26/2023 | 09:30 AM Mountain Time |

| Telephone Hearing Call-in Number (*if applicable*) | Passcode or Collaboration Code (*for telephone hearing*) |
|---|---|
| (833) 419-1926 | 1995338559 |

| VTC or In-Person Hearing Address (*if applicable*) | City | State | ZIP Code |
|---|---|---|---|
| | | | |

| Section 2: What is the responding party's or participant's information? (*Representative information in next section*) |
|---|

| Name (*First, Middle initial, Last*) | Firm or Organization (*if applicable*) | Telephone Number |
|---|---|---|
| | | |

| Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| | | | |

If the respondent is an entity or organization, please list all individuals who plan to attend the hearing and the capacity in which they are attending (*attach a continuation sheet if necessary*):

| Section 3: What is the representative's information? (*Skip if you do not have a representative*) |
|---|

| Name | Firm or Organization (*if applicable*) | Telephone Number |
|---|---|---|
| | | |

| Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| | | | |

| Section 4: Will you be present at the time and place shown above? (*Check one*) |
|---|

☐ **I will be present at the time and place shown on the notice of hearing.** If an emergency arises after I submit this response and I cannot be present, I will notify the ALJ at the telephone number shown at the top of the notice of hearing as soon as possible.

☐ **I cannot be present at the time and place shown on the notice of hearing and would like to request that my hearing be rescheduled.** I understand that the ALJ has the discretion to change the time and place of the hearing as long as my explanation for my request to reschedule meets the good cause standard for changing the time and place of the hearing. (For example, good cause may be found due to an inability to attend the hearing because of a serious physical or mental condition, incapacitating injury, or death in the family or if severe weather conditions make it impossible to travel to the hearing. *See* 42 C.F.R. sections 405.1020(f) and (g), and 42 C.F.R. sections 423.2020(f) and (g) for additional circumstances that may establish good cause.) I understand that if I am the appellant and the hearing is postponed at my request, the time between the originally scheduled hearing date and the new hearing date is not counted toward any applicable adjudication period.

I would like to reschedule my hearing for the following date and time, and I have good cause to reschedule my hearing because:

☐ **I want to waive my right to appear at the ALJ hearing.** (*Please complete form OMHA-104 and attach it to this response.*)

---

**Section 5: Do you intend to call any witnesses to provide testimony at the hearing?**

☐ No.

☐ Yes, I intend to call the following witnesses *(attach a continuation sheet if necessary)*:

---

**Section 6: Do you object to any of the following conditions?** *(Check all that apply)*

☐ **I object to the type of hearing scheduled.** If you are an unrepresented beneficiary or enrollee, and a telephone hearing is scheduled, you have the right to request that a VTC hearing be held instead if VTC technology is available. For all other parties, if a telephone hearing is scheduled, the ALJ may find good cause for an appearance by VTC if he or she determines that VTC is necessary to examine the facts or issues involved in the appeal.

If a telephone or VTC hearing is scheduled and the party, including an unrepresented beneficiary or enrollee, requests that an in-person hearing be held instead, the ALJ, with the agreement of the Chief ALJ or designee, may find good cause for an in-person hearing if VTC or telephone technology is not available, or if special or extraordinary circumstances exist.

I object to the type of hearing scheduled and request a *(check one)* ☐ VTC *or* ☐ in-person hearing because:

**Note**: No explanation is required if you are an unrepresented beneficiary or enrollee requesting a VTC hearing.

---

☐ **I object to the issues described in the notice of hearing.** I understand that I must send a copy of my objection to the issues to all the other parties who were sent a copy of the notice of hearing, and to CMS or a CMS contractor that elected to be a party to the hearing (if you do not have these addresses, please contact the ALJ's adjudication team at the telephone number shown in the letterhead of the notice of hearing). I understand that the ALJ will make a decision on my objection either in writing, at a prehearing conference, or at the hearing.

I object to the issues described in the notice of hearing because:

---

☐ **I object to the ALJ assigned to my appeal.** I understand that an ALJ cannot adjudicate an appeal if he or she is prejudiced or partial with respect to any party or has an interest in the matter pending for decision, and that I may object to the ALJ assigned to my appeal for these reasons. I understand that the ALJ will consider my objection and decide whether to proceed with the appeal or withdraw. I understand that if I object to the ALJ assigned to my appeal, and the ALJ subsequently withdraws from the appeal, another ALJ will be assigned, and any applicable adjudication time frame will be extended by 14 calendar days.

I object to the assigned ALJ because:

---

**Section 7: If you are the appellant, do you want to waive or extend the time frame to decide your appeal?** *(If yes, check one)*

☐ **I want to waive the time frame for the ALJ to decide my appeal.** I understand that by waiving this time frame, the ALJ does not have to decide my appeal within any applicable adjudication period that would otherwise apply.

☐ **I want to extend the time frame for the ALJ to decide my appeal.** I want the time frame to be extended _____ calendar days beyond any applicable adjudication period.

---

**Section 8: Sign and date this form.**

| Party, Participant or Representative Signature | Date |
|---|---|
| | |

---

### Privacy Act Statement

The legal authority for the collection of information on this form is authorized by the Social Security Act (section 1155 of Title XI and sections 1852(g)(5), 1860D-4(h)(1), 1869(b)(1), and 1876 of Title XVIII). The information provided will be used to further document your appeal. Submission of the information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your appeal. Information you furnish on this form may be disclosed by the Office of Medicare Hearings and Appeals to another person or governmental agency only with respect to the Medicare Program and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services and other agencies.

---

## If you need large print or assistance, please call 1-855-556-8475

---

OMHA-102 (08/17)                    **PAGE 2 of 2**                    10



Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Denver Satellite Office
1 Denver Federal Ctr Bld 25,
Room 1840, P.O. Box 25167
Denver, CO 80225-0167
720-462-7900
(505) 407-3845 (Direct)
303-231-5154 (Fax)
833-921-0393 (Toll Free)

09/12/2023

FOULSTON SIEFKIN LLP
ATTN: AMANDA WILWERT
7500 COLLEGE BLVD STE 1400
OVERLAND PARK, KS 66210

NOTICE OF RESCHEDULED HEARING

| | |
|---|---|
| Appellant | ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA |
| Beneficiary | [Multiple] |
| Medicare No. | [Multiple] |
| Date(s) of Service | 01/21/2022 - 05/23/2022 |
| OMHA Appeal Number | 3-12683356911 |
| Administrative Law Judge | Jamie Mendelson |

A hearing in the above appeal is scheduled for:

Hearing Date:  WEDNESDAY, 10/11/2023
Hearing Time:  09:30 AM Mountain Time

You are scheduled to appear by:

☑ Telephone
☐ Video-Teleconference (VTC)
☐ In-Person

You are instructed to call our office on the hearing date at the time indicated above. Please call (833) 419-1926 and enter 1995 33 8559 when asked for a passcode or collaboration code. Failure to call at the scheduled time will be considered a failure to appear for the hearing.

The following parties, participants, and/or witnesses are also scheduled to appear at the hearing:

| Name | Role | Appearing by |
|---|---|---|
| Wisconsin Physicians Service | | |
| QIC - C2C B North | | |

## What do I do next?

You must respond to this notice within 5 calendar days of receipt. You are encouraged, but not required, to use the enclosed *Response to Notice of Hearing* (form OMHA-102) when responding. If you are a party to the appeal, your response must indicate whether you plan to attend the scheduled hearing, or whether you object to the proposed time and/or place of the hearing.  If applicable, you must specify who else from your organization or entity plans to attend the hearing and in what capacity, and list any witnesses who will be providing testimony. If you are an employee of CMS or a CMS contractor and wish to attend the hearing as a participant, your response must indicate that you plan to attend the hearing and specify each individual who plans to attend.

## What if I object to the type of hearing?

If you are a party to the appeal and you object to the type of hearing scheduled, please complete section 6 of the enclosed *Response to Notice of Hearing*, and indicate what type of hearing you would prefer (if you are also requesting to change the time of your scheduled hearing, see the section below titled "What if I can't attend my scheduled hearing?").  No explanation is required if you are an unrepresented beneficiary or enrollee requesting to appear by VTC.  For all other requests for a VTC hearing, and any requests for an in-person hearing, you must explain why you object to the type of hearing scheduled.  If the Administrative Law Judge changes the type of hearing, an amended notice of hearing will be sent to the parties and any potential participants who were sent a copy of this notice.

## What if I can't attend my scheduled hearing?

If you are a party to the appeal and you cannot attend the hearing at the scheduled time and place, please call our office immediately at the direct dial phone number at the top of this notice. Please _also_ complete section 4 of the enclosed _Response to Notice of Hearing_ and explain why you are unable to attend the hearing at the scheduled time and place. If the Administrative Law Judge finds good cause to reschedule the hearing, an amended notice of hearing will be sent to the parties and any potential participants who were sent a copy of this notice.

### What if I don't attend my scheduled hearing?

If you are the appellant and neither you nor your representative appears at the scheduled hearing, the Administrative Law Judge may dismiss your request for hearing unless good cause for the failure to appear is found. If you respond to this notice of hearing and fail to appear, you must contact the Administrative Law Judge within 10 calendar days after the hearing and provide a good cause reason for not appearing. If you do not respond to this notice of hearing and fail to appear, the Administrative Law Judge will send you a notice asking why you did not appear, and you will have 10 calendar days to respond. If you do not respond to the Administrative Law Judge's notice within 10 calendar days, or you do respond and the Administrative Law Judge determines you did not have good cause for failing to appear, your request for hearing will be dismissed. If the Administrative Law Judge determines that good cause exists, the hearing will be rescheduled and the time between the originally scheduled hearing date and new hearing date will not count toward the adjudication period.

### What if I don't want a hearing?

If you are a party to the appeal, you have a right to appear at the hearing to present arguments in favor of your position, and offer testimony and evidence to the Administrative Law Judge. However, if you do not wish to present your case at a hearing, you may request a decision based on the written and other evidence in the record. To do so, please complete section 4 of the enclosed _Response to Notice of Hearing_. Please also complete and submit a _Waiver of Right to an Administrative Law Judge (ALJ) Hearing_ (form OMHA-104). You can find a copy of this form online at www.hhs.gov/omha, or you may contact our office to receive a copy. Please note that your waiver does not affect the right of other parties to participate in the hearing and even if all parties waive the hearing, the Administrative Law Judge may still decide to conduct a hearing if it is necessary to decide the case. If a hearing is conducted and you do not attend, you may still offer written evidence to the Administrative Law Judge. Please see below for additional information regarding the submission of evidence.

### What if I no longer wish to pursue this appeal?

If you decide that you no longer wish to pursue this appeal, you may withdraw your request for hearing in writing. You may do this by letter or by completing and submitting a _Withdrawal of Request for an Administrative Law Judge Hearing_ (form OMHA-119). You can find a copy of

this form online at www.hhs.gov/omha, or you may contact our office to receive a copy. If you submit a written request for withdrawal and no other party has filed a valid request for hearing, your appeal will be dismissed. Your request to withdraw will not be honored if a decision, dismissal or remand has already been issued.

## What issues will be addressed at the hearing?

The issues before the Administrative Law Judge include all of the issues brought out in the initial determination, coverage determination, or organization determination; redetermination; or reconsideration that were not decided entirely in a party's favor, for the claims or other appealed matters specified in the request for hearing.

## What if I object to the issues listed above?

If you are a party and you object to the issues, you must notify the Administrative Law Judge in writing at the earliest possible opportunity before the time set for the hearing and explain your objections. You can either do this in section 6 of the enclosed *Response to Notice of Hearing* or at a later time, but no later than 5 calendar days before the date of your scheduled hearing. You must send a copy of your objections to all the parties who were sent a copy of this notice and to CMS or any CMS contractor that has elected to be a party to the hearing. The Administrative Law Judge will make a decision on your objections either in writing, at a prehearing conference, or at the hearing.

## Can I have a representative?

Yes. You have the right to have a representative attend the hearing on your behalf or attend the hearing with you. You can be represented by an attorney or other person. If you have a representative and have not completed and submitted an *Appointment of Representative* (form CMS-1696), which can be found online at www.hhs.gov/omha, or other written statement authorizing your representative to act on your behalf, please call our office as soon as possible.

## Can I request a copy of the case file?

Yes. If you would like a copy of all or part of your file before the date of the hearing, please contact our office for further instructions.

## Can I submit additional evidence?

If you want to submit additional written or other evidence, please complete and submit a *Filing of New Evidence* (form OMHA-115). You can find a copy of this form online at www.hhs.gov/omha, or you may contact our office to receive a copy. Unless you are an unrepresented beneficiary or enrollee, you must submit all evidence by the date (if any) you have

specified in your request for hearing, or within 10 calendar days of receiving this notice. If evidence is submitted more than 10 calendar days after receiving this notice, any applicable adjudication period will be extended by the number of calendar days in the period between 10 calendar days after receipt of this notice and the day the evidence is received. Please note that although the 10-day submission time frame does not apply to unrepresented beneficiaries and enrollees, they may wish to submit any additional evidence as soon as possible to allow the Administrative Law Judge more time to consider the evidence before the hearing.

If you are a provider or supplier, or a beneficiary represented by a provider or supplier, and you are appealing a reconsideration issued by a Medicare Part A or Part B Qualified Independent Contractor (QIC), you must also submit a statement explaining why the evidence was not submitted prior to the issuance of the QIC's reconsideration. The Administrative Law Judge will determine whether you have good cause for submitting the evidence for the first time at the OMHA level of appeal.

**Will any experts participate or testify at the hearing?**

No experts are scheduled to testify at your hearing.

**What happens at the hearing?**

- The Administrative Law Judge will open the hearing and ask the parties, participants and any representatives to identify themselves and any witnesses they may be calling;
- The Administrative Law Judge will ask you and any other witnesses to take an oath or to affirm that the testimony is true;
- You will have the opportunity to present facts and arguments;
- If you are a party, you or your representative may present witnesses and may cross-examine the witnesses of the other parties;
- The Administrative Law Judge may question you and any other witnesses about the facts and issues;
- The Administrative Law Judge may allow you to submit additional written statements and affidavits about the matter in lieu of testimony or argument at the hearing. You must submit the additional statements and affidavits within the time frame designated by the Administrative Law Judge and provide a copy of them to the other parties to your hearing, if any, at the same time you submit them to the Administrative Law Judge;
- The Administrative Law Judge will review the issue(s) and entire record of your claim, independent of any determinations previously made on your claim; and
- The Administrative Law Judge will make an audio recording of the hearing.

**How will I know the result of my case?**

After the hearing, the Administrative Law Judge will issue a written decision, which will be mailed to all parties to the appeal, the relevant QIC or Independent Review Entity, and the Part D plan sponsor if you are appealing a Part D coverage determination. The decision will include findings of fact, conclusions of law, and the reasons for the decision. The Administrative Law Judge will base the decision on the evidence of record, including the testimony at the hearing.

**<u>Whom do I contact with other questions about my hearing?</u>**

If you have any questions about your hearing, please call or write our office. A direct dial phone number and mailing address are at the top of this notice. Please provide the Administrative Law Judge name and OMHA appeal number if you write to the office, or have the information available if you call the office.

cc:
     Q2A

Enclosures:
Attachment A
OMHA-102 Response to NOH

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 17-18



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Office of Medicare Hearings and Appeals**

## RESPONSE TO NOTICE OF HEARING

**Instructions:** Complete sections 2 through 8 below, as applicable, and return this form to the assigned Administrative Law Judge (ALJ) **within 5 days of receiving the notice of hearing**. For expedited Part D hearings, contact the ALJ at the telephone number provided at the top of the notice of hearing **or** complete and return this form to the assigned ALJ **within 2 days of receiving the notice of hearing.** The return mailing address and fax number are at the top of the notice of hearing. You do not need to include the notice of hearing with your response.

Please note that only a party to the hearing may call witnesses; object to the time, place, or type of hearing; object to the statement of issues to be decided at the hearing; or object to the assigned ALJ (sections 4 through 6 below). Non-party participants are not permitted to call witnesses and may not file objections.

---

**Section 1: Hearing information. [TO BE COMPLETED BY THE OFFICE OF MEDICARE HEARINGS AND APPEALS]**

| OMHA Appeal Number | Appellant |
|---|---|
| 3-12683356911 | ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA |

Type of Hearing
[X] Telephone    [ ] Video-Teleconference (VTC)    [ ] In-Person

Assigned ALJ
Mendelson

| Hearing Day of Week | Hearing Date | Hearing Time |
|---|---|---|
| WEDNESDAY | 10/11/2023 | 09:30 AM Mountain Time |

| Telephone Hearing Call-in Number *(if applicable)* | Passcode or Collaboration Code *(for telephone hearing)* |
|---|---|
| (833) 419-1926 | 1995 33 8559 |

| VTC or In-Person Hearing Address *(if applicable)* | City | State | ZIP Code |
|---|---|---|---|
| | | | |

---

**Section 2:  What is the responding party's or participant's information?** *(Representative information in next section)*

| Name *(First, Middle initial, Last)* | Firm or Organization *(if applicable)* | Telephone Number |
|---|---|---|
| | | |

| Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| | | | |

If the respondent is an entity or organization, please list all individuals who plan to attend the hearing and the capacity in which they are attending *(attach a continuation sheet if necessary)*:

---

**Section 3 : What is the representative's information?** *(Skip if you do not have a representative)*

| Name | Firm or Organization *(if applicable)* | Telephone Number |
|---|---|---|
| | | |

| Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| | | | |

---

**Section 4:  Will you be present at the time and place shown above?** *(Check one)*

[ ]  **I will be present at the time and place shown on the notice of hearing.** If an emergency arises after I submit this response and I cannot be present, I will notify the ALJ at the telephone number shown at the top of the notice of hearing as soon as possible.

[ ]  **I cannot be present at the time and place shown on the notice of hearing and would like to request that my hearing be rescheduled.** I understand that the ALJ has the discretion to change the time and place of the hearing as long as my explanation for my request to reschedule meets the good cause standard for changing the time and place of the hearing. (For example, good cause may be found due to an inability to attend the hearing because of a serious physical or mental condition, incapacitating injury, or death in the family or if severe weather conditions make it impossible to travel to the hearing. *See* 42 C.F.R. sections 405.1020(f) and (g), and 42 C.F.R. sections 423.2020(f) and (g) for additional circumstances that may establish good cause.) I understand that if I am the appellant and the hearing is postponed at my request, the time between the originally scheduled hearing date and the new hearing date is not counted toward any applicable adjudication period.

I would like to reschedule my hearing for the following date and time, and I have good cause to reschedule my hearing because:

---

[ ]  **I want to waive my right to appear at the ALJ hearing.** *(Please complete form OMHA-104 and attach it to this response.)*

---

**Section 5: Do you intend to call any witnesses to provide testimony at the hearing?**

☐ No.

☐ Yes, I intend to call the following witnesses *(attach a continuation sheet if necessary)*:

---

**Section 6: Do you object to any of the following conditions?** *(Check all that apply)*

☐ **I object to the type of hearing scheduled.** If you are an unrepresented beneficiary or enrollee, and a telephone hearing is scheduled, you have the right to request that a VTC hearing be held instead if VTC technology is available. For all other parties, if a telephone hearing is scheduled, the ALJ may find good cause for an appearance by VTC if he or she determines that VTC is necessary to examine the facts or issues involved in the appeal.

If a telephone or VTC hearing is scheduled and the party, including an unrepresented beneficiary or enrollee, requests that an in-person hearing be held instead, the ALJ, with the agreement of the Chief ALJ or designee, may find good cause for an in-person hearing if VTC or telephone technology is not available, or if special or extraordinary circumstances exist.

I object to the type of hearing scheduled and request a *(check one)* ☐ VTC *or* ☐ in-person hearing because:

**Note**: No explanation is required if you are an unrepresented beneficiary or enrollee requesting a VTC hearing.

☐ **I object to the issues described in the notice of hearing.** I understand that I must send a copy of my objection to the issues to all the other parties who were sent a copy of the notice of hearing, and to CMS or a CMS contractor that elected to be a party to the hearing (if you do not have these addresses, please contact the ALJ's adjudication team at the telephone number shown in the letterhead of the notice of hearing). I understand that the ALJ will make a decision on my objection either in writing, at a prehearing conference, or at the hearing.

I object to the issues described in the notice of hearing because:

☐ **I object to the ALJ assigned to my appeal.** I understand that an ALJ cannot adjudicate an appeal if he or she is prejudiced or partial with respect to any party or has an interest in the matter pending for decision, and that I may object to the ALJ assigned to my appeal for these reasons. I understand that the ALJ will consider my objection and decide whether to proceed with the appeal or withdraw. I understand that if I object to the ALJ assigned to my appeal, and the ALJ subsequently withdraws from the appeal, another ALJ will be assigned, and any applicable adjudication time frame will be extended by 14 calendar days.

I object to the assigned ALJ because:

---

**Section 7: If you are the appellant, do you want to waive or extend the time frame to decide your appeal?** *(If yes, check one)*

☐ **I want to waive the time frame for the ALJ to decide my appeal.** I understand that by waiving this time frame, the ALJ does not have to decide my appeal within any applicable adjudication period that would otherwise apply.

☐ **I want to extend the time frame for the ALJ to decide my appeal.** I want the time frame to be extended _____ calendar days beyond any applicable adjudication period.

**Section 8: Sign and date this form.**

| Party, Participant or Representative Signature | Date |
|---|---|
| | |

**Privacy Act Statement**

The legal authority for the collection of information on this form is authorized by the Social Security Act (section 1155 of Title XI and sections 1852(g)(5), 1860D-4(h)(1), 1869(b)(1), and 1876 of Title XVIII). The information provided will be used to further document your appeal. Submission of the information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your appeal. Information you furnish on this form may be disclosed by the Office of Medicare Hearings and Appeals to another person or governmental agency only with respect to the Medicare Program and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services and other agencies.

---

# If you need large print or assistance, please call 1-855-556-8475

Foulston Siefkin LLP

**FROM**                    **TO**

Name:   Shea Riggenbach

Phone:          Fax:                        3032315154

E-mail:  sriggenbach@foulston.com

Sent:  8/31/23      at:  8:49:37 AM                    3  page(s) (including cover)

Subject:   Response to Notice of Hearing

Comments:

On behalf of Amanda Wilwert:

Hello,

Please see attached a Response to the Notice of Hearing for Advanced Dermatology appeal 3-12683356911. Please let us know if you have any questions or need anything further.

Thank you,

**Shea Riggenbach**
Legal Administrative Assistant | **FOULSTON SIEFKIN LLP**
7500 College Boulevard, Suite 1400 | Overland Park, Kansas 66210
D: 913.253.2138
sriggenbach@foulston.com | www.foulston.com

**IMPORTANT**: This communication contains information from the law firm of Foulston Siefkin LLP which may be confidential and privileged. If it appears that this communication was addressed or sent to you in error, you may not use or copy this communication or any information contained therein, and you may not disclose this communication or the information contained therein to anyone else. In such circumstances, please notify me immediately by reply email or by telephone. Thank you.



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Office of Medicare Hearings and Appeals**

## RESPONSE TO NOTICE OF HEARING

**Instructions:** Complete sections 2 through 8 below, as applicable, and return this form to the assigned Administrative Law Judge (ALJ) **within 5 days of receiving the notice of hearing**. For expedited Part D hearings, contact the ALJ at the telephone number provided at the top of the notice of hearing **or** complete and return this form to the assigned ALJ **within 2 days of receiving the notice of hearing.** The return mailing address and fax number are at the top of the notice of hearing. You do not need to include the notice of hearing with your response.

Please note that only a party to the hearing may call witnesses; object to the time, place, or type of hearing; object to the statement of issues to be decided at the hearing; or object to the assigned ALJ (sections 4 through 6 below). Non-party participants are not permitted to call witnesses and may not file objections.

### Section 1: Hearing information. [TO BE COMPLETED BY THE OFFICE OF MEDICARE HEARINGS AND APPEALS]

| OMHA Appeal Number 3-12683356911 | Appellant ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA | | |
|---|---|---|---|
| Type of Hearing ☒ Telephone ☐ Video-Teleconference (VTC) ☐ In-Person | | Assigned ALJ Mendelson | |
| Hearing Day of Week TUESDAY | Hearing Date 09/26/2023 | | Hearing Time 09:30 AM Mountain Time |
| Telephone Hearing Call-in Number (if applicable) (833) 419-1926 | | Passcode or Collaboration Code (for telephone hearing) 1995338559 | |
| VTC or In-Person Hearing Address (if applicable) | | City | State | ZIP Code |

### Section 2: What is the responding party's or participant's information? (Representative information in next section)

| Name (First, Middle initial, Last) | Firm or Organization (if applicable) Advanced Dermatology and Skin Cancer Center, PA | | Telephone Number 785-537-4990 | |
|---|---|---|---|---|
| Mailing Address 2735 Pembrook PL | | City Manhattan | State KS | ZIP Code 66502 |

If the respondent is an entity or organization, please list all individuals who plan to attend the hearing and the capacity in which they are attending (attach a continuation sheet if necessary):

Dr. John Adams, practice owner and treating physician

### Section 3 : What is the representative's information? (Skip if you do not have a representative)

| Name Amanda M. Wilwert | Firm or Organization (if applicable) Foulston Siefkin LLP | | Telephone Number 913-253-2181 | |
|---|---|---|---|---|
| Mailing Address 7500 College Blvd, Ste. 1400 | | City Overland Park | State KS | ZIP Code 66210 |

### Section 4: Will you be present at the time and place shown above? (Check one)

☐ **I will be present at the time and place shown on the notice of hearing.** If an emergency arises after I submit this response and I cannot be present, I will notify the ALJ at the telephone number shown at the top of the notice of hearing as soon as possible.

☒ **I cannot be present at the time and place shown on the notice of hearing and would like to request that my hearing be rescheduled.** I understand that the ALJ has the discretion to change the time and place of the hearing as long as my explanation for my request to reschedule meets the good cause standard for changing the time and place of the hearing. (For example, good cause may be found due to an inability to attend the hearing because of a serious physical or mental condition, incapacitating injury, or death in the family or if severe weather conditions make it impossible to travel to the hearing. See 42 C.F.R. sections 405.1020(f) and (g), and 42 C.F.R. sections 423.2020(f) and (g) for additional circumstances that may establish good cause.) I understand that if I am the appellant and the hearing is postponed at my request, the time between the originally scheduled hearing date and the new hearing date is not counted toward any applicable adjudication period.

I would like to reschedule my hearing for the following date and time, and I have good cause to reschedule my hearing because:

I will be in another hearing at the same date and time for another client. Please reschedule to October 11th at a time that is convenient for the Judge.

☐ **I want to waive my right to appear at the ALJ hearing.** (Please complete form OMHA-104 and attach it to this response.)

| Section 5: Do you intend to call any witnesses to provide testimony at the hearing? |

☐ No.

☒ Yes, I intend to call the following witnesses *(attach a continuation sheet if necessary)*:

### Dr. John Adams

| Section 6: Do you object to any of the following conditions? (*Check all that apply*) |

☐ **I object to the type of hearing scheduled.** If you are an unrepresented beneficiary or enrollee, and a telephone hearing is scheduled, you have the right to request that a VTC hearing be held instead if VTC technology is available. For all other parties, if a telephone hearing is scheduled, the ALJ may find good cause for an appearance by VTC if he or she determines that VTC is necessary to examine the facts or issues involved in the appeal.

If a telephone or VTC hearing is scheduled and the party, including an unrepresented beneficiary or enrollee, requests that an in-person hearing be held instead, the ALJ, with the agreement of the Chief ALJ or designee, may find good cause for an in-person hearing if VTC or telephone technology is not available, or if special or extraordinary circumstances exist.

I object to the type of hearing scheduled and request a (*check one*) ☐ VTC *or* ☐ in-person hearing because:

**Note**: No explanation is required if you are an unrepresented beneficiary or enrollee requesting a VTC hearing.

☐ **I object to the issues described in the notice of hearing.** I understand that I must send a copy of my objection to the issues to all the other parties who were sent a copy of the notice of hearing, and to CMS or a CMS contractor that elected to be a party to the hearing (if you do not have these addresses, please contact the ALJ's adjudication team at the telephone number shown in the letterhead of the notice of hearing). I understand that the ALJ will make a decision on my objection either in writing, at a prehearing conference, or at the hearing.

I object to the issues described in the notice of hearing because:

☐ **I object to the ALJ assigned to my appeal.** I understand that an ALJ cannot adjudicate an appeal if he or she is prejudiced or partial with respect to any party or has an interest in the matter pending for decision, and that I may object to the ALJ assigned to my appeal for these reasons. I understand that the ALJ will consider my objection and decide whether to proceed with the appeal or withdraw. I understand that if I object to the ALJ assigned to my appeal, and the ALJ subsequently withdraws from the appeal, another ALJ will be assigned, and any applicable adjudication time frame will be extended by 14 calendar days.

I object to the assigned ALJ because:

| Section 7: If you are the appellant, do you want to waive or extend the time frame to decide your appeal? (*If yes, check one*) |

☐ **I want to waive the time frame for the ALJ to decide my appeal.** I understand that by waiving this time frame, the ALJ does not have to decide my appeal within any applicable adjudication period that would otherwise apply.

☐ **I want to extend the time frame for the ALJ to decide my appeal.** I want the time frame to be extended _____ calendar days beyond any applicable adjudication period.

| Section 8: Sign and date this form. |

| Party, Participant or Representative Signature | Date |
| | 8/31/23 |

#### Privacy Act Statement

The legal authority for the collection of information on this form is authorized by the Social Security Act (section 1155 of Title XI and sections 1852(g)(5), 1860D-4(h)(1), 1869(b)(1), and 1876 of Title XVIII). The information provided will be used to further document your appeal. Submission of the information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your appeal. Information you furnish on this form may be disclosed by the Office of Medicare Hearings and Appeals to another person or governmental agency only with respect to the Medicare Program and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services and other agencies.

# If you need large print or assistance, please call 1-855-556-8475

Foulston Siefkin LLP

**FROM**                                                **TO**

Name:   Shea Riggenbach

Phone:              Fax:                                    3032315154

E-mail:  sriggenbach@foulston.com

Sent:  9/6/23        at:  10:06:50 AM                    4  page(s) (including cover)

Subject:   Request for records- appeal case 3-12683356911

Comments:

On behalf of Amanda Wilwert:

Hello,

Please see attached a request for records in the appeal case 3-12683356911 for
Advanced Dermatology and Skin Cancer Center, PA. Please let us know if you have any
questions.

Thank you,

**Shea Riggenbach**
Legal Administrative Assistant | **FOULSTON SIEFKIN LLP**
7500 College Boulevard, Suite 1400 | Overland Park, Kansas 66210
D: 913.253.2138
sriggenbach@foulston.com | www.foulston.com

**IMPORTANT**: This communication contains information from the law firm of Foulston
Siefkin LLP which may be confidential and privileged. If it appears that this communication
was addressed or sent to you in error, you may <u>not</u> use or copy this communication or any
information contained therein, and you may <u>not</u> disclose this communication or the
information contained therein to anyone else. In such circumstances, please notify me
immediately by reply email or by telephone. Thank you.



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Office of Medicare Hearings and Appeals**

## REQUEST FOR COPY OF THE
## RECORD(S) IN THE CASE FILE

**This form is only applicable to appellants and non-appellant beneficiaries.**

I, <u>Amanda M. Wilwert</u>                                                      am requesting a copy of the following record(s) from the Office of Medicare Hearings and Appeals, Department of Health and Human Services.

**Please check if applicable:**

[X] I am requesting a copy of the entire record   [ ] I am requesting a partial copy of the record

**NOTE:** If you are not requesting a copy of the entire record, please specify below in detail the record(s) you are requesting Include the title of the record and the date it was sent/created. If you need more room please attach another sheet of paper.

**Type of Requestor *(please check one)*:**

[ ] Individual Appellant        [X] Entity Appellant     [ ] Non-Appellant Beneficiary

[ ] Authorized Representative   [ ] Appointed Representative     [ ] Substitute Party

[ ] Other *(if other, please specify your relationship to the appellant)*: _____

**Please provide the following information for the appellant if available:**

| Name | ALJ Appeal |
|---|---|
| Advanced Dermatology And Skin Cancer Center, PA | 3-12683356911 |

| Health Insurance Claim (HIC) Number | Social Security Number | Date of Birth |
|---|---|---|
| | | |

**Please check if applicable:**   [ ] I have already received a copy of the record(s) I am requesting

**The requested record(s) will be sent to the following address:**

| Street | City |
|---|---|
| 7500 College Boulevard, Suite 1400 | Overland Park |

| State | ZIP Code | Requestor's Phone Number |
|---|---|---|
| KS | 66210 | 913-253-2181 |

HHS-719 (09/05)                                      **PAGE 1 OF 3**                             PSC Publishing Services (301) 443-6740  EF

File 3 pdf - Page 2 of 4

## INSTRUCTIONS FOR COMPLETING THIS FORM
### FEES GENERALLY

Appellants and non-appellant beneficiaries will receive one free copy of the record(s) in the case file. Appellants and non-appellant beneficiaries may be charged for subsequent copies.

If you are a third party, i.e. **not** the individual identified in the record(s) and you have no legal authority to act on behalf of the individual, you will have to obtain the identified individual's consent for access to the record(s). The identified individual is not required to provide such consent. To obtain the identified individual's consent you may use forms HHS-720 and HHS-721 instead of this form (HHS-719).

Representatives of the individual(s) identified in the record(s) who have completed and submitted the "Appointment of Representative" form (CMS-1696), and were subsequently approved by the Administrative Law Judge (ALJ) assigned to the appeal, do not need to obtain a separate consent from the individual identified in the record(s).

Authorized representatives, i.e. individuals who are legally authorized to act on behalf of the individual identified in the record (s), (for instance, a legal guardian or power of attorney), do not need to obtain a separate written consent from the individual so long as they have submitted the legal document that authorized them to act on behalf of the individual. If the legal document, however, does not expressly give the individual's consent to access his or her record(s), submit forms HHS-720 and HHS-721 instead of this form (HHS-719).

Authorized substitute parties who have completed form HHS-722, or some other similar document that verifies your legal status as a substitute party, do not need to obtain a separate written consent from the individual identified in the record(s).

The following requestors must make a Freedom of Information Act (FOIA) request for copies of the record(s):

Third-parties without the written consent of the individual identified in the record(s), whether it is their first or subsequent request for the record(s);

Entity appellants, for instance a provider or supplier organization, making subsequent requests for the record(s); and

Authorized substitute parties subsequent requests for the record(s).

For instructions on how to make a FOIA request, please read the "Instructions for Making a FOIA Request" below.

### INSTRUCTIONS FOR MAKING A FOIA REQUEST

If you have been instructed to make a FOIA request, rather than use this form, please read the following. The Department of Health and Human Services FOIA Office requires all FOIA requests to be submitted in writing, by postal service, facsimile, or messenger. Requests must contain the requestor's postal address and the name of the person responsible for paying any fees that may be charged. You should provide a phone number where the FOIA Office can reach you to get clarification of the request or resolve other issues concerning the request. For more information, please go to:

http://www.hhs.gov/about/infoguid.html#foia

FOIA requests should be sent to:

Department FOI Officer
Department of Health and Human Services
200 Independence Ave, S.W.
Room 645F
Washington, D.C. 20201

If the Office of Medicare Hearings and Appeals (OMHA) receives a FOIA request, the OMHA will forward it to the Department FOI Officer.

**HOW TO CALCULATE FEES**

**The fees calculated in this section only apply to those requestors who are eligible to complete this form (HHS-719) as indicated in the instructions and not for FOIA requests.**

**If the OMHA is charging you a fee for photocopying, the charges will be determined as follows:**

Copying of records susceptible to photocopying is assessed at 10 cents per page and copying of records not susceptible to photocopying is assessed at actual cost. No charge will be made if the total amount of copying does not exceed \$25. If the total cost exceeds \$25, the requesting party will be charged in full.

The OMHA will send you an invoice to the address you have listed on this form, unless otherwise specified, if it is determined that you will be charged a fee for photocopying as described in this form. The OMHA will send the requested copies when payment for the fee has been received.

**VERIFYING YOUR IDENTITY**

**In addition to completing this form, your request must be notarized by an official notary public in order to verify your identity. Please have the following statement notarized:**

I Amanda M. Wilwert certify that I am in fact the individual I claim to be. I understand that the knowing and willful request for or acquisition of a record pertaining to an individual under false pretenses is a criminal offense under the Privacy Act subject to a \$5,000 fine.

| Requestor's Name | | NOTARY SEAL |
|---|---|---|
| Amanda M. Wilwert | | |
| Requestor's Signature | Date<br>9/6/2023 | NOTARY PUBLIC - State of Kansas<br>SHEA RIGGENBACH<br>My Appt Expires 3.21.25 |
| Notary Public's Name | | |
| Shea Riggenbach | | |
| Notary Public's Signature | Date<br>9/6/2023 | **Notary's Expiration Date**<br>3/21/23 |

The OMHA will make every effort to deliver a copy of the requested records before the date of the hearing.

**PRIVACY ACT STATEMENT**

The legal authority for the collection of information on this form is authorized by the Social Security Act (section 1155 of Title XI and sections 1852(g)(5), 1860D-4(h)(1), 1869(h)(1), and 1876 of Title XVIII). The information provided will be used to further document your appeal. The Social Security Number will be used to verify the identity of the individual appellant. Submission of the information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your appeal. Information you furnish on this form may be disclosed by the Office of Medicare Hearings and Appeals to another person or governmental agency only with respect to the Medicare Program and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services and other agencies.

HHS-719 (09/05) **PAGE 3 OF 3**



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Office of Medicare Hearings and Appeals**

**NOTICE OF INTENT TO PARTICIPATE OR BE A PARTY IN A PART A OR**
**PART B ADMINISTRATIVE LAW JUDGE (ALJ) HEARING**

**Instructions:** For CMS contractor use only. This form is for use **only** in Medicare Part A and Part B appeals following receipt of a notice of hearing and must be submitted centrally by the Centers for Medicare & Medicaid Services (CMS) Administrative Qualified Independent Contractor (AdQIC). CMS or CMS contractors filing an election to be a participant in the proceedings in a Medicare Part A or Part B appeal prior to receipt of a notice of hearing should use form OMHA-105, as should CMS, Independent Review Entities, or Part D plan sponsors filing a request to participate in the proceedings in a Medicare Part D appeal.

CMS or a CMS contractor may use this form to elect to be a participant in the proceedings on a request for an Administrative Law Judge (ALJ) hearing. CMS or a CMS contractor may alternatively use this form to elect to be a party to an ALJ hearing on a Medicare Part A or Part B appeal, unless the request for hearing was filed by an unrepresented beneficiary. The time frames for submission of a valid election are set forth in 42 C.F.R. sections 405.1010 and 405.1012.

CMS or a CMS contractor will complete this form if it intends to file an election to participate or be a party in an ALJ hearing. The AdQIC will then send the completed form(s) to the assigned ALJ on behalf of all the CMS or CMS contractors filing an election. CMS or CMS contractors filing an election must also send a copy of this form to the parties who were sent a copy of the notice of hearing. An ALJ may determine that an election is invalid if it was not timely filed or not sent to the correct parties.

**Section 1: What is the OMHA Appeal Number (ECAPE and/or MAS)?**

| OMHA Appeal Number (ECAPE) | OMHA Appeal Number (MAS) |
|---|---|
| 3-12683356911 | 1-13143028686 |

**Note**: If the appeal involves multiple claims and/or beneficiaries and you intend to be a party or participant with respect to some, but not all, include a separate sheet listing the claims and/or beneficiaries for which you are filing this notice of intent.

**Section 2: CMS or Contractor Contact Information**

| Name of CMS Office or Contractor | Point of Contact (POC) | | |
|---|---|---|---|
| CoventBridge – UPIC MW | Emilie Fix | | |

| Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| 2118 Southwest Blvd. | Grove City | OH | 43123 |

| POC Telephone Number | POC Fax Number | POC E-Mail |
|---|---|---|
| 9044280444 | | Emilie.Fix@us.coventbridge.com |

**Section 3: Intended Participation Information**

| Hearing Date | Hearing Time | Assigned ALJ |
|---|---|---|
| 9/26/2023 | 11:30 AM EST | Jamie Mendelson |

Date you received the notice of hearing: 8/23/2023

**Note:** Your notice of intent must be sent no later than 10 days after receiving the notice of hearing.

Do you intend to submit a position paper, written testimony, and/or evidence, or participate in the oral hearing? (*Check all that apply*)

☐ I am submitting a position paper, written testimony, and/or evidence with this form.

☒ I intend to submit a position paper, written testimony, and/or evidence on a future date. (*See 42 C.F.R. sections 405.1010 and 405.1012 for time frames for submission of position papers, written testimony, and/or evidence.*)

☐ I intend to participate in the oral hearing. (*See 42 C.F.R. sections 405.1010 and 405.1012 for limitations on the number of entities that may participate in the oral hearing.*) The following is a list of all individuals from my entity who plan to attend the hearing and the capacity in which they are attending:

Do you intend to be a participant or a party? (*Check one*)

☒ Participant

☐ Party (*Only if the appellant is not an unrepresented beneficiary–see 42 C.F.R. section 405.1012 for additional limitations.*)

If you selected <u>party</u> in the previous question, do you intend to call witnesses, submit evidence, or submit objections as a party to the hearing? (*Check all that apply*)

☐    I intend to call the witness(es) identified by name and occupation below:

☐    I am submitting the evidence described below:

☐    I object to the proposed time and place of the hearing, or to the issues as described in the notice of hearing, for the reason(s) below:

Acknowledge the following by signing and dating below:

- *The CMS office or contractor named above has been informed of its responsibility to notify the appellant and the parties who were sent a copy of the notice of hearing of its intent to participate in the hearing, and understands that the ALJ may determine this election is invalid if it is not timely filed or is not sent to the correct parties.*

- *The CMS office or contractor named above has provided, or will provide, a copy of all submitted position papers, written testimony, and/or evidence to the appropriate parties and within the time frames as set forth in 42 C.F.R. sections 405.1010 and 405.1012, as applicable. Failure to provide copies to the appropriate parties or to submit all items within the required time frames will result in the submissions not being considered by the ALJ.*

- *The CMS office or contractor named above understands that the entities that may participate in the oral hearing will be subject to the limitations of 42 C.F.R. sections 405.1010 and 405.1012, as applicable.*

| POC Signature | Date |
|---|---|
| Digitally signed by AdQIC<br>Date: 2023.08.31 10:39:25 -04:00<br>Reason: The AdQIC is signing this Notice of Intent on behalf of the contractor above. | 8/31/2023 |

**Medicare Appeal Number:**

~~1-12683356911~~

April 20, 2023

**FOULSTON ATTORNEYS AT LAW**
**7500 COLLEGE BOULEVARD**
**SUITE 1400**
**OVERLAND PARK, KS 66210**

RE:

BENEFICIARY:  SEE ATTACHED CHART
APPELLANT:  ADVANCED DERMATOLOGY AND
SKIN CANCER CENTER

DEAR A. WILWERT:

This letter is to inform you that we received your reconsideration request on April 11, 2023. Medicare hired C2C Innovative Solutions, Inc. to review your appeal and make a decision.

**What we do**

We will look at your file carefully and review applicable Medicare rules to decide your case. If the item or service was denied as not being medically necessary, then we will ask a clinical panel to review your file.

We will start processing your request immediately. In most cases, we will issue a decision within 60 days of receipt of your request.

**What you can do**

We ask that you submit any additional information you wish to have considered in your appeal to our office within 14 days. Evidence that is not submitted prior to the issuance of the reconsideration decision will not be considered at the Administrative Law Judge (ALJ) level, or made part of administrative record, unless the appellant demonstrates good cause as to why the evidence was not provided prior to the issuance of this decision.  See 42 Code of Federal Regulations (CFR) 405.966(a)(2). This requirement does

**How to get Information?**

If you want a status on your appeal and you are the beneficiary, please contact - 1- 800 MEDICARE. If you are a provider, please visit Q2A.com.

If you have questions about your appeal other than status or post decision issues, contact:

**C2C Innovative Solutions, Inc.**
Medicare Part B North
QIC Contractor
P.O. Box 45258
Jacksonville, FL 32232-5258

For non-status inquiries dial:
904-224-7426

Who we are:
We are a Qualified Independent Contractor (QIC). Medicare has contracted with us to review your file and make an independent

not apply to beneficiaries, unless they are represented by a physician, supplier or a provider of services. Submission of all evidence will allow us to thoroughly address the issues of the case and provide an accurate determination for your appeal. Due to a rapid increase in claim appeals at the third level of Medicare appeal, a substantial backlog has resulted that has increased the average time to decision. Our review of all pertinent supporting documentation and medical evidence will help to ensure that cases are resolved as early as possible in the appeals process.

When submitting additional documentation, please include the Medicare Appeals Number referenced in the upper right corner of this letter and securely fax it to 904-224-2772, or submit your appeal and documentation to our appeals portal found at www.c2cinc.com. You can also mail this information to:

> Medicare Part B
> QIC Contractor
> P.O. Box 45258
> Jacksonville, Fl. 32232-5258

You do not have to call or write to us to find out our decision. We will review your file and send you our decision.

**How to get more information:**

If you would like a status update on your appeal, you can contact:
Beneficiaries: call 1-800-MEDICARE (1-800-633-4227)
Providers: check www.q2a.com

For questions about your appeal other than status, please call 904-224-7426.

Sincerely,

A. Christie
QIC-C2C Innovative Solutions, Inc.
Medicare Contractor

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 32-34

000545 C2C NIAR_C0000016262 04-12-2023

*Attention*
*Controlled Unclassified Information*

# QIC PBN

RECEIVED

APR 11 2023

Receipt Date: _____

C2C MAILROOM
QA# MR106

Case Count: _____

PHP

6

1 TD

| Document Type | Scan Profile Selection | |
|---|---|---|
| New Appeal | **NIAR** | X |
| Follow up | **NFUR** | |
| Misroute | **NMIS** | |
| Correspondence | **NFAX** | |

000546 C2C NIAR_C00000016262 04-12-2023

# Problem Condition Identified with Original Documents or Media

| | | |
|---|---|---|
| | File received as-is | |
| | No supporting documentation present | RECEIVED |
| | Poor quality original | APR 11 2023 |
| ✓ | PHP- Potential High Profile Case | C2C MAILROOM QA# MR106 |
| | CD/media received in damaged condition | |
| | File contains records for a beneficiary not listed on the appeal | |
| | Envelope/package received in damaged/open condition – some contents may be missing | |
| | No envelope present | |
| | Envelope received empty | |
| | Combined case – multiple providers – please evaluate carefully | |
| | | |

Mailroom Employee's Initials





INNOVATIVE
S O L U T I O N S, I N C.
Integrity, Quality & Value – Coast to Coast

1-2.1.01 Problem Condition Identification Form
06/30/2022

000547 C2C NIAR_C0000016262 04-12-2023

# Hard evidence was received with this file.

RECEIVED

APR 11 2023

C2C MAILROOM
QA# MR106

|  | CD/DVD | |
|---|---|---|
| ✓ | Thumb drive | 1 TD |
|  | X-Ray negatives | |
|  | Diabetic logbook | |
|  | Other: | |

1-2.1.01 Hard Evidence Form
06/30/2022
VOL. II

37

000548 C2C NIAR_C0000016262 04-12-2023

# FOULSTON

#### ATTORNEYS AT LAW

Amanda M. Wilwert

awilwert@foulston.com
Phone 913.253.2181
Fax: 913 498 2101

7500 COLLEGE BOULEVARD, SUITE 1400
OVERLAND PARK, KS 66210-4041

April 7, 2022

## REQUEST FOR RECONSIDERATION
(LEVEL 2 APPEAL)

**RECEIVED**
**APR 1 1 2023**
C2C MAILROOM
QA# MR106

C2C Innovative Solutions, Inc. – QIC Part B North
P.O. Box 45208
Jacksonville, FL 32232-5208

Re:    Advanced Dermatology and Skin Cancer Center
Redetermination/Appeals Number: 5422349094000
Beneficiary Identifier: Multiple, see Reconsideration Request Form
Internal Control Number: Multiple, see Reconsideration Request Form
Service Dates: January 21, 2022, to May 23, 2022
Service Provided to: Multiple, see Reconsideration Request Form

To Whom It May Concern:

Wisconsin Physician Service ("WPS") notified Advanced Dermatology and Skin
Cancer Center PA ("Advanced Dermatology") that it received an unfavorable decision on its
request for redetermination in the above-referenced claim. WPS denied the claim on the
grounds that (1) services were not reasonable and necessary; (2) services were not rendered as
billed; and (3) services related to non-covered or denied primary services. We disagree. We
are writing to request reconsideration of WPS' denial.

For the timeframe applicable to this denial, Advanced Dermatology maintained
processes and procedures for determining the clinically appropriate level of care. These
procedures were based on established clinical criteria, community standards of care, guidelines
from peer-reviewed medical journals, and internal review processes. Advanced Dermatology
is confident that the above referenced claims were billed correctly in accordance with the
applicable Medicare regulations. Put simply, the care Advanced Dermatology provided was
reasonable and necessary and appropriately documented.

### Standard of Review

In the second level of appeal, a Qualified Independent Contractor ("QIC") conducts an
independent review of the administrative record, including the initial determination and
redetermination. Second Level of Appeal: Reconsideration by a Qualified Independent
Contractor, cms.gov (June 23, 2022) https://www.cms.gov/Medicare/Appeals-and-
Grievances/OrgMedFFSAppeals/ReconsiderationbyaQualifiedIndependentContractor.
Review can include submitting issues of medical necessity to a panel of physicians or other

Page 2

health care professionals. Medicare Parts A & B Appeals Process at 9, CMS (Aug. 2022). QICs can consider additional evidence that was not presented to the original fact finder or at the redetermination level. Level 2 Appeals: Original Medicare (Parts A & B), hhs.gov (Jan. 23, 2017) https://www.hhs.gov/about/agencies/omha/the-appeals-process/level-2/parts-a-and-b/index.html#:~:text=A.

### Background on Mohs Micrographic Surgery and Allografts

Dr. John Adams is a board-certified dermatologist and an accredited Mohs surgeon who has practiced in the Manhattan, Kansas area at Advanced Dermatology since 1998. Dr. Adams expanded his dermatology practice to Nebraska and Missouri in 2020. From 2013 to 2016, Dr. Adams served on the Board of Directors for the American Society for Mohs Surgery. In 2016, Dr. Adams served as the President of the Kansas Society for Dermatology and Dermatologic Surgery. Also in 2016, Dr. Adams was recognized for his significant contribution to the specialty of dermatology and his dedication to patient care and received the 2017 American Academy of Dermatology's Presidential Citation Award.

Dr. Adams is one of a handful of Hispanic physicians in the state of Kansas, and the only Hispanic dermatologist in the state. Dr. Adams' parents were born in Puerto Rico, and he grew up in an entirely Hispanic household and culture. In 1994, Dr. Adams legally changed his name from John Raymond Rivera, Jr. to John Raymond Adams. The Advanced Dermatology staff is comprised of over thirty percent (30%) Hispanic individuals; in addition to Dr. Adams, one (1) staff member is from the Dominican Republic and seven (7) are of Mexican descent. The ability to speak Spanish with patients and understand the culture greatly enhances Advanced Dermatology's ability to provide health care for Hispanic patients.

Advanced Dermatology focuses on Mohs Micrographic Surgery ("MMS" or "Mohs"). Mohs Surgery combines the process of surgical removal of cancerous tissue, processing of the removed tissue and the histopathological examination and interpretation of the tissue, and reconstruction of the post Mohs surgical defect into a single procedure that can be performed in a physician's office under local anesthesia. A trained Mohs surgeon will remove small slices of tissue and examine the margins of each for cancerous cells. If any remain at the margins, another small slice is removed around that area and the process continues until all cancerous tissue has been removed. The resulting wound is repaired through reconstructive techniques that are also used by plastic surgeons. The surgical wound from a Mohs procedure is typically much smaller than the wound from a simple/traditional basic form of surgical excision. Many referring physicians recognize Mohs surgery as the standard of care for removal of skin lesions from the face and surrounding areas.

### Post Mohs Surgery Wounds and Repairs

While the wound from a Mohs procedure is less than those from other surgical excisions, a Mohs surgical wound can be extensive and require repair. Thus, there are generally three options for repairs after a Mohs procedure depending on the extent of the

000550 C2C NIAR_C00000016262 04-12-2023

Page 3

surgical wound: (1) secondary intention, which allows the surgical wound to heal on its own; (2) primary side to side repairs, which involve suturing the skin edges together; and (3) flap and/or graft repairs. Flaps and grafts are considered true reconstructive surgery. Advanced Dermatology uses allografts in this way, i.e., as an option to a flap and/or graft repair of a surgical wound resulting from the removal of skin cancer. But, if the wound can be repaired with primary side to side repair, Advanced Dermatology does not recommend an allograft as a repair option.

Advanced Dermatology provided care and documentation to all patients consistent with WPS Local Coverage Determinations ("LDC") and Local Coverage Articles ("LCA") related to Mohs procedures and repairs. WPS LCA 57477 (Mohs Micrographic Surgery) provides that, to support medical necessity, the patient's medical record should include:

> 11. Measurement of the primary lesion necessitating MMS and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:
> - Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).
> - Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
> - It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.
>
> 12. When the surgical defect created by MMS requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.

Every case reviewed by the UPIC was a surgical defect created by MMS. The documentation in the patient's medical record included measurements and photos. Further, the reconstructive technic performed, generally fap and/or graft repairs, was extensively documented as the appropriate choice to preserve functional capabilities and to restore physical appearance.

One overarching comment from the UPIC and WPS determination was that the records did not support off label-use and did not contain medical literature to support the medical necessity of the services billed. However, the package inserts for both the Artacent and MiMedx allografts used for the surgical repair indicate that an appropriate use is as a barrier for use in the treatment of acute and chronic wounds, providing a protective environment to

File 11 PDF - Page 6 of 38

000551 C2C NIAR_C0000016262 04-12-2023

Page 4

support the healing process. Thus, Dr. Adams was using allografts consistent with the use indicated on the labels. Further, medical literature in the form of peer reviewed articles and payor policies support the use of allografts as reconstructive repair of surgical defects created by MMS. In fact, the article *Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane*, published in the peer review journal, *Facial Plastic Surgery & Aesthetic Medicine*, provides information on allografts and their use in post Mohs defects and compared repair via allograft vs. repair via flaps or grafts in a propensity matched (similar patients and cancers in both groups) study. A copy is attached for your convenience. The article includes medical indications, guidelines and utilization in a large, involving 1,550 patients, study. The study presented a valuable opportunity to address a practice gap with evidence in terms of flaps and grafts compared to allografts in similarly matched patients and settings. The study included patients with a diagnosis of basal or squamous cell carcinoma and a Mohs surgery defect located in a moderate to high-risk area of recurrence, (face, head, neck, or dorsal hand) if "*simple*" excision is utilized in lieu of Mohs surgery with its low (1%) risk of recurrence. The focus of the study was to compare defects distinguished by equivalent reconstructive demands in terms of complexity, low oxygenation (legs, COPD), immunosuppression, extensive defects; location, surrounding tissue is scarred or atrophic; other patient co-morbidities and post Mohs surgery wound size. The key findings of the article are: "the incidence of infection and all-cause postoperative morbidity in placental allograft repairs was significantly lower than observed with autologous tissue." The significance was a remarkable 28.7% complications for the flap and graft group vs. only 2.1%complication rate for the allograft group. The disparity of these two groups and the egregious rate of complication in the flap and graft group underscore the fact that most of the patients who we offer allografts to as an option for repair tend to be our most complex cases in terms of cancer size, location and patient co-morbidities. Further:

> "Larger cutaneous Mohs-related defects of the face, head, and hands were effectively reconstructed with a placental allograft in a population of older adults.… Incisional repair utilizing autologous tissue such as local flaps and full-thickness skin grafts (FTSG) represent the mainstay of reconstructive techniques following Mohs micrographic surgery (MMS).[8,9] However, postoperative morbidity increases after the age of sixty by as much as twenty-five percent due to a greater depth of tumor invasion and extensive defects with higher demands for donor tissues…In situations where incisional repair options are limited, an ideal alternative would be a nonsurgical approach capable of yielding outcomes comparable to autologous tissue techniques. Placental tissues may offer a novel solution to address this emerging clinical need in cutaneous reconstruction…Postoperative complication rates for placental reconstructions did not exceed those demonstrated by autologous tissue counterparts, indicating this is a safe alternative to flap and FTSG in cosmetically sensitive repairs."

In other words, surgical wounds which are relatively large and are in locations such as the head, neck, hand, and feet can be safely and effectively repaired via allograft. In early April

000552 C2C NIAR_C0000016262 04-12-2023

Page 5

2022, Blue Cross Blue Shield of Kansas issued a medical policy update for Amniotic Membrane and Amniotic Fluid which cites this article and its findings for its policy guidance. A copy of the Blue Cross Blue Shield of Kansas medical policy for Amniotic Membrane and Amniotic Fluid is attached for your convenience. Further, MiMedx has recently also cited this article in its brochure regarding Mohs surgery closures.

Allografts are used as a tissue graft to treat wounds. Allografts are derived from the amniotic membrane, which is responsible for physically protecting the fetus by acting as a cover/barrier. The amniotic membrane also acts as a semi-permeable, protective barrier membrane which allows for the transfer of nutrients and waste and protects the fetus.

In the reviewed records, skin substitute allografts, including both EpiFix (MiMedx manufacturer) and Artacent (Tides Medical manufacturer), were used as allografts, as confirmed by the FDA, FDA approved Package inserts, CPT, and letters from the respective manufacturers. Advanced Dermatology followed manufacturer guidelines with reference to the utilization and application of the allograft. The manufacturer's guidelines, via the FDA approved package insert, were followed with reference to the utilization and application of amniotic skin substitute allografts. Moreover, the two primary skin substitutes utilized by Dr. Adams, Artacent Tides and EpiFix MiMedx provided letters and records in support of Dr. Adam's use of the skin substitutes and the erroneous nature of the auditor's findings. Those support letters and documentation are included in the supporting documents submitted for consideration.

Moreover, Dr. Adams provided adequate rationale as to why "other options" were not feasible in these instances in the patient's medical record. It was reasonable and justified for the physician to utilize the application of Artacent or EpiFix. The patients opted for repair via allograft and consequently declined to accept the other alternatives provided and there is no documentation requirement that requires a provider document the specific reasons why a patient declined other treatment alternatives.

Dr. Adams has provided a line-by-line response to the UPIC's findings which is attached for convenience. As outlined in that response, the UPIC's findings were based on articles and guidance documents that are not applicable to the services provided. The QIC must apply the appropriate LCA and overturn the UPIC's findings.

## CONCLUSION

Almost every beneficiary involved in this overpayment determination involved Mohs surgery with allograft reconstruction. As the records demonstrate, Advanced Dermatology competently documented the medical indications and options and in conjunction with the photos establish care was medically necessary and appropriate for every beneficiary. A significant majority of the claims denied involved Mohs surgical cases in complex/high-risk areas. The remaining claims denied involved patients with an aggressive cancer or significant

000553 C2C NIAR_C0000016262 04-12-2023

Page 6

tumor size, or the patient was immunocompromised. The skin substitute allografts utilized in the denied claims are scientifically supported, in coding guidance, and medically indicated.

The claims submitted were medically necessary. Therefore, WPS' and CoventBridge's unfavorable determination should be reversed.

Sincerely,

FOULSTON SIEFKIN LLP

Amanda M. Wilwert

000554 C2C NIAR_C0000016262 04-12-2023

# FOULSTON

ATTORNEYS AT LAW

Amanda M. Wilwert

awilwert@foulston.com
Phone: 913.253.2181
Fax 913.498.2101

7500 COLLEGE BOULEVARD, SUITE 1400
OVERLAND PARK, KS 66210-4041

April 7, 2023

*Sent via USPS*

C2C Innovative Solutions, Inc. – QIC Part B' North
P.O. Box 45208
Jacksonville, FL 32232-5208

> Re:   Provider Name: Advanced Dermatology and Skin Cancer Center
>        Redetermination/Appeals Number: 5422359094000

To Whom It May Concern:

This firm represents Advanced Dermatology and Skin Cancer Center ("Advanced Dermatology"). Enclosed please find a CMS 1969 appointment of representation form.

Advanced Dermatology is requesting reconsideration of the unfavorable appeal decision articulated in the February 6, 2023 redetermination decision letter, which was received on February 13, 2023. Enclosed please find the reconsideration request form, a copy of the February 6, 2023 redetermination decision letter, a cover letter outlining the reasons for requesting reconsideration, and an encrypted flash drive. ***Please call my office at 913-253-2138 for the password for the encrypted flash drive.***

The encrypted flash drive contains a copy of the enclosed appointment of representation form, a copy of the reconsideration request form, a copy of the enclosed letter outlining the reasons for requesting reconsideration, individual patient records, responses to the auditor's findings, and other supporting documentation.

The enclosed flash drive is encrypted. The following instructions will assist with opening the flash drive:

1.   Insert flash drive into USB port of a computer connected to the internet.
     a.   If the computer utilized to open the flash drive does not have internet access, please contact my office immediately at 913-253-2138 to arrange for a different flash drive to be delivered.

2.   You will receive a small black popup in the lower corner of your screen that says select to choose what to do with this flash drive. Click on the popup.
     a.   If you miss the popup, open File Explorer and look for a "DVD RW Drive (D:) DTL+G3"



FOULSTON SIEFKIN LLP   I   KANSAS CITY · TOPEKA · WICHITA   I   FOULSTON.COM

000555 C2C NIAR_C0000016262 04-12-2023

Page 2

3.      Another box will popup labeled DVD RW Drive.  Select the first option: Run DTL Plus- Launcher.

4.      A screen will popup asking for the password.  ***Please call my office at 913-253-2138 for the password***.  Enter the password and select "ok".

5.      A licensing offer may appear.  Close or decline the licensing offer.

If you have any questions or issues with the encrypted flash drive, please contact my office at 913-253-2138.  Thank you for your time and consideration of Advanced Dermatology's request for reconsideration.

Sincerely,

FOULSTON SIEFKIN LLP

Amanda M. Wilwert

Enclosures including documents on encrypted flash drive.

009556.C2C NIAR_C0000016262 04-12-2023

 **GOVERNMENT HEALTH ADMINISTRATORS**

Wisconsin Physicians Service Insurance Corporation
*A CMS Medicare Contractor*
1717 W. Broadway | P.O. Box 1787 | Madison, WI 53701-1787

Foulston Siefkin LLP
Attn: Amanda Wilwert
Ste 1400
7500 College Blvd
Overland Park, KS 66210-4041

Date February 06, 2023
In Any Inquiry Refer To
   5422349094000
Beneficiary Identifier
   Multiple
Internal Control Number
   Multiple
Service Date (s)
   January 21, 2022, to May 23, 2022
Service Provided By
   Advanced Dermatology PA
Service Provided To
   Multiple

Dear Ms. Wilwert,

This letter is to inform you of the decision on your Medicare appeal. An appeal is a new and independent review of a claim. You are receiving this letter because you requested an appeal on behalf of Advanced Dermatology PA for multiple overpayments totaling $116,510.11.

The appeal decision is unfavorable. Medicare cannot make payment for the service(s) at issue in your appeal.

More information on the decision is provided below. If you disagree with the decision, you may appeal to a Qualified Independent Contractor (QIC). Your appeal of this decision must be made in writing and received by the QIC within 180 days of receipt of this letter. You are presumed to have received this decision five days from the date of the letter unless there is evidence to show otherwise. However, if you do not wish to appeal this decision, you are not required to take any action. For more information on how to appeal this decision, see the section at the end of this letter entitled, "Important Information about Your Appeal Rights".

Wisconsin Physicians Service (WPS) was contracted by Medicare to review your appeal.

Provider: Advanced Dermatology PA
Dates of Service: January 21, 2022, to May 23, 2022
Type of Service: Application of skin substitute graft to wound (procedure codes 15271, 15272, 15275, and 15276), therapy procedure using a special bandage, vacuum pump and disposable medical equipment (procedure code 97608), established patient office or outpatient visit (procedure code 99212), ceftriaxone sodium injection (procedure code J0696), artacent wound (procedure code Q4169), and epifix (procedure code Q4186)

Initial determinations on these claims were made on various dates. Advanced Dermatology PA was



009557.C2C NIAR_C0000016262 04-12-2023

5422349094000

notified of an overpayment in the amount of $116,450.65 by the Unified Program Integrity Contractor (UPIC), in a letter dated November 10, 2022. Review indicates that the services billed to Medicare by Advanced Dermatology PA did not meet Medicare coverage requirements. The primary findings on this review were:

- The documentation sent did not support the services were reasonable and necessary.
- The documentation sent did not support the services were rendered as billed.
- The documentation sent supported the services were related to non-covered/denied primary services.

WPS issued four overpayment demand letters to Advanced Dermatology PA with instructions to submit an appeal or make a refund. At this time, the overpayment has not been satisfied.

WPS received a redetermination request on December 15, 2022. The redetermination request alleges that this overpayment was assessed in error. An appointment of representative form, literature for allografts, procedure code(s) information, copies of the patient's insurance cards and identification cards, intake forms, visit notes, pathology reports, a copy of letters from CoventBridge, the UPIC, literature for wound care, a copy of retired Local Coverage Determination (LCD) L345693, literature for Mohs defect repair, a copy of a medical policy from Blue Cross Blue Shield for amniotic membrane and amniotic fluid, package insert for EpiFix, and copies of the overpayment letters were submitted with the redetermination request.

The overpayment is a result of findings identified from claims reviewed by the UPIC and communicated in the letter dated November 10, 2022. A summary of the overpayment demand letters and amount of each overpayment is listed in the following table. The difference in the overpayment amounts is due to a claim for REDACTED for date(s) of service February 12, 2022, reprocessed and applied part of the payment to the Medicare Part B 2022 deductible.

| Date of Overpayment Letter | Overpayment Letter Number | Amount of Overpayment | Type of Overpayment |
|---|---|---|---|
| November 21, 2022 | 31377512 | $46,834.65 | Specific Claims |
| November 21, 2022 | 31378432 | $41,354.99 | Specific Claims |
| November 23, 2022 | 31448324 | $6,365.64 | Specific Claims |
| November 23, 2022 | 31448423 | $21,954.83 | Specific Claims |
| | Total | $116,510.11 | |

DECISION

The result of this redetermination is that these claims are not covered by Medicare. It has also been determined that the overpayment of $116,510.11 is valid.

EXPLANATION OF THE DECISION

This redetermination decision has been rendered based upon the review of the documentation by our medical staff.

2

009558 .C2C NIAR_C0000016262 04-12-2023

5422349094000

You requested a redetermination for beneficiary claims representing a total of 131 lines of wound care services. The billed services include the following Healthcare Common Procedure Coding System (HCPCS) and Current Procedural Terminology (CPT) codes:

HCPCS code J0696- injection, ceftriaxone, sodium, per 250 milligrams (mg)

HCPCS code Q4169- artacent wound, per sq cm

HCPCS code Q4186- epifix, per sq cm

CPT code 15271- application of skin substitutes graft to wound of trunk, arms or legs, 25.0 sq cm of less of wound 100 sq cm or less

CPT code 15272- application of skin substitutes graft to wound of trunk, arms or legs, 25.0 sq cm of less of wound 100 sq cm or less, each additional 25.0 sq cm wound surface area, or part thereof

CPT code 15275- application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

CPT code 15276- application of skim substitutes graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; each additional sq cm wound surface area, or part thereof

CPT code 97608- therapy procedure using special bandage, vacuum pump and disposable medical equipment, surface area more than 50.0 sq cm

CPT code 99212- established patient office or other outpatient visit, 10-19 minutes

The submitted records were reviewed in order to ascertain if the services set forth in the claims were medically reasonable and necessary, and met all other pertinent Medicare payment requirements. We considered the documentation contained in the case files received from the CoventBridge Group (f/k/a Advanced Med) Medical Review Department as well as the records submitted with your redetermination.

Please see the enclosed WPS Redetermination Form detailing the individual decisions. The redetermination decisions can be found in the column titled "WPS Redetermination Outcome." Please refer to the legend located at the bottom of the form. Further details of the decisions will be explained throughout this section.

The determination of medical necessity for the service(s) in question is an essential element in determining whether payment for services was appropriate. While at no time does Medicare tell providers how to practice medicine, it does establish guidelines stating that medical necessity must be documented in the medical record in order for a service to be reimbursed.

3

009559 C2C NIAR_C0000016262 04-12-2023

5422349094000

The Regional Office of the Centers for Medicare and Medicaid Services (CMS) and this
Medicare Part B Carrier have agreed upon the following definition of medical necessity:

*A service, treatment, procedure, equipment, drug, device or supply provided by a hospital,
physician, or other health care provider that is required to identify or treat a beneficiary's
illness or injury and which is, as determined by the contractor: (a) consistent with the
symptom(s) or diagnosis and treatment of the beneficiary's illness or injury; (b) appropriate
under the standards of acceptable medical practice to treat that illness or injury; (c) not solely
for the convenience of the participant, physician, hospital, or other health care provider; and,
(d) the most appropriate service, treatment, procedure, equipment, drug, device or supply which
can be safely provided to the beneficiary and accomplishes the desired end result in the most
economical manner.*

Title XVIII of the Social Security Act section 1862 (a)(1)(A) states no Medicare payment shall be made
for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or
injury or to improve the functioning of a malformed body member.

Title XVIII of the Social Security Act section 1833 (e) addresses documentation and states: No payment
shall be made to any provider of services or other person under this part unless there has been furnished
such information as may be necessary in order to determine the amounts due such provider.

As published in the CMS IOM Publication 100-8, Section 13.5.1, in order to be covered under
Medicare, a service shall be reasonable and necessary. The service provided should have an appropriate
duration and frequency in terms of whether it is:

1. Furnished in accordance with accepted standards of medical practice for the diagnosis or
   treatment of the patient's condition or to improve the function of a malformed body member.
2. Furnished in a setting appropriate to the patient's medical needs and condition.
3. Ordered and furnished by qualified personnel.
4. One that meets but does not exceed, the patient's medical needs and at least as beneficial as an
   existing and available medically appropriate alternative.

The determination of medical necessity for the service(s) in question is an essential element in
determining whether payment for services was appropriate. While at no time does Medicare tell
providers how to practice medicine, it does establish guidelines stating that medical necessity
must be documented in the medical record in order for a service to be reimbursed.

The Code of Federal Regulations, Title 42 - Public Health, Volume 3, Part 424, Section 424.5(6) Basic
Conditions – Sufficient Information requires that the documentation must be sufficient to support the
services billed.

General principles of medical record documentation include:

1. The medical record should be complete and legible.

4

5422349094000

2. The documentation of each patient encounter should include:
   - Reason for encounter and relevant history. physical examination findings, and pertinent diagnostic test results;
   - Assessment, clinical impression, or diagnosis;
   - Plan for care; and
   - Date and legible identity of the observer.
3. If not documented, the rational for ordering diagnostic and other ancillary services should be easily inferred.
4. Past and present diagnoses should be accessible to the treating and/or consulting physician.
5. Appropriate health risk factors should be identified.
6. The patient's progress, response to and changes in treatment, and revision of diagnosis should be documented.
7. The CPT and International Classification of Diseases, 10th Revision, Clinical Modification (ICD-10-CM) codes reported on the health insurance claim form should be supported by the documentation in the medical record.

**Finding No. 1: Submitted documentation failed to support that the billed services were reasonable and necessary, ordered as billed and rendered as billed.**

This decision was made in accordance with Title XVIII of Social Security Act, Section 1862 (a)(1)(A). Medicare coverage and payment are only allowed for those services that are considered medically reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Records were submitted for review. The documentation supported the services were provided as billed. However, the records did support off label-use and did not contain medical literature to support the medical necessity of the services billed. The documentation did not support the services were medically reasonable and necessary.

Of the 131 lines of service reviewed, 18 lines of service of Q4169 and 39 lines of service of Q4186 have been denied as the submitted medical records did not meet guidelines requirements to demonstrate the medical necessity of the services. Therefore, payment cannot be made. These decisions have been given the designation: **F1 (Finding 1 - Documentation failed to support the billed services were medically reasonable and necessary)** on the attached spreadsheet.

**Finding No. 2: Documentation did not support the E & M services were a separate service from the procedures billed.**

The E & M services were billed with modifier 25, indicating a significant, separately identifiable E & M service by the same physician or other qualified health care professional on the same day of a procedure or other service. The documentation did not support the E & M services were for a significant and separately identifiable reason from the procedures that were billed on the same dates of service.

5

009561 C2C NIAR_C0000016262 04-12-2023

5422349094000

Of the 131 lines of service reviewed, four lines of service of 99212, have been denied as the documentation did not support the E & M services were a separate service from the procedure billed. Therefore, payment cannot be made. These decisions have been given the designation: **F2 (Finding 2 – Documentation did not support the E & M services were a separate service from the procedures billed)** on the attached spreadsheet.

**Finding 3: The submitted documentation does not support the services were rendered and medical necessity for the billed service.**

According to the Wisconsin Physicians Association, LCD L37228, Wound Care, requires that for wound care to be considered reasonable and necessary the provider must support the beneficiary is eligible for a defined Medicare benefit category, be reasonable and necessary and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member and meet all other applicable Medicare statutory and regulatory requirements

The documentation supported the patient was seen for follow up of wound services. The documentation did not support the patient starting a wound vacuum as part of the plan of care. The documentation did not support a reason for the wound vacuum application, nor was there documentation of the examination of the wound on the date of service billed. Therefore, the service remains denied.

Of the 131 lines of services reviewed, one line of service has been denied with the CPT code of 97608, as the documentation did not support Medicare guidelines were met for coverage. Therefore, payment cannot be made. These decisions have been given the designation: **F3 (Finding 3 – Documentation did not support the services were rendered and medically reasonable and necessary)** on the attached spreadsheet.

**Finding No. 4: Submitted documentation failed to support the billed services were rendered and reasonable and necessary.**

The services were billed in conjunction with other services that were determined not to be medically reasonable and necessary. The documentation did not support the services were provided for any other reason than the administration of the services as no explanation was given for the therapeutic options.

Of the 131 lines of service reviewed, one line of service billed with HCPCS code J0696, eight lines of services billed with CPT code 15271, one line of service billed with CPT code 15272, 52 lines of service billed with CPT code 15275 and seven lines of service billed with CPT code 15276, have been denied as they were billed in conjunction with services that were denied as not medically reasonable and necessary. Therefore, payment cannot be made. These decisions have been given the designation: **F4 (Finding 4 - Services were billed in conjunction with services that were denied as not medically reasonable and necessary)** on the attached spreadsheet.

Conclusion

In summary, the findings are as follows:

- The documentation did not support the services were medically reasonable and necessary

6

5422349094000

- The documentation did not support the services were a separate service from the procedures billed

- The documentation did not support the medical necessity for the billed wound care services

- The services were billed in conjunction with services that were denied as not medically reasonable and necessary

This redetermination decision was based on the following references:

- The Social Security Act which is available at https://www.ssa.gov
  Section 1862 (a)(1)(A)
  Section 1833 (e)

- The Code of Federal Regulations, Title 42 – Public Health, Volume 3, Part 424, Section 424.5(6)
  Basic Conditions

- The Centers for Medicare & Medicaid (CMS) Internet Only Manual (IOM) which is available at https://www.cms.gov

- The Code of Federal Regulations, Title 21 – Food and Drugs, Volume 8, Part 1271, Section 10
  Human Cells, Tissues and Cellular and Tissue-Based Products
  Publication 100-2, Medicare Benefit Policy Manual, Chapter 16, Section 20
  Publication 100-8, Medicare Program Integrity Manual, Chapter 4, Section 4.3

- Wisconsin Physicians Service Local Coverage Determination: Billing and Coding: Wound Care (L37228), Located on the Internet at www.cms.gov/medicare-coverage-database

- Current Procedural Terminology (CPT) Manual, Professional Editions 2022

- Healthcare Common Procedure Coding System (HCPCS) Manual 2022

If you do not have access to the internet or CPT/HCPCS manuals, you may request a copy of the references used by calling us toll free at 1-866-518-3285.

WHO IS RESPONSIBLE FOR THIS BILL?

The appeal decisions reflect that Advanced Dermatology PA is responsible for services determined to be not covered by Medicare. We have determined that Advanced Dermatology PA is responsible for the overpayment of those services that are not covered by Medicare. The overpayment letters you have received instruct you on the process for refund. If you have not already sent the refund and the money owed is not refunded timely, interest will be applied.

We have also determined under Section 1870 of the Social Security Act that Advanced Dermatology PA

7

009563 C2C NIAR_C0000016262 04-12-2023

5422349094000

is not without fault in regards to this overpayment. We have determined that you are liable because you were informed about Medicare coverage and billing guidelines through the references noted in the "Explanation of Decision" section of this letter. Therefore, Advanced Dermatology PA was aware of correct billing and coverage criteria for the service(s) billed.

WHAT TO INCLUDE IN YOUR REQUEST FOR AN INDEPENDENT APPEAL

Please submit the following documents with your request for an appeal: additional medical documentation which supports the services billed and the medical necessity of those services as described above. You may submit any documentation pertinent to these services and/or any information not provided thus far that you believe Medicare needs to make another decision about these claims.

NOTE: (Medicare physicians, providers, and suppliers ONLY) Any additional evidence as indicated in this section should be submitted with the request for reconsideration. All evidence must be presented before the reconsideration decision is issued. If all additional evidence as indicated above and/or otherwise is not submitted prior to issuance of the reconsideration decision, you will not be able to submit any new evidence to the administrative law judge or the Medicare Appeals Council unless you can demonstrate good cause for withholding the evidence from the qualified independent contractor.

NOTE: You do not need to resubmit documentation that was submitted as part of the redetermination. This information will be forwarded to the QIC as part of the case file utilized in the reconsideration process.

Sincerely,


Dawn Bailey
Redetermination Representative
Wisconsin Physicians Service

Enclosure

8

000564 ·C2C NIAR_C0000016262 04-12-2023

5422349094000

## IMPORTANT INFORMATION ABOUT YOUR APPEAL RIGHTS

**Your Right to Appeal this Decision:** If you do not agree with this decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claim so far. The next level of appeal is called reconsideration. A reconsideration is a new and impartial review performed by a qualified independent contractor (QIC), separate and independent of Wisconsin Physicians Service.

**How to Appeal:** To exercise your right to an appeal, you must file a request in writing. Your request must be received by the QIC at the address below within 180 days of receiving this decision. You are presumed to have received this decision five days after the date of the letter unless there is evidence to show otherwise. If you are unable to file your appeal request timely, please explain why you could not meet the filing deadline. ·You may request an appeal·by using the form enclosed with this·letter.- ----

If you do not use this form, you can write a letter. You must include: your name, your signature, the name of the beneficiary, the Medicare number, a list of the service(s) or item(s) that you are appealing and the date(s) of service, and any evidence you wish to attach. You must also indicate that Wisconsin Physicians Service made the redetermination. You may also attach supporting materials, such as those listed in item 10 of the enclosed Reconsideration Request Form, or other information that explains why this service should be paid. Your doctor may be able to provide supporting materials.

If you want to file an appeal, send your request to:

> C2C Innovative Solutions, Inc. - QIC Part B North
> P O Box 45208
> Jacksonville, FL 32232-5208

**Who May File an Appeal:** You or someone you name to act for you (your appointed representative) may file an appeal. You can name a relative, friend, advocate, attorney, doctor, or someone else to act for you.

If you want someone to act for you, you may visit https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1696.pdf to download the "Appointment of Representative" form, which may be used to appoint a representative. Medicare does not require that you use this form to appoint a representative. Alternately, you may submit a written statement containing the same information indicated on the form. If you are a Medicare beneficiary, you may also call 1-800-MEDICARE (1-800-633-4227) to learn more about how to name a representative.

000565 ·C2C NIAR_C0000016262 04-12-2023

5422349094000

**Other Important Information:** If you want copies of statutes, regulations. policies, and/or manual instructions CMS used to arrive at this decision, or if you have any questions specifically related to your appeal, please write to us at the following address and attach a copy of this letter:

> WPS Medicare Part B
> General Correspondence
> P.O. Box 7238
> Madison, WI 53707-7238

**Resources for Medicare Beneficiaries:** If you want help with an appeal, or if you have questions about Medicare, you can have a friend or someone else help you with your appeal. You can also contact your State health insurance assistance program (SHIP). You can find the phone number for your SHIP in your "Medicare & You" handbook, under the "Helpful Contacts" section of www.medicare.gov Web site, or by calling 1-800-MEDICARE (1-800-633-4227). Your SHIP can answer questions about payment denials and appeals.

For general questions about Medicare. you can call 1-800-MEDICARE (1-800-633-4227), TTY/TDD: 1-877-486-2048.

Remember that specific questions about your appeal should be directed to the contractor that is processing your appeal.

009566 ·C2C NIAR_C0000016262 04-12-2023

Redetermination/Appeals Number:
5422349094000

**Reconsideration Request Form**

**Directions:** If you wish to appeal this decision, please fill out the required information below and mail this form to the address shown below. At a minimum, you must complete/include information for items 1, 2a, 6, 7, 11, & 12, but to help us serve you better, please include a copy of the redetermination notice with your request.

C2C Solutions - QIC Part B North
P O Box 45208
Jacksonville, FL 32232-5208

1.    Name of Beneficiary: _____

2a.   Medicare Number: _____

2b.   Claim Number (ICN / DCN, if available): _____

3.    Provider Name: _____

4.    Person Appealing: ☐Beneficiary    ☐Provider of Service    ☐Representative

5.    Address of the Person Appealing: _____

5a.   Telephone Number of the Person Appealing: _____

5b.   Email Address of the Person Appealing: _____

6.    Item or service you wish to appeal: _____

7.    Date of the service:   From _____   To _____

8.    Does this appeal involve an overpayment?   ☐Yes ☐No
      *Please include a copy of the demand letter (*if applicable*) with your request.

9.    Why do you disagree? Or what are your reasons for your appeal? (Attach additional pages, if necessary.) _____
      _____

10.   You may also include any supporting material to assist your appeal. Examples of supporting materials include:
      ☐ Medical Records   ☐ Office Records/Progress Notes
      ☐ Copy of the Claim ☐Treatment Plan    ☐ Certificate of Medical Necessity

11.   Name of Person Appealing: _____

12.   Signature of Person Appealing: _____ Date:_____

Contractor Number: 05202

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 57-62

020573 C2C NIAR_C0000016262 04-12-2023

Department of Health and Human Services
Centers for Medicare & Medicaid Services

Form Approved OMB No.0938-0950

## Appointment of Representative

| Name of Party | Medicare Number (beneficiary as party) or National Provider Identifier (provider or supplier as party) |
|---|---|
| Advanced Dermatology and Skin Cancer Center, P.A. | 1124094867 |

## Section 1: Appointment of Representative

**To be completed by the party seeking representation (i.e., the Medicare beneficiary, the provider or the supplier):**

I appoint this individual, Amanda M. Wilwert _____, to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the Act) and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my claim, appeal, grievance or request wholly in my stead. I understand that personal medical information related to my request may be disclosed to the representative indicated below.

| Signature of Party Seeking Representation | Date 04/27/2022 |
|---|---|
| Street Address 2735 Pembrook Pl | Phone Number (with Area Code) (785)537-4990 |
| City Manhattan | State KS | Zip Code 66502 |
| Email Address (optional) | | |

## Section 2: Acceptance of Appointment

**To be completed by the representative:**

I, Amanda M. Wilwert _____, hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services (HHS); that I am not, as a current or former employee of the United States, disqualified from acting as the party's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.

I am a / an attorney with Foulston Siefkin LLP and the firm has been engaged to represent Advanced Dermatology and Skin Cancer Center P.A  in the appeals process _____

*(Professional status or relationship to the party, e.g. attorney, relative, etc.)*

| Signature of Representative | Date 5/3/22 |
|---|---|
| Street Address 7500 College Blvd Ste. 1400 | Phone Number (with Area Code) 913-253-2181 |
| City Overland Park | State KS | Zip Code 66210 |
| Email Address (optional) awilwert@foulston.com | | |

## Section 3: Waiver of Fee for Representation

**Instructions: This section must be completed if the representative is required to, or chooses to, waive their fee for representation.** (Note that providers or suppliers that are representing a beneficiary and furnished the items or services may not charge a fee for representation and **must** complete this section.)

I waive my right to charge and collect a fee for representing _____ before the Secretary of HHS.

| Signature | Date |
|---|---|
| | |

## Section 4: Waiver of Payment for Items or Services at Issue

**Instructions: Providers or suppliers serving as a representative for a beneficiary to whom they provided items or services must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act.** (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, or could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.) I waive my right to collect payment from the beneficiary for the items or services at issue in this appeal if a determination of liability under §1879(a)(2) of the Act is at issue.

| Signature | Date |
|---|---|
| | |

File 11 PDF - Page 29 of 38

000514 C2C NIAR_C0000016262 04-12-2023

## Charging of Fees for Representing Beneficiaries before the Secretary of HHS

An attorney, or other representative for a beneficiary, who wishes to charge a fee for services rendered in connection with an appeal before the Secretary of HHS (i.e., an Administrative Law Judge (ALJ) hearing or attorney adjudicator review by the Office of Medicare Hearings and Appeals (OMHA), Medicare Appeals Council review, or a proceeding before OMHA or the Medicare Appeals Council as a result of a remand from federal district court) is required to obtain approval of the fee in accordance with 42 CFR 405.910(f).

The form, "Petition to Obtain Representative Fee" elicits the information required for a fee petition. It should be completed by the representative and filed with the request for ALJ hearing, OMHA review, or request for Medicare Appeals Council review. Approval of a representative's fee is not required if: (1) the appellant being represented is a provider or supplier; (2) the fee is for services rendered in an official capacity such as that of legal guardian, committee, or similar court appointed representative and the court has approved the fee in question; (3) the fee is for representation of a beneficiary in a proceeding in federal district court; or (4) the fee is for representation of a beneficiary in a redetermination or reconsideration. If the representative wishes to waive a fee, he or she may do so. Section III on the front of this form can be used for that purpose. In some instances, as indicated on the form, the fee **must** be waived for representation

## Approval of Fee

The requirement for the approval of fees ensures that a representative will receive fair value for the services performed before HHS on behalf of a beneficiary, and provides the beneficiary with a measure of security that the fees are determined to be reasonable. In approving a requested fee, OMHA or Medicare Appeals Council will consider the nature and type of services rendered, the complexity of the case, the level of skill and competence required in rendition of the services, the amount of time spent on the case, the results achieved, the level of administrative review to which the representative carried the appeal and the amount of the fee requested by the representative.

## Conflict of Interest

Sections 203, 205 and 207 of Title XVIII of the United States Code make it a criminal offense for certain officers, employees and former officers and employees of the United States to render certain services in matters affecting the Government or to aid or assist in the prosecution of claims against the United States. Individuals with a conflict of interest are excluded from being representatives of beneficiaries before HHS.

## Where to Send This Form

Send this form to the same location where you are sending (or have already sent) your: appeal if you are filing an appeal, grievance or complaint if you are filing a grievance or complaint, or an initial determination or decision if you are requesting an initial determination or decision. If additional help is needed, contact 1-800-MEDICARE (1-800-633-4227) or your Medicare plan. TTY users please call 1-877-486-2048.

You have the right to get Medicare information in an accessible format, like large print, Braille, or audio. You also have the right to file a complaint if you believe you've been discriminated against. Visit https://www.cms.gov/about-cms/agency-Information/aboutwebsite/cmsnondiscriminationnotice.html, or call 1-800-MEDICARE (1-800-633-4227) for more information.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0950  The time required to prepare and distribute this collection is 15 minutes per notice, including the time to select the preprinted form, complete it and deliver it to the beneficiary. If you have comments concerning the accuracy of the time estimates or suggestions for improving this form, please write to CMS, PRA Clearance Officer, 7500 Security Boulevard, Baltimore, Maryland  21244-1850.

Form CMS-1696 (Rev 08/18)

`000575 C2C NIAR_C0000016262 04-12-2023`

Redetermination/Appeals Number:
5422349094000

**Reconsideration Request Form**

**Directions**: If you wish to appeal this decision, please fill out the required information below and mail this form to the address shown below. At a minimum, you must complete/include information for items 1, 2a, 6, 7, 11, & 12, but to help us serve you better, please include a copy of the redetermination notice with your request.

C2C Solutions - QIC Part B North
P O Box 45208
Jacksonville, FL 32232-5208

1.   Name of Beneficiary: __Multiple see attached list__

2a.  Medicare Number: __Multiple see attached list__

2b.  Claim Number (ICN / DCN, if available): __Multiple see attached list__

3.   Provider Name: __Advanced Dermatology and Skin Cancer Center__

4.   Person Appealing: ☐Beneficiary    ☐Provider of Service    ☒Representative of Provider of Service

5.   Address of the Person Appealing: __7500 College Boulevard, Suite 1400, Overland Park, KS 66210__

5a.  Telephone Number of the Person Appealing: __913-253-2181__

5b.  Email Address of the Person Appealing: __awilwert@foulston.com__

6.   Item or service you wish to appeal: __All items and services as outlined in the 02/06/2023 unfavorable decision__

7.   Date of the service:   From __01/21/2022__    To __05/23/2022__

8.   Does this appeal involve an overpayment?   ☒Yes ☐No
     *Please include a copy of the demand letter (*if applicable*) with your request.

9.   Why do you disagree? Or what are your reasons for your appeal? (Attach additional pages, if necessary.) __Please see attached cover letter and supporting documents__

10.  You may also include any supporting material to assist your appeal. Examples of supporting materials include:
     ☒ Medical Records   ☒ Office Records/Progress Notes
     ☐ Copy of the Claim ☒Treatment Plan    ☐ Certificate of Medical Necessity

11.  Name of Person Appealing: __Amanda M. Wilwert__

12.  Signature of Person Appealing: __Amanda M Wilwert__    Date: __4/6/23__

Contractor Number:  05202

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 66-71

PRESS FIRMLY TO SEAL   PRESS FIRMLY T

THUMB DRIVE Enclosed



## UNITED STATES POSTAL SERVICE ®   |   PRIORIT MAIL

- Expected delivery date specified for domestic use.
- Domestic shipments include $100 of insurance (restrictions apply).*
- USPS Tracking® service included for domestic and many international dest
- Limited international insurance.**
- When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.

** See International Mail Manual at http://pe.usps.com for availability and limitations of coverage

## FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

RECEIVED
APR 11 2023
C2C MAILROOM
QA# MR110

## TRACKED ■ INSURED



To schedule free Package Pickup scan the QR code.



PS00001000014

EP14F July 2022
OD: 12 1/2 x 9 1/2



USPS.COM/PICKUP

---

STATES POSTAL SERVICE    **Click-N-Ship®**

E   usps.com      9470 1036 9930 0071 2328 31 0287 5000 0053 2232
    $28.75
    US POSTAGE     **U.S. POSTAGE PAID**
    Flat Rate Env

    04/07/2023      Mailed from 66210    986760645113157

### PRIORITY MAIL EXPRESS 1-DAY®

AMANDA WILWERT                  Scheduled Delivery Date 04/08/23
FOULSTON SIEFKIN                Ref# 5422359094
STE 1400                                    **0007**
7500 COLLEGE BLVD
OVERLAND PARK KS 66210-4041

                                           **B099**

WAIVER OF SIGNATURE

SCHEDULED DELIVERY 6:00 PM

 C2C INNOVATIVE SOLUTIONS, INC.
QIC PART B NORTH
PO BOX 45208
JACKSONVILLE FL 32232-5208

### USPS TRACKING #



9470 1036 9930 0071 2328 31



<table>
<tr><td>

**Medicare Appeal
Number:
1-12683356911**

</td></tr>
</table>

JUNE 9, 2023

ADVANCED DERMATOLOGY AND SKIN
CENTER PA
2735 PEMBROOK PL
MANHATTAN KS 66502-7482

**Medicare Reconsideration Decision**

RE:

       BENEFICIARIES: SEE ATTACHED LIST
       MED ID#: SEE ATTACHED LIST
       APPELLANT: ADVANCED DERMATOLOGY AND SKIN
       CANCER CENTER, PA

Dear Advanced Dermatology and Skin Cancer Center:

This letter is to inform you of the decision on your Medicare appeal. An appeal is a new and independent review of a claim. You are receiving this letter because you requested an appeal for the services shown under the *Analysis* section.

The appeal decision is UNFAVORABLE. The Qualified Independent Contractor's (QIC's) decision is that Medicare will make no additional payment. More information on the decision is provided on the next pages. You are not required to take any action. If you disagree with the decision, you may appeal to an Administrative Law Judge (ALJ). You must file your appeal, in writing, within 60 days of receipt of this letter. For more information on how to appeal, see the page entitled "Important Information About Your Appeal Rights." The amount still in dispute is estimated to be equal to or over $180. However, the ALJ will determine if your appeal case meets the $180 amount in controversy requirement for an ALJ hearing.

If this appeal is partially favorable or unfavorable, and it originated from an overpayment, the Medicare Administrative Contractor (MAC) is responsible for processing this determination in accordance with standard Medicare methodologies. Any outstanding debts, prior coverage, and prior

---

**Contact
Information**

If you have questions, write or call:

*C2C Innovative
Solutions, Inc.*
Medicare Part B
North
QIC Contractor
P.O. Box 45258
Jacksonville, FL
32232-5258

*Telephone:*
904-224-7426

Who we are:
We are a Qualified Independent Contractor (QIC). Medicare has contracted with us to review your file and make an independent decision.

reimbursement will be taken into account when processing this decision. The MAC will issue a demand letter containing information regarding the collection process, interest accrual, and requesting an extended repayment schedule (ERS).

A copy of this letter was also sent to the parties shown below. C2C Innovative Solutions, Inc. (C2C) was contracted by Medicare to review your appeal.

Sincerely,

*R. S. Marcus M.D*

R. S. Marcus, M.D.
Medical Director

CC:     Wisconsin Physician Service Insurance Corporation
        Foulson, Attorneys at Law

## Summary of Facts

Artacent and Epifix products and their related applications, as well as evaluation and management (E/M) services were provided by Advanced Dermatology and Skin Cancer Center, PA from January 21, 2022, through May 23, 2022. The appellant submitted claims for these services to Wisconsin Physician Service Insurance Corporation (WPS), the Medicare Administrative Contractor (MAC). The MAC initially paid the claims in full. Subsequently, CoventBridge Group, the Unified Program Integrity Contractor (UPIC), then conducted a post-payment review.

On July 8, 2022, the UPIC sent the appellant a request for medical records needed to conduct a post-payment review of claims. A second request for medical records was sent to the appellant on August 8, 2022. The UPIC's review was prompted by data analysis which suggested your practice improperly billed Medicare for services. Specifically, the UPIC reviewed a 55-claim sample involving 163 services. The UPIC denied the services for the following reasons:

- The services were not reasonable and necessary:
    - o  The services were not used in a homologous fashion;
    - o  The provider did not apply a true graft;
    - o  The provider billed and used larger sized products than necessary;
    - o  Cloned documentation;
- The services were not rendered as billed; and/or,
- The services were related to non-covered/denied primary services.

Using that sample of claims, the UPIC discovered an overpayment amount of $116,450.65. The appellant was notified of the total overpayment amount on November 10, 2022.

From November 21, 2022, through November 23, 2022, the MAC issued overpayment notification letters (demand letters) to the appellant.

On December 13, 2022, A. M. Wilwert, Esq., of Foulston, Attorneys at Law (also referred to as appellant) submitted a redetermination request to the MAC. The MAC issued a redetermination decision on February 6, 2023, which upheld the overpayment determination. Specifically, the MAC denied the services for the following reasons:

- The documentation failed to support the services were not reasonable and necessary, ordered as billed and rendered as billed; and/or,
- The documentation did not support the E/M services were a separate service from the procedures billed.

On April 11, 2023, C2C Innovative Solutions, Inc. (C2C), the Qualified Independent Contractor (QIC), received a reconsideration request dated April 7, 2023, for eight units of Current Procedural Terminology (CPT) code 15271; one unit of CPT code 15272; 52 units of CPT code 15275; seven units of CPT code 15276; one unit of CPT code 97608; four units of CPT code 99212; one unit of Healthcare Common Procedure Coding System (HCPCS) code J0696; 120 units of HCPCS code Q4169; and 572 units of HCPCS code Q4186. An Appointment of Representative form dated May 3, 2022, was submitted with the reconsideration request.

3

The QIC review is a *de novo* review of the case based on the information provided from all prior levels of review and the appellant. The responsibilities of the QIC include rendering a decision only on the coverage or payment issues raised by the review request and the QIC's scope of review.

Key records contained in the case file included:
- Appointment of Representative Form dated May 3, 2022
- Reconsideration Request dated April 7, 2023
- MAC Redetermination Decision Letter dated February 6, 2023
- Redetermination Request dated December 13, 2022
- MAC Overpayment Notification Letters dated November 21, 2022, through November 23, 2022
- UPIC Post-payment Review Results and Overpayment Determination dated November 10, 2022
- UPIC Request for Medical Records dated July 8, 2022, and August 8, 2022
- Medical Records

---

**Decision**

---

A panel of licensed health care professionals, including a physician, reviewed the documentation in this case and made these decisions.

The decision on your appeal is shown in the table (*Conclusion* section) below.

We have determined the provider is responsible for the denied charges.

---

**Explanation of the Decision**

---

**Laws, Regulations, and Applicable Policies**

The QIC performs reconsideration review in accordance with Medicare rules and regulations. The laws, regulations, and policies pertaining to this case are identified below. Findings and the decision rendered will follow in the QIC's *Claim Review* section.

**Medical Necessity**

Medicare provides coverage for items and services that are reasonable and necessary to diagnose or treat an illness or injury or to improve a malformed body member. Payment is excluded if the medical necessity for the service cannot be substantiated. [Section 1862(a)(1)(A) of the Social Security Act (the Act) and the Centers for Medicare & Medicaid Services (CMS) Internet-Only Manual (IOM), Publication (Pub.) 100-02, Medicare Benefit Policy Manual (MBPM), Chapter 16, Section 20]

**Documentation Requirements**

4

Medicare guidelines place the burden upon the provider to furnish information that may be necessary to determine if payment is due. The service rendered to the patient must be documented in a clear and understandable fashion. The information must be clearly displayed in the medical records. [Section 1833(e) of the Act and Title 42 Code of Federal Regulations (42 CFR) Section 424.5(a)(6)]

**Scope of Review**

QICs generally have discretion while conducting appeals to develop new issues and review all aspects of coverage and payment related to a claim or claim line. However, for reconsiderations of claims denied following a complex pre-payment review, a complex post-payment review or an automated post-payment review by a contractor, QICs are required to limit their review to the reason(s) the claim or line item at issue was initially denied.

If a QIC conducts a reconsideration where the line item or claim was denied on pre or post-payment review for lack of documentation, the QIC will review all applicable coverage and payment requirements for the item or service at issue, including whether the item or service was medically reasonable and necessary. This limitation on scope of review is effective for all reconsideration requests received on or after April 18, 2016. [Medicare Learning Network (MLN) Matters Number SE 1521]

**Human Cellular and Tissue based Products (HCT/Ps)**

<u>Are my HCT/Ps regulated solely under Section 361 of the Public Health Service (PHS) Act and the regulations in this part, and if so what must I do?</u>
(a) An HCT/P is regulated solely under Section 361 of the PHS Act and the regulations in this part if it meets all of the following criteria:
(1) The HCT/P is minimally manipulated;
(2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
(3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
(4) Either:
(i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
(ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
(a) Is for autologous use;
(b) Is for allogeneic use in a first-degree or second-degree blood relative; or
(c) Is for reproductive use. [Title 21 CFR Section 1271.10]

<u>How does the Food and Drug Administration (FDA) define important terms in this part?</u>

(a) Autologous use means the implantation, transplantation, infusion, or transfer of human cells or tissue back into the individual from whom the cells or tissue were recovered.

5

(c) Homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor.

(d) HCT/Ps means articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient. [21 CFR Section 1271.3]

FDA acceptance of an establishment registration and HCT/P listing form does not constitute a determination that an establishment is in compliance with applicable rules and regulations or that the HCT/P is licensed or approved by FDA. [21 CFR Part 1271.27(b)]

**Particular Services Excluded from Coverage**

The following services are excluded from coverage: Any services that are not reasonable and necessary for one of the following purposes: For the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. [42 CFR Section 411.15(k)(1)]

**Related Services**

Medical and hospital services are sometimes required to treat a condition that arises as a result of services that are not covered because they are determined to be not reasonable and necessary or because they are excluded from coverage for other reasons. Services "related to" non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services "not related to" non-covered services are covered under Medicare. [CMS IOM, Pub. 100-02, MBPM, Chapter 16, Section 180]

**CPT Modifier "-25" - Significant E/M Service by Same Physician on Date of Global Procedure**

Medicare requires that CPT modifier -25 should only be used on claims for E/M services, and only when these services are provided by the same physician (or same qualified nonphysician practitioner [NPP]) to the same patient on the same day as another procedure or other service. A/B MACs (B) pay for an E/M service provided on the day of a procedure with a global fee period if the physician indicates that the service is for a significant, separately identifiable E/M service that is above and beyond the usual pre- and post-operative work of the procedure. Different diagnoses are not required for reporting the E/M service on the same date as the procedure or other service. Modifier "-25" is added to the E/M code on the claim. Both the medically necessary E/M service and the procedure must be appropriately and sufficiently documented by the physician or qualified NPP in the patient's medical record to support the claim for these services, even though the documentation is not required to be submitted with the claim. [CMS IOM, Pub. 100-04, Medicare Claims Processing Manual (MCPM), Chapter 12, Section 30.6.6(B)]

**Reasonable and Necessary Criteria**

CMS issues national coverage determinations (NCDs) that specify whether certain items, services, procedures or technologies are reasonable and necessary under Section 1862(a)(l)(A) of the Act. In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no local coverage determination (LCD) exists for a particular item or

6

service, the MACs, Comprehensive Error Rate Testing (CERT), Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
    o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
    o Furnished in a setting appropriate to the beneficiary's medical needs and condition;
    o Ordered and furnished by qualified personnel; and,
    o One that meets, but does not exceed, the beneficiary's medical need.

There are several exceptions to the requirement that a service be reasonable and necessary for diagnosis or treatment of illness or injury in order to be considered for payment. The exceptions appear in the full text of Section 1862(a)(l)(A) of the Act. See also Medicare Program Integrity Manual (MPIM) Chapters 13, Section 5.1 and 7.1. [CMS IOM, Pub. 100-08, MPIM, Chapter 3, Section 3.6.2.2]

## Wound Care

<u>Negative Pressure Wound Therapy (NPWT)</u>

NPWT, utilizing either durable or disposable medical equipment, involves the application of controlled or intermittent negative pressure to a properly dressed wound cavity. Suction (negative pressure) is applied under airtight wound dressings to promote the healing of open wounds resistant to prior treatments. Coverage of traditional NPWT (tNPWT) device/unit/type, or supplies is under DME and providers should consult their DME LCD for specific coverage, parameters, and guidelines.

<u>Utilization Guidelines</u>

The number of debridements and NPWT for a wound within the context of a palliative treatment plan (i.e., when wounds are not expected to heal or when patients are in an end-of-life situation) would be expected to be of a limited frequency and duration consistent with that of palliative care.

The extent and number of services provided should be medically necessary and reasonable based on the documented medical evaluation of the patient's condition, diagnosis, and plan. [Local Coverage Determination (LCD) L37228]

## Overpayments

Overpayments are Medicare payments a provider or beneficiary has received in excess of amounts due and payable under the statute and regulations. Once a determination of an overpayment has been made, the amount is a debt owed by the debtor to the United States (U.S.) Government.

Under the Federal Claims Collection Act of 1966, as amended, each agency of the Federal Government (pursuant to regulations jointly promulgated by the Attorney General and the Comptroller General of the U.S.) must attempt collection of claims of the Federal Government for money arising out of the activities of the agency. The Fiscal Intermediary (FI) or carrier will not be liable for overpayments it

7

makes to debtors in the absence of fraud or gross negligence on its part, however once an intermediary or carrier determines an overpayment has been made it must attempt recovery of overpayments in accordance with CMS regulations.

The Federal Claims Collection Act requires timely and aggressive efforts to recover overpayments, including efforts to locate the debtor where necessary, demands for repayment, and establishment of repayment schedules, suspension of interim payments by intermediaries to institutional providers, and recoupment or setoff, where appropriate.

In addition, The Debt Collection Improvement Act of 1996 requires Federal agencies to refer eligible delinquent debt to a Treasury designated Debt Collection Center (DCC) for cross servicing and offset. CMS is mandated to refer all eligible debt over 180 days delinquent for cross servicing and offset. [CMS IOM, Pub. 100-06, Medicare Financial Management Manual (MFMM), Chapter 3, Section 10]

<u>**Analysis**</u>

The following services are at issue for reconsideration:

- **15271** Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 square centimeter (sq cm); first 25 sq cm or less wound surface area

- **15272** Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure)

- **15275** Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

- **15276** Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure)

- **97608** Negative pressure wound therapy, (e.g., vacuum assisted drainage collection), utilizing disposable, non-durable medical equipment including provision of exudate management collection system, topical application(s), wound assessment, and instructions for ongoing care, per session; total wound(s) surface area greater than 50 square centimeters

- **99212** Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and straightforward medical decision making. When using time for code selection, 10-19 minutes of total time is spent on the date of the encounter.

- **J0696** Injection, ceftriaxone sodium, per 250 mg

- **Q4169** Artacent wound, per sq cm

- **Q4186** Epifix, per sq cm

## Appellant Arguments and QIC Responses

Below are the points made by the appellant within the reconsideration appeal:

8

**Appellant Argument 1:** The claims were billed correctly in accordance with the applicable Medicare regulations, reasonable and necessary and appropriately documented. The appellant cites Local Coverage Article (LCA) A57477 to support the medical necessity of the grafts after Mohs surgery. In addition, the appellant states the package inserts for both the Artacent and MiMedx allographs used for the surgical repair indicate that an appropriate use is as a barrier for use in the treatment of acute and chronic wounds, providing a protective environment to support the healing process. Thus, the appellant was using allografts consistent with the use indicated on the labels. A peer review journal article and references to insurance company policies were included in the appellant rebuttal to support the necessity of the services.

> **The QIC's Response:** Medical necessity is an essential element in determining if payment for a service(s) is appropriate. Medicare has established guidelines which state that medical necessity must be documented in the medical record in order for a service to be reimbursed. The QIC review is a *de novo* review, within the scope of review requirements, of the case based on the provided information from all prior levels of review and the appellant. The responsibilities of the QIC include rendering a decision only on the coverage or payment issues raised by the review request and within the QIC's scope of review. Further information regarding the QIC's detailed review is located under the section titled *Claim Review.*
>
> In addition, LCA A57477 is not relevant to the services at issue in this appeal as Mohs surgeries (codes 17311 through 17315) are not part of the UPIC and MAC's denials and are not being appealed.

**Appellant Argument 2:** The UPIC's findings were based on articles and guidance documents that are not applicable to the services provided.

> **The QIC's Response:** The QIC finds that any flawed rationale used by the UPIC or MAC in the redetermination decision is cured by the QIC reconsideration.

**Claim Review**

The issue is whether payment can be made for the Artacent and Epifix products and their related applications, as well as the E/M services billed. The UPIC and MAC denied the services for the following reasons:
- The services were not reasonable and necessary:
  - The services were not used in a homologous fashion;
  - The provider did not apply a true graft;
  - The provider billed and used larger sized products than necessary;
  - Cloned documentation;
- The services were not rendered as billed; and/or,
- The services were related to non-covered/denied primary services

The QIC will provide a detailed reconsideration review by section below.

<u>Skin Substitute Allografts</u>

The 21 CFR Section 1271 states a HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent. Additionally, the FDA

9

provided regulatory considerations for HCT/Ps in July 2020. The FDA provided specific information regarding amniotic membranes. Example 19-4(b) and (c) of the FDA's regulatory considerations states, "An amniotic membrane product is used for wound healing and/or to reduce scarring and inflammation. This is not homologous use because wound healing and reduction of scarring and inflammation are not basic functions of amniotic membrane. An amniotic membrane product is applied to the surface of the eye to cover or offer protection from the surrounding environment in-ocular repair and reconstruction procedures. This is homologous use because serving as a covering and offering protection from the surrounding environment are basic functions of amniotic membrane." [*Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use*, U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download, accessed 07 June 2023]

The QIC has determined that the amniotic skin substitute allografts are denied as not medically reasonable and necessary under Section 1862(a)(1)(A) of the Act and the MPIM, Chapter 3, Section 3.6.2.2, as these products cannot be used for wound healing per the CFR and FDA. In every instance where EpiFix and Artacent were billed, the documentation contains the same entries which state, "Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amendable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repair associated with "true reconstruction" (flaps & grafts) of the Primary defect…Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated for repair and wound healing of the wound/defect in order to: avoid the risks, complications and trauma associated with incisional reconstruction; and optimize skin function and cosmesis; create a natural barrier with a skin substitute allograft, minimize scar tissue formation, minimize pain, minimize disfigurement and dysfunction associated with unwanted contraction; reduce the risk of infection and to decrease the time and demands which the patient is required to devote to wound care."

The provider is not utilizing the products in a homologous manner as outlined in the preceding paragraph. Specifically, the documentation supports that the amniotic skin substitute allografts are being utilized for wound healing which is not homologous use. In addition, the provider documents that EpiFix and Artacent were applied to post-Mohs wounds due to the size and nature of the wounds and stated that wounds were not amenable to primary side to side repair. It is noted that oftentimes, the provider billed for an excessive amount of the product for wounds measuring much less. For instance, for Internal Control Number (ICN) 2322320303170, the medical records support that the beneficiary presented for Mohs to remove a squamous cell cancer on the right superior crus of the antihelix. The post-operative measurements of the wound measured 1.0 cm x 0.9 cm (0.9sqcm) but four units of the allograft were utilized with no units discarded and no indication of stacking the product in the wound. Thus, the provider is utilizing an excessive amount of the product that exceeds the needs of the beneficiary. The provider also documents that the skin substitute allografts were the most appropriate choice. However, the documentation does not support why the acute wounds required an expensive dressing and why the product was medically necessary over dressings more commonly utilized after Mohs Micrographic Surgery (MMS). This can be seen for Internal Control Number (ICN) 2322320900366. As such, payment must remain denied. This decision has been made in accordance with Section 1862(a)(1)(A) of the Act, 21 CFR Section 1271.3; 42 CFR Section 411.15(k)(1); CMS IOM, Pub. 100-02, MBPM Chapter 16, Section 20 and the MPIM, Chapter 3, Section 3.6.2.2.

In addition, services "related to" non-covered services, including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. For CPT codes 15271 through 15275, the QIC has determined that the services must remain denied as they are related to non-covered/primary services. Moreover, the QIC notes that contrary to the UPIC and MAC's denials, the documentation did support that the services were rendered as billed. Specifically, application of skin substitute grafts, not biological dressings, were applied to wounds. However, the services must remain denied for the reasons stated previously in accordance with CMS IOM, Pub. 100-02, MBPM, Chapter 16, Section 180.

E/M Services

During the prior levels of review, both the UPIC and MAC denied the E/M services because the documentation did not support that a significant and separately identifiable E/M service was performed on the same day as procedure. Modifier "-25" should only be used for E/M services when the services if the physician indicates that the service is for a significant, separately identifiable E/M service that is above and beyond the usual pre- and post-operative work of the procedure.

In every instance, the documentation does not support that the E/M service billed was separate from the procedure(s) performed on the same day. This can be seen for ICN 2322320303150. As such, payment cannot be made in accordance with the MCPM, Chapter 12, Section 30.6.6(B).

NPWT

LCD L37228 contains coverage guidelines for wound care, including NPWT. The LCD states NPWT, utilizing either durable or disposable medical equipment, involves the application of controlled or intermittent negative pressure to a properly dressed wound cavity. Suction (negative pressure) is applied under airtight wound dressings to promote the healing of open wounds resistant to prior treatments. The extent and number of services provided should be medically necessary and reasonable based on the documented medical evaluation of the patient's condition, diagnosis, and plan.

The UPIC and MAC denied this service and stated that the documentation did not support that wound vacuum was part of a plan of care, the documentation did not support the reason for the wound vacuum application and the documentation lacked an examination of the wound on the date of service at issue. The QIC has reviewed the documentation and has determined that the service associated with ICN 3322320900392 must remain denied for not meeting these requirements. While the documentation supports that a vacuum assisted closure was initiated to a wound located on the right central frontal scalp, there is no indication that vacuum assisted closure was part of the plan, there is no examination of the wound and there is no documented reason to state why the wound vacuum was chosen. As such, in accordance with LCD L37228, payment must remain denied.

**Conclusion**

The decision of the QIC is unfavorable and finds the services do not meet the Medicare requirements for payment. After careful consideration, QIC finds an overpayment was made. The provider is responsible to return the overpaid amount.

11

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 84-88

## Who is Responsible for the Bill?

When services are denied as not medically reasonable and necessary under the Medicare program, the QIC must also determine if the provider or beneficiary is liable for payment. Section 1879(a)-(g) of the Act, also referred to as "the limitation on liability provision," spells out how to arrive at this decision.

Medicare regulations, 42 CFR Part 424, require providers to be familiar with Medicare rules and regulations. In addition, 42 CFR Section 411.406 provides criteria for determining when a provider is responsible for payment for the services considered not reasonable and necessary. This regulation states that providers are presumed to have knowledge of published Medicare coverage rules and regulations, CMS Rulings, Medicare coverage policies in WPS bulletins or websites, and acceptable standards within the local community. The QIC finds that Advanced Dermatology and Skin Cancer Center, PA is liable for the denied charges and found at fault in causing an overpayment for the denied services. The records do not support the beneficiaries were notified in advance that Medicare would likely deny payment for the service(s) at issue. The beneficiaries cannot be charged for these service(s). [Section 1870 of the Act]

## Other Important Information

If you appeal this decision the Administrative Law Judge (ALJ) will not consider new evidence unless you show good cause for not presenting the evidence to the QIC. This requirement does not apply to beneficiaries, unless a provider or supplier represents the beneficiary.

For information on how to appeal this decision, refer to the page titled "Important Information about Your Appeal Rights." If you need more information or have any questions, please call 1-800-Medicare (1-800-633-4227) [TTY/TDD: 1-800-486-2048] or the phone number listed on page one.

You can receive copies of statutes, regulations, policies, and/or manual instructions we used to arrive at this decision. For instructions on how to do this, please see 'Other Important Information' on the page entitled "Important Information about Your Appeal Rights." The request must be submitted in writing to this office.

C2C Innovative Solutions, Inc.
P.O. Box 45258, Jacksonville, Florida 32232-5258

# IMPORTANT INFORMATION ABOUT YOUR APPEAL RIGHTS

## Your Right to Appeal this Decision

If you do not agree with this decision, you may file an appeal. The next level of appeal is an ALJ Hearing at the Office of Medicare Hearings and Appeals (OMHA). At this hearing, you or your representative may present your case to an ALJ.

*As of January 1, 2021, you must have $180.00 in dispute to appeal to an ALJ.* A claim can be combined ("aggregated") with others to reach this amount if: (1) the other claims have also been decided or dismissed by a QIC; (2) all of the claims are listed on your request for review; (3) your request for review is filed within 60 days of receipt of all of the QIC dismissals being appealed; and (4) you explain why you believe the claims involve similar or related services.

You can find more information about your right to an ALJ hearing at www.hhs.gov/omha or by calling 1-855-556-8475. This is a toll free call.

## How to Appeal

To exercise your right to appeal, you must file a written request for an ALJ hearing within **60 days** of receiving this letter.

When preparing your request for hearing, please use **Form CMS-20034 A/B**, available at:
www.hhs.gov/omha/forms/index.html

If you do not use the form, your request for hearing must include the following:

1. The Beneficiary's name, address, and Medicare health insurance claim number;
2. The name and address of the person appealing, if the person is not the beneficiary;
3. The representative's name and address, if any;
4. The Medicare appeal number listed on the front page of this reconsideration notice;
5. The dates of service for the claims at issue;
6. The reasons why you disagree with the QIC's reconsideration; and
7. A statement of any additional evidence to be submitted and the date it will be submitted.

Please **do not attach evidence to your hearing request**. If you have evidence to submit, please submit the evidence directly to the ALJ when your case is assigned.
Mail your hearing request to (tracked mail is suggested):

**HHS OMHA Central Operations**
**1001 Lakeside Avenue, Suite 930**
**Cleveland, OH 44114-1158**

If you are a Medicare Beneficiary filing a request for an ALJ hearing, please also include "**Attn: Beneficiary Mail Stop**" in the address above.

If your request for hearing is being filed late, you must explain why your request is being filed late.

The ALJ will require proof that you sent a copy of the request for hearing to the other parties who received a copy of the QIC reconsideration (for example, the Beneficiary or provider/supplier). Please **do not** send a copy of your hearing request to the QIC that issued the reconsideration or to the Medicare Administrative Contractor that issued the redetermination.

Please **do not** submit multiple requests for hearing for the same QIC reconsideration.

For additional filing tips, go to www.hhs.gov/omha or call 1-855-556-8475 for a copy.

## Who May File an Appeal

You or someone you name to act for you (your **appointed representative**) may file an appeal. You can name a relative, friend, advocate, attorney, doctor, or someone else to act for you.

If you want someone to act for you, you and your appointed representative must sign and date a statement naming that person to act for you and send it with your request for hearing. Call 1-800-MEDICARE (1-800-633-4227) to learn more about how to name a representative.

## Help With Your Appeal

You can have a friend or someone else help you with your appeal. If you have any questions about payment denials or appeals, you can also contact your State Health Insurance Assistance Program (SHIP). For information on contacting your local SHIP, call 1-800-MEDICARE (1-800-633-4227). Information about the ALJ hearing process can also be found at www.hhs.gov/omha or by calling 1-855-556-8475.

## Other Important Information

If you want copies of statutes, regulations, and/or policies we used to arrive at this decision, please write to us and attach a copy of this letter, at:

**C2C Innovative Solutions, Inc.**
A Medicare Contractor
P.O. Box 45258
Jacksonville FL 32232-5258

If you have questions, please call us at the phone number provided on the front of this notice.

## Other Resources To Help You

1-800-MEDICARE (1-800-633-4227),
TTY/TDD: 1-800-486-2048

18

**IMPORTANT INFORMATION ABOUT YOUR APPEAL RIGHTS**

C2C Innovative Solutions, Inc.
P.O. Box 45258, Jacksonville, Florida 32232-5258

File 12.pdf - Page 19 of 19

Redetermination/Appeals Number:
5422349094000

**Reconsideration Request Form**

**Directions**: If you wish to appeal this decision, please fill out the required information below and mail this form to the address shown below.  At a minimum, you must complete/include information for items 1, 2a, 6, 7, 11, & 12, but to help us serve you better, please include a copy of the redetermination notice with your request.

C2C Solutions - QIC Part B North
P O Box 45208
Jacksonville, FL 32232-5208

1.      Name of Beneficiary: _____

2a.     Medicare Number: _____

2b.     Claim Number (ICN / DCN, if available): _____

3.      Provider Name: _____

4.      Person Appealing: ☐Beneficiary      ☐Provider of Service      ☐Representative

5.      Address of the Person Appealing: _____

5a.     Telephone Number of the Person Appealing: _____

5b.     Email Address of the Person Appealing: _____

6.      Item or service you wish to appeal: _____

7.      Date of the service:   From _____   To _____

8.      Does this appeal involve an overpayment?   ☐Yes ☐No
        *Please include a copy of the demand letter (*if applicable*) with your request.

9.      Why do you disagree? Or what are your reasons for your appeal? (Attach additional pages, if
        necessary.) _____
        _____

10.     You may also include any supporting material to assist your appeal. Examples of supporting
        materials include:
        ☐ Medical Records   ☐ Office Records/Progress Notes
        ☐ Copy of the Claim ☐Treatment Plan      ☐ Certificate of Medical Necessity

11.     Name of Person Appealing: _____

12.     Signature of Person Appealing: _____ Date: __4/6/23____

Contractor Number:  05202

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 93-98

Department of Health and Human Services
Centers for Medicare & Medicaid Services

Form Approved OMB No.0938-0950

# Appointment of Representative

| Name of Party | Medicare Number (beneficiary as party) or National Provider Identifier (provider or supplier as party) |
|---|---|
| Advanced Dermatology and Skin Cancer Center, P.A. | 1124094867 |

## Section 1: Appointment of Representative
**To be completed by the party seeking representation (i.e., the Medicare beneficiary, the provider or the supplier):**
I appoint this individual, Amanda M. Wilwert _____, to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the Act) and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my claim, appeal, grievance or request wholly in my stead. I understand that personal medical information related to my request may be disclosed to the representative indicated below.

| Signature of Party Seeking Representation | | Date 04/27/2022 |
|---|---|---|
| Street Address 2735 Pembrook Pl | | Phone Number (with Area Code) (785) 537-4990 |
| City Manhattan | State KS | Zip Code 66502 |
| Email Address (optional) | | |

## Section 2: Acceptance of Appointment
**To be completed by the representative:**
I, Amanda M. Wilwert _____, hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services (HHS); that I am not, as a current or former employee of the United States, disqualified from acting as the party's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.
I am a / an attorney with Foulston Siefkin LLP and the firm has been engaged to represent Advanced Dermatology and Skin Cancer Center P.A. in the appeals process

(Professional status or relationship to the party, e.g. attorney, relative, etc.)

| Signature of Representative | | Date 5/3/22 |
|---|---|---|
| Street Address 7500 College Blvd Ste. 1400 | | Phone Number (with Area Code) 913-253-2181 |
| City Overland Park | State KS | Zip Code 66210 |
| Email Address (optional) awilwert@foulston.com | | |

## Section 3: Waiver of Fee for Representation
**Instructions: This section must be completed if the representative is required to, or chooses to, waive their fee for representation.** (Note that providers or suppliers that are representing a beneficiary and furnished the items or services may not charge a fee for representation and **must** complete this section.)
I waive my right to charge and collect a fee for representing _____ before the Secretary of HHS.

| Signature | Date |
|---|---|
| | |

## Section 4: Waiver of Payment for Items or Services at Issue
**Instructions: Providers or suppliers serving as a representative for a beneficiary to whom they provided items or services must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act.** (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, or could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.) I waive my right to collect payment from the beneficiary for the items or services at issue in this appeal if a determination of liability under §1879(a)(2) of the Act is at issue.

| Signature | Date |
|---|---|
| | |

## Charging of Fees for Representing Beneficiaries before the Secretary of HHS

An attorney, or other representative for a beneficiary, who wishes to charge a fee for services rendered in connection with an appeal before the Secretary of HHS (i.e., an Administrative Law Judge (ALJ) hearing or attorney adjudicator review by the Office of Medicare Hearings and Appeals (OMHA), Medicare Appeals Council review, or a proceeding before OMHA or the Medicare Appeals Council as a result of a remand from federal district court) is required to obtain approval of the fee in accordance with 42 CFR 405.910(f).

The form, "Petition to Obtain Representative Fee" elicits the information required for a fee petition. It should be completed by the representative and filed with the request for ALJ hearing, OMHA review, or request for Medicare Appeals Council review. Approval of a representative's fee is not required if: (1) the appellant being represented is a provider or supplier; (2) the fee is for services rendered in an official capacity such as that of legal guardian, committee, or similar court appointed representative and the court has approved the fee in question; (3) the fee is for representation of a beneficiary in a proceeding in federal district court; or (4) the fee is for representation of a beneficiary in a redetermination or reconsideration. If the representative wishes to waive a fee, he or she may do so. Section III on the front of this form can be used for that purpose. In some instances, as indicated on the form, the fee **must** be waived for representation

### Approval of Fee

The requirement for the approval of fees ensures that a representative will receive fair value for the services performed before HHS on behalf of a beneficiary, and provides the beneficiary with a measure of security that the fees are determined to be reasonable. In approving a requested fee, OMHA or Medicare Appeals Council will consider the nature and type of services rendered, the complexity of the case, the level of skill and competence required in rendition of the services, the amount of time spent on the case, the results achieved, the level of administrative review to which the representative carried the appeal and the amount of the fee requested by the representative.

### Conflict of Interest

Sections 203, 205 and 207 of Title XVIII of the United States Code make it a criminal offense for certain officers, employees and former officers and employees of the United States to render certain services in matters affecting the Government or to aid or assist in the prosecution of claims against the United States. Individuals with a conflict of interest are excluded from being representatives of beneficiaries before HHS.

### Where to Send This Form

Send this form to the same location where you are sending (or have already sent) your: appeal if you are filing an appeal, grievance or complaint if you are filing a grievance or complaint, or an initial determination or decision if you are requesting an initial determination or decision. If additional help is needed, contact 1-800-MEDICARE (1-800-633-4227) or your Medicare plan. TTY users please call 1-877-486-2048.

You have the right to get Medicare information in an accessible format, like large print, Braille, or audio. You also have the right to file a complaint if you believe you've been discriminated against. Visit https://www.cms.gov/about-cms/agency-Information/aboutwebsite/cmsnondiscriminationnotice.html, or call 1-800-MEDICARE (1-800-633-4227) for more information.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0950. The time required to prepare and distribute this collection is 15 minutes per notice, including the time to select the preprinted form, complete it and deliver it to the beneficiary. If you have comments concerning the accuracy of the time estimates or suggestions for improving this form, please write to CMS, PRA Clearance Officer, 7500 Security Boulevard, Baltimore, Maryland 21244-1850.

Form CMS-1696 (Rev 08/18)

# FOULSTON

ATTORNEYS AT LAW

Amanda M. Wilwert

awilwert@foulston.com
Phone: 913.253.2181
Fax: 913.498.2101

7500 COLLEGE BOULEVARD, SUITE 1400
OVERLAND PARK, KS 66210-4041

April 7, 2022

## REQUEST FOR RECONSIDERATION
### (LEVEL 2 APPEAL)

C2C Innovative Solutions, Inc. – QIC Part B North
P.O. Box 45208
Jacksonville, FL 32232-5208

  Re: Advanced Dermatology and Skin Cancer Center
    Redetermination/Appeals Number: 5422349094000
    Beneficiary Identifier:  Multiple, see Reconsideration Request Form
    Internal Control Number:  Multiple, see Reconsideration Request Form
    Service Dates:  January 21, 2022, to May 23, 2022
    Service Provided to:  Multiple, see Reconsideration Request Form

To Whom It May Concern:

  Wisconsin Physician Service ("WPS") notified Advanced Dermatology and Skin Cancer Center PA ("Advanced Dermatology") that it received an unfavorable decision on its request for redetermination in the above-referenced claim.  WPS denied the claim on the grounds that (1) services were not reasonable and necessary; (2) services were not rendered as billed; and (3) services related to non-covered or denied primary services.  We disagree.  We are writing to request reconsideration of WPS' denial.

  For the timeframe applicable to this denial, Advanced Dermatology maintained processes and procedures for determining the clinically appropriate level of care.  These procedures were based on established clinical criteria, community standards of care, guidelines from peer-reviewed medical journals, and internal review processes.  Advanced Dermatology is confident that the above referenced claims were billed correctly in accordance with the applicable Medicare regulations.  Put simply, the care Advanced Dermatology provided was reasonable and necessary and appropriately documented.

### Standard of Review

  In the second level of appeal, a Qualified Independent Contractor ("QIC") conducts an independent review of the administrative record, including the initial determination and redetermination.  Second Level of Appeal:  Reconsideration by a Qualified Independent Contractor, cms.gov (June 23, 2022) https://www.cms.gov/Medicare/Appeals-and-Grievances/OrgMedFFSAppeals/ReconsiderationbyaQualifiedIndependentContractor. Review can include submitting issues of medical necessity to a panel of physicians or other

VOL. II  FOULSTON SIEFKIN LLP | KANSAS CITY · TOPEKA · WICHITA | FOULSTON.COM  101

File 13 pdf · Page 10 of 2526

Page 2

health care professionals.  Medicare Parts A & B Appeals Process at 9, CMS (Aug. 2022).
QICs can consider additional evidence that was not presented to the original fact finder or at
the redetermination level.  Level 2 Appeals: Original Medicare (Parts A & B), hhs.gov (Jan.
23, 2017) https://www.hhs.gov/about/agencies/omha/the-appeals-process/level-2/parts-a-and-
b/index.html#:~:text=A.

### Background on Mohs Micrographic Surgery and Allografts

Dr. John Adams is a board-certified dermatologist and an accredited Mohs surgeon
who has practiced in the Manhattan, Kansas area at Advanced Dermatology since 1998.  Dr.
Adams expanded his dermatology practice to Nebraska and Missouri in 2020.  From 2013 to
2016, Dr. Adams served on the Board of Directors for the American Society for Mohs Surgery.
In 2016, Dr. Adams served as the President of the Kansas Society for Dermatology and
Dermatologic Surgery.   Also in 2016, Dr. Adams was recognized for his significant
contribution to the specialty of dermatology and his dedication to patient care and received the
2017 American Academy of Dermatology's Presidential Citation Award.

Dr. Adams is one of a handful of Hispanic physicians in the state of Kansas, and the
only Hispanic dermatologist in the state.  Dr. Adams' parents were born in Puerto Rico, and
he grew up in an entirely Hispanic household and culture.  In 1994, Dr. Adams legally changed
his name from John Raymond Rivera, Jr. to John Raymond Adams.  The Advanced
Dermatology staff is comprised of over thirty percent (30%) Hispanic individuals; in addition
to Dr. Adams, one (1) staff member is from the Dominican Republic and seven (7) are of
Mexican descent.  The ability to speak Spanish with patients and understand the culture greatly
enhances Advanced Dermatology's ability to provide health care for Hispanic patients.

Advanced Dermatology focuses on Mohs Micrographic Surgery ("MMS" or "Mohs").
Mohs Surgery combines the process of surgical removal of cancerous tissue, processing of the
removed tissue and the histopathological examination and interpretation of the tissue, and
reconstruction of the post Mohs surgical defect into a single procedure that can be performed
in a physician's office under local anesthesia.  A trained Mohs surgeon will remove small slices
of tissue and examine the margins of each for cancerous cells.  If any remain at the margins,
another small slice is removed around that area and the process continues until all cancerous
tissue has been removed.  The resulting wound is repaired through reconstructive techniques
that are also used by plastic surgeons.  The surgical wound from a Mohs procedure is typically
much smaller than the wound from a simple/traditional basic form of surgical excision.  Many
referring physicians recognize Mohs surgery as the standard of care for removal of skin lesions
from the face and surrounding areas.

### Post Mohs Surgery Wounds and Repairs

While the wound from a Mohs procedure is less than those from other surgical
excisions, a Mohs surgical wound can be extensive and require repair.  Thus, there are
generally three options for repairs after a Mohs procedure depending on the extent of the

Page 3

surgical wound:  (1) secondary intention, which allows the surgical wound to heal on its own; (2) primary side to side repairs, which involve suturing the skin edges together; and (3) flap and/or graft repairs.  Flaps and grafts are considered true reconstructive surgery.  Advanced Dermatology uses allografts in this way, i.e., as an option to a flap and/or graft repair of a surgical wound resulting from the removal of skin cancer.  But, if the wound can be repaired with primary side to side repair, Advanced Dermatology does not recommend an allograft as a repair option.

Advanced Dermatology provided care and documentation to all patients consistent with WPS Local Coverage Determinations ("LDC") and Local Coverage Articles ("LCA") related to Mohs procedures and repairs. WPS LCA 57477 (Mohs Micrographic Surgery) provides that, to support medical necessity, the patient's medical record should include:

11. Measurement of the primary lesion necessitating MMS and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable.  Documentation of the clinical tumor border definition may be accomplished by:
- Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).
- Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
- It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.

12. When the surgical defect created by MMS requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.

Every case reviewed by the UPIC was a surgical defect created by MMS.  The documentation in the patient's medical record included measurements and photos.  Further, the reconstructive technic performed, generally fap and/or graft repairs, was extensively documented as the appropriate choice to preserve functional capabilities and to restore physical appearance.

One overarching comment from the UPIC and WPS determination was that the records did not support off label-use and did not contain medical literature to support the medical necessity of the services billed.  However, the package inserts for both the Artacent and MiMedx allographs used for the surgical repair indicate that an appropriate use is as a barrier for use in the treatment of acute and chronic wounds, providing a protective environment to

Page 4

support the healing process. Thus, Dr. Adams was using allografts consistent with the use indicated on the labels. Further, medical literature in the form of peer reviewed articles and payor policies support the use of allografts as reconstructive repair of surgical defects created by MMS. In fact, the article *Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane*, published in the peer review journal, *Facial Plastic Surgery & Aesthetic Medicine*, provides information on allografts and their use in post Mohs defects and compared repair via allograft vs. repair via flaps or grafts in a propensity matched (similar patients and cancers in both groups) study. A copy is attached for your convenience. The article includes medical indications, guidelines and utilization in a large, involving 1,550 patients, study. The study presented a valuable opportunity to address a practice gap with evidence in terms of flaps and grafts compared to allografts in similarly matched patients and settings. The study included patients with a diagnosis of basal or squamous cell carcinoma and a Mohs surgery defect located in a moderate to high-risk area of recurrence, (face, head, neck, or dorsal hand) if "*simple*" excision is utilized in lieu of Mohs surgery with its low (1%) risk of recurrence. The focus of the study was to compare defects distinguished by equivalent reconstructive demands in terms of complexity, low oxygenation (legs, COPD), immunosuppression, extensive defects; location, surrounding tissue is scarred or atrophic; other patient co-morbidities and post Mohs surgery wound size. The key findings of the article are: "the incidence of infection and all-cause postoperative morbidity in placental allograft repairs was significantly lower than observed with autologous tissue." The significance was a remarkable 28.7% complications for the flap and graft group vs. only 2.1%complication rate for the allograft group. The disparity of these two groups and the egregious rate of complication in the flap and graft group underscore the fact that most of the patients who we offer allografts to as an option for repair tend to be our most complex cases in terms of cancer size, location and patient co-morbidities. Further:

> "Larger cutaneous Mohs-related defects of the face, head, and hands were effectively reconstructed with a placental allograft in a population of older adults.… Incisional repair utilizing autologous tissue such as local flaps and full-thickness skin grafts (FTSG) represent the mainstay of reconstructive techniques following Mohs micrographic surgery (MMS).[8,9] However, postoperative morbidity increases after the age of sixty by as much as twenty-five percent due to a greater depth of tumor invasion and extensive defects with higher demands for donor tissues…In situations where incisional repair options are limited, an ideal alternative would be a nonsurgical approach capable of yielding outcomes comparable to autologous tissue techniques. Placental tissues may offer a novel solution to address this emerging clinical need in cutaneous reconstruction…Postoperative complication rates for placental reconstructions did not exceed those demonstrated by autologous tissue counterparts, indicating this is a safe alternative to flap and FTSG in cosmetically sensitive repairs."

In other words, surgical wounds which are relatively large and are in locations such as the head, neck, hand, and feet can be safely and effectively repaired via allograft. In early April

Page 5

2022, Blue Cross Blue Shield of Kansas issued a medical policy update for Amniotic Membrane and Amniotic Fluid which cites this article and its findings for its policy guidance. A copy of the Blue Cross Blue Shield of Kansas medical policy for Amniotic Membrane and Amniotic Fluid is attached for your convenience. Further, MiMedx has recently also cited this article in its brochure regarding Mohs surgery closures.

Allografts are used as a tissue graft to treat wounds. Allografts are derived from the amniotic membrane, which is responsible for physically protecting the fetus by acting as a cover/barrier. The amniotic membrane also acts as a semi-permeable, protective barrier membrane which allows for the transfer of nutrients and waste and protects the fetus.

In the reviewed records, skin substitute allografts, including both EpiFix (MiMedx manufacturer) and Artacent (Tides Medical manufacturer), were used as allografts, as confirmed by the FDA, FDA approved Package inserts, CPT, and letters from the respective manufacturers. Advanced Dermatology followed manufacturer guidelines with reference to the utilization and application of the allograft. The manufacturer's guidelines, via the FDA approved package insert, were followed with reference to the utilization and application of amniotic skin substitute allografts. Moreover, the two primary skin substitutes utilized by Dr. Adams, Artacent Tides and EpiFix MiMedx provided letters and records in support of Dr. Adam's use of the skin substitutes and the erroneous nature of the auditor's findings. Those support letters and documentation are included in the supporting documents submitted for consideration.

Moreover, Dr. Adams provided adequate rationale as to why "other options" were not feasible in these instances in the patient's medical record. It was reasonable and justified for the physician to utilize the application of Artacent or EpiFix. The patients opted for repair via allograft and consequently declined to accept the other alternatives provided and there is no documentation requirement that requires a provider document the specific reasons why a patient declined other treatment alternatives.

Dr. Adams has provided a line-by-line response to the UPIC's findings which is attached for convenience. As outlined in that response, the UPIC's findings were based on articles and guidance documents that are not applicable to the services provided. The QIC must apply the appropriate LCA and overturn the UPIC's findings.

**CONCLUSION**

Almost every beneficiary involved in this overpayment determination involved Mohs surgery with allograft reconstruction. As the records demonstrate, Advanced Dermatology competently documented the medical indications and options and in conjunction with the photos establish care was medically necessary and appropriate for every beneficiary. A significant majority of the claims denied involved Mohs surgical cases in complex/high-risk areas. The remaining claims denied involved patients with an aggressive cancer or significant

Page 6

tumor size, or the patient was immunocompromised. The skin substitute allografts utilized in the denied claims are scientifically supported, in coding guidance, and medically indicated.

The claims submitted were medically necessary. Therefore, WPS' and CoventBridge's unfavorable determination should be reversed.

Sincerely,

FOULSTON SIEFKIN LLP

Amanda M. Wilwert



**WPS.** | **GOVERNMENT HEALTH ADMINISTRATORS**

Wisconsin Physicians Service Insurance Corporation
*A CMS Medicare Contractor*
1717 W. Broadway | P.O. Box 1787 | Madison, WI 53701-1787

Date February 06, 2023
In Any Inquiry Refer To
  5422349094000
Beneficiary Identifier
  Multiple
Internal Control Number
  Multiple
Service Date (s)
  January 21, 2022, to May 23, 2022
Service Provided By
  Advanced Dermatology PA
Service Provided To
  Multiple

Foulston Siefkin LLP
Attn: Amanda Wilwert
Ste 1400
7500 College Blvd
Overland Park, KS 66210-4041

Dear Ms. Wilwert,

This letter is to inform you of the decision on your Medicare appeal. An appeal is a new and independent review of a claim. You are receiving this letter because you requested an appeal on behalf of Advanced Dermatology PA for multiple overpayments totaling $116,510.11.

The appeal decision is unfavorable. Medicare cannot make payment for the service(s) at issue in your appeal.

More information on the decision is provided below. If you disagree with the decision, you may appeal to a Qualified Independent Contractor (QIC). Your appeal of this decision must be made in writing and received by the QIC within 180 days of receipt of this letter. You are presumed to have received this decision five days from the date of the letter unless there is evidence to show otherwise. However, if you do not wish to appeal this decision, you are not required to take any action. For more information on how to appeal this decision, see the section at the end of this letter entitled, "Important Information about Your Appeal Rights".

Wisconsin Physicians Service (WPS) was contracted by Medicare to review your appeal.

Provider: Advanced Dermatology PA
Dates of Service: January 21, 2022, to May 23, 2022
Type of Service: Application of skin substitute graft to wound (procedure codes 15271, 15272, 15275, and 15276), therapy procedure using a special bandage, vacuum pump and disposable medical equipment (procedure code 97608), established patient office or outpatient visit (procedure code 99212), ceftriaxone sodium injection (procedure code J0696), artacent wound (procedure code Q4169), and epifix (procedure code Q4186)

Initial determinations on these claims were made on various dates. Advanced Dermatology PA was



5422349094000

notified of an overpayment in the amount of $116,450.65 by the Unified Program Integrity Contractor (UPIC), in a letter dated November 10, 2022. Review indicates that the services billed to Medicare by Advanced Dermatology PA did not meet Medicare coverage requirements. The primary findings on this review were:

- The documentation sent did not support the services were reasonable and necessary.
- The documentation sent did not support the services were rendered as billed.
- The documentation sent supported the services were related to non-covered/denied primary services.

WPS issued four overpayment demand letters to Advanced Dermatology PA with instructions to submit an appeal or make a refund. At this time, the overpayment has not been satisfied.

WPS received a redetermination request on December 15, 2022. The redetermination request alleges that this overpayment was assessed in error. An appointment of representative form, literature for allografts, procedure code(s) information, copies of the patient's insurance cards and identification cards, intake forms, visit notes, pathology reports, a copy of letters from CoventBridge, the UPIC, literature for wound care, a copy of retired Local Coverage Determination (LCD) L345693, literature for Mohs defect repair, a copy of a medical policy from Blue Cross Blue Shield for amniotic membrane and amniotic fluid, package insert for EpiFix, and copies of the overpayment letters were submitted with the redetermination request.

The overpayment is a result of findings identified from claims reviewed by the UPIC and communicated in the letter dated November 10, 2022. A summary of the overpayment demand letters and amount of each overpayment is listed in the following table. The difference in the overpayment amounts is due to a claim for REDACTED for date(s) of service February 12, 2022, reprocessed and applied part of the payment to the Medicare Part B 2022 deductible.

| Date of Overpayment Letter | Overpayment Letter Number | Amount of Overpayment | Type of Overpayment |
|---|---|---|---|
| November 21, 2022 | 31377512 | $46,834.65 | Specific Claims |
| November 21, 2022 | 31378432 | $41,354.99 | Specific Claims |
| November 23, 2022 | 31448324 | $6,365.64 | Specific Claims |
| November 23, 2022 | 31448423 | $21,954.83 | Specific Claims |
| | **Total** | **$116,510.11** | |

DECISION

The result of this redetermination is that these claims are not covered by Medicare. It has also been determined that the overpayment of $116,510.11 is valid.

EXPLANATION OF THE DECISION

This redetermination decision has been rendered based upon the review of the documentation by our medical staff.

2

5422349094000

You requested a redetermination for beneficiary claims representing a total of 131 lines of wound care services. The billed services include the following Healthcare Common Procedure Coding System (HCPCS) and Current Procedural Terminology (CPT) codes:

HCPCS code J0696- injection, ceftriaxone, sodium, per 250 milligrams (mg)

HCPCS code Q4169- artacent wound, per sq cm

HCPCS code Q4186- epifix, per sq cm

CPT code 15271- application of skin substitutes graft to wound of trunk, arms or legs, 25.0 sq cm of less of wound 100 sq cm or less

CPT code 15272- application of skin substitutes graft to wound of trunk, arms or legs, 25.0 sq cm of less of wound 100 sq cm or less, each additional 25.0 sq cm wound surface area, or part thereof

CPT code 15275- application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

CPT code 15276- application of skim substitutes graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; each additional sq cm wound surface area, or part thereof

CPT code 97608- therapy procedure using special bandage, vacuum pump and disposable medical equipment, surface area more than 50.0 sq cm

CPT code 99212- established patient office or other outpatient visit, 10-19 minutes

The submitted records were reviewed in order to ascertain if the services set forth in the claims were medically reasonable and necessary, and met all other pertinent Medicare payment requirements. We considered the documentation contained in the case files received from the CoventBridge Group (f/k/a Advanced Med) Medical Review Department as well as the records submitted with your redetermination.

Please see the enclosed WPS Redetermination Form detailing the individual decisions. The redetermination decisions can be found in the column titled "WPS Redetermination Outcome." Please refer to the legend located at the bottom of the form. Further details of the decisions will be explained throughout this section.

The determination of medical necessity for the service(s) in question is an essential element in determining whether payment for services was appropriate. While at no time does Medicare tell providers how to practice medicine, it does establish guidelines stating that medical necessity must be documented in the medical record in order for a service to be reimbursed.

3

5422349094000

The Regional Office of the Centers for Medicare and Medicaid Services (CMS) and this
Medicare Part B Carrier have agreed upon the following definition of medical necessity:

> *A service, treatment, procedure, equipment, drug, device or supply provided by a hospital,
> physician, or other health care provider that is required to identify or treat a beneficiary's
> illness or injury and which is, as determined by the contractor:  (a) consistent with the
> symptom(s) or diagnosis and treatment of the beneficiary's illness or injury; (b) appropriate
> under the standards of acceptable medical practice to treat that illness or injury; (c) not solely
> for the convenience of the participant, physician, hospital, or other health care provider; and,
> (d) the most appropriate service, treatment, procedure, equipment, drug, device or supply which
> can be safely provided to the beneficiary and accomplishes the desired end result in the most
> economical manner.*

Title XVIII of the Social Security Act section 1862 (a)(1)(A) states no Medicare payment shall be made
for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or
injury or to improve the functioning of a malformed body member.

Title XVIII of the Social Security Act section 1833 (e) addresses documentation and states: No payment
shall be made to any provider of services or other person under this part unless there has been furnished
such information as may be necessary in order to determine the amounts due such provider.

As published in the CMS IOM Publication 100-8, Section 13.5.1, in order to be covered under
Medicare, a service shall be reasonable and necessary. The service provided should have an appropriate
duration and frequency in terms of whether it is:

1. Furnished in accordance with accepted standards of medical practice for the diagnosis or
   treatment of the patient's condition or to improve the function of a malformed body member.
2. Furnished in a setting appropriate to the patient's medical needs and condition.
3. Ordered and furnished by qualified personnel.
4. One that meets but does not exceed, the patient's medical needs and at least as beneficial as an
   existing and available medically appropriate alternative.

The determination of medical necessity for the service(s) in question is an essential element in
determining whether payment for services was appropriate.  While at no time does Medicare tell
providers how to practice medicine, it does establish guidelines stating that medical necessity
must be documented in the medical record in order for a service to be reimbursed.

The Code of Federal Regulations, Title 42 - Public Health, Volume 3, Part 424, Section 424.5(6) Basic
Conditions – Sufficient Information requires that the documentation must be sufficient to support the
services billed.

General principles of medical record documentation include:

1. The medical record should be complete and legible.

4

5422349094000

2. The documentation of each patient encounter should include:
   - Reason for encounter and relevant history, physical examination findings, and pertinent diagnostic test results;
   - Assessment, clinical impression, or diagnosis;
   - Plan for care; and
   - Date and legible identity of the observer.
3. If not documented, the rational for ordering diagnostic and other ancillary services should be easily inferred.
4. Past and present diagnoses should be accessible to the treating and/or consulting physician.
5. Appropriate health risk factors should be identified.
6. The patient's progress, response to and changes in treatment, and revision of diagnosis should be documented.
7. The CPT and International Classification of Diseases, 10th Revision, Clinical Modification (ICD-10-CM) codes reported on the health insurance claim form should be supported by the documentation in the medical record.

**Finding No. 1: Submitted documentation failed to support that the billed services were reasonable and necessary, ordered as billed and rendered as billed.**

This decision was made in accordance with Title XVIII of Social Security Act, Section 1862 (a)(1)(A). Medicare coverage and payment are only allowed for those services that are considered medically reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Records were submitted for review. The documentation supported the services were provided as billed. However, the records did support off label-use and did not contain medical literature to support the medical necessity of the services billed. The documentation did not support the services were medically reasonable and necessary.

Of the 131 lines of service reviewed, 18 lines of service of Q4169 and 39 lines of service of Q4186 have been denied as the submitted medical records did not meet guidelines requirements to demonstrate the medical necessity of the services. Therefore, payment cannot be made. These decisions have been given the designation: **F1 (Finding 1 - Documentation failed to support the billed services were medically reasonable and necessary)** on the attached spreadsheet.

**Finding No. 2: Documentation did not support the E & M services were a separate service from the procedures billed.**

The E & M services were billed with modifier 25, indicating a significant, separately identifiable E & M service by the same physician or other qualified health care professional on the same day of a procedure or other service. The documentation did not support the E & M services were for a significant and separately identifiable reason from the procedures that were billed on the same dates of service.

5

5422349094000

Of the 131 lines of service reviewed, four lines of service of 99212, have been denied as the documentation did not support the E & M services were a separate service from the procedure billed. Therefore, payment cannot be made. These decisions have been given the designation: **F2 (Finding 2 – Documentation did not support the E & M services were a separate service from the procedures billed)** on the attached spreadsheet.

**Finding 3: The submitted documentation does not support the services were rendered and medical necessity for the billed service.**

According to the Wisconsin Physicians Association, LCD L37228, Wound Care, requires that for wound care to be considered reasonable and necessary the provider must support the beneficiary is eligible for a defined Medicare benefit category, be reasonable and necessary and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member and meet all other applicable Medicare statutory and regulatory requirements

The documentation supported the patient was seen for follow up of wound services. The documentation did not support the patient starting a wound vacuum as part of the plan of care. The documentation did not support a reason for the wound vacuum application, nor was there documentation of the examination of the wound on the date of service billed. Therefore, the service remains denied.

Of the 131 lines of services reviewed, one line of service has been denied with the CPT code of 97608, as the documentation did not support Medicare guidelines were met for coverage. Therefore, payment cannot be made. These decisions have been given the designation: **F3 (Finding 3 – Documentation did not support the services were rendered and medically reasonable and necessary)** on the attached spreadsheet.

**Finding No. 4: Submitted documentation failed to support the billed services were rendered and reasonable and necessary.**

The services were billed in conjunction with other services that were determined not to be medically reasonable and necessary. The documentation did not support the services were provided for any other reason than the administration of the services as no explanation was given for the therapeutic options.

Of the 131 lines of service reviewed, one line of service billed with HCPCS code J0696, eight lines of services billed with CPT code 15271, one line of service billed with CPT code 15272, 52 lines of service billed with CPT code 15275 and seven lines of service billed with CPT code 15276, have been denied as they were billed in conjunction with services that were denied as not medically reasonable and necessary. Therefore, payment cannot be made. These decisions have been given the designation: **F4 (Finding 4 - Services were billed in conjunction with services that were denied as not medically reasonable and necessary)** on the attached spreadsheet.

**Conclusion**

In summary, the findings are as follows:

- The documentation did not support the services were medically reasonable and necessary

6

5422349094000

- The documentation did not support the services were a separate service from the procedures billed

- The documentation did not support the medical necessity for the billed wound care services

- The services were billed in conjunction with services that were denied as not medically reasonable and necessary

This redetermination decision was based on the following references:

- The Social Security Act which is available at https://www.ssa.gov
  Section 1862 (a)(1)(A)
  Section 1833 (e)

- The Code of Federal Regulations, Title 42 – Public Health, Volume 3, Part 424, Section 424.5(6) Basic Conditions

- The Centers for Medicare & Medicaid (CMS) Internet Only Manual (IOM) which is available at https://www.cms.gov

- The Code of Federal Regulations, Title 21 – Food and Drugs, Volume 8, Part 1271, Section 10 Human Cells, Tissues and Cellular and Tissue-Based Products
  Publication 100-2, Medicare Benefit Policy Manual, Chapter 16, Section 20
  Publication 100-8, Medicare Program Integrity Manual, Chapter 4, Section 4.3

- Wisconsin Physicians Service Local Coverage Determination: Billing and Coding: Wound Care (L37228), Located on the Internet at www.cms.gov/medicare-coverage-database

- Current Procedural Terminology (CPT) Manual, Professional Editions 2022

- Healthcare Common Procedure Coding System (HCPCS) Manual 2022

If you do not have access to the internet or CPT/HCPCS manuals, you may request a copy of the references used by calling us toll free at 1-866-518-3285.

## WHO IS RESPONSIBLE FOR THIS BILL?

The appeal decisions reflect that Advanced Dermatology PA is responsible for services determined to be not covered by Medicare. We have determined that Advanced Dermatology PA is responsible for the overpayment of those services that are not covered by Medicare. The overpayment letters you have received instruct you on the process for refund. If you have not already sent the refund and the money owed is not refunded timely, interest will be applied.

We have also determined under Section 1870 of the Social Security Act that Advanced Dermatology PA

7

5422349094000

is not without fault in regards to this overpayment. We have determined that you are liable because you were informed about Medicare coverage and billing guidelines through the references noted in the "Explanation of Decision" section of this letter. Therefore, Advanced Dermatology PA was aware of correct billing and coverage criteria for the service(s) billed.

WHAT TO INCLUDE IN YOUR REQUEST FOR AN INDEPENDENT APPEAL

Please submit the following documents with your request for an appeal: additional medical documentation which supports the services billed and the medical necessity of those services as described above. You may submit any documentation pertinent to these services and/or any information not provided thus far that you believe Medicare needs to make another decision about these claims.

NOTE: (Medicare physicians, providers, and suppliers ONLY) Any additional evidence as indicated in this section should be submitted with the request for reconsideration. All evidence must be presented before the reconsideration decision is issued. If all additional evidence as indicated above and/or otherwise is not submitted prior to issuance of the reconsideration decision, you will not be able to submit any new evidence to the administrative law judge or the Medicare Appeals Council unless you can demonstrate good cause for withholding the evidence from the qualified independent contractor.

NOTE: You do not need to resubmit documentation that was submitted as part of the redetermination. This information will be forwarded to the QIC as part of the case file utilized in the reconsideration process.

Sincerely,


Dawn Bailey
Redetermination Representative
Wisconsin Physicians Service

Enclosure

8

5422349094000

## IMPORTANT INFORMATION ABOUT YOUR APPEAL RIGHTS

**Your Right to Appeal this Decision:** If you do not agree with this decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claim so far. The next level of appeal is called reconsideration. A reconsideration is a new and impartial review performed by a qualified independent contractor (QIC), separate and independent of Wisconsin Physicians Service.

**How to Appeal:** To exercise your right to an appeal, you must file a request in writing. Your request must be received by the QIC at the address below within 180 days of receiving this decision. You are presumed to have received this decision five days after the date of the letter unless there is evidence to show otherwise. If you are unable to file your appeal request timely, please explain why you could not meet the filing deadline. You may request an appeal by using the form enclosed with this letter.

If you do not use this form, you can write a letter. You must include: your name, your signature, the name of the beneficiary, the Medicare number, a list of the service(s) or item(s) that you are appealing and the date(s) of service, and any evidence you wish to attach. You must also indicate that Wisconsin Physicians Service made the redetermination. You may also attach supporting materials, such as those listed in item 10 of the enclosed Reconsideration Request Form, or other information that explains why this service should be paid. Your doctor may be able to provide supporting materials.

If you want to file an appeal, send your request to:

> C2C Innovative Solutions, Inc. - QIC Part B North
> P O Box 45208
> Jacksonville, FL 32232-5208

**Who May File an Appeal:** You or someone you name to act for you (your appointed representative) may file an appeal. You can name a relative, friend, advocate, attorney, doctor, or someone else to act for you.

If you want someone to act for you, you may visit https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1696.pdf to download the "Appointment of Representative" form, which may be used to appoint a representative. Medicare does not require that you use this form to appoint a representative. Alternately, you may submit a written statement containing the same information indicated on the form. If you are a Medicare beneficiary, you may also call 1-800-MEDICARE (1-800-633-4227) to learn more about how to name a representative.

File 13.pdf - Page 24 of 2526

5422349094000

**Other Important Information:** If you want copies of statutes, regulations, policies, and/or manual instructions CMS used to arrive at this decision, or if you have any questions specifically related to your appeal, please write to us at the following address and attach a copy of this letter:

> WPS Medicare Part B
> General Correspondence
> P.O. Box 7238
> Madison, WI 53707-7238

**Resources for Medicare Beneficiaries:** If you want help with an appeal, or if you have questions about Medicare, you can have a friend or someone else help you with your appeal. You can also contact your State health insurance assistance program (SHIP). You can find the phone number for your SHIP in your "Medicare & You" handbook, under the "Helpful Contacts" section of www.medicare.gov Web site, or by calling 1-800-MEDICARE (1-800-633-4227). Your SHIP can answer questions about payment denials and appeals.

For general questions about Medicare, you can call 1-800-MEDICARE (1-800-633-4227), TTY/TDD: 1-877-486-2048.

Remember that specific questions about your appeal should be directed to the contractor that is processing your appeal.

Redetermination/Appeals Number:
5422349094000

### Reconsideration Request Form

**Directions**: If you wish to appeal this decision, please fill out the required information below and mail this form to the address shown below. At a minimum, you must complete/include information for items 1, 2a, 6, 7, 11, & 12, but to help us serve you better, please include a copy of the redetermination notice with your request.

> C2C Solutions - QIC Part B North
> P O Box 45208
> Jacksonville, FL 32232-5208

1.  Name of Beneficiary: _____

2a. Medicare Number: _____

2b. Claim Number (ICN / DCN, if available): _____

3.  Provider Name: _____

4.  Person Appealing: ☐Beneficiary     ☐Provider of Service     ☐Representative

5.  Address of the Person Appealing: _____

5a. Telephone Number of the Person Appealing: _____

5b. Email Address of the Person Appealing: _____

6.  Item or service you wish to appeal: _____

7.  Date of the service:    From _____    To _____

8.  Does this appeal involve an overpayment?    ☐Yes ☐No
    *Please include a copy of the demand letter (*if applicable*) with your request.

9.  Why do you disagree? Or what are your reasons for your appeal? (Attach additional pages, if necessary.) _____
    _____

10. You may also include any supporting material to assist your appeal. Examples of supporting materials include:
    ☐ Medical Records    ☐ Office Records/Progress Notes
    ☐ Copy of the Claim ☐Treatment Plan     ☐ Certificate of Medical Necessity

11. Name of Person Appealing: _____

12. Signature of Person Appealing: _____ Date:_____

Contractor Number: 05202

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 118-123

**2022 AUDIT LINE BY LINE PROVIDER RESPONSE TO REVIEWER'S COMMENTS:**

**REVIEWER COMMENTS in blue font. We have recited the reviewer comments in full for convenience and clarity. Each allegation below will be addressed in detail. These reviewer comments are CoventBridge's findings outlined in the spreadsheet included with this appeal.**

Deny. Not medically reasonable and necessary. Service not rendered as billed.
Service related to denied primary service.

The provider billed Current Procedural Terminology (CPT) code 15271, application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq. cm; first 25 sq. cm or less wound surface area. The submitted documentation indicates the beneficiary had a biopsy of the left distal pretibial region and left radial dorsal hand which indicated invasive squamous cell carcinoma (SCC). The beneficiary underwent Mohs procedure to these areas on the billed date of service (DOS) 5/2/2022 with initial application of **Artacent**. The beneficiary presented for a post operative wound check on 5/9/2022 and 5/16/2022 in which **Epifix** (another skin substitute product made of amniotic membrane) was applied.

**The claim is initially denied** under SSA 1862(a)(1)(A) because the **Artacent** product **was denied as not being medically reasonable and necessary**. If the alleged skin substitute was not reasonable and necessary, then the patient would have no medically necessary reason for its application. Additionally, the claim is denied as not reasonable or necessary under SSA 1862(a)(1)(A) as documentation did not indicate the need for applying a genuine skin substitute graft (i.e., one that met the criteria in the CPT Codebook)

Additionally, the CPT Codebook requirement for billing 15271 **states that skin substitute grafts include various kinds of human skin grafts, non-human skin grafts, and biological products that form a sheet scaffolding for skin growth.** In other words, this code is associated with the application/implantation of skin, or a biological substance **intended to remain in the person for the purpose of helping the person's own skin cells to grow back**. The CPT Codebook specifically states, "[a]pplication of non-graft [i.e., something intended to be removed] wound dressings is not separately reportable."

In this case, provider clearly applied a product defined by the manufacturer and the Food and Drug Administration (FDA) as a wound covering, not a "graft" as per the definition in the CPT Codebook required to bill this code.

No sutures were utilized during the procedure to support a true skin graft procedure was performed.

Therefore, the claim for 15271 (application of skin substitute) is denied under SSA 1833(e) as services not rendered since the application of a biological dressing does not qualify the provider to bill for this code.

Additionally, the provider billed this code week after week for this beneficiary, supporting the product was being utilized as an expensive band aid/wound covering and was not the type of service to be billed under 15271.

**PROVIDER RESPONSE TO THE FOLLOWING ALLEGATION pages 2-5:**
The reviewer's comments below are taken from page 1 of this document.

**REVIEWER COMMENT from page 1**:
*The claim is initially denied under SSA 1862(a)(1)(A) because the Artacent product was denied as not being medically reasonable and necessary. If the alleged skin substitute was not reasonable and necessary, then the patient would have no medically necessary **reason for its application.***

*Additionally, the claim is denied as not reasonable or necessary under SSA 1862(a)(1)(A) as documentation did not indicate the need for applying a genuine skin substitute graft (i.e., one that met the criteria in the CPT Codebook)*

The reviewer applied Standard (non-advanced) **Chronic** wound care LCDs to this audit. Standard LCDs for chronic wounds require that wounds must have failed treatment regimens and are of a chronic nature (>4 weeks).  However, every case involved in this audit deals with **Acute** wounds secondary to the removal of a skin cancer, via Mohs micrographic surgery which are in need of reconstructive surgery.  The reviewer's use of standards for chronic wound care are misplaced and inappropriate.

The UPIC's alleged supporting documents included an "*article*"[1] which appears to be based upon a wound care LCD; unfortunately, no identification numbers were noted within the article nor his citation references in which he entitled it as "*Skin Substitute Definitions per CPT*" (the complete name of an allograft is: human skin substitute allograft derived from amniotic membrane [Artacent and EpiFix]). The article was apparently previously highlighted by the UPIC and the language relates to medical necessity for allografts and has **2 requirements**: (1) that **the wound be of a chronic nature (> 4 weeks** without healing) and (2) **to have failed conservative treatments** (compression stockings, keeping legs elevated and debridement); in order to satisfy the medical need and reasonability for the application of a skin substitute allograft (Artacent or EpiFix) on the lower extremities.

**Excerpts of the highlighted language from the article cited above:**

>  **Chronic Wounds** are defined as wounds that do not respond to standard wound treatment for at least a **30-day period during organized comprehensive conservative therapy.**  For all wounds, documentation (**as outlined in the documentation requirements of the policy**) and a comprehensive treatment plan, before initiation of a specialized wound therapy product is required….
>  Medicare covers application of skin substitutes to Ulcers or Wounds with Failed Response…
>  **Documentation (in the pre-service record) specifically addressing circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed.** Such record should include updated medication history, review of pertinent medical problems that may have occurred since the previous wound evaluation, and explanation

---

[1] The Article is titled "Skin Substitutes Definitions per CPT."  Notably, all the CPT codes referenced in the article are not the CPT codes billed by Advanced Dermatology, further demonstrating the inappropriate use of the article and its contents/requirements by the UPIC.

**This is the primary issue in this case regarding medical indications, necessity and reasonability**; that is, the UPIC has taken the false premise, that this case is regarding chronic wounds (> 4weeks) that have failed treatment; when in fact this audit is of <u>Acute</u> wounds from skin cancer removal.  The bigger problem here is that when the UPIC acts in this fashion, subsequent reviewers accept his statements as fact when they were based upon a false premise.

Two problems exist here, 1. we do not know what LCD this article was based upon and 2. the article/LCD was not appropriate for **acute** wounds **due to skin cancer removal in need of true reconstructive surgery**. We believe this article/LCD is based upon skin substitute LCD(s) (retired and or current), because they have the same medical indications for allograft use; that is, Chronic wounds which have failed treatments; HOWEVER, these LCDs are complete and within their "limitations" sections clearly state that they are NOT applicable to our wounds as we are dealing exclusively with **ACUTE wounds** secondary to the **removal of skin cancer** via Mohs micrographic surgery which are **in need of reconstructive surgery.** Please see excerpts below of probable source(s) of article:

<u>Excerpt from Skin Substitute LCD 34953</u>
Skin Substitutes Coverage Indications, Limitations, and/or Medical Necessity. This LCD covers the **use of skin substitutes** and related products **in the treatment of lower extremity ulcer disease**. **The LCD does not pertain or otherwise apply to the use of any skin substitutes** or related products **in the treatment of** burns, **skin cancer, or for true reconstructive surgery.**

<u>Excerpt from Wound Care LCD 37288</u>
Coverage Guidance Coverage Indications, Limitations
**For the purposes of this LCD, wound care is defined as care of wounds that are refractory to healing** or have complicated healing cycles either because of the nature of the wound itself or because of complicating metabolic and/or physiological factors. **This policy does not address** metabolically active **human skin** equivalent/**substitute** dressings, **burns, skin cancer** or hyperbaric oxygen therapy.

It seems as though once the UPIC made these unreferenced statements, that all subsequent reviewers followed suit and assumed the UPIC's own remarks to be true and applicable.

In our case, if we were to allow these ACUTE post-Mohs surgery wounds to stay open and heal on their own - the consequences would be disastrous and the consequences would begin to show <u>in days not weeks</u>.  To be clear, LCD 34953 and LCD 37288 are NOT applicable to any case reviewed by the UPIC.

There is vital importance in utilizing the correct LCD/LCA for a given clinical situation. LCD/LCA's are readily found in their complete form on CMS's website. In fact, there are applicable LCD/LCA's for the clinical situation presented in all cases reviewed, LCA 57477, which is discussed in detail below.

However, the UPIC instead cites medical indications from this, "*Skin Substitute Definitions per CPT*" article without source reference, and then repeats, often subtly, **the mantra that the medical indications for allografts to be utilized requires that the wound must be chronic and have**

**failed treatments.** To inappropriately apply the article/LCDs stated medical indications for allograft use without having any actual LCD "limitations" or LCD identifying numbers available is inappropriate for a professional and lends itself to the question of if this was done by mistake.

**<u>As a matter of fact, it is the Mohs LCA 57477 which is the one and only appropriate document for ALL post-Mohs surgery repairs</u>,** and which we fully complied with in terms of documentation requirements for Mohs and the repair. I have not seen the reviewers make a single citation from **Mohs LCA 57477 which contains <u>all</u> documentation requirements.** The reviewer's "*citations*" have been limited to the **Mohs LCD 35494 - which contains no information on documentation requirements.**

The services we provided were medically indicated, reasonable, necessary and appropriately documented. All supportive citations will be incorporated within my responses below whenever possible. All references will be attached in their complete form should a more detailed review be desired.

Post Mohs surgery **photographs, co-morbidities, measurements of the wound/defect** are the three mandatory requirements to justify repairs per the Mohs LCA 57477. So, what appears to be the basis for their denials is that they did not seem to be familiar with Mohs LCA 57477 which contains everything on the subject of covered services and required documentation for Mohs surgery and any subsequent repairs. Instead, they followed the UPIC's "*Skin Substitute Definitions per CPT*" article authored by, "*Medical Billing*" which does not even address CPT codes billed by Advanced Dermatology for the services provided.

The Mohs LCA 57477 thoroughly outlines the required documentation for BOTH Mohs surgery (to remove skin cancer); as well as, any subsequent repair, including but not limited to flaps and graphs (AKA true reconstructive surgery). **Photographs are required** and help to verify documented wound size and defect location. Medical/surgical history of any **co-morbidities** is also **required** as these can be medical indications as to why one repair is chosen over another. **Measurement** of the **"Primary defect"**, the defect/wound created after Mohs surgery - is **required**.

**Photographs, co-morbidities and Primary defect/defect/wound measurements** are required essential elements to support any type of repair selected along the "reconstructive ladder"; e.g., flaps, grafts, allografts, tissue expansion, etc.

**<u>Excerpt Mohs LCA 57477 Documentation Requirements for Mohs surgery & Repairs:</u>**
Documentation Requirements
11.    Measurement of the primary lesion necessitating MMS and **measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable.** Documentation of the clinical tumor border definition may be accomplished by:
    - Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).

- **Postoperative photography** to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
- It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.

12.    **When the surgical defect created by MMS requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.**

Today in reconstructive surgery, pre-op photographs of wounds/defects to be repaired are standard required documentation. Co-morbidities, both local skin and systemic must also be documented; e.g., COPD, cigarette smoking, diabetes, immunosuppression, atrophic tissue etc. may affect the choice of repair. Finally, measurements are required of the wound/defect (which are confirmed via photographs). In summary, photos, comorbidities and measurements of the defect/wound are the three requirements of documentation in the Mohs LCA 57477 regarding repairs of post Mohs surgery defects/wounds.

With reference to Primary defect/wound/defect size, the UPIC commented on many occasions that the wounds were "small". This was done without any comment regarding the photos which are in each and every chart. I find it hard to believe that the UPIC actually looked at the photos and if he did I would have even more concern as the most of these wounds are severe (big) in nature. The photos and co-morbidities are to my mind the most important factors for documentation in support of repair.

To my mind allografts are one step up on the reconstruction ladder from flaps and grafts. This is why I add "additional medical indications" to all allograft repairs. These medical indications are different and in excess of what I document for flaps and grafts.

**Co-morbidities** help guide you as to what types of repairs may be sub-optimal. For example, if the patient runs relatively low on oxygen (hypoxia), is immunosuppressed or has diabetes, this information would most likely effect your decision as to what type of repair you may or may not recommend especially with regards to allografts.

The only medical indication the auditors ever mention from our allograft notes is our threshold for flaps and grafts (reconstructive surgery) requirement that the wound could not be closed via primary side to side repair. The auditors also consistently stated that, just because the patient declined other options and the allograft treatment is safe and effective does not mean it is medically indicated, but, these are not medical indications and we never said they were. The reviewers never cite any of the variety of specific additional medical indications we document in each patient's chart note, albeit towards the later half of each allograft note.

The Mohs surgery notes and Allograft repair notes have the photos of the wound/defects **incorporated directly into the chart.** This was done in an attempt to remove any doubt as to the appropriateness and justification of any repairs. The bottom line is that **photos trump all in terms of justification for any particular type of repair**. There is no better way than photography to

show how the wound/defect sits in relation to vital structures such as the: eyes, ears, nose, lips and face in general.

## PROVIDER RESPONSE TO THE FOLLOWING ALLEGATION:
The reviewer's comments below are taken from page 1 of this document.

### REVIEWER COMMENTS FROM PAGE 1:
Additionally, the CPT Codebook requirement for billing 15271 states that **skin substitute grafts include** various kinds of human skin grafts, non-human skin grafts, and biological products that form a sheet scaffolding for skin growth.

**In other words**, this code is associated with the application/implantation of skin, or a biological substance intended to remain in the person for the purpose of helping the person's own skin cells to grow back.

The CPT Codebook **specifically states**, "[a]pplication of non-graft [i.e., something intended to be removed] wound dressings is not separately reportable."

## PROVIDER RESPONSE
Unfortunately, the reviewer has incorrectly paraphrased CPT 15271, in a most material fashion. Specifically, he excluded the word allograft. Please see the complete quote of CPT 15271 with the word allograft, below.

### Excerpt from CPT 15271 Skin Substitute Graft ACTUALLY states:
Skin substitute grafts include _**non-autologous human skin (dermal or epidermal, cellular and acellular) grafts (eg, homograft, allograft),**_ non-human skin substitute grafts (ie, xenograft), and biological products that form a sheet scaffolding for skin growth.

Artacent and EpiFix are both human allografts, specifically they are biologic human amniotic membrane derived skin substitute allografts (allografts). Please see excerpts below from their FDA approved package inserts:

### Excerpts from FDA approved ARTACENT package insert:
Description: **This** human tissue **allograft** is supplied and processed by Tides Medical. Applications and Directions for Use: **This allograft <u>may be used as a wound covering</u>** in <u>various surgical procedures</u>.

### Excerpts from FDA approved EPIFIX package insert:
EpiFix Description **EpiFix is a** minimally manipulated, dehydrated, non-viable cellular **allograft** derived from human amniotic membrane.
Tissue Uses **EpiFix is a barrier intended for use** in the treatment of **<u>acute</u>** and chronic wounds, providing a protective environment **to support the healing process**

Unfortunately, the UPIC appears to have a bit of a habit of creating a false premise, from which he then creates a series of intertwined false statements, which seems compelling to the point of him even stating, "_in other words_".

Again, the real problem here is that if this type of activity goes on and then an unsuspecting subsequent reviewer who is working in good faith performs his review, but understandably believes everyone is working in good faith they may rely on this UPIC's statements which thus far have been at least inaccurate.

**PROVIDER RESPONSE TO THE FOLLOWING ALLEGATION:**
The reviewer's comments below are taken from page 1 of this document.

**REVIEWER COMMENTS from page 1:**
In this case, provider **clearly applied a product defined by the manufacturer and the Food and Drug Administration (FDA) as a <u>wound covering</u>, not a "graft"** as per the definition in the CPT Codebook required to bill this code.

The CPT Codebook **specifically states,** "[**a]pplication of non-graft** [i.e., **something intended to be removed**] **<u>wound dressings</u> is not separately reportable.**"

**PROVIDER RESPONSE**
The reviewer is incorrect in his interpretation of the FDA approved manufacturer's package inserts which clearly describe Artacent as an allograft. Please see package insert below.

**Excerpts from FDA Approved ARTACENT Package Insert:**
> Description: **This** human tissue **allograft** is supplied and processed by Tides Medical. Applications and Directions for Use: **This allograft <u>may be used as a wound covering</u>** in <u>various surgical procedures</u>.

The FDA package insert defines Artacent as an allograft; additionally, it does **not** define Artacent as a wound covering, it states that, this allograft (Artacent) **<u>may be used</u> as a wound covering.** To not understand this nuanced material issue regarding homologous use (**used as a wound covering)** and allografts, is concerning as a great deal of this audit concerns homologous use.

**Excerpts from FDA Approved ARTACENT Package Insert:**
> Description: **This** human tissue **allograft** is supplied and processed by Tides Medical. Applications and Directions for Use: **This allograft <u>may be used as a wound covering</u>** in <u>various surgical procedures</u>.

Regarding CPT 15271 and the reviewer's speculation that there was, **"[i.e., something intended to be removed]"** one does not remove an amniotic membrane derived allograft, such as Artacent and EpiFix as it dissolves into the milieu of the wound within days. Therefore, there is no type of product that we remove from the wound bed when we see our allograft patients for follow up visits.

**Excerpt from CPT 15271 skin substitute graft (applications):**
> **Application of non-graft wound dressings** is not separately reportable. **Removal of current graft** and/or simple cleansing of the wound is included, when performed.

**PROVIDER RESPONSE TO THE FOLLOWING ALLEGATION Graft Fixation:**
The reviewer's comments below are taken from page 1 of this document.

**REVIEWER COMMENTS FROM PAGE 1:**
No sutures were utilized during the procedure to support a true skin graft procedure was performed.

**PROVIDER RESPONSE:**
Artacent and Epifix are amniotic membrane derived allografts. These allografts are tissue paper thin and dissolve rapidly into the milieu of the wound within days of application. "Suturing" (the word *suture* simply means to *close*) with <u>*a needle and suture material*</u> would be difficult to do with an allograft of this nature and would only accomplish unnecessary traumatization of the wound. That is why the word suture was not found in relation to our graft fixation.

In our case graft fixation is successfully accomplished via <u>tissue adhesives in the form of a soft silicone dressing</u> - MEPITEL.

<u>Excerpt from our medical records of KS patient JG DOS 5/9/2022 documentation of graft fixation via Mepilex "Safetac" tissue adhesive:</u>
> *Tissue adhesives were used to fixate the allograft to the wound site….*
> *The outer border strip of the Mepilex dressing is unique and has a very adhesive, yet gentle nature which provides for both security and for ease of change.*

EXCERPTS FROM MEPITEL (MÖLNLYCKE HEALTH CARE) LITERATURE:
When using Mepitel One (Mölnlycke Health Care) **for the fixation of skin grafts** and protection of blisters, the dressing should not be changed before the fifth day post application.

<u>Excerpts from Epifix's FDA Approved Package Insert:</u>
Tissue Uses EpiFix is a barrier intended for use in the treatment of acute and chronic wounds, providing a protective environment to support the healing process
-Please take great care when removing Epifix from the internal pouch.
-Epifix is thin and extremely lightweight.
<u>-Absorbable, non-absorbable suture material and/or</u> **tissue adhesives can be used to fixate EpiFix to the wound site, if desired.**

<u>Excerpts from Artacent's FDA approved package insert:</u>
**-** Please use caution when removing allograft from pouch as the allograft is thin and lightweight
-Anchor graft using preferred method of fixation. <u>Absorbable/non-absorbable suture material and/or</u>
**tissue adhesives may be used to apply the graft to the surgical site, if necessary.**

<u>Artacent Wound® Physician's Office Brochure</u>
<u>Artacent Wound® is a safe, natural biologic</u> **barrier** that maintains the original powerful characteristics of amniotic tissue….EASE-OF-USE: Can be placed on either side facing the wound, remains in place and
**doesn't require sutures.**

<u>EXCERPT from Scand J Plast Reconstr Surg 28:75-76, 1994 A.F.P.M. Vloemans and Kreis RW:</u>

## FIXATION OF SKIN GRAFTS WITH A NEW SILICONE RUBBER DRESSING (MEPITEL)

Abstract A new silicone rubber dressing material, Mepitel was tested as an alternative to surfasoft and staples or sutures and a Vaseline gauze for the fixation of 45 split skin grafts in 38 children. Almost all grafts took completely. No graft was lost because of inadequate fixation.

Excerpts from Mimedx (Epifix) Health Policy Medicare Update:
Indications or Limitations of Coverage and/or Medical Necessity: All products must be provided in accordance with the material's Food and Drug Administration (FDA) approved package label. Utilization Guidelines: Medicare expects skin substitutes to be applied according to the manufacturers' instructions. Any utilization above these parameters is subject to medical review.

## 5 PROVIDER RESPONSE TO THE FOLLOWING ALLEGATION -:
Secondary intention for all.

## SECONDARY INTENTION (SI):

Healing via Secondary Intention (SI) has a significantly higher rate of surgical site infection (SSI); eg, > 10% for the legs.  Therefore, prior to recommending a patient for healing via SI it is incumbent upon the provider to assess the complete situation in terms of both local and systemic co-morbidities which the patient may have that could make an impact on the decision as to whether or not to utilize SI or any repair for that matter. The point being that no two wounds are alike, and that SI is something that should NOT be recommended without at least some degree of forethought.
.

LARGE PRIMARY DEFECTS > 3.0 CM:
Full Thickness Skin Grafts (>3 cm diameter - Stephenson) performed on defects more than 3.0 cm in diameter are at a higher risk for failure due to the greater surface area of the graft and it will be too large for adequate imbibition (drinking).  If a defect is over 3.0 cm repair via a flap  can be quite challenging for both the patient and provider.

Excerpt from Elseth A, Nunez Lopez O. **Wound Grafts**. [Updated 2022 Oct 31]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2023 Jan-.
Larger grafts (>3 cm diameter - Stephenson) risk failure because the surface area will be too large for adequate imbibition.

Secondary intention (SI) for a post MMS (Mohs Micrographic Surgery) or WLE (Wide Local Excision) wound on the Lower extremities, or the scalp would lead to a 100% and 150% increase respectively in the rate of post op infections vs. closure with repair. Unfortunately, what's often times not understood is the catastrophic, permanent damage and all the other negative sequelae which our patients would incur with SI; which is why with our expertise we must inform our patients, just as we try to advise the auditors, that in this particular case SI would be extremely ill advised due to the following medical conditions: chronic leg edema (Chronic Venus Insufficiency) and Leg Ulcers [VLUs]), immunocompromised, diabetic, systemic or local lack of vascularity, systemic or local lack of oxygenation (smoker, COPD, supplemental O2, scarred tissue, atrophic tissue, etc) and finally due to the potential to develop an ectropion (eyelid pulling downwards), eclabium (lip pulling upwards),  To recommend Secondary intention for many wounds in this audit

would constitute malpractice. The photos are incorporated into each chart to make it easy for anyone to confirm our documentation of the medical need and reasonability for all of our repairs.

When we state that the defect is not feasible to be closed with Primary side to side repair that indicates the wound is medically indicated to be closed with true reconstructive surgery; i.e., flaps, grafts and allografts, etc. Within our additional medical indications, part of the reason that they are towards the end of the note, along with the **photos**, is because by the time the note is at that stage the Additional Medical Indications are there to provide the *additional* rational as to why this defect requires an allograft over a flap, graft or secondary intention.  No auditor has yet to comment on the many unique and varied medical indications we have documented for flaps, grafts or allografts other than to say, provider states that the wound is not feasible for side-to-side repair. To not comment on the photo in this situation is very surprising.  No document in the world can trump a photo for the purpose of determining the medical appropriateness of performing true reconstructive surgery.

Therefore, in situations in which the primary defect is 3.0 cm or more in diameter your options will often times come down to a are secondary intention (SI) with its significantly higher rate of infection, or amniotic membrane derived skin substitute allografts. It is at this point that we must further assess the complete situation in terms of both local and systemic co-morbidities. Many if not most of the wounds in this audit were 3.0 cm or greater.

Excerpt from the American Society of Dermatologic Surgery:
Incidence of Surgical Site Infections in Second Intention Healing After Dermatologic Surgery
Joshua Schimmel, BS,* Matthew Belcher, MD,† Carlos Vieira, BS,* Naomi Lawrence, MD,† and Ashley Decker, MD† 2020 by the American Society for Dermatologic Surgery, ISSN: 1076-0512 Dermatol Surg 2020;46:1492–1497 ·DOI: 10.1097/DSS.0000000000002409
*"There are few studies analyzing the surgical site infection (SSI) rate of second intention wounds after dermatologic surgery, and the results are inconclusive. Yet, the current dogma in dermatologic surgery is that wounds healed by second intention have lower infection rates. ....*
***Second intention wounds were associated with a significantly higher risk of infection compared with sutured wounds** (odds ratio = 2.22, 95% confidence interval 1.63–2.99). The lower extremity (LE) had the highest overall infection rate (10.5%)...*
*To the best of our knowledge, this is the largest study analyzing second intention infection rates after dermatologic surgery...*
*In conclusion, this retrospective review of **5,679 dermatologic surgeries** supports that MMS or WLE performed on the LE <u>or allowed to heal by second intention</u> has an increased risk of SSI.*
<u>*Clinicians should carefully monitor patients who have these risk factors.*</u>

The issue of SSI (surgical site infection) and all that it entails, is just one of the negative consequences every one of the patients in this audit would have suffered if we were to have abided by the reviewer's suggestion.

**ECONOMICS:**

Reviewer stated that,
      SSA 1156(a) states, in relevant part, that it is the "obligation of any health care practitioner who provides health care services for which payment may be made (in whole or in part) under this Act,

to assure, to the extent of his authority that services or items ordered or provided by such practitioner to beneficiaries and recipients under this Act—(1) **will be provided economically and only when, and to the extent, medically necessary".**

On the billed DOS, the provider was paid **3,349.60** for the product itself.

In an effort to act in good faith and add transparency, in addition to comparing apples to apples, I believe it is important to point out that this 3,349.60 was the reimbursement figure for two allograft repairs not just one. Furthermore, Dr. Adams received **$1,272.85** for these two allograft repair products and the allograft manufacturer received the lion's share of **$2,545.70.**

$700-$1,000 dollars is the approximate average reimbursement Dr. Adams would receive for the performance of a single flap or graft. Therefore, if Dr. Adams had performed a standard flap or graft on each of these two wounds, he would have received **$1,400 to $2,000** dollars for the repair of these two repairs either of which is greater than the **$1,272.85** he received for these two allograft products.

Sec. 1156: Obligations of Health Care Practitioners and Providers of Health Care Services; Sanctions and Penalties; Hearings and Review Click to open document in a browser
Sec. 1156. [42 U.S.C. 1320c-5] (a) It shall be the obligation of any health care practitioner and any other person (including a hospital or other health care facility, organization, or agency) who provides health care services for which payment may be made (in whole or in part) under this Act, to assure, to the extent of his authority that **services or items ordered or provided by such practitioner or person to beneficiaries and recipients under this Act—**

Economics: Currently approximately 15% of our Post Mohs surgery patients are repaired via allografts. If we offered repair via allograft to all of our Post Mohs surgery patients, I would estimate that greater than 70% or more would opt for repair via allograft. They would do so in order to avoid the additional time, pain (injections) and potential serious complications associated with true reconstructive surgery.

Medical Indications, reasonable and necessary: The patients we offer allografts to, are carefully selected based upon the fact that their wounds are relatively large and these patients virtually all have additional medical indications (co-morbidities) which are contrary to incisional reconstructive surgery and supportive of repair via allograft. In addition to having relatively large defects, in high-risk (sensitive head, neck, hands, feet and pretibial region) locations which are medically indicated for reconstructive surgery, i.e., flaps or grafts, all additional medical indications, in addition to size and inability to close primarily are thoroughly documented for all of our patients. So, that if per chance one were to make an unsubstantiated remark regarding my choice for repair, such as "it's not medically indicated" or "the wound is small" is one of the primary reasons we take photos with all of our Mohs surgery and allograft patients - which are all incorporated into all of our Allograft notes.

Upon reviewing thousands of our records, the reviewer has never once commented on our photographs – that is quite remarkable considering the complexity of these procedures; however, to do so may not fit with the reviewer's persistent, inappropriate opinion that our notes are cloned.

The vast majority of the Mohs cases which are repaired via allografts, would otherwise be sent to plastic surgery for consultation and repair which would generally cost thousands of dollars more due to anesthesia and facility fees in addition to any repairs.

The previously cited peer review article specifically compared Post Mohs surgery repair via allograft vs. flaps and grafts in high-risk patients. The complication rates were 28.7 % when flaps or grafts were used in these in high-risk patient/situations vs. only 2.1% when allografts were utilized in these high-risk

patient/situations.  Complications often times included additional procedures, which can mean more pain, trauma, time, cost and inconvenience for the patient. Although, this study also showed that the allograft group cost **$560 more and one additional appointment** when compared to traditional reconstructive repair; ie flaps and grafts; the rate of complication and the rate at which the allograft treated patients would have alternatively been sent to plastic surgery, with all of the cost increases that would generally entail to include loss of 50% surgery reduction rule, anesthesia and facility fees which would add thousand of dollars to the treatment costs.

Finally, we are also attempting to put together a protocol for allograft use post Mohs surgery. Please see our Peer Review article on Mohs surgery and Allografts which was published in 2021 and is the first and by far the largest of its' kind.

Almost, all of the patients in this audit were over 65 years of age or older; patients who are 65 years or older have an associated 25% increase in post op complications.

**$1,000 dollars Net Income to Dr. Adams for one flap or graft**
$1,000 dollars is the average reimbursement we receive for the performance of a flap or graft, which would have been the two next most appropriate repairs behind repair via allograft.

> AUDITOR'S COMMENTS: The provider had the patient return on 5/3/2022, 5/4/2022, and 5/5/2022 for post operative wound checks and IM Rocephin injections.

> The provider also had the patient return on 5/9/2022 and 5/16/2022 for repeated applications of amniotic membrane product grafts.

> PROVIDER'S RESPONSE: Which is standard care with post Mohs allograft repairs. Please see manufacturers recommendations for re-applications which Medicare states it wants us to abide by.

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 136-137

# FOULSTON

ATTORNEYS AT LAW

Amanda M. Wilwert

awilwert@foulston.com
Phone: 913.253.2181
Fax: 913.498.2101

7500 COLLEGE BOULEVARD, SUITE 1400
OVERLAND PARK, KS 66210-4041

April 7, 2023

*Sent via USPS*

C2C Innovative Solutions, Inc. – QIC Part B North
P.O. Box 45208
Jacksonville, FL 32232-5208

    Re:    Provider Name: Advanced Dermatology and Skin Cancer Center
           Redetermination/Appeals Number: 5422359094000

To Whom It May Concern:

This firm represents Advanced Dermatology and Skin Cancer Center ("Advanced Dermatology"). Enclosed please find a CMS 1969 appointment of representation form.

Advanced Dermatology is requesting reconsideration of the unfavorable appeal decision articulated in the February 6, 2023 redetermination decision letter, which was received on February 13, 2023.  Enclosed please find the reconsideration request form, a copy of the February 6, 2023 redetermination decision letter, a cover letter outlining the reasons for requesting reconsideration, and an encrypted flash drive.  ***Please call my office at 913-253-2138 for the password for the encrypted flash drive.***

The encrypted flash drive contains a copy of the enclosed appointment of representation form, a copy of the reconsideration request form, a copy of the enclosed letter outlining the reasons for requesting reconsideration, individual patient records, responses to the auditor's findings, and other supporting documentation.

The enclosed flash drive is encrypted.  The following instructions will assist with opening the flash drive:

1.    Insert flash drive into USB port of a computer connected to the internet.
    a.    If the computer utilized to open the flash drive does not have internet access, please contact my office immediately at 913-253-2138 to arrange for a different flash drive to be delivered.

2.    You will receive a small black popup in the lower corner of your screen that says select to choose what to do with this flash drive.  Click on the popup.
    a.    If you miss the popup, open File Explorer and look for a "DVD RW Drive (D:) DTL+G3"

Page 2

3.      Another box will popup labeled DVD RW Drive.  Select the first option: Run DTL Plus- Launcher.

4.      A screen will popup asking for the password.  ***Please call my office at 913-253-2138 for the password***.  Enter the password and select "ok".

5.      A licensing offer may appear.  Close or decline the licensing offer.

If you have any questions or issues with the encrypted flash drive, please contact my office at 913-253-2138.  Thank you for your time and consideration of Advanced Dermatology's request for reconsideration.

                    Sincerely,

                    FOULSTON SIEFKIN LLP

                    Amanda M. Wilwert


Enclosures including documents on encrypted flash drive.

283 - 1





**MEDICARE**
Part B

Date: 11/21/2022

Letter Number: 31378432

ADVANCED DERMATOLOGY PA
2735 PEMBROOK PL
MANHATTAN, KS 665027482

**INITIAL REQUEST**

RE : MMA 935 - Overpayment Amount
    Overpayment Amount: $41,354.99
    Outstanding Balance: $41,354.99
    Provider Number: 110568-1124094867

Dear Sir/Madam,

This letter is to inform you that you have received a Medicare payment in error, which has resulted in an overpayment subject to section 935(f)(2) of the Medicare Modernization Act (MMA), section 1893(f)(2) of the Social Security Act, Limitation on Recoupment, in the amount $41,354.99. **The purpose of this letter is to request that this amount be repaid to our office.** The attached enclosure explains how this happened.

**NOTE:** If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding please follow the instructions found at the end of this letter.

**Why you are responsible:**

You are responsible for following correct Medicare filing procedures and must use care when billing and accepting payment. You are responsible for repayment in this matter based upon one or both of the following criteria:

1. You billed and/or received payment for services for which you should have known you were not entitled to receive payment. Therefore, you are not without fault and are responsible for repaying the overpayment amount.

2. You received overpayments resulting from retroactive changes in the Medicare Physician Fee Schedule and/or changes mandated by legislation.

If you dispute this determination, please follow the appropriate appeals process listed below.

---

WPS Government Health Administrators

P.O. Box 1787, Madison, WI 53701

www.wpsgha.com

VOL. II

140

File 13 pdf - Page 49 of 2526

(Applicable authorities: section 1870(b) of Social Security Act; subsection 405.350 - 405.359 of Title 42, subsection 404.506 - 404.509, 404.510a and 404.512 of Title 20 of the United States Code of Federal Regulations.)

This amount is subject to section 935(f)(2) of the Medicare Modernization Act (MMA) (section1893(f)(2) of the Social Security Act), Limitation on Recoupment (42 CFR 405.379).

### Rebuttal Process:

Under the existing regulations 42 CFR section 405.374, providers and other suppliers will have **15 days from the date of this demand letter** to submit a statement of opportunity to rebuttal. The rebuttal process provides the debtor the opportunity, before the suspension, offset, or recoupment takes effect, to submit any statement (to include any pertinent information) as to why it should not be put into effect on the date specified in the notice. A rebuttal is not intended to review supporting medical documentation nor disagreement with the overpayment decision. A rebuttal shall not duplicate the redetermination process. **This is not an appeal of the overpayment determination and the limitation on recoupment under** section1893 (f)(2)(a) of the Social Security Act **does not apply to rebuttal requests.** We will review your rebuttal documentation and determine whether the facts justify ceasing the recoupment or offset. Our office will advise you of our decision 15 days from the mailroom-stamped receipt date of your request.

### Interest Assessment:

**If you do not refund in 30 days:**

In accordance with 42 CFR 405.378, simple interest at the rate of 10.125% will be charged on the unpaid balance of the overpayment, beginning on the 31st day. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made on time. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged. Each payment will be applied first to accrued interest and then to principal. After each payment, interest will continue to accrue on the remaining principal balance, at the rate of 10.125%.

### Suspended Funds Applied To The Overpayment and Has a Remaining Outstanding Balance:

If the suspended funds are insufficient to fully eliminate any overpayment, and the provider or supplier meets the requirements of 42 CFR section 405.379 "Limitation on Recoupment" provision under section1893(f) (2) of the Act, then the provider or supplier is subject to 935 Appeals rights and will be available for offset after 41 days on the remaining balance still owed to CMS. (See 42 CFR section 405.372(e) for more information.)

### Payment by Recoupment:

Page 3
Date : 11/21/2022
Letter Number : 31378432

If payment in full is not received by 12/31/2022, **payments** to you can be recouped (recoupment) until payment in full is received if you haven't submitted an acceptable ERS request, an immediate recoupment request, and/or a valid and timely appeal is received.

**Make a payment or Arrange for payments:**

What you should do:

Please return the overpaid amount to us by 12/20/2022 and no interest will be assessed. We request that you refund this amount in full.

Make the check payable to Medicare Part B and send it with a copy of this letter to:

> WPS Government Health Administrators
> Payment Recovery
> P.O. Box 8215
> Madison, WI 53708-8215

If you are unable to refund the entire amount at this time, advise this office immediately, with a request for an **Extended Repayment Schedule (ERS)** so that we may determine if you are eligible for one. Any repayment schedule (where one is approved) would run from the date of the ERS review approval date.

**You can visit our website at www.wpsgha.com for the ERS Request instructions.**

**Immediate Recoupment:**

**TO SIMPLIFY THE REPAYMENT PROCESS,** reduce the extra work and cost associated with mailing your repayment each time, you may elect to have automatic immediate recoupments for ALL overpayments by requesting the **Immediate Recoupment** process for All Current and Future Accounts Receivable. This will automatically begin recoupment starting on day 16 for ALL future accounts receivable. When the initial request is received after day 16 the debt shall be placed in an immediate recoupment status. If the debt is not collected in full before day 31, interest will continue to accrue until the debt is collected in full.

You must specify whether you are submitting:

1. A request on the current demanded overpayment (all accounts receivables within this demand letter) and ALL FUTURE OVERPAYMENTS; or

2. A one-time request on this current demanded overpayment (all accounts receivables) addressed in this demand letter only.

**You can visit our website at www.wpsgha.com for the Immediate Recoupment Request**

**instructions.**

You may contact this office for information on how to fax your request.

This process is voluntary and for your convenience. Your request must specifically state you understand you are waiving potential receipt of interest payment pursuant to § 1893(f) (2) for the overpayments.

**Note:** Such interest may be payable for certain overpayments reversed at the ALJ level or subsequent levels of appeal.

### If You Wish To Appeal This Decision

If you disagree with this overpayment decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claims. The first level of appeal is called a redetermination. You must file your request for a redetermination 120 days from the date of this letter. However, if you wish to avoid recoupment from occurring, you need to file your request for redetermination within 30 days from the date of this letter, as described above. Unless you show us otherwise, we assume you received this letter within 5 days of the date of this letter.

Please send your request for redetermination to:

> WPS Government Health Administrators - 935 APPEALS
> REDETERMINATION
> Appeals Department
> P.O. Box 14260
> Madison, WI 53708-0260

### How to Stop Recoupment:

Even if the overpayment and any assessed interest has not been paid in full, you can temporarily stop Medicare from recouping any payments. **If you act quickly and decidedly,** Medicare will stop recoupment at two points.

**First Opportunity:** We must receive a valid and timely request for a redetermination within 30 days from the date of this letter. We will stop or delay recoupment pending the results of an appeal. To assist us in expeditiously stopping the recoupment process, we request that you clearly indicate on your appeal request that this is a 935 overpayment appeal for a redetermination.

**Second Opportunity:** If the redetermination decision is (1) **unfavorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare redetermination notice (Medicare Appeal Decision Letter); or (2) if the decision is **partially favorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare revised overpayment

Page 5
Date : 11/21/2022
Letter Number : 31378432

Notice/Revised Demand Letter. Therefore, it is important to act quickly and decidedly to limit recoupment by submitting a valid and timely request for reconsideration within 60 days of the appropriate notice/letter. The address and details on how to file a request for reconsideration will be included in the Redetermination decision letter.

## What Happens Following a Reconsideration By a Qualified Independent Contractor (QIC):

Following **a decision or dismissal** by the QIC, if the debt has not been paid in full, we will begin or resume recoupment whether or not you appeal to the next level, Administrative Law Judge (ALJ). **NOTE:** Even when recoupment is stopped, interest continues to accrue.

## Medicaid Offset:

If this matter is not resolved, CMS may instruct the Medicaid State Agency to withhold the Federal share of any Medicaid payments that may be due you or related facilities until the full amount owed Medicare is recouped; Title 42 CFR, section 447.30(g). These recoveries will be in addition to any recoupments from other Medicare funds due you until the full amount owed to Medicare is recovered.

## Right to Inspect Records Prior to Referral to Treasury:

In the event an Intent to Refer (ITR) letter is sent, you have the right to inspect and copy all records pertaining to your debt. In order to present evidence or review the CMS records, you must submit a written request to the address below. Your request must be received within 60 calendar days from the ITR letter date. In response to a timely request for access to CMS' records, you will be notified of the location and time when you can inspect and copy records related to this debt. Interest will continue to accrue during any review period. Therefore, while review is pending, you will be liable for interest and related late payment charges on amounts not paid by the due date identified above.

## For Individual Debtors Filing a Joint Federal Income Tax Return:

The Treasury Offset Program automatically refers debts to the Internal Revenue Service (IRS) for Offset. Your Federal income tax refund is subject to offset under this program. If you file a joint income tax return, you should contact the IRS before filing your tax return to determine the steps to be taken to protect the share of the refund, which may be payable to the non-debtor spouse.

## For Debtors that Share a Tax Identification Number(s):

Section 1866(j)(6) of the Social Security Act authorizes the Secretary of Health and Human Services (the Secretary) to make any necessary adjustments to the payments of an applicable provider or supplier who shares a TIN with an obligated provider or supplier, one that has an outstanding Medicare overpayment. The Secretary is authorized to adjust the payments of

such a provider or supplier regardless of whether it has been assigned a different billing number or National Provider Identification Number (NPI) from that of the provider or supplier with the outstanding Medicare overpayment.

**Federal Salary Offset:**

If the facility ownership is either a sole proprietorship or partnership, your individual salary(s) may be offset if you are, or become, a federal employee.

**If you have filed a bankruptcy petition:**

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy, please include the name in the bankruptcy is filed under and the district where the bankruptcy is filed.

Should you have any questions, please contact your overpayment consultant at the following:

Part B Immediate Recoupment - Fax: 608-223-7550
Part B Extended Repayment Request: 866-518-3285
Provider - Part B: 866-518-3285

We look forward to hearing from you shortly.

Sincerely,


Medicare Part B Recovery Unit
WPS Government Health Administrators

Enclosures
How This Overpayment Was Determined

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 146-154





**MEDICARE**

Part B

Date: 11/23/2022

Letter Number: 31448423

ADVANCED DERMATOLOGY PA
2735 PEMBROOK PL
MANHATTAN, KS 665027482

## INITIAL REQUEST

RE : MMA 935 - Overpayment Amount
    Overpayment Amount: $21,954.83
    Outstanding Balance: $21,954.83
    Provider Number: 110568-1124094867

Dear Sir/Madam,

This letter is to inform you that you have received a Medicare payment in error, which has resulted in an overpayment subject to section 935(f)(2) of the Medicare Modernization Act (MMA), section 1893(f)(2) of the Social Security Act, Limitation on Recoupment, in the amount $21,954.83. **The purpose of this letter is to request that this amount be repaid to our office.** The attached enclosure explains how this happened.

**NOTE:** If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding please follow the instructions found at the end of this letter.

## Why you are responsible:

You are responsible for following correct Medicare filing procedures and must use care when billing and accepting payment. You are responsible for repayment in this matter based upon one or both of the following criteria:

1.  You billed and/or received payment for services for which you should have known you were not entitled to receive payment. Therefore, you are not without fault and are responsible for repaying the overpayment amount.

2.  You received overpayments resulting from retroactive changes in the Medicare Physician Fee Schedule and/or changes mandated by legislation.

If you dispute this determination, please follow the appropriate appeals process listed below.

WPS Government Health Administrators

P.O. Box 1787, Madison, WI 53701

www.wpsgha.com

(Applicable authorities: section 1870(b) of Social Security Act; subsection 405.350 - 405.359 of Title 42, subsection 404.506 - 404.509, 404.510a and 404.512 of Title 20 of the United States Code of Federal Regulations.)

This amount is subject to section 935(f)(2) of the Medicare Modernization Act (MMA) (section1893(f)(2) of the Social Security Act), Limitation on Recoupment (42 CFR 405.379).

## Rebuttal Process:

Under the existing regulations 42 CFR section 405.374, providers and other suppliers will have **15 days from the date of this demand letter** to submit a statement of opportunity to rebuttal. The rebuttal process provides the debtor the opportunity, before the suspension, offset, or recoupment takes effect, to submit any statement (to include any pertinent information) as to why it should not be put into effect on the date specified in the notice. A rebuttal is not intended to review supporting medical documentation nor disagreement with the overpayment decision. A rebuttal shall not duplicate the redetermination process. **This is not an appeal of the overpayment determination and the limitation on recoupment under** section1893 (f)(2)(a) of the Social Security Act **does not apply to rebuttal requests.** We will review your rebuttal documentation and determine whether the facts justify ceasing the recoupment or offset. Our office will advise you of our decision 15 days from the mailroom-stamped receipt date of your request.

## Interest Assessment:

**If you do not refund in 30 days:**

In accordance with 42 CFR 405.378, simple interest at the rate of 10.125% will be charged on the unpaid balance of the overpayment, beginning on the 31st day. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made on time. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged. Each payment will be applied first to accrued interest and then to principal. After each payment, interest will continue to accrue on the remaining principal balance, at the rate of 10.125%.

## Suspended Funds Applied To The Overpayment and Has a Remaining Outstanding Balance:

If the suspended funds are insufficient to fully eliminate any overpayment, and the provider or supplier meets the requirements of 42 CFR section 405.379 "Limitation on Recoupment" provision under section1893(f) (2) of the Act, then the provider or supplier is subject to 935 Appeals rights and will be available for offset after 41 days on the remaining balance still owed to CMS. (See 42 CFR section 405.372(e) for more information.)

## Payment by Recoupment:

Page 3
Date : 11/23/2022
Letter Number : 31448423

If payment in full is not received by 01/02/2023, **payments** to you can be recouped (recoupment) until payment in full is received if you haven't submitted an acceptable ERS request, an immediate recoupment request, and/or a valid and timely appeal is received.

**Make a payment or Arrange for payments:**

What you should do:

Please return the overpaid amount to us by 12/22/2022 and no interest will be assessed. We request that you refund this amount in full.

Make the check payable to Medicare Part B and send it with a copy of this letter to:

> WPS Government Health Administrators
> Payment Recovery
> P.O. Box 8215
> Madison, WI 53708-8215

If you are unable to refund the entire amount at this time, advise this office immediately, with a request for an **Extended Repayment Schedule (ERS)** so that we may determine if you are eligible for one. Any repayment schedule (where one is approved) would run from the date of the ERS review approval date.

**You can visit our website at www.wpsgha.com for the ERS Request instructions.**

**Immediate Recoupment:**

**TO SIMPLIFY THE REPAYMENT PROCESS,** reduce the extra work and cost associated with mailing your repayment each time, you may elect to have automatic immediate recoupments for ALL overpayments by requesting the **Immediate Recoupment** process for All Current and Future Accounts Receivable. This will automatically begin recoupment starting on day 16 for ALL future accounts receivable. When the initial request is received after day 16 the debt shall be placed in an immediate recoupment status. If the debt is not collected in full before day 31, interest will continue to accrue until the debt is collected in full.

You must specify whether you are submitting:

1. A request on the current demanded overpayment (all accounts receivables within this demand letter) and ALL FUTURE OVERPAYMENTS; or

2. A one-time request on this current demanded overpayment (all accounts receivables) addressed in this demand letter only.

**You can visit our website at www.wpsgha.com for the Immediate Recoupment Request**

**instructions.**

You may contact this office for information on how to fax your request.

This process is voluntary and for your convenience. Your request must specifically state you understand you are waiving potential receipt of interest payment pursuant to § 1893(f) (2) for the overpayments.

**Note:** Such interest may be payable for certain overpayments reversed at the ALJ level or subsequent levels of appeal.

**If You Wish To Appeal This Decision**

If you disagree with this overpayment decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claims. The first level of appeal is called a redetermination. You must file your request for a redetermination 120 days from the date of this letter. However, if you wish to avoid recoupment from occurring, you need to file your request for redetermination within 30 days from the date of this letter, as described above. Unless you show us otherwise, we assume you received this letter within 5 days of the date of this letter.

Please send your request for redetermination to:

> WPS Government Health Administrators - 935 APPEALS
> REDETERMINATION
> Appeals Department
> P.O. Box 14260
> Madison, WI 53708-0260

**How to Stop Recoupment:**

Even if the overpayment and any assessed interest has not been paid in full, you can temporarily stop Medicare from recouping any payments. **If you act quickly and decidedly,** Medicare will stop recoupment at two points.

**First Opportunity:** We must receive a valid and timely request for a redetermination within 30 days from the date of this letter. We will stop or delay recoupment pending the results of an appeal. To assist us in expeditiously stopping the recoupment process, we request that you clearly indicate on your appeal request that this is a 935 overpayment appeal for a redetermination.

**Second Opportunity:** If the redetermination decision is (1) **unfavorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare redetermination notice (Medicare Appeal Decision Letter); or (2) if the decision is **partially favorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare revised overpayment

Notice/Revised Demand Letter. Therefore, it is important to act quickly and decidedly to limit recoupment by submitting a valid and timely request for reconsideration within 60 days of the appropriate notice/letter. The address and details on how to file a request for reconsideration will be included in the Redetermination decision letter.

## What Happens Following a Reconsideration By a Qualified Independent Contractor (QIC):

Following a **decision or dismissal** by the QIC, if the debt has not been paid in full, we will begin or resume recoupment whether or not you appeal to the next level, Administrative Law Judge (ALJ). **NOTE:** Even when recoupment is stopped, interest continues to accrue.

## Medicaid Offset:

If this matter is not resolved, CMS may instruct the Medicaid State Agency to withhold the Federal share of any Medicaid payments that may be due you or related facilities until the full amount owed Medicare is recouped; Title 42 CFR, section 447.30(g). These recoveries will be in addition to any recoupments from other Medicare funds due you until the full amount owed to Medicare is recovered.

## Right to Inspect Records Prior to Referral to Treasury:

In the event an Intent to Refer (ITR) letter is sent, you have the right to inspect and copy all records pertaining to your debt. In order to present evidence or review the CMS records, you must submit a written request to the address below. Your request must be received within 60 calendar days from the ITR letter date. In response to a timely request for access to CMS' records, you will be notified of the location and time when you can inspect and copy records related to this debt. Interest will continue to accrue during any review period. Therefore, while review is pending, you will be liable for interest and related late payment charges on amounts not paid by the due date identified above.

## For Individual Debtors Filing a Joint Federal Income Tax Return:

The Treasury Offset Program automatically refers debts to the Internal Revenue Service (IRS) for Offset. Your Federal income tax refund is subject to offset under this program. If you file a joint income tax return, you should contact the IRS before filing your tax return to determine the steps to be taken to protect the share of the refund, which may be payable to the non-debtor spouse.

## For Debtors that Share a Tax Identification Number(s):

Section 1866(j)(6) of the Social Security Act authorizes the Secretary of Health and Human Services (the Secretary) to make any necessary adjustments to the payments of an applicable provider or supplier who shares a TIN with an obligated provider or supplier, one that has an outstanding Medicare overpayment. The Secretary is authorized to adjust the payments of

such a provider or supplier regardless of whether it has been assigned a different billing number or National Provider Identification Number (NPI) from that of the provider or supplier with the outstanding Medicare overpayment.

**Federal Salary Offset:**

If the facility ownership is either a sole proprietorship or partnership, your individual salary(s) may be offset if you are, or become, a federal employee.

**If you have filed a bankruptcy petition:**

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy, please include the name in the bankruptcy is filed under and the district where the bankruptcy is filed.

Should you have any questions, please contact your overpayment consultant at the following:

Part B Immediate Recoupment - Fax: 608-223-7550
Part B Extended Repayment Request: 866-518-3285
Provider - Part B: 866-518-3285

We look forward to hearing from you shortly.

Sincerely,


Medicare Part B Recovery Unit
WPS Government Health Administrators

Enclosures
How This Overpayment Was Determined

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 161-163



**MEDICARE**
Part B

Letter Number: 31377512

Date: 11/21/2022

ADVANCED DERMATOLOGY PA
2735 PEMBROOK PL
MANHATTAN, KS 665027482

**INITIAL REQUEST**

RE : MMA 935 - Overpayment Amount
    Overpayment Amount: $46,834.65
    Outstanding Balance: $46,834.65
    Provider Number: NA3713-1124094867

Dear Sir/Madam,

This letter is to inform you that you have received a Medicare payment in error, which has resulted in an overpayment subject to section 935(f)(2) of the Medicare Modernization Act (MMA), section 1893(f)(2) of the Social Security Act, Limitation on Recoupment, in the amount $46,834.65. **The purpose of this letter is to request that this amount be repaid to our office.** The attached enclosure explains how this happened.

**NOTE:** If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding please follow the instructions found at the end of this letter.

**Why you are responsible:**

You are responsible for following correct Medicare filing procedures and must use care when billing and accepting payment. You are responsible for repayment in this matter based upon one or both of the following criteria:

1. You billed and/or received payment for services for which you should have known you were not entitled to receive payment. Therefore, you are not without fault and are responsible for repaying the overpayment amount.

2. You received overpayments resulting from retroactive changes in the Medicare Physician Fee Schedule and/or changes mandated by legislation.

If you dispute this determination, please follow the appropriate appeals process listed below.

---

(Applicable authorities: section 1870(b) of Social Security Act; subsection 405.350 - 405.359 of Title 42, subsection 404.506 - 404.509, 404.510a and 404.512 of Title 20 of the United States Code of Federal Regulations.)

This amount is subject to section 935(f)(2) of the Medicare Modernization Act (MMA) (section1893(f)(2) of the Social Security Act), Limitation on Recoupment (42 CFR 405.379).

**Rebuttal Process:**

Under the existing regulations 42 CFR section 405.374, providers and other suppliers will have **15 days from the date of this demand letter** to submit a statement of opportunity to rebuttal. The rebuttal process provides the debtor the opportunity, before the suspension, offset, or recoupment takes effect, to submit any statement (to include any pertinent information) as to why it should not be put into effect on the date specified in the notice. A rebuttal is not intended to review supporting medical documentation nor disagreement with the overpayment decision. A rebuttal shall not duplicate the redetermination process. **This is not an appeal of the overpayment determination and the limitation on recoupment under** section1893 (f)(2)(a) of the Social Security Act **does not apply to rebuttal requests.** We will review your rebuttal documentation and determine whether the facts justify ceasing the recoupment or offset. Our office will advise you of our decision 15 days from the mailroom-stamped receipt date of your request.

**Interest Assessment:**

**If you do not refund in 30 days:**

In accordance with 42 CFR 405.378, simple interest at the rate of 10.125% will be charged on the unpaid balance of the overpayment, beginning on the 31st day. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made on time. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged. Each payment will be applied first to accrued interest and then to principal. After each payment, interest will continue to accrue on the remaining principal balance, at the rate of 10.125%.

**Suspended Funds Applied To The Overpayment and Has a Remaining Outstanding Balance:**

If the suspended funds are insufficient to fully eliminate any overpayment, and the provider or supplier meets the requirements of 42 CFR section 405.379 "Limitation on Recoupment" provision under section1893(f) (2) of the Act, then the provider or supplier is subject to 935 Appeals rights and will be available for offset after 41 days on the remaining balance still owed to CMS. (See 42 CFR section 405.372(e) for more information.)

**Payment by Recoupment:**

Page 3
Date : 11/21/2022
Letter Number : 31377512

If payment in full is not received by 12/31/2022, **payments** to you can be recouped (recoupment) until payment in full is received if you haven't submitted an acceptable ERS request, an immediate recoupment request, and/or a valid and timely appeal is received.

## Make a payment or Arrange for payments:

What you should do:

Please return the overpaid amount to us by 12/20/2022 and no interest will be assessed. We request that you refund this amount in full.

Make the check payable to Medicare Part B and send it with a copy of this letter to:

>  WPS Government Health Administrators
>  Payment Recovery
>  P.O. Box 8215
>  Madison, WI 53708-8215

If you are unable to refund the entire amount at this time, advise this office immediately, with a request for an **Extended Repayment Schedule (ERS)** so that we may determine if you are eligible for one. Any repayment schedule (where one is approved) would run from the date of the ERS review approval date.

**You can visit our website at www.wpsgha.com for the ERS Request instructions.**

## Immediate Recoupment:

**TO SIMPLIFY THE REPAYMENT PROCESS,** reduce the extra work and cost associated with mailing your repayment each time, you may elect to have automatic immediate recoupments for ALL overpayments by requesting the **Immediate Recoupment** process for All Current and Future Accounts Receivable. This will automatically begin recoupment starting on day 16 for ALL future accounts receivable. When the initial request is received after day 16 the debt shall be placed in an immediate recoupment status. If the debt is not collected in full before day 31, interest will continue to accrue until the debt is collected in full.

You must specify whether you are submitting:

1. A request on the current demanded overpayment (all accounts receivables within this demand letter) and ALL FUTURE OVERPAYMENTS; or

2. A one-time request on this current demanded overpayment (all accounts receivables) addressed in this demand letter only.

**You can visit our website at www.wpsgha.com for the Immediate Recoupment Request**

**instructions.**

You may contact this office for information on how to fax your request.

This process is voluntary and for your convenience. Your request must specifically state you understand you are waiving potential receipt of interest payment pursuant to § 1893(f) (2) for the overpayments.

**Note:** Such interest may be payable for certain overpayments reversed at the ALJ level or subsequent levels of appeal.

**If You Wish To Appeal This Decision**

If you disagree with this overpayment decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claims. The first level of appeal is called a redetermination. You must file your request for a redetermination 120 days from the date of this letter. However, if you wish to avoid recoupment from occurring, you need to file your request for redetermination within 30 days from the date of this letter, as described above. Unless you show us otherwise, we assume you received this letter within 5 days of the date of this letter.

Please send your request for redetermination to:

> WPS Government Health Administrators - 935 APPEALS
> REDETERMINATION
> Appeals Department
> P.O. Box 14260
> Madison, WI 53708-0260

**How to Stop Recoupment:**

Even if the overpayment and any assessed interest has not been paid in full, you can temporarily stop Medicare from recouping any payments. **If you act quickly and decidedly,** Medicare will stop recoupment at two points.

**First Opportunity:** We must receive a valid and timely request for a redetermination within 30 days from the date of this letter. We will stop or delay recoupment pending the results of an appeal. To assist us in expeditiously stopping the recoupment process, we request that you clearly indicate on your appeal request that this is a 935 overpayment appeal for a redetermination.

**Second Opportunity:** If the redetermination decision is (1) **unfavorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare redetermination notice (Medicare Appeal Decision Letter); or (2) if the decision is **partially favorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare revised overpayment

Notice/Revised Demand Letter. Therefore, it is important to act quickly and decidedly to limit recoupment by submitting a valid and timely request for reconsideration within 60 days of the appropriate notice/letter. The address and details on how to file a request for reconsideration will be included in the Redetermination decision letter.

## What Happens Following a Reconsideration By a Qualified Independent Contractor (QIC):

Following **a decision or dismissal** by the QIC, if the debt has not been paid in full, we will begin or resume recoupment whether or not you appeal to the next level, Administrative Law Judge (ALJ). **NOTE:** Even when recoupment is stopped, interest continues to accrue.

## Medicaid Offset:

If this matter is not resolved, CMS may instruct the Medicaid State Agency to withhold the Federal share of any Medicaid payments that may be due you or related facilities until the full amount owed Medicare is recouped; Title 42 CFR, section 447.30(g). These recoveries will be in addition to any recoupments from other Medicare funds due you until the full amount owed to Medicare is recovered.

## Right to Inspect Records Prior to Referral to Treasury:

In the event an Intent to Refer (ITR) letter is sent, you have the right to inspect and copy all records pertaining to your debt. In order to present evidence or review the CMS records, you must submit a written request to the address below. Your request must be received within 60 calendar days from the ITR letter date. In response to a timely request for access to CMS' records, you will be notified of the location and time when you can inspect and copy records related to this debt. Interest will continue to accrue during any review period. Therefore, while review is pending, you will be liable for interest and related late payment charges on amounts not paid by the due date identified above.

## For Individual Debtors Filing a Joint Federal Income Tax Return:

The Treasury Offset Program automatically refers debts to the Internal Revenue Service (IRS) for Offset. Your Federal income tax refund is subject to offset under this program. If you file a joint income tax return, you should contact the IRS before filing your tax return to determine the steps to be taken to protect the share of the refund, which may be payable to the non-debtor spouse.

## For Debtors that Share a Tax Identification Number(s):

Section 1866(j)(6) of the Social Security Act authorizes the Secretary of Health and Human Services (the Secretary) to make any necessary adjustments to the payments of an applicable provider or supplier who shares a TIN with an obligated provider or supplier, one that has an outstanding Medicare overpayment. The Secretary is authorized to adjust the payments of

such a provider or supplier regardless of whether it has been assigned a different billing number or National Provider Identification Number (NPI) from that of the provider or supplier with the outstanding Medicare overpayment.

### Federal Salary Offset:

If the facility ownership is either a sole proprietorship or partnership, your individual salary(s) may be offset if you are, or become, a federal employee.

### If you have filed a bankruptcy petition:

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy, please include the name in the bankruptcy is filed under and the district where the bankruptcy is filed.

Should you have any questions, please contact your overpayment consultant at the following:

Part B Immediate Recoupment - Fax: 608-223-7550
Part B Extended Repayment Request: 866-518-3285
Provider - Part B: 866-518-3285

We look forward to hearing from you shortly.

Sincerely,


Medicare Part B Recovery Unit
WPS Government Health Administrators

Enclosures
How This Overpayment Was Determined

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 170-177



**MEDICARE**
Part B

Letter Number: 31448324

Date: 11/23/2022

ADVANCED DERMATOLOGY PA
2735 PEMBROOK PL
MANHATTAN, KS 665027482

## INITIAL REQUEST

RE : MMA 935 - Overpayment Amount
    Overpayment Amount: $6,365.64
    Outstanding Balance: $6,365.64
    Provider Number: NA3713-1124094867

Dear Sir/Madam,

This letter is to inform you that you have received a Medicare payment in error, which has resulted in an overpayment subject to section 935(f)(2) of the Medicare Modernization Act (MMA), section 1893(f)(2) of the Social Security Act, Limitation on Recoupment, in the amount $6,365.64. **The purpose of this letter is to request that this amount be repaid to our office.** The attached enclosure explains how this happened.

**NOTE:** If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding please follow the instructions found at the end of this letter.

## Why you are responsible:

You are responsible for following correct Medicare filing procedures and must use care when billing and accepting payment. You are responsible for repayment in this matter based upon one or both of the following criteria:

1.  You billed and/or received payment for services for which you should have known you were not entitled to receive payment. Therefore, you are not without fault and are responsible for repaying the overpayment amount.

2.  You received overpayments resulting from retroactive changes in the Medicare Physician Fee Schedule and/or changes mandated by legislation.

If you dispute this determination, please follow the appropriate appeals process listed below.

(Applicable authorities: section 1870(b) of Social Security Act; subsection 405.350 - 405.359 of Title 42, subsection 404.506 - 404.509, 404.510a and 404.512 of Title 20 of the United States Code of Federal Regulations.)

This amount is subject to section 935(f)(2) of the Medicare Modernization Act (MMA) (section1893(f)(2) of the Social Security Act), Limitation on Recoupment (42 CFR 405.379).

## Rebuttal Process:

Under the existing regulations 42 CFR section 405.374, providers and other suppliers will have **15 days from the date of this demand letter** to submit a statement of opportunity to rebuttal. The rebuttal process provides the debtor the opportunity, before the suspension, offset, or recoupment takes effect, to submit any statement (to include any pertinent information) as to why it should not be put into effect on the date specified in the notice. A rebuttal is not intended to review supporting medical documentation nor disagreement with the overpayment decision. A rebuttal shall not duplicate the redetermination process. **This is not an appeal of the overpayment determination and the limitation on recoupment under** section1893 (f)(2)(a) of the Social Security Act **does not apply to rebuttal requests.** We will review your rebuttal documentation and determine whether the facts justify ceasing the recoupment or offset. Our office will advise you of our decision 15 days from the mailroom-stamped receipt date of your request.

## Interest Assessment:

**If you do not refund in 30 days:**

In accordance with 42 CFR 405.378, simple interest at the rate of 10.125% will be charged on the unpaid balance of the overpayment, beginning on the 31st day. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made on time. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged. Each payment will be applied first to accrued interest and then to principal. After each payment, interest will continue to accrue on the remaining principal balance, at the rate of 10.125%.

## Suspended Funds Applied To The Overpayment and Has a Remaining Outstanding Balance:

If the suspended funds are insufficient to fully eliminate any overpayment, and the provider or supplier meets the requirements of 42 CFR section 405.379 "Limitation on Recoupment" provision under section1893(f) (2) of the Act, then the provider or supplier is subject to 935 Appeals rights and will be available for offset after 41 days on the remaining balance still owed to CMS. (See 42 CFR section 405.372(e) for more information.)

## Payment by Recoupment:

Page 3
Date : 11/23/2022
Letter Number : 31448324

If payment in full is not received by 01/02/2023, **payments** to you can be recouped (recoupment) until payment in full is received if you haven't submitted an acceptable ERS request, an immediate recoupment request, and/or a valid and timely appeal is received.

**Make a payment or Arrange for payments:**

What you should do:

Please return the overpaid amount to us by 12/22/2022 and no interest will be assessed. We request that you refund this amount in full.

Make the check payable to Medicare Part B and send it with a copy of this letter to:

> WPS Government Health Administrators
> Payment Recovery
> P.O. Box 8215
> Madison, WI 53708-8215

If you are unable to refund the entire amount at this time, advise this office immediately, with a request for an **Extended Repayment Schedule (ERS)** so that we may determine if you are eligible for one. Any repayment schedule (where one is approved) would run from the date of the ERS review approval date.

**You can visit our website at www.wpsgha.com for the ERS Request instructions.**

**Immediate Recoupment:**

**TO SIMPLIFY THE REPAYMENT PROCESS,** reduce the extra work and cost associated with mailing your repayment each time, you may elect to have automatic immediate recoupments for ALL overpayments by requesting the **Immediate Recoupment** process for All Current and Future Accounts Receivable. This will automatically begin recoupment starting on day 16 for ALL future accounts receivable. When the initial request is received after day 16 the debt shall be placed in an immediate recoupment status. If the debt is not collected in full before day 31, interest will continue to accrue until the debt is collected in full.

You must specify whether you are submitting:

1. A request on the current demanded overpayment (all accounts receivables within this demand letter) and ALL FUTURE OVERPAYMENTS; or

2. A one-time request on this current demanded overpayment (all accounts receivables) addressed in this demand letter only.

**You can visit our website at www.wpsgha.com for the Immediate Recoupment Request**

**instructions.**

You may contact this office for information on how to fax your request.

This process is voluntary and for your convenience. Your request must specifically state you understand you are waiving potential receipt of interest payment pursuant to § 1893(f) (2) for the overpayments.

**Note:** Such interest may be payable for certain overpayments reversed at the ALJ level or subsequent levels of appeal.

## If You Wish To Appeal This Decision

If you disagree with this overpayment decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claims. The first level of appeal is called a redetermination. You must file your request for a redetermination 120 days from the date of this letter. However, if you wish to avoid recoupment from occurring, you need to file your request for redetermination within 30 days from the date of this letter, as described above. Unless you show us otherwise, we assume you received this letter within 5 days of the date of this letter.

Please send your request for redetermination to:

> WPS Government Health Administrators - 935 APPEALS
> REDETERMINATION
> Appeals Department
> P.O. Box 14260
> Madison, WI 53708-0260

## How to Stop Recoupment:

Even if the overpayment and any assessed interest has not been paid in full, you can temporarily stop Medicare from recouping any payments. **If you act quickly and decidedly,** Medicare will stop recoupment at two points.

**First Opportunity:** We must receive a valid and timely request for a redetermination within 30 days from the date of this letter. We will stop or delay recoupment pending the results of an appeal. To assist us in expeditiously stopping the recoupment process, we request that you clearly indicate on your appeal request that this is a 935 overpayment appeal for a redetermination.

**Second Opportunity:** If the redetermination decision is (1) **unfavorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare redetermination notice (Medicare Appeal Decision Letter); or (2) if the decision is **partially favorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare revised overpayment

Page 5
Date : 11/23/2022
Letter Number : 31448324

Notice/Revised Demand Letter. Therefore, it is important to act quickly and decidedly to limit recoupment by submitting a valid and timely request for reconsideration within 60 days of the appropriate notice/letter. The address and details on how to file a request for reconsideration will be included in the Redetermination decision letter.

## What Happens Following a Reconsideration By a Qualified Independent Contractor (QIC):

Following a **decision or dismissal** by the QIC, if the debt has not been paid in full, we will begin or resume recoupment whether or not you appeal to the next level, Administrative Law Judge (ALJ). **NOTE:** Even when recoupment is stopped, interest continues to accrue.

## Medicaid Offset:

If this matter is not resolved, CMS may instruct the Medicaid State Agency to withhold the Federal share of any Medicaid payments that may be due you or related facilities until the full amount owed Medicare is recouped; Title 42 CFR, section 447.30(g). These recoveries will be in addition to any recoupments from other Medicare funds due you until the full amount owed to Medicare is recovered.

## Right to Inspect Records Prior to Referral to Treasury:

In the event an Intent to Refer (ITR) letter is sent, you have the right to inspect and copy all records pertaining to your debt. In order to present evidence or review the CMS records, you must submit a written request to the address below. Your request must be received within 60 calendar days from the ITR letter date. In response to a timely request for access to CMS' records, you will be notified of the location and time when you can inspect and copy records related to this debt. Interest will continue to accrue during any review period. Therefore, while review is pending, you will be liable for interest and related late payment charges on amounts not paid by the due date identified above.

## For Individual Debtors Filing a Joint Federal Income Tax Return:

The Treasury Offset Program automatically refers debts to the Internal Revenue Service (IRS) for Offset. Your Federal income tax refund is subject to offset under this program. If you file a joint income tax return, you should contact the IRS before filing your tax return to determine the steps to be taken to protect the share of the refund, which may be payable to the non-debtor spouse.

## For Debtors that Share a Tax Identification Number(s):

Section 1866(j)(6) of the Social Security Act authorizes the Secretary of Health and Human Services (the Secretary) to make any necessary adjustments to the payments of an applicable provider or supplier who shares a TIN with an obligated provider or supplier, one that has an outstanding Medicare overpayment. The Secretary is authorized to adjust the payments of

such a provider or supplier regardless of whether it has been assigned a different billing number or National Provider Identification Number (NPI) from that of the provider or supplier with the outstanding Medicare overpayment.

### Federal Salary Offset:

If the facility ownership is either a sole proprietorship or partnership, your individual salary(s) may be offset if you are, or become, a federal employee.

### If you have filed a bankruptcy petition:

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy, please include the name in the bankruptcy is filed under and the district where the bankruptcy is filed.

Should you have any questions, please contact your overpayment consultant at the following:

Part B Immediate Recoupment - Fax: 608-223-7550
Part B Extended Repayment Request: 866-518-3285
Provider - Part B: 866-518-3285

We look forward to hearing from you shortly.

Sincerely,

Medicare Part B Recovery Unit
WPS Government Health Administrators

Enclosures
How This Overpayment Was Determined

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 184

decision is based on either the documentation that was submitted or the failure by the physician/supplier to furnish information that was requested to support the claim. Therefore, payment was made to you in error.




November 10, 2022

Advanced Dermatology and Skin Cancer Center PA
Attn: John Adams
2735 Pembrook Place
Manhattan, Kansas 66502-7482

Re:    **Post-Payment Review Results and Overpayment Determination – Advanced Dermatology and Skin Cancer Center PA**
**Provider/Supplier Medicare ID Number(s): 110568**
**Provider/Supplier NPI: 1124094867**
**EIN: 48-0879603**
**Reference Number: CSE-220330-00013**

Dear John Adams:

As you know, most Medicare providers strive to work ethically, render high-quality medical care to their patients, and submit proper claims for payment. The Federal Government places enormous trust in providers, relying on their medical judgment to treat patients with appropriate services, and to submit accurate and truthful claims information when seeking reimbursement. ***As a Medicare provider, you play a vital role in protecting the Medicare Program.***

You are receiving this letter as a result of a Medicare program integrity review conducted by CoventBridge. This letter serves as additional education regarding these findings, as explained in more detail below.

**Statutory Basis for CoventBridge's Actions**

In accordance with Section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II § 202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, the Centers for Medicare & Medicaid Services (CMS) is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program.  CMS utilizes Unified Program Integrity Contractors (UPIC) to perform these functions. CoventBridge is the UPIC for Part B services in the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

---

[1]   UPIC Midwestern consists of the following states:  Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio  43123
phone 614.801.0495 | fax 614.801.2361 | http://coventbridge.com
Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction
Doc. 14
File 13.pdf - Page 95 of 2526
186

**Scope of Review**

CoventBridge conducts reviews based on information from various sources, including but not limited to: 1) requests from CMS or the Office of the Inspector General (OIG); 2) data analysis; 3) complaints; and 4) inquiries from various entities.  Our review was prompted by data analysis that suggests your practice is improperly billing Medicare for services.

Based on this information, on July 8, 2022 and August 8, 2022, CoventBridge requested medical records from your practice for dates of service January 21, 2022 through June 30, 2022. CoventBridge reviewed 55 claims which included 163 services.  **Based on the claims and supporting documentation we reviewed, we identified overpayments made to you**.  This letter constitutes formal notice to you of the outcomes of our review, as well as any actions you should take.

**Outcome of the Review and Education**

The medical review resulted in the following general findings:

- Services not reasonable and necessary
- Services not rendered as billed
- Services related to non-covered/denied primary services

The following serve as examples of our findings, designed to help you better understand coverage criteria. The rationale listed below are not exhaustive. You must refer to the documents contained on the included secured CD for detailed information about the coverage decision on each reviewed claim.

- Services not reasonable and necessary
    - o No Medicare payment shall be made for items or services, which are not reasonable and necessary for the diagnosis or treatment of illness or to improve the functioning of a malformed body member.

- 131 claim lines or 80.37%  of claim lines reviewed were denied as services not reasonable and necessary

    Claim example:
    CCN 742822025240340                         Date of Service January 24, 2022

- Services not rendered as billed
    - o As a basis for Medicare payment, the provider must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment. Upon review of the documentation, it was noted that this requirement was not met.
        - ▪ Documentation was submitted but it did not support the service billed was actually rendered.

- 73 claim lines or 44.79% of claim lines reviewed were denied as services not rendered as billed

  Claim example:
  CCN 742822027222550                                Date of Service January 24, 2022

- Services related to non-covered/denied primary services
  - Medicare payment may not be made for services related to other non-covered services.

- 68 claim lines or 41.72% of claim lines reviewed were denied as services related to non-covered/denied primary services

  Claim example:
  CCN 742822112077110                                Date of Service April 19, 2022

For more detailed information regarding these denial categories, refer to the attached report, which also includes claim-specific denial/change rationales.

**References/Citations**
All references and citations utilized in this review can be found on the enclosed encrypted CD.

CoventBridge also noted the following trends persistent throughout the medical review:
- **Using amniotic products for wound healing, which is not their homologous use.**
Patients/Medicare were billed for human cellular and tissue product (HCT/P), which is approved as a wound covering, but not as a skin substitute graft per the CPT Codebook and the FDA. Although provider was billing using the skin graft code, they called the product in the documentation a "Repair: Skin Substitute". Documentation supported grafts were being used for wound healing and regeneration of skin growth which is not the product's homologous use per the Food and Drug Administration (FDA)/Code of Federal Regulations (CFR). Provider is also using this product to decrease the risk of infection, reduce pain, minimize inflammation, decrease scar formation and disfigurement (cosmetic reasons), minimize pain, as well as for numerous other reasons.

- **Provider is not applying a true graft.**
The provider applied a product defined by the manufacturer and the FDA as a wound covering, not a "graft" as per the definition in the Current Procedural Terminology (CPT) Codebook for CPT 15271-15276. Provider also had the patient return sometimes week after week to have another application of skin substitute placed, which is further confirmation that this product was not the type of item or service covered under codes 15271-15276.

Codes 15271-15276 are associated with the application/implantation of skin, or a biological substance intended to remain in the person for the purpose of helping the person's own skin cells to grow back. The CPT Codebook specifically states, "[a]pplication of non-graft [i.e., something intended to be removed] wound dressings is not separately reportable."

- **Provider is billing and using larger sized products than necessary.**

The provider billing/applying larger sized amniotic product than necessary according to the wound dimensions documented in the medical record, despite smaller and more appropriate sizes being available from the manufacturer. The provider documented a cloned statement saying if the correct sized amniotic product was not in stock, they would use the closest graft in stock that would allow for total wound coverage. This is also a concern for waste and abuse.

- **Cloning.**

There is cloning in the medical records from beneficiary to beneficiary involving the reasons for graft placement. Example: "Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair."

There is cloning in the medical record from beneficiary to beneficiary involving the reason why a larger sized amniotic product was utilized. Example: "If the appropriate size of allograft is not in stock, it is in the patient's best interest that we apply the next largest allograft which is in stock. Today, the closest graft in terms of size which was in stock which would allow for complete wound coverage, to include the vertical aspect, was utilized."

- **Submitted lists of typed letters, symbols, and words.**

Provider submitted thousands of pages with typed random numbers, letters, words, and symbols that were not part of the medical record. It was unclear how this occurred or if this was intentional.

- **Impossible days for John Adams, MD:**

One of the allegations for this case was that impossible days were being billed for John Adams, MD. While documentation supported Dr. Adams performed and signed the progress notes for the services billed, there was documentation found of the PA-C being a "scribe" while Dr. Adams was documented as the provider performing the service. For example, this statement was documented "I, Alyssa Bengtson, PA-C am scribing for, and in the presence of John Adams, M." Both sign notes for billed DOS at the same time. While the claim could not be denied for incorrect rendering provider, it is suspicious and unlikely that the PA-C was performing the role of the scribe and they were both in the room at the same time.

Based on our findings as explained in this letter, CoventBridge has determined that you have been overpaid by Medicare in the amount of $116,450.65.  Please keep this letter and all attached documentation for your records.  **This is not a demand letter; you will be notified at a later date by your Medicare Administrative Contractor (MAC) regarding the amount due, potential repayment options, and any formal appeal processes you may pursue.**  The CMS publication "Medicare Overpayments" explains more about overpayments: https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/OverpaymentBrochure508-09.pdf.

Accompanying this letter is an encrypted CD containing an electronic copy of this letter, a Claim Line Spreadsheet listing the claims filed for services not rendered as billed, services not reasonable and necessary, services related to non-covered/denied primary services, and various references cited in this letter. Specific information regarding these findings, per claim, is explained in the attached Claim Decision Spreadsheet. All documents are contained within a password protected ZIP file.

Again, please review the attachments, along with this letter, to ensure you understand Medicare coverage and payment requirements. Consider and implement corrections to billing procedures that could prevent

such errors in the future. Further, we recommend you maintain documentation of any changes you implement to your current processes or procedures as a result of the information provided herein. Publications at the following links give you additional information you need to protect the Medicare Program, your patients, your organization, and yourself.

- **Medicare Fraud & Abuse: Prevent, Detect, Report (cms.gov)**

If you misrepresent, falsify, or conceal essential information required for payment of federal funds, then you may be subject to civil or criminal liability, which can result in fine, imprisonment, civil penalty, and potential collateral consequences.

**Action Needed - Self-Assessment/Voluntary Refund**

The rate of error identified in this small sampling of claims is significant; therefore, it is likely that you have been overpaid by Medicare on other claims or services not identified in this letter or its attachments. If so, you are *obligated* to refund the program.  After reviewing the education provided herein, **CoventBridge recommends that you conduct a self-assessment in order to identify any additional overpayments your practice or facility has received as a result of the actions which are the subject of this letter.**  Contact your MAC for instructions on making a voluntary refund.

Additionally, CMS published a final rule regarding overpayments in the Federal Register on February 12, 2016 [CMS-6037-F] to provide clarity and consistency in the reporting and returning of self-identified overpayments: https://www.gpo.gov/fdsys/pkg/FR-2016-02-12/pdf/2016-02789.pdf.

**Provider Self-Disclosure Protocol**

If you identify evidence of potential fraud, you may choose to voluntarily disclose this to the Office of Inspector General (OIG) under the Provider Self-Disclosure Protocol (SDP).  The OIG's website explains further:

> "Self-disclosure gives providers the opportunity to avoid the costs and disruptions associated with a Government-directed investigation and civil or administrative litigation.
> OIG endeavors to work cooperatively with providers who are forthcoming, thorough, and transparent in their disclosures in resolving these matters. While OIG does not speak for the Department of Justice or other agencies, OIG consults with those agencies, as appropriate, regarding the resolution of SDP matters."

More information on voluntary disclosure is available on the OIG website: http://oig.hhs.gov/compliance/self-disclosure-info/protocol.asp.

**Authority to Conduct Reviews**

Under *Section 1893* of the Act, CoventBridge is required to conduct reviews of providers to ensure that Medicare claims have been appropriately billed. It is Congress' intent, as stated *in Section 1156* of the Act, that services and items will be: provided economically; of a quality which meets professionally recognized standards of health care; and supported by evidence of medical necessity. Services or items not proven to be reasonable or medically necessary are denied under *Section 1862(a)(1)* of the Act.

**Requirement to Provide Documentation Upon Request**

*Section 1815(a)* of the Act and *Title 42 CFR Part 424.5(a)(6)* place the burden upon the provider to furnish such information as may be necessary if payment is (or was) due and the amount of the payment.

**Statutory Requirement: Medical Necessity**

Social Security Act:

> *§1862(a)(1)* of the Act states, "Notwithstanding any other provision of this title, no payment may be made under part A or part B for any expenses incurred for items or services—(1)(A) which, except for items and services described in a succeeding subparagraph, are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

Laws governing Medicare are generally found in the Act as amended. Most provisions are in Title XVIII of the Act and may also be included in Title XI. Medicare regulations are found in Title 42 of the Code of Federal Regulations (CFR). Instructions are issued by CMS via *MLN Matters* articles, the Medicare Internet-Only Manuals (e.g., Pub. 100-02 and 100-04) and other means (e.g., by Medicare Administrative Contractors via bulletins, letters, notices, web articles).

**Statutory Requirement: Liability for Overpayments**

Our determinations were made in accordance with sections 1879 and 1870 of the Social Security Act (the Act) as well as the specific statutory and regulatory references provided in this letter.

- **Section 1879 of the Social Security Act** -The determinations which follow a §1862(a)(1) denial may require a decision if the beneficiary or provider knew or could have known that a service would not be covered by Medicare because it would be considered medically unnecessary. The provider is liable if it is determined the provider knew, or could reasonably have been expected to know, that the items or services provided were not covered under Medicare. The beneficiary is liable if it is determined the beneficiary knew, or could reasonably have been expected to know that the items or services provided were not covered under Medicare. However, the Medicare program accepts liability if neither the beneficiary nor the provider knew, or could reasonably be

expected to have known, that the services were not covered. Waiver of liability exists when both the beneficiary and the provider did not and could not reasonably have been expected to know that payment would not be made for services.

- **Section 1870 of the Social Security Act**- Section 1870 permits Medicare to not recover inappropriate payments with respect to an individual deemed without fault in having caused the overpayment.  For the "without fault" provision to apply, the individual must have complied with all pertinent regulations and instruction materials.  A provider is responsible for an overpayment if he/she knew or had reason to know that service(s) were not reasonable and necessary, and/or he/she did not follow correct procedures or use care in billing or receiving payment.

**Other Laws**

Other laws pertaining to penalties associated with Medicare fraud and abuse include:

- Social Security Act (SSA), Sections 1128A(a)(1) and 1128B(a)(1)
- Civil False Claims Act, 31 U.S.C. § 3729
- 18 U.S.C. § 1001, 1035, and 1347
- 18 U.S.C. § 1516, Obstruction of Federal Audit

Our goal is to ensure that you are fully aware of the laws, regulations, and Medicare instructions which apply to you and other providers who furnish services or items to Medicare beneficiaries.  We hope this information is helpful to you.

**CoventBridge will continue to monitor future Medicare claim submissions in order to verify adherence to this education.**

In addition, we remind you that the regulation at 42 CFR §424.535 authorizes us to revoke Medicare billing privileges under certain conditions. In particular, we note that per 42 CFR §424.535(a)(8)(ii), CMS has the authority to revoke a currently enrolled provider's or supplier's Medicare billing privileges if CMS determines that the provider or supplier has a pattern or practice of submitting claims that fail to meet Medicare requirements.

**This is not a demand letter.  You will be notified at a later date by Wisconsin Physicians Service Insurance Corporation regarding the overpayment due, the repayment, and appeal options available to you.**

For the password to the enclosed encrypted CD or if you have any questions, please contact me at 614.782.6071.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT: 2022_144_334243646

Enclosed CD

1.  Medical Records Request Letter
2.  Medical Review.
    a.  Overpayment Spreadsheet
    b.  Medical Review Export
    c.  Citations applicable to the medical review
3.  Signed Digital Copy of Overpayment Determination / Education letter

File 13 pdf - Page 103 of 2526



# WPS - Wisconsin Physicians Service MAC - Retired Date: 03/01/2016

**LCD L34593:** "Application of Bioengineered Skin Substitutes"    **Effective Date:** 10/01/2015

**States:** Alaska, Alabama, Arkansas, Arizona, Connecticut, Florida, Georgia, Iowa, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts Maine, Michigan, Minnesota, Missouri, Mississippi, Montana, North Carolina, North Dakota, Nebraska, New Hampshire, New Jersey, Ohio, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Virginia, Vermont, Washington, Wisconsin, West Virginia, and Wyoming

**EpiFix Tissue Uses:** EpiFix (Q4131) is intended for homologous use in the treatment of acute and chronic partial and full-thickness wounds for the reduction of scar tissue formation, modulation of inflammation, and enhancement of soft tissue healing.

**Indications or Limitations of Coverage and/or Medical Necessity:** All products must be provided in accordance with the material's Food and Drug Administration (FDA) approved package label. Applied to partial- or full-thickness wounds (see individual product information for labeled indications) not involving tendon, muscle, joint capsule, exposed bone or sinus tracts. Applied in a frequency supported either by FDA product labeling or clearly supported by documentation showing the medical reasonable and necessary indications.

**Documentation Requirements:** The ulcer must be measured at the beginning of conservative treatment, following cessation of conservative treatment and at the beginning of the skin substitute treatment. Clearly, if during treatment the ulcer shows obvious signs of worsening or lack of treatment response, continuing skin substitute treatment would be inappropriate absent documentation of an appropriate rationale for doing so. There must be a documented plan of care with documented goals and provider follow-up in the medical record. Documentation to include current wound size, wound depth, presence and extent of or absence of obvious signs of infection, presence and extent of or absence of necrotic, devitalized or non-viable tissue, or other material in the wound that is expected to inhibit healing or promote adjacent tissue breakdown. When the documentation does not meet the criteria for the service rendered or does not establish the medical necessity for the service, such service will be denied as not reasonable and necessary under Section 1862(a)(1) of the Social Security Act.

**Utilization Guidelines:** Medicare expects skin substitutes to be applied according to the manufacturers' instructions. Any utilization above these parameters is subject to medical review. Exceptions with more frequent timing (every seven days) should be documented with appropriate narrative. Surgical Wound Preparation (CPT 15002-15005): Medicare does not expect to be billed for codes 15002-15005 in conjunction with routine, simple and/or repeat application of skin substitutes/replacements. These codes describe burn and wound preparation or incisional or excisional release of scar contracture resulting in an open wound requiring a skin graft. An operative report is required and must be available upon request. If this procedure is performed in an office the claim can be resubmitted with a request for a redetermination and the medical staff will give the claim individual consideration.

**Limitations:** Reimbursement may be made only when the medical record clearly documents that these products have been used in a comprehensive, organized wound management program. For venous stasis ulcers, there should be no fewer than two (2) weeks between applications and for diabetic ulcers there should be no fewer than three (3) weeks between applications, except when more frequent applications are either a part of the FDA product specific labeling instructions or are clearly supported by medical record documentation of medically reasonable and necessary indications.

> **NOTE: All claims are subject to medical review. Medical record documentation is critical to ensure proper payment of claims. Per WPS, with the retirement of the LCD, "there are established billing, coding and documentation guidelines that should be followed in these circumstances."**

**Disclaimer: The coverage information provided is gathered from third party sources for informational purposes only and has not been verified with any entity responsible for policy, such as the CMS, or any payer. It does not represent a statement, promise or guarantee from MiMedx Group, Inc. concerning coverage. MiMedx® makes no guarantee that any private or government payer will guarantee coverage. Health policies change frequently and can vary considerably from one payer to another. MiMedx® strongly recommends that you consult your payer for interpretation of local coverage and/or policy. The ultimate responsibility for policy interpretation and related claims submission lies with the physician, clinician, hospital or other facility.**



# WPS - Wisconsin Physicians Service MAC - Retired Date: 03/01/2016

**LCD L34593:** "Application of Bioengineered Skin Substitutes"    **Effective Date:** 10/01/2015

**States: Alaska, Alabama, Arkansas, Arizona, Connecticut, Florida, Georgia, Iowa, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts Maine, Michigan, Minnesota, Missouri, Mississippi, Montana, North Carolina, North Dakota, Nebraska, New Hampshire, New Jersey, Ohio, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Virginia, Vermont, Washington, Wisconsin, West Virginia, and Wyoming**

**EpiFix Tissue Uses:** EpiFix (Q4131) is intended for homologous use in the treatment of acute and chronic partial and full-thickness wounds for the reduction of scar tissue formation, modulation of inflammation, and enhancement of soft tissue healing.

**Indications or Limitations of Coverage and/or Medical Necessity:** All products must be provided in accordance with the material's Food and Drug Administration (FDA) approved package label. Applied to partial- or full-thickness wounds (see individual product information for labeled indications) not involving tendon, muscle, joint capsule, exposed bone or sinus tracts. Applied in a frequency supported either by FDA product labeling or clearly supported by documentation showing the medical reasonable and necessary indications.

**Documentation Requirements:** The ulcer must be measured at the beginning of conservative treatment, following cessation of conservative treatment and at the beginning of the skin substitute treatment. Clearly, if during treatment the ulcer shows obvious signs of worsening or lack of treatment response, continuing skin substitute treatment would be inappropriate absent documentation of an appropriate rationale for doing so. There must be a documented plan of care with documented goals and provider follow-up in the medical record. Documentation to include current wound size, wound depth, presence and extent of or absence of obvious signs of infection, presence and extent of or absence of necrotic, devitalized or non-viable tissue, or other material in the wound that is expected to inhibit healing or promote adjacent tissue breakdown. When the documentation does not meet the criteria for the service rendered or does not establish the medical necessity for the service, such service will be denied as not reasonable and necessary under Section 1862(a)(1) of the Social Security Act.

**Utilization Guidelines:** Medicare expects skin substitutes to be applied according to the manufacturers' instructions. Any utilization above these parameters is subject to medical review. Exceptions with more frequent timing (every seven days) should be documented with appropriate narrative. Surgical Wound Preparation (CPT 15002-15005): Medicare does not expect to be billed for codes 15002-15005 in conjunction with routine, simple and/or repeat application of skin substitutes/replacements. These codes describe burn and wound preparation or incisional or excisional release of scar contracture resulting in an open wound requiring a skin graft. An operative report is required and must be available upon request. If this procedure is performed in an office the claim can be resubmitted with a request for a redetermination and the medical staff will give the claim individual consideration.

**Limitations:** Reimbursement may be made only when the medical record clearly documents that these products have been used in a comprehensive, organized wound management program. For venous stasis ulcers, there should be no fewer than two (2) weeks between applications and for diabetic ulcers there should be no fewer than three (3) weeks between applications, except when more frequent applications are either a part of the FDA product specific labeling instructions or are clearly supported by medical record documentation of medically reasonable and necessary indications.

> **NOTE: All claims are subject to medical review. Medical record documentation is critical to ensure proper payment of claims. Per WPS, with the retirement of the LCD, "there are established billing, coding and documentation guidelines that should be followed in these circumstances."**

**Disclaimer:** The coverage information provided is gathered from third party sources for informational purposes only and has not been verified with any entity responsible for policy, such as the CMS, or any payer. It does not represent a statement, promise or guarantee from MiMedx Group, Inc. concerning coverage. MiMedx® makes no guarantee that any private or government payer will guarantee coverage. Health policies change frequently and can vary considerably from one payer to another. MiMedx® strongly recommends that you consult your payer for interpretation of local coverage and/or policy. The ultimate responsibility for policy interpretation and related claims submission lies with the physician, clinician, hospital or other facility.



Dehydrated Human Amnion/Chorion
Membrane Allograft
Information / Instructions for Use



1775 West Oak Commons Court NE
Marietta, GA 30062

# 866.477.4219

www.mimedx.com

File 13.pdf - Page 106 of 2526           EP117.011

## EpiFix® Description

Human amniotic membrane is a unique, thin, collagenous membrane derived from the placenta, the area in which the human fetus grows and develops within the mother's uterus. Human amniotic membrane consists of collagen layers including:
(1) basement membrane; (2) stromal matrix.

EpiFix® is a minimally manipulated, dehydrated, non-viable cellular amniotic membrane allograft that contains multiple extracellular matrix proteins, growth factors, cytokines, and other specialty proteins present in amniotic tissue to help regenerate soft tissue.

### Tissue Uses
EpiFix® Amniotic Membrane Allograft is intended for homologous use in the treatment of acute and chronic partial and full-thickness wounds for the reduction of scar tissue formation, reduction of inflammation, and enhancement of soft tissue healing.

### Contraindications
EpiFix® should not be used on (1) areas with active or latent infection and/or (2) a patient with a disorder that would create an unacceptable risk of post-operative complications. Not intended to be used as a bone substitute or bone replacement.

### Precautions/Warnings
- EpiFix® allografts remain suitable for transplantation in an unopened, undamaged package, under proper storage conditions.
- Please inspect the integrity of the package upon receipt. If package and contents appear defective or damaged in any way, immediately contact the distributor.
- This allograft is intended for single-patient use only. Discard all unused material.
- The procedure should be performed by an authorized medical professional.
- Strict donor screening and laboratory testing, along with dedicated processing and sterilization methods, are employed to reduce the risk of any disease transmission. However, as with all biological implants, an absolute guarantee of tissue safety is not possible. This allograft has the potential to transmit infectious disease to the recipient.
- The reaction of the body to any biological implant is not completely understood.
- Caution should be used when treating patients with a known sensitivity to aminoglycoside antibiotics.
- Discard all damaged, mishandled or potentially contaminated tissue.
- This product has not been tested in combination with other products.
- DO NOT RE-STERILIZE.

### Preparation, Reconstitution and Surgical Use
Prior to implantation, carefully follow the EpiFix® allograft preparation steps below using aseptic technique:

#### Wound Bed Preparation
- Ensure the wound is free from clinical sign of infection.
- Prepare wound bed as needed.

#### Removing EpiFix® from Packaging
- The outer peel pouch is NOT sterile. The inner pouch that contains EpiFix® is sterile (unless the pouches are damaged or compromised).
- Carefully open the peelable corner of the outer pouch and extract the inner pouch using aseptic technique. Ensure the inner pouch does not come in contact with any portions of non-sterile surface of the outer pouch.
- Using aseptic technique, SLOWLY peel a corner of the inner peel pouch and allow the authorized medical professional to grasp EpiFix® with fingers or non-toothed, sterile forceps.
- Use EpiFix® promptly after opening the inner, sterile pouch.

**PLEASE TAKE GREAT CARE WHEN REMOVING EPIFIX® FROM THE INTERNAL POUCH. EPIFIX® IS THIN AND EXTREMELY LIGHTWEIGHT.**

EP117.011

### EpiFix® Preparation

1. In a dry state, use sterile dry scissors to cut EpiFix® to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix® by 1mm.
2. If needed, EpiFix® can be fenestrated to accommodate wounds that produce copious amounts of exudate.
3. EpiFix® can be applied wet or dry.
4. EpiFix® can be hydrated while on the wound site with sterile saline solution. Simply apply several drops of sterile solution to EpiFix®. During and following hydration, the embossment on EpiFix® will begin to fade.

### EpiFix® Orientation & Application

1. EpiFix® should be placed on the wound site, using the orientation of the embossment lettering as a guide. Proper orientation of EpiFix® can be noted when the embossment nomenclature reads correctly from left to right.
2. Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix® to the wound site.

### Primary Dressing

- EpiFix® should be covered with a non-adherent contact layer.
- EpiFix® should NOT be disturbed, if possible, for several days or before the next application, if needed.
- If an infection occurs at the graft site, treat infection per institution's protocol.

### Secondary Dressing

- EpiFix® requires a moist wound environment.  Use appropriate moisture management dressings for the wound type and treatment ideology.

### Support Therapies

- EpiFix® is compatible with offloading/compression/negative pressure therapies.
- EpiFix® can be used in conjunction with hyperbaric oxygen therapy.

### Re-application of EpiFix®

- It is recommended that EpiFix® grafts are applied weekly until wound epithelialization is achieved. However, clinician discretion should be used based on patient and wound condition/progress. It is clinically acceptable to apply EpiFix® on a biweekly basis if desired.

## Adverse Effects & Reporting

- As with any surgical procedure, the possibility of infection exists.
- Proprietary processing and sterilization methods are employed to eliminate potential deleterious components of the allograft. However, as with all biological implants, the possibility of rejection exists.
- Any adverse reactions, including the suspected transmission of disease attributable to this allograft, should be reported immediately to MiMedx®.

## Acceptable Storage

EpiFix® allografts should be stored in a clean, dry environment at ambient conditions. EpiFix® allografts have a 5 year shelf life. Check the label for the expiration date.

## Recovery & Quality Control

All tissue recovered meets stringent specifications during donor screening and laboratory testing to reduce the risk of transmitting infectious disease. EpiFix® allografts are procured and processed in the United States according to standards and/or regulations established by the American Association of Tissue Banks (AATB) and the United States Food & Drug Administration (FDA). All tissues are recovered under full informed consent of the donors (mothers of the newborn children).  The donors have consented to the transfer of the allografts to third parties. A thorough medical and social history of the donor is also obtained.

### Recovery & Quality Control (cont.)

The donor is screened for:

| | |
|---|---|
| HIV-1&2 Plus 0 Antibody | Hepatitis B Core Antibody |
| HIV Type 1 (Nucleic Acid Test (NAT)) | Hepatitis B Surface Antigen |
| HTLV-1&2 Antibody | Hepatitis C Antibody |
| Syphilis (Serologic Test) | Hepatitis C Virus (Nucleic Acid Test (NAT)) |
| CMV Total Antibody | Hepatitis B Virus (Nucleic Acid Test (NAT)) |

All test results are reviewed prior to the release of the tissue. Only tissue from donors with acceptable test results, according to the standards of MiMedx Tissue Services, LLC, as well as the standards and/or regulations of all state and federal regulatory bodies, are released.

The infectious disease test results, consent documents, donor medical history, behavior risk assessment according to current public health services guidelines, physical assessment, available relevant medical records, as well as information from other sources or records that may pertain to donor suitability, and tissue procurement test results, have been evaluated and are sufficient to indicate that the donor suitability criteria current at the time of tissue recovery have been met.

The names and addresses of the testing laboratories, the listing and interpretation of all required infectious disease tests, a listing of the documents reviewed as part of the relevant medical records, and the name of the person or establishment determining the suitability of this allograft are on file and available upon request.

**Donated Human Tissue. This allograft has been determined to be suitable for transplantation.**

### Allograft Processing/Preservation/Sterilization

EpiFix® allografts are processed based upon strict, quality-controlled protocols that have demonstrated bioburden control. An additional assurance of safety is achieved by terminally sterilizing each allograft. Based upon validations, each graft has been effectively sterilized using e-beam irradiation. The allografts are processed with aminoglycoside antibiotics.

### Recipient Tracking

The FDA requires that recipient records be maintained for the purpose of tracking the allograft following surgical transplantation. The authorized medical professional must complete the enclosed Tissue Utilization Record, attach a peel-off, allograft-tracking label provided, and mail to the distributor (postage-paid). Please use the remaining peel-off, allograft-tracking labels for patient and hospital records.

**Caution: This product must be administered by an authorized medical professional.**

The user shall be solely responsible for determining the adequacy and appropriateness of the allograft for any and all uses to which the user shall apply the allograft.

**Processed with:**



Processing and donor suitability performed by MiMedx Tissue Services, LLC
Patents and patents pending see: www.mimedx.com/patents
EpiFix®, PURION®, and MiMedx® are
registered trademarks of MiMedx Group, Inc.
1775 West Oak Commons Court NE, Marietta, GA 30062
©2015 MiMedx Group, Inc. All Rights Reserved. www.mimedx.com



EP117.011



Dehydrated Human Amnion/Chorion
Membrane Allograft
Information/Instructions for Use



1775 West Oak Commons Court NE
Marietta, GA 30062

# 866.477.4219

www.mimedx.com

## EpiFix® Description

Human amniotic membrane is a thin, collagenous membrane derived from the placenta, the area in which the human fetus grows and develops within the mother's uterus. Human amniotic membrane consists of multiple layers.

EpiFix is a minimally manipulated, dehydrated, non-viable cellular amniotic membrane allograft that contains multiple extracellular matrix proteins, growth factors, cytokines and other specialty proteins present in amniotic tissue to provide a barrier membrane that enhances healing.

EpiFix allografts are human tissue products and appearance may vary between donors. Variations in color (tan to light brown), opacity, and thickness are normal due to the nature of human tissue.

**Tissue Uses**

EpiFix Amniotic Membrane Allograft is intended for homologous use in the treatment of acute and chronic wounds to reduce scar tissue formation, modulate inflammation, provide a barrier, and enhance healing.

**Contraindications**

EpiFix should not be used on (1) areas with active or latent infection and/or (2) a patient with a disorder that would create an unacceptable risk of post-operative complications.

**IPrecautions/Warnings**

- EpiFix allografts remain suitable for transplantation in an unopened, undamaged package, under proper storage conditions.
- Please inspect the integrity of the package upon receipt. If package and contents appear defective or damaged in any way, immediately contact the distributor.
- This allograft is intended for single-patient use only. Discard all unused material.
- The procedure should be performed by an authorized medical professional.
- Strict donor screening and laboratory testing, along with dedicated processing and sterilization methods, are employed to reduce the risk of any disease transmission. However, as with all biological implants, an absolute guarantee of tissue safety is not possible. This allograft has the potential to transmit infectious disease to the recipient.
- The reaction of the body to any biological implant is not completely understood.
- Caution should be used when treating patients with a known sensitivity to aminoglycoside antibiotics.
- Discard all damaged, mishandled or potentially contaminated tissue.
- This product has not been tested in combination with other products.
- DO NOT RE-STERILIZE.

**Preparation, Reconstitution and Use**

Prior to implantation, carefully follow the EpiFix allograft preparation steps below using aseptic technique:

### Wound Bed Preparation

- Ensure the wound is free from clinical signs of infection.
- Prepare wound bed as needed.

### Removing EpiFix from Packaging

- The outer peel pouch is NOT sterile. The inner pouch that contains EpiFix is sterile (unless the pouches are damaged or compromised).
- Carefully open the peelable corner of the outer pouch and extract the inner pouch using aseptic technique. Ensure the inner pouch does not come in contact with any portions of non-sterile surface of the outer pouch.
- Using aseptic technique, SLOWLY peel a corner of the inner peel pouch and grasp EpiFix with fingers or non-toothed, sterile forceps.
- Use EpiFix promptly after opening the inner, sterile pouch.

**PLEASE TAKE GREAT CARE WHEN REMOVING EpiFix FROM THE INTERNAL POUCH. EpiFix IS THIN AND EXTREMELY LIGHTWEIGHT.**                    202

### EpiFix Preparation

1. In a dry state, use sterile dry scissors to cut EpiFix to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix by 1mm.
2. EpiFix can be applied wet or dry.
3. EpiFix can be hydrated while on the wound site with sterile saline solution. Simply apply several drops of sterile solution to EpiFix. During and following hydration, the embossment on EpiFix will begin to fade.

### EpiFix Orientation & Application

EpiFix should be placed on the wound site, using the orientation of the embossment lettering as a guide.  Proper orientation of EpiFix can be noted when the embossment nomenclature reads correctly from left to right.  If the mesh process has diminished the ability to clearly read the embossment, the following two alternate methods may be used for placement:

1. An elongated, horizontal perforation is located in the top left area of the graft connecting two adjacent perforations.  Proper orientation can be noted when the graft is placed on the wound site such that this horizontal perforation remains visually in the top left area of the graft.
2. The clear side of the inner pouch is indicative of the UP side of the graft orientation. Proper placement can be achieved by removing the graft from the pouch with the clear side up and moving to the wound site with that same orientation.

Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix to the wound site, if desired.

### Primary Dressing

- EpiFix should be covered with a non-adherent contact layer.
- EpiFix should NOT be disturbed, if possible, for several days or before the next application, if needed.
- If an infection occurs at the graft site, treat infection per institution's protocol.

### Secondary Dressing

- EpiFix requires a moist wound environment.  Use appropriate moisture management dressings for the wound type and treatment ideology.

### Support Therapies

- EpiFix is compatible with offloading/compression/negative pressure therapies.
- EpiFix can be used in conjunction with hyperbaric oxygen therapy.

### Re-application of EpiFix

- It is recommended that EpiFix grafts are applied weekly until wound epithelialization is achieved. However, clinician discretion should be used based on patient and wound condition/progress. It is clinically acceptable to apply EpiFix on a biweekly basis if desired.

## Adverse Effects & Reporting

- As with any procedure, the possibility of infection exists.
- Proprietary processing and validated sterilization methods are employed to eliminate potential deleterious components of the allograft. However, as with all biological implants, the possibility of rejection exists.
- Any adverse reactions, including the suspected transmission of disease attributable to this allograft, should be reported immediately to MiMedx®.

## Acceptable Storage

EpiFix allografts should be stored in a clean, dry environment at ambient conditions. EpiFix allografts have a 5 year shelf life. Check the label for the expiration date.

## Recovery & Quality Control

All tissue recovered meets stringent specifications during donor screening and laboratory testing to reduce the risk of transmitting infectious disease. EpiFix allografts are procured and processed in the United States according to standards and/or regulations established by the American Association of Tissue Banks (AATB) and the United States Food & Drug Administration (FDA). All tissues are recovered under full informed consent of the donors (mothers of the newborn children).  The donors have consented to the transfer of the allografts to third parties. A thorough medical and social history of the donor is also obtained.

### Recovery & Quality Control (cont.)

The listed communicable disease testing was performed by a laboratory registered with FDA to perform donor testing and certified to perform such testing on human specimens in accordance with the Clinical Laboratory Improvement Amendments of 1988 (CLIA) and 42 CFR part 493, or that has met equivalent requirements as determined by the Centers for Medicare and Medicaid Services (CMS).

The donor is screened for:

| | |
|---|---|
| HIV-1&2 Plus 0 Antibody | Hepatitis B Surface Antigen |
| HIV Type 1 (Nucleic Acid Test (NAT)) | Hepatitis C Antibody |
| HTLV-1&2 Antibody | Hepatitis C Virus (Nucleic Acid Test (NAT)) |
| Syphilis (Serologic Test) | Hepatitis B Virus (Nucleic Acid Test (NAT)) |
| Hepatitis B Core Antibody | West Nile Virus (Nucleic Acid Test (NAT))* |

*WNV NAT screening conducted on donors recovered beginning February 1, 2017.*

All tests produced negative results and were reviewed prior to the release of the tissue. Only tissue from donors with acceptable test results, according to the standards of MiMedx Tissue Services, LLC, as well as the standards and/or regulations of all state and federal regulatory bodies, are released.

The infectious disease test results, consent documents, donor medical history, behavior risk assessment according to current public health services guidelines, physical assessment, available relevant medical records, as well as information from other sources or records that may pertain to donor suitability, and tissue procurement test results, have been evaluated by the MiMedx Medical Director and are sufficient to indicate that the donor suitability criteria current at the time of tissue recovery have been met.

The names and addresses of the testing laboratories, the listing and interpretation of all required infectious disease tests, a listing of the documents reviewed as part of the relevant medical records, and the name of the person or establishment determining the suitability of this allograft are on file and available upon request.

**Donated Human Tissue. This allograft has been determined to be suitable for transplantation.**

### Allograft Processing/Preservation/Sterilization

EpiFix allografts are processed based upon strict, quality-controlled protocols that have demonstrated bioburden control. An additional assurance of safety is achieved by terminally sterilizing each allograft. Based upon validations, each graft has been effectively sterilized using e-beam irradiation. The allografts are processed with aminoglycoside antibiotics.

### Recipient Tracking

The FDA requires that recipient records be maintained for the purpose of tracking the allograft following transplantation. The authorized medical professional must complete the enclosed Tissue Utilization Record, attach a peel-off, allograft-tracking label provided, and mail to the distributor (postage-paid). Please use the remaining peel-off, allograft-tracking labels for patient and hospital records.

**Caution: This product must be administered by an authorized medical professional.**

The user shall be solely responsible for determining the adequacy and appropriateness of the allograft for any and all uses to which the user shall apply the allograft.

MiMedx's dehydrated Human Amnion/Chorion Membrane (dHACM) allografts are now described in an official U.S. Pharmacopeia – National Formulary monograph with the publication of USP 40 - NF 35.



Processed with:



VOL. II

Processing and donor suitability performed by MiMedx Tissue Services, LLC
Patents and patents pending see: www.mimedx.com/patents
EpiFix®, PURION®, and MiMedx® are registered trademarks of MiMedx Group, Inc.  1775 West Oak Commons Court NE, Marietta, GA 30062
©2017 MiMedx Group, Inc.
All Rights Reserved. **mimedx.com**

ES101.004





# An Amnion/Chorion Membrane Allograft for Homologous Use in Acute and Chronic Wound Care

- Enhances Healing
- Modulates Inflammation
- Reduces Scar Tissue Formation
- Provides a Barrier



APPROVED

AMERICAN
PODIATRIC
MEDICAL
ASSOCIATION

The EpiFix® dehydrated Human Amnion/Chorion Membrane (dHACM) Allograft is a minimally manipulated natural membrane that provides a scaffold for cellular ingrowth, modulates inflammation, and reduces scar tissue formation for enhanced healing.



EpiFix is processed using the PURION® process, a unique approach that provides an easy to use allograft stored at ambient conditions.

**MiMedx**





**EpiFix is composed of human amnion and chorion membranes that line the amniotic cavity. EpiFix has multiple layers including a single layer of epithelial cells, a basement membrane and an avascular connective tissue matrix.**

## Growth factors present in EpiFix:

285 regulatory proteins including growth factors, specialized cytokines, and enzyme inhibitors have been identified in EpiFix.[1-3] The following are some of the growth factors that help enhance healing:

- **Epidermal Growth Factor (EGF)** - Promotes proliferation of epithelial cells
- **Transforming Growth Factor $\beta$(TGF-$\beta$)** - Anti-inflammatory, and promotes normal wound healing and reduced scar formation
- **Fibroblast Growth Factor (FGF)** - Promotes cellular proliferation & important for collagen matrix formation
- **Platelet Derived Growth Factor A & B (PDGF A & B)** - Promotes cell proliferation in connective tissue and enhances soft tissue healing

## How to apply EpiFix:

- **Cut to fit**
- **Apply to the wound**
- **Cover to maintain a moist wound environment**

## Extracellular Components:

**The Extracellular Matrix of amniotic membrane is composed of 3 major classes of biomolecules:**

- **Structural proteins:** collagen types I, III, IV, V and VII, and elastin
- **Specialized proteins:** fibronectin, TIMPs[†], and laminins
- **Proteoglycans:** formed when GAGs are linked to core proteins

[†]Tissue Inhibitors of Metalloproteinases

## Product Offering:

- **Multiple sizes available to reduce graft wastage**
- **Available in a variety of configurations**

## Shelf Life: 5 years at ambient conditions

## Ordering Information:

 Customer Service: 866.477.4219

 Email: customerservice@mimedx.com



**1.** MiMedx Research Report: MM-RD-00072, Proteome Characterization of MiMedx Placental Tissue Products. **2.** Koob TJ, Lim JJ, Massee M, Zabek N, Denozière G. Properties of dehydrated human amnion/chorion composite grafts: implications for wound repair and soft tissue regeneration. J Biomed Mater Res B Appl Biomater. 2014 Aug;102(6):1353-62. **3.** Lei J, Priddy LB, Lim JJ, Massee M, Koob TJ. Identification of Extracellular Matrix Components and Biological Factors in Micronized Dehydrated Human Amnion/Chorion Membrane. Adv Wound Care (New Rochelle). 2017 Feb 1;6(2):43-53.

Patents and patents pending see: www.mimedx.com/patents. EpiFix®, PURION®, and MiMedx® are registered U.S. trademarks of MiMedx Group, Inc. 1775 West Oak Commons NE, Marietta, GA 30062 ©2018 MiMedx Group, Inc. All Rights Reserved. www.mimedx.com EP408.002

## EpiFix® Description

EpiFix is a minimally manipulated, dehydrated, non-viable cellular allograft derived from human amniotic membrane. Amniotic membrane is a thin, collagenous membrane composed of multiple layers that surrounds the fetus within the mother's uterus.

EpiFix preserves multiple extracellular matrix components and other proteins present in amniotic tissue.

EpiFix is a human tissue product and appearance may vary between donors. Variations in color (tan to light brown), opacity, and thickness are normal due to the nature of human tissue.

### Tissue Uses

EpiFix is a barrier intended for use in the treatment of acute and chronic wounds, providing a protective environment to support the healing process.

### Contraindications

EpiFix should not be used on (1) areas with active or latent infection and/or (2) a patient with a disorder that would create an unacceptable risk of post-operative complications.

### Precautions/Warnings

- EpiFix allografts remain suitable for transplantation in an unopened, undamaged package, under proper storage conditions.
- Please inspect the integrity of the package upon receipt. If package and contents appear defective or damaged in any way, immediately contact the distributor.
- This allograft is intended for single-patient use only. Discard all unused material.
- The procedure should be performed by an authorized medical professional.
- Strict donor screening and laboratory testing, along with dedicated processing and sterilization methods, are employed to reduce the risk of any disease transmission. However, as with all biological implants, an absolute guarantee of tissue safety is not possible. This allograft has the potential to transmit infectious disease to the recipient.
- The reaction of the body to any biological implant is not completely understood.
- Caution should be used when treating patients with a known sensitivity to aminoglycoside antibiotics.
- Discard all damaged, mishandled or potentially contaminated tissue.
- This product has not been tested in combination with other products.
- DO NOT RE-STERILIZE.

### Preparation, Reconstitution and Use

Prior to implantation, carefully follow the EpiFix allograft preparation steps below using aseptic technique:

#### Wound Bed Preparation
- Ensure the wound is free from clinical signs of infection.
- Prepare wound bed as needed.

#### Removing EpiFix from Packaging
- The outer peel pouch is NOT sterile. The inner pouch that contains EpiFix is sterile (unless the pouches are damaged or compromised).
- Carefully open the peelable corner of the outer pouch and extract the inner pouch using aseptic technique. Ensure the inner pouch does not come in contact with any portions of non-sterile surface of the outer pouch.
- Using aseptic technique, SLOWLY peel a corner of the inner peel pouch and grasp EpiFix with fingers or non-toothed, sterile forceps.
- Use EpiFix promptly after opening the inner, sterile pouch.

**PLEASE TAKE GREAT CARE WHEN REMOVING EpiFix FROM THE INTERNAL POUCH. EpiFix IS THIN AND EXTREMELY LIGHTWEIGHT.**

VOL. II

### EpiFix Preparation

1. In a dry state, use sterile dry scissors to cut EpiFix to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix by 1mm.
2. EpiFix can be applied wet or dry.
3. EpiFix can be hydrated while on the wound site with sterile saline solution. Simply apply several drops of sterile solution to EpiFix. During and following hydration, the embossment on EpiFix will begin to fade.

#### EpiFix Orientation & Application

EpiFix should be placed on the wound site, using the orientation of the embossment lettering as a guide.  Proper orientation of EpiFix can be noted when the embossment nomenclature reads correctly from left to right.  If the mesh process has diminished the ability to clearly read the embossment, the following two alternate methods may be used for placement:

1. An elongated, horizontal perforation is located in the top left area of the graft connecting two adjacent perforations. Proper orientation can be noted when the graft is placed on the wound site such that this horizontal perforation remains visually in the top left area of the graft.
2. The clear side of the inner pouch is indicative of the UP side of the graft orientation. Proper placement can be achieved by removing the graft from the pouch with the clear side up and moving to the wound site with that same orientation.

Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix to the wound site, if desired.

#### Primary Dressing
- EpiFix should be covered with a non-adherent contact layer.
- EpiFix should NOT be disturbed, if possible, for several days or before the next application, if needed.
- If an infection occurs at the graft site, treat infection per institution's protocol.

#### Secondary Dressing
- EpiFix requires a moist wound environment.  Use appropriate moisture management dressings for the wound type and treatment ideology.

#### Support Therapies
- EpiFix is compatible with offloading/compression/negative pressure therapies.
- EpiFix can be used in conjunction with hyperbaric oxygen therapy.

#### Re-application of EpiFix
- It is recommended that EpiFix grafts are applied weekly until wound epithelialization is achieved. However, clinician discretion should be used based on patient and wound condition/progress. It is clinically acceptable to apply EpiFix on a biweekly basis if desired.

### Adverse Effects & Reporting
- As with any procedure, the possibility of infection exists.
- Proprietary processing and validated sterilization methods are employed to eliminate potential deleterious components of the allograft. However, as with all biological implants, the possibility of rejection exists.
- Any adverse reactions, including the suspected transmission of disease attributable to this allograft, should be reported immediately to MiMedx®.

### Acceptable Storage

It is the responsibility of the distributor and/or end-user clinician to store EpiFix allografts in a clean, dry environment between 2-30°C prior to further distribution or transplant. EpiFix allografts have a 5-year shelf life. Check the label for the expiration date.

### Recovery & Quality Control

All tissue recovered meets stringent specifications during donor screening and laboratory testing to reduce the risk of transmitting infectious disease. EpiFix allografts are procured and processed in the United States according to standards and/or regulations established by the American Association of Tissue Banks (AATB) and the United States Food & Drug Administration (FDA). All tissues are recovered under full informed consent of the donors (mothers of the newborn children).  The donors have consented to the transfer of the allografts to third parties. A thorough medical and social history of the donor is also obtained.

## EpiFix® Description

EpiFix is a minimally manipulated, dehydrated, non-viable cellular allograft derived from human amniotic membrane. Amniotic membrane is a thin, collagenous membrane composed of multiple layers that surrounds the fetus within the mother's uterus.

EpiFix preserves multiple extracellular matrix components and other proteins present in amniotic tissue.

EpiFix is a human tissue product and appearance may vary between donors. Variations in color (tan to light brown), opacity, and thickness are normal due to the nature of human tissue.

### Tissue Uses

EpiFix is a barrier intended for use in the treatment of acute and chronic wounds, providing a protective environment to support the healing process.

### Contraindications

EpiFix should not be used on (1) areas with active or latent infection and/or (2) a patient with a disorder that would create an unacceptable risk of post-operative complications.

### Precautions/Warnings

- EpiFix allografts remain suitable for transplantation in an unopened, undamaged package, under proper storage conditions.
- Please inspect the integrity of the package upon receipt. If package and contents appear defective or damaged in any way, immediately contact the distributor.
- This allograft is intended for single-patient use only. Discard all unused material.
- The procedure should be performed by an authorized medical professional.
- Strict donor screening and laboratory testing, along with dedicated processing and sterilization methods, are employed to reduce the risk of any disease transmission. However, as with all biological implants, an absolute guarantee of tissue safety is not possible. This allograft has the potential to transmit infectious disease to the recipient.
- The reaction of the body to any biological implant is not completely understood.
- Caution should be used when treating patients with a known sensitivity to aminoglycoside antibiotics.
- Discard all damaged, mishandled or potentially contaminated tissue.
- This product has not been tested in combination with other products.
- DO NOT RE-STERILIZE.

### Preparation, Reconstitution and Use

Prior to implantation, carefully follow the EpiFix allograft preparation steps below using aseptic technique:

#### Wound Bed Preparation

- Ensure the wound is free from clinical signs of infection.
- Prepare wound bed as needed.

#### Removing EpiFix from Packaging

- The outer peel pouch is NOT sterile. The inner pouch that contains EpiFix is sterile (unless the pouches are damaged or compromised).
- Carefully open the peelable corner of the outer pouch and extract the inner pouch using aseptic technique. Ensure the inner pouch does not come in contact with any portions of non-sterile surface of the outer pouch.
- Using aseptic technique, SLOWLY peel a corner of the inner peel pouch and grasp EpiFix with fingers or non-toothed, sterile forceps.
- Use EpiFix promptly after opening the inner, sterile pouch.

**PLEASE TAKE GREAT CARE WHEN REMOVING EpiFix FROM THE INTERNAL POUCH. EpiFix IS THIN AND EXTREMELY LIGHTWEIGHT.**

VOL. II

### EpiFix Preparation

1. In a dry state, use sterile dry scissors to cut EpiFix to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix by 1mm.
2. EpiFix can be applied wet or dry.
3. EpiFix can be hydrated while on the wound site with sterile saline solution. Simply apply several drops of sterile solution to EpiFix. During and following hydration, the embossment on EpiFix will begin to fade.

### EpiFix Orientation & Application

EpiFix should be placed on the wound site, using the orientation of the embossment lettering as a guide. Proper orientation of EpiFix can be noted when the embossment nomenclature reads correctly from left to right. If the mesh process has diminished the ability to clearly read the embossment, the following two alternate methods may be used for placement:

1. An elongated, horizontal perforation is located in the top left area of the graft connecting two adjacent perforations. Proper orientation can be noted when the graft is placed on the wound site such that this horizontal perforation remains visually in the top left area of the graft.
2. The clear side of the inner pouch is indicative of the UP side of the graft orientation. Proper placement can be achieved by removing the graft from the pouch with the clear side up and moving to the wound site with that same orientation.

Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix to the wound site, if desired.

### Primary Dressing

- EpiFix should be covered with a non-adherent contact layer.
- EpiFix should NOT be disturbed, if possible, for several days or before the next application, if needed.
- If an infection occurs at the graft site, treat infection per institution's protocol.

### Secondary Dressing

- EpiFix requires a moist wound environment. Use appropriate moisture management dressings for the wound type and treatment ideology.

### Support Therapies

- EpiFix is compatible with offloading/compression/negative pressure therapies.
- EpiFix can be used in conjunction with hyperbaric oxygen therapy.

### Re-application of EpiFix

- It is recommended that EpiFix grafts are applied weekly until wound epithelialization is achieved. However, clinician discretion should be used based on patient and wound condition/progress. It is clinically acceptable to apply EpiFix on a biweekly basis if desired.

### Adverse Effects & Reporting

- As with any procedure, the possibility of infection exists.
- Proprietary processing and validated sterilization methods are employed to eliminate potential deleterious components of the allograft. However, as with all biological implants, the possibility of rejection exists.
- Any adverse reactions, including the suspected transmission of disease attributable to this allograft, should be reported immediately to MiMedx®.

### Acceptable Storage

It is the responsibility of the distributor and/or end-user clinician to store EpiFix allografts in a clean, dry environment between 2-30°C prior to further distribution or transplant. EpiFix allografts have a 5-year shelf life. Check the label for the expiration date.

### Recovery & Quality Control

All tissue recovered meets stringent specifications during donor screening and laboratory testing to reduce the risk of transmitting infectious disease. EpiFix allografts are procured and processed in the United States according to standards and/or regulations established by the American Association of Tissue Banks (AATB) and the United States Food & Drug Administration (FDA). All tissues are recovered under full informed consent of the donors (mothers of the newborn children). The donors have consented to the transfer of the allografts to third parties. A thorough medical and social history of the donors is also obtained.

## EpiFix® Description

EpiFix is a minimally manipulated, dehydrated, non-viable cellular allograft derived from human amniotic membrane. Amniotic membrane is a thin, collagenous membrane composed of multiple layers that surrounds the fetus within the mother's uterus.

EpiFix preserves multiple extracellular matrix components and other proteins present in amniotic tissue.

EpiFix is a human tissue product and appearance may vary between donors. Variations in color (tan to light brown), opacity, and thickness are normal due to the nature of human tissue.

### Tissue Uses

EpiFix is a barrier intended for use in the treatment of acute and chronic wounds, providing a protective environment to support the healing process.

### Contraindications

EpiFix should not be used on (1) areas with active or latent infection and/or (2) a patient with a disorder that would create an unacceptable risk of post-operative complications.

### Precautions/Warnings

- EpiFix allografts remain suitable for transplantation in an unopened, undamaged package, under proper storage conditions.
- Please inspect the integrity of the package upon receipt. If package and contents appear defective or damaged in any way, immediately contact the distributor.
- This allograft is intended for single-patient use only. Discard all unused material.
- The procedure should be performed by an authorized medical professional.
- Strict donor screening and laboratory testing, along with dedicated processing and sterilization methods, are employed to reduce the risk of any disease transmission. However, as with all biological implants, an absolute guarantee of tissue safety is not possible. This allograft has the potential to transmit infectious disease to the recipient.
- The reaction of the body to any biological implant is not completely understood.
- Caution should be used when treating patients with a known sensitivity to aminoglycoside antibiotics.
- Discard all damaged, mishandled or potentially contaminated tissue.
- This product has not been tested in combination with other products.
- DO NOT RE-STERILIZE.

### Preparation, Reconstitution and Use

Prior to implantation, carefully follow the EpiFix allograft preparation steps below using aseptic technique:

#### Wound Bed Preparation
- Ensure the wound is free from clinical signs of infection.
- Prepare wound bed as needed.

#### Removing EpiFix from Packaging
- The outer peel pouch is NOT sterile. The inner pouch that contains EpiFix is sterile (unless the pouches are damaged or compromised).
- Carefully open the peelable corner of the outer pouch and extract the inner pouch using aseptic technique. Ensure the inner pouch does not come in contact with any portions of non-sterile surface of the outer pouch.
- Using aseptic technique, SLOWLY peel a corner of the inner peel pouch and grasp EpiFix with fingers or non-toothed, sterile forceps.
- Use EpiFix promptly after opening the inner, sterile pouch.

**PLEASE TAKE GREAT CARE WHEN REMOVING EpiFix FROM THE INTERNAL POUCH. EpiFix IS THIN AND EXTREMELY LIGHTWEIGHT.**

VOL. II

### EpiFix Preparation
1. In a dry state, use sterile dry scissors to cut EpiFix to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix by 1mm.
2. EpiFix can be applied wet or dry.
3. EpiFix can be hydrated while on the wound site with sterile saline solution. Simply apply several drops of sterile solution to EpiFix. During and following hydration, the embossment on EpiFix will begin to fade.

### EpiFix Orientation & Application

EpiFix should be placed on the wound site, using the orientation of the embossment lettering as a guide. Proper orientation of EpiFix can be noted when the embossment nomenclature reads correctly from left to right. If the mesh process has diminished the ability to clearly read the embossment, the following two alternate methods may be used for placement:

1. An elongated, horizontal perforation is located in the top left area of the graft connecting two adjacent perforations. Proper orientation can be noted when the graft is placed on the wound site such that this horizontal perforation remains visually in the top left area of the graft.
2. The clear side of the inner pouch is indicative of the UP side of the graft orientation. Proper placement can be achieved by removing the graft from the pouch with the clear side up and moving to the wound site with that same orientation.

Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix to the wound site, if desired.

### Primary Dressing
- EpiFix should be covered with a non-adherent contact layer.
- EpiFix should NOT be disturbed, if possible, for several days or before the next application, if needed.
- If an infection occurs at the graft site, treat infection per institution's protocol.

### Secondary Dressing
- EpiFix requires a moist wound environment. Use appropriate moisture management dressings for the wound type and treatment ideology.

### Support Therapies
- EpiFix is compatible with offloading/compression/negative pressure therapies.
- EpiFix can be used in conjunction with hyperbaric oxygen therapy.

### Re-application of EpiFix
- It is recommended that EpiFix grafts are applied weekly until wound epithelialization is achieved. However, clinician discretion should be used based on patient and wound condition/progress. It is clinically acceptable to apply EpiFix on a biweekly basis if desired.

### Adverse Effects & Reporting
- As with any procedure, the possibility of infection exists.
- Proprietary processing and validated sterilization methods are employed to eliminate potential deleterious components of the allograft. However, as with all biological implants, the possibility of rejection exists.
- Any adverse reactions, including the suspected transmission of disease attributable to this allograft, should be reported immediately to MiMedx®.

### Acceptable Storage

It is the responsibility of the distributor and/or end-user clinician to store EpiFix allografts in a clean, dry environment between 2-30°C prior to further distribution or transplant. EpiFix allografts have a 5-year shelf life. Check the label for the expiration date.

### Recovery & Quality Control

All tissue recovered meets stringent specifications during donor screening and laboratory testing to reduce the risk of transmitting infectious disease. EpiFix allografts are procured and processed in the United States according to standards and/or regulations established by the American Association of Tissue Banks (AATB) and the United States Food & Drug Administration (FDA). All tissues are recovered under full informed consent of the donors (mothers of the newborn children). The donors have consented to the transfer of the allografts to third parties. A thorough medical and social history of the donors is also obtained.



**artacent®**
W O U N D

### PACKAGE INSERT AND INSTRUCTIONS FOR USE

#### Description:

This human tissue allograft is supplied and processed by Tides Medical. This allograft is derived from voluntarily DONATED HUMAN TISSUES. Artacent is a dual-layer, dehydrated amniotic membrane allograft. Human amniotic membrane is a thin collagenous membrane derived from the submucosa of the placenta, the organ that connects the developing fetus to the mother's uterus. Human amniotic membrane consists of multiple layers including epithelial cells, a basement membrane, and a stromal matrix.

This allograft is supplied sterile.

#### Regulatory Classification:

This allograft is a human tissue product for transplantation. It is processed and distributed in accordance with Federal Drug Administration (FDA) requirements for Human Cellular and Tissue-based Products (HCT/P) (21 Code of Federal Regulations Part 1271), State regulations, and the guidelines of the American Association of Tissue Banks (AATB).
Caution: Federal Law restricts this product to sale by or on the order of a licensed medical professional, not for veterinary use.

#### Applications and Directions for Use:

This allograft may be used as a wound covering in various surgical procedures. It may be used independently or in combination with autologous tissue or other forms of allograft tissue. This allograft may be applied weekly or at the discretion of the health care provider.

#### Preparation of Allograft for Use:

Once a package seal has been compromised, the tissue shall be either transplanted, if appropriate, or properly discarded. Used allograft containers should be disposed of in accordance with recognized procedures for discarding medical waste material.

Prepare the allograft for use in accordance with the following procedures:

1. Open the 1st peel pouch and deliver the innermost sterile sealed pouch containing the allograft material to a sterile field.
2. Open the sterile sealed pouch and carefully deliver the graft to a sterile field for transplantation. PLEASE USE CAUTION WHEN REMOVING ALLOGRAFT FROM POUCH AS THE ALLOGRAFT IS THIN AND LIGHTWEIGHT
3. The allograft may be cut and shaped to the appropriate size required prior to placement
4. The allograft should then be placed onto the surgical site
5. Anchor graft using preferred method of fixation. Absorbable/non-absorbable suture material and/or tissue adhesives may be used to apply the graft to the surgical site, if necessary.
6. Once applied to the surgical site, the allograft can be hydrated with sterile saline or other sterile solution, if needed.

If for any reason the graft is opened and not used, it should be disposed of properly or returned to Tides Medical by contacting Customer Service and following appropriate return procedures. Document the reason for the non-use of the graft and indicate the disposition of the tissue on the enclosed Transplant Record and return the record to Tides Medical.

#### Donor Recovery, Screening and Processing:

After authorization for donation is obtained (represented by the mothers of the newborn children), collection of the donor tissue is performed in an aseptic manner by appropriately licensed tissue establishments. Donor eligibility is carefully evaluated as required by the US FDA and in accordance with AATB Standards and applicable State guidelines. Tissue donors are evaluated for high-risk behaviors and relevant communicable diseases. Screening includes a review of the donor medical and social history, a physical assessment, serological screening, and tissue collection microbiology.
Each donor is tested and shown to be negative or nonreactive for the following:

| | | | |
|---|---|---|---|
| HIV-1&2 Antibody | Hepatitis B Surface Antigen | Syphilis Rapid Plasma Reagin or Treponemal Specific Assay | Human T-Cell Lymphotropic Virus Type I Antibody (not required) |
| Hepatitis C Virus Antibody (NAT) | Hepatitis B Core Antibody (total) | HIV1/HCV/HBV Nucleic Acid Test | Human T-Cell Lymphotropic Virus Type II Antibody (not required) |

West Nile Virus (WNV NAT)

This testing is performed by a laboratory registered with FDA to perform donor testing and certified to perform such testing on human specimens under the Clinical Laboratory Improvement Amendments of 1988 (CLIA) and 42 CFR part 493, or that has met equivalent requirements as determined by the Centers for Medicare and Medicaid Services (CMS). Test kits used are approved by the FDA.

Tides Medical's Medical Director has determined this donor tissue to be eligible for transplantation. The testing and medical release records are maintained by Tides Medical

Allograft tissues are processed in a controlled environment using methods designed to prevent contamination and cross contamination. Proprietary physiological buffers and surfactants are used during processing. Allograft tissue may contain traces of these processing agents. Final products are sized and packaged according to approved specifications and procedures and are sterilized using electron beam irradiation.

Note: Allograft tissues will naturally vary in color. Occasional dark spots or localized discoloration is a normal occurrence.

#### Warnings and Contraindications:

Careful donor screening, laboratory testing, tissue processing, and gamma irradiation have been utilized to minimize the risk of transmission of relevant communicable diseases to the patient. As with any processed human donor tissue, this graft cannot be guaranteed to be free of all pathogens.

This allograft is intended for single patient use only.
Do NOT reuse or re-sterilize.

210

Prior to Usage: Examine Allograft Packaging - Do Not Use This Allograft If:

Any part of the package or product elements appear to be missing, tampered with or damaged. The product label or identifying bar code is severely damaged, illegible or missing.
The expiration date shown on the package label has passed.

If any of the above conditions exist or are suspected, this allograft should NOT be used.

Contraindications:

Dehydrated amnion allografts should not be implanted into: (1) areas of active or latent infection; and/or (2) into a patient with a disorder that would create an unacceptable risk of post-operative complications. Additional contraindications for the use of this allograft shall be determined by a licensed practitioner.

Packaging and Labeling:

Each allograft distributed by Tides Medical is identified by its own unique serial number. The allograft is packaged in a pouch. Each pouch features a peel back seal and is also heat sealed to provide a sterile barrier. The package label includes graft details such as dimensions. Contents of the package are sterile unless the package is opened or damaged.

Recommended Storage and Expiration:

Maintain allograft in a clean, dry environment at ambient temperature (15°C to 30°C). No refrigeration is necessary, protect from freezing.

See package label for expiration dating.

It is the responsibility of the Tissue Dispensing Service, Tissue Distribution Intermediary, and/or End-User clinician to maintain tissue intended for transplantation in appropriate storage conditions prior to further Distribution or transplant and that Recipient records must be maintained for the purpose of tracing tissue post-transplantation.

Returns:

If for any reason tissue must be returned, a return authorization is required from Tides Medical prior to shipping. It is the responsibility of the health care institution returning the tissue to adequately package and label the tissue for return shipment.

Recipient Tracking:

The F.D.A. requires that recipient records be maintained for the purpose of tracking the allograft following surgical transplantation. The surgeon or operating staff member must complete the enclosed Allograft Utilization Record, attach a peal-off allograft-tracking label and patient label, and mail it to Tides Medical. Please use the remaining peel-off, allograft-tracking labels for patient and hospital records.

Adverse Effects and Reporting:

As allografts are composed of proteins such as collagen, the potential for hypersensitivity, allergic reactions or other immune responses may exist. All adverse outcomes potentially attributed to this allograft must be promptly reported to Tides Medical.

Possible complications can occur with any surgical procedure including, but not limited to pain, infection, hematoma, and/or immune rejection of the introduced tissue. Disease screening methods are limited; therefore, certain diseases may not be detected.

The following complications of tissue transplantation may occur:
Transmission of diseases of unknown etiology;
Transmission of known infectious agents including, but not limited to viruses, bacteria, and fungi.

Any adverse reactions, including the suspected transmission of disease attributable to this allograft should be immediately reported to Tides Medical. Disposal:

Allograft disposal shall be in accordance with local, state, and federal regulations for human tissue.

Inquiries:

For additional information, to place an order, or to report adverse reactions, contact: Tides Medical Customer Service at:

Phone: 888-494-4441        Fax: 781-823-0321        customerservice@tidesmedical.com

**tides**medical

Donor eligibility determination and processed by Tides Medical
1819 W. Pinhook Road
Suite 206
Lafayette, LA 70508
(888) 494-4441
FDA Registration FEI: 3010125671

| Title: | ARTACENT™ WOUND PACKAGE INSERT AND INSTRUCTIONS FOR USE | Number: | LBL-078 | Revision: | 04 |
| | | | | Date: | 04/28/2022 |

VOL. II                                                                                211



# WPS - Wisconsin Physicians Service MAC - Retired Date: 03/01/2016

**LCD L34593:** "Application of Bioengineered Skin Substitutes"    **Effective Date:** 10/01/2015

**States: Alaska, Alabama, Arkansas, Arizona, Connecticut, Florida, Georgia, Iowa, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts Maine, Michigan, Minnesota, Missouri, Mississippi, Montana, North Carolina, North Dakota, Nebraska, New Hampshire, New Jersey, Ohio, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Virginia, Vermont, Washington, Wisconsin, West Virginia, and Wyoming**

**EpiFix Tissue Uses:** EpiFix (Q4131) is intended for homologous use in the treatment of acute and chronic partial and full-thickness wounds for the reduction of scar tissue formation, modulation of inflammation, and enhancement of soft tissue healing.

**Indications or Limitations of Coverage and/or Medical Necessity:** All products must be provided in accordance with the material's Food and Drug Administration (FDA) approved package label. Applied to partial- or full-thickness wounds (see individual product information for labeled indications) not involving tendon, muscle, joint capsule, exposed bone or sinus tracts. Applied in a frequency supported either by FDA product labeling or clearly supported by documentation showing the medical reasonable and necessary indications.

**Documentation Requirements:** The ulcer must be measured at the beginning of conservative treatment, following cessation of conservative treatment and at the beginning of the skin substitute treatment. Clearly, if during treatment the ulcer shows obvious signs of worsening or lack of treatment response, continuing skin substitute treatment would be inappropriate absent documentation of an appropriate rationale for doing so. There must be a documented plan of care with documented goals and provider follow-up in the medical record. Documentation to include current wound size, wound depth, presence and extent of or absence of obvious signs of infection, presence and extent of or absence of necrotic, devitalized or non-viable tissue, or other material in the wound that is expected to inhibit healing or promote adjacent tissue breakdown. When the documentation does not meet the criteria for the service rendered or does not establish the medical necessity for the service, such service will be denied as not reasonable and necessary under Section 1862(a)(1) of the Social Security Act.

**Utilization Guidelines:** Medicare expects skin substitutes to be applied according to the manufacturers' instructions. Any utilization above these parameters is subject to medical review. Exceptions with more frequent timing (every seven days) should be documented with appropriate narrative. Surgical Wound Preparation (CPT 15002-15005): Medicare does not expect to be billed for codes 15002-15005 in conjunction with routine, simple and/or repeat application of skin substitutes/replacements. These codes describe burn and wound preparation or incisional or excisional release of scar contracture resulting in an open wound requiring a skin graft. An operative report is required and must be available upon request. If this procedure is performed in an office the claim can be resubmitted with a request for a redetermination and the medical staff will give the claim individual consideration.

**Limitations:** Reimbursement may be made only when the medical record clearly documents that these products have been used in a comprehensive, organized wound management program. For venous stasis ulcers, there should be no fewer than two (2) weeks between applications and for diabetic ulcers there should be no fewer than three (3) weeks between applications, except when more frequent applications are either a part of the FDA product specific labeling instructions or are clearly supported by medical record documentation of medically reasonable and necessary indications.

---

**NOTE: All claims are subject to medical review. Medical record documentation is critical to ensure proper payment of claims. Per WPS, with the retirement of the LCD, "there are established billing, coding and documentation guidelines that should be followed in these circumstances."**

---

**Disclaimer:** The coverage information provided is gathered from third party sources for informational purposes only and has not been verified with any entity responsible for policy, such as the CMS, or any payer. It does not represent a statement, promise or guarantee from MiMedx Group, Inc. concerning coverage. MiMedx® makes no guarantee that any private or government payer will guarantee coverage. Health policies change frequently and can vary considerably from one payer to another. MiMedx® strongly recommends that you consult your payer for interpretation of local coverage and/or policy. The ultimate responsibility for policy interpretation and related claims submission lies with the physician, clinician, hospital or other facility.

Scand J Plast Reconstr Hand Surg 28: 75–76, 1994

# FIXATION OF SKIN GRAFTS WITH A NEW SILICONE RUBBER DRESSING (MEPITEL®)

A. F. P. M. Vloemans and R. W. Kreis

*From Burns Center, Red Cross Hospital, 1942 LE Beverwijk, The Netherlands*

(Submitted for publication January 15, 1993)

*Abstract.* A new silicone rubber dressing material, Mepitel® was tested as an alternative to SurfaSoft® and staples or sutures and a vaseline gauze for the fixation of 45 split skin grafts in 38 children. Almost all grafts took completely. No graft was lost because of inadequate fixation. The main advantage over fixing the graft with SurfaSoft combined with staples, or a vaseline gauze combined with sutures, is that the removal of the dressing is painless, and neither the graft nor the wound is disturbed.

*Key words:* split skin grafting, Mepitel®, graft take, graft fixation.

Whether a split skin graft takes is dependent on the quality of the wound bed, but the amount of ingrowth of the graft can be affected by several other factors. Freshly applied split skin grafts are vulnerable to mechanical displacement during the first postoperative days, when ingrowth is not yet fully established. Wounds grafted with widely expanded mesh grafts (expansion ratio more than one to two) are prone to desiccation and infection, as the grafts fail to provide effective wound coverage until epithelialisation is advanced. This may also cause loss of graft. Finally the graft may be destroyed at the time of removal of the dressing material, due to adherence of the graft and the open wounds to the dressing. Dressing materials for split skin grafts should ideally meet the following requirements. Mechanical displacement from the wound bed must be impossible. The dressing material must allow drainage of serous wound exudate and haematoma, and also allow antibacterial solution to reach the wound. At the time of removal, the dressing should not adhere to the graft and open areas of the wound.

It is a common practice to use vaseline gauze as a dressing, with the graft fixed to the wound bed with stitches, though a better technique is the combination of SurfaSoft® and staples (1).

A new dressing material, Mepitel® (Mölnlycke), was tested in an open prospective study to see if it was an improvement for the fixation of split skin grafts.

## MATERIALS AND METHODS

Mepitel consists of a polyamide net, impregnated with a silicone gel. It has an open structure with 14 pores/cm$^2$ each with a diameter of 1.2 mm.

After the split skin graft had been applied to the wound bed, Mepitel was placed over the graft and over a margin of surrounding healthy skin (Figs. 1, 2). No stitches or staples were used. A cotton wool gauze soaked in an antibacterial solution was then applied and finally the dressing was completed with a bandage and an elastic net dressing. Daily or every other day the outer bandage was changed. On the fifth to seventh day after operation the Mepitel dressing was removed and the take of the graft was established by two doctors and a trained nurse. The degree of "take" was divided in four categories: >95%, complete take; 75–95%, almost complete take; 50–75%, poor take; <50%, almost complete graft loss.

All patients were admitted to the Burns Centre or the Childrens Burns Centre of the Red Cross Hospital in Beverwijk.

As the removal of stitches or staples is painful and requires analgesics or even general anaesthesia in children, we expected to see most benefit in children, so only children below the age of 13 years were entered into the study.

Thirty-eight children, mean age 4.1 years (range 0.5–13) were included. Third degree skin defects were the result of scalds ($n = 19$), flame burns ($n = 10$) and contact burns ($n = 4$). In five cases the skin defect resulted from another traumatic skin lesions. Forty-five split skin grafts were performed: on the trunk ($n = 8$), the arms and legs ($n = 15$ each); neck and hand ($n = 1$ each), and the trunk, and arm ($n = 5$). The mean area grafted was 1.9% of the total body surface area (range 0.5–6%). In two cases a full sheet split skin graft was used, in all others we used a mesh graft with expansion ratios of 1:1.5 ($n = 24$), 1:2 ($n = 15$), 1:3 ($n = 2$), and 1:4 ($n = 2$).

The antibacterial dressing consisted of gauze soaked in a Furacine solution (nitrofurazone 0.2% in polyethylene glycol 400) or a solution of chlorhexidine 1% in polyethylene glycol 400 35%, glycerol 35%, and water.

©1994 Scandinavian University Press. *ISSN 0284–4311*

*Scand J Plast Reconstr Hand Surg 28*

76    *A. F. P. M. Vloemans and R. W. Kreis*



*Fig. 1.* Mesh graft applied to a tangentially excised wound bed.



*Fig. 2.* Mepitel covering a split skin graft.

## RESULTS

There were no wound infections, although two patients developed small haematomas underneath the graft. Haematomas and wound exudate drained satisfactorily through Mepitel. Removal of the outer dressing was painless, as was the final removal of the Mepitel. No analgesia or anaesthesia was needed for the changes of dressings. Though Mepitel tends to curl at the edges, and there was a little displacement near joints and other areas of the body where the skin is mobile, none of the grafts became displaced. No displacement of the skin graft was seen in other areas.

Three take rates ended up in category 2 (75–95%). Due to formation of haematoma underneath the graft and remnants of necrosis in the wound bed, parts of the grafts did not take. In 42 cases the take was almost complete, category 1 (>95%).

## DISCUSSION

To use Mepitel to fix split skin grafts requires a margin of healthy skin around the wound, so its use is therefore limited to minor skin grafts. In this study the maximum size was 6% of the total body surface area. In addition it can only be used on flat (trunk) or convex (extremities) areas of the body. In concave areas such as the neck, the axilla, and the groin, firm fixation is either difficult or impossible. If there is no margin of healthy skin around the wound, (in concave areas or for major skin grafts) we pre-

fer to fix grafts with SurfaSoft and staples. Mepitel must be applied accurately to the skin graft as it can easily become displaced at that time.

The main advantage of Mepitel is that it makes it easy and painless to change the additional dressings, which allows frequent dressing changes before the final removal of the interface dressing and the painless removal of the silicone material from the graft, without disturbance of open wound areas such as spaces between the grafts, the holes in the mesh and at the edges of the graft. No anaesthesia is necessary and in some cases the dressing can be removed by the child himself. In two cases the Mepitel had become stuck to parts of the open wound by small plugs of exudate in the pores. This problem was overcome by soaking the dressing with saline before removal.

## ACKNOWLEDGEMENTS

We thank the surgical team of the Red Cross Hospital for their support.

## REFERENCES

1. Kreis RW, Vloemans AFPM. Fixation of skin transplants in burns with Surfasoft® and staples. Scand J Plast Reconstr Hand Surg 1987; 21: 249–251.

*Correspondence to:*
A. F. P. M. Vloemans
Red Cross Hospital
Vondellaan 13
NL-LE Beverwijk
The Netherlands

https://www.tandfonline.com/doi/epdf/10.3109/02844319409015992?needAccess=true&role=button

File 13 pdf - Page 123 of 2526

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 215-223

## EpiFix® Description

EpiFix is a minimally manipulated, dehydrated, non-viable cellular allograft derived from human amniotic membrane. Amniotic membrane is a thin, collagenous membrane composed of multiple layers that surrounds the fetus within the mother's uterus.

EpiFix preserves multiple extracellular matrix components and other proteins present in amniotic tissue.

EpiFix is a human tissue product and appearance may vary between donors. Variations in color (tan to light brown), opacity, and thickness are normal due to the nature of human tissue.

### Tissue Uses
EpiFix is a barrier intended for use in the treatment of acute and chronic wounds, providing a protective environment to support the healing process.

### Contraindications
EpiFix should not be used on (1) areas with active or latent infection and/or (2) a patient with a disorder that would create an unacceptable risk of post-operative complications.

### Precautions/Warnings
- EpiFix allografts remain suitable for transplantation in an unopened, undamaged package, under proper storage conditions.
- Please inspect the integrity of the package upon receipt. If package and contents appear defective or damaged in any way, immediately contact the distributor.
- This allograft is intended for single-patient use only. Discard all unused material.
- The procedure should be performed by an authorized medical professional.
- Strict donor screening and laboratory testing, along with dedicated processing and sterilization methods, are employed to reduce the risk of any disease transmission. However, as with all biological implants, an absolute guarantee of tissue safety is not possible. This allograft has the potential to transmit infectious disease to the recipient.
- The reaction of the body to any biological implant is not completely understood.
- Caution should be used when treating patients with a known sensitivity to aminoglycoside antibiotics.
- Discard all damaged, mishandled or potentially contaminated tissue.
- This product has not been tested in combination with other products.
- DO NOT RE-STERILIZE.

### Preparation, Reconstitution and Use
Prior to implantation, carefully follow the EpiFix allograft preparation steps below using aseptic technique:

#### Wound Bed Preparation
- Ensure the wound is free from clinical signs of infection.
- Prepare wound bed as needed.

#### Removing EpiFix from Packaging
- The outer peel pouch is NOT sterile. The inner pouch that contains EpiFix is sterile (unless the pouches are damaged or compromised).
- Carefully open the peelable corner of the outer pouch and extract the inner pouch using aseptic technique. Ensure the inner pouch does not come in contact with any portions of non-sterile surface of the outer pouch.
- Using aseptic technique, SLOWLY peel a corner of the inner peel pouch and grasp EpiFix with fingers or non-toothed, sterile forceps.
- Use EpiFix promptly after opening the inner, sterile pouch.

**PLEASE TAKE GREAT CARE WHEN REMOVING EpiFix FROM THE INTERNAL POUCH. EpiFix IS THIN AND EXTREMELY LIGHTWEIGHT.**

VOL. II

### EpiFix Preparation
1. In a dry state, use sterile dry scissors to cut EpiFix to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix by 1mm.
2. EpiFix can be applied wet or dry.
3. EpiFix can be hydrated while on the wound site with sterile saline solution. Simply apply several drops of sterile solution to EpiFix. During and following hydration, the embossment on EpiFix will begin to fade.

### EpiFix Orientation & Application
EpiFix should be placed on the wound site, using the orientation of the embossment lettering as a guide. Proper orientation of EpiFix can be noted when the embossment nomenclature reads correctly from left to right. If the mesh process has diminished the ability to clearly read the embossment, the following two alternate methods may be used for placement:
1. An elongated, horizontal perforation is located in the top left area of the graft connecting two adjacent perforations. Proper orientation can be noted when the graft is placed on the wound site such that this horizontal perforation remains visually in the top left area of the graft.
2. The clear side of the inner pouch is indicative of the UP side of the graft orientation. Proper placement can be achieved by removing the graft from the pouch with the clear side up and moving to the wound site with that same orientation.

Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix to the wound site, if desired.

### Primary Dressing
- EpiFix should be covered with a non-adherent contact layer.
- EpiFix should NOT be disturbed, if possible, for several days or before the next application, if needed.
- If an infection occurs at the graft site, treat infection per institution's protocol.

### Secondary Dressing
- EpiFix requires a moist wound environment. Use appropriate moisture management dressings for the wound type and treatment ideology.

### Support Therapies
- EpiFix is compatible with offloading/compression/negative pressure therapies.
- EpiFix can be used in conjunction with hyperbaric oxygen therapy.

### Re-application of EpiFix
- It is recommended that EpiFix grafts are applied weekly until wound epithelialization is achieved. However, clinician discretion should be used based on patient and wound condition/progress. It is clinically acceptable to apply EpiFix on a biweekly basis if desired.

### Adverse Effects & Reporting
- As with any procedure, the possibility of infection exists.
- Proprietary processing and validated sterilization methods are employed to eliminate potential deleterious components of the allograft. However, as with all biological implants, the possibility of rejection exists.
- Any adverse reactions, including the suspected transmission of disease attributable to this allograft, should be reported immediately to MiMedx®.

### Acceptable Storage
It is the responsibility of the distributor and/or end-user clinician to store EpiFix allografts in a clean, dry environment between 2-30°C prior to further distribution or transplant. EpiFix allografts have a 5-year shelf life. Check the label for the expiration date.

### Recovery & Quality Control
All tissue recovered meets stringent specifications during donor screening and laboratory testing to reduce the risk of transmitting infectious disease. EpiFix allografts are procured and processed in the United States according to standards and/or regulations established by the American Association of Tissue Banks (AATB) and the United States Food & Drug Administration (FDA). All tissues are recovered under full informed consent of the donors (mothers of the newborn children). The donors have consented to the transfer of the allografts to third parties. A thorough medical and social history of the donor is also obtained.



**artacent®**
W O U N D

## PACKAGE INSERT AND INSTRUCTIONS FOR USE

Description:

This human tissue allograft is supplied and processed by Tides Medical. This allograft is derived from voluntarily DONATED HUMAN TISSUES. Artacent is a dual-layer, dehydrated amniotic membrane allograft. Human amniotic membrane is a thin collagenous membrane derived from the submucosa of the placenta, the organ that connects the developing fetus to the mother's uterus. Human amniotic membrane consists of multiple layers including epithelial cells, a basement membrane, and a stromal matrix.

This allograft is supplied sterile.

Regulatory Classification:

This allograft is a human tissue product for transplantation. It is processed and distributed in accordance with Federal Drug Administration (FDA) requirements for Human Cellular and Tissue-based Products (HCT/P) (21 Code of Federal Regulations Part 1271), State regulations, and the guidelines of the American Association of Tissue Banks (AATB).
Caution: Federal Law restricts this product to sale by or on the order of a licensed medical professional, not for veterinary use.

Applications and Directions for Use:

This allograft may be used as a wound covering in various surgical procedures. It may be used independently or in combination with autologous tissue or other forms of allograft tissue. This allograft may be applied weekly or at the discretion of the health care provider.

Preparation of Allograft for Use:

Once a package seal has been compromised, the tissue shall be either transplanted, if appropriate, or properly discarded. Used allograft containers should be disposed of in accordance with recognized procedures for discarding medical waste material.

Prepare the allograft for use in accordance with the following procedures:

1. Open the 1st peel pouch and deliver the innermost sterile sealed pouch containing the allograft material to a sterile field.
2. Open the sterile sealed pouch and carefully deliver the graft to a sterile field for transplantation. PLEASE USE CAUTION WHEN REMOVING ALLOGRAFT FROM POUCH AS THE ALLOGRAFT IS THIN AND LIGHTWEIGHT
3. The allograft may be cut and shaped to the appropriate size required prior to placement
4. The allograft should then be placed onto the surgical site
5. Anchor graft using preferred method of fixation. Absorbable/non-absorbable suture material and/or tissue adhesives may be used to apply the graft to the surgical site, if necessary.
6. Once applied to the surgical site, the allograft can be hydrated with sterile saline or other sterile solution, if needed.

If for any reason the graft is opened and not used, it should be disposed of properly or returned to Tides Medical by contacting Customer Service and following appropriate return procedures. Document the reason for the non-use of the graft and indicate the disposition of the tissue on the enclosed Transplant Record and return the record to Tides Medical.

Donor Recovery, Screening and Processing:

After authorization for donation is obtained (represented by the mothers of the newborn children), collection of the donor tissue is performed in an aseptic manner by appropriately licensed tissue establishments. Donor eligibility is carefully evaluated as required by the US FDA and in accordance with AATB Standards and applicable State guidelines. Tissue donors are evaluated for high-risk behaviors and relevant communicable diseases. Screening includes a review of the donor medical and social history, a physical assessment, serological screening, and tissue collection microbiology.
Each donor is tested and shown to be negative or nonreactive for the following:

| | | | |
|---|---|---|---|
| HIV-1&2 Antibody | Hepatitis B Surface Antigen | Syphilis Rapid Plasma Reagin or Treponemal Specific Assay | Human T-Cell Lymphotropic Virus Type I Antibody (not required) |
| Hepatitis C Virus Antibody (NAT) | Hepatitis B Core Antibody (total) | HIV1/HCV/HBV Nucleic Acid Test | Human T-Cell Lymphotropic Virus Type II Antibody (not required) |

West Nile Virus (WNV NAT)

This testing is performed by a laboratory registered with FDA to perform donor testing and certified to perform such testing on human specimens under the Clinical Laboratory Improvement Amendments of 1988 (CLIA) and 42 CFR part 493, or that has met equivalent requirements as determined by the Centers for Medicare and Medicaid Services (CMS). Test kits used are approved by the FDA.

Tides Medical's Medical Director has determined this donor tissue to be eligible for transplantation. The testing and medical release records are maintained by Tides Medical

Allograft tissues are processed in a controlled environment using methods designed to prevent contamination and cross contamination. Proprietary physiological buffers and surfactants are used during processing. Allograft tissue may contain traces of these processing agents. Final products are sized and packaged according to approved specifications and procedures and are sterilized using electron beam irradiation.

Note: Allograft tissues will naturally vary in color. Occasional dark spots or localized discoloration is a normal occurrence.

Warnings and Contraindications:

Careful donor screening, laboratory testing, tissue processing, and gamma irradiation have been utilized to minimize the risk of transmission of relevant communicable diseases to the patient. As with any processed human donor tissue, this graft cannot be guaranteed to be free of all pathogens.

This allograft is intended for single patient use only.
Do NOT reuse or re-sterilize.

225

Prior to Usage: Examine Allograft Packaging - Do Not Use This Allograft If:

Any part of the package or product elements appear to be missing, tampered with or damaged. The product label or identifying bar code is severely damaged, illegible or missing.
The expiration date shown on the package label has passed.

If any of the above conditions exist or are suspected, this allograft should NOT be used.

Contraindications:

Dehydrated amnion allografts should not be implanted into: (1) areas of active or latent infection; and/or (2) into a patient with a disorder that would create an unacceptable risk of post-operative complications. Additional contraindications for the use of this allograft shall be determined by a licensed practitioner.

Packaging and Labeling:

Each allograft distributed by Tides Medical is identified by its own unique serial number. The allograft is packaged in a pouch. Each pouch features a peel back seal and is also heat sealed to provide a sterile barrier. The package label includes graft details such as dimensions. Contents of the package are sterile unless the package is opened or damaged.

Recommended Storage and Expiration:

Maintain allograft in a clean, dry environment at ambient temperature (15°C to 30°C). No refrigeration is necessary, protect from freezing.

See package label for expiration dating.

It is the responsibility of the Tissue Dispensing Service, Tissue Distribution Intermediary, and/or End-User clinician to maintain tissue intended for transplantation in appropriate storage conditions prior to further Distribution or transplant and that Recipient records must be maintained for the purpose of tracing tissue post-transplantation.

Returns:

If for any reason tissue must be returned, a return authorization is required from Tides Medical prior to shipping. It is the responsibility of the health care institution returning the tissue to adequately package and label the tissue for return shipment.

Recipient Tracking:

The F.D.A. requires that recipient records be maintained for the purpose of tracking the allograft following surgical transplantation. The surgeon or operating staff member must complete the enclosed Allograft Utilization Record, attach a peal-off allograft-tracking label and patient label, and mail it to Tides Medical. Please use the remaining peel-off, allograft-tracking labels for patient and hospital records.

Adverse Effects and Reporting:

As allografts are composed of proteins such as collagen, the potential for hypersensitivity, allergic reactions or other immune responses may exist. All adverse outcomes potentially attributed to this allograft must be promptly reported to Tides Medical.

Possible complications can occur with any surgical procedure including, but not limited to pain, infection, hematoma, and/or immune rejection of the introduced

tissue. Disease screening methods are limited; therefore, certain diseases may not be detected.

The following complications of tissue transplantation may occur:
Transmission of diseases of unknown etiology;
Transmission of known infectious agents including, but not limited to viruses, bacteria, and fungi.

Any adverse reactions, including the suspected transmission of disease attributable to this allograft should be immediately reported to Tides

Medical. Disposal:

Allograft disposal shall be in accordance with local, state, and federal regulations for human tissue.

Inquiries:

For additional information, to place an order, or to report adverse reactions, contact: Tides Medical Customer Service at:

Phone: 888-494-4441        Fax: 781-823-0321        customerservice@tidesmedical.com

**tides**medical

Donor eligibility determination and processed by Tides Medical
1819 W. Pinhook Road
Suite 206
Lafayette, LA 70508
(888) 494-4441
FDA Registration FEI: 3010125671

| Title: | ARTACENT™ WOUND PACKAGE INSERT AND INSTRUCTIONS FOR USE | Number: | LBL-078 | Revision: | 04 |
|--------|------------------------------------------------------------|---------|---------|-----------|----|
| | | | | Date: | 04/28/2022 |





More Application Info



# Artacent® Wound

Artacent Wound is the only wound-specific amniotic patch that can be applied with either side facing the wound. Amniotic tissues are safe, natural biologic barriers delivering essential growth factors on a structural collagen matrix. The unique design of Artacent Wound allows for easy manipulation and repositioning, making it a flexible, dependable option for a variety of wound covering applications.



## Wound covering for patients with these types of chronic wounds

- Diabetic Ulcers
- Pressure Ulcers

- Venous Stasis Ulcers
- Burns
- Mohs Surgery

## Key Benefits of Artacent Wound

- Dual layering of amniotic tissue.
- Ability to place either side facing the wound.
- Stores dry at room temperature rather than cryopreservation.
- Readily adheres to wound surface without requiring sutures.
- Repositionable design reverts to original shape when placed in saline.
- Excellent handling – maintains shape when placed on moist wound bed.

## Tides Medical Offers Reimbursement Services for Artacent Wound:

- Coding Help
- Benefits Verification
- Pre-authorization
- Pre-certification



FIND OUT MORE ABOUT REIMBURSEMENT FOR ARTACENT WOUND



**Artacent Wound Part Numbers & Patch Sizes**

1. ART0202: 2x2 cm
2. ART0203: 2x3 cm
3. ART0303: 3x3 cm
4. ART0404: 4x4 cm
5. ART0408: 4x8 cm
6. ART0009: 9 mm
7. ART0012: 12 mm
8. ART0015: 15 mm
9. ART0018: 18 mm

**BIOLOGICS** • AmnioHeal® Plus • Artacent® Flex • Artacent® Wound • Artacent® Ocular • Artacleanse® Process

Copyright © 2021 Tides Medical | All Rights Reserved | **Licensures and Certifications** | Employee Portal

   

## EpiFix® Description

EpiFix is a minimally manipulated, dehydrated, non-viable cellular allograft derived from human amniotic membrane. Amniotic membrane is a thin, collagenous membrane composed of multiple layers that surrounds the fetus within the mother's uterus.

EpiFix preserves multiple extracellular matrix components and other proteins present in amniotic tissue.

EpiFix is a human tissue product and appearance may vary between donors. Variations in color (tan to light brown), opacity, and thickness are normal due to the nature of human tissue.

### Tissue Uses

EpiFix is a barrier intended for use in the treatment of acute and chronic wounds, providing a protective environment to support the healing process.

### Contraindications

EpiFix should not be used on (1) areas with active or latent infection and/or (2) a patient with a disorder that would create an unacceptable risk of post-operative complications.

### Precautions/Warnings

- EpiFix allografts remain suitable for transplantation in an unopened, undamaged package, under proper storage conditions.
- Please inspect the integrity of the package upon receipt. If package and contents appear defective or damaged in any way, immediately contact the distributor.
- This allograft is intended for single-patient use only. Discard all unused material.
- The procedure should be performed by an authorized medical professional.
- Strict donor screening and laboratory testing, along with dedicated processing and sterilization methods, are employed to reduce the risk of any disease transmission. However, as with all biological implants, an absolute guarantee of tissue safety is not possible. This allograft has the potential to transmit infectious disease to the recipient.
- The reaction of the body to any biological implant is not completely understood.
- Caution should be used when treating patients with a known sensitivity to aminoglycoside antibiotics.
- Discard all damaged, mishandled or potentially contaminated tissue.
- This product has not been tested in combination with other products.
- DO NOT RE-STERILIZE.

### Preparation, Reconstitution and Use

Prior to implantation, carefully follow the EpiFix allograft preparation steps below using aseptic technique:

**Wound Bed Preparation**
- Ensure the wound is free from clinical signs of infection.
- Prepare wound bed as needed.

**Removing EpiFix from Packaging**
- The outer peel pouch is NOT sterile. The inner pouch that contains EpiFix is sterile (unless the pouches are damaged or compromised).
- Carefully open the peelable corner of the outer pouch and extract the inner pouch using aseptic technique. Ensure the inner pouch does not come in contact with any portions of non-sterile surface of the outer pouch.
- Using aseptic technique, SLOWLY peel a corner of the inner peel pouch and grasp EpiFix with fingers or non-toothed, sterile forceps.
- Use EpiFix promptly after opening the inner, sterile pouch.

**PLEASE TAKE GREAT CARE WHEN REMOVING EpiFix FROM THE INTERNAL POUCH. EpiFix IS THIN AND EXTREMELY LIGHTWEIGHT.**

VOL. II

### EpiFix Preparation

1. In a dry state, use sterile dry scissors to cut EpiFix to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix by 1mm.
2. EpiFix can be applied wet or dry.
3. EpiFix can be hydrated while on the wound site with sterile saline solution. Simply apply several drops of sterile solution to EpiFix. During and following hydration, the embossment on EpiFix will begin to fade.

### EpiFix Orientation & Application

EpiFix should be placed on the wound site, using the orientation of the embossment lettering as a guide. Proper orientation of EpiFix can be noted when the embossment nomenclature reads correctly from left to right. If the mesh process has diminished the ability to clearly read the embossment, the following two alternate methods may be used for placement:

1. An elongated, horizontal perforation is located in the top left area of the graft connecting two adjacent perforations. Proper orientation can be noted when the graft is placed on the wound site such that this horizontal perforation remains visually in the top left area of the graft.
2. The clear side of the inner pouch is indicative of the UP side of the graft orientation. Proper placement can be achieved by removing the graft from the pouch with the clear side up and moving to the wound site with that same orientation.

Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix to the wound site, if desired.

### Primary Dressing

- EpiFix should be covered with a non-adherent contact layer.
- EpiFix should NOT be disturbed, if possible, for several days or before the next application, if needed.
- If an infection occurs at the graft site, treat infection per institution's protocol.

### Secondary Dressing

- EpiFix requires a moist wound environment. Use appropriate moisture management dressings for the wound type and treatment ideology.

### Support Therapies

- EpiFix is compatible with offloading/compression/negative pressure therapies.
- EpiFix can be used in conjunction with hyperbaric oxygen therapy.

### Re-application of EpiFix

- It is recommended that EpiFix grafts are applied weekly until wound epithelialization is achieved. However, clinician discretion should be used based on patient and wound condition/progress. It is clinically acceptable to apply EpiFix on a biweekly basis if desired.

### Adverse Effects & Reporting

- As with any procedure, the possibility of infection exists.
- Proprietary processing and validated sterilization methods are employed to eliminate potential deleterious components of the allograft. However, as with all biological implants, the possibility of rejection exists.
- Any adverse reactions, including the suspected transmission of disease attributable to this allograft, should be reported immediately to MiMedx®.

### Acceptable Storage

It is the responsibility of the distributor and/or end-user clinician to store EpiFix allografts in a clean, dry environment between 2-30°C prior to further distribution or transplant. EpiFix allografts have a 5-year shelf life. Check the label for the expiration date.

### Recovery & Quality Control

All tissue recovered meets stringent specifications during donor screening and laboratory testing to reduce the risk of transmitting infectious disease. EpiFix allografts are procured and processed in the United States according to standards and/or regulations established by the American Association of Tissue Banks (AATB) and the United States Food & Drug Administration (FDA). All tissues are recovered under full informed consent of the donors (mothers of the newborn children). The donors have consented to the transfer of the allografts to third parties. A thorough medical and social history of the donor is also obtained.



# WPS - Wisconsin Physicians Service MAC - Retired Date: 03/01/2016

**LCD L34593:** "Application of Bioengineered Skin Substitutes"    **Effective Date:** 10/01/2015

**States:** Alaska, Alabama, Arkansas, Arizona, Connecticut, Florida, Georgia, Iowa, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts Maine, Michigan, Minnesota, Missouri, Mississippi, Montana, North Carolina, North Dakota, Nebraska, New Hampshire, New Jersey, Ohio, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Virginia, Vermont, Washington, Wisconsin, West Virginia, and Wyoming

**EpiFix Tissue Uses:** EpiFix (Q4131) is intended for homologous use in the treatment of acute and chronic partial and full-thickness wounds for the reduction of scar tissue formation, modulation of inflammation, and enhancement of soft tissue healing.

**Indications or Limitations of Coverage and/or Medical Necessity:** All products must be provided in accordance with the material's Food and Drug Administration (FDA) approved package label. Applied to partial- or full-thickness wounds (see individual product information for labeled indications) not involving tendon, muscle, joint capsule, exposed bone or sinus tracts. Applied in a frequency supported either by FDA product labeling or clearly supported by documentation showing the medical reasonable and necessary indications.

**Documentation Requirements:** The ulcer must be measured at the beginning of conservative treatment, following cessation of conservative treatment and at the beginning of the skin substitute treatment. Clearly, if during treatment the ulcer shows obvious signs of worsening or lack of treatment response, continuing skin substitute treatment would be inappropriate absent documentation of an appropriate rationale for doing so. There must be a documented plan of care with documented goals and provider follow-up in the medical record. Documentation to include current wound size, wound depth, presence and extent of or absence of obvious signs of infection, presence and extent of or absence of necrotic, devitalized or non-viable tissue, or other material in the wound that is expected to inhibit healing or promote adjacent tissue breakdown. When the documentation does not meet the criteria for the service rendered or does not establish the medical necessity for the service, such service will be denied as not reasonable and necessary under Section 1862(a)(1) of the Social Security Act.

**Utilization Guidelines:** Medicare expects skin substitutes to be applied according to the manufacturers' instructions. Any utilization above these parameters is subject to medical review. Exceptions with more frequent timing (every seven days) should be documented with appropriate narrative. Surgical Wound Preparation (CPT 15002-15005): Medicare does not expect to be billed for codes 15002-15005 in conjunction with routine, simple and/or repeat application of skin substitutes/replacements. These codes describe burn and wound preparation or incisional or excisional release of scar contracture resulting in an open wound requiring a skin graft. An operative report is required and must be available upon request. If this procedure is performed in an office the claim can be resubmitted with a request for a redetermination and the medical staff will give the claim individual consideration.

**Limitations:** Reimbursement may be made only when the medical record clearly documents that these products have been used in a comprehensive, organized wound management program. For venous stasis ulcers, there should be no fewer than two (2) weeks between applications and for diabetic ulcers there should be no fewer than three (3) weeks between applications, except when more frequent applications are either a part of the FDA product specific labeling instructions or are clearly supported by medical record documentation of medically reasonable and necessary indications.

> **NOTE: All claims are subject to medical review. Medical record documentation is critical to ensure proper payment of claims. Per WPS, with the retirement of the LCD, "there are established billing, coding and documentation guidelines that should be followed in these circumstances."**

**Disclaimer:** The coverage information provided is gathered from third party sources for informational purposes only and has not been verified with any entity responsible for policy, such as the CMS, or any payer. It does not represent a statement, promise or guarantee from MiMedx Group, Inc. concerning coverage. MiMedx® makes no guarantee that any private or government payer will guarantee coverage. Health policies change frequently and can vary considerably from one payer to another. MiMedx® strongly recommends that you consult your payer for interpretation of local coverage and/or policy. The ultimate responsibility for policy interpretation and related claims submission lies with the physician, clinician, hospital or other facility.



Dehydrated Human Amnion/Chorion
Membrane Allograft
Information / Instructions for Use



1775 West Oak Commons Court NE
Marietta, GA 30062

# 866.477.4219

www.mimedx.com

File 13.pdf - Page 141 of 2526

EP117.011

## EpiFix® Description

Human amniotic membrane is a unique, thin, collagenous membrane derived from the placenta, the area in which the human fetus grows and develops within the mother's uterus. Human amniotic membrane consists of collagen layers including: (1) basement membrane; (2) stromal matrix.

EpiFix® is a minimally manipulated, dehydrated, non-viable cellular amniotic membrane allograft that contains multiple extracellular matrix proteins, growth factors, cytokines, and other specialty proteins present in amniotic tissue to help regenerate soft tissue.

### Tissue Uses

EpiFix® Amniotic Membrane Allograft is intended for homologous use in the treatment of acute and chronic partial and full-thickness wounds for the reduction of scar tissue formation, reduction of inflammation, and enhancement of soft tissue healing.

### Contraindications

EpiFix® should not be used on (1) areas with active or latent infection and/or (2) a patient with a disorder that would create an unacceptable risk of post-operative complications. Not intended to be used as a bone substitute or bone replacement.

### Precautions/Warnings

- EpiFix® allografts remain suitable for transplantation in an unopened, undamaged package, under proper storage conditions.
- Please inspect the integrity of the package upon receipt. If package and contents appear defective or damaged in any way, immediately contact the distributor.
- This allograft is intended for single-patient use only. Discard all unused material.
- The procedure should be performed by an authorized medical professional.
- Strict donor screening and laboratory testing, along with dedicated processing and sterilization methods, are employed to reduce the risk of any disease transmission. However, as with all biological implants, an absolute guarantee of tissue safety is not possible. This allograft has the potential to transmit infectious disease to the recipient.
- The reaction of the body to any biological implant is not completely understood.
- Caution should be used when treating patients with a known sensitivity to aminoglycoside antibiotics.
- Discard all damaged, mishandled or potentially contaminated tissue.
- This product has not been tested in combination with other products.
- DO NOT RE-STERILIZE.

### Preparation, Reconstitution and Surgical Use

Prior to implantation, carefully follow the EpiFix® allograft preparation steps below using aseptic technique:

#### Wound Bed Preparation

- Ensure the wound is free from clinical sign of infection.
- Prepare wound bed as needed.

#### Removing EpiFix® from Packaging

- The outer peel pouch is NOT sterile. The inner pouch that contains EpiFix® is sterile (unless the pouches are damaged or compromised).
- Carefully open the peelable corner of the outer pouch and extract the inner pouch using aseptic technique. Ensure the inner pouch does not come in contact with any portions of non-sterile surface of the outer pouch.
- Using aseptic technique, SLOWLY peel a corner of the inner peel pouch and allow the authorized medical professional to grasp EpiFix® with fingers or non-toothed, sterile forceps.
- Use EpiFix® promptly after opening the inner, sterile pouch.

**PLEASE TAKE GREAT CARE WHEN REMOVING EPIFIX® FROM THE INTERNAL POUCH. EPIFIX® IS THIN AND EXTREMELY LIGHTWEIGHT.**

EP117.011

### EpiFix® Preparation

1. In a dry state, use sterile dry scissors to cut EpiFix® to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix® by 1mm.
2. If needed, EpiFix® can be fenestrated to accommodate wounds that produce copious amounts of exudate.
3. EpiFix® can be applied wet or dry.
4. EpiFix® can be hydrated while on the wound site with sterile saline solution. Simply apply several drops of sterile solution to EpiFix®. During and following hydration, the embossment on EpiFix® will begin to fade.

### EpiFix® Orientation & Application

1. EpiFix® should be placed on the wound site, using the orientation of the embossment lettering as a guide. Proper orientation of EpiFix® can be noted when the embossment nomenclature reads correctly from left to right.
2. Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix® to the wound site.

### Primary Dressing

- EpiFix® should be covered with a non-adherent contact layer.
- EpiFix® should NOT be disturbed, if possible, for several days or before the next application, if needed.
- If an infection occurs at the graft site, treat infection per institution's protocol.

### Secondary Dressing

- EpiFix® requires a moist wound environment.  Use appropriate moisture management dressings for the wound type and treatment ideology.

### Support Therapies

- EpiFix® is compatible with offloading/compression/negative pressure therapies.
- EpiFix® can be used in conjunction with hyperbaric oxygen therapy.

### Re-application of EpiFix®

- It is recommended that EpiFix® grafts are applied weekly until wound epithelialization is achieved. However, clinician discretion should be used based on patient and wound condition/progress. It is clinically acceptable to apply EpiFix® on a biweekly basis if desired.

## Adverse Effects & Reporting

- As with any surgical procedure, the possibility of infection exists.
- Proprietary processing and sterilization methods are employed to eliminate potential deleterious components of the allograft. However, as with all biological implants, the possibility of rejection exists.
- Any adverse reactions, including the suspected transmission of disease attributable to this allograft, should be reported immediately to MiMedx®.

## Acceptable Storage

EpiFix® allografts should be stored in a clean, dry environment at ambient conditions. EpiFix® allografts have a 5 year shelf life. Check the label for the expiration date.

## Recovery & Quality Control

All tissue recovered meets stringent specifications during donor screening and laboratory testing to reduce the risk of transmitting infectious disease. EpiFix® allografts are procured and processed in the United States according to standards and/or regulations established by the American Association of Tissue Banks (AATB) and the United States Food & Drug Administration (FDA). All tissues are recovered under full informed consent of the donors (mothers of the newborn children).  The donors have consented to the transfer of the allografts to third parties. A thorough medical and social history of the donor is also obtained.

## Recovery & Quality Control (cont.)

The donor is screened for:

| | |
|---|---|
| HIV-1&2 Plus 0 Antibody | Hepatitis B Core Antibody |
| HIV Type 1 (Nucleic Acid Test (NAT)) | Hepatitis B Surface Antigen |
| HTLV-1&2 Antibody | Hepatitis C Antibody |
| Syphilis (Serologic Test) | Hepatitis C Virus (Nucleic Acid Test (NAT)) |
| CMV Total Antibody | Hepatitis B Virus (Nucleic Acid Test (NAT)) |

All test results are reviewed prior to the release of the tissue. Only tissue from donors with acceptable test results, according to the standards of MiMedx Tissue Services, LLC, as well as the standards and/or regulations of all state and federal regulatory bodies, are released.

The infectious disease test results, consent documents, donor medical history, behavior risk assessment according to current public health services guidelines, physical assessment, available relevant medical records, as well as information from other sources or records that may pertain to donor suitability, and tissue procurement test results, have been evaluated and are sufficient to indicate that the donor suitability criteria current at the time of tissue recovery have been met.

The names and addresses of the testing laboratories, the listing and interpretation of all required infectious disease tests, a listing of the documents reviewed as part of the relevant medical records, and the name of the person or establishment determining the suitability of this allograft are on file and available upon request.

**Donated Human Tissue. This allograft has been determined to be suitable for transplantation.**

## Allograft Processing/Preservation/Sterilization

EpiFix® allografts are processed based upon strict, quality-controlled protocols that have demonstrated bioburden control. An additional assurance of safety is achieved by terminally sterilizing each allograft. Based upon validations, each graft has been effectively sterilized using e-beam irradiation. The allografts are processed with aminoglycoside antibiotics.

## Recipient Tracking

The FDA requires that recipient records be maintained for the purpose of tracking the allograft following surgical transplantation. The authorized medical professional must complete the enclosed Tissue Utilization Record, attach a peel-off, allograft-tracking label provided, and mail to the distributor (postage-paid). Please use the remaining peel-off, allograft-tracking labels for patient and hospital records.

**Caution: This product must be administered by an authorized medical professional.**

The user shall be solely responsible for determining the adequacy and appropriateness of the allograft for any and all uses to which the user shall apply the allograft.

**Processed with:**



Processing and donor suitability performed by MiMedx Tissue Services, LLC
Patents and patents pending see: www.mimedx.com/patents
EpiFix®, PURION®, and MiMedx® are
registered trademarks of MiMedx Group, Inc.
1775 West Oak Commons Court NE, Marietta, GA 30062
©2015 MiMedx Group, Inc. All Rights Reserved. www.mimedx.com



EP117.011



P.O. BOX 82237 | LAFAYETTE, LA 70598
PHONE 888.494.4441 | FAX 781.823.0321
INFO@TIDESMEDICAL.COM

September 6, 2022

C2C Innovative Solutions, Inc
QIC Part B North
PO Box 45208
Jacksonville, FL 32232-5208

Dear Sir/Madam,

It is our understanding that Dr. John Adams is in the process of appealing claim denials for skin substitute grafts related to a 2021 UPIC audit. We thought it would be relevant, and helpful to you, to provide some insights and perspectives as it pertains to claims related to our product, Artacent Wound (Q4169).

Below are a few of the pertinent topics related to the regulation status of Artacent Wound, the FDA's standards for Homologous use, CPT coding for skin substitutes and product sizing.

1. Homologous Use
   a. Dr. Adams specifically mentions in his chart notes that he is using Artacent Wound as a "natural barrier"
   b. Dr. Adams also mentions other intended outcomes related to scar reduction inflammation reduction, etc. as part of the patient treatment and practice of medicine but these are not pertinent for purposes of a homologous use determination. There is no legal or regulatory requirement that a doctor restrict his use of a product to the intended use of said product and FDA regulations do not extend to the practice of medicine.
   c. Use as a barrier is consistent with homologous use. Please reference the 2020 FDA Guidance Document, the Tides Medical FDA Tissue Reference Group (TRG) Reference Letter, and the Tides Medical package insert to demonstrate that homologous use for our product includes use as a wound cover and a barrier.
   d. FDA is not authorized to regulate the practice of medicine. FDA regulations and guidance apply only to the manufacturer of the products, not the users of the products. As such referencing an FDA guidance documents (which themselves are not legally binding, i.e. FDA guidance is only a reference



P.O. BOX 82237 | LAFAYETTE, LA 70598
PHONE 888.494.4441 | FAX 781.823.0321
INFO@TIDESMEDICAL.COM

document for manufacturers of products) is not appropriate, https://www.fda.gov/medical-devices/home-use-devices/fdas-role-regulating-medical-devices , see bullet 1 in the link; "FDA does not have authority to regulate… a physician's practice…". It is therefore not appropriate to hold a clinician responsible for following regulations that do not apply to them (the doctor).

e.  Setting aside the inapplicability of FDA regulations to the practice of medicine, and out of an abundance of cooperation, Dr. Adams did in fact use the Artacent Wound product in a homologous way as per the manufacturer's intended use, and as confirmed by the FDA Tissue Reference Group (TRG) (see TRG letter). Extraneous commentary respecting the use and performance of the Artacent Wound product beyond its use as a wound covering (barrier) is not relevant for purposes of deciding if the product was used homologously, per the intended use as provided by the manufacturer; Dr. Adams used the product as a wound covering (natural barrier) as stated in his notes.  There is no requirement that a doctor restrict his notes to the intended use statement provided by the manufacturer, and it is therefore not appropriate to deny payment for doing otherwise.

f.  FDA guidance related to homologous use and minimal manipulation (https://www.fda.gov/media/109176/download) gives many examples whereby tissue products generally, and amniotic tissue specifically, falls within the guidance for tissue products.

g.  Amniotic tissue is a structural tissue (see page 9 of the guidance). Section 1271.10(a)(1) (21 CFR 1271.10(a)(1)) provides that one of the criteria for an HCT/P to be regulated solely under section 361 of the PHS Act and the regulations in Part 1271 is that the HCT/P is minimally manipulated.  As defined in 21 CFR 1271.3(f), minimal manipulation means: processing that does not alter the original relevant characteristics of the tissue relating to the tissue's utility for reconstruction, repair, or replacement. HCT/Ps that physically support or serve as a barrier or conduit, or connect, cover, or cushion are generally considered  tissues for the purpose of applying the HCT/P regulatory framework example 10-2 on page 11 of the guidance says:  (The) "original relevant characteristics of amniotic membrane relating to its utility to serve as a barrier…" Thus, the use referenced in Dr. Adams notes is consistent with FDA homologous use for amniotic tissue; and as referenced in the FDA Tissue Reference Group letter confirming homologous use when used as a wound covering.



P.O. BOX 82237 | LAFAYETTE, LA 70598
PHONE  888.494.4441 | FAX  781.823.0321
INFO@TIDESMEDICAL.COM

2.      Use on non-chronic wounds

a.      The auditor(s) have pushed back on use of Artacent Wound without prior conservative wound treatment. Auditor(s) question why an expensive advanced treatment was used instead of conservative treatment. The Auditor(s) have also mentioned that use of amniotic grafts is outside of accepted standards of medical practice for non-chronic wounds.

Answer: There is no requirement under CMS or AMA guidances that treatment of a wound begin with conservative treatment and escalate to more rigorous treatment.

b.      Dr. Adams submits claims to WPS (MAC contractor) which does not have an LCD that outlines a requirement for conservative treatment or a limit to use on only chronic wounds.

c.      The manufacturer of Artacent Wound does not restrict use of the product to chronic or acute wounds (including MOHs) use of the product and the appropriateness is based on the provider's determination of medical necessity. There is no LCD stating that cheaper, more conservative measures have to be used first.  Therefore, unless there is some guidance from CMS or evidence of a lack of medical necessity the auditor is employing an arbitrary and subjective opinion, which is not appropriate.

3.   CPT coding

a.      According to the auditor, the codebook for graft application codes (15271 & 15272) states that skin substitute grafts include various kinds of human skin grafts, non-human skin grafts, and "biological products that form a sheet scaffolding for skin growth."

b.      Further, the clear intent of all three definitions is for the substance to remain on the person for the purpose of growing in place or helping the person's own skin cells to grow back.

c.      Labeling amniotic tissues as "biological dressings" is erroneous, the Tides Medical Artacent Wound product is a skin substitute, not a dressing. Denial of payment by applying the incorrect products category is not appropriate.  Allograft is defined as a graft of tissue between individuals of the same species but of disparate genotype, i.e. they are unrelated.  As such Artacent Wound is an allograft. As an allograft Artacent Wound is appropriately classified as a skin substitute.  Further, our submission to the Tissue Reference Group was evaluated as: "Human tissue allograft derived from human amniotic membrane,

specifically from the submucosa of the placenta." (please see letter from FDA TRG).

4.   Product Sizing



P.O. BOX 82237 | LAFAYETTE, LA 70598
PHONE  888.494.4441 | FAX  781.823.0321
INFO@TIDESMEDICAL.COM

a.    The auditor, on multiple occasions, said that Dr. Adams was using excessive product (over utilization), the auditor's point of reference is erroneous and was based on his apparent misunderstanding that a single tissue/package of Artacent Wound was 1 unit. Artacent Wound (Q4169) is billed per square centimeter, not per tissue. Tides offers multiple product sizes to physicians, ranging from 2 to 32 units.

Thank you for your consideration of these facts in your processing of the claim appeals. It is our hope that this will aid in your review. Attached is the Artacent Wound package insert and the TRG Designation Letter from the FDA to support the statements in this letter.

Sincerely,

Benjamin Kimball, J.D.
VP of Quality and Regulatory Affairs
Tides Medical



By Electronic Mail

August 1, 2022

Mr. Benjamin Kimball, J.D.
Tides Medical
1819 W Pinhook Rd, Unit 109
Lafayette, Louisiana  70508
BKimball@tidesmedical.com

RE: Request for Recommendation for Artacent Wound Amniotic Membrane

Dear Mr. Kimball:

This letter is in response to your inquiry provided to the Food and Drug Administration's Tissue
Reference Group (TRG) received on March 10, 2022 and follow-up communications.  You are
seeking a recommendation from the TRG whether your amniotic membrane product, Artacent
Wound, a human cell, tissue, or cellular or tissue-based product (HCT/P), is regulated solely under
section 361 of the Public Health Service (PHS) Act and the regulations in 21 CFR part 1271.

Your submission describes processing the amniotic membrane that includes dissection, washing
using a detergent, rinsing, folding to create a dual layer, and drying.  The dried membrane is cut,
packaged, then terminally sterilized, and the smallest product size is described as a 9mm disk.  The
Artacent Wound product is intended for use as a "wound covering in various surgical procedures."

An HCT/P is regulated solely under section 361 of the PHS Act and the regulations in part 1271, if
the HCT/P meets all four criteria at 21 CFR 1271.10(a)[1].  Based on the description you provide of
the processing steps and the minimum size of the product, Artacent Wound, when intended for use
as a "wound covering", appears to meet the criteria for regulation solely under section 361 of the
PHS Act and the regulations in 21 CFR part 1271.

This recommendation applies solely to the Artacent Wound product described in your submission
of March 10, 2022, when intended for use as a "wound covering".  This recommendation does not
apply to other Artacent branded products manufactured or marketed by Tides Medical.  We are
also aware of Tides Medical's application to the Centers for Medicare & Medicaid Services for the
Artacent Wound product[2].

---

[1] The four criteria can be found at 21 CFR 1271.10(a), and, as applicable, see the following guidance documents:
"Regulatory Considerations for Human Cell, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation
and Homologous Use; Guidance for Industry and Food and Drug Administration Staff" dated July 2020; and, "Same
Surgical Procedure Exception under 21 CFR 1271.15(b): Questions and Answers Regarding the Scope of the Exception;
Guidance for Industry" dated November 2017.

[2] Centers for Medicare & Medicaid Services (CMS)  Healthcare Common Procedure Coding System (HCPCS)
Application Summaries for Drugs, Biologicals, and Radiopharmaceuticals  May 19, 2016.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20903
www.fda.gov

Page 2    Mr. Benjamin Kimball, J.D., Tides Medical (Artacent Wound Amniotic Membrane)

Please note that this recommendation is based on the information you provided.  Any variation from what you describe in your request for recommendation to the TRG, including but not limited to changes in the processing (including the minimum product size) or proposed use, may raise additional regulatory considerations that could impact the applicability of this recommendation. For example, an amniotic membrane product, when intended for wound healing and/or to reduce scarring and inflammation would not be considered a homologous use because wound healing and reduction of scarring and inflammation are not basic functions of amniotic membrane.[3]

For questions regarding this response letter, please contact the Executive Secretary for the TRG at TissueReferenceGroup@fda.hhs.gov.

Sincerely,

Wilson Bryan -S
Digitally signed by Wilson Bryan -S
Date: 2022.07.29 20:41:50 -04'00'

James P. Bertram -S
Digitally signed by James P. Bertram -S
Date: 2022.08.01 14:23:04 -04'00'

Wilson W. Bryan, M.D.
Director
Office of Tissues and Advanced Therapies
Center for Biologics Evaluation and Research

James Bertram, Ph.D.
Associate Director
Regulatory Policy and Combination Products Staff
Office of Product Evaluation and Quality
Center for Devices and Radiological Health

---

[3] See Example 19-4 in "Regulatory Considerations for Human Cell, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use; Guidance for Industry and Food and Drug  Administration Staff" dated July 2020.

# Incidence of Surgical Site Infections in Second Intention Healing After Dermatologic Surgery

Joshua Schimmel, BS,* Matthew Belcher, MD,† Carlos Vieira, BS,* Naomi Lawrence, MD,† and Ashley Decker, MD†

BACKGROUND   There are few studies analyzing the surgical site infection (SSI) rate of second intention wounds after dermatologic surgery, and the results are inconclusive. Yet, the current dogma in dermatologic surgery is that wounds healed by second intention have lower infection rates.

OBJECTIVE   To determine the rate of SSI and associated pathogenic organisms of second intention wounds compared with sutured wounds after skin cancer extirpation.

MATERIALS AND METHODS   This was a retrospective cohort study of patients who had either Mohs micrographic surgery or wide local excision (WLE) for skin cancer extirpation between 2012 and 2016. Wounds were stratified by closure type, location, and associated organisms. Infection was diagnosed by a positive wound culture.

RESULTS   The overall infection rate was 3.9%. The infection rate for sutured and second intention wounds was 3.2% and 6.8%, respectively. Second intention wounds were associated with a significantly higher risk of infection compared with sutured wounds (odds ratio = 2.22, 95% confidence interval 1.63–2.99). The lower extremity (LE) had the highest overall infection rate (10.5%). The face had the lowest overall infection rate (2.5%).

CONCLUSION   Mohs micrographic surgery or WLE performed on the LE or lesions allowed to heal by second intention has an increased risk of SSI.

*The authors have indicated no significant interest with commercial supporters.*

The infection rate in dermatologic surgery, including wide local excision (WLE) and Mohs micrographic surgery (MMS), ranges from 0.7% to 4.2%.[1–4] The low infection rate is attributed to the relatively fast and noninvasive nature of dermatologic surgery compared with other types of surgery.[3] Despite the low infection rate, surgical site infections (SSIs) result in significant morbidity, affecting patient outcomes/satisfaction and health care costs.[3] Previous studies show SSI rates in dermatologic surgery vary based on anatomic location, with the highest rate of infection after surgery on the head (specifically the ear, lips, and nose), groin, and lower legs/feet.[1–3,5] The increased infection rate in these locations is likely due to high levels of pathogenic bacterial colonization.[6,7]

Surgical site infection rates may also vary based on closure type. A 2003 longitudinal study by Lawson and colleagues[8] analyzed second intention infection rates in 2 acute care units. The study population comprised more than 5,000 patients with one or more postoperative second intention wounds from the digestive health, trauma, transplant, general surgery, and urology service. The infection rate was found to be 1.2%.[8] Despite this large

*Cooper Medical School of Rowan University, Camden, New Jersey; †Department of Dermatology, Cooper Center for Dermatologic Surgery, Evesham, New Jersey

*Supplemental digital content is available for this article. Direct URL citations appear in the printed text and are provided in the HTML and PDF versions of this article on the journal's Web site (www.dermatologicsurgery.org).*

© 2020 by the American Society for Dermatologic Surgery, Inc. Published by Wolters Kluwer Health, Inc. All rights reserved.
ISSN: 1076-0512 • Dermatol Surg 2020;46:1492–1497 • DOI: 10.1097/DSS.0000000000002409

© 2020 by the American Society for Dermatologic Surg          File 13 pdf - Page 151 of 2526          Unauthorized reproduction of this article is prohibited.

multidisciplinary study, there have been few studies analyzing infection rates in second intention wounds after dermatologic surgery, specifically.[5,9–12] Despite the lack of objective data, there is a commonly held belief in dermatologic surgery that second intention wounds have a similar, or even lower, infection rate than primary closures, flaps, or grafts. The few studies that report wound infection rates after second intention closure in dermatologic surgery either contain small sample sizes (<150) or are limited to lesions on the head/neck or back of the hand.

To the best of our knowledge, there are no studies directly comparing infection rates of second intention versus closure of surgical defects after MMS or WLE. In addition, there are no studies analyzing the association between closure type, wound location, and the isolated bacterial pathogen. The purpose of this study is to determine the rate of SSI and associated pathogenic organisms for second intention wounds compared with sutured wounds (primary closures, flaps, and grafts) after skin cancer extirpation. These data may enable more directed empiric antibiotic use in suspected SSI and improve preoperative and postoperative wound care.

## Methods

The authors conducted a retrospective cohort study examining the rate of postsurgical infections after skin cancer removal by either MMS or WLE between January 1, 2012, and December 31, 2016, at a single academic center (see **Supplemental Digital Content 1**, Table S1, http://links.lww.com/DSS/A317). Second intention wounds were defined as those lacking complete skin closure. Partial closures, delayed repairs, interpolated flaps, and purse string closures were not included in this analysis due to the ambiguity in classifying these repairs as primary versus secondary closures. All other closures (primary closures, flaps, and grafts) were classified as sutured wounds. Wounds exhibiting signs or symptoms of infection (e.g., local swelling, erythema, warmth, tenderness, or purulent discharge) were sampled with aerobic and anaerobic culture swabs. Swabs were rotated around the entire

surface of the wound bed. A diagnosis of infection was only made if supported by a positive wound culture. Cultures with no bacterial growth or growth of a contaminant or normal skin flora were classified as noninfected. Lesions were stratified by anatomic location: face, hand, scalp (including forehead), ear (including the periauricular region), arm, trunk, and lower extremity (LE) (including groin). Chi-square tests were used to compare SSI rates between the closure methods, stratified by anatomic location. All statistical analyses were conducted using STATA. The Institutional Review Board at Cooper University Hospital approved this study (17-144EX).

## Results

Five thousand six hundred seventy-nine skin cancers were treated with MMS or WLE by one surgeon between January 1, 2012, and December 31, 2016. Eighty-two percent ($n = 4{,}655$) were sutured and 18% ($n = 1{,}024$) healed by second intention. Location distribution can be found in **Supplemental Digital Content 2**, Table S2, http://links.lww.com/DSS/A318. The most common site for second intention wounds was the LE (37%). The most common site for sutured wounds was the face (44%).

Two hundred eighty-five wounds of all closure types were clinically suspected of infection after surgery. Of these 285 suspected infections, 219 (sutured = 149; second intention = 70) were confirmed with a positive culture. The remaining 66 were noninfected (i.e., normal skin flora, contamination, or no growth). Twenty-two percent ($n = 41$) of cultures from sutured wounds were noninfected while 26% ($n = 25$) of cultured second intention wounds were noninfected (Figure 1). The overall infection rate including both sutured and second intention wounds was 3.9% ($n = 219$). Second intention wounds were associated with a significantly higher risk of infection compared with sutured wounds (odds ratio = 2.22, 95% confidence interval 1.63–2.99) (Figure 2). The LE had the highest risk for infection overall (10.5%) (Figure 3). There was no significant difference in LE infection rate between closure types. The face and hand had the lowest

© 2020 by the American Society for Dermatologic Surg    File 13 pdf - Page 152 of 2526    Unauthorized reproduction of this article is prohibited.

INCIDENCE OF SURGICAL SITE INFECTIONS



**Figure 1.** Study outline, repair type, and culture outcomes. LE, lower extremity; MMS, Mohs micrographic surgery; WLE, wide local excision. *Primary closures, flaps, and grafts.

infection rate among sutured wounds (2.5%), whereas the arm had the lowest infection rate in second intention wounds (2.3%).

Types of organisms cultured from clinically infected wounds can be found in **Supplemental Digital Content 3**, Table S3, http://links.lww.com/DSS/A319. *Staphylococcus aureus* was the most common organism cultured in both second intention (35%) and sutured wounds (81%). *Pseudomonas* spp. were the second most common organism cultured in second intention

wounds (20%), whereas Diphtheroids and *Klebsiella spp.* were the second most common among sutured wounds (3%).

## Discussion

Surgical site infection negatively impact multiple aspects of the postsurgical period including wound healing, scarring, and overall patient satisfaction. Therefore, it is imperative the authors explain any relationship between the type of closure, location, and



**Figure 2.** Infection rate versus surgical site for sutured and second intention wounds. LE, lower extremity. *Odds ratio = 2.22, 95% confidence interval 1.63 to 2.99.

© 2020 by the American Society for Dermatologic Surg    File 13.pdf - Page 153 of 2526    Unauthorized reproduction of this article is prohibited.



**Figure 3.** Infection rate versus surgical site for combined closures. LE, lower extremity.

pathogenic organisms to streamline our preoperative and postoperative prevention strategies.

There is a lack of literature analyzing the characteristics of SSI (infection rate, location, associated organisms, etc) between the various closure methods. This is especially true for second intention infections. The few studies analyzing infection rate in second intention healing are limited by sample size and repair location. Snow and colleagues[9] performed a study in 1994 to analyze wound healing by second intention over scalp and facial bone after MMS. This retrospective chart review, including 91 patients closed by second intention or partial closure, reported an overall infection rate of 2.7%. Mailler-Savage and colleagues[10] performed a study in 2008 to determine the efficacy of levofloxacin in preventing postoperative infection of auricular second intention wounds. This was a prospective, randomized trial of 84 patients who underwent MMS for an auricular neoplasm left to heal by second intention. The study reported a 2.4% overall infection rate in the group who received local wound care only and 2.5% in the levofloxacin + local wound care group. A 1999 retrospective review by Becker and colleagues,[11] which analyzed 205 post-MMS defects on the scalp and forehead, sought to

determine the appropriateness of second intention healing versus surgical reconstruction. In this study, there were no SSI in second intention wounds. Bosley and colleagues[12] completed a study in 2012 to determine the efficacy of second intention healing in the management of defects on the hands and fingers after MMS. The study had a sample size of 25 and an infection rate of 4.0%. As opposed to the other studies, the most recent study, published in 2018 by Liu and colleagues,[5] found an increased risk of infection in second intention wounds compared with the accepted range previously mentioned (0.7–4.2).[1–4] This observational cohort study had the largest sample size of all the studies ($n = 147$); however, surgical site location was not provided. The authors reported a second intention infection rate of 6.1%.

The goal of our study was to address this paucity of data on second intention infections by analyzing data from a large cohort of patients who underwent MMS and WLE for skin cancer removal in various anatomic locations. To the best of our knowledge, this is the largest study analyzing second intention infection rates after dermatologic surgery. Based on our data, there was a significantly increased risk of developing SSI in wounds allowed to heal by second intention

© 2020 by the American Society for Dermatologic Surg    File 13 pdf - Page 154 of 2526    Unauthorized reproduction of this article is prohibited.

(6.8%) versus other closure methods (3.2%) (Figure 2). These data challenge the current dogma in dermatologic surgery that second intention infection rates are associated with lower infection rates. Our large sample size and distribution of repairs to a variety of anatomic locations provide a more comprehensive evaluation of second intention infections that previous studies failed to establish. None of the other studies analyzed second intention wounds on the LE, which had a significantly higher infection rate than other locations in our study (Figure 3). The increased risk of SSI in the LE may be explained by the high rate of S. aureus colonization in the groin and poorer hygiene practices in the LE.[6] Future studies on the use of S. aureus decolonizing strategies (chlorhexidine wash, bleach baths, and topical mupirocin) on the groin and LE before MMS or WLE may be useful.

The higher infection rate in second intention and LE repairs has important clinical implications for clinicians. A 2008 retrospective study by Bari and colleagues[13] analyzed the clinical characteristics of LE SSIs in 271 patients after MMS or WLE. The study found a higher SSI rate with WLE (8.3%) versus MMS (2.3%). Vertical mattress sutures were associated with a lower infection rate compared with other suture methods. The study also found no significant difference in LE SSI with prophylactic doxycycline or cephalexin antibiotic use. However, the doxycycline prophylaxis results approached statistical significance.[13] The high infection rate of second intention wounds by Pseudomonas spp. (See Supplemental Digital Content 3, Table S3, http://links.lww.com/DSS/A319) suggests the prophylactic use of antipseudomonal antibiotics such as topical gentamicin and polymyxin B as well as oral fluoroquinolones may be useful in preventing second intention infections.[14] The ambiguity of evidence regarding prophylactic antibiotic use in LE wounds after MMS and WLE warrants future studies on their efficacy. The possibility of resistant infectious organisms must not be overlooked. Despite the lack of conclusive evidence, clinicians should still consider prophylactic washes, antibiotics, suture type, surgical approach (MMS vs WLE), and careful monitoring for high-risk LE repairs, especially those let to heal by second intention.

S. aureus and Pseudomonas spp. were the most common organisms cultured among clinically infected second intention wounds (See Supplemental Digital Content 3, Table S3, http://links.lww.com/DSS/A319). Chronic wounds (>3 months) are commonly colonized by S. aureus and Pseudomonas spp.,[15] but often lack evidence of clinical infection (i.e., erythema, swelling, tenderness, etc.)[16] All the wounds in this study were cultured within 3 months of surgery; however, it is possible that some positive cultures were colonized bacteria and not true infections. A future study in which all second intention wounds, with or without signs of clinical infection, are cultured at the same time point postoperatively may be useful. In this study, less than 1% (n = 34) of defects on the LE were sutured (See Supplemental Digital Content 2, Table S2, http://links.lww.com/DSS/A318). Of these 34, 2 (5.8%) had positive cultures (Figure 2). A larger sample size is needed to clarify the rate of SSI of sutured wounds on the LE. However, the authors hypothesize that the high infection rate of sutured wounds on the LE may in part be due to the tension on the wound leading to partial/full necrosis and subsequent infection.

The ear, arm, and trunk were the only locations which the SSI rate of sutured wounds was higher than second intention wounds (Figure 2). This may be due to regional differences in bacterial flora at these locations and their predilection for infecting open versus closed wounds. Notably, the sample size of second intention wounds on the trunk was relatively low (See Supplemental Digital Content 2, Table S2, http://links.lww.com/DSS/A318). Future studies with a larger sample size are necessary to clarify the SSI rate of second intention wounds at these sites.

In our experience, early signs of infection (mild erythema, edema, and tenderness) can be difficult to distinguish from those of normal wound healing which may have contributed to the high rate of noninfected cultures in this study.

Limitations include a retrospective, single-institution study design performed at an academic practice with many large, complicated defects. The specific patient population may have also been a

© 2020 by the American Society for Dermatologic Surg          File 13 pdf - Page 155 of 2526          Jnauthorized reproduction of this article is prohibited.

contributing factor to the increased rate; however, this is unlikely considering the overall infection rate in our study (3.9%) is consistent with the current estimated rate of 0.7% to 4.2%.[1–4]

In conclusion, this retrospective review of 5,679 dermatologic surgeries supports that MMS or WLE performed on the LE or allowed to heal by second intention has an increased risk of SSI. Clinicians should carefully monitor patients who have these risk factors. Future studies analyzing the efficacy of antibiotics and prophylactic washes, specifically in treating LE and second intention wounds, may be useful in reducing infection rate in dermatologic surgery.

## References

1. Dixon AJ, Dixon MP, Askew DA, Wilkinson D. Prospective study of wound infections in dermatologic surgery in the absence of prophylactic antibiotics. Dermatol Surg 2006;32:819–27.

2. Rogers HD, Desciak EB, Marcus RP, Wang S, et al. Prospective study of wound infections in Mohs micrographic surgery using clean surgical technique in the absence of prophylactic antibiotics. J Am Acad Dermatol 2010;63:842–51.

3. Futoryan T, Grande D. Postoperative wound infection rates in dermatologic surgery. Dermatol Surg 1995;21:509–14.

4. Levin EC, Chow C, Makhzoumi Z, Jin C, et al. Association of postoperative antibiotics with surgical site infection in Mohs micrographic surgery. Dermatol Surg 2019;45:52–7.

5. Liu X, Sprengers M, Nelemans PJ, Mosterd K, et al. Risk factors for surgical site infections in dermatological surgery. Acta Derm Venereol 2018;98:246–50.

6. Peters PJ, Brooks JT, McAllister SK, Limbago B, et al. Methicillin-resistant staphylococcus aureus colonization of the groin and risk for clinical infection among HIV-infected adults. Emerg Infect Dis 2013;19:623–9.

7. Otto M. Staphylococcus colonization of the skin and antimicrobial peptides. Expert Rev Dermatol 2010;5:183–95.

8. Lawson C, Juliano L, Ratliff CR. Does sterile or nonsterile technique make a difference in wounds healing by secondary intention? Ostomy Wound Manage 2003;49:56–60.

9. Snow SN, Stiff MA, Bullen R, Mohs FE, et al. Second-intention healing of exposed facial-scalp bone after Mohs surgery for skin cancer: review of ninety-one cases. J Am Acad Dermatol 1994;31:450–4.

10. Mailler-Savage EA, Neal KW, Godsey T, Adams BB, et al. Is levofloxacin necessary to prevent postoperative infections of auricular second-intention wounds? Dermatol Surg 2007;34:26–31.

11. Becker GD, Adams LA, Levin BC. Secondary intention healing of exposed scalp and forehead bone after mohs surgery. Otolaryngol Neck Surg 1999;121:751–4.

12. Bosley R, Leithauser L, Turner M, Gloster HM. The efficacy of second-intention healing in the management of defects on the dorsal surface of the hands and fingers after Mohs micrographic surgery. Dermatol Surg 2012;38:647–53.

13. Bari O, Eilers RE, Rubin AG, Jiang SB. Clinical characteristics of lower extremity surgical site infections in dermatologic surgery based upon 24-month retrospective review. J Drugs Dermatol 2018;17:766–71.

14. Campbell RM, Perlis CS, Fisher E, Gloster HM. Gentamicin ointment versus petrolatum for management of auricular wounds. Dermatol Surg 2005;31:664–9.

15. Gjødsbol K, Christiensen JJ, Karlsmark T, Jørgensen B, et al. Multiple bacterial species reside in chronic wounds: a longitudinal study. Int Wound J 2006;3:225–31.

16. Siddiqui AR, Bernstein JM. Chronic wound infection: facts and controversies. Clin Dermatol 2010;28:519–26.

Address correspondence and reprint requests to: Joshua Schimmel, BS, 401 Broadway, Camden, NJ 08103, or e-mail: schimmelj4@rowan.edu

© 2020 by the American Society for Dermatologic Surg    File 13 pdf · Page 156 of 2526    Unauthorized reproduction of this article is prohibited.

Facial Plastic Surgery & Aesthetic Medicine
Volume 0, Number 0, 2021
American Academy of Facial Plastic and Reconstructive Surgery, Inc.
DOI: 10.1089/fpsam.2021.0167



# Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane

Julia Toman, MD,[1] Georgina M. Michael, MSN, FNP-BC,[2,*,i] Oliver J. Wisco, DO, FAAD, FACMS,[3,4] John R. Adams, MD,[5,6] and Brandon S. Hubbs, MS, MA[7]

## Abstract

**Importance:** Reconstructing cosmetically sensitive defects in an aging population undergoing multiple Mohs micrographic surgeries (MMS) may be addressed with alternatives to surgery.

**Objective:** Patients undergoing MMS with defect reconstruction in visually prominent areas receiving placental allograft were compared with traditional autologous tissue-based procedures—flaps and full-thickness skin grafts (FTSG).

**Design, Setting, and Participants:** This retrospective case–control study evaluated patients who underwent MMS for removal of a basal or squamous cell carcinoma with same-day repair.

**Main Outcomes and Measures:** The primary endpoint was the incidence and comparison of postoperative morbidity. Risk for developing medical or cosmetic sequelae was determined through multivariate logistic regression.

**Results:** The study population consisted of 143 propensity score-matched pairs ($n = 286$) with moderate- to high-risk defects on the face, head, and neck. Compared with autologous tissue, placental allograft cases were associated with significantly lower risk for infection ($p = 0.004$), poor scar cosmesis ($p < 0.0001$), scar revision ($p < 0.0001$), or reoperation ($p = 0.0007$).

**Conclusions and Relevance:** Postoperative complication rates for placental reconstructions did not exceed those demonstrated by autologous tissue counterparts, indicating this is a safe alternative to flap and FTSG in cosmetically sensitive repairs.

## Introduction

Epidemiological estimates indicate a disproportionate surge of nonmelanoma skin cancer (NMSC) in the elderly, with 80% of all new cases occurring in persons >65 years.[1,2] As a result of longer life expectancy and the cumulative impact of ultraviolet radiation and sun exposure on anatomically vulnerable sites such as the face, head, and neck, older individuals may develop multiple tumors in localized regions.[3,4] This necessitates repeat surgical management that maintains a delicate balance between adequate excision, aesthetics, and function.[5–7]

Incisional repair utilizing autologous tissue such as local flaps and full-thickness skin grafts (FTSG) represent the mainstay of reconstructive techniques after Mohs micrographic surgery (MMS).[8,9] However, postoperative morbidity increases after the age of 60 years by as much

[1]Division of Facial Plastics and Reconstructive Surgery, Department of Otolaryngology Head and Neck Surgery, University of South Florida, Tampa, Florida, USA.
[2]Department of Clinical Research, MiMedx Group, Inc., Marietta, Georgia, USA.
[3]Dermatology Health Specialists, Bend, Oregon, USA.
[4]Department of Dermatology, The Warren Alpert Medical School of Brown University, Providence, Rhode Island, USA.
[5]Advanced Dermatology and Skin Cancer Center, Manhattan, Kansas, USA.
[6]Division of Dermatology, Department of Internal Medicine, University of Kansas School of Medicine, Wichita, Kansas, USA.
[7]Biostatistics Consulting, Alpharetta, GA, USA.
[i]ORCID ID (https://orcid.org/0000-0002-1797-9839).

*Address correspondence to: Julia Toman, MD, Assistant Professor, Department of Otolaryngology Head and Neck Surgery, Division of Facial Plastics and Reconstructive Surgery, University of South Florida, 2901 Bruce B. Downs Boulevard, MDC2, Tampa, FL 33602, USA. Email: juliatoman@usf.edu

© Julia Toman et al. 2021; Published by Mary Ann Liebert, Inc. This Open Access article is distributed under the terms of the Creative Commons License [CC-BY] (http://creativecommons.org/licenses/by/4.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

**2**                                         TOMAN ET AL.

---

### KEY POINTS

**Question:** Is the use of a placental allograft a feasible alternative to incisional methods of repair for cosmetically sensitive defects in select patient cases after Mohs surgery?

**Findings:** Larger cutaneous Mohs-related defects of the face, head, and hands were effectively reconstructed with a placental allograft in a population of older adults.

**Meaning:** This study suggests that surgical reconstruction after skin cancer removal from the face may be avoided in some cases when treated with a placental-derived material.

---

as 25% due to a greater depth of tumor invasion and extensive defects with higher demands for donor tissues.[10,11] Age and previous surgery alter characteristics of surrounding tissues and complicate the aesthetic and functional success of flaps and FTSG.[12,13] Medically fragile patients or those who are ineligible for incisional repair may be limited to second intention healing, a method typically reserved for smaller concave surfaces.[14]

Larger MMS defects that do not receive definitive reconstruction have been associated with increased recovery time, delayed healing, wound retraction, unpredictable scarring, and poor cosmesis.[15] This can lead to an altered appearance or impairment, causing patients to feel a sense of disfigurement, emotional distress, social isolation, or diminished quality of life.[16–18]

In situations where incisional repair options are limited, an ideal alternative would be a nonsurgical approach capable of yielding outcomes comparable with autologous tissue techniques. Placental tissues may offer a novel solution to address this emerging clinical need in cutaneous reconstruction. These commercially available allografts retain the three-dimensional collagen-rich (types I, III, IV, V, and VII) extracellular matrix, growth factors (bFGF, basic fibroblast growth factor; VEGF, vascular endothelial growth factor; PDGF, platelet-derived growth factor; EGF, epidermal growth factor; SDF-1, stromal cell-derived factor-1; and TGF$\beta$-3, transforming growth factor beta-3), cytokines (IL-10, interleukin 10; IL-1Ra, interleukin-1 receptor antagonist; and TIMPs, tissue inhibitors of metalloproteinases), antimicrobial peptides (NGAL, neutrophil gelatinase associated lipocalin; LL-37, human cationic antibacterial protein of 18 kDA; and RNase7, ribonuclease 7), and endogenous cells—epithelial cells, fibroblasts, and mesenchymal stem cells—native to human placental tissues.[19,20] Nearly all Level 1 randomized clinical trial placental allograft data exist in the chronic wound care space.[21] Low immunogenicity, ease of transplantation, and anti-inflammatory, antiangiogenic, and antiscarring properties suggest that this biomaterial is particularly well suited for a variety of clinical applications.[22–24]

To date, no controlled study has investigated placental allografts in the reconstructive management of moderate- and high-risk MMS defects in cosmetically sensitive areas. The primary purpose of this analysis is to assess the safety and utility of a dehydrated human amnion/chorion membrane (dHACM) (EpiFix®; MiMedx Group Inc., Marietta, GA) as a nonsurgical approach to cutaneous reconstruction. When compared in equivalent cases, we hypothesized that postoperative outcomes would be statistically similar to those achieved with flap and FTSG.

## Methods

### Study design

To ensure accurate and transparent reporting, this retrospective case–control study was conducted according to the Strengthening the Reporting of Observational Studies in Epidemiology guidelines.[25] Institutional Review Board approval and waiver of informed consent (Pro0031033) was granted before review of electronic medical records and extraction of deidentified data between January 2014 and December 2018. Patients were included if their diagnosis was basal or squamous cell carcinoma, if the MMS defect was located in a moderate- to high-risk area (face, head, neck, or dorsal hand), and necessitated same-day reconstruction. The American Academy of Dermatology Mohs Appropriate Use Criteria was used to assign reconstructive complexity and stratify defects according to location and aesthetic subunit.[26]

After exclusions, a total of 1550 eligible patients were identified. Cases were categorized based on the modality of same-day reconstruction. In this study, reconstructions were dichotomized into two groups, defined as either autologous tissue ($n = 1397$)—flaps and FTSG—or placental allograft (dHACM) ($n = 153$). To avoid selection bias and ensure a balanced comparison, propensity scores were constructed for each patient. Cases without an equivalent match were discarded. The final study population consisted of 286 patients that could be propensity score-matched at a 1:1 ratio, generating 143 case–control pairs.

### Outcome measures

All MMS and reconstructions were managed with the same postoperative protocol. Prophylactic antibiotics were not prescribed. Patients were evaluated every 5–7 days and received appropriate site care and dressing changes. Placental allograft applications were repeated if the previous graft material was no longer visible in the wound bed (Fig. 1A–C). Subjects were discharged from care once reconstruction sites were healed and free from complication (Fig. 1D).

The primary endpoint was the incidence of postoperative morbidity. Comparisons included the rate of medical complications for the index site: (1) infection, (2) bleeding/hematoma, (3) dehiscence, (4) surgical reintervention, or (5) development of a nonhealing wound. Postoperative cosmetic outcomes were assessed at ≥9 months. These

measures included documentation of (1) suboptimal scarring (per the International Classification of Diseases, Tenth Revision, Clinical Modification; ICD-10-CM-L90.5 cicatrix descriptors: adherent, painful, hypertrophic, contracted, fibrotic, or ectropion), (2) scar revision/treatment (excision, debulking, intralesional injection, laser, and dermabrasion), and (3) patient satisfaction with scar appearance. The length of time (days) and total number of visits required before discharge (determined by complete wound closure), and the billed costs associated with the MMS and primary reconstruction were also evaluated.

## Statistical analysis

The statistical software program SAS/STAT® v9.4 (SAS Institute Inc., Cary, NC) analyzed deidentified study data. Descriptive statistics for continuous variables were expressed as means and standard deviations (SDs). Frequencies ($n$) and percentages summarized dichotomous variables and categorical observations. Differences were compared with Student's $t$-test, Fisher's exact test, or Pearson's $\chi^2$ test. Use of nonparametric Mann–Whitney test or Wilcoxon rank-sum methods depended on the distribution of data. All statistical tests were two-sided and results were regarded as statistically significant at $p < 0.05$.

Propensity scores for matched case–controls were estimated using a logistic regression model to correct for differences in covariates: gender, age in years, medical history, tumor size, tumor location, histopathology, and other MMS characteristics. The goodness of propensity

score-matched pairs was evaluated using signed-rank sum for continuous data and McNemar's test for binary data. Adjusted multivariate odds ratio (OR; 95% confidence interval [CI]) determined predictors of significant postoperative morbidity and relative risk ratios (RR; 95% CI) were used to assess the strength of associations in univariate comparisons.

## Results

Baseline characteristics for unmatched and matched patients are summarized in Table 1. Significant covariate imbalances were corrected in the matched case–control sample ($n = 286$). Males represented the majority gender in both groups ($p = 0.161$). The mean (SD) ages ranged from 78.0 to 78.8 years ($p = 0.454$). There were no significant differences in medical history, tumor size, tumor type, moderate- versus high-risk defect location, or operative time ($p > 0.05$).

## Univariate analysis

The univariate comparison of outcomes is summarized in Table 2. The mean (SD) size of MMS defects reconstructed with placental allograft were similar to autologous tissue, 3.5 (3.7) versus 3.3 (3.1) cm$^2$, respectively ($p = 0.531$). A significantly greater proportion of placental allograft patients (97.9%) experienced zero postoperative complications compared with autologous tissue (71.3%), $p \leq 0.0001$ (Supplementary Figs. 1–3); strength of association was confirmed by relative risk measures (RR = 13.67; 95% CI = 4.33–43.12).

**Table 1.** Patient, tumor, and Mohs micrographic surgery characteristics for entire sample and matched sample

| | Entire sample | | | Matched sample | | |
|---|---|---|---|---|---|---|
| | Placental allograft (n = 153) | Autologous flap/FTSG (n = 1397) | p | Placental allograft (n = 143) | Autologous flap/FTSG (n = 143) | p |
| White | 153 (100.0) | 1397 (100.0) | — | 143 (100.0) | 143 (100.0) | — |
| Male, n | 122 (79.7) | 1038 (74.3) | 0.141 | 115 (80.4) | 105 (73.4) | 0.160 |
| Age, years | 78.4 (9.5) | 76.0 (9.4) | 0.003 | 78.0 (9.6) | 78.8 (9.1) | 0.454 |
| Immunocompromised, n | 33 (21.6) | 286 (20.5) | 0.750 | 32 (22.4) | 23 (16.1) | 0.177 |
| Anticoagulation, n | 36 (23.5) | 344 (24.6) | 0.765 | 34 (23.8) | 39 (27.3) | 0.497 |
| Current smoker, n | 16 (10.5) | 131 (9.4) | 0.868 | 16 (11.2) | 17 (11.9) | 0.600 |
| Tumor type (NMSC), n | | | 0.408 | | | 0.233 |
| Basal cell | 38 (24.8) | 392 (28.1) | | 35 (24.5) | 39 (27.3) | |
| Squamous cell | 115 (75.2) | 996 (71.3) | | 108 (75.5) | 104 (72.7) | |
| Other | 0 (0.0) | 9 (0.6) | | 0 (0.0) | 0 (0.0) | |
| Tumor length, cm | 1.3 (0.7) | 1.4 (0.7) | 0.027 | 1.3 (7.0) | 1.3 (6.0) | 0.692 |
| Tumor width, cm | 1.0 (0.4) | 1.1 (0.5) | <0.001 | 1.0 (4.0) | 1.0 (3.0) | 0.929 |
| MMS AUC area | | | 0.213 | | | 0.233 |
| Area M | 33 (21.6) | 366 (26.2) | | 32 (22.4) | 24 (16.8) | |
| Area H | 120 (78.4) | 1031 (73.8) | | 111 (77.6) | 119 (83.2) | |
| MMS time, minutes | 195.8 (62.4) | 237.6 (50.1) | <0.001 | 197.4 (57.5) | 199.9 (44.4) | 0.677 |

Data are expressed as absolute number ($n$) and percent (%) or mean and standard deviation (SD); statistical significance at $p < 0.05$.

Allograft, placental (dHACM, dehydrated human amnion/chorion membrane); Autologous tissue, flap and full-thickness skin graft (FTSG); NMSC, non-melanoma skin cancers; AUC, Appropriate Use Criteria per American Academy of Dermatology; Area H (high risk), central face, eyelids [including inner/outer canthi], eyebrows, nose, lips [including cutaneous surround, mucosal area, vermillion border], chin, ear [including periauricular skin/sulci], temple, and hands; Area M (moderate risk), cheeks, forehead, scalp, neck, and jawline; MMS time, length of Mohs procedure in minutes; NMSC, non-melanoma skin cancers.

**4**

TOMAN ET AL.

**Table 2. Univariate analysis for outcomes in case–control comparisons**

| | Placental allograft (n = 143) | Autologous flap/FTSG (n = 143) | p |
|---|---|---|---|
| Size of MMS defect, cm² | 3.5 (3.7) | 3.3 (3.1) | 0.531 |
| Stages for tumor clearance | 2.0 (1.2) | 2.1 (1.1) | 0.605 |
| Experienced no complications | 140.0 (97.9) | 102.0 (71.3) | <0.0001 |
| Postoperative sequelae | | | |
| Infection | 3.0 (2.0) | 15.0 (10.0) | 0.004 |
| Bleeding or hematoma | 0.0 (0.0) | 7.0 (5.0) | 0.015 |
| Wound dehiscence | 0.0 (0.0) | 4.0 (3.0) | 0.122 |
| Surgical reintervention | 0.0 (0.0) | 11.0 (8.0) | 0.0007 |
| Nonhealing wound | 0.0 (0.0) | 5.0 (3.5) | 0.060 |
| Poor scar cosmesis | 0.0 (0.0) | 21.0 (15.0) | <0.0001 |
| Scar revision | 0.0 (0.0) | 14.0 (9.8) | <0.0001 |
| Follow-up visits | 3.4 (1.6) | 2.5 (1.1) | <0.0001 |
| Time to discharge, days | 30.7 (16.9) | 30.3 (22.9) | 0.840 |
| Cost of reconstruction, dollars | 4463 (2272) | 3904 (951) | 0.007 |

Data are expressed as absolute number (n) and percent (%) or mean and standard deviation (SD); statistical significance at $p < 0.05$.

Placental allograft reconstructions developed less infection ($p = 0.004$) and were less likely to experience poor scar cosmesis ($p < 0.0001$) (Supplementary Figs. 4 and 5), scar revision ($p < 0.0001$), or surgical reintervention at the index site ($p = 0.0007$). Autologous tissue reconstructions required fewer mean (SD) follow-up visits (2.5 [1.1] versus 3.4 [1.6] visits; $p < 0.0001$) and cost less (3,904 [951] versus 4,463 [2,272] dollars; $p = 0.007$). The number of days to discharge were not significantly different between groups 30.7 (16.9) versus 30.3 (22.9) days ($p = 0.840$).

**Multivariate analysis**

Logistic regression model results are depicted in Table 3. When controlling for defect surface area, operation time, age, medical history, and gender, autologous tissue reconstruction remained an independent significant risk factor for infection or additional operation (OR = 11.71; 95% CI = 3.35–40.99; $p < 0.0001$). In a separate model that included cosmetic outcomes, the odds of infection, additional operation, poor scar cosmesis, or scar revision were 19 times higher in the autologous tissue group (OR = 18.76; 95% CI = 5.56–63.34; $p < 0.0001$). Being female was also associated with three times greater odds of having a cosmetic complication (OR = 2.84; 95% CI = 1.29–6.23; $p = 0.010$).

**Discussion**

This propensity score-matched case–control is the first to compare the outcomes for placental allograft with the gold standard of management in complex MMS defect reconstruction, flaps, and FTSG. This study presented a unique opportunity to address a practice gap with evidence that is currently missing from the literature. The key findings of this investigation are the incidence of infection and all-cause postoperative morbidity in placental allograft repairs was significantly lower than observed with autologous tissue; and the use of placental allograft was independently associated with a lower risk of infection, repeat operation, poor scar cosmesis, and scar revision. Even after controlling for covariates, patients receiving autologous tissue reconstruction were 12 times more likely to have infection or surgical reintervention and 19 times more likely to experience poor scar cosmesis or scar revision. Although female patients were at a greater risk of having postoperative scar-related issues, such outcomes coincide consistent with previous studies in which females experienced more psychosocial distress and scar concerns after MMS in a visually prominent area.[18]

Our study findings are consistent with long-standing reports in the scientific and medical literature, which recognize the placental membrane as a safe and effective surgical material.[19–24] Considerable research supports its use for tissue engineering as a biocompatible scaffold

**Table 3. Multivariate logistic regression analysis for the risk of medical and cosmetic postoperative complications**

| | Infection or surgical reintervention | | Poor scar cosmesis or scar revision | |
|---|---|---|---|---|
| | OR (95% CI) | p | OR (95% CI) | p |
| Female gender | 1.68 (0.68–4.15) | 0.260 | 2.84 (1.29–6.23) | 0.009 |
| Age | 0.98 (0.94–1.03) | 0.481 | 1.00 (0.96–1.05) | 0.861 |
| Tumor size, cm² | 1.27 (0.82–1.97) | 0.279 | 1.06 (0.74–1.52) | 0.755 |
| Defect size, cm² | 0.91 (0.71–1.17) | 0.470 | 0.97 (0.82–1.14) | 0.683 |
| Central face defect location | 0.45 (0.17–1.24) | 0.123 | 0.77 (0.30–2.01) | 0.593 |
| Autologous tissue vs. placental allograft | 11.71 (3.35–40.99) | 0.0001 | 18.76 (5.56–63.34) | <0.0001 |
| Current smoker | 0.74 (0.17–3.14) | 0.677 | 0.92 (0.27–3.08) | 0.886 |
| Anticoagulation | 1.00 (0.39–2.61) | 0.997 | 0.98 (0.43–2.23) | 0.953 |
| Immunocompromised | 1.32 (0.45–3.85) | 0.618 | 0.92 (0.33–2.56) | 0.873 |
| No. stages to extirpation | 1.04 (0.71–1.53) | 0.846 | 1.16 (0.84–1.61) | 0.363 |
| Length of surgery | 1.00 (1.00–1.01) | 0.447 | 1.00 (1.00–1.01) | 0.419 |

Statistical significance at $p < 0.05$.
CI, confidence interval; OR, odds ratio.

File 13 pdf - Page 160 of 2526

with capacity to promote re-epithelialization while reducing wound fibrosis and scar formation.[20] The successful closure of chronic wounds, management of orthopedic injury, prevention of surgical tissue adhesions, ocular surface reconstruction, reduced pain and infection in burn treatment, and prevention of postoperative hematoma and serous fluid collections are evidenced through various levels of research.[21,22]

In the dermatologic surgery setting, placental allografts may optimize clinical results in a variety of circumstances where a combination of patient, anatomical, and tissue-related factors are a concern: individual refuses incisional repair or presents with a medical contraindication; the quality/availability of local donor tissues are challenged; underlying structures are exposed and require a protective barrier; free skin margin contraction may lead to impaired cosmesis/altered function; or, the area cannot be immobilized to maintain autograft survival.[23]

The treatment algorithm for placental allograft use would supplement, not substitute for, levels in the reconstructive ladder. In this study, defects managed with placental allograft were characterized by exposed muscle, bone, and cartilage. These large complex wounds required one

additional visit and cost an average $560 more than autologous tissue techniques. This can be attributed to repeat application of the placental tissue and cost of the graft. Despite increased health care utilization concerns, this nonsurgical method became an option—when due to a combination of patient, anatomical, and tissue-related factors—the optimal reconstruction method could not be pursued.

### Limitations

As with all observational data, these study findings must be interpreted in the context of the retrospective study design. Results are limited by the accuracy and thoroughness of medical records. Given the resources available, this investigation made extensive efforts to increase internal validity and limit the confounding of results. Although propensity score-matching reduced baseline covariate imbalances, it does not substitute for randomization. A demographically homogenous cohort also constrains the generalizability of findings. The inherent risks associated with each reconstructive modality, incisional repair versus allograft tissue transplantation, present another limitation. The aim of this study was to compare defects distinguished by equivalent reconstructive demands in terms of complexity, location, and size. Smaller MMS defects managed with second intention were distinctly different (shallow depth, concave surfaces, and low-risk location) and, therefore, a case–control match with a population of dissimilar wounds was not applicable.

### Conclusion

Placental allograft can be a safe and effective tool for repairing MMS defects of the face, head, neck, and dorsal hand in a subset of patients who are not good candidates for traditional methods of autologous tissue reconstruction. In the authors' experience, this includes older adults with moderate- to high-risk defects $>3$ cm$^2$ and medically comorbid individuals with wound bed concerns making them ineligible for incisional repair. Further investigation into the efficacy of placental allograft for MMS reconstruction among racially diverse groups needs to be addressed in future studies.

### Authors' Contributions

All authors made substantial contributions to the conception and design of the study, including the acquisition, analysis, and interpretation of data, preparation of content, and critical review of the article. All authors performed a final review and provided their approval to submit the article for publication.

### Acknowledgments

The authors thank Dave Mason, MD, and Don Fetterol, MD, MBA, for assisting with the critical review and revision of the study manuscript.



**Fig. 1.    (A)** Placental allograft (dHACM) out of package before implantation (additional detail regarding product application is provided in the manufacturer's instructions for use [IFU], provided as Supplemental Data). **(B)** Mohs patient with large cutaneous defect involving upper eyelid and medial canthus right eye and right upper bridge of nose. **(C)** Placental allograft in situ, remains visible in situ at postoperative day 7. **(D)** Complete closure of Mohs defect without complication to surrounding structures, postoperative day 42. dHACM, dehydrated human amnion/chorion membrane.

**6** TOMAN ET AL.

## Author Disclosure Statement

This study was initiated by the Primary Investigator (PI), J.R.A. Third-party data analysis and open-access publication fees were supported in part by the company, MiMedx Group, Inc., through the Clinical Research Agreement, AFSUR008. J.T and O.J.W are academic physician/surgeon collaborators. G.M.M is a clinical researcher for the company and B.S.H is an independently contracted biostatistician. The company, MiMedx Group, Inc., did not pay for, gift, contribute, or provide free of charge, any of the tissues used in this study. Additionally, J.R.A received no financial incentives for conducting this research. The surgical care rendered—including but not limited to the Mohs, reconstruction, and placental allografts—were all billed through patient insurance as covered services.

## Funding Information

The publication of this study was supported with funding from MiMedx Group, Inc.

## Supplementary Material

Supplementary Data
Supplementary Figure S1
Supplementary Figure S2
Supplementary Figure S3
Supplementary Figure S4
Supplementary Figure S5

## References

1. Siegel RL, Miller KD, Jemal A. Cancer statistics, 2019. *CA Cancer J Clin.* 2019;69(1):7–34.
2. Lenzi TCR, Reis CMS, Novaes MRCG. Epidemiological profile of elderly patients with non-melanoma skin cancer seen at the dermatology outpatient clinic of a public hospital. *An Bras Dermatol.* 2017;92(6):882–884.
3. Linos E, Chren MM, Stijacic Cenzer I, Covinsky KE. Skin cancer in the U.S. elderly adults: does life expectancy play a role in treatment decisions. *J Am Geriatr Soc.* 2016;64(8):1610–1615.
4. Nestor MS, Zarraga MB. The incidence of nonmelanoma skin cancers and acitinic keratoses in South Florida. *J Clin Aesthet Dermatol.* 2012;5(4):20–24.
5. Sclafani AP, Sclafani JA, Sclafani AM. Successes, revisions, and postoperative complications in 466 Mohs defect repairs. *Facial Plast Surg.* 2012;28(3):358–366.
6. Johnson AR, Egeler SA, Wu WW, et al. Facial reconstruction after Mohs surgery: a critical review of defects involving the cheek, forehead, and perioral region. *J Craniofac Surg.* 2019;30(2):400–407.
7. Egler S, Johnson AR, Ibrahim AMS, et al. Reconstruction of Mohs defects located in the head and neck. *J Craniofac Surg.* 2019;30:412–417.
8. Tokede O, Jadotte YT, Nkemjika S, et al. Effectiveness of Mohs micrographic surgery for nonmelanoma skin cancer: a systematic review protocol. *JBI Database System Rev Implement Rep.* 2017;15(3):666–675.
9. Meaike JDF, Dickey RM, Killion E, Bartlett EL, Brown RH. Facial skin cancer reconstruction. *Semin Plast Surg.* 2016;30(3):108–121.
10. Grosfeld EC, Smit JM, Krekels GA, van Rappard JH, Hoogbergen MM. Facial reconstruction following Mohs micrographic surgery: a report of 622 cases. *J Cutan Med Surg.* 2014;18(4):265–270.
11. Renzi M, Schimmel J, Decker A, Lawrence N. Management of skin cancer in the elderly. *Dermatol Clin.* 2019;37(3):279–286.
12. van Leeuwen AC, The A, Moolenburgh SE, de Haas ERM, et al. A retrospective review of reconstructive options and outcomes of 202 cases large facial Mohs micrographic surgical defects, based on aesthetic unit involved. *J Cutan Med Surg.* 2015;19(6):580–587.
13. Ibrahim AM, Rabie AN, Borud L, et al. Common patterns of reconstruction for Mohs defects in the head and neck. *J Craniofac Surg.* 2014;25(1):87–92.
14. Schwartzman G, Carton AM, Khachemoune A. Review and appraisal of assessment parameters of second intention healing after Mohs micrographic surgery. *Arch Dermatol Res.* [Epub ahead of print]; 10.1007/s00403-021-02209-y.
15. Patel SA, Liu JJ, Murakami CS, Berg D, Akkina SR, Bhrany AD. Complication rates in delayed reconstruction of the head and neck after Mohs micrographic surgery. *JAMA Facial Plast Surg.* 2016;18(5):340–346.
16. Brown BC, Moss TP, McGrouther DA, Bayat A. Skin scar perceptions must be challenged: importance of self-perception in skin scarring. *J Plast Reconstr Aesthet Surg.* 2010;63:1022–1029.
17. Hughley BB, Schmalbach CE. Cutaneous head and neck malignancies in the elderly. *Clin Geriatr Med.* 2018;34(2):245–258.
18. Sabanko JF, Sarwer DB, Zvargulis Z, Miller CJ. Importance of physical appearance in patients with skin cancer. *Dermatol Surg.* 2015;41(2):183–188.
19. Niknejad H, Peirovi H, Jorjani M, Ahmadiani A, Ghanavi J, Seifalian A. Properties of the amniotic membrane for potential use in tissue engineering. *Eur Cell Mater.* 2008;15;88–99.
20. Mamede AC, Carvalho MJ, Abrantes AM, Laranjo M, Maia CJ, Botelho MF. Amniotic membrane: from structure and functions to clinical applications. *Cell Tissue Res.* 2012;339:447–458.
21. Koob TJ, Lim JJ, Massee M, Zabek N, Denozière G. Properties of dehydrated human amnion/chorion composite grafts: implications for wound repair and soft tissue regeneration. *J Biomed Mater Res B Appl Biomater.* 2014;102(6):1353–1362.
22. Lim JJ, Koob TJ. Placental cells and tissues: The transformative rise in advanced wound care. In: Fonseca C, ed. *Worldwide Wound Healing—Innovation in Natural and Conventional Methods.* Rijeka, Croatia: InTech; 2016, pp. 121–151.
23. Lo V, Pope, E. Amniotic membrane in dermatology. *Int J Dermatol.* 2009;48(9):935–940.
24. Silini AR, Cargnoni A, Magatti M, et al. The long path of human placenta and its derivatives, in regenerative medicine. *Front Bioeng Biotechnol.* 2015;3:162.
25. von Elm E, Altman DG, Egger M, Pocock SJ, Gotzsche PC, Vandenbroucke JP. The Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) statement: guidelines for reporting observational studies. *J Clin Epidemiol.* 2007;61:344–349.
26. Ad Hoc Task Force, Connolly SM, Baker DR, et al. AAD/ACMS/ASD-SA/ASMS 2012 appropriate use criteria for Mohs micrographic surgery: a report of the American Academy of Dermatology, American College of Mohs Surgery, American Society for Dermatologic Surgery Association, and the American Society for Mohs Surgery. *J Am Acad Dermatol.* 2012;67(4):531–550.

NCBI Bookshelf. A service of the National Library of Medicine, National Institutes of Health.

StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2023 Jan-.

# Wound Grafts

### Authors

Anna Elseth[1]; Omar Nunez Lopez[2].

### Affiliations

1 Dwight D. Eisenhower Army Medical Center
2 University of Texas Medical Branch

Last Update: October 31, 2022.

## Continuing Education Activity

Skin grafting is a procedure that is essential to reconstructive surgery for patients who have suffered burns, traumas, and non-healing or large wounds. This skill is necessary to provide improved quality of life for patients with significant wounds and extensive burns. This activity reviews the indications for skin grafts, the preparation of the wound bed, and the steps required to perform successful wound grafting. It explains the role of the interprofessional team in managing care for patients with burns and large or non-healing wounds.

**Objectives:**

- Describe the different types of wound grafts that are available as either temporary dressings or for permanent healing.

- Review the steps that are taken to ensure a wound bed is appropriately prepared for grafting.

- Outline the methods and tools used to harvest both full-thickness and split-thickness skin grafts.

- Explain the importance of early eschar removal and wound grafting for overall patient health.

Access free multiple choice questions on this topic.

## Introduction

Skin grafting is a procedure that is essential to reconstructive surgery for patients who have suffered burns, traumas, and non-healing or large wounds. This skill is necessary to provide improved quality of life for patients with significant wounds and extensive burns. Even more important than cosmesis is reestablishing the continuity of the skin to provide protection for the body.[1]

Xenografts are harvested from different species, the most common of these are porcine, and they are used as temporary bandages on wounds. They will not revascularize. The next type of graft is an allograft. These are cadaveric skin grafts taken from organ donors. They are ideal biologic dressings for patients who need resuscitation and continued debridements of the wound bed to ensure that it will accept an autograft.[2][3] Allografts will undergo revascularization in the initial period. The body's host defenses will eventually reject both of these types of grafts. Autografts are skin grafts that are taken from the patient. In this case, antigenic compatibility is not an issue and will allow for permanent skin healing. This is often the final stage of wound healing after extensive debridement to ensure that the wound bed is healthy.[4][5]

In addition to the different types of skin grafts available, there are also skin substitutes. One of the major limitations of skin substitutes is the associated cost. A majority of the available products provide either epidermis or dermis. The lack of dermis and subcutaneous tissue in epidermis substitutes results in a lack of elasticity and strength. Dermal

layer products do not have epidermal coverage and depend on a long period of epidermal in-growth to effectively cover the wound.

Currently, the most commonly used skin substitute is a cultured epidermal autograft (CEA). A full-thickness skin biopsy from the patient is obtained, and the keratinocytes are then used to develop a graft by expanding the cells into a neoepidermis. These grafts are even more delicate than autografts, they are extremely susceptible to shear injuries, and after they are incorporated, they remain fragile and require longer periods of immobility to ensure they are not damaged.[6][7]

Dermal substitutes are composed of a matrix of glycosaminoglycans and collagen. Alloderm is a popular dermal substitute that is obtained from cadaveric allografts. It has had good cosmetic outcomes in several studies with small populations, but extensive costs have limited widespread use and studies.[7][8]

A newer therapy product requires a biopsy from the dermal-epidermal junction to produce autologous cells (keratinocytes, fibroblasts, melanocytes) that are delivered in a suspension. This suspension is then applied to the wound by spraying it on the wound. Integra is a bilayer product composed of bovine collagen and glycosaminoglycans with a silicone sheet that acts as an epidermis for 2 to 3 weeks while the allograft degradation matrix occurs. As neovascularization occurs, the matrix degrades and is replaced by a collagen matrix produced by the patient's body. The silicone is then removed and replaced with a split-thickness skin graft (STSG). This product is used to reduce the amount of skin surface area needed for the eventual STSG.[9] Several other options are currently being developed and are under investigation. These products are accompanied by a high cost, and more research is necessary to confirm good cosmetic outcomes and long-term wound coverage.[7]

## Indications

Indications of skin grafting include deep second or third-degree burns, traumas, and non-healing or large wounds that will not close via primary or secondary intention. Patients who may benefit from skin grafts include burn patients, patients with non-healing wounds, such as diabetic foot wounds, or patients who have had to undergo extensive excision, such as in the case of necrotizing fasciitis.

## Contraindications

There are not many contraindications to wound grafts except for a few, such as infected wound bed and under-resuscitated patient.

## Preparation

Following are some necessary prerequisites needed to carry out the procedure of wound grafting successfully:

- Watson knife, Goulian blade
- Scalpel
- Electrocautery
- Dermatome
- Mineral oil
- Skin mesher
- Suture or staples

An appropriate team includes a well-trained surgeon, an anesthesiologist, a scrub tech, and a scrub nurse.

Preparation of the wound bed is essential to a successful procedure. Early excision and debridement to healthy tissue are vital to ensuring that the graft will heal. The standard of care for successful grafting is a 95% graft take. Removing eschar and necrotic tissue in a timely manner will lower the risk of developing a wound infection. This is essential to preventing the loss of the graft. Early excision has also been proven to decrease the number of contractures, scarring, skin tightness, and patients often are rehabilitated faster.[10][11]

The eschar is removed in layers until healthy tissue is identified by diffuse punctate bleeding with a Watson knife or Goulian blade. This is known as tangential excision. Fascial excision allows for faster resection and provides a plane that is ready for grafting but can lead to subpar cosmetic results. Wounds over joints need early excision and grafting to help prevent excessive contracture.[12][1][13]

Before placing the graft, all granulation tissue should be excised as it can have a significant bacterial burden and will prevent adherence of the graft. Skin margins should be freshened to expose healthy dermis. Hemostasis must be ensured to prevent the formation of a hematoma, failing the graft.[1]

## Technique

Full-thickness skin grafts include both the epidermis and the dermis. The selection of the donor site is carefully considered for optimal cosmetic outcome and control of discomfort. Cosmetic outcome is based on desired pigmentation, texture, and skin thickness.[2] These skin grafts are used to minimize the degree of contracture across joints as well as on the face and fingers.[14][2]

Full-thickness grafts are chosen from the flank, groin, hypothenar eminence, pre- and post-auricular areas, or the forearm.

- The skin is shaved, and the tumescent is injected into the tissue below the intended donor site.

- The skin is then gently harvested using a scalpel, customizing the shape to that of the area to be grafted. Sharp dissection is preferred as electrocautery can damage the donor graft very easily.

- Some of the subcutaneous tissue is removed with the graft, it is then taken to the back table and "defatted" to remove the excess tissue. The donor site is then closed primarily.

- When placing the full-thickness skin graft, it is sutured along the edges using rapidly dissolving sutures. Many surgeons use quilting sutures to help hold the graft in place, preventing both shear and empty space in which a hematoma or seroma could develop. Larger grafts (>3 cm diameter - Stephenson) risk failure because the surface area will be too large for adequate imbibition.

Split thickness skin grafts (STSGs) are the most common type of wound graft placed. They are ideal because smaller amounts of harvested skin can cover a larger area. The dermis and epidermis from the donor site also heal quickly (10-14 days), and that location can be used as a donor site again if necessary. The ideal donor site is the anterolateral thigh because it is easily accessed on the supine patient, it is easy to use the dermatome in this location, and the dressings required are in an easily accessible location.[15]

STSGs are generally meshed to allow for increased coverage when limited donor skin is available. This is useful for decreasing the amount of skin harvest, but the interstices also allow for the egress of serum and blood buildup, minimizing the risk of losing the graft because it will maintain contact with the underlying wound. The most common ratios utilized in meshing are 1:1 to 3:1. Increasing this to 4:1 or higher can be done but there is an increased risk of the graft not taking because the distance between the interstices is too large for the skin to heal between them.[16] [14]. The orientation of the graft, when placed on the body surface to be covered, can affect the amount of coverage available based on the meshing pattern.[17]

Sheet grafts are STSGs that are unmeshed. The largest disadvantage of STSGs is the cosmetic outcome. The meshing is scarred into place at the wound site. They also have increased rates of contracture during healing. Sheet grafts are used in areas greater than 3 cm on the face and hands to reduce the contracture and improve cosmetic outcomes. They are also used in areas that are more commonly exposed, such as the forearms and legs, if possible. The risks of seroma and hematoma buildup resulting in loss of the graft are similar to those associated with full-thickness grafts, so they must be monitored closely.[1]

- Infiltrate subcutaneous tissue with tumescent infiltrate.

- Ensure the dermatome is at the correct height for the desired thickness. This can be as thin as 1/1000 of an inch, but the most common thickness utilized is between 8/1000 and 12/1000 of an inch. This can be easily checked with a #10 scalpel blade. If the blade falls into the space between the dermatome and the dermatome blade, the harvested skin will likely be too thick. The scalpel blade should fit into space easily and then become snug as the scalpel blade thickens. It is essential that appropriate thickness is checked every time, even if the settings are the same.

- The area to be harvested is covered in mineral oil to decrease resistance. Tension is applied to the donor site to make it as even and flat as possible. The dermatome is introduced at a 45-degree angle and advanced while placing downward pressure. It is essential to place appropriate pressure to keep the dermatome in the dermis. Too much pressure will result in a skin graft that is too thick, and the donor site will need more time to heal or may even require primary closure if a full-thickness graft is taken. Too little pressure will result in a skin graft that is too thin, uneven, and irregular. Once the desired length is obtained, the dermatome is lifted off the surface, generally amputating the graft from the adjacent skin left in place. If it does not amputate, it can be severed with a scalpel. The donor site is then covered with a 1:1000 epinephrine and a normal saline pad to allow for hemostasis.

- If the graft is to be meshed, it is taken to the back table where it is placed in the mesher at the desired ratio.

- Once meshed, the STSG is placed on the wound with the dermis side contacting the wound bed. It is then either sutured or stapled into place to reduce shearing and improve contact with the wound. It can also be secured with fibrin sealants, but these are often used in combination with staples and sutures.

Dressings

- Graft site

  - The graft must be immobilized to prevent shear injury to the healing areas. Shearing of the graft results in failure of neovascularization and leads to graft death. This is especially important with full-thickness grafts and sheet grafts.

  - Negative pressure wound therapy (NPWT) is an ideal dressing choice because it pulls all excessive fluid out from under the graft while keeping it in place. This minimizes risks of shearing. This is the preferred dressing method to protect the skin graft of many surgeons and has been demonstrated to be superior to bolstered dressings.[18][19]

  - If NPWT is not available, bolstered dressings can be placed and tied or sutured into place to ensure that the underlying graft does not move. The bolster is generally an absorbent gauze to assist with the egress of exudate that will occur.

- Donor site

  - Donor site dressing options are numerous and often surgeon dependent. A commonly used dressing is vaseline gauze. It is important to use nonadherent dressings that will not pull off the healing skin when

changed. It is usually changed around postoperative day 5.

## Complications

Failure of the graft can occur due to fluid build-up under the graft, infection, shearing, excessive tension, or poor vascularity of the wound bed. These complications can generally be avoided if appropriate wound bed preparation is performed along with meticulous hemostasis. The graft is further protected by securing it in place and by the dressings. Care must be taken along each step of the way to provide the graft with the best chance of survival.

Long term contracture and scarring can result. Contracture over joints can be improved by early mobilization, but this must be carefully balanced to avoid damage to the underlying grafts.[13]

## Clinical Significance

Skin grafts can be a life-altering procedure for patients with large wounds that would otherwise be unable to heal. Cosmesis is often determined by timely wound debridement and treatment, often at specialized centers, if the wounds are large enough. It is essential that all teams work together, so that wound debridement and grafting occur in a timely manner so that patients have optimal outcomes. Patients with extensive injuries or burns that do not have sufficient skin available for grafting may be appropriate candidates for skin substitutes. Reestablishing skin continuity is essential to preventing infections and reduce insensible fluid losses, as well as provide patients with an increased quality of life.

## Enhancing Healthcare Team Outcomes

Communication between the wound care specialist, the surgeon, and the care team is necessary to ensure that a proper wound bed is prepared and that no infection exists in the wound bed. The care team is essential to this process because they change bandages daily and see the wounds. They are also responsible for the care of the patient after the graft when it is most fragile and must be protected.

## Review Questions

- Access free multiple choice questions on this topic.

- Comment on this article.

## References

1. Adams DC, Ramsey ML. Grafts in dermatologic surgery: review and update on full- and split-thickness skin grafts, free cartilage grafts, and composite grafts. Dermatol Surg. 2005 Aug;31(8 Pt 2):1055-67. [PubMed: 16042930]

2. Hazani R, Whitney R, Wilhelmi BJ. Optimizing aesthetic results in skin grafting. Am Surg. 2012 Feb;78(2):151-4. [PubMed: 22369820]

3. Oravcová D, Koller J. Currently available skin substitutes. Cas Lek Cesk. 2014;153(1):7-12. [PubMed: 24506687]

4. Sheridan R. Closure of the excised burn wound: autografts, semipermanent skin substitutes, and permanent skin substitutes. Clin Plast Surg. 2009 Oct;36(4):643-51. [PubMed: 19793558]

5. Leon-Villapalos J, Eldardiri M, Dziewulski P. The use of human deceased donor skin allograft in burn care. Cell Tissue Bank. 2010 Feb;11(1):99-104. [PubMed: 20077178]

6. Sood R, Roggy D, Zieger M, Balledux J, Chaudhari S, Koumanis DJ, Mir HS, Cohen A, Knipe C, Gabehart K, Coleman JJ. Cultured epithelial autografts for coverage of large burn wounds in eighty-eight patients: the Indiana University experience. J Burn Care Res. 2010 Jul-Aug;31(4):559-68. [PubMed: 20616650]

7. Haddad AG, Giatsidis G, Orgill DP, Halvorson EG. Skin Substitutes and Bioscaffolds: Temporary and Permanent Coverage. Clin Plast Surg. 2017 Jul;44(3):627-634. [PubMed: 28576252]

8.  Metcalfe AD, Ferguson MW. Tissue engineering of replacement skin: the crossroads of biomaterials, wound healing, embryonic development, stem cells and regeneration. J R Soc Interface. 2007 Jun 22;4(14):413-37. [PMC free article: PMC2373411] [PubMed: 17251138]

9.  Heimbach DM, Warden GD, Luterman A, Jordan MH, Ozobia N, Ryan CM, Voigt DW, Hickerson WL, Saffle JR, DeClement FA, Sheridan RL, Dimick AR. Multicenter postapproval clinical trial of Integra dermal regeneration template for burn treatment. J Burn Care Rehabil. 2003 Jan-Feb;24(1):42-8. [PubMed: 12543990]

10. Barrett S. Wound-bed preparation: a vital step in the healing process. Br J Nurs. 2017 Jun 22;26(12 Suppl):S24-S31. [PubMed: 28640728]

11. Speeding up wound healing with debridement. Frequent wound cleaning can yield faster results. Johns Hopkins Med Lett Health After 50. 2013 Nov;25(11):6. [PubMed: 24634956]

12. Jones CM, Rothermel AT, Mackay DR. Evidence-Based Medicine: Wound Management. Plast Reconstr Surg. 2017 Jul;140(1):201e-216e. [PubMed: 28654620]

13. Rose LF, Wu JC, Carlsson AH, Tucker DI, Leung KP, Chan RK. Recipient wound bed characteristics affect scarring and skin graft contraction. Wound Repair Regen. 2015 Mar-Apr;23(2):287-96. [PubMed: 25683192]

14. Koljonen V. [Techniques of skin grafting]. Duodecim. 2011;127(20):2139-47. [PubMed: 22191200]

15. Liu HH, Chang CK, Huang CH, Wu JR, Chen CY, Huang DW, Chu TS, Hsu KF, Wang CY, Chiang IH, Ou KL, Wang CH, Dai NT, Chen SG, Tzeng YS. Use of split-thickness plantar skin grafts in the management of leg and foot skin defects. Int Wound J. 2018 Oct;15(5):783-788. [PMC free article: PMC7949531] [PubMed: 29797454]

16. Lyons JL, Kagan RJ. The true meshing ratio of skin graft meshers. J Burn Care Res. 2014 May-Jun;35(3):257-60. [PubMed: 24126474]

17. Capek L, Flynn C, Molitor M, Chong S, Henys P. Graft orientation influences meshing ratio. Burns. 2018 Sep;44(6):1439-1445. [PubMed: 29861098]

18. Nakamura Y, Fujisawa Y, Ishitsuka Y, Tanaka R, Maruyama H, Okiyama N, Watanabe R, Fujimoto M. Negative-pressure closure was superior to tie-over technique for stabilization of split-thickness skin graft in large or muscle-exposing defects: A retrospective study. J Dermatol. 2018 Oct;45(10):1207-1210. [PubMed: 30010206]

19. Isago T, Nozaki M, Kikuchi Y, Honda T, Nakazawa H. Skin graft fixation with negative-pressure dressings. J Dermatol. 2003 Sep;30(9):673-8. [PubMed: 14578557]

Copyright © 2023, StatPearls Publishing LLC.

This book is distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivatives 4.0 International (CC BY-NC-ND 4.0) ( http://creativecommons.org/licenses/by-nc-nd/4.0/ ), which permits others to distribute the work, provided that the article is not altered or used commercially. You are not required to obtain permission to distribute this article, provided that you credit the author and journal.

Bookshelf ID: NBK564382   PMID: 33232052

File 13 pdf - Page 163 of 2526



# Medical Policy



An Independent licensee of the
Blue Cross Blue Shield Association

## Title:     Amniotic Membrane and Amniotic Fluid

| Related Policies: | • Bio-Engineered Skin and Soft Tissue Substitutes<br>• Orthopedic Applications of Stem Cell Therapy (Including Allografts and Bone Substitutes Used With Autologous Bone Marrow)<br>• Recombinant and Autologous Platelet-Derived Growth Factors for Wound Healing and Other Non–Orthopedic Conditions |
|---|---|

| Professional | Institutional |
|---|---|
| Original Effective Date:  March 20, 2017 | Original Effective Date:  March 20, 2017 |
| Revision Date(s):  March 20, 2017;<br>January 1, 2019; February 18, 2019;<br>March 27, 2019; May 21, 2019;<br>September 27, 2019; October 1, 2019;<br>July 1, 2020; July 16, 2021; October 8, 2021;<br>January 3, 2022; April 1, 2022; April 8, 2022 | Revision Date(s):  March 20, 2017;<br>January 1, 2019; February 18, 2019;<br>March 27, 2019; May 21, 2019;<br>September 27, 2019; October 1, 2019;<br>July 1, 2020; July 16, 2021; October 8, 2021;<br>January 3, 2022; April 1, 2022; April 8, 2022 |
| Current Effective Date: July 16, 2021 | Current Effective Date: July 16, 2021 |

**State and Federal mandates and health plan member contract language, including specific provisions/exclusions, take precedence over Medical Policy and must be considered first in determining eligibility for coverage. To verify a member's benefits, contact Blue Cross and Blue Shield of Kansas Customer Service.**

**The BCBSKS Medical Policies contained herein are for informational purposes and apply only to members who have health insurance through BCBSKS or who are covered by a self-insured group plan administered by BCBSKS. Medical Policy for FEP members is subject to FEP medical policy which may differ from BCBSKS Medical Policy.**

**The medical policies do not constitute medical advice or medical care. Treating health care providers are independent contractors and are neither employees nor agents of Blue Cross and Blue Shield of Kansas and are solely responsible for diagnosis, treatment and medical advice.**

**If your patient is covered under a different Blue Cross and Blue Shield plan, please refer to the Medical Policies of that plan.**

| Populations | Interventions | Comparators | Outcomes |
|---|---|---|---|
| Individuals: | Interventions of interest are: | Comparators of interest are:<br>• Standard wound care | Relevant outcomes include:<br>• Symptoms |

| Populations | Interventions | Comparators | Outcomes |
|---|---|---|---|
| • With nonhealing diabetic lower-extremity ulcers | • Patch or flowable formulation of human amniotic membrane | • Advanced wound therapies | • Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With lower-extremity ulcers due to venous insufficiency | Interventions of interest are:<br>• Patch or flowable formulation of human amniotic membrane | Comparators of interest are:<br>• Compression therapy<br>• Advanced wound therapies | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With knee osteoarthritis | Interventions of interest are:<br>• Injection of suspension or particulate formulation of human amniotic membrane or amniotic fluid | Comparators of interest are:<br>• Conservative therapy<br>• Corticosteroid injections | Relevant outcomes include:<br>• Symptoms<br>• Functional outcomes<br>• Quality of life<br>• Treatment-related morbidity |
| Individuals:<br>• With plantar fasciitis | Interventions of interest are:<br>• Injection of suspension or particulate formulation of human amniotic membrane or amniotic fluid | Comparators of interest are:<br>• Conservative therapy<br>• Corticosteroid injections | Relevant outcomes include:<br>• Symptoms<br>• Functional outcomes<br>• Quality of life<br>• Treatment-related morbidity |
| Individuals:<br>• With neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative treatment | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With corneal ulcers or melts that do not respond to initial medical therapy | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>•Quality of life |
| Individuals:<br>• With bullous keratopathy as a palliative measure in patients who are not candidates for a | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Populations | Interventions | Comparators | Outcomes |
|---|---|---|---|
| curative treatment (e.g., endothelial or penetrating keratoplasty) | | | |
| Individuals:<br>• With partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With moderate or severe Stevens-Johnson syndrome | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With persistent epithelial defects that do not respond to conservative therapy | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With severe dry eye with ocular surface damage and inflammation that does not respond to conservative therapy | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With moderate or severe acute ocular chemical burn | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With corneal perforation when corneal tissue is not immediately available | Interventions of interest are:<br>• Sutured human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft | Interventions of interest are:<br>• Sutured or glued human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Populations | Interventions | Comparators | Outcomes |
|---|---|---|---|
| Individuals:<br>• Who have undergone Mohs micrographic surgery for skin cancer on the face, head, neck, or dorsal hand | Interventions of interest are:<br>• Human amniotic membrane | Comparators of interest are:<br>• Autologous tissue-based surgical repair (full-thickness skin grafts and flaps)<br>• Non-surgical treatment (e.g., secondary intention healing) | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |

## DESCRIPTION

Several commercially available forms of human amniotic membrane (HAM) and amniotic fluid can be administered by patches, topical application, or injection. Amniotic membrane and amniotic fluid are being evaluated for the treatment of a variety of conditions, including chronic full-thickness diabetic lower-extremity ulcers, venous ulcers, knee osteoarthritis, plantar fasciitis, and ophthalmic conditions.

## OBJECTIVE

The objective of this evidence review is to evaluate whether various human amniotic membrane products improve the net health outcome for patients with various diabetic and venous ulcers, osteoarthritis, plantar fasciitis, and ophthalmic conditions.

## BACKGROUND
### Human Amniotic Membrane

Human amniotic membrane (HAM) consists of 2 conjoined layers, the amnion, and chorion, and forms the innermost lining of the amniotic sac or placenta. When prepared for use as an allograft, the membrane is harvested immediately after birth, cleaned, sterilized, and either cryopreserved or dehydrated. Many products available using amnion, chorion, amniotic fluid, and umbilical cord are being studied for the treatment of a variety of conditions, including chronic full-thickness diabetic lower-extremity ulcers, venous ulcers, knee osteoarthritis, plantar fasciitis, and ophthalmic conditions. The products are formulated either as patches, which can be applied as wound covers, or as suspensions or particulates, or connective tissue extractions, which can be injected or applied topically.

Fresh amniotic membrane contains collagen, fibronectin, and hyaluronic acid, along with a combination of growth factors, cytokines, and anti-inflammatory proteins such as interleukin-1 receptor antagonist.[1] There is evidence that the tissue has anti-inflammatory, antifibroblastic, and antimicrobial properties. HAM is considered nonimmunogenic and has not been observed to cause a substantial immune response. It is believed that these properties are retained in cryopreserved HAM and HAM products, resulting in a readily available tissue with regenerative potential. In support, 1 HAM product has been shown to elute growth factors into saline and stimulate the migration of mesenchymal stem cells, both in vitro and in vivo.[2]

Use of a HAM graft, which is fixated by sutures, is an established treatment for disorders of the corneal surface, including neurotrophic keratitis, corneal ulcers and melts, following pterygium

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

repair, Stevens-Johnson syndrome, and persistent epithelial defects. Amniotic membrane products that are inserted like a contact lens have more recently been investigated for the treatment of corneal and ocular surface disorders. Amniotic membrane patches are also being evaluated for the treatment of various other conditions, including skin wounds, burns, leg ulcers, and prevention of tissue adhesion in surgical procedures.[1] Additional indications studied in preclinical models include tendonitis, tendon repair, and nerve repair. The availability of HAM opens the possibility of regenerative medicine for an array of conditions.

## Amniotic Fluid
Amniotic fluid surrounds the fetus during pregnancy and provides protection and nourishment. In the second half of gestation, most of the fluid is a result of micturition and secretion from the respiratory tract and gastrointestinal tract of the fetus, along with urea.[1] The fluid contains proteins, carbohydrates, peptides, fats, amino acids, enzymes, hormones, pigments, and fetal cells. Use of human and bovine amniotic fluid for orthopedic conditions was first reported in 1927.[3] Amniotic fluid has been compared with synovial fluid, containing hyaluronan, lubricant, cholesterol, and cytokines. Injection of amniotic fluid or amniotic fluid-derived cells is currently being evaluated for the treatment of osteoarthritis and plantar fasciitis.

▪ Amniotic membrane and amniotic fluid are also being investigated as sources of pluripotent stem cells.[1] Pluripotent stem cells can be cultured and are capable of differentiation toward any cell type. The use of stem cells in orthopedic applications is addressed in BCBSKS medical policy *Orthopedic Applications of Stem Cell Therapy (Including Allografts and Bone Substitutes Used With Autologous Bone Marrow).*


## REGULATORY STATUS
The U.S. Food and Drug Administration (FDA) regulates human cells and tissues intended for implantation, transplantation, or infusion through the Center for Biologics Evaluation and Research, under Code of Federal Regulation, Title 21, parts 1270 and 1271. In 2017, the FDA published clarification of what is considered minimal manipulation and homologous use for human cells, tissues, and cellular and tissue-based products (HCT/Ps).[4]

HCT/Ps are defined as human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient. If an HCT/P does not meet the criteria below and does not qualify for any of the stated exceptions, the HCT/P will be regulated as a drug, device, and/or biological product and applicable regulations and premarket review will be required.

An HCT/P is regulated solely under section 361 of the PHS Act and 21 CFR Part 1271 if it meets all of the following criteria:
1. "The HCT/P is minimally manipulated;
2. The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
3. The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
4. Either:

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

    i.   The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or

   ii.   The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:

        a.  Is for autologous use;

        b.  Is for allogeneic use in a first-degree or second-degree blood relative; or

        c.  Is for reproductive use."

The guidance provides the following specific examples of homologous and non-homologous use for amniotic membrane:

   a.  "Amniotic membrane is used for bone tissue replacement to support bone regeneration following surgery to repair or replace bone defects. This is not a homologous use because bone regeneration is not a basic function of amniotic membrane.

   b.  An amniotic membrane product is used for wound healing and/or to reduce scarring and inflammation. This is not homologous use because wound healing and reduction of scarring and inflammation are not basic functions of amniotic membrane.

   c.  An amniotic membrane product is applied to the surface of the eye to cover or offer protection from the surrounding environment in ocular repair and reconstruction procedures. This is homologous use because serving as a covering and offering protection from the surrounding environment are basic functions of amniotic membrane."

The FDA noted the intention to exercise enforcement discretion for the next 36 months after publication of the guidance.

In 2003, Prokera was cleared for marketing by the FDA through the 510(k) process for the ophthalmic conformer that incorporates amniotic membrane (K032104). The FDA determined that this device was substantially equivalent to the Symblepharon Ring. The Prokera device is intended "for use in eyes in which the ocular surface cells have been damaged, or underlying stroma is inflamed and scarred."[5,] The development of Prokera, a commercially available product, was supported in part by the National Institute of Health and the National Eye Institute.

AmnioClip (FORTECH GmbH) is a ring designed to hold the amniotic membrane in the eye without sutures or glue fixation. A mounting device is used to secure the amniotic membrane within the AmnioClip. The AmnioClip currently has CE approval in Europe.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**POLICY**

A.  Treatment of nonhealing diabetic lower-extremity ulcers using the following human amniotic membrane products may be considered **medically necessary**.
    1.  Affinity (Q4159)
    2.  AmnioBand Membrane (Q4151)
    3.  Biovance (Q4154)
    4.  EpiCord (Q4187)
    5.  Epifix (Q4186)
    6.  Grafix (Q4132, Q4133)

B.  Human amniotic membrane grafts with or without suture (Prokera®, AmbioDisk™) or glue, may be considered **medically necessary** for the treatment of the following ophthalmic indications:

    1.  Neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative therapy;
    2.  Corneal ulcers and melts that do not respond to initial conservative therapy;
    3.  Corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment;
    4.  Bullous keratopathy as a palliative measure in patients who are not candidates for curative treatment (e.g., endothelial or penetrating keratoplasty);
    5.  Partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient;
    6.  Moderate or severe Stevens-Johnson syndrome;
    7.  Persistent epithelial defects that do not respond as stated in policy guidelines.
    8.  Severe dry eye (DEWS 3 or 4) with ocular surface damage and inflammation that remains symptomatic after Steps 1, 2, and 3 of the dry eye disease management algorithm (see Policy Guidelines);
    9.  Moderate or severe acute ocular chemical burn.
    10. Corneal perforation when corneal tissue is not immediately available; or
    11. Pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft

C.  Human amniotic membrane grafts with or without suture are considered **experimental / investigational** for all ophthalmic indications not outlined above.

D.  Injection of micronized or particulated human amniotic membrane is considered **experimental / investigational** for all indications, including, but not limited to, treatment of osteoarthritis and plantar fasciitis.

E.  Injection of human amniotic fluid is considered **experimental / investigational** for all indications.

F.  All other human amniotic products (e.g., derived from amnion, chorion, amniotic fluid, umbilical cord, or Wharton's jelly) not listed above are considered **experimental / investigational** (see policy guidelines).

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

G.    All other indications not listed above are considered **experimental / investigational**, including, but not limited to, treatment of lower-extremity ulcers due to venous insufficiency and repair following Mohs micrographic surgery.


## POLICY GUIDELINES

A.    Nonhealing of diabetic wounds is defined as less than a 20% decrease in wound area with standard wound care for at least 2 weeks based on the entry criteria for clinical trials (e.g., Zelen et al, 2015).

B.    A persistent epithelial defect is one that failed to close completely after 5 days of conservative treatment or has failed to demonstrate a decrease in size after 2 days of conservative treatment.

C.    Conservative treatment is defined as use of topical lubricants and/or topical antibiotics and/or therapeutic contact lens and/or patching. Failure of multiple modalities should not be required prior to moving to human amniotic membrane grafts. An amniotic membrane graft requires less effort on the part of the patient to adhere to a treatment regimen and has a significant advantage in regard to treatments requiring multiple drops per day.

Tables PG1 and PG2 list the medically necessary and investigational amniotic products that have an HCPCS code.

### Table PG1 Amniotic Products Listed in the Policy Statements

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| Affinity® | Organogenesis (previously NuTech Medical) | Q4159 |
| AmnioBand® Membrane | MTF Wound Care | Q4151 |
| Biovance® | Celularity | Q4154 |
| Epifix® | MiMedx | Q4186 |
| Epicord® | MiMedx | Q4187 |
| Grafix® | Osiris | Q4132, Q4133 |

### Table PG2 Other Amniotic Products with HCPCS Codes

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| Allogen | Vivex Biomedical | Q4212 |
| AlloWrap™ | AlloSource | Q4150 |
| AmnioAMP-MP | Stratus BioSystems | Q4250 |
| Amnioarmor™ | Tissue Transplant Technology | Q4188 |
| AmnioBand® Particulate | MTF Wound Care | Q4168 |
| AmnioExcel® | Derma Sciences | Q4137 |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Trade Name | Supplier | HCPCS Code |
|------------|----------|------------|
| Amnio-maxx or Manio-maxx lite | Royal Biologics | Q4239 |
| Amniotext | Regenerative Labs | Q4245 |
| Amniowound | Alpha Tissue | Q4181 |
| Amnion bio or Axomembrane | Axolotl Biologix | Q4211 |
| Amniocore™ | Stability Biologics | Q4227 |
| Amniocyte | Predictive Biotech | Q4242 |
| AmnioMatrix® | Integra Life Sciences | Q4139 |
| Amniply | International Tissue | Q4249 |
| Amniorepair or AltiPly | Zimmer Biomet | Q4235 |
| Amniotext patch | Regenerative Labs | Q4247 |
| AmnioWrap2™ | Direct Biologics | Q4221 |
| Articent ac (flowable) | Tides Medical | Q4189 |
| Artacent ac (patch) | Tides Medical | Q4190 |
| Artacent® Wound | Tides Medical | Q4169 |
| Artacent® Cord | Tides Medical | Q4126 |
| Ascent | StimLabs | Q4213 |
| Axolotl ambien or Axolotl Cryo | Axolotl Biology | Q4215 |
| BioDDryFlex® | BioD | Q4138 |
| BioDfence™ | Integra Life Science | Q4140 |
| BioNextPATCH | BioNext Solutions | Q4228 |
| BioWound, BioWound Plus™, BioWound XPlus™ | HRT[a] | Q4217 |
| carePATCH | Extremity Care | Q4236 |
| Cellesta/Cellesta duo | Ventris Medical | Q4184 |
| Cellesta Cord | Ventris Medical | Q4214 |
| Cellesta flowable | Ventris Medical | Q4185 |
| Clarix® | Amniox Medical | Q4156 |
| Clarix® Flo | Amniox Medical | Q4155 |
| Cogenex flowable amnion | Ventris Medical | Q4230 |
| Cogenex amniotic membrane | Ventris Medical | Q4229 |
| Corecyte | Predictive Biotech | Q4240 |
| Corplex | StimLabs | Q4232 |
| Corplex P | StimLabs | Q4231 |
| Coretext or Protext | Regenerative Labs | Q4246 |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| Cryo-cord | Royal Biologics | Q4237 |
| Cygnus | Vivex Biomedical | Q4170 |
| Dermacyte | Merakris Therapeutics | Q4248 |
| Dermavest™ or Plurivest | AediCell[a] | Q4153 |
| Derm-maxx | Royal Biologics | Q4238 |
| Epifix Injectable | MiMedx | Q4145 |
| Floweramnioflo | Flower Orthopedics | Q4177 |
| Floweramniopatch | Flower Orthopedics | Q4178 |
| Fluid flow or Fluid GF | BioLab Sciences | Q4206 |
| Genesis | Genesis Biologics | Q4198 |
| Guardian/AmnioBand® | MTF Wound Care | Q4151 |
| Interfyl® | Celularity | Q4171 |
| Matrion | LifeNet Health | Q4201 |
| Neopatch or Therion | CryoLife | Q4176 |
| Neox® Cord | Amniox Medical | Q4148 |
| Neox® Flo | Amniox Medical | Q4155 |
| Neox® Wound | Amniox Medical | Q4156 |
| Novachor | Organogenisis | Q4191 |
| Novafix® | Triad Life Sciences | Q4208 |
| Novafix DL | Triad Life Sciences | Q4254 |
| NuShield | Organogenesis | Q4160 |
| PalinGen® Membrane | Amnio ReGen Solutions | Q4173 |
| PalinGen® SportFlow | Amnio ReGen Solutions | Q4174 |
| Plurivest™ | AediCell | Q4153 |
| Polycyte | Predictive Biotech | Q4241 |
| Procenta | Lucina BioSciences | Q4244 |
| Reguard | New Life Medical | Q4255 |
| Restorigin | UMTB Biomedical | Q4191 |
| Restorigin Injectable | UMTB Biomedical | Q4192 |
| Revita | StimLabs | Q4180 |
| Revitalon™ | Medline Industries | Q4157 |
| Surgenex, Surfactor, and Nudyn | Surgenex | Q4233 |
| Surgicord | Synergy Biologics | Q4218 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| SurgiGRAFT™ | Synergy Biologics | Q4183 |
| WoundEx® | Skye Biologics[a] | Q4163 |
| WoundEx® Flow | Skye Biologics[a] | Q4162 |
| Woundfix, Woundfix Plus, Wounfix XPlus (see BioWound above) | HRT | Q4217 |
| Xcellerate | Precise Bioscience | Q4234 |
| Xwrap | Applied Biologics | Q4204 |

HRT: Human Regenerative Technologies; MTF: Musculoskeletal Transplant Foundation
[a] Processed by HRT and marketed under different tradename

Tear Film and Ocular Surface Society staged management for dry eye disease (Jones et al, 2017)
Step 1:
• Education regarding the condition, its management, treatment and prognosis
• Modification of local environment
• Education regarding potential dietary modifications (including oral essential fatty acid supplementation)
• Identification and potential modification/elimination of offending systemic and topical medications
• Ocular lubricants of various types (if meibomian gland dysfunction is present, then consider lipid containing supplements)
• Lid hygiene and warm compresses of various types

Step 2:
If above options are inadequate consider:
• Non-preserved ocular lubricants to minimize preservative-induced toxicity
• Tea tree oil treatment for Demodex (if present)
• Tear conservation
• Punctal occlusion
• Moisture chamber spectacles/goggles
• Overnight treatments (such as ointment or moisture chamber devices)
• In-office, physical heating and expression of the meibomian glands
• In-office intense pulsed light therapy for meibomian gland dysfunction
• Prescription drugs to manage dry eye disease
• Topical antibiotic or antibiotic/steroid combination applied to the lid margins for anterior blepharitis (if present)
• Topical corticosteroid (limited-duration)
• Topical secretagogues
• Topical non-glucocorticoid immunomodulatory drugs (such as cyclosporine)
• Topical LFA-1 antagonist drugs (such as lifitegrast)
• Oral macrolide or tetracycline antibiotics

Step 3:
If above options are inadequate consider:
• Oral secretagogues
• Autologous/allogeneic serum eye drops

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

- Therapeutic contact lens options
- Soft bandage lenses
- Rigid scleral lenses

Step 4:
If above options are inadequate consider:
- Topical corticosteroid for longer duration
- Amniotic membrane grafts
- Surgical punctal occlusion
- Other surgical approaches (e.g. tarsorrhaphy, salivary gland transplantation)

Dry eye severity level DEWS 3 to 4
- Discomfort, severity, and frequency - Severe frequent or constant
- Visual symptoms - chronic and/or constant, limiting to disabling
- Conjunctival Injection - +/- or +/+
- Conjunctive Staining - moderate to marked
- Corneal Staining - marked central or severe punctate erosions
- Corneal/tear signs - Filamentary keratitis, mucus clumping, increase in tear debris
- Lid/meibomian glands - Frequent
- Tear film breakup time - < 5
- Schirmer score (mm/5 min) - < 5

| **Please refer to the member's contract benefits in effect at the time of service to determine coverage or non-coverage of these services as it applies to an individual member.** |
|---|

**RATIONALE**
This evidence review has been updated regularly with searches of the PubMed database. The most recent literature update was performed through January 3, 2022.

Evidence reviews assess the clinical evidence to determine whether the use
of technology improves the net health outcome. Broadly defined, health outcomes are the length of life, quality of life (quality of life), and ability to function, including benefits and harms. Every clinical condition has specific outcomes that are important to patients and managing the course of that condition. Validated outcome measures are necessary to ascertain whether a condition improves or worsens; and whether the magnitude of that change is clinically significant. The net health outcome is a balance of benefits and harms.

To assess whether the evidence is sufficient to draw conclusions about the net health outcome of technology, 2 domains are examined: the relevance, and quality and credibility. To be relevant, studies must represent one or more intended clinical use of the technology in the intended population and compare an effective and appropriate alternative at a comparable intensity. For some conditions, the alternative will be supportive care or surveillance. The quality and credibility of the evidence depend on study design and conduct, minimizing bias and confounding that can generate incorrect findings. The randomized controlled trial (RCT) is preferred to assess efficacy; however, in some circumstances, nonrandomized studies may be adequate. RCTs are rarely large enough or long enough to capture less common adverse events

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

and long-term effects. Other types of studies can be used for these purposes and to assess generalizability to broader clinical populations and settings of clinical practice.

## DIABETIC LOWER-EXTREMITY ULCERS

### Patch or Flowable Amniotic Membrane or Placental Membrane

#### Clinical Context and Therapy Purpose
The purpose of patch or flowable amniotic membrane or placental membrane in patients who have diabetic lower-extremity ulcers is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does amniotic membrane or placental membrane improve the net health outcome in patients with diabetic lower-extremity ulcers?

The following PICO was used to select literature to inform this review.

#### Populations
The relevant population of interest is patients with diabetic lower-extremity ulcers that have failed to heal with the standard of care (SOC) therapy.

#### Interventions
The therapy being considered is an amniotic membrane or placental membrane applied every 1 to 2 weeks. It is applied in addition to the SOC.

#### Comparators
The following therapies are currently being used to make decisions about the healing of diabetic lower-extremity ulcers: SOC, which involves moist dressing, dry dressing, compression therapy, and offloading.

#### Outcomes
The primary endpoints of interest for trials of wound closure are as follows, consistent with guidance from the U.S. Food and Drug Administration (FDA) for the industry in developing products for the treatment of chronic cutaneous ulcer and burn wounds:
- Incidence of complete wound closure.
- Time to complete wound closure (reflecting accelerated wound closure).
- Incidence of complete wound closure following surgical wound closure.
- Pain control.
- Complete ulcer healing with advanced wound therapies may be measured at 6 to 12 weeks.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**

At least 7 RCTs have evaluated rates of healing with amniotic membrane grafts or placental membrane graft compared to SOC or an advanced wound therapy in patients with chronic diabetic foot ulcers (see Table 1). The number of patients in these studies ranged from 25 to 155. Human amniotic membrane (HAM) or placental membrane grafts improved healing compared to SOC by 22% (EpiCord vs. Alginate dressing) to 60% (EpiFix) in the intention-to-treat (ITT) analysis (see Table 2). In a 2018 trial, the cryopreserved placental membrane Grafix was found to be non-inferior to an advanced fibroblast-derived wound therapy (Dermagraft).

**Table 1. Summary of Key RCT Characteristics**

| Study; Trial | Countries | Sites | Dates | Participants | Active Intervention | Comparator |
|---|---|---|---|---|---|---|
| Serena et al (2020)[6,] | U.S. | 14 | | 76 patients with chronic (> 4 weeks) non-healing diabetic foot ulcers unresponsive to SOC and extending into dermis, subcutaneous tissue, muscle, or tendon | n=38, Affinity | n=38, SOC |
| Ananian et al (2018)[7,] | U.S. | 7 | 2016-2017 | 75 patients with chronic (> 4 weeks) non-healing diabetic foot ulcers between 1 cm2 and 15 cm2 | n=38, Grafix weekly for up to 8 weeks | n=37, Dermagraft (fibroblast-derived) weekly for up to 8 weeks |
| Tettelbach et al (2018)[8,] | U.S. | 11 | 2016-2018 | 155 patients with chronic (> 4 weeks) non-healing diabetic foot ulcers | n=101 EpiCord plus SOC | n=54 SOC with alginate dressing |
| DiDomenico et al (2018)[9,] | | | | 80 patients with non-healing (4 weeks) diabetic foot ulcers | AmnioBand Membrane plus SOC | SOC |
| Snyder et al (2016)[10,] | | | | 29 patients with non-healing diabetic foot ulcers | AmnioExcel plus SOC | SOC |
| Zelen et al (2015, 2016)[11,12,] | | 4 | | 60 patients with less than 20% wound healing in a 2 week run-in period | EpiFix | Apligraf or SOC with collagen-alginate dressing |
| Tettelbach et al (2019)[13,] | U.S. | 14 | | 110 patients with non-healing (4 weeks) lower extremity ulcers | EpiFix | SOC with alginate dressing |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Study; Trial | Countries | Sites | Dates | Participants | Active Intervention | Comparator |
|---|---|---|---|---|---|---|
| Lavery et al (2014)[14,] | | | | 97 patients with chronic diabetic foot ulcers | Grafix Weekly | SOC |

RCT: randomized controlled trial; SOC: standard of care including debridement, nonadherent dressing, moisture dressing, a compression dressing and offloading.

## Table 2. Summary of Key RCT Results

| Study | Wounds Healed | Wounds Healed | Time to Complete Healing | Adverse Events and Number of Treatments |
|---|---|---|---|---|
| Serena et al (2020)[6,] | 12 Weeks (ITT) (%) | 16 Weeks (ITT) (%) | Median | |
| N | 76 | 76 | 76 | |
| Affinity | 55% | 58% | 11 weeks | |
| SOC | 29% | 29% | not attained by 16 weeks | |
| p-value | .02 | .01 | | |
| HR (95% CI) | | 1.75 (1.16 to 2.70) | | |
| Ananian et al (2018)[7,] | 8 Weeks (PP) n (%) | | | Patients with Index Ulcer Related Adverse Events n (%) |
| N | 62 | | | 75 |
| Grafix | 15 (48.4%) | | | 1 (5.9%) |
| Dermagraft | 12 (38.7%) | | | 4 (16.7%) |
| Diff (95% CI) | 9.68% (−10.7 to 28.9) | | | |
| Lower bound for non-inferiority | -15% | | | |
| Tettlebach et al (2018)[8,] | 12 Weeks (PP) n (%) | 12 Weeks (ITT) n (%) | | Patients with Adverse Events (% of total) |
| N | 134 | 155 | | 155 |
| EpiCord | 81 (81%) | 71 (70%) | | 42 (42%) |
| SOC | 29 (54%) | 26 (48%) | | 33 (61%) |
| p-value | .001 | .009 | | |
| DiDomenico et al (2018)[9,] | 6 Weeks (ITT) n (%) | 12 weeks ITT n (%) | Mean Days (95% CI) | |
| N | 80 | 80 | 80 | |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Study | Wounds Healed | Wounds Healed | Time to Complete Healing | Adverse Events and Number of Treatments |
|---|---|---|---|---|
| AmnioBand | 27 (68) | 34 (85) | 37.0 (29.5 to 44.4) | |
| SOC | 8 (20) | 13 (33) | 67.3 (59.0 to 79.6) | |
| HR (95% CI) | | 4.25 (0.44 to 0.79) | | |
| p-value | <.001 | <.001 | <.001 | |
| Snyder et al. (2016)[10,] | **6 Weeks (PP) Mean (95% CI)** | | | |
| N | 21 | | | |
| AmnioExcel | 45.5% (32.9% to 58.0%) | | | |
| SOC | 0% | | | |
| p-value | .014 | | | |
| Zelen et al (2015, 2016)[11,12,] | 6 Weeks ITT n (%) | Wounds Healed at 12 Weeks | | Weekly Treatments |
| N | 60 | 100 | | |
| EpiFix | 19 (95%) | NR | | 3.4 |
| Apligraf | 9 (45%) | NR | | 5.9 |
| SOC | 7 (35%) | NR | | |
| HR (95% CI) | | 5.66; (3.03 to 10.57) | | |
| p-value | .003 | <.001 vs. SOC | | .003 |
| Tettelbach et al (2019)[13,] | | Wounds Healed at 12 Weeks (ITT) n(%) | | |
| N | | 110 | | 110 |
| EpiFix | | 38 (81) | | |
| SOC | | 28 (55) | | |
| p-value | | | | |
| Lavery et al (2014)[14,] | | Wounds Healed at 12 Weeks | | Patients With Adverse Events |
| N | | 97a | 97 | 97 |

| Study | Wounds Healed | Wounds Healed | Time to Complete Healing | Adverse Events and Number of Treatments |
|---|---|---|---|---|
| Grafix | | 62.0% | 42.0 | 44.0% |
| SOC | | 21.3% | 69.5 | 66.0% |
| p-value | | <.001 | .019 | .031 |
| Difference in wounds healed between amniotic or placental membrane and SOC | Affinity 26% AmnioBand 55% AmnioExcel 33% EpiFix 60% | Affinity 28% EpiCord 22% Grafix 41% | | |

CI: confidence interval; DIFF: difference; HR: hazard ratio; ITT: intention-to-treat; NR: not reported; PP: per-protocol; RCT: randomized controlled trial; SOC: standard of care.

a. Power analysis indicated that 94 patients per arm would be needed. However, after a prespecified interim analysis at 50% enrollment, the blinded review committee recommended the trial is stopped due to the efficacy of the treatment.

Limitations in study design and conduct are shown in Table 3. Studies without notable limitations reported power analysis, blinded assessment of wound healing, evaluation of wound closure as the primary outcome measure, and ITT analysis. Limitations from the RCT with AmnioExcel (Snyder et al, 2016) [10,] preclude conclusions for this product.

## Table 3. Study Design and Conduct Limitations

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| Serena et al (2020)[6,] | 3. The randomization process and allocation concealment were not described | 1, 2. No blinding of patients or investigators. Assessors were blinded | | 1. Although ITT analysis, there was substantial missing data for depth and volume with the digital analysis system. | | |
| Ananian et al (2018)[7,] | | 2, 3. No blinding for outcomes assessment | | | | |
| Tettelbach et al (2018)[8,] | | 1, 2, 3. No blinding | | | | |
| DiDomenico et al (2018)[9,] | | | | | | |
| Snyder et al (2016)[10,] | | | | 1. There was high loss to follow-up with discontinuation of 8 of 29 participants | 1. Power analysis | |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| | | | | | was not reported | |
| Zelen et al (2015, 2016)[11,12,] | | | | 1. Thirteen of 35 patients in the SOC group exited the study at 6 weeks due to less than 50% healing, which may have affected the 12-week results. | | |
| Tettelbach et al (2019)[13,] | | 1, 2. No blinding of patients or investigators. Assessors were blinded | | | | |
| Lavery et al (2014)[14,] | | | | | | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
ITT: intention to treat; SOC: standard of care.
a Allocation key: 1. Participants not randomly allocated; 2. Allocation not concealed; 3. Allocation concealment unclear; 4. Inadequate control for selection bias.
b Blinding key: 1. Not blinded to treatment assignment; 2. Not blinded outcome assessment; 3. Outcome assessed by treating physician.
c Selective Reporting key: 1. Not registered; 2. Evidence of selective reporting; 3. Evidence of selective publication.
d Data Completeness key: 1. High loss to follow-up or missing data; 2. Inadequate handling of missing data; 3. High number of crossovers; 4. Inadequate handling of crossovers; 5. Inappropriate exclusions; 6. Not intent to treat analysis (per protocol for noninferiority trials).
e Power key: 1. Power calculations not reported; 2. Power not calculated for primary outcome; 3. Power not based on clinically important difference.
f Statistical key: 1. Analysis is not appropriate for outcome type: (a) continuous; (b) binary; (c) time to event; 2. Analysis is not appropriate for multiple observations per patient; 3. Confidence intervals and/or p values not reported; 4. Comparative treatment effects not calculated.

## Prospective Single-arm or Registry Studies
Prospective single-arm or registry studies are described in Tables 4 and 5.

Smiell et al (2015) reported on an industry-sponsored, multicenter registry study of Biovance d-HAM for the treatment of various chronic wound types; about a third (n=47) were diabetic foot wounds.[15,] Of those treated, 28 ulcers had failed prior treatment with advanced biologic therapies. For all wound types, 41.6% closed within a mean time of 8 weeks and a mean of 2.4 amniotic membrane applications.

In 2016, Frykberg et al reported treatment of complex chronic wounds (exposed tendon or bone) with Grafix. With the cryopreserved placental membrane applied weekly for up to 16 weeks, 59% of wounds closed with a mean time to closure of 9 weeks.[16,]

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 4. Summary of Prospective Single-arm Studies or Registry Characteristics**

| Study | Study Design | Participants | Treatment Delivery |
|-------|--------------|--------------|--------------------|
| Smiell et al (2015)[15,] | Multicenter Registry | Various chronic wounds: 47 diabetic foot wounds, 20 pressure ulcers, and 89 venous ulcers; 28 had failed prior treatment with advanced biologic therapies (Apligraf, Dermagraft, or Regranex) | Biovance |
| Frykberg et al (2016)[16,] | Prospective multi-center single-arm study | 31 patients with chronic complex diabetic foot wounds with exposed tendon or bone | Grafix weekly until closure or 16 weeks |

**Table 5. Summary of Prospective Single-arm Studies or Registry Results**

| Study | Treatment | Wounds Closed | Mean Time to Closure | Number of Applications |
|-------|-----------|---------------|----------------------|------------------------|
| Smiell et al (2015)[15,] | Biovance | 41.6% | 8 weeks | 2.4 |
| Frykberg et al (2016)[16,] | Grafix | 59.3% | 9 weeks | 9 |

**Section Summary: Diabetic Lower-Extremity Ulcers**
For individuals who have non-healing diabetic lower-extremity ulcers who receive a patch or flowable formulation of HAM or placental membrane (i.e., Affinity, AmnioBand Membrane, AmnioExcel, Biovance, EpiCord, EpiFix, Grafix), the evidence includes RCTs. The RCTs evaluating amniotic and placental membrane products for the treatment of non-healing (<20% healing with ≥2 weeks of standard care) diabetic lower-extremity ulcers have compared HAM with standard care or with an established advanced wound care product. These trials used wound closure as the primary outcome measure, and some included power analysis, blinded assessment of wound healing, and ITT analysis. For the HAM products that have been sufficiently evaluated (i.e., Affinity, AmnioBand Membrane, Biovance, EpiCord, EpiFix, Grafix), results have shown improved outcomes compared with standard care, and outcomes that are at least as good as an established advanced wound care product. Improved health outcomes in the RCTs are supported by multicenter registries. No studies were identified that compared different amniotic or placental products, and indirect comparison between products is limited by variations in the patient populations.

**LOWER-EXTREMITY ULCERS DUE TO VENOUS INSUFFICIENCY**

**Amniotic Membrane**

**Clinical Context and Therapy Purpose**
The purpose of amniotic membrane or placental membrane in patients who have lower-extremity ulcers due to venous insufficiency is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does amniotic membrane or placental membrane improve the net health outcome in patients with venous ulcers?

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The following PICO was used to select literature to inform this review.

### Populations
The relevant population of interest is patients with lower-extremity venous ulcers that have failed to heal with SOC therapy.

### Interventions
The therapy being considered is amniotic membrane or placental membrane applied every 1 to 2 weeks. It is applied in addition to the SOC.

### Comparators
The following therapies are currently being used to make decisions about the healing of venous ulcers: SOC, which involves moist dressing, dry dressing, and compression therapy.

### Outcomes
The primary endpoints of interest for trials of wound closure are as follows, consistent with guidance from the FDA for the industry in developing products for the treatment of chronic cutaneous ulcer and burn wounds:

- Incidence of complete wound closure.
- Time to complete wound closure (reflecting accelerated wound closure).
- Incidence of complete wound closure following surgical wound closure.
- Pain control.
- Complete ulcer healing with advanced wound therapies may be measured at 6 to 12 weeks.

## Study Selection Criteria
Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

## Review of Evidence
Two RCTs, both with EpiFix, were identified on HAM for venous leg ulcers. Serena et al (2014) reported on an industry-sponsored multicenter open-label RCT that compared EpiFix d-HAM plus compression therapy with compression therapy alone for venous leg ulcers (see Tables 6 and 7).[17,] The primary outcome in this trial was the proportion of patients with 40% wound closure at 4 weeks, which was achieved by about twice as many patients in the combined EpiFix group compared with the control group (see Table 8). However, a similar percentage of patients in the combined EpiFix group and the control group achieved complete wound closure during the 4-week study. There was no significant difference in healing for wounds given 1 versus 2 applications of amniotic membrane (62% vs. 63%, respectively). Strengths of this trial included

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

adequate power and ITT analysis with last observation carried forward. Limitations included the lack of blinding for wound evaluation and use of 40% closure rather than complete closure. A 2015 retrospective study of 44 patients from this RCT (31 treated with amniotic membrane) found that wounds with at least 40% closure at 4 weeks (n=20) had a closure rate of 80% by 24 weeks; however, this analysis did not take into account additional treatments after the 4-week randomized trial period.

A second industry-sponsored, multicenter, open-label RCT (Bianchi et al [2018; 2019]) evaluated the time to complete ulcer healing following weekly treatment with EpiFix d-HAM plus compression therapy or compression wound therapy alone (see Tables 6 and 7).[18,19,] Patients treated with EpiFix had a higher probability of complete healing by 12 weeks, as adjudicated by blinded outcome assessors (hazard ratio, 2.26; 95% CI, 1.25 to 4.10; p=.01), and improved time to complete healing, as assessed by Kaplan-Meier analysis. In per-protocol analysis, healing within 12 weeks was reported for 60% of patients in the EpiFix group and 35% of patients in the control group (p<.013) (see Table 8). Intent-to-treat analysis found complete healing in 50% of patients in the EpiFix group compared to 31% of patients in the control group (p=.0473). There were several limitations of this trial (see Tables 8 and 9). In the per-protocol analysis, 19 (15%) patients were excluded from the analysis, and the proportion of patients excluded differed between groups (19% from the EpiFix group vs. 11% from the control group). There was also a difference between the groups in how treatment failures at 8 weeks were handled. Patients in the control group who did not have a 40% decrease in wound area at 8 weeks were considered study failures and treated with advanced wound therapies. The ITT analysis used last-observation-carried-forward for these patients and sensitivity analysis was not performed to determine how alternative methods of handling the missing data would affect results. Kaplan-Meier analysis suggested a modest improvement in the time to heal when measured by ITT analysis, but may be subject to the same methodological limitations.

Two additional studies, one with Amnioband and a second with Artacent, are listed on clinicaltrials.gov as completed in 2018, but results have not been published (see Table 14)

## Table 6. Summary of Key RCT Characteristics

| Study | Countries | Sites | Dates | Participants | Interventions | |
|---|---|---|---|---|---|---|
| | | | | | Active | Comparator |
| Serena et al (2014)[17,] | U.S. | 8 | 2012-2014 | 84 patients with a full-thickness chronic VLU between 2 and 20 cm2 treated for at least 14 d | 1 (n=26) or 2 (n=27) applications of EpiFix plus standard wound therapy (n=53) | Standard wound therapy (debridement with alginate dressing and compression) (n=31) |
| Bianchi et al (2018, 2019)[18,19,] | U.S. | 15 | 2015-2017 | 128 patients with a full-thickness VLU of at least 30-d duration | Weekly EpiFix plus moist wound therapy plus compression (n=64 ITT; 52 PP) | Moist wound therapy plus compression (n=64 ITT; 57 PP) |

ITT: Intent-to-treat; PP: per-protocol; RCT: randomized controlled trial; VLU: venous leg ulcer.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Table 7. Summary of Key RCT Results

| Study | Percent With 40% Wound Closure at 4 Weeks | Percent With Complete Wound Closure at 4 Weeks | Complete Wound Closure at 12 Weeks n (%) | | Complete Wound Closure at 16 Weeks n (%) | |
|---|---|---|---|---|---|---|
| | | | PP | ITT | PP | ITT |
| Serena et al (2014)[17,] | | | | | | |
| EpiFix | 62 | 11.3 | | | | |
| Control | 32 | 12.9 | | | | |
| p-Value | .005 | | | | | |
| Bianchi et al (2018, 2019 )[18,19,] | | | | | | |
| EpiFix | | | 31 (60) | 32 (50) | 37 (71) | 38 (59) |
| Control | | | 20 (35) | 20 (31) | 25 (44) | 25 (39) |
| p-Value | | | .013 | .047 | .007 | .034 |

ITT: Intent-to-treat; PP: per protocol; RCT: randomized controlled trial.

## Table 8. Study Relevance Limitations

| Study | Population[a] | Intervention[b] | Comparator[c] | Outcomes[d] | Follow-Up[e] |
|---|---|---|---|---|---|
| Serena et al (2014)[17,] | | | | | |
| Bianchi et al (2018, 2019 )[18,19,] | | | | | 1. Advanced wound therapy was allowed in the control group before the primary endpoint was reached. |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
[a] Population key: 1. Intended use population unclear; 2. Clinical context is unclear; 3. Study population is unclear; 4. Study population not representative of intended use.
[b] Intervention key: 1. Not clearly defined; 2. Version used unclear; 3. Delivery not similar intensity as comparator; 4.Not the intervention of interest.
[c] Comparator key: 1. Not clearly defined; 2. Not standard or optimal; 3. Delivery not similar intensity as intervention; 4. Not delivered effectively.
[d] Outcomes key: 1. Key health outcomes not addressed; 2. Physiologic measures, not validated surrogates; 3. No CONSORT reporting of harms; 4. Not establish and validated measurements; 5. Clinical significant difference not prespecified; 6. Clinical significant difference not supported.
[e] Follow-Up key: 1. Not sufficient duration for benefit; 2. Not sufficient duration for harms.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Table 9. Study Design and Conduct Limitations

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| Serena et al (2014)[17,] | | | | | | |
| Bianchi et al (2018, 2019 )[18,19,] | | 1. Open-label with blinded assessors | | 1. Unequal exclusion of patients in the 2 groups in the per-protocol analysis.3. Advanced wound therapy was allowed in the control group before the primary endpoint was reached | | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.

[a] Allocation key: 1. Participants not randomly allocated; 2. Allocation not concealed; 3. Allocation concealment unclear; 4. Inadequate control for selection bias.
[b] Blinding key: 1. Not blinded to treatment assignment; 2. Not blinded outcome assessment; 3. Outcome assessed by treating physician.
[c] Selective Reporting key: 1. Not registered; 2. Evidence of selective reporting; 3. Evidence of selective publication.
[d] Data Completeness key: 1. High loss to follow-up or missing data; 2. Inadequate handling of missing data; 3. High number of crossovers; 4. Inadequate handling of crossovers; 5. Inappropriate exclusions; 6. Not intent to treat analysis (per protocol for noninferiority trials).
[e] Power key: 1. Power calculations not reported; 2. Power not calculated for primary outcome; 3. Power not based on clinically important difference.
[f] Statistical key: 1. Analysis is not appropriate for outcome type: (a) continuous; (b) binary; (c) time to event; 2. Analysis is not appropriate for multiple observations per patient; 3. Confidence intervals and/or p values not reported; 4. Comparative treatment effects not calculated.

### Biovance

As described above, Smiell et al (2015) reported on an industry-sponsored, multicenter registry study of Biovance d-HAM for the treatment of various chronic wound types; about half (n=89) were venous ulcers.[15,] Of the 179 treated, 28 (16%) ulcers had failed prior treatment with advanced biologic therapies. For all wound types, 41.6% closed within a mean time of 8 weeks and a mean of 2.4 amniotic membrane applications. However, without a control group, the percentage of wounds that would have healed with SOC is unknown.

### Section Summary: Lower-Extremity Ulcers Due to Venous Insufficiency

The evidence on HAM for the treatment of venous leg ulcers includes 2 multicenter RCTs with EpiFix. One RCT reported a larger percent wound closure at 4 weeks, but the percentage of patients with complete wound closure at 4 weeks did not differ between EpiFix and the SOC. A second RCT evaluated complete wound closure at 12 weeks after weekly application of EpiFix or standard dressings with compression. Although a significant difference in complete healing was reported, interpretation is limited by the differential loss to follow-up and exclusions between

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

groups. Although a subsequent publication reported ITT analysis, the handling of missing data differed between the groups and sensitivity analysis was not performed. The methodological flaws in the design, execution, and reporting of both of these RCTs limit inference that can be drawn from the results. Two additional studies with other HAM products have been completed but not published, raising further questions about the efficacy of HAM for lower-extremity ulcers due to venous insufficiency. Therefore, corroboration with well-designed and well-conducted RCTs evaluating wound healing in patients with venous leg ulcers is needed to demonstrate efficacy. The corroborating RCTs should report ITT and sensitivity analysis, with analysis of all patients, including those who were off treatment or had protocol deviations and exclusions.

## OSTEOARTHRITIS

### ReNu™ Knee Injection in Patients with Osteoarthritis

In 2016, a feasibility study (N=6) was reported of cryopreserved human amniotic membrane (c-HAM) suspension with amniotic fluid-derived cells for the treatment of knee osteoarthritis.[20,] A single intra-articular injection of the suspension was used, with follow-up at 1 and 2 weeks and at 3, 6, and 12 months posttreatment. Outcomes included the Knee Injury and Osteoarthritis Outcome Score, International Knee Documentation Committee scale, and a numeric pain scale. Statistical analyses were not performed for this small sample. No adverse events, aside from a transient increase in pain, were noted. RCTs are in progress.

A trial with 200 participants was completed in February 2019 (see Table 14). No publications from this trial have been identified.

### Section Summary: Osteoarthritis

Current evidence is insufficient to support definitive conclusions on the utility of c-HAM in the treatment of knee osteoarthritis.

## PLANTAR FASCIITIS

### Clinical Context and Therapy Purpose

The purpose of micronized amniotic membrane in patients who have plantar fasciitis is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does injectable amniotic membrane improve the net health outcome in patients with plantar fasciitis?

The following PICO was used to select literature to inform this review.

### *Populations*

The relevant population of interest is patients with plantar fasciitis that has failed to heal with SOC therapy.

### *Interventions*

The therapy being considered is micronized amniotic membrane. It is applied in addition to the SOC.

### *Comparators*

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The following therapies are currently being used to make decisions about the healing of plantar fasciitis: corticosteroid injections and SOC, which involves offloading, night-splinting, stretching, and orthotics.

### Outcomes
The primary endpoints of interest for trials of plantar fasciitis are as follows: Visual Analog Score (VAS) for pain and function measured by the Foot Functional Index.

Acute effects of HAM injection may be measured at 2 to 4 weeks. The durability of treatment would be assessed at 6 to 12 months.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence
One systematic review and 2 randomized pilot studies were identified on the treatment of plantar fasciitis using an injection of micronized HAM.

### Systematic Review
A 2016 network meta-analysis of 22 RCTs (total N=1216 patients) compared injection therapies for plantar fasciitis.[21,] In addition to c-HAM and micronized d-HAM/chorionic membrane, treatments included corticosteroids, botulinum toxin type A, autologous whole blood, platelet-rich plasma, nonsteroidal anti-inflammatory drugs, dry needling, dextrose prolotherapy, and polydeoxyribonucleotide. Placebo arms included normal saline, local anesthetic, sham dry needling, and tibial nerve block. Analysis indicated d-HAM had the highest probability for improvement in pain and composite outcomes in the short-term, however, this finding was based only on a single RCT. Outcomes at 2 to 6 months (7 RCTs) favored botulinum toxin for pain and patient recovery plan for composite outcomes.

### Randomized Controlled Trials
Zelen et al (2013) reported a preliminary study with 15 patients per group (placebo, 0.5 cc, and 1.25 cc) and 8-week follow-up.[22,] A subsequent RCT by Cazell et al (2018) enrolled 145 patients and reported 3-month follow-up (see Table 10).[23,] In Cazzell et al (2018) amniotic membrane injection led to greater improvements in the VAS for pain and the Foot Functional Index between baseline and 3 months (see Table 11) compared to controls. VAS at 3 months had decreased to 17.1 in the AmnioFix group compared to 38.8 in the placebo control group, which would be considered a clinically significant difference.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Table 10. Summary of Key RCT Characteristics

| Study; Trial | Countries | Sites | Dates | Participants | Active Intervention | Comparator Intervention |
|---|---|---|---|---|---|---|
| Cazzell et al (2018)[23,];AIPF004 (NCT02427191) | U.S. | 14 | 2015-2018 | Adult patients with plantar fasciitis with VAS for pain > 45 | n=73; Single injection of AmnioFix 40 mg/ml | n = 72; Single injection of saline |

NCT02427191: Micronized dHACM Injection as Compared to the Saline Placebo Injection in the Treatment of Plantar Fasciitis; RCT: randomized controlled trial; VAS: visual analog score.

## Table 11. Summary of Key RCT Results

| Study | Change in VAS-Pain Between Baseline and 3 mo (95% CI) | Change in FFI-R Between Baseline and 3mo (95% CI) | Patients with Adverse Events up to 3 mo n(%) | Patients with Serious Adverse Events up to 3 mo n(%) |
|---|---|---|---|---|
| Cazzell et al (2018)[23,]; AIPF004 | N=145 | N=145 | N=145 | N=145 |
| AmnioFix | 54.1 (48.3 to 59.9) | 35.7 (30.5 to 41.0) | 30 (41.1%) | 1 (0.6%) |
| Placebo | 31.9 (24.8 to 39.1) | 22.2 (17.1 to 27.4) | 39 (54.2%) | 3 (1.8%) |
| Diff (95% CI) | 22.2 (13.1 to 31.3) | 13.5 (6.2 to 20.8) | | |
| p-Value | <.001 | <.001 | | |

CI: confidence interval; FFI-R: Foot Function Index; RCT: randomized controlled trial; VAS: visual analog score.

Limitations in relevance and design and conduct of this publication are described in Tables 12 and 13. The major limitation of the study is the short-term follow-up, which the authors note is continuing to 12 months. The extended follow-up will be reported in a separate publication.

## Table 12. Study Relevance Limitations

| Study | Population[a] | Intervention[b] | Comparator[c] | Outcomes[d] | Follow-Up[e] |
|---|---|---|---|---|---|
| Cazzell et al (2018)[23,]; AIPF004 | | | 3. Placebo injections were used. A control delivered at a similar intensity as the investigational treatment would be corticosteroid injections. | | 1, 2. Follow-up to 12 mo will be reported in a subsequent publication. |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.

a Population key: 1. Intended use population unclear; 2. Clinical context is unclear; 3. Study population is unclear; 4. Study population not representative of intended use.

b Intervention key: 1. Not clearly defined; 2. Version used unclear; 3. Delivery not similar intensity as comparator; 4. the intervention of interest.

c Comparator key: 1. Not clearly defined; 2. Not standard or optimal; 3. Delivery not similar intensity as intervention; 4. Not delivered effectively.

d Outcomes key: 1. Key health outcomes not addressed; 2. Physiologic measures, not validated surrogates; 3. No

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

File 13 pdf - Page 194 of 2526

CONSORT reporting of harms; 4. Not establish and validated measurements; 5. Clinically significant difference not prespecified; 6. Clinically significant difference not supported.
e Follow-Up key: 1. Not sufficient duration for benefit; 2. Not sufficient duration for harms.

## Table 13. Study Design and Conduct Limitations

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|-------|------------|----------|---------------------|-------------------|--------|-------------|
| Cazzell et al (2018)[23,]; AIPF004 | | 1. Single blinded trial, although outcomes were self-reported by blinded patients | | 1. Only the first 3 months of 12-month follow-up were reported. | | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
a Allocation key: 1. Participants not randomly allocated; 2. Allocation not concealed; 3. Allocation concealment unclear; 4. Inadequate control for selection bias.
b Blinding key: 1. Not blinded to treatment assignment; 2. Not blinded outcome assessment; 3. Outcome assessed by treating physician.
c Selective Reporting key: 1. Not registered; 2. Evidence of selective reporting; 3. Evidence of selective publication.
d Data Completeness key: 1. High loss to follow-up or missing data; 2. Inadequate handling of missing data; 3. High number of crossovers; 4. Inadequate handling of crossovers; 5. Inappropriate exclusions; 6. Not intent to treat analysis (per protocol for noninferiority trials).
e Power key: 1. Power calculations not reported; 2. Power not calculated for primary outcome; 3. Power not based on clinically important difference.
f Statistical key: 1. Analysis is not appropriate for outcome type: (a) continuous; (b) binary; (c) time to event; 2. Analysis is not appropriate for multiple observations per patient; 3. Confidence intervals and/or p values not reported; 4. Comparative treatment effects not calculated.

### Section Summary: Plantar Fasciitis
The evidence on injection of amniotic membrane for the treatment of plantar fasciitis includes preliminary studies and a larger (N =145) patient-blinded comparison of micronized injectable-HAM and placebo control. Injection of micronized amniotic membrane resulted in greater improvements in VAS for pain and the Foot Functional Index compared to placebo controls. The primary limitation of the study is this is an interim report of 3 months' results. The authors noted that 12-month follow-up will be reported in a subsequent publication. No additional publications have been identified as of the latest update.

### Human Amniotic Membrane for Ophthalmologic Conditions
Sutured and self-retained HAM has been evaluated for a variety of ophthalmologic conditions. Traditionally, the amniotic membrane has been fixed onto the eye with sutures or glue or placed under a bandage contact lens for a variety of ocular surface disorders. Several devices have been reported that use a ring around a HAM allograft that allows it to be inserted under topical anesthesia similar to insertion of a contact lens. Sutured HAM transplant has been used for many years for the treatment of ophthalmic conditions. Many of these conditions are rare, leading to difficulty in conducting RCTs. The rarity, severity, and variability of the ophthalmic condition was taken into consideration in evaluating the evidence. The following indications apply to both sutured and self-retained HAM unless specifically noted.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## NEUROTROPHIC KERATITIS WITH OCULAR SURFACE DAMAGE OR INFLAMMATION THAT DOES NOT RESPOND TO CONSERVATIVE TREATMENT

### Clinical Context and Therapy Purpose
The purpose of HAM in patients who have neurotrophic keratitis is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have neurotrophic keratitis?

The following PICO was used to select literature to inform this review.

### Populations
The relevant population of interest is patients who have neurotrophic keratitis with ocular surface damage or inflammation that does not respond to conservative treatment.

### Interventions
The therapy being considered is sutured or non-sutured HAM.

### Comparators
The following therapies are currently being used: tarsorrhaphy or bandage contact lens.

### Outcomes
The general outcomes of interest are eye pain and epithelial healing.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence
Khokhar et al (2005) reported on an RCT of 30 patients (30 eyes) with refractory neurotrophic corneal ulcers who were randomized to HAM transplantation (n=15) or conventional treatment with tarsorrhaphy or bandage contact lens. At the 3-month follow-up, 11 (73%) of 15 patients in the HAM group showed complete epithelialization compared with 10 (67%) of 15 patients in the conventional group. This difference was not significantly significant.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Suri et al (2013) reported on 11 eyes of 11 patients with neurotrophic keratopathy that had not responded to conventional treatment.[24,] The mean duration of treatment prior to ProKera insertion was 51 days. Five of the 11 patients (45.5%) were considered to have had a successful outcome.

**Section Summary: Neurotrophic Keratitis with Ocular Surface Damage and Inflammation that Does Not Respond to Conservative Therapy**
An RCT of 30 patients showed no benefit of sutured HAM graft compared to tarsorrhaphy or bandage contact lens.

**Corneal Ulcers and Melts That D o Not Respond to Initial Medical Therapy**
**Clinical Context and Therapy Purpose**
The purpose of HAM in patients who have corneal ulcers and melts is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net heath outcome in patients who have corneal ulcers and melts?

The following PICO was used to select literature to inform this review.

*Populations*
The relevant population of interest is patients who have corneal ulcers and melts that do not respond to initial medical therapy.

*Interventions*
The therapy being considered is sutured or non-sutured HAM.

*Comparators*
The following therapies are currently being used: tarsorrhaphy and bandage soft contact lens.

*Outcomes*
The general outcomes of interest are eye discomfort and epithelial healing.

Changes in symptoms may be measured in days, while changes in ocular surface would be measured at 1 to 3 months.

**Study Selection Criteria**
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Review of Evidence

Liu et al (2019) conducted a systematic review of 17 studies (390 eyes) of amniotic membrane for corneal ulcers.[25,] All but 1 of the studies was conducted outside of the U.S. There was 1 RCT with 30 patients, the remainder of the studies were prospective or retrospective case series. Corneal healing was obtained in 97% (95% CI: 0.94 to 0.99, p=.089) of patients evaluated. In the 12 studies (222 eyes) that reported on vision, the vision improvement rate was improved in 113 eyes (53%, 95% CI: 0.42 to 0.65, p<.001).

Yin et al (2020) compared epithelialization and visual outcomes of 24 patients with corneal infectious ulcers and visual acuity of less than 20/200 who were treated with (n=11) or without (n=13) self-retained amniotic membrane.[26,] Utilization of amniotic membrane was initiated in their institution in 2018, allowing a retrospective comparison of the 2 treatment groups. Complete epithelialization occurred more rapidly (3.56± 1.78 weeks vs. 5.87 ± 2.20 weeks, p=.01) and was reached in significantly more patients (72.7% vs. 23.1%, p=.04). The group treated with amniotic membrane plus the standard therapy had more patients with clinically significant (> 3 lines) improvement in visual acuity (81.8% vs 38.4%, p=.047) and greater total improvement in visual acuity (log MAR 0.7 ± 0.6 vs 1.6 ± 0.9, p=.016).

Suri et al (2013) reported on a series of 35 eyes of 33 patients who were treated with the self-retained ProKera HAM for a variety of ocular surface disorders.[24,] Nine of the eyes had non-healing corneal ulcers. Complete or partial success was seen in 2 of 9 (22%) patients with this indication.

### Section Summary: Corneal Ulcers and Melts That Do Not Respond to Initial Medical Therapy

Corneal ulcers and melts are uncommon and variable and additional RCTs are not expected. A systematic review of 1 RCT and case series showed healing in 97% of patients with an improvement of vision in 53% of eyes. One retrospective comparative study with 22 patients found more rapid and complete epithelialization and more patients with a clinically significant improvement in visual acuity following early treatment with self-retained amniotic membrane when compared to historical controls. These results support the use of non-sutured amniotic membrane for corneal ulcers and melts that do not respond to initial medical therapy.

## CORNEAL PERFORATION WHEN THERE IS ACTIVE INFLAMMATION AFTER CORNEAL TRANSPLANT REQUIRING ADJUNCTIVE TREATMENT

### Clinical Context and Therapy Purpose

The purpose of HAM in patients who have active inflammation after a corneal transplant is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have corneal perforation when there is active inflammation after corneal transplant?

The following PICO was used to select literature to inform this review.

### *Populations*

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The relevant population of interest is patients who have corneal perforation when there is active inflammation after a corneal transplant.

### Interventions
The therapy being considered is sutured or non-sutured HAM.

### Comparators
The following therapies are currently being used: medical therapy.

### Outcomes
The general outcomes of interest are eye discomfort and reduction in inflammation.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence
No evidence was identified for this indication.

### Section Summary: Corneal Perforation When There is Active Inflammation After Corneal Transplant Requiring Adjunctive Treatment

No evidence was identified for this indication.

### BULLOUS KERATOPATHY IN PATIENTS WHO ARE NOT CANDIDATES FOR A CURATIVE TREATMENT (EG, ENDOTHELIAL OR PENETRATING KERATOPLASTY)

### Clinical Context and Therapy Purpose
The purpose of HAM in patients who have bullous keratopathy is to provide a treatment option that is an alternative to or an improvement on existing therapies. Bullous keratopathy is characterized by stromal edema and epithelial and subepithelial bulla formation.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have bullous keratopathy and are not candidates for a curative treatment?

The following PICO was used to select literature to inform this review.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

### Populations
The relevant population of interest is patients who have bullous keratopathy who are not candidates for curative treatment.

### Interventions
The therapy being considered is sutured or non-sutured HAM.

### Comparators
The following therapies are currently being used: stromal puncture.

### Outcomes
The general outcomes of interest are eye discomfort and epithelial healing.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence
Dos Santos Paris et al (2013) published an RCT that compared fresh HAM with stromal puncture for the management of pain in patients with bullous keratopathy.[27,] Forty patients with pain from bullous keratopathy who were either waiting for a corneal transplant or had no potential for sight in the affected eye were randomized to the 2 treatments. Symptoms had been present for approximately 2 years. HAM resulted in a more regular epithelial surface at up to 180 days follow-up, but there was no difference between the treatments related to the presence of bullae or the severity or duration of pain. Because of the similar effects on pain, the authors recommended initial use of the simpler stromal puncture procedure, with use of HAM only if the pain did not resolve.

### Section Summary: Bullous Keratopathy in Patients Who are Not Candidates for a Curative Treatment and Who are Unable to Remain Still for Stromal Puncture
An RCT found no advantage of sutured HAM over the simpler stromal puncture procedure for the treatment of pain from bullous keratopathy.

### PARTIAL LIMBAL STEM CELL DEFICIENCY WITH EXTENSIVE DISEASED TISSUE WHERE SELECTIVE REMOVAL ALONE IS NOT SUFFICIENT

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Clinical Context and Therapy Purpose**
The purpose of HAM in patients who have partial limbal stem cell deficiency is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have partial limbal stem cell deficiency?

The following PICO was used to select literature to inform this review.

**Populations**
The relevant population of interest is patients who have limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient.

**Interventions**
The therapy being considered is sutured or non-sutured HAM.

**Comparators**
The following therapies are currently being used: limbal stem cell transplants.

**Outcomes**
The general outcomes of interest are visual acuity and corneal epithelial healing.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

**Study Selection Criteria**
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**
No RCTs were identified on HAM for limbal stem cell deficiency.

Keirkhah et al (2008) reported on the use of HAM in 11 eyes of 9 patients who had limbal stem cell deficiency.[28,] Patients underwent superficial keratectomy to remove the conjunctivalized pannus followed by HAM transplantation using fibrin glue. An additional ProKera patch was used in 7 patients. An improvement in visual acuity was observed in all but 2 patients. Pachigolla et al (2009) reported a series of 20 patients who received a ProKera implant for ocular surface disorders; 6 of the patients had limbal stem cell deficiency with a history of chemical burn.[29,] Following treatment with ProKera, 3 of the 6 patients had a smooth corneal surface and

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

improved vision to 20/40.[29,] The other 3 patients had final visual acuity of 20/400, counting fingers, or light perception.

**Section Summary: Partial Limbal Stem Cell Deficiency with Extensive Diseased Tissue Where Selective Removal Alone is Not Sufficient**
No RCTs were identified on HAM for partial limbal stem cell deficiency. Improvement in visual acuity has been reported for some patients who have received HAM in conjunction with removal of the diseased limbus.

## MODERATE OR SEVERE STEVENS-JOHNSON SYNDROME

**Clinical Context and Therapy Purpose**
The purpose of HAM in patients who have Stevens-Johnson syndrome is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have moderate or severe SJS?

The following PICO was used to select literature to inform this review.

*Populations*
The relevant population of interest is patients who have moderate or severe Stevens-Johnson syndrome.

*Interventions*
The therapy being considered is sutured or non-sutured HAM.

*Comparators*
The following therapies are currently being used: medical therapy alone (antibiotics, steroids, or lubricants).

*Outcomes*
The general outcomes of interest are visual acuity, tear function, and corneal clarity.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

**Study Selection Criteria**
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Review of Evidence**

One RCT from India by Sharma et al (2016) assigned 25 patients (50 eyes) with acute ocular Stevens-Johnson syndrome to c-HAM plus medical therapy (antibiotics, steroids, or lubricants) or medical therapy alone.[30,] The c-HAM was prepared locally and applied with fibrin glue rather than sutures. Application of c-HAM in the early stages of SJS resulted in improved visual acuity (p=.042), better tear breakup time (p=.015), improved Schirmer test results (p<.001), and less conjunctival congestion (p=.03). In the c-HAM group at 180 days, there were no cases of corneal haze, limbal stem cell deficiency, symblepharon, ankyloblepharon, or lid-related complications. These outcomes are dramatically better than those in the medical therapy alone group, which had 11 (44%) cases with corneal haze (p=.001), 6 (24%) cases of corneal vascularization and conjunctivalization (p=.03), and 6 (24%) cases of trichiasis and metaplastic lashes.

**Section Summary: Moderate or Severe Stevens-Johnson Syndrome**
The evidence on HAM for the treatment of SJ Syndrome includes 1 RCT with 25 patients (50 eyes) that found improved symptoms and function with HAM compared to medical therapy alone.

**PERSISTENT EPITHELIAL DEFECTS AND ULCERATIONS THAT DO NOT RESPOND TO CONSERVATIVE THERAPY**

**Clinical Context and Therapy Purpose**
The purpose of HAM in patients who have persistent epithelial defects and ulcerations is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have persistent epithelial defects and ulcerations that do not respond to conservative therapy?

The following PICO was used to select literature to inform this review.

*Populations*
The relevant population of interest is patients who have persistent epithelial defects that do not respond to conservative therapy.

*Interventions*
The therapy being considered is sutured or non-sutured HAM.

*Comparators*
The following therapies are currently being used for persistent epithelial defects and ulceration: medical therapy alone (e.g., topical lubricants, topical antibiotics, therapeutic contact lens, or patching).

*Outcomes*
The general outcomes of interest are epithelial closure.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Study Selection Criteria**

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**

Bouchard and John (2004) reviewed the use of amniotic membrane transplantation in the management of severe ocular surface disease.[31,] They noted that c-HAM has been available since 1995, and has become an established treatment for persistent epithelial defects and ulceration refractory to conventional therapy. However, there was a lack of controlled studies due to the rarity of the diseases and the absence of standard therapy. They identified 661 reported cases in the peer-reviewed literature. Most cases reported assessed the conjunctival indications of pterygium, scars and symblepharon, and corneal indications of acute chemical injury and postinfectious keratitis.

**Section Summary: Persistent Epithelial Defects and Ulceration that Do Not Respond to Conservative Therapy**

No RCTs were identified on persistent epithelial defects and ulceration.

**SEVERE DRY EYE DISEASE WITH OCULAR SURFACE DAMAGE AND INFLAMMATION THAT DOES NOT RESPOND TO CONSERVATIVE THERAPY**

**Clinical Context and Therapy Purpose**

The purpose of HAM in patients who have severe dry eye is to provide a treatment option that is an alternative to or an improvement on existing therapies. Dry eye disease involves tear film insufficiency with the involvement of the corneal epithelium. Inflammation is common in dry eye disease, which causes additional damage to the corneal epithelium.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have severe dry eye with ocular surface damage and inflammation?

The following PICO was used to select literature to inform this review.

*Populations*

The relevant population of interest is patients who have severe dry eye with ocular surface damage and inflammation.

*Interventions*

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The therapy being considered is sutured or non-sutured HAM.

## Comparators
The following therapies are currently being used: medical management consisting of artificial tears, cyclosporine A, serum tears, antibiotics, steroids, and nonsteroidal anti-inflammatory medications.

## Outcomes
The general outcomes of interest are the pain, corneal surface regularity, and vision, which may be measured by the Report of the International Dry Eye WorkShop score (DEWS). The DEWS assess 9 domains with a score of 1 to 4 including discomfort, visual symptoms, tear breakup time, corneal signs and corneal staining. Corneal staining with fluorescein or Rose Bengal indicates damaged cell membranes or gaps in the epithelial cell surface. A DEWS of 2 to 4 indicates moderate-to-severe dry eye disease.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

## Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

## Review of Evidence
John et al (2017) reported on an RCT with 20 patients with moderate-to-severe dry eye disease who were treated with Prokera c-HAM or maximal conventional treatment.[32,] The c-HAM was applied for an average of 3.4 days (range, 3-5 days), while the control group continued treatment with artificial tears, cyclosporine A, serum tears, antibiotics, steroids, and nonsteroidal anti-inflammatory medications. The primary outcome was an increase in corneal nerve density. Signs and symptoms of dry eye disease improved at both 1-month and 3-month follow-ups in the c-HAM group but not in the conventional treatment group. For example, pain scores decreased from 7.1 at baseline to 2.2 at 1 month and 1.0 at 3 months in the c-HAM group. In vivo confocal microscopy, reviewed by masked readers, showed a significant increase in corneal nerve density in the study group at 3 months, with no change in nerve density in the controls. Corneal sensitivity was similarly increased in the c-HAM group but not in controls.

The treatment outcomes in the Dry Eye Amniotic Membrane (DREAM) study (McDonald et al [2018]) was a retrospective series of 84 patients (97 eyes) with severe dry eye despite maximal medical therapy who were treated with Prokera self-retained c-HAM.[33,] A majority of patients (86%) had superficial punctate keratitis. Other patients had filamentary keratitis (13%), exposure keratitis (19%), neurotrophic keratitis (2%), and corneal epithelial defect (7%). Treatment with

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Prokera for a mean of 5.4 days (range, 2 to 11) resulted in an improved ocular surface and reduction in the DEWS score from 3.25 at baseline to 1.44 at 1 week, 1.45 at 1 month and 1.47 at 3 months (p=.001). Ten percent of eyes required repeated treatment. There was no significant difference in the number of topical medications following c-HAM treatment.

### Section Summary: Severe Dry Eye with Ocular Surface Damage and Inflammation that Does Not Respond to Conservative Therapy

The evidence on HAM for severe dry eye with ocular surface damage and inflammation includes an RCT with 20 patients and a retrospective series of 84 patients (97 eyes). Placement of self-retained HAM for 2 to 11 days reduced symptoms and restored a smooth corneal surface and corneal nerve density for as long as 3 months.

## MODERATE OR SEVERE ACUTE OCULAR CHEMICAL BURNS

### Clinical Context and Therapy Purpose

The purpose of HAM in patients who have acute ocular burns is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have moderate or severe acute ocular chemical burns?

The following PICO was used to select literature to inform this review.

### Populations

The relevant population of interest is patients who have moderate or severe acute ocular chemical burn.

### Interventions

The therapy being considered is sutured or non-sutured HAM.

### Comparators

The following therapies are currently being used: medical therapy (e.g., topical antibiotics, lubricants, steroids and cycloplegics, oral vitamin C, doxycycline).

### Outcomes

The general outcomes of interest are visual acuity, corneal epithelialization, corneal clarity, and corneal vascularization.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**
An RCT of 100 patients with chemical or thermal ocular burns was published by Tandon et al (2011).[34,] Half of the patients (n=50) had moderate ocular burns and the remainder (n=50) had severe ocular burns. All but 8 of the patients had alkali or acid burns. Patients were randomized to HAM transplantation plus medical therapy or medical therapy alone. Epithelial healing, which was the primary outcome, was improved in the group treated with HAM, but there was no significant difference between the 2 groups for final visual outcome, symblepharon formation, corneal clarity or vascularization.

A second RCT that compared amniotic membrane plus medical therapy (30 eyes) to medical therapy alone (30 eyes) for grade IV ocular burn was reported by Eslani et al (2018).[35,] Medical therapy at this tertiary referral hospital included topical preservative-free lubricating gel and drops, chloramphenicol, betamethasone, homatropine, oral vitamin C, and doxycycline. There was no significant difference in the time to epithelial healing (amniotic membrane: 75.8 vs. 72.6 days) or in visual acuity between the 2 groups (2.06 logMAR for both groups). There was a trend for a decrease in corneal neovascularization (p=.108); the study was not powered for this outcome.

A third RCT by Tamhane et al (2005) found no difference between amniotic membrane and medical therapy groups in an RCT of 37 patients with severe ocular burns.[36,]

**Section Summary: Moderate or Severe Acute Ocular Chemical Burns**
Evidence includes 3 RCTs with a total of 197 patients with acute ocular chemical burns who were treated with HAM transplantation plus medical therapy or medical therapy alone. Patients in the HAM group had a faster rate of epithelial healing in 1 of the 3 trials, without a significant benefit for other outcomes. The other 2 trials did not find an increase in the rate of epithelial healing in patients with severe burns.

**CORNEAL PERFORATION WHEN CORNEAL TISSUE IS NOT IMMEDIATELY AVAILABLE**

**Clinical Context and Therapy Purpose**
The purpose of HAM in patients who have corneal perforation when corneal tissue is not immediately available is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured HAM improve the net health outcome in patients who have corneal perforation?

The following PICO was used to select literature to inform this review.

*Populations*

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The relevant population of interest is patients who have corneal perforation when corneal tissue is not immediately available.

### Interventions
The therapy being considered is sutured HAM.

### Comparators
The following therapies are currently being used: conservative management.

### Outcomes
The general outcomes of interest are eye pain.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence
No RCTs were identified on corneal perforation.

### Section Summary: Corneal Perforation When Corneal Tissue is Not Immediately Available
The standard treatment for corneal perforation is corneal transplantation, however, sutured HAM may be used as a temporary covering for this severe defect when corneal tissue is not immediately available.

### FOLLOWING PTERYGIUM REPAIR WHEN THERE IS INSUFFICIENT HEALTHY TISSUE TO CREATE A CONJUNCTIVAL AUTOGRAFT

### Clinical Context and Therapy Purpose
The purpose of HAM in patients who have pterygium repair is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or glued HAM improve the net health outcome in patients who have pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft (e.g., extensive, double, or recurrent pterygium)?

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The following PICO was used to select literature to inform this review.

**Populations**
The relevant population of interest is patients who have pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft.

**Interventions**
The therapy being considered is sutured or glued HAM.

**Comparators**
The following therapies are currently being used: conjunctival autograft.

**Outcomes**
The general outcomes of interest are a recurrence of pterygium.

Pterygium recurrence would be measured at 1 to 3 months.

## Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

## Review of Evidence
RCTs have been reported on the use of amniotic membrane following pterygium repair. In 2013, the American Academy of Ophthalmology published a technology assessment on options and adjuvants for pterygium surgery.[37,] Reviewers identified 4 RCTs comparing conjunctival or limbal autograft procedure with amniotic membrane graft, finding that conjunctival or limbal autograft was more effective than HAM graft in reducing the rate of pterygium recurrence. A 2016 Cochrane review of 20 RCTs (total N=1866 patients) arrived at the same conclusion.[38,]

## Section Summary: Following Pterygium Repair When There is Insufficient Healthy Tissue to Create a Conjunctival Autograft
Systematic reviews of RCTs have been published that found that conjunctival or limbal autograft is more effective than HAM graft in reducing the rate of pterygium recurrence.

## REPAIR FOLLOWING MOHS MICROSCOPIC SURGERY

## Clinical Context and Therapy Purpose
The purpose of repair with human amniotic membrane in patients who have undergone Mohs microsurgery for skin cancer is to provide a treatment option that is an alternative to or an improvement on existing procedures.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The question addressed in this evidence review is: Does amniotic membrane improve the net health outcome in patients requiring repair following Mohs microsurgery?

The following PICO was used to select literature to inform this review.

### Populations
The relevant population of interest is patients who require reconstruction following Mohs microsurgery for skin cancer on the head, neck, face, or dorsal hand.

### Interventions
The therapy being considered is repair following Mohs microsurgery with human amniotic membrane. It is proposed as a nonsurgical alternative to cutaneous repair in cosmetically sensitive areas such as the head, neck, face, or dorsal hand.

### Comparators
Comparators of interest include surgical repair using autologous tissue (e.g., local flaps and full-thickness skin grafts) and healing without surgery. Second intention healing (i.e., the wound is left open to heal by granulation, contraction, and epithelialization) is a nonsurgical option for certain defects.

### Outcomes
The primary endpoints of interest for trials of wound closure are as follows, consistent with guidance from the U.S. Food and Drug Administration (FDA) for the industry in developing products for the treatment of chronic cutaneous ulcer and burn wounds:
- Incidence of complete wound closure.
- Time to complete wound closure (reflecting accelerated wound closure).
- Incidence of complete wound closure following surgical wound closure.
- Pain control.
- Complete ulcer healing with advanced wound therapies may be measured at 6 to 12 weeks.

In trials comparing human amniotic membrane to surgical repair in patients post-Mohs microscopic surgery, other important outcomes are post-procedure morbidity and mortality, surgical complications, development of a non-healing wound, and quality of life.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Review of Evidence**
No RCTs were identified for this indication.

**Nonrandomized Studies**
Toman et al (2022) conducted an observational study that compared repair using a dehydrated human amnion/chorion membrane product (Epifix) with surgical repair using autologous tissue in patients who underwent same-day repair following Mohs microsurgery for removal of skin cancer on the face, head, or neck (Table 14).[39,] Propensity-score matching using retrospective data from medical records was used to identify 143 matched pairs. The primary endpoint was the incidence of postoperative morbidity, including the rate of infection, bleeding/hematoma, dehiscence, surgical reintervention, or development of a nonhealing wound. Postoperative cosmetic outcomes were assessed at 9 months or later and included documentation of suboptimal scarring, scar revision treatment, and patient satisfaction.

Results are summarized in Table 15, and study limitations in Tables 16 and 17. A greater proportion of patients who received dHACM repair experienced zero complications (97.9% vs. 71.3%; p<.0001; relative risk 13.67; 95% CI 4.33 to 43.12). Placental allograft reconstructions developed less infection (p=.004) and were less likely to experience poor scar cosmesis (P <.0001). Confidence in these findings is limited, however, by the study's retrospective design and potential for bias due to missing data. Additionally, the study's relevance is limited due to a lack of diversity in the study population and no comparison to non-surgical treatment options.

**Table 14. Nonrandomized Study of Dehydrated Human Amnion/Chorion Membrane for Repair Following Mohs Microsurgery - Characteristics**

| Study | Study Type | Country | Dates | Participants | Repair using dHACM | Repair using autologous tissue | Follow-Up |
|---|---|---|---|---|---|---|---|
| Toman et al (2022)[39,] | Retrospective, observational<br><br>Propensity-score matching used to identify matched pairs | US | 2014-2018 | Patients who underwent Mohs microsurgery for removal of a basal or squamous cell carcinoma and required same day repair for moderate- to high-risk defects on the face, head, and neck.<br><br>Mean age 78.0 years; 76.9% male 100% white | n = 143 | n = 143 | Unclear; 9 months or later for postoperative cosmetic outcomes. |

dHACM: dehydrated human amnionic/chorionic membrane.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 15. Nonrandomized Study of Dehydrated Human Amnion/Chorion Membrane for Repair Following Mohs Microsurgery- Results**

| Study | dHACM repair n = 143 | Autogolous tissue Repair n = 143 | P |
|---|---|---|---|
| Toman et al (2022)[39,] | | | |
| Experienced no complications, n (%) | 140 (97.9) | 102 (71.3) | <.0001 |
| Infection, n (%) | 3 (2.0) | 15 (10.0) | .004 |
| Bleeding or hematoma, n (%) | 0 (0.0) | 7 (5.0) | .015 |
| Wound dehiscence, n (%) | 0 (0.0) | 4 (3.0) | .122 |
| Surgical reintervention, n (%) | 0 (0.0) | 11 (8.0) | .0007 |
| Nonhealing wound, n (%) | 0 (0.0) | 5 (3.5) | .060 |
| Poor scar cosmesis, n (%) | 0 (0.0) | 21 (15.0) | <.0001 |
| Scar revision, n (%) | 0 (0.0) | 14 (9.8) | <.0001 |
| Follow-up visits, mean (SD) | 3.4 (1.6) | 2.5 (1.1) | <.0001 |
| Days to discharge, mean (SD) | 30.7 (16.9) | 30.3 (22.9) | .840 |

SD: standard deviation; dHACM: dehydrated human amnionic/chorionic membrane.

**Table 16. Study Relevance Limitations**

| Study | Population[a] | Intervention[b] | Comparator[c] | Outcomes[d] | Duration of Follow-up[e] |
|---|---|---|---|---|---|
| Toman et al (2022)[39,] | 4. Study participants were 100% white, over two-thirds male | | 2. No comparison to non-surgical options (e.g., second intention healing) | 1. Not all outcomes mentioned in methods had results reported (e.g., patient satisfaction with scar appearance) | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
[a] Population key: 1. Intended use population unclear; 2. Study population is unclear; 3. Study population not representative of intended use; 4, Enrolled populations do not reflect relevant diversity; 5. Other.
[b] Intervention key: 1. Not clearly defined; 2. Version used unclear; 3. Delivery not similar intensity as comparator; 4. Not the intervention of interest (e.g., proposed as an adjunct but not tested as such); 5. Other.
[c] Comparator key: 1. Not clearly defined; 2. Not standard or optimal; 3. Delivery not similar intensity as intervention; 4. Not delivered effectively; 5. Other.
[d] Outcomes key: 1. Key health outcomes not addressed; 2. Physiologic measures, not validated surrogates; 3. Incomplete reporting of harms; 4. Not establish and validated measurements; 5. Clinically significant difference not prespecified; 6. Clinically significant difference not supported; 7. Other.
[e] Follow-Up key: 1. Not sufficient duration for benefit; 2. Not sufficient duration for harms; 3. Other.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 17. Study Design and Conduct Limitations**

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|-------|---------------|-------------|------------------------|----------------------|----------|----------------|
| Toman et al (2022)[39,] | 1. Not randomized | 1, 2. Not blinded | | 7. Data extracted from medical records could be incomplete/ inaccurate; 10 of 153 patients excluded because no match identified | | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.

[a] Allocation key: 1. Participants not randomly allocated; 2. Allocation not concealed; 3. Allocation concealment unclear; 4. Inadequate control for selection bias; 5. Other.

[b] Blinding key: 1. Participants or study staff not blinded; 2. Outcome assessors not blinded; 3. Outcome assessed by treating physician; 4. Other.

[c] Selective Reporting key: 1. Not registered; 2. Evidence of selective reporting; 3. Evidence of selective publication; 4. Other.

[d] Data Completeness key: 1. High loss to follow-up or missing data; 2. Inadequate handling of missing data; 3. High number of crossovers; 4. Inadequate handling of crossovers; 5. Inappropriate exclusions; 6. Not intent to treat analysis (per protocol for noninferiority trials); 7. Other.

[e] Power key: 1. Power calculations not reported; 2. Power not calculated for primary outcome; 3. Power not based on clinically important difference; 4. Other.

[f] Statistical key: 1. Analysis is not appropriate for outcome type: (a) continuous; (b) binary; (c) time to event; 2. Analysis is not appropriate for multiple observations per patient; 3. Confidence intervals and/or p values not reported; 4. Comparative treatment effects not calculated; 5. Other.

**Section Summary: Repair Following Mohs Microscopic Surgery**

A retrospective observational study found a higher complication-free rate in 143 propensity score-matched pairs of patients who had received autologous tissue or dHACM repair following Mohs microsurgery for skin cancer on the face, head, or neck. This study was limited by its retrospective design. Additional evidence from well-designed and conducted prospective studies is needed.

**SUMMARY OF EVIDENCE**

**Diabetic Lower-Extremity Ulcers**

For individuals who have non-healing diabetic lower-extremity ulcers who receive a patch or flowable formulation of HAM or placental membrane (i.e., Affinity, AmnioBand Membrane, AmnioExcel, Biovance, EpiCord, EpiFix, Grafix), the evidence includes randomized controlled trials (RCTs). Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. The RCTs evaluating amniotic and placental membrane products for the treatment of non-healing (<20% healing with ≥2 weeks of standard care) diabetic lower-extremity ulcers have compared HAM with standard care or with an established advanced wound care product. These trials used wound closure as the primary outcome measure, and some used power analysis, blinded assessment of wound healing, and intention-to-treat analysis. For the HAM products that have been sufficiently evaluated (i.e., Affinity, AmnioBand Membrane, Biovance, EpiCord, EpiFix,

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Grafix), results have shown improved outcomes compared with standard care, and outcomes that are at least as good as an established advanced wound care product. Improved health outcomes in the RCTs are supported by multicenter registries. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

## Lower-Extremity Ulcers due to Venous Insufficiency

For individuals who have lower-extremity ulcers due to venous insufficiency who receive a patch or flowable formulation of HAM, the evidence includes 2 RCTs. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. The published evidence on HAM for the treatment of venous leg ulcers includes 2 multicenter RCTs with EpiFix. One RCT reported a larger percent wound closure at 4 weeks, but the percentage of patients with complete wound closure at 4 weeks did not differ between EpiFix and the standard of care. A second RCT evaluated complete wound closure at 12 weeks after weekly application of EpiFix or standard dressings with compression, but interpretation is limited by methodologic concerns. Two additional studies with other HAM products have been completed but not published, raising further questions about the efficacy of HAM for venous insufficiency ulcers. Therefore, corroboration with well-designed and well-conducted RCTs evaluating wound healing is needed to demonstrate efficacy for this indication. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

## Osteoarthritis

For individuals who have knee osteoarthritis who receive an injection of suspension or particulate formulation of HAM or amniotic fluid, the evidence includes a feasibility study. Relevant outcomes are symptoms, functional outcomes, quality of life, and treatment-related morbidity. The pilot study assessed the feasibility of a larger RCT evaluating HAM injection. Additional trials, which will have a larger sample size and longer follow-up, are needed to permit conclusions on the effect of this treatment. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

## Plantar Fasciitis

The evidence on injection of amniotic membrane for the treatment of plantar fasciitis includes preliminary studies and a larger (N =145) patient-blinded comparison of micronized injectable-HAM and placebo control. Injection of micronized amniotic membrane resulted in greater improvements in the visual analog score for pain and the Foot Functional Index compared to placebo controls. The primary limitation of the study is that this is an interim report with 12-month results pending. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

## Ophthalmic Conditions

Sutured HAM transplant has been used for many years for the treatment of ophthalmic conditions. Many of these conditions are rare, leading to difficulty in conducting RCTs. The rarity, severity, and variability of the ophthalmic condition was taken into consideration in evaluating the evidence.

## Neurotrophic Keratitis with Ocular Surface Damage and Inflammation That Does Not Respond to Conservative Therapy

For individuals who have neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative therapy who receive HAM, the evidence includes an RCT.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. An RCT of 30 patients showed no benefit of sutured HAM graft compared to tarsorrhaphy or bandage contact lens. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

### Corneal Ulcers and Melts That Do Not Respond to Initial Medical Therapy

For individuals who have corneal ulcers and melts, that do not respond to initial medical therapy who receive HAM, the evidence includes a systematic review of primarily case series and a non-randomized comparative study. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. Corneal ulcers and melts are uncommon and variable and additional RCTs are not expected. The systematic review showed healing in 97% of patients with an improvement of vision in 53% of eyes. One retrospective comparative study with 22 patients found more rapid and complete epithelialization and more patients with a clinically significant improvement in visual acuity following early treatment with self-retained amniotic membrane when compared to historical controls. Corneal ulcers and melts are uncommon and variable and RCTs are not expected. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

### Corneal Perforation When There is Active Inflammation After Corneal Transplant Requiring Adjunctive Treatment

For individuals who have corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment who receive HAM, the evidence is limited. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. No comparative evidence was identified for this indication. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

### Bullous Keratopathy as a Palliative Measure in Patients Who are Not Candidates for a Curative Treatment (e.g., Endothelial or Penetrating Keratoplasty)

For individuals who have bullous keratopathy and who are not candidates for curative treatment (e.g., endothelial or penetrating keratoplasty) who receive HAM, the evidence includes an RCT. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. An RCT found no advantage of sutured HAM over the simpler stromal puncture procedure for the treatment of pain from bullous keratopathy. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

### Partial Limbal Stem Cell Deficiency with Extensive Diseased Tissue Where Selective Removal Alone is Not Sufficient

For individuals who have partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient who receive HAM, the evidence is limited. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. No comparative trials were identified on HAM for limbal stem cell deficiency. Improvement in visual acuity has been reported for some patients who have received HAM in conjunction with removal of the diseased limbus. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

### Moderate or Severe Stevens-Johnson Syndrome

For individuals who have moderate or severe Stevens-Johnson syndrome who receive HAM, the evidence includes an RCT. Relevant outcomes are symptoms, morbid events, functional

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

outcomes, and quality of life. The evidence on HAM for the treatment of Stevens-Johnson syndrome (includes 1 RCT with 25 patients [ 50 eyes]) found improved symptoms and function with HAM compared to medical therapy alone. Large RCTs are unlikely due to the severity and rarity of the disease. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

## Persistent Epithelial Defects and Ulceration That Do Not Respond to Conservative Therapy

For individuals who have persistent epithelial defects that do not respond to conservative therapy who receive HAM, the evidence is limited. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. No comparative trials were identified on persistent epithelial defects and ulceration. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

## Severe Dry Eye with Ocular Surface Damage and Inflammation That Does Not Respond to Conservative Therapy

For individuals who have severe dry eye with ocular surface damage and inflammation that does not respond to conservative therapy, who receive HAM, the evidence includes an RCT and a large case series. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. The evidence on HAM for severe dry eye with ocular surface damage and inflammation includes an RCT with 20 patients and a retrospective series of 84 patients (97 eyes). Placement of self-retained HAM for 2 to 11 days reduced symptoms and restored a smooth corneal surface and corneal nerve density for as long as 3 months. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

## Moderate or Severe Acute Ocular Chemical Burns

For individuals who have moderate or severe acute ocular chemical burn who receive HAM, the evidence includes 3 RCTs. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. Evidence includes a total of 197 patients with acute ocular chemical burns who were treated with HAM transplantation plus medical therapy or medical therapy alone. Two of the 3 RCTs did not show a faster rate of epithelial healing, and there was no significant benefit for other outcomes. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

## Corneal Perforation When Corneal Tissue is Not Immediately Available

For individuals who have corneal perforation when corneal tissue is not immediately available who receive sutured HAM, the evidence is limited. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. The standard treatment for corneal perforation is corneal transplantation, however, HAM may provide temporary coverage of the severe defect when corneal tissue is not immediately available. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

## Pterygium Repair When There is Insufficient Healthy Tissue to Create a Conjunctival Autograft

For individuals who have pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft who receive HAM, the evidence includes RCTs and systematic reviews of RCTs. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. Systematic reviews of RCTs have been published that found that conjunctival or limbal autograft

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

is more effective than HAM graft in reducing the rate of pterygium recurrence. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Repair Following Mohs Micrographic Surgery**
For individuals who have undergone Mohs micrographic surgery for skin cancer on the face, head, neck, or dorsal hand who receive human amniotic/chorionic membrane, the evidence includes a nonrandomized, comparative study and no RCTs. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. A retrospective analysis using data from medical records compared a dehydrated human amnionic/chorionic membrane product (dHACM, Epifix) to repair using autologous surgery in 143 propensity-score matched pairs of patients requiring same-day reconstruction after Mohs microsurgery for skin cancer on the head, face, or neck. A greater proportion of patients who received dHACM repair experienced zero complications (97.9% vs. 71.3%; p<.0001; relative risk 13.67; 95% CI 4.33 to 43.12). Placental allograft reconstructions developed less infection (p=.004) and were less likely to experience poor scar cosmesis (p<.0001). This study is limited by its retrospective observational design. Well-designed and conducted prospective studies are lacking. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**SUPPLEMENTAL INFORMATION**
The purpose of the following information is to provide reference material. Inclusion does not imply endorsement or alignment with the evidence review conclusions.

**Clinical Input From Physician Specialty Societies and Academic Medical Centers**
While the various physician specialty societies and academic medical centers may collaborate with and make recommendations during this process, through the provision of appropriate reviewers, input received does not represent an endorsement or position statement by the physician specialty societies or academic medical centers, unless otherwise noted.

**2019 Input**
Clinical input was sought to help determine whether the use of human amniotic membrane graft either without or with suture fixation for several ophthalmic conditions would provide a clinically meaningful improvement in net health outcome and whether the use is consistent with generally accepted medical practice. In response to requests, clinical input was received from 2 respondents, including 1 specialty society-level response and 1 physician-level response identified through specialty societies including physicians with academic medical center affiliations.

Clinical input supported the use of amniotic membrane in individuals with the following indications:
- Neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative therapy. Non-sutured HAM in an office setting would be preferred to avoid a delay in treatment associated with scheduling a surgical treatment.
- Corneal ulcers and melts that do not respond to initial medical therapy. Non-sutured HAM in an office setting would be preferred to avoid a delay in treatment associated with scheduling a surgical treatment.
- Corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

- Bullous keratopathy and who are not candidates for curative treatment (e.g., endothelial or penetrating keratoplasty) as an alternative to stromal puncture.
- Partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient.
- Persistent epithelial defects and ulcerations that do not respond to conservative therapy.
- Severe dry eye with ocular surface damage and inflammation that does not respond to conservative therapy.
- Moderate or severe acute ocular chemical burn.
- Corneal perforation when corneal tissue is not immediately available.
- Pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft.

Further details from clinical input are included in the Appendix.

## Practice Guidelines and Position Statements
Guidelines or position statements will be considered for inclusion in 'Supplemental Information' if they were issued by, or jointly by, a US professional society, an international society with US representation, or National Institute for Health and Care Excellence (NICE). Priority will be given to guidelines that are informed by a systematic review, include strength of evidence ratings, and include a description of management of conflict of interest.

## Society for Vascular Surgery et al.
In 2016, the Society for Vascular Surgery in collaboration with the American Podiatric Medical Association and the Society for Vascular Medicine made the following recommendation: "For DFUs [diabetic foot ulcers] that fail to demonstrate improvement (>50% wound area reduction) after a minimum of 4 weeks of standard wound therapy, we recommend adjunctive wound therapy options. These include negative pressure therapy, biologics (platelet-derived growth factor [PDGF], living cellular therapy, extracellular matrix products, amnionic membrane products), and hyperbaric oxygen therapy. Choice of adjuvant therapy is based on clinical findings, availability of therapy, and cost-effectiveness; there is no recommendation on ordering of therapy choice."[40,]

## Tear Film and Ocular Surface Society
In 2017, the Tear Film and Ocular Surface Society published the Dry Eye Workshop II (DEWS) management and therapy report.[23,] The report evaluated the evidence on treatments for dry eye and provided the following treatment algorithm for dry eye disease management:

Step 1:
- Education regarding the condition, its management, treatment, and prognosis
- Modification of local environment
- Education regarding potential dietary modifications (including oral essential fatty acid supplementation)
- Identification and potential modification/elimination of offending systemic and topical medications
- Ocular lubricants of various types (if meibomian gland dysfunction is present, then consider lipid containing supplements)
- Lid hygiene and warm compresses of various types

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Step 2:
If above options are inadequate consider:

- Non-preserved ocular lubricants to minimize preservative-induced toxicity
- Tea tree oil treatment for Demodex (if present)
- Tear conservation
- Punctal occlusion
- Moisture chamber spectacles/goggles
- Overnight treatments (such as ointment or moisture chamber devices)
- In-office, physical heating and expression of the meibomian glands
- In-office intense pulsed light therapy for meibomian gland dysfunction
- Prescription drugs to manage dry eye disease
- Topical antibiotic or antibiotic/steroid combination applied to the lid margins for anterior blepharitis (if present)
- Topical corticosteroid (limited-duration)
- Topical secretagogues
- Topical non-glucocorticoid immunomodulatory drugs (such as cyclosporine)
- Topical LFA-1 antagonist drugs (such as lifitegrast)
- Oral macrolide or tetracycline antibiotics

Step 3:
If above options are inadequate consider:

- Oral secretagogues
- Autologous/allogeneic serum eye drops
- Therapeutic contact lens options
- Soft bandage lenses
- Rigid scleral lenses

Step 4:
If above options are inadequate consider:

- Topical corticosteroid for longer duration
- Amniotic membrane grafts
- Surgical punctal occlusion
- Other surgical approaches (e.g. tarsorrhaphy, salivary gland transplantation)

**Wound Healing Society**
In 2016, the Wound Healing Society updated their guidelines on diabetic foot ulcer treatment.[41,] The Society concluded that there was level 1 evidence that cellular and acellular skin equivalents improve diabetic foot ulcer healing, noting that, "healthy living skin cells assist in healing DFUs [diabetic foot ulcers] by releasing therapeutic amounts of growth factors, cytokines, and other proteins that stimulate the wound bed." References from 2 randomized controlled trials on amniotic membrane were included with references on living and acellular bioengineered skin substitutes.

**U.S. Preventive Services Task Force Recommendations**
Not applicable.

**Ongoing and Unpublished Clinical Trials**
Some currently unpublished trials that might influence this review are listed in Table 18.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Table 18. Summary of Key Trials

| NCT No. | Trial Name | Planned Enrollment | Completion Date |
|---|---|---|---|
| **Ongoing** | | | |
| NCT04457752[a] | A Randomized Controlled Multicentre Clinical Trial, Evaluating the Efficacy of Dual Layer Amniotic Membrane (Artacent®) and Standard of Care Versus Standard of Care Alone in the Healing of Chronic Diabetic Foot Ulcers | 124 | Dec 2022 |
| NCT03390920[a] | Evaluation of Outcomes With Amniotic Fluid for Musculoskeletal Conditions | 200 | Jun 2030 |
| NCT04612023 | A Prospective, Double-Blinded, Randomized Controlled Trial of an Amniotic Membrane Allograft Injection Comparing Two Doses (1 mL and 2 mL Injection) and a Placebo (Sterile Saline) in the Treatment of Osteoarthritis of the Knee | 90 | Jul 2022 |
| NCT04553432[a] | Dry Eye OmniLenz Application of Omnigen Research Study | 70 | Jul 2022 |
| NCT04599673 | Prospective Analysis of Intraoperative AMNIOGEN® Injection in Patients With Rotator Cuff Tear | 100 | Sep 2022 |
| NCT04636229[a] | A Phase 3 Prospective, Multicenter, Double-blind, Randomized, Placebo-controlled Study to Evaluate the Efficacy of Amniotic Suspension Allograft (ASA) in Patients With Osteoarthritis of the Knee | 474 | Dec 2023 |
| NCT03864939 | Randomized Pilot Study to Improve Postprostatectomy Incontinence and Potency by Application of Dried Human Amnion Graft | 328 | Apr 2025 |
| NCT03855514[a] | A Prospective, Multicenter, Randomized, Controlled Clinical Study Of NuShield® and Standard of Care (SOC) Compared to SOC Alone For The Management Of Diabetic Foot Ulcers | 200 | Dec 2021 |
| **Unpublished** | | | |
| NCT02609594[a] | A Multi-center Randomized Controlled Clinical Trial Evaluating Two Application Regimens of Amnioband Human Amniotic Membrane and Standard of Care vs. Standard of Care Alone in the Treatment of Venous Leg Ulcers | 240 | Dec 2018 (status unknown) |
| NCT02838784[a] | The Efficacy and Safety of Artacent™ for Treatment Resistant Lower Extremity Venous and Diabetic Ulcers: A Prospective Randomized Study | 134 | Dec 2018 (status unknown) |
| NCT03441607[a] | Safety & Efficacy of Micronized Human Amnion Chorion Membrane Biologic (mHACMb) FloGraft (Micronized Human Amnion Chorion Membrane)® in Adults With Pain Due to Osteoarthritis of the Knee | 320 | Mar 2019 (status unknown) |
| NCT02318511[a] | An Investigation of ReNu™ Knee Injection: Monitoring the Response of Knee Function and Pain in Patients With Osteoarthritis | 200 | Feb 2019 (completed) |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| NCT No. | Trial Name | Planned Enrollment | Completion Date |
|---|---|---|---|
| NCT03379324[a] | A Prospective, Randomized Study Comparing Outcomes Following Arthroscopic Double-row Rotator Cuff Repair With and Without the Addition of a Cryopreserved, Liquid, Injectable Amnion Allograft | 260 | Sep 2019 (status unknown) |
| NCT03414268[a] | A Phase 3, Prospective, Double-Blinded, Randomized Controlled Trial of the Micronized dHACM Injection As Compared To Saline Placebo Injection In The Treatment Of Plantar Fasciitis | 276 | Apr 2021 (active, not recruiting) |
| NCT02982226[a] | A Comparative Study of Injectable Human Amniotic Allograft (ReNu™) Versus Corticosteroids for Plantar Fasciitis: A Prospective, Randomized, Blinded Study | 150 | Apr 2021 (active, not recruiting) |
| NCT03414255[a] | A Phase 3, Prospective, Double-Blinded, Randomized Controlled Trial Of The Micronized dHACM Injection As Compared To Saline Placebo Injection In The Treatment Of Achilles Tendonitis | 158 | May 2021 (active, not recruiting) |
| NCT03485157[a] | A Phase 2B, Prospective, Double-blinded, Randomized Controlled Trial of the Micronized Human Amnion Chorion Membrane Injection as Compared to Saline Placebo Injection in the Treatment of Osteoarthritis of the Knee | 466 | Oct 2021 |

NCT: national clinical trial.
[a] Denotes industry-sponsored or cosponsored trial.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## CODING

The following codes for treatment and procedures applicable to this policy are included below for informational purposes.  This may not be a comprehensive list of procedure codes applicable to this policy.

Inclusion or exclusion of a procedure, diagnosis or device code(s) does not constitute or imply member coverage or provider reimbursement. Please refer to the member's contract benefits in effect at the time of service to determine coverage or non-coverage of these services as it applies to an individual member.

The code(s) listed below are medically necessary ONLY if the procedure is performed according to the "Policy" section of this document.

| CPT/HCPCS | |
|-----------|---|
| 65778 | Placement of amniotic membrane on the ocular surface; without sutures |
| 65779 | Placement of amniotic membrane on the ocular surface; single layer, sutured |
| A2001 | Innovamatrix ac, per square centimeter (effective 01-01-2022) |
| Q4132 | Grafix Core and GrafixPL Core, per sq cm |
| Q4133 | Grafix PRIME, GrafixPL PRIME, Stravix and StravixPL, per sq cm |
| Q4137 | AmnioExcel, AmnioExcel Plus or BioDExcel, per sq cm |
| Q4138 | BioDFence DryFlex, per sq cm |
| Q4139 | AmnioMatrix or BioDMatrix, injectable, 1 cc |
| Q4140 | BioDFence, per sq cm |
| Q4145 | EpiFix, injectable, 1 mg |
| Q4148 | Neox Cord 1K, Neox Cord RT, or Clarix Cord 1K, per sq cm |
| Q4150 | AlloWrap DS or dry, per sq cm |
| Q4151 | AmnioBand or Guardian, per sq cm |
| Q4153 | Dermavest and Plurivest, per sq cm |
| Q4154 | Biovance, per sq cm |
| Q4155 | Neox Flo or Clarix Flo 1 mg |
| Q4156 | Neox 100 or Clarix 100, per sq cm |
| Q4157 | Revitalon, per sq cm |
| Q4159 | Affinity, per sq cm |
| Q4160 | Nushield, per sq cm |
| Q4162 | WoundEx Flow, BioSkin Flow, 0.5 cc |
| Q4163 | WoundEx, BioSkin, per sq cm |
| Q4168 | AmnioBand, 1 mg |
| Q4169 | Artacent wound, per sq cm |
| Q4170 | Cygnus, per sq cm |
| Q4171 | Interfyl, 1 mg |
| Q4173 | PalinGen or PalinGen XPlus, per sq cm |
| Q4174 | PalinGen or ProMatrX, 0.36 mg per 0.25 cc |
| Q4176 | NeoPatch or Therion per sq. cm |
| Q4177 | FlowerAmnioFlo, 0.1 cc |
| Q4178 | FlowerAmnioPatch, per sq cm |
| Q4180 | Revita, per square centimeter |
| Q4181 | Amnio Wound, per sq cm |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| CPT/HCPCS | |
|---|---|
| Q4183 | Surgigraft, per sq cm |
| Q4184 | Cellesta, per sq cm |
| Q4185 | Cellesta flowable amnion (25 mg per cc); per 0.5 cc |
| Q4186 | Epifix, per sq cm |
| Q4187 | Epicord, per sq cm |
| Q4188 | AmnioArmor, per sq cm |
| Q4189 | Artacent AC, 1 mg |
| Q4190 | Artacent AC, per sq cm |
| Q4191 | Restorigin, per sq cm |
| Q4192 | Restorigin, 1 cc |
| Q4194 | Novachor, per sq cm |
| Q4198 | Genesis Amniotic Membrane, per sq cm |
| Q4199 | Cygnus matrix, per square centimeter |
| Q4201 | Matrion, per sq cm |
| Q4204 | XWRAP, per sq cm |
| Q4205 | Membrane graft or membrane wrap, per square centimeter |
| Q4206 | Fluid flow or fluid GF, 1 cc |
| Q4208 | Novafix, per square centimeter |
| Q4209 | Surgraft, per square centimeter |
| Q4210 | Axolotl graft or axolotl dualgraft, per square centimeter |
| Q4211 | Amnion bio or Axobiomembrane, per square centimeter |
| Q4212 | Allogen, per cc |
| Q4213 | Ascent, 0.5 mg |
| Q4214 | Cellesta cord, per square centimeter |
| Q4215 | Axolotl ambient or axolotl cryo, 0.1 mg |
| Q4216 | Artacent cord, per square centimeter |
| Q4217 | Woundfix, BioWound, Woundfix Plus, BioWound Plus, Woundfix Xplus or BioWound Xplus, per square centimeter |
| Q4218 | Surgicord, per square centimeter |
| Q4219 | Surgigraft-dual, per square centimeter |
| Q4220 | BellaCell HD or Surederm, per square centimeter |
| Q4221 | Amniowrap2, per square centimeter |
| Q4227 | Corplex, per square centimeter |
| Q4229 | Cogenex Amniotic Membrane |
| Q4230 | Cogenex Flowable Amnion, per 0.5 cc |
| Q4231 | Corplex P, per cubic centimeter |
| Q4232 | Corplex, per square centimeter |
| Q4233 | SurFactor or NuDyn, per 0.5 cc |
| Q4234 | XCellerate, per square centimeter |
| Q4235 | Amniorepair, altiply, per square centimeter |
| Q4237 | Cryo-Cord, per square centimeter |
| Q4238 | Derm-maxx, per square centimeter |
| Q4239 | Amnio-Maxx, Amnio-Maxx Lite, per square centimeter |
| Q4240 | Amniotext patch, per square centimeter |
| Q4241 | PolyCyte, per 0.5 mL |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| CPT/HCPCS | |
|---|---|
| Q4242 | AmnioCyte Plus, per 0.5 mL |
| Q4244 | Procenta 200 mg, 1-6 square centimeter |
| Q4245 | AmnioText, per square centimeter |
| Q4246 | CoreText, ProText, per cc |
| Q4247 | Amniotext patch, per square centimeter |
| Q4248 | Dermacyte Matrix, per sq cm |
| Q4249 | Amniply, for topical use only, per square centimeter |
| Q4250 | Amnioamp-mp, per square centimeter |
| Q4251 | Vim, per square centimeter  Effective 10-01-2021 |
| Q4252 | Vendaje, per square centimeter  Effective 10-01-2021 |
| Q4253 | Zenith amniotic membrane, per square centimeter.  Effective 10-01-2021 |
| Q4254 | Novafix dl, per square centimeter |
| Q4255 | Reguard, for topical use only, per square centimeter |

| ICD-10 DIAGNOSES | |
|---|---|
| E08.621-E08.622; E09.621-E09.622; E10.621-E10.622; E11.621-E11.622: E13.621-E13.622 | Diabetes codes with foot ulcer or other skin ulcer |
| H04.121-H04.129 | Dry eye syndrome code range |
| H11.001-H11.069 | Pterygium of eye code range |
| H16.001-H16.079 | Corneal ulcer code range (includes perforation) |
| H16.231-H16.239 | Neurotrophic keratoconjunctivitis code range |
| H18.10-H18.13 | Bullous Keratopathy code range |
| H18.30 | Unspecified Corneal Membrane Change |
| H18.52 | Epithelial (Juvenile) Corneal Dystrophy |
| H18.831-H18.839 | Recurrent erosion of cornea code range |
| H18.891-H18.899 | Other specified disorders of the cornea code range (includes limbal stem cell deficiency) |
| I87.2 | Venous Insufficiency (Chronic) (Peripheral) |
| L51.1 | Stevens-Johnson Syndrome |
| M17.10-M17.9 | Osteoarthritis of the knee code range |
| M72.2 | Plantar fasciitis |
| T26.10-T26.12 | Burn of cornea and conjunctival sac code range |
| T26.50-T26.52 | Corrosion of cornea and conjunctival sac code rang |

| REVISIONS | |
|---|---|
| 03-20-2017 | Policy added to the bcbsks.com web site. |
| 01-01-2019 | Updated Description section. |
| | In Policy section: |
| | ▪ In Item A 1, added "Q4168". |
| | ▪ In Item A 3, removed "Q4131" and added "Q4145, Q4186". |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| REVISIONS | |
|---|---|
| | ▪ Added new Item B, "FDA-approved sutured and non-sutured human amniotic membrane grafts may be considered medically necessary for the treatment of the following ophthalmic indications: 1. Neurotrophic keratitis 2. Corneal ulcers and melts 3. Pterygium repair 4. Stevens-Johnson syndrome 5. Persistent epithelial defects (with documented pain for ≥5 days) 6. Acid or alkaline burn. |
| | ▪ Added new Item C, "FDA-approved sutured and non-sutured human amniotic membrane grafts are considered experimental / investigational for the treatment of all other ophthalmic conditions including but not limited to dry eye syndrome, corneal perforation, bullous keratopathy, limbus stem cell deficiency, and after photorefractive keratectomy." |
| | ▪ In Item D (previous Item B), added "including but not limited to treatment of osteoarthritis and plantar fasciitis" to read "Injection of micronized or particulated human amniotic membrane is considered experimental / investigational for all indications, including but not limited to treatment of osteoarthritis and plantar fasciitis." |
| | ▪ In Item F (previous Item D), removed "human amniotic membrane products and" and added "including but not limited to treatment of lower-extremity ulcers due to venous insufficiency" to read "All other human amniotic membrane products and indications not listed above are considered experimental / investigational, including but not limited to treatment of lower-extremity ulcers due to venous insufficiency." |
| | ▪ Updated Policy Guidelines. |
| | Updated Rationale section. |
| | In Coding section: |
| | ▪ Added CPT codes:  65778, 65779. |
| | ▪ Added new HCPCS codes: Q4183, Q4184, Q4185, Q4186, Q4187, Q4188, Q4189, Q4190, Q4191, Q4192, Q4194, Q4198, Q4201, Q4204. |
| | ▪ Removed deleted HCPCS code: Q4131. |
| | ▪ Revised nomenclature to HCPCS codes: Q4132, Q4133, Q4137, Q4148, Q4156, Q4162, Q4163. |
| | ▪ Added ICD-10 codes:  H11.001, H11.002, H11.003, H11.011, H11.012, H11.013, H11.021, H11.022, H11.023, H11.031, H11.032, H11.033, H11.041, H11.042, H11.043, H11.051, H11.052, H11.053, H11.061, H11.062, H11.063, H16.011, H16.012, H16.013, H16.021, H16.022, H16.023, H16.031, H16.032, H16.033, H16.041, H16.042, H16.043, H16.051, H16.052, H16.053, H16.061, H16.062, H16.063, H16.121, H16.122, H16.123, H16.231, H16.232, H16.233, H18.831, H18.832, H18.833, T26.11XA, T26.11XD, T26.11XS, T26.12XA, T26.12XD, T26.12XS, T26.31XA, T26.31XD, T26.31XS, T26.32XA, T26.32XD, T26.32XS, T26.51XA, T26.51XD, T26.51XS, T26.52XA, T26.52XD, T26.52XS, T26.61XA, T26.61XD, T26.61XS, T26.62XA, T26.62XD, T26.62XS, T26.81XA, T26.81XD, T26.81XS, T26.82XA, T26.82XD, T26.82XS. |
| | Updated References section. |
| 02-18-2019 | In Policy section: |
| | ▪ In Item A 3, removed "Q4145". |
| 03-27-2019 | Updated Description section. |
| | In Policy section: |
| | ▪ In Item A, added new Item A 3, "Epicord (Q4187)". |
| | Updated Rationale section. |
| | In Coding section: |
| | ▪ Removed ICD-10 codes: T26.51XA, T26.51XD, T26.51XS, T26.52XA, T26,52XD, T26.52XS. |
| | Updated References section. |
| 05-21-2019 | In Policy section: |
| | ▪ In Item A 1, removed HCPCS code Q4168. |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| REVISIONS | |
|---|---|
| 09-27-2019 | Policy published to the bcbsks.com website on 08-28-2019 with an effective date of 09-27-2019. |
| | In Coding section:<br>▪ Added ICD-10 codes: H18.891, H18.892, H18.893. |
| | Updated References section. |
| 10-01-2019 | In Coding section:<br>▪ Added HCPCS Codes:  Q4205, Q4206, Q4208, Q4209, Q4210, Q4211, Q4212, Q4213, Q4214, Q4215, Q4216, Q4217, Q4218, Q4219, Q4221 |
| 07-01-2020 | In Coding section:<br>▪ Added HCPCS Codes:  Q4176, Q4177, Q4178, Q4181, Q4227, Q4228, Q4229, Q4230, Q4231, Q4232, Q4233, Q4234, Q4235, Q4236, Q4237, Q4239, Q4240, Q4241, Q4242, Q4244, Q4245, Q4246, Q4247, Q4248 |
| 07-16-2021 | Updated Description section |
| | **In Policy section**<br>Added item A.1<br>In Item B<br>• Removed:  "FDA-approved sutured and non-sutured human amniotic membrane grafts may be considered medically necessary for the treatment of the following ophthalmic indications:<br>  1.  Neurotrophic keratitis<br>  2.  Corneal ulcers and melts<br>  3.  Pterygium repair<br>  4.  Stevens-Johnson syndrome<br>  5.  Persistent epithelial defects (with documented pain for ≥5 days)<br>  6.  Acid or alkaline burn"<br>• Added: "Human amniotic membrane grafts with or without suture (Prokera®, AmbioDisk™) or glue may be considered medically necessary for the treatment of the following ophthalmic indications:<br>  1.  Neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative therapy;<br>  2.  Corneal ulcers and melts that do not respond to initial conservative therapy;<br>  3.  Corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment;<br>  4.  Bullous keratopathy as a palliative measure in patients who are not candidates for curative treatment (e.g., endothelial or penetrating keratoplasty);<br>  5.  Partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient;<br>  6.  Moderate or severe Stevens-Johnson syndrome;<br>  7.  Persistent epithelial defects that do not respond as stated in policy guideline #2;<br>  8.  Severe dry eye (DEWS 3 or 4) with ocular surface damage and inflammation that remains symptomatic after Steps 1, 2, and 3 of the dry eye disease management algorithm (see Policy Guidelines); or<br>  9.  Moderate or severe acute ocular chemical burn."<br>  10. Corneal perforation when corneal tissue is not immediately available; or<br>  11. Pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft<br>In Item C<br>• Removed: "FDA approved sutured and non-sutured human amniotic membrane grafts are considered **experimental / investigational** for the treatment of all other ophthalmic conditions including, but not limited to, dry eye syndrome, corneal |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| REVISIONS | |
|---|---|
| | perforation, bullous keratopathy, limbus stem cell deficiency, and after photorefractive keratectomy." |
| | • Added: "Human amniotic membrane grafts with or without suture are considered **experimental / investigational** for all ophthalmic indications not outlined above." |
| | <u>Added</u> |
| | • <u>Item F</u> |
| | • <u>Policy Guidelines</u> |
| | Updated Rationale section |
| | In Coding section: |
| | • Added HCPCS Codes: Q4180, Q4220, Q4238, Q4249, Q4250, Q4254, Q4255 |
| | • Added ICD 10 Diagnosis codes: H18.11, H18.12, H18.13, H18.30, H18.52, I87.2, L51.1, T26.50XA, T26.50XD, T26.50XS, T26.51XA, T26.51XD, T26.51XS, T26.52XA, T26.52XD, T26.52XS |
| | • Removed ICD 10 Diagnosis codes: H16.121, H16.122, H16.123, L97.212, L97.213, L97.214, L97.222, L97.223, L97.224, L97.312, L97.313, L97.314, L97.322, L97.323, L97.324, L97.412, L97.413, L97.414, L97.422, L97.423, L97.424, L97.512, L97.513, L97.514, L97.522, L97.523, L97.524, L97.812, L97.813, L97.814, L97.822, L97.823, L97.824, T26.31XA, T26.31XD, T26.31XS, T26.32XA, T26.32XD, T26.32XS, T26.61XA, T26.61XD, T26.61XS, T26.62XA, T26.62XD, T26.62XS, T26.81XA, T26.81XD, T26.81XS, T26.82XA, T26.82XD, T26.82XS |
| | Updated Reference section |
| | Added Appendix |
| 10-08-2021 | In Coding section:  Effective 10-01-2021 |
| | Added HCPCS codes: Q4251, Q4252, Q4253 |
| | Deleted HCPCS codes: Q4228, Q4236 (no longer being manufactured) |
| 01-03-2022 | In Coding Section |
| | Added HCPCS code A2001, Q4199 (effective 01-01-2022) |
| 04-01-2022 | In Coding Section Added: |
| | Q4225, Q4256, Q4257, Q4258 (new codes 04-01-2022) |
| 04-08-2022 | Updated Description Section |
| | Updated Policy Section |
| | ▪ Section G "All other indications not listed above are considered experimental / investigational, including, but not limited to, treatment of lower-extremity ulcers due to venous insufficiency." added "and repair following Mohs micrographic surgery" to the end of the statement. |
| | Updated Rationale Section |
| | Updated Coding Section |
| | ▪ Removed coding bullets |
| | • There are specific HCPCS codes for some of these products. If no specific HCPCS code exists for the product, an unlisted code such as Q4100 would be used. |
| | • There are no specific codes for AmnioFix or OrthoFlo. It might be reported using the code for another MiMedx product such as Q4145 or the not otherwise specified code Q4100. |
| | • There is no specific code for this type of injection. It might be reported with one of the musculoskeletal system injection codes (e.g., 20550), the unlisted general musculoskeletal system code (20999), or if subcutaneous or intramuscular, the therapeutic injection code (96372). |
| | • There are codes for the placement of amniotic membrane on the ocular surface: 65778, 65779 |
| | ▪ Removed Code: Q4100 |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| REVISIONS | | |
|---|---|---|
| | ▪ Added ICD-10 Codes: H04.121-H04.129, M17.10-M17.9 and M72.2<br>▪ Converted ICD-10 codes to ranges | |
| | Updated References Section | |

## REFERENCES

1. Parolini O, Soncini M, Evangelista M, et al. Amniotic membrane and amniotic fluid-derived cells: potential tools for regenerative medicine?. Regen Med. Mar 2009; 4(2): 275-91. PMID 19317646

2. Koob TJ, Rennert R, Zabek N, et al. Biological properties of dehydrated human amnion/chorion composite graft: implications for chronic wound healing. Int Wound J. Oct 2013; 10(5): 493-500. PMID 23902526

3. Shimberg M, Wadsworth K. The use of amniotic-fluid concentrate in orthopaedic conditions. J Bone Joint Surg. 1938;20(I):167-177.

4. U.S. Food and Drug Administration. Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use Guidance for Industry and Food and Drug Administration Staff. 2017 https://www.regulations.gov/document?D=FDA-2017-D-6146-0003 Accessed January 10, 2022

5. Food and Drug Administration. 510(k) Summary: ProKeraTM Bio-Tissue Inc. (K032104). 2003; https://www.accessdata.fda.gov/cdrh_docs/pdf3/K032104.pdf. Accessed January 10, 2022.

6. Serena TE, Yaakov R, Moore S, et al. A randomized controlled clinical trial of a hypothermically stored amniotic membrane for use in diabetic foot ulcers. J Comp Eff Res. Jan 2020; 9(1): 23-34. PMID 31691579

7. Ananian CE, Dhillon YS, Van Gils CC, et al. A multicenter, randomized, single-blind trial comparing the efficacy of viable cryopreserved placental membrane to human fibroblast-derived dermal substitute for the treatment of chronic diabetic foot ulcers. Wound Repair Regen. May 2018; 26(3): 274-283. PMID 30098272

8. Tettelbach W, Cazzell S, Sigal F, et al. A multicentre prospective randomized controlled comparative parallel study of dehydrated human umbilical cord (EpiCord) allograft for the treatment of diabetic foot ulcers. Int Wound J. Feb 2019; 16(1): 122-130. PMID 30246926

9. DiDomenico LA, Orgill DP, Galiano RD, et al. Use of an aseptically processed, dehydrated human amnion and chorion membrane improves likelihood and rate of healing in chronic diabetic foot ulcers: A prospective, randomized, multi-centre clinical trial in 80 patients. Int Wound J. Dec 2018; 15(6): 950-957. PMID 30019528

10. Snyder RJ, Shimozaki K, Tallis A, et al. A Prospective, Randomized, Multicenter, Controlled Evaluation of the Use of Dehydrated Amniotic Membrane Allograft Compared to Standard of Care for the Closure of Chronic Diabetic Foot Ulcer. Wounds. Mar 2016; 28(3): 70-7. PMID 26978860

11. Zelen CM, Gould L, Serena TE, et al. A prospective, randomized, controlled, multi-centre comparative effectiveness study of healing using dehydrated human amnion/chorion membrane allograft, bioengineered skin substitute or standard of care for treatment of chronic lower extremity diabetic ulcers. Int Wound J. Dec 2015; 12(6): 724-32. PMID 25424146

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

12. Zelen CM, Serena TE, Gould L, et al. Treatment of chronic diabetic lower extremity ulcers with advanced therapies: a prospective, randomized, controlled, multi-centre comparative study examining clinical efficacy and cost. Int Wound J. Apr 2016; 13(2): 272-82. PMID 26695998

13. Tettelbach W, Cazzell S, Reyzelman AM, et al. A confirmatory study on the efficacy of dehydrated human amnion/chorion membrane dHACM allograft in the management of diabetic foot ulcers: A prospective, multicentre, randomized, controlled study of 110 patients from 14 wound clinics. Int Wound J. Feb 2019; 16(1): 19-29. PMID 30136445

14. Lavery LA, Fulmer J, Shebetka KA, et al. The efficacy and safety of Grafix((R)) for the treatment of chronic diabetic foot ulcers: results of a multi-centre, controlled, randomized, blinded, clinical trial. Int Wound J. Oct 2014; 11(5): 554-60. PMID 25048468

15. Smiell JM, Treadwell T, Hahn HD, et al. Real-world Experience With a Decellularized Dehydrated Human Amniotic Membrane Allograft. Wounds. Jun 2015; 27(6): 158-69. PMID 26061491

16. Frykberg RG, Gibbons GW, Walters JL, et al. A prospective, multicentre, open-label, single-arm clinical trial for treatment of chronic complex diabetic foot wounds with exposed tendon and/or bone: positive clinical outcomes of viable cryopreserved human placental membrane. Int Wound J. Jun 2017; 14(3): 569-577. PMID 27489115

17. Serena TE, Carter MJ, Le LT, et al. A multicenter, randomized, controlled clinical trial evaluating the use of dehydrated human amnion/chorion membrane allografts and multilayer compression therapy vs. multilayer compression therapy alone in the treatment of venous leg ulcers. Wound Repair Regen. Nov-Dec 2014; 22(6): 688-93. PMID 25224019

18. Bianchi C, Cazzell S, Vayser D, et al. A multicentre randomized controlled trial evaluating the efficacy of dehydrated human amnion/chorion membrane (EpiFix (R) ) allograft for the treatment of venous leg ulcers. Int Wound J. Feb 2018; 15(1): 114-122. PMID 29024419

19. Bianchi C, Tettelbach W, Istwan N, et al. Variations in study outcomes relative to intention-to-treat and per-protocol data analysis techniques in the evaluation of efficacy for treatment of venous leg ulcers with dehydrated human amnion/chorion membrane allograft. Int Wound J. Jun 2019; 16(3): 761-767. PMID 30864259

20. Vines JB, Aliprantis AO, Gomoll AH, et al. Cryopreserved Amniotic Suspension for the Treatment of Knee Osteoarthritis. J Knee Surg. Aug 2016; 29(6): 443-50. PMID 26683979

21. Tsikopoulos K, Vasiliadis HS, Mavridis D. Injection therapies for plantar fasciopathy ('plantar fasciitis'): a systematic review and network meta-analysis of 22 randomized controlled trials. Br J Sports Med. Nov 2016; 50(22): 1367-1375. PMID 27143138

22. Zelen CM, Poka A, Andrews J. Prospective, randomized, blinded, comparative study of injectable micronized dehydrated amniotic/chorionic membrane allograft for plantar fasciitis--a feasibility study. Foot Ankle Int. Oct 2013; 34(10): 1332-9. PMID 23945520

23. Cazzell S, Stewart J, Agnew PS, et al. Randomized Controlled Trial of Micronized Dehydrated Human Amnion/Chorion Membrane (dHACM) Injection Compared to Placebo for the Treatment of Plantar Fasciitis. Foot Ankle Int. Oct 2018; 39(10): 1151-1161. PMID 30058377

24. Suri K, Kosker M, Raber IM, et al. Sutureless amniotic membrane ProKera for ocular surface disorders: short-term results. Eye Contact Lens. Sep 2013; 39(5): 341-7. PMID 23945524

25. Liu J, Li L, Li X. Effectiveness of Cryopreserved Amniotic Membrane Transplantation in Corneal Ulceration: A Meta-Analysis. Cornea. Apr 2019; 38(4): 454-462. PMID 30702468

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

26. Yin HY, Cheng AMS, Tighe S, et al. Self-retained cryopreserved amniotic membrane for treating severe corneal ulcers: a comparative, retrospective control study. Sci Rep. Oct 12 2020; 10(1): 17008. PMID 33046729

27. Paris Fdos S, Goncalves ED, Campos MS, et al. Amniotic membrane transplantation versus anterior stromal puncture in bullous keratopathy: a comparative study. Br J Ophthalmol. Aug 2013; 97(8): 980-4. PMID 23723410

28. Kheirkhah A, Casas V, Raju VK, et al. Sutureless amniotic membrane transplantation for partial limbal stem cell deficiency. Am J Ophthalmol. May 2008; 145(5): 787-94. PMID 18329626

29. Pachigolla G, Prasher P, Di Pascuale MA, et al. Evaluation of the role of ProKera in the management of ocular surface and orbital disorders. Eye Contact Lens. Jul 2009; 35(4): 172-5. PMID 19474753

30. Sharma N, Thenarasun SA, Kaur M, et al. Adjuvant Role of Amniotic Membrane Transplantation in Acute Ocular Stevens-Johnson Syndrome: A Randomized Control Trial. Ophthalmology. Mar 2016; 123(3): 484-91. PMID 26686968

31. Bouchard CS, John T. Amniotic membrane transplantation in the management of severe ocular surface disease: indications and outcomes. Ocul Surf. Jul 2004; 2(3): 201-11. PMID 17216092

32. John T, Tighe S, Sheha H, et al. Corneal Nerve Regeneration after Self-Retained Cryopreserved Amniotic Membrane in Dry Eye Disease. J Ophthalmol. 2017; 2017: 6404918. PMID 28894606

33. McDonald MB, Sheha H, Tighe S, et al. Treatment outcomes in the DRy Eye Amniotic Membrane (DREAM) study. Clin Ophthalmol. 2018; 12: 677-681. PMID 29670328

34. Tandon R, Gupta N, Kalaivani M, et al. Amniotic membrane transplantation as an adjunct to medical therapy in acute ocular burns. Br J Ophthalmol. Feb 2011; 95(2): 199-204. PMID 20675729

35. Eslani M, Baradaran-Rafii A, Cheung AY, et al. Amniotic Membrane Transplantation in Acute Severe Ocular Chemical Injury: A Randomized Clinical Trial. Am J Ophthalmol. Mar 2019; 199: 209-215. PMID 30419194

36. Tamhane A, Vajpayee RB, Biswas NR, et al. Evaluation of amniotic membrane transplantation as an adjunct to medical therapy as compared with medical therapy alone in acute ocular burns. Ophthalmology. Nov 2005; 112(11): 1963-9. PMID 16198422

37. Kaufman SC, Jacobs DS, Lee WB, et al. Options and adjuvants in surgery for pterygium: a report by the American Academy of Ophthalmology. Ophthalmology. Jan 2013; 120(1): 201-8. PMID 23062647

38. Clearfield E, Muthappan V, Wang X, et al. Conjunctival autograft for pterygium. Cochrane Database Syst Rev. Feb 11 2016; 2: CD011349. PMID 26867004

39. Toman J, Michael GM, Wisco OJ, et al. Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane. Facial Plast Surg Aesthet Med. Jan-Feb 2022; 24(1): 48-53. PMID 34714143

40. Hingorani A, LaMuraglia GM, Henke P, et al. The management of diabetic foot: A clinical practice guideline by the Society for Vascular Surgery in collaboration with the American Podiatric Medical Association and the Society for Vascular Medicine. J Vasc Surg. Feb 2016; 63(2 Suppl): 3S-21S. PMID 26804367

41. Lavery LA, Davis KE, Berriman SJ, et al. WHS guidelines update: Diabetic foot ulcer treatment guidelines. Wound Repair Regen. Jan-Feb 2016; 24(1): 112-26. PMID 26663430

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**OTHER REFERENCES**

1.   Blue Cross and Blue Shield of Kansas Ophthalmology / Optometry Liaison Committee Consent Ballot, November 2018, May 2021.
2.   Blue Cross and Blue Shield of Kansas Ophthalmology / Optometry Liaison Committee, May 2011, May 2012, May 2018; August 2019, May 2021.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Appendix
## 2019 Clinical Input

Clinical input was sought to help determine whether the use of human amniotic membrane graft either without or with suture fixation for several ophthalmic conditions would provide a clinically meaningful improvement in net health outcome and whether the use is consistent with generally accepted medical practice. In response to requests, clinical input was received from 2 respondents, including 1 specialty society-level response and 1 physician-level response identified through specialty societies including physicians with academic medical center affiliations.

## Respondents

Clinical input was provided by the following specialty societies and physician members identified by a specialty society or clinical health system:

- American Academy of Ophthalmology (AAO)
- Mark Latina, MD, Ophthalmology, Tufts University School of Medicine, identified by Massachusetts Society of Eye Physicians and Surgeons

Clinical input provided by the specialty society at an aggregate level is attributed to the specialty society. Clinical input provided by a physician member designated by a specialty society or health system is attributed to the individual physician and is not a statement from the specialty society or health system. Specialty society and physician respondents participating in the Evidence Street® clinical input process provide a review, input, and feedback on topics being evaluated by Evidence Street. However, participation in the clinical input process by a specialty society and/or physician member designated by a specialty society or health system does not imply an endorsement or explicit agreement with the Evidence Opinion published by BCBSA nor any Blue Plan.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Clinical Input Ratings

| Use of human amniotic membrane for following indications | Type of HAM | Respondent | Identified by | Confidence Level That Clinical Use Expected to Provide Clinically Meaningful Improvement in Net Health Outcome — Yes or No | Confidence Level that Clinical Use is Consistent with Generally Accepted Medical Practice — Yes or No |
|---|---|---|---|---|---|
| Neurotrophic keratitis | With suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| | Without suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| Corneal ulcers and melts | With suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | No |
| | Without suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| Corneal perforation | With suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| | Without suture | AAO | | No | No |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | No | No |
| Bullous keratopathy | With suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | No |
| | Without suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| Pterygium repair | With suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| | Without suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | No |
| Limbal stem cell deficiency | With suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| | Without suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| Stevens-Johnson | With suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| | Without suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| Persistent epithelial defects | With suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | No |
| | Without suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| Severe dry eye | With suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | No |
| | Without suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| Acute ocular chemical burn | With suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |
| | Without suture | AAO | | Yes | Yes |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | Yes |

## Respondent Profile

| | Specialty Society | |
|---|---|---|
| **#** | **Name of Organization** | **Clinical Specialty** |
| **1** | American Academy of Ophthalmology | Ophthalmology |
| | **Physician** | |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Name | Degree | Institutional Affiliation | Clinical Specialty | Board Certification and Fellowship Training |
|---|------|--------|--------------------------|-------------------|--------------------------------------------|
| | **Identified by Mass Society of Eye Physicians and Surgeons** | | | | |
| 2 | Mark Latina | MD | Tufts University School of Medicine | Ophthalmology | Ophthalmology, Glaucoma Fellowship trained |

**Respondent Conflict of Interest Disclosure**

| # | 1) Research support related to the topic where clinical input is being sought | | 2) Positions, paid or unpaid, related to the topic where clinical input is being sought | | 3) Reportable, more than $1,000, health care related assets or sources of income for myself, my spouse, or my dependent children related to the topic where clinical input is being sought | | 4) Reportable, more than $350, gifts or travel reimbursements for myself, my spouse, or my dependent children related to the topic where clinical input is being sought | |
|---|---|---|---|---|---|---|---|---|
| | YES/NO | Explanation | YES/NO | Explanation | YES/NO | Explanation | YES/NO | Explanation |
| 1 | No | | No | | No | | No | |
| 2 | No | | No | | No | | No | |

Individual physician respondents answered at individual level. Specialty Society respondents provided aggregate information that may be relevant to the group of clinicians who provided input to the Society-level response. NR = not reported

**Responses**

- We are seeking your opinion on whether using human amniotic membrane graft either without or with suture fixation for the below indications provide a clinically meaningful improvement in net health outcome. Please respond based on the evidence and your clinical experience. Please address these points in your response:
  - Relevant clinical scenarios (e.g., a chain of evidence) where the technology is expected to provide a clinically meaningful improvement in net health outcome;
  - Any relevant patient inclusion/exclusion criteria or clinical context important to consider in identifying individuals who may be appropriate for human amniotic membrane graft with versus without suture fixation for this indication;
  - Supporting evidence from the authoritative scientific literature (please include PMID).

| # | Indications | Rationale |
|---|-------------|-----------|
| 1 | Neurotrophic keratitis | Sutured and non-sutured human amniotic membrane HAM are both accepted and effective treatments for neurotrophic keratopathy that does not respond to conservative therapy in patients with corneal staining or an epithelial defect that (1) has failed to completely close after 5 days of conservative treatment, or (2) has failed to demonstrate a decrease in size after 2 days of conservative |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | treatment. Conservative treatment is defined as use of topical lubricants and/or topical antibiotics and/or therapeutic contact lens and/or patching. Failure of multiple modalities should not be required prior to moving to HAM. HAM requires less effort on the part of the patient to adhere to a treatment regimen and has a significant advantage in that regard over treatments that require multiple drops per day. Non-sutured HAM is the preferred initial treatment because it can be performed rapidly in an office setting, bypassing the delay associated with scheduling a procedure in an outpatient facility. It also avoids the facility fees associated with the sutured HAM procedure. Patients that are responding to non-sutured HAM may need a second or third application if healing is not yet complete. Those who show a poor response or poorly tolerate a non-sutured HAM device are candidates for sutured HAM.<br><br>Khokhar (Cornea 2005;24:654. PMID 16015082) found an increased but nonsignificant rate of epithelial healing with sutured HAM compared to more invasive interventions such as tarsorrhaphy for neurotrophic corneal ulceration in a small randomized clinical trial (RCT). A larger trial might have demonstrated a significant difference but the disease is uncommon enough to make such a trial difficult to perform. For the same reason, there have been no trials directly comparing sutured and non-sutured HAM for neurotrophic keratopathy. This reflects not only the uncommon nature of the disease but also the lack of interest in subjecting patients to the more invasive and expensive sutured HAM procedure when clinical experience indicates that non-sutured HAM is effective in a significant number of patients.<br><br>Other uncontrolled series and case reports supporting effectiveness of HAM for neurotrophic keratopathy:<br>Chen HJ. Br J Ophthalmol 2000;84:63. PMID 10906085<br>Ivekovic B. Coll Anthropol 2002;26:47. PMID 12137322<br>Suri K. Eye Contact Lens 2013;39:341. PMID 23945524<br>Uhlig CE. Acta Ophthalmol 2015;93:e481. PMID 25773445 |
| 2 | Neurothrophic keratitis | Neurotrophic keratitis is a degenerative corneal disease induced by an impairment of corneal innervation and often manifested by corneal persistent epithelial defects (PED). Neurotrophic PED is characterized by painless epithelial breakdown, inflammation of the underlying stroma, and poor healing. The disease progression often leads to spontaneous corneal melting and perforation. In my practice, conventional treatments including topical medications, bandage contact lens, eye patching, and tarsorrhaphy usually fail to promote healing. If delayed healing was achieved, there is still a high risk of corneal scarring.<br><br>Cryopreserved amniotic membrane (AM) has successfully been used to enhance healing in patients with Neurotrophic keratitis. [1-8] Besides the known actions of the AM in controlling inflammation and promoting healing, it is also rich in nerve growth factors that facilitate the recovery of the corneal nerves and enhancement of corneal wound healing.<br><br>In my opinion and based on the literature, the use of AM (with or without sutures) for treating neurotrophic keratoconjunctivitis is medically necessary when the standard therapy fails. It interrupts the disease process by controlling inflammation, preventing further damage and restoring ocular surface integrity. |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome. |
| | | 1. Chen H-J, Pires RTF, Tseng SCG. Amniotic membrane transplantation for severe neurotrophic corneal ulcers. Br. J. Ophthalmol. 2000; 84:826–833. [PubMed: 10906085] |
| | | 2. Ivekoviĸ B, Tedeschi-Reiner E, Petric I, et al. Amniotic membrane transplantation for ocular surface reconstruction in neurotrophic corneal ulcer a. Coll Antropol. 2002;26(1):47-54. [PMID: 12137322] |
| | | 3. Khokhar S, Natung T, Sony P, et al. Amniotic membrane transplantation in refractory neurotrophic corneal ulcers: a randomized, controlled clinical trial. Cornea. 2005;24:654–660. [PMID: 16015082] |
| | | 4. Pachigolla G, Prasher P, Di Pascuale MA, et al. Evaluation of the role of ProKera in the management of ocular surface and orbital disorders. Eye Contact Lens. 2009; 35(4):172-175 [PMID: 19474753] |
| | | 5. Suri K, Kosker M, Raber I, et al. Sutureless Amniotic Membrane ProKera for Ocular Surface Disorders. Short-Term Results. Eye Contact Lens. 2013;39:341-347 [PMID: 23945524] |
| | | 6. Uhlig CE, Frings C, Rohloff N, et al. Long-term efficacy of glycerine-processed amniotic membrane transplantation in patients with corneal ulcer. Acta Ophthalmol. 2015;93(6):e481-7. [PMID:25773445] |
| | | 7. Röck T, Bartz-Schmidt KU, Röck D. Management of a neurotrophic deep corneal ulcer with amniotic membrane transplantation in a patient with functional monocular vision: A case report. Medicine (Baltimore). 2017;96(50):e8997. [PMID: 29390295] |
| | | 8. Morkin, M. I. and P. Hamrah. "Efficacy of self-retained cryopreserved amniotic membrane for treatment of neuropathic corneal pain." Ocul Surf 2018, 16(1): 132-138. [PMID: 29032001] |
| 1 | Corneal ulcers and melts | Corneal ulcers and melts comprise a wide range of disorders with varying etiologies. Common to many of these are an underlying inflammatory component. HAM has been shown to reduce inflammation and promote epithelial healing. These properties make HAM an effective adjunct in treating these conditions while the primary etiology is addressed with targeted therapy (e.g. corticosteroids, antibiotics, biologic immunomodulators). HAM is typically employed when there is a lack of response to initial medical treatment or where HAM can offer some degree of tectonic support in cases where there is significant stromal tissue loss.<br><br>The varied and uncommon nature of the etiology of ulcers and melts makes it unlikely that there will ever be significantly-sized RCTs comparing HAM to conventional therapy or sutured vs. non-sutured HAM. There are numerous small series and case reports without controls showing improvement after HAM placement in cases that were not responding to conventional therapy. A number of these were summarized in a review by Bouchard (Ocul Surf 2004;2:201. PMID 17216092).<br><br>Cited below are selected reports supporting the efficacy of HAM for the treatment of corneal ulcers and melts, including several published since Bouchard's review:<br>Kruse FE. Ophthalmology 1999;106:1504. PMID: 10442895<br>Hanada K. Am J Ophthalmol 2001;131:324. PMID 11239864<br>Chen HC. Cornea 2006;25:564. PMID 16783145 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | Sheha H. Cornea 2009;28:1118. PMID 19770726<br>Tok OY. Int J Ophthalmol 2015;18:938. PMID 26558205<br>Sharma N. Indian J Ophthalmol 2018;66:816. PMID 29785990<br>Prabhasawat P. Br J Ophthalmol 2001;85:1455. PMID 11734521<br>Solomon A. Ophthalmology 2002;109:694. PMID 11927426<br>Uhlig CE. Am J Ophthalmol Case Rep 2018;10:296. PMID 29780958 |
| 2 | Corneal ulcers and melts | Cryopreserved amniotic membrane (AM) has successfully been used to control inflammation and promote healing in corneal ulcers of varying etiology. [1-9] Based on my experience, the use of AM at an early stage of the disease would prevent any unexpected complications such as infection, scarring, melt and perforation. Particularly, using AM without suture for this indication provides the advantage of in-office treatment without any delay. Furthermore, it avoids potential sight-threatening complications and achieves a clinically meaningful improvement in net visual outcome.<br>1. Kruse FE, Rohrschneider K, Völcker HE. Multilayer amniotic membrane transplantation for reconstruction of deep corneal ulcers. Ophthalmology. 1999;106(8):1504-10; discussion 1511. [PMID: 10442895]<br>2. Hanada K, Shimazaki J, Shimmura S, et al. Multilayered amniotic membrane transplantation for severe ulceration of the cornea and sclera. Am. J. Ophthalmol. 2001; 131(3):324–331. [PubMed: 11239864]<br>3. Chen HC, Tan HY, Hsiao CH, et al. Amniotic membrane transplantation for persistent corneal ulcers and perforations in acute fungal keratitis. Cornea. 2006 Jun;25(5):564-72. [PMID: 16783145]<br>4. Barequet IS, Habot-Wilner Z, Keller N, Smollan G, Ziv H, Belkin M, Rosner M. Effect of amniotic membrane transplantation on the healing of bacterial keratitis. Invest Ophthalmol Vis Sci. 2008 Jan;49(1):163-7. [PMID: 18172088]<br>5. Sheha H, Liang L, Li J, et al. Sutureless amniotic membrane transplantation for severe bacterial keratitis. Cornea 2009; 28(10): 1118-1123. [PMID: 19770726]<br>6. Tok OY, Tok L, Atay IM, et al. Toxic keratopathy associated with abuse of topical anesthetics and amniotic membrane transplantation for treatment. Int J Ophthalmol. 2015; 18;8(5):938-44. [PMID: 26558205]<br>7. Sheha H, Tighe S, Cheng AMS, et al. A stepping stone in treating dendritic keratitis. Am J Ophthalmol Case Rep. 2017; 6(7):55-58. [PMID: 29260079]<br>8. Zhong J, Wang B, Li S, et al. Full-thickness conjunctival flap covering surgery combined with amniotic membrane transplantation for severe fungal keratitis. Exp Ther Med. 2018;15(3):2711-2718. [PMID: 29456673]<br>9. Sharma N, Singhal D, Maharana PK, et al. Continuous intraoperative optical coherence tomography-guided shield ulcer debridement with tuck in multilayered amniotic membrane transplantation. Indian J Ophthalmol. 2018;66(6):816-819. [PMID: 29785990] |
| 1 | Corneal perforation | Multilayered sutured HAM has been performed in some cases of corneal perforation. While it offers some tectonic support, corneal tissue is the preferred graft material in these cases. HAM alone may be a reasonable temporizing alternative when corneal tissue is not immediately available. Non-sutured HAM would not offer significant tectonic support in these cases.<br><br>Both sutured and non-sutured HAM reduces inflammation and promotes epithelial healing. It is therefore a useful adjunct in addition to corneal |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|-------------|-----------|
|   |             | transplantation in those patients with active inflammation and perforation. |
|   |             | The rare nature of these cases guarantees that there will be no large RCTs performed for this indication. A number of clinical series and case reports supporting the efficacy of HAM for corneal perforation are cited here: |
|   |             | Prabhasawat P. Br J Ophthalmol 2001;85:1455. PMID 11734521 <br> Solomon A. Ophthalmology 2002;109:694. PMID 11927426 <br> Rodriguez-Ares MT. Cornea 2004;23:577. PMID 15256996 <br> Hick S. Cornea 2005;24:369. PMID 15829790 <br> Uhlig CE. Am J Ophthalmol Case Rep 2018;10:296. PMID 29780958 |
| 2 | Corneal perforation | Depending on the size and location of the corneal perforation, treatment options include gluing, amniotic membrane transplantation, and corneal transplantation. The success rate of using AM to repair corneal perforation is reported to be as high as 93%. [1-7] Kim et al [7] used multiple layers of AM with tissue glue in 10 patients with large corneal perforations up to 5 mm and noted 90% success in complete closure of perforation. AM offers the advantage of avoiding potential corneal graft rejection and postoperative astigmatism of tectonic corneal grafts. I personally did not use AM for this indication, but based on the literature, multiple layers of AM for this indication provides a clinically meaningful improvement in net health outcome. <br> 1. Prabhasawat P, Tesavibul N, Komolsuradej W. Single and multilayer amniotic membrane transplantation for persistent corneal epithelial defect with and without stromal thinning and perforation. Br J Ophthalmol. 2001;85(12):1455-63. [PMID: 11734521] <br> 2. Solomon A, Meller D, Prabhasawat P, et al. Amniotic membrane grafts for nontraumatic corneal perforations, descemetoceles, and deep ulcers. Ophthalmology. 2002; 109(4):694–703. [PubMed: 11927426] <br> 3. Rodriguez-Ares MT, Tourino R, Lopez-Valladares MJ, et al. Multilayer amniotic membrane transplantation in the treatment of corneal perforations. Cornea. 2004; 23(6):577–583. [PubMed: 15256996] <br> 4. Hick S, Demers PE, Brunette I, et al. Amniotic membrane transplantation and fibrin glue in the management of corneal ulcers and perforations: a review of 33 cases. Cornea. 2005; 24(4):369–377. [PubMed: 15829790] <br> 5. Xie HT, Zhao D, Liu Y, et al. Umbilical Cord Patch Transplantation for Corneal Perforations and Descemetoceles. J Ophthalmol. 2017;2017:2767053. [PMID: 28660079] <br> 6. Uhlig CE, Müller VC. Resorbable and running suture for stable fixation of amniotic membrane multilayers: A useful modification in deep or perforating sterile corneal ulcers. Am J Ophthalmol Case Rep. 2018; 19 (10):296-299. [PMID: 29780958] <br> 7. Kim HK, Park HS. Fibrin glue-assisted augmented amniotic membrane transplantation for the treatment of large noninfectious corneal perforations. Cornea 2009; 28(2), 170–176.[PMID: 19158560] |
| 1 | Bullous keratopathy | HAM is one of several modalities for treatment of bullous keratopathy due to corneal endothelial dysfunction. HAM does not address the underlying endothelial disease, so it is considered palliative rather than curative therapy. It is a reasonable alternative for patients who are not candidates for curative endothelial or penetrating keratoplasty. Sutured HAM has been shown to be as effective for bullous keratopathy as anterior stromal puncture (Paris F. Br J |

| # | Indications | Rationale |
|---|---|---|
| | | Ophthalmol 2013;97:980. PMID 23723410) and phototherapeutic keratectomy (Chawla B. Cornea 2010;29:976. PMID 20517149). Non-sutured HAM is a reasonable alternative to anterior stromal puncture as it is faster and simpler to perform. Sutured HAM in an operating room setting and non-sutured HAM in the office are of particular value in patients who have difficulty holding still for office procedures such as anterior stromal puncture in which there is a risk of increased corneal scarring or globe perforation with patient movement. HAM typically offers long-lasting pain relief in these cases, obviating the need for corneal transplantation with its associated increased risks (rejection, infection) and costs.<br><br>There are additional reports demonstrating the efficacy of HAM for bullous keratopathy:<br><br>Pires RTF. Arch Ophthalmol 1999;117:1291. PMID 10532436<br>Espana EM. J Cataract Refract Surg 2003;29:279. PMID 12648638<br>Chansanti O. J Med Assoc Thai 2005;9:S57. PMID 16681053<br>Srinivas S. Eur J Ophthalmol 2007;17:7. PMID 17294377<br>Georgiadis NS. Clin Exp Ophthalmol 2008;36:130. PMID 18352868<br>Chawla B. Eur J Ophthalmol 2008;18:998. PMID 18988175<br>Altiparmak UE. Am J Ophthalmol 2009;147:442. PMID 19019342<br>Stefaniu GI. J Med Life 2014;7:88. PMID 25870682<br>Siu GD. Int Ophthalmol 2015;35:777. PMID: 255866 |
| 2 | Bullous keratopathy | Cryopreserved amniotic membrane (AM) is recommended for Bullous keratopathy with poor visual potential. AM achieves immediate pain relief, reduced inflammation, and complete healing. [1-12] Chansanti et al [4] noted postoperative relief of pain in 14 eyes (82.4%) and complete corneal epithelial healing in 15 eyes (88.2%) after AMT. Sonmez et al. [5] performed anterior stromal micropuncture and AMT in 5 eyes with painful bullous keratopathy [40]. All showed an intact, smooth corneal epithelial surface 1 month after the procedure, and there were no patients that developed recurrent bullae formation during an average follow-up period of 21 months. Siu et al [12] reported a long term symptomatic relief of bullous keratopathy with amniotic membrane transplant in a total of 21 eyes of 20 patients. The majority of eyes experienced pain reduction (94 %), with a significant mean pain score difference of 6.8 ± 2.6, 2-tail p < 0.001 (99 % CI 4.9-8.7). The mean preoperative and postoperative pain scores were 7.3 ± 2.9 and 0.5 ± 1.0, respectively. 16 eyes (76 %) were completely pain free, and 10 eyes (47 %) remained symptom free after a mean follow-up of 39.0 ± 36.3 months (range 5-171 months). The median epithelial healing time was 2 weeks (range 1-20 weeks). Based on the literature, AM is considered as a longer-term treatment for bullous keratopathy patients with poorer visual prognosis. AM without sutures may also be used as an interim measure for patients awaiting corneal transplant. Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Pires RTF, Tseng SCG, Prabhasawat P et al. Amniotic membrane transplantation for symptomatic bullous keratopathy. Arch.Ophthalmol. 1999; 117, 1291-1297.[PMID: 10532436] |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 2. Mrukwa-Kominek E, Gierek-Ciaciura S, Rokita-Wala I, et al. Use of amniotic membrane transplantation for treating bullous keratopathy. Klin Oczna. 2002;104(1):41-6. Polish. [PMID: 12046309] |
| | | 3. Espana EM, Grueterich M, Sandoval H et al. Amniotic membrane transplantation for bullous keratopathy in eyes with poor visual potential. J.Cat.Refract.Surg. 2003; 29, 279-284. |
| | | 4. Chansanti O, Horatanaruang O. The results of amniotic membrane transplantation for symptomatic bullous keratopathy. J Med.Assoc.Thai. 88 Suppl 2005; 9, S57-S62. |
| | | 5. Sonmez B, Kim BT, Aldave AJ. Amniotic membrane transplantation with anterior stromal micropuncture for treatment of painful bullous keratopathy in eyes with poor visual potential. Cornea 26(2), 227–229 (2007). |
| | | 6. Srinivas S, Mavrikakis E, Jenkins C. Amniotic membrane transplantation for painful bullous keratopathy. Eur J Ophthalmol. 2007;17(1):7-10. [PMID: 17294377] |
| | | 7. Georgiadis NS, Ziakas NG, Boboridis KG, et al. Cryopreserved amniotic membrane transplantation for the management of symptomatic bullous keratopathy. Clin Exp Ophthalmol. 2008;36(2):130-5. [PMID: 18352868] |
| | | 8. Chawla B, Tandon R. Sutureless amniotic membrane fixation with fibrin glue in symptomatic bullous keratopathy with poor visual potential. Eur J Ophthalmol. 2008;18(6):998-1001. [PMID: 18988175] |
| | | 9. Altiparmak UE, Oflu Y, Yildiz EH, et al. Prospective comparison of two suturing techniques of amniotic membrane transplantation for symptomatic bullous keratopathy. Am J Ophthalmol. 2009;147(3):442-446.e1. [PMID:19019342] |
| | | 10. Gregory ME, Spiteri-Cornish K, Hegarty B, et al. Combined amniotic membrane transplant and anterior stromal puncture in painful bullous keratopathy: clinical outcome and confocal microscopy. Can J Ophthalmol. 2011;46(2):169-74. [PMID: 21708086] |
| | | 11. Stefaniu GI, Chiotoroiu SM, Secureanu FA, et al. Use of amniotic membrane in bullous keratopathy palliative care. J Med Life. 2014;7 Spec No. 2:88-91. [PMID: 25870682] |
| | | 12. Siu GD, Young AL, Cheng LL. Long-term symptomatic relief of bullous keratopathy with amniotic membrane transplant. Int Ophthalmol. 2015;35(6):777-83. [PMID: 25586624] |
| 1 | Pterygium repair | Sutured HAM has been fairly extensively studied as an alternative to conjunctival autograft or bare sclera technique in pterygium surgery (Kaufman SC. Ophthalmology 2013;120:201. PMID 23062647. Clearfield, Cochrane Database Syst Rev 2016;2:CD011349. PMID 26807004). While HAM is more effective at preventing recurrences than bare sclera technique, and subject to fewer serious complications than mitomycin C, conjunctival autograft has been shown to be more effective than HAM in terms of reducing recurrences. However, there are patients with extensive, double, or recurrent pterygia in which there is insufficient healthy tissue to create a conjunctival autograft. In these patients, sutured or non-sutured (glued) HAM is the material of choice for covering the conjunctival defect left after removal of the pterygium as the recurrence rate is lower than if the sclera is left bare. Sutured and glued HAM should be covered for these cases.<br><br>Non-sutured HAM is effective at promoting epithelial healing in patients who |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | have persistent epithelial defects (see below) after pterygium surgery and should be covered in these cases. |
| 2 | Pterygium repair | The most daunting challenge of pterygium surgery is the high rate of recurrence, as high as 88%. Surgical techniques in more recent years, in which scleral defects are covered with conjunctival autograft or cryopreserved amniotic membrane (AM) with or without mitomycin C (MMC), have resulted in much better outcomes, with less recurrence rates and minimal complications. [1-16] However, some debate still continues regarding which graft offers the better outcome. In a prospective study, Prabhasawat et al [1] first reported a recurrence rate of 10.9% in primary pterygium (n = 54) after excision and AMT. Solomon et al [2] subsequently modified the technique of AMT and achieved a low recurrence rate of 3% in 33 cases of primary pterygium. Another surgical parameter is the use of MMC. Rosen et al [16] reported a considerably low recurrence rate (3.6%) when used AM graft without sutures along with reduced exposure to MMC. In my opinion, AM is as effective as conjunctival autograft in preventing pterygium recurrence and can be considered as a preferred grafting procedure for pterygium repair. The use of AM provides the following benefits: save donor conjunctiva, minimize surgical trauma, reduce surgery time, reduce postoperative pain, reduce inflammation, facilitate faster recovery and healing. Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br><br>1. Prabhasawat P, Barton K, Burkett G, et al. Comparison of conjunctival autografts, amniotic membrane grafts and primary closure for pterygium excision. Ophthalmology 1997; 104, 974-985. [PMID: 9186439]<br>2. Ma DH-K, See L-C, Liau S-B, et al. Amniotic membrane graft for primary pterygium: comparison with conjunctival autograft and topical mitomycin C treatment. Br.J.Ophthalmol. 2000; 84, 973-978.[PMID: 10966947]<br>3. Solomon A, Espana EM, Tseng SCG. Amniotic membrane transplantation for reconstruction of the conjunctival fornices. Ophthalmology. 2003; 110:93–100. [PubMed: 12511352]<br>4. Jain S, Rastogi A. Evaluation of the outcome of amniotic membrane transplantation for ocular surface reconstruction in symblepharon. Eye. 2004; 18(12):1251–1257. [PubMed: 15184952]<br>5. Zhou SY, Chen JQ, Chen LS, et al. Long-term results of amniotic membrane transplantation for conjunctival surface reconstruction. Zhonghua Yan. Ke. Za Zhi. 2004; 40(11):745–749. [PubMed: 15634481]<br>6. Keklikci U, Celik Y, Cakmak SS, et al. Conjunctival-limbal autograft, amniotic membrane transplantation, and intraoperative mitomycin C for primary pterygium. Ann Ophthalmol (Skokie). 2007;39(4):296-301. [PMID: 18025649]<br>7. Kucukerdonmez C, Akova YA, Altinors DD. Comparison of conjunctival autograft with amniotic membrane transplantation for pterygium surgery: surgical and cosmetic outcome. Cornea. 2007:26(4):407-413. [PMID: 17457187]<br>8. Kucukerdonmez C, Akova YA, Altinors DD. Vascularization is more delayed in amniotic membrane graft than conjunctival autograft after pterygium excision. Am.J.Ophthalmol 2007; 143(2), 245-249. [PMID: 17173849]<br>9. Fallah MR, Golabdar MR, Amozadeh J, et al. Transplantation of conjunctival limbal autograft and amniotic membrane vs mitomycin C and amniotic |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|-------------|-----------|
|   |             | membrane in treatment of recurrent pterygium. Eye 2008; 22(3), 420-424. [PMID: 17159974] |
|   |             | 10. Kheirkhah A, Casas V, Sheha H, et al. Role of conjunctival inflammation in surgical outcome after amniotic membrane transplantation with or without fibrin glue for pterygium. Cornea 2008; 27(1), 56-63. [PMID: 18245968] |
|   |             | 11. Kheirkhah A, Blanco G, Casas V, et al. Surgical strategies for fornix reconstruction based on symblepharon severity. Am. J. Ophthalmol. 2008; 146(2):266– 275. [PubMed: 18514608] |
|   |             | 12. Park JH, Jeoung JW, Wee WR, et al. Clinical efficacy of amniotic membrane transplantation in the treatment of various ocular surface diseases. Cont Lens Anterior Eye. 2008 Apr;31(2):73-80. [PMID: 18249149] |
|   |             | 13. KatÄ±rcÄ±oglu YA, Altiparmak U, Engur Goktas S, et al. Comparison of Two Techniques for the Treatment of Recurrent Pterygium: Amniotic Membrane vs Conjunctival Autograft Combined with Mitomycin C. Semin Ophthalmol. 2015;30(5-6):321-7. [PMID: 24506693] |
|   |             | 14. Zhao D, Yin HY, Cheng A, et al. Sealing of the gap between the conjunctiva and tenon capsule to improve symblepharon surgery. Am J Ophthalmol. 2015;160(3):438-446.e1. [PMID: 26093286] |
|   |             | 15. Tanaka TS, Demirci H. Cryopreserved Ultra-Thick Human Amniotic Membrane for Conjunctival Surface Reconstruction After Excision of Conjunctival Tumors. Cornea. 2016;35(4):445-50. [PMID: 26807897] |
|   |             | 16. Rosen R. Amniotic Membrane Grafts to Reduce Pterygium Recurrence. Cornea. 2018;37(2):189-193. [PMID: 28976415] |
| 1 | Limbal stem cell deficiency | Limbal stem cell deficiency is an uncommon, serious disorder leading to conjunctivalization, irregularity, and opacity of the corneal surface. Total limbal stem cell deficiency typically requires a limbal stem cell transplant to restore the ocular surface. These vascularized transplants require prolonged systemic immunosuppression and the attendant risks to support graft survival and prevent recurrence of the disease. Partial limbal stem cell deficiency may respond to selective removal of the diseased tissue without a transplant when a limited portion of the ocular surface is involved. In more extensive cases where selective removal alone is not sufficient, HAM in conjunction with superficial keratectomy to remove the diseased tissue can provide long-term restoration of a smooth and transparent ocular surface and improved visual acuity without having to resort to a transplant (Kheirkhah AV. Am J Ophthalmol 2008;145:787. PMID 18329626). Due to the rarity of this disease, it is unlikely that RCTs will ever be performed. Comparisons to limbal stem cell transplants are unlikely to be performed because of the risks of systemic immune suppression. HAM should be covered in conjunction with superficial keratectomy for cases of limbal stem cell deficiency. |
| 2 | Limbal stem cell deficiency | Patients with Limbal stem cell deficiency (LSCD) suffer from severe loss of vision due to vascularized cornea scarring and non-healing epithelial defect. Their vision cannot be corrected by conventional penetrating keratoplasty. Previous studies have shown that in eyes with partial LSCD, AM promotes expansion of remaining limbal epithelial stem cells [1-4]. To avoid suture-related disadvantages and complications, Kheirkhah et al. [5] recently reported successful reconstruction of the corneal surface in nine patients with nearly total LSCD using fibrin glue. Kheirkhah et al. [56] further reported successful use of minimal conjunctival limbal autograft in conjunction with AM for total limbal stem cell deficiency. |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 1. Tseng SCG, Prabhasawat P, Barton K, et al. Amniotic membrane transplantation with or without limbal allografts for corneal surface reconstruction in patients with limbal stem cell deficiency. Arch. Ophthalmol. 1998;116, 431–441. [PMID: 9565039] <br> 2. Anderson DF, Ellies P, Pires RT, et al. Amniotic membrane transplantation for partial limbal stem cell deficiency. Br. J. Ophthalmol. 2001; 85(5), 567–575. [PMID: 11316719 ] <br> 3. Gomes JA, dos Santos MS, Cunha MC, et al. Amniotic membrane transplantation for partial and total limbal stem cell deficiency secondary to chemical burn. Ophthalmology 2003; 110(3), 466–473. [PMID: 12623806] <br> 4. Sangwan VS, Matalia HP, Vemuganti GK, et al. Amniotic membrane transplantation for reconstruction of corneal epithelial surface in cases of partial limbal stem cell deficiency. Indian J. Ophthalmol. 2004; 52(4), 281–285. [PMID: 15693318] <br> 5. Kheirkhah A, V. Casas V. Raju K et al. Sutureless amniotic membrane transplantation for partial limbal stem cell deficiency. Am.J.Ophthalmol. 2008; 145(5): 787-794. [PMID: 18329626] <br> 6. Kheirkhah, A., Raju VK and S. C. Tseng. "Minimal conjunctival limbal autograft for total limbal stem cell deficiency." Cornea 2008; 27(6): 730-733. [PMID: 18580269] |
| 1 | Stevens-Johnson | Sutureless medical therapy has been demonstrated in a small RCT to be more effective than medical therapy alone in treatment of Stevens-Johnson syndrome (Sharma N. Ophthalmology 2016;123:484. PMID 26686968). Sutureless or sutured HAM, depending on the severity of the disease, in conjunction with medical therapy has become the accepted management technique for the treatment of moderate or severe Stevens-Johnson. Both should be covered for this indication. The severity of the disease and its infrequency makes it unlikely that a large RCT will be performed. Additional literature demonstrating good visual outcomes with both sutured and sutureless HAM in a disease that prior to introduction of HAM was typically blinding includes: <br><br> Shammas MC. Am J Ophthalmol 2010;149:203. PMID 20005508 <br> Gregory DM. Ocular Surf 2008;6:40. PMID 18418506 <br> Shay E. Surv Ophthalmol 2009;54:686. PMID 19699503 <br> Gregory DM. Ophthalmology 2011;118:908. PMID 21440941 <br> Shay E. Cornea 2010;29:359. PMID 20098313 <br> Tomlins PJ. Cornea 2013;32:365. PMID 22677638 <br> Kolomeyer AM. Eye Contact Lens 2013;39:e7. PMID 22683916 <br> Ma KN. Ocular Surf 2016;14:31. PMID 26387869 |
| 2 | Stevens-Johnson | Amniotic membrane with sutures has been used to suppress inflammation, promote healing, and prevent scarring in patients with acute Stevens Johnson Syndrome (SJS) with or without toxic epidermal necrolysis (TEN) [1-6]. The conventional management at intensive care and burn units are usually reserved for life-threatening problems, and thus are frequently inadequate to address ocular inflammation and ulceration. As a result, patients suffering are frequently left with a blinding disease owing to scarring-induced late complications. Gregory et al. [7] and Shay et al. [8] have reviewed the literature and found that AMT performed within 2 weeks after the onset of disease effectively aborts inflammation and facilitates rapid healing in AM-covered areas, thus preventing pathogenic cicatricial complications at the chronic stage in 12 eyes. Several case |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | reports and case series [6-12] demonstrated the effectiveness of AM without sutures (ProKera) at the acute stage of SJS/ TEN, and noted restoration of normal vision. Gregory et al [9] further reported restoration of vision in 10 consecutive cases using AM with and without sutures. However, because this devastating ocular surface disease usually elicits inflammation and ulceration in such hidden areas as the lid margin, the tarsus, and the fornix, AM extended to cover the entire ocular surface is necessary.[10] Ma et al [13] developed a novel technique for using large AM graft without suture to cover the entire ocular surface in patients with acute SJS. In my opinion, and based on the literature, the use of AM with sutures is preferred to prevent long term lid related complications. The use of AM without suture is still helpful in emergency settings when the patient condition does not allow for surgical intervention. Collectively, the use of AM for this indication provides a clinically meaningful improvement in net health outcome. <br><br> 1. John T, Foulks GN, John ME, et al. Amniotic membrane in the surgical management of acute toxic epidermal necrolysis. Ophthalmology 2002; 109(2), 351–360. [PMID: 11825823] <br> 2. Kobayashi A, Yoshita T, Sugiyama K et al. Amniotic membrane transplantation in acute phase of toxic epidermal necrolysis with severe corneal involvement. Ophthalmology 2006; 113(1), 126–132. [PMID: 16324747] <br> 3. Di Pascuale MA, Espana EM, Liu DT et al. Correlation of corneal complications with eyelipid cicatricial pathologies in patients with Steven-Johnson syndrome and toxic epidermal necrolysi syndrome. Ophthalmology 2005; 112(5), 904–912. [PMID: 15878074] <br> 4. Muqit MM, Ellingham RB, Daniel C. Technique of amniotic membrane transplant dressing in the management of acute Stevens–Johnson syndrome. Br. J. Ophthalmol. 2007; 91(11), 1536. [PMID: 17947270] <br> 5. Tandon A, Cackett P, Mulvihill A, et al. Amniotic membrane grafting for conjunctival and lid surface disease in the acute phase of toxic epidermal necrolysis. J. AAPOS 2007; 11(6), 612–613. [PMID: 17681814] <br> 6. Shammas MC, Lai EC, Sarkar JS, et al. Management of acute Stevens–Johnson syndrome and toxic epidermal necrolysis utilizing amniotic membrane and topical corticosteroids. Am. J. Ophthalmol. 2010; 149(2), 203–213. [PMID: 20005508] <br> 7. Gregory DG. The ophthalmologic management of acute Stevens–Johnson syndrome. Ocul. Surf. 2008; 6(2), 87–95. [PMID: 18418506] <br> 8. Shay E, Kheirkhah A, Liang L, et al. Amniotic membrane transplantation as a new therapy for the acute ocular manifestations of Stevens–Johnson syndrome and toxic epidermal necrolysis. Surv. Ophthalmol. 2009; 54(6), 686–696. [PMID: 19699503] <br> 9. Gregory, DG. Treatment of Acute Stevens–Johnson Syndrome and Toxic Epidermal Necrolysis Using Amniotic Membrane: A Review of 10 Consecutive Cases. Ophthalmology 2011; 118:908–914. [PMID: 21440941] <br> 10. Shay E, Khadem JJ and Tseng SC. Efficacy and limitation of sutureless amniotic membrane transplantation for acute toxic epidermal necrolysis. Cornea 2010; 29(3): 359-361. [PMID: 20098313] <br> 11. Tomlins, PJ., Parulekar MV, and Rauz S. ""Triple-TEN" in the Treatment of Acute Ocular Complications From Toxic Epidermal Necrolysis." Cornea 2013; 32(3): 365-369. [PMID: 22677638] |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 12. Kolomeyer AM, Do BK, Tu Y, et al. Placement of ProKera in the management of ocular manifestations of acute Stevens-Johnson syndrome in an outpatient. Eye Contact Lens. 2013;39: e7-11. [PMID: 22683916]<br>13. Ma KN, Thanos A, Chodosh J, et al. A Novel Technique for Amniotic Membrane Transplantation in Patients with Acute Stevens-Johnson Syndrome. Ocul Surf. 2016;14(1):31-6. [PMID: 26387869] |
| 1 | Persistent epithelial defects | HAM is an effective treatment for persistent epithelial defects due to a number of underlying causes. While not a first-line treatment, both sutured and non-sutured HAM are appropriate in patients with epithelial defects that fail to show a response within 2 days of initiation of conservative therapy. Conservative therapy is considered to be any one or more of the following: topical lubricants and/or antibiotics, therapeutic contact lens, or patching. If there is a failure to respond to any one of these modalities, HAM is an appropriate second step.<br><br>Persistent epithelial defects are often a precursor to corneal stromal melting and ulceration. Many of the comments and citations in the above "Section b. corneal ulcers and melts" are applicable here. The uncommon nature of the diseases associated with persistent epithelial defects and the lack of a standard therapeutic regimen account for the lack of RCTs. However, the following publications demonstrate the effectiveness of HAM for this indication.<br><br>Prabhasawat P. Br J Ophthalmol 2001;85:1455. PMID 11734521<br>Lee SH. Am J Ophthalmol 97;123:303. PMID 9063239<br>Letko E. Arch Ophthalmol 2001;119:659. PMID 11346392<br>Gris O. Cornea 2002;21:22. PMID 11805502<br>Seitz B. Eye (London) 2009;23:840. PMID 18535612<br>Dekaris I. Coll Antropol 2010;34 Suppl 2:15. PMID 21305721 |
| 2 | Persistent epithelial defects | Persistent epithelial defect (PED) is often caused by microtrauma, neurotrophic keratopathy and exposure. Conventional treatment includes correcting the underlying condition, suppressing the inflammation, and promoting the healing process using tears. If conventional treatment fails after 2 weeks, these patients are prone to further complications and corneal scarring and haze. Because PED also be 'neurotrophic', please refer to Neurotrophic keratitis indication. As stated above, conventional treatments usually fail to promote prompt healing in these conditions and the eyes are prone to delayed healing, corneal ulceration, scarring, and infection. These complications in turn result in poor patient outcomes, visual detriment, and a greater frequency of office visits and associated costs. The following publications [1-6] show the effectiveness of AM with and without sutures in promoting healing in PEDs. Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Lee SH, Tseng SC. Amniotic membrane transplantation for persistent epithelial defects with ulceration. Am J Ophthalmol. 1997;123(3):303-12. [PMID:9063239]<br>2. Letko E, Stechschulte SU, Kenyon KR, et al. Amniotic membrane inlay and overlay grafting for corneal epithelial defects and stromal ulcers. Arch Ophthalmol. 2001;119(5):659-63. [PMID: 11346392]<br>3. Gris O, del Campo Z, Wolley-Dod C, et al. Amniotic membrane implantation as a therapeutic contact lens for the treatment of epithelial disorders. Cornea. 2002;21(1):22-7. [PMID: 11805502] |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|-------------|-----------|
|   |             | 4.  Seitz B, Das S, Sauer R, et al. Amniotic membrane transplantation for persistent corneal epithelial defects in eyes after penetrating keratoplasty. Eye (Lond). 2009;23(4):840-8. [PMID: 18535612] <br> 5.  Dekaris I, Mravicià‡ I, Barisià‡ A, et al. Amniotic membrane transplantation in the treatment of persistent epithelial defect on the corneal graft. Coll Antropol. 2010;34 Suppl 2:15-9. [PMID: 21305721] <br> 6.  Nguyen, P., K. Rue, M. Heur, et al. "Ocular surface rehabilitation: Application of human amniotic membrane in high-risk penetrating keratoplasties." Saudi J Ophthalmol 2014; 28(3): 198-202. [PMID: 25278797] |
| 1 | Severe dry eye | As noted in the BCBS review, non-sutured HAM has been demonstrated in an RCT to be more effective than conservative therapy in patients with moderate to severe dry eye disease (John T. J Ophthalmol 2017;2017:6404918. PMID 28894606). Also noted in the review was a small series of 10 patients with moderate to severe dry eye that were non-responsive to conventional therapy (Cheng AM. Ocul Surf 2016;14:56. PMID 26387870). These patients improved with placement of non-sutured HAM. A more recent, larger retrospective review of patients with severe dry eye disease unresponsive to traditional therapy and then treated with non-sutured HAM showed that 88% of subjects demonstrated significant improvement of symptoms extending beyond the period of treatment with HAM (McDonald MD. Clin Ophthalmol 2018;12:677. PMID 29670328). <br><br> Traditional dry eye therapy typically consists of frequent application of lubricants, hot compresses, and environmental controls to increase humidity. Patients may not respond to traditional dry eye therapy due to the severity of the disease or due to inability to control the environment or administer drops frequently. Topical drugs such as cyclosporine and lifitegrast may be helpful in these cases but they may take months to take effect. If the patient's daily activities are significantly affected by dry eye signs and symptoms, HAM may provide rapid relief while waiting for long-term medications to take effect. HAM is unlikely to be of benefit for mild dry eye disease or disease that responds to conservative therapy. Because HAM limits acuity it is only viable as a short-term therapy. Sutured HAM is not typically used for severe dry eye alone, but may be necessary in the face of one or more concomitant diseases discussed in the other sections. <br><br> Our recommendation is that non-sutured HAM be covered in patients with persistent symptoms or persistent corneal staining that does not respond to traditional dry eye therapy. |
| 2 | Severe dry eye | Dry eye disease (DED) is a multifactorial disease comprised of tear film insufficiency and associated ocular surface disorder such as superficial epithelial defect. Treatment of DED depends on the etiology and the level of severity. Although artificial tears, immunosuppressants, and punctal occlusion are commonly used for tear film insufficiency, ocular surface involvement with a defect are usually refractory and may require eye protection devices and/ or surgical intervention. <br><br> In fact, Prokera has been reported to manage ocular signs and symptoms of DED. In a retrospective study by Cheng et al,[1] Prokera was placed for 5 days (Range: 2-8 days) in 15 eyes of 10 patients with moderate to severe DED. The dry eye severity ranged from Grade 1 to 4 according to the Report of the International Dry Eye Work Shop (DEWS) 2007.[2] All patients experienced |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | symptomatic relief for a mean period of 4.2 months (Range: 0.3-6.8). Such improvement was accompanied by reduction of Ocular Surface Disease Index (OSDI) symptom scores, the use of topical medications, conjunctival hyperemia, and corneal staining as well as improvement in the quality of vision.11 In a single site prospective, randomized, and controlled study conducted by John et al [3], Prokera together with standard of care was placed in 10 patients for 3.4 ± 0.7 days (Range: 3-5 days) while standard of care was instituted in another 10 patients as the control. All 20 patients presented with moderate to severe DED with DEWS Grade 2-4. Compared to the control arm of 10 patients receiving standard of care, the treatment arm of 10 patients receiving Prokera together with standard of care resulted in reduction of symptoms based on SPEED score and signs such as superficial punctate keratitis (SPK) measured by fluorescein staining, leading to an overall reduction of the mean DEWS severity score from 2.9 ± 0.3 at baseline to 1.1 ± 0.3 at 1 month and 1.0 ± 0.0 at 3 months, respectively (both p ≤ 0 001).These palliative benefits are correlated with an increase of corneal nerve density measured by in vivo confocal microscopy from 12,241 ± 5,083 μm/mm2 at baseline to 16,364 ±3,734 μm/mm2 at 1 month, and 18,827 ±5,453 μm/mm2 at 3 months(both p=0.015). The increase of corneal nerve density is also correlated with an increase of corneal sensitivity measured by a monofilament in the Bonnet-Crochet esthesiometer. A lasting benefit for more than 3 months after one placement of Prokera was also demonstrated in a retrospective study by McDonald et al [4] in 97 eyes of 84 of patients with moderate to severe DED (DEWS 2-4), of which the majority presented with symptoms of ocular discomfort, blurry vision, ocular pain, redness, and light sensitivity. Most of the cases manifested the ocular sign of SPK due to exposure keratitis, filamentary keratitis, epithelial defect, and neurotrophic keratitis. A single placement of Prokera for 5.4 ± 2.8 days leads to notable improvement of DED symptoms and reduction of ocular signs in 74 subjects (88%) as evidenced by notable reduction of the mean DEWS severity score from 3.25 to 1.44 at 1 week, 1.45 at 1 month, and 1.47 at 3 months.<br><br>In my practice, a single placement of Amniotic Membrane (non-sutured) was also effective in reducing signs and symptoms of DED for a period lasting more than three months. Therefore, amniotic membrane without sutures should be considered for severe dry eye with ocular surface damage and inflammation.<br>1. Cheng AM, Zhao D, Chen R, et al. Accelerated Restoration of Ocular Surface Health in Dry Eye Disease by Self-Retained Cryopreserved Amniotic Membrane. Ocul Surf. 2016 Jan;14(1):56-63. [PMID: 26387870]<br>2. The definition and classification of dry eye disease: report of the Definition and Classification Subcommittee of the International Dry Eye WorkShop (2007). Ocul Surf. 2007; 5: 75-92.<br>3. John T, Tighe S, Sheha H, et al. Corneal Nerve Regeneration after Self-Retained Cryopreserved Amniotic Membrane in Dry Eye Disease. J Ophthalmol. 2017;6404918. [PMC5574308]<br>4. McDonald MB, Sheha H, Tighe S, et al. Treatment outcomes in the Dry Eye Amniotic Membrane (DREAM) study. Clin Ophthalmol. 2018 Apr 9;12:677-681. [PMID: 29670328] |
| 1 | Acute ocular chemical burn | Ocular chemical burns represent a diverse array of clinical conditions and severity, making high quality RCTs difficult or impossible to perform. The Cochrane review cited in the BCBS review (Clare G. Cochrane Database Syst Rev |

| # | Indications | Rationale |
|---|---|---|
|   |   | 2012;9:CD009379. PMID 22972141) reflects this difficulty. However, it is clear that there are subsets of patients that respond to either sutured or non-sutured HAM based in its ability to reduce inflammation and promote epithelial healing. Particularly in moderate and severe burns where the prognosis with traditional therapy is poor, sutured and non-sutured HAM are important alternatives that should be covered. There are multiple reports of good outcomes in these cases. Though control groups are lacking, several of these reports are fairly large series and were not addressed directly in the BCBS review: <br><br> Westekemper H. Br J Ophthalmol 2017;101:103. PMID 27150827 <br> Meller D. Ophthalmology 2000;107:980. PMID 10811094 <br> Ucakhan OO. Cornea 2002;21:169. PMID 11862088 <br> Arora R. Eye 2005;19:273. PMID 15286672 <br> Tamhane A. Ophthalmology 2005;112:1963. PMID: 16198422 <br> Tejwani S. Cornea 2007;26:21. PMID 17198009 <br> Prabhasawat P. J Med Assoc Thai 2007;90:319. PMID 17375638 <br> Kheirkhah A. Arch Ophthalmol 2008;126:1059. PMID 18695099 <br> Tandon R. Br J Ophthalmol 2011;95:199. PMID: 20675729 |
| 2 | Acute ocular chemical burn | Previous studies have demonstrated the importance of early intervention with cryopreserved amniotic membrane (AM) in mild and moderate chemical burns.[1-10] Specifically, Miller et al [7] used AM as a patch graft with sutures in 13 eyes of patients with acute chemical burn grade II-IV (within 2 weeks of the injury) and epithelial healing occurred within 2-5 weeks. Prabhasawat et al [8] also showed that AM as a patch graft performed within 5 days of grades II and III chemical burns promoted faster epithelial healing and less corneal haze than if performed after 5 days. These results were confirmed by Tandon et al [9] who demonstrated the efficacy of sutured AM in eyes with acute ocular burns in a prospective, randomized, controlled clinical trial of 100 patients with grade II to IV acute ocular burns. Patients were randomized to receive AM or conventional medical treatment. The rate of epithelial healing was significantly better in the AM group than the group with standard medical therapy alone. Kheirkhah et al [10] noted a similar positive outcome when AM without sutures (Prokera) was used within 8 days of chemical burn injury. Based on the above, the use of AM with or without sutures in acute chemical burn is considered a medical necessity to control inflammation, prevent further damage, reduce scarring and restore visual function. In my opinion, and based on the literature, the use of AM without sutures is preferred to prevent surgical trauma and suture related complications in such compromised eyes. Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome. <br> 1. Kim JS, Kim JC, Na BK, et al. Amniotic membrane patching promotes healing and inhibits protease activity on wound healing following acute corneal alkali burns. Exp Eye Res. 2000;70:329Y337. [PMID: 10712819] <br> 2. Sridhar MS, Bansal AK, Sangwan VS, et al. Amniotic membrane transplantation in acute chemical and thermal injury. Am J Ophthalmol. 2000;130:134Y137. [PMID: 10712819] <br> 3. Ucakhan OO, Koklu G, Firat E. Nonpreserved human amniotic membrane transplantation in acute and chronic chemical eye injuries. Cornea. 2002;21:169Y172. |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 4. Arora R, Mehta D, Jain V. Amniotic membrane transplantation in acute chemical burns. Eye. 2005;19:273Y278. [PMID: 11862088]<br>5. Tamhane A, Vajpayee RB, Biswas NR, et al. Evaluation of amniotic membrane transplantation as an adjunct to medical therapy as compared with medical therapy alone in acute ocular burns. Ophthalmology. 2005;112:1963Y1969. [PMID: 16198422]<br>6. Tejwani S, Kolari RS, Sangwan VS, et al. Role of amniotic membrane graft for ocular chemical and thermal injuries. Cornea. 2007;26:21Y26. [PMID: 17198009]<br>7. Meller D, Pires RTF, Mack RJS, et al. Amniotic membrane transplantation for acute chemical or thermal burns. Ophthalmology. 2000;107:980Y990. [PMID: 10811094]<br>8. Prabhasawat P, Tesavibul N, Prakairungthong N, et al. Efficacy of amniotic membrane patching for acute chemical and thermal ocular burns. J Med Assoc Thai. 2007;90:319Y326. PMID: [17375638]<br>9. Tandon R, Gupta N, Kalaivani M, et al. Amniotic Membrane Transplantation as an Adjunct to Medical Therapy in Acute Ocular Burns. Br J Ophthalmol. 2011;95(2):199-204. [PMID: 20675729]<br>10. Kheirkhah A, Johnson DA, Paranjpe DR, et al. Temporary sutureless amniotic membrane patch for acute alkaline burns. Arch Ophthalmol. 2008;126:1059Y1066. [PMID: 18695099] |

NR = not reported

- Based on the evidence and your clinical experience for using **human amniotic membrane with suture fixation** for the clinical indications described below:
  - Respond YES or NO for each clinical indication whether the intervention would be expected to provide a clinically meaningful improvement in net health outcome; AND
  - Rate your level of confidence in your YES or NO response using the 1 to 5 scale outlined below.

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 |
| 1 | Neurothrophic keratitis | Yes | | | | | X |
| 2 | Neurothrophic keratitis | Yes | | | | X | |
| 1 | Corneal ulcers and melts | Yes | | | | | X |
| 2 | Corneal ulcers and melts | Yes | | | | | X |
| 1 | Corneal perforation | Yes | | | | | X |
| 2 | Corneal perforation | Yes | | | | | X |
| 1 | Bullous keratopathy | Yes | | | | | X |
| 2 | Bullous keratopathy | Yes | | | | X | |
| 1 | Pterygium repair | Yes | | | | | X |
| 2 | Pterygium repair | Yes | | | | | X |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|-------------|----------|----------------|---|-------------------------|---|-----------------|
| 1 | Limbal stem cell deficiency | Yes | | | | | X |
| 2 | Limbal stem cell deficiency | Yes | | | | X | |
| 1 | Stevens-Johnson | Yes | | | | | X |
| 2 | Stevens-Johnson | Yes | | | | | X |
| 1 | Persistent epithelial defects | Yes | | | | | X |
| 2 | Persistent epithelial defects | Yes | | | | | X |
| 1 | Severe dry eye | Yes | | | | X | |
| 2 | Severe dry eye | Yes | | | | X | |
| 1 | Acute ocular chemical burn | Yes | | | | | X |
| 2 | Acute ocular chemical burn | Yes | | | | | X |

NR = not reported

- Based on the evidence and your clinical experience for using **human amniotic membrane with suture fixation** for the clinical indications described below:
  - Respond YES or NO for each clinical indication whether this intervention is consistent with generally accepted medical practice; AND
  - Rate your level of confidence in your YES or NO response using the 1 to 5 scale outlined below.

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|-------------|----------|----------------|---|-------------------------|---|-----------------|
| | | | 1 | 2 | 3 | 4 | 5 |
| 1 | Neurothrophic keratitis | Yes | | | | | X |
| 2 | Neurothrophic keratitis | Yes | | | | X | |
| 1 | Corneal ulcers and melts | Yes | | | | | X |
| 2 | Corneal ulcers and melts | No | | | | X | |
| 1 | Corneal perforation | Yes | | | | | X |
| 2 | Corneal perforation | Yes | | | | | X |
| 1 | Bullous keratopathy | Yes | | | | | X |
| 2 | Bullous keratopathy | No | | | | X | |
| 1 | Pterygium repair | Yes | | | | | X |
| 2 | Pterygium repair | Yes | | | | | X |
| 1 | Limbal stem cell deficiency | Yes | | | | X | |
| 2 | Limbal stem cell deficiency | Yes | | | | | X |
| 1 | Stevens-Johnson | Yes | | | | | X |
| 2 | Stevens-Johnson | Yes | | | | | X |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| 1 | Persistent epithelial defects | Yes | | | | | X |
| 2 | Persistent epithelial defects | No | | | | X | |
| 1 | Severe dry eye | Yes | | | | X | |
| 2 | Severe dry eye | No | | | | | X |
| 1 | Acute ocular chemical burn | Yes | | | | | X |
| 2 | Acute ocular chemical burn | Yes | | | | | X |

NR = not reported

- Based on the evidence and your clinical experience for using **human amniotic membrane without suture fixation** for the clinical indications described below:
  - Respond YES or NO for each clinical indication whether the intervention would be expected to provide a clinically meaningful improvement in net health outcome; AND
  - Rate your level of confidence in your YES or NO response using the 1 to 5 scale outlined below.

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 |
| 1 | Neurothrophic keratitis | Yes | | | | | X |
| 2 | Neurothrophic keratitis | Yes | | | | | X |
| 1 | Corneal ulcers and melts | Yes | | | | | X |
| 2 | Corneal ulcers and melts | Yes | | | | | X |
| 1 | Corneal perforation | No | | | | | X |
| 2 | Corneal perforation | No | | | | X | |
| 1 | Bullous keratopathy | Yes | | | | | X |
| 2 | Bullous keratopathy | Yes | | | | | X |
| 1 | Pterygium repair | Yes | | | | | X |
| 2 | Pterygium repair | Yes | | | X | | |
| 1 | Limbal stem cell deficiency | Yes | | | | X | |
| 2 | Limbal stem cell deficiency | Yes | | | | | X |
| 1 | Stevens-Johnson | Yes | | | | | X |
| 2 | Stevens-Johnson | Yes | | | | | X |
| 1 | Persistent epithelial defects | Yes | | | | | X |
| 2 | Persistent epithelial defects | Yes | | | | | X |
| 1 | Severe dry eye | Yes | | | | X | |
| 2 | Severe dry eye | Yes | | | | | X |

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| 1 | Acute ocular chemical burn | Yes | | | | | X |
| 2 | Acute ocular chemical burn | Yes | | | | | X |

NR = not reported

- Based on the evidence and your clinical experience for using human amniotic membrane without suture fixation for the clinical indications described below:
  - Respond YES or NO for each clinical indication whether this intervention is consistent with generally accepted medical practice; AND
  - Rate your level of confidence in your YES or NO response using the 1 to 5 scale outlined below.

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 |
| 1 | Neurothrophic keratitis | Yes | | | | | X |
| 2 | Neurothrophic keratitis | Yes | | | | X | |
| 1 | Corneal ulcers and melts | Yes | | | | | X |
| 2 | Corneal ulcers and melts | Yes | | | | | X |
| 1 | Corneal perforation | No | | | | | X |
| 2 | Corneal perforation | No | | | | X | |
| 1 | Bullous keratopathy | Yes | | | | | X |
| 2 | Bullous keratopathy | Yes | | | | X | |
| 1 | Pterygium repair | Yes | | | | | X |
| 2 | Pterygium repair | No | | | | X | |
| 1 | Limbal stem cell deficiency | Yes | | | | X | |
| 2 | Limbal stem cell deficiency | Yes | | | | X | |
| 1 | Stevens-Johnson | Yes | | | | | X |
| 2 | Stevens-Johnson | Yes | | | | | X |
| 1 | Persistent epithelial defects | Yes | | | | | X |
| 2 | Persistent epithelial defects | Yes | | | | X | |
| 1 | Severe dry eye | Yes | | | | X | |
| 2 | Severe dry eye | Yes | | | | | X |
| 1 | Acute ocular chemical burn | Yes | | | | | X |
| 2 | Acute ocular chemical burn | Yes | | | | | X |

NR = not reported

- Additional narrative rationale or comments regarding clinical pathway and/or any relevant scientific citations (including the PMID) supporting your clinical input on this topic.

*Current Procedural Terminology* © American Medical Association.  All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Additional Comments |
|---|---|
| 1 | Specific citations are included above in the comments for each of the individual indications. |
| 2 | Amniotic Membrane is available either as an outpatient clinic based only protective bandage contact lens AM patch, or as an ASC or hospital based operating room surgical inlay tissue substitute and is an established treatment for several severe ocular surface diseases. It is most commonly used in patients whose condition is refractory to conventional therapies, such as Corneal Ulcers and Melts, Neurotrophic Keratitis, severe anterior basement membrane dystrophy, and especially difficult-to-heal Persistent Epithelial Defects (PED).<br><br>I use Prokera (BioTissue) to treat ocular surface diseases because based on the clinical presentation and the failure of conventional therapy, it is medically necessary in order to achieve the best clinical outcome. Prokera is a cryopreserved (not dehydrated) sutureless AM and is the only such AM cleared by the FDA (2003). It is indicated for use "where the ocular surface is damaged, or the underlying corneal stroma is inflamed." The Prokera self-retaining ring makes it possible to non-surgically insert AM into the eye like a very large contact lens and thereby secure the membrane in place. As such, Prokera represents a significant improvement over the use of AM grafts that require the more invasive, time consuming, and costly suturing procedure.<br><br>Clinically, use of amniotic membranes serve two primary roles: reduction of inflammation and promotion of wound healing. These are critical functions to accelerating and facilitating optimal clinical outcomes for the patient. Other therapies that provide these mechanisms do exist but either come with drawbacks (side effects such as thinning of the conjunctiva, time to effect) or address one function but not the other (in some cases, therapies may be counterproductive for the other critical clinical need). |

NR = not reported

- Is there any evidence missing from the attached draft review of evidence that demonstrates clinically meaningful improvement in net health outcome?

| # | YES / NO | Citations of Missing Evidence |
|---|---|---|
| 1 | Yes | See specific citations in above comments on each of the individual indications. |
| 2 | No | In general- amniotic membrane is an important Therapy for ocular surface disease which is unresponsive to conventional therapies. In my experience Amniotic membrane grafts have significantly improved the clinical course of many patients, that would have otherwise resulted in vision loss and saved patients from more extensive surgical procedures. |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

MediRegs Master Suite



*HCPCS and CPT Codebook - 2022 > Surgery Codes - Integumentary Codes - (10004 - 19499)*
# 15271 - SKIN SUB GRAFT TRNK/ARM/LEG

[Click to open document in a browser](#)
- [Related Revenue Codes](#)

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
  - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Surgical Repair (Closure) Procedures on the Integumentary System
  - Use the codes in this section to designate wound closure utilizing sutures, staples, or tissue adhesives (eg, 2-cyanoacrylate), either singly or in combination with each other, or in combination with adhesive strips. Chemical cauterization, electrocauterization, or wound closure utilizing adhesive strips as the sole repair material are included in the appropriate E/M code.

    Definitions

    The repair of wounds may be classified as Simple, Intermediate, or Complex.

    Simple repair is used when the wound is superficial (eg, involving primarily epidermis or dermis, or subcutaneous tissues without significant involvement of deeper structures) and requires simple one-layer closure. Hemostasis and local or topical anesthesia, when performed, are not reported separately.

    Intermediate repair includes the repair of wounds that, in addition to the above, require layered closure of one or more of the deeper layers of subcutaneous tissue and superficial (non-muscle) fascia, in addition to the skin (epidermal and dermal) closure. It includes limited undermining (defined as a distance less than the maximum width of the defect, measured perpendicular to the closure line, along at least one entire edge of the defect). Single-layer closure of heavily contaminated wounds that have required extensive cleaning or removal of particulate matter also constitutes intermediate repair.

    Complex repair includes the repair of wounds that, in addition to the requirements for intermediate repair, require at least one of the following: exposure of bone, cartilage, tendon, or named neurovascular structure; debridement of wound edges (eg, traumatic lacerations or avulsions); extensive undermining (defined as a distance greater than or equal to the maximum width of the defect, measured perpendicular to the closure line along at least one entire edge of the defect); involvement of free margins of helical rim, vermilion border, or nostril rim; placement of retention sutures. Necessary preparation includes creation of a limited defect for repairs or the debridement of complicated lacerations or avulsions. Complex repair does not include excision of benign (11400-11446) or malignant (11600-11646) lesions, excisional preparation of a wound bed (15002-15005) or debridement of an open fracture or open dislocation.

    Instructions for listing services at time of wound repair:

    1. The repaired wound(s) should be measured and recorded in centimeters, whether curved, angular, or stellate.

    2. When multiple wounds are repaired, add together the lengths of those in the same classification (see above) and from all anatomic sites that are grouped together into the same code descriptor.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.     Oct 7, 2022 from MediRegs

MediRegs Master Suite 

For example, add together the lengths of intermediate repairs to the trunk and extremities. Do not add lengths of repairs from different groupings of anatomic sites (eg, face and extremities). Also, do not add together lengths of different classifications (eg, intermediate and complex repairs).

When more than one classification of wounds is repaired, list the more complicated as the primary procedure and the less complicated as the secondary procedure, using modifier 59.

3. Decontamination and/or debridement: Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

(For extensive debridement of soft tissue and/or bone, not associated with open fracture(s) and/or dislocation(s) resulting from penetrating and/or blunt trauma, see 11042-11047.)

(For extensive debridement of subcutaneous tissue, muscle fascia, muscle, and/or bone associated with open fracture(s) and/or dislocation(s), see 11010-11012.)

4. Involvement of nerves, blood vessels and tendons: Report under appropriate system (Nervous, Cardiovascular, Musculoskeletal) for repair of these structures. The repair of these associated wounds is included in the primary procedure unless it qualifies as a complex repair, in which case modifier 59 applies.

Simple ligation of vessels in an open wound is considered as part of any wound closure.

Simple "exploration" of nerves, blood vessels or tendons exposed in an open wound is also considered part of the essential treatment of the wound and is not a separate procedure unless appreciable dissection is required. If the wound requires enlargement, extension of dissection (to determine penetration), debridement, removal of foreign body(s), ligation or coagulation of minor subcutaneous and/or muscular blood vessel(s) of the subcutaneous tissue, muscle fascia, and/or muscle, not requiring thoracotomy or laparotomy, use codes 20100-20103, as appropriate.

- Skin Replacement Surgery
  - Skin replacement surgery consists of surgical preparation and topical placement of an autograft (including tissue cultured autograft) or skin substitute graft (ie, homograft, allograft, xenograft). The graft is anchored using the individual's choice of fixation. When services are performed in the office, routine dressing supplies are not reported separately.

    The following definition should be applied to those codes that reference "100 sq cm or 1% of body area of infants and children" when determining the involvement of body size: The measurement of 100 sq cm is applicable to adults and children 10 years of age and older; and percentages of body surface area apply to infants and children younger than 10 years of age. The measurements apply to the size of the recipient area.

    Procedures involving wrist and/or ankle are reported with codes that include arm or leg in the descriptor.

    When a primary procedure requires a skin substitute or skin autograft for definitive skin closure (eg, orbitectomy, radical mastectomy, deep tumor removal), use 15100-15278 in conjunction with primary procedure.

    For biological implant for soft tissue reinforcement, use 15777 in conjunction with primary procedure.

    The supply of skin substitute graft(s) should be reported separately in conjunction with 15271-15278.

- Skin Replacement Surgery Definitions
  - Surgical preparation codes 15002-15005 for skin replacement surgery describe the initial services related to preparing a clean and viable wound surface for placement of an autograft, flap, skin

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.

substitute graft or for negative pressure wound therapy. In some cases, closure may be possible using adjacent tissue transfer (14000-14061) or complex repair (13100-13153). In all cases, appreciable nonviable tissue is removed to treat a burn, traumatic wound or a necrotizing infection. The clean wound bed may also be created by incisional release of a scar contracture resulting in a surface defect from separation of tissues. The intent is to heal the wound by primary intention, or by the use of negative pressure wound therapy. Patient conditions may require the closure or application of graft, flap, or skin substitute to be delayed, but in all cases the intent is to include these treatments or negative pressure wound therapy to heal the wound. Do not report 15002-15005 for removal of nonviable tissue/debris in a chronic wound (eg, venous or diabetic) when the wound is left to heal by secondary intention. See active wound management codes (97597, 97598) and debridement codes (11042-11047) for this service. For necrotizing soft tissue infections in specific anatomic locations, see 11004-11008.

Select the appropriate code from 15002-15005 based upon location and size of the resultant defect. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms). Use 15002 or 15004, as appropriate, for excisions and incisional releases resulting in wounds up to and including 100 sq cm of surface area. Use 15003 or 15005 for each additional 100 sq cm or part thereof. For example: Surgical preparation of a 20 sq cm wound on the right hand and a 15 sq cm wound on the left hand would be reported with a single code, 15004. Surgical preparation of a 75 sq cm wound on the right thigh and a 75 sq cm wound on the left thigh would be reported with 15002 for the first 100 sq cm and 15003 for the second 50 sq cm. If all four wounds required surgical preparation on the same day, use modifier 59 with 15002, and 15004.

Autografts/tissue cultured autografts include the harvest and/or application of an autologous skin graft. Repair of donor site requiring skin graft or local flaps is reported separately. Removal of current graft and/or simple cleansing of the wound is included, when performed. Do not report 97602. Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

Select the appropriate code from 15040-15261 based upon type of autograft and location and size of the defect. The measurements apply to the size of the recipient area. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms).

Skin substitute grafts include non-autologous human skin (dermal or epidermal, cellular and acellular) grafts (eg, homograft, allograft), non-human skin substitute grafts (ie, xenograft), and biological products that form a sheet scaffolding for skin growth. These codes are not to be reported for application of non-graft wound dressings (eg, gel, powder, ointment, foam, liquid) or injected skin substitutes. Application of non-graft wound dressings is not separately reportable. Removal of current graft and/or simple cleansing of the wound is included, when performed. Do not report 97602. Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

Select the appropriate code from 15271-15278 based upon location and size of the defect. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms). The supply of skin substitute graft(s) should be reported separately in conjunction with 15271, 15272, 15273, 15274, 15275, 15276, 15277, 15278. For biologic implant for soft tissue reinforcement, use 15777 in conjunction with code for primary procedure.

- Surgical Preparation for Skin Replacement Surgery
- Skin Substitute Grafts
  - The supply of skin substitute graft(s) should be reported separately in conjunction with 15271-15278. For biologic implant for soft tissue reinforcement, use 15777 in conjunction with code

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.    Oct 7, 2022 from MediRegs

MediRegs Master Suite · Wolters Kluwer

for primary procedure.

- Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm

| CPT Code: | 15271 |
|---|---|
| Long Descriptor: | Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area |
| Medium Descriptor: | APP SKN SUB GRFT T/A/L AREA/100SQ CM /<1ST 25 |
| Short Descriptor: | SKIN SUB GRAFT TRNK/ARM/LEG |
| Consumer Friendly Descriptor: | Application of skin substitute graft to wound of trunk, arms, or legs, 25.0 sq cm or less of wound 100.0 sq cm or less |
| Clinician Friendly Descriptor: | Application of skin substitute graft of arm, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of leg, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of trunk, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less |

**Citation**

CPT Changes: An Insider's View 2012
CPT Assistant Jan 12: 6
CPT Assistant Oct 12: 3
CPT Assistant Jun 14: 14
CPT Assistant Oct 17: 9

**Code Flags**

First Appearance: 20120101

**Additional parenthetical guidelines from associated codes**

15272 - (Do not report 15271, 15272 in conjunction with 15273, 15274)
15278 - (Do not report 15271-15278 in conjunction with 97602)
69320 - (For other reconstructive procedures with grafts (eg, skin, cartilage, bone), see 13151-15760, 21230-21235)
26952 - (For repair of soft tissue defect requiring split or full thickness graft or other pedicle flaps, see 15050-15758)
15777 - (For topical application of skin substitute graft to a wound surface, see 15271-15278)
15274 - (For total wound surface area up to 100 sq cm, see 15271, 15272)
15272 - (Use 15272 in conjunction with 15271)

**Related Codes**

Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm

15271 - Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

15272 - Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure)

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite

Wolters Kluwer

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 20120101 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 15271 |
| Description: | SKIN SUB GRAFT TRNK/ARM/LEG |
| Payment Status Indicator: | T - **Procedure or Service, Multiple Procedure Reduction Applies** Paid under OPPS; separate APC payment. |
| APC: | 5054 |
| National Unadjusted Payment: | $1,749.26 |
| Relative Weight: | 20.7807 |
| Related Information: | Click to Search APC Codebook for 15271<br>NCCI Edits may apply, Click to Search NCCI Edits for 15271<br>Allowable Hospital Outpatient Modifiers which *may* be appropriate with this code include:<br><br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br><br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 15271 |
| Description: | SKIN SUB GRAFT TRNK/ARM/LEG |
| Payment Indicator: | G2 - Non office-based surgical procedure added in CY 2008 or later; payment based on OPPS relative payment weight. |
| Payment Weight: | 17.7550 |
| Payment: | $886.26 |
| Subject to multi-procedure discounting?: | Y |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which *may* be appropriate with this code include:<br><br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite



Physician Fee Schedule Information

| Effective Date: | 10/01/2022 |
| --- | --- |
| Code: | 15271 |
| Description: | SKIN SUB GRAFT TRNK/ARM/LEG |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 4.62 / 2.46 |
| National Unadjusted Payment (NonFac/Fac): | $159.88 / $85.13 |
| Related Information: | Allowable Physician Fee Modifiers which **may** be appropriate with this code include:<br><br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br><br>For Outpatient Rehabilitation codes Modifiers which **may** be appropriate include:<br><br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br><br>Physician Fee Schedule CodeBook Page for 15271 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 15271 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

15271 SKIN SUB GRAFT TRNK/ARM/LEG

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 LOCH Incorporated and its affiliates and licensors. All rights reserved.



**Select Page**



# Skin Substitutes Definitions per CPT:

by Medical Billing

Autografts/tissue cultured autografts: Include the harvest and/or application of an autologous skin graft.

Skin substitute grafts: Include non-autologous human cellular and tissue products (e.g., dermal or epidermal, cellular and acellular, homograft or allograft), non-human cellular or tissue products (i.e., xenograft), and biological products (synthetic or xenogeneic) that are applied in a sheet over an open wound to augment wound closure and/or skin growth.

Chronic Wounds are defined as wounds that do not respond to standard wound treatment for at least a 30 day period during organized comprehensive conservative therapy.

For all wounds, documentation (as outlined in the documentation requirements of the policy) and a comprehensive treatment plan, before initiation of a specialized wound therapy product is required.

For purposes of this LCD, a Failed Response is defined as an ulcer or skin deficit that has failed to respond to documented appropriate wound-care measures, has increased in size or depth, or has not changed in baseline size or depth and has no indication that improvement is likely (such as granulation, epithelialization or progress towards closing).

Medicare covers application of skin substitutes to Ulcers or Wounds with Failed



You can give a child the ongoing support to overcome generations of inequality.
Sponsor a child

• Skin deficit at least 1.0 cm² in size;

• Clean and free of necrotic debris or exudate;

• Have adequate circulation/oxygenation to support tissue growth/wound healing as evidenced by physical examination (e.g., Ankle-Brachial Index (ABI) of no less than 0.60, toe pressure > 30mm Hg);

• For diabetic foot ulcers, the patient's medical record reflects a diagnosis of Type 1 or Type 2 Diabetes and also reflects medical management for this condition.

Wound healing is impaired by the systemic use of tobacco. Therefore, ideally patients who have smoked will have ceased smoking or have refrained from systemic tobacco intake for at least 4 weeks during conservative wound care and prior to planned bioengineered skin replacement therapy.

Documentation (in the pre-service record) specifically addressing circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed. Such record should include updated medication history, review of pertinent medical problems that may have occurred since the previous wound evaluation, and explanation of the planned skin replacement surgery with choice of skin substitute graft product. The procedure risks and complications should also be reviewed and documented. Documentation of smoking cessation counseling and cessation measures prescribed, if applicable, must also be documented in the patient's record.

Application of a skin substitute graft for lower extremity chronic wound (DFU and VLU) will be covered when the following conditions are met for the individual patient:

• Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks, during which the patient is compliant with recommendations, and without evidence of underlying osteomyelitis or nidus of infection.

• Presence of a venous stasis ulcer for at least 3 months but unresponsive to appropriate wound care for at least 30 days with documented compliance.

• Presence of a full thickness skin loss ulcer that is the result of abscess, injury or trauma that has failed to respond to appropriate control of infection, foreign body, tumor resection, or other disease process for a period of 4 weeks or longer.



VOL. II                                                                                              352

file:///K:/Medical Review/CLIN 6 Postpay AA NOT USED UNTIL 7.19.2021/AA_KS_B_2021_189_534235030_Christopher Surtman/Citations Resourc…    2/8

File 13.pdf - Page 261 of 2526

In all wound management the ulcer must be free of infection and underlying osteomyelitis with documentation of the conditions that have been treated and resolved prior to the institution of skin substitute therapy. For purposes of this LCD, appropriate therapy includes, but is not limited to:

o Control of edema, venous hypertension or lymphedema

o Control of any nidus of infection or colonization with bacterial or fungal elements

o Elimination of underlying cellulitis, osteomyelitis, foreign body, or malignant process

o Appropriate debridement of necrotic tissue or foreign body (exposed bone or tendon)

o For diabetic foot ulcers, appropriate non-weight bearing and/or off-loading pressure

o For venous stasis ulcers, compression therapy provided with documented diligent use of multilayer dressings, compression stockings of > 20mmHg pressure, or pneumatic compression

o Provision of wound environment to promote healing (protection from trauma and contaminants, elimination of inciting or aggravating processes)

**Limitations:**

Due to the propensity for misuse of skin substitute and biological dressing products, reimbursement may be made only when the medical record clearly documents that these products have been used in a comprehensive, organized wound management program. All listed products, unless they are specifically FDA-labeled or cleared for use in the types of wounds being treated, will be considered to be biologic dressings and part of the relevant Evaluation and Management (E/M) service provided and not separately reimbursed.

• Partial thickness loss with the retention of epithelial appendages is not a candidate for grafting or replacement, as epithelium will repopulate the deficit from the appendages, negating the benefit of overgrafting

• Skin substitute grafts will be allowed for the episode of wound care in compliance with FDA guidelines for the specific product (see utilization guidelines) not to exceed 10 applications or treatments. In situations where more than one specific product is used, it is expected that the number of applications or treatments will still not exceed 10



• Simultaneous use of more than one product for the episode of wound is not covered. Product change within the episode of wound is allowed, not to exceed the 10 application limit per wound per 12 week period of care.

• Treatment of any chronic skin wound will typically last no more than twelve (12) weeks.

• Repeat or alternative applications of skin substitute grafts are not considered medically reasonable and necessary when a previous full course of applications was unsuccessful. Unsuccessful treatment is defined as increase in size or depth of an ulcer or no change in baseline size or depth and no sign of improvement or indication that improvement is likely (such as granulation, epithelialization or progress towards closing) for a period of 4 weeks past start of therapy.

• Retreatment of healed ulcers, those showing greater than 75% size reduction and smaller than .5 sq. cm, is not considered medically reasonable and necessary.

• Skin substitute grafts are contraindicated and are not considered reasonable and necessary in patients with inadequate control of underlying conditions or exacerbating factors (e.g., uncontrolled diabetes, active infection, and active Charcot arthropathy of the ulcer extremity, vasculitis or continued tobacco smoking without physician attempt to effect smoking cessation).

• Skin substitute grafts are contraindicated in patients with known hypersensitivity to any component of the specific skin substitute graft (e.g., allergy to avian, bovine, porcine, equine products).

• Repeat use of surgical preparation services (CPT codes 15002, 15003, 15004, and 15005) in conjunction with skin substitute application codes will be considered not reasonable and necessary. It is expected that each wound will require the use of appropriate wound preparation code at least once at initiation of care prior to placement of the skin substitute graft.

• Re-treatment within one (1) year of any given course of skin substitute treatment for a venous stasis ulcer or (diabetic) neuropathic foot ulcer is considered treatment failure and does not meet reasonable and necessary criteria for re-treatment of that ulcer with a skin substitute procedure.



VOL. II                                                   354

file:///K:/Medical Review/CLIN 6 Postpay AA NOT USED UNTIL 7.19.2021/AA_KS_R_2021_180_534235030_Christopher Surtman/Citations Resourc…    4/8

File 13 pdf - Page 263 of 2526

CMS has guidance regarding other specialized wound treatment technology and specifically addresses platelet rich plasma systems (e.g., Autologet, Magellan); negative pressure wound therapy devices and electro-magnetic/ultrasound/mist therapies. They are not addressed in this LCD as their role in the treatment of the two major types of lower extremity wounds discussed here is limited. Utilization remains at the provider's discretion and must be reasonable and necessary. Note that combination therapy with any bioengineered skin substitute (CTP) will be considered not reasonable and necessary.

| | Search |
|---|---|

## Get Medicare billing update instantly



## Medicare reimbursement articles

Medicare allowed amount, Maximum allowable

VOL. II                                                                                                         355

file:///K:/Medical Review/CLIN 6 Postpay AA NOT USED UNTIL 7.19.2021/AA_KS_B_2021_180_534235030_Christopher Surtman/Citations Resourc…    5/8

File 13 pdf - Page 264 of 2526

CPT 30075, 30473, 30688 – Panendoscopy

Modifier 22 – Unusual increased procedural services – tips and reimbursement guidelines

Medicare ACO – Accountable care Organizations – All the update and Guideline

CPT code 49082, 49083, 49084 – abdominal paracentesis

CPT 47560, 47561, 47562, 47563, 47564, 47570 and 47579

CPT code 87635, 87426, 87428, 87811

CPT 99401, 99402, g0446, g0447 and G0473

Most used Anesthesia CPT codes and time units

Finger Modifier Guidelines and usage examples



VOL. II                                                                                                      356

file:///K:/Medical Review/CLIN 6 Postpay AA NOT USED UNTIL 7.19.2021/AA_KS_R_2021_180_534235030_Christopher Surtman/Citations Resourc...    6/8

File 13.pdf - Page 265 of 2526

See Also

See Also

| | | |
|---|---|---|
| 1 | BEST CAR INSURANCE FOR SENIORS | ▶ |
| 2 | MP3 MUSIC DOWNLOADS | ▶ |
| 3 | FIND JOBS ONLINE | ▶ |
| 4 | BEST DROPS FOR DRY EYES | ▶ |
| 5 | CDL JOBS NEAR ME LOCAL | ▶ |

VOL. II                                                                                                                  857

file:///K:/Medical Review/CLIN 6 Postpay AA NOT USED UNTIL 7.19.2021/AA_KS_B_2021_180_534235030_Christopher Surtman/Citations Resourc...    7/8

File 13 pdf - Page 266 of 2526

| 6 | WORK FROM HOME OPTIONS | ▶ |
|---|---|---|
| 7 | JOBS HIRING IMMEDIATELY | ▶ |
| 8 | BEST AUTO INSURANCE COMPANIES | ▶ |

## Medicare Guidelines visitors

## AMA

CPT Codes, Descriptors, and other data only are copyright 1999 American Medical Association (or such other date of publication of CPT). All Rights Reserved to AMA

Medicare payment basics



Designed by **Elegant Themes** | Powered by **WordPress**



VOL. II                                            358

file:///K:/Medical Review/CLIN 6 Postpay AA NOT USED UNTIL 7.19.2021/AA_KS_B_2021_180_534335030_Christopher Surtman/Citations Resourc…    8/8

File 13 pdf - Page 267 of 2526

MediRegs Master Suite



*COVERAGE ARTICLES - MAC Part B (J5) - Wisconsin Physicians Service Insurance Corporation [05202] - KS > Active Articles*

# Local Coverage Article for Billing and Coding: Mohs Micrographic Surgery V5 (Rev. Eff. 12/31/2020)

[Click to open document in a browser](#)

[Article Information](#)    [Coding Information](#)    [Other Information](#)    [Associated Documents](#)

| | |
|---|---|
| Contractor Information | |
| Contractor Name | Wisconsin Physicians Service Insurance Corporation |
| Contract Number | 05202 |
| Contract Type | MAC - Part B |
| Other Information | www.wpsgha.com |
| | 1717 W. Broadway |
| | PO Box 1787 |
| | Madison Wisconsin (WI) 53701-1787 |
| | 8665183285 |
| | Medical Director: Robert E. Kettler, MD (MAC Jurisdiction 5 Contractor Medical Director) |
| Article Information | |
| Article ID | A57477 |
| Source Article ID | |
| Article Version Number | 5 |
| Article Type | Billing and Coding |
| Key Article? | No |
| Article Title | **Billing and Coding: Mohs Micrographic Surgery** |
| Status of this Version | **Approved** |
| Jurisdiction | Kansas (KS) |
| DME Region for Article | |
| Original Effective Date | 10/31/2019 |
| Revision Effective Date | 12/31/2020 |
| Retirement Date | N/A |
| AMA CPT / ADA CDT Copyright Statement | CPT codes, descriptions and other data only are copyright 2019 American Medical Association. All Rights Reserved. Applicable FARS/HHSARS apply. |
| | Current Dental Terminology © 2019 American Dental Association. All rights reserved. |
| | Copyright © 2019, the American Hospital Association, Chicago, Illinois. Reproduced with permission. No portion of the AHA copyrighted materials contained within this publication may be copied without the express written consent of the AHA. AHA copyrighted materials including the UB-04 codes and descriptions may not be removed, copied, or utilized within any software, product, service, solution or derivative work without the written consent of the AHA. If an entity wishes to utilize any AHA materials, please contact the AHA at 312-893-6816. Making copies or utilizing the content of the UB-04 Manual, including the codes and/or descriptions, for internal purposes, resale and/or to be used in any product or publication; creating any modified or derivative work of the UB-04 Manual and/or codes and descriptions; and/or making any commercial use of UB-04 Manual or any portion thereof, including the codes and/or |

© 2020 LCCH Incorporated and its affiliates and licensors. All rights reserved.          Nov 18, 2021 from MediRegs

MediRegs Master Suite 

descriptions, is only authorized with an express license from the American Hospital Association. To license the electronic data file of UB-04 Data Specifications, contact Tim Carlson at (312) 893-6816 or Laryssa Marshall at (312) 893-6814. You may also contact us at ub04@healthforum.com.

CMS National Coverage Policy

*Italicized* font represents CMS national language/wording copied directly from CMS Manuals or CMS Transmittals. Contractors are prohibited from changing national language/wording.

**Social Security Act**
Title XVIII of the Social Security Act (SSA):

- Title XVIII of the Social Security Act, Sections 1861 [s] [1], only physicians (MD/DO) may perform this procedure.
- Title XVIII of the Social Security Act, Section 1862 (a) (1)(A), this section allows coverage and payment for only those services considered medically reasonable and necessary.
- Title XVIII of the Social Security Act, Section 1833 (e), this section prohibits Medicare payment for any claim which lacks the necessary information to process the claim.

**CMS Publications:**

- CMS Pub. *100-02, Medicare Benefit Policy Manual*, Chapter 15 - Covered Medical and Other Health Services, Section §30 - Physician Services.
- CMS Pub. *100-02, Medicare Benefit Policy Manual*, Chapter 16 - General Exclusions From Coverage, Section §120 - Cosmetic Surgery.
- CMS Pub. *100-04, Medicare Claims Processing Manual,* Chapter 12 - Physicians/Nonphysician Practitioners, Section §40-40.6, Surgeons and Global Surgery.
- CMS Pub. *100-04, Medicare Claims Processing Manual*, Chapter 12 - Physicians/Nonphysician Practitioners, Section §60, Payment for Pathology Services.
- CMS Transmittal No. 434, Pub. *100-04, Medicare Claims Processing Manual*, Change Request #3458, January 14, 2005, Addition of CLIA Edits to Certain Health Care Procedure Coding System (HCPCS) Codes for Mohs Surgery.
- CMS Transmittal No, 857, effective date October 3, 2018 Change Request 10901 Local Coverage Determinations (LCDs) Implementation date January 8, 2019.

Article Text

The billing and coding information in this article is dependent on the coverage indications, limitations and/or medical necessity described in the associated LCD L35494 Mohs Micrographic Surgery.

The medical records should clearly show that Mohs surgery was chosen because of the complexity, size and/or location of the lesion and why other approaches are not medically necessary and reasonable. The operative notes and pathology documentation in the patient's medical record must clearly show that Mohs micrographic surgery was performed using accepted Mohs technique, with the same physician performing both the surgical and pathology services. The notes should also contain the location(s), number, and size of the lesion(s), the number of stages performed, and the number of specimens per stage. Denied claims may be appealed and providers can submit documentation to support the service.

The Current Procedural Terminology (CPT)/Healthcare Common Procedure Coding System (HCPCS) code(s) may be subject to National Correct Coding Initiative (NCCI) edits. This information does not take precedence over NCCI edits. Refer to NCCI for correct coding guidelines and specific applicable code combinations prior to billing Medicare.

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite

Wolters Kluwer

CPT codes 17311-17315 are reserved for the surgeon who removes a lesion, prepares, and interprets the slides. Select skin biopsy/excision services and pathology services are part of the MOHS surgery and bundled into 17311-17315. Refer to the NCCI Manual and CPT manual for additional information.

MOHS surgery includes the pathologic examination of the specimen performed by the surgeon and should not be reported separately. There may be instances when a MOHS surgeon submits a specimen(s) derived from the procedure for pathologic examination to another physician (i.e., pathologist) for either frozen or permanent section. In those situations, the service is not considered a MOHS service and pathology service may be reported by the performing pathologist. The surgeon should report for excision and repair using appropriate codes (Reference American Medical Association [AMA] CPT Professional Edition)

- It is **NOT** appropriate to report modifier -59 when the biopsy and MOHS surgery are performed on the same lesion, in the same operative session and on the same date of service. However, if a suspected skin cancer is biopsied for pathologic diagnosis prior to proceeding to MOHS micrographic surgery, the biopsy and frozen section pathology may be reported separately using modifier -59 to distinguish the diagnostic biopsy from the definitive MOHS surgery Refer to the NCCI Manual and CPT manual for additional information.
  - Modifier -59 should **only** be appended to the pathology codes, by the MOHS surgeon, if a biopsy is performed on a completely separate lesion that does not involve the MOHS surgery; however, MOHS surgery and pathology service may be reported when tissue separate from the tissue examined during the MOHS surgery is submitted for subsequent formalin-fixed processing and histopathologic examination (i.e., the submitted specimen originates from the same operative site or from a different operative site but is not the same tissue processed during the MOHS surgery). Refer to the NCCI Manual and CPT manual for additional information.
  - There may be rare instances where a biopsy and pathology must occur on the same date as a MOHS procedure. In these instances, skin biopsy CPT codes and the pathology CPT codes may be reported with the -59 modifier appended if:
    - The lesion for which MOHS is planned has not been biopsied within the previous 60 days, or
    - If the surgeon cannot obtain a pathology report from the referring physician with a reasonable effort, or
    - The biopsy is performed on a lesion that is not associated with the MOHS surgery. For example: If a biopsy is performed prior to the MOHS surgery for a diagnostic purpose, the biopsy can also be performed. Modifier -59 or -58 would be appended to distinguish the diagnostic biopsy from the definitive MOHS surgery Refer to the NCCI Manual and CPT manual for additional information.
- When it is appropriate to report modifier -59, the modifier should be reported on the same line as the biopsy procedure codes. It should **NOT** be reported on the same line as the MOHS procedure.

The appropriate MOHS surgery code should be reported with the appropriate quantities for the specimens mapped in the days/units field.

CPT code 17312 should be reported for additional stages with the first stage code 17311.
CPT code 17314 should be reported for additional stages with the first stage code 17313.
CPT code 17315 may be used to report each block after the first 5 blocks for any single stage.

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite                                          Wolters Kluwer

**All surgical procedures performed in the same operative session should be reported on the same claim.**

Multiple instances of CPT codes 17312 and 17314 should not be reported on separate claim lines. The services should be totaled and entered as a single item with the appropriate number of units of service.

Please note that these codes refer to the number of blocks, not number of slides.

If a MOHS procedure is performed on a **completely separate lesion** on the same date of service, each first stage (CPT code 17311 or 17313) code should be reported on a separate claim line with a -59 modifier signifying a separate and distinct lesion. If additional stages are required on the additional lesion, report the second stage codes (CPT code 17312 or 17314) on separate claim lines with a -59 modifier (Reference NCCI Initiative Modifiers: Modifier 59 Fact Sheet).

**Documentation Requirements**

1. All documentation must be maintained in the patient's medical record and made available to the contractor upon request.
2. Every page of the record must be legible and include appropriate patient identification information (e.g., complete name, dates of service[s]). The documentation must include the legible signature of the physician or non-physician practitioner responsible for and providing the care to the patient.
3. The submitted medical record must support the use of the selected ICD-10-CM code(s).
4. The submitted CPT/HCPCS code must describe the service performed. The medical record documentation must support the medical necessity of the services as stated in this policy.
5. Procedures that exceed the medical need are not reasonable and necessary (not a Medicare covered service), therefore, documentation (pre-procedure E/M note and/or post-procedure operative notes) must address (a) why the lesion will not be (was not) managed by standard excision or destruction technique and (when applicable) (b) why (when utilized or referred to a plastic surgeon) procedures for complex repair, adjacent tissue transfer or rearrangement, flap, or graft codes are employed.
6. The physician must document in the patient's medical record that the diagnosis is appropriate for MMS and that MMS is an appropriate choice as the treatment of the particular lesion. The options for care (both the primary procedure options and repair options) must be discussed with the patient and clearly noted in the pre-procedure (or post procedure as appropriate) documentation. In summary, the minimal medical record documentation entails that the beneficiary was informed of their treatment options and explained the risks/benefits of the MMS technique and associated repair.
7. Though complexity of the lesion (poorly defined borders, suspected deep invasion, recurrent lesion, prior radiation), lesion size/location, and maximum conservation of healthy tissue are to be addressed in the preoperative medical record, the surgeon must document why the lesion will not be (was not) managed by excision or destruction technique.
8. Operative notes and pathology documentation in the patient's medical record should clearly document that MMS was performed using accepted MMS technique, in which the physician acts in two integrated and distinct capacities: surgeon and pathologist (therefore confirming that the procedure meets the definition of the CPT code[s]).
9. Operative documentation should note: location, number, and size of the lesion(s); number of stages performed; number of specimens per stage.
10. Histology documentation must include the following:
    - First stage: if tumor present, depth of invasion; pathological pattern of the tumor; cell morphology; if present, note perineural invasion of scar

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.



tissue.
- Subsequent stages: if the tumor characteristics are the same as in the first stage, note this fact only. If the tumor characteristics are different from the first stage, describe the differences.

11. Measurement of the primary lesion necessitating MMS and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:
- Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).
- Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
- It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.

12. When the surgical defect created by MMS requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.

**Coding Information**
**CPT/HCPCS Codes**

**Group 1 Codes:**

17311
MOHS MICROGRAPHIC TECHNIQUE, INCLUDING REMOVAL OF ALL GROSS TUMOR, SURGICAL EXCISION OF TISSUE SPECIMENS, MAPPING, COLOR CODING OF SPECIMENS, MICROSCOPIC EXAMINATION OF SPECIMENS BY THE SURGEON, AND HISTOPATHOLOGIC PREPARATION INCLUDING ROUTINE STAIN(S) (EG, HEMATOXYLIN AND EOSIN, TOLUIDINE BLUE), HEAD, NECK, HANDS, FEET, GENITALIA, OR ANY LOCATION WITH SURGERY DIRECTLY INVOLVING MUSCLE, CARTILAGE, BONE, TENDON, MAJOR NERVES, OR VESSELS; FIRST STAGE, UP TO 5 TISSUE BLOCKS

17312
MOHS MICROGRAPHIC TECHNIQUE, INCLUDING REMOVAL OF ALL GROSS TUMOR, SURGICAL EXCISION OF TISSUE SPECIMENS, MAPPING, COLOR CODING OF SPECIMENS, MICROSCOPIC EXAMINATION OF SPECIMENS BY THE SURGEON, AND HISTOPATHOLOGIC PREPARATION INCLUDING ROUTINE STAIN(S) (EG, HEMATOXYLIN AND EOSIN, TOLUIDINE BLUE), HEAD, NECK, HANDS, FEET, GENITALIA, OR ANY LOCATION WITH SURGERY DIRECTLY INVOLVING MUSCLE, CARTILAGE, BONE, TENDON, MAJOR NERVES, OR VESSELS; EACH ADDITIONAL STAGE AFTER THE FIRST STAGE, UP TO 5 TISSUE BLOCKS (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE)

17313
MOHS MICROGRAPHIC TECHNIQUE, INCLUDING REMOVAL OF ALL GROSS TUMOR, SURGICAL EXCISION OF TISSUE SPECIMENS, MAPPING, COLOR CODING OF SPECIMENS, MICROSCOPIC EXAMINATION OF SPECIMENS BY THE SURGEON, AND HISTOPATHOLOGIC PREPARATION INCLUDING ROUTINE STAIN(S) (EG, HEMATOXYLIN AND EOSIN, TOLUIDINE BLUE), OF THE TRUNK, ARMS, OR LEGS; FIRST STAGE, UP TO 5 TISSUE BLOCKS

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite 

**17314**
MOHS MICROGRAPHIC TECHNIQUE, INCLUDING REMOVAL OF ALL GROSS TUMOR, SURGICAL EXCISION OF TISSUE SPECIMENS, MAPPING, COLOR CODING OF SPECIMENS, MICROSCOPIC EXAMINATION OF SPECIMENS BY THE SURGEON, AND HISTOPATHOLOGIC PREPARATION INCLUDING ROUTINE STAIN(S) (EG, HEMATOXYLIN AND EOSIN, TOLUIDINE BLUE), OF THE TRUNK, ARMS, OR LEGS; EACH ADDITIONAL STAGE AFTER THE FIRST STAGE, UP TO 5 TISSUE BLOCKS (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE)

**17315**
MOHS MICROGRAPHIC TECHNIQUE, INCLUDING REMOVAL OF ALL GROSS TUMOR, SURGICAL EXCISION OF TISSUE SPECIMENS, MAPPING, COLOR CODING OF SPECIMENS, MICROSCOPIC EXAMINATION OF SPECIMENS BY THE SURGEON, AND HISTOPATHOLOGIC PREPARATION INCLUDING ROUTINE STAIN(S) (EG, HEMATOXYLIN AND EOSIN, TOLUIDINE BLUE), EACH ADDITIONAL BLOCK AFTER THE FIRST 5 TISSUE BLOCKS, ANY STAGE (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE)

CPT/HCPCS Modifiers

**Group 1 Paragraph:**

N/A

**Group 1 Codes:**

**CODE DESCRIPTION**

| | |
|---|---|
| 59 | DISTINCT PROCEDURAL SERVICE: UNDER CERTAIN CIRCUMSTANCES, THE PHYSICIAN MAY NEED TO INDICATE THAT A PROCEDURE OR SERVICE WAS DISTINCT OR INDEPENDENT FROM OTHER SERVICES PERFORMED ON THE SAME DAY. MODIFIER -59 IS USED TO IDENTIFY PROCEDURES/SERVICES THAT ARE NOT NORMALLY REPORTED TOGETHER, BUT ARE APPROPRIATE UNDER THE CIRCUMSTANCES. THIS MAY REPRESENT A DIFFERENT SESSION OR PATIENT ENCOUNTER, DIFFERENT PROCEDURE OR SURGERY, DIFFERNET SITE OR ORGAN SYSTEM, SEPARATE INCISION/EXCISION, SEPARATE LESION, OR SEPARATE INJURY (OR AREA OF INJURY IN EXTENSIVE INJURIES) NOT ORDINARILY ENCOUNTERED OR PERFORMED ON THE SAME DAY BY THE SAME PHYSICIAN. HOWEVER, WHAN ANOTHER ALREADY ESTABLISHED MODIFIER IS APPROPRIATE IT SHOULD BE USED RATHER THAN MODIFIER -59. ONLY IF NO MORE DESCRIPTIVE MODIFIER IS AVAILABLE, AND THE USE OF MODIFIER -59 BEST EXPLAINS THE CIRCUMSTANCES, SHOULD MODIFIER -59 BE USED. MODIFIER CODE 09959 MAY BE USED AS AN ALTERNATE TO MODIFIER -59. |

**Group 1 Codes:**

ICD-10 Codes that Support Medical Necessity

It is the responsibility of the provider to code to the highest level specified in the ICD-10-CM. The correct use of an ICD-10-CM code listed below does not assure coverage of a service. The service must be reasonable and necessary in the specific case and must meet the criteria specified in this determination.

Diagnosis codes for lesions involving the trunk (excluding scrotum), upper limb including the shoulder and lower limb including the hip should only be used when the surgery is done for one of the indications specifically noted in this LCD.

Diagnosis codes C44.81, C44.82, and C44.89 should only be used when reporting malignant neoplasms of contiguous or overlapping sites of skin whose

MediRegs Master Suite                                                            Wolters Kluwer

point of origin cannot be determined.

C00.0
Malignant neoplasm of external upper lip

C00.1
Malignant neoplasm of external lower lip

C00.3
Malignant neoplasm of upper lip, inner aspect

C00.4
Malignant neoplasm of lower lip, inner aspect

C00.6
Malignant neoplasm of commissure of lip, unspecified

C00.8
Malignant neoplasm of overlapping sites of lip

C43.0
Malignant melanoma of lip

C43.111
Malignant melanoma of right upper eyelid, including canthus

C43.112
Malignant melanoma of right lower eyelid, including canthus

C43.121
Malignant melanoma of left upper eyelid, including canthus

C43.122
Malignant melanoma of left lower eyelid, including canthus

C43.21
Malignant melanoma of right ear and external auricular canal

C43.22
Malignant melanoma of left ear and external auricular canal

C43.31
Malignant melanoma of nose

C43.39
Malignant melanoma of other parts of face

C43.4
Malignant melanoma of scalp and neck

C43.51
Malignant melanoma of anal skin

C43.52
Malignant melanoma of skin of breast

C43.59
Malignant melanoma of other part of trunk

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite

Wolters Kluwer

C43.61
Malignant melanoma of right upper limb, including shoulder

C43.62
Malignant melanoma of left upper limb, including shoulder

C43.71
Malignant melanoma of right lower limb, including hip

C43.72
Malignant melanoma of left lower limb, including hip

C43.8
Malignant melanoma of overlapping sites of skin

C44.00
Unspecified malignant neoplasm of skin of lip

C44.01
Basal cell carcinoma of skin of lip

C44.02
Squamous cell carcinoma of skin of lip

C44.09
Other specified malignant neoplasm of skin of lip

C44.1021
Unspecified malignant neoplasm of skin of right upper eyelid, including canthus

C44.1022
Unspecified malignant neoplasm of skin of right lower eyelid, including canthus

C44.1091
Unspecified malignant neoplasm of skin of left upper eyelid, including canthus

C44.1092
Unspecified malignant neoplasm of skin of left lower eyelid, including canthus

C44.1121
Basal cell carcinoma of skin of right upper eyelid, including canthus

C44.1122
Basal cell carcinoma of skin of right lower eyelid, including canthus

C44.1191
Basal cell carcinoma of skin of left upper eyelid, including canthus

C44.1192
Basal cell carcinoma of skin of left lower eyelid, including canthus

C44.1221
Squamous cell carcinoma of skin of right upper eyelid, including canthus

C44.1222
Squamous cell carcinoma of skin of right lower eyelid, including canthus

C44.1291
Squamous cell carcinoma of skin of left upper eyelid, including canthus

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.

C44.1292
Squamous cell carcinoma of skin of left lower eyelid, including canthus

C44.1921
Other specified malignant neoplasm of skin of right upper eyelid, including canthus

C44.1922
Other specified malignant neoplasm of skin of right lower eyelid, including canthus

C44.1991
Other specified malignant neoplasm of skin of left upper eyelid, including canthus

C44.1992
Other specified malignant neoplasm of skin of left lower eyelid, including canthus

C44.202
Unspecified malignant neoplasm of skin of right ear and external auricular canal

C44.209
Unspecified malignant neoplasm of skin of left ear and external auricular canal

C44.212
Basal cell carcinoma of skin of right ear and external auricular canal

C44.219
Basal cell carcinoma of skin of left ear and external auricular canal

C44.222
Squamous cell carcinoma of skin of right ear and external auricular canal

C44.229
Squamous cell carcinoma of skin of left ear and external auricular canal

C44.292
Other specified malignant neoplasm of skin of right ear and external auricular canal

C44.299
Other specified malignant neoplasm of skin of left ear and external auricular canal

C44.301
Unspecified malignant neoplasm of skin of nose

C44.309
Unspecified malignant neoplasm of skin of other parts of face

C44.311
Basal cell carcinoma of skin of nose

C44.319
Basal cell carcinoma of skin of other parts of face

C44.321
Squamous cell carcinoma of skin of nose

C44.329
Squamous cell carcinoma of skin of other parts of face

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite

Wolters Kluwer

C44.391
Other specified malignant neoplasm of skin of nose

C44.399
Other specified malignant neoplasm of skin of other parts of face

C44.40
Unspecified malignant neoplasm of skin of scalp and neck

C44.41
Basal cell carcinoma of skin of scalp and neck

C44.42
Squamous cell carcinoma of skin of scalp and neck

C44.49
Other specified malignant neoplasm of skin of scalp and neck

C44.500
Unspecified malignant neoplasm of anal skin

C44.501
Unspecified malignant neoplasm of skin of breast

C44.509
Unspecified malignant neoplasm of skin of other part of trunk

C44.510
Basal cell carcinoma of anal skin

C44.511
Basal cell carcinoma of skin of breast

C44.519
Basal cell carcinoma of skin of other part of trunk

C44.520
Squamous cell carcinoma of anal skin

C44.521
Squamous cell carcinoma of skin of breast

C44.529
Squamous cell carcinoma of skin of other part of trunk

C44.590
Other specified malignant neoplasm of anal skin

C44.591
Other specified malignant neoplasm of skin of breast

C44.599
Other specified malignant neoplasm of skin of other part of trunk

C44.602
Unspecified malignant neoplasm of skin of right upper limb, including shoulder

C44.609
Unspecified malignant neoplasm of skin of left upper limb, including shoulder

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite

Wolters Kluwer

C44.612
Basal cell carcinoma of skin of right upper limb, including shoulder

C44.619
Basal cell carcinoma of skin of left upper limb, including shoulder

C44.622
Squamous cell carcinoma of skin of right upper limb, including shoulder

C44.629
Squamous cell carcinoma of skin of left upper limb, including shoulder

C44.692
Other specified malignant neoplasm of skin of right upper limb, including shoulder

C44.699
Other specified malignant neoplasm of skin of left upper limb, including shoulder

C44.711
Basal cell carcinoma of skin of unspecified lower limb, including hip

C44.712
Basal cell carcinoma of skin of right lower limb, including hip

C44.719
Basal cell carcinoma of skin of left lower limb, including hip

C44.722
Squamous cell carcinoma of skin of right lower limb, including hip

C44.729
Squamous cell carcinoma of skin of left lower limb, including hip

C44.792
Other specified malignant neoplasm of skin of right lower limb, including hip

C44.799
Other specified malignant neoplasm of skin of left lower limb, including hip

C44.81
Basal cell carcinoma of overlapping sites of skin

C44.82
Squamous cell carcinoma of overlapping sites of skin

C44.89
Other specified malignant neoplasm of overlapping sites of skin

C49.0
Malignant neoplasm of connective and soft tissue of head, face and neck

C4A.0
Merkel cell carcinoma of lip

C4A.111
Merkel cell carcinoma of right upper eyelid, including canthus

C4A.112

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.    Nov 18, 2021 from MediRegs

MediRegs Master Suite                                    Wolters Kluwer

Merkel cell carcinoma of right lower eyelid, including canthus

**C4A.121**
Merkel cell carcinoma of left upper eyelid, including canthus

**C4A.122**
Merkel cell carcinoma of left lower eyelid, including canthus

**C4A.21**
Merkel cell carcinoma of right ear and external auricular canal

**C4A.22**
Merkel cell carcinoma of left ear and external auricular canal

**C4A.31**
Merkel cell carcinoma of nose

**C4A.39**
Merkel cell carcinoma of other parts of face

**C4A.4**
Merkel cell carcinoma of scalp and neck

**C4A.51**
Merkel cell carcinoma of anal skin

**C4A.52**
Merkel cell carcinoma of skin of breast

**C4A.59**
Merkel cell carcinoma of other part of trunk

**C4A.61**
Merkel cell carcinoma of right upper limb, including shoulder

**C4A.62**
Merkel cell carcinoma of left upper limb, including shoulder

**C4A.71**
Merkel cell carcinoma of right lower limb, including hip

**C4A.72**
Merkel cell carcinoma of left lower limb, including hip

**C4A.8**
Merkel cell carcinoma of overlapping sites

**C51.0**
Malignant neoplasm of labium majus

**C51.1**
Malignant neoplasm of labium minus

**C51.2**
Malignant neoplasm of clitoris

**C51.8**
Malignant neoplasm of overlapping sites of vulva

**C57.7**

MediRegs Master Suite



Malignant neoplasm of other specified female genital organs

C57.8
Malignant neoplasm of overlapping sites of female genital organs

C60.0
Malignant neoplasm of prepuce

C60.1
Malignant neoplasm of glans penis

C60.2
Malignant neoplasm of body of penis

C60.8
Malignant neoplasm of overlapping sites of penis

C63.2
Malignant neoplasm of scrotum

C63.7
Malignant neoplasm of other specified male genital organs

C63.8
Malignant neoplasm of overlapping sites of male genital organs

D03.0
Melanoma in situ of lip

D03.111
Melanoma in situ of right upper eyelid, including canthus

D03.112
Melanoma in situ of right lower eyelid, including canthus

D03.121
Melanoma in situ of left upper eyelid, including canthus

D03.122
Melanoma in situ of left lower eyelid, including canthus

D03.21
Melanoma in situ of right ear and external auricular canal

D03.22
Melanoma in situ of left ear and external auricular canal

D03.39
Melanoma in situ of other parts of face

D03.4
Melanoma in situ of scalp and neck

D03.51
Melanoma in situ of anal skin

D03.52
Melanoma in situ of breast (skin) (soft tissue)

D03.59

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite 

Melanoma in situ of other part of trunk

D03.61
Melanoma in situ of right upper limb, including shoulder

D03.62
Melanoma in situ of left upper limb, including shoulder

D03.71
Melanoma in situ of right lower limb, including hip

D03.72
Melanoma in situ of left lower limb, including hip

D03.8
Melanoma in situ of other sites

D04.0
Carcinoma in situ of skin of lip

D04.111
Carcinoma in situ of skin of right upper eyelid, including canthus

D04.112
Carcinoma in situ of skin of right lower eyelid, including canthus

D04.121
Carcinoma in situ of skin of left upper eyelid, including canthus

D04.122
Carcinoma in situ of skin of left lower eyelid, including canthus

D04.21
Carcinoma in situ of skin of right ear and external auricular canal

D04.22
Carcinoma in situ of skin of left ear and external auricular canal

D04.39
Carcinoma in situ of skin of other parts of face

D04.4
Carcinoma in situ of skin of scalp and neck

D04.5
Carcinoma in situ of skin of trunk

D04.61
Carcinoma in situ of skin of right upper limb, including shoulder

D04.62
Carcinoma in situ of skin of left upper limb, including shoulder

D04.71
Carcinoma in situ of skin of right lower limb, including hip

D04.72
Carcinoma in situ of skin of left lower limb, including hip

D04.8

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite 

Carcinoma in situ of skin of other sites

---

D07.1
Carcinoma in situ of vulva

---

D07.2
Carcinoma in situ of vagina

---

D07.39
Carcinoma in situ of other female genital organs

---

D07.4
Carcinoma in situ of penis

---

D07.61
Carcinoma in situ of scrotum

---

D07.69
Carcinoma in situ of other male genital organs

---

D49.2
Neoplasm of unspecified behavior of bone, soft tissue, and skin

**Additional ICD-10 Information**    N/A

**Bill Type Codes**    Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.
11x
Hospital Inpatient (Including Medicare Part A)

---

13x
Hospital Outpatient

---

71x
Clinic - Rural Health

---

73x
Clinic - Freestanding

---

85x
Critical Access Hospital

**Revenue Codes**    Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy, services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.

0360
Operating Room Services - General Classification

---

0361
Operating Room Services - Minor Surgery

---

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite

Wolters Kluwer

0362
Operating Room Services - Organ Transplant - Other than Kidney

0367
Operating Room Services - Kidney Transplant

0369
Operating Room Services - Other OR Services

0510
Clinic - General Classification

0511
Clinic - Chronic Pain Center

0512
Clinic - Dental Clinic

0513
Clinic - Psychiatric Clinic

0514
Clinic - OB-GYN Clinic

0515
Clinic - Pediatric Clinic

0516
Clinic - Urgent Care Clinic

0517
Clinic - Family Practice Clinic

0519
Clinic - Other Clinic

0520
Freestanding Clinic - General Classification

0521
Freestanding Clinic - Clinic Visit by Member to RHC/FQHC

0522
Freestanding Clinic - Home Visit by RHC/FQHC Practitioner

0523
Freestanding Clinic - Family Practice Clinic

0524
Freestanding Clinic - Visit by RHC/FQHC Practitioner to a Member in a SNF or Skilled Swing Bed in a Covered Part A Stay

0525
Freestanding Clinic - Visit by RHC/FQHC Practitioner to a Member in a SNF (not in a Covered Part A Stay) or NF or ICF MR or Other Residential Facility

0526
Freestanding Clinic - Urgent Care Clinic

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite



**0527**

Freestanding Clinic - Visiting Nurse Service(s) to a Member's Home when in a Home Health Shortage Area

**0528**

Freestanding Clinic - Visit by RHC/FQHC Practitioner to Other non-RHC/FQHC site (e.g. Scene of Accident)

**0529**

Freestanding Clinic - Other Freestanding Clinic

**0761**

Specialty Services - Treatment Room

| | |
|---|---|
| Other Coding Information | **Group 1 Paragraph:** |
| | N/A |
| | **Group 1 Codes:** |
| | N/A |
| Other Information | |
| Keywords | N/A |
| Revision History | |
| Revision Number (Date) | Revision History Explanation |
| R1 (12/31/2020) | 12/31/2020 Reformatted CMS National Coverage Policy: no change in content. Clarified Article Guidance and Article Text to support current billing and coding information dependent on coverage indications and limitations described in the associated L35494. Relocated Documentation Requirements from L35494 to A57477 and updated requirements. No change in coverage. Review completed 11/24/2020. |
| Associated Documents | |
| Related Documents: LCDs | • L35494 (version 24) - Mohs Micrographic Surgery |
| Related Documents: Articles | N/A |
| Statutory Requirements URL(s) | N/A |
| Rules and Regulations URL(s) | N/A |
| CMS Manual Explanations URL(s) | N/A |
| Other URL(s) | N/A |

Source: https://www.cms.gov/medicare-coverage-database/details/article-details.aspx?articleId=57477&ver=5 (accessed 11/13/2021)

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.    Nov 18, 2021 from MediRegs

# RETIRED Local Coverage Determination (LCD): Application of Bioengineered Skin Substitutes (L34593)

Links in PDF documents are not guaranteed to work. To follow a web link, please use the MCD Website.

Please note: This is a Retired LCD.

# Contractor Information

| Contractor Name | Contract Type | Contract Number | Jurisdiction | State(s) |
|---|---|---|---|---|
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 05101 - MAC A | N/A | Iowa |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part B | 05102 - MAC B | N/A | Iowa |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 05201 - MAC A | N/A | Kansas |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part B | 05202 - MAC B | N/A | Kansas |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 05301 - MAC A | N/A | Missouri - Entire State |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part B | 05302 - MAC B | N/A | Missouri - Entire State |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 05401 - MAC A | N/A | Nebraska |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part B | 05402 - MAC B | N/A | Nebraska |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 05901 - MAC A | N/A | Alaska Alabama Arkansas Arizona Connecticut Florida Georgia Iowa Idaho Illinois Indiana Kansas Kentucky Louisiana Massachusetts Maine Michigan Minnesota Missouri - Entire State Mississippi Montana North Carolina North Dakota Nebraska New Hampshire New Jersey Ohio Oregon Rhode Island South Carolina South Dakota |

| Contractor Name | Contract Type | Contract Number | Jurisdiction | State(s) |
|---|---|---|---|---|
| | | | | Tennessee |
| | | | | Utah |
| | | | | Virginia |
| | | | | Virgin Islands |
| | | | | Vermont |
| | | | | Washington |
| | | | | Wisconsin |
| | | | | West Virginia |
| | | | | Wyoming |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 08101 - MAC A | N/A | Indiana |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part B | 08102 - MAC B | N/A | Indiana |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 08201 - MAC A | N/A | Michigan |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part B | 08202 - MAC B | N/A | Michigan |

Back to Top

# LCD Information

## Document Information

☒ LCD ID
L34593

Original ICD-9 LCD ID
L30135

LCD Title
Application of Bioengineered Skin Substitutes

AMA CPT / ADA CDT / AHA NUBC Copyright Statement
CPT only copyright 2002-2016 American Medical Association. All Rights Reserved. CPT is a registered trademark of the American Medical Association. Applicable FARS/DFARS Apply to Government Use. Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

The Code on Dental Procedures and Nomenclature (Code) is published in Current Dental Terminology (CDT). Copyright © American Dental Association. All rights reserved. CDT and CDT-2016 are trademarks of the American Dental Association.

Original Effective Date
For services performed on or after 10/01/2015

Revision Effective Date
For services performed on or after 01/01/2016

Revision Ending Date
03/01/2016

Retirement Date
03/01/2016

Notice Period Start Date
N/A

Notice Period End Date
N/A

UB-04 Manual. OFFICIAL UB-04 DATA SPECIFICATIONS MANUAL, 2014, is copyrighted by American Hospital Association ("AHA"), Chicago, Illinois. No portion of OFFICIAL UB-04 MANUAL may be reproduced, sorted in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without prior express, written consent of AHA." Health Forum reserves the right to change the copyright notice from time to time upon written notice to Company.

CMS National Coverage Policy Title XVIII of the Social Security Act, Section 1862(a)(1)(A)
Title XVIII of the Social Security Act, Section 1833(e)
CMS Publication 100-02, *Medicare Benefits Policy Manual Chapter 15*, section 100- Surgical Dressings.
CMS Manual System, Pub 100-4, *Medicare Claims Processing Manual*,
Chapter 17, §40 – Discarded drugs and biologicals.

Coverage Guidance
**Coverage Indications, Limitations, and/or Medical Necessity**

This LCD covers the use of skin substitutes and related products in the treatment of lower extremity ulcer disease. The LCD does not pertain or otherwise apply to the use of any skin substitutes or related products in the treatment of burns, skin cancer, or for true reconstructive surgery.

**Indications**
Application of Bioengineered Skin Substitutes will be covered when the following conditions are met and documented as appropriate for the individual patient:

1.  Presence of neuropathic diabetic foot ulcers for greater than four (4) weeks duration

2.  Presence of venous stasis ulcers of greater than (1) one month duration that have failed to respond to documented conservative measures for greater than (1) one month duration

3.  Presence of neuropathic diabetic foot ulcers that have failed to respond to documented conservative measures for greater than one (1) month duration. These measures must include appropriate steps to off-load pressure during treatment.

4.  Presence of partial or full-thickness ulcers

5.  Measurements of the initial ulcer size, the size following cessation of any conservative management and the size at the beginning of skin substitute treatment.

In all cases, the ulcer must be free of infection and underlying osteomyelitis. Documentation must be provided that these conditions have been successfully treated and resolved, prior to instituting skin substitute treatment.

**Surgical Preparation for Initial Wound Recipient Site Preparation**

**CPT codes 15002-15005 Surgical Preparation**
Note: CPT codes 15002-15005 describe burn and wound preparation or incisional or excisional release of scar contracture resulting in an open wound requiring a skin graft. These CPT codes are appropriately used in place of service inpatient hospital, outpatient hospital, ambulatory surgical center or office surgical suite with regional or general anesthesia to resurface an area damaged by burns, traumatic injury or surgery. An operative report is required and must be available upon request. If this procedure is performed in an office the claim can be resubmitted with a request for a redetermination and the medical staff will give the claim individual consideration.

Surgical preparation codes 15002 - 15005 for skin replacement surgery describe initial services related to preparing a clean and viable wound service for placement of an autograft, flap, skin substitute graft, or for negative pressure wound therapy. Select the appropriate code from 15002 - 15005 based upon location and size of the resultant defect.

**Surgical Preparation of Wound prior to Application of Skin Substitute**

# LCD - Application of Bioengineered Skin Substitutes (L34593)

Links in PDF documents are not guaranteed to work. To follow a web link, please use the MCD Archive Website.

Retired

# Contractor Information

| CONTRACTOR NAME | CONTRACT TYPE | CONTRACT NUMBER | JURISDICTION | STATES |
|---|---|---|---|---|
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 05101 - MAC A | J - 05 | Iowa |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part B | 05102 - MAC B | J - 05 | Iowa |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 05201 - MAC A | J - 05 | Kansas |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part B | 05202 - MAC B | J - 05 | Kansas |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 05301 - MAC A | J - 05 | Missouri - Entire State |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part B | 05302 - MAC B | J - 05 | Missouri - Entire State |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 05401 - MAC A | J - 05 | Nebraska |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part B | 05402 - MAC B | J - 05 | Nebraska |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 05901 - MAC A | J - 05 | Alabama Alaska Arizona Arkansas Connecticut Florida Georgia Idaho Illinois Indiana Iowa Kansas Kentucky Louisiana Maine Massachusetts Michigan |

| CONTRACTOR NAME | CONTRACT TYPE | CONTRACT NUMBER | JURISDICTION | STATES |
|---|---|---|---|---|
| | | | | Mississippi<br>Missouri - Entire State<br>Montana<br>Nebraska<br>New Hampshire<br>New Jersey<br>North Carolina<br>North Dakota<br>Ohio<br>Oregon<br>Rhode Island<br>South Carolina<br>South Dakota<br>Tennessee<br>Utah<br>Vermont<br>Virginia<br>Washington<br>West Virginia<br>Wisconsin<br>Wyoming |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 08101 - MAC A | J - 08 | Indiana |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part B | 08102 - MAC B | J - 08 | Indiana |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part A | 08201 - MAC A | J - 08 | Michigan |
| Wisconsin Physicians Service Insurance Corporation | MAC - Part B | 08202 - MAC B | J - 08 | Michigan |

# LCD Information

## Document Information

**LCD ID**
L34593

**Original ICD-9 LCD ID**
L30135

**LCD Title**VOL. II

**AMA CPT / ADA CDT / AHA NUBC Copyright Statement**

CPT codes, descriptions and other data only are copyright 2022 American Medical Association. All Rights Reserved. Applicable FARS/HHSARS apply.

Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the

380

Application of Bioengineered Skin Substitutes

**Source Proposed LCD**

N/A

**Original Effective Date**

For services performed on or after 10/01/2015

**Revision Effective Date**

For services performed on or after 01/01/2016

**Revision Ending Date**

03/01/2016

**Retirement Date**

03/01/2016

**Notice Period Start Date**

N/A

**Notice Period End Date**

N/A

AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

Current Dental Terminology © 2022 American Dental Association. All rights reserved.

Copyright © 2022, the American Hospital Association, Chicago, Illinois. Reproduced with permission. No portion of the American Hospital Association (AHA) copyrighted materials contained within this publication may be copied without the express written consent of the AHA. AHA copyrighted materials including the UB☐04 codes and descriptions may not be removed, copied, or utilized within any software, product, service, solution or derivative work without the written consent of the AHA. If an entity wishes to utilize any AHA materials, please contact the AHA at 312☐893☐6816.

Making copies or utilizing the content of the UB☐04 Manual, including the codes and/or descriptions, for internal purposes, resale and/or to be used in any product or publication; creating any modified or derivative work of the UB☐04 Manual and/or codes and descriptions; and/or making any commercial use of UB☐04 Manual or any portion thereof, including the codes and/or descriptions, is only authorized with an express license from the American Hospital Association. The American Hospital Association (the "AHA") has not reviewed, and is not responsible for, the completeness or accuracy of any information contained in this material, nor was the AHA or any of its affiliates, involved in the preparation of this material, or the analysis of information provided in the material. The views and/or positions presented in the material do not necessarily represent the views of the AHA. CMS and its products and services are not endorsed by the AHA or any of its affiliates.

## CMS National Coverage Policy

Title XVIII of the Social Security Act, Section 1862(a)(1)(A)

Title XVIII of the Social Security Act, Section 1833(e)

CMS Publication 100-02, *Medicare Benefits Policy Manual Chapter 15*, section 100- Surgical Dressings.

CMS Manual System, Pub 100-4, *Medicare Claims Processing Manual*,

Chapter 17, §40 – Discarded drugs and biologicals.

## Coverage Guidance

**Coverage Indications, Limitations, and/or Medical Necessity**

This LCD covers the use of skin substitutes and related products in the treatment of lower extremity ulcer disease. The LCD does not pertain or otherwise apply to the use of any skin substitutes or related products in the treatment of burns, skin cancer, or for true reconstructive surgery.

**Indications**

Application of Bioengineered Skin Substitutes will be covered when the following conditions are met and documented as appropriate for the individual patient:

1. Presence of neuropathic diabetic foot ulcers for greater than four (4) weeks duration
2. Presence of venous stasis ulcers of greater than (1) one month duration that have failed to respond to documented conservative measures for greater than (1) one month duration
3. Presence of neuropathic diabetic foot ulcers that have failed to respond to documented conservative measures for greater than one (1) month duration. These measures must include appropriate steps to off-load pressure during treatment.

4. Presence of partial or full-thickness ulcers
5. Measurements of the initial ulcer size, the size following cessation of any conservative management and the size at the beginning of skin substitute treatment.


In all cases, the ulcer must be free of infection and underlying osteomyelitis. Documentation must be provided that these conditions have been successfully treated and resolved, prior to instituting skin substitute treatment.


**Surgical Preparation for Initial Wound Recipient Site Preparation**


**CPT codes 15002-15005 Surgical Preparation**
Note: CPT codes 15002-15005 describe burn and wound preparation or incisional or excisional release of scar contracture resulting in an open wound requiring a skin graft. These CPT codes are appropriately used in place of service inpatient hospital, outpatient hospital, ambulatory surgical center or office surgical suite with regional or general anesthesia to resurface an area damaged by burns, traumatic injury or surgery. An operative report is required and must be available upon request. If this procedure is performed in an office the claim can be resubmitted with a request for a redetermination and the medical staff will give the claim individual consideration.


Surgical preparation codes 15002 - 15005 for skin replacement surgery describe initial services related to preparing a clean and viable wound service for placement of an autograft, flap, skin substitute graft, or for negative pressure wound therapy. Select the appropriate code from 15002 - 15005 based upon location and size of the resultant defect.


**Surgical Preparation of Wound prior to Application of Skin Substitute**
Repair of donor site requiring skin graft or local flaps is reported separately. Removal of current graft and/or simple cleansing of the wound is included, when performed.


Do not report CPT code 97602. Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure. Select the appropriate code from CPT codes 15271-15278 based upon location and size of the defect. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms).


Medicare accepts the Food and Drug Drug Administration's (FDA) classification and description of any bioengineered skin substitute. Application of a Bioengineered Skin Substitute is covered when the following conditions are met and documented as appropriate for the individual patient:

1. Beneficiaries with diabetes under current medical management and controlled with stable HgbA1c level.
2. Venous stasis ulcers that have failed to heal, using conservative measures.
3. Neuropathic diabetic foot ulcers that have failed to heal, using conservative measures.
4. Ulcers that do not involve tendon, muscle or joint capsule, or have bone exposure that extends through the dermis unless specifically indicated within the FDA approved package insert.
5. Beneficiaries with adequate arterial blood supply to the foot evidenced by a palpable pulse on the foot (either dorsalis pedis or posterior tibial artery) or an Ankle Brachial Index (ABI) of 0.65 or greater
6. Neuropathic diabetic foot ulcers that have been treated with appropriate steps to off-load pressure.
7. The ulcer must be free of infection and underlying osteomyelitis

The following Skin Substitutes are covered under Medicare in place of service inpatient hospital, outpatient hospital, ambulatory surgical center, or office setting:

| Q4101 | Skin substitute, apligraf, per square centimeter |
|---|---|
| Q4102 | Skin substitute, oasis wound matrix, per square centimeter |
| Q4106 | Skin substitute, dermagraft, per square centimeter |
| Q4107 | Graftjacket, per square centimeter |
| Q4110 | Skin substitute, primatrix, per square centimeter |
| Q4121 | Theraskin per square centimeter |
| Q4131 | Epifix per square centimeter |

All products must be:

- Provided in accordance with the material's Food and Drug Administration- (FDA) approved package label unless otherwise stated in this policy.
- Applied to partial- or full-thickness wounds (see individual product information for labeled indications).
- Applied in a frequency that is supported either by the FDA product specific labeling instructions or are clearly supported by documentation in the medical record showing the medical reasonable and necessary indications.

## Q4101 Skin substitute, apligraf, per square centimeter

Dermal and epidermal, (substitute) tissue of human origin, with or without bioengineered or processed elements, with metabolically active elements, per square centimeter

1. This product is a manufactured viable bilaminate graft or skin substitute designed to be used for treatment of non-infected, partial, and full thickness skin ulcers due to venous insufficiency or neuropathic diabetic foot ulcers.
2. Apligraf is indicated for use with standard therapeutic compression for the treatment of non-infected partial and full-thickness skin ulcers due to venous insufficiency of greater than 1 month duration and which have not adequately responded to conventional ulcer therapy.
3. Apligraf is also indicated for use with standard diabetic foot ulcer care for the treatment of full-thickness neuropathic diabetic foot ulcers of greater than three weeks duration which have not adequately responded to conventional ulcer therapy and which extend through the dermis but without tendon, muscle, capsule or bone exposure.
4. Apligraf is limited to 5 applications
5. Per FDA-approved labeling, no time restriction between applications
6. If the skin product is going to be billed to Medicare Part B, it must be billed on the same claim as the surgical application of the product.

## Q4131 Epifix

Epifix is an amniotic membrane allograft used in the treatment of chronic and acute wounds.

1. Epifix is indicated for neuropathic diabetic foot ulcer and venous stasis ulcer that have failed to respond to conservative measures.
2. Payment is limited to five applications per ulcer.
3. Continued reapplication when the treatment is unsuccessful after 30 days of treatment, retreatment of an ulcer following an unsuccessful course of treatment or retreatment of a successfully treated healed ulcer will not be

considered medically necessary.

### Q4102 Skin substitute, oasis wound matrix, per square centimeter

Dermal (substitute) tissue of non-human origin, with or without other bioengineered or processed elements, with metabolically active elements, per square centimeter.

1. The product is intended to be used for the management of wounds including:
   - Treatment of neuropathic diabetic foot ulcers that have failed conservative measures of at least four weeks duration.
   - Treatment of partial and full-thickness skin venous insufficiency ulcers present for a minimum of four weeks duration and have failed conventional treatment for at least two weeks.
   - Skin substitute used in conjunction with standard wound care regiment.
2. This product is covered when the medical record clearly documents that the product is being used in an office or clinic based comprehensive, organized wound management program.

### Q4106 Skin substitute, dermagraft, per square centimeter

Dermal (substitute) tissue of human, with or without other bioengineered or processed elements, with metabolically active elements, per square centimeter

1. This product is covered for the treatment of full-thickness diabetic foot ulcers of greater than six weeks duration, which extend through the dermis, but without tendon, muscle, joint capsule or bone exposure.
2. This product is covered when the medical record clearly documents that the product is being used in an office or clinic based comprehensive, organized wound management program.

### Q4107 - Graftjacket, per square centimeter

GRAFTJACKET® Regenerative Tissue Matrix-Ulcer Repair will be considered reasonable and necessary for treatment of neuropathic diabetic foot ulcers (DFU) with all the following conditions:

1. Patient has a current medical diagnosis of either Type I or Type II diabetes mellitus; and
2. Patient does not have a current HbA1C reading exceeding 12%; and
3. Full thickness ulcers of greater than three weeks duration that extend through the dermis but without tendon, muscle, capsule or bone exposure; and
4. Underlying disease process(es) contributing to the ulcer, e.g., diabetes, is adequately treated and documented; and
5. Ulcers are located on the foot or toes and are free of infection, redness, drainage, underlying osteomyelitis, surrounding cellulitis, tunnels or tracts, eschar or any necrotic material that could interfere with the adherence of GRAFTJACKET® Regenerative Tissue Matrix-Ulcer Repair and the process of wound healing; and
6. Patient must have adequate arterial blood supply as evidenced by ankle-brachial index (ABI) of 0.65 or greater in the limb undergoing the procedure.

GRAFTJACKET® Regenerative Tissue Matrix-Ulcer Repair must be used in conjunction with the following standard conservative measures:

1. Pressure-reducing footwear and/or non-weight bearing regimen
2. Debridement of necrotic and callused tissue when necessary; and
3. Acceptable methods of wound care

The patient must be competent and/or have the support system required to participate in follow-up care as associated

with treatment of the wound with GRAFTJACKET® Regenerative Tissue Matrix-Ulcer Repair.

Limitations:

The use of GRAFTJACKET® Regenerative Tissue Matrix-Ulcer Repair on ulcers with any of the following conditions is considered not reasonable and necessary.

1. Cellulitis
2. Osteomyelitis
3. Necrotic ulcer
4. Draining wound
5. Bone exposed wound bed
6. Clinically significant wound healing impairment due to uncontrolled diabetes, poor nutrition and/or general medical condition
7. Autoimmune connective tissue disease

A single application of Acellular Dermal Tissue Matrix for any particular ulcer is usually all that is required to achieve wound healing in those wounds that are likely to be helped by this therapy. Treatment with GRAFTJACKET® Regenerative Tissue Matrix-Ulcer Repair is usually expected to last no more than twelve (12) weeks and to involve a maximum of two applications for any ulcer that initially qualifies for treatment. The use of more than two applications for the same ulcer is not considered reasonable and necessary. Re-application of GRAFTJACKET® Regenerative Tissue Matrix-Ulcer Repair within three weeks for the same ulcer is not considered reasonable and necessary. Re-application of GRAFTJACKET® Regenerative Tissue Matrix-Ulcer Repair where initial application has resulted in no decrease in size or depth of the wound or increase in granulation tissue, epithelialization, or progress towards closing, will be denied as not reasonable and necessary. Retreatment within one year following the last successful application with GRAFTJACKET® Regenerative Tissue Matrix-Ulcer is not considered reasonable and necessary. Retreatment of an ulcer following two failed GRAFTJACKET® Regenerative Tissue Matrix-Ulcer Repair applications is not considered reasonable and necessary.

This product is covered when the medical record clearly documents that the product is being used in an office or clinic based comprehensive, organized wound management program. This is a physician service and may only be covered when applied by a physician or Medicare non-physician practitioner such as a Physician Assistant, Clinical Nurse Specialists (CNS) or Nurse Practitioner (NP).

When this service is rendered in place of service office, both the application of the skin graft and the product used must be billed on the same claim.

Use of GRAFTJACKET® XPRESS Flowable Soft Tissue Scaffold is considered investigational and is not covered.

## Q4110 - Skin substitute, primatrix, per square centimeter

Primatrix will be considered reasonable and necessary for treatment of diabetic foot ulcers and venous ulcers:

1. When this service is rendered in place of service office, both the application of the skin graft and the product used must be billed on the same claim.
2. These codes may not be billed with a modifier 58 (staged procedure).

The following skin product is also covered:

## Q4121 TheraSkin®, per square centimeter

TheraSkin® will be considered reasonable and necessary when the following conditions are satisfied and documented when used with standard therapeutic compression for venous stasis ulcer (VSU):

1. Only for ulcers that have failed to respond to documented conservative measures of greater than four (4) weeks in duration, that have at minimum included regular dressing changes, debridement of necrotic tissue and standard therapeutic compression. A "failed response" is defined as an ulcer that has increased in size or depth, or for which there has been no change in baseline size or depth and no sign of improvement or indication that improvement is likely, such as granulation, epithelialization, or progress towards closing. Documentation of response or lack thereof, requires measurement of the ulcer at baseline, following cessation of conservative or conventional management. Documentation should also include measurement of the ulcer immediately prior to the placement of TheraSkin®.
2. Only when adequate treatment of the underlying disease process(es) contributing to the ulcer, e.g. hypertension, is provided and documented in conjunction with the treatment; and
3. Only for ulcers that are free of infection, redness, drainage, underlying osteomyelitis, surround cellulitis, sinus tracts or tunnels, eschar or any necrotic material that could interfere with the adherence of TheraSkin® and wound healing.

When used with standard diabetic foot ulcer care for neuropathic diabetic foot ulcers (DFU):

1. Only if the patient has the current medical diagnosis of either Type I or Type II diabetes mellitus;
2. Only if the patient does not have a current HbA1C reading exceeding 12%;
3. Only for full thickness ulcers of greater than three weeks in duration, which extend through the dermis, with or without tendon, muscle, capsule or bone exposure;
4. Only when adequate treatment of the underlying disease process(es) contributing to the ulcer, e.g., diabetes is provided and documented in conjunction with treatment; and
5. Only for ulcers located on the foot or toes that are free of infection, redness, drainage, underlying osteomyelitis, surrounding cellulitis, tunnels and tracts, eschar or any necrotic material that could interfere with the adherence of TheraSkin®, and the process of wound healing.

For both VSUs and DFUs all of the following must also be satisfied and documented:

1. The patient must have adequate arterial blood supply as evidenced by ankle-brachial index (ABI) of 0.65 or greater in limb undergoing the procedure;
2. TheraSkin® treatment must be used in conjunction with following standard conservative measures:
   a. Use of pressure-reducing footwear and/or non-weight bearing regimen.
   b. Debridement of necrotic and callused tissue when necessary; and
   c. Acceptable methods of wound care.

The patient must be competent and/or have the support system required to participate in follow-up care associated with treatment of the wound with TheraSkin®.

The use of TheraSkin® on ulcers with any of the following conditions is considered not necessary and reasonable, and will result in denial of a claim:

1. cellulitis;
2. osteomyelitis;
3. necrotic ulcer;
4. draining wound; or
5. clinically significant wound healing impairment due to uncontrolled diabetes.

TheraSkin® Utilization

1. Treatment with Q4121 TheraSkin® is usually expected to last no more than twelve (12) weeks for any ulcer that initially qualifies for treatment.
2. Re-application of TheraSkin® within one week for the same ulcer is not considered reasonable and necessary and will not be reimbursed.
3. Re-application of TheraSkin® where initial application has resulted in no decrease in size or depth or increase in granulation tissue, epithelialization, or progress towards closing, will be denied as not reasonable and necessary and will not be reimbursed.
4. Re-treatment within one year following the last successful application with TheraSkin® is not considered reasonable and necessary, and will not be reimbursed.
5. These codes are not intended to be reported for simple graft application alone or application stabilized with dressings (eg, by simple gauze wrap). The skin substitute/graft is anchored using the surgeon's choice of fixation. If it is not medically reasonable and necessary to anchor the TheraSkin®, (for example, due to size, depth or location of the wound), then the application is included in the appropriate E&M code and should not be submitted with the application codes.

## Limitations

Due to marked propensity for misuse of the entire range of "skin substitute" products, reimbursement may be made only when the medical record clearly documents that these products have been used in a comprehensive, organized wound management program.

1. There should be no fewer than two (2) weeks between applications for venous stasis ulcers and there should be no fewer than three (3) weeks between applications for neuropathic diabetic foot ulcers, except when more frequent applications are either a part of the FDA product specific labeling instructions or are clearly supported by medical record documentation of medically reasonable and necessary indications.
2. Treatment of any ulcer will typically last no more than twelve (12) weeks.
3. If after twelve (12) weeks of compression treatment and the appropriate number of applications of the skin substitutes a 50 percent or greater improvement is noted and documented, then one or more subsequent re-application of the skin substitute will be considered for Medicare coverage. Otherwise, re-application of the skin substitute is not recommended and other treatment modalities should be considered.
4. Re-treatment within one (1) year of completion of any given course of skin substitutes for venous stasis ulcers is not covered.
5. For neuropathic diabetic foot ulcers, if after nine (9) weeks of treatment, satisfactory healing progress is not noted, then re-application of the skin substitute is not recommended and other treatment modalities should be considered.
6. All products, unless they are **specifically** FDA-labeled for use in the types of ulcers considered in this LCD, will be considered to be - at most - "biologic wound dressings" and part of the relevant Evaluation & Management (E/M) service provided and not separately payable. Furthermore, even in those instances when the labeled indications include venous stasis or neuropathic diabetic ulcers, if the product is not biologically active, they will be considered as not covered under the terms of this LCD.
7. Application of the wound dressing is included in the payment for the E&M service and should not be billed separately; when provided on the same or a previous day,
8. Providers are reminded that CPT code Manual language in the introductory comments to the "Skin Replacement Surgery and Skin Substitutes" chapter reconfirms this position in stating, "Identify by size… and the type of graft or skin substitute; **includes simple debridement of granulation tissue or recent avulsion**." (Emphasis WPS) When more substantial debridement is warranted, consider use of one of the debridement codes. In either instance, the medical record documentation must clearly support the medically reasonable and necessary of the debridement of the wound."
9. Minimal wound preparation is considered a part of the procedure. All other products are included in the Evaluation & Management (E/M) service and are not separately payable.
10. The repair of ventral hernias, should be billed as CPT 49568(Implantation of mesh or other prosthesis of open

incision of ventral hernia repair)and not with any of these skin substitutes.

# Coding Information

**Bill Type Codes**

Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.

N/A

**Revenue Codes**

Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory. Unless specified in the policy, services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.

N/A

**CPT/HCPCS Codes**

**Group 1 Paragraph:**

**N/A**

**Group 1 Codes:** (25 Codes)

| CODE | DESCRIPTION |
|------|-------------|
| 11042 | DEBRIDEMENT, SUBCUTANEOUS TISSUE (INCLUDES EPIDERMIS AND DERMIS, IF PERFORMED); FIRST 20 SQ CM OR LESS |
| 11043 | DEBRIDEMENT, MUSCLE AND/OR FASCIA (INCLUDES EPIDERMIS, DERMIS, AND SUBCUTANEOUS TISSUE, IF PERFORMED); FIRST 20 SQ CM OR LESS |
| 11044 | DEBRIDEMENT, BONE (INCLUDES EPIDERMIS, DERMIS, SUBCUTANEOUS TISSUE, MUSCLE AND/OR FASCIA, IF PERFORMED); FIRST 20 SQ CM OR LESS |
| 11045 | DEBRIDEMENT, SUBCUTANEOUS TISSUE (INCLUDES EPIDERMIS AND DERMIS, IF PERFORMED); EACH ADDITIONAL 20 SQ CM, OR PART THEREOF (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE) |
| 11046 | DEBRIDEMENT, MUSCLE AND/OR FASCIA (INCLUDES EPIDERMIS, DERMIS, AND SUBCUTANEOUS TISSUE, IF PERFORMED); EACH ADDITIONAL 20 SQ CM, OR PART THEREOF (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE) |
| 11047 | DEBRIDEMENT, BONE (INCLUDES EPIDERMIS, DERMIS, SUBCUTANEOUS TISSUE, |

VOL. II

| CODE | DESCRIPTION |
|------|-------------|
|  | MUSCLE AND/OR FASCIA, IF PERFORMED); EACH ADDITIONAL 20 SQ CM, OR PART THEREOF (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE) |
| 15002 | SURGICAL PREPARATION OR CREATION OF RECIPIENT SITE BY EXCISION OF OPEN WOUNDS, BURN ESCHAR, OR SCAR (INCLUDING SUBCUTANEOUS TISSUES), OR INCISIONAL RELEASE OF SCAR CONTRACTURE, TRUNK, ARMS, LEGS; FIRST 100 SQ CM OR 1% OF BODY AREA OF INFANTS AND CHILDREN |
| 15003 | SURGICAL PREPARATION OR CREATION OF RECIPIENT SITE BY EXCISION OF OPEN WOUNDS, BURN ESCHAR, OR SCAR (INCLUDING SUBCUTANEOUS TISSUES), OR INCISIONAL RELEASE OF SCAR CONTRACTURE, TRUNK, ARMS, LEGS; EACH ADDITIONAL 100 SQ CM, OR PART THEREOF, OR EACH ADDITIONAL 1% OF BODY AREA OF INFANTS AND CHILDREN (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE) |
| 15004 | SURGICAL PREPARATION OR CREATION OF RECIPIENT SITE BY EXCISION OF OPEN WOUNDS, BURN ESCHAR, OR SCAR (INCLUDING SUBCUTANEOUS TISSUES), OR INCISIONAL RELEASE OF SCAR CONTRACTURE, FACE, SCALP, EYELIDS, MOUTH, NECK, EARS, ORBITS, GENITALIA, HANDS, FEET AND/OR MULTIPLE DIGITS; FIRST 100 SQ CM OR 1% OF BODY AREA OF INFANTS AND CHILDREN |
| 15005 | SURGICAL PREPARATION OR CREATION OF RECIPIENT SITE BY EXCISION OF OPEN WOUNDS, BURN ESCHAR, OR SCAR (INCLUDING SUBCUTANEOUS TISSUES), OR INCISIONAL RELEASE OF SCAR CONTRACTURE, FACE, SCALP, EYELIDS, MOUTH, NECK, EARS, ORBITS, GENITALIA, HANDS, FEET AND/OR MULTIPLE DIGITS; EACH ADDITIONAL 100 SQ CM, OR PART THEREOF, OR EACH ADDITIONAL 1% OF BODY AREA OF INFANTS AND CHILDREN (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE) |
| 15271 | APPLICATION OF SKIN SUBSTITUTE GRAFT TO TRUNK, ARMS, LEGS, TOTAL WOUND SURFACE AREA UP TO 100 SQ CM; FIRST 25 SQ CM OR LESS WOUND SURFACE AREA |
| 15272 | APPLICATION OF SKIN SUBSTITUTE GRAFT TO TRUNK, ARMS, LEGS, TOTAL WOUND SURFACE AREA UP TO 100 SQ CM; EACH ADDITIONAL 25 SQ CM WOUND SURFACE AREA, OR PART THEREOF (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE) |
| 15273 | APPLICATION OF SKIN SUBSTITUTE GRAFT TO TRUNK, ARMS, LEGS, TOTAL WOUND SURFACE AREA GREATER THAN OR EQUAL TO 100 SQ CM; FIRST 100 SQ CM WOUND SURFACE AREA, OR 1% OF BODY AREA OF INFANTS AND CHILDREN |
| 15274 | APPLICATION OF SKIN SUBSTITUTE GRAFT TO TRUNK, ARMS, LEGS, TOTAL WOUND SURFACE AREA GREATER THAN OR EQUAL TO 100 SQ CM; EACH ADDITIONAL 100 SQ CM WOUND SURFACE AREA, OR PART THEREOF, OR EACH ADDITIONAL 1% OF BODY AREA OF INFANTS AND CHILDREN, OR PART THEREOF (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE) |
| 15275 | APPLICATION OF SKIN SUBSTITUTE GRAFT TO FACE, SCALP, EYELIDS, MOUTH, NECK, EARS, ORBITS, GENITALIA, HANDS, FEET, AND/OR MULTIPLE DIGITS, TOTAL |

| CODE | DESCRIPTION |
|---|---|
|  | WOUND SURFACE AREA UP TO 100 SQ CM; FIRST 25 SQ CM OR LESS WOUND SURFACE AREA |
| 15276 | APPLICATION OF SKIN SUBSTITUTE GRAFT TO FACE, SCALP, EYELIDS, MOUTH, NECK, EARS, ORBITS, GENITALIA, HANDS, FEET, AND/OR MULTIPLE DIGITS, TOTAL WOUND SURFACE AREA UP TO 100 SQ CM; EACH ADDITIONAL 25 SQ CM WOUND SURFACE AREA, OR PART THEREOF (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE) |
| 15277 | APPLICATION OF SKIN SUBSTITUTE GRAFT TO FACE, SCALP, EYELIDS, MOUTH, NECK, EARS, ORBITS, GENITALIA, HANDS, FEET, AND/OR MULTIPLE DIGITS, TOTAL WOUND SURFACE AREA GREATER THAN OR EQUAL TO 100 SQ CM; FIRST 100 SQ CM WOUND SURFACE AREA, OR 1% OF BODY AREA OF INFANTS AND CHILDREN |
| 15278 | APPLICATION OF SKIN SUBSTITUTE GRAFT TO FACE, SCALP, EYELIDS, MOUTH, NECK, EARS, ORBITS, GENITALIA, HANDS, FEET, AND/OR MULTIPLE DIGITS, TOTAL WOUND SURFACE AREA GREATER THAN OR EQUAL TO 100 SQ CM; EACH ADDITIONAL 100 SQ CM WOUND SURFACE AREA, OR PART THEREOF, OR EACH ADDITIONAL 1% OF BODY AREA OF INFANTS AND CHILDREN, OR PART THEREOF (LIST SEPARATELY IN ADDITION TO CODE FOR PRIMARY PROCEDURE) |
| Q4101 | APLIGRAF, PER SQUARE CENTIMETER |
| Q4102 | OASIS WOUND MATRIX, PER SQUARE CENTIMETER |
| Q4106 | DERMAGRAFT, PER SQUARE CENTIMETER |
| Q4107 | GRAFTJACKET, PER SQUARE CENTIMETER |
| Q4110 | PRIMATRIX, PER SQUARE CENTIMETER |
| Q4121 | THERASKIN, PER SQUARE CENTIMETER |
| Q4131 | EPIFIX, PER SQUARE CENTIMETER |

**Group 2 Paragraph:**

**Non Covered**

**Group 2 Codes:** (57 Codes)

| CODE | DESCRIPTION |
|---|---|
| Q4100 | SKIN SUBSTITUTE, NOT OTHERWISE SPECIFIED |
| Q4103 | OASIS BURN MATRIX, PER SQUARE CENTIMETER |
| Q4104 | INTEGRA BILAYER MATRIX WOUND DRESSING (BMWD), PER SQUARE CENTIMETER |
| Q4105 | INTEGRA DERMAL REGENERATION TEMPLATE (DRT), PER SQUARE CENTIMETER |
| Q4108 | INTEGRA MATRIX, PER SQUARE CENTIMETER |
| Q4111 | GAMMAGRAFT, PER SQUARE CENTIMETER |
| Q4112 | CYMETRA, INJECTABLE, 1 CC |
| Q4113 | GRAFTJACKET XPRESS, INJECTABLE, 1 CC |

| CODE | DESCRIPTION |
|------|-------------|
| Q4114 | INTEGRA FLOWABLE WOUND MATRIX, INJECTABLE, 1 CC |
| Q4115 | ALLOSKIN, PER SQUARE CENTIMETER |
| Q4116 | ALLODERM, PER SQUARE CENTIMETER |
| Q4117 | HYALOMATRIX, PER SQUARE CENTIMETER |
| Q4118 | MATRISTEM MICROMATRIX, 1 MG |
| Q4119 | MATRISTEM WOUND MATRIX, PER SQUARE CENTIMETER |
| Q4120 | MATRISTEM BURN MATRIX, PER SQUARE CENTIMETER |
| Q4122 | DERMACELL, PER SQUARE CENTIMETER |
| Q4123 | ALLOSKIN RT, PER SQUARE CENTIMETER |
| Q4124 | OASIS ULTRA TRI-LAYER WOUND MATRIX, PER SQUARE CENTIMETER |
| Q4125 | ARTHROFLEX, PER SQUARE CENTIMETER |
| Q4126 | MEMODERM, DERMASPAN, TRANZGRAFT OR INTEGUPLY, PER SQUARE CENTIMETER |
| Q4127 | TALYMED, PER SQUARE CENTIMETER |
| Q4128 | FLEX HD, ALLOPATCH HD, OR MATRIX HD, PER SQUARE CENTIMETER |
| Q4129 | UNITE BIOMATRIX, PER SQUARE CENTIMETER |
| Q4130 | STRATTICE TM, PER SQUARE CENTIMETER |
| Q4132 | GRAFIX CORE, PER SQUARE CENTIMETER |
| Q4133 | GRAFIX PRIME, PER SQUARE CENTIMETER |
| Q4134 | HMATRIX, PER SQUARE CENTIMETER |
| Q4135 | MEDISKIN, PER SQUARE CENTIMETER |
| Q4136 | EZ-DERM, PER SQUARE CENTIMETER |
| Q4137 | AMNIOEXCEL OR BIODEXCEL, PER SQUARE CENTIMETER |
| Q4138 | BIODFENCE DRYFLEX, PER SQUARE CENTIMETER |
| Q4139 | AMNIOMATRIX OR BIODMATRIX, INJECTABLE, 1 CC |
| Q4140 | BIODFENCE, PER SQUARE CENTIMETER |
| Q4141 | ALLOSKIN AC, PER SQUARE CENTIMETER |
| Q4142 | XCM BIOLOGIC TISSUE MATRIX, PER SQUARE CENTIMETER |
| Q4143 | REPRIZA, PER SQUARE CENTIMETER |
| Q4145 | EPIFIX, INJECTABLE, 1 MG |
| Q4146 | TENSIX, PER SQUARE CENTIMETER |
| Q4147 | ARCHITECT, ARCHITECT PX, OR ARCHITECT FX, EXTRACELLULAR MATRIX, PER SQUARE CENTIMETER |

| CODE | DESCRIPTION |
|------|-------------|
| Q4148 | NEOX 1K, PER SQUARE CENTIMETER |
| Q4149 | EXCELLAGEN, 0.1 CC |
| Q4150 | ALLOWRAP DS OR DRY, PER SQUARE CENTIMETER |
| Q4151 | AMNIOBAND OR GUARDIAN, PER SQUARE CENTIMETER |
| Q4152 | DERMAPURE, PER SQUARE CENTIMETER |
| Q4153 | DERMAVEST AND PLURIVEST, PER SQUARE CENTIMETER |
| Q4154 | BIOVANCE, PER SQUARE CENTIMETER |
| Q4155 | NEOXFLO OR CLARIXFLO, 1 MG |
| Q4156 | NEOX 100, PER SQUARE CENTIMETER |
| Q4157 | REVITALON, PER SQUARE CENTIMETER |
| Q4158 | MARIGEN, PER SQUARE CENTIMETER |
| Q4159 | AFFINITY, PER SQUARE CENTIMETER |
| Q4160 | NUSHIELD, PER SQUARE CENTIMETER |
| Q4161 | BIO-CONNEKT WOUND MATRIX, PER SQUARE CENTIMETER |
| Q4162 | AMNIOPRO FLOW, BIOSKIN FLOW, BIORENEW FLOW, WOUNDEX FLOW, AMNIOGEN-A, AMNIOGEN-C, 0.5 CC |
| Q4163 | AMNIOPRO, BIOSKIN, BIORENEW, WOUNDEX, AMNIOGEN-45, AMNIOGEN-200, PER SQUARE CENTIMETER |
| Q4164 | HELICOLL, PER SQUARE CENTIMETER |
| Q4165 | KERAMATRIX, PER SQUARE CENTIMETER |

## ICD-10-CM Codes that Support Medical Necessity

**Group 1 Paragraph:**

The ICD-10 codes in List 1 may be used alone.

**List 1**

**Group 1 Codes:** (31 Codes)

| CODE | DESCRIPTION |
|------|-------------|
| I83.011 | Varicose veins of right lower extremity with ulcer of thigh |
| I83.012 | Varicose veins of right lower extremity with ulcer of calf |
| I83.013 | Varicose veins of right lower extremity with ulcer of ankle |
| I83.014 | Varicose veins of right lower extremity with ulcer of heel and midfoot |
| I83.015 | Varicose veins of right lower extremity with ulcer other part of foot |

| CODE | DESCRIPTION |
|---|---|
| I83.018 | Varicose veins of right lower extremity with ulcer other part of lower leg |
| I83.021 | Varicose veins of left lower extremity with ulcer of thigh |
| I83.022 | Varicose veins of left lower extremity with ulcer of calf |
| I83.023 | Varicose veins of left lower extremity with ulcer of ankle |
| I83.024 | Varicose veins of left lower extremity with ulcer of heel and midfoot |
| I83.025 | Varicose veins of left lower extremity with ulcer other part of foot |
| I83.028 | Varicose veins of left lower extremity with ulcer other part of lower leg |
| I83.211 | Varicose veins of right lower extremity with both ulcer of thigh and inflammation |
| I83.212 | Varicose veins of right lower extremity with both ulcer of calf and inflammation |
| I83.213 | Varicose veins of right lower extremity with both ulcer of ankle and inflammation |
| I83.214 | Varicose veins of right lower extremity with both ulcer of heel and midfoot and inflammation |
| I83.215 | Varicose veins of right lower extremity with both ulcer other part of foot and inflammation |
| I83.218 | Varicose veins of right lower extremity with both ulcer of other part of lower extremity and inflammation |
| I83.221 | Varicose veins of left lower extremity with both ulcer of thigh and inflammation |
| I83.222 | Varicose veins of left lower extremity with both ulcer of calf and inflammation |
| I83.223 | Varicose veins of left lower extremity with both ulcer of ankle and inflammation |
| I83.224 | Varicose veins of left lower extremity with both ulcer of heel and midfoot and inflammation |
| I83.225 | Varicose veins of left lower extremity with both ulcer other part of foot and inflammation |
| I83.228 | Varicose veins of left lower extremity with both ulcer of other part of lower extremity and inflammation |
| I87.001 | Postthrombotic syndrome without complications of right lower extremity |
| I87.002 | Postthrombotic syndrome without complications of left lower extremity |
| I87.003 | Postthrombotic syndrome without complications of bilateral lower extremity |
| I87.011 | Postthrombotic syndrome with ulcer of right lower extremity |
| I87.012 | Postthrombotic syndrome with ulcer of left lower extremity |
| I87.013 | Postthrombotic syndrome with ulcer of bilateral lower extremity |
| I87.2 | Venous insufficiency (chronic) (peripheral) |

**Group 2 Paragraph:**

When billing for wound care for ulcers caused by diabetes, the provider must use both an ICD-10 code from List 2

and an additional ICD-10 code from the diabetes range in List 3.

**List 2**

**Group 2 Codes:** (102 Codes)

| CODE | DESCRIPTION |
| --- | --- |
| I70.238 | Atherosclerosis of native arteries of right leg with ulceration of other part of lower right leg |
| I70.241 | Atherosclerosis of native arteries of left leg with ulceration of thigh |
| I70.242 | Atherosclerosis of native arteries of left leg with ulceration of calf |
| I70.243 | Atherosclerosis of native arteries of left leg with ulceration of ankle |
| I70.244 | Atherosclerosis of native arteries of left leg with ulceration of heel and midfoot |
| I70.245 | Atherosclerosis of native arteries of left leg with ulceration of other part of foot |
| I70.248 | Atherosclerosis of native arteries of left leg with ulceration of other part of lower left leg |
| I70.431 | Atherosclerosis of autologous vein bypass graft(s) of the right leg with ulceration of thigh |
| I70.432 | Atherosclerosis of autologous vein bypass graft(s) of the right leg with ulceration of calf |
| I70.433 | Atherosclerosis of autologous vein bypass graft(s) of the right leg with ulceration of ankle |
| I70.434 | Atherosclerosis of autologous vein bypass graft(s) of the right leg with ulceration of heel and midfoot |
| I70.435 | Atherosclerosis of autologous vein bypass graft(s) of the right leg with ulceration of other part of foot |
| I70.438 | Atherosclerosis of autologous vein bypass graft(s) of the right leg with ulceration of other part of lower leg |
| I70.441 | Atherosclerosis of autologous vein bypass graft(s) of the left leg with ulceration of thigh |
| I70.442 | Atherosclerosis of autologous vein bypass graft(s) of the left leg with ulceration of calf |
| I70.443 | Atherosclerosis of autologous vein bypass graft(s) of the left leg with ulceration of ankle |
| I70.444 | Atherosclerosis of autologous vein bypass graft(s) of the left leg with ulceration of heel and midfoot |
| I70.445 | Atherosclerosis of autologous vein bypass graft(s) of the left leg with ulceration of other part of foot |
| I70.448 | Atherosclerosis of autologous vein bypass graft(s) of the left leg with ulceration of other part of lower leg |

| CODE | DESCRIPTION |
|------|-------------|
| I70.531 | Atherosclerosis of nonautologous biological bypass graft(s) of the right leg with ulceration of thigh |
| I70.532 | Atherosclerosis of nonautologous biological bypass graft(s) of the right leg with ulceration of calf |
| I70.533 | Atherosclerosis of nonautologous biological bypass graft(s) of the right leg with ulceration of ankle |
| I70.534 | Atherosclerosis of nonautologous biological bypass graft(s) of the right leg with ulceration of heel and midfoot |
| I70.535 | Atherosclerosis of nonautologous biological bypass graft(s) of the right leg with ulceration of other part of foot |
| I70.538 | Atherosclerosis of nonautologous biological bypass graft(s) of the right leg with ulceration of other part of lower leg |
| I70.541 | Atherosclerosis of nonautologous biological bypass graft(s) of the left leg with ulceration of thigh |
| I70.542 | Atherosclerosis of nonautologous biological bypass graft(s) of the left leg with ulceration of calf |
| I70.543 | Atherosclerosis of nonautologous biological bypass graft(s) of the left leg with ulceration of ankle |
| I70.544 | Atherosclerosis of nonautologous biological bypass graft(s) of the left leg with ulceration of heel and midfoot |
| I70.545 | Atherosclerosis of nonautologous biological bypass graft(s) of the left leg with ulceration of other part of foot |
| I70.631 | Atherosclerosis of nonbiological bypass graft(s) of the right leg with ulceration of thigh |
| I70.632 | Atherosclerosis of nonbiological bypass graft(s) of the right leg with ulceration of calf |
| I70.633 | Atherosclerosis of nonbiological bypass graft(s) of the right leg with ulceration of ankle |
| I70.634 | Atherosclerosis of nonbiological bypass graft(s) of the right leg with ulceration of heel and midfoot |
| I70.635 | Atherosclerosis of nonbiological bypass graft(s) of the right leg with ulceration of other part of foot |
| I70.638 | Atherosclerosis of nonbiological bypass graft(s) of the right leg with ulceration of other part of lower leg |
| I70.641 | Atherosclerosis of nonbiological bypass graft(s) of the left leg with ulceration of thigh |
| I70.642 | Atherosclerosis of nonbiological bypass graft(s) of the left leg with ulceration of calf |

| CODE | DESCRIPTION |
|------|-------------|
| I70.643 | Atherosclerosis of nonbiological bypass graft(s) of the left leg with ulceration of ankle |
| I70.644 | Atherosclerosis of nonbiological bypass graft(s) of the left leg with ulceration of heel and midfoot |
| I70.645 | Atherosclerosis of nonbiological bypass graft(s) of the left leg with ulceration of other part of foot |
| I70.648 | Atherosclerosis of nonbiological bypass graft(s) of the left leg with ulceration of other part of lower leg |
| I70.731 | Atherosclerosis of other type of bypass graft(s) of the right leg with ulceration of thigh |
| I70.732 | Atherosclerosis of other type of bypass graft(s) of the right leg with ulceration of calf |
| I70.733 | Atherosclerosis of other type of bypass graft(s) of the right leg with ulceration of ankle |
| I70.734 | Atherosclerosis of other type of bypass graft(s) of the right leg with ulceration of heel and midfoot |
| I70.735 | Atherosclerosis of other type of bypass graft(s) of the right leg with ulceration of other part of foot |
| I70.738 | Atherosclerosis of other type of bypass graft(s) of the right leg with ulceration of other part of lower leg |
| I70.741 | Atherosclerosis of other type of bypass graft(s) of the left leg with ulceration of thigh |
| I70.742 | Atherosclerosis of other type of bypass graft(s) of the left leg with ulceration of calf |
| I70.743 | Atherosclerosis of other type of bypass graft(s) of the left leg with ulceration of ankle |
| I70.744 | Atherosclerosis of other type of bypass graft(s) of the left leg with ulceration of heel and midfoot |
| I70.745 | Atherosclerosis of other type of bypass graft(s) of the left leg with ulceration of other part of foot |
| I70.748 | Atherosclerosis of other type of bypass graft(s) of the left leg with ulceration of other part of lower leg |
| L97.111 | Non-pressure chronic ulcer of right thigh limited to breakdown of skin |
| L97.112 | Non-pressure chronic ulcer of right thigh with fat layer exposed |
| L97.113 | Non-pressure chronic ulcer of right thigh with necrosis of muscle |
| L97.114 | Non-pressure chronic ulcer of right thigh with necrosis of bone |
| L97.121 | Non-pressure chronic ulcer of left thigh limited to breakdown of skin |

| CODE | DESCRIPTION |
|------|-------------|
| L97.122 | Non-pressure chronic ulcer of left thigh with fat layer exposed |
| L97.123 | Non-pressure chronic ulcer of left thigh with necrosis of muscle |
| L97.124 | Non-pressure chronic ulcer of left thigh with necrosis of bone |
| L97.211 | Non-pressure chronic ulcer of right calf limited to breakdown of skin |
| L97.212 | Non-pressure chronic ulcer of right calf with fat layer exposed |
| L97.213 | Non-pressure chronic ulcer of right calf with necrosis of muscle |
| L97.214 | Non-pressure chronic ulcer of right calf with necrosis of bone |
| L97.221 | Non-pressure chronic ulcer of left calf limited to breakdown of skin |
| L97.222 | Non-pressure chronic ulcer of left calf with fat layer exposed |
| L97.223 | Non-pressure chronic ulcer of left calf with necrosis of muscle |
| L97.224 | Non-pressure chronic ulcer of left calf with necrosis of bone |
| L97.311 | Non-pressure chronic ulcer of right ankle limited to breakdown of skin |
| L97.312 | Non-pressure chronic ulcer of right ankle with fat layer exposed |
| L97.313 | Non-pressure chronic ulcer of right ankle with necrosis of muscle |
| L97.314 | Non-pressure chronic ulcer of right ankle with necrosis of bone |
| L97.321 | Non-pressure chronic ulcer of left ankle limited to breakdown of skin |
| L97.322 | Non-pressure chronic ulcer of left ankle with fat layer exposed |
| L97.323 | Non-pressure chronic ulcer of left ankle with necrosis of muscle |
| L97.324 | Non-pressure chronic ulcer of left ankle with necrosis of bone |
| L97.411 | Non-pressure chronic ulcer of right heel and midfoot limited to breakdown of skin |
| L97.412 | Non-pressure chronic ulcer of right heel and midfoot with fat layer exposed |
| L97.413 | Non-pressure chronic ulcer of right heel and midfoot with necrosis of muscle |
| L97.414 | Non-pressure chronic ulcer of right heel and midfoot with necrosis of bone |
| L97.421 | Non-pressure chronic ulcer of left heel and midfoot limited to breakdown of skin |
| L97.422 | Non-pressure chronic ulcer of left heel and midfoot with fat layer exposed |
| L97.423 | Non-pressure chronic ulcer of left heel and midfoot with necrosis of muscle |
| L97.424 | Non-pressure chronic ulcer of left heel and midfoot with necrosis of bone |
| L97.511 | Non-pressure chronic ulcer of other part of right foot limited to breakdown of skin |
| L97.512 | Non-pressure chronic ulcer of other part of right foot with fat layer exposed |
| L97.513 | Non-pressure chronic ulcer of other part of right foot with necrosis of muscle |
| L97.514 | Non-pressure chronic ulcer of other part of right foot with necrosis of bone |
| L97.521 | Non-pressure chronic ulcer of other part of left foot limited to breakdown of skin |

| CODE | DESCRIPTION |
|------|-------------|
| L97.522 | Non-pressure chronic ulcer of other part of left foot with fat layer exposed |
| L97.523 | Non-pressure chronic ulcer of other part of left foot with necrosis of muscle |
| L97.524 | Non-pressure chronic ulcer of other part of left foot with necrosis of bone |
| L97.811 | Non-pressure chronic ulcer of other part of right lower leg limited to breakdown of skin |
| L97.812 | Non-pressure chronic ulcer of other part of right lower leg with fat layer exposed |
| L97.813 | Non-pressure chronic ulcer of other part of right lower leg with necrosis of muscle |
| L97.814 | Non-pressure chronic ulcer of other part of right lower leg with necrosis of bone |
| L97.821 | Non-pressure chronic ulcer of other part of left lower leg limited to breakdown of skin |
| L97.822 | Non-pressure chronic ulcer of other part of left lower leg with fat layer exposed |
| L97.823 | Non-pressure chronic ulcer of other part of left lower leg with necrosis of muscle |
| CODE | DESCRIPTION |
| L97.824 | Non-pressure chronic ulcer of other part of left lower leg with necrosis of bone |

**Group 3 Paragraph:**

**List 3**

**Group 3 Codes:** (42 Codes)

| CODE | DESCRIPTION |
|------|-------------|
| E08.40 | Diabetes mellitus due to underlying condition with diabetic neuropathy, unspecified |
| E08.41 | Diabetes mellitus due to underlying condition with diabetic mononeuropathy |
| E08.42 | Diabetes mellitus due to underlying condition with diabetic polyneuropathy |
| E08.43 | Diabetes mellitus due to underlying condition with diabetic autonomic (poly)neuropathy |
| E08.49 | Diabetes mellitus due to underlying condition with other diabetic neurological complication |
| E08.51 | Diabetes mellitus due to underlying condition with diabetic peripheral angiopathy without gangrene |
| E08.52 | Diabetes mellitus due to underlying condition with diabetic peripheral angiopathy with gangrene |
| E08.610 | Diabetes mellitus due to underlying condition with diabetic neuropathic arthropathy |
| E09.40 | Drug or chemical induced diabetes mellitus with neurological complications with diabetic neuropathy, unspecified |
| E09.41 | Drug or chemical induced diabetes mellitus with neurological complications with diabetic mononeuropathy |

| CODE | DESCRIPTION |
|------|-------------|
| E09.42 | Drug or chemical induced diabetes mellitus with neurological complications with diabetic polyneuropathy |
| E09.43 | Drug or chemical induced diabetes mellitus with neurological complications with diabetic autonomic (poly)neuropathy |
| E09.49 | Drug or chemical induced diabetes mellitus with neurological complications with other diabetic neurological complication |
| E09.51 | Drug or chemical induced diabetes mellitus with diabetic peripheral angiopathy without gangrene |
| E09.52 | Drug or chemical induced diabetes mellitus with diabetic peripheral angiopathy with gangrene |
| E10.40 | Type 1 diabetes mellitus with diabetic neuropathy, unspecified |
| E10.41 | Type 1 diabetes mellitus with diabetic mononeuropathy |
| E10.42 | Type 1 diabetes mellitus with diabetic polyneuropathy |
| E10.43 | Type 1 diabetes mellitus with diabetic autonomic (poly)neuropathy |
| E10.51 | Type 1 diabetes mellitus with diabetic peripheral angiopathy without gangrene |
| E10.59 | Type 1 diabetes mellitus with other circulatory complications |
| E10.621 | Type 1 diabetes mellitus with foot ulcer |
| E10.622 | Type 1 diabetes mellitus with other skin ulcer |
| E11.40 | Type 2 diabetes mellitus with diabetic neuropathy, unspecified |
| E11.41 | Type 2 diabetes mellitus with diabetic mononeuropathy |
| E11.42 | Type 2 diabetes mellitus with diabetic polyneuropathy |
| E11.43 | Type 2 diabetes mellitus with diabetic autonomic (poly)neuropathy |
| E11.51 | Type 2 diabetes mellitus with diabetic peripheral angiopathy without gangrene |
| E11.59 | Type 2 diabetes mellitus with other circulatory complications |
| E11.621 | Type 2 diabetes mellitus with foot ulcer |
| E11.622 | Type 2 diabetes mellitus with other skin ulcer |
| E11.69 | Type 2 diabetes mellitus with other specified complication |
| E13.40 | Other specified diabetes mellitus with diabetic neuropathy, unspecified |
| E13.41 | Other specified diabetes mellitus with diabetic mononeuropathy |
| E13.42 | Other specified diabetes mellitus with diabetic polyneuropathy |
| E13.43 | Other specified diabetes mellitus with diabetic autonomic (poly)neuropathy |
| E13.44 | Other specified diabetes mellitus with diabetic amyotrophy |
| E13.49 | Other specified diabetes mellitus with other diabetic neurological complication |

| CODE | DESCRIPTION |
|------|-------------|
| E13.51 | Other specified diabetes mellitus with diabetic peripheral angiopathy without gangrene |
| E13.59 | Other specified diabetes mellitus with other circulatory complications |
| E13.621 | Other specified diabetes mellitus with foot ulcer |
| E13.622 | Other specified diabetes mellitus with other skin ulcer |

**ICD-10-CM Codes that DO NOT Support Medical Necessity**

**Group 1 Paragraph:**

All ICD-10-CM codes not listed under ICD-10-CM Codes that "Support Medical Necessity" above, including but not limited to ICD-10 codes related to the following diagnoses:

1. Infected ulcer
2. Osteomyelitis
3. Allergy to bovine collagen
4. Neuropathic diabetic foot ulcers without pedal pulses
5. Uncontrolled diabetes ("controlled" diabetes for purposes of this policy would be based on documentation in the medical record of the HgbAlc level)
6. Active Charcot arthropathy of the ulcer extremity
7. Vasculitis
8. Uncontrolled rheumatoid arthritis and/or rheumatoid ulcers
9. Other uncontrolled collagen vascular disease
10. Patients being treated with high dose corticosteroids or immunosuppressants
11. Patients who have undergone radiation and/or chemotherapy within the month immediately proceeding proposed skin substitute treatment.
12. The service is considered investigational and/or for cosmetic purposes,

**Group 1 Codes:**

N/A

**Additional ICD-10 Information**

N/A

# General Information

## Associated Information

## Documentation Requirements

The medical record must clearly show that the criteria listed in "Indications and Limitation of Coverage and/or Medical Necessity" have been met. The ulcer must be measured at the beginning of conservative treatment, following cessation of conservative treatment and at the beginning of the skin substitute treatment. Clearly, if during treatment the ulcer shows obvious signs of worsening or lack of treatment response, continuing skin substitute treatment would be inappropriate absent documentation of an appropriate rationale for doing so.

1. The medical record must clearly show that the criteria listed in "Indications and Limitations of Coverage and/or Medical Necessity" have been met.
2. The medical record must clearly document that conservative pre-treatment wound management has been tried and failed to induce healing.
3. There must be a documented plan of care with documented goals and documented provider follow-up present in the patient's medical record. Wound healing must be a medically reasonable expectation based on the clinical circumstances documented.
4. Documentation of the progress of the wound's response to treatment must be made for each service billed. At a minimum this must include current wound size, wound depth, presence and extent of or absence of obvious signs of infection, presence and extent of or absence of necrotic, devitalized or non-viable tissue, or other material in the wound that is expected to inhibit healing or promote adjacent tissue breakdown.
5. When debridements are performed, the debridement procedure notes must document tissue removal (i.e. skin, full or partial thickness; subcutaneous tissue; muscle; and/or bone), the method used to debride (i.e., hydrostatic versus sharp versus abrasion methods), and the character of the wound (including dimensions, description of necrotic material present, description of tissue removed, degree of epithelialization, etc.) before and after debridement.
6. When, the documentation does not meet the criteria for the service(s) rendered or the documentation does not establish the medical necessity for the service(s), such service(s) will be denied as not reasonable and necessary under Section 1862(a)(1) of the Social Security Act.
7. For Dermagraft® (Q4106) the record must document that the twenty-four (24) steps involved in the correct use of this product, as described in the clinical trials leading to FDA approval and included in the manufacturer's "Directions for Use", as of the date of development of this LCD have been followed. This requirement is based on the demonstrated decrement in survival of the dermal substitute when the 24 steps noted in the FDA labeling are not followed. The provider must take notice of these specific instructions for use.
8. The medical record must document that wound treatment is accompanied by appropriate wound dressing during the healing period and by appropriate compressive therapy for foot ulcer(s) and appropriate steps to off-load wound pressure during follow-up. Adequate patient compliance must be clearly ascertained and documented during such treatment.


The HCPCS/CPT code(s) may be subject to Correct Coding Initiative (CCI) edits. This policy does not take precedence over CCI edits. Please refer to the CCI for correct coding guidelines and specific applicable code combinations prior to billing Medicare.

**Utilization Guidelines**

1. If the debridement of chronic ulcers requires more than eight services, the rationale and medical necessity must be clearly documented in the medical record.
2. It is expected that, within twelve weeks, a wound will reach a state at which its care should be performed primarily by the patient and/or the patient's caregiver with periodic provider assessment and supervision. Wound care that can be performed by the patient or the patient's caregiver is considered maintenance care. Re-assessment of a wound maintained by the patient or patient's caregiver is covered as an evaluation and management service.
3. For venous stasis ulcers, treatment will normally last no longer than twelve weeks. If after twelve weeks of compression treatment, satisfactory healing progress is not noted then reapplication of the skin substitute is not recommended and other treatment modalities should be considered.
4. For neuropathic diabetic foot ulcers, treatment will normally last no longer than twelve weeks. If after nine weeks of treatment, satisfactory healing progress is not noted, then reapplication of the skin substitute is not recommended and other treatment modalities should be considered.
5. No re-treatment would be expected within the first year following successful initial treatment.

**Sources of Information and Basis for Decision**

DiDomenico, L., Emch, K.J., Landsman, A.R., et al. (2011). A prospective comparison of diabetic foot ulcers treated with either cryopreserved skin allograft or bioengineered skin substitute. *Wounds*, 23(7), 184-189.

Falanga, V., Margolis, D., Alvarez, O., et al. (1988). Rapid healing of venous ulcers and lack of clinical rejection with an allogeneic cultured human skin equivalent. Human skin equivalent investigators group. *Arch Dermatol*, 134(3), 293-300. PMID: 9521027.

Marston, W.A., Hanft, J., Norwood, P., et al. (2003). The efficacy and safety of Dermagraft in improving the healing of chronic diabetic foot ulcers: results of a prospective randomized trial. *Diabetes Care*, 26(6), 1701-1705. PMID: 12766097.

Mostow, E.N., Haraway, G.D., Dalsing, M., et al. (2005). Effectiveness of an extracellular matrix graft (OASIS Wound Matrix) in the treatment of chronic leg ulcers: a randomized clinical trial. *J Vasc Surg*, 41(5), 837-843. PMID: 15886669.

Reyzelman, A., Crews, R.T., Moore, J.C., et al. (2009) Clinical effectiveness of an acellular dermal regenerative tissue matrix compared to standard wound management in healing diabetic foot ulcers: a prospective, randomised, multicentre study. *Int. Wound J*, 6(3), 196-208.

Romanelli, M., Dini, V., Bertone, M., et al. (2007) OASIS wound matrix versus Hyaloskin in the treatment of difficult-to-heal wounds of mixed arterial/venous aetiology. *Int. Wound J* 4(1), 3-7. PMID: 17425543.

Snyder, D., Sullivan N., Schoelles, K.(2012) Skin substitutes for treating chronic wounds (2012) Agency for Health care Research and Quality Technology Assessment Report. Project ID HCPR0610.

# Revision History Information

| REVISION HISTORY DATE | REVISION HISTORY NUMBER | REVISION HISTORY EXPLANATION | REASONS FOR CHANGE |
|---|---|---|---|
| 03/01/2016 | R7 | 03/01/2016 Retired. | • LCD Being Retired |
| 01/01/2016 | R6 | 01/01/2016 HCPCS code updates added new codes Q4161, Q4162, Q4163, Q4164, Q4165, to the list of non-covered codes. Description changed for code Q4153. Removed CAC information. | • Revisions Due To... <br> • Revisions Due To CPT/HCPCS Code Changes |
| 10/01/2015 | R5 | 10/06/2015 - Due to CMS guidance, we have removed the Jurisdiction 8 Notice and corresponding table from the CMS National Coverage Policy section. No other changes to policy or coverage. | • Other |
| 10/01/2015 | R4 | 06/01/2015 Added statement regarding FDA. Ulcers that do not involve tendon, muscle or joint capsule, or have bone | • Other |

| REVISION HISTORY DATE | REVISION HISTORY NUMBER | REVISION HISTORY EXPLANATION | REASONS FOR CHANGE |
|---|---|---|---|
| | | exposure that extends through the dermis unless specifically indicated within the FDA approved package insert. Updated sources of information list, annual review. | (Maintenance annual review) |
| 10/01/2015 | R3 | 01/01/2015 HCPCS code update 2015 added new codes Q4150, Q4151, Q4152, Q4153, Q4154, Q4155, Q4156, Q4157, Q4158, Q4159 and Q4160 to the list of non-covered codes. Description change for codes Q4119 and Q4147. | • Revisions Due To CPT/HCPCS Code Changes |
| 10/01/2015 | R2 | 10/01/2014 Removed product information under Primatrix that did not apply to this topic. Added and/or to pressure reducing footwear and non- weight bearing regimen and removed saline moistened dressing under Graftjacket and Theraskin. Corrected typographical errors. | • Typographical Error<br>• Other |
| 10/01/2015 | R1 | 08/01/2014 Reformatted removed duplicate statements. Moved TheraSkin utilization to the section on TheraSkin corrected the conservative care requirement from six weeks to four weeks for TheraSkin. | • Other |

# Associated Documents

### Attachments

[Billing & Coding Guidelines](#) (135 KB) (Uploaded on 05/18/2015)

### Related Local Coverage Documents

This LCD version has no Related Local Coverage Documents.

### Related National Coverage Documents

This LCD version has no Related National Coverage Documents.

### Public Versions

| UPDATED ON | EFFECTIVE DATES | STATUS |
|---|---|---|
| 03/01/2016 | 01/01/2016 - 03/01/2016 | Retired (This Version) |
| 12/21/2015 | 01/01/2016 - N/A | Superseded |
| 10/07/2015 | 10/01/2015 - 12/31/2015 | Superseded |
| 05/20/2015 | 10/01/2015 - N/A | Superseded |
| 12/19/2014 | 10/01/2015 - N/A | Superseded |
| 09/17/2014 | 10/01/2015 - N/A | Superseded |
| 07/25/2014 | 10/01/2015 - N/A | Superseded |

| UPDATED ON | EFFECTIVE DATES | STATUS |
|------------|-----------------|--------|
| 03/04/2014 | 10/01/2015 - N/A | Superseded |

# Keywords

N/A

MediRegs Master Suite



*LCD - MAC Part B (J5) - Wisconsin Physicians Service Insurance Corporation [05202] - KS > Active LCDs*

# Wound Care V14 (Rev. Eff. 01/28/2021)

[Click to open document in a browser](#)

    [LCD Information](#)    [Coding Information](#)    [General Information](#)    [Associated Documents](#)

| | |
|---|---|
| Contractor Information | |
| Contractor Name | Wisconsin Physicians Service Insurance Corporation |
| Contract Number | 05202 |
| Contract Type | MAC - Part B |
| Other Information | www.wpsgha.com<br>1717 W. Broadway<br>PO Box 1787<br>Madison WI 53701-1787<br>Medical Director: Robert E. Kettler, MD (MAC Jurisdiction 5 Contractor Medical Director) |
| LCD Information | |
| LCD ID | L37228 |
| LCD Version Number | 14 |
| Original ICD-9 LCD ID | |
| LCD Title | **Wound Care** |
| Contractor's Determination Number | |
| Status of this Version | **Approved** |
| Reason for this change | Other. |
| Jurisdiction | Kansas (KS) |
| Oversight Region | Region V |
| Original Effective Date | 04/16/2018 |
| Original Ending Date | N/A |
| Revision Effective Date | 01/28/2021 |
| Revision Ending Date | N/A |
| Retirement Date | N/A |
| Notice Period Start Date | 12/26/2019 |
| Notice Period End Date | 02/08/2020 |
| AMA CPT / ADA CDT Copyright Statement | CPT codes, descriptions and other data only are copyright 2019 American Medical Association. All Rights Reserved. Applicable FARS/HHSARS apply.<br><br>Current Dental Terminology © 2019 American Dental Association. All rights reserved.<br><br>Copyright © 2019, the American Hospital Association, Chicago, Illinois. Reproduced with permission. No portion of the AHA copyrighted materials contained within this publication may be copied without the express written consent of the AHA. AHA copyrighted materials including the UB-04 codes and descriptions may not be removed, copied, or utilized within any software, product, service, solution or derivative work without the written consent of the AHA. If an entity wishes to utilize any AHA materials, please contact the AHA at 312-893-6816. Making copies or utilizing the content of the UB-04 Manual, including the codes and/or descriptions, for internal purposes, resale and/or to be used in any product or publication; creating any modified or derivative work of the UB-04 Manual and/or codes and descriptions; and/or making any commercial use of UB-04 Manual or any portion thereof, including the codes and/or |

MediRegs Master Suite



descriptions, is only authorized with an express license from the American Hospital Association. To license the electronic data file of UB-04 Data Specifications, contact Tim Carlson at (312) 893-6816 or Laryssa Marshall at (312) 893-6814. You may also contact us at ub04@healthforum.com.

CMS National Coverage Policy

*Italicized font* -represents CMS national NCD language/wording copied directly from CMS Manuals or CMS Transmittals. Contractors are prohibited from changing national NCD language/wording.

Title XVIII of the Social Security Act; Section 1833(e). This section prohibits Medicare payment for any claim which lacks the necessary information to process the claim.

Title XVIII of the Social Security Act section 1862 (a)(1)(A). This section excludes expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. A service must be reasonable and necessary, which includes services which are safe and effective, furnished in the appropriate setting and ordered and/or furnished by qualified personnel.

Title XVIII of the Social Security Act section 1862 (a) (1) (D). This section states that no Medicare payment may be made under part A or part B for any expenses incurred for items or services that are investigational or experimental.

CMS IOM Publication 100-02, *Medicare Benefit Policy Manual*, Chapter 15, Sections
100 - Surgical Dressings. Splints, Casts, and Other Devices Used for Reductions of Fractures and
Dislocations
220 - Coverage of Outpatient Rehabilitation Therapy Services (Physical Therapy, Occupational
Therapy, and Speech-Language Pathology Services, Under Medical Insurance and
230 - Practice of Physical Therapy, Occupational Therapy, and Speech-Language Pathology.

CMS IOM Publication 100-03 *Medicare Coverage Determinations (NCD) Manual*, Chapter 1, Part One, Section 20.29: Hyperbaric Oxygen Therapy (Section C, Topical Application of Oxygen).

CMS IOM Publication 100-03, *Medicare National Coverage Determinations (NCD) Manual*, Chapter 1, Part 4, Section 270 - Wound Treatment
270.1 Electrical Stimulation (ES) and Electromagnetic Therapy for the Treatment of Wounds
270.2 Noncontact Normothermic Wound Therapy (NNWT)
270.3 Blood Derived Products for Chronic Non-Healing Wounds
270.6 Infrared Therapy Devices

MLM SE17027 *Clarification of Billing and Payment Policies for Negative Pressure Wound Therapy (NPWT) Using a Disposable Device*

CMS IOM Publication 100-08, *Medicare Program Integrity Manual*, Chapter 13, Section 13.5.4 - Reasonable and Necessary Provisions in an LCD.

42 Code of Federal Regulations (CFR) § 410.20 - Physicians' services

Coverage Guidance

**Coverage Indications, Limitations, and/or Medical Necessity**

This Local Coverage Determination (LCD) offers coverage indications and

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite                                    Wolters Kluwer

guidelines for wound care involving: debridement, electrical stimulation and electromagnetic therapy, negative pressure wound therapy, low frequency non-contact non-thermal ultrasound (MIST Therapy), and topical oxygen therapy (TOT).

For the purposes of this LCD, wound care is defined as care of wounds that are refractory to healing or have complicated healing cycles either because of the nature of the wound itself or because of complicating metabolic and/or physiological factors.

Active wound care procedures are performed to remove necrotic tissue and/or devitalized tissue to promote healing. Providers are responsible to determine medical necessity and use the appropriate current CPT/HCPCS code for service provided. Please consult the current AMA CPT book for the complete code description of the procedures being performed to submit claims.

This LCD supplements but does not replace, modify or supersede existing Medicare applicable National Coverage Determinations (NCDs) or payment policy rules and regulations for additional wound care. Federal statute and subsequent Medicare regulations regarding provision and payment for medical services are lengthy. They are not repeated in this LCD. Neither Medicare payment policy rules nor this LCD replace, modify or supersede applicable state statutes regarding medical practice or other health practice professions acts, definitions and/or scopes of practice. All providers who report services for Medicare payment must fully understand and follow all existing laws, regulations and rules for Medicare payment for additional wound care sessions and must properly submit only valid claims for them. Please review and understand them and apply the medical necessity provisions in the policy within the context of the manual rules. Relevant CMS manual instructions and policies are provided in CMS National Coverage Policy section.

This policy **does not** address metabolically active human skin equivalent/substitute dressings, burns, skin cancer or hyperbaric oxygen therapy.

**Debridement**

Debridement is defined as the removal of foreign material and/or devitalized or contaminated tissue from or adjacent to a traumatic or infected wound until surrounding healthy tissue is exposed. This LCD applies to debridement of localized areas such as wounds and ulcers. The mere removal of secretions, cleansing of a wound, does not represent a debridement service.

At least ONE of the following conditions must be present and documented:

- Pressure Injury, Stage II, III or IV,
- Venous or arterial insufficiency ulcers,
- Dehiscenced wounds,
- Wounds with exposed hardware or bone,
- Neuropathic ulcers,
- Neuroischaemic ulcers,
- Diabetic Foot Ulcer(s)
- Complications of surgically created or traumatic wound where accelerated granulation therapy is necessary which cannot be achieved by other available topical wound treatment.

Should deep tissue pressure injury or Stage II injury progress to Unstageable, Stage III or Stage IV requiring debridement then documentation supporting this must be included in the medical record

**Goals of Debridement:**

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.        Dec 1, 2021 from MediRegs

MediRegs Master Suite                                                    Wolters Kluwer

Remove devitalized tissue
Decrease risk of infection
Promote wound healing
Prevent further complications

**Debridement may be categorized as selective or non-selective:**

Selective debridement refers to the removal of specific, targeted areas of devitalized or necrotic tissue from a wound along the margin of viable tissue. Occasional bleeding and pain may occur. The routine application of a topical or local anesthetic does not elevate active wound care management to surgical debridement. Selective debridement includes selective removal of necrotic tissue by sharp dissection including scissors, scalpel, and forceps; and selective removal of necrotic tissue by high-pressure water jet. Selective debridement should only be done under the specific order of a physician.

Wound Care Non-Selective Debridement includes:

- Surgical debridement is excision or wide resection of all necrotic or devitalized tissue, possibly including excision of the viable wound margin. This is usually carried out in the operating room by a surgeon. Anesthesia is usually required. It is frequently used for deep tissue infection, drainage of abscess or involved tendon sheath, or debridement of bone.
- Sharp debridement is the removal of necrotic or foreign material just above the level of viable tissue and is performed in an office setting or at the patient's bedside with or without the use of local anesthesia. Sharp debridement is less aggressive than surgical debridement but has the advantage of rapidly improving the healing conditions in the ulcer. These typically are the services of recurrent, superficial or repeated wound care.
- Enzymatic Debridement is debridement with topical enzymes used when the necrotic substances to be removed from a wound are protein, fiber and collagen. The manufacturers' product insert contains indications, contraindications, precautions, dosage and administration guidelines.
- Wet to moist dressing: This type of dressing is used to keep the wound moist. This type of dressing is used to remove drainage and necrotic tissue from wounds.

Debridement of the wound(s), if indicated, must be performed judiciously and at appropriate intervals. Medicare expects that with appropriate care and no extenuating medical or surgical complications or setbacks, wound volume or surface dimensions should decrease over time or wounds optimally will demonstrate granulation tissue. Wounds that fail to demonstrate measurable reduction in size at 2 to 4 weeks despite appropriate therapy are unlikely to heal. There is also literature to support that a reduction of less than 40% for venous and less than 50% diabetic ulcers at 4 weeks is an overall predictor of outcome for healing.

Medicare expects the wound care treatment plan to be modified in the event that appropriate healing is not achieved. Debridement should be performed by a health care professional acting within the scope of his/her legal authority.

Evidence of improvement includes measurable changes (decreases) of some of the following:

Drainage (color, amount, consistency)
Inflammation
Swelling
Pain
Wound dimensions (diameter, depth, tunneling)
Necrotic tissue/slough

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.                Dec 1, 2021 from MediRegs

### Use of Evaluation and Management (E/M) Codes in Conjunction with Debridement(s)

Patients who have chronic wounds may frequently have underlying medical problems that require concomitant management in order to bring about wound closure. In addition, patients may require education, other services, and coordination of care both in the preoperative and postoperative phases of the debridement procedure. An E/M service provided and documented on the same day as a debridement service may be covered by Medicare only when the documentation clearly establishes the service as a "separately identifiable service" that was reasonable and necessary, as well as distinct, from the debridement service(s) provided.

### Biophysical Agents

Biophysical agents or modalities such as electrical stimulation; induced electrical stimulation;
negative pressure wound therapy; hyperbaric oxygen; and non-contact, non-thermal ultrasound all add some form of energy to the wound bed to help drive the healing process forward, especially in the compromised tissues of patients who tend to get pressure ulcers.

### Electrical Stimulation and Electromagnetic Therapy

Please refer to: CMS Publication 100-03, *Medicare National Coverage Determination (NCD) Manual*, Chapter 1-Part 4, § 270.1 Electrical Stimulation (ES) and Electromagnetic Therapy for the Treatment of Wounds.

### Negative Pressure Wound Therapy

Negative Pressure Wound Therapy (NPWT), utilizing either durable or disposable medical equipment, involves the application of controlled or intermittent negative pressure to a properly dressed wound cavity. Suction (negative pressure) is applied under airtight wound dressings to promote the healing of open wounds **resistant to prior treatments**. Coverage of traditional NPWT (tNPWT) device/unit/type, or supplies is under DME and providers should consult their DME LCD for specific coverage, parameters, and guidelines.

### Low Frequency, Non-contact, Non-thermal Ultrasound (MIST Therapy)

Low frequency, non-contact, non-thermal ultrasound is a system that uses continuous low frequency ultrasonic energy to atomize a liquid and deliver continuous low frequency ultrasound to the wound bed. This modality is often referred to as "MIST Therapy".

There should be documented improvements in the wound(s) evident after six MIST treatments.
Improvements include documented reduction in pain, necrotic tissue, or wound size or improved granulation tissue. Continuing MIST treatments for wounds demonstrating no improvement after six treatments is considered not reasonable and necessary. No more than 18 services of low frequency, non-contact, non-thermal ultrasound (MIST Therapy) within a six-week period will be considered reasonable and necessary. Also, Low Frequency, Non-Contact, Non-Thermal Ultrasound treatments would be separately billable if other active wound management and/or wound debridement is not performed.

### Topical Oxygen Therapy

Refer to Change Request (CR) 10220, *Hyperbaric Oxygen (HBO) Therapy*

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite                                                    Wolters Kluwer

*(Section C, Topical Application of Oxygen.*

**Summary of Evidence**

Despite many recent advances in wound care, the challenge of managing chronic wounds remains
complicated by the lack of agreement on clearly defined comprehensive wound care principles and consistently accepted analytical scientific methods to evaluate outcomes.

**Negative Pressure Wound Therapy (NPWT)**
There is moderate evidence in the peer-reviewed published literature to indicate that NPWT using a powered device approved by the U.S. Food and Drug Administration (FDA) is effective for a specific subgroup of patients who have failed a comprehensive, conventional wound therapy program that includes all reasonable, well-established alternative medical treatments. There is also moderate evidence to support the use of this therapy as an alternative to surgery. There is insufficient evidence to support the routine use of NPWT.

Although NPWT appears effective and its superiority to conventional techniques has been demonstrated, there are still some critical concerns concerning its efficacy. Because its mechanisms of action remain partly unclear and because there are still some gaps between evidence-based data and the excellent clinical results, further prospective, randomized, ideally blinded studies are needed.[1]

**Low Frequency, Non-contact, Non-thermal Ultrasound (MIST Therapy)**
A 2011 meta-analysis, three randomized-control trials. 444 patients with various chronic wounds.
It found 85% wound-area reduction in a mean of 7 weeks, wound-volume reduction of 80% at a mean of 12 weeks, and 42% complete wound closure at 12 weeks. By comparison, a meta-analysis of standard-of-care treatment found only 24% complete wound closure at 12 weeks.
Thus, Noncontact, Low Frequency Ultrasound (NLFU) achieves almost twice the healing of the standard treatment.[2]

**Topical Oxygen Therapy (TOT)**
Because of the difficulties in obtaining reliable wound measurements, wound closure is an important and measurable goal, and we agree with the FDA that complete wound closure is the most objective and clinically meaningful endpoint. Studies were weighted stronger when randomized and with controls, and when study end-points or patient selection did not change during the study. The review of the literature that was conducted for TOT is summarized below.

Azimian's paper was a sample of 100 hospitalized adult patients were recruited to this single blinded multi-center study and were randomly assigned to an intervention or control group. Patients in the intervention group received transdermal wound oxygen therapy (TWOT). TWOT consisted of the direct application of humidified high-pressure oxygen via disposable catheter, at a rate of 10 liters per minute, to the wound site for 20 minutes, three times a day for 12 days. The authors concluded that transdermal wound oxygen therapy could effectively promote the healing of pressure wounds on the sacral and ischial areas of the body. However, due to the relatively small study sample, they recommended larger studies be pursued.

Blackman's paper describes a controlled, single site study of a prospective comparison of the healing rates of chronic diabetic foot ulcers (DFUs) treated with either topical wound oxygen therapy (TWO$_2$) or advanced moist wound therapy (AMWT). Only 28 patients were included in the trial. The authors concluded that the wounds of study patients treated with TWO$_2$ were significantly more likely to heal and in a shorter period than those treated with AMWT, and

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.           Dec 1, 2021 from MediRegs

Wolters Kluwer

that well designed randomized controlled trials to confirm the efficacy of TWO2 were needed.

The goal of this prospective, randomized study, reported by Driver was to evaluate the efficacy of the use of transdermal continuous oxygen therapy (TCOT) in patients with nonhealing diabetic foot wounds by following wound healing and biological markers of tissue response. Eligible patients were randomized either to the intervention group (n = 9) or control group (n=8) by a block randomization scheme. TCOT provided a continuous delivery of 99.8% pure oxygen by cannula at a rate of 3 mL/hour directly to the wound site. The manufacturer of the TCOT device supported this study. The authors concluded that the clinical efficacy of TCOT was established, as there was a significant difference in percent volume reduction in wound size for the TCOT group compared to the control group. No wounds completely healed during the study.

Niederauer 2015 reports a planned interim analysis of a randomized, balanced, double blind, sham controlled, parallel group clinical trial performed to evaluate use of a device providing the continuous diffusion of oxygen (CDO) to diabetic foot ulcers (DFU) compared to treatment of the ulcers with standard moist wound therapy (MWT).

The full sample size of the study is anticipated to be 84 subjects. With this report of the results of the first 50% of subjects who completed a twelve-week course of treatment (n=42). The primary outcome of the investigation is complete wound closure defined as complete reepithelization with no drainage. Those in the sham group received no oxygen to the wound but did receive standard of care MWT. Patients were followed for twelve weeks or until wound closure, whichever came first. Dressing change frequency depended on rate of exudate and varied from 2-12 times per week.

Upon analysis of the data, the investigators excluded any subject that had fast wound healing between the screening and visit number one.
As the study progressed, the authors found it necessary to have regular conference calls with investigators to provide emphasis on the proper principles of moist wound therapy, and the number of dressing changes.
Any subject who withdrew from the study, for any reason, was excluded from the statistical analysis. This study reported on the first 42 subjects (active group: n = 21; sham group, n= 21) to complete the study per protocol. The authors reported that they found no significant and beneficial treatment effect in the active arm of the study.

However, in a series of subsequent analyses, the authors found that among subjects with wound size of at least 1.5 cm$^2$ and who experienced wound closure and excluding subjects who experienced fast closure between Screen and Visit 1 (Active n=9; Sham n=3), the average number of days to closure was significantly lower among the active group than the sham group. However, stratification was then used and at the median randomization date, wound closure was found to be significantly increased in those individuals in the active group seen after the median randomization date. The authors concluded that this interim analysis suggested improved healing with CDO versus MWT for slower to close, larger chronic wounds.

Niederauer (2017) followed up on the interim report (2015) that was published in *Wound Medicin*e; with the protocol being amended to change the minimum baseline wound size and run-in rate of wound closure inclusion/exclusion criteria. Subjects that failed these criteria were removed from the study. Sixty-six of 146 subjects were now dropped or excluded from the study after randomization. The authors stated that the results of this study suggest that CDO over a wound leads to significantly higher rates of closure and faster time to closure compared to similarly treated patients receiving standard therapy provided along with a sham

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

Wolters Kluwer

device.

In a paper by Tawfick, a parallel group observational comparative study was used to examine the safety and efficacy of topical wound oxygen ($TWO_2$) versus conventional compression dressings in the management of refractory nonhealing venous ulcers. Here patient preference determined group allocation. The ulcer healing time among wounds treated with $TWO_2$ was shorter regardless of the duration or size of the ulcer. During the twelve-month follow up, none of the 37 healed $TWO_2$ ulcers showed signs of reoccurrence, while five of the thirteen healed ulcers by compression did. The authors concluded that $TWO_2$ produced superior outcomes to compression therapy in the treatment of refractory venous ulcers by achieving shorter healing times and reducing recurrence rates. They also noted that a randomized controlled trial was underway to study the benefits of $TWO_2$.

Yu's paper reports a pilot randomized controlled trial to compare a continuous topical oxygen delivery system to standard best practice in patients with nonhealing DFUs. Patients were randomized into either a group which received topical oxygen as well as standard of care (SOC) (n=10) or into a nonplacebo control group which received standard of care alone (n = 10). The study was performed for eight weeks. One subject in the continuous topical oxygen group dropped out; and the results of one subject in the control group were discarded as an outlier, due to the large size of the wound. (n=18 total). The authors concluded that though this study was underpowered, it demonstrated that topical oxygen applied continuously to a chronic wound can have a great effect on healing.

**Analysis of Evidence**
**(Rationale for Determination)**

*Level of Evidence*
Quality -Moderate
Strength - Limited
Weight - Limited

Coding Information

Bill Type Codes

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

Revenue Codes

Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy, services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.

Note: WPS Medicare has identified the Type of Bill (TOB) and Revenue Center (RC) codes applicable for use with the CPT/HCPCS codes included in this LCD. Providers are reminded that not all CPT/HCPCS codes listed can be billed with all TOB and/or RC codes listed. CPT/HCPCS codes are required to be billed with specific TOB and RC codes. Providers are encouraged to refer to the CMS Internet-Only Manual (IOM) Pub. 100-04, Claims Processing Manual, for further guidance.

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite 

CPT/HCPCS Codes

ICD-10 Codes that Support
Medical Necessity

ICD-10 Codes that DO NOT
Support Medical Necessity

Additional ICD-10          N/A
Information

General Information

Synopsis of Changes

| CHANGES | FIELDS CHANGED |
|---|---|
| N/A | N/A |

Associated Information        Documentation
The medical record must clearly show that the criteria under Coverage
Indications, Limitations, and /or Medical Necessity have been met. The medical
record must include a certified plan of care containing a treatment plan with
goals, physician follow-up, the expected frequency and duration of the skilled
treatment, and the potential to heal. With continuation of a treatment plan, there
needs to be ongoing evidence of the effectiveness of the plan, including
diminishing area and depth of the ulceration, resolution of surrounding erythema
and /or wound exudates, decreasing symptomatology, and overall assessment of
wound status (such as stable, improved, worsening, etc.) documented.
Appropriate modification of treatment plan, when necessitated by failure of
wounds to improve, must be demonstrated. The record must document
complicating factors for wound healing as well as measures taken to control
complicating factors when debridement is part of the plan. Medical records must
be made available to Medicare upon request.

The patient's medical record must contain clearly documented evidence of the
progress of the wound's response to treatment at each visit. This documentation
must include, at a minimum:

Current wound volume (surface dimensions and depth).

- Presence (and extent of) or absence of obvious signs of infection.
- Presence (and extent of) or absence of necrotic, devitalized or non-viable
  tissue or other material in the
- wound that is expected to inhibit healing or promote adjacent tissue
  breakdown.

When debridement is reported, the debridement procedure notes should
demonstrate tissue removal (i.e., skin, full or partial thickness; subcutaneous
tissue; muscle and/or bone), the method used to debride (i.e., hydrostatic, sharp,
abrasion, etc.) and the character of the wound (including dimensions, description
of necrotic material present, before and after debridement; and after debridement
the description of tissue removed (including amount in sq. cm, degree of
epithelialization, etc.). Procedure notes should also include the severity of tissue
destruction, undermining or tunneling, necrosis, infection or evidence of reduced
circulation.

When performing debridement of a single wound, report depth using the deepest

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.          Dec 1, 2021 from MediRegs

Wolters Kluwer

level of tissue removed. In multiple wounds, sum the surface area of those wounds that are at the same depth, but do not combine sums from different depths. See current CPT Book for coding guidance.

Active debridement must be performed under a treatment plan as any other therapy service outlining specific goals, duration, frequency, modalities, an anticipated endpoint, and other pertinent factors as they may apply. Departure from this plan must be documented.

Documentation for debridement exceeding Utilization Guidelines must include a complete description of the wound, progress towards healing, complications that have delayed healing and a projected number of additional treatments necessary.

Appropriate evaluation and management of contributory medical conditions or other factors affecting the course of wound healing (such as nutritional status or other predisposing conditions) should be addressed in the record at intervals consistent with the nature of the condition or factor.

Photographic documentation of wounds immediately before and after debridement is recommended for prolonged or repetitive debridement services and maybe requested by this contractor for payment of claims.

When wound care is provided by the Therapist, for both in and out patient wound care, the medical record is required to have the following documentation:

- Physician order(s) for therapy /wound care services and signed plan of treatment (also known as a plan of care) detailing treatment modalities for therapy/wound care services must be established as soon as possible or within 30 days.
- Initial evaluation of therapy/wound care services.
- Wound characteristics such as diameter, depth, color, presence of exudates or necrotic.
- Previous wound care services administered including date and modalities of treatment.
- Every 10 days progress notes to include current wound status, measurements (including size and depth), and the treatment provided.
- Description of instrument used for selective or sharp debridement (i.e. forceps, scalpel, scissors, tweezers, high-pressure water jet, etc.).
- Certification/recertification for therapy/wound care services.
- Actual minutes provided to support each timed service/HCPCS provided

**Utilization Guidelines**
Prolonged, repetitive debridement services require adequate documentation of complicating circumstances that reasonably necessitated additional services. The record must clearly document the failure of wounds to improve to support the medical necessity for removal of muscle and/or bone for complicated management of wounds.

Coverage of traditional Negative Pressure Wound Therapy (tNPWT) device/unit/type, or supplies is covered under the Durable Medical Equipment benefit (Social Security Act §1861(s)(6)), and providers should consult their DME LCD for specific coverage, parameters, and guidelines.

The beneficiaries who undergo treatment utilizing negative pressure wound therapy, only when medical necessity continues to be met and there is documented evidence of clear benefit from the NPWT treatment already provided.

The number of debridements and NPWT for a wound within the context of a

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.    Dec 1, 2021 from MediRegs

palliative treatment plan (i.e., when wounds are not expected to heal or when patients are in an end-of-life situation) would be expected to be of a limited frequency and duration consistent with that of palliative care.

The extent and number of services provided should be medically necessary and reasonable based on the documented medical evaluation of the patient's condition, diagnosis, and plan.
Only when medical necessity continues to be met and there is documented evidence of clear benefit from the services provided, should services be continued. When services are performed in excess of anticipated peer norms based on data analysis, the services may be subject to medical review.

**Summary of Evidence from Comment Period (09/26/2019 - 11/10/2019):**

Overall conclusions:

Included in this LCD are the revisions to add debridement for stage 2 pressure injuries, diabetic foot ulcers (DFU) and chronic non-pressure ulcers with severity limited to breakdown of the skin when biofilm or devitalization is present. It is clear, and never under reconsideration, that a standard treatment of wounds includes debridement of devitalized tissue including necrotic, infected, slough, debris and tissue with abnormal granulation. Prior to the reconsideration, debridement was limited to stage 3 and 4 pressure ulcerations. The reconsideration requested the addition of stage 2, DFU (listed in addition to neuroischemic ulceration) and non-pressure wounds with limited skin breakdown.

Although literature directly discussing stage 2 pressure injury and the value of debridement may be limited we accept the premise but the National Pressure Ulcer Advisory Panel stating "there is strong informed clinical consensus to support the role of debridement in wound bed preparation, despite the ethically understandable lack of randomized controlled trials directly comparing debridement to no debridement in human subjects." There is ample evidence demonstrating debridement of ulcers with biofilm or devitalized tissue, regardless of the stage. It is therefore reasonable and medically necessary, and considered the medically accepted standard of care, to treat with debridement. Biofilms and devitalized tissue can be found both on the surface and in deeper wounds. Accepting the premise that wounds with biofilms and devitalized tissue require debridement it is then accepted that Stage 2 pressure injury and non-pressure wounds with limited skin breakdown may require debridement for proper wound healing.

It has been and continues to be accepted that DFU require debridement as part of standard wound healing practices. Prior to this reconsideration request, DFU were categorized as part of neuroischemic ulcerations understanding the mechanism of most diabetic wounds arise from a vascular or neurologic etiology. The request in the reconsideration was to specifically add DFU for coverage. The reviewed literature and comments support evidence for diabetic foot wounds with an etiology other than neurological or ischemic injury. Such other causes include deformity, limited ankle range of motion, high plantar foot pressures, minor trauma, previous ulceration or amputation and visual impairment. Evidence has shown that debridement of diabetic foot ulcers enhances the healing process when combined with standard wound care for a diabetic foot ulcer. Accepting that not all DFU are neuroischemic and continuing to accept that debridement is an important part of the wound treatment, the LCD has been changed to specifically identify DFU for coverage independent of neurological and ischemic injuries.

**Analysis of Evidence**

**(Rationale for Determination)**

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.        Dec 1, 2021 from MediRegs

Analysis of Evidence included in the above Summary of Evidence from Comment Period (09/26/2019 - 11/10/2019).

**Summary of Evidence for Reconsideration** (01/17/2019):

Khanolkar MP, Bain SC, Stephens JW. The diabetic foot. QJM: *An International Journal of Medicine*. 2008;101(9) 9:685-695. https://doi.org/10.1093/qjmed/hcn027. The article discusses epidemiology, pathogenesis, assessment, and management of the "Diabetic Foot". The article states, "Regular foot care includes debridement of calluses as this has been shown to reduce peak plantar pressure by 26%." The debridement discussion focuses on the types of debridement but does not expand into the types of wounds that should be debrided and when a diabetic wound should be debrided. The authors only mentions regular debridement of calluses, which are not classified as wounds.

Johani K, Malone M, Jensen S, Gosbell I, Dickson H, Hu H, Vickery K. Microscopy visualisation confirms multispecies biofilms are ubiquitous in diabetic foot ulcers. *Int Wound J*. 2017;6:1160-1169. https://onlinelibrary.wiley.com/doi/pdf/10.1111/iwj.12777. Epub Jun 23, 2017. The article studied tissue specimens taken from 65 subjects with diabetic foot ulcers (DFU) to see if the presence of biofilms in chronic wounds contribute to delay in wound healing. A secondary objective was to study the results of microscopic wound observations to determine if clinical cues are useful in detecting wound biofilm. The article lists various factors (neuropathy, peripheral vascular disease, trauma and infection) that can cause diabetic foot complications along with management. This included the general management of "diabetic foot" (correct foot care, smoking cessation etc.) to more advanced interventions (debridement, prophylactic foot surgery etc.). In summary, this study reviews biofilms and their relationship to diabetic foot ulcers. Debridement is mentioned only once in the context of poor healing post debridement and may be the presence of biofilms. This study does not directly address the requested additions in the reconsideration request.

Schultz GS, Sibbald RG, Falanga V, Ayello EA, Dowsett C, Harding K, Romanelli M., Stacey MC, Teot L, Vanscheidt W.Wound bed preparation: a systematic approach to wound management.*Wound Repair Regen*.2003;Suppl 1:S1-28. An article discussing the molecular events and key elements of wound bed management in acute and chronic wound healing.

The article addresses the benefits of debridement in the healing process but does not address the type of wounds such as those requested in the reconsideration. Allogenic bilayered tissue is discussed in regards to diabetic foot ulcer treatment but there is no mention of debridement and its role in healing. There is a discussion on the role of human recombinant PDGF and its role in the healing of pressure ulcers. There is no mention of the stage of pressure ulcer or debridement.

*Medicare National Coverage Determinations Manual* 270.1: Electrical Stimulation (ES) and Electromagnetic Therapy for the Treatment of Wounds. https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/ncd103c1_Part4.pdf

Prevention and Treatment of Pressure Ulcers: Quick Reference Guide. National Pressure Ulcer Advisory Panel, European Pressure Ulcer Advisory Panel and Pan Pacific Pressure Injury Alliance. 2014; Cambridge Media: Osborne Park, Australia. A summary of evidence based recommendations and guidelines for prevention and treatment of pressure ulcers.

The article discusses debridement of devitalized tissue within the wound bed or

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.    Dec 1, 2021 from MediRegs

MediRegs Master Suite                                             Wolters Kluwer

edge of pressure ulcers when appropriate to the individual's condition and consistent with overall goals of care. It is noted the strength of evidence is grade C. Grade C means, the recommendation is supported by indirect evidence (e.g., studies in healthy humans, humans with other types of chronic wounds, animal models) and/or expert opinion). The authors also note that caution should be taken when debriding tissue with inadequate perfusion to the wound. The review suggests diabetic ulcers would be high risk given poor circulation. The article notes *Surgical/ sharp debridement is recommended in the presence of extensive necrosis, advancing cellulitis, crepitus, fluctuance, and/or sepsis secondary to ulcer-related infection*. This description is not consistent with a stage II pressure ulceration. The only mention of debridement in regards to the stage of ulcer (referring only to stage III/IV and not stage II) is *Refer individuals with Category/ Stage III or IV pressure ulcers with undermining, tunneling/ sinus tracts, and/or extensive necrotic tissue that cannot be easily removed by other debridement methods for surgical evaluation as appropriate to the individual's condition and goals of care*.

Steed DL, Donohoe D, Webster MW, Lindley L. Effect of extensive debridement and treatment on the healing of diabetic foot ulcers. Diabetic Ulcer Study Group. *J Am Coll Surg.* 1996;183(1):61-64. One hundred and eighteen patients participated in a randomized, prospective, double-blind, multicenter study to analyze the effect of extensive debridement and treatment on the healing of Diabetic Foot Ulcers. The treatment also included topically applied recombinant human platelet derived growth factor or placebo to treat patients with chronic nonischemic diabetic ulcers. ALL study participants underwent sharp debridement of the ulcer bed.

Results: use of rhPDGF had better healing than placebo. All patients had debridement at assessment and as needed during the treatment phase of study. The percentage of debridement was the same between groups. The authors state more debridement (regardless of group) led to better healing. The authors do not describe criteria for debriding. The authors provide no cut off of "intermediate vs high debridement," and there was no statistics to show clinically significant difference. They note that the influence of debridement was evaluated by reviewing clinic notes at the time of follow up which is a very subjective and non-objective evaluation tool. Conclusions are drawn looking at one chart illustration without statistical analysis. This study's primary purpose was to evaluate the effect of rhPDGF on wound healing. The additional effects of frequent debridement were not appropriately analyzed.

Sage RA, Webster JK, Fisher SG. Outpatient care and morbidity reduction in diabetic foot ulcers associated with chronic pressure callus. *J Am Podiatr Med Assoc.* 2001; 91(6):275-279. A retrospective review of 233 cases of diabetic foot ulceration preceded by minor trauma to determine if aggressive outpatient care was effective in decreasing hospitalization and surgery in these patients. This article makes the case for debridement of keratotic and pressure lesions such as focal pressure keratosis in PREVENTION of wounds. The article is not relevant to the request as it does not address treatment of DM ulcer, stage II wounds (discusses prevention) and NON-pressure wounds with limited skin breakdown.

Saap LJ, Falanga V. Debridement performance index and its correlation with complete closure of diabetic foot ulcers. *Wound Repair Regen*. 2002; 10(6):354-359. The article is written to address the current issue of there being an established way to judge the appropriate extent of debridement and its performance. The use of the Debridement Performance Index was used as an independent predictor of wound closure. The methods included evaluation of digital photographs from 143 patients. The study was a controlled, randomized pivotal clinical trial. The study compared "standard therapy" (twice daily moist saline gauze dressings and off-loading) vs. the use of a bilayered graft. All ulcers were defined as full thickness neuropathic ulcers. The frequency and need for

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.          Dec 1, 2021 from MediRegs

debridement was not defined. The study reviews the effectiveness of debridement using the debridement performance index (DPI). The better the DPI score the better results in regards to wound closure. This study does not address the issue defined in the reconsideration request. The study evaluates the benefit of the DPI index. The study does not account for how standard treatment or biofilm grafting effected the results. The study includes "neuropathic ulcers" which are currently included in the LCD coverage criteria.

Ndip A, Jude EB. Emerging evidence for neuroischemic diabetic foot ulcers: model of care and how to adapt practice. *Int J Low Ext Wounds.* 2009;82-94. A study discussing the importance of conducting a vascular review in patients with ischemic/neuroischemic ulcers utilizing a multidisciplinary foot care team. The article repeatedly discussed neuroischemic foot ulcers and does not address specifically diabetic foot ulcer as the etiology compared to other causes of neuroischemic ulceration. Debridement is mentioned in the context of general treatments for neuroischemic ulcers. Does not address the request.

**Analysis of Evidence**

**(Rationale for Determination)**

Overall conclusions:

Diabetic foot ulcerations:

1. No study was presented to show clear evidence that debridement improves ulcer healing. One study suggests high frequency debridement improves ulcer healing. There was no data analysis to support this finding and show statistical significance. One study evaluates the DPI and indirectly measures the effect of debridement on DFUs. It is noted however that all ulcers debrided were classified as "neuropathic ulcers."
2. Studies repeatedly describe pressure keratosis (callus) debridement to prevent diabetic ulcer. The provider request is for diabetic and non-pressure ulcer.

Stage II ulcer

1. No study was submitted that specifically addresses stage II debridement. No study discussed outcomes of debridement in any stage. Studies presented referred to class C evidence in support of debridement and debridements MAY decrease the time to healing.

Non-pressure limited to breakdown of skin:

1. No studies presented addressing debridement for this. Frequent discussion of treatment of PRESSURE keratosis to PREVENT ulcers.

My Recommendation: No change to current LCD coverage guidelines.

Level of Evidence

Quality - The overall quality of evidence is average. There is mix of review studies and randomized trials. Although most studies address the topic of the article adequately, none of the articles directly addresses the specific requests of the reconsideration.

Strength - The strength of the evidence is poor. No study directly provided evidence to support debridement of stage II foot ulcerations. Stage III and IV were addressed and are already included in the current LCD. Treatment and prevention of diabetic foot ulcerations were reviewed in several articles but the mention of debridement was focused on neuropathic ulceration, which are

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.    Dec 1, 2021 from MediRegs

MediRegs Master Suite

Wolters Kluwer

already included in the current LCD article.

Weight - No weight is given to the articles provided. The articles do not address the reconsideration request in such a way to justify the addition of stage II pressure ulcers and diabetic foot ulcers, with associated requested codes, to the LCD.

| | |
|---|---|
| Documentation Requirements | N/A |
| Bibliography | Bibliography from Comment Period (09/26/2019 - 11/10/2019): |

American Physical Therapy Association (APTA): Minimum required skills of physical therapist graduates at entry-level. BOD G11-05-20-49. http://www.calstate.edu/app/dpt/documents/minimum-required-skills-APTA.pdf

Armstrong DG, de Asia RJ. Management of diabetic foot ulcers. Edits:JF, Mills JL, Nathan DM, eds. UpToDate.

Attinger CE, Bulan EJ. Debridement: The key initial first step in wound healing. *Foot Ankle Clin N Am*. 2001; 6:627- 660.

Cuddigan J, NDNQI: Getting the numbers - pressure injuries across the U.S., in NPUAP 2017 Biennial Conference Pressure Injury: Advancing the Vision. 2017; National Pressure Ulcer Advisory Panel: New Orleans, LA.

Edsberg LE, et al., Revised National Pressure Ulcer Advisory Panel Pressure Injury Staging System: Revised Pressure Injury Staging System. *J Wound Ostomy Continence Nurs.* 2016;43(6):585-597.

Game FL, Apelqvist J, Attinger C, et al. for the International Working Group on the Diabetic Foot (IWGDF). IWGDF Guidance on use of interventions to enhance the healing of chronic ulcers of the foot in diabetes. International Working Group on the Diabetic Foot. 2015.

Gupta S, Andersen C, Black J, et al. Management of chronic wounds: Diagnosis, preparation, treatment, and follow-up. *Wounds*. 2017; 29(9 Suppl):S19-S36.

Hingorani A, LaMuraglia GM, Henke P, et al. The management of diabetic foot: A practice guideline by the Society for Vascular Surgery in collaboration with the American Podiatric Medical Association and the Society for Vascular Medicine. *J Vasc Surg* 2016; 63(2S): 3S-21S.

International Working Group on the Diabetic Foot (IWGDF) Guidance on use of interventions to enhance the healing of chronic ulcers of the foot in diabetes. International Working Group on the Diabetic Foot. 2015.

International Best Practice Guidelines: *Best Practice Guidelines: Wound Management in Diabetic Foot Ulcers*. Wounds International, 2013.

Lavery LA, Davis KE, Berriman SJ, et al. WHS guidelines update: Diabetic foot ulcer treatment guidelines. *Wound Repair Regen*. 2016; 24:112-126.

Lipsky BA, Berendt AR, Cornia PB, et al. 2012 Infectious Diseases Society of America clinical practice guideline for the diagnosis and treatment of diabetic foot infections. *Clinical Infectious Diseases*. 2012; 54:132-173.

National Pressure Ulcer Advisory Panel, European Pressure Ulcer Advisory

Wolters Kluwer

Panel and Pan Pacific Pressure Injury Alliance. Prevention and Treatment of Pressure Ulcers: Quick Reference Guide. Emily Haesler (Ed.). Cambridge Media: Osborne Park, Australia; 2014.

National Pressure Ulcer Advisory Panel. National Pressure Ulcer Advisory Panel (NPUAP) announces a change in terminology from pressure ulcer to pressure injury and updates the stages of pressure injury. 2016 June 14.

National Pressure Ulcer Advisory Panel. NPUAP Position statement on staging - 2017 clarifications. 2017 Jan 24.

Ndip A, Ebah L, Mbako A. Neuropathic diabetic foot ulcer - evidence-to-practice. I*nt J Gen Med*. 2012.

Püllen R, Popp R, Volkers P, Füsgen I. Prospective randomized double-blind study of the wound-debriding effects of collagenase and fibrinolysin/deoxyribonuclease in pressure ulcers. *Age Ageing*. 2002; 31(2):126-130. doi:10.1093/ageing/31.2.126.

Schultz G, Bjarnsholt T, James G et al. Consensus guidelines for the identification and treatment of biofilms in chronic nonhealing wounds. *Wound Repair Regen*. 2017;25(5):744-757. doi:10.1111/wrr.12590.

Steed DL, Attinger C, Colaizzi T, et al. Guidelines for the treatment of diabetic ulcers. *Wound Repair Regen*. 2006; 15:680-692.

Wilcox J, Carter M, Covington S. Frequency of debridements and time to heal. *JAMA Dermatol*.
2013;149(9):1050-1058. doi:10.1001/*jamadermatol.*2013.4960.

Wolcott RD, Kennedy JP, Dowd SE. Regular debridement is the main tool for maintaining a healthy wound bed in most chronic wounds. *J Wound Care* 2009; 18(2):54-56.

Wounds International. International Best Practice Guidelines: Wound Management in Diabetic Foot Ulcers. Wounds International. 2013.

Bibliography for Reconsideration (01/17/2019):

Johani K, Malone M, Jensen S, Gosbell I, Dickson H, Hu H, Vickery K. Microscopy visualisation confirms multispecies biofilms are ubiquitous in diabetic foot ulcers. *Int Wound J*. 2017;6:1160-1169. https://onlinelibrary.wiley.com/doi/pdf/10.1111/iwj.12777. Epub Jun 23, 2017.

Khanolkar MP, Bain SC, Stephens JW. The diabetic foot. *QJM: Int J Med.* 2008; 101(9) 9:685-695. https://doi.org/10.1093/qjmed/hcn027

*Medicare National Coverage Determinations Manual* 270.1: Electrical Stimulation (ES) and Electromagnetic Therapy for the Treatment of Wounds. https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/ncd103c1_Part4.pdf

Ndip A, Jude EB. Emerging evidence for neuroischemic diabetic foot ulcers: model of care and how to adapt practice. *Int J Low Ext Wounds.* 2009;82-94.

Prevention and Treatment of Pressure Ulcers: Quick Reference Guide. National Pressure Ulcer Advisory Panel, European Pressure Ulcer Advisory Panel and Pan PacificPressure Injury Alliance. 2014; Cambridge Media: Osborne Park, Australia.

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

Saap LJ, Falanga V. Debridement performance index and its correlation with complete closure of diabetic foot ulcers. *Wound Repair Regen*. 2002; 10(6):354-9.

Sage RA, Webster JK, Fisher SG. Outpatient care and morbidity reduction in diabetic foot ulcers associated with chronic pressure callus. *J Am Podiatr Med Assoc*. 2001; 91(6):275-9.

Schultz GS, Sibbald RG, Falanga V, Ayello EA, Dowsett C, Harding K, Romanelli M., Stacey MC, Teot L, Vanscheidt W.Wound bed preparation: a systematic approach to wound management. *Wound Repair Regen*.2003;Suppl 1:S1-28.

Steed DL, Donohoe D, Webster MW, Lindley L. Effect of extensive debridement and treatment on the healing of diabetic foot ulcers. Diabetic Ulcer Study Group. *J Am Coll Surg.* 1996;183(1):61-4.

Original Bibliography:

Agency for Healthcare Research and Quality (AHRQ). Pressure ulcer treatment strategies: comparative effectiveness. *Effective Health Care Program*. 2013 May; 90:1-24.

Agency for Healthcare Research and Quality (AHRQ). Negative pressure wound therapy devices. *Technology Assessment Program* 2009 May;1-59.

Alumia A, Improving outcomes with noncontact low-frequency ultrasound. *Wound Care Advisor*. 2013 Sept./Oct.; 2(5):17-202.
http://woundcareadvisor.com/wp-content/uploads/2013/09/BP_IMPROVE_S-O13.pdf

Azimian J, Nayeri ND, Pourkhaleghi E, Ansari M. Transdermal Wound Oxygen Therapy on Pressure Ulcer Healing: A single-blind multi-center randomized controlled trial. *Iran Red Crescent Med J*. 2015; 17(11): e20211. doi:10.5812/ircmj.20211. PMID: 26734476.

Baharestani MM., Berger T M, Bolton LL, et al. Association for the Advancement of Wound Care Guideline of Pressure Ulcer Guidelines. *Agency for Healthcare Research and Quality. National Clearinghouse Website*. 2010 Oct 1.

Bell, A.L., Cavorsi, J. Noncontact ultrasound therapy for adjunctive treatment of nonhealing wounds: A retrospective analysis. *Phys Ther*. 2008 Dec; 88(12):1517-1524.

Blackman E, Moore C, Hyatt J, Railton R, Frye C. Topical wound oxygen therapy in the treatment of severe diabetic foot ulcers: A prospective controlled study. *Ostomy Wound Manage.* 2010; 56(6): 24-31. PMID: 20567051.

Burke TJ. The effect of monochromatic infrared energy on sensation in subjects with diabetic peripheral neuropathy: a double-blind, placebo-controlled study. *Diabetes Care*. 2006 May; 29(5):1186. A response to Clifft et al. Accessed 11/03/2015.

Cole PS, Quisberg J, Melin MM. Adjuvant use of acoustic pressure wound therapy for treatment of chronic wounds. *J Wound Ostomy Continence Nurs*. 2009 Mar/Apr; 36(2):171-177.

Department of Health and Human Services. *Negative Pressure Wound Therapy Technologies For Chronic Wound Care in the Home Setting - Technology Assessment Program*. 2014; (Project ID: WNDT0913) Rockville, Maryland.

[1]Division of Plastic Surgery and Reconstructive Surgery, Medical University Graz, et al Negative pressure therapy: theory and practice. Diabetes Metab Res Rev. 2012 Feb;28 Suppl 1:72-7. doi: 10.1002/dmrr.2243.

[2]Driver VR, Yao M, Miller CJ. Noncontract low-frequency ultrasound therapy in the treatment of chronic wounds: A meta-analysis. *Wound Repair Regen*. 2011 Jun; 19(4): 475-480.

Driver VR, Yao M, Kantarci A, Gu G. Park N, Hasturk H. A Prospective, Randomized Clinical Study Evaluating the Effect of Transdermal Continuous Oxygen Therapy on Biological Processes and Foot Ulcer Healing in Persons with Diabetes Mellitus. Ostomy Wound Manage. 2013; 59(11): 19-26. PMID: 24201169.

Escandon J, Vivas,AC, Perez R, Kirsner R, Davis S. A prospective pilot study of ultrasound therapy effectiveness in refractory venous leg ulcers. *Int Wound J*. 2012 Oct; 9(5):570-578.

Flanagan M. Wound measurement: can it help us to monitor progression to healing? *J Wound Care*. 2003; 12(5):189-194.

Fonder MA, Lazarus GS, Cowan DA, Aronson-Cook B, Kohli AR, Mamelak AJ. Treating the chronic wound: A practical approach to the care of nonhealing wounds and wound care dressings. *J of Am Acad Dermatol*. 2008,Feb; 58(2):185-206.

Gray, M., Black, J.M., Baharestani, M.M., Bliss, D.Z., Colwell, J.C., Goldberg, M., et al.
Moisture-Associated Skin Damage: Overview and Pathology. *J Wound Ostomy Continence Nurs*. 2011;38(3):233-241. Wound Care Literature Review 2011

Haan J, Lucich, S. A retrospective analysis of acoustic pressure wound therapy: effects on the healing progression of chronic wounds. *J Am Col Certif Wound Spec*.2009; 1:28-34.

Honaker JS, Forston MR, Davis EA, Wiesner MM., Morgan JA. Effects of noncontact low-frequency ultrasound on healing of suspected deep tissue injury: a retrospective analysis. *Int Wound J*. 2013 Feb; 10(1):65-72.

Hurd T, Trueman P, Rossington A. Use of a portable, single-use negative pressure wound therapy device in home care patients with low to moderately exuding wounds: a case series. *Ostomy Wound Manage*. 2014 Mar; 60(3):1943-2720.

International Consolidated Venous Ulcer Guideline (ICVUG) 2015
(Update of AAWC Venous Ulcer Guideline, 2005 and 2010) Retrieved from:
https://aawconline

Krokowicz L, Borejsza-Wysocki M, Mackiewicz J, Iqbal A, Drews M.
10 years of Negative Pressure Wound Therapy [NPWT]: Evolution of indications for its use.
*Negative Pressure Wound Therapy*. 2014 Jan; 1(1):27-321.
http://researchpub.org/journal/npwt/number/vol1-no1/vol1-no1-6.pdf

Niederauer MQ, Michalek JE, Armstrong DG. Interim results for a prospective, randomized, double-blind multicenter study comparing continuous diffusion of oxygen therapy to standard moist wound therapy in the treatment of diabetic foot ulcers. *Wound Med*. 2015; 8:19-23.
http://dx.doi.org/10.1016/j.wndm.2015.03.005.

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite

Wolters Kluwer

Niederauer M, Michalek J, Armstrong D. A prospective, randomized, double-blind multicenter study comparing continuous diffusion of oxygen therapy to sham therapy in the treatment of diabetic foot ulcers. *J Diabetes Sci Technol*. 2017; 1-9.

Photography in Wound Documentation: Fact Sheet from Wound Ostomy and Continence Nurses Society January 2, 2012.

U.S. Food & Drug Administration, UPDATE on Serious Complications Associated with Negative Pressure Wound Therapy Systems: FDA Safety Communication. Date issued: February 24, 2011.

Sheehan P, Jones P, Caswlli A, Giurini and J. Veves. Percent change in wound area of diabetic foot ulcers over a 4-week period is a robust predictor of complete healing in a 12-week prospective trial. *Diabetes Care*. 2003 Jun; 26(6):1879-1882. https://doi.org/10.2337/diacare.26.6.1879.

Synder RJ, Cardinal M, Dauphinée DM, Stavpsky J. A post-hoc analysis of reduction in diabetic foot ulcer size at 4 weeks as a predictor of healing by 12 weeks. *Ostomy Wound Manage*. 2010 Mar 1; 56(3):44-50.

Steed D L, Attinger C, Colaizzi T, Crossland M, Franz M, Harkless L, Johnson A, Moosa H, Robson M, Serena T, Sheehan P, Veves A, Wiersma-Bryant L. Guidelines for the treatment of diabetic ulcers. *Wound Repair Regen* 2006; 14:680-692. doi:10.1111/j.1524-475X.2006. 00176.x

Tawfick WA, Sultan S. Does Topical Wound Oxygen (TWO2Offer an Improved Outcome Over Conventional Compression Dressings (CCD) in the Management of Refractory Venous Ulcers (RVU)? A Parallel Observational Comparative Study. *Eur J Vasc Endovasc Surg*. 2009 Jul; 38(1):125-32. doi: 10.1016/j.ejvs.2009.03.027. Epub 2009 May 22. PMID: 19464933.

The Management of Diabetic Foot: A Clinical Practice Guideline by the Society for Vascular Surgery in Collaboration with the American Podiatric Medical Association and the Society for Vascular Medicine. *J Vasc Surg 2016*; special supplement published February 2016.

Yu J, Lu S, McLaren A, Perry JA, Cross KM. Topical oxygen therapy results in complete wound healing in diabetic foot ulcers. *Wound Repair Regen*. 2016. doi: 10.1111/wrr.12490. PMID: 27733020.

| | |
|---|---|
| Appendices | N/A |
| Utilization Guidelines | N/A |
| Sources of Information and Basis for Decision | N/A |
| Advisory Committee Meeting Notes | N/A |
| MAC Meeting Information URL(s) | N/A |
| Proposed LCD Posting Date | N/A |
| Comment Period Start Date | N/A |
| Comment Period End Date | N/A |
| Released to Final LCD Date Please Note: This is not the LCD Effective Date | N/A |

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

Dec 1, 2021 from MediRegs

MediRegs Master Suite  Wolters Kluwer

Revision History

| Revision Number (Date) | Revision History Explanation |
| --- | --- |
| R6 (01/28/2021) | 01/28/2021 CMS National Coverage Policy: Deleted: Change Request 10901 Local Coverage Determinations (LCDs). Format revisions completed. Bibliography updated to AMA format. Review completed on 01/06/2021 with no change in coverage. |
| R5 (02/09/2020) | 02/13/2020 Correction necessary for consistency between final Local Coverage Determination (LCD) effective 02/09/2020 and DL37228 in Documentation Section to read, "When wound care is provided by the Therapist, for either in or out patient wound care, the medical record is required to have the following documentation" (removed, "Physical") effective 02/09/2020. |
| R4 (02/09/2020) | Added the following to CMS National Coverage Policy: |

CMS IOM Publication 100-08, *Medicare Program Integrity Manual*, Chapter 13, Section 13.5.4 - Reasonable and Necessary Provisions in an LCD.
Change Request 10901, Local Coverage Determinations (LCDs)
42 Code of Federal Regulations (CFR) § 410.20 - Physicians' services

Added the following to Coverage Guidance:
Active wound care procedures are performed to remove necrotic tissue and/or devitalized tissue to promote healing. Providers are responsible to determine medical necessity and use the appropriate current CPT/HCPCS code for service provided. Please consult the current AMA CPT book for the complete code description of the procedures being performed to submit claims.

This LCD supplements but does not replace, modify or supersede existing Medicare applicable National Coverage Determinations (NCDs) or payment policy rules and regulations for additional wound care. Federal statute and subsequent Medicare regulations regarding provision and payment for medical services are lengthy. They are not repeated in this LCD. Neither Medicare payment policy rules nor this LCD replace, modify or supersede applicable state statutes regarding medical practice or other health practice professions acts, definitions and/or scopes of practice. All providers who report services for Medicare payment must fully understand and follow all existing laws, regulations and rules for Medicare payment for additional hemodialysis sessions and must properly submit only valid claims for them. Please review and understand them and apply the medical necessity provisions in the policy within the context of the manual rules. Relevant CMS manual instructions and policies are provided under CMS National Coverage Policy section.

Debridement section added:

- Pressure Injury
- Stage II
- Diabetic Foot Ulcer(s)

Should deep tissue pressure injury or Stage II injury progress to Unstageable, Stage III or Stage IV requiring debridement then documentation supporting this must be included in the medical record.

Evaluation and Management Section has been revised and the following has been removed:
The following services may be done during wound care services and can be medically necessary, but they are not considered wound debridement services and wound debridement CPT codes should not be used.

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

Wolters Kluwer

- Removal of necrotic tissue by cleansing, scraping (other than by a scalpel or a curette), chemical application, or **dry-to-dry** or **wet-to dry** dressing. Generally, dressing changes are not considered a skilled service. The prior dressings are different and distinct from **wet-to-moist** dressings that are used for removal of devitalized tissue from wound(s) for non-selective debridement.
- Washing bacterial or fungal debris from lesions.
- Removal of secretions and coagulation serum from normal skin surrounding an ulcer.
- Dressing of small or superficial lesions.
- Removal of fibrinous material from the margin of an ulcer.
- Paring or cutting of corns or non-plantar calluses. Skin breakdown under a dorsal corn that begins to heal when the corn is removed, and shoe pressure eliminated is not considered an ulcer that requires debridement unless there is extension into the subcutaneous tissue.
- Incision and drainage of abscess including paronychia, trimming or debridement of mycotic nails, avulsion of nail plates, acne surgery, or destruction of warts.
- Removal of non-tissue integrated fibrin exudates, crusts, biofilms or other materials from a wound without removal of tissue does not meet the definition of any debridement code and may not be reported as such.
- While mechanical debridement is a valuable technique for healing ulcers, it does not qualify as a surgical wound debridement service, and therefore should not be coded as such.
- Scraping the base of the wound bed to induce bleeding, following the removal of devitalized tissue, is not considered to be a separately billable service.
- Removing a collar of callus (hyperkeratotic tissue) around an ulcer is not debridement of skin or necrotic tissue and should not be billed as debridement unless additional partial full skin thickness tissue directly deep to the callus is removed as well.
- Infrared, ultrasound thermal and phototherapy-ultraviolet modalities are not considered debridement services.

Negative Pressure Wound Therapy has been revised and the following has been removed
For disposable NPWT (dNPWT) devices, this contractor recommends following manufacturer's instructions but, generally be limited to a maximum of 4 applications per 30 days.

NPWT services should not exceed a 120-day period. It is expected a licensed medical professional must directly assess the wound(s) being treated with NPWT and supervise or directly perform the NPWT dressing changes. It is expected there will be an evaluation with documentation of the wound's dimensions and characteristics conducted every 30 days.

NWPT coverage would end, and the pump and/or supplies will be denied as not reasonable and necessary with any of the following, whichever occurs earliest.
In the judgment of the treating physician, adequate wound healing has occurred to the degree that NPWT may be discontinued,
Any measurable degree of wound healing has failed to occur over the prior month. Wound healing is defined as improvement occurring in either surface area (length times width) or depth of the wound.
One hundred twenty (120) days (including the time NPWT was applied in an inpatient setting prior to discharge to the home) have elapsed using NPWT in the treatment of the most recent wound.

Documentation Section revision completed

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite



When wound care is provided by the Physical Therapist, for both in and out patient wound care, the medical record is required to have the following documentation:

Physician order(s) for therapy /wound care services and signed plan of treatment (also known as a plan of care) detailing treatment modalities for therapy/wound care services must be established as soon as possible or within 30 days.

Every 10 days progress notes to include current wound status, measurements (including size and depth), and the treatment provided.

Utilization Guidelines has been revised and the following two statements have been removed:
For disposable NPWT (dNPWT) devices, this contractor recommends following manufacturer's instructions but, generally be limited to a maximum of 4 applications per 30 days.

Negative Pressure Wound Therapy services should not exceed a 120-day period. There should be no more than 4 dressing changes per wound per month for the majority of wounds. With dNPWT, there should be a maximum of 4 new disposable NPWT per month. It is expected there will be an evaluation with documentation for a wound(s) every 30 days.

Added Summary of Evidence, Analysis of Evidence, and Bibliography related to Comment Period (09/26/2019 - 11/10/2019)

Format revisions completed.

| | |
|---|---|
| R3 (11/01/2019) | Content has been moved to the new template. |
| R2 (03/28/2019) | 03/28/2019 Removed national policy language from the sections: Electrical Stimulation and Electromagnetic Therapy and Topical Oxygen Therapy due to Change Request (CR)10901 Local Coverage Determinations (LCDs). Typographical error corrected. Review completed 03/05/2019. |
| R1 (04/16/2018) | Corrected Title in companion Article A55909 |

**Associated Documents**

Related Documents: Articles
- A55910 (version 2) - Response to Comments: Wound Care (DL37228)
- A55909 (version 30) - Billing and Coding: Wound Care
- A57846 (version 4) - Response to Comments: DL37228 Wound Care

Related Documents: LCDs    N/A

Related Documents: NCDs
- NCD ID: 217; Version: 5
- NCD ID: 131; Version: 3
- NCD ID: 315; Version: 1
- NCD ID: 232; Version: 1
- NCD ID: 47; Version: 1

Keywords
- Debridement

© 2020 CCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite

Wolters Kluwer

- Electrical Stimulation
- Electrical Therapy
- MIST
- Wound

Source: https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=37228&ver=14
(accessed 11/06/2021)

© 2020 LOCH Incorporated and its affiliates and licensors. All rights reserved.

# Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products:  Minimal Manipulation and Homologous Use

## Guidance for Industry and Food and Drug Administration Staff

For questions on the content of this guidance, contact Center for Biologics Evaluation and Research (CBER), Office of Communication, Outreach, and Development (OCOD) at 240-402-8010 or 800-835-4709.  For questions about this document concerning products regulated by Center for Devices and Radiological Health (CDRH), contact the CDRH product jurisdiction officer at CDRHProductJurisdiction@fda.hhs.gov.  If you need additional assistance with regulation of combination products, contact the Office of Combination Products (OCP) at 301-796-8930.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Biologics Evaluation and Research**
**Center for Devices and Radiological Health**
**Office of Combination Products**
**July 2020**

Contains Nonbinding Recommendations

# Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products:  Minimal Manipulation and Homologous Use

---

# Guidance for Industry and Food and Drug Administration Staff

*Additional copies are available from:*
*Office of Communication, Outreach and Development*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Ave., WO71, Room 3103*
*Silver Spring, MD 20993*
*Phone:  800-835-4709 or 240-402-8010*
*ocod@fda.hhs.gov*
*https://www.fda.gov/vaccines-blood-biologics/guidance-compliance-regulatory-information-biologics/biologics-guidances*
*or*
*Office of Policy*
*Guidance and Policy Development*
*Center for Devices and Radiological Health*
*Food and Drug Administration*
*10903 New Hampshire Ave., WO66, Room 5431*
*Silver Spring, MD 20993*
*Phone:  301-796-5900*
*https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/guidance-documents-medical-devices-and-radiation-emitting-products*
*or*
*Office of Combination Products*
*Office of Special Medical Programs*
*Office of the Commissioner*
*Food and Drug Administration*
*10903 New Hampshire Ave., WO32, Hub 5129*
*Silver Spring, MD 20993*
*Phone:  301-796-8930, Fax:  301-847-8619*
*combination@fda.gov*
*https://www.fda.gov/CombinationProducts/default.htm*

**Contains Nonbinding Recommendations**

# Table of Contents

I.      INTRODUCTION ..................................................................................................... 1

II.     BACKGROUND ....................................................................................................... 2

III.   QUESTIONS AND ANSWERS REGARDING MINIMAL MANIPULATION ....... 7

     A.    General Concepts ........................................................................................ 7
     B.    Structural Tissue ........................................................................................ 8
     C.    Cells or Nonstructural Tissues ................................................................ 14

IV.   QUESTIONS AND ANSWERS REGARDING HOMOLOGOUS USE .................. 16

V.    REGULATORY SCOPE AND COMPLIANCE POLICY ....................................... 22

     A.    Scope of FDA's Regulation of HCT/Ps ................................................... 22
     B.    Compliance and Enforcement Policy Regarding Certain Regulatory
          Requirements ............................................................................................ 22

VI.   ADDITIONAL INFORMATION ............................................................................ 23

# Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use

## Guidance for Industry and Food and Drug Administration Staff

*This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA staff responsible for this guidance as listed on the title page.*

## I.    INTRODUCTION

We, FDA, are providing you, human cells, tissues, and cellular and tissue-based product (HCT/P) manufacturers, healthcare providers, and FDA staff, with our current thinking on the criteria under Title 21 of the Code of Federal Regulations (CFR) Part 1271, specifically the 21 CFR 1271.10(a)(1) criterion of minimal manipulation and the 21 CFR 1271.10(a)(2) criterion of homologous use.

This guidance supersedes the guidance of the same title dated November 2017 and corrected December 2017.[1] This guidance revises section V. to extend the period of enforcement discretion through May 31, 2021.

The interpretation of the minimal manipulation and homologous use criteria and definitions of related key terms have been of considerable interest to industry stakeholders since the criteria and definitions were first proposed.[2] This guidance is intended to improve stakeholders' understanding of the definitions of minimal manipulation in 21 CFR 1271.3(f) and homologous use in 21 CFR 1271.3(c). It will also facilitate stakeholders' understanding of how the regulatory criteria in 21 CFR 1271.10(a)(1) and (2) apply to their HCT/Ps.[3] In addition, the November 2017 version of the guidance informed manufacturers, healthcare providers, and other interested persons that over the next 36 months (through November 2020), we intended to

---

[1] This document was updated December 2017 to correct language to remove references to autologous and non-autologous (allogeneic) products in section V.B. (Compliance and Enforcement Policy Regarding Certain Regulatory Requirements).

[2] "Establishment Registration and Listing for Manufacturers of Human Cellular and Tissue-Based Products" 63 FR 26744 at 26748-26749 (May 14, 1998). (Tissue Registration and Listing: Proposed Rule)

[3] This guidance does not address the classification and/or assignment of HCT/Ps that do not meet the criteria for regulation solely under section 361 of the Public Health Service (PHS) Act and 21 CFR Part 1271.

1

**Contains Nonbinding Recommendations**

exercise enforcement discretion under limited conditions with respect to the investigational new drug (IND) application and premarket approval (biologics license application (BLA)) requirements, for certain HCT/Ps. The current version of this guidance explains that FDA intends to exercise such enforcement discretion for a longer period of time: through May 2021.

The November 2017 version of the guidance finalized the document entitled "Minimal Manipulation of Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/Ps); Draft Guidance for Industry and Food Administration Staff" dated December 2014, and "Homologous Use of Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/Ps); Draft Guidance for Industry and FDA Staff" dated October 2015. It also finalized certain material related to adipose tissue that was included in draft guidance entitled "Human Cells, Tissues, and Cellular and Tissue-Based Products (HCT/Ps) from Adipose Tissue: Regulatory Considerations; Draft Guidance for Industry" dated December 2014 (Adipose Draft Guidance). This material, together with the material related to adipose tissue included in the final guidance entitled "Same Surgical Procedure Exception under 21 CFR 1271.15(b); Questions and Answers Regarding the Scope of the Exception" dated November 2017, superseded the Adipose Draft Guidance. Accordingly, we did finalize the Adipose Draft Guidance, and that draft guidance was withdrawn in November 2017. Finally, the November 2017 version of the guidance superseded the document entitled "Minimal Manipulation of Structural Tissue (Jurisdictional Update); Guidance for Industry and FDA Staff" dated September 2006 (2006 Guidance).

In general, FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe FDA's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in FDA's guidances means that something is suggested or recommended, but not required.

## II.    BACKGROUND

HCT/Ps are defined in 21 CFR 1271.3(d) as articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient.[4] Because of the unique nature of HCT/Ps, FDA proposed and in 2005 implemented a tiered, risk-based approach to the regulation of HCT/Ps. Although FDA is authorized to apply

---

[4] Examples of HCT/Ps include, but are not limited to, bone, ligament, skin, dura mater, heart valve, cornea, hematopoietic stem/progenitor cells derived from peripheral and cord blood, manipulated autologous chondrocytes, epithelial cells on a synthetic matrix, and semen or other reproductive tissue. The following articles are not considered HCT/Ps: (1) Vascularized human organs for transplantation; (2) Whole Blood or blood components or blood derivative products subject to listing under 21 CFR Parts 607 and 207, respectively; (3) Secreted or extracted human products, such as milk, collagen, and cell factors, except that semen is considered an HCT/P; (4) Minimally manipulated bone marrow for homologous use and not combined with another article (except for water, crystalloids, or a sterilizing, preserving, or storage agent, if the addition of the agent does not raise new clinical safety concerns with respect to the bone marrow); (5) Ancillary products used in the manufacture of HCT/P; (6) Cells, tissues, and organs derived from animals other than humans; (7) In vitro diagnostic products as defined in 21 CFR 809.3(a); and (8) Blood vessels recovered with an organ, as defined in 42 CFR 121.2 that are intended for use in organ transplantation and labeled "For use in organ transplantation only" (21 CFR 1271.3(d)).

Please note, the regulatory status of products identified as not being HCT/Ps is beyond the scope of this guidance.

2

**Contains Nonbinding Recommendations**

the requirements in the Federal Food, Drug, and Cosmetic Act (FD&C Act) and the Public Health Service Act (PHS Act) to those products that meet the definition of drug, biologic, or device, under this tiered, risk-based approach, those HCT/Ps that meet specific criteria or fall within detailed exceptions do not require premarket review and approval. In developing the tiered, risk-based approach the agency focused on public health and regulatory concerns, including how transmission of communicable disease can be prevented; what processing controls are necessary to prevent contamination that could result in an unsafe or ineffective product, and to preserve integrity and function so that the products will work as they are intended; and how clinical safety and effectiveness can be assured. The tiered, risk-based approach is contained in a set of regulations commonly referred to as the "tissue rules," issued by FDA through notice and comment rulemaking, under the communicable disease authority of section 361 of the PHS Act (42 U.S.C. 264). These regulations explain the types of HCT/Ps that do not require premarket approval; and the registration, manufacturing, and reporting steps that must be taken to prevent the introduction, transmission, and spread of communicable disease by these HCT/Ps. These regulations can be found in 21 CFR Part 1271[5].

In 21 CFR 1271.10, the regulations identify the criteria for regulation solely under section 361 of the PHS Act and 21 CFR Part 1271. An HCT/P is regulated solely under section 361 of the PHS Act and 21 CFR Part 1271 if it meets all of the following criteria (21 CFR 1271.10(a)):

1) The HCT/P is minimally manipulated;
2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
4) Either:
   i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
   ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
      a) Is for autologous use;
      b) Is for allogeneic use in a first-degree or second-degree blood relative; or
      c) Is for reproductive use.

If an HCT/P does not meet the criteria set out in 21 CFR1271.10(a), and the establishment that manufactures the HCT/P does not qualify for any of the exceptions in 21 CFR 1271.15[6], the

---

[5] *See* "Human Cells, Tissues, and Cellular and Tissue-Based Products; Establishment Registration and Listing;" Final Rule, 66 FR 5447 (January 19, 2001); "Eligibility Determination for Donors of Human Cells, Tissues, and Cellular and Tissue-Based Products;" Final Rule, 69 FR 29786 (May 25, 2004); "Current Good Tissue Practice for Human Cell, Tissue, and Cellular and Tissue-Based Product Establishments; Inspection and Enforcement;" Final Rule, 69 FR 68612 (November 24, 2004).

[6] See the "Same Surgical Procedure Exception under 21 CFR 1271.15(b): Questions and Answers Regarding the Scope of the Exception; Guidance for Industry" dated November 2017 available at: https://www.fda.gov/media/89920/download.

3

Contains Nonbinding Recommendations

HCT/P will be regulated as a drug, device, and/or biological product under the FD&C Act, and/or section 351 of the PHS Act (42 U.S.C. 262), and applicable regulations, including 21 CFR Part 1271, and premarket review will be required.

## Minimal Manipulation

Section 1271.10(a)(1) (21 CFR 1271.10(a)(1)) provides that one of the criteria for an HCT/P to be regulated solely under section 361 of the PHS Act and the regulations in Part 1271 is that the HCT/P is minimally manipulated. As defined in 21 CFR 1271.3(f), minimal manipulation means:

1) For structural tissue, processing that does not alter the original relevant characteristics of the tissue relating to the tissue's utility for reconstruction, repair, or replacement;
2) For cells or nonstructural tissues, processing that does not alter the relevant biological characteristics of cells or tissues.

FDA discussed these terms in the preamble to the HCT/P Establishment Registration and Listing final rule[7] and the 2006 Guidance. However, we have received requests from stakeholders to provide additional guidance that explains our current thinking related to meeting the criterion in 21 CFR 1271.10(a)(1). This guidance supersedes the 2006 Guidance.

Please note that if information does not exist to show that the processing meets the definition of minimal manipulation, FDA considers the processing of an HCT/P to be "more than minimal manipulation" that cannot qualify for regulation solely under section 361 of the PHS Act and 21 CFR Part 1271[8].

## Homologous Use

Section 1271.10(a)(2) (21 CFR 1271.10(a)(2)) provides that one of the criteria for an HCT/P to be regulated solely under section 361 of the PHS Act and the regulations in Part 1271 is that the "HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent." As defined in 21 CFR 1271.3(c), homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor. This criterion reflects the Agency's conclusion that there would be increased safety and effectiveness concerns for HCT/Ps that are intended for a non-homologous use, because there is less basis on which to predict the product's behavior, whereas HCT/Ps for homologous use can reasonably be expected to function appropriately (assuming all of the other criteria are also met)[9].

---

[7] "Human Cells, Tissues, and Cellular and Tissue-Based Products; Establishment Registration and Listing" 66 FR 5447 at 5457 (January 19, 2001). (Tissue Registration and Listing; Final Rule).
[8] See the proposed rule, "Establishment Registration and Listing for Manufacturers of Human Cellular and Tissue-Based Products" 63 FR 26744 at 26748-26749 (May 14, 1998). (Tissue Registration and Listing; Proposed Rule)
[9] "Proposed Approach to Regulation of Cellular and Tissue-Based Products," dated February 28, 1997 62 FR 9721 (March 4, 1997) page 19. (1997 Proposed Approach).

4

**Contains Nonbinding Recommendations**

In applying the homologous use criterion, FDA will determine what the intended use of the HCT/P is, as reflected by the labeling, advertising, and other indications of a manufacturer's objective intent, and will then apply the homologous use definition.

FDA has received many inquiries from manufacturers about whether their HCT/Ps meet the minimal manipulation and/or homologous use criteria. Additionally, transplant and healthcare providers often need to know this information about the HCT/Ps that they are considering for use in their patients. This guidance provides examples of different types of HCT/Ps and how the regulations in 21 CFR 1271.10(a)(1) and (2) apply to them, and provides general principles that can be applied to HCT/Ps that may be developed in the future. In some of the examples, the HCT/Ps may fail to meet more than one of the four criteria in 21 CFR 1271.10(a). The following flowchart illustrates how manufacturers and healthcare providers should apply the criteria outlined in 21 CFR 1271.15(b)[10] and 1271.10(a) for HCT/Ps:

---

[10] For additional information about applying the exception in 21 CFR 1271.15(b), see the "Same Surgical Procedure Exception under 21 CFR 1271.15(b): Questions and Answers Regarding the Scope of the Exception; Guidance for Industry" dated November 2017.

5

**Contains Nonbinding Recommendations**

Flowchart to illustrate how to apply the criteria in 21 CFR 1271.15(b) and 1271.10(a)



Contains Nonbinding Recommendations

III.    QUESTIONS AND ANSWERS REGARDING MINIMAL MANIPULATION

    A.    General Concepts

        1.    How do the regulations define minimal manipulation?

Section 1271.3(f) provides two definitions of minimal manipulation, one that applies to structural tissue and one that applies to cells or nonstructural tissues. For structural tissue, minimal manipulation means that the processing of the HCT/P does not alter the original relevant characteristics of the tissue relating to the tissue's utility for reconstruction, repair, or replacement (21 CFR 1271.3(f)(1)). For cells or nonstructural tissues, minimal manipulation means that the processing of the HCT/P does not alter the relevant biological characteristics of cells or tissues (21 CFR 1271.3(f)(2)).

Original relevant characteristics of structural tissues generally include the properties of that tissue in the donor that contribute to the tissue's function or functions. Similarly, relevant biological characteristics of cells or nonstructural tissues generally include the properties of the cells or nonstructural tissues in the donor that contribute to the cells or tissue's function(s). Processing that alters the original characteristics of the HCT/P, raises increased safety and effectiveness concerns for the HCT/P because there would be less basis on which to predict the product's function after transplantation.[11] Thus, the determination of whether an HCT/P is minimally manipulated is based on the effect of manufacturing on the original relevant characteristics of the HCT/P as the HCT/P exists in the donor, and not based on the intended use of the HCT/P in the recipient.

        2.    Why is there a different definition of minimal manipulation for
              structural tissue and for cells or nonstructural tissue?

Under the regulations, HCT/Ps are considered either structural tissues or cells/nonstructural tissue, based on the characteristics of the tissue in the donor. This distinction, which was first described in the 1997 Proposed Approach for the regulation of cell and tissue-based products, is reflected in the definitions of minimal manipulation for structural tissue and cells/nonstructural tissue. Structural HCT/Ps generally raise different safety and efficacy concerns than do cells or nonstructural tissues.[12]

---

[11] See the "Proposed Approach to Regulation of Cell and Tissue-Based Products" page 19. (1997 Proposed Approach)

[12] See the "Proposed Approach to Regulation of Cell and Tissue-Based Products" page 20 (many structural HCT/Ps are conventional tissues with a long established history of safe use). (1997 Proposed Approach)

7

Contains Nonbinding Recommendations

**3.    How do I determine whether an HCT/P is structural tissue or cellular/nonstructural tissue for purposes of applying the minimal manipulation criterion?**

To apply the minimal manipulation criterion, you first determine whether the HCT/P is structural or cellular/nonstructural. This determination is made based on the characteristics of the HCT/P in the donor, before recovery and before any processing that takes place. Then, you apply the appropriate definition to determine whether the HCT/P has been minimally manipulated.

HCT/Ps may perform multiple functions and FDA acknowledges that structural tissues contain cells. FDA also acknowledges that some manufacturers assert that an HCT/P has both a structural and cellular/nonstructural function. However, under the regulations, HCT/Ps are considered either structural tissues or cells/nonstructural tissues. HCT/Ps that physically support or serve as a barrier or conduit, or connect, cover, or cushion are generally considered structural tissues for the purpose of applying the HCT/P regulatory framework. Examples of structural tissue are provided in question 6 (see section III.B. of this guidance). HCT/Ps that serve metabolic or other biochemical roles in the body such as hematopoietic, immune, and endocrine functions, are generally considered cells/nonstructural tissues for the purpose of applying the HCT/P regulatory framework. Examples of cells or nonstructural tissues are provided in question 15 (see section III.C. of this guidance).

**4.    What is processing of an HCT/P?**

Processing is defined as any activity performed on an HCT/P, other than recovery, donor screening, donor testing, storage, labeling, packaging, or distribution, such as testing for microorganisms, preparation, sterilization, steps to inactivate or remove adventitious agents, preservation for storage, and removal from storage (21 CFR 1271.3(ff)). Processing also includes cutting, grinding, shaping, culturing, enzymatic digestion, and decellularization.

**5.    Which processing steps should be considered in determining whether an HCT/P is minimally manipulated?**

You should consider all of the processing steps.

**B.    Structural Tissue**

**1.    What types of tissues are considered structural tissues?**

Tissues that physically support or serve as a barrier or conduit, or connect, cover, or cushion in the donor are generally considered structural tissues for the purposes of determining the applicable regulatory definition.

Contains Nonbinding Recommendations

Examples of structural tissues include:

- Bone;
- Skin;
- Amniotic membrane and umbilical cord;
- Blood vessel;
- Adipose tissue;
- Articular cartilage;
- Non-articular cartilage; and
- Tendon or ligament

**2.    Why is adipose tissue considered a structural tissue for the purpose of applying the HCT/P regulatory framework?**

Adipose tissue is typically defined as a connective tissue composed of clusters of cells (adipocytes) surrounded by a reticular fiber network and interspersed small blood vessels, divided into lobes and lobules by connective tissue septa.[13] Additionally, adipose tissue contains other cells, including preadipocytes, fibroblasts, vascular endothelial cells, and macrophages.[14]  Adipose tissue provides cushioning and support for other tissues, including the skin and internal organs, stores energy in the form of lipids, and insulates the body, among other functions.  While adipose tissue has multiple functions, because it is predominantly composed of adipocytes and surrounding connective tissues that provide cushioning and support to the body, FDA considers adipose tissue to be a structural tissue for the purpose of applying the HCT/P regulatory framework.

To evaluate whether processing of adipose tissue would meet the regulatory definition of minimal manipulation, you should consider whether the processing alters the original relevant characteristics of the adipose tissue relating to its utility to provide cushioning and support.

**3.    If my HCT/P is a structural tissue, how do I determine whether it is minimally manipulated?**

To evaluate whether processing of a structural tissue would meet the regulatory definition of minimal manipulation, you should consider whether the processing alters an original relevant characteristic of the tissue, relating to the tissue's utility for reconstruction, repair, or replacement as structural tissue.

---

[13] Chapter 6. Adipose Tissue. In: Mescher AL. eds. *Junqueira's Basic Histology: Text & Atlas, 13e*. New York: McGraw-Hill; 2013. http://accessmedicine.mhmedical.com/content.aspx?bookid=574&Sectionid=42542592.
[14] Brown SA, Levi, B, Lequeux, C, et al. Basic Science Review on Adipose Tissue for Clinicians. *Plast. Reconstr. Surg.* 126:1936, 2010.

9

**4.    What are original relevant characteristics of structural tissues?**

Original relevant characteristics of structural tissues generally include the properties of that tissue in the donor that contribute to the tissue's function or functions.  For purposes of determining whether a structural HCT/P is minimally manipulated, a tissue characteristic is "original" if it is present in the tissue in the donor.  A structural tissue characteristic is "relevant" if it could have a meaningful bearing on the tissue's utility for reconstruction, repair, or replacement.  The structural tissue's utility for reconstruction, repair, or replacement relates to how that tissue functions in the donor.  Examples of relevant characteristics of structural tissues include strength, flexibility, cushioning, covering, compressibility, and response to friction and shear.

**5.    How does changing the size or shape of the structural tissue affect whether an HCT/P is minimally manipulated?**

Structural tissues may be processed by various machining and other mechanical methods to change the size or shape of the HCT/P.  Such processing can be either minimal manipulation or more than minimal manipulation depending on whether the processing alters the original relevant characteristics of the structural tissue relating to its utility for reconstruction, repair, or replacement.

Example 10-1:  Original relevant characteristics of bone relating to its utility to support the body and protect internal structures include strength, and resistance to compression.  Milling, grinding, and other methods for shaping and sizing bone may generally be considered minimal manipulation when they do not alter bone's original relevant characteristics relating to its utility to support the body and protect internal structures.

    a.    A manufacturer performs threading and other mechanical machining procedures to shape bone into dowels, screws, and pins.  The HCT/Ps are generally considered minimally manipulated because the processing does not alter the bone's original relevant characteristics relating to its utility to support the body and protect internal structures.

    b.    A manufacturer grinds bone to form bone chips and particles.  The HCT/Ps would generally be considered minimally manipulated because the processing does not alter the bone's original relevant characteristics relating to its utility to support bodily structures.[15]

---

[15] Refer to the "Jurisdictional Update:  Human Demineralized Bone Matrix" dated January 19, 2001 (DBM Guidance) https://www.fda.gov/combination-products/jurisdictional-updates/jurisdictional-update-human-demineralized-bone-matrix  for information relating to the regulatory classification of demineralized bone matrix (DBM).  The guidance remains applicable to HCT/Ps that are DBM products.  However, the DBM Guidance is based on factors that are specific to DBM products.  The DBM Guidance document does not inform analyses to determine whether HCT/Ps other than DBM have been minimally manipulated and we do not consider it to be applicable to HCT/Ps other than DBM.

Contains Nonbinding Recommendations

c.  A manufacturer exposes bone to acid at elevated temperature to
demineralize bone and dissolve collagen in order to form a gel.
The HCT/P is generally considered more than minimally
manipulated because the processing alters the bone's original
relevant characteristics relating to its utility to support the body
and protect internal structures.

Example 10-2:  Original relevant characteristics of amniotic membrane relating to
its utility to serve as a barrier generally include the tissue's physical integrity,
tensile strength, and elasticity.

a.  A manufacturer processes amniotic membrane to preserve it and
package it in sheets.  The HCT/P generally is considered minimally
manipulated because the processing does not alter the original relevant
characteristics of the HCT/P relating to its utility to serve as a barrier.

b.  A manufacturer grinds and lyophilizes amniotic membrane and
packages it as particles.  The HCT/P generally is considered more than
minimally manipulated because the processing alters the original
relevant characteristics of the HCT/P relating to its utility to serve as a
barrier.

Example 10-3:  Original relevant characteristics of fascia lata, relating to its utility
to cover muscle and aid in movement, generally include its strength, flexibility,
and its fibrous, sheet-like configuration.  A manufacturer grinds sheets of fascia
lata into particles.  The HCT/P generally is considered more than minimally
manipulated because the processing alters the original relevant characteristics of
the HCT/P relating to its utility to cover muscle and aid in movement.

Example 10-4:  The original relevant characteristics of skin relating to its utility to
serve as a protective covering generally include its large surface area, keratinized,
water-resistant epithelial layer (epidermis), and dense, strong, and flexible
connective tissue layer (dermis).

a.  A manufacturer processes skin by mechanical meshing and
cryopreservation and packages it in sheets as meshed skin.  The
HCT/P generally is considered minimally manipulated because the
processing does not alter the original relevant characteristics of the
skin relating to its utility as a protective covering.

b.  A manufacturer processes skin by removing the epidermis and then
grinding the dermis into particles.  The HCT/P generally is considered
more than minimally manipulated because the processing alters the
original relevant characteristics of skin related to its utility as a
protective covering.

11

Contains Nonbinding Recommendations

**6.    How does removal of cells from structural tissue affect whether an HCT/P is minimally manipulated?**

Structural tissues may contain both extracellular matrix and cellular components, and any alteration of these components that relates to the structural tissue's utility for reconstruction, repair, or replacement generally would be considered more than minimal manipulation.  However, separation of structural tissue into components in which the original relevant characteristics relating to the tissue's utility for reconstruction, repair, or replacement are not altered generally would be considered minimal manipulation.  For example, extraction or separation of cells from structural tissue in which the remaining structural tissue's original relevant characteristics relating to its utility for reconstruction, repair, or replacement remain unchanged generally would be considered minimal manipulation.[16]

While some structural tissues may undergo processing that alters the cellular or extracellular matrix components without altering the original relevant characteristics of the tissue, the same processing may alter the original relevant characteristics of a different structural tissue.  Therefore, to assess whether a processing step alters the original relevant characteristics of a structural tissue relating to its utility for reconstruction, repair, or replacement, you should consider the effects of the processing on the properties that contribute to the specific tissue's function in the donor, for each type of tissue you manufacture.

Example 11-1:  Original relevant characteristics of adipose tissue relating to its utility to provide cushioning and support generally include its bulk and lipid storage capacity.  A manufacturer processes adipose tissue by removing the cells, which leaves the decellularized extracellular matrix portion of the HCT/P.  The HCT/P generally is considered more than minimally manipulated because the processing alters the original relevant characteristics of the HCT/P relating to its utility to provide cushioning and support.

Example 11-2:  Original relevant characteristics of the amniotic membrane related to its utility to serve as a barrier generally include its physical integrity, tensile strength, and elasticity.  A manufacturer processes amniotic tissue to remove the chorion and other cells.  The HCT/P generally is considered minimally manipulated because the processing does not alter the original relevant characteristics of the HCT/P relating to its utility to serve as a barrier.

Example 11-3:  The original relevant characteristics of skin relating to its utility to serve as a protective covering generally include its large surface area, keratinized, water-resistant epithelial layer (epidermis), and dense, strong, and flexible connective tissue layer (dermis).  A manufacturer processes skin to remove epidermis and freeze-dries and packages the remaining connective tissue, as

---

[16] See the Proposed Rule "Establishment Registration and Listing for Manufacturers of Human Cellular and Tissue-Based Products" 63 FR 26744 at 26748.  (May 14, 1998).  (Tissue Registration and Listing; Proposed Rule)

decellularized dermis.  The HCT/P generally is considered minimally manipulated because the processing does not alter the original relevant characteristics of the HCT/P relating to its utility to serve as a protective covering**.**

### 7.    How does changing the physical state of the structural HCT/P affect whether it is minimally manipulated?

In addition to mechanical methods, there are other types of processing that may alter the physical state of a structural tissue, such as chemical modification.  If the mechanical, chemical, or other method of modification alters the HCT/P's physical state relating to its utility for reconstruction, repair, or replacement, then the HCT/P is generally considered more than minimally manipulated.

Example 12-1:  The original relevant characteristics of cartilage relating to its utility to perform its load-bearing and other physical functions generally include firmness, smoothness, flexibility, and resistance to deformation.  A manufacturer processes cartilage allograft by homogenizing it into a slurry.  The HCT/P generally is considered more than minimally manipulated because the processing alters the original relevant characteristics of the HCT/P relating to its utility to absorb shock and reduce friction between joints.

Example 12-2:  The original relevant characteristics of ligament relating to its utility to attach bone to bone and aid in movement and stability generally include its tensile strength which is imparted by the bundled fibrous collagen.  A manufacturer processes ligament to disaggregate the collagen fibers.  The HCT/P generally is considered more than minimally manipulated because the processing alters the original relevant characteristics of the HCT/P relating to its utility to aid in movement and stability.

### 8.    How does storage affect whether a structural tissue is minimally manipulated?

Storage that does not alter the original relevant characteristics of a structural tissue relating to its utility for reconstruction, repair, or replacement would generally be considered minimal manipulation.  For example, an HCT/P that is placed in a tissue medium and refrigerated, such as stored in a buffer solution; or an HCT/P that is cryopreserved and stored in liquid nitrogen vapor, would generally meet the minimal manipulation criterion.[17]

---

[17] According to 21 CFR 1271.10(a)(3), to meet the criteria for regulation solely under section 361 of the PHS Act and 21 CFR Part 1271, the manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P.

Contains Nonbinding Recommendations

9. **I isolate cells from structural tissue to produce a cellular therapy product. What definition of minimal manipulation would apply?**

If you isolate cells from structural tissue, the definition of minimal manipulation for structural tissue applies, regardless of the method used to isolate the cells. This is because the assessment of whether the HCT/P is a structural tissue or cellular/nonstructural tissue is based on the characteristics of the HCT/P as it exists in the donor, prior to recovery and any processing that takes place.

Example 14-1: Original relevant characteristics of adipose tissue relating to its utility to provide cushioning and support generally include its bulk and lipid storage capacity. A manufacturer recovers adipose tissue by tumescent liposuction and processes (e.g., enzymatically digests, mechanically disrupts, etc.) the adipose tissue to isolate cellular components (with or without subsequent cell culture or expansion), commonly referred to as stromal vascular fraction, which is considered a potential source of adipose-derived stromal/stem cells. The definition of minimal manipulation for structural tissue applies.

In this example, the HCT/P generally is considered more than minimally manipulated because the processing breaks down and eliminates the adipocytes and the surrounding structural components that provide cushioning and support, thereby altering the original relevant characteristics of the HCT/P relating to its utility for reconstruction, repair, or replacement.

## C. Cells or Nonstructural Tissues

Under the regulatory framework for HCT/Ps, minimal manipulation of cells or nonstructural tissues is defined as processing that does not alter the relevant biological characteristics of cells or tissues (21 CFR 1271.3(f)(2)).

1. **What types of tissue are considered cells or nonstructural tissues?**

Cells or nonstructural tissues are generally those that serve predominantly metabolic or other biochemical roles in the body such as hematopoietic, immune, and endocrine functions.

Examples of cells or nonstructural tissues include:

- Reproductive cells or tissues (e.g., oocytes);
- Hematopoietic stem/progenitor cells (e.g., cord blood)[18];
- Lymph nodes and thymus;

---

[18] Bone marrow is a source of hematopoietic stem/progenitor cells. Minimally manipulated bone marrow for homologous use and not combined with another article (with certain exceptions), is not considered an HCT/P (21 CFR 1271.3(d)(4)). However, bone marrow that is more than minimally manipulated, intended by the manufacturer for a non-homologous use, or combined with another article with limited exceptions, meets the definition of an HCT/P and is subject to the regulations in 21 CFR Part 1271.

14

Contains Nonbinding Recommendations

- Parathyroid glands;
- Peripheral nerve; and
- Pancreatic tissue.

Secreted body fluids (e.g., amniotic fluid) are generally not considered HCT/Ps.[19] Cells from secreted body fluids are generally considered HCT/Ps, and the definition of minimal manipulation for cells or nonstructural tissues would apply.

### 2.  What are relevant biological characteristics of cells or nonstructural tissues?

Relevant biological characteristics of cells or nonstructural tissues generally include the properties of the cells or nonstructural tissues in the donor that contribute to the cells or tissue's function or functions.

Examples of relevant biological characteristics of cells or nonstructural tissues include differentiation and activation state, proliferation potential, and metabolic activity.  Processing that alters any relevant biological characteristics of cells or nonstructural tissues generally would be considered more than minimal manipulation.

Example 16-1:  Relevant biological characteristics of hematopoietic stem/progenitor cells generally include the ability to repopulate the bone marrow by self-renewal and by differentiating along myeloid and lymphoid cell lines.

   a. Hematopoietic stem/progenitor cells are circulating in increased numbers in the peripheral blood of a donor after administration of mobilizing agent.  A manufacturer performs cell selection on the mobilized peripheral blood apheresis product to obtain a higher concentration of hematopoietic stem/progenitor cells for transplantation.  The HCT/P would generally be considered minimally manipulated because the concentrated peripheral blood stem/progenitor cells are not altered with regard to their relevant biological characteristics to repopulate the bone marrow.

   b. A manufacturer uses hematopoietic stem/progenitor cells to produce terminally differentiated cells by culturing the cells under specific conditions.  This HCT/P derived from hematopoietic stem/progenitor cells would generally be considered more than minimally manipulated because the processing alters the cells' relevant biological characteristics of multipotency and capacity for self-renewal.

---

[19] 21 CFR 1271.3(d) states, "…The following articles are not considered HCT/Ps:…(3) secreted or extracted human products such as milk, collagen, and cell factors, except that semen is considered an HCT/P".

Contains Nonbinding Recommendations

    c.   A manufacturer of a placental/umbilical cord blood product performs cell selection and incubates the selected cells in a laboratory vessel containing culture media and growth factors to achieve large numbers of cells capable of long-term repopulation of the bone marrow. This HCT/P derived from cord blood would generally be considered more than minimally manipulated because the processing affects the production of intracellular or cell-surface proteins and other markers of cell lineage, activation state, and proliferation, thereby altering the cells' relevant biological characteristics of multipotency and capacity for self-renewal.

## IV.    QUESTIONS AND ANSWERS REGARDING HOMOLOGOUS USE

### 1.    What is the definition of homologous use?

Homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor (21 CFR 1271.3(c)), including when such cells or tissues are for autologous use. We generally consider an HCT/P to be for homologous use when it is used to repair, reconstruct, replace, or supplement:

- Recipient cells or tissues that are identical (e.g., skin for skin) to the donor cells or tissues, and perform one or more of the same basic functions in the recipient as the cells or tissues performed in the donor; or,

- Recipient cells or tissues that may not be identical to the donor's cells or tissues, but that perform one or more of the same basic functions in the recipient as the cells or tissues performed in the donor.[20]

Example 17-1: A heart valve is transplanted to replace a dysfunctional heart valve. This is homologous use because the donor heart valve performs the same basic function in the donor as in the recipient of ensuring unidirectional blood flow within the heart.

Example 17-2: Pericardium is intended to be used as a wound covering for dura mater defects. This is homologous use because the pericardium is intended to serve as a covering in the recipient, which is one of the basic functions it performs in the donor.

If an HCT/P is intended for use as an unproven treatment for a myriad of diseases or conditions, the HCT/P is likely not intended for homologous use only.[21]

---

[20] "Establishment Registration and Listing for Manufacturers of Human Cellular and Tissue-Based Products" 63 FR 26744 at 26748-26749 (May 14, 1998). (Tissue Registration and Listing; Proposed Rule)

[21] "Human Cells, Tissues, and Cellular and Tissue-Based Products; Establishment Registration and Listing" 66 FR 5447 at 5457 (January 19, 2001). (Tissue Registration and Listing; Final Rule)

16

Contains Nonbinding Recommendations

2.    **What does FDA mean by repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues?**

Repair generally means the physical or mechanical restoration of tissues, including by covering or protecting.  For example, FDA generally would consider skin removed from a donor and then transplanted to a recipient in order to cover a burn wound to be a homologous use.  Reconstruction generally means surgical reassembling or re-forming.  For example, reconstruction generally would include the reestablishment of the physical integrity of a damaged aorta.[22]  Replacement generally means substitution of a missing tissue or cell, for example, the replacement of a damaged or diseased cornea with a healthy cornea or the replacement of donor hematopoietic stem/progenitor cells in a recipient with a disorder affecting the hematopoietic system that is inherited, acquired, or the result of myeloablative treatment.  Supplementation generally means to add to, or complete.  For example, FDA generally would consider the implantation of dermal matrix into the facial wrinkles to supplement a recipient's tissues and the use of bone chips to supplement bony defects to be homologous uses.  Repair, reconstruction, replacement, and supplementation are not mutually exclusive functions and an HCT/P could perform more than one of these functions for a given intended use.

3.    **What does FDA mean by "the same basic function or functions" in the definition of homologous use?**

For the purpose of applying the HCT/P regulatory framework, the same basic function or functions of HCT/Ps are considered to be those basic functions the HCT/P performs in the body of the donor, which, when transplanted, implanted, infused, or transferred, the HCT/P would be expected to perform in the recipient.  It is not necessary for the HCT/P in the recipient to perform all of the basic functions it performed in the donor in order to meet the definition of homologous use.  However, to meet the definition of homologous use, any of the basic functions that the HCT/P is expected to perform in the recipient must be a basic function that the HCT/P performed in the donor.

The basic function of an HCT/P is what it does from a biological/physiological point of view, or is capable of doing when in its native state.[23]  By "basic" we mean the function or functions that are commonly attributed to the HCT/P as it exists in the donor.  Basic functions are well understood; it should not be necessary to perform laboratory, pre-clinical, or clinical studies to demonstrate a basic function or functions for the purpose of applying the HCT/P regulatory framework.  Also, clinical effects of the HCT/P in the

---

[22] "Current Good Tissue Practice for Human Cell, Tissue, and Cellular and Tissue-Based Product Establishments; Inspection and Enforcement" 69 FR 68612 at 68643 (November 24, 2004) states, "HCT/Ps with claims for "reconstruction or repair" can be appropriately regulated solely under section 361 of the PHS Act, if such HCT/P meets all the criteria in § 1271.10, including minimal manipulation and homologous use."

[23] "Establishment Registration and Listing for Manufacturers of Human Cellular and Tissue-Based Products," 63 FR 26744 at 26749 (May 14, 1998).  (Tissue Registration and Listing; Proposed Rule)

17

Contains Nonbinding Recommendations

recipient that are not basic function or functions of the HCT/P in the donor would generally not be considered basic function or functions of the HCT/P for the purpose of applying the definition of homologous use.

Basic functions of a structural tissue would generally be to perform a structural function for example, to physically support or serve as a barrier or conduit, or connect, cover, or cushion.

Basic functions of a cellular or nonstructural tissue would generally be a metabolic or biochemical function, such as, hematopoietic, immune, and endocrine functions.

Example 19-1: Sources of hematopoietic stem/progenitor cells (HPCs) include cord blood, peripheral blood, and bone marrow.[24] The basic functions of HPCs include forming and replenishing the lymphohematopoietic system.

   a.  HPCs from mobilized peripheral blood are intended for transplantation into an individual with a disorder affecting the hematopoietic system that is inherited, acquired, or the result of myeloablative treatment. This is homologous use because the peripheral blood product performs the same basic function of reconstituting the hematopoietic system in the recipient.

   b.  HPCs from bone marrow are intended for infusion into an artery with a balloon catheter for the purpose of limiting ventricular remodeling following acute myocardial infarction. This is not homologous use because limiting ventricular remodeling is not a basic function of bone marrow.

   c.  HPCs from cord blood are intended for intravenous infusion to treat cerebral palsy purportedly through the repair of damaged tissue in the brain through paracrine signaling or differentiation into neuronal cells. This is not homologous use because there is insufficient evidence to support that repair of neurologic tissue through paracrine signaling or differentiation into neuronal cells is a basic function of these cells in the donor.

Example 19-2: The basic functions of the cornea include protecting the eye and serving as its outermost lens. A corneal graft is transplanted to a patient with corneal blindness. This is homologous use because a corneal graft performs the same basic functions in the donor as in the recipient.

Example 19-3: The basic functions of a vein or artery include serving as a conduit for blood flow throughout the body. A cryopreserved vein or artery is used for arteriovenous access during hemodialysis. This is homologous use because the vein or artery is supplementing the vessel as a conduit for blood flow.

---

[24] See "Establishment Registration and Listing for Manufacturers of Human Cellular and Tissue Based Products," 63 FR 26744 at 26749 (May 14, 1998). (Tissue Registration and Listing; Proposed Rule)

18

Contains Nonbinding Recommendations

Example 19-4:  The basic functions of amniotic membrane include serving as a selective barrier for the movement of nutrients between the external and in utero environment, protecting the fetus from the surrounding maternal environment, and serving as a covering to enclose the fetus and retain fluid in utero.

    a.  Amniotic membrane is used for bone tissue replacement to support bone regeneration following surgery to repair or replace bone defects.  This is not a homologous use because bone regeneration is not a basic function of amniotic membrane.

    b.  An amniotic membrane product is used for wound healing and/or to reduce scarring and inflammation.  This is not homologous use because wound healing and reduction of scarring and inflammation[25] are not basic functions of amniotic membrane.

    c.  An amniotic membrane product is applied to-the surface of the eye to cover or offer protection from the surrounding environment in-ocular repair and reconstruction procedures.  This is homologous use because serving as a covering and offering protection from the surrounding environment are basic functions of amniotic membrane.[26]

Example 19-5:  The basic functions of pericardium include covering, protecting against infection, fixing the heart to the mediastinum, and providing lubrication to allow normal heart movement within chest.  Autologous pericardium is used to replace a dysfunctional heart valve in the same patient.  This is not homologous use because facilitating unidirectional blood flow is not a basic function of pericardium.

The use of an HCT/P from adipose tissue for the repair, reconstruction, replacement, or supplementation of adipose tissue would be considered a homologous use.  In these situations, FDA would consider the HCT/P from adipose tissue to be performing the same basic function in the recipient as in the donor.  In contrast, the use of an HCT/P from adipose tissue for the treatment of a degenerative, inflammatory, or demyelinating disorder would generally be considered a non-homologous use.

Example 19-6:  The basic functions of adipose tissue include providing cushioning and support for other tissues, including the skin and internal organs, storing energy in the form of lipids, and insulating the body.

---

[25] Reducing scarring, angiogenesis, and inflammation are potential clinical effects in the recipient but are not basic functions of amniotic membrane in the donor; therefore, they are not considered homologous uses of amniotic membrane.
[26] Bio-Tissue 2001 RFD available at:  https://www.fda.gov/media/74873/download .

19

Contains Nonbinding Recommendations

a. Adipose tissue is used to fill voids in the face or hands (e.g., for cosmetic reasons). This is homologous use because providing cushioning and support, is a basic function of adipose tissue.[27]

b. An HCT/P from adipose tissue is used to treat musculoskeletal conditions such as arthritis or tendonitis by regenerating or promoting the regeneration of articular cartilage or tendon. This is generally not considered a homologous use because regenerating or promoting the regeneration of cartilage or tendon is not a basic function of adipose tissue.

c. An HCT/P from adipose tissue is used to treat neurological disorders such as multiple sclerosis by limiting the autoimmune reaction and promoting remyelinization. This is generally not considered a homologous use because limiting the autoimmune reaction and promoting remyelinization are not basic functions of adipose tissue.

d. Adipose tissue is used for transplantation into the subcutaneous areas of breast for reconstruction or augmentation procedures. This is homologous use because providing cushioning and support is a basic function of adipose tissue.[28]

### 20. Does my HCT/P have to be used in the same anatomic location to perform the same basic function or functions?

An HCT/P may perform the same basic function or functions even when it is not used in the same anatomic location where it existed in the donor.[29] A transplanted HCT/P could replace missing tissue, or repair, reconstruct, or supplement tissue that is missing or damaged, either when placed in the same or different anatomic location, as long as it performs the same basic function(s) in the recipient as in the donor.

Example 20-1: The basic functions of skin include covering, protecting the body from external force, and serving as a water-resistant barrier to pathogens or other damaging agents in the external environment. The dermis is the elastic connective tissue layer of the skin that covers, provides support and protects the body from mechanical stress.

---

[27] Some cosmetic procedures involving reimplantation of autologous adipose tissue that is only rinsed or cleansed may meet the exception in 21 CFR 1271.15(b). For additional information about applying the exception in 21 CFR 1271.15(b), see the "Same Surgical Procedure Exception under 21 CFR 1271.15(b): Questions and Answers Regarding the Scope of the Exception; Guidance for Industry" dated November 2017.

[28] Some breast reconstruction or augmentation procedures involving re-implantation of autologous adipose tissue that is only rinsed or cleansed may meet the exception in 21 CFR 1271.15(b). For additional information about applying the exception in 21 CFR 1271.15(b), see the "Same Surgical Procedure Exception under 21 CFR 1271.15(b): Questions and Answers Regarding the Scope of the Exception; Guidance for Industry" dated November 2017.

[29] "Human Cells, Tissues, and Cellular and Tissue-Based Products; Establishment Registration and Listing" 66 FR 5447 at 5457 (January 19, 2001). (Tissue Registration and Listing; Final Rule)

20

**Contains Nonbinding Recommendations**

    a.  An acellular dermal product is used for supplemental support, protection, reinforcement, or covering for a tendon.  This is homologous use because in both anatomic locations, the dermis provides support and protects the soft tissue structure from mechanical stress.

    b.  An acellular dermal product is used for tendon replacement or repair.  This is not homologous use because serving as a connection between muscle and bone is not a basic function of dermis.

Example 20-2:  The basic functions of bone are supporting the body and protecting internal structures such as the brain.  Allogeneic mineralized or demineralized cortical human bone is used to supplement the recipient's bone for repair, replacement, and reconstruction of bony voids or gaps involving the extremities, cranium, and spinal column; or for augmentation for posterior lateral fusions in the spinal column.  These are homologous uses because in all locations, the HCT/P is supplementing the recipient's bone, for the purpose of supporting the body or protecting internal structures.

Example 20-3:  The basic functions of pancreatic islets include regulating glucose homeostasis within the body.  Pancreatic islets are transplanted into the liver through the portal vein for preservation of endocrine function after pancreatectomy.  This is homologous use because the regulation of glucose homeostasis is a basic function of pancreatic islets.

### 21.    What does FDA mean by "intended for homologous use" in 21 CFR 1271.10(a)(2)?

The regulatory criterion in 21 CFR 1271.10(a)(2) states that the HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent.

Labeling includes the HCT/P label and any written, printed, or graphic materials that supplement, explain, or are textually related to the product, and which are disseminated by or on behalf of its manufacturer.[30]  Advertising includes information, other than labeling, that originates from the same source as the product and that is intended to supplement, explain, or be textually related to the product (e.g., print advertising, broadcast advertising, electronic advertising (including the Internet), statements of company representatives).[31]

An HCT/P is intended for homologous use when its labeling, advertising, or other indications of the manufacturer's objective intent refer to only homologous uses for the HCT/P.  When an HCT/P's labeling, advertising, or other indications of the

---

[30] "Human Cells, Tissues, and Cellular and Tissue-Based Products; Establishment Registration and Listing" 66 FR 5447 at 5457 (January 19, 2001).  (Tissue Registration and Listing; Final Rule)
[31] Id.

Contains Nonbinding Recommendations

manufacturer's objective intent refer to non-homologous uses, the HCT/P would not meet the homologous use criterion in 21 CFR 1271.10(a)(2).

### 22.    What does FDA mean by "manufacturer's objective intent" in 21 CFR 1271.10(a)(2)?

A manufacturer's objective intent is determined by the expressions of the manufacturer or its representatives, or may be shown by the circumstances surrounding the distribution of the article.  A manufacturer's objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by the manufacturer or its representatives.  It may be shown by surrounding circumstances under which a HCT/P is offered for a purpose for which it is neither labeled nor advertised.


## V.    REGULATORY SCOPE AND COMPLIANCE POLICY

### A.    Scope of FDA's Regulation of HCT/Ps

As noted in the Background section of this guidance, this guidance only applies to products and establishments that are subject to FDA's regulations in 21 CFR Part 1271. Establishments that meet the same surgical procedure exception in 21 CFR 1271.15(b) are not subject to FDA's regulations in 21 CFR Part 1271.  This guidance also does not apply to products that fall outside the definition of HCT/P in 21 CFR 1271.3(d).  For example, platelet rich plasma (PRP, blood taken from an individual and given back to the same individual as platelet rich plasma) is not an HCT/P under 21 CFR Part 1271 because it is a blood product.  Accordingly, FDA does not apply the criteria in 21 CFR 1271.10(a) to PRP, and PRP is outside the scope of this guidance.

### B.    Compliance and Enforcement Policy Regarding Certain Regulatory Requirements

To give manufacturers time to determine if they need to submit an IND or marketing application in light of this guidance and, if such an application is needed, to prepare the IND or marketing application, FDA generally intends to exercise enforcement discretion through May 31, 2021,[32] with respect to the IND and the premarket approval requirements for HCT/Ps that do not meet one or more of the 21 CFR 1271.10(a) criteria, provided that use of the HCT/P does not raise reported safety concerns or potential significant safety concerns.

FDA intends to focus enforcement actions on products with higher risk, including based on the route and site of administration.  For example, actions related to products with routes of administration associated with a higher risk (e.g., those administered by

---

[32] The November 2017 guidance, corrected in December 2017 provided a period of 36 months, through November 2020, in which FDA intended to exercise enforcement discretion.  This enforcement discretion period now extends through May 2021.

Contains Nonbinding Recommendations

intravenous injection or infusion, aerosol inhalation, intraocular injection, or injection or infusion into the central nervous system) will be prioritized over those associated with a lower risk (e.g., those administered by intradermal, subcutaneous, or intra-articular injection). HCT/Ps that are intended for non-homologous use, particularly those intended to be used for the prevention or treatment of serious and/or life-threatening diseases and conditions, are also more likely to raise significant safety concerns than HCT/Ps intended for homologous use because there is less basis on which to predict the product's behavior in the recipient, and use of these unapproved products may cause users to delay or discontinue medical treatments that have been found safe and effective through the New Drug Application or BLA approval processes.

Regenerative medicine is a complex and rapidly evolving field. Accordingly, FDA will continue to reassess its application of the HCT/P regulatory framework, including the minimal manipulation and homologous use criteria in 21 CFR 1271.10(a), as additional scientific evidence emerges in this field.

# VI.    ADDITIONAL INFORMATION

## 23.    What regulations apply if my HCT/P is regulated as a biological product?[33]

HCT/Ps that are regulated as biological products are subject to section 351 of the PHS Act and the FD&C Act and require premarket approval. Such HCT/Ps are subject to the applicable drug regulations, including the requirements in 21 CFR Parts 210 and 211, and the applicable requirements in 21 CFR Parts 600 through 680. Such products are also regulated under section 361 of the PHS Act and are subject to requirements in 21 CFR Part 1271 designed to prevent the introduction, transmission, and spread of communicable diseases. Pursuant to these regulations, you are required to register as an establishment, and list your HCT/Ps (21 CFR 1271.1(b)(2)) (see section VI. question 25 of this document).

In order to lawfully market a biological product, a biologics license must be in effect (PHS Act 42 U.S.C. 262(a)). Such licenses are issued only after a determination by FDA that the establishment(s) and the biological products meet the applicable requirements to ensure the continued safety, purity, and potency of such products (21 CFR 601.2(d)). For clinical studies of investigational drug products, the sponsor must have an IND application in effect in accordance with the FD&C Act (21 U.S.C. 355(i)) and FDA regulations (21 CFR Part 312 and 21 CFR 601.21). See section VI. question 27 of this document about obtaining more information regarding the IND process.

---

[33] Some HCT/Ps may be regulated as devices. For more information about device regulation, see CDRH's webpage Device Advice – Overview of Medical Device Regulation at https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Overview/default.htm.

**24.    What must I do if my HCT/P meets the criteria for regulation solely under section 361 of the PHS Act and 21 CFR Part 1271?**

If you are a domestic or foreign establishment that manufactures an HCT/P that is regulated solely under section 361 of the PHS Act and 21 CFR Part 1271, you must, in accordance with 21 CFR 1271.1(b)(1):

> 1) Register with FDA (see section VI. question 25 of this guidance);
> 2) Submit to FDA a list of each HCT/P manufactured; and
> 3) Comply with all applicable requirements contained in 21 CFR Part 1271.

Establishment means a place of business under one management, at one general physical location that engages in the manufacture of HCT/Ps, including:

> 1) Any individual, partnership, corporation, association, or other legal entity engaged in the manufacture of HCT/Ps; and
> 2) Facilities that engage in contract manufacturing services for a manufacturer of HCT/Ps (21 CFR 1271.3(b)).

Manufacture means, but is not limited to, any or all steps in the recovery, processing, storage, labeling, packaging, or distribution of any human cell or tissue, and the screening and testing of the cell or tissue donor (21 CFR 1271.3(e)).

**25.    Must I register as an HCT/P manufacturer?**

FDA regulations require establishments that perform one or more steps in the manufacture of HCT/Ps to register and submit a list of products with the Agency.  If you are a manufacturer that is required to register, you must do so within five days after beginning operations (21 CFR 1271.21(a)).  Registrations must be updated annually in December (21 CFR 1271.21(b)), except if the ownership or location of the establishment changes, or if there is a change in the United States agent's name, address, telephone number, or email address, in which case, you must submit an amendment to the registration within 30 calendar days of the change (21 CFR 1271.26).

**26.    How can I get more information about the appropriate regulatory considerations for my HCT/P?**

The Agency provides two mechanisms through which a manufacturer may obtain a recommendation or decision regarding the classification of an HCT/P:

> 1) The Tissue Reference Group (TRG), a group that includes representatives from CBER and CDRH, provides product sponsors with an informal process through which they may obtain an Agency recommendation regarding the application of the criteria in 21 CFR 1271.10(a) to their HCT/Ps for a given indication. Information about this process as well as what you may want to include to

24

Contains Nonbinding Recommendations

facilitate review of your request can be found at:  https://www.fda.gov/vaccines-blood-biologics/tissue-tissue-products/tissue-reference-group .

2) A Request for Designation (RFD) may be submitted to the Office of Combination Products (OCP) to obtain a formal Agency decision regarding the regulatory identity or classification of an HCT/P (21 CFR Part 3).  A description of that process and information on how to submit an RFD can be found at: https://www.fda.gov/combination-products/rfd-process.  Additional information may be found at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/how-write-request-designation-rfd.  You may also submit a Pre-RFD to OCP to obtain preliminary feedback on the classification for your HCT/P as well as assistance on how to prepare an RFD.  Additional information may be found at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/how-write-request-designation-rfd.

### 27.    How can I obtain more information about the IND process for my HCT/P that requires premarket approval?

Further information about IND requirements for biological products may be obtained through the Division of Regulatory Project Management, Office of Tissues and Advanced Therapies, at 240-402-8190 or mail to:OTATRPMS@fda.hhs.gov.

25



September 28, 2022

C2C Innovative Solutions, Inc. – QIC Part B North
P.O. Box 45208
Jacksonville, FL 32232-5208

To Whom It May Concern:

MIMEDX Group, Inc., (MIMEDX) is the manufacturer of EPIFIX®, a placental tissue allograft. In this capacity as manufacturer, we are writing at the request of Dr. Adams to provide information regarding our product.   We understand that Dr. Adams is undergoing a second round of audits related to the use of amniotic allografts post Mohs micrographic surgery.

Here is background information that may be relevant to the UPIC audit.

1. **Homologous Use**
2. **Product Size and Billing Units**
3. **Appropriate Use of CPT Codes 15271-15278   with HCPCs Code Q4186**
4. **Clinical and Scientific Research**

## Issue 1:  Homologous Use

The CoventBridge auditors have expressed concern with language within the documentation related to amniotic membrane allografts and a) the minimization of scar formation or  modulation of inflammation versus b) functioning coverage or barrier.

The question surrounding homologous use stems from FDA guidance, entitled *Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous*:  *Guidance for Industry and Food and Drug Administration Staff*.[1]

**Of note, the FDA guidance quoted by the CoventBridge auditor is targeted toward "industry and Food and Drug Administration Staff"—<u>not toward the individually practicing physician.</u>**  That the guidance

---

[1]U.S. Food and Drug Administration. 2020. Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous:  Guidance for Industry and Food and Drug Administration Staff. Center for Biologics Evaluation and Research Center for Devices and Radiological Health Office of Combination Products https://www.fda.gov/regulatory-information/search-fda-guidance-documents/regulatory-considerations-human-cells-tissues-and-cellular-and-tissue-based-products-minimal

is a document intended for manufacturers is further evidenced in the section for *Homologous Use*, where it states, "HCT/P is intended for homologous use only, as reflected by the **labeling, advertising, or other indications of the manufacturer's objective intent**" (emphasis added).  Other sections of the document speak to the "manufacturer's intent" with continued emphasis on advertising and labeling.  Again, at no point does the document direct the practicing clinician as end user.   Physicians must be able to use products that lead to the best outcomes for their patients in the physician's best clinical judgement.

Importantly, the FDA guidance on homologous use claims by manufacturers does not negate the body of published scientific research that explores the use of amniotic and placental tissue to heal as well as modulate inflammation and reduce scar tissue formation.

## Issue 2:  Product Size and Billing Units

Skin substitutes are single use products, meaning that the product cannot be split among patients, or saved for the same patient for future use.[2]  Providers should first choose a skin substitute that meets the clinical needs of the patient.

Area of the wound is calculated as Length x Width in square centimeters.  However, volume can also play a factor (Length x Width x Depth) in assessing the needs of the wound.

If the chosen product comes in multiple sizes, a reasonable size should be selected to minimize waste. (However, because these are single use products Medicare does pay for the necessary wastage.  The provider should bill--and be reimbursed--for the units that were opened regardless of whether all units were applied to the wound).

<u>Skin substitutes are supplied in square centimeters; each square centimeter equals one billing unit</u>. Products such as EPIFIX Mesh have holes punched to clinically accommodate larger areas or exudate (drainage).  Because the holes are negative space, the area of the holes is deducted from the total billing units.  As an example, below is a chart of EPIFIX sizes and the associated billing units.  Note that the billing units correlate exactly to the area of the graft (in square centimeters) except for the last three products, which are "mesh sheets" (fenestrated with holes).  For the mesh products, the billing units match the area of extant product.

---

[2] Center for Medicare and Medicaid Services.  Claims Processing Manual.  Chapter 17 Drugs and Biologicals.  Accessed 08/17/2022 at:
https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/clm104c17.pdf

File 13 pdf - Page 366 of 2526

### EPIFIX SIZES

| SKU | UPC | RED BOOK IDENTIFIER | EPIFIX SIZE | TOTAL BILLABLE UNITS | |
|------|------|------|------|------|------|
| GS-5024 | 00855310003391 | 55310-000339 | 24 mm disk sheet | 5 | |
| GS-5330 | 00855310003445 | 55310-000344 | 3 cm x 3 cm sheet | 9 | |
| GS-5350 | 00855310003469 | 55310-000346 | 3 cm x 5 cm sheet | 15 | |
| GS-5460 | 00855310003476 | 55310-000347 | 4 cm x 6 cm sheet | 24 | |
| ES-3500 | 00855310003858 | 55310-000385 | 3 cm x 5 cm mesh sheet | 10 | EPIFIX mesh sheets |
| ES-4400 | 00855310003872 | 55310-000387 | 4 cm x 4.5 cm mesh sheet | 11 | |
| ES-5500 | 00856019007062 | 56019-000706 | 5 cm x 5.5 cm mesh sheet | 17 | |

Below is an illustration of a mesh EPIFIX product (not real size), to demonstrate the negative space created by the holes. The area of the holes is subtracted from the overall area so that Medicare is not billed for the negative space.



## Issue 3:  Appropriate Use of CPT Codes 15271-15278 with HCPCs Code Q4186

HCPCS code (Q4186) is appropriately utilized with CPT application codes 15271-15278.

- HCPCS code Q4186 is located within the official Level II CPT HCPCS Manuals under *Skin Substitutes and Biologicals.*

- EPIFIX has been included as a *skin substitute and biologic* code since **2014** as Q4131 (since **2019** as Q4186).

- EPIFIX is a dehydrated human amnion/chorion membrane **allograft comprising a biocompatible human extracellular matrix and retains 300+ regulatory proteins.**[3, 4, 5]

- The U.S. Agency for Healthcare Research and Quality (AHRQ) classifies EPIFIX as a skin substitute within its 2020 Technology Assessment, *Skin Substitutes for Treating Chronic Wounds.*[6]

---

[3] Koob, et al. J Biomed Mater Res B Appl Biomater. 2014 Aug;102(6):1353-62.

[4] Lei, et al. Adv Wound Care. 2017 Feb 1;6(2):43-53.

[5] MM-RD-00086, Proteome Characterization of PURION Processed Dehydrated Human Amnion Chorion Membrane (dHACM) and PURION Plus Processed Dehydrated Human Umbilical Cord (dHUC) Allografts

[6] Snyder D, Sullivan N, Margolis D, et al. Skin Substitutes for Treating Chronic Wounds [Internet]. Rockville (MD): Agency for Healthcare Research and Quality (US); 2020 Feb 2. Available from: https://www.ncbi.nlm.nih.gov/books/NBK554220/

- **CMS includes Section 361 HCT/P products (including EPIFIX) in reimbursement methodologies tied to 15271-15278 in both the physician office and hospital outpatient department.** EPIFIX is also codified as a skin substitute within the current CMS Medicare Claims Manual, which can be accessed at: https://www.cms.gov/files/document/r11150cp.pdf  Please reference Table 10, *Skin Substitute Assignments to High Cost and Low Cost Groups for CY 2022,* which begins on p. 57 and includes EPIFIX as a high tier skin substitute.

## Issue 5:  Clinical and Scientific Research

The use of dehydrated human amniotic chorionic membrane (DHACM) over surgical wound care in certain patients is scientifically supported.  A peer-reviewed study in Facial Plastic Surgery & Aesthetic Medicine investigating the safety and utility of PURION® processed DHACM (EPIFIX®) for use in Mohs micrographic surgeries (MMS).[7]  The retrospective propensity score-matched case-control study demonstrated that DHACM placental allografts were associated with a statistically significant lower risk for infection, poor scar cosmesis, scar revision, and additional operation at the index site, when compared to traditional methods of incisional repair. The findings indicate that placental allografts may be a viable alternative to autologous tissue-based reconstruction, including flaps and full-thickness skin grafts (FTSG), particularly in an aging population undergoing numerous Mohs procedures in moderate to high-risk areas of the face, head, neck, and dorsal hand. Notably, a significantly greater proportion of patients in the placental allograft group (97.9%) experienced zero postoperative complications compared to patients undergoing autologous tissue-based repairs (71.3%).

As a natural and readily available biomaterial, the medical use of human placental tissues has been documented in the literature for over a century.[8,9] As a protective dressing, the clinical benefits associated with homologous applications of the amniotic membrane have been scientifically demonstrated, both *in vitro* and *in vivo*. An abundance of peer-reviewed evidence supporting the advantages of its homologous use within medicine exists and continues to grow world-wide. A basic search using the terms "amniotic membrane" + "clinical applications" on PubMed.gov or EBSCO results in >14,000 peer-reviewed journal articles.

With a predilection for the head and neck area, the majority of NMSCs must be treated with surgical excision. Defects arising from such excisions vary in size, depth, anatomy and hence lead to reconstructive challenges. Given the high risk for functional and psychosocial morbidity to the patient, repair of such complex wounds must take additional factors into consideration.  While the reconstructive

---

[7] Toman J, Michael G, Wisco O, Adams, JR, Hubbs B. Mohs defect repair with dehydrated human amnion/chorion membrane. Facial Plast Surg Aesthetic Med. 2021. PMID: 34714143 [PubMed]

[8] Lo V, Pope E. Amniotic membrane use in dermatology. Int J Dermatol. 2009 Sep;48(9):935-40. doi: 10.1111/j.1365-4632.2009.04173.x. PMID: 19702975.

[9] Elkhenany H, El-Derby A, Abd Elkodous M, Salah RA, Lotfy A, El-Badri N. Applications of the amniotic membrane in tissue engineering and regeneration: the hundred-year challenge. Stem Cell Res Ther. 2022 Jan 10;13(1):8. doi: 10.1186/s13287-021-02684-0. PMID: 35012669; PMCID: PMC8744057.

ladder provides broad guidance, the most simplistic approach is not always applicable when seeking the best possible outcome for the beneficiary.

Our hope is that CoventBridge finds the above useful.

Sincerely,

*Jennie Feight*

**Jennie Feight, MS, CPC, CPMS, CPC-I**
**Director, Health Policy**
MIMEDX Group, Inc.

770.891.3742
jfeight@mimedx.com

## Enclosure

Toman J, Michael G, Wisco O, Adams, JR, Hubbs B. Mohs defect repair with dehydrated human amnion/chorion membrane. Facial Plast Surg Aesthetic Med. 2021. PMID: 34714143 [PubMed]

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 461-2617

KS 5523109897020  694328940
The documentation has been sent on 042023 using Secure-EDI.

**This fax contains sensitive information including PHI or PII information**

# Redetermination Case File Request/Transmittal Form

| 1. Joint File Request Type | X  QIC Request | | Misfiled | Misrouted |
|---|---|---|---|---|
| ☐ Supplemental File Request/Basis for Request | | | | |

| 2. QIC Reconsideration # | 1-12683356911 | Reconsideration Request Date | April 11, 2023 |
|---|---|---|---|
| 3. AC Name / Number | **Wisconsin Physician Service Insurance Corporation(05202)** | | |
| 4. Claim Type | ☒ Part B   ☐ DME | Redetermination # | **Multiple** |
| 4a. Overpayments | ☐ RAC          ☐ PSC/ZPIC ☐ AC/MAC MR Probe  ☐ Overpayment-other | | |

| 5. * Beneficiary Name **Multiple** | Bene HIC# **Multiple** | Provider # 110568 AND NA3713 | Redet. Date **Multiple** | DOS **Multiple** |
|---|---|---|---|---|
| Claim # or CPT/HCPCS Codes at issue: | **Multiple** | | | |

\* Use Redetermination Request Continuation Sheet for multiple beneficiaries

| AC Acknowledgement: Return to Name and QIC Fax # | **F7A6** |
|---|---|
| AC Receipt Date & Signature | |

**Exhibits List:** Label exhibits with the letters provided below, and place them in order by letter. Refer to Exhibit List Quick Guide in JOA for detailed description of exhibits.

| Procedural Documents | ☐ A. Claims and System Screens ☐ B.  MSN or RA ☒ C.  Redetermination Request | ☒ D. Redetermination Notice ☐ E. Appointment of Rep. ☐ F. Other ‾OVERPAYMENT LETTERS |
|---|---|---|
| Evidentiary Documents | ☒ G. Medical Records ‾sent via secure edi ☒ H. Referral to/from Contractor Med. Staff ☐ I. Contractor Medical Policies ☐ L. Other | ☐ J. Regs/CMS Rulings/NCDs, etc. ☐ K. Overpayment Extrapolation Materials |

**Comments (discrepancies, no redetermination, other comments):** UPIC
☐No redetermination ☐ Claim fully paid ☐ Incorrect HICN ☒ Other ____
☐ Complete case previously sent to ____ (QIC) on (date) ____ . No additional appellant information.
☐ RAC  ☐PSC/ZPIC ☐ AC/MAC MR Probe  ☒ Overpayment

| Interest in ALJ Participation: | ☐Yes ☐No |
|---|---|
| Position Paper Enclosed: | ☐Yes ☐No |

| Form Completed By | BRENDA HORN | |
|---|---|---|
| Name of Contact Person | DAVID JENSEN | Contact Phone # | 618-998-5393 |
| Date Sent | 04/20/23 | # of Boxes | |
| QIC Acknowledgement – AC Fax # | | |
| QIC Receipt Date & Signature | | |

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 2619-2623

**Exhibit C**

# OnBase Electronic Committal Values for CDs/Flash Drives

*This form indicates documents have been committed to OnBase using the control number attached.*
*To view all pages, see all instances of this control number.*

## Mailroom:

**Julian Date:** 22349     **Name:** Foulston / Advanced Dermatology

| J5 | ☐ NAT | J8 | | |
|---|---|---|---|---|
| | ☐ IA  ☒ KS | | ☐ IN | ☐ MI |
| | ☐ MO  ☐ NE | | | |

**Segment**     ☐ A     ☒ B

**Dept**     Bene  ☒ Appeal  ☐ Claims  ☐ Med Review

Prov  ☐ Reimbursement  ☐ Audit  Ptan_____

## CD Administrator:

**Review Date:** 12·16·22     **Reviewer:** Cm

| Can the CD be read/documents extracted? |
|---|
| ☒ Yes     Scan Date: 12·19·22 |

| ☒ No     Reason: ~~password~~ |
|---|

**Date password received:** 12·19·22

**Upload Date:**_____     **Uploaded by:**_____

# FOULSTON

**ATTORNEYS AT LAW**

Amanda M. Wilwert

awilwert@foulston.com
Phone: 913.253.2181
Fax: 913.498.2101

7500 COLLEGE BOULEVARD, SUITE 1400
OVERLAND PARK, KS 66210-4041

December 13, 2022

***Sent Via USPS***

### 935 OVERPAYMENT APPEAL FOR REDETERMINATION

WPS Government Health Administrators
935 APPEALS REDETERMINATION
Appeals Department
P.O. Box 14260
Madison, WI 53708-0260

Re:    935 Overpayment Appeal for Redetermination
Letter numbers: 31448423 & 31378432
Provider Number: 110568-1124094967

Dear Appeals Department:

This firm represents Advanced Dermatology and Skin Cancer Center ("Advanced Dermatology"). Enclosed please find a CMS 1969 appointment of representation form.

Advanced Dermatology is requesting redetermination of the overpayment determination articulated in the November 21, 2022 and November 23, 2022 WPS initial request letters (enclosed). Please note this appeal is filed within 30 days of the date of the letter to stop or delay the recoupment.

Enclosed please find a flash drive with the beneficiary records and other supporting documents outlining the reasons for requesting redetermination. The beneficiary records are in one password protected PDF on the flash drive. ***Please call my office at 913-253-2181 for the password for the patient records***. Enclosed please also find a letter outlining the basic concepts of allografts and details regarding Advanced Dermatology's dispute of the overpayment determination.

If you have any questions or issues with the flash drive, please contact my office at 913-253-2181. Thank you for your time and consideration of Advanced Dermatology's request for redetermination.

Sincerely,

FOULSTON SIEFKIN LLP

Amanda M. Wilwert

2022349  102683527

*PRESS FIRMLY TO S*

# PRIORIT
## MAIL

®

stic use.

nce (restrictions apply).*

stic and many international de

ration form is required.

rding claims exclusions see the

r availability and limitations of covera





PE

To schedule free Package P
scan the QR code.



2022
: 9 1/2        USPS.COM/PICKUP



**UNITED STATES POSTAL SERVICE®**    **Click-N-Ship®**

usps.com
**$27.90**
**US POSTAGE**
Flat Rate Env

9470 1036 9930 0069 3345 61 0279 0000 0045 3708

**U.S. POSTAGE PAID**

Mailed from 66210    986773062535053

12/13/2022

### PRIORITY MAIL EXPRESS 1-DAY®

AMANDA WILWERT
FOULSTON SIEFKIN LLP
STE 1400
7500 COLLEGE BLVD
OVERLAND PARK KS 66210-4041

Scheduled Delivery Date: 12/14/22
Ref#: 11716-01
**0007**

**B055**

**WAIVER OF SIGNATURE**

**SCHEDULED DELIVERY 6:00 PM**

WPS GOVERNMENT HEALTH ADMINISTRATORS
935 APPEALS REDETERMINATION
PO BOX 14250
MADISON WI 53708-0260

### USPS TRACKING #



9470 1036 9930 0069 3345 61



Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; July 2022; All rights reserved.

Department of Health and Human Services
Centers for Medicare & Medicaid Services

Form Approved OMB No.0938-0950

# Appointment of Representative

| Name of Party | Medicare Number (beneficiary as party) or National Provider Identifier (provider or supplier as party) |
|---|---|
| Advanced Dermatology and Skin Cancer Center, P.A. | 1124094867 |

## Section 1: Appointment of Representative

**To be completed by the party seeking representation (i.e., the Medicare beneficiary, the provider or the supplier):**

I appoint this individual, _Amanda M. Wilwert_, to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the Act) and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my claim, appeal, grievance or request wholly in my stead. I understand that personal medical information related to my request may be disclosed to the representative indicated below.

| Signature of Party Seeking Representation | Date 04/27/2022 |
|---|---|
| Street Address 2735 Pembrook Pl | Phone Number (with Area Code) (785) 537-4990 |
| City Manhattan | State KS | Zip Code 66502 |
| Email Address (optional) | | |

## Section 2: Acceptance of Appointment

**To be completed by the representative:**

I, _Amanda M. Wilwert_, hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services (HHS); that I am not, as a current or former employee of the United States, disqualified from acting as the party's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.

I am a / an _attorney with Foulston Siefkin LLP and the firm has been engaged to represent Advanced Dermatology and Skin Cancer Center P.A. in the appeals process_

*(Professional status or relationship to the party, e.g. attorney, relative, etc.)*

| Signature of Representative | Date 5/3/22 |
|---|---|
| Street Address 7500 College Blvd Ste. 1400 | Phone Number (with Area Code) 913-253-2181 |
| City Overland Park | State KS | Zip Code 66210 |
| Email Address (optional) awilwert@foulston.com | | |

## Section 3: Waiver of Fee for Representation

**Instructions: This section must be completed if the representative is required to, or chooses to, waive their fee for representation.** (Note that providers or suppliers that are representing a beneficiary and furnished the items or services may not charge a fee for representation and **must** complete this section.)

I waive my right to charge and collect a fee for representing _____ before the Secretary of HHS.

| Signature | Date |
|---|---|
| | |

## Section 4: Waiver of Payment for Items or Services at Issue

**Instructions: Providers or suppliers serving as a representative for a beneficiary to whom they provided items or services must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act.** (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, or could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.) I waive my right to collect payment from the beneficiary for the items or services at issue in this appeal if a determination of liability under §1879(a)(2) of the Act is at issue.

| Signature | Date |
|---|---|
| | |



170 - 1

**MEDICARE**

Part B

Date: 11/23/2022

Letter Number: 31448423

ADVANCED DERMATOLOGY PA
2735 PEMBROOK PL
MANHATTAN, KS 665027482

**INITIAL REQUEST**

RE : MMA 935 - Overpayment Amount
Overpayment Amount: $21,954.83
Outstanding Balance: $21,954.83
Provider Number: 110568-1124094867

Dear Sir/Madam,

This letter is to inform you that you have received a Medicare payment in error, which has
resulted in an overpayment subject to section 935(f)(2) of the Medicare Modernization Act
*(MMA), section 1893(f)(2) of the Social Security Act, Limitation on Recoupment, in the amount*
$21,954.83. The purpose of this letter is to request that this amount be repaid to our
office. The attached enclosure explains how this happened.

**NOTE: If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding
please follow the instructions found at the end of this letter.**

**Why you are responsible:**

You are responsible for following correct Medicare filing procedures and must use care when
billing and accepting payment. You are responsible for repayment in this matter based upon
one or both of the following criteria:

1. You billed and/or received payment for services for which you should have known you
   were not entitled to receive payment. Therefore, you are not without fault and are
   responsible for repaying the overpayment amount.

2. *You received overpayments resulting from retroactive changes in the Medicare
   Physician Fee Schedule and/or changes mandated by legislation.*

If you dispute this determination, please follow the appropriate appeals process listed below.

(Applicable authorities: section 1870(b) of Social Security Act; subsection 405.350 - 405.359 of Title 42, subsection 404.506 - 404.509, 404.510a and 404.512 of Title 20 of the United States Code of Federal Regulations.)

This amount is subject to section 935(f)(2) of the Medicare Modernization Act (MMA) (section1893(f)(2) of the Social Security Act), Limitation on Recoupment (42 CFR 405.379).

**Rebuttal Process:**

Under the existing regulations 42 CFR section 405.374, providers and other suppliers will have **15 days from the date of this demand letter** to submit a statement of opportunity to rebuttal. The rebuttal process provides the debtor the opportunity, before the suspension, offset, or recoupment takes effect, to submit any statement (to include any pertinent information) as to why it should not be put into effect on the date specified in the notice. A rebuttal is not intended to review supporting medical documentation nor disagreement with the overpayment decision. A rebuttal shall not duplicate the redetermination process. **This is not an appeal of the overpayment determination and the limitation on recoupment under** section1893 (f)(2)(a) of the Social Security Act **does not apply to rebuttal requests.** We will review your rebuttal documentation and determine whether the facts justify ceasing the recoupment or offset. Our office will advise you of our decision 15 days from the mailroom-stamped receipt date of your request.

**Interest Assessment:**

**If you do not refund in 30 days:**

In accordance with 42 CFR 405.378, simple interest at the rate of 10.125% will be charged on the unpaid balance of the overpayment, beginning on the 31st day. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made on time. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged. Each payment will be applied first to accrued interest and then to principal. After each payment, interest will continue to accrue on the remaining principal balance, at the rate of 10.125%.

**Suspended Funds Applied To The Overpayment and Has a Remaining Outstanding Balance:**

If the suspended funds are insufficient to fully eliminate any overpayment, and the provider or supplier meets the requirements of 42 CFR section 405.379 "Limitation on Recoupment" provision under section1893(f) (2) of the Act, then the provider or supplier is subject to 935 Appeals rights and will be available for offset after 41 days on the remaining balance still owed to CMS. (See 42 CFR section 405.372(e) for more information.)

**Payment by Recoupment:**

Page 3
Date : 11/23/2022
Letter Number : 31448423

If payment in full is not received by 01/02/2023, **payments** to you can be recouped (recoupment) until payment in full is received if you haven't submitted an acceptable ERS request, an immediate recoupment request, and/or a valid and timely appeal is received.

**Make a payment or Arrange for payments:**

What you should do:

Please return the overpaid amount to us by 12/22/2022 and no interest will be assessed. We request that you refund this amount in full.

Make the check payable to Medicare Part B and send it with a copy of this letter to:

> WPS Government Health Administrators
> Payment Recovery
> P.O. Box 8215
> Madison, WI 53708-8215

If you are unable to refund the entire amount at this time, advise this office immediately, with a request for an **Extended Repayment Schedule (ERS)** so that we may determine if you are eligible for one. Any repayment schedule (where one is approved) would run from the date of the ERS review approval date.

**You can visit our website at www.wpsgha.com for the ERS Request instructions.**

**Immediate Recoupment:**

**TO SIMPLIFY THE REPAYMENT PROCESS,** reduce the extra work and cost associated with mailing your repayment each time, you may elect to have automatic immediate recoupments for ALL overpayments by requesting the **Immediate Recoupment** process for All Current and Future Accounts Receivable. This will automatically begin recoupment starting on day 16 for ALL future accounts receivable. When the initial request is received after day 16 the debt shall be placed in an immediate recoupment status. If the debt is not collected in full before day 31, interest will continue to accrue until the debt is collected in full.

You must specify whether you are submitting:

1. A request on the current demanded overpayment (all accounts receivables within this demand letter) and ALL FUTURE OVERPAYMENTS; or

2. A one-time request on this current demanded overpayment (all accounts receivables) addressed in this demand letter only.

**You can visit our website at www.wpsgha.com for the Immediate Recoupment Request**

instructions.

You may contact this office for information on how to fax your request.

This process is voluntary and for your convenience. Your request must specifically state you understand you are waiving potential receipt of interest payment pursuant to § 1893(f) (2) for the overpayments.

**Note:** Such interest may be payable for certain overpayments reversed at the ALJ level or subsequent levels of appeal.

**If You Wish To Appeal This Decision**

If you disagree with this overpayment decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claims. The first level of appeal is called a redetermination. You must file your request for a redetermination 120 days from the date of this letter. However, if you wish to avoid recoupment from occurring, you need to file your request for redetermination within 30 days from the date of this letter, as described above. Unless you show us otherwise, we assume you received this letter within 5 days of the date of this letter.

Please send your request for redetermination to:

> WPS Government Health Administrators - 935 APPEALS
> REDETERMINATION
> Appeals Department
> P.O. Box 14260
> Madison, WI 53708-0260

**How to Stop Recoupment:**

Even if the overpayment and any assessed interest has not been paid in full, you can temporarily stop Medicare from recouping any payments. **If you act quickly and decidedly,** Medicare will stop recoupment at two points.

**First Opportunity:** We must receive a valid and timely request for a redetermination within 30 days from the date of this letter. We will stop or delay recoupment pending the results of an appeal. To assist us in expeditiously stopping the recoupment process, we request that you clearly indicate on your appeal request that this is a 935 overpayment appeal for a redetermination.

**Second Opportunity:** If the redetermination decision is (1) **unfavorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare redetermination notice (Medicare Appeal Decision Letter); or (2) if the decision is **partially favorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare revised overpayment

Notice/Revised Demand Letter. Therefore, it is important to act quickly and decidedly to limit recoupment by submitting a valid and timely request for reconsideration within 60 days of the appropriate notice/letter. The address and details on how to file a request for reconsideration will be included in the Redetermination decision letter.

**What Happens Following a Reconsideration By a Qualified Independent Contractor (QIC):**

Following a **decision or dismissal** by the QIC, if the debt has not been paid in full, we will begin or resume recoupment whether or not you appeal to the next level, Administrative Law Judge (ALJ). **NOTE:** Even when recoupment is stopped, interest continues to accrue.

**Medicaid Offset:**

If this matter is not resolved, CMS may instruct the Medicaid State Agency to withhold the Federal share of any Medicaid payments that may be due you or related facilities until the full amount owed Medicare is recouped; Title 42 CFR, section 447.30(g). These recoveries will be in addition to any recoupments from other Medicare funds due you until the full amount owed to Medicare is recovered.

**Right to Inspect Records Prior to Referral to Treasury:**

In the event an Intent to Refer (ITR) letter is sent, you have the right to inspect and copy all records pertaining to your debt. In order to present evidence or review the CMS records, you must submit a written request to the address below. Your request must be received within 60 calendar days from the ITR letter date. In response to a timely request for access to CMS' records, you will be notified of the location and time when you can inspect and copy records related to this debt. Interest will continue to accrue during any review period. Therefore, while review is pending, you will be liable for interest and related late payment charges on amounts not paid by the due date identified above.

**For Individual Debtors Filing a Joint Federal Income Tax Return:**

The Treasury Offset Program automatically refers debts to the Internal Revenue Service (IRS) for Offset. Your Federal income tax refund is subject to offset under this program. If you file a joint income tax return, you should contact the IRS before filing your tax return to determine the steps to be taken to protect the share of the refund, which may be payable to the non-debtor spouse.

**For Debtors that Share a Tax Identification Number(s):**

Section 1866(j)(6) of the Social Security Act authorizes the Secretary of Health and Human Services (the Secretary) to make any necessary adjustments to the payments of an applicable provider or supplier who shares a TIN with an obligated provider or supplier, one that has an outstanding Medicare overpayment. The Secretary is authorized to adjust the payments of

Page 6
Date : 11/23/2022
Letter Number : 31448423

such a provider or supplier regardless of whether it has been assigned a different billing number or National Provider Identification Number (NPI) from that of the provider or supplier with the outstanding Medicare overpayment.

**Federal Salary Offset:**

If the facility ownership is either a sole proprietorship or partnership, your individual salary(s) may be offset if you are, or become, a federal employee.

**If you have filed a bankruptcy petition:**

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy, please include the name in the bankruptcy is filed under and the district where the bankruptcy is filed.

Should you have any questions, please contact your overpayment consultant at the following:

Part B Immediate Recoupment - Fax: 608-223-7550
Part B Extended Repayment Request: 866-518-3285
Provider - Part B: 866-518-3285

We look forward to hearing from you shortly.

Sincerely,


Medicare Part B Recovery Unit
WPS Government Health Administrators

Enclosures
How This Overpayment Was Determined

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 2634-2636

# Allografts
### Basic Concepts and Glossary for Post Mohs Surgery Repair via Skin Substitute Allografts

**What is an allograft?**  Allografts are used as a tissue graft to treat wounds. Allografts are derived from the amniotic membrane, which is responsible for physically protecting the fetus by acting as a cover/barrier.  The amniotic membrane also acts as a semi-permeable, protective barrier membrane which allows for the transfer of nutrients and waste and protects the fetus.

In the reviewed records, skin substitute allografts, including both EpiFix (MiMedx manufacturer) and Artacent (Tides Medical manufacturer), were used as allografts, as confirmed by the FDA, FDA approved Package inserts, CPT, and letters from the respective manufacturers. (Please see package inserts, FDA 2020 Guidelines, CPT and manufacturers letters, excerpted below)

Excerpts from FDA approved Artacent package insert:

> _Description:_  _This human tissue_ _allograft_ _is supplied and processed by Tides Medical._
>
> _Applications and Directions for Use_:  _This allograft may be used as a wound covering in various surgical procedures. ... This allograft may be applied weekly or at the discretion of the health care provider._
>
> _Preparation of Allograft for Use_: _...5. Anchor graft using preferred method of fixation. Absorbable/non-absorbable suture material and/or tissue adhesives may be used to apply the graft to the surgical site,        if necessary._

Excerpts from FDA approved EpiFix package insert:

> _EpiFix Description  EpiFix is a minimally manipulated, dehydrated, non-viable cellular allograft derived from human amniotic membrane._
>
> _Tissue Uses  EpiFix is a barrier intended for use in the treatment of acute and chronic wounds, providing a protective environment to support the healing process._
>
> _Re-application of EpiFix  It is recommended that EpiFix grafts are applied weekly until wound epithelialization is achieved._

These allografts also have their own Q-codes defining them as allografts; i.e., CPT Q4169 Artacent wound, per sq cm and CPT Q4186 Epifix 1 sq cm.

**What is homologous use?**  "Homologous use" means a use that performs the same basic uses in both the recipient (patient) and the donor.  With reference to allografts, the FDA defines "homologous use" as a use or functioning of allografts as a barrier or covering, not as a "wound covering." Although the EpiFix package insert states that "EpiFix is a barrier," the language could more accurately state that EpiFix can be _used_ as a barrier.

Although the FDA defined homologous use of an allograft as a cover or barrier, that does not change the fact that Artacent and EpiFix are skin substitute allografts. Homologous use changes nothing about the nature of allografts.

**When does Advanced Dermatology use allografts?** Advanced Dermatology offers allografts to carefully selected patients with relatively large wounds and additional medical indications (co-morbidities), which are contrary to incisional reconstructive surgery and supportive of repair via allograft. The selected patients also have relatively large defects, in high-risk (sensitive head, neck, hands, feet and pretibial region) locations, which are medically indicated for reconstructive surgery, i.e., flaps or grafts.

Finally, Advanced Dermatology is putting together a protocol for allograft use post Mohs surgery. Please see our Peer Review article on Mohs surgery and Allografts which was published in 2021 and is the first and by far the largest of its kind.

**How does Advanced Dermatology document homologous allograft use?** Advanced Dermatology based its description and documentation of homologous use of allografts on the applicable product's brochure. Although the applicable product brochures do not explicitly mention all possible "homologous uses" for the products, they do describe other uses. Similarly, Advanced Dermatology also elected to describe its homologous use of the products, without expressly using the word "homologous."

**How is an allograft applied?** Wound depth is a critical component in covering the vertical aspects of a wound with allograft.

Excerpts from EpiFix package insert:

> **Removing EpiFix from Packaging**
> PEASE TAKE GREAT CARE WHEN REMOVING EPIFIX FROM THE INTERNAL POUCH. **EPIFIX IS THIN AND EXTREMELY LIGHTWEIGHT.**
>
> **EpiFix Preparation**
> 1.        In a dry state, use sterile dry scissors to cut EpiFix to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix by 1 mm.
>
> **EpiFix Orientation & Application**
> Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix to the wound site, if desired.

Excerpts from Artacent package insert:

> **Preparation of Allograft for Use:**
> PLEASE USE CAUTION WHEN REMOVING ALLOGRAFT FROM POUCH AS **THE ALLOGRAFT IS THIN AND LIGHTWEIGHT**
>
> Anchor graft using preferred method of fixation. Absorbable/non-absorbable suture material and/or tissue adhesives may be used to apply the graft to the surgical site, if necessary.

To follow the manufacture's guidance, from the FDA-approved package insert that "it is acceptable to overlap the wound margins with EpiFix by 1 mm," it is critical to understand the depth of the wound/defect. Generally speaking, wounds/defects are comprised of hemispheres which consist of a wound/defect's length, width, and a depth.

If one were to travel directly across the face of a clock from 12 to 6 in a direct straight line by traveling directly down the center of the face of the clock, that would be a diameter: i.e., length or width, depending on if the shape of the clock's face (round, square or rectangle). On the other hand, if we travel along the perimeter of the clock to get from 12 to 6 that would be a much longer distance. Furthermore, the distance from 3 to 9, if traveled in a direct straight line by traveling directly across the center of the face of the clock would be a diameter: i.e., length or width (depending on the shape of the clock). Now, the straight-line distance by traveling directly across the center of the face of the clock from 12 to 6 multiplied by the straight-line distance from 3 to 9 would equal the area of the wound/defect. The distance traveled by measuring along the perimeter of the hemisphere adds the depth. If we merely rotate the face of the clock such that 3 is at the midpoint/base of the clock face, which represents a wound/defect, and then measure a straight-line distance from 3 to the mid-point of the hemisphere, it intersects with at the midpoint of the straight line from 12 to 6. We can now see that the wound/defect is comprised of a hemisphere. So, while we need the wound/defect area (Length x Width), depth is going to play a critical factor in terms of the amount allograft which will be needed to attain complete wound/defect bed coverage, which is the goal. Volume = Length x Width x Depth.

**What is the scientific basis for allograft use?** The use of dehydrated human amniotic chorionic membrane (DHACM) over surgical wound care in certain patients is scientifically supported. A peer-reviewed study in Facial Plastic Surgery & Aesthetic Medicine investigated the safety and utility of PURION® processed DHACM (EPIFIX®) for use in Mohs micrographic surgeries (MMS).[1] The retrospective propensity score-matched case-control study demonstrated that DHACM placental allografts were associated with a statistically significant lower risk for infection, poor scar cosmesis, scar revision, and additional operation at the index site, when compared to traditional methods of incisional repair. The findings indicate that placental allografts may be a viable alternative to autologous tissue-based reconstruction, including flaps and full-thickness skin grafts (FTSG), particularly in an aging population undergoing numerous Mohs procedures in moderate to high-risk areas of the face, head, neck, and dorsal hand. Notably, a significantly greater proportion of patients in the placental allograft group (97.9%) experienced zero postoperative complications compared to patients undergoing autologous tissue-based repairs (71.3%).

As a natural and readily available biomaterial, the medical use of human placental tissues has been documented in the literature for over a century.[2,3] As a protective dressing, the clinical benefits

[1] Toman J, Michael G, Wisco O, Adams, JR, Hubbs B. Mohs defect repair with dehydrated human amnion/chorion membrane. Facial Plast Surg Aesthetic Med. 2021. PMID: 34714143 [PubMed]

[2] Lo V, Pope E. Amniotic membrane use in dermatology. Int J Dermatol. 2009 Sep;48(9):935-40. doi: 10.1111/j.13654632.2009.04173.x. PMID: 19702975.

[3] Elkhenany H, El-Derby A, Abd Elkodous M, Salah RA, Lotfy A, El-Badri N. Applications of the amniotic membrane in tissue engineering and regeneration: the hundred-year challenge. Stem Cell Res Ther. 2022 Jan 10;13(1):8. doi: 10.1186/s13287021-02684-0. PMID: 35012669; PMCID: PMC8744057.

associated with homologous applications of the amniotic membrane have been scientifically demonstrated, both *in vitro* and *in vivo*. An abundance of peer-reviewed evidence supporting the advantages of its homologous use within medicine exists and continues to grow world-wide. A basic search using the terms "amniotic membrane" + "clinical applications" on PubMed.gov or EBSCO results in >14,000 peer-reviewed journal articles.

With a predilection for the head and neck area, the majority of NMSCs must be treated with surgical excision. Defects arising from such excisions vary in size, depth, anatomy and hence lead to reconstructive challenges. Given the high risk for functional and psychosocial morbidity to the patient, repair of such complex wounds must take additional factors into consideration. While the reconstructive ladder provides broad guidance, the most simplistic approach is not always applicable when seeking the best possible outcome for the beneficiary.

**What are the economic benefits of allografts?** Currently, approximately 15% of Advanced Dermatology's post-Mohs surgery patients are repaired via allografts. If allograft repairs were offered to all post-Mohs surgery patients, Advanced Dermatology estimates that greater than 70% or more would opt for repair via allograft. They would do so to avoid the additional time, pain (injections). and potential serious complications associated with true reconstructive surgery.

The vast majority of the Mohs cases that are repaired via allografts, would otherwise be sent to plastic surgery for consultation and repair, which would generally cost thousands of dollars more due to anesthesia and facility fees (zero cost with allograft) in addition to any repairs.

A recent peer review article specifically compared post Mohs surgery repair via allograft vs. flaps and grafts in high-risk patients. The article found that complication rates were almost 30% when flaps or grafts were used in these in high-risk patient/situations vs. only 2% when allografts were used in these high-risk patient/situations. The complications often included additional procedures, which can mean more pain, trauma, time, cost and inconvenience for the patient.
Although this study also showed that the allograft group cost $560 more and one additional appointment when compared to traditional reconstructive repair (i.e., flaps and grafts), the complication rate and the rate at which the allograft-treated patients would have been alternatively sent to plastic surgery would add thousands of dollars to treatment costs.



**Wisconsin Physicians Service Insurance Corporation**
*A CMS Medicare Contractor*
1717 W. Broadway | P.O. Box 1787 | Madison, WI 53701-1787

**Exhibit D**

Date February 06, 2023
In Any Inquiry Refer To
  5422349094000
Beneficiary Identifier
  Multiple
Internal Control Number
  Multiple
Service Date (s)
  January 21, 2022, to May 23, 2022
Service Provided By
  Advanced Dermatology PA
Service Provided To
  Multiple

Foulston Siefkin LLP
Attn: Amanda Wilwert
Ste 1400
7500 College Blvd
Overland Park, KS 66210-4041

Dear Ms. Wilwert,

This letter is to inform you of the decision on your Medicare appeal. An appeal is a new and independent review of a claim. You are receiving this letter because you requested an appeal on behalf of Advanced Dermatology PA for multiple overpayments totaling $116,510.11.

The appeal decision is unfavorable. Medicare cannot make payment for the service(s) at issue in your appeal.

More information on the decision is provided below. If you disagree with the decision, you may appeal to a Qualified Independent Contractor (QIC). Your appeal of this decision must be made in writing and received by the QIC within 180 days of receipt of this letter. You are presumed to have received this decision five days from the date of the letter unless there is evidence to show otherwise. However, if you do not wish to appeal this decision, you are not required to take any action. For more information on how to appeal this decision, see the section at the end of this letter entitled, "Important Information about Your Appeal Rights".

Wisconsin Physicians Service (WPS) was contracted by Medicare to review your appeal.

Provider: Advanced Dermatology PA
Dates of Service: January 21, 2022, to May 23, 2022
Type of Service: Application of skin substitute graft to wound (procedure codes 15271, 15272, 15275, and 15276), therapy procedure using a special bandage, vacuum pump and disposable medical equipment (procedure code 97608), established patient office or outpatient visit (procedure code 99212), ceftriaxone sodium injection (procedure code J0696), artacent wound (procedure code Q4169), and epifix (procedure code Q4186)

Initial determinations on these claims were made on various dates. Advanced Dermatology PA was



5422349094000

notified of an overpayment in the amount of $116,450.65 by the Unified Program Integrity Contractor (UPIC), in a letter dated November 10, 2022. Review indicates that the services billed to Medicare by Advanced Dermatology PA did not meet Medicare coverage requirements. The primary findings on this review were:

- The documentation sent did not support the services were reasonable and necessary.
- The documentation sent did not support the services were rendered as billed.
- The documentation sent supported the services were related to non-covered/denied primary services.

WPS issued four overpayment demand letters to Advanced Dermatology PA with instructions to submit an appeal or make a refund. At this time, the overpayment has not been satisfied.

WPS received a redetermination request on December 15, 2022. The redetermination request alleges that this overpayment was assessed in error. An appointment of representative form, literature for allografts, procedure code(s) information, copies of the patient's insurance cards and identification cards, intake forms, visit notes, pathology reports, a copy of letters from CoventBridge, the UPIC, literature for wound care, a copy of retired Local Coverage Determination (LCD) L345693, literature for Mohs defect repair, a copy of a medical policy from Blue Cross Blue Shield for amniotic membrane and amniotic fluid, package insert for EpiFix, and copies of the overpayment letters were submitted with the redetermination request.

The overpayment is a result of findings identified from claims reviewed by the UPIC and communicated in the letter dated November 10, 2022. A summary of the overpayment demand letters and amount of each overpayment is listed in the following table. The difference in the overpayment amounts is due to a claim for REDACTED for date(s) of service February 12, 2022, reprocessed and applied part of the payment to the Medicare Part B 2022 deductible.

| Date of Overpayment Letter | Overpayment Letter Number | Amount of Overpayment | Type of Overpayment |
|---|---|---|---|
| November 21, 2022 | 31377512 | $46,834.65 | Specific Claims |
| November 21, 2022 | 31378432 | $41,354.99 | Specific Claims |
| November 23, 2022 | 31448324 | $6,365.64 | Specific Claims |
| November 23, 2022 | 31448423 | $21,954.83 | Specific Claims |
| | **Total** | **$116,510.11** | |

DECISION

The result of this redetermination is that these claims are not covered by Medicare. It has also been determined that the overpayment of $116,510.11 is valid.

EXPLANATION OF THE DECISION

This redetermination decision has been rendered based upon the review of the documentation by our medical staff.

2

5422349094000

You requested a redetermination for beneficiary claims representing a total of 131 lines of wound care services. The billed services include the following Healthcare Common Procedure Coding System (HCPCS) and Current Procedural Terminology (CPT) codes:

HCPCS code J0696- injection, ceftriaxone, sodium, per 250 milligrams (mg)

HCPCS code Q4169- artacent wound, per sq cm

HCPCS code Q4186- epifix, per sq cm

CPT code 15271- application of skin substitutes graft to wound of trunk, arms or legs, 25.0 sq cm of less of wound 100 sq cm or less

CPT code 15272- application of skin substitutes graft to wound of trunk, arms or legs, 25.0 sq cm of less of wound 100 sq cm or less, each additional 25.0 sq cm wound surface area, or part thereof

CPT code 15275- application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

CPT code 15276- application of skim substitutes graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; each additional sq cm wound surface area, or part thereof

CPT code 97608- therapy procedure using special bandage, vacuum pump and disposable medical equipment, surface area more than 50.0 sq cm

CPT code 99212- established patient office or other outpatient visit, 10-19 minutes

The submitted records were reviewed in order to ascertain if the services set forth in the claims were medically reasonable and necessary, and met all other pertinent Medicare payment requirements. We considered the documentation contained in the case files received from the CoventBridge Group (f/k/a Advanced Med) Medical Review Department as well as the records submitted with your redetermination.

Please see the enclosed WPS Redetermination Form detailing the individual decisions. The redetermination decisions can be found in the column titled "WPS Redetermination Outcome." Please refer to the legend located at the bottom of the form. Further details of the decisions will be explained throughout this section.

The determination of medical necessity for the service(s) in question is an essential element in determining whether payment for services was appropriate. While at no time does Medicare tell providers how to practice medicine, it does establish guidelines stating that medical necessity must be documented in the medical record in order for a service to be reimbursed.

5422349094000

The Regional Office of the Centers for Medicare and Medicaid Services (CMS) and this Medicare Part B Carrier have agreed upon the following definition of medical necessity:

> *A service, treatment, procedure, equipment, drug, device or supply provided by a hospital, physician, or other health care provider that is required to identify or treat a beneficiary's illness or injury and which is, as determined by the contractor: (a) consistent with the symptom(s) or diagnosis and treatment of the beneficiary's illness or injury; (b) appropriate under the standards of acceptable medical practice to treat that illness or injury; (c) not solely for the convenience of the participant, physician, hospital, or other health care provider; and, (d) the most appropriate service, treatment, procedure, equipment, drug, device or supply which can be safely provided to the beneficiary and accomplishes the desired end result in the most economical manner.*

Title XVIII of the Social Security Act section 1862 (a)(1)(A) states no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Title XVIII of the Social Security Act section 1833 (e) addresses documentation and states: No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider.

As published in the CMS IOM Publication 100-8, Section 13.5.1, in order to be covered under Medicare, a service shall be reasonable and necessary. The service provided should have an appropriate duration and frequency in terms of whether it is:

1. Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member.
2. Furnished in a setting appropriate to the patient's medical needs and condition.
3. Ordered and furnished by qualified personnel.
4. One that meets but does not exceed, the patient's medical needs and at least as beneficial as an existing and available medically appropriate alternative.

The determination of medical necessity for the service(s) in question is an essential element in determining whether payment for services was appropriate. While at no time does Medicare tell providers how to practice medicine, it does establish guidelines stating that medical necessity must be documented in the medical record in order for a service to be reimbursed.

The Code of Federal Regulations, Title 42 - Public Health, Volume 3, Part 424, Section 424.5(6) Basic Conditions – Sufficient Information requires that the documentation must be sufficient to support the services billed.

General principles of medical record documentation include:

1. The medical record should be complete and legible.

4

5422349094000

2. The documentation of each patient encounter should include:
   - Reason for encounter and relevant history, physical examination findings, and pertinent diagnostic test results;
   - Assessment, clinical impression, or diagnosis;
   - Plan for care; and
   - Date and legible identity of the observer.
3. If not documented, the rational for ordering diagnostic and other ancillary services should be easily inferred.
4. Past and present diagnoses should be accessible to the treating and/or consulting physician.
5. Appropriate health risk factors should be identified.
6. The patient's progress, response to and changes in treatment, and revision of diagnosis should be documented.
7. The CPT and International Classification of Diseases, 10th Revision, Clinical Modification (ICD-10-CM) codes reported on the health insurance claim form should be supported by the documentation in the medical record.

**Finding No. 1:  Submitted documentation failed to support that the billed services were reasonable and necessary, ordered as billed and rendered as billed.**

This decision was made in accordance with Title XVIII of Social Security Act, Section 1862 (a)(1)(A). Medicare coverage and payment are only allowed for those services that are considered medically reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Records were submitted for review.  The documentation supported the services were provided as billed. However, the records did support off label-use and did not contain medical literature to support the medical necessity of the services billed.  The documentation did not support the services were medically reasonable and necessary.

Of the 131 lines of service reviewed, 18 lines of service of Q4169 and 39 lines of service of Q4186 have been denied as the submitted medical records did not meet guidelines requirements to demonstrate the medical necessity of the services.  Therefore, payment cannot be made.  These decisions have been given the designation: **F1 (Finding 1 - Documentation failed to support the billed services were medically reasonable and necessary)** on the attached spreadsheet.

**Finding No. 2: Documentation did not support the E & M services were a separate service from the procedures billed.**

The E & M services were billed with modifier 25, indicating a significant, separately identifiable E & M service by the same physician or other qualified health care professional on the same day of a procedure or other service.  The documentation did not support the E & M services were for a significant and separately identifiable reason from the procedures that were billed on the same dates of service.

5

5422349094000

Of the 131 lines of service reviewed, four lines of service of 99212, have been denied as the documentation did not support the E & M services were a separate service from the procedure billed. Therefore, payment cannot be made.  These decisions have been given the designation: **F2 (Finding 2 – Documentation did not support the E & M services were a separate service from the procedures billed)** on the attached spreadsheet.

**Finding 3: The submitted documentation does not support the services were rendered and medical necessity for the billed service.**

According to the Wisconsin Physicians Association, LCD L37228, Wound Care, requires that for wound care to be considered reasonable and necessary the provider must support the beneficiary is eligible for a defined Medicare benefit category, be reasonable and necessary and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member and meet all other applicable Medicare statutory and regulatory requirements

The documentation supported the patient was seen for follow up of wound services.  The documentation did not support the patient starting a wound vacuum as part of the plan of care.  The documentation did not support a reason for the wound vacuum application, nor was there documentation of the examination of the wound on the date of service billed. Therefore, the service remains denied.

Of the 131 lines of services reviewed, one line of service has been denied with the CPT code of 97608, as the documentation did not support Medicare guidelines were met for coverage.  Therefore, payment cannot be made.  These decisions have been given the designation: **F3 (Finding 3 – Documentation did not support the services were rendered and medically reasonable and necessary)** on the attached spreadsheet.

**Finding No. 4: Submitted documentation failed to support the billed services were rendered and reasonable and necessary.**

The services were billed in conjunction with other services that were determined not to be medically reasonable and necessary.  The documentation did not support the services were provided for any other reason than the administration of the services as no explanation was given for the therapeutic options.

Of the 131 lines of service reviewed, one line of service billed with HCPCS code J0696, eight lines of services billed with CPT code 15271, one line of service billed with CPT code 15272, 52 lines of service billed with CPT code 15275 and seven lines of service billed with CPT code 15276, have been denied as they were billed in conjunction with services that were denied as not medically reasonable and necessary.  Therefore, payment cannot be made.  These decisions have been given the designation: **F4 (Finding 4 - Services were billed in conjunction with services that were denied as not medically reasonable and necessary)** on the attached spreadsheet.

**Conclusion**

In summary, the findings are as follows:

- The documentation did not support the services were medically reasonable and necessary

6

5422349094000

- The documentation did not support the services were a separate service from the procedures billed

- The documentation did not support the medical necessity for the billed wound care services

- The services were billed in conjunction with services that were denied as not medically reasonable and necessary

This redetermination decision was based on the following references:

- The Social Security Act which is available at https://www.ssa.gov
  Section 1862 (a)(1)(A)
  Section 1833 (e)

- The Code of Federal Regulations, Title 42 – Public Health, Volume 3, Part 424, Section 424.5(6) Basic Conditions

- The Centers for Medicare & Medicaid (CMS) Internet Only Manual (IOM) which is available at https://www.cms.gov

- The Code of Federal Regulations, Title 21 – Food and Drugs, Volume 8, Part 1271, Section 10 Human Cells, Tissues and Cellular and Tissue-Based Products
  Publication 100-2, Medicare Benefit Policy Manual, Chapter 16, Section 20
  Publication 100-8, Medicare Program Integrity Manual, Chapter 4, Section 4.3

- Wisconsin Physicians Service Local Coverage Determination: Billing and Coding: Wound Care (L37228),  Located on the Internet at www.cms.gov/medicare-coverage-database

- Current Procedural Terminology (CPT) Manual, Professional Editions 2022

- Healthcare Common Procedure Coding System (HCPCS) Manual 2022

If you do not have access to the internet or CPT/HCPCS manuals, you may request a copy of the references used by calling us toll free at 1-866-518-3285.

WHO IS RESPONSIBLE FOR THIS BILL?

The appeal decisions reflect that Advanced Dermatology PA is responsible for services determined to be not covered by Medicare.  We have determined that Advanced Dermatology PA is responsible for the overpayment of those services that are not covered by Medicare.  The overpayment letters you have received instruct you on the process for refund.  If you have not already sent the refund and the money owed is not refunded timely, interest will be applied.

We have also determined under Section 1870 of the Social Security Act that Advanced Dermatology PA

7

5422349094000

is not without fault in regards to this overpayment. We have determined that you are liable because you were informed about Medicare coverage and billing guidelines through the references noted in the "Explanation of Decision" section of this letter. Therefore, Advanced Dermatology PA was aware of correct billing and coverage criteria for the service(s) billed.

WHAT TO INCLUDE IN YOUR REQUEST FOR AN INDEPENDENT APPEAL

Please submit the following documents with your request for an appeal: additional medical documentation which supports the services billed and the medical necessity of those services as described above. You may submit any documentation pertinent to these services and/or any information not provided thus far that you believe Medicare needs to make another decision about these claims.

NOTE: (Medicare physicians, providers, and suppliers ONLY) Any additional evidence as indicated in this section should be submitted with the request for reconsideration. All evidence must be presented before the reconsideration decision is issued. If all additional evidence as indicated above and/or otherwise is not submitted prior to issuance of the reconsideration decision, you will not be able to submit any new evidence to the administrative law judge or the Medicare Appeals Council unless you can demonstrate good cause for withholding the evidence from the qualified independent contractor.

NOTE: You do not need to resubmit documentation that was submitted as part of the redetermination. This information will be forwarded to the QIC as part of the case file utilized in the reconsideration process.

Sincerely,


Dawn Bailey
Redetermination Representative
Wisconsin Physicians Service

Enclosure

8

5422349094000

# IMPORTANT INFORMATION ABOUT YOUR APPEAL RIGHTS

**Your Right to Appeal this Decision:** If you do not agree with this decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claim so far. The next level of appeal is called reconsideration. A reconsideration is a new and impartial review performed by a qualified independent contractor (QIC), separate and independent of Wisconsin Physicians Service.

**How to Appeal:** To exercise your right to an appeal, you must file a request in writing. Your request must be received by the QIC at the address below within 180 days of receiving this decision. You are presumed to have received this decision five days after the date of the letter unless there is evidence to show otherwise. If you are unable to file your appeal request timely, please explain why you could not meet the filing deadline. You may request an appeal by using the form enclosed with this letter.

If you do not use this form, you can write a letter. You must include: your name, your signature, the name of the beneficiary, the Medicare number, a list of the service(s) or item(s) that you are appealing and the date(s) of service, and any evidence you wish to attach. You must also indicate that Wisconsin Physicians Service made the redetermination. You may also attach supporting materials, such as those listed in item 10 of the enclosed Reconsideration Request Form, or other information that explains why this service should be paid. Your doctor may be able to provide supporting materials.

If you want to file an appeal, send your request to:

> C2C Innovative Solutions, Inc. - QIC Part B North
> P O Box 45208
> Jacksonville, FL 32232-5208

**Who May File an Appeal:** You or someone you name to act for you (your appointed representative) may file an appeal. You can name a relative, friend, advocate, attorney, doctor, or someone else to act for you.

If you want someone to act for you, you may visit https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1696.pdf to download the "Appointment of Representative" form, which may be used to appoint a representative. Medicare does not require that you use this form to appoint a representative. Alternately, you may submit a written statement containing the same information indicated on the form. If you are a Medicare beneficiary, you may also call 1-800-MEDICARE (1-800-633-4227) to learn more about how to name a representative.

5422349094000

**Other Important Information:** If you want copies of statutes, regulations, policies, and/or manual instructions CMS used to arrive at this decision, or if you have any questions specifically related to your appeal, please write to us at the following address and attach a copy of this letter:

> WPS Medicare Part B
> General Correspondence
> P.O. Box 7238
> Madison, WI  53707-7238

**Resources for Medicare Beneficiaries:** If you want help with an appeal, or if you have questions about Medicare, you can have a friend or someone else help you with your appeal.  You can also contact your State health insurance assistance program (SHIP).  You can find the phone number for your SHIP in your "Medicare & You" handbook, under the "Helpful Contacts" section of www.medicare.gov Web site, or by calling 1-800-MEDICARE (1-800-633-4227).  Your SHIP can answer questions about payment denials and appeals.

For general questions about Medicare, you can call 1-800-MEDICARE (1-800-633-4227), TTY/TDD: 1-877-486-2048.

Remember that specific questions about your appeal should be directed to the contractor that is processing your appeal.

Redetermination/Appeals Number:
5422349094000

## Reconsideration Request Form

**Directions**: If you wish to appeal this decision, please fill out the required information below and mail this form to the address shown below.  At a minimum, you must complete/include information for items 1, 2a, 6, 7, 11, & 12, but to help us serve you better, please include a copy of the redetermination notice with your request.

> C2C Solutions - QIC Part B North
> P O Box 45208
> Jacksonville, FL 32232-5208

1. Name of Beneficiary: _____

2a. Medicare Number: _____

2b. Claim Number (ICN / DCN, if available): _____

3. Provider Name: _____

4. Person Appealing: ☐Beneficiary      ☐Provider of Service      ☐Representative

5. Address of the Person Appealing: _____

5a. Telephone Number of the Person Appealing: _____

5b. Email Address of the Person Appealing: _____

6. Item or service you wish to appeal: _____

7. Date of the service:   From _____   To _____

8. Does this appeal involve an overpayment?   ☐Yes ☐No
   *Please include a copy of the demand letter (*if applicable*) with your request.

9. Why do you disagree? Or what are your reasons for your appeal? (Attach additional pages, if necessary.) _____
   _____

10. You may also include any supporting material to assist your appeal. Examples of supporting materials include:
    ☐ Medical Records   ☐ Office Records/Progress Notes
    ☐ Copy of the Claim ☐Treatment Plan      ☐ Certificate of Medical Necessity

11. Name of Person Appealing: _____

12. Signature of Person Appealing: _____ Date:_____

Contractor Number:  05202

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 2652-2656



**Exhibit F**

**MEDICARE**
Part B

Letter Number: 31448423

Date: 11/23/2022

ADVANCED DERMATOLOGY PA
2735 PEMBROOK PL
MANHATTAN, KS 665027482

**INITIAL REQUEST**

RE : MMA 935 - Overpayment Amount
    Overpayment Amount: $21,954.83
    Outstanding Balance: $21,954.83
    Provider Number: 110568-1124094867

Dear Sir/Madam,

This letter is to inform you that you have received a Medicare payment in error, which has resulted in an overpayment subject to section 935(f)(2) of the Medicare Modernization Act (MMA), section 1893(f)(2) of the Social Security Act, Limitation on Recoupment, in the amount $21,954.83. **The purpose of this letter is to request that this amount be repaid to our office.** The attached enclosure explains how this happened.

**NOTE:** If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding please follow the instructions found at the end of this letter.

**Why you are responsible:**

You are responsible for following correct Medicare filing procedures and must use care when billing and accepting payment. You are responsible for repayment in this matter based upon one or both of the following criteria:

1.   You billed and/or received payment for services for which you should have known you were not entitled to receive payment. Therefore, you are not without fault and are responsible for repaying the overpayment amount.

2.   You received overpayments resulting from retroactive changes in the Medicare Physician Fee Schedule and/or changes mandated by legislation.

If you dispute this determination, please follow the appropriate appeals process listed below.

---

WPS Government Health Administrators

P.O. Box 1787, Madison, WI 53701

www.wpsgha.com

VOL. II

2657

File 14 PDF - Page 40 of 91

(Applicable authorities: section 1870(b) of Social Security Act; subsection 405.350 - 405.359 of Title 42, subsection 404.506 - 404.509, 404.510a and 404.512 of Title 20 of the United States Code of Federal Regulations.)

This amount is subject to section 935(f)(2) of the Medicare Modernization Act (MMA) (section1893(f)(2) of the Social Security Act), Limitation on Recoupment (42 CFR 405.379).

**Rebuttal Process:**

Under the existing regulations 42 CFR section 405.374, providers and other suppliers will have **15 days from the date of this demand letter** to submit a statement of opportunity to rebuttal. The rebuttal process provides the debtor the opportunity, before the suspension, offset, or recoupment takes effect, to submit any statement (to include any pertinent information) as to why it should not be put into effect on the date specified in the notice. A rebuttal is not intended to review supporting medical documentation nor disagreement with the overpayment decision. A rebuttal shall not duplicate the redetermination process. **This is not an appeal of the overpayment determination and the limitation on recoupment under** section1893 (f)(2)(a) of the Social Security Act **does not apply to rebuttal requests.** We will review your rebuttal documentation and determine whether the facts justify ceasing the recoupment or offset. Our office will advise you of our decision 15 days from the mailroom-stamped receipt date of your request.

**Interest Assessment:**

**If you do not refund in 30 days:**

In accordance with 42 CFR 405.378, simple interest at the rate of 10.125% will be charged on the unpaid balance of the overpayment, beginning on the 31st day. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made on time. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged. Each payment will be applied first to accrued interest and then to principal. After each payment, interest will continue to accrue on the remaining principal balance, at the rate of 10.125%.

**Suspended Funds Applied To The Overpayment and Has a Remaining Outstanding Balance:**

If the suspended funds are insufficient to fully eliminate any overpayment, and the provider or supplier meets the requirements of 42 CFR section 405.379 "Limitation on Recoupment" provision under section1893(f) (2) of the Act, then the provider or supplier is subject to 935 Appeals rights and will be available for offset after 41 days on the remaining balance still owed to CMS. (See 42 CFR section 405.372(e) for more information.)

**Payment by Recoupment:**

If payment in full is not received by 01/02/2023, **payments** to you can be recouped (recoupment) until payment in full is received if you haven't submitted an acceptable ERS request, an immediate recoupment request, and/or a valid and timely appeal is received.

**Make a payment or Arrange for payments:**

What you should do:

Please return the overpaid amount to us by 12/22/2022 and no interest will be assessed. We request that you refund this amount in full.

Make the check payable to Medicare Part B and send it with a copy of this letter to:

> WPS Government Health Administrators
> Payment Recovery
> P.O. Box 8215
> Madison, WI 53708-8215

If you are unable to refund the entire amount at this time, advise this office immediately, with a request for an **Extended Repayment Schedule (ERS)** so that we may determine if you are eligible for one. Any repayment schedule (where one is approved) would run from the date of the ERS review approval date.

**You can visit our website at www.wpsgha.com for the ERS Request instructions.**

**Immediate Recoupment:**

**TO SIMPLIFY THE REPAYMENT PROCESS,** reduce the extra work and cost associated with mailing your repayment each time, you may elect to have automatic immediate recoupments for ALL overpayments by requesting the **Immediate Recoupment** process for All Current and Future Accounts Receivable. This will automatically begin recoupment starting on day 16 for ALL future accounts receivable. When the initial request is received after day 16 the debt shall be placed in an immediate recoupment status. If the debt is not collected in full before day 31, interest will continue to accrue until the debt is collected in full.

You must specify whether you are submitting:

1. A request on the current demanded overpayment (all accounts receivables within this demand letter) and ALL FUTURE OVERPAYMENTS; or

2. A one-time request on this current demanded overpayment (all accounts receivables) addressed in this demand letter only.

**You can visit our website at www.wpsgha.com for the Immediate Recoupment Request**

**instructions.**

You may contact this office for information on how to fax your request.

This process is voluntary and for your convenience. Your request must specifically state you understand you are waiving potential receipt of interest payment pursuant to § 1893(f) (2) for the overpayments.

<u>**Note:**</u> Such interest may be payable for certain overpayments reversed at the ALJ level or subsequent levels of appeal.

<u>**If You Wish To Appeal This Decision**</u>

If you disagree with this overpayment decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claims. The first level of appeal is called a redetermination. You must file your request for a redetermination 120 days from the date of this letter. However, if you wish to avoid recoupment from occurring, you need to file your request for redetermination within 30 days from the date of this letter, as described above. Unless you show us otherwise, we assume you received this letter within 5 days of the date of this letter.

Please send your request for redetermination to:

> WPS Government Health Administrators - 935 APPEALS
> REDETERMINATION
> Appeals Department
> P.O. Box 14260
> Madison, WI 53708-0260

<u>**How to Stop Recoupment:**</u>

Even if the overpayment and any assessed interest has not been paid in full, you can temporarily stop Medicare from recouping any payments. **If you act quickly and decidedly,** Medicare will stop recoupment at two points.

**First Opportunity:** We must receive a valid and timely request for a redetermination within 30 days from the date of this letter. We will stop or delay recoupment pending the results of an appeal. To assist us in expeditiously stopping the recoupment process, we request that you clearly indicate on your appeal request that this is a 935 overpayment appeal for a redetermination.

**Second Opportunity:** If the redetermination decision is (1) **unfavorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare redetermination notice (Medicare Appeal Decision Letter); or (2) if the decision is **partially favorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare revised overpayment

Notice/Revised Demand Letter. Therefore, it is important to act quickly and decidedly to limit recoupment by submitting a valid and timely request for reconsideration within 60 days of the appropriate notice/letter. The address and details on how to file a request for reconsideration will be included in the Redetermination decision letter.

## What Happens Following a Reconsideration By a Qualified Independent Contractor (QIC):

Following a **decision or dismissal** by the QIC, if the debt has not been paid in full, we will begin or resume recoupment whether or not you appeal to the next level, Administrative Law Judge (ALJ). **NOTE:** Even when recoupment is stopped, interest continues to accrue.

## Medicaid Offset:

If this matter is not resolved, CMS may instruct the Medicaid State Agency to withhold the Federal share of any Medicaid payments that may be due you or related facilities until the full amount owed Medicare is recouped; Title 42 CFR, section 447.30(g). These recoveries will be in addition to any recoupments from other Medicare funds due you until the full amount owed to Medicare is recovered.

## Right to Inspect Records Prior to Referral to Treasury:

In the event an Intent to Refer (ITR) letter is sent, you have the right to inspect and copy all records pertaining to your debt. In order to present evidence or review the CMS records, you must submit a written request to the address below. Your request must be received within 60 calendar days from the ITR letter date. In response to a timely request for access to CMS' records, you will be notified of the location and time when you can inspect and copy records related to this debt. Interest will continue to accrue during any review period. Therefore, while review is pending, you will be liable for interest and related late payment charges on amounts not paid by the due date identified above.

## For Individual Debtors Filing a Joint Federal Income Tax Return:

The Treasury Offset Program automatically refers debts to the Internal Revenue Service (IRS) for Offset. Your Federal income tax refund is subject to offset under this program. If you file a joint income tax return, you should contact the IRS before filing your tax return to determine the steps to be taken to protect the share of the refund, which may be payable to the non-debtor spouse.

## For Debtors that Share a Tax Identification Number(s):

Section 1866(j)(6) of the Social Security Act authorizes the Secretary of Health and Human Services (the Secretary) to make any necessary adjustments to the payments of an applicable provider or supplier who shares a TIN with an obligated provider or supplier, one that has an outstanding Medicare overpayment. The Secretary is authorized to adjust the payments of

such a provider or supplier regardless of whether it has been assigned a different billing number or National Provider Identification Number (NPI) from that of the provider or supplier with the outstanding Medicare overpayment.

**Federal Salary Offset:**

If the facility ownership is either a sole proprietorship or partnership, your individual salary(s) may be offset if you are, or become, a federal employee.

**If you have filed a bankruptcy petition:**

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy, please include the name in the bankruptcy is filed under and the district where the bankruptcy is filed.

Should you have any questions, please contact your overpayment consultant at the following:

Part B Immediate Recoupment - Fax: 608-223-7550
Part B Extended Repayment Request: 866-518-3285
Provider - Part B: 866-518-3285

We look forward to hearing from you shortly.

Sincerely,


Medicare Part B Recovery Unit
WPS Government Health Administrators

Enclosures
How This Overpayment Was Determined

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 2663-2665



Letter Number: 31378432

Date: 11/21/2022

ADVANCED DERMATOLOGY PA
2735 PEMBROOK PL
MANHATTAN, KS 665027482

**INITIAL REQUEST**

RE : MMA 935 - Overpayment Amount
    Overpayment Amount: $41,354.99
    Outstanding Balance: $41,354.99
    Provider Number: 110568-1124094867

Dear Sir/Madam,

This letter is to inform you that you have received a Medicare payment in error, which has resulted in an overpayment subject to section 935(f)(2) of the Medicare Modernization Act (MMA), section 1893(f)(2) of the Social Security Act, Limitation on Recoupment, in the amount $41,354.99. **The purpose of this letter is to request that this amount be repaid to our office.** The attached enclosure explains how this happened.

**NOTE:** If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding please follow the instructions found at the end of this letter.

**Why you are responsible:**

You are responsible for following correct Medicare filing procedures and must use care when billing and accepting payment. You are responsible for repayment in this matter based upon one or both of the following criteria:

1.   You billed and/or received payment for services for which you should have known you were not entitled to receive payment. Therefore, you are not without fault and are responsible for repaying the overpayment amount.

2.   You received overpayments resulting from retroactive changes in the Medicare Physician Fee Schedule and/or changes mandated by legislation.

If you dispute this determination, please follow the appropriate appeals process listed below.

---

(Applicable authorities: section 1870(b) of Social Security Act; subsection 405.350 - 405.359 of Title 42, subsection 404.506 - 404.509, 404.510a and 404.512 of Title 20 of the United States Code of Federal Regulations.)

This amount is subject to section 935(f)(2) of the Medicare Modernization Act (MMA) (section1893(f)(2) of the Social Security Act), Limitation on Recoupment (42 CFR 405.379).

**Rebuttal Process:**

Under the existing regulations 42 CFR section 405.374, providers and other suppliers will have **15 days from the date of this demand letter** to submit a statement of opportunity to rebuttal. The rebuttal process provides the debtor the opportunity, before the suspension, offset, or recoupment takes effect, to submit any statement (to include any pertinent information) as to why it should not be put into effect on the date specified in the notice. A rebuttal is not intended to review supporting medical documentation nor disagreement with the overpayment decision. A rebuttal shall not duplicate the redetermination process. **This is not an appeal of the overpayment determination and the limitation on recoupment under** section1893 (f)(2)(a) of the Social Security Act **does not apply to rebuttal requests.** We will review your rebuttal documentation and determine whether the facts justify ceasing the recoupment or offset. Our office will advise you of our decision 15 days from the mailroom-stamped receipt date of your request.

**Interest Assessment:**

**If you do not refund in 30 days:**

In accordance with 42 CFR 405.378, simple interest at the rate of 10.125% will be charged on the unpaid balance of the overpayment, beginning on the 31st day. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made on time. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged. Each payment will be applied first to accrued interest and then to principal. After each payment, interest will continue to accrue on the remaining principal balance, at the rate of 10.125%.

**Suspended Funds Applied To The Overpayment and Has a Remaining Outstanding Balance:**

If the suspended funds are insufficient to fully eliminate any overpayment, and the provider or supplier meets the requirements of 42 CFR section 405.379 "Limitation on Recoupment" provision under section1893(f) (2) of the Act, then the provider or supplier is subject to 935 Appeals rights and will be available for offset after 41 days on the remaining balance still owed to CMS. (See 42 CFR section 405.372(e) for more information.)

**Payment by Recoupment:**

If payment in full is not received by 12/31/2022, **payments** to you can be recouped (recoupment) until payment in full is received if you haven't submitted an acceptable ERS request, an immediate recoupment request, and/or a valid and timely appeal is received.

**Make a payment or Arrange for payments:**

What you should do:

Please return the overpaid amount to us by 12/20/2022 and no interest will be assessed. We request that you refund this amount in full.

Make the check payable to Medicare Part B and send it with a copy of this letter to:

> WPS Government Health Administrators
> Payment Recovery
> P.O. Box 8215
> Madison, WI 53708-8215

If you are unable to refund the entire amount at this time, advise this office immediately, with a request for an **Extended Repayment Schedule (ERS)** so that we may determine if you are eligible for one. Any repayment schedule (where one is approved) would run from the date of the ERS review approval date.

**You can visit our website at www.wpsgha.com for the ERS Request instructions.**

**Immediate Recoupment:**

**TO SIMPLIFY THE REPAYMENT PROCESS,** reduce the extra work and cost associated with mailing your repayment each time, you may elect to have automatic immediate recoupments for ALL overpayments by requesting the **Immediate Recoupment** process for All Current and Future Accounts Receivable. This will automatically begin recoupment starting on day 16 for ALL future accounts receivable. When the initial request is received after day 16 the debt shall be placed in an immediate recoupment status. If the debt is not collected in full before day 31, interest will continue to accrue until the debt is collected in full.

You must specify whether you are submitting:

1. A request on the current demanded overpayment (all accounts receivables within this demand letter) and ALL FUTURE OVERPAYMENTS; or

2. A one-time request on this current demanded overpayment (all accounts receivables) addressed in this demand letter only.

**You can visit our website at www.wpsgha.com for the Immediate Recoupment Request**

**instructions.**

You may contact this office for information on how to fax your request.

This process is voluntary and for your convenience. Your request must specifically state you understand you are waiving potential receipt of interest payment pursuant to § 1893(f) (2) for the overpayments.

**Note:** Such interest may be payable for certain overpayments reversed at the ALJ level or subsequent levels of appeal.

**If You Wish To Appeal This Decision**

If you disagree with this overpayment decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claims. The first level of appeal is called a redetermination. You must file your request for a redetermination 120 days from the date of this letter. However, if you wish to avoid recoupment from occurring, you need to file your request for redetermination within 30 days from the date of this letter, as described above. Unless you show us otherwise, we assume you received this letter within 5 days of the date of this letter.

Please send your request for redetermination to:

> WPS Government Health Administrators - 935 APPEALS
> REDETERMINATION
> Appeals Department
> P.O. Box 14260
> Madison, WI 53708-0260

**How to Stop Recoupment:**

Even if the overpayment and any assessed interest has not been paid in full, you can temporarily stop Medicare from recouping any payments. **If you act quickly and decidedly,** Medicare will stop recoupment at two points.

**First Opportunity:** We must receive a valid and timely request for a redetermination within 30 days from the date of this letter. We will stop or delay recoupment pending the results of an appeal. To assist us in expeditiously stopping the recoupment process, we request that you clearly indicate on your appeal request that this is a 935 overpayment appeal for a redetermination.

**Second Opportunity:** If the redetermination decision is (1) **unfavorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare redetermination notice (Medicare Appeal Decision Letter); or (2) if the decision is **partially favorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare revised overpayment

Notice/Revised Demand Letter. Therefore, it is important to act quickly and decidedly to limit recoupment by submitting a valid and timely request for reconsideration within 60 days of the appropriate notice/letter. The address and details on how to file a request for reconsideration will be included in the Redetermination decision letter.

## What Happens Following a Reconsideration By a Qualified Independent Contractor (QIC):

Following a **decision or dismissal** by the QIC, if the debt has not been paid in full, we will begin or resume recoupment whether or not you appeal to the next level, Administrative Law Judge (ALJ). **NOTE:** Even when recoupment is stopped, interest continues to accrue.

## Medicaid Offset:

If this matter is not resolved, CMS may instruct the Medicaid State Agency to withhold the Federal share of any Medicaid payments that may be due you or related facilities until the full amount owed Medicare is recouped; Title 42 CFR, section 447.30(g). These recoveries will be in addition to any recoupments from other Medicare funds due you until the full amount owed to Medicare is recovered.

## Right to Inspect Records Prior to Referral to Treasury:

In the event an Intent to Refer (ITR) letter is sent, you have the right to inspect and copy all records pertaining to your debt. In order to present evidence or review the CMS records, you must submit a written request to the address below. Your request must be received within 60 calendar days from the ITR letter date. In response to a timely request for access to CMS' records, you will be notified of the location and time when you can inspect and copy records related to this debt. Interest will continue to accrue during any review period. Therefore, while review is pending, you will be liable for interest and related late payment charges on amounts not paid by the due date identified above.

## For Individual Debtors Filing a Joint Federal Income Tax Return:

The Treasury Offset Program automatically refers debts to the Internal Revenue Service (IRS) for Offset. Your Federal income tax refund is subject to offset under this program. If you file a joint income tax return, you should contact the IRS before filing your tax return to determine the steps to be taken to protect the share of the refund, which may be payable to the non-debtor spouse.

## For Debtors that Share a Tax Identification Number(s):

Section 1866(j)(6) of the Social Security Act authorizes the Secretary of Health and Human Services (the Secretary) to make any necessary adjustments to the payments of an applicable provider or supplier who shares a TIN with an obligated provider or supplier, one that has an outstanding Medicare overpayment. The Secretary is authorized to adjust the payments of

such a provider or supplier regardless of whether it has been assigned a different billing number or National Provider Identification Number (NPI) from that of the provider or supplier with the outstanding Medicare overpayment.

**Federal Salary Offset:**

If the facility ownership is either a sole proprietorship or partnership, your individual salary(s) may be offset if you are, or become, a federal employee.

**If you have filed a bankruptcy petition:**

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy, please include the name in the bankruptcy is filed under and the district where the bankruptcy is filed.

Should you have any questions, please contact your overpayment consultant at the following:

Part B Immediate Recoupment - Fax: 608-223-7550
Part B Extended Repayment Request: 866-518-3285
Provider - Part B: 866-518-3285

We look forward to hearing from you shortly.

Sincerely,


Medicare Part B Recovery Unit
WPS Government Health Administrators

Enclosures
How This Overpayment Was Determined

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 2672-2680



**MEDICARE**

Part B

Letter Number: 31448324

Date: 11/23/2022

ADVANCED DERMATOLOGY PA
2735 PEMBROOK PL
MANHATTAN, KS 665027482

**INITIAL REQUEST**

RE : MMA 935 - Overpayment Amount
    Overpayment Amount: $6,365.64
    Outstanding Balance: $6,365.64
    Provider Number: NA3713-1124094867

Dear Sir/Madam,

This letter is to inform you that you have received a Medicare payment in error, which has resulted in an overpayment subject to section 935(f)(2) of the Medicare Modernization Act (MMA), section 1893(f)(2) of the Social Security Act, Limitation on Recoupment, in the amount $6,365.64. **The purpose of this letter is to request that this amount be repaid to our office.** The attached enclosure explains how this happened.

<u>**NOTE:**</u> <u>If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding please follow the instructions found at the end of this letter.</u>

<u>**Why you are responsible:**</u>

You are responsible for following correct Medicare filing procedures and must use care when billing and accepting payment. You are responsible for repayment in this matter based upon one or both of the following criteria:

1.    You billed and/or received payment for services for which you should have known you were not entitled to receive payment. Therefore, you are not without fault and are responsible for repaying the overpayment amount.

2.    You received overpayments resulting from retroactive changes in the Medicare Physician Fee Schedule and/or changes mandated by legislation.

If you dispute this determination, please follow the appropriate appeals process listed below.

---

(Applicable authorities: section 1870(b) of Social Security Act; subsection 405.350 - 405.359 of Title 42, subsection 404.506 - 404.509, 404.510a and 404.512 of Title 20 of the United States Code of Federal Regulations.)

This amount is subject to section 935(f)(2) of the Medicare Modernization Act (MMA) (section1893(f)(2) of the Social Security Act), Limitation on Recoupment (42 CFR 405.379).

**Rebuttal Process:**

Under the existing regulations 42 CFR section 405.374, providers and other suppliers will have **15 days from the date of this demand letter** to submit a statement of opportunity to rebuttal. The rebuttal process provides the debtor the opportunity, before the suspension, offset, or recoupment takes effect, to submit any statement (to include any pertinent information) as to why it should not be put into effect on the date specified in the notice. A rebuttal is not intended to review supporting medical documentation nor disagreement with the overpayment decision. A rebuttal shall not duplicate the redetermination process. **This is not an appeal of the overpayment determination and the limitation on recoupment under** section1893 (f)(2)(a) of the Social Security Act **does not apply to rebuttal requests.** We will review your rebuttal documentation and determine whether the facts justify ceasing the recoupment or offset. Our office will advise you of our decision 15 days from the mailroom-stamped receipt date of your request.

**Interest Assessment:**

**If you do not refund in 30 days:**

In accordance with 42 CFR 405.378, simple interest at the rate of 10.125% will be charged on the unpaid balance of the overpayment, beginning on the 31st day. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made on time. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged. Each payment will be applied first to accrued interest and then to principal. After each payment, interest will continue to accrue on the remaining principal balance, at the rate of 10.125%.

**Suspended Funds Applied To The Overpayment and Has a Remaining Outstanding Balance:**

If the suspended funds are insufficient to fully eliminate any overpayment, and the provider or supplier meets the requirements of 42 CFR section 405.379 "Limitation on Recoupment" provision under section1893(f) (2) of the Act, then the provider or supplier is subject to 935 Appeals rights and will be available for offset after 41 days on the remaining balance still owed to CMS. (See 42 CFR section 405.372(e) for more information.)

**Payment by Recoupment:**

If payment in full is not received by 01/02/2023, **payments** to you can be recouped (recoupment) until payment in full is received if you haven't submitted an acceptable ERS request, an immediate recoupment request, and/or a valid and timely appeal is received.

**<u>Make a payment or Arrange for payments:</u>**

What you should do:

Please return the overpaid amount to us by 12/22/2022 and no interest will be assessed. We request that you refund this amount in full.

Make the check payable to Medicare Part B and send it with a copy of this letter to:

WPS Government Health Administrators
Payment Recovery
P.O. Box 8215
Madison, WI 53708-8215

If you are unable to refund the entire amount at this time, advise this office immediately, with a request for an **<u>Extended Repayment Schedule (ERS)</u>** so that we may determine if you are eligible for one. Any repayment schedule (where one is approved) would run from the date of the ERS review approval date.

**You can visit our website at www.wpsgha.com for the ERS Request instructions.**

**<u>Immediate Recoupment:</u>**

**TO SIMPLIFY THE REPAYMENT PROCESS,** reduce the extra work and cost associated with mailing your repayment each time, you may elect to have automatic immediate recoupments for ALL overpayments by requesting the **Immediate Recoupment** process for All Current and Future Accounts Receivable. This will automatically begin recoupment starting on day 16 for ALL future accounts receivable. When the initial request is received after day 16 the debt shall be placed in an immediate recoupment status. If the debt is not collected in full before day 31, interest will continue to accrue until the debt is collected in full.

You must specify whether you are submitting:

1. A request on the current demanded overpayment (all accounts receivables within this demand letter) and ALL FUTURE OVERPAYMENTS; or

2. A one-time request on this current demanded overpayment (all accounts receivables) addressed in this demand letter only.

**You can visit our website at www.wpsgha.com for the Immediate Recoupment Request**

**instructions.**

You may contact this office for information on how to fax your request.

This process is voluntary and for your convenience. Your request must specifically state you understand you are waiving potential receipt of interest payment pursuant to § 1893(f) (2) for the overpayments.

**Note:** Such interest may be payable for certain overpayments reversed at the ALJ level or subsequent levels of appeal.

**If You Wish To Appeal This Decision**

If you disagree with this overpayment decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claims. The first level of appeal is called a redetermination. You must file your request for a redetermination 120 days from the date of this letter. However, if you wish to avoid recoupment from occurring, you need to file your request for redetermination within 30 days from the date of this letter, as described above. Unless you show us otherwise, we assume you received this letter within 5 days of the date of this letter.

Please send your request for redetermination to:

> WPS Government Health Administrators - 935 APPEALS
> REDETERMINATION
> Appeals Department
> P.O. Box 14260
> Madison, WI 53708-0260

**How to Stop Recoupment:**

Even if the overpayment and any assessed interest has not been paid in full, you can temporarily stop Medicare from recouping any payments. **If you act quickly and decidedly,** Medicare will stop recoupment at two points.

**First Opportunity:** We must receive a valid and timely request for a redetermination within 30 days from the date of this letter. We will stop or delay recoupment pending the results of an appeal. To assist us in expeditiously stopping the recoupment process, we request that you clearly indicate on your appeal request that this is a 935 overpayment appeal for a redetermination.

**Second Opportunity:** If the redetermination decision is (1) **unfavorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare redetermination notice (Medicare Appeal Decision Letter); or (2) if the decision is **partially favorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare revised overpayment

Notice/Revised Demand Letter. Therefore, it is important to act quickly and decidedly to limit recoupment by submitting a valid and timely request for reconsideration within 60 days of the appropriate notice/letter. The address and details on how to file a request for reconsideration will be included in the Redetermination decision letter.

**What Happens Following a Reconsideration By a Qualified Independent Contractor (QIC):**

Following a **decision or dismissal** by the QIC, if the debt has not been paid in full, we will begin or resume recoupment whether or not you appeal to the next level, Administrative Law Judge (ALJ). **NOTE:** Even when recoupment is stopped, interest continues to accrue.

**Medicaid Offset:**

If this matter is not resolved, CMS may instruct the Medicaid State Agency to withhold the Federal share of any Medicaid payments that may be due you or related facilities until the full amount owed Medicare is recouped; Title 42 CFR, section 447.30(g). These recoveries will be in addition to any recoupments from other Medicare funds due you until the full amount owed to Medicare is recovered.

**Right to Inspect Records Prior to Referral to Treasury:**

In the event an Intent to Refer (ITR) letter is sent, you have the right to inspect and copy all records pertaining to your debt. In order to present evidence or review the CMS records, you must submit a written request to the address below. Your request must be received within 60 calendar days from the ITR letter date. In response to a timely request for access to CMS' records, you will be notified of the location and time when you can inspect and copy records related to this debt. Interest will continue to accrue during any review period. Therefore, while review is pending, you will be liable for interest and related late payment charges on amounts not paid by the due date identified above.

**For Individual Debtors Filing a Joint Federal Income Tax Return:**

The Treasury Offset Program automatically refers debts to the Internal Revenue Service (IRS) for Offset. Your Federal income tax refund is subject to offset under this program. If you file a joint income tax return, you should contact the IRS before filing your tax return to determine the steps to be taken to protect the share of the refund, which may be payable to the non-debtor spouse.

**For Debtors that Share a Tax Identification Number(s):**

Section 1866(j)(6) of the Social Security Act authorizes the Secretary of Health and Human Services (the Secretary) to make any necessary adjustments to the payments of an applicable provider or supplier who shares a TIN with an obligated provider or supplier, one that has an outstanding Medicare overpayment. The Secretary is authorized to adjust the payments of

such a provider or supplier regardless of whether it has been assigned a different billing number or National Provider Identification Number (NPI) from that of the provider or supplier with the outstanding Medicare overpayment.

**Federal Salary Offset:**

If the facility ownership is either a sole proprietorship or partnership, your individual salary(s) may be offset if you are, or become, a federal employee.

**If you have filed a bankruptcy petition:**

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy, please include the name in the bankruptcy is filed under and the district where the bankruptcy is filed.

Should you have any questions, please contact your overpayment consultant at the following:

Part B Immediate Recoupment - Fax: 608-223-7550
Part B Extended Repayment Request: 866-518-3285
Provider - Part B: 866-518-3285

We look forward to hearing from you shortly.

Sincerely,


Medicare Part B Recovery Unit
WPS Government Health Administrators

Enclosures
How This Overpayment Was Determined

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 2687

decision is based on either the documentation that was submitted or the failure by the physician/supplier to furnish information that was requested to support the claim. Therefore, payment was made to you in error.



**MEDICARE**
Part B

**Exhibit F**

Letter Number: 31377512

Date: 11/21/2022

ADVANCED DERMATOLOGY PA
2735 PEMBROOK PL
MANHATTAN, KS 665027482

**INITIAL REQUEST**

RE : MMA 935 - Overpayment Amount
    Overpayment Amount: $46,834.65
    Outstanding Balance: $46,834.65
    Provider Number: NA3713-1124094867

Dear Sir/Madam,

This letter is to inform you that you have received a Medicare payment in error, which has resulted in an overpayment subject to section 935(f)(2) of the Medicare Modernization Act (MMA), section 1893(f)(2) of the Social Security Act, Limitation on Recoupment, in the amount $46,834.65. **The purpose of this letter is to request that this amount be repaid to our office.** The attached enclosure explains how this happened.

**NOTE:** If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding please follow the instructions found at the end of this letter.

**Why you are responsible:**

You are responsible for following correct Medicare filing procedures and must use care when billing and accepting payment. You are responsible for repayment in this matter based upon one or both of the following criteria:

1. You billed and/or received payment for services for which you should have known you were not entitled to receive payment. Therefore, you are not without fault and are responsible for repaying the overpayment amount.

2. You received overpayments resulting from retroactive changes in the Medicare Physician Fee Schedule and/or changes mandated by legislation.

If you dispute this determination, please follow the appropriate appeals process listed below.

(Applicable authorities: section 1870(b) of Social Security Act; subsection 405.350 - 405.359 of Title 42, subsection 404.506 - 404.509, 404.510a and 404.512 of Title 20 of the United States Code of Federal Regulations.)

This amount is subject to section 935(f)(2) of the Medicare Modernization Act (MMA) (section1893(f)(2) of the Social Security Act), Limitation on Recoupment (42 CFR 405.379).

**Rebuttal Process:**

Under the existing regulations 42 CFR section 405.374, providers and other suppliers will have **15 days from the date of this demand letter** to submit a statement of opportunity to rebuttal. The rebuttal process provides the debtor the opportunity, before the suspension, offset, or recoupment takes effect, to submit any statement (to include any pertinent information) as to why it should not be put into effect on the date specified in the notice. A rebuttal is not intended to review supporting medical documentation nor disagreement with the overpayment decision. A rebuttal shall not duplicate the redetermination process. **This is not an appeal of the overpayment determination and the limitation on recoupment under** section1893 (f)(2)(a) of the Social Security Act **does not apply to rebuttal requests.** We will review your rebuttal documentation and determine whether the facts justify ceasing the recoupment or offset. Our office will advise you of our decision 15 days from the mailroom-stamped receipt date of your request.

**Interest Assessment:**

**If you do not refund in 30 days:**

In accordance with 42 CFR 405.378, simple interest at the rate of 10.125% will be charged on the unpaid balance of the overpayment, beginning on the 31st day. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made on time. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged. Each payment will be applied first to accrued interest and then to principal. After each payment, interest will continue to accrue on the remaining principal balance, at the rate of 10.125%.

**Suspended Funds Applied To The Overpayment and Has a Remaining Outstanding Balance:**

If the suspended funds are insufficient to fully eliminate any overpayment, and the provider or supplier meets the requirements of 42 CFR section 405.379 "Limitation on Recoupment" provision under section1893(f) (2) of the Act, then the provider or supplier is subject to 935 Appeals rights and will be available for offset after 41 days on the remaining balance still owed to CMS. (See 42 CFR section 405.372(e) for more information.)

**Payment by Recoupment:**

If payment in full is not received by 12/31/2022, **payments** to you can be recouped (recoupment) until payment in full is received if you haven't submitted an acceptable ERS request, an immediate recoupment request, and/or a valid and timely appeal is received.

**Make a payment or Arrange for payments:**

What you should do:

Please return the overpaid amount to us by 12/20/2022 and no interest will be assessed. We request that you refund this amount in full.

Make the check payable to Medicare Part B and send it with a copy of this letter to:

> WPS Government Health Administrators
> Payment Recovery
> P.O. Box 8215
> Madison, WI 53708-8215

If you are unable to refund the entire amount at this time, advise this office immediately, with a request for an **Extended Repayment Schedule (ERS)** so that we may determine if you are eligible for one. Any repayment schedule (where one is approved) would run from the date of the ERS review approval date.

**You can visit our website at www.wpsgha.com for the ERS Request instructions.**

**Immediate Recoupment:**

**TO SIMPLIFY THE REPAYMENT PROCESS,** reduce the extra work and cost associated with mailing your repayment each time, you may elect to have automatic immediate recoupments for ALL overpayments by requesting the **Immediate Recoupment** process for All Current and Future Accounts Receivable. This will automatically begin recoupment starting on day 16 for ALL future accounts receivable. When the initial request is received after day 16 the debt shall be placed in an immediate recoupment status. If the debt is not collected in full before day 31, interest will continue to accrue until the debt is collected in full.

You must specify whether you are submitting:

1. A request on the current demanded overpayment (all accounts receivables within this demand letter) and ALL FUTURE OVERPAYMENTS; or

2. A one-time request on this current demanded overpayment (all accounts receivables) addressed in this demand letter only.

**You can visit our website at www.wpsgha.com for the Immediate Recoupment Request**

**instructions.**

You may contact this office for information on how to fax your request.

This process is voluntary and for your convenience. Your request must specifically state you understand you are waiving potential receipt of interest payment pursuant to § 1893(f) (2) for the overpayments.

**Note:** Such interest may be payable for certain overpayments reversed at the ALJ level or subsequent levels of appeal.

**If You Wish To Appeal This Decision**

If you disagree with this overpayment decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claims. The first level of appeal is called a redetermination. You must file your request for a redetermination 120 days from the date of this letter. However, if you wish to avoid recoupment from occurring, you need to file your request for redetermination within 30 days from the date of this letter, as described above. Unless you show us otherwise, we assume you received this letter within 5 days of the date of this letter.

Please send your request for redetermination to:

> WPS Government Health Administrators - 935 APPEALS
> REDETERMINATION
> Appeals Department
> P.O. Box 14260
> Madison, WI 53708-0260

**How to Stop Recoupment:**

Even if the overpayment and any assessed interest has not been paid in full, you can temporarily stop Medicare from recouping any payments. **If you act quickly and decidedly,** Medicare will stop recoupment at two points.

**First Opportunity:** We must receive a valid and timely request for a redetermination within 30 days from the date of this letter. We will stop or delay recoupment pending the results of an appeal. To assist us in expeditiously stopping the recoupment process, we request that you clearly indicate on your appeal request that this is a 935 overpayment appeal for a redetermination.

**Second Opportunity:** If the redetermination decision is (1) **unfavorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare redetermination notice (Medicare Appeal Decision Letter); or (2) if the decision is **partially favorable,** we will begin to recoup no earlier than the 60th day from the date of the Medicare revised overpayment

Notice/Revised Demand Letter. Therefore, it is important to act quickly and decidedly to limit recoupment by submitting a valid and timely request for reconsideration within 60 days of the appropriate notice/letter. The address and details on how to file a request for reconsideration will be included in the Redetermination decision letter.

## What Happens Following a Reconsideration By a Qualified Independent Contractor (QIC):

Following a **decision or dismissal** by the QIC, if the debt has not been paid in full, we will begin or resume recoupment whether or not you appeal to the next level, Administrative Law Judge (ALJ). **NOTE:** Even when recoupment is stopped, interest continues to accrue.

## Medicaid Offset:

If this matter is not resolved, CMS may instruct the Medicaid State Agency to withhold the Federal share of any Medicaid payments that may be due you or related facilities until the full amount owed Medicare is recouped; Title 42 CFR, section 447.30(g). These recoveries will be in addition to any recoupments from other Medicare funds due you until the full amount owed to Medicare is recovered.

## Right to Inspect Records Prior to Referral to Treasury:

In the event an Intent to Refer (ITR) letter is sent, you have the right to inspect and copy all records pertaining to your debt. In order to present evidence or review the CMS records, you must submit a written request to the address below. Your request must be received within 60 calendar days from the ITR letter date. In response to a timely request for access to CMS' records, you will be notified of the location and time when you can inspect and copy records related to this debt. Interest will continue to accrue during any review period. Therefore, while review is pending, you will be liable for interest and related late payment charges on amounts not paid by the due date identified above.

## For Individual Debtors Filing a Joint Federal Income Tax Return:

The Treasury Offset Program automatically refers debts to the Internal Revenue Service (IRS) for Offset. Your Federal income tax refund is subject to offset under this program. If you file a joint income tax return, you should contact the IRS before filing your tax return to determine the steps to be taken to protect the share of the refund, which may be payable to the non-debtor spouse.

## For Debtors that Share a Tax Identification Number(s):

Section 1866(j)(6) of the Social Security Act authorizes the Secretary of Health and Human Services (the Secretary) to make any necessary adjustments to the payments of an applicable provider or supplier who shares a TIN with an obligated provider or supplier, one that has an outstanding Medicare overpayment. The Secretary is authorized to adjust the payments of

such a provider or supplier regardless of whether it has been assigned a different billing number or National Provider Identification Number (NPI) from that of the provider or supplier with the outstanding Medicare overpayment.

**Federal Salary Offset:**

If the facility ownership is either a sole proprietorship or partnership, your individual salary(s) may be offset if you are, or become, a federal employee.

**If you have filed a bankruptcy petition:**

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy, please include the name in the bankruptcy is filed under and the district where the bankruptcy is filed.

Should you have any questions, please contact your overpayment consultant at the following:

Part B Immediate Recoupment - Fax: 608-223-7550
Part B Extended Repayment Request: 866-518-3285
Provider - Part B: 866-518-3285

We look forward to hearing from you shortly.

Sincerely,


Medicare Part B Recovery Unit
WPS Government Health Administrators

Enclosures
How This Overpayment Was Determined

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 2695-2702

Exhibit H

**CCN: KS 5422349094000 – Advanced Dermatology KS**

**Date: 1/27/2022**

Sarah Braun, LPN
Medical Management LPN2
Government Health Administrators
Medicare Part B

This redetermination decision has been rendered based upon the review of the documentation by our medical staff.

You requested a redetermination for beneficiary claims representing a total of 131 lines of wound care services.  The billed services include the following Healthcare Common Procedure Coding System (HCPCS) and Current Procedural Terminology (CPT) codes:

HCPCS code J0696- injection, ceftriaxone, sodium, per 250 milligrams (mg)

HCPCS code Q4169- artacent wound, per sq cm

HCPCS code Q4186- epifix, per sq cm

CPT code 15271- application of skin substitutes graft to wound of trunk, arms or legs, 25.0 sq cm of less of wound 100 sq cm or less

CPT code 15272- application of skin substitutes graft to wound of trunk, arms or legs, 25.0 sq cm of less of wound 100 sq cm or less, each additional 25.0 sq cm wound surface area, or part thereof

CPT code 15275- application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

CPT code 15276- application of skim substitutes graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; each additional sq cm wound surface area, or part thereof

CPT code 97608- therapy procedure using special bandage, vacuum pump and disposable medical equipment, surface area more than 50.0 sq cm

CPT code 99212- established patient office or other outpatient visit, 10-19 minutes

The submitted records were reviewed in order to ascertain if the services set forth in the claims were medically reasonable and necessary, and met all other pertinent Medicare payment

requirements.  We considered the documentation contained in the case files received from the CoventBridge Group (f/k/a Advanced Med) Medical Review Department as well as the records submitted with your redetermination.

Please see the enclosed WPS Redetermination Form detailing the individual decisions.  The redetermination decisions can be found in the column titled "WPS Redetermination Outcome."  Please refer to the legend located at the bottom of the form.  Further details of the decisions will be explained throughout this section.

The determination of medical necessity for the service(s) in question is an essential element in determining whether payment for services was appropriate.  While at no time does Medicare tell providers how to practice medicine, it does establish guidelines stating that medical necessity must be documented in the medical record in order for a service to be reimbursed.

The Regional Office of the Centers for Medicare and Medicaid Services (CMS) and this Medicare Part B Carrier have agreed upon the following definition of medical necessity:

> *A service, treatment, procedure, equipment, drug, device or supply provided by a hospital, physician, or other health care provider that is required to identify or treat a beneficiary's illness or injury and which is, as determined by the contractor:  (a) consistent with the symptom(s) or diagnosis and treatment of the beneficiary's illness or injury; (b) appropriate under the standards of acceptable medical practice to treat that illness or injury; (c) not solely for the convenience of the participant, physician, hospital, or other health care provider; and, (d) the most appropriate service, treatment, procedure, equipment, drug, device or supply which can be safely provided to the beneficiary and accomplishes the desired end result in the most economical manner.*

Title XVIII of the Social Security Act section 1862 (a)(1)(A) states no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Title XVIII of the Social Security Act section 1833 (e) addresses documentation and states: No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider.

As published in the CMS IOM Publication 100-8, Section 13.5.1, in order to be covered under Medicare, a service shall be reasonable and necessary. The service provided should have an appropriate duration and frequency in terms of whether it is:

1. Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member.
2. Furnished in a setting appropriate to the patient's medical needs and condition.
3. Ordered and furnished by qualified personnel.

4.  One that meets but does not exceed, the patient's medical needs and at least as beneficial as an existing and available medically appropriate alternative.

The determination of medical necessity for the service(s) in question is an essential element in determining whether payment for services was appropriate.  While at no time does Medicare tell providers how to practice medicine, it does establish guidelines stating that medical necessity must be documented in the medical record in order for a service to be reimbursed.

The Code of Federal Regulations, Title 42 - Public Health, Volume 3, Part 424, Section 424.5(6) Basic

Conditions – Sufficient Information requires that the documentation must be sufficient to support the services billed.

General principles of medical record documentation include:

1.  The medical record should be complete and legible.
2.  The documentation of each patient encounter should include:
    • Reason for encounter and relevant history, physical examination findings, and pertinent diagnostic test results;
    • Assessment, clinical impression, or diagnosis;
    • Plan for care; and
    • Date and legible identity of the observer.
3.  If not documented, the rational for ordering diagnostic and other ancillary services should be easily inferred.
4.  Past and present diagnoses should be accessible to the treating and/or consulting physician.
5.  Appropriate health risk factors should be identified.
6.  The patient's progress, response to and changes in treatment, and revision of diagnosis should be documented.
7.  The CPT and International Classification of Diseases, 10th Revision, Clinical Modification (ICD-10-CM) codes reported on the health insurance claim form should be supported by the documentation in the medical record.

**Finding No. 1:  Submitted documentation failed to support that the billed services were reasonable and necessary, ordered as billed and rendered as billed.**

This decision was made in accordance with Title XVIII of Social Security Act, Section 1862 (a)(1)(A).   Medicare coverage and payment are only allowed for those services that are

considered medically reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Records were submitted for review. The documentation supported the services were provided as billed. However, the records did support off label-use and did not contain medical literature to support the medical necessity of the services billed. The documentation did not support the services were medically reasonable and necessary.

Of the 131 lines of service reviewed, 18 lines of service of Q4169 and 39 lines of service of Q4186 have been denied as the submitted medical records did not meet guidelines requirements to demonstrate the medical necessity of the services. Therefore, payment cannot be made. These decisions have been given the designation: **F1** (Finding 1 - Documentation failed to support the billed services were medically reasonable and necessary) on the attached spreadsheets.

**Finding No. 2:** Documentation did not support the E & M services were a separate service from the procedures billed.

The E & M services were billed with modifier 25, indicating a significant, separately identifiable E & M service by the same physician or other qualified health care professional on the same day of a procedure or other service. The documentation did not support the E & M services were for a significant and separately identifiable reason from the procedures that were billed on the same dates of service.

Of the 131 lines of service reviewed, four lines of service of 99212, have been denied as the documentation did not support the E & M services were a separate service from the procedure billed. Therefore, payment cannot be made. These decisions have been given the designation: **F2** (Finding 2 – Documentation did not support the E & M services were a separate service from the procedures billed) on the attached spreadsheets.

**Finding 3:** The submitted documentation does not support the services were rendered and medical necessity for the billed service.

According to the Wisconsin Physicians Association, LCD L37228, Wound Care, requires that for wound care to be considered reasonable and necessary the provider must support the beneficiary is eligible for a defined Medicare benefit category, be reasonable and necessary and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member and meet all other applicable Medicare statutory and regulatory requirements

The documentation supported the patient was seen for follow up of wound services. The documentation did not support the patient starting a wound vacuum as part of the plan of care. The documentation did not support a reason for the wound vacuum application, nor was there documentation of the examination of the wound on the date of service billed. Therefore, the service remains denied.

Of the 131 lines of services reviewed, one line of service has been denied with the CPT code of 97608, as the documentation did not support Medicare guidelines were met for coverage. Therefore, payment cannot be made. These decisions have been given the designation: **F3 (Finding 3 – Documentation did not support the services were rendered and medically reasonable and necessary**) on the attached spreadsheet.

**Finding No. 4:** Submitted documentation failed to support the billed services were rendered and reasonable and necessary.

The services were billed in conjunction with other services that were determined not to be medically reasonable and necessary. The documentation did not support the services were provided for any other reason than the administration of the services as no explanation was given for the therapeutic options.

Of the 131 lines of service reviewed, one line of service billed with HCPCS code J0696, eight lines of services billed with CPT code 15271, one line of service billed with CPT code 15272, 52 lines of service billed with CPT code 15275 and seven lines of service billed with CPT code 15276, have been denied as they were billed in conjunction with services that were denied as not medically reasonable and necessary. Therefore, payment cannot be made. These decisions have been given the designation: **F4 (Finding 4 - Services were billed in conjunction with services that were denied as not medically reasonable and necessary**) on the attached spreadsheets.

**Conclusion**
In summary, the findings are as follows:

- The documentation did not support the services were medically reasonable and necessary
- The documentation did not support the services were a separate service from the procedures billed
- The documentation did not support the medical necessity for the billed wound care services
- The services were billed in conjunction with services that were denied as not medically reasonable and necessary

This redetermination decision was based on the following references:

- The Social Security Act which is available at https://www.ssa.gov

Section 1862 (a)(1)(A)

Section 1833 (e)

- The Code of Federal Regulations, Title 42 – Public Health, Volume 3, Part 424, Section 424.5(6) Basic Conditions
- The Centers for Medicare & Medicaid (CMS) Internet Only Manual (IOM) which is available at https://www.cms.gov
- The Code of Federal Regulations, Title 21 – Food and Drugs, Volume 8, Part 1271, Section 10 Human Cells, Tissues and Cellular and Tissue-Based Products
  Publication 100-2, Medicare Benefit Policy Manual, Chapter 16, Section 20
  Publication 100-8, Medicare Program Integrity Manual, Chapter 4, Section 4.3
- Wisconsin Physicians Service Local Coverage Determination: Billing and Coding: Wound Care (L37228),  Located on the Internet at www.cms.gov/medicare-coverage-database
- Current Procedural Terminology (CPT) Manual, Professional Editions 2022
- Healthcare Common Procedure Coding System (HCPCS) Manual 2022

If you do not have access to the internet or CPT/HCPCS manuals, you may request a copy of the references used by calling us toll free at

 

July 8, 2022

COVENTBRIDGE
THINK TRUTH

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943

Re:    **Post Payment Medical Records Request (Kansas)**
       **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
       **110568010**
       **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

    A contractor may reopen and revise its initial determination or redetermination on its own motion--

            1)    Within one year from the date of the initial determination or redetermination for any reason.
            2)    Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. II                                                                                    2709

File 15 pdf - Page 1 of 8574

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—
        1) There is new and material evidence that—
            i) Was not available or known at the time of the determination or decision; and
            ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

### For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——

    (A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

    (B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

        (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——

    (A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

    (B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

    (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 2714

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center, LLC, PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_Elizabeth Robledo, Co-office Manager_
Custodian of records and Job Title        (Print)


_Elizabeth Robledo_                              _8/19/2022_
Custodian of records              (Signature)          (Date)


_John R. Adams, M.D._
Physician/Supplier              (Print)


_[signature]_                                    _8/19/2022_
Physician/Supplier              (Signature)          (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- ✓ Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- ✓ All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

- ✓ • **Laboratory test results, if applicable**
- • **All documentation related to operative procedures performed, including:**
  - o **Consent forms**
  - o **Intra-operative or Intra-procedural notes**
  - o **Anesthesia notes**
  - o **Nursing notes**
  - o **Post-anesthesia care notes**
  - o **Operative or procedural reports**
  - o **Medication administration records**
- ✓ • Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- ✓ • Copy of Medicare card and state identification card (driver's license or state identification)
- • Consent for treatment, authorizing service
- • Advanced Beneficiary Notice (ABNs)
- • Legends, keys, or acronym lists to assist with understanding documentation
- • Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- • Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- • If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- ✓ • If electronic health records (EHR), complete EHR audit trails

- • Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- • Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- • Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- • Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- • Copy of all order forms for skin substitutes and wound care products in the last 12 months
- • Copy of any rebates for skin substitutes and wound care products in the last 12 months
- • Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- • Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 2718-3208

 

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re:    **Post Payment Medical Records Request (Kansas)**
       **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
       **110568010**
       **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--

> > 1) Within one year from the date of the initial determination or redetermination for any reason.

> > 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. II                                                                                    3209

File 15 pdf - Page 501 of 8574

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause.  Good cause may be established when-
        1) There is new and material evidence that--
            i) Was not available or known at the time of the determination or decision; and
            ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause.  The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list.  Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

2116 Southwest Boulevard | Grove City, Ohio  43123    Contract HHSM-500-2016-00079/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com    UPIC Midwestern Jurisdiction

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number.  Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval.  [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations.  When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations.  CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.  If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a)  *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

2118 Southwest Boulevard | Grove City, Ohio  43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                       UPIC Midwestern Jurisdiction

Post Payment Medical Records Request                                    Page 5 of 9

10)  *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f)  *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A)  Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B)  Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)  A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A)  Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B)  Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 3214

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo  Co-office Manager
Custodian of records and Job Title       (Print)

Elizabeth Robledo
Custodian of records              (Signature)                    8/19/2022
(Date)

John R. Adams M.D.
Physician/Supplier              (Print)

Physician/Supplier              (Signature)                    8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - ○ **Consent forms**
  - ○ **Intra-operative or Intra-procedural notes**
  - ○ **Anesthesia notes**
  - ○ **Nursing notes**
  - ○ **Post-anesthesia care notes**
  - ○ **Operative or procedural reports**
  - ○ **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- ✓ If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 3218-3248




July 8, 2022

COVENTBRIDGE
THINK TRUTH
AUG 2 4 2022
RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:    **Post Payment Medical Records Request (Kansas)**
       **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
       **110568010**
       **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment. We are requesting additional information to properly evaluate these
claims. Please review the directions and information in this letter. **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:
       A contractor may reopen and revise its initial determination or redetermination on its own
       motion~
              1)   Within one year from the date of the initial determination or
                   redetermination for any reason.
              2)   Within four years from the date of the initial determination or
                   redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—
        1) There is new and material evidence that—
            i)   Was not available or known at the time of the determination or decision; and
            ii)  May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

Post Payment Medical Records Request                                         Page 5 of 9

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——

  (A)  Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

  (B)  Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

    (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——

  (A)  Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

  (B)  Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

  (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 3254

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo  Co-office Manager
Custodian of records and Job Title        (Print)

Elizabeth Robledo _____        8/19/2022
Custodian of records            (Signature)                (Date)

JOHN R. ADAMS M.D.
Physician/Supplier            (Print)

_____        8/19/2022
Physician/Supplier            (Signature)                (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2561 | http://coventbridge.com

Contract HHSM-500-2016-00079H/HHSM-500-T0001
UPIC Midwestern Jurisdiction

Post Payment Medical Records Request                                      Page 8 of 9

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - o  **Consent forms**
  - o  **Intra-operative or Intra-procedural notes**
  - o  **Anesthesia notes**
  - o  **Nursing notes**
  - o  **Post-anesthesia care notes**
  - o  **Operative or procedural reports**
  - o  **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- ✓ If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 3258-3748



July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:    **Post Payment Medical Records Request (Nebraska)**
       **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
       **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion—
>
> > 1) Within one year from the date of the initial determination or redetermination for any reason.
> > 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                UPIC Midwestern Jurisdiction

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—

        1) There is new and material evidence that—

            i)     Was not available or known at the time of the determination or decision; and

            ii)    May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- ✓ **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- ✓ Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- ✓ Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079i/HHSM-500-T0001
ph 614.801.6495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

**The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.** 

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

    a)  *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

    (A)    Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

    (B)    Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

        (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

    (A)    Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

    (B)    Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

    (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 3755

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_____
Custodian of records and Job Title       (Print)


_____                      _____
Custodian of records                     (Signature)                      (Date)


_____
Physician/Supplier                       (Print)


_____                      _____
Physician/Supplier                       (Signature)                      (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123                Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                          UPIC Midwestern Jurisdiction

<u>Acknowledgement of Completion</u>

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)

_Elizabeth Robledo_ _____        _8/19/2022_
Custodian of records        (Signature)                    (Date)

_John R. Adams M.D_ _____
Physician/Supplier        (Print)

_(signature)_ _____        _8/19/2022_
Physician/Supplier        (Signature)                    (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
- 

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://covenbridge.com          UPIC Midwestern Jurisdiction

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. II                                                                                          3759

File 15 pdf - Page 1051 of 8574

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 3760-4248

 

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:     **Post Payment Medical Records Request (Nebraska)**
        **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
        **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth in 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion—
>
>> 1) Within one year from the date of the initial determination or redetermination for any reason.
>> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

      a) Establishing good cause. Good cause may be established when—
          1) There is new and material evidence that—
             i)     Was not available or known at the time of the determination or decision; and
             ii)    May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. II                                                                4250

File 15.pdf - Page 1542 of 8574

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079i/HHSM-500-T0001
ph 614.801.6495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

**If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number.   Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval.   [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]**

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations.  When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations.  CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.  If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

   a)  *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

   (A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

   (B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

      (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

   (A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

   (B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

   (ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnson@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

2118 Southwest Boulevard | Grove City, Ohio  43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079i/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. II                                                                                                     4254

File 15 pdf - Page 1546 of 8574

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 4255

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_____
Custodian of records and Job Title    (Print)


_____          _____
Custodian of records          (Signature)                (Date)


_____
Physician/Supplier          (Print)


_____          _____
Physician/Supplier          (Signature)                (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

<u>Acknowledgement of Completion</u>

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Roberto  Co-office Manager
Custodian of records and Job Title      (Print)

Elizabeth Roberto
Custodian of records          (Signature)

8/19/2022
(Date)

JOHN R. ADAMS, M.D.
Physician/Supplier          (Print)

Physician/Supplier          (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-000791/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com          UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

### For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 4354-4759

 

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:     **Post Payment Medical Records Request (Nebraska)**
        **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
        **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion—
>> 1)   Within one year from the date of the initial determination or redetermination for any reason.
>> 2)   Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1]  UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—

        1) There is new and material evidence that—

            i)    Was not available or known at the time of the determination or decision; and

            ii)    May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

2118 Southwest Boulevard | Grove City, Ohio 43123                Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                          UPIC Midwestern Jurisdiction

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079i/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

**The HIPAA Privacy Rule permits disclosure of protected health information or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]**

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

    (A)    Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

    (B)    Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

        (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

    (2)(i)    A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

        (A)    Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

        (B)    Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

    (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614)-782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 4766

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_____
Custodian of records and Job Title        (Print)

_____                    _____
Custodian of records              (Signature)                      (Date)

_____
Physician/Supplier                (Print)

_____                    _____
Physician/Supplier                (Signature)                      (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com              UPIC Midwestern Jurisdiction

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)


_Elizabeth Robledo_                           _8/19/2022_
Custodian of records            (Signature)            (Date)


_John R. Adams M.D_
Physician/Supplier                (Print)


_[signature]_                                  _8/19/2022_
Physician/Supplier            (Signature)            (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123            Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 4771-5131

month
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

VOL. II

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

File 15.pdf - Page 2445 of 8574

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1

1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
1
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

  

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re:    **Post Payment Medical Records Request (Nebraska)**
       **Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
       **Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion—
>> 1) Within one year from the date of the initial determination or redetermination for any reason.
>> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—

        1) There is new and material evidence that—

            i)    Was not available or known at the time of the determination or decision; and

            ii)    May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

2118 Southwest Boulevard | Grove City, Ohio 43123                    Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                      UPIC Midwestern Jurisdiction

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10)  *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f)  *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—
   (A)  Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and
   (B)  Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).
      (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)  A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—
   (A)  Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and
   (B)  Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).
  (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

2118 Southwest Boulevard | Grove City, Ohio  43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079i/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. II                                                                                                                    5275

File 15 pdf - Page 2567 of 8574

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 5277

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _____ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_____
Custodian of records and Job Title      (Print)

_____      _____
Custodian of records          (Signature)          (Date)

_____
Physician/Supplier                  (Print)

_____      _____
Physician/Supplier            (Signature)          (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Robledo   Co-office Manager_
Custodian of records and Job Title        (Print)

_Elizabeth Robledo_                          _8/19/2022_
Custodian of records        (Signature)                      (Date)

_John R. Adams M.D._
Physician/Supplier        (Print)

_(signature)_                                _8/19/2022_
Physician/Supplier        (Signature)                      (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                      UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

Case 2:25-cv-02250-KHV-ADM    Document 14-1    Filed 12/17/25    Page 781 of 1113

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 5282-5559

month
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2

2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
2
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3
3

 

July 8, 2022

COVENTBRIDGE
THINK TRUTH

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:     **Post Payment Medical Records Request (Kansas)**
        **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
        **110568010**
        **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment. We are requesting additional information to properly evaluate these
claims. Please review the directions and information in this letter. **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:
        A contractor may reopen and revise its initial determination or redetermination on its own
        motion--
                1)   Within one year from the date of the initial determination or
                redetermination for any reason.
                2)   Within four years from the date of the initial determination or
                redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. II                                                                                    5782

File 15 pdf - Page 3074 of 8574

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when-

        1) There is new and material evidence that--

            i) Was not available or known at the time of the determination or decision; and

            ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

### For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to----

   (A)    Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

   (B)    Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

      (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to----

   (A)    Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

   (B)    Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

      (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 5787

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center, PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo  Co-office Manager
Custodian of records and Job Title        (Print)

Elizabeth Robledo
Custodian of records              (Signature)          8/19/2022
                                                       (Date)

John R. Adams, M.D.
Physician/Supplier              (Print)

_[signature]_
Physician/Supplier              (Signature)          8/19/2022
                                                       (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- ✓ If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2018-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com          UPIC Midwestern Jurisdiction

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 5791-6281




July 8, 2022


COVENTBRIDGE

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:     **Post Payment Medical Records Request (Kansas)**
        **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
        **110568010**
        **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--

> > 1) Within one year from the date of the initial determination or redetermination for any reason.

> > 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. II                                                                                                              6282

File 15 pdf - Page 3574 of 8574

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when-

        1) There is new and material evidence that--

            i)   Was not available or known at the time of the determination or decision; and

            ii)  May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see* http://www.cms.gov/esMD. *Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

2118 Southwest Boulevard | Grove City, Ohio 43123                Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                        UPIC Midwestern Jurisdiction

Post Payment Medical Records Request                                    Page 5 of 9

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to----
(A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and
(B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).
(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to----
(A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and
(B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).
(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 6287

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)

_Elizabeth Robledo_                                    _8/19/2022_
Custodian of records        (Signature)                  (Date)

_John R. Adams M.D._
Physician/Supplier        (Print)

_(signature)_                                            _8/19/2022_
Physician/Supplier        (Signature)                    (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
✓ - Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
✓ - All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

- ✓ **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - o **Consent forms**
  - o **Intra-operative or Intra-procedural notes**
  - o **Anesthesia notes**
  - o **Nursing notes**
  - o **Post-anesthesia care notes**
  - o **Operative or procedural reports**
  - o **Medication administration records**
- ✓ Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- ✓ Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- ✓ If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com        UPIC Midwestern Jurisdiction

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 6291-6781

  

July 8, 2022

COVENTBRIDGE

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:     **Post Payment Medical Records Request (Kansas)**
        **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
        **110568010**
        **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment. We are requesting additional information to properly evaluate these
claims. Please review the directions and information in this letter. **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:
        A contractor may reopen and revise its initial determination or redetermination on its own
        motion-~

                1)  Within one year from the date of the initial determination or
                redetermination for any reason.
                2)  Within four years from the date of the initial determination or
                redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123              Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com              UPIC Midwestern Jurisdiction

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when–

        1) There is new and material evidence that--

            i) Was not available or known at the time of the determination or decision; and

            ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——

    (A)    Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

    (B)    Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

        (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)  A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——

    (A)    Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

    (B)    Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

    (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 6787

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center, PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)

_Elizabeth Robledo_                          _8/19/2022_
Custodian of records        (Signature)              (Date)

_John R. Adams M D_
Physician/Supplier            (Print)

_[signature]_                                 _8/19/2022_
Physician/Supplier          (Signature)              (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                UPIC Midwestern Jurisdiction

Post Payment Medical Records Request                                                    Page 8 of 9

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    o **Consent forms**
    o **Intra-operative or Intra-procedural notes**
    o **Anesthesia notes**
    o **Nursing notes**
    o **Post-anesthesia care notes**
    o **Operative or procedural reports**
    o **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- ✓ If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

### For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 6791-7281





July 8, 2022

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943

Re:     **Post Payment Medical Records Request (Kansas)**
        **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
        **110568010**
        **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment. We are requesting additional information to properly evaluate these
claims. Please review the directions and information in this letter. **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:
      A contractor may reopen and revise its initial determination or redetermination on its own
      motion-~
            1)   Within one year from the date of the initial determination or
                 redetermination for any reason.
            2)   Within four years from the date of the initial determination or
                 redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause.  Good cause may be established when-

        1) There is new and material evidence that--

            i)    Was not available or known at the time of the determination or decision; and

            ii)    May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause.  The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list.  Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

Post Payment Medical Records Request                                    Page 5 of 9

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——

    (A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

    (B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

      (ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——

    (A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

    (B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

    (ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 7287

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced dermatology and Skin Cancer Center, PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)

_Elizabeth Robledo_                          _8/19/2022_
Custodian of records        (Signature)           (Date)

_John R. Adams M.D._
Physician/Supplier                  (Print)

_[signature]_                                    _8/19/2022_
Physician/Supplier        (Signature)             (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

Post Payment Medical Records Request                                        Page 8 of 9

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- ✓ If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

Post Payment Medical Records Request                                    Page 9 of 9

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 7291-8272




July 8, 2022

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943

Re:    **Post Payment Medical Records Request (Kansas)**
       **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
       **110568010**
       **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment. We are requesting additional information to properly evaluate these
claims. Please review the directions and information in this letter. **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:
        A contractor may reopen and revise its initial determination or redetermination on its own
        motion--
                1)    Within one year from the date of the initial determination or
                redetermination for any reason.
                2)    Within four years from the date of the initial determination or
                redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when-

        1) There is new and material evidence that--

            i) Was not available or known at the time of the determination or decision; and

            ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully

*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

Post Payment Medical Records Request                                      Page 5 of 9

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—
(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and
(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).
(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—
(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and
(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).
(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 8278

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)


_Elizabeth Robledo_                          _8/19/2022_
Custodian of records        (Signature)            (Date)


_John R. Adams, M.D._
Physician/Supplier        (Print)


_[signature]_                                _8/19/2022_
Physician/Supplier        (Signature)            (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com          UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - o **Consent forms**
    - o **Intra-operative or Intra-procedural notes**
    - o **Anesthesia notes**
    - o **Nursing notes**
    - o **Post-anesthesia care notes**
    - o **Operative or procedural reports**
    - o **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- ✓ If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2118 Southwest Boulevard | Grove City, Ohio  43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2018-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. II                                                                 8281

File 15.pdf - Page 5573 of 8574

 

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
THINK TRUTH

AUG 2 4 2022

RECEIVED
GROVE CITY

MR#: 2022_188_534244943
Re:    **Post Payment Medical Records Request (Kansas)**
       **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
       **110568010**
       **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment. We are requesting additional information to properly evaluate these
claims. Please review the directions and information in this letter. **It is critically important that you**
**include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:
   A contractor may reopen and revise its initial determination or redetermination on its own
   motion--
       1)  Within one year from the date of the initial determination or
       redetermination for any reason.
       2)  Within four years from the date of the initial determination or
       redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

Post Payment Medical Records Request                                        Page 2 of 9

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when–

        1) There is new and material evidence that––

            i) Was not available or known at the time of the determination or decision; and

            ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

Post Payment Medical Records Request                                    Page 3 of 9

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A)  Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B)  Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A)  Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B)  Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

2118 Southwest Boulevard | Grove City, Ohio  43123          Contract HHSM-500-2016-000760/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center, PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.


_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)


_Elizabeth Robledo_                                _8/19/2022_
Custodian of records        (Signature)                (Date)


_JOHN R. ADAMS, M.D._
Physician/Supplier        (Print)


_[signature]_                                _8/19/2022_
Physician/Supplier        (Signature)                (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- • Physician/Mid-level practitioner office/progress notes
- • Physician/Mid-level practitioner order(s)
- • History and Physical Examination
- ✓ • Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- • Consultation reports, if applicable
- ✓ • All progress notes, including wound measurements
- • Surgical reports, if applicable
- • Pathology reports, if applicable
- • Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio  43123                Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                        UPIC Midwestern Jurisdiction

- ✓ • **Laboratory test results, if applicable**
  - • **All documentation related to operative procedures performed, including:**
    - o **Consent forms**
    - o **Intra-operative or Intra-procedural notes**
    - o **Anesthesia notes**
    - o **Nursing notes**
    - o **Post-anesthesia care notes**
    - o **Operative or procedural reports**
    - o **Medication administration records**
- ✓ • Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- ✓ • Copy of Medicare card and state identification card (driver's license or state identification)
  - • Consent for treatment, authorizing service
  - • Advanced Beneficiary Notice (ABNs)
  - • Legends, keys, or acronym lists to assist with understanding documentation
  - • Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
  - • Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
  - • If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- ✓ • If electronic health records (EHR), complete EHR audit trails

  - • Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
  - • Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- • Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- • Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- • Copy of all order forms for skin substitutes and wound care products in the last 12 months
- • Copy of any rebates for skin substitutes and wound care products in the last 12 months
- • Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- • Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

Post Payment Medical Records Request                    Page 9 of 9

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 8291-8781

 

July 8, 2022

COVENTBRIDGE
THINK TRUTH
AUG 2 4 2022
RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:     **Post Payment Medical Records Request (Kansas)**
        **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
        **110568010**
        **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
        **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment.  We are requesting additional information to properly evaluate these claims.  Please review the directions and information in this letter.  **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program.  Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1].  As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b).  Regarding timeframes, the regulation provides:
    A contractor may reopen and revise its initial determination or redetermination on its own motion--
            1)   Within one year from the date of the initial determination or redetermination for any reason.
            2)   Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio  43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when—

        1) There is new and material evidence that—

            i) Was not available or known at the time of the determination or decision; and

            ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10)   *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f)   *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——

(A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)   A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——

(A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 8787

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo  Co-office Manager
Custodian of records and Job Title       (Print)

Elizabeth Robledo _____        8/19/2022
Custodian of records          (Signature)          (Date)

John R. Adams M.D _____
Physician/Supplier           (Print)

_____                          8/19/2022
Physician/Supplier           (Signature)          (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
✓ - Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
✓ - All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

Post Payment Medical Records Request                                    Page 8 of 9

- ✓ **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - o **Consent forms**
  - o **Intra-operative or Intra-procedural notes**
  - o **Anesthesia notes**
  - o **Nursing notes**
  - o **Post-anesthesia care notes**
  - o **Operative or procedural reports**
  - o **Medication administration records**
- ✓ Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- ✓ Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- ✓ If electronic health records (EHR), complete EHR audit trails

- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

Post Payment Medical Records Request                                    Page 9 of 9

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com              UPIC Midwestern Jurisdiction

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 8791-9281

 

July 8, 2022

COVENTBRIDGE
THINK TRUTH

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:    **Post Payment Medical Records Request (Kansas)**
       **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and 110568010**
       **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
>> 1) Within one year from the date of the initial determination or redetermination for any reason.
>> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. II                                                                                            9282

File 15 pdf - Page 6574 of 8574

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when-
        1) There is new and material evidence that--
            i) Was not available or known at the time of the determination or decision; and
            ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

   a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

2118 Southwest Boulevard | Grove City, Ohio 43123                    Contract HHSM-500-2016-00079i/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                              UPIC Midwestern Jurisdiction

Post Payment Medical Records Request                                                          Page 5 of 9

10)  *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f)  *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——
   (A)  Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and
   (B)  Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).
      (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)  A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——
   (A)  Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and
   (B)  Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).
   (ii)  The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 9287

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center, LLC_ PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo  Co-office Manager
Custodian of records and Job Title        (Print)

Elizabeth Robledo                          8/19/2022
Custodian of records          (Signature)      (Date)

John R. Adams M.D.
Physician/Supplier            (Print)

_____              8/19/2022
Physician/Supplier            (Signature)      (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
✓ - Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
✓ - All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

Post Payment Medical Records Request                                    Page 8 of 9

- ✓ • **Laboratory test results, if applicable**
  - • **All documentation related to operative procedures performed, including:**
    - o **Consent forms**
    - o **Intra-operative or Intra-procedural notes**
    - o **Anesthesia notes**
    - o **Nursing notes**
    - o **Post-anesthesia care notes**
    - o **Operative or procedural reports**
    - o **Medication administration records**
- ✓ • Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- ✓ • Copy of Medicare card and state identification card (driver's license or state identification)
  - • Consent for treatment, authorizing service
  - • Advanced Beneficiary Notice (ABNs)
  - • Legends, keys, or acronym lists to assist with understanding documentation
  - • Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
  - • Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
  - • If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- ✓ • If electronic health records (EHR), complete EHR audit trails

  - • Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
  - • Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

  - • Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
  - • Copy of all Invoices for skin substitutes and wound care products in the last 12 months
  - • Copy of all order forms for skin substitutes and wound care products in the last 12 months
  - • Copy of any rebates for skin substitutes and wound care products in the last 12 months
  - • Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
  - • Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2018-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. II                                                                     9290

File 15 pdf - Page 6582 of 8574

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 9291-9781

     

July 8, 2022

COVENTBRIDGE
THINK TRUTH

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:   **Post Payment Medical Records Request (Kansas)**
      **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
      **110568010**
      **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
      **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment. We are requesting additional information to properly evaluate these
claims. Please review the directions and information in this letter. **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:
      A contractor may reopen and revise its initial determination or redetermination on its own
      motion--
            1)   Within one year from the date of the initial determination or
            redetermination for any reason.
            2)   Within four years from the date of the initial determination or
            redetermination for good cause as defined in § 405.986...

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a)  Establishing good cause.  Good cause may be established when-

        1)  There is new and material evidence that--

            i)  Was not available or known at the time of the determination or decision; and

            ii)  May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause.  The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list.  Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

2116 Southwest Boulevard | Grove City, Ohio  43123                Contract HHSM-500-2016-00079/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                                    UPIC Midwestern Jurisdiction

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——

    (A)    Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

    (B)    Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

        (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——

    (A)    Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

    (B)    Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

    (ii)    The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 9787

<u>Acknowledgement of Completion</u>

Upon fulfilling the request for records, I certify that _Advanced dermatology and Skin Cancer Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Robledo  Co-office Manager_
Custodian of records and Job Title        (Print)

_Elizabeth Robledo_ _____        _8/19/2022_
Custodian of records        (Signature)        (Date)

_John R. Adams M.D._ _____
Physician/Supplier        (Print)

_____        _8/19/2022_
Physician/Supplier        (Signature)        (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com        UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
✓ • If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 9791-10281





July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943

Re:    **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

A contractor may reopen and revise its initial determination or redetermination on its own motion--

1)   Within one year from the date of the initial determination or redetermination for any reason.

2)   Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio  43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

VOL. II                                                                                               10282

File 15 pdf - Page 7574 of 8574

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

   a) Establishing good cause. Good cause may be established when–
      1) There is new and material evidence that--
         i)   Was not available or known at the time of the determination or decision; and
         ii)  May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

### For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

### Directions for esMD Submission: please read carefully
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

2118 Southwest Boulevard | Grove City, Ohio 43123          Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

10)   *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f)   *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to——

(A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)   A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to——

(A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio  43123

Your cooperation and prompt reply is requested.  If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 10287

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that *Advanced dermatology and Skin Cancer Center PA* provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title        (Print)

Elizabeth Robledo                          8/19/2022
Custodian of records          (Signature)          (Date)

John R. Adams M.D.
Physician/Supplier          (Print)

_____          8/19/2022
Physician/Supplier          (Signature)          (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- ✓ If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

### For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

Post Payment Medical Records Request                                    Page 9 of 9

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 10291-10781





July 8, 2022

COVENTBRIDGE
THINK TRUTH

AUG 2 4 2022

RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943
Re:    **Post Payment Medical Records Request (Kansas)**
       **Provider/Supplier Medicare ID Number(s): 110568, 858601, 110568008, 110568009, and**
       **110568010**
       **Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
       **Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you
previously submitted for payment. We are requesting additional information to properly evaluate these
claims. Please review the directions and information in this letter. **It is critically important that you
include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the
Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with
entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction
Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity
Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge")
is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity
activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated
by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:
    A contractor may reopen and revise its initial determination or redetermination on its own
    motion—
        1)  Within one year from the date of the initial determination or
        redetermination for any reason.
        2)  Within four years from the date of the initial determination or
        redetermination for good cause as defined in § 405.986…

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,
Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

    a) Establishing good cause. Good cause may be established when-
        1) There is new and material evidence that--
            i)  Was not available or known at the time of the determination or decision; and
            ii) May result in a different conclusion ...

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**
*CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).*

*If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.*

*If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.*

*If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]*

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a)  *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to----

(A)   Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B)   Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i)   A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to----

(A)   Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B)   Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii)   The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGE 10787

### Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Advanced Dermatology and Skin Cancer Center Center PA_ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

_Elizabeth Roberto  Co-office Manager_
Custodian of records and Job Title        (Print)

_Elizabeth Roberto_                                        _8/19/2022_
Custodian of records        (Signature)                       (Date)

_John R. Adams M.D._
Physician/Supplier        (Print)

_[signature]_                                        _8/19/2022_
Physician/Supplier        (Signature)                       (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- Physician/Mid-level practitioner office/progress notes
- Physician/Mid-level practitioner order(s)
- History and Physical Examination
- Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment
- Consultation reports, if applicable
- All progress notes, including wound measurements
- Surgical reports, if applicable
- Pathology reports, if applicable
- Radiology reports, if applicable

2118 Southwest Boulevard | Grove City, Ohio 43123        Contract HHSM-500-2016-00079H/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com                UPIC Midwestern Jurisdiction

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - o **Consent forms**
  - o **Intra-operative or Intra-procedural notes**
  - o **Anesthesia notes**
  - o **Nursing notes**
  - o **Post-anesthesia care notes**
  - o **Operative or procedural reports**
  - o **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

2118 Southwest Boulevard | Grove City, Ohio  43123            Contract HHSM-500-2016-00079I/HHSM-500-T0001
ph 614.801.0495 | fax 614.801.2301 | http://coventbridge.com                    UPIC Midwestern Jurisdiction

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. II, PAGES 10791-11281

| | |
|---|---|
| **From:** | Jensen, David |
| **Sent:** | Thursday, April 20, 2023 1:21 PM |
| **To:** | Shawndrika Houston |
| **Cc:** | Horn, Brenda |
| **Subject:** | [EXTERNAL] 1-12683356911 Supporting Documentation |

**ATTENTION:** This message originated from an **EXTERNAL** source. Please exercise caution when opening attachments, clicking on links, or replying.

The supporting documentation for the below appeal has been sent thru the Secure-EDI process. You should be receiving an email shortly with a link to retrieve it. Please feel free to reach out if you have any questions.

1-12683356911

Thank You

**David Jensen**
*Sr. Redetermination Analyst*
WPS Government Health Administrators

CONFIDENTIALITY NOTICE: This e-mail, including any attachments, may contain confidential, privileged and/or proprietary information which is solely for the use of the intended recipient(s). Any review, use, disclosure, or retention by others is strictly prohibited. If you are not an intended recipient, please contact the sender and delete this e-mail, any attachments, and all copies.