WPS GOVERNMENT HEALTH ADMINISTRATORS

Wisconsin Physicians Service Insurance Corporation
*A CMS Medicare Contractor*
1717 W. Broadway | P.O. Box 1787 | Madison, WI 53701-1787

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, OH 43123

December 20, 2022
In Any Inquiry Refer To
KS 5422349094000
Beneficiary Identifier
Multiple
Service Dates
Multiple
Service Provided By
Advanced Dermatology PA

Dear CoventBridge:

This letter is to inform you of a redetermination request made to Wisconsin Physicians Service (WPS) by Advanced Dermatology PA – KS-110568 – 1124094867. The CoventBridge tracking number is: OPT-221024-00004.

Please forward the medical records used to determine the $116,450.65 overpayment assessed toward this provider.

Please mail the records to the following address:

Wisconsin Physicians Service
Attn: Dawn Bailey
1000 Factory Outlet Blvd
Suite 106
West Frankfort, IL 62986
Reference Number: KS 5422129438000

If you have any questions, please call me at 618-694-2063. I can be reached through email at samantha.bean@wpsic.com.

Sincerely,

Samantha Bean
Medicare Part B Redeterminations Representative
Wisconsin Physicians Service
A Medicare Contractor

WPS GOVERNMENT HEALTH ADMINISTRATORS

Wisconsin Physicians Service Insurance Corporation
*A CMS Medicare Contractor*
1717 W. Broadway | P.O. Box 1787 | Madison, WI 53701-1787

Date February 06, 2023
In Any Inquiry Refer To
5422349094000
Beneficiary Identifier
Multiple
Internal Control Number
Multiple
Service Date (s)
January 21, 2022, to May 23, 2022
Service Provided By
Advanced Dermatology PA
Service Provided To
Multiple

Foulston Siefkin LLP
Attn: Amanda Wilwert
Ste 1400
7500 College Blvd
Overland Park, KS 66210-4041

Dear Ms. Wilwert,

This letter is to inform you of the decision on your Medicare appeal. An appeal is a new and independent review of a claim. You are receiving this letter because you requested an appeal on behalf of Advanced Dermatology PA for multiple overpayments totaling $116,510.11.

The appeal decision is unfavorable. Medicare cannot make payment for the service(s) at issue in your appeal.

More information on the decision is provided below. If you disagree with the decision, you may appeal to a Qualified Independent Contractor (QIC). Your appeal of this decision must be made in writing and received by the QIC within 180 days of receipt of this letter. You are presumed to have received this decision five days from the date of the letter unless there is evidence to show otherwise. However, if you do not wish to appeal this decision, you are not required to take any action. For more information on how to appeal this decision, see the section at the end of this letter entitled, "Important Information about Your Appeal Rights".

Wisconsin Physicians Service (WPS) was contracted by Medicare to review your appeal.

Provider: Advanced Dermatology PA
Dates of Service: January 21, 2022, to May 23, 2022
Type of Service: Application of skin substitute graft to wound (procedure codes 15271, 15272, 15275, and 15276), therapy procedure using a special bandage, vacuum pump and disposable medical equipment (procedure code 97608), established patient office or outpatient visit (procedure code 99212), ceftriaxone sodium injection (procedure code J0696), artacent wound (procedure code Q4169), and epifix (procedure code Q4186)

Initial determinations on these claims were made on various dates. Advanced Dermatology PA was

notified of an overpayment in the amount of $116,450.65 by the Unified Program Integrity Contractor (UPIC), in a letter dated November 10, 2022. Review indicates that the services billed to Medicare by Advanced Dermatology PA did not meet Medicare coverage requirements. The primary findings on this review were:

- The documentation sent did not support the services were reasonable and necessary.
- The documentation sent did not support the services were rendered as billed.
- The documentation sent supported the services were related to non-covered/denied primary services.

WPS issued four overpayment demand letters to Advanced Dermatology PA with instructions to submit an appeal or make a refund. At this time, the overpayment has not been satisfied.

WPS received a redetermination request on December 15, 2022. The redetermination request alleges that this overpayment was assessed in error. An appointment of representative form, literature for allografts, procedure code(s) information, copies of the patient's insurance cards and identification cards, intake forms, visit notes, pathology reports, a copy of letters from CoventBridge, the UPIC, literature for wound care, a copy of retired Local Coverage Determination (LCD) L345693, literature for Mohs defect repair, a copy of a medical policy from Blue Cross Blue Shield for amniotic membrane and amniotic fluid, package insert for EpiFix, and copies of the overpayment letters were submitted with the redetermination request.

The overpayment is a result of findings identified from claims reviewed by the UPIC and communicated in the letter dated November 10, 2022. A summary of the overpayment demand letters and amount of each overpayment is listed in the following table. The difference in the overpayment amounts is due to a claim for REDACTED for date(s) of service February 12, 2022, reprocessed and applied part of the payment to the Medicare Part B 2022 deductible.

| Date of Overpayment Letter | Overpayment Letter Number | Amount of Overpayment | Type of Overpayment |
|---|---|---|---|
| November 21, 2022 | 31377512 | $46,834.65 | Specific Claims |
| November 21, 2022 | 31378432 | $41,354.99 | Specific Claims |
| November 23, 2022 | 31448324 | $6,365.64 | Specific Claims |
| November 23, 2022 | 31448423 | $21,954.83 | Specific Claims |
| | **Total** | **$116,510.11** | |

DECISION

The result of this redetermination is that these claims are not covered by Medicare. It has also been determined that the overpayment of $116,510.11 is valid.

EXPLANATION OF THE DECISION

This redetermination decision has been rendered based upon the review of the documentation by our medical staff.

You requested a redetermination for beneficiary claims representing a total of 131 lines of wound care services. The billed services include the following Healthcare Common Procedure Coding System (HCPCS) and Current Procedural Terminology (CPT) codes:

HCPCS code J0696- injection, ceftriaxone, sodium, per 250 milligrams (mg)

HCPCS code Q4169- artacent wound, per sq cm

HCPCS code Q4186- epifix, per sq cm

CPT code 15271- application of skin substitutes graft to wound of trunk, arms or legs, 25.0 sq cm of less of wound 100 sq cm or less

CPT code 15272- application of skin substitutes graft to wound of trunk, arms or legs, 25.0 sq cm of less of wound 100 sq cm or less, each additional 25.0 sq cm wound surface area, or part thereof

CPT code 15275- application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

CPT code 15276- application of skim substitutes graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; each additional sq cm wound surface area, or part thereof

CPT code 97608- therapy procedure using special bandage, vacuum pump and disposable medical equipment, surface area more than 50.0 sq cm

CPT code 99212- established patient office or other outpatient visit, 10-19 minutes

The submitted records were reviewed in order to ascertain if the services set forth in the claims were medically reasonable and necessary, and met all other pertinent Medicare payment requirements. We considered the documentation contained in the case files received from the CoventBridge Group (f/k/a Advanced Med) Medical Review Department as well as the records submitted with your redetermination.

Please see the enclosed WPS Redetermination Form detailing the individual decisions. The redetermination decisions can be found in the column titled "WPS Redetermination Outcome." Please refer to the legend located at the bottom of the form. Further details of the decisions will be explained throughout this section.

The determination of medical necessity for the service(s) in question is an essential element in determining whether payment for services was appropriate. While at no time does Medicare tell providers how to practice medicine, it does establish guidelines stating that medical necessity must be documented in the medical record in order for a service to be reimbursed.

The Regional Office of the Centers for Medicare and Medicaid Services (CMS) and this Medicare Part B Carrier have agreed upon the following definition of medical necessity:

> *A service, treatment, procedure, equipment, drug, device or supply provided by a hospital, physician, or other health care provider that is required to identify or treat a beneficiary's illness or injury and which is, as determined by the contractor: (a) consistent with the symptom(s) or diagnosis and treatment of the beneficiary's illness or injury; (b) appropriate under the standards of acceptable medical practice to treat that illness or injury; (c) not solely for the convenience of the participant, physician, hospital, or other health care provider; and, (d) the most appropriate service, treatment, procedure, equipment, drug, device or supply which can be safely provided to the beneficiary and accomplishes the desired end result in the most economical manner.*

Title XVIII of the Social Security Act section 1862 (a)(1)(A) states no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Title XVIII of the Social Security Act section 1833 (e) addresses documentation and states: No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider.

As published in the CMS IOM Publication 100-8, Section 13.5.1, in order to be covered under Medicare, a service shall be reasonable and necessary. The service provided should have an appropriate duration and frequency in terms of whether it is:

1. Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member.
2. Furnished in a setting appropriate to the patient's medical needs and condition.
3. Ordered and furnished by qualified personnel.
4. One that meets but does not exceed, the patient's medical needs and at least as beneficial as an existing and available medically appropriate alternative.

The determination of medical necessity for the service(s) in question is an essential element in determining whether payment for services was appropriate. While at no time does Medicare tell providers how to practice medicine, it does establish guidelines stating that medical necessity must be documented in the medical record in order for a service to be reimbursed.

The Code of Federal Regulations, Title 42 - Public Health, Volume 3, Part 424, Section 424.5(6) Basic Conditions – Sufficient Information requires that the documentation must be sufficient to support the services billed.

General principles of medical record documentation include:

1. The medical record should be complete and legible.

2. The documentation of each patient encounter should include:
    - Reason for encounter and relevant history, physical examination findings, and pertinent diagnostic test results;
    - Assessment, clinical impression, or diagnosis;
    - Plan for care; and
    - Date and legible identity of the observer.
3. If not documented, the rational for ordering diagnostic and other ancillary services should be easily inferred.
4. Past and present diagnoses should be accessible to the treating and/or consulting physician.
5. Appropriate health risk factors should be identified.
6. The patient's progress, response to and changes in treatment, and revision of diagnosis should be documented.
7. The CPT and International Classification of Diseases, 10th Revision, Clinical Modification (ICD-10-CM) codes reported on the health insurance claim form should be supported by the documentation in the medical record.

**Finding No. 1: Submitted documentation failed to support that the billed services were reasonable and necessary, ordered as billed and rendered as billed.**

This decision was made in accordance with Title XVIII of Social Security Act, Section 1862 (a)(1)(A). Medicare coverage and payment are only allowed for those services that are considered medically reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Records were submitted for review. The documentation supported the services were provided as billed. However, the records did support off label-use and did not contain medical literature to support the medical necessity of the services billed. The documentation did not support the services were medically reasonable and necessary.

Of the 131 lines of service reviewed, 18 lines of service of Q4169 and 39 lines of service of Q4186 have been denied as the submitted medical records did not meet guidelines requirements to demonstrate the medical necessity of the services. Therefore, payment cannot be made. These decisions have been given the designation: **F1 (Finding 1 - Documentation failed to support the billed services were medically reasonable and necessary)** on the attached spreadsheet.

**Finding No. 2: Documentation did not support the E & M services were a separate service from the procedures billed.**

The E & M services were billed with modifier 25, indicating a significant, separately identifiable E & M service by the same physician or other qualified health care professional on the same day of a procedure or other service. The documentation did not support the E & M services were for a significant and separately identifiable reason from the procedures that were billed on the same dates of service.

Of the 131 lines of service reviewed, four lines of service of 99212, have been denied as the documentation did not support the E & M services were a separate service from the procedure billed. Therefore, payment cannot be made. These decisions have been given the designation: **F2 (Finding 2 – Documentation did not support the E & M services were a separate service from the procedures billed)** on the attached spreadsheet.

**Finding 3: The submitted documentation does not support the services were rendered and medical necessity for the billed service.**

According to the Wisconsin Physicians Association, LCD L37228, Wound Care, requires that for wound care to be considered reasonable and necessary the provider must support the beneficiary is eligible for a defined Medicare benefit category, be reasonable and necessary and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member and meet all other applicable Medicare statutory and regulatory requirements

The documentation supported the patient was seen for follow up of wound services. The documentation did not support the patient starting a wound vacuum as part of the plan of care. The documentation did not support a reason for the wound vacuum application, nor was there documentation of the examination of the wound on the date of service billed. Therefore, the service remains denied.

Of the 131 lines of services reviewed, one line of service has been denied with the CPT code of 97608, as the documentation did not support Medicare guidelines were met for coverage. Therefore, payment cannot be made. These decisions have been given the designation: **F3 (Finding 3 – Documentation did not support the services were rendered and medically reasonable and necessary)** on the attached spreadsheet.

**Finding No. 4: Submitted documentation failed to support the billed services were rendered and reasonable and necessary.**

The services were billed in conjunction with other services that were determined not to be medically reasonable and necessary. The documentation did not support the services were provided for any other reason than the administration of the services as no explanation was given for the therapeutic options.

Of the 131 lines of service reviewed, one line of service billed with HCPCS code J0696, eight lines of services billed with CPT code 15271, one line of service billed with CPT code 15272, 52 lines of service billed with CPT code 15275 and seven lines of service billed with CPT code 15276, have been denied as they were billed in conjunction with services that were denied as not medically reasonable and necessary. Therefore, payment cannot be made. These decisions have been given the designation: **F4 (Finding 4 - Services were billed in conjunction with services that were denied as not medically reasonable and necessary)** on the attached spreadsheet.

**Conclusion**

In summary, the findings are as follows:

- The documentation did not support the services were medically reasonable and necessary

- The documentation did not support the services were a separate service from the procedures billed

- The documentation did not support the medical necessity for the billed wound care services

- The services were billed in conjunction with services that were denied as not medically reasonable and necessary

This redetermination decision was based on the following references:

- The Social Security Act which is available at https://www.ssa.gov
  Section 1862 (a)(1)(A)
  Section 1833 (e)

- The Code of Federal Regulations, Title 42 – Public Health, Volume 3, Part 424, Section 424.5(6) Basic Conditions

- The Centers for Medicare & Medicaid (CMS) Internet Only Manual (IOM) which is available at https://www.cms.gov

- The Code of Federal Regulations, Title 21 – Food and Drugs, Volume 8, Part 1271, Section 10 Human Cells, Tissues and Cellular and Tissue-Based Products
  Publication 100-2, Medicare Benefit Policy Manual, Chapter 16, Section 20
  Publication 100-8, Medicare Program Integrity Manual, Chapter 4, Section 4.3

- Wisconsin Physicians Service Local Coverage Determination: Billing and Coding: Wound Care (L37228), Located on the Internet at www.cms.gov/medicare-coverage-database

- Current Procedural Terminology (CPT) Manual, Professional Editions 2022

- Healthcare Common Procedure Coding System (HCPCS) Manual 2022

If you do not have access to the internet or CPT/HCPCS manuals, you may request a copy of the references used by calling us toll free at 1-866-518-3285.

WHO IS RESPONSIBLE FOR THIS BILL?

The appeal decisions reflect that Advanced Dermatology PA is responsible for services determined to be not covered by Medicare. We have determined that Advanced Dermatology PA is responsible for the overpayment of those services that are not covered by Medicare. The overpayment letters you have received instruct you on the process for refund. If you have not already sent the refund and the money owed is not refunded timely, interest will be applied.

We have also determined under Section 1870 of the Social Security Act that Advanced Dermatology PA

is not without fault in regards to this overpayment. We have determined that you are liable because you were informed about Medicare coverage and billing guidelines through the references noted in the "Explanation of Decision" section of this letter. Therefore, Advanced Dermatology PA was aware of correct billing and coverage criteria for the service(s) billed.

WHAT TO INCLUDE IN YOUR REQUEST FOR AN INDEPENDENT APPEAL

Please submit the following documents with your request for an appeal: additional medical documentation which supports the services billed and the medical necessity of those services as described above. You may submit any documentation pertinent to these services and/or any information not provided thus far that you believe Medicare needs to make another decision about these claims.

NOTE: (Medicare physicians, providers, and suppliers ONLY) Any additional evidence as indicated in this section should be submitted with the request for reconsideration. All evidence must be presented before the reconsideration decision is issued. If all additional evidence as indicated above and/or otherwise is not submitted prior to issuance of the reconsideration decision, you will not be able to submit any new evidence to the administrative law judge or the Medicare Appeals Council unless you can demonstrate good cause for withholding the evidence from the qualified independent contractor.

NOTE: You do not need to resubmit documentation that was submitted as part of the redetermination. This information will be forwarded to the QIC as part of the case file utilized in the reconsideration process.

Sincerely,

Dawn Bailey
Redetermination Representative
Wisconsin Physicians Service

Enclosure

5422349094000

## IMPORTANT INFORMATION ABOUT YOUR APPEAL RIGHTS

**Your Right to Appeal this Decision:** If you do not agree with this decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claim so far. The next level of appeal is called reconsideration. A reconsideration is a new and impartial review performed by a qualified independent contractor (QIC), separate and independent of Wisconsin Physicians Service.

**How to Appeal:** To exercise your right to an appeal, you must file a request in writing. Your request must be received by the QIC at the address below within 180 days of receiving this decision. You are presumed to have received this decision five days after the date of the letter unless there is evidence to show otherwise. If you are unable to file your appeal request timely, please explain why you could not meet the filing deadline. You may request an appeal by using the form enclosed with this letter.

If you do not use this form, you can write a letter. You must include: your name, your signature, the name of the beneficiary, the Medicare number, a list of the service(s) or item(s) that you are appealing and the date(s) of service, and any evidence you wish to attach. You must also indicate that Wisconsin Physicians Service made the redetermination. You may also attach supporting materials, such as those listed in item 10 of the enclosed Reconsideration Request Form, or other information that explains why this service should be paid. Your doctor may be able to provide supporting materials.

If you want to file an appeal, send your request to:

C2C Innovative Solutions, Inc. - QIC Part B North
P O Box 45208
Jacksonville, FL 32232-5208

**Who May File an Appeal:** You or someone you name to act for you (your appointed representative) may file an appeal. You can name a relative, friend, advocate, attorney, doctor, or someone else to act for you.

If you want someone to act for you, you may visit https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1696.pdf to download the “Appointment of Representative” form, which may be used to appoint a representative. Medicare does not require that you use this form to appoint a representative. Alternately, you may submit a written statement containing the same information indicated on the form. If you are a Medicare beneficiary, you may also call 1-800-MEDICARE (1-800-633-4227) to learn more about how to name a representative.

**Other Important Information:** If you want copies of statutes, regulations, policies, and/or manual instructions CMS used to arrive at this decision, or if you have any questions specifically related to your appeal, please write to us at the following address and attach a copy of this letter:

WPS Medicare Part B
General Correspondence
P.O. Box 7238
Madison, WI 53707-7238

**Resources for Medicare Beneficiaries:** If you want help with an appeal, or if you have questions about Medicare, you can have a friend or someone else help you with your appeal. You can also contact your State health insurance assistance program (SHIP). You can find the phone number for your SHIP in your "Medicare & You" handbook, under the "Helpful Contacts" section of www.medicare.gov Web site, or by calling 1-800-MEDICARE (1-800-633-4227). Your SHIP can answer questions about payment denials and appeals.

For general questions about Medicare, you can call 1-800-MEDICARE (1-800-633-4227), TTY/TDD: 1-877-486-2048.

Remember that specific questions about your appeal should be directed to the contractor that is processing your appeal.

Redetermination/Appeals Number:
5422349094000

**Reconsideration Request Form**

**Directions**: If you wish to appeal this decision, please fill out the required information below and mail this form to the address shown below. At a minimum, you must complete/include information for items 1, 2a, 6, 7, 11, & 12, but to help us serve you better, please include a copy of the redetermination notice with your request.

C2C Solutions - QIC Part B North
P O Box 45208
Jacksonville, FL 32232-5208

1. Name of Beneficiary: ____________________________________________

2a. Medicare Number: ____________________________________________

2b. Claim Number (ICN / DCN, if available): ______________________________

3. Provider Name: ____________________________________________

4. Person Appealing: ☐Beneficiary ☐Provider of Service ☐Representative

5. Address of the Person Appealing: ____________________________________

5a. Telephone Number of the Person Appealing: ____________________________

5b. Email Address of the Person Appealing: ______________________________

6. Item or service you wish to appeal: ____________________________________

7. Date of the service: From ________________ To ________________

8. Does this appeal involve an overpayment? ☐Yes ☐No
*Please include a copy of the demand letter (*if applicable*) with your request.

9. Why do you disagree? Or what are your reasons for your appeal? (Attach additional pages, if necessary.) ____________________________________________
______________________________________________________________

10. You may also include any supporting material to assist your appeal. Examples of supporting materials include:
☐ Medical Records ☐ Office Records/Progress Notes
☐ Copy of the Claim ☐Treatment Plan ☐ Certificate of Medical Necessity

11. Name of Person Appealing: ____________________________________________

12. Signature of Person Appealing: ______________________ Date:________________

Contractor Number: 05202

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 13-18

**CCN: KS 5422349094000 – Advanced Dermatology KS**

**Date: 1/27/2022**

Sarah Braun, LPN
Medical Management LPN2
Government Health Administrators
Medicare Part B

This redetermination decision has been rendered based upon the review of the documentation by our medical staff.

You requested a redetermination for beneficiary claims representing a total of 131 lines of wound care services. The billed services include the following Healthcare Common Procedure Coding System (HCPCS) and Current Procedural Terminology (CPT) codes:

HCPCS code J0696- injection, ceftriaxone, sodium, per 250 milligrams (mg)

HCPCS code Q4169- artacent wound, per sq cm

HCPCS code Q4186- epifix, per sq cm

CPT code 15271- application of skin substitutes graft to wound of trunk, arms or legs, 25.0 sq cm of less of wound 100 sq cm or less

CPT code 15272- application of skin substitutes graft to wound of trunk, arms or legs, 25.0 sq cm of less of wound 100 sq cm or less, each additional 25.0 sq cm wound surface area, or part thereof

CPT code 15275- application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

CPT code 15276- application of skim substitutes graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; each additional sq cm wound surface area, or part thereof

CPT code 97608- therapy procedure using special bandage, vacuum pump and disposable medical equipment, surface area more than 50.0 sq cm

CPT code 99212- established patient office or other outpatient visit, 10-19 minutes

The submitted records were reviewed in order to ascertain if the services set forth in the claims were medically reasonable and necessary, and met all other pertinent Medicare payment

requirements. We considered the documentation contained in the case files received from the CoventBridge Group (f/k/a Advanced Med) Medical Review Department as well as the records submitted with your redetermination.

Please see the enclosed WPS Redetermination Form detailing the individual decisions. The redetermination decisions can be found in the column titled "WPS Redetermination Outcome." Please refer to the legend located at the bottom of the form. Further details of the decisions will be explained throughout this section.

The determination of medical necessity for the service(s) in question is an essential element in determining whether payment for services was appropriate. While at no time does Medicare tell providers how to practice medicine, it does establish guidelines stating that medical necessity must be documented in the medical record in order for a service to be reimbursed.

The Regional Office of the Centers for Medicare and Medicaid Services (CMS) and this Medicare Part B Carrier have agreed upon the following definition of medical necessity:

> *A service, treatment, procedure, equipment, drug, device or supply provided by a hospital, physician, or other health care provider that is required to identify or treat a beneficiary's illness or injury and which is, as determined by the contractor: (a) consistent with the symptom(s) or diagnosis and treatment of the beneficiary's illness or injury; (b) appropriate under the standards of acceptable medical practice to treat that illness or injury; (c) not solely for the convenience of the participant, physician, hospital, or other health care provider; and, (d) the most appropriate service, treatment, procedure, equipment, drug, device or supply which can be safely provided to the beneficiary and accomplishes the desired end result in the most economical manner.*

Title XVIII of the Social Security Act section 1862 (a)(1)(A) states no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Title XVIII of the Social Security Act section 1833 (e) addresses documentation and states: No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider.

As published in the CMS IOM Publication 100-8, Section 13.5.1, in order to be covered under Medicare, a service shall be reasonable and necessary. The service provided should have an appropriate duration and frequency in terms of whether it is:

1. Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member.
2. Furnished in a setting appropriate to the patient's medical needs and condition.
3. Ordered and furnished by qualified personnel.

4. One that meets but does not exceed, the patient's medical needs and at least as beneficial as an existing and available medically appropriate alternative.

The determination of medical necessity for the service(s) in question is an essential element in determining whether payment for services was appropriate. While at no time does Medicare tell providers how to practice medicine, it does establish guidelines stating that medical necessity must be documented in the medical record in order for a service to be reimbursed.

The Code of Federal Regulations, Title 42 - Public Health, Volume 3, Part 424, Section 424.5(6) Basic

Conditions – Sufficient Information requires that the documentation must be sufficient to support the services billed.

General principles of medical record documentation include:

1. The medical record should be complete and legible.
2. The documentation of each patient encounter should include:
    - Reason for encounter and relevant history, physical examination findings, and pertinent diagnostic test results;
    - Assessment, clinical impression, or diagnosis;
    - Plan for care; and
    - Date and legible identity of the observer.
3. If not documented, the rational for ordering diagnostic and other ancillary services should be easily inferred.
4. Past and present diagnoses should be accessible to the treating and/or consulting physician.
5. Appropriate health risk factors should be identified.
6. The patient's progress, response to and changes in treatment, and revision of diagnosis should be documented.
7. The CPT and International Classification of Diseases, 10th Revision, Clinical Modification (ICD-10-CM) codes reported on the health insurance claim form should be supported by the documentation in the medical record.

**Finding No. 1: Submitted documentation failed to support that the billed services were reasonable and necessary, ordered as billed and rendered as billed.**

This decision was made in accordance with Title XVIII of Social Security Act, Section 1862 (a)(1)(A). Medicare coverage and payment are only allowed for those services that are

considered medically reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Records were submitted for review. The documentation supported the services were provided as billed. However, the records did support off label-use and did not contain medical literature to support the medical necessity of the services billed. The documentation did not support the services were medically reasonable and necessary.

Of the 131 lines of service reviewed, 18 lines of service of Q4169 and 39 lines of service of Q4186 have been denied as the submitted medical records did not meet guidelines requirements to demonstrate the medical necessity of the services. Therefore, payment cannot be made. These decisions have been given the designation: **F1** (Finding 1 - Documentation failed to support the billed services were medically reasonable and necessary) on the attached spreadsheets.

**Finding No. 2:** Documentation did not support the E & M services were a separate service from the procedures billed.

The E & M services were billed with modifier 25, indicating a significant, separately identifiable E & M service by the same physician or other qualified health care professional on the same day of a procedure or other service. The documentation did not support the E & M services were for a significant and separately identifiable reason from the procedures that were billed on the same dates of service.

Of the 131 lines of service reviewed, four lines of service of 99212, have been denied as the documentation did not support the E & M services were a separate service from the procedure billed. Therefore, payment cannot be made. These decisions have been given the designation: **F2** (Finding 2 – Documentation did not support the E & M services were a separate service from the procedures billed) on the attached spreadsheets.

**Finding 3:** The submitted documentation does not support the services were rendered and medical necessity for the billed service.

According to the Wisconsin Physicians Association, LCD L37228, Wound Care, requires that for wound care to be considered reasonable and necessary the provider must support the beneficiary is eligible for a defined Medicare benefit category, be reasonable and necessary and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member and meet all other applicable Medicare statutory and regulatory requirements

The documentation supported the patient was seen for follow up of wound services. The documentation did not support the patient starting a wound vacuum as part of the plan of care. The documentation did not support a reason for the wound vacuum application, nor was there documentation of the examination of the wound on the date of service billed. Therefore, the service remains denied.

Of the 131 lines of services reviewed, one line of service has been denied with the CPT code of 97608, as the documentation did not support Medicare guidelines were met for coverage. Therefore, payment cannot be made. These decisions have been given the designation: **F3** (**Finding 3 – Documentation did not support the services were rendered and medically reasonable and necessary**) on the attached spreadsheet.

**Finding No. 4:** Submitted documentation failed to support the billed services were rendered and reasonable and necessary.

The services were billed in conjunction with other services that were determined not to be medically reasonable and necessary. The documentation did not support the services were provided for any other reason than the administration of the services as no explanation was given for the therapeutic options.

Of the 131 lines of service reviewed, one line of service billed with HCPCS code J0696, eight lines of services billed with CPT code 15271, one line of service billed with CPT code 15272, 52 lines of service billed with CPT code 15275 and seven lines of service billed with CPT code 15276, have been denied as they were billed in conjunction with services that were denied as not medically reasonable and necessary. Therefore, payment cannot be made. These decisions have been given the designation: **F4** (**Finding 4 - Services were billed in conjunction with services that were denied as not medically reasonable and necessary**) on the attached spreadsheets.

**Conclusion**

In summary, the findings are as follows:

- The documentation did not support the services were medically reasonable and necessary
- The documentation did not support the services were a separate service from the procedures billed
- The documentation did not support the medical necessity for the billed wound care services
- The services were billed in conjunction with services that were denied as not medically reasonable and necessary

This redetermination decision was based on the following references:

- The Social Security Act which is available at https://www.ssa.gov

Section 1862 (a)(1)(A)
Section 1833 (e)

- The Code of Federal Regulations, Title 42 – Public Health, Volume 3, Part 424, Section 424.5(6) Basic Conditions
- The Centers for Medicare & Medicaid (CMS) Internet Only Manual (IOM) which is available at https://www.cms.gov
- The Code of Federal Regulations, Title 21 – Food and Drugs, Volume 8, Part 1271, Section 10 Human Cells, Tissues and Cellular and Tissue-Based Products
  Publication 100-2, Medicare Benefit Policy Manual, Chapter 16, Section 20
  Publication 100-8, Medicare Program Integrity Manual, Chapter 4, Section 4.3
- Wisconsin Physicians Service Local Coverage Determination: Billing and Coding: Wound Care (L37228), Located on the Internet at www.cms.gov/medicare-coverage-database
- Current Procedural Terminology (CPT) Manual, Professional Editions 2022
- Healthcare Common Procedure Coding System (HCPCS) Manual 2022

If you do not have access to the internet or CPT/HCPCS manuals, you may request a copy of the references used by calling us toll free at

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 25-41

WPS GOVERNMENT HEALTH ADMINISTRATORS

Wisconsin Physicians Service Insurance Corporation
*A CMS Medicare Contractor*
1717 W. Broadway | P.O. Box 1787 | Madison, WI 53701-1787

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, OH 43123

December 20, 2022
In Any Inquiry Refer To
KS 5422349094000
Beneficiary Identifier
Multiple
Service Dates
Multiple
Service Provided By
Advanced Dermatology PA

Dear CoventBridge:

This letter is to inform you of a redetermination request made to Wisconsin Physicians Service (WPS) by Advanced Dermatology PA – KS-110568 – 1124094867. The CoventBridge tracking number is: OPT-221024-00004.

Please forward the medical records used to determine the $116,450.65 overpayment assessed toward this provider.

Please mail the records to the following address:

Wisconsin Physicians Service
Attn: Dawn Bailey
1000 Factory Outlet Blvd
Suite 106
West Frankfort, IL 62986
Reference Number: KS 5422129438000

If you have any questions, please call me at 618-694-2063. I can be reached through email at samantha.bean@wpsic.com.

Sincerely,

Samantha Bean
Medicare Part B Redeterminations Representative
Wisconsin Physicians Service
A Medicare Contractor

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

December 21, 2022

Wisconsin Physicians Service
Attn: Dawn Bailey, Redeterminations
1000 Factory Outlet Blvd.
Suite 106
West Frankfort, IL 62896

RE: Redetermination Request for Documentation
Provider Name: Advanced Dermatology
Provider Number: KS-110568
UCM Case Number: CSE-220330-00013

Dear Ms. Bailey:

This letter is in response to your request to provide objective evidence to support an overpayment identified by CoventBridge. As a Unified Program Integrity Contractor (UPIC), CoventBridge performs benefit integrity activities with the goal of reducing fraud, waste and abuse in the Medicare program. As you review our coverage decisions, please consider the facts of our investigation set forth in the Post-Payment Review Results and Overpayment Determination (Attachment #2) of the enclosed package.

CoventBridge is available to provide additional testimony, in person or by telephone, in support of our decisions.

CoventBridge's supporting documentation is contained in the attachments which were sent via secure email. If asked, the password to the materials will be the standard UPIC MW password. For additional information, please contact me by email (UPICMWAppeals@us.coventbridge.com) or by phone at 904-428-0444. Upon completion of the redetermination, please provide CoventBridge a copy of the decision, decision rationale and any supporting documentation by emailing the results to UPICMWAppeals@us.coventbridge.com. Should you learn that a subsequent level of appeal is initiated, please notify me and forward our supporting documentation to the appropriate contact person for that level of appeal.

Sincerely,

Emilie Fix

Emilie Fix
Appeal Team Lead

Enclosures: Attachment #1 – Additional Documentation Request Letter(s)
Attachment #2 – Post-Payment Review Results and Overpayment Determination
Attachment #3 – Medical Records
Attachment #4 – OP/Claim Line Decision Spreadsheets
Attachment #5 – Medical Review Findings Report
Attachment #6 – Citations

AdvanceTrack Number: 2022_144_334243646

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

August 08, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re: **Second Request for Medical Records (Nebraska)**
**Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
**Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

CoventBridge requested medical records on July 8, 2022. No reply has been received; therefore, this notice serves as a second, and final, request to produce the requested documents. If you have already complied with our request, please disregard this notice.

The attached copy of the previous letter is self-explanatory. Your cooperation will be appreciated. Please be advised that should the requested records not be received by the date due, a review will be conducted and those claims for which there is no documentation will be denied. Please submit your documentation **within 15 days** from the date of this letter to:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

If no medical documentation is received, it will be a violation of 42 CFR 424.5(a)(6), which specifies that the provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment. Social Security Act Section 1833(e), states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider**. If no documentation is received within 15 days from the date of this letter, the services billed will be denied for no supporting documentation and an overpayment will be sought.**

Failure to submit requested documentation may result in the suspension of your Medicare payments. The Medicare Program Integrity Manual, Chapter 8, Section 8.3.1.4 provides CoventBridge with this authority when a provider fails to furnish records to determine the amounts due to the provider.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation*. CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:
   10) *Failure to document or provide CMS access to documentation*. (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—
   (A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and
   (B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).
      (ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

   (2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—
      (A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and
      (B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).
   (ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge will accept these records in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]

The Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. Unified Program Integrity Contractors, including CoventBridge, perform health care operations as business associates of CMS with respect to the HIPAA Privacy Rule. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

If you have any questions about this request, please contact me at (614) 782-6071 and/or by email LaTonya.Johnston@us.coventbridge.com.
Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

Enclosure

AT# 2022_144_334243646

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re: **Post Payment Medical Records Request (Nebraska)**
**Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
**Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion—
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
>
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that—

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

## **For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD/. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***

***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation*. CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation*. (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

LaTonya Johnston

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 53

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that ______________________________________ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Custodian of records and Job Title (Print)

Custodian of records (Signature) (Date)

Physician/Supplier (Print)

Physician/Supplier (Signature) (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

## **For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

November 10, 2022

Advanced Dermatology and Skin Cancer Center PA
Attn: John Adams
2735 Pembrook Place
Manhattan, Kansas 66502-7482

Re: **Post-Payment Review Results and Overpayment Determination – Advanced Dermatology and Skin Cancer Center PA**
**Provider/Supplier Medicare ID Number(s): 110568**
**Provider/Supplier NPI: 1124094867**
**EIN: 48-0879603**
**Reference Number: CSE-220330-00013**

Dear John Adams:

As you know, most Medicare providers strive to work ethically, render high-quality medical care to their patients, and submit proper claims for payment. The Federal Government places enormous trust in providers, relying on their medical judgment to treat patients with appropriate services, and to submit accurate and truthful claims information when seeking reimbursement. ***As a Medicare provider, you play a vital role in protecting the Medicare Program.***

You are receiving this letter as a result of a Medicare program integrity review conducted by CoventBridge. This letter serves as additional education regarding these findings, as explained in more detail below.

**Statutory Basis for CoventBridge's Actions**

In accordance with Section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II § 202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, the Centers for Medicare & Medicaid Services (CMS) is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPIC) to perform these functions. CoventBridge is the UPIC for Part B services in the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

**Scope of Review**

CoventBridge conducts reviews based on information from various sources, including but not limited to: 1) requests from CMS or the Office of the Inspector General (OIG); 2) data analysis; 3) complaints; and 4) inquiries from various entities. Our review was prompted by data analysis that suggests your practice is improperly billing Medicare for services.

Based on this information, on July 8, 2022 and August 8, 2022, CoventBridge requested medical records from your practice for dates of service January 21, 2022 through June 30, 2022. CoventBridge reviewed 55 claims which included 163 services. **Based on the claims and supporting documentation we reviewed, we identified overpayments made to you**. This letter constitutes formal notice to you of the outcomes of our review, as well as any actions you should take.

**Outcome of the Review and Education**

The medical review resulted in the following general findings:

- Services not reasonable and necessary
- Services not rendered as billed
- Services related to non-covered/denied primary services

The following serve as examples of our findings, designed to help you better understand coverage criteria. The rationale listed below are not exhaustive. You must refer to the documents contained on the included secured CD for detailed information about the coverage decision on each reviewed claim.

- Services not reasonable and necessary
  - No Medicare payment shall be made for items or services, which are not reasonable and necessary for the diagnosis or treatment of illness or to improve the functioning of a malformed body member.

- 131 claim lines or 80.37% of claim lines reviewed were denied as services not reasonable and necessary

  Claim example:
  CCN 742822025240340 Date of Service January 24, 2022

- Services not rendered as billed
  - As a basis for Medicare payment, the provider must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment. Upon review of the documentation, it was noted that this requirement was not met.
    - Documentation was submitted but it did not support the service billed was actually rendered.

- 73 claim lines or 44.79% of claim lines reviewed were denied as services not rendered as billed

  Claim example:
  CCN 742822027222550 Date of Service January 24, 2022

- Services related to non-covered/denied primary services
  - Medicare payment may not be made for services related to other non-covered services.

- 68 claim lines or 41.72% of claim lines reviewed were denied as services related to non-covered/denied primary services

  Claim example:
  CCN 742822112077110 Date of Service April 19, 2022

For more detailed information regarding these denial categories, refer to the attached report, which also includes claim-specific denial/change rationales.

**References/Citations**
All references and citations utilized in this review can be found on the enclosed encrypted CD.

CoventBridge also noted the following trends persistent throughout the medical review:

- **Using amniotic products for wound healing, which is not their homologous use.**

Patients/Medicare were billed for human cellular and tissue product (HCT/P), which is approved as a wound covering, but not as a skin substitute graft per the CPT Codebook and the FDA. Although provider was billing using the skin graft code, they called the product in the documentation a "Repair: Skin Substitute". Documentation supported grafts were being used for wound healing and regeneration of skin growth which is not the product's homologous use per the Food and Drug Administration (FDA)/Code of Federal Regulations (CFR). Provider is also using this product to decrease the risk of infection, reduce pain, minimize inflammation, decrease scar formation and disfigurement (cosmetic reasons), minimize pain, as well as for numerous other reasons.

- **Provider is not applying a true graft.**

The provider applied a product defined by the manufacturer and the FDA as a wound covering, not a "graft" as per the definition in the Current Procedural Terminology (CPT) Codebook for CPT 15271-15276. Provider also had the patient return sometimes week after week to have another application of skin substitute placed, which is further confirmation that this product was not the type of item or service covered under codes 15271-15276.

Codes 15271-15276 are associated with the application/implantation of skin, or a biological substance intended to remain in the person for the purpose of helping the person's own skin cells to grow back. The CPT Codebook specifically states, "[a]pplication of non-graft [i.e., something intended to be removed] wound dressings is not separately reportable."

- **Provider is billing and using larger sized products than necessary.**

The provider billing/applying larger sized amniotic product than necessary according to the wound dimensions documented in the medical record, despite smaller and more appropriate sizes being available from the manufacturer. The provider documented a cloned statement saying if the correct sized amniotic product was not in stock, they would use the closest graft in stock that would allow for total wound coverage. This is also a concern for waste and abuse.

- **Cloning.**

There is cloning in the medical records from beneficiary to beneficiary involving the reasons for graft placement. Example: "Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amenable to Primary side to side repair."

There is cloning in the medical record from beneficiary to beneficiary involving the reason why a larger sized amniotic product was utilized. Example: "If the appropriate size of allograft is not in stock, it is in the patient's best interest that we apply the next largest allograft which is in stock. Today, the closest graft in terms of size which was in stock which would allow for complete wound coverage, to include the vertical aspect, was utilized."

- **Submitted lists of typed letters, symbols, and words.**

Provider submitted thousands of pages with typed random numbers, letters, words, and symbols that were not part of the medical record. It was unclear how this occurred or if this was intentional.

- **Impossible days for John Adams, MD:**

One of the allegations for this case was that impossible days were being billed for John Adams, MD. While documentation supported Dr. Adams performed and signed the progress notes for the services billed, there was documentation found of the PA-C being a "scribe" while Dr. Adams was documented as the provider performing the service. For example, this statement was documented "I, Alyssa Bengtson, PA-C am scribing for, and in the presence of John Adams, M." Both sign notes for billed DOS at the same time. While the claim could not be denied for incorrect rendering provider, it is suspicious and unlikely that the PA-C was performing the role of the scribe and they were both in the room at the same time.

Based on our findings as explained in this letter, CoventBridge has determined that you have been overpaid by Medicare in the amount of $116,450.65. Please keep this letter and all attached documentation for your records. **This is not a demand letter; you will be notified at a later date by your Medicare Administrative Contractor (MAC) regarding the amount due, potential repayment options, and any formal appeal processes you may pursue.** The CMS publication "Medicare Overpayments" explains more about overpayments: https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/OverpaymentBrochure508-09.pdf.
Accompanying this letter is an encrypted CD containing an electronic copy of this letter, a Claim Line Spreadsheet listing the claims filed for services not rendered as billed, services not reasonable and necessary, services related to non-covered/denied primary services, and various references cited in this letter. Specific information regarding these findings, per claim, is explained in the attached Claim Decision Spreadsheet. All documents are contained within a password protected ZIP file.

Again, please review the attachments, along with this letter, to ensure you understand Medicare coverage and payment requirements. Consider and implement corrections to billing procedures that could prevent

such errors in the future. Further, we recommend you maintain documentation of any changes you implement to your current processes or procedures as a result of the information provided herein.
Publications at the following links give you additional information you need to protect the Medicare Program, your patients, your organization, and yourself.

- Medicare Fraud & Abuse: Prevent, Detect, Report (cms.gov)

If you misrepresent, falsify, or conceal essential information required for payment of federal funds, then you may be subject to civil or criminal liability, which can result in fine, imprisonment, civil penalty, and potential collateral consequences.

**Action Needed - Self-Assessment/Voluntary Refund**
The rate of error identified in this small sampling of claims is significant; therefore, it is likely that you have been overpaid by Medicare on other claims or services not identified in this letter or its attachments. If so, you are *obligated* to refund the program. After reviewing the education provided herein, **CoventBridge recommends that you conduct a self-assessment in order to identify any additional overpayments your practice or facility has received as a result of the actions which are the subject of this letter.** Contact your MAC for instructions on making a voluntary refund.

Additionally, CMS published a final rule regarding overpayments in the Federal Register on February 12, 2016 [CMS-6037-F] to provide clarity and consistency in the reporting and returning of self-identified overpayments: https://www.gpo.gov/fdsys/pkg/FR-2016-02-12/pdf/2016-02789.pdf.

**Provider Self-Disclosure Protocol**

If you identify evidence of potential fraud, you may choose to voluntarily disclose this to the Office of Inspector General (OIG) under the Provider Self-Disclosure Protocol (SDP). The OIG's website explains further:

> "Self-disclosure gives providers the opportunity to avoid the costs and disruptions associated with a Government-directed investigation and civil or administrative litigation.
> OIG endeavors to work cooperatively with providers who are forthcoming, thorough, and transparent in their disclosures in resolving these matters. While OIG does not speak for the Department of Justice or other agencies, OIG consults with those agencies, as appropriate, regarding the resolution of SDP matters."

More information on voluntary disclosure is available on the OIG website:
http://oig.hhs.gov/compliance/self-disclosure-info/protocol.asp.

**Authority to Conduct Reviews**

Under *Section 1893* of the Act, CoventBridge is required to conduct reviews of providers to ensure that Medicare claims have been appropriately billed. It is Congress' intent, as stated *in Section 1156* of the Act, that services and items will be: provided economically; of a quality which meets professionally recognized standards of health care; and supported by evidence of medical necessity. Services or items not proven to be reasonable or medically necessary are denied under *Section 1862(a)(1)* of the Act.

**Requirement to Provide Documentation Upon Request**

*Section 1815(a)* of the Act and *Title 42 CFR Part 424.5(a)(6)* place the burden upon the provider to furnish such information as may be necessary if payment is (or was) due and the amount of the payment.

**Statutory Requirement: Medical Necessity**

Social Security Act:

> *§1862(a)(1)* of the Act states, "Notwithstanding any other provision of this title, no payment may be made under part A or part B for any expenses incurred for items or services—(1)(A) which, except for items and services described in a succeeding subparagraph, are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

Laws governing Medicare are generally found in the Act as amended. Most provisions are in Title XVIII of the Act and may also be included in Title XI. Medicare regulations are found in Title 42 of the Code of Federal Regulations (CFR). Instructions are issued by CMS via *MLN Matters* articles, the Medicare Internet-Only Manuals (e.g., Pub. 100-02 and 100-04) and other means (e.g., by Medicare Administrative Contractors via bulletins, letters, notices, web articles).

**Statutory Requirement: Liability for Overpayments**

Our determinations were made in accordance with sections 1879 and 1870 of the Social Security Act (the Act) as well as the specific statutory and regulatory references provided in this letter.

- **Section 1879 of the Social Security Act -**The determinations which follow a §1862(a)(1) denial may require a decision if the beneficiary or provider knew or could have known that a service would not be covered by Medicare because it would be considered medically unnecessary. The provider is liable if it is determined the provider knew, or could reasonably have been expected to know, that the items or services provided were not covered under Medicare. The beneficiary is liable if it is determined the beneficiary knew, or could reasonably have been expected to know that the items or services provided were not covered under Medicare. However, the Medicare program accepts liability if neither the beneficiary nor the provider knew, or could reasonably be

expected to have known, that the services were not covered. Waiver of liability exists when both the beneficiary and the provider did not and could not reasonably have been expected to know that payment would not be made for services.

- **Section 1870 of the Social Security Act-** Section 1870 permits Medicare to not recover inappropriate payments with respect to an individual deemed without fault in having caused the overpayment. For the "without fault" provision to apply, the individual must have complied with all pertinent regulations and instruction materials. A provider is responsible for an overpayment if he/she knew or had reason to know that service(s) were not reasonable and necessary, and/or he/she did not follow correct procedures or use care in billing or receiving payment.

**Other Laws**

Other laws pertaining to penalties associated with Medicare fraud and abuse include:

- Social Security Act (SSA), Sections 1128A(a)(1) and 1128B(a)(1)
- Civil False Claims Act, 31 U.S.C. § 3729
- 18 U.S.C. § 1001, 1035, and 1347
- 18 U.S.C. § 1516, Obstruction of Federal Audit

Our goal is to ensure that you are fully aware of the laws, regulations, and Medicare instructions which apply to you and other providers who furnish services or items to Medicare beneficiaries. We hope this information is helpful to you.

**CoventBridge will continue to monitor future Medicare claim submissions in order to verify adherence to this education.**

In addition, we remind you that the regulation at 42 CFR §424.535 authorizes us to revoke Medicare billing privileges under certain conditions. In particular, we note that per 42 CFR §424.535(a)(8)(ii), CMS has the authority to revoke a currently enrolled provider's or supplier's Medicare billing privileges if CMS determines that the provider or supplier has a pattern or practice of submitting claims that fail to meet Medicare requirements.

**This is not a demand letter. You will be notified at a later date by Wisconsin Physicians Service Insurance Corporation regarding the overpayment due, the repayment, and appeal options available to you.**

For the password to the enclosed encrypted CD or if you have any questions, please contact me at 614.782.6071.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT: 2022_144_334243646

Enclosed CD

1. Medical Records Request Letter
2. Medical Review.
    a. Overpayment Spreadsheet
    b. Medical Review Export
    c. Citations applicable to the medical review
3. Signed Digital Copy of Overpayment Determination / Education letter

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 65-471

Reviewer Credential Statement:

The employee performing medical review for UPIC Midwestern Jurisdiction is a Registered Nurse.

# CFR - Code of Federal Regulations Title 21

**The information on this page is current as of Mar 29, 2022.**

For the most up-to-date version of CFR Title 21, go to the Electronic Code of Federal Regulations (eCFR).[6]



[Code of Federal Regulations]
[Title 21, Volume 8]
[CITE: 21CFR1271]

TITLE 21--FOOD AND DRUGS
CHAPTER I--FOOD AND DRUG ADMINISTRATION
DEPARTMENT OF HEALTH AND HUMAN SERVICES
SUBCHAPTER L - REGULATIONS UNDER CERTAIN OTHER ACTS ADMINISTERED BY THE FOOD AND DRUG ADMINISTRATION
PART 1271HUMAN CELLS, TISSUES, AND CELLULAR AND TISSUE-BASED PRODUCTS

## Subpart A - General Provisions

### Sec. 1271.1 What are the purpose and scope of this part?

(a) *Purpose.* The purpose of this part, in conjunction with §§ 207.9(a)(5), 210.1(c), 210.2, 807.20(d), and 820.1(a) of this chapter, is to create an electronic registration and listing system for establishments that manufacture human cells, tissues, and cellular and tissue-based products (HCT/P's) and to establish donor-eligibility, current good tissue practice, and other procedures to prevent the introduction, transmission, and spread of communicable diseases by HCT/P's.

(b) *Scope.* (1) If you are an establishment that manufactures HCT/P's that are regulated solely under the authority of section 361 of the Public Health Service Act (the PHS Act), this part requires you to register and list your HCT/P's with the Food and Drug Administration's (FDA's) Center for Biologics Evaluation and Research and to comply with the other requirements contained in this part, whether or not the HCT/P enters into interstate commerce. Those HCT/P's that are regulated solely under the authority of section 361 of the PHS Act are described in § 1271.10.

(2) If you are an establishment that manufactures HCT/P's that are regulated as drugs, devices and/or biological products under section 351 of the PHS Act and/or the Federal Food, Drug, and Cosmetic Act, §§ 207.9(a)(5) and 807.20(d) of this chapter require you to register and list your HCT/P's following the procedures in part 207 (if a drug and/or biological product) of this chapter or part 807 (if a device) of this chapter. Sections 210.1(c), 210.2, 211.1(b), and 820.1(a) of this chapter require you to comply with the donor-eligibility procedures in subpart C of this part and the current good tissue practice procedures in subpart D of this part, in addition to all other applicable regulations.

[66 FR 5466, Jan. 19, 2001, as amended at 69 FR 29829, May 25, 2004; 81 FR 60223, Aug. 31, 2016]

### Sec. 1271.3 How does FDA define important terms in this part?

The following definitions apply only to this part:

(a) *Autologous use* means the implantation, transplantation, infusion, or transfer of human cells or tissue back into the individual from whom the cells or tissue were recovered.

(b) *Establishment* means a place of business under one management, at one general physical location, that engages in the manufacture of human cells, tissues, and cellular and tissue-based products. "Establishment" includes:

(1) Any individual, partnership, corporation, association, or other legal entity engaged in the manufacture of human cells, tissues, and cellular and tissue-based products; and

(2) Facilities that engage in contract manufacturing services for a manufacturer of human cells, tissues, and cellular and tissue-based products.

(c) *Homologous use* means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor.

(d) *Human cells, tissues, or cellular or tissue-based products (HCT/Ps)* means articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient. Examples of HCT/Ps include, but are not limited to, bone, ligament, skin, dura mater, heart valve, cornea, hematopoietic stem/progenitor cells derived from peripheral and cord blood, manipulated autologous chondrocytes, epithelial cells on a synthetic matrix, and semen or other reproductive tissue. The following articles are not considered HCT/Ps:

(1) Vascularized human organs for transplantation;

(2) Whole blood or blood components or blood derivative products subject to listing under parts 607 and 207 of this chapter, respectively;

(3) Secreted or extracted human products, such as milk, collagen, and cell factors; except that semen is considered an HCT/P;

(4) Minimally manipulated bone marrow for homologous use and not combined with another article (except for water, crystalloids, or a sterilizing, preserving, or storage agent, if the addition of the agent does not raise new clinical safety concerns with respect to the bone marrow);

(5) Ancillary products used in the manufacture of HCT/P;

(6) Cells, tissues, and organs derived from animals other than humans; and

(7) In vitro diagnostic products as defined in § 809.3(a) of this chapter.

(8) Blood vessels recovered with an organ, as defined in 42 CFR 121.2, that are intended for use in organ transplantation and labeled "For use in organ transplantation only."

(e) *Manufacture means,* but is not limited to, any or all steps in the recovery, processing, storage, labeling, packaging, or distribution of any human cell or tissue, and the screening or testing of the cell or tissue donor.

(f) *Minimal manipulation* means:

(1) For structural tissue, processing that does not alter the original relevant characteristics of the tissue relating to the tissue's utility for reconstruction, repair, or replacement; and

(2) For cells or nonstructural tissues, processing that does not alter the relevant biological characteristics of cells or tissues.

(g) *Transfer* means the placement of human reproductive cells or tissues into a human recipient.

(h) *Biohazard legend* appears on the label as follows and is used to mark HCT/Ps that present a known or suspected relevant communicable disease risk.




(i) *Blood component* means a product containing a part of human blood separated by physical or mechanical means.

(j) *Colloid* means:

(1) A protein or polysaccharide solution, such as albumin, dextran, or hetastarch, that can be used to increase or maintain osmotic (oncotic) pressure in the intravascular compartment; or

(2) Blood components such as plasma and platelets.

(k) *Crystalloid* means an isotonic salt and/or glucose solution used for electrolyte replacement or to increase intravascular volume, such as saline solution, Ringer's lactate solution, or 5 percent dextrose in water.

(l) *Directed reproductive donor* means a donor of reproductive cells or tissue (including semen, oocytes, and embryos to which the donor contributed the spermatozoa or oocyte) to a specific recipient, and who knows and is known by the recipient before donation. The term directed reproductive donor does not include a sexually intimate partner under § 1271.90.

(m) *Donor* means a person, living or dead, who is the source of cells or tissue for an HCT/P.

(n) *Donor medical history interview means* a documented dialog about the donor's medical history and relevant social behavior, including activities, behaviors, and descriptions considered to increase the donor's relevant communicable disease risk:

(1) With the donor, if the donor is living and able to participate in the interview, or

(2) If not, with an individual or individuals able to provide the information sought in the interview (e.g., the donor's next-of-kin, the nearest available relative, a member of the donor's household, an individual with an affinity relationship, and/or the primary treating physician).

(o) *Physical assessment of a cadaveric donor* means a limited autopsy or recent antemortem or postmortem physical examination of the donor to assess for signs of a relevant communicable disease and for signs suggestive of any risk factor for a relevant communicable disease.

(p) *Plasma dilution* means a decrease in the concentration of the donor's plasma proteins and circulating antigens or antibodies resulting from the transfusion of blood or blood components and/or infusion of fluids.

(q) *Quarantine* means the storage or identification of an HCT/P, to prevent improper release, in a physically separate area clearly identified for such use, or through use of other procedures, such as automated designation.

(r) *Relevant communicable disease agent or disease* means:

(1)(i) For all human cells and tissues, a communicable disease or disease agent listed as follows:

(A) Human immunodeficiency virus, types 1 and 2;

(B) Hepatitis B virus;

(C) Hepatitis C virus;

(D) Human transmissible spongiform encephalopathy, including Creutzfeldt-Jakob disease; and

(E) *Treponema pallidum*.

(ii) For viable, leukocyte-rich cells and tissues, a cell-associated disease agent or disease listed as follows:

(A) Human T-lymphotropic virus, type I; and

(B) Human T-lymphotropic virus, type II.

(iii) For reproductive cells or tissues, a disease agent or disease of the genitourinary tract listed as follows:

(A) *Chlamydia trachomatis* ; and

(B) *Neisseria gonorrhea.*

(2) A disease agent or disease not listed in paragraph (r)(1) of this section:

(i) For which there may be a risk of transmission by an HCT/P, either to the recipient of the HCT/P or to those people who may handle or otherwise come in contact with it, such as medical personnel, because the disease agent or disease:

(A) Is potentially transmissible by an HCT/P and

(B) Either of the following applies:

(*1* ) The disease agent or disease has sufficient incidence and/or prevalence to affect the potential donor population, or

(*2* ) The disease agent or disease may have been released accidentally or intentionally in a manner that could place potential donors at risk of infection;

(ii) That could be fatal or life-threatening, could result in permanent impairment of a body function or permanent damage to body structure, or could necessitate medical or surgical intervention to preclude permanent impairment of body function or permanent damage to a body structure; and

(iii) For which appropriate screening measures have been developed and/or an appropriate screening test for donor specimens has been licensed, approved, or cleared for such use by FDA and is available.

(s) *Relevant medical records* means a collection of documents that includes a current donor medical history interview; a current report of the physical assessment of a cadaveric donor or the physical examination of a living donor; and, if available, the following:

(1) Laboratory test results (other than results of testing for relevant communicable disease agents required under this subpart);

(2) Medical records;

(3) Coroner and autopsy reports; and

(4) Records or other information received from any source pertaining to risk factors for relevant communicable disease (e.g., social behavior, clinical signs and symptoms of relevant communicable disease, and treatments related to medical conditions suggestive of risk for relevant communicable disease).

(t) *Responsible person* means a person who is authorized to perform designated functions for which he or she is trained and qualified.

(u) *Urgent medical need* means that no comparable HCT/P is available and the recipient is likely to suffer death or serious morbidity without the HCT/P.

(v) *Act* means the Federal Food, Drug, and Cosmetic Act.

(w) *PHS Act* means the Public Health Service Act.

(x) *FDA* means the Food and Drug Administration.

(y) *Adverse reaction* means a noxious and unintended response to any HCT/P for which there is a reasonable possibility that the HCT/P caused the response.

(z) *Available for distribution* means that the HCT/P has been determined to meet all release criteria.

(aa) *Complaint* means any written, oral, or electronic communication about a distributed HCT/P that alleges:

(1) That an HCT/P has transmitted or may have transmitted a communicable disease to the recipient of the HCT/P; or

(2) Any other problem with an HCT/P relating to the potential for transmission of communicable disease, such as the failure to comply with current good tissue practice.

(bb) *Distribution* means any conveyance or shipment (including importation and exportation) of an HCT/P that has been determined to meet all release criteria, whether or not such conveyance or shipment is entirely intrastate. If an entity does not take physical possession of an HCT/P, the entity is not considered a distributor.

(cc) *Establish and maintain* means define, document (in writing or electronically), and implement; then follow, review, and, as needed, revise on an ongoing basis.

(dd) *HCT/P deviation* means an event:

(1) That represents a deviation from applicable regulations in this part or from applicable standards or established specifications that relate to the prevention of communicable disease transmission or HCT/P contamination; or

(2) That is an unexpected or unforeseeable event that may relate to the transmission or potential transmission of a communicable disease or may lead to HCT/P contamination.

(ee) *Importer of record* means the person, establishment, or its representative responsible for making entry of imported goods in accordance with all laws affecting such importation.

(ff) *Processing* means any activity performed on an HCT/P, other than recovery, donor screening, donor testing, storage, labeling, packaging, or distribution, such as testing for microorganisms, preparation, sterilization, steps to inactivate or remove adventitious agents, preservation for storage, and removal from storage.

(gg) *Quality audit* means a documented, independent inspection and review of an establishment's activities related to core CGTP requirements. The purpose of a quality audit is to verify, by examination and evaluation of objective evidence, the degree of compliance with those aspects of the quality program under review.

(hh) *Quality program* means an organization's comprehensive system for manufacturing and tracking HCT/Ps in accordance with this part. A quality program is designed to prevent, detect, and correct deficiencies that may lead to circumstances that increase the risk of introduction, transmission, or spread of communicable diseases.

(ii) *Recovery* means obtaining from a human donor cells or tissues that are intended for use in human implantation, transplantation, infusion, or transfer.

(jj) *Storage* means holding HCT/Ps for future processing and/or distribution.

(kk) *Validation* means confirmation by examination and provision of objective evidence that particular requirements can consistently be fulfilled. Validation of a process, or *process validation* , means establishing by objective evidence that a process consistently produces a result or HCT/P meeting its predetermined specifications.

(ll) *Verification* means confirmation by examination and provision of objective evidence that specified requirements have been fulfilled.

(mm) *Importer* means a company or individual in the United States that is the owner, consignee, or recipient, at the time of entry, of the foreign establishment's HCT/P that is imported into the United States.

(nn) *United States agent* means a person residing or maintaining a place of business in the United States whom a foreign establishment designates as

its agent. This definition excludes mailboxes, answering machines or services, or other places where an individual acting as the foreign establishment's agent is not physically present.

[66 FR 5466, Jan. 19, 2001, as amended at 68 FR 3826, Jan. 27, 2004; 69 FR 29829, May 25, 2004; 69 FR 68680, Nov. 24, 2004; 81 FR 60223, Aug. 31, 2016]

Sec. 1271.10 Are my HCT/P's regulated solely under section 361 of the PHS Act and the regulations in this part, and if so what must I do?

(a) An HCT/P is regulated solely under section 361 of the PHS Act and the regulations in this part if it meets all of the following criteria:

(1) The HCT/P is minimally manipulated;

(2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;

(3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and

(4) Either:

(i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or

(ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:

(*a* ) Is for autologous use;

(*b* ) Is for allogeneic use in a first-degree or second-degree blood relative; or

(*c* ) Is for reproductive use.

(b) If you are a domestic or foreign establishment that manufactures an HCT/P described in paragraph (a) of this section:

(1) You must register with FDA;

(2) You must submit to FDA a list of each HCT/P manufactured; and

(3) You must comply with the other requirements contained in this part.

[66 FR 5466, Jan. 19, 2001, as amended at 69 FR 68681, Nov. 24, 2004]

Sec. 1271.15 Are there any exceptions from the requirements of this part?

(a) You are not required to comply with the requirements of this part if you are an establishment that uses HCT/P's solely for nonclinical scientific or educational purposes.

(b) You are not required to comply with the requirements of this part if you are an establishment that removes HCT/P's from an individual and implants such HCT/P's into the same individual during the same surgical procedure.

(c) You are not required to comply with the requirements of this part if you are a carrier who accepts, receives, carries, or delivers HCT/P's in the usual course of business as a carrier.

(d) You are not required to comply with the requirements of this part if you are an establishment that does not recover, screen, test, process, label, package, or distribute, but only receives or stores HCT/P's solely for implantation, transplantation, infusion, or transfer within your facility.

(e) You are not required to comply with the requirements of this part if you are an establishment that only recovers reproductive cells or tissue

and immediately transfers them into a sexually intimate partner of the cell or tissue donor.

(f) You are not required to register or list your HCT/P's independently, but you must comply with all other applicable requirements in this part, if you are an individual under contract, agreement, or other arrangement with a registered establishment and engaged solely in recovering cells or tissues and sending the recovered cells or tissues to the registered establishment.

Sec. 1271.20 If my HCT/P's do not meet the criteria in 1271.10, and I do not qualify for any of the exceptions in 1271.15, what regulations apply?

If you are an establishment that manufactures an HCT/P that does not meet the criteria set out in § 1271.10(a), and you do not qualify for any of the exceptions in § 1271.15, your HCT/P will be regulated as a drug, device, and/or biological product under the act and/or section 351 of the PHS Act, and applicable regulations in title 21, chapter I. Applicable regulations include, but are not limited to, §§ 207.9(a)(5), 210.1(c), 210.2, 211.1(b), 807.20(d), and 820.1(a) of this chapter, which require you to follow the procedures in subparts C and D of this part.

[66 FR 5466, Jan. 19, 2001, as amended at 81 FR 60223, Aug. 31, 2016]

## Subpart B - Procedures for Registration and Listing

Sec. 1271.21 When do I register, submit an HCT/P list, and submit updates?

(a) You must register and submit a list of every HCT/P that your establishment manufactures within 5 days after beginning operations or within 30 days of the effective date of this regulation, whichever is later.

(b) You must update your establishment registration annually in December, except as required by § 1271.26. You may accomplish your annual registration in conjunction with updating your HCT/P list under paragraph (c) of this section.

(c)(i) If no change described in § 1271.25(c) has occurred since you previously submitted an HCT/P list, you are not required to update your listing.

(ii) If a change described in § 1271.25(c) has occurred, you must update your HCT/P listing with the new information:

(*a* ) At the time of the change, or

(*b* ) Each June or December, whichever month occurs first after the change.

[69 FR 68681, Nov. 24, 2004]

Sec. 1271.22 How do I register and submit an HCT/P list?

(a) You must use the electronic registration and listing system at *http://www.fda.gov/cber/tissue/tisreg.htm* in accordance with § 1271.25 for:

(1) Establishment registration,

(2) HCT/P listings, and

(3) Updates of registration and HCT/P listing.

(b) FDA will periodically issue guidance on recommended procedures for providing registration and listing information in electronic format (for example, method of transmission, media, file formats, preparation, and organization of files).

(c) You must provide the information under paragraph (a) of this section in accordance with part 11 of this chapter, except for the requirements in § 11.10(b), (c), and (e) and the corresponding requirements in § 11.30.

[81 FR 60223, Aug. 31, 2016]

Sec. 1271.23 How is a waiver from the electronic format requirements requested?

(a) You may request a waiver from the requirement in § 1271.22 that information must be provided to FDA in electronic format. Submission of a request for waiver does not excuse timely compliance with the registration and listing requirements. FDA will grant a waiver request if FDA determines that the use of electronic means for submission of registration and listing information is not reasonable for the registrant making the waiver request.

(b) Waiver requests under this section must be submitted in writing and must include the specific reasons why electronic submission is not reasonable for the registrant and a U.S. telephone number and mailing address where FDA can contact the registrant. Waiver requests may be sent to the Center for Biologics Evaluation and Research (CBER), Document Control Center (see addresses in § 600.2 of this chapter).

(c) If FDA grants the waiver request, FDA may limit its duration and will specify terms of the waiver and provide information on how to submit establishment registration, listings, other information, and updates, as applicable.

[81 FR 60224, Aug. 31, 2016]

Sec. 1271.25 What information is required for establishment registration and HCT/P listing?

(a) Your establishment registration must include:

(1) The legal name(s) of the establishment;

(2) Each physical location, including the street address, telephone number, email address, and the postal service ZIP code of the establishment;

(3) The name, address, telephone number, email address, and title of the reporting official;

(4) A dated signature by the reporting official affirming that all information contained in the establishment registration and HCT/P listing form is true and accurate, to the best of his or her knowledge.

(5) Each foreign establishment must also submit the name, address, telephone number, and email address of each importer that is known to the establishment, and the name of each person who imports or offers for import such HCT/P to the United States for purposes of importation; and

(6) Each foreign establishment must also submit the name, address, telephone number, and email address of its United States agent.

(i) The United States agent must reside or maintain a place of business in the United States.

(ii) Upon request from FDA, the United States agent must assist FDA in communications with the foreign establishment, respond to questions concerning the foreign establishment's products that are imported or offered for import into the United States, and assist FDA in scheduling inspections of the foreign establishment. If the Agency is unable to contact the foreign establishment directly or expeditiously, FDA may provide information or documents to the United States agent, and such an action is equivalent to providing the same information or documents to the foreign establishment.

(iii) The foreign establishment or the United States agent must report changes in the United States agent's name, address, telephone number, or email address to FDA within 30 calendar days of the change.

(b) Your HCT/P listing must include all HCT/P's (including the established name and the proprietary name) that you recover, process, store, label, package, distribute, or for which you perform donor screening or testing. You must also state whether each HCT/P meets the criteria set out in § 1271.10.

(c) Your HCT/P listing update must include:

(1) A list of each HCT/P that you have begun recovering, processing, storing, labeling, packaging, distributing, or for which you have begun donor screening or testing, that has not been included in any list previously submitted. You must provide all of the information required by § 1271.25(b) for each new HCT/P.

(2) A list of each HCT/P formerly listed in accordance with § 1271.21(a) for which you have discontinued recovery, processing, storage, labeling, packaging, distribution, or donor screening or testing, including for each HCT/P so listed, the identity by established name and proprietary name, and the date of discontinuance. We request but do not require that you include the reason for discontinuance with this information.

(3) A list of each HCT/P for which a notice of discontinuance was submitted under paragraph (c)(2) of this section and for which you have resumed recovery, processing, storage, labeling, packaging, distribution, or donor screening or testing, including the identity by established name and proprietary name, the date of resumption, and any other information required by § 1271.25(b) not previously submitted.

(4) Any material change in any information previously submitted. Material changes include any change in registration and listing information, submitted, such as whether the HCT/P meets the criteria set out in § 1271.10.

(d) If your HCT/P is described under § 1271.20 and is regulated under a BLA, you must submit the information required under part 207 of this chapter using the procedures under subpart E of part 207.

[66 FR 5466, Jan. 19, 2001, as amended at 81 FR 60224, Aug. 31, 2016]

Sec. 1271.26 When must I amend my establishment registration?

If the ownership or location of your establishment changes, or if there is a change in the United States agent's name, address, telephone number, or email address, you must submit an amendment to registration within 30 calendar days of the change.

[81 FR 60224, Aug. 31, 2017]

Sec. 1271.27 Will FDA assign me a registration number?

(a) FDA will assign each location a permanent registration number.

(b) FDA acceptance of an establishment registration and HCT/P listing form does not constitute a determination that an establishment is in compliance with applicable rules and regulations or that the HCT/P is licensed or approved by FDA.

Sec. 1271.37 Will establishment registrations and HCT/P listings be available for inspection, and how do I request information on registrations and listings?

(a) Any registration on Form FDA 3356 filed in paper or electronic format by each establishment will be available for public inspection through the Center for Biologics Evaluation and Research Human Cell and Tissue Establishment Registration - Public Query Web site by using the CBER electronic Web-based application or by going in person to the Food and Drug Administration, Division of Dockets Management Public Reading Room (see address in § 20.120(a) of this chapter). The following information submitted under the HCT/P requirements is illustrative of the type of information that will be available for public disclosure when it is compiled:

(1) A list of all HCT/P's;

(2) A list of all HCT/P's manufactured by each establishment;

(3) A list of all HCT/P's discontinued; and

(4) All data or information that has already become a matter of public record.

(b) You should direct your other requests for information regarding HCT/P establishment registrations and HCT/P listings to the Food and Drug Administration, Center for Biologics Evaluation and Research, Office of Communication, Outreach and Development, 10903 New Hampshire Ave., Bldg. 71, Rm. 3103, Silver Spring, MD 20993-0002.

[80 FR 18094, Apr. 3, 2015]

**Subpart C - Donor Eligibility**

Sec. 1271.45 What requirements does this subpart contain?

(a) *General.* This subpart sets out requirements for determining donor eligibility, including donor screening and testing. The requirements contained in this subpart are a component of current good tissue practice (CGTP) requirements. Other CGTP requirements are set out in subpart D of this part.

(b) *Donor-eligibility determination required.* A donor-eligibility determination, based on donor screening and testing for relevant communicable disease agents and diseases, is required for all donors of cells or tissue used in HCT/Ps, except as provided under § 1271.90. In the case of an embryo or of cells derived from an embryo, a donor-eligibility determination is required for both the oocyte donor and the semen donor.

(c) *Prohibition on use.* An HCT/P must not be implanted, transplanted, infused, or transferred until the donor has been determined to be eligible, except as provided under §§ 1271.60(d), 1271.65(b), and 1271.90 of this subpart.

(d) *Applicability of requirements.* If you are an establishment that performs any function described in this subpart, you must comply with the requirements contained in this subpart that are applicable to that function.

[69 FR 29830, May 25, 2004, as amended at 69 FR 68681, Nov. 24, 2004]

Sec. 1271.47 What procedures must I establish and maintain?

(a) *General.* You must establish and maintain procedures for all steps that you perform in testing, screening, determining donor eligibility, and complying with all other requirements of this subpart. Establish and maintain means define, document (in writing or electronically), and implement; then follow, review, and as needed, revise on an ongoing basis. You must design these procedures to ensure compliance with the requirements of this subpart.

(b) *Review and approval.* Before implementation, a responsible person must review and approve all procedures.

(c) *Availability.* Procedures must be readily available to the personnel in the area where the operations to which they relate are performed, or in a nearby area if such availability is impractical.

(d) *Departures from procedures.* You must record and justify any departure from a procedure relevant to preventing risks of communicable disease transmission at the time of its occurrence. You must not make available for distribution any HCT/P from a donor whose eligibility is determined under such a departure unless a responsible person has determined that the departure does not increase the risks of communicable disease transmission through the use of the HCT/P.

(e) *Standard procedures.* You may adopt current standard procedures, such as those in a technical manual prepared by another organization, provided that you have verified that the procedures are consistent with and at least as stringent as the requirements of this part and appropriate for your operations.

Sec. 1271.50 How do I determine whether a donor is eligible?

(a) *Determination based on screening and testing.* If you are the establishment responsible for making the donor-eligibility determination, you must determine whether a donor is eligible based upon the results of donor screening in accordance with § 1271.75 and donor testing in accordance with §§ 1271.80 and 1271.85. A responsible person, as defined in § 1271.3(t), must determine and document the eligibility of a cell or tissue donor.

(b) *Eligible donor.* A donor is eligible under these provisions only if:

(1) Donor screening in accordance with § 1271.75 indicates that the donor:

(i) Is free from risk factors for, and clinical evidence of, infection due to relevant communicable disease agents and diseases; and

(ii) Is free from communicable disease risks associated with xenotransplantation; and

(2) The results of donor testing for relevant communicable disease agents in accordance with §§ 1271.80 and 1271.85 are negative or nonreactive, except as provided in § 1271.80(d)(1).

Sec. 1271.55 What records must accompany an HCT/P after the donor-eligibility determination is complete; and what records must I retain?

(a) *Accompanying records.* Once a donor-eligibility determination has been made, the following must accompany the HCT/P at all times:

(1) A distinct identification code affixed to the HCT/P container, e.g., alphanumeric, that relates the HCT/P to the donor and to all records pertaining to the HCT/P and, except in the case of autologous donations, directed reproductive donations, or donations made by first-degree or second-degree blood relatives, does not include an individual's name, social security number, or medical record number;

(2) A statement whether, based on the results of screening and testing, the donor has been determined to be eligible or ineligible; and

(3) A summary of the records used to make the donor-eligibility determination.

(b) *Summary of records.* The summary of records required by paragraph (a)(3) of this section must contain the following information:

(1) A statement that the communicable disease testing was performed by a laboratory:

(i) Certified to perform such testing on human specimens under the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. 263a) and 42 CFR part 493; or

(ii) That has met equivalent requirements as determined by the Centers for Medicare and Medicaid Services in accordance with those provisions;

(2) A listing and interpretation of the results of all communicable disease tests performed;

(3) The name and address of the establishment that made the donor-eligibility determination; and

(4) In the case of an HCT/P from a donor who is ineligible based on screening and released under paragraph (b) of § 1271.65, a statement noting the reason(s) for the determination of ineligibility.

(c) *Deletion of personal information.* The accompanying records required by this section must not contain the donor's name or other personal information that might identify the donor.

(d) *Record retention requirements.* (1) You must maintain documentation of:

(i) Results and interpretation of all testing for relevant communicable disease agents in compliance with §§ 1271.80 and 1271.85, as well as the name and address of the testing laboratory or laboratories;

(ii) Results and interpretation of all donor screening for communicable diseases in compliance with § 1271.75; and

(iii) The donor-eligibility determination, including the name of the responsible person who made the determination and the date of the determination.

(2) All records must be accurate, indelible, and legible. Information on the identity and relevant medical records of the donor, as defined in § 1271.3(s), must be in English or, if in another language, must be retained and translated to English and accompanied by a statement of authenticity by the translator that specifically identifies the translated document.

(3) You must retain required records and make them available for authorized inspection by or upon request from FDA. Records that can be readily retrieved from another location by electronic means are considered "retained."

(4) You must retain the records pertaining to a particular HCT/P at least 10 years after the date of its administration, or if the date of administration is not known, then at least 10 years after the date of the HCT/P's distribution, disposition, or expiration, whichever is latest.

[69 FR 29830, May 25, 2004, as amended at 70 FR 29952, May 25, 2005]

Sec. 1271.60 What quarantine and other requirements apply before the donor-eligibility determination is complete?

(a) *Quarantine.* You must keep an HCT/P in quarantine, as defined in § 1271.3(q), until completion of the donor-eligibility determination required by § 1271.50. You must quarantine semen from anonymous donors until the retesting required under § 1271.85(d) is complete.

(b) *Identification of HCT/Ps in quarantine.* You must clearly identify as quarantined an HCT/P that is in quarantine pending completion of a donor-eligibility determination. The quarantined HCT/P must be easily distinguishable from HCT/Ps that are available for release and distribution.

(c) *Shipping of HCT/Ps in quarantine.* If you ship an HCT/P before completion of the donor-eligibility determination, you must keep it in quarantine during shipment. The HCT/P must be accompanied by records:

(1) Identifying the donor (e.g., by a distinct identification code affixed to the HCT/P container);

(2) Stating that the donor-eligibility determination has not been completed; and

(3) Stating that the product must not be implanted, transplanted, infused, or transferred until completion of the donor-eligibility determination, except under the terms of paragraph (d) of this section.

(d) *Use in cases of urgent medical need.* (1) This subpart C does not prohibit the implantation, transplantation, infusion, or transfer of an HCT/P from a donor for whom the donor-eligibility determination is not complete if there is a documented urgent medical need for the HCT/P, as defined in § 1271.3(u).

(2) If you make an HCT/P available for use under the provisions of paragraph (d)(1) of this section, you must prominently label it "NOT EVALUATED FOR INFECTIOUS SUBSTANCES," and " WARNING: Advise patient of communicable disease risks." The following information must accompany the HCT/P:

(i) The results of any donor screening required under § 1271.75 that has been completed;

(ii) The results of any testing required under § 1271.80 or 1271.85 that has been completed; and

(iii) A list of any screening or testing required under § 1271.75, 1271.80 or 1271.85 that has not yet been completed.

(3) If you are the establishment that manufactured an HCT/P used under the provisions of paragraph (d)(1) of this section, you must document that you notified the physician using the HCT/P that the testing and screening were not complete.

(4) In the case of an HCT/P used for an urgent medical need under the provisions of paragraph (d)(1) of this section, you must complete the donor-eligibility determination during or after the use of the HCT/P, and you must inform the physician of the results of the determination.

Sec. 1271.65 How do I store an HCT/P from a donor determined to be ineligible, and what uses of the HCT/P are not prohibited?

(a) *Storage.* If you are the establishment that stores the HCT/P, you must store or identify HCT/Ps from donors who have been determined to be ineligible in a physically separate area clearly identified for such use, or follow other procedures, such as automated designation, that are adequate to prevent improper release until destruction or other disposition of the HCT/P in accordance with paragraph (b) or (c) of this section.

(b) *Limited uses of HCT/P from ineligible donor.* (1) An HCT/P from a donor who has been determined to be ineligible, based on the results of required testing and/or screening, is not prohibited by subpart C of this part from use for implantation, transplantation, infusion, or transfer under the following circumstances:

(i) The HCT/P is for allogeneic use in a first-degree or second-degree blood relative;

(ii) The HCT/P consists of reproductive cells or tissue from a directed reproductive donor, as defined in § 1271.3(l); or

(iii) There is a documented urgent medical need as defined in § 1271.3(u).

(2) You must prominently label an HCT/P made available for use under the provisions of paragraph (b)(1) of this section with the Biohazard legend shown in § 1271.3(h) with the statement "WARNING: Advise patient of communicable disease risks," and, in the case of reactive test results, "WARNING: Reactive test results for (name of disease agent or disease)." The HCT/P must be accompanied by the records required under § 1271.55.

(3) If you are the establishment that manufactured an HCT/P used under the provisions of paragraph (b)(1) of this section, you must document that you notified the physician using the HCT/P of the results of testing and screening.

(c) *Nonclinical use.* You may make available for nonclinical purposes an HCT/P from a donor who has been determined to be ineligible, based on the results of required testing and/or screening, provided that it is labeled:

(1) "For Nonclinical Use Only" and

(2) With the Biohazard legend shown in § 1271.3(h).

Sec. 1271.75 How do I screen a donor?

(a) *All donors.* Except as provided under § 1271.90, if you are the establishment that performs donor screening, you must screen a donor of cells or tissue by reviewing the donor's relevant medical records for:

(1) Risk factors for, and clinical evidence of, relevant communicable disease agents and diseases, including:

(i) Human immunodeficiency virus;

(ii) Hepatitis B virus;

(iii) Hepatitis C virus;

(iv) Human transmissible spongiform encephalopathy, including Creutzfeldt-Jakob disease;

(v) *Treponema pallidum* ; and

(2) Communicable disease risks associated with xenotransplantation.

(b) *Donors of viable, leukocyte-rich cells or tissue.* In addition to the relevant communicable disease agents and diseases for which screening is required under paragraph (a) of this section, and except as provided under § 1271.90, you must screen the donor of viable, leukocyte-rich cells or tissue by reviewing the donor's relevant medical records for risk factors for and clinical evidence of relevant cell-associated communicable disease agents and diseases, including Human T-lymphotropic virus.

(c) *Donors of reproductive cells or tissue.* In addition to the relevant communicable disease agents and diseases for which screening is required under paragraphs (a) and (b) of this section, as applicable, and except as provided under § 1271.90, you must screen the donor of reproductive cells or tissue by reviewing the donor's relevant medical records for risk factors for and clinical evidence of infection due to relevant communicable diseases of the genitourinary tract. Such screening must include screening for the communicable disease agents listed in paragraphs (c)(1) and (c)(2) of this section. However, if the reproductive cells or tissues are recovered by a method that ensures freedom from contamination of the cells or tissue by infectious disease organisms that may be present in the genitourinary tract, then screening for the communicable disease agents listed in paragraphs (c)(1) and (c)(2) of this section is not required. Communicable disease agents of the genitourinary tract for which you must screen include:

(1) *Chlamydia trachomatis* ; and

(2) *Neisseria gonorrhea.*

(d) *Ineligible donors.* You must determine ineligible a donor who is identified as having either of the following:

(1) A risk factor for or clinical evidence of any of the relevant communicable disease agents or diseases for which screening is required under paragraphs (a)(1), (b), or (c) of this section; or

(2) Any communicable disease risk associated with xenotransplantation.

(e) *Abbreviated procedure for repeat donors.* If you have performed a complete donor screening procedure on a living donor within the previous 6 months, you may use an abbreviated donor screening procedure on repeat donations. The abbreviated procedure must determine and document any changes in the donor's medical history since the previous donation that would make the donor ineligible, including relevant social behavior.

[66 FR 5466, Jan. 19, 2001, as amended at 71 FR 14798, Mar. 24, 2006]

Sec. 1271.80 What are the general requirements for donor testing?

(a) *Testing for relevant communicable diseases is required.* To adequately and appropriately reduce the risk of transmission of relevant communicable diseases, and except as provided under § 1271.90, if you are the establishment that performs donor testing, you must test a donor specimen for evidence of infection due to communicable disease agents in accordance with paragraph (c) of this section. You must test for those communicable disease agents specified in § 1271.85. In the case of a donor 1 month of age or younger, you must test a specimen from the birth mother instead of a specimen from the donor.

(b) *Timing of specimen collection.* You must collect the donor specimen for testing at the time of recovery of cells or tissue from the donor; or up to 7 days before or after recovery, except:

(1) For donors of peripheral blood stem/progenitor cells, bone marrow (if not excepted under § 1271.3(d)(4)), or oocytes, you may collect the donor specimen for testing up to 30 days before recovery; or

(2) In the case of a repeat semen donor from whom a specimen has already been collected and tested, and for whom retesting is required under §

1271.85(d), you are not required to collect a donor specimen at the time of each donation.

(c) *Tests.* You must test using appropriate FDA-licensed, approved, or cleared donor screening tests, in accordance with the manufacturer's instructions, to adequately and appropriately reduce the risk of transmission of relevant communicable disease agents or diseases; however, until such time as appropriate FDA-licensed, approved, or cleared donor screening tests for *Chlamydia trachomatis* and for *Neisseria gonorrhea* are available, you must use FDA-licensed, approved, or cleared tests labeled for the detection of those organisms in an asymptomatic, low-prevalence population. You must use a test specifically labeled for cadaveric specimens instead of a more generally labeled test when applicable and when available. Required testing under this section must be performed by a laboratory that either is certified to perform such testing on human specimens under the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. 263a) and 42 CFR part 493, or has met equivalent requirements as determined by the Centers for Medicare and Medicaid Services.

(d) *Ineligible donors.* You must determine the following donors to be ineligible:

(1) A donor whose specimen tests reactive on a screening test for a communicable disease agent in accordance with § 1271.85, except for a donor whose specimen tests reactive on a non-treponemal screening test for syphilis and negative on a specific treponemal confirmatory test;

(2)(i) A donor in whom plasma dilution sufficient to affect the results of communicable disease testing is suspected, unless:

(A) You test a specimen taken from the donor before transfusion or infusion and up to 7 days before recovery of cells or tissue; or

(B) You use an appropriate algorithm designed to evaluate volumes administered in the 48 hours before specimen collection, and the algorithm shows that plasma dilution sufficient to affect the results of communicable disease testing has not occurred.

(ii) Clinical situations in which you must suspect plasma dilution sufficient to affect the results of communicable disease testing include but are not limited to the following:

(A) Blood loss is known or suspected in a donor over 12 years of age, and the donor has received a transfusion or infusion of any of the following, alone or in combination:

(*1* ) More than 2,000 milliliters (mL) of blood (e.g., whole blood, red blood cells) or colloids within 48 hours before death or specimen collection, whichever occurred earlier, or

(*2* ) More than 2,000 mL of crystalloids within 1 hour before death or specimen collection, whichever occurred earlier.

(B) Regardless of the presence or absence of blood loss, the donor is 12 years of age or younger and has received a transfusion or infusion of any amount of any of the following, alone or in combination:

(*1* ) Blood (e.g., whole blood, red blood cells) or colloids within 48 hours before death or specimen collection, whichever occurred earlier, or

(*2* ) Crystalloids within 1 hour before death or specimen collection, whichever occurred earlier.

[69 FR 29830, May 25, 2004, as amended at 70 FR 29952, May 25, 2005]

Sec. 1271.85 What donor testing is required for different types of cells and tissues?

(a) *All donors.* To adequately and appropriately reduce the risk of transmission of relevant communicable diseases, and except as provided under § 1271.90, you must test a specimen from the donor of cells or

tissue, whether viable or nonviable, for evidence of infection due to relevant communicable disease agents, including:

(1) Human immunodeficiency virus, type 1;

(2) Human immunodeficiency virus, type 2;

(3) Hepatitis B virus;

(4) Hepatitis C virus; and

(5) *Treponema pallidum.*

(b) *Donors of viable, leukocyte-rich cells or tissue.* In addition to the relevant communicable disease agents for which testing is required under paragraph (a) of this section, and except as provided under § 1271.90,

(1) You must test a specimen from the donor of viable, leukocyte-rich cells or tissue to adequately and appropriately reduce the risk of transmission of relevant cell-associated communicable diseases, including:

(i) Human T-lymphotropic virus, type I; and

(ii) Human T-lymphotropic virus, type II.

(2) You must test a specimen from the donor of viable, leukocyte-rich cells or tissue for evidence of infection due to cytomegalovirus (CMV), to adequately and appropriately reduce the risk of transmission. You must establish and maintain a standard operating procedure governing the release of an HCT/P from a donor whose specimen tests reactive for CMV.

(c) *Donors of reproductive cells or tissue.* In addition to the communicable disease agents for which testing is required under paragraphs (a) and (b) of this section, as applicable, and except as provided under § 1271.90, you must test a specimen from the donor of reproductive cells or tissue to adequately and appropriately reduce the risk of transmission of relevant communicable disease agents of the genitourinary tract. Such testing must include testing for the communicable disease agents listed in paragraphs (c)(1) and (c)(2) of this section. However, if the reproductive cells or tissues are recovered by a method that ensures freedom from contamination of the cells or tissue by infectious disease organisms that may be present in the genitourinary tract, then testing for the communicable disease agents listed in paragraphs (c)(1) and (c)(2) of this section is not required. Communicable disease agents of the genitourinary tract for which you must test include:

(1) *Chlamydia trachomatis* ; and

(2) *Neisseria gonorrhea.*

(d) *Retesting anonymous semen donors.* Except as provided under § 1271.90 and except for directed reproductive donors as defined in § 1271.3(l), at least 6 months after the date of donation of semen from anonymous donors, you must collect a new specimen from the donor and test it for evidence of infection due to the communicable disease agents for which testing is required under paragraphs (a), (b), and (c) of this section.

(e) *Dura mater.* For donors of dura mater, you must perform an adequate assessment designed to detect evidence of transmissible spongiform encephalopathy.

Sec. 1271.90 Are there other exceptions and what labeling requirements apply?

(a) *Donor-eligibility determination not required.* You are not required to make a donor-eligibility determination under § 1271.50 or to perform donor screening or testing under §§ 1271.75, 1271.80 and 1271.85 for:

(1) Cells and tissues for autologous use; or

(2) Reproductive cells or tissue donated by a sexually intimate partner of the recipient for reproductive use; or

(3) Cryopreserved cells or tissue for reproductive use, other than embryos, originally excepted under paragraphs (a)(1) or (a)(2) of this section at

the time of donation, that are subsequently intended for directed donation, provided that:

(i) Additional donations are unavailable, for example, due to the infertility or health of a donor of the cryopreserved reproductive cells or tissue; and

(ii) Appropriate measures are taken to screen and test the donor(s) before transfer to the recipient.

(4) A cryopreserved embryo, originally excepted under paragraph (a)(2) of this section at the time of recovery or cryopreservation, that is subsequently intended for directed or anonymous donation. When possible, appropriate measures should be taken to screen and test the semen and oocyte donors before transfer of the embryo to the recipient.

(b) *Exceptions for reproductive use.* An embryo originally intended for reproductive use for a specific individual or couple that is subsequently intended for directed or anonymous donation for reproductive use is excepted from the prohibition on use under § 1271.45(c) even when the applicable donor eligibility requirements under subpart C of this part are not met. Nothing in this paragraph creates an exception for deficiencies that occurred in making the donor eligibility determination for either the oocyte donor or the semen donor as required under § 1271.45(b), or for deficiencies in performing donor screening or testing, as required under §§ 1271.75, 1271.80, and 1271.85.

(c) *Required labeling.* As applicable, you must prominently label an HCT/P described in paragraphs (a) and (b) of this section as follows:

(1) "FOR AUTOLOGOUS USE ONLY," if it is stored for autologous use.

(2) "NOT EVALUATED FOR INFECTIOUS SUBSTANCES," unless you have performed all otherwise applicable screening and testing under §§ 1271.75, 1271.80, and 1271.85. This paragraph does not apply to reproductive cells or tissue labeled in accordance with paragraph (c)(6) of this section.

(3) Unless the HCT/P is for autologous use only, "WARNING: Advise recipient of communicable disease risks,"

(i) When the donor-eligibility determination under § 1271.50(a) is not performed or is not completed; or

(ii) If the results of any screening or testing performed indicate:

(A) The presence of relevant communicable disease agents and/or

(B) Risk factors for or clinical evidence of relevant communicable disease agents or diseases.

(4) With the Biohazard legend shown in § 1271.3(h), if the results of any screening or testing performed indicate:

(i) The presence of relevant communicable disease agents and/or

(ii) Risk factors for or clinical evidence of relevant communicable disease agents or diseases.

(5) "WARNING: Reactive test results for (name of disease agent or disease)," in the case of reactive test results.

(6) "Advise recipient that screening and testing of the donor(s) were not performed at the time of recovery or cryopreservation of the reproductive cells or tissue, but have been performed subsequently," for paragraphs (a)(3) or (a)(4) of this section.

[69 FR 29830, May 25, 2004, as amended at 70 FR 29952, May 25, 2005; 81 FR 40517, June 22, 2016]

## Subpart D - Current Good Tissue Practice

Sec. 1271.145 Prevention of the introduction, transmission, or spread of communicable diseases.

You must recover, process, store, label, package, and distribute HCT/Ps,

and screen and test cell and tissue donors, in a way that prevents the introduction, transmission, or spread of communicable diseases.

Sec. 1271.150 Current good tissue practice requirements.

(a) *General*. This subpart D and subpart C of this part set forth current good tissue practice (CGTP) requirements. You must follow CGTP requirements to prevent the introduction, transmission, or spread of communicable diseases by HCT/Ps (e.g., by ensuring that the HCT/Ps do not contain communicable disease agents, that they are not contaminated, and that they do not become contaminated during manufacturing). Communicable diseases include, but are not limited to, those transmitted by viruses, bacteria, fungi, parasites, and transmissible spongiform encephalopathy agents. CGTP requirements govern the methods used in, and the facilities and controls used for, the manufacture of HCT/Ps, including but not limited to all steps in recovery, donor screening, donor testing, processing, storage, labeling, packaging, and distribution. The CGTP provisions specifically governing determinations of donor eligibility, including donor screening and testing, are set out separately in subpart C of this part.

(b) *Core CGTP requirements*. The following are core CGTP requirements:

(1) Requirements relating to facilities in § 1271.190(a) and (b);

(2) Requirements relating to environmental control in § 1271.195(a);

(3) Requirements relating to equipment in § 1271.200(a);

(4) Requirements relating to supplies and reagents in § 1271.210(a) and (b);

(5) Requirements relating to recovery in § 1271.215;

(6) Requirements relating to processing and process controls in § 1271.220;

(7) Requirements relating to labeling controls in § 1271.250(a) and (b);

(8) Requirements relating to storage in § 1271.260 (a) through (d);

(9) Requirements relating to receipt, predistribution shipment, and distribution of an HCT/P in § 1271.265(a) through (d); and

(10) Requirements relating to donor eligibility determinations, donor screening, and donor testing in §§ 1271.50, 1271.75, 1271.80, and 1271.85.

(c) *Compliance with applicable requirements* - (1) *Manufacturing arrangements* (i) If you are an establishment that engages in only some operations subject to the regulations in this subpart and subpart C of this part, and not others, then you need only comply with those requirements applicable to the operations that you perform.

(ii) If you engage another establishment (e.g., a laboratory to perform communicable disease testing, or an irradiation facility to perform terminal sterilization), under a contract, agreement, or other arrangement, to perform any step in manufacture for you, that establishment is responsible for complying with requirements applicable to that manufacturing step.

(iii) Before entering into a contract, agreement, or other arrangement with another establishment to perform any step in manufacture for you, you must ensure that the establishment complies with applicable CGTP requirements. If, during the course of this contract, agreement, or other arrangement, you become aware of information suggesting that the establishment may no longer be in compliance with such requirements, you must take reasonable steps to ensure the establishment complies with those requirements. If you determine that the establishment is not in compliance with those requirements, you must terminate your contract, agreement, or other arrangement with the establishment.

(2) If you are the establishment that determines that an HCT/P meets all release criteria and makes the HCT/P available for distribution, whether or not you are the actual distributor, you are responsible for reviewing manufacturing and tracking records to determine that the HCT/P has been

manufactured and tracked in compliance with the requirements of this subpart and subpart C of this part and any other applicable requirements.

(3) With the exception of §§ 1271.150(c) and 1271.155 of this subpart, the regulations in this subpart are not being implemented for reproductive HCT/Ps described in § 1271.10 and regulated solely under section 361 of the Public Health Service Act and the regulations in this part, or for the establishments that manufacture them.

(d) *Compliance with parts 210, 211, and 820 of this chapter.* With respect to HCT/Ps that are drugs (subject to review under an application submitted under section 505 of the Federal Food, Drug, and Cosmetic Act or under a biological product license application under section 351 of the Public Health Service Act) or that are devices (subject to premarket review or notification under the device provisions of the act or under a biological product license application under section 351 of the Public Health Service Act), the procedures contained in this subpart and in subpart C of this part and the current good manufacturing practice regulations in parts 210 and 211 of this chapter and the quality system regulations in part 820 of this chapter supplement, and do not supersede, each other unless the regulations explicitly provide otherwise. In the event that a regulation in part 1271 of this chapter is in conflict with a requirement in parts 210, 211, or 820 of this chapter, the regulations more specifically applicable to the product in question will supersede the more general.

(e) *Where appropriate.* When a requirement is qualified by "where appropriate," it is deemed to be "appropriate" unless you can document justification otherwise. A requirement is "appropriate" if nonimplementation of the requirement could reasonably be expected to result in the HCT/P not meeting its specified requirements related to prevention of introduction, transmission, or spread of communicable diseases, or in your inability to carry out any necessary corrective action.

Sec. 1271.155 Exemptions and alternatives.

(a) *General.* You may request an exemption from or alternative to any requirement in subpart C or D of this part.

(b) *Request for exemption or alternative.* Submit your request under this section to the Director of the appropriate Center (the Director), e.g., the Center for Biologics Evaluation and Research or the Center for Devices and Radiological Health. The request must be accompanied by supporting documentation, including all relevant valid scientific data, and must contain either:

(1) Information justifying the requested exemption from the requirement, or

(2) A description of a proposed alternative method of meeting the requirement.

(c) *Criteria for granting an exemption or alternative.* The Director may grant an exemption or alternative if he or she finds that such action is consistent with the goals of protecting the public health and/or preventing the introduction, transmission, or spread of communicable diseases and that:

(1) The information submitted justifies an exemption; or

(2) The proposed alternative satisfies the purpose of the requirement.

(d) *Form of request.* You must ordinarily make your request for an exemption or alternative in writing (hard copy or electronically). However, if circumstances make it difficult (e.g., there is inadequate time) to submit your request in writing, you may make the request orally, and the Director may orally grant an exemption or alternative. You must follow your oral request with an immediate written request, to which the Director will respond in writing.

(e) *Operation under exemption or alternative.* You must not begin operating under the terms of a requested exemption or alternative until the exemption

or alternative has been granted. You may apply for an extension of an exemption or alternative beyond its expiration date, if any.

(f) *Documentation.* If you operate under the terms of an exemption or alternative, you must maintain documentation of:

(1) FDA's grant of the exemption or alternative, and

(2) The date on which you began operating under the terms of the exemption or alternative.

(g) *Issuance of an exemption or alternative by the Director.* In a public health emergency, the Director may issue an exemption from, or alternative to, any requirement in part 1271. The Director may issue an exemption or alternative under this section if the exemption or alternative is necessary to assure that certain HCT/Ps will be available in a specified location to respond to an unanticipated immediate need for those HCT/Ps.

Sec. 1271.160 Establishment and maintenance of a quality program.

(a) *General.* If you are an establishment that performs any step in the manufacture of HCT/Ps, you must establish and maintain a quality program intended to prevent the introduction, transmission, or spread of communicable diseases through the manufacture and use of HCT/Ps. The quality program must be appropriate for the specific HCT/Ps manufactured and the manufacturing steps performed. The quality program must address all core CGTP requirements listed in § 1271.150(b).

(b) *Functions.* Functions of the quality program must include:

(1) Establishing and maintaining appropriate procedures relating to core CGTP requirements, and ensuring compliance with the requirements of § 1271.180 with respect to such procedures, including review, approval, and revision;

(2) Ensuring that procedures exist for receiving, investigating, evaluating, and documenting information relating to core CGTP requirements, including complaints, and for sharing any information pertaining to the possible contamination of the HCT/P or the potential for transmission of a communicable disease by the HCT/P with the following:

(i) Other establishments that are known to have recovered HCT/Ps from the same donor;

(ii) Other establishments that are known to have performed manufacturing steps with respect to the same HCT/P; and

(iii) Relating to consignees, in the case of such information received after the HCT/P is made available for distribution, shipped to the consignee, or administered to the recipient, procedures must include provisions for assessing risk and appropriate followup, and evaluating the effect this information has on the HCT/P and for the notification of all entities to whom the affected HCT/P was distributed, the quarantine and recall of the HCT/P, and/or reporting to FDA, as necessary.

(3) Ensuring that appropriate corrective actions relating to core CGTP requirements, including reaudits of deficiencies, are taken and documented, as necessary. You must verify corrective actions to ensure that such actions are effective and are in compliance with CGTP. Where appropriate, corrective actions must include both short-term action to address the immediate problem and long-term action to prevent the problem's recurrence. Documentation of corrective actions must include, where appropriate:

(i) Identification of the HCT/P affected and a description of its disposition;

(ii) The nature of the problem requiring corrective action;

(iii) A description of the corrective action taken; and

(iv) The date(s) of the corrective action.

(4) Ensuring the proper training and education of personnel involved in activities related to core CGTP requirements;

(5) Establishing and maintaining appropriate monitoring systems as necessary to comply with the requirements of this subpart (e.g., environmental monitoring);

(6) Investigating and documenting HCT/P deviations and trends of HCT/P deviations relating to core CGTP requirements and making reports if required under § 1271.350(b) or other applicable regulations. Each investigation must include a review and evaluation of the HCT/P deviation, the efforts made to determine the cause, and the implementation of corrective action(s) to address the HCT/P deviation and prevent recurrence.

(c) *Audits.* You must periodically perform for management review a quality audit, as defined in § 1271.3(gg), of activities related to core CGTP requirements.

(d) *Computers.* You must validate the performance of computer software for the intended use, and the performance of any changes to that software for the intended use, if you rely upon the software to comply with core CGTP requirements and if the software either is custom software or is commercially available software that has been customized or programmed (including software programmed to perform a user defined calculation or table) to perform a function related to core CGTP requirements. You must verify the performance of all other software for the intended use if you rely upon it to comply with core CGTP requirements. You must approve and document these activities and results before implementation.

Sec. 1271.170 Personnel.

(a) *General.* You must have personnel sufficient to ensure compliance with the requirements of this part.

(b) *Competent performance of functions.* You must have personnel with the necessary education, experience, and training to ensure competent performance of their assigned functions. Personnel must perform only those activities for which they are qualified and authorized.

(c) *Training.* You must train all personnel, and retrain as necessary, to perform their assigned responsibilities adequately.

Sec. 1271.180 Procedures.

(a) *General.* You must establish and maintain procedures appropriate to meet core CGTP requirements for all steps that you perform in the manufacture of HCT/Ps. You must design these procedures to prevent circumstances that increase the risk of the introduction, transmission, or spread of communicable diseases through the use of HCT/Ps.

(b) *Review and approval.* Before implementation, a responsible person must review and approve these procedures.

(c) *Availability.* These procedures must be readily available to the personnel in the area where the operations to which they relate are performed, or in a nearby area if such availability is impractical.

(d) *Standard procedures.* If you adopt current standard procedures from another organization, you must verify that the procedures meet the requirements of this part and are appropriate for your operations.

Sec. 1271.190 Facilities.

(a) *General.* Any facility used in the manufacture of HCT/Ps must be of suitable size, construction, and location to prevent contamination of HCT/Ps with communicable disease agents and to ensure orderly handling of HCT/Ps without mix-ups. You must maintain the facility in a good state of repair. You must provide lighting, ventilation, plumbing, drainage, and

access to sinks and toilets that are adequate to prevent the introduction, transmission, or spread of communicable disease.

(b) *Facility cleaning and sanitation.* (1) You must maintain any facility used in the manufacture of HCT/Ps in a clean, sanitary, and orderly manner, to prevent the introduction, transmission, or spread of communicable disease.

(2) You must dispose of sewage, trash, and other refuse in a timely, safe, and sanitary manner.

(c) *Operations.* You must divide a facility used in the manufacture of HCT/Ps into separate or defined areas of adequate size for each operation that takes place in the facility, or you must establish and maintain other control systems to prevent improper labeling, mix-ups, contamination, cross-contamination, and accidental exposure of HCT/Ps to communicable disease agents.

(d) *Procedures and records.* (1) You must establish and maintain procedures for facility cleaning and sanitation for the purpose of preventing the introduction, transmission, or spread of communicable disease. These procedures must assign responsibility for sanitation and must describe in sufficient detail the cleaning methods to be used and the schedule for cleaning the facility.

(2) You must document, and maintain records of, all cleaning and sanitation activities performed to prevent contamination of HCT/Ps. You must retain such records 3 years after their creation.

Sec. 1271.195 Environmental control and monitoring.

(a) *Environmental control.* Where environmental conditions could reasonably be expected to cause contamination or cross-contamination of HCT/Ps or equipment, or accidental exposure of HCT/Ps to communicable disease agents, you must adequately control environmental conditions and provide proper conditions for operations. Where appropriate, you must provide for the following control activities or systems:

(1) Temperature and humidity controls;

(2) Ventilation and air filtration;

(3) Cleaning and disinfecting of rooms and equipment to ensure aseptic processing operations; and

(4) Maintenance of equipment used to control conditions necessary for aseptic processing operations.

(b) *Inspections.* You must inspect each environmental control system periodically to verify that the system, including necessary equipment, is adequate and functioning properly. You must take appropriate corrective action as necessary.

(c) *Environmental monitoring.* You must monitor environmental conditions where environmental conditions could reasonably be expected to cause contamination or cross-contamination of HCT/Ps or equipment, or accidental exposure of HCT/Ps to communicable disease agents. Where appropriate, you must provide environmental monitoring for microorganisms.

(d) *Records.* You must document, and maintain records of, environmental control and monitoring activities.

Sec. 1271.200 Equipment.

(a) *General.* To prevent the introduction, transmission, or spread of communicable diseases, equipment used in the manufacture of HCT/Ps must be of appropriate design for its use and must be suitably located and installed to facilitate operations, including cleaning and maintenance. Any automated, mechanical, electronic, or other equipment used for inspection, measuring, or testing in accordance with this part must be capable of

producing valid results. You must clean, sanitize, and maintain equipment according to established schedules.

(b) *Procedures and schedules.* You must establish and maintain procedures for cleaning, sanitizing, and maintaining equipment to prevent malfunctions, contamination or cross-contamination, accidental exposure of HCT/Ps to communicable disease agents, and other events that could reasonably be expected to result in the introduction, transmission, or spread of communicable diseases.

(c) *Calibration of equipment.* Where appropriate, you must routinely calibrate according to established procedures and schedules all automated, mechanical, electronic, or other equipment used for inspection, measuring, and testing in accordance with this part.

(d) *Inspections.* You must routinely inspect equipment for cleanliness, sanitation, and calibration, and to ensure adherence to applicable equipment maintenance schedules.

(e) *Records.* You must document and maintain records of all equipment maintenance, cleaning, sanitizing, calibration, and other activities performed in accordance with this section. You must display records of recent maintenance, cleaning, sanitizing, calibration, and other activities on or near each piece of equipment, or make the records readily available to the individuals responsible for performing these activities and to the personnel using the equipment. You must maintain records of the use of each piece of equipment, including the identification of each HCT/P manufactured with that equipment.

Sec. 1271.210 Supplies and reagents.

(a) *Verification.* You must not use supplies and reagents until they have been verified to meet specifications designed to prevent circumstances that increase the risk of the introduction, transmission, or spread of communicable diseases. Verification may be accomplished by the establishment that uses the supply or reagent, or by the vendor of the supply or reagent.

(b) *Reagents.* Reagents used in processing and preservation of HCT/Ps must be sterile, where appropriate.

(c) *In-house reagents.* You must validate and/or verify the processes used for production of in-house reagents.

(d) *Records.* You must maintain the following records pertaining to supplies and reagents:

(1) Records of the receipt of each supply or reagent, including the type, quantity, manufacturer, lot number, date of receipt, and expiration date;

(2) Records of the verification of each supply or reagent, including test results or, in the case of vendor verification, a certificate of analysis from the vendor; and

(3) Records of the lot of supply or reagent used in the manufacture of each HCT/P.

Sec. 1271.215 Recovery.

If you are an establishment that recovers HCT/Ps, you must recover each HCT/P in a way that does not cause contamination or cross-contamination during recovery, or otherwise increase the risk of the introduction, transmission, or spread of communicable disease through the use of the HCT/P.

Sec. 1271.220 Processing and process controls.

(a) *General.* If you are an establishment that processes HCT/Ps, you must process each HCT/P in a way that does not cause contamination or cross-contamination during processing, and that prevents the introduction,

transmission, or spread of communicable disease through the use of the HCT/P.

(b) *Pooling.* Human cells or tissue from two or more donors must not be pooled (placed in physical contact or mixed in a single receptacle) during manufacturing.

(c) *In-process control and testing.* You must ensure that specified requirements, consistent with paragraph (a) of this section, for in-process controls are met, and that each in-process HCT/P is controlled until the required inspection and tests or other verification activities have been completed, or necessary approvals are received and documented. Sampling of in-process HCT/Ps must be representative of the material to be evaluated.

(d) *Dura mater.* (1) When there is a published validated process that reduces the risk of transmissible spongiform encephalopathy, you must use this process for dura mater (or an equivalent process that you have validated), unless following this process adversely affects the clinical utility of the dura mater.

(2) When you use a published validated process, you must verify such a process in your establishment.

Sec. 1271.225 Process changes.

Any change to a process must be verified or validated in accordance with § 1271.230, to ensure that the change does not create an adverse impact elsewhere in the operation, and must be approved before implementation by a responsible person with appropriate knowledge and background. You must communicate approved changes to the appropriate personnel in a timely manner.

Sec. 1271.230 Process validation.

(a) *General.* Where the results of processing described in § 1271.220 cannot be fully verified by subsequent inspection and tests, you must validate and approve the process according to established procedures. The validation activities and results must be documented, including the date and signature of the individual(s) approving the validation.

(b) *Written representation.* Any written representation that your processing methods reduce the risk of transmission of communicable disease by an HCT/P, including but not limited to, a representation of sterility or pathogen inactivation of an HCT/P, must be based on a fully verified or validated process.

(c) *Changes.* When changes to a validated process subject to paragraph (a) of this section occur, you must review and evaluate the process and perform revalidation where appropriate. You must document these activities.

Sec. 1271.250 Labeling controls.

(a) *General.* You must establish and maintain procedures to control the labeling of HCT/Ps. You must design these procedures to ensure proper HCT/P identification and to prevent mix-ups.

(b) *Verification.* Procedures must include verification of label accuracy, legibility, and integrity.

(c) *Labeling requirements.* Procedures must ensure that each HCT/P is labeled in accordance with all applicable labeling requirements, including those in §§ 1271.55, 1271.60, 1271.65, 1271.90, 1271.290, and 1271.370, and that each HCT/P made available for distribution is accompanied by documentation of the donor eligibility determination as required under § 1271.55.

Sec. 1271.260 Storage.

(a) *Control of storage areas.* You must control your storage areas and stock

rooms to prevent:

(1) Mix-ups, contamination, and cross-contamination of HCT/Ps, supplies, and reagents, and

(2) An HCT/P from being improperly made available for distribution.

(b) *Temperature.* You must store HCT/Ps at an appropriate temperature.

(c) *Expiration date.* Where appropriate, you must assign an expiration date to each HCT/P based on the following factors:

(1) HCT/P type;

(2) Processing, including the method of preservation;

(3) Storage conditions; and

(4) Packaging.

(d) *Corrective action.* You must take and document corrective action whenever proper storage conditions are not met.

(e) *Acceptable temperature limits.* You must establish acceptable temperature limits for storage of HCT/Ps at each step of the manufacturing process to inhibit the growth of infectious agents. You must maintain and record storage temperatures for HCT/Ps. You must periodically review recorded temperatures to ensure that temperatures have been within acceptable limits.

Sec. 1271.265 Receipt, predistribution shipment, and distribution of an HCT/P.

(a) *Receipt.* You must evaluate each incoming HCT/P for the presence and significance of microorganisms and inspect for damage and contamination. You must determine whether to accept, reject, or place in quarantine each incoming HCT/P, based upon pre-established criteria designed to prevent communicable disease transmission.

(b) *Predistribution shipment.* If you ship an HCT/P within your establishment or between establishments (e.g., procurer to processor) and the HCT/P is not available for distribution as described in paragraph (c) of this section, you must first determine and document whether pre-established criteria designed to prevent communicable disease transmission have been met, and you must ship the HCT/P in quarantine.

(c) *Availability for distribution.* (1) Before making an HCT/P available for distribution, you must review manufacturing and tracking records pertaining to the HCT/P, and, on the basis of that record review, you must verify and document that the release criteria have been met. A responsible person must document and date the determination that an HCT/P is available for distribution.

(2) You must not make available for distribution an HCT/P that is in quarantine, is contaminated, is recovered from a donor who has been determined to be ineligible or for whom a donor-eligibility determination has not been completed (except as provided under §§ 1271.60, 1271.65, and 1271.90), or that otherwise does not meet release criteria designed to prevent communicable disease transmission.

(3) You must not make available for distribution any HCT/P manufactured under a departure from a procedure relevant to preventing risks of communicable disease transmission, unless a responsible person has determined that the departure does not increase the risk of communicable disease through the use of the HCT/P. You must record and justify any departure from a procedure at the time of its occurrence.

(d) *Packaging and shipping.* Packaging and shipping containers must be designed and constructed to protect the HCT/P from contamination. For each type of HCT/P, you must establish appropriate shipping conditions to be maintained during transit.

(e) *Procedures.* You must establish and maintain procedures, including release criteria, for the activities in paragraphs (a) through (d) of this section. You must document these activities. Documentation must include:

(1) Identification of the HCT/P and the establishment that supplied the HCT/P;

(2) Activities performed and the results of each activity;

(3) Date(s) of activity;

(4) Quantity of HCT/P subject to the activity; and

(5) Disposition of the HCT/P (e.g., identity of consignee).

(f) *Return to inventory.* You must establish and maintain procedures to determine if an HCT/P that is returned to your establishment is suitable to be returned to inventory.

Sec. 1271.270 Records.

(a) *General.* You must maintain records concurrently with the performance of each step required in this subpart and subpart C of this part. Any requirement in this part that an action be documented involves the creation of a record, which is subject to the requirements of this section. All records must be accurate, indelible, and legible. The records must identify the person performing the work and the dates of the various entries, and must be as detailed as necessary to provide a complete history of the work performed and to relate the records to the particular HCT/P involved.

(b) *Records management system.* You must establish and maintain a records management system relating to core CGTP requirements. Under this system, records pertaining to a particular HCT/P must be maintained in such a way as to facilitate review of the HCT/Ps history before making it available for distribution and, if necessary, subsequent to the HCT/Ps release as part of a followup evaluation or investigation. Records pertinent to the manufacture of HCT/Ps (e.g., labeling and packaging procedures, and equipment logs) must also be maintained and organized under the records management system. If records are maintained in more than one location, then the records management system must be designed to ensure prompt identification, location, and retrieval of all records.

(c) *Methods of retention.* You may maintain records required under this subpart electronically, as original paper records, or as true copies such as photocopies, microfiche, or microfilm. Equipment that is necessary to make the records available and legible, such as computer and reader equipment, must be readily available. Records stored in electronic systems must be backed up.

(d) *Length of retention.* You must retain all records for 10 years after their creation, unless stated otherwise in this part. However, you must retain the records pertaining to a particular HCT/P at least 10 years after the date of its administration, or if the date of administration is not known, then at least 10 years after the date of the HCT/Ps distribution, disposition, or expiration, whichever is latest. You must retain records for archived specimens of dura mater for 10 years after the appropriate disposition of the specimens.

(e) *Contracts and agreements.* You must maintain the name and address and a list of the responsibilities of any establishment that performs a manufacturing step for you. This information must be available during an inspection conducted under § 1271.400.

Sec. 1271.290 Tracking.

(a) *General.* If you perform any step in the manufacture of an HCT/P in which you handle the HCT/P, you must track each such HCT/P in accordance with this section, to facilitate the investigation of actual or suspected transmission of communicable disease and take appropriate and timely corrective action.

(b) *System of HCT/P tracking.* (1) You must establish and maintain a system of HCT/P tracking that enables the tracking of all HCT/Ps from:

(i) The donor to the consignee or final disposition; and

(ii) The consignee or final disposition to the donor.

(2) Alternatively, if you are an establishment that performs some but not all of the steps in the manufacture of an HCT/P in which you handle the HCT/P, you may participate in a system of HCT/P tracking established and maintained by another establishment responsible for other steps in the manufacture of the same HCT/P, provided that the tracking system complies with all the requirements of this section.

(c) *Distinct identification code.* As part of your tracking system, you must ensure: That each HCT/P that you manufacture is assigned and labeled with a distinct identification code, e.g., alphanumeric, that relates the HCT/P to the donor and to all records pertaining to the HCT/P; and that labeling includes information designed to facilitate effective tracking, using the distinct identification code, from the donor to the recipient and from the recipient to the donor. Except as described in § 1271.55(a)(1), you must create such a code specifically for tracking, and it may not include an individual's name, social security number, or medical record number. You may adopt a distinct identification code assigned by another establishment engaged in the manufacturing process, or you may assign a new code. If you assign a new code to an HCT/P, you must establish and maintain procedures for relating the new code to the old code.

(d) *Tracking from consignee to donor.* As part of your tracking system, you must establish and maintain a method for recording the distinct identification code and type of each HCT/P distributed to a consignee to enable tracking from the consignee to the donor.

(e) *Tracking from donor to consignee or final disposition.* As part of your tracking system, you must establish and maintain a method for documenting the disposition of each of your HCT/Ps, to enable tracking from the donor to the consignee or final disposition. The information you maintain must permit the prompt identification of the consignee of the HCT/P, if any.

(f) *Consignees.* At or before the time of distribution of an HCT/P to a consignee, you must inform the consignee in writing of the requirements in this section and of the tracking system that you have established and are maintaining to comply with these requirements.

(g) *Requirements specific to dura mater donors.* You must archive appropriate specimens from each donor of dura mater, under appropriate storage conditions, and for the appropriate duration, to enable testing of the archived material for evidence of transmissible spongiform encephalopathy, and to enable appropriate disposition of any affected nonadministered dura mater tissue, if necessary.

[69 FR 68681, Nov. 24, 2004, as amended at 70 FR 29952, May 25, 2005]

Sec. 1271.320 Complaint file.

(a) *Procedures.* You must establish and maintain procedures for the review, evaluation, and documentation of complaints as defined in § 1271.3(aa), relating to core current good tissue practice (CGTP) requirements, and the investigation of complaints as appropriate.

(b) *Complaint file.* You must maintain a record of complaints that you receive in a file designated for complaints. The complaint file must contain sufficient information about each complaint for proper review and evaluation of the complaint (including the distinct identification code of the HCT/P that is the subject of the complaint) and for determining whether the complaint is an isolated event or represents a trend. You must make the complaint file available for review and copying upon request from FDA.

(c) *Review and evaluation of complaints.* You must review and evaluate each complaint relating to core CGTP requirements to determine if the complaint

is related to an HCT/P deviation or to an adverse reaction, and to determine if a report under § 1271.350 or another applicable regulation is required. As soon as practical, you must review, evaluate, and investigate each complaint that represents an event required to be reported to FDA, as described in § 1271.350. You must review and evaluate a complaint relating to core CGTP requirements that does not represent an event required to be reported to determine whether an investigation is necessary; an investigation may include referring a copy of the complaint to another establishment that performed manufacturing steps pertinent to the complaint. When no investigation is made, you must maintain a record that includes the reason no investigation was made, and the name of the individual(s) responsible for the decision not to investigate.

**Subpart E - Additional Requirements for Establishments Described in § 1271.10**

Sec. 1271.330 Applicability.

The provisions set forth in this subpart are being implemented for nonreproductive HCT/Ps described in § 1271.10 and regulated solely under section 361 of the Public Health Service Act and the regulations in this part, and for the establishments that manufacture those HCT/Ps. HCT/Ps that are drugs or devices regulated under the act, or are biological products regulated under section 351 of the Public Health Service Act, are not subject to the regulations set forth in this subpart.

Sec. 1271.350 Reporting.

(a) *Adverse reaction reports.* (1) You must investigate any adverse reaction involving a communicable disease related to an HCT/P that you made available for distribution. You must report to FDA an adverse reaction involving a communicable disease if it:

(i) Is fatal;

(ii) Is life-threatening;

(iii) Results in permanent impairment of a body function or permanent damage to body structure; or

(iv) Necessitates medical or surgical intervention, including hospitalization.

(2) You must submit each report on a Form FDA-3500A to the address in paragraph (a)(5) of this section within 15 calendar days of initial receipt of the information.

(3) You must, as soon as practical, investigate all adverse reactions that are the subject of these 15-day reports and must submit followup reports within 15 calendar days of the receipt of new information or as requested by FDA. If additional information is not obtainable, a followup report may be required that describes briefly the steps taken to seek additional information and the reasons why it could not be obtained.

(4) You may obtain copies of the reporting form (FDA-3500A) from the Center for Biologics Evaluation and Research (see address in paragraph (a)(5) of this section). Electronic Form FDA-3500A may be obtained at *http://www.fda.gov/medwatch* or at *http://www.hhs.gov/forms.*

(5) You must submit two copies of each report described in this paragraph to the Food and Drug Administration, Center for Biologics Evaluation and Research, Document Control Center, 10903 New Hampshire Ave., Bldg. 71, Rm. G112, Silver Spring, MD 20993-0002. FDA may waive the requirement for the second copy in appropriate circumstances.

(b) *Reports of HCT/P deviations.* (1) You must investigate all HCT/P deviations related to a distributed HCT/P for which you performed a manufacturing step.

(2) You must report any such HCT/P deviation relating to the core CGTP requirements, if the HCT/P deviation occurred in your facility or in a facility that performed a manufacturing step for you under contract, agreement, or other arrangement. Each report must contain a description of the HCT/P deviation, information relevant to the event and the manufacture of the HCT/P involved, and information on all follow-up actions that have been or will be taken in response to the HCT/P deviation (e.g., recalls).

(3) You must report each such HCT/P deviation that relates to a core CGTP requirement on Form FDA 3486 within 45 days of the discovery of the event either electronically using the Center for Biologics Evaluation and Research electronic Web-based application or by mail to the Food and Drug Administration, Center for Biologics Evaluation and Research, Document Control Center, 10903 New Hampshire Ave., Bldg. 71, Rm. G112, Silver Spring, MD 20993-0002.

[69 FR 68686, Nov. 24, 2004, as amended at 80 FR 18095, Apr. 3, 2015]

Sec. 1271.370 Labeling.

The following requirements apply in addition to §§ 1271.55, 1271.60, 1271.65, and 1271.90:

(a) You must label each HCT/P made available for distribution clearly and accurately.

(b) The following information must appear on the HCT/P label:

(1) Distinct identification code affixed to the HCT/P container, and assigned in accordance with § 1271.290(c);

(2) Description of the type of HCT/P;

(3) Expiration date, if any; and

(4) Warnings required under § 1271.60(d)(2), § 1271.65(b)(2), or § 1271.90(c), if applicable and physically possible. If it is not physically possible to include these warnings on the label, the warnings must, instead, accompany the HCT/P.

(c) The following information must either appear on the HCT/P label or accompany the HCT/P:

(1) Name and address of the establishment that determines that the HCT/P meets release criteria and makes the HCT/P available for distribution;

(2) Storage temperature;

(3) Other warnings, where appropriate; and

(4) Instructions for use when related to the prevention of the introduction, transmission, or spread of communicable diseases.

[69 FR 68686, Nov. 24, 2004, as amended at 70 FR 29952, May 25, 2005; 81 FR 40518, June 22, 2016]

## Subpart F - Inspection and Enforcement of Establishments Described in § 1271.10

Sec. 1271.390 Applicability.

The provisions set forth in this subpart are applicable only to HCT/Ps described in § 1271.10 and regulated solely under section 361 of the Public Health Service Act and the regulations in this part, and to the establishments that manufacture those HCT/Ps. HCT/Ps that are drugs or devices regulated under the act, or are biological products regulated under section 351 of the Public Health Service Act, are not subject to the regulations set forth in this subpart.

Sec. 1271.400 Inspections.

(a) If you are an establishment that manufactures HCT/Ps described in § 1271.10, whether or not under contract, you must permit the Food and Drug

Administration (FDA) to inspect any manufacturing location at any reasonable time and in a reasonable manner to determine compliance with applicable provisions of this part. The inspection will be conducted as necessary in the judgment of the FDA and may include your establishment, facilities, equipment, finished and unfinished materials, containers, processes, HCT/Ps, procedures, labeling, records, files, papers, and controls required to be maintained under the part. The inspection may be made with or without prior notification and will ordinarily be made during regular business hours.

(b) The frequency of inspection will be at the agency's discretion.

(c) FDA will call upon the most responsible person available at the time of the inspection of the establishment and may question the personnel of the establishment as necessary to determine compliance with the provisions of this part.

(d) FDA's representatives may take samples, may review and copy any records required to be kept under this part, and may use other appropriate means to record evidence of observations during inspections conducted under this subpart.

(e) The public disclosure of records containing the name or other positive identification of donors or recipients of HCT/Ps will be handled in accordance with FDA's procedures on disclosure of information as set forth in parts 20 and 21 of this chapter.

Sec. 1271.420 HCT/Ps offered for import.

(a) Except as provided in paragraphs (c) and (d) of this section, when an HCT/P is offered for import, the importer of record must notify, either before or at the time of importation, the director of the district of the Food and Drug Administration (FDA) having jurisdiction over the port of entry through which the HCT/P is imported or offered for import, or such officer of the district as the director may designate to act in his or her behalf in administering and enforcing this part, and must provide sufficient information, including information submitted in the Automated Commercial Environment (ACE) system or any other electronic data interchange system authorized by the U.S. Customs and Border Protection Agency as required in part 1, subpart D of this chapter, for FDA to make an admissibility decision.

(b) Except as provided in paragraphs (c) and (d) of this section, an HCT/P offered for import must be held intact by the importer or consignee, under conditions necessary to prevent transmission of communicable disease, until an admissibility decision is made by FDA. The HCT/P may be transported under quarantine to the consignee, while the FDA district reviews the documentation accompanying the HCT/P. When FDA makes a decision regarding the admissibility of the HCT/P, FDA will notify the importer of record.

(c) This section does not apply to reproductive HCT/Ps regulated solely under section 361 of the Public Health Service Act and the regulations in this part, and donated by a sexually intimate partner of the recipient for reproductive use.

(d) This section does not apply to peripheral blood stem/progenitor cells regulated solely under section 361 of the Public Health Service Act and the regulations in this part, except that paragraphs (a) and (b) of this section apply when circumstances occur under which such imported peripheral blood stem/progenitor cells may present an unreasonable risk of communicable disease transmission which indicates the need to review the information referenced in paragraph (a) of this section.

[69 FR 68687, Nov. 24, 2004, as amended at 81 FR 85873, Nov. 29, 2016]

Sec. 1271.440 Orders of retention, recall, destruction, and cessation of manufacturing.

(a) Upon an agency finding that there are reasonable grounds to believe

that an HCT/P is a violative HCT/P because it was manufactured in violation of the regulations in this part and, therefore, the conditions of manufacture of the HCT/P do not provide adequate protections against risks of communicable disease transmission; or the HCT/P is infected or contaminated so as to be a source of dangerous infection to humans; or an establishment is in violation of the regulations in this part and, therefore, does not provide adequate protections against the risks of communicable disease transmission, the Food and Drug Administration (FDA) may take one or more of the following actions:

(1) Serve upon the person who distributed the HCT/P a written order that the HCT/P be recalled and/or destroyed, as appropriate, and upon persons in possession of the HCT/P that the HCT/P must be retained until it is recalled by the distributor, destroyed, or disposed of as agreed by FDA, or the safety of the HCT/P is confirmed;

(2) Take possession of and/or destroy the violative HCT/P; or

(3) Serve upon the establishment an order to cease manufacturing until compliance with the regulations of this part has been achieved. When FDA determines there are reasonable grounds to believe there is a danger to health, such order will be effective immediately. In other situations, such order will be effective after one of the following events, whichever is later:

(i) Passage of 5 working days from the establishment's receipt of the order; or

(ii) If the establishment requests a hearing in accordance with paragraph (e) of this section and part 16 of this chapter, a decision in, and in accordance with, those proceedings.

(b) A written order issued under paragraph (a) of this section will state with particularity the facts that justify the order.

(c)(1) A written order issued under paragraph (a)(1) of this section will ordinarily provide that the HCT/P be recalled and/or destroyed within 5 working days from the date of receipt of the order. After receipt of an order issued under paragraph (a)(1) of this section, the establishment in possession of the HCT/P must not distribute or dispose of the HCT/P in any manner except to recall and/or destroy the HCT/P consistent with the provisions of the order, under the supervision of FDA.

(2) In lieu of paragraph (c)(1) of this section, other arrangements for assuring the proper disposition of the HCT/P may be agreed upon by the person receiving the written order and FDA. Such arrangements may include, among others, providing FDA with records or other written information that adequately ensure that the HCT/P has been recovered, processed, stored, and distributed in conformance with this part, and that, except as provided under §§ 1271.60, 1271.65, and 1271.90, the donor of the cells or tissue for the HCT/P has been determined to be eligible.

(d) A written order issued under paragraph (a)(3) of this section will specify the regulations with which you must achieve compliance and will ordinarily specify the particular operations covered by the order. After receipt of an order that is in effect and issued under paragraph (a)(3) of this section, you must not resume operations without prior written authorization of FDA.

(e) The recipient of an order issued under this section may request a hearing in accordance with part 16 of this chapter. To request a hearing, the recipient of the written order or prior possessor of such HCT/P must make the request within 5 working days of receipt of a written order for retention, recall, destruction, and/or cessation (or within 5 working days of the agency's possession of an HCT/P under paragraph (a)(2) of this section), in accordance with part 16 of this chapter. An order of destruction will be held in abeyance pending resolution of the hearing request. Upon request under part 16 of this chapter, FDA will provide an

opportunity for an expedited hearing for an order of cessation that is not stayed by the Commissioner of Food and Drugs.

(f) FDA will not issue an order for the destruction of reproductive tissue under paragraph (a)(1) of this section, nor will it carry out such destruction itself under paragraph (a)(2) of this section.

**Authority:** 42 U.S.C. 216, 243, 263a, 264, 271.
**Source:** 66 FR 5466, Jan. 19, 2001, unless otherwise noted.

---

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. https://www.fda.gov/
4. https://www.fda.gov/Medical-Devices
5. https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/medical-device-databases
6. https://www.ecfr.gov
7. /scripts/cdrh/cfdocs/search/default.cfm?FAQ=true
8. https://www.fda.gov/medical-devices/medical-device-databases/code-federal-regulations-title-21-food-and-drugs

Page Last Updated: 03/29/2022

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.
Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisyen | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

Accessibility Contact FDA Careers FDA Basics FOIA No FEAR Act Nondiscrimination Website Policies / Privacy

FDA

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Contact FDA

For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive Vulnerability Disclosure Policy

U.S. Department of Health & Human Services

---

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. https://www.fda.gov/
4. https://www.fda.gov/Medical-Devices
5. https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/medical-device-databases
6. https://www.ecfr.gov

7. /scripts/cdrh/cfdocs/search/default.cfm?FAQ=true
8. https://www.fda.gov/medical-devices/medical-device-databases/code-federal-regulations-title-21-food-and-drugs

# SS 411.15 Particular services excluded from coverage.

Click to open document in a browser

The following services are excluded from coverage:

(a) Routine physical checkups such as:

(1) Examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury, except for screening mammography, colorectal cancer screening tests, screening pelvic exams, prostate cancer screening tests, glaucoma screening exams, ultrasound screening for abdominal aortic aneurysms (AAA), cardiovascular disease screening tests, diabetes screening tests, a screening electrocardiogram, initial preventive physical examinations that meet the criteria specified in paragraphs (k)(6) through (k)(15) of this section, additional preventive services that meet the criteria in § 410.64 of this chapter, or annual wellness visits providing personalized prevention plan services.

(2) Examinations required by insurance companies, business establishments, government agencies, or other third parties.

(b) *Low vision aid exclusion* - (1) *Scope.* The scope of the eyeglass exclusion encompasses all devices irrespective of their size, form, or technological features that use one or more lens to aid vision or provide magnification of images for impaired vision.

(2) *Exceptions.* (i) Post-surgical prosthetic lenses customarily used during convalescence for eye surgery in which the lens of the eye was removed (for example, cataract surgery).

(ii) Prosthetic intraocular lenses and one pair of conventional eyeglasses or contact lenses furnished subsequent to each cataract surgery with insertion of an intraocular lens.

(iii) Prosthetic lenses used by Medicare beneficiaries who are lacking the natural lens of the eye and who were not furnished with an intraocular lens.

(c) *Eye examinations* for the purpose of prescribing, fitting, or changing eyeglasses or contact lenses for refractive error only and procedures performed in the course of any eye examination to determine the refractive state of the eyes, without regard to the reason for the performance of the refractive procedures. Refractive procedures are excluded even when performed in connection with otherwise covered diagnosis or treatment of illness or injury.

(d) *Hearing aids* or examinations for the purpose of prescribing, fitting, or changing hearing aids.

(1) *Scope.* The scope of the hearing aid exclusion encompasses all types of air conduction hearing aids that provide acoustic energy to the cochlea via stimulation of the tympanic membrane with amplified sound and bone conduction hearing aids that provide mechanical stimulation of the cochlea via stimulation of the scalp with amplified mechanical vibration or by direct contact with the tympanic membrane or middle ear ossicles.

(2) *Devices not subject to the hearing aid exclusion.* Paragraph (d)(1) of this section shall not apply to the following devices that produce the perception of sound by replacing the function of the middle ear, cochlea, or auditory nerve:

(i) Osseointegrated implants in the skull bone that provide mechanical energy to the cochlea via a mechanical transducer, or

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(ii) Cochlear implants and auditory brainstem implants that replace the function of cochlear structures or auditory nerve and provide electrical energy to auditory nerve fibers and other neural tissue via implanted electrode arrays.

(e) *Immunizations, except for* -

(1) Vaccinations or inoculations directly related to the treatment of an injury or direct exposure such as antirabies treatment, tetanus antitoxin or booster vaccine, botulin antitoxin, antivenom sera, or immune globulin;

(2) Pneumococcal vaccinations that are reasonable and necessary for the prevention of illness;

(3) Hepatitis B vaccinations that are reasonable and necessary for the prevention of illness for those individuals, as defined in § 410.63(a) of this chapter, who are at high or intermediate risk of contracting hepatitis B;

(4) Influenza vaccinations that are reasonable and necessary for the prevention of illness; and

(5) COVID-19 vaccinations that are reasonable and necessary for the prevention of illness.

(f) *Orthopedic shoes* or other supportive devices for the feet, *except when* shoes are integral parts of leg braces.

(g) *Custodial care, except as necessary* for the palliation or management of terminal illness, as provided in part 418 of this chapter. (Custodial care is any care that does not meet the requirements for coverage as SNF care as set forth in §§ 409.31 through 409.35 of this chapter.)

(h) *Cosmetic surgery and related services,* except as required for the prompt repair of accidental injury or to improve the functioning of a malformed body member.

(i) *Dental services* in connection with the care, treatment, filling, removal, or replacement of teeth, or structures directly supporting the teeth, *except for* inpatient hospital services in connection with such dental procedures when hospitalization is required because of -

(1) The individual's underlying medical condition and clinical status; or

(2) The severity of the dental procedures. [1]

(j) *Personal comfort services, except* as necessary for the palliation or management of terminal illness as provided in part 418 of this chapter. The use of a television set or a telephone are examples of personal *comfort* services.

(k) *Any services that are not reasonable and necessary* for one of the following purposes:

(1) For the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

(2) In the case of hospice services, for the palliation or management of terminal illness, as provided in part 418 of this chapter.

(3) In the case of pneumococcal vaccine for the prevention of illness.

(4) In the case of the patient outcome assessment program established under section 1875(c) of the Act, for carrying out the purpose of that section.

(5) In the case of hepatitis B vaccine, for the prevention of illness for those individuals at high or intermediate risk of contracting hepatitis B. (Section 410.63(a) of this chapter sets forth criteria for identifying those individuals.)

(6) In the case of screening mammography, for the purpose of early detection of breast cancer subject to the

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

conditions and limitations specified in § 410.34 of this chapter.

(7) In the case of colorectal cancer screening tests, for the purpose of early detection of colorectal cancer subject to the conditions and limitations specified in § 410.37 of this chapter.

(8) In the case of screening pelvic examinations, for the purpose of early detection of cervical or vaginal cancer subject to the conditions and limitations specified in § 410.56 of this chapter.

(9) In the case of prostate cancer screening tests, for the purpose of early detection of prostate cancer, subject to the conditions and limitations specified in § 410.39 of this chapter.

(10) In the case of screening exams for glaucoma, for the purpose of early detection of glaucoma, subject to the conditions and limitations specified in § 410.23 of this chapter.

(11) In the case of initial preventive physical examinations, with the goal of health promotion and disease prevention, subject to the conditions and limitations specified in § 410.16 of this chapter.

(12) In the case of ultrasound screening for abdominal aortic aneurysms, with the goal of early detection of abdominal aortic aneurysms, subject to the conditions and limitation specified in § 410.19 of this chapter.

(13) In the case of cardiovascular disease screening tests for the early detection of cardiovascular disease or abnormalities associated with an elevated risk for that disease, subject to the conditions specified in § 410.17 of this chapter.

(14) In the case of diabetes screening tests furnished to an individual at risk for diabetes for the purpose of the early detection of that disease, subject to the conditions specified in § 410.18 of this chapter.

(15) In the case of additional preventive services not otherwise described in this title, subject to the conditions and limitation specified in § 410.64 of this chapter.

(16) In the case of an annual wellness visit providing a personalized prevention plan, subject to the conditions and limitations specified in § 410.15 of this subpart.

(l) *Foot care* - (1) *Basic rule.* Except as provided in paragraph (l)(2) of this section, any services furnished in connection with the following:

(i) *Routine foot care,* such as the cutting or removal of corns, or calluses, the trimming of nails, routine hygienic care (preventive maintenance care ordinarily within the realm of self care), and any service performed in the absence of localized illness, injury, or symptoms involving the feet.

(ii) *The evaluation or treatment of subluxations of the feet* regardless of underlying pathology. (Subluxations are structural misalignments of the joints, other than fractures or complete dislocations, that require treatment only by nonsurgical methods.

(iii) *The evaluation or treatment of flattened arches* (including the prescription of supportive devices) regardless of the underlying pathology.

(2) *Exceptions.* (i) Treatment of warts is not excluded.

(ii) Treatment of mycotic toenails may be covered if it is furnished no more often than every 60 days or the billing physician documents the need for more frequent treatment.

(iii) The services listed in paragraph (l)(1) of this section are not excluded if they are furnished -

(A) As an incident to, at the same time as, or as a necessary integral part of a primary covered procedure performed on the foot; or

(B) As initial diagnostic services (regardless of the resulting diagnosis) in connection with a specific symptom or complaint that might arise from a condition whose treatment would be covered.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(m) *Services to hospital patients* - (1) *Basic rule.* Except as provided in paragraph (m)(3) of this section, any service furnished to an inpatient of a hospital or to a hospital outpatient (as defined in § 410.2 of this chapter) during an encounter (as defined in § 410.2 of this chapter) by an entity other than the hospital unless the hospital has an arrangement (as defined in § 409.3 of this chapter) with that entity to furnish that particular service to the hospital's patients. As used in this paragraph (m)(1), the term “hospital” includes a CAH.

(2) *Scope of exclusion.* Services subject to exclusion from coverage under the provisions of this paragraph (m) include, but are not limited to, clinical laboratory services; pacemakers and other prostheses and prosthetic devices (other than dental) that replace all or part of an internal body organ (for example, intraocular lenses); artificial limbs, knees, and hips; equipment and supplies covered under the prosthetic device benefits; and services incident to a physician service.

(3) *Exceptions.* The following services are not excluded from coverage:

(i) Physicians' services that meet the criteria of § 415.102(a) of this chapter for payment on a reasonable charge or fee schedule basis.

(ii) Physician assistant services, as defined in section 1861(s)(2)(K)(i) of the Act, that are furnished after December 31, 1990.

(iii) Nurse practitioner and clinical nurse specialist services, as defined in section 1861(s)(2)(K)(ii) of the Act.

(iv) Certified nurse-midwife services, as defined in section 1861(ff) of the Act, that are furnished after December 31, 1990.

(v) Qualified psychologist services, as defined in section 1861(ii) of the Act, that are furnished after December 31, 1990.

(vi) Services of an anesthetist, as defined in § 410.69 of this chapter.

(n) *Certain services of an assistant-at-surgery.* (1) Services of an assistant-at-surgery in a cataract operation (including subsequent insertion of an intraocular lens) unless, before the surgery is performed, the appropriate QIO or a carrier has approved the use of such an assistant in the surgical procedure based on the existence of a complicating medical condition.

(2) Services on an assistant-at-surgery in a surgical procedure (or class of surgical procedures) for which assistants-at-surgery on average are used in fewer than 5 percent of such procedures nationally.

(o) Experimental or investigational devices, except for certain devices.

(1) Categorized by the FDA as a Category B (Nonexperimental/investigational) device as defined in § 405.201(b) of the chapter; and

(2) Furnished in accordance with the coverage requirements in § 405.211(b).

(p) *Services furnished to SNF residents* - (1) *Basic rule.* Except as provided in paragraph (p)(2) of this section, any service furnished to a resident of an SNF during a covered Part A stay by an entity other than the SNF, unless the SNF has an arrangement (as defined in § 409.3 of this chapter) with that entity to furnish that particular service to the SNF's residents. Services subject to exclusion under this paragraph include, but are not limited to -

(i) Any physical, occupational, or speech-language therapy services, regardless of whether the services are furnished by (or under the supervision of) a physician or other health care professional, and regardless of whether the resident who receives the services is in a covered Part A stay; and

(ii) Services furnished as an incident to the professional services of a physician or other health care professional specified in paragraph (p)(2) of this section.

(2) *Exceptions.* The following services are not excluded from coverage, provided that the claim for payment includes the SNF's Medicare provider number in accordance with § 424.32(a)(5) of this chapter:

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(i) Physicians' services that meet the criteria of § 415.102(a) of this chapter for payment on a fee schedule basis.

(ii) Services performed under a physician's supervision by a physician assistant who meets the applicable definition in section 1861(aa)(5) of the Act.

(iii) Services performed by a nurse practitioner or clinical nurse specialist who meets the applicable definition in section 1861(aa)(5) of the Act and is working in collaboration (as defined in section 1861(aa)(6) of the Act) with a physician.

(iv) Services performed by a certified nurse-midwife, as defined in section 1861(gg) of the Act.

(v) Services performed by a qualified psychologist, as defined in section 1861(ii) of the Act.

(vi) Services performed by a certified registered nurse anesthetist, as defined in section 1861(bb) of the Act.

(vii) Dialysis services and supplies, as defined in section 1861(s)(2)(F) of the Act, and those ambulance services that are furnished in conjunction with them.

(viii) Erythropoietin (EPO) for dialysis patients, as defined in section 1861(s)(2)(O) of the Act.

(ix) Hospice care, as defined in section 1861(dd) of the Act.

(x) An ambulance trip that initially conveys an individual to the SNF to be admitted as a resident, or that conveys an individual from the SNF in connection with one of the circumstances specified in paragraphs (p)(3)(i) through (p)(3)(iv) of this section as ending the individual's status as an SNF resident.

(xi) The transportation costs of electrocardiogram equipment (HCPCS code R0076), but only with respect to those electrocardiogram test services furnished during 1998.

(xii) Services described in subparagraphs (p)(2)(i) through (vi) of this section when furnished via telehealth under section 1834(m)(4)(C)(ii)(VII) of the Act.

(xiii) Those chemotherapy items identified, as of July 1, 1999, by HCPCS codes J9000-J9020, J9040-J9151, J9170-J9185, J9200-J9201, J9206-J9208, J9211, J9230-J9245, and J9265-J9600, and as of January 1, 2004, by HCPCS codes A9522, A9523, A9533, and A9534 (as subsequently modified by CMS), and any additional chemotherapy items identified by CMS.

(xiv) Those chemotherapy administration services identified, as of July 1, 1999, by HCPCS codes 36260-36262, 36489, 36530-36535, 36640, 36823, and 96405-96542 (as subsequently modified by CMS), and any additional chemotherapy administration services identified by CMS.

(xv) Those radioisotope services identified, as of July 1, 1999, by HCPCS codes 79030-79440 (as subsequently modified by CMS), and any additional radioisotope services identified by CMS.

(xvi) Those customized prosthetic devices (including artificial limbs and their components) identified, as of July 1, 1999, by HCPCS codes L5050-L5340, L5500-L5611, L5613-L5986, L5988, L6050-L6370, L6400-6880, L6920-L7274, and L7362-L7366 (as subsequently modified by CMS) and any additional customized prosthetic devices identified by CMS, which are delivered for a resident's use during a stay in the SNF and intended to be used by the resident after discharge from the SNF.

(xvii) Those blood clotting factors indicated for the treatment of patients with hemophilia and other bleeding disorders identified, as of July 1, 2020, by HCPCS codes J7170, J7175, J7177-J7183, J7185-J7190, J7192-J7195, J7198-J7203, J7205, and J7207-J7211 (as subsequently modified by CMS) and items and services related to the furnishing of such factors, and any additional blood clotting factors identified by CMS and items and services related to the furnishing of such factors.

(xviii) Those RHC and FQHC services that are described in § 405.2411(b)(2) of this chapter.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(3) *SNF resident defined.* For purposes of this paragraph, a beneficiary who is admitted to a Medicare-participating SNF is considered to be a resident of the SNF for the duration of the beneficiary's covered Part A stay. In addition, for purposes of the services described in paragraph (p)(1)(i) of this section, a beneficiary who is admitted to a Medicare-participating SNF is considered to be a resident of the SNF regardless of whether the beneficiary is in a covered Part A stay. Whenever the beneficiary leaves the facility, the beneficiary's status as an SNF resident for purposes of this paragraph (along with the SNF's responsibility to furnish or make arrangements for the services described in paragraph (p)(1) of this section) ends when one of the following events occurs -

(i) The beneficiary is admitted as an inpatient to a Medicare-participating hospital or CAH, or as a resident to another SNF;

(ii) The beneficiary receives services from a Medicare-participating home health agency under a plan of care;

(iii) The beneficiary receives outpatient services from a Medicare-participating hospital or CAH (but only for those services that CMS designates as being beyond the general scope of SNF comprehensive care plans, as required under § 483.21(b) of this chapter); or

(iv) The beneficiary is formally discharged (or otherwise departs) from the SNF, unless the beneficiary is readmitted (or returns) to that or another SNF before the following midnight.

(q) *Assisted suicide.* Any health care service used for the purpose of causing, or assisting to cause, the death of any individual. This does not pertain to the withholding or withdrawing of medical treatment or care, nutrition or hydration or to the provision of a service for the purpose of alleviating pain or discomfort, even if the use may increase the risk of death, so long as the service is not furnished for the specific purpose of causing death.

(r) A home health service (including medical supplies described in section 1861(m)(5) of the Act, but excluding durable medical equipment to the extent provided for in such section) as defined in section 1861(m) of the Act furnished to an individual who is under a plan of care of an HHA, unless that HHA has submitted a claim for payment for such services.

(s) Unless § 414.404(d) or § 414.408(e)(2) of this subchapter applies, Medicare does not make payment if an item or service that is included in a competitive bidding program (as described in part 414, subpart F of this subchapter) is furnished by a supplier other than a contract supplier (as defined in § 414.402 of this subchapter).

[54 FR 41734, Oct. 11, 1989; 55 FR 1820, Jan. 19, 1990] Editorial Note: For Federal Register citations affecting § 411.15, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov.*

1 Before July 1981, inpatient hospital care in connection with dental procedures was covered only when required by the patient's underlying medical condition and clinical status.

---

e-CFR content retrieved from https://www.govinfo.gov/bulkdata/ECFR. The e-CFR is an editorial compilation of CFR material and Federal Register amendments produced by the National Archives and Records Administration's Office of the Federal Register (OFR) and the Government Publishing Office. » e-CFR 42 last accessed on 2022-05-02. **e-CFR 42 bundle modified on 2022-04-16.**

*42 CFR - Public Health > CHAPTER IV - CENTERS FOR MEDICARE MEDICAID SERVICES, DEPARTMENT OF HEALTH AND HUMAN SERVICES (CONTINUED) (Parts 414-429) > SUBCHAPTER B - MEDICARE PROGRAM (CONTINUED) (414.1 to 426.587) > PART 424 - CONDITIONS FOR MEDICARE PAYMENT (424.1 to 424.570) > SUBPART A - GENERAL PROVISIONS (424.1 to 424.7)*

# SS 424.5 Basic conditions.

Click to open document in a browser

(a) As a basis for Medicare payment, the following conditions must be met:

(1) *Types of services.* The services must be -

(i) Covered services, as specified in part 409 or part 410 of this chapter; or

(ii) Services excluded from coverage as custodial care or services not reasonable and necessary, but reimbursable in accordance with §§ 405.332 through 405.334 of this chapter, pertaining to limitation of liability.

(2) *Sources of services.* The services must have been furnished by a provider, nonparticipating hospital, or supplier that was, at the time it furnished the services, qualified to have payment made for them.

(3) *Beneficiary of services.* Except as provided in § 409.68 of this chapter, the services must have been furnished while the individual was eligible to have payment made for them. (Section 409.68 provides for payment of inpatient hospital services furnished before the hospital is notified that the beneficiary has exhausted the Medicare benefits available for the current benefit period.)

(4) *Certification of need for services.* When required, the provider must obtain certification and recertification of the need for the services in accordance with subpart B of this part.

(5) *Claim for payment.* The provider, supplier, or beneficiary, as appropriate, must file a claim that includes or makes reference to a request for payment, in accordance with subpart C of this part.

(6) *Sufficient information.* The provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment.

(b) Additional conditions applicable in certain circumstances or to certain services are set forth in other sections of this part.

[53 FR 6635, Mar. 2, 1988; 53 FR 12945, Apr. 20, 1988; 60 FR 38271, July 26, 1995]

---

e-CFR content retrieved from https://www.govinfo.gov/bulkdata/ECFR. The e-CFR is an editorial compilation of CFR material and Federal Register amendments produced by the National Archives and Records Administration's Office of the Federal Register (OFR) and the Government Publishing Office. » e-CFR 42 last accessed on 2022-05-02. **e-CFR 42 bundle modified on 2022-04-16.**

Roche

# ROCEPHIN®

## (ceftriaxone sodium)

## FOR INJECTION

### Rx only

To reduce the development of drug-resistant bacteria and maintain the effectiveness of Rocephin and other antibacterial drugs, Rocephin should be used only to treat or prevent infections that are proven or strongly suspected to be caused by bacteria.

## DESCRIPTION

Rocephin is a sterile, semisynthetic, broad-spectrum cephalosporin antibiotic for intravenous or intramuscular administration. Ceftriaxone sodium is (6*R*,7*R*)-7-[2-(2-Amino-4-thiazolyl)glyoxylamido]-8-oxo-3-[[(1,2,5,6-tetrahydro-2-methyl-5,6-dioxo-*as*-triazin-3-yl)thio]methyl]-5-thia-1-azabicyclo[4.2.0]oct-2-ene-2-carboxylic acid, $7^2$-(*Z*)-(*O*-methyloxime), disodium salt, sesquaterhydrate.

The chemical formula of ceftriaxone sodium is $C_{18}H_{16}N_8Na_2O_7S_3 \cdot 3.5H_2O$. It has a calculated molecular weight of 661.59 and the following structural formula:




Rocephin is a white to yellowish-orange crystalline powder which is readily soluble in water, sparingly soluble in methanol and very slightly soluble in ethanol. The pH of a 1% aqueous solution is approximately 6.7. The color of Rocephin solutions ranges from light yellow to amber, depending on the length of storage, concentration and diluent used.

Rocephin contains approximately 83 mg (3.6 mEq) of sodium per gram of ceftriaxone activity.

## CLINICAL PHARMACOLOGY

Average plasma concentrations of ceftriaxone following a single 30-minute intravenous (IV) infusion of a 0.5, 1 or 2 gm dose and intramuscular (IM) administration of a single 0.5 (250 mg/mL or 350 mg/mL concentrations) or 1 gm dose in healthy subjects are presented in Table 1.

**Table 1 Ceftriaxone Plasma Concentrations After Single Dose Administration**

| Dose/Route | Average Plasma Concentrations (µg/mL) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 0.5 hr | 1 hr | 2 hr | 4 hr | 6 hr | 8 hr | 12 hr | 16 hr | 24 hr |
| 0.5 gm IV∗ | 82 | 59 | 48 | 37 | 29 | 23 | 15 | 10 | 5 |
| 0.5 gm IM 250 mg/mL | 22 | 33 | 38 | 35 | 30 | 26 | 16 | ND | 5 |
| 0.5 gm IM 350 mg/mL | 20 | 32 | 38 | 34 | 31 | 24 | 16 | ND | 5 |
| 1 gm IV∗ | 151 | 111 | 88 | 67 | 53 | 43 | 28 | 18 | 9 |
| 1 gm IM | 40 | 68 | 76 | 68 | 56 | 44 | 29 | ND | ND |
| 2 gm IV∗ | 257 | 192 | 154 | 117 | 89 | 74 | 46 | 31 | 15 |

∗IV doses were infused at a constant rate over 30 minutes.
ND = Not determined.

Ceftriaxone was completely absorbed following IM administration with mean maximum plasma concentrations occurring between 2 and 3 hours post-dose. Multiple IV or IM doses ranging from 0.5 to 2 gm at 12- to 24-hour intervals resulted in 15% to 36% accumulation of ceftriaxone above single dose values.

Ceftriaxone concentrations in urine are shown in Table 2.

**Table 2 Urinary Concentrations of Ceftriaxone After Single Dose Administration**

| Dose/Route | Average Urinary Concentrations (µg/mL) | | | | | |
|---|---|---|---|---|---|---|
| | 0-2 hr | 2-4 hr | 4-8 hr | 8-12 hr | 12-24 hr | 24-48 hr |
| 0.5 gm IV | 526 | 366 | 142 | 87 | 70 | 15 |
| 0.5 gm IM | 115 | 425 | 308 | 127 | 96 | 28 |
| 1 gm IV | 995 | 855 | 293 | 147 | 132 | 32 |
| 1 gm IM | 504 | 628 | 418 | 237 | ND | ND |
| 2 gm IV | 2692 | 1976 | 757 | 274 | 198 | 40 |

ND = Not determined.

Thirty-three percent to 67% of a ceftriaxone dose was excreted in the urine as unchanged drug and the remainder was secreted in the bile and ultimately found in the feces as microbiologically inactive compounds. After a 1 gm IV dose, average concentrations of ceftriaxone, determined from 1 to 3 hours after dosing, were 581 µg/mL in the gallbladder bile, 788 µg/mL in the common duct bile, 898 µg/mL in the cystic duct bile, 78.2 µg/gm in the gallbladder wall and 62.1 µg/mL in the concurrent plasma.

Over a 0.15 to 3 gm dose range in healthy adult subjects, the values of elimination half-life ranged from 5.8 to 8.7 hours; apparent volume of distribution from 5.78 to 13.5 L; plasma clearance from 0.58 to 1.45 L/hour; and renal clearance from 0.32 to 0.73 L/hour. Ceftriaxone is reversibly bound to human plasma proteins, and the binding decreased from a value of 95% bound at plasma concentrations of <25 µg/mL to a value of 85% bound at 300 µg/mL. Ceftriaxone crosses the blood placenta barrier.

The average values of maximum plasma concentration, elimination half-life, plasma clearance and volume of distribution after a 50 mg/kg IV dose and after a 75 mg/kg IV dose in pediatric patients suffering from bacterial meningitis are shown in Table 3. Ceftriaxone penetrated the inflamed meninges of infants and pediatric patients; CSF concentrations after a 50 mg/kg IV dose and after a 75 mg/kg IV dose are also shown in Table 3.

**Table 3 Average Pharmacokinetic Parameters of Ceftriaxone in Pediatric Patients With Meningitis**

| | 50 mg/kg IV | 75 mg/kg IV |
|---|---|---|
| Maximum Plasma Concentrations (µg/mL) | 216 | 275 |
| Elimination Half-life (hr) | 4.6 | 4.3 |
| Plasma Clearance (mL/hr/kg) | 49 | 60 |
| Volume of Distribution (mL/kg) | 338 | 373 |
| CSF Concentration—inflamed meninges (µg/mL) | 5.6 | 6.4 |
| Range (µg/mL) | 1.3-18.5 | 1.3-44 |
| Time after dose (hr) | 3.7 (± 1.6) | 3.3 (± 1.4) |

Compared to that in healthy adult subjects, the pharmacokinetics of ceftriaxone were only minimally altered in elderly subjects and in patients with renal impairment or hepatic dysfunction (Table 4); therefore, dosage adjustments are not necessary for these patients with ceftriaxone dosages up to 2 gm per day. Ceftriaxone was not removed to any significant extent from the plasma by hemodialysis; in six of 26 dialysis patients, the elimination rate of ceftriaxone was markedly reduced.

**Table 4 Average Pharmacokinetic Parameters of Ceftriaxone in Humans**

| Subject Group | Elimination Half-Life (hr) | Plasma Clearance (L/hr) | Volume of Distribution (L) |
|---|---|---|---|
| Healthy Subjects | 5.8-8.7 | 0.58-1.45 | 5.8-13.5 |
| Elderly Subjects (mean age, 70.5 yr) | 8.9 | 0.83 | 10.7 |
| Patients With Renal Impairment | | | |
| Hemodialysis Patients (0-5 mL/min)* | 14.7 | 0.65 | 13.7 |
| Severe (5-15 mL/min) | 15.7 | 0.56 | 12.5 |
| Moderate (16-30 mL/min) | 11.4 | 0.72 | 11.8 |
| Mild (31-60 mL/min) | 12.4 | 0.70 | 13.3 |
| Patients With Liver Disease | 8.8 | 1.1 | 13.6 |

*Creatinine clearance.

The elimination of ceftriaxone is not altered when Rocephin is co-administered with probenecid.

***Pharmacokinetics in the Middle Ear Fluid:*** In one study, total ceftriaxone concentrations (bound and unbound) were measured in middle ear fluid obtained during the insertion of tympanostomy tubes in 42 pediatric patients with otitis media. Sampling times were from 1 to 50 hours after a single intramuscular injection of 50 mg/kg of ceftriaxone. Mean (± SD) ceftriaxone levels in the middle ear reached a peak of 35 (± 12)

μg/mL at 24 hours, and remained at 19 (± 7) μg/mL at 48 hours. Based on middle ear fluid ceftriaxone concentrations in the 23 to 25 hour and the 46 to 50 hour sampling time intervals, a half-life of 25 hours was calculated. Ceftriaxone is highly bound to plasma proteins. The extent of binding to proteins in the middle ear fluid is unknown.

***Interaction with Calcium:*** Two in vitro studies, one using adult plasma and the other neonatal plasma from umbilical cord blood have been carried out to assess interaction of ceftriaxone and calcium. Ceftriaxone concentrations up to 1 mM (in excess of concentrations achieved in vivo following administration of 2 grams ceftriaxone infused over 30 minutes) were used in combination with calcium concentrations up to 12 mM (48 mg/dL). Recovery of ceftriaxone from plasma was reduced with calcium concentrations of 6 mM (24 mg/dL) or higher in adult plasma or 4 mM (16 mg/dL) or higher in neonatal plasma. This may be reflective of ceftriaxone-calcium precipitation.

***Microbiology:*** The bactericidal activity of ceftriaxone results from inhibition of cell wall synthesis. Ceftriaxone has a high degree of stability in the presence of beta-lactamases, both penicillinases and cephalosporinases, of gram-negative and gram-positive bacteria.

In an in vitro study antagonistic effects have been observed with the combination of chloramphenicol and ceftriaxone.

Ceftriaxone has been shown to be active against most strains of the following microorganisms, both in vitro and in clinical infections described in the **INDICATIONS AND USAGE** section.

Aerobic gram-negative microorganisms:
*Acinetobacter calcoaceticus*
*Enterobacter aerogenes*
*Enterobacter cloacae*
*Escherichia coli*
*Haemophilus influenzae* (including ampicillin-resistant and beta-lactamase producing strains)
*Haemophilus parainfluenzae*
*Klebsiella oxytoca*
*Klebsiella pneumoniae*
*Moraxella catarrhalis* (including beta-lactamase producing strains)
*Morganella morganii*
*Neisseria gonorrhoeae* (including penicillinase- and nonpenicillinase-producing strains)
*Neisseria meningitidis*
*Proteus mirabilis*
*Proteus vulgaris*
*Serratia marcescens*

Ceftriaxone is also active against many strains of *Pseudomonas aeruginosa*.

NOTE: Many strains of the above organisms that are resistant to multiple antibiotics, eg, penicillins, cephalosporins, and aminoglycosides, are susceptible to ceftriaxone.

Aerobic gram-positive microorganisms:

**ROCEPHIN® (ceftriaxone sodium)**

*Staphylococcus aureus* (including penicillinase-producing strains)
*Staphylococcus epidermidis*
*Streptococcus pneumoniae*
*Streptococcus pyogenes*
Viridans group streptococci

NOTE: Methicillin-resistant staphylococci are resistant to cephalosporins, including ceftriaxone. Most strains of Group D streptococci and enterococci, eg, *Enterococcus (Streptococcus) faecalis*, are resistant.

Anaerobic microorganisms:
*Bacteroides fragilis*
*Clostridium* species
*Peptostreptococcus* species

NOTE: Most strains of *Clostridium difficile* are resistant.

The following in vitro data are available, **but their clinical significance is unknown**. Ceftriaxone exhibits in vitro minimal inhibitory concentrations (MICs) of ≤8 μg/mL or less against most strains of the following microorganisms, however, the safety and effectiveness of ceftriaxone in treating clinical infections due to these microorganisms have not been established in adequate and well-controlled clinical trials.

Aerobic gram-negative microorganisms:
*Citrobacter diversus*
*Citrobacter freundii*
*Providencia* species (including *Providencia rettgeri*)
*Salmonella* species (including *Salmonella typhi*)
*Shigella* species

Aerobic gram-positive microorganisms:
*Streptococcus agalactiae*

Anaerobic microorganisms:
*Prevotella (Bacteroides) bivius*
*Porphyromonas (Bacteroides) melaninogenicus*

## Susceptibility Tests:

**Dilution Techniques**: Quantitative methods are used to determine antimicrobial minimal inhibitory concentrations (MICs). These MICs provide estimates of the susceptibility of bacteria to antimicrobial compounds. The MICs should be determined using a standardized procedure.[1] Standardized procedures are based on a dilution method (broth or agar) or equivalent with standardized inoculum concentrations and standardized concentrations of ceftriaxone powder. The MIC values should be interpreted according to the following criteria[2] for aerobic organisms other than *Haemophilus* spp, *Neisseria gonorrhoeae*, and *Streptococcus* spp, including *Streptococcus pneumoniae:*

| MIC (μg/mL) | Interpretation |
|---|---|
| ≤8 | (S) Susceptible |

| | |
|---|---|
| 16-32 | (I) Intermediate |
| ≥64 | (R) Resistant |

The following interpretive criteria[2] should be used when testing *Haemophilus* species using Haemophilus Test Media (HTM).

| MIC (µg/mL) | Interpretation |
|---|---|
| ≤2 | (S) Susceptible |

The absence of resistant strains precludes defining any categories other than "Susceptible". Strains yielding results suggestive of a "Nonsusceptible" category should be submitted to a reference laboratory for further testing.

The following interpretive criteria[2] should be used when testing *Neisseria gonorrhoeae* when using GC agar base and 1% defined growth supplement.

| MIC (µg/mL) | Interpretation |
|---|---|
| ≤0.25 | (S) Susceptible |

The absence of resistant strains precludes defining any categories other than "Susceptible". Strains yielding results suggestive of a "Nonsusceptible" category should be submitted to a reference laboratory for further testing.

The following interpretive criteria[2] should be used when testing *Streptococcus* spp including *Streptococcus pneumoniae* using cation-adjusted Mueller-Hinton broth with 2 to 5% lysed horse blood.

| MIC (µg/mL) | Interpretation |
|---|---|
| ≤0.5 | (S) Susceptible |
| 1 | (I) Intermediate |
| ≥2 | (R) Resistant |

A report of "Susceptible" indicates that the pathogen is likely to be inhibited if the antimicrobial compound in the blood reaches the concentrations usually achievable. A report of "Intermediate" indicates that the results should be considered equivocal, and if the microorganism is not fully susceptible to alternative, clinically feasible drugs, the test should be repeated. This category implies possible clinical applicability in body sites where the drug is physiologically concentrated or in situations where high dosage of the drug can be used. This category also provides a buffer zone which prevents small uncontrolled technical factors from causing major discrepancies in interpretation. A report of "Resistant" indicates that the pathogen is not likely to be inhibited if the antimicrobial compound in the blood reaches the concentrations usually achievable; other therapy should be selected.

Standardized susceptibility test procedures require the use of laboratory control microorganisms to control the technical aspects of the laboratory procedures. Standardized ceftriaxone powder should provide the following MIC values:[2]

**ROCEPHIN® (ceftriaxone sodium)**

| Microorganism | ATCC® # | MIC (μg/mL) |
|---|---|---|
| *Escherichia coli* | 25922 | 0.03 - 0.12 |
| *Staphylococcus aureus* | 29213 | 1 - 8* |
| *Pseudomonas aeruginosa* | 27853 | 8 - 32 |
| *Haemophilus influenzae* | 49247 | 0.06 - 0.25 |
| *Neisseria gonorrhoeae* | 49226 | 0.004 - 0.015 |
| *Streptococcus pneumoniae* | 49619 | 0.03 - 0.12 |

* A bimodal distribution of MICs results at the extremes of the acceptable range should be suspect and control validity should be verified with data from other control strains.

**Diffusion Techniques:** Quantitative methods that require measurement of zone diameters also provide reproducible estimates of the susceptibility of bacteria to antimicrobial compounds. One such standardized procedure[3] requires the use of standardized inoculum concentrations. This procedure uses paper discs impregnated with 30 μg of ceftriaxone to test the susceptibility of microorganisms to ceftriaxone.

Reports from the laboratory providing results of the standard single-disc susceptibility test with a 30 μg ceftriaxone disc should be interpreted according to the following criteria for aerobic organisms other than *Haemophilus* spp, *Neisseria gonorrhoeae*, and *Streptococcus* spp:

| Zone Diameter (mm) | Interpretation |
|---|---|
| ≥21 | (S) Susceptible |
| 14-20 | (I) Intermediate |
| ≤13 | (R) Resistant |

The following interpretive criteria[3] should be used when testing *Haemophilus* species when using Haemophilus Test Media (HTM).

| Zone Diameter (mm) | Interpretation |
|---|---|
| ≥26 | (S) Susceptible |

The absence of resistant strains precludes defining any categories other than "Susceptible". Strains yielding results suggestive of a "Nonsusceptible" category should be submitted to a reference laboratory for further testing.

The following interpretive criteria[3] should be used when testing *Neisseria gonorrhoeae* when using GC agar base and 1% defined growth supplement.

| Zone Diameter (mm) | Interpretation |
|---|---|
| ≥35 | (S) Susceptible |

The absence of resistant strains precludes defining any categories other than "Susceptible". Strains yielding results suggestive of a "Nonsusceptible" category should be submitted to a reference laboratory for further testing.

The following interpretive criteria[3] should be used when testing *Streptococcus* spp other than *Streptococcus pneumoniae* when using Mueller-Hinton agar supplemented with 5% sheep blood incubated in 5% $CO_2$.

**ROCEPHIN® (ceftriaxone sodium)**

| Zone Diameter (mm) | Interpretation |
|---|---|
| ≥27 | (S) Susceptible |
| 25-26 | (I) Intermediate |
| ≤24 | (R) Resistant |

Interpretation should be as stated above for results using dilution techniques. Interpretation involves correlation of the diameter obtained in the disc test with the MIC for ceftriaxone.

Disc diffusion interpretive criteria for ceftriaxone discs against *Streptococcus pneumoniae* are not available, however, isolates of pneumococci with oxacillin zone diameters of >20 mm are susceptible (MIC ≤0.06 μg/mL) to penicillin and can be considered susceptible to ceftriaxone. *Streptococcus pneumoniae* isolates should not be reported as penicillin (ceftriaxone) resistant or intermediate based solely on an oxacillin zone diameter of ≤19 mm. The ceftriaxone MIC should be determined for those isolates with oxacillin zone diameters ≤19 mm.

As with standardized dilution techniques, diffusion methods require the use of laboratory control microorganisms that are used to control the technical aspects of the laboratory procedures. For the diffusion technique, the 30 μg ceftriaxone disc should provide the following zone diameters in these laboratory test quality control strains:[3]

| Microorganism | ATCC®# | Zone Diameter Ranges (mm) |
|---|---|---|
| *Escherichia coli* | 25922 | 29 - 35 |
| *Staphylococcus aureus* | 25923 | 22 - 28 |
| *Pseudomonas aeruginosa* | 27853 | 17 - 23 |
| *Haemophilus influenzae* | 49247 | 31 - 39 |
| *Neisseria gonorrhoeae* | 49226 | 39 - 51 |
| *Streptococcus pneumoniae* | 49619 | 30 - 35 |

**Anaerobic Techniques:** For anaerobic bacteria, the susceptibility to ceftriaxone as MICs can be determined by standardized test methods.[4] The MIC values obtained should be interpreted according to the following criteria:

| MIC (μg/mL) | Interpretation |
|---|---|
| ≤16 | (S) Susceptible |
| 32 | (I) Intermediate |
| ≥64 | (R) Resistant |

As with other susceptibility techniques, the use of laboratory control microorganisms is required to control the technical aspects of the laboratory standardized procedures. Standardized ceftriaxone powder should provide the following MIC values for the indicated standardized anaerobic dilution[4] testing method:

| Method | Microorganism | ATCC® # | MIC (µg/mL) |
|---|---|---|---|
| Agar | *Bacteroides fragilis* | 25285 | 32 - 128 |
| | *Bacteroides thetaiotaomicron* | 29741 | 64 - 256 |
| Broth | *Bacteroides thetaiotaomicron* | 29741 | 32 - 128 |

ATCC® is a registered trademark of the American Type Culture Collection.

## INDICATIONS AND USAGE

Before instituting treatment with Rocephin, appropriate specimens should be obtained for isolation of the causative organism and for determination of its susceptibility to the drug. Therapy may be instituted prior to obtaining results of susceptibility testing.

To reduce the development of drug-resistant bacteria and maintain the effectiveness of Rocephin and other antibacterial drugs, Rocephin should be used only to treat or prevent infections that are proven or strongly suspected to be caused by susceptible bacteria. When culture and susceptibility information are available, they should be considered in selecting or modifying antibacterial therapy. In the absence of such data, local epidemiology and susceptibility patterns may contribute to the empiric selection of therapy.

Rocephin is indicated for the treatment of the following infections when caused by susceptible organisms:

*LOWER RESPIRATORY TRACT INFECTIONS* caused by *Streptococcus pneumoniae, Staphylococcus aureus, Haemophilus influenzae, Haemophilus parainfluenzae, Klebsiella pneumoniae, Escherichia coli, Enterobacter aerogenes, Proteus mirabilis* or *Serratia marcescens.*

*ACUTE BACTERIAL OTITIS MEDIA* caused by *Streptococcus pneumoniae, Haemophilus influenzae* (including beta-lactamase producing strains) or *Moraxella catarrhalis* (including beta-lactamase producing strains).

NOTE: In one study lower clinical cure rates were observed with a single dose of Rocephin compared to 10 days of oral therapy. In a second study comparable cure rates were observed between single dose Rocephin and the comparator. The potentially lower clinical cure rate of Rocephin should be balanced against the potential advantages of parenteral therapy (see **CLINICAL STUDIES**).

*SKIN AND SKIN STRUCTURE INFECTIONS* caused by *Staphylococcus aureus, Staphylococcus epidermidis, Streptococcus pyogenes*, Viridans group streptococci, *Escherichia coli, Enterobacter cloacae, Klebsiella oxytoca, Klebsiella pneumoniae, Proteus mirabilis, Morganella morganii,∗ Pseudomonas aeruginosa, Serratia marcescens, Acinetobacter calcoaceticus, Bacteroides fragilis∗* or *Peptostreptococcus* species.

*URINARY TRACT INFECTIONS (complicated and uncomplicated)* caused by *Escherichia coli, Proteus mirabilis, Proteus vulgaris, Morganella morganii* or *Klebsiella pneumoniae.*

## ROCEPHIN® (ceftriaxone sodium)

*UNCOMPLICATED GONORRHEA (cervical/urethral and rectal)* caused by *Neisseria gonorrhoeae*, including both penicillinase- and nonpenicillinase-producing strains, and pharyngeal gonorrhea caused by nonpenicillinase-producing strains of *Neisseria gonorrhoeae.*

*PELVIC INFLAMMATORY DISEASE* caused by *Neisseria gonorrhoeae*. Rocephin, like other cephalosporins, has no activity against *Chlamydia trachomatis*. Therefore, when cephalosporins are used in the treatment of patients with pelvic inflammatory disease and *Chlamydia trachomatis* is one of the suspected pathogens, appropriate antichlamydial coverage should be added.

*BACTERIAL SEPTICEMIA* caused by *Staphylococcus aureus, Streptococcus pneumoniae*, *Escherichia coli, Haemophilus influenzae* or *Klebsiella pneumoniae.*

*BONE AND JOINT INFECTIONS* caused by *Staphylococcus aureus, Streptococcus pneumoniae*, *Escherichia coli*, *Proteus mirabilis*, *Klebsiella pneumoniae* or *Enterobacter* species.

*INTRA-ABDOMINAL INFECTIONS* caused by *Escherichia coli*, *Klebsiella pneumoniae, Bacteroides fragilis*, *Clostridium* species (Note: most strains of *Clostridium difficile* are resistant) or *Peptostreptococcus* species.

*MENINGITIS* caused by *Haemophilus influenzae, Neisseria meningitidis* or *Streptococcus pneumoniae.* Rocephin has also been used successfully in a limited number of cases of meningitis and shunt infection caused by *Staphylococcus epidermidis*∗ and *Escherichia coli.*∗

∗Efficacy for this organism in this organ system was studied in fewer than ten infections.

*SURGICAL PROPHYLAXIS:* The preoperative administration of a single 1 gm dose of Rocephin may reduce the incidence of postoperative infections in patients undergoing surgical procedures classified as contaminated or potentially contaminated (eg, vaginal or abdominal hysterectomy or cholecystectomy for chronic calculous cholecystitis in high-risk patients, such as those over 70 years of age, with acute cholecystitis not requiring therapeutic antimicrobials, obstructive jaundice or common duct bile stones) and in surgical patients for whom infection at the operative site would present serious risk (eg, during coronary artery bypass surgery). Although Rocephin has been shown to have been as effective as cefazolin in the prevention of infection following coronary artery bypass surgery, no placebo-controlled trials have been conducted to evaluate any cephalosporin antibiotic in the prevention of infection following coronary artery bypass surgery.

When administered prior to surgical procedures for which it is indicated, a single 1 gm dose of Rocephin provides protection from most infections due to susceptible organisms throughout the course of the procedure.

## CONTRAINDICATIONS

Rocephin is contraindicated in patients with known allergy to the cephalosporin class of antibiotics.

### Neonates ( ≤ 28 days)

Hyperbilirubinemic neonates, especially prematures, should not be treated with Rocephin. In vitro studies have shown that ceftriaxone can displace bilirubin from its binding to serum albumin and bilirubin encephalopathy can possibly develop in these patients.

**Rocephin is contraindicated in neonates if they require (or are expected to require) treatment with calcium-containing IV solutions, including continuous calcium-containing infusions such as parenteral nutrition because of the risk of precipitation of ceftriaxone-calcium (see CLINICAL PHARMACOLOGY, WARNINGS and DOSAGE AND ADMINISTRATION).**

A small number of cases of fatal outcomes in which a crystalline material was observed in the lungs and kidneys at autopsy have been reported in neonates receiving Rocephin and calcium-containing fluids. In some of these cases, the same intravenous infusion line was used for both Rocephin and calcium-containing fluids and in some a precipitate was observed in the intravenous infusion line. At least one fatality has been reported in a neonate in whom Rocephin and calcium-containing fluids were administered at different time points via different intravenous lines; no crystalline material was observed at autopsy in this neonate. There have been no similar reports in patients other than neonates.

## WARNINGS

### Hypersensitivity

BEFORE THERAPY WITH ROCEPHIN IS INSTITUTED, CAREFUL INQUIRY SHOULD BE MADE TO DETERMINE WHETHER THE PATIENT HAS HAD PREVIOUS HYPERSENSITIVITY REACTIONS TO CEPHALOSPORINS, PENICILLINS OR OTHER DRUGS. THIS PRODUCT SHOULD BE GIVEN CAUTIOUSLY TO PENICILLIN-SENSITIVE PATIENTS. ANTIBIOTICS SHOULD BE ADMINISTERED WITH CAUTION TO ANY PATIENT WHO HAS DEMONSTRATED SOME FORM OF ALLERGY, PARTICULARLY TO DRUGS. SERIOUS ACUTE HYPERSENSITIVITY REACTIONS MAY REQUIRE THE USE OF SUBCUTANEOUS EPINEPHRINE AND OTHER EMERGENCY MEASURES.

### Interaction with Calcium-Containing Products

**Do not use diluents containing calcium, such as Ringer's solution or Hartmann's solution, to reconstitute Rocephin vials or to further dilute a reconstituted vial for IV administration because a precipitate can form. Precipitation of ceftriaxone-calcium can also occur when Rocephin is mixed with calcium-containing solutions in the same IV administration line. Rocephin must not be administered simultaneously with calcium-containing IV solutions, including continuous calcium-containing infusions such as parenteral nutrition via a Y-site. However, in patients other than neonates, Rocephin and calcium-containing solutions may be administered sequentially of one another if the infusion lines are thoroughly flushed between infusions with a compatible fluid. In vitro studies using adult and neonatal plasma from umbilical cord blood demonstrated that neonates have an increased risk of**

**precipitation of ceftriaxone-calcium (see CLINICAL PHARMACOLOGY, CONTRAINDICATIONS and DOSAGE AND ADMINISTRATION).**

### *Clostridium difficile*

***Clostridium difficile* associated diarrhea (CDAD) has been reported with use of nearly all antibacterial agents, including Rocephin, and may range in severity from mild diarrhea to fatal colitis. Treatment with antibacterial agents alters the normal flora of the colon leading to overgrowth of *C. difficile.***

*C. difficile* produces toxins A and B which contribute to the development of CDAD. Hypertoxin producing strains of *C. difficile* cause increased morbidity and mortality, as these infections can be refractory to antimicrobial therapy and may require colectomy. CDAD must be considered in all patients who present with diarrhea following antibiotic use. Careful medical history is necessary since CDAD has been reported to occur over two months after the administration of antibacterial agents.

If CDAD is suspected or confirmed, ongoing antibiotic use not directed against *C. difficile* may need to be discontinued. Appropriate fluid and electrolyte management, protein supplementation, antibiotic treatment of *C. difficile*, and surgical evaluation should be instituted as clinically indicated.

### Hemolytic Anemia

An immune mediated hemolytic anemia has been observed in patients receiving cephalosporin class antibacterials including Rocephin. Severe cases of hemolytic anemia, including fatalities, have been reported during treatment in both adults and children. If a patient develops anemia while on ceftriaxone, the diagnosis of a cephalosporin associated anemia should be considered and ceftriaxone stopped until the etiology is determined.

## PRECAUTIONS

***General:*** Prescribing Rocephin in the absence of a proven or strongly suspected bacterial infection or a prophylactic indication is unlikely to provide benefit to the patient and increases the risk of the development of drug-resistant bacteria.

Although transient elevations of BUN and serum creatinine have been observed, at the recommended dosages, the nephrotoxic potential of Rocephin is similar to that of other cephalosporins.

Ceftriaxone is excreted via both biliary and renal excretion (see **CLINICAL PHARMACOLOGY**). Therefore, patients with renal failure normally require no adjustment in dosage when usual doses of Rocephin are administered.

Dosage adjustments should not be necessary in patients with hepatic dysfunction; however, in patients with both hepatic dysfunction and significant renal disease, caution should be exercised and the Rocephin dosage should not exceed 2 gm daily.

Alterations in prothrombin times have occurred rarely in patients treated with Rocephin. Patients with impaired vitamin K synthesis or low vitamin K stores (eg, chronic hepatic disease and malnutrition) may require monitoring of prothrombin time during Rocephin

treatment. Vitamin K administration (10 mg weekly) may be necessary if the prothrombin time is prolonged before or during therapy.

Prolonged use of Rocephin may result in overgrowth of nonsusceptible organisms. Careful observation of the patient is essential. If superinfection occurs during therapy, appropriate measures should be taken.

Rocephin should be prescribed with caution in individuals with a history of gastrointestinal disease, especially colitis.

**There have been reports of sonographic abnormalities in the gallbladder of patients treated with Rocephin; some of these patients also had symptoms of gallbladder disease.** These abnormalities appear on sonography as an echo without acoustical shadowing suggesting sludge or as an echo with acoustical shadowing which may be misinterpreted as gallstones. The chemical nature of the sonographically detected material has been determined to be predominantly a ceftriaxone-calcium salt. **The condition appears to be transient and reversible upon discontinuation of Rocephin and institution of conservative management.** Therefore, Rocephin should be discontinued in patients who develop signs and symptoms suggestive of gallbladder disease and/or the sonographic findings described above.

Cases of pancreatitis, possibly secondary to biliary obstruction, have been reported rarely in patients treated with Rocephin. Most patients presented with risk factors for biliary stasis and biliary sludge (preceding major therapy, severe illness, total parenteral nutrition). A cofactor role of Rocephin-related biliary precipitation cannot be ruled out.

As with other cephalosporins, anaphylactic shock cannot be ruled out even if a thorough patient history is taken.

***Information for Patients:*** Patients should be counseled that antibacterial drugs including Rocephin should only be used to treat bacterial infections. They do not treat viral infections (eg, common cold). When Rocephin is prescribed to treat a bacterial infection, patients should be told that although it is common to feel better early in the course of therapy, the medication should be taken exactly as directed. Skipping doses or not completing the full course of therapy may (1) decrease the effectiveness of the immediate treatment and (2) increase the likelihood that bacteria will develop resistance and will not be treatable by Rocephin or other antibacterial drugs in the future.

Diarrhea is a common problem caused by antibiotics which usually ends when the antibiotic is discontinued. Sometimes after starting treatment with antibiotics, patients can develop watery and bloody stools (with or without stomach cramps and fever) even as late as two or more months after having taken the last dose of the antibiotic. If this occurs, patients should contact their physician as soon as possible.

***Carcinogenesis, Mutagenesis, Impairment of Fertility:*** *Carcinogenesis:* Considering the maximum duration of treatment and the class of the compound, carcinogenicity studies with ceftriaxone in animals have not been performed. The maximum duration of animal toxicity studies was 6 months.

*Mutagenesis:* Genetic toxicology tests included the Ames test, a micronucleus test and a test for chromosomal aberrations in human lymphocytes cultured in vitro with ceftriaxone. Ceftriaxone showed no potential for mutagenic activity in these studies.

*Impairment of Fertility:* Ceftriaxone produced no impairment of fertility when given intravenously to rats at daily doses up to 586 mg/kg/day, approximately 20 times the recommended clinical dose of 2 gm/day.

***Pregnancy:*** *Teratogenic Effects:* Pregnancy Category B. Reproductive studies have been performed in mice and rats at doses up to 20 times the usual human dose and have no evidence of embryotoxicity, fetotoxicity or teratogenicity. In primates, no embryotoxicity or teratogenicity was demonstrated at a dose approximately 3 times the human dose.

There are, however, no adequate and well-controlled studies in pregnant women. Because animal reproductive studies are not always predictive of human response, this drug should be used during pregnancy only if clearly needed.

*Nonteratogenic Effects:* In rats, in the Segment I (fertility and general reproduction) and Segment III (perinatal and postnatal) studies with intravenously administered ceftriaxone, no adverse effects were noted on various reproductive parameters during gestation and lactation, including postnatal growth, functional behavior and reproductive ability of the offspring, at doses of 586 mg/kg/day or less.

***Nursing Mothers:*** Low concentrations of ceftriaxone are excreted in human milk. Caution should be exercised when Rocephin is administered to a nursing woman.

***Pediatric Use:*** Safety and effectiveness of Rocephin in neonates, infants and pediatric patients have been established for the dosages described in the **DOSAGE AND ADMINISTRATION** section. In vitro studies have shown that ceftriaxone, like some other cephalosporins, can displace bilirubin from serum albumin. Rocephin should not be administered to hyperbilirubinemic neonates, especially prematures (see **CONTRAINDICATIONS**).

***Geriatric Use:*** Of the total number of subjects in clinical studies of Rocephin, 32% were 60 and over. No overall differences in safety or effectiveness were observed between these subjects and younger subjects, and other reported clinical experience has not identified differences in responses between the elderly and younger patients, but greater sensitivity of some older individuals cannot be ruled out.

The pharmacokinetics of ceftriaxone were only minimally altered in geriatric patients compared to healthy adult subjects and dosage adjustments are not necessary for geriatric patients with ceftriaxone dosages up to 2 grams per day (see **CLINICAL PHARMACOLOGY**).

## ADVERSE REACTIONS

Rocephin is generally well tolerated. In clinical trials, the following adverse reactions, which were considered to be related to Rocephin therapy or of uncertain etiology, were observed:

**ROCEPHIN® (ceftriaxone sodium)**

*LOCAL REACTIONS*—pain, induration and tenderness was 1% overall. Phlebitis was reported in <1% after IV administration. The incidence of warmth, tightness or induration was 17% (3/17) after IM administration of 350 mg/mL and 5% (1/20) after IM administration of 250 mg/mL.

*HYPERSENSITIVITY*—rash (1.7%). Less frequently reported (<1%) were pruritus, fever or chills.

*HEMATOLOGIC*—eosinophilia (6%), thrombocytosis (5.1%) and leukopenia (2.1%). Less frequently reported (<1%) were anemia, hemolytic anemia, neutropenia, lymphopenia, thrombocytopenia and prolongation of the prothrombin time.

*GASTROINTESTINAL*—diarrhea (2.7%). Less frequently reported (<1%) were nausea or vomiting, and dysgeusia. The onset of pseudomembranous colitis symptoms may occur during or after antibacterial treatment (see **WARNINGS**).

*HEPATIC*—elevations of SGOT (3.1%) or SGPT (3.3%). Less frequently reported (<1%) were elevations of alkaline phosphatase and bilirubin.

*RENAL*—elevations of the BUN (1.2%). Less frequently reported (<1%) were elevations of creatinine and the presence of casts in the urine.

*CENTRAL NERVOUS SYSTEM*—headache or dizziness were reported occasionally (<1%).

*GENITOURINARY*—moniliasis or vaginitis were reported occasionally (<1%).

*MISCELLANEOUS*—diaphoresis and flushing were reported occasionally (<1%).

Other rarely observed adverse reactions (<0.1%) include abdominal pain, agranulocytosis, allergic pneumonitis, anaphylaxis, basophilia, biliary lithiasis, bronchospasm, colitis, dyspepsia, epistaxis, flatulence, gallbladder sludge, glycosuria, hematuria, jaundice, leukocytosis, lymphocytosis, monocytosis, nephrolithiasis, palpitations, a decrease in the prothrombin time, renal precipitations, seizures, and serum sickness.

**Postmarketing Experience:** In addition to the adverse reactions reported during clinical trials, the following adverse experiences have been reported during clinical practice in patients treated with Rocephin. Data are generally insufficient to allow an estimate of incidence or to establish causation.

A small number of cases of fatal outcomes in which a crystalline material was observed in the lungs and kidneys at autopsy have been reported in neonates receiving Rocephin and calcium-containing fluids. In some of these cases, the same intravenous infusion line was used for both Rocephin and calcium-containing fluids and in some a precipitate was observed in the intravenous infusion line. At least one fatality has been reported in a neonate in whom Rocephin and calcium-containing fluids were administered at different time points via different intravenous lines; no crystalline material was observed at autopsy in this neonate. There have been no similar reports in patients other than neonates.

*GASTROINTESTINAL* – stomatitis and glossitis.

*GENITOURINARY* – oliguria.

*DERMATOLOGIC* – exanthema, allergic dermatitis, urticaria, edema. As with many medications, isolated cases of severe cutaneous adverse reactions (erythema multiforme, Stevens-Johnson syndrome or Lyell's syndrome/toxic epidermal necrolysis) have been reported.

**Cephalosporin Class Adverse Reactions**

In addition to the adverse reactions listed above which have been observed in patients treated with ceftriaxone, the following adverse reactions and altered laboratory test results have been reported for cephalosporin class antibiotics:

*Adverse Reactions:* Allergic reactions, drug fever, serum sickness-like reaction, renal dysfunction, toxic nephropathy, reversible hyperactivity, hypertonia, hepatic dysfunction including cholestasis, aplastic anemia, hemorrhage, and superinfection.

*Altered Laboratory Tests:* Positive direct Coombs' test, false-positive test for urinary glucose, and elevated LDH.

Several cephalosporins have been implicated in triggering seizures, particularly in patients with renal impairment when the dosage was not reduced (see **DOSAGE AND ADMINISTRATION**). If seizures associated with drug therapy occur, the drug should be discontinued. Anticonvulsant therapy can be given if clinically indicated.

## OVERDOSAGE

In the case of overdosage, drug concentration would not be reduced by hemodialysis or peritoneal dialysis. There is no specific antidote. Treatment of overdosage should be symptomatic.

## DOSAGE AND ADMINISTRATION

Rocephin may be administered intravenously or intramuscularly.

**Do not use diluents containing calcium, such as Ringer's solution or Hartmann's solution, to reconstitute Rocephin vials or to further dilute a reconstituted vial for IV administration because a precipitate can form. Precipitation of ceftriaxone-calcium can also occur when Rocephin is mixed with calcium-containing solutions in the same IV administration line. Rocephin must not be administered simultaneously with calcium-containing IV solutions, including continuous calcium-containing infusions such as parenteral nutrition via a Y-site. However, in patients other than neonates, Rocephin and calcium-containing solutions may be administered sequentially of one another if the infusion lines are thoroughly flushed between infusions with a compatible fluid (see WARNINGS).**

There have been no reports of an interaction between ceftriaxone and oral calcium-containing products or interaction between intramuscular ceftriaxone and calcium-containing products (IV or oral).

*NEONATES:* Hyperbilirubinemic neonates, especially prematures, should not be treated with Rocephin (see **CONTRAINDICATIONS**).

Rocephin is contraindicated in neonates if they require (or are expected to require) treatment with calcium-containing IV solutions, including continuous calcium-containing infusions such as parenteral nutrition because of the risk of precipitation of ceftriaxone-calcium (see **CONTRAINDICATIONS**).

*PEDIATRIC PATIENTS:* For the treatment of skin and skin structure infections, the recommended total daily dose is 50 to 75 mg/kg given once a day (or in equally divided doses twice a day). The total daily dose should not exceed 2 grams.

For the treatment of acute bacterial otitis media, a single intramuscular dose of 50 mg/kg (not to exceed 1 gram) is recommended (see **INDICATIONS AND USAGE**).

For the treatment of serious miscellaneous infections other than meningitis, the recommended total daily dose is 50 to 75 mg/kg, given in divided doses every 12 hours. The total daily dose should not exceed 2 grams.

In the treatment of meningitis, it is recommended that the initial therapeutic dose be 100 mg/kg (not to exceed 4 grams). Thereafter, a total daily dose of 100 mg/kg/day (not to exceed 4 grams daily) is recommended. The daily dose may be administered once a day (or in equally divided doses every 12 hours). The usual duration of therapy is 7 to 14 days.

*ADULTS:* The usual adult daily dose is 1 to 2 grams given once a day (or in equally divided doses twice a day) depending on the type and severity of infection. The total daily dose should not exceed 4 grams.

If *Chlamydia trachomatis* is a suspected pathogen, appropriate antichlamydial coverage should be added, because ceftriaxone sodium has no activity against this organism.

For the treatment of uncomplicated gonococcal infections, a single intramuscular dose of 250 mg is recommended.

For preoperative use (surgical prophylaxis), a single dose of 1 gram administered intravenously 1⁄2 to 2 hours before surgery is recommended.

Generally, Rocephin therapy should be continued for at least 2 days after the signs and symptoms of infection have disappeared. The usual duration of therapy is 4 to 14 days; in complicated infections, longer therapy may be required.

When treating infections caused by *Streptococcus pyogenes*, therapy should be continued for at least 10 days.

No dosage adjustment is necessary for patients with impairment of renal or hepatic function.

*DIRECTIONS FOR USE: Intramuscular Administration:* Reconstitute Rocephin powder with the appropriate diluent (see ***COMPATIBILITY AND STABILITY***).

**ROCEPHIN® (ceftriaxone sodium)**

Inject diluent into vial, shake vial thoroughly to form solution. Withdraw entire contents of vial into syringe to equal total labeled dose.

After reconstitution, each 1 mL of solution contains approximately 250 mg or 350 mg equivalent of ceftriaxone according to the amount of diluent indicated below. If required, more dilute solutions could be utilized.

As with all intramuscular preparations, Rocephin should be injected well within the body of a relatively large muscle; aspiration helps to avoid unintentional injection into a blood vessel.

| Vial Dosage Size | Amount of Diluent to be Added | |
|---|---|---|
| | 250 mg/mL | 350 mg/mL |
| 500 mg | 1.8 mL | 1.0 mL |
| 1 gm | 3.6 mL | 2.1 mL |

*Intravenous Administration:* Rocephin should be administered intravenously by infusion over a period of 30 minutes. Concentrations between 10 mg/mL and 40 mg/mL are recommended; however, lower concentrations may be used if desired. Reconstitute vials with an appropriate IV diluent (see ***COMPATIBILITY AND STABILITY***).

| Vial Dosage Size | Amount of Diluent to be Added |
|---|---|
| 500 mg | 4.8 mL |
| 1 gm | 9.6 mL |

After reconstitution, each 1 mL of solution contains approximately 100 mg equivalent of ceftriaxone. Withdraw entire contents and dilute to the desired concentration with the appropriate IV diluent.

*COMPATIBILITY AND STABILITY:* Ceftriaxone has been shown to be compatible with Flagyl®* IV (metronidazole hydrochloride). The concentration should not exceed 5 to 7.5 mg/mL metronidazole hydrochloride with ceftriaxone 10 mg/mL as an admixture. The admixture is stable for 24 hours at room temperature only in 0.9% sodium chloride injection or 5% dextrose in water (D5W). No compatibility studies have been conducted with the Flagyl® IV RTU® (metronidazole) formulation or using other diluents. Metronidazole at concentrations greater than 8 mg/mL will precipitate. Do not refrigerate the admixture as precipitation will occur.

Vancomycin, amsacrine, aminoglycosides, and fluconazole are physically incompatible with ceftriaxone in admixtures. When any of these drugs are to be administered concomitantly with ceftriaxone by intermittent intravenous infusion, it is recommended that they be given sequentially, with thorough flushing of the intravenous lines (with one of the compatible fluids) between the administrations.

**Do not use diluents containing calcium, such as Ringer's solution or Hartmann's solution, to reconstitute Rocephin vials or to further dilute a reconstituted vial for IV administration. Particulate formation can result.**

Rocephin solutions should *not* be physically mixed with or piggybacked into solutions containing other antimicrobial drugs or into diluent solutions other than those listed above, due to possible incompatibility (see **WARNINGS**).

## ROCEPHIN® (ceftriaxone sodium)

Rocephin sterile powder should be stored at room temperature—77°F (25°C)—or below and protected from light. After reconstitution, protection from normal light is not necessary. The color of solutions ranges from light yellow to amber, depending on the length of storage, concentration and diluent used.

Rocephin *intramuscular* solutions remain stable (loss of potency less than 10%) for the following time periods:

| Diluent | Concentration mg/ml | Storage Room Temp. (25°C) | Storage Refrigerated (4°C) |
|---|---|---|---|
| Sterile Water for Injection | 100 | 2 days | 10 days |
| | 250, 350 | 24 hours | 3 days |
| 0.9% Sodium Chloride Solution | 100 | 2 days | 10 days |
| | 250, 350 | 24 hours | 3 days |
| 5% Dextrose Solution | 100 | 2 days | 10 days |
| | 250, 350 | 24 hours | 3 days |
| Bacteriostatic Water + 0.9% Benzyl Alcohol | 100 | 24 hours | 10 days |
| | 250, 350 | 24 hours | 3 days |
| 1% Lidocaine Solution (without epinephrine) | 100 | 24 hours | 10 days |
| | 250, 350 | 24 hours | 3 days |

Rocephin *intravenous* solutions, at concentrations of 10, 20 and 40 mg/mL, remain stable (loss of potency less than 10%) for the following time periods stored in glass or PVC containers:

∗ Registered trademark of G.D. Searle & Co.

| Diluent | Storage Room Temp. (25°C) | Storage Refrigerated (4°C) |
|---|---|---|
| Sterile Water | 2 days | 10 days |
| 0.9% Sodium Chloride Solution | 2 days | 10 days |
| 5% Dextrose Solution | 2 days | 10 days |
| 10% Dextrose Solution | 2 days | 10 days |
| 5% Dextrose + 0.9% Sodium Chloride Solution∗ | 2 days | Incompatible |
| 5% Dextrose + 0.45% Sodium Chloride Solution | 2 days | Incompatible |

∗Data available for 10 to 40 mg/mL concentrations in this diluent in PVC containers only.

The following *intravenous* Rocephin solutions are stable at room temperature (25°C) for 24 hours, at concentrations between 10 mg/mL and 40 mg/mL: Sodium Lactate (PVC container), 10% Invert Sugar (glass container), 5% Sodium Bicarbonate (glass container), Freamine III (glass container), Normosol-M in 5% Dextrose (glass and PVC containers), Ionosol-B in 5% Dextrose (glass container), 5% Mannitol (glass container), 10% Mannitol (glass container).

After the indicated stability time periods, unused portions of solutions should be discarded.

## ROCEPHIN® (ceftriaxone sodium)

NOTE: Parenteral drug products should be inspected visually for particulate matter before administration.

Rocephin reconstituted with 5% Dextrose or 0.9% Sodium Chloride solution at concentrations between 10 mg/mL and 40 mg/mL, and then stored in frozen state (-20°C) in PVC or polyolefin containers, remains stable for 26 weeks.

Frozen solutions of Rocephin should be thawed at room temperature before use. After thawing, unused portions should be discarded. **DO NOT REFREEZE.**

## ANIMAL PHARMACOLOGY

Concretions consisting of the precipitated calcium salt of ceftriaxone have been found in the gallbladder bile of dogs and baboons treated with ceftriaxone.

These appeared as a gritty sediment in dogs that received 100 mg/kg/day for 4 weeks. A similar phenomenon has been observed in baboons but only after a protracted dosing period (6 months) at higher dose levels (335 mg/kg/day or more). The likelihood of this occurrence in humans is considered to be low, since ceftriaxone has a greater plasma half-life in humans, the calcium salt of ceftriaxone is more soluble in human gallbladder bile and the calcium content of human gallbladder bile is relatively low.

## HOW SUPPLIED

Rocephin is supplied as a sterile crystalline powder in glass vials. The following packages are available:

Vials containing 500 mg equivalent of ceftriaxone. Box of 1 (NDC 0004-1963-02) and box of 10 (NDC 0004-1963-01).

Vials containing 1 gm equivalent of ceftriaxone. Box of 1 (NDC 0004-1964-04) and box of 10 (NDC 0004-1964-01).

NOTE: Rocephin sterile powder should be stored at room temperature, 77°F (25°C) or below, and protected from light.

## CLINICAL STUDIES

*Clinical Trials in Pediatric Patients With Acute Bacterial Otitis Media:* In two adequate and well-controlled US clinical trials a single IM dose of ceftriaxone was compared with a 10 day course of oral antibiotic in pediatric patients between the ages of 3 months and 6 years. The clinical cure rates and statistical outcome appear in the table below:

**Clinical Efficacy in Evaluable Population**

| Study Day | Ceftriaxone Single Dose | Comparator – 10 Days of Oral Therapy | 95% Confidence Interval | Statistical Outcome |
|---|---|---|---|---|
| Study 1 – US | | amoxicillin/clavulanate | | |
| 14 | 74% (220/296) | 82% (247/302) | (-14.4%, -0.5%) | Ceftriaxone is lower than control at study day 14 and 28. |
| 28 | 58% (167/288) | 67% (200/297) | (-17.5%, -1.2%) | |
| Study 2 - US[5] | | TMP-SMZ | | |
| 14 | 54% (113/210) | 60% (124/206) | (-16.4%, 3.6%) | Ceftriaxone is equivalent to control at study day 14 and 28. |
| 28 | 35% (73/206) | 45% (93/205) | (-19.9%, 0.0%) | |

An open-label bacteriologic study of ceftriaxone without a comparator enrolled 108 pediatric patients, 79 of whom had positive baseline cultures for one or more of the common pathogens. The results of this study are tabulated as follows:

Week 2 and 4 Bacteriologic Eradication Rates in the Per Protocol Analysis in the Roche Bacteriologic Study by pathogen:

| | Study Day 13-15 | | Study Day 30+2 | |
|---|---|---|---|---|
| Organism | No. Analyzed | No. Erad. (%) | No. Analyzed | No. Erad. (%) |
| *Streptococcus pneumoniae* | 38 | 32 (84) | 35 | 25 (71) |
| *Haemophilus influenzae* | 33 | 28 (85) | 31 | 22 (71) |
| *Moraxella catarrhalis* | 15 | 12 (80) | 15 | 9 (60) |

## REFERENCES


1. National Committee for Clinical Laboratory Standards, *Methods for Dilution Antimicrobial Susceptibility Tests for Bacteria that Grow Aerobically;* Approved Standard-Fifth Edition. NCCLS document M7-A5 (ISBN 1-56238-309-9). NCCLS, Wayne, PA 19087-1898, 2000.

2. National Committee for Clinical Laboratory Standards, Supplemental Tables. NCCLS document M100-S10(M7) (ISBN 1-56238-309-9). NCCLS, Wayne, PA 19087-1898, 2000.

3. National Committee for Clinical Laboratory Standards, *Performance Standards for Antimicrobial Disk Susceptibility Tests;* Approved Standard-Seventh Edition. NCCLS document M2-A7 (ISBN 1-56238-393-0). NCCLS, Wayne, PA 19087-1898, 2000.

4. National Committee for Clinical Laboratory Standards, *Methods for Antimicrobial Susceptibility Testing of Anaerobic Bacteria;* Approved Standard-Fourth Edition. NCCLS document M11-A4 (ISBN 1-56238-210-1). NCCLS, Wayne, PA 19087-1898, 1997.

5. Barnett ED, Teele DW, Klein JO, et al. *Comparison of Ceftriaxone and Trimethoprim-Sulfamethoxazole for Acute Otitis Media*. Pediatrics. Vol. 99, No. 1, January 1997.

Roche Pharmaceuticals

Roche Laboratories Inc.
340 Kingsland Street
Nutley, New Jersey 07110-1199

XXXXXXXX

Revised: Month/Year

Copyright © 1998-200X by Roche Laboratories Inc. All rights reserved.

# Medicare Benefit Policy Manual
## Chapter 16 - General Exclusions From Coverage

**Table of Contents**
***(Rev. 198, 11-06-14)***

**Transmittals for Chapter 16**


10 - General Exclusions from Coverage

20 - Services Not Reasonable and Necessary

30 - Foot Care

40 - No Legal Obligation to Pay for or Provide Services

40.1 - Indigence

40.2 – Provider, Physician, or Supplier Bills Only Insured Patients

40.3 - Medicare Patient Has Other Health Coverage

40.4 - Items Covered Under Warranty

40.5 - Members of Religious Orders

40.6 - Ambulance Services

50 - Items and Services Furnished, Paid for or Authorized by Governmental Entities - Federal, State, or Local Governments

50.1 - Items and Services Which a Non-Federal Provider Furnishes Pursuant to an Authorization Issued by a Federal Agency

50.1.1 - Veterans' Administration (VA) Authorized Services

50.1.2 - Medicare Secondary Payment Where VA Authorizes Fewer Days Than Total Number of Covered Days in the Stay

50.1.3 - Effect of VA Payments on Medicare Deductible and Utilization

50.1.4 - VA "Fee Basis Card"

50.1.5 - Services Authorized by Indian Health Service

50.2 - Items and Services Furnished by Federal Provider of Services or Federal Agency

50.3 - Items or Services Paid for by Governmental Entity

50.3.1 - Application of Exclusion to State and Local Government Providers

50.3.2 - Application of Exclusion to Nongovernmental Providers, Physicians and Suppliers

50.3.3 - Examples of Application of Government Entity Exclusion

50.4 - TRICARE and CHAMPVA (Civilian Health and Medical Program of Veterans Administration)

50.5 - Active Duty Members of Uniformed Services

60 - Services Not Provided Within United States

70 - Services Resulting from War

80 - Personal Comfort Items

90 - Routine Services and Appliances

100 - Hearing Aids and Auditory Implants

110 - Custodial Care

110.1 - Custodial Care Under a Hospice Program

120 - Cosmetic Surgery

130 - Charges Imposed by Immediate Relatives of the Patient or Members of the Patient's Household

140 - Dental Services Exclusion

150 - Services Reimbursable Under Automobile, No Fault, Any Liability Insurance or Workers' Compensation

170 - Inpatient Hospital or SNF Services Not Delivered Directly or Under Arrangement by the Provider

180 - Services Related to and Required as a Result of Services Which Are Not Covered Under Medicare

## 10 - General Exclusions from Coverage

***(Rev. 198, Issued: 11-06-14, Effective: 01-01-15, Implementation: 01-05-15)***

No payment can be made under either the hospital insurance or supplementary medical insurance program for certain items and services, when the following conditions exist:

- Not reasonable and necessary (§20);
- No legal obligation to pay for or provide (§40);
- Paid for by a governmental entity (§50);
- Not provided within United States (§60);
- Resulting from war (§70);
- Personal comfort (§80);
- Routine services and appliances (§90);
- Custodial care (§110);
- Cosmetic surgery (§120);
- Charges by immediate relatives or members of household (§130);
- Dental services (§140);
- Paid or expected to be paid under workers' compensation (§150);
- Non-physician services provided to a hospital inpatient that were not provided directly or arranged for by the hospital (§170);
- Services Related to and Required as a Result of Services Which are not Covered Under Medicare (§180);
- Excluded foot care services and supportive devices for feet (§30); or,
- *Excluded investigational devices (See Chapter 14).*

## 20 - Services Not Reasonable and Necessary

**(Rev. 1, 10-01-03)**

A3-3151, HO-260.1, B3-2303, AB-00-52 - 6/00

Items and services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member are not covered, e.g., payment cannot be made for the rental of a special hospital bed to be used

by the patient in their home unless it was a reasonable and necessary part of the patient's treatment. See also §80.

A health care item or service for the purpose of causing, or assisting to cause, the death of any individual (assisted suicide) is not covered. This prohibition does not apply to the provision of an item or service for the purpose of alleviating pain or discomfort, even if such use may increase the risk of death, so long as the item or service is not furnished for the specific purpose of causing death.

## 30 - Foot Care

**(Rev. 1, 10-01-03)**

Some foot care is excluded and some is covered. A description of both is in Chapter 15, §290.

## 40 - No Legal Obligation to Pay for or Provide Services

**(Rev. 1, 10-01-03)**
A3-3152, HO-260.2, B3-2306

Program payment may not be made for items or services which neither the beneficiary nor any other person or organization has a legal obligation to pay for or provide. This exclusion applies where items and services are furnished gratuitously without regard to the beneficiary's ability to pay and without expectation of payment from any source, such as free x-rays or immunizations provided by health organizations. However, Medicare reimbursement is not precluded merely because a provider, physician, or supplier waives the charge in the case of a particular patient or group or class of patients, as the waiver of charges for some patients does not impair the right to charge others, including Medicare patients. The determinative factor in applying this exclusion is the reason the particular individual is not charged.

The following sections illustrate the applicability of this exclusion to various situations involving services other than those paid for directly or indirectly by a governmental entity. (For a discussion of the latter, see §50.)

## 40.1 - Indigence

**(Rev. 1, 10-01-03)**
A3-3152.A, HO-260.2.A

This exclusion does not apply where items and services are furnished to an indigent individual without charge because of their inability to pay, if the provider, physician, or supplier bills other patients to the extent that they are able to pay.

## 40.2 - Provider, Physician, or Supplier Bills Only Insured Patients

**(Rev. 1, 10-01-03)**
A3-3152.B, HO-260.2.B

Some providers, physicians, and suppliers waive their charges for individuals of limited means, but they also expect to be paid where the patient has insurance which covers the items or services they furnish. In such a situation, because it is clear that a patient would be charged if insured, a legal obligation to pay exists and benefits are payable for services rendered to patients with medical insurance if the provider, physician, or supplier customarily bills all insured patients - not just Medicare patients - even though non-insured patients are not charged.

Individuals with conditions which are the subject of a research project may receive treatment financed by a private research foundation. The foundation may establish its own clinic to study certain diseases or it may make grants to various other organizations. In most cases, the patient is not expected to pay for treatment out-of-pocket, but if the patient has insurance, the parties expect that the insurer will pay for the services. In this situation, a legal obligation is considered to exist in the case of a Medicare patient even though other patients may not have insurance and are not charged.

## 40.3 - Medicare Patient Has Other Health Coverage

**(Rev. 1, 10-01-03)**

A3-3152.C, HO-260.2.C

Payment is not precluded under Medicare if the patient is covered by another health insurance plan or program, which is obligated to provide or pay for the same services.

However, Medicare does not pay until after the other payer has paid in the following situations:

- Services covered by automobile medical or no-fault insurance;
- Services rendered during a specified period of up to 30 months to individuals eligible or entitled solely on the basis of end stage renal disease (ESRD) who are insured under an employer group health plan;
- Services rendered to individuals age 65 or over and spouses age 65 or over who are insured under an employer group health plan by virtue of current employment status;
- Services rendered to individuals under age 65 entitled to Medicare based on disability and have large group health plan coverage based on the individual's current employment status or the current employment status of a family member; and
- Services covered by workers' compensation.

In these cases, the other plan pays primary benefits and if the other plan does not pay the entire bill, secondary Medicare benefits may be payable. Medicare is also secondary to the extent that a liability insurer has paid for services.

See the Medicare Secondary Payment (MSP) Manual, Pub. 100-05.

## 40.4 - Items Covered Under Warranty

**(Rev. 1, 10-01-03)**

A3-3152.D, HO-260.2.D

When defective equipment or a defective medical device is replaced under a warranty, hospital or other provider services rendered by parties other than the warrantor are covered despite the warrantor's liability. However, see the Medicare MSP Manual (CMS Pub. 100-05) for requirements for recovery under the liability insurance provisions.

With respect to payment for the device itself under cost reimbursement, the following rules apply:

- If equipment or a device is replaced free of charge by the warrantor, no program payment may be made, since there was no charge involved.

- If replacement equipment or device from another manufacturer had to be substituted because the replacement offered under the warranty was not acceptable to the beneficiary or the beneficiary's physician, payment may be made for the replaced device.

- If the warrantor supplied the replaced equipment or device, but some charge or a pro rata payment was imposed, program payment may be made for the partial payment imposed for the device furnished by the warrantor.

- If an acceptable replacement could have been obtained free of charge under a warranty but the provider chose to purchase one instead, payment cannot be made for the purchased device under the prudent buyer rules. (See Provider Reimbursement Manual, Part 1, §2103.)

- If an acceptable replacement could have been purchased at a reduced price under a warranty but the full price was paid to the original manufacturer or a new replacement was purchased from a different manufacturer or other source, coverage is limited to the amount that would have been paid under the warranty.

While payments to a hospital for inpatient services under the prospective payment system (PPS) are not reduced to reflect collections under warranty provisions for medical devices, cost-based reimbursed hospitals and exempt units are subject to the prudent buyer rules.

## 40.5 - Members of Religious Orders

**(Rev. 1, 10-01-03)**

A3-3152.E, HO-260.2.E

A legal obligation to pay exists where a religious order either pays for or furnishes services to members of the order. Although medical services furnished in such a setting would not ordinarily be expressed in terms of a legal obligation, the order has an obligation to care for its members who have rendered life-long services, similar to that existing under an employer's prepayment plan. Thus, payment may be made for such services whether they are furnished by the order itself or by independent sources that customarily charge for their services.

## 40.6 - Ambulance Services

**(Rev. 1, 10-01-03)**
B3-2306

There are numerous methods of financing ambulance companies. For example, some volunteer organizations do not charge the patient or any other person but ask the recipient of services for a donation to help offset the cost of the service. Although the recipients may be under considerable moral and social pressure to donate, they are not required to do so, and there is no enforceable legal obligation on the part of the individual or anyone else to pay for the services. Thus, Medicare benefits would not be payable. However, services of volunteer ambulance corps are not categorically excluded. Many such companies regularly charge for their services and Medicare covers these services.

Some ambulance companies provide services without charge to residents of specific geographical areas but charge non-residents to the extent they are able to pay (e.g., through private health insurance). Under those circumstances, the free services provided the residents would be excluded from coverage, while the services furnished non-residents would be covered.

Ambulance companies which charge membership fees generally do not charge additional fees for services covered under the membership plan, although they may charge for certain other services (e.g., additional trips or mileage). Services furnished by such ambulance companies including services for which prepayment is made under the membership plan, are considered to be services for which there is a legal obligation to pay. Therefore, such services are reimbursable provided the ambulance company bills all third party payers. Membership fees and insurance premiums are not incurred expenses under Medicare (see the Medicare Benefit Policy Manual, Chapter 15, "Covered Medical and Other Health Services," §10) and are not reimbursable.

## 50 - Items and Services Furnished, Paid for or Authorized by Governmental Entities - Federal, State, or Local Governments

**(Rev. 1, 10-01-03)**
A3-3153, HO-260.3, B3-2309

The law contains three separate exclusions applicable to items and services furnished, paid for or authorized by governmental entities. In general, payment may not be made for items and services:

- Furnished by a provider (Governmental or non governmental) or other person at public expense pursuant to an authorization issued by a Federal agency (§50.1);

- Furnished by a provider of services or agency of the Federal government (§50.2); and

- Paid for directly or indirectly by a Federal, State, or local governmental entity (§50.3).

The A/B MAC (A) or (B) applies each of these exclusions separately, i.e., benefits are excluded where any one of the exclusions applies.

## 50.1 - Items and Services Which a Non-Federal Provider Furnishes Pursuant to an Authorization Issued by a Federal Agency

**(Rev. 1, 10-01-03)**

A3-3153.1, HO-260.3.B, B3-2309.2

## 50.1.1 - Veterans' Administration (VA) Authorized Services

**(Rev. 1, 10-01-03)**

A3-3153.1.A, B3-2309.2, A3-3153.1.E, HO-260.3.B

Generally, an authorization issued by the Veterans' Administration (VA) binds the VA to pay in full for the items and services provided. No payment is made under Medicare for such authorized services.

**NOTE:** Medicare can reimburse veterans for (or credit toward Medicare deductible or coinsurance amounts) VA copayment amounts charged for VA authorized services furnished by non-VA sources.

Medicare does not pay for any item or service rendered by a non-Federal provider pursuant to an authorization issued by a Federal agency, under the terms of which the Federal government agrees to pay for the services.

The VA may authorize non-Federal providers or private physicians or other suppliers to render services at Federal expense. For example, the VA may pay for treatment of veterans in non-VA hospitals for service connected disabilities and, in certain circumstances, for nonservice-connected disabilities, provided the VA has given prior authorization for the services. The VA may also agree to pay for emergency services furnished a veteran who appears at a hospital without prior authorization, provided a notification of the veteran's admission and a request for authorization to provide care at VA expense is submitted to the VA within 72 hours after the admission.

As a general rule, the VA does not authorize inpatient services at non-VA facilities for treatment of nonservice-connected conditions. Accordingly, the A/B MAC (A) should receive few, if any, requests for reimbursement for a VA copayment for treatment in a non-VA provider. If a beneficiary requests reimbursement for the amount of the VA

copayment, the beneficiary must submit to the A/B MAC (A), along with their request, VA Form 10-9014, Statement of Charges for Medical Care. These requests will be handled on an ad hoc basis. For further guidance contact:

Centers for Medicare & Medicaid Services
Center for Medicare Management
Provider Billing Group
7500 Security Boulevard
Baltimore, Maryland 21244-1850

The VA may authorize up to six months of care in non-VA SNFs for veterans requiring such care after transfer from a VA hospital. Services furnished pursuant to a VA authorization do not count against the 100 days of extended care benefits available in a benefit period. Where a veteran remains in a SNF until VA benefits are exhausted, extended care benefits could begin under Medicare. Such benefits begin with the first day after the VA benefits are exhausted, provided a physician certifies that the individual still requires skilled nursing care on a continuing basis for a condition for which the patient received inpatient hospital services or which arose while the patient was still being treated in the facility for such a condition. The 3-day qualifying hospital stay and 30-day transfer requirements of the law must be met **as of the time of entrance to the facility.**

Where an authorization from the VA was not given to the party rendering the services, Medicare payment is not precluded even though the individual might have been entitled to have payment made by the VA had they requested the authorization. Also, Medicare secondary benefits may be payable where the VA authorizes fewer days than the total number of covered days in the stay.

Generally it is advantageous for Medicare beneficiaries who are veterans to have items and services paid for by the VA where possible, since in most cases the VA has no deductible or coinsurance requirements. Also, services paid for in full by the VA do not count against the individual's maximum number of benefit days or visits available in a Medicare benefit period.

However, the VA may charge veterans copayments for treatment of nonservice-connected conditions (during periods of 90 days duration within a period of 365 days) if a veteran's income exceeds a specified amount (38 CFR Part 17). The VA may charge the beneficiary a copayment for physician/supplier and outpatient services. The amount of the copayment is equal to 20 percent of the estimated average cost (during the calendar year in which the services are furnished) of an outpatient visit in a VA facility. The VA determines the estimated average cost. The beneficiary pays the copayment amount **directly** to the VA, i.e., the VA does not reduce its payments to physicians/suppliers or for outpatient services. The total amount of a veteran's copayment obligation for all services received (inpatient and outpatient, authorized or furnished directly by the VA) during any 90-day period within the 365-day period cannot exceed the amount of the inpatient Medicare deductible in effect on the first day of the 365-day period. Medicare

pays secondary benefits to the beneficiary for VA copayment amounts in accordance with §§50.1.4.

The charges for the following services are credited to the Medicare deductibles, on the basis of Medicare fee schedule or allowable amounts, even though the Federal Agency (VA) has not yet paid for them.

- Charges for services that exceed the VA copayment;
- Services rendered in a non-VA facility that are not authorized by the VA; or
- Services rendered after VA benefits are exhausted in a non-VA facility.

Crediting of VA payments to Medicare deductibles is handled in the same manner as the crediting of employer group health plan payments. See Pub 100-05, the Medicare Secondary Payer (MSP) Manual, Chapter 3, for billing and Chapter 5 for payment instructions. Medicare can pay for such services where neither the physician/supplier nor beneficiary has claimed benefits from the VA.

Medicare may also pay for (covered) services for which the VA does not make any payment. For example, if a veteran is authorized "fee basis" care at VA expense for a service connected back injury, and receives treatment for a different condition for which the VA does not pay, Medicare can pay for the (covered) services that are not reimbursable by the VA.

## 50.1.2 - Medicare Secondary Payment Where VA Authorizes Fewer Days Than Total Number of Covered Days in the Stay

**(Rev. 1, 10-01-03)**

A3-3153.1.C, HO-260.3.B

The Medicare secondary payment is the lower of:

- The gross amount payable by Medicare for all covered days in the stay (without regard to deductible or coinsurance) minus the amount paid by the VA for Medicare covered services, or
- The gross amount payable by Medicare (without regard to deductible or coinsurance) minus any applicable Medicare deductible or coinsurance.

**EXAMPLE:** The VA authorizes payment for 4 days of a 7-day stay. Charges for the 4 days total $2,350. The VA reimburses the hospital that amount. The gross amount payable by Medicare (unreduced by deductible and coinsurance) for the 7-day stay is $3,350. The beneficiary's Part A deductible has not been met. The Medicare secondary payment is determined by subtracting the VA payment from the gross amount payable by Medicare: $3,350 - $2,350 = $1,000.

Medicare pays $1,000, which is less than the gross amount payable by Medicare minus the Medicare deductible ($3,350 - $812 = $2,538). The beneficiary's Part A deductible is met by the VA payment.

## 50.1.3 - Effect of VA Payments on Medicare Deductible and Utilization

**(Rev. 1, 10-01-03)**
A3-3153.1.D, HO-260.3.B

Where an authorization issued by the VA binds the VA to pay in full for the items and services, no payment may be made under Medicare. When the VA pays in full, the services do not count against benefit maximums, e.g., the 90 days of inpatient hospital services or the 60-day lifetime reserve. Charges which would be reimbursable by Medicare except for the fact that the VA paid in full for authorized services may be credited to the Medicare deductibles.

When the VA authorizes fewer days than the total number of covered days in the stay, Medicare utilization is determined as follows:

- Divide the actual Medicare payment by the amount Medicare would have paid for covered charges as primary payer (i.e., the gross amount payable by Medicare for all covered days in the stay reduced by applicable Medicare deductible and coinsurance).

- Multiply this percentage by the number of covered days in the stay.

A partial day resulting from this calculation is not charged as a full day if it is less than .5 of a day, but is charged as a full day if it is .5 or more of a day.

**EXAMPLE:** The following is the same facts as presented in example in §50.1.2. The amount Medicare would pay, as a primary payer, is $2,538 ($3,350 - $812 deductible). Utilization is determined as follows: $1,000 ÷ $2,538 =. 39 X 7 days = 2.75, rounded to 3 days.

When the VA pays an amount for Medicare covered services that is equal to, or less than, the deductible and coinsurance that would apply if Medicare were the primary payer, utilization is **not** reduced.

## 50.1.4 - VA "Fee Basis Card"

**(Rev. 1, 10-01-03)**
B3-2309.2

**1. General**

One method the VA uses to authorize physician services is to issue the veteran a "fee basis ID card" (formally designated the VA Outpatient Medical Treatment Information Card). This card is issued to certain veterans with a service connected disability, as well

as certain other veterans who require medical services for an extended period when VA and other Federal health care facilities are not capable of furnishing economical care, or, because of geographical inaccessibility, are not capable of furnishing the care or services required. The card constitutes an agreement by the VA to pay up to a specified monthly dollar amount for treatment of specific disabilities or for any condition specified on the face of the card. The veteran is not restricted in choice of physician nor does the physician selected by the veteran have to inform the VA in advance that they will be treating the veteran. (The physicians are not participating physicians in the VA program nor does the VA have an express "assignment" procedure.)

When the charges for the services exceed the specified monthly amount routinely allowed by the VA, the VA may allow an additional amount if the physician justifies the need for the additional cost. If justified, the VA will authorize an increase in the monthly dollar limitation for a specific period of time. The VA may approve charges for services exceeding the specified monthly amount retroactively if they were of the type that would have been approved had they been submitted in advance.

### 2. VA Fee Basis Payment Is Payment in Full

When a physician accepts veterans as patients **and bills the VA**, the physician must accept the VA's "usual and customary" charge determination as payment in full. Neither the patient nor any other party can be charged an additional amount. Except for the VA copayment (see subsection 4(b)), Medicare cannot make payment on an assigned or unassigned basis when the physician's bill exceeds the amount the VA paid a physician who has accepted the "Fee Basis" card. However, as indicated in subsection 4(a), Medicare can pay for services that are not reimbursable by the VA. Therefore, the mere existence of a "Y" trailer code indicating that the beneficiary has a VA fee card (as discussed in subsection 5) is not sufficient to deny Medicare benefits. See subsection 4(a) for secondary Medicare benefits where the veteran bills the VA, and the VA reimburses the beneficiary or physician less than the Medicare allowable amount.

### 3. Crediting Part B Deductible

Payments made by the VA for otherwise covered services are credited to the beneficiary's Part B deductible. (See subsection 5(c).)

### 4. Secondary Benefits

#### (a) Veteran Bills the VA

Where the physician does not accept the fee basis card (i.e., bills the veteran directly) the veteran may file a claim with the VA. The VA may either reimburse the beneficiary for out-of-pocket costs or pay the physician based on a claim filed by the beneficiary. If the VA payment to the beneficiary or physician based on a claim filed by the beneficiary is less than the Medicare fee schedule or allowable amount for the services, Medicare can pay secondary benefits to supplement the VA payment,

provided the beneficiary submits a copy of the VA's explanation of benefits which accompanies the VA payment.

The VA explanation of benefits generally consists of a computer-generated notice, which looks much like a punch card. It contains the beneficiary's name and social security number, the physician's or supplier's name, the month of service, and the amount paid. (The VA plans to add the day of service to the notice.) The VA sends this notice to the party that receives the payment (i.e., the beneficiary or the physician/supplier). In some cases, the VA may also send a letter containing more detailed information. If the A/B MAC (B) cannot determine from the VA notice the amount the VA paid for particular services, it asks the physician or supplier to help it match up the VA payment with specific services for which Medicare has been billed. If the A/B MAC (B) is unable to obtain the help it needs from the physician or supplier, it make reasonable assumptions about the relationship between the VA payment and the services which have been billed to Medicare based on the information available to it.

The Medicare secondary benefit amount, where the VA payment to the beneficiary or physician is less than the allowable amount, is the lower of the following:

- The Medicare allowable amount minus applicable Medicare deductible and coinsurance amounts; or

- The Medicare allowable amount minus the VA payment.

**EXAMPLE:** An individual who is authorized by the VA to receive physician services for treatment of a nonservice-connected condition is issued a fee basis card. The individual receives treatment from a physician who charges $135. The physician does not accept the fee basis card. The individual bills the VA directly. The VA pays the individual $82 ($96 fee basis rate minus $14 outpatient copayment). The Medicare allowable amount for the service is $115. The individual's unmet Part B deductible is $75. The Medicare secondary benefit is the lower of:

- The Medicare allowable amount minus applicable deductible and coinsurance amounts:

  $115 - $75 = $40 X .80 = $32, or

- The Medicare allowable amount minus the VA payment:

  $115 - $82 = $33.

The A/B MAC (B) pays $32, the lower of $32 or $33.

The beneficiary's Part B deductible is considered met by the VA payment.

**(b) Physician Bills the VA; VA Bills Beneficiary for Copayment**

If a physician accepts the fee basis card and bills the VA, the VA payment is considered payment in full. If the VA bills the beneficiary a copayment amount for authorized physician/supplier services that are covered by Medicare in the absence of the VA authorization, the A/B MAC (B) pays a secondary benefit to the beneficiary consisting of the lower of the VA copayment amount or the amount Medicare would pay in the absence of VA coverage (Medicare allowable amount minus applicable deductible and coinsurance amounts).

**EXAMPLE:** A physician accepts fee basis reimbursement for services rendered. The charges for the services are $96. The VA fee basis rate is $78. The VA pays the physician $78 and charges the beneficiary a $14 copayment. The beneficiary claims Medicare reimbursement for the VA copayment amount. The Medicare allowable amount for the services is $83. The individual's unmet Part B deductible is $75. The Medicare secondary benefit is the lower of:

- Amount payable by Medicare in the absence of VA coverage:

  $83 - $75 = $8 X .8 = $6.40, or

- Individual's VA copayment obligation: $14.

The A/B MAC (B) pays $6.40.

The beneficiary's deductible is credited with $75. If the beneficiary's Part B deductible had been met previously, the Medicare secondary payment would be $14, the lower of:

- $66.40 ($83 X .8), or
- $14.

**NOTE:** Medicare may pay for covered outpatient emergency services furnished by a VA hospital if there is a charge for the services. Medicare's payment is subject to applicable Part B Medicare deductible and coinsurance provisions. Accordingly, there is no Medicare payment until the Part B deductible is met. However, any charges to the beneficiary for covered VA hospital outpatient emergency services are credited to the Medicare Part B deductible. The CMS, OMB, Division of Accounting, which is responsible for processing claims for emergency services by Federal providers, will ensure, in these cases, that pertinent data is entered into the beneficiary's Health Insurance Master Beneficiary Record.

**5. Procedure**

**(a) Claim Is for Primary Medicare Benefits**

When the A/B MAC (B) receives a Y trailer code (code 3) or a code 36, (type code 3), automatic notice from the Health Insurance Master File (which is sent in instances where a Medicare beneficiary also has a VA fee basis card), it follows the instructions in the Medicare Secondary Payer (MSP) Manual, Chapter 5, “Contractor Prepayment Processing Requirements,” §20.3.1. It contacts the physician or supplier to ascertain whether a claim has been, or will be submitted to the VA based on an authorization of the VA or based on the fee basis card. If the physician responds that no claim has been or will be submitted to the VA, the A/B MAC (B) pays the Medicare claim in the usual manner. If the physician or supplier indicates that a claim has been or will be submitted to the VA, the A/B MAC (B) denies the Medicare claim. If the physician fails to respond to the A/B MAC (B)’s inquiry within 30 days, the A/B MAC (B) denies the claim **if the physician has accepted assignment** on the grounds that the physician refuses to furnish information necessary to determine the proper Medicare payment. (The assignment agreement prohibits the physician from charging the beneficiary in these cases because the basis for denial is failure to furnish information, not noncoverage of services.) In unassigned cases, if the physician fails to respond to the A/B MAC (B)’s inquiry within 30 days, the A/B MAC (B) pays the Medicare claim in the usual manner. In accordance with a CMS-VA agreement, no contacts are to be made with the beneficiary, unless the beneficiary has submitted a claim for secondary Medicare benefits. Ordinarily, the A/B MAC (B) does not contact the VA for information concerning actual or potential VA payments; but if a VA facility offers to share such information with it, e.g., information about payments to beneficiaries or physicians or about VA authorized services to beneficiaries, the A/B MAC (B) may work out arrangements with the facility to receive such information on a periodic basis or on request.

**(b) Claim Is for Secondary Medicare Benefits**

If the information on the claim indicates that the VA has already paid benefits for the services, but has not paid all of the charges, the Medicare A/B MAC (B) pays Medicare secondary benefits in accordance with subsection 4(a) **provided the VA claim was filed by the beneficiary**. If the beneficiary submits the VA’s computer generated notice, the A/B MAC (B) assumes that the beneficiary filed the VA claim and pays secondary benefits. If it is unclear whether the physician or beneficiary submitted the VA notification, the A/B MAC (B) assumes that, in unassigned cases, the beneficiary filed the VA claim and the A/B MAC (B) pays secondary benefits. In assigned cases, the A/B MAC (B) asks the physician whether the physician or the beneficiary filed the VA claim. Also, when it is clear that the physician submitted the computer-generated notice, the A/B MAC (B) asks the physician (on both assigned and unassigned claims) whether the physician or the beneficiary filed the claim with the VA (since in either case the VA sends the notice to the physician who receives the VA payment).

If the physician does not respond within 30 days, the A/B MAC (B) denies benefits, in assigned cases, because of the physician’s refusal to furnish information necessary

to determine the proper Medicare payment. (The assignment agreement prohibits the physician from charging the beneficiary in these cases because the basis for denial is failure to furnish information, not noncoverage of services.) In unassigned cases, if the physician does not respond within 30 days, the A/B MAC (B) assumes that the beneficiary filed the VA claim and pays secondary benefits to the beneficiary.

**(c) Claim Is for Reimbursement of VA Copayment Amounts or Crediting of Medicare Deductible**

Beneficiaries must attach to the Medicare claim form a copy of VA form 10-9014 (Statement of Charges for Medical Care) showing the VA copayment amount for authorized services, when requesting Medicare payment toward that amount or in order to have their Part B deductible credited.

## 50.1.5 - Services Authorized by Indian Health Service

**(Rev. 1, 10-01-03)**

A3-3153.1.B, HO-260.3A.2 B.3-2309.3

The Division of Indian Health of the United States Public Health Service authorizes private physicians and privately owned hospitals and nursing homes to provide treatment to Indians and their dependents under contractual arrangements with the Division of Indian Health. In the case of such contract health services to Indians and their dependents entitled under the Indian Health Service (IHS) program and Medicare, Medicare is the primary payer and the IHS the secondary payer.

## 50.2 - Items and Services Furnished by Federal Provider of Services or Federal Agency

**(Rev. 1, 10-01-03)**

A3-3153.2, HO-260.3.A, B3-2309.1

Generally, Federal providers are excluded from participation in the Medicare program. However, Federal hospitals, like other nonparticipating hospitals, may be paid for emergency inpatient and outpatient hospital services. Additionally, payment is precluded for items and services rendered by a federally operated nonprovider, e.g., Veterans Administration clinics. A provider or other facility acquired by the Department of Housing and Urban Development (DHUD) in the administration of an FHA mortgage insurance program is not considered to be a Federal provider or agency and this exclusion is not applicable to services furnished by such facilities. The law provides exceptions to this exclusion which permits the following categories of Federal providers to participate in Medicare:

- Hospitals and SNFs of Indian Health Service; and

- A Federal provider which is determined to be providing services to the public generally as a community institution or agency. VA hospitals which have sharing agreements with non-VA participating hospitals under which the VA hospitals

furnish end-stage renal disease (ESRD) services to nonveterans may be considered community hospitals with respect to any otherwise covered service rendered to ESRD beneficiaries. This exception does not apply to Federal clinics or other Federal health facilities which are not "providers of services" as defined in the Medicare law, i.e., which are not hospitals, SNFs, HHAs or CORFs. The CMS is responsible for processing claims for services furnished directly by Federal providers. If the A/B MAC (A) were to receive a request for Medicare reimbursement of such services it would forward the request to:

Centers for Medicare & Medicaid Services
Office of Financial Management
P.O. Box 17255
Baltimore, Maryland 21203-7255

**NOTE:** The VA copayment provisions mentioned in §50.1.1 also applies to inpatient services furnished in a VA hospital. Should the A/B MAC (A) receive a request for Medicare reimbursement of VA copayment amounts for emergency services furnished by VA hospitals, it would refer the request to CMS.

## 50.3 - Items or Services Paid for by Governmental Entity

**(Rev. 1, 10-01-03)**
A3-3153.3, HO-260.3.C, B3-2309.4

Medicare payment may not be made for items or services paid for directly or indirectly by a Federal, State or local governmental entity. However, the law specifies that this exclusion does not prohibit payment for:

- Items or services furnished under a health benefits or insurance plan established for employees of the governmental entity;

- Items or services furnished under one of the titles of the Social Security Act (such as medical assistance under title XIX); or

- Rural health clinic services.

## 50.3.1 - Application of Exclusion to State and Local Government Providers

**(Rev. 1, 10-01-03)**
A3-3153.3.A, HO-260.3.C

Except for the two categories of facilities referred to below, payment may not be made for items and services which a State or local government facility furnishes free of charge, i.e., without expectation of payment from any source and without regard to the individuals' ability to pay. A facility which reduces or waives its charges for patients unable to pay, or charges patients only to the extent of their Medicare and other health

insurance coverage, is not viewed as furnishing free services and may therefore receive program payment.

Medicare regulations permit payment to the following two categories of governmental providers even though they furnish services free of charge:

- Payment may be made for items and services furnished in or by a participating State or local Government hospital, including a psychiatric or tuberculosis hospital, which serves the general community. A psychiatric hospital to which patients convicted of crimes are committed involuntarily is considered to be serving the general community if State law provides for voluntary commitment to the institution. However, payment may not be made for services furnished in or by State or local hospitals, which serve only a special category of the population, but do not serve the general community, e.g., prison hospitals.

- Payment may be made for items and services paid for by a State or local governmental entity and furnished an individual as a means of controlling infectious diseases or because the individual is medically indigent.

## 50.3.2 - Application of Exclusion to Nongovernmental Providers, Physicians and Suppliers

**(Rev. 1, 10-01-03)**

A3-3153.3.B, HO-260.3.D, B3-2309.4

Payment may not be made for items or services furnished by a nongovernmental provider, physician or supplier if the charges have been paid for by a government program other than Medicare, or if the provider, physician, or supplier intends to look to another government program for payment, unless the payment by the other program is limited to the Medicare deductible and coinsurance amounts, as it is for certain individuals covered under TRICARE/CHAMPVA. (See §50.4).

The mere fact that a nongovernmental provider receives government financing does not mean that the items and services it furnishes are considered paid for by a governmental entity. However, if a clinic receives government financing earmarked for particular services to patients (e.g., in the form of a research grant), Medicare may not pay for the same services.

If an individual has the option of receiving care free of charge at a government provider or care which is not free at a nongovernment provider, and the individual, chooses the latter, Medicare payment may be made for the care at the nongovernment provider. However, items and services authorized by a Federal agency (for example, by the VA at a nongovernmental hospital) are excluded. (See §50.3.3, below.)

## 50.3.3 - Examples of Application of Government Entity Exclusion

**(Rev. 122, Issued: 04-09-10, Effective/Implementation Date: 07-09-10)**

The following paragraphs explain the application of the governmental entity exclusion to various situations involving services rendered by governmental and non governmental facilities:

**1. State Veterans Homes**

Many State governments operate veterans homes and hospitals. These institutions are generally open only to veterans and certain dependents of veterans, and include domiciliary, hospital, infirmary, and/or nursing home type facilities. These institutions are financed primarily from State funds; in addition, most receive nominal per diem payments from the VA for domiciliary care, hospital care, or nursing home type care for each veteran who would also qualify for admission to a VA hospital or domiciliary.

When such a participating institution charges its residents and patients to the extent of their ability to pay, or seeks payment from available sources other than Medicare, benefits are payable for covered items and services furnished to Medicare beneficiaries. However, if it is the policy of the institution to admit and treat a veteran without charge simply because the individual is a veteran, or because the condition is service-connected, payment would be precluded under title XVIII.

Per diem amounts paid by the VA to State veterans homes on behalf of those patients who are otherwise eligible for care in a VA facility may be credited towards any deductible, coinsurance, or noncovered amounts required to be paid by the patient. However, if a State veterans home collects amounts from the VA in excess of the applicable deductible and coinsurance, the A/B MAC (A) reduces the Medicare payment to the extent of such payments.

**2. State and Local Psychiatric Hospitals**

In general, payment may be made under Medicare for covered services furnished without charge by State or local psychiatric hospitals which serve the general community. (See §50.3.1.) However, payment may not be made for services furnished without charge to individuals who have been committed under a penal statute (e.g., defective delinquents, persons found not guilty by reason of insanity, and persons incompetent to stand trial). For Medicare purposes such individuals are "prisoners," as defined in subsection 3, and may have services paid by Medicare only under the exceptional circumstances described there.

A psychiatric hospital to which patients convicted of crimes are committed is considered to be serving the general community if State law also provides for voluntary admissions to the institution.

**3. Prisoners**

The regulation at 42 CFR §411.4(b) states:

> "Individuals who are in custody include, but are not limited to, individuals who are under arrest, incarcerated, imprisoned, escaped from confinement, under supervised release, on medical furlough, required to reside in mental health facilities, required to reside in halfway houses, required to live under home detention, or confined completely or partially in any way under a penal statute or rule."

Moreover, 72 FR 47405 states further that the—

> "…definition of "custody" is in accordance with how custody is defined by Federal courts for purposes of the habeas corpus protections of the Constitution. For example, the term "custody" is not limited solely to physical confinement. (Sanders v. Freeman, 221F.3d 846, 850-851 (6th Cir. 2000).) Individuals on parole, probation, bail, or supervised release may be "in custody."

42 CFR §411.4(b) goes on to describe the special conditions that must be met in order for Medicare to make payment for individuals who are in custody, 42 CFR §411.4(b) states:

> "Payment may be made for services furnished to individuals or groups of individuals who are in the custody of the police or other penal authorities or in the custody of a government agency under a penal statute only if the following conditions are met:

1. State or local law requires those individuals or groups of individuals to repay the cost of medical services they receive while in custody, and

2. The State or local government entity enforces the requirement to pay by billing all such individuals, whether or not covered by Medicare or any other health insurance, and by pursuing the collection of the amounts they owe in the same way and with the same vigor that it pursues the collection of other debts."

The CMS presumes that a state or local government that has custody of a Medicare beneficiary under a penal statute has a financial obligation to pay for the cost of healthcare items and services unless the State can demonstrate to the A/B MAC (A)'s, (B)'s, or (HHH)'s, or DME MAC's satisfaction, in consultation with the RO, that:

- State or local law requires that individuals in custody repay the cost of the services.

- The State or local government entity enforces the requirement to pay by billing and seeking collection from all individuals in custody with the same legal status (e.g., not guilty by reason of insanity), whether insured or uninsured, and by pursuing collection of the amounts they owe in the same way and with the same vigor that it pursues the collection of other debts. This includes collection of any Medicare deductible and coinsurance amounts and the cost of items and services not covered by Medicare.

**NOTE:** The A/B MAC (A), (B), or (HHH), or DME MAC will require evidence that routine collection efforts include the filing of lawsuits to obtain liens against individuals' assets outside the prison and income derived from non-prison sources.

- The State or local entity documents its case with copies of regulations, manual instructions, directives, etc., spelling out the rules and procedures for billing and collecting amounts paid for prisoners' medical expenses. As a rule, the A/B MAC (A), (B), or (HHH), or DME MAC will inspect a representative sample of cases in which prisoners have been billed and payment pursued, randomly selected from both Medicare and non-Medicare eligible. The existence of cases in which the State or local entity did not actually pursue collection, even though there is no indication that the effort would have been unproductive, indicates that the requirement to pay is not enforced.

The CMS maintains a file of incarcerated beneficiaries, obtained from SSA, that is used to edit claims.

Providers and suppliers that render services or items to a prisoner or patient in a jurisdiction that meets the conditions described above indicate this fact with the use of a modifier (for A/B MAC (B) processed claims) or condition code (for A/B MAC (A) processed claims). Otherwise the claims are denied.

### 4. Health Department Outpatient Clinics

Services rendered free of charge by State and local health department outpatient clinics are not covered unless the services are rendered because of the individual's indigence or as a means of controlling infectious diseases. Thus, services rendered by city-operated clinics for the poor and clinics for the detection and treatment of such illnesses as venereal disease and tuberculosis are **not** excluded from Medicare coverage.

### 5. Vocational Rehabilitation (VR) Agencies

Under the vocational rehabilitation (VR) programs of the various States, vocational training and services, including hospital and medical care, are provided to handicapped persons who qualify under State law. These programs are financed in part by a Federal matching fund program set up under the Vocational Rehabilitation Act.

When items or services are furnished by a State VR agency, title XVIII benefits are payable if the agency charges all clients for its services or makes services available without cost only to medically indigent individuals. If a rehabilitation agency has paid for items and services furnished by nonproviders (e.g., physicians' services and prosthetic appliances), it may claim the Part B payment due the beneficiary if the latter has authorized it to do so. The procedure is similar to that provided for State welfare agencies; the State vocational rehabilitation agency function is comparable to that of a State welfare agency in relation to a welfare recipient.

## 50.4 - TRICARE and CHAMPVA (Civilian Health and Medical Program of Veterans Administration)

**(Rev. 1, 10-01-03)**
A3-3153.3.D, HO-260.3.F

### 1. General

TRICARE and CHAMPVA are similar programs administered by the Department of Defense, except that the Veterans Administration determines the eligibility of persons seeking to establish entitlement to CHAMPVA coverage. TRICARE provides benefits for health care services furnished by civilian providers, physicians, and suppliers to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members. The term “Uniformed Services” includes the Army, Navy, Air Force, Marine Corps, Coast Guard, and the Commissioned Corps of the U.S. Public Health Service and of the National Oceanic and Atmospheric Administration. CHAMPVA provides similar benefits for spouses and children of veterans who are entitled to VA permanent and total disability benefits and to widows and children of veterans who died of service-connected disabilities.

The governmental entity exclusion does not preclude Medicare payment for items or services furnished to a beneficiary who is also eligible for TRICARE/CHAMPVA benefit payments for the same services. Medicare is the primary payer for such items and services, and TRICARE/CHAMPVA is a supplementary payer. (See subsection 3, below.)

### 2. Effect of Medicare Eligibility on TRICARE/CHAMPVA Entitlement

TRICARE/CHAMPVA beneficiaries, other than dependents of active duty members, lose their entitlement to TRICARE/CHAMPVA if they qualify for Medicare Part A on any basis and do not enroll in Medicare Part B (effective October 1, 2001).

**NOTE:** TRICARE beneficiaries that turned age 65 prior to April 1, 2001 are not required to purchase Medicare Part B in order to retain their TRICARE Pharmacy benefits. However, all TRICARE individuals entitled to Medicare Part A must be enrolled in Medicare Part B to receive the **rest of their TRICARE benefit.**

Individuals who are eligible for Medicare Part B benefits only, do not lose their entitlement to TRICARE/CHAMPVA benefits. If a Medicare beneficiary, who has lost entitlement to CHAMPVA upon becoming entitled to Part A of Medicare, thereafter exhausts any Part A benefits, the individual can again be entitled to CHAMPVA. Once the individual re-attains CHAMPVA benefits, the individual will not lose them by virtue of later again becoming eligible for Medicare Part A benefits. There is no similar provision for TRICARE which enables an individual to re-attain TRICARE eligibility after exhausting Medicare Part A benefits. A/B MACs (A) and (B) will direct questions concerning this provision to the CHAMPVA Center.

**3. Medicare-TRICARE/CHAMPVA Relationship**

If a TRICARE/CHAMPVA beneficiary also has Medicare coverage, TRICARE/ CHAMPVA reduces its liability in all cases by the amount payable by Medicare, i.e., Medicare is the primary payer and TRICARE/CHAMPVA supplements Medicare by paying the Medicare deductible and coinsurance amounts and portions of the bill not covered by Medicare. Thus, dually entitled individuals may be reimbursed up to 100 percent of expenses for items and services covered by both programs.

TRICARE/CHAMPVA has established policies and procedures which provide for (a) the identification of claimants who have coverage under both TRICARE/CHAMPVA and Medicare and (b) the detection of duplicate payments under both programs. If TRICARE/CHAMPVA inadvertently pays amounts which duplicate Medicare payments for the same items or services, TRICARE/CHAMPVA will take steps to recover the incorrect TRICARE/CHAMPVA payments.

## 50.5 - Active Duty Members of Uniformed Services

**(Rev. 1, 10-01-03)**

A3-3153.3.E, HO-260.3.G

In limited circumstances, active duty members of the Uniformed Services may have care in civilian facilities paid for by the Army, Navy, Air Force, Marine Corps, or other appropriate uniformed service. Except for emergency services, prior approval is generally required before such payment can be made. Services furnished pursuant to such approval and services paid for or expected to be paid for by the Uniformed Services are not reimbursable under Medicare.

## 60 - Services Not Provided Within United States

**(Rev. 102; Issued: 02-13-09; Effective/Implementation Date: 03-13-09)**

Items and services furnished outside the United States are excluded from coverage except for the following services, and certain services rendered on board a ship:

- Emergency inpatient hospital services where the emergency occurred:
    - While the beneficiary was physically present in the United States; or
    - In Canada while the beneficiary was traveling without reasonable delay and by the most direct route between Alaska and another State. See Pub. 100-04, Medicare Claims Processing Manual Chapter 3, Inpatient Hospital Billing, Section 110 for a description of claims processing procedures.
- Emergency or nonemergency inpatient hospital services furnished by a hospital located outside the United States, if the hospital was closer to, or substantially more accessible from, the beneficiary's United States residence than the nearest participating United States hospital which was adequately equipped to deal with

and available to provide treatment of the illness or injury (see Pub. 100-04, Medicare Claims Processing Manual Chapter 3, Inpatient Hospital Billing, Section 110 for a description of claims processing procedures);

- Physician and ambulance services furnished in connection with a covered foreign hospitalization. Program payment may not be made for any other Part B medical and other health services, including outpatient services furnished outside the United States (see Pub. 100-04, Medicare Claims Processing Manual Chapter 1, General Billing Requirements, Section 10.1.4.1 for a description of claims processing procedures);

- Services rendered on board a ship in a United States port, or within 6 hours of when the ship arrived at, or departed from, a United States port, are considered to have been furnished in United States territorial waters. Services not furnished in a United States port, or within 6 hours of when the ship arrived at, or departed from, a United States port, are considered to have been furnished outside United States territorial waters, even if the ship is of United States registry (see Pub. 100-04, Medicare Claims Processing Manual Chapter 1, General Billing Requirements, Section 10.1.4.7 for a description of claims processing procedures); and

The term "United States" means the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Northern Mariana Islands, American Samoa and, for purposes of services rendered on a ship, includes the territorial waters adjoining the land areas of the United States.

A hospital that is not physically situated in one of the above jurisdictions is considered to be outside the United States, even if it is owned or operated by the United States Government.

Payment may not be made for any item provided or delivered to the beneficiary outside the United States, even though the beneficiary may have contracted to purchase the item while they were within the United States or purchased the item from an American firm.

Payment may not be made for a medical service (or a portion of it) that was subcontracted to another provider or supplier located outside the United States. For example, if a radiologist who practices in India analyzes imaging tests that were performed on a beneficiary in the United States, Medicare would not pay the radiologist or the U.S. facility that performed the imaging test for any of the services that were performed by the radiologist in India.

Under the Railroad Retirement Act, payment is made to Qualified Railroad Retirement beneficiaries (QRRBs) by the RRB for covered hospital services furnished in Canadian hospitals as well as in the U.S. Physician and ambulance services are not covered by the Railroad Retirement Act; however, under an agreement between CMS and RRB, if the QRRB claims payment for Part B services in connection with Canadian hospitalization, RRB processes the Part B claim. In such cases the RRB determines:

- Whether the requirements are met for the inpatient services; and
- Whether the physician and/or ambulance services were furnished in connection with the services.

Services for an individual who has elected religious nonmedical health care status may be covered if the above requirements are met but this revokes the religious nonmedical health care institution election.

## 70 - Services Resulting from War

**(Rev. 1, 10-01-03)**

A3-3155, HO-260.5, B3-2315

Items and services which are required as a result of war, or of an act of war, occurring after the effective date of the patient's current entitlement date are not covered.

## 80 - Personal Comfort Items

**(Rev. 1, 10-01-03)**

A3-3156, HO-260.6, B3-2318

Items that do not contribute meaningfully to the treatment of an illness or injury or the functioning of a malformed body member are not covered.

Charges for special items requested by the patient such as radio, television, telephone, and air conditioner, and beauty and barber services are excluded from coverage. The patient may be charged for such a service if they requested it with knowledge that they will be charged. To avoid misunderstanding and disputes, the provider informs the individual upon request for such an item or service that there is a specified charge (not exceeding the customary charge). Thereafter, the provider may not charge the patient more for the item or service than the charge specified. A provider may not require a beneficiary to request noncovered items or services as a condition of admission or of continued stay.

Basic personal services such as simple barber and beautician services (e.g., shaves, haircuts, shampoos, and simple hair sets) which patients need and cannot perform for themselves may be viewed as ordinary patient care when furnished by a long-stay institution. Such services are covered costs reimbursable under Part A when included in the flat rate charge and provided routinely without charge to the patient by an SNF or by a general psychiatric or tuberculosis hospital. The services are maintenance of at least a minimum level of personal hygiene, decency, and presentability **items** essential to the well-being of the patient and of other patients who must associate with the patient. However, under the personal comfort exclusion, more elaborate services, such as professional manicures, hair styling, etc., are excluded even when furnished routinely and without special charge.

## 90 - Routine Services and Appliances

**(Rev. 186, Issued: 04-16-14, Effective: 01-01 01, Implementation: 05-12-14)**

Routine physical checkups; eyeglasses, contact lenses, and eye examinations for the purpose of prescribing, fitting, or changing eyeglasses; eye refractions by whatever practitioner and for whatever purpose performed; hearing aids and examinations for hearing aids; and immunizations are not covered.

The routine physical checkup exclusion applies to (a) examinations performed without relationship to treatment or diagnosis for a specific illness, symptom, complaint, or injury; and (b) examinations required by third parties such as insurance companies, business establishments, or Government agencies.

The routine physical checkup exclusion does not apply to the following services (as noted in section 42 CFR 411.15(a)(1)):

- Screening mammography,
- Colorectal cancer screening tests,
- Screening pelvic exams,
- Prostate cancer screening tests,
- Glaucoma screening exams,
- Ultrasound screening for abdominal aortic aneurysms (AAA),
- cardiovascular disease screening tests,
- diabetes screening tests,
- screening electrocardiogram,
- Initial preventive physical examinations,
- Annual wellness visits providing personalized prevention plan services, and
- Additional preventive services that meet the criteria specified in 42 CFR 410.64.

If the claim is for a diagnostic test or examination performed solely for the purpose of establishing a claim under title IV of Public Law 91-173, “Black Lung Benefits,” the service is not covered under Medicare and the claimant should be advised to contact their Social Security office regarding the filing of a claim for reimbursement under the “Black Lung” program.

The exclusions apply to eyeglasses or contact lenses, and eye examinations for the purpose of prescribing, fitting, or changing eyeglasses or contact lenses for refractive errors. The exclusions do not apply to physicians’ services (and services incident to a physicians’ service) performed in conjunction with an eye disease, as for example, glaucoma or cataracts, or to post-surgical prosthetic lenses which are customarily used during convalescence from eye surgery in which the lens of the eye was removed, or to permanent prosthetic lenses required by an individual lacking the organic lens of the eye, whether by surgical removal or congenital disease. Such prosthetic lens is a replacement for an internal body organ - the lens of the eye. (See the Medicare Benefit Policy Manual, Chapter 15, “Covered Medical and Other Health Services,” §120).

Expenses for all refractive procedures, whether performed by an ophthalmologist (or any other physician) or an optometrist and without regard to the reason for performance of the refraction, are excluded from coverage.

**A. Immunizations**

Vaccinations or inoculations are excluded as immunizations unless they are either:

- Directly related to the treatment of an injury or direct exposure to a disease or condition, such as antirabies treatment, tetanus antitoxin or booster vaccine, botulin antitoxin, antivenin sera, or immune globulin. (In the absence of injury or direct exposure, preventive immunization (vaccination or inoculation) against such diseases as smallpox, polio, diphtheria, etc., is not covered.); or

- Specifically covered by statute, as described in the Medicare Benefit Policy Manual, Chapter 15, "Covered Medical and Other Health Services," §50.4.4.2.

**B. Antigens**

Prior to the Omnibus Reconciliation Act of 1980, a physician who prepared an antigen for a patient could not be reimbursed for that service unless the physician also administered the antigen to the patient. Effective January 1, 1981, payment may be made for a reasonable supply of antigens that have been prepared for a particular patient even though they have not been administered to the patient by the same physician who prepared them if:

- The antigens are prepared by a physician who is a doctor of medicine or osteopathy, and

- The physician who prepared the antigens has examined the patient and has determined a plan of treatment and a dosage regimen.

A reasonable supply of antigens is considered to be not more than a 12-month supply of antigens that has been prepared for a particular patient at any one time. The purpose of the reasonable supply limitation is to assure that the antigens retain their potency and effectiveness over the period in which they are to be administered to the patient. (See the Medicare Benefit Policy Manual, Chapter 15, "Covered Medical and Other Health Services," §50.4.4.1)

## 100 - Hearing Aids and Auditory Implants

**(Rev. 39; Issued: 11-10-05; Effective: 11-10-05; Implementation: 12-12-05)**

Section 1862(a)(7) of the Social Security Act states that no payment may be made under part A or part B for any expenses incurred for items or services "where such expenses are for . . . hearing aids or examinations therefore. . . ." This policy is further reiterated at

42 CFR 411.15(d) which specifically states that "hearing aids or examination for the purpose of prescribing, fitting, or changing hearing aids" are excluded from coverage.

Hearing aids are amplifying devices that compensate for impaired hearing. Hearing aids include air conduction devices that provide acoustic energy to the cochlea via stimulation of the tympanic membrane with amplified sound. They also include bone conduction devices that provide mechanical energy to the cochlea via stimulation of the scalp with amplified mechanical vibration or by direct contact with the tympanic membrane or middle ear ossicles.

Certain devices that produce perception of sound by replacing the function of the middle ear, cochlea or auditory nerve are payable by Medicare as prosthetic devices. These devices are indicated only when hearing aids are medically inappropriate or cannot be utilized due to congenital malformations, chronic disease, severe sensorineural hearing loss or surgery.

The following are prosthetic devices:

- Cochlear implants and auditory brainstem implants, i.e., devices that replace the function of cochlear structures or auditory nerve and provide electrical energy to auditory nerve fibers and other neural tissue via implanted electrode arrays.

- Osseointegrated implants, i.e., devices implanted in the skull that replace the function of the middle ear and provide mechanical energy to the cochlea via a mechanical transducer.

Medicare contractors deny payment for an item or service that is associated with any hearing aid as defined above. See §180 for policy for the medically necessary treatment of complications of implantable hearing aids, such as medically necessary removals of implantable hearing aids due to infection.

## 110 - Custodial Care

**(Rev. 1, 10-01-03)**

A3-3159, HO-260.10, HO-261, B3-2326

Custodial care is excluded from coverage. Custodial care serves to assist an individual in the activities of daily living, such as assistance in walking, getting in and out of bed, bathing, dressing, feeding, and using the toilet, preparation of special diets, and supervision of medication that usually can be self-administered. Custodial care essentially is personal care that does not require the continuing attention of trained medical or paramedical personnel. In determining whether a person is receiving custodial care, the A/B MAC (A) or (B) considers the level of care and medical supervision required and furnished. It does not base the decision on diagnosis, type of condition, degree of functional limitation, or rehabilitation potential.

Institutional care that is below the level of care covered in a SNF is custodial care. (See the Medicare Benefit Policy Manual, Chapter 8, "Coverage of Extended Care (SNF) Services Under Hospital Insurance," §30.) Some examples of custodial care in hospitals and SNFs are:

- A stroke patient who is ambulatory, has no bladder or bowel involvement, no serious associated or secondary illnesses and does not require medical or paramedical care but requires only the assistance of an aide in feeding, dressing, and bathing;

- A cardiac patient who is stable and compensated and has reasonable cardiac reserve and no associated illnesses, but who because of advanced age has difficulty in managing alone in the home, and requires assistance in meeting the activities of daily living; and

- A senile patient who has diabetes which remains stabilized as long as someone sees to it that the patient takes oral medication and sticks to a prescribed diet.

Even if a patient's stay in a hospital or SNF is determined to be custodial, some individual services may still be covered under Part B if they are reasonable and necessary. For example, periodic visits by a physician to their patient are covered under Part B if such services are reasonable and necessary to the treatment of the patient's illness or injury even though a finding has been made that the care being furnished the patient in the hospital or SNF is custodial care and, therefore, not covered. Similarly, such a finding of custodial care does not preclude payment for a Part B claim for ancillary services, which are medically necessary (see the Medicare Benefit Policy Manual, Chapter 15, "Covered Medical and Other Health Services," §250). (See the Medicare Benefit Policy Manual, Chapter 6, "Hospital Services Covered Under Part B," §10, and Chapter 8, §80.)

## 110.1 - Custodial Care Under a Hospice Program

**(Rev. 1, 10-01-03)**
A3-3159.1

Care furnished to an individual who has elected the hospice care option is custodial only if it is not reasonable and necessary for the palliation or management of the terminal illness or related conditions. (See the Medicare Benefit Policy Manual, Chapter 9, "Coverage of Hospice Services Under Hospital Insurance," §40.)

## 120 - Cosmetic Surgery

**(Rev. 1, 10-01-03)**
A3-3160, HO-260.11, B3-2329

Cosmetic surgery or expenses incurred in connection with such surgery is not covered. Cosmetic surgery includes any surgical procedure directed at improving appearance, except when required for the prompt (i.e., as soon as medically feasible) repair of

accidental injury or for the improvement of the functioning of a malformed body member. For example, this exclusion does not apply to surgery in connection with treatment of severe burns or repair of the face following a serious automobile accident, or to surgery for therapeutic purposes which coincidentally also serves some cosmetic purpose.

## 130 - Charges Imposed by Immediate Relatives of the Patient or Members of the Patient's Household

**(Rev. 1, 10-01-03)**
A3-3161, HO-260.12, B3-2332

**A. General**
These are expenses that constitute charges by immediate relatives of the beneficiary or by members of their household. The intent of this exclusion is to bar Medicare payment for items and services that would ordinarily be furnished gratuitously because of the relationship of the beneficiary to the person imposing the charge. This exclusion applies to items and services rendered by providers to immediate relatives of the owner(s) of the provider. It also applies to services rendered by physicians to their immediate relatives and items furnished by suppliers to immediate relatives of the owner(s) of the supplier.

**B. Immediate Relative**

The following degrees of relationship are included within the definition of immediate relative.

- Husband and wife;
- Natural or adoptive parent, child, and sibling;
- Stepparent, stepchild, stepbrother, and stepsister;
- Father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, and sister-in-law;
- Grandparent and grandchild; and
- Spouse of grandparent and grandchild.

**NOTE 1:** A brother-in-law or sister-in-law relationship does not exist between the physician, supplier or owner of a provider (or supplier) and the spouse of his wife's or her husband's brother or sister.

**NOTE 2:** A father-in-law or mother-in-law relationship does not exist between a physician or the owner of a provider and his or her spouse's stepfather or stepmother.

A step-relationship and an in-law relationship continues to exist even if the marriage upon which the relationship is based is terminated through divorce or through the death of one of the parties. For example, if a provider treats the stepfather of the owner after the death of the owner's natural mother or after the owner's stepfather and natural mother are divorced, or if the provider treats the owner's father-in-law or mother-in-law after the death of their spouse, the services are considered to have been furnished to an immediate relative, and therefore, are excluded from coverage.

**C. Members of Patient's Household**

These are persons sharing a common abode with the patient as a part of a single family unit, including those related by blood, marriage or adoption, domestic employees and others who live together as part of a single family unit. A mere roomer or boarder is not included.

**D. Charges for Provider Services**

Payment is not made under Part A or Part B for items and services furnished by providers to immediate relatives of the owner(s) of the providers. This exclusion applies whether the provider is a sole proprietor who has an excluded relationship to the patient, or a partnership in which even one of the partners is related to the patient.

**E. Charges for Physician and Physician-Related Services**

This exclusion applies to physician services, including services of a physician who belongs to a professional corporation, and services furnished incident to those services (for example, by the physician's nurse or technician) if the physician who furnished the services or who ordered or supervised services incident to their services has an excluded relationship to the beneficiary.

Professional corporation means a corporation that is completely owed by one or more physicians, and is operated for the purpose of conducting the practice of medicine, osteopathy, dentistry, podiatry, optometry, or chiropractic, or is owned by other health care professionals as authorized by State law. Any physician or group of physicians which is incorporated constitutes a professional corporation. (Generally, physicians who are incorporated identify themselves by adding letters such as P.C. or P.A. after their title.)

**F. Charges for Items Furnished by Nonphysician Suppliers**

This exclusion applies to charges imposed by a nonphysician supplier that is not incorporated, whether the supplier is owned by a sole proprietor who has an excluded relationship to the patient, or by a partnership in which even one of the partners is related. It does not apply to charges imposed by a corporation (other than a professional corporation), regardless of the patient's relationship to any of the stockholders, officers, or directors of the corporation or to the person who furnished the service.

## 140 - Dental Services Exclusion

**(Rev. 1, 10-01-03)**

A3-3162, HO-260.13, B3-2336

Items and services in connection with the care, treatment, filling, removal, or replacement of teeth, or structures directly supporting the teeth are not covered. Structures directly supporting the teeth mean the periodontium, which includes the gingivae, dentogingival junction, periodontal membrane, cementum, and alveolar process. However, payment may be made for certain other services of a dentist. (See the Medicare Benefit Policy Manual, Chapter 15, "Covered Medical and Other Health Services," §150.)

The hospitalization or nonhospitalization of a patient has no direct bearing on the coverage or exclusion of a given dental procedure.

When an excluded service is the primary procedure involved, it is not covered regardless of its complexity or difficulty. For example, the extraction of an impacted tooth is not covered. Similarly, an alveoplasty (the surgical improvement of the shape and condition of the alveolar process) and a frenectomy are excluded from coverage when either of these procedures is performed in connection with an excluded service, e.g., the preparation of the mouth for dentures. In like manner, the removal of the torus palatinus (a bony protuberance of the hard palate) could be a covered service. However, with rare exception, this surgery is performed in connection with an excluded service, i.e., the preparation of the mouth for dentures. Under such circumstances, reimbursement is not made for this purpose.

The extraction of teeth to prepare the jaw for radiation treatments of neoplastic disease is also covered. This is an exception to the requirement that to be covered, a noncovered procedure or service performed by a dentist must be an incident to and an integral part of a covered procedure or service performed by the dentist. Ordinarily, the dentist extracts the patient's teeth, but another physician, e.g., a radiologist, administers the radiation treatments.

Whether such services as the administration of anesthesia, diagnostic x-rays, and other related procedures are covered depends upon whether the primary procedure being performed by the dentist is covered. Thus, an x-ray taken in connection with the reduction of a fracture of the jaw or facial bone is covered. However, a single x-ray or x-ray survey taken in connection with the care or treatment of teeth or the periodontium is not covered.

See also the Medicare Benefit Policy Manual, Chapter 1, "Inpatient Hospital Services," §70, and Chapter 15, "Covered Medical and Other Health Services," §150 for additional information on dental services.

## 150 - Services Reimbursable Under Automobile, No Fault, Any Liability Insurance or Workers' Compensation

**(Rev. 1, 10-01-03)**

A3-313, HO-260.14, B3-2370

The program may not pay for items and services for which payment has been made or can reasonably be expected to be made promptly under a liability, automobile, no-fault or workers' compensation law or plan of the United States or a State. Also, payments for items and services under the health insurance program are subject to repayment to the appropriate trust fund if notice or information is received that payment is available for the items and services under a liability, automobile, no-fault or workers' compensation plan.

See the MSP manual for specific instructions.

## 170 - Inpatient Hospital or SNF Services Not Delivered Directly or Under Arrangement by the Provider

**(Rev. 1, 10-01-03)**

A3-3164, HO-260.15, B3-2390, PM A 00-88

Nonphysician services provided to a Part A inpatient or Part B inpatient of a hospital or to a Part A inpatient of a SNF which are not provided directly by the hospital/SNF or under arrangement generally are excluded from coverage under Medicare.

This coverage exclusion does not apply to the following types of services:

- Physicians' services for hospital inpatients or physician's services other than therapy for SNF inpatients (i.e., therapy provided by physicians is not covered for any SNF Part A and Part B inpatient unless provided by the SNF, but other physician services may be covered. Any normally-covered service may be provided by a physician to a hospital inpatient);

- Physician assistant services;

- Nurse practitioners and clinical nurse specialists;

- Certified nurse-midwife services;

- Qualified clinical psychologist services;

- Certified registered nurse anesthetist; and

- Services of an anesthetist employed by a physician that were furnished during cost reporting periods beginning on or after October 1, 1984, through any part of a cost reporting period occurring before January 1, 1989.

The A/B MAC (B) may make direct payment on Part B bills for these services, if they are medically necessary, even though they are not furnished directly or arranged for by the hospital/SNF.

For SNF Part A inpatients, the following services are additional exceptions to this non coverage rule and may be covered if provided by another authorized provider or supplier:

- Home dialysis supplies and equipment, self-care home dialysis support services, and institutional dialysis services and supplies, including any related necessary ambulance services;

- EPO;

- Hospice care related to a beneficiary's terminal condition;

- Radioisotope services;

- Some customized prosthetic devices;

- Some chemotherapy and chemotherapy administration services;

- The following services which are considered beyond the scope of a SNF when furnished in a Medicare participating Hospital or Critical Access Hospital. Note that this exception does not apply if the service is furnished in an ASC. Specific coding is described in the Medicare Claims Processing Manual.

    - Cardiac catheterization;

    - CT scans;

    - MRIs;

    - Ambulatory surgery involving the use of an operating room;

    - Radiation therapy;

    - Emergency services;

    - Ambulance services related to the six services listed immediately above; and ambulance transportation related to dialysis services.

## 180 - Services Related to and Required as a Result of Services Which Are Not Covered Under Medicare

**(Rev. 189, Issued: 06-27-14, Effective: 05-30-14, Implementation: 06-29-14)**

Medical and hospital services are sometimes required to treat a condition that arises as a result of services that are not covered because they are determined to be not reasonable and necessary or because they are excluded from coverage for other reasons. Services "related to" non-covered services (e.g., cosmetic surgery, non-covered organ transplants, non-covered artificial organ implants, etc.), including services related to follow-up care

and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services "not related to" non-covered services are covered under Medicare.

Following are examples of services "related to" and "not related to" non-covered services while the beneficiary is an inpatient:

- A beneficiary was hospitalized for a non-covered service and broke a leg while in the hospital. Services related to care of the broken leg during this stay is a clear example of "not related to" services and are covered under Medicare.

- A beneficiary was admitted to the hospital for covered services, but during the course of hospitalization became a candidate for a non-covered transplant or implant and actually received the transplant or implant during that hospital stay. When the original admission was entirely unrelated to the diagnosis that led to a recommendation for a non-covered transplant or implant, the services related to the admitting condition would be covered.

- A beneficiary was admitted to the hospital for covered services related to a condition which ultimately led to identification of a need for transplant and receipt of a transplant during the same hospital stay. If, on the basis of the nature of the services and a comparison of the date they are received with the date on which the beneficiary is identified as a transplant candidate, the services could reasonably be attributed to preparation for the non-covered transplant, the services would be "related to" non-covered services and would also be non-covered.

Following is an example of services received subsequent to a non-covered inpatient stay:

After a beneficiary has been discharged from the hospital stay in which the beneficiary received non-covered services, medical and hospital services required to treat a condition or complication that arises as a result of the prior non-covered services may be covered when they are reasonable and necessary in all other respects. Thus, coverage could be provided for subsequent inpatient stays or outpatient treatment ordinarily covered by Medicare, even if the need for treatment arose because of a previous non-covered procedure. Some examples of services that may be found to be covered under this policy are the reversal of intestinal bypass surgery for obesity, complications from cosmetic surgery, removal of a non-covered bladder stimulator, or treatment of any infection at the surgical site of a non-covered transplant that occurred following discharge from the hospital.

However, any subsequent services that could be expected to have been incorporated into a global fee are not covered. Thus, where a patient undergoes cosmetic surgery and the treatment regimen calls for a series of postoperative visits to the surgeon for evaluating the patient's progress, these visits are not covered.

## Transmittals Issued for this Chapter

| Rev # | Issue Date | Subject | Impl Date | CR# |
|---|---|---|---|---|
| R198BP | 11/06/2014 | Medicare Coverage of Items and Services in Category A and B Investigational Device Exemption (IDE) Studies | 01/05/2015 | 8921 |
| R189BP | 06/27/2014 | Invalidation of National Coverage Determination 140.3 - Transsexual Surgery | 06/29/2014 | 8825 |
| R186BP | 04/16/2014 | Clarification to Pub. 100-02, Medicare Benefit Policy Manual Regarding Antigens and Deletion of Section 13.14 from Chapter 13 of Pub. 100-08, Medicare Program Integrity Manual | 05/12/2014 | 8665 |
| R184BP | 04/11/2014 | Clarification to Pub. 100-02, Medicare Benefit Policy Manual Regarding Antigens and Deletion of Section 13.14 from Chapter 13 of Pub. 100-08, Medicare Program Integrity Manual – Rescinded and replaced by Transmittal 186 | 05/12/2014 | 8665 |
| R170BP | 05/10/2013 | Updates to Medicare Coverage of Hepatitis B Vaccine and its Administration and Medicare Coverage of the Annual Wellness Visit (AWV) Providing Personalized Prevention Plan Services (PPPS) | 06/10/2013 | 8275 |
| R122BP | 04/09/2010 | Claims Submitted for Items or Services Furnished to Medicare Beneficiaries in State or Local Custody Under a Penal Authority and Examples of Application of Government Entity Exclusion. This CR rescinds and fully replaces CR 6544. | 07/09/2010 | 6880 |
| R110BP | 09/04/2009 | Claims Submitted for Items or Services Furnished to Medicare Beneficiaries in State or Local Custody Under a Penal Authority and Examples of Application of Government Entity Exclusion – Rescinded and replaced by CR 6880, Transmittal 122 | 12/07/2009 | 6544 |

| | | | | |
|---|---|---|---|---|
| R102BP | 02/12/2009 | Shipboard Services Billed to the Carrier and Services Not Provided Within the United States | 03/13/2009 | 6327 |
| R95BP | 10/03/2008 | Shipboard Services Billed to the Carrier and Services Not Provided Within the United States – Rescinded and replaced by CR 6327, Transmittal 102 | 01/05/2009 | 6217 |
| R66BP | 02/23/2007 | Services Not Provided Within United States | 04/02/2007 | 5427 |
| R39BP | 11/10/2005 | Auditory Osseointegrated and Auditory Brainstem Devices | 12/12/2005 | 4038 |
| R38BP | 08/19/2005 | Services Not Provided Within United States | 11/17/2005 | 3781 |
| R1BP | 10/01/2003 | Introduction to the Benefit Policy Manual | N/A | N/A |

Back to Top of Chapter

| | |
|---|---|
| CMS Manual System | **Department of Health & Human Services (DHHS)** |
| Pub 100-08 Medicare Program Integrity | **Centers for Medicare & Medicaid Services (CMS)** |
| **Transmittal 11032** | **Date: September 30, 2021** |
| | **Change Request 12375** |

**Transmittal 10984, dated September 9, 2021, is being rescinded and replaced by Transmittal 11032, dated September 30, 2021 to revise section 4.3.2.3, Chapter 4 of Pub. 100-08. All other information remains the same.**

**SUBJECT: Updates to Chapters 1, 3, 4, 5, 8 and 9 of Publication (Pub.) 100-08**

**I. SUMMARY OF CHANGES:** The purpose of this Change Request (CR) is to update various sections within Chapters 1, 3, 4, 5, 8 and 9 in Pub. 100-08. Additionally, the order of the sections in Chapters 4 in Pub. 100-08 are being revised, although the content of the sections will remain the same. This update does not affect the provider and/or beneficiary populations. Rather, this update is solely related to contractor technical processes and procedures. All updates ensure our contractors have the most recent guidance. This CR does not require Provider Education.

**EFFECTIVE DATE: October 12, 2021**
**Unless otherwise specified, the effective date is the date of service.*
**IMPLEMENTATION DATE: November 10, 2021**

***Disclaimer for manual changes only: The revision date and transmittal number apply only to red italicized material. Any other material was previously published and remains unchanged. However, if this revision contains a table of contents, you will receive the new/revised information only, and not the entire table of contents.***

**II. CHANGES IN MANUAL INSTRUCTIONS:** (N/A if manual is not updated)
R=REVISED, N=NEW, D=DELETED-*Only One Per Row.*

| R/N/D | CHAPTER / SECTION / SUBSECTION / TITLE |
|---|---|
| R | 1/1.3/1.3.6/Quality of Care Issues and Potential Fraud Issues |
| R | 1/1.3/1.3.9/Provider Self Audits |
| R | 3/3.3/3.3.2/3.3.2.4/Signature Requirements |
| R | 4/4.1/Introduction |
| D | 4/4.1/4.1.1/Definitions |
| R | 4/4.2/Medicare Program Integrity |
| R | 4/4.2/4.2.2/Program Integrity Contractors |
| R | 4/4.2/4.2.2/4.2.2.1/Unified Program Integrity Contractor |
| R | 4/4.2/4.2.2/4.2.2.2/Investigations Medicare Drug Integrity Contractor |
| R | 4/4.2/4.2.2/4.2.2.3/Organizational Requirements |
| D | 4/4.2/4.2.2/4.2.2.3/4.2.2.3.1/Training for Law Enforcement Organizations |
| R | 4/4.2/4.2.2/4.2.2.4/Liability of Program Integrity Contractor Employees |
| D | 4/4.2/4.2.2/4.2.2.4/4.2.2.4.1/Maintain Controlled Filing System and Documentation |
| D | 4/4.2/4.2.2/4.2.2.4/4.2.2.4.2/File/Document Retention |
| R | 4/4.2/4.2.2/4.2.2/4.2.2.5/Anti-Fraud Training |
| N | 4/4.2/4.2.2/4.2.2/4.2.2.5/4.2.2.5.1/Training for Law Enforcement Organizations |
| R | 4/4.2/4.2.2/4.2.2/4.2.2.6/Procedural Requirements |
| N | 4/4.2/4.2.2/4.2.2/4.2.2.6/4.2.2.6.1/Maintain Controlled Filing System and Documentation |
| N | 4/4.2/4.2.2/4.2.2/4.2.2.6/4.2.2.6.2/File/Document Retention |
| N | 4/4.2/4.2.2/4.2.2/4.2.2.7/Program Integrity Security Requirements |
| N | 4/4.2/4.2.2/4.2.2/4.2.2.8/Program Integrity Contractor Coordination |
| N | 4/4.2/4.2.2/4.2.2/4.2.2.8/4.2.2.8.1/Program Integrity Contractor Coordination with Other Unified Program Integrity Contractors and Other Entities |
| N | 4/4.2/4.2.2/4.2.2/4.2.2.8/4.2.2.8.1/4.2.2.8.1.1/Coordination with the Office of Inspector General |
| N | 4/4.2/4.2.2/4.2.2/4.2.2.8/4.2.2.8.1/4.2.2.8.1.2/Joint Operating Agreement |
| N | 4/4.2/4.2.2/4.2.2/4.2.2.8/4.2.2.8.1/4.2.2.8.1.3/MAC and UPIC Coordination on Voluntary Refunds |

| R/N/D | CHAPTER / SECTION / SUBSECTION / TITLE |
|---|---|
| N | 4/4.2/4.2.2/4.2.2/4.2.2.8/4.2.2.8.1/4.2.2.8.1.4/UPIC Coordination with Other Contractors Related to the RAC Data Warehouse |
| N | 4/4.2/4.2.2/4.2.2/4.2.2.8/4.2.2.8.1/4.2.2.8.1.4/4.2.2.8.1.4.1/Suppression and/or Exclusion – Examples |
| D | 4/4.2/4.2.3/Durable Medical Equipment Medicare Administrative Contractor Fraud Functions |
| D | 4/4.2/4.2.4/Investigations MEDIC |
| R | 4/4.3/Complaints |
| N | 4/4.3/4.3.1/Definition of a Complaint |
| N | 4/4.3/4.3.2/Complaint Screening |
| N | 4/4.3/4.3.2/4.3.2.1/Contact Center Operations |
| N | 4/4.3/4.3.2/4.3.2.2/OIG Hotline |
| N | 4/4.3/4.3.2/4.3.2.3/MAC Complaint Screening |
| N | 4/4.3/4.3.2/4.3.2.4/Referrals to the UPIC |
| R | 4/4.4/Home Health Agency Misuse of Requests for Anticipated Payments |
| R | 4/4.4/4.4.1/RAP Monitoring |
| D | 4/4.4/4.4.1/4.4.1.1/Reserved for Future Use |
| R | 4/4.4/4.4.2/Education and Additional Monitoring |
| D | 4/4.4/4.4.2/4.4.2.1/Unified Program Integrity Contractor Coordination with Other Entities |
| R | 4/4.4/4.4.3/Corrective Action Plans |
| N | 4/4.4/4.4.3/4.4.3.1/Notification to the HHA |
| N | 4/4.4/4.4.3/4.4.3.2/CAP Submission |
| N | 4/4.4/4.4.3/4.4.3.3/CAP Acceptance and Monitoring |
| N | 4/4.4/4.4.3/4.4.3.4/CAP Closeout |
| N | 4/4.4/4.4.4/RAP Suppression |
| N | 4/4.4/4.4.4/4.4.4.1/Notice of RAP Suppression |
| N | 4/4.4/4.4.4/4.4.4.2/Monitoring During RAP Suppression |
| N | 4/4.4/4.4.4/4.4.4.3/Result of Initial RAP Suppression Monitoring Period |
| N | 4/4.4/4.4.4/4.4.4.3/4.4.4.3.1/Reinstatement of RAP Authorization |
| N | 4/4.4/4.4.4/4.4.4.3/4.4.4.3.2/Continuation of RAP Suppression |

| R/N/D | CHAPTER / SECTION / SUBSECTION / TITLE |
|---|---|
| N | 4/4.4/4.4.5/Coordination and Referral to the UPIC |
| R | 4/4.5/Screening Leads |
| R | 4/4.5/4.5.1/UPIC and I-MEDIC Responsibilities |
| D | 4/4.5/4.5.2/Education and Additional Monitoring |
| D | 4/4.5/4.5.3/Corrective Action Plans |
| D | 4/4.5/4.5.3/4.5.3.1/Notification to the HHA |
| D | 4/4.5/4.5.3/4.5.3.2/CAP Submission |
| D | 4/4.5/4.5.3/4.5.3.3/CAP Acceptance and Monitoring |
| D | 4/4.5/4.5.3/4.5.3.4/CAP Closeout |
| D | 4/4.5/4.5.4/RAP Suppression |
| D | 4/4.5/4.5.4/4.5.4.1/Notice of RAP Suppression |
| D | 4/4.5/4.5.4/4.5.4.2/Monitoring During RAP Suppression |
| D | 4/4.5/4.5.4/4.5.4.3/Result of Initial RAP Suppression Monitoring Period |
| D | 4/4.5/4.5.4/4.5.4.3/4.5.4.3.1/Reinstatement of RAP Authorization |
| D | 4/4.5/4.5.4/4.5.4.3/4.5.4.3.2/Continuation of RAP Suppression |
| D | 4/4.5/4.5.5/Coordination and Referral to the UPIC |
| R | 4/4.6/Vetting Leads with CMS |
| D | 4/4.6/4.6.1/Definition of a Complaint |
| D | 4/4.6/4.6.2/Complaint Screening |
| D | 4/4.6/4.6.2/4.6.2.1/Contact Center Operations |
| D | 4/4.6/4.6.2/4.6.2.2/OIG Hotline |
| D | 4/4.6/4.6.2/4.6.2.3/MAC Complaint Screening |
| D | 4/4.6/4.6.2/4.6.2.4/Referrals to the UPIC |
| D | 4/4.6/4.6.2/4.6.2.5/UPIC and I-MEDIC Responsibilities |
| D | 4/4.6/4.6.3/Screening Leads |
| D | 4/4.6/4.6.4/Vetting Leads with CMS |
| R | 4/4.7/Investigations |
| R | 4/4.7/4.7.1/Conducting Investigations |
| N | 4/4.7/4.7.1/4.7.1.1/Provider/Supplier Contacts by the UPIC |
| N | 4/4.7/4.7.1/4.7.1.2/Case Coordination with UPICs |

| R/N/D | CHAPTER / SECTION / SUBSECTION / TITLE |
|---|---|
| R | 4/4.7/4.7.2/Identity Theft Investigations and Victimized Provider Waiver of Liability Process |
| N | 4/4.7/4.7.3/Durable Medical Equipment Medicare Investigative Functions |
| N | 4/4.7/4.7.3/4.7.3.1/Supplier Proof of Delivery Documentation Requirements |
| N | 4/4.7/4.7.3/4.7.3.1/4.7.3.1.1/Proof of Delivery and Delivery Methods |
| N | 4/4.7/4.7.3/4.7.3.1/4.7.3.1.2/Exceptions |
| N | 4/4.7/4.7.3/4.7.3.1/4.7.3.1.3/Proof of Delivery Requirements for Recently Eligible Medicare FFS Beneficiaries |
| N | 4/4.7/4.7.4/Medical Review for Program Integrity Purposes |
| N | 4/4.7/4.7.4/4.7.4.1/Production of Medical Records and Documentation for an Appeals Case File |
| N | 4/4.7/4.7.4/4.7.4.2/Reversed Denials by Administrative Law Judges on Open Cases |
| N | 4/4.7/4.7.5/Administrative Relief from Program Integrity Review in the Presence of a Disaster |
| N | 4/4.7/4.7.6/UPIC Hospice Cap Liability Process – Coordination with the MAC |
| N | 4/4.7/4.7.7/Closing Investigations |
| N | 4/4.7/4.7.7/4.7.7.1/Monitor Compliance |
| N | 4/4.7/4.7.7/4.7.7.1/4.7.7.1.1/Resumption of Payment to a Provider – Continued Surveillance After Detection of Fraud |
| R | 4/4.8/Requests for Information from Outside Organizations |
| D | 4/4.8/4.8.1/Reversed Denials by Administrative Law Judges on Open Cases |
| D | 4/4.8/4.8.2/Production of Medical Records and Documentation for an Appeals Case File |
| R | 4/4.9/Referrals |
| R | 4/4.9/4.9.1/Immediate Advisements to the OIG/OI |
| R | 4/4.9/4.9.2/Referral of Cases to the OIG/OI |
| N | 4/4.9/4.9.2/4.9.2.1/OIG/OI Referral and Summary Report |
| N | 4/4.9/4.9.2/4.9.2.2/Take Administrative Action on Cases Referred to and Declined/Returned by OIG/OI |

| R/N/D | CHAPTER / SECTION / SUBSECTION / TITLE |
|---|---|
| N | 4/4.9/4.9.2/4.9.2.3/Continue to Monitor Provider and Document Case File |
| R | 4/4.9/4.9.3/Referral to Other Law Enforcement Agencies |
| R | 4/4.9/4.9.4/Referral to Other Entities |
| N | 4/4.9/4.9.4/4.9.4.1/Referral to State Agencies or Other Organizations |
| N | 4/4.9/4.9.4/4.9.4.2/UPICs and QIOs |
| N | 4/4.9/4.9.4/4.9.4.3/Referral of Cases to the MAC |
| D | 4/4.9/4.9.5/Amount and Payment of Reward |
| D | 4/4.9/4.9.6/Unified Program Integrity Contractor Responsibilities |
| D | 4/4.9/4.9.6/4.9.6.1/Guidelines for Processing Incoming Complaints |
| D | 4/4.9/4.9.6/4.9.6.2/Guidelines for IRP Complaint Tracking |
| D | 4/4.9/4.9.6/4.9.6.3/Overpayment Recovery |
| D | 4/4.9/4.9.6/4.9.6.4/Eligibility Notification |
| D | 4/4.9/4.9.6/4.9.6.5/Incentive Reward Payment |
| D | 4/4.9/4.9.6/4.9.6.6/Reward Payment Audit Trail |
| D | 4/4.9/4.9.7/CMS Incentive Reward Winframe Database |
| D | 4/4.9/4.9.8/Updating the Incentive Reward Database |
| R | 4/4.10/Administrative Sanctions |
| N | 4/4.10/4.10.1/Unified Program Integrity Contractor's and Medicare Administrative Contractor's Role |
| N | 4/4.10/4.10.2/Authority to Exclude Practitioners, Providers, and Suppliers of Services |
| N | 4/4.10/4.10.2/4.10.2.1/Basis for Exclusion Under &sect,1128(b)(6) of the Social Security Act |
| N | 4/4.10/4.10.2/4.10.2.2/Identification of Potential Exclusion Cases |
| N | 4/4.10/4.10.2/4.10.2.3/Contents of Sanction Recommendation |
| N | 4/4.10/4.10.2/4.10.2.4/Notice of Administrative Sanction Action |
| N | 4/4.10/4.10.2/4.10.2.4/4.10.2.4.1/Notification to Other Agencies |
| N | 4/4.10/4.10.2/4.10.2.5/Denial of Payment to an Excluded Party |
| N | 4/4.10/4.10.2/4.10.2.5/4.10.2.5.1/Denial of Payment to Employer of Excluded Physician |

| R/N/D | CHAPTER / SECTION / SUBSECTION / TITLE |
|---|---|
| N | 4/4.10/4.10.2/4.10.2.5/4.10.2.5.2/Denial of Payment to Beneficiaries and Others |
| N | 4/4.10/4.10.3/Appeals Process |
| N | 4/4.10/4.10.4/Reinstatements |
| N | 4/4.10/4.10.4/4.10.4.1/Monthly Notification of Sanction Actions |
| N | 4/4.11/Civil Monetary Penalties |
| N | 4/4.11/4.11.1/Basis of Authority |
| N | 4/4.11/4.11.2/Administrative Actions |
| N | 4/4.11/4.11.3/Enforcement |
| N | 4/4.11/4.11.4/Documents |
| N | 4/4.11/4.11.5/Civil Monetary Penalty Authorities |
| N | 4/4.11/4.11.5/4.11.5.1/Civil Monetary Penalties Delegated to CMS |
| N | 4/4.11/4.11.5/4.11.5.2/Civil Monetary Penalties Delegated to OIG |
| N | 4/4.11/4.11.6/Referral Process |
| N | 4/4.11/4.11.6/4.11.6.1/Referral Process to CMS |
| N | 4/4.11/4.11.6/4.11.6.2/Referrals to OIG |
| N | 4/4.11/4.11.7/CMS Generic Civil Monetary Penalty Case Contents |
| N | 4/4.11/4.11.8/Additional Guidance for Specific Civil Monetary Penalties |
| N | 4/4.11/4.11.8/4.11.8.1/Beneficiary Right to Itemized Statement |
| N | 4/4.11/4.11.8/4.11.8.2/Medicare Limiting Charge Violations |
| R | 4/4.12/4.12.2/Initial Entry and Update Requirements for UPIC Leads and Investigations |
| R | 4/4.12/4.12.5/Update Requirements for Immediate Advisements |
| R | 4/4.13/Vulnerabilities |
| R | 4/4.14/Fraud Alerts |
| R | 4/4.15/Incentive Reward Program |
| N | 4/4.15/4.15.1/UPIC Responsibilities for the Incentive Reward Program |
| N | 4/4.15/4.15.2/Guidelines for Processing Incoming Complaints |
| N | 4/4.15/4.15.3/Guidelines for Incentive Reward Program Complaint Tracking |

| R/N/D | CHAPTER / SECTION / SUBSECTION / TITLE |
|---|---|
| N | 4/4.15/4.15.4/Excluded Individuals |
| N | 4/4.15/4.15.5/Amount and Payment of Reward |
| N | 4/4.15/4.15.6/Unified Program Integrity Contractor Responsibilities |
| N | 4/4.15/4.15.6/4.15.6.1/Guidelines for Processing Incoming Complaints |
| N | 4/4.15/4.15.6/4.15.6.2/Guidelines for Incentive Reward Program Complaint Tracking |
| N | 4/4.15/4.15.6/4.15.6.3/Overpayment Recovery |
| N | 4/4.15/4.15.6/4.15.6.4/Eligibility Notification |
| N | 4/4.15/4.15.6/4.15.6.5/Incentive Reward Payment |
| N | 4/4.15/4.15.6/4.15.6.6/Reward Payment Audit Trail |
| N | 4/4.15/4.15.7/CMS Incentive Reward Winframe Database |
| N | 4/4.15/4.15.8/Updating the Incentive Reward Database |
| R | 4/4.16/Discounts, Rebates, and Other Reductions in Price |
| N | 4/4.16/4.16.1/Anti-Kickback Statute Implications |
| N | 4/4.16/4.16.1/4.16.1.1/Marketing to Medicare Beneficiaries |
| N | 4/4.16/4.16.2/Cost-Based Payment (Intermediary and MAC Processing of Part A Claims): Necessary Factors for Protected Discounts |
| N | 4/4.16/4.16.3/Charge-Based Payment (MAC Processing of Part B Claims): Necessary Factors for Protected Discounts |
| N | 4/4.16/4.16.4/Risk-Based Provider Payment: Necessary Factors for Protected Discounts |
| R | 4/4.17/Participation Agreement and Limiting Charge Violations |
| D | 4/4.18/Referral of Cases to Other Entities for Action |
| D | 4/4.18/4.18.1/Referral of Cases to the OIG/OI |
| D | 4/4.18/4.18.1/4.18.1.1/Reserved for Future Use |
| D | 4/4.18/4.18.1/4.18.1.2/Immediate Advisements to the OIG/OI |
| D | 4/4.18/4.18.1/4.18.1.3/Payment Suspension |
| D | 4/4.18/4.18.1/4.18.1.3/4.18.1.3.1/Suspension |
| D | 4/4.18/4.18.1/4.18.1.3/4.18.1.3.2/Denial of Payments for Cases Referred to and Accepted by OIG/OI |
| D | 4/4.18/4.18.1/4.18.1.3/4.18.1.3.3/Recoupment of Overpayments |

| R/N/D | CHAPTER / SECTION / SUBSECTION / TITLE |
|---|---|
| D | 4/4.18/4.18.1/4.18.1.4/OIG/OI Referral and Summary Report |
| D | 4/4.18/4.18.1/4.18.1.5/Referral to Other Law Enforcement Agencies |
| D | 4/4.18/4.18.1/4.18.1.5/4.18.1.5.1/Continue to Monitor Provider and Document Case File |
| D | 4/4.18/4.18.1/4.18.1.5/4.18.1.5.2/Take Administrative Action on Cases Referred to and Declined/Returned by OIG/OI |
| D | 4/4.18/4.18.1/4.18.1.5/4.18.1.5.3/Reserved for Future Use |
| D | 4/4.18/4.18.2/Referral to State Agencies or Other Organizations |
| D | 4/4.18/4.18.3/UPICs and QIOs |
| D | 4/4.18/4.18.4/Referral of Cases to the MAC |
| D | 4/4.19/Administrative Sanctions |
| D | 4/4.19/4.19.1/Unified Program Integrity Contractor's and Medicare Administrative Contractor's Role |
| D | 4/4.19/4.19.2/Authority to Exclude Practitioners, Providers, and Suppliers of Services |
| D | 4/4.19/4.19.2/4.19.2.1/Basis for Exclusion Under &sect,1128(b)(6) of the Social Security Act |
| D | 4/4.19/4.19.2/4.19.2.2/Identification of Potential Exclusion Cases |
| D | 4/4.19/4.19.2/4.19.2.3/Development of Potential Exclusion Cases |
| D | 4/4.19/4.19.2/4.19.2.4/Contents of Sanction Recommendation |
| D | 4/4.19/4.19.2/4.19.2.5/Notice of Administrative Sanction Action |
| D | 4/4.19/4.19.2/4.19.2.5,4.19.2.5.1/Notification to Other Agencies |
| D | 4/4.19/4.19.2/4.19.2.6/Denial of Payment to an Excluded Party |
| D | 4/4.19/4.19.2/4.19.2.6/4.19.2.6.1/Denial of Payment to Employer of Excluded Physician |
| D | 4/4.19/4.19.2/4.19.2.6/4.19.2.6.2/Denial of Payment to Beneficiaries and Others |
| D | 4/4.19/4.19.3/Appeals Process |
| D | 4/4.19/4.19.4/Reinstatements |
| D | 4/4.19/4.19.4/4.19.4.1/Monthly Notification of Sanction Actions |
| D | 4/4.20/Civil Monetary Penalties |
| D | 4/4.20/4.20.1/Background |

| R/N/D | CHAPTER / SECTION / SUBSECTION / TITLE |
|---|---|
| D | 4/4.20/4.20.1/4.20.1.1/Basis of Authority |
| D | 4/4.20/4.20.1/4.20.1.2/Purpose |
| D | 4/4.20/4.20.1/4.20.1.3/Enforcement |
| D | 4/4.20/4.20.1/4.20.1.4/Administrative Actions |
| D | 4/4.20/4.20.1/4.20.1.5/Documents |
| D | 4/4.20/4.20.2/Civil Monetary Penalty Authorities |
| D | 4/4.20/4.20.2/4.20.2.1/Civil Monetary Penalties Delegated to CMS |
| D | 4/4.20/4.20.2/4.20.2.2/Civil Monetary Penalties Delegated to OIG |
| D | 4/4.20/4.20.3/Referral Process |
| D | 4/4.20/4.20.3/4.20.3.1/Referral Process to CMS |
| D | 4/4.20/4.20.3/4.20.3.2/Referrals to OIG |
| D | 4.20.4/CMS Generic Civil Monetary Penalty Case Contents |
| D | 4/4.20/4.20.5/Additional Guidance for Specific Civil Monetary Penalties |
| D | 4/4.20/4.20.5/4.20.5.1/Beneficiary Right to Itemized Statement |
| D | 4/4.20/4.20.5/4.20.5.2/Medicare Limiting Charge Violations |
| D | 4/4.21/Monitor Compliance |
| D | 4/4.21/4.21.1/Resumption of Payment to a Provider - Continued Surveillance After Detection of Fraud |
| D | 4/4.22/Discounts, Rebates, and Other Reductions in Price |
| D | 4/4.22/4.22.1/Anti-Kickback Statute Implications |
| D | 4/4.22/4.22.1/4.22.1.1/Marketing to Medicare Beneficiaries |
| D | 4/4.22/4.22.2/Cost-Based Payment (Intermediary and MAC Processing of Part A Claims): Necessary Factors for Protected Discounts |
| D | 4/4.22/4.22.3/Charge-Based Payment (MAC Processing of Part B Claims): Necessary Factors for Protected Discounts |
| D | 4/4.22/4.22.4/Risk-Based Provider Payment: Necessary Factors for Protected Discounts |
| D | 4/4.23/Identity Theft – Investigations and Victimized Provider Waiver of Liability Process |
| D | 4/4.24/Reserved for Future Use |
| D | 4/4.25/Participation Agreement and Limiting Charge Violations |

| R/N/D | CHAPTER / SECTION / SUBSECTION / TITLE |
|---|---|
| D | 4/4.26/Supplier Proof of Delivery Documentation Requirements |
| D | 4/4.26/4.26.1/Proof of Delivery and Delivery Methods |
| D | 4/4.26/4.26.2/Exceptions |
| D | 4/4.26/4.26.3/Proof of Delivery Requirements for Recently Eligible Medicare FFS Beneficiaries |
| D | 4/4.27/Reserved for Future Use |
| D | 4/4.28/Joint Operating Agreement |
| D | 4/4.29/Reserved for Future Use |
| D | 4/4.30/Reserved for Future Use |
| D | 4/4.31/Vulnerabilities |
| D | 4/4.32/Reserved for Future Use |
| D | 4/4.33/UPIC Coordination with Other Contractors (RAC) Related to the RAC Data Warehouse |
| D | 4/4.34/Suppression and/or Exclusion – Examples |
| R | 5/5.10/Supplier Documentation |
| R | 8/8.2/Overpayment Procedures |
| R | 8/8.3/Suspension of Payment |
| R | 8/8.3/8.3.1/8.3.1.1/Credible Allegation of Fraud Exists Against a Provider - Fraud Suspensions |
| R | 8/8.3/8.3.1/8.3.1.2/Reliable Information that an Overpayment Exists - General Suspensions |
| R | 8/8.3/8.3.2/8.3.2.1/CMS Approval |
| R | 8/8.3/8.3.2/8.3.2.2/8.3.2.2.4/Mailing the Notice to the Provider |
| R | 8/8.3/8.3.2/8.3.2.2/8.3.2.2.5/Opportunity for Rebuttal |
| R | 8/8.3/8.3.2/8.3.2.3/8.3.2.3.2/Case Development – Program Integrity |
| R | 8/8.3/8.3.2/8.3.2.4/Duration of the Payment Suspension |
| R | 8/8.3/8.3.2/8.3.2.5/Terminating the Payment Suspension |
| R | 9/9.4/ Inputting Suppression and Exclusion Cases to the RACDW |
| R | 9/9.12/Voluntary Refund |

**III. FUNDING:**
**For Medicare Administrative Contractors (MACs):**

The Medicare Administrative Contractor is hereby advised that this constitutes technical direction as defined in your contract. CMS does not construe this as a change to the MAC Statement of Work. The contractor is not obligated to incur costs in excess of the amounts allotted in your contract unless and until specifically authorized by the Contracting Officer. If the contractor considers anything provided, as described above, to be outside the current scope of work, the contractor shall withhold performance on the part(s) in question and immediately notify the Contracting Officer, in writing or by e-mail, and request formal directions regarding continued performance requirements.

**IV. ATTACHMENTS:**

**Business Requirements**
**Manual Instruction**

# Attachment - Business Requirements

| Pub. 100-08 | Transmittal: 11032 | Date: September 30, 2021 | Change Request: 12375 |
|---|---|---|---|

**Transmittal 10984, dated September 9, 2021, is being rescinded and replaced by Transmittal 11032, dated September 30, 2021 to revise section 4.3.2.3, Chapter 4 of Pub. 100-08. All other information remains the same.**

**SUBJECT: Updates to Chapters 1, 3, 4, 5, 8 and 9 of Publication (Pub.) 100-08**

**EFFECTIVE DATE: October 12, 2021**
**Unless otherwise specified, the effective date is the date of service.*
**IMPLEMENTATION DATE: November 10, 2021**

## I. GENERAL INFORMATION

**A. Background:** The CMS will make revisions to Chapters 1, 3, 4, 5, 8 and 9 of Pub. 100-08 based on updates to the Unified Program Integrity Contractor (UPIC) and Investigations Medicare Drug Integrity Contractor processes.

**B. Policy:** This CR does not involve any legislative or regulatory policies.

## II. BUSINESS REQUIREMENTS TABLE

*"Shall" denotes a mandatory requirement, and "should" denotes an optional requirement.*

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| 12375.1 | Potential quality of care issues shall be the responsibiltiy of the the Quality Improvement Organizations (QIO), State licensing/survey and certification agency, or other appropriate entity in the service area, not the responsibility of the MAC, Comprehensive Error Rate Testing (CERT) or Recovery Auditor, UPIC, and | X | X | X | X | | | | | CERT, QIO, RAC, SMRC, UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | Supplemental Medical Review Contractor (SMRC). | | | | | | | | | |
| 12375.1.1 | MACs, CERT, Recovery Auditor, UPICs, and SMRC shall refer quality of care issues to the QIO, State licensing/survey and certification agency, or other appropriate entity in the service area. | X | X | X | X | | | | | CERT, QIO, RAC, SMRC, UPICs |
| 12375.1.2 | Contractors shall see section 4.9.4.2 in chapter 4 of Pub. 100-08 for a discussion on benefit integrity interaction with QIOs. | | | | | | | | | CERT, QIO, RAC, SMRC, UPICs |
| 12375.2 | The MACs shall follow section 4.2.2.8.1.3 in chapter 4 of Pub. 100-08 handling any voluntary refunds that may result from provider self-audits. | X | X | X | X | | | | | |
| 12375.3 | MACs, UPICs, SMRC, and CERT shall disregard the order during the review of the claim (e.g., the reviewer will proceed as if the order was not received) if the | X | X | X | X | | | | | CERT, SMRC, UPICs |

| **Number** | **Requirement** | **Responsibility** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | signature is missing from an order. | | | | | | | | | |
| 12375.4 | MACs, UPICs, SMRC, and CERT shall accept a signature attestation from the author of the medical record entry if the signature is missing from any other medical documentation (other than an order). | X | X | X | X | | | | | CERT, SMRC, UPICs |
| 12375.5 | Contractors shall follow the guidance in section 4.2.2.1 in Chapter 4 of Pub. 100-08 of which was originally referenced in section 4.2.2 in Chapter 4 of Pub. 100-08. | | | | | | | | | UPICs |
| 12375.6 | Contractors shall follow the guidance in section 4.2.2.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.2.4 in Chapter 4. | | | | | | | | | UPICs |
| 12375.7 | Contractors shall follow the guidance in section 4.2.2.3 in Chapter 4 of Pub. 100-08 which was originally referenced in | X | X | X | X | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | section 4.2.2.1 in Chapter 4. | | | | | | | | | |
| 12375.8 | Contractors shall follow the guidance in section 4.2.2.4 in Chapter 4 of Pub 100-08 of which was originally referenced in section 4.2.2.2 in Chapter 4. | | | | | | | | | UPICs |
| 12375.9 | Contractors shall follow the guidance in section 4.2.2.5 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.2.2.3 in Chapter 4. | | | | | | | | | UPICs |
| 12375.10 | Contractors shall follow the guidance in section 4.2.2.5.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.2.2.3.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.11 | Contractors shall follow the guidance in section 4.2.2.6 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.2.2.4 in Chapter 4. | X | X | X | X | | | | | UPICs |
| 12375.12 | Contractors shall follow the guidance | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | in section 4.2.2.6.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.2.2.4.1 in Chapter 4. | | | | | | | | | |
| 12375.13 | Contractors shall follow the guidance in section 4.2.2.6.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.2.2.4.2 in Chapter 4. | | | | | | | | | UPICs |
| 12375.14 | Contractors shall follow the guidance in section 4.2.2.7 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.2.2.6 in Chapter 4. | | | | | | | | | UPICs |
| 12375.15 | Contractors shall follow the guidance in section 4.2.2.8.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.4.2.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.16 | Contractors shall follow the guidance in section 4.2.2.8.1.1 in Chapter 4 of Pub. 100-08 which was originally | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | referenced in section 4.4.3 in Chapter 4. | | | | | | | | | |
| 12375.17 | Contractors shall follow the guidance in section 4.2.2.8.1.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.28 in Chapter 4. | X | X | X | X | | | | | QIC, RAC, UPICs |
| 12375.18 | Contractors shall follow the guidance in section 4.2.2.8.1.3 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.16 in Chapter 4. | X | X | X | X | | | | | UPICs |
| 12375.19 | Contractors shall follow the guidance in section 4.2.2.8.1.4 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.33 in Chapter 4. | X | X | X | X | | | | | CERT, RAC, RAC Data Warehouse, UPICs |
| 12375.20 | Contractors shall follow the guidance in section 4.2.2.8.1.4.1 in Chapter 4 of Pub. 100-08 which was originally referenced in | | | | | | | | | RAC, UPICs |

| **Number** | **Requirement** | **Responsibility** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | section 4.34 in Chapter 4. | | | | | | | | | |
| 12375.21 | Contractors shall follow the guidance in section 4.3.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.6.1 in Chapter 4. | X | X | X | X | | | | | UPICs |
| 12375.22 | Contractors shall follow the guidance in section 4.3.2.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.6.2.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.23 | Contractors shall follow the guidance in section 4.3.2.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.6.2.2 in Chapter 4. | | | | | | | | | UPICs |
| 12375.24 | Contractors shall follow the guidance in section 4.3.2.3 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.6.2.3 in Chapter 4. | X | X | X | X | | | | | UPICs |
| 12375.25 | Contractors shall follow the guidance | X | X | X | X | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | in section 4.3.2.4 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.6.2.4 in Chapter 4. | | | | | | | | | |
| 12375.26 | Contractors shall follow the guidance in section 4.4 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5 in Chapter 4. | | | X | | | | | | UPICs |
| 12375.27 | Contractors shall follow the guidance in section 4.4.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5.1 in Chapter 4. | | | X | | | | | | UPICs |
| 12375.28 | Contractors shall follow the guidance in section 4.4.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5.2 in Chapter 4. | | | X | | | | | | UPICs |
| 12375.29 | Contractors shall follow the guidance in section 4.4.3 in Chapter 4 of Pub. 100-08 which was originally referenced in | | | X | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | section 4.5.3 in Chapter 4. | | | | | | | | | |
| 12375.30 | Contractors shall follow the guidance in section 4.4.3.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5.3.1 in Chapter 4. | | | X | | | | | | UPICs |
| 12375.31 | Contractors shall follow the guidance in section 4.4.3.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5.3.2 in Chapter 4. | | | X | | | | | | UPICs |
| 12375.32 | Contractors shall follow the guidance in section 4.4.3.3 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5.3.3 in Chapter 4. | | | X | | | | | | UPICs |
| 12375.33 | Contractors shall follow the guidance in section 4.4.3.4 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5.3.4 in Chapter 4. | | | X | | | | | | UPICs |
| 12375.34 | Contractors shall follow the guidance | | | X | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | in section 4.4.4 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5.4 in Chapter 4. | | | | | | | | | |
| 12375.35 | Contractors shall follow the guidance in section 4.4.4.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5.4.1 in Chapter 4. | | | X | | | | | | UPICs |
| 12375.36 | Contractors shall follow the guidance in section 4.4.4.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5.4.2 in Chapter 4. | | | X | | | | | | UPICs |
| 12375.37 | Contractors shall follow the guidance in section 4.4.4.3 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5.4.3 in Chapter 4. | | | X | | | | | | UPICs |
| 12375.38 | Contractors shall follow the guidance in section 4.4.4.3.1 in Chapter 4 of Pub. 100-08 which was originally referenced in | | | X | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | section 4.5.4.3.1 in Chapter 4. | | | | | | | | | |
| 12375.39 | Contractors shall follow the guidance in section 4.4.4.3.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5.4.3.2 in Chapter 4. | | | X | | | | | | UPICs |
| 12375.40 | Contractors shall follow the guidance in section 4.4.5 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.5.5 in Chapter 4. | | | X | | | | | | UPICs |
| 12375.41 | Contractors shall follow the guidance in section 4.5 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.6.3 in Chapter 4. | | | | | | | | | UPICs |
| 12375.42 | Contractors shall follow the guidance in section 4.5.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.6.2.5 in Chapter 4. | | | | | | | | | UPICs |
| 12375.43 | Contractors shall follow the guidance | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | in section 4.6 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.6.4 in Chapter 4. | | | | | | | | | |
| 12375.44 | The UPIC shall submit any investigative activities that require preapproval by CMS (i.e., activities referenced in section 4.7.1.2). | | | | | | | | | UPICs |
| 12375.45 | The UPIC shall use screening activities as referenced in section 4.5 as an investigative method. | | | | | | | | | UPICs |
| 12375.46 | The UPIC shall use recommendations of other administrative actions (as defined in Pub. 100-08 chapters 3, 8, and 10) to CMS as an investigative method. | | | | | | | | | UPICs |
| 12375.47 | Contractors shall follow the guidance in section 4.7.1.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.14 in Chapter 4. | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| 12375.48 | Contractors shall follow the guidance in section 4.7.1.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.15 in Chapter 4. | | | | | | | | | UPICs |
| 12375.49 | Contractors shall follow the guidance in section 4.7.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.23 in Chapter 4. | | | | | | | | | UPICs |
| 12375.50 | Contractors shall follow the guidance in section 4.7.3 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.2.3 in Chapter 4. | | | | | | | | | UPICs |
| 12375.51 | Contractors shall follow the guidance in section 4.7.3.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.26 in Chapter 4. | | | | X | | | | | CERT, RAC, SMRC, UPICs |
| 12375.52 | Contractors shall follow the guidance in section 4.7.3.1.1 in Chapter 4 of Pub. 100-08 which was | | | | X | | | | | CERT, RAC, SMRC, UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | originally referenced in section 4.26.1 in Chapter 4. | | | | | | | | | |
| 12375.53 | Contractors shall follow the guidance in section 4.7.3.1.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.26.2 in Chapter 4. | | | | X | | | | | CERT, RAC, SMRC, UPICs |
| 12375.54 | Contractors shall follow the guidance in section 4.7.3.1.3 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.26.3 in Chapter 4. | | | | X | | | | | CERT, RAC, SMRC, UPICs |
| 12375.55 | Contractors shall follow the guidance in section 4.7.4 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.3 in Chapter 4. | | | | | | | | | UPICs |
| 12375.56 | Contractors shall follow the guidance in section 4.7.4.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.8.2 in Chapter 4. | | | | | | | | | UPICs |

| **Number** | **Requirement** | **Responsibility** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| 12375.57 | Contractors shall follow the guidance in section 4.7.4.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.8.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.58 | Contractors shall follow the guidance in section 4.7.5 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.13 in Chapter 4. | | | | | | | | | UPICs |
| 12375.59 | Contractors shall follow the guidance in section 4.7.6 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.17 in Chapter 4. | | | | | | | | | UPICs |
| 12375.60 | Contractors shall follow the guidance in section 4.7.7 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.7.2 in Chapter 4. | | | | | | | | | UPICs |
| 12375.61 | Contractors shall follow the guidance in section 4.7.7.1 in Chapter 4 of Pub. 100-08 which was | | | | | | | | | UPICs |

| **Number** | **Requirement** | **Responsibility** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | originally referenced in section 4.21 in Chapter 4. | | | | | | | | | |
| 12375.62 | Contractors shall follow the guidance in section 4.7.7.1.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.21.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.63 | Contractors shall follow the guidance in section 4.8 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.4.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.64 | Contractors shall follow the guidance in section 4.9 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.8 in Chapter 4. | | | | | | | | | UPICs |
| 12375.65 | Contractors shall follow the guidance in section 4.9.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.18.1.2 in Chapter 4. | | | | | | | | | UPICs |

| **Number** | **Requirement** | **Responsibility** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| 12375.66 | Contractors shall follow the guidance in section 4.9.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.18.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.67 | Contractors shall follow the guidance in section 4.9.2.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.18.1.4 in Chapter 4. | | | | | | | | | UPICs |
| 12375.68 | Contractors shall follow the guidance in section 4.9.2.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.18.1.5.2 in Chapter 4. | | | | | | | | | UPICs |
| 12375.69 | Contractors shall follow the guidance in section 4.9.2.3 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.18.1.5.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.70 | Contractors shall follow the guidance in section 4.9.3 in Chapter 4 of Pub. 100-08 which was | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | originally referenced in section 4.18.1.5 in Chapter 4. | | | | | | | | | |
| 12375.71 | Contractors shall follow the guidance in section 4.9.4.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.18.2 in Chapter 4. | | | | | | | | | UPICs |
| 12375.72 | Contractors shall follow the guidance in section 4.9.4.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.18.3 in Chapter 4. | | | | | | | | | UPICs |
| 12375.73 | Contractors shall follow the guidance in section 4.9.4.3 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.18.4 in Chapter 4. | | | | | | | | | UPICs |
| 12375.74 | Contractors shall follow the guidance in section 4.10 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| 12375.75 | Contractors shall follow the guidance in section 4.10.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19.1 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.76 | Contractors shall follow the guidance in section 4.10.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19.2 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.77 | Contractors shall follow the guidance in section 4.10.2.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19.2.1 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.78 | Contractors shall follow the guidance in section 4.10.2.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19.2.2 in Chapter 4. | | | | | | | | | UPICs |
| 12375.79 | Contractors shall follow the guidance in section 4.10.2.3 in Chapter 4 of Pub. 100-08 which was | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | originally referenced in section 4.19.2.4 in Chapter 4. | | | | | | | | | |
| 12375.80 | Contractors shall follow the guidance in section 4.10.2.4 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19.2.5 in Chapter 4. | | | | | | | | | UPICs |
| 12375.81 | Contractors shall follow the guidance in section 4.10.2.4.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19.2.5.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.82 | Contractors shall follow the guidance in section 4.10.2.5 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19.2.6 in Chapter 4. | X | X | X | X | | | | | UPICs |
| 12375.83 | Contractors shall follow the guidance in section 4.10.2.5.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19.2.6.1 in Chapter 4. | X | X | X | X | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| 12375.84 | Contractors shall follow the guidance in section 4.10.2.5.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19.2.6.2 in Chapter 4. | X | X | X | X | | | | | UPICs |
| 12375.85 | Contractors shall follow the guidance in section 4.10.3 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19.3 in Chapter 4. | | | | | | | | | UPICs |
| 12375.86 | Contractors shall follow the guidance in section 4.10.4 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19.4 in Chapter 4. | X | X | X | X | | | | | UPICs |
| 12375.87 | Contractors shall follow the guidance in section 4.10.4.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.19.4.1 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.88 | Contractors shall follow the guidance in section 4.11.1 in Chapter 4 of Pub. 100-08 which was | X | X | X | X | | | | | SMRC, UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | originally referenced in section 4.20.1.1 in Chapter 4. | | | | | | | | | |
| 12375.89 | Contractors shall follow the guidance in section 4.11.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.20.1.2 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.90 | Contractors shall follow the guidance in section 4.11.3 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.20.1.3 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.91 | Contractors shall follow the guidance in section 4.11.4 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.20.1.5 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.92 | Contractors shall follow the guidance in section 4.11.5 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.20.2 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| 12375.93 | Contractors shall follow the guidance in section 4.11.5.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.20.2.1 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.94 | Contractors shall follow the guidance in section 4.11.5.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.20.2.2 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.95 | Contractors shall follow the guidance in section 4.11.6.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.20.3.1 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.96 | Contractors shall follow the guidance in section 4.11.6.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.20.3.2 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.97 | Contractors shall follow the guidance in section 4.11.7 in Chapter 4 of Pub. 100-08 which was | X | X | X | X | | | | | SMRC, UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | originally referenced in section 4.20.4 in Chapter 4. | | | | | | | | | |
| 12375.98 | Contractors shall follow the guidance in section 4.11.8.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.20.5.1 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.99 | Contractors shall follow the guidance in section 4.11.8.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.20.5.2 in Chapter 4. | X | X | X | X | | | | | SMRC, UPICs |
| 12375.100 | The UPIC shall screen all leads in accordance with the Medicare PIM guidelines at Chapter 4, Section 4.5 – Screening Leads, unless otherwise directed by CMS. | | | | | | | | | UPICs |
| 12375.101 | The UPIC shall take all appropriate administrative actions, as defined in Pub. 100-08 Chapters 3, 8, and/or 10. | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| 12375.102 | The UPIC shall notify the Office of Inspector General (OIG)/Office of Investigations (OI) by phone or email to determine if a formal Immediate Advisement should be sent to the OIG/OI when criteria for an Immediate Advisement to the OIG/OI is met based on the criteria referenced in section 4.9.1 in Chapter 4 of the Pub. 100.08. | | | | | | | | | UPICs |
| 12375.103 | Contractors shall follow the guidance in section 4.13 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.31 in Chapter 4. | | | | | | | | | SMRC, UPICs |
| 12375.104 | Contractors shall follow the guidance in section 4.14 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.10 in Chapter 4. | | | | | | | | | UPICs |
| 12375.105 | Contractors shall follow the guidance in section 4.15 in Chapter 4 of Pub. | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | 100-08 which was originally referenced in section 4.9 in Chapter 4. | | | | | | | | | |
| 12375.106 | Contractors shall follow the guidance in section 4.15.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.107 | Contractors shall follow the guidance in section 4.15.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.2 in Chapter 4. | | | | | | | | | UPICs |
| 12375.108 | Contractors shall follow the guidance in section 4.15.3 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.3 in Chapter 4. | | | | | | | | | UPICs |
| 12375.109 | Contractors shall follow the guidance in section 4.15.4 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.4 in | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | Chapter 4. | | | | | | | | | |
| 12375.110 | Contractors shall follow the guidance in section 4.15.5 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.5 in Chapter 4. | | | | | | | | | UPICs |
| 12375.111 | Contractors shall follow the guidance in section 4.15.6 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.6 in Chapter 4. | | | | | | | | | UPICs |
| 12375.112 | Contractors shall follow the guidance in section 4.15.6.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.6.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.113 | Contractors shall follow the guidance in section 4.15.6.2 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.6.2 in Chapter 4. | | | | | | | | | UPICs |
| 12375.114 | Contractors shall follow the guidance in section 4.15.6.3 | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.6.3 in Chapter 4. | | | | | | | | | |
| 12375.115 | Contractors shall follow the guidance in section 4.15.6.4 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.6.4 in Chapter 4. | | | | | | | | | UPICs |
| 12375.116 | Contractors shall follow the guidance in section 4.15.6.5 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.6.5 in Chapter 4. | | | | | | | | | UPICs |
| 12375.117 | Contractors shall follow the guidance in section 4.15.6.6 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.6.6 in Chapter 4. | | | | | | | | | UPICs |
| 12375.118 | Contractors shall follow the guidance in section 4.15.7 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.7 in | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | Chapter 4. | | | | | | | | | |
| 12375.119 | Contractors shall follow the guidance in section 4.15.8 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.9.8 in Chapter 4. | | | | | | | | | UPICs |
| 12375.120 | Contractors shall follow the guidance in section 4.16 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.22 in Chapter 4. | | | | | | | | | UPICs |
| 12375.121 | Contractors shall follow the guidance in section 4.16.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.22.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.122 | Contractors shall follow the guidance in section 4.16.1.1 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.22.1.1 in Chapter 4. | | | | | | | | | UPICs |
| 12375.123 | Contractors shall follow the guidance in section 4.16.2 in | X | X | X | X | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | Chapter 4 of Pub. 100-08 which was originally referenced in section 4.22.2 in Chapter 4. | | | | | | | | | |
| 12375.124 | Contractors shall follow the guidance in section 4.16.3 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.22.3 in Chapter 4. | X | X | X | X | | | | | UPICs |
| 12375.125 | Contractors shall follow the guidance in section 4.16.4 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.22.4 in Chapter 4. | | | | | | | | | UPICs |
| 12375.126 | Contractors shall follow the guidance in section 4.17 in Chapter 4 of Pub. 100-08 which was originally referenced in section 4.25 in Chapter 4. | | | | | | | | | UPICs |
| 12375.127 | Contractors shall refer to Internet Only Manual, Pub. 100-08, section 4.7.3.1 in chapter 4 for additional information regarding all proof | | | | X | | | | | CERT, RAC, SMRC, UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | of delivery requirements. | | | | | | | | | |
| 12375.128 | The UPIC shall refrain from referring the overpayment determination to the MAC during specified times as noted in section 4.9.4 in chapter 4 in Pub. 100-08, when making a referral to law enforcement. | | | | | | | | | UPICs |
| 12375.129 | The UPIC shall refer all payment suspensions to the CMS/Center for Program Integrity (CPI) via the Unified Case Management System (UCM) for approval. | | | | | | | | | UPICs |
| 12375.129.1 | The UPIC shall notify their appropriate CPI Contracting Officer's Representative/Business Function Lead (BFL) of the submission by providing the UCM number via email. | | | | | | | | | UPICs |
| 12375.130 | The UPIC shall submit the payment suspension request via the UCM if the contractor determines such | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | action is warranted after informing the BFL about the suspension. | | | | | | | | | |
| 12375.130.1 | The UPIC shall upload the Payment Suspension Administrative Action Request, draft suspension notice, and all other relevant documentation that supports the suspension request as part of the UCM submission. | | | | | | | | | UPICs |
| 12375.130.2 | The UPIC shall prepare and submit, if appropriate, a payment suspension referral package to CPI via the UCM for all requests received from (but not limited to) the OIG, Federal Bureau of Investigation, Assistant United States Attorney, and other law enforcement agencies. | | | | | | | | | UPICs |
| 12375.131 | The UPIC shall submit requests to CPI via the UCM within 14 calendar days before the suspension expires for all fraud | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | suspensions. | | | | | | | | | |
| 12375.132 | The UPIC shall refer a payment suspension to CPI via the UCM for consideration when reliable information that an overpayment exists. | | | | | | | | | UPICs |
| 12375.133 | The UPIC shall enter all money on the payment floor in the UCM as the first monetary entry. | | | | | | | | | UPICs |
| 12375.134 | The UPIC shall upload the signed copies of all notices released to the provider into the UCM. | | | | | | | | | UPICs |
| 12375.135 | The UPIC shall forward the provider's rebuttal statement and any pertinent information to CPI via the UCM within 1 business day of receipt. | | | | | | | | | UPICs |
| 12375.136 | The UPIC shall evaluate the information presented and then draft a response addressing each item mentioned in the rebuttal and submit it to CPI for approval via the | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | UCM no later than 10 calendar days from receipt. | | | | | | | | | |
| 12375.137 | The UPIC shall enter all payment suspensions into the UCM. | | | | | | | | | UPICs |
| 12375.137.1 | The UPIC shall refelct the money withheld on day one of the payment suspension in the first monetary entry of money withheld in the UCM. | | | | | | | | | UPICs |
| 12375.138 | The UPIC shall prepare a "draft extension notice" (in accordance with section 8.3.2.2 in chapter 8 of Pub. 100-08) and submit it via the UCM, along with any other supportive information, to CPI for approval at least 14 calendar days before the payment suspension is set to expire. | | | | | | | | | UPICs |
| 12375.138.1 | The UPIC shall provide a copy of the signed notice to CPI via the UCM upon approval of the notice from CPI. | | | | | | | | | UPICs |
| 12375.139 | The UPIC shall provide a request | | | | | | | | | UPICs |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | for payment suspension termination via the UCM at least 14 calendar days prior to the anticipated payment suspension expiration date. | | | | | | | | | |
| 12375.140 | The UPIC shall provide a copy of the signed payment suspension notice via the UCM to CPI upon approval of the termination notice by CPI. | | | | | | | | | UPICs |
| 12375.141 | Contractors shall refer to section 3.5.2 in chapter 3 of Pub. 100-08 and section 4.7.4 in chapter 4 of Pub. 100-08 for direction regarding suppression or exclusion of an entire provider. | X | X | X | X | | | | | CERT, SMRC, UPICs |
| 12375.142 | Contractors shall process the refund as they do all other voluntary refunds (i.e., in accordance with the section 4.2.2.8.1.3 in chapter 4 of Pub. 100-08) if they receive a voluntary refund from a provider on a claim in the Recovery Audit Contractor | X | X | X | X | | | | | |

| Number | Requirement | Responsibility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | Shared-System Maintainers | | | | Other |
| | | A | B | HHH | | FISS | MCS | VMS | CWF | |
| | Data Warehouse. | | | | | | | | | |

## III. PROVIDER EDUCATION TABLE

| Number | Requirement | Responsibility | | | | |
|---|---|---|---|---|---|---|
| | | A/B MAC | | | DME MAC | CEDI |
| | | A | B | HHH | | |
| | None | | | | | |

## IV. SUPPORTING INFORMATION

**Section A: Recommendations and supporting information associated with listed requirements:** N/A

*"Should" denotes a recommendation.*

| X-Ref Requirement Number | Recommendations or other supporting information: |
|---|---|

**Section B: All other recommendations and supporting information:** N/A

## V. CONTACTS

**Pre-Implementation Contact(s):** Jesse Havens, 410-786-6566 or jesse.havens@cms.hhs.gov

**Post-Implementation Contact(s):** Contact your Contracting Officer's Representative (COR).

## VI. FUNDING

**Section A: For Medicare Administrative Contractors (MACs):**
The Medicare Administrative Contractor is hereby advised that this constitutes technical direction as defined in your contract. CMS does not construe this as a change to the MAC Statement of Work. The contractor is not obligated to incur costs in excess of the amounts allotted in your contract unless and until specifically authorized by the Contracting Officer. If the contractor considers anything provided, as described above, to be outside the current scope of work, the contractor shall withhold performance on the part(s) in question and immediately

notify the Contracting Officer, in writing or by e-mail, and request formal directions regarding continued performance requirements.

**ATTACHMENTS: 0**

# Medicare Program Integrity Manual

## Chapter 1 - Medicare Improper Payments: Measuring, Correcting, and Preventing Overpayments and Underpayments

### Table of Contents

***(Rev. 11032; Issued: 09-30-21)***

## 1.3.6 - Quality of Care Issues and Potential Fraud Issues

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

Potential quality of care issues are not the responsibility of the MAC, CERT or Recovery Auditor, *UPIC*, and SMRC but they are the responsibility of the QIO, State licensing/survey and certification agency, or other appropriate entity in the service area. MACs, CERT, Recovery Auditor, *UPICs* and SMRC shall refer quality of care issues to the QIO, State licensing/survey and certification agency, or other appropriate entity in the service area. See chapter 3, section 3.1, for a discussion of how contractors should handle situations where providers are non-compliant with Medicare conditions of participation.

Contractors shall analyze provider compliance with Medicare coverage and coding rules and take appropriate corrective action when providers are found to be non-compliant. For repeated infractions, or infractions showing potential fraud or pattern of abuse, more severe administrative action shall be initiated. At any time, evidence of fraud shall result in referral to the *UPICs* for development. See chapter 4, section *4.9.4.2* for a discussion on benefit integrity interaction with QIOs.

## 1.3.9 – Provider Self Audits

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

Providers may conduct self-audits to identify coverage and coding errors. The Office of Inspector General (OIG) Compliance Program Guidelines can be found at https://oig.hhs.gov/compliance/compliance-guidance/index.asp and the statistical guidelines in https://oig.hhs.gov/authorities/docs/selfdisclosure.pdf (if statistical sampling is utilized during the audit). The MACs shall follow chapter 4, section *4.2.2.8.1.3*, handling any voluntary refunds that may result from these provider self-audits.

Most errors do not represent fraud. Most errors are not acts that were committed knowingly, willfully, and intentionally. However, in situations where a provider has repeatedly submitted claims in error, the MACs shall follow the procedures listed in chapter 3, section 3.2.1. For example, some errors will be the result of provider misunderstanding or failure to pay adequate attention to Medicare policy. Other errors will represent calculated plans to knowingly acquire unwarranted payment. Per chapter 4, section 4.2.1, MACs shall take action commensurate with errors made. The MACs shall evaluate the circumstances surrounding the errors and proceed with the appropriate plan of correction.

# Medicare Program Integrity Manual Chapter 3 - Verifying Potential Errors and Taking Corrective Actions

## Table of Contents

***(Rev. 11032; Issued: 09-30-21)***

### 3.3.2.4 - Signature Requirements
*(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)*

This section is applicable for Medicare Administrative Contractors (MACs), Unified Program Integrity Contractors (UPICs), Supplemental Medical Review Contractors (SMRCs), Comprehensive Error Rate Testing (CERT), and Recovery Audit Contractor (RACs), as indicated.

For medical review purposes, Medicare requires that services provided/ordered/certified be authenticated by the persons responsible for the care of the beneficiary in accordance with Medicare's policies. For example, if the physician's authenticated documentation corroborates the nurse's unsigned note, and the physician was the responsible party per Medicare's payment policy, medical reviewers would consider signature requirements to have been met. The method used shall be a handwritten or electronic signature. Stamped signatures are not acceptable.

NOTE: Scribes are not providers of items or services. When a scribe is used by a provider in documenting medical record entries (e.g. progress notes), CMS does not require the scribe to sign/date the documentation. The treating physician's/non-physician practitioner's (NPP's) signature on a note indicates that the physician/NPP affirms the note adequately documents the care provided. Reviewers are only required to look for the signature (and date) of the treating physician/non-physician practitioner on the note.

Reviewers shall not deny claims for items or services because a scribe has not signed/dated a note.

EXCEPTION 1: Facsimiles of original written or electronic signatures are acceptable for the certifications of terminal illness for hospice.

EXCEPTION 2: There are some circumstances for which an order does not need to be signed. For example, orders for some clinical diagnostic tests are not required to be signed. The rules in 42 CFR 410 and Pub.100-02 chapter 15, *Section* 80.6.1 state that if the order for the clinical diagnostic test is unsigned, there must be medical documentation (e.g., a progress note) by the treating physician that he/she intended the clinical diagnostic test be performed. This documentation showing the intent that the test be performed must be authenticated by the author via a handwritten or electronic signature.

EXCEPTION 3: Other regulations and the CMS' instructions regarding conditions of payment related to signatures (such as timeliness standards for particular benefits) take precedence. For medical review purposes, if the relevant regulation, NCD, LCD and CMS manuals are silent on whether the signature needs to be legible or present and the signature is illegible/missing, the reviewer shall follow the guidelines listed below to discern the identity and credentials (e.g., MD, RN, etc.) of the signator. In cases where the relevant regulation, NCD, LCD and CMS manuals have specific signature requirements, those signature requirements take precedence.

EXCEPTION 4: CMS would permit use of a rubber stamp for signature in accordance with the Rehabilitation Act of 1973 in the case of an author with a physical disability that can provide proof to a CMS contractor of his/her inability to sign their signature due to their disability. By affixing the rubber stamp, the provider is certifying that they have reviewed the document.

**NOTE:** Conditions of participation (COP) are not conditions of payment.

If MAC and CERT reviewers find reasons for denial unrelated to signature requirements, the reviewer need not proceed to signature authentication. If the criteria in the relevant Medicare policy cannot be met but for a key piece of medical documentation that contains a missing or illegible signature, the reviewer shall proceed to the signature assessment.

Providers should not add late signatures to the medical record, (beyond the short delay that occurs during the transcription process) but instead should make use of the signature authentication process. The signature authentication process described below should also be used for illegible signatures.

### A. Handwritten Signature

A handwritten signature is a mark or sign by an individual on a document signifying knowledge, approval, acceptance or obligation.

- If the signature is illegible, MACs, UPICs, SMRC, and CERT shall consider evidence in a signature log, attestation statement, or other documentation submitted to determine the identity of the author of a medical record entry.

- If the signature is missing from an order, MACs, *UPICs,* SMRC, and CERT **shall disregard the order** during the review of the claim (e.g., the reviewer will proceed as if the order was not received).

- If the signature is missing from any other medical documentation (other than an order), MACs, *UPICs,* SMRC, and CERT shall accept a signature attestation from the author of the medical record entry.

### B. Signature Log

Providers will sometimes include a signature log in the documentation they submit that lists the typed or printed name of the author associated with initials or illegible signature. The signature log might be included on the actual page where the initials or illegible signature are used or might be a separate document. Reviewers should encourage providers to list their credentials in the log. However, reviewers shall not deny a claim for a signature log that is missing credentials. Reviewers shall consider all submitted signature logs regardless of the date they were created. Reviewers are encouraged to file signature logs in an easily accessible manner to minimize the cost of future reviews where the signature log may be needed again.

### C. Signature Attestation Statement

Providers will sometimes include an attestation statement in the documentation they submit. In order to be considered valid for Medicare medical review purposes, an attestation statement must be signed and dated by the author of the medical record entry and must contain sufficient information to identify the beneficiary.

Should a provider choose to submit an attestation statement, they may choose to use the following statement:

“I, [print full name of the physician/practitioner], hereby attest that the medical record entry for _[date of service] accurately reflects signatures/notations that I made in my capacity as [insert provider credentials, e.g., M.D.] when I treated/diagnosed the above listed Medicare beneficiary. I do hereby attest that this information is true, accurate and complete to the best of my knowledge and I understand that any falsification, omission, or concealment of material fact may subject me to administrative, civil, or criminal liability.”

Although this format is acceptable, the CMS currently neither requires nor instructs providers to use a certain form or format. A general request for signature attestation shall be considered a non-standardized follow-up question from the contractors to the providers. However, since no form for signature attestation has been approved by the Office of Management and Budget (OMB), the contractors should not give the providers any standard format on which to submit the attestation. Once the OMB has assigned an OMB Paperwork Reduction Act number to this attestation form, its use will be mandatory.

Note: The MACs and CERT shall NOT consider attestation statements where there is no associated medical record entry. Reviewers shall NOT consider attestation statements from someone other than the author of the medical record entry in question (even in cases where two individuals are in the same group, one should not sign for the other in medical record entries or attestation statements). Reviewers shall consider all attestations that meet the above requirements regardless of the date the attestation was created, except in those cases where the regulations or policy indicate that a signature must be in place prior to a given event or a given date. For example, if a policy states the physician must sign the plan of care before therapy begins, an attestation can be used to clarify the identity associated with an illegible signature. However, such attestation cannot be used to "backdate" the plan of care.

### D. Signature Guidelines

The guidelines below will assist in determining whether to consider the signature requirements met:

- In the situations where the guidelines indicate **"signature requirements met,"** the reviewer shall consider the entry.

- In situations where the guidelines indicate **"contact billing provider and ask a non-standardized follow up question,"** the reviewer shall contact the person or organization that billed the claim and ask if the billing entity would like to submit an attestation statement or signature log within 20 calendar days. The 20 day timeframe begins on the date of the telephone contact with the provider or on the date the request letter is received by the provider. If the biller submits a signature log or attestation, the reviewer shall consider the contents of the medical record entry.

- In cases where a reviewer has requested a signature attestation or log, the time for completing the review is extended by 15 days. This extension starts upon receipt of the signature attestation or log.

- The MACs, CERT and UPICs shall document all contacts with the provider and/or other efforts to authenticate the signature.

**Note:** The MACs, CERT and UPICs shall **NOT** contact the **biller when the claim should be denied for reasons unrelated** to the signature requirement.

| | | Signature Requirement Met | Contact billing provider and ask a non-standardized follow up question |
|---|---|---|---|
| 1 | Legible full signature | X | |
| 2 | Legible first initial and last name | X | |
| 3 | Illegible signature over a typed or printed name<br><br>Example: <br>John Whigg, MD | X | |
| 4 | Illegible signature where the letterhead, addressograph or other information on the page indicates the identity **of** the signatory.<br><br>Example: An illegible signature appears on a prescription. The letterhead of the prescription lists (3) physicians' names. One of the names is circled. | X | |
| 5 | Illegible signature NOT over a typed/printed name and NOT on letterhead, but the submitted documentation **is accompanied** by:<br>a signature log, or an attestation statement | X | |
| 6 | Illegible signature NOT over a typed/printed name, NOT on letterhead and the documentation is **UNaccompanied** by:<br>a signature log, or<br>an attestation statement<br><br>Example: | | X |
| 7 | Initials over a typed or printed name | X | |
| 8 | Initials NOT over a typed/printed name but **accompanied** by: a<br>signature log, or<br>an attestation statement | X | |
| 9 | Initials NOT over a typed/printed name<br>**UNaccompanied** by: a<br>signature log, or<br>an attestation statement | | X |
| 10 | Unsigned typed note with provider's typed name | | X |
| | Example:<br>John Whigg, MD | | |
| 11 | Unsigned typed note without providers typed/printed name | | X |
| 12 | Unsigned handwritten note, the only entry on the page | | X |
| 13 | Unsigned handwritten note where other entries on the same page in the same handwriting are signed. | X | |

| | | | |
|---|---|---|---|
| 14 | "signature on file" | | X |

### E. Electronic Signatures

Providers using electronic systems need to recognize that there is a potential for misuse or abuse with alternate signature methods. For example, providers need a system and software products that are protected against modification, etc., and should apply adequate administrative procedures that correspond to recognized standards and laws. The individual whose name is on the alternate signature method and the provider bear the responsibility for the authenticity of the information for which an attestation has been provided. Physicians are encouraged to check with their attorneys and malpractice insurers concerning the use of alternative signature methods.

### F. Electronic Prescribing

Electronic prescribing (e-prescribing) is the transmission of prescription or prescription-related information through electronic media. E-prescribing takes place between a prescriber and dispenser, pharmacy benefit manager (PBM), or health plan. It can take place directly or through an e-prescribing network. With e-prescribing, health care professionals can electronically transmit both new prescriptions and responses to renewal requests to a pharmacy without having to write or fax the prescription. E-prescribing can save time, enhance office and pharmacy productivity, and improve beneficiary safety and quality of care.

A "qualified" e-prescribing system is one that meets the Medicare Part D requirements described in 42 CFR 423.160 (Standards for Electronic Prescribing).

#### 1. E-Prescribing for Part B Medications (Other than Controlled Substances)

The MAC, CERT and UPIC reviewers shall accept as a valid order any Part B medications, other than controlled substances, ordered through a qualified e-prescribing system. For Medicare Part B medical review purposes, a qualified e-prescribing system is one that meets all 42 CFR §423.160 requirements. When Part B medications have been ordered through a qualified e-prescribing system, the reviewer shall NOT require the provider to produce hardcopy pen and ink signatures as evidence of a medication order.

#### 2. E-Prescribing for Part B Controlled Substance Medications

Historically, the Drug Enforcement Agency (DEA) has not permitted the prescribing of controlled substance medications through e-prescribing systems. Therefore, when reviewing claims for controlled substance medications, MAC, CERT and UPICs reviewers shall only accept hardcopy pen and ink signatures as evidence of a medication order. However, the DEA is in the process of establishing requirements for electronic prescriptions for controlled substances. Refer to 21 CFR§§1300, 1304, 1306 and 1311 for further information.

#### 3. E-Prescribing for Medications Incident to DME

The MAC, CERT and UPICs reviewers shall accept as valid any e-prescribed order for medications incident to Durable Medical Equipment (DME), other than controlled substances. For the purpose of conducting Medicare medical review of medications incident to DME, a qualified e-prescribing system is one that meets all §42 CFR 423.160 requirements. When medications incident to DME have been ordered through a qualified e-prescribing system, the reviewer shall NOT require the provider to produce hardcopy pen and ink signatures as evidence of a medication order.

**G. Additional Signature Requirements for Durable Medical Equipment, Prosthetics, Orthotics, & Supplies (DMEPOS)**

Refer to PIM chapter 5 for further details regarding additional signature requirements for DMEPOS.

**H. Signature Dating Requirements**

For medical review purposes, if the relevant regulation, NCD, LCD and other CMS manuals are silent on whether the signature must be dated, the MACs, CERT and UPICs shall ensure that the documentation contains enough information for the reviewer to determine the date on which the service was performed/ ordered.

Example: The claim selected for review is for a hospital visit on October 4. The ADR response is one page from the hospital medical record containing three (3) entries. The first entry is dated October 4 and is a physical therapy note. The second entry is a physician visit note that is undated. The third entry is a nursing note dated October 4. The reviewer should conclude that the physician visit was conducted on October 4.

**I. Additional Documentation Request Language Regarding Signatures**

The CERT contractor shall use language in its ADR letters reminding providers that the provider may need to contact another entity to obtain the signed version of a document. For example, a hospital discharge summary in the physician's office files may be unsigned, whereas the version of the discharge summary in the hospital files should be signed and dated. MACs are encouraged to use such language in their letters. In addition, MACs, CERT and UPICs have the discretion to add language to their ADRs stating that the provider is encouraged to review their documentation prior to submission, to ensure that all services and orders are signed appropriately. In cases where a reviewer finds a note with a missing or illegible signature, the ADR may inform the provider that it should submit a signature log or signature attestation as part of the ADR response.

The following is sample language that reviewers may choose to use in certain ADRs:

"Medicare requires that medical record entries for services provided/ordered be authenticated by the author. The method used shall be a handwritten or electronic signature. Stamp signatures are not acceptable. Beneficiary identification, date of service, and provider of the service should be clearly identified on the submitted documentation.

The documentation you submit in response to this request should comply with these requirements. This may require you to contact the hospital or other facility where you provided the service and obtain your signed progress notes, plan of care, discharge summary, etc.

If you question the legibility of your signature, you may submit an attestation statement in your ADR response.

If the signature requirements are not met, the reviewer will conduct the review without considering the documentation with the missing or illegible signature. This could lead the reviewer to determine that the medical necessity for the service billed has not been substantiated."

**J. Potential Fraud Referrals**

At any time, suspected fraud shall result in a referral to the UPIC for development. If MAC, RAC, SMRC or CERT reviewers identify a pattern of missing/illegible signatures, the reviewer shall refer to the appropriate UPIC for further development.

# Medicare Program Integrity Manual
## Chapter 4 - Program Integrity

Table of Contents
*(Rev. 11032; Issued: 09-30-21)*

**Transmittals for Chapter 4**


4.2.2 – Program Integrity Contractor*s*
4.2.2.1 – *Unified Program Integrity Contractor*
4.2.2.2 – *Investigations Medicare Drug Integrity Contractor*
4.2.2.3 – *Organizational Requirements*
4.2.2.4 – *Liability of Program Integrity Contractor Employees*
4.2.2.5 – *Anti-Fraud Training*
*4.2.2.5.1 – Training for Law Enforcement Organizations*
4.2.2.6 – *Procedural Requirements*
*4.2.2.6.1 – Maintain Controlled Filing System and Documentation*
*4.2.2.6.2 – File/Document Retention*
*4.2.2.7 – Program Integrity Security Requirements*
*4.2.2.8 – Program Integrity Contractor Coordination*
*4.2.2.8.1 – Program Integrity Contractor Coordination with Other Unified Program Integrity Contractors and Other Entities*
*4.2.2.8.1.1 – Coordination with the Office of Inspector General*
*4.2.2.8.1.2 – Joint Operating Agreement*
*4.2.2.8.1.3 – MAC and UPIC Coordination on Voluntary Refunds*
*4.2.2.8.1.4 – UPIC Coordination with Other Contractors Related to the RAC Data Warehouse*
*4.2.2.8.1.4.1 – Suppression and/or Exclusion – Examples*
4.3 – *Complaints*
*4.3.1 – Definition of a Complaint*
*4.3.2 – Complaint Screening*
*4.3.2.1 – Contact Center Operations*
*4.3.2.2 – OIG Hotline*
*4.3.2.3 – MAC Complaint Screening*
*4.3.2.4 – Referrals to the UPIC*
4.4 – *Home Health Agency Misuse of Requests for Anticipated Payments*
4.4.1 – *RAP Monitoring*
4.4.2 – *Education and Additional Monitoring*
4.4.3 – *Corrective Action Plans*
*4.4.3.1 – Notification to the HHA*
*4.4.3.2 – CAP Submission*
*4.4.3.3 – CAP Acceptance and Monitoring*
*4.4.3.4 – CAP Closeout*
*4.4.4 – RAP Suppression*
*4.4.4.1 – Notice of RAP Suppression*
*4.4.4.2 – Monitoring During RAP Suppression*
*4.4.4.3 – Result of Initial RAP Suppression Monitoring Period*

4.4.4.3.1 – *Reinstatement of RAP Authorization*
4.4.4.3.2 – *Continuation of RAP Suppression*
4.4.5 – *Coordination and Referral to the UPIC*
4.5 – *Screening Leads*
4.5.1 – *UPIC and I-MEDIC Responsibilities*
4.6 – *Vetting Leads with CMS*
4.7.1.1 – *Provider/Supplier Contacts by the UPIC*
4.7.1.2 – *Case Coordination with UPICs*
4.7.2 – *Identity Theft Investigations and Victimized Provider Waiver of Liability Process*
4.7.3 – *Durable Medical Equipment Medicare Investigative Functions*
4.7.3.1 – *Supplier Proof of Delivery Documentation Requirements*
4.7.3.1.1 – *Proof of Delivery and Delivery Methods*
4.7.3.1.2 – *Exceptions*
4.7.3.1.3 – *Proof of Delivery Requirements for Recently Eligible Medicare FFS Beneficiaries*
4.7.4 – *Medical Review for Program Integrity Purposes*
4.7.4.1 – *Production of Medical Records and Documentation for an Appeals Case File*
4.7.4.2 – *Reversed Denials by Administrative Law Judges on Open Cases*
4.7.5 – *Administrative Relief from Program Integrity Review in the Presence of a Disaster*
4.7.6 – *UPIC Hospice Cap Liability Process – Coordination with the MAC*
4.7.7 – *Closing Investigations*
4.7.7.1 – *Monitor Compliance*
4.7.7.1.1 – *Resumption of Payment to a Provider – Continued Surveillance After Detection of Fraud*
4.8 – *Requests for Information from Outside Organizations*
4.9 – *Referrals*
4.9.1 – *Immediate Advisements to the OIG/OI*
4.9.2 – *Referral of Cases to the OIG/OI*
4.9.2.1 – *OIG/OI Referral and Summary Report*
4.9.2.2 – *Take Administrative Action on Cases Referred to and Declined/Returned by OIG/OI*
4.9.2.3 – *Continue to Monitor Provider and Document Case File*
4.9.3 – *Referral to Other Law Enforcement Agencies*
4.9.4 – *Referral to Other Entities*
4.9.4.1 – *Referral to State Agencies or Other Organizations*
4.9.4.2 – *UPICs and QIOs*
4.9.4.3 – *Referral of Cases to the MAC*
4.10 - *Administrative Sanctions*
4.10.1 - *Unified Program Integrity Contractor's and Medicare Administrative Contractor's Role*
4.10.2 - *Authority to Exclude Practitioners, Providers, and Suppliers of Services*
4.10.2.1 - *Basis for Exclusion Under §1128(b)(6) of the Social Security Act*
4.10.2.2 - *Identification of Potential Exclusion Cases*
4.10.2.3 - *Contents of Sanction Recommendation*
4.10.2.4 - *Notice of Administrative Sanction Action*
4.10.2.4.1 - *Notification to Other Agencies*
4.10.2.5 - *Denial of Payment to an Excluded Party*
4.10.2.5.1 - *Denial of Payment to Employer of Excluded Physician*
4.10.2.5.2 - *Denial of Payment to Beneficiaries and Others*
4.10.3 - *Appeals Process*
4.10.4 - *Reinstatements*

*4.10.4.1 - Monthly Notification of Sanction Actions*
*4.11 - Civil Monetary Penalties*
*4.11.1 - Basis of Authority*
*4.11.2 – Administrative Actions*
*4.11.3 – Enforcement*
*4.11.4 - Documents*
*4.11.5 - Civil Monetary Penalty Authorities*
*4.11.5.1 - Civil Monetary Penalties Delegated to CMS*
*4.11.5.2 - Civil Monetary Penalties Delegated to OIG*
*4.11.6 - Referral Process*
*4.11.6.1 - Referral Process to CMS*
*4.11.6.2 - Referrals to OIG*
*4.11.7 - CMS Generic Civil Monetary Penalty Case Contents*
*4.11.8 - Additional Guidance for Specific Civil Monetary Penalties*
*4.11.8.1 - Beneficiary Right to Itemized Statement*
*4.11.8.2 - Medicare Limiting Charge Violations*
4.13 – *Vulnerabilities*
4.14 – *Fraud Alerts*
4.15 – *Incentive Reward Program*
*4.15.1 - UPIC Responsibilities for the Incentive Reward Program*
*4.15.2 - Guidelines for Processing Incoming Complaints*
*4.15.3 - Guidelines for Incentive Reward Program Complaint Tracking*
*4.15.4 - Excluded Individuals*
*4.15.5 - Amount and Payment of Reward*
*4.15.6 - Unified Program Integrity Contractor Responsibilities*
*4.15.6.1 - Guidelines for Processing Incoming Complaints*
*4.15.6.2 - Guidelines for Incentive Reward Program Complaint Tracking*
*4.15.6.3 - Overpayment Recovery*
*4.15.6.4 - Eligibility Notification*
*4.15.6.5 - Incentive Reward Payment*
*4.15.6.6 - Reward Payment Audit Trail*
*4.15.7 - CMS Incentive Reward Winframe Database*
*4.15.8 - Updating the Incentive Reward Database*
4.16 – *Discounts, Rebates, and Other Reductions in Price*
*4.16.1 - Anti-Kickback Statute Implications*
*4.16.1.1 - Marketing to Medicare Beneficiaries*
*4.16.2 - Cost-Based Payment (Intermediary and MAC Processing of Part A Claims): Necessary Factors for Protected Discounts*
*4.16.3 - Charge-Based Payment (MAC Processing of Part B Claims): Necessary Factors for Protected Discounts*
*4.16.4 - Risk-Based Provider Payment: Necessary Factors for Protected Discounts*
4.17 – *Participation Agreement and Limiting Charge Violations*

## 4.1 - Introduction

*(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)*

CMS Pub. 100-08, Program Integrity Manual (PIM), reflects the principles, values, and priorities of the Medicare Integrity Program (MIP). The primary principle of program integrity (PI) is to pay claims correctly. To meet this goal, Unified Program Integrity Contractors (UPICs), Supplemental Medical Review Contractors (SMRC) and Medicare Administrative Contractors (MACs) must ensure that Medicare pays the right amount for covered and correctly coded services rendered to eligible beneficiaries by legitimate providers. The focus of the UPICs, SMRCs and MACs shall be to ensure compliance with Medicare regulations, refer suspected fraud and abuse to our Law Enforcement (LE) partners, and/or recommend revocation of providers that are non-compliant with Medicare regulation and policies. The Centers for Medicare & Medicaid Services (CMS) follows four parallel strategies in meeting this goal:

1. Prevent fraud through effective enrollment and education of providers/suppliers and beneficiaries;

2. Encourage early detection (through, for example, the Fraud Prevention System (FPS), medical review (MR) and data analysis);

3. Coordinate closely with partners, including other UPICs, SMRCs, MACs, LE agencies, and State PI units; and

4. Enact fair and firm enforcement policies.

The UPICs shall follow the PIM to the extent outlined in their respective task orders' Statement of Work (SOW). The UPICs shall only perform the functions outlined in the PIM as they pertain to their own operation. The UPICs, in partnership with CMS, shall be proactive and innovative in finding ways to enhance the performance of PIM guidelines.

For this entire chapter, any reference to UPICs shall also apply to the Investigations Medicare Drug Integrity Contractor (I-MEDIC), unless otherwise noted or identified in the Contractors' SOW. MACs shall follow the PIM in accordance with their SOW.

To facilitate understanding, the terms used in the PIM are defined in PIM Exhibit 1. The acronyms used in the PIM are listed in PIM Exhibit 23.

## 4.2 - Medicare Program Integrity

*(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)*

This section applies to UPICs, SMRCs and MACs, as indicated.

The primary goal of the UPIC is to identify cases of suspected fraud, waste and abuse, develop them thoroughly and in a timely manner, and take immediate action to ensure that Medicare Trust Fund monies are not inappropriately paid. Payment suspension and denial of payments and the recoupment of overpayments are examples of the actions that may be taken in cases of suspected fraud. Once such actions are taken, cases where there is potential fraud are referred to LE for consideration and initiation of criminal or civil prosecution, civil monetary penalties (CMP), or administrative sanction actions.

Preventing and detecting fraud, waste, and abuse involves a cooperative effort among beneficiaries; UPICs; SMRCs; MACs; providers/suppliers; quality improvement organizations (QIOs); and federal agencies such as CMS; the Department of Health and

Human Services (DHHS); the Office of Inspector General (OIG); the Federal Bureau of Investigation (FBI); and the Department of Justice (DOJ).

Each investigation is unique and shall be tailored to the specific circumstances. These guidelines are not to be interpreted as requiring the UPIC to follow a specific course of action or establish any specific requirements on the part of the government or its agents with respect to any investigation. Similarly, these guidelines shall not be interpreted as creating any rights in favor of any person, including the subject of an investigation.

When the UPIC makes the determination of potential fraud, waste, and/or abuse, the UPIC shall effectuate all appropriate administrative actions and refer the case to LE, if appropriate. When the UPIC makes the determination that a matter is not potential fraud, waste, and/or abuse, the UPIC shall close the matter, or de-escalate the matter to the appropriate unit at the MAC, QIO, or other entity, when appropriate.

## 4.2.2 - Program Integrity Contractor*s*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

### 4.2.2.1 *– Unified Program Integrity Contractor*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPIC is responsible for preventing, detecting, and deterring fraud, waste, and abuse in both the Medicare program and the Medicaid program. The UPIC:*

- *Prevents fraud by identifying program vulnerabilities;*
- *Proactively identifies incidents of potential fraud, waste, and abuse that exist within its service area and takes appropriate action on each case;*
- *Investigates (determines the factual basis of) allegations of fraud made by beneficiaries, providers/suppliers, CMS, OIG, and other sources. When appropriate, the UPIC may collaborate with CMS, State Medicaid Agency (SMA), and MFCU personnel;*
- *Explores all available sources of fraud leads in its jurisdiction, including the SMA and the Medicaid Fraud Control Unit (MFCU);*
- *Initiates appropriate administrative actions where there is reliable evidence of fraud, including, but not limited to, payment suspensions and revocations;*
- *Refers cases to the OIG/Office of Investigations (OI) for consideration of civil and criminal prosecution and/or application of administrative sanctions (see section 4.9 of this chapter, as well as PIM, chapter 8);*
- *Refers any necessary provider/supplier and beneficiary outreach to the provider outreach and education (POE) staff at the MAC;*
- *Initiates and maintains networking and outreach activities to ensure effective interaction and exchange of information with internal components as well as outside groups;*
- *Partners with state Medicaid PI units to perform the above activities in suspected Medicaid fraud, waste, and abuse cases (including Medi-Medi cases); or*

- *Works closely with CMS on joint projects, investigations and other proactive, anti-fraud activities.*

*The UPIC is required to use a variety of techniques, both proactive and reactive, to address any potentially fraudulent, wasteful, or abusive billing practices based on the various leads they receive.*

*Proactive leads are leads identified or self-initiated by the UPIC. Examples of proactive leads include, but are not limited to: (1) UPIC data analysis that uncovers inexplicable aberrancies that indicate potentially fraudulent, wasteful, or abusive billing for specific providers/suppliers; (2) the discovery of a new lead by a UPIC during a provider/supplier or beneficiary interview; and (3) the combining of information from a variety of sources to create a new lead. The UPIC shall pursue leads identified through data analysis (UPICs shall follow PIM Chapter 2, Section 2.3 for sources of data), the Internet, the Unified Case Management system (UCM), news media, industry workgroups, conferences, etc. For workload reporting purposes, the UPIC shall only identify as proactive those investigations and cases that the UPIC self-initiated.*

*The UPIC shall take prompt action after scrutinizing billing practices, patterns, or trends that may indicate fraudulent billing, (i.e., reviewing data for inexplicable aberrancies and relating the aberrancies to specific providers/suppliers, identifying "hit and run" providers/suppliers, etc.).*

*Fraud leads from any external source (e.g., LE, CMS referrals, beneficiary complaints, and the FPS) are considered to be reactive and not proactive. However, taking ideas from external sources, such as Fraud Alerts, and using them to look for unidentified aberrancies within UPIC data is proactive.*

### 4.2.2.2 - *Investigations Medicare Drug Integrity Contractor*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The Investigations Medicare Drug Integrity Contractor (I-MEDIC) is a task order under the UPIC Umbrella Statement of Work (USOW). The primary purpose of the I-MEDIC is to investigate Medicare Parts C and D prescriber, pharmacy, and beneficiary suspected FWA, develop investigations thoroughly and in a timely manner, and take immediate action to ensure that the Medicare Trust Fund is protected. The I-MEDIC shall coordinate with staff from the Centers for Medicare & Medicaid Services (CMS), CMS contractors, and other stakeholders as needed and as directed by the CMS Contracting Officer's Representative (COR), in collaboration with Business Function Leads (BFLs) to perform this program integrity work.*

### 4.2.2.3 - *Organizational Requirements*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs and MACs, as indicated.*

*UPIC program integrity (PI) managers shall have sufficient authority to guide PI activities and establish, control, evaluate, and revise fraud-detection procedures to ensure their compliance with Medicare requirements.*

*The UPIC shall follow the requirements in its UPIC SOW for prioritizing leads. UPIC PI managers shall prioritize work coming into the UPIC to ensure that investigations with the greatest program impact and/or urgency are given the highest priority. The UPIC shall prioritize all work on an ongoing basis as new work is received. The UPIC shall contact its*

*Contracting Officer's Representative (COR) and Business Function Lead (BFL) if it has any questions or concerns about prioritization of workload.*

*Allegations having the greatest program impact and priority would include investigations cases involving, but not limited to:*

- *Patient abuse or harm*
- *Multi-state fraud*
- *High dollar amounts of potential overpayment or potential for other admin actions, e.g. payment suspensions and revocations*
- *Likelihood of an increase in the amount of fraud or enlargement of a pattern*
- *LE requests for assistance that involve responding to court-imposed deadlines*
- *LE requests for assistance in ongoing investigations that involve national interagency (HHS-DOJ) initiatives or projects.*
- ***Note:** The UPIC and MAC shall give high priority to fraud, waste, or abuse complaints made by Medicare supplemental insurers. If a referral by a Medigap insurer includes investigatory findings indicating fraud stemming from site reviews, beneficiary interviews, and/or medical record reviews, the UPIC shall 1) conduct an immediate data run to determine possible Medicare losses, and 2) refer the case to the OIG.*

## 4.2.2.4 - *Liability of Program Integrity Contractor Employees*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*Under the terms of their contracts (refer to 42 CFR §421.316(a)), UPICs, their employees, and professional consultants are protected from criminal or civil liability as a result of the activities they perform under their contracts as long as they use due care. If a UPIC or any of its employees or consultants is named as defendants in a lawsuit, CMS will determine, on a case-by-case basis, whether to request that the U.S. Attorney's office offer legal representation. If the U.S. Attorney's office does not provide legal representation, the UPIC will be reimbursed for the reasonable cost of legal expenses it incurs in connection with defense of the lawsuit, as long as funds are available and the expenses are otherwise allowable under the terms of the contract.*

*If a UPIC is served with a complaint, the UPIC shall immediately contact its chief legal counsel and the COR. The UPIC shall forward the complaint to the HHS Office of the Regional Chief Counsel (the CMS regional attorney) who, in turn, will notify the U.S. Attorney's office. The HHS Office of the Regional Chief Counsel and/or the COR will notify the UPIC whether legal representation will be sought from the U.S. Attorney's office prior to the deadline for filing an answer to the complaint.*

## 4.2.2.5 – *Anti-Fraud Training*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*All levels of UPIC employees shall know the goals and techniques of fraud detection and control in general, and as they relate to their own areas of responsibility and the level of knowledge required (i.e., general orientation for new employees and highly technical sessions for existing staff). All UPIC staff shall be adequately qualified for the work of detecting and investigating situations of potential fraud, waste, and abuse.*

## *4.2.2.5.1 - Training for Law Enforcement Organizations*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*The FBI agents, OIG, and DOJ attorneys need to understand Medicare. The UPIC shall conduct special training programs for them upon request. The UPIC should also consider inviting appropriate DOJ, OIG, and FBI personnel to existing programs for orienting employees about UPIC operations or provide the aforementioned personnel with briefings on specific cases or Medicare issues.*

## 4.2.2.6 - *Procedural Requirements*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs and MACs, as indicated.*

*The MAC personnel conducting each segment of claims adjudication, MR, and professional relations functions shall be aware of their responsibility for identifying potential fraud, waste, or abuse and be familiar with internal procedures for forwarding potential fraud, waste, or abuse instances to the UPIC. Any area within the MAC (e.g., MR, enrollment, screening staff) that refers potential fraud, waste, and abuse to the UPIC shall maintain a log of all these referrals. At a minimum, the log shall include the following information: provider/physician/supplier name, beneficiary name, Health Insurance Claim Number (HICN), nature of the referral, date the referral is forwarded to the UPIC, name and contact information of the individual who made the referral, and the name of the UPIC to which the referral was made.*

*The MAC shall provide written procedures for personnel in various contractor functions (claims processing, MR, beneficiary services, POE, cost report audit, etc.) to help identify potential fraud situations. The MAC shall include provisions to ensure that personnel shall:*

- *Refer potential fraud, waste, or abuse situations promptly to the UPIC;*
- *Forward complaints alleging fraud through the screening staff to the UPIC;*
- *Maintain confidentiality of referrals to the UPIC;*
- *Forward to the UPIC detailed documentation of telephone or personal contacts involving fraud issues discussed with providers/suppliers or provider/supplier staff, and retain such information in individual provider/supplier files; and*

*The UPIC shall ensure the performance of the functions below and have written procedures for implementing these functions:*

***Investigations:***

- *Keep educational/warning correspondence with providers/suppliers and other fraud documentation concerning specific issues in individual provider/supplier files so that the UPICs are able to easily retrieve such documentation;*

- *Maintain documentation on the number of investigations alleging fraud, waste or abuse, the number of cases referred to the OIG/OI (and the disposition of those cases), processing time of investigations, and types of violations referred to the OIG (e.g., item or service not received, unbundling, waiver of co-payment) and;*

- *Conduct investigations (following a plan of action) and make the appropriate beneficiary and provider contacts.*

***Communications/Coordination:***

- *Maintain communication and information flowing between the UPIC and the MAC MR staff, and as appropriate, MAC audit staff;*

- *Communicate with the MAC MR staff on all findings of overutilization and coordinate with the MAC POE staff to determine what, if any, education has been provided before any PI investigation is pursued;*

- *Obtain and share information on health care fraud issues/fraud investigations among MACs, UPICs, CMS, and LE;*

- *Coordinate, attend, and actively participate in fraud-related meetings/conferences and inform, as well as, include all appropriate parties in these meetings/conferences. These meetings/conferences include, but are not limited to, health care fraud task force meetings, conference calls, and industry- specific events;*

- *Distribute Fraud Alerts released by CMS to their staff;*

- *Serve as a resource to CMS, as necessary; for example, serve as a resource to CMS on the UCM, provide ideas and feedback on Fraud Alerts and/or vulnerabilities within the Medicare or Medicaid programs;*

- *Report to the Contracting Officer's Representative (COR) and the Business Function Lead (BFL) all situations that have been identified in which a provider consistently fails to comply with the provisions of the assignment agreement; and*

- *Coordinate and communicate with the MR units within the MACs to avoid duplication of work.*

***Coordination with Law Enforcement:***

- *Serve as a reference point for LE and other organizations and agencies to contact when they need help or information on Medicare fraud issues and do not know whom to contact;*

- *Hire and retain employees who are qualified to testify in a criminal and civil trial when requested by LE;*

- *Provide support to LE agencies for investigation of potential fraud, including those for which an initial referral to LE did not originate from the UPIC;*

- *Meet (in person or via telephone call) with OIG agents to discuss pending or potential cases, as necessary;*

- *Meet (in person or via telephone) when needed with the DOJ to enhance coordination on current or pending cases;*

- *Furnish all available information upon request to the OIG/OI with respect to excluded providers/suppliers requesting reinstatement;*

- *Notify, via e-mail, the COR and BFL who will obtain approval or disapproval when the UPIC is asked to accompany the OIG/OI or any other LE agency onsite to a provider/supplier for the purpose of gathering evidence in a potential fraud case (e.g., executing a search warrant). However, LE must make clear the role of*

*UPIC personnel in the proposed onsite visit. The potential harm to the case and the safety of UPIC personnel shall be thoroughly evaluated. The UPIC personnel shall properly identify themselves as UPIC employees and under no circumstances shall they represent themselves as LE personnel or special agents. Lastly, under no circumstances shall UPIC personnel accompany LE in situations in which their personal safety is in question; and*

- *Maintain independence from LE and do not collect evidence, i.e., request medical records or conduct interviews, at LE's request. The UPIC is expected to follow the current vetting process and the requirements of PIM Section 4.6. The UPIC shall consult with the BFLs and CORs if questions arise about complying with LE requests for medical records, conducting interviews, or refraining from specific administrative actions.*

***Training:***

- *Work with the COR and BFL to develop and organize external programs and perform training, as appropriate, for LE, ombudsmen, grantees (e.g., Senior Medicare Patrols), and other CMS health care partners (e.g., Administration on Aging, state MFCUs);*

- *Help to develop fraud-related outreach materials (e.g., pamphlets, brochures, videos) in cooperation with beneficiary services and/or provider relations department of the MACs for use in their training. Submit written outreach material to the COR and BFL for clearance;*

- *Assist in preparing and developing fraud-related articles for MAC newsletters/bulletins. Once completed, the UPIC shall submit such materials to the following email address: CPIFraudRelatedLeads@cms.hhs.gov, with a copy to the CORs and BFLs; and*

- *Provide resources and training for the development of existing employees and new hires.*

*The MACs shall ensure the performance of the functions below and have written procedures for these functions:*

- *Ensure no payments are made for items or services ordered, referred, or furnished by an individual or entity following the effective date of exclusion (refer to Section 4.10, for exceptions);*

- *Ensure all instances in which an excluded individual or entity that submits claims for which payment may not be made after the effective date of the exclusion are reported to the OIG (refer to PIM, Chapter 8); and*

- *Ensure no payments are made to a Medicare provider/supplier that employs an excluded individual or entity.*

## *4.2.2.6.1 - Maintain Controlled Filing System and Documentation*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPIC shall maintain files on providers/suppliers who have been the subject of complaints, prepayment edits, UPIC investigations, OIG/OI and/or DOJ investigations,*

*U.S. Attorney prosecution, and any other civil, criminal, or administrative action for violations of the Medicare or Medicaid programs. The files shall contain documented warnings and educational contacts, the results of previous investigations, and copies of complaints resulting in investigations.*

*The UPIC shall set up a system for assigning and controlling numbers at the initiation of investigations, and shall ensure that:*

- *All incoming correspondence or other documentation associated with an investigation contains the same file number and is placed in a folder containing the original investigation material.*
- *Investigation files are adequately documented to provide an accurate and complete picture of the investigative effort.*
- *All contacts are clearly and appropriately documented.*
- *Each file contains the initial prioritization assigned and all updates.*

*It is important to establish and maintain histories and documentation on all fraud, waste, and abuse investigations and cases. The UPIC shall conduct periodic reviews of data over the past several months to identify any patterns of potential fraud, waste, or abusive billings for particular providers. The UPIC shall ensure that all evidentiary documents are kept free of annotations, underlining, bracketing, or other emphasizing pencil, pen, or similar marks.*

*The UPIC shall establish an internal monitoring and investigation review system to ensure the adequacy and timeliness of fraud, waste, and abuse activities. The UPIC shall maintain their workload in the Unified Case Management (UCM) system, unless otherwise directed by CMS.*

## *4.2.2.6.2 - File/Document Retention*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Files/documents shall be retained for 10 years. However, files/documents shall be retained indefinitely and shall not be destroyed if they relate to a current investigation or litigation/negotiation; ongoing Workers' Compensation set aside arrangements, or documents which prompt suspicions of fraud, waste, and/or abuse of overutilization of services. This will satisfy evidentiary needs and discovery obligations critical to the agency's litigation interests.*

*For UPIC's in transition, all existing electronic files for all years shall be transferred into UCM. Any hard copy files (that do not need to be retained indefinitely) older than 10 years shall be destroyed.*

*For UPICs in operation, all paper/hard copy files older than 10 years (that do not need to be retained indefinitely) shall be destroyed.*

*Any hard copy files older than 10 years that are part of a current investigation or litigation may be scanned as an electronic copy. After certification that it has been properly scanned, it shall be destroyed. All scanned/electronic copies shall be transferred to the UCM.*

## *4.2.2.7 – Program Integrity Security Requirements*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*To ensure a high level of security for the UPIC functions, the UPIC shall develop, implement, operate, and maintain security policies and procedures that meet and conform to the requirements of the Business Partners System Security Manual (BPSSM) and the CMS Informational Security Acceptable Risk Safeguards (ISARS). Further, the UPIC shall adequately inform and train all UPIC employees to follow UPIC security policies and procedures so that the information the UPIC obtain is confidential.*

***Note:*** *The data UPICs collect in administering UPIC contracts belong to CMS. Thus, the UPICs collect and use individually identifiable information on behalf of the Medicare program to routinely perform the business functions necessary for administering the Medicare program, such as MR and program integrity activities to prevent fraud, waste, and abuse. Consequently, any disclosure of individually identifiable information without prior consent from the individual to whom the information pertains, or without statutory or contract authority, requires CMS' prior approval.*

*This section discusses broad security requirements that UPICs shall follow. The requirements listed below are in the BPSSM or ARS. There are several exceptions. The first is requirement A (concerning UPIC operations), which addresses several broad requirements; CMS has included requirement A here for emphasis and clarification. Two others are in requirement B (concerning sensitive information) and requirement G (concerning telephone security). Requirements B and G relate to security issues that are not systems related and are not in the BPSSM.*

***A. Unified Program Integrity Contractor Operations***

- *The UPIC shall conduct their activities in areas not accessible to the general public.*
- *The UPIC shall completely segregate itself from all other operations. Segregation shall include floor-to-ceiling walls and/or other measures described in ARS Appendix B PE-3 and CMS-2 that prevent unauthorized persons access to or inadvertent observation of sensitive and investigative information.*
- *Other requirements regarding UPIC operations shall include sections 3.1, 3.1.2, 4.2, 4.2.5, and 4.2.6 of the BPSSM.*

***B. Handling and Physical Security of Sensitive and Investigative Material***

*Refer to ARS Appendix B PE-3 and CMS-1 for definitions of sensitive and investigative material.*

*In addition, the UPIC shall follow the requirements provided below:*

- *Establish a policy that employees shall discuss specific allegations of fraud only within the context of their professional duties and only with those who have a valid need to know, which includes (this is not an exhaustive list):*

  *- Appropriate CMS personnel*

  *- UPIC staff*

  *- MAC MR staff*

  *- UPIC or MAC audit staff*

*- UPIC or MAC data analysis staff*

*- UPIC or MAC senior management*

*- UPIC or MAC corporate counsel*

- *The ARSs require that:*

  *- The following workstation security requirements are specified and implemented: (1) what workstation functions can be performed, (2) the manner in which those functions are to be performed, and (3) the physical attributes of the surroundings of a specific workstation or class of workstation that can access sensitive CMS information. CMS requires that for UPICs all local workstations as well as workstations used at home by UPICs comply with these requirements.*

  *- If UPIC employees are authorized to work at home on sensitive data, they shall observe the same security practices that they observe at the office. These shall address such items as viruses, virtual private networks, and protection of sensitive data, including printed documents.*

  *- Users are prohibited from installing desktop modems.*

  *- The connection of portable computing or portable network devices on the CMS claims processing network is restricted to approved devices only. Removable hard drives and/or a Federal Information Processing Standards (FIPS)-approved method of cryptography shall be employed to protect information residing on portable and mobile information systems.*

  *- Alternate work sites are those areas where employees, subcontractors, consultants, auditors, etc. perform work associated duties. The most common alternate work site is an employee's home. However, there may be other alternate work sites such as training centers, specialized work areas, processing centers, etc. For alternate work site equipment controls, (1) only CMS Business Partner-owned computers and software are used to process, access, and store sensitive information; (2) a specific room or area that has the appropriate space and facilities is used; (3) means are available to facilitate communication with the managers or other members of the Business Partner Security staff in case of security problems; (4) locking file cabinets or desk drawers; (5) "locking hardware" to secure IT equipment to larger objects such as desks or tables; and (6) smaller Business Partner- owned equipment is locked in a storage cabinet or desk when not in use. If wireless networks are used at alternate work sites, wireless base stations are placed away from outside walls to minimize transmission of data outside of the building.*

*The UPIC shall also adhere to the following:*

- *Ensure the mailroom, general correspondence, and telephone inquiries procedures maintain confidentiality whenever the UPIC receives correspondence, telephone calls, or other communication alleging fraud. Further, all internal written operating procedures shall clearly state security procedures.*

- *Direct mailroom staff not to open UPIC mail in the mailroom unless the UPIC has*

*requested the mailroom do so for safety and health precautions. Alternately, if mailroom staff opens UPIC mail, mailroom staff shall not read the contents.*

- *For mail processing sites separate from the UPIC, the UPIC shall minimize the handling of UPIC mail by multiple parties before delivery to the UPIC.*

- *The UPIC shall mark mail to CMS Central Office or to another UPIC "personal and confidential" and address it to a specific person.*

- *Where more specialized instructions do not prohibit UPIC employees, they may retain sensitive and investigative materials at their desks, in office work baskets, and at other points in the office during the course of the normal work day. Regardless of other requirements, the employees shall restrict access to sensitive and investigative materials, and UPIC staff shall not leave such material unattended.*

- *The UPIC staff shall safeguard all sensitive or investigative material when the materials are being transported or sent by UPIC staff.*

- *The UPIC shall maintain a controlled filing system (refer to section 4.2.2.6.1).*

### *C. Designation of a Security Officer*

*The security officer shall take such action as is necessary to correct breaches of the security standards and to prevent recurrence of the breaches. In addition, the security officer shall document the action taken and maintain that documentation for at least seven (7) years.*

*Actions shall include:*

- *Within one (1) hour of discovering a security incident, clearly and accurately report the incident following BPSSM requirements for reporting of security incidents. For purposes of this requirement, a security incident is the same as the definition in section 3.6 of the BPSSM, Incident Reporting and Response.*

- *Specifically, the report shall address the following where appropriate:*

  *- Types of information about beneficiaries shall at a minimum address whether the compromised information includes name, address, HICNs, and date of birth;*

  *- Types of information about providers/suppliers shall at a minimum address if the compromised information includes name, address, and provider/supplier ID;*

  *- Whether LE is investigating any of the providers/suppliers with compromised information; and*

  *- Police reports.*

- *Provide additional information that CMS requests within 72 hours of the request.*

- *If CMS requests, issue a Fraud Alert to all CMS Medicare contractors within 72 hours of the discovery that the data was compromised, listing the HICNs and provider/supplier IDs that were compromised.*

- *Within 72 hours of discovery of a security incident, when feasible, review all security measures and revise them if necessary so they are adequate to protect data against physical or electronic theft.*

*Refer to section 3.1 of the BPSSM and Attachment 1 of this manual section (letter from Director, Office of Financial Management, concerning security and confidentiality of UPIC data) for additional requirements.*

### ***D. Staffing of the Unified Program Integrity Contractor and Security Training***

*The UPIC shall perform thorough background and character reference checks, including at a minimum credit checks, for potential employees to verify their suitability for employment. Specifically, background checks shall at least be at level 2- moderate risk. (People with access to sensitive data at CMS have a level 5 risk). The UPIC may require investigations above a level 2 if the UPIC believes the higher level is required to protect sensitive information.*

*At the point the UPIC makes a hiring decision for a UPIC position, and prior to the selected person's starting work, the UPIC shall require the proposed candidate to fill out a conflict of interest declaration, as well as a confidentiality statement.*

*Annually, the UPICs shall require existing employees to complete a conflict of interest declaration, as well as a confidentiality statement.*

*The UPICs shall not employ temporary employees, such as those from temporary agencies, or students (nonpaid or interns).*

*At least once a year, the UPICs shall thoroughly explain to and discuss with employees the special security considerations under which the UPIC operates. Further, this training shall emphasize that in no instance shall employees disclose sensitive or investigative information, even in casual conversation. The UPIC shall ensure that employees understand the training provided.*

*Refer to section 2.0 of the BPSSM and ARS Appendix B AT-2, AT-3, AT-4, SA-6, MA- 5.0, PE-5.CMS.1, IR2-2.2, CP 3.1, CP 3.2, CP 3.3, and SA 3.CMS.1 for additional training requirements.*

### ***E. Access to Unified Program Integrity Contractor Information***

*Refer to section 2.3.4 of the BPSSM for requirements regarding access to UPIC information.*

*The UPIC shall notify the OIG if parties without a need to know are asking inappropriate questions regarding any investigations. The UPICs shall refer all requests from the press related to the Medicare Integrity Program to the CMS contracting officer with a copy to the CORs and BFLs for approval prior to release. This includes, but is not limited to, contractor initiated press releases, media questions, media interviews, and Internet postings.*

### ***F. Computer Security***

*Refer to section 4.1.1 of the BPSSM for the computer security requirements.*

### ***G. Telephone and Fax Security***

*The UPICs shall implement phone security practices. The UPICs shall discuss investigations only with those individuals who need to know the information and shall not divulge information to individuals not known to the UPIC involved in the investigation of the related issue.*

*Additionally, the UPICs shall only use CMS, the OIG, the DOJ, and the FBI phone numbers that they can verify. To assist with this requirement, UPIC management shall provide UPIC staff with a list of the names and telephone numbers of the individuals of the authorized agencies that the UPICs deal with and shall ensure that this list is properly maintained and periodically updated.*

*Employees shall be polite and brief in responding to phone calls but shall not volunteer any information or confirm or deny that an investigation is in process. However, UPICs shall not respond to questions concerning any case the OIG, the FBI, or any other LE agency is investigating. The UPICs shall refer such questions to the OIG, the FBI, etc., as appropriate.*

*Finally, the UPICs shall transmit sensitive and investigative information via facsimile (fax) lines only after the UPIC has verified that the receiving fax machine is secure. Unless the fax machine is secure, UPICs shall make arrangements with the addressee to have someone waiting at the receiving machine while the fax is transmitting. The UPICs shall not transmit sensitive and investigative information via fax if the sender must delay a feature, such as entering the information into the machine's memory.*

## *4.2.2.8 - Program Integrity Contractor Coordination*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

## *4.2.2.8.1 - Unified Program Integrity Contractor Coordination with Unified Program Integrity Contractors and Other Entities*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*The UPIC shall coordinate with UPICs in other jurisdictions, as directed in the USOW and Task Order Statement of Works (SOWs).*

*The UPIC shall establish and maintain formal and informal communication with state survey agencies, the OIG, the DOJ, state Medicaid agency, other Medicare contractors, other UPICs, and other organizations as applicable to determine information that is available and that should be exchanged to enhance program integrity activities.*

*If the UPIC identifies a potential quality problem with a provider or practitioner in its area, it shall refer such cases to the appropriate entity, be it the QIO, state medical board, state licensing agency, etc. Any provider-specific information shall be handled as confidential information.*

### *4.2.2.8.1.1 - Coordination with the Office of Inspector General*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPICs shall establish regular (i.e., monthly or quarterly) teleconference meetings with Regional LE from OIG and CMS for the purpose of discussing:*

- *the status of referrals and immediate advisements;*
- *any relevant updates to previously discussed cases (i.e., contractor identified spikes in billing, change to the operational status of a provider, patient harm*

*situations, etc.);*

- *data analysis projects (i.e., planned data projects, results of recently completed data projects, etc.); and*
- *areas of interest to CMS, OIG, or other regional partners.*

*Other agenda topics may include a discussion regarding areas of concern in the UPIC and/or Regional LE respective region, case/project developments (including planned provider onsite reviews to ensure the proposed activities do not negatively affect any ongoing LE efforts), and other topics. In preparation for the meeting, the UPIC shall set the agenda and prepare any additional documents or reports for the participants at least three (3) business days prior to the meeting.*

*However, at no time shall a referral be made as a result of discussions during these regular meetings. If OIG expresses interest, the contractor shall discuss the case with its COR/BFL to determine if it should be added to the next case coordination meeting with CMS.*

## *4.2.2.8.1.2 - Joint Operating Agreement*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs, SMRCs, MACs, RACs, and QICs, as indicated.*

*A JOA is a document developed between two entities (CMS contractors) that delineates the roles and responsibilities of each entity regarding their interactions with each other on CMS contracts.*

*The UPICs shall have JOAs with the entities as outlined in their Statement of Work. As it*

*applies to the UPIC's task orders, the JOA with the MACs shall, at a minimum, provide information on assigned responsibilities, timeframes, processes and procedures, and coordination. Additional detail related to this information is referenced in the UPIC Statement of Work.*

*Periodically, there are instances in which the UPIC is in need of the requested information in a shorter timeframe than 30 calendar days. To account for these instances, the UPICs and MACs may add language to their JOA that allows for a shorter timeframe for the MAC to furnish the requested information (i.e. 48 hours, 72, hours, etc.).*

## *4.2.2.8.1.3– MAC and UPIC Coordination on Voluntary Refunds*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs and MACs, as indicated.*

*Voluntary refund checks payable to the Medicare program shall not be returned to the provider/supplier, regardless of the amount of the refund. The UPIC shall communicate with the MAC staff responsible for processing voluntary refunds to obtain information on the checks received. The MAC shall refer to Pub. 100-06, Financial Management Manual, for instructions on processing and reporting unsolicited/voluntary refunds received from providers/physicians/suppliers.*

*The UPIC shall perform an investigation on any voluntary refund where there is suspicion of inappropriate payment or if a provider/supplier is under an active investigation.*
*Should the UPIC receive a voluntary refund check in error, the UPIC shall coordinate the transfer of voluntary refund checks to the MAC through the JOA.*

*Through the JOA, the UPIC shall establish a mechanism whereby the MAC notifies the UPIC on a regular basis of all voluntary refunds it received. The UPIC or MAC shall send one letter annually (calendar year) to any provider/supplier that submits a voluntary refund during that calendar year, advising the provider/supplier of the following:*

*"The acceptance of a voluntary refund in no way affects or limits the rights of the Federal Government or any of its agencies or agents to pursue any appropriate criminal, civil, or administrative remedies arising from or relating to these or any other claims."*

*The UPIC and MAC shall establish in the JOA which contractor sends the above language. The MACs may send the language above on a voluntary refund acknowledgement letter or on a Remittance Advice, if this capability exists.*

*The UPIC shall refer to section 4.8 of this chapter for law enforcement requests for voluntary refund information.*

## *4.2.2.8.1.4 – UPIC Coordination with Other Contractors Related to the RAC Data Warehouse*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs, RACs, MACs, CERT, and SMRC as indicated.*

*The CMS established the RAC Data Warehouse (RACDW) to track RAC activity and prevent conflicts between RAC reviews and other program integrity activities. The success of this mission depends on timely and accurate information reporting by the UPICs, as well as by claims processing contractors and by the RACs themselves. CMS has expanded the functionality of the RACDW to allow all contractors that perform medical review to collaborate so there is no duplication of effort.*

*To prevent other contractors from interference with active investigations or cases, UPICs shall enter suppressions in the RAC Data Warehouse to temporarily mark entire providers/suppliers or subsets of a provider's/supplier's claims as "off-limits" to the RACs, MACs, CERT, and SMRC. The suppression must be entered in the RACDW when the investigation is opened, but no later than 2 business days after the investigation is opened.*

*Individual claims that have been previously reviewed (or that are part of an extrapolated settlement universe) shall be excluded to permanently block them from repeat reviews by a RAC, MAC, CERT, or SMRC.*

*The RAC Data Warehouse allows users to enter suppressions on any combination of provider ID, Diagnostic Related Group (DRG), International Classification of Diseases-9/10 (ICD- 9/10) procedure code, Healthcare Common Procedure Coding System (HCPCS) code, State, or ZIP code although CMS requires that suppressions be tailored as narrowly as possible.*

*UPICs shall suppress targeted procedure codes from specific providers/suppliers associated with open investigations/cases. Suppressions of one or more procedure codes across an entire geographic area may be considered in egregious situations of widespread fraud, waste and/or abuse of specific codes or types of services (e.g., infusion therapy in South Florida).*

*The Data Warehouse can accept suppressions on a rendering provider, supplier, or institution ID. Suppressions on referring, ordering, billing (for professional DME claims) and attending providers (institutional claims) are not currently supported.*

*Whether suppressing an entire provider or only a portion of a provider's claims, the UPIC shall indicate the nature of the provider being suppressed (i.e., hospital, individual physician, physician group, home health agency, etc.) in the provider type field, using the codes specified in the Data Warehouse. The UPIC shall also indicate the name of the provider being suppressed in the comment field, which can accommodate up to 256 characters.*

*When entering a suppression on a six-digit provider/supplier ID, the UPIC shall also enter the provider's/supplier's practice State. States are not required for NPIs, NSC numbers, alphanumeric or PTANs that are other than six digits long; but six-digit PTANs potentially overlap with six-digit CMS institutional provider numbers. Having the provider/supplier state will help CMS suppression reviewers to differentiate among multiple providers/suppliers with the same ID.*

*Specific suppression start and end dates are also mandatory. Suppressions can extend up to three (3) years into the past and one (1) year forward from date of entry (the start date is initially fixed at 10/1/2007, which is the earliest start date that RACs can select for their reviews). Users will be notified as their suppressions approach the expiration dates and can renew them if necessary. CMS expects users to release them sooner if the underlying investigations/cases are closed.*

*Once a suppression is lifted or expires, UPICs are also responsible for entering any necessary exclusions. Any claims for which the UPIC has requested medical records shall be excluded to prevent re-review by a RAC.*

*In addition, the UPICs shall review the RACDW to determine if other contractors currently have a particular provider under review. If the provider is under review by another contractor (RAC, MAC, CERT, SMRC) the UPIC shall contact that respective contractor to determine which entity should continue to review that provider and how to handle the current medical review,*
*i.e. close it out or complete the medical review and then refer to the UPIC.*

*Below are examples of suppressions and exclusions in various circumstances: this list is not all-inclusive. The UPIC staff may need to consult with its respective CMS COR and BFLs and/or CMS RAC liaison to determine the appropriate level of suppression or exclusion.*

## *4.2.2.8.1.4.1 - Suppression and/or Exclusion – Examples*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs and RACs, as indicated.*

- *Suppressions of providers/suppliers that the UPIC has referred to law enforcement and are the subject of a law enforcement investigation should remain effective until the provider's/supplier's case is returned with a declination for prosecution from law enforcement and without a request for UPIC administrative action. The suppression may be entered using one of the following methods:*

  *Suppression at the provider/supplier and/or geographic level requires the user to supply detailed justification for each request; in addition to provider name/type, NPI, start/end dates, CSE number, and other fields as specified in the RAC Data Warehouse User's Guide. UPICs shall routinely monitor accepted suppression records to ensure that the suppressions remain relevant/appropriate and that they are ultimately released in a timely manner.*

  *Suppression at the procedure code level for individual providers/suppliers may be done without providing justification, due to the narrower scope of the suppression.*

> *Suppressions at this level still require the user to supply a DRG, ICD-9/10 procedure or HCPCS code, provider/supplier identifiers, NPI, start and end dates, CSE number, and any additional information as defined in the RAC Data Warehouse User's Guide.*
>
> *Note: The RACs can review claims paid as early as 10/1/2007, which is before NPI submission became mandatory. Therefore, UPICs are strongly encouraged to enter suppressions on both NPIs and legacy provider/supplier numbers for suppressions that cover the period of October 2007 through May 2008.*

*Suppression/Exclusion for postpayment review where extrapolation may or may not be performed – In the event that the UPIC is unable to determine at the time of review whether any overpayments that are identified will be extrapolated to the parent claim universe, the UPIC shall enter a suppression on the relevant provider/supplier ID and service code(s). If the UPIC does ultimately assess an extrapolated overpayment, the UPIC shall release the suppression and exclude the entire universe. If the overpayment is computed based only on the sampled claims (i.e., the overpayment is not projected to the entire universe), the UPIC shall release the suppression and exclude only the sample claims that were actually reviewed.*

*Exclusion for prepayment edits or clinically unlikely edits (CUEs) – Claims that have been subjected to automated edits only are still eligible for RAC review and should generally not be excluded. Claims that have subsequently undergone medical record review do require exclusion.*

*Exclusion for prepayment review – In those instances in which a provider/supplier is under investigation and is subject to 100% prepayment review, a suppression will not be necessary because the RACs do not receive claim data in real time. However, all individual claims that were reviewed shall be excluded (this requirement applies whether the provider/supplier was on 100% prepayment review, or a lesser fraction of that provider's/supplier's claims were being reviewed).*

*For access to the RAC Data Warehouse, contact the system administrators at rac@cms.hhs.gov. Current suppression/exclusion file layouts and the user's guide are available from the help desk staff or by download from the system itself.*

*The UPICs shall have a JOA with the RACs. Refer to PIM Exhibit 44 for the JOA between the UPICs and the RACs. The UPICs shall include in the JOA quarterly meetings with the RAC in their zone, at a minimum, to discuss trends in possible fraudulent billing. If UPICs or RACs have any recommendations for modifying the JOA, they shall provide these modifications to their respective CORs.*

## 4.3 – *Complaints*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

### *4.3.1 - Definition of a Complaint*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs and MACs.*

*A complaint is a statement, oral or written, alleging that a provider, supplier, or beneficiary billed for and/or received a Medicare reimbursement or benefit to which he or she is not entitled under current Medicare law, regulations, or policy. Included are allegations of misrepresentation and violations of Medicare requirements applicable to persons or entities*

*that bill for covered items and services. Examples of complaints include (this is not an exhaustive list):*

- *Allegations that items or services were not received;*
- *Allegations that items or services were not furnished as shown on the Explanation of Medicare Benefits (EOMB), Notice of Utilization (NOU), or Medicare Summary Notice (MSN), or that the services were not performed by the provider/supplier shown;*
- *Allegations that a provider/supplier is billing Medicare for a different item or service than was furnished;*
- *Allegations that a provider or supplier has billed both the beneficiary and Medicare for the same item or service;*
- *Allegations regarding waiver of co-payments or deductibles;*
- *Allegations that a supplier or provider has misrepresented itself as having an affiliation with an agency or department of the state, local, or federal government, whether expressed or implied; and*
- *Allegations or inquiries from a beneficiary concerning payment for an item or service that, in his/her opinion far exceeds reasonable payment for the item or service that the beneficiary received (e.g., the supplier or physician has "upcoded" to receive higher payment).*

*The following are not examples of a fraud complaint (this is not an exhaustive list):*

- *Complaints or inquiries regarding Medicare coverage policy;*
- *Complaints regarding the appeals process;*
- *Complaints over the status of a claim;*
- *Requests for an appeal or reconsideration; or*
- *Complaints concerning providers or suppliers (other than those complaints meeting the criteria established above) that are general in nature and are policy- or program-oriented.*

*Complaints alleging malpractice or poor quality of care may or may not involve a fraudulent situation. These complaints shall be reviewed and determined on a case-by- case basis. The UPIC shall refer complaints alleging poor quality of care to the Medicare/Medicaid survey and certification agencies and the QIOs within two (2) business days. The UPIC shall forward any medical records to the QIO upon receipt from the provider, when appropriate. Any complaints involving allegations of fraud shall be screened to determine if further investigation by the UPIC is necessary.*

## *4.3.2 - Complaint Screening*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs, Beneficiary Contact Center, and MACs, as indicated.*

### *4.3.2.1 – Contact Center Operations*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The Contact Center Operations (CCO) is a CMS managed contact center which provides beneficiaries with personalized Medicare information and accepts both inquiries and complaints regarding a variety of topics including, but not limited to, billing errors, the provision of services/tests, and coverage guidelines.*

*The Customer Service Representatives (CSRs) at the CCO shall try to resolve as many complaints or inquiries as possible with data available in their desktop systems. The following are some scenarios that a CSR may receive and resolve in the initial phone call rather than refer to the MAC for additional screening (this is not an all-inclusive list):*

- *Lab Tests - CSRs shall ask callers if they recognize the referring physician. If they do, remind callers that the referring physician may have ordered some lab work for them. The beneficiaries usually do not have contact with the lab because specimens are sent to the lab by the referring physician office. (Tip: ask if they remember the doctor withdrawing blood or obtaining a tissue sample on their last visit).*

- *Anesthesia Services - CSRs shall check the beneficiary claims history for existing surgery or assistant surgeon services on the same date. If a surgery charge is on file, explain to the caller that anesthesia service is part of the surgery rendered on that day.*

- *Injections - CSRs shall check the beneficiary claim history for the injectable (name of medication) and the administration. Most of the time, the administration of the injection is not payable, as it is a bundled service under Part B only. There are very few exceptions to pay for the administration.*

- *Services for Spouse - If the beneficiaries state that services were rendered to their spouse and the HICNs are the same, with a different suffix, the CSR shall initiate the adjustment and the overpayment processes.*

- *Billing Errors - If the beneficiaries state that they already contacted their provider/supplier and the provider/supplier admitted there was a billing error but a check is still outstanding, the CSR shall follow the normal procedures for resolving this type of billing error.*

- *Services Performed on a Different Date - The beneficiaries state that a service was rendered, but on a different date. The CSR shall review the beneficiary claim history to determine if there are multiple dates billed for this service. If not, an adjustment to the claim may be required to record the proper date on the beneficiaries' file.*

- *Incident to Services - Services may be performed by a nurse in a doctor's office as "incident to." These services are usually billed under the physician's provider/supplier transaction access number (PTAN) (e.g., blood pressure check, injections). These services may be billed under the minimal evaluation and management codes.*

- *Billing Address vs. Practice Location Address - The CSR shall check the practice location address where services were rendered. Many times the Medicare Summary Notice will show the billing address, causing the*

*beneficiaries to think the billing might be fraud.*

*The CSRs shall use proper probing questions and shall use claim history files to determine if the complaint or inquiry needs to be referred to the MAC for additional screening.*

*Any provider/supplier inquiries regarding potential fraud, waste, and abuse shall be referred immediately to the MAC for handling and screening.*

*Immediate advisements (IA) shall be referred immediately to the MAC for handling and screening. These advisements include inquiries or allegations by beneficiaries or providers/suppliers concerning kickbacks, bribes, or a crime by a federal employee (e.g., altering claims data or manipulating them to create preferential treatment to certain providers/suppliers; improper preferential treatment collecting overpayments; or embezzlement). Indicators of contractor employee fraud shall be forwarded to the CMS Compliance Group.*

## *4.3.2.2 – OIG Hotline*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The OIG Hotline is an OIG managed system that accepts tips and complaints from all sources about potential fraud, waste, abuse in the Medicare, Medicaid and CHIP programs. Complaints and any relevant documents originating from the OIG Hotline will be sent to CMS by the OIG. CMS will conduct an initial screening of the complaints received to determine which MAC should receive the complaint referral (Initial screening of the complaint and assignment to the MAC will be based solely upon the information provided to CMS by the OIG). CMS will then email the complaint to the appropriate MAC via the OIG Hotline Referral mailbox established by the relevant MAC. The email will contain the OIG Hotline Complaint Referral Template and any supporting documentation, if available. The OIG Hotline Complaint Referral Template will be populated with information relevant to the complaint. Due to the varying information obtained from each complaint, some fields within the template may appear blank because the information for the specific data field was not reported to the OIG Hotline. Should the UPIC receive an OIG Hotline complaint directly from the OIG, the UPIC shall proceed with the necessary screening, vetting, and investigative steps, as described in sections 4.5, 4.6, and 4.7 of this chapter.*

## *4.3.2.3 – MAC Complaint Screening*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

### *A. MAC Screening of CCO Referrals*

*The MAC shall only screen potential fraud, waste, and abuse complaints, inquiries referred by the CCO with a paid amount of $100 or greater (including the deductible as payment), or three (3) or more beneficiary complaints or inquiries, regardless of dollar amount, about the same provider/supplier. Complaints or inquiries that do not meet the above threshold for screening shall be closed.*

*Prior to proceeding with the adjustment of a claim as the result of a second-level screening, the MAC shall check the Recovery Audit Contractor (RAC) Data Warehouse (RACDW) for suppressions and/or exclusions. If a suppression and/or exclusion is present, the MAC shall not adjust the claim and the complaint or inquiry shall be closed. However, if the MAC determines that the complaint or inquiry indicates potential fraud, and a suppression and/or exclusion is not present, the MAC shall make a referral to the UPIC, using the referral guidelines established in 4.3.2.4 – Referrals to the UPIC.*

*Each complaint or inquiry shall be tracked and retained for one (1) year. Beneficiaries inquiring about complaints should be advised that they are being tracked and reviewed. The MAC shall perform a more in-depth review if additional complaints or inquiries are received. The MAC shall enter all potential fraud, waste, and abuse complaints or inquiries received from beneficiaries into their internal tracking system. The MAC shall maintain a log of all potential fraud, waste, and abuse complaints or inquiries received from the CCO. At a minimum, the log shall include the following information:*

- *Beneficiary name;*
- *Provider/supplier name;*
- *Beneficiary HICN;*
- *Nature of the inquiry;*
- *Date received from the initial screening staff (i.e. date the initial screening staff receives the lead from the CCO);*
- *If applicable, date RACDW was checked to confirm the absence of a suppression and/or exclusion.*
- *Date referral was sent to the UPIC;*
- *Destination of the referral (i.e., name of the UPIC);*
- *Documentation that a complaint or inquiry received from the initial screening staff was not forwarded to the UPIC and an explanation why (e.g., inquiry was misrouted or inquiry was a billing error that should not have been referred to the screening staff); and*
- *Date complaint or inquiry was closed.*

*The MAC staff may call the beneficiary or the provider/supplier, check claims history, and check provider/supplier correspondence files for educational or warning letters or contact reports that relate to similar complaints or inquiries, to help determine whether or not there is a pattern of potential fraud, waste, and abuse. The MAC shall request and review certain documents, such as itemized billing statements and other pertinent information, as appropriate, from the provider/supplier. If the MAC is unable to make a determination on the nature of the complaint or inquiry (e.g., fraud, waste, and abuse, billing errors) based on the aforementioned contacts and documents, the MAC shall order medical records and limit the number of medical records ordered to only those required to make a determination. The MAC shall only perform a billing and document review on medical records to verify that services were rendered. If fraud, waste, and abuse are suspected after performing the billing and document review, the medical records shall be forwarded to the UPIC for review in accordance with the referral timeframe identified below.*

*When a complaint meeting the criteria of an IA or potential fraud, waste or abuse is received, the MAC shall not perform any screening but shall prepare a referral package within ten (10) business days of when the inquiry or IA was received, except for instances of potential patient harm, of which a referral package shall be prepared by the end of the next business day after the inquiry or IA was received, and send it to the UPIC during the same timeframe using the guidelines established in section 4.3.2.4 – Referrals to the UPIC. Once the complaint has been referred to the UPIC, the MAC shall close the complaint in its internal tracking system.*

### *B. Screening of OIG Hotline Referrals*

*The MAC shall screen every OIG Hotline complaint received from CMS to determine if the complaint can be closed, resolved, other appropriate action taken by the MAC, or referred to either another contractor, a State Medicaid Agency, or Marketplace Integrity. If the MAC determines that a referral shall be made, the MAC shall adhere to the referral guidelines established below and in 4.3.2.4 – Referrals to the UPIC.*

*All OIG Hotline complaints sent to the MAC by CMS shall be reviewed, determinations shall be made, and final action shall be taken within 45 business days from the date the complaint is received, unless medical records have been requested and the MAC is pending receipt of the records. The MAC shall use the date contained in the e-mail from CMS as the start of the 45 business day timeframe.*

*If, the MAC requests medical records and those records are not received within 45 business days, the MAC shall deny the claim(s) or keep the request open beyond the 45 business day timeframe to allow for receipt of the requested records, whichever is appropriate.*

*If fraud is suspected when medical records are not received or the MAC determines otherwise that the complaint or inquiry indicates potential fraud, waste, and abuse, the MAC shall forward it to the UPIC for further development within 45 business days of the date of receipt from CMS or within 30 business days of the date of receipt of medical records and/or other documentation, whichever is later. If a referral shall be made, the MAC shall adhere to the referral guidelines established below and in 4.3.2.4 – Referrals to the UPIC.*

*If the MAC determines that the complaint or inquiry is not a fraud and/or abuse issue, and if the MAC discovers that the complaint or inquiry has other issues (e.g., MR, enrollment, claims processing), it shall be referred to the appropriate department and then closed.*

*When a complaint meeting the criteria of an IA or potential fraud, waste or abuse is received, the MAC shall not perform any screening but shall prepare a referral package within ten (10) business days of when the inquiry or IA was received, and send it to the UPIC during the same timeframe using the guidelines established in 4.3.2.4 – Referrals to the UPIC. Once the complaint has been referred to the UPIC, the MAC shall close the complaint in its internal tracking system.*

*If the MAC receives a complaint from CMS that has been erroneously assigned to the MAC, the contractor shall transfer the erroneously assigned complaint to the appropriate MAC within 10 business days from the date it determined that the complaint was erroneously assigned.*

*MACs may receive complaints alleging fraud, waste or abuse in the Medicaid program. Upon receipt, the MAC shall refer the complaints to the appropriate Program Integrity Unit (PIU) within the State Medicaid Agency (SMA) noted in Exhibit 47.*

*The MAC shall identify and refer complaints alleging fraud, waste, or abuse in the Medicare Part C or Part D programs to the MEDIC. This includes complaints that do not have a credible allegation of fraud.*

*The MAC shall identify and refer complaints alleging fraud, waste, or abuse involving the Federal Marketplace and State-Based Exchanges, insurance agents/brokers marketing Marketplace plans, and Marketplace consumers to the following email address: marketplaceintegrity@cms.hhs.gov, with a copy to the MAC CORs. The MAC shall close the*

*complaint in its internal tracking system. These referrals shall be done in accordance with the timeframes established above.*

*The MAC shall only be required to close a complaint from the OIG Hotline in its internal tracking system and will no longer refer complaints that do not allege fraud, waste, or abuse involving CMS programs to the OIG.*

*If the MAC receives duplicate complaints, the second duplicate complaint shall be closed and cross-referenced to the original complaint. Subsequent complaints will be thoroughly reviewed to ensure that any new information is added to the original complaint. This will ensure all items in question related to the complaint are addressed. When the complaint is closed, monetary actions (if involved) shall only be claimed on the primary complaint.*

## *4.3.2.4 - Referrals to the UPIC*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*MACs that refer a complaint to the UPIC shall notify the UPIC via e-mail that a complaint is being referred as potentially fraudulent. The MAC shall develop a referral package (see below for what should be included in the referral package) for all complaints being referred to the UPIC and shall send the complaint via a secure method such as e-mail or mail directly to the UPIC.*

*Complaints shall be forwarded to the UPIC for further review under the circumstances listed below (this is not an exhaustive list):*

- *Claims may have been altered*
- *Claims have been up-coded to obtain a higher reimbursement amount and appear to be fraudulent or abusive;*
- *Documentation appears to indicate that the provider/supplier has attempted to obtain duplicate reimbursement (e.g., billing both Medicare and the beneficiary for the same service or billing both Medicare and another insurer in an attempt to be paid twice). An example of an attempt to obtain duplicate reimbursement might be that a provider/supplier has submitted a claim to Medicare, and then in two (2) business days resubmits the same claim in an attempt to bypass the duplicate edits and gain double payment. This apparent double-billing does not include routine assignment violations. The MAC shall attempt to resolve all routine assignment violations. However, referral from the MAC to the UPIC shall be made in instances where the provider/supplier has repeatedly committed assignment violations, indicating a potential pattern;*
- *Potential misrepresentation with respect to the nature of the services rendered, charges for the services rendered, identity of the person receiving the services, identity of persons or doctor providing the services, dates of the services, etc.;*
- *Alleged submissions of claims for non-covered services are misrepresented as covered services, excluding demand bills and those with Advanced Beneficiary Notices (ABNs);*
- *Claims involving potential collusion between a provider/supplier and a beneficiary resulting in higher costs or charges to the Medicare program;*

- *Alleged use of another person's Medicare number to obtain medical care;*
- *Alleged alteration of claim history records to generate inappropriate payments;*
- *Alleged use of the adjustment payment process to generate inappropriate payments; or*
- *Any other instance that is likely to indicate a potential fraud, waste, and abuse situation.*

*Note: Since this is not an all-inclusive list, the UPIC has the right to request additional information in the resolution of the complaint referral or the subsequent development of a related case (e.g., provider/supplier enrollment information).*

*When the above situations occur requiring that the complaint be referred to the UPIC for review, the MAC shall prepare a referral package that includes, at a minimum, the following:*

- *Provider/supplier name, NPI, provider/supplier number, and address.*
- *Type of provider/supplier involved in the allegation and the perpetrator, if an employee of the provider/supplier.*
- *Type of service involved in the allegation.*
- *Place of service.*
- *Nature of the allegation(s).*
- *Timeframe of the allegation(s).*
- *Narration of the steps taken and results found during the MAC's screening process (discussion of beneficiary contact, if applicable, information determined from reviewing internal data, etc.).*
- *Date of service, procedure code(s).*
- *Beneficiary name, beneficiary HICN, telephone number.*
- *Name and telephone number of the MAC employee who received the complaint.*

***NOTE:*** *Since this is not an all-inclusive list, the UPIC has the right to request additional information in the resolution of the complaint referral or the subsequent development of a related case (e.g., provider/supplier enrollment information).*

*The MAC shall maintain a copy of all referral packages.*

## 4.4 - *Home Health Agency Misuse of Requests for Anticipated Payments*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to MACs who process Home Health claims.*

*Under the Prospective Payment System (PPS) Medicare makes a split percentage payment for most Home Health PPS episode periods. The first payment is for a Request for Anticipated Payment (RAP), and the last is for a claim. See Pub 100-04, Medicare Claims Processing Manual, Chapter 10, Home Health Agency Billing, for more detailed information regarding the processing of RAPs and final claims, including exceptions.*

*RAP payments were implemented in October 2000 when CMS moved home health services to the PPS payment model as directed in the Balanced budget Act of 1997 and are designed to ensure home health agencies have sufficient cash flow. 42 CFR § 409.43(c)(2) gives CMS the authority to cancel and recover RAPs unless the claim is submitted within the greater of 60 days from the end of the episode or 60 days from the issuance of the request for anticipated payment. In addition, 42 CFR § 409.43(c)(2) and Pub 100-02, MBPM, Chapter 7, section 10.6, convey CMS's authority to reduce or disapprove RAPs in situations when protecting Medicare program integrity warrants the action.*

*MACs may identify instances where a Home Health Agency's (HHA) use of RAPs indicates potential fraud, waste or abuse. Such instances should be rare and includes, but is not limited to situations where an HHA exhibits a high rate of final claims not being filed. Upon identifying misuse of RAPs, the MAC shall initiate corrective action.*
*Corrective action includes, but is not limited to, education, warnings, Corrective Action Plans, RAP suppression, and referrals to the UPIC.*

### 4.4.1 - *RAP Monitoring*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*MACs shall conduct routine (at least monthly) monitoring activities to account for potential misuse of RAPs. The focus of the monitoring is to identify providers exhibiting misuse of RAPs at the earliest possible time so that the MAC can intervene with the lowest degree of corrective action (e.g., education, warnings, corrective action plans, RAP suppression, referrals to UPICs) necessary to resolve the problem(s). MACs have discretion to implement RAP suppression immediately, if warranted.*

*The ratios, percentages, etc., indicating likely misuse may vary according to the specific attributes of the HHA activities and metrics considered. MACs shall analyze an HHA's behavior in comparison to individual metrics as well as holistically. In general, a MAC's monitoring activities shall account for various situations where an HHA's behavior indicates potential fraud, waste, or abuse, including but not limited to:*

- *The number of final claims submitted is less than the number of RAPs submitted generally;*
- *The number of final claims submitted late resulting in RAPs being "auto-canceled";*
- *Variation in the number of RAPs submitted on key markers, including but not limited to:*
  - *comparable intervals, e.g., weekly, monthly, quarterly, yearly; and/or*
  - *beneficiaries, e.g., beneficiaries already receiving care, newly entering beneficiaries, beneficiaries with 2 or more admit dates during the same 60 day episode;*
  - *HHAs, e.g., the intensity of relationships between HHAs where at least one is already on RAP suppression; and*
- *Other behavior indicative of misuse.*

### 4.4.2 - *Education and Additional Monitoring*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*In monitoring the use of RAPs, a MAC may identify potential misuse that is not significant enough to warrant immediate implementation of a Corrective Action Plan, RAP Suppression, etc., but may indicate the need for additional education and monitoring. The MAC shall educate the HHA on the appropriate use of RAPs and monitor the HHA's use of RAPs for a reasonable period of time. Appropriate steps include calling the HHA to discuss the concerns identified, distributing educational materials to the HHA, and/or sending correspondence to the HHA. At a minimum, the MAC shall make clear to the HHA that:*

- *the HHA's billing practices are inconsistent with Medicare policy guidelines;*
- *the HHA's billing practices are being subjected to increased monitoring;*
- *if improvement is not demonstrated upon completion of a reasonable monitoring period (e.g., 30 days), there is potential for additional future action, including Corrective Action Plans, RAP Suppression and/or referral to the UPIC; and*
- *the MAC will convey next steps, if any, upon completion of the monitoring period.*

*Once the monitoring period has ended, the MAC shall inform the HHA of the outcome. This may include no additional action being taken, the monitoring period being extended or the implementation of additional corrective action, including but not limited to a Corrective Action Plan as detailed in Section 4.4.3.*

## 4.4.3 - *Corrective Action Plans*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*In monitoring an HHA's activities, a MAC may identify misuse of RAPs that warrants immediate implementation of a Corrective Action Plan (CAP). The purpose of the CAP is to ensure adherence to CMS regulations and that an HHA is implementing processes/internal controls to improve billing practices.*

### *4.4.3.1 - Notification to the HHA*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*A MAC shall notify the HHA in writing that a CAP is required based on non-compliant billing practices; detail the misuse the MAC identified; indicate the anticipated length of the CAP; and advise the HHA regarding whether the HHA is also being placed on RAP suppression as detailed in section 4.4.4. RAP Suppression.*

### *4.4.3.2 - CAP Submission*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The HHA must submit the CAP within 14 calendar days from the date of the MAC's letter. In the CAP, the HHA must address the following:*

- *A statement of the problem(s) or weakness(es) that caused the misuse of RAPs identified by the MAC.*

- *The proposed solution(s) along with other pertinent information including time frames for resolving the problem(s).*

- *The individual responsible for monitoring the CAP who will coordinate with the MAC.*

- *Other relevant information.*

*If an HHA fails or refuses to submit a CAP, the MAC shall take immediate action to implement a RAP suppression in accordance with Section 4.4.4. and/or refer the HHA to the UPIC in accordance with Section 4.4.5.*

*The MAC shall provide the UPICs a list of HHAs with pending or accepted CAPs on a regular basis, i.e., at least monthly. The submission or acceptance of a CAP does not preclude UPIC from opening an investigation for potential fraud.*

### *4.4.3.3 - CAP Acceptance and Monitoring*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The MAC shall notify the HHA once the CAP has been reviewed and accepted. The MAC shall convey the length of time the CAP will be in place. Normally, CAPs will be implemented for a minimum of 30 calendar days, but the MAC may require a longer implementation period based on the specific problems/weaknesses. When CAPs are implemented with RAP Suppression the minimum implementation period is 90 calendar days. The MAC shall periodically monitor the HHA's progress toward the proposed solutions prior to the end of the implementation period.*

*When a HHA is placed on RAP suppression and a CAP, the MAC's acceptance of the CAP does not automatically reinstate RAP payments. Once the CAP has been submitted, the MAC will determine whether reinstatement of the RAP is appropriate.*

*If the MAC is unable to accept the CAP, the MAC has discretion to allow the HHA an additional period not to exceed 14 calendar days to resubmit. If the HHA is unable to resolve the issues with the CAP, the MAC shall consider additional corrective action, including RAP Suppression and/or referral to the UPIC.*

### *4.4.3.4 - CAP Closeout*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Once the monitoring period has ended, the MAC shall formally inform the HHA of the outcome. This includes no additional action being taken, the monitoring period being extended or the implementation of additional corrective action, including but not limited to a Corrective Action Plan as detailed in Section 4.4.3, based on other misuse identified.*

*Upon request by a UPIC, the MAC shall provide information regarding a CAP.*

### *4.4.4 - RAP Suppression*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*In certain situations, a MAC may identify misuse of RAPs that warrants immediate RAP Suppression in accordance with 42 CFR § 409.43(c)(2). RAP Suppression entails all RAP payments submitted by an HHA being set to process with zero payment. The purpose of RAP Suppression is to ensure that an HHA initiates immediate changes to processes/internal controls to improve billing practices and adhere to CMS regulations. When a RAP Suppression is in place, payments will only be made when the final claim is received and processed. Note that in some situations, a UPIC may request that a MAC place an HHA on RAP Suppression.*

### *4.4.4.1 - Notice of RAP Suppression*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*A MAC must notify the HHA in writing that RAP Suppression is being instituted as soon as practicable after the MAC determines with reasonable certainty that the HHA is engaging in*

*unacceptable billing practices; detail the misuse the MAC identified; and indicate the anticipated length of the RAP Suppression. Note that RAP Suppression can be implemented in conjunction with a CAP under Section 4.4.3. Correction Action Plans.*

### *4.4.4.2 - Monitoring During RAP Suppression*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Once a RAP Suppression is instituted, the MAC will monitor the HHA's progress on a regular basis (e.g., weekly). The HHA must submit a CAP in accordance with Section 4.5.4.2. The MAC shall follow the CAP procedures detailed in sections 4.4.3.3. CAP Acceptance and Monitoring and 4.4.3.4. CAP Closeout.*

*At a minimum, a RAP Suppression will be in place for 90 calendar days. If warranted, a MAC may extend the RAP Suppression before the 90 day period ends.*

### *4.4.4.3 - Result of Initial RAP Suppression Monitoring Period*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*At the conclusion of the original RAP Suppression Monitoring Period (typically 90 calendar days), the MAC shall inform the HHA of the outcome which may include either reinstatement of the HHA's RAP authorization or continuation of the RAP Suppression.*

### *4.4.4.3.1 - Reinstatement of RAP Authorization*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Once an HHA has demonstrated adequate improvement regarding its billing practices and maintains the improvement, the MAC has discretion to reinstitute an HHA's ability to submit RAPs except when the RAP Suppression was initiated at the request of a UPIC.*

### *4.4.4.3.2 - Continuation of RAP Suppression*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*If an HHA fails to demonstrate adequate improvement regarding its billing practices and/or fails to submit an acceptable CAP, the MAC shall formally notify the HHA that the monitoring period and RAP Suppression will be extended for an additional period (typically 90 calendar days).*

*Once an HHA has demonstrated improvement regarding its billing practices and maintains the improvement, the MAC has discretion to reinstitute a HHA's ability to submit RAPs.*

### *4.4.5 - Coordination and Referral to the UPIC*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Throughout the RAP monitoring and suppression process (prior to contacting an HHA for education or other corrective actions, e.g., CAPs, RAP Suppression; or prior to the continuation or removal of a RAP suppression, the MAC shall coordinate with the UPIC to determine if there is an open investigation concerning the HHA and appropriate next steps. If there is an open investigation on the HHA, the MAC shall immediately refer their findings to the UPIC and take no further action unless otherwise agreed upon.*

*A MAC may determine that an HHA's misuse of RAPs and/or other conduct, such as an HHA's failure to respond to requests/queries during periods of increased monitoring, CAPs, etc., warrants immediate referral to the appropriate UPIC. MACs and UPICs shall coordinate in accordance with Pub 100-08, Medicare Program Integrity Manual, Chapter 4, Program Integrity and their Joint Operating Agreements.*

## 4.5 - *Screening Leads*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*Screening is the initial step in the review of a lead (described in section 4.2.2.1 of this chapter) to determine the need to perform further investigation based on the potential for fraud, waste, or abuse. Screening shall be completed within 45 calendar days after receipt of the lead.*

*The receipt date of the lead is generally determined by the date the UPIC receives a complaint. If the lead resulted from data analysis conducted by the UPIC, the receipt of the lead shall be the date the lead was referred from the UPIC data analysis department to its investigation or screening unit. For a new lead that is identified from an active or current UPIC investigation, the receipt of the lead shall be the date the new lead was identified by the UPIC investigator.*

*Note: If criteria for an IA are met during evaluation of the lead, the UPIC shall forward the IA to LE and continue to screen the lead, if deemed appropriate.*

*Activities that the UPIC may perform in relation to the screening process include, but are not limited to:*

- *Verification of provider's enrollment status;*
- *Coordination with the MAC on prior activities (i.e., prior medical reviews, education, appeals information, etc.);*
- *Data analysis;*
- *Policy / regulation analysis;*
- *Contact with the complainant, when the lead source is a complaint;*
- *Beneficiary interviews; and*
- *Site verification to validate the provider's/supplier's practice location.*

*Any screening activities shall not involve contact with the subject provider/supplier or implementation of any administrative actions (i.e., post-payment reviews, prepayment reviews/edits, payment suspension, and revocation). However, if the lead is based solely on a potential assignment violation issue, the UPIC may contact the provider directly to resolve only the assignment violation issue. If there are circumstances noted in UCM that would raise additional concerns, the UPIC shall contact its COR and BFL for further guidance. If the lead involves potential patient harm, the UPIC shall immediately notify CMS within two (2) business days.*

*After completing its screening, the UPIC shall close the lead if it does not appear to be related to fraud, waste, or abuse. Prior to closing the lead, the UPIC shall take any appropriate actions (i.e., referrals to the MAC, RA, state, or QIO). For example, if a lead does not appear to be related to potential fraud, waste, or abuse but the lead needs to be referred to the MAC, the date that the UPIC refers the information to the MAC is the last day of the screening.*

*At a minimum, the UPIC shall document the following information in its case file:*

- *The date the lead was received and closed;*

- *Lead source (e.g., beneficiary, MAC, provider/supplier);*

- *Record the name and telephone number of the individual (or organization), if applicable, that provided the information concerning the alleged fraud or abuse;*
- *Indicate the provider's/supplier's name, address, and ID number;*
- *Start and end date of the screening;*
- *Description of the actions/activities performed;*
- *Start and end date of each action/activity;*
- *A brief description of the action taken to close the lead (e.g., reviewed records and substantiated amounts billed). Ensure that sufficient information is provided to understand the reason for the closeout;*
- *The number of leads received to date regarding this provider/supplier, including the present lead. This information is useful in identifying providers/suppliers that are involved in an undue number of complaints; and*
- *Any documentation associated with the UPIC's activities (i.e., referrals to other entities).*

*Additionally, if the screening process exceeds 45 calendar days, the UPIC shall document the reasons, circumstances, dates, and actions associated with the delay to its COR and BFL within its monthly reporting in CMS ARTS.*

*If the UPIC identifies specific concerns while screening a lead that warrants contact with a specific provider/supplier, the UPIC shall contact its Contract Office Representative (COR) and Business Function Lead (BFL) for further guidance (e.g., UPIC determines that provider/supplier contact is needed in order to determine if the case warrants further investigation).*

### 4.5.1 – *UPIC and I-MEDIC Responsibilities*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to the UPICs.*

*When a complaint is received from the MAC screening staff, the UPIC shall further screen the complaint, resolve the complaint, or make referrals, as needed, to the appropriate entity.*

*The MAC shall screen and forward the complaints within 45 business days from the date of receipt by the screening staff, or within 30 business days of receiving medical records and/or other documentation, whichever is later, to the UPIC. The UPIC shall send the acknowledgement letter within 15 calendar days of receipt of the complaint referral from the MAC screening staff, unless it can be resolved sooner. The letter shall be sent on UPIC letterhead and shall contain the telephone number of the UPIC analyst handling the case.*

*If the UPIC staff determines, after screening the complaint, that it is not a potential fraud, waste, and/or abuse issue, but involves other issues (e.g., MR, enrollment, claims processing), the complaint shall be referred back to the MAC area responsible for screening. The MAC screening staff shall track the complaints returned by the UPIC. However, the UPIC shall send an acknowledgement to the complainant, indicating that a referral is being made, if applicable, to the appropriate MAC unit for further action. The UPIC shall track complaints referred by the MAC screening area in the UPIC's internal*

*tracking system. The UPIC shall send the complainant a resolution letter within seven (7) calendar days of resolving the complaint investigation.*

*This section applies to the I-MEDIC.*

*When a complaint is received by the I-MEDIC complaint screening staff, an acknowledgement letter shall be sent to the complainant within five (5) calendar days. The I-MEDIC complaint screening staff shall screen, resolve, or if warranted, escalate the complaint to the screening team at the I-MEDIC within 30 calendar days from the date of receipt.*

*Once a complaint has been escalated to lead screening, the I-MEDIC shall further screen the lead, open an investigation, or make referrals, as needed, to the appropriate entity within 45 days.*

*The I-MEDIC shall track all complaints received by its complaint screening staff in an internal tracking system. All complaints that have escalated to a lead status shall be tracked in the UCM.*

*The I-MEDIC complaint screening staff shall send the complainant a resolution letter within five (5) calendar days of resolving the complaint investigation.*

## 4.6 - *Vetting Leads with CMS*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*All leads and any new subjects that the UPIC determines warrant further investigation shall be vetted through CMS for approval before transitioning to an investigation. The UPIC shall vet all applicable National Provider Identifiers (NPIs) and Provider Identifiers associated with the provider or supplier's tax-identification number, when initially vetting the lead with CMS. The UPIC shall submit the lead to CMS within two (2) business days of the UPIC determining that the lead should be transitioned into an investigation. Periodically, based on high priority fraud schemes identified by CMS and/or Law Enforcement, CMS may require the UPIC to vet leads in an expedited timeframe. When instances such as this are identified, the details associated with the expedited vetting will be communicated to the UPIC by their COR and BFL.*

*For the submission to CMS, the UPIC shall use the designated CMS Vetting Form, which shall include, at a minimum, NPI, name, and practice location.*

*The UPIC shall only open investigations on leads that are approved by CMS. Once the lead is approved by CMS, the UPIC shall notate the date the lead was initially vetted and approved by CMS in UCM. If the UPIC is instructed by CMS to close the lead without further action, the UPIC shall do so within two (2) business days. If the screening results in a new investigation or becomes part of an existing investigation, the aforementioned screening information shall become part of the investigation file. If, during the course of a UPIC investigation, it is determined that additional NPIs should be incorporated into the ongoing investigation, the UPIC shall vet each additional NPI with CMS utilizing the approved CMS process described above before implementing any investigative actions (noted in section 4.7 of this chapter) on the additional NPIs. For any new investigations, the UPIC shall complete the appropriate updates in the UCM within seven (7) calendar days.*

*If multiple contractors become involved with the investigation, the UPIC that initially vetted the lead with CMS shall become the lead contractor, unless otherwise specified by CMS. The lead contractor shall notify all applicable contractors of the date the lead was vetted and approved by CMS for investigation. Therefore, no additional vetting is required by the other*

*participating contractors. The other participating contractors shall also notate the date the lead was initially vetted and approved by CMS in their applicable case tracking system(s).*

## 4.7 - Investigations

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

This section applies to UPICs.

An investigation is the expanded analysis performed on leads once such lead is vetted and approved by CMS to be opened as an investigation. The UPIC shall focus its investigation in an effort to establish the facts and the magnitude of the alleged fraud, waste, or abuse and take any appropriate action to protect Medicare Trust Fund dollars within 180 calendar days, unless otherwise specified by CMS.

For any investigative activities that require preapproval by CMS (i.e., activities referenced in Section *4.7.1.2*), the UPIC shall submit those requests to CMS for approval with a copy to its COR and BFLs for approval when initiating those actions.

Prioritization of the investigation workload is critical to ensure that the resources available are devoted primarily to high-priority investigations. The UPIC shall ensure that all investigations originating from an Accountable Care Organization (ACO) referral or involving ACOs, ACO participants or ACO providers/suppliers are provided a heightened level of priority and are promptly reviewed and investigated to ensure the appropriate administrative or other action(s) are taken in an expeditious manner.

The UPIC shall maintain files on all investigations. The files shall be organized by provider or supplier and shall contain all pertinent documents including, but not limited to, the original referral or complaint, investigative findings, reports of telephone contacts, warning letters, documented discussions, documented results of any investigative activities, any data analysis or analytical work involving the potential subject or target of the investigation, and decision memoranda regarding final disposition of the investigation (refer to section 4.2.2.6.2 of this chapter for information concerning the retention of these documents).

Under the terms of their contract, the UPICs shall investigate potential fraud, waste, or abuse on the part of providers, suppliers, and other entities that receive reimbursement under the Medicare program for services rendered to beneficiaries. The UPICs shall refer potential fraud cases to LE, as appropriate, and provide support for these cases. In addition, the UPICs may provide data and other information related to potential fraud cases initiated by LE when the cases involve entities or individuals that receive reimbursement under the Medicare program for services rendered to beneficiaries.

For investigations that the providers/suppliers are subject to prior authorization by the MAC, the UPIC may request the MAC to release the prior authorization requirement prior to pursuing the investigation further.

For those investigations that are national in scope, CMS will designate a lead UPIC, if appropriate, to facilitate activities across the zones.

### 4.7.1 – Conducting Investigations

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

The UPIC shall, unless otherwise advised by CMS, use one or more of the following investigative methods (this is not an exhaustive list):

- Screening activities as referenced in Section *4.5*;

- Contact with the subject provider or ordering/referring providers via telephone or on-site visit;
- Medical record requests and reviews (as defined in PIM, chapter 3);
- Prepayment medical reviews associated with a limited claim count (i.e., 25- 50 claims) or targeted review (i.e., specific CPT codes) (as defined in PIM, chapter 3);
- Implementation of auto-denial edits; and
- Recommendation of other administrative actions (as defined in PIM chapters 3, 8, and *10*) to CMS. These items will include any administrative actions identified below to be discussed during the case coordination meetings.

Additionally, the UPICs shall coordinate with LE partners prior to making contact with any provider/supplier, when it knows there is or was a LE case on the provider/supplier.

The UPIC shall review the Unified Case Management (UCM) system prior to contacting any provider/supplier to verify the following:

- There are no current or prior requests for information from LE;
- There are no other current or prior coordination activities with LE concerning the provider; and
- The CMS vetting response indicates there is no current LE activity associated with the provider/supplier.

If the UPIC identifies prior LE activity within the past 24 months, the UPIC shall communicate with the LE contact person identified in the UCM to determine if making contact with a provider/supplier will impact its case. If the UPIC is not able to identify the LE contact person in UCM, the UPIC shall consult with its BFL for further guidance. Once the UPIC contacts LE, it shall document the results of the conversation, including the date, time, name of the individual, and the specific LE agency in UCM prior to contacting the provider/supplier. If the UPIC has attempted to contact LE on multiple occasions within five (5) business days, but does not receive a response, the UPIC shall notify its COR and BFL for CMS escalation to the appropriate LE contacts.

For any investigative activities that require approval by CMS (i.e., Payment Suspension, Requests for Anticipated Payment (RAP) suppression, or revocation/deactivation requests), the UPIC shall submit those requests through its current processes (i.e., via UCM) and coordinate subsequent actions with the appropriate points of contact within CPI.

After reviewing the provider's/supplier’s background, specialty, and profile, the UPIC decides whether the situation involves potential fraud, waste, or abuse, or may be more accurately categorized as a billing error. For example, records might indicate that a physician has billed, in some instances, both Medicare and the beneficiary for the same service. Upon review, the UPIC may determine that, rather than attempting to be paid twice for the same service, the physician made an error in his/her billing methodology. Therefore, this error would be considered a determination of incorrect billing, rather than potential fraud, waste, or abuse involving intentional duplicate billing. If the UPIC determines that an overpayment exists solely on data analysis, the UPIC shall obtain COR and BFL approval prior to initiating the overpayment.

### *4.7.1.1 – Provider/Supplier Contacts by the UPIC*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*A UPIC may determine that the resolution of an investigation does not warrant administrative action and that an educational meeting with the provider/supplier is more appropriate. The UPIC shall inform the provider/supplier of the questionable or improper practices, the correct procedure to be followed, and that continuation of the improper practice may result in administrative actions. The UPIC shall document contacts and/or warnings with written reports and correspondence to the provider/supplier and place them in the investigation file in the UCM.*

*If the provider/supplier continues aberrant billing practices, the UPIC shall initiate the appropriate administrative actions. If the UPIC meets with a provider/supplier, the UPIC shall prepare a detailed report for the investigation file in the UCM. The report shall include the information in A, B, and C below:*

***A. Background of Provider/Supplier (Specialty)***

*The UPIC shall include a list of all enterprises in which the subject had affiliations, the states where the provider/supplier is licensed, all past complaints, and all prior educational contacts/notices.*

***B. Total Medicare Earnings***

*The UPIC shall include a report of the subject provider's/supplier's total Medicare earnings for the past 12 months.*

*The report shall include the following:*

- *Earnings for the procedures or services in question;*
- *Frequency of billing for these procedures/services; and*
- *Total number of claims submitted for these procedures/services.*

***C. Extent of Review Performed***

*The UPIC shall include in the detailed report, to be placed in the investigative file, the number and type of reviews performed, as well as the specific information outlined below:*

- *A report of the review process, including methodologies utilized, reason for the review, and findings;*
- *Any administrative actions implemented (e.g., overpayments identified); and*
- *Recommendation(s).*

***D. Report of Meeting***

*The UPIC shall include information pertaining to the meeting(s) conducted with the provider/supplier. This report shall include the following:*

- *Minutes from the meeting describing the problems and/or aberrancies discussed with the provider/supplier and the education provided to the provider/supplier to correct those problems based on the UPIC's MR; and*
- *Copies of educational materials given to the provider/supplier before, during, or subsequent to the meeting.*

***E. Written Correspondence Regarding Non-compliance***

*Per the abuse of billing authority under 42 C.F.R. § 424.535(a)(8)(ii) for a pattern or practice of submitting claims that do not meet Medicare requirements and in an effort to*

*fully inform providers of the potential administrative actions that may be imposed based on continued violations of Medicare policy, the below statement should be included in all post payment correspondence that include an error rate, and if applicable, other communications that identify non-compliant billings and inform the provider/supplier of their non-compliance with Medicare requirements.*

*In addition, we remind you that our regulation at 42 CFR § 424.535 authorizes us to revoke Medicare billing privileges under certain conditions. In particular, we note that per 42 CFR § 424.535(a)(8)(ii), CMS has the authority to revoke a currently enrolled provider's or supplier's Medicare billing privileges if CMS determines that the provider or supplier has a pattern or practice of submitting claims that fail to meet Medicare requirements.*

## *4.7.1.2 - Case Coordination with UPICs*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*UPICs shall discuss their top investigations with CMS during regularly scheduled case coordination meetings.*

*The purpose of these meetings is to ensure that the contractor's top investigations are shared with all relevant stakeholders to ensure the appropriate parties handle a specific case as expeditiously as possible. In addition, CPI identified the following types of investigations that shall be discussed during the case coordination meetings:*

- *Immediate Advisements (IA);*
- *Extrapolated Overpayment Requests (not associated with a Payment Suspension);*
- *100% Prepayment Review Requests;*
- *Payment Suspension Requests;*
- *RAP Suppressions;*
- *Revocation Requests;*
- *Potential Referrals to Law Enforcement.*

## 4.7.2 *- Identity Theft Investigations and Victimized Provider Waiver of Liability Process*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*For purposes of this chapter, a "compromised number" is a beneficiary or provider/supplier number that has been stolen and used by unauthorized entities or individuals to submit claims to, i.e., bill, the Medicare program.*

*The UPICs shall investigate the alleged theft of provider identities, and report validated compromised numbers into the UCM Compromised Number Records module, in accordance with the applicable instruction and guidance documents (Of note, the instruction and guidance documents are located in the "Job Aids" and "Release Notes" section of the UCM Documentation Storage site. These documents are updated each time updates/enhancements occur.). An example of provider identity theft may include a provider's identity having been stolen and used to establish a new Medicare enrollment or a new billing number (reassignment) under an existing Medicare enrollment, or updating a current Medicare provider identification number with a different electronic funds transfer (EFT) payment account causing inappropriate Medicare payments to unknown person(s) and potential Medicare overpayment and eventually, U.S. Department of Treasury (UST) debt issued to the victimized provider.*

*The UPICs shall discuss the identity theft case with the COR and BFL. If claims are still being submitted and Medicare payments are being made, the UPIC should pursue strategies to prevent likely overpayments from being disbursed, such as prepayment reviews, auto-denial edits, Do Not Forward (DNF) requests, or immediate payment suspensions. The purpose of these administrative actions is to stop the payments. The UPICs are not authorized to request the MAC to write-off any overpayments related to the ID theft. Prior to any enrollment actions, the UPIC should be aware of the suspected victim's reassignments and consider the effect of Medicare enrollment enforcement actions on the alleged ID theft victim's current employments.*

*If an actual financial harm exists as a result of the ID theft (i.e., existence of Medicare debt or overpayment determination), the UPIC will follow the Victimized Provider Project (VPP) procedures, which include the following:*

- *At the point in which a UPIC begins to investigate provider ID theft complaints and incurred debt, it sends a letter acknowledging receipt of the complaint, informing the provider that CMS is investigating the complaint and reviewing materials submitted, and designating a VPP point of contact at the UPIC (IOM Pub. #100-08; Exhibit 8 – Letter 1);*
- *The next steps in this process include, but may not be limited to, the following:*
  - *Check if the case in question is in the UCM system. Vet the provider(s) with the DHHS - OIG or other appropriate LE agency to ensure that the contractor's investigative process will not interfere with prosecution;*
  - *A VPP case package must then be completed by the UPIC using the templates provided in the VPP information packet;*
  - *Describe the case and how the provider's ID was stolen or compromised. List all overpayment(s) for which the provider is being held liable. Clearly indicate those paid amounts that are in DNF and/or on payment suspension status, and the amounts that were paid with an actual check or electronic transfer to the fraudulent bank account;*
  - *Provide legitimate and compromised/stolen 855 forms with provider enrollment and reassignment of benefits information in order to verify legitimate PTAN(s)/NPI(s) and identify the fraudulent ones;*
  - *Get signed provider victim attestation statement(s) about the ID theft from the provider(s)/supplier(s).*
  - *Provide a police report from the alleged victim provider or any law enforcement documentation;*
  - *Provide financial background information, such as*
    - *IRS Form 1099 or W-2; and*
    - *Overpayment requests/debt collection notices.*
  - *Include any trial, DOJ and OIG documents like OIG proffers, indictment, judgments and sentencing documents; and*
  - *Based on the information gathered and the investigation conducted, the UPICs will state their recommendation as part of the package and provide the reason for the recommendation. Two recommendations are possible:*
    - *Hold provider harmless and rescind provider of federal ID theft case-related debt; OR*
    - *Hold provider liable for debt.*

*The UPIC will submit the complete VPP packet to the CMS CPI VPP team. In ID theft cases in which the victimized providers are located in multiple states and served by different UPICs, the UPIC jurisdiction in which the perpetrator's trial was located will be the lead UPIC that will coordinate with the other UPICs and submit a completed VPP packet to the CMS CPI VPP team.*

*The VPP team will validate and remediate all facts and information submitted by the UPIC. Part of the VPP team review may involve consultation with the HHS Office of General Counsel. This consultation may include, but may not be limited to, consideration of supporting documentation or lack thereof to support a decision that the provider is an actual victim of ID theft as well as compliance with federal statutes and regulations related to ID theft policies, debt collection and recall of overpayments.*

*The VPP team will make a final determination if the alleged ID theft victim is a true victim and approve a rescindment of Medicare overpayments reported in the name of the confirmed ID theft victim.*

*When calculating the actual overpayments related to the fraudulent claims under each provider victim, there may be situations in which discrepancies exist between LE and contractor loss calculation data. In these situations, the final figures used in making overpayment determinations should come from MAC data on amounts paid out in the name of the victimized providers using the cleared payments transmitted to the fraudulent bank accounts established in the DOJ case.*

*Once a final decision is made by the VPP team, the UPIC or Lead UPIC, as appropriate, will be informed.*

*If the provider victim is determined to be a true victim of ID theft, the UPIC will send out a letter using the template in the IOM Pub. #100-08 Exhibits chapter informing the provider of the favorable decision and that the assessed overpayment against the victim will be rescinded ((IOM Pub. #100-08; Exhibit 8 – Letter 2). This decision shall then flow through the UPIC to the MAC for a recall of the associated debt. (NOTE: The MAC's instructions for processing providers' debts that have been confirmed as identity theft are found in the Medicare Financial Management Manual Chapter 4, Section 110 – Confirmed Identity Theft). The MAC shall follow the process for making adjustments to the claims system and recall the debt registered under the victimized provider from the US Department of Treasury.*

*If the decision is not positive (i.e. ID theft is not confirmed), the UPIC shall correspond directly with the provider to inform him/her that CMS did not have sufficient information to confirm that identity theft has occurred. The UPIC shall send Letter 3 from the IOM Pub. #100-08 Exhibits chapter to the provider with a copy to the MAC.*

## *4.7.3 - Durable Medical Equipment Medicare Investigative Functions*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Since the Medicare program has become particularly vulnerable to fraudulent activity in the DMEPOS area, each UPIC shall:*

- *Routinely communicate with and exchange information with its MR unit and ensure that referrals for prepayment MR review or other actions are made.*

- *Consult with the UPIC medical directors in cases involving medical policy or coding issues.*

- *Fully utilize data available from the MAC with the pricing, data analysis and coding function (PDAC) to identify items susceptible to fraud.*

- *Keep the PDAC contractor, other UPICs, CORs, BFLs, and SMEs*

*informed of its ongoing activities and share information concerning aberrancies identified using data analysis, ongoing and emerging fraud schemes identified, and any other information that may be used to prevent similar activity from spreading to other jurisdictions.*

## *4.7.3.1 – Supplier Proof of Delivery Documentation Requirements*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs. This section is applicable to DME MACs, RACs, SMRC, and CERT MR contractors, as noted in Ch. 5, Section 5.8. Suppliers are required to maintain proof of delivery documentation in their files. Proof of delivery documentation must be maintained in the supplier's files for seven years (starting from the date of service).*

*Section 1833(e) grants Medicare contractors the authority to request any information necessary to determine the amounts due. This includes proof of delivery in order to verify that the beneficiary received the DMEPOS item and thus to determine the amounts due to the provider. Proof of delivery is also one of the supplier standards as noted in 42 CFR § 424.57(c)(12). If the UPIC has reason to be concerned that Medicare was billed for an item that was not received (such as a complaint from a beneficiary about non-receipt), the UPIC shall request proof of delivery from the supplier. Proof of delivery documentation must be made available, within the prescribed timeframes, to the UPIC upon request. For any items that do not have proof of delivery from the supplier, such claimed items shall be denied by the UPIC and overpayments recovered. Suppliers that consistently do not provide documentation to support that their items were delivered may be referred to the OIG or NSC for investigation and/or imposition of sanctions.*

## *4.7.3.1.1 - Proof of Delivery and Delivery Methods*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs. This section is applicable to DME MACs, RACs, SMRC, and CERT medical review contractors, as noted in Ch. 5, Section 5.8.*
*For the purpose of the delivery methods noted below, **designee** is defined as:*

*"Any person who can sign and accept the delivery of durable medical equipment on behalf of the beneficiary."*

*Suppliers, their employees, or anyone else having a financial interest in the delivery of the item are prohibited from signing and accepting an item on behalf of a beneficiary (i.e., acting as a designee on behalf of the beneficiary). The signature of the designee should be legible. If the signature of the designee is not legible, the supplier/shipping service should note the name of the designee on the delivery slip.*

*Three methods of delivery are:*

- *Supplier delivering directly to the beneficiary or designee;*
- *Supplier utilizing a delivery/shipping service to deliver items; and*
- *Delivery of items to a nursing facility on behalf of the beneficiary.*

*The date of delivery may be entered by the beneficiary, designee or the supplier. As a general Medicare rule, the date of service shall be the date of delivery. Exceptions are made for suppliers who use a delivery/shipping service. If the supplier uses a delivery/shipping service, the supplier may use the shipping date as the date of service on the claim. The shipping date may be defined as the date the delivery/shipping service label is created or the date the item is retrieved for delivery; however, such dates should not demonstrate*

*significant variation. (See Pub. 100-08, chapter 5, section 5.2.4 for further information on written orders prior to delivery.)*

### *4.7.3.1.2 – Exceptions*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs. This section is applicable to DME MACs, RACs, SMRC, and CERT MR contractors, as noted in Ch. 5, Section 5.8.*

***Early Delivery to an Inpatient Facility in Anticipation of Discharge***

*Exceptions to the preceding statements concerning the date(s) of service on the claim occur when the items are provided in anticipation of discharge from an inpatient facility that does not qualify as the beneficiary's home. A supplier may deliver a DME, prosthetics, or orthotics item (but not supplies) to a beneficiary in an inpatient facility that does not qualify as the beneficiary's home, for the purpose of fitting or training the beneficiary in the proper use of the item. This delivery may be done up to two (2) days prior to the beneficiary's anticipated discharge to their home. The supplier must bill the date of service on the claim as the date of discharge and the supplier must ensure that the beneficiary takes the item home, or the supplier picks up the item at the facility and delivers it to the beneficiary's home on the date of discharge. The item must be medically necessary on the date of discharge, i.e., there is a physician's order and corroborating medical documentation to support a stated initial date of need that is no later than the date of discharge for home use, and the item must be for subsequent use in the beneficiary's home.*

*(See IOM Pub. 100-04, Chapter 20, Section 110.3, for the policy and billing procedures regarding the circumstances under which a supplier may deliver durable medical equipment, prosthetics, and orthotics (but not supplies) to a beneficiary who is in an inpatient facility that does not qualify as the beneficiary's home.)*

***Early Delivery to Home in Anticipation of Discharge***

*In some cases, it would be appropriate for a supplier to deliver a medically necessary item of durable medical equipment (DME), a prosthetic, or an orthotic (but not supplies) to a beneficiary's home in anticipation of discharge to a Place of Service that qualifies as home. A supplier may deliver an item of DME, a prosthetic or an orthotic to a beneficiary's home in anticipation of a discharge from a hospital or nursing facility. The supplier may arrange for actual delivery of the item no sooner than two (2) days prior to the beneficiary's anticipated discharge to their home. The supplier shall bill the date of service on the claim as the date of discharge and shall use the Place of Service (POS) as 12 (Patient's Home).*

***Early Delivery of Immunosuppressive Drugs***

*Delivery of the immunosuppressive drugs may be made to the beneficiary's home (i.e., his/her own dwelling, an apartment, a relative's home, a home for the aged, or some other type of institution— such as an assisted living facility, or an intermediate care facility for individuals with intellectual disabilities (ICF/IID) but not a hospital or skilled nursing facility). In certain cases, a beneficiary who has received a transplant does not return home immediately after discharge. In order to ensure timely beneficiary access to prescribed immunosuppressive medications at the time of discharge, suppliers may deliver the initial prescriptions of a beneficiary's immunosuppressive drugs to an alternate address, such as the inpatient hospital that performed the transplant or alternative location where the beneficiary is temporarily staying (e.g., temporary housing), instead of delivering the drugs to the beneficiary's home address.*

*To allow payment for the first immunosuppressive drug claim after the beneficiary is discharged from an inpatient stay, the immunosuppressive drug may be mailed by a supplier no earlier than two (2) days before a beneficiary is discharged from an inpatient facility. The supplier must enter the date of discharge as the date of service on the claim.*

*Note that this is an optional, not mandatory, process. If the supplier chooses not to mail the immunosuppressive drug(s) prior to the beneficiary's date of discharge from the hospital, they may wait for the beneficiary to be discharged before delivering the drugs, and follow all applicable Medicare and DME MAC rules for immunosuppressive drug billing (for example, the date of service will be the date of delivery). If the supplier ships immunosuppressive drugs to an alternate address, all parties involved, including the beneficiary and the transplant facility, must agree to the use of this approach. The supplier will not receive additional payment for delivery to an alternate location.*

*Early and/or direct delivery to the transplant facility does not change the facility's responsibility to provide all immunosuppressive drugs required by the beneficiary for the duration of the beneficiary's inpatient stay.*

*(See IOM Pub. 100-04, Chapter 17, Section 80.3.3 for additional information.)*

***General Information***

*No billing may be made for any day prior to the date of discharge. A supplier may not bill for drugs or other DMEPOS items used by the beneficiary prior to the beneficiary's discharge from a stay in an inpatient facility that does not qualify as the beneficiary's home. Billing the DME MAC for surgical dressings, urological supplies, or ostomy supplies that are provided during a stay in an inpatient facility that does not qualify as the beneficiary's home is not allowed. These items are payable to the facility under Part A of Medicare. This prohibition applies even if the item is worn home by the beneficiary from the inpatient facility. Any attempt by the supplier and/or facility to substitute an item that is payable to the supplier for an item that, under statute, should be provided by the facility, may be considered to be fraudulent.*

*Separate payment will also not be available from either Medicare or the beneficiary if, for any reason, redelivery is necessary. All other applicable Medicare and DME MAC billing requirements continue to apply.*

## *4.7.3.1.3 - Proof of Delivery Requirements for Recently Eligible Medicare FFS Beneficiaries*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.* ***[This section is applicable to DME MACs, RACs, SMRC, and CERT MR contractors, as noted in Ch. 5, Section 5.8.]***

*Medicare does not automatically assume payment for a DMEPOS item that was covered prior to a beneficiary becoming eligible for the Medicare FFS program. When a beneficiary receiving a DMEPOS item from another payer becomes eligible for the Medicare FFS program, the beneficiary may continue to receive such items only if*

*Medicare requirements are met for such DMEPOS items. The DME MAC shall educate the supplier community that the supplier must submit an initial or new claim for the item and the necessary documentation to support Medicare payment, upon request, even if there is no change in the beneficiary's medical condition. The first day of the first rental month in which Medicare payments are made for the item serves as the start date of the reasonable useful lifetime and period of continuous use. The contractor shall consider the proof of delivery*

*requirements met for this type of beneficiary by instructing the supplier to obtain a statement, signed and dated by the beneficiary (or beneficiary's designee), that the supplier has examined the item. The DME MAC shall educate the supplier that the supplier must also attest to the fact that the item meets Medicare requirements.*

### *4.7.4 – Medical Review for Program Integrity Purposes*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Medical Review (MR) for Program Integrity (PI) is one of the parallel strategies of the Medicare Integrity Program (MIP) to encourage the early detection of fraud, waste, and abuse. The primary task of the UPIC is to identify suspected fraud, develop investigations and cases thoroughly and in a timely manner, and take immediate action to ensure that Medicare Trust Fund monies are not inappropriately paid out and that any improper payments are identified. For this reason, it is recommended that MR is integrated early into the development of the investigative process. The focus of PI MR includes, but is not limited to:*

- *Possible falsification or other evidence of alterations of medical record documentation including, but not limited to: obliterated sections; missing pages, inserted pages, white out; and excessive late entries;*

- *Evidence that the service billed for was actually provided and/or provided as billed; or,*

- *Patterns and trends that may indicate potential fraud, waste, and abuse.*

*The statutory authority for the MR program includes the following sections of the Social Security Act (the Act):*

- *Section 1833(e), which states in part "...no payment shall be made to any provider... unless there has been furnished such information as may be necessary in order to determine the amounts due such provider ...;"*

- *Section 1842(a)(2)(B), which requires MACs to "assist in the application of safeguards against unnecessary utilization of services furnished by providers ...; "*

- *Section 1862(a)(1), which states no Medicare payment shall be made for expenses incurred for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member;"*

*The remainder of Section 1862(a), which describes all statutory exclusions from coverage;*

- *Section 1893(b)(1) establishes the Medicare Integrity Program, which allows contractors to review activities of providers of services or other individuals and entities furnishing items and services for which payment may be made under this title (including skilled nursing facilities and home health agencies), including medical and utilization review and fraud review (employing similar standards, processes, and technologies used by private health plans, including equipment and software technologies which surpass the capability of the equipment and technologies. . .")*

- *Sections 1812, 1861, and 1832, which describe the Medicare benefit categories; and*

- *Sections 1874, 1816, and 1842, which provide further authority.*

*The regulatory authority for the MR program rests in:*

- *42 CFR §421.100 for intermediaries.*
- *42 CFR §421.200 for carriers.*
- *42 CFR §421.400 for MACs.*

*Data analysis is an essential first step in determining whether patterns of claims submission and payment indicate potential problems. Such data analysis may include simple identification of aberrancies in billing patterns within a homogeneous group, or much more sophisticated detection of patterns within claims or groups of claims that might suggest improper billing or payment. The UPIC's ability to make use of available data and apply innovative analytical methodologies is critical to the success of MR for PI purposes. Refer to PIM chapter 2 in its entirety for MR and PI data analysis requirements.*

*The UPIC and the MAC MR units shall have ongoing discussions and close working relationships regarding situations identified that may be signs of potential fraud, waste, or abuse. MACs shall also include the cost report audit unit in the on-going discussions. MAC MR staff shall coordinate and communicate with their associated UPICs to ensure coordination of efforts, to prevent inappropriate duplication of review activities, and to assure contacts made by the MAC are not in conflict with program integrity related activities, as defined by the Joint Operating Agreement (JOA).*

*It is essential that MR is integrated early in the investigative plan of action to facilitate the timeliness of the investigative process. Before deploying significant MR resources to examine claims identified as potentially fraudulent, the UPIC may perform a limited prepayment MR to help identify signs of potential fraud, waste, or abuse. The general recommendation for a provider/supplier specific edit would be to limit the prepayment MR to specific procedure codes, a specific number of claims, or based on a particular subset of beneficiaries identified through the UPIC's analysis. Another option may be for the UPIC to perform a MR probe to validate the data analysis or allegation by selecting a small representative sample of claims. The general recommendation for a provider/supplier-specific probe sample is 20-40 claims. This sample size should be sufficient to determine the need for additional prepayment or post-payment MR actions. MR resources shall be used efficiently and not cause a delay in the investigative process. In addition, development of an investigation shall continue while the contractor is awaiting the results of the MR.*

### *A. Referrals from the Medicare Administrative Contractor or Recovery Audit Contractor to the Unified Program Integrity Contractor*

*If a provider/supplier appears to have knowingly and intentionally furnished services that are not covered, or filed claims for services not furnished as billed, or made any false statement on the claim or supporting documentation to receive payment, the MAC or RAC personnel may discuss potential referral of the matter to the UPIC. If the UPIC agrees that there is potential fraud, waste, and/or abuse, the MAC or RAC personnel shall escalate and refer the matter to the UPIC.*

*Provider/supplier documentation that shows a pattern of repeated misconduct or conduct that is clearly abusive or potentially fraudulent, despite provider/supplier education and direct contact with the provider/supplier to explain identified errors, shall be referred to the UPIC.*

*The focus of MAC MR is to reduce the error rate through MR and provider/supplier notification and feedback. The focus of the RAC is to identify and correct Medicare improper payments through detection and collection of overpayments. The focus of the UPIC is to address situations of potential fraud, waste, and abuse.*

***B. Referrals from the Unified Program Integrity Contractor to the Medical Review Unit and Other Units***

*The UPICs are also responsible for preventing and minimizing the opportunity for fraud. The UPICs shall identify procedures that may make Medicare vulnerable to questionable billing or improper practices and take appropriate action.*

*CMS has implemented recurring edit modules in all claims processing systems to allow UPICs and/or CMS to monitor specific beneficiary and/or provider/supplier numbers and other claims criteria. When appropriate, the UPIC may request the MAC to install a prepayment or auto-denial edit. The MACs shall comply with requests from UPICs and/or CMS to implement those edits. The MACs shall implement parameters for those edits/audits within the timeframe established in the MAC and UPIC JOA, which shall not exceed more than 15 business days.*

***C. Program Integrity/Medical Review Determinations***

*When MAC MR staff is reviewing a medical record for MR purposes, its focus is on making a coverage and/or coding determination. However, when UPIC staff is performing MR for PI purposes, its focus may be different (e.g., looking for possible falsification). The UPIC shall follow all chapters of the PIM as applicable unless otherwise instructed in this chapter and/or in its Umbrella Statement of Work (USOW). Chapter 3 of the PIM outlines the procedures to be followed to make coverage and coding determinations.*

*1. The UPIC shall maintain current references to support MR determinations. The review staff shall be familiar with the below references and be able to track requirements in the internal review guidelines back to the statute or manual. References include, but are not limited to:*

- *CFRs;*
- *CMS Internet Only Manuals (IOMs);*
- *Local coverage determinations (LCDs);*
- *National coverage determinations (NCDs); and*
- *Internal review guidelines (sometimes defined as desktop procedures).*

*2. The UPIC shall have specific review parameters and guidelines established for the identified claims. Each claim shall be evaluated using the same review guidelines. The claim and the medical record shall be linked by patient name, HICN, diagnosis, Internal Control Number (ICN), and procedure. The UPIC shall have access to provider/supplier tracking systems from MR. The information on the tracking systems shall be used for comparison to UPIC findings. The UPIC shall also consider that the MR department may have established internal guidelines (see PIM, chapter 3).*

*3. The UPIC shall evaluate if the provider specialty is reasonable for the procedure(s) being reviewed. As examples, one would not expect to see chiropractors billing for cardiac care, podiatrists for dermatological procedures, and ophthalmologists for foot care.*

*4. The UPIC shall evaluate and determine if there is evidence in the medical record that the service submitted was actually provided, and if so, if the service was medically reasonable and necessary. The UPIC shall also verify diagnosis and match to age, gender, and procedure.*

*5. The UPIC shall determine if patterns and/or trends exist in the medical record that may indicate potential fraud, waste, or abuse or demonstrate potential patient harm. Examples include, but are not limited to:*

- *The medical records tend to have obvious or nearly identical documentation.*
- *In reviews that cover a sequence of codes (e.g., evaluation and management codes, therapies, radiology), evidence may exist of a trend to use with greater frequency than would be expected the high-end billing codes representing higher level services.*
- *In a provider/supplier review, a pattern may be identified of billing more hours of care than would normally be expected on a given workday.*
- *The medical records indicate a procedure is being done more frequently than prescribed per suggested CMS guidance or industry standards of care, resulting in potential situations of patient harm.*

*6. The UPIC shall evaluate the medical record for evidence of alterations including, but not limited to, obliterated sections, missing pages, inserted pages, white out, and excessive late entries. The UPIC shall not consider undated or unsigned entries handwritten in the margin of a document. These entries shall be excluded from consideration when performing medical review. See chapter 3 for recordkeeping principles.*

*7. The UPIC shall document errors found and communicate these to the provider/supplier in writing when the UPIC's review does not find evidence of questionable billing or improper practices. A referral may be made to the POE staff at the MAC for additional provider/supplier education and follow up, if appropriate (see PIM, chapter 3).*

*8. The UPIC shall adjust the service, in part or in whole, depending upon the service under review, when medical records/documentation do not support services billed by the provider/supplier.*

*9. The UPIC shall thoroughly document the rationale utilized to make the MR decision.*

### *D. Quality Assurance*

*Quality assurance activities shall ensure that each element is being performed consistently and accurately throughout the UPIC's MR for PI program. In addition, the UPIC shall have*

*in place procedures for continuous quality improvement in order to continually improve the effectiveness of their processes.*

1. *The UPIC shall assess the need for internal training on changes or new instructions (e.g., through minutes, agendas, sign-in sheets) and confirm with staff that they have participated in training as appropriate. The UPIC staff shall be able to request training on specific issues.*

2. *The UPIC shall evaluate internal mechanisms to determine whether staff members have correctly interpreted the training (training evaluation forms, staff assessments) and demonstrated the ability to implement the instruction (internal quality assessment processes).*

3. *The UPIC shall have an objective process to assign staff to review projects, ensuring that the correct level of expertise is available. For example, situations dealing with therapy issues may include review by an appropriate therapist or use of a therapist as a consultant to develop internal guidelines. Situations with complicated or questionable medical issues, or where no policy exists, may require a physician consultant (medical director or outside consultant).*

4. *The UPIC shall develop a system to address how it will monitor and maintain accuracy in decision making (inter-reviewer reliability) as referenced in chapter 3 of the PIM. The UPIC shall establish a Quality Improvement (QI) process that verifies the accuracy of MR decisions made by licensed health care professionals. UPICs shall include inter-rater reliability and/or peer-review assessments in their QI process and shall report these results as directed by CMS.*

5. *When the UPIC evaluation results identify the need for prepayment edit placement at the MAC, the UPIC shall have a system in place to evaluate the effectiveness of those edits on an ongoing basis as development continues. The MAC may provide the claims data necessary to the UPIC to evaluate edits submitted at the request of the UPIC. The evaluation of edits shall consider the timing and staffing needs for reviews. The UPIC may submit an inquiry to the MAC to verify that a new edit is accomplishing its objective of selecting claims for MR 30 business days after an edit has been implemented or placed into production. The UPIC shall use data analysis of the selected provider's claims history to verify possible changes in billing patterns.*

*Automated edits shall be evaluated annually.*

*Prepayment edits shall be evaluated on a quarterly basis. They shall be analyzed in conjunction with data analysis to confirm or re-establish priorities. For example, a prepayment edit is implemented to stop all claims with a specific diagnostic/procedure code and the provider stops submitting claims with that code to circumvent the edit.*

*Data analysis shall be used to identify if the provider's general billing pattern has changed in volume and/or to another/similar code that may need to be considered/evaluated to revise the current edit in question and/or expansion of the current investigation.*

## *4.7.4.1 - Production of Medical Records and Documentation for an Appeals Case File*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*When the UPIC denies a claim and the provider, supplier, physician or beneficiary appeals the denial, the MAC shall request the medical records and documentation that the UPIC*

*used in making its determination. The UPIC shall assemble the case file and send it to the MAC within five (5) calendar days. If the MAC request is received outside of normal business hours or on an observed holiday that the UPIC is closed for business, the first calendar day will not be counted until the first business day after receipt of the request (i.e. if received on Saturday, the following Monday will be counted as the first calendar day).*

*The UPIC shall include any position papers or rationale and support for its decision so that the appeals adjudicator can consider it during the appeals process. However, UPICs shall be aware that an appeals case file is discoverable by the appellant. This means that the appellant can receive a complete copy of the case file. Since the provider may receive the case file, the UPIC shall consult with law enforcement before including any sensitive information relative to a case.*

*If the UPIC would like to be notified of an ALJ hearing on a particular case, the UPIC shall put a cover sheet in the case file before sending it to the MAC. The cover sheet shall state that the UPIC would like to be notified of an ALJ hearing and list a contact name with a phone and fax number where the contact can be reached. The cover sheet shall also include language stating, "PLEASE DO NOT REMOVE" to ensure it stays on the case file should the file be sent to the QIC. If the UPIC receives a notice of hearing, the UPIC shall contact the QIC immediately.*

*The QICs are tasked with participating in ALJ hearings; therefore, they are the primary Medicare contractor responsible for this function. UPICs may participate in an ALJ hearing, but they shall work with the QIC to ensure that duplicative work is not being performed by both the UPIC and the QIC in preparation for the hearing. UPICs shall never invoke party status. If the UPIC participates in a hearing, it shall be as a non-party. An ALJ cannot require participation in a hearing, whether it is party or non-party. If a UPIC receives a notice that appears contrary to this instruction, the UPIC shall contact the QIC and their primary COR and BFL immediately.*

### *4.7.4.2 – Reversed Denials by Administrative Law Judges on Open Cases*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*If a case is still pending at the OIG, FBI, or AUSA, and denials are reversed by an Administrative Law Judge (ALJ), the UPIC should recommend to CMS that it consider protesting the ALJ's decision to the DHHS Appeals Council, which has the authority to remand or reverse the ALJ's decision. UPICs should be aware, however, that ALJs are bound only by statutory and administrative law (federal regulations), CMS rulings, and National Coverage Determinations.*

*The UPIC shall consult with its COR and BFL before initiating a protest of an ALJ's decision. They should be aware that the Appeals Council has only 60 days in which to decide whether to review an ALJ's decisions. Thus, CMS needs to protest the ALJ decision within 30 days of the decision, to allow the Appeals Council to review within the 60-day limit. The UPIC shall notify all involved parties immediately if it learns that claims/claim denials have been reversed by an ALJ in a case pending prosecution.*

### *4.7.5 - Administrative Relief from Program Integrity Review in the Presence of a Disaster*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This applies to the UPICs.*

*The UPICs shall be aware of Federal Emergency Management Agency (FEMA) declared natural disasters that occur in their jurisdiction(s). In the immediate aftermath of these*

*occurrences, the UPICs shall assess the circumstances with each provider in declared disaster areas before pursuing investigative activities.*

*Due to the nature of fraud, waste and abuse that exists in the Medicare program and the potential for emerging trends specific to FEMA declared natural disasters, contractors should remain vigilant in their oversight, monitoring, and proactive/reactive analysis but follow the guidance identified below:*

> *1) Should the contractor confirm that medical record loss resulted from this disaster to the point where administrative relief from medical review requirements is necessary to allow the provider sufficient time to retrieve copies of, or restore damaged, medical documentation, the contractors shall delay the request for medical records for a period of 60-days beginning on the date designated by FEMA/as advised by COR/BFL and ending as directed by their COR/BFL. The contractors are permitted to respond to inquiries, requests, or complaints that are submitted by a provider or beneficiary during this 60-day period;*
>
> *2) The contractors shall consult with their COR and BFL on any time sensitive issues that must be resolved involving contact with a provider or beneficiary in the areas affected by FEMA declared natural disasters;*
>
> *3) The contractors shall closely monitor Technical Direction Letters (TDLs) and Change Requests (CRs) issued to the MACs related to FEMA designated disaster relief efforts. The contractors shall consult with the COR and BFL on any questions resulting from MAC TDLs or CRs; and*
>
> *4) The contractors are reminded to contact their COR and BFL prior to granting specific relief based on any TDL guidance or PIM requirement. Each contractor shall maintain a list of cases/investigations/complaints to which any exception is granted or applied and must include the basis (TDL or PIM reference) and the actual exception applied.*

*During a governmentally declared disaster, whether manmade or otherwise, the UPIC shall continue every effort to identify cases of potential fraud, waste, and abuse. If the UPIC suspects fraud of a provider/supplier who cannot furnish medical records in a timely manner due to a disaster, the UPIC shall ensure that the provider/supplier is not attempting to harm the Medicare Trust Fund by taking an unreasonable amount of time to furnish records. The UPIC shall request and review verification documentation in all instances where fraud is suspected.*

*In the case of complete destruction of medical records/documentation in which backup records exist, the UPIC shall accept reproduced medical records from microfiche, microfilm, or optical disk systems that may be available in larger facilities, in lieu of the original document. In the case of complete destruction of medical records in which no backup records exist, the UPICs shall consult with its COR and BFL to determine the appropriateness of the request to reconstruct the medical records. If the COR and BFL determine that MR is appropriate, the UPIC shall instruct providers/suppliers to reconstruct the records as completely as possible with whatever original records can be salvaged. Providers/suppliers should note on the face sheet of the completely or partially reconstructed medical record: "This record was reconstructed because of disaster."*

## *4.7.6 – UPIC Hospice Cap Liability Process – Coordination with the MAC*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*Medicare Part A includes a hospice benefit for terminally ill patients. Congress has established a retrospective "cap" on the aggregate amount that Medicare will reimburse hospice providers each year. Historically, PI contractor reviews of hospices have overlapped with the MAC review of the benefit cap liability for those same hospices; resulting in a potential double recovery for the government. Therefore, the following communication and process between the UPICs and MACs shall be followed, in order to minimize the occurrence of these double recoveries, and check the RAC Data Warehouse to ensure the provider is not under suppression.*

- *UPIC Initiated Reviews:*

    - *When selecting claims using statistical sampling that may result in an actual and/or extrapolated overpayment, upon the initiation of a hospice review, the UPIC shall coordinate with the MAC to determine whether the hospice is subject to any finalized or ongoing cap liability reviews (self-reported, final, and/or re-opening) for the applicable period of the UPIC's audit.*

      *If there are no cap liability determinations, the UPIC shall proceed with its review. Upon identification of an overpayment, the UPIC shall coordinate with the MAC to ascertain whether in the intervening period (from the claims selection period to the overpayment determination) the hospice had become subject to any cap liability proceedings for that same period.*

      *The UPIC shall finalize its review and issue the findings to the hospice and refer any overpayment to the MAC for collection. The MAC shall take into account the cap liability and adjust as appropriate.*

      *If it is determined that the hospice is subject to any finalized or ongoing cap liability reviews (self-reported, final, and/or re-opening), the UPIC shall consult with the MAC and design a statistical sampling for overpayment estimation (SSOE) for those specific year(s) according to the cap determinations to assist with reconciling cap overpayments. The UPIC shall finalize its review and issue the findings to the hospice and refer any overpayment to the MAC. The MAC shall take into account the overpayments submitted by the UPIC and apply these to any subsequent, ongoing cap overpayments (self-reported, final, and/or reopening). This process ensures that a provider is not penalized for the same beneficiary twice.*

## *4.7.7 – Closing Investigations*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*An investigation shall be closed if it is referred to LE (i.e., it is referred to OIG, DOJ, FBI, or AUSA) and there are no pending administrative actions. In addition, an investigation may be closed due to the following circumstances:*

- *When no further action is warranted by the UPIC and the matter is referred back to the MAC or to another CMS contractor for further review;*
- *If it is closed with administrative action(s);*
- *If the potential fraud is not substantiated; and/or*
- *If CMS declined a requested administrative action.*

### *4.7.7.1 - Monitor Compliance*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPIC shall monitor future claims and related actions of the provider at least 6 months after the UPIC has closed its investigation to ensure the propriety of future payments. In addition to internal screening of the claims, if previous experience or future billings warrant, they shall periodically interview a sampling of the provider's patients to verify that billed services were actually furnished.*

*If, at the end of a 6-month period, there is no indication of a continuing aberrant pattern, the UPIC shall discontinue the monitoring.*

## *4.7.7.1.1 - Resumption of Payment to a Provider - Continued Surveillance After Detection of Fraud*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*After completion of the investigation and appropriate legal action, all determined overpayments are recouped by either direct refund or offset against payments being held in suspense. Once recoupment is completed, UPICs shall release any suspended monies that are not needed to recoup determined overpayments and, if applicable, penalties.*

*UPICs shall monitor future claims and related actions of the provider for at least 6 months, to assure the propriety of future payments. In addition to internal screening of the claims, if previous experience or future billings warrant, they shall periodically interview a sampling of the provider's patients to verify that billed services were actually furnished.*

*If, at the end of a 6-month period, there is no indication of a continuing aberrant pattern, UPICs shall discontinue the monitoring.*

## 4.8 - *Requests for Information From Outside Organizations*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*Federal, state, and local LE agencies may seek beneficiary and provider/supplier information to further their investigations or prosecutions of individuals or businesses alleged to have committed health care fraud and other crimes for which medical records may be sought as evidence. When these agencies request that a UPIC disclose beneficiary records or provider/supplier information, the responsive disclosure shall comply with applicable federal law as required by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Business Associate provision of the UPIC's contract. Federal law will dictate whether, and how much, requested information can be disclosed. The determination regarding disclosure will be contingent on the purpose for which it is sought and whether information is sought about beneficiaries or providers/suppliers. For example, certain general information that does not include specific beneficiary identifiers may be shared with a broader community, including private insurers. The information may include that of a general nature of how fraudulent practices were detected, the actions being taken, and aggregated data showing trends and/or patterns.*

*The UPIC may release information, in accordance with the requirements specified in Sections A – G below, to the following organizations:*

- *Other UPICs;*
- *Qualified Independent Contractors (QICs);*
- *QIOs;*
- *State Attorneys General and State Agencies;*

- *MFCUs;*
- *OIG;*
- *DOJ; and*
- *FBI.*

*Requests for information from entities not listed above shall be submitted to the COR for approval, with a copy to the BFL.*

*In deciding to share information voluntarily or in response to outside requests, the UPIC shall carefully review each request to ensure that disclosure would not violate the requirements of the Privacy Act of 1974 (5 U.S.C. §552a) and/or the Privacy Rule (45 CFR, Parts 160 and 164) implemented under the HIPAA. Both the Privacy Act and the Privacy Rule seek to strike a balance that allows the flow of health information needed to provide and promote high-quality health care while protecting the privacy of people who seek this care. In addition, both statutes provide individuals with the right to know with whom their personal information has been shared, necessitating the tracking of any disclosures of information by the UPIC. The UPIC shall direct questions concerning what information may be disclosed under the Privacy Act or Privacy Rule to the CMS Regional Office Freedom of Information Act /privacy coordinator. Ultimately, the authority to release information from a Privacy Act System of Records to a third-party rests with the system manager/business owner of the system of records.*

*The HIPAA Privacy Rule establishes national standards for the use and disclosure of individuals' health information (also called protected health information [PHI]) by organizations subject to the Privacy Rule (which are called "covered entities"). As "business associates" of CMS, UPICs are contractually required to comply with the HIPAA Privacy Rule. The Privacy Rule restricts the disclosure of any information, in any form, that can identify the recipient of medical services; unless that disclosure is expressly permitted under the Privacy Rule. Two of the circumstances in which the Privacy Rule allows disclosure are for "health oversight activities" (45 CFR §164.512(d)) and for "law enforcement purposes" (45 CFR §164.512 (f)), provided the disclosure meets all the relevant prerequisite procedural requirements in those subsections.*

*Generally, PHI may be disclosed to a health oversight agency (as defined in 45 CFR §164.501) for purposes of health oversight activities authorized by law, including administrative, civil, and criminal investigations necessary for appropriate oversight of the health care system (45 CFR §164.512(d)). The DOJ, through its U.S. Attorneys' Offices and its headquarters-level litigating divisions; the FBI; the HHS OIG; and other federal, state, or local enforcement agencies, are acting in the capacity of health oversight agencies when they investigate fraud against Medicare, Medicaid, or other health care insurers or programs.*

*The Privacy Rule also permits disclosures for other LE purposes that are not health oversight activities but involve other specified LE activities for which disclosures are permitted under HIPAA, which include a response to grand jury or administrative subpoenas and court orders, and for assistance in locating and identifying material witnesses, suspects, or fugitives. The complete list of circumstances that permit disclosures to a LE agency is detailed in 45 CFR §164.512(f). Furthermore, the Privacy Rule permits covered entities and business associates acting on their behalf to rely on the representation of public officials seeking disclosures of PHI for health oversight or LE purposes, provided that the identities of the public officials requesting the disclosure have been verified by the methods specified in the Privacy Rule (45 CFR §164.514(h)).*

*The Privacy Act of 1974 protects information about an individual that is collected and maintained by a federal agency in a system of records. A "record" is any item, collection, or*

*grouping of information about an individual that is maintained by an agency. This includes, but is not limited to, information about educational background, financial transactions, medical history, criminal history, or employment history that contains a name or an identifying number, symbol, or other identifying particulars assigned to the individual. The identifying particulars can be a finger or voiceprint or a photograph. A "system of records" is any group of records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identification assigned to the individual. For example, Medicare beneficiary data used by UPICs are maintained in a CMS "system of records" covered by the Privacy Act.*

*Information from some systems of records may be released only if the disclosure would be consistent with "routine uses" that CMS has issued and published. Routine uses specify who may be given the information and the basis or reason for access that must exist.*

*Routine uses vary by the specified systems of record, and a decision concerning the applicability of a routine use lies solely in the purview of the system's manager for each system of record. In instances where information is released as a routine use, the Privacy Act and Privacy Rule remain applicable. For example, the HHS has published a routine use that permits the disclosure of personal information concerning individuals to the DOJ, as needed for the evaluation of potential violations of civil or criminal law and for detecting, discovering, investigating, litigating, addressing, or prosecuting a violation or potential violation of law, in health benefits programs administered by CMS. Refer to 63 Fed. Reg. 38414 (July 16, 1998).*

*The 1994 Agreement and the 2003 form letter (refer to PIM Exhibits 35 and 25 respectively) are consistent with the Privacy Act. Therefore, requests that appear on the 2003 form letter do not violate the Privacy Act. The Privacy Act of 1974 requires federal agencies that collect information on individuals that will be retrieved by the name or another unique characteristic of the individual to maintain this information in a system of records.*

*The Privacy Act permits disclosure of a record without the prior written consent of an individual if at least one (1) of 12 disclosure provisions apply. Two of these provisions, the "routine use" provision and/or another "law enforcement" provision, may apply to requests from the DOJ and/or the FBI.*

*Disclosure is permitted under the Privacy Act if a routine use exists in a system of records.*

*Both the Fiscal Intermediary Shared System (FISS) #8 and #10, the Multi-Carrier System (MCS), and the VIPS Medicare System (VMS) contain a routine use that permits disclosure to:*

> *"The Department of Justice for investigating and prosecuting violations of the Social Security Act to which criminal penalties attach, or other criminal statutes as they pertain to Social Security Act programs, for representing the Secretary, and for investigating issues of fraud by agency officers or employees, or violation of civil rights."*
>
> *The CMS Utilization Review Investigatory File, System No. 09-70-0527, contains a routine use that permits disclosure to "The Department of Justice for consideration of criminal prosecution or civil action."*
>
> *The latter routine use is more limited than the former, in that it is only for "consideration of criminal or civil action." It is important to evaluate each request based on its applicability to the specifications of the routine use.*

*In most cases, such routine uses will permit disclosure from these systems of records; however, each request should be evaluated on an individual basis.*

*Disclosure from other CMS systems of records is not permitted (i.e., use of such records compatible with the purpose for which the record was collected) unless a routine use exists or one (1) of the 11 other exceptions to the Privacy Act applies.*

*The LE provision may apply to requests from the DOJ and/or the FBI. This provision permits disclosures "to another agency or to an instrumentality of any jurisdiction within or under the control of the U.S. for a civil or criminal LE activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency that maintains the record specifying the particular portion desired and the LE activity for which the record is sought."*

*The LE provision may permit disclosure from any system of records if all of the criteria established in the provision are satisfied. Again, requests should be evaluated on an individual basis.*

*To be in full compliance with the Privacy Act, all requests must be in writing and must satisfy the requirements of the disclosure provision. However, subsequent requests for the same provider/supplier that are within the scope of the initial request do not have to be in writing. The UPICs shall refer requests that raise Privacy Act concerns and/or issues to the CORs for further consideration.*

### *A. Requests from Private, Non-LE Agencies*

*Generally, UPICs may furnish information on a scheme (e.g., where it is operating or specialties involved). Neither the name of a beneficiary or suspect can be disclosed. If it is not possible to determine whether or not information may be released to an outside entity, the UPIC shall contact its COR and BFL for further guidance.*

### *B. Requests from Other UPICs*

*The UPICs may furnish requested specific information concerning ongoing fraud investigations and individually identifiable PHI to any UPIC, SMRC or MAC. The UPICs, SMRCs and MACs are "business associates" of CMS under the Privacy Rule and thus are permitted to exchange information necessary to conduct health care operations. If the request concerns investigations already referred to the OIG/OI, the UPIC shall notify the OIG/OI of the RFI received from another UPIC and notify the requesting UPIC that the case has been referred to the OIG/OI.*

### *C. RFI from QICs*

*When a QIC receives a request for reconsideration on a claim arising from a UPIC review determination, it shall coordinate with the MAC to obtain all records and supporting documentation that the UPIC provided to the MAC in support of the MAC's first level appeals activities (redeterminations). As necessary, the QIC may also contact the UPIC to discuss materials obtained from the MAC and/or obtain additional information to support the QIC's reconsideration activities. The QIC shall send any requests to the UPIC for additional information via electronic mail, facsimile, and/or telephone.*

*These requests should be minimal. The QIC shall include in its request a name, phone number, and address to which the requested information shall be sent and/or follow-up questions shall be directed. The UPIC shall document the date of the QIC's request and send*

*the requested information within seven (7) calendar days of the date of the QIC's request. The date of the QIC's request is defined as the date the phone call was made (if a message was left, it is defined as the date the message was left), the date the facsimile was received, or the date of the e-mail request.*

***Note:*** *Individually identifiable beneficiary information shall not be included in an e- mail. If a QIC identifies a situation of potential fraud, waste, and abuse, it shall immediately refer all related information to the appropriate UPIC for further investigation. Refer to PIM Exhibit 38 for QIC task orders and jurisdictions.*

### *D. Requests from QIOs and State Survey and Certification Agencies*

*The UPIC may furnish requested specific information concerning ongoing fraud investigations containing personally identifiable information to the QIOs and state survey and certification agencies. The functions QIOs perform for CMS are required by law; thus the Privacy Rule permits disclosures to them. State survey and certification agencies are required by law to perform inspections, licensures, and other activities necessary for appropriate oversight of entities subject to government regulatory programs for which health information is necessary for determining compliance with program standards; thus the Privacy Rule permits disclosures to them. If the request concerns cases already referred to the OIG/OI, UPICs shall refer the requestor to the OIG/OI.*

### *E. Requests from State Attorneys General and State Agencies*

*The UPIC may furnish requested specific information on ongoing fraud investigations to state Attorneys General and to state agencies. Releases of information to these entities in connection with their responsibility to investigate, prosecute, enforce, or implement a state statute, rule, or regulation may be made as a routine use under the Privacy Act of 1974, as amended; 5 USC §552a(b)(3) and 45 CFR Part 5b Appendix B (5). If individually identifiable PHI is requested, the disclosure shall comply with the Privacy Rule. (Refer to subsection H below and PIM Exhibit 25 for guidance on how requests should be structured to comply with the Privacy Rule.)*

*The UPIC may, at its discretion, share PIM Exhibit 25 with the requestor as a template to assist them in preparing their request. If the request concerns cases already referred to the OIG/OI, the UPIC shall refer the requestor to the OIG/OI.*

### *F. Requests from MFCUs*

*Under current Privacy Act requirements applicable to PI investigations, the UPIC may respond to requests from MFCUs for information on current investigations. Releases of information to MFCUs in connection with their responsibility to investigate, prosecute, enforce, or implement a state statute, rule or regulation may be made as a routine use under the Privacy Act of 1974, as amended; 5 USC §552a(b)(3) and 45 CFR Part 5b Appendix B (5). Refer to Subsection H below for further information regarding the Privacy Act requirements. If individually identifiable PHI is requested, the disclosure shall comply with the Privacy Rule. Refer to subsection H below and PIM Exhibit 25 for guidance on how requests should be structured to comply with the Privacy Rule.*

*The UPIC may, at its discretion, share PIM Exhibit 25 with the requestors as a template to assist them in preparing their request. If the request concerns cases already referred to the OIG/OI, the UPIC shall refer the requestor to the OIG/OI.*

### *G. Requests from the OIG/OI for Data and Other Records*

*The UPIC shall provide the OIG/OI with requested information and shall maintain cost information related to fulfilling these requests. An RFI shall consist of requests to run data for the OIG (including OnePI national data for suppliers and entities whose billed claims span across multiple jurisdictions), extract of records, or a request to furnish any documentation or reports (see below for requests for assistance). Such requested information may include LE requests for voluntary refund data (see section 4.2.2.8.1.3of this chapter). The UPIC shall not fulfill a request if there is a substantial impact (i.e., 40 hours or more) on the budget without prior COR approval. The UPIC shall copy the BFL on these requests for approval from the COR. These requests generally fall into one of the following categories:*

***Priority I** – This type of request is a top priority request requiring a quick turnaround. The information is essential to the prosecution of a provider/supplier. The request shall be completed with the utmost urgency. Priority I requests shall be fulfilled within thirty (30) calendar days when the information or material is contained in the UPIC's files unless an exception exists as described below.*

*The UPIC shall provide the relevant data, reports, and findings to the requesting agency in the format(s) requested within 30 calendar days or sooner, when possible. The MAC shall furnish requested information to the UPIC within 20 calendar days of receipt of the request from the UPIC unless there are extenuating circumstances. The MAC shall communicate any extenuating circumstances to the UPIC and the MAC COR as soon as they become known. The UPIC shall communicate these extenuating circumstances to its COR.*

*Periodically, there are instances in which the OIG/OI is in need of the requested information in a shorter timeframe than (30) calendar days. To account for these instances, the UPIC and MAC may add language to their Joint Operating Agreement (JOA) that allows for a shorter timeframe for the MAC to furnish the requested information (i.e. 48 hours, 72, hours, etc.). In these instances, the OIG/OI must provide justification as to why the requested information is needed in a shorter timeframe than the standard Priority I request.*

*Otherwise, the UPIC shall follow-up with other contractors, and document all communication with contractors to ensure the request is not delayed unnecessarily. If extenuating circumstances exist that prevent the UPIC from meeting the thirty (30) day timeframe, the UPIC shall inform the requestor what, if any, portion of the request can be provided within thirty (30) days. The UPIC shall notify the requesting office as soon as possible (but not later than thirty (30) days) after receiving the request. The UPIC shall also document all communication with the requesting office regarding the delay, and shall include an estimate of when all requested information will be supplied.*

*If the request requires that the UPIC access National Claims History (NCH) using Data Extract Software (DESY), the thirty (30) day timeframe for Priority I requests does not apply.*

***Priority II** – This type of request is less critical than a Priority I request. An RFI shall consist of requests to run data for the OIG, extract of records, or a request to furnish any documentation or reports (see below for requests for assistance). Based on the review of its available resources, the UPIC shall inform the requestor what, if any, portion of the request can be provided. The UPIC shall provide the relevant data, reports, and findings to the requesting agency in the format(s) requested.*

*The UPICs shall respond to such requests within 45 calendar days or sooner, when possible. The MAC shall furnish requested information to the UPIC within 30 calendar days of receipt of the request from the UPIC unless there are extenuating circumstances. The MAC shall communicate any extenuating circumstances to the UPIC and the MAC COR as soon as they become known. The UPIC shall communicate these extenuating circumstances to its COR.*

*The UPIC shall follow-up with other contractors, and document all communication with contractors to ensure the request is not delayed unnecessarily. If extenuating circumstances exist that prevent the UPIC from meeting the 45-day timeframe, the UPIC shall inform the requestor what, if any, portion of the request can be provided within 45 calendar days. The UPIC shall notify the requesting office as soon as possible (but not later than 45 calendar days) after receiving the request. The UPIC shall also document all communication with the requesting office regarding the delay, and shall include an estimate of when all requested information will be supplied.*

***Request for Assistance (RFA)*** *– An LE RFA is a type of RFI and shall consist of any LE requests that do not include running data and reports but include requests such as the review and interpretation of medical records/medical documentation, interpretation of policies, and reviewing cost reports. The timeframes for RFIs specified in Priority I and II do not apply to RFAs. Due dates shall be negotiated with the requesting entity and documented appropriately along with the reasons for not meeting the agreed upon timeframes. The UPIC shall contact the COR if an agreement cannot be reached on the timeframe for completion. Disclosures of information to the OIG shall comply with the Privacy Rule and Privacy Act. When the OIG makes a data request, the UPIC shall track these requests and document the following: (1) nature/purpose of the disclosure (cite a specific investigation and have a general description); (2) what information was disclosed; and (3) the name of the individual and the agency. The aforementioned information shall be maintained in a secure file and made available to CMS upon request through a secure means.*

*The CMS has established a level of effort limit of 40 hours for any individual request for support RFIs and RFAs. If the estimated level of effort to fulfill any one request is likely to meet or exceed this figure, the UPIC shall contact its COR for approval to proceed. A CMS representative will contact the OIG to explore the feasibility of other data search and/or production options.*

*The UPIC shall obtain approval from the COR regarding requests started by the UPIC that it subsequently anticipates will exceed that 40-hour level of effort. The UPIC shall not exceed the 40-hour level of effort until it receives COR approval.*

### *H. Procedures for Sharing CMS Data with the DOJ*

*In April 1994, CMS entered into an interagency agreement with the OIG and the DOJ that permitted UPICs to furnish information that previously had to be routed through OIG (refer to PIM Exhibit 16) including data related to the investigation of health care fraud matters directly to the DOJ that previously had to be routed through OIG (refer to PIM Exhibit 35). This agreement was supplemented on April 11, 2003, when in order to comply with the HIPAA Privacy Rule, the DOJ issued procedures, guidance, and a form letter for obtaining information (refer to PIM Exhibit 25). CMS and the DOJ have agreed that the DOJ's requests for individually identifiable health information will follow the procedures that appear on the form letter (refer to PIM Exhibit 25). The 2003 form letter must be customized to each request. The form letter mechanism is not applicable to requests regarding Medicare Secondary Payer (MSP) information, unless the DOJ requestor indicates he or she is pursuing an MSP fraud matter.*

*The PIM Exhibit 25 contains the entire document issued by the DOJ on April 11, 2003. The UPIC shall familiarize itself with the instructions contained in this document. Data requests for individually identifiable PHI related to the investigation of health care fraud matters will come directly from those individuals at the FBI or the DOJ who are involved in the work of the health care oversight agency (including, for example, FBI agents, Assistant U.S. Attorneys, or designees such as analysts, auditors, investigators, or paralegals). For*

*example, data may be sought to assess allegations of fraud; examine billing patterns; ascertain dollar losses to the Medicare program for a procedure, service, or time period; determine the nature and extent of a provider's/supplier's voluntary refund(s); or conduct a random sample of claims for MR. The LE agency should begin by consulting with the appropriate Medicare contractor (usually the UPIC, but possibly also the MAC) or CMS to discuss the purpose or goal of the data request. Requests for cost report audits and/or associated documents shall be referred directly to the appropriate MAC.*

*The UPIC shall discuss the information needed by the DOJ and determine the most efficient and timely way to provide the information. When feasible, the UPIC shall use statistical systems to inform the DOJ of the amount of dollars associated with its investigation, and the probable number of claims to expect from a claims-level data run. The UPIC shall obtain and transmit relevant statistical information to the DOJ (as soon as possible but no later than five (5) calendar days). The UPIC shall advise the DOJ of the anticipated volume, format, and media to be used (or alternative options, if any) for fulfilling a request for claims data.*

*The UPIC shall provide the DOJ with the requested information and shall maintain cost information related to fulfilling these requests. An RFI shall consist of requests to run data for the DOJ (including national data for suppliers and entities whose claims billings span across multiple jurisdictions), extract of records, or a request to furnish any documentation or reports.*

*The DOJ will confirm whether a request for claims data remains necessary based on the results of statistical analysis. If so, the DOJ and CMS will discuss issues involving the infrastructure and data expertise necessary to analyze and further process the data that CMS will provide to the DOJ.*

*If the DOJ confirms that claims data are necessary, the DOJ will prepare a formal request letter to the UPIC with existing DOJ guidance (Exhibit 25).*

*The UPIC shall provide data to the DOJ, when feasible, in a format to be agreed upon by the UPIC and the DOJ. Expected time frames for fulfilling the DOJ claims-level data requests will depend on the respective source(s) and duration of time for which data are sought, with the exception of emergency requests, which require coordination with Headquarters, the DOJ, and CMS staff. These are as follows:*

***Emergency Requests -** Require coordination with Headquarters DOJ and CMS staff.*

***Priority I** – This type of request is a top priority request requiring a quick turnaround. The information is essential to the prosecution of a provider/supplier. A RFI shall consist of requests to run data for the DOJ, extract of records, or a request to furnish any documentation or reports (see below for requests for assistance). The request shall be completed with the utmost urgency. Priority I requests shall be fulfilled within thirty (30) calendar days when the information or material is contained in the UPIC's files unless an exception exists as described below.*

*The UPIC shall provide the relevant data, reports, and findings to the requesting agency in the format(s) requested within 30 calendar days or sooner, when possible. The MAC shall furnish requested information to the UPIC within 20 calendar days of receipt of the request from the UPIC unless there are extenuating circumstances. The MAC shall communicate any extenuating circumstances to the UPIC and the MAC COR as soon as they become known. The UPIC shall communicate these extenuating circumstances to its COR.*

*Periodically, there are instances in which the DOJ is in need of the requested information in a shorter timeframe than (30) calendar days. To account for these instances, the UPIC and MAC may add language to their JOA that allows for a shorter timeframe for the MAC to furnish the requested information (i.e. 48 hours, 72, hours, etc.). In these instances, the DOJ must provide justification as to why the requested information is needed in a shorter timeframe than the standard Priority I request.*

*Otherwise, the UPIC shall follow-up with other contractors, and document all communication with contractors to ensure the request is not delayed unnecessarily. If extenuating circumstances exist that prevent the UPIC from meeting the thirty (30) day timeframe, the UPIC shall inform the requestor what, if any, portion of the request can be provided within thirty (30) days. The UPIC shall notify the requesting office as soon as possible (but not later than thirty (30) days) after receiving the request. The UPIC shall also document all communication with the requesting office regarding the delay, and shall include an estimate of when all requested information will be supplied.*

*If the request requires that the UPIC access NCH using DESY, the thirty (30) day timeframe for Priority I requests does not apply.*

***Priority II Requests*** *– This type of request is less critical than a Priority I request. An RFI shall consist of requests to run data for the DOJ, extract of records, or a request to furnish any documentation or reports (see below for requests for assistance). Based on the review of its available resources, the UPIC shall inform the requestor what, if any, portion of the request can be provided. The UPIC shall provide the relevant data, reports, and findings to the requesting agency in the format(s) requested.*

*The UPIC shall respond to such requests within 45 calendar days or sooner, when possible. The MAC shall furnish requested information to the UPIC within 30 calendar days of receipt of the request from the UPIC unless there are extenuating circumstances. The MAC shall communicate any extenuating circumstances to the UPIC and the MAC COR as soon as they become known. The UPIC shall communicate these extenuating circumstances to its COR. The UPIC shall follow-up with other contractors, and document all communication with contractors to ensure the request is not delayed unnecessarily. If extenuating circumstances exist that prevent the UPIC from meeting the 45-day timeframe, the UPIC shall inform the requestor what, if any, portion of the request can be provided within 45 calendar days. The UPIC shall notify the requesting office as soon as possible (but not later than 45 calendar days) after receiving the request. The UPIC shall also document all communication with the requesting office regarding the delay, and shall include an estimate of when all requested information will be supplied.*

***RFA*** *– A LE RFA is a type of RFI and shall consist of any LE requests that do not include running data and reports, but include requests such as the review and interpretation of medical records/medical documentation, interpretation of policies, and reviewing cost reports. The timeframes for RFIs specified in Priority I and II do not apply to RFAs. Due dates shall be negotiated with the requesting entity and documented appropriately along with the reasons for not meeting the agreed upon timeframes. The UPIC shall contact the COR if an agreement cannot be reached on the timeframe for completion.*

*Disclosures of information to the DOJ shall comply with the Privacy Rule and Privacy Act. When DOJ makes a data request, the UPIC shall track these requests and document the following: (1) nature/purpose of the disclosure (cite a specific investigation and have a general description); (2) what information was disclosed; and (3) name of the individual and the agency. The aforementioned information shall be maintained in a secure file and made available to CMS upon request through a secure means.*

*The CMS has established a level of effort limit of 40 hours for any individual request for support (RFIs and RFAs). If the estimated level of effort to fulfill any one request is likely to meet or exceed this figure, the PI contractor shall contact its COR for approval to proceed. A CMS representative will contact the OIG to explore the feasibility of other data search and/or production options.*

*The UPIC shall obtain approval from the COR regarding requests started by the UPIC that it subsequently anticipates will exceed that 40-hour level of effort. The UPIC shall not exceed the 40-hour level of effort until it receives COR approval.*

### *I. Duplicate/Similar RFIs*

*If the UPIC receives duplicate or similar RFIs from OIG and DOJ, the UPIC shall notify the requestors. If the requestors are not willing to share the information, the UPIC shall ask the COR and BFL for assistance.*

### *J. Reporting Requirements for the DOJ and OIG*

*For each data request received from the DOJ and the OIG, the UPIC shall maintain a record that includes:*

- *The name and organization of the requestor;*
- *The date of the written request (all requests must be in writing);*
- *The nature of the request;*
- *Any subsequent modifications to the request;*
- *The cost of furnishing a response to each request; and*
- *The date completed.*

### *K. LE Requests for MR*

*The UPIC shall not send document request letters or go onsite to providers/suppliers to obtain medical records solely at the direction of LE. However, if LE furnishes the medical records and requests the UPIC to review and interpret medical records for them, the UPIC shall require LE to put this request in writing. At a minimum, this request shall include the following information:*

- *The nature of the request (e.g., what type of service is in question, what is the allegation, and what should the reviewer be looking for in the medical record);*
- *The volume of records furnished;*
- *The due date; and*
- *The format required for response.*

*The UPIC shall present the written request to the COR, and copy its BFL prior to fulfilling the request. Each written request will be considered on a case-by-case basis to determine whether the UPIC has resources to fulfill the request. If so, the request may be approved.*

*If LE requests the UPIC to perform MR on all investigations the UPIC initiates, the UPIC shall perform MR if it deems it necessary, on a case-by-case basis. The UPIC shall inform the COR and copy its BFL of such requests by LE.*

*It is recommended that the MR Manager be included in the evaluation of the Request for MR to provide input as to:*

- *The resources required;*

- *The resources available; and*
- *Recommended revisions to the volume of records to be reviewed that will still provide a statistically and clinically significant sample to support the purpose or allegation in the request and provide for the best use of MR resources.*

### *L. LE Requests for UPIC Audits of Medicare Provider Cost Reports Relating to Fraud*

*If LE requests the UPIC to perform an audit of a Medicare provider's cost report for fraud, the UPIC shall consult with the MAC to inquire if an audit of the cost report has already been performed. The UPIC shall also consult with the COR and BFL. The UPIC shall provide its COR and copy its BFL with the basis for the LE request and a detailed cost estimate to complete the audit. If the COR approves the audit, the UPIC shall perform the audit within the timeframe and cost agreed upon with LE.*

### *M. Requests from LE for Information Crossing Several UPIC Jurisdictions*

*If a UPIC receives a RFI from LE that crosses several UPIC zones, the UPIC shall contact its COR and BFL. In the event that multiple zones are providing information in connection with the request, each UPIC shall enter a separate entry into the UCM as described in Section 4.12 of this chapter. The COR and BFL may assign a lead UPIC to process these requests that will coordinate with the other UPICs to obtain the necessary data and consolidate the information into one comprehensive response for the requestor. The lead UPIC may be the UPIC that initially received the request; however, the nature of the RFI should be considered when assigning a lead UPIC.*

## 4.9 – *Referrals*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPIC shall refer investigations to law enforcement when it has substantiated allegations of fraud including, but not limited to, documented allegations that a provider, beneficiary, supplier, or other subject: (a) engaged in a pattern of improper billing, (b) submitted improper claims with suspected knowledge of their falsity, or (c) submitted improper claims with reckless disregard or deliberate ignorance of their truth or falsity. Prior to making such referrals, the UPIC shall follow the direction as outlined in Section 4.9.2 Referral of Cases to the OIG/OI, unless otherwise instructed by CMS.*

## 4.9.1 - *Immediate Advisements to the OIG/OI*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPIC shall notify the OIG/OI of an immediate advisement as quickly as possible, but not more than four (4) business days after identifying a lead or investigation that meets the following criteria. The UPIC shall maintain internal documentation on these advisements when it receives allegations with one or more of the following characteristics:*

- *Indications of UPIC or MAC employee fraud*
- *Allegations of kickbacks or bribes, discounts, rebates, and other reductions in price*
- *Allegations of a crime committed by a federal or state employee in the execution of their duties*
- *Indications of fraud by a third-party insurer that is primary to Medicare*
- *Confirmation of forged documentation during the course of an investigation, include, but is not limited to:*
  - *identification of forged documents through medical review; and/or*
  - *attestation from provider confirming forged documentation.*
- *Allegations and subsequent verification of services not rendered as a result of any*

*of the following:*
  - *o medical review findings;*
  - *o interviews or attestations from a minimum of three (3) beneficiaries indicating that they did not receive services; and/or*
  - *o attestations from referring/ordering providers indicating they did not refer/order a service (e.g., confirmation of no relationship with the beneficiary prior to service, or confirmed impossible day billings).*
- *Confirmed complaints from current or former employees that indicate the provider in question inappropriately billed Medicare for all or a majority of its services. Confirmation would be required though one of the following:*
  - *o minimum of three (3) beneficiary interviews confirming the inappropriate billing;*
  - *o provider attestation(s) confirming the inappropriate billing; or*
  - *o medical review findings.*
- *Confirmation of beneficiary recruitment into potentially fraudulent schemes and/or provider participation (e.g., telemarketing or solicitation schemes);*
- *Substantiated identity theft of a provider's Medicare number, a beneficiary's Medicare number, or selling or sharing of beneficiary lists;*
- *Confirmed indication of patient harm (e.g., through medical review findings or confirmation of issues identified during an onsite visit or interviews with providers or beneficiaries).*
- *Indication of provider/supplier fraud related to national emergency, pandemic, etc.*
  - *o Should an IA of this nature be identified, the UPIC shall notify their BFL to determine if the IA should be forwarded to a specific OIG/OI point-of-contact.*

*IAs should be referred to the OIG/OI only when the above criteria are met, unless prior approval is given by the COR and BFL.*

*Should local LE have specific parameters or thresholds in place that do not allow them to accept certain IAs, the UPIC shall notify its COR/BFL and request exemption from the applicable IA criteria in that particular jurisdiction.*

*When IA criteria are met, the UPICs shall perform an initial assessment to identify and document dollars currently pending payment to the provider, and/or if RAP claim payment is pending, if applicable. Should high dollar amounts be identified with either scenario, the UPIC shall notify CMS immediately, but not to exceed two (2) business days from date of identification.*

*Once the criteria for an IA are met, the UPIC shall notify the OIG/OI via phone or email to determine if a formal IA referral should be sent to the OIG/OI. If the IA is related to a provider/supplier that spans multiple jurisdictions, the UPIC shall notify any impacted UPIC and/or I-MEDIC Program Directors of the potential IA, allegation, and IA criteria.*

*The UPIC shall document this communication in UCM. The UPIC shall also send notification to its COR and BFL of the potential IA. If the UPIC does not receive a response from the OIG/OI within two (2) business days (5 business days for the I- MEDIC), it shall notify its COR and BFL team and await further instructions. If the OIG/OI confirms that a formal IA should be sent, the UPIC shall provide all available documentation, including billed/paid amounts for the YTD and the previous year, to the OIG/OI within four (4) business days of receiving the response from OIG/OI. Upon submission of the IA to the OIG/OI, the UPIC shall request written and/or email confirmation from the OIG/OI acknowledging receipt of the IA. Simultaneously, the UPIC shall notify the CMS identified Strike Force points of contacts, if the notification includes providers/suppliers located within a Strike Force jurisdiction. Additionally, the UPIC shall notify and send a copy of the IA to*

*its COR/BFL and the case coordination team, at CPIMCCNotifications@cms.hhs.gov, the same day the advisement is made to OIG/OI. In this notification to CMS, the UPIC shall advise if it has any other potential administrative actions it may want to pursue related to the provider(s)/supplier(s). The provider(s)/supplier(s) identified in an accepted IA shall be added to the UPIC's next scheduled case coordination meeting.*

*If the OIG/OI determines that a formal IA is not needed, the UPIC shall advise its COR/BFL and immediately continue its investigation. In instances where an IA is related to a Plan employee whistleblower, the I-MEDIC does not have to notify the case coordination team of the IA nor does the IA have to be discussed at a case coordination meeting. Rather, the I-MEDIC shall close the complaint upon acceptance and/or declination of the IA due to these complaint types being outside of the I-MEDIC's SOW.*

*If the IA is related to a provider/supplier that spans multiple jurisdictions, the UPIC shall send a notification to the other UPIC and/or I-MEDIC Program Directors on the same date the formal IA is sent to OIG/OI. The UPIC shall copy its COR/BFL on such communication. Upon receipt of the notification from the primary UPIC, the other UPICs and/or I-MEDIC shall provide confirmation to the primary UPIC and its COR/BFL that the notification has been received, and it is ceasing activity as instructed below. Upon receipt of acceptance or declination of the IA from the OIG/OI, the primary UPIC shall notify the other UPIC and/or I-MEDIC Program Directors of the outcome.*

*Upon identification and submission of an IA to the OIG/OI, unless otherwise directed, all impacted UPICs and/or I-MEDIC shall cease all investigative and administrative activities, with the exception of screening activities, data analysis, etc., until the OIG/OI responds with its acceptance or declination of the IA. If the UPIC does not receive an immediate response from the OIG/OI, the UPIC shall contact OIG/OI after two (2) business days from the date of the IA notification and document the communication in the UCM system. If the UPIC does not receive a response from the OIG/OI within five (5) business days from the date of the IA notification, the UPIC shall contact its COR/BFL for further guidance.*

*If the OIG/OI declines or accepts the IA, the UPIC shall document the decision in UCM and follow the processes described in Chapter 4, Sections 4.5, 4.6, and 4.7 of the PIM, unless otherwise directed by CMS.*

*Additionally, until the necessary updates are made in the UCM, if the UPIC submits an IA based on the updated criteria, it shall select all six (6) IA options on the "External Stakeholders" page of the UCM, and notate the justification of the IA in the Record Summary section of the UCM.*

*During the case coordination meeting, the UPIC may receive additional guidance from CMS related to subsequent actions related to the IA. If the UPIC has questions following the case coordination meeting, the UPIC shall coordinate with its COR and BFL.*

## 4.9.2 - *Referral of Cases to the OIG/OI*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPIC shall identify cases of potential fraud and shall make referrals of such cases, as appropriate, to the OIG/OI, regardless of dollar thresholds or subject matter. Matters shall be referred when the UPIC has documented allegations including, but not limited to, a provider, beneficiary, supplier, or other subject, a) engaged in a pattern of improper billing, b) submitted improper claims with suspected knowledge of their falsity or c) submitted improper claims with reckless disregard or deliberate ignorance of their truth or falsity.*

*If the UPIC believes a case should be referred to LE, the UPIC shall discuss the matter with its BFL. If the BFL agrees that referral to LE is appropriate, the UPIC shall update the UCM appropriately to ensure the provider/supplier is included in the next case coordination meeting discussion for final approval. If it is determined an investigation should be referred to LE, the UPIC shall refer the matter to the designated OIG/OI Special Agents-in-Charge (SAC), Department of Justice Assistant United States Trial Attorneys, or other parties identified during the case coordination discussion. In such instances, the UPIC shall make immediate referrals to the designated parties within seven (7) calendar days, unless otherwise specified by its COR and BFL.*

*Referrals to LE shall include all applicable information that the UPIC has obtained through its investigation at the time of the referral. The UPIC shall utilize the "LE Referral Template" available in PIM Exhibit 16.1 Additionally, if the referral is related to a multi-jurisdiction or national provider/supplier, the UPIC shall coordinate and collect all applicable investigative information from the other UPICs that have an open investigation on that same provider/supplier. The UPIC shall then send one comprehensive referral with all the UPICs' investigative findings to LE. Once the referral package is complete, the UPIC shall submit the referral to LE and copy its COR and BFL. Upon submission of the referral to LE, the UPIC shall request written and/or email confirmation from LE acknowledging receipt of the referral. UCM shall be updated with the date the referral was sent, the name of the agent acknowledging receipt of the referral, and the date of receipt. In the event that written confirmation is not received, the UPIC shall notify the COR and BFL.*

*As previously instructed, the UPIC shall continue to refrain from implementing any additional administrative actions against the provider/supplier without CMS approval during the 60-day window OIG/OI and/or DOJ has to respond to the referral. If the UPIC has any questions related to referrals, the UPIC shall coordinate with its COR and BFL.*

*If OIG/OI and/or DOJ declines the case, the UPIC shall notify its COR and respective CPI points of contact within two (2) business days in order to move forward with the secondary administrative actions identified during the case coordination meeting.*
*Following this notice, the UPIC shall work with its COR, respective BFL, or suspension team member on developing the appropriate documentation for the designated secondary actions.*

*Regarding LE Referrals that are declined and/or returned to the I-MEDIC to take appropriate administrative action to the extent possible, should there be an outstanding overpayment that the Medicare Part C Plan Sponsor(s) could develop, upon receipt of LE's Referral declination/return, the I-MEDIC shall notify the appropriate Medicare Part C Plan Sponsor(s) of the status of the LE Referral and the outstanding overpayment, and advise the Medicare Part C Plan Sponsor(s) to move forward with the overpayment recovery efforts.*

*This notification shall take place within five (5) business days upon receipt of the declination/return of the LE Referral. In addition, the I-MEDIC shall document this communication in the UCM REF record, indicating the date of the LE Referral declination/return, outstanding overpayment amount, if appropriate. The I-MEDIC shall also document the Medicare Part C Plan Sponsors impacted, the date the notification was issued to the Medicare Part C Plan Sponsors, as well as the point-of-contact at the Medicare Part C Plan Sponsor(s) who received the notification. Upon submission of this notification to the Medicare Part C Plan Sponsor(s), the I-MEDIC shall close the REF record as required.*

## *4.9.2.1 - OIG/OI Referral and Summary Report*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPIC shall use the Referral Fact Sheet Template when preparing referrals to the OIG/OI. The UPIC shall forward the referral directly to the OIG, shall send a copy of the referral to its BFL(s) and COR(s), and shall retain a copy of the referral in the investigation case file.*

*The Referral Fact Sheet Template can be found in PIM Exhibit 16.1.*

### *4.9.2.2 - Take Administrative Action on Cases Referred to and Declined/Returned by OIG/OI*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPICs take immediate action to implement appropriate administrative remedies, including the suspension or denial of payments, and the recovery of overpayments (see PIM, chapter 3). Because the case has been rejected by LE, UPICs shall consult with the COR, BFL, or Suspension SME concerning the imposition of suspension. They pursue administrative and/or civil sanctions by OIG where LE has declined a case.*

### *4.9.2.3 - Continue to Monitor Provider and Document Case File*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Unless no additional administrative action and/or investigation is warranted, the UPIC shall not close a case simply because it is not accepted by OIG/OI. Since the subject is likely to continue to demonstrate a pattern of fraudulent activity, they shall continue to monitor the situation and to document the file, noting all instances of suspected fraudulent activity, complaints received, actions taken, etc. This will strengthen the case if it is necessary to take further administrative action or there is a wish to resubmit the case to OIG/OI at a later date. If the UPICs do resubmit the case to OIG/OI, they shall highlight the additional information collected and the increased amount of money involved.*

### 4.9.3 - *Referral to Other Law Enforcement Agencies*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*If the OIG/OI declines a case that the UPIC believes has merit, the UPIC shall first implement any identified secondary administrative action, and then advise their COR/BFL to determine if referral to another law enforcement agency, such as the FBI, DEA, Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), RRB/OIG, and/or MFCU, is appropriate. The UPIC must receive COR/BFL approval prior to submitting a referral to another law enforcement agency, of which the UPIC shall document in the UCM.*

### 4.9.4 – *Referral to Other Entities*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

### *4.9.4.1 - Referral to State Agencies or Other Organizations*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPIC shall refer instances of apparent unethical or improper practices or unprofessional conduct to state licensing authorities, medical boards, the QIO, or professional societies for review and possible disciplinary action.*

*Additionally, referrals should be made to the Medicare survey and certification agency which exist in each state, typically within the state's Department of Health. The survey agency has a contract with CMS to survey and certify institutional providers, indicating whether they meet or do not meet applicable Medicare health and safety requirements, called "conditions of participation." Providers not meeting these requirements are subject to a variety of adverse actions, including bans on new admissions to termination of their provider agreements. These*

*administrative sanctions are imposed by the Regional Office, typically after an onsite survey by the survey agency.*

*The UPIC's and the MAC's MR staffs shall confer before such referrals, to avoid duplicate referrals. The UPIC shall gather available information and leave any further investigation, review, and disciplinary action to the appropriate professional society or State board. Consultation and agreement between the UPIC's and the MAC's MR staffs shall precede any referral to these agencies.*

*The UPIC shall notify its CORs and BFL of these referrals.*

## *4.9.4.2 - UPICs and QIOs*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Communication with the QIO is essential to discuss the potential impact of efforts to prevent abuse, as well as ensure efforts are made to improve quality of care and access to such care.*

*If potential patient harm is discovered during the course of screening a lead or through the investigation process, the UPIC shall refer those instances to the QIO, state medical board, or state licensing agency. In addition to making the appropriate referrals, the UPIC shall notify the COR and BFL within two (2) business days once the potential patient harm issue is discovered.*

*If the UPIC refers a provider to the State licensing agency or medical society (i.e., those referrals that need immediate response from the State licensing agency), the UPIC shall also send a copy of the referral to the QIO.*

*If a claim has been reviewed by the QIO, the decision made is final and binding on CMS, and the specific decision rendered by the QIO shall not be overturned by the UPIC.*

## *4.9.4.3 – Referral of Cases to the MAC*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*There are certain instances when the UPIC may refer cases to the MAC for review and additional education. At any time during the course of a review of a provider, the UPIC may determine that referral to the MAC is appropriate. Under certain circumstances, CMS may direct the UPIC to initiate a referral to the MAC at any time if deemed appropriate.*

### *A. Situations When a Referral to the MAC is Appropriate*

*The following are examples of when it may be appropriate for the UPIC to submit a referral to the MAC:*

- *During lead screening, the UPIC determines that there is not a potential fraud, waste, or abuse issue (e.g. MR, enrollment, claims processing).*
- *During lead screening, the UPIC determines that the risk for fraud, waste, or abuse is extremely low. Such a determination could be made based upon a low total amount of dollars at risk, information that the erroneous billing was unintentional or without a significant pattern.*
- *During the investigation, the only available outcome deemed appropriate by the UPIC at the time is the identification of an overpayment and no referral to law enforcement or other administrative actions are contemplated (i.e. revocation, payment suspension, etc.). The UPIC shall complete their review, calculate the overpayment, and refer the matter to the MAC for issuance of the overpayment and for potential education and/or MAC medical review*

*If the UPIC refers a provider/supplier to the MAC, but subsequently receives additional information of potential fraud, waste, and/or abuse that warrants further UPIC review, the UPIC shall inform the MAC that they are re-opening the investigation of the provider/supplier.*

***B. Situations When a Referral to the MAC is Not Appropriate***

*There are certain instances when the UPIC may determine that it is not appropriate to refer cases to the MAC for review. During the investigation, the UPIC may determine that the provider has been previously educated on the same issue(s) and there is a potential for the UPIC to pursue other administrative actions and/or referral to law enforcement. In those instances, the UPIC shall continue to monitor for fraud, waste, and/or abuse.*

## 4.10 - *Administrative Sanctions*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The term "sanctions" represents the full range of administrative remedies and actions available to deal with questionable, improper, or abusive practices of practitioners, providers, and suppliers under the Medicare and Medicaid programs or any state health care programs as defined under §1128(h) of the Act. There are two purposes for these sanctions. First, they are designed to be remedial, to ensure that questionable, improper, or abusive practices are dealt with appropriately. Practitioners, providers, and suppliers are encouraged to correct their behavior and operate in accordance with program policies and procedures. Second, the sanctions are designed to protect the programs by ensuring that improper payments are identified and recovered and that future improper payments are not made.*

*The primary focus of this section is sanctions authorized in §1128 and §1128A of the Act (exclusions and CMPs). Other, less severe administrative remedies may precede the more punitive sanctions affecting participation in the programs. The corrective actions UPICs, SMRCs, and MACs shall initially consider are:*

- *Provider education and warnings;*
- *Revocation of assignment privileges;*
- *Suspension of payments (refer to PIM, chapter 3);*
- *Recovery of overpayments (refer to PIM, chapter 3); and*
- *Referral of situations to state licensing boards or medical/professional societies.*

## *4.10.1 - The Unified Program Integrity Contractor's and Medicare Administrative Contractor's Role*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The MAC shall be responsible for:*

- *Ensuring that no payments are made to provider/suppliers for a salaried individual who is excluded from the program. OIG, as it becomes aware of such employment situations, notifies providers that payment for services furnished to Medicare patients by the individual is prohibited and that any costs (salary, fringe benefits, etc.) submitted to Medicare for services furnished by the individual will not be paid. A copy of this notice is sent to the UPIC and to the appropriate RO.*

*The UPIC and the MAC shall work out the following in their JOA:*

- *Furnishing any available information to the OIG/OI with respect to providers/suppliers requesting reinstatement.*
- *Reporting all instances where an excluded provider/supplier submits claims for which payment may not be made after the effective date of the exclusion.*

*The UPIC shall also be responsible for:*

- *Contacting OIG/OI when it determines that an administrative sanction against an abusive provider/supplier is appropriate.*
- *Providing OIG/OI with appropriate documentation in proposed administrative sanction cases.*

## *4.10.2 - Authority to Exclude Practitioners, Providers, and Suppliers of Services*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Section 1128 of the Act provides the Secretary of DHHS the authority to exclude various health care providers, individuals, and businesses from receiving payment for services that would otherwise be payable under Medicare, Medicaid, and all federal health care programs. This authority has been delegated to the OIG.*

*When an exclusion is imposed, no payment is made to anyone for any items or services in any capacity (other than an emergency item or service provided by an individual who does not routinely provide emergency health care items or services) furnished, ordered, or prescribed by an excluded party under the Medicare, Medicaid, and all federal health care programs. In addition, no payment is made to any business or facility, e.g., a hospital, that submits claims for payment of items or services provided, ordered, prescribed, or referred by an excluded party.*

*The OIG also has the authority under §1128(b)(6) of the Act to exclude from coverage items and services furnished by practitioners, providers, or other suppliers of health care services who have engaged in certain forms of program abuse and quality of care issues. In order to prove such cases, the UPICs shall document a long-standing pattern of care in which educational efforts have failed to change the abusive pattern. Isolated instances and statistical samples are not actionable. Medical doctors must be willing to testify.*

*Authority under §1156 of the Act is delegated to OIG to exclude practitioners and other persons who have been determined by a QIO to have violated their obligations under §1156 of the Act. To exclude, the violation of obligation under §1156 of the Act must be a substantial violation in a substantial number of cases or a gross and flagrant violation in one or more instances. Payment is not made for items and services furnished by an excluded practitioner or other person. Section 1156 of the Act also contains the authority to impose a monetary penalty in lieu of exclusion. Section 1156 exclusion actions and monetary penalties are submitted by QIOs to the OIG/OI.*

*Payment is not made for items and services furnished by an excluded practitioner or other person.*

### *4.10.2.1 - Basis for Exclusion Under §1128(b)(6) of the Social Security Act*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Exclusions under §1128(b)(6) of the Act are affected upon a determination that a provider has done one of the following:*

- *Submitted or caused to be submitted claims or requests for payment under Medicare or a state health care program containing charges (or costs) for items or services furnished substantially in excess of its usual charges (or costs).*

- *Furnished or caused to be furnished items or services to patients (whether or not eligible for benefits under Medicare or under a state health care program) substantially in excess of the needs of such patients or of a quality that does not meet professionally recognized standards of health care.*

*For purposes of the exclusion procedures, "furnished" refers to items or services provided or supplied, directly or indirectly, by any individual or entity. This includes items or services manufactured, distributed or otherwise provided by individuals or entities that do not directly submit claims to Medicare, Medicaid or other Federal health care programs, but that supply items or services to providers, practitioners or suppliers who submit claims to these programs for such items or services.*

### *4.10.2.2 - Identification of Potential Exclusion Cases*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPIC shall review and evaluate abuse cases to determine if they warrant exclusion action. Examples of abuse cases suitable for exclusion include, but are not limited to:*

- *Providers who have a pattern of adverse QIO or MAC findings;*

- *Providers whose claims must be reviewed continually and are subsequently denied because of repeated instances of overutilization;*

- *Providers who have been the subject of previous cases that were not accepted for prosecution because of the low dollar value;*

- *Providers who furnish or cause to be furnished items or services that are substantially in excess of the beneficiary's needs or are of a quality that does not meet professionally recognized standards of health care (whether or not eligible for benefits under Medicare, Medicaid, title V or title XX);*

- *Providers who are the subject of prepayment review for an extended period of time (longer than 6 months) who have not corrected their pattern of practice after receiving educational/warning letters;*

- *Providers who have been convicted of a program related offense (§1128(a) of the Social Security Act); or*

- *Providers who have been convicted of a non-program related offense (e.g., a conviction related to neglect or abuse of a beneficiary, or related to a controlled substance) (§1128(a) of the Social Security Act).*

*Also, §1833(a)(1)(D) of the Act provides that payment for clinical diagnostic laboratory tests is made on the basis of the lower of the fee schedule or the amount of charges billed for such tests. Laboratories are subject to exclusion from the Medicare program under §1128(b)(6)(A) of the Act where the charges made to Medicare are substantially in excess of their customary charges to other clients. This is true regardless of the fact that the fee schedule exceeds such customary charges.*

*Generally, to be considered for exclusion due to abuse, the practices have to consist of a clear pattern that the provider/supplier refuses or fails to remedy in spite of efforts on the part of the UPIC, SMRC, MAC, or QIO groups. An exclusion recommendation is implemented only where efforts to get the provider/supplier to change the pattern of practice are unsuccessful. The educational or persuasive efforts are not necessary or desirable when the issues involve life-threatening or harmful care or practice.*

*If a case involves the furnishing of items or services in excess of the needs of the individual or of a quality that does not meet professionally recognized standards of health care, the UPIC shall make every effort to obtain reports confirming the medical determination of its MR from one or more of the following:*

- *The QIO for the area served by the provider/supplier;*
- *State or local licensing or certification authorities;*
- *QIO committees;*
- *State or local professional societies; or*
- *Other sources deemed appropriate.*

## *4.10.2.3 - Contents of Sanction Recommendation*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPIC shall include in the sanction recommendation (to the extent appropriate) the following information:*

- *Identification of the subject, including the subject's name, address, date of birth, social security number, and a brief description of the subject's special field of medicine. If the subject is an institution or corporation, include a brief description of the type of services it provides and the names of its officers and directors.*
- *A brief description of how the violation was discovered.*
- *A description of the subject's fraudulent or abusive practices and the type of health service(s) involved.*
- *A case-by-case written evaluation of the care provided, prepared by the UPIC's, or MAC's MR staff, which includes the patient's medical records. This evaluation shall cite what care was provided and why such care was unnecessary and/or of poor quality. (The reviewer may want to consult with someone from their RO CCSQ.) Medicare reimbursement rules shall not be the basis for a determination that the care was not medically necessary. The reviewer shall identify the specific date, place, circumstance, and any other relevant information. If possible, the reviewer should review the medical records of the care provided to the patient before and after the care being questioned.*

***NOTE:*** *A minimum of 10 examples shall be submitted in support of a sanction recommendation under §1128(b)(6)(B) of the Act. In addition, none of the services being used to support the sanction recommendations shall be over 2 years old.*

- *Documentation supporting the case referral, e.g., records reviewed, copies of any letters or reports of contact showing efforts to educate the provider, profiles of the*

*provider who is being recommended for sanction, and relevant information provided by other program administrative entities.*

- *Copies of written correspondence and written summaries of the meetings held with the provider regarding the violation.*
- *Copies of all notices to the party.*
- *Information on the amount billed and paid to the provider for the 2 years prior to the referral.*
- *Data on program monies on an assigned/non-assigned basis for the last 2 years, if available.*
- *Any additional information that may be of value in supporting the proposal to exclude or that would support the action in the event of a hearing.*

***NOTE:*** *All documents and medical records should be legible.*

### *4.10.2.4 - Notice of Administrative Sanction Action*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*When OIG receives the sanction recommendation, it is reviewed by medical and legal staff to determine whether the anticipated sanction action is supportable.*

*OIG then develops a proposal and sends it to the provider, advising it of the recommended sanction period, the basis for the determination that excessive or poor- quality care has been provided, and its appeal rights. The provider is also furnished with a copy of all the material used to make the determination. This is the material that was previously forwarded to OIG with the initial sanction recommendation.*

*The provider has 30 days from the date on the proposal letter to submit:*

- *Documentary evidence and written argument against the proposed action, or*
- *A written request to present evidence or argument orally to an OIG official*

*OIG may extend the 30-day period. All additional information is reviewed by OIG, as well as by medical and/or legal personnel when necessary. In the event the provider requests an in-person review, it is conducted by OIG in Washington, D.C.*

*When a final determination is made to exclude a provider, OIG sends a written notice to the provider at least 20 days prior to the effective date of the action (see 42 CFR §1001.2003 for exceptions to the 20 day notice). The notice includes:*

- *The basis for the exclusion.*
- *The duration of the exclusion and the factors considered in setting the duration.*
- *The earliest date on which OIG accepts a request for reinstatement, and the requirements and procedures for reinstatement.*
- *Appeal rights.*
- *A statement that, should claims continue to be submitted during the period of sanction*

*for which payments may not be made, the provider/supplier may be criminally prosecuted, subject to a CMP action and/or denied reinstatement.*

### *4.10.2.4.1 - Notification to Other Agencies*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Concurrent with the mailing of the notice to the provider, OIG sends a notice to the state agency administering or supervising the administration of each state health care program, the appropriate state licensing board, and CMS. CMS is responsible for ensuring proper effectuation of sanction actions.*

*OIG also notifies the appropriate licensing agency, the public, and all known employers of the sanctioned provider.*

*The effective date of exclusion is 20 days from the date of the notice to the provider (see 42 CFR §1001.2003 for exceptions to the 20 day notice).*

### *4.10.2.5 - Denial of Payment to an Excluded Party*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPICs shall not recommend payments to the AC or MAC, and ACs and MACs shall not make payment on any excluded individual or entity for items or services furnished, ordered, or prescribed in any capacity on or after the effective date of exclusion, except in the following cases:*

- *For inpatient hospital services or post-hospital SNF care provided to an individual admitted to a hospital or SNF before the effective date of the exclusion, make payment, if appropriate, for up to 30 days after that date.*

- *For home health services provided under a plan established before the effective date of exclusion, make payment, if appropriate, for 30 days after the date on the notice.*

- *For emergency items and services furnished, ordered, or prescribed (other than an emergency item or service furnished, ordered, or prescribed in a hospital emergency room) payment may be made to an excluded provider on or after the effective date of exclusion.*

### *4.10.2.5.1 - Denial of Payment to Employer of Excluded Physician*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*If an excluded physician is employed in a hospital setting and submits claims for which payment is prohibited, the MAC surveillance process usually detects and investigates the situation.*

*However, in some instances an excluded physician may have a salary arrangement with a hospital or clinic, or work in group practice, and may not directly submit claims for payment. If this situation is detected, MACs:*

- *Contact the hospital/clinic/group practice and inform them that they are reducing the amount of their payment by the amount of federal money involved in paying the excluded physician*

- *Develop and refer to the UPIC as a CMP case.*

*Upon referral from the MAC, the UPIC shall finalize the case and refer it to the OIG.*

### *4.10.2.5.2 - Denial of Payment to Beneficiaries and Others*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*If claims are submitted after the effective date of the exclusion by a beneficiary for items or services furnished, ordered, or prescribed by an excluded provider in any capacity, ACs and MACs shall:*

- *Pay the first claim submitted by the beneficiary and immediately give notice of the exclusion.*
- *Not pay the beneficiary for items or services provided by an excluded party more than 15 days after the date of the notice to the beneficiary or after the effective date of the exclusion, whichever is later. The regulatory time frame is 15 days; however, CMS allows an additional 5 days for mailing.*

*If claims are submitted by a laboratory or DME supplier for any items or services ordered by a provider in any capacity excluded under §1156, or any items or services ordered or prescribed by a physician excluded under §1128, ACs and MACs shall handle the claims as above.*

***A. Notice to Beneficiaries***

*To ensure that the notice to the beneficiary indicates the proper reason for denial of payment, ACs and MACs shall include the following language in the notice:*

*"We have received your claim for services furnished or ordered by________________on _________________. Effective________________,___________________was excluded from receiving payment for any items and services furnished in any capacity to Medicare beneficiaries. This notice is to advise you that no payment will be made for any items or services furnished by____________________if rendered more than 20 days from the date of this notice."*

***B. Notice to Others***

*The Medicare Patient and Program Protection Act of 1987 provides that payment is denied for any items or services ordered or prescribed by a provider excluded under §§1128 or 1156. It also provides that payment cannot be denied until the supplier of the items and services has been notified of the exclusion.*

*If claims are submitted by a laboratory or a DME company for any items or services ordered or prescribed by a provider excluded under §§1128 or 1156, ACs and MACs shall:*

- *Pay the first claim submitted by the supplier and immediately give notice of the exclusion.*
- *Do not pay the supplier for items or services ordered or prescribed by an excluded provider in any capacity if such items or services were ordered or prescribed more than 20 days after the date of notice to the supplier, or after the effective date of the exclusion, whichever is later.*

*To ensure that the notice to the supplier indicates the proper reason for denial of payment, ACs and MACs shall include the following language in the notice:*

*"We have received your claim for services ordered or prescribed by ____________________ on___________________. Effective___________________,____________________was excluded from receiving payment for items or services ordered or prescribed in any capacity for Medicare beneficiaries. This notice is to advise you that no payment will be made for any items or services ordered or prescribed by_____________ if ordered or prescribed more than 20 days from the date of this notice."*

## *4.10.3 - Appeals Process*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*An excluded provider may try to have the decision reversed or modified, through the appeals process. The Departmental Appeals Board is responsible for processing hearing requests received from sanctioned providers except in very limited circumstances.*
*Exclusions remain in effect during the appeals process (see 42 CFR §§1001.901 (false claims), 1001.951 (kickbacks), 1001.1601 (violations of the limitation on physician charges), or 1001.1701 (billing for services of assistant-at-surgery during cataract operations)).*

## *4.10.4 - Reinstatements*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*A provider may apply for reinstatement when the basis for exclusion has been removed, at the expiration of the sanction period, or any time thereafter. UPICs shall refer all requests they receive for reinstatement to the Office of Investigation of the OIG. Also, they furnish, as requested, information regarding the subject requesting reinstatement. OIG notifies the UPIC in the State where the subject lives/practices of all reinstatements.*

### *4.10.4.1 - Monthly Notification of Sanction Actions*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The Medicare Exclusion Database (MED) is a standard format, cumulative exclusion database that contains information on all exclusions and reinstatement actions in Medicare, Medicaid, and other Federal health care programs. CMS receives this information from the OIG monthly.*

*The UPICs, SMRCs and MACs shall use the information contained in the MED and the Government Accountability Office (GAO) Debarment list to:*

- *Determine whether a physician/practitioner/provider or other health care supplier who seeks approval as a provider of services in the Medicare/Medicaid programs is eligible to receive payment; and*

- *Ensure that sanctioned providers are not being inappropriately paid.*

*The dates reflected on the MED are the effective dates of the exclusion. Exclusion actions are effective 20 days from the date of the notice. Reinstatements or withdrawals are effective as of the date indicated.*

*The MED shows the names of a number of individuals and entities where the sanction period has expired. These names appear on the MED because the individual or entity has not been granted reinstatement. Therefore, the sanction remains in effect until such time as reinstatement is granted.*

*The UPICs, SMRCs and MACs shall check their systems to determine whether any physician, practitioner, provider, or other health care worker or supplier is being paid for*

*items or services provided subsequent to the date they were excluded from participation in the Medicare program. In the event a situation is identified in which inappropriate payment is being made, the contractors shall notify OIG and take appropriate action to correct the situation. In addition, UPICs shall consider the instructions contained in the CMP section of the PIM (PIM, chapter 4, Section 4.11).*

*The UPICs and SMRCs shall work with the MACs to document a process in the JOA to make the MAC aware of any payments to an excluded provider.*

*The MACs shall ensure that no payments are made after the effective date of a sanction, except as provided for in regulations at 42 CFR 1001.1901(c) and 489.55.*

*The MACs shall check payment systems periodically to determine whether any individual or entity who has been excluded since January 1982 is submitting claims for which payment is prohibited. If any such claims are submitted by any individual in any capacity or any entity who has been sanctioned under §§1128, 1862(d), 1156, 1160(b) or 1866(b) of the Act, UPICs shall forward them to OIG/OI.*

*In addition, MACs shall refer to the RO all cases that involve habitual assignment violators. In cases where there is an occasional violation of assignment by a provider, they shall notify the provider in writing that continued violation could result in a penalty under the CMP Law.*

## *4.11 - Civil Monetary Penalties*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

### *4.11.1 - Basis of Authority*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*In 1981, Congress added §1128A (42 U.S.C. 1320a-7a) to the Social Security Act to authorize the Secretary of Health and Human Services to impose civil monetary penalties (CMPs). Since the enactment of the first CMP authority in 1981, Congress has increased both the number and types of circumstances under which CMPs may be imposed. Most of the specific statutory provisions authorizing CMPs also permit the Secretary to impose an assessment in addition to the CMP. An assessment is an additional monetary payment in lieu of damages sustained by the government because of the improper claim. Also, for many statutory violations, the Secretary may exclude the individual or entity violating the statute from participating in Medicare and other federal health care programs for specified periods of time.*

*In October 1994, the Secretary realigned the responsibility for enforcing these CMP authorities between the Centers for Medicare & Medicaid Services and the Office of the Inspector General. CMS was delegated the responsibility for implementing CMPs that involve program compliance. The OIG was delegated the responsibility for implementing CMPs that involve threats to the integrity of the Medicare or Medicaid programs, i.e., those that involve fraud or false representations. On August 21, 1996, the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) was enacted. This law provides for higher maximum CMPs ($10,000 per false item or service on a claim or instance of non-compliance, instead of $2,000 per item or service), and higher assessments (three times the amount claimed, instead of twice the amount) for some of the violations.*

### *4.11.2 - Administrative Actions*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPICs, SMRCs and MACs shall ensure that the program rules and regulations are being appropriately followed. If violations are noted (either through internal reviews or through a complaint process), MACs shall take the appropriate steps to inform and educate the provider of the non-compliance and encourage future compliance.*

*If, after a period of time, there is no significant change by the provider (the non- compliance continues), then a final warning notice of plans to propose a corrective action (such as a CMP) shall be issued by the MAC. This notice shall be sent by certified mail (return receipt required) to ensure its receipt by the provider. The notice shall indicate that previous notifications sent to the provider failed to correct the problem, and that this is a final warning. Additionally, it shall indicate that any further continuation of the non- compliance will result in the matter being forwarded to CMS or the OIG for administrative enforcement. While not specifically assessing a monetary penalty amount, the notice shall indicate that this is one type of sanction that may be applied*

## *4.11.3 - Enforcement*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*An essential part of enforcement is that potential violations be discovered at the earliest possible time. Every alleged violation should be identified, developed, and processed in a timely manner. Delays in developing and/or processing the violations affect the program in several ways. First, such delays may permit an unsafe medical condition to prevail if prompt corrective action is not taken. Second, delays tend to improperly de- emphasize the seriousness of the violation. Lastly, delays diminish the deterrent effect.*

## *4.11.4 - Documents*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Documentary evidence is extremely important in the CMP process. It is not only the evidence needed to support the administrative actions, but also a tool used for cross-referencing, verifying statements, and/or providing backup or background information.*

*Documentary evidence shall be identified, accounted for, and protected from loss, damage, or alteration. When copies of documents are made, care shall be taken to ensure that all copies are legible and accurate. Wherever possible, documents or copies shall be preserved in their original state; making marks on the face of the documents shall be avoided. If marks or explanations are necessary for explanation or clarification, include an additional copy of the document with marks on the copy.*

## *4.11.5 - Civil Monetary Penalty Authorities*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The following sections list the authorities under which CMS's Program Integrity Group and the OIG may impose civil money penalties, assessments, and/or exclusions for program non-compliance.*

### *4.11.5.1 - Civil Monetary Penalties Delegated to CMS*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The following is a brief description of authorities from the Social Security Act:*

- *Section 1806(b)(2)(B) - Any person or entity that fails to provide an itemized statement describing each item or service requested by a Medicare beneficiary.*

- *Section 1833(h)(5)(D) - Any person billing for a clinical diagnostic laboratory test,*

*other than on an assignment-related basis. This provision includes tests performed in a physician's office but excludes tests performed in a rural health clinic. (This violation may also cause an assessment and an exclusion.)*

- *Section 1833(i)(6) - Any person billing for an intraocular lens inserted during or after cataract surgery for which payment may be made for services in an ambulatory surgical center.*

- *Section 1833(q)(2)(B) - When seeking payment on an unassigned basis, any entity failing to provide information about a referring physician, including the referring physician's name and unique physician identification number. (This violation may also cause an exclusion.)*

- *Sections 1834(a)(11)(A) and 1842(j)(2) - Any supplier of durable medical equipment charging for covered items (furnished on a rental basis) after the rental payments may no longer be made (except for maintenance and servicing) as provided in §1834(a)(7)(A) of the Act. (This violation may also cause an assessment and an exclusion.)*

- *Section 1834(a)(17)(C) - Unsolicited telephone contacts by any supplier of durable medical equipment to Medicare beneficiaries regarding the furnishing of covered services. (This violation may only cause an exclusion.)*

- *Sections 1834(a)(18)(B) and 1842(j)(2) - Any durable medical equipment supplier that fails to make a refund to Medicare beneficiaries for a covered item for which payment is precluded due to an unsolicited telephone contact from the supplier. (This violation may also cause an assessment and an exclusion.)*

- *Sections 1834(b)(5)(C) and 1842(j)(2) - Any non-participating physician or supplier that charges a Medicare beneficiary more than the limiting charge as specified in §1834(b)(5)(B) of the Act for radiologist services. (This violation may also cause an assessment and an exclusion.)*

- *Sections 1834(c)(4)(C) and 1842(j)(2) - Any non-participating physician or supplier charging a Medicare beneficiary more than the limiting charge for mammography screening, as specified in §1834(c)(3) of the Act. (This violation may also cause an assessment and an exclusion.)*

- *Sections 1834(h)(3) and 1842(j)(2) - Any supplier of durable medical equipment, prosthetics, orthotics, and supplies charging for a covered prosthetic device, orthotic, or prosthetic (furnished on a rental basis) after the rental payment may no longer be made (except for maintenance and servicing). (This violation may also cause an assessment and an exclusion.)*

- *Section 1834(h)(3) - Unsolicited telephone contacts by any supplier of durable medical equipment, prosthetics, orthotics to Medicare beneficiaries regarding the furnishing of prosthetic devices, orthotics, or prosthetics. (This violation may only cause an exclusion.)*

- *Section 1834(j)(2)(A)(iii) - Any durable equipment supplier that completes the medical necessity section on the certificate of medical necessity or fails to provide the fee schedule amount and the supplier's charge for the medical equipment or supply prior to distributing the certificate to the physician.*

- *Sections 1834(j)(4) and 1842(j)(2) - Any supplier of durable medical equipment,*

*prosthetics, orthotics, and supplies that fails to make refunds in a timely manner to Medicare beneficiaries (for items or services billed on a non-assigned basis) if the supplier does not possess a Medicare supplier number, if the item or service is denied in advance, or if the item or service is determined not to be medically necessary or reasonable. (This violation may also cause an assessment and an exclusion.)*

- *Sections 1834(k)(6) and 1842(j)(2) - Any practitioner or other person that bills or collects for outpatient therapy services or comprehensive outpatient rehabilitation services on a non-assigned basis. (This violation may also cause an assessment and an exclusion.)*

- *Section 1842(b)(18)(B) - For practitioners specified in §1842(b)(18)(C) of the Act (physician assistants, nurse practitioners, clinical nurse specialists, certified registered nurse anesthetists, certified nurse-midwives, clinical social workers, and clinical psychologists), any practitioner billing (or collecting) for any services on a non-assigned basis. (This violation may also cause an assessment and an exclusion.)*

- *Section 1842(k) - Any physician presenting a claim or bill for an assistant at cataract surgery performed on or after March 1, 1987. (This violation may also cause an assessment and an exclusion.)*

- *Section 1842(l)(3) - Any non-participating physician who does not accept payment on an assigned basis and who fails to refund beneficiaries for services that are not reasonable or medically necessary or are of poor quality. (This violation may also cause an assessment and an exclusion.)*

- *Section 1842(m)(3) - Any non-participating physician billing for an elective surgical procedure on a non-assigned basis, who charges at least $500, fails to disclose charge and coinsurance amounts to the Medicare beneficiary prior to rendering the service, and fails to refund any amount collected for the procedure in excess of the charges recognized and approved by the Medicare program. (This violation may cause an assessment and an exclusion.)*

- *Section 1842(n)(3) - Any physician billing diagnostic tests in excess of the scheduled fee amount. (This violation may cause an assessment and an exclusion.)*

- *Section 1842(p)(3)(A) - Any physician that fails to promptly provide the appropriate diagnosis code or codes upon request by CMS or a carrier on any request for payment or bill submitted on a non-assigned basis.*

- *Section 1842(p)(3)(B) - Any physician failing to provide the diagnosis code or codes after repeatedly being notified by CMS of the obligations on any request for payment or bill submitted on a non-assigned basis. (This violation is only subject to an exclusion.)*

- *Section 1848(g)(1)(B) - Any non-participating physician, supplier, or other person who furnishes physicians' services and bills on a non-assigned basis, or collects in excess of the limiting charge, or fails to make an adjustment or refund to the Medicare beneficiary. (This violation may cause an assessment and an exclusion.)*

- *Section 1848(g)(3) - Any person billing for physicians' services on a non-assigned basis for a Medicare beneficiary who is also eligible for Medicaid (these individuals include qualified Medicare beneficiaries). This provision applies to services furnished on or after April 1, 1990. (This violation may cause an assessment and an*

*exclusion.)*

- *Section 1848(g)(4) - Any physician, supplier, or other person (except one excluded from the Medicare program) that fails to submit a claim for a beneficiary within one year of providing the service; or imposes a charge for completing and submitting the standard claims form. (This violation may cause an exclusion.)*

- *Section 1862(b)(5)(C) - Any employer who (before October 1, 1998) fails to provide an employee's group health insurance coverage information to the Medicare contractor.*

- *Section 1862(b)(6)(B) - Any entity that fails to complete a claim form relating to the availability of other health benefit plans, or provides inaccurate information relating to the availability of other health plans on the claim form.*

- *Section 1877(g)(5) - Any person failing to report information concerning ownership, investment, and compensation arrangements. (This violation may cause an assessment and an exclusion.)*

- *Section 1879(h) - Any durable medical equipment supplier (including a supplier of durable medical equipment, prosthetic devices, prosthetics, orthotics, and supplies) failing to make refunds to Medicare beneficiaries for items or services billed on an assigned basis if the supplier did not possess a Medicare supplier number, if the item or service is denied in advance, or if the item or service is determined to be not medically necessary or reasonable. (This violation may cause an assessment and an exclusion.)*

- *Section 1882(a)(2) - Any person who issues a Medicare supplemental policy that has not been approved by the state regulatory program or does not meet federal standards. (This violation may cause an assessment and an exclusion.)*

- *Section 1882(p)(8) - Any person who sells or issues non-standard Medicare supplemental policies. (This violation may cause an assessment and an exclusion.)*

- *Section 1882(p)(9)(C) - Any person who sells a Medicare supplemental policy and fails to make available the core group of basic benefits as part of its product line; or fails to provide the individual (before the sale of the policy) an outline of coverage describing the benefits provided by the policy. (This violation may cause an assessment and an exclusion.)*

- *Section 1882(q)(5)(C) - Any person who fails to suspend a Medicare supplemental policy at the policyholder's request (if the policyholder applies for and is determined eligible for Medicaid); or to automatically reinstate the policy as of the date the policyholder loses medical assistance eligibility (and the policyholder provides timely notice of losing his or her Medicaid eligibility). (This violation may cause an assessment and an exclusion.)*

- *Section 1882(r)(6)(A) - Any person that fails to refund or credit as required by the supplemental insurance policy loss ratio requirements. (This violation may cause an assessment and an exclusion.)*

- *Section 1882(s)(4) - Any issuer of a Medicare supplemental policy that does not waive any time periods applicable to pre-existing conditions, waiting periods, elimination periods, or probationary periods if the time periods were already satisfied under a preceding Medicare policy; or denies a policy, conditions the*

*issuance or effectiveness of the policy, or discriminates in the pricing of the policy based on health status or other criteria. (This violation may cause an assessment and an exclusion.)*

- *Section 1882(t)(2) - Any issuer of a Medicare supplemental policy who fails to provide medically necessary services to enrollees through the issuer's network of entities; imposes premiums on enrollees in excess of the premiums approved by the state; acts to expel an enrollee for reasons other than non-payment of premiums; does not provide each enrollee at the time of enrollment with specific information regarding policy restrictions; or fails to obtain a written acknowledgment from the enrollee of receipt of the information. (This violation may cause an assessment and an exclusion.)*

## *4.11.5.2 - Civil Monetary Penalties Delegated to OIG*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The following is a brief description of authorities from the Social Security Act:*

| | |
|---|---|
| *Section 1128(a)(1)(A), (B)* | *False or fraudulent claim for item or service including incorrect coding (upcoding) or medically unnecessary services.* |
| *Section 1128A(a)(1)(C)* | *Falsely certified specialty.* |
| *Section 1128A(a)(1)(D)* | *Claims presented by excluded party.* |
| *Section 1128A(a)(1)(E)* | *Pattern of claims for unnecessary services or supplies.* |
| *Section 1128A(a)(2)* | *Assignment agreement, Prospective Payment System (PPS) abuse violations.* |
| *Section 1128A(a)(3)* | *PPS false/misleading information influencing discharge decision.* |
| *Section 1128A(a)(4)* | *Excluded party retaining ownership or controlling interest in participating entity.* |
| *Section 1128A(a)(5)* | *Remuneration offered to induce program beneficiaries to use particular providers, practitioners, or suppliers.* |
| *Section 1128A(a)(6)* | *Contracting with an excluded individual.* |
| *Section 1128A(a)(7)* | *Improper remuneration; i.e., kickbacks.* |
| *Section 1128A(b)* | *Hospital physician incentive plans.* |
| *Section 1128A(b)(3)* | *Physician falsely certifying medical necessity for home health benefits.* |
| *Section 1128E(b)* | *Failure to supply information on adverse action to the Health Integrity and Protection Data Bank (HIPDB).* |
| *Section 1140(b)(1)* | *Misuse of Departmental symbols/emblems.* |
| *Section 1819(b)(3)(B)*<br>*Section 1919(b)(3)(B)* | *False statement in assessment of functional capacity of skilled nursing facility (SNF) resident.* |

| | |
|---|---|
| *Section 1819(g)(2)(A)*<br>*Section 1919 (g)(2)(A)* | *Notice to SNF/nursing facility of standard scheduled survey.* |
| *Section 1857(g)(1)(F)* | *Managed care organization (MCO) fails to comply with requirements of §1852(j)(3) or §1852(k)(2)(A)(ii). (Prohibits MCO interference with the provider's advice to an enrollee; mandates that providers not affiliated with the MCO may not bill or collect in excess of the limiting charge.)* |
| *Section 1860D-31(i)(3)* | *Engaged in false or misleading marketing practices under the Medicare prescription drug discount card program; or overcharge prescription drug enrollees; or misuse of transitional assistance funds.* |
| *Section 1862(b)(3)(c)* | *Financial incentives not to enroll in a group health plan.* |
| *Section 1866(g)* | *Unbundling outpatient hospital costs.* |
| *Section 1867* | *Dumping by hospital/responsible physician of patients needing emergency medical care.* |
| *Section 1876(i)(6)(A)(i)*<br>*Section 1903(m)(5)(A)(i)*<br>*Section 1857(g)(1)(A)* | *Failure by Health Maintenance Organization (HMO)/competitive medical plan/MCO to provide necessary care affecting beneficiaries.* |
| *Section 1876(i)(6)(A)(ii)*<br>*Section 1903(m)(5)(A)(ii)*<br>*Section 1857(g)(1)(B)* | *Premiums by HMO/competitive medical plan/MCO in excess of permitted amounts.* |
| *Section 1876(i)(6)(A)(iii)*<br>*Section 1903(m)(5)(A)(iii)*<br>*Section 1857(g)(1)(C)* | *HMO/competitive medical plan/MCO expulsion/refusal to re-enroll individual per prescribed conditions.* |
| *Section 1876(i)(6)(A)(iv)*<br>*Section 1903(m)(5)(A)(iii)*<br>*Section 1857(g)(1)(D)* | *HMO/competitive medial plan/MCO practices to discourage enrollment of individuals.* |
| *Section 1876(i)(6)(A)(v)*<br>*Section 1903(m)(5)(A)(iii)*<br>*Section 1857(g)(1)(E)* | *False or misrepresenting HMO/competitive medical plan/MCO information to Secretary.* |
| *Section 1876(i)(6)(A)(vi)*<br>*Section 1903(m)(5)(A)(v)*<br>*Section 1857(f)* | *Failure by HMO/competitive medical plan/MCO to assure prompt payment for Medicare risk-sharing contracts only or incentive plan provisions.* |
| *Section 1876(i)(6)(A)(vii)*<br>*Section 1857(g)(1)(G)* | *HMO/competitive medical plan/MCO hiring/employing person excluded under §1128 or §1128A.* |
| *Section 1877(g)(3)* | *Ownership restrictions for billing clinical lab services.* |
| *Section 1877(g)(4)* | *Circumventing ownership restriction governing clinical labs and referring physicians.* |
| *Section 1882(d)(1)* | *Material misrepresentation referencing compliance of Medicare supplemental policies (including Medicare + Choice).* |

| | |
|---|---|
| *Section 1882(d)(2)* | *Selling Medicare supplemental policy (including Medicare + Choice) under false pretense.* |
| *Section 1882(d)(3)(A)* | *Selling health insurance that duplicates benefits.* |
| *Section 1882(d)(3)(B)* | *Selling or issuing Medicare supplemental policy (including Medicare + Choice) to a beneficiary without obtaining a written statement from beneficiary with regard to Medicaid status.* |
| *Section 1882(d)(4)(A)* | *Use of mailings in the sale of non-approved Medicare supplemental insurance (including Medicare + Choice).* |
| *Section 1891(c)(1)* | *Notifying home health agency of scheduled survey.* |
| *Section 1927(b)(3)(B)* | *False information on drug manufacturer survey from manufacturer/wholesaler/seller.* |
| *Section 1927(b)(3)(C)* | *Provision of untimely or false information by drug manufacturer with rebate agreement.* |
| *Section 1929(i)(3)* | *Notifying home- and community-based care providers/settings of survey.* |
| *Section 421(c) of the Health Care Quality Improvement Act (HCQIA)* | *Failure to report medical malpractice liability to National Practitioner Data Bank.* |
| *Section 427(b) of HCQIA* | *Breaching confidentiality of information report to National Practitioner Data Bank.* |

## *4.11.6 - Referral Process*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

### *4.11.6.1 - Referral Process to CMS*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Compliance is promoted through both administrative and formal legal actions. Administrative compliance action shall first be attempted by MACs through education and warning letters that request the provider to comply with Medicare's rules and regulations. If the provider fails to take corrective action and continues to remain non- compliant, the MAC shall make a referral to the UPIC who shall forward it to the COR and BFL.*

*It is important for MACs to promote program compliance in their respective jurisdictions. The MACs shall ensure that all materials presented to providers through education, published bulletins, or written communication are clear and concise and accurately represent the facts of compliance versus non-compliance. Providers shall also be allowed the opportunity to present additional facts that may represent mitigating circumstances. UPICs shall consider this information in an objective manner before proceeding with a CMP referral to CMS.*

*When a UPIC elects to make a CMP referral to CMS, the initial referral package shall consist of a brief overview of the case; supportive documentation is not required at such time. The initial referral package shall consist of:*

1. *Identification of the provider, including the provider's name, address, date of*

*birth, Social Security number, Medicare identification number(s), and medical specialty. If the provider is an entity, include the names of its applicable owners, officers, and directors.*

*2. Identification of the CMP authorities to be considered (use the authorities identified in PIM Chapter 4, Section 4.11.5).*

*3. Identification of any applicable Medicare manual provisions.*

*4. A brief description of how the violations identified above were discovered, and the volume of violations identified.*

*5. Total overpayments due the program or the beneficiary(ies), respectively.*

*6. A brief chronological listing of events depicting communication (oral and written) between the MAC and the provider.*

*7. A brief chronological listing of bulletins addressing the non-compliant area (starting with the bulletin released immediately prior to the first incident of non-compliance by the provider).*

*8. Any additional information that may be of value to support the referral.*

*9. The name and phone number of contacts at the UPIC.*

*Upon receipt of the above information, CMS staff will review the materials and may conduct follow-up discussions with the UPIC regarding the referral. Typically, within 90 days of receipt of the referral, CMS will notify the UPIC of its decision to accept or decline the referral.*

*If CMS declines the referral, the UPIC shall communicate this to the MAC to continue in their efforts to educate and promote compliance by the provider. The UPIC shall also consider other (less severe) administrative remedies, which, at a minimum, may include revocation of assignment privileges, establishing prepayment or postpayment medical reviews, and referral of situations to state licensing boards or medical/professional societies, where applicable. In all situations where inappropriate Medicare payments have been identified, MACs shall initiate the appropriate steps for recovery.*

*If CMS accepts the referral, the UPIC shall provide any supportive documentation that may be requested, and be able to clarify any issues regarding the data in the case file or UPIC and MAC processes.*

### *4.11.6.2 - Referrals to OIG*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Upon discovery of any case that may implicate any of the OIG's delegated CMP authority, regardless of whether there is any other pending activity, or whether the fraud case was closed, UPIC shall contact the OIG/OI Field Office to discuss the potential case. If this contact results in a referral, the UPIC shall follow the same referral format as described in PIM, chapter 4, Section 4.9.2.1. If a referral is not made or a referral is declined, the UPIC shall consider other administrative remedies, which, at a minimum, may include revocation of assignment privileges, establishing prepayment or post payment medical reviews, and referral of situations to state licensing boards or medical/professional societies, where applicable. In all situations where appropriate Medicare payments have been identified, MACs shall initiate the appropriate steps for recovery.*

*The UPIC shall send to the OIG all cases, as appropriate, where an excluded provider or individual has billed or caused to be billed to the Medicare or Medicaid program for the furnishing of items or services after exclusion. Such misconduct is sanctionable under §1128A(a)(C)(1) of the Social Security Act.*

*The UPIC shall send to the CMS Provider Enrollment and Oversight Group all cases where UPIC believes that misuse has occurred of the Medicare name, symbols, emblems, or other violations as described in §1140 of the Social Security Act and in 42 CFR 1003.102(b)(7).*

## *4.11.7 - CMS Generic Civil Monetary Penalties Case Contents*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The following information, if available, shall be included as part of the CMP case package and made available upon request by CMS:*

1. *Background information:*

    a. *All known identification numbers (NPI, Provider Transaction Access Number (PTAN), etc.);*

    b. *Provider's first and last name or entity name (if subject is an entity, also include the full name of the principal operator);*

    c. *Provider/supplier's address (street, city, state, and zip code). If violator is an entity, identify address where principal operator personally receives his/her mail;*

2. *Copies of any interviews, reports, or statements obtained regarding the violation;*

3. *Copies of documentation supporting a confirmation of the violation;*

4. *Copies of all applicable correspondence between beneficiary and provider;*

5. *Copies of all applicable correspondence (including telephone contacts) between the MAC and provider;*

6. *Copies of provider's applicable bills to beneficiaries and/or MACs, and associated payment histories;*

7. *Copies of any complaints regarding provider and disposition of the complaint;*

8. *Copies of all publications (e.g., bulletins, newsletters) sent to provider by the UPIC, SMRCs or MAC who discuss the type of violation being addressed in the CMP case;*

9. *Copies of any monitoring reports regarding the provider; and*

10. *Name and telephone number of UPIC contact.*

## *4.11.8 - Additional Guidance for Specific Civil Monetary Penalties*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

### *4.11.8.1 - Beneficiary Right to Itemized Statement*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The following is background information for developing specific CMS CMP cases:*

*Effective for services or items provided on or after January 1, 1999, §4311 of the Balanced Budget Act (BBA) provides that Medicare beneficiaries have the right to request and receive an itemized statement from their health care provider of service (e.g., hospital, nursing facility, home health agency, physician, non-physician practitioner, DMEPOS supplier). Upon receipt of this request, providers have 30 days to furnish the itemized statement to the beneficiary. Health care providers who fail to provide an itemized statement may be subject to a CMP of not more than $100 for each failure to furnish the information (§1806(b)(2)(B) of the Social Security Act). An itemized statement is defined as a listing of each service(s) or item(s) provided to the beneficiary. Statements that reflect a grouping of services or items (such as a revenue code) are not considered an itemized statement.*

*A beneficiary who files a complaint with a MAC regarding a provider's failure to provide an itemized statement must initially validate that his/her request was in writing (if available), and that the statutory 30-day time limit (calendar days) for receiving the information has expired. In most cases, an additional 5 calendar days should be allowed for the provider to receive the beneficiary's written request. If the beneficiary did not make his/her request in writing, inform him/her that he/she must first initiate the request to the provider in writing. It is only after this condition and the time limit condition are met that the MAC may contact the provider.*

*Once the MAC confirms that the complaint is valid, the MAC shall initiate steps to assist the beneficiary in getting the provider to furnish the itemized statement. MACs shall initiate the same or similar procedures when receiving complaints regarding mandatory submission of claims (i.e., communicating with the provider about their non-compliance and the possibility of the imposition of a CMP).*

*If the intervention of the MAC results in the provider furnishing an itemized statement to the beneficiary, the conditions for the statute are considered met, and a CMP case should not be developed. Should the intervention of the MAC prove unsuccessful, the MAC shall consider referral to the UPIC for subsequent referral of the potential CMP case to CMS, following the guidelines established in Chapter 4, Sections 4.11.6.1 and 4.11.7 of the PIM.*

- *There may be instances where a beneficiary receives an itemized statement and the MAC receives the beneficiary's request (written or oral) to review discrepancies on his/her itemized statement. MACs shall follow their normal operating procedures in handling these complaints. MACs shall determine whether itemized services or items were provided, or if any other irregularity (including duplicate billing) resulted in improper Medicare payments. If so, the MAC shall recover the improper payments.*

## *4.11.8.2 - Medicare Limiting Charge Violations*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The Omnibus Budget Reconciliation Act of 1989 (OBRA) established a limitation on actual charges (balanced billing) by non-participating physicians. (Refer to §1848(g) of the Act, and Medicare Carriers Manual §§5000ff. and 7555, respectively, for further information.)*

*As a result of the reduction in limiting charge monitoring activities (i.e., the discontinuance of the Limiting Charge Exception Report and the Limiting Charge Monitoring Report, the discontinuance of sending compliance monitoring letters and Refund/Adjustment Verification Forms), developing a Limiting Charge CMP case shall require the following additional information:*

- *Contact with the provider - Based on CMS instructions, ACs and MACs are to assist beneficiaries in obtaining overcharge refunds from the providers. This assistance reinstates the activity of sending the refund verification forms and compliance monitoring letters respective to the beneficiary(ies) who request assistance. Copies of these communications will become part of the CMP case file. Ensure that the communication includes language that reminds the provider that the limiting charge amounts for most physician fee schedule services are listed on the disclosure reports they receive in their yearly participation enrollment packages. (This constitutes "notice" of the Medicare charge limits for those services.) The provider's letter should also include information that describes "what constitutes a violation of the charge limit," and that providers are provided notification on their copy of the remittance statements when they exceed the limiting charge. Providers who elected not to receive remittance statements for non- assigned claims should be reminded that they are still bound by the limiting charge rules, and that they are required to make refunds of overcharges. It may be appropriate at this time for providers to reconsider their decision not to receive remittance forms for non-assigned claims. Providers should also be informed of what action to take in order to receive these statements.*

- *Limiting Charge Monitoring Reports (LCMRs) - Produce LCMRs for all limiting charge violations respective to the provider and which encompasses the last three years. ACs and MACs shall also identify those beneficiaries appearing on the reports who have requested assistance in obtaining a refund from their provider.*

## 4.12.2 - Initial Entry and Update Requirements for UPIC Leads and Investigations

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

Leads and Investigations are logged into the UCM as a case record type (CSE). CSEs are generated based on PDP outcomes, or through a reactive measure (i.e., complaint, FPS lead, etc.). When a PDP identifies a lead that justifies the opening of a CSE, the UPIC shall initiate the CSE from the PDP record within seven (7) calendar days, unless otherwise directed by CMS. When a reactive lead is identified, the UPIC shall initiate a CSE within seven (7) calendar days of receipt of the lead. All leads are required to be screened in accordance with the Medicare PIM guidelines at Chapter 4, Section *4.5* – Screening Leads, unless otherwise directed by CMS.

CMS expects the UPICs to make timely updates, generally within two (2) business days of the action, to the UCM throughout the course of a lead and/or investigation. The UPIC shall document all activities it has performed in order to substantiate any allegations of potential fraud, waste, or abuse. For example, on-site visits, medical reviews, audits, data analysis, etc., shall be documented, along with the applicable dates for each action. Investigative notes should be documented in the Record Summary, rather than added as a separate document, attachment, etc.

The UPIC shall take all appropriate administrative actions, as defined in PIM Chapters 3, 8, and/or *10.* Each action shall be noted in the UCM under the appropriate administrative action record type (i.e., PSP, OPT, REV, PPE, etc.) and linked to the primary investigation CSE record, when applicable. Of note, when pursuing an administrative action based on an existing CSE, the UPIC shall generate the appropriate administrative action record from the originating CSE record. The primary investigation record (CSE) should include a high level summary of the action(s) taken within the administrative action record. In addition, all

applicable documents linked to these activities shall be uploaded to the corresponding UCM record.

In instances where the UPIC is referring the subject of an investigation to law enforcement, the UPIC shall generate a referral record (REF) per the primary NPI from the case record (CSE) within seven (7) calendar days of each referral, unless otherwise directed by CMS. The primary investigation record (CSE) should include a high level summary of the action(s) taken within the referral record. In addition, all applicable documents linked to the referral shall be uploaded to the UCM referral record.

For investigations referred to law enforcement (i.e., OIG, DOJ, FBI, etc.), updates to the UCM shall be made within the following parameters:

- Upon notice from law enforcement on the status of the referral, UCM updates shall be made within seven (7) calendar days;
- If the investigation is accepted and the contractor has no pending administrative actions, the UPIC shall close the case in the UCM within seven (7) calendar days;
- If the case is accepted and the UPIC has pending administrative actions, the UPIC shall keep the case open in the UCM and pursue the outstanding administrative actions as directed by CMS. Once law enforcement closes its case and all administrative actions have been finalized, the UPIC shall close the case in the UCM within seven (7) calendar days.
- Information regarding law enforcement activities that are, or could be considered to be, of a sensitive nature shall not be entered into the UCM. These activities include, but are not limited to, planned search warrants, undercover operations and activities, and executed search warrants, where only some of the search warrants have been executed.

After all actions are taken and all subsequent administrative activities are complete, the UPIC shall close the investigation in the UCM within seven (7) calendar days.

### 4.12.5 - Update Requirements for Immediate Advisements

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

When criteria for an Immediate Advisement to the OIG/OI is met based on the criteria referenced in Chapter 4, *Section 4.9.1* of the PIM, the UPIC shall notify the OIG/OI by phone or email to determine if a formal Immediate Advisement should be sent to the OIG/OI. The UPIC shall document this communication in the UCM Record Summary field immediately. Should the OIG/OI confirm that an Immediate Advisement should be sent, the UPIC shall provide all available documentation to the OIG/OI within four (4) business days. Upon submission of an Immediate Advisement to the OIG/OI, the UPIC shall update the applicable UCM fields, as referenced in the UCM User Manual, within two (2) calendar days of submission. Once notification is received by the OIG/OI regarding its acceptance or declination of the Immediate Advisement, the UPIC shall update the applicable UCM fields within two (2) calendars days of the notice. All further correspondence and details associated with the Immediate Advisement shall be documented in the UCM Record Summary field as it is received.

## 4.13 *– Vulnerabilities*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs and SMRCs.*

*Program vulnerabilities are identified flaws or weaknesses in policy and/or regulatory authority that increases the likelihood of significant inappropriate payments being made to a*

*broad provider/supplier population. Program vulnerabilities can be identified through a variety of sources such as the Chief Financial Officer's audit, Fraud Alerts, the GAO, the OIG, data driven studies, and UPIC and Medicare contractor operations.*

*Program Integrity concerns are issues CPI and/or the UPICs/SMRCs have identified through their own analysis and have the ability to mitigate through existing operations. Examples of PI concerns include, but are not limited to: routine changes and implementation of new billing codes (i.e. ICD-10, HCPCs, CPT codes, etc.) that may lead to questionable billing practices, reports/complaints of a potential fraud schemes that can be addressed in CMS regulations or policy guidance, or identified concerns and significant mitigating changes to enrollment processes.*

*The UPICs and SMRC shall discuss potential program vulnerabilities with the COR(s) and BFL(s) during the established recurring workload meetings. Program vulnerabilities should be submitted sooner if the UPIC/SMRC believes it requires immediate consideration. The BFL will validate the lead to determine whether the potential issue is a program vulnerability, a PI Concern, or another type of issue that may need to be addressed. Should the BFL need additional information, the UPIC shall submit an overview of the potential program vulnerability, program impact, and proposed action to the COR(s) and BFL(s) via email.*

*Should the COR(s) and BFL(s) agree that the identified issue is a program vulnerability, the UPIC/SMRC shall submit the proposed program vulnerability to the vulnerability mailbox at CPIVulnerabilityIntake@cms.hhs.gov, using the Vulnerability Template.*

*Additionally, all program vulnerabilities that are submitted to the mailbox shall be documented in the UPIC/SMRC program vulnerability report. If the UPIC/SMRC believes the proposed program vulnerability has potential Medicaid impact, the UPIC/SMRC shall document this in the submission to the vulnerability mailbox.*

*Should the COR(s) and BFL(s) determine that the identified issue is a PI concern, the COR(s) and BFL(s) shall advise the UPIC/SMRC to mitigate the concern through its existing operations. Issues not considered to be program vulnerabilities or PI concerns will be addressed on a case by case basis.*

***Vulnerability Template Date Submitted:***

***Submitted by:***

*Name:*
*Organization:*
*Phone:*
*Email:*

***Vulnerability***

*Vulnerability Title:*

*Provider Type (if applicable):*

*Vulnerability Description:*

*Risk Factors (specific conditions, drivers, and/or actions that likely cause the vulnerability or increase the chances of it occurring):*

* Be as specific as possible about what the root cause(s) of the vulnerability may be. This field provides detail that may be used to ultimately help "solve the problem" and mitigate the vulnerability.

For the below, provide risk assessment point valuation and provide a written justification for each (This is not required but will greatly assist in the vulnerability process).

Likelihood (Likelihood for the identified vulnerability. Provide 1-2 sentences behind the reasoning for selecting this level of likelihood for the vulnerability):

4 -- Almost Certain (>=75% likelihood to occur) 3 -- Likely (>=50% - <75% likelihood to occur)
2 -- Possible (>=25% - <50% likelihood to occur) 1 -- Unlikely (<25% likelihood to occur)

Patient Harm (Provide 1-2 sentences behind the reasoning for selecting this level of likelihood for the vulnerability):

4 -- Life Threatening 3 -- Significant
2 -- Minimal 1 -- No harm

Financial Impact (Provide 1-2 sentences behind the reasoning for selecting this level of financial impact for the vulnerability):

4 -- Greater than $200m (>=$200 million)
3 -- $100m - $200m (>=$100 million <$200 million) 2 -- $10m - $100m (>=$10 million <=$100 million) 1 -- Less than $10m (<$10 million)

Breadth (Provide 1-2 sentences behind the reasoning for selecting this level of breadth for the vulnerability):

4 -- National
3 -- Regional
2 -- Pocketed
1 -- Isolated

Existing Controls (Provide current projects or activities that are underway to address the risk factor):

Suggested Mitigation Activities (Suggestions for action items (i.e. key results) that may help to mitigate the risk factor(s):

Source (i.e. person/organization that first identified it):

FPS Model-Related (Y/N):
* If yes, simultaneously report the information consistent with requirements of the FPS.

Attachments (If applicable, upload document(s), such as Office of Inspector General reports or relevant data that can provide additional information or context on the vulnerability being reported):

## 4.14 - *Fraud Alerts*
**(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)**

*This section applies to UPICs.*

*Fraud Alerts are issued when circumstances arise that indicate a need to advise the UPICs, SMRCs, MACs, LE, state Medicaid agencies, and other appropriate stakeholders about an activity that resulted in the filing of inappropriate and potentially false Medicare claims. If the UPIC identifies the need for a Fraud Alert, it shall provide the COR and BFL a summary of the circumstances. The CMS will evaluate the need to issue a Fraud Alert. All Fraud Alerts will be disseminated by CMS to the appropriate stakeholders and supplied to the UPICs in the UCM. Once the information is disseminated, the UPIC may send any questions related to the Fraud Alert to the COR and BFL.*

## 4.15 - *Incentive Reward Program*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*Section 203(b)(1) of the Health Insurance Portability and Accountability Act (HIPAA) of 1996 (Public Law 104-191) instructs the Secretary to establish a program to encourage individuals to report information on individuals and entities that are engaged in or have engaged in acts or omissions that constitute grounds for the imposition of a sanction under sections 1128, 1128A, or 1128B of the Social Security Act (the Act), or who have otherwise engaged in sanctionable fraud, waste, and/or abuse against the Medicare program under title XVIII of the Act.*

*The Incentive Reward Program (IRP) was established to pay an incentive reward to individuals who provide information on Medicare fraud, waste, and/or abuse or other sanctionable activities. The applicable regulations are in 42 CFR § 420.405.*

## *4.15.1 - UPIC Responsibilities for the Incentive Reward Program*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs and MACs, as indicated.*

*For UPICs and MACs, the IRP responsibilities explained below shall be worked out in the UPIC and MAC Joint Operating Agreement (JOA).*

## *4.15.2 - Guidelines for Processing Incoming Complaints*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs and MACs, as indicated.*

*On or after July 8, 1998, any complaints received that pertain to a potentially sanctionable offense as defined by sections 1128, 1128A, or 1128B of the Act, or that pertain to those who have otherwise engaged in sanctionable fraud, waste, and/or abuse against the Medicare program under title XVIII of the Act, are eligible for consideration for reward under the IRP. The UPIC should consider the complainant for the reward program. Complaints may originate from a variety of sources such as the OIG Hotline, the UPIC, customer service representatives, etc. The UPIC and MAC shall inform their staff of this program to ensure that the staff will respond to or refer questions correctly. PIM, Exhibit 5 provides IRP background information to assist staff who handle inquiries.*

*The UPIC and MAC shall treat all complaints as legitimate until proven otherwise. The MAC shall refer potential fraud, waste, and abuse incoming complaints to the UPIC for investigation. Complaints shall either be resolved by the UPIC or, if determined to be a*

*sanctionable offense, referred to the OIG for investigation. Complaints that belong in another UPIC's zone shall be recorded and forwarded to the appropriate UPIC. All information shall be forwarded according to existing procedures.*

*If an individual registers a complaint about a Medicare managed care provider/supplier, UPICs and MACs shall record and forward all information to:*

> *Centers for Medicare & Medicaid Services Centers for Medicare Management*
> *Performance Review Division*
> *Mail Stop C4-23-07 7500 Security Blvd.*
> *Baltimore, MD 21244*

### *4.15.3 - Guidelines for Incentive Reward Program Complaint Tracking*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*If the UPIC receives a related complaint and the complainant is eligible for the IRP, the UPIC shall notate the IRP in the UCM and coordinate with its COR and BFL when issuance of the award is identified.*

### *4.15.4 - Excluded Individuals*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The following individuals are not eligible to receive a reward under the IRP:*

- *An individual who was, or is, an immediate family member of an officer or employee of DHHS, its UPICs, SMRCs, MACs, or subcontractors, the Social Security Administration (SSA), the OIG, a SMA, the DOJ, the FBI, or any other federal, state, or local LE agency at the time he/she came into possession, or divulged information leading to a recovery of Medicare funds. Immediate family is as defined in 42 CFR 411.12(b), which includes any of the following:*
    - *Husband or wife;*
    - *Natural or adoptive parent, child, or sibling;*
    - *Stepparent, stepchild, stepbrother, or stepsister;*
    - *Father-in-law, mother-in-law, son-in-law, daughter-in-law, brother- in- law, or sister-in-law; and*
    - *Grandparent or grandchild.*
- *Any other federal or state employee, UPIC, SMRCs, MAC, or subcontractor, or DHHS grantee, if the information submitted came to his/her knowledge during the course of his/her official duties;*
- *An individual who received a reward under another government program for the same information furnished;*
- *An individual who illegally obtained the information he/she submitted; and.*
- *An individual who participated in the sanctionable offense with respect to which payment would be made.*

### *4.15.5 - Amount and Payment of Reward*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The amount of the reward shall not exceed 10 percent of the overpayments recovered in the case, or $1,000, whichever is less. Collected fines and penalties are not included as part of the recovered money for purposes of calculating the reward amount. If multiple complainants are involved in the same case, the reward will be shared equally among each complainant but not to exceed the maximum amount of the reward.*

### *4.15.6 - Unified Program Integrity Contractor Responsibilities*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*For UPICs, SMRCs, and MACs, the IRP responsibilities explained below shall be worked out in the JOA.*

### *4.15.6.1 - Guidelines for Processing Incoming Complaints*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*On or after July 8, 1998, any complaints received that pertain to a potentially sanctionable offense as defined by §§1128, 1128A, or 1128B of the Act, or that pertain to those who have otherwise engaged in sanctionable fraud, waste, and/or abuse against the Medicare program under title XVIII of the Act, are eligible for consideration for reward under the IRP. While the complainant may not specifically request to be included in the IRP, the UPIC should consider the complainant for the reward program. Complaints may originate from a variety of sources such as the OIG Hotline, the UPIC, customer service representatives, etc. The UPICs, SMRCs and MACs shall inform their staff of this program, so they will respond to or refer questions correctly. Exhibit 5 of the PIM provides IRP background information to assist staff who handle inquiries. The UPICs, SMRCs and MACs shall treat all complaints as legitimate until proven otherwise. They shall refer incoming complaints to the UPIC for further screening.*

*Complaints shall either be resolved by the UPIC, if determined to be a sanctionable offense, referred to the OIG for investigation. Complaints that belong in another UPIC's zone shall be recorded and forwarded to the appropriate UPIC. All information shall be forwarded to them according to existing procedures.*

*If an individual registers a complaint about a Medicare Managed Care provider, UPICs and MACs shall record and forward all information to:*

> *Centers for Medicare & Medicaid Services Centers for Medicare Management*
> *Performance Review Division*
> *Mail Stop C4-23-07 7500 Security Blvd.*
> *Baltimore, MD 21244*

### *4.15.6.2 - Guidelines for Incentive Reward Program Complaint Tracking*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPICs shall continue to track all incoming complaints potentially eligible for reward in their existing internal tracking system. The following complainant information shall be included:*

- *Name;*
- *HICN or Social Security number (for non-beneficiary complaints);*
- *Address;*
- *Telephone number; or*
- *Any other requested identifying information needed to contact the individual. The UPIC shall refer cases to the OIG for investigation if referral criteria are met according to PIM Chapter 4, Section 4.9.2 - Referral of Cases to the OIG/OI. The case report shall also be forwarded to the OIG.*

*The UPIC shall enter all available information into the IRP tracking database. Information that shall be maintained on the IRP tracking database includes:*

- *Date the case is referred to the OIG;*
- *OIG determination of acceptance;*
- *If accepted by OIG, the date and final disposition of the case by the OIG (e.g., CMP, exclusion, referral to DOJ); and*
- *Any provider identifying information required in the UCM, e.g., the Unique Physician Identification Number (UPIN).*

*The OIG has 90 calendar days from the referral date to make a determination for disposition of the case. If no action is taken by the OIG within the 90 calendar days, the UPIC should begin the process for recovering the overpayment and issuance of the reward, if appropriate.*

### *4.15.6.3 - Overpayment Recovery*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPIC and SMRCs shall initiate overpayment recovery actions according to PIM Chapter 3, if it is determined an overpayment exist. Only MACs shall issue demand letters and recoup the overpayment.*

### *4.15.6.4 - Eligibility Notification*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*After all fraudulently obtained Medicare funds have been recovered and all fines and penalties collected, if appropriate, the UPIC will send a reward eligibility notification letter and a reward claim form to the complainant by mail at the most recent address supplied by the individual. PIM Exhibit 5.1 provides a sample eligibility notification letter and Exhibit 5.2 provides a sample reward claim form that may be used as guides.*

### *4.15.6.5 - Incentive Reward Payment*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*After the complainant has returned the reward claim form with appropriate attachments, the UPIC shall determine the amount of the reward and initiate payment. The reward payment should be disbursed to the complainant from the overpayment money recovered. Payments made under this system are considered income and subject to reporting under Internal Revenue Service tax law. No systems changes to implement these procedures are to be made.*

*For UPICs, only the MAC shall make IRP payments. The UPIC shall provide the necessary documentation to the MAC to initiate the IRP payment.*

### *4.15.6.6 - Reward Payment Audit Trail*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPIC shall maintain an audit trail of the disbursed check. The following data shall be included:*

*Amount of the disbursed check*
*Date issued*
*Check number*
*Overpayment amount identified*
*Overpayment amount recovered*
*Social Security number of complainant*
*Party the complaint is against*

*The UPIC shall update the IRP tracking database to reflect disbursement of the reward check to the complainant, and the UPIC shall work with the MAC via the JOA to disburse the reward check.*

## *4.15.7 - CMS Incentive Reward Winframe Database*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The IRP database was designed to track rewards that could be paid for information about fraud or abuse of the Medicare Trust Fund. Access to the IRP database is through the Winframe file server located at the CMS data center and is controlled through password and access codes. Cases can be entered into the IRP system by any UPIC, or managed care organization contractor, or by the OIG. When the UPIC refers a case to the OIG, for which the complaint is eligible for the IRP, they shall update the IRP system with all available information. The database contains the current status of all Medicare fraud/abuse cases pending reward. Some cases may be closed without a reward, based on final disposition of the case. UPICs and CMS ROs have oversight responsibility for this system. The database provides the following information:*

*On-demand management reports*
*Duplicate complaints submitted for reward*
*Audit trail of overpayments recovered as a result of the reward program*

*The IRP database user instructions are found in PIM Exhibit 5.3.*

## *4.15.8 - Updating the Incentive Reward Database*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*The UPICs shall be responsible for updating the incentive reward database on overpayment recovery and reward amounts. UPICs shall regularly follow up with the OIG to obtain information on recovery of complaints referred to them that originated from an IRP complainant. The UPIC shall follow up on referrals to the OIG when no action is taken within 90 calendar days. The tracking system database shall be updated as information becomes available. Updates shall be entered, at a minimum, on a quarterly basis.*

*The IRP screens may be viewed in PIM Exhibit 5.9.*

## 4.16 - *Discounts, Rebates, and Other Reductions in Price*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*A UPIC that learns of a questionable discount program shall contact its BFL to determine the course of action, when needed.*

## *4.16.1 - Anti-Kickback Statute Implications*

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, hospital incentive or bribe) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring a patient to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or a State health care program, or in return for purchasing, leasing, or ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under Medicare, Medicaid or a State health program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. 1320a-7b(b), §1128B(b) of the Act.*

*Discounts, rebates, or other reductions in price may violate the anti-kickback statute because such arrangements induce the purchase of items or services payable by Medicare or Medicaid. However, some arrangements are clearly permissible if they fall within a safe harbor. One safe harbor protects certain discounting practices. For purposes of this safe harbor, a "discount" is the reduction in the amount a seller charges a buyer for a good or service based on an arms-length transaction. In addition, to be protected under the discount safe harbor, the discount must apply to the original item or service that is purchased or furnished (i.e., a discount cannot be applied to the purchase of a different good or service than the one on which the discount was earned). The definition of discount under the anti-kickback statute does not include "bundled" goods or services. As a result, a discount may apply to the purchase of different goods or services other than the one on which the discount was earned, when they are bundled together to induce the purchase of that good or service without coming under the anti-kickback statute.*

*Additionally, the discount offered for bundled goods or services to induce the purchase of a different good or service would not come under the anti-kickback statute only when both items are subject to the same reimbursement methodology under Medicare or Medicaid. A "rebate" is defined as a discount that is not given at the time of sale. A "buyer" is the individual or entity responsible for submitting a claim for the item or service that is payable by the Medicare or Medicaid programs. If the buyer is an entity that reports its costs on a cost report required by the Department or state health care program, it must comply with all of the following standards:*

> *The discount must be earned based on purchases of that same good or service bought within a single fiscal year.*
>
> *The buyer must claim the benefit of the discount in the fiscal year in which the discount is earned or the following year.*
>
> *The buyer must fully and accurately report the discount in the applicable cost report.*
>
> *The buyer must provide, upon request by the Secretary or a state agency, information provided by the seller as specified in 42 CFR §1001.952 (h)(2)(ii) of this section, or information provided by the offeror as specified in 42 CFR §1001.952 (h)(3)(ii).*

*A "seller" is the individual or entity that offers the discount.*

### *4.16.1.1 - Marketing to Medicare Beneficiaries*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*Certain marketing or solicitation practices could be in violation of the Medicare anti-kickback statute, 42 U.S.C. 1320a-7b(b). All marketing practices shall comply with the Medicare anti-kickback statute and with the Office of the Inspector General's (OIG's) Compliance Program Guidance for the DMEPOS industry.*

*Marketing practices may influence Medicare beneficiaries who use medical supplies, such as blood glucose strips, on a repeated basis. Beneficiaries are advised to report any instances of fraudulent or abusive practices, such as misleading advertising and excessive or non-requested deliveries of test strips, to their durable medical equipment MACs.*

*Advertising incentives that indicate or imply a routine waiver of coinsurance or deductibles could be in violation of 42 U.S.C. 1320a-7b(b). Routine waivers of coinsurance or deductibles are unlawful because they could result in--1) false claims; 2) violation of the anti-kickback statute; and/or 3) excessive utilization of items and services paid for by Medicare.*

*In addition, 42 U.S.C. 1320a-7a(a) (5) prohibits a person from offering or transferring remuneration. Remuneration is a waiver of coinsurance and deductible amounts, with exceptions for certain financial hardship waivers that are not prohibited.*

*Suppliers should seek legal counsel if they have any questions or concerns regarding waivers of deductibles and/or coinsurance or the propriety of marketing or advertising material.*

*Any supplier that routinely waives co-payments or deductibles can be criminally prosecuted and excluded from participating in Federal health care programs.*

### ***4.16.2 - Cost-Based Payment (Intermediary and MAC Processing of Part A Claims): Necessary Factors for Protected Discounts***
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This applies to UPICs and MACs.*

*For a discount to be protected, certain factors must exist. These factors assure that the benefit of the discount or rebate will be reported and passed on to the programs. If the buyer is a Part A provider, it must fully and accurately report the discount in its cost report. The buyer may note the submitted charge for the item or service on the cost report as a "net discount." In addition, the discount must be based on purchases of goods or services bought within the same fiscal year. However, the buyer may claim the benefit of a discount in the fiscal year in which the discount is earned, or in the following fiscal year. The buyer is obligated, upon request by the HHS or a state agency, to provide information given by the seller relating to the discount.*

*The following types of discounts may be protected if they comply with all of the applicable standards in the discount safe harbor:*

- *Rebate check*
- *Credit or coupon directly redeemable from the seller*
- *Volume discount or rebate*

*The following types of discounts are not protected:*

- *Cash payment*
- *Furnishing one good or service free of charge or at a reduced charge in exchange for any agreement to buy a different good or service*
- *Reduction in price applicable to one payer but not to Medicare or a State health care program*
- *Routine reduction or waiver of any coinsurance or deductible amount owed by a program beneficiary*

***Note:*** *There is a separate safe harbor for routine waiver of co-payments for inpatient hospital services. (Refer to 42 CFR §1001.952(k)(1).)*

### *4.16.3 - Charge-Based Payment (MAC Processing of Part B Claims): Necessary Factors for Protected Discounts*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs and MACs.*

*For a discount program to be protected for Part B billing, certain factors must exist. These factors ensure that the benefit of the discount or other reduction in price is reported and passed on to the Medicare or Medicaid programs. A rebate rendered after the time of sale is not protected under any circumstances. The discount must be made at the time of sale of the good or service. In other words, rebates are not permitted for items or services if payable on the basis of charges. The discount must be offered for the same item or service that is being purchased or furnished. The discount must be clearly and accurately reported on the claim form.*

*The following types of discounts may be protected if they comply with all of the applicable standards in the discount safe harbor:*

> *Credit or coupon directly redeemable from the seller The following types of discounts are not protected:*

- *Rebates offered to beneficiaries*
- *Cash payment*
- *Furnishing an item or service free of charge or at a reduced charge in exchange for any agreement to buy a different item or service*
- *Reduction in price applicable to one payer but not to Medicare or a State health care program*
- *Routine reduction or waiver of any coinsurance or deductible amount owed by a program beneficiary*

***NOTE:*** *There is a separate safe harbor for routine waiver of co-payments for inpatient hospital services. (Refer to 42 CFR §1001.952(k)(1).)*

### *4.16.4 - Risk-Based Provider Payment: Necessary Factors for Protected Discounts*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*This section applies to UPICs.*

*If the buyer is a health maintenance organization or a competitive medical plan acting in accordance with a risk contract or under another state health care program, the buyer does not need to report the discount, except as otherwise required under the risk contract.*

### 4.17 *- Participation Agreement and Limiting Charge Violations*
***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

*Section 2306 of the Deficit Reduction Act of 1984 established a physician/supplier participation program. The Omnibus Budget Reconciliation Act of 1989 established a limitation on actual charges by non-participating physicians (see §1848(g) of the Act). Participating physicians/suppliers who violate their participation agreements, and non-*

*participating physicians who knowingly, willfully, and repeatedly increase their charges to Medicare beneficiaries beyond the limits, are liable for action in the form of CMPs, assessments, and exclusion from the Medicare program for up to 5 years, or both. Criminal penalties also apply to serious violations of the participation agreement provisions.*

*For further discussion of the participation agreement and limiting charge provisions, see IOM Pub.100-04, chapter 1.*

# Medicare Program Integrity Manual Chapter 5 – Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Items and Services Having Special DME Review Considerations

**Table of Contents**

***(Rev. 11032; Issued: 09-30-21)***

## 5.10- Supplier Documentation

*(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)*

### A. General

Before submitting a claim to the DME MAC (or before dispensing the item – see section 5.2.4), the supplier must have on file a standard written order, the CMN (if applicable), the DIF (if applicable), information from the treating practitioner concerning the patient's diagnosis, and any information required for the use of specific modifiers or attestation statements as defined in certain DME MAC policies. The supplier should also obtain as much documentation from the patient's medical record as they determine they need to assure themselves that coverage criteria for an item have been met. If the information in the patient's medical record does not adequately support the medical necessity for the item, the supplier is liable for the dollar amount involved unless a properly executed ABN of possible denial has been obtained.

Documentation must be maintained in the supplier's files for seven (7) years from date of service. If the provider responds, in writing, that the Medicare qualifying supplier documentation is older than 7 years, and provides proof of continued medical necessity of the item or necessity of the repair, the contractors shall not deny the claim based solely on missing the supporting Medicare qualifying documentation that is over 7 years old.

### B. Proof of Delivery

Section 424.57(c)(12) requires suppliers, as part of their standards to be met for enrollment and participation, to maintain proof of delivery documentation in their files. In certain instances, compliance with proof of delivery may be required as a condition of payment, and must be available to the DME MAC, RAC, SMRC, CERT, and UPIC on request. For such items, if the supplier does not have appropriate proof of delivery documentation within the prescribed timeframes, associated claims will be denied and overpayments recouped. We note that non-compliance with supplier standards may also result in revocation from the Medicare program. Suppliers who consistently do not provide documentation to support their services may be referred to the OIG or NSC for investigation and/or imposition of sanctions. If the beneficiary is newly eligible to the Medicare program, the proof of delivery standards require the supplier to obtain a statement, signed and dated by the beneficiary (or beneficiary's designee), that the supplier has examined the item.

Please refer to IOM 100-08. Ch. 4, Section *4.7.3.1* for additional information regarding all proof of delivery requirements.

# Medicare Program Integrity Manual

## Chapter 8 – Administrative Actions and Sanctions and Statistical Sampling for Overpayment Estimation

Table of Contents

*(Rev. 11032; Issued: 09-30-21)*

## 8.2 – Overpayment Procedures

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

**This section applies to Medicare Administrative Contractors (MACs) and Unified Program Integrity Contractors (UPICs).**

The UPIC shall refer all identified overpayments to the MAC who shall send the demand letter and recoup the overpayment.

Contractors should initiate recovery of overpayments whenever it is determined that Medicare has erroneously paid. In any case involving an overpayment, even where there is a strong likelihood of fraud, contractors shall request recovery of the overpayment.

The UPIC shall refer such overpayments to the MAC only after the investigation has been vetted with CMS (see Pub. 100-08, chapter 4, section 4.6). In addition, if a UPIC is making a referral to law enforcement, it shall refrain from referring the overpayment determination to the MAC during specified times noted in Pub. 100-08, chapter 4, section *4.9.4*. If a large number of claims are involved, contractors consider using statistical sampling for overpayment estimation to calculate the amount of the overpayment. (See section 8.4 of this chapter.)

Contractors have the option to request the periodic production of records or supporting documentation for a limited sample of submitted claims from providers or suppliers to which amounts were previously overpaid to ensure that the practice leading to the overpayment is not continuing. The MAC may take any appropriate remedial action described in this chapter if a provider or supplier continues to have a high level of payment error. Offer the provider a consent settlement based on the potential projected overpayment amount.

## 8.3 – Suspension of Payment

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

**This section applies to Medicare Administrative Contractors (MACs) and Unified Program Integrity Contractors (UPICs).**

**Hereinafter, suspension of payment may be referenced as "payment suspension."**

Requests for Suspension of Payment ("Payment Suspension") may be approved when there is reliable information that an overpayment exists, when payments to be made may not be correct, or when there is a credible allegation of fraud existing against a provider. The process by which the UPIC notifies and coordinates with the MAC to implement a CMS-approved suspension of payment shall be documented in the Joint Operating Agreement (JOA) between the MAC and the UPIC. The UPICs shall advise and coordinate the imposition of a payment suspension with the appropriate MAC when a payment suspension has been approved by CMS. The UPIC shall perform the necessary medical review and development of overpayments for payment suspensions that have received CMS approval, when appropriate.

Medicare authority to withhold payment in whole or in part for claims otherwise determined to be payable is found in federal regulations at 42 CFR §405.370-375, which provide for the suspension of payments.

All payment suspensions shall be referred to the CMS/Center for Program Integrity (CPI) via the *Unified Case Management System (UCM)* for approval. UPICs shall notify their appropriate CPI Contracting Officer's Representative (COR)/Business Function Lead (BFL) of the submission by providing the *UCM* number via email.

## 8.3.1.1 – Credible Allegation of Fraud Exists Against a Provider - Fraud Suspensions

*(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)*

A payment suspension may be used when the UPIC, law enforcement, or CMS determines that a credible allegation of fraud exists against a provider or supplier (hereinafter referred to as provider). For purposes of section 8.3 et seq., these types of payment suspensions will be called "fraud suspensions."

Fraud suspensions may also be imposed for reasons not typically viewed within the context of false claims. For example:

- The Quality Improvement Organization (QIO) has reviewed inpatient claims and determined that the diagnosis related groups (DRGs) have been upcoded.

- The UPIC or MAC may suspect a violation of the physician self-referral ban. For this reason, the violation may be considered the cause for a payment suspension since claims submitted in violation of this statutory provision must be denied and any payments made would constitute an overpayment.

- Even though services are rendered and may be determined as medically necessary and reasonable by the Medicare contractor, law enforcement has credible allegations of kickbacks.

- Forged signatures on medical record documentation (e.g., Certificates ofMedical Necessity (CMN), treatment plans, etc.) and/or other misrepresentations on Medicare claims or associated forms to obtain payment that would result in an overpayment determination.

Whether or not the UPIC recommends a payment suspension to CMS, the final determination is determined on a case-by-case basis and requires review and analysis of the allegation and facts. The following information is provided to assist the UPIC in deciding when to recommend a payment suspension to CPI.

### A. Complaints

There is considerable latitude with regard to complaints alleging fraud, waste, and abuse. The provider's Medicare history, including the volume and frequency of complaints concerning the provider, and the nature of the complaints all contribute to whether a payment suspension should be referred to CPI. If there is a credible allegation(s) that a provider is submitting or may have submitted false claims, the UPIC may recommend a fraud suspension to CPI only after the UPIC has vetted the provider in accordance with Pub. 100-08, chapter 4, section 4.6. (If the MAC identifies the potential fraud issue from a complaint, the MAC shall refer its information to the respective UPIC for development).

### B. Requests for Suspension of Payment

For initial UPIC requests to suspend payments, the UPIC shall inform its assigned BFL of the potential suspension. The BFL will discuss all findings with the UPIC. After informing the BFL about the suspension, the contractor shall submit the payment suspension request via the *UCM* if the contractor determines such action is warranted. The Payment Suspension Administrative Action Request (AAR), draft suspension notice, and all other relevant

documentation that supports the suspension request shall be uploaded by the contractor as part of the *UCM* submission.

The UPIC shall also prepare and submit, if appropriate, a payment suspension referral package to CPI via the *UCM* for all requests received from (but not limited to):

- CMS
- Office of Inspector General (OIG)
- Federal Bureau of Investigation (FBI)
- Assistant United States Attorney (AUSA)
- Other law enforcement agencies

## C. Other Situations

Other situations that may be considered when recommending a fraud suspension to CPI include, but are not limited to:

- Provider has pled guilty to, or been convicted of, Medicare, Medicaid, TRICARE, or private health care fraud and is still billing Medicare for services;
- Federal/State law enforcement has subpoenaed the records of, or executed a search warrant upon, a health care provider billing Medicare;
- Provider has been indicted by a Federal Grand Jury for fraud, theft, embezzlement, breach of fiduciary responsibility, or other misconduct related to a health care program;
- Provider presents a pattern of evidence of known false documentation or statements sent to the UPIC or the MAC; e.g., false treatment plans, false statements on provider application forms.

## D. Good Cause Exceptions

Reference is made in 42 CFR §405.371(b)(1) that allows for good cause exceptions to not suspend payments or continue a payment suspension when there are credible allegations of fraud. These exceptions may be considered for approval by CMS if any apply:

- Law enforcement has requested that a payment suspension not be imposed because such action may compromise or jeopardize its investigation;
- CMS/CPI has determined that a beneficiary access to care issue may exist and potentially cause a danger to life or health in whole or part;
- CMS/CPI has been determined that other administrative remedies may be implemented that would be more effective in protecting Medicare funds (such as revocation, prepayment review); or
- CMS determines that the imposition or the continuation of a payment suspension is not in the best interest of the Medicare program.

Every 180 calendar days after the initiation of a payment suspension based on credible allegations of fraud, CMS is required to evaluate whether there is good cause to terminate the payment suspension. Good cause to terminate a payment suspension is deemed to exist if the payment suspension has been in effect for 18 months. However, there are two exceptions. The first exception is that the case has been referred to and is being considered by the OIG for an administrative action such as a civil monetary penalty or permissive exclusion, or such administrative action is pending, and the OIG has made its request to not terminate the payment suspension in writing. The second exception is that the Department of Justice has submitted a written request to extend the payment suspension based on the ongoing investigation and its anticipation of filing a criminal or civil action or both, or based on a pending criminal or civil action or both. (See 42 CFR §405.371(b)(2) and §405.371(b)(3).)

CMS/CPI makes the final decision on whether good cause to terminate exists, based on the totality of the circumstances. For all fraud suspensions, the UPICs shall submit requests to CPI via the *UCM* within 14 calendar days before the suspension expires. CPI will evaluate the request to consider whether good cause to terminate the payment suspension exists.

## 8.3.1.2 – Reliable Information that an Overpayment Exists - General Suspensions

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

A payment suspension may be implemented when the MAC, UPIC, or CMS possesses reliable information that an overpayment exists. In this situation, the MAC shall refer its information to the respective UPIC for development of a potential suspension. The UPIC shall refer a payment suspension to CPI via the *UCM* for consideration. For the purposes of this section, these types of payment suspensions will be called “general suspensions.”

**EXAMPLE (including but not limited to):** Several claimed services identified from either a prepayment or post-payment review were determined to be non-covered or miscoded. It has been determined that there is a pattern of noncompliant billings (the provider has billed this service many times before) and it is suspected that there may be a substantial number of additional non-covered or miscoded claims paid in the past.

## 8.3.2.1 – CMS Approval

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

If the UPIC believes that a UPIC-initiated Payment Suspension and/or RAP suppression is a viable option for an investigation, they shall update *UCM* appropriately to ensure the case is included on the next case coordination meeting agenda for discussion. For national or multi-regional suspensions, only the lead UPIC shall discuss the suspension at the case coordination meeting.

During the case coordination meeting, if CMS agrees that the criteria for Payment Suspension and/or RAP suppression is met, CMS will instruct the UPIC to submit the Payment Suspension request(s) and RAP suppression request(s) with the completed Administrative Action Review (AAR) form to IAG through the *UCM*. The IAG Payment Suspension team member will review the submissions and make a formal determination as to whether a Payment Suspension and/or RAP suppression is a viable option.

During the case coordination meeting, the UPIC may receive additional guidance from CMS related to subsequent actions related to these investigations. If the UPIC has questions following the case coordination meeting, the UPIC shall coordinate with its COR, IAG BFL, and IAG suspension team member.

When a payment suspension is approved by CPI, the UPIC shall inform the respective MAC of this action and the MAC shall effectuate the suspension of payments to the provider unless prior notice of the payment suspension is necessary. When prior notice is necessary, the MAC shall effectuate the suspension of payment in concert with the established date from the payment suspension notice. The MACs shall ensure that all money on the payment floor is not released to the provider after the effective date of the suspension and the money is withheld in accordance with the payment suspension rules and regulations. MACs shall provide an accounting of the money withheld on day one of the payment suspension to the UPIC. The UPIC shall enter this amount in the *UCM* as the first monetary entry.

Unless otherwise specified, when a payment suspension is imposed, no payments are to be released to the provider as of the effective date of the payment suspension. This includes payments for new claims processed, payments for adjustments to claims previously paid, interim PIPs, and RAPs. If it is discovered that money is released to the provider after the effective date of the payment suspension, the MAC or UPIC shall contact CPI for guidance.

## 8.3.2.2.4 – Mailing the Notice to the Provider

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

After consultation with and approval from CPI, the UPIC shall send the approved payment suspension notice (initial, responses to rebuttals, extensions, and terminations) to the provider. All such notices shall be sent via USPS certified mail or utilizing other commercial mail carriers that allow the tracking of the correspondence to ensure receipt by the provider. In the case of fraud suspensions, the UPIC shall send an informational copy to the OIG, FBI, or the AUSA for its file, if law enforcement has been previously involved and/or has an active investigation/case on the provider. The UPIC shall also upload the signed copies of all notices released to the provider into the *UCM.*

## 8.3.2.2.5 – Opportunity for Rebuttal

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

If the payment suspension is approved with prior notice, the provider is afforded an opportunity to submit to the UPIC a statement within 15 calendar days indicating why the payment suspension action should not be imposed. However, this time may be shortened or lengthened for cause. (See 42 CFR §405.374(b).)

If the payment suspension is approved without prior notice, the provider is also afforded an opportunity to submit to the UPIC a statement as to why the payment suspension action should not be imposed. (See 42 CFR §405.372(b)(2).) For purposes of consistency for both prior notice and no prior notice, CMS/CPI suggests that a 15 calendar day response time be established for the provider.

If a provider submits a rebuttal timely, a timely determination and written response by the UPIC is required in accordance with 42 CFR §405.375. If a provider does not respond in a timely manner, the UPIC shall submit a written response to the provider within 30 calendar days from the receipt date of the rebuttal.

UPICs shall ensure the following:

- CMS Review – UPICs shall forward the provider's rebuttal statement and any pertinent information to CPI via the *UCM* within 1 business day of receipt. The UPIC shall evaluate the information presented and then draft a response addressing each item mentioned in the rebuttal and submit it to CPI for approval via the *UCM* no later than 10 calendar days from receipt. The UPIC may contact CPI for guidance before drafting a response.

- Timing –The payment suspension shall go into effect as indicated in the notice.

- Review of Rebuttal – Because payment suspension actions are not appealable, the rebuttal is the provider's only opportunity to present information as to why suspension action should not be initiated or should be terminated. UPICs shall carefully review the provider's rebuttal statement and pertinent information, and shall consider all facts and issues raised by the provider. If the UPIC is convinced that the payment suspension action should not be initiated or should be terminated, it shall consult with the CPI for guidance.

- Response – CMS is obligated to consider the initial rebuttal and supportive information received from the provider and to make a determination within 15 calendar days from receipt of the rebuttal. (See 42 CFR §405.375(a).) If a full response cannot be drafted in the required timeframe, the UPIC shall draft an interim response for release that is approved by CPI.

## 8.3.2.3.2 – Case Development – Program Integrity

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

The UPIC shall enter all payment suspensions into the *UCM*. In the Suspension Narrative field, the UPIC shall include the items/services affected (i.e., type of item/service and applicable HCPCS/CPT codes). The first monetary entry of money withheld in the *UCM* shall reflect the money withheld on Day One of the payment suspension.

## 8.3.2.4 – Duration of the Payment Suspension

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

### A. Time Limits for General Suspensions

If CPI approves a general suspension, it will be for a 180 calendar day period. The UPIC shall complete its medical review and any subsequent activities (i.e., statistical sampling extrapolation, draft overpayment determination notice, etc.) during the initial 180 days of a general suspension. CMS expects the medical reviews to be completed and the calculation of any potential overpayments to be determined before the end of the initial suspension period. Only in rare instances will an extension be granted.

If an extension is required, the UPIC shall request an extension of an additional 180 calendar days if time is needed to complete the overpayment determination. Only CPI may approve the request to extend the period of the payment suspension for up to an additional 180 calendar days upon the written request of the UPIC. The request to CPI to extend the payment suspension shall provide the following:

- The AAR – Payment Suspension form
- A draft of the proposed payment suspension extension notice following the format noted in section 8.3.2.2 of this chapter (in a word document format);
- A timeline of the completion of the medical review; and
- Any other supporting documentation.

If approved for an extension, the period of time shall not exceed 180 calendar days. General suspensions shall not continue beyond 360 calendar days. However, there may be an occasion when the information gathered by the UPIC during its review supports a change from a general suspension to a fraud suspension. Only with CPI approval may the category of the type of payment suspension be transitioned from a general payment suspension to a fraud suspension. If the transition from a general payment suspension to a fraud payment suspension is approved, the provider must be informed of the new development by the UPIC

with a CPI-approved notice. Additionally, the provider must be afforded the opportunity for rebuttal.

**B. Exceptions to Time Limits for Fraud Suspensions**

If a payment suspension is based on credible allegations of fraud, the payment suspension may continue beyond 360 days with a written request for an extension from law enforcement. An extension may be warranted if there has not been a resolution of law enforcement's investigation of the potential fraud. After 18 months, good cause not to continue a payment suspension is deemed to exist unless certain criteria are satisfied. (See 42 C.F.R. §405.371(b)(3).) To extend a fraud suspension beyond 18 months:

- The Department of Justice must submit a written request for an extension. Requests must include: 1) the identity of the person or entity under the payment suspension, 2) the amount of time needed for continuation of the payment suspension in order to conclude the criminal or civil proceeding or both, and 3) a statement of why and/or how criminal and/or civil actions may be affected if the payment suspension is not granted.

- The OIG must submit a written request to extend the payment suspension because the case is being considered by the OIG for an administrative action (e.g., permissive exclusions, CMPs) or such action is pending. However, this exception does not apply to pending criminal investigations by OIG.

**C. Provider Notice of the Extension**

The UPIC shall obtain CPI approval for the extension request and draft notice, and shall notify the provider if the suspension action has been extended. The UPIC shall prepare a "draft extension notice" (in accordance with section 8.3.2.2 of this chapter) and submit it via the *UCM*, along with any other supportive information, to CPI for approval at least 14 calendar days before the payment suspension is set to expire. The draft notice shall follow the model language provided in the exhibits and shall include, at a minimum:

- The date the payment suspension will be extended (**NOTE**: The date is to be the same date the payment suspension was to expire);

- The reason for extending the payment suspension; and

- That CMS has approved the extension of the payment suspension.

Upon approval of the notice from CPI, the UPIC shall provide a copy of the signed notice to CPI via the *UCM.*

## 8.3.2.5 – Terminating the Payment Suspension

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

The UPIC shall recommend to CPI that the payment suspension be terminated prior to the payment suspension expiring. The UPIC shall provide this request via the *UCM* at least 14 calendar days prior to the anticipated payment suspension expiration date. No action associated with the termination shall be taken without the explicit approval of CPI. The UPIC shall prepare a "draft termination notice" (in accordance with section 8.3.2.2 of this chapter) and send it, along with a draft overpayment notice(s) and any other supportive information, to CPI for approval.

The UPIC shall recommend to CPI that a suspension be terminated when any of the following occur:

- The basis for the payment suspension action was that an overpayment may exist or money to be paid may be incorrect, and the UPIC has determined the amount of the overpayment, if any.

- The basis for the payment suspension action was that a credible allegation of fraud exists against the provider, and the amount of the overpayment has been determined.

- The basis for the payment suspension action was that payments to be made may not be correct, and the UPIC has determined that current payments to be made are now correct, and any associated overpayments have been determined.

- The basis for the payment suspension action was that the provider failed to furnish records, and the provider has now submitted all appropriate requested records.

When the payment suspension is terminated, the disposition of the withheld funds shall be achieved in accordance with 42 CFR §405.372(e) and the payment suspension edit withholding the provider's funds is removed in the MAC system accordingly. Upon approval of the termination notice by CPI, the UPIC shall provide a copy of the signed notice via the *UCM* to CPI.

# Medicare Program Integrity Manual
## Chapter 9 – The Medicare Fee-for-Service (FFS) Recovery Audit Program

Table of Contents

*(Rev. 11032; Issued: 09-30-21)*

## 9.4 – Inputting Suppression and Exclusion Cases to the RACDW

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

The MAC, Supplemental Medical Review Contractor (SMRC) and CERT shall input all claims requiring suppression and exclusion into the RACDW. An exclusion is the permanent removal of a claim due to a previous review. A suppression is a temporary removal of a claim to an ongoing case development. The MAC can permanently exclude an individual claim or a series of claims, or suppress a provider's claim submission for a particular claim type for a period of time not to exceed one calendar year.

The following cases require **exclusion**:

- A medical review is in progress; or claims subjected to post payment review
- Claims subjected to prepayment medical review
- Claims originally denied and later paid by an appeal entity

The following cases require **suppression**:

- A fraud/benefit integrity review is in progress;
- The MAC or Unified Program Integrity Contractor (UPIC) has been notified by an outside agency (law enforcement, Office of Inspector General (OIG), Department of Justice (DOJ)) that an investigation is ongoing.

The MACs shall not suppress or exclude claims that do not meet the above criteria. Claims on which the MAC is conducting education should not be suppressed.

The MACs shall enter suppression and/or exclusion records immediately after the need for these actions are identified. After the initial data input, contractors shall consistently monitor the RACDW and update on an as needed basis.

The MACs shall keep documentation on file that supports the information they added to the RACDW.

**NOTE:** The suppression or exclusion of an entire provider will require CMS approval. Additional direction can be found in the Medicare Program Integrity Manual (MPIM), Publication 100-08, Chapter 3, Section 3.5.2, and Chapter 4, Section *4.7.4.*

## 9.12 - Voluntary Refund

***(Rev. 11032; Issued: 09-30-21; Effective: 10-12-21; Implementation: 11-10-21)***

If the MAC receives a voluntary refund from a provider on a claim in the RACDW, the MAC shall process the refund as they do all other voluntary refunds (i.e., in accordance with the Medicare Program Integrity Manual (MPIM), Publication 100-08, Chapter 4, Section *4.2.2.8.1.3*).

PHYSICIAN OFFICE

# EPIFIX®

## CARING FOR CHALLENGING CLOSURES WHEN PATIENTS NEED IT MOST




### Protective Barrier

- Supports the healing cascade
- Protects the wound bed to aid in the development of granulation tissue in acute and chronic wounds

### Provides a Human Biocompatible Extracellular Matrix (ECM)

- **Structural components:** Collagen I, III, IV; elastin
- **Cell-binding domains:** Fibronectin, collagen V, VII
- **ECM-binding domains:** Proteoglycans, laminin

### Retains Regulatory Proteins

- 300+ Regulatory Proteins[1-3]

- Dehydrated amnion/chorion membrane sheet allograft
- EPIFIX® is SMR²T™ Technology
  *Selective Membrane of Reparative and Reconstructive Tissue*
- Uses PURION® patented processing



MIMEDX

# EPIFIX®

EPIFIX is a dehydrated human amnion/chorion membrane allograft. EPIFIX sheets provide a semi-permeable protective barrier that supports the healing cascade and protects the wound bed to aid in the development of granulation tissue in acute and chronic closures. EPIFIX provides a biocompatible human extracellular matrix and retains 300+ regulatory proteins.[1-3]

## Clinical Use Examples

- Comorbid patients with complex defects or delayed healing
- Diabetic foot ulcers (DFUs)
- Venous leg ulcers (VLUs)
- Debridements
- Decubitus ulcers

## Product Advantages

- Most level I evidence in placental-based allografts: 6 EPIFIX RCTs
- SMR²T Technology and patented PURION processing
- Terminally sterilized for additional level of safety
- Easy to apply
- Room temperature storage
- 5-year shelf life
- Compatible with negative pressure wound therapy (NPWT) and hyperbaric oxygen therapy (HBO)

| Published Studies | N | Outcomes Observed in Studies |
|---|---|---|
| **DFU RCT:**[4,5]<br>EPIFIX vs. Apligraf®<br>vs. SOC | EPIFIX: 32<br>Apligraf: 33<br>SOC: 35 | Complete wound closure:<br>**85% at 4 weeks** (EPIFIX vs. Apligraf *p=0.001*; EPIFIX vs. SOC *p=0.001)*<br>**95% at 6 weeks** (EPIFIX vs. Apligraf *p=0.0006*; EPIFIX vs. SOC *p=0.0001*)<br>**97% at 12 weeks** (EPIFIX vs. Apligraf *p=0.0001*; EPIFIX vs. SOC *p=0.0001*) |
| **VLU Multicenter RCT:**[6,7]<br>EPIFIX vs. SOC | EPIFIX: 52<br>SOC: 57 | Complete wound closure (Per Protocol):<br>**60% at 12 weeks** *(p=0.0128)*<br>**71% at 16 weeks** *(p=0.0065)* |

## Physician Office* Ordering Information

| Item # | Size & Description |
|---|---|
| GS-5024 | 24 mm disk |
| GS-5330 | 3 cm x 3 cm sheet |
| GS-5350 | 3 cm x 5 cm sheet |
| GS-5460 | 4 cm x 6 cm sheet |
| GS-5560 | 5 cm x 6 cm sheet |
| GS-5770 | 7 cm x 7 cm sheet |

| Item # | Size & Description |
|---|---|
| ES-3500 | 3 cm x 5 cm mesh sheet |
| ES-4400 | 4 cm x 4.5 cm mesh sheet |
| ES-5500 | 5 cm x 5.5 cm mesh sheet |

**Q Code: 4186*

## Patient Insurance Verification Team: 855.882.8480

MIMEDX

Patents and patents pending see: www.mimedx.com/patents. EPIFIX, PURION, SMR²T, and MIMEDX are trademarks of MIMEDX Group, Inc. ©2020 MIMEDX Group, Inc. All Rights Reserved. www.mimedx.com EP579.002

VOL. IV

Apligraf is a registered trademark of Organogenesis.

SMR²T™ & Purion®

**REFERENCES: 1.** Koob TJ, Lim JJ, Massee M, Zabek N, Denozière G. Properties of dehydrated human amnion/chorion composite grafts: Implications for wound repair and soft tissue regeneration. *J Biomed Mater Res B Appl Biomater.* 2014;102(6):1353-1362. **2.** Lei J, Priddy LB, Lim JJ, Massee M, Koob TJ. Identification of Extracellular Matrix Components and Biological Factors in Micronized Dehydrated Human Amnion/Chorion Membrane. *Adv Wound Care (New Rochelle).* 2017;6(2):43-53. **3.** MM-RD-00086, Proteome Characterization of PURION Processed Dehydrated Human Amnion Chorion Membrane (dHACM) and PURION PLUS Processed Dehydrated Human Umbilical Cord (dHUC) Allografts. **4.** Zelen CM, Gould L, Serena TE, Carter MJ, Keller J, Li WW. A prospective, randomised, controlled, multi-centre comparative effectiveness study of healing using dehydrated human amnion/chorion membrane allograft, bioengineered skin substitute or standard of care for treatment of chronic lower extremity diabetic ulcers. *Int Wound J.* 2015;12(6):724-732. **5.** Zelen CM, Serena TE, Gould L, et al. Treatment of chronic diabetic lower extremity ulcers with advanced therapies: a prospective, randomised, controlled, multi-centre comparative study examining clinical efficacy and cost. *Int Wound J.* 2016;13(2):272-282. **6.** Bianchi C, Cazzell S, Vayser D, et al. A multicentre randomised controlled trial evaluating the efficacy of dehydrated human amnion/chorion membrane (EPIFIX®) allograft for the treatment of venous leg ulcers. *Int Wound J.* 2018;15(1):114-122. **7.** Bianchi C, Tettelbach W, Istwan N, et al. Variations in study outcomes relative to intention-to-treat and per-protocol data analysis techniques in the evaluation of efficacy for treatment of venous leg ulcers with dehydrated human amnion/chorion membrane allograft. *Int Wound J.* 2019;16(3):761-767.



866.477.4219 • customerservice@mimedx.com

Menu

MIMEDX

EPIFIX®

EPIFIX® MESH

We Use Cookies: for purposes including personalizing content and ads; social media; and analyzing traffic, including third-party cookies collecting site-use information for marketing. Read more about those activities and your rights in our Privacy Policy, and access our preference center through "Manage Cookie Preferences" links on our webpages. To learn more, visit our **Privacy Notice.**

Manage Cookie Preferences

Accept All Cookies




We Use Cookies: for purposes including personalizing content and ads; social media; and analyzing traffic, including third-party cookies collecting site-use information for marketing. Read more about those activities and your rights in our Privacy Policy, and access our preference center through "Manage Cookie Preferences" links on our webpages. To learn more, visit our **Privacy Notice.**

Manage Cookie Preferences

Accept All Cookies

EPIFIX is a dehydrated human amnion/chorion membrane allograft. The product is available in sheet configurations in a variety of sizes to reduce wastage.

## Protective Barrier



- A semi-permeable protective barrier that supports the healing cascade
- Protects the wound bed to aid in the development of granulation tissue
- Provides a human biocompatible extracellular matrix

## Retains Regulatory Proteins



We Use Cookies: for purposes including personalizing content and ads; social media; and analyzing traffic, including third-party cookies collecting site-use information for marketing. Read more about those activities and your rights in our Privacy Policy, and access our preference center through "Manage Cookie Preferences" links on our webpages. To learn more, visit our **Privacy Notice.**

Manage Cookie Preferences

Accept All Cookies

300+ regulatory proteins[1-3]

## Product Advantages

- SMR$^2$T™ Technology and patented PURION processing
- Terminally sterilized for additional level of safety
- Easy to apply
- Room temperature storage
- 5-year shelf life
- Compatible with negative pressure wound therapy (NPWT) and hyperbaric oxygen therapy (HBO)

## Clinical Uses Examples

- Comorbid patients with complex defects or delayed healing
- Diabetic foot ulcers (DFUs)
- Venous leg ulcers (VLUs)
- Debridements
- Decubitus ulcers

## Product Details

EPIFIX is processed using PURION, a unique patented method for placental-based allografts that is in accordance with the American Association of Tissue Banks (AATB) standards. The product is derived from

We Use Cookies: for purposes including personalizing content and ads; social media; and analyzing traffic, including third-party cookies collecting site-use information for marketing. Read more about those activities and your rights in our Privacy Policy, and access our preference center through "Manage Cookie Preferences" links on our webpages. To learn more, visit our **Privacy Notice.**

Manage Cookie Preferences

Accept All Cookies

bed to aid in the development of granulation tissue and provides a human biocompatible extracellular matrix that retains 300+ regulatory proteins.[1-3]

1. Koob TJ, Lim JJ, Massee M, Zabek N, Denozière G. Properties of dehydrated human amnion/chorion composite grafts: Implications for wound repair and soft tissue regeneration. *J Biomed Mater Res B Appl Biomater*. 2014;102(6):1353-1362. 2. Lei J, Priddy LB, Lim JJ, Massee M, Koob TJ. Identification of Extracellular Matrix Components and Biological Factors in Micronized Dehydrated Human Amnion/Chorion Membrane. *Adv Wound Care (New Rochelle)*. 2017;6(2):43-53. 3. MM-RD-00086, Proteome Characterization of Purion Processed Dehydrated Human Amnion Chorion Membrane (dHACM) and Purion Plus Processed Dehydrated Human Umbilical Cord (dHUC) Allografts.

04:57

## Contact us for more information about EPIFIX

We Use Cookies: for purposes including personalizing content and ads; social media; and analyzing traffic, including third-party cookies collecting site-use information for marketing. Read more about those activities and your rights in our Privacy Policy, and access our preference center through "Manage Cookie Preferences" links on our webpages. To learn more, visit our **Privacy Notice.**

**Manage Cookie Preferences**

Accept All Cookies




EPIFIX HOPD & WCC
Product Sheet

DOWNLOAD

We Use Cookies: for purposes including personalizing content and ads; social media; and analyzing traffic, including third-party cookies collecting site-use information for marketing. Read more about those activities and your rights in our Privacy Policy, and access our preference center through "Manage Cookie Preferences" links on our webpages. To learn more, visit our **Privacy Notice.**

Manage Cookie Preferences

Accept All Cookies




EPIFIX Physician Office
Product Sheet

DOWNLOAD

We Use Cookies: for purposes including personalizing content and ads; social media; and analyzing traffic, including third-party cookies collecting site-use information for marketing. Read more about those activities and your rights in our Privacy Policy, and access our preference center through “Manage Cookie Preferences” links on our webpages. To learn more, visit our **Privacy Notice.**

**Manage Cookie Preferences**

Accept All Cookies

Quality Assurance & Regulatory

Scientific Advisory Board

## PRODUCTS

EPIFIX

EPICORD

AMNIOFIX

AMNIOCORD

AMNIOBURN

Product Catalog

## SCIENCE

The Healing Cascade

SMR2T & PURION

Medical Affairs

Patents

## RESOURCES

Investors

News

Archive

Returns Policy

## CONTACT US

1775 West Oak Commons Ct.

We Use Cookies: for purposes including personalizing content and ads; social media; and analyzing traffic, including third-party cookies collecting site-use information for marketing. Read more about those activities and your rights in our Privacy Policy, and access our preference center through “Manage Cookie Preferences” links on our webpages. To learn more, visit our **Privacy Notice.**

Manage Cookie Preferences

Accept All Cookies

# Sec. 1156: Obligations of Health Care Practitioners and Providers of Health Care Services; Sanctions and Penalties; Hearings and Review

Click to open document in a browser

Sec. 1156. [42 U.S.C. 1320c-5] (a) It shall be the obligation of any health care practitioner and any other person (including a hospital or other health care facility, organization, or agency) who provides health care services for which payment may be made (in whole or in part) under this Act, to assure, to the extent of his authority that services or items ordered or provided by such practitioner or person to beneficiaries and recipients under this Act—

(1) will be provided economically and only when, and to the extent, medically necessary;

(2) will be of a quality which meets professionally recognized standards of health care; and

(3) will be supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing quality improvement[230] organization in the exercise of its duties and responsibilities.

(b) (1) If after reasonable notice and opportunity for discussion with the practitioner or person concerned, and, if appropriate, after the practitioner or person has been given a reasonable opportunity to enter into and complete a corrective action plan (which may include remedial education) agreed to by the organization, and has failed successfully to complete such plan, any organization having a contract with the Secretary under this part determines that such practitioner or person has—

(A) failed in a substantial number of cases substantially to comply with any obligation imposed on him under subsection (a), or

(B) grossly and flagrantly violated any such obligation in one or more instances,

such organization shall submit a report and recommendations to the Secretary. If the Secretary agrees with such determination, the Secretary (in addition to any other sanction provided under law) may exclude (permanently or for such period as the Secretary may prescribe, except that such period may not be less than 1 year) such practitioner or person from eligibility to provide services under this Act on a reimbursable basis. If the Secretary fails to act upon the recommendations submitted to him by such organization within 120 days after such submission, such practitioner or person shall be excluded from eligibility to provide services on a reimbursable basis until such time as the Secretary determines otherwise.

(2) A determination made by the Secretary under this subsection to exclude a practitioner or person shall be effective on the same date and in the same manner as an exclusion from participation under the programs under this Act becomes effective under section 1128(c), and shall (subject to the minimum period specified in the second sentence of paragraph (1)) remain in effect until the Secretary finds and gives reasonable notice to the public that the basis for such determination has been removed and that there is reasonable assurance that it will not recur.

(3) In lieu of the sanction authorized by paragraph (1), the Secretary may require that (as a condition to the continued eligibility of such practitioner or person to provide such health care services on a reimbursable basis) such practitioner or person pays to the United States, in case such acts or conduct involved the provision or ordering by such practitioner or person of health care services which were medically improper or unnecessary, an amount not in excess of up to $10,000 for each instance of the medically improper or unnecessary services so provided. Such amount may be deducted from any sums owing by the United States (or any instrumentality thereof) to the practitioner or person from whom such amount is claimed.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(4) Any practitioner or person furnishing services described in paragraph (1) who is dissatisfied with a determination made by the Secretary under this subsection shall be entitled to reasonable notice and opportunity for a hearing thereon by the Secretary to the same extent as is provided in section 205(b), and to judicial review of the Secretary's final decision after such hearing as is provided in section 205(g).

(5) Before the Secretary may effect an exclusion under paragraph (2) in the case of a provider or practitioner located in a rural health professional shortage area or in a county with a population of less than 70,000, the provider or practitioner adversely affected by the determination is entitled to a hearing before an administrative law judge (described in section 205(b)) respecting whether the provider or practitioner should be able to continue furnishing services to individuals entitled to benefits under this Act, pending completion of the administrative review procedure under paragraph (4). If the judge does not determine, by a preponderance of the evidence, that the provider or practitioner will pose a serious risk to such individuals if permitted to continue furnishing such services, the Secretary shall not effect the exclusion under paragraph (2) until the provider or practitioner has been provided reasonable notice and opportunity for an administrative hearing thereon under paragraph (4).

(6) When the Secretary effects an exclusion of a physician under paragraph (2), the Secretary shall notify the State board responsible for the licensing of the physician of the exclusion.

(c) It shall be the duty of each quality improvement[231] organization to use such authority or influence it may possess as a professional organization, and to enlist the support of any other professional or governmental organization having influence or authority over health care practitioners and any other person (including a hospital or other health care facility, organization, or agency) providing health care services in the area served by such review organization, in assuring that each practitioner or person (referred to in subsection (a)) providing health care services in such area shall comply with all obligations imposed on him under subsection (a).

---

[230] P.L. 112-40, §261(a)(2)(C), struck out "peer review" and inserted "quality improvement", applicable to contracts entered into or renewed on or after January 1, 2012.

[231] P.L. 112-40, §261(a)(2)(C), struck out "utilization and quality control peer review" and inserted "quality improvement", applicable to contracts entered into or renewed on or after January 1, 2012.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

# Sec. 1833: Payment of Benefits

Click to open document in a browser

Footnote: [71]

Sec. 1833. [42 U.S.C. 1395l] (a) Except as provided in section 1876, and subject to the succeeding provisions of this section, there shall be paid from the Federal Supplementary Medical Insurance Trust Fund, in the case of each individual who is covered under the insurance program established by this part and incurs expenses for services with respect to which benefits are payable under this part, amounts equal to—

(1) in the case of services described in section 1832(a)(1)—80 percent of the reasonable charges for the services; except that

(A) an organization which provides medical and other health services (or arranges for their availability) on a prepayment basis (and either is sponsored by a union or employer, or does not provide, or arrange for the provision of, any inpatient hospital services) may elect to be paid 80 percent of the reasonable cost of services for which payment may be made under this part on behalf of individuals enrolled in such organization in lieu of 80 percent of the reasonable charges for such services if the organization undertakes to charge such individuals no more than 20 percent of such reasonable cost plus any amounts payable by them as a result of subsection (b),

(B) with respect to items and services described in section 1861(s)(10)(A), the amounts paid shall be 100 percent of the reasonable charges for such items and services,

(C) with respect to expenses incurred for those physicians' services for which payment may be made under this part that are described in section 1862(a)(4), the amounts paid shall be subject to such limitations as may be prescribed by regulations,

(D)[72] with respect to clinical diagnostic laboratory tests for which payment is made under this part

(i) (I) on the basis[73] of a fee schedule under subsection (h)(1) (for tests furnished before January 1, 2017)[74] or section 1834(d)(1), the amount paid shall be equal to 80 percent (or 100 percent, in the case of such tests for which payment is made on an assignment-related basis) of the lesser of the amount determined under such fee schedule, the limitation amount for that test determined under subsection (h)(4)(B), or the amount of the charges billed for the tests, or

(II) under section 1834A (for tests furnished on or after January 1, 2017), the amount paid shall be equal to 80 percent (or 100 percent, in the case of such tests for which payment is made on an assignment-related basis) of the lesser of the amount determined under such section or the amount of the charges billed for the tests, or

(ii)[75] for tests furnished before January 1, 2017, on the basis of a negotiated rate established under subsection (h)(6), the amount paid shall be equal to 100 percent of such negotiated rate[76],

(E) with respect to services furnished to individuals who have been determined to have end stage renal disease, the amounts paid shall be determined subject to the provisions of section 1881,

(F) with respect to clinical social worker services under section 1861(s)(2)(N), the amounts paid shall be 80 percent of the lesser of

(i) the actual charge for the services or

(ii) 75 percent of the amount determined for payment of a psychologist under clause (L),

(G) with respect to facility services furnished in connection with a surgical procedure specified pursuant to subsection (i)(1)(A) and furnished to an individual in an ambulatory surgical center described in such subsection, for services furnished beginning with the implementation date of a revised payment system for

such services in such facilities specified in subsection (i)(2)(D), the amounts paid shall be 80 percent of the lesser of the actual charge for the services or the amount determined by the Secretary under such revised payment system,

(H) with respect to services of a certified registered nurse anesthetist under section 1861(s)(11), the amounts paid shall be 80 percent of the least of the actual charge, the prevailing charge that would be recognized (or, for services furnished on or after January 1, 1992, the fee schedule amount provided under section 1848) if the services had been performed by an anesthesiologist, or the fee schedule for such services established by the Secretary in accordance with subsection (1),

(I) with respect to covered items (described in section 1834(a)(13)), the amounts paid shall be the amounts described in section 1834(a)(1), and

(J) with respect to expenses incurred for radiologist services (as defined in section 1834(b)(6)), subject to section 1848, the amounts paid shall be 80 percent of the lesser of the actual charge for the services or the amount provided under the fee schedule established under section 1834(b),

(K) with respect to certified nurse–midwife services under section 1861(s)(2)(L), the amounts paid shall be 80 percent of the lesser of the actual charge for the services or the amount determined by a fee schedule established by the Secretary for the purposes of this subparagraph (but in no event shall such fee schedule exceed 65 percent of the prevailing charge that would be allowed for the same service performed by a physician, or, for services furnished on or after January 1, 1992, 65 percent (or 100 per cent for services furnished on or after January 1, 2011) of the fee schedule amount provided under section 1848 for the same service performed by a physician),

(L) with respect to qualified psychologist services under section 1861(s)(2)(M), the amounts paid shall be 80 percent of the lesser of the actual charge for the services or the amount determined by a fee schedule established by the Secretary for the purposes of this subparagraph,

(M) with respect to prosthetic devices and orthotics (as defined in section 1834(h)(4)), the amounts paid shall be the amounts described in section 1834(h)(1),

(N) with respect to expenses incurred for physicians' services (as defined in section 1848(j)(3)) other than personalized prevention plan services (as defined in section 1861(hhh)(1)), the amounts paid shall be 80 percent of the payment basis determined under section 1848(a)(1),

(O) with respect to services described in section 1861(s)(2)(K) (relating to services furnished by physicians assistants, nurse practitioners, or clinical nurse specialists), the amounts paid shall be equal to 80 percent of

(i) the lesser of the actual charge or 85 percent of the fee schedule amount provided under section 1848, or

(ii) in the case of services as an assistant at surgery, the lesser of the actual charge or 85 percent of the amount that would otherwise be recognized if performed by a physician who is serving as an assistant at surgery,

(P) with respect to surgical dressings, the amounts paid shall be the amounts determined under section 1834(i),

(Q) with respect to items or services for which fee schedules are established pursuant to section 1842(s), the amounts paid shall be 80 percent of the lesser of the actual charge or the fee schedule established in such section,

(R) with respect to ambulance services,

(i) the amounts paid shall be 80 percent of the lesser of the actual charge for the services or the amount determined by a fee schedule established by the Secretary under section 1834(l) and

(ii) with respect to ambulance services described in section 1834(l)(8), the amounts paid shall be the amounts determined under section 1834(g) for outpatient critical access hospital services ,

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(S) with respect to drugs and biologicals (including intravenous immune globulin (as defined in section 1861(zz))) not paid on a cost or prospective payment basis as otherwise provided in this part (other than items and services described in subparagraph (B)), the amounts paid shall be 80 percent of the lesser of the actual charge or the payment amount established in section 1842(o) (or, if applicable, under section 1847, 1847A, or 1847B),

(T) with respect to medical nutrition therapy services (as defined in section 1861(vv)), the amount paid shall be 80 percent (or 100 percent if such services are recommended with a grade of A or B by the United States Preventive Services Task Force for any indication or population and are appropriate for the individual) of the lesser of the actual charge for the services or 85 percent of the amount determined under the fee schedule established under section 1848(b) for the same services if furnished by a physician,

(U) with respect to facility fees described in section 1834(m)(2)(B), the amounts paid shall be 80 percent of the lesser of the actual charge or the amounts specified in such section,

(V) notwithstanding subparagraphs (I) (relating to durable medical equipment), (M) (relating to prosthetic devices and orthotics and prosthetics), and (Q) (relating to 1842(s) items), with respect to competitively priced items and services (described in section 1847(a)(2)) that are furnished in a competitive area, the amounts paid shall be the amounts described in section 1847(b)(5),

(W) with respect to additional preventive services (as defined in section 1861(ddd)(1) ), the amount paid shall be

(i) in the case of such services which are clinical diagnostic laboratory tests, the amount determined under subparagraph (D) (if such subparagraph were applied, by substituting “100 percent” for “80 percent”, and

(ii) in the case of all other such services, 100 percent of the lesser of the actual charge for the service or the amount determined under a fee schedule established by the Secretary for purposes of this subparagraph;

(X) with respect to personalized prevention plan services (as defined in section 1861(hhh)(1)), the amount paid shall be 100 percent of the lesser of the actual charge for the services or the amount determined under the payment basis determined under section 1848,

(Y) with respect to preventive services described in subparagraphs (A) and (B) of section 1861(ddd)(3) that are appropriate for the individual and, in the case of such services described in subparagraph (A), are recommended with a grade of A or B by the United States Preventive Services Task Force for any indication or population, the amount paid shall be 100 percent of

(i) except as provided in clause (ii), the lesser of the actual charge for the services or the amount determined under the fee schedule that applies to such services under this part, and

(ii) in the case of such services that are covered OPD services (as defined in subsection (t)(1)(B)), the amount determined under subsection (t),

(Z) with respect to Federally qualified health center services for which payment is made under section 1834(o), the amounts paid shall be 80 percent of the lesser of the actual charge or the amount determined under such section,

(AA) with respect to an applicable disposable device (as defined in paragraph (2) of section 1834(s)) furnished to an individual pursuant to paragraph (1) of such section, the amount paid shall be equal to 80 percent of the lesser of the actual charge or the amount determined under paragraph (3) of such section; and[77]

(BB) with respect to home infusion therapy, the amount paid shall be an amount equal to 80 percent of the lesser of the actual charge for the services or the amount determined under section 1834(u), and[78]

(CC)[79] with respect to opioid use disorder treatment services furnished during an episode of care, the amount paid shall be equal to the amount payable under section 1834(w) less any copayment required as specified by the Secretary

(2) in the case of services described in section 1832(a)(2) (except those services described in subparagraphs

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(C), (D), (E), (F), (G), (H), and (I) of such section and unless otherwise specified in section 1881)—

(A) with respect to home health services (other than a covered osteoporosis drug) (as defined in section 1861(kk)), the amount determined under the prospective payment system under section 1895;

(B) with respect to other items and services (except those described in subparagraph (C), (D), or (E) of this paragraph and except as may be provided in section 1886or section 1888(e)(9))—

(i) furnished before January 1, 1999, the lesser of—

(I) the reasonable cost of such services, as determined under section 1861(v), or

(II) the customary charges with respect to such services,

less the amount a provider may charge as described in clause (ii) of section 1866(a)(2)(A), but in no case may the payment for such other services exceed 80 percent of such reasonable cost, or

(ii) if such services are furnished before January 1, 1999, by a public provider of services, or by another provider which demonstrates to the satisfaction of the Secretary that a significant portion of its patients are low-income (and requests that payment be made under this clause), free of charge or at nominal charges to the public, 80 percent of the amount determined in accordance with section 1814(b)(2), or

(iii) if such services are furnished on or after January 1, 1999, the amount determined under subsection (t), or

(iv) if (and for so long as) the conditions described in section 1814(b)(3) are met, the amounts determined under the reimbursement system described in such section;

(C) with respect to services described in the second sentence of section 1861(p), 80 percent of the reasonable charges for such services;

(D) with respect to clinical diagnostic laboratory tests for which payment is made under this part

(i)

(I) on the basis[80] of a fee schedule determined under subsection (h)(1) (for tests furnished before January 1, 2017[81]) or section 1834(d)(1), the amount paid shall be equal to 80 percent (or 100 percent, in the case of such tests for which payment is made on an assignment-related basis or to a provider having an agreement under section 1866 of the lesser of the amount determined under such fee schedule, the limitation amount for that test determined under subsection (h)(4)(B), or the amount of the charges billed for the tests, or

(II) under section 1834A (for tests furnished on or after January 1, 2017), the amount paid shall be equal to 80 percent (or 100 percent, in the case of such tests for which payment is made on an assignment-related basis or to a provider having an agreement under section 1866) of the lesser of the amount determined under such section or the amount of the charges billed for the tests, or

(ii)[82] for tests furnished before January 1, 2017, on the basis[83] of a negotiated rate established under subsection (h)(6), the amount paid shall be equal to 100 percent of such negotiated rate for such tests; or (iii) on the basis of a rate established under a demonstration project under section 1847(e), the amount paid shall be equal to 100 percent of such rate,

(E) with respect to—

(i) outpatient hospital radiology services (including diagnostic and therapeutic radiology, nuclear medicine and CAT scan procedures, magnetic resonance imaging, and ultrasound and other imaging services, but excluding screening mammography and, for services furnished on or after January 1, 2005, diagnostic mammography), and

(ii) effective for procedures performed on or after October 1, 1989, diagnostic procedures (as defined by the Secretary) described in section 1861(s)(3) (other than diagnostic x-ray tests and diagnostic laboratory tests),

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

the amount determined under subsection (n) or, for services or procedures performed on or after January 1, 1999, subsection (t);

(F) with respect to a covered osteoporosis drug (as defined in section 1861(kk)) furnished by a home health agency, 80 percent of the reasonable cost of such service, as determined under section 1861(v);

(G) with respect to items and services described in section 1861(s)(10)(A), the lesser of—

(i) the reasonable cost of such services, as determined under section 1861(v), or

(ii) the customary charges with respect to such services; and

or, if such services are furnished by a public provider of services, or by another provider which demonstrates to the satisfaction of the Secretary that a significant portion of its patients are low-income (and requests that payment be made under this provision), free of charge or at nominal charges to the public, the amount determined in accordance with section 1814(b)(2);

(H) with respect to personalized prevention plan services (as defined in section 1861(hhh)(1)) furnished by an outpatient department of a hospital, the amount determined under paragraph (1)(X),

(3) in the case of services described in section 1832(a)(2)(D)—

(A) except as provided in subparagraph (B), the costs which are reasonable and related to the cost of furnishing such services or which are based on such other tests of reasonableness as the Secretary may prescribe in regulations, including those authorized under section 1861(v)(1)(A), less the amount a provider may charge as described in clause (ii) of section 1866(a)(2)(A), but in no case may the payment for such services (other than for items and services described in section 1861(s)(10)(A)) exceed 80 percent of such costs; or

(B) with respect to the services described in clause (ii) of section 1832(a)(2)(D) that are furnished to an individual enrolled with a MA plan under part C pursuant to a written agreement described in section 1853(a)(4), the amount (if any) by which—

(i) the amount of payment that would have otherwise been provided (I) under subparagraph (A) (calculated as if “100 percent” were substituted for “80 percent” in such subparagraph) for such services if the individual had not been so enrolled, or (II) in the case of such services furnished on or after the implementation date of the prospective payment system under section 1834(o), under such section (calculated as if “100 percent” were substituted for “80 percent” in such section) for such services if the individual had not been so enrolled; exceeds

(ii) the amount of the payments received under such written agreement for such services (not including any financial incentives provided for in such agreement such as risk pool payments, bonuses, or withholds), less the amount the federally qualified health center may charge as described in section 1857(e)(3)(B);

(4) in the case of facility services described in section 1832(a)(2)(F), and outpatient hospital facility services furnished in connection with surgical procedures specified by the Secretary pursuant to section 1833(i)(1)(A), the applicable amount as determined under paragraph (2) or (3) of subsection (i) or subsection (t);

(5) in the case of covered items (described in section 1834(a)(13)) the amounts described in section 1834(a)(1);

(6) in the case of outpatient critical access hospital services, the amounts described in section 1834(g);

(7) in the case of prosthetic devices and orthotics and prosthetics (as described in section 1834(h)(4)), the amounts described in section 1834(h);

(8) in the case of—

(A) outpatient physical therapy services, outpatient speech-language pathology services and outpatient occupational therapy services furnished—

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(i) by a rehabilitation agency, public health agency, clinic, comprehensive outpatient rehabilitation facility, or skilled nursing facility,

(ii) by a home health agency to an individual who is not homebound, or

(iii) by another entity under an arrangement with an entity described in clause (i) or (ii); and

(B) outpatient physical therapy services, outpatient speech-language pathology services) and outpatient occupational therapy services furnished—

(i) by a hospital to an outpatient or to a hospital inpatient who is entitled to benefits under part A but has exhausted benefits for inpatient hospital services during a spell of illness or is not so entitled to benefits under part A, or

(ii) by another entity under an arrangement with a hospital described in clause (i), the amounts described in section 1834(k); and

(9) in the case of services described in section 1832(a)(2)(E) that are not described in paragraph (8), the amounts described in section 1834(k).

Paragraph (3)(A) shall not apply to Federally qualified health center services furnished on or after the implementation date of the prospective payment system under section 1834(0)[84].

(b) Before applying subsection (a) with respect to expenses incurred by an individual during any calendar year, the total amount of the expenses incurred by such individual during such year (which would, except for this subsection, constitute incurred expenses from which benefits payable under subsection (a) are determinable) shall be reduced by a deductible of $75 for calendar years before 1991, $100 for 1991 through 2004, $110 for 2005, and for a subsequent year the amount of such deductible for the previous year increased by the annual percentage increase in the monthly actuarial rate under section 1839(a)(1) ending with such subsequent year (rounded to the nearest $1); except that

(1) such total amount shall not include expenses incurred for preventive services described in subparagraph (A) of section 1861(ddd)(3) that are recommended with a grade of A or B by the United States Preventive Services Task Force for any indication or population and are appropriate for the individual.[85],

(2) such deductible shall not apply with respect to home health services (other than a covered osteoporosis drug (as defined in section 1861(kk)),

(3) such deductible shall not apply with respect to clinical diagnostic laboratory tests for which payment is made under this part

(A) under subsection (a)(1)(D)(i) or (a)(2)(D)(i) on an assignment-related basis, or to a provider having an agreement under section 1866, or

(B) for tests furnished before January 1, 2017, on the basis[86] of a negotiated rate determined under subsection (h)(6),

(4) such deductible shall not apply to Federally qualified health center services. The total amount of the expenses incurred by an individual as determined under the preceding sentence shall, after the reduction specified in such sentence, be further reduced by an amount equal to the expenses incurred for the first three pints of whole blood (or equivalent quantities of packed red blood cells, as defined under regulations) furnished to the individual during the calendar year, except that such deductible for such blood shall in accordance with regulations be appropriately reduced to the extent that there has been a replacement of such blood (or equivalent quantities of packed red blood cells, as so defined); and for such purposes blood (or equivalent quantities of packed red blood cells, as so defined) furnished such individual shall be deemed replaced when the institution or other person furnishing such blood (or such equivalent quantities of packed red blood cells, as so defined) is given one pint of blood for each pint of blood (or equivalent quantities of packed red blood cells, as so defined) furnished such individual with respect to which a deduction is made under this sentence. The deductible under the previous sentence for blood or blood cells furnished an individual in a year shall be

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

reduced to the extent that a deductible has been imposed under section 1813(a)(2) to blood or blood cells furnished the individual in the year,

(5) such deductible shall not apply with respect to screening mammography (as described in section 1861(jj)),

(6) such deductible shall not apply with respect to screening pap smear and screening pelvic exam (as described in section 1861(nn)),

(7) such deductible shall not apply with respect to ultrasound screening for abdominal aortic aneursym (as defined in section 1861(bbb)),

(8) such deductible shall not apply with respect to colorectal cancer screening tests (as described in section 1861(pp)(1)) , and

(9) such deductible shall not apply with respect to an initial preventive physical examination (as defined in section 1861(ww), and

(10) such deductible shall not apply with respect to personalized prevention plan services (as defined in section 1861(hhh)(1)) The total amount of the expenses incurred by an individual as determined under the preceding sentence shall, after the reduction specified in such sentence, be further reduced by an amount equal to the expenses incurred for the first three pints of whole blood (or equivalent quantities of packed red blood cells, as defined under regulations) furnished to the individual during the calendar year, except that such deductible for such blood shall in accordance with regulations be appropriately reduced to the extent that there has been a replacement of such blood (or equivalent quantities of packed red blood cells, as so defined); and for such purposes blood (or equivalent quantities of packed red blood cells, as so defined) furnished such individual shall be deemed replaced when the institution or other person furnishing such blood (or such equivalent quantities of packed red blood cells, as so defined) is given one pint of blood for each pint of blood (or equivalent quantities of packed red blood cells, as so defined) furnished such individual with respect to which a deduction is made under this sentence. The deductible under the previous sentence for blood or blood cells furnished an individual in a year shall be reduced to the extent that a deductible has been imposed under section 1813(a)(2) to blood or blood cells furnished the individual in the year. Paragraph (1) of the first sentence of this subsection shall apply with respect to a colorectal cancer screening test regardless of the code that is billed for the establishment of a diagnosis as a result of the test, or for the removal of tissue or other matter or other procedure that is furnished in connection with, as a result of, and in the same clinical encounter as the screening test.

(c)

(1) Notwithstanding any other provision of this part, with respect to expenses incurred in a calendar year in connection with the treatment of mental, psychoneurotic, and personality disorders of an individual who is not an inpatient of a hospital at the time such expenses are incurred, there shall be considered as incurred expenses for purposes of subsections (a) and (b)—

(A) for expenses incurred in years prior to 2010, only 621/2 percent of such expenses;

(B) for expenses incurred in 2010 or 2011, only 683/4 percent of such expenses;

(C) for expenses incurred in 2012, only 75 percent of such expenses;

(D) for expenses incurred in 2013, only 811/4 percent of such expenses; and

(E) for expenses incurred in 2014 or any subsequent calendar year, 100 percent of such expenses.

(2) For purposes of subparagraphs (A) through (D) of paragraph (1), the term “treatment” does not include brief office visits (as defined by the Secretary) for the sole purpose of monitoring or changing drug prescriptions used in the treatment of such disorders or partial hospitalization services that are not directly provided by a physician

(d) No payment may be made under this part with respect to any services furnished an individual to the extent that such individual is entitled (or would be entitled except for section 1813) to have payment made with

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

respect to such services under part A.

(e) No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

(f) In establishing limits under subsection (a) on payment for rural health clinic services provided by rural health clinics (other than such clinics in hospitals with less than 50 beds), the Secretary shall establish such limit, for services provided—

(1) in 1988, after March 31, at $46 per visit, and

(2) in a subsequent year, at the limit established under this subsection for the previous year increased by the percentage increase in the MEI (as defined in section 1842(i)(3)) applicable to primary care services (as defined in section 1842(i)(4)) furnished as of the first day of that year.

(g) (1)[87] (A) Subject to paragraphs (4) and (5), in the case of physical therapy services of the type described in section 1861(p) and speech-language pathology services of the type described in such section through the application of section 1861(ll)(2), but (except as provided in paragraph (6)) not described in section 1833(a)(8)(B), and physical therapy services and speech-language pathology services of such type which are furnished by a physician or as incident to physicians’ services, with respect to expenses incurred in any calendar year, no more than the amount specified in paragraph (2) for the year shall be considered as incurred expenses for purposes of subsections (a) and (b). The preceding sentence shall not apply to expenses incurred with respect to services furnished after December 31, 2017.

(B) With respect to services furnished during 2018 or a subsequent year, in the case of physical therapy services of the type described in section 1861(p), speech-language pathology services of the type described in such section through the application of section 1861(ll)(2), and physical therapy services and speech-language pathology services of such type which are furnished by a physician or as incident to physicians' services, with respect to expenses incurred in any calendar year, any amount that is more than the amount specified in paragraph (2) for the year shall not be considered as incurred expenses for purposes of subsections (a) and (b) unless the applicable requirements of paragraph (7) are met.

(2) The amount specified in this paragraph—

(A) for 1999, 2000, and 2001, is $1,500, and

(B) for a subsequent year is the amount specified in this paragraph for the preceding year increased by the percentage increase in the MEI (as defined in section 1842(i)(3)) for such subsequent year;

except that if an increase under subparagraph (B) for a year is not a multiple of $10, it shall be rounded to the nearest multiple of $10.

(3)

(A)[88] Subject to paragraphs (4) and (5), in the case of occupational therapy services (of the type that are described in section 1861(p) (but (except as provided in paragraph (6)) not described in section 1833(a)(8)(B)) through the operation of section 1861(g) and of such type which are furnished by a physician or as incident to physicians’ services), with respect to expenses incurred in any calendar year, no more than the amount specified in paragraph (2) for the year shall be considered as incurred expenses for purposes of subsections (a) and (b). The preceding sentence shall not apply to expenses incurred with respect to services furnished after December 31, 2017.

(B) With respect to services furnished during 2018 or a subsequent year, in the case of occupational therapy services (of the type that are described in section 1861(p) through the operation of section 1861(g) and of such type which are furnished by a physician or as incident to physicians' services), with respect to expenses incurred in any calendar year, any amount that is more than the amount specified in paragraph (2) for the year shall not be considered as incurred expenses for purposes of subsections (a) and (b) unless the applicable requirements of paragraph (7) are met.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(4) This subsection shall not apply to expenses incurred with respect to services furnished during 2000, 2001, 2002, 2004, and 2005.

(5) (A)[89] With respect to expenses incurred during the period beginning on January 1, 2006, and ending on December 31, 2017, for services, the Secretary shall implement a process under which an individual enrolled under this part may, upon request of the individual or a person on behalf of the individual, obtain an exception from the uniform dollar limitation specified in paragraph (2), for services described in paragraphs (1) and (3) if the provision of such services is determined to be medically necessary and if the requirement of subparagraph (B) is met. Under such process, if the Secretary does not make a decision on such a request for an exception within 10 business days of the date of the Secretary's receipt of the request made in accordance with such requirement, the Secretary shall be deemed to have found the services to be medically necessary.

(B)[90] In the case of outpatient therapy services for which an exception is requested under the first sentence of subparagraph (A), the claim for such services shall contain an appropriate modifier (such as the KX modifier used as of the date of the enactment of this subparagraph) indicating that such services are medically necessary as justified by appropriate documentation in the medical record involved.

(C)[91] (i) In applying this paragraph with respect to a request for an exception with respect to expenses that would be incurred for outpatient therapy services (including services described in subsection (a)(8)(B)) that would exceed the threshold described in clause (ii) for a year, the request for such an exception, for services furnished on or after October 1, 2012, shall be subject to a manual medical review process that, subject to subparagraph (E), is similar to the manual medical review process used for certain exceptions under this paragraph in 2006.[92]

(ii) The threshold under this clause for a year is $3,700. Such threshold shall be applied separately—

(I) for physical therapy services and speech-language pathology services; and

(II) for occupational therapy services.

(E) (i) In place of the manual medical review process under subparagraph (C)(i), the Secretary shall implement a process for medical review under this subparagraph under which the Secretary shall identify and conduct medical review for services described in subparagraph (C)(i) furnished by a provider of services or supplier (in this subparagraph referred to as a "therapy provider") using such factors as the Secretary determines to be appropriate.

(ii) Such factors may include the following:

(I) The therapy provider has had a high claims denial percentage for therapy services under this part or is less compliant with applicable requirements under this title.

(II) The therapy provider has a pattern of billing for therapy services under this part that is aberrant compared to peers or otherwise has questionable billing practices for such services, such as billing medically unlikely units of services in a day.

(III) The therapy provider is newly enrolled under this title or has not previously furnished therapy services under this part.

(IV) The services are furnished to treat a type of medical condition.

(V) The therapy provider is part of group that includes another therapy provider identified using the factors determined under this subparagraph.

(iii) For purposes of carrying out this subparagraph, the Secretary shall provide for the transfer, from the Federal Supplementary Medical Insurance Trust Fund under section 1841, of $5,000,000 to the Centers for Medicare & Medicaid Services Program Management Account for fiscal years 2015 and 2016, to remain available until expended. Such funds may not be used by a contractor under section 1893(h) for medical reviews under this subparagraph.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(iv)[94] The targeted review process under this subparagraph shall not apply to services for which expenses are incurred beyond the period for which the exceptions process under subparagraph (A) is implemented, except as such process is applied under paragraph (7)(B).

(6) (A)[95] In applying paragraphs (1) and (3) to services furnished during the period beginning not later than October 1, 2012, and ending on December 31, 2017, the exclusion of services described in subsection (a)(8)(B) from the uniform dollar limitation specified in paragraph (2) shall not apply to such services furnished during 2012 through 2017.

(B)(i)[96] With respect to outpatient therapy services furnished beginning on or after January 1, 2013, and before January 1, 2014, for which payment is made under section 1834(g), the Secretary shall count toward the uniform dollar limitations described in paragraphs (1) and (3) and the threshold described in paragraph (5)(C) the amount that would be payable under this part if such services were paid under section 1834(k)(1)(B) instead of being paid under section 1834(g).

(ii) Nothing in clause (i) shall be construed as changing the method of payment for outpatient therapy services under section 1834(g).

(7)[97] For purposes of paragraphs (1)(B) and (3)(B), with respect to services described in such paragraphs, the requirements described in this paragraph are as follows:

(A) Inclusion of appropriate modifier.—The claim for such services contains an appropriate modifier (such as the KX modifier described in paragraph (5)(B)) indicating that such services are medically necessary as justified by appropriate documentation in the medical record involved.

(B)Targeted medical review for certain services above threshold.—

(i) In general.—In the case where expenses that would be incurred for such services would exceed the threshold described in clause (ii) for the year, such services shall be subject to the process for medical review implemented under paragraph (5)(E).

(ii) Threshold.—The threshold under this clause for—

(I) a year before 2028, is $3,000;

(II) 2028, is the amount specified in subclause (I) increased by the percentage increase in the MEI (as defined in section 1842(i)(3)) for 2028; and

(III) a subsequent year, is the amount specified in this clause for the preceding year increased by the percentage increase in the MEI (as defined in section 1842(i)(3)) for such subsequent year; except that if an increase under subclause (II) or (III) for a year is not a multiple of $10, it shall be rounded to the nearest multiple of $10.

(iii) Application.—The threshold under clause (ii) shall be applied separately—

(I) for physical therapy services and speech-language pathology services; and

(II) for occupational therapy services.

(iv) Funding.—For purposes of carrying out this subparagraph, the Secretary shall provide for the transfer, from the Federal Supplementary Medical Insurance Trust Fund under section 1841 to the Centers for Medicare & Medicaid Services Program Management Account, of $5,000,000 for each fiscal year beginning with fiscal year 2018, to remain available until expended. Such funds may not be used by a contractor under section 1893(h) for medical reviews under this subparagraph.

(8) With respect to services furnished on or after January 1, 2013, where payment may not be made as a result of application of paragraphs (1) and (3), section 1879 shall apply in the same manner as such section applies to a denial that is made by reason of section 1862(a)(1).[98]

(h) (1) (A) Subject to section 1834(d)(1), the Secretary shall establish fee schedules for clinical diagnostic

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

laboratory tests (including prostate cancer screening tests under section 1861(oo) consisting of prostate-specific antigen blood tests) for which payment is made under this part, other than such tests performed by a provider of services for an inpatient of such provider.

(B) In the case of clinical diagnostic laboratory tests performed by a physician or by a laboratory (other than tests performed by a qualified hospital laboratory (as defined in subparagraph (D)) for outpatients of such hospital), the fee schedules established under subparagraph (A) shall be established on a regional, statewide, or carrier service area basis (as the Secretary may determine to be appropriate) for tests furnished on or after July 1, 1984.

(C) In the case of clinical diagnostic laboratory tests performed by a qualified hospital laboratory (as defined in subparagraph (D)) for outpatients of such hospital, the fee schedules established under subparagraph (A) shall be established on a regional, statewide, or carrier service area basis (as the Secretary may determine to be appropriate) for tests furnished on or after July 1, 1984.

(D) In this subsection, the term “qualified hospital laboratory” means a hospital laboratory, in a sole community hospital (as defined in section 1886(d)(5)(D)(iii)), which provides some clinical diagnostic laboratory tests 24 hours a day in order to serve a hospital emergency room which is available to provide services 24 hours a day and 7 days a week.

(2) (A) (i) Except as provided in clause (v), subparagraph (B), and paragraph (4)[99], the Secretary shall set the fee schedules at 60 percent (or, in the case of a test performed by a qualified hospital laboratory (as defined in paragraph (1)(D)) for outpatients of such hospital, 62 percent) of the prevailing charge level determined pursuant to the third and fourth sentences of section 1842(b)(3) for similar clinical diagnostic laboratory tests for the applicable region, State, or area for the 12-month period beginning July 1, 1984, adjusted annually (to become effective on January 1 of each year) by, subject to clause (iv), subject to a percentage increase or decrease equal to the percentage increase or decrease in the Consumer Price Index for All Urban Consumers (United States city average minus, for each of the years 2009 and 2010, 0.5 percentage points), and, for tests furnished before the date of enactment of section 1834A, subject to[100] such other adjustments as the Secretary determines are justified by technological changes.

(ii) Notwithstanding clause (i)—

(I) any change in the fee schedules which would have become effective under this subsection for tests furnished on or after January 1, 1988, shall not be effective for tests furnished during the 3-month period beginning on January 1, 1988,

(II) the Secretary shall not adjust the fee schedules under clause (i) to take into account any increase in the consumer price index for 1988,

(III) the annual adjustment in the fee schedules determined under clause (i) for each of the years 1991, 1992, and 1993 shall be 2 percent, and

(IV) the annual adjustment in the fee schedules determined under clause (i) for each of the years 1994 and 1995, 1998 through 2002, and 2004 through 2008 shall be 0 percent.

(iii) In establishing fee schedules under clause (i) with respect to automated tests and tests (other than cytopathology tests) which before July 1, 1984, the Secretary made subject to a limit based on lowest charge levels under the sixth sentence of section 1842(b)(3) performed after March 31, 1988, the Secretary shall reduce by 8.3 percent the fee schedules otherwise established for 1988, and such reduced fee schedules shall serve as the base for 1989 and subsequent years.

(iv) After determining the adjustment to the fee schedules under clause (i), the Secretary shall reduce such adjustment—

(I) for 2011 and each subsequent year, by the productivity adjustment described in section 1886(b)(3)(B)(xi)(II); and.

(II) for each of 2011 through 2015, by 1.75 percentage points.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

Subclause (I) shall not apply in a year where the adjustment to the fee schedules determined under clause (i) is 0.0 or a percentage decrease for a year. The application of the productivity adjustment under subclause (I) shall not result in an adjustment to the fee schedules under clause (i) being less than 0.0 for a year. The application of subclause (II) may result in an adjustment to the fee schedules under clause (i) being less than 0.0 for a year, and may result in payment rates for a year being less than such payment rates for the preceding year.

(v)[101] The Secretary shall reduce by 2 percent the fee schedules otherwise determined under clause (i) for 2013, and such reduced fee schedules shall serve as the base for 2014 and subsequent years.

(B) The Secretary may make further adjustments or exceptions to the fee schedules to assure adequate reimbursement of (i) emergency laboratory tests needed for the provision of bona fide emergency services, and (ii) certain low volume high-cost tests where highly sophisticated equipment or extremely skilled personnel are necessary to assure quality.

(3) In addition to the amounts provided under the fee schedules (for tests furnished before January 1, 2017) or under section 1834A (for tests furnished on or after January 1, 2017), subject to subsection (b)(5) of such section[102], the Secretary shall provide for and establish

(A) a nominal fee to cover the appropriate costs in collecting the sample on which a clinical diagnostic laboratory test was performed and for which payment is made under this part, except that not more than one such fee may be provided under this paragraph with respect to samples collected in the same encounter, and

(B) a fee to cover the transportation and personnel expenses for trained personnel to travel to the location of an individual to collect the sample, except that such a fee may be provided only with respect to an individual who is homebound or an inpatient in an inpatient facility (other than a hospital). In establishing a fee to cover the transportation and personnel expenses for trained personnel to travel to the location of an individual to collect a sample, the Secretary shall provide a method for computing the fee based on the number of miles traveled and the personnel costs associated with the collection of each individual sample, but the Secretary shall only be required to apply such method in the case of tests furnished during the period beginning on April 1, 1989, and ending on December 31, 1990, by a laboratory that establishes to the satisfaction of the Secretary (based on data for the 12-month period ending June 30, 1988) that

(i) the laboratory is dependent upon payments under this title for at least 80 percent of its collected revenues for clinical diagnostic laboratory tests,

(ii) at least 85 percent of its gross revenues for such tests are attributable to tests performed with respect to individuals who are homebound or who are residents in a nursing facility, and

(iii) the laboratory provided such tests for residents in nursing facilities representing at least 20 percent of the number of such facilities in the State in which the laboratory is located.

(4) (A) In establishing any fee schedule under this subsection, the Secretary may provide for an adjustment to take into account, with respect to the portion of the expenses of clinical diagnostic laboratory tests attributable to wages, the relative difference between a region's or local area's wage rates and the wage rate presumed in the data on which the schedule is based.

(B) For purposes of subsections (a)(1)(D)(i) and (a)(2)(D)(i), the limitation amount for a clinical diagnostic laboratory test performed—

(i) on or after July 1, 1986, and before April 1, 1988, is equal to 115 percent of the median of all the fee schedules established for that test for that laboratory setting under paragraph (1),

(ii) after March 31, 1988, and before January 1, 1990, is equal to the median of all the fee schedules established for that test for that laboratory setting under paragraph (1),

(iii) after December 31, 1989, and before January 1, 1991, is equal to 93 percent of the median of all the fee schedules established for that test for that laboratory setting under paragraph (1),

(iv) after December 31, 1990, and before January 1, 1994, is equal to 88 percent of such median,

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(v) after December 31, 1993, and before January 1, 1995, is equal to 84 percent of such median,

(vi) after December 31, 1994, and before January 1, 1996, is equal to 80 percent of such median,

(vii) after December 31, 1995, and before January 1, 1998, is equal to 76 percent of such median, and

(viii) after December 31, 1997, is equal to 74 percent of such median (or 100 percent of such median in the case of a clinical diagnostic laboratory test performed on or after January 1, 2001, that the Secretary determines is a new test for which no limitation amount has previously been established under this subparagraph).

(5) (A) In the case of a bill or request for payment for a clinical diagnostic laboratory test for which payment may otherwise be made under this part on an assignment-related basis or under a provider agreement under section 1866, payment may be made only to the person or entity which performed or supervised the performance of such test; except that—

(i) if a physician performed or supervised the performance of such test, payment may be made to another physician with whom he shares his practice,

(ii) in the case of a test performed at the request of a laboratory by another laboratory, payment may be made to the referring laboratory but only if—

(I) the referring laboratory is located in, or is part of, a rural hospital,

(II) the referring laboratory is wholly owned by the entity performing such test, the referring laboratory wholly owns the entity performing such test, or both the referring laboratory and the entity performing such test are wholly-owned by a third entity, or

(III) not more than 30 percent of the clinical diagnostic laboratory tests for which such referring laboratory (but not including a laboratory described in subclause (II)), receives requests for testing during the year in which the test is performed are performed by another laboratory, and

(iii) in the case of a clinical diagnostic laboratory test provided under an arrangement (as defined in section 1861(w)(1)) made by a hospital, critical access hospital or skilled nursing facility, payment shall be made to the hospital or skilled nursing facility.

(B) In the case of such a bill or request for payment for a clinical diagnostic laboratory test for which payment may otherwise be made under this part, and which is not described in subparagraph (A), payment may be made to the beneficiary only on the basis of the itemized bill of the person or entity which performed or supervised the performance of the test.

(C) Payment for a clinical diagnostic laboratory test, including a test performed in a physician's office but excluding a test performed by a rural health clinic may only be made on an assignment-related basis or to a provider of services with an agreement in effect under section 1866.

(D) A person may not bill for a clinical diagnostic laboratory test, including a test performed in a physician's office but excluding a test performed by a rural health clinic, other than on an assignment-related basis. If a person knowingly and willfully and on a repeated basis bills for a clinical diagnostic laboratory test in violation of the previous sentence, the Secretary may apply sanctions against the person in the same manner as the Secretary may apply sanctions against a physician in accordance with paragraph (2) of section 1842(j) in the same manner such paragraphs apply with respect to a physician. Paragraph (4) of such section shall apply in this subparagraph in the same manner as such paragraph applies to such section.

(6) For tests furnished before January 1, 2017, in the case[103] of any diagnostic laboratory test payment for which is not made on the basis of a fee schedule under paragraph (1), the Secretary may establish a payment rate which is acceptable to the person or entity performing the test and which would be considered the full charge for such tests. Such negotiated rate shall be limited to an amount not in excess of the total payment that would have been made for the services in the absence of such rate.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(7) Notwithstanding paragraphs (1) and (4) and section 1834A[104] the Secretary shall establish a national minimum payment amount under this part for a diagnostic or screening pap smear laboratory test (including all cervical cancer screening technologies that have been approved by the Food and Drug Administration as a primary screening method for detection of cervical cancer) equal to $14.60 for tests furnished in 2000. For such tests furnished in subsequent years, such national minimum payment amount shall be adjusted annually as provided in paragraph (2).

(8) (A) The Secretary shall establish by regulation procedures for determining the basis for, and amount of, payment under this subsection for any clinical diagnostic laboratory test with respect to which a new or substantially revised HCPCS code is assigned on or after January 1, 2005 (in this paragraph referred to as “new tests”).

(B) Determinations under subparagraph (A) shall be made only after the Secretary—

(i) makes available to the public (through an Internet website and other appropriate mechanisms) a list that includes any such test for which establishment of a payment amount under this subsection is being considered for a year;

(ii) on the same day such list is made available, causes to have published in the Federal Register notice of a meeting to receive comments and recommendations (and data on which recommendations are based) from the public on the appropriate basis under this subsection for establishing payment amounts for the tests on such list;

(iii) not less than 30 days after publication of such notice convenes a meeting, that includes representatives of officials of the Centers for Medicare and Medicaid Services involved in determining payment amounts, to receive such comments and recommendations (and data on which the recommendations are based);

(iv) taking into account the comments and recommendations (and accompanying data) received at such meeting, develops and makes available to the public (through an Internet website and other appropriate mechanisms) a list of proposed determinations with respect to the appropriate basis for establishing a payment amount under this subsection for each such code, together with an explanation of the reasons for each such determination, the data on which the determinations are based, and a request for public written comments on the proposed determination; and

(v) taking into account the comments received during the public comment period, develops and makes available to the public (through an Internet website and other appropriate mechanisms) a list of final determinations of the payment amounts for such tests under this subsection, together with the rationale for each such determination, the data on which the determinations are based, and responses to comments and suggestions received from the public.

(C) Under the procedures established pursuant to subparagraph (A), the Secretary shall—

(i) set forth the criteria for making determinations under subparagraph (A); and

(ii) make available to the public the data (other than proprietary data) considered in making such determinations.

(D) The Secretary may convene such further public meetings to receive public comments on payment amounts for new tests under this subsection as the Secretary deems appropriate.

(E) For purposes of this paragraph:

(i) The term “HCPCS” refers to the Health Care Procedure Coding System.

(ii) A code shall be considered to be “substantially revised” if there is a substantive change to the definition of the test or procedure to which the code applies (such as a new analyte or a new methodology for measuring an existing analyte-specific test).

(9) Notwithstanding any other provision in this part, in the case of any diagnostic laboratory test for HbA1c that is labeled by the Food and Drug Administration for home use and is furnished on or after April 1, 2008, the

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

payment rate for such test shall be the payment rate established under this part for a glycated hemoglobin test (identified as of October 1, 2007, by HCPCS code 83036 (and any succeeding codes)).

(i) (1) The Secretary shall, in consultation with appropriate medical organizations—

(A) specify those surgical procedures which are appropriately (when considered in terms of the proper utilization of hospital inpatient facilities) performed on an inpatient basis in a hospital but which also can be performed safely on an ambulatory basis in an ambulatory surgical center (meeting the standards specified under section 1832(a)(2)(F)(i)), critical access hospital, or hospital outpatient department, and

(B) specify those surgical procedures which are appropriately (when considered in terms of the proper utilization of hospital inpatient facilities) performed on an inpatient basis in a hospital but which also can be performed safely on an ambulatory basis in a physician's office.

The lists of procedures established under subparagraphs (A) and (B) shall be reviewed and updated not less often than every 2 years.

(2) (A) For services furnished prior to the implementation of the system described in subparagraph (D), subject to subparagraph (E), the amount of payment to be made for facility services furnished in connection with a surgical procedure specified pursuant to paragraph (1)(A) and furnished to an individual in an ambulatory surgical center described in such paragraph shall be equal to 80 percent of a standard overhead amount established by the Secretary (with respect to each such procedure) on the basis of the Secretary's estimate of a fair fee which—

(i) takes into account the costs incurred by such centers, or classes of centers, generally in providing services furnished in connection with the performance of such procedure as determined in accordance with a survey (based upon a representative sample of procedures and facilities) of the actual audited costs incurred by such centers in providing such services,

(ii) takes such costs into account in such a manner as will assure that the performance of the procedure in such a center will result in substantially less amounts paid under this title than would have been paid if the procedure had been performed on an inpatient basis in a hospital, and

(iii) in the case of insertion of an intraocular lens during or subsequent to cataract surgery includes payment which is reasonable and related to the cost of acquiring the class of lens involved.

Each amount so established shall be reviewed and updated not later than July 1, 1987, and annually thereafter to take account of varying conditions in different areas.

(B) The amount of payment to be made under this part for facility services furnished, in connection with a surgical procedure specified pursuant to paragraph (1)(B), in a physician's office shall be equal to 80 percent of a standard overhead amount established by the Secretary (with respect to each such procedure) on the basis of the Secretary's estimate of a fair fee which—

(i) takes into account additional costs, not usually included in the professional fee, incurred by physicians in securing, maintaining, and staffing the facilities and ancillary services appropriate for the performance of such procedure in the physician's office, and

(ii) takes such items into account in such a manner which will assure that the performance of such procedure in the physician's office will result in substantially less amounts paid under this title than would have been paid if the services had been furnished on an inpatient basis in a hospital.

Each amount so established shall be reviewed and updated not later than July 1, 1987, and annually thereafter and may be adjusted by the Secretary, when appropriate, to take account of varying conditions in different areas.

(C) (i) Notwithstanding the second sentence of each of subparagraphs (A) and (B), except as otherwise specified in clauses (ii), (iii), and (iv), if the Secretary has not updated amounts established under such subparagraphs or under subparagraph (D), with respect to facility services furnished during a fiscal year (beginning with fiscal year 1986 or a calendar year (beginning with 2006)), such amounts shall be increased by

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

the percentage increase in the Consumer Price Index for all urban consumers (U.S. city average) as estimated by the Secretary for the 12-month period ending with the midpoint of the year involved.

(ii) In each of the fiscal years 1998 through 2002, the increase under this subparagraph shall be reduced (but not below zero) by 2.0 percentage points.

(iii) In fiscal year 2004, beginning with April 1, 2004, the increase under this subparagraph shall be the Consumer Price Index for all urban consumers (U.S. city average) as estimated by the Secretary for the 12-month period ending with March 31, 2003, minus 3.0 percentage points.

(iv) In fiscal year 2005, the last quarter of calendar year 2005, and each of calendar years 2006 through 2009, the increase under this subparagraph shall be 0 percent.

(D) (i) Taking into account the recommendations in the report under section 626(d) of Medicare Prescription Drug, Improvement, and Modernization Act of 2003, the Secretary shall implement a revised payment system for payment of surgical services furnished in ambulatory surgical centers.

(ii) In the year the system described in clause (i) is implemented, such system shall be designed to result in the same aggregate amount of expenditures for such services as would be made if this subparagraph did not apply, as estimated by the Secretary and taking into account reduced expenditures that would apply if subparagraph (E) were to continue to apply, as estimated by the Secretary.

(iii) The Secretary shall implement the system described in clause (i) for periods in a manner so that it is first effective beginning on or after January 1, 2006, and not later than January 1, 2008.

(iv) The Secretary may implement such system in a manner so as to provide for a reduction in any annual update for failure to report on quality measures in accordance with paragraph (7).

(v) In implementing the system described in clause (i) for 2011 and each subsequent year, any annual update under such system for the year, after application of clause (iv), shall be reduced by the productivity adjustment described in section 1886(b)(3)(B)(xi)(II). The application of the preceding sentence may result in such update being less than 0.0 for a year, and may result in payment rates under the system described in clause (i) for a year being less than such payment rates for the preceding year.

(vi) There shall be no administrative or judicial review under section 1869, 1878, or otherwise, of the classification system, the relative weights, payment amounts, and the geographic adjustment factor, if any, under this subparagraph.

(E) With respect to surgical procedures furnished on or after January 1, 2007, and before the effective date of the implementation of a revised payment system under subparagraph (D), if—

(i) the standard overhead amount under subparagraph (A) for a facility service for such procedure, without the application of any geographic adjustment, exceeds

(ii) the Medicare OPD fee schedule amount established under the prospective payment system for hospital outpatient department services under paragraph (3)(D) of section 1833(t) for such service for such year, determined without regard to geographic adjustment under paragraph (2)(D) of such section,

the Secretary shall substitute under subparagraph (A) the amount described in clause (ii) for the standard overhead amount for such service referred to in clause (i).

(iii) The Secretary shall implement the system described in clause (i) for periods in a manner so that it is first effective beginning on or after January 1, 2006, and not later than January 1, 2008.

(iv) The Secretary may implement such system in a manner so as to provide for a reduction in any annual update for failure to report on quality measures in accordance with paragraph (7).

(v) There shall be no administrative or judicial review under section 1869, 1878, or otherwise, of the classification system, the relative weights, payment amounts, and the geographic adjustment factor, if any, under this subparagraph.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(3) (A) The aggregate amount of the payments to be made under this part for outpatient hospital facility services or critical access hospital services furnished before January 1, 1999, in connection with surgical procedures specified under paragraph (1)(A) shall be equal to the lesser of—

(i) the amount determined with respect to such services under subsection (a)(2)(B); or

(ii) the blend amount (described in subparagraph (B)).

(B)

(i) The blend amount for a cost reporting period is the sum of—

(I) the cost proportion (as defined in clause (ii)(I)) of the amount described in subparagraph (A)(i), and

(II) the ASC proportion (as defined in clause (ii)(II)) of the standard overhead amount payable with respect to the same surgical procedure as if it were provided in an ambulatory surgical center in the same area, as determined under paragraph (2)(A), less the amount a provider may charge as described in clause (ii) of section 1866(a)(2)(A).

(ii) Subject to paragraph (4), in this paragraph:

(I) The term “cost proportion” means 75 percent for cost reporting periods beginning in fiscal year 1988, 50 percent for portions of cost reporting periods beginning on or after October 1, 1988, and ending on or before December 31, 1990, and 42 percent for portions of cost reporting periods beginning on or after January 1, 1991.

(II) The term “ASC proportion” means 25 percent for cost reporting periods beginning in fiscal year 1988, 50 percent for portions of cost reporting periods beginning on or after October 1, 1988, and ending on or before December 31, 1990, and 58 percent for portions of cost reporting periods beginning on or after January 1, 1991.

(4) (A) In the case of a hospital that—

(i) makes application to the Secretary and demonstrates that it specializes in eye services or eye and ear services (as determined by the Secretary),

(ii) receives more than 30 percent of its total revenues from outpatient services, and

(iii) on October 1, 1987—

(I) was an eye specialty hospital or an eye and ear specialty hospital, or

(II) was operated as an eye or eye and ear unit (as defined in subparagraph (B)) of a general acute care hospital which, on the date of the application described in clause (i), operates less than 20 percent of the beds that the hospital operated on October 1, 1987, and has sold or otherwise disposed of a substantial portion of the hospital’s other acute care operations,

the cost proportion and ASC proportion in effect under subclauses (I) and (II) of paragraph (3)(B)(ii) for cost reporting periods beginning in fiscal year 1988 shall remain in effect for cost reporting periods beginning on or after October 1, 1988, and before January 1, 1995.

(B) For purposes of this subparagraph (A)(iii)(II), the term “eye or eye and ear unit” means a physically separate or distinct unit containing separate surgical suites devoted solely to eye or eye and ear services.

(5) (A) The Secretary is authorized to provide by regulations that in the case of a surgical procedure, specified by the Secretary pursuant to paragraph (1)(A), performed in an ambulatory surgical center described in such paragraph, there shall be paid (in lieu of any amounts otherwise payable under this part) with respect to the facility services furnished by such center and with respect to all related services (including physicians’ services, laboratory, X-ray, and diagnostic services) a single all-inclusive fee established pursuant to subparagraph (B),

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

if all parties furnishing all such services agree to accept such fee (to be divided among the parties involved in such manner as they shall have previously agreed upon) as full payment for the services furnished.

(B) In implementing this paragraph, the Secretary shall establish with respect to each surgical procedure specified pursuant to paragraph (1)(A) the amount of the all-inclusive fee for such procedure, taking into account such factors as may be appropriate. The amount so established with respect to any surgical procedure shall be reviewed periodically and may be adjusted by the Secretary, when appropriate, to take account of varying conditions in different areas.

(6) Any person, including a facility having an agreement under section 1832(a)(2)(F)(i), who knowingly and willfully presents, or causes to be presented, a bill or request for payment, for an intraocular lens inserted during or subsequent to cataract surgery for which payment may be made under paragraph (2)(A)(iii), is subject to a civil money penalty of not to exceed $2,000. The provisions of section 1128A (other than subsections (a) and (b)) shall apply to a civil money penalty under the previous sentence in the same manner as such provisions apply to a penalty or proceeding under section 1128A(a).

(7) (A) For purposes of paragraph (2)(D)(iv), the Secretary may provide, in the case of an ambulatory surgical center that does not submit, to the Secretary in accordance with this paragraph, data required to be submitted on measures selected under this paragraph with respect to a year, any annual increase provided under the system established under paragraph (2)(D) for such year shall be reduced by 2.0 percentage points. A reduction under this subparagraph shall apply only with respect to the year involved and the Secretary shall not take into account such reduction in computing any annual increase factor for a subsequent year.

(B) Except as the Secretary may otherwise provide, the provisions of subparagraphs (B), (C), (D), and (E) of paragraph (17) of section 1833(t) shall apply with respect to services of ambulatory surgical centers under this paragraph in a similar manner to the manner in which they apply under such paragraph and, for purposes of this subparagraph, any reference to a hospital, outpatient setting, or outpatient hospital services is deemed a reference to an ambulatory surgical center, the setting of such a center, or services of such a center, respectively.

(8)[105] The Secretary shall conduct a similar type of review as required under paragraph (22) of section 1833(t)), including the second sentence of subparagraph (C) of such paragraph, to payment for services under this subsection, and make such revisions under this paragraph, in an appropriate manner (as determined by the Secretary).

(j) Whenever a final determination is made that the amount of payment made under this part either to a provider of services or to another person pursuant to an assignment under section 1842(b)(3)(B)(ii) was in excess of or less than the amount of payment that is due, and payment of such excess or deficit is not made (or effected by offset) within 30 days of the date of the determination, interest shall accrue on the balance of such excess or deficit not paid or offset (to the extent that the balance is owed by or owing to the provider) at a rate determined in accordance with the regulations of the Secretary of the Treasury applicable to charges for late payments.

(k) With respect to services described in section 1861(s)(10)(B), the Secretary may provide, instead of the amount of payment otherwise provided under this part, for payment of such an amount or amounts as reasonably reflects the general cost of efficiently providing such services.

(l) (1) (A) The Secretary shall establish a fee schedule for services of certified registered nurse anesthetists under section 1861(s)(11).

(B) In establishing the fee schedule under this paragraph the Secretary may utilize a system of time units, a system of base and time units, or any appropriate methodology.

(C) The provisions of this subsection shall not apply to certain services furnished in certain hospitals in rural areas under the provisions of section 9320(k) of the Omnibus Budget Reconciliation Act of 1986[106], as amended by section 6132 of the Omnibus Budget Reconciliation Act of 1989[107].

(2) Except as provided in paragraph (3), the fee schedule established under paragraph (1) shall be initially based on audited data from cost reporting periods ending in fiscal year 1985 and such other data as the Secretary determines necessary.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(3) (A) In establishing the initial fee schedule for those services, the Secretary shall adjust the fee schedule to the extent necessary to ensure that the estimated total amount which will be paid under this title for those services plus applicable coinsurance in 1989 will equal the estimated total amount which would be paid under this title for those services in 1989 if the services were included as inpatient hospital services and payment for such services was made under part A in the same manner as payment was made in fiscal year 1987, adjusted to take into account changes in prices and technology relating to the administration of anesthesia.

(B) The Secretary shall also reduce the prevailing charge of physicians for medical direction of a certified registered nurse anesthetist, or the fee schedule for services of certified registered nurse anesthetists, or both, to the extent necessary to ensure that the estimated total amount which will be paid under this title plus applicable coinsurance for such medical direction and such services in 1989 and 1990 will not exceed the estimated total amount which would have been paid plus applicable coinsurance but for the enactment of the amendments made by section 9320 of the Omnibus Budget Reconciliation Act of 1986[108]. A reduced prevailing charge under this subparagraph shall become the prevailing charge but for subsequent years for purposes of applying the economic index under the fourth sentence of section 1842(b)(3).

(4) (A) Except as provided in subparagraphs (C) and (D), in determining the amount paid under the fee schedule under this subsection for services furnished on or after January 1, 1991, by a certified registered nurse anesthetist who is not medically directed—

(i) the conversion factor shall be—

(I) for services furnished in 1991, $15.50,

(II) for services furnished in 1992, $15.75,

(III) for services furnished in 1993, $16.00,

(IV) for services furnished in 1994, $16.25,

(V) for services furnished in 1995, $16.50,

(VI) for services furnished in 1996, $16.75, and

(VII) for services furnished in calendar years after 1996, the previous year's conversion factor increased by the update determined under section 1848(d) for physician anesthesia services for that year;

(ii) the payment areas to be used shall be the fee schedule areas used under section 1848 (or, in the case of services furnished during 1991, the localities used under section 1842(b)) for purposes of computing payments for physicians' services that are anesthesia services;

(iii) the geographic adjustment factors to be applied to the conversion factor under clause (i) for services in a fee schedule area or locality is—

(I) in the case of services furnished in 1991, the geographic work index value and the geographic practice cost index value specified in section 1842(q)(1)(B) for physicians' services that are anesthesia services furnished in the area or locality, and

(II) in the case of services furnished after 1991, the geographic work index value, the geographic practice cost index value, and the geographic malpractice index value used for determining payments for physicians' services that are anesthesia services under section 1848,

with 70 percent of the conversion factor treated as attributable to work and 30 percent as attributable to overhead for services furnished in 1991 (and the portions attributable to work, practice expenses, and malpractice expenses in 1992 and thereafter being the same as is applied under section 1848).

(B) (i) Except as provided in clause (ii) and subparagraph (D), in determining the amount paid under the fee schedule under this subsection for services furnished on or after January 1, 1991, and before January 1, 1994, by a certified registered nurse anesthetist who is medically directed, the Secretary shall apply the same

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

methodology specified in subparagraph (A).

(ii) The conversion factor used under clause (i) shall be—

(I) for services furnished in 1991, $10.50,

(II) for services furnished in 1992, $10.75, and

(III) for services furnished in 1993, $11.00.

(iii) In the case of services of a certified registered nurse anesthetist who is medically directed or medically supervised by a physician which are furnished on or after January 1, 1994, the fee schedule amount shall be one-half of the amount described in section 1848(a)(5)(B) with respect to the physician.

(C) Notwithstanding subclauses (I) through (V) of subparagraph (A)(i)—

(i) in the case of a 1990 conversion factor that is greater than $16.50, the conversion factor for a calendar year after 1990 and before 1996 shall be the 1990 conversion factor reduced by the product of the last digit of the calendar year and one-fifth of the amount by which the 1990 conversion factor exceeds $16.50; and

(ii) in the case of a 1990 conversion factor that is greater than $15.49 but less than $16.51, the conversion factor for a calendar year after 1990 and before 1996 shall be the greater of—

(I) the 1990 conversion factor, or

(II) the conversion factor specified in subparagraph (A)(i) for the year involved.

(D) Notwithstanding subparagraph (C), in no case may the conversion factor used to determine payment for services in a fee schedule area or locality under this subsection, as adjusted by the adjustment factors specified in subparagraphs[109] (A)(iii), exceed the conversion factor used to determine the amount paid for physicians' services that are anesthesia services in the area or locality.

(5) (A) Payment for the services of a certified registered nurse anesthetist (for which payment may otherwise be made under this part) may be made on the basis of a claim or request for payment presented by the certified registered nurse anesthetist furnishing such services, or by a hospital, critical access hospital, physician, group practice, or ambulatory surgical center with which the certified registered nurse anesthetist furnishing such services has an employment or contractual relationship that provides for payment to be made under this part for such services to such hospital, critical access hospital, physician, group practice, or ambulatory surgical center.

(B) No hospital or critical access hospital that presents a claim or request for payment for services of a certified nurse anesthetist under this part may treat any uncollected coinsurance amount imposed under this part with respect to such services as a bad debt of such hospital or critical access hospital for purposes of this title.

(6) If an adjustment under paragraph (3)(B) results in a reduction in the reasonable charge for a physicians' service and a nonparticipating physician furnishes the service to an individual entitled to benefits under this part after the effective date of the reduction, the physician's actual charge is subject to a limit under section 1842(j)(1)(D).

(m) (1) In the case of physicians' services furnished in a year to an individual, who is covered under the insurance program established by this part and who incurs expenses for such services, in an area that is designated (under section 332(a)(1)(A) of the Public Health Service Act)[110] as a health professional shortage area as identified by the Secretary prior to the beginning of such year, in addition to the amount otherwise paid under this part, there also shall be paid to the physician (or to an employer or facility in the cases described in clause (A) of section 1842(b)(6)) (on a monthly or quarterly basis) from the Federal Supplementary Medical Insurance Trust Fund an amount equal to 10 percent of the payment amount for the service under this part.

(2) For each health professional shortage area identified in paragraph (1) that consists of an entire county, the Secretary shall provide for the additional payment under paragraph (1) without any requirement on the physician to identify the health professional shortage area involved. The Secretary may implement the previous

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

sentence using the method specified in subsection (u)(4)(C).

(3) The Secretary shall post on the Internet website of the Centers for Medicare and Medicaid Services a list of the health professional shortage areas identified in paragraph (1) that consist of a partial county to facilitate the additional payment under paragraph (1) in such areas.

(4) There shall be no administrative or judicial review under section 1869, section 1878, or otherwise, respecting—

(A) the identification of a county or area;

(B) the assignment of a specialty of any physician under this paragraph;

(C) the assignment of a physician to a county under this subsection; or

(D) the assignment of a postal ZIP Code to a county or other area under this subsection.

(n) (1) (A) The aggregate amount of the payments to be made for all or part of a cost reporting period for services described in subsection (a)(2)(E)(i) furnished under this part on or after October 1, 1988, and before January 1, 1999, and for services described in subsection (a)(2)(E)(ii) furnished under this part on or after October 1, 1989, and before January 1, 1999, shall be equal to the lesser of—

(i) the amount determined with respect to such services under subsection (a)(2)(B), or

(ii) the blend amount for radiology services and diagnostic procedures determined in accordance with subparagraph (B).

(B) (i) The blend amount for radiology services and diagnostic procedures for a cost reporting period is the sum of—

(I) the cost proportion (as defined in clause (ii)) of the amount described in subparagraph (A)(i); and

(II) the charge proportion (as defined in clause (ii)(II)) of 62 percent (for services described in subsection (a)(2)(E)(i)), or (for procedures described in subsection (a)(2)(E)(ii)), 42 percent or such other percent established by the Secretary (or carriers acting pursuant to guidelines issued by the Secretary) based on prevailing charges established with actual charge data, of the prevailing charge or (for services described in subsection (a)(2)(E)(i) furnished on or after April 1, 1989 and for services described in subsection (a)(2)(E)(ii) furnished on or after January 1, 1992) the fee schedule amount established for participating physicians for the same services as if they were furnished in a physician's office in the same locality as determined under section 1842(b) (or, in the case of services furnished on or after January 1, 1992, under section 1848), less the amount a provider may charge as described in clause (ii) of section 1866(a)(2)(A).

(ii) In this subparagraph:

(I) The term "cost proportion" means 50 percent, except that such term means 65 percent in the case of outpatient radiology services for portions of cost reporting periods which occur in fiscal year 1989 and in the case of diagnostic procedures described in subsection (a)(2)(E)(ii) for portions of cost reporting periods which occur in fiscal year 1990, and such term means 42 percent in the case of outpatient radiology services for portions of cost reporting periods beginning on or after January 1, 1991.

(II) The term "charge proportion" means 100 percent minus the cost proportion.

(o) (1) In the case of shoes described in section 1861(s)(12)—

(A) no payment may be made under this part, with respect to any individual for any year, for the furnishing of—

(i) more than one pair of custom molded shoes (including inserts provided with such shoes) and 2 additional pairs of inserts for such shoes, or

(ii) more than one pair of extra-depth shoes (not including inserts provided with such shoes) and 3 pairs of

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

inserts for such shoes, and

(B) with respect to expenses incurred in any calendar year, no more than the amount of payment applicable under paragraph (2) shall be considered as incurred expenses for purposes of subsections (a) and (b).

Payment for shoes (or inserts) under this part shall be considered to include payment for any expenses for the fitting of such shoes (or inserts).

(2) (A) Except as provided by the Secretary under subparagraphs (B) and (C), the amount of payment under this paragraph for custom molded shoes, extra-depth shoes, and inserts shall be the amount determined for such items by the Secretary under section 1834(h).

(B) The Secretary may establish payment amounts for shoes and inserts that are lower than the amount established under section 1834(h) if the Secretary finds that shoes and inserts of an appropriate quality are readily available at or below the amount established under such section.

(C) In accordance with procedures established by the Secretary, an individual entitled to benefits with respect to shoes described in section 1861(s)(12) may substitute modification of such shoes instead of obtaining one (or more, as specified by the Secretary) pair of inserts (other than the original pair of inserts with respect to such shoes). In such case, the Secretary shall substitute, for the payment amount established under section 1834(h), a payment amount that the Secretary estimates will assure that there is no net increase in expenditures under this subsection as a result of this subparagraph.

(3) In this title, the term “shoes” includes, except for purposes of subparagraphs (A)(ii) and (B) of paragraph (2), inserts for extra-depth shoes.

(p) [Stricken.[111]]

(q) (1) Each request for payment, or bill submitted, for an item or service furnished by an entity for which payment may be made under this part and for which the entity knows or has reason to believe there has been a referral by a referring physician (within the meaning of section 1877) shall include the name and unique physician identification number for the referring physician.

(2) (A) In the case of a request for payment for an item or service furnished by an entity under this part on an assignment-related basis and for which information is required to be provided under paragraph (1) but not included, payment may be denied under this part.

(B) In the case of a request for payment for an item or service furnished by an entity under this part not submitted on an assignment-related basis and for which information is required to be provided under paragraph (1) but not included—

(i) if the entity knowingly and willfully fails to provide such information promptly upon request of the Secretary or a carrier, the entity may be subject to a civil money penalty in an amount not to exceed $2,000, and

(ii) if the entity knowingly, willfully, and in repeated cases fails, after being notified by the Secretary of the obligations and requirements of this subsection to provide the information required under paragraph (1), the entity may be subject to exclusion from participation in the programs under this Act for a period not to exceed 5 years, in accordance with the procedures of subsections (c), (f), and (g) of section 1128.

The provisions of section 1128A (other than subsections (a) and (b)) shall apply to civil money penalties under clause (i) in the same manner as they apply to a penalty or proceeding under section 1128A(a).

(r) (1) With respect to services described in section 1861(s)(2)(K)(ii) (relating to nurse practitioner or clinical nurse specialist services), payment may be made on the basis of a claim or request for payment presented by the nurse practitioner or clinical nurse specialist furnishing such services, or by a hospital, critical access hospital, skilled nursing facility or nursing facility (as defined in section 1919(a)), physician, group practice or ambulatory surgical center with which the nurse practitioner or clinical nurse specialist has an employment or contractual relationship that provides for payment to be made under this part for such services to such hospital, physician, group practice, or ambulatory surgical center.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(2) No hospital or critical access hospital that presents a claim or request for payment under this part for services described in section 1861(s)(2)(K)(ii) may treat any uncollected coinsurance amount imposed under this part with respect to such services as a bad debt of such hospital for purposes of this title.

(s) The Secretary may not provide for payment under subsection (a)(1)(A) with respect to an organization unless the organization provides assurances satisfactory to the Secretary that the organization meets the requirement of section 1866(f) (relating to maintaining written policies and procedures respecting advance directives).

(t)[112] Prospective Payment System for Hospital Outpatient Department Services.—

(1) Amount of payment.—

(A) In general.—With respect to covered OPD services (as defined in subparagraph (B)) furnished during a year beginning with 1999, the amount of payment under this part shall be determined under a prospective payment system established by the Secretary in accordance with this subsection.

(B) Definition of covered opd services.—For purposes of this subsection, the term “covered OPD services”—

(i) means hospital outpatient services designated by the Secretary;

(ii) subject to clause (iv), includes inpatient hospital services designated by the Secretary that are covered under this part and furnished to a hospital inpatient who (I) is entitled to benefits under part A but has exhausted benefits for inpatient hospital services during a spell of illness, or (II) is not so entitled;

(iii) includes implantable items described in paragraph (3), (6), or (8) of section 1861(s);

(iv) does not include any therapy services described in subsection (a)(8) or ambulance services, for which payment is made under a fee schedule described in section 1834(k) or section 1834(l) and does not include screening mammography (as defined in section 1861(jj)), diagnostic mammography, or personalized prevention plan services (as defined in section 1861(hhh)(1)); and

(v)[113] does not include applicable items and services (as defined in subparagraph (A) of paragraph (21)) that are furnished on or after January 1, 2017, by an off-campus outpatient department of a provider (as defined in subparagraph (B) of such paragraph).

(2) System requirements.—Under the payment system—

(A) the Secretary shall develop a classification system for covered OPD services;

(B) the Secretary may establish groups of covered OPD services, within the classification system described in subparagraph (A), so that services classified within each group are comparable clinically and with respect to the use of resources and so that an implantable item is classified to the group that includes the service to which the item relates;

(C) the Secretary shall, using data on claims from 1996 and using data from the most recent available cost reports, establish relative payment weights for covered OPD services (and any groups of such services described in subparagraph (B)) based on median (or, at the election of the Secretary, mean) hospital costs and shall determine projections of the frequency of utilization of each such service (or group of services) in 1999;

(D) subject to paragraph (19), the Secretary shall determine a wage adjustment factor to adjust the portion of payment and coinsurance attributable to labor-related costs for relative differences in labor and labor-related costs across geographic regions in a budget neutral manner;

(E) the Secretary shall establish, in a budget neutral manner, outlier adjustments under paragraph (5) and transitional pass–through payments under paragraph (6) and other adjustments as determined to be necessary to ensure equitable payments, such as adjustments for certain classes of hospitals;

(F) the Secretary shall develop a method for controlling unnecessary increases in the volume of covered OPD services;

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(G) the Secretary shall create additional groups of covered OPD services that classify separately those procedures that utilize contrast agents from those that do not; and

(H) with respect to devices of brachytherapy consisting of a seed or seeds (or radioactive source), the Secretary shall create additional groups of covered OPD services that classify such devices separately from the other services (or group of services) paid for under this subsection in a manner reflecting the number, isotope, and radioactive intensity of such devices furnished, including separate groups for palladium–103 and iodine–125 devices.

For purposes of subparagraph (B), items and services within a group shall not be treated as “comparable with respect to the use of resources” if the highest median cost (or mean cost, if elected by the Secretary under subparagraph (C)) for an item or service within the group is more than 2 times greater than the lowest median cost (or mean cost, if so elected) for an item or service within the group; except that the Secretary may make exceptions in unusual cases, such as low volume items and services, but may not make such an exception in the case of a drug or biological that has been designated as an orphan drug under section 526 of the Federal Food, Drug and Cosmetic Act.

(3) Calculation of base amounts.—

(A) Aggregate amounts that would be payable if deductibles were disregarded.—The Secretary shall estimate the sum of—

(i) the total amounts that would be payable from the Trust Fund under this part for covered OPD services in 1999, determined without regard to this subsection, as though the deductible under section 1833(b) did not apply, and

(ii) the total amounts of copayments estimated to be paid under this subsection by beneficiaries to hospitals for covered OPD services in 1999, as though the deductible under section 1833(b) did not apply.

(B) Unadjusted copayment amount.—

(i) In general.—For purposes of this subsection, subject to clause (ii), the “unadjusted copayment amount” applicable to a covered OPD service (or group of such services) is 20 percent of the national median of the charges for the service (or services within the group) furnished during 1996, updated to 1999 using the Secretary’s estimate of charge growth during the period.

(ii) Adjusted to be 20 percent when fully phased in.—If the pre–deductible payment percentage for a covered OPD service (or group of such services) furnished in a year would be equal to or exceed 80 percent, then the unadjusted copayment amount shall be 20 percent of amount determined under subparagraph (D).

(iii) Rules for new services.—The Secretary shall establish rules for establishment of an unadjusted copayment amount for a covered OPD service not furnished during 1996, based upon its classification within a group of such services.

(C) Calculation of conversion factors.—

(i) For 1999.—

(I) In general.—The Secretary shall establish a 1999 conversion factor for determining the medicare OPD fee schedule amounts for each covered OPD service (or group of such services) furnished in 1999. Such conversion factor shall be established on the basis of the weights and frequencies described in paragraph (2)(C) and in such a manner that the sum for all services and groups of the products (described in subclause (II) for each such service or group) equals the total projected amount described in subparagraph (A).

(II) Product described.—The Secretary shall determine for each service or group the product of the medicare OPD fee schedule amounts (taking into account appropriate adjustments described in paragraphs (2)(D) and (2)(E)) and the estimated frequencies for such service or group.

(ii) Subsequent years.—Subject to paragraph (8)(B), the Secretary shall establish a conversion factor for

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

covered OPD services furnished in subsequent years in an amount equal to the conversion factor established under this subparagraph and applicable to such services furnished in the previous year increased by the OPD fee schedule increase factor specified under clause (iv) for the year involved.

(iii) Adjustment for service mix changes.—Insofar as the Secretary determines that the adjustments for service mix under paragraph (2) for a previous year (or estimates that such adjustments for a future year) did (or are likely to) result in a change in aggregate payments under this subsection during the year that are a result of changes in the coding or classification of covered OPD services that do not reflect real changes in service mix, the Secretary may adjust the conversion factor computed under this subparagraph for subsequent years so as to eliminate the effect of such coding or classification changes.

(iv) OPD fee schedule increase factor.—For purposes of this subparagraph, subject to paragraph (17) and subparagraph (F) of this paragraph the “OPD fee schedule increase factor” for services furnished in a year is equal to the market basket percentage increase applicable under section 1886(b)(3)(B)(iii) to hospital discharges occurring during the fiscal year ending in such year, reduced by 1 percentage point for such factor for services furnished in each of 2000 and 2002. In applying the previous sentence for years beginning with 2000, the Secretary may substitute for the market basket percentage increase an annual percentage increase that is computed and applied with respect to covered OPD services furnished in a year in the same manner as the market basket percentage increase is determined and applied to inpatient hospital services for discharges occurring in a fiscal year.

(D) Calculation of medicare opd fee schedule amounts.—The Secretary shall compute a medicare OPD fee schedule amount for each covered OPD service (or group of such services) furnished in a year, in an amount equal to the product of—

(i) the conversion factor computed under subparagraph (C) for the year, and

(ii) the relative payment weight (determined under paragraph (2)(C)) for the service or group.

(E) Pre–deductible payment percentage.—The pre-deductible payment percentage for a covered OPD service (or group of such services) furnished in a year is equal to the ratio of—

(i) the medicare OPD fee schedule amount established under subparagraph (D) for the year, minus the unadjusted copayment amount determined under subparagraph (B) for the service or group, to

(ii) the medicare OPD fee schedule amount determined under subparagraph (D) for the year for such service or group.

(F) Productivity and other adjustment.—After determining the OPD fee schedule increase factor under subparagraph (C)(iv), the Secretary shall reduce such increase factor—

(i) for 2012 and subsequent years, by the productivity adjustment described in section 1886(b)(3)(B)(xi)(II); and

(ii) for each of 2010 through 2019, by the adjustment described in subparagraph (G).

The application of this subparagraph may result in the increase factor under subparagraph (C)(iv) being less than 0.0 for a year, and may result in payment rates under the payment system under this subsection for a year being less than such payment rates for the preceding year.

(G) Other adjustment.—

(i) For purposes of subparagraph (F)(ii), the adjustment described in this subparagraph is—

(I) for each of 2010 and 2011, 0.25 percentage point;

(II) for each of 2012 and 2013, 0.1 percentage point; and

(III) subject to clause (ii), for each of 2014 through 2019, 0.2 percentage point.

(ii) Reduction of other adjustment.— Clause (i)(II) shall be applied with respect to any of 2014 through 2019 by

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

substituting “0.0 percentage points” for “0.2 percentage point”, if for such year—

(I) the excess (if any) of—

(aa) the total percentage of the nonelderly insured population for the preceding year (based on the most recent estimates available from the Director of the Congressional Budget Office before a vote in either House on the Patient Protection and Affordable Care Act that, if determined in the affirmative, would clear such Act for enrollment); over ‘‘(bb) the total percentage of the nonelderly insured population for such preceding year (as estimated by the Secretary); exceeds ‘‘(II) .

(bb) the total percentage of the nonelderly insured population for such preceding year (as estimated by the Secretary); exceeds

(II) 5 percentage points.

(4) Medicare payment amount.—The amount of payment made from the Trust Fund under this part for a covered OPD service (and such services classified within a group) furnished in a year is determined, subject to paragraph (7) as follows:

(A) Fee schedule adjustments.—The medicare OPD fee schedule amount (computed under paragraph (3)(D)) for the service or group and year is adjusted for relative differences in the cost of labor and other factors determined by the Secretary, as computed under paragraphs (2)(D) and (2)(E).

(B) Subtract applicable deductible.—Reduce the adjusted amount determined under subparagraph (A) by the amount of the deductible under section 1833(b), to the extent applicable.

(C) Apply payment proportion to remainder.—The amount of payment is the amount so determined under subparagraph (B) multiplied by the pre–deductible payment percentage (as determined under paragraph (3)(E)) for the service or group and year involved, plus the amount of any reduction in the copayment amount attributable to paragraph (8)(C).

(5) Outlier adjustment.—

(A) In general.—Subject to subparagraph (D), the Secretary shall provide for an additional payment for each covered OPD service (or group of services) for which a hospital’s charges, adjusted to cost, exceed—

(i) a fixed multiple of the sum of—

(I) the applicable medicare OPD fee schedule amount determined under paragraph (3)(D), as adjusted under paragraph (4)(A) (other than for adjustments under this paragraph or paragraph (6)); and

(II) any transitional pass-through payment under paragraph (6); and

(ii) at the option of the Secretary, such fixed dollar amount as the Secretary may establish.

(B) Amount of adjustment.—The amount of the additional payment under subparagraph (A) shall be determined by the Secretary and shall approximate the marginal cost of care beyond the applicable cutoff point under such subparagraph.

(C) Limit on aggregate outlier adjustments.—

(i) In general.—The total of the additional payments made under this paragraph for covered OPD services furnished in a year (as estimated by the Secretary before the beginning of the year) may not exceed the applicable percentage (specified in clause (ii)) of the total program payments estimated to be made under this subsection for all covered OPD services furnished in that year. If this paragraph is first applied to less than a full year, the previous sentence shall apply only to the portion of such year.

(ii) Applicable percentage.—For purposes of clause (i), the term “applicable percentage” means a percentage specified by the Secretary up to (but not to exceed)—

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(I) for a year (or portion of a year) before 2004, 2.5 percent; and

(II) for 2004 and thereafter, 3.0 percent.

(D) Transitional authority.—In applying subparagraph (A) for covered OPD services furnished before January 1, 2002, the Secretary may—

(i) apply such subparagraph to a bill for such services related to an outpatient encounter (rather than for a specific service or group of services) using OPD fee schedule amounts and transitional pass–through payments covered under the bill; and

(ii) use an appropriate cost-to-charge ratio for the hospital involved (as determined by the Secretary), rather than for specific departments within the hospital.

(E) Exclusion of separate drug and biological apcs from outlier payments.—No additional payment shall be made under subparagraph (A) in the case of ambulatory payment classification groups established separately for drugs or biologicals.

(6) Transitional pass–through for additional costs of innovative medical devices, drugs, and biologicals.—

(A) In general.—The Secretary shall provide for an additional payment under this paragraph for any of the following that are provided as part of a covered OPD service (or group of services):

(i) Current orphan drugs.—A drug or biological that is used for a rare disease or condition with respect to which the drug or biological has been designated as an orphan drug under section 526 of the Federal Food, Drug and Cosmetic Act if payment for the drug or biological as an outpatient hospital service under this part was being made on the first date that the system under this subsection is implemented.

(ii) Current cancer therapy drugs and biologicals and brachytherapy.—A drug or biological that is used in cancer therapy, including (but not limited to) a chemotherapeutic agent, an antiemetic, a hematopoietic growth factor, a colony stimulating factor, a biological response modifier, a bisphosphonate, and a device of brachytherapy or temperature monitored cryoablation, if payment for such drug, biological, or device as an outpatient hospital service under this part was being made on such first date.

(iii) Current radiopharmaceutical drugs and biological products.—A radiopharmaceutical drug or biological product used in diagnostic, monitoring, and therapeutic nuclear medicine procedures if payment for the drug or biological as an outpatient hospital service under this part was being made on such first date.

(iv) New medical devices, drugs, and biologicals.—A medical device, drug, or biological not described in clause (i), (ii), or (iii) if—

(I) payment for the device, drug, or biological as an outpatient hospital service under this part was not being made as of December 31, 1996; and

(II) the cost of the drug or biological or the average cost of the category of devices is not insignificant in relation to the OPD fee schedule amount (as calculated under paragraph (3)(D)) payable for the service (or group of services) involved.

(B) Use of categories in determining eligibility of a device for pass–through payments.—The following provisions apply for purposes of determining whether a medical device qualifies for additional payments under clause (ii) or (iv) of subparagraph (A):

(i) Establishment of initial categories.—

(I) In general.—The Secretary shall initially establish under this clause categories of medical devices based on type of device by April 1, 2001. Such categories shall be established in a manner such that each medical device that meets the requirements of clause (ii) or (iv) of subparagraph (A) as of January 1, 2001, is included in such a category and no such device is included in more than one category. For purposes of the preceding sentence, whether a medical device meets such requirements as of such date shall be determined on the basis of the program memoranda issued before such date.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(II) Authorization of implementation other than through regulations.—The categories may be established under this clause by program memorandum or otherwise, after consultation with groups representing hospitals, manufacturers of medical devices, and other affected parties.

(ii) Establishing criteria for additional categories.—

(I) In general.—The Secretary shall establish criteria that will be used for creation of additional categories (other than those established under clause (i)) through rulemaking (which may include use of an interim final rule with comment period).

(II) Standard.—Such categories shall be established under this clause in a manner such that no medical device is described by more than one category. Such criteria shall include a test of whether the average cost of devices that would be included in a category and are in use at the time the category is established is not insignificant, as described in subparagraph (A)(iv)(II).

(III) Deadline.—Criteria shall first be established under this clause by July 1, 2001. The Secretary may establish in compelling circumstances categories under this clause before the date such criteria are established.

(IV) Adding categories.—The Secretary shall promptly establish a new category of medical devices under this clause for any medical device that meets the requirements of subparagraph (A)(iv) and for which none of the categories in effect (or that were previously in effect) is appropriate.

(iii) Period for which category is in effect.—A category of medical devices established under clause (i) or (ii) shall be in effect for a period of at least 2 years, but not more than 3 years, that begins—

(I) in the case of a category established under clause (i), on the first date on which payment was made under this paragraph for any device described by such category (including payments made during the period before April 1, 2001); and

(II) in the case of any other category, on the first date on which payment is made under this paragraph for any medical device that is described by such category.

(iv) Requirements treated as met.—A medical device shall be treated as meeting the requirements of subparagraph (A)(iv), regardless of whether the device meets the requirement of subclause (I) of such subparagraph, if—

(I) the device is described by a category established and in effect under clause (i); or

(II) the device is described by a category established and in effect under clause (ii) and an application under section 515 of the Federal Food, Drug, and Cosmetic Act has been approved with respect to the device, or the device has been cleared for market under section 510(k) of such Act, or the device is exempt from the requirements of section 510(k) of such Act pursuant to subsection (l) or (m) of section 510 of such Act or section 520(g) of such Act.

Nothing in this clause shall be construed as requiring an application or prior approval (other than that described in subclause (II)) in order for a covered device described by a category to qualify for payment under this paragraph.

(C) Limited period of payment.—

(i) Drugs and biologicals.—Subject to subparagraph (G), the payment under this paragraph with respect to a drug or biological shall only apply during a period of at least 2 years, but not more than 3 years, that begins—[114]

(I) on the first date this subsection is implemented in the case of a drug or biological described in clause (i), (ii), or (iii) of subparagraph (A) and in the case of a drug or biological described in subparagraph (A)(iv) and for which payment under this part is made as an outpatient hospital service before such first date; or

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(II) in the case of a drug or biological described in subparagraph (A)(iv) not described in subclause (I), on the first date on which payment is made under this part for the drug or biological as an outpatient hospital service.

(ii) Medical devices.—Payment shall be made under this paragraph with respect to a medical device only if such device—

(I) is described by a category of medical devices established and in effect under subparagraph (B); and

(II) is provided as part of a service (or group of services) paid for under this subsection and provided during the period for which such category is in effect under such subparagraph.

(D) Amount of additional payment.—Subject to subparagraph (E)(iii), the amount of the payment under this paragraph with respect to a device, drug, or biological provided as part of a covered OPD service is—

(i) subject to subparagraph (H), in the case of a drug or biological, the amount by which the amount determined under section 1842(o) (or if the drug or biological is covered under a competitive acquisition contract under section 1847B, an amount determined by the Secretary equal to the average price for the drug or biological for all competitive acquisition areas and year established under such section as calculated and adjusted by the Secretary for purposes of this paragraph) for the drug or biological exceeds the portion of the otherwise applicable medicare OPD fee schedule that the Secretary determines is associated with the drug or biological; or[115]

(ii) in the case of a medical device, the amount by which the hospital's charges for the device, adjusted to cost, exceeds the portion of the otherwise applicable medicare OPD fee schedule that the Secretary determines is associated with the device.

(E) Limit on aggregate annual adjustment.—

(i) In general.—[116]The total of the additional payments made under this paragraph for covered OPD services furnished in a year (as estimated by the Secretary before the beginning of the year) may not exceed the applicable percentage (specified in clause (ii)) of the total program payments estimated to be made under this subsection for all covered OPD services furnished in that year. If this paragraph is first applied to less than a full year, the previous sentence shall apply only to the portion of such year. This clause shall not apply for 2018.

(ii) Applicable percentage.—For purposes of clause (i), the term “applicable percentage” means—

(I) for a year (or portion of a year) before 2004, 2.5 percent; and

(II) for 2004 and thereafter, a percentage specified by the Secretary up to (but not to exceed) 2.0 percent.

(iii) Uniform prospective reduction if aggregate limit projected to be exceeded.—If the Secretary estimates before the beginning of a year that the amount of the additional payments under this paragraph for the year (or portion thereof) as determined under clause (i) without regard to this clause will exceed the limit established under such clause, the Secretary shall reduce pro rata the amount of each of the additional payments under this paragraph for that year (or portion thereof) in order to ensure that the aggregate additional payments under this paragraph (as so estimated) do not exceed such limit.

(F) Limitation of application of functional equivalence standard.—

(i) In general.—The Secretary may not publish regulations that apply a functional equivalence standard to a drug or biological under this paragraph.

(ii) Application.—Clause (i) shall apply to the application of a functional equivalence standard to a drug or biological on or after the date of enactment of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 unless—

(I) such application was being made to such drug or biological prior to such date of enactment; and

(II) the Secretary applies such standard to such drug or biological only for the purpose of determining eligibility

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

of such drug or biological for additional payments under this paragraph and not for the purpose of any other payments under this title.

(iii) Rule of construction.—Nothing in this subparagraph shall be construed to effect the Secretary's authority to deem a particular drug to be identical to another drug if the 2 products are pharmaceutically equivalent and bioequivalent, as determined by the Commissioner of Food and Drugs.

(G) Pass-through extension for certain drugs and biologicals.—In the case of a drug or biological whose period of pass-through status under this paragraph ended on December 31, 2017, and for which payment under this subsection was packaged into a payment for a covered OPD service (or group of services) furnished beginning January 1, 2018, such pass-through status shall be extended for a 2-year period beginning on October 1, 2018.[117]

(H) Temporary payment rule for certain drugs and biologicals.—In the case of a drug or biological whose period of pass-through status under this paragraph ended on December 31, 2017, and for which payment under this subsection was packaged into a payment for a covered OPD service (or group of services) furnished beginning January 1, 2018, the payment amount for such drug or biological under this subsection that is furnished during the period beginning on October 1, 2018, and ending on March 31, 2019, shall be the greater of—

(i) the payment amount that would otherwise apply under subparagraph (D)(i) for such drug or biological during such period; or

(ii) the payment amount that applied under such subparagraph (D)(i) for such drug or biological on December 31, 2017.[118]

(I) Special payment adjustment rules for last quarter of 2018.—In the case of a drug or biological whose period of pass-through status under this paragraph ended on December 31, 2017, and for which payment under this subsection was packaged into a payment amount for a covered OPD service (or group of services) beginning January 1, 2018, the following rules shall apply with respect to payment amounts under this subsection for covered a OPD service (or group of services) furnished during the period beginning on October 1, 2018, and ending on December 31, 2018:

(i) The Secretary shall remove the packaged costs of such drug or biological (as determined by the Secretary) from the payment amount under this subsection for the covered OPD service (or group of services) with which it is packaged.

(ii) The Secretary shall not make any adjustments to payment amounts under this subsection for a covered OPD service (or group of services) for which no costs were removed under clause (i).[119]

(J) Additional pass-through extension and special payment adjustment rule for certain diagnostic radiopharmaceuticals.—[120]In the case of a drug or biological furnished in the context of a clinical study on diagnostic imaging tests approved under a coverage with evidence development determination whose period of passthrough status under this paragraph concluded on December 31, 2018, and for which payment under this subsection was packaged into a payment for a covered OPD service (or group of services) furnished beginning January 1, 2019, the Secretary shall—

(i) extend such pass-through status for such drug or biological for the 9-month period beginning on January 1, 2020;

(ii) remove, during such period, the packaged costs of such drug or biological (as determined by the Secretary) from the payment amount under this subsection for the covered OPD service (or group of services) with which it is packaged; and

(iii) not make any adjustments to payment amounts under this subsection for a covered OPD service (or group of services) for which no costs were removed under clause (ii).

(7) Transitional adjustment to limit decline in payment.—

(A) Before 2002.—Subject to subparagraph (D), for covered OPD services furnished before January 1, 2002,


© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

for which the PPS amount (as defined in subparagraph (E)) is—

(i) at least 90 percent, but less than 100 percent, of the pre-BBA amount (as defined in subparagraph (F)), the amount of payment under this subsection shall be increased by 80 percent of the amount of such difference;

(ii) at least 80 percent, but less than 90 percent, of the pre-BBA amount, the amount of payment under this subsection shall be increased by the amount by which (I) the product of 0.71 and the pre-BBA amount, exceeds (II) the product of 0.70 and the PPS amount;

(iii) at least 70 percent, but less than 80 percent, of the pre-BBA amount, the amount of payment under this subsection shall be increased by the amount by which (I) the product of 0.63 and the pre-BBA amount, exceeds (II) the product of 0.60 and the PPS amount; or

(iv) less than 70 percent of the pre-BBA amount, the amount of payment under this subsection shall be increased by 21 percent of the pre-BBA amount.

(B) 2002.—Subject to subparagraph (D), for covered OPD services furnished during 2002, for which the PPS amount is—

(i) at least 90 percent, but less than 100 percent, of the pre-BBA amount, the amount of payment under this subsection shall be increased by 70 percent of the amount of such difference;

(ii) at least 80 percent, but less than 90 percent, of the pre-BBA amount, the amount of payment under this subsection shall be increased by the amount by which (I) the product of 0.61 and the pre-BBA amount, exceeds (II) the product of 0.60 and the PPS amount; or

(iii) less than 80 percent of the pre-BBA amount, the amount of payment under this subsection shall be increased by 13 percent of the pre-BBA amount.

(C) 2003.—Subject to subparagraph (D), for covered OPD services furnished during 2003, for which the PPS amount is—

(i) at least 90 percent, but less than 100 percent, of the pre-BBA amount, the amount of payment under this subsection shall be increased by 60 percent of the amount of such difference; or

(ii) less than 90 percent of the pre-BBA amount, the amount of payment under this subsection shall be increased by 6 percent of the pre-BBA amount.

(D) Hold harmless provisions.—

(i) Temporary treatment for certain rural hospitals.—

(I) In the case of a hospital located in a rural area and that has not more than 100 beds or a sole community hospital (as defined in section 1886(d)(5)(D)(iii)) located in a rural area , for covered OPD services furnished before January 1, 2006, for which the PPS amount is less than the pre-BBA amount, the amount of payment under this subsection shall be increased by the amount of such difference.

(II) In the case of a hospital located in a rural area and that has not more than 100 beds and that is not a sole community hospital (as defined in section 1886(d)(5)(D)(iii)), for covered OPD services furnished on or after January 1, 2006, and before January 1, 2013[121], for which the PPS amount is less than the pre-BBA amount, the amount of payment under this subsection shall be increased by the applicable percentage of the amount of such difference. For purposes of the preceding sentence, the applicable percentage shall be 95 percent with respect to covered OPD services furnished in 2006, 90 percent with respect to such services furnished in 2007, and 85 percent with respect to such services furnished in 2008, 2009, 2010, 2011, or 2012[122].

(III) In the case of a sole community hospital (as defined in section 1886(d)(5)(D)(iii)) that has not more than 100 beds, for covered OPD services furnished on or after January 1, 2009, and before January 1, 2013, for which[123] the PPS amount is less than the pre-BBA amount, the amount of payment under this subsection shall be increased by 85 percent of the amount of such difference. In the case of covered OPD services furnished on or after January 1, 2010, and before January 1, 2013, the preceding[124] sentence shall be

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

applied without regard to the 100-bed limitation.

(ii) Permanent treatment for cancer hospitals and children's hospitals.—In the case of a hospital described in section clause (iii) or (v) of 1886(d)(1)(B), for covered OPD services for which the PPS amount is less than the pre-BBA amount, the amount of payment under this subsection shall be increased by the amount of such difference.

(E) PPS amount defined.—In this paragraph, the term "PPS amount" means, with respect to covered OPD services, the amount payable under this title for such services (determined without regard to this paragraph), including amounts payable as copayment under paragraph (8), coinsurance under section 1866(a)(2)(A)(ii), and the deductible under section 1833(b).

(F) Pre-BBA amount defined.—

(i) In general.—In this paragraph, the "pre-BBA amount" means, with respect to covered OPD services furnished by a hospital in a year, an amount equal to the product of the reasonable cost of the hospital for such services for the portions of the hospital's cost reporting period (or periods) occurring in the year and the base OPD payment-to-cost ratio for the hospital (as defined in clause (ii)).

(ii) Base payment-to-cost-ratio defined.—For purposes of this subparagraph, the "base payment-to-cost ratio" for a hospital means the ratio of—

(I) the hospital's reimbursement under this part for covered OPD services furnished during the cost reporting period ending in 1996 (or in the case of a hospital that did not submit a cost report for such period, during the first subsequent cost reporting period ending before 2001 for which the hospital submitted a cost report), including any reimbursement for such services through cost-sharing described in subparagraph (E), to (II) the reasonable cost of such services for such period.

The Secretary shall determine such ratios as if the amendments made by section 4521 of the Balanced Budget Act of 1997[125] were in effect in 1996.

(G) Interim payments.—The Secretary shall make payments under this paragraph to hospitals on an interim basis, subject to retrospective adjustments based on settled cost reports.

(H) No effect on copayments.—Nothing in this paragraph shall be construed to affect the unadjusted copayment amount described in paragraph (3)(B) or the copayment amount under paragraph (8).

(I) Application without regard to budget neutrality.—The additional payments made under this paragraph—

(i) shall not be considered an adjustment under paragraph (2)(E); and

(ii) shall not be implemented in a budget neutral manner.

(8) Copayment amount.—

(A) In general.—Except as provided in subparagraphs (B) and (C), the copayment amount under this subsection is the amount by which the amount described in paragraph (4)(B) exceeds the amount of payment determined under paragraph (4)(C).

(B) Election to offer reduced copayment amount.—The Secretary shall establish a procedure under which a hospital, before the beginning of a year (beginning with 1999), may elect to reduce the copayment amount otherwise established under subparagraph (A) for some or all covered OPD services to an amount that is not less than 20 percent of the medicare OPD fee schedule amount (computed under paragraph (3)(D)) for the service involved. Under such procedures, such reduced copayment amount may not be further reduced or increased during the year involved and the hospital may disseminate information on the reduction of copayment amount effected under this subparagraph.

(C) Limitation on copayment amount.—

(i) To inpatient hospital deductible amount.—In no case shall the copayment amount for a procedure

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

performed in a year exceed the amount of the inpatient hospital deductible established under section 1813(b) for that year.

(ii) To specified percentage.—The Secretary shall reduce the national unadjusted copayment amount for a covered OPD service (or group of such services) furnished in a year in a manner so that the effective copayment rate (determined on a national unadjusted basis) for that service in the year does not exceed the following percentage:

(I) For procedures performed in 2001, on or after April 1, 2001, 57 percent.

(II) For procedures performed in 2002 or 2003, 55 percent.

(III) For procedures performed in 2004, 50 percent.

(IV) For procedures performed in 2005, 45 percent.

(V) For procedures performed in 2006 and thereafter, 40 percent.

(D) No impact on deductibles.—Nothing in this paragraph shall be construed as affecting a hospital's authority to waive the charging of a deductible under section 1833(b).

(E) Computation ignoring outlier and pass-through adjustments.—The copayment amount shall be computed under subparagraph (A) as if the adjustments under paragraphs (5) and (6) (and any adjustment made under paragraph (2)(E) in relation to such adjustments) had not occurred.

(9) Periodic review and adjustments components of prospective payment system.—

(A) Periodic review.—The Secretary shall review not less often than annually and revise the groups, the relative payment weights, and the wage and other adjustments described in paragraph (2) to take into account changes in medical practice, changes in technology, the addition of new services, new cost data, and other relevant information and factors. The Secretary shall consult with an expert outside advisory panel composed of an appropriate selection of representatives of providers to review (and advise the Secretary concerning) the clinical integrity of the groups and weights. Such panel may use data collected or developed by entities and organizations (other than the Department of Health and Human Services) in conducting such review.

(B) Budget neutrality adjustment.—If the Secretary makes adjustments under subparagraph (A), then the adjustments for a year may not cause the estimated amount of expenditures under this part for the year to increase or decrease from the estimated amount of expenditures under this part that would have been made if the adjustments had not been made. In determining adjustments under the preceding sentence for 2004 and 2005, the Secretary shall not take into account under this subparagraph or paragraph (2)(E) any expenditures that would not have been made but for the application of paragraph (14).

(C) Update factor.—If the Secretary determines under methodologies described in paragraph (2)(F) that the volume of services paid for under this subsection increased beyond amounts established through those methodologies, the Secretary may appropriately adjust the update to the conversion factor otherwise applicable in a subsequent year.

(10) Special rule for ambulance services.—The Secretary shall pay for hospital outpatient services that are ambulance services on the basis described in section 1861(v)(1)(U), or, if applicable, the fee schedule established under section 1834(l).

(11) Special rules for certain hospitals.—In the case of hospitals described in clause (iii) or (v) of section 1886(d)(1)(B)—

(A) the system under this subsection shall not apply to covered OPD services furnished before January 1, 2000; and

(B) the Secretary may establish a separate conversion factor for such services in a manner that specifically takes into account the unique costs incurred by such hospitals by virtue of their patient population and service intensity.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(12) Limitation on review.—There shall be no administrative or judicial review under section 1869, 1878, or otherwise of—

(A) the development of the classification system under paragraph (2), including the establishment of groups and relative payment weights for covered OPD services, of wage adjustment factors, other adjustments, and methods described in paragraph (2)(F);

(B) the calculation of base amounts under paragraph (3);

(C) periodic adjustments made under paragraph (6);

(D) the establishment of a separate conversion factor under paragraph (8)(B); and

(E) the determination of the fixed multiple, or a fixed dollar cutoff amount, the marginal cost of care, or applicable percentage under paragraph (5) or the determination of insignificance of cost, the duration of the additional payments, the determination and deletion of initial and new categories (consistent with subparagraphs (B) and (C) of paragraph (6)), the portion of the medicare OPD fee schedule amount associated with particular devices, drugs, or biologicals, and the application of any pro rata reduction under paragraph (6).

(13) Authorization of adjustment for rural hospitals.—

(A) Study.—The Secretary shall conduct a study to determine if, under the system under this subsection, costs incurred by hospitals located in rural areas by ambulatory payment classification groups (APCs) exceed those costs incurred by hospitals located in urban areas.

(B) Authorization of adjustment.—Insofar as the Secretary determines under subparagraph (A) that costs incurred by hospitals located in rural areas exceed those costs incurred by hospitals located in urban areas, the Secretary shall provide for an appropriate adjustment under paragraph (2)(E) to reflect those higher costs by January 1, 2006.

(14) Drug apc payment rates.—

(A) In general.—The amount of payment under this subsection for a specified covered outpatient drug (defined in subparagraph (B)) that is furnished as part of a covered OPD service (or group of services)—

(i) in 2004, in the case of—

(I) a sole source drug shall in no case be less than 88 percent, or exceed 95 percent, of the reference average wholesale price for the drug;

(II) an innovator multiple source drug shall in no case exceed 68 percent of the reference average wholesale price for the drug; or

(III) a noninnovator multiple source drug shall in no case exceed 46 percent of the reference average wholesale price for the drug;

(ii) in 2005, in the case of—

(I) a sole source drug shall in no case be less than 83 percent, or exceed 95 percent, of the reference average wholesale price for the drug;

(II) an innovator multiple source drug shall in no case exceed 68 percent of the reference average wholesale price for the drug; or

(III) a noninnovator multiple source drug shall in no case exceed 46 percent of the reference average wholesale price for the drug; or

(iii) in a subsequent year, shall be equal, subject to subparagraph (E)—

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(I) to the average acquisition cost for the drug for that year (which, at the option of the Secretary, may vary by hospital group (as defined by the Secretary based on volume of covered OPD services or other relevant characteristics)), as determined by the Secretary taking into account the hospital acquisition cost survey data under subparagraph (D); or

(II) if hospital acquisition cost data are not available, the average price for the drug in the year established under section 1842(o), section 1847A, or section 1847B, as the case may be, as calculated and adjusted by the Secretary as necessary for purposes of this paragraph.

(B) Specified covered outpatient drug defined.—

(i) In general.—In this paragraph, the term “specified covered outpatient drug” means, subject to clause (ii), a covered outpatient drug (as defined in section 1927(k)(2)) for which a separate ambulatory payment classification group (APC) has been established and that is—

(I) a radiopharmaceutical; or

(II) a drug or biological for which payment was made under paragraph (6) (relating to pass-through payments) on or before December 31, 2002.

(ii) Exception.—Such term does not include—

(I) a drug or biological for which payment is first made on or after January 1, 2003, under paragraph (6);

(II) a drug or biological for which a temporary HCPCS code has not been assigned; or

(III) during 2004 and 2005, an orphan drug (as designated by the Secretary).

(C) Payment for designated orphan drugs during 2004 and 2005.—The amount of payment under this subsection for an orphan drug designated by the Secretary under subparagraph (B)(ii)(III) that is furnished as part of a covered OPD service (or group of services) during 2004 and 2005 shall equal such amount as the Secretary may specify.

(D) Acquisition cost survey for hospital outpatient drugs.—

(i) Annual GAO surveys in 2004 and 2005.—

(I) In general.—The Comptroller General of the United States shall conduct a survey in each of 2004 and 2005 to determine the hospital acquisition cost for each specified covered outpatient drug. Not later than April 1, 2005, the Comptroller General shall furnish data from such surveys to the Secretary for use in setting the payment rates under subparagraph (A) for 2006.

(II) Recommendations.—Upon the completion of such surveys, the Comptroller General shall recommend to the Secretary the frequency and methodology of subsequent surveys to be conducted by the Secretary under clause (ii).

(ii) Subsequent secretarial surveys.—The Secretary, taking into account such recommendations, shall conduct periodic subsequent surveys to determine the hospital acquisition cost for each specified covered outpatient drug for use in setting the payment rates under subparagraph (A).

(iii) Survey requirements.—The surveys conducted under clauses (i) and (ii) shall have a large sample of hospitals that is sufficient to generate a statistically significant estimate of the average hospital acquisition cost for each specified covered outpatient drug. With respect to the surveys conducted under clause (i), the Comptroller General shall report to Congress on the justification for the size of the sample used in order to assure the validity of such estimates.

(iv) Differentiation in cost.—In conducting surveys under clause (i), the Comptroller General shall determine and report to Congress if there is (and the extent of any) variation in hospital acquisition costs for drugs among hospitals based on the volume of covered OPD services performed by such hospitals or other relevant

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

characteristics of such hospitals (as defined by the Comptroller General).

(v) Comment on proposed rates.—Not later than 30 days after the date the Secretary promulgated proposed rules setting forth the payment rates under subparagraph (A) for 2006, the Comptroller General shall evaluate such proposed rates and submit to Congress a report regarding the appropriateness of such rates based on the surveys the Comptroller General has conducted under clause (i).

(E) Adjustment in payment rates for overhead costs.—

(i) Medpac report on drug apc design.—The Medicare Payment Advisory Commission shall submit to the Secretary, not later than July 1, 2005, a report on adjustment of payment for ambulatory payment classifications for specified covered outpatient drugs to take into account overhead and related expenses, such as pharmacy services and handling costs. Such report shall include—

(I) a description and analysis of the data available with regard to such expenses;

(II) a recommendation as to whether such a payment adjustment should be made; and

(III) if such adjustment should be made, a recommendation regarding the methodology for making such an adjustment.

(ii) Adjustment authorized.—The Secretary may adjust the weights for ambulatory payment classifications for specified covered outpatient drugs to take into account the recommendations contained in the report submitted under clause (i).

(F) Classes of drugs.—For purposes of this paragraph:

(i) Sole source drugs.—The term “sole source drug” means—

(I) a biological product (as defined under section 1861(t)(1)); or

(II) a single source drug (as defined in section 1927(k)(7)(A)(iv)).

(ii) Innovator multiple source drugs.—The term “innovator multiple source drug” has the meaning given such term in section 1927(k)(7)(A)(ii).

(iii) Noninnovator multiple source drugs.—The term “noninnovator multiple source drug” has the meaning given such term in section 1927(k)(7)(A)(iii).

(G) Reference average wholesale price.—The term “reference average wholesale price” means, with respect to a specified covered outpatient drug, the average wholesale price for the drug as determined under section 1842(o) as of May 1, 2003.

(H) Inapplicability of expenditures in determining conversion, weighting, and other adjustment factors.—Additional expenditures resulting from this paragraph shall not be taken into account in establishing the conversion, weighting, and other adjustment factors for 2004 and 2005 under paragraph (9), but shall be taken into account for subsequent years.

(15) Payment for new drugs and biologicals until hcpcs code assigned.—With respect to payment under this part for an outpatient drug or biological that is covered under this part and is furnished as part of covered OPD services for which a HCPCS code has not been assigned, the amount provided for payment for such drug or biological under this part shall be equal to 95 percent of the average wholesale price for the drug or biological.

(16) Miscellaneous provisions.—

(A) Application of reclassification of certain hospitals.—If a hospital is being treated as being located in a rural area under section 1886(d)(8)(E), that hospital shall be treated under this subsection as being located in that rural area.

(B) Threshold for establishment of separate apcs for drugs.—The Secretary shall reduce the threshold for the

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

establishment of separate ambulatory payment classification groups (APCs) with respect to drugs or biologicals to $50 per administration for drugs and biologicals furnished in 2005 and 2006.

(C) Payment for devices of brachytherapy and therapeutic radiopharmaceuticals at charges adjusted to cost.—Notwithstanding the preceding provisions of this subsection, for a device of brachytherapy consisting of a seed or seeds (or radioactive source) furnished on or after January 1, 2004, and before July 1, 2008, and for therapeutic radiopharmaceuticals furnished on or after January 1, 2008, and before July 1, 2008, the payment basis for the device or therapeutic radiopharmaceutical under this subsection shall be equal to the hospital's charges for each deviceor therapeutic radiopharmaceutical furnished, adjusted to cost. Charges for such devices or therapeutic radiopharmaceuticals shall not be included in determining any outlier payment under this subsection.

(D)[126]Special payment rule.—

(i) In general.—In the case of covered OPD services furnished on or after April 1, 2013, in a hospital described in clause (ii), if—

(I) the payment rate that would otherwise apply under this subsection for stereotactic radiosurgery, complete course of treatment of cranial lesion(s) consisting of 1 session that is multisource Cobalt 60 based (identified as of January 1, 2013, by HCPCS code 77371 (and any succeeding code) and reimbursed as of such date under APC 0127 (and any succeeding classification group)); exceeds

(II) the payment rate that would otherwise apply under this subsection for linear accelerator based stereotactic radiosurgery, complete course of therapy in one session (identified as of January 1, 2013, by HCPCS code G0173 (and any succeeding code) and reimbursed as of such date under APC 0067 (and any succeeding classification group)),

the payment rate for the service described in subclause (I) shall be reduced to an amount equal to the payment rate for the service described in subclause (II).

(ii) Hospital described.—A hospital described in this clause is a hospital that is not—

(I) located in a rural area (as defined in section 1886(d)(2)(D));

(II) classified as a rural referral center under section 1886(d)(5)(C); or

(III) a sole community hospital (as defined in section 1886(d)(5)(D)(iii)).

(iii) Not budget neutral.—In making any budget neutrality adjustments under this subsection for 2013 (with respect to covered OPD services furnished on or after April 1, 2013, and before January 1, 2014) or a subsequent year, the Secretary shall not take into account the reduced expenditures that result from the application of this subparagraph.

(E) Application of appropriate use criteria for certain imaging services.—For provisions relating to the application of appropriate use criteria for certain imaging services, see section 1834(q).[127]

(17) Quality Reporting.—

(A) Reduction in update for failure to report.—

(i) In general.—For purposes of paragraph (3)(C)(iv) for 2009 and each subsequent year, in the case of a subsection (d) hospital (as defined in section 1886(d)(1)(B)) that does not submit, to the Secretary in accordance with this paragraph, data required to be submitted on measures selected under this paragraph with respect to such a year, the OPD fee schedule increase factor under paragraph (3)(C)(iv) for such year shall be reduced by 2.0 percentage points.

(ii) Non-cumulative application.—A reduction under this subparagraph shall apply only with respect to the year involved and the Secretary shall not take into account such reduction in computing the OPD fee schedule increase factor for a subsequent year.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(B) Form and manner of submission.—Each subsection (d) hospital shall submit data on measures selected under this paragraph to the Secretary in a form and manner, and at a time, specified by the Secretary for purposes of this paragraph.

(C) Development of outpatient measures.—

(i) In general.—The Secretary shall develop measures that the Secretary determines to be appropriate for the measurement of the quality of care (including medication errors) furnished by hospitals in outpatient settings and that reflect consensus among affected parties and, to the extent feasible and practicable, shall include measures set forth by one or more national consensus building entities.

(ii) Construction.—Nothing in this paragraph shall be construed as preventing the Secretary from selecting measures that are the same as (or a subset of) the measures for which data are required to be submitted under section 1886(b)(3)(B)(viii).

(D) Replacement of measures.—For purposes of this paragraph, the Secretary may replace any measures or indicators in appropriate cases, such as where all hospitals are effectively in compliance or the measures or indicators have been subsequently shown not to represent the best clinical practice.

(E) Availability of data.—The Secretary shall establish procedures for making data submitted under this paragraph available to the public. Such procedures shall ensure that a hospital has the opportunity to review the data that are to be made public with respect to the hospital prior to such data being made public. The Secretary shall report quality measures of process, structure, outcome, patients' perspectives on care, efficiency, and costs of care that relate to services furnished in outpatient settings in hospitals on the Internet website of the Centers for Medicare and Medicaid Services.

(18)[128] Authorization of adjustment for cancer hospitals.—

(A) Study.—The Secretary shall conduct a study to determine if, under the system under this subsection, costs incurred by hospitals described in section 1886(d)(1)(B)(v) with respect to ambulatory payment classification groups exceed those costs incurred by other hospitals furnishing services under this subsection (as determined appropriate by the Secretary). In conducting the study under this subparagraph, the Secretary shall take into consideration the cost of drugs and biologicals incurred by such hospitals.

(B) Authorization of adjustment.—Insofar as the Secretary determines under subparagraph (A) that costs incurred by hospitals described in section 1886(d)(1)(B)(v) exceed those costs incurred by other hospitals furnishing services under this subsection, the Secretary shall, subject to subparagraph (C), provide for an appropriate adjustment under paragraph (2)(E) to reflect those higher costs effective for services furnished on or after January 1, 2011.

(C) Target pcr adjustmentIn applying section 419.43(i) of title 42 of the Code of Federal Regulations to implement the appropriate adjustment under this paragraph for services furnished on or after January 1, 2018, the Secretary shall use a target PCR that is 1.0 percentage points less than the target PCR that would otherwise apply. In addition to the percentage point reduction under the previous sentence, the Secretary may consider making an additional percentage point reduction to such target PCR that takes into account payment rates for applicable items and services described in paragraph (21)(C) other than for services furnished by hospitals described in section 1886(d)(1)(B)(v). In making any budget neutrality adjustments under this subsection for 2018 or a subsequent year, the Secretary shall not take into account the reduced expenditures that result from the application of this subparagraph.

(19) Floor on area wage adjustment factor for hospital outpatient department services in frontier states.—

(A) In general.—Subject to subparagraph (B), with respect to covered OPD services furnished on or after January 1, 2011, the area wage adjustment factor applicable under the payment system established under this subsection to any hospital outpatient department which is located in a frontier State (as defined in section 1886(d)(3)(E)(iii)(II)) may not be less than 1.00. The preceding sentence shall not be applied in a budget neutral manner.

(B) Limitation.—This paragraph shall not apply to any hospital outpatient department located in a State that receives a non-labor related share adjustment under section 1886(d)(5)(H).

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(20) Not budget neutral application of reduced expenditures resulting from quality incentives for computed tomography.—The Secretary shall not take into account the reduced expenditures that result from the application of section 1834(p) in making any budget neutrality adjustments this subsection.[129]

(21)Services furnished by an off-campus outpatient department of a provider[130].—

(A) Applicable items and services.— For purposes of paragraph (1)(B)(v) and this paragraph, the term "applicable items and services" means items and services other than items and services furnished by a dedicated emergency department (as defined in section 489.24(b) of title 42 of the Code of Federal Regulations).

(B)Off-campus outpatient department of a provider.—

(i) In general.— [131]For purposes of paragraph (1)(B)(v) and this paragraph, subject to the subsequent provisions of this subparagraph, the term "off- campus outpatient department of a provider" means a department of a provider (as defined in section 413.65(a)(2) of title 42 of the Code of Federal Regulations, as in effect as of the date of the enactment of this paragraph) that is not located—

(I) on the campus (as defined in such section 413.65(a)(2)) of such provider; or

(II) within the distance (described in such definition of campus) from a remote location of a hospital facility (as defined in such section 413.65(a)(2)).

(ii) Exception.— For purposes of paragraph (1)(B)(v) and this paragraph, the term "off-campus outpatient department of a provider" shall not include a department of a provider (as so defined) that was billing under this subsection with respect to covered OPD services furnished prior to the date of the enactment of this paragraph.

(iii) Deemed treatment for 2017.—For purposes of applying clause (ii) with respect to applicable items and services furnished during 2017, a department of a provider (as so defined) not described in such clause is deemed to be billing under this subsection with respect to covered OPD services furnished prior to November 2, 2015, if the Secretary received from the provider prior to December 2, 2015, an attestation (pursuant to section 413.65(b)(3) of title 42 of the Code of Federal Regulations) that such department was a department of a provider (as so defined).

(iv) Alternative exception beginning with 2018.—For purposes of paragraph (1)(B)(v) and this paragraph with respect to applicable items and services furnished during 2018 or a subsequent year, the term "off-campus outpatient department of a provider" also shall not include a department of a provider (as so defined) that is not described in clause (ii) if—

(I) the Secretary receives from the provider an attestation (pursuant to such section 413.65(b)(3)) not later than December 31, 2016 (or, if later, 60 days after the date of the enactment of this clause), that such department met the requirements of a department of a provider specified in section 413.65 of title 42 of the Code of Federal Regulations;

(II) the provider includes such department as part of the provider on its enrollment form in accordance with the enrollment process under section 1866(j); and

(III) the department met the mid-build requirement of clause (v) and the Secretary receives, not later than 60 days after the date of the enactment of this clause, from the chief executive officer or chief operating officer of the provider a written certification that the department met such requirement.

(v) Mid-build requirement described.—The mid-build requirement of this clause is, with respect to a department of a provider, that before November 2, 2015, the provider had a binding written agreement with an outside unrelated party for the actual construction of such department.

(vi) Exclusion for certain cancer hospitals.—[132]For purposes of paragraph (1)(B)(v) and this paragraph with respect to applicable items and services furnished during 2017 or a subsequent year, the term "off-campus outpatient department of a provider" also shall not include a department of a provider (as so defined) that is not

described in clause (ii) if the provider is a hospital described in section 1886(d)(1)(B)(v) and—

(I) in the case of a department that met the requirements of section 413.65 of title 42 of the Code of Federal Regulations after November 1, 2015, and before the date of the enactment of this clause, the Secretary receives from the provider an attestation that such department met such requirements not later than 60 days after such date of enactment; or

(II) in the case of a department that meets such requirements after such date of enactment, the Secretary receives from the provider an attestation that such department meets such requirements not later than 60 days after the date such requirements are first met with respect to such department.

(vii) Audit.—[133]Not later than December 31, 2018, the Secretary shall audit the compliance with requirements of clause (iv) with respect to each department of a provider to which such clause applies. Not later than 2 years after the date the Secretary receives an attestation under clause (vi) relating to compliance of a department of a provider with requirements referred to in such clause, the Secretary shall audit the compliance with such requirements with respect to the department. and If the Secretary finds as a result of an audit under this clause that the applicable requirements were not met with respect to such department, the department shall not be excluded from the term “off- campus outpatient department of a provider” under such clause.

(viii) Implementation.—For purposes of implementing clauses (iii) through (vii):

(I) Notwithstanding any other provision of law, the Secretary may implement such clauses by program instruction or otherwise.

(II) Subchapter I of chapter 35 of title 44, United States Code, shall not apply.

(III)[134] For purposes of carrying out this subparagraph with respect to clauses (iii) and (iv) (and clause (vii) insofar as it relates to clause (iv)), $10,000,000 shall be available from the Federal Supplementary Medical Insurance Trust Fund under section 1841, to remain available until December 31, 2018. For purposes of carrying out this subparagraph with respect to clause (vi) (and clause (vii) insofar as it relates to such clause), $2,000,000 shall be available from the Federal Supplementary Medical Insurance Trust Fund under section 1841, to remain available until expended.

(C) Availability of payment under other payment systems.— Payments for applicable items and services furnished by an off-campus outpatient department of a provider that are described in paragraph (1)(B)(v) shall be made under the applicable payment system under this part (other than under this subsection) if the requirements for such payment are otherwise met.

(D) Information needed for implementation.— Each hospital shall provide to the Secretary such information as the Secretary determines appropriate to implement this paragraph and paragraph (1)(B)(v) (which may include reporting of information on a hospital claim using a code or modifier and reporting information about off-campus outpatient departments of a provider on the enrollment form described in section 1866(j)).

(E) Limitations.— There shall be no administrative or judicial review under section 1869, section 1878, or otherwise of the following:

(i) The determination of the applicable items and services under subparagraph (A) and applicable payment systems under subparagraph (C).

(ii) The determination of whether a department of a provider meets the term described in subparagraph (B).

(iii) Any information that hospitals are required to report pursuant to subparagraph (D).

(iv) The determination of an audit under subparagraph (B)(vii).[135]

(22)[136]Review and revisions of payments for non-opioid alternative treatments.—

(A) In general.—With respect to payments made under this subsection for covered OPD services (or groups of services), including covered OPD services assigned to a comprehensive ambulatory payment classification, the Secretary—

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(i) shall, as soon as practicable, conduct a review (part of which may include a request for information) of payments for opioids and evidence-based non-opioid alternatives for pain management (including drugs and devices, nerve blocks, surgical injections, and neuromodulation) with a goal of ensuring that there are not financial incentives to use opioids instead of non-opioid alternatives;

(ii) may, as the Secretary determines appropriate, conduct subsequent reviews of such payments; and

(iii) shall consider the extent to which revisions under this subsection to such payments (such as the creation of additional groups of covered OPD services to classify separately those procedures that utilize opioids and non-opioid alternatives for pain management) would reduce payment incentives to use opioids instead of non-opioid alternatives for pain management.

(B) Priority.—In conducting the review under clause (i) of subparagraph (A) and considering revisions under clause (iii) of such subparagraph, the Secretary shall focus on covered OPD services (or groups of services) assigned to a comprehensive ambulatory payment classification, ambulatory payment classifications that primarily include surgical services, and other services determined by the Secretary which generally involve treatment for pain management.

(C) Revisions.—If the Secretary identifies revisions to payments pursuant to subparagraph (A)(iii), the Secretary shall, as determined appropriate, begin making such revisions for services furnished on or after January 1, 2020. Revisions under the previous sentence shall be treated as adjustments for purposes of application of paragraph (9)(B).

(D) Rules of construction.—Nothing in this paragraph shall be construed to preclude the Secretary—

(i) from conducting a demonstration before making the revisions described in subparagraph (C); or

(ii) prior to implementation of this paragraph, from changing payments under this subsection for covered OPD services (or groups of services) which include opioids or non-opioid alternatives for pain management.

(u) Incentive Payments for Physician Scarcity Areas.—

(1) In general.—In the case of physicians' services furnished on or after January 1, 2005, and before July 1, 2008—

(A) by a primary care physician in a primary care scarcity county (identified under paragraph (4)); or

(B) by a physician who is not a primary care physician in a specialist care scarcity county (as so identified),

in addition to the amount of payment that would otherwise be made for such services under this part, there also shall be paid an amount equal to 5 percent of the payment amount for the service under this part.

(2) Determination of ratios of physicians to medicare beneficiaries in area.—Based upon available data, the Secretary shall establish for each county or equivalent area in the United States, the following:

(A) Number of physicians practicing in the area.—The number of physicians who furnish physicians' services in the active practice of medicine or osteopathy in that county or area, other than physicians whose practice is exclusively for the Federal Government, physicians who are retired, or physicians who only provide administrative services. Of such number, the number of such physicians who are—

(i) primary care physicians; or

(ii) physicians who are not primary care physicians.

(B) Number of medicare beneficiaries residing in the area.—The number of individuals who are residing in the county and are entitled to benefits under part A or enrolled under this part, or both (in this subsection referred to as "individuals").

(C) Determination of ratios.—

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(i) Primary care ratio.—The ratio (in this paragraph referred to as the “primary care ratio”) of the number of primary care physicians (determined under subparagraph (A)(i)), to the number of individuals determined under subparagraph (B).

(ii) Specialist care ratio.—The ratio (in this paragraph referred to as the “specialist care ratio”) of the number of other physicians (determined under subparagraph (A)(ii)), to the number of individuals determined under subparagraph (B).

(3) Ranking of counties.—The Secretary shall rank each such county or area based separately on its primary care ratio and its specialist care ratio.

(4) Identification of counties.—

(A) In general.—The Secretary shall identify—

(i) those counties and areas (in this paragraph referred to as “primary care scarcity counties”) with the lowest primary care ratios that represent, if each such county or area were weighted by the number of individuals determined under paragraph (2)(B), an aggregate total of 20 percent of the total of the individuals determined under such paragraph; and

(ii) those counties and areas (in this subsection referred to as “specialist care scarcity counties”) with the lowest specialist care ratios that represent, if each such county or area were weighted by the number of individuals determined under paragraph (2)(B), an aggregate total of 20 percent of the total of the individuals determined under such paragraph.

(B) Periodic revisions.—The Secretary shall periodically revise the counties or areas identified in subparagraph (A) (but not less often than once every three years) unless the Secretary determines that there is no new data available on the number of physicians practicing in the county or area or the number of individuals residing in the county or area, as identified in paragraph (2).

(C) Identification of counties where service is furnished.—For purposes of paying the additional amount specified in paragraph (1), if the Secretary uses the 5-digit postal ZIP Code where the service is furnished, the dominant county of the postal ZIP Code (as determined by the United States Postal Service, or otherwise) shall be used to determine whether the postal ZIP Code is in a scarcity county identified in subparagraph (A) or revised in subparagraph (B).

(D) Special rule.—With respect to physicians’ services furnished on or after January 1, 2008, and before July 1, 2008, for purposes of this subsection, the Secretary shall use the primary care scarcity counties and the speciality care scarcity counties (as identified under the preceding provisions of this paragraph) that the Secretary was using under this subsection with respect to physicians’ services furnished on December 31, 2007.

(E) Judicial review.—There shall be no administrative or judicial review under section 1869, 1878, or otherwise, respecting—

(i) the identification of a county or area;

(ii) the assignment of a specialty of any physician under this paragraph;

(iii) the assignment of a physician to a county under paragraph (2); or

(iv) the assignment of a postal ZIP Code to a county or other area under this subsection.

(5) Rural census tracts.—To the extent feasible, the Secretary shall treat a rural census tract of a metropolitan statistical area (as determined under the most recent modification of the Goldsmith Modification, originally published in the Federal Register on February 27, 1992 (57 Fed. Reg. 6725)), as an equivalent area for purposes of qualifying as a primary care scarcity county or specialist care scarcity county under this subsection.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(6) Physician Defined.—For purposes of this paragraph, the term “physician” means a physician described in section 1861(r)(1) and the term “primary care physician” means a physician who is identified in the available data as a general practitioner, family practice practitioner, general internist, or obstetrician or gynecologist.

(7) Publication of list of counties; posting on website.—With respect to a year for which a county or area is identified or revised under paragraph (4), the Secretary shall identify such counties or areas as part of the proposed and final rule to implement the physician fee schedule under section 1848 for the applicable year. The Secretary shall post the list of counties identified or revised under paragraph (4) on the Internet website of the Centers for Medicare and Medicaid Services.

(v) Increase of fqhc payment limits.—In the case of services furnished by Federally qualified health centers (as defined in section 1861(aa)(4)), the Secretary shall establish payment limits with respect to such services under this part for services furnished—

(1) in 2010, at the limits otherwise established under this part for such year increased by $5; and

(2) in a subsequent year, at the limits established under this subsection for the previous year increased by the percentage increase in the MEI (as defined in section 1842(i)(3)) for such subsequent year.

(w) Methods of payment.—The Secretary may develop alternative methods of payment for items and services provided under clinical trials and comparative effectiveness studies sponsored or supported by an agency of the Department of Health and Human Services, as determined by the Secretary, to those that would otherwise apply under this section, to the extent such alternative methods are necessary to preserve the scientific validity of such trials or studies, such as in the case where masking the identity of interventions from patients and investigators is necessary to comply with the particular trial or study design.

(x) Incentive Payments for Primary Care Services.—

(1) In general.—In the case of primary care services furnished on or after January 1, 2011, and before January 1, 2016, by a primary care practitioner, in addition to the amount of payment that would otherwise be made for such services under this part, there also shall be paid (on a monthly or quarterly basis) an amount equal to 10 percent of the payment amount for the service under this part.

(2) Definitions .—In this subsection:

(A) Primary care practitioner—The term “primary care practitioner” means an individual—

(i) who—

(I) is a physician (as described in section 1861(r)(1)) who has a primary specialty designation of family medicine, internal medicine, geriatric medicine, or pediatric medicine; or

(II) is a nurse practitioner, clinical nurse specialist, or physician assistant (as those terms are defined in section 1861(aa)(5)); and

(ii) for whom primary care services accounted for at least 60 percent of the allowed charges under this part for such physician or practitioner in a prior period as determined appropriate by the Secretary

(B) Primary care services.—The term “primary care services” means services identified, as of January 1, 2009, by the following HCPCS codes (and as subsequently modified by the Secretary):

(i) 99201 through 99215.

(ii) 99304 through 99340.

(iii) 99341 through 99350.

(3) Coordination with other payments.—The amount of the additional payment for a service under this subsection and subsection (m) shall be determined without regard to any additional payment for the service under subsection (m) and this subsection, respectively. The amount of the additional payment for a service

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

under this subsection and subsection (z) shall be determined without regard to any additional payment for the service under subsection (z) and this subsection, respectively.[137]

(4) Limitation on review.—There shall be no administrative or judicial review under section 1869, 1878, or otherwise, respecting the identification of primary care practitioners under this subsection.

(y)Incentive Payments for Major Surgical Procedures Furnished in Health Professional Shortage Areas.—

(1) In general.—In the case of major surgical procedures furnished on or after January 1, 2011, and before January 1, 2016, by a general surgeon in an area that is designated (under section 332(a)(1)(A) of the Public Health Service Act[138]) as a health professional shortage area as identified by the Secretary prior to the beginning of the year involved, in addition to the amount of payment that would otherwise be made for such services under this part, there also shall be paid (on a monthly or quarterly basis) an amount equal to 10 percent of the payment amount for the service under this part.

(2) Definitions.—In this subsection.—

(A) General surgeon.—In this subsection, the term “general surgeon” means a physician (as described in section 1861(r)(1)) who has designated CMS specialty code 02– General Surgery as their primary specialty code in the physician’s enrollment under section 1866(j).

(B) Major surgical procedures.—The term “major surgical procedures” means physicians’ services which are surgical procedures for which a 10-day or 90-day global period is used for payment under the fee schedule under section 1848(b).

(3) Coordination with others.—The amount of the additional payment for a service under this subsection and subsection (m) shall be determined without regard to any additional payment for the service under subsection (m) and this subsection, respectively. The amount of the additional payment for a service under this subsection and subsection (z) shall be determined without regard to any additional payment for the service under subsection (z) and this subsection, respectively.[139]

(4) Application.—The provisions of paragraph (2) and (4) of subsection (m) shall apply to the determination of additional payments under this subsection in the same manner as such provisions apply to the determination of additional payments under subsection (m).

(z)Incentive Payments for Participation in Eligible Alternative Payment Models.—[140]

(1)Payment incentive.—

(A) In general.— In the case of covered professional services furnished by an eligible professional during a year that is in the period beginning with 2019 and ending with 2024 and for which the professional is a qualifying APM participant with respect to such year, in addition to the amount of payment that would otherwise be made for such covered professional services under this part for such year, there also shall be paid to such professional an amount equal to 5 percent of the estimated aggregate payment amounts for such covered professional services under this part for the preceding year. For purposes of the previous sentence, the payment amount for the preceding year may be an estimation for the full preceding year based on a period of such preceding year that is less than the full year. The Secretary shall establish policies to implement this subparagraph in cases in which payment for covered professional services furnished by a qualifying APM participant in an alternative payment model—

(i) is made to an eligible alternative payment entity rather than directly to the qualifying APM participant; or

(ii) is made on a basis other than a fee- for-service basis (such as payment on a capitated basis).

(B) Form of payment.— Payments under this subsection shall be made in a lump sum, on an annual basis, as soon as practicable.

(C) Treatment of payment incentive.— Payments under this subsection shall not be taken into account for purposes of determining actual expenditures under an alternative payment model and for purposes of determining or rebasing any benchmarks used under the alternative payment model.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(D) Coordination.— The amount of the additional payment under this subsection or subsection (m) shall be determined without regard to any additional payment under subsection (m) and this subsection, respectively. The amount of the additional payment under this subsection or subsection (x) shall be determined without regard to any additional payment under subsection (x) and this subsection, respectively. The amount of the additional payment under this subsection or subsection (y) shall be determined without regard to any additional payment under subsection (y) and this subsection, respectively.

(2) Qualifying apm participant.— For purposes of this subsection, the term “qualifying APM participant” means the following:

(A) 2019 and 2020.— With respect to 2019 and 2020, an eligible professional for whom the Secretary determines that at least 25 percent of payments under this part for covered professional services furnished by such professional during the most recent period for which data are available (which may be less than a year) were attributable to such services furnished under this part through an eligible alternative payment entity.

(B) 2021 and 2022.— With respect to 2021 and 2022, an eligible professional described in either of the following clauses:

(i) Medicare payment threshold option.— An eligible professional for whom the Secretary determines that at least 50 percent of payments under this part for covered professional services furnished by such professional during the most recent period for which data are available (which may be less than a year) were attributable to such services furnished under this part through an eligible alternative payment entity.

(ii) Combination all-payer and medicare payment threshold option.— An eligible professional—

(I) for whom the Secretary determines, with respect to items and services furnished by such professional during the most recent period for which data are available (which may be less than a year), that at least 50 percent of the sum of—

(aa) payments described in clause (i); and

(bb) all other payments, regardless of payer (other than payments made by the Secretary of Defense or the Secretary of Veterans Affairs and other than payments made under title XIX in a State in which no medical home or alternative payment model is available under the State program under that title), meet the requirement described in clause (iii)(I) with respect to payments described in item (aa) and meet the requirement described in clause (iii)(II) with respect to payments described in item (bb);

(II) for whom the Secretary determines at least 25 percent of payments under this part for covered professional services furnished by such professional during the most recent period for which data are available (which may be less than a year) were attributable to such services furnished under this part through an eligible alternative payment entity; and

(III) who provides to the Secretary such information as is necessary for the Secretary to make a determination under subclause (I), with respect to such professional.

(iii) Requirement.— For purposes of clause (ii)(I)—

(I) the requirement described in this subclause, with respect to payments described in item (aa) of such clause, is that such payments are made to an eligible alternative payment entity; and

(II) the requirement described in this subclause, with respect to payments described in item (bb) of such clause, is that such payments are made under arrangements in which—

(aa) quality measures comparable to measures under the performance category described in section 1848(q)(2)(B)(i) apply;

(bb) certified EHR technology is used; and

(cc) the eligible professional participates in an entity that—

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(AA) bears more than nominal financial risk if actual aggregate expenditures exceeds expected aggregate expenditures; or

(BB) with respect to beneficiaries under title XIX, is a medical home that meets criteria comparable to medical homes expanded under section 1115A(c).

(C) Beginning in 2023.— With respect to 2023 and each subsequent year, an eligible professional described in either of the following clauses:

(i) Medicare payment threshold option.— An eligible professional for whom the Secretary determines that at least 75 percent of payments under this part for covered professional services furnished by such professional during the most recent period for which data are available (which may be less than a year) were attributable to such services furnished under this part through an eligible alternative payment entity.

(ii) Combination all-payer and medicare payment threshold option.— An eligible professional—

(I) for whom the Secretary determines, with respect to items and services furnished by such professional during the most recent period for which data are available (which may be less than a year), that at least 75 percent of the sum of—

(aa) payments described in clause (i); and

(bb) all other payments, regardless of payer (other than payments made by the Secretary of Defense or the Secretary of Veterans Affairs and other than payments made under title XIX in a State in which no medical home or alternative payment model is available under the State program under that title), meet the requirement described in clause (iii)(I) with respect to payments described in item (aa) and meet the requirement described in clause (iii)(II) with respect to payments described in item (bb);

(II) for whom the Secretary determines at least 25 percent of payments under this part for covered professional services furnished by such professional during the most recent period for which data are available (which may be less than a year) were attributable to such services furnished under this part through an eligible alternative payment entity; and

(III) who provides to the Secretary such information as is necessary for the Secretary to make a determination under subclause (I), with respect to such professional.

(iii) Requirement.— For purposes of clause (ii)(I)—

(I) the requirement described in this subclause, with respect to payments described in item (aa) of such clause, is that such payments are made to an eligible alternative payment entity; and

(II) the requirement described in this subclause, with respect to payments described in item (bb) of such clause, is that such payments are made under arrangements in which—

(aa) quality measures comparable to measures under the performance category described in section 1848(q)(2)(B)(i) apply;

(bb) certified EHR technology is used; and

(cc) the eligible professional participates in an entity that—

(AA) bears more than nominal financial risk if actual aggregate expenditures exceeds expected aggregate expenditures; or

(BB) with respect to beneficiaries under title XIX, is a medical home that meets criteria comparable to medical homes expanded under section 1115A(c).

(D) Use of patient approach.— The Secretary may base the determination of whether an eligible professional is a qualifying APM participant under this subsection and the determination of whether an eligible professional

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

is a partial qualifying APM participant under section 1848(q)(1)(C)(iii) by using counts of patients in lieu of using payments and using the same or similar percentage criteria (as specified in this subsection and such section, respectively), as the Secretary determines appropriate.

(3) Additional definitions.— In this subsection:

(A) Covered professional services.— The term “covered professional services” has the meaning given that term in section 1848(k)(3)(A).

(B) Eligible professional.— The term “eligible professional” has the meaning given that term in section 1848(k)(3)(B) and includes a group that includes such professionals.

(C) Alternative payment model (apm).— The term “alternative payment model” means, other than for purposes of subparagraphs (B)(ii)(I)(bb) and (C)(ii)(I)(bb) of paragraph (2), any of the following:

(i) A model under section 1115A (other than a health care innovation award).

(ii) The shared savings program under section 1899.

(iii) A demonstration under section 1866C.

(iv) A demonstration required by Federal law.

(D) Eligible alternative payment entity.— The term “eligible alternative payment entity” means, with respect to a year, an entity that—

(i) participates in an alternative payment model that—

(I) requires participants in such model to use certified EHR technology (as defined in subsection (o)(4)); and

(II) provides for payment for covered professional services based on quality measures comparable to measures under the performance category described in section 1848(q)(2)(B)(i); and

(ii) (I) bears financial risk for monetary losses under such alternative payment model that are in excess of a nominal amount; or

(II) is a medical home expanded under section 1115A(c).

(4) Limitation.— There shall be no administrative or judicial review under section 1869, 1878, or otherwise, of the following:

(A) The determination that an eligible professional is a qualifying APM participant under paragraph (2) and the determination that an entity is an eligible alternative payment entity under paragraph (3)(D).

(B) The determination of the amount of the 5 percent payment incentive under paragraph (1)(A), including any estimation as part of such determination.[141]

(z)Medical Review of Spinal Subluxation Services.— [142]

(1) In general.— The Secretary shall implement a process for the medical review (as described in paragraph (2)) of treatment by a chiropractor described in section 1861(r)(5) by means of manual manipulation of the spine to correct a subluxation (as described in such section) of an individual who is enrolled under this part and apply such process to such services furnished on or after January 1, 2017, focusing on services such as—

(A) services furnished by a such a chiropractor whose pattern of billing is aberrant compared to peers; and

(B) services furnished by such a chiropractor who, in a prior period, has a services denial percentage in the 85th percentile or greater, taking into consideration the extent that service denials are overturned on appeal.

(2)Medical review.—

(A)Prior authorization medical review.—

(i) In general.— Subject to clause (ii), the Secretary shall use prior authorization medical review for services described in paragraph (1) that are furnished to an individual by a chiropractor described in section 1861(r)(5) that are part of an episode of treatment that includes more than 12 services. For purposes of the preceding sentence, an episode of treatment shall be determined by the underlying cause that justifies the need for services, such as a diagnosis code.

(ii) Ending application of prior authorization medical review.— The Secretary shall end the application of prior authorization medical review under clause (i) to services described in paragraph (1) by such a chiropractor if the Secretary determines that the chiropractor has a low denial rate under such prior authorization medical review. The Secretary may subsequently reapply prior authorization medical review to such chiropractor if the Secretary determines it to be appropriate and the chiropractor has, in the time period subsequent to the determination by the Secretary of a low denial rate with respect to the chiropractor, furnished such services described in paragraph (1).

(iii) Early request for prior authorization review permitted.— Nothing in this subsection shall be construed to prevent such a chiropractor from requesting prior authorization for services described in paragraph (1) that are to be furnished to an individual before the chiropractor furnishes the twelfth such service to such individual for an episode of treatment.

(B) Type of review.— The Secretary may use pre- payment review or post-payment review of services described in section 1861(r)(5) that are not subject to prior authorization medical review under subparagraph (A).

(C) Relationship to law enforcement activities.— The Secretary may determine that medical review under this subsection does not apply in the case where potential fraud may be involved.

(3) No payment without prior authorization.— With respect to a service described in paragraph (1) for which prior authorization medical review under this subsection applies, the following shall apply:

(A) Prior authorization determination.— The Secretary shall make a determination, prior to the service being furnished, of whether the service would or would not meet the applicable requirements of section 1862(a)(1)(A).

(B) Denial of payment.— Subject to paragraph (5), no payment may be made under this part for the service unless the Secretary determines pursuant to subparagraph (A) that the service would meet the applicable requirements of such section 1862(a)(1)(A).

(4) Submission of information.— A chiropractor described in section 1861(r)(5) may submit the information necessary for medical review by fax, by mail, or by electronic means. The Secretary shall make available the electronic means described in the preceding sentence as soon as practicable.

(5) Timeliness.— If the Secretary does not make a prior authorization determination under paragraph (3)(A) within 14 business days of the date of the receipt of medical documentation needed to make such determination, paragraph (3)(B) shall not apply.

(6) Application of limitation on beneficiary liability.— Where payment may not be made as a result of the application of paragraph (2)(B), section 1879 shall apply in the same manner as such section applies to a denial that is made by reason of section 1862(a)(1).

(7) Review by contractors.— The medical review described in paragraph (2) may be conducted by medicare administrative contractors pursuant to section 1874A(a)(4)(G) or by any other contractor determined appropriate by the Secretary that is not a recovery audit contractor.

(8) Multiple services.— The Secretary shall, where practicable, apply the medical review under this subsection in a manner so as to allow an individual described in paragraph (1) to obtain, at a single time rather than on a service-by-service basis, an authorization in accordance with paragraph (3)(A) for multiple services.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(9) Construction.— With respect to a service described in paragraph (1) that has been affirmed by medical review under this subsection, nothing in this subsection shall be construed to preclude the subsequent denial of a claim for such service that does not meet other applicable requirements under this Act.

(10)Authority.—

(A) The Secretary may implement the provisions of this subsection by interim final rule with comment period.

(B) Administration.— Chapter 35 of title 44, United States Code, shall not apply to medical review under this subsection.

(bb)[143]Additional Payments for Certain Rural Health Clinics With Physicians or Practitioners Receiving DATA Waiveres.—

(1) In general.—In the case of a rural health clinic with respect to which, beginning on or after January 1, 2019, rural health clinic services (as defined in section 1861(aa)(1)) are furnished for the treatment of opioid use disorder by a physician or practitioner who meets the requirements described in paragraph (3), the Secretary shall, subject to availability of funds under paragraph (4), make a payment (at such time and in such manner as specified by the Secretary) to such rural health clinic after receiving and approving an application described in paragraph (2). Such payment shall be in an amount determined by the Secretary, based on an estimate of the average costs of training for purposes of receiving a waiver described in paragraph (3)(B). Such payment may be made only one time with respect to each such physician or practitioner.

(2) Application—In order to receive a payment described in paragraph (1), a rural health clinic shall submit to the Secretary an application for such a payment at such time, in such manner, and containing such information as specified by the Secretary. A rural health clinic may apply for such a payment for each physician or practitioner described in paragraph (1) furnishing services described in such paragraph at such clinic.

(3) Requirements.—For purposes of paragraph (1), the requirements described in this paragraph, with respect to a physician or practitioner, are the following:

(A) The physician or practitioner is employed by or working under contract with a rural health clinic described in paragraph (1) that submits an application under paragraph (2).

(B) The physician or practitioner first receives a waiver under section 303(g)[144] of the Controlled Substances Act on or after January 1, 2019.

(4) Funding.—For purposes of making payments under this subsection, there are appropriated, out of amounts in the Treasury not otherwise appropriated, $2,000,000, which shall remain available until expended.

---

[71] See Vol. II, P.L. 108-173, §416, with respect to treatment of certain clinical diagnostic laboratory tests furnished to hospital outpatients in certain rural areas and §733, with respect to payments for pancreatic islet cell investigational transplants for medicare beneficiaries in clinical trials.

See Vol. II, P.L. 112-96, §3005(d), with respect to the implementation of the amendments made by §3005; §3005(e), with respect to the effective date for the amendment to §1833(g)(5)(B); §3005(g), with respect to the collection of additional data; and §3005(h), with respect to a GAO report on manual medical review process implementation.

[72] Formatting for this subparagraph appears different than in law because of limitations of the software used in designation of clauses and subclauses.

[73] P.L. 113-93, §216(b)(1)(A)(i), struck “(i) on the basis” and inserted ”(i)(I) on the basis”. Effective April 1, 2014.

[74] P.L. 113-93, §216(b)(1)(A)(ii), struck “subsection (h)(1)” and inserted ”subsection (h)(1) (for tests furnished before January 1, 2017)”. Effective April 1, 2014.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

[75] P.L. 113-93, §216(b)(1)(A)(iii), struck “or (ii)” and inserted ”or (II) under section 1834A (for tests furnished on or after January 1, 2017), the amount paid shall be equal to 80 percent (or 100 percent, in the case of such tests for which payment is made on an assignment-related basis) of the lesser of the amount determined under such section or the amount of the charges billed for the tests, or (ii)”. Effective April 1, 2014.

P.L. 113-93, §216(b)(1)(A)(iv), struck “on the basis” and inserted ”for tests furnished before January 1, 2017, on the basis”. Effective April 1, 2014.

[76] As in original law. 2nd comma should be deleted.

[77] P.L.114-113, §504(b)(1) inserted subparagraph (AA). Effective for devices furnished on or after January 1, 2017.

[78] P.L.114-255, §5012(c)(1), inserted new subparagraph (BB), Effective for items and services furnished on or after January 1, 2021.

[79] P.L. 115–271, §2005(c), inserted subparagraph (CC). Effective October 24, 2018.

[80] P.L. 113-93, §216(b)(1)(B)(i), struck “(i) on the basis” and inserted ”(i)(I) on the basis”. Effective April 1, 2014.

[81] P.L. 113-93, §216(b)(1)(B)(ii), struck “subsection (h)(1)” and inserted ”subsection (h)(1) (for tests furnished before January 1, 2017)”. Effective April 1, 2014.

[82] P.L. 113-93, §216(b)(1)(B)(iii), struck “or (ii)” and inserted ”or (II) under section 1834A (for tests furnished on or after January 1, 2017), the amount paid shall be equal to 80 percent (or 100 percent, in the case of such tests for which payment is made on an assignment-related basis or to a provider having an agreement under section 1866) of the lesser of the amount determined under such section or the amount of the charges billed for the tests, or (ii)”. Effective April 1, 2014.

[83] P.L. 113-93, §216(b)(1)(B)(iv), struck “on the basis” and inserted ”for tests furnished before January 1, 2017, on the basis”. Effective April 1, 2014.

[84] As in original. Should be “(o)” rather than “(O)”.

[85] *Punctuation as in original.

[86] P.L. 113-93, §216(b)(1)(C), struck “on the basis” and inserted ”for tests furnished before January 1, 2017, on the basis”. Effective April 1, 2014.

[87] P.L. 112-96, §3005(b)(1), struck out “but not described in section 1833(a)(8)(B)” and inserted “but (except as provided in paragraph (6)) not described in section 1833(a)(8)(B)”, effective February 22, 2012.

P.L. 115–123, §50202(1) struck “Subject to paragraphs (4) and (5)”; inserted “(A) Subject to paragraphs (4) and (5)” in paragraph (1); added the following new sentence at the end of subparagraph (A), “The preceding sentence shall not apply to expenses incurred with respect to services furnished after December 31, 2017.”; and added new subparagraph (B). Effective February 9, 2018.

[88] P.L. 112-96, §3005(b)(1), struck out “but not described in section 1833(a)(8)(B)” and inserted “but (except as provided in paragraph (6)) not described in section 1833(a)(8)(B)””, effective February 22, 2012.

P.L. 115–123, §50202(2) struck “Subject to paragraphs (4) and (5)”; inserted “(A) Subject to paragraphs (4) and (5)” in paragraph (3); added the following new sentence at the end of subparagraph (A), “The preceding sentence shall not apply to expenses incurred with respect to services furnished after December 31, 2017.”; and added new subparagraph (B). Effective February 9, 2018.

[89] P.L. 112-96, §3005(a)(1), inserted “(A)”.

P.L. 112–78, §304, struck “December 31, 2011” and inserted “February 29, 2012”. Effective December 23, 2011.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

P.L. 112-96, §3005(a)(3), inserted “and if the requirement of subparagraph (B) is met”, effective February 22, 2012.

P.L. 112-96, §3005(a)(4), inserted “made in accordance with such requirement”, effective February 22, 2012.

P.L. 113-67 §1103, struck out “December 31, 2013” and inserted “March 31, 2014*”, effective December 26, 2013.

P.L. 113-93 §103(1), struck out “March 31, 2014” and inserted “March 31, 2015*”, effective April 1, 2014.

P.L. 114-10 §202(a)(1), struck out “March 31, 2015” and inserted “December 31, 2017”, effective April 16, 2015.

[90] P.L. 112-96, §3005(a)(5), added subparagraph (B), effective February 22, 2012, applicable to services furnished on or after March 1, 2012.

[91] P.L. 112-96, §3005(a)(5), added subparagraph (C), effective February 22, 2012.

[92] P.L. 114-10 §202(b)(1), Inserted “, subject to subparagraph (E)," after “manual medical review process that”, effective April 16, 2015.

[93] P.L. 112-240, §603(c), added subparagraph (D), effective January 2, 2012.

P.L. 115–123, §50202(3)(A), redesignated and moved this subparagraph 1833(g)(5)(D) to paragraph (g)(8). The amendment did not redesignate subparagraph (E) below. Effective February 9, 2018.

[94] P.L. 114-10, §202(b)(1)(B) added subparagraph 1833(g)(5)(E). Effective April 16, 2015.

P.L. 115–123, §50202(3)(B )inserted text following “implemented”. Effective February 9, 2018.

[95] P.L. 112-96, §3005(b)(2), added paragraph (6), effective February 22, 2012.

P.L. 112-240, §603(b)(1), struck out “In applying” and inserted “(A) In applying”, effective January 2, 2013.

P.L. 113-67, §1103, struck out “December 31, 2013” and inserted “March 31, 2014”, effective December 26, 2013.

P.L. 113-67 §1103, struck “or 2013”, and inserted “, 2013 or the first three months of 2014”. Effective December 26, 2013.

P.L. 113-93 §103(2), struck out “March 31, 2014” and inserted “March 31, 2015*”, effective April 1, 2014.

P.L. 113-93 §103(2)(B), struck “, or the first three months of 2014”, and inserted “, 2014 or the first three months of 2015”. Effective April 1, 2014.

P.L. 114-10 §202(a)(2)(A), struck out “March 31, 2015” and inserted “December 31, 2017”, effective April 16, 2015.

P.L. 114-10 §202(a)(2)(B), struck “2012, 2013, 2014, or the first three months of 2015” and inserted “2012 through 2017”, effective April 16, 2015.

[96] P.L. 112-240, §603(b)(2), added subparagraph (B), effective January 2, 2013.

[97] P.L. 115–123, §50202(4) added paragraph (7). Effective February 9, 2018.

[98] This paragraph was originally designated by P.L. 112-240, §603(c) as subparagraph (g)(5)(D), effective January 2, 2012.

P.L. 115–123, §50202(3)(A) moved subparagraph 1833(g)(5)(D) to paragraph (8). Effective February 9, 2018.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

[99] P.L. 112–96, §3202(1), struck out “paragraph (4)” and inserted “clause (v), subparagraph (B), and paragraph (4)”, effective February 22, 2012.

[100] P.L. 113-93, §216(b)(1)(D), struck “and subject to” and inserted ”and, for tests furnished before the date of enactment of section 1834A, subject to”. Effective April 1, 2014.

[101] P.L. 112-96, §3202(3), added clause (v), effective February 22, 2012.

[102] P.L. 113-93, §216(b)(1)(E), struck out “fee schedules” and inserted “fee schedules (for tests furnished before January 1, 2017) or under section 1834A (for tests furnished on or after January 1, 2017), subject to subsection (b)(5) of such section”, effective April 1, 2014.

[103] P.L. 113-93, §216(b)(1)(F), struck out “in the case” and inserted “For tests furnished before January 1, 2017, in the case”, effective April 1, 2014.

[104] P.L. 113-93, §216(b)(1)(G)(i) and P.L. 113-93, §216(b)(1)(G)(ii) , struck out “and (4)” and inserted “and (4) and section 1834A”; and struck out “under this subsection” and inserted “under this part”, effective April 1, 2014.

[105] P.L. 115–271, §6082(b), added this paragraph. Effective October 24, 2018.

[106] See Vol. II, P.L. 99-509, §9320(k).

[107] P.L. 101-239, §6132; 103 Stat. 2222.

[108] P.L. 99-509, §9320; 100 Stat. 2013.

[109] Probably should be “subparagraph”.

[110] See Vol. II, P.L. 78-410, §332(a).

[111] P.L. 103-432, §123(b)(2)(A)(ii); 108 Stat. 4411.

[112] See Vol. II, P.L. 115–271, §6072, with respect to MEDPAC report to Congress on payments, adverse incentives and data regarding pain management treatment, including opioid prescriptions.

[113] P.L. 114-74, §603(a)(1)(C) Inserted clause (v). Effective November 2, 2016.

[114] P.L. 115–141, Div. S, Title XIII, §1301(a)(1)(A), struck “The payment” and inserted “Subject to subparagraph (G), the payment”. Effective March 23, 2018.

[115] P.L. 115–141, Div. S, Title XIII, §1301(a)(1)(B), inserted “subject to subparagraph (H),” before “in the case”. Effective March 23, 2018.

[116] P.L. 115–141, Div. S, Title XIII, §1301(a)(2), added “This clause shall not apply for 2018.” at the end of clause (i).

P.L. 116–94, Div. N, §107(a), struck “2018” and inserted “2018 or 2020”. Effective December 20, 2019.

[117] P.L. 115–141, Div. S, Title XIII, §1301(a)(1)(C), added subparagraph (G). Effective March 23, 2018.

[118] P.L. 115–141, Div. S, Title XIII, §1301(a)(1)(C), added subparagraph (H). Effective March 23, 2018.

[119] P.L. 115–141, Div. S, Title XIII, §1301(a)(1)(C), added subparagraph (I). Effective March 23, 2018.

[120] P.L. 116–94, Div. N, §107(a)(2), added subparagraph (J). Effective December 20, 2019. P.L. 116–94, Div. N. §107(b), authorized implementation by program instruction or otherwise.

[121] P.L. 112-78, §308(1)(A), struck out “January 1, 2012” and inserted “March 1, 2012*”, effective December

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

23, 2011.

*P.L. 112-96, §3002(a)(1)(A), struck out “March 1, 2012” and inserted “January 1, 2013”, effective February 22, 2012.

[122] P.L. 112-78, §308(1)(B), struck out “or 2011” and inserted “2011, or the first two months of 2012*”, effective December 23, 2011.

*P.L. 112-96, §3002(a)(1)(B), struck out “or the first two months of 2012” and inserted “or 2012”, effective February 22, 2012.

[123] P.L. 112-78, §308(2)(A), struck out “2009, and before January 1, 2012, for which” and inserted “2009, and before March 1, 2012*, for which”, effective December 23, 2011.

P.L. 112-96, §3002(a)(2), struck out “March 1, 2012” and inserted “January 1, 2013”, effective February 22, 2012.

[124] P.L. 112-78, §308(2)(B), struck out “2010, and before January 1, 2012, the preceding” and inserted “2010, and before March 1, 2012*, the preceding”, effective December 23, 2011.

P.L. 112-96, §3002(a)(2), struck out “March 1, 2012” and inserted “January 1, 2013”, effective February 22, 2012.

[125] P.L. 105-33, 4521; 110 Stat. 444.

[126] P.L. 112-240, §634, added this new subparagraph (D), effective January 2, 2013.

[127] P.L. 113-93, §218(b)(2), added subparagraph (E). Effective April 1, 2014..

[128] P.L.114-255, §16002(b)(1), inserted “, subject to subparagraph (C),” after “shall” in subparagraph (B), and added new subparagraph (C). §16002(c) applied these changes retroactively as if enacted as part of P.L. 111–74, effective November 2, 2015.

[129] P.L. 113-93, §218(a)(20(A), added paragraph (20). Effective April 1, 2014.

[130] P.L. 114-74, §603(a)(2) Inserted subparagraph (C). Effective November 2, 2016.

[131] P.L.114-255, §16001(a)(1)(A), struck “clause (ii)” in clause(i), and inserted “the subsequent provisions of this subparagraph”; and added new clauses (iii) through (viiI). §16001(b) applied these changes retroactively as if enacted as part of P.L. 111–74, effective November 2, 2015.

[132] P.L. 114–255, §16002(a)(1) inserted new clause (vi). §16002(c) applied these changes retroactively as if enacted as part of P.L. 111–74, effective November 2, 2015

[133] P.L.114-255, §16002(a)(2), inserted “Not later than 2 years after the date the Secretary receives an attestation under clause (vi) relating to compliance of a department of a provider with requirements referred to in such clause, the Secretary shall audit the compliance with such requirements with respect to the department.” after the first sentence. §16002(c) applied these changes retroactively as if enacted as part of P.L. 111–74, effective November 2, 2015.

[134] P.L.114-255, §16002(a)(3), added at the end of subclause (III), “For purposes of carrying out this subparagraph with respect to clause (vi) (and clause (vii) insofar as it relates to such clause), $2,000,000 shall be available from the Federal Supplementary Medical Insurance Trust Fund under section 1841, to remain available until expended.”. §16002(c) applied these changes retroactively as if enacted as part of P.L. 111–74, effective November 2, 2015.

[135] P.L.114-255, §16001(a)(2); inserted clause (iv). Effective December 10, 2016.

[136] P.L. 115–271, §6082, inserted this paragraph. Effective October 24, 2018.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

[137] P.L. 114-10, §101(e)(3)(A) Appended sentence referencing subsection (z). Effective April 16, 2015.

[138] See Vol. II, P.L. 78–410, §332(a)(1)(A).

[139] P.L. 114-10, §101(e)(3)(B) Appended sentence referencing subsection (z). Effective April 16, 2015.

[140] P.L. 114-10, §101(e)(2) Appended subsection (z). Effective April 16, 2015.

P.L. 114-10, §514(a); directed adding new subsection (z) to Section 1833 (follows). Effective April 16, 2015

[141] P.L. 114-10, §101(e)(2) Appended subsection (z). Effective April 16, 2015.

[142] P.L. 114-10, §514(a); directed adding new subsection, also designated as (z), to Section 1833. Effective April 16, 2015

P.L. 115–271, §6083(b) redesignated this subsection (z) as subsection (aa). Effective October 24, 2018.

[143] P.L. 115–271, §6083(b)(2), added new subsection (bb). Effective October 24, 2018.

[144] 21 U.S.C. §823(g).

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

*Social Security Act [42 USC Chapter 7] > As of December 20, 2019 > Title XVIII -- Health Insurance for the Aged and Disabled > Part E -- Miscellaneous Provisions*

# Sec. 1862: Exclusions from Coverage and Medicare as Secondary Payer

Click to open document in a browser
Footnote: [547]

Sec. 1862. [42 U.S.C. 1395y] (a) Notwithstanding any other provision of this title, no payment may be made under part A or part B for any expenses incurred for items or services—

(1) (A) which, except for items and services described in a succeeding subparagraph, are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member,

(B) in the case of items and services described in section 1861(s)(10), which are not reasonable and necessary for the prevention of illness,

(C) in the case of hospice care, which are not reasonable and necessary for the palliation or management of terminal illness,

(D) in the case of clinical care items and services provided with the concurrence of the Secretary and with respect to research and experimentation conducted by, or under contract with, the Medicare Payment Advisory Commission or the Secretary, which are not reasonable and necessary to carry out the purposes of section 1886(e)(6),

(E) in the case of research conducted pursuant to section 1142, which is not reasonable and necessary to carry out the purposes of that section,

(F) in the case of screening mammography, which is performed more frequently than is covered under section 1834(c)(2) or which is not conducted by a facility described in section 1834(c)(1)(B), in the case of screening pap smear and screening pelvic exam, which is performed more frequently than is provided under section 1861(nn), and, in the case of screening for glaucoma, which is performed more frequently than is provided under section 1861(uu),

(G) in the case of prostate cancer screening tests (as defined in section 1861(oo)), which are performed more frequently than is covered under such section,

(H) in the case of colorectal cancer screening tests, which are performed more frequently than is covered under section 1834(d),

(I) the frequency and duration of home health services which are in excess of normative guidelines that the Secretary shall establish by regulation,

(J) in the case of a drug or biological specified in section 1847A(c)(6)(C) for which payment is made under part B that is furnished in a competitive area under section 1847B, that is not furnished by an entity under a contract under such section,

(K) in the case of an initial preventive physical examination, which is performed more than 1 year after the date the individual's first coverage period begins under part B;

(L) in the case of cardiovascular screening blood tests (as defined in section 1861(xx)(1)), which are performed more frequently than is covered under section 1861(xx)(2),

(M) in the case of a diabetes screening test (as defined in section 1861(yy)(1)), which is performed more frequently than is covered under section 1861(yy)(3), and

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(N) in the case of ultrasound screening for abdominal aortic aneursym which is performed more frequently than is provided for under section 1861(s)(2)(AA),

(O) in the case of kidney disease education services (as defined in paragraph (1) of section 1861(ggg)), which are furnished in excess of the number of sessions covered under paragraph (4) of such section, and

(P) in the case of personalized prevention plan services (as defined in section 1861(hhh)(1)), which are performed more frequently than is covered under such section;

(2) for which the individual furnished such items or services has no legal obligation to pay, and which no other person (by reason of such individual's membership in a prepayment plan or otherwise) has a legal obligation to provide or pay for, except in the case of Federally qualified health center services;

(3) which are paid for directly or indirectly by a governmental entity (other than under this Act and other than under a health benefits or insurance plan established for employees of such an entity), except in the case of rural health clinic services, as defined in section 1861(aa)(1), in the case of Federally qualified health center services, as defined in section 1861(aa)(3), in the case of services for which payment may be made under section 1880(e), and in such other cases as the Secretary may specify;

(4) which are not provided within the United States (except for inpatient hospital services furnished outside the United States under the conditions described in section 1814(f) and, subject to such conditions, limitations, and requirements as are provided under or pursuant to this title, physicians' services and ambulance services furnished an individual in conjunction with such inpatient hospital services but only for the period during which such inpatient hospital services were furnished);

(5) which are required as a result of war, or of an act of war, occurring after the effective date of such individual's current coverage under such part;

(6) which constitute personal comfort items (except, in the case of hospice care, as is otherwise permitted under paragraph (1)(C));

(7) where such expenses are for routine physical checkups, eyeglasses (other than eyewear described in section 1861(s)(8)) or eye examinations for the purpose of prescribing, fitting, or changing eyeglasses, procedures performed (during the course of any eye examination) to determine the refractive state of the eyes, hearing aids or examinations therefor, or immunizations (except as otherwise allowed under section 1861(s)(10) and subparagraph (B), (F), (G), (H), or (K) or (P) of paragraph (1));

(8) where such expenses are for orthopedic shoes or other supportive devices for the feet, other than shoes furnished pursuant to section 1861(s)(12);

(9) where such expenses are for custodial care (except, in the case of hospice care, as is otherwise permitted under paragraph (1)(C));

(10) where such expenses are for cosmetic surgery or are incurred in connection therewith, except as required for the prompt repair of accidental injury or for improvement of the functioning of a malformed body member;

(11) where such expenses constitute charges imposed by immediate relatives of such individual or members of his household;

(12) where such expenses are for services in connection with the care, treatment, filling, removal, or replacement of teeth or structures directly supporting teeth, except that payment may be made under part A in the case of inpatient hospital services in connection with the provision of such dental services if the individual, because of his underlying medical condition and clinical status or because of the severity of the dental procedure, requires hospitalization in connection with the provision of such services;

(13) where such expenses are for—

(A) the treatment of flat foot conditions and the prescription of supportive devices therefor,

(B) the treatment of subluxations of the foot, or

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(C) routine foot care (including the cutting or removal of corns or calluses, the trimming of nails, and other routine hygienic care);

(14) which are other than physicians' services (as defined in regulations promulgated specifically for purposes of this paragraph), services described by section 1861(s)(2)(K), certified nurse-midwife services, qualified psychologist services, and services of a certified registered nurse anesthetist, and which are furnished to an individual who is a patient of a hospital or critical access hospital by an entity other than the hospital or critical access hospital, unless the services are furnished under arrangements (as defined in section 1861(w)(1)) with the entity made by the hospital or critical access hospital;

(15) (A) which are for services of an assistant at surgery in a cataract operation (including subsequent insertion of an intraocular lens) unless, before the surgery is performed, the appropriate quality improvement[548] organization (under part B of title XI) or a carrier under section 1842 has approved of the use of such an assistant in the surgical procedure based on the existence of a complicating medical condition, or[549]

(B) which are for services of an assistant at surgery to which section 1848(i)(2)(B) applies;

(16) in the case in which funds may not be used for such items and services under the Assisted Suicide Funding Restriction Act of 1997;

(17) where the expenses are for an item or service furnished in a competitive acquisition area (as established by the Secretary under section 1847(a)) by an entity other than an entity with which the Secretary has entered into a contract under section 1847(b) for the furnishing of such an item or service in that area, unless the Secretary finds that the expenses were incurred in a case of urgent need, or in other circumstances specified by the Secretary;

(18) which are covered skilled nursing facility services described in section 1888(e)(2)(A)(i) and which are furnished to an individual who is a resident of a skilled nursing facility during a period in which the resident is provided covered post-hospital extended care services (or, for services described in section 1861(s)(2)(D), which are furnished to such an individual without regard to such period), by an entity other than the skilled nursing facility, unless the services are furnished under arrangements (as defined in section 1861(w)(1)) with the entity made by the skilled nursing facility; or

(19) which are for items or services which are furnished pursuant to a private contract described in section 1802(b);

(20) in the case of outpatient physical therapy services, outpatient speech-language pathology services, or outpatient occupational therapy services[550] furnished as an incident to a physician's professional services (as described in section 1861(s)(2)(A)), that do not meet the standards and conditions (other than any licensing requirement specified by the Secretary) under the second sentence of section 1861(p) (or under such sentence through the operation of subsection (g) or (ll)(2) of section 1861(g)) as such standards and conditions would apply to such therapy services if furnished by a therapist;

(21) where such expenses are for home health services (including medical supplies described in section 1861(m)(5), but excluding durable medical equipment to the extent provided for in such section), furnished to an individual who is under a plan of care of the home health agency if the claim for payment for such services is not submitted by the agency; or

(22) subject to subsection (h), for which a claim is submitted other than in an electronic form specified by the Secretary;

(23)[551] which are the technical component of advanced diagnostic imaging services described in section 1834(e)(1)(B) for which payment is made under the fee schedule established under section 1848(b) and that are furnished by a supplier (as defined in section 1861(d)), if such supplier is not accredited by an accreditation organization designated by the Secretary under section 1834(e)(2)(B);

(24) where such expenses are for renal dialysis services (as defined in subparagraph (B) of section 1881(b)(14)) for which payment is made under such section unless such payment is made under such section to a provider of services or a renal dialysis facility for such services; or

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(25)[552] not later than January 1, 2014, for which the payment is other than by electronic funds transfer (EFT) or an electronic remittance in a form as specified in ASC X12 835 Health Care Payment and Remittance Advice[553] or subsequent standard.

Paragraph (7) shall not apply to Federally qualified health center services described in section 1861(aa)(3)(B). In making a national coverage determination (as defined in paragraph (1)(B) of section 1869(f)) the Secretary shall ensure consistent with subsection (l) that the public is afforded notice and opportunity to comment prior to implementation by the Secretary of the determination; meetings of advisory committees with respect to the determination are made on the record; in making the determination, the Secretary has considered applicable information (including clinical experience and medical, technical, and scientific evidence) with respect to the subject matter of the determination; and in the determination, provide a clear statement of the basis for the determination (including responses to comments received from the public), the assumptions underlying that basis, and make available to the public the data (other than proprietary data) considered in making the determination.

(b) Medicare as Secondary Payer.—

(1) Requirements of group health plans.—

(A) Working aged under group health plans.—

(i) In general.—A group health plan—

(I) may not take into account that an individual (or the individual's spouse) who is covered under the plan by virtue of the individual's current employment status with an employer is entitled to benefits under this title under section 226(a), and

(II) shall provide that any individual age 65 or older (and the spouse age 65 or older of any individual) who has current employment status with an employer shall be entitled to the same benefits under the plan under the same conditions as any such individual (or spouse) under age 65.

(ii) Exclusion of group health plan of a small employer.—Clause (i) shall not apply to a group health plan unless the plan is a plan of, or contributed to by, an employer that has 20 or more employees for each working day in each of 20 or more calendar weeks in the current calendar year or the preceding calendar year.

(iii) Exception for small employers in multi-employer or multiple employer group health plans.—Clause (i) also shall not apply with respect to individuals enrolled in a multiemployer or multiple employer group health plan if the coverage of the individuals under the plan is by virtue of current employment status with an employer that does not have 20 or more individuals in current employment status for each working day in each of 20 or more calendar weeks in the current calendar year and the preceding calendar year; except that the exception provided in this clause shall only apply if the plan elects treatment under this clause.

(iv) Exception for individuals with end stage renal disease.—Subparagraph (C) shall apply instead of clause (i) to an item or service furnished in a month to an individual if for the month the individual is, or (without regard to entitlement under section 226) would upon application be, entitled to benefits under section 226A.

(v) Group health plan defined.—In this subparagraph, and subparagraph (C), the term "group health plan" has the meaning given such term in section 5000(b)(1) of the Internal Revenue Code of 1986[554], without regard to section 5000(d) of such Code.

(B) Disabled individuals in large group health plans.—

(i) In general.—A large group health plan (as defined in clause (iii)) may not take into account that an individual (or a member of the individual's family) who is covered under the plan by virtue of the individual's current employment status with an employer is entitled to benefits under this title under section 226(b).

(ii) Exception for individuals with end stage renal disease.—Subparagraph (C) shall apply instead of clause (i) to an item or service furnished in a month to an individual if for the month the individual is, or (without regard to entitlement under section 226) would upon application be, entitled to benefits under section 226A.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(iii) Large group health plan defined.—In this subparagraph, the term "large group health plan" has the meaning given such term in section 5000(b)(2) of the Internal Revenue Code of 1986, without regard to section 5000(d) of such Code.

(C) Individuals with end stage renal disease.—A group health plan (as defined in subparagraph (A)(v))—

(i) may not take into account that an individual is entitled to or eligible for benefits under this title under section 226A during the 12-month period which begins with the first month in which the individual becomes entitled to benefits under part A under the provisions of section 226A, or, if earlier, the first month in which the individual would have been entitled to benefits under such part under the provisions of section 226A if the individual had filed an application for such benefits; and

(ii) may not differentiate in the benefits it provides between individuals having end stage renal disease and other individuals covered by such plan on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner;

except that clause (ii) shall not prohibit a plan from paying benefits secondary to this title when an individual is entitled to or eligible for benefits under this title under section 226A after the end of the 12-month period described in clause (i). Effective for items and services furnished on or after February 1, 1991, and before the date of enactment of the Balanced Budget Act of 1997[555] (with respect to periods beginning on or after February 1, 1990), this subparagraph shall be applied by substituting "18-month" for "12-month" each place it appears. Effective for items and services furnished on or after the date of enactment of the Balanced Budget Act of 1997, (with respect to periods beginning on or after the date that is 18 months prior to such date), clauses (i) and (ii) shall be applied by substituting "30-month" for "12-month" each place it appears.

(D) Treatment of certain members of religious orders.—In this subsection, an individual shall not be considered to be employed, or an employee, with respect to the performance of services as a member of a religious order which are considered employment only by virtue of an election made by the religious order under section 3121(r) of the Internal Revenue Code of 1986.

(E) General provisions.—For purposes of this subsection:

(i) Aggregation rules.—

(I) All employers treated as a single employer under subsection (a) or (b) of section 52 of the Internal Revenue Code of 1986 shall be treated as a single employer.

(II) All employees of the members of an affiliated service group (as defined in section 414(m) of such Code) shall be treated as employed by a single employer.

(III) Leased employees (as defined in section 414(n)(2) of such Code) shall be treated as employees of the person for whom they perform services to the extent they are so treated under section 414(n) of such Code.

In applying sections of the Internal Revenue Code of 1986 under this clause, the Secretary shall rely upon regulations and decisions of the Secretary of the Treasury respecting such sections.

(ii) Current employment status defined.—An individual has "current employment status" with an employer if the individual is an employee, is the employer, or is associated with the employer in a business relationship.

(iii) Treatment of self-employed persons as employers.—The term "employer" includes a self-employed person.

(F) Limitation on beneficiary liability.—An individual who is entitled to benefits under this title and is furnished an item or service for which such benefits are incorrectly paid is not liable for repayment of such benefits under this paragraph unless payment of such benefits was made to the individual.

(2) Medicare secondary payer.—

(A) In general.—Payment under this title may not be made, except as provided in subparagraph (B), with respect to any item or service to the extent that—

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(i) payment has been made, or can reasonably be expected to be made, with respect to the item or service as required under paragraph (1), or

(ii) payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance.

In the subsection, the term "primary plan" means a group health plan or large group health plan, to the extent that clause (i) applies, and a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies. An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part.

(B) Conditional payment.—

(i) Authority to make conditional payment.—The Secretary may make payment under this title with respect to an item or service if a primary plan described in subparagraph (A)(ii) has not made or cannot reasonably be expected to make payment with respect to such item or service promptly (as determined in accordance with regulations). Any such payment by the Secretary shall be conditioned on reimbursement to the appropriate Trust Fund in accordance with the succeeding provisions of this subsection.

(ii) Repayment required.—A primary plan[556], and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this title with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service. A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means. If reimbursement is not made to the appropriate Trust Fund before the expiration of the 60-day period that begins on the date notice of, or information related to, a primary plan's responsibility for such payment or other information is received, the Secretary may charge interest (beginning with the date on which the notice or other information is received) on the amount of the reimbursement until reimbursement is made (at a rate determined by the Secretary in accordance with regulations of the Secretary of the Treasury applicable to charges for late payments).

(iii) Action by united states.—In order to recover payment made under this title for an item or service, the United States may bring an action against any or all entities that are or were required or responsible (directly, as an insurer or self-insurer, as a third-party administrator, as an employer that sponsors or contributes to a group health plan, or large group health plan, or otherwise) to make payment with respect to the same item or service (or any portion thereof) under a primary plan. The United States may, in accordance with paragraph (3)(A) collect double damages against any such entity. In addition, the United States may recover under this clause from any entity that has received payment from a primary plan or from the proceeds of a primary plan's payment to any entity. The United States may not recover from a third-party administrator under this clause in cases where the third-party administrator would not be able to recover the amount at issue from the employer or group health plan and is not employed by or under contract with the employer or group health plan at the time the action for recovery is initiated by the United States or for whom it provides administrative services due to the insolvency or bankruptcy of the employer or plan. An action may not be brought by the United States under this clause with respect to payment owed unless the complaint is filed not later than 3 years after the date of the receipt of notice of a settlement, judgment, award, or other payment made pursuant to paragraph (8) relating to such payment owed.[557]

(iv) Subrogation rights.—The United States shall be subrogated (to the extent of payment made under this title for such an item or service) to any right under this subsection of an individual or any other entity to payment with respect to such item or service under a primary plan.

(v) Waiver of rights.—The Secretary may waive (in whole or in part) the provisions of this subparagraph in the case of an individual claim if the Secretary determines that the waiver is in the best interests of the program established under this title.

(vi) Claims-filing period.—Notwithstanding any other time limits that may exist for filing a claim under an employer group health plan, the United States may seek to recover conditional payments in accordance with

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

this subparagraph where the request for payment is submitted to the entity required or responsible under this subsection to pay with respect to the item or service (or any portion thereof) under a primary plan within the 3-year period beginning on the date on which the item or service was furnished.

(vii)[558] Use of website to determine final conditional reimbursement amount.—

(I) Notice to secretary of expected dateof a settlement, judgment, etc.—In the case of a payment made by the Secretary pursuant to clause (i) for items and services provided to the claimant, the claimant or applicable plan (as defined in paragraph (8)(F)) may at any time beginning 120 days before the reasonably expected date of a settlement, judgment, award, or other payment, notify the Secretary that a payment is reasonably expected and the expected date of such payment.

(II) Secretarial providing access to claims information through a website.—The Secretary shall maintain and make available to individuals to whom items and services are furnished under this title (and to authorized family or other representatives recognized under regulations and to an applicable plan which has obtained the consent of the individual) access to information on the claims for such items and services (including payment amounts for such claims), including those claims that relate to a potential settlement, judgment, award, or other payment. Such access shall be provided to an individual, representative, or plan through a website that requires a password to gain access to the information. The Secretary shall update the information on claims and payments on such website in as timely a manner as possible but not later than 15 days after the date that payment is made. Information related to claims and payments subject to the notice under subclause (I) shall be maintained and made available consistent with the following:

(aa) The information shall be as complete as possible and shall include provider or supplier name, diagnosis codes (if any), dates of service, and conditional payment amounts.

(bb) The information accurately identifies those claims and payments that are related to a potential settlement, judgment, award, or other payment to which the provisions of this subsection apply.

(cc) The website provides a method for the receipt of secure electronic communications with the individual, representative, or plan involved.

(dd) The website provides that information is transmitted from the website in a form that includes an official time and date that the information is transmitted.

(ee) The website shall permit the individual, representative, or plan to download a statement of reimbursement amounts (in this clause referred to as a “statement of reimbursement amount”) on payments for claims under this title relating to a potential settlement, judgment, award, or other payment.

(III) Use of timely web download as a basis for final conditional amount.—If an individual (or other claimant or applicable plan with the consent of the individual) obtains a statement of reimbursement amount from the website during the protected period as defined in subclause (V) and the related settlement, judgment, award or other payment is made during such period, then the last statement of reimbursement amount that is downloaded during such period and within 3 business days before the date of the settlement, judgment, award, or other payment shall constitute the final conditional amount subject to recovery under clause (ii) related to such settlement, judgment, award, or other payment.

(IV) Resolution of discrepancies.—If the individual (or authorized representative) believes there is a discrepancy with the statement of reimbursement amount, the Secretary shall provide a timely process to resolve the discrepancy. Under such process the individual (or representative) must provide documentation explaining the discrepancy and a proposal to resolve such discrepancy. Within 11 business days after the date of receipt of such documentation, the Secretary shall determine whether there is a reasonable basis to include or remove claims on the statement of reimbursement. If the Secretary does not make such determination within the 11 business-day period, then the proposal to resolve the discrepancy shall be accepted. If the Secretary determines within such period that there is not a reasonable basis to include or remove claims on the statement of reimbursement, the proposal shall be rejected. If the Secretary determines within such period that there is a reasonable basis to conclude there is a discrepancy, the Secretary must respond in a timely manner by agreeing to the proposal to resolve the discrepancy or by providing documentation showing with good cause why the Secretary is not agreeing to such proposal and establishing an alternate discrepancy resolution. In no case shall the process under this subclause be treated as an appeals process or as

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

establishing a right of appeal for a statement of reimbursement amount and there shall be no administrative or judicial review of the Secretary's determinations under this subclause.

(V) Protected period.—In subclause (III), the term '"protected period"' means, with respect to a settlement, judgment, award or other payment relating to an injury or incident, the portion (if any) of the period beginning on the date of notice under subclause (I) with respect to such settlement, judgment, award, or other payment that is after the end of a Secretarial response period beginning on the date of such notice to the Secretary. Such Secretarial response period shall be a period of 65 days, except that such period may be extended by the Secretary for a period of an additional 30 days if the Secretary determines that additional time is required to address claims for which payment has been made. Such Secretarial response period shall be extended and shall not include any days for any part of which the Secretary determines (in accordance with regulations) that there was a failure in the claims and payment posting system and the failure was justified due to exceptional circumstances (as defined in such regulations). Such regulations shall define exceptional circumstances in a manner so that not more than 1 percent of the repayment obligations under this subclause would qualify as exceptional circumstances

(VI) Effective date.—The Secretary shall promulgate final regulations to carry out this clause not later than 9 months after the date of the enactment of this clause.

(VII) Website including successor technology.—In this clause, the term "website" includes any successor technology.

(viii)[559] Right of appeal for secondary payer determinations relating to liability insurance (including self-insurance), no fault insurance, and workers' compensation laws and plans.—The Secretary shall promulgate regulations establishing a right of appeal and appeals process, with respect to any determination under this subsection for a payment made under this title for an item or service for which the Secretary is seeking to recover conditional payments from an applicable plan (as defined in paragraph (8)(F)) that is a primary plan under subsection (A)(ii), under which the applicable plan involved, or an attorney, agent, or third party administrator on behalf of such plan, may appeal such determination. The individual furnished such an item or service shall be notified of the plan's intent to appeal such determination[560]

(C) Treatment of questionnaires.—The Secretary may not fail to make payment under subparagraph (A) solely on the ground that an individual failed to complete a questionnaire concerning the existence of a primary plan.

(3) Enforcement.—

(A) Private cause of action.—There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).

(B) Reference to excise tax with respect to nonconforming group health plans.—For provision imposing an excise tax with respect to nonconforming group health plans, see section 5000 of the Internal Revenue Code of 1986[561].

(C) Prohibition of financial incentives not to enroll in a group health plan or a large group health plan.—It is unlawful for an employer or other entity to offer any financial or other incentive for an individual entitled to benefits under this title not to enroll (or to terminate enrollment) under a group health plan or a large group health plan which would (in the case of such enrollment) be a primary plan (as defined in paragraph (2)(A)). Any entity that violates the previous sentence is subject to a civil money penalty of not to exceed $5,000 for each such violation. The provisions of section 1128A (other than subsections (a) and (b)) shall apply to a civil money penalty under the previous sentence in the same manner as such provisions apply to a penalty or proceeding under section 1128A(a).

(4) Coordination of benefits.—Where payment for an item or service by a primary plan is less than the amount of the charge for such item or service and is not payment in full, payment may be made under this title (without regard to deductibles and coinsurance under this title) for the remainder of such charge, but—

(A) payment under this title may not exceed an amount which would be payable under this title for such item or service if paragraph (2)(A) did not apply; and

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(B) payment under this title, when combined with the amount payable under the primary plan, may not exceed—

(i) in the case of an item or service payment for which is determined under this title on the basis of reasonable cost (or other cost-related basis) or under section 1886, the amount which would be payable under this title on such basis, and

(ii) in the case of an item or service for which payment is authorized under this title on another basis—

(I) the amount which would be payable under the primary plan (without regard to deductibles and coinsurance under such plan), or

(II) the reasonable charge or other amount which would be payable under this title (without regard to deductibles and coinsurance under this title),

whichever is greater.

(5) Identification of secondary payer situations.—

(A) Requesting matching information.—

(i) Commissioner of social security.—The Commissioner of Social Security shall, not less often that annually, transmit to the Secretary of the Treasury a list of the names and TINs of Medicare beneficiaries (as defined in section 6103(l)(12) of the Internal Revenue Code of 1986[562]) and request that the Secretary disclose to the Commissioner the information described in subparagraph (A) of such section.

(ii) Administrator.—The Administrator of the Centers for Medicare and Medicaid Services shall request, not less often than annually, the Commissioner of the Social Security Administration to disclose to the Administrator the information described in subparagraph (B) of section 6103(l)(12) of the Internal Revenue Code of 1986.

(B) Disclosure to fiscal intermediaries and carriers.—In addition to any other information provided under this title to fiscal intermediaries and carriers, the Administrator shall disclose to such intermediaries and carriers (or to such a single intermediary or carrier as the Secretary may designate) the information received under subparagraph (A) for purposes of carrying out this subsection.

(C) Contacting employers.—

(i) In general.—With respect to each individual (in this subparagraph referred to as an “employee”) who was furnished a written statement under section 6051 of the Internal Revenue Code of 1986[563] by a qualified employer (as defined in section 6103(l)(12)(E)(iii), of such Code[564]), as disclosed under subparagraph (B)(i) the appropriate fiscal intermediary or carrier shall contact the employer in order to determine during what period the employee or employee’s spouse may be (or have been) covered under a group health plan of the employer and the nature of the coverage that is or was provided under the plan (including the name, address, and identifying number of the plan).

(ii) Employer response.—Within 30 days of the date of receipt of the inquiry, the employer shall notify the intermediary or carrier making the inquiry as to the determinations described in clause (i). An employer (other than a Federal or other governmental entity) who willfully or repeatedly fails to provide timely and accurate notice in accordance with the previous sentence shall be subject to a civil money penalty of not to exceed $1,000 for each individual with respect to which such an inquiry is made. The provision of section 1128A (other than subsections (a) and (b)) shall apply to a civil money penalty under the previous sentence in the same manner as such provisions apply to a penalty or proceeding under section 1128A(a).

(D) Obtaining information from beneficiaries.—Before an individual applies for benefits under part A or enrolls under part B, the Administrator shall mail the individual a questionnaire to obtain information on whether the individual is covered under a primary plan and the nature of the coverage provided under the plan, including the name, address, and identifying number of the plan.

(E) End date.— The provisions of this paragraph shall not apply to information required to be provided on or after July 1, 2016.[565]

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(6) Screening requirements for provider and suppliers.—

(A) In general.—Notwithstanding any other provisions of this title, no payment may be made for any item or service furnished under part B unless the entity furnishing such item or service completes (to the best of its knowledge and on the basis of information obtained from the individual to whom the item or service is furnished) the portion of the claim form relating to the availability of other health benefit plans.

(B) Penalties.—An entity that knowingly, willfully, and repeatedly fails to complete a claim form in accordance with subparagraph (A) or provides inaccurate information relating to the availability of other health benefit plans on a claim form under such subparagraph shall be subject to a civil money penalty of not to exceed $2,000 for each such incident. The provisions of section 1128A (other than subsections (a) and (b)) shall apply to a civil money penalty under the previous sentence in the same manner as such provisions apply to a penalty or proceeding under section 1128A(a).

(7) Required submission of information by group health plans.—

(A) Requirement.—On and after the first day of the first calendar quarter beginning after the date that is 1 year after the date of the enactment of this paragraph, an entity serving as an insurer or third party administrator for a group health plan, as defined in paragraph (1)(A)(v), and, in the case of a group health plan that is self-insured and self-administered, a plan administrator or fiduciary, shall—

(i)[566] secure from the plan sponsor and plan participants such information as the Secretary shall specify for the purpose of identifying situations where the group health plan is or has been–

(I) a primary plan to the program under this title; or

(II) for calendar quarters beginning on or after January 1, 2020, a primary payer with respect to benefits relating to prescription drug coverage under part D; and

(ii) submit such information to the Secretary in a form and manner (including frequency) specified by the Secretary.

(B) Enforcement.—

(i) In general.—An entity, a plan administrator, or a fiduciary described in subparagraph (A) that fails to comply with the requirements under such subparagraph shall be subject to a civil money penalty of $1,000 for each day of noncompliance for each individual for which the information under such subparagraph should have been submitted. The provisions of subsections (e) and (k) of section 1128A shall apply to a civil money penalty under the previous sentence in the same manner as such provisions apply to a penalty or proceeding under section 1128A(a). A civil money penalty under this clause shall be in addition to any other penalties prescribed by law and in addition to any Medicare secondary payer claim under this title with respect to an individual.

(ii) Deposit of amounts collected.—Any amounts collected pursuant to clause (i) shall be deposited in the Federal Hospital Insurance Trust Fund under section 1817.

(C) Sharing of information.—Notwithstanding any other provision of law, under terms and conditions established by the Secretary, the Secretary—

(i) shall share information on entitlement under Part A and enrollment under Part B under this title with entities, plan administrators, and fiduciaries described in subparagraph (A);

(ii) may share the entitlement and enrollment information described in clause (i) with entities and persons not described in such clause; and

(iii) may share information collected under this paragraph as necessary for purposes of the proper coordination of benefits.

(D) Implementation.—Notwithstanding any other provision of law, the Secretary may implement this paragraph by program instruction or otherwise.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(8) Required submission of information by or on behalf of liability insurance (including self-insurance), no fault insurance, and workers' compensation laws and plans.—

(A) Requirement.—On and after the first day of the first calendar quarter beginning after the date that is 18 months after the date of the enactment of this paragraph, an applicable plan shall—

(i) determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under the program under this title on any basis; and

(ii) if the claimant is determined to be so entitled, submit the information described in subparagraph (B) with respect to the claimant to the Secretary in a form and manner (including frequency) specified by the Secretary.

(B) Required information.—The information described in this subparagraph is—

(i) the identity of the claimant for which the determination under subparagraph (A) was made; and

(ii) such other information as the Secretary shall specify in order to enable the Secretary to make an appropriate determination concerning coordination of benefits, including any applicable recovery claim.

Not later than 18 months after the date of enactment of this sentence, the Secretary shall modify the reporting requirements under this paragraph so that an applicable plan in complying with such requirements is permitted but not required to access or report to the Secretary beneficiary social security account numbers or health identification claim numbers, except that the deadline for such modification shall be extended by one or more periods (specified by the Secretary) of up to 1 year each if the Secretary notifies the committees of jurisdiction of the House of Representatives and of the Senate that the prior deadline for such modification, without such extension, threatens patient privacy or the integrity of the secondary payer program under this subsection. Any such deadline extension notice shall include information on the progress being made in implementing such modification and the anticipated implementation date for such modification.[567]

(C) Timing.—Information shall be submitted under subparagraph (A)(ii) within a time specified by the Secretary after the claim is resolved through a settlement, judgment, award, or other payment (regardless of whether or not there is a determination or admission of liability).

(D) Claimant.—For purposes of subparagraph (A), the term "claimant" includes—

(i) an individual filing a claim directly against the applicable plan; and

(ii) an individual filing a claim against an individual or entity insured or covered by the applicable plan.

(E) Enforcement.—

(i) In general.—An applicable plan that fails to comply with the requirements under subparagraph (A) with respect to any claimant shall be subject to a civil money penalty of $1,000 for each day of noncompliance with respect to each claimant may be subject to a civil penalty of up to $1,000 for each day of noncompliance with respect to each claimant.[568]. The provisions of subsections (e) and (k) of section 1128A shall apply to a civil money penalty under the previous sentence in the same manner as such provisions apply to a penalty or proceeding under section 1128A(a) A civil money penalty under this clause shall be in addition to any other penalties prescribed by law and in addition to any Medicare secondary payer claim under this title with respect to an individual.

(ii) Deposit of amounts collected.—Any amounts collected pursuant to clause (i) shall be deposited in the Federal Hospital Insurance Trust Fund.

(F) Applicable plan.—In this paragraph, the term "applicable plan" means the following laws, plans, or other arrangements, including the fiduciary or administrator for such law, plan, or arrangement:

(i) Liability insurance (including self-insurance).

(ii) No fault insurance.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(iii) Workers' compensation laws or plans.

(G) Sharing of information.—The Secretary may share information collected under this paragraph as necessary for purposes of the proper coordination of benefits.

(H) Implementation.—Notwithstanding any other provision of law, the Secretary may implement this paragraph by program instruction or otherwise.

(I)[569] Regulations.—Not later than 60 days after the date of the enactment of this subparagraph, the Secretary shall publish a notice in the Federal Register soliciting proposals, which will be accepted during a 60-day period, for the specification of practices for which sanctions will and will not be imposed under subparagraph (E), including not imposing sanctions for good faith efforts to identify a beneficiary pursuant to this paragraph under an applicable entity responsible for reporting information. After considering the proposals so submitted, the Secretary, in consultation with the Attorney General, shall publish in the Federal Register, including a 60-day period for comment, proposed specified practices for which such sanctions will and will not be imposed. After considering any public comments received during such period, the Secretary shall issue final rules specifying such practices.

(9)[570] Exception.—

(A) In General.—Clause (ii) of paragraph (2)(B) and any reporting required by paragraph (8) shall not apply with respect to any settlement, judgment, award, or other payment by an applicable plan arising from liability insurance (including self-insurance) and from alleged physical trauma-based incidents (excluding alleged ingestion, implantation, or exposure cases) constituting a total payment obligation to a claimant of not more than the single threshold amount calculated by the Secretary under subparagraph (B) for the year involved.

(B)Annual computation of threshold.—

(i) In General.—Not later than November 15 before each year, the Secretary shall calculate and publish a single threshold amount for settlements, judgments, awards, or other payments for obligations arising from liability insurance (including self-insurance) and for alleged physical trauma-based incidents (excluding alleged ingestion, implantation, or exposure cases) subject to this section for that year. The annual single threshold amount for 2014 [571] shall be set such that the estimated average amount to be credited to the Medicare trust funds of collections of conditional payments from such settlements, judgments, awards, or other payments arising from liability insurance (including self-insurance) and for such alleged incidents subject to this section shall equal the estimated cost of collection incurred by the United States (including payments made to contractors) for a conditional payment arising from liability insurance (including self-insurance) and for such alleged incidents subject to this section for the year. At the time of calculating, but before publishing, the single threshold amount for a year, the Secretary shall inform, and seek review of, the Comptroller General of the United States with regard to such amount.

(ii) Publication.—The Secretary shall include, as part of such publication for a year—

(I) the estimated cost of collection incurred by the United States (including payments made to contractors) for a conditional payment arising from liability insurance (including self-insurance) and for such alleged incidents; and

(II) a summary of the methodology and data used by the Secretary in computing such threshold amount and such cost of collection.

(C) Exclusion of ongoing expenses.—For purposes of this paragraph and with respect to a settlement, judgment, award, or other payment not otherwise addressed in clause (ii) of paragraph (2)(B) that includes ongoing responsibility for medical payments (excluding settlements, judgments, awards, or other payments made by a workers' compensation law or plan or no fault insurance), the amount utilized for calculation of the threshold described in subparagraph (A) shall include only the cumulative value of the medical payments made under this title.

(D) Report to congress.—Not later than November 15 before each year, the Secretary shall submit to the Congress a report on the single threshold amount for settlements, judgments, awards, or other payments for conditional payment obligations arising from liability insurance (including self-insurance) and alleged incidents

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

described in subparagraph (A) for that year and on the establishment and application of similar thresholds for such payments for conditional payment obligations arising from worker compensation cases and from no fault insurance cases subject to this section for the year. For each such report, the Secretary shall—

(i) calculate the threshold amount by using the methodology applicable to certain liability claims described in subparagraph (B); and

(ii) include a summary of the methodology and data used in calculating each threshold amount and the amount of estimated savings under this title achieved by the Secretary implementing each such threshold.

(c) No payment may be made under part B for any expenses incurred for—

(1) a drug product—

(A) which is described in section 107(c)(3) of the Drug Amendments of 1962[572],

(B) which may be dispensed only upon prescription,

(C) for which the Secretary has issued a notice of an opportunity for a hearing under subsection (e) of section 505 of the Federal Food, Drug, and Cosmetic Act[573] on a proposed order of the Secretary to withdraw approval of an application for such drug product under such section because the Secretary has determined that the drug is less than effective for all conditions of use prescribed, recommended, or suggested in its labeling, and

(D) for which the Secretary has not determined there is a compelling justification for its medical need; and

(2) any other drug product—

(A) which is identical, related, or similar (as determined in accordance with section 310.6 of title 21 of the Code of Federal Regulations[574]) to a drug product described in paragraph (1), and

(B) for which the Secretary has not determined there is a compelling justification for its medical need,

until such time as the Secretary withdraws such proposed order.

(d) For purposes of subsection (a)(1)(A), in the case of any item or service that is required to be provided pursuant to section 1867 to an individual who is entitled to benefits under this title, determinations as to whether the item or service is reasonable and necessary shall be made on the basis of the information available to the treating physician or practitioner (including the patient's presenting symptoms or complaint) at the time the item or service was ordered or furnished by the physician or practitioner (and not on the patient's principal diagnosis). When making such determinations with respect to such an item or service, the Secretary shall not consider the frequency with which the item or service was provided to the patient before or after the time of the admission or visit.

(e) (1) No payment may be made under this title with respect to any item or service (other than an emergency item or service, not including items or services furnished in an emergency room of a hospital) furnished—

(A) by an individual or entity during the period when such individual or entity is excluded pursuant to section 1128, 1128A, 1156 or 1842(j)(2) from participation in the program under this title; or

(B) at the medical direction or on the prescription of a physician during the period when he is excluded pursuant to section 1128, 1128A, 1156 or 1842(j)(2) from participation in the program under this title and when the person furnishing such item or service knew or had reason to know of the exclusion (after a reasonable time period after reasonable notice has been furnished to the person).

(2) Where an individual eligible for benefits under this title submits a claim for payment for items or services furnished by an individual or entity excluded from participation in the programs under this title, pursuant to section 1128, 1128A, 1156, 1160 (as in effect on September 2, 1982), 1842(j)(2), 1862(d) (as in effect on the date of the enactment of the Medicare and Medicaid Patient and Program Protection Act of 1987[575]), or 1866, and such beneficiary did not know or have reason to know that such individual or entity was so excluded, then,

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

to the extent permitted by this title, and notwithstanding such exclusion, payment shall be made for such items or services. In each such case the Secretary shall notify the beneficiary of the exclusion of the individual or entity furnishing the items or services. Payment shall not be made for items or services furnished by an excluded individual or entity to a beneficiary after a reasonable time (as determined by the Secretary in regulations) after the Secretary has notified the beneficiary of the exclusion of that individual or entity.

(f) The Secretary shall establish utilization guidelines for the determination of whether or not payment may be made, consistent with paragraph (1)(A) of subsection (a), under part A or part B for expenses incurred with respect to the provision of home health services, and shall provide for the implementation of such guidelines through a process of selective postpayment coverage review by intermediaries or otherwise.

(g) The Secretary shall, in making the determinations under paragraphs (1) and (9) of subsection (a), and for the purposes of promoting the effective, efficient, and economical delivery of health care services, and of promoting the quality of services of the type for which payment may be made under this title, enter into contracts with quality improvement[576] organizations pursuant to part B of title XI of this Act.

(h) (1) The Secretary.—

(A) shall waive the application of subsection (a)(22) in cases in which—

(i) there is no method available for the submission of claims in an electronic form; or

(ii) the entity submitting the claim is a small provider of services or supplier; and

(B) may waive the application of such subsection in such unusual cases as the Secretary finds appropriate.

(2) For purposes of this subsection, the term “small provider of services or supplier” means—

(A) a provider of services with fewer than 25 full-time equivalent employees; or

(B) a physician, practitioner, facility, or supplier (other than provider of services) with fewer than 10 full-time equivalent employees.

(i) In order to supplement the activities of the Medicare Payment Advisory Commission under section 1886(e)in assessing the safety, efficacy, and cost-effectiveness of new and existing medical procedures, the Secretary may carry out, or award grants or contracts for, original research and experimentation of the type described in clause (ii) of section 1886(e)(6)(E) with respect to such a procedure if the Secretary finds that—

(1) such procedure is not of sufficient commercial value to justify research and experimentation by a commerical organization;

(2) research and experimentation with respect to such procedure is not of a type that may appropriately be carried out by an institute, division, or bureau of the National Institutes of Health; and

(3) such procedure has the potential to be more cost-effective in the treatment of a condition than procedures currently in use with respect to such condition.

(j) (1) Any advisory committee appointed under to advise the Secretary on matters relating to the interpretation, application, or implementation of subsection (a)(1) shall assure the full participation of a nonvoting member in the deliberations of the advisory committee, and shall provide such nonvoting member access to all information and data made available to voting members of the advisory committee, other than information that—

(A) is exempt from disclosure pursuant to subsection (a) of section 552 of title 5, United States Code[577], by reason of subsection (b)(4) of such section (relating to trade secrets); or

(B) the Secretary determines would present a conflict of interest relating to such nonvoting member.

(2) If an advisory committee described in paragraph (1) organizes into panels of experts according to types of items or services considered by the advisory committee, any such panel of experts may report any recommendation with respect to such items or services directly to the Secretary without the prior approval of

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

the advisory committee or an executive committee thereof.

(k) (1) Subject to paragraph (2), a group health plan (as defined in subsection (a)(1)(A)(v)) providing supplemental or secondary coverage to individuals also entitled to services under this title shall not require a Medicare claims determination under this title for dental benefits specifically excluded under subsection (a)(12) as a condition of making a claims determination for such benefits under the group health plan.

(2) A group health plan may require a claims determination under this title in cases involving or appearing to involve inpatient dental hospital services or dental services expressly covered under this title pursuant to actions taken by the Secretary.

(l) National and Local Coverage Determination Process.—

(1) Factors and evidence used in making national coverage determinations.—The Secretary shall make available to the public the factors considered in making national coverage determinations of whether an item or service is reasonable and necessary. The Secretary shall develop guidance documents to carry out this paragraph in a manner similar to the development of guidance documents under section 701(h) of the Federal Food, Drug, and Cosmetic Act[578] (21 U.S.C. 371(h)).

(2) Timeframe for decisions on requests for national coverage determinations.—In the case of a request for a national coverage determination that—

(A) does not require a technology assessment from an outside entity or deliberation from the Medicare Coverage Advisory Committee, the decision on the request shall be made not later than 6 months after the date of the request; or

(B) requires such an assessment or deliberation and in which a clinical trial is not requested, the decision on the request shall be made not later than 9 months after the date of the request.

(3) Process for public comment in national coverage determinations.—

(A) Period for proposed decision.—Not later than the end of the 6-month period (or 9-month period for requests described in paragraph (2)(B)) that begins on the date a request for a national coverage determination is made, the Secretary shall make a draft of proposed decision on the request available to the public through the Internet website of the Centers for Medicare and Medicaid Services or other appropriate means.

(B) 30-day period for public comment.—Beginning on the date the Secretary makes a draft of the proposed decision available under subparagraph (A), the Secretary shall provide a 30-day period for public comment on such draft.

(C) 60-day period for final decision.—Not later than 60 days after the conclusion of the 30-day period referred to under subparagraph (B), the Secretary shall—

(i) make a final decision on the request;

(ii) include in such final decision summaries of the public comments received and responses to such comments;

(iii) make available to the public the clinical evidence and other data used in making such a decision when the decision differs from the recommendations of the Medicare Coverage Advisory Committee; and

(iv) in the case of a final decision under clause (i) to grant the request for the national coverage determination, the Secretary shall assign a temporary or permanent code (whether existing or unclassified) and implement the coding change.

(4) Consultation with outside experts in certain national coverage determinations.—With respect to a request for a national coverage determination for which there is not a review by the Medicare Coverage Advisory Committee, the Secretary shall consult with appropriate outside clinical experts.

(5) Local coverage determination process.—

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(A) Plan to promote consistency of coverage determinations.—The Secretary shall develop a plan to evaluate new local coverage determinations to determine which determinations should be adopted nationally and to what extent greater consistency can be achieved among local coverage determinations.

(B) Consultation.—The Secretary shall require the fiscal intermediaries or carriers providing services within the same area to consult on all new local coverage determinations within the area.

(C) Dissemination of information.—The Secretary should serve as a center to disseminate information on local coverage determinations among fiscal intermediaries and carriers to reduce duplication of effort.

(D) Local coverage determinationsThe Secretary shall require each Medicare administrative contractor that develops a local coverage determination to make available on the Internet website of such contractor and on the Medicare Internet website, at least 45 days before the effective date of such determination, the following information:

(i) Such determination in its entirety.

(ii) Where and when the proposed determination was first made public.

(iii) Hyperlinks to the proposed determination and a response to comments submitted to the contractor with respect to such proposed determination.

(iv) A summary of evidence that was considered by the contractor during the development of such determination and a list of the sources of such evidence.

(v) An explanation of the rationale that supports such determination. [579]

(6) National and local coverage determination defined.—For purposes of this subsection—

(A) National coverage determination.—The term “national coverage determination” means a determination by the Secretary with respect to whether or not a particular item or service is covered nationally under this title.

(B) Local coverage determination.—The term “local coverage determination” has the meaning given that in section 1869(f)(2)(B).

(m) Coverage of Routine Costs Associated With Certain Clinical Trials of Category A Devices.—

(1) In general.—In the case of an individual entitled to benefits under part A, or enrolled under part B, or both who participates in a category A clinical trial, the Secretary shall not exclude under subsection (a)(1) payment for coverage of routine costs of care (as defined by the Secretary) furnished to such individual in the trial.

(2) Category a clinical trial.—For purposes of paragraph (1), a “category A clinical trial” means a trial of a medical device if—

(A) the trial is of an experimental/investigational (category A) medical device (as defined in regulations under section 405.201(b) of title 42, Code of Federal Regulations (as in effect as of September 1, 2003));

(B) the trial meets criteria established by the Secretary to ensure that the trial conforms to appropriate scientific and ethical standards; and

(C) in the case of a trial initiated before January 1, 2010, the device involved in the trial has been determined by the Secretary to be intended for use in the diagnosis, monitoring, or treatment of an immediately life-threatening disease or condition.

(n) Requirement of a Surety Bond for Certain Providers of Services and Suppliers.—

(1) In general.—The Secretary may require a provider of services or supplier described in paragraph (2) to provide the Secretary on a continuing basis with a surety bond in a form specified by the Secretary in an amount (not less than $50,000) that the Secretary determines is commensurate with the volume of the billing of

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

the provider of services or supplier. The Secretary may waive the requirement of a bond under the preceding sentence in the case of a provider of services or supplier that provides a comparable surety bond under State law.

(2) Provider of services or supplier described.—A provider of services or supplier described in this paragraph is a provider of services or supplier the Secretary determines appropriate based on the level of risk involved with respect to the provider of services or supplier, and consistent with the surety bond requirements under sections 1834(a)(16)(B) and 1861(o)(7)(C).

(o) Suspension of Payments Pending Investigation of Credible Allegations of Fraud.—

(1) In general.—The Secretary may suspend payments to a provider of services or supplier under this title pending an investigation of a credible allegation of fraud against the provider of services or supplier, unless the Secretary determines there is good cause not to suspend such payments.

(2) Consultation.—The Secretary shall consult with the Inspector General of the Department of Health and Human Services in determining whether there is a credible allegation of fraud against a provider of services or supplier.

(3) Promulgation of regulations.—The Secretary shall promulgate regulations to carry out this subsection, section 1860D–12(b)(7) (including as applied pursuant to section 1857(f)(3)(D)),[580] and section 1903(i)(2)(C).

(4)[581] Credible allegation of fraud.—In carrying out this subsection, section 1860D–12(b)(7) (including as applied pursuant to section 1857(f)(3)(D)), and section 1903(i)(2)(C), a fraud hotline tip (as defined by the Secretary) without further evidence shall not be treated as sufficient evidence for a credible allegation of fraud.

---

[547] See Vol. II, P.L. 108-173, §953(b), with respect to the annual publication of a list of national coverage determinations.

[548] P.L. 112-40, §261(a)(3)(A), struck out “utilization and quality control peer review” and inserted “quality improvement”, applicable to contracts entered into or renewed on or after January 1, 2012.

[549] See Vol. II, P.L. 99-514, §1895(b)(16)(C), with respect to deeming approval.

[550] See Vol. II, P.L. 110-275, §143(d), with respect to a rule of construction regarding existing regulations and policies.

[551] P.L. 110-275, §135(a)(2)(A)(iii), added paragraph (23), applicable to advanced diagnostic imaging services furnished on or after January 1, 2012.

[552] P.L. 111–148, §1104(d)(1), added paragraph (25). Effective March 23, 2010.

[553] Current version available at https://www.cms.gov/Medicare/Billing/ElectronicBillingEDITrans/Remittance.html, (October 3, 2018).

[554] See Vol. II, P.L. 83-591, §5000.

[555] August 5, 1997 [P.L. 105-33; 111 Stat. 329].

[556] P.L. 112-242, §202(a)(1), struck “A primary plan” and inserted “Subject to paragraph (9), a primary plan”, effective for years beginning with 2014.

[557] P.L. 112-242, §205(a), added this new sentence, applicable with respect to actions brought and penalties sought on or after 6 months after January 10, 2013.

[558] P.L. 112-242, §201(b), added this new clause (vii), effective January 10, 2013.

[559] P.L. 112-242, §201(b), added this new clause (viii), effective January 10, 2013.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

[560] As in original-period missing.

[561] See Vol. II, P.L. 83-591, §5000.

[562] See Vol. II, P.L. 83-591, §6103(l)(12).

[563] See Vol. II, P.L. 83-591, §6051.

[564] See Vol. II, P.L. 83-591, §6103(l)(12).

[565] P.L. 114-10, §516(a); Inserted subparagraph (b)(5)(E). Effective April 16, 2015

[566] P.L. 115–271, §4002, amended clause (i) to include subclause (II). Effective October 24, 2018.

[567] P.L. 112-242, §204, added these 2 sentences after clause (ii) of §1862(b)(8)(B), effective January 10, 2013.

[568] P.L. 112-242, §203(1), struck out "shall be subject to a civil money penalty of $1,000 for each day of noncompliance with respect to each claimant." and inserted "may be subject to a civil penalty of up to $1,000 for each day of noncompliance with respect to each claimant.", effective January 10, 2013.

[569] P.L. 112-242, §203(2), added this new subparagraph (I), effective January 10, 2013.

[570] P.L. 112-242, §202(a)(2), added this new paragraph (9), to be applicable to years after 2014.

[571] P.L. 113-188, §901(d), struck out "for a year" and inserted "for 2014". Effective November 26, 2014.

[572] See Vol. II, P.L. 87-781, §103(c)(3).

[573] See Vol. II, P.L. 75-717, §505(e).

[574] See Vol. II, 21 C.F.R. 310.6.

[575] August 18, 1987 [P.L. 100-93; 101 Stat. 680].

[576] P.L. 112-40, §261(a)(3)(A), struck out "utilization and quality control peer review" and inserted "quality improvement", applicable to contracts entered into or renewed on or after January 1, 2012.

[577] See Vol. II, 5 U.S.C. 552.

[578] P.L. 75-717.

[579] P.L.114-255, §4009(a); inserted new subparagraph (D); Effective with respect to local coverage determinations that are proposed or revised on or after the date that is 180 days after enactment, which was December 13, 2016.

[580] P.L. 115–271, §2008(c), inserted ", section 1860D–12(b)(7) (including as applied pursuant to section 1857(f)(3)(D))," after "this subsection." Effective with respect to plan years beginning on or after January 1, 2020.,

[581] P.L. 115–271, §2008(d), inserted paragraph (4). Effective with respect to plan years beginning on or after January 1, 2020.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

# artacent®

## APPLICATION GUIDE



1. Ensure the wound is free of active infection and then **prep the wound site.** *Do not use Betadyne.



2. **Debride wound,** removing all the necrotic (dead) tissue.



3. Open the outer peel pouch and deliver the innermost sterile sealed pouch containing the allograft material to a **sterile field**.



4. Open the sterile sealed pouch and **place allograft** using either side directly on the granular bed of the wound.



5. **Anchor** allograft using preferred method of fixation. Apply **non-adherent bandage** to cover allograft. Then **wrap** the area with gauze. *Optimal dressings promote moisture balance and provide exudate control.



6. **Evaluate wound** and repeat application weekly or at the discretion of the health care provider.

**APPLICATION GUIDE FOR:**

**artacent wound® & artacent ac®**
advanced products of

**tides**medical
advanced **products**. expert **service.**

Want to learn more? Our team is available by phone at **888-494-4441** and email at **info@tidesmedical.com.**

888-494-4441 I am a customer employee sales agent

about products patients clinicians reimbursement work with tides resources contact us

about us products patients clinicians reimbursement
work with tides resources contact us CUSTOMER LOGIN

EMPLOYEE LOGIN SALES AGENT LOGIN 888-494-4441

about us products patients clinicians reimbursement work with tides resources contact us CUSTOMER LOGIN EMPLOYEE LOGIN

SALES AGENT LOGIN 888-494-4441



artacent wound

## Wound specific, dual-layer amniotic graft designed for ease-of-use.

## Q-CODE: Q4169



### Flexible

Stores dry at room temperature with no need for refrigeration. Product remains safe and effective up to 5 years from date of manufacturing.

### Easy-to-Use

The graft can be placed on either side facing the wound, remains in place, and doesn't require sutures.

### Safe

Produced through Tides Medical's proprietary Artacleanse® process: strong enough to make a graft safe for implantation but gentle enough to maintain the natural biologic factors.

ARTACLEANSE

### Reimbursable

Expert support to help you navigate the complex reimbursement process.

REIMBURSEMENT

# Incredibly versatile wound covering for patients with:

Diabetic Foot Ulcer • Pressure Ulcer • Venous Stasis Ulcer • Burns • Mohs Surgery

artacent wound

## part numbers and patch sizes

If you are a physician, PA, podiatrist, or a nurse practitioner, contact Tides to learn how we can help increase your patients' access to Artacent Wound products.

### ARTACENT WOUND PART NUMBERS AND SIZES

| Part Number | Size |
|---|---|
| 1. ART0009 | 9 mm |
| 2. ART0012 | 12 mm |
| 3. ART0015 | 15 mm |
| 4. ART0018 | 18 mm |
| 5. ART0202 | 2 x 2 cm |
| 6. ART0203 | 2 x 3 cm |
| 7. ART0303 | 3 x 3 cm |
| 8. ART0404 | 4 x 4 cm |
| 9. ART0408 | 4 x 8 cm |




# Artacleanse Process

Our proprietary Artacleanse Process is strong enough to make a graft safe for implantation but gentle enough to maintain natural biologic factors.

LEARN MORE

## Artacent Wound Resources:

ARTACENT WOUND PHYSICIAN OFFICE FACT SHEET

ARTACENT WOUND HOPD/INPATIENT FACT SHEET

MORE RESOURCES

APPLICATION HOW-TO

ARTACENT REIMBURSEMENT GUIDE


## Artacent Wound Resources:

ARTACENT WOUND PHYSICIAN OFFICE FACT SHEET

MORE RESOURCES

ARTACENT WOUND HOPD/INPATIENT FACT SHEET

APPLICATION HOW-TO

ARTACENT REIMBURSEMENT GUIDE


contact us
888-494-4441
info@tidesmedical.com
1819 W. Pinhook Rd., Suite 206
Lafayette, LA 70508

quick resources
new account form
patient intake form
new agent form
logins
sitemap

CONTACT US

Search

Copyright © 2022 Tides Medical | All Rights Reserved | Licensures and Certifications



# artacent

## WOUND

for the physician office

## to us, it's personal.

**tides medical**® stands behind our advanced products and expert service, so you can...

**Help patients get the treatments they deserve.** By providing high-quality, safe products for your patients and supporting physicians throughout the process, we ensure more people can benefit from advanced treatment.

**Focus on what you do best and let us handle the rest.** Our team of experts are here to help you and your staff through:

- Ample inventory options and overnight shipping
- Favorable customer programs, minimizing your risk
- Reimbursement reviews and confirmations
- Benefits verification and pre-authorization
- Coding and appeals guidance

tidesmedical®

advanced **products**. expert **service.**

**INCREDIBLY VERSATILE WOUND COVERING FOR PATIENTS WITH:**

- Diabetic Ulcers
- Pressure Ulcers
- Venous Stasis Ulcers
- Burns
- Mohs Procedures

888-494-4441

www.**tidesmedical**.com

# artacent WOUND

wound specific, dual-layer amniotic patch designed for ease-of-use




## Q Code: **Q4169**

Artacent Wound® is a safe, natural biologic barrier that maintains the original powerful characteristics of amniotic tissue. The unique design of Artacent Wound allows for easy manipulation and repositioning, making it a flexible, dependable option for a variety of wound covering applications.

**EASE-OF-USE:** Can be placed on either side facing the wound, remains in place and doesn't require sutures.

**SAFE:** Produced through Tides Medical's proprietary Artacleanse® process: strong enough to make a graft safe for implantation but gentle enough to maintain the natural biologic factors.

**REIMBURSABLE:** Expert support to help you navigate the complex reimbursement process.

**FLEXIBLE:** Stores dry at room temperature with no need for refrigeration. Product remains safe and effective up to 5 years from date of manufacturing.

### ARTACENT WOUND PART NUMBERS AND SIZES

| Part Number | Size | Billing Units |
|---|---|---|
| **1.** ART0015 | 15 mm | 2 |
| **2.** ART0202 | 2x2 cm | 4 |
| **3.** ART0404 | 4x4 cm | 16 |
| **4.** ART0408 | 4x8 cm | 32 |







Contact the sales and service professionals in our nationwide network to learn how we take your business personally.

sales: **888-494-4441**
**tidesmedical.com**

service: **800-318-9419**
**reimbursement@tidesmedical.com**

tidesmedical® advanced **products.** expert **service.**

# artacent®

## 2022 reimbursement guide
## artacent wound & artacent ac

available for download at https://www.tidesmedical.com/guide



**REIMBURSEMENT SERVICES CONTACT:**
800-318-9419
337-205-3599
reimbursement@tidesmedical.com

tidesmedical®
888-494-4441
www.tidesmedical.com



© 2022 Tides Medical
CPT Copyright 2022 American Medica
File 18.pdf - Page 833 of 8980
of the American Medical Association.

we're here if you need us.

**REIMBURSEMENT SERVICES CONTACT:**

800-318-9419 337-205-3599 reimbursement@tidesmedical.com

# table of contents

1. Diagnosis Codes....5
2. Coverage....5
3. Site Preparation Codes....6
4. Application Codes....6-7
5. Patient Intake Form....8
6. Billing Reminders....9
7. **Artacent AC** Product Codes and Claim forms ....10-11
8. **Artacent Wound** Product Codes and Claim forms ....12-13
9. Claim form Field 19 Guidance....14

**REIMBURSEMENT SERVICES CONTACT:**
800-318-9419 337-205-3599 reimbursement@tidesmedical.com

# taking your business personally.



**KEVIN KABOOS**
VP of Reimbursement

At Tides Medical, we sell advanced biologic products like Artacent Wound and Artacent AC to help revolutionize access to the power of birth tissue technology. But at the end of the day, we are really in the business of helping people like you. Your business centers around patient care – and it should. With our advanced products and expert service, your patients can get the care they deserve.

As your dedicated Reimbursement Team, we are here to take the complex burden of reimbursement off your shoulders so that you can concentrate on what matters most – your patients. Our team is committed to working with yours to deliver patient-first, over-the-top service. This is at the core of what we do, every single day. **At Tides, helping you with reimbursement is a responsibility we take personally.**

## HOTLINE REIMBURSEMENT TEAM:

Have a question about proper coding? Need help with benefit verification or billing issues for Artacent® products? Just give us a call! Our in-house team of reimbursement professionals is available Monday through Friday, 9:00 am to 5:00 pm CST, to help resolve common reimbursement and billing issues.

## FIELD REIMBURSEMENT MANAGERS:

Our Field Reimbursement Managers (FRM) are well versed in Medicare (MAC) claim requirements. They work directly with clinicians and their staff in providing specific regional MAC claim guidance and support during the claims and billing process. Should you have questions or need reimbursement assistance, call our reimbursement hotline to be connected with your regional FRM.

**REIMBURSEMENT SERVICES CONTACT:**

800-318-9419 | 337-205-3599 | reimbursement@tidesmedical.com

# diagnosis codes (ICD-10 CODES) 1.

- Artacent Wound® and Artacent AC® are human tissue products for transplantation. Artacent Wound and Artacent AC are processed and distributed in accordance with Food and Drug Administration (FDA) requirements for Human Cellular and Tissue-based Products (HCT/P) (21 Code of Federal Regulations Part 1271, and confirmed by FDA Tissue Reference Group (TRG), confirmation letter on file at Tides Medical), State regulations, and the guidelines of the American Association of Tissue Banks (AATB). Caution: Federal Law restricts this product to sale by or on the order of a licensed medical professional, not for veterinary use.
- Artacent Wound and Artacent AC products are a wound covering for patients with various types of wounds including, but not limited to, diabetic ulcers, pressure ulcers, venous stasis ulcers, burns and Mohs surgery.
- We recommend reviewing your Local Coverage Determination (LCD) for approved uses.
- Providers should select the ICD:10 code that most accurately reflects the patient's condition.

# coverage 2.

- **Based on medical necessity: Noridian, NGS, WPS and Palmetto** do not have an active Local Coverage Determination (LCD) for Skin Substitutes or Artacent AC®/Artacent Wound®. Coverage is based on medical necessity. All guidelines in the product's instructions for use must be followed. Coverage cannot be guaranteed and is ultimately determined by the payer.
- **LCD: Novitas Solutions (L35041), CGS (L35041), First Coast (L36377)** have active Local Coverage Determinations (LCD) for Skin Substitutes. These LCD should be reviewed for all coverage requirements for Artacent Wound®/ Artacent AC® including covered indications, documentation requirements and limitations. Please see the LCD numbers referenced above.
- **MUE (Medically Unlikely Edits):** Medicare covers up to 124 units per application for Artacent Wound®, and up to 36 units per application of Artacent AC®.

# site preparation codes 3.

| Code | Description |
|---|---|
| 15002 | Surgical preparation or creation of recipient site by excision of open wounds, burn eschar, or scar (including subcutaneous tissues), or incisional release of scar contracture, trunk, arms, legs; first 100 sq cm or 1% of body area of infants and children |
| +15003 | Each additional 100 sq cm, or part thereof, or each additional 1% of body area of infants and children (List separately in addition to code for primary procedure) |
| 15004 | Surgical preparation or creation of recipient site by excision of open wounds, burn eschar, or scar (including subcutaneous tissues), or incisional release of scar contracture, face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet and/or multiple digits; first 100 sq cm or 1% of body area of infants and children |
| +15005 | Each additional 100 sq cm, or part thereof, or each additional 1% of body area of infants and children (List separately in addition to code for primary procedure) |

- The surgical site preparation codes may not be reimbursed in the physician office; payer guidelines vary.
- Code may only be billed once per wound and the documentation should reflect medical necessity.
- If billed on the same day as the product application, the application codes are subject to the multiple procedure reduction rule.
- For additional details on the utilization of the surgical site preparation codes please contact the payer directly.

# application codes 4.

| WOUND SIZE / WOUND LOCATION | trunks, arms & legs | face, scalp, hands & feet |
|---|---|---|
| wounds up to 100 $cm^2$ | **15271** first 25 $cm^2$ | **15275** first 25 $cm^2$ |
| | **+15272** each additional 25 $cm^2$ | **+15276** each additional 25 $cm^2$ |
| wounds 100 $cm^2$ & larger | **15273** first 100 $cm^2$ | **15277** first 100 $cm^2$ |
| | **+15274** each additional 100 $cm^2$ | **+15278** each additional 100 $cm^2$ |

see page 7 for a more detailed description of application codes →

# application codes

# 4.

| CPT®[1] Code | CPT® Description | Medicare National Average Payment 2022 Non-Facility (Office) | Medicare National Average Payment 2022 Facility |
|---|---|---|---|
| 15271 | Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq. cm; first 25 sq. cm or less wound surface area | $152.27 | $77.52 |
| +15272 | Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq. cm; each additional 25 sq. cm wound surface area, or part thereof (List separately in addition to code for primary) | $23.53 | $15.57 |
| 15273 | Application of skin substitute graft to trunk, arms, legs, total wound surface area greater than or equal to 100 sq. cm; first 100 sq. cm wound surface area, or 1% of body area of infants and children | $305.23 | $178.91 |
| +15274 | Application of skin substitute graft to trunk, arms, legs, total wound surface area greater than or equal to 100 sq. cm; each additional 100 sq. cm wound surface area, or part thereof, or each additional 1% of body area of infants and children, or part thereof (List separately in addition to code for primary procedure) | $80.63 | $40.14 |
| 15275 | Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq. cm; first 25 sq. cm or less wound surface area | $157.46 | $87.90 |
| +15276 | Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq. cm; each additional 25 sq. cm wound surface area, or part thereof (List separately in addition to code for primary procedure) | $30.80 | $23.19 |
| 15277 | Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area greater than or equal to 100 sq. cm; first 100 sq. cm wound surface area, or 1% of body area of infants and children | $334.30 | $204.18 |
| +15278 | Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area greater than or equal to 100 sq. cm; each additional 100 sq. cm wound surface area, or part thereof, or each additional 1% of body area of infants and children, or part thereof (List separately in addition to code for primary procedure.) | $93.44 | $50.87 |

# patient intake form 5.

The patient intake form should be filled out in its entirety and faxed to 337-205-3599. Once received, the Hotline team will complete the benefits investigation and return results to your office within 24-48 hours. Case managers are available Monday-Friday from 9:00am - 5:00pm CST to answer questions.

**This form is available on the Tides Medical website at www.tidesmedical.com/intake**

## tidesmedical® Patient Intake Form

Hotline Contact Info
Phone: 1-800-318-9419
E-fax: 337-205-3599

Agent Name: ______________________ Agent Email: ______________________

| PROVIDER INFORMATION | | |
|---|---|---|
| Provider Name | Provider NPI | |
| Practice Name | Practice NPI | Practice Tax ID |
| Address, City, State Zip | | |
| Office Contact Name | Phone | Fax |
| Office Contact Email | | Preferred Contact Method ☐ Fax ☐ Email |

| TREATING FACILITY (IF DIFFERENT FROM ABOVE) | | | |
|---|---|---|---|
| Facility Name | | | |
| Phone | Fax | NPI | Tax ID |
| Address, City, State Zip | | | |

| PATIENT INFORMATION (*NAME AND DOB REQUIRED) | | |
|---|---|---|
| Patient Name* | Phone | Date of Birth* |
| Address, City, State Zip | | |

| INSURANCE INFORMATION (PLEASE ATTACH A COPY OF THE PATIENT'S INSURANCE CARDS) | | |
|---|---|---|
| Primary Insurance | Member ID | Phone |
| Secondary Insurance | Member ID | Phone |

### TREATMENT INFORMATION

Product *REQUIRED: ☐ Artacent Wound® ☐ Artacent AC®

| | Diagnosis Codes *REQUIRED | Wound Size (sq cm) |
|---|---|---|
| Wound 1 | | |
| Wound 2 | | |

Don't forget to select the correct product.

Place of Service *REQUIRED

☐ Physician Office
☐ Patient Home
☐ Hospital Outpatient (HOPD)
☐ Assisted Living
☐ Surgery Center
☐ Nursing Facility
☐ Other: ______________

Graft Application

☐ 15271: Application of graft to trunk, arms, legs, total wound surface area up to 100cm²; First 25cm² wound surface area or less
☐ 15273: Application of graft to trunk, arms, legs, total wound surface area greater than or equal to 100cm²; First 100cm² wound surface area
☐ 15275: Application of graft to face, scalp, feet, etc. total wound surface area up to 100cm²; First 25cm² wound surface area or less
☐ 15277: Application of graft to face, scalp, feet, etc. total wound surface area greater than or equal to 100cm²; First 100cm² wound surface area

### HIPAA AUTHORIZATION

By submitting this form you certify that you have received the necessary patient consent to release the medical and/or other patient information referenced on this form to Tides Medical for the purpose of using and re-disclosing this information, as necessary, for insurance verification, prior authorization, and/or claims support.

The Tides Medical® Hotline is an information service program. Reimbursement and coverage results are based on the information provided to Tides Medical® from the third party payer. Coverage and reimbursement are subject to change at any time. The Hotline results are not a guarantee of coverage and payment now or in the future.

Fax this form to Reimbursement Services: 337-205-3599

MKT-020, Rev. 01

# billing reminders

# 6.

## documentation checklist

The following guidelines are suggested based on general documentation practices. For specific information please reference your Local Coverage Determination (LCD).

- ☐ Baseline measurements of the wound immediately prior to initiation of treatment (size, location, stage, duration)
- ☐ Type(s) of conservative treatment that failed to induce significant healing
- ☐ Presence or absence of infection and treatment provided/response (if applicable)
- ☐ Adequate treatment of the underlying disease contributing to the ulcer
- ☐ Adequate blood flow
- ☐ Adequate glucose control (diabetic patients)
- ☐ Clean wound bed, free of exudate or necrotic tissue
- ☐ Note **Artacent Wound®** or **Artacent AC®** by name/descriptor and provide lot number
- ☐ Wound description prior to and after graft application
- ☐ Application number and improvement since last treatment
- ☐ Amount of graft utilized and amount discarded (if applicable)
- ☐ Appropriate wound dressing changes, patient compliance and off-loading
- ☐ Fixation method used to anchor the graft

## helpful billing tips to remember.

1. Verify the size of **Artacent Wound®** or **Artacent AC®** applied and bill the appropriate number of units. Artacent Wound and Artacent AC are considered single use products; always bill for the entire piece.

2. Understand the CPT® code descriptors: look at total surface area and anatomical location.

3. Review add-on CPT® codes for larger wounds.

4. Verify your billed charge for Artacent Wound or Artacent AC. Review applicable allowables and your cost. Determine your charge using the methodology you use for other products/services.

5. The Tides Reimbursement Hotline is available to answer any questions you may have when billing for Artacent Wound.

**REIMBURSEMENT SERVICES:**
800-318-9419
337-205-3599
reimbursement@tidesmedical.com

# artacent ac PRODUCT CODE (HCPCS CODE) 7.

| | |
|---|---|
| HCPCS CODE | Q4190 |
| DESCRIPTION | Artacent AC®, Per square centimeter |
| MEDICARE PAYMENT RATE | Priced by contractor |

- HCPCS codes not listed on the Medicare Part B ASP file are priced individually by Medicare Administrative Contractor (MAC). Contractors may use Wholesale Acquisition Cost® (WAC) +6% or the invoice cost[1].
- For information specific to your MAC, please contact the Tides Medical Reimbursement Hotline, 800-318-9419.

| Size | Area | Billing Units |
|---|---|---|
| 15 mm | 1.77 cm² | 2 |
| 2x2 cm | 4.00 cm² | 4 |
| 4x4 cm | 16.00 cm² | 16 |
| 4x8 cm | 32.00 cm² | 32 |

**MAC REGION PRICING**

Invoice Cost

**CGS Medicare**
**First Coast Service Options**
**NGS Medicare**
**Noridian Healthcare Solutions**
**Novitas Solutions**
**Palmetto GBA Medicare**
**WPS Medicare**



# SAMPLE CLAIM FORM 7.

## SAMPLE CMS 1500 CLAIM FORM FOR ARTACENT AC




For internal use only.

# artacent wound PRODUCT CODE (HCPCS CODE) 8.

| | |
|---|---|
| HCPCS CODE | Q4169 |
| DESCRIPTION | Artacent Wound®, Per square centimeter |
| MEDICARE PAYMENT RATE | Priced by Contractor |

- HCPCS codes not listed on the Medicare Part B ASP file are priced individually by Medicare Administrative Contractor (MAC). Contractors may use Wholesale Acquisition Cost® (WAC) +6% or the invoice cost[1].
- For information specific to your MAC, please contact the Tides Medical Reimbursement Hotline, 800-318-9419.

| Size | Area | Billing Units |
|---|---|---|
| 15 mm | 1.77 $cm^2$ | 2 |
| 2x2 cm | 4.00 $cm^2$ | 4 |
| 4x4 cm | 16.00 $cm^2$ | 16 |
| 4x8 cm | 32.00 $cm^2$ | 32 |

**MAC REGION PRICING**

| Invoice Cost | WAC+6% |
|---|---|
| CGS Medicare | First Coast Service Options |
| NGS Medicare | Palmetto GBA Medicare |
| Noridian Healthcare Solutions | WPS Medicare |
| | Novitas Solutions |

ALLOWABLE RATE FOR MEDICARE in the WAC +6% MACs:

**$418.70 per unit**



# artacent wound SAMPLE CLAIMS FORM 8.

## SAMPLE CMS 1500 CLAIM FORM FOR ARTACENT WOUND


1. MEDICARE (Medicare #) MEDICAID (Medicaid #) TRICARE CHAMPUS (Sponsor's SSN) CHAMPVA (Member ID#) GROUP HEALTH PLAN (SSN or ID) FECA BLK LUNG (SSN) OTHER (ID)
1a. INSURED'S I.D. NUMBER (For Program in Item 1)
2. PATIENT'S NAME (Last Name, First Name, Middle Initial): Jones, John J.
3. PATIENT'S BIRTH DATE MM DD YY: 09 19 1931 SEX M [X] F
4. INSURED'S NAME (Last Name, First Name, Middle Initial)
5. PATIENT'S ADDRESS (No., Street): 1234 Any Street
6. PATIENT RELATIONSHIP TO INSURED: Self [X] Spouse Child Other
7. INSURED'S ADDRESS (No., Street)
CITY: Anywhere STATE: LA
8. PATIENT STATUS: Single [X] Married Other
CITY STATE
ZIP CODE: 99999 TELEPHONE (Include Area Code): (999 )999-9999
Employed Full-Time Student Part-Time Student
ZIP CODE TELEPHONE (Include Area Code) ( )
9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)
10. IS PATIENT'S CONDITION RELATED TO:
11. INSURED'S POLICY GROUP OR FECA NUMBER
a. OTHER INSURED'S POLICY OR GROUP NUMBER
a. EMPLOYMENT? (Current or Previous) YES NO [X]
a. INSURED'S DATE OF BIRTH MM DD YY SEX M F
b. OTHER INSURED'S DATE OF BIRTH MM DD
b. AUTO ACCIDENT? YES NO [X] PLACE (State)
b. EMPLOYER'S NAME OR SCHOOL NAME
c. EMPLOYER'S NAME
c. OTHER ACCIDENT? YES NO
c. INSURANCE PLAN NAME OR PROGRAM NAME
10d. RESERVED FOR LOCAL USE
d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES NO If yes, return to and complete item 9 a-d.
13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize
14. DATE OF CURRENT MM DD YY
INJURY (Accident) OR PREGNANCY(LMP)
15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS GIVE FIRST DATE MM DD
17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
17a.
17b. NPI
FROM TO
19. RESERVED FOR LOCAL USE
20. OUTSIDE LAB? YES NO $ CHARGES
21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY (Relate Items 1, 2, 3 or 4 to Item 24E by Line)
1. E11 621
2.
3.
4.
22. MEDICAID RESUBMISSION CODE ORIGINAL REF. NO.
23. PRIOR AUTHORIZATION NUMBER: XXXXX
24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. #
07 01 20 07 01 20 | 11 | Q4169 | 1 | xxx xx 4 | NPI
07 01 20 07 01 20 | 11 | 15275 RT | 1 | xxx xx 1 | NPI
31. SIGNATURE OF PHYSICIAN INCLUDING DEGREES OR (I certify that the statements apply to this bill and are made
SIGNED

**Field 21**
Enter appropriate ICD-10 diagnosis code(s)

**Field 19**
Enter appropriate invoice information per the chart on the following page according to your MAC

**Field 24F**
Enter appropriate charges for each line item

**Field 23**
Enter if prior authorization is required

**Field 24B**
Enter appropriate code indicating where service was provided.

**Field 24D**
Enter applicable HCPCS/CPT® codes and modifiers. Check directly with the payer to determine specific modifier requirements.

**Field 24E**
Enter diagnosis code(s) corresponding with code(s) in Field 21.

**Field 24G**
Enter appropriate number of units for each service provided. Artacent Wound is billed per sq. cm. (this is an example, sizes vary)
15 mm = 2 units
2x2 cm = 4 units
4x4 cm = 16 units
4x8 cm = 32 units

For internal use only.

# FIELD 19 GUIDANCE ARTACENT AC & ARTACENT WOUND 9.

**Field 19**
Enter appropriate invoice information per the chart on the following page according to your MAC

19. RESERVED FOR LOCAL USE

AS REFERENCED ON PAGE 11 FOR ARTACENT AC
AS REFERENCED ON PAGE 13 FOR ARTACENT WOUND

## FIELD 19 GUIDANCE BY MAC for artacent ac

**For CGS:**
Artacent AC, # Units, Invoice Total $XXX.XX

**For First Coast:**
Invoice $XXX.XX

**For NGS:**
Artacent AC, # Units, Invoice Total $XXX.XX

**For Noridian:**
Invoice $XXX.XX

**For Novitas:**
Invoice $XXX.XX, Product Name, Graft Size

**For Palmetto:**
Invoice $XXX.XX

**For WPS:**
Invoice $XXX.XX

Q4190




## FIELD 19 GUIDANCE BY MAC for artacent wound

**For CGS:**
Artacent Wound, # Units, Invoice Total $XXX.XX

**For NGS:**
Artacent Wound, # Units, Invoice Total $XXX.XX

**For Noridian:**
Invoice $XXX.XX

Q4169




artacent ac                artacent WOUND

The reimbursement information provided is for informational purposes only. Coding and coverage should always be confirmed directly with the payer. Information provided in this guide was gathered from outside sources and does not represent a guarantee of coverage or payment now or in the future. Coding should always accurately reflect the services provided.

CPT® is a registered trademark of the American Medical Association.

© 2022 Tides Medical

PAGE 6 [1] CPT 2019 Professional Edition, 2019, American Medical Association and CMS 2019 PFS Final Rule, www.cms.gov

PAGE 8 [1] Medicare Claims Processing Manual, Chapter 17 Drugs and Biologicals, http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c17.pdf

PAGE 10 Medicare Claims Processing Manual, Chapter 17 Drugs and Biologicals, http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c17.pdf

tidesmedical®
advanced **products.** expert **service.**




## REIMBURSEMENT
### SUPPORT SERVICES

**supporting you,**
so you can focus
on what you
do best.

**CONTACT A REIMBURSEMENT SPECIALIST FOR HELP TODAY**

800-318-9419 | 337-205-3599 | reimbursement@tidesmedical.com

www.tidesmedical.com | 888-494-4441 | 1819 w. pinhook road, suite 206 lafayette, la 70508

*HCPCS and CPT Codebook - 2022 > Surgery Codes - Integumentary Codes - (10004 - 19499)*

# 11102 - TANGNTL BX SKIN SINGLE LES

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
  - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Surgical Procedures on the Skin, Subcutaneous and Accessory Structures
- Biopsy Procedures on the Skin
  - The use of a biopsy procedure code (eg, 11102, 11103, 11104, 11105, 11106, 11107) indicates that the procedure to obtain tissue solely for diagnostic histopathologic examination was performed independently, or was unrelated or distinct from other procedures/services provided at that time. Biopsies performed on different lesions or different sites on the same date of service may be reported separately, as they are not considered components of other procedures.

    During certain surgical procedures in the integumentary system, such as excision, destruction, or shave removals, the removed tissue is often submitted for pathologic examination. The obtaining of tissue for pathology during the course of these procedures is a routine component of such procedures. This obtaining of tissue is not considered a separate biopsy procedure and is not separately reported.

    Partial-thickness biopsies are those that sample a portion of the thickness of skin or mucous membrane and do not penetrate below the dermis or lamina propria. Full-thickness biopsies penetrate into tissue deep to the dermis or lamina propria, into the subcutaneous or submucosal space.

    Sampling of stratum corneum only, by any modality (eg, skin scraping, tape stripping) does not constitute a skin biopsy procedure and is not separately reportable.

    An appropriate biopsy technique is selected based on optimal tissue-sampling considerations for the type of neoplastic, inflammatory, or other lesion requiring a tissue diagnosis. Biopsy of the skin is reported under three distinct techniques:

    Tangential biopsy (eg, shave, scoop, saucerize, curette) is performed with a sharp blade, such as a flexible biopsy blade, obliquely oriented scalpel or curette to remove a sample of epidermal tissue with or without portions of underlying dermis. The intent of a tangential biopsy (11102, 11103) is to obtain a tissue sample from a lesion for the purpose of diagnostic pathologic examination. Biopsy of lesions by tangential technique (11102, 11103) is not considered an excision. Tangential biopsy technique may be represented by a superficial sample and does not involve the full thickness of the dermis, which could result in portions of the lesion remaining in the deeper layers of the dermis.

    For therapeutic removal of epidermal or dermal lesion(s) using shave technique, see 11300-11313.

    An indication for a shave removal (11300-11313) procedure may include a symptomatic lesion that rubs on waistband or bra, or any other reason why an elevated lesion is being completely removed with the shave technique, suggesting a therapeutic intent. It is the responsibility of the physician or qualified health care professional performing the procedure to clearly indicate the purpose of the procedure.

Punch biopsy requires a punch tool to remove a full-thickness cylindrical sample of skin. The intent of a punch biopsy (11104, 11105) is to obtain a cylindrical tissue sample of a cutaneous lesion for the purpose of diagnostic pathologic examination. Simple closure of the defect is included in the service. Manipulation of the biopsy defect to improve wound approximation is included in simple closure.

Incisional biopsy requires the use of a sharp blade (not a punch tool) to remove a full-thickness sample of tissue via a vertical incision or wedge, penetrating deep to the dermis, into the subcutaneous space. The intent of an incisional biopsy (11106, 11107) is to obtain a full-thickness tissue sample of a skin lesion for the purpose of diagnostic pathologic examination. This type of biopsy may sample subcutaneous fat, such as those performed for the evaluation of panniculitis. Although closure is usually performed on incisional biopsies, simple closure is not separately reported.

(For complete lesion excision with margins, see 11400-11646)

When multiple biopsy techniques are performed during the same encounter, only one primary lesion biopsy code (11102, 11104, 11106) is reported. Additional biopsy codes should be selected based on the following convention:

If multiple biopsies of the same type are performed, the primary code for that biopsy should be used along with the corresponding add-on code(s).

If an incisional biopsy is performed, report 11106 in combination with a tangential (11103), punch (11105), or incisional biopsy (11107) for the additional biopsy procedures.

If a punch biopsy is performed, report 11104 in combination with a tangential (11103), or punch (11105), for the additional biopsy procedures.

If multiple tangential biopsies are performed, report tangential biopsy (11102) in combination with 11103 for the additional tangential biopsy procedures.

When two or more biopsies of the same technique (ie, tangential, punch, or incisional) are performed on separate/additional lesions, use the appropriate add-on code (11103, 11105, 11107) to specify each additional biopsy. When two or three different biopsy techniques (ie, tangential, punch, or incisional) are performed to sample separate/additional lesions, select the appropriate biopsy code (11102, 11104, 11106) plus an additional add-on code (11103, 11105, 11107) for each additional biopsy performed.

The following table provides an illustration of the appropriate use of these codes for multiple biopsies:

| Procedures Performed | CPT Code(s) Reported |
|---|---|
| 2 tangential biopsies | 11102 X 1, 11103 X 1 |
| 3 punch biopsies | 11104 X 1, 11105 X 2 |
| 2 incisional biopsies | 11106 X 1, 11107 X 1 |
| 1 incisional biopsy, 1 tangential biopsy and 1 punch biopsy | 11106 X 1, 11103 X 1, 11105 X 1 |
| 1 punch biopsy and 2 tangential biopsies | 11104 X 1, 11103 X 2 |

(For biopsy of nail unit, use 11755)

(For biopsy, intranasal, use 30100)

(For biopsy of lip, use 40490)

(For biopsy of vestibule of mouth, use 40808)

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(For biopsy of tongue, anterior two-thirds, use 41100)

(For biopsy of floor of mouth, use 41108)

(For biopsy of penis, use 54100)

(For biopsy of vulva or perineum, see 56605, 56606)

(For biopsy of eyelid skin including lid margin, use 67810)

(For biopsy of conjunctiva, use 68100)

(For biopsy of ear, use 69100)

- Tangential biopsy of skin (eg, shave, scoop, saucerize, curette)

| | |
|---|---|
| **CPT Code:** | 11102 |
| **Long Descriptor:** | Tangential biopsy of skin (eg, shave, scoop, saucerize, curette); single lesion |
| **Medium Descriptor:** | TANGENTIAL BIOPSY SKIN SINGLE LESION |
| **Short Descriptor:** | TANGNTL BX SKIN SINGLE LES |
| **Consumer Friendly Descriptor:** | Biopsy of related skin growth, first growth |
| **Clinician Friendly Descriptor:** | Tangential biopsy of single lesion of skin |

### Citation

CPT Changes: An Insider's View 2019
CPT Assistant Jan 19: 9
CPT Assistant Dec 19: 9
CPT Assistant May 20: 13

### Code Flags

First Appearance: 20190101

### Additional parenthetical guidelines from associated codes

67810 - (For biopsy of skin of the eyelid, see 11102, 11103, 11104, 11105, 11106, 11107)
30100 - (For biopsy skin of nose, see 11102, 11103, 11104, 11105, 11106, 11107)
11103 - (Report 11103 in conjunction with 11102, 11104, 11106, when different biopsy techniques are performed to sample separate/additional lesions for each type of biopsy technique used)

### Related Codes

Tangential biopsy of skin (eg, shave, scoop, saucerize, curette)

11102 - Tangential biopsy of skin (eg, shave, scoop, saucerize, curette); single lesion

11103 - Tangential biopsy of skin (eg, shave, scoop, saucerize, curette); each separate/additional lesion (List separately in addition to code for primary procedure)

### Change History

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 20190101 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 11102 |
| Description: | TANGNTL BX SKIN SINGLE LES |
| Payment Status Indicator: | T - **Procedure or Service, Multiple Procedure Reduction Applies** Paid under OPPS; separate APC payment. |
| APC: | 5051 |
| National Unadjusted Payment: | $183.40 |
| Relative Weight: | 2.1788 |
| Related Information: | Click to Search APC Codebook for 11102<br>NCCI Edits may apply, Click to Search NCCI Edits for 11102<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 11102 |
| Description: | TANGNTL BX SKIN SINGLE LES |
| Payment Indicator: | P3 - Office-based surgical procedure added to ASC list in CY 2008 or later with MPFS nonfacility PE RVUs; payment based on MPFS nonfacility PE RVUs. |
| Payment Weight: | N/A |
| Payment: | $80.29 |
| Subject to multi-procedure discounting?: | Y |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 11102 |
| Description: | TANGNTL BX SKIN SINGLE LES |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 3.05 / 1.10 |
| National Unadjusted Payment (NonFac/Fac): | $105.55 / $38.07 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 11102 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 11102 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

11102 TANGNTL BX SKIN SINGLE LES

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

# 11103 - TANGNTL BX SKIN EA SEP/ADDL

Click to open document in a browser
- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
  - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Surgical Procedures on the Skin, Subcutaneous and Accessory Structures
- Biopsy Procedures on the Skin
  - The use of a biopsy procedure code (eg, 11102, 11103, 11104, 11105, 11106, 11107) indicates that the procedure to obtain tissue solely for diagnostic histopathologic examination was performed independently, or was unrelated or distinct from other procedures/services provided at that time. Biopsies performed on different lesions or different sites on the same date of service may be reported separately, as they are not considered components of other procedures.

    During certain surgical procedures in the integumentary system, such as excision, destruction, or shave removals, the removed tissue is often submitted for pathologic examination. The obtaining of tissue for pathology during the course of these procedures is a routine component of such procedures. This obtaining of tissue is not considered a separate biopsy procedure and is not separately reported.

    Partial-thickness biopsies are those that sample a portion of the thickness of skin or mucous membrane and do not penetrate below the dermis or lamina propria. Full-thickness biopsies penetrate into tissue deep to the dermis or lamina propria, into the subcutaneous or submucosal space.

    Sampling of stratum corneum only, by any modality (eg, skin scraping, tape stripping) does not constitute a skin biopsy procedure and is not separately reportable.

    An appropriate biopsy technique is selected based on optimal tissue-sampling considerations for the type of neoplastic, inflammatory, or other lesion requiring a tissue diagnosis. Biopsy of the skin is reported under three distinct techniques:

    Tangential biopsy (eg, shave, scoop, saucerize, curette) is performed with a sharp blade, such as a flexible biopsy blade, obliquely oriented scalpel or curette to remove a sample of epidermal tissue with or without portions of underlying dermis. The intent of a tangential biopsy (11102, 11103) is to obtain a tissue sample from a lesion for the purpose of diagnostic pathologic examination. Biopsy of lesions by tangential technique (11102, 11103) is not considered an excision. Tangential biopsy technique may be represented by a superficial sample and does not involve the full thickness of the dermis, which could result in portions of the lesion remaining in the deeper layers of the dermis.

    For therapeutic removal of epidermal or dermal lesion(s) using shave technique, see 11300-11313.

    An indication for a shave removal (11300-11313) procedure may include a symptomatic lesion that rubs on waistband or bra, or any other reason why an elevated lesion is being completely removed with the shave technique, suggesting a therapeutic intent. It is the responsibility of the physician or qualified health care professional performing the procedure to clearly indicate the purpose of the procedure.

Punch biopsy requires a punch tool to remove a full-thickness cylindrical sample of skin. The intent of a punch biopsy (11104, 11105) is to obtain a cylindrical tissue sample of a cutaneous lesion for the purpose of diagnostic pathologic examination. Simple closure of the defect is included in the service. Manipulation of the biopsy defect to improve wound approximation is included in simple closure.

Incisional biopsy requires the use of a sharp blade (not a punch tool) to remove a full-thickness sample of tissue via a vertical incision or wedge, penetrating deep to the dermis, into the subcutaneous space. The intent of an incisional biopsy (11106, 11107) is to obtain a full-thickness tissue sample of a skin lesion for the purpose of diagnostic pathologic examination. This type of biopsy may sample subcutaneous fat, such as those performed for the evaluation of panniculitis. Although closure is usually performed on incisional biopsies, simple closure is not separately reported.

(For complete lesion excision with margins, see 11400-11646)

When multiple biopsy techniques are performed during the same encounter, only one primary lesion biopsy code (11102, 11104, 11106) is reported. Additional biopsy codes should be selected based on the following convention:

If multiple biopsies of the same type are performed, the primary code for that biopsy should be used along with the corresponding add-on code(s).

If an incisional biopsy is performed, report 11106 in combination with a tangential (11103), punch (11105), or incisional biopsy (11107) for the additional biopsy procedures.

If a punch biopsy is performed, report 11104 in combination with a tangential (11103), or punch (11105), for the additional biopsy procedures.

If multiple tangential biopsies are performed, report tangential biopsy (11102) in combination with 11103 for the additional tangential biopsy procedures.

When two or more biopsies of the same technique (ie, tangential, punch, or incisional) are performed on separate/additional lesions, use the appropriate add-on code (11103, 11105, 11107) to specify each additional biopsy. When two or three different biopsy techniques (ie, tangential, punch, or incisional) are performed to sample separate/additional lesions, select the appropriate biopsy code (11102, 11104, 11106) plus an additional add-on code (11103, 11105, 11107) for each additional biopsy performed.

The following table provides an illustration of the appropriate use of these codes for multiple biopsies:

| Procedures Performed | CPT Code(s) Reported |
|---|---|
| 2 tangential biopsies | 11102 X 1, 11103 X 1 |
| 3 punch biopsies | 11104 X 1, 11105 X 2 |
| 2 incisional biopsies | 11106 X 1, 11107 X 1 |
| 1 incisional biopsy, 1 tangential biopsy and 1 punch biopsy | 11106 X 1, 11103 X 1, 11105 X 1 |
| 1 punch biopsy and 2 tangential biopsies | 11104 X 1, 11103 X 2 |

(For biopsy of nail unit, use 11755)

(For biopsy, intranasal, use 30100)

(For biopsy of lip, use 40490)

(For biopsy of vestibule of mouth, use 40808)

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(For biopsy of tongue, anterior two-thirds, use 41100)

(For biopsy of floor of mouth, use 41108)

(For biopsy of penis, use 54100)

(For biopsy of vulva or perineum, see 56605, 56606)

(For biopsy of eyelid skin including lid margin, use 67810)

(For biopsy of conjunctiva, use 68100)

(For biopsy of ear, use 69100)

- Tangential biopsy of skin (eg, shave, scoop, saucerize, curette)

| | |
|---|---|
| **CPT Code:** | 11103 |
| **Long Descriptor:** | Tangential biopsy of skin (eg, shave, scoop, saucerize, curette); each separate/additional lesion (List separately in addition to code for primary procedure) |
| **Medium Descriptor:** | TANGENTIAL BIOPSY SKIN EA SEP/ADDITIONAL LESION |
| **Short Descriptor:** | TANGNTL BX SKIN EA SEP/ADDL |
| **Consumer Friendly Descriptor:** | Biopsy of related skin growth, each additional growth |
| **Clinician Friendly Descriptor:** | Tangential biopsy of each additional lesion of skin<br>Tangential biopsy of each separate lesion of skin |

**Citation**

CPT Changes: An Insider's View 2019
CPT Assistant Jan 19: 9
CPT Assistant Dec 19: 9
CPT Assistant May 20: 13

**Code Flags**

First Appearance: 20190101
This is an add-on code. See Appendix D

**Parenthetical Guidelines specific to 11103**

(Report 11103 in conjunction with 11102, 11104, 11106, when different biopsy techniques are performed to sample separate/additional lesions for each type of biopsy technique used)

**Additional parenthetical guidelines from associated codes**

67810 - (For biopsy of skin of the eyelid, see 11102, 11103, 11104, 11105, 11106, 11107)
30100 - (For biopsy skin of nose, see 11102, 11103, 11104, 11105, 11106, 11107)

**Related Codes**

Tangential biopsy of skin (eg, shave, scoop, saucerize, curette)

11102 - Tangential biopsy of skin (eg, shave, scoop, saucerize, curette); single lesion

11103 - Tangential biopsy of skin (eg, shave, scoop, saucerize, curette); each separate/additional lesion (List separately in addition to code for primary procedure)

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 20190101 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 11103 |
| Description: | TANGNTL BX SKIN EA SEP/ADDL |
| Payment Status Indicator: | N - **Packaged** Items and Services Packaged into APC Rates<br>Paid under OPPS; payment is packaged into payment for other services. Therefore, there is no separate APC payment. |
| APC: | N/A |
| National Unadjusted Payment: | N/A |
| Relative Weight: | N/A |
| Related Information: | Click to Search APC Codebook for 11103<br>NCCI Edits may apply, Click to Search NCCI Edits for 11103<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91<br>E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 11103 |
| Description: | TANGNTL BX SKIN EA SEP/ADDL |
| Payment Indicator: | N1 - Packaged service/item; no separate payment made. |
| Payment Weight: | N/A |
| Payment: | N/A |
| Subject to multi-procedure discounting?: | N |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| | T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 11103 |
| Description: | TANGNTL BX SKIN EA SEP/ADDL |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 1.52 / 0.64 |
| National Unadjusted Payment (NonFac/Fac): | $52.60 / $22.15 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 11103 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 11103 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

11103 TANGNTL BX SKIN EA SEP/ADDL

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Surgery Codes - Integumentary Codes - (10004 - 19499)*

# 11601 - EXC TR-EXT MAL+MARG 0.6-1 CM

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
  - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Surgical Procedures on the Skin, Subcutaneous and Accessory Structures
- Excision-Malignant Lesions Procedures on the Skin
  - Excision (including simple closure) of malignant lesions of skin (eg, basal cell carcinoma, squamous cell carcinoma, melanoma) includes local anesthesia. (See appropriate size and body area below.) For destruction of malignant lesions of skin, see destruction codes 17260-17286.

    Excision is defined as full-thickness (through the dermis) removal of a lesion including margins, and includes simple (non-layered) closure when performed. Report separately each malignant lesion excised. Code selection is determined by measuring the greatest clinical diameter of the apparent lesion plus that margin required for complete excision (lesion diameter plus the most narrow margins required equals the excised diameter). The margins refer to the most narrow margin required to adequately excise the lesion, based on the physician's judgment. The measurement of lesion plus margin is made prior to excision. The excised diameter is the same whether the surgical defect is repaired in a linear fashion, or reconstructed (eg, with a skin graft).

    The closure of defects created by incision, excision, or trauma may require intermediate or complex closure. Repair by intermediate or complex closure should be reported separately. For excision of malignant lesions requiring more than simple closure, ie, requiring intermediate or complex closure, report 11600-11646 in addition to appropriate intermediate (12031-12057) or complex closure (13100-13153) codes. For reconstructive closure, see 15002-15261, 15570-15770. For excision performed in conjunction with adjacent tissue transfer, report only the adjacent tissue transfer code (14000-14302). Excision of lesion (11600-11646) is not separately reportable with adjacent tissue transfer. See page 106 for the definition of intermediate or complex closure.

    When frozen section pathology shows the margins of excision were not adequate, an additional excision may be necessary for complete tumor removal. Use only one code to report the additional excision and re-excision(s) based on the final widest excised diameter required for complete tumor removal at the same operative session. To report a re-excision procedure performed to widen margins at a subsequent operative session, see codes 11600-11646, as appropriate. Append modifier 58 if the re-excision procedure is performed during the postoperative period of the primary excision procedure.

- Excision, malignant lesion including margins, trunk, arms, or legs

| | |
|---|---|
| **CPT Code:** | 11601 |
| **Long Descriptor:** | Excision, malignant lesion including margins, trunk, arms, or legs; excised diameter 0.6 to 1.0 cm |
| **Medium Descriptor:** | EXCISION MAL LESION TRUNK/ARM/LEG 0.6-1.0 CM |

| | |
|---|---|
| **Short Descriptor:** | EXC TR-EXT MAL+MARG 0.6-1 CM |
| **Consumer Friendly Descriptor:** | Removal of cancer skin growth of body, arms, or legs, 0.6-1.0 cm |
| **Clinician Friendly Descriptor:** | Excision of malignant lesion of arm, 0.6-1.0 cm<br>Excision of malignant lesion of arm, including margins, 0.6-1.0 cm<br>Excision of malignant lesion of leg, 0.6-1.0 cm<br>Excision of malignant lesion of leg, including margins, 0.6-1.0 cm<br>Excision of malignant lesion of trunk, 0.6-1.0 cm<br>Excision of malignant lesion of trunk, including margins, 0.6-1.0 cm |

**Citation**

CPT Changes: An Insider's View 2003
CPT Assistant Fall 95: 3
CPT Assistant May 96: 11
CPT Assistant Nov 02: 5
CPT Assistant Feb 10: 3
CPT Assistant Mar 12: 7
CPT Assistant May 12: 13
CPT Assistant Jul 12: 12
CPT Assistant Mar 14: 4, 12
CPT Assistant Sep 18: 7
CPT Assistant Nov 19: 3

**Code Flags**

First Appearance: Pre-1990

**Additional parenthetical guidelines from associated codes**

(For complete lesion excision with margins, see 11400-11646)
21936, 22905, 23078, 24079, 25078, 27059, 27364, 27616 - (For radical resection of tumor[s] of cutaneous origin [eg, melanoma], see 11600-11606)
21558 - (For radical resection of tumor[s] of cutaneous origin [eg, melanoma], see 11600-11620)

**Related Codes**

Excision, malignant lesion including margins, trunk, arms, or legs

11600 - Excision, malignant lesion including margins, trunk, arms, or legs; excised diameter 0.5 cm or less

11601 - Excision, malignant lesion including margins, trunk, arms, or legs; excised diameter 0.6 to 1.0 cm

11602 - Excision, malignant lesion including margins, trunk, arms, or legs; excised diameter 1.1 to 2.0 cm

11603 - Excision, malignant lesion including margins, trunk, arms, or legs; excised diameter 2.1 to 3.0 cm

11604 - Excision, malignant lesion including margins, trunk, arms, or legs; excised diameter 3.1 to 4.0 cm

11606 - Excision, malignant lesion including margins, trunk, arms, or legs; excised diameter over 4.0 cm

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | Pre-1990 | |
| CHANGED | 20030101 | CC |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 11601 |
| Description: | EXC TR-EXT MAL+MARG 0.6-1 CM |
| Payment Status Indicator: | T - **Procedure or Service, Multiple Procedure Reduction Applies** Paid under OPPS; separate APC payment. |
| APC: | 5071 |
| National Unadjusted Payment: | $635.54 |
| Relative Weight: | 7.5501 |
| Related Information: | Click to Search APC Codebook for 11601<br>NCCI Edits may apply, Click to Search NCCI Edits for 11601<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 11601 |
| Description: | EXC TR-EXT MAL+MARG 0.6-1 CM |
| Payment Indicator: | P3 - Office-based surgical procedure added to ASC list in CY 2008 or later with MPFS nonfacility PE RVUs; payment based on MPFS nonfacility PE RVUs. |
| Payment Weight: | N/A |
| Payment: | $155.38 |
| Subject to multi-procedure discounting?: | Y |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

| | |
|---|---|
| Code: | 11601 |
| Description: | EXC TR-EXT MAL+MARG 0.6-1 CM |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 6.81 / 4.34 |
| National Unadjusted Payment (NonFac/Fac): | $235.67 / $150.19 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 11601 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 11601 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

11601 EXC TR-EXT MAL+MARG 0.6-1 CM

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

*HCPCS and CPT Codebook - 2022 > Surgery Codes - Integumentary Codes - (10004 - 19499)*

# 12032 - INTMD RPR S/A/T/EXT 2.6-7.5

Click to open document in a browser
- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
  - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Surgical Repair (Closure) Procedures on the Integumentary System
  - Use the codes in this section to designate wound closure utilizing sutures, staples, or tissue adhesives (eg, 2-cyanoacrylate), either singly or in combination with each other, or in combination with adhesive strips. Chemical cauterization, electrocauterization, or wound closure utilizing adhesive strips as the sole repair material are included in the appropriate E/M code.

    Definitions

    The repair of wounds may be classified as Simple, Intermediate, or Complex.

    Simple repair is used when the wound is superficial (eg, involving primarily epidermis or dermis, or subcutaneous tissues without significant involvement of deeper structures) and requires simple one-layer closure. Hemostasis and local or topical anesthesia, when performed, are not reported separately.

    Intermediate repair includes the repair of wounds that, in addition to the above, require layered closure of one or more of the deeper layers of subcutaneous tissue and superficial (non-muscle) fascia, in addition to the skin (epidermal and dermal) closure. It includes limited undermining (defined as a distance less than the maximum width of the defect, measured perpendicular to the closure line, along at least one entire edge of the defect). Single-layer closure of heavily contaminated wounds that have required extensive cleaning or removal of particulate matter also constitutes intermediate repair.

    Complex repair includes the repair of wounds that, in addition to the requirements for intermediate repair, require at least one of the following: exposure of bone, cartilage, tendon, or named neurovascular structure; debridement of wound edges (eg, traumatic lacerations or avulsions); extensive undermining (defined as a distance greater than or equal to the maximum width of the defect, measured perpendicular to the closure line along at least one entire edge of the defect); involvement of free margins of helical rim, vermilion border, or nostril rim; placement of retention sutures. Necessary preparation includes creation of a limited defect for repairs or the debridement of complicated lacerations or avulsions. Complex repair does not include excision of benign (11400-11446) or malignant (11600-11646) lesions, excisional preparation of a wound bed (15002-15005) or debridement of an open fracture or open dislocation.

    Instructions for listing services at time of wound repair:

    1. The repaired wound(s) should be measured and recorded in centimeters, whether curved, angular, or stellate.

    2. When multiple wounds are repaired, add together the lengths of those in the same classification (see above) and from all anatomic sites that are grouped together into the same code descriptor.

For example, add together the lengths of intermediate repairs to the trunk and extremities. Do not add lengths of repairs from different groupings of anatomic sites (eg, face and extremities). Also, do not add together lengths of different classifications (eg, intermediate and complex repairs).

When more than one classification of wounds is repaired, list the more complicated as the primary procedure and the less complicated as the secondary procedure, using modifier 59.

3. Decontamination and/or debridement: Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

(For extensive debridement of soft tissue and/or bone, not associated with open fracture(s) and/or dislocation(s) resulting from penetrating and/or blunt trauma, see 11042-11047.)

(For extensive debridement of subcutaneous tissue, muscle fascia, muscle, and/or bone associated with open fracture(s) and/or dislocation(s), see 11010-11012.)

4. Involvement of nerves, blood vessels and tendons: Report under appropriate system (Nervous, Cardiovascular, Musculoskeletal) for repair of these structures. The repair of these associated wounds is included in the primary procedure unless it qualifies as a complex repair, in which case modifier 59 applies.

Simple ligation of vessels in an open wound is considered as part of any wound closure.

Simple "exploration" of nerves, blood vessels or tendons exposed in an open wound is also considered part of the essential treatment of the wound and is not a separate procedure unless appreciable dissection is required. If the wound requires enlargement, extension of dissection (to determine penetration), debridement, removal of foreign body(s), ligation or coagulation of minor subcutaneous and/or muscular blood vessel(s) of the subcutaneous tissue, muscle fascia, and/or muscle, not requiring thoracotomy or laparotomy, use codes 20100-20103, as appropriate.

- Repair-Intermediate Procedures on the Integumentary System
  - Sum of lengths of repairs for each group of anatomic sites.

- Repair, intermediate, wounds of scalp, axillae, trunk and/or extremities (excluding hands and feet)
  - 

| | |
|---|---|
| **CPT Code:** | 12032 |
| **Long Descriptor:** | Repair, intermediate, wounds of scalp, axillae, trunk and/or extremities (excluding hands and feet); 2.6 cm to 7.5 cm |
| **Medium Descriptor:** | REPAIR INTERMEDIATE S/A/T/E 2.6-7.5 CM |
| **Short Descriptor:** | INTMD RPR S/A/T/EXT 2.6-7.5 |
| **Consumer Friendly Descriptor:** | Intermediate repair of wound of scalp, underarms, trunk, arms, or legs, 2.6-7.5 cm |
| **Clinician Friendly Descriptor:** | Intermediate repair of wound of axilla, 2.6-7.5 cm<br>Intermediate repair of wound of extremity, 2.6-7.5 cm<br>Intermediate repair of wound of scalp, 2.6-7.5 cm<br>Intermediate repair of wound of trunk, 2.6-7.5 cm |

**Citation**

CPT Changes: An Insider's View 2009
CPT Assistant May 96: 6
CPT Assistant Jun 96: 8
CPT Assistant Feb 00: 10
CPT Assistant Jan 02: 10

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

CPT Assistant Feb 07: 10
CPT Assistant Sep 18: 7

**Code Flags**

First Appearance: Pre-1990
Last Revised: 20090101

**Additional parenthetical guidelines from associated codes**

15830 - (Do not report 15830 in conjunction with 12031-12037, 13100-13102, 14000, 14001, 14302 for the same wound)
19380 - (Do not report 19380 in conjunction with 12031, 12032, 12034, 12035, 12036, 12037, 13100, 13101, 13102, 15877, 19316, 19318, 19370, for the same breast)
(For suture of wound or injury of external ear, see 12011-14302)

**Related Codes**

Repair, intermediate, wounds of scalp, axillae, trunk and/or extremities (excluding hands and feet)

12031 - Repair, intermediate, wounds of scalp, axillae, trunk and/or extremities (excluding hands and feet); 2.5 cm or less

12032 - Repair, intermediate, wounds of scalp, axillae, trunk and/or extremities (excluding hands and feet); 2.6 cm to 7.5 cm

12034 - Repair, intermediate, wounds of scalp, axillae, trunk and/or extremities (excluding hands and feet); 7.6 cm to 12.5 cm

12035 - Repair, intermediate, wounds of scalp, axillae, trunk and/or extremities (excluding hands and feet); 12.6 cm to 20.0 cm

12036 - Repair, intermediate, wounds of scalp, axillae, trunk and/or extremities (excluding hands and feet); 20.1 cm to 30.0 cm

12037 - Repair, intermediate, wounds of scalp, axillae, trunk and/or extremities (excluding hands and feet); over 30.0 cm

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | Pre-1990 | |
| CHANGED | 20090101 | CC |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 12032 |
| Description: | INTMD RPR S/A/T/EXT 2.6-7.5 |
| Payment Status | T - **Procedure or Service, Multiple Procedure Reduction Applies** Paid under |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| Indicator: | OPPS; separate APC payment. |
| APC: | 5052 |
| National Unadjusted Payment: | $353.00 |
| Relative Weight: | 4.1936 |
| Related Information: | Click to Search APC Codebook for 12032<br>NCCI Edits may apply, Click to Search NCCI Edits for 12032<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 12032 |
| Description: | INTMD RPR S/A/T/EXT 2.6-7.5 |
| Payment Indicator: | P2 - Office-based surgical procedure added to ASC list in CY 2008 or later with MPFS nonfacility PE RVUs; payment based on OPPS relative payment weight. |
| Payment Weight: | 3.5830 |
| Payment: | $178.85 |
| Subject to multi-procedure discounting?: | Y |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 12032 |
| Description: | INTMD RPR S/A/T/EXT 2.6-7.5 |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| Total RVUs (NonFac/Fac): | 9.03 / 5.52 |
| National Unadjusted Payment (NonFac/Fac): | $312.49 / $191.03 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 12032 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 12032 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

12032 INTMD RPR S/A/T/EXT 2.6-7.5

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

*HCPCS and CPT Codebook - 2022 > Surgery Codes - Integumentary Codes - (10004 - 19499)*

# 15271 - SKIN SUB GRAFT TRNK/ARM/LEG

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
  - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Surgical Repair (Closure) Procedures on the Integumentary System
  - Use the codes in this section to designate wound closure utilizing sutures, staples, or tissue adhesives (eg, 2-cyanoacrylate), either singly or in combination with each other, or in combination with adhesive strips. Chemical cauterization, electrocauterization, or wound closure utilizing adhesive strips as the sole repair material are included in the appropriate E/M code.

    Definitions

    The repair of wounds may be classified as Simple, Intermediate, or Complex.

    Simple repair is used when the wound is superficial (eg, involving primarily epidermis or dermis, or subcutaneous tissues without significant involvement of deeper structures) and requires simple one-layer closure. Hemostasis and local or topical anesthesia, when performed, are not reported separately.

    Intermediate repair includes the repair of wounds that, in addition to the above, require layered closure of one or more of the deeper layers of subcutaneous tissue and superficial (non-muscle) fascia, in addition to the skin (epidermal and dermal) closure. It includes limited undermining (defined as a distance less than the maximum width of the defect, measured perpendicular to the closure line, along at least one entire edge of the defect). Single-layer closure of heavily contaminated wounds that have required extensive cleaning or removal of particulate matter also constitutes intermediate repair.

    Complex repair includes the repair of wounds that, in addition to the requirements for intermediate repair, require at least one of the following: exposure of bone, cartilage, tendon, or named neurovascular structure; debridement of wound edges (eg, traumatic lacerations or avulsions); extensive undermining (defined as a distance greater than or equal to the maximum width of the defect, measured perpendicular to the closure line along at least one entire edge of the defect); involvement of free margins of helical rim, vermilion border, or nostril rim; placement of retention sutures. Necessary preparation includes creation of a limited defect for repairs or the debridement of complicated lacerations or avulsions. Complex repair does not include excision of benign (11400-11446) or malignant (11600-11646) lesions, excisional preparation of a wound bed (15002-15005) or debridement of an open fracture or open dislocation.

    Instructions for listing services at time of wound repair:

    1. The repaired wound(s) should be measured and recorded in centimeters, whether curved, angular, or stellate.

    2. When multiple wounds are repaired, add together the lengths of those in the same classification (see above) and from all anatomic sites that are grouped together into the same code descriptor.

For example, add together the lengths of intermediate repairs to the trunk and extremities. Do not add lengths of repairs from different groupings of anatomic sites (eg, face and extremities). Also, do not add together lengths of different classifications (eg, intermediate and complex repairs).

When more than one classification of wounds is repaired, list the more complicated as the primary procedure and the less complicated as the secondary procedure, using modifier 59.

3. Decontamination and/or debridement: Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

(For extensive debridement of soft tissue and/or bone, not associated with open fracture(s) and/or dislocation(s) resulting from penetrating and/or blunt trauma, see 11042-11047.)

(For extensive debridement of subcutaneous tissue, muscle fascia, muscle, and/or bone associated with open fracture(s) and/or dislocation(s), see 11010-11012.)

4. Involvement of nerves, blood vessels and tendons: Report under appropriate system (Nervous, Cardiovascular, Musculoskeletal) for repair of these structures. The repair of these associated wounds is included in the primary procedure unless it qualifies as a complex repair, in which case modifier 59 applies.

Simple ligation of vessels in an open wound is considered as part of any wound closure.

Simple "exploration" of nerves, blood vessels or tendons exposed in an open wound is also considered part of the essential treatment of the wound and is not a separate procedure unless appreciable dissection is required. If the wound requires enlargement, extension of dissection (to determine penetration), debridement, removal of foreign body(s), ligation or coagulation of minor subcutaneous and/or muscular blood vessel(s) of the subcutaneous tissue, muscle fascia, and/or muscle, not requiring thoracotomy or laparotomy, use codes 20100-20103, as appropriate.

- Skin Replacement Surgery
  - Skin replacement surgery consists of surgical preparation and topical placement of an autograft (including tissue cultured autograft) or skin substitute graft (ie, homograft, allograft, xenograft). The graft is anchored using the individual's choice of fixation. When services are performed in the office, routine dressing supplies are not reported separately.

    The following definition should be applied to those codes that reference "100 sq cm or 1% of body area of infants and children" when determining the involvement of body size: The measurement of 100 sq cm is applicable to adults and children 10 years of age and older; and percentages of body surface area apply to infants and children younger than 10 years of age. The measurements apply to the size of the recipient area.

    Procedures involving wrist and/or ankle are reported with codes that include arm or leg in the descriptor.

    When a primary procedure requires a skin substitute or skin autograft for definitive skin closure (eg, orbitectomy, radical mastectomy, deep tumor removal), use 15100-15278 in conjunction with primary procedure.

    For biological implant for soft tissue reinforcement, use 15777 in conjunction with primary procedure.

    The supply of skin substitute graft(s) should be reported separately in conjunction with 15271-15278.

- Skin Replacement Surgery Definitions
  - Surgical preparation codes 15002-15005 for skin replacement surgery describe the initial services related to preparing a clean and viable wound surface for placement of an autograft, flap, skin

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

substitute graft or for negative pressure wound therapy. In some cases, closure may be possible using adjacent tissue transfer (14000-14061) or complex repair (13100-13153). In all cases, appreciable nonviable tissue is removed to treat a burn, traumatic wound or a necrotizing infection. The clean wound bed may also be created by incisional release of a scar contracture resulting in a surface defect from separation of tissues. The intent is to heal the wound by primary intention, or by the use of negative pressure wound therapy. Patient conditions may require the closure or application of graft, flap, or skin substitute to be delayed, but in all cases the intent is to include these treatments or negative pressure wound therapy to heal the wound. Do not report 15002-15005 for removal of nonviable tissue/debris in a chronic wound (eg, venous or diabetic) when the wound is left to heal by secondary intention. See active wound management codes (97597, 97598) and debridement codes (11042-11047) for this service. For necrotizing soft tissue infections in specific anatomic locations, see 11004-11008.

Select the appropriate code from 15002-15005 based upon location and size of the resultant defect. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms). Use 15002 or 15004, as appropriate, for excisions and incisional releases resulting in wounds up to and including 100 sq cm of surface area. Use 15003 or 15005 for each additional 100 sq cm or part thereof. For example: Surgical preparation of a 20 sq cm wound on the right hand and a 15 sq cm wound on the left hand would be reported with a single code, 15004. Surgical preparation of a 75 sq cm wound on the right thigh and a 75 sq cm wound on the left thigh would be reported with 15002 for the first 100 sq cm and 15003 for the second 50 sq cm. If all four wounds required surgical preparation on the same day, use modifier 59 with 15002, and 15004.

Autografts/tissue cultured autografts include the harvest and/or application of an autologous skin graft. Repair of donor site requiring skin graft or local flaps is reported separately. Removal of current graft and/or simple cleansing of the wound is included, when performed. Do not report 97602. Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

Select the appropriate code from 15040-15261 based upon type of autograft and location and size of the defect. The measurements apply to the size of the recipient area. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms).

Skin substitute grafts include non-autologous human skin (dermal or epidermal, cellular and acellular) grafts (eg, homograft, allograft), non-human skin substitute grafts (ie, xenograft), and biological products that form a sheet scaffolding for skin growth. These codes are not to be reported for application of non-graft wound dressings (eg, gel, powder, ointment, foam, liquid) or injected skin substitutes. Application of non-graft wound dressings is not separately reportable. Removal of current graft and/or simple cleansing of the wound is included, when performed. Do not report 97602. Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

Select the appropriate code from 15271-15278 based upon location and size of the defect. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms). The supply of skin substitute graft(s) should be reported separately in conjunction with 15271, 15272, 15273, 15274, 15275, 15276, 15277, 15278. For biologic implant for soft tissue reinforcement, use 15777 in conjunction with code for primary procedure.

- Surgical Preparation for Skin Replacement Surgery
- Skin Substitute Grafts
  - The supply of skin substitute graft(s) should be reported separately in conjunction with 15271-15278. For biologic implant for soft tissue reinforcement, use 15777 in conjunction with code

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

for primary procedure.

- Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm

| | |
|---|---|
| **CPT Code:** | 15271 |
| **Long Descriptor:** | Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area |
| **Medium Descriptor:** | APP SKN SUB GRFT T/A/L AREA/100SQ CM /<1ST 25 |
| **Short Descriptor:** | SKIN SUB GRAFT TRNK/ARM/LEG |
| **Consumer Friendly Descriptor:** | Application of skin substitute graft to wound of trunk, arms, or legs, 25.0 sq cm or less of wound 100.0 sq cm or less |
| **Clinician Friendly Descriptor:** | Application of skin substitute graft of arm, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of leg, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of trunk, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less |

**Citation**

CPT Changes: An Insider's View 2012
CPT Assistant Jan 12: 6
CPT Assistant Oct 12: 3
CPT Assistant Jun 14: 14
CPT Assistant Oct 17: 9

**Code Flags**

First Appearance: 20120101

**Additional parenthetical guidelines from associated codes**

15272 - (Do not report 15271, 15272 in conjunction with 15273, 15274)
15278 - (Do not report 15271-15278 in conjunction with 97602)
69320 - (For other reconstructive procedures with grafts (eg, skin, cartilage, bone), see 13151-15760, 21230-21235)
26952 - (For repair of soft tissue defect requiring split or full thickness graft or other pedicle flaps, see 15050-15758)
15777 - (For topical application of skin substitute graft to a wound surface, see 15271-15278)
15274 - (For total wound surface area up to 100 sq cm, see 15271, 15272)
15272 - (Use 15272 in conjunction with 15271)

**Related Codes**

Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm

15271 - Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

15272 - Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure)

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 20120101 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 15271 |
| Description: | SKIN SUB GRAFT TRNK/ARM/LEG |
| Payment Status Indicator: | T - **Procedure or Service, Multiple Procedure Reduction Applies** Paid under OPPS; separate APC payment. |
| APC: | 5054 |
| National Unadjusted Payment: | $1,749.26 |
| Relative Weight: | 20.7807 |
| Related Information: | Click to Search APC Codebook for 15271<br>NCCI Edits may apply, Click to Search NCCI Edits for 15271<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 15271 |
| Description: | SKIN SUB GRAFT TRNK/ARM/LEG |
| Payment Indicator: | G2 - Non office-based surgical procedure added in CY 2008 or later; payment based on OPPS relative payment weight. |
| Payment Weight: | 17.7550 |
| Payment: | $886.26 |
| Subject to multi-procedure discounting?: | Y |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 15271 |
| Description: | SKIN SUB GRAFT TRNK/ARM/LEG |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 4.62 / 2.46 |
| National Unadjusted Payment (NonFac/Fac): | $159.88 / $85.13 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 15271 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 15271 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

15271 SKIN SUB GRAFT TRNK/ARM/LEG

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

*HCPCS and CPT Codebook - 2022 > Surgery Codes - Integumentary Codes - (10004 - 19499)*

# 15272 - SKIN SUB GRAFT T/A/L ADD-ON

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
  - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Surgical Repair (Closure) Procedures on the Integumentary System
  - Use the codes in this section to designate wound closure utilizing sutures, staples, or tissue adhesives (eg, 2-cyanoacrylate), either singly or in combination with each other, or in combination with adhesive strips. Chemical cauterization, electrocauterization, or wound closure utilizing adhesive strips as the sole repair material are included in the appropriate E/M code.

    Definitions

    The repair of wounds may be classified as Simple, Intermediate, or Complex.

    Simple repair is used when the wound is superficial (eg, involving primarily epidermis or dermis, or subcutaneous tissues without significant involvement of deeper structures) and requires simple one-layer closure. Hemostasis and local or topical anesthesia, when performed, are not reported separately.

    Intermediate repair includes the repair of wounds that, in addition to the above, require layered closure of one or more of the deeper layers of subcutaneous tissue and superficial (non-muscle) fascia, in addition to the skin (epidermal and dermal) closure. It includes limited undermining (defined as a distance less than the maximum width of the defect, measured perpendicular to the closure line, along at least one entire edge of the defect). Single-layer closure of heavily contaminated wounds that have required extensive cleaning or removal of particulate matter also constitutes intermediate repair.

    Complex repair includes the repair of wounds that, in addition to the requirements for intermediate repair, require at least one of the following: exposure of bone, cartilage, tendon, or named neurovascular structure; debridement of wound edges (eg, traumatic lacerations or avulsions); extensive undermining (defined as a distance greater than or equal to the maximum width of the defect, measured perpendicular to the closure line along at least one entire edge of the defect); involvement of free margins of helical rim, vermilion border, or nostril rim; placement of retention sutures. Necessary preparation includes creation of a limited defect for repairs or the debridement of complicated lacerations or avulsions. Complex repair does not include excision of benign (11400-11446) or malignant (11600-11646) lesions, excisional preparation of a wound bed (15002-15005) or debridement of an open fracture or open dislocation.

    Instructions for listing services at time of wound repair:

    1. The repaired wound(s) should be measured and recorded in centimeters, whether curved, angular, or stellate.

    2. When multiple wounds are repaired, add together the lengths of those in the same classification (see above) and from all anatomic sites that are grouped together into the same code descriptor.

For example, add together the lengths of intermediate repairs to the trunk and extremities. Do not add lengths of repairs from different groupings of anatomic sites (eg, face and extremities). Also, do not add together lengths of different classifications (eg, intermediate and complex repairs).

When more than one classification of wounds is repaired, list the more complicated as the primary procedure and the less complicated as the secondary procedure, using modifier 59.

3. Decontamination and/or debridement: Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

(For extensive debridement of soft tissue and/or bone, not associated with open fracture(s) and/or dislocation(s) resulting from penetrating and/or blunt trauma, see 11042-11047.)

(For extensive debridement of subcutaneous tissue, muscle fascia, muscle, and/or bone associated with open fracture(s) and/or dislocation(s), see 11010-11012.)

4. Involvement of nerves, blood vessels and tendons: Report under appropriate system (Nervous, Cardiovascular, Musculoskeletal) for repair of these structures. The repair of these associated wounds is included in the primary procedure unless it qualifies as a complex repair, in which case modifier 59 applies.

Simple ligation of vessels in an open wound is considered as part of any wound closure.

Simple "exploration" of nerves, blood vessels or tendons exposed in an open wound is also considered part of the essential treatment of the wound and is not a separate procedure unless appreciable dissection is required. If the wound requires enlargement, extension of dissection (to determine penetration), debridement, removal of foreign body(s), ligation or coagulation of minor subcutaneous and/or muscular blood vessel(s) of the subcutaneous tissue, muscle fascia, and/or muscle, not requiring thoracotomy or laparotomy, use codes 20100-20103, as appropriate.

- Skin Replacement Surgery
  - Skin replacement surgery consists of surgical preparation and topical placement of an autograft (including tissue cultured autograft) or skin substitute graft (ie, homograft, allograft, xenograft). The graft is anchored using the individual's choice of fixation. When services are performed in the office, routine dressing supplies are not reported separately.

    The following definition should be applied to those codes that reference "100 sq cm or 1% of body area of infants and children" when determining the involvement of body size: The measurement of 100 sq cm is applicable to adults and children 10 years of age and older; and percentages of body surface area apply to infants and children younger than 10 years of age. The measurements apply to the size of the recipient area.

    Procedures involving wrist and/or ankle are reported with codes that include arm or leg in the descriptor.

    When a primary procedure requires a skin substitute or skin autograft for definitive skin closure (eg, orbitectomy, radical mastectomy, deep tumor removal), use 15100-15278 in conjunction with primary procedure.

    For biological implant for soft tissue reinforcement, use 15777 in conjunction with primary procedure.

    The supply of skin substitute graft(s) should be reported separately in conjunction with 15271-15278.

- Skin Replacement Surgery Definitions
  - Surgical preparation codes 15002-15005 for skin replacement surgery describe the initial services related to preparing a clean and viable wound surface for placement of an autograft, flap, skin

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

substitute graft or for negative pressure wound therapy. In some cases, closure may be possible using adjacent tissue transfer (14000-14061) or complex repair (13100-13153). In all cases, appreciable nonviable tissue is removed to treat a burn, traumatic wound or a necrotizing infection. The clean wound bed may also be created by incisional release of a scar contracture resulting in a surface defect from separation of tissues. The intent is to heal the wound by primary intention, or by the use of negative pressure wound therapy. Patient conditions may require the closure or application of graft, flap, or skin substitute to be delayed, but in all cases the intent is to include these treatments or negative pressure wound therapy to heal the wound. Do not report 15002-15005 for removal of nonviable tissue/debris in a chronic wound (eg, venous or diabetic) when the wound is left to heal by secondary intention. See active wound management codes (97597, 97598) and debridement codes (11042-11047) for this service. For necrotizing soft tissue infections in specific anatomic locations, see 11004-11008.

Select the appropriate code from 15002-15005 based upon location and size of the resultant defect. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms). Use 15002 or 15004, as appropriate, for excisions and incisional releases resulting in wounds up to and including 100 sq cm of surface area. Use 15003 or 15005 for each additional 100 sq cm or part thereof. For example: Surgical preparation of a 20 sq cm wound on the right hand and a 15 sq cm wound on the left hand would be reported with a single code, 15004. Surgical preparation of a 75 sq cm wound on the right thigh and a 75 sq cm wound on the left thigh would be reported with 15002 for the first 100 sq cm and 15003 for the second 50 sq cm. If all four wounds required surgical preparation on the same day, use modifier 59 with 15002, and 15004.

Autografts/tissue cultured autografts include the harvest and/or application of an autologous skin graft. Repair of donor site requiring skin graft or local flaps is reported separately. Removal of current graft and/or simple cleansing of the wound is included, when performed. Do not report 97602. Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

Select the appropriate code from 15040-15261 based upon type of autograft and location and size of the defect. The measurements apply to the size of the recipient area. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms).

Skin substitute grafts include non-autologous human skin (dermal or epidermal, cellular and acellular) grafts (eg, homograft, allograft), non-human skin substitute grafts (ie, xenograft), and biological products that form a sheet scaffolding for skin growth. These codes are not to be reported for application of non-graft wound dressings (eg, gel, powder, ointment, foam, liquid) or injected skin substitutes. Application of non-graft wound dressings is not separately reportable. Removal of current graft and/or simple cleansing of the wound is included, when performed. Do not report 97602. Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

Select the appropriate code from 15271-15278 based upon location and size of the defect. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms). The supply of skin substitute graft(s) should be reported separately in conjunction with 15271, 15272, 15273, 15274, 15275, 15276, 15277, 15278. For biologic implant for soft tissue reinforcement, use 15777 in conjunction with code for primary procedure.

- Surgical Preparation for Skin Replacement Surgery
- Skin Substitute Grafts
    - The supply of skin substitute graft(s) should be reported separately in conjunction with 15271-15278. For biologic implant for soft tissue reinforcement, use 15777 in conjunction with code

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

for primary procedure.

- Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm

| | |
|---|---|
| **CPT Code:** | 15272 |
| **Long Descriptor:** | Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure) |
| **Medium Descriptor:** | APP SKN SUB GRFT T/A/L AREA/100SQ CM EA ADL 25SC |
| **Short Descriptor:** | SKIN SUB GRAFT T/A/L ADD-ON |
| **Consumer Friendly Descriptor:** | Application of skin substitute graft to wound of trunk, arms, or legs, each additional 25.0 sq cm of wound 100.0 sq cm or less |
| **Clinician Friendly Descriptor:** | Application of skin-substitute graft of arm, total wound surface area less than 100.0 sq cm, each additional 25.0 sq cm or less<br>Application of skin-substitute graft of leg, total wound surface area less than 100.0 sq cm, each additional 25.0 sq cm or less<br>Application of skin-substitute graft of trunk, total wound surface area less than 100.0 sq cm, each additional 25.0 sq cm or less |

**Citation**

CPT Changes: An Insider's View 2012
CPT Assistant Jan 12: 6
CPT Assistant Oct 12: 3
CPT Assistant Oct 13: 15
CPT Assistant Jun 14: 14

**Code Flags**

First Appearance: 20120101
This is an add-on code. See Appendix D

**Parenthetical Guidelines specific to 15272**

(Use 15272 in conjunction with 15271)
(For total wound surface area greater than or equal to 100 sq cm, see 15273, 15274)
(Do not report 15271, 15272 in conjunction with 15273, 15274)

**Additional parenthetical guidelines from associated codes**

15278 - (Do not report 15271-15278 in conjunction with 97602)
69320 - (For other reconstructive procedures with grafts (eg, skin, cartilage, bone), see 13151-15760, 21230-21235)
26952 - (For repair of soft tissue defect requiring split or full thickness graft or other pedicle flaps, see 15050-15758)
15777 - (For topical application of skin substitute graft to a wound surface, see 15271-15278)
15274 - (For total wound surface area up to 100 sq cm, see 15271, 15272)

**Related Codes**

Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm

15271 - Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; first

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

25 sq cm or less wound surface area

15272 - Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure)

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 20120101 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 15272 |
| Description: | SKIN SUB GRAFT T/A/L ADD-ON |
| Payment Status Indicator: | N - **Packaged** Items and Services Packaged into APC Rates<br>Paid under OPPS; payment is packaged into payment for other services. Therefore, there is no separate APC payment. |
| APC: | N/A |
| National Unadjusted Payment: | N/A |
| Relative Weight: | N/A |
| Related Information: | Click to Search APC Codebook for 15272<br>NCCI Edits may apply, Click to Search NCCI Edits for 15272<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 15272 |
| Description: | SKIN SUB GRAFT T/A/L ADD-ON |
| Payment Indicator: | N1 - Packaged service/item; no separate payment made. |
| Payment Weight: | N/A |
| Payment: | N/A |
| Subject to multi-procedure discounting?: | N |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| | |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 15272 |
| Description: | SKIN SUB GRAFT T/A/L ADD-ON |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 0.75 / 0.52 |
| National Unadjusted Payment (NonFac/Fac): | $25.95 / $18.00 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 15272 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 15272 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

15272 SKIN SUB GRAFT T/A/L ADD-ON

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Surgery Codes - Integumentary Codes - (10004 - 19499)*

# 15275 - SKIN SUB GRAFT FACE/NK/HF/G

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
  - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Surgical Repair (Closure) Procedures on the Integumentary System
  - Use the codes in this section to designate wound closure utilizing sutures, staples, or tissue adhesives (eg, 2-cyanoacrylate), either singly or in combination with each other, or in combination with adhesive strips. Chemical cauterization, electrocauterization, or wound closure utilizing adhesive strips as the sole repair material are included in the appropriate E/M code.

    Definitions

    The repair of wounds may be classified as Simple, Intermediate, or Complex.

    Simple repair is used when the wound is superficial (eg, involving primarily epidermis or dermis, or subcutaneous tissues without significant involvement of deeper structures) and requires simple one-layer closure. Hemostasis and local or topical anesthesia, when performed, are not reported separately.

    Intermediate repair includes the repair of wounds that, in addition to the above, require layered closure of one or more of the deeper layers of subcutaneous tissue and superficial (non-muscle) fascia, in addition to the skin (epidermal and dermal) closure. It includes limited undermining (defined as a distance less than the maximum width of the defect, measured perpendicular to the closure line, along at least one entire edge of the defect). Single-layer closure of heavily contaminated wounds that have required extensive cleaning or removal of particulate matter also constitutes intermediate repair.

    Complex repair includes the repair of wounds that, in addition to the requirements for intermediate repair, require at least one of the following: exposure of bone, cartilage, tendon, or named neurovascular structure; debridement of wound edges (eg, traumatic lacerations or avulsions); extensive undermining (defined as a distance greater than or equal to the maximum width of the defect, measured perpendicular to the closure line along at least one entire edge of the defect); involvement of free margins of helical rim, vermilion border, or nostril rim; placement of retention sutures. Necessary preparation includes creation of a limited defect for repairs or the debridement of complicated lacerations or avulsions. Complex repair does not include excision of benign (11400-11446) or malignant (11600-11646) lesions, excisional preparation of a wound bed (15002-15005) or debridement of an open fracture or open dislocation.

    Instructions for listing services at time of wound repair:

    1. The repaired wound(s) should be measured and recorded in centimeters, whether curved, angular, or stellate.

    2. When multiple wounds are repaired, add together the lengths of those in the same classification (see above) and from all anatomic sites that are grouped together into the same code descriptor.

For example, add together the lengths of intermediate repairs to the trunk and extremities. Do not add lengths of repairs from different groupings of anatomic sites (eg, face and extremities). Also, do not add together lengths of different classifications (eg, intermediate and complex repairs).

When more than one classification of wounds is repaired, list the more complicated as the primary procedure and the less complicated as the secondary procedure, using modifier 59.

3. Decontamination and/or debridement: Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

(For extensive debridement of soft tissue and/or bone, not associated with open fracture(s) and/or dislocation(s) resulting from penetrating and/or blunt trauma, see 11042-11047.)

(For extensive debridement of subcutaneous tissue, muscle fascia, muscle, and/or bone associated with open fracture(s) and/or dislocation(s), see 11010-11012.)

4. Involvement of nerves, blood vessels and tendons: Report under appropriate system (Nervous, Cardiovascular, Musculoskeletal) for repair of these structures. The repair of these associated wounds is included in the primary procedure unless it qualifies as a complex repair, in which case modifier 59 applies.

Simple ligation of vessels in an open wound is considered as part of any wound closure.

Simple "exploration" of nerves, blood vessels or tendons exposed in an open wound is also considered part of the essential treatment of the wound and is not a separate procedure unless appreciable dissection is required. If the wound requires enlargement, extension of dissection (to determine penetration), debridement, removal of foreign body(s), ligation or coagulation of minor subcutaneous and/or muscular blood vessel(s) of the subcutaneous tissue, muscle fascia, and/or muscle, not requiring thoracotomy or laparotomy, use codes 20100-20103, as appropriate.

- Skin Replacement Surgery
  - Skin replacement surgery consists of surgical preparation and topical placement of an autograft (including tissue cultured autograft) or skin substitute graft (ie, homograft, allograft, xenograft). The graft is anchored using the individual's choice of fixation. When services are performed in the office, routine dressing supplies are not reported separately.

    The following definition should be applied to those codes that reference "100 sq cm or 1% of body area of infants and children" when determining the involvement of body size: The measurement of 100 sq cm is applicable to adults and children 10 years of age and older; and percentages of body surface area apply to infants and children younger than 10 years of age. The measurements apply to the size of the recipient area.

    Procedures involving wrist and/or ankle are reported with codes that include arm or leg in the descriptor.

    When a primary procedure requires a skin substitute or skin autograft for definitive skin closure (eg, orbitectomy, radical mastectomy, deep tumor removal), use 15100-15278 in conjunction with primary procedure.

    For biological implant for soft tissue reinforcement, use 15777 in conjunction with primary procedure.

    The supply of skin substitute graft(s) should be reported separately in conjunction with 15271-15278.

- Skin Replacement Surgery Definitions
  - Surgical preparation codes 15002-15005 for skin replacement surgery describe the initial services related to preparing a clean and viable wound surface for placement of an autograft, flap, skin

substitute graft or for negative pressure wound therapy. In some cases, closure may be possible using adjacent tissue transfer (14000-14061) or complex repair (13100-13153). In all cases, appreciable nonviable tissue is removed to treat a burn, traumatic wound or a necrotizing infection. The clean wound bed may also be created by incisional release of a scar contracture resulting in a surface defect from separation of tissues. The intent is to heal the wound by primary intention, or by the use of negative pressure wound therapy. Patient conditions may require the closure or application of graft, flap, or skin substitute to be delayed, but in all cases the intent is to include these treatments or negative pressure wound therapy to heal the wound. Do not report 15002-15005 for removal of nonviable tissue/debris in a chronic wound (eg, venous or diabetic) when the wound is left to heal by secondary intention. See active wound management codes (97597, 97598) and debridement codes (11042-11047) for this service. For necrotizing soft tissue infections in specific anatomic locations, see 11004-11008.

Select the appropriate code from 15002-15005 based upon location and size of the resultant defect. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms). Use 15002 or 15004, as appropriate, for excisions and incisional releases resulting in wounds up to and including 100 sq cm of surface area. Use 15003 or 15005 for each additional 100 sq cm or part thereof. For example: Surgical preparation of a 20 sq cm wound on the right hand and a 15 sq cm wound on the left hand would be reported with a single code, 15004. Surgical preparation of a 75 sq cm wound on the right thigh and a 75 sq cm wound on the left thigh would be reported with 15002 for the first 100 sq cm and 15003 for the second 50 sq cm. If all four wounds required surgical preparation on the same day, use modifier 59 with 15002, and 15004.

Autografts/tissue cultured autografts include the harvest and/or application of an autologous skin graft. Repair of donor site requiring skin graft or local flaps is reported separately. Removal of current graft and/or simple cleansing of the wound is included, when performed. Do not report 97602. Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

Select the appropriate code from 15040-15261 based upon type of autograft and location and size of the defect. The measurements apply to the size of the recipient area. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms).

Skin substitute grafts include non-autologous human skin (dermal or epidermal, cellular and acellular) grafts (eg, homograft, allograft), non-human skin substitute grafts (ie, xenograft), and biological products that form a sheet scaffolding for skin growth. These codes are not to be reported for application of non-graft wound dressings (eg, gel, powder, ointment, foam, liquid) or injected skin substitutes. Application of non-graft wound dressings is not separately reportable. Removal of current graft and/or simple cleansing of the wound is included, when performed. Do not report 97602. Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

Select the appropriate code from 15271-15278 based upon location and size of the defect. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms). The supply of skin substitute graft(s) should be reported separately in conjunction with 15271, 15272, 15273, 15274, 15275, 15276, 15277, 15278. For biologic implant for soft tissue reinforcement, use 15777 in conjunction with code for primary procedure.

- Surgical Preparation for Skin Replacement Surgery
- Skin Substitute Grafts
  - The supply of skin substitute graft(s) should be reported separately in conjunction with 15271-15278. For biologic implant for soft tissue reinforcement, use 15777 in conjunction with code

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

for primary procedure.

- Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm

| | |
|---|---|
| **CPT Code:** | 15275 |
| **Long Descriptor:** | Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area |
| **Medium Descriptor:** | SUB GRFT F/S/N/H/F/G/M/D <100SQ CM 1ST 25 SQ CM |
| **Short Descriptor:** | SKIN SUB GRAFT FACE/NK/HF/G |
| **Consumer Friendly Descriptor:** | Application of skin substitute graft to wound of face, scalp, eyelids, mouth, neck, ears, around eyes, genitals, hands, feet, fingers, or toes, 25.0 sq cm or less of wound 100.0 sq cm or less |
| **Clinician Friendly Descriptor:** | Application of skin substitute graft of digit, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of ear, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of eyelid, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of face, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of foot, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of genitalia, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of hand, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of mouth, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of neck, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of orbit, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less<br>Application of skin substitute graft of scalp, total wound surface area less than 100.0 sq cm, first 25.0 sq cm or less |

**Citation**

CPT Changes: An Insider's View 2012
CPT Assistant Jan 12: 6
CPT Assistant Oct 12: 3
CPT Assistant Oct 13: 15
CPT Assistant Jun 14: 14

**Code Flags**

First Appearance: 20120101

**Additional parenthetical guidelines from associated codes**

15278 - (Do not report 15271-15278 in conjunction with 97602)
15276 - (Do not report 15275, 15276 in conjunction with 15277, 15278)
54352 - (Do not report 54352 in conjunction with 15275, 15574, 15740, 53235, 53410, 54300, 54336, 54340, 54344, 54348, 54360)

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

69320 - (For other reconstructive procedures with grafts (eg, skin, cartilage, bone), see 13151-15760, 21230-21235)
26952 - (For repair of soft tissue defect requiring split or full thickness graft or other pedicle flaps, see 15050-15758)
15777 - (For topical application of skin substitute graft to a wound surface, see 15271-15278)
15278 - (For total wound surface area up to 100 sq cm, see 15275, 15276)
15276 - (Use 15276 in conjunction with 15275)

**Related Codes**

Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm

15275 - Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

15276 - Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure)

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 20120101 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 15275 |
| Description: | SKIN SUB GRAFT FACE/NK/HF/G |
| Payment Status Indicator: | T - **Procedure or Service, Multiple Procedure Reduction Applies** Paid under OPPS; separate APC payment. |
| APC: | 5054 |
| National Unadjusted Payment: | $1,749.26 |
| Relative Weight: | 20.7807 |
| Related Information: | Click to Search APC Codebook for 15275<br>NCCI Edits may apply, Click to Search NCCI Edits for 15275<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 15275 |
| Description: | SKIN SUB GRAFT FACE/NK/HF/G |
| Payment Indicator: | G2 - Non office-based surgical procedure added in CY 2008 or later; payment based on OPPS relative payment weight. |
| Payment Weight: | 17.7550 |
| Payment: | $886.26 |
| Subject to multi-procedure discounting?: | Y |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 15275 |
| Description: | SKIN SUB GRAFT FACE/NK/HF/G |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 4.75 / 2.74 |
| National Unadjusted Payment (NonFac/Fac): | $164.38 / $94.82 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 15275 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 15275 |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

15275 SKIN SUB GRAFT FACE/NK/HF/G

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

# 15276 - SKIN SUB GRAFT F/N/HF/G ADDL

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
    - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Surgical Repair (Closure) Procedures on the Integumentary System
    - Use the codes in this section to designate wound closure utilizing sutures, staples, or tissue adhesives (eg, 2-cyanoacrylate), either singly or in combination with each other, or in combination with adhesive strips. Chemical cauterization, electrocauterization, or wound closure utilizing adhesive strips as the sole repair material are included in the appropriate E/M code.

      Definitions

      The repair of wounds may be classified as Simple, Intermediate, or Complex.

      Simple repair is used when the wound is superficial (eg, involving primarily epidermis or dermis, or subcutaneous tissues without significant involvement of deeper structures) and requires simple one-layer closure. Hemostasis and local or topical anesthesia, when performed, are not reported separately.

      Intermediate repair includes the repair of wounds that, in addition to the above, require layered closure of one or more of the deeper layers of subcutaneous tissue and superficial (non-muscle) fascia, in addition to the skin (epidermal and dermal) closure. It includes limited undermining (defined as a distance less than the maximum width of the defect, measured perpendicular to the closure line, along at least one entire edge of the defect). Single-layer closure of heavily contaminated wounds that have required extensive cleaning or removal of particulate matter also constitutes intermediate repair.

      Complex repair includes the repair of wounds that, in addition to the requirements for intermediate repair, require at least one of the following: exposure of bone, cartilage, tendon, or named neurovascular structure; debridement of wound edges (eg, traumatic lacerations or avulsions); extensive undermining (defined as a distance greater than or equal to the maximum width of the defect, measured perpendicular to the closure line along at least one entire edge of the defect); involvement of free margins of helical rim, vermilion border, or nostril rim; placement of retention sutures. Necessary preparation includes creation of a limited defect for repairs or the debridement of complicated lacerations or avulsions. Complex repair does not include excision of benign (11400-11446) or malignant (11600-11646) lesions, excisional preparation of a wound bed (15002-15005) or debridement of an open fracture or open dislocation.

      Instructions for listing services at time of wound repair:

      1. The repaired wound(s) should be measured and recorded in centimeters, whether curved, angular, or stellate.

      2. When multiple wounds are repaired, add together the lengths of those in the same classification (see above) and from all anatomic sites that are grouped together into the same code descriptor.

For example, add together the lengths of intermediate repairs to the trunk and extremities. Do not add lengths of repairs from different groupings of anatomic sites (eg, face and extremities). Also, do not add together lengths of different classifications (eg, intermediate and complex repairs).

When more than one classification of wounds is repaired, list the more complicated as the primary procedure and the less complicated as the secondary procedure, using modifier 59.

3. Decontamination and/or debridement: Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

(For extensive debridement of soft tissue and/or bone, not associated with open fracture(s) and/or dislocation(s) resulting from penetrating and/or blunt trauma, see 11042-11047.)

(For extensive debridement of subcutaneous tissue, muscle fascia, muscle, and/or bone associated with open fracture(s) and/or dislocation(s), see 11010-11012.)

4. Involvement of nerves, blood vessels and tendons: Report under appropriate system (Nervous, Cardiovascular, Musculoskeletal) for repair of these structures. The repair of these associated wounds is included in the primary procedure unless it qualifies as a complex repair, in which case modifier 59 applies.

Simple ligation of vessels in an open wound is considered as part of any wound closure.

Simple "exploration" of nerves, blood vessels or tendons exposed in an open wound is also considered part of the essential treatment of the wound and is not a separate procedure unless appreciable dissection is required. If the wound requires enlargement, extension of dissection (to determine penetration), debridement, removal of foreign body(s), ligation or coagulation of minor subcutaneous and/or muscular blood vessel(s) of the subcutaneous tissue, muscle fascia, and/or muscle, not requiring thoracotomy or laparotomy, use codes 20100-20103, as appropriate.

- Skin Replacement Surgery
  - Skin replacement surgery consists of surgical preparation and topical placement of an autograft (including tissue cultured autograft) or skin substitute graft (ie, homograft, allograft, xenograft). The graft is anchored using the individual's choice of fixation. When services are performed in the office, routine dressing supplies are not reported separately.

    The following definition should be applied to those codes that reference "100 sq cm or 1% of body area of infants and children" when determining the involvement of body size: The measurement of 100 sq cm is applicable to adults and children 10 years of age and older; and percentages of body surface area apply to infants and children younger than 10 years of age. The measurements apply to the size of the recipient area.

    Procedures involving wrist and/or ankle are reported with codes that include arm or leg in the descriptor.

    When a primary procedure requires a skin substitute or skin autograft for definitive skin closure (eg, orbitectomy, radical mastectomy, deep tumor removal), use 15100-15278 in conjunction with primary procedure.

    For biological implant for soft tissue reinforcement, use 15777 in conjunction with primary procedure.

    The supply of skin substitute graft(s) should be reported separately in conjunction with 15271-15278.

- Skin Replacement Surgery Definitions
  - Surgical preparation codes 15002-15005 for skin replacement surgery describe the initial services related to preparing a clean and viable wound surface for placement of an autograft, flap, skin

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

substitute graft or for negative pressure wound therapy. In some cases, closure may be possible using adjacent tissue transfer (14000-14061) or complex repair (13100-13153). In all cases, appreciable nonviable tissue is removed to treat a burn, traumatic wound or a necrotizing infection. The clean wound bed may also be created by incisional release of a scar contracture resulting in a surface defect from separation of tissues. The intent is to heal the wound by primary intention, or by the use of negative pressure wound therapy. Patient conditions may require the closure or application of graft, flap, or skin substitute to be delayed, but in all cases the intent is to include these treatments or negative pressure wound therapy to heal the wound. Do not report 15002-15005 for removal of nonviable tissue/debris in a chronic wound (eg, venous or diabetic) when the wound is left to heal by secondary intention. See active wound management codes (97597, 97598) and debridement codes (11042-11047) for this service. For necrotizing soft tissue infections in specific anatomic locations, see 11004-11008.

Select the appropriate code from 15002-15005 based upon location and size of the resultant defect. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms). Use 15002 or 15004, as appropriate, for excisions and incisional releases resulting in wounds up to and including 100 sq cm of surface area. Use 15003 or 15005 for each additional 100 sq cm or part thereof. For example: Surgical preparation of a 20 sq cm wound on the right hand and a 15 sq cm wound on the left hand would be reported with a single code, 15004. Surgical preparation of a 75 sq cm wound on the right thigh and a 75 sq cm wound on the left thigh would be reported with 15002 for the first 100 sq cm and 15003 for the second 50 sq cm. If all four wounds required surgical preparation on the same day, use modifier 59 with 15002, and 15004.

Autografts/tissue cultured autografts include the harvest and/or application of an autologous skin graft. Repair of donor site requiring skin graft or local flaps is reported separately. Removal of current graft and/or simple cleansing of the wound is included, when performed. Do not report 97602. Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

Select the appropriate code from 15040-15261 based upon type of autograft and location and size of the defect. The measurements apply to the size of the recipient area. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms).

Skin substitute grafts include non-autologous human skin (dermal or epidermal, cellular and acellular) grafts (eg, homograft, allograft), non-human skin substitute grafts (ie, xenograft), and biological products that form a sheet scaffolding for skin growth. These codes are not to be reported for application of non-graft wound dressings (eg, gel, powder, ointment, foam, liquid) or injected skin substitutes. Application of non-graft wound dressings is not separately reportable. Removal of current graft and/or simple cleansing of the wound is included, when performed. Do not report 97602. Debridement is considered a separate procedure only when gross contamination requires prolonged cleansing, when appreciable amounts of devitalized or contaminated tissue are removed, or when debridement is carried out separately without immediate primary closure.

Select the appropriate code from 15271-15278 based upon location and size of the defect. For multiple wounds, sum the surface area of all wounds from all anatomic sites that are grouped together into the same code descriptor. For example, sum the surface area of all wounds on the trunk and arms. Do not sum wounds from different groupings of anatomic sites (eg, face and arms). The supply of skin substitute graft(s) should be reported separately in conjunction with 15271, 15272, 15273, 15274, 15275, 15276, 15277, 15278. For biologic implant for soft tissue reinforcement, use 15777 in conjunction with code for primary procedure.

- Surgical Preparation for Skin Replacement Surgery
- Skin Substitute Grafts
    - The supply of skin substitute graft(s) should be reported separately in conjunction with 15271-15278. For biologic implant for soft tissue reinforcement, use 15777 in conjunction with code

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

for primary procedure.

- Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm

| | |
|---|---|
| **CPT Code:** | 15276 |
| **Long Descriptor:** | Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure) |
| **Medium Descriptor:** | SUB GRFT F/S/N/H/F/G/M/D<100SQ CM EA ADDL25SQ CM |
| **Short Descriptor:** | SKIN SUB GRAFT F/N/HF/G ADDL |
| **Consumer Friendly Descriptor:** | Application of skin substitute graft to wound of face, scalp, eyelids, mouth, neck, ears, around eyes, genitals, hands, feet, fingers, or toes, each additional 25.0 sq cm of wound 100.0 sq cm or less |
| **Clinician Friendly Descriptor:** | Application of skin substitute graft of digit, total wound surface area 100.0 sq cm or more, each additional 25.0 sq cm or less<br>Application of skin substitute graft of ear, total wound surface area 100.0 sq cm or more, each additional 25.0 sq cm or less<br>Application of skin substitute graft of eyelid, total wound surface area 100.0 sq cm or more, each additional 25.0 sq cm or less<br>Application of skin substitute graft of face, total wound surface area 100.0 sq cm or more, each additional 25.0 sq cm or less<br>Application of skin substitute graft of foot, total wound surface area 100.0 sq cm or more, each additional 25.0 sq cm or less<br>Application of skin substitute graft of genitalia, total wound surface area 100.0 sq cm or more, each additional 25.0 sq cm or less<br>Application of skin substitute graft of hand, total wound surface area 100.0 sq cm or more, each additional 25.0 sq cm or less<br>Application of skin substitute graft of mouth, total wound surface area 100.0 sq cm or more, each additional 25.0 sq cm or less<br>Application of skin substitute graft of neck, total wound surface area 100.0 sq cm or more, each additional 25.0 sq cm or less<br>Application of skin substitute graft of orbit, total wound surface area 100.0 sq cm or more, each additional 25.0 sq cm or less<br>Application of skin substitute graft of scalp, total wound surface area 100.0 sq cm or more, each additional 25.0 sq cm or less |

**Citation**

CPT Changes: An Insider's View 2012
CPT Assistant Jan 12: 6
CPT Assistant Oct 12: 3
CPT Assistant Oct 13: 15
CPT Assistant Jun 14: 14

**Code Flags**

First Appearance: 20120101
This is an add-on code. See Appendix D

**Parenthetical Guidelines specific to 15276**

(Use 15276 in conjunction with 15275)

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

(For total wound surface area greater than or equal to 100 sq cm, see 15277, 15278)
(Do not report 15275, 15276 in conjunction with 15277, 15278)

**Additional parenthetical guidelines from associated codes**

15278 - (Do not report 15271-15278 in conjunction with 97602)
69320 - (For other reconstructive procedures with grafts (eg, skin, cartilage, bone), see 13151-15760, 21230-21235)
26952 - (For repair of soft tissue defect requiring split or full thickness graft or other pedicle flaps, see 15050-15758)
15777 - (For topical application of skin substitute graft to a wound surface, see 15271-15278)
15278 - (For total wound surface area up to 100 sq cm, see 15275, 15276)

**Related Codes**

Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm

15275 - Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area

15276 - Application of skin substitute graft to face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof (List separately in addition to code for primary procedure)

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 20120101 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 15276 |
| Description: | SKIN SUB GRAFT F/N/HF/G ADDL |
| Payment Status Indicator: | N - **Packaged** Items and Services Packaged into APC Rates<br>Paid under OPPS; payment is packaged into payment for other services. Therefore, there is no separate APC payment. |
| APC: | N/A |
| National Unadjusted Payment: | N/A |
| Relative Weight: | N/A |
| Related Information: | Click to Search APC Codebook for 15276<br>NCCI Edits may apply, Click to Search NCCI Edits for 15276<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91<br>E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, |

| | |
|---|---|
| | LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br><br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 15276 |
| Description: | SKIN SUB GRAFT F/N/HF/G ADDL |
| Payment Indicator: | N1 - Packaged service/item; no separate payment made. |
| Payment Weight: | N/A |
| Payment: | N/A |
| Subject to multi-procedure discounting?: | N |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br><br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 15276 |
| Description: | SKIN SUB GRAFT F/N/HF/G ADDL |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 0.97 / 0.75 |
| National Unadjusted Payment (NonFac/Fac): | $33.57 / $25.95 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br><br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br><br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include: |

| | |
|---|---|
| | • GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br><br>Physician Fee Schedule CodeBook Page for 15276 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 15276 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

15276 SKIN SUB GRAFT F/N/HF/G ADDL

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

*HCPCS and CPT Codebook - 2022 > Surgery Codes - Integumentary Codes - (10004 - 19499)*

# 17311 - MOHS 1 STAGE H/N/HF/G

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
  - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Destruction Procedures on the Integumentary System
  - Destruction means the ablation of benign, premalignant or malignant tissues by any method, with or without curettement, including local anesthesia, and not usually requiring closure.

    Any method includes electrosurgery, cryosurgery, laser and chemical treatment. Lesions include condylomata, papillomata, molluscum contagiosum, herpetic lesions, warts (ie, common, plantar, flat), milia, or other benign, premalignant (eg, actinic keratoses), or malignant lesions.

    (For destruction of lesion(s) in specific anatomic sites, see 40820, 46900-46917, 46924, 54050-54057, 54065, 56501, 56515, 57061, 57065, 67850, 68135)

    (For laser treatment for inflammatory skin disease, see 96920-96922)

    (For paring or cutting of benign hyperkeratotic lesions (eg, corns or calluses), see 11055-11057)

    (For sharp removal or electrosurgical destruction of skin tags and fibrocutaneous tags, see 11200, 11201)

    (For cryotherapy of acne, use 17340)

    (For initiation or follow-up care of topical chemotherapy (eg, 5-FU or similar agents), see appropriate office visits)

    (For shaving of epidermal or dermal lesions, see 11300-11313)

    (For excision of cicatricial lesion[s] [eg, full thickness excision, through the dermis], see 11400-11446)

    (For incisional removal of burn scar, see 16035, 16036)

    (For fractional ablative laser fenestration for functional improvement of traumatic or burn scars, see 0479T, 0480T)

- Mohs Micrographic Surgery Procedures
  - Mohs micrographic surgery is a technique for the removal of complex or ill-defined skin cancer with histologic examination of 100% of the surgical margins. It requires the integration of an individual functioning in two separate and distinct capacities: surgeon and pathologist. If either of these responsibilities is delegated to another physician or other qualified health care professional who reports the services separately, these codes should not be reported. The Mohs surgeon removes the tumor tissue and maps and divides the tumor specimen into pieces, and each piece is embedded into an individual tissue block for histopathologic examination. Thus a tissue block in

Mohs surgery is defined as an individual tissue piece embedded in a mounting medium for sectioning.

If repair is performed, use separate repair, flap, or graft codes. If a biopsy of a suspected skin cancer is performed on the same day as Mohs surgery because there was no prior pathology confirmation of a diagnosis, then report a diagnostic skin biopsy (11102, 11104, 11106) and frozen section pathology (88331) with modifier 59 to distinguish from the subsequent definitive surgical procedure of Mohs surgery.

(If additional special pathology procedures, stains or immunostains are required, see 88311-88314, 88342)

(Do not report 88314 in conjunction with 17311-17315 for routine frozen section stain (eg, hematoxylin and eosin, toluidine blue) performed during Mohs surgery. When a nonroutine histochemical stain on frozen tissue is utilized, report 88314 with modifier 59)

(Do not report 88302-88309 on the same specimen as part of the Mohs surgery)

- Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels

| | |
|---|---|
| **CPT Code:** | 17311 |
| **Long Descriptor:** | Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels; first stage, up to 5 tissue blocks |
| **Medium Descriptor:** | MOHS MICROGRAPHIC H/N/H/F/G 1ST STAGE 5 BLOCKS |
| **Short Descriptor:** | MOHS 1 STAGE H/N/HF/G |
| **Consumer Friendly Descriptor:** | Removal and microscopic exam of growth of head, neck, hands, feet, or genitals, 1-5 tissue blocks |
| **Clinician Friendly Descriptor:** | Chemosurgery by Mohs technique, first stage, up to 5 tissue blocks<br>Chemosurgery of foot by Mohs technique, first stage, up to 5 tissue blocks<br>Chemosurgery of genitalia by Mohs technique, first stage, up to 5 tissue blocks<br>Chemosurgery of hand by Mohs technique, first stage, up to 5 tissue blocks<br>Chemosurgery of head by Mohs technique, first stage, up to 5 tissue blocks<br>Chemosurgery of neck by Mohs technique, first stage, up to 5 tissue blocks |

**Citation**

CPT Changes: An Insider's View 2007
CPT Assistant Feb 14: 10
CPT Assistant Oct 14: 14

**Code Flags**

First Appearance: 20070101

**Additional parenthetical guidelines from associated codes**

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

(Do not report 88314 in conjunction with 17311-17315 for routine frozen section stain (eg, hematoxylin and eosin, toluidine blue) performed during Mohs surgery. When a nonroutine histochemical stain on frozen tissue is utilized, report 88314 with modifier 59)
88314 - (Do not report 88314 with 17311-17315 for routine frozen section stain [eg, hematoxylin and eosin, toluidine blue], performed during Mohs surgery. When a nonroutine histochemical stain on frozen tissue during Mohs surgery is utilized, report 88314 with modifier 59)
67850 - (For Mohs micrographic surgery, see 17311-17315)
17312 - (Use 17312 in conjunction with 17311)
17315 - (Use 17315 in conjunction with 17311-17314)
88314 - (Use 88314 in conjunction with 17311-17315, 88302-88309, 88331, 88332)

**Related Codes**

Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels

17311 - Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels; first stage, up to 5 tissue blocks

17312 - Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels; each additional stage after the first stage, up to 5 tissue blocks (List separately in addition to code for primary procedure)

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 20070101 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 17311 |
| Description: | MOHS 1 STAGE H/N/HF/G |
| Payment Status Indicator: | T - **Procedure or Service, Multiple Procedure Reduction Applies** Paid under OPPS; separate APC payment. |
| APC: | 5053 |
| National Unadjusted Payment: | $534.89 |
| Relative Weight: | 6.3543 |
| | |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| Related Information: | Click to Search APC Codebook for 17311<br>NCCI Edits may apply, Click to Search NCCI Edits for 17311<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 17311 |
| Description: | MOHS 1 STAGE H/N/HF/G |
| Payment Indicator: | P2 - Office-based surgical procedure added to ASC list in CY 2008 or later with MPFS nonfacility PE RVUs; payment based on OPPS relative payment weight. |
| Payment Weight: | 5.4291 |
| Payment: | $271.00 |
| Subject to multi-procedure discounting?: | Y |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 17311 |
| Description: | MOHS 1 STAGE H/N/HF/G |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 19.87 / 10.34 |
| National Unadjusted Payment | $687.63 / $357.83 |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| (NonFac/Fac): | |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 17311 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 17311 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

17311 MOHS 1 STAGE H/N/HF/G

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

*HCPCS and CPT Codebook - 2022 > Surgery Codes - Integumentary Codes - (10004 - 19499)*

# 17312 - MOHS ADDL STAGE

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
  - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Destruction Procedures on the Integumentary System
  - Destruction means the ablation of benign, premalignant or malignant tissues by any method, with or without curettement, including local anesthesia, and not usually requiring closure.

    Any method includes electrosurgery, cryosurgery, laser and chemical treatment. Lesions include condylomata, papillomata, molluscum contagiosum, herpetic lesions, warts (ie, common, plantar, flat), milia, or other benign, premalignant (eg, actinic keratoses), or malignant lesions.

    (For destruction of lesion(s) in specific anatomic sites, see 40820, 46900-46917, 46924, 54050-54057, 54065, 56501, 56515, 57061, 57065, 67850, 68135)

    (For laser treatment for inflammatory skin disease, see 96920-96922)

    (For paring or cutting of benign hyperkeratotic lesions (eg, corns or calluses), see 11055-11057)

    (For sharp removal or electrosurgical destruction of skin tags and fibrocutaneous tags, see 11200, 11201)

    (For cryotherapy of acne, use 17340)

    (For initiation or follow-up care of topical chemotherapy (eg, 5-FU or similar agents), see appropriate office visits)

    (For shaving of epidermal or dermal lesions, see 11300-11313)

    (For excision of cicatricial lesion[s] [eg, full thickness excision, through the dermis], see 11400-11446)

    (For incisional removal of burn scar, see 16035, 16036)

    (For fractional ablative laser fenestration for functional improvement of traumatic or burn scars, see 0479T, 0480T)

- Mohs Micrographic Surgery Procedures
  - Mohs micrographic surgery is a technique for the removal of complex or ill-defined skin cancer with histologic examination of 100% of the surgical margins. It requires the integration of an individual functioning in two separate and distinct capacities: surgeon and pathologist. If either of these responsibilities is delegated to another physician or other qualified health care professional who reports the services separately, these codes should not be reported. The Mohs surgeon removes the tumor tissue and maps and divides the tumor specimen into pieces, and each piece is embedded into an individual tissue block for histopathologic examination. Thus a tissue block in

Mohs surgery is defined as an individual tissue piece embedded in a mounting medium for sectioning.

If repair is performed, use separate repair, flap, or graft codes. If a biopsy of a suspected skin cancer is performed on the same day as Mohs surgery because there was no prior pathology confirmation of a diagnosis, then report a diagnostic skin biopsy (11102, 11104, 11106) and frozen section pathology (88331) with modifier 59 to distinguish from the subsequent definitive surgical procedure of Mohs surgery.

(If additional special pathology procedures, stains or immunostains are required, see 88311-88314, 88342)

(Do not report 88314 in conjunction with 17311-17315 for routine frozen section stain (eg, hematoxylin and eosin, toluidine blue) performed during Mohs surgery. When a nonroutine histochemical stain on frozen tissue is utilized, report 88314 with modifier 59)

(Do not report 88302-88309 on the same specimen as part of the Mohs surgery)

- Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels

| | |
|---|---|
| **CPT Code:** | 17312 |
| **Long Descriptor:** | Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels; each additional stage after the first stage, up to 5 tissue blocks (List separately in addition to code for primary procedure) |
| **Medium Descriptor:** | MOHS MICROGRAPHIC H/N/H/F/G EACH ADDL STAGE |
| **Short Descriptor:** | MOHS ADDL STAGE |
| **Consumer Friendly Descriptor:** | Removal and microscopic exam of growth of head, neck, hands, feet, or genitals, each additional stage, 1-5 tissue blocks |
| **Clinician Friendly Descriptor:** | Chemosurgery by Mohs technique, each additional stage after the first stage, up to 5 tissue blocks<br>Chemosurgery of foot by Mohs technique, each additional stage after the first stage, up to 5 tissue blocks<br>Chemosurgery of genitalia by Mohs technique, each additional stage after the first stage, up to 5 tissue blocks<br>Chemosurgery of hand by Mohs technique, each additional stage after the first stage, up to 5 tissue blocks<br>Chemosurgery of head by Mohs technique, each additional stage after the first stage, up to 5 tissue blocks<br>Chemosurgery of neck by Mohs technique, each additional stage after the first stage, up to 5 tissue blocks |

**Citation**

CPT Changes: An Insider's View 2007

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

**Code Flags**

First Appearance: 20070101
This is an add-on code. See Appendix D

**Parenthetical Guidelines specific to 17312**

(Use 17312 in conjunction with 17311)

**Additional parenthetical guidelines from associated codes**

(Do not report 88314 in conjunction with 17311-17315 for routine frozen section stain (eg, hematoxylin and eosin, toluidine blue) performed during Mohs surgery. When a nonroutine histochemical stain on frozen tissue is utilized, report 88314 with modifier 59)
88314 - (Do not report 88314 with 17311-17315 for routine frozen section stain [eg, hematoxylin and eosin, toluidine blue], performed during Mohs surgery. When a nonroutine histochemical stain on frozen tissue during Mohs surgery is utilized, report 88314 with modifier 59)
67850 - (For Mohs micrographic surgery, see 17311-17315)
17315 - (Use 17315 in conjunction with 17311-17314)
88314 - (Use 88314 in conjunction with 17311-17315, 88302-88309, 88331, 88332)

**Related Codes**

Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels

17311 - Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels; first stage, up to 5 tissue blocks

17312 - Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels; each additional stage after the first stage, up to 5 tissue blocks (List separately in addition to code for primary procedure)

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 20070101 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 17312 |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| Description: | MOHS ADDL STAGE |
| Payment Status Indicator: | N - **Packaged** Items and Services Packaged into APC Rates<br>Paid under OPPS; payment is packaged into payment for other services. Therefore, there is no separate APC payment. |
| APC: | N/A |
| National Unadjusted Payment: | N/A |
| Relative Weight: | N/A |
| Related Information: | Click to Search APC Codebook for 17312<br>NCCI Edits may apply, Click to Search NCCI Edits for 17312<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 17312 |
| Description: | MOHS ADDL STAGE |
| Payment Indicator: | N1 - Packaged service/item; no separate payment made. |
| Payment Weight: | N/A |
| Payment: | N/A |
| Subject to multi-procedure discounting?: | N |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 17312 |
| Description: | MOHS ADDL STAGE |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

| | |
|---|---|
| | 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 12.11 / 5.50 |
| National Unadjusted Payment (NonFac/Fac): | $419.08 / $190.33 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 17312 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 17312 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

17312 MOHS ADDL STAGE

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Surgery Codes - Integumentary Codes - (10004 - 19499)*

# 17313 - MOHS 1 STAGE T/A/L

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
  - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Destruction Procedures on the Integumentary System
  - Destruction means the ablation of benign, premalignant or malignant tissues by any method, with or without curettement, including local anesthesia, and not usually requiring closure.

    Any method includes electrosurgery, cryosurgery, laser and chemical treatment. Lesions include condylomata, papillomata, molluscum contagiosum, herpetic lesions, warts (ie, common, plantar, flat), milia, or other benign, premalignant (eg, actinic keratoses), or malignant lesions.

    (For destruction of lesion(s) in specific anatomic sites, see 40820, 46900-46917, 46924, 54050-54057, 54065, 56501, 56515, 57061, 57065, 67850, 68135)

    (For laser treatment for inflammatory skin disease, see 96920-96922)

    (For paring or cutting of benign hyperkeratotic lesions (eg, corns or calluses), see 11055-11057)

    (For sharp removal or electrosurgical destruction of skin tags and fibrocutaneous tags, see 11200, 11201)

    (For cryotherapy of acne, use 17340)

    (For initiation or follow-up care of topical chemotherapy (eg, 5-FU or similar agents), see appropriate office visits)

    (For shaving of epidermal or dermal lesions, see 11300-11313)

    (For excision of cicatricial lesion[s] [eg, full thickness excision, through the dermis], see 11400-11446)

    (For incisional removal of burn scar, see 16035, 16036)

    (For fractional ablative laser fenestration for functional improvement of traumatic or burn scars, see 0479T, 0480T)

- Mohs Micrographic Surgery Procedures
  - Mohs micrographic surgery is a technique for the removal of complex or ill-defined skin cancer with histologic examination of 100% of the surgical margins. It requires the integration of an individual functioning in two separate and distinct capacities: surgeon and pathologist. If either of these responsibilities is delegated to another physician or other qualified health care professional who reports the services separately, these codes should not be reported. The Mohs surgeon removes the tumor tissue and maps and divides the tumor specimen into pieces, and each piece is embedded into an individual tissue block for histopathologic examination. Thus a tissue block in

Mohs surgery is defined as an individual tissue piece embedded in a mounting medium for sectioning.

If repair is performed, use separate repair, flap, or graft codes. If a biopsy of a suspected skin cancer is performed on the same day as Mohs surgery because there was no prior pathology confirmation of a diagnosis, then report a diagnostic skin biopsy (11102, 11104, 11106) and frozen section pathology (88331) with modifier 59 to distinguish from the subsequent definitive surgical procedure of Mohs surgery.

(If additional special pathology procedures, stains or immunostains are required, see 88311-88314, 88342)

(Do not report 88314 in conjunction with 17311-17315 for routine frozen section stain (eg, hematoxylin and eosin, toluidine blue) performed during Mohs surgery. When a nonroutine histochemical stain on frozen tissue is utilized, report 88314 with modifier 59)

(Do not report 88302-88309 on the same specimen as part of the Mohs surgery)

- Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs

| | |
|---|---|
| **CPT Code:** | 17313 |
| **Long Descriptor:** | Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs; first stage, up to 5 tissue blocks |
| **Medium Descriptor:** | MOHS TRUNK/ARM/LEG 1ST STAGE 5 BLOCKS |
| **Short Descriptor:** | MOHS 1 STAGE T/A/L |
| **Consumer Friendly Descriptor:** | Removal and microscopic exam of growth of trunk, arms, or legs, 1-5 tissue blocks |
| **Clinician Friendly Descriptor:** | Chemosurgery of arm by Mohs technique, first stage, up to 5 tissue blocks<br>Chemosurgery of leg by Mohs technique, first stage, up to 5 tissue blocks<br>Chemosurgery of trunk by Mohs technique, first stage, up to 5 tissue blocks |

**Citation**

CPT Changes: An Insider's View 2007

**Code Flags**

First Appearance: 20070101

**Additional parenthetical guidelines from associated codes**

(Do not report 88314 in conjunction with 17311-17315 for routine frozen section stain (eg, hematoxylin and eosin, toluidine blue) performed during Mohs surgery. When a nonroutine histochemical stain on frozen tissue is utilized, report 88314 with modifier 59)
88314 - (Do not report 88314 with 17311-17315 for routine frozen section stain [eg, hematoxylin and eosin, toluidine blue], performed during Mohs surgery. When a nonroutine histochemical stain on frozen tissue during Mohs surgery is utilized, report 88314 with modifier 59)

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

67850 - (For Mohs micrographic surgery, see 17311-17315)
17314 - (Use 17314 in conjunction with 17313)
17315 - (Use 17315 in conjunction with 17311-17314)
88314 - (Use 88314 in conjunction with 17311-17315, 88302-88309, 88331, 88332)

**Related Codes**

Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs

17313 - Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs; first stage, up to 5 tissue blocks

17314 - Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs; each additional stage after the first stage, up to 5 tissue blocks (List separately in addition to code for primary procedure)

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 20070101 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 17313 |
| Description: | MOHS 1 STAGE T/A/L |
| Payment Status Indicator: | T - **Procedure or Service, Multiple Procedure Reduction Applies** Paid under OPPS; separate APC payment. |
| APC: | 5053 |
| National Unadjusted Payment: | $534.89 |
| Relative Weight: | 6.3543 |
| Related Information: | Click to Search APC Codebook for 17313<br>NCCI Edits may apply, Click to Search NCCI Edits for 17313<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 17313 |
| Description: | MOHS 1 STAGE T/A/L |
| Payment Indicator: | P2 - Office-based surgical procedure added to ASC list in CY 2008 or later with MPFS nonfacility PE RVUs; payment based on OPPS relative payment weight. |
| Payment Weight: | 5.4291 |
| Payment: | $271.00 |
| Subject to multi-procedure discounting?: | Y |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 17313 |
| Description: | MOHS 1 STAGE T/A/L |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 18.67 / 9.29 |
| National Unadjusted Payment (NonFac/Fac): | $646.10 / $321.49 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 17313 (includes Supervision, Bilateral and |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| | other Indicators)<br>NCCI Edits for 17313 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

17313 MOHS 1 STAGE T/A/L

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

# 17314 - MOHS ADDL STAGE T/A/L

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
  - *Surgery Guidelines*
- Surgical Procedures on the Integumentary System
- Destruction Procedures on the Integumentary System
  - Destruction means the ablation of benign, premalignant or malignant tissues by any method, with or without curettement, including local anesthesia, and not usually requiring closure.

    Any method includes electrosurgery, cryosurgery, laser and chemical treatment. Lesions include condylomata, papillomata, molluscum contagiosum, herpetic lesions, warts (ie, common, plantar, flat), milia, or other benign, premalignant (eg, actinic keratoses), or malignant lesions.

    (For destruction of lesion(s) in specific anatomic sites, see 40820, 46900-46917, 46924, 54050-54057, 54065, 56501, 56515, 57061, 57065, 67850, 68135)

    (For laser treatment for inflammatory skin disease, see 96920-96922)

    (For paring or cutting of benign hyperkeratotic lesions (eg, corns or calluses), see 11055-11057)

    (For sharp removal or electrosurgical destruction of skin tags and fibrocutaneous tags, see 11200, 11201)

    (For cryotherapy of acne, use 17340)

    (For initiation or follow-up care of topical chemotherapy (eg, 5-FU or similar agents), see appropriate office visits)

    (For shaving of epidermal or dermal lesions, see 11300-11313)

    (For excision of cicatricial lesion[s] [eg, full thickness excision, through the dermis], see 11400-11446)

    (For incisional removal of burn scar, see 16035, 16036)

    (For fractional ablative laser fenestration for functional improvement of traumatic or burn scars, see 0479T, 0480T)

- Mohs Micrographic Surgery Procedures
  - Mohs micrographic surgery is a technique for the removal of complex or ill-defined skin cancer with histologic examination of 100% of the surgical margins. It requires the integration of an individual functioning in two separate and distinct capacities: surgeon and pathologist. If either of these responsibilities is delegated to another physician or other qualified health care professional who reports the services separately, these codes should not be reported. The Mohs surgeon removes the tumor tissue and maps and divides the tumor specimen into pieces, and each piece is embedded into an individual tissue block for histopathologic examination. Thus a tissue block in

Mohs surgery is defined as an individual tissue piece embedded in a mounting medium for sectioning.

If repair is performed, use separate repair, flap, or graft codes. If a biopsy of a suspected skin cancer is performed on the same day as Mohs surgery because there was no prior pathology confirmation of a diagnosis, then report a diagnostic skin biopsy (11102, 11104, 11106) and frozen section pathology (88331) with modifier 59 to distinguish from the subsequent definitive surgical procedure of Mohs surgery.

(If additional special pathology procedures, stains or immunostains are required, see 88311-88314, 88342)

(Do not report 88314 in conjunction with 17311-17315 for routine frozen section stain (eg, hematoxylin and eosin, toluidine blue) performed during Mohs surgery. When a nonroutine histochemical stain on frozen tissue is utilized, report 88314 with modifier 59)

(Do not report 88302-88309 on the same specimen as part of the Mohs surgery)

- Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs

| | |
|---|---|
| **CPT Code:** | 17314 |
| **Long Descriptor:** | Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs; each additional stage after the first stage, up to 5 tissue blocks (List separately in addition to code for primary procedure) |
| **Medium Descriptor:** | MOHS TRUNK/ARM/LEG EA STAGE AFTER 1ST STAGE |
| **Short Descriptor:** | MOHS ADDL STAGE T/A/L |
| **Consumer Friendly Descriptor:** | Removal and microscopic exam of growth of trunk, arms, or legs, each additional stage, 1-5 tissue blocks |
| **Clinician Friendly Descriptor:** | Chemosurgery of arm by Mohs technique, each additional stage after the first stage, up to 5 tissue blocks<br>Chemosurgery of leg by Mohs technique, each additional stage after the first stage, up to 5 tissue blocks<br>Chemosurgery of trunk by Mohs technique, each additional stage after the first stage, up to 5 tissue blocks |

**Citation**

CPT Changes: An Insider's View 2007

**Code Flags**

First Appearance: 20070101
This is an add-on code. See Appendix D

**Parenthetical Guidelines specific to 17314**

(Use 17314 in conjunction with 17313)

**Additional parenthetical guidelines from associated codes**

(Do not report 88314 in conjunction with 17311-17315 for routine frozen section stain (eg, hematoxylin and eosin, toluidine blue) performed during Mohs surgery. When a nonroutine histochemical stain on frozen tissue is utilized, report 88314 with modifier 59)
88314 - (Do not report 88314 with 17311-17315 for routine frozen section stain [eg, hematoxylin and eosin, toluidine blue], performed during Mohs surgery. When a nonroutine histochemical stain on frozen tissue during Mohs surgery is utilized, report 88314 with modifier 59)
67850 - (For Mohs micrographic surgery, see 17311-17315)
17315 - (Use 17315 in conjunction with 17311-17314)
88314 - (Use 88314 in conjunction with 17311-17315, 88302-88309, 88331, 88332)

**Related Codes**

Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs

17313 - Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs; first stage, up to 5 tissue blocks

17314 - Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (eg, hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs; each additional stage after the first stage, up to 5 tissue blocks (List separately in addition to code for primary procedure)

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 20070101 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 17314 |
| Description: | MOHS ADDL STAGE T/A/L |
| Payment Status Indicator: | N - **Packaged** Items and Services Packaged into APC Rates<br>Paid under OPPS; payment is packaged into payment for other services. Therefore, there is no separate APC payment. |
| APC: | N/A |
| National Unadjusted Payment: | N/A |
| Relative Weight: | N/A |
| | Click to Search APC Codebook for 17314 |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

| | |
|---|---|
| Related Information: | NCCI Edits may apply, Click to Search NCCI Edits for 17314<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 17314 |
| Description: | MOHS ADDL STAGE T/A/L |
| Payment Indicator: | N1 - Packaged service/item; no separate payment made. |
| Payment Weight: | N/A |
| Payment: | N/A |
| Subject to multi-procedure discounting?: | N |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 17314 |
| Description: | MOHS ADDL STAGE T/A/L |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 11.59 / 5.09 |
| National Unadjusted Payment (NonFac/Fac): | $401.09 / $176.15 |
| | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include: |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| Related Information: | • 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 17314 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 17314 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

17314 MOHS ADDL STAGE T/A/L

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Surgery Codes - Endocrine, Nervous, Eye and Ocular Adnexa, Operating Microscope, and Auditory System Services Codes - (60000 - 69990)*

# 69100 - BIOPSY OF EXTERNAL EAR

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Surgery
    - *Surgery Guidelines*
- Surgical Procedures on the Auditory System
    - (For diagnostic services (eg, audiometry, vestibular tests), see 92502 et seq)
- Surgical Procedures on the External Ear
- Excision Procedures on the External Ear

| | |
|---|---|
| **CPT Code:** | 69100 |
| **Long Descriptor:** | Biopsy external ear |
| **Medium Descriptor:** | BIOPSY EXTERNAL EAR |
| **Short Descriptor:** | BIOPSY OF EXTERNAL EAR |
| **Consumer Friendly Descriptor:** | Biopsy of ear |
| **Clinician Friendly Descriptor:** | Biopsy of external ear |

**Code Flags**

First Appearance: Pre-1990

**Additional parenthetical guidelines from associated codes**

(For biopsy of ear, use 69100)

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | Pre-1990 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 69100 |
| | |

| | |
|---|---|
| Description: | BIOPSY OF EXTERNAL EAR |
| Payment Status Indicator: | T - **Procedure or Service, Multiple Procedure Reduction Applies** Paid under OPPS; separate APC payment. |
| APC: | 5161 |
| National Unadjusted Payment: | $216.07 |
| Relative Weight: | 2.5668 |
| Related Information: | Click to Search APC Codebook for 69100<br>NCCI Edits may apply, Click to Search NCCI Edits for 69100<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | 69100 |
| Description: | BIOPSY OF EXTERNAL EAR |
| Payment Indicator: | P3 - Office-based surgical procedure added to ASC list in CY 2008 or later with MPFS nonfacility PE RVUs; payment based on MPFS nonfacility PE RVUs. |
| Payment Weight: | N/A |
| Payment: | $68.52 |
| Subject to multi-procedure discounting?: | Y |
| ASC Designation: | ASC Covered Surgical Procedures (Addendum AA) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 69100 |
| Description: | BIOPSY OF EXTERNAL EAR |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

| | |
|---|---|
| | 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 2.88 / 1.36 |
| National Unadjusted Payment (NonFac/Fac): | $99.67 / $47.06 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 69100 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 69100 |

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

69100 BIOPSY OF EXTERNAL EAR

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

*HCPCS and CPT Codebook - 2022 > Pathology and Laboratory Procedures Codes - (0001U - 89398)*

# 88331 - PATH CONSULT INTRAOP 1 BLOC

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Pathology and Laboratory Procedures
    - *Pathology and Laboratory Procedures Guidelines*
- Surgical Pathology Procedures
    - Services 88300 through 88309 include accession, examination, and reporting. They do not include the services designated in codes 88311 through 88365 and 88399, which are coded in addition when provided.

      The unit of service for codes 88300 through 88309 is the specimen.

      A specimen is defined as tissue or tissues that is (are) submitted for individual and separate attention, requiring individual examination and pathologic diagnosis. Two or more such specimens from the same patient (eg, separately identified endoscopic biopsies, skin lesions) are each appropriately assigned an individual code reflective of its proper level of service.

      Service code 88300 is used for any specimen that in the opinion of the examining pathologist can be accurately diagnosed without microscopic examination. Service code 88302 is used when gross and microscopic examination is performed on a specimen to confirm identification and the absence of disease. Service codes 88304 through 88309 describe all other specimens requiring gross and microscopic examination, and represent additional ascending levels of physician work. Levels 88302 through 88309 are specifically defined by the assigned specimens.

      Any unlisted specimen should be assigned to the code which most closely reflects the physician work involved when compared to other specimens assigned to that code.

      (Do not report 88302-88309 on the same specimen as part of Mohs surgery)

- Pathology consultation during surgery

| | |
|---|---|
| **CPT Code:** | 88331 |
| **Long Descriptor:** | Pathology consultation during surgery; first tissue block, with frozen section(s), single specimen |
| **Medium Descriptor:** | PATH CONSLTJ SURG 1ST BLK FROZEN SCTJ 1 SPEC |
| **Short Descriptor:** | PATH CONSULT INTRAOP 1 BLOC |
| **Consumer Friendly Descriptor:** | Pathology examination of specimen during surgery, first tissue block |
| **Clinician Friendly Descriptor:** | Intraoperative pathology examination with frozen section, single specimen |

**Citation**

CPT Changes: An Insider's View 2001
CPT Assistant Winter 91: 19
CPT Assistant Spring 91: 2
CPT Assistant Apr 97: 12
CPT Assistant Aug 97: 18
CPT Assistant Jul 00: 4
CPT Assistant Nov 02: 7
CPT Assistant Mar 06: 6
CPT Assistant Nov 06: 1
CPT Assistant Jan 07: 29
CPT Assistant Oct 10: 9
CPT Assistant Dec 10: 9
CPT Assistant Dec 11: 18

**Code Flags**

First Appearance: Pre-1990

**Additional parenthetical guidelines from associated codes**

88387 - (Do not report 88387 in conjunction with 88388, 88329-88334)
88334 - (For intraoperative consultation on a specimen requiring both frozen section and cytologic evaluation, use 88331 and 88334)
88314 - (Use 88314 in conjunction with 17311-17315, 88302-88309, 88331, 88332)
88332 - (Use 88332 in conjunction with 88331)
88334 - (Use 88334 in conjunction with 88331, 88333)
88388 - (Use 88388 in conjunction with 88329-88334)

**Related Codes**

Pathology consultation during surgery

88329 - Pathology consultation during surgery

88331 - Pathology consultation during surgery; first tissue block, with frozen section(s), single specimen

88332 - Pathology consultation during surgery; each additional tissue block with frozen section(s) (List separately in addition to code for primary procedure)

88333 - Pathology consultation during surgery; cytologic examination (eg, touch prep, squash prep), initial site

88334 - Pathology consultation during surgery; cytologic examination (eg, touch prep, squash prep), each additional site (List separately in addition to code for primary procedure)

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | Pre-1990 | |
| CHANGED | 20010101 | CC |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 88331 |
| Description: | PATH CONSULT INTRAOP 1 BLOC |
| Payment Status Indicator: | Q1 - **STV-Packaged Codes** Paid under OPPS; Addendum B displays APC assignments when services are separately payable.<br>(1) Packaged APC payment if billed on the same claim as a HCPCS code assigned status indicator "S", "T", or "V".<br>(2) Composite APC payment if billed with specific combinations of services based on OPPS composite-specific payment criteria. Payment is packaged into a single payment for specific combinations of services.<br>(3) In other circumstances, payment is made through a separate APC payment. |
| APC: | 5672 |
| National Unadjusted Payment: | $152.32 |
| Relative Weight: | 1.8095 |
| Related Information: | Click to Search APC Codebook for 88331<br>NCCI Edits may apply, Click to Search NCCI Edits for 88331<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 88331 |
| Description: | PATH CONSULT INTRAOP 1 BLOC |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 1 - Identifies codes that describe diagnostic tests. Examples are pulmonary function tests or therapeutic radiology procedures, e.g., radiation therapy. These codes have both a professional and technical component. Modifiers 26 and TC can be used with these codes. The total RVUs for codes reported with a 26 modifier include values for physician work, practice expense, and malpractice expense. The total RVUs for codes reported with a TC modifier include values for practice expense and malpractice expense only. The total RVUs for codes reported without a modifier include values for physician work, practice expense, and malpractice expense. |
| Total RVUs (NonFac/Fac): | 2.99 / 2.99 |
| National Unadjusted Payment (NonFac/Fac): | $103.47 / $103.47 |
| | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| | 77, 78, 79, 80, 81, 82, 90, 99, LT, RT |
| Related Information: | For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 88331 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 88331 |

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Medicine Services and Procedures Codes - (0001A - 99607)*

# 97608 - NEG PRESS WOUND TX >50 CM

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Medicine Services and Procedures
    - *Medicine Services and Procedures Guidelines*
- Physical Medicine and Rehabilitation Evaluations
    - Codes 97010-97763 should be used to report each distinct procedure performed. Do not append modifier 51 to 97010-97763.

      The work of the physician or other qualified health care professional consists of face-to-face time with the patient (and caregiver, if applicable) delivering skilled services. For the purpose of determining the total time of a service, incremental intervals of treatment at the same visit may be accumulated.

      The meanings of terms in the Physical Medicine and Rehabilitation section are not the same as those in the Evaluation and Management Services section (99202-99350). Do not use the Definitions of Commonly Used Terms in the Evaluation and Management (E/M) Guidelines for physical medicine and rehabilitation services.

      (For range of joint motion, see 95851, 95852)

      (For biofeedback training by EMG, use 90901)

      (For transcutaneous nerve stimulation [TENS], use 97014 for electrical stimulation requiring supervision only, or use 97032 for electrical stimulation requiring constant attendance)

- Active Wound Care Management
    - Active wound care procedures are performed to remove devitalized and/or necrotic tissue and promote healing. Chemical cauterization (17250) to achieve wound hemostasis is included in active wound care procedures (97597, 97598, 97602) and should not be separately reported for the same lesion. Services require direct (one-on-one) contact with the patient.

      (Do not report 97597-97602 in conjunction with 11042-11047 for the same wound)

      (For debridement of burn wounds, see 16020-16030)

- Negative pressure wound therapy, (eg, vacuum assisted drainage collection), utilizing disposable, non-durable medical equipment including provision of exudate management collection system, topical application(s), wound assessment, and instructions for ongoing care, per session

| | |
|---|---|
| **CPT Code:** | 97608 |
| **Long Descriptor:** | Negative pressure wound therapy, (eg, vacuum assisted drainage collection), utilizing disposable, non-durable medical equipment including provision of exudate management collection system, topical application(s), wound assessment, and instructions for ongoing care, per session; total wound(s) surface area greater than 50 square centimeters |

| | |
|---|---|
| **Medium Descriptor:** | NEG PRESSURE WOUND THERAPY NON DME >50 SQ CM |
| **Short Descriptor:** | NEG PRESS WOUND TX >50 CM |
| **Consumer Friendly Descriptor:** | Therapy procedure using a special bandage, vacuum pump and disposable medical equipment, surface area more than 50.0 sq cm |
| **Clinician Friendly Descriptor:** | Negative pressure wound therapy including use of nondurable medical equipment, wound assessment, and instructions for ongoing care, more than 50.0 sq cm of total wound surface area |

**Citation**

CPT Changes: An Insider's View 2015
CPT Assistant Nov 14: 8
CPT Assistant May 18: 5

**Code Flags**

First Appearance: 20150101

**Parenthetical Guidelines specific to 97608**

(Do not report 97607, 97608 in conjunction with 97605, 97606)

**Related Codes**

Negative pressure wound therapy, (eg, vacuum assisted drainage collection), utilizing disposable, non-durable medical equipment including provision of exudate management collection system, topical application(s), wound assessment, and instructions for ongoing care, per session

97607 - Negative pressure wound therapy, (eg, vacuum assisted drainage collection), utilizing disposable, non-durable medical equipment including provision of exudate management collection system, topical application(s), wound assessment, and instructions for ongoing care, per session; total wound(s) surface area less than or equal to 50 square centimeters

97608 - Negative pressure wound therapy, (eg, vacuum assisted drainage collection), utilizing disposable, non-durable medical equipment including provision of exudate management collection system, topical application(s), wound assessment, and instructions for ongoing care, per session; total wound(s) surface area greater than 50 square centimeters

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 20150101 | |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 97608 |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

| | |
|---|---|
| Description: | NEG PRESS WOUND TX >50 CM |
| Payment Status Indicator: | T - **Procedure or Service, Multiple Procedure Reduction Applies** Paid under OPPS; separate APC payment. |
| APC: | 5052 |
| National Unadjusted Payment: | $353.00 |
| Relative Weight: | 4.1936 |
| Related Information: | Click to Search APC Codebook for 97608<br>NCCI Edits may apply, Click to Search NCCI Edits for 97608<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 97608 |
| Description: | NEG PRESS WOUND TX >50 CM |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 11.32 / 0.74 |
| National Unadjusted Payment (NonFac/Fac): | $391.74 / $25.61 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 97608 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 97608 |

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Evaluation and Management Codes - (99091 - 99499)*

# 99212 - OFFICE O/P EST SF 10-19 MIN

Click to open document in a browser

- Related Revenue Codes

Information from AMA

CPT (c) 2021 American Medical Association. All Rights Reserved. Fee schedules, relative units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein.

- Current Procedural Terminology Concept
- Evaluation and Management
    - *Evaluation and Management Guidelines*
- Office or Other Outpatient Services
    - The following codes are used to report evaluation and management services provided in the office or in an outpatient or other ambulatory facility. A patient is considered an outpatient until inpatient admission to a health care facility occurs.

      To report services provided to a patient who is admitted to a hospital or nursing facility in the course of an encounter in the office or other ambulatory facility, see the notes for initial hospital inpatient care (page 23) or initial nursing facility care (page 34).

      For services provided in the emergency department, see 99281-99285.

      For observation care, see 99217-99226.

      For observation or inpatient care services (including admission and discharge services), see 99234-99236.

      Coding Tip

      Determination of Patient Status as New or Established Patient

      Solely for the purposes of distinguishing between new and established patients, professional services are those face-to-face services rendered by physicians and other qualified health care professionals who may report evaluation and management services reported by a specific CPT code(s). A new patient is one who has not received any professional services from the physician/qualified health care professional or another physician/qualified health care professional of the exact same specialty and subspecialty who belongs to the same group practice, within the past three years.

      An established patient is one who has received professional services from the physician/qualified health care professional or another physician/qualified health care professional of the exact same specialty and subspecialty who belongs to the same group practice, within the past three years.

      In the instance where a physician/qualified health care professional is on call for or covering for another physician/qualified health care professional, the patient's encounter will be classified as it would have been by the physician/qualified health care professional who is not available. When advanced practice nurses and physician assistants are working with physicians they are considered as working in the exact same specialty and exact same subspecialties as the physician.

      CPT Coding Guidelines, Evaluation and Management, Guidelines Common to All E/M Services, New and Established Patient

- Established Patient

| | |
|---|---|
| **CPT Code:** | 99212 |
| **Long Descriptor:** | Office or other outpatient visit for the evaluation and management of an established patient, which requires a medically appropriate history and/or examination and straightforward medical decision making.<br>When using time for code selection, 10-19 minutes of total time is spent on the date of the encounter. |
| **Medium Descriptor:** | OFFICE/OUTPATIENT ESTABLISHED SF MDM 10-19 MIN |
| **Short Descriptor:** | OFFICE O/P EST SF 10-19 MIN |
| **Consumer Friendly Descriptor:** | Established patient office or other outpatient visit, 10-19 minutes |
| **Clinician Friendly Descriptor:** | Outpatient visit for evaluation and management of established patient, including medically appropriate examination and straightforward medical decision making, total time 10-19 minutes<br>Outpatient visit for evaluation and management of established patient, including medically appropriate history and straightforward medical decision making, total time 10-19 minutes<br>Outpatient visit for evaluation and management of established patient, including medically appropriate history, examination and straightforward medical decision making, total time 10-19 minutes |

**Citation**

CPT Changes: An Insider's View 2013
CPT Changes: An Insider's View 2017
CPT Changes: An Insider's View 2021
CPT Assistant Winter 91: 11
CPT Assistant Spring 92: 14, 24
CPT Assistant Summer 92: 1, 24
CPT Assistant Spring 93: 34
CPT Assistant Summer 93: 2
CPT Assistant Fall 93: 9
CPT Assistant Spring 95: 1
CPT Assistant Summer 95: 4
CPT Assistant Fall 95: 9
CPT Assistant Jul 98: 9
CPT Assistant Sep 98: 5
CPT Assistant Feb 00: 11
CPT Assistant Jun 00: 11
CPT Assistant Aug 01: 2
CPT Assistant Jan 02: 2
CPT Assistant May 02: 3
CPT Assistant Apr 04: 14
CPT Assistant Oct 04: 10
CPT Assistant Apr 05: 1, 3
CPT Assistant Jun 05: 11
CPT Assistant Dec 05: 10
CPT Assistant May 06: 1
CPT Assistant Jun 06: 1, 11
CPT Assistant Sep 06: 8
CPT Assistant Oct 06: 15
CPT Assistant Apr 07: 11
CPT Assistant Jul 07: 1
CPT Assistant Sep 07: 1

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

CPT Assistant Mar 08: 3
CPT Assistant Mar 09: 3
CPT Assistant Aug 09: 5
CPT Assistant Feb 10: 13
CPT Assistant Jul 10: 4
CPT Assistant Sep 10: 4
CPT Assistant Jan 11: 3
CPT Assistant Jun 11: 3
CPT Assistant Mar 12: 4, 8
CPT Assistant Apr 12: 17
CPT Assistant Jan 13: 9
CPT Assistant Mar 13: 13
CPT Assistant Jun 13: 3
CPT Assistant Aug 13: 13-14
CPT Assistant Feb 14: 11
CPT Assistant Jan 15: 12
CPT Assistant Mar 16: 11
CPT Assistant Sep 16: 6
CPT Assistant Dec 16: 12
CPT Assistant Oct 17: 6
CPT Assistant Apr 18: 10
CPT Assistant Sep 18: 14
CPT Assistant Jan 19: 3
CPT Assistant Jan 20: 3
CPT Assistant Feb 20: 3
CPT Assistant Mar 20: 3
CPT Assistant May 20: 3
CPT Assistant Jun 20: 3
CPT Assistant Sep 20: 13
CPT Assistant Oct 20: 14
CPT Assistant Nov 20: 3
CPT Assistant Jan 21: 3
CPT Assistant Feb 21: 8

**Code Flags**

First Appearance: 19920101
This code may be used for Synchronous Telemedicine Services. See Appendix P
Last Revised: 20210101

**Additional parenthetical guidelines from associated codes**

90792 - (Do not report 90791 or 90792 in conjunction with 99202-99337, 99341-99350, 99366-99368, 99401-99443, 97151, 97152, 97153, 97154, 97155, 97156, 97157, 97158, 0362T, 0373T)
92532 - (Do not report 92531, 92532 with evaluation and management services including office or other outpatient services [99202-99215], observation care [99218-99220, 99224-99226], observation or inpatient care including admission and discharge [99234-99236], hospital care [99221-99223, 99231-99233], office or other outpatient consultations [99241-99245], nursing facility services [99304-99318], and domiciliary, rest home, or custodial care services [99324-99337])
93793 - (Do not report 93793 in conjunction with 99202, 99203, 99204, 99205, 99211, 99212, 99213, 99214, 99215, 99241, 99242, 99243, 99244, 99245)
94004 - (Do not report 94002-94004 in conjunction with evaluation and management services 99202-99499)
99354 - (Do not report 99354 in conjunction with 99202, 99203, 99204, 99205, 99212, 99213, 99214, 99215, 99415, 99416, 99417)
99355 - (Do not report 99355 in conjunction with 99202, 99203, 99204, 99205, 99212, 99213, 99214, 99215, 99415, 99416, 99417)
99359 - (Do not report 99358, 99359 on the same date of service as 99202, 99203, 99204, 99205, 99212, 99213, 99214, 99215, 99417)
99423 - (Do not report 99421, 99422, 99423 on a day when the physician or other qualified health care

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

professional reports E/M services [99202, 99203, 99204, 99205, 99212, 99213, 99214, 99215, 99241, 99242, 99243, 99244, 99245])
99483 - (Do not report 99483 in conjunction with E/M services [99202, 99203, 99204, 99205, 99211, 99212, 99213, 99214, 99215, 99241, 99242, 99243, 99244, 99245, 99324, 99325, 99326, 99327, 99328, 99334, 99335, 99336, 99337, 99341, 99342, 99343, 99344, 99345, 99347, 99348, 99349, 99350, 99366, 99367, 99368, 99497, 99498]; psychiatric diagnostic procedures [90785, 90791, 90792]; brief emotional/behavioral assessment [96127]; psychological or neuropsychological test administration [96146]; health risk assessment administration [96160, 96161]; medication therapy management services [99605, 99606, 99607])
69210, 69209 - (For cerumen removal that is not impacted, see E/M service code, which may include new or established patient office or other outpatient services [99202-99215], hospital observation services [99217-99220, 99224-99226], hospital care [99221-99223, 99231-99233], consultations [99241-99255], emergency department services [99281-99285], nursing facility services [99304-99318], domiciliary, rest home, or custodial care services [99324-99337], home services [99341-99350])
(For counseling and education provided by a physician to an individual, see the appropriate evaluation and management codes including office or other outpatient services [99202-99215], hospital observation care [99217-99220, 99224-99226], hospital care [99221-99223, 99231-99233], new or established patient office or other outpatient consultations [99241-99245], inpatient consultations [99251-99255], emergency department services [99281-99285], nursing facility services [99304-99318], domiciliary, rest home, or custodial care services [99324-99337], home services [99341-99350], and counseling risk factor reduction and behavior change intervention [99401-99429]. See also Instructions for Use of the CPT Codebook for definition of reporting qualifications)
(For medical treatment of spontaneous complete abortion, any trimester, use E/M codes 99202-99233)
90863 - (For pharmacologic management with psychotherapy services performed by a physician or other qualified health care professional who may report evaluation and management codes, use the appropriate evaluation and management codes 99202-99255, 99281-99285, 99304-99337, 99341-99350 and the appropriate psychotherapy with evaluation and management service 90833, 90836, 90838)
47537 - (For removal of biliary drainage catheter not requiring fluoroscopic guidance, see E/M services and report the appropriate level of service provided [eg, 99202-99215, 99217, 99218, 99219, 99220, 99221, 99222, 99223, 99224, 99225, 99226, 99231, 99232, 99233])
90833 - (Use 90833 in conjunction with 99202-99255, 99304-99337, 99341-99350)
90836 - (Use 90836 in conjunction with 99202-99255, 99304-99337, 99341-99350)
90838 - (Use 90838 in conjunction with 99202-99255, 99304-99337, 99341-99350)
99415 - (Use 99415 in conjunction with 99202, 99203, 99204, 99205, 99212, 99213, 99214, 99215)

**Change History**

| Change Type | Year | Prior Value |
|---|---|---|
| ADDED | 19920101 | |
| CHANGED | 20070101 | PC |
| CHANGED | 20080101 | PC |
| CHANGED | 20130101 | PC |
| CHANGED | 20210101 | PC |

Expand All Additional Information Collapse All Additional Information

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | 99212 |
| Description: | OFFICE O/P EST SF 10-19 MIN |
| | B - **Codes That Are Not Recognized by OPPS** Codes That are Not Recognized by OPPS when submitted on an outpatient hospital Part B bill type (12x and 13x). Not paid under OPPS. |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

| | |
|---|---|
| Payment Status Indicator: | • May be paid by MACs when submitted on a different bill type, for example, 75x (CORF), but not paid under OPPS.<br>• An alternate code that is recognized by OPPS when submitted on an outpatient hospital Part B bill type (12x and 13x) may be available. |
| APC: | N/A |
| National Unadjusted Payment: | N/A |
| Relative Weight: | N/A |
| Related Information: | Click to Search APC Codebook for 99212<br>NCCI Edits may apply, Click to Search NCCI Edits for 99212<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91<br>E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | 99212 |
| Description: | OFFICE O/P EST SF 10-19 MIN |
| Status Code: | A - **Active Code**These codes are paid separately under the physician fee schedule, if covered. There will be RVUs for codes with this status. The presence of an "A" indicator does not mean that Medicare has made a national coverage determination regarding the service; carriers remain responsible for coverage decisions in the absence of a national Medicare policy. |
| Pro/Tech Flag: | 0 - Identifies codes that describe physician services. Examples include visits, consultations, and surgical procedures. The concept of PC/TC does not apply since physician services cannot be split into professional and technical components. Modifiers 26 and TC cannot be used with these codes. The RVUS include values for physician work, practice expense and malpractice expense. There are some codes with no work RVUs. |
| Total RVUs (NonFac/Fac): | 1.66 / 1.06 |
| National Unadjusted Payment (NonFac/Fac): | $57.45 / $36.68 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for 99212 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for 99212 |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

Skilled Nursing Facility Consolidated Billing Information (SNF)

Source: https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/

99212 OFFICE O/P EST SF 10-19 MIN

**CMS SNF Consolidated Billing - 2022 Part B MAC Update - File 1 Part A Stay (Physician Services)**
These codes are not subject to SNF consolidated billing. They should be submitted to the Part B Medicare Administrative Contractor or Durable Medical Equipment Medicare Administrative Contractor as appropriate for payment consideration.

Expand All Additional Information Collapse All Additional Information

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

*HCPCS and CPT Codebook - 2022 > J Codes (Drugs)*

# J0696 Ceftriaxone sodium injection

Click to open document in a browser

- Related Revenue Codes

Information from CMS Annual Update

| | |
|---|---|
| Year: | 2022 |
| Code: | J0696 |
| Short Description: | Ceftriaxone sodium injection |
| Long Description: | Injection, ceftriaxone sodium, per 250 mg |
| CMS Coverage: | D Special coverage instructions apply |
| Citations: | Coverage Issues Manual:<br>Medicare Carriers Manual: 2049<br>Statute addressing coverage/noncoverage: |
| Action: | N - No maintenance for this code 01/01/1997 |
| Code Added: | 01/01/1990 |

Expand All Additional Information Collapse All Additional Information

Special Information from CMS

Type of Service

| | |
|---|---|
| Effective Date: | 2022 |
| Berenson-Eggers Type of Service Code: | O1E |
| BETOS Description: | Other drugs |
| BETOS Category: | OTHER |
| Related Information: | See the Complete BETOS Index for more information. |

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | J0696 |
| Description: | Ceftriaxone sodium injection |
| Payment Status Indicator: | N - **Packaged** Items and Services Packaged into APC Rates<br>Paid under OPPS; payment is packaged into payment for other services. Therefore, there is no separate APC payment. |
| APC: | N/A |
| National Unadjusted Payment: | N/A |
| Relative Weight: | N/A |
| | Click to Search APC Codebook for J0696<br>NCCI Edits may apply, Click to Search NCCI Edits for J0696<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include: |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

| | |
|---|---|
| Related Information: | • 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | J0696 |
| Description: | Ceftriaxone sodium injection |
| Payment Indicator: | N1 - Packaged service/item; no separate payment made. |
| Payment Weight: | N/A |
| Payment: | N/A |
| ASC Designation: | Covered Ancillary Services Integral to Covered Surgical Procedures (Addendum BB) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | J0696 |
| Description: | Ceftriaxone sodium injection |
| Status Code: | E - **Excluded from Physician Fee Schedule by regulation**These codes are for items and/or services that CMS chose to exclude from the fee schedule payment by regulation. No RVUs are shown, and no payment may be made under the fee schedule for these codes. Payment for them, when covered, generally continues under reasonable charge procedures. |
| Pro/Tech Flag: | 9 - Concept of a professional/technical component does not apply |
| Total RVUs (NonFac/Fac): | 0.00 / 0.00 |
| National Unadjusted Payment (NonFac/Fac): | $0.00 / $0.00 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br>Physician Fee Schedule CodeBook Page for J0696 (includes Supervision, Bilateral and |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

| | |
|---|---|
| | other Indicators)<br>NCCI Edits for J0696 |

Expand All Additional Information Collapse All Additional Information

Generated by MediRegs™ on 09/28/2022 via MediScript.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Modifiers*

# Modifier -24 Unrelated Evaluation and Management Service by the Same Physician or Other Qualified Health Care Professional During a Postoperative Period

Click to open document in a browser
Information from AMA

**Unrelated Evaluation and Management Service by the Same Physician or Other Qualified Health Care Professional During a Postoperative Period**

Unrelated Evaluation and Management Service by the Same Physician or Other Qualified Health Care Professional During a Postoperative Period: The physician or other qualified health care professional may need to indicate that an evaluation and management service was performed during a postoperative period for a reason(s) unrelated to the original procedure. This circumstance may be reported by adding modifier 24 to the appropriate level of E/M service.

Additional Information:

**New Modifier Instructions 01/2013**

Additional modifiers shall be added to the list of NCCI-associated modifiers that will allow an edit with modifier indicator of "1" to be bypassed when the modifier is utilized correctly.

- Modifier -LM left main coronary artery
- Modifier -RI ramus intermedius
- Modifier -24 unrelated evaluation and management service by the same physician during a postoperative period
- Modifier -57 decision for surgery
- R1136OTN National Correct Coding Initiative (NCCI) Associated Modifier Changes (Additions) - 11/01/2012 (PDF)

**Hospital Observation Services During Global Surgical Period**

The global surgical fee includes payment for hospital observation (codes 99217, 99218, 99219, and 99220, 99234, 99235, 99236) services unless the criteria for use of CPT modifiers "-24," "-25," or "-57" are met. Contractors must pay for these services in addition to the global surgical fee only if both of the following requirements are met:

• The hospital observation service meets the criteria needed to justify billing it with CPT modifiers "-24," "-25," or "-57" (decision for major surgery); and

• The hospital observation service furnished by the surgeon meets all of the criteria for the hospital observation code billed.

- R1875CP Revisions to Consultation Services Payment Policy - 12/14/2009

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

### Critical Care Visits and Neonatal Intensive Care (Codes 99291 - 99292)

Effective July 1, 2008, CPT® code 36591 should be reported for bundled vascular access procedures performed with a critical care service, replaces code 36540. CPT® ventilator codes 94002, 94003, 94004, 94660 and 94662 are not separately payable when critical care services are reported for the same patient. Additionally, critical care codes 99291 and 99292 must be appended with modifier -24 on the given date of the procedure by the same physician in order to be paid for services.

- R1548CP Critical Care Visits and Neonatal Intensive Care (Codes 99291 - 99292) - 07/09/2008
- MM5993: Critical Care Visits and Neonatal Intensive Care (Codes 99291 - 99292) (PDF)

### Critical Care Services Provided During Preoperative Portion and Postoperative Portion of Global Period of Procedure with 90 Day Global Period in Trauma and Burn Cases

Postoperatively, in order for critical care services to be paid, two reporting requirements must be met. Codes 99291 - 99292 and modifier -24 (unrelated evaluation and management service by the same physician during a postoperative period) must be used, and documentation that the critical care was unrelated to the specific anatomic injury or general surgical procedure performed must be submitted. An ICD-9-CM code in the range 800.0 through 959.9 (except 930.0 - 939.9), which clearly indicates that the critical care was unrelated to the surgery, is acceptable documentation.

- R1548CP Critical Care Visits and Neonatal Intensive Care (Codes 99291 - 99292) - 07/09/2008
- MM5993: Critical Care Visits and Neonatal Intensive Care (Codes 99291 - 99292) (PDF)

- All Modifiers Index
- AMA Appendix A - Modifiers
- Study Aid: Physician Evaluation and Management Coding (08/2010)
- RAC Issue Page: Global Surgery - Pre and Post-Operative Visits [RAC Region A]

### Related Codes

- Modifier -24 Unrelated Evaluation and Management Service by the Same Physician During a Postoperative Period
- Modifier -25 Significant, Separately Identifiable Evaluation and Management Service by the Same Physician on the Same Day of the Procedure or Other Service
- Modifier -57 Decision for Surgery

---

This file was last updated 2010-11-09 RKG

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Modifiers*

# Modifier -25 Significant, Separately Identifiable Evaluation and Management Service by the Same Physician or Other Qualified Health Care Professional on the Same Day of the Procedure or Other Service

Click to open document in a browser
Information from AMA

**Significant, Separately Identifiable Evaluation and Management Service by the Same Physician or Other Qualified Health Care Professional on the Same Day of the Procedure or Other Service**

Significant, Separately Identifiable Evaluation and Management Service by the Same Physician or Other Qualified Health Care Professional on the Same Day of the Procedure or Other Service: It may be necessary to indicate that on the day a procedure or service identified by a CPT code was performed, the patient's condition required a significant, separately identifiable E/M service above and beyond the other service provided or beyond the usual preoperative and postoperative care associated with the procedure that was performed. A significant, separately identifiable E/M service is defined or substantiated by documentation that satisfies the relevant criteria for the respective E/M service to be reported (see Evaluation and Management Services Guidelines for instructions on determining level of E/M service). The E/M service may be prompted by the symptom or condition for which the procedure and/or service was provided. As such, different diagnoses are not required for reporting of the E/M services on the same date. This circumstance may be reported by adding modifier 25 to the appropriate level of E/M service. Note: This modifier is not used to report an E/M service that resulted in a decision to perform surgery. See modifier 57. For significant, separately identifiable non-E/M services, see modifier 59.

Integrated Outpatient Code Editor Information

**Same day medical and procedure APC**

Significant procedure visits and medical visits will not usually occur on the same day. However, if a medical visit identified by an E&M (status indicator V) code with modifier 25 occurs on the same date as a significant procedure, an additional payment will be made. Modifier 25 indicates that the medical visit was significant and separately identifiable from the procedure performed. When the E&M code does not have a modifier of 25, that line item will be rejected.

**IOCE Edit 21.** Medical visit on the same day as a type T or S procedure without modifier 25

**Generated When** One or more type T or S procedures occur on the same day as a line item containing an E&M code without modifier 25.

**Note:** This modifier is not used to report an E/M service that resulted in a decision to perform surgery. See modifier 57.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

Additional Information:

CPT Assistant:*Feb 09:22; Mar 09:3; Apr 09:4; Jun 09:11*

CPT Changes: *2008*

- All Modifiers Index
- AMA Appendix A - Modifiers

**CMS FAQs**

- FAQ 1831: Will modifier -25 be used for all ER small laceration repairs, etc?
- FAQ 1973: How are drug administration services and Evaluation and Management (E/M) visits billed on the same day of service defined?
- FAQ 2027: What Common Procedural Terminology (CPT) modifier should physicians and qualified non-physician practitioners (NPP) use to designate a significant, separately identifiable Evaluation and Management (E/M) service provided by the same physician/qualified NPP to the same patient on the same day?
- FAQ 2029: When should CPT modifier -25 be used?
- FAQ 2031: What documentation is needed to support the need for modifier -25 for evaluation and management (E/M) services?
- FAQ 2033: Under what circumstances will a carrier pay for an evaluation and management (E/M) service reported with a procedure having a global fee period?
- FAQ 3325: Can a separate Evaluation and Management (E/M) service be billed at the same visit as the Annual Wellness Visit (AWV)?
- FAQ 3357: Can a separate Evaluation and Management (E/M) service be billed at the same visit as the Initial Preventive Physical Examination (IPPE)?

**Related Codes**

- Modifier -24 Unrelated Evaluation and Management Service by the Same Physician During a Postoperative Period
- Modifier -25 Significant, Separately Identifiable Evaluation and Management Service by the Same Physician on the Same Day of the Procedure or Other Service
- Modifier -57 Decision for Surgery
- Modifier -58 Staged or Related Procedure or Service by the Same Physician During the Postoperative Period
- Modifier -59 Distinct Procedural Service
- Modifier -78 Return to the Operating Room for a Related Procedure During the Postoperative Period
- Modifier -79 Unrelated Procedure or Service by the Same Physician During the Postoperative Period

**OIG Alert!**

- OIG Evaluation & Inspection Report: Use of Modifier 25 (OEI-07-03-00470; 11/05)
- PM Rev. A-01-80, Use of Modifier -25 and Modifier -27 in the Hospital Outpatient Prospective Payment System (OPPS)

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

### Payment for Evaluation and Management Services Provided During Global Period of Surgery

- MM5025 JA5025 R954CP Payment for Evaluation and Management Services Provided During Global Period of Surgery

### Counseling to Prevent Tobacco Use

Contractors shall allow payment for a medically necessary E/M service on the same day as the smoking and tobacco-use cessation counseling service when it is clinically appropriate. Physicians and qualified non-physician practitioners shall use an appropriate HCPCS code to report an E/M service with modifier -25 to indicate that the E/M service is a separately identifiable service from G0436 or G0437.

- R2058CP Counseling to Prevent Tobacco Use - 09/30/2010

### Hospital Observation Services During Global Surgical Period

The global surgical fee includes payment for hospital observation (codes 99217, 99218, 99219, and 99220, 99234, 99235, 99236) services unless the criteria for use of CPT modifiers "-24," "-25," or "-57" are met. Contractors must pay for these services in addition to the global surgical fee only if both of the following requirements are met:

• The hospital observation service meets the criteria needed to justify billing it with CPT modifiers "-24," "-25," or "-57" (decision for major surgery); and

• The hospital observation service furnished by the surgeon meets all of the criteria for the hospital observation code billed.

- R1875CP Revisions to Consultation Services Payment Policy - 12/14/2009

### Substance Abuse and E&M Services

According to: CPT® Assistant for May 2008, Using CPT® codes 99408 and 99409 to report SBI for alcohol and substance abuse requires that the services be documented in the clinical record for a patient. When determining the work effort for codes 99408 and 99409 it should be reviewed as separate and distinct from all other Evaluation and Management (E&M) services performed on the same date of service. Modifier 25 should be used to report separate significant E&M services performed on the same date as the SBI. Due to statutory restrictions on screening services the Centers for Medicare & Medicaid Services created codes G0396 and G0397 for reporting services comparable to those reported with codes 99408 and 99409 for Medicare fee-for-service schedule patients.

- 99408 ALCOHOL/SUBSTANCE SCREEN & INTERVEN 15-30 MIN
- 99409 ALCOHOL/SUBSTANCE SCREEN & INTERVEN >30 MIN
- G0396 lcohol/subs interv 15-30 min
- G0397 Alcohol/subs interv >30 min
- Modifier 25 Significant, Separately Identifiable Evaluation and Management Service by the Same Physician on the Same Day of the Procedure or Other Service

---

This file was last updated 2014-09-01 RKG

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Modifiers*

# Modifier -51 Multiple Procedures

Click to open document in a browser

Information from AMA

**Multiple Procedures:**

Multiple Procedures: When multiple procedures, other than E/M services, Physical Medicine and Rehabilitation services or provision of supplies (eg, vaccines), are performed at the same session by the same individual, the primary procedure or service may be reported as listed. The additional procedure(s) or service(s) may be identified by appending modifier 51 to the additional procedure or service code(s). Note: This modifier should not be appended to designated "add-on" codes (see Appendix D).

**Modifier -51 is not used by hospitals**

- CMS FAQ 2396

Additional Information:

CPT Assistant:*Feb 09:6; Mar 09:10; Apr 09:8*

CPT Changes: *2008*

- All Modifiers Index
- AMA Appendix E - Summary of CPT Codes Exempt from Modifier 51
- AMA Appendix A - Modifiers
- AMA Appendix D - Add-On Codes

**CMS FAQs**

- FAQ 1837: Can hospitals use modifier -51?

**OIG Alert!**

...Upon examination of the OIG findings, TrailBlazer determined the overpayment amount for three claims, totaling $8,813, was improperly determined. The OIG calculation of the overpayment is based on the use of the 51 modifier which calculates the multiple surgery logic. The claim detail lines for these claims used the 78 modifier which is excluded from the multiple surgery pricing logic....

- Review of High-Dollar Payments for Texas Medicare Part B Claims Processed by TrailBlazer Health Enterprises for the Period January 1 through December 31, 2006 (A-06-08-00070) (05/2010)(PDF)

**Physician Fee Schedule Edit Information**

- Index of "No payment adjustment" (Multiproc = 0) Codes
- Index of "Multiple Procedure payment adjustment" (Multiproc = 2) Codes
- Index of "Endoscopic payment adjustment" (Multiproc = 3) Codes

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

- Index of "TC Diagnostic imaging payment adjustment" (Multiproc = 4) Codes

**Billing and Payment for Multiple Anesthesia Procedures**

Physicians bill for the anesthesia services associated with multiple bilateral surgeries by reporting the anesthesia procedure with the highest base unit value with the multiple procedure modifier "-51." They report the total time for all procedures in the line item with the highest base unit value.

If the same anesthesia CPT code applies to two or more of the surgical procedures, billers enter the anesthesia code with the "-51" modifier and the number of surgeries to which the modified CPT code applies.

- R1859CP [PDF, 276 KB] MIPPA Section 139 Teaching Anesthesiologists - 11/20/2009

---

This file was last updated 2014-09-01 RKG

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Modifiers*

# Modifier -59 Distinct Procedural Service

Click to open document in a browser
Information from AMA

**Distinct Procedural Service**

Distinct Procedural Service: Under certain circumstances, it may be necessary to indicate that a procedure or service was distinct or independent from other non-E/M services performed on the same day. Modifier 59 is used to identify procedures/services, other than E/M services, that are not normally reported together, but are appropriate under the circumstances. Documentation must support a different session, different procedure or surgery, different site or organ system, separate incision/excision, separate lesion, or separate injury (or area of injury in extensive injuries) not ordinarily encountered or performed on the same day by the same individual. However, when another already established modifier is appropriate it should be used rather than modifier 59. Only if no more descriptive modifier is available, and the use of modifier 59 best explains the circumstances, should modifier 59 be used. Note: Modifier 59 should not be appended to an E/M service. To report a separate and distinct E/M service with a non-E/M service performed on the same date, see modifier 25.

Integrated Outpatient Code Editor Information

**Drug administration**

When multiple occurrences of any APC that represents drug administration are assigned in a single day, modifier 59 is required on the code(s) to permit payment for multiple units of that APC, up to a specified maximum; additional units above the maximum are packaged. If modifier 59 is not used, only one occurrence of any drug administration APC is allowed, and any additional units are packaged.

Additional Information:

CPT Assistant: *Feb 09:17; Apr 09:4,8; May 09:6; Jun 09:8*

CPT Changes: *2008*

**Related Codes**

- Modifier -XE: Separate Encounter - a service that is distinct because it occurred during a separate encounter
- Modifier -XS: Separate Structure - a service that is distinct because it was performed on a separate organ/structure
- Modifier -XP: Separate Practitioner - a service that is distinct because it was performed by a different practitioner
- Modifier -XU: Unusual Non-Overlapping - the use of a service that is distinct because it does not overlap usual components of the main service
- Modifier -25 Significant, Separately Identifiable Evaluation and Management Service by the Same Physician on the Same Day of the Procedure or Other Service
- Modifier -58 Staged or Related Procedure or Service by the Same Physician During the Postoperative Period
- Modifier -78 Return to the Operating Room for a Related Procedure During the Postoperative Period
Modifier -79 Unrelated Procedure or Service by the Same Physician During the Postoperative Period

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

- 
- Modifier -59 Distinct Procedural Service

**CodeBook Appendices**

- All Modifiers Index
- AMA Appendix A - Modifiers

**CMS FAQs**

- FAQ 9744: How should hospitals report ancillary services provided in conjunction with critical care?
- FAQ 2295: Prior to January 1, 2011, what services are included in CPT code 99291 (critical care, first 30-74 minutes) and should therefore not be billed separately? How should hospitals report ancillary services provided in conjunction with critical care beginning January 1, 2011?

**CMS Guidance**

Effective January 1, 2015, CMS has established four new HCPCS modifiers (referred collectively as the -X{EPSU} Modifiers) to define specific subsets of the -59 modifier.

CMS will continue to recognize the -59 modifier, but notes that -59 should not be used when a more descriptive modifier is available.

CMS may selectively require a more specific -X{EPSU} modifier for billing certain codes at high risk for incorrect billing.

Contractors will apply or bypass edits to lines containing a =X{EPSU} modifier in the same manner as teh edits would apply to a line containing a -59 modifier.

- R1422OTN Specific Modifiers for Distinct Procedural Services - 2014-08-15
- MM8863 Specific Modifiers for Distinct Procedural Services - 2014-08-15
- SE1418 Proper Use of Modifier 59 - 2014-01-01, Corrected 2014-06-02
- NCCI Modifier 59 Article (PDF)

**Pub 100-04 Chapter 4 Section 230 - Billing and Payment for Drugs and Drug Administration**

Includes a section 230.2.6 Use of Modifier 59, which provides guidance on use of this code.

- Pub 100-04, Chapter 4, Section 230

**OIG Alert**

- Use of Modifier 59 to Bypass Medicare's National Correct Coding Initiative Edits (OEI-03-02-00771; 11/05)

**Medically Unlikely Edits**

Since each line of a claim is adjudicated separately against the MUE of the code on that line, the appropriate use of CPT modifiers to report the same code on separate lines of a claim will enable a provider/supplier to report medically reasonable and necessary units of service in excess of an MUE. CPT modifiers such as 76 (repeat procedure by same physician), 77 (repeat procedure by another physician), anatomic modifiers (e.g., RT, LT, F1, F2), 91 (repeat clinical diagnostic laboratory test), and 59 (distinct procedural service), will accomplish this purpose. Providers/suppliers should use Modifier 59 only if no other modifier describes the service.

- R652OTN [PDF, 361 KB] Medically Unlikely Edits (MUE) - 03/17/2010

**Historical Information**

Modifier 59 is used to identify procedures/services that are not normally reported together, but are appropriate under the circumstances.

This may represent a different session or patient encounter, different procedure or surgery, different site or organ system, separate incision/excision, separate lesion, or separate injury (or area of injury in extensive injuries) not ordinarily encountered or performed on the same day by the same physician.

However, when another already established modifier is appropriate it should be used rather than modifier 59. Only if no more descriptive modifier is available, and the use of modifier 59 best explains the circumstances, should modifier 59 be used.

---

This file was last updated 2014-09-12 RKG

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

*HCPCS and CPT Codebook - 2022 > Modifiers*

# Modifier -79 Unrelated Procedure or Service by the Same Physician or Other Qualified Health Care Professional During the Postoperative Period

Click to open document in a browser

Information from AMA

**Unrelated Procedure or Service by the Same Physician or Other Qualified Health Care Professional During the Postoperative Period**

Unrelated Procedure or Service by the Same Physician or Other Qualified Health Care Professional During the Postoperative Period: The individual may need to indicate that the performance of a procedure or service during the postoperative period was unrelated to the original procedure. This circumstance may be reported by using modifier 79. (For repeat procedures on the same day, see modifier 76.)

**Use of Modifier 79**

Modifier 79 is used to explain that a patient requires a procedure by the same surgeon for a condition completely unrelated to the condition for which the first operation was performed. The description of the modifier is as follows:

The physician may need to indicate that the -performance of a procedure or service during the postoperative period was unrelated to the original -procedure. This circumstance may be reported by using modifier 79. (For repeat procedures on the same day, see modifier 76).

Modifier 79 is used to denote that the operating surgeon performed a procedure on a surgical patient during the postoperative period of an initial procedure for problems unrelated to the original surgical procedure. The procedure must be performed by the same physician and is reported by appending modifier 79 to the procedure code for the subsequent service. Modifier 79 is appended to report, for example, a colposcopy performed during the global period of a mastectomy by the same surgeon. (Note that modifier 79 should not be reported with procedures that are related to the original procedure and modifier 58 is used with staged procedures.) A new global period should start when this modifier is used.

- See CPT Assistant: September 2010, Volume 20, Issue 9, pages 6-7

Integrated Outpatient Code Editor Information

**Type "T" Multiple and Terminated Procedure Discounting:**

Line items with a status indicator of "T" are subject to multiple-procedure discounting unless modifiers 76, 77, 78 and/or 79 are present. The "T" line item with the highest payment amount will not be multiple procedure discounted, and all other "T" line items will be multiple procedure discounted. All line items that do not have a status indicator of "T" will be ignored in determining the multiple procedure discount. A modifier of 52 or 73 indicates that a procedure was terminated prior to anesthesia. A terminated type "T" procedure will also be discounted although not necessarily at the same level as the discount for multiple type "T" procedures.

Terminated bilateral procedures or terminated procedures with units greater than one should not occur, and have the discounting factor set so as to result in the equivalent of a single procedure. Claims submitted with terminated bilateral procedures or terminated procedure with units greater than one are returned to the

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

provider (edit 37).

- IOCE Logic: Computation of Discounting Fraction [OPPS Only] (PDF)

Additional Information:

**CodeBook Appendices**

- All Modifiers Index
- AMA Appendix A - Modifiers
- Study Aid: Basics of Interventional Radiology Coding (05/2010)

**OIG Alert!**

**Misuse of Modifier -79.**

The Office of the Inspector General has issued a Management Implication Report on the Misuses of the Modifier 79.

CMS has instructed contractors to institute program safeguards to prevent improper payment for Modifier 79.

**RAC Alert!**

Problem Description: Reviews by Recovery Auditors determined that providers are incorrectly billing E/M services provided by the surgeon the day before, the day of, and up to 90 days after major surgery, and 0-10 days after minor surgery. The Global Surgical Package (GSP) was established by the CMS to ensure that all components of surgery (including pre- and postoperative services) were bundled into one payment.

Guidance on How Providers Can Avoid These Problems: Under Medicare Physician Fee Schedule rules, most surgical procedures include pre- and postoperative E/M services. Physicians can indicate that E/M services rendered during the global period are not paid in the GSP by submitting modifiers 24 (Unrelated E/M Service by Same Physician During Postoperative Period), 25 (Significant, Separately Identifiable E/M Service by the Same Physician on the same day of the Procedure or Other Service), and 57 (Decision for Surgery Made Within Global Surgical Period) on the E/M service.

The following explanation of modifier 79 (Unrelated Procedure or Service by the Same Physician During the Postoperative Period) is provided in the "Medicare Claims Processing Manual": - CMS established modifier 79 to simplify billing for services provided to a patient by the same physician during the postoperative period that were unrelated to the original surgical procedure and not included in the payment for the surgical procedure. CMS established prepayment edits to detect separate billing of services that are included in the GSP; however, services billed with modifier 79 were excluded from those prepayment edits.

Make certain your billing staff reviews the payment guidelines for E/M services provided during the global period of surgery listed in this newsletter. These instructions can be found in the "Medicare Claims Processing Manual," Chapter 12, Section 40, which is available at http://www.cms.gov/manuals/ downloads/clm104c12.pdf on the CMS website.

- CMS - Medicare Quarterly Provider Compliance Newsletter: Guidance to Address Billing Errors Volume 1, Issue 2 - February 2011

**Additional CMS Guidance**

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

- R2282CP Clarification of Evaluation and Management Payment Policy - 08/26/2011
- R442OTN Modifier 79 - 02/13/2009
- R1875CP [PDF, 244 KB] Revisions to Consultation Services Payment Policy - 12/14/2009
- Claims Processing Manual Chapter 4 Section 20.6 - Use of Modifiers
- R1466CP [PDF, 91 KB] Payment for Hospital Observation Services (Codes 99217 - 99220) and Observation or Inpatient Care Services (Including Admission and Discharge Services - Codes 99234 - 99236) - 02/22/2008
- OIG Corporate Integrity Agreement with Pradeep Srivastava, PC - Oxon Hill, MD (PDF)
- R442CP 02/22/2005 - Hospital Outpatient Prospective Payment System (OPPS): Use of Modifiers -52, -73 and -74 for Reduced or Discontinued Services

**Related Codes**

- Modifier -25 Significant, Separately Identifiable Evaluation and Management Service by the Same Physician on the Same Day of the Procedure or Other Service
- Modifier -52 Reduced Services
- Modifier -58 Staged or Related Procedure or Service by the Same Physician During the Postoperative Period
- Modifier -59 Distinct Procedural Service
- Modifier -73 Discontinued Out-Patient Hospital/Ambulatory Surgery Center (ASC) Procedure Prior to the Administration of Anesthesia
- Modifier -76 Repeat Procedure by Same Physician
- Modifier -77 Repeat Procedure by Another Physician
- Modifier -78 Return to the Operating Room for a Related Procedure During the Postoperative Period
- Modifier -79 Unrelated Procedure or Service by the Same Physician During the Postoperative Period

---

This file was last updated 2011-11-09 RKG

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Modifiers*

# Modifier -JC Skin substitute used as a graft

Click to open document in a browser

Information from CMS Annual Update

| | |
|---|---|
| Version: | 2016 |
| Code: | JC |
| Short Description: | Skin substitute graft |
| Long Description: | Skin substitute used as a graft |
| Code Added: | 01/01/2009 |
| Action: | N No maintenance for this code 01/01/2009 |
| CMS Coverage: | C Carrier judgment |

For More Information

**CodeBook Appendices**

- All Modifiers Index
- AMA Appendix A - Modifiers

---

This file was last updated 11/2015 by RK

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Modifiers*

# Modifier -JW Drug amount discarded/not administered to any patient

Click to open document in a browser
Information from CMS Annual Update

| | |
|---|---|
| Version: | 2013 |
| Code: | JW |
| Short Description: | Discarded drug not administe |
| Long Description: | Drug amount discarded/not administered to any patient |
| Code Added: | 01/01/2003 |
| Action: | N No maintenance for this code 01/01/2003 |
| CMS Coverage: | C Carrier judgment |

For More Information

**CodeBook Appendices**

- All Modifiers Index
- AMA Appendix A - Modifiers

**Use of Modifier JW**

When processing all drugs except those provided under the Competitive Acquisition Program for Part B drugs and biologicals (CAP), local contractors may require the use of the modifier JW to identify unused drug or biologicals from single use vials or single use packages that are appropriately discarded. This modifier will provide payment for the discarded drug or biological. The JW modifier is not used on claims for CAP drugs.

- Pub 100-04 Chapter 17 Section 40 - Discarded Drugs and Biologicals
- Pub 100-04 Transmittal #1478 Additional Clarification to Chapter 17, Section 40, Regarding Processing of Drug Claims with the JW Modifier
- MM5923 Processing Of Drug Claims With The JW Modifier

---

This file was last updated 11/2012 by RKG

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

*HCPCS and CPT Codebook - 2022 > Q Codes (Temporary Procedures, Services, Drugs and Supplies)*

# Q4169 Artacent wound, per sq cm

Click to open document in a browser

- Related Revenue Codes

Information from CMS Annual Update

| | |
|---|---|
| Year: | 2022 |
| Code: | Q4169 |
| Short Description: | Artacent wound, per sq cm |
| Long Description: | Artacent wound, per square centimeter |
| CMS Coverage: | C Carrier judgment |
| Citations: | Coverage Issues Manual:<br>Medicare Carriers Manual:<br>Statute addressing coverage/noncoverage: |
| Action: | N - No maintenance for this code 01/01/2017 |
| Code Added: | 01/01/2017 |

Expand All Additional Information Collapse All Additional Information

Special Information from CMS

Type of Service

| | |
|---|---|
| Effective Date: | 2022 |
| Berenson-Eggers Type of Service Code: | O1E |
| BETOS Description: | Other drugs |
| BETOS Category: | OTHER |
| Related Information: | See the Complete BETOS Index for more information. |

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | Q4169 |
| Description: | Artacent wound, per sq cm |
| Payment Status Indicator: | N - **Packaged** Items and Services Packaged into APC Rates<br>Paid under OPPS; payment is packaged into payment for other services. Therefore, there is no separate APC payment. |
| APC: | N/A |
| National Unadjusted Payment: | N/A |
| Relative Weight: | N/A |
| | Click to Search APC Codebook for Q4169<br>NCCI Edits may apply, Click to Search NCCI Edits for Q4169<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include: |

| | |
|---|---|
| Related Information: | • 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br><br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | Q4169 |
| Description: | Artacent wound, per sq cm |
| Payment Indicator: | N1 - Packaged service/item; no separate payment made. |
| Payment Weight: | N/A |
| Payment: | N/A |
| ASC Designation: | Covered Ancillary Services Integral to Covered Surgical Procedures (Addendum BB) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br><br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | Q4169 |
| Description: | Artacent wound, per sq cm |
| Status Code: | E - **Excluded from Physician Fee Schedule by regulation**These codes are for items and/or services that CMS chose to exclude from the fee schedule payment by regulation. No RVUs are shown, and no payment may be made under the fee schedule for these codes. Payment for them, when covered, generally continues under reasonable charge procedures. |
| Pro/Tech Flag: | 9 - Concept of a professional/technical component does not apply |
| Total RVUs (NonFac/Fac): | 0.00 / 0.00 |
| National Unadjusted Payment (NonFac/Fac): | $0.00 / $0.00 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br><br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br><br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br><br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR<br><br>Physician Fee Schedule CodeBook Page for Q4169 (includes Supervision, Bilateral and |

| | |
|---|---|
| | other Indicators)<br>NCCI Edits for Q4169 |

Expand All Additional Information Collapse All Additional Information

Generated by MediRegs™ on 09/28/2022 via MediScript.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

MediRegs Master Suite

Wolters Kluwer

*HCPCS and CPT Codebook - 2022 > Q Codes (Temporary Procedures, Services, Drugs and Supplies)*

# Q4186 Epifix 1 sq cm

Click to open document in a browser

- Related Revenue Codes

Information from CMS Annual Update

| | |
|---|---|
| Year: | 2022 |
| Code: | Q4186 |
| Short Description: | Epifix 1 sq cm |
| Long Description: | Epifix, per square centimeter |
| CMS Coverage: | C Carrier judgment |
| Citations: | Coverage Issues Manual:<br>Medicare Carriers Manual:<br>Statute addressing coverage/noncoverage: |
| Action: | N - No maintenance for this code 01/01/2019 |
| Code Added: | 01/01/2019 |

Expand All Additional Information Collapse All Additional Information

Special Information from CMS

Type of Service

| | |
|---|---|
| Effective Date: | 2022 |
| Berenson-Eggers Type of Service Code: | O1E |
| BETOS Description: | Other drugs |
| BETOS Category: | OTHER |
| Related Information: | See the Complete BETOS Index for more information. |

Hospital Outpatient PPS Information

| | |
|---|---|
| Effective Date: | 07/01/2022 |
| Code: | Q4186 |
| Description: | Epifix 1 sq cm |
| Payment Status Indicator: | N - **Packaged** Items and Services Packaged into APC Rates<br>Paid under OPPS; payment is packaged into payment for other services. Therefore, there is no separate APC payment. |
| APC: | N/A |
| National Unadjusted Payment: | N/A |
| Relative Weight: | N/A |
| | Click to Search APC Codebook for Q4186<br>NCCI Edits may apply, Click to Search NCCI Edits for Q4186<br>Allowable Hospital Outpatient Modifiers which ***may*** be appropriate with this code include: |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

| | |
|---|---|
| Related Information: | • 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91 E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA<br><br>See the Integrated Outpatient Code Editor Definitions Manual for more information |

Ambulatory Surgical Center (ASC) Payment Information

| | |
|---|---|
| Date: | 07/01/2022 (R1) |
| Code: | Q4186 |
| Description: | Epifix 1 sq cm |
| Payment Indicator: | N1 - Packaged service/item; no separate payment made. |
| Payment Weight: | N/A |
| Payment: | N/A |
| ASC Designation: | Covered Ancillary Services Integral to Covered Surgical Procedures (Addendum BB) |
| Related Information: | ASC Codebook Page<br>Allowable ASC Modifiers which ***may*** be appropriate with this code include:<br><br>• 25, 27, 50, 52, 58, 59, 73, 74, 76, 77, 78, 79, 91, E1, E2, E3, E4, F1, F2, F3, F4, F5, F6, F7, F8, F9, FA, GG, GH, LC, LD, LM, LT, RC, RI, RT, T1, T2, T3, T4, T5, T6, T7, T8, T9, TA |

Physician Fee Schedule Information

| | |
|---|---|
| Effective Date: | 10/01/2022 |
| Code: | Q4186 |
| Description: | Epifix 1 sq cm |
| Status Code: | X - **Statutory Exclusion**These codes represent an item or service that is not in the statutory definition of "physician services" for fee schedule payment purposes. No RVUS or payment amounts are shown for these codes, and no payment may be made under the physician fee schedule. (Examples are ambulance services and clinical diagnostic laboratory services.) |
| Pro/Tech Flag: | 9 - Concept of a professional/technical component does not apply |
| Total RVUs (NonFac/Fac): | 0.00 / 0.00 |
| National Unadjusted Payment (NonFac/Fac): | $0.00 / $0.00 |
| Related Information: | Allowable Physician Fee Modifiers which ***may*** be appropriate with this code include:<br><br>• 22, 23, 24, 25, 26, 32, 33, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 66, 76, 77, 78, 79, 80, 81, 82, 90, 99, LT, RT<br><br>For Outpatient Rehabilitation codes Modifiers which ***may*** be appropriate include:<br><br>• GN, GO, GP, KX, CH, CI, CJ, CK, CL, CM, CN, CR |

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved.

| | |
|---|---|
| | Physician Fee Schedule CodeBook Page for Q4186 (includes Supervision, Bilateral and other Indicators)<br>NCCI Edits for Q4186 |

Expand All Additional Information Collapse All Additional Information

---

Generated by MediRegs™ on 09/28/2022 via MediScript.

© 2022 CCH Incorporated and its affiliates and licensors. All rights reserved. 

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
THINK TRUTH
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022 188 534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 961

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-Office Manager
Custodian of records and Job Title (Print)

[signature] 8/19/2022
Custodian of records (Signature) (Date)

JOHN R. ADAMS M.D.
Physician/Supplier (Print)

[signature] 8/19/2022
Physician/Supplier (Signature) (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**<u>For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.</u>**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# FOULSTON

ATTORNEYS AT LAW

Amanda M. Wilwert

awilwert@foulston.com
Phone: 913.253.2181
Fax: 913.498.2101

32 CORPORATE WOODS
9225 INDIAN CREEK PARKWAY SUITE 600
OVERLAND PARK, KS 66210-2000

August 22, 2022

LaTonya Johnston
Program Integrity Analysis
CoventBridge Group
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Re: Advanced Dermatology and Skin Cancer Center PA
Post Payment Medical Records Request
MR #: 2022_188_534244943 (Kansas)
MR #: 2022_188_534244943 (Nebraska)

Dear Ms. Johnston:

This responds to the following requests in the Post Payment Medical Records Request for Advanced Dermatology and Skin Cancer Center PA's ("Advanced Dermatology"):

For all skin substitutes and wound care products, including but not limited to Artacent, Epifix and Epicord,

- Copy of all order forms for skin substitutes and wound care products in the last 12 months.
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreement for skin substitutes and wound care products between the provider and any distributor/manufacture
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products.

Advanced Dermatology does not have any documentation responsive to these requests. Further, Advanced Dermatology is a dermatology clinic and is not a wound care facility.

Advanced Dermatology does not have any order forms for skin substitutes. To order skin substitutes, Advanced Dermatology calls the distributor/manufacture representative to verbally request the desired skin substitutes.

Advanced Dermatology has not received or participated in any rebate program for skin substitutes and/or wound care products. Artacent permits bulk purchases of fifty (50) products with no limitation as to what sizes to order, and as long as fifty (50) products are ordered, Artacent offers a ten percent (10%) discount. This discount is reflected on the invoices. However, this is not a rebate.

LexMundi
GGI

Advanced Dermatology does not have a rebate agreement with any distributor/manufacture for skin substitutes and wound care products.

Regarding marketing material, Artacent and MiMedx have presented brochures to Advanced Dermatology which is material that is available online. Advanced Dermatology does not present marketing material to its patients related to skin substitutes and wound care products. Advanced Dermatology directs CoventBridge to Artacent and MiMedx (Epifix) for copies of marketing materials provided to providers and/or patients.

Please let me know if you have any questions. Thanks.

Sincerely,

FOULSTON SIEFKIN LLP

Amanda M. Wilwert

tidesmedical
P.O. BOX 82237 | LAFAYETTE, LA 70598
PHONE 888.494.4441 | FAX 781.823.0321
INFO@TIDESMEDICAL.COM

August 18, 2022

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Ms. Johnston

It has come to our attention that you are in the process of conducting a UPIC audit of Dr. John Adams related to his use of skin substitutes, and in particular our product, Artacent Wound.

We thought it would be relevant, and helpful to you, to provide some insights and perspectives that we compiled from a prior UPIC audit of Dr. Adams. Below are a few of the pertinent topics related to the regulation status of Artacent Wound, the FDA's standards for Homologous use, CPT coding for skin substitutes and product sizing.

1. Homologous Use
   a. Dr. Adams specifically mentions in his chart notes that he is using Artacent Wound as a "natural barrier"
   b. Dr. Adams also mentions other intended outcomes related to scar reduction inflammation reduction, etc. as part of the patient treatment and practice of medicine but these are not pertinent for purposes of a homologous use determination. There is no legal or regulatory requirement that a doctor restrict his use of a product to the intended use of said product and FDA regulations do not extend to the practice of medicine.
   c. Use as a barrier is consistent with homologous use. Please reference the 2020 FDA Guidance Document, the Tides Medical FDA Tissue Reference Group (TRG) Reference Letter, and the Tides Medical package insert to demonstrate that homologous use for our product includes use as a wound cover and a barrier.

tidesmedical
P.O. BOX 82237 | LAFAYETTE, LA 70598
PHONE 888.494.4441 | FAX 781.823.0321
INFO@TIDESMEDICAL.COM

d. FDA is not authorized to regulate the practice of medicine. FDA regulations and guidance apply only to the manufacturer of the products, not the users of the products. As such referencing an FDA guidance documents (which themselves are not legally binding; i.e. FDA guidance is only a reference document for manufacturers of products) is not appropriate, https://www.fda.gov/medical-devices/home-use-devices/fdas-role-regulating-medical-devices , see bullet 1 in the link; "FDA does not have authority to regulate… a physician's practice…". It is therefore not appropriate to hold a clinician responsible for following regulations that do not apply to them (the doctor).

e. Setting aside the inapplicability of FDA regulations to the practice of medicine, and out of an abundance of cooperation, Dr. Adams did in fact use the Artacent Wound product in a homologous way as per the manufacturer's intended use, and as confirmed by the FDA Tissue Reference Group (TRG) (see TRG letter). Extraneous commentary respecting the use and performance of the Artacent Wound product beyond its use as a wound covering (barrier) is not relevant for purposes of deciding if the product was used homologously, per the intended use as provided by the manufacturer; Dr. Adams used the product as a wound covering (natural barrier) as stated in his notes. There is no requirement that a doctor restrict his notes to the intended use statement provided by the manufacturer, and it is therefore not appropriate to deny payment for doing otherwise.

f. FDA guidance related to homologous use and minimal manipulation (https://www.fda.gov/media/109176/download) gives many examples whereby tissue products generally, and amniotic tissue specifically, falls within the guidance for tissue products.

g. Amniotic tissue is a structural tissue (see page 9 of the guidance). Section 1271.10(a)(1) (21 CFR 1271.10(a)(1)) provides that one of the criteria for an HCT/P to be regulated solely under section 361 of the PHS Act and the regulations in Part 1271 is that the HCT/P is minimally manipulated. As defined in 21 CFR 1271.3(f), minimal manipulation means: processing that does not alter the original relevant characteristics of the tissue relating to the tissue's utility for reconstruction, repair, or replacement. HCT/Ps that physically support or serve as a barrier or conduit, or connect, cover, or cushion are generally considered tissues for the purpose of applying the HCT/P regulatory framework example 10-2 on page 11 of the guidance says: (The) "original relevant characteristics of amniotic membrane relating to its utility to serve as a

tidesmedical
P.O. BOX 82237 | LAFAYETTE, LA 70598
PHONE 888.494.4441 | FAX 781.823.0321
INFO@TIDESMEDICAL.COM

barrier…" Thus, the use referenced in Dr. Adams notes is consistent with FDA homologous use for amniotic tissue; and as referenced in the FDA Tissue Reference Group letter confirming homologous use when used as a wound covering.

2. Use on non-chronic wounds
   a. The auditor(s) have pushed back on use of Artacent Wound without prior conservative wound treatment. Auditor(s) question why an expensive advanced treatment was used instead of conservative treatment. The Auditor(s) have also mentioned that use of amniotic grafts is outside of accepted standards of medical practice for non-chronic wounds.
   Answer: There is no requirement under CMS or AMA guidances that treatment of a wound begin with conservative treatment and escalate to more rigorous treatment.
   b. Dr. Adams submits claims to WPS (MAC contractor) which does not have an LCD that outlines a requirement for conservative treatment or a limit to use on only chronic wounds.
   c. The manufacturer of Artacent Wound does not restrict use of the product to chronic or acute wounds (including MOHs) use of the product and the appropriateness is based on the provider's determination of medical necessity. There is no LCD stating that cheaper, more conservative measures have to be used first. Therefore, unless there is some guidance from CMS or evidence of a lack of medical necessity the auditor is employing an arbitrary and subjective opinion, which is not inappropriate.

3. CPT coding
   a. According to the auditor, the codebook for graft application codes (15271 & 15272) states that skin substitute grafts include various kinds of human skin grafts, non-human skin grafts, and "biological products that form a sheet scaffolding for skin growth."
   b. Further, the clear intent of all three definitions is for the substance to remain on the person for the purpose of growing in place or helping the person's own skin cells to grow back.
   c. Labeling amniotic tissues as "biological dressings" is erroneous, the Tides Medical Artacent Wound product is a skin substitute, not a dressing. Denial of

tidesmedical
P.O. BOX 82237 | LAFAYETTE, LA 70598
PHONE 888.494.4441 | FAX 781.823.0321
INFO@TIDESMEDICAL.COM

payment by applying the incorrect products category is not appropriate. Allograft is defined as a graft of tissue between individuals of the same species but of disparate genotype, i.e. they are unrelated. As such Artacent Wound is an allograft. As an allograft Artacent Wound is appropriately classified as a skin substitute. Further, our submission to the Tissue Reference Group was evaluated as: "Human tissue allograft derived from human amniotic membrane, specifically from the submucosa of the placenta." (please see letter from FDA TRG).

4. Product Sizing
   a. The auditor, on multiple occasions, said that Dr. Adams was using excessive product (over utilization), the auditor's point of reference is erroneous and was based on his apparent misunderstanding that a single tissue/package of Artacent Wound was 1 unit. Artacent Wound (Q4169) is billed per square centimeter, not per tissue. Tides offers multiple product sizes to physicians, ranging from 2 to 32 units.

Thank you for your consideration of these facts in advance of completing your audit. It is our hope that this will aid in your review. Attached is the Artacent Wound package insert and the TRG Designation Letter from the FDA to support the statements in this letter.

Sincerely,

Benjamin Kimball, J.D.
VP of Quality and Regulatory Affairs
Tides Medical

FDA U.S. FOOD & DRUG ADMINISTRATION

By Electronic Mail

August 1, 2022

Mr. Benjamin Kimball, J.D.
Tides Medical
1819 W Pinhook Rd, Unit 109
Lafayette, Louisiana 70508
BKimball@tidesmedical.com

RE: Request for Recommendation for Artacent Wound Amniotic Membrane

Dear Mr. Kimball:

This letter is in response to your inquiry provided to the Food and Drug Administration's Tissue Reference Group (TRG) received on March 10, 2022 and follow-up communications. You are seeking a recommendation from the TRG whether your amniotic membrane product, Artacent Wound, a human cell, tissue, or cellular or tissue-based product (HCT/P), is regulated solely under section 361 of the Public Health Service (PHS) Act and the regulations in 21 CFR part 1271.

Your submission describes processing the amniotic membrane that includes dissection, washing using a detergent, rinsing, folding to create a dual layer, and drying. The dried membrane is cut, packaged, then terminally sterilized, and the smallest product size is described as a 9mm disk. The Artacent Wound product is intended for use as a "wound covering in various surgical procedures."

An HCT/P is regulated solely under section 361 of the PHS Act and the regulations in part 1271, if the HCT/P meets all four criteria at 21 CFR 1271.10(a)[1]. Based on the description you provide of the processing steps and the minimum size of the product, Artacent Wound, when intended for use as a "wound covering", appears to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271.

This recommendation applies solely to the Artacent Wound product described in your submission of March 10, 2022, when intended for use as a "wound covering". This recommendation does not apply to other Artacent branded products manufactured or marketed by Tides Medical. We are also aware of Tides Medical's application to the Centers for Medicare & Medicaid Services for the Artacent Wound product[2].

---

[1] The four criteria can be found at 21 CFR 1271.10(a), and, as applicable, see the following guidance documents: "Regulatory Considerations for Human Cell, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use: Guidance for Industry and Food and Drug Administration Staff" dated July 2020; and, "Same Surgical Procedure Exception under 21 CFR 1271.15(b): Questions and Answers Regarding the Scope of the Exception: Guidance for Industry" dated November 2017.

[2] Centers for Medicare & Medicaid Services (CMS) Healthcare Common Procedure Coding System (HCPCS) Application Summaries for Drugs, Biologicals, and Radiopharmaceuticals May 19, 2016.

Please note that this recommendation is based on the information you provided. Any variation from what you describe in your request for recommendation to the TRG, including but not limited to changes in the processing (including the minimum product size) or proposed use, may raise additional regulatory considerations that could impact the applicability of this recommendation. For example, an amniotic membrane product, when intended for wound healing and/or to reduce scarring and inflammation would not be considered a homologous use because wound healing and reduction of scarring and inflammation are not basic functions of amniotic membrane.[3]

For questions regarding this response letter, please contact the Executive Secretary for the TRG at TissueReferenceGroup@fda.hhs.gov.

Sincerely,

Wilson Bryan -S Digitally signed by Wilson Bryan -S Date: 2022.07.29 20:41:50 -04'00'

James P. Bertram -S Digitally signed by James P. Bertram -S Date: 2022.08.01 14:23:04 -04'00'

Wilson W. Bryan, M.D.
Director
Office of Tissues and Advanced Therapies
Center for Biologics Evaluation and Research

James Bertram, Ph.D.
Associate Director
Regulatory Policy and Combination Products Staff
Office of Product Evaluation and Quality
Center for Devices and Radiological Health

[3] See Example 19-4 in "Regulatory Considerations for Human Cell, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use: Guidance for Industry and Food and Drug Administration Staff" dated July 2020.

**Kansas State Board of Healing Arts**
**800 SW Jackson, Lower Level, Suite A**
**Topeka, Kansas 66612**
**785-296-7413**

This is your wallet card which indicates that you are authorized to practice in the State of Kansas. Please sign the wallet card prior to using. Keep your card in a safe place to prevent loss or theft. You may also access a current copy of your wallet card in the Online Portal.

JOHN RAYMOND ADAMS
2735 PEMBROOK PLACE
MANHATTAN KS 66502

**Kansas State Board of Healing Arts**

This is to certify that the individual named below is authorized to practice as indicated.

***JOHN RAYMOND ADAMS***

| | | | |
|---|---|---|---|
| Profession: | Medical Doctor (MD) | | |
| License #: | 04-26086 | Status: | Active |
| Date Last Renewed: | 06/27/2022 | Expiration: | 07/31/2023 |
| Orig License Date: | 02/17/1996 | Date This Status: | 07/01/2013 |
| CE Due: | 06/30/2023 | | |

Signature of Practitioner

**Kansas State Board of Healing Arts**
**800 SW Jackson, Lower Level, Suite A**
**Topeka, Kansas 66612**
**785-296-7413**

This is your wallet card which indicates that you are authorized to practice in the State of Kansas. Please sign the wallet card prior to using. Keep your card in a safe place to prevent loss or theft. You may also access a current copy of your wallet card in the Online Portal.

VINCENT RIVERA ADAMS
2735 PEMBROOK PLACE
MANHATTAN KS 66502

**Kansas State Board of Healing Arts**

This is to certify that the individual named below is authorized to practice as indicated.

***VINCENT RIVERA ADAMS***

| | | | |
|---|---|---|---|
| Profession: | Medical Doctor (MD) | | |
| License #: | 04-44119 | Status: | Active |
| Date Last Renewed: | 06/17/2022 | Expiration: | 07/31/2023 |
| Orig License Date: | 11/20/2020 | Date This Status: | 11/20/2020 |
| CE Due: | 06/30/2023 | | |

Signature of Practitioner

Kansas Department for Aging and Disability Services

## Survey, Certification and Credentialing Commission

# Nurse Aide Registry Confirmation Notice

certification@kdads.ks.gov - **REGISTRY INQUIRIES ONLY!** FAQS

Pursuant to EO 22-02 and in accordance with KS House Bill 2477, KDADS Certified individuals: Certified Nurse Aide, Certified Medication Aide, and Home Health Aide that were active and in good standing as of January 6, 2022, their certification shall be considered active through January 20, 2023. At which time, all renewal requirements outlined by statue and regulations must be met or their certification will lapse.

**Name:** JOCELYN AGUIRRE **AideID:** 186757

**Other Names:**

JOCELYN CARRANZA

| Certification Type | Issued | Expiration | Status | Employment Verification End Date |
|---|---|---|---|---|
| Certified Nurse Aide | 08/15/2011 | | Inactive | 04/21/2020 |

**Last Criminal Record Check:** 08/12/2011

**Last Criminal Record Check Requested By**

***DISCLAIMER: All information provided on this web page and other associated web pages are made available to provide immediate access for the convenience of interested persons. While we believe the information to be reliable, human or mechanical error remains a possibility, as does delay in the posting or updating of information. Therefore there is no guarantee as to the accuracy, completeness, timeliness, currency, or correct sequencing of the information. Neither this agency, nor any of the sources of the information, shall be responsible for any errors or omissions, or for the use or results obtained from the use of this information.

**Health Occupations, Credentialing**

**503 S Kansas Ave**
**Fax: 785-296-3075** http://www.kdads.ks.gov

nursys QUICKCONFIRM

# QuickConfirm License Verification Report

Primary Source Boards of Nursing Report Summary for

## JOSHUA NICHOLAS SCHELL [NCSBN ID: 22408470]

As of Wednesday July 20 2022 02:21:58 PM US Central Time

**Disclaimer of Representations and Warranties**
*Through a written agreement, participating individual state boards of nursing designate Nursys as a primary source equivalent database. NCSBN posts the information in Nursys when, and as, submitted by the individual state boards of nursing. NCSBN may not make any changes to the submitted information and disclaims any responsibility to update or verify such information as it is received from the individual state boards of nursing. Nursys displays the dates on which a board of nursing updated its information in Nursys.*

*This report is not sufficient when applying to another board of nursing for licensure. Use the "Nurse License Verification for Endorsement" service to request the required verification of licensure.*

*Contact the board of nursing for details about the Nurse Practice Act, which includes nurse scope of practice and privileges and information about advanced nursing practice roles (practice privileges, prescription authority, dispensing privileges & independent practice privileges).*

**UNENCUMBERED** *means that the nurse has a full and unrestricted license to practice by the state board of nursing.*

| Name on License | Type | License State | License | Active | License Status | License Original Issue Date | License Expiration Date | Compact Status |
|---|---|---|---|---|---|---|---|---|
| SCHELL, JOSHUA NICHOLAS | RN | KANSAS | 13-123677-011 | YES | UNENCUMBERED | 06/11/2013 | 01/31/2023 | SINGLE STATE |

| Name on License | Type | License State | License | Active | License Status | License Original Issue Date | License Expiration Date | Compact Status |
|---|---|---|---|---|---|---|---|---|
| SCHELL, JOSHUA NICHOLAS | CERTIFIED NURSE PRACTITIONER | KANSAS | 53-80066-011 | YES | UNENCUMBERED | 03/12/2021 | 01/31/2023 | N/A |

**Advanced Practice license/recognition information**
- Focus/Specialty: Family
- Prescription authority: NOT SUPPLIED
- Certification expiration date: NOT SUPPLIED
- Focus/Specialty expiration date: 01/31/2023

## Where can the nurse practice as an RN and/or PN?

**Authorized to Practice in**

KANSAS (RN)

Non-participating: MI. Non-participating boards of nursing do not submit licensure data to Nursys. Please contact them for authorization to practice details.
APRN authorization to practice details are not available.

**UNENCUMBERED** *means that the nurse has a full and unrestricted license to practice by the state board of nursing.*

**License type information**
- **RN:** Registered Nurse
- **PN:** Practical Nurse (aka Licensed Practical Nurse (LPN), Vocational Nurse (VN), Licensed Vocational Nurse (LVN))
- **CNP:** Certified Nurse Practitioner
- **CNS:** Clinical Nurse Specialist
- **CNM:** Certified Nurse Midwife
- **CRNA:** Certified Registered Nurse Anesthetist

**License status information**

- Unencumbered (full unrestricted license to practice)
- Cease & Desist
- Denial of License
- Expired
- Other license action
- Probation
- Reprimand
- Restriction
- Revoked
- Suspension
- Voluntary agreement to refrain from practice
- Voluntary Surrender

**Nurse Licensure Compact (NLC) information**

- **Multistate licensure privilege:** Authority to practice as a licensed nurse in a remote state under the current license issued by the individual's home state provided both states are party to the Nurse Licensure Compact (NLC) and the privilege is not otherwise restricted.
- **Single state license:** A license issued by a state board of nursing that authorizes practice only in the state of issuance.
- **Privilege to Practice (PTP):** Multistate licensure privilege is the authority under the Nurse Licensure Compact (NLC) to practice nursing in any compact party state that is not the state of licensure. All party states have the authority in accordance with existing state due process law to take actions against the nurse's privilege such as: revocation, suspension, probation or any other action which affects a nurse's authorization to practice.

NCSBN

© 2022 National Council of State Boards of Nursing Inc. All rights reserved.

www.nursys.com

Kansas
Department for Aging
and Disability Services

# Survey, Certification and Credentialing Commission

## Nurse Aide Registry Confirmation Notice

certification@kdads.ks.gov - **REGISTRY INQUIRIES ONLY!** FAQS

Pursuant to EO 22-02 and in accordance with KS House Bill 2477, KDADS Certified individuals: Certified Nurse Aide, Certified Medication Aide, and Home Health Aide that were active and in good standing as of January 6, 2022, their certification shall be considered active through January 20, 2023. At which time, all renewal requirements outlined by statue and regulations must be met or their certification will lapse.

**Name:** KATLYNN MARIE HEVELONE **AideID:** 237137
**Other Names:**

| Certification Type | Issued | Expiration | Status | Employment Verification End Date |
|---|---|---|---|---|
| Certified Nurse Aide | 05/21/2018 | | Active | 01/26/2024 |

**Last Criminal Record Check:** 10/04/2020

**Last Criminal Record Check Requested By**
STONEYBROOK ASSISTED LIVING
STONEYBROOK RETIREMENT COMMUNITY
SUMMITT RESCARE
SUMMITT RESCARE
RESOURCE CENTER FOR INDEPENDENT LIVING INC
VIA CHRISTI VILLAGE MANHATTAN INC

***DISCLAIMER: All information provided on this web page and other associated web pages are made available to provide immediate access for the convenience of interested persons. While we believe the information to be reliable, human or mechanical error remains a possibility, as does delay in the posting or updating of information. Therefore there is no guarantee as to the accuracy, completeness, timeliness, currency, or correct sequencing of the information. Neither this agency, nor any of the sources of the information, shall be responsible for any errors or omissions, or for the use or results obtained from the use of this information.

**Health Occupations, Credentialing**

503 S Kansas Ave
Fax: 785-296-3075 http://www.kdads.ks.gov

nursys QUICKCONFIRM

# QuickConfirm License Verification Report

Primary Source Boards of Nursing Report Summary for

## KYLIE NICOLE WIEDMER [NCSBN ID: 23263482]

As of Friday July 15 2022 02:36:42 PM US Central Time

**Disclaimer of Representations and Warranties**
*Through a written agreement, participating individual state boards of nursing designate Nursys as a primary source equivalent database. NCSBN posts the information in Nursys when, and as, submitted by the individual state boards of nursing. NCSBN may not make any changes to the submitted information and disclaims any responsibility to update or verify such information as it is received from the individual state boards of nursing. Nursys displays the dates on which a board of nursing updated its information in Nursys.*

*This report is not sufficient when applying to another board of nursing for licensure. Use the "Nurse License Verification for Endorsement" service to request the required verification of licensure.*

*Contact the board of nursing for details about the Nurse Practice Act, which includes nurse scope of practice and privileges and information about advanced nursing practice roles (practice privileges, prescription authority, dispensing privileges & independent practice privileges).*

**UNENCUMBERED** *means that the nurse has a full and unrestricted license to practice by the state board of nursing.*

| Name on License | Type | License State | License | Active | License Status | License Original Issue Date | License Expiration Date | Compact Status |
|---|---|---|---|---|---|---|---|---|
| WIEDMER, KYLIE NICOLE | RN | KANSAS | 13-153548-011 | YES | UNENCUMBERED (see history) | 01/08/2021 | 01/31/2023 | MULTISTATE |

**Primary source Boards of Nursing message & notification history**

- This notification was provided by Kansas Board of Nursing: This LPN is IV-Certified by the Kansas State Board of Nursing.

| Name on License | Type | License State | License | Active | License Status | License Original Issue Date | License Expiration Date | Compact Status |
|---|---|---|---|---|---|---|---|---|
| WIEDMER, KYLIE NICOLE | PN | KANSAS | 23-48468-011 | NO | EXPIRED (see history) | 02/09/2017 | 08/28/2021 | NONE |

**Primary source Boards of Nursing message & notification history**

- This notification was provided by Kansas Board of Nursing: This LPN is IV-Certified by the Kansas State Board of Nursing.

## Where can the nurse practice as an RN and/or PN?

**Authorized to Practice in**

| | | |
|---|---|---|
| ALABAMA (RN) | KENTUCKY (RN) | NORTH DAKOTA (RN) |
| ARIZONA (RN) | LOUISIANA (RN) | OKLAHOMA (RN) |
| ARKANSAS (RN) | MAINE (RN) | SOUTH CAROLINA (RN) |
| COLORADO (RN) | MARYLAND (RN) | SOUTH DAKOTA (RN) |
| DELAWARE (RN) | MISSISSIPPI (RN) | TENNESSEE (RN) |
| FLORIDA (RN) | MISSOURI (RN) | TEXAS (RN) |
| GEORGIA (RN) | MONTANA (RN) | UTAH (RN) |
| GUAM (RN) | NEBRASKA (RN) | VERMONT (RN) |
| IDAHO (RN) | NEW HAMPSHIRE (RN) | VIRGINIA (RN) |
| INDIANA (RN) | NEW JERSEY (RN) | WEST VIRGINIA (RN) |
| IOWA (RN) | NEW MEXICO (RN) | WISCONSIN (RN) |
| KANSAS (RN) | NORTH CAROLINA (RN) | WYOMING (RN) |

Non-participating: MI. Non-participating boards of nursing do not submit licensure data to Nursys. Please contact them for authorization to practice details.
APRN authorization to practice details are not available.

**UNENCUMBERED** *means that the nurse has a full and unrestricted license to practice by the state board of nursing.*

**License type information**

- **RN:** Registered Nurse
- **PN:** Practical Nurse (aka Licensed Practical Nurse (LPN), Vocational Nurse (VN), Licensed Vocational Nurse (LVN))
- **CNP:** Certified Nurse Practitioner
- **CNS:** Clinical Nurse Specialist
- **CNM:** Certified Nurse Midwife
- **CRNA:** Certified Registered Nurse Anesthetist

**License status information**

- Unencumbered (full unrestricted license to practice)
- Cease & Desist
- Denial of License
- Expired
- Other license action
- Probation
- Reprimand
- Restriction
- Revoked
- Suspension
- Voluntary agreement to refrain from practice
- Voluntary Surrender

**Nurse Licensure Compact (NLC) information**

- **Multistate licensure privilege:** Authority to practice as a licensed nurse in a remote state under the current license issued by the individual's home state provided both states are party to the Nurse Licensure Compact (NLC) and the privilege is not otherwise restricted.
- **Single state license:** A license issued by a state board of nursing that authorizes practice only in the state of issuance.
- **Privilege to Practice (PTP):** Multistate licensure privilege is the authority under the Nurse Licensure Compact (NLC) to practice nursing in any compact party state that is not the state of licensure. All party states have the authority in accordance with existing state due process law to take actions against the nurse's privilege such as: revocation, suspension, probation or any other action which affects a nurse's authorization to practice.

NCSBN

© 2022 National Council of State Boards of Nursing Inc. All rights reserved.

www.nursys.com

nursys QUICKCONFIRM

# QuickConfirm License Verification Report

Primary Source Boards of Nursing Report Summary for

## LUIS MIGUEL FUERTES [NCSBN ID: 41013260]

As of Friday July 15 2022 02:39:27 PM US Central Time

**Disclaimer of Representations and Warranties**
*Through a written agreement, participating individual state boards of nursing designate Nursys as a primary source equivalent database. NCSBN posts the information in Nursys when, and as, submitted by the individual state boards of nursing. NCSBN may not make any changes to the submitted information and disclaims any responsibility to update or verify such information as it is received from the individual state boards of nursing. Nursys displays the dates on which a board of nursing updated its information in Nursys.*

*This report is not sufficient when applying to another board of nursing for licensure. Use the "Nurse License Verification for Endorsement" service to request the required verification of licensure.*

*Contact the board of nursing for details about the Nurse Practice Act, which includes nurse scope of practice and privileges and information about advanced nursing practice roles (practice privileges, prescription authority, dispensing privileges & independent practice privileges).*

**UNENCUMBERED** *means that the nurse has a full and unrestricted license to practice by the state board of nursing.*

| Name on License | Type | License State | License | Active | License Status | License Original Issue Date | License Expiration Date | Compact Status |
|---|---|---|---|---|---|---|---|---|
| FUERTES, LUIS MIGUEL | PN | KANSAS | 24-21129-101 | YES | UNENCUMBERED (see history) | 10/20/1991 | 10/31/2023 | SINGLE STATE |

**Primary source Boards of Nursing message & notification history**
- This notification was provided by Kansas Board of Nursing: This LPN is IV-Certified by the Kansas State Board of Nursing.

| Name on License | Type | License State | License | Active | License Status | License Original Issue Date | License Expiration Date | Compact Status |
|---|---|---|---|---|---|---|---|---|
| FUERTES, LUIS MIGUEL | PN | NORTH CAROLINA | 035407 | NO | EXPIRED | 11/25/1987 | 12/31/1991 | NONE |

## Where can the nurse practice as an RN and/or PN?

**Authorized to Practice in**

KANSAS (PN)

Non-participating: MI. Non-participating boards of nursing do not submit licensure data to Nursys. Please contact them for authorization to practice details.
APRN authorization to practice details are not available.

**UNENCUMBERED** *means that the nurse has a full and unrestricted license to practice by the state board of nursing.*

**License type information**
- **RN:** Registered Nurse
- **PN:** Practical Nurse (aka Licensed Practical Nurse (LPN), Vocational Nurse (VN), Licensed Vocational Nurse (LVN))
- **CNP:** Certified Nurse Practitioner
- **CNS:** Clinical Nurse Specialist
- **CNM:** Certified Nurse Midwife
- **CRNA:** Certified Registered Nurse Anesthetist

**License status information**
- Unencumbered (full unrestricted license to practice)
- Cease & Desist
- Denial of License

- Expired
- Other license action
- Probation
- Reprimand
- Restriction
- Revoked
- Suspension
- Voluntary agreement to refrain from practice
- Voluntary Surrender

**Nurse Licensure Compact (NLC) information**

- **Multistate licensure privilege:** Authority to practice as a licensed nurse in a remote state under the current license issued by the individual's home state provided both states are party to the Nurse Licensure Compact (NLC) and the privilege is not otherwise restricted.
- **Single state license:** A license issued by a state board of nursing that authorizes practice only in the state of issuance.
- **Privilege to Practice (PTP):** Multistate licensure privilege is the authority under the Nurse Licensure Compact (NLC) to practice nursing in any compact party state that is not the state of licensure. All party states have the authority in accordance with existing state due process law to take actions against the nurse's privilege such as: revocation, suspension, probation or any other action which affects a nurse's authorization to practice.

---

NCSBN

© 2022 National Council of State Boards of Nursing Inc. All rights reserved.

www.nursys.com

Kansas
Department for Aging and Disability Services

# Survey, Certification and Credentialing Commission

## Nurse Aide Registry Confirmation Notice

certification@kdads.ks.gov - **REGISTRY INQUIRIES ONLY!** FAQS

Pursuant to EO 22-02 and in accordance with KS House Bill 2477, KDADS Certified individuals: Certified Nurse Aide, Certified Medication Aide, and Home Health Aide that were active and in good standing as of January 6, 2022, their certification shall be considered active through January 20, 2023. At which time, all renewal requirements outlined by statue and regulations must be met or their certification will lapse.

**Name:** MEGHARA FRANCES PRALLE **AideID:** 197762
**Other Names:**

| Certification Type | Issued | Expiration | Status | Employment Verification End Date |
|---|---|---|---|---|
| Certified Nurse Aide | 01/18/2013 | | Inactive | 01/18/2015 |
| Home Health Aide | 03/20/2013 | | Inactive | 03/20/2015 |
| Certified Medication Aide | 07/03/2013 | 07/03/2015 | Inactive | |

**Last Criminal Record Check:** 02/14/2013

**Last Criminal Record Check Requested By**

***DISCLAIMER: All information provided on this web page and other associated web pages are made available to provide immediate access for the convenience of interested persons. While we believe the information to be reliable, human or mechanical error remains a possibility, as does delay in the posting or updating of information. Therefore there is no guarantee as to the accuracy, completeness, timeliness, currency, or correct sequencing of the information. Neither this agency, nor any of the sources of the information, shall be responsible for any errors or omissions, or for the use or results obtained from the use of this information.

**Health Occupations, Credentialing**

**503 S Kansas Ave**
**Fax: 785-296-3075** http://www.kdads.ks.gov

# Wichita Area Technical College

By authority of the Kansas Board of Regents and the Board of Trustees
and upon recommendation of the Faculty
Wichita Area Technical College confers upon

## Meghara Pralle

The Award of

## Certificate of Completion in Certified Nurse Aide

With all the rights, privileges and responsibilities thereunto appertaining.

In witness whereof, the seal of the College and the signatures as authorized
by the Board of Trustees, Wichita Area Technical College, are hereunto affixed,
this fourteenth day of December, in the year two thousand twelve.

Jim Walters, Chairman
Board of Trustees

WICHITA AREA TECHNICAL COLLEGE
WATC

Dr. Anthony G. (Tony) Kinkel, President
Wichita Area Technical College

# Wichita Area Technical College

By authority of the Kansas Board of Regents and the Board of Trustees
and upon recommendation of the Faculty
Wichita Area Technical College confers upon

## Meghara Pralle

The Award of

## Certificate of Completion in Home Health Aide

With all the rights, privileges and responsibilities thereunto appertaining.

In witness whereof, the seal of the College and the signatures as authorized
by the Board of Trustees, Wichita Area Technical College, are hereunto affixed,
this first day of February, in the year two thousand thirteen.

Jim Walters, Chairman
Board of Trustees

Dr. Anthony G. (Tony) Kinkel, President
Wichita Area Technical College

WICHITA AREA TECHNICAL COLLEGE
WATC

# Wichita Area Technical College

By authority of the Kansas Board of Regents and the Board of Trustees
and upon recommendation of the Faculty
Wichita Area Technical College confers upon

## Meghara Pralle

The Award of

## Certificate of Completion in Certified Medication Aide

With all the rights, privileges and responsibilities thereunto appertaining.

In witness whereof, the seal of the College and the signatures as authorized
by the Board of Trustees, Wichita Area Technical College, are hereunto affixed,
this tenth day of May, in the year two thousand thirteen.

Jim Walters, Chairman
Board of Trustees

Dr. Anthony G. (Tony) Kinkel, President
Wichita Area Technical College

WICHITA AREA TECHNICAL COLLEGE
WATC

nursys QUICKCONFIRM

# QuickConfirm License Verification Report

Primary Source Boards of Nursing Report Summary for

## MELISSA FRANCINE LEWIS [NCSBN ID: 22159572]

As of Friday July 15 2022 11:52:17 AM US Central Time

**Disclaimer of Representations and Warranties**
*Through a written agreement, participating individual state boards of nursing designate Nursys as a primary source equivalent database. NCSBN posts the information in Nursys when, and as, submitted by the individual state boards of nursing. NCSBN may not make any changes to the submitted information and disclaims any responsibility to update or verify such information as it is received from the individual state boards of nursing. Nursys displays the dates on which a board of nursing updated its information in Nursys.*

*This report is not sufficient when applying to another board of nursing for licensure. Use the "Nurse License Verification for Endorsement" service to request the required verification of licensure.*

*Contact the board of nursing for details about the Nurse Practice Act, which includes nurse scope of practice and privileges and information about advanced nursing practice roles (practice privileges, prescription authority, dispensing privileges & independent practice privileges).*

**UNENCUMBERED** *means that the nurse has a full and unrestricted license to practice by the state board of nursing.*

| Name on License | Type | License State | License | Active | License Status | License Original Issue Date | License Expiration Date | Compact Status |
|---|---|---|---|---|---|---|---|---|
| LEWIS, MELISSA FRANCINE | PN | KANSAS | 23-42620-041 | YES | UNENCUMBERED (see history) | 03/22/2012 | 04/30/2023 | SINGLE STATE |

**Primary source Boards of Nursing message & notification history**
- This notification was provided by Kansas Board of Nursing: This LPN is IV-Certified by the Kansas State Board of Nursing.

## Where can the nurse practice as an RN and/or PN?

**Authorized to Practice in**

KANSAS (PN)

Non-participating: MI. Non-participating boards of nursing do not submit licensure data to Nursys. Please contact them for authorization to practice details.
APRN authorization to practice details are not available.

**UNENCUMBERED** *means that the nurse has a full and unrestricted license to practice by the state board of nursing.*

**License type information**
- **RN:** Registered Nurse
- **PN:** Practical Nurse (aka Licensed Practical Nurse (LPN), Vocational Nurse (VN), Licensed Vocational Nurse (LVN))
- **CNP:** Certified Nurse Practitioner
- **CNS:** Clinical Nurse Specialist
- **CNM:** Certified Nurse Midwife
- **CRNA:** Certified Registered Nurse Anesthetist

**License status information**
- Unencumbered (full unrestricted license to practice)
- Cease & Desist
- Denial of License
- Expired
- Other license action
- Probation
- Reprimand
- Restriction
- Revoked
- Suspension
- Voluntary agreement to refrain from practice

- Voluntary Surrender

**Nurse Licensure Compact (NLC) information**

- **Multistate licensure privilege:** Authority to practice as a licensed nurse in a remote state under the current license issued by the individual's home state provided both states are party to the Nurse Licensure Compact (NLC) and the privilege is not otherwise restricted.
- **Single state license:** A license issued by a state board of nursing that authorizes practice only in the state of issuance.
- **Privilege to Practice (PTP):** Multistate licensure privilege is the authority under the Nurse Licensure Compact (NLC) to practice nursing in any compact party state that is not the state of licensure. All party states have the authority in accordance with existing state due process law to take actions against the nurse's privilege such as: revocation, suspension, probation or any other action which affects a nurse's authorization to practice.

NCSBN

© 2022 National Council of State Boards of Nursing Inc. All rights reserved.

www.nursys.com

Kansas
Department for Aging
and Disability Services

Survey, Certification and Credentialing Commission

# Nurse Aide Registry Confirmation Notice

certification@kdads.ks.gov - **REGISTRY INQUIRIES ONLY!** FAQS

Pursuant to EO 22-02 and in accordance with KS House Bill 2477, KDADS Certified individuals: Certified Nurse Aide, Certified Medication Aide, and Home Health Aide that were active and in good standing as of January 6, 2022, their certification shall be considered active through January 20, 2023. At which time, all renewal requirements outlined by statue and regulations must be met or their certification will lapse.

**Name:** REBECCA ALISSE MARES **AideID:** 253484
**Other Names:**

| Certification Type | Issued | Expiration | Status | Employment Verification End Date |
|---|---|---|---|---|
| Certified Nurse Aide | 01/23/2021 | | Active | 01/13/2024 |
| Certified Medication Aide | 06/11/2021 | 06/11/2023 | Active | |

**Last Criminal Record Check:** 08/23/2021

**Last Criminal Record Check Requested By**
PINNACLE PARK NRSG & REHAB SALINA
LEGACY AT SALINA
STONEYBROOK RETIREMENT COMMUNITY
MEADOWLARK HILLS

***DISCLAIMER: All information provided on this web page and other associated web pages are made available to provide immediate access for the convenience of interested persons. While we believe the information to be reliable, human or mechanical error remains a possibility, as does delay in the posting or updating of information. Therefore there is no guarantee as to the accuracy, completeness, timeliness, currency, or correct sequencing of the information. Neither this agency, nor any of the sources of the information, shall be responsible for any errors or omissions, or for the use or results obtained from the use of this information.

**Health Occupations, Credentialing**

**503 S Kansas Ave**
**Fax: 785-296-3075** http://www.kdads.ks.gov

Kansas Department for Aging and Disability Services

# Survey, Certification and Credentialing Commission

## Nurse Aide Registry Confirmation Notice

certification@kdads.ks.gov - **REGISTRY INQUIRIES ONLY!** FAQS

Pursuant to EO 22-02 and in accordance with KS House Bill 2477, KDADS Certified individuals: Certified Nurse Aide, Certified Medication Aide, and Home Health Aide that were active and in good standing as of January 6, 2022, their certification shall be considered active through January 20, 2023. At which time, all renewal requirements outlined by statue and regulations must be met or their certification will lapse.

**Name:** SELENA ANDREY HERNANDEZ-VELAZQUEZ **AideID:** 204032
**Other Names:**
SELENA ANDREY HERNANDEZ

| Certification Type | Issued | Expiration | Status | Employment Verification End Date |
|---|---|---|---|---|
| Certified Nurse Aide | 11/08/2013 | | Active | 01/02/2024 |
| Home Health Aide | 05/12/2014 | | Active | 01/02/2024 |
| Certified Medication Aide | 03/16/2020 | 03/16/2022 | Inactive | |

**Last Criminal Record Check:** 06/06/2021

**Last Criminal Record Check Requested By**
EMPORIA PLACE

***DISCLAIMER: All information provided on this web page and other associated web pages are made available to provide immediate access for the convenience of interested persons. While we believe the information to be reliable, human or mechanical error remains a possibility, as does delay in the posting or updating of information. Therefore there is no guarantee as to the accuracy, completeness, timeliness, currency, or correct sequencing of the information. Neither this agency, nor any of the sources of the information, shall be responsible for any errors or omissions, or for the use or results obtained from the use of this information.

**Health Occupations, Credentialing**

**503 S Kansas Ave**
**Fax: 785-296-3075** http://www.kdads.ks.gov

nursys QUICKCONFIRM

# QuickConfirm License Verification Report

Primary Source Boards of Nursing Report Summary for

## TAYLOR GAIL AYESTAS [NCSBN ID: 24282208]

As of Wednesday July 20 2022 02:13:30 PM US Central Time

**Disclaimer of Representations and Warranties**
*Through a written agreement, participating individual state boards of nursing designate Nursys as a primary source equivalent database. NCSBN posts the information in Nursys when, and as, submitted by the individual state boards of nursing. NCSBN may not make any changes to the submitted information and disclaims any responsibility to update or verify such information as it is received from the individual state boards of nursing. Nursys displays the dates on which a board of nursing updated its information in Nursys.*

*This report is not sufficient when applying to another board of nursing for licensure. Use the "Nurse License Verification for Endorsement" service to request the required verification of licensure.*

*Contact the board of nursing for details about the Nurse Practice Act, which includes nurse scope of practice and privileges and information about advanced nursing practice roles (practice privileges, prescription authority, dispensing privileges & independent practice privileges).*

**UNENCUMBERED** *means that the nurse has a full and unrestricted license to practice by the state board of nursing.*

| Name on License | Type | License State | License | Active | License Status | License Original Issue Date | License Expiration Date | Compact Status |
|---|---|---|---|---|---|---|---|---|
| AYESTAS, TAYLOR GAIL | PN | KANSAS | 23-52348-042 | YES | UNENCUMBERED | 06/14/2021 | 04/30/2024 | MULTISTATE |

## Where can the nurse practice as an RN and/or PN?

**Authorized to Practice in**

- ALABAMA (PN)
- ARIZONA (PN)
- ARKANSAS (PN)
- COLORADO (PN)
- DELAWARE (PN)
- FLORIDA (PN)
- GEORGIA (PN)
- GUAM (PN)
- IDAHO (PN)
- INDIANA (PN)
- IOWA (PN)
- KANSAS (PN)
- KENTUCKY (PN)
- LOUISIANA (PN)
- MAINE (PN)
- MARYLAND (PN)
- MISSISSIPPI (PN)
- MISSOURI (PN)
- MONTANA (PN)
- NEBRASKA (PN)
- NEW HAMPSHIRE (PN)
- NEW JERSEY (PN)
- NEW MEXICO (PN)
- NORTH CAROLINA (PN)
- NORTH DAKOTA (PN)
- OKLAHOMA (PN)
- SOUTH CAROLINA (PN)
- SOUTH DAKOTA (PN)
- TENNESSEE (PN)
- TEXAS (PN)
- UTAH (PN)
- VERMONT (PN)
- VIRGINIA (PN)
- WEST VIRGINIA (PN)
- WISCONSIN (PN)
- WYOMING (PN)

Non-participating: MI. Non-participating boards of nursing do not submit licensure data to Nursys. Please contact them for authorization to practice details.
APRN authorization to practice details are not available.

**UNENCUMBERED** *means that the nurse has a full and unrestricted license to practice by the state board of nursing.*

**License type information**
- **RN:** Registered Nurse
- **PN:** Practical Nurse (aka Licensed Practical Nurse (LPN), Vocational Nurse (VN), Licensed Vocational Nurse (LVN))
- **CNP:** Certified Nurse Practitioner
- **CNS:** Clinical Nurse Specialist
- **CNM:** Certified Nurse Midwife
- **CRNA:** Certified Registered Nurse Anesthetist

**License status information**

- Unencumbered (full unrestricted license to practice)
- Cease & Desist
- Denial of License
- Expired
- Other license action
- Probation
- Reprimand
- Restriction
- Revoked
- Suspension
- Voluntary agreement to refrain from practice
- Voluntary Surrender

**Nurse Licensure Compact (NLC) information**

- **Multistate licensure privilege:** Authority to practice as a licensed nurse in a remote state under the current license issued by the individual's home state provided both states are party to the Nurse Licensure Compact (NLC) and the privilege is not otherwise restricted.
- **Single state license:** A license issued by a state board of nursing that authorizes practice only in the state of issuance.
- **Privilege to Practice (PTP):** Multistate licensure privilege is the authority under the Nurse Licensure Compact (NLC) to practice nursing in any compact party state that is not the state of licensure. All party states have the authority in accordance with existing state due process law to take actions against the nurse's privilege such as: revocation, suspension, probation or any other action which affects a nurse's authorization to practice.

NCSBN

© 2022 National Council of State Boards of Nursing Inc. All rights reserved.

www.nursys.com

Nursys QuickConfirm

# QuickConfirm License Verification Report

Primary Source Boards of Nursing Report Summary for

## TYLER ALEXIS LUFHOLM [NCSBN ID: 23053323]

As of Wednesday July 20 2022 02:19:31 PM US Central Time

**Disclaimer of Representations and Warranties**
*Through a written agreement, participating individual state boards of nursing designate Nursys as a primary source equivalent database. NCSBN posts the information in Nursys when, and as, submitted by the individual state boards of nursing. NCSBN may not make any changes to the submitted information and disclaims any responsibility to update or verify such information as it is received from the individual state boards of nursing. Nursys displays the dates on which a board of nursing updated its information in Nursys.*

*This report is not sufficient when applying to another board of nursing for licensure. Use the "Nurse License Verification for Endorsement" service to request the required verification of licensure.*

*Contact the board of nursing for details about the Nurse Practice Act, which includes nurse scope of practice and privileges and information about advanced nursing practice roles (practice privileges, prescription authority, dispensing privileges & independent practice privileges).*

**UNENCUMBERED** *means that the nurse has a full and unrestricted license to practice by the state board of nursing.*

| Name on License | Type | License State | License | Active | License Status | License Original Issue Date | License Expiration Date | Compact Status |
|---|---|---|---|---|---|---|---|---|
| LUFHOLM, TYLER ALEXIS | RN | KANSAS | 13-133992-071 | YES | UNENCUMBERED | 12/21/2015 | 07/31/2023 | SINGLE STATE |

| Name on License | Type | License State | License | Active | License Status | License Original Issue Date | License Expiration Date | Compact Status |
|---|---|---|---|---|---|---|---|---|
| LUFHOLM, TYLER ALEXIS | CERTIFIED NURSE PRACTITIONER | KANSAS | 53-79915-071 | YES | UNENCUMBERED | 01/19/2021 | 07/31/2023 | N/A |

**Advanced Practice license/recognition information**
- Focus/Specialty: Family
- Prescription authority: NOT SUPPLIED
- Certification expiration date: NOT SUPPLIED
- Focus/Specialty expiration date: 07/31/2023

| Name on License | Type | License State | License | Active | License Status | License Original Issue Date | License Expiration Date | Compact Status |
|---|---|---|---|---|---|---|---|---|
| BESSEY, TYLER ALEXIS | RN | MISSOURI | 2017002793 | YES | UNENCUMBERED | 01/31/2017 | 04/30/2023 | SINGLE STATE |

| Name on License | Type | License State | License | Active | License Status | License Original Issue Date | License Expiration Date | Compact Status |
|---|---|---|---|---|---|---|---|---|
| BESSEY, TYLER ALEXIS | CERTIFIED NURSE PRACTITIONER | MISSOURI | 2021004756 | YES | UNENCUMBERED | 02/05/2021 | 04/30/2023 | N/A |

**Advanced Practice license/recognition information**

- Focus/Specialty: Family/individual across the lifespan
- Prescription authority: YES
- Certification expiration date: NOT SUPPLIED
- Focus/Specialty expiration date: 04/30/2023

## Where can the nurse practice as an RN and/or PN?

**Authorized to Practice in**

KANSAS (RN) MISSOURI (RN)

Non-participating: MI. Non-participating boards of nursing do not submit licensure data to Nursys. Please contact them for authorization to practice details.
APRN authorization to practice details are not available.

**UNENCUMBERED** *means that the nurse has a full and unrestricted license to practice by the state board of nursing.*

**License type information**

- **RN:** Registered Nurse
- **PN:** Practical Nurse (aka Licensed Practical Nurse (LPN), Vocational Nurse (VN), Licensed Vocational Nurse (LVN))
- **CNP:** Certified Nurse Practitioner
- **CNS:** Clinical Nurse Specialist
- **CNM:** Certified Nurse Midwife
- **CRNA:** Certified Registered Nurse Anesthetist

**License status information**

- Unencumbered (full unrestricted license to practice)
- Cease & Desist
- Denial of License
- Expired
- Other license action
- Probation
- Reprimand
- Restriction
- Revoked
- Suspension
- Voluntary agreement to refrain from practice
- Voluntary Surrender

**Nurse Licensure Compact (NLC) information**

- **Multistate licensure privilege:** Authority to practice as a licensed nurse in a remote state under the current license issued by the individual's home state provided both states are party to the Nurse Licensure Compact (NLC) and the privilege is not otherwise restricted.
- **Single state license:** A license issued by a state board of nursing that authorizes practice only in the state of issuance.
- **Privilege to Practice (PTP):** Multistate licensure privilege is the authority under the Nurse Licensure Compact (NLC) to practice nursing in any compact party state that is not the state of licensure. All party states have the authority in accordance with existing state due process law to take actions against the nurse's privilege such as: revocation, suspension, probation or any other action which affects a nurse's authorization to practice.

NCSBN

© 2022 National Council of State Boards of Nursing Inc. All rights reserved.

www.nursys.com

THE NATIONAL BOARD
OF SURGICAL TECHNOLOGY
AND SURGICAL ASSISTING

January 21, 2022

To Whom It May Concern:

Your request for information on the certification status of the following person has been received.

Current records to date indicate:

| | |
|---|---|
| **Name:** | **Allison N. Hux** |
| **Certification Type:** | **CST** |
| **Certification Number:** | **188675** |
| **Date Originally Certified:** | **04/25/2019** |
| **Current Cycle:** | **04/25/2019** |
| **Certification Current Until:** | **04/25/2023** |

All Surgical Technologists and Surgical First Assistants who are certified receive a certificate and certification card reflecting their certification number and expiration date. If the Certified Surgical Technologist (CST) or Certified Surgical First Assistant (CSFA) at your hospital does not have a certification document bearing the National Board of Surgical Technologist and Surgical Assisting (NBSTSA) logo, they should contact our office for information on receiving a replacement certification card or certificate. Certification should not be confused with membership in the Association of Surgical Technologists (AST).

Sincerely,

Deborah L Penrose

Digitally signed by Deborah L Penrose
Date: 2018.06.11 16:09:52 -06'00'

NATIONAL BOARD OF SURGICAL TECHNOLOGY AND SURGICAL ASSISTING CORPORATE SEAL COLORADO

NATIONAL BOARD OF SURGICAL TECHNOLOGY AND SURGICAL ASSISTING OFFICIAL CERTIFICATION VERIFICATION

PHONE 1-800-707-0057 FAX 303-325-2536
3 WEST DRY CREEK CIRCLE, LITTLETON, COLORADO 80120
WWW.NBSTSA.ORG

UNOFFICIAL COPY UNOFFICIAL

Certification Number

188675

THE NATIONAL BOARD
OF SURGICAL TECHNOLOGY
AND SURGICAL ASSISTING

# National Certification as a Surgical Technologist

## *Allison N. Hux, CST*

Having successfully fulfilled all requirements for certification as a Surgical Technologist:

Is hereby authorized as of 04/25/2019 by the National Board of Surgical Technology and Surgical Assisting, to use the title of Certified Surgical Technologist® (CST®) through 04/25/2023

NCCA

Grant Wilson
President, NBSTSA

Ben Price
CEO, NBSTSA

UNOFFICIAL COPY UNOFFICIAL

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Aug-16-2021 | 26911 |

| Bill To | Ship To |
|---|---|
| Advanced Dermatology and Skin Center, PA<br>Attn: Accounts Payable/Elizabeth Robledo<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Advanced Dermatology and Skin Center, PA<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA |

| PO Number | Terms | Due Date |
|---|---|---|
| 08162021 | Net 60 | 10/15/2021 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 50 | ART0015 | 15mm Artacent Wound Donor#: T2012-007 TID: T2012-007-023; T2012-007-024; T2012-007-025; T2012-007-019; T2012-007-020; T2012-007-021; T2012-007-022; ExpDate: Jun 10, 2026 Donor#: T2011-073 TID: T2011-073-019; T2011-073-020; T2011-073-021; T2011-073-022; T2011-073-023; T2011-073-024; T2011-073-025; T2011-073-026; T2011-073-027; T2011-073-028; T2011-073-029; T2011-073-030; T2011-073-031; T2011-073-032; T2011-073-033; T2011-073-034; T2011-073-035; T2011-073-036; T2011-073-037; ExpDate: Jun 3, 2026 Donor#: T2011-098 TID: T2011-098-011; T2011-098-012; T2011-098-013; T2011-098-014; T2011-098-015; T2011-098-016; T2011-098-017; T2011-098-018; T2011-098-019; T2011-098-020; T2011-098-021; T2011-098-022; T2011-098-023; T2011-098-024; T2011-098-025; T2011-098-026; T2011-098-027; T2011-098-028; T2011-098-029; T2011-098-030; T2011-098-031; T2011-098-032; T2011-098-033; T2011-098-034; ExpDate: Jun 9, 2026 | $513.00 | $25,650.00 Tax |
| 1 | Shipping | Shipping Charges Tracking: 774548794778 | $0.00<br>0.00% | $0.00 Tax |

| | |
|---|---|
| **Total** | $25,650.00 |
| **Payments/Credits** | ($25,650.00) |
| **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Dec-02-2021 | I-99639 |

| Bill To | Ship To |
|---|---|
| Advanced Dermatology - Manhattan<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Advanced Dermatology and Skin Center, PA<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 02DEC2021 | Due on receipt | 12/2/2021 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 6 | ART0202 | 2x2cm Artacent Wound TID: T2102-083-014, T2102-083-015, T2102-083-016, T2102-083-017, T2102-083-018, T2102-083-019; ExpDate: Oct 11, 2026; Purchase Date: Dec 2, 2021 | $1,026.00 | $6,156.00 Tax |
| 6 | ART0202 | 2x2cm Artacent Wound TID: T2102-084-001, T2102-084-002, T2102-084-003, T2102-084-004, T2102-084-005, T2102-084-006; ExpDate: Oct 11, 2026; Purchase Date: Dec 2, 2021 | $1,026.00 | $6,156.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2102-086-001, T2102-086-003, T2102-086-002; ExpDate: Oct 12, 2026; Purchase Date: Dec 2, 2021 | $1,026.00 | $3,078.00 Tax |
| 10 | ART0202 | 2x2cm Artacent Wound TID: T2102-085-001, T2102-085-002, T2102-085-003, T2102-085-004, T2102-085-005, T2102-085-006, T2102-085-007, T2102-085-008, T2102-085-009, T2102-085-010; ExpDate: Oct 12, 2026; Purchase Date: Dec 2, 2021 | $1,026.00 | $10,260.00 Tax |
| | | | 0.00% | |

| | |
|---|---|
| **Total** | $25,650.00 |
| **Payments/Credits** | ($25,650.00) |
| **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Dec-14-2021 | I-99860 |

| Bill To | Ship To |
|---|---|
| Advanced Dermatology and Skin Center, PA<br>Attn: Accounts Payable/Elizabeth Robledo<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Advanced Dermatology and Skin Center, PA<br>2509 W. 18th Avenue<br>Emporia, KS 66801<br>USA |

| PO Number | Terms | Due Date |
|---|---|---|
| CNO10028683 | Net 60 | 2/12/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | ART0404 | 4x4cm Artacent Wound TID: T2103-036-009; ExpDate: Oct 25, 2026; Purchase Date: Dec 7, 2021 | $2,245.50<br><br>0.00% | $2,245.50 Tax |

| | |
|---|---|
| **Total** | $2,245.50 |
| **Payments/Credits** | ($2,245.50<br>) |
| **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Apr-04-2022 | I-102190 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 412022 | Net 60 | 6/3/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 7 | ART0202 | 2x2cm Artacent Wound TID: T2103-100-001, T2103-100-002, T2103-100-003, T2103-100-004, T2103-100-005, T2103-100-006, T2103-100-007; ExpDate: Dec 28, 2026; Purchase Date: Apr 1, 2022 | $1,140.00 | $7,980.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2104-095-001, T2104-095-002, T2104-095-003; ExpDate: Dec 28, 2026; Purchase Date: Apr 1, 2022 | $1,140.00 | $3,420.00 Tax |
| | | | 0.00% | |
| | | **Total** | | $11,400.00 |
| | | **Payments/Credits** | | ($11,400.00) |
| | | **Balance Due** | | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Apr-08-2022 | I-102373 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 4082022 | Net 60 | 6/7/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | ART0202 | 2x2cm Artacent Wound TID: T2105-013-005; ExpDate: Dec 29, 2026; Purchase Date: Apr 8, 2022 | $1,026.00 | $1,026.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2105-014-001, T2105-014-002, T2105-014-003, T2105-014-004; ExpDate: Dec 29, 2026; Purchase Date: Apr 8, 2022 | $1,026.00 | $4,104.00 Tax |
| | | | 0.00% | |

| | |
|---|---|
| **Total** | $5,130.00 |
| **Payments/Credits** | ($5,130.00<br>) |
| **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Apr-18-2022 | I-102571 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 4182022 | Net 60 | 6/17/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2104-071-003, T2104-071-004; ExpDate: Dec 14, 2026; Purchase Date: Apr 18, 2022 | $1,026.00 | $2,052.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2104-073-001, T2104-073-002, T2104-073-003, T2104-073-004; ExpDate: Dec 14, 2026; Purchase Date: Apr 18, 2022 | $1,026.00 | $4,104.00 Tax |
| 1 | ART0202 | 2x2cm Artacent Wound TID: T2104-074-001; ExpDate: Dec 14, 2026; Purchase Date: Apr 18, 2022 | $1,026.00 | $1,026.00 Tax |
| | | | 0.00% | |

| | |
|---|---|
| **Total** | $7,182.00 |
| **Payments/Credits** | ($7,182.00 ) |
| **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Apr-21-2022 | I-102698 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 21APR2022 | Net 60 | 6/20/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 7 | ART0202 | 2x2cm Artacent Wound TID: T2106-005-001, T2106-005-002, T2106-005-003, T2106-005-004, T2106-005-005, T2106-005-006, T2106-005-007; ExpDate: Jan 10, 2027; Purchase Date: Apr 21, 2022 | $1,026.00<br>0.00% | $7,182.00 Tax |

| | |
|---|---|
| **Total** | $7,182.00 |
| **Payments/Credits** | ($7,182.00<br>) |
| **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Apr-27-2022 | I-102809 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 25APR2022 | Net 60 | 6/26/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 10 | ART0202 | 2x2cm Artacent Wound TID: T2105-059-001, T2105-059-002, T2105-059-003, T2105-059-004, T2105-059-005, T2105-059-006, T2105-059-007, T2105-059-008, T2105-059-009, T2105-059-010; ExpDate: Jan 11, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $10,260.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2105-059-011, T2105-059-012; ExpDate: Jan 11, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $2,052.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2105-065-004, T2105-065-005, T2105-065-007, T2105-065-008; ExpDate: Jan 12, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $4,104.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2105-073-001, T2105-073-002, T2105-073-003, T2105-073-004; ExpDate: Jan 13, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $4,104.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2105-073-005, T2105-073-006; ExpDate: Jan 13, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $2,052.00 Tax |
| 6 | ART0202 | 2x2cm Artacent Wound TID: T2105-078-006, T2105-078-007, T2105-078-008, T2105-078-009, T2105-078-010, T2105-078-011; ExpDate: Jan 17, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $6,156.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2105-079-001, T2105-079-002; ExpDate: Jan 17, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $2,052.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2105-079-003, T2105-079-004, T2105-079-005, T2105-079-006; ExpDate: Jan 17, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $4,104.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2105-087-001, T2105-087-002, T2105-087-003, T2105-087-004; ExpDate: Jan 17, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $4,104.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2105-096-001, T2105-096-002; ExpDate: Jan 17, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $2,052.00 Tax |
| 10 | ART0015 | 15mm Artacent Wound TID: T2106-046-022, T2106-046-023, T2106-046-024, T2106-046-025, T2106-046-026, T2106-046-027, T2106-046-028, T2106-046-029, T2106-046-030, T2106-046-031; ExpDate: Feb 2, 2027; Purchase Date: Apr 25, 2022 | $513.00 | $5,130.00 Tax |
| | | | 0.00% | |

Total

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Apr-27-2022 | I-102809 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 25APR2022 | Net 60 | 6/26/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| | | | Total | $46,170.00 |
| | | | Payments/Credits | ($46,170.00) |
| | | | **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| May-20-2022 | I-103476 |

| Bill To |
|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA |

| Ship To |
|---|
| Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 20MAY2022 | Net 60 | 7/19/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 10 | ART0202 | 2x2cm Artacent Wound TID: T2107-086-001, T2107-086-002, T2107-086-003, T2107-086-005, T2107-086-006, T2107-086-007, T2107-086-008, T2107-086-009, T2107-086-010, T2107-086-011; ExpDate: Mar 9, 2027; Purchase Date: May 20, 2022 | $1,026.00 | $10,260.00 Tax |
| 5 | ART0015 | 15mm Artacent Wound TID: T2106-061-030, T2106-061-031, T2106-061-032, T2106-061-033, T2106-061-034; ExpDate: Feb 8, 2027; Purchase Date: May 20, 2022 | $513.00 | $2,565.00 Tax |
| | | | 0.00% | |

| | |
|---|---|
| **Total** | $12,825.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $12,825.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Jun-23-2022 | I-104367 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 13JUN2022 | Net 60 | 8/22/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | ART0015 | 15mm Artacent Wound TID: T2105-055-017; ExpDate: Jan 4, 2027; Purchase Date: Jun 13, 2022 | $513.00 | $513.00 Tax |
| 2 | ART0015 | 15mm Artacent Wound TID: T2107-018-021, T2107-018-022; ExpDate: Feb 21, 2027; Purchase Date: Jun 13, 2022 | $513.00 | $1,026.00 Tax |
| 7 | ART0015 | 15mm Artacent Wound TID: T2107-022-007, T2107-022-008, T2107-022-009, T2107-022-010, T2107-022-011, T2107-022-012, T2107-022-013; ExpDate: Feb 22, 2027; Purchase Date: Jun 13, 2022 | $513.00 | $3,591.00 Tax |
| 5 | ART0015 | 15mm Artacent Wound TID: T2107-022-014, T2107-022-015, T2107-022-016, T2107-022-017, T2107-022-018; ExpDate: Feb 22, 2027; Purchase Date: Jun 13, 2022 | $513.00 | $2,565.00 Tax |
| 1 | ART0202 | 2x2cm Artacent Wound TID: T2108-035-002; ExpDate: Mar 24, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $1,026.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2108-050-001, T2108-050-002, T2108-050-003; ExpDate: Mar 28, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $3,078.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2108-055-001, T2108-055-002, T2108-055-003, T2108-055-004; ExpDate: Mar 29, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $4,104.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2108-060-001, T2108-060-002; ExpDate: Mar 29, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $2,052.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2108-062-001, T2108-062-002; ExpDate: Mar 29, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $2,052.00 Tax |
| 5 | ART0202 | 2x2cm Artacent Wound TID: T2108-060-003, T2108-060-004, T2108-060-005, T2108-060-006, T2108-060-007; ExpDate: Mar 29, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $5,130.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2108-051-001, T2108-051-002, T2108-051-003; ExpDate: Mar 30, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $3,078.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2108-058-001, T2108-058-003, T2108-058-002; ExpDate: Mar 30, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $3,078.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2108-054-001, T2108-054-002; ExpDate: Mar 31, 2027; Purchase Date: Jun | $1,026.00 | $2,052.00 Tax |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Jun-23-2022 | I-104367 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 13JUN2022 | Net 60 | 8/22/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| | | 13, 2022 | | |
| 5 | ART0202 | 2x2cm Artacent Wound TID: T2108-051-004, T2108-051-005, T2108-051-006, T2108-051-007, T2108-051-008; ExpDate: Mar 30, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $5,130.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2108-054-003, T2108-054-004; ExpDate: Mar 31, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $2,052.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2108-056-001, T2108-056-002, T2108-056-003; ExpDate: Mar 31, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $3,078.00 Tax |
| | | | 0.00% | |

| | |
|---|---|
| **Total** | $43,605.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $43,605.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Jun-23-2022 | I-104368 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 10JUN2022RA | Net 60 | 8/22/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | ACA0202 | 2x2cm Artacent AC TID: T2107-059-005; ExpDate: Mar 2, 2027; Purchase Date: Jun 10, 2022; NOTE: Artacent AC Trial Application; Q4190 | $1,786.00<br>0.00% | $1,786.00 Tax |

| | |
|---|---|
| **Total** | $1,786.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $1,786.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Jul-07-2022 | I-104812 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 07JUL2022 | Net 60 | 9/5/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 5 | ART0015 | 15mm Artacent Wound TID: T2107-084-008, T2107-084-009, T2107-084-010, T2107-084-011, T2107-084-012; ExpDate: Mar 9, 2027; Purchase Date: Jul 7, 2022 | $513.00 | $2,565.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2110-010-003, T2110-010-004, T2110-010-005; ExpDate: Apr 28, 2027; Purchase Date: Jul 7, 2022 | $1,026.00 | $3,078.00 Tax |
| 7 | ART0202 | 2x2cm Artacent Wound TID: T2110-012-001, T2110-012-002, T2110-012-003, T2110-012-004, T2110-012-005, T2110-012-006, T2110-012-007; ExpDate: Apr 28, 2027; Purchase Date: Jul 7, 2022 | $1,026.00 | $7,182.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2110-085-001, T2110-085-002, T2110-085-003, T2110-085-004; ExpDate: May 11, 2027; Purchase Date: Jul 7, 2022 | $1,026.00 | $4,104.00 Tax |
| 1 | ART0202 | 2x2cm Artacent Wound TID: T2110-086-001; ExpDate: May 11, 2027; Purchase Date: Jul 7, 2022 | $1,026.00 | $1,026.00 Tax |
| | | | 0.00% | |

| | |
|---|---|
| **Total** | $17,955.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $17,955.00 |

Pd ck #010080
6/7/22

KCI
The Clinical Advantage®

Phone: 1-800-275-4524
Fax: 210-406-4703
TAX ID: 74-2152396
www.kci1.com

**BILL TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN KS 66502-7482

**SHIP TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN KS 66502-7482

INVOICE # : 31005879
INVOICE DATE : 13-APR-22
REFERENCE :
DELIVERY : 195908148
ACCOUNT : 4765259
Page 1 of 1

| Purchase Order Number | Terms | Due Date |
|---|---|---|
| 4122022 | 30 NET | 13-MAY-22 |

* P indicates Partial Bill, D indicates Discharge Bill

| Product Billed | Serial Number | Order Number | Patient Last, First Name/Location/Patient # | Ship Date | * | QTY | UOM | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|---|
| SNPA125USSNAP CARTRIDGE 125MMHG W/RESET, US | | G26448690 | STOCK, STOCK | 04/13/22 | | 2 | EA | 165.17 | 330.34 |
| SNPA125US/10Snap Cartridge 125mmHg w/Reset, US, 10 Pack | | G26448690 | STOCK, STOCK | 04/13/22 | | 1 | C10 | 1,501.50 | 1,501.50 |
| SKTF10X10/10Snap Wound Care Dressing Kit 10X10, 10 Pack | | G26448690 | STOCK, STOCK | 04/13/22 | | 1 | C10 | 552.75 | 552.75 |

**NOTICE:** This invoice may reflect a discount, rebate or other reduction of regular price. Please refer to the terms of your contract, pricing acknowledgment and/or rebate/expense cap program documentation for information on specific discounts or reductions of regular price, including list price, rebate and expense cap calculations. You will receive a report detailing any rebate or expense cap payments. Federal and State laws may require you to report these discounts, rebates or other reductions when submitting a claim to a Federal or State program, including Medicare and Medicaid. You also may be required to furnish this invoice and documentation of the discount, rebate or other reduction in price.

**FOR INQUIRIES AND COMMENTS CONCERNING THIS INVOICE PLEASE CONTACT Blake Wiltshire Sanarrusia AT 1-800-275-4524 EXT. 43136**

Account Representative: JONES, OLIVER

REMIT TO: KCI USA PO BOX 301557
DALLAS, TX 75303-1557

| | |
|---|---|
| SUBTOTAL | 2,384.59 |
| TAX | 216.60 |
| FREIGHT | 35.54 |
| TOTAL | 2,636.73 |

VOL. IV

1013

A 1.5% PER MONTH FINANCE CHARGE WILL BE CHARGED FOR ALL PAST DUE INVOICES. CUSTOMER AGREES TO PAY ANY AND ALL AMOUNTS INCURRED IN THE COLLECTION OF AMOUNTS DUE, INCLUDING BUT NOT LIMITED TO, COLLECTION ... EY'S FEES.



Please submit invoice disputes v... 0 days.

KCI
The Clinical Advantage

Phone: 1-800-275-4524
Fax: 1-210-406-4703
Tax ID: 74-2152396
www.kci1.com

**BILL TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN, KS 66502-7482

**SHIP TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN KS 66502-7482

INVOICE #: 31137309
INVOICE DATE: 6/14/22
REFERENCE:
DELIVERY #:
ACCOUNT: 4765259-1
Page 1

| Purchase Order Number | Terms | Due Date | Requestor Name/Department/Phone Number |
|---|---|---|---|
| 6142022 | 30 NET | 7/14/22 | |

* P Indicates Partial Bill, D Indicated Discharge Bill

| Product Billed | Serial Number | Order Number | Patient Last, First Name/Location/Patient # | Ship/Rental Date | * | QTY | UOM | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|---|
| SKTF15X15.S SNAP WOUND CARE DRESSING KIT 15 X 15 | | 26594407 | / / STOCK, STOCK | 06/14/22 | | 6.00 | EACH | 47.52 | 285.12 |
| SNPA125US.S SNAP CARTRIDGE 125MMHG W/RESET, US | | 26594407 | / / STOCK, STOCK | 06/14/22 | | 8.00 | EACH | 126.5 | 1012 |
| FRTHERO1.S FRTHERO1 | | 26594407 | / / STOCK, STOCK | 06/14/22 | | 1.00 | EACH | 16.02 | 16.02 |

NOTICE: This invoice may reflect a discount, rebate or other reduction of regular price. Please refer to the terms of your contract, pricing acknowledgment and/or rebate/expense cap program documenation for information on special discounts or reductions of regular price, including list price, rebate and expense cap calculations. You will receive a report detailing any rebate or expense cap payments. Federal and State laws may require you to report these discounts, rebates or other reductions when submitting a claim to a Federal or State program, including Medicare and Medicaid. You also may be required to furnish this invoice and documentation of the discount, rebate or other reduction in price.

FOR INQUIRIES AND COMMENTS CONCERNING THIS INVOICE PLEASE CONTACT Alejandra Alvarado Montoya AT 1-800-275-4524 EXT. 43134

Account Representative: JONES, OLIVER **Please submit invoice disputes withing 30 days from date of invoice.**

**REMIT: KCI USA PO BOX 301557**
**DALLAS, TX 75303-1557**

| | |
|---|---|
| SUBTOTAL | 1313.14 |
| TAX | 117.52 |
| FREIGHT | 0 |
| TOTAL | $1,430.66 |

A 1.5% PER MONTH FINANCE CHARGE WILL BE CHARGED FOR ALL PAST DUE INVOICES. CUSTOMER AGREES TO PAY ANY AND ALL AMOUNTS INCURRED IN THE COLLECTION OF THE AMOUNTS DUE, INCLUDING BUT NOT LIMITED TO, COLLECTION COSTS, COURT COSTS AND REASONABLE ATTORNEY'S FEES.

KCI
The Clinical Advantage

Phone: 1-800-275-4524
Fax: 1-210-406-4703
Tax ID: 74-2152396
www.kci1.com

**BILL TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN, KS 66502-7482

**SHIP TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN KS 66502-7482

INVOICE #: 31150236
INVOICE DATE: 6/21/22
REFERENCE:
DELIVERY #:
ACCOUNT: 4765259-1
Page 1

| Purchase Order Number | Terms | Due Date | Requestor Name/Department/Phone Number |
|---|---|---|---|
| 6212022 | 30 NET | 7/21/22 | |

* P Indicates Partial Bill, D Indicated Discharge Bill

| Product Billed | Serial Number | Order Number | Patient Last, First Name/Location/Patient # | Ship/Rental Date | * | QTY | UOM | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|---|
| SNPA125PLUS.S SNAP PLUS CARTRIDGE (125MMHG), US | | 26612175 | / / STOCK, STOCK | 06/21/22 | | 3.00 | EACH | 203.5 | 610.5 |
| FRTHERO1.S FRTHERO1 | | 26612175 | / / STOCK, STOCK | 06/21/22 | | 1.00 | EACH | 32.09 | 32.09 |

NOTICE: This invoice may reflect a discount, rebate or other reduction of regular price. Please refer to the terms of your contract, pricing acknowledgment and/or rebate/expense cap program documenation for information on special discounts or reductions of regular price, including list price, rebate and expense cap calculations. You will receive a report detailing any rebate or expense cap payments. Federal and State laws may require you to report these discounts, rebates or other reductions when submitting a claim to a Federal or State program, including Medicare and Medicaid. You also may be required to furnish this invoice and documentation of the discount, rebate or other reduction in price.

FOR INQUIRIES AND COMMENTS CONCERNING THIS INVOICE PLEASE CONTACT Alejandra Alvarado Montoya AT 1-800-275-4524 EXT. 43134

Account Representative: JONES, OLIVER **Please submit invoice disputes withing 30 days from date of invoice.**

**REMIT: KCI USA PO BOX 301557**
**DALLAS, TX 75303-1557**

| | |
|---|---|
| SUBTOTAL | 642.59 |
| TAX | 57.51 |
| FREIGHT | 0 |
| TOTAL | $700.10 |

A 1.5% PER MONTH FINANCE CHARGE WILL BE CHARGED FOR ALL PAST DUE INVOICES. CUSTOMER AGREES TO PAY ANY AND ALL AMOUNTS INCURRED IN THE COLLECTION OF THE AMOUNTS DUE, INCLUDING BUT NOT LIMITED TO, COLLECTION COSTS, COURT COSTS AND REASONABLE ATTORNEY'S FEES.

KCI
The Clinical Advantage

Phone: 1-800-275-4524
Fax: 1-210-406-4703
Tax ID: 74-2152396
www.kci1.com

**BILL TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN, KS 66502-7482

**SHIP TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN KS 66502-7482

INVOICE #: 31187398
INVOICE DATE: 7/7/22
REFERENCE:
DELIVERY #:
ACCOUNT: 4765259-1
Page 1

| Purchase Order Number | Terms | Due Date | Requestor Name/Department/Phone Number |
|---|---|---|---|
| 772022 | 30 NET | 8/6/22 | |

* P Indicates Partial Bill, D Indicated Discharge Bill

| Product Billed | Serial Number | Order Number | Patient Last, First Name/Location/Patient # | Ship/Rental Date | * | QTY | UOM | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|---|
| SNPA125PLUS.S SNAP PLUS CARTRIDGE (125MMHG), US | | 26648926 | / / STOCK, STOCK | 07/07/22 | | 4.00 | EACH | 203.5 | 814 |
| FRTHERO1.S FRTHERO1 | | 26648926 | / / STOCK, STOCK | 07/07/22 | | 1.00 | EACH | 53.48 | 53.48 |

NOTICE: This invoice may reflect a discount, rebate or other reduction of regular price. Please refer to the terms of your contract, pricing acknowledgment and/or rebate/expense cap program documenation for information on special discounts or reductions of regular price, including list price, rebate and expense cap calculations. You will receive a report detailing any rebate or expense cap payments. Federal and State laws may require you to report these discounts, rebates or other reductions when submitting a claim to a Federal or State program, including Medicare and Medicaid. You also may be required to furnish this invoice and documentation of the discount, rebate or other reduction in price.

FOR INQUIRIES AND COMMENTS CONCERNING THIS INVOICE PLEASE CONTACT Alejandra Alvarado Montoya AT 1-800-275-4524 EXT. 43134

Account Representative: JONES, OLIVER

**Please submit invoice disputes withing 30 days from date of invoice.**

**REMIT: KCI USA PO BOX 301557**
**DALLAS, TX 75303-1557**

| | |
|---|---|
| SUBTOTAL | 867.48 |
| TAX | 77.64 |
| FREIGHT | 0 |
| TOTAL | $945.12 |

A 1.5% PER MONTH FINANCE CHARGE WILL BE CHARGED FOR ALL PAST DUE INVOICES. CUSTOMER AGREES TO PAY ANY AND ALL AMOUNTS INCURRED IN THE COLLECTION OF THE AMOUNTS DUE, INCLUDING BUT NOT LIMITED TO, COLLECTION COSTS, COURT COSTS AND REASONABLE ATTORNEY'S FEES.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 3

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **58272375** | **Invoice Number** | **37950145** |
| **Sales Order Date** | **01/24/2022** | **Invoice Date** | **01/24/2022** |
| **PO Number** | **01242022EMP** | **Payment Due Date** | **03/25/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$2,419.70** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 1 | 3 | PK | 3 | 7.70 | 23.10 | 1.96 | |
| | Tracking # 1Z2R57A30365344499 Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 68107 | Vendor: MGM16 Vend Cat#: 25-515 | DRAPE, LINED POLY STR WHT NONF PO LN 5 | 1 | CS | 1 | 128.83 | 128.83 | 10.95 | |
| | Tracking # 1Z2R57A30365344097 Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 1031795 | Vendor: MGM16 Vend Cat#: 16-N251 | NEEDLE, HYPO TW 25GX1" (100/BX PO LN 9 | 1 | CS | 1 | 84.55 | 84.55 | 7.19 | |
| | Tracking # 1Z2R57A30365343721 Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 487480 | Vendor: MGM43 Vend Cat#: 43-2-231 | SCISSOR, LISTER BANDAGE OG 5 1 PO LN 14 | 8 | EA | 8 | 9.03 | 72.24 | 6.14 | |
| | Tracking # 1Z2R57A30365344499 | | | | | | | | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **37950145** | **Date** | **01/24/2022** |
| | **Terms** | | **AR NET 60** |
| **Pay This Amount Before** | **03/25/2022** | | **$2,419.70** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 37950145 | PO Number 01242022EMP | Invoice Date 01/24/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 774188 | Vendor: AME3M<br>Vend Cat#: 2770-1 | TAPE, SILICONE KIND REMOVAL 1"<br>PO LN 15 | 2 | BX | 2 | 47.12 | 94.24 | 8.01 | |
| | Tracking # 1Z2R57A30365344499 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 555783 | Vendor: MOLYCK<br>Vend Cat#: 295300 | DRESSING, MEPILEX 4"X4" (5/BX<br>PO LN 17 | 4 | BX | 4 | 36.53 | 146.12 | 12.42 | |
| | Tracking # 1Z2R57A30365344499 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 1040600 | Vendor: MGM16<br>Vend Cat#: 165-MF250 | TOWEL, MULTI-FOLD 1PLY WHT 9.0<br>PO LN 18 | 1 | CS | 1 | 27.45 | 27.45 | 2.33 | |
| | Tracking # 1Z2R57A30365344104 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 1031788 | Vendor: MGM16<br>Vend Cat#: 16-N181 | NEEDLE, HYPO TW 18GX1" (100/BX<br>PO LN 19 | 1 | CS | 1 | 45.08 | 45.08 | 3.83 | |
| | Tracking # 1Z2R57A30365343721 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 960944 | Vendor: MGM16<br>Vend Cat#: 16-6424 | POUCH, SELF SEAL ECON 5.25X10<br>PO LN 21 | 1 | CS | 1 | 245.54 | 245.54 | 20.87 | |
| | Tracking # 1Z2R57A30365344113 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 960945 | Vendor: MGM16<br>Vend Cat#: 16-6425 | POUCH, SELF SEAL ECON 7.5X13 (<br>PO LN 22 | 3 | BX | 3 | 43.37 | 130.11 | 11.06 | |
| | Tracking # 1Z2R57A30365344499 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 960944 | Vendor: MGM16<br>Vend Cat#: 16-6424 | POUCH, SELF SEAL ECON 5.25X10<br>PO LN 23 | 3 | BX | 3 | 24.55 | 73.65 | 6.26 | |
| | Tracking # 1Z2R57A30365344499 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 1114380 | Vendor: MOLYCK<br>Vend Cat#: 595300 | DRESSING, BORDER MEPILEX FLEX<br>PO LN 27 | 4 | BX | 4 | 32.05 | 128.20 | 10.90 | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

**Invoice Number 37950145** | **PO Number 01242022EMP** | **Invoice Date 01/24/2022**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Tracking # 1Z2R57A30365344499<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 403360 | Vendor: ETHSPC<br>Vend Cat#: 1972 | SPONGE, GELATIN SURGIFOAM 2CMX<br>PO LN 30 | 8 | EA | 8 | 7.45 | 59.60 | 5.07 | |
| | Tracking # 1Z2R57A30365344499<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 487433 | Vendor: MGM43<br>Vend Cat#: 43-1-776 | FORCEP, ADSON TISS SG DEL 1X2T<br>PO LN 36 | 16 | EA | 16 | 38.13 | 610.08 | 51.86 | |
| | Tracking # 1Z2R57A30365344499<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 725645 | Vendor: AMREGT<br>Vend Cat#: & 00517072001 | BETAMETHASONE SOD PHOS/ACE, MD<br>PO LN 41 | 6 | EA | 6 | 40.13 | 240.78 | .00 | |
| | Tracking # 1Z2R57A30365344499<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 927287 | Vendor: 9FERN<br>Vend Cat#: 00496052306 | BANDAGE, LIQ ADH MASTISOL 2OZ<br>PO LN 42 | 4 | EA | 4 | 34.52 | 138.08 | 11.74 | |
| | Tracking # 1Z2R57A30365344499<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| | | FUEL SURCHARGE<br>PO LN 43 | 1 | EA | 1 | 1.35 | 1.35 | .11 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $130.54 | $20.08 | $20.08 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $2,249.00 | $0.00 | $170.70 | $2,419.70 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1 RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **58272375** | **Invoice Number** | **37953012** |
| **Sales Order Date** | **01/24/2022** | **Invoice Date** | **01/24/2022** |
| **PO Number** | **01242022EMP** | **Payment Due Date** | **03/25/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$58.48** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 1 | 7 | PK | 7 | 7.70 | 53.90 | 4.58 | |

Shipped: 01/24/2022 From: Dallas Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $3.50 | $0.54 | $0.54 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $53.90 | $0.00 | $4.58 | $58.48 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **37953012** | **Date** | **01/24/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **03/25/2022** | | **$58.48** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

 RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **59185590** | **Invoice Number** | **38454548** |
| **Sales Order Date** | **02/03/2022** | **Invoice Date** | **02/03/2022** |
| **PO Number** | **Kylie** | **Payment Due Date** | **04/04/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$3,589.09** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 1031795 | Vendor: MGM16 Vend Cat#: 16-N251 | NEEDLE, HYPO TW 25GX1" (100/BX PO LN 1 | 15 | BX | 15 PO# KYLIE | 8.45 | 126.75 | 11.34 | |
| | Tracking # 1Z2R57A30365528522 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 854368 | Vendor: MGM16 Vend Cat#: 1635 | BLADE, SURG CARBON STEEL STR # PO LN 2 | 5 | BX | 0 | 30.91 | .00 | .00 | |
| 1107575 | Vendor: MGM18 Vend Cat#: 18-917 | PILLOWCASE, DISP STD WHT 21"X3 PO LN 3 | 4 | CS | 4 PO# KYLIE | 21.53 | 86.12 | 7.71 | |
| | Tracking # 1Z2R57A30365528531 1Z2R57A30365528540 1Z2R57A30365528559 | | | | | | | | |
| | Tracking # 1Z2R57A30365528568 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 1077277 | Vendor: ARMDPH NDC Num: & 55150025050 | BUPIVACAINE, MDV 0.50% 50ML (2 PO LN 4 | 1 | CT | 0 | 123.38 | .00 | .00 | |
| 143490 | Vendor: CONMED Vend Cat#: 130309A | PENCIL, ELECTROSURG HND CNTL W PO LN 5 | 5 | CS | 5 PO# KYLIE | 158.07 | 790.35 | 70.74 | |
| | Tracking # 1Z2R57A30365528157 1Z2R57A30365528273 | | | | | | | | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **38454548** | **Date** | **02/03/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **04/04/2022** | | **$3,589.09** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 38454548 | PO Number Kylie | Invoice Date 02/03/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 516461 | Vendor: CARDCV Vend Cat#: 441402 | SPONGE, DERMACEA ALL PURP 4X4 PO LN 6 | 8 | CS | 3 PO# KYLIE | 24.47 | 73.41 | 6.57 | |
| | Tracking # 1Z2R57A30365528273 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 7 | 50 | PK | 0 PO# KYLIE | 7.33 | .00 | .00 | |
| 2612 | Vendor: ETHCON Vend Cat#: 662G | SUTURE, ETHLON BLK MONO 4-0 1 PO LN 8 | 4 | BX | 4 PO# KYLIE | 71.01 | 284.04 | .00 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 444657 | Vendor: USSUT Vend Cat#: SN-666 | SUTURE, MONOSOFT 2.0 36" BLK C PO LN 9 | 1 | BX | 0 | 101.62 | .00 | .00 | |
| 923621 | Vendor: TISSUE Vend Cat#: C0069090 | SUTURE, NOVOSYN UD 2/0 VICRYL PO LN 10 | 1 | BX | 0 | 172.63 | .00 | .00 | |
| 257803 | Vendor: 9PERSN Vend Cat#: & 00096070737 | DRYSOL, SOL 20% 37.5ML (1/EA) PO LN 11 | 7 | EA | 7 PO# KYLIE | 11.97 | 83.79 | .00 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 466870 | Vendor: MGM16 Vend Cat#: 16-4812 | BANDAGE, ADHSV FABR SPOT 1" (1 PO LN 12 | 3 | CS | 3 PO# KYLIE | 92.59 | 277.77 | 24.86 | |
| | Tracking # 1Z2R57A30365528335 1Z2R57A30365528577 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 854752 | Vendor: MGM16 Vend Cat#: 986 | SWABSTICK, PVP STR (1/PK 50PK/ PO LN 13 | 1 | BX | 0 PO# KYLIE | 9.77 | .00 | .00 | |
| 508716 | Vendor: MGM16 Vend Cat#: 24-106 | APPLICATOR, COTTON TIP N/S 6" PO LN 14 | 12 | BX | 12 PO# KYLIE | 12.16 | 145.92 | 13.06 | |
| | Tracking # 1Z2R57A30365528335 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 1031794 | Vendor: MGM16 Vend Cat#: 16-N231 | NEEDLE, HYPO TW 23GX1" (100/BX PO LN 15 | 5 | BX | 5 PO# KYLIE | 9.25 | 46.25 | 4.14 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 38454548 | PO Number Kylie | Invoice Date 02/03/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 661789 | Vendor: MGM19 Vend Cat#: 19-0752 | MARKER, SKIN REG STR LF RULER/ PO LN 16 | 1 | BX | 1 PO# KYLIE | 41.56 | 41.56 | 3.72 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 927287 | Vendor: 9FERN Vend Cat#: 00496052306 | BANDAGE, LIQ ADH MASTISOL 2OZ PO LN 17 | 2 | EA | 2 PO# KYLIE | 34.52 | 69.04 | 6.18 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 565780 | Vendor: JOHCON Vend Cat#: 10312547238134 | POLYSPORIN, OINT 1/32OZ (12BX/ PO LN 18 | 1 | CS | 1 PO# KYLIE | 461.03 | 461.03 | 41.26 | |
| | Tracking # 1Z2R57A30365528335 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 10119 | Vendor: CARDCV Vend Cat#: 6017 | DRESSING, TELFA ADHSV STR 2"X PO LN 19 | 1 | CS | 0 PO# KYLIE | 274.59 | .00 | .00 | |
| 1181517 | Vendor: 9NORST Vend Cat#: & 16714015001 | TRIAMCINOLONE ACETONIDE, MDV 4 PO LN 20 | 5 | EA | 5 PO# KYLIE | 62.66 | 313.30 | .00 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 725645 | Vendor: AMREGT Vend Cat#: & 00517072001 | BETAMETHASONE SOD PHOS/ACE, MD PO LN 21 | 3 | EA | 3 PO# KYLIE | 40.13 | 120.39 | .00 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 1184500 | Vendor: HOSPLG Vend Cat#: & 00409662514 | SODIUM BICARB, SDV 8.4% 1MEQ/M PO LN 22 | 1 | PK | 1 PO# KYLIE | 337.69 | 337.69 | .00 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 684274 | Vendor: 3M Vend Cat#: 1584 | BANDAGE, COBAN ELAS TAN 4"X5YD PO LN 23 | 1 | BX | 1 PO# KYLIE | 52.15 | 52.15 | 4.67 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 836200 | Vendor: 3M Vend Cat#: 9680 | BLADE, SURG CLIPPER PROFESSION PO LN 24 | 1 | CS | 0 PO# KYLIE | 141.67 | .00 | .00 | |
| 854368 | Vendor: MGM16 Vend Cat#: 1635 | BLADE, SURG CARBON STEEL STR # PO LN 25 | 1 | BX | 0 | 30.91 | .00 | .00 | |
| 916491 | Vendor: 9FREKB NDC Num: & 63323049227 | XYLOCAINE MPF, SDV 1% 2ML (25/ PO LN 26 | 1 | CT | 1 PO# KYLIE | 83.81 | 83.81 | .00 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| | | FUEL SURCHARGE PO LN 27 | 1 | EA | 1 PO# KYLIE | 1.35 | 1.35 | .12 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $141.17 | $21.71 | $31.49 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $3,394.72 | $0.00 | $194.37 | $3,589.09 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.
PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **59185590** | **Invoice Number** | **38465406** |
| **Sales Order Date** | **02/03/2022** | **Invoice Date** | **02/04/2022** |
| **PO Number** | **Kylie** | **Payment Due Date** | **04/05/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$399.30** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 7 | 50 | PK | 50 PO# KYLIE | 7.33 | 366.50 | 32.80 | |

Shipped: 02/04/2022 From: Dallas Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $23.82 | $3.67 | $5.31 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $366.50 | $0.00 | $32.80 | $399.30 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **38465406** | **Date** | **02/04/2022** |
| | **Terms** | | **AR NET 60** |
| **Pay This Amount Before** | **04/05/2022** | | **$399.30** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 2

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **60241757** | **Invoice Number** | **39016839** |
| **Sales Order Date** | **02/17/2022** | **Invoice Date** | **02/17/2022** |
| **PO Number** | **Kylie** | **Payment Due Date** | **04/18/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$441.37** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 11 | 20 | PK | 20 PO# KYLIE | 7.33 | 146.60 | 13.12 | |
| | Tracking # 1Z7E08560352713190 | | | | | | | | |
| | Shipped: 02/17/2022 From: Dallas Via: UPS GROUND | | | | | | | | |
| 864638 | Vendor: MGM138 Vend Cat#: 2201 | DRESSING, XEROFORM 1X8 (50/BX PO LN 22 | 7 | BX | 7 PO# KYLIE | 36.93 | 258.51 | 23.14 | |
| | Tracking # 1Z7E08560352711825 1Z7E08560352713190 | | | | | | | | |
| | Shipped: 02/17/2022 From: Dallas Via: UPS GROUND | | | | | | | | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| **$26.32** | **$4.06** | **$5.88** | **$0.00** | **$0.00** |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **39016839** | **Date** | **02/17/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **04/18/2022** | | **$441.37** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 39016839 | PO Number Kylie | Invoice Date 02/17/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $405.11 | $0.00 | $36.26 | $441.37 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

**Page 1 of 2**

RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **60263370** | **Invoice Number** | **39048484** |
| **Sales Order Date** | **02/17/2022** | **Invoice Date** | **02/18/2022** |
| **PO Number** | **02.17.22 EMP** | **Payment Due Date** | **04/19/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$174.36** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS<br>Vend Cat#: 10356010140<br>Tracking # 1Z7E08560352725267<br>Shipped: 02/18/2022 From: Dallas Via: UPS GROUND | AQUAPHOR, OINT 0.7OZ (2/PK)<br>PO LN 12 | 1 | PK | 1 | 7.70 | 7.70 | .65 | |
| 307872 | Vendor: MICFLX<br>Vend Cat#: MF-300-M<br>Tracking # 1Z7E08560352729389<br>Shipped: 02/18/2022 From: Dallas Via: UPS GROUND | GLOVE, EXAM LTX MED N/S (100/B<br>PO LN 28 | 1 | CS | 1 | 153.00 | 153.00 | 13.01 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| **$10.44** | **$1.61** | **$1.61** | **$0.00** | **$0.00** |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **39048484** | **Date** | **02/18/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **04/19/2022** | | **$174.36** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 39048484 | PO Number 02.17.22 EMP | Invoice Date 02/18/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $160.70 | $0.00 | $13.66 | $174.36 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 2

Shipped From: RCHE1DPD01

MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **61953209** | **Invoice Number** | **39911577** |
| **Sales Order Date** | **03/11/2022** | **Invoice Date** | **03/11/2022** |
| **PO Number** | **KYLIE** | **Payment Due Date** | **05/10/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$2,349.67** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 862369 | Vendor: MGM22 Vend Cat#: 471 | SHEATH, HANDPIECE STR 36" (25/ PO LN 1 | 8 | BX | 8 | 73.16 | 585.28 | 52.38 | |
| | Tracking # 1Z2R57A30366095097 | | | | | | | | |
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 1065318 | Vendor: SNCAST Vend Cat#: 4209 | TAPE, DRESSING HYPAFIX RETENTI PO LN 5 | 1 | CS | 1 | 345.96 | 345.96 | 30.96 | |
| | Tracking # 1Z2R57A30366095079 | | | | | | | | |
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 146731 | Vendor: SKLAR Vend Cat#: 10-1635 | LUBRICANT, INSTR PO LN 9 | 1 | GL | 1 | 40.91 | 40.91 | 3.66 | |
| | Tracking # 1Z2R57A30366095408 | | | | | | | | |
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 167694 | Vendor: CARDCV Vend Cat#: 8884417601 | GAUZE, CISION DRSNG STR 1"X8" PO LN 11 | 1 | BX | 1 | 53.18 | 53.18 | 4.76 | |
| | Tracking # 1Z2R57A30366095097 | | | | | | | | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **39911577** | **Date** | **03/11/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **05/10/2022** | | **$2,349.67** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 39911577 | PO Number KYLIE | Invoice Date 03/11/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 1114380 | Vendor: MOLYCK<br>Vend Cat#: 595300<br>Tracking # 1Z2R57A30366095097 | DRESSING, BORDER MEPILEX FLEX<br>PO LN 13 | 5 | BX | 5 | 39.22 | 196.10 | 17.55 | |
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 927287 | Vendor: 9FERN<br>Vend Cat#: 00496052306<br>Tracking # 1Z2R57A30366095097 | BANDAGE, LIQ ADH MASTISOL 2OZ<br>PO LN 14 | 6 | EA | 6 | 34.52 | 207.12 | 18.54 | |
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 1065403 | Vendor: MGM14<br>Vend Cat#: 14-6NPNK6<br>Tracking # 1Z2R57A30366095097 | GLOVE, EXAM NTRL LG N/S PNK 3.<br>PO LN 15 | 5 | BX | 5 | 29.41 | 147.05 | 13.16 | |
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 99422 | Vendor: ETHCON<br>Vend Cat#: J496G<br>Tracking # 1Z2R57A30366095097 | SUTURE, VICRYL UD BR CT 4-0 1<br>PO LN 18 | 3 | BX | 3 | 210.53 | 631.59 | .00 | |
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| | | FUEL SURCHARGE<br>PO LN 20 | 1 | EA | 1 | 1.35 | 1.35 | .12 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $102.51 | $15.76 | $22.86 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $2,208.54 | $0.00 | $141.13 | $2,349.67 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **61953209** | **Invoice Number** | **39912110** |
| **Sales Order Date** | **03/11/2022** | **Invoice Date** | **03/11/2022** |
| **PO Number** | **KYLIE** | **Payment Due Date** | **05/10/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$159.72** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 4 | 20 | PK | 20 | 7.33 | 146.60 | 13.12 | |

Tracking # 1Z7E08560353427257

Shipped: 03/11/2022 From: Dallas Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $9.52 | $1.47 | $2.13 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $146.60 | $0.00 | $13.12 | $159.72 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **39912110** | **Date** | **03/11/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **05/10/2022** | | **$159.72** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1 RCHE1DPD01

Shipped From:
MCKESSON MEDICAL SURGICAL INC (BARTLETT)
375 SPITZER ROAD
BARTLETT,IL 60103
SHIPPED FROM LICENSE: 5-115068

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **61953209** | **Invoice Number** | **39922956** |
| **Sales Order Date** | **03/11/2022** | **Invoice Date** | **03/11/2022** |
| **PO Number** | **KYLIE** | **Payment Due Date** | **05/10/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$112.83** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 927287 | Vendor: 9FERN Vend Cat#: 00496052306 | BANDAGE, LIQ ADH MASTISOL 2OZ PO LN 14 | 3 | EA | 3 | 34.52 | 103.56 | 9.27 | |

Shipped: 03/11/2022 From: MMS Chicago Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $6.73 | $1.04 | $1.50 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $103.56 | $0.00 | $9.27 | $112.83 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **39922956** | **Date** | **03/11/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **05/10/2022** | | **$112.83** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 2

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 62297320

ADVANCED DERMATOLOGY &SKIN CANCER CTR PA
210 W 13TH ST
OTTAWA KS 66067-3545
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **63975289** | **Invoice Number** | **40968049** |
| **Sales Order Date** | **04/07/2022** | **Invoice Date** | **04/07/2022** |
| **PO Number** | **040722EMP** | **Payment Due Date** | **06/06/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$425.84** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 929309 | Vendor: METREX Vend Cat#: 10-4000 | DETERGENT, ENZYMATIC METRIZYME PO LN 11 | 1 | CS | 1 | 185.26 | 185.26 | 17.78 | |
| | Tracking # 1Z2R57A30366498830 | | | | | | | | |
| | Shipped: 04/07/2022 From: Kansas City | | | | | | | | |
| 1002261 | Vendor: STLBMD Vend Cat#: NB0507 | FORMALIN, NEUTRAL BUFFERED PRE PO LN 17 | 3 | CS | 3 | 37.02 | 111.06 | 10.66 | |
| | Tracking # 1Z2R57A30366498849 | | | | | | | | |
| | Shipped: 04/07/2022 From: Kansas City | | | | | | | | |
| 927287 | Vendor: 9FERN Vend Cat#: 00496052306 | BANDAGE, LIQ ADH MASTISOL 2OZ PO LN 21 | 1 | EA | 1 | 34.52 | 34.52 | 3.31 | |
| | Tracking # 1Z2R57A30366498849 | | | | | | | | |
| | Shipped: 04/07/2022 From: Kansas City | | | | | | | | |
| 944362 | Vendor: MGM115 Vend Cat#: 100197 | TAPE, TRANS PREM 1"X10YDS (12/ PO LN 25 | 4 | BX | 4 | 13.79 | 55.16 | 5.30 | |
| | Tracking # 1Z2R57A30366498849 | | | | | | | | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **40968049** | **Date** | **04/07/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **06/06/2022** | | **$425.84** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY &SKIN CANCER CTR PA
210 W 13TH ST
OTTAWA KS 66067-3545
REGULATORY LICENSE: 04-26086

| Invoice Number 40968049 | PO Number 040722EMP | Invoice Date 04/07/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| Shipped: 04/07/2022 From: Kansas City | | | | | | | | | |
| | | FUEL SURCHARGE PO LN 26 | 1 | EA | 1 | 2.55 | 2.55 | .24 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $25.24 | $5.84 | $6.21 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $388.55 | $0.00 | $37.29 | $425.84 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

 RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **64043804** | **Invoice Number** | **41014249** |
| **Sales Order Date** | **04/07/2022** | **Invoice Date** | **04/08/2022** |
| **PO Number** | **4/7/2022** | **Payment Due Date** | **06/07/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$10,854.20** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 1065401 | Vendor: MGM14 Vend Cat#: 14-6NPNK2 | GLOVE, EXAM NTRL SM N/S PNK 3. PO LN 1 | 20 | BX | 20 | 29.41 | 588.20 | 52.64 | |
| | Tracking # 1Z2R57A30366519147 1Z2R57A30366519156 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 1065402 | Vendor: MGM14 Vend Cat#: 14-6NPNK4 | GLOVE, EXAM NTRL MED N/S PNK 3 PO LN 2 | 20 | BX | 20 | 29.41 | 588.20 | 52.64 | |
| | Tracking # 1Z2R57A30366518942 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 1065403 | Vendor: MGM14 Vend Cat#: 14-6NPNK6 | GLOVE, EXAM NTRL LG N/S PNK 3. PO LN 3 | 20 | BX | 20 | 29.41 | 588.20 | 52.64 | |
| | Tracking # 1Z2R57A30366518979 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 516461 | Vendor: CARDCV Vend Cat#: 441402 | SPONGE, DERMACEA ALL PURP 4X4 PO LN 4 | 10 | CS | 0 | 24.47 | .00 | .00 | |
| 940552 | Vendor: MGM22 Vend Cat#: 243 | CAUTERY, HI-TEMP LOOP TIP PO LN 5 | 3 | BX | 3 | 117.49 | 352.47 | 31.55 | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **41014249** | **Date** | **04/08/2022** |
| | **Terms** | | **AR NET 60** |
| **Pay This Amount Before** | **06/07/2022** | | **$10,854.20** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 41014249 | PO Number 4/7/2022 | Invoice Date 04/08/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Tracking # 1Z2R57A30366518782<br>Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 194823 | Vendor: USSURG<br>Vend Cat#: E7507 | PAD, GROUNDING PATIENT RETURN<br>PO LN 6 | 7 | CS | 7 | 328.17 | 2297.19 | 205.60 | |
| | Tracking # 1Z2R57A30366518988 1Z2R57A30366519012 1Z2R57A30366519049<br>Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 143490 | Vendor: CONMED<br>Vend Cat#: 130309A | PENCIL, ELECTROSURG HND CNTL W<br>PO LN 7 | 5 | CS | 5 | 158.07 | 790.35 | 70.74 | |
| | Tracking # 1Z2R57A30366518988 1Z2R57A30366519058 1Z2R57A30366519094<br>Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 1065318 | Vendor: SNCAST<br>Vend Cat#: 4209 | TAPE, DRESSING HYPAFIX RETENTI<br>PO LN 8 | 2 | CS | 2 | 345.96 | 691.92 | 61.93 | |
| | Tracking # 1Z2R57A30366519101 1Z2R57A30366519110<br>Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 99421 | Vendor: ETHCON<br>Vend Cat#: J494G | SUTURE, VICRYL UD BR CT 4-0 1<br>PO LN 10 | 10 | BX | 10 | 167.72 | 1677.20 | .00 | |
| | Tracking # 1Z2R57A30366518773<br>Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 512816 | Vendor: 9PERSN<br>NDC Num: & 00096070760 | DRYSOL, DAB-O-MATIC, SOL 20% 6<br>PO LN 11 | 10 | EA | 6 | 18.75 | 112.50 | .00 | |
| | Tracking # 1Z2R57A30366519389<br>Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 1181515 | Vendor: 9NORST<br>Vend Cat#: & 16714014001 | TRIAMCINOLONE ACETONIDE, MDV 4<br>PO LN 12 | 5 | EA | 5 | 24.54 | 122.70 | .00 | |
| | Tracking # 1Z2R57A30366519389<br>Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 725645 | Vendor: AMREGT<br>Vend Cat#: & 00517072001 | BETAMETHASONE SOD PHOS/ACE, MD<br>PO LN 13 | 5 | EA | 5 | 40.13 | 200.65 | .00 | |
| | Tracking # 1Z2R57A30366518773<br>Shipped: 04/08/2022 From: Kansas City | | | | | | | | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 41014249 | PO Number 4/7/2022 | Invoice Date 04/08/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 555549 | Vendor: VISCOT<br>Vend Cat#: 1451-1000 | PEN, MINI SURGICAL MARKING SIG<br>PO LN 14 | 1 | CS | 0 | 290.99 | .00 | .00 | |
| 927287 | Vendor: 9FERN<br>Vend Cat#: 00496052306<br>Tracking # 1Z2R57A30366518773<br>Shipped: 04/08/2022 From: Kansas City | BANDAGE, LIQ ADH MASTISOL 2OZ<br>PO LN 16 | 10 | EA | 10 | 34.52 | 345.20 | 30.90 | |
| 1195996 | Vendor: MOLYCK<br>Vend Cat#: 581200<br>Tracking # 1Z2R57A30366519389<br>Shipped: 04/08/2022 From: Kansas City | DRESSING, BORDER FLEX LITE 3"X<br>PO LN 17 | 5 | BX | 5 | 29.24 | 146.20 | 13.08 | |
| 1065404 | Vendor: MGM14<br>Vend Cat#: 14-6NPNK8<br>Tracking # 1Z2R57A30366519129 1Z2R57A30366519389<br>Shipped: 04/08/2022 From: Kansas City | GLOVE, EXAM NTRL XL N/S PNK 3.<br>PO LN 18 | 20 | BX | 20 | 29.41 | 588.20 | 52.64 | |
| 1034507 | Vendor: MGM168<br>Vend Cat#: S662GX<br>Tracking # 1Z2R57A30366518782 1Z2R57A30366519389<br>Shipped: 04/08/2022 From: Kansas City | SUTURE, 4-0 NYLON 18" C-13 (12<br>PO LN 19 | 10 | BX | 10 | 30.95 | 309.50 | .00 | |
| 68107 | Vendor: MGM16<br>Vend Cat#: 25-515<br>Tracking # 1Z2R57A30366519165 1Z2R57A30366519174<br>Shipped: 04/08/2022 From: Kansas City | DRAPE, LINED POLY STR WHT NONF<br>PO LN 20 | 2 | CS | 2 | 128.83 | 257.66 | 23.06 | |
| 724984 | Vendor: BRSDRF<br>Vend Cat#: 072140006747<br>Tracking # 1Z2R57A30366519138<br>Shipped: 04/08/2022 From: Kansas City | OINTMENT, AQUAPHOR HEALING .9G<br>PO LN 21 | 1 | CS | 1 | 502.67 | 502.67 | 44.99 | |
| 733529 | Vendor: 9BEIRS<br>Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK)<br>PO LN 22 | 24 | PK | 0 | 7.33 | .00 | .00 | |
| | | FUEL SURCHARGE<br>PO LN 23 | 1 | EA | 1 | 2.55 | 2.55 | .23 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $503.03 | $77.38 | $112.23 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $10,161.56 | $0.00 | $692.64 | $10,854.20 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 62297320

ADVANCED DERMATOLOGY &SKIN CANCER CTR PA
210 W 13TH ST
OTTAWA KS 66067-3545
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **63975289** | **Invoice Number** | **41437747** |
| **Sales Order Date** | **04/07/2022** | **Invoice Date** | **04/20/2022** |
| **PO Number** | **040722EMP** | **Payment Due Date** | **06/19/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$8.03** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 19 | 1 | PK | 1 | 7.33 | 7.33 | .70 | |

Tracking # 1Z7E08560354649640

Shipped: 04/20/2022 From: Dallas Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $0.47 | $0.11 | $0.12 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $7.33 | $0.00 | $0.70 | $8.03 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **41437747** | **Date** | **04/20/2022** |
| | **Terms** | | **AR NET 60** |
| **Pay This Amount Before** | **06/19/2022** | | **$8.03** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1

RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **64043804** | **Invoice Number** | **41437750** |
| **Sales Order Date** | **04/07/2022** | **Invoice Date** | **04/20/2022** |
| **PO Number** | **4/7/2022** | **Payment Due Date** | **06/19/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$7.99** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 22 | 1 | PK | 1 | 7.33 | 7.33 | .66 | |

Tracking # 1Z7E08560354649999
Shipped: 04/20/2022 From: Dallas Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $0.48 | $0.07 | $0.11 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $7.33 | $0.00 | $0.66 | $7.99 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **41437750** | **Date** | **04/20/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **06/19/2022** | | **$7.99** |

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1
RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **64043804** | **Invoice Number** | **41494043** |
| **Sales Order Date** | **04/07/2022** | **Invoice Date** | **04/21/2022** |
| **PO Number** | **4/7/2022** | **Payment Due Date** | **06/20/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$183.68** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR. OINT 0.7OZ (2/PK) PO LN 22 | 23 | PK | 23 | 7.33 | 168.59 | 15.09 | |

Shipped: 04/21/2022 From: Dallas Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $10.96 | $1.69 | $2.44 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $168.59 | $0.00 | $15.09 | $183.68 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **41494043** | **Date** | **04/21/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **06/20/2022** | | **$183.68** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 3

RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 205

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 66772285
ADVANCED DERMATOLOGY & SKIN CANCER CTR P
747 N BURLINGTON AVE STE 312
HASTINGS NE 68901-4478
REGULATORY LICENSE: 04-26086

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **65583987** | **Invoice Number** | **41765586** |
| **Sales Order Date** | **04/28/2022** | **Invoice Date** | **04/28/2022** |
| **PO Number** | **Michelle 04.28.2022** | **Payment Due Date** | **06/27/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$2,743.46** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 1083090 | Vendor: MGM16 Vend Cat#: 4873 | FOAM, ADH SIL LT W/BORDER 4"X4 PO LN 1 | 1 | BX | 1 | 50.38 | 50.38 | 3.53 | |
| | PO# MICHELLE 04.28.2022 | | | | | | | | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 99421 | Vendor: ETHCON Vend Cat#: J494G | SUTURE, VICRYL UD BR CT 4-0 1 PO LN 2 | 3 | BX | 3 | 167.72 | 503.16 | .00 | |
| | PO# MICHELLE 04.28.2022 | | | | | | | | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 516461 | Vendor: CARDCV Vend Cat#: 441402 | SPONGE, DERMACEA ALL PURP 4X4 PO LN 3 | 2 | CS | 2 | 24.47 | 48.94 | 3.43 | |
| | PO# MICHELLE 04.28.2022 | | | | | | | | |
| | Tracking # 1Z2R57A30366801699 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 862369 | Vendor: MGM22 Vend Cat#: 471 | SHEATH, HANDPIECE STR 36" (25/ PO LN 4 | 4 | BX | 4 | 73.16 | 292.64 | 20.48 | |
| | PO# MICHELLE 04.28.2022 | | | | | | | | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **41765586** | **Date** | **04/28/2022** |
| | **Terms** | | **AR NET 60** |
| **Pay This Amount Before** | **06/27/2022** | | **$2,743.46** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY & SKIN CANCER CTR P
747 N BURLINGTON AVE STE 312
HASTINGS NE 68901-4478
REGULATORY LICENSE: 04-26086

| Invoice Number 41765586 | PO Number Michelle 04.28.2022 | Invoice Date 04/28/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 143490 | Vendor: CONMED<br>Vend Cat#: 130309A | PENCIL, ELECTROSURG HND CNTL W<br>PO LN 5 | 2 | CS | 2<br>PO# MICHELLE 04.28.2022 | 158.07 | 316.14 | 22.13 | |
| | Tracking # 1Z2R57A30366801699 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 1065318 | Vendor: SNCAST<br>Vend Cat#: 4209 | TAPE, DRESSING HYPAFIX RETENTI<br>PO LN 6 | 1 | CS | 1<br>PO# MICHELLE 04.28.2022 | 345.96 | 345.96 | 24.22 | |
| | Tracking # 1Z2R57A30366801895 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 485127 | Vendor: PURMED<br>Vend Cat#: 806-WCXL | APPLICATOR, CTN TIP 5/16" (50/<br>PO LN 7 | 2 | BX | 0<br>PO# MICHELLE 04.28.2022 | 17.35 | .00 | .00 | |
| 1034507 | Vendor: MGM168<br>Vend Cat#: S662GX | SUTURE, 4-0 NYLON 18" C-13 (12<br>PO LN 8 | 6 | BX | 6<br>PO# MICHELLE 04.28.2022 | 30.95 | 185.70 | .00 | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 466180 | Vendor: USSUT<br>Vend Cat#: SN-5696G | SUTURE, MONOSOF 6-0 18" P-13<br>PO LN 9 | 6 | BX | 6<br>PO# MICHELLE 04.28.2022 | 68.67 | 412.02 | .00 | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 927287 | Vendor: 9FERN<br>Vend Cat#: 00496052306 | BANDAGE, LIQ ADH MASTISOL 2OZ<br>PO LN 10 | 6 | EA | 6<br>PO# MICHELLE 04.28.2022 | 34.52 | 207.12 | 14.50 | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 1002261 | Vendor: STLBMD<br>Vend Cat#: NB0507 | FORMALIN, NEUTRAL BUFFERED PRE<br>PO LN 11 | 2 | CS | 2<br>PO# MICHELLE 04.28.2022 | 37.02 | 74.04 | 5.18 | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 347468 | Vendor: 3M<br>Vend Cat#: 9660 | BLADE, CLIPPER ASSEMBLY (50/CS<br>PO LN 12 | 1 | CS | 1<br>PO# MICHELLE 04.28.2022 | 197.35 | 197.35 | 13.81 | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY & SKIN CANCER CTR P
747 N BURLINGTON AVE STE 312
HASTINGS NE 68901-4478
REGULATORY LICENSE: 04-26086

| Invoice Number 41765586 | PO Number Michelle 04.28.2022 | Invoice Date 04/28/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | | FUEL SURCHARGE | 1 | EA | 1 | 2.55 | 2.55 | .18 | |
| | | PO LN 13 | | | PO# MICHELLE 04.28.2022 | | | | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $84.43 | $0.00 | $23.03 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $2,636.00 | $0.00 | $107.46 | $2,743.46 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 2

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 205

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 66772285

ADVANCED DERMATOLOGY & SKIN CANCER CTR P
747 N BURLINGTON AVE STE 312
HASTINGS NE 68901-4478
REGULATORY LICENSE: 04-26086

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **67677353** | **Invoice Number** | **42850130** |
| **Sales Order Date** | **05/25/2022** | **Invoice Date** | **05/25/2022** |
| **PO Number** | **05252022NE** | **Payment Due Date** | **07/24/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$937.82** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 724984 | Vendor: BRSDRF<br>Vend Cat#: 072140006747<br>Tracking # 1Z2R57A30367202227<br>Shipped: 05/26/2022 From: Kansas City | OINTMENT, AQUAPHOR HEALING 9G<br>PO LN 1 | 2 | PK | 2 | 42.17 | 84.34 | 5.90 | |
| 520118 | Vendor: MGM37<br>Vend Cat#: 37-6270 | SALINE, IRR SOL STR 250ML (24/<br>PO LN 2 | 1 | CS | 0 | 56.35 | .00 | .00 | |
| 565780 | Vendor: JOHCON<br>Vend Cat#: 10312547238134<br>Tracking # 1Z2R57A30367199938<br>Shipped: 05/26/2022 From: Kansas City | POLYSPORIN, OINT 1/32OZ (12BX/<br>PO LN 3 | 1 | CS | 1 | 464.16 | 464.16 | 32.49 | |
| 369610 | Vendor: BDDIAG<br>Vend Cat#: 220116<br>Tracking # 1Z2R57A30367202227<br>Shipped: 05/26/2022 From: Kansas City | SWAB, TRANSPORT AMIES MED (50/<br>PO LN 4 | 1 | PK | 1 | 48.96 | 48.96 | 3.43 | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **42850130** | **Date** | **05/25/2022** |
| | **Terms** | | **AR NET 60** |
| **Pay This Amount Before** | **07/24/2022** | | **$937.82** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY & SKIN CANCER CTR P
747 N BURLINGTON AVE STE 312
HASTINGS NE 68901-4478
REGULATORY LICENSE: 04-26086

| Invoice Number 42850130 | PO Number 05252022NE | Invoice Date 05/25/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 10119 | Vendor: CARDCV Vend Cat#: 6017 | DRESSING, TELFA ADHSV STR 2"X PO LN 5 | 1 | CS | 1 | 276.46 | 276.46 | 19.35 | |
| | Tracking # 1Z2R57A30367199938 Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| | | FUEL SURCHARGE PO LN 6 | 1 | EA | 1 | 2.55 | 2.55 | .18 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $48.20 | $0.00 | $13.15 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $876.47 | $0.00 | $61.35 | $937.82 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **67677040** | **Invoice Number** | **42850133** |
| **Sales Order Date** | **05/25/2022** | **Invoice Date** | **05/25/2022** |
| **PO Number** | **05252022EMP** | **Payment Due Date** | **07/24/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$4,860.18** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 725645 | Vendor: AMREGT Vend Cat#: & 00517072001 | BETAMETHASONE SOD PHOS/ACE, MD PO LN 1 | 6 | EA | 6 | 40.41 | 242.46 | .00 | |
| | Tracking # 1Z2R57A30367201737 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 32727 | Vendor: CARDCV Vend Cat#: 8884414600 | DRESSING, VASELINE FOIL PK STR PO LN 6 | 1 | DZ | 1 | 17.10 | 17.10 | 1.45 | |
| | Tracking # 1Z2R57A30367201737 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 565780 | Vendor: JOHCON Vend Cat#: 10312547238134 | POLYSPORIN, OINT 1/32OZ (12BX/ PO LN 8 | 2 | CS | 2 | 464.16 | 928.32 | 78.91 | |
| | Tracking # 1Z2R57A30367200005 1Z2R57A30367200327 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 171930 | Vendor: ACCTEC Vend Cat#: 74-0002-0000 | BLADE, DBL EDGE S/S (100/BX) PO LN 9 | 8 | BX | 8 | 29.46 | 235.68 | 20.03 | |
| | Tracking # 1Z2R57A30367201737 | | | | | | | | |

# Invoice

MCKESSON

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **42850133** | **Date** | **05/25/2022** |
| | **Terms** | | **AR NET 60** |
| **Pay This Amount Before** | **07/24/2022** | | **$4,860.18** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 42850133 | PO Number 05252022EMP | Invoice Date 05/25/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 143490 | Vendor: CONMED Vend Cat#: 130309A | PENCIL, ELECTROSURG HND CNTL W PO LN 11 | 5 | CS | 5 | 159.14 | 795.70 | 67.63 | |
| | Tracking # 1Z2R57A30367199803 1Z2R57A30367199812 1Z2R57A30367199821 | | | | | | | | |
| | Tracking # 1Z2R57A30367199830 1Z2R57A30367199974 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1034507 | Vendor: MGM168 Vend Cat#: S662GX | SUTURE, 4-0 NYLON 18" C-13 (12 PO LN 13 | 8 | BX | 8 | 31.29 | 250.32 | .00 | |
| | Tracking # 1Z2R57A30367201737 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1031805 | Vendor: MGM16 Vend Cat#: 16-S5C | SYRINGE, LL 5CC (100/BX 20BX/C PO LN 16 | 1 | CS | 1 | 326.62 | 326.62 | 27.76 | |
| | Tracking # 1Z2R57A30367200336 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 164755 | Vendor: MGM18 Vend Cat#: 18-885 | TOWEL, PRO 3PLY/POLY WHT 13X18 PO LN 17 | 1 | CS | 1 | 47.39 | 47.39 | 4.03 | |
| | Tracking # 1Z2R57A30367200005 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 9962 | Vendor: CARDCV Vend Cat#: 1961 | DRESSING, TELFA STR 2"X3" 1'S PO LN 22 | 1 | CS | 1 | 304.33 | 304.33 | 25.87 | |
| | Tracking # 1Z2R57A30367199974 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1031795 | Vendor: MGM16 Vend Cat#: 16-N251 | NEEDLE, HYPO TW 25GX1" (100/BX PO LN 24 | 1 | CS | 1 | 85.40 | 85.40 | 7.26 | |
| | Tracking # 1Z2R57A30367199974 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 304984 | Vendor: 9TEVA Vend Cat#: & 00093314701 | CEPHALEXIN, CAP 500MG (100/BT) PO LN 27 | 1 | BT | 1 | 64.47 | 64.47 | .00 | |
| | Tracking # 1Z2R57A30367201737 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 42850133 | PO Number 05252022EMP | Invoice Date 05/25/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 1158583 | Vendor: 9GREEN<br>Vend Cat#: & 59762219803<br>Tracking # 1Z2R57A30367201737<br>Shipped: 05/26/2022 From: Kansas City | AZITHROMYCIN, TAB 250MG 3X6 (1<br>PO LN 29 | 1 | CT | 1 | 13.25 | 13.25 | .00 | |
| 960943 | Vendor: MGM16<br>Vend Cat#: 16-6423<br>Tracking # 1Z2R57A30367200005<br>Shipped: 05/26/2022 From: Kansas City | POUCH, SELF SEAL ECON 3.5X9 (2<br>PO LN 31 | 1 | CS | 1 | 182.53 | 182.53 | 15.52 | |
| 512816 | Vendor: 9PERSN<br>NDC Num: & 00096070760<br>Tracking # 1Z2R57A30367201737<br>Shipped: 05/26/2022 From: Kansas City | DRYSOL, DAB-O-MATIC, SOL 20% 6<br>PO LN 33 | 8 | EA | 8 | 18.88 | 151.04 | .00 | |
| 466870 | Vendor: MGM16<br>Vend Cat#: 16-4812<br>Tracking # 1Z2R57A30367200005 1Z2R57A30367200345<br>Shipped: 05/26/2022 From: Kansas City | BANDAGE, ADHSV FABR SPOT 1" (1<br>PO LN 35 | 2 | CS | 2 | 93.52 | 187.04 | 15.90 | |
| 738650 | Vendor: MOLYCK<br>Vend Cat#: 395290<br>Tracking # 1Z2R57A30367201737<br>Shipped: 05/26/2022 From: Kansas City | DRESSING, BRDR MEPILEX AG 3X3<br>PO LN 36 | 5 | BX | 5 | 50.10 | 250.50 | 21.29 | |
| 738653 | Vendor: MOLYCK<br>Vend Cat#: 395390<br>Tracking # 1Z2R57A30367201737<br>Shipped: 05/26/2022 From: Kansas City | DRESSING, BRDR MEPILEX AG 4X4<br>PO LN 37 | 5 | BX | 5 | 79.93 | 399.65 | 33.97 | |
| 5762 | Vendor: 3M<br>Vend Cat#: 1527-1<br>Tracking # 1Z2R57A30367201737<br>Shipped: 05/26/2022 From: Kansas City | TAPE, ADHSV TRANSPORE 1"X10YDS<br>PO LN 38 | 4 | BX | 4 | 12.90 | 51.60 | 4.39 | |
| | | FUEL SURCHARGE<br>PO LN 41 | 1 | EA | 1 | 2.55 | 2.55 | .22 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $247.91 | $38.16 | $38.16 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $4,535.95 | $0.00 | $324.23 | $4,860.18 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 2

RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL (ROGERS)
12999 WILFRED LANE STE #100
ROGERS,MN 55374
SHIPPED FROM LICENSE: 5-31292

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **67677040** | **Invoice Number** | **42860700** |
| **Sales Order Date** | **05/25/2022** | **Invoice Date** | **05/26/2022** |
| **PO Number** | **05252022EMP** | **Payment Due Date** | **07/25/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$1,192.29** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 862369 | Vendor: MGM22<br>Vend Cat#: 471 | SHEATH, HANDPIECE STR 36" (25/<br>PO LN 14 | 8 | BX | 8 | 74.10 | 592.80 | 50.39 | |
| | Tracking # 1ZY8E8030321617434<br>Shipped: 05/26/2022 From: Rogers Via: UPS GROUND | | | | | | | | |
| 724984 | Vendor: BRSDRF<br>Vend Cat#: 072140006747 | OINTMENT, AQUAPHOR HEALING 9G<br>PO LN 30 | 1 | CS | 1 | 506.08 | 506.08 | 43.02 | |
| | Tracking # 1ZY8E8030321618273<br>Shipped: 05/26/2022 From: Rogers Via: UPS GROUND | | | | | | | | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| **$71.43** | **$10.99** | **$10.99** | **$0.00** | **$0.00** |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **42860700** | **Date** | **05/26/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **07/25/2022** | | **$1,192.29** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 42860700 | PO Number 05252022EMP | Invoice Date 05/26/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $1,098.88 | $0.00 | $93.41 | $1,192.29 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 2

RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **67677040** | **Invoice Number** | **42862684** |
| **Sales Order Date** | **05/25/2022** | **Invoice Date** | **05/26/2022** |
| **PO Number** | **05252022EMP** | **Payment Due Date** | **07/25/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$571.31** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 307874 | Vendor: MICFLX Vend Cat#: MF-300-XL | GLOVE, EXAM LTX XL N/S (100/BX PO LN 25 | 1 | CS | 1 | 154.07 | 154.07 | 13.10 | |
| | Tracking # 1Z7E08560355746524 Shipped: 05/26/2022 From: Dallas Via: UPS GROUND | | | | | | | | |
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT DUAL .35OZ (2/P PO LN 34 | 48 | PK | 48 | 7.76 | 372.48 | 31.66 | |
| | Tracking # 1Z7E08560355746524 Shipped: 05/26/2022 From: Dallas Via: UPS GROUND | | | | | | | | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| **$34.24** | **$5.26** | **$5.26** | **$0.00** | **$0.00** |

MCKESSON

# Invoice

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **42862684** | **Date** | **05/26/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **07/25/2022** | | **$571.31** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 42862684 | PO Number 05252022EMP | Invoice Date 05/26/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $526.55 | $0.00 | $44.76 | $571.31 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **67677137** | **Invoice Number** | **42865204** |
| **Sales Order Date** | **05/25/2022** | **Invoice Date** | **05/26/2022** |
| **PO Number** | **05252022MHK** | **Payment Due Date** | **07/25/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$5,575.97** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 919573 | Vendor: MGM143 Vend Cat#: 100 | PAPER, TABLE SMTH ECON WHT 18" PO LN 3 | 4 | CS | 4 | 29.99 | 119.96 | 10.74 | |
| | Tracking # 1Z2R57A30367206045 1Z2R57A30367206063 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 466870 | Vendor: MGM16 Vend Cat#: 16-4812 | BANDAGE, ADHSV FABR SPOT 1" (1 PO LN 4 | 4 | CS | 4 | 93.52 | 374.08 | 33.48 | |
| | Tracking # 1Z2R57A30367206278 1Z2R57A30367206287 1Z2R57A30367206974 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 466872 | Vendor: MGM16 Vend Cat#: 16-4811 | BANDAGE, ADHSV FABR STRP 1X3 ( PO LN 5 | 5 | CS | 5 | 85.74 | 428.70 | 38.37 | |
| | Tracking # 1Z2R57A30367206278 1Z2R57A30367206287 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1195996 | Vendor: MOLYCK Vend Cat#: 581200 | DRESSING, BORDER FLEX LITE 3"X PO LN 7 | 3 | BX | 3 | 29.44 | 88.32 | 7.90 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **42865204** | **Date** | **05/26/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **07/25/2022** | | **$5,575.97** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 42865204 | PO Number 05252022MHK | Invoice Date 05/26/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 738653 | Vendor: MOLYCK Vend Cat#: 395390 | DRESSING, BRDR MEPILEX AG 4X4 PO LN 8 | 5 | BX | 5 | 79.93 | 399.65 | 35.77 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 774188 | Vendor: AME3M Vend Cat#: 2770-1 | TAPE, SILICONE KIND REMOVAL 1" PO LN 9 | 7 | BX | 7 | 47.12 | 329.84 | 29.52 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 508715 | Vendor: MGM16 Vend Cat#: 24-103 | APPLICATOR, COTTON TIP N/S 3" PO LN 11 | 5 | BX | 5 | 12.78 | 63.90 | 5.72 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1181515 | Vendor: 9NORST Vend Cat#: & 16714014001 | TRIAMCINOLONE ACETONIDE, MDV 4 PO LN 13 | 5 | EA | 5 | 24.74 | 123.70 | .00 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 459558 | Vendor: BMSPHM Vend Cat#: & 049420 | KENALOG-10, VL 10MG/ML 5ML PO LN 14 | 5 | EA | 5 | 13.60 | 68.00 | .00 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 929309 | Vendor: METREX Vend Cat#: 10-4000 | DETERGENT, ENZYMATIC METRIZYME PO LN 15 | 1 | CS | 1 | 194.17 | 194.17 | 17.38 | |
| | Tracking # 1Z2R57A30367206036 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1031788 | Vendor: MGM16 Vend Cat#: 16-N181 | NEEDLE, HYPO TW 18GX1" (100/BX PO LN 16 | 5 | BX | 5 | 4.55 | 22.75 | 2.04 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1031800 | Vendor: MGM16 Vend Cat#: 16-N3005 | NEEDLE, HYPO RW 30GX1/2" (100/ PO LN 17 | 7 | BX | 7 | 19.85 | 138.95 | 12.44 | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 42865204 | PO Number 05252022MHK | Invoice Date 05/26/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Tracking # 1Z2R57A30367207517<br>Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1031804 | Vendor: MGM16<br>Vend Cat#: 16-S3C | SYRINGE, LL 3CC (100/BX 24BX/C<br>PO LN 19 | 3 | CS | 3 | 148.34 | 445.02 | 39.83 | |
| | Tracking # 1Z2R57A30367206983 1Z2R57A30367206992 1Z2R57A30367207008<br>Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 565780 | Vendor: JOHCON<br>Vend Cat#: 10312547238134 | POLYSPORIN, OINT 1/32OZ (12BX/<br>PO LN 25 | 4 | CS | 4 | 464.16 | 1856.64 | 166.17 | |
| | Tracking # 1Z2R57A30367206214<br>Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 143490 | Vendor: CONMED<br>Vend Cat#: 130309A | PENCIL, ELECTROSURG HND CNTL W<br>PO LN 28 | 3 | CS | 3 | 159.14 | 477.42 | 42.73 | |
| | Tracking # 1Z2R57A30367206045 1Z2R57A30367206063 1Z2R57A30367207017<br>Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| | | FUEL SURCHARGE<br>PO LN 30 | 1 | EA | 1 | 2.55 | 2.55 | .23 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $321.24 | $49.43 | $71.65 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $5,133.65 | $0.00 | $442.32 | $5,575.97 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1

Shipped From: RCHE1DPD01

MCKESSON MEDICAL-SURGICAL (ROGERS)
12999 WILFRED LANE STE #100
ROGERS,MN 55374
SHIPPED FROM LICENSE: 5-31292

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **67677137** | **Invoice Number** | **42874897** |
| **Sales Order Date** | **05/25/2022** | **Invoice Date** | **05/26/2022** |
| **PO Number** | **05252022MHK** | **Payment Due Date** | **07/25/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$551.37** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 724984 | Vendor: BRSDRF Vend Cat#: 072140006747 | OINTMENT, AQUAPHOR HEALING .9G PO LN 26 | 1 | CS | 1 | 506.08 | 506.08 | 45.29 | |

Tracking # 1ZY8E8030321618282
Shipped: 05/26/2022 From: Rogers Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $32.89 | $5.06 | $7.34 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $506.08 | $0.00 | $45.29 | $551.37 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **42874897** | **Date** | **05/26/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **07/25/2022** | | **$551.37** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 4

RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **60263370** | **Invoice Number** | **39034926** |
| **Sales Order Date** | **02/17/2022** | **Invoice Date** | **02/17/2022** |
| **PO Number** | **02.17.22 EMP** | **Payment Due Date** | **04/18/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$6,820.30** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 565947 | Vendor: HOSPLG<br>Vend Cat#: & 00409733801 | CEFTRIAXONE, SDV 500MG (10/BX)<br>PO LN 1 | 6 | BX | 6 | 12.82 | 76.92 | .00 | |
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 381716 | Vendor: HOSPLG<br>NDC Num: & 00409174910 | MARCAINE HCL +EPI, VL 0.5% 10M<br>PO LN 2 | 6 | BX | 0 | 98.92 | .00 | .00 | |
| 488903 | Vendor: USSUT<br>Vend Cat#: SN-5767G | SUTURE, MONOSOFT BLK 6-0 18" P<br>PO LN 3 | 8 | BX | 0 | 52.09 | .00 | .00 | |
| 153825 | Vendor: ETHCON<br>Vend Cat#: 1915G | SUTURE, GUT PL FAST ABSRB 5-0<br>PO LN 4 | 4 | BX | 4 | 293.25 | 1173.00 | .00 | |
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 2983 | Vendor: ETHCON<br>Vend Cat#: 1644G | SUTURE, GUT PL 4-0 18" P-3 (12<br>PO LN 5 | 4 | BX | 0 | 288.95 | .00 | .00 | |
| 725645 | Vendor: AMREGT<br>Vend Cat#: & 00517072001 | BETAMETHASONE SOD PHOS/ACE, MD<br>PO LN 6 | 10 | EA | 10 | 40.13 | 401.30 | .00 | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **39034926** | **Date** | **02/17/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **04/18/2022** | | **$6,820.30** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 39034926 | PO Number 02.17.22 EMP | Invoice Date 02/17/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 511699 | Vendor: USSUT<br>Vend Cat#: SL-5691G | SUTURE, POLYSORB 4-0 P-13 (12/<br>PO LN 7 | 4 | BX | 4 | 134.98 | 539.92 | .00 | |
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 403360 | Vendor: ETHSPC<br>Vend Cat#: 1972 | SPONGE, GELATIN SURGIFOAM 2CMX<br>PO LN 8 | 1 | EA | 1 | 7.45 | 7.45 | .63 | |
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 505306 | Vendor: SKLAR<br>Vend Cat#: 20-3090 | NEEDLE HOLDER, WEBSTER HVY 5 1<br>PO LN 9 | 1 | EA | 0 | 100.47 | .00 | .00 | |
| 250325 | Vendor: MILTEX<br>Vend Cat#: 8-7 | NEEDLE HOLDER, WEBSTER 4 3/4"<br>PO LN 10 | 1 | EA | 0 | 79.11 | .00 | .00 | |
| 1002261 | Vendor: STLBMD<br>Vend Cat#: NB0507 | FORMALIN, NEUTRAL BUFFERED PRE<br>PO LN 11 | 1 | CS | 1 | 37.26 | 37.26 | 3.17 | |
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 733529 | Vendor: 9BEIRS<br>Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK)<br>PO LN 12 | 1 | PK | 0 | 7.70 | .00 | .00 | |
| 1003250 | Vendor: BD<br>Vend Cat#: 220235 | SWAB, CULTURE MAXV+ AMIES W/O<br>PO LN 13 | 2 | BX | 0 | 58.91 | .00 | .00 | |
| 862369 | Vendor: MGM22<br>Vend Cat#: 471 | SHEATH, HANDPIECE STR 36" (25/<br>PO LN 14 | 8 | BX | 8 | 73.16 | 585.28 | 49.75 | |
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 1202413 | Vendor: HRPHRM<br>Vend Cat#: 6050B | WIPE, PROTECTIVE BARRIER VITUS<br>PO LN 15 | 8 | CS | 0 | 240.35 | .00 | .00 | |
| 404 | Vendor: BD<br>Vend Cat#: 305156 | NEEDLE, HYPO 22GX1 1/2" (100/B<br>PO LN 16 | 1 | CS | 1 | 49.01 | 49.01 | 4.17 | |
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 39034926 | PO Number 02.17.22 EMP | Invoice Date 02/17/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 1065318 | Vendor: SNCAST Vend Cat#: 4209 | TAPE, DRESSING HYPAFIX RETENTI PO LN 17 | 2 | CS | 2 | 345.96 | 691.92 | 58.81 | |
| | Tracking # 1Z2R57A30365742264 1Z2R57A30365742273 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 257803 | Vendor: 9PERSN Vend Cat#: & 00096070737 | DRYSOL, SOL 20% 37.5ML (1/EA) PO LN 19 | 10 | EA | 10 | 11.97 | 119.70 | .00 | |
| | Tracking # 1Z2R57A30365744226 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 194823 | Vendor: USSURG Vend Cat#: E7507 | PAD, GROUNDING PATIENT RETURN PO LN 20 | 4 | CS | 4 | 328.17 | 1312.68 | 111.58 | |
| | Tracking # 1Z2R57A30365742282 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 143490 | Vendor: CONMED Vend Cat#: 130309A | PENCIL, ELECTROSURG HND CNTL W PO LN 21 | 4 | CS | 0 | 158.07 | .00 | .00 | |
| 881681 | Vendor: MGM22 Vend Cat#: 233 | TIP, HYFRECATOR SHARP N/S (100 PO LN 22 | 8 | BX | 8 | 59.72 | 477.76 | 40.61 | |
| | Tracking # 1Z2R57A30365754591 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 691382 | Vendor: ASPNSR Vend Cat#: 2554 | RULER, SURG STR 6" (25/BX) PO LN 23 | 4 | BX | 0 | 22.18 | .00 | .00 | |
| 560284 | Vendor: MGM37 Vend Cat#: 37-6240 | SALINE, IRR SOL STR 100ML (48/ PO LN 24 | 2 | CS | 2 | 32.39 | 64.78 | .00 | |
| | Tracking # 1Z2R57A30365742728 1Z2R57A30365742737 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 864638 | Vendor: MGM138 Vend Cat#: 2201 | DRESSING, XEROFORM 1X8 (50/BX PO LN 25 | 3 | BX | 0 | 36.93 | .00 | .00 | |
| 882991 | Vendor: MGM16 Vend Cat#: 1886 | DRESSING, HYDROCOLLOID FILM-BC PO LN 26 | 3 | BX | 3 | 64.30 | 192.90 | 16.40 | |
| | Tracking # 1Z2R57A30365744226 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 882992 | Vendor: MGM16 Vend Cat#: 1887 | DRESSING, HYDROCOLLOID FILM-BC PO LN 27 | 3 | BX | 3 | 60.81 | 182.43 | 15.51 | |
| | Tracking # 1Z2R57A30365754591 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 307872 | Vendor: MICFLX Vend Cat#: MF-300-M | GLOVE, EXAM LTX MED N/S (100/B PO LN 28 | 1 | CS | 0 | 153.00 | .00 | .00 | |
| 886431 | Vendor: MGM16 Vend Cat#: 4842 | FOAM, ADH SIL W/BORDER 3"X3" ( PO LN 29 | 6 | BX | 6 | 47.10 | 282.60 | 24.02 | |
| | Tracking # 1Z2R57A30365744226 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 1175172 | Vendor: MGM16 Vend Cat#: 16-1311 | PUNCH, BIOPSY DISP STR 3MM (25 PO LN 30 | 2 | BX | 2 | 48.86 | 97.72 | 8.31 | |
| | Tracking # 1Z2R57A30365744226 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 172312 | Vendor: 3M Vend Cat#: 1582 | BANDAGE, COBAN ELAS TAN 2"X5YD PO LN 31 | 1 | BX | 1 | 63.80 | 63.80 | 5.42 | |
| | Tracking # 1Z2R57A30365742433 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 545515 | Vendor: KCLAPC Vend Cat#: 50606 | TOWEL, KLEENEX HRT (600/RL 6RL PO LN 32 | 1 | CS | 1 | 58.31 | 58.31 | 4.96 | |
| | Tracking # 1Z2R57A30365742746 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 495868 | Vendor: JOHCON Vend Cat#: 00300810237895 | POLYSPORIN, OINT 1OZ (24/CS) PO LN 33 | 1 | CS | 0 | 197.92 | .00 | .00 | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 39034926 | PO Number 02.17.22 EMP | Invoice Date 02/17/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 147712 | Vendor: MGM18 Vend Cat#: 18-852 | CAPE, EXAM T/P/T F/B OPN BLU 3 PO LN 34 | 2 | CS | 2 | 28.00 | 56.00 | 4.76 | |
| | Tracking # 1Z2R57A30365742433 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| | | FUEL SURCHARGE PO LN 35 | 1 | EA | 1 | 1.35 | 1.35 | .11 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $266.29 | $40.96 | $40.96 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $6,472.09 | $0.00 | $348.21 | $6,820.30 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 744598 | 8/24/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADCC-082421 |

Page 1 of 2

# Invoice

Bill To:
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To:
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 692363 | 0 | 8/24/2021 | 00030347 | FedEx Priority | 8/24/2021 |

Salesperson(s) PATRICK ATCHITY — Channel

Credit Terms NET 60 — Bill of Lading 282925268716 — FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2105372-013 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-014 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-015 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-016 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-017 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-018 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-019 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-020 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-021 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-022 | 6/1/2026 | 1.00 | | | |
| EC-5230 | | 5.0 EA | 0.0 EA | 1,225.00 | 6,125.00 |
| EPICORD 2X3 CM | | | | | |
| Q4187 6 SQ CM | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| LU23-P2105821-004 | 6/1/2026 | 1.00 | | | |
| LU23-P2105821-005 | 6/1/2026 | 1.00 | | | |
| LU23-P2105821-006 | 6/1/2026 | 1.00 | | | |
| LU23-P2105821-007 | 6/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 744598 | 8/24/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADCC-082421 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Lot/Serial | Expires | Quantity | | | |
|---|---|---|---|---|---|
| LU23-P2105821-008 | 6/1/2026 | 1.00 | | | |
| | | | | Line Total | 19,875.00 |
| | | | USD | Total | 19,875.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 748092 | 9/8/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | AD090821 |



Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 695872 | 0 | 9/8/2021 | 00030347 | FedEx Priority | 9/8/2021 |

Salesperson(s): PATRICK ATCHITY
Channel:

Credit Terms: NET 60
Bill of Lading: 283471851260
FOB Point: Marietta

Message:

Remarks:

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| ES-4400 | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | |
| Q4186 | | | | |

| Lot/Serial | Expires | Quantity |
|---|---|---|
| ES46-P2106122-020 | 6/1/2026 | 1.00 |
| ES46-P2106129-003 | 6/1/2026 | 1.00 |
| ES46-P2106129-004 | 6/1/2026 | 1.00 |
| ES46-P2106129-005 | 6/1/2026 | 1.00 |
| ES46-P2106129-006 | 6/1/2026 | 1.00 |
| ES46-P2106129-007 | 6/1/2026 | 1.00 |
| ES46-P2106129-008 | 6/1/2026 | 1.00 |
| ES46-P2106129-009 | 6/1/2026 | 1.00 |
| ES46-P2106129-010 | 6/1/2026 | 1.00 |
| ES46-P2106129-014 | 6/1/2026 | 1.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 748092 | 9/8/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | AD090821 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 752174 | | 9/24/2021 | 7/20/2022 |
| Bill To 00020219 | Sold To 00030347 | Purchase Order ADC-092421 | |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 699996 | 0 | 9/24/2021 | 00030347 | FedEx Saturday | 9/24/2021 |

Salesperson(s) PATRICK ATCHITY | Channel

Credit Terms NET 60 | Bill of Lading 284160486919 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2106775-008 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-009 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-010 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-011 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-012 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-013 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-014 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-015 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-016 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-017 | 7/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 752174 | | 9/24/2021 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00030347 | ADC-092421 | |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 755754 | | 10/8/2021 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00030347 | AD100821 | |

Page 1 of 1

# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 703602 | 0 | 10/8/2021 | 00030347 | FedEx Priority | 10/8/2021 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 284689006166

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| EC-5230 | | 5.0 EA | 0.0 EA | 1,225.00 | 6,125.00 |
| EPICORD 2X3 CM | | | | | |
| Q4187 6 SQ CM | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| LU23-P2106718-005 | 7/1/2026 | 1.00 | | | |
| LU23-P2106718-006 | 7/1/2026 | 1.00 | | | |
| LU23-P2106718-007 | 7/1/2026 | 1.00 | | | |
| LU23-P2106722-003 | 7/1/2026 | 1.00 | | | |
| LU23-P2106722-004 | 7/1/2026 | 1.00 | | | |

Line Total 6,125.00

USD Total 6,125.00

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 756050 | | 10/11/2021 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00020219 | AD10112021 | |

Page 1 of 1

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 703900 | 0 | 10/11/2021 | 00020219 | FedEx Priority | 10/11/2021 |

Salesperson(s) MARC WATTS | Channel

Credit Terms NET 60 | Bill of Lading 284765258900 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| EC-5230<br>EPICORD 2X3 CM<br>Q4187 6 SQ CM<br>Lot/Serial Expires<br>LU23-P2106760-001 7/1/2026 | 1.0 EA<br><br><br>Quantity<br>1.00 | 0.0 EA | 1,295.00 | 1,295.00 |
| | | | Line Total | 1,295.00 |
| | | USD | Total | 1,295.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 761591 | 11/2/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADERM-Carrollton-11-02-21 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 709493 | 0 | 11/2/2021 | 00030347 | FedEx Priority | 11/2/2021 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 285650164499

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| ES-4400 | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | |
| Q4186 | | | | |

| Lot/Serial | Expires | Quantity |
|---|---|---|
| ES46-P2108158-004 | 8/1/2026 | 1.00 |
| ES46-P2108158-005 | 8/1/2026 | 1.00 |
| ES46-P2108158-006 | 8/1/2026 | 1.00 |
| ES46-P2108158-007 | 8/1/2026 | 1.00 |
| ES46-P2108158-008 | 8/1/2026 | 1.00 |
| ES46-P2108158-009 | 8/1/2026 | 1.00 |
| ES46-P2108158-010 | 8/1/2026 | 1.00 |
| ES46-P2108158-011 | 8/1/2026 | 1.00 |
| ES46-P2108158-012 | 8/1/2026 | 1.00 |
| ES46-P2108158-013 | 8/1/2026 | 1.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 761591 | 11/2/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADERM-Carrollton-11-02-21 |



Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 766059 | 11/18/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 111821 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 713991 | 0 | 11/18/2021 | 00030347 | FedEx Priority | 11/18/2021 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 286313962918
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2108661-004 | 8/1/2026 | 1.00 | | | |
| ES46-P2108661-005 | 8/1/2026 | 1.00 | | | |
| ES46-P2108661-006 | 8/1/2026 | 1.00 | | | |
| ES46-P2108661-007 | 8/1/2026 | 1.00 | | | |
| ES46-P2108661-008 | 8/1/2026 | 1.00 | | | |
| ES46-P2108661-009 | 8/1/2026 | 1.00 | | | |
| ES46-P2108661-010 | 8/1/2026 | 1.00 | | | |
| ES46-P2108661-011 | 8/1/2026 | 1.00 | | | |
| ES46-P2108661-012 | 8/1/2026 | 1.00 | | | |
| ES46-P2108661-013 | 8/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 766059 | 11/18/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 111821 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 769150 | 12/2/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 120221 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 717088 | 0 | 12/2/2021 | 00030347 | FedEx Priority | 12/2/2021 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 286975545080 FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2109056-004 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-005 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-006 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-007 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-008 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-009 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-010 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-011 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-012 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-013 | 9/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 769150 | 12/2/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 120221 |



MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 774918 | 12/28/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADRM-122721 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 722863 | 0 | 12/27/2021 | 00030347 | FedEx Priority | 12/28/2021 |

Salesperson(s) PATRICK ATCHITY — Channel

Credit Terms NET 60 — Bill of Lading 288126068220 — FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| ES-4400 | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | |
| Q4186 | | | | |

| Lot/Serial | Expires | Quantity |
|---|---|---|
| ES46-P2109763-013 | 9/1/2026 | 1.00 |
| ES46-P2109763-014 | 9/1/2026 | 1.00 |
| ES46-P2109763-015 | 9/1/2026 | 1.00 |
| ES46-P2109763-016 | 9/1/2026 | 1.00 |
| ES46-P2109763-017 | 9/1/2026 | 1.00 |
| ES46-P2109763-018 | 9/1/2026 | 1.00 |
| ES46-P2109763-019 | 9/1/2026 | 1.00 |
| ES46-P2109763-020 | 9/1/2026 | 1.00 |
| ES46-P2109763-021 | 9/1/2026 | 1.00 |
| ES46-P2109763-022 | 9/1/2026 | 1.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 774918 | 12/28/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADRM-122721 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 775283 | | 12/28/2021 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00020219 | ADERM-MHK122821 | |

Page 1 of 1

# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 723238 | 0 | 12/28/2021 | 00020219 | FedEx First Over | 12/28/2021 |

Salesperson(s) MARC WATTS | Channel

Credit Terms NET 60 | Bill of Lading 288148338920 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 5.0 EA | 0.0 EA | 1,390.00 | 6,950.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2109814-006 | 9/1/2026 | 1.00 | | | |
| ES46-P2109814-007 | 9/1/2026 | 1.00 | | | |
| ES46-P2109814-008 | 9/1/2026 | 1.00 | | | |
| ES46-P2109814-009 | 9/1/2026 | 1.00 | | | |
| ES46-P2109814-010 | 9/1/2026 | 1.00 | | | |
| | | | | Line Total | 6,950.00 |
| | | | USD | Total | 6,950.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 775286 | 12/28/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030993 | ADH-122821 |

Page 1 of 1

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
PREMIER DERMATOLOGY & MOHS S
747 N BURLINGTON AVENUE
SUITE 312
HASTINGS, NE 68901
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 723241 | 0 | 12/28/2021 | 00030993 | FedEx First Over | 12/28/2021 |

Salesperson(s) KEVIN MAR
Channel

Credit Terms NET 60
Bill of Lading 288148379264
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 3.0 EA | 0.0 EA | 1,395.00 | 4,185.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2109814-011 | 9/1/2026 | 1.00 | | | |
| ES46-P2109814-012 | 9/1/2026 | 1.00 | | | |
| ES46-P2109814-013 | 9/1/2026 | 1.00 | | | |

Line Total 4,185.00

USD Total 4,185.00

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 778561 | 1/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 1132022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 726550 | 0 | 1/13/2022 | 00030347 | FedEx Priority | 1/13/2022 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 288706268390
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| ES-4400<br>EPIFIX MESH 4X4.5 CM<br>Q4186 | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |

| Lot/Serial | Expires | Quantity |
|---|---|---|
| ES46-P2110220-005 | 10/1/2026 | 1.00 |
| ES46-P2110220-006 | 10/1/2026 | 1.00 |
| ES46-P2110220-007 | 10/1/2026 | 1.00 |
| ES46-P2110220-008 | 10/1/2026 | 1.00 |
| ES46-P2110220-009 | 10/1/2026 | 1.00 |
| ES46-P2110220-010 | 10/1/2026 | 1.00 |
| ES46-P2110220-011 | 10/1/2026 | 1.00 |
| ES46-P2110220-012 | 10/1/2026 | 1.00 |
| ES46-P2110220-013 | 10/1/2026 | 1.00 |
| ES46-P2110220-014 | 10/1/2026 | 1.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 778561 | 1/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 1132022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 778600 | 1/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030993 | 02132022 |

Page 1 of 1

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
PREMIER DERMATOLOGY & MOHS S
747 N BURLINGTON AVENUE
SUITE 312
HASTINGS, NE 68901
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 726589 | 0 | 1/13/2022 | 00030993 | FedEx First Over | 1/13/2022 |

Salesperson(s) KEVIN MAR — Channel

Credit Terms NET 60 — Bill of Lading 288711913108 — FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 4.0 EA | 0.0 EA | 1,395.00 | 5,580.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2110229-003 | 10/1/2026 | 1.00 | | | |
| ES46-P2110229-004 | 10/1/2026 | 1.00 | | | |
| ES46-P2110229-005 | 10/1/2026 | 1.00 | | | |
| ES46-P2110229-006 | 10/1/2026 | 1.00 | | | |
| | | | | Line Total | 5,580.00 |
| | | | USD | Total | 5,580.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 780328 | 1/21/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 012122 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 728336 | 0 | 1/21/2022 | 00020219 | FedEx Priority | 1/21/2022 |

Salesperson(s) MARC WATTS | Channel

Credit Terms NET 60 | Bill of Lading 289014765437 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2110385-013 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-014 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-015 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-016 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-017 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-018 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-019 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-020 | 10/1/2026 | 1.00 | | | |
| ES46-P2110386-003 | 10/1/2026 | 1.00 | | | |
| ES46-P2110386-004 | 10/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 780328 | 1/21/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 012122 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| | | |
|---|---|---|
| | Line Total | 13,750.00 |
| USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 781312 | 1/26/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 01262022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 729328 | 0 | 1/26/2022 | 00030347 | FedEx Priority | 1/26/2022 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 289174147186
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2110495-015 | 10/1/2026 | 1.00 | | | |
| ES46-P2110495-016 | 10/1/2026 | 1.00 | | | |
| ES46-P2110495-017 | 10/1/2026 | 1.00 | | | |
| ES46-P2110495-018 | 10/1/2026 | 1.00 | | | |
| ES46-P2110495-019 | 10/1/2026 | 1.00 | | | |
| ES46-P2110495-020 | 10/1/2026 | 1.00 | | | |
| ES46-P2110499-003 | 10/1/2026 | 1.00 | | | |
| ES46-P2110499-004 | 10/1/2026 | 1.00 | | | |
| ES46-P2110499-005 | 10/1/2026 | 1.00 | | | |
| ES46-P2110499-006 | 10/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 781312 | 1/26/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 01262022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 783525 | 2/4/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 2/4/2022 |

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 731549 | 0 | 2/4/2022 | 00020219 | FedEx Priority | 2/4/2022 |

Salesperson(s) MARC WATTS
Channel

Credit Terms NET 60
Bill of Lading 289490105427
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2110866-011 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-012 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-013 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-014 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-015 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-016 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-017 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-018 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-019 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-020 | 10/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 783525 | 2/4/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 2/4/2022 |



MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 784920 | 2/10/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 02102022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 732938 | 0 | 2/10/2022 | 00030347 | FedEx Priority | 2/10/2022 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 289713914250
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2111033-011 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-012 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-013 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-014 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-015 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-016 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-017 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-018 | 11/1/2026 | 1.00 | | | |
| ES46-P2111039-003 | 11/1/2026 | 1.00 | | | |
| ES46-P2111039-004 | 11/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 784920 | | 2/10/2022 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00030347 | 02102022 | |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 786237 | 2/16/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030993 | 02162022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
PREMIER DERMATOLOGY & MOHS S
747 N BURLINGTON AVENUE
SUITE 312
HASTINGS, NE 68901
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 734288 | 0 | 2/16/2022 | 00030993 | FedEx Priority | 2/16/2022 |

Salesperson(s) KEVIN MAR — Channel

Credit Terms NET 60 — Bill of Lading 289915752633 — FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400<br>EPIFIX MESH 4X4.5 CM<br>Q4186 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2111259-006 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-007 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-008 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-009 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-010 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-011 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-012 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-013 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-015 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-016 | 11/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 786237 | 2/16/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030993 | 02162022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

PREMIER DERMATOLOGY & MOHS S
747 N BURLINGTON AVENUE
SUITE 312
HASTINGS, NE 68901
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 787599 | 2/22/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADerm-022222 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 735638 | 0 | 2/22/2022 | 00030347 | FedEx Priority | 2/22/2022 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 270126984804
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2111553-012 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-013 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-014 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-015 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-016 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-017 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-018 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-019 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-020 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-021 | 11/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 787599 | 2/22/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADerm-022222 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | |
|---|---|---|
| | Line Total | 13,750.00 |
| USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 789180 | 3/1/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 03012022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 737224 | 0 | 3/1/2022 | 00030347 | FedEx Priority | 3/1/2022 |

Salesperson(s) PATRICK ATCHITY | Channel

Credit Terms NET 60 | Bill of Lading 270364116893 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| ES-4400<br>EPIFIX MESH 4X4.5 CM<br>Q4186 | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |

| Lot/Serial | Expires | Quantity |
|---|---|---|
| ES46-P2110451-009 | 10/1/2026 | 1.00 |
| ES46-P2110451-010 | 10/1/2026 | 1.00 |
| ES46-P2110451-011 | 10/1/2026 | 1.00 |
| ES46-P2110451-012 | 10/1/2026 | 1.00 |
| ES46-P2110451-013 | 10/1/2026 | 1.00 |
| ES46-P2110451-014 | 10/1/2026 | 1.00 |
| ES46-P2110451-015 | 10/1/2026 | 1.00 |
| ES46-P2110451-016 | 10/1/2026 | 1.00 |
| ES46-P2112139-016 | 12/1/2026 | 1.00 |
| ES46-P2112139-017 | 12/1/2026 | 1.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 789180 | 3/1/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 03012022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 791508 | 3/10/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 03102022 |



MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 739558 | 0 | 3/10/2022 | 00030347 | FedEx Priority | 3/10/2022 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 270728466822

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2112411-024 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-025 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-026 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-027 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-028 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-029 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-030 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-031 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-032 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-033 | 12/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 791508 | 3/10/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 03102022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 793553 | 3/18/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 03182022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 741610 | 0 | 3/18/2022 | 00020219 | FedEx First Over | 3/18/2022 |

Salesperson(s) MARC WATTS | Channel

Credit Terms NET 60 | Bill of Lading 271029111935 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 20.0 EA | 0.0 EA | 1,150.00 | 23,000.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2200151-008 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-009 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-010 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-011 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-012 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-013 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-014 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-015 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-016 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-017 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-018 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-019 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-020 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-021 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-022 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-023 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-024 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-025 | 1/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 793553 | 3/18/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 03182022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Lot/Serial | Expires | Quantity | | | |
|---|---|---|---|---|---|
| ES46-P2200151-026 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-027 | 1/1/2027 | 1.00 | | | |
| | | | | Line Total | 23,000.00 |
| | | | USD | Total | 23,000.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 795958 | 3/29/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 32922 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 744026 | 0 | 3/29/2022 | 00030347 | FedEx Priority | 3/29/2022 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 271409135596
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 20.0 EA | 0.0 EA | 1,150.00 | 23,000.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2200582-009 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-011 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-012 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-013 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-015 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-016 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-017 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-018 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-019 | 1/1/2027 | 1.00 | | | |
| ES46-P2200635-020 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-003 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-004 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-005 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-006 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-007 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-008 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-009 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-010 | 1/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
<u>**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**</u>
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 795958 | 3/29/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 32922 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Lot/Serial | Expires | Quantity | | | |
|---|---|---|---|---|---|
| ES46-P2200638-011 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-012 | 1/1/2027 | 1.00 | | | |
| | | | | Line Total | 23,000.00 |
| | | | USD | Total | 23,000.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 799856 | 4/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 04132022 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 747964 | 0 | 4/13/2022 | 00030347 | FedEx Priority | 4/13/2022 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 271993639522

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2201127-024 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-025 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-026 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-027 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-028 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-029 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-030 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-031 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-032 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-033 | 2/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 799856 | 4/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 04132022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 801754 | 4/21/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 4/21/2022 |

Page 1 of 2

Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 749877 | 0 | 4/21/2022 | 00030347 | FedEx Priority | 4/21/2022 |

Salesperson(s) PATRICK ATCHITY | Channel

Credit Terms NET 60 | Bill of Lading 272275620198 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2201477-035 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-003 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-004 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-005 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-006 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-007 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-008 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-009 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-010 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-011 | 2/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 801754 | 4/21/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 4/21/2022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 802717 | 4/25/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 042522 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 750846 | 0 | 4/25/2022 | 00030347 | FedEx Priority | 4/25/2022 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 272404477058

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2201602-003 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-004 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-005 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-006 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-007 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-008 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-009 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-010 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-011 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-012 | 2/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 802717 | 4/25/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 042522 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | |
|---|---|---|
| | Line Total | 11,500.00 |
| USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 805749 | 5/5/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 05052022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 753890 | 0 | 5/5/2022 | 00030347 | FedEx Priority | 5/5/2022 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 272820604283

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2201021-039 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-040 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-041 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-042 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-043 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-044 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-045 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-046 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-047 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-048 | 2/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 805749 | | 5/5/2022 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00030347 | 05052022 | |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 808342 | 5/16/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 05162022 |

Page 1 of 2

# Invoice

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 756494 | 0 | 5/16/2022 | 00030347 | FedEx Priority | 5/16/2022 |

Salesperson(s) PATRICK ATCHITY | Channel

Credit Terms NET 60 | Bill of Lading 273203587056 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400<br>EPIFIX MESH 4X4.5 CM<br>Q4186 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2202414-020 | 3/1/2027 | 1.00 | | | |
| ES46-P2202414-021 | 3/1/2027 | 1.00 | | | |
| ES46-P2202414-022 | 3/1/2027 | 1.00 | | | |
| ES46-P2202414-023 | 3/1/2027 | 1.00 | | | |
| ES46-P2202414-024 | 3/1/2027 | 1.00 | | | |
| ES46-P2202419-003 | 3/1/2027 | 1.00 | | | |
| ES46-P2202419-004 | 3/1/2027 | 1.00 | | | |
| ES46-P2202419-005 | 3/1/2027 | 1.00 | | | |
| ES46-P2202419-006 | 3/1/2027 | 1.00 | | | |
| ES46-P2202419-007 | 3/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 808342 | 5/16/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 05162022 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 808569 | 5/17/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 05172022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 756714 | 0 | 5/17/2022 | 00020219 | FedEx Priority | 5/17/2022 |

Salesperson(s) MARC WATTS
Channel

Credit Terms NET 60
Bill of Lading 273239140106
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2202121-025 | 3/1/2027 | 1.00 | | | |
| ES46-P2202121-026 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-003 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-004 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-005 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-006 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-007 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-008 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-009 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-010 | 3/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 808569 | | 5/17/2022 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00020219 | 05172022 | |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 811362 | 5/26/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 5/26/2022 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 759504 | 0 | 5/26/2022 | 00030347 | FedEx Priority | 5/26/2022 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 273601968910

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| ES-4400 | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | |
| Q4186 | | | | |

| Lot/Serial | Expires | Quantity |
|---|---|---|
| ES46-P2202666-020 | 3/1/2027 | 1.00 |
| ES46-P2202666-021 | 3/1/2027 | 1.00 |
| ES46-P2202666-022 | 3/1/2027 | 1.00 |
| ES46-P2202666-023 | 3/1/2027 | 1.00 |
| ES46-P2202666-024 | 3/1/2027 | 1.00 |
| ES46-P2202676-003 | 3/1/2027 | 1.00 |
| ES46-P2202676-004 | 3/1/2027 | 1.00 |
| ES46-P2202676-005 | 3/1/2027 | 1.00 |
| ES46-P2202676-006 | 3/1/2027 | 1.00 |
| ES46-P2202676-007 | 3/1/2027 | 1.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 811362 | | 5/26/2022 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00030347 | 5/26/2022 | |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 812087 | | 5/31/2022 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00020219 | 05312022 | |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 760238 | 0 | 5/31/2022 | 00020219 | FedEx Priority | 5/31/2022 |

Salesperson(s) MARC WATTS
Channel

Credit Terms NET 60
Bill of Lading 273754277305
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2202816-012 | 3/1/2027 | 1.00 | | | |
| ES46-P2202816-013 | 3/1/2027 | 1.00 | | | |
| ES46-P2202816-014 | 3/1/2027 | 1.00 | | | |
| ES46-P2202816-015 | 3/1/2027 | 1.00 | | | |
| ES46-P2202816-016 | 3/1/2027 | 1.00 | | | |
| ES46-P2202816-017 | 3/1/2027 | 1.00 | | | |
| ES46-P2202816-018 | 3/1/2027 | 1.00 | | | |
| ES46-P2202816-019 | 3/1/2027 | 1.00 | | | |
| ES46-P2202816-020 | 3/1/2027 | 1.00 | | | |
| ES46-P2202824-003 | 3/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 812087 | 5/31/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 05312022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| | | |
|---|---|---|
| | Line Total | 11,500.00 |
| USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 813531 | 6/6/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | AD-050622 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 761685 | 0 | 6/6/2022 | 00030347 | FedEx Priority | 6/6/2022 |

Salesperson(s) PATRICK ATCHITY — Channel

Credit Terms NET 60 — Bill of Lading 274004553011 — FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 20.0 EA | 0.0 EA | 1,150.00 | 23,000.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2202962-017 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-018 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-019 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-020 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-021 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-022 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-023 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-024 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-025 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-003 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-004 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-005 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-006 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-007 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-008 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-009 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-010 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-011 | 4/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement. Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 813531 | 6/6/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | AD-050622 |



Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Lot/Serial | Expires | Quantity | | | |
|---|---|---|---|---|---|
| ES46-P2202963-012 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-013 | 4/1/2027 | 1.00 | | | |
| | | | | Line Total | 23,000.00 |
| | | | USD | Total | 23,000.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 815218 | 6/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADERM-061322 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 763384 | 0 | 6/13/2022 | 00030347 | FedEx Priority | 6/13/2022 |

Salesperson(s) PATRICK ATCHITY — Channel

Credit Terms NET 30 — Bill of Lading 274287958830 — FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 20.0 EA | 0.0 EA | 1,150.00 | 23,000.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2203228-004 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-005 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-006 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-007 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-008 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-009 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-010 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-011 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-012 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-013 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-014 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-015 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-016 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-017 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-018 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-019 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-020 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-021 | 4/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 815218 | 6/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADERM-061322 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Lot/Serial | Expires | Quantity | | | |
|---|---|---|---|---|---|
| ES46-P2203228-022 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-023 | 4/1/2027 | 1.00 | | | |
| | | | | Line Total | 23,000.00 |
| | | | USD | Total | 23,000.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 820756 | 7/7/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | AD07072022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 768943 | 0 | 7/7/2022 | 00020219 | FedEx Priority | 7/7/2022 |

Salesperson(s) MARC WATTS
Channel

Credit Terms NET 30
Bill of Lading 275253751070
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2204385-021 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-022 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-023 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-024 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-025 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-026 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-027 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-028 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-029 | 5/1/2027 | 1.00 | | | |
| ES46-P2204387-003 | 5/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 820756 | 7/7/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | AD07072022 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 1124-1217

tidesmedical.

More Application Info

# Artacent® Wound

Artacent Wound is the only wound-specific amniotic patch that can be applied with either side facing the wound. Amniotic tissues are safe, natural biologic barriers delivering essential growth factors on a structural collagen matrix. The unique design of Artacent Wound allows for easy manipulation and repositioning, making it a flexible, dependable option for a variety of wound covering applications.



## Wound covering for patients with these types of chronic wounds

- Diabetic Ulcers
- Pressure Ulcers

- Venous Stasis Ulcers
- Burns
- Mohs Surgery

## Key Benefits of Artacent Wound

- Dual layering of amniotic tissue.
- Ability to place either side facing the wound.
- Stores dry at room temperature rather than cryopreservation.
- Readily adheres to wound surface without requiring sutures.
- Repositionable design reverts to original shape when placed in saline.
- Excellent handling – maintains shape when placed on moist wound bed.

## Tides Medical Offers Reimbursement Services for Artacent Wound:

- Coding Help
- Benefits Verification
- Pre-authorization
- Pre-certification

FIND OUT MORE ABOUT REIMBURSEMENT FOR ARTACENT WOUND




BIOLOGICS • AmnioHeal® Plus • Artacent® Flex • Artacent® Wound • Artacent® Ocular • Artacleanse® Process

Copyright © 2021 Tides Medical | All Rights Reserved | Licensures and Certifications | Employee Portal

# ARTACENT™ WOUND PACKAGE INSERT AND INSTRUCTIONS FOR USE

Description:

This human tissue allograft is supplied and processed by Tides Medical. This allograft is derived from voluntarily DONATED HUMAN TISSUES. Artacent is a dual-layer, dehydrated amniotic membrane allograft. Human amniotic membrane is a thin collagenous membrane derived from the submucosa of the placenta, the organ that connects the developing fetus to the mother's uterus. Human amniotic membrane consists of multiple layers including epithelial cells, a basement membrane, and a stromal matrix.

This allograft is supplied sterile.

Regulatory Classification:

This allograft is a human tissue product for transplantation. It is processed and distributed in accordance with FDA requirements for Human Cellular and Tissue-based Products (HCT/P) (21 CFR Part 1271), State regulations, and the guidelines of the American Association of Tissue Banks (AATB).
Caution: Federal Law restricts this product to sale by or on the order of a licensed medical professional, not for veterinary use.

Applications and Directions for Use:

This allograft may be used as a wound covering in various surgical procedures. It may be used independently or in combination with autologous tissue or other forms of allograft tissue.

Preparation of Allograft for Use:

Once a package seal has been compromised, the tissue shall be either transplanted, if appropriate, or properly discarded. Used allograft containers should be disposed of in accordance with recognized procedures for discarding medical waste material.

Prepare the allograft for use in accordance with the following procedures:

1. Open the 1st peel pouch and deliver the innermost sterile sealed pouch containing the allograft material to a sterile field.
2. Open the sterile sealed pouch and carefully deliver the graft to a sterile field for transplantation. PLEASE USE CAUTION WHEN REMOVING ALLOGRAFT FROM POUCH AS THE ALLOGRAFT IS THIN AND LIGHTWEIGHT
3. The allograft may be cut and shaped to the appropriate size required prior to placement
4. The allograft should then be placed onto the surgical site
5. Absorbable/non-absorbable suture material and/or tissue adhesives may be used to apply the graft to the surgical site, if necessary.
6. Once applied to the surgical site, the allograft can be hydrated with sterile saline or other sterile solution, if needed.

If for any reason the graft is opened and not used, it should be disposed of properly or returned to Tides Medical by contacting Customer Service and following appropriate return procedures. Document the reason for the non-use of the graft and indicate the disposition of the tissue on the enclosed Transplant Record and return the record to Tides Medical.

Donor Recovery, Screening and Processing:

After authorization for donation is obtained (represented by the mothers of the newborn children), collection of the donor tissue is performed in an aseptic manner by appropriately licensed tissue establishments. Donor eligibility is carefully evaluated as required by the US FDA and in accordance with AATB Standards and applicable State guidelines. Tissue donors are evaluated for high-risk behaviors and relevant communicable diseases. Screening includes a review of the donor medical and social history, a physical assessment, serological screening, and tissue collection microbiology.
Each donor is tested and shown to be negative or nonreactive for the following:

| | | | |
|---|---|---|---|
| HIV-1&2 Antibody | Hepatitis B Surface Antigen | Syphilis Rapid Plasma Reagin or Treponemal Specific Assay | Human T-Cell Lymphotropic Virus Type I Antibody (not required) |
| Hepatitis C Virus Antibody | Hepatitis B Core Antibody (total) | HIV1/HCV/HBV Nucleic Acid Test (NAT) | Human T-Cell Lymphotropic Virus Type II Antibody (not required) |
| West Nile Virus (WNV NAT) | | | |

This testing is performed by a laboratory registered with FDA to perform donor testing and certified to perform such testing on human specimens under the Clinical Laboratory Improvement Amendments of 1988 (CLIA) and 42 CFR part 493, or that has met equivalent requirements as determined by the Centers for Medicare and Medicaid Services (CMS). Test kits used are approved by the FDA.

Tides Medical's Medical Director has determined this donor tissue to be eligible for transplantation. The testing and medical release records are maintained by Tides Medical

Allograft tissues are processed in a controlled environment using methods designed to prevent contamination and cross contamination. Proprietary physiological buffers and surfactants are used during processing. Allograft tissue may contain traces of these processing agents. Final products are sized and packaged according to approved specifications and procedures and are sterilized using electron beam irradiation.

Note: Allograft tissues will naturally vary in color. Occasional dark spots or localized discoloration is a normal occurrence.

Warnings and Contraindications:

Careful donor screening, laboratory testing, tissue processing, and gamma irradiation have been utilized to minimize the risk of transmission of relevant communicable diseases to the patient. As with any processed human donor tissue, this graft cannot be guaranteed to be free of all pathogens.

This allograft is intended for single patient use only.
Do NOT reuse or re-sterilize.

Prior to Usage: Examine Allograft Packaging – Do Not Use This Allograft If:

Any part of the package or product elements appear to be missing, tampered with or damaged.
The product label or identifying bar code is severely damaged, illegible or missing.
The expiration date shown on the package label has passed.

If any of the above conditions exist or are suspected, this allograft should NOT be used.

Contraindications:

Dehydrated amnion allografts should not be implanted into: (1) areas of active or latent infection; and/or (2) into a patient with a disorder that would create an unacceptable risk of post-operative complications. Additional contraindications for the use of this allograft shall be determined by a licensed practitioner.

Packaging and Labeling:

Each allograft distributed by Tides Medical is identified by its own unique serial number. The allograft is packaged in a pouch. Each pouch features a peel back seal and is also heat sealed to provide a sterile barrier. The package label includes graft details such as dimensions. Contents of the package are sterile unless the package is opened or damaged.

Recommended Storage and Expiration:

Maintain allograft in a clean, dry environment at ambient temperature (15°C to 30°C). No refrigeration is necessary, protect from freezing.

See package label for expiration dating.

It is the responsibility of the Tissue Dispensing Service, Tissue Distribution Intermediary, and/or End-User clinician to maintain tissue intended for transplantation in appropriate storage conditions prior to further Distribution or transplant and that Recipient records must be maintained for the purpose of tracing tissue post-transplantation.

Returns:

If for any reason tissue must be returned, a return authorization is required from Tides Medical prior to shipping. It is the responsibility of the health care institution returning the tissue to adequately package and label the tissue for return shipment.

Recipient Tracking:

The F.D.A. requires that recipient records be maintained for the purpose of tracking the allograft following surgical transplantation. The surgeon or operating staff member must complete the enclosed Allograft Utilization Record, attach a peal-off allograft-tracking label and patient label, and mail it to Tides Medical. Please use the remaining peel-off, allograft-tracking labels for patient and hospital records.

Adverse Effects and Reporting:

As allografts are composed of proteins such as collagen, the potential for hypersensitivity, allergic reactions or other immune responses may exist. All adverse outcomes potentially attributed to this allograft must be promptly reported to Tides Medical.

Possible complications can occur with any surgical procedure including, but not limited to pain, infection, hematoma, and/or immune rejection of the introduced tissue.

Disease screening methods are limited; therefore, certain diseases may not be detected.

The following complications of tissue transplantation may occur:
Transmission of diseases of unknown etiology;
Transmission of known infectious agents including, but not limited to viruses, bacteria, and fungi.

Any adverse reactions, including the suspected transmission of disease attributable to this allograft should be immediately reported to Tides Medical.

Disposal:

Allograft disposal shall be in accordance with local, state, and federal regulations for human tissue.

Inquiries:

For additional information, to place an order, or to report adverse reactions, contact: Tides Medical Customer Service at:

Phone: 888-494-4441
Fax: 781-823-0321
customerservice@tidesmedical.com

tidesmedical

Donor eligibility determination and processed by Tides Medical
1819 W. Pinhook Road
Suite 206
Lafayette, LA 70508
(888) 494-4441
FDA Registration FEI: 3010125671

| Title: | ARTACENT™ WOUND PACKAGE INSERT AND INSTRUCTIONS FOR USE | Number: | LBL-078 | Revision:<br>Date: | 03<br>02/14/2020 |
|---|---|---|---|---|---|

# Medical Policy

BlueCross BlueShield Kansas
An Independent licensee of the Blue Cross Blue Shield Association

# Title: Amniotic Membrane and Amniotic Fluid

| | |
|---|---|
| Related Policies: | ▪ *Bio-Engineered Skin and Soft Tissue Substitutes*<br>▪ *Orthopedic Applications of Stem Cell Therapy (Including Allografts and Bone Substitutes Used With Autologous Bone Marrow)*<br>▪ *Recombinant and Autologous Platelet-Derived Growth Factors for Wound Healing and Other Non–Orthopedic Conditions* |

| **Professional** | **Institutional** |
|---|---|
| Original Effective Date: March 20, 2017 | Original Effective Date: March 20, 2017 |
| Revision Date(s): March 20, 2017; January 1, 2019; February 18, 2019; March 27, 2019; May 21, 2019; September 27, 2019; October 1, 2019; July 1, 2020; July 16, 2021; October 8, 2021; January 3, 2022; April 1, 2022; April 8, 2022 | Revision Date(s): March 20, 2017; January 1, 2019; February 18, 2019; March 27, 2019; May 21, 2019; September 27, 2019; October 1, 2019; July 1, 2020; July 16, 2021; October 8, 2021; January 3, 2022; April 1, 2022; April 8, 2022 |
| Current Effective Date: July 16, 2021 | Current Effective Date: July 16, 2021 |

**State and Federal mandates and health plan member contract language, including specific provisions/exclusions, take precedence over Medical Policy and must be considered first in determining eligibility for coverage. To verify a member's benefits, contact Blue Cross and Blue Shield of Kansas Customer Service.**

**The BCBSKS Medical Policies contained herein are for informational purposes and apply only to members who have health insurance through BCBSKS or who are covered by a self-insured group plan administered by BCBSKS. Medical Policy for FEP members is subject to FEP medical policy which may differ from BCBSKS Medical Policy.**

**The medical policies do not constitute medical advice or medical care. Treating health care providers are independent contractors and are neither employees nor agents of Blue Cross and Blue Shield of Kansas and are solely responsible for diagnosis, treatment and medical advice.**

**If your patient is covered under a different Blue Cross and Blue Shield plan, please refer to the Medical Policies of that plan.**

| Populations | Interventions | Comparators | Outcomes |
|---|---|---|---|
| Individuals: | Interventions of interest are: | Comparators of interest are:<br>• Standard wound care | Relevant outcomes include:<br>• Symptoms |

| Populations | Interventions | Comparators | Outcomes |
|---|---|---|---|
| • With nonhealing diabetic lower-extremity ulcers | • Patch or flowable formulation of human amniotic membrane | • Advanced wound therapies | • Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With lower-extremity ulcers due to venous insufficiency | Interventions of interest are:<br>• Patch or flowable formulation of human amniotic membrane | Comparators of interest are:<br>• Compression therapy<br>• Advanced wound therapies | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With knee osteoarthritis | Interventions of interest are:<br>• Injection of suspension or particulate formulation of human amniotic membrane or amniotic fluid | Comparators of interest are:<br>• Conservative therapy<br>• Corticosteroid injections | Relevant outcomes include:<br>• Symptoms<br>• Functional outcomes<br>• Quality of life<br>• Treatment-related morbidity |
| Individuals:<br>• With plantar fasciitis | Interventions of interest are:<br>• Injection of suspension or particulate formulation of human amniotic membrane or amniotic fluid | Comparators of interest are:<br>• Conservative therapy<br>• Corticosteroid injections | Relevant outcomes include:<br>• Symptoms<br>• Functional outcomes<br>• Quality of life<br>• Treatment-related morbidity |
| Individuals:<br>• With neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative treatment | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With corneal ulcers or melts that do not respond to initial medical therapy | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With bullous keratopathy as a palliative measure in patients who are not candidates for a | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Populations | Interventions | Comparators | Outcomes |
|---|---|---|---|
| curative treatment (e.g., endothelial or penetrating keratoplasty) | | | |
| Individuals:<br>• With partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With moderate or severe Stevens-Johnson syndrome | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With persistent epithelial defects that do not respond to conservative therapy | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With severe dry eye with ocular surface damage and inflammation that does not respond to conservative therapy | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With moderate or severe acute ocular chemical burn | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With corneal perforation when corneal tissue is not immediately available | Interventions of interest are:<br>• Sutured human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft | Interventions of interest are:<br>• Sutured or glued human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Populations | Interventions | Comparators | Outcomes |
|---|---|---|---|
| Individuals:<br>• Who have undergone Mohs micrographic surgery for skin cancer on the face, head, neck, or dorsal hand | Interventions of interest are:<br>• Human amniotic membrane | Comparators of interest are:<br>• Autologous tissue-based surgical repair (full-thickness skin grafts and flaps)<br>• Non-surgical treatment (e.g., secondary intention healing) | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |

## DESCRIPTION

Several commercially available forms of human amniotic membrane (HAM) and amniotic fluid can be administered by patches, topical application, or injection. Amniotic membrane and amniotic fluid are being evaluated for the treatment of a variety of conditions, including chronic full-thickness diabetic lower-extremity ulcers, venous ulcers, knee osteoarthritis, plantar fasciitis, and ophthalmic conditions.

## OBJECTIVE

The objective of this evidence review is to evaluate whether various human amniotic membrane products improve the net health outcome for patients with various diabetic and venous ulcers, osteoarthritis, plantar fasciitis, and ophthalmic conditions.

## BACKGROUND

### Human Amniotic Membrane

Human amniotic membrane (HAM) consists of 2 conjoined layers, the amnion, and chorion, and forms the innermost lining of the amniotic sac or placenta. When prepared for use as an allograft, the membrane is harvested immediately after birth, cleaned, sterilized, and either cryopreserved or dehydrated. Many products available using amnion, chorion, amniotic fluid, and umbilical cord are being studied for the treatment of a variety of conditions, including chronic full-thickness diabetic lower-extremity ulcers, venous ulcers, knee osteoarthritis, plantar fasciitis, and ophthalmic conditions. The products are formulated either as patches, which can be applied as wound covers, or as suspensions or particulates, or connective tissue extractions, which can be injected or applied topically.

Fresh amniotic membrane contains collagen, fibronectin, and hyaluronic acid, along with a combination of growth factors, cytokines, and anti-inflammatory proteins such as interleukin-1 receptor antagonist.[1] There is evidence that the tissue has anti-inflammatory, antifibroblastic, and antimicrobial properties. HAM is considered nonimmunogenic and has not been observed to cause a substantial immune response. It is believed that these properties are retained in cryopreserved HAM and HAM products, resulting in a readily available tissue with regenerative potential. In support, 1 HAM product has been shown to elute growth factors into saline and stimulate the migration of mesenchymal stem cells, both in vitro and in vivo.[2]

Use of a HAM graft, which is fixated by sutures, is an established treatment for disorders of the corneal surface, including neurotrophic keratitis, corneal ulcers and melts, following pterygium

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

repair, Stevens-Johnson syndrome, and persistent epithelial defects. Amniotic membrane products that are inserted like a contact lens have more recently been investigated for the treatment of corneal and ocular surface disorders. Amniotic membrane patches are also being evaluated for the treatment of various other conditions, including skin wounds, burns, leg ulcers, and prevention of tissue adhesion in surgical procedures.[1,] Additional indications studied in preclinical models include tendonitis, tendon repair, and nerve repair. The availability of HAM opens the possibility of regenerative medicine for an array of conditions.

**Amniotic Fluid**

Amniotic fluid surrounds the fetus during pregnancy and provides protection and nourishment. In the second half of gestation, most of the fluid is a result of micturition and secretion from the respiratory tract and gastrointestinal tract of the fetus, along with urea.[1,] The fluid contains proteins, carbohydrates, peptides, fats, amino acids, enzymes, hormones, pigments, and fetal cells. Use of human and bovine amniotic fluid for orthopedic conditions was first reported in 1927.[3,] Amniotic fluid has been compared with synovial fluid, containing hyaluronan, lubricant, cholesterol, and cytokines. Injection of amniotic fluid or amniotic fluid-derived cells is currently being evaluated for the treatment of osteoarthritis and plantar fasciitis.

- Amniotic membrane and amniotic fluid are also being investigated as sources of pluripotent stem cells.[1,] Pluripotent stem cells can be cultured and are capable of differentiation toward any cell type. The use of stem cells in orthopedic applications is addressed in BCBSKS medical policy *Orthopedic Applications of Stem Cell Therapy (Including Allografts and Bone Substitutes Used With Autologous Bone Marrow).*

**REGULATORY STATUS**

The U.S. Food and Drug Administration (FDA) regulates human cells and tissues intended for implantation, transplantation, or infusion through the Center for Biologics Evaluation and Research, under Code of Federal Regulation, Title 21, parts 1270 and 1271. In 2017, the FDA published clarification of what is considered minimal manipulation and homologous use for human cells, tissues, and cellular and tissue-based products (HCT/Ps).[4,]

HCT/Ps are defined as human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient. If an HCT/P does not meet the criteria below and does not qualify for any of the stated exceptions, the HCT/P will be regulated as a drug, device, and/or biological product and applicable regulations and premarket review will be required.

An HCT/P is regulated solely under section 361 of the PHS Act and 21 CFR Part 1271 if it meets all of the following criteria:

1. "The HCT/P is minimally manipulated;
2. The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
3. The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
4. Either:

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

i. The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
ii. The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
    a. Is for autologous use;
    b. Is for allogeneic use in a first-degree or second-degree blood relative; or
    c. Is for reproductive use."

The guidance provides the following specific examples of homologous and non-homologous use for amniotic membrane:

a. "Amniotic membrane is used for bone tissue replacement to support bone regeneration following surgery to repair or replace bone defects. This is not a homologous use because bone regeneration is not a basic function of amniotic membrane.
b. An amniotic membrane product is used for wound healing and/or to reduce scarring and inflammation. This is not homologous use because wound healing and reduction of scarring and inflammation are not basic functions of amniotic membrane.
c. An amniotic membrane product is applied to the surface of the eye to cover or offer protection from the surrounding environment in ocular repair and reconstruction procedures. This is homologous use because serving as a covering and offering protection from the surrounding environment are basic functions of amniotic membrane."

The FDA noted the intention to exercise enforcement discretion for the next 36 months after publication of the guidance.

In 2003, Prokera was cleared for marketing by the FDA through the 510(k) process for the ophthalmic conformer that incorporates amniotic membrane (K032104). The FDA determined that this device was substantially equivalent to the Symblepharon Ring. The Prokera device is intended "for use in eyes in which the ocular surface cells have been damaged, or underlying stroma is inflamed and scarred."[5,] The development of Prokera, a commercially available product, was supported in part by the National Institute of Health and the National Eye Institute.

AmnioClip (FORTECH GmbH) is a ring designed to hold the amniotic membrane in the eye without sutures or glue fixation. A mounting device is used to secure the amniotic membrane within the AmnioClip. The AmnioClip currently has CE approval in Europe.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## POLICY

A. Treatment of nonhealing diabetic lower-extremity ulcers using the following human amniotic membrane products may be considered **medically necessary**.
   1. Affinity (Q4159)
   2. AmnioBand Membrane (Q4151)
   3. Biovance (Q4154)
   4. EpiCord (Q4187)
   5. Epifix (Q4186)
   6. Grafix (Q4132, Q4133)

B. Human amniotic membrane grafts with or without suture (Prokera®, AmbioDisk™) or glue, may be considered **medically necessary** for the treatment of the following ophthalmic indications:
   1. Neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative therapy;
   2. Corneal ulcers and melts that do not respond to initial conservative therapy;
   3. Corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment;
   4. Bullous keratopathy as a palliative measure in patients who are not candidates for curative treatment (e.g., endothelial or penetrating keratoplasty);
   5. Partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient;
   6. Moderate or severe Stevens-Johnson syndrome;
   7. Persistent epithelial defects that do not respond as stated in policy guidelines.
   8. Severe dry eye (DEWS 3 or 4) with ocular surface damage and inflammation that remains symptomatic after Steps 1, 2, and 3 of the dry eye disease management algorithm (see Policy Guidelines);
   9. Moderate or severe acute ocular chemical burn.
   10. Corneal perforation when corneal tissue is not immediately available; or
   11. Pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft

C. Human amniotic membrane grafts with or without suture are considered **experimental / investigational** for all ophthalmic indications not outlined above.

D. Injection of micronized or particulated human amniotic membrane is considered **experimental / investigational** for all indications, including, but not limited to, treatment of osteoarthritis and plantar fasciitis.

E. Injection of human amniotic fluid is considered **experimental / investigational** for all indications.

F. All other human amniotic products (e.g., derived from amnion, chorion, amniotic fluid, umbilical cord, or Wharton's jelly) not listed above are considered **experimental / investigational** (see policy guidelines).

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

G. All other indications not listed above are considered **experimental / investigational**, including, but not limited to, treatment of lower-extremity ulcers due to venous insufficiency and repair following Mohs micrographic surgery.

## POLICY GUIDELINES

A. Nonhealing of diabetic wounds is defined as less than a 20% decrease in wound area with standard wound care for at least 2 weeks based on the entry criteria for clinical trials (e.g., Zelen et al, 2015).

B. A persistent epithelial defect is one that failed to close completely after 5 days of conservative treatment or has failed to demonstrate a decrease in size after 2 days of conservative treatment.

C. Conservative treatment is defined as use of topical lubricants and/or topical antibiotics and/or therapeutic contact lens and/or patching. Failure of multiple modalities should not be required prior to moving to human amniotic membrane grafts. An amniotic membrane graft requires less effort on the part of the patient to adhere to a treatment regimen and has a significant advantage in regard to treatments requiring multiple drops per day.

Tables PG1 and PG2 list the medically necessary and investigational amniotic products that have an HCPCS code.

**Table PG1 Amniotic Products Listed in the Policy Statements**

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| Affinity® | Organogenesis (previously NuTech Medical) | Q4159 |
| AmnioBand® Membrane | MTF Wound Care | Q4151 |
| Biovance® | Celularity | Q4154 |
| Epifix® | MiMedx | Q4186 |
| Epicord® | MiMedx | Q4187 |
| Grafix® | Osiris | Q4132, Q4133 |

**Table PG2 Other Amniotic Products with HCPCS Codes**

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| Allogen | Vivex Biomedical | Q4212 |
| AlloWrap™ | AlloSource | Q4150 |
| AmnioAMP-MP | Stratus BioSystems | Q4250 |
| Amnioarmor™ | Tissue Transplant Technology | Q4188 |
| AmnioBand® Particulate | MTF Wound Care | Q4168 |
| AmnioExcel® | Derma Sciences | Q4137 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| Amnio-maxx or Manio-maxx lite | Royal Biologics | Q4239 |
| Amniotext | Regenerative Labs | Q4245 |
| Amniowound | Alpha Tissue | Q4181 |
| Amnion bio or Axomembrane | Axolotl Biologix | Q4211 |
| Amniocore™ | Stability Biologics | Q4227 |
| Amniocyte | Predictive Biotech | Q4242 |
| AmnioMatrix® | Integra Life Sciences | Q4139 |
| Amniply | International Tissue | Q4249 |
| Amniorepair or AltiPly | Zimmer Biomet | Q4235 |
| Amniotext patch | Regenerative Labs | Q4247 |
| AmnioWrap2™ | Direct Biologics | Q4221 |
| Articent ac (flowable) | Tides Medical | Q4189 |
| Artacent ac (patch) | Tides Medical | Q4190 |
| Artacent® Wound | Tides Medical | Q4169 |
| Artacent® Cord | Tides Medical | Q4126 |
| Ascent | StimLabs | Q4213 |
| Axolotl ambien or Axolotl Cryo | Axolotl Biology | Q4215 |
| BioDDryFlex® | BioD | Q4138 |
| BioDfence™ | Integra Life Science | Q4140 |
| BioNextPATCH | BioNext Solutions | Q4228 |
| BioWound, BioWound Plus™, BioWound XPlus™ | HRT[a] | Q4217 |
| carePATCH | Extremity Care | Q4236 |
| Cellesta/Cellesta duo | Ventris Medical | Q4184 |
| Cellesta Cord | Ventris Medical | Q4214 |
| Cellesta flowable | Ventris Medical | Q4185 |
| Clarix® | Amniox Medical | Q4156 |
| Clarix® Flo | Amniox Medical | Q4155 |
| Cogenex flowable amnion | Ventris Medical | Q4230 |
| Cogenex amniotic membrane | Ventris Medical | Q4229 |
| Corecyte | Predictive Biotech | Q4240 |
| Corplex | StimLabs | Q4232 |
| Corplex P | StimLabs | Q4231 |
| Coretext or Protext | Regenerative Labs | Q4246 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| Cryo-cord | Royal Biologics | Q4237 |
| Cygnus | Vivex Biomedical | Q4170 |
| Dermacyte | Merakris Therapeutics | Q4248 |
| Dermavest™ or Plurivest | AediCell[a] | Q4153 |
| Derm-maxx | Royal Biologics | Q4238 |
| Epifix Injectable | MiMedx | Q4145 |
| Floweramnioflo | Flower Orthopedics | Q4177 |
| Floweramniopatch | Flower Orthopedics | Q4178 |
| Fluid flow or Fluid GF | BioLab Sciences | Q4206 |
| Genesis | Genesis Biologics | Q4198 |
| Guardian/AmnioBand® | MTF Wound Care | Q4151 |
| Interfyl® | Celularity | Q4171 |
| Matrion | LifeNet Health | Q4201 |
| Neopatch or Therion | CryoLife | Q4176 |
| Neox® Cord | Amniox Medical | Q4148 |
| Neox® Flo | Amniox Medical | Q4155 |
| Neox® Wound | Amniox Medical | Q4156 |
| Novachor | Organogenisis | Q4191 |
| Novafix® | Triad Life Sciences | Q4208 |
| Novafix DL | Triad Life Sciences | Q4254 |
| NuShield | Organogenesis | Q4160 |
| PalinGen® Membrane | Amnio ReGen Solutions | Q4173 |
| PalinGen® SportFlow | Amnio ReGen Solutions | Q4174 |
| Plurivest™ | AediCell | Q4153 |
| Polycyte | Predictive Biotech | Q4241 |
| Procenta | Lucina BioSciences | Q4244 |
| Reguard | New Life Medical | Q4255 |
| Restorigin | UMTB Biomedical | Q4191 |
| Restorigin Injectable | UMTB Biomedical | Q4192 |
| Revita | StimLabs | Q4180 |
| Revitalon™ | Medline Industries | Q4157 |
| Surgenex, Surfactor, and Nudyn | Surgenex | Q4233 |
| Surgicord | Synergy Biologics | Q4218 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| SurgiGRAFT™ | Synergy Biologics | Q4183 |
| WoundEx® | Skye Biologics[a] | Q4163 |
| WoundEx® Flow | Skye Biologics[a] | Q4162 |
| Woundfix, Woundfix Plus, Wounfix XPlus (see BioWound above) | HRT | Q4217 |
| Xcellerate | Precise Bioscience | Q4234 |
| Xwrap | Applied Biologics | Q4204 |

HRT: Human Regenerative Technologies; MTF: Musculoskeletal Transplant Foundation
[a] Processed by HRT and marketed under different tradename

Tear Film and Ocular Surface Society staged management for dry eye disease (Jones et al, 2017)
Step 1:

- Education regarding the condition, its management, treatment and prognosis
- Modification of local environment
- Education regarding potential dietary modifications (including oral essential fatty acid supplementation)
- Identification and potential modification/elimination of offending systemic and topical medications
- Ocular lubricants of various types (if meibomian gland dysfunction is present, then consider lipid containing supplements)
- Lid hygiene and warm compresses of various types

Step 2:
If above options are inadequate consider:

- Non-preserved ocular lubricants to minimize preservative-induced toxicity
- Tea tree oil treatment for Demodex (if present)
- Tear conservation
- Punctal occlusion
- Moisture chamber spectacles/goggles
- Overnight treatments (such as ointment or moisture chamber devices)
- In-office, physical heating and expression of the meibomian glands
- In-office intense pulsed light therapy for meibomian gland dysfunction
- Prescription drugs to manage dry eye disease
- Topical antibiotic or antibiotic/steroid combination applied to the lid margins for anterior blepharitis (if present)
- Topical corticosteroid (limited-duration)
- Topical secretagogues
- Topical non-glucocorticoid immunomodulatory drugs (such as cyclosporine)
- Topical LFA-1 antagonist drugs (such as lifitegrast)
- Oral macrolide or tetracycline antibiotics

Step 3:
If above options are inadequate consider:

- Oral secretagogues
- Autologous/allogeneic serum eye drops

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

- Therapeutic contact lens options
- Soft bandage lenses
- Rigid scleral lenses

Step 4:
If above options are inadequate consider:
- Topical corticosteroid for longer duration
- Amniotic membrane grafts
- Surgical punctal occlusion
- Other surgical approaches (e.g. tarsorrhaphy, salivary gland transplantation)

Dry eye severity level DEWS 3 to 4
- Discomfort, severity, and frequency - Severe frequent or constant
- Visual symptoms - chronic and/or constant, limiting to disabling
- Conjunctival Injection - +/- or +/+
- Conjunctive Staining - moderate to marked
- Corneal Staining - marked central or severe punctate erosions
- Corneal/tear signs - Filamentary keratitis, mucus clumping, increase in tear debris
- Lid/meibomian glands - Frequent
- Tear film breakup time - < 5
- Schirmer score (mm/5 min) - < 5

**Please refer to the member's contract benefits in effect at the time of service to determine coverage or non-coverage of these services as it applies to an individual member.**

## RATIONALE

This evidence review has been updated regularly with searches of the PubMed database. The most recent literature update was performed through January 3, 2022.

Evidence reviews assess the clinical evidence to determine whether the use of technology improves the net health outcome. Broadly defined, health outcomes are the length of life, quality of life (quality of life), and ability to function, including benefits and harms. Every clinical condition has specific outcomes that are important to patients and managing the course of that condition. Validated outcome measures are necessary to ascertain whether a condition improves or worsens; and whether the magnitude of that change is clinically significant. The net health outcome is a balance of benefits and harms.

To assess whether the evidence is sufficient to draw conclusions about the net health outcome of technology, 2 domains are examined: the relevance, and quality and credibility. To be relevant, studies must represent one or more intended clinical use of the technology in the intended population and compare an effective and appropriate alternative at a comparable intensity. For some conditions, the alternative will be supportive care or surveillance. The quality and credibility of the evidence depend on study design and conduct, minimizing bias and confounding that can generate incorrect findings. The randomized controlled trial (RCT) is preferred to assess efficacy; however, in some circumstances, nonrandomized studies may be adequate. RCTs are rarely large enough or long enough to capture less common adverse events

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

and long-term effects. Other types of studies can be used for these purposes and to assess generalizability to broader clinical populations and settings of clinical practice.

## DIABETIC LOWER-EXTREMITY ULCERS

### Patch or Flowable Amniotic Membrane or Placental Membrane

### Clinical Context and Therapy Purpose

The purpose of patch or flowable amniotic membrane or placental membrane in patients who have diabetic lower-extremity ulcers is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does amniotic membrane or placental membrane improve the net health outcome in patients with diabetic lower-extremity ulcers?

The following PICO was used to select literature to inform this review.

#### *Populations*

The relevant population of interest is patients with diabetic lower-extremity ulcers that have failed to heal with the standard of care (SOC) therapy.

#### *Interventions*

The therapy being considered is an amniotic membrane or placental membrane applied every 1 to 2 weeks. It is applied in addition to the SOC.

#### *Comparators*

The following therapies are currently being used to make decisions about the healing of diabetic lower-extremity ulcers: SOC, which involves moist dressing, dry dressing, compression therapy, and offloading.

#### *Outcomes*

The primary endpoints of interest for trials of wound closure are as follows, consistent with guidance from the U.S. Food and Drug Administration (FDA) for the industry in developing products for the treatment of chronic cutaneous ulcer and burn wounds:

- Incidence of complete wound closure.
- Time to complete wound closure (reflecting accelerated wound closure).
- Incidence of complete wound closure following surgical wound closure.
- Pain control.
- Complete ulcer healing with advanced wound therapies may be measured at 6 to 12 weeks.

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**

At least 7 RCTs have evaluated rates of healing with amniotic membrane grafts or placental membrane graft compared to SOC or an advanced wound therapy in patients with chronic diabetic foot ulcers (see Table 1). The number of patients in these studies ranged from 25 to 155. Human amniotic membrane (HAM) or placental membrane grafts improved healing compared to SOC by 22% (EpiCord vs. Alginate dressing) to 60% (EpiFix) in the intention-to-treat (ITT) analysis (see Table 2). In a 2018 trial, the cryopreserved placental membrane Grafix was found to be non-inferior to an advanced fibroblast-derived wound therapy (Dermagraft).

**Table 1. Summary of Key RCT Characteristics**

| Study; Trial | Countries | Sites | Dates | Participants | Active Intervention | Comparator |
|---|---|---|---|---|---|---|
| Serena et al (2020)[6,] | U.S. | 14 | | 76 patients with chronic (> 4 weeks) non-healing diabetic foot ulcers unresponsive to SOC and extending into dermis, subcutaneous tissue, muscle, or tendon | n=38, Affinity | n=38, SOC |
| Ananian et al (2018)[7,] | U.S. | 7 | 2016-2017 | 75 patients with chronic (> 4 weeks) non-healing diabetic foot ulcers between 1 cm2 and 15 cm2 | n=38, Grafix weekly for up to 8 weeks | n=37, Dermagraft (fibroblast-derived) weekly for up to 8 weeks |
| Tettelbach et al (2018)[8,] | U.S. | 11 | 2016-2018 | 155 patients with chronic (> 4 weeks) non-healing diabetic foot ulcers | n=101 EpiCord plus SOC | n=54 SOC with alginate dressing |
| DiDomenico et al (2018)[9,] | | | | 80 patients with non-healing (4 weeks) diabetic foot ulcers | AmnioBand Membrane plus SOC | SOC |
| Snyder et al (2016)[10,] | | | | 29 patients with non-healing diabetic foot ulcers | AmnioExcel plus SOC | SOC |
| Zelen et al (2015, 2016)[11,12,] | | 4 | | 60 patients with less than 20% wound healing in a 2 week run-in period | EpiFix | Apligraf or SOC with collagen-alginate dressing |
| Tettelbach et al (2019)[13,] | U.S. | 14 | | 110 patients with non-healing (4 weeks) lower extremity ulcers | EpiFix | SOC with alginate dressing |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Study; Trial | Countries | Sites | Dates | Participants | Active Intervention | Comparator |
|---|---|---|---|---|---|---|
| Lavery et al (2014)[14,] | | | | 97 patients with chronic diabetic foot ulcers | Grafix Weekly | SOC |

RCT: randomized controlled trial; SOC: standard of care including debridement, nonadherent dressing, moisture dressing, a compression dressing and offloading.

**Table 2. Summary of Key RCT Results**

| Study | Wounds Healed | Wounds Healed | Time to Complete Healing | Adverse Events and Number of Treatments |
|---|---|---|---|---|
| Serena et al (2020)[6,] | 12 Weeks (ITT) (%) | 16 Weeks (ITT) (%) | Median | |
| N | 76 | 76 | 76 | |
| Affinity | 55% | 58% | 11 weeks | |
| SOC | 29% | 29% | not attained by 16 weeks | |
| p-value | .02 | .01 | | |
| HR (95% CI) | | 1.75 (1.16 to 2.70) | | |
| Ananian et al (2018)[7,] | 8 Weeks (PP) n (%) | | | Patients with Index Ulcer Related Adverse Events n (%) |
| N | 62 | | | 75 |
| Grafix | 15 (48.4%) | | | 1 (5.9%) |
| Dermagraft | 12 (38.7%) | | | 4 (16.7%) |
| Diff (95% CI) | 9.68% (−10.7 to 28.9) | | | |
| Lower bound for non-inferiority | -15% | | | |
| Tettlebach et al (2018)[8,] | 12 Weeks (PP) n (%) | 12 Weeks (ITT) n (%) | | Patients with Adverse Events (% of total) |
| N | 134 | 155 | | 155 |
| EpiCord | 81 (81%) | 71 (70%) | | 42 (42%) |
| SOC | 29 (54%) | 26 (48%) | | 33 (61%) |
| p-value | .001 | .009 | | |
| DiDomenico et al (2018)[9,] | 6 Weeks (ITT) n (%) | 12 weeks ITT n (%) | Mean Days (95% CI) | |
| N | 80 | 80 | 80 | |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Study | Wounds Healed | Wounds Healed | Time to Complete Healing | Adverse Events and Number of Treatments |
|---|---|---|---|---|
| AmnioBand | 27 (68) | 34 (85) | 37.0 (29.5 to 44.4) | |
| SOC | 8 (20) | 13 (33) | 67.3 (59.0 to 79.6) | |
| HR (95% CI) | | 4.25 (0.44 to 0.79) | | |
| p-value | <.001 | <.001 | <.001 | |
| Snyder et al. (2016)[10,] | **6 Weeks (PP) Mean (95% CI)** | | | |
| N | 21 | | | |
| AmnioExcel | 45.5% (32.9% to 58.0%) | | | |
| SOC | 0% | | | |
| p-value | .014 | | | |
| Zelen et al (2015, 2016)[11,12,] | 6 Weeks ITT n (%) | Wounds Healed at 12 Weeks | | Weekly Treatments |
| N | 60 | 100 | | |
| EpiFix | 19 (95%) | NR | | 3.4 |
| Apligraf | 9 (45%) | NR | | 5.9 |
| SOC | 7 (35%) | NR | | |
| HR (95% CI) | | 5.66; (3.03 to 10.57) | | |
| p-value | .003 | <.001 vs. SOC | | .003 |
| Tettelbach et al (2019)[13,] | | Wounds Healed at 12 Weeks (ITT) n(%) | | |
| N | | 110 | | 110 |
| EpiFix | | 38 (81) | | |
| SOC | | 28 (55) | | |
| p-value | | | | |
| Lavery et al (2014)[14,] | | Wounds Healed at 12 Weeks | | Patients With Adverse Events |
| N | | 97a | 97 | 97 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Study | Wounds Healed | Wounds Healed | Time to Complete Healing | Adverse Events and Number of Treatments |
|---|---|---|---|---|
| Grafix | | 62.0% | 42.0 | 44.0% |
| SOC | | 21.3% | 69.5 | 66.0% |
| p-value | | <.001 | .019 | .031 |
| Difference in wounds healed between amniotic or placental membrane and SOC | Affinity 26% AmnioBand 55% AmnioExcel 33% EpiFix 60% | Affinity 28% EpiCord 22% Grafix 41% | | |

CI: confidence interval; DIFF: difference; HR: hazard ratio; ITT: intention-to-treat; NR: not reported; PP: per-protocol; RCT: randomized controlled trial; SOC: standard of care.
a. Power analysis indicated that 94 patients per arm would be needed. However, after a prespecified interim analysis at 50% enrollment, the blinded review committee recommended the trial is stopped due to the efficacy of the treatment.

Limitations in study design and conduct are shown in Table 3. Studies without notable limitations reported power analysis, blinded assessment of wound healing, evaluation of wound closure as the primary outcome measure, and ITT analysis. Limitations from the RCT with AmnioExcel (Snyder et al, 2016) [10,] preclude conclusions for this product.

**Table 3. Study Design and Conduct Limitations**

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| Serena et al (2020)[6,] | 3. The randomization process and allocation concealment were not described | 1, 2. No blinding of patients or investigators. Assessors were blinded | | 1. Although ITT analysis, there was substantial missing data for depth and volume with the digital analysis system. | | |
| Ananian et al (2018)[7,] | | 2, 3. No blinding for outcomes assessment | | | | |
| Tettelbach et al (2018)[8,] | | 1, 2, 3. No blinding | | | | |
| DiDomenico et al (2018)[9,] | | | | | | |
| Snyder et al (2016)[10,] | | | | 1. There was high loss to follow-up with discontinuation of 8 of 29 participants | 1. Power analysis | |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| | | | | | was not reported | |
| Zelen et al (2015, 2016)[11,12,] | | | | 1. Thirteen of 35 patients in the SOC group exited the study at 6 weeks due to less than 50% healing, which may have affected the 12-week results. | | |
| Tettelbach et al (2019)[13,] | | 1, 2. No blinding of patients or investigators. Assessors were blinded | | | | |
| Lavery et al (2014)[14,] | | | | | | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
ITT: intention to treat; SOC: standard of care.
a Allocation key: 1. Participants not randomly allocated; 2. Allocation not concealed; 3. Allocation concealment unclear; 4. Inadequate control for selection bias.
b Blinding key: 1. Not blinded to treatment assignment; 2. Not blinded outcome assessment; 3. Outcome assessed by treating physician.
c Selective Reporting key: 1. Not registered; 2. Evidence of selective reporting; 3. Evidence of selective publication.
d Data Completeness key: 1. High loss to follow-up or missing data; 2. Inadequate handling of missing data; 3. High number of crossovers; 4. Inadequate handling of crossovers; 5. Inappropriate exclusions; 6. Not intent to treat analysis (per protocol for noninferiority trials).
e Power key: 1. Power calculations not reported; 2. Power not calculated for primary outcome; 3. Power not based on clinically important difference.
f Statistical key: 1. Analysis is not appropriate for outcome type: (a) continuous; (b) binary; (c) time to event; 2. Analysis is not appropriate for multiple observations per patient; 3. Confidence intervals and/or p values not reported; 4. Comparative treatment effects not calculated.

**Prospective Single-arm or Registry Studies**
Prospective single-arm or registry studies are described in Tables 4 and 5.

Smiell et al (2015) reported on an industry-sponsored, multicenter registry study of Biovance d-HAM for the treatment of various chronic wound types; about a third (n=47) were diabetic foot wounds.[15,] Of those treated, 28 ulcers had failed prior treatment with advanced biologic therapies. For all wound types, 41.6% closed within a mean time of 8 weeks and a mean of 2.4 amniotic membrane applications.

In 2016, Frykberg et al reported treatment of complex chronic wounds (exposed tendon or bone) with Grafix. With the cryopreserved placental membrane applied weekly for up to 16 weeks, 59% of wounds closed with a mean time to closure of 9 weeks.[16,]

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 4. Summary of Prospective Single-arm Studies or Registry Characteristics**

| Study | Study Design | Participants | Treatment Delivery |
|---|---|---|---|
| Smiell et al (2015)[15,] | Multicenter Registry | Various chronic wounds: 47 diabetic foot wounds, 20 pressure ulcers, and 89 venous ulcers; 28 had failed prior treatment with advanced biologic therapies (Apligraf, Dermagraft, or Regranex) | Biovance |
| Frykberg et al (2016)[16,] | Prospective multi-center single-arm study | 31 patients with chronic complex diabetic foot wounds with exposed tendon or bone | Grafix weekly until closure or 16 weeks |

**Table 5. Summary of Prospective Single-arm Studies or Registry Results**

| Study | Treatment | Wounds Closed | Mean Time to Closure | Number of Applications |
|---|---|---|---|---|
| Smiell et al (2015)[15,] | Biovance | 41.6% | 8 weeks | 2.4 |
| Frykberg et al (2016)[16,] | Grafix | 59.3% | 9 weeks | 9 |

**Section Summary: Diabetic Lower-Extremity Ulcers**

For individuals who have non-healing diabetic lower-extremity ulcers who receive a patch or flowable formulation of HAM or placental membrane (i.e., Affinity, AmnioBand Membrane, AmnioExcel, Biovance, EpiCord, EpiFix, Grafix), the evidence includes RCTs. The RCTs evaluating amniotic and placental membrane products for the treatment of non-healing (<20% healing with ≥2 weeks of standard care) diabetic lower-extremity ulcers have compared HAM with standard care or with an established advanced wound care product. These trials used wound closure as the primary outcome measure, and some included power analysis, blinded assessment of wound healing, and ITT analysis. For the HAM products that have been sufficiently evaluated (i.e., Affinity, AmnioBand Membrane, Biovance, EpiCord, EpiFix, Grafix), results have shown improved outcomes compared with standard care, and outcomes that are at least as good as an established advanced wound care product. Improved health outcomes in the RCTs are supported by multicenter registries. No studies were identified that compared different amniotic or placental products, and indirect comparison between products is limited by variations in the patient populations.

## LOWER-EXTREMITY ULCERS DUE TO VENOUS INSUFFICIENCY

### Amniotic Membrane

### Clinical Context and Therapy Purpose

The purpose of amniotic membrane or placental membrane in patients who have lower-extremity ulcers due to venous insufficiency is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does amniotic membrane or placental membrane improve the net health outcome in patients with venous ulcers?

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The following PICO was used to select literature to inform this review.

### *Populations*
The relevant population of interest is patients with lower-extremity venous ulcers that have failed to heal with SOC therapy.

### *Interventions*
The therapy being considered is amniotic membrane or placental membrane applied every 1 to 2 weeks. It is applied in addition to the SOC.

### *Comparators*
The following therapies are currently being used to make decisions about the healing of venous ulcers: SOC, which involves moist dressing, dry dressing, and compression therapy.

### *Outcomes*
The primary endpoints of interest for trials of wound closure are as follows, consistent with guidance from the FDA for the industry in developing products for the treatment of chronic cutaneous ulcer and burn wounds:

- Incidence of complete wound closure.
- Time to complete wound closure (reflecting accelerated wound closure).
- Incidence of complete wound closure following surgical wound closure.
- Pain control.
- Complete ulcer healing with advanced wound therapies may be measured at 6 to 12 weeks.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence
Two RCTs, both with EpiFix, were identified on HAM for venous leg ulcers. Serena et al (2014) reported on an industry-sponsored multicenter open-label RCT that compared EpiFix d-HAM plus compression therapy with compression therapy alone for venous leg ulcers (see Tables 6 and 7).[17,] The primary outcome in this trial was the proportion of patients with 40% wound closure at 4 weeks, which was achieved by about twice as many patients in the combined EpiFix group compared with the control group (see Table 8). However, a similar percentage of patients in the combined EpiFix group and the control group achieved complete wound closure during the 4-week study. There was no significant difference in healing for wounds given 1 versus 2 applications of amniotic membrane (62% vs. 63%, respectively). Strengths of this trial included

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

adequate power and ITT analysis with last observation carried forward. Limitations included the lack of blinding for wound evaluation and use of 40% closure rather than complete closure. A 2015 retrospective study of 44 patients from this RCT (31 treated with amniotic membrane) found that wounds with at least 40% closure at 4 weeks (n=20) had a closure rate of 80% by 24 weeks; however, this analysis did not take into account additional treatments after the 4-week randomized trial period.

A second industry-sponsored, multicenter, open-label RCT (Bianchi et al [2018; 2019]) evaluated the time to complete ulcer healing following weekly treatment with EpiFix d-HAM plus compression therapy or compression wound therapy alone (see Tables 6 and 7).[18,19,] Patients treated with EpiFix had a higher probability of complete healing by 12 weeks, as adjudicated by blinded outcome assessors (hazard ratio, 2.26; 95% CI, 1.25 to 4.10; p=.01), and improved time to complete healing, as assessed by Kaplan-Meier analysis. In per-protocol analysis, healing within 12 weeks was reported for 60% of patients in the EpiFix group and 35% of patients in the control group (p<.013) (see Table 8). Intent-to-treat analysis found complete healing in 50% of patients in the EpiFix group compared to 31% of patients in the control group (p=.0473). There were several limitations of this trial (see Tables 8 and 9). In the per-protocol analysis, 19 (15%) patients were excluded from the analysis, and the proportion of patients excluded differed between groups (19% from the EpiFix group vs. 11% from the control group). There was also a difference between the groups in how treatment failures at 8 weeks were handled. Patients in the control group who did not have a 40% decrease in wound area at 8 weeks were considered study failures and treated with advanced wound therapies. The ITT analysis used last-observation-carried-forward for these patients and sensitivity analysis was not performed to determine how alternative methods of handling the missing data would affect results. Kaplan-Meier analysis suggested a modest improvement in the time to heal when measured by ITT analysis, but may be subject to the same methodological limitations.

Two additional studies, one with Amnioband and a second with Artacent, are listed on clinicaltrials.gov as completed in 2018, but results have not been published (see Table 14)

**Table 6. Summary of Key RCT Characteristics**

| | | | | | Interventions | |
|---|---|---|---|---|---|---|
| **Study** | **Countries** | **Sites** | **Dates** | **Participants** | **Active** | **Comparator** |
| Serena et al (2014)[17,] | U.S. | 8 | 2012-2014 | 84 patients with a full-thickness chronic VLU between 2 and 20 cm2 treated for at least 14 d | 1 (n=26) or 2 (n=27) applications of EpiFix plus standard wound therapy (n=53) | Standard wound therapy (debridement with alginate dressing and compression) (n=31) |
| Bianchi et al (2018, 2019)[18,19,] | U.S. | 15 | 2015-2017 | 128 patients with a full-thickness VLU of at least 30-d duration | Weekly EpiFix plus moist wound therapy plus compression (n=64 ITT; 52 PP) | Moist wound therapy plus compression (n=64 ITT; 57 PP) |

ITT: Intent-to-treat; PP: per-protocol; RCT: randomized controlled trial; VLU: venous leg ulcer.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 7. Summary of Key RCT Results**

| Study | Percent With 40% Wound Closure at 4 Weeks | Percent With Complete Wound Closure at 4 Weeks | Complete Wound Closure at 12 Weeks n (%) | | Complete Wound Closure at 16 Weeks n (%) | |
|---|---|---|---|---|---|---|
| | | | PP | ITT | PP | ITT |
| Serena et al (2014)[17,] | | | | | | |
| EpiFix | 62 | 11.3 | | | | |
| Control | 32 | 12.9 | | | | |
| p-Value | .005 | | | | | |
| Bianchi et al (2018, 2019 )[18,19,] | | | | | | |
| EpiFix | | | 31 (60) | 32 (50) | 37 (71) | 38 (59) |
| Control | | | 20 (35) | 20 (31) | 25 (44) | 25 (39) |
| p-Value | | | .013 | .047 | .007 | .034 |

ITT: Intent-to-treat; PP: per protocol; RCT: randomized controlled trial.

**Table 8. Study Relevance Limitations**

| Study | Population[a] | Intervention[b] | Comparator[c] | Outcomes[d] | Follow-Up[e] |
|---|---|---|---|---|---|
| Serena et al (2014)[17,] | | | | | |
| Bianchi et al (2018, 2019 )[18,19,] | | | | | 1. Advanced wound therapy was allowed in the control group before the primary endpoint was reached. |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.

[a] Population key: 1. Intended use population unclear; 2. Clinical context is unclear; 3. Study population is unclear; 4. Study population not representative of intended use.

[b] Intervention key: 1. Not clearly defined; 2. Version used unclear; 3. Delivery not similar intensity as comparator; 4.Not the intervention of interest.

[c] Comparator key: 1. Not clearly defined; 2. Not standard or optimal; 3. Delivery not similar intensity as intervention; 4. Not delivered effectively.

[d] Outcomes key: 1. Key health outcomes not addressed; 2. Physiologic measures, not validated surrogates; 3. No CONSORT reporting of harms; 4. Not establish and validated measurements; 5. Clinical significant difference not prespecified; 6. Clinical significant difference not supported.

[e] Follow-Up key: 1. Not sufficient duration for benefit; 2. Not sufficient duration for harms.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 9. Study Design and Conduct Limitations**

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| Serena et al (2014)[17,] | | | | | | |
| Bianchi et al (2018, 2019 )[18,19,] | | 1. Open-label with blinded assessors | | 1. Unequal exclusion of patients in the 2 groups in the per-protocol analysis.3. Advanced wound therapy was allowed in the control group before the primary endpoint was reached | | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.

[a] Allocation key: 1. Participants not randomly allocated; 2. Allocation not concealed; 3. Allocation concealment unclear; 4. Inadequate control for selection bias.

[b] Blinding key: 1. Not blinded to treatment assignment; 2. Not blinded outcome assessment; 3. Outcome assessed by treating physician.

[c] Selective Reporting key: 1. Not registered; 2. Evidence of selective reporting; 3. Evidence of selective publication.

[d] Data Completeness key: 1. High loss to follow-up or missing data; 2. Inadequate handling of missing data; 3. High number of crossovers; 4. Inadequate handling of crossovers; 5. Inappropriate exclusions; 6. Not intent to treat analysis (per protocol for noninferiority trials).

[e] Power key: 1. Power calculations not reported; 2. Power not calculated for primary outcome; 3. Power not based on clinically important difference.

[f] Statistical key: 1. Analysis is not appropriate for outcome type: (a) continuous; (b) binary; (c) time to event; 2. Analysis is not appropriate for multiple observations per patient; 3. Confidence intervals and/or p values not reported; 4. Comparative treatment effects not calculated.

### Biovance

As described above, Smiell et al (2015) reported on an industry-sponsored, multicenter registry study of Biovance d-HAM for the treatment of various chronic wound types; about half (n=89) were venous ulcers.[15,] Of the 179 treated, 28 (16%) ulcers had failed prior treatment with advanced biologic therapies. For all wound types, 41.6% closed within a mean time of 8 weeks and a mean of 2.4 amniotic membrane applications. However, without a control group, the percentage of wounds that would have healed with SOC is unknown.

### Section Summary: Lower-Extremity Ulcers Due to Venous Insufficiency

The evidence on HAM for the treatment of venous leg ulcers includes 2 multicenter RCTs with EpiFix. One RCT reported a larger percent wound closure at 4 weeks, but the percentage of patients with complete wound closure at 4 weeks did not differ between EpiFix and the SOC. A second RCT evaluated complete wound closure at 12 weeks after weekly application of EpiFix or standard dressings with compression. Although a significant difference in complete healing was reported, interpretation is limited by the differential loss to follow-up and exclusions between

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

groups. Although a subsequent publication reported ITT analysis, the handling of missing data differed between the groups and sensitivity analysis was not performed. The methodological flaws in the design, execution, and reporting of both of these RCTs limit inference that can be drawn from the results. Two additional studies with other HAM products have been completed but not published, raising further questions about the efficacy of HAM for lower-extremity ulcers due to venous insufficiency. Therefore, corroboration with well-designed and well-conducted RCTs evaluating wound healing in patients with venous leg ulcers is needed to demonstrate efficacy. The corroborating RCTs should report ITT and sensitivity analysis, with analysis of all patients, including those who were off treatment or had protocol deviations and exclusions.

## OSTEOARTHRITIS

### ReNu™ Knee Injection in Patients with Osteoarthritis

In 2016, a feasibility study (N=6) was reported of cryopreserved human amniotic membrane (c-HAM) suspension with amniotic fluid-derived cells for the treatment of knee osteoarthritis.[20,] A single intra-articular injection of the suspension was used, with follow-up at 1 and 2 weeks and at 3, 6, and 12 months posttreatment. Outcomes included the Knee Injury and Osteoarthritis Outcome Score, International Knee Documentation Committee scale, and a numeric pain scale. Statistical analyses were not performed for this small sample. No adverse events, aside from a transient increase in pain, were noted. RCTs are in progress.

A trial with 200 participants was completed in February 2019 (see Table 14). No publications from this trial have been identified.

### Section Summary: Osteoarthritis

Current evidence is insufficient to support definitive conclusions on the utility of c-HAM in the treatment of knee osteoarthritis.

## PLANTAR FASCIITIS

### Clinical Context and Therapy Purpose

The purpose of micronized amniotic membrane in patients who have plantar fasciitis is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does injectable amniotic membrane improve the net health outcome in patients with plantar fasciitis?

The following PICO was used to select literature to inform this review.

#### *Populations*

The relevant population of interest is patients with plantar fasciitis that has failed to heal with SOC therapy.

#### *Interventions*

The therapy being considered is micronized amniotic membrane. It is applied in addition to the SOC.

#### *Comparators*

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The following therapies are currently being used to make decisions about the healing of plantar fasciitis: corticosteroid injections and SOC, which involves offloading, night-splinting, stretching, and orthotics.

### *Outcomes*

The primary endpoints of interest for trials of plantar fasciitis are as follows: Visual Analog Score (VAS) for pain and function measured by the Foot Functional Index.

Acute effects of HAM injection may be measured at 2 to 4 weeks. The durability of treatment would be assessed at 6 to 12 months.

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence

One systematic review and 2 randomized pilot studies were identified on the treatment of plantar fasciitis using an injection of micronized HAM.

### Systematic Review

A 2016 network meta-analysis of 22 RCTs (total N=1216 patients) compared injection therapies for plantar fasciitis.[21,] In addition to c-HAM and micronized d-HAM/chorionic membrane, treatments included corticosteroids, botulinum toxin type A, autologous whole blood, platelet-rich plasma, nonsteroidal anti-inflammatory drugs, dry needling, dextrose prolotherapy, and polydeoxyribonucleotide. Placebo arms included normal saline, local anesthetic, sham dry needling, and tibial nerve block. Analysis indicated d-HAM had the highest probability for improvement in pain and composite outcomes in the short-term, however, this finding was based only on a single RCT. Outcomes at 2 to 6 months (7 RCTs) favored botulinum toxin for pain and patient recovery plan for composite outcomes.

### Randomized Controlled Trials

Zelen et al (2013) reported a preliminary study with 15 patients per group (placebo, 0.5 cc, and 1.25 cc) and 8-week follow-up.[22,] A subsequent RCT by Cazell et al (2018) enrolled 145 patients and reported 3-month follow-up (see Table 10).[23,] In Cazzell et al (2018) amniotic membrane injection led to greater improvements in the VAS for pain and the Foot Functional Index between baseline and 3 months (see Table 11) compared to controls. VAS at 3 months had decreased to 17.1 in the AmnioFix group compared to 38.8 in the placebo control group, which would be considered a clinically significant difference.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 10. Summary of Key RCT Characteristics**

| Study; Trial | Countries | Sites | Dates | Participants | Active Intervention | Comparator Intervention |
|---|---|---|---|---|---|---|
| Cazzell et al (2018)[23,];AIPF004 (NCT02427191) | U.S. | 14 | 2015-2018 | Adult patients with plantar fasciitis with VAS for pain > 45 | n=73; Single injection of AmnioFix 40 mg/ml | n = 72; Single injection of saline |

NCT02427191: Micronized dHACM Injection as Compared to the Saline Placebo Injection in the Treatment of Plantar Fasciitis; RCT: randomized controlled trial; VAS: visual analog score.

**Table 11. Summary of Key RCT Results**

| Study | Change in VAS-Pain Between Baseline and 3 mo (95% CI) | Change in FFI-R Between Baseline and 3mo (95% CI) | Patients with Adverse Events up to 3 mo n(%) | Patients with Serious Adverse Events up to 3 mo n(%) |
|---|---|---|---|---|
| Cazzell et al (2018)[23,]; AIPF004 | N=145 | N=145 | N=145 | N=145 |
| AmnioFix | 54.1 (48.3 to 59.9) | 35.7 (30.5 to 41.0) | 30 (41.1%) | 1 (0.6%) |
| Placebo | 31.9 (24.8 to 39.1) | 22.2 (17.1 to 27.4) | 39 (54.2%) | 3 (1.8%) |
| Diff (95% CI) | 22.2 (13.1 to 31.3) | 13.5 (6.2 to 20.8) | | |
| p-Value | <.001 | <.001 | | |

CI: confidence interval; FFI-R: Foot Function Index; RCT: randomized controlled trial; VAS: visual analog score.

Limitations in relevance and design and conduct of this publication are described in Tables 12 and 13. The major limitation of the study is the short-term follow-up, which the authors note is continuing to 12 months. The extended follow-up will be reported in a separate publication.

**Table 12. Study Relevance Limitations**

| Study | Population[a] | Intervention[b] | Comparator[c] | Outcomes[d] | Follow-Up[e] |
|---|---|---|---|---|---|
| Cazzell et al (2018)[23,]; AIPF004 | | | 3. Placebo injections were used. A control delivered at a similar intensity as the investigational treatment would be corticosteroid injections. | | 1, 2. Follow-up to 12 mo will be reported in a subsequent publication. |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
a Population key: 1. Intended use population unclear; 2. Clinical context is unclear; 3. Study population is unclear; 4. Study population not representative of intended use.
b Intervention key: 1. Not clearly defined; 2. Version used unclear; 3. Delivery not similar intensity as comparator; 4. the intervention of interest.
c Comparator key: 1. Not clearly defined; 2. Not standard or optimal; 3. Delivery not similar intensity as intervention; 4. Not delivered effectively.
d Outcomes key: 1. Key health outcomes not addressed; 2. Physiologic measures, not validated surrogates; 3. No

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

CONSORT reporting of harms; 4. Not establish and validated measurements; 5. Clinically significant difference not prespecified; 6. Clinically significant difference not supported.
e Follow-Up key: 1. Not sufficient duration for benefit; 2. Not sufficient duration for harms.

**Table 13. Study Design and Conduct Limitations**

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| Cazzell et al (2018)[23,]; AIPF004 | | 1. Single blinded trial, although outcomes were self-reported by blinded patients | | 1. Only the first 3 months of 12-month follow-up were reported. | | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
a Allocation key: 1. Participants not randomly allocated; 2. Allocation not concealed; 3. Allocation concealment unclear; 4. Inadequate control for selection bias.
b Blinding key: 1. Not blinded to treatment assignment; 2. Not blinded outcome assessment; 3. Outcome assessed by treating physician.
c Selective Reporting key: 1. Not registered; 2. Evidence of selective reporting; 3. Evidence of selective publication.
d Data Completeness key: 1. High loss to follow-up or missing data; 2. Inadequate handling of missing data; 3. High number of crossovers; 4. Inadequate handling of crossovers; 5. Inappropriate exclusions; 6. Not intent to treat analysis (per protocol for noninferiority trials).
e Power key: 1. Power calculations not reported; 2. Power not calculated for primary outcome; 3. Power not based on clinically important difference.
f Statistical key: 1. Analysis is not appropriate for outcome type: (a) continuous; (b) binary; (c) time to event; 2. Analysis is not appropriate for multiple observations per patient; 3. Confidence intervals and/or p values not reported; 4. Comparative treatment effects not calculated.

### Section Summary: Plantar Fasciitis

The evidence on injection of amniotic membrane for the treatment of plantar fasciitis includes preliminary studies and a larger (N =145) patient-blinded comparison of micronized injectable-HAM and placebo control. Injection of micronized amniotic membrane resulted in greater improvements in VAS for pain and the Foot Functional Index compared to placebo controls. The primary limitation of the study is this is an interim report of 3 months' results. The authors noted that 12-month follow-up will be reported in a subsequent publication. No additional publications have been identified as of the latest update.

### Human Amniotic Membrane for Ophthalmologic Conditions

Sutured and self-retained HAM has been evaluated for a variety of ophthalmologic conditions. Traditionally, the amniotic membrane has been fixed onto the eye with sutures or glue or placed under a bandage contact lens for a variety of ocular surface disorders. Several devices have been reported that use a ring around a HAM allograft that allows it to be inserted under topical anesthesia similar to insertion of a contact lens. Sutured HAM transplant has been used for many years for the treatment of ophthalmic conditions. Many of these conditions are rare, leading to difficulty in conducting RCTs. The rarity, severity, and variability of the ophthalmic condition was taken into consideration in evaluating the evidence. The following indications apply to both sutured and self-retained HAM unless specifically noted.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## NEUROTROPHIC KERATITIS WITH OCULAR SURFACE DAMAGE OR INFLAMMATION THAT DOES NOT RESPOND TO CONSERVATIVE TREATMENT

### Clinical Context and Therapy Purpose
The purpose of HAM in patients who have neurotrophic keratitis is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have neurotrophic keratitis?

The following PICO was used to select literature to inform this review.

#### *Populations*
The relevant population of interest is patients who have neurotrophic keratitis with ocular surface damage or inflammation that does not respond to conservative treatment.

#### *Interventions*
The therapy being considered is sutured or non-sutured HAM.

#### *Comparators*
The following therapies are currently being used: tarsorrhaphy or bandage contact lens.

#### *Outcomes*
The general outcomes of interest are eye pain and epithelial healing.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence
Khokhar et al (2005) reported on an RCT of 30 patients (30 eyes) with refractory neurotrophic corneal ulcers who were randomized to HAM transplantation (n=15) or conventional treatment with tarsorrhaphy or bandage contact lens. At the 3-month follow-up, 11 (73%) of 15 patients in the HAM group showed complete epithelialization compared with 10 (67%) of 15 patients in the conventional group. This difference was not significantly significant.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Suri et al (2013) reported on 11 eyes of 11 patients with neurotrophic keratopathy that had not responded to conventional treatment.[24,] The mean duration of treatment prior to ProKera insertion was 51 days. Five of the 11 patients (45.5%) were considered to have had a successful outcome.

**Section Summary: Neurotrophic Keratitis with Ocular Surface Damage and Inflammation that Does Not Respond to Conservative Therapy**
An RCT of 30 patients showed no benefit of sutured HAM graft compared to tarsorrhaphy or bandage contact lens.

**Corneal Ulcers and Melts That D o Not Respond to Initial Medical Therapy**
**Clinical Context and Therapy Purpose**
The purpose of HAM in patients who have corneal ulcers and melts is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net heath outcome in patients who have corneal ulcers and melts?

The following PICO was used to select literature to inform this review.

***Populations***
The relevant population of interest is patients who have corneal ulcers and melts that do not respond to initial medical therapy.

***Interventions***
The therapy being considered is sutured or non-sutured HAM.

***Comparators***
The following therapies are currently being used: tarsorrhaphy and bandage soft contact lens.

***Outcomes***
The general outcomes of interest are eye discomfort and epithelial healing.

Changes in symptoms may be measured in days, while changes in ocular surface would be measured at 1 to 3 months.

**Study Selection Criteria**
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

### Review of Evidence

Liu et al (2019) conducted a systematic review of 17 studies (390 eyes) of amniotic membrane for corneal ulcers.[25] All but 1 of the studies was conducted outside of the U.S. There was 1 RCT with 30 patients, the remainder of the studies were prospective or retrospective case series. Corneal healing was obtained in 97% (95% CI: 0.94 to 0.99, p=.089) of patients evaluated. In the 12 studies (222 eyes) that reported on vision, the vision improvement rate was improved in 113 eyes (53%, 95% CI: 0.42 to 0.65, p<.001).

Yin et al (2020) compared epithelialization and visual outcomes of 24 patients with corneal infectious ulcers and visual acuity of less than 20/200 who were treated with (n=11) or without (n=13) self-retained amniotic membrane.[26] Utilization of amniotic membrane was initiated in their institution in 2018, allowing a retrospective comparison of the 2 treatment groups. Complete epithelialization occurred more rapidly (3.56± 1.78 weeks vs. 5.87 ± 2.20 weeks, p=.01) and was reached in significantly more patients (72.7% vs. 23.1%, p=.04). The group treated with amniotic membrane plus the standard therapy had more patients with clinically significant (> 3 lines) improvement in visual acuity (81.8% vs 38.4%, p=.047) and greater total improvement in visual acuity (log MAR 0.7 ± 0.6 vs 1.6 ± 0.9, p=.016).

Suri et al (2013) reported on a series of 35 eyes of 33 patients who were treated with the self-retained ProKera HAM for a variety of ocular surface disorders.[24] Nine of the eyes had non-healing corneal ulcers. Complete or partial success was seen in 2 of 9 (22%) patients with this indication.

### Section Summary: Corneal Ulcers and Melts That Do Not Respond to Initial Medical Therapy

Corneal ulcers and melts are uncommon and variable and additional RCTs are not expected. A systematic review of 1 RCT and case series showed healing in 97% of patients with an improvement of vision in 53% of eyes. One retrospective comparative study with 22 patients found more rapid and complete epithelialization and more patients with a clinically significant improvement in visual acuity following early treatment with self-retained amniotic membrane when compared to historical controls. These results support the use of non-sutured amniotic membrane for corneal ulcers and melts that do not respond to initial medical therapy.

## CORNEAL PERFORATION WHEN THERE IS ACTIVE INFLAMMATION AFTER CORNEAL TRANSPLANT REQUIRING ADJUNCTIVE TREATMENT

### Clinical Context and Therapy Purpose

The purpose of HAM in patients who have active inflammation after a corneal transplant is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have corneal perforation when there is active inflammation after corneal transplant?

The following PICO was used to select literature to inform this review.

#### *Populations*

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The relevant population of interest is patients who have corneal perforation when there is active inflammation after a corneal transplant.

***Interventions***
The therapy being considered is sutured or non-sutured HAM.

***Comparators***
The following therapies are currently being used: medical therapy.

***Outcomes***
The general outcomes of interest are eye discomfort and reduction in inflammation.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

**Study Selection Criteria**
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**
No evidence was identified for this indication.

**Section Summary: Corneal Perforation When There is Active Inflammation After Corneal Transplant Requiring Adjunctive Treatment**

No evidence was identified for this indication.

**BULLOUS KERATOPATHY IN PATIENTS WHO ARE NOT CANDIDATES FOR A CURATIVE TREATMENT (EG, ENDOTHELIAL OR PENETRATING KERATOPLASTY)**

**Clinical Context and Therapy Purpose**
The purpose of HAM in patients who have bullous keratopathy is to provide a treatment option that is an alternative to or an improvement on existing therapies. Bullous keratopathy is characterized by stromal edema and epithelial and subepithelial bulla formation.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have bullous keratopathy and are not candidates for a curative treatment?

The following PICO was used to select literature to inform this review.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

***Populations***
The relevant population of interest is patients who have bullous keratopathy who are not candidates for curative treatment.

***Interventions***
The therapy being considered is sutured or non-sutured HAM.

***Comparators***
The following therapies are currently being used: stromal puncture.

***Outcomes***
The general outcomes of interest are eye discomfort and epithelial healing.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

**Study Selection Criteria**
Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**
Dos Santos Paris et al (2013) published an RCT that compared fresh HAM with stromal puncture for the management of pain in patients with bullous keratopathy.[27,] Forty patients with pain from bullous keratopathy who were either waiting for a corneal transplant or had no potential for sight in the affected eye were randomized to the 2 treatments. Symptoms had been present for approximately 2 years. HAM resulted in a more regular epithelial surface at up to 180 days follow-up, but there was no difference between the treatments related to the presence of bullae or the severity or duration of pain. Because of the similar effects on pain, the authors recommended initial use of the simpler stromal puncture procedure, with use of HAM only if the pain did not resolve.

**Section Summary: Bullous Keratopathy in Patients Who are Not Candidates for a Curative Treatment and Who are Unable to Remain Still for Stromal Puncture**
An RCT found no advantage of sutured HAM over the simpler stromal puncture procedure for the treatment of pain from bullous keratopathy.

**PARTIAL LIMBAL STEM CELL DEFICIENCY WITH EXTENSIVE DISEASED TISSUE WHERE SELECTIVE REMOVAL ALONE IS NOT SUFFICIENT**

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Clinical Context and Therapy Purpose**
The purpose of HAM in patients who have partial limbal stem cell deficiency is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have partial limbal stem cell deficiency?

The following PICO was used to select literature to inform this review.

***Populations***
The relevant population of interest is patients who have limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient.

***Interventions***
The therapy being considered is sutured or non-sutured HAM.

***Comparators***
The following therapies are currently being used: limbal stem cell transplants.

***Outcomes***
The general outcomes of interest are visual acuity and corneal epithelial healing.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

**Study Selection Criteria**
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**
No RCTs were identified on HAM for limbal stem cell deficiency.

Keirkhah et al (2008) reported on the use of HAM in 11 eyes of 9 patients who had limbal stem cell deficiency.[28,] Patients underwent superficial keratectomy to remove the conjunctivalized pannus followed by HAM transplantation using fibrin glue. An additional ProKera patch was used in 7 patients. An improvement in visual acuity was observed in all but 2 patients. Pachigolla et al (2009) reported a series of 20 patients who received a ProKera implant for ocular surface disorders; 6 of the patients had limbal stem cell deficiency with a history of chemical burn.[29,] Following treatment with ProKera, 3 of the 6 patients had a smooth corneal surface and

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

improved vision to 20/40.[29,] The other 3 patients had final visual acuity of 20/400, counting fingers, or light perception.

**Section Summary: Partial Limbal Stem Cell Deficiency with Extensive Diseased Tissue Where Selective Removal Alone is Not Sufficient**

No RCTs were identified on HAM for partial limbal stem cell deficiency. Improvement in visual acuity has been reported for some patients who have received HAM in conjunction with removal of the diseased limbus.

## MODERATE OR SEVERE STEVENS-JOHNSON SYNDROME

### Clinical Context and Therapy Purpose

The purpose of HAM in patients who have Stevens-Johnson syndrome is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have moderate or severe SJS?

The following PICO was used to select literature to inform this review.

***Populations***

The relevant population of interest is patients who have moderate or severe Stevens-Johnson syndrome.

***Interventions***

The therapy being considered is sutured or non-sutured HAM.

***Comparators***

The following therapies are currently being used: medical therapy alone (antibiotics, steroids, or lubricants).

***Outcomes***

The general outcomes of interest are visual acuity, tear function, and corneal clarity.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Review of Evidence

One RCT from India by Sharma et al (2016) assigned 25 patients (50 eyes) with acute ocular Stevens-Johnson syndrome to c-HAM plus medical therapy (antibiotics, steroids, or lubricants) or medical therapy alone.[30,] The c-HAM was prepared locally and applied with fibrin glue rather than sutures. Application of c-HAM in the early stages of SJS resulted in improved visual acuity (p=.042), better tear breakup time (p=.015), improved Schirmer test results (p<.001), and less conjunctival congestion (p=.03). In the c-HAM group at 180 days, there were no cases of corneal haze, limbal stem cell deficiency, symblepharon, ankyloblepharon, or lid-related complications. These outcomes are dramatically better than those in the medical therapy alone group, which had 11 (44%) cases with corneal haze (p=.001), 6 (24%) cases of corneal vascularization and conjunctivalization (p=.03), and 6 (24%) cases of trichiasis and metaplastic lashes.

### Section Summary: Moderate or Severe Stevens-Johnson Syndrome

The evidence on HAM for the treatment of SJ Syndrome includes 1 RCT with 25 patients (50 eyes) that found improved symptoms and function with HAM compared to medical therapy alone.

## PERSISTENT EPITHELIAL DEFECTS AND ULCERATIONS THAT DO NOT RESPOND TO CONSERVATIVE THERAPY

### Clinical Context and Therapy Purpose

The purpose of HAM in patients who have persistent epithelial defects and ulcerations is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have persistent epithelial defects and ulcerations that do not respond to conservative therapy?

The following PICO was used to select literature to inform this review.

#### *Populations*

The relevant population of interest is patients who have persistent epithelial defects that do not respond to conservative therapy.

#### *Interventions*

The therapy being considered is sutured or non-sutured HAM.

#### *Comparators*

The following therapies are currently being used for persistent epithelial defects and ulceration: medical therapy alone (e.g., topical lubricants, topical antibiotics, therapeutic contact lens, or patching).

#### *Outcomes*

The general outcomes of interest are epithelial closure.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence

Bouchard and John (2004) reviewed the use of amniotic membrane transplantation in the management of severe ocular surface disease.[31,] They noted that c-HAM has been available since 1995, and has become an established treatment for persistent epithelial defects and ulceration refractory to conventional therapy. However, there was a lack of controlled studies due to the rarity of the diseases and the absence of standard therapy. They identified 661 reported cases in the peer-reviewed literature. Most cases reported assessed the conjunctival indications of pterygium, scars and symblepharon, and corneal indications of acute chemical injury and postinfectious keratitis.

### Section Summary: Persistent Epithelial Defects and Ulceration that Do Not Respond to Conservative Therapy

No RCTs were identified on persistent epithelial defects and ulceration.

## SEVERE DRY EYE DISEASE WITH OCULAR SURFACE DAMAGE AND INFLAMMATION THAT DOES NOT RESPOND TO CONSERVATIVE THERAPY

### Clinical Context and Therapy Purpose

The purpose of HAM in patients who have severe dry eye is to provide a treatment option that is an alternative to or an improvement on existing therapies. Dry eye disease involves tear film insufficiency with the involvement of the corneal epithelium. Inflammation is common in dry eye disease, which causes additional damage to the corneal epithelium.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have severe dry eye with ocular surface damage and inflammation?

The following PICO was used to select literature to inform this review.

#### *Populations*

The relevant population of interest is patients who have severe dry eye with ocular surface damage and inflammation.

#### *Interventions*

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The therapy being considered is sutured or non-sutured HAM.

### *Comparators*

The following therapies are currently being used: medical management consisting of artificial tears, cyclosporine A, serum tears, antibiotics, steroids, and nonsteroidal anti-inflammatory medications.

### *Outcomes*

The general outcomes of interest are the pain, corneal surface regularity, and vision, which may be measured by the Report of the International Dry Eye WorkShop score (DEWS). The DEWS assess 9 domains with a score of 1 to 4 including discomfort, visual symptoms, tear breakup time, corneal signs and corneal staining. Corneal staining with fluorescein or Rose Bengal indicates damaged cell membranes or gaps in the epithelial cell surface. A DEWS of 2 to 4 indicates moderate-to-severe dry eye disease.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence

John et al (2017) reported on an RCT with 20 patients with moderate-to-severe dry eye disease who were treated with Prokera c-HAM or maximal conventional treatment.[32,] The c-HAM was applied for an average of 3.4 days (range, 3-5 days), while the control group continued treatment with artificial tears, cyclosporine A, serum tears, antibiotics, steroids, and nonsteroidal anti-inflammatory medications. The primary outcome was an increase in corneal nerve density. Signs and symptoms of dry eye disease improved at both 1-month and 3-month follow-ups in the c-HAM group but not in the conventional treatment group. For example, pain scores decreased from 7.1 at baseline to 2.2 at 1 month and 1.0 at 3 months in the c-HAM group. In vivo confocal microscopy, reviewed by masked readers, showed a significant increase in corneal nerve density in the study group at 3 months, with no change in nerve density in the controls. Corneal sensitivity was similarly increased in the c-HAM group but not in controls.

The treatment outcomes in the Dry Eye Amniotic Membrane (DREAM) study (McDonald et al [2018]) was a retrospective series of 84 patients (97 eyes) with severe dry eye despite maximal medical therapy who were treated with Prokera self-retained c-HAM.[33,] A majority of patients (86%) had superficial punctate keratitis. Other patients had filamentary keratitis (13%), exposure keratitis (19%), neurotrophic keratitis (2%), and corneal epithelial defect (7%). Treatment with

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Prokera for a mean of 5.4 days (range, 2 to 11) resulted in an improved ocular surface and reduction in the DEWS score from 3.25 at baseline to 1.44 at 1 week, 1.45 at 1 month and 1.47 at 3 months (p=.001). Ten percent of eyes required repeated treatment. There was no significant difference in the number of topical medications following c-HAM treatment.

**Section Summary: Severe Dry Eye with Ocular Surface Damage and Inflammation that Does Not Respond to Conservative Therapy**

The evidence on HAM for severe dry eye with ocular surface damage and inflammation includes an RCT with 20 patients and a retrospective series of 84 patients (97 eyes). Placement of self-retained HAM for 2 to 11 days reduced symptoms and restored a smooth corneal surface and corneal nerve density for as long as 3 months.

## MODERATE OR SEVERE ACUTE OCULAR CHEMICAL BURNS

### Clinical Context and Therapy Purpose

The purpose of HAM in patients who have acute ocular burns is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have moderate or severe acute ocular chemical burns?

The following PICO was used to select literature to inform this review.

#### *Populations*

The relevant population of interest is patients who have moderate or severe acute ocular chemical burn.

#### *Interventions*

The therapy being considered is sutured or non-sutured HAM.

#### *Comparators*

The following therapies are currently being used: medical therapy (e.g., topical antibiotics, lubricants, steroids and cycloplegics, oral vitamin C, doxycycline).

#### *Outcomes*

The general outcomes of interest are visual acuity, corneal epithelialization, corneal clarity, and corneal vascularization.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**

An RCT of 100 patients with chemical or thermal ocular burns was published by Tandon et al (2011).[34,] Half of the patients (n=50) had moderate ocular burns and the remainder (n=50) had severe ocular burns. All but 8 of the patients had alkali or acid burns. Patients were randomized to HAM transplantation plus medical therapy or medical therapy alone. Epithelial healing, which was the primary outcome, was improved in the group treated with HAM, but there was no significant difference between the 2 groups for final visual outcome, symblepharon formation, corneal clarity or vascularization.

A second RCT that compared amniotic membrane plus medical therapy (30 eyes) to medical therapy alone (30 eyes) for grade IV ocular burn was reported by Eslani et al (2018).[35,] Medical therapy at this tertiary referral hospital included topical preservative-free lubricating gel and drops, chloramphenicol, betamethasone, homatropine, oral vitamin C, and doxycycline. There was no significant difference in the time to epithelial healing (amniotic membrane: 75.8 vs. 72.6 days) or in visual acuity between the 2 groups (2.06 logMAR for both groups). There was a trend for a decrease in corneal neovascularization (p=.108); the study was not powered for this outcome.

A third RCT by Tamhane et al (2005) found no difference between amniotic membrane and medical therapy groups in an RCT of 37 patients with severe ocular burns.[36,]

**Section Summary: Moderate or Severe Acute Ocular Chemical Burns**

Evidence includes 3 RCTs with a total of 197 patients with acute ocular chemical burns who were treated with HAM transplantation plus medical therapy or medical therapy alone. Patients in the HAM group had a faster rate of epithelial healing in 1 of the 3 trials, without a significant benefit for other outcomes. The other 2 trials did not find an increase in the rate of epithelial healing in patients with severe burns.

**CORNEAL PERFORATION WHEN CORNEAL TISSUE IS NOT IMMEDIATELY AVAILABLE**

**Clinical Context and Therapy Purpose**

The purpose of HAM in patients who have corneal perforation when corneal tissue is not immediately available is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured HAM improve the net health outcome in patients who have corneal perforation?

The following PICO was used to select literature to inform this review.

***Populations***

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The relevant population of interest is patients who have corneal perforation when corneal tissue is not immediately available.

***Interventions***
The therapy being considered is sutured HAM.

***Comparators***
The following therapies are currently being used: conservative management.

***Outcomes***
The general outcomes of interest are eye pain.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

**Study Selection Criteria**
Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**
No RCTs were identified on corneal perforation.

**Section Summary: Corneal Perforation When Corneal Tissue is Not Immediately Available**
The standard treatment for corneal perforation is corneal transplantation, however, sutured HAM may be used as a temporary covering for this severe defect when corneal tissue is not immediately available.

**FOLLOWING PTERYGIUM REPAIR WHEN THERE IS INSUFFICIENT HEALTHY TISSUE TO CREATE A CONJUNCTIVAL AUTOGRAFT**

**Clinical Context and Therapy Purpose**
The purpose of HAM in patients who have pterygium repair is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or glued HAM improve the net health outcome in patients who have pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft (e.g., extensive, double, or recurrent pterygium)?

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The following PICO was used to select literature to inform this review.

### *Populations*
The relevant population of interest is patients who have pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft.

### *Interventions*
The therapy being considered is sutured or glued HAM.

### *Comparators*
The following therapies are currently being used: conjunctival autograft.

### *Outcomes*
The general outcomes of interest are a recurrence of pterygium.

Pterygium recurrence would be measured at 1 to 3 months.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence
RCTs have been reported on the use of amniotic membrane following pterygium repair. In 2013, the American Academy of Ophthalmology published a technology assessment on options and adjuvants for pterygium surgery.[37,] Reviewers identified 4 RCTs comparing conjunctival or limbal autograft procedure with amniotic membrane graft, finding that conjunctival or limbal autograft was more effective than HAM graft in reducing the rate of pterygium recurrence. A 2016 Cochrane review of 20 RCTs (total N=1866 patients) arrived at the same conclusion.[38,]

### Section Summary: Following Pterygium Repair When There is Insufficient Healthy Tissue to Create a Conjunctival Autograft
Systematic reviews of RCTs have been published that found that conjunctival or limbal autograft is more effective than HAM graft in reducing the rate of pterygium recurrence.

## REPAIR FOLLOWING MOHS MICROSCOPIC SURGERY

### Clinical Context and Therapy Purpose
The purpose of repair with human amniotic membrane in patients who have undergone Mohs microsurgery for skin cancer is to provide a treatment option that is an alternative to or an improvement on existing procedures.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The question addressed in this evidence review is: Does amniotic membrane improve the net health outcome in patients requiring repair following Mohs microsurgery?

The following PICO was used to select literature to inform this review.

### *Populations*
The relevant population of interest is patients who require reconstruction following Mohs microsurgery for skin cancer on the head, neck, face, or dorsal hand.

### *Interventions*
The therapy being considered is repair following Mohs microsurgery with human amniotic membrane. It is proposed as a nonsurgical alternative to cutaneous repair in cosmetically sensitive areas such as the head, neck, face, or dorsal hand.

### *Comparators*
Comparators of interest include surgical repair using autologous tissue (e.g., local flaps and full-thickness skin grafts) and healing without surgery. Second intention healing (i.e., the wound is left open to heal by granulation, contraction, and epithelialization) is a nonsurgical option for certain defects.

### *Outcomes*
The primary endpoints of interest for trials of wound closure are as follows, consistent with guidance from the U.S. Food and Drug Administration (FDA) for the industry in developing products for the treatment of chronic cutaneous ulcer and burn wounds:
- Incidence of complete wound closure.
- Time to complete wound closure (reflecting accelerated wound closure).
- Incidence of complete wound closure following surgical wound closure.
- Pain control.
- Complete ulcer healing with advanced wound therapies may be measured at 6 to 12 weeks.

In trials comparing human amniotic membrane to surgical repair in patients post-Mohs microscopic surgery, other important outcomes are post-procedure morbidity and mortality, surgical complications, development of a non-healing wound, and quality of life.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Review of Evidence**
No RCTs were identified for this indication.

**Nonrandomized Studies**
Toman et al (2022) conducted an observational study that compared repair using a dehydrated human amnion/chorion membrane product (Epifix) with surgical repair using autologous tissue in patients who underwent same-day repair following Mohs microsurgery for removal of skin cancer on the face, head, or neck (Table 14).[39,] Propensity-score matching using retrospective data from medical records was used to identify 143 matched pairs. The primary endpoint was the incidence of postoperative morbidity, including the rate of infection, bleeding/hematoma, dehiscence, surgical reintervention, or development of a nonhealing wound. Postoperative cosmetic outcomes were assessed at 9 months or later and included documentation of suboptimal scarring, scar revision treatment, and patient satisfaction.

Results are summarized in Table 15, and study limitations in Tables 16 and 17. A greater proportion of patients who received dHACM repair experienced zero complications (97.9% vs. 71.3%; p<.0001; relative risk 13.67; 95% CI 4.33 to 43.12). Placental allograft reconstructions developed less infection (p=.004) and were less likely to experience poor scar cosmesis (P <.0001). Confidence in these findings is limited, however, by the study's retrospective design and potential for bias due to missing data. Additionally, the study's relevance is limited due to a lack of diversity in the study population and no comparison to non-surgical treatment options.

**Table 14. Nonrandomized Study of Dehydrated Human Amnion/Chorion Membrane for Repair Following Mohs Microsurgery - Characteristics**

| Study | Study Type | Country | Dates | Participants | Repair using dHACM | Repair using autologous tissue | Follow-Up |
|---|---|---|---|---|---|---|---|
| Toman et al (2022)[39,] | Retrospective, observational<br><br>Propensity-score matching used to identify matched pairs | US | 2014-2018 | Patients who underwent Mohs microsurgery for removal of a basal or squamous cell carcinoma and required same day repair for moderate- to high-risk defects on the face, head, and neck.<br><br>Mean age 78.0 years;<br>76.9% male<br>100% white | n = 143 | n = 143 | Unclear; 9 months or later for postoperative cosmetic outcomes. |

dHACM: dehydrated human amnionic/chorionic membrane.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

### Table 15. Nonrandomized Study of Dehydrated Human Amnion/Chorion Membrane for Repair Following Mohs Microsurgery- Results

| Study | dHACM repair<br>n = 143 | Autogolous tissue Repair<br>n = 143 | P |
|---|---|---|---|
| Toman et al (2022)[39,] | | | |
| Experienced no complications, n (%) | 140 (97.9) | 102 (71.3) | <.0001 |
| Infection, n (%) | 3 (2.0) | 15 (10.0) | .004 |
| Bleeding or hematoma, n (%) | 0 (0.0) | 7 (5.0) | .015 |
| Wound dehiscence, n (%) | 0 (0.0) | 4 (3.0) | .122 |
| Surgical reintervention, n (%) | 0 (0.0) | 11 (8.0) | .0007 |
| Nonhealing wound, n (%) | 0 (0.0) | 5 (3.5) | .060 |
| Poor scar cosmesis, n (%) | 0 (0.0) | 21 (15.0) | <.0001 |
| Scar revision, n (%) | 0 (0.0) | 14 (9.8) | <.0001 |
| Follow-up visits, mean (SD) | 3.4 (1.6) | 2.5 (1.1) | <.0001 |
| Days to discharge, mean (SD) | 30.7 (16.9) | 30.3 (22.9) | .840 |

SD: standard deviation; dHACM: dehydrated human amnionic/chorionic membrane.

### Table 16. Study Relevance Limitations

| Study | Population[a] | Intervention[b] | Comparator[c] | Outcomes[d] | Duration of Follow-up[e] |
|---|---|---|---|---|---|
| Toman et al (2022)[39,] | 4. Study participants were 100% white, over two-thirds male | | 2. No comparison to non-surgical options (e.g., second intention healing) | 1. Not all outcomes mentioned in methods had results reported (e.g., patient satisfaction with scar appearance) | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.

[a] Population key: 1. Intended use population unclear; 2. Study population is unclear; 3. Study population not representative of intended use; 4, Enrolled populations do not reflect relevant diversity; 5. Other.

[b] Intervention key: 1. Not clearly defined; 2. Version used unclear; 3. Delivery not similar intensity as comparator; 4. Not the intervention of interest (e.g., proposed as an adjunct but not tested as such); 5: Other.

[c] Comparator key: 1. Not clearly defined; 2. Not standard or optimal; 3. Delivery not similar intensity as intervention; 4. Not delivered effectively; 5. Other.

[d] Outcomes key: 1. Key health outcomes not addressed; 2. Physiologic measures, not validated surrogates; 3. Incomplete reporting of harms; 4. Not establish and validated measurements; 5. Clinically significant difference not prespecified; 6. Clinically significant difference not supported; 7. Other.

[e] Follow-Up key: 1. Not sufficient duration for benefit; 2. Not sufficient duration for harms; 3. Other.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 17. Study Design and Conduct Limitations**

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| Toman et al (2022)[39,] | 1. Not randomized | 1, 2. Not blinded | | 7. Data extracted from medical records could be incomplete/ inaccurate; 10 of 153 patients excluded because no match identified | | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
[a] Allocation key: 1. Participants not randomly allocated; 2. Allocation not concealed; 3. Allocation concealment unclear; 4. Inadequate control for selection bias; 5. Other.
[b] Blinding key: 1. Participants or study staff not blinded; 2. Outcome assessors not blinded; 3. Outcome assessed by treating physician; 4. Other.
[c] Selective Reporting key: 1. Not registered; 2. Evidence of selective reporting; 3. Evidence of selective publication; 4. Other.
[d] Data Completeness key: 1. High loss to follow-up or missing data; 2. Inadequate handling of missing data; 3. High number of crossovers; 4. Inadequate handling of crossovers; 5. Inappropriate exclusions; 6. Not intent to treat analysis (per protocol for noninferiority trials); 7. Other.
[e] Power key: 1. Power calculations not reported; 2. Power not calculated for primary outcome; 3. Power not based on clinically important difference; 4. Other.
[f] Statistical key: 1. Analysis is not appropriate for outcome type: (a) continuous; (b) binary; (c) time to event; 2. Analysis is not appropriate for multiple observations per patient; 3. Confidence intervals and/or p values not reported; 4. Comparative treatment effects not calculated; 5. Other.

### Section Summary: Repair Following Mohs Microscopic Surgery

A retrospective observational study found a higher complication-free rate in 143 propensity score-matched pairs of patients who had received autologous tissue or dHACM repair following Mohs microsurgery for skin cancer on the face, head, or neck. This study was limited by its retrospective design. Additional evidence from well-designed and conducted prospective studies is needed.

## SUMMARY OF EVIDENCE

### Diabetic Lower-Extremity Ulcers

For individuals who have non-healing diabetic lower-extremity ulcers who receive a patch or flowable formulation of HAM or placental membrane (i.e., Affinity, AmnioBand Membrane, AmnioExcel, Biovance, EpiCord, EpiFix, Grafix), the evidence includes randomized controlled trials (RCTs). Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. The RCTs evaluating amniotic and placental membrane products for the treatment of non-healing (<20% healing with ≥2 weeks of standard care) diabetic lower-extremity ulcers have compared HAM with standard care or with an established advanced wound care product. These trials used wound closure as the primary outcome measure, and some used power analysis, blinded assessment of wound healing, and intention-to-treat analysis. For the HAM products that have been sufficiently evaluated (i.e., Affinity, AmnioBand Membrane, Biovance, EpiCord, EpiFix,

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Grafix), results have shown improved outcomes compared with standard care, and outcomes that are at least as good as an established advanced wound care product. Improved health outcomes in the RCTs are supported by multicenter registries. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

**Lower-Extremity Ulcers due to Venous Insufficiency**
For individuals who have lower-extremity ulcers due to venous insufficiency who receive a patch or flowable formulation of HAM, the evidence includes 2 RCTs. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. The published evidence on HAM for the treatment of venous leg ulcers includes 2 multicenter RCTs with EpiFix. One RCT reported a larger percent wound closure at 4 weeks, but the percentage of patients with complete wound closure at 4 weeks did not differ between EpiFix and the standard of care. A second RCT evaluated complete wound closure at 12 weeks after weekly application of EpiFix or standard dressings with compression, but interpretation is limited by methodologic concerns. Two additional studies with other HAM products have been completed but not published, raising further questions about the efficacy of HAM for venous insufficiency ulcers. Therefore, corroboration with well-designed and well-conducted RCTs evaluating wound healing is needed to demonstrate efficacy for this indication. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Osteoarthritis**
For individuals who have knee osteoarthritis who receive an injection of suspension or particulate formulation of HAM or amniotic fluid, the evidence includes a feasibility study. Relevant outcomes are symptoms, functional outcomes, quality of life, and treatment-related morbidity. The pilot study assessed the feasibility of a larger RCT evaluating HAM injection. Additional trials, which will have a larger sample size and longer follow-up, are needed to permit conclusions on the effect of this treatment. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Plantar Fasciitis**
The evidence on injection of amniotic membrane for the treatment of plantar fasciitis includes preliminary studies and a larger (N =145) patient-blinded comparison of micronized injectable-HAM and placebo control. Injection of micronized amniotic membrane resulted in greater improvements in the visual analog score for pain and the Foot Functional Index compared to placebo controls. The primary limitation of the study is that this is an interim report with 12-month results pending. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Ophthalmic Conditions**
Sutured HAM transplant has been used for many years for the treatment of ophthalmic conditions. Many of these conditions are rare, leading to difficulty in conducting RCTs. The rarity, severity, and variability of the ophthalmic condition was taken into consideration in evaluating the evidence.

**Neurotrophic Keratitis with Ocular Surface Damage and Inflammation That Does Not Respond to Conservative Therapy**
For individuals who have neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative therapy who receive HAM, the evidence includes an RCT.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. An RCT of 30 patients showed no benefit of sutured HAM graft compared to tarsorrhaphy or bandage contact lens. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Corneal Ulcers and Melts That Do Not Respond to Initial Medical Therapy**
For individuals who have corneal ulcers and melts, that do not respond to initial medical therapy who receive HAM, the evidence includes a systematic review of primarily case series and a non-randomized comparative study. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. Corneal ulcers and melts are uncommon and variable and additional RCTs are not expected. The systematic review showed healing in 97% of patients with an improvement of vision in 53% of eyes. One retrospective comparative study with 22 patients found more rapid and complete epithelialization and more patients with a clinically significant improvement in visual acuity following early treatment with self-retained amniotic membrane when compared to historical controls. Corneal ulcers and melts are uncommon and variable and RCTs are not expected. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

**Corneal Perforation When There is Active Inflammation After Corneal Transplant Requiring Adjunctive Treatment**
For individuals who have corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment who receive HAM, the evidence is limited. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. No comparative evidence was identified for this indication. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Bullous Keratopathy as a Palliative Measure in Patients Who are Not Candidates for a Curative Treatment (e.g., Endothelial or Penetrating Keratoplasty)**
For individuals who have bullous keratopathy and who are not candidates for curative treatment (e.g., endothelial or penetrating keratoplasty) who receive HAM, the evidence includes an RCT. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. An RCT found no advantage of sutured HAM over the simpler stromal puncture procedure for the treatment of pain from bullous keratopathy. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Partial Limbal Stem Cell Deficiency with Extensive Diseased Tissue Where Selective Removal Alone is Not Sufficient**
For individuals who have partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient who receive HAM, the evidence is limited. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. No comparative trials were identified on HAM for limbal stem cell deficiency. Improvement in visual acuity has been reported for some patients who have received HAM in conjunction with removal of the diseased limbus. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Moderate or Severe Stevens-Johnson Syndrome**
For individuals who have moderate or severe Stevens-Johnson syndrome who receive HAM, the evidence includes an RCT. Relevant outcomes are symptoms, morbid events, functional

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

outcomes, and quality of life. The evidence on HAM for the treatment of Stevens-Johnson syndrome (includes 1 RCT with 25 patients [ 50 eyes]) found improved symptoms and function with HAM compared to medical therapy alone. Large RCTs are unlikely due to the severity and rarity of the disease. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

**Persistent Epithelial Defects and Ulceration That Do Not Respond to Conservative Therapy**

For individuals who have persistent epithelial defects that do not respond to conservative therapy who receive HAM, the evidence is limited. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. No comparative trials were identified on persistent epithelial defects and ulceration. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Severe Dry Eye with Ocular Surface Damage and Inflammation That Does Not Respond to Conservative Therapy**

For individuals who have severe dry eye with ocular surface damage and inflammation that does not respond to conservative therapy, who receive HAM, the evidence includes an RCT and a large case series. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. The evidence on HAM for severe dry eye with ocular surface damage and inflammation includes an RCT with 20 patients and a retrospective series of 84 patients (97 eyes). Placement of self-retained HAM for 2 to 11 days reduced symptoms and restored a smooth corneal surface and corneal nerve density for as long as 3 months. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

**Moderate or Severe Acute Ocular Chemical Burns**

For individuals who have moderate or severe acute ocular chemical burn who receive HAM, the evidence includes 3 RCTs. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. Evidence includes a total of 197 patients with acute ocular chemical burns who were treated with HAM transplantation plus medical therapy or medical therapy alone. Two of the 3 RCTs did not show a faster rate of epithelial healing, and there was no significant benefit for other outcomes. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Corneal Perforation When Corneal Tissue is Not Immediately Available**

For individuals who have corneal perforation when corneal tissue is not immediately available who receive sutured HAM, the evidence is limited. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. The standard treatment for corneal perforation is corneal transplantation, however, HAM may provide temporary coverage of the severe defect when corneal tissue is not immediately available. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

**Pterygium Repair When There is Insufficient Healthy Tissue to Create a Conjunctival Autograft**

For individuals who have pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft who receive HAM, the evidence includes RCTs and systematic reviews of RCTs. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. Systematic reviews of RCTs have been published that found that conjunctival or limbal autograft

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

is more effective than HAM graft in reducing the rate of pterygium recurrence. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Repair Following Mohs Micrographic Surgery**
For individuals who have undergone Mohs micrographic surgery for skin cancer on the face, head, neck, or dorsal hand who receive human amniotic/chorionic membrane, the evidence includes a nonrandomized, comparative study and no RCTs. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. A retrospective analysis using data from medical records compared a dehydrated human amnionic/chorionic membrane product (dHACM, Epifix) to repair using autologous surgery in 143 propensity-score matched pairs of patients requiring same-day reconstruction after Mohs microsurgery for skin cancer on the head, face, or neck. A greater proportion of patients who received dHACM repair experienced zero complications (97.9% vs. 71.3%; p<.0001; relative risk 13.67; 95% CI 4.33 to 43.12). Placental allograft reconstructions developed less infection (p=.004) and were less likely to experience poor scar cosmesis (p<.0001). This study is limited by its retrospective observational design. Well-designed and conducted prospective studies are lacking. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

## SUPPLEMENTAL INFORMATION
The purpose of the following information is to provide reference material. Inclusion does not imply endorsement or alignment with the evidence review conclusions.

### Clinical Input From Physician Specialty Societies and Academic Medical Centers
While the various physician specialty societies and academic medical centers may collaborate with and make recommendations during this process, through the provision of appropriate reviewers, input received does not represent an endorsement or position statement by the physician specialty societies or academic medical centers, unless otherwise noted.

### 2019 Input
Clinical input was sought to help determine whether the use of human amniotic membrane graft either without or with suture fixation for several ophthalmic conditions would provide a clinically meaningful improvement in net health outcome and whether the use is consistent with generally accepted medical practice. In response to requests, clinical input was received from 2 respondents, including 1 specialty society-level response and 1 physician-level response identified through specialty societies including physicians with academic medical center affiliations.

Clinical input supported the use of amniotic membrane in individuals with the following indications:

- Neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative therapy. Non-sutured HAM in an office setting would be preferred to avoid a delay in treatment associated with scheduling a surgical treatment.
- Corneal ulcers and melts that do not respond to initial medical therapy. Non-sutured HAM in an office setting would be preferred to avoid a delay in treatment associated with scheduling a surgical treatment.
- Corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

- Bullous keratopathy and who are not candidates for curative treatment (e.g., endothelial or penetrating keratoplasty) as an alternative to stromal puncture.
- Partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient.
- Persistent epithelial defects and ulcerations that do not respond to conservative therapy.
- Severe dry eye with ocular surface damage and inflammation that does not respond to conservative therapy.
- Moderate or severe acute ocular chemical burn.
- Corneal perforation when corneal tissue is not immediately available.
- Pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft.

Further details from clinical input are included in the Appendix.

**Practice Guidelines and Position Statements**
Guidelines or position statements will be considered for inclusion in 'Supplemental Information' if they were issued by, or jointly by, a US professional society, an international society with US representation, or National Institute for Health and Care Excellence (NICE). Priority will be given to guidelines that are informed by a systematic review, include strength of evidence ratings, and include a description of management of conflict of interest.

**Society for Vascular Surgery et al.**
In 2016, the Society for Vascular Surgery in collaboration with the American Podiatric Medical Association and the Society for Vascular Medicine made the following recommendation: "For DFUs [diabetic foot ulcers] that fail to demonstrate improvement (>50% wound area reduction) after a minimum of 4 weeks of standard wound therapy, we recommend adjunctive wound therapy options. These include negative pressure therapy, biologics (platelet-derived growth factor [PDGF], living cellular therapy, extracellular matrix products, amnionic membrane products), and hyperbaric oxygen therapy. Choice of adjuvant therapy is based on clinical findings, availability of therapy, and cost-effectiveness; there is no recommendation on ordering of therapy choice."[40,]

**Tear Film and Ocular Surface Society**
In 2017, the Tear Film and Ocular Surface Society published the Dry Eye Workshop II (DEWS) management and therapy report.[23,] The report evaluated the evidence on treatments for dry eye and provided the following treatment algorithm for dry eye disease management:

Step 1:
- Education regarding the condition, its management, treatment, and prognosis
- Modification of local environment
- Education regarding potential dietary modifications (including oral essential fatty acid supplementation)
- Identification and potential modification/elimination of offending systemic and topical medications
- Ocular lubricants of various types (if meibomian gland dysfunction is present, then consider lipid containing supplements)
- Lid hygiene and warm compresses of various types

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Step 2:
If above options are inadequate consider:
- Non-preserved ocular lubricants to minimize preservative-induced toxicity
- Tea tree oil treatment for Demodex (if present)
- Tear conservation
- Punctal occlusion
- Moisture chamber spectacles/goggles
- Overnight treatments (such as ointment or moisture chamber devices)
- In-office, physical heating and expression of the meibomian glands
- In-office intense pulsed light therapy for meibomian gland dysfunction
- Prescription drugs to manage dry eye disease
- Topical antibiotic or antibiotic/steroid combination applied to the lid margins for anterior blepharitis (if present)
- Topical corticosteroid (limited-duration)
- Topical secretagogues
- Topical non-glucocorticoid immunomodulatory drugs (such as cyclosporine)
- Topical LFA-1 antagonist drugs (such as lifitegrast)
- Oral macrolide or tetracycline antibiotics

Step 3:
If above options are inadequate consider:
- Oral secretagogues
- Autologous/allogeneic serum eye drops
- Therapeutic contact lens options
- Soft bandage lenses
- Rigid scleral lenses

Step 4:
If above options are inadequate consider:
- Topical corticosteroid for longer duration
- Amniotic membrane grafts
- Surgical punctal occlusion
- Other surgical approaches (e.g. tarsorrhaphy, salivary gland transplantation)

**Wound Healing Society**
In 2016, the Wound Healing Society updated their guidelines on diabetic foot ulcer treatment.[41,] The Society concluded that there was level 1 evidence that cellular and acellular skin equivalents improve diabetic foot ulcer healing, noting that, "healthy living skin cells assist in healing DFUs [diabetic foot ulcers] by releasing therapeutic amounts of growth factors, cytokines, and other proteins that stimulate the wound bed." References from 2 randomized controlled trials on amniotic membrane were included with references on living and acellular bioengineered skin substitutes.

**U.S. Preventive Services Task Force Recommendations**
Not applicable.

**Ongoing and Unpublished Clinical Trials**
Some currently unpublished trials that might influence this review are listed in Table 18.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 18. Summary of Key Trials**

| NCT No. | Trial Name | Planned Enrollment | Completion Date |
|---|---|---|---|
| ***Ongoing*** | | | |
| NCT04457752[a] | A Randomized Controlled Multicentre Clinical Trial, Evaluating the Efficacy of Dual Layer Amniotic Membrane (Artacent®) and Standard of Care Versus Standard of Care Alone in the Healing of Chronic Diabetic Foot Ulcers | 124 | Dec 2022 |
| NCT03390920[a] | Evaluation of Outcomes With Amniotic Fluid for Musculoskeletal Conditions | 200 | Jun 2030 |
| NCT04612023 | A Prospective, Double-Blinded, Randomized Controlled Trial of an Amniotic Membrane Allograft Injection Comparing Two Doses (1 mL and 2 mL Injection) and a Placebo (Sterile Saline) in the Treatment of Osteoarthritis of the Knee | 90 | Jul 2022 |
| NCT04553432[a] | Dry Eye OmniLenz Application of Omnigen Research Study | 70 | Jul 2022 |
| NCT04599673 | Prospective Analysis of Intraoperative AMNIOGEN® Injection in Patients With Rotator Cuff Tear | 100 | Sep 2022 |
| NCT04636229[a] | A Phase 3 Prospective, Multicenter, Double-blind, Randomized, Placebo-controlled Study to Evaluate the Efficacy of Amniotic Suspension Allograft (ASA) in Patients With Osteoarthritis of the Knee | 474 | Dec 2023 |
| NCT03864939 | Randomized Pilot Study to Improve Postprostatectomy Incontinence and Potency by Application of Dried Human Amnion Graft | 328 | Apr 2025 |
| NCT03855514[a] | A Prospective, Multicenter, Randomized, Controlled Clinical Study Of NuShield® and Standard of Care (SOC) Compared to SOC Alone For The Management Of Diabetic Foot Ulcers | 200 | Dec 2021 |
| ***Unpublished*** | | | |
| NCT02609594[a] | A Multi-center Randomized Controlled Clinical Trial Evaluating Two Application Regimens of Amnioband Human Amniotic Membrane and Standard of Care vs. Standard of Care Alone in the Treatment of Venous Leg Ulcers | 240 | Dec 2018 (status unknown) |
| NCT02838784[a] | The Efficacy and Safety of Artacent™ for Treatment Resistant Lower Extremity Venous and Diabetic Ulcers: A Prospective Randomized Study | 134 | Dec 2018 (status unknown) |
| NCT03441607[a] | Safety & Efficacy of Micronized Human Amnion Chorion Membrane Biologic (mHACMb) FloGraft (Micronized Human Amnion Chorion Membrane)® in Adults With Pain Due to Osteoarthritis of the Knee | 320 | Mar 2019 (status unknown) |
| NCT02318511[a] | An Investigation of ReNu™ Knee Injection: Monitoring the Response of Knee Function and Pain in Patients With Osteoarthritis | 200 | Feb 2019 (completed) |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| NCT No. | Trial Name | Planned Enrollment | Completion Date |
|---|---|---|---|
| NCT03379324[a] | A Prospective, Randomized Study Comparing Outcomes Following Arthroscopic Double-row Rotator Cuff Repair With and Without the Addition of a Cryopreserved, Liquid, Injectable Amnion Allograft | 260 | Sep 2019 (status unknown) |
| NCT03414268[a] | A Phase 3, Prospective, Double-Blinded, Randomized Controlled Trial of the Micronized dHACM Injection As Compared To Saline Placebo Injection In The Treatment Of Plantar Fasciitis | 276 | Apr 2021 (active, not recruiting) |
| NCT02982226[a] | A Comparative Study of Injectable Human Amniotic Allograft (ReNu™) Versus Corticosteroids for Plantar Fasciitis: A Prospective, Randomized, Blinded Study | 150 | Apr 2021 (active, not recruiting) |
| NCT03414255[a] | A Phase 3, Prospective, Double-Blinded, Randomized Controlled Trial Of The Micronized dHACM Injection As Compared To Saline Placebo Injection In The Treatment Of Achilles Tendonitis | 158 | May 2021 (active, not recruiting) |
| NCT03485157[a] | A Phase 2B, Prospective, Double-blinded, Randomized Controlled Trial of the Micronized Human Amnion Chorion Membrane Injection as Compared to Saline Placebo Injection in the Treatment of Osteoarthritis of the Knee | 466 | Oct 2021 |

NCT: national clinical trial.
[a] Denotes industry-sponsored or cosponsored trial.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## CODING

**The following codes for treatment and procedures applicable to this policy are included below for informational purposes. This may not be a comprehensive list of procedure codes applicable to this policy.**

**Inclusion or exclusion of a procedure, diagnosis or device code(s) does not constitute or imply member coverage or provider reimbursement. Please refer to the member's contract benefits in effect at the time of service to determine coverage or non-coverage of these services as it applies to an individual member.**

**The code(s) listed below are medically necessary ONLY if the procedure is performed according to the "Policy" section of this document.**

| CPT/HCPCS | |
|---|---|
| 65778 | Placement of amniotic membrane on the ocular surface; without sutures |
| 65779 | Placement of amniotic membrane on the ocular surface; single layer, sutured |
| A2001 | Innovamatrix ac, per square centimeter (effective 01-01-2022) |
| Q4132 | Grafix Core and GrafixPL Core, per sq cm |
| Q4133 | Grafix PRIME, GrafixPL PRIME, Stravix and StravixPL, per sq cm |
| Q4137 | AmnioExcel, AmnioExcel Plus or BioDExcel, per sq cm |
| Q4138 | BioDFence DryFlex, per sq cm |
| Q4139 | AmnioMatrix or BioDMatrix, injectable, 1 cc |
| Q4140 | BioDFence, per sq cm |
| Q4145 | EpiFix, injectable, 1 mg |
| Q4148 | Neox Cord 1K, Neox Cord RT, or Clarix Cord 1K, per sq cm |
| Q4150 | AlloWrap DS or dry, per sq cm |
| Q4151 | AmnioBand or Guardian, per sq cm |
| Q4153 | Dermavest and Plurivest, per sq cm |
| Q4154 | Biovance, per sq cm |
| Q4155 | Neox Flo or Clarix Flo 1 mg |
| Q4156 | Neox 100 or Clarix 100, per sq cm |
| Q4157 | Revitalon, per sq cm |
| Q4159 | Affinity, per sq cm |
| Q4160 | Nushield, per sq cm |
| Q4162 | WoundEx Flow, BioSkin Flow, 0.5 cc |
| Q4163 | WoundEx, BioSkin, per sq cm |
| Q4168 | AmnioBand, 1 mg |
| Q4169 | Artacent wound, per sq cm |
| Q4170 | Cygnus, per sq cm |
| Q4171 | Interfyl, 1 mg |
| Q4173 | PalinGen or PalinGen XPlus, per sq cm |
| Q4174 | PalinGen or ProMatrX, 0.36 mg per 0.25 cc |
| Q4176 | NeoPatch or Therion per sq. cm |
| Q4177 | FlowerAmnioFlo, 0.1 cc |
| Q4178 | FlowerAmnioPatch, per sq cm |
| Q4180 | Revita, per square centimeter |
| Q4181 | Amnio Wound, per sq cm |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| **CPT/HCPCS** | |
|---|---|
| Q4183 | Surgigraft, per sq cm |
| Q4184 | Cellesta, per sq cm |
| Q4185 | Cellesta flowable amnion (25 mg per cc); per 0.5 cc |
| Q4186 | Epifix, per sq cm |
| Q4187 | Epicord, per sq cm |
| Q4188 | AmnioArmor, per sq cm |
| Q4189 | Artacent AC, 1 mg |
| Q4190 | Artacent AC, per sq cm |
| Q4191 | Restorigin, per sq cm |
| Q4192 | Restorigin, 1 cc |
| Q4194 | Novachor, per sq cm |
| Q4198 | Genesis Amniotic Membrane, per sq cm |
| Q4199 | Cygnus matrix, per square centimeter |
| Q4201 | Matrion, per sq cm |
| Q4204 | XWRAP, per sq cm |
| Q4205 | Membrane graft or membrane wrap, per square centimeter |
| Q4206 | Fluid flow or fluid GF, 1 cc |
| Q4208 | Novafix, per square centimeter |
| Q4209 | Surgraft, per square centimeter |
| Q4210 | Axolotl graft or axolotl dualgraft, per square centimeter |
| Q4211 | Amnion bio or Axobiomembrane, per square centimeter |
| Q4212 | Allogen, per cc |
| Q4213 | Ascent, 0.5 mg |
| Q4214 | Cellesta cord, per square centimeter |
| Q4215 | Axolotl ambient or axolotl cryo, 0.1 mg |
| Q4216 | Artacent cord, per square centimeter |
| Q4217 | Woundfix, BioWound, Woundfix Plus, BioWound Plus, Woundfix Xplus or BioWound Xplus, per square centimeter |
| Q4218 | Surgicord, per square centimeter |
| Q4219 | Surgigraft-dual, per square centimeter |
| Q4220 | BellaCell HD or Surederm, per square centimeter |
| Q4221 | Amniowrap2, per square centimeter |
| Q4227 | Corplex, per square centimeter |
| Q4229 | Cogenex Amniotic Membrane |
| Q4230 | Cogenex Flowable Amnion, per 0.5 cc |
| Q4231 | Corplex P, per cubic centimeter |
| Q4232 | Corplex, per square centimeter |
| Q4233 | SurFactor or NuDyn, per 0.5 cc |
| Q4234 | XCellerate, per square centimeter |
| Q4235 | Amniorepair, altiply, per square centimeter |
| Q4237 | Cryo-Cord, per square centimeter |
| Q4238 | Derm-maxx, per square centimeter |
| Q4239 | Amnio-Maxx, Amnio-Maxx Lite, per square centimeter |
| Q4240 | Amniotext patch, per square centimeter |
| Q4241 | PolyCyte, per 0.5 mL |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Contains Public Information

| CPT/HCPCS | |
|---|---|
| Q4242 | AmnioCyte Plus, per 0.5 mL |
| Q4244 | Procenta 200 mg, 1-6 square centimeter |
| Q4245 | AmnioText, per square centimeter |
| Q4246 | CoreText, ProText, per cc |
| Q4247 | Amniotext patch, per square centimeter |
| Q4248 | Dermacyte Matrix, per sq cm |
| Q4249 | Amniply, for topical use only, per square centimeter |
| Q4250 | Amnioamp-mp, per square centimeter |
| Q4251 | Vim, per square centimeter Effective 10-01-2021 |
| Q4252 | Vendaje, per square centimeter Effective 10-01-2021 |
| Q4253 | Zenith amniotic membrane, per square centimeter. Effective 10-01-2021 |
| Q4254 | Novafix dl, per square centimeter |
| Q4255 | Reguard, for topical use only, per square centimeter |

| ICD-10 DIAGNOSES | |
|---|---|
| E08.621-E08.622; E09.621-E09.622; E10.621-E10.622; E11.621-E11.622: E13.621-E13.622 | Diabetes codes with foot ulcer or other skin ulcer |
| H04.121-H04.129 | Dry eye syndrome code range |
| H11.001-H11.069 | Pterygium of eye code range |
| H16.001-H16.079 | Corneal ulcer code range (includes perforation) |
| H16.231-H16.239 | Neurotrophic keratoconjunctivitis code range |
| H18.10-H18.13 | Bullous Keratopathy code range |
| H18.30 | Unspecified Corneal Membrane Change |
| H18.52 | Epithelial (Juvenile) Corneal Dystrophy |
| H18.831-H18.839 | Recurrent erosion of cornea code range |
| H18.891-H18.899 | Other specified disorders of the cornea code range (includes limbal stem cell deficiency) |
| I87.2 | Venous Insufficiency (Chronic) (Peripheral) |
| L51.1 | Stevens-Johnson Syndrome |
| M17.10-M17.9 | Osteoarthritis of the knee code range |
| M72.2 | Plantar fasciitis |
| T26.10-T26.12 | Burn of cornea and conjunctival sac code range |
| T26.50-T26.52 | Corrosion of cornea and conjunctival sac code rang |

| REVISIONS | |
|---|---|
| 03-20-2017 | Policy added to the bcbsks.com web site. |
| 01-01-2019 | Updated Description section. |
| | In Policy section:<br>▪ In Item A 1, added "Q4168".<br>▪ In Item A 3, removed "Q4131" and added "Q4145, Q4186". |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Contains Public Information

| REVISIONS | |
|---|---|
| | ▪ Added new Item B, "FDA-approved sutured and non-sutured human amniotic membrane grafts may be considered medically necessary for the treatment of the following ophthalmic indications: 1. Neurotrophic keratitis 2. Corneal ulcers and melts 3. Pterygium repair 4. Stevens-Johnson syndrome 5. Persistent epithelial defects (with documented pain for ≥5 days) 6. Acid or alkaline burn.<br>▪ Added new Item C, "FDA-approved sutured and non-sutured human amniotic membrane grafts are considered experimental / investigational for the treatment of all other ophthalmic conditions including but not limited to dry eye syndrome, corneal perforation, bullous keratopathy, limbus stem cell deficiency, and after photorefractive keratectomy."<br>▪ In Item D (previous Item B), added "including but not limited to treatment of osteoarthritis and plantar fasciitis" to read "Injection of micronized or particulated human amniotic membrane is considered experimental / investigational for all indications, including but not limited to treatment of osteoarthritis and plantar fasciitis."<br>▪ In Item F (previous Item D), removed "human amniotic membrane products and" and added "including but not limited to treatment of lower-extremity ulcers due to venous insufficiency" to read "All other human amniotic membrane products and indications not listed above are considered experimental / investigational, including but not limited to treatment of lower-extremity ulcers due to venous insufficiency."<br>▪ Updated Policy Guidelines. |
| | Updated Rationale section. |
| | In Coding section:<br>▪ Added CPT codes: 65778, 65779.<br>▪ Added new HCPCS codes: Q4183, Q4184, Q4185, Q4186, Q4187, Q4188, Q4189, Q4190, Q4191, Q4192, Q4194, Q4198, Q4201, Q4204.<br>▪ Removed deleted HCPCS code: Q4131.<br>▪ Revised nomenclature to HCPCS codes: Q4132, Q4133, Q4137, Q4148, Q4156, Q4162, Q4163.<br>▪ Added ICD-10 codes: H11.001, H11.002, H11.003, H11.011, H11.012, H11.013, H11.021, H11.022, H11.023, H11.031, H11.032, H11.033, H11.041, H11.042, H11.043, H11.051, H11.052, H11.053, H11.061, H11.062, H11.063, H16.011, H16.012, H16.013, H16.021, H16.022, H16.023, H16.031, H16.032, H16.033, H16.041, H16.042, H16.043, H16.051, H16.052, H16.053, H16.061, H16.062, H16.063, H16.121, H16.122, H16.123, H16.231, H16.232, H16.233, H18.831, H18.832, H18.833, T26.11XA, T26.11XD, T26.11XS, T26.12XA, T26.12XD, T26.12XS, T26.31XA, T26.31XD, T26.31XS, T26.32XA, T26.32XD, T26.32XS, T26.51XA, T26.51XD, T26.51XS, T26.52XA, T26.52XD, T26.52XS, T26.61XA, T26.61XD, T26.61XS, T26.62XA, T26.62XD, T26.62XS, T26.81XA, T26.81XD, T26.81XS, T26.82XA, T26.82XD, T26.82XS. |
| | Updated References section. |
| 02-18-2019 | In Policy section:<br>▪ In Item A 3, removed "Q4145". |
| 03-27-2019 | Updated Description section. |
| | In Policy section:<br>▪ In Item A, added new Item A 3, "Epicord (Q4187)". |
| | Updated Rationale section. |
| | In Coding section:<br>▪ Removed ICD-10 codes: T26.51XA, T26.51XD, T26.51XS, T26.52XA, T26,52XD, T26.52XS. |
| | Updated References section. |
| 05-21-2019 | In Policy section:<br>▪ In Item A 1, removed HCPCS code Q4168. |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| **REVISIONS** | |
|---|---|
| 09-27-2019 | Policy published to the bcbsks.com website on 08-28-2019 with an effective date of 09-27-2019. |
| | In Coding section:<br>▪ Added ICD-10 codes: H18.891, H18.892, H18.893. |
| | Updated References section. |
| 10-01-2019 | In Coding section:<br>▪ Added HCPCS Codes: Q4205, Q4206, Q4208, Q4209, Q4210, Q4211, Q4212, Q4213, Q4214, Q4215, Q4216, Q4217, Q4218, Q4219, Q4221 |
| 07-01-2020 | In Coding section:<br>▪ Added HCPCS Codes: Q4176, Q4177, Q4178, Q4181, Q4227, Q4228, Q4229, Q4230, Q4231, Q4232, Q4233, Q4234, Q4235, Q4236, Q4237, Q4239, Q4240, Q4241, Q4242, Q4244, Q4245, Q4246, Q4247, Q4248 |
| 07-16-2021 | Updated Description section |
| | **In Policy section**<br><u>Added item A.1</u><br><u>In Item B</u><br>• Removed: "FDA-approved sutured and non-sutured human amniotic membrane grafts may be considered medically necessary for the treatment of the following ophthalmic indications:<br>1. Neurotrophic keratitis<br>2. Corneal ulcers and melts<br>3. Pterygium repair<br>4. Stevens-Johnson syndrome<br>5. Persistent epithelial defects (with documented pain for ≥5 days)<br>6. Acid or alkaline burn"<br>• Added: "Human amniotic membrane grafts with or without suture (Prokera®, AmbioDisk™) or glue may be considered medically necessary for the treatment of the following ophthalmic indications:<br>1. Neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative therapy;<br>2. Corneal ulcers and melts that do not respond to initial conservative therapy;<br>3. Corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment;<br>4. Bullous keratopathy as a palliative measure in patients who are not candidates for curative treatment (e.g., endothelial or penetrating keratoplasty);<br>5. Partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient;<br>6. Moderate or severe Stevens-Johnson syndrome;<br>7. Persistent epithelial defects that do not respond as stated in policy guideline #2;<br>8. Severe dry eye (DEWS 3 or 4) with ocular surface damage and inflammation that remains symptomatic after Steps 1, 2, and 3 of the dry eye disease management algorithm (see Policy Guidelines); or<br>9. Moderate or severe acute ocular chemical burn."<br>10. Corneal perforation when corneal tissue is not immediately available; or<br>11. Pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft<br><u>In Item C</u><br>• Removed: "FDA approved sutured and non-sutured human amniotic membrane grafts are considered **experimental / investigational** for the treatment of all other ophthalmic conditions including, but not limited to, dry eye syndrome, corneal |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| REVISIONS | |
|---|---|
| | perforation, bullous keratopathy, limbus stem cell deficiency, and after photorefractive keratectomy."<br>• Added: "Human amniotic membrane grafts with or without suture are considered **experimental / investigational** for all ophthalmic indications not outlined above."<br>Added<br>• Item F<br>• Policy Guidelines |
| | Updated Rationale section |
| | In Coding section:<br>• Added HCPCS Codes: Q4180, Q4220, Q4238, Q4249, Q4250, Q4254, Q4255<br>• Added ICD 10 Diagnosis codes: H18.11, H18.12, H18.13, H18.30, H18.52, I87.2, L51.1, T26.50XA, T26.50XD, T26.50XS, T26.51XA, T26.51XD, T26.51XS, T26.52XA, T26.52XD, T26.52XS<br>• Removed ICD 10 Diagnosis codes: H16.121, H16.122, H16.123, L97.212, L97.213, L97.214, L97.222, L97.223, L97.224, L97.312, L97.313, L97.314, L97.322, L97.323, L97.324, L97.412, L97.413, L97.414, L97.422, L97.423, L97.424, L97.512, L97.513, L97.514, L97.522, L97.523, L97.524, L97.812, L97.813, L97.814, L97.822, L97.823, L97.824, T26.31XA, T26.31XD, T26.31XS, T26.32XA, T26.32XD, T26.32XS, T26.61XA, T26.61XD, T26.61XS, T26.62XA, T26.62XD, T26.62XS, T26.81XA, T26.81XD, T26.81XS, T26.82XA, T26.82XD, T26.82XS |
| | Updated Reference section |
| | Added Appendix |
| 10-08-2021 | In Coding section: Effective 10-01-2021<br>Added HCPCS codes: Q4251, Q4252, Q4253<br>Deleted HCPCS codes: Q4228, Q4236 (no longer being manufactured) |
| 01-03-2022 | In Coding Section<br>Added HCPCS code A2001, Q4199 (effective 01-01-2022) |
| 04-01-2022 | In Coding Section Added:<br>Q4225, Q4256, Q4257, Q4258 (new codes 04-01-2022) |
| 04-08-2022 | Updated Description Section |
| | Updated Policy Section<br>▪ Section G "All other indications not listed above are considered experimental / investigational, including, but not limited to, treatment of lower-extremity ulcers due to venous insufficiency." added "and repair following Mohs micrographic surgery" to the end of the statement. |
| | Updated Rationale Section |
| | Updated Coding Section<br>▪ Removed coding bullets<br>• There are specific HCPCS codes for some of these products. If no specific HCPCS code exists for the product, an unlisted code such as Q4100 would be used.<br>• There are no specific codes for AmnioFix or OrthoFlo. It might be reported using the code for another MiMedx product such as Q4145 or the not otherwise specified code Q4100.<br>• There is no specific code for this type of injection. It might be reported with one of the musculoskeletal system injection codes (e.g., 20550), the unlisted general musculoskeletal system code (20999), or if subcutaneous or intramuscular, the therapeutic injection code (96372).<br>• There are codes for the placement of amniotic membrane on the ocular surface: 65778, 65779<br>▪ Removed Code: Q4100 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| REVISIONS | |
|---|---|
| | ▪ Added ICD-10 Codes: H04.121-H04.129, M17.10-M17.9 and M72.2<br>▪ Converted ICD-10 codes to ranges |
| | Updated References Section |

## REFERENCES


1. Parolini O, Soncini M, Evangelista M, et al. Amniotic membrane and amniotic fluid-derived cells: potential tools for regenerative medicine?. Regen Med. Mar 2009; 4(2): 275-91. PMID 19317646
2. Koob TJ, Rennert R, Zabek N, et al. Biological properties of dehydrated human amnion/chorion composite graft: implications for chronic wound healing. Int Wound J. Oct 2013; 10(5): 493-500. PMID 23902526
3. Shimberg M, Wadsworth K. The use of amniotic-fluid concentrate in orthopaedic conditions. J Bone Joint Surg. 1938;20(I):167-177.
4. U.S. Food and Drug Administration. Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use Guidance for Industry and Food and Drug Administration Staff. 2017 https://www.regulations.gov/document?D=FDA-2017-D-6146-0003 Accessed January 10, 2022
5. Food and Drug Administration. 510(k) Summary: ProKeraTM Bio-Tissue Inc. (K032104). 2003; https://www.accessdata.fda.gov/cdrh_docs/pdf3/K032104.pdf. Accessed January 10, 2022.
6. Serena TE, Yaakov R, Moore S, et al. A randomized controlled clinical trial of a hypothermically stored amniotic membrane for use in diabetic foot ulcers. J Comp Eff Res. Jan 2020; 9(1): 23-34. PMID 31691579
7. Ananian CE, Dhillon YS, Van Gils CC, et al. A multicenter, randomized, single-blind trial comparing the efficacy of viable cryopreserved placental membrane to human fibroblast-derived dermal substitute for the treatment of chronic diabetic foot ulcers. Wound Repair Regen. May 2018; 26(3): 274-283. PMID 30098272
8. Tettelbach W, Cazzell S, Sigal F, et al. A multicentre prospective randomized controlled comparative parallel study of dehydrated human umbilical cord (EpiCord) allograft for the treatment of diabetic foot ulcers. Int Wound J. Feb 2019; 16(1): 122-130. PMID 30246926
9. DiDomenico LA, Orgill DP, Galiano RD, et al. Use of an aseptically processed, dehydrated human amnion and chorion membrane improves likelihood and rate of healing in chronic diabetic foot ulcers: A prospective, randomized, multi-centre clinical trial in 80 patients. Int Wound J. Dec 2018; 15(6): 950-957. PMID 30019528
10. Snyder RJ, Shimozaki K, Tallis A, et al. A Prospective, Randomized, Multicenter, Controlled Evaluation of the Use of Dehydrated Amniotic Membrane Allograft Compared to Standard of Care for the Closure of Chronic Diabetic Foot Ulcer. Wounds. Mar 2016; 28(3): 70-7. PMID 26978860
11. Zelen CM, Gould L, Serena TE, et al. A prospective, randomized, controlled, multi-centre comparative effectiveness study of healing using dehydrated human amnion/chorion membrane allograft, bioengineered skin substitute or standard of care for treatment of chronic lower extremity diabetic ulcers. Int Wound J. Dec 2015; 12(6): 724-32. PMID 25424146


*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

12. Zelen CM, Serena TE, Gould L, et al. Treatment of chronic diabetic lower extremity ulcers with advanced therapies: a prospective, randomized, controlled, multi-centre comparative study examining clinical efficacy and cost. Int Wound J. Apr 2016; 13(2): 272-82. PMID 26695998
13. Tettelbach W, Cazzell S, Reyzelman AM, et al. A confirmatory study on the efficacy of dehydrated human amnion/chorion membrane dHACM allograft in the management of diabetic foot ulcers: A prospective, multicentre, randomized, controlled study of 110 patients from 14 wound clinics. Int Wound J. Feb 2019; 16(1): 19-29. PMID 30136445
14. Lavery LA, Fulmer J, Shebetka KA, et al. The efficacy and safety of Grafix((R)) for the treatment of chronic diabetic foot ulcers: results of a multi-centre, controlled, randomized, blinded, clinical trial. Int Wound J. Oct 2014; 11(5): 554-60. PMID 25048468
15. Smiell JM, Treadwell T, Hahn HD, et al. Real-world Experience With a Decellularized Dehydrated Human Amniotic Membrane Allograft. Wounds. Jun 2015; 27(6): 158-69. PMID 26061491
16. Frykberg RG, Gibbons GW, Walters JL, et al. A prospective, multicentre, open-label, single-arm clinical trial for treatment of chronic complex diabetic foot wounds with exposed tendon and/or bone: positive clinical outcomes of viable cryopreserved human placental membrane. Int Wound J. Jun 2017; 14(3): 569-577. PMID 27489115
17. Serena TE, Carter MJ, Le LT, et al. A multicenter, randomized, controlled clinical trial evaluating the use of dehydrated human amnion/chorion membrane allografts and multilayer compression therapy vs. multilayer compression therapy alone in the treatment of venous leg ulcers. Wound Repair Regen. Nov-Dec 2014; 22(6): 688-93. PMID 25224019
18. Bianchi C, Cazzell S, Vayser D, et al. A multicentre randomized controlled trial evaluating the efficacy of dehydrated human amnion/chorion membrane (EpiFix (R) ) allograft for the treatment of venous leg ulcers. Int Wound J. Feb 2018; 15(1): 114-122. PMID 29024419
19. Bianchi C, Tettelbach W, Istwan N, et al. Variations in study outcomes relative to intention-to-treat and per-protocol data analysis techniques in the evaluation of efficacy for treatment of venous leg ulcers with dehydrated human amnion/chorion membrane allograft. Int Wound J. Jun 2019; 16(3): 761-767. PMID 30864259
20. Vines JB, Aliprantis AO, Gomoll AH, et al. Cryopreserved Amniotic Suspension for the Treatment of Knee Osteoarthritis. J Knee Surg. Aug 2016; 29(6): 443-50. PMID 26683979
21. Tsikopoulos K, Vasiliadis HS, Mavridis D. Injection therapies for plantar fasciopathy ('plantar fasciitis'): a systematic review and network meta-analysis of 22 randomized controlled trials. Br J Sports Med. Nov 2016; 50(22): 1367-1375. PMID 27143138
22. Zelen CM, Poka A, Andrews J. Prospective, randomized, blinded, comparative study of injectable micronized dehydrated amniotic/chorionic membrane allograft for plantar fasciitis--a feasibility study. Foot Ankle Int. Oct 2013; 34(10): 1332-9. PMID 23945520
23. Cazzell S, Stewart J, Agnew PS, et al. Randomized Controlled Trial of Micronized Dehydrated Human Amnion/Chorion Membrane (dHACM) Injection Compared to Placebo for the Treatment of Plantar Fasciitis. Foot Ankle Int. Oct 2018; 39(10): 1151-1161. PMID 30058377
24. Suri K, Kosker M, Raber IM, et al. Sutureless amniotic membrane ProKera for ocular surface disorders: short-term results. Eye Contact Lens. Sep 2013; 39(5): 341-7. PMID 23945524
25. Liu J, Li L, Li X. Effectiveness of Cryopreserved Amniotic Membrane Transplantation in Corneal Ulceration: A Meta-Analysis. Cornea. Apr 2019; 38(4): 454-462. PMID 30702468

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

26. Yin HY, Cheng AMS, Tighe S, et al. Self-retained cryopreserved amniotic membrane for treating severe corneal ulcers: a comparative, retrospective control study. Sci Rep. Oct 12 2020; 10(1): 17008. PMID 33046729
27. Paris Fdos S, Goncalves ED, Campos MS, et al. Amniotic membrane transplantation versus anterior stromal puncture in bullous keratopathy: a comparative study. Br J Ophthalmol. Aug 2013; 97(8): 980-4. PMID 23723410
28. Kheirkhah A, Casas V, Raju VK, et al. Sutureless amniotic membrane transplantation for partial limbal stem cell deficiency. Am J Ophthalmol. May 2008; 145(5): 787-94. PMID 18329626
29. Pachigolla G, Prasher P, Di Pascuale MA, et al. Evaluation of the role of ProKera in the management of ocular surface and orbital disorders. Eye Contact Lens. Jul 2009; 35(4): 172-5. PMID 19474753
30. Sharma N, Thenarasun SA, Kaur M, et al. Adjuvant Role of Amniotic Membrane Transplantation in Acute Ocular Stevens-Johnson Syndrome: A Randomized Control Trial. Ophthalmology. Mar 2016; 123(3): 484-91. PMID 26686968
31. Bouchard CS, John T. Amniotic membrane transplantation in the management of severe ocular surface disease: indications and outcomes. Ocul Surf. Jul 2004; 2(3): 201-11. PMID 17216092
32. John T, Tighe S, Sheha H, et al. Corneal Nerve Regeneration after Self-Retained Cryopreserved Amniotic Membrane in Dry Eye Disease. J Ophthalmol. 2017; 2017: 6404918. PMID 28894606
33. McDonald MB, Sheha H, Tighe S, et al. Treatment outcomes in the DRy Eye Amniotic Membrane (DREAM) study. Clin Ophthalmol. 2018; 12: 677-681. PMID 29670328
34. Tandon R, Gupta N, Kalaivani M, et al. Amniotic membrane transplantation as an adjunct to medical therapy in acute ocular burns. Br J Ophthalmol. Feb 2011; 95(2): 199-204. PMID 20675729
35. Eslani M, Baradaran-Rafii A, Cheung AY, et al. Amniotic Membrane Transplantation in Acute Severe Ocular Chemical Injury: A Randomized Clinical Trial. Am J Ophthalmol. Mar 2019; 199: 209-215. PMID 30419194
36. Tamhane A, Vajpayee RB, Biswas NR, et al. Evaluation of amniotic membrane transplantation as an adjunct to medical therapy as compared with medical therapy alone in acute ocular burns. Ophthalmology. Nov 2005; 112(11): 1963-9. PMID 16198422
37. Kaufman SC, Jacobs DS, Lee WB, et al. Options and adjuvants in surgery for pterygium: a report by the American Academy of Ophthalmology. Ophthalmology. Jan 2013; 120(1): 201-8. PMID 23062647
38. Clearfield E, Muthappan V, Wang X, et al. Conjunctival autograft for pterygium. Cochrane Database Syst Rev. Feb 11 2016; 2: CD011349. PMID 26867004
39. Toman J, Michael GM, Wisco OJ, et al. Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane. Facial Plast Surg Aesthet Med. Jan-Feb 2022; 24(1): 48-53. PMID 34714143
40. Hingorani A, LaMuraglia GM, Henke P, et al. The management of diabetic foot: A clinical practice guideline by the Society for Vascular Surgery in collaboration with the American Podiatric Medical Association and the Society for Vascular Medicine. J Vasc Surg. Feb 2016; 63(2 Suppl): 3S-21S. PMID 26804367
41. Lavery LA, Davis KE, Berriman SJ, et al. WHS guidelines update: Diabetic foot ulcer treatment guidelines. Wound Repair Regen. Jan-Feb 2016; 24(1): 112-26. PMID 26663430

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## OTHER REFERENCES

1. Blue Cross and Blue Shield of Kansas Ophthalmology / Optometry Liaison Committee Consent Ballot, November 2018, May 2021.
2. Blue Cross and Blue Shield of Kansas Ophthalmology / Optometry Liaison Committee, May 2011, May 2012, May 2018; August 2019, May 2021.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Appendix
### 2019 Clinical Input

Clinical input was sought to help determine whether the use of human amniotic membrane graft either without or with suture fixation for several ophthalmic conditions would provide a clinically meaningful improvement in net health outcome and whether the use is consistent with generally accepted medical practice. In response to requests, clinical input was received from 2 respondents, including 1 specialty society-level response and 1 physician-level response identified through specialty societies including physicians with academic medical center affiliations.

### Respondents

Clinical input was provided by the following specialty societies and physician members identified by a specialty society or clinical health system:

- American Academy of Ophthalmology (AAO)
- Mark Latina, MD, Ophthalmology, Tufts University School of Medicine, identified by Massachusetts Society of Eye Physicians and Surgeons

Clinical input provided by the specialty society at an aggregate level is attributed to the specialty society. Clinical input provided by a physician member designated by a specialty society or health system is attributed to the individual physician and is not a statement from the specialty society or health system. Specialty society and physician respondents participating in the Evidence Street® clinical input process provide a review, input, and feedback on topics being evaluated by Evidence Street. However, participation in the clinical input process by a specialty society and/or physician member designated by a specialty society or health system does not imply an endorsement or explicit agreement with the Evidence Opinion published by BCBSA nor any Blue Plan.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Clinical Input Ratings

| | | | | Confidence Level That Clinical Use Expected to Provide Clinically Meaningful Improvement in Net Health Outcome | | | | | | | | | | | Confidence Level that Clinical Use is Consistent with Generally Accepted Medical Practice | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | NO | | | | | YES | | | | | | NO | | | | | YES | | | | |
| Use of human amniotic membrane for following indications | Type of HAM | Respondent | Identified by | Yes or No | 5 | 4 | 3 | 2 | 1 | 1 | 2 | 3 | 4 | 5 | Yes or No | 5 | 4 | 3 | 2 | 1 | 1 | 2 | 3 | 4 | 5 |
| Neurotrophic keratitis | With sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | X | | Yes | | | | | | | | | X | |
| | Without sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | X | |
| Corneal ulcers and melts | With sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | No | | X | | | | | | | | |
| | Without sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| Corneal perforation | With sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | Without sutures | AAO | | No | X | | | | | | | | | | No | X | | | | | | | | | |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | No | | X | | | | | | | | | No | | X | | | | | | | | |
| Bullous keratopathy | With sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | X | | No | | X | | | | | | | | |
| | Without sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | X | |
| Pterygium repair | With sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | Without sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | X | | | No | | X | | | | | | | | |
| Limbal stem cell deficiency | With sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | X | |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | X | | Yes | | | | | | | | | | X |
| | Without sutures | AAO | | Yes | | | | | | | | | X | | Yes | | | | | | | | | X | |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | X | |
| Stevens Johnson | With sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | Without sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| Persistent epithelial defects | With sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | No | | X | | | | | | | | |
| | Without sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | X | |
| Severe dry eye | With sutures | AAO | | Yes | | | | | | | | | X | | Yes | | | | | | | | | X | |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | X | | No | X | | | | | | | | | |
| | Without sutures | AAO | | Yes | | | | | | | | | X | | Yes | | | | | | | | | X | |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| Acute ocular chemical burn | With sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | Without sutures | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. [illegible] | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |

## Respondent Profile

| | Specialty Society | | | |
|---|---|---|---|---|
| # | Name of Organization | Clinical Specialty | | |
| 1 | American Academy of Ophthalmology | Ophthalmology | | |
| | Physician | | | |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Name | Degree | Institutional Affiliation | Clinical Specialty | Board Certification and Fellowship Training |
|---|---|---|---|---|---|
| **Identified by Mass Society of Eye Physicians and Surgeons** | | | | | |
| 2 | Mark Latina | MD | Tufts University School of Medicine | Ophthalmology | Ophthalmology, Glaucoma Fellowship trained |

**Respondent Conflict of Interest Disclosure**

| # | 1) Research support related to the topic where clinical input is being sought | | 2) Positions, paid or unpaid, related to the topic where clinical input is being sought | | 3) Reportable, more than $1,000, health care related assets or sources of income for myself, my spouse, or my dependent children related to the topic where clinical input is being sought | | 4) Reportable, more than $350, gifts or travel reimbursements for myself, my spouse, or my dependent children related to the topic where clinical input is being sought | |
|---|---|---|---|---|---|---|---|---|
| | YES/NO | Explanation | YES/NO | Explanation | YES/NO | Explanation | YES/NO | Explanation |
| 1 | No | | No | | No | | No | |
| 2 | No | | No | | No | | No | |

Individual physician respondents answered at individual level. Specialty Society respondents provided aggregate information that may be relevant to the group of clinicians who provided input to the Society-level response. NR = not reported

**Responses**

- We are seeking your opinion on whether using human amniotic membrane graft either without or with suture fixation for the below indications provide a clinically meaningful improvement in net health outcome. Please respond based on the evidence and your clinical experience. Please address these points in your response:
  - Relevant clinical scenarios (e.g., a chain of evidence) where the technology is expected to provide a clinically meaningful improvement in net health outcome;
  - Any relevant patient inclusion/exclusion criteria or clinical context important to consider in identifying individuals who may be appropriate for human amniotic membrane graft with versus without suture fixation for this indication;
  - Supporting evidence from the authoritative scientific literature (please include PMID).

| # | Indications | Rationale |
|---|---|---|
| 1 | Neurothrophic keratitis | Sutured and non-sutured human amniotic membrane HAM are both accepted and effective treatments for neurotrophic keratopathy that does not respond to conservative therapy in patients with corneal staining or an epithelial defect that (1) has failed to completely close after 5 days of conservative treatment, or (2) has failed to demonstrate a decrease in size after 2 days of conservative |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | treatment. Conservative treatment is defined as use of topical lubricants and/or topical antibiotics and/or therapeutic contact lens and/or patching. Failure of multiple modalities should not be required prior to moving to HAM. HAM requires less effort on the part of the patient to adhere to a treatment regimen and has a significant advantage in that regard over treatments that require multiple drops per day. Non-sutured HAM is the preferred initial treatment because it can be performed rapidly in an office setting, bypassing the delay associated with scheduling a procedure in an outpatient facility. It also avoids the facility fees associated with the sutured HAM procedure. Patients that are responding to non-sutured HAM may need a second or third application if healing is not yet complete. Those who show a poor response or poorly tolerate a non-sutured HAM device are candidates for sutured HAM.<br><br>Khokhar (Cornea 2005;24:654. PMID 16015082) found an increased but nonsignificant rate of epithelial healing with sutured HAM compared to more invasive interventions such as tarsorrhaphy for neurotrophic corneal ulceration in a small randomized clinical trial (RCT). A larger trial might have demonstrated a significant difference but the disease is uncommon enough to make such a trial difficult to perform. For the same reason, there have been no trials directly comparing sutured and non-sutured HAM for neurotrophic keratopathy. This reflects not only the uncommon nature of the disease but also the lack of interest in subjecting patients to the more invasive and expensive sutured HAM procedure when clinical experience indicates that non-sutured HAM is effective in a significant number of patients.<br><br>Other uncontrolled series and case reports supporting effectiveness of HAM for neurotrophic keratopathy:<br>Chen HJ. Br J Ophthalmol 2000;84:63. PMID 10906085<br>Ivekovic B. Coll Anthropol 2002;26:47. PMID 12137322<br>Suri K. Eye Contact Lens 2013;39:341. PMID 23945524<br>Uhlig CE. Acta Ophthalmol 2015;93:e481. PMID 25773445 |
| **2** | Neurothrophic keratitis | Neurotrophic keratitis is a degenerative corneal disease induced by an impairment of corneal innervation and often manifested by corneal persistent epithelial defects (PED). Neurotrophic PED is characterized by painless epithelial breakdown, inflammation of the underlying stroma, and poor healing. The disease progression often leads to spontaneous corneal melting and perforation. In my practice, conventional treatments including topical medications, bandage contact lens, eye patching, and tarsorrhaphy usually fail to promote healing. If delayed healing was achieved, there is still a high risk of corneal scarring.<br><br>Cryopreserved amniotic membrane (AM) has successfully been used to enhance healing in patients with Neurotrophic keratitis. [1-8] Besides the known actions of the AM in controlling inflammation and promoting healing, it is also rich in nerve growth factors that facilitate the recovery of the corneal nerves and enhancement of corneal wound healing.<br><br>In my opinion and based on the literature, the use of AM (with or without sutures) for treating neurotrophic keratoconjunctivitis is medically necessary when the standard therapy fails. It interrupts the disease process by controlling inflammation, preventing further damage and restoring ocular surface integrity. |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Chen H-J, Pires RTF, Tseng SCG. Amniotic membrane transplantation for severe neurotrophic corneal ulcers. Br. J. Ophthalmol. 2000; 84:826–833. [PubMed: 10906085]<br>2. IvekoviÄ‡ B, Tedeschi-Reiner E, Petric I, et al. Amniotic membrane transplantation for ocular surface reconstruction in neurotrophic corneal ulcer a. Coll Antropol. 2002;26(1):47-54. [PMID: 12137322]<br>3. Khokhar S, Natung T, Sony P, et al. Amniotic membrane transplantation in refractory neurotrophic corneal ulcers: a randomized, controlled clinical trial. Cornea. 2005;24:654–660. [PMID: 16015082]<br>4. Pachigolla G, Prasher P, Di Pascuale MA, et al. Evaluation of the role of ProKera in the management of ocular surface and orbital disorders. Eye Contact Lens. 2009; 35(4):172-175 [PMID: 19474753]<br>5. Suri K, Kosker M, Raber I, et al. Sutureless Amniotic Membrane ProKera for Ocular Surface Disorders. Short-Term Results. Eye Contact Lens. 2013;39:341-347 [PMID: 23945524]<br>6. Uhlig CE, Frings C, Rohloff N, et al. Long-term efficacy of glycerine-processed amniotic membrane transplantation in patients with corneal ulcer. Acta Ophthalmol. 2015;93(6):e481-7. [PMID:25773445]<br>7. Röck T, Bartz-Schmidt KU, Röck D. Management of a neurotrophic deep corneal ulcer with amniotic membrane transplantation in a patient with functional monocular vision: A case report. Medicine (Baltimore). 2017;96(50):e8997. [PMID: 29390295]<br>8. Morkin, M. I. and P. Hamrah. "Efficacy of self-retained cryopreserved amniotic membrane for treatment of neuropathic corneal pain." Ocul Surf 2018, 16(1): 132-138. [PMID: 29032001] |
| 1 | Corneal ulcers and melts | Corneal ulcers and melts comprise a wide range of disorders with varying etiologies. Common to many of these are an underlying inflammatory component. HAM has been shown to reduce inflammation and promote epithelial healing. These properties make HAM an effective adjunct in treating these conditions while the primary etiology is addressed with targeted therapy (e.g. corticosteroids, antibiotics, biologic immunomodulators). HAM is typically employed when there is a lack of response to initial medical treatment or where HAM can offer some degree of tectonic support in cases where there is significant stromal tissue loss.<br><br>The varied and uncommon nature of the etiology of ulcers and melts makes it unlikely that there will ever be significantly-sized RCTs comparing HAM to conventional therapy or sutured vs. non-sutured HAM. There are numerous small series and case reports without controls showing improvement after HAM placement in cases that were not responding to conventional therapy. A number of these were summarized in a review by Bouchard (Ocul Surf 2004;2:201. PMID 17216092).<br><br>Cited below are selected reports supporting the efficacy of HAM for the treatment of corneal ulcers and melts, including several published since Bouchard's review:<br>Kruse FE. Ophthalmology 1999;106:1504. PMID: 10442895<br>Hanada K. Am J Ophthalmol 2001;131:324. PMID 11239864<br>Chen HC. Cornea 2006;25:564. PMID 16783145 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | Sheha H. Cornea 2009;28:1118. PMID 19770726<br>Tok OY. Int J Ophthalmol 2015;18:938. PMID 26558205<br>Sharma N. Indian J Ophthalmol 2018;66:816. PMID 29785990<br>Prabhasawat P. Br J Ophthalmol 2001;85:1455. PMID 11734521<br>Solomon A. Ophthalmology 2002;109:694. PMID 11927426<br>Uhlig CE. Am J Ophthalmol Case Rep 2018;10:296. PMID 29780958 |
| 2 | Corneal ulcers and melts | Cryopreserved amniotic membrane (AM) has successfully been used to control inflammation and promote healing in corneal ulcers of varying etiology. [1-9] Based on my experience, the use of AM at an early stage of the disease would prevent any unexpected complications such as infection, scarring, melt and perforation. Particularly, using AM without suture for this indication provides the advantage of in-office treatment without any delay. Furthermore, it avoids potential sight-threatening complications and achieves a clinically meaningful improvement in net visual outcome.<br>1. Kruse FE, Rohrschneider K, Völcker HE. Multilayer amniotic membrane transplantation for reconstruction of deep corneal ulcers. Ophthalmology. 1999;106(8):1504-10; discussion 1511. [PMID: 10442895]<br>2. Hanada K, Shimazaki J, Shimmura S, et al. Multilayered amniotic membrane transplantation for severe ulceration of the cornea and sclera. Am. J. Ophthalmol. 2001; 131(3):324–331. [PubMed: 11239864]<br>3. Chen HC, Tan HY, Hsiao CH, et al. Amniotic membrane transplantation for persistent corneal ulcers and perforations in acute fungal keratitis. Cornea. 2006 Jun;25(5):564-72. [PMID: 16783145]<br>4. Barequet IS, Habot-Wilner Z, Keller N, Smollan G, Ziv H, Belkin M, Rosner M. Effect of amniotic membrane transplantation on the healing of bacterial keratitis. Invest Ophthalmol Vis Sci. 2008 Jan;49(1):163-7. [PMID: 18172088]<br>5. Sheha H, Liang L, Li J, et al. Sutureless amniotic membrane transplantation for severe bacterial keratitis. Cornea 2009; 28(10): 1118-1123. [PMID: 19770726]<br>6. Tok OY, Tok L, Atay IM, et al. Toxic keratopathy associated with abuse of topical anesthetics and amniotic membrane transplantation for treatment. Int J Ophthalmol. 2015; 18;8(5):938-44. [PMID: 26558205]<br>7. Sheha H, Tighe S, Cheng AMS, et al. A stepping stone in treating dendritic keratitis. Am J Ophthalmol Case Rep. 2017; 6(7):55-58. [PMID: 29260079]<br>8. Zhong J, Wang B, Li S, et al. Full-thickness conjunctival flap covering surgery combined with amniotic membrane transplantation for severe fungal keratitis. Exp Ther Med. 2018;15(3):2711-2718. [PMID: 29456673]<br>9. Sharma N, Singhal D, Maharana PK, et al. Continuous intraoperative optical coherence tomography-guided shield ulcer debridement with tuck in multilayered amniotic membrane transplantation. Indian J Ophthalmol. 2018;66(6):816-819. [PMID: 29785990] |
| 1 | Corneal perforation | Multilayered sutured HAM has been performed in some cases of corneal perforation. While it offers some tectonic support, corneal tissue is the preferred graft material in these cases. HAM alone may be a reasonable temporizing alternative when corneal tissue is not immediately available. Non-sutured HAM would not offer significant tectonic support in these cases.<br><br>Both sutured and non-sutured HAM reduces inflammation and promotes epithelial healing. It is therefore a useful adjunct in addition to corneal |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | transplantation in those patients with active inflammation and perforation.<br><br>The rare nature of these cases guarantees that there will be no large RCTs performed for this indication. A number of clinical series and case reports supporting the efficacy of HAM for corneal perforation are cited here:<br><br>Prabhasawat P. Br J Ophthalmol 2001;85:1455. PMID 11734521<br>Solomon A. Ophthalmology 2002;109:694. PMID 11927426<br>Rodriguez-Ares MT. Cornea 2004;23:577. PMID 15256996<br>Hick S. Cornea 2005;24:369. PMID 15829790<br>Uhlig CE. Am J Ophthalmol Case Rep 2018;10:296. PMID 29780958 |
| 2 | Corneal perforation | Depending on the size and location of the corneal perforation, treatment options include gluing, amniotic membrane transplantation, and corneal transplantation. The success rate of using AM to repair corneal perforation is reported to be as high as 93%. [1-7] Kim et al [7] used multiple layers of AM with tissue glue in 10 patients with large corneal perforations up to 5 mm and noted 90% success in complete closure of perforation. AM offers the advantage of avoiding potential corneal graft rejection and postoperative astigmatism of tectonic corneal grafts. I personally did not use AM for this indication, but based on the literature, multiple layers of AM for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Prabhasawat P, Tesavibul N, Komolsuradej W. Single and multilayer amniotic membrane transplantation for persistent corneal epithelial defect with and without stromal thinning and perforation. Br J Ophthalmol. 2001;85(12):1455-63. [PMID: 11734521]<br>2. Solomon A, Meller D, Prabhasawat P, et al. Amniotic membrane grafts for nontraumatic corneal perforations, descemetoceles, and deep ulcers. Ophthalmology. 2002; 109(4):694–703. [PubMed: 11927426]<br>3. Rodriguez-Ares MT, Tourino R, Lopez-Valladares MJ, et al. Multilayer amniotic membrane transplantation in the treatment of corneal perforations. Cornea. 2004; 23(6):577–583. [PubMed: 15256996]<br>4. Hick S, Demers PE, Brunette I, et al. Amniotic membrane transplantation and fibrin glue in the management of corneal ulcers and perforations: a review of 33 cases. Cornea. 2005; 24(4):369–377. [PubMed: 15829790]<br>5. Xie HT, Zhao D, Liu Y, et al. Umbilical Cord Patch Transplantation for Corneal Perforations and Descemetoceles. J Ophthalmol. 2017;2017:2767053. [PMID: 28660079]<br>6. Uhlig CE, Müller VC. Resorbable and running suture for stable fixation of amniotic membrane multilayers: A useful modification in deep or perforating sterile corneal ulcers. Am J Ophthalmol Case Rep. 2018; 19 (10):296-299. [PMID: 29780958]<br>7. Kim HK, Park HS. Fibrin glue-assisted augmented amniotic membrane transplantation for the treatment of large noninfectious corneal perforations. Cornea 2009; 28(2), 170–176.[PMID: 19158560] |
| 1 | Bullous keratopathy | HAM is one of several modalities for treatment of bullous keratopathy due to corneal endothelial dysfunction. HAM does not address the underlying endothelial disease, so it is considered palliative rather than curative therapy. It is a reasonable alternative for patients who are not candidates for curative endothelial or penetrating keratoplasty. Sutured HAM has been shown to be as effective for bullous keratopathy as anterior stromal puncture (Paris F. Br J |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | Ophthalmol 2013;97:980. PMID 23723410) and phototherapeutic keratectomy (Chawla B. Cornea 2010;29:976. PMID 20517149). Non-sutured HAM is a reasonable alternative to anterior stromal puncture as it is faster and simpler to perform. Sutured HAM in an operating room setting and non-sutured HAM in the office are of particular value in patients who have difficulty holding still for office procedures such as anterior stromal puncture in which there is a risk of increased corneal scarring or globe perforation with patient movement. HAM typically offers long-lasting pain relief in these cases, obviating the need for corneal transplantation with its associated increased risks (rejection, infection) and costs.<br><br>There are additional reports demonstrating the efficacy of HAM for bullous keratopathy:<br><br>Pires RTF. Arch Ophthalmol 1999;117:1291. PMID 10532436<br>Espana EM. J Cataract Refract Surg 2003;29:279. PMID 12648638<br>Chansanti O. J Med Assoc Thai 2005;9:S57. PMID 16681053<br>Srinivas S. Eur J Ophthalmol 2007;17:7. PMID 17294377<br>Georgiadis NS. Clin Exp Ophthalmol 2008;36:130. PMID 18352868<br>Chawla B. Eur J Ophthalmol 2008;18:998. PMID 18988175<br>Altiparmak UE. Am J Ophthalmol 2009;147:442. PMID 19019342<br>Stefaniu GI. J Med Life 2014;7:88. PMID 25870682<br>Siu GD. Int Ophthalmol 2015;35:777. PMID: 255866 |
| 2 | Bullous keratopathy | Cryopreserved amniotic membrane (AM) is recommended for Bullous keratopathy with poor visual potential. AM achieves immediate pain relief, reduced inflammation, and complete healing. [1-12] Chansanti et al [4] noted postoperative relief of pain in 14 eyes (82.4%) and complete corneal epithelial healing in 15 eyes (88.2%) after AMT. Sonmez et al. [5] performed anterior stromal micropuncture and AMT in 5 eyes with painful bullous keratopathy [40]. All showed an intact, smooth corneal epithelial surface 1 month after the procedure, and there were no patients that developed recurrent bullae formation during an average follow-up period of 21 months. Siu et al [12] reported a long term symptomatic relief of bullous keratopathy with amniotic membrane transplant in a total of 21 eyes of 20 patients. The majority of eyes experienced pain reduction (94 %), with a significant mean pain score difference of 6.8 ± 2.6, 2-tail $p < 0.001$ (99 % CI 4.9-8.7). The mean preoperative and postoperative pain scores were 7.3 ± 2.9 and 0.5 ± 1.0, respectively. 16 eyes (76 %) were completely pain free, and 10 eyes (47 %) remained symptom free after a mean follow-up of 39.0 ± 36.3 months (range 5-171 months). The median epithelial healing time was 2 weeks (range 1-20 weeks). Based on the literature, AM is considered as a longer-term treatment for bullous keratopathy patients with poorer visual prognosis. AM without sutures may also be used as an interim measure for patients awaiting corneal transplant. Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Pires RTF, Tseng SCG, Prabhasawat P et al. Amniotic membrane transplantation for symptomatic bullous keratopathy. Arch.Ophthalmol. 1999; 117, 1291-1297.[PMID: 10532436] |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 2. Mrukwa-Kominek E, Gierek-Ciaciura S, Rokita-Wala I, et al. Use of amniotic membrane transplantation for treating bullous keratopathy. Klin Oczna. 2002;104(1):41-6. Polish. [PMID: 12046309]<br>3. Espana EM, Grueterich M, Sandoval H et al. Amniotic membrane transplantation for bullous keratopathy in eyes with poor visual potential. J.Cat.Refract.Surg. 2003; 29, 279-284.<br>4. Chansanti O, Horatanaruang O. The results of amniotic membrane transplantation for symptomatic bullous keratopathy. J Med.Assoc.Thai. 88 Suppl 2005; 9, S57-S62.<br>5. Sonmez B, Kim BT, Aldave AJ. Amniotic membrane transplantation with anterior stromal micropuncture for treatment of painful bullous keratopathy in eyes with poor visual potential. Cornea 26(2), 227–229 (2007).<br>6. Srinivas S, Mavrikakis E, Jenkins C. Amniotic membrane transplantation for painful bullous keratopathy. Eur J Ophthalmol. 2007;17(1):7-10. [PMID: 17294377]<br>7. Georgiadis NS, Ziakas NG, Boboridis KG, et al. Cryopreserved amniotic membrane transplantation for the management of symptomatic bullous keratopathy. Clin Exp Ophthalmol. 2008;36(2):130-5. [PMID: 18352868]<br>8. Chawla B, Tandon R. Sutureless amniotic membrane fixation with fibrin glue in symptomatic bullous keratopathy with poor visual potential. Eur J Ophthalmol. 2008;18(6):998-1001. [PMID: 18988175]<br>9. Altiparmak UE, Oflu Y, Yildiz EH, et al. Prospective comparison of two suturing techniques of amniotic membrane transplantation for symptomatic bullous keratopathy. Am J Ophthalmol. 2009;147(3):442-446.e1. [PMID:19019342]<br>10. Gregory ME, Spiteri-Cornish K, Hegarty B, et al. Combined amniotic membrane transplant and anterior stromal puncture in painful bullous keratopathy: clinical outcome and confocal microscopy. Can J Ophthalmol. 2011;46(2):169-74. [PMID: 21708086]<br>11. Stefaniu GI, Chiotoroiu SM, Secureanu FA, et al. Use of amniotic membrane in bullous keratopathy palliative care. J Med Life. 2014;7 Spec No. 2:88-91. [PMID: 25870682]<br>12. Siu GD, Young AL, Cheng LL. Long-term symptomatic relief of bullous keratopathy with amniotic membrane transplant. Int Ophthalmol. 2015;35(6):777-83. [PMID: 25586624] |
| 1 | Pterygium repair | Sutured HAM has been fairly extensively studied as an alternative to conjunctival autograft or bare sclera technique in pterygium surgery (Kaufman SC. Ophthalmology 2013;120:201. PMID 23062647. Clearfield, Cochrane Database Syst Rev 2016;2:CD011349. PMID 26867004). While HAM is more effective at preventing recurrences than bare sclera technique, and subject to fewer serious complications than mitomycin C, conjunctival autograft has been shown to be more effective than HAM in terms of reducing recurrences. However, there are patients with extensive, double, or recurrent pterygia in which there is insufficient healthy tissue to create a conjunctival autograft. In these patients, sutured or non-sutured (glued) HAM is the material of choice for covering the conjunctival defect left after removal of the pterygium as the recurrence rate is lower than if the sclera is left bare. Sutured and glued HAM should be covered for these cases.<br><br>Non-sutured HAM is effective at promoting epithelial healing in patients who |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | have persistent epithelial defects (see below) after pterygium surgery and should be covered in these cases. |
| 2 | Pterygium repair | The most daunting challenge of pterygium surgery is the high rate of recurrence, as high as 88%. Surgical techniques in more recent years, in which scleral defects are covered with conjunctival autograft or cryopreserved amniotic membrane (AM) with or without mitomycin C (MMC), have resulted in much better outcomes, with less recurrence rates and minimal complications. [1-16] However, some debate still continues regarding which graft offers the better outcome. In a prospective study, Prabhasawat et al [1] first reported a recurrence rate of 10.9% in primary pterygium (n = 54) after excision and AMT. Solomon et al [2] subsequently modified the technique of AMT and achieved a low recurrence rate of 3% in 33 cases of primary pterygium. Another surgical parameter is the use of MMC. Rosen et al [16] reported a considerably low recurrence rate (3.6%) when used AM graft without sutures along with reduced exposure to MMC. In my opinion, AM is as effective as conjunctival autograft in preventing pterygium recurrence and can be considered as a preferred grafting procedure for pterygium repair. The use of AM provides the following benefits: save donor conjunctiva, minimize surgical trauma, reduce surgery time, reduce postoperative pain, reduce inflammation, facilitate faster recovery and healing. Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Prabhasawat P, Barton K, Burkett G, et al. Comparison of conjunctival autografts, amniotic membrane grafts and primary closure for pterygium excision. Ophthalmology 1997; 104, 974-985. [PMID: 9186439]<br>2. Ma DH-K, See L-C, Liau S-B, et al. Amniotic membrane graft for primary pterygium: comparison with conjunctival autograft and topical mitomycin C treatment. Br.J.Ophthalmol. 2000; 84, 973-978.[PMID: 10966947]<br>3. Solomon A, Espana EM, Tseng SCG. Amniotic membrane transplantation for reconstruction of the conjunctival fornices. Ophthalmology. 2003; 110:93–100. [PubMed: 12511352]<br>4. Jain S, Rastogi A. Evaluation of the outcome of amniotic membrane transplantation for ocular surface reconstruction in symblepharon. Eye. 2004; 18(12):1251–1257. [PubMed: 15184952]<br>5. Zhou SY, Chen JQ, Chen LS, et al. Long-term results of amniotic membrane transplantation for conjunctival surface reconstruction. Zhonghua Yan. Ke. Za Zhi. 2004; 40(11):745–749. [PubMed: 15634481]<br>6. Keklikci U, Celik Y, Cakmak SS, et al. Conjunctival-limbal autograft, amniotic membrane transplantation, and intraoperative mitomycin C for primary pterygium. Ann Ophthalmol (Skokie). 2007;39(4):296-301. [PMID: 18025649]<br>7. Kucukerdonmez C, Akova YA, Altinors DD. Comparison of conjunctival autograft with amniotic membrane transplantation for pterygium surgery: surgical and cosmetic outcome. Cornea. 2007:26(4):407-413. [PMID: 17457187]<br>8. Kucukerdonmez C, Akova YA, Altinors DD. Vascularization is more delayed in amniotic membrane graft than conjunctival autograft after pterygium excision. Am.J.Ophthalmol 2007; 143(2), 245-249. [PMID: 17173849]<br>9. Fallah MR, Golabdar MR, Amozadeh J, et al. Transplantation of conjunctival limbal autograft and amniotic membrane vs mitomycin C and amniotic |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | membrane in treatment of recurrent pterygium. Eye 2008; 22(3), 420-424. [PMID: 17159974]<br>10. Kheirkhah A, Casas V, Sheha H, et al. Role of conjunctival inflammation in surgical outcome after amniotic membrane transplantation with or without fibrin glue for pterygium. Cornea 2008; 27(1), 56-63. [PMID: 18245968]<br>11. Kheirkhah A, Blanco G, Casas V, et al. Surgical strategies for fornix reconstruction based on symblepharon severity. Am. J. Ophthalmol. 2008; 146(2):266– 275. [PubMed: 18514608]<br>12. Park JH, Jeoung JW, Wee WR, et al. Clinical efficacy of amniotic membrane transplantation in the treatment of various ocular surface diseases. Cont Lens Anterior Eye. 2008 Apr;31(2):73-80. [PMID: 18249149]<br>13. KatÄ±rcÄ±oglu YA, Altiparmak U, Engur Goktas S, et al. Comparison of Two Techniques for the Treatment of Recurrent Pterygium: Amniotic Membrane vs Conjunctival Autograft Combined with Mitomycin C. Semin Ophthalmol. 2015;30(5-6):321-7. [PMID: 24506693]<br>14. Zhao D, Yin HY, Cheng A, et al. Sealing of the gap between the conjunctiva and tenon capsule to improve symblepharon surgery. Am J Ophthalmol. 2015;160(3):438-446.e1. [PMID: 26093286]<br>15. Tanaka TS, Demirci H. Cryopreserved Ultra-Thick Human Amniotic Membrane for Conjunctival Surface Reconstruction After Excision of Conjunctival Tumors. Cornea. 2016;35(4):445-50. [PMID: 26807897]<br>16. Rosen R. Amniotic Membrane Grafts to Reduce Pterygium Recurrence. Cornea. 2018;37(2):189-193. [PMID: 28976415] |
| **1** | Limbal stem cell deficiency | Limbal stem cell deficiency is an uncommon, serious disorder leading to conjunctivalization, irregularity, and opacity of the corneal surface. Total limbal stem cell deficiency typically requires a limbal stem cell transplant to restore the ocular surface. These vascularized transplants require prolonged systemic immunosuppression and the attendant risks to support graft survival and prevent recurrence of the disease. Partial limbal stem cell deficiency may respond to selective removal of the diseased tissue without a transplant when a limited portion of the ocular surface is involved. In more extensive cases where selective removal alone is not sufficient, HAM in conjunction with superficial keratectomy to remove the diseased tissue can provide long-term restoration of a smooth and transparent ocular surface and improved visual acuity without having to resort to a transplant (Kheirkhah AV. Am J Ophthalmol 2008;145:787. PMID 18329626). Due to the rarity of this disease, it is unlikely that RCTs will ever be performed. Comparisons to limbal stem cell transplants are unlikely to be performed because of the risks of systemic immune suppression.<br>HAM should be covered in conjunction with superficial keratectomy for cases of limbal stem cell deficiency. |
| **2** | Limbal stem cell deficiency | Patients with Limbal stem cell deficiency (LSCD) suffer from severe loss of vision due to vascularized cornea scarring and non-healing epithelial defect. Their vision cannot be corrected by conventional penetrating keratoplasty. Previous studies have shown that in eyes with partial LSCD, AM promotes expansion of remaining limbal epithelial stem cells [1-4]. To avoid suture-related disadvantages and complications, Kheirkhah et al. [5] recently reported successful reconstruction of the corneal surface in nine patients with nearly total LSCD using fibrin glue. Kheirkhah et al. [56] further reported successful use of minimal conjunctival limbal autograft in conjunction with AM for total limbal stem cell deficiency. |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 1. Tseng SCG, Prabhasawat P, Barton K, et al. Amniotic membrane transplantation with or without limbal allografts for corneal surface reconstruction in patients with limbal stem cell deficiency. Arch. Ophthalmol. 1998;116, 431–441. [PMID: 9565039]<br>2. Anderson DF, Ellies P, Pires RT, et al. Amniotic membrane transplantation for partial limbal stem cell deficiency. Br. J. Ophthalmol. 2001; 85(5), 567–575. [PMID: 11316719 ]<br>3. Gomes JA, dos Santos MS, Cunha MC, et al. Amniotic membrane transplantation for partial and total limbal stem cell deficiency secondary to chemical burn. Ophthalmology 2003; 110(3), 466–473. [PMID: 12623806]<br>4. Sangwan VS, Matalia HP, Vemuganti GK, et al. Amniotic membrane transplantation for reconstruction of corneal epithelial surface in cases of partial limbal stem cell deficiency. Indian J. Ophthalmol. 2004; 52(4), 281–285. [PMID: 15693318]<br>5. Kheirkhah A, V. Casas V. Raju K et al. Sutureless amniotic membrane transplantation for partial limbal stem cell deficiency. Am.J.Ophthalmol. 2008; 145(5): 787-794. [PMID: 18329626]<br>6. Kheirkhah, A., Raju VK and S. C. Tseng. "Minimal conjunctival limbal autograft for total limbal stem cell deficiency." Cornea 2008; 27(6): 730-733. [PMID: 18580269] |
| **1** | Stevens-Johnson | Sutureless HAM plus medical therapy has been demonstrated in a small RCT to be more effective than medical therapy alone in treatment of Stevens-Johnson syndrome (Sharma N. Ophthalmology 2016;123:484. PMID 26686968). Sutureless or sutured HAM, depending on the severity of the disease, in conjunction with medical therapy has become the accepted management technique for the treatment of moderate or severe Stevens-Johnson. Both should be covered for this indication. The severity of the disease and its infrequency makes it unlikely that a large RCT will be performed. Additional literature demonstrating good visual outcomes with both sutured and sutureless HAM in a disease that prior to introduction of HAM was typically blinding includes:<br><br>Shammas MC. Am J Ophthalmol 2010;149:203. PMID 20005508<br>Gregory DM. Ocular Surf 2008;6:40. PMID 18418506<br>Shay E. Surv Ophthalmol 2009;54:686. PMID 19699503<br>Gregory DM. Ophthalmology 2011;118:908. PMID 21440941<br>Shay E. Cornea 2010;29:359. PMID 20098313<br>Tomlins PJ. Cornea 2013;32:365. PMID 22677638<br>Kolomeyer AM. Eye Contact Lens 2013;39:e7. PMID 22683916<br>Ma KN. Ocular Surf 2016;14:31. PMID 26387869 |
| **2** | Stevens-Johnson | Amniotic membrane with sutures has been used to suppress inflammation, promote healing, and prevent scarring in patients with acute Stevens Johnson Syndrome (SJS) with or without toxic epidermal necrolysis (TEN) [1-6]. The conventional management at intensive care and burn units are usually reserved for life-threatening problems, and thus are frequently inadequate to address ocular inflammation and ulceration. As a result, patients suffering are frequently left with a blinding disease owing to scarring-induced late complications. Gregory et al. [7] and Shay et al. [8] have reviewed the literature and found that AMT performed within 2 weeks after the onset of disease effectively aborts inflammation and facilitates rapid healing in AM-covered areas, thus preventing pathogenic cicatricial complications at the chronic stage in 12 eyes. Several case |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | reports and case series [6-12] demonstrated the effectiveness of AM without sutures (ProKera) at the acute stage of SJS/ TEN, and noted restoration of normal vision. Gregory et al [9] further reported restoration of vision in 10 consecutive cases using AM with and without sutures. However, because this devastating ocular surface disease usually elicits inflammation and ulceration in such hidden areas as the lid margin, the tarsus, and the fornix, AM extended to cover the entire ocular surface is necessary.[10] Ma et al [13] developed a novel technique for using large AM graft without suture to cover the entire ocular surface in patients with acute SJS. In my opinion, and based on the literature, the use of AM with sutures is preferred to prevent long term lid related complications. The use of AM without suture is still helpful in emergency settings when the patient condition does not allow for surgical intervention. Collectively, the use of AM for this indication provides a clinically meaningful improvement in net health outcome.<br>1. John T, Foulks GN, John ME, et al. Amniotic membrane in the surgical management of acute toxic epidermal necrolysis. Ophthalmology 2002; 109(2), 351–360. [PMID: 11825823]<br>2. Kobayashi A, Yoshita T, Sugiyama K et al. Amniotic membrane transplantation in acute phase of toxic epidermal necrolysis with severe corneal involvement. Ophthalmology 2006; 113(1), 126–132. [PMID: 16324747]<br>3. Di Pascuale MA, Espana EM, Liu DT et al. Correlation of corneal complications with eyelid cicatricial pathologies in patients with Steven-Johnson syndrome and toxic epidermal necrolysi syndrome. Ophthalmology 2005; 112(5), 904–912. [PMID: 15878074]<br>4. Muqit MM, Ellingham RB, Daniel C. Technique of amniotic membrane transplant dressing in the management of acute Stevens–Johnson syndrome. Br. J. Ophthalmol. 2007; 91(11), 1536. [PMID: 17947270]<br>5. Tandon A, Cackett P, Mulvihill A, et al. Amniotic membrane grafting for conjunctival and lid surface disease in the acute phase of toxic epidermal necrolysis. J. AAPOS 2007; 11(6), 612–613. [PMID: 17681814]<br>6. Shammas MC, Lai EC, Sarkar JS, et al. Management of acute Stevens–Johnson syndrome and toxic epidermal necrolysis utilizing amniotic membrane and topical corticosteroids. Am. J. Ophthalmol. 2010; 149(2), 203–213. [PMID: 20005508]<br>7. Gregory DG. The ophthalmologic management of acute Stevens–Johnson syndrome. Ocul. Surf. 2008; 6(2), 87–95. [PMID: 18418506]<br>8. Shay E, Kheirkhah A, Liang L, et al. Amniotic membrane transplantation as a new therapy for the acute ocular manifestations of Stevens–Johnson syndrome and toxic epidermal necrolysis. Surv. Ophthalmol. 2009; 54(6), 686–696. [PMID: 19699503]<br>9. Gregory, DG. Treatment of Acute Stevens–Johnson Syndrome and Toxic Epidermal Necrolysis Using Amniotic Membrane: A Review of 10 Consecutive Cases. Ophthalmology 2011; 118:908–914. [PMID: 21440941]<br>10. Shay E, Khadem JJ and Tseng SC. Efficacy and limitation of sutureless amniotic membrane transplantation for acute toxic epidermal necrolysis. Cornea 2010; 29(3): 359-361. [PMID: 20098313]<br>11. Tomlins, PJ., Parulekar MV, and Rauz S. ""Triple-TEN" in the Treatment of Acute Ocular Complications From Toxic Epidermal Necrolysis." Cornea 2013; 32(3): 365-369. [PMID: 22677638] |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 12. Kolomeyer AM, Do BK, Tu Y, et al. Placement of ProKera in the management of ocular manifestations of acute Stevens-Johnson syndrome in an outpatient. Eye Contact Lens. 2013;39: e7-11. [PMID: 22683916]<br>13. Ma KN, Thanos A, Chodosh J, et al. A Novel Technique for Amniotic Membrane Transplantation in Patients with Acute Stevens-Johnson Syndrome. Ocul Surf. 2016;14(1):31-6. [PMID: 26387869] |
| **1** | Persistent epithelial defects | HAM is an effective treatment for persistent epithelial defects due to a number of underlying causes. While not a first-line treatment, both sutured and non-sutured HAM are appropriate in patients with epithelial defects that fail to show a response within 2 days of initiation of conservative therapy. Conservative therapy is considered to be any one or more of the following: topical lubricants and/or antibiotics, therapeutic contact lens, or patching. If there is a failure to respond to any one of these modalities, HAM is an appropriate second step.<br><br>Persistent epithelial defects are often a precursor to corneal stromal melting and ulceration. Many of the comments and citations in the above "Section b. corneal ulcers and melts" are applicable here. The uncommon nature of the diseases associated with persistent epithelial defects and the lack of a standard therapeutic regimen account for the lack of RCTs. However, the following publications demonstrate the effectiveness of HAM for this indication.<br><br>Prabhasawat P. Br J Ophthalmol 2001;85:1455. PMID 11734521<br>Lee SH. Am J Ophthalmol 97;123:303. PMID 9063239<br>Letko E. Arch Ophthalmol 2001;119:659. PMID 11346392<br>Gris O. Cornea 2002;21:22. PMID 11805502<br>Seitz B. Eye (London) 2009;23:840. PMID 18535612<br>Dekaris I. Coll Antropol 2010;34 Suppl 2:15. PMID 21305721 |
| **2** | Persistent epithelial defects | Persistent epithelial defect (PED) is often caused by microtrauma, neurotrophic keratopathy and exposure. Conventional treatment includes correcting the underlying condition, suppressing the inflammation, and promoting the healing process using tears. If conventional treatment fails after 2 weeks, these patients are prone to further complications and corneal scarring and haze. Because PED also be 'neurotrophic', please refer to Neurotrophic keratitis indication. As stated above, conventional treatments usually fail to promote prompt healing in these conditions and the eyes are prone to delayed healing, corneal ulceration, scarring, and infection. These complications in turn result in poor patient outcomes, visual detriment, and a greater frequency of office visits and associated costs. The following publications [1-6] show the effectiveness of AM with and without sutures in promoting healing in PEDs. Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Lee SH, Tseng SC. Amniotic membrane transplantation for persistent epithelial defects with ulceration. Am J Ophthalmol. 1997;123(3):303-12. [PMID:9063239]<br>2. Letko E, Stechschulte SU, Kenyon KR, et al. Amniotic membrane inlay and overlay grafting for corneal epithelial defects and stromal ulcers. Arch Ophthalmol. 2001;119(5):659-63. [PMID: 11346392]<br>3. Gris O, del Campo Z, Wolley-Dod C, et al. Amniotic membrane implantation as a therapeutic contact lens for the treatment of epithelial disorders. Cornea. 2002;21(1):22-7. [PMID: 11805502] |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 4. Seitz B, Das S, Sauer R, et al. Amniotic membrane transplantation for persistent corneal epithelial defects in eyes after penetrating keratoplasty. Eye (Lond). 2009;23(4):840-8. [PMID: 18535612]<br>5. Dekaris I, MraviciÄ‡ I, BarisiÄ‡ A, et al. Amniotic membrane transplantation in the treatment of persistent epithelial defect on the corneal graft. Coll Antropol. 2010;34 Suppl 2:15-9. [PMID: 21305721]<br>6. Nguyen, P., K. Rue, M. Heur, et al. "Ocular surface rehabilitation: Application of human amniotic membrane in high-risk penetrating keratoplasties." Saudi J Ophthalmol 2014; 28(3): 198-202. [PMID: 25278797] |
| **1** | Severe dry eye | As noted in the BCBS review, non-sutured HAM has been demonstrated in an RCT to be more effective than conservative therapy in patients with moderate to severe dry eye disease (John T. J Ophthalmol 2017;2017:6404918. PMID 28894606). Also noted in the review was a small series of 10 patients with moderate to severe dry eye that were non-responsive to conventional therapy (Cheng AM. Ocul Surf 2016;14:56. PMID 26387870). These patients improved with placement of non-sutured HAM. A more recent, larger retrospective review of patients with severe dry eye disease unresponsive to traditional therapy and then treated with non-sutured HAM showed that 88% of subjects demonstrated significant improvement of symptoms extending beyond the period of treatment with HAM (McDonald MD. Clin Ophthalmol 2018;12:677. PMID 29670328).<br><br>Traditional dry eye therapy typically consists of frequent application of lubricants, hot compresses, and environmental controls to increase humidity. Patients may not respond to traditional dry eye therapy due to the severity of the disease or due to inability to control the environment or administer drops frequently. Topical drugs such as cyclosporine and lifitegrast may be helpful in these cases but they may take months to take effect. If the patient's daily activities are significantly affected by dry eye signs and symptoms, HAM may provide rapid relief while waiting for long-term medications to take effect. HAM is unlikely to be of benefit for mild dry eye disease or disease that responds to conservative therapy. Because HAM limits acuity it is only viable as a short-term therapy. Sutured HAM is not typically used for severe dry eye alone, but may be necessary in the face of one or more concomitant diseases discussed in the other sections.<br><br>Our recommendation is that non-sutured HAM be covered in patients with persistent symptoms or persistent corneal staining that does not respond to traditional dry eye therapy. |
| **2** | Severe dry eye | Dry eye disease (DED) is a multifactorial disease comprised of tear film insufficiency and associated ocular surface disorder such as superficial epithelial defect. Treatment of DED depends on the etiology and the level of severity. Although artificial tears, immunosuppressants, and punctal occlusion are commonly used for tear film insufficiency, ocular surface involvement with a defect are usually refractory and may require eye protection devices and/ or surgical intervention.<br><br>In fact, Prokera has been reported to manage ocular signs and symptoms of DED. In a retrospective study by Cheng et al,[1] Prokera was placed for 5 days (Range: 2-8 days) in 15 eyes of 10 patients with moderate to severe DED. The dry eye severity ranged from Grade 1 to 4 according to the Report of the International Dry Eye Work Shop (DEWS) 2007.[2] All patients experienced |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | symptomatic relief for a mean period of 4.2 months (Range: 0.3-6.8). Such improvement was accompanied by reduction of Ocular Surface Disease Index (OSDI) symptom scores, the use of topical medications, conjunctival hyperemia, and corneal staining as well as improvement in the quality of vision.11 In a single site prospective, randomized, and controlled study conducted by John et al [3], Prokera together with standard of care was placed in 10 patients for 3.4 ± 0.7 days (Range: 3-5 days) while standard of care was instituted in another 10 patients as the control. All 20 patients presented with moderate to severe DED with DEWS Grade 2-4. Compared to the control arm of 10 patients receiving standard of care, the treatment arm of 10 patients receiving Prokera together with standard of care resulted in reduction of symptoms based on SPEED score and signs such as superficial punctate keratitis (SPK) measured by fluorescein staining, leading to an overall reduction of the mean DEWS severity score from 2.9 ± 0.3 at baseline to 1.1 ± 0.3 at 1 month and 1.0 ± 0.0 at 3 months, respectively (both p ≤ 0 001).These palliative benefits are correlated with an increase of corneal nerve density measured by in vivo confocal microscopy from 12,241 ± 5,083 µm/mm2 at baseline to 16,364 ±3,734 µm/mm2 at 1 month, and 18,827 ±5,453 µm/mm2 at 3 months(both p=0.015). The increase of corneal nerve density is also correlated with an increase of corneal sensitivity measured by a monofilament in the Bonnet-Crochet esthesiometer. A lasting benefit for more than 3 months after one placement of Prokera was also demonstrated in a retrospective study by McDonald et al [4] in 97 eyes of 84 of patients with moderate to severe DED (DEWS 2-4), of which the majority presented with symptoms of ocular discomfort, blurry vision, ocular pain, redness, and light sensitivity. Most of the cases manifested the ocular sign of SPK due to exposure keratitis, filamentary keratitis, epithelial defect, and neurotrophic keratitis. A single placement of Prokera for 5.4 ± 2.8 days leads to notable improvement of DED symptoms and reduction of ocular signs in 74 subjects (88%) as evidenced by notable reduction of the mean DEWS severity score from 3.25 to 1.44 at 1 week, 1.45 at 1 month, and 1.47 at 3 months.<br><br>In my practice, a single placement of Amniotic Membrane (non-sutured) was also effective in reducing signs and symptoms of DED for a period lasting more than three months. Therefore, amniotic membrane without sutures should be considered for severe dry eye with ocular surface damage and inflammation.<br>1. Cheng AM, Zhao D, Chen R, et al. Accelerated Restoration of Ocular Surface Health in Dry Eye Disease by Self-Retained Cryopreserved Amniotic Membrane. Ocul Surf. 2016 Jan;14(1):56-63. [PMID: 26387870]<br>2. The definition and classification of dry eye disease: report of the Definition and Classification Subcommittee of the International Dry Eye WorkShop (2007). Ocul Surf. 2007; 5: 75-92.<br>3. John T, Tighe S, Sheha H, et al. Corneal Nerve Regeneration after Self-Retained Cryopreserved Amniotic Membrane in Dry Eye Disease. J Ophthalmol. 2017;6404918. [PMC5574308]<br>4. McDonald MB, Sheha H, Tighe S, et al. Treatment outcomes in the Dry Eye Amniotic Membrane (DREAM) study. Clin Ophthalmol. 2018 Apr 9;12:677-681. [PMID: 29670328] |
| 1 | Acute ocular chemical burn | Ocular chemical burns represent a diverse array of clinical conditions and severity, making high quality RCTs difficult or impossible to perform. The Cochrane review cited in the BCBS review (Clare G. Cochrane Database Syst Rev |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 2012;9:CD009379. PMID 22972141) reflects this difficulty. However, it is clear that there are subsets of patients that respond to either sutured or non-sutured HAM based in its ability to reduce inflammation and promote epithelial healing. Particularly in moderate and severe burns where the prognosis with traditional therapy is poor, sutured and non-sutured HAM are important alternatives that should be covered. There are multiple reports of good outcomes in these cases. Though control groups are lacking, several of these reports are fairly large series and were not addressed directly in the BCBS review:<br><br>Westekemper H. Br J Ophthalmol 2017;101:103. PMID 27150827<br>Meller D. Ophthalmology 2000;107:980. PMID 10811094<br>Ucakhan OO. Cornea 2002;21:169. PMID 11862088<br>Arora R. Eye 2005;19:273. PMID 15286672<br>Tamhane A. Ophthalmology 2005;112:1963. PMID: 16198422<br>Tejwani S. Cornea 2007;26:21. PMID 17198009<br>Prabhasawat P. J Med Assoc Thai 2007;90:319. PMID 17375638<br>Kheirkhah A. Arch Ophthalmol 2008;126:1059. PMID 18695099<br>Tandon R. Br J Ophthalmol 2011;95:199. PMID: 20675729 |
| **2** | Acute ocular chemical burn | Previous studies have demonstrated the importance of early intervention with cryopreserved amniotic membrane (AM) in mild and moderate chemical burns.[1-10] Specifically, Miller et al [7] used AM as a patch graft with sutures in 13 eyes of patients with acute chemical burn grade II-IV (within 2 weeks of the injury) and epithelial healing occurred within 2-5 weeks. Prabhasawat et al [8] also showed that AM as a patch graft performed within 5 days of grades II and III chemical burns promoted faster epithelial healing and less corneal haze than if performed after 5 days. These results were confirmed by Tandon et al [9] who demonstrated the efficacy of sutured AM in eyes with acute ocular burns in a prospective, randomized, controlled clinical trial of 100 patients with grade II to IV acute ocular burns. Patients were randomized to receive AM or conventional medical treatment. The rate of epithelial healing was significantly better in the AM group than the group with standard medical therapy alone. Kheirkhah et al [10] noted a similar positive outcome when AM without sutures (Prokera) was used within 8 days of chemical burn injury. Based on the above, the use of AM with or without sutures in acute chemical burn is considered a medical necessity to control inflammation, prevent further damage, reduce scarring and restore visual function. In my opinion, and based on the literature, the use of AM without sutures is preferred to prevent surgical trauma and suture related complications in such compromised eyes. Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Kim JS, Kim JC, Na BK, et al. Amniotic membrane patching promotes healing and inhibits protease activity on wound healing following acute corneal alkali burns. Exp Eye Res. 2000;70:329Y337. [PMID: 10712819]<br>2. Sridhar MS, Bansal AK, Sangwan VS, et al. Amniotic membrane transplantation in acute chemical and thermal injury. Am J Ophthalmol. 2000;130:134Y137. [PMID: 10712819]<br>3. Ucakhan OO, Koklu G, Firat E. Nonpreserved human amniotic membrane transplantation in acute and chronic chemical eye injuries. Cornea. 2002;21:169Y172. |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 4. Arora R, Mehta D, Jain V. Amniotic membrane transplantation in acute chemical burns. Eye. 2005;19:273Y278. [PMID: 11862088]<br>5. Tamhane A, Vajpayee RB, Biswas NR, et al. Evaluation of amniotic membrane transplantation as an adjunct to medical therapy as compared with medical therapy alone in acute ocular burns. Ophthalmology. 2005;112:1963Y1969. [PMID: 16198422]<br>6. Tejwani S, Kolari RS, Sangwan VS, et al. Role of amniotic membrane graft for ocular chemical and thermal injuries. Cornea. 2007;26:21Y26. [PMID: 17198009]<br>7. Meller D, Pires RTF, Mack RJS, et al. Amniotic membrane transplantation for acute chemical or thermal burns. Ophthalmology. 2000;107:980Y990. [PMID: 10811094]<br>8. Prabhasawat P, Tesavibul N, Prakairungthong N, et al. Efficacy of amniotic membrane patching for acute chemical and thermal ocular burns. J Med Assoc Thai. 2007;90:319Y326. PMID: [17375638]<br>9. Tandon R, Gupta N, Kalaivani M, et al. Amniotic Membrane Transplantation as an Adjunct to Medical Therapy in Acute Ocular Burns. Br J Ophthalmol. 2011;95(2):199-204. [PMID: 20675729]<br>10. Kheirkhah A, Johnson DA, Paranjpe DR, et al. Temporary sutureless amniotic membrane patch for acute alkaline burns. Arch Ophthalmol. 2008;126:1059Y1066. [PMID: 18695099] |

NR = not reported

- Based on the evidence and your clinical experience for using **human amniotic membrane with suture fixation** for the clinical indications described below:
  - Respond YES or NO for each clinical indication whether the intervention would be expected to provide a clinically meaningful improvement in net health outcome; AND
  - Rate your level of confidence in your YES or NO response using the 1 to 5 scale outlined below.

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 |
| **1** | Neurothrophic keratitis | Yes | | | | | X |
| **2** | Neurothrophic keratitis | Yes | | | | X | |
| **1** | Corneal ulcers and melts | Yes | | | | | X |
| **2** | Corneal ulcers and melts | Yes | | | | | X |
| **1** | Corneal perforation | Yes | | | | | X |
| **2** | Corneal perforation | Yes | | | | | X |
| **1** | Bullous keratopathy | Yes | | | | | X |
| **2** | Bullous keratopathy | Yes | | | | X | |
| **1** | Pterygium repair | Yes | | | | | X |
| **2** | Pterygium repair | Yes | | | | | X |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| 1 | Limbal stem cell deficiency | Yes | | | | | X |
| 2 | Limbal stem cell deficiency | Yes | | | | X | |
| 1 | Stevens-Johnson | Yes | | | | | X |
| 2 | Stevens-Johnson | Yes | | | | | X |
| 1 | Persistent epithelial defects | Yes | | | | | X |
| 2 | Persistent epithelial defects | Yes | | | | | X |
| 1 | Severe dry eye | Yes | | | | X | |
| 2 | Severe dry eye | Yes | | | | X | |
| 1 | Acute ocular chemical burn | Yes | | | | | X |
| 2 | Acute ocular chemical burn | Yes | | | | | X |

NR = not reported

- Based on the evidence and your clinical experience for using **human amniotic membrane with suture fixation** for the clinical indications described below:
  - Respond YES or NO for each clinical indication whether this intervention is consistent with generally accepted medical practice; AND
  - Rate your level of confidence in your YES or NO response using the 1 to 5 scale outlined below.

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 |
| 1 | Neurothrophic keratitis | Yes | | | | | X |
| 2 | Neurothrophic keratitis | Yes | | | | X | |
| 1 | Corneal ulcers and melts | Yes | | | | | X |
| 2 | Corneal ulcers and melts | No | | | | X | |
| 1 | Corneal perforation | Yes | | | | | X |
| 2 | Corneal perforation | Yes | | | | | X |
| 1 | Bullous keratopathy | Yes | | | | | X |
| 2 | Bullous keratopathy | No | | | | X | |
| 1 | Pterygium repair | Yes | | | | | X |
| 2 | Pterygium repair | Yes | | | | | X |
| 1 | Limbal stem cell deficiency | Yes | | | | X | |
| 2 | Limbal stem cell deficiency | Yes | | | | | X |
| 1 | Stevens-Johnson | Yes | | | | | X |
| 2 | Stevens-Johnson | Yes | | | | | X |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| 1 | Persistent epithelial defects | Yes | | | | | X |
| 2 | Persistent epithelial defects | No | | | | X | |
| 1 | Severe dry eye | Yes | | | | X | |
| 2 | Severe dry eye | No | | | | | X |
| 1 | Acute ocular chemical burn | Yes | | | | | X |
| 2 | Acute ocular chemical burn | Yes | | | | | X |

NR = not reported

- Based on the evidence and your clinical experience for using **human amniotic membrane without suture fixation** for the clinical indications described below:
  - Respond YES or NO for each clinical indication whether the intervention would be expected to provide a clinically meaningful improvement in net health outcome; AND
  - Rate your level of confidence in your YES or NO response using the 1 to 5 scale outlined below.

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 |
| 1 | Neurothrophic keratitis | Yes | | | | | X |
| 2 | Neurothrophic keratitis | Yes | | | | | X |
| 1 | Corneal ulcers and melts | Yes | | | | | X |
| 2 | Corneal ulcers and melts | Yes | | | | | X |
| 1 | Corneal perforation | No | | | | | X |
| 2 | Corneal perforation | No | | | | X | |
| 1 | Bullous keratopathy | Yes | | | | | X |
| 2 | Bullous keratopathy | Yes | | | | | X |
| 1 | Pterygium repair | Yes | | | | | X |
| 2 | Pterygium repair | Yes | | | X | | |
| 1 | Limbal stem cell deficiency | Yes | | | | X | |
| 2 | Limbal stem cell deficiency | Yes | | | | | X |
| 1 | Stevens-Johnson | Yes | | | | | X |
| 2 | Stevens-Johnson | Yes | | | | | X |
| 1 | Persistent epithelial defects | Yes | | | | | X |
| 2 | Persistent epithelial defects | Yes | | | | | X |
| 1 | Severe dry eye | Yes | | | | X | |
| 2 | Severe dry eye | Yes | | | | | X |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| 1 | Acute ocular chemical burn | Yes | | | | | X |
| 2 | Acute ocular chemical burn | Yes | | | | | X |

NR = not reported

- Based on the evidence and your clinical experience for using human amniotic membrane without suture fixation for the clinical indications described below:
  - Respond YES or NO for each clinical indication whether this intervention is consistent with generally accepted medical practice; AND
  - Rate your level of confidence in your YES or NO response using the 1 to 5 scale outlined below.

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 |
| 1 | Neurothrophic keratitis | Yes | | | | | X |
| 2 | Neurothrophic keratitis | Yes | | | | X | |
| 1 | Corneal ulcers and melts | Yes | | | | | X |
| 2 | Corneal ulcers and melts | Yes | | | | | X |
| 1 | Corneal perforation | No | | | | | X |
| 2 | Corneal perforation | No | | | | X | |
| 1 | Bullous keratopathy | Yes | | | | | X |
| 2 | Bullous keratopathy | Yes | | | | X | |
| 1 | Pterygium repair | Yes | | | | | X |
| 2 | Pterygium repair | No | | | | X | |
| 1 | Limbal stem cell deficiency | Yes | | | | X | |
| 2 | Limbal stem cell deficiency | Yes | | | | X | |
| 1 | Stevens-Johnson | Yes | | | | | X |
| 2 | Stevens-Johnson | Yes | | | | | X |
| 1 | Persistent epithelial defects | Yes | | | | | X |
| 2 | Persistent epithelial defects | Yes | | | | X | |
| 1 | Severe dry eye | Yes | | | | X | |
| 2 | Severe dry eye | Yes | | | | | X |
| 1 | Acute ocular chemical burn | Yes | | | | | X |
| 2 | Acute ocular chemical burn | Yes | | | | | X |

NR = not reported

- Additional narrative rationale or comments regarding clinical pathway and/or any relevant scientific citations (including the PMID) supporting your clinical input on this topic.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Additional Comments |
|---|---|
| 1 | Specific citations are included above in the comments for each of the individual indications. |
| 2 | Amniotic Membrane is available either as an outpatient clinic based only protective bandage contact lens AM patch, or as an ASC or hospital based operating room surgical inlay tissue substitute and is an established treatment for several severe ocular surface diseases. It is most commonly used in patients whose condition is refractory to conventional therapies, such as Corneal Ulcers and Melts, Neurotrophic Keratitis, severe anterior basement membrane dystrophy, and especially difficult-to-heal Persistent Epithelial Defects (PED).<br><br>I use Prokera (BioTissue) to treat ocular surface diseases because based on the clinical presentation and the failure of conventional therapy, it is medically necessary in order to achieve the best clinical outcome. Prokera is a cryopreserved (not dehydrated) sutureless AM and is the only such AM cleared by the FDA (2003). It is indicated for use "where the ocular surface is damaged, or the underlying corneal stroma is inflamed." The Prokera self-retaining ring makes it possible to non-surgically insert AM into the eye like a very large contact lens and thereby secure the membrane in place. As such, Prokera represents a significant improvement over the use of AM grafts that require the more invasive, time consuming, and costly suturing procedure.<br><br>Clinically, use of amniotic membranes serve two primary roles: reduction of inflammation and promotion of wound healing. These are critical functions to accelerating and facilitating optimal clinical outcomes for the patient. Other therapies that provide these mechanisms do exist but either come with drawbacks (side effects such as thinning of the conjunctiva, time to effect) or address one function but not the other (in some cases, therapies may be counterproductive for the other critical clinical need). |

NR = not reported

- Is there any evidence missing from the attached draft review of evidence that demonstrates clinically meaningful improvement in net health outcome?

| # | YES / NO | Citations of Missing Evidence |
|---|---|---|
| 1 | Yes | See specific citations in above comments on each of the individual indications. |
| 2 | No | In general- amniotic membrane is an important Therapy for ocular surface disease which is unresponsive to conventional therapies. In my experience Amniotic membrane grafts have significantly improved the clinical course of many patients, that would have otherwise resulted in vision loss and saved patients from more extensive surgical procedures. |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

# What is Mohs Surgery?

Mohs surgery is considered the most effective technique for treating many basal cell carcinomas (BCCs) and squamous cell carcinomas (SCCs), the two most common types of skin cancer. Sometimes called Mohs micrographic surgery, the procedure is done in stages, including lab work, while the patient waits. This allows the removal of all cancerous cells for the highest cure rate while sparing healthy tissue and leaving the smallest possible scar.

*Definition provided by The Skin Cancer Foundation*[2]

## A Patient Story






*Scan with camera app to watch video*

*Cynthia's physician performed Mohs surgery to remove her skin cancer. He applied EPIFIX to the area to help support the wound healing cascade. Scan the QR code to hear more about her story.*

All placental tissue is donated by pre-screened, consenting mothers undergoing scheduled Caesarean sections of live births in the U.S. Placental tissue is typically discarded after the baby is born. The recovery of the placental tissue does not affect the baby or the delivery process.

All tissue donors are tested for infectious diseases, similar to the testing done for blood donation. The amniotic membranes then undergo a validated process to thoroughly clean and preserve the tissue, called the PURION® process. The steps of the PURION process include: preservation, cleansing, drying, and sterilization of the tissue. The facility where EPIFIX is processed is regulated by the Food and Drug Administration and accredited by the American Association of Tissue Banks.

**To learn more about EPIFIX please visit:**

**www.mimedx.com/EPIFIX**

*MIMEDX Tissues Services, LLC. is American Association of Tissue Banks (AATB) Accredited*

MIMEDX

1. BioMedGPS ---- SmartTRAK 2021 US Amniotic Tissue Market -- Revenues/Shares. Accessed May 15, 2022. https://www.smarttrak.com. 2. Mohs Surgery. Skincancer.org. Accessed June 29, 2022. https://www.skincancer.org/treatment-resources/mohs-surgery/

Patents and patents pending: www.mimedx.com/patents. EPIFIX, PURION, and MIMEDX are trademarks of MIMEDX Group, Inc. ©2022 MIMEDX Group, Inc. All Rights Reserved www.mimedx.com US-65-2200031 v1.0



# Ask Your Dermatologist About Advanced Treatments for Mohs Surgery

EPIFIX®




## What is EPIFIX?

EPIFIX is a placental-based tissue product that acts as a barrier to promote closure of wound defects.



## Is EPIFIX Right For Me?

Placental-based allografts can be helpful in supporting defect closure for patients who are not good candidates for traditional methods of tissue reconstruction. Mohs closures can be challenging and EPIFIX provides an alternative for patients to help support healing.

## Treatment Information

**How will my doctor apply EPIFIX?**

After completing the Mohs surgery, your physician will apply the graft and may secure it with a non-adherent dressing and then a bandage to keep the wound moist.

**How do I care for my graft site?**

Your doctor will provide you with instructions on how to care for your wound. It is extremely important to follow these instructions and not to disturb the graft. If you have questions, please consult your doctor.

## Discuss EPIFIX With Your Dermatologist

## Options For EPIFIX Use

- Secondary intention wound closure
- An alternative for patients that are not candidates for skin grafts or flaps
- Location of wound in high tension area or highly visible
- Patients who decline surgery

**Many factors may complicate healing in Mohs procedures.**

PATIENT FACTORS

- Thin Skin
- Poor Vasculature/Tissue Quality
- Comorbidities such as Diabetes or Heart Disease
- Advanced Age

LOCATION

- Scalp
- Ears
- Face/Visible Areas
- Shin or Lower Extremity
- Dorsal Hand





US-GS-2200031 v1.0

MIMEDX



# MOHS CLOSURES CAN BE CHALLENGING

## MIMEDX PLACENTAL-BASED ALLOGRAFT SOLUTIONS IN CHALLENGING SOFT TISSUE DEFICITS

## KEY CHALLENGES:

# Many factors may complicate healing in Mohs procedures and other dermal excisions and closures.

Patients may have the simultaneous presence of two or more chronic diseases or conditions which can affect wound healing. Compromised healing can lead to costly complications such as infection, dehiscence, or delayed healing.[1-3] In certain patient populations, studies have shown that the greater the number of comorbidities, the higher the risk of complications.[1-4]




### A PATIENT FACTORS

- Thin Skin
- Poor Vasculature/ Tissue Quality
- Comorbidities
- Advanced Age

### B LOCATION

- Scalp
- Ears
- Face/Visible Areas
- Shin or Lower Extremity
- Dorsal Hand

### POTENTIAL OPTIONS WITH EPIFIX®

- Secondary intention wound closure
- An alternative for patients that are not candidates for skin grafts or flaps
- Multiple co-morbidities and/or age
- Location of wound in high tension area or highly visible
- Patients who refuse surgery

## NEW PEER-REVIEWED STUDY IN FACIAL PLASTIC SURGERY & AESTHETIC MEDICINE

# Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane[4]

Julia Toman, MD, Georgina Michael, MSN, FNP-BC, Oliver Wisco, DO, FAA, FACMS, John Adams, MD, and Brandon Hubbs, MS, MA

In a new retrospective study, researchers compared outcomes in patients that received placental-based allografts to those that received autoglous flaps and full-thickness skin grafts (FTSG).

| | |
|---|---|
| 1550 Eligible Patients | · Diagnosis of basal or squamous cell carcinoma<br>· MMS defect located in a moderate to high risk area (face, head, neck, or dorsal hand)<br>· Same-day reconstruction necessary |
| GROUPS | · Flaps/FTSG n=1397<br>· Placental-based allograft n=153 |
| PROPENSITY MATCHED | · 286 total patients<br>· 143 case-controlled pairs |

Mohs patient with large cutaneous defect involving upper eyelid and medial canthus right eye and right upper bridge of nose





Complete closure to Mohs defect without complication to surrounding structures, postop day 42

## ANALYSIS OF SEVERAL OUTCOMES IN CASE-CONTROL COMPARISONS BETWEEN AUTOLOGOUS FLAP/FTSG GROUPS AND PLACENTAL ALLOGRAFTS:

KEY
Autologous Flap/ FTSG Group
Placental-Based Allograft Group

RESULTS

**EXPERIENCED COMPLICATIONS** $p<0.0001$: 28.7% / 2.1%

PATIENTS WERE **19X** MORE LIKELY TO EXPERIENCE POOR COSMESIS OR REVISIONS[4]

**POOR COSMESIS** $p<0.0001$: 15% / 0%

**REVISIONS** $p<0.0001$: 9.8% / 0%

PATIENTS WERE **12X** MORE LIKELY TO HAVE INFECTIONS OR SURGICAL REINTERVENTION

**INFECTIONS** $p=0.004$: 10% / 2%

**SURGICAL REINTERVENTION** $p=0.0007$: 8% / 0%

## CONCLUSION

Placental-based allografts can be a safe and effective tool for repairing MMS defects of the face, head, neck, and dorsal hand in a subset of patients who are not good candidates for traditional methods of autologous tissue reconstruction.

## MARKET LEADER:

# PLACENTAL-BASED ALLOGRAFTS

#1 Amniotic Skin Substitute[5]

7 RCTs: Demonstrated Clinical Data[6-16]

50+ Clinical and Scientific Publications

90+% Complete Wound Closure

Observed 90+% Complete Wound Closure in DFUs at 6 Weeks[6,10,11]

2.5

Average Number of Treatments to Closure[6]

## PRODUCT ADVANTAGES:

- Terminally sterilized for additional level of safety
- Easy to apply
- Room temperature storage
- 5-year shelf life

## BACKED BY:

- 300M+ lives covered by insurance for MIMEDX products
- Reimbursement team that provides information and education on coverage and insurance verification for MIMEDX products

To find out more about MIMEDX products or to start an evaluation:

Customer Service: 866.477.4219

Email: customerservice@mimedx.com

Patient Insurance Verification Team: 855.882.8480


**REFERENCES**

**1.** Guo S, DiPietro LA. Factors Affecting Wound Healing. J Dent Res. 2010;89(3):219-229. **2.** Thombs BD, Singh VA, Halonen J, Diallo A, Milner SM. The effects of preexisting medical comorbidities on mortality and length of hospital stay in acute burn injury: evidence from a national sample of 31,338 adult patients. Ann Surg. 2007 Apr;245(4):629-34. **3.** Everhart JS, Altneu E, Calhoun JH. Medical comorbidities are independent preoperative risk factors for surgical infection after total joint arthroplasty. Clin Orthop Relat Res. 2013;471(10):3112-3119. **4.** Toman J, Michael G, Wisco O, Adams J, Hubbs B. Mohs defect repair with dehydrated human amnion/chorion membrane. Facial Plastic Surgery & Aesthetic Medicine. ahead of print. **5.** BioMedGPS ---- SmartTRAK. 2019 US Amniotic Tissue Market -- Revenues/Shares. Accessed October 18, 2021. https://www.smarttrak.com. **6.** Zelen CM, Serena TE, Denoziere G, Fetterolf DE. A prospective randomised comparative parallel study of amniotic membrane wound graft in the management of diabetic foot ulcers. Int Wound J. 2013;10(5):502-507. **7.** Zelen CM. An evaluation of dehydrated human amniotic membrane allografts in patients with DFUs. J Wound Care. 2013;22(7):347-351. **8.** Zelen CM, Serena TE, Fetterolf DE. Dehydrated human amnion/chorion membrane allografts in patients with chronic diabetic foot ulcers: A long-term follow-up study. Wound Medicine. 2014;4:1-4. **9.** Zelen CM, Serena TE, Snyder RJ. A prospective, randomised comparative study of weekly versus biweekly application of dehydrated human amnion/chorion membrane allograft in the management of diabetic foot ulcers. Int Wound J. 2014;11(2):122-128. **10.** Zelen CM, Gould L, Serena TE, Carter MJ, Keller J, Li WW. A prospective, randomised, controlled, multi-centre comparative effectiveness study of healing using dehydrated human amnion/chorion membrane allograft, bioengineered skin substitute or standard of care for treatment of chronic lower extremity diabetic ulcers. Int Wound J. 2015;12(6):724-732. **11.** Zelen CM, Serena TE, Gould L, et al. Treatment of chronic diabetic lower extremity ulcers with advanced therapies: a prospective, randomised, controlled, multi-centre comparative study examining clinical efficacy and cost. Int Wound J. 2016;13(2):272-282. **12.** Tettelbach W, Cazzell S, Reyzelman AM, Sigal F, Caporusso JM, Agnew PS. A confirmatory study on the efficacy of dehydrated human amnion/chorion membrane dHACM allograft in the management of diabetic foot ulcers: A prospective, multicentre, randomised, controlled study of 110 patients from 14 wound clinics. Int Wound J. 2019;16(1):19-29. **13.** Tettelbach W, Cazzell S, Sigal F, et al. A multicentre prospective randomised controlled comparative parallel study of dehydrated human umbilical cord (EpiCord) allograft for the treatment of diabetic foot ulcers. Int Wound J. 2019;16(1):122-130. **14.** Serena TE, Carter MJ, Le LT, Sabo MJ, DiMarco DT; EpiFix VLU Study Group. A multicenter, randomized, controlled clinical trial evaluating the use of dehydrated human amnion/chorion membrane allografts and multilayer compression therapy vs. multilayer compression therapy alone in the treatment of venous leg ulcers. Wound Repair Regen. 2014;22(6):688-693. **15.** Bianchi C, Cazzell S, Vayser D, et al. A multicentre randomised controlled trial evaluating the efficacy of dehydrated human amnion/chorion membrane (EpiFix®) allograft for the treatment of venous leg ulcers. Int Wound J. 2018;15(1):114-122. **16.** Bianchi C, Tettelbach W, Istwan N, et al. Variations in study outcomes relative to intention-to-treat and per-protocol data analysis techniques in the evaluation of efficacy for treatment of venous leg ulcers with dehydrated human amnion/chorion membrane allograft. Int Wound J. 2019;16(3):761-767.


SMR²T Purion

Patents and patents pending see: www.mimedx.com/patents. EPIFIX, PURION, SMR²T, and MIMEDX are trademarks of MIMEDX Group, Inc. ©2021 MIMEDX Group, Inc. All Rights Reserved. www.mimedx.com EP611.001

MIMEDX

MiMedx Health Policy **Medicare Update**

## WPS - Wisconsin Physicians Service MAC - Retired Date: 03/01/2016

LCD L34593: **"Application of Bioengineered Skin Substitutes"** Effective Date: **10/01/2015**

**States: Alaska, Alabama, Arkansas, Arizona, Connecticut, Florida, Georgia, Iowa, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts Maine, Michigan, Minnesota, Missouri, Mississippi, Montana, North Carolina, North Dakota, Nebraska, New Hampshire, New Jersey, Ohio, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Virginia, Vermont, Washington, Wisconsin, West Virginia, and Wyoming**

---

**EpiFix Tissue Uses:** EpiFix (Q4131) is intended for homologous use in the treatment of acute and chronic partial and full-thickness wounds for the reduction of scar tissue formation, modulation of inflammation, and enhancement of soft tissue healing.

**Indications or Limitations of Coverage and/or Medical Necessity:** All products must be provided in accordance with the material's Food and Drug Administration (FDA) approved package label. Applied to partial- or full-thickness wounds (see individual product information for labeled indications) not involving tendon, muscle, joint capsule, exposed bone or sinus tracts. Applied in a frequency supported either by FDA product labeling or clearly supported by documentation showing the medical reasonable and necessary indications.

**Documentation Requirements**: The ulcer must be measured at the beginning of conservative treatment, following cessation of conservative treatment and at the beginning of the skin substitute treatment. Clearly, if during treatment the ulcer shows obvious signs of worsening or lack of treatment response, continuing skin substitute treatment would be inappropriate absent documentation of an appropriate rationale for doing so. There must be a documented plan of care with documented goals and provider follow-up in the medical record. Documentation to include current wound size, wound depth, presence and extent of or absence of obvious signs of infection, presence and extent of or absence of necrotic, devitalized or non-viable tissue, or other material in the wound that is expected to inhibit healing or promote adjacent tissue breakdown. When the documentation does not meet the criteria for the service rendered or does not establish the medical necessity for the service, such service will be denied as not reasonable and necessary under Section 1862(a)(1) of the Social Security Act.

**Utilization Guidelines:** Medicare expects skin substitutes to be applied according to the manufacturers' instructions. Any utilization above these parameters is subject to medical review. Exceptions with more frequent timing (every seven days) should be documented with appropriate narrative. Surgical Wound Preparation (CPT 15002-15005): Medicare does not expect to be billed for codes 15002-15005 in conjunction with routine, simple and/or repeat application of skin substitutes/replacements. These codes describe burn and wound preparation or incisional or excisional release of scar contracture resulting in an open wound requiring a skin graft. An operative report is required and must be available upon request. If this procedure is performed in an office the claim can be resubmitted with a request for a redetermination and the medical staff will give the claim individual consideration.

**Limitations:** Reimbursement may be made only when the medical record clearly documents that these products have been used in a comprehensive, organized wound management program. For venous stasis ulcers, there should be no fewer than two (2) weeks between applications and for diabetic ulcers there should be no fewer than three (3) weeks between applications, except when more frequent applications are either a part of the FDA product specific labeling instructions or are clearly supported by medical record documentation of medically reasonable and necessary indications.

**NOTE: All claims are subject to medical review. Medical record documentation is critical to ensure proper payment of claims. Per WPS, with the retirement of the LCD, "there are established billing, coding and documentation guidelines that should be followed in these circumstances."**

**Disclaimer: The coverage information provided is gathered from third party sources for informational purposes only and has not been verified with any entity responsible for policy, such as the CMS, or any payer. It does not represent a statement, promise or guarantee from MiMedx Group, Inc. concerning coverage. MiMedx® makes no guarantee that any private or government payer will guarantee coverage. Health policies change frequently and can vary considerably from one payer to another. MiMedx® strongly recommends that you consult your payer for interpretation of local coverage and/or policy. The ultimate responsibility for policy interpretation and related claims submission lies with the physician, clinician, hospital or other facility.**

# EpiFix®



## An Amnion/Chorion Membrane Allograft for Homologous Use in Acute and Chronic Wound Care

- Enhances Healing
- Modulates Inflammation
- Reduces Scar Tissue Formation
- Provides a Barrier

APPROVED
AMERICAN PODIATRIC MEDICAL ASSOCIATION

The EpiFix® dehydrated Human Amnion/Chorion Membrane (dHACM) Allograft is a minimally manipulated natural membrane that provides a scaffold for cellular ingrowth, modulates inflammation, and reduces scar tissue formation for enhanced healing.

purion®

EpiFix is processed using the PURION® process, a unique approach that provides an easy to use allograft stored at ambient conditions.

MiMedx



# EpiFix®

EpiFix is composed of human amnion and chorion membranes that line the amniotic cavity. EpiFix has multiple layers including a single layer of epithelial cells, a basement membrane and an avascular connective tissue matrix.

## Growth factors present in EpiFix:

285 regulatory proteins including growth factors, specialized cytokines, and enzyme inhibitors have been identified in EpiFix.[1-3] The following are some of the growth factors that help enhance healing:

- **Epidermal Growth Factor (EGF)** - Promotes proliferation of epithelial cells
- **Transforming Growth Factor β(TGF-β)** - Anti-inflammatory, and promotes normal wound healing and reduced scar formation
- **Fibroblast Growth Factor (FGF)** - Promotes cellular proliferation & important for collagen matrix formation
- **Platelet Derived Growth Factor A & B (PDGF A & B)** - Promotes cell proliferation in connective tissue and enhances soft tissue healing

## How to apply EpiFix:

- **Cut to fit**
- **Apply to the wound**
- **Cover to maintain a moist wound environment**

## Extracellular Components:

**The Extracellular Matrix of amniotic membrane is composed of 3 major classes of biomolecules:**

- **Structural proteins:** collagen types I, III, IV, V and VII, and elastin
- **Specialized proteins:** fibronectin, TIMPs[†], and laminins
- **Proteoglycans:** formed when GAGs are linked to core proteins

[†]Tissue inhibitors of Metalloproteinases

## Product Offering:

- **Multiple sizes available to reduce graft wastage**
- **Available in a variety of configurations**

## Shelf Life: 5 years at ambient conditions

**Ordering Information:**

Customer Service: 866.477.4219

Email: customerservice@mimedx.com

MiMedx

**1.** MiMedx Research Report: MM-RD-00072, Proteome Characterization of MiMedx Placental Tissue Products. **2.** Koob TJ, Lim JJ, Massee M, Zabek N, Denozière G. Properties of dehydrated human amnion/chorion composite grafts: implications for wound repair and soft tissue regeneration. J Biomed Mater Res B Appl Biomater. 2014 Aug;102(6):1353-62. **3.** Lei J, Priddy LB, Lim JJ, Massee M, Koob TJ. Identification of Extracellular Matrix Components and Biological Factors in Micronized Dehydrated Human Amnion/Chorion Membrane. Adv Wound Care (New Rochelle). 2017 Feb 1;6(2):43-53.

Patents and patents pending see: www.mimedx.com/patents. EpiFix®, PURION®, and MiMedx® are registered U.S. trademarks of MiMedx Group, Inc. 1775 West Oak Commons Court NE, Marietta, GA 30062 ©2018 MiMedx Group, Inc. All Rights Reserved. www.mimedx.com EP408.002

## EpiFix® Description

EpiFix is a minimally manipulated, dehydrated, non-viable cellular allograft derived from human amniotic membrane. Amniotic membrane is a thin, collagenous membrane composed of multiple layers that surrounds the fetus within the mother's uterus.

EpiFix preserves multiple extracellular matrix components and other proteins present in amniotic tissue.

EpiFix is a human tissue product and appearance may vary between donors. Variations in color (tan to light brown), opacity, and thickness are normal due to the nature of human tissue.

### Tissue Uses

EpiFix is a barrier intended for use in the treatment of acute and chronic wounds, providing a protective environment to support the healing process.

### Contraindications

EpiFix should not be used on (1) areas with active or latent infection and/or (2) a patient with a disorder that would create an unacceptable risk of post-operative complications.

### Precautions/Warnings

- EpiFix allografts remain suitable for transplantation in an unopened, undamaged package, under proper storage conditions.
- Please inspect the integrity of the package upon receipt. If package and contents appear defective or damaged in any way, immediately contact the distributor.
- This allograft is intended for single-patient use only. Discard all unused material.
- The procedure should be performed by an authorized medical professional.
- Strict donor screening and laboratory testing, along with dedicated processing and sterilization methods, are employed to reduce the risk of any disease transmission. However, as with all biological implants, an absolute guarantee of tissue safety is not possible. This allograft has the potential to transmit infectious disease to the recipient.
- The reaction of the body to any biological implant is not completely understood.
- Caution should be used when treating patients with a known sensitivity to aminoglycoside antibiotics.
- Discard all damaged, mishandled or potentially contaminated tissue.
- This product has not been tested in combination with other products.
- DO NOT RE-STERILIZE.

### Preparation, Reconstitution and Use

Prior to implantation, carefully follow the EpiFix allograft preparation steps below using aseptic technique:

**Wound Bed Preparation**

- Ensure the wound is free from clinical signs of infection.
- Prepare wound bed as needed.

**Removing EpiFix from Packaging**

- The outer peel pouch is NOT sterile. The inner pouch that contains EpiFix is sterile (unless the pouches are damaged or compromised).
- Carefully open the peelable corner of the outer pouch and extract the inner pouch using aseptic technique. Ensure the inner pouch does not come in contact with any portions of non-sterile surface of the outer pouch.
- Using aseptic technique, SLOWLY peel a corner of the inner peel pouch and grasp EpiFix with fingers or non-toothed, sterile forceps.
- Use EpiFix promptly after opening the inner, sterile pouch.

**PLEASE TAKE GREAT CARE WHEN REMOVING EpiFix FROM THE INTERNAL POUCH. EpiFix IS THIN AND EXTREMELY LIGHTWEIGHT.**

**EpiFix Preparation**

1. In a dry state, use sterile dry scissors to cut EpiFix to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix by 1mm.
2. EpiFix can be applied wet or dry.
3. EpiFix can be hydrated while on the wound site with sterile saline solution. Simply apply several drops of sterile solution to EpiFix. During and following hydration, the embossment on EpiFix will begin to fade.

**EpiFix Orientation & Application**

EpiFix should be placed on the wound site, using the orientation of the embossment lettering as a guide. Proper orientation of EpiFix can be noted when the embossment nomenclature reads correctly from left to right. If the mesh process has diminished the ability to clearly read the embossment, the following two alternate methods may be used for placement:

1. An elongated, horizontal perforation is located in the top left area of the graft connecting two adjacent perforations. Proper orientation can be noted when the graft is placed on the wound site such that this horizontal perforation remains visually in the top left area of the graft.
2. The clear side of the inner pouch is indicative of the UP side of the graft orientation. Proper placement can be achieved by removing the graft from the pouch with the clear side up and moving to the wound site with that same orientation.

Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix to the wound site, if desired.

**Primary Dressing**

- EpiFix should be covered with a non-adherent contact layer.
- EpiFix should NOT be disturbed, if possible, for several days or before the next application, if needed.
- If an infection occurs at the graft site, treat infection per institution's protocol.

**Secondary Dressing**

- EpiFix requires a moist wound environment. Use appropriate moisture management dressings for the wound type and treatment ideology.

**Support Therapies**

- EpiFix is compatible with offloading/compression/negative pressure therapies.
- EpiFix can be used in conjunction with hyperbaric oxygen therapy.

**Re-application of EpiFix**

- It is recommended that EpiFix grafts are applied weekly until wound epithelialization is achieved. However, clinician discretion should be used based on patient and wound condition/progress. It is clinically acceptable to apply EpiFix on a biweekly basis if desired.

### Adverse Effects & Reporting

- As with any procedure, the possibility of infection exists.
- Proprietary processing and validated sterilization methods are employed to eliminate potential deleterious components of the allograft. However, as with all biological implants, the possibility of rejection exists.
- Any adverse reactions, including the suspected transmission of disease attributable to this allograft, should be reported immediately to MiMedx®.

### Acceptable Storage

It is the responsibility of the distributor and/or end-user clinician to store EpiFix allografts in a clean, dry environment between 2-30°C prior to further distribution or transplant. EpiFix allografts have a 5-year shelf life. Check the label for the expiration date.

### Recovery & Quality Control

All tissue recovered meets stringent specifications during donor screening and laboratory testing to reduce the risk of transmitting infectious disease. EpiFix allografts are procured and processed in the United States according to standards and/or regulations established by the American Association of Tissue Banks (AATB) and the United States Food & Drug Administration (FDA). All tissues are recovered under full informed consent of the donors (mothers of the newborn children). The donors have consented to the transfer of the allografts to third parties. A thorough medical and social history of the donor is also obtained.

# EpiFix®

Dehydrated Human Amnion/Chorion
Membrane Allograft
Information/Instructions for Use

MiMedx

1775 West Oak Commons Court NE
Marietta, GA 30062

866.477.4219

www.mimedx.com

## EpiFix® Description

Human amniotic membrane is a thin, collagenous membrane derived from the placenta, the area in which the human fetus grows and develops within the mother's uterus. Human amniotic membrane consists of multiple layers.

EpiFix is a minimally manipulated, dehydrated, non-viable cellular amniotic membrane allograft that contains multiple extracellular matrix proteins, growth factors, cytokines and other specialty proteins present in amniotic tissue to provide a barrier membrane that enhances healing.

EpiFix allografts are human tissue products and appearance may vary between donors. Variations in color (tan to light brown), opacity, and thickness are normal due to the nature of human tissue.

### Tissue Uses

EpiFix Amniotic Membrane Allograft is intended for homologous use in the treatment of acute and chronic wounds to reduce scar tissue formation, modulate inflammation, provide a barrier, and enhance healing.

### Contraindications

EpiFix should not be used on (1) areas with active or latent infection and/or (2) a patient with a disorder that would create an unacceptable risk of post-operative complications.

### Precautions/Warnings

- EpiFix allografts remain suitable for transplantation in an unopened, undamaged package, under proper storage conditions.
- Please inspect the integrity of the package upon receipt. If package and contents appear defective or damaged in any way, immediately contact the distributor.
- This allograft is intended for single-patient use only. Discard all unused material.
- The procedure should be performed by an authorized medical professional.
- Strict donor screening and laboratory testing, along with dedicated processing and sterilization methods, are employed to reduce the risk of any disease transmission. However, as with all biological implants, an absolute guarantee of tissue safety is not possible. This allograft has the potential to transmit infectious disease to the recipient.
- The reaction of the body to any biological implant is not completely understood.
- Caution should be used when treating patients with a known sensitivity to aminoglycoside antibiotics.
- Discard all damaged, mishandled or potentially contaminated tissue.
- This product has not been tested in combination with other products.
- DO NOT RE-STERILIZE.

### Preparation, Reconstitution and Use

Prior to implantation, carefully follow the EpiFix allograft preparation steps below using aseptic technique:

**Wound Bed Preparation**

- Ensure the wound is free from clinical signs of infection.
- Prepare wound bed as needed.

**Removing EpiFix from Packaging**

- The outer peel pouch is NOT sterile. The inner pouch that contains EpiFix is sterile (unless the pouches are damaged or compromised).
- Carefully open the peelable corner of the outer pouch and extract the inner pouch using aseptic technique. Ensure the inner pouch does not come in contact with any portions of non-sterile surface of the outer pouch.
- Using aseptic technique, SLOWLY peel a corner of the inner peel pouch and grasp EpiFix with fingers or non-toothed, sterile forceps.
- Use EpiFix promptly after opening the inner, sterile pouch.

**PLEASE TAKE GREAT CARE WHEN REMOVING EpiFix FROM THE INTERNAL POUCH. EpiFix IS THIN AND EXTREMELY LIGHTWEIGHT.**

**EpiFix Preparation**

1. In a dry state, use sterile dry scissors to cut EpiFix to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix by 1mm.
2. EpiFix can be applied wet or dry.
3. EpiFix can be hydrated while on the wound site with sterile saline solution. Simply apply several drops of sterile solution to EpiFix. During and following hydration, the embossment on EpiFix will begin to fade.

**EpiFix Orientation & Application**

EpiFix should be placed on the wound site, using the orientation of the embossment lettering as a guide. Proper orientation of EpiFix can be noted when the embossment nomenclature reads correctly from left to right. If the mesh process has diminished the ability to clearly read the embossment, the following two alternate methods may be used for placement:

1. An elongated, horizontal perforation is located in the top left area of the graft connecting two adjacent perforations. Proper orientation can be noted when the graft is placed on the wound site such that this horizontal perforation remains visually in the top left area of the graft.
2. The clear side of the inner pouch is indicative of the UP side of the graft orientation. Proper placement can be achieved by removing the graft from the pouch with the clear side up and moving to the wound site with that same orientation.

Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix to the wound site, if desired.

**Primary Dressing**

- EpiFix should be covered with a non-adherent contact layer.
- EpiFix should NOT be disturbed, if possible, for several days or before the next application, if needed.
- If an infection occurs at the graft site, treat infection per institution's protocol.

**Secondary Dressing**

- EpiFix requires a moist wound environment. Use appropriate moisture management dressings for the wound type and treatment ideology.

**Support Therapies**

- EpiFix is compatible with offloading/compression/negative pressure therapies.
- EpiFix can be used in conjunction with hyperbaric oxygen therapy.

**Re-application of EpiFix**

- It is recommended that EpiFix grafts are applied weekly until wound epithelialization is achieved. However, clinician discretion should be used based on patient and wound condition/progress. It is clinically acceptable to apply EpiFix on a biweekly basis if desired.

## Adverse Effects & Reporting

- As with any procedure, the possibility of infection exists.
- Proprietary processing and validated sterilization methods are employed to eliminate potential deleterious components of the allograft. However, as with all biological implants, the possibility of rejection exists.
- Any adverse reactions, including the suspected transmission of disease attributable to this allograft, should be reported immediately to MiMedx®.

## Acceptable Storage

EpiFix allografts should be stored in a clean, dry environment at ambient conditions. EpiFix allografts have a 5 year shelf life. Check the label for the expiration date.

## Recovery & Quality Control

All tissue recovered meets stringent specifications during donor screening and laboratory testing to reduce the risk of transmitting infectious disease. EpiFix allografts are procured and processed in the United States according to standards and/or regulations established by the American Association of Tissue Banks (AATB) and the United States Food & Drug Administration (FDA). All tissues are recovered under full informed consent of the donors (mothers of the newborn children). The donors have consented to the transfer of the allografts to third parties. A thorough medical and social history of the donor is also obtained.

## Recovery & Quality Control (cont.)

The listed communicable disease testing was performed by a laboratory registered with FDA to perform donor testing and certified to perform such testing on human specimens in accordance with the Clinical Laboratory Improvement Amendments of 1988 (CLIA) and 42 CFR part 493, or that has met equivalent requirements as determined by the Centers for Medicare and Medicaid Services (CMS).

The donor is screened for:

| | |
|---|---|
| HIV-1&2 Plus O Antibody | Hepatitis B Surface Antigen |
| HIV Type 1 (Nucleic Acid Test (NAT)) | Hepatitis C Antibody |
| HTLV-1&2 Antibody | Hepatitis C Virus (Nucleic Acid Test (NAT)) |
| Syphilis (Serologic Test) | Hepatitis B Virus (Nucleic Acid Test (NAT)) |
| Hepatitis B Core Antibody | West Nile Virus (Nucleic Acid Test (NAT))* |

**WNV NAT screening conducted on donors recovered beginning February 1, 2017.*

All tests produced negative results and were reviewed prior to the release of the tissue. Only tissue from donors with acceptable test results, according to the standards of MiMedx Tissue Services, LLC, as well as the standards and/or regulations of all state and federal regulatory bodies, are released.

The infectious disease test results, consent documents, donor medical history, behavior risk assessment according to current public health services guidelines, physical assessment, available relevant medical records, as well as information from other sources or records that may pertain to donor suitability, and tissue procurement test results, have been evaluated by the MiMedx Medical Director and are sufficient to indicate that the donor suitability criteria current at the time of tissue recovery have been met.

The names and addresses of the testing laboratories, the listing and interpretation of all required infectious disease tests, a listing of the documents reviewed as part of the relevant medical records, and the name of the person or establishment determining the suitability of this allograft are on file and available upon request.

**Donated Human Tissue. This allograft has been determined to be suitable for transplantation.**

## Allograft Processing/Preservation/Sterilization

EpiFix allografts are processed based upon strict, quality-controlled protocols that have demonstrated bioburden control. An additional assurance of safety is achieved by terminally sterilizing each allograft. Based upon validations, each graft has been effectively sterilized using e-beam irradiation. The allografts are processed with aminoglycoside antibiotics.

## Recipient Tracking

The FDA requires that recipient records be maintained for the purpose of tracking the allograft following transplantation. The authorized medical professional must complete the enclosed Tissue Utilization Record, attach a peel-off, allograft-tracking label provided, and mail to the distributor (postage-paid). Please use the remaining peel-off, allograft-tracking labels for patient and hospital records.

**Caution: This product must be administered by an authorized medical professional.**

The user shall be solely responsible for determining the adequacy and appropriateness of the allograft for any and all uses to which the user shall apply the allograft.

MiMedx's dehydrated Human Amnion/Chorion Membrane (dHACM) allografts are now described in an official U.S. Pharmacopeia – National Formulary monograph with the publication of USP 40 - NF 35.

Processed with: PURION® process

VOL. IV

Processing and donor suitability performed by MiMedx Tissue Services, LLC
Patents and patents pending see: www.mimedx.com/patents
EpiFix®, PURION®, and MiMedx® are registered trademarks of MiMedx Group, Inc. 1775 West Oak Commons Court NE, Marietta, GA 30062
©2017 MiMedx Group, Inc.
All Rights Reserved. **mimedx.com**

1320

ES101.004

Facial Plastic Surgery & Aesthetic Medicine
Volume 0, Number 0, 2021
American Academy of Facial Plastic and Reconstructive Surgery, Inc.
DOI: 10.1089/fpsam.2021.0167

Facial Plastic Surgery & Aesthetic Medicine

# Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane

Julia Toman, MD,[1] Georgina M. Michael, MSN, FNP-BC,[2,*,i] Oliver J. Wisco, DO, FAAD, FACMS,[3,4] John R. Adams, MD,[5,6] and Brandon S. Hubbs, MS, MA[7]

**Abstract**

**Importance:** Reconstructing cosmetically sensitive defects in an aging population undergoing multiple Mohs micrographic surgeries (MMS) may be addressed with alternatives to surgery.

**Objective:** Patients undergoing MMS with defect reconstruction in visually prominent areas receiving placental allograft were compared with traditional autologous tissue-based procedures—flaps and full-thickness skin grafts (FTSG).

**Design, Setting, and Participants:** This retrospective case–control study evaluated patients who underwent MMS for removal of a basal or squamous cell carcinoma with same-day repair.

**Main Outcomes and Measures:** The primary endpoint was the incidence and comparison of postoperative morbidity. Risk for developing medical or cosmetic sequelae was determined through multivariate logistic regression.

**Results:** The study population consisted of 143 propensity score-matched pairs ($n = 286$) with moderate- to high-risk defects on the face, head, and neck. Compared with autologous tissue, placental allograft cases were associated with significantly lower risk for infection ($p = 0.004$), poor scar cosmesis ($p < 0.0001$), scar revision ($p < 0.0001$), or reoperation ($p = 0.0007$).

**Conclusions and Relevance:** Postoperative complication rates for placental reconstructions did not exceed those demonstrated by autologous tissue counterparts, indicating this is a safe alternative to flap and FTSG in cosmetically sensitive repairs.

## Introduction

Epidemiological estimates indicate a disproportionate surge of nonmelanoma skin cancer (NMSC) in the elderly, with 80% of all new cases occurring in persons >65 years.[1,2] As a result of longer life expectancy and the cumulative impact of ultraviolet radiation and sun exposure on anatomically vulnerable sites such as the face, head, and neck, older individuals may develop multiple tumors in localized regions.[3,4] This necessitates repeat surgical management that maintains a delicate balance between adequate excision, aesthetics, and function.[5–7]

Incisional repair utilizing autologous tissue such as local flaps and full-thickness skin grafts (FTSG) represent the mainstay of reconstructive techniques after Mohs micrographic surgery (MMS).[8,9] However, postoperative morbidity increases after the age of 60 years by as much

[1]Division of Facial Plastics and Reconstructive Surgery, Department of Otolaryngology Head and Neck Surgery, University of South Florida, Tampa, Florida, USA.
[2]Department of Clinical Research, MiMedx Group, Inc., Marietta, Georgia, USA.
[3]Dermatology Health Specialists, Bend, Oregon, USA.
[4]Department of Dermatology, The Warren Alpert Medical School of Brown University, Providence, Rhode Island, USA.
[5]Advanced Dermatology and Skin Cancer Center, Manhattan, Kansas, USA.
[6]Division of Dermatology, Department of Internal Medicine, University of Kansas School of Medicine, Wichita, Kansas, USA.
[7]Biostatistics Consulting, Alpharetta, GA, USA.
[i]ORCID ID (https://orcid.org/0000-0002-1797-9839).

*Address correspondence to: *Julia Toman, MD, Assistant Professor, Department of Otolaryngology Head and Neck Surgery, Division of Facial Plastics and Reconstructive Surgery, University of South Florida, 2901 Bruce B. Downs Boulevard, MDC2, Tampa, FL 33602, USA.* Email: juliatoman@usf.edu

© Julia Toman et al. 2021; Published by Mary Ann Liebert, Inc. This Open Access article is distributed under the terms of the Creative Commons License [CC-BY] (http://creativecommons.org/licenses/by/4.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

**KEY POINTS**

**Question:** Is the use of a placental allograft a feasible alternative to incisional methods of repair for cosmetically sensitive defects in select patient cases after Mohs surgery?

**Findings:** Larger cutaneous Mohs-related defects of the face, head, and hands were effectively reconstructed with a placental allograft in a population of older adults.

**Meaning:** This study suggests that surgical reconstruction after skin cancer removal from the face may be avoided in some cases when treated with a placental-derived material.

as 25% due to a greater depth of tumor invasion and extensive defects with higher demands for donor tissues.[10,11] Age and previous surgery alter characteristics of surrounding tissues and complicate the aesthetic and functional success of flaps and FTSG.[12,13] Medically fragile patients or those who are ineligible for incisional repair may be limited to second intention healing, a method typically reserved for smaller concave surfaces.[14]

Larger MMS defects that do not receive definitive reconstruction have been associated with increased recovery time, delayed healing, wound retraction, unpredictable scarring, and poor cosmesis.[15] This can lead to an altered appearance or impairment, causing patients to feel a sense of disfigurement, emotional distress, social isolation, or diminished quality of life.[16–18]

In situations where incisional repair options are limited, an ideal alternative would be a nonsurgical approach capable of yielding outcomes comparable with autologous tissue techniques. Placental tissues may offer a novel solution to address this emerging clinical need in cutaneous reconstruction. These commercially available allografts retain the three-dimensional collagen-rich (types I, III, IV, V, and VII) extracellular matrix, growth factors (bFGF, basic fibroblast growth factor; VEGF, vascular endothelial growth factor; PDGF, platelet-derived growth factor; EGF, epidermal growth factor; SDF-1, stromal cell-derived factor-1; and TGF$\beta$-3, transforming growth factor beta-3), cytokines (IL-10, interleukin 10; IL-1Ra, interleukin-1 receptor antagonist; and TIMPs, tissue inhibitors of metalloproteinases), antimicrobial peptides (NGAL, neutrophil gelatinase associated lipocalin; LL-37, human cationic antibacterial protein of 18 kDA; and RNase7, ribonuclease 7), and endogenous cells—epithelial cells, fibroblasts, and mesenchymal stem cells—native to human placental tissues.[19,20] Nearly all Level 1 randomized clinical trial placental allograft data exist in the chronic wound care space.[21] Low immunogenicity, ease of transplantation, and anti-inflammatory, antiangiogenic, and antiscarring properties suggest that this biomaterial is particularly well suited for a variety of clinical applications.[22–24]

To date, no controlled study has investigated placental allografts in the reconstructive management of moderate- and high-risk MMS defects in cosmetically sensitive areas. The primary purpose of this analysis is to assess the safety and utility of a dehydrated human amnion/chorion membrane (dHACM) (EpiFix®; MiMedx Group Inc., Marietta, GA) as a nonsurgical approach to cutaneous reconstruction. When compared in equivalent cases, we hypothesized that postoperative outcomes would be statistically similar to those achieved with flap and FTSG.

## Methods

### Study design

To ensure accurate and transparent reporting, this retrospective case–control study was conducted according to the Strengthening the Reporting of Observational Studies in Epidemiology guidelines.[25] Institutional Review Board approval and waiver of informed consent (Pro0031033) was granted before review of electronic medical records and extraction of deidentified data between January 2014 and December 2018. Patients were included if their diagnosis was basal or squamous cell carcinoma, and if the MMS defect was located in a moderate- to high-risk area (face, head, neck, or dorsal hand), and necessitated same-day reconstruction. The American Academy of Dermatology Mohs Appropriate Use Criteria was used to assign reconstructive complexity and stratify defects according to location and aesthetic subunit.[26]

After exclusions, a total of 1550 eligible patients were identified. Cases were categorized based on the modality of same-day reconstruction. In this study, reconstructions were dichotomized into two groups, defined as either autologous tissue ($n = 1397$)—flaps and FTSG—or placental allograft (dHACM) ($n = 153$). To avoid selection bias and ensure a balanced comparison, propensity scores were constructed for each patient. Cases without an equivalent match were discarded. The final study population consisted of 286 patients that could be propensity score-matched at a 1:1 ratio, generating 143 case–control pairs.

### Outcome measures

All MMS and reconstructions were managed with the same postoperative protocol. Prophylactic antibiotics were not prescribed. Patients were evaluated every 5–7 days and received appropriate site care and dressing changes. Placental allograft applications were repeated if the previous graft material was no longer visible in the wound bed (Fig. 1A–C). Subjects were discharged from care once reconstruction sites were healed and free from complication (Fig. 1D).

The primary endpoint was the incidence of postoperative morbidity. Comparisons included the rate of medical complications for the index site: (1) infection, (2) bleeding/hematoma, (3) dehiscence, (4) surgical reintervention, or (5) development of a nonhealing wound. Postoperative cosmetic outcomes were assessed at ≥9 months. These

measures included documentation of (1) suboptimal scarring (per the International Classification of Diseases, Tenth Revision, Clinical Modification; ICD-10-CM-L90.5 cicatrix descriptors: adherent, painful, hypertrophic, contracted, fibrotic, or ectropion), (2) scar revision/treatment (excision, debulking, intralesional injection, laser, and dermabrasion), and (3) patient satisfaction with scar appearance. The length of time (days) and total number of visits required before discharge (determined by complete wound closure), and the billed costs associated with the MMS and primary reconstruction were also evaluated.

### Statistical analysis

The statistical software program SAS/STAT® v9.4 (SAS Institute Inc., Cary, NC) analyzed deidentified study data. Descriptive statistics for continuous variables were expressed as means and standard deviations (SDs). Frequencies ($n$) and percentages summarized dichotomous variables and categorical observations. Differences were compared with Student's $t$-test, Fisher's exact test, or Pearson's $\chi^2$ test. Use of nonparametric Mann–Whitney test or Wilcoxon rank-sum methods depended on the distribution of data. All statistical tests were two-sided and results were regarded as statistically significant at $p < 0.05$.

Propensity scores for matched case–controls were estimated using a logistic regression model to correct for differences in covariates: gender, age in years, medical history, tumor size, tumor location, histopathology, and other MMS characteristics. The goodness of propensity score-matched pairs was evaluated using signed-rank sum for continuous data and McNemar's test for binary data. Adjusted multivariate odds ratio (OR; 95% confidence interval [CI]) determined predictors of significant postoperative morbidity and relative risk ratios (RR; 95% CI) were used to assess the strength of associations in univariate comparisons.

## Results

Baseline characteristics for unmatched and matched patients are summarized in Table 1. Significant covariate imbalances were corrected in the matched case–control sample ($n = 286$). Males represented the majority gender in both groups ($p = 0.161$). The mean (SD) ages ranged from 78.0 to 78.8 years ($p = 0.454$). There were no significant differences in medical history, tumor size, tumor type, moderate- versus high-risk defect location, or operative time ($p > 0.05$).

### Univariate analysis

The univariate comparison of outcomes is summarized in Table 2. The mean (SD) size of MMS defects reconstructed with placental allograft were similar to autologous tissue, 3.5 (3.7) versus 3.3 (3.1) cm$^2$, respectively ($p = 0.531$). A significantly greater proportion of placental allograft patients (97.9%) experienced zero postoperative complications compared with autologous tissue (71.3%), $p \leq 0.0001$ (Supplementary Figs. 1–3); strength of association was confirmed by relative risk measures (RR = 13.67; 95% CI = 4.33–43.12).

**Table 1. Patient, tumor, and Mohs micrographic surgery characteristics for entire sample and matched sample**

| | *Entire sample* | | | *Matched sample* | | |
|---|---|---|---|---|---|---|
| | *Placental allograft (n = 153)* | *Autologous flap/FTSG (n = 1397)* | *p* | *Placental allograft (n = 143)* | *Autologous flap/FTSG (n = 143)* | *p* |
| White | 153 (100.0) | 1397 (100.0) | — | 143 (100.0) | 143 (100.0) | — |
| Male, *n* | 122 (79.7) | 1038 (74.3) | 0.141 | 115 (80.4) | 105 (73.4) | 0.160 |
| Age, years | 78.4 (9.5) | 76.0 (9.4) | 0.003 | 78.0 (9.6) | 78.8 (9.1) | 0.454 |
| Immunocompromised, *n* | 33 (21.6) | 286 (20.5) | 0.750 | 32 (22.4) | 23 (16.1) | 0.177 |
| Anticoagulation, *n* | 36 (23.5) | 344 (24.6) | 0.765 | 34 (23.8) | 39 (27.3) | 0.497 |
| Current smoker, *n* | 16 (10.5) | 131 (9.4) | 0.868 | 16 (11.2) | 17 (11.9) | 0.600 |
| Tumor type (NMSC), *n* | | | 0.408 | | | 0.233 |
| Basal cell | 38 (24.8) | 392 (28.1) | | 35 (24.5) | 39 (27.3) | |
| Squamous cell | 115 (75.2) | 996 (71.3) | | 108 (75.5) | 104 (72.7) | |
| Other | 0 (0.0) | 9 (0.6) | | 0 (0.0) | 0 (0.0) | |
| Tumor length, cm | 1.3 (0.7) | 1.4 (0.7) | 0.027 | 1.3 (7.0) | 1.3 (6.0) | 0.692 |
| Tumor width, cm | 1.0 (0.4) | 1.1 (0.5) | <0.001 | 1.0 (4.0) | 1.0 (3.0) | 0.929 |
| MMS AUC area | | | 0.213 | | | 0.233 |
| Area M | 33 (21.6) | 366 (26.2) | | 32 (22.4) | 24 (16.8) | |
| Area H | 120 (78.4) | 1031 (73.8) | | 111 (77.6) | 119 (83.2) | |
| MMS time, minutes | 195.8 (62.4) | 237.6 (50.1) | <0.001 | 197.4 (57.5) | 199.9 (44.4) | 0.677 |

Data are expressed as absolute number ($n$) and percent (%) or mean and standard deviation (SD); statistical significance at $p < 0.05$.

Allograft, placental (dHACM, dehydrated human amnion/chorion membrane); Autologous tissue, flap and full-thickness skin graft (FTSG); NMSC, non-melanoma skin cancers; AUC, Appropriate Use Criteria per American Academy of Dermatology; Area H (high risk), central face, eyelids [including inner/outer canthi], eyebrows, nose, lips [including cutaneous surround, mucosal area, vermillion border], chin, ear [including periauricular skin/sulci], temple, and hands; Area M (moderate risk), cheeks, forehead, scalp, neck, and jawline; MMS time, length of Mohs procedure in minutes; NMSC, non-melanoma skin cancers.

**Table 2. Univariate analysis for outcomes in case–control comparisons**

| | *Placental allograft (n = 143)* | *Autologous flap/FTSG (n = 143)* | *p* |
|---|---|---|---|
| Size of MMS defect, $cm^2$ | 3.5 (3.7) | 3.3 (3.1) | 0.531 |
| Stages for tumor clearance | 2.0 (1.2) | 2.1 (1.1) | 0.605 |
| Experienced no complications | 140.0 (97.9) | 102.0 (71.3) | <0.0001 |
| Postoperative sequelae | | | |
| Infection | 3.0 (2.0) | 15.0 (10.0) | 0.004 |
| Bleeding or hematoma | 0.0 (0.0) | 7.0 (5.0) | 0.015 |
| Wound dehiscence | 0.0 (0.0) | 4.0 (3.0) | 0.122 |
| Surgical reintervention | 0.0 (0.0) | 11.0 (8.0) | 0.0007 |
| Nonhealing wound | 0.0 (0.0) | 5.0 (3.5) | 0.060 |
| Poor scar cosmesis | 0.0 (0.0) | 21.0 (15.0) | <0.0001 |
| Scar revision | 0.0 (0.0) | 14.0 (9.8) | <0.0001 |
| Follow-up visits | 3.4 (1.6) | 2.5 (1.1) | <0.0001 |
| Time to discharge, days | 30.7 (16.9) | 30.3 (22.9) | 0.840 |
| Cost of reconstruction, dollars | 4463 (2272) | 3904 (951) | 0.007 |

Data are expressed as absolute number (*n*) and percent (%) or mean and standard deviation (SD); statistical significance at $p < 0.05$.

Placental allograft reconstructions developed less infection ($p = 0.004$) and were less likely to experience poor scar cosmesis ($p < 0.0001$) (Supplementary Figs. 4 and 5), scar revision ($p < 0.0001$), or surgical reintervention at the index site ($p = 0.0007$). Autologous tissue reconstructions required fewer mean (SD) follow-up visits (2.5 [1.1] versus 3.4 [1.6] visits; $p < 0.0001$) and cost less (3,904 [951] versus 4,463 [2,272] dollars; $p = 0.007$). The number of days to discharge were not significantly different between groups 30.7 (16.9) versus 30.3 (22.9) days ($p = 0.840$).

## Multivariate analysis

Logistic regression model results are depicted in Table 3. When controlling for defect surface area, operation time, age, medical history, and gender, autologous tissue reconstruction remained an independent significant risk factor for infection or additional operation (OR = 11.71; 95% CI = 3.35–40.99; $p < 0.0001$). In a separate model that included cosmetic outcomes, the odds of infection, additional operation, poor scar cosmesis, or scar revision were 19 times higher in the autologous tissue group (OR = 18.76; 95% CI = 5.56–63.34; $p < 0.0001$). Being female was also associated with three times greater odds of having a cosmetic complication (OR = 2.84; 95% CI = 1.29–6.23; $p = 0.010$).

## Discussion

This propensity score-matched case–control is the first to compare the outcomes for placental allograft with the gold standard of management in complex MMS defect reconstruction, flaps, and FTSG. This study presented a unique opportunity to address a practice gap with evidence that is currently missing from the literature. The key findings of this investigation are the incidence of infection and all-cause postoperative morbidity in placental allograft repairs was significantly lower than observed with autologous tissue; and the use of placental allograft was independently associated with a lower risk of infection, repeat operation, poor scar cosmesis, and scar revision. Even after controlling for covariates, patients receiving autologous tissue reconstruction were 12 times more likely to have infections or surgical reintervention and 19 times more likely to experience poor scar cosmesis or scar revision. Although female patients were at a greater risk of having postoperative scar-related issues, such outcomes coincide consistent with previous studies in which females experienced more psychosocial distress and scar concerns after MMS in a visually prominent area.[18]

Our study findings are consistent with long-standing reports in the scientific and medical literature, which recognize the placental membrane as a safe and effective surgical material.[19–24] Considerable research supports its use for tissue engineering as a biocompatible scaffold

**Table 3. Multivariate logistic regression analysis for the risk of medical and cosmetic postoperative complications**

| | *Infection or surgical reintervention* | | *Poor scar cosmesis or scar revision* | |
|---|---|---|---|---|
| | *OR (95% CI)* | *p* | *OR (95% CI)* | *p* |
| Female gender | 1.68 (0.68–4.15) | 0.260 | 2.84 (1.29–6.23) | 0.009 |
| Age | 0.98 (0.94–1.03) | 0.481 | 1.00 (0.96–1.05) | 0.861 |
| Tumor size, $cm^2$ | 1.27 (0.82–1.97) | 0.279 | 1.06 (0.74–1.52) | 0.755 |
| Defect size, $cm^2$ | 0.91 (0.71–1.17) | 0.470 | 0.97 (0.82–1.14) | 0.683 |
| Central face defect location | 0.45 (0.17–1.24) | 0.123 | 0.77 (0.30–2.01) | 0.593 |
| Autologous tissue vs. placental allograft | 11.71 (3.35–40.99) | 0.0001 | 18.76 (5.56–63.34) | <0.0001 |
| Current smoker | 0.74 (0.17–3.14) | 0.677 | 0.92 (0.27–3.08) | 0.886 |
| Anticoagulation | 1.00 (0.39–2.61) | 0.997 | 0.98 (0.43–2.23) | 0.953 |
| Immunocompromised | 1.32 (0.45–3.85) | 0.618 | 0.92 (0.33–2.56) | 0.873 |
| No. stages to extirpation | 1.04 (0.71–1.53) | 0.846 | 1.16 (0.84–1.61) | 0.363 |
| Length of surgery | 1.00 (1.00–1.01) | 0.447 | 1.00 (1.00–1.01) | 0.419 |

Statistical significance at $p < 0.05$.
CI, confidence interval; OR, odds ratio.

with capacity to promote re-epithelialization while reducing wound fibrosis and scar formation.[20] The successful closure of chronic wounds, management of orthopedic injury, prevention of surgical tissue adhesions, ocular surface reconstruction, reduced pain and infection in burn treatment, and prevention of postoperative hematoma and serous fluid collections are evidenced through various levels of research.[21,22]

In the dermatologic surgery setting, placental allografts may optimize clinical results in a variety of circumstances where a combination of patient, anatomical, and tissue-related factors are a concern: individual refuses incisional repair or presents with a medical contraindication; the quality/availability of local donor tissues are challenged; underlying structures are exposed and require a protective barrier; free skin margin contraction may lead to impaired cosmesis/altered function; or, the area cannot be immobilized to maintain autograft survival.[23]

The treatment algorithm for placental allograft use would supplement, not substitute for, levels in the reconstructive ladder. In this study, defects managed with placental allograft were characterized by exposed muscle, bone, and cartilage. These large complex wounds required one additional visit and cost an average $560 more than autologous tissue techniques. This can be attributed to repeat application of the placental tissue and cost of the graft. Despite increased health care utilization concerns, this nonsurgical method became an option—when due to a combination of patient, anatomical, and tissue-related factors—the optimal reconstruction method could not be pursued.




**Fig. 1.** **(A)** Placental allograft (dHACM) out of package before implantation (additional detail regarding product application is provided in the manufacturer's instructions for use [IFU], provided as Supplemental Data). **(B)** Mohs patient with large cutaneous defect involving upper eyelid and medial canthus right eye and right upper bridge of nose. **(C)** Placental allograft in situ, remains visible in situ at postoperative day 7. **(D)** Complete closure of Mohs defect without complication to surrounding structures, postoperative day 42. dHACM, dehydrated human amnion/chorion membrane.

## Limitations

As with all observational data, these study findings must be interpreted in the context of the retrospective study design. Results are limited by the accuracy and thoroughness of medical records. Given the resources available, this investigation made extensive efforts to increase internal validity and limit the confounding of results. Although propensity score-matching reduced baseline covariate imbalances, it does not substitute for randomization. A demographically homogenous cohort also constrains the generalizability of findings. The inherent risks associated with each reconstructive modality, incisional repair versus allograft tissue transplantation, present another limitation. The aim of this study was to compare defects distinguished by equivalent reconstructive demands in terms of complexity, location, and size. Smaller MMS defects managed with second intention were distinctly different (shallow depth, concave surfaces, and low-risk location) and, therefore, a case–control match with a population of dissimilar wounds was not applicable.

## Conclusion

Placental allograft can be a safe and effective tool for repairing MMS defects of the face, head, neck, and dorsal hand in a subset of patients who are not good candidates for traditional methods of autologous tissue reconstruction. In the authors' experience, this includes older adults with moderate- to high-risk defects >3 $cm^2$ and medically comorbid individuals with wound bed concerns making them ineligible for incisional repair. Further investigation into the efficacy of placental allograft for MMS reconstruction among racially diverse groups needs to be addressed in future studies.

## Authors' Contributions

All authors made substantial contributions to the conception and design of the study, including the acquisition, analysis, and interpretation of data, preparation of content, and critical review of the article. All authors performed a final review and provided their approval to submit the article for publication.

## Acknowledgments

The authors thank Dave Mason, MD, and Don Fetterolf, MD, MBA, for assisting with the critical review and revision of the study manuscript.

## Author Disclosure Statement

This study was initiated by the Primary Investigator (PI), J.R.A. Third-party data analysis and open-access publication fees were supported in part by the company, MiMedx Group, Inc., through the Clinical Research Agreement, AFSUR008. J.T and O.J.W are academic physician/surgeon collaborators. G.M.M is a clinical researcher for the company and B.S.H is an independently contracted biostatistician. The company, MiMedx Group, Inc., did not pay for, gift, contribute, or provide free of charge, any of the tissues used in this study. Additionally, J.R.A received no financial incentives for conducting this research. The surgical care rendered—including but not limited to the Mohs, reconstruction, and placental allografts—were all billed through patient insurance as covered services.

## Funding Information

The publication of this study was supported with funding from MiMedx Group, Inc.

## Supplementary Material

Supplementary Data
Supplementary Figure S1
Supplementary Figure S2
Supplementary Figure S3
Supplementary Figure S4
Supplementary Figure S5

## References

1. Siegel RL, Miller KD, Jemal A. Cancer statistics, 2019. *CA Cancer J Clin.* 2019;69(1):7–34.
2. Lenzi TCR, Reis CMS, Novaes MRCG. Epidemiological profile of elderly patients with non-melanoma skin cancer seen at the dermatology outpatient clinic of a public hospital. *An Bras Dermatol.* 2017;92(6):882–884.
3. Linos E, Chren MM, Stijacic Cenzer I, Covinsky KE. Skin cancer in the U.S. elderly adults: does life expectancy play a role in treatment decisions. *J Am Geriatr Soc.* 2016;64(8):1610–1615.
4. Nestor MS, Zarraga MB. The incidence of nonmelanoma skin cancers and acitinic keratoses in South Florida. *J Clin Aesthet Dermatol.* 2012;5(4):20–24.
5. Sclafani AP, Sclafani JA, Sclafani AM. Successes, revisions, and postoperative complications in 466 Mohs defect repairs. *Facial Plast Surg.* 2012;28(3):358–366.
6. Johnson AR, Egeler SA, Wu WW, et al. Facial reconstruction after Mohs surgery: a critical review of defects involving the cheek, forehead, and perioral region. *J Craniofac Surg.* 2019;30(2):400–407.
7. Egler S, Johnson AR, Ibrahim AMS, et al. Reconstruction of Mohs defects located in the head and neck. *J Craniofac Surg.* 2019;30:412–417.
8. Tokede O, Jadotte YT, Nkemjika S, et al. Effectiveness of Mohs micrographic surgery for nonmelanoma skin cancer: a systematic review protocol. *JBI Database System Rev Implement Rep.* 2017;15(3): 666–675.
9. Meaike JDF, Dickey RM, Killion E, Bartlett EL, Brown RH. Facial skin cancer reconstruction. *Semin Plast Surg.* 2016;30(3):108–121.
10. Grosfeld EC, Smit JM, Krekels GA, van Rappard JH, Hoogbergen MM. Facial reconstruction following Mohs Micrographic surgery: a report of 622 cases. *J Cutan Med Surg.* 2014;18(4):265–270.
11. Renzi M, Schimmel J, Decker A, Lawrence N. Management of skin cancer in the elderly. *Dermatol Clin.* 2019;37(3):279–286.
12. van Leeuwen AC, The A, Moolenburgh SE, de Haas ERM, et al. A retrospective review of reconstructive options and outcomes of 202 cases large facial Mohs micrographic surgical defects, based on aesthetic unit involved. *J Cutan Med Surg.* 2015;19(6):580–587.
13. Ibrahim AM, Rabie AN, Borud L, et al. Common patterns of reconstruction for Mohs defects in the head and neck. *J Craniofac Surg.* 2014;25(1):87–92.
14. Schwartzman G, Carton AM, Khachemoune A. Review and appraisal of assessment parameters of second intention healing after Mohs micrographic surgery. *Arch Dermatol Res.* [Epub ahead of print]; 10.1007/s00403-021-02209-y.
15. Patel SA, Liu JJ, Murakami CS, Berg D, Akkina SR, Bhrany AD. Complication rates in delayed reconstruction of the head and neck after Mohs micrographic surgery. *JAMA Facial Plast Surg.* 2016;18(5):340–346.
16. Brown BC, Moss TP, McGrouther DA, Bayat A. Skin scar perceptions must be challenged: importance of self-perception in skin scarring. *J Plast Reconstr Aesthet Surg.* 2010;63:1022–1029.
17. Hughley BB, Schmalbach CE. Cutaneous head and neck malignancies in the elderly. *Clin Geriatr Med.* 2018;34(2):245–258.
18. Sabanko JF, Sarwer DB, Zvargulis Z, Miller CJ. Importance of physical appearance in patients with skin cancer. *Dermatol Surg.* 2015;41(2):183–188.
19. Niknejad H, Peirovi H, Jorjani M, Ahmadiani A, Ghanavi J, Seifalian A. Properties of the amniotic membrane for potential use in tissue engineering. *Eur Cell Mater.* 2008;15;88–99.
20. Mamede AC, Carvalho MJ, Abrantes AM, Laranjo M, Maia CJ, Botelho MF. Amniotic membrane: from structure and functions to clinical applications. *Cell Tissue Res.* 2012;339:447–458.
21. Koob TJ, Lim JJ, Massee M, Zabek N, Denozière G. Properties of dehydrated human amnion/chorion composite grafts: implications for wound repair and soft tissue regeneration. *J Biomed Mater Res B Appl Biomater.* 2014;102(6):1353–1362.
22. Lim JJ, Koob TJ. Placental cells and tissues: The transformative rise in advanced wound care. In: Fonseca C, ed. *Worldwide Wound Healing—Innovation in Natural and Conventional Methods*. Rijeka, Croatia: InTech; 2016, pp. 121–151.
23. Lo V, Pope, E. Amniotic membrane in dermatology. *Int J Dermatol.* 2009;48(9):935–940.
24. Silini AR, Cargnoni A, Magatti M, et al. The long path of human placenta and its derivatives, in regenerative medicine. *Front Bioeng Biotechnol.* 2015;3:162.
25. von Elm E, Altman DG, Egger M, Pocock SJ, Gotzsche PC, Vandenbroucke JP. The Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) statement: guidelines for reporting observational studies. *J Clin Epidemiol.* 2007;61:344–349.
26. Ad Hoc Task Force, Connolly SM, Baker DR, et al. AAD/ACMS/ASDSA/ASMS 2012 appropriate use criteria for Mohs micrographic surgery: a report of the American Academy of Dermatology, American College of Mohs Surgery, American Society for Dermatologic Surgery Association, and the American Society for Mohs Surgery. *J Am Acad Dermatol.* 2012;67(4):531–550.

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
THINK TRUTH
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 1332

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS, M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**<u>For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.</u>**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 1336-1826

COVENTBRIDGE GROUP
THINK TRUTH

CMS

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
>
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 1832

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS, M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**<u>For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.</u>**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 1836-2326

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 2332

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

Elizabeth Robledo
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**<u>For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.</u>**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 2336-2398

COVENTBRIDGE GROUP
THINK TRUTH

CMS

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 2404

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS, M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 2408-2898

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re: **Post Payment Medical Records Request (Nebraska)**
**Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
**Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion—
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
>
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that—

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

> ***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 2905

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that ______________________________ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

______________________________
Custodian of records and Job Title (Print)

______________________________ ______________
Custodian of records (Signature) (Date)

______________________________
Physician/Supplier (Print)

______________________________ ______________
Physician/Supplier (Signature) (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-Office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# FOULSTON

ATTORNEYS AT LAW

Amanda M. Wilwert

awilwert@foulston.com
Phone: 913.253.2181
Fax: 913.498.2101

32 CORPORATE WOODS
9225 INDIAN CREEK PARKWAY SUITE 600
OVERLAND PARK, KS 66210-2000

August 22, 2022

LaTonya Johnston
Program Integrity Analysis
CoventBridge Group
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Re: Advanced Dermatology and Skin Cancer Center PA
Post Payment Medical Records Request
MR #: 2022_188_534244943 (Kansas)
MR #: 2022_188_534244943 (Nebraska)

Dear Ms. Johnston:

This responds to the following requests in the Post Payment Medical Records Request for Advanced Dermatology and Skin Cancer Center PA's ("Advanced Dermatology"):

For all skin substitutes and wound care products, including but not limited to Artacent, Epifix and Epicord,

- Copy of all order forms for skin substitutes and wound care products in the last 12 months.
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreement for skin substitutes and wound care products between the provider and any distributor/manufacture
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products.

Advanced Dermatology does not have any documentation responsive to these requests. Further, Advanced Dermatology is a dermatology clinic and is not a wound care facility.

Advanced Dermatology does not have any order forms for skin substitutes. To order skin substitutes, Advanced Dermatology calls the distributor/manufacture representative to verbally request the desired skin substitutes.

Advanced Dermatology has not received or participated in any rebate program for skin substitutes and/or wound care products. Artacent permits bulk purchases of fifty (50) products with no limitation as to what sizes to order, and as long as fifty (50) products are ordered, Artacent offers a ten percent (10%) discount. This discount is reflected on the invoices. However, this is not a rebate.

LexMundi
GGI INDEPENDENT MEMBER

Advanced Dermatology does not have a rebate agreement with any distributor/manufacture for skin substitutes and wound care products.

Regarding marketing material, Artacent and MiMedx have presented brochures to Advanced Dermatology which is material that is available online. Advanced Dermatology does not present marketing material to its patients related to skin substitutes and wound care products. Advanced Dermatology directs CoventBridge to Artacent and MiMedx (Epifix) for copies of marketing materials provided to providers and/or patients.

Please let me know if you have any questions. Thanks.

Sincerely,

FOULSTON SIEFKIN LLP

Amanda M. Wilwert

U.S. FOOD & DRUG
ADMINISTRATION

By Electronic Mail

August 1, 2022

Mr. Benjamin Kimball, J.D.
Tides Medical
1819 W Pinhook Rd, Unit 109
Lafayette, Louisiana 70508
BKimball@tidesmedical.com

RE: Request for Recommendation for Artacent Wound Amniotic Membrane

Dear Mr. Kimball:

This letter is in response to your inquiry provided to the Food and Drug Administration's Tissue Reference Group (TRG) received on March 10, 2022 and follow-up communications. You are seeking a recommendation from the TRG whether your amniotic membrane product, Artacent Wound, a human cell, tissue, or cellular or tissue-based product (HCT/P), is regulated solely under section 361 of the Public Health Service (PHS) Act and the regulations in 21 CFR part 1271.

Your submission describes processing the amniotic membrane that includes dissection, washing using a detergent, rinsing, folding to create a dual layer, and drying. The dried membrane is cut, packaged, then terminally sterilized, and the smallest product size is described as a 9mm disk. The Artacent Wound product is intended for use as a "wound covering in various surgical procedures."

An HCT/P is regulated solely under section 361 of the PHS Act and the regulations in part 1271, if the HCT/P meets all four criteria at 21 CFR 1271.10(a)[1]. Based on the description you provide of the processing steps and the minimum size of the product, Artacent Wound, when intended for use as a "wound covering", appears to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271.

This recommendation applies solely to the Artacent Wound product described in your submission of March 10, 2022, when intended for use as a "wound covering". This recommendation does not apply to other Artacent branded products manufactured or marketed by Tides Medical. We are also aware of Tides Medical's application to the Centers for Medicare & Medicaid Services for the Artacent Wound product[2].

---

[1] The four criteria can be found at 21 CFR 1271.10(a), and, as applicable, see the following guidance documents: "Regulatory Considerations for Human Cell, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use: Guidance for Industry and Food and Drug Administration Staff" dated July 2020; and, "Same Surgical Procedure Exception under 21 CFR 1271.15(b): Questions and Answers Regarding the Scope of the Exception; Guidance for Industry" dated November 2017.

[2] Centers for Medicare & Medicaid Services (CMS) Healthcare Common Procedure Coding System (HCPCS) Application Summaries for Drugs, Biologicals, and Radiopharmaceuticals May 19, 2016.

Please note that this recommendation is based on the information you provided. Any variation from what you describe in your request for recommendation to the TRG, including but not limited to changes in the processing (including the minimum product size) or proposed use, may raise additional regulatory considerations that could impact the applicability of this recommendation. For example, an amniotic membrane product, when intended for wound healing and/or to reduce scarring and inflammation would not be considered a homologous use because wound healing and reduction of scarring and inflammation are not basic functions of amniotic membrane.[3]

For questions regarding this response letter, please contact the Executive Secretary for the TRG at TissueReferenceGroup@fda.hhs.gov.

Sincerely,

Wilson Bryan -S Digitally signed by Wilson Bryan -S Date: 2022.07.29 20:41:50 -04'00'

Wilson W. Bryan, M.D.
Director
Office of Tissues and Advanced Therapies
Center for Biologics Evaluation and Research

James P. Bertram -S Digitally signed by James P. Bertram -S Date: 2022.08.01 14:23:04 -04'00'

James Bertram, Ph.D.
Associate Director
Regulatory Policy and Combination Products Staff
Office of Product Evaluation and Quality
Center for Devices and Radiological Health

---

[3] See Example 19-4 in "Regulatory Considerations for Human Cell, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use: Guidance for Industry and Food and Drug Administration Staff" dated July 2020.

tidesmedical®
P.O. BOX 82237 | LAFAYETTE, LA 70598
PHONE 888.494.4441 | FAX 781.823.0321
INFO@TIDESMEDICAL.COM

August 18, 2022

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Ms. Johnston

It has come to our attention that you are in the process of conducting a UPIC audit of Dr. John Adams related to his use of skin substitutes, and in particular our product, Artacent Wound.

We thought it would be relevant, and helpful to you, to provide some insights and perspectives that we compiled from a prior UPIC audit of Dr. Adams. Below are a few of the pertinent topics related to the regulation status of Artacent Wound, the FDA's standards for Homologous use, CPT coding for skin substitutes and product sizing.

1. Homologous Use
    a. Dr. Adams specifically mentions in his chart notes that he is using Artacent Wound as a "natural barrier"
    b. Dr. Adams also mentions other intended outcomes related to scar reduction inflammation reduction, etc. as part of the patient treatment and practice of medicine but these are not pertinent for purposes of a homologous use determination. There is no legal or regulatory requirement that a doctor restrict his use of a product to the intended use of said product and FDA regulations do not extend to the practice of medicine.
    c. Use as a barrier is consistent with homologous use. Please reference the 2020 FDA Guidance Document, the Tides Medical FDA Tissue Reference Group (TRG) Reference Letter, and the Tides Medical package insert to demonstrate that homologous use for our product includes use as a wound cover and a barrier.

tidesmedical
P.O. BOX 82237 | LAFAYETTE, LA 70598
PHONE 888.494.4441 | FAX 781.823.0321
INFO@TIDESMEDICAL.COM

d. FDA is not authorized to regulate the practice of medicine. FDA regulations and guidance apply only to the manufacturer of the products, not the users of the products. As such referencing an FDA guidance documents (which themselves are not legally binding; i.e. FDA guidance is only a reference document for manufacturers of products) is not appropriate, https://www.fda.gov/medical-devices/home-use-devices/fdas-role-regulating-medical-devices , see bullet 1 in the link; "FDA does not have authority to regulate… a physician's practice…". It is therefore not appropriate to hold a clinician responsible for following regulations that do not apply to them (the doctor).

e. Setting aside the inapplicability of FDA regulations to the practice of medicine, and out of an abundance of cooperation, Dr. Adams did in fact use the Artacent Wound product in a homologous way as per the manufacturer's intended use, and as confirmed by the FDA Tissue Reference Group (TRG) (see TRG letter). Extraneous commentary respecting the use and performance of the Artacent Wound product beyond its use as a wound covering (barrier) is not relevant for purposes of deciding if the product was used homologously, per the intended use as provided by the manufacturer; Dr. Adams used the product as a wound covering (natural barrier) as stated in his notes. There is no requirement that a doctor restrict his notes to the intended use statement provided by the manufacturer, and it is therefore not appropriate to deny payment for doing otherwise.

f. FDA guidance related to homologous use and minimal manipulation (https://www.fda.gov/media/109176/download) gives many examples whereby tissue products generally, and amniotic tissue specifically, falls within the guidance for tissue products.

g. Amniotic tissue is a structural tissue (see page 9 of the guidance). Section 1271.10(a)(1) (21 CFR 1271.10(a)(1)) provides that one of the criteria for an HCT/P to be regulated solely under section 361 of the PHS Act and the regulations in Part 1271 is that the HCT/P is minimally manipulated. As defined in 21 CFR 1271.3(f), minimal manipulation means: processing that does not alter the original relevant characteristics of the tissue relating to the tissue's utility for reconstruction, repair, or replacement. HCT/Ps that physically support or serve as a barrier or conduit, or connect, cover, or cushion are generally considered tissues for the purpose of applying the HCT/P regulatory framework example 10-2 on page 11 of the guidance says: (The) "original relevant characteristics of amniotic membrane relating to its utility to serve as a

tidesmedical
P.O. BOX 82237 | LAFAYETTE, LA 70598
PHONE 888.494.4441 | FAX 781.823.0321
INFO@TIDESMEDICAL.COM

barrier…" Thus, the use referenced in Dr. Adams notes is consistent with FDA homologous use for amniotic tissue; and as referenced in the FDA Tissue Reference Group letter confirming homologous use when used as a wound covering.

2. Use on non-chronic wounds
   a. The auditor(s) have pushed back on use of Artacent Wound without prior conservative wound treatment. Auditor(s) question why an expensive advanced treatment was used instead of conservative treatment. The Auditor(s) have also mentioned that use of amniotic grafts is outside of accepted standards of medical practice for non-chronic wounds.
   Answer: There is no requirement under CMS or AMA guidances that treatment of a wound begin with conservative treatment and escalate to more rigorous treatment.
   b. Dr. Adams submits claims to WPS (MAC contractor) which does not have an LCD that outlines a requirement for conservative treatment or a limit to use on only chronic wounds.
   c. The manufacturer of Artacent Wound does not restrict use of the product to chronic or acute wounds (including MOHs) use of the product and the appropriateness is based on the provider's determination of medical necessity. There is no LCD stating that cheaper, more conservative measures have to be used first. Therefore, unless there is some guidance from CMS or evidence of a lack of medical necessity the auditor is employing an arbitrary and subjective opinion, which is not inappropriate.

3. CPT coding
   a. According to the auditor, the codebook for graft application codes (15271 & 15272) states that skin substitute grafts include various kinds of human skin grafts, non-human skin grafts, and "biological products that form a sheet scaffolding for skin growth."
   b. Further, the clear intent of all three definitions is for the substance to remain on the person for the purpose of growing in place or helping the person's own skin cells to grow back.
   c. Labeling amniotic tissues as "biological dressings" is erroneous, the Tides Medical Artacent Wound product is a skin substitute, not a dressing. Denial of

tidesmedical
P.O. BOX 82237 | LAFAYETTE, LA 70598
PHONE 888.494.4441 | FAX 781.823.0321
INFO@TIDESMEDICAL.COM

payment by applying the incorrect products category is not appropriate. Allograft is defined as a graft of tissue between individuals of the same species but of disparate genotype, i.e. they are unrelated. As such Artacent Wound is an allograft. As an allograft Artacent Wound is appropriately classified as a skin substitute. Further, our submission to the Tissue Reference Group was evaluated as: "Human tissue allograft derived from human amniotic membrane, specifically from the submucosa of the placenta." (please see letter from FDA TRG).

4. Product Sizing
   a. The auditor, on multiple occasions, said that Dr. Adams was using excessive product (over utilization), the auditor's point of reference is erroneous and was based on his apparent misunderstanding that a single tissue/package of Artacent Wound was 1 unit. Artacent Wound (Q4169) is billed per square centimeter, not per tissue. Tides offers multiple product sizes to physicians, ranging from 2 to 32 units.

Thank you for your consideration of these facts in advance of completing your audit. It is our hope that this will aid in your review. Attached is the Artacent Wound package insert and the TRG Designation Letter from the FDA to support the statements in this letter.

Sincerely,

Benjamin Kimball, J.D.
VP of Quality and Regulatory Affairs
Tides Medical

NEBRASKA
Good Life. Great Mission.
DEPT. OF HEALTH AND HUMAN SERVICES

Pete Ricketts, Governor

# Public Health Licensure Unit
# Certification of Licensure

This certificate serves as primary source verification of licensure in the State of Nebraska as of the close of the business day before 7/15/2022.

| | |
|---|---|
| **Name:** | Adriana A Salaz |
| **Type:** | Nurse Aide |
| **Number:** | 119231 |
| **Status:** | Lapsed |
| **Issued:** | 07/10/2015 |
| **Expiration:** | 0000-00-00 |
| **Education:** | 06/29/2015 Central Community College-Hastings-75hr |

## Examination Information

| Date | Score | Exam Type |
|---|---|---|
| 01/16/2021 | Pass | Comp Eval - Written |
| 06/29/2015 | pass | Comp Eval - Written |
| 01/16/2021 | Failed X 1 | Comp Eval - Clinical |
| 06/29/2015 | pass | Comp Eval - Clinical |

## Disciplinary/Non-Disciplinary Information:

No disciplinary/non-disciplinary actions taken against this license.

If you have questions about this information, please contact the Licensure Unit at (402) 471-2115 or DHHS.LicensureUnit@nebraska.gov.

THE NATIONAL BOARD
OF SURGICAL TECHNOLOGY
AND SURGICAL ASSISTING

January 21, 2022

To Whom It May Concern:

Your request for information on the certification status of the following person has been received.

Current records to date indicate:

| | |
|---|---|
| **Name:** | **Allison N. Hux** |
| **Certification Type:** | **CST** |
| **Certification Number:** | **188675** |
| **Date Originally Certified:** | **04/25/2019** |
| **Current Cycle:** | **04/25/2019** |
| **Certification Current Until:** | **04/25/2023** |

All Surgical Technologists and Surgical First Assistants who are certified receive a certificate and certification card reflecting their certification number and expiration date. If the Certified Surgical Technologist (CST) or Certified Surgical First Assistant (CSFA) at your hospital does not have a certification document bearing the National Board of Surgical Technologist and Surgical Assisting (NBSTSA) logo, they should contact our office for information on receiving a replacement certification card or certificate. Certification should not be confused with membership in the Association of Surgical Technologists (AST).

Sincerely,

Deborah L Penrose

Digitally signed by Deborah L Penrose
Date: 2018.06.11 16:09:52 -06'00'

NATIONAL BOARD OF SURGICAL TECHNOLOGIST AND SURGICAL ASSISTING CORPORATE SEAL COLORADO

NATIONAL BOARD OF SURGICAL TECHNOLOGY AND SURGICAL ASSISTING OFFICIAL CERTIFICATION VERIFICATION

PHONE 1-800-707-0057 FAX 303-325-2536
3 WEST DRY CREEK CIRCLE, LITTLETON, COLORADO 80120
WWW.NBSTSA.ORG

UNOFFICIAL COPY UNOFFICIAL

Certification Number

188675

THE NATIONAL BOARD
OF SURGICAL TECHNOLOGY
AND SURGICAL ASSISTING

# National Certification as a Surgical Technologist

## *Allison N. Hux, CST*

**Having successfully fulfilled all requirements for certification as a Surgical Technologist:**

**Is hereby authorized as of 04/25/2019 by the National Board of Surgical Technology and Surgical Assisting, to use the title of Certified Surgical Technologist® (CST®) through 04/25/2023**

Grant Wilson
President, NBSTSA

Ben Price
CEO, NBSTSA

NCCA

UNOFFICIAL COPY UNOFFICIAL

NEBRASKA
Good Life. Great Mission.
DEPT. OF HEALTH AND HUMAN SERVICES

Pete Ricketts, Governor

# Public Health Licensure Unit
# Certification of Licensure

This certificate serves as primary source verification of licensure in the State of Nebraska as of the close of the business day before 1/19/2022.

**Name:** Alyssa Lynn Bengtson PA
**Type:** Physician Assistant
**Number:** 2153
**Status:** Active
**Issued:** 07/05/2017
**Expiration:** 10/01/2023
**Education:** 06/20/2013 NE Health Care Learning Center, Lincoln
06/28/2013 Central Community College-Hastings-75hr
06/16/2017 Des Moines University

## Disciplinary/Non-Disciplinary Information:

No disciplinary/non-disciplinary actions taken against this license.

If you have questions about this information, please contact the Licensure Unit at (402) 471-2115 or DHHS.LicensureUnit@nebraska.gov.

NEBRASKA
Good Life. Great Mission.
DEPT. OF HEALTH AND HUMAN SERVICES

Pete Ricketts, Governor

## Public Health Licensure Unit
## Certification of Licensure

This certificate serves as primary source verification of licensure in the State of Nebraska as of the close of the business day before 7/15/2022.

**Name:** Karina Montes
**Type:** Nurse Aide
**Number:** 139295
**Status:** Lapsed
**Issued:** 07/23/2019
**Expiration:** 0000-00-00
**Education:** 06/19/2019 Central Community College-Grand Island-75hr

### Examination Information

| Date | Score | Exam Type |
|---|---|---|
| 06/20/2019 | pass | Comp Eval - Written |
| 06/24/2019 | Pass X 2 | Comp Eval - Clinical |
| 06/21/2019 | Fail X1 | Comp Eval - Clinical |

**Disciplinary/Non-Disciplinary Information:**

No disciplinary/non-disciplinary actions taken against this license.

If you have questions about this information, please contact the Licensure Unit at (402) 471-2115 or DHHS.LicensureUnit@nebraska.gov.

NEBRASKA
Good Life. Great Mission.
DEPT. OF HEALTH AND HUMAN SERVICES

Pete Ricketts, Governor

# Public Health Licensure Unit
# Certification of Licensure

This certificate serves as primary source verification of licensure in the State of Nebraska as of the close of the business day before 7/15/2022.

**Name:** Michelle E Wood
**Type:** Licensed Practical Nurse
**Compact:** Multi-State License
**Number:** 13629
**Status:** Active
**Issued:** 05/31/1990
**Expiration:** 10/31/2023
**Education:** 30 Hour Course
07/14/1989 Central Community College
04/01/1991 EMTA
12/20/1996 EMTB
07/26/1997 AD

**Disciplinary/Non-Disciplinary Information:**

No disciplinary/non-disciplinary actions taken against this license.

If you have questions about this information, please contact the Licensure Unit at (402) 471-2115 or DHHS.LicensureUnit@nebraska.gov.

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Aug-16-2021 | 26911 |

| Bill To | Ship To |
|---|---|
| Advanced Dermatology and Skin Center, PA<br>Attn: Accounts Payable/Elizabeth Robledo<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Advanced Dermatology and Skin Center, PA<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA |

| PO Number | Terms | Due Date |
|---|---|---|
| 08162021 | Net 60 | 10/15/2021 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 50 | ART0015 | 15mm Artacent Wound Donor#: T2012-007 TID: T2012-007-023; T2012-007-024; T2012-007-025; T2012-007-019; T2012-007-020; T2012-007-021; T2012-007-022; ExpDate: Jun 10, 2026 Donor#: T2011-073 TID: T2011-073-019; T2011-073-020; T2011-073-021; T2011-073-022; T2011-073-023; T2011-073-024; T2011-073-025; T2011-073-026; T2011-073-027; T2011-073-028; T2011-073-029; T2011-073-030; T2011-073-031; T2011-073-032; T2011-073-033; T2011-073-034; T2011-073-035; T2011-073-036; T2011-073-037; ExpDate: Jun 3, 2026 Donor#: T2011-098 TID: T2011-098-011; T2011-098-012; T2011-098-013; T2011-098-014; T2011-098-015; T2011-098-016; T2011-098-017; T2011-098-018; T2011-098-019; T2011-098-020; T2011-098-021; T2011-098-022; T2011-098-023; T2011-098-024; T2011-098-025; T2011-098-026; T2011-098-027; T2011-098-028; T2011-098-029; T2011-098-030; T2011-098-031; T2011-098-032; T2011-098-033; T2011-098-034; ExpDate: Jun 9, 2026 | $513.00 | $25,650.00 Tax |
| 1 | Shipping | Shipping Charges Tracking: 774548794778 | $0.00<br>0.00% | $0.00 Tax |

| | |
|---|---|
| **Total** | $25,650.00 |
| **Payments/Credits** | ($25,650.00) |
| **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Dec-02-2021 | I-99639 |

| Bill To | Ship To |
|---|---|
| Advanced Dermatology - Manhattan<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Advanced Dermatology and Skin Center, PA<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 02DEC2021 | Due on receipt | 12/2/2021 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 6 | ART0202 | 2x2cm Artacent Wound TID: T2102-083-014, T2102-083-015, T2102-083-016, T2102-083-017, T2102-083-018, T2102-083-019; ExpDate: Oct 11, 2026; Purchase Date: Dec 2, 2021 | $1,026.00 | $6,156.00 Tax |
| 6 | ART0202 | 2x2cm Artacent Wound TID: T2102-084-001, T2102-084-002, T2102-084-003, T2102-084-004, T2102-084-005, T2102-084-006; ExpDate: Oct 11, 2026; Purchase Date: Dec 2, 2021 | $1,026.00 | $6,156.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2102-086-001, T2102-086-003, T2102-086-002; ExpDate: Oct 12, 2026; Purchase Date: Dec 2, 2021 | $1,026.00 | $3,078.00 Tax |
| 10 | ART0202 | 2x2cm Artacent Wound TID: T2102-085-001, T2102-085-002, T2102-085-003, T2102-085-004, T2102-085-005, T2102-085-006, T2102-085-007, T2102-085-008, T2102-085-009, T2102-085-010; ExpDate: Oct 12, 2026; Purchase Date: Dec 2, 2021 | $1,026.00 | $10,260.00 Tax |
| | | | 0.00% | |
| | | **Total** | | $25,650.00 |
| | | **Payments/Credits** | | ($25,650.00) |
| | | **Balance Due** | | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Dec-14-2021 | I-99860 |

**Bill To**

Advanced Dermatology and Skin Center, PA
Attn: Accounts Payable/Elizabeth Robledo
2735 Pembrook Place
Manhattan, KS 66502
USA

**Ship To**

Advanced Dermatology and Skin Center, PA
2509 W. 18th Avenue
Emporia, KS 66801
USA

| PO Number | Terms | Due Date |
|---|---|---|
| CNO10028683 | Net 60 | 2/12/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | ART0404 | 4x4cm Artacent Wound TID: T2103-036-009; ExpDate: Oct 25, 2026; Purchase Date: Dec 7, 2021 | $2,245.50<br>0.00% | $2,245.50 Tax |

| | |
|---|---|
| **Total** | $2,245.50 |
| **Payments/Credits** | ($2,245.50 ) |
| **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Apr-04-2022 | I-102190 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 412022 | Net 60 | 6/3/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 7 | ART0202 | 2x2cm Artacent Wound TID: T2103-100-001, T2103-100-002, T2103-100-003, T2103-100-004, T2103-100-005, T2103-100-006, T2103-100-007; ExpDate: Dec 28, 2026; Purchase Date: Apr 1, 2022 | $1,140.00 | $7,980.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2104-095-001, T2104-095-002, T2104-095-003; ExpDate: Dec 28, 2026; Purchase Date: Apr 1, 2022 | $1,140.00 | $3,420.00 Tax |
| | | | 0.00% | |

| | |
|---|---|
| **Total** | $11,400.00 |
| **Payments/Credits** | ($11,400.00) |
| **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Apr-08-2022 | I-102373 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 4082022 | Net 60 | 6/7/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | ART0202 | 2x2cm Artacent Wound TID: T2105-013-005; ExpDate: Dec 29, 2026; Purchase Date: Apr 8, 2022 | $1,026.00 | $1,026.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2105-014-001, T2105-014-002, T2105-014-003, T2105-014-004; ExpDate: Dec 29, 2026; Purchase Date: Apr 8, 2022 | $1,026.00 | $4,104.00 Tax |
| | | | 0.00% | |

| | |
|---|---|
| **Total** | $5,130.00 |
| **Payments/Credits** | ($5,130.00<br>) |
| **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Apr-18-2022 | I-102571 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 4182022 | Net 60 | 6/17/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2104-071-003, T2104-071-004; ExpDate: Dec 14, 2026; Purchase Date: Apr 18, 2022 | $1,026.00 | $2,052.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2104-073-001, T2104-073-002, T2104-073-003, T2104-073-004; ExpDate: Dec 14, 2026; Purchase Date: Apr 18, 2022 | $1,026.00 | $4,104.00 Tax |
| 1 | ART0202 | 2x2cm Artacent Wound TID: T2104-074-001; ExpDate: Dec 14, 2026; Purchase Date: Apr 18, 2022 | $1,026.00 | $1,026.00 Tax |
| | | | 0.00% | |

| | |
|---|---|
| **Total** | $7,182.00 |
| **Payments/Credits** | ($7,182.00 ) |
| **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Apr-21-2022 | I-102698 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 21APR2022 | Net 60 | 6/20/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 7 | ART0202 | 2x2cm Artacent Wound TID: T2106-005-001, T2106-005-002, T2106-005-003, T2106-005-004, T2106-005-005, T2106-005-006, T2106-005-007; ExpDate: Jan 10, 2027; Purchase Date: Apr 21, 2022 | $1,026.00<br><br>0.00% | $7,182.00 Tax |

| | |
|---|---|
| **Total** | $7,182.00 |
| **Payments/Credits** | ($7,182.00 ) |
| **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Apr-27-2022 | I-102809 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 25APR2022 | Net 60 | 6/26/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 10 | ART0202 | 2x2cm Artacent Wound TID: T2105-059-001, T2105-059-002, T2105-059-003, T2105-059-004, T2105-059-005, T2105-059-006, T2105-059-007, T2105-059-008, T2105-059-009, T2105-059-010; ExpDate: Jan 11, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $10,260.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2105-059-011, T2105-059-012; ExpDate: Jan 11, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $2,052.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2105-065-004, T2105-065-005, T2105-065-007, T2105-065-008; ExpDate: Jan 12, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $4,104.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2105-073-001, T2105-073-002, T2105-073-003, T2105-073-004; ExpDate: Jan 13, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $4,104.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2105-073-005, T2105-073-006; ExpDate: Jan 13, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $2,052.00 Tax |
| 6 | ART0202 | 2x2cm Artacent Wound TID: T2105-078-006, T2105-078-007, T2105-078-008, T2105-078-009, T2105-078-010, T2105-078-011; ExpDate: Jan 17, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $6,156.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2105-079-001, T2105-079-002; ExpDate: Jan 17, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $2,052.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2105-079-003, T2105-079-004, T2105-079-005, T2105-079-006; ExpDate: Jan 17, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $4,104.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2105-087-001, T2105-087-002, T2105-087-003, T2105-087-004; ExpDate: Jan 17, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $4,104.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2105-096-001, T2105-096-002; ExpDate: Jan 17, 2027; Purchase Date: Apr 25, 2022 | $1,026.00 | $2,052.00 Tax |
| 10 | ART0015 | 15mm Artacent Wound TID: T2106-046-022, T2106-046-023, T2106-046-024, T2106-046-025, T2106-046-026, T2106-046-027, T2106-046-028, T2106-046-029, T2106-046-030, T2106-046-031; ExpDate: Feb 2, 2027; Purchase Date: Apr 25, 2022 | $513.00 | $5,130.00 Tax |
| | | | 0.00% | |

Total

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Apr-27-2022 | I-102809 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 25APR2022 | Net 60 | 6/26/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| | | | **Total** | $46,170.00 |
| | | | **Payments/Credits** | ($46,170.00) |
| | | | **Balance Due** | $0.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| May-20-2022 | I-103476 |

**Bill To**

Adv. Derm. and Skin Cancer Ctr.
2735 Pembrook Place
Manhattan, KS 66502
USA

**Ship To**

Adv. Derm. and Skin Cancer Ctr
2735 Pembrook Place
Manhattan, KS 66502

| PO Number | Terms | Due Date |
|---|---|---|
| 20MAY2022 | Net 60 | 7/19/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 10 | ART0202 | 2x2cm Artacent Wound TID: T2107-086-001, T2107-086-002, T2107-086-003, T2107-086-005, T2107-086-006, T2107-086-007, T2107-086-008, T2107-086-009, T2107-086-010, T2107-086-011; ExpDate: Mar 9, 2027; Purchase Date: May 20, 2022 | $1,026.00 | $10,260.00 Tax |
| 5 | ART0015 | 15mm Artacent Wound TID: T2106-061-030, T2106-061-031, T2106-061-032, T2106-061-033, T2106-061-034; ExpDate: Feb 8, 2027; Purchase Date: May 20, 2022 | $513.00 | $2,565.00 Tax |
| | | | 0.00% | |

| | |
|---|---|
| **Total** | $12,825.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $12,825.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Jun-23-2022 | I-104367 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 13JUN2022 | Net 60 | 8/22/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | ART0015 | 15mm Artacent Wound TID: T2105-055-017; ExpDate: Jan 4, 2027; Purchase Date: Jun 13, 2022 | $513.00 | $513.00 Tax |
| 2 | ART0015 | 15mm Artacent Wound TID: T2107-018-021, T2107-018-022; ExpDate: Feb 21, 2027; Purchase Date: Jun 13, 2022 | $513.00 | $1,026.00 Tax |
| 7 | ART0015 | 15mm Artacent Wound TID: T2107-022-007, T2107-022-008, T2107-022-009, T2107-022-010, T2107-022-011, T2107-022-012, T2107-022-013; ExpDate: Feb 22, 2027; Purchase Date: Jun 13, 2022 | $513.00 | $3,591.00 Tax |
| 5 | ART0015 | 15mm Artacent Wound TID: T2107-022-014, T2107-022-015, T2107-022-016, T2107-022-017, T2107-022-018; ExpDate: Feb 22, 2027; Purchase Date: Jun 13, 2022 | $513.00 | $2,565.00 Tax |
| 1 | ART0202 | 2x2cm Artacent Wound TID: T2108-035-002; ExpDate: Mar 24, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $1,026.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2108-050-001, T2108-050-002, T2108-050-003; ExpDate: Mar 28, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $3,078.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2108-055-001, T2108-055-002, T2108-055-003, T2108-055-004; ExpDate: Mar 29, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $4,104.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2108-060-001, T2108-060-002; ExpDate: Mar 29, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $2,052.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2108-062-001, T2108-062-002; ExpDate: Mar 29, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $2,052.00 Tax |
| 5 | ART0202 | 2x2cm Artacent Wound TID: T2108-060-003, T2108-060-004, T2108-060-005, T2108-060-006, T2108-060-007; ExpDate: Mar 29, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $5,130.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2108-051-001, T2108-051-002, T2108-051-003; ExpDate: Mar 30, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $3,078.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2108-058-001, T2108-058-003, T2108-058-002; ExpDate: Mar 30, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $3,078.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2108-054-001, T2108-054-002; ExpDate: Mar 31, 2027; Purchase Date: Jun | $1,026.00 | $2,052.00 Tax |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Jun-23-2022 | I-104367 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 13JUN2022 | Net 60 | 8/22/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| | | 13, 2022 | | |
| 5 | ART0202 | 2x2cm Artacent Wound TID: T2108-051-004, T2108-051-005, T2108-051-006, T2108-051-007, T2108-051-008; ExpDate: Mar 30, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $5,130.00 Tax |
| 2 | ART0202 | 2x2cm Artacent Wound TID: T2108-054-003, T2108-054-004; ExpDate: Mar 31, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $2,052.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2108-056-001, T2108-056-002, T2108-056-003; ExpDate: Mar 31, 2027; Purchase Date: Jun 13, 2022 | $1,026.00 | $3,078.00 Tax |
| | | | 0.00% | |

| | |
|---|---|
| **Total** | $43,605.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $43,605.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Jun-23-2022 | I-104368 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 10JUN2022RA | Net 60 | 8/22/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 1 | ACA0202 | 2x2cm Artacent AC TID: T2107-059-005; ExpDate: Mar 2, 2027; Purchase Date: Jun 10, 2022; NOTE: Artacent AC Trial Application; Q4190 | $1,786.00<br>0.00% | $1,786.00 Tax |

| | |
|---|---|
| **Total** | $1,786.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $1,786.00 |

Tides Medical
P.O. Box 82237
Lafayette, LA 70598
T: 888-494-4441 F: 781-823-0321
accounting@tidesmedical.com

# Invoice

| Date | Invoice # |
|---|---|
| Jul-07-2022 | I-104812 |

| Bill To | Ship To |
|---|---|
| Adv. Derm. and Skin Cancer Ctr.<br>2735 Pembrook Place<br>Manhattan, KS 66502<br>USA | Adv. Derm. and Skin Cancer Ctr<br>2735 Pembrook Place<br>Manhattan, KS 66502 |

| PO Number | Terms | Due Date |
|---|---|---|
| 07JUL2022 | Net 60 | 9/5/2022 |

| Quantity | Item Code | Description | Price Each | Amount |
|---|---|---|---|---|
| 5 | ART0015 | 15mm Artacent Wound TID: T2107-084-008, T2107-084-009, T2107-084-010, T2107-084-011, T2107-084-012; ExpDate: Mar 9, 2027; Purchase Date: Jul 7, 2022 | $513.00 | $2,565.00 Tax |
| 3 | ART0202 | 2x2cm Artacent Wound TID: T2110-010-003, T2110-010-004, T2110-010-005; ExpDate: Apr 28, 2027; Purchase Date: Jul 7, 2022 | $1,026.00 | $3,078.00 Tax |
| 7 | ART0202 | 2x2cm Artacent Wound TID: T2110-012-001, T2110-012-002, T2110-012-003, T2110-012-004, T2110-012-005, T2110-012-006, T2110-012-007; ExpDate: Apr 28, 2027; Purchase Date: Jul 7, 2022 | $1,026.00 | $7,182.00 Tax |
| 4 | ART0202 | 2x2cm Artacent Wound TID: T2110-085-001, T2110-085-002, T2110-085-003, T2110-085-004; ExpDate: May 11, 2027; Purchase Date: Jul 7, 2022 | $1,026.00 | $4,104.00 Tax |
| 1 | ART0202 | 2x2cm Artacent Wound TID: T2110-086-001; ExpDate: May 11, 2027; Purchase Date: Jul 7, 2022 | $1,026.00 | $1,026.00 Tax |
| | | | 0.00% | |

| | |
|---|---|
| **Total** | $17,955.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $17,955.00 |

Pd ck #010080
6/7/22

KCI
The Clinical Advantage®

Phone: 1-800-275-4524
Fax: 210-406-4703
TAX ID: 74-2152396
www.kci1.com

**BILL TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN KS 66502-7482

**SHIP TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN KS 66502-7482

INVOICE # : 31005879
INVOICE DATE : 13-APR-22
REFERENCE :
DELIVERY : 195908148
ACCOUNT : 4765259
Page 1 of 1

| Purchase Order Number | Terms | Due Date |
|---|---|---|
| 4122022 | 30 NET | 13-MAY-22 |

* P indicates Partial Bill, D indicates Discharge Bill

| Product Billed | Serial Number | Order Number | Patient Last, First Name/Location/Patient # | Ship Date | * | QTY | UOM | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|---|
| SNPA125USSNAP CARTRIDGE 125MMHG W/RESET, US | | G26448690 | STOCK, STOCK | 04/13/22 | | 2 | EA | 165.17 | 330.34 |
| SNPA125US/10Snap Cartridge 125mmHg w/Reset, US, 10 Pack | | G26448690 | STOCK, STOCK | 04/13/22 | | 1 | C10 | 1,501.50 | 1,501.50 |
| SKTF10X10/10Snap Wound Care Dressing Kit 10X10, 10 Pack | | G26448690 | STOCK, STOCK | 04/13/22 | | 1 | C10 | 552.75 | 552.75 |

**NOTICE:** This invoice may reflect a discount, rebate or other reduction of regular price. Please refer to the terms of your contract, pricing acknowledgment and/or rebate/expense cap program documentation for information on specific discounts or reductions of regular price, including list price, rebate and expense cap calculations. You will receive a report detailing any rebate or expense cap payments. Federal and State laws may require you to report these discounts, rebates or other reductions when submitting a claim to a Federal or State program, including Medicare and Medicaid. You also may be required to furnish this invoice and documentation of the discount, rebate or other reduction in price.

**FOR INQUIRIES AND COMMENTS CONCERNING THIS INVOICE PLEASE CONTACT Blake Wiltshire Sanarrusia AT 1-800-275-4524 EXT. 43136**

Account Representative: JONES, OLIVER

REMIT TO: KCI USA PO BOX 301557
DALLAS, TX 75303-1557

| | |
|---|---|
| SUBTOTAL | 2,384.59 |
| TAX | 216.60 |
| FREIGHT | 35.54 |
| TOTAL | 2,636.73 |

VOL. IV

A 1.5% PER MONTH FINANCE CHARGE WILL BE CHARGED FOR ALL PAST DUE INVOICES. CUSTOMER AGREES TO PAY ANY AND ALL AMOUNTS INCURRED IN THE COLLECTION OF AMOUNTS DUE, INCLUDING BUT NOT LIMITED TO, COLLECTION EY'S FEES.

*Please submit invoice disputes v 0 days.*

KCI
The Clinical Advantage

Phone: 1-800-275-4524
Fax: 1-210-406-4703
Tax ID: 74-2152396
www.kci1.com

**BILL TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN, KS 66502-7482

**SHIP TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN KS 66502-7482

INVOICE #: 31137309
INVOICE DATE: 6/14/22
REFERENCE:
DELIVERY #:
ACCOUNT: 4765259-1
Page 1

| Purchase Order Number | Terms | Due Date | Requestor Name/Department/Phone Number |
|---|---|---|---|
| 6142022 | 30 NET | 7/14/22 | |

* P Indicates Partial Bill, D Indicated Discharge Bill

| Product Billed | Serial Number | Order Number | Patient Last, First Name/Location/Patient # | Ship/Rental Date | * | QTY | UOM | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|---|
| SKTF15X15.S SNAP WOUND CARE DRESSING KIT 15 X 15 | | 26594407 | / / STOCK, STOCK | 06/14/22 | | 6.00 | EACH | 47.52 | 285.12 |
| SNPA125US.S SNAP CARTRIDGE 125MMHG W/RESET, US | | 26594407 | / / STOCK, STOCK | 06/14/22 | | 8.00 | EACH | 126.5 | 1012 |
| FRTHERO1.S FRTHERO1 | | 26594407 | / / STOCK, STOCK | 06/14/22 | | 1.00 | EACH | 16.02 | 16.02 |

NOTICE: This invoice may reflect a discount, rebate or other reduction of regular price. Please refer to the terms of your contract, pricing acknowledgment and/or rebate/expense cap program documenation for information on special discounts or reductions of regular price, including list price, rebate and expense cap calculations. You will receive a report detailing any rebate or expense cap payments. Federal and State laws may require you to report these discounts, rebates or other reductions when submitting a claim to a Federal or State program, including Medicare and Medicaid. You also may be required to furnish this invoice and documentation of the discount, rebate or other reduction in price.

FOR INQUIRIES AND COMMENTS CONCERNING THIS INVOICE PLEASE CONTACT Alejandra Alvarado Montoya AT 1-800-275-4524 EXT. 43134

Account Representative: JONES, OLIVER **Please submit invoice disputes withing 30 days from date of invoice.**

**REMIT: KCI USA PO BOX 301557**
**DALLAS, TX 75303-1557**

| | |
|---|---|
| SUBTOTAL | 1313.14 |
| TAX | 117.52 |
| FREIGHT | 0 |
| TOTAL | $1,430.66 |

A 1.5% PER MONTH FINANCE CHARGE WILL BE CHARGED FOR ALL PAST DUE INVOICES. CUSTOMER AGREES TO PAY ANY AND ALL AMOUNTS INCURRED IN THE COLLECTION OF THE AMOUNTS DUE, INCLUDING BUT NOT LIMITED TO, COLLECTION COSTS, COURT COSTS AND REASONABLE ATTORNEY'S FEES.

KCI
The Clinical Advantage

Phone: 1-800-275-4524
Fax: 1-210-406-4703
Tax ID: 74-2152396
www.kci1.com

**BILL TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN, KS 66502-7482

**SHIP TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN KS 66502-7482

INVOICE #: 31150236
INVOICE DATE: 6/21/22
REFERENCE:
DELIVERY #:
ACCOUNT: 4765259-1
Page 1

| Purchase Order Number | Terms | Due Date | Requestor Name/Department/Phone Number |
|---|---|---|---|
| 6212022 | 30 NET | 7/21/22 | |

* P Indicates Partial Bill, D Indicated Discharge Bill

| Product Billed | Serial Number | Order Number | Patient Last, First Name/Location/Patient # | Ship/Rental Date | * | QTY | UOM | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|---|
| SNPA125PLUS.S SNAP PLUS CARTRIDGE (125MMHG), US | | 26612175 | / / STOCK, STOCK | 06/21/22 | | 3.00 | EACH | 203.5 | 610.5 |
| FRTHERO1.S FRTHERO1 | | 26612175 | / / STOCK, STOCK | 06/21/22 | | 1.00 | EACH | 32.09 | 32.09 |

NOTICE: This invoice may reflect a discount, rebate or other reduction of regular price. Please refer to the terms of your contract, pricing acknowledgment and/or rebate/expense cap program documenation for information on special discounts or reductions of regular price, including list price, rebate and expense cap calculations. You will receive a report detailing any rebate or expense cap payments. Federal and State laws may require you to report these discounts, rebates or other reductions when submitting a claim to a Federal or State program, including Medicare and Medicaid. You also may be required to furnish this invoice and documentation of the discount, rebate or other reduction in price.

FOR INQUIRIES AND COMMENTS CONCERNING THIS INVOICE PLEASE CONTACT Alejandra Alvarado Montoya AT 1-800-275-4524 EXT. 43134

Account Representative: JONES, OLIVER **Please submit invoice disputes withing 30 days from date of invoice.**

**REMIT: KCI USA PO BOX 301557**
**DALLAS, TX 75303-1557**

| | |
|---|---|
| SUBTOTAL | 642.59 |
| TAX | 57.51 |
| FREIGHT | 0 |
| TOTAL | $700.10 |

A 1.5% PER MONTH FINANCE CHARGE WILL BE CHARGED FOR ALL PAST DUE INVOICES. CUSTOMER AGREES TO PAY ANY AND ALL AMOUNTS INCURRED IN THE COLLECTION OF THE AMOUNTS DUE, INCLUDING BUT NOT LIMITED TO, COLLECTION COSTS, COURT COSTS AND REASONABLE ATTORNEY'S FEES.

KCI
The Clinical Advantage

Phone: 1-800-275-4524
Fax: 1-210-406-4703
Tax ID: 74-2152396
www.kci1.com

**BILL TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN, KS 66502-7482

**SHIP TO:**
ADVANCED DERMATOLOGY
2735 PEMBROOK PL
MANHATTAN KS 66502-7482

INVOICE #: 31187398
INVOICE DATE: 7/7/22
REFERENCE:
DELIVERY #:
ACCOUNT: 4765259-1
Page 1

| Purchase Order Number | Terms | Due Date | Requestor Name/Department/Phone Number |
|---|---|---|---|
| 772022 | 30 NET | 8/6/22 | |

* P Indicates Partial Bill, D Indicated Discharge Bill

| Product Billed | Serial Number | Order Number | Patient Last, First Name/Location/Patient # | Ship/Rental Date | * | QTY | UOM | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|---|
| SNPA125PLUS.S SNAP PLUS CARTRIDGE (125MMHG), US | | 26648926 | / / STOCK, STOCK | 07/07/22 | | 4.00 | EACH | 203.5 | 814 |
| FRTHERO1.S FRTHERO1 | | 26648926 | / / STOCK, STOCK | 07/07/22 | | 1.00 | EACH | 53.48 | 53.48 |

NOTICE: This invoice may reflect a discount, rebate or other reduction of regular price. Please refer to the terms of your contract, pricing acknowledgment and/or rebate/expense cap program documenation for information on special discounts or reductions of regular price, including list price, rebate and expense cap calculations. You will receive a report detailing any rebate or expense cap payments. Federal and State laws may require you to report these discounts, rebates or other reductions when submitting a claim to a Federal or State program, including Medicare and Medicaid. You also may be required to furnish this invoice and documentation of the discount, rebate or other reduction in price.

FOR INQUIRIES AND COMMENTS CONCERNING THIS INVOICE PLEASE CONTACT Alejandra Alvarado Montoya AT 1-800-275-4524 EXT. 43134

Account Representative: JONES, OLIVER **Please submit invoice disputes withing 30 days from date of invoice.**

**REMIT: KCI USA PO BOX 301557**
**DALLAS, TX 75303-1557**

| | |
|---|---|
| SUBTOTAL | 867.48 |
| TAX | 77.64 |
| FREIGHT | 0 |
| TOTAL | $945.12 |

A 1.5% PER MONTH FINANCE CHARGE WILL BE CHARGED FOR ALL PAST DUE INVOICES. CUSTOMER AGREES TO PAY ANY AND ALL AMOUNTS INCURRED IN THE COLLECTION OF THE AMOUNTS DUE, INCLUDING BUT NOT LIMITED TO, COLLECTION COSTS, COURT COSTS AND REASONABLE ATTORNEY'S FEES.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **58272375** | **Invoice Number** | **37950145** |
| **Sales Order Date** | **01/24/2022** | **Invoice Date** | **01/24/2022** |
| **PO Number** | **01242022EMP** | **Payment Due Date** | **03/25/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$2,419.70** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS<br>Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK)<br>PO LN 1 | 3 | PK | 3 | 7.70 | 23.10 | 1.96 | |
| | Tracking # 1Z2R57A30365344499<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 68107 | Vendor: MGM16<br>Vend Cat#: 25-515 | DRAPE, LINED POLY STR WHT NONF<br>PO LN 5 | 1 | CS | 1 | 128.83 | 128.83 | 10.95 | |
| | Tracking # 1Z2R57A30365344097<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 1031795 | Vendor: MGM16<br>Vend Cat#: 16-N251 | NEEDLE, HYPO TW 25GX1" (100/BX<br>PO LN 9 | 1 | CS | 1 | 84.55 | 84.55 | 7.19 | |
| | Tracking # 1Z2R57A30365343721<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 487480 | Vendor: MGM43<br>Vend Cat#: 43-2-231 | SCISSOR, LISTER BANDAGE OG 5 1<br>PO LN 14 | 8 | EA | 8 | 9.03 | 72.24 | 6.14 | |
| | Tracking # 1Z2R57A30365344499 | | | | | | | | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **37950145** | **Date** | **01/24/2022** |
| | **Terms** | | **AR NET 60** |
| **Pay This Amount Before** | **03/25/2022** | | **$2,419.70** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 37950145 | PO Number 01242022EMP | Invoice Date 01/24/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 774188 | Vendor: AME3M Vend Cat#: 2770-1 | TAPE, SILICONE KIND REMOVAL 1" PO LN 15 | 2 | BX | 2 | 47.12 | 94.24 | 8.01 | |
| | Tracking # 1Z2R57A30365344499 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 555783 | Vendor: MOLYCK Vend Cat#: 295300 | DRESSING, MEPILEX 4"X4" (5/BX PO LN 17 | 4 | BX | 4 | 36.53 | 146.12 | 12.42 | |
| | Tracking # 1Z2R57A30365344499 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 1040600 | Vendor: MGM16 Vend Cat#: 165-MF250 | TOWEL, MULTI-FOLD 1PLY WHT 9.0 PO LN 18 | 1 | CS | 1 | 27.45 | 27.45 | 2.33 | |
| | Tracking # 1Z2R57A30365344104 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 1031788 | Vendor: MGM16 Vend Cat#: 16-N181 | NEEDLE, HYPO TW 18GX1" (100/BX PO LN 19 | 1 | CS | 1 | 45.08 | 45.08 | 3.83 | |
| | Tracking # 1Z2R57A30365343721 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 960944 | Vendor: MGM16 Vend Cat#: 16-6424 | POUCH, SELF SEAL ECON 5.25X10 PO LN 21 | 1 | CS | 1 | 245.54 | 245.54 | 20.87 | |
| | Tracking # 1Z2R57A30365344113 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 960945 | Vendor: MGM16 Vend Cat#: 16-6425 | POUCH, SELF SEAL ECON 7.5X13 ( PO LN 22 | 3 | BX | 3 | 43.37 | 130.11 | 11.06 | |
| | Tracking # 1Z2R57A30365344499 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 960944 | Vendor: MGM16 Vend Cat#: 16-6424 | POUCH, SELF SEAL ECON 5.25X10 PO LN 23 | 3 | BX | 3 | 24.55 | 73.65 | 6.26 | |
| | Tracking # 1Z2R57A30365344499 | | | | | | | | |
| | Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 1114380 | Vendor: MOLYCK Vend Cat#: 595300 | DRESSING, BORDER MEPILEX FLEX PO LN 27 | 4 | BX | 4 | 32.05 | 128.20 | 10.90 | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 37950145 | PO Number 01242022EMP | Invoice Date 01/24/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Tracking # 1Z2R57A30365344499<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 403360 | Vendor: ETHSPC<br>Vend Cat#: 1972 | SPONGE, GELATIN SURGIFOAM 2CMX<br>PO LN 30 | 8 | EA | 8 | 7.45 | 59.60 | 5.07 | |
| | Tracking # 1Z2R57A30365344499<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 487433 | Vendor: MGM43<br>Vend Cat#: 43-1-776 | FORCEP, ADSON TISS SG DEL 1X2T<br>PO LN 36 | 16 | EA | 16 | 38.13 | 610.08 | 51.86 | |
| | Tracking # 1Z2R57A30365344499<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 725645 | Vendor: AMREGT<br>Vend Cat#: & 00517072001 | BETAMETHASONE SOD PHOS/ACE, MD<br>PO LN 41 | 6 | EA | 6 | 40.13 | 240.78 | .00 | |
| | Tracking # 1Z2R57A30365344499<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| 927287 | Vendor: 9FERN<br>Vend Cat#: 00496052306 | BANDAGE, LIQ ADH MASTISOL 2OZ<br>PO LN 42 | 4 | EA | 4 | 34.52 | 138.08 | 11.74 | |
| | Tracking # 1Z2R57A30365344499<br>Shipped: 01/24/2022 From: Kansas City | | | | | | | | |
| | | FUEL SURCHARGE<br>PO LN 43 | 1 | EA | 1 | 1.35 | 1.35 | .11 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $130.54 | $20.08 | $20.08 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $2,249.00 | $0.00 | $170.70 | $2,419.70 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1 RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **58272375** | **Invoice Number** | **37953012** |
| **Sales Order Date** | **01/24/2022** | **Invoice Date** | **01/24/2022** |
| **PO Number** | **01242022EMP** | **Payment Due Date** | **03/25/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$58.48** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 1 | 7 | PK | 7 | 7.70 | 53.90 | 4.58 | |

Shipped: 01/24/2022 From: Dallas Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $3.50 | $0.54 | $0.54 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $53.90 | $0.00 | $4.58 | $58.48 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **37953012** | **Date** | **01/24/2022** |
| | **Terms** | | **AR NET 60** |
| **Pay This Amount Before** | **03/25/2022** | | **$58.48** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 3

RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **59185590** | **Invoice Number** | **38454548** |
| **Sales Order Date** | **02/03/2022** | **Invoice Date** | **02/03/2022** |
| **PO Number** | **Kylie** | **Payment Due Date** | **04/04/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$3,589.09** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 1031795 | Vendor: MGM16 Vend Cat#: 16-N251 | NEEDLE, HYPO TW 25GX1" (100/BX PO LN 1 | 15 | BX | 15 PO# KYLIE | 8.45 | 126.75 | 11.34 | |
| | Tracking # 1Z2R57A30365528522 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 854368 | Vendor: MGM16 Vend Cat#: 1635 | BLADE, SURG CARBON STEEL STR # PO LN 2 | 5 | BX | 0 | 30.91 | .00 | .00 | |
| 1107575 | Vendor: MGM18 Vend Cat#: 18-917 | PILLOWCASE, DISP STD WHT 21"X3 PO LN 3 | 4 | CS | 4 PO# KYLIE | 21.53 | 86.12 | 7.71 | |
| | Tracking # 1Z2R57A30365528531 1Z2R57A30365528540 1Z2R57A30365528559 | | | | | | | | |
| | Tracking # 1Z2R57A30365528568 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 1077277 | Vendor: ARMDPH NDC Num: & 55150025050 | BUPIVACAINE, MDV 0.50% 50ML (2 PO LN 4 | 1 | CT | 0 | 123.38 | .00 | .00 | |
| 143490 | Vendor: CONMED Vend Cat#: 130309A | PENCIL, ELECTROSURG HND CNTL W PO LN 5 | 5 | CS | 5 PO# KYLIE | 158.07 | 790.35 | 70.74 | |
| | Tracking # 1Z2R57A30365528157 1Z2R57A30365528273 | | | | | | | | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **38454548** | **Date** | **02/03/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **04/04/2022** | | **$3,589.09** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 38454548 | PO Number Kylie | Invoice Date 02/03/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 516461 | Vendor: CARDCV Vend Cat#: 441402 | SPONGE, DERMACEA ALL PURP 4X4 PO LN 6 | 8 | CS | 3 PO# KYLIE | 24.47 | 73.41 | 6.57 | |
| | Tracking # 1Z2R57A30365528273 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 7 | 50 | PK | 0 PO# KYLIE | 7.33 | .00 | .00 | |
| 2612 | Vendor: ETHCON Vend Cat#: 662G | SUTURE, ETHLON BLK MONO 4-0 1 PO LN 8 | 4 | BX | 4 PO# KYLIE | 71.01 | 284.04 | .00 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 444657 | Vendor: USSUT Vend Cat#: SN-666 | SUTURE, MONOSOFT 2.0 36" BLK C PO LN 9 | 1 | BX | 0 | 101.62 | .00 | .00 | |
| 923621 | Vendor: TISSUE Vend Cat#: C0069090 | SUTURE, NOVOSYN UD 2/0 VICRYL PO LN 10 | 1 | BX | 0 | 172.63 | .00 | .00 | |
| 257803 | Vendor: 9PERSN Vend Cat#: & 00096070737 | DRYSOL, SOL 20% 37.5ML (1/EA) PO LN 11 | 7 | EA | 7 PO# KYLIE | 11.97 | 83.79 | .00 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 466870 | Vendor: MGM16 Vend Cat#: 16-4812 | BANDAGE, ADHSV FABR SPOT 1" (1 PO LN 12 | 3 | CS | 3 PO# KYLIE | 92.59 | 277.77 | 24.86 | |
| | Tracking # 1Z2R57A30365528335 1Z2R57A30365528577 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 854752 | Vendor: MGM16 Vend Cat#: 986 | SWABSTICK, PVP STR (1/PK 50PK/ PO LN 13 | 1 | BX | 0 PO# KYLIE | 9.77 | .00 | .00 | |
| 508716 | Vendor: MGM16 Vend Cat#: 24-106 | APPLICATOR, COTTON TIP N/S 6" PO LN 14 | 12 | BX | 12 PO# KYLIE | 12.16 | 145.92 | 13.06 | |
| | Tracking # 1Z2R57A30365528335 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 1031794 | Vendor: MGM16 Vend Cat#: 16-N231 | NEEDLE, HYPO TW 23GX1" (100/BX PO LN 15 | 5 | BX | 5 PO# KYLIE | 9.25 | 46.25 | 4.14 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 38454548 | PO Number Kylie | Invoice Date 02/03/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 661789 | Vendor: MGM19 Vend Cat#: 19-0752 | MARKER, SKIN REG STR LF RULER/ PO LN 16 | 1 | BX | 1 PO# KYLIE | 41.56 | 41.56 | 3.72 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 927287 | Vendor: 9FERN Vend Cat#: 00496052306 | BANDAGE, LIQ ADH MASTISOL 2OZ PO LN 17 | 2 | EA | 2 PO# KYLIE | 34.52 | 69.04 | 6.18 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 565780 | Vendor: JOHCON Vend Cat#: 10312547238134 | POLYSPORIN, OINT 1/32OZ (12BX/ PO LN 18 | 1 | CS | 1 PO# KYLIE | 461.03 | 461.03 | 41.26 | |
| | Tracking # 1Z2R57A30365528335 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 10119 | Vendor: CARDCV Vend Cat#: 6017 | DRESSING, TELFA ADHSV STR 2"X PO LN 19 | 1 | CS | 0 PO# KYLIE | 274.59 | .00 | .00 | |
| 1181517 | Vendor: 9NORST Vend Cat#: & 16714015001 | TRIAMCINOLONE ACETONIDE, MDV 4 PO LN 20 | 5 | EA | 5 PO# KYLIE | 62.66 | 313.30 | .00 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 725645 | Vendor: AMREGT Vend Cat#: & 00517072001 | BETAMETHASONE SOD PHOS/ACE, MD PO LN 21 | 3 | EA | 3 PO# KYLIE | 40.13 | 120.39 | .00 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 1184500 | Vendor: HOSPLG Vend Cat#: & 00409662514 | SODIUM BICARB, SDV 8.4% 1MEQ/M PO LN 22 | 1 | PK | 1 PO# KYLIE | 337.69 | 337.69 | .00 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 684274 | Vendor: 3M Vend Cat#: 1584 | BANDAGE, COBAN ELAS TAN 4"X5YD PO LN 23 | 1 | BX | 1 PO# KYLIE | 52.15 | 52.15 | 4.67 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| 836200 | Vendor: 3M Vend Cat#: 9680 | BLADE, SURG CLIPPER PROFESSION PO LN 24 | 1 | CS | 0 PO# KYLIE | 141.67 | .00 | .00 | |
| 854368 | Vendor: MGM16 Vend Cat#: 1635 | BLADE, SURG CARBON STEEL STR # PO LN 25 | 1 | BX | 0 | 30.91 | .00 | .00 | |
| 916491 | Vendor: 9FREKB NDC Num: & 63323049227 | XYLOCAINE MPF, SDV 1% 2ML (25/ PO LN 26 | 1 | CT | 1 PO# KYLIE | 83.81 | 83.81 | .00 | |
| | Tracking # 1Z2R57A30365531741 | | | | | | | | |
| | Shipped: 02/04/2022 From: Kansas City | | | | | | | | |
| | | FUEL SURCHARGE PO LN 27 | 1 | EA | 1 PO# KYLIE | 1.35 | 1.35 | .12 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $141.17 | $21.71 | $31.49 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $3,394.72 | $0.00 | $194.37 | $3,589.09 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

**Invoice**

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

**Page 1 of 1** RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **59185590** | **Invoice Number** | **38465406** |
| **Sales Order Date** | **02/03/2022** | **Invoice Date** | **02/04/2022** |
| **PO Number** | **Kylie** | **Payment Due Date** | **04/05/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$399.30** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 7 | 50 | PK | 50 PO# KYLIE | 7.33 | 366.50 | 32.80 | |

Shipped: 02/04/2022 From: Dallas Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $23.82 | $3.67 | $5.31 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $366.50 | $0.00 | $32.80 | $399.30 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

**Invoice**

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **38465406** | **Date** | **02/04/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **04/05/2022** | | **$399.30** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 2

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **60241757** | **Invoice Number** | **39016839** |
| **Sales Order Date** | **02/17/2022** | **Invoice Date** | **02/17/2022** |
| **PO Number** | **Kylie** | **Payment Due Date** | **04/18/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$441.37** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 11 | 20 | PK | 20 PO# KYLIE | 7.33 | 146.60 | 13.12 | |
| | Tracking # 1Z7E08560352713190 | | | | | | | | |
| | Shipped: 02/17/2022 From: Dallas Via: UPS GROUND | | | | | | | | |
| 864638 | Vendor: MGM138 Vend Cat#: 2201 | DRESSING, XEROFORM 1X8 (50/BX PO LN 22 | 7 | BX | 7 PO# KYLIE | 36.93 | 258.51 | 23.14 | |
| | Tracking # 1Z7E08560352711825 1Z7E08560352713190 | | | | | | | | |
| | Shipped: 02/17/2022 From: Dallas Via: UPS GROUND | | | | | | | | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| **$26.32** | **$4.06** | **$5.88** | **$0.00** | **$0.00** |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **39016839** | **Date** | **02/17/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **04/18/2022** | | **$441.37** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 2 of 2

Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 39016839 | PO Number Kylie | Invoice Date 02/17/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $405.11 | $0.00 | $36.26 | $441.37 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 2

RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **60263370** | **Invoice Number** | **39048484** |
| **Sales Order Date** | **02/17/2022** | **Invoice Date** | **02/18/2022** |
| **PO Number** | **02.17.22 EMP** | **Payment Due Date** | **04/19/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$174.36** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS<br>Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK)<br>PO LN 12 | 1 | PK | 1 | 7.70 | 7.70 | .65 | |
| | Tracking # 1Z7E08560352725267<br>Shipped: 02/18/2022 From: Dallas Via: UPS GROUND | | | | | | | | |
| 307872 | Vendor: MICFLX<br>Vend Cat#: MF-300-M | GLOVE, EXAM LTX MED N/S (100/B<br>PO LN 28 | 1 | CS | 1 | 153.00 | 153.00 | 13.01 | |
| | Tracking # 1Z7E08560352729389<br>Shipped: 02/18/2022 From: Dallas Via: UPS GROUND | | | | | | | | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| **$10.44** | **$1.61** | **$1.61** | **$0.00** | **$0.00** |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **39048484** | **Date** | **02/18/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **04/19/2022** | | **$174.36** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 39048484 | PO Number 02.17.22 EMP | Invoice Date 02/18/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $160.70 | $0.00 | $13.66 | $174.36 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

 RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **61953209** | **Invoice Number** | **39911577** |
| **Sales Order Date** | **03/11/2022** | **Invoice Date** | **03/11/2022** |
| **PO Number** | **KYLIE** | **Payment Due Date** | **05/10/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$2,349.67** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 862369 | Vendor: MGM22 Vend Cat#: 471 | SHEATH, HANDPIECE STR 36" (25/ PO LN 1 | 8 | BX | 8 | 73.16 | 585.28 | 52.38 | |
| | Tracking # 1Z2R57A30366095097 Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 1065318 | Vendor: SNCAST Vend Cat#: 4209 | TAPE, DRESSING HYPAFIX RETENTI PO LN 5 | 1 | CS | 1 | 345.96 | 345.96 | 30.96 | |
| | Tracking # 1Z2R57A30366095079 Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 146731 | Vendor: SKLAR Vend Cat#: 10-1635 | LUBRICANT, INSTR PO LN 9 | 1 | GL | 1 | 40.91 | 40.91 | 3.66 | |
| | Tracking # 1Z2R57A30366095408 Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 167694 | Vendor: CARDCV Vend Cat#: 8884417601 | GAUZE, CISION DRSNG STR 1"X8" PO LN 11 | 1 | BX | 1 | 53.18 | 53.18 | 4.76 | |
| | Tracking # 1Z2R57A30366095097 | | | | | | | | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **39911577** | **Date** | **03/11/2022** |
| | **Terms** | | **AR NET 60** |
| **Pay This Amount Before** | **05/10/2022** | | **$2,349.67** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 39911577 | PO Number KYLIE | Invoice Date 03/11/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 1114380 | Vendor: MOLYCK Vend Cat#: 595300 | DRESSING, BORDER MEPILEX FLEX PO LN 13 | 5 | BX | 5 | 39.22 | 196.10 | 17.55 | |
| | Tracking # 1Z2R57A30366095097 | | | | | | | | |
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 927287 | Vendor: 9FERN Vend Cat#: 00496052306 | BANDAGE, LIQ ADH MASTISOL 2OZ PO LN 14 | 6 | EA | 6 | 34.52 | 207.12 | 18.54 | |
| | Tracking # 1Z2R57A30366095097 | | | | | | | | |
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 1065403 | Vendor: MGM14 Vend Cat#: 14-6NPNK6 | GLOVE, EXAM NTRL LG N/S PNK 3. PO LN 15 | 5 | BX | 5 | 29.41 | 147.05 | 13.16 | |
| | Tracking # 1Z2R57A30366095097 | | | | | | | | |
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| 99422 | Vendor: ETHCON Vend Cat#: J496G | SUTURE, VICRYL UD BR CT 4-0 1 PO LN 18 | 3 | BX | 3 | 210.53 | 631.59 | .00 | |
| | Tracking # 1Z2R57A30366095097 | | | | | | | | |
| | Shipped: 03/11/2022 From: Kansas City | | | | | | | | |
| | | FUEL SURCHARGE PO LN 20 | 1 | EA | 1 | 1.35 | 1.35 | .12 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $102.51 | $15.76 | $22.86 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $2,208.54 | $0.00 | $141.13 | $2,349.67 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1 RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **61953209** | **Invoice Number** | **39912110** |
| **Sales Order Date** | **03/11/2022** | **Invoice Date** | **03/11/2022** |
| **PO Number** | **KYLIE** | **Payment Due Date** | **05/10/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$159.72** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 4 | 20 | PK | 20 | 7.33 | 146.60 | 13.12 | |

Tracking # 1Z7E08560353427257
Shipped: 03/11/2022 From: Dallas Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $9.52 | $1.47 | $2.13 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $146.60 | $0.00 | $13.12 | $159.72 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **39912110** | **Date** | **03/11/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **05/10/2022** | | **$159.72** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL SURGICAL INC (BARTLETT)
375 SPITZER ROAD
BARTLETT,IL 60103
SHIPPED FROM LICENSE: 5-115068

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **61953209** | **Invoice Number** | **39922956** |
| **Sales Order Date** | **03/11/2022** | **Invoice Date** | **03/11/2022** |
| **PO Number** | **KYLIE** | **Payment Due Date** | **05/10/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$112.83** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 927287 | Vendor: 9FERN Vend Cat#: 00496052306 | BANDAGE, LIQ ADH MASTISOL 2OZ PO LN 14 | 3 | EA | 3 | 34.52 | 103.56 | 9.27 | |

Shipped: 03/11/2022 From: MMS Chicago Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $6.73 | $1.04 | $1.50 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $103.56 | $0.00 | $9.27 | $112.83 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **39922956** | **Date** | **03/11/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **05/10/2022** | | **$112.83** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

# Invoice

Page 1 of 2
RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 62297320
ADVANCED DERMATOLOGY &SKIN CANCER CTR PA
210 W 13TH ST
OTTAWA KS 66067-3545
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **63975289** | **Invoice Number** | **40968049** |
| **Sales Order Date** | **04/07/2022** | **Invoice Date** | **04/07/2022** |
| **PO Number** | **040722EMP** | **Payment Due Date** | **06/06/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$425.84** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 929309 | Vendor: METREX<br>Vend Cat#: 10-4000<br>Tracking # 1Z2R57A30366498830<br>Shipped: 04/07/2022 From: Kansas City | DETERGENT, ENZYMATIC METRIZYME<br>PO LN 11 | 1 | CS | 1 | 185.26 | 185.26 | 17.78 | |
| 1002261 | Vendor: STLBMD<br>Vend Cat#: NB0507<br>Tracking # 1Z2R57A30366498849<br>Shipped: 04/07/2022 From: Kansas City | FORMALIN, NEUTRAL BUFFERED PRE<br>PO LN 17 | 3 | CS | 3 | 37.02 | 111.06 | 10.66 | |
| 927287 | Vendor: 9FERN<br>Vend Cat#: 00496052306<br>Tracking # 1Z2R57A30366498849<br>Shipped: 04/07/2022 From: Kansas City | BANDAGE, LIQ ADH MASTISOL 2OZ<br>PO LN 21 | 1 | EA | 1 | 34.52 | 34.52 | 3.31 | |
| 944362 | Vendor: MGM115<br>Vend Cat#: 100197<br>Tracking # 1Z2R57A30366498849 | TAPE, TRANS PREM 1"X10YDS (12/<br>PO LN 25 | 4 | BX | 4 | 13.79 | 55.16 | 5.30 | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **40968049** | **Date** | **04/07/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **06/06/2022** | | **$425.84** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 2 of 2
RCHE10PD01

Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY &SKIN CANCER CTR PA
210 W 13TH ST
OTTAWA KS 66067-3545
REGULATORY LICENSE: 04-26086

| Invoice Number 40968049 | PO Number 040722EMP | Invoice Date 04/07/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| Shipped: 04/07/2022 From: Kansas City | | | | | | | | | |
| | | FUEL SURCHARGE<br>PO LN 26 | 1 | EA | 1 | 2.55 | 2.55 | .24 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $25.24 | $5.84 | $6.21 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $388.55 | $0.00 | $37.29 | $425.84 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

**Page 1 of 3**

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **64043804** | **Invoice Number** | **41014249** |
| **Sales Order Date** | **04/07/2022** | **Invoice Date** | **04/08/2022** |
| **PO Number** | **4/7/2022** | **Payment Due Date** | **06/07/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$10,854.20** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 1065401 | Vendor: MGM14 Vend Cat#: 14-6NPNK2 | GLOVE, EXAM NTRL SM N/S PNK 3. PO LN 1 | 20 | BX | 20 | 29.41 | 588.20 | 52.64 | |
| | Tracking # 1Z2R57A30366519147 1Z2R57A30366519156 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 1065402 | Vendor: MGM14 Vend Cat#: 14-6NPNK4 | GLOVE, EXAM NTRL MED N/S PNK 3 PO LN 2 | 20 | BX | 20 | 29.41 | 588.20 | 52.64 | |
| | Tracking # 1Z2R57A30366518942 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 1065403 | Vendor: MGM14 Vend Cat#: 14-6NPNK6 | GLOVE, EXAM NTRL LG N/S PNK 3. PO LN 3 | 20 | BX | 20 | 29.41 | 588.20 | 52.64 | |
| | Tracking # 1Z2R57A30366518979 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 516461 | Vendor: CARDCV Vend Cat#: 441402 | SPONGE, DERMACEA ALL PURP 4X4 PO LN 4 | 10 | CS | 0 | 24.47 | .00 | .00 | |
| 940552 | Vendor: MGM22 Vend Cat#: 243 | CAUTERY, HI-TEMP LOOP TIP PO LN 5 | 3 | BX | 3 | 117.49 | 352.47 | 31.55 | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **41014249** | **Date** | **04/08/2022** |
| | **Terms** | | **AR NET 60** |
| **Pay This Amount Before** | **06/07/2022** | | **$10,854.20** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

**Invoice**

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 41014249 | PO Number 4/7/2022 | Invoice Date 04/08/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Tracking # 1Z2R57A30366518782 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 194823 | Vendor: USSURG<br>Vend Cat#: E7507 | PAD, GROUNDING PATIENT RETURN<br>PO LN 6 | 7 | CS | 7 | 328.17 | 2297.19 | 205.60 | |
| | Tracking # 1Z2R57A30366518988 1Z2R57A30366519012 1Z2R57A30366519049 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 143490 | Vendor: CONMED<br>Vend Cat#: 130309A | PENCIL, ELECTROSURG HND CNTL W<br>PO LN 7 | 5 | CS | 5 | 158.07 | 790.35 | 70.74 | |
| | Tracking # 1Z2R57A30366518988 1Z2R57A30366519058 1Z2R57A30366519094 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 1065318 | Vendor: SNCAST<br>Vend Cat#: 4209 | TAPE, DRESSING HYPAFIX RETENTI<br>PO LN 8 | 2 | CS | 2 | 345.96 | 691.92 | 61.93 | |
| | Tracking # 1Z2R57A30366519101 1Z2R57A30366519110 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 99421 | Vendor: ETHCON<br>Vend Cat#: J494G | SUTURE, VICRYL UD BR CT 4-0 1<br>PO LN 10 | 10 | BX | 10 | 167.72 | 1677.20 | .00 | |
| | Tracking # 1Z2R57A30366518773 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 512816 | Vendor: 9PERSN<br>NDC Num: & 00096070760 | DRYSOL, DAB-O-MATIC, SOL 20% 6<br>PO LN 11 | 10 | EA | 6 | 18.75 | 112.50 | .00 | |
| | Tracking # 1Z2R57A30366519389 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 1181515 | Vendor: 9NORST<br>Vend Cat#: & 16714014001 | TRIAMCINOLONE ACETONIDE, MDV 4<br>PO LN 12 | 5 | EA | 5 | 24.54 | 122.70 | .00 | |
| | Tracking # 1Z2R57A30366519389 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |
| 725645 | Vendor: AMREGT<br>Vend Cat#: & 00517072001 | BETAMETHASONE SOD PHOS/ACE, MD<br>PO LN 13 | 5 | EA | 5 | 40.13 | 200.65 | .00 | |
| | Tracking # 1Z2R57A30366518773 | | | | | | | | |
| | Shipped: 04/08/2022 From: Kansas City | | | | | | | | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 41014249 | PO Number 4/7/2022 | Invoice Date 04/08/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 555549 | Vendor: VISCOT Vend Cat#: 1451-1000 | PEN, MINI SURGICAL MARKING SIG PO LN 14 | 1 | CS | 0 | 290.99 | .00 | .00 | |
| 927287 | Vendor: 9FERN Vend Cat#: 00496052306 Tracking # 1Z2R57A30366518773 Shipped: 04/08/2022 From: Kansas City | BANDAGE, LIQ ADH MASTISOL 2OZ PO LN 16 | 10 | EA | 10 | 34.52 | 345.20 | 30.90 | |
| 1195996 | Vendor: MOLYCK Vend Cat#: 581200 Tracking # 1Z2R57A30366519389 Shipped: 04/08/2022 From: Kansas City | DRESSING, BORDER FLEX LITE 3"X PO LN 17 | 5 | BX | 5 | 29.24 | 146.20 | 13.08 | |
| 1065404 | Vendor: MGM14 Vend Cat#: 14-6NPNK8 Tracking # 1Z2R57A30366519129 1Z2R57A30366519389 Shipped: 04/08/2022 From: Kansas City | GLOVE, EXAM NTRL XL N/S PNK 3. PO LN 18 | 20 | BX | 20 | 29.41 | 588.20 | 52.64 | |
| 1034507 | Vendor: MGM168 Vend Cat#: S662GX Tracking # 1Z2R57A30366518782 1Z2R57A30366519389 Shipped: 04/08/2022 From: Kansas City | SUTURE, 4-0 NYLON 18" C-13 (12 PO LN 19 | 10 | BX | 10 | 30.95 | 309.50 | .00 | |
| 68107 | Vendor: MGM16 Vend Cat#: 25-515 Tracking # 1Z2R57A30366519165 1Z2R57A30366519174 Shipped: 04/08/2022 From: Kansas City | DRAPE, LINED POLY STR WHT NONF PO LN 20 | 2 | CS | 2 | 128.83 | 257.66 | 23.06 | |
| 724984 | Vendor: BRSDRF Vend Cat#: 072140006747 Tracking # 1Z2R57A30366519138 Shipped: 04/08/2022 From: Kansas City | OINTMENT, AQUAPHOR HEALING .9G PO LN 21 | 1 | CS | 1 | 502.67 | 502.67 | 44.99 | |
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 22 | 24 | PK | 0 | 7.33 | .00 | .00 | |
| | | FUEL SURCHARGE PO LN 23 | 1 | EA | 1 | 2.55 | 2.55 | .23 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $503.03 | $77.38 | $112.23 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $10,161.56 | $0.00 | $692.64 | $10,854.20 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 62297320

ADVANCED DERMATOLOGY &SKIN CANCER CTR PA
210 W 13TH ST
OTTAWA KS 66067-3545
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **63975289** | **Invoice Number** | **41437747** |
| **Sales Order Date** | **04/07/2022** | **Invoice Date** | **04/20/2022** |
| **PO Number** | **040722EMP** | **Payment Due Date** | **06/19/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$8.03** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 19 | 1 | PK | 1 | 7.33 | 7.33 | .70 | |

Tracking # 1Z7E08560354649640

Shipped: 04/20/2022 From: Dallas Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $0.47 | $0.11 | $0.12 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $7.33 | $0.00 | $0.70 | $8.03 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **41437747** | **Date** | **04/20/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **06/19/2022** | | **$8.03** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180

Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **64043804** | **Invoice Number** | **41437750** |
| **Sales Order Date** | **04/07/2022** | **Invoice Date** | **04/20/2022** |
| **PO Number** | **4/7/2022** | **Payment Due Date** | **06/19/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$7.99** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS<br>Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK)<br>PO LN 22 | 1 | PK | 1 | 7.33 | 7.33 | .66 | |

Tracking # 1Z7E08560354649999
Shipped: 04/20/2022 From: Dallas Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $0.48 | $0.07 | $0.11 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $7.33 | $0.00 | $0.66 | $7.99 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **41437750** | **Date** | **04/20/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **06/19/2022** | | **$7.99** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1 RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **64043804** | **Invoice Number** | **41494043** |
| **Sales Order Date** | **04/07/2022** | **Invoice Date** | **04/21/2022** |
| **PO Number** | **4/7/2022** | **Payment Due Date** | **06/20/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$183.68** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK) PO LN 22 | 23 | PK | 23 | 7.33 | 168.59 | 15.09 | |

Shipped: 04/21/2022 From: Dallas Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $10.96 | $1.69 | $2.44 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $168.59 | $0.00 | $15.09 | $183.68 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **41494043** | **Date** | **04/21/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **06/20/2022** | | **$183.68** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Shipped From: RCHE1DPD01

MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 205

Bill To: 121525

Shipped To: 66772285

ADVANCED DERMATOLOGY & SKIN CANCER CTR P
747 N BURLINGTON AVE STE 312
HASTINGS NE 68901-4478
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **65583987** | **Invoice Number** | **41765586** |
| **Sales Order Date** | **04/28/2022** | **Invoice Date** | **04/28/2022** |
| **PO Number** | **Michelle 04.28.2022** | **Payment Due Date** | **06/27/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$2,743.46** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 1083090 | Vendor: MGM16 Vend Cat#: 4873 | FOAM, ADH SIL LT W/BORDER 4"X4 PO LN 1 | 1 | BX | 1 | 50.38 | 50.38 | 3.53 | |
| | Tracking # 1Z2R57A30366801644 Shipped: 04/28/2022 From: Kansas City | | | | PO# MICHELLE 04.28.2022 | | | | |
| 99421 | Vendor: ETHCON Vend Cat#: J494G | SUTURE, VICRYL UD BR CT 4-0 1 PO LN 2 | 3 | BX | 3 | 167.72 | 503.16 | .00 | |
| | Tracking # 1Z2R57A30366801644 Shipped: 04/28/2022 From: Kansas City | | | | PO# MICHELLE 04.28.2022 | | | | |
| 516461 | Vendor: CARDCV Vend Cat#: 441402 | SPONGE, DERMACEA ALL PURP 4X4 PO LN 3 | 2 | CS | 2 | 24.47 | 48.94 | 3.43 | |
| | Tracking # 1Z2R57A30366801699 Shipped: 04/28/2022 From: Kansas City | | | | PO# MICHELLE 04.28.2022 | | | | |
| 862369 | Vendor: MGM22 Vend Cat#: 471 | SHEATH, HANDPIECE STR 36" (25/ PO LN 4 | 4 | BX | 4 | 73.16 | 292.64 | 20.48 | |
| | Tracking # 1Z2R57A30366801644 | | | | PO# MICHELLE 04.28.2022 | | | | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **41765586** | **Date** | **04/28/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **06/27/2022** | | **$2,743.46** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY & SKIN CANCER CTR P
747 N BURLINGTON AVE STE 312
HASTINGS NE 68901-4478
REGULATORY LICENSE: 04-26086

| Invoice Number 41765586 | PO Number Michelle 04.28.2022 | Invoice Date 04/28/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 143490 | Vendor: CONMED<br>Vend Cat#: 130309A | PENCIL, ELECTROSURG HND CNTL W<br>PO LN 5 | 2 | CS | 2<br>PO# MICHELLE 04.28.2022 | 158.07 | 316.14 | 22.13 | |
| | Tracking # 1Z2R57A30366801699 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 1065318 | Vendor: SNCAST<br>Vend Cat#: 4209 | TAPE, DRESSING HYPAFIX RETENTI<br>PO LN 6 | 1 | CS | 1<br>PO# MICHELLE 04.28.2022 | 345.96 | 345.96 | 24.22 | |
| | Tracking # 1Z2R57A30366801895 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 485127 | Vendor: PURMED<br>Vend Cat#: 806-WCXL | APPLICATOR, CTN TIP 5/16" (50/<br>PO LN 7 | 2 | BX | 0<br>PO# MICHELLE 04.28.2022 | 17.35 | .00 | .00 | |
| 1034507 | Vendor: MGM168<br>Vend Cat#: S662GX | SUTURE, 4-0 NYLON 18" C-13 (12<br>PO LN 8 | 6 | BX | 6<br>PO# MICHELLE 04.28.2022 | 30.95 | 185.70 | .00 | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 466180 | Vendor: USSUT<br>Vend Cat#: SN-5696G | SUTURE, MONOSOF 6-0 18" P-13<br>PO LN 9 | 6 | BX | 6<br>PO# MICHELLE 04.28.2022 | 68.67 | 412.02 | .00 | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 927287 | Vendor: 9FERN<br>Vend Cat#: 00496052306 | BANDAGE, LIQ ADH MASTISOL 2OZ<br>PO LN 10 | 6 | EA | 6<br>PO# MICHELLE 04.28.2022 | 34.52 | 207.12 | 14.50 | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 1002261 | Vendor: STLBMD<br>Vend Cat#: NB0507 | FORMALIN, NEUTRAL BUFFERED PRE<br>PO LN 11 | 2 | CS | 2<br>PO# MICHELLE 04.28.2022 | 37.02 | 74.04 | 5.18 | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |
| 347468 | Vendor: 3M<br>Vend Cat#: 9660 | BLADE, CLIPPER ASSEMBLY (50/CS<br>PO LN 12 | 1 | CS | 1<br>PO# MICHELLE 04.28.2022 | 197.35 | 197.35 | 13.81 | |
| | Tracking # 1Z2R57A30366801644 | | | | | | | | |
| | Shipped: 04/28/2022 From: Kansas City | | | | | | | | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY & SKIN CANCER CTR P
747 N BURLINGTON AVE STE 312
HASTINGS NE 68901-4478
REGULATORY LICENSE: 04-26086

| Invoice Number 41765586 | PO Number Michelle 04.28.2022 | Invoice Date 04/28/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | | FUEL SURCHARGE | 1 | EA | 1 | 2.55 | 2.55 | .18 | |
| | | PO LN 13 | | | PO# MICHELLE 04.28.2022 | | | | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $84.43 | $0.00 | $23.03 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $2,636.00 | $0.00 | $107.46 | $2,743.46 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 2

RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 205

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 66772285
ADVANCED DERMATOLOGY & SKIN CANCER CTR P
747 N BURLINGTON AVE STE 312
HASTINGS NE 68901-4478
REGULATORY LICENSE: 04-26086

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **67677353** | **Invoice Number** | **42850130** |
| **Sales Order Date** | **05/25/2022** | **Invoice Date** | **05/25/2022** |
| **PO Number** | **05252022NE** | **Payment Due Date** | **07/24/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$937.82** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 724984 | Vendor: BRSDRF Vend Cat#: 072140006747 | OINTMENT, AQUAPHOR HEALING 9G PO LN 1 | 2 | PK | 2 | 42.17 | 84.34 | 5.90 | |
| | Tracking # 1Z2R57A30367202227 Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 520118 | Vendor: MGM37 Vend Cat#: 37-6270 | SALINE, IRR SOL STR 250ML (24/ PO LN 2 | 1 | CS | 0 | 56.35 | .00 | .00 | |
| 565780 | Vendor: JOHCON Vend Cat#: 10312547238134 | POLYSPORIN, OINT 1/32OZ (12BX/ PO LN 3 | 1 | CS | 1 | 464.16 | 464.16 | 32.49 | |
| | Tracking # 1Z2R57A30367199938 Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 369610 | Vendor: BDDIAG Vend Cat#: 220116 | SWAB, TRANSPORT AMIES MED (50/ PO LN 4 | 1 | PK | 1 | 48.96 | 48.96 | 3.43 | |
| | Tracking # 1Z2R57A30367202227 Shipped: 05/26/2022 From: Kansas City | | | | | | | | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **42850130** | **Date** | **05/25/2022** |
| | **Terms** | | **AR NET 60** |
| **Pay This Amount Before** | **07/24/2022** | | **$937.82** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY & SKIN CANCER CTR P
747 N BURLINGTON AVE STE 312
HASTINGS NE 68901-4478
REGULATORY LICENSE: 04-26086

| Invoice Number 42850130 | PO Number 05252022NE | Invoice Date 05/25/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 10119 | Vendor: CARDCV Vend Cat#: 6017 | DRESSING, TELFA ADHSV STR 2"X PO LN 5 | 1 | CS | 1 | 276.46 | 276.46 | 19.35 | |
| | Tracking # 1Z2R57A30367199938 Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| | | FUEL SURCHARGE PO LN 6 | 1 | EA | 1 | 2.55 | 2.55 | .18 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $48.20 | $0.00 | $13.15 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $876.47 | $0.00 | $61.35 | $937.82 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 3

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **67677040** | **Invoice Number** | **42850133** |
| **Sales Order Date** | **05/25/2022** | **Invoice Date** | **05/25/2022** |
| **PO Number** | **05252022EMP** | **Payment Due Date** | **07/24/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$4,860.18** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 725645 | Vendor: AMREGT Vend Cat#: & 00517072001 | BETAMETHASONE SOD PHOS/ACE, MD PO LN 1 | 6 | EA | 6 | 40.41 | 242.46 | .00 | |
| | Tracking # 1Z2R57A30367201737 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 32727 | Vendor: CARDCV Vend Cat#: 8884414600 | DRESSING, VASELINE FOIL PK STR PO LN 6 | 1 | DZ | 1 | 17.10 | 17.10 | 1.45 | |
| | Tracking # 1Z2R57A30367201737 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 565780 | Vendor: JOHCON Vend Cat#: 10312547238134 | POLYSPORIN, OINT 1/32OZ (12BX/ PO LN 8 | 2 | CS | 2 | 464.16 | 928.32 | 78.91 | |
| | Tracking # 1Z2R57A30367200005 1Z2R57A30367200327 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 171930 | Vendor: ACCTEC Vend Cat#: 74-0002-0000 | BLADE, DBL EDGE S/S (100/BX) PO LN 9 | 8 | BX | 8 | 29.46 | 235.68 | 20.03 | |
| | Tracking # 1Z2R57A30367201737 | | | | | | | | |

# Invoice

MCKESSON

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

RCHE1DPD01

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **42850133** | **Date** | **05/25/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **07/24/2022** | | **$4,860.18** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 42850133 | PO Number 05252022EMP | Invoice Date 05/25/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 143490 | Vendor: CONMED Vend Cat#: 130309A | PENCIL, ELECTROSURG HND CNTL W PO LN 11 | 5 | CS | 5 | 159.14 | 795.70 | 67.63 | |
| | Tracking # 1Z2R57A30367199803 1Z2R57A30367199812 1Z2R57A30367199821 | | | | | | | | |
| | Tracking # 1Z2R57A30367199830 1Z2R57A30367199974 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1034507 | Vendor: MGM168 Vend Cat#: S662GX | SUTURE, 4-0 NYLON 18" C-13 (12 PO LN 13 | 8 | BX | 8 | 31.29 | 250.32 | .00 | |
| | Tracking # 1Z2R57A30367201737 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1031805 | Vendor: MGM16 Vend Cat#: 16-S5C | SYRINGE, LL 5CC (100/BX 20BX/C PO LN 16 | 1 | CS | 1 | 326.62 | 326.62 | 27.76 | |
| | Tracking # 1Z2R57A30367200336 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 164755 | Vendor: MGM18 Vend Cat#: 18-885 | TOWEL, PRO 3PLY/POLY WHT 13X18 PO LN 17 | 1 | CS | 1 | 47.39 | 47.39 | 4.03 | |
| | Tracking # 1Z2R57A30367200005 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 9962 | Vendor: CARDCV Vend Cat#: 1961 | DRESSING, TELFA STR 2"X3" 1'S PO LN 22 | 1 | CS | 1 | 304.33 | 304.33 | 25.87 | |
| | Tracking # 1Z2R57A30367199974 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1031795 | Vendor: MGM16 Vend Cat#: 16-N251 | NEEDLE, HYPO TW 25GX1" (100/BX PO LN 24 | 1 | CS | 1 | 85.40 | 85.40 | 7.26 | |
| | Tracking # 1Z2R57A30367199974 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 304984 | Vendor: 9TEVA Vend Cat#: & 00093314701 | CEPHALEXIN, CAP 500MG (100/BT) PO LN 27 | 1 | BT | 1 | 64.47 | 64.47 | .00 | |
| | Tracking # 1Z2R57A30367201737 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 42850133 | PO Number 05252022EMP | Invoice Date 05/25/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 1158583 | Vendor: 9GREEN<br>Vend Cat#: & 59762219803 | AZITHROMYCIN, TAB 250MG 3X6 (1<br>PO LN 29 | 1 | CT | 1 | 13.25 | 13.25 | .00 | |
| | Tracking # 1Z2R57A30367201737<br>Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 960943 | Vendor: MGM16<br>Vend Cat#: 16-6423 | POUCH, SELF SEAL ECON 3.5X9 (2<br>PO LN 31 | 1 | CS | 1 | 182.53 | 182.53 | 15.52 | |
| | Tracking # 1Z2R57A30367200005<br>Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 512816 | Vendor: 9PERSN<br>NDC Num: & 00096070760 | DRYSOL, DAB-O-MATIC, SOL 20% 6<br>PO LN 33 | 8 | EA | 8 | 18.88 | 151.04 | .00 | |
| | Tracking # 1Z2R57A30367201737<br>Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 466870 | Vendor: MGM16<br>Vend Cat#: 16-4812 | BANDAGE, ADHSV FABR SPOT 1" (1<br>PO LN 35 | 2 | CS | 2 | 93.52 | 187.04 | 15.90 | |
| | Tracking # 1Z2R57A30367200005 1Z2R57A30367200345<br>Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 738650 | Vendor: MOLYCK<br>Vend Cat#: 395290 | DRESSING, BRDR MEPILEX AG 3X3<br>PO LN 36 | 5 | BX | 5 | 50.10 | 250.50 | 21.29 | |
| | Tracking # 1Z2R57A30367201737<br>Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 738653 | Vendor: MOLYCK<br>Vend Cat#: 395390 | DRESSING, BRDR MEPILEX AG 4X4<br>PO LN 37 | 5 | BX | 5 | 79.93 | 399.65 | 33.97 | |
| | Tracking # 1Z2R57A30367201737<br>Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 5762 | Vendor: 3M<br>Vend Cat#: 1527-1 | TAPE, ADHSV TRANSPORE 1"X10YDS<br>PO LN 38 | 4 | BX | 4 | 12.90 | 51.60 | 4.39 | |
| | Tracking # 1Z2R57A30367201737<br>Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| | | FUEL SURCHARGE<br>PO LN 41 | 1 | EA | 1 | 2.55 | 2.55 | .22 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $247.91 | $38.16 | $38.16 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $4,535.95 | $0.00 | $324.23 | $4,860.18 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 2

RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL (ROGERS)
12999 WILFRED LANE STE #100
ROGERS,MN 55374
SHIPPED FROM LICENSE: 5-31292

Bill To: 121525

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **67677040** | **Invoice Number** | **42860700** |
| **Sales Order Date** | **05/25/2022** | **Invoice Date** | **05/26/2022** |
| **PO Number** | **05252022EMP** | **Payment Due Date** | **07/25/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$1,192.29** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 862369 | Vendor: MGM22 Vend Cat#: 471 | SHEATH, HANDPIECE STR 36" (25/ PO LN 14 | 8 | BX | 8 | 74.10 | 592.80 | 50.39 | |
| | Tracking # 1ZY8E8030321617434 Shipped: 05/26/2022 From: Rogers Via: UPS GROUND | | | | | | | | |
| 724984 | Vendor: BRSDRF Vend Cat#: 072140006747 | OINTMENT, AQUAPHOR HEALING 9G PO LN 30 | 1 | CS | 1 | 506.08 | 506.08 | 43.02 | |
| | Tracking # 1ZY8E8030321618273 Shipped: 05/26/2022 From: Rogers Via: UPS GROUND | | | | | | | | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $71.43 | $10.99 | $10.99 | $0.00 | $0.00 |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **42860700** | **Date** | **05/26/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **07/25/2022** | | **$1,192.29** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 42860700 | PO Number 05252022EMP | Invoice Date 05/26/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $1,098.88 | $0.00 | $93.41 | $1,192.29 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 2

RCHE1DPD01

Shipped From:

MCKESSON MEDICAL-SURGICAL INC
4250 PATRIOT DRIVE, STE 100
GRAPEVINE,TX 76051
SHIPPED FROM LICENSE: 5-01634

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **67677040** | **Invoice Number** | **42862684** |
| **Sales Order Date** | **05/25/2022** | **Invoice Date** | **05/26/2022** |
| **PO Number** | **05252022EMP** | **Payment Due Date** | **07/25/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$571.31** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 307874 | Vendor: MICFLX Vend Cat#: MF-300-XL | GLOVE, EXAM LTX XL N/S (100/BX PO LN 25 | 1 | CS | 1 | 154.07 | 154.07 | 13.10 | |
| | Tracking # 1Z7E08560355746524 | | | | | | | | |
| | Shipped: 05/26/2022 From: Dallas Via: UPS GROUND | | | | | | | | |
| 733529 | Vendor: 9BEIRS Vend Cat#: 10356010140 | AQUAPHOR, OINT DUAL .35OZ (2/P PO LN 34 | 48 | PK | 48 | 7.76 | 372.48 | 31.66 | |
| | Tracking # 1Z7E08560355746524 | | | | | | | | |
| | Shipped: 05/26/2022 From: Dallas Via: UPS GROUND | | | | | | | | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $34.24 | $5.26 | $5.26 | $0.00 | $0.00 |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **42862684** | **Date** | **05/26/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **07/25/2022** | | **$571.31** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**

MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 2 of 2

Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 42862684 | PO Number 05252022EMP | Invoice Date 05/26/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $526.55 | $0.00 | $44.76 | $571.31 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **67677137** | **Invoice Number** | **42865204** |
| **Sales Order Date** | **05/25/2022** | **Invoice Date** | **05/26/2022** |
| **PO Number** | **05252022MHK** | **Payment Due Date** | **07/25/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$5,575.97** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 919573 | Vendor: MGM143 Vend Cat#: 100 | PAPER, TABLE SMTH ECON WHT 18" PO LN 3 | 4 | CS | 4 | 29.99 | 119.96 | 10.74 | |
| | Tracking # 1Z2R57A30367206045 1Z2R57A30367206063 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 466870 | Vendor: MGM16 Vend Cat#: 16-4812 | BANDAGE, ADHSV FABR SPOT 1" (1 PO LN 4 | 4 | CS | 4 | 93.52 | 374.08 | 33.48 | |
| | Tracking # 1Z2R57A30367206278 1Z2R57A30367206287 1Z2R57A30367206974 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 466872 | Vendor: MGM16 Vend Cat#: 16-4811 | BANDAGE, ADHSV FABR STRP 1X3 ( PO LN 5 | 5 | CS | 5 | 85.74 | 428.70 | 38.37 | |
| | Tracking # 1Z2R57A30367206278 1Z2R57A30367206287 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1195996 | Vendor: MOLYCK Vend Cat#: 581200 | DRESSING, BORDER FLEX LITE 3"X PO LN 7 | 3 | BX | 3 | 29.44 | 88.32 | 7.90 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **42865204** | **Date** | **05/26/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **07/25/2022** | | **$5,575.97** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 42865204 | PO Number 05252022MHK | Invoice Date 05/26/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 738653 | Vendor: MOLYCK<br>Vend Cat#: 395390 | DRESSING, BRDR MEPILEX AG 4X4<br>PO LN 8 | 5 | BX | 5 | 79.93 | 399.65 | 35.77 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 774188 | Vendor: AME3M<br>Vend Cat#: 2770-1 | TAPE, SILICONE KIND REMOVAL 1"<br>PO LN 9 | 7 | BX | 7 | 47.12 | 329.84 | 29.52 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 508715 | Vendor: MGM16<br>Vend Cat#: 24-103 | APPLICATOR, COTTON TIP N/S 3"<br>PO LN 11 | 5 | BX | 5 | 12.78 | 63.90 | 5.72 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1181515 | Vendor: 9NORST<br>Vend Cat#: & 16714014001 | TRIAMCINOLONE ACETONIDE, MDV 4<br>PO LN 13 | 5 | EA | 5 | 24.74 | 123.70 | .00 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 459558 | Vendor: BMSPHM<br>Vend Cat#: & 049420 | KENALOG-10, VL 10MG/ML 5ML<br>PO LN 14 | 5 | EA | 5 | 13.60 | 68.00 | .00 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 929309 | Vendor: METREX<br>Vend Cat#: 10-4000 | DETERGENT, ENZYMATIC METRIZYME<br>PO LN 15 | 1 | CS | 1 | 194.17 | 194.17 | 17.38 | |
| | Tracking # 1Z2R57A30367206036 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1031788 | Vendor: MGM16<br>Vend Cat#: 16-N181 | NEEDLE, HYPO TW 18GX1" (100/BX<br>PO LN 16 | 5 | BX | 5 | 4.55 | 22.75 | 2.04 | |
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1031800 | Vendor: MGM16<br>Vend Cat#: 16-N3005 | NEEDLE, HYPO RW 30GX1/2" (100/<br>PO LN 17 | 7 | BX | 7 | 19.85 | 138.95 | 12.44 | |

MCKESSON

**Invoice**

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



ROHE10PD01

Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

| Invoice Number 42865204 | PO Number 05252022MHK | Invoice Date 05/26/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Tracking # 1Z2R57A30367207517 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 1031804 | Vendor: MGM16 Vend Cat#: 16-S3C | SYRINGE, LL 3CC (100/BX 24BX/C PO LN 19 | 3 | CS | 3 | 148.34 | 445.02 | 39.83 | |
| | Tracking # 1Z2R57A30367206983 1Z2R57A30367206992 1Z2R57A30367207008 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 565780 | Vendor: JOHCON Vend Cat#: 10312547238134 | POLYSPORIN, OINT 1/32OZ (12BX/ PO LN 25 | 4 | CS | 4 | 464.16 | 1856.64 | 166.17 | |
| | Tracking # 1Z2R57A30367206214 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| 143490 | Vendor: CONMED Vend Cat#: 130309A | PENCIL, ELECTROSURG HND CNTL W PO LN 28 | 3 | CS | 3 | 159.14 | 477.42 | 42.73 | |
| | Tracking # 1Z2R57A30367206045 1Z2R57A30367206063 1Z2R57A30367207017 | | | | | | | | |
| | Shipped: 05/26/2022 From: Kansas City | | | | | | | | |
| | | FUEL SURCHARGE PO LN 30 | 1 | EA | 1 | 2.55 | 2.55 | .23 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $321.24 | $49.43 | $71.65 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $5,133.65 | $0.00 | $442.32 | $5,575.97 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

Page 1 of 1

RCHE1DPD01

Bill To: 121525

Shipped From:
MCKESSON MEDICAL-SURGICAL (ROGERS)
12999 WILFRED LANE STE #100
ROGERS,MN 55374
SHIPPED FROM LICENSE: 5-31292

Shipped To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770
REGULATORY LICENSE: 04-26086

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

TIN: 94-2640465
DUNS: 02-390-4428

Payment / Account Balance Inquires: 1-800-453-5180
Customer Service: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **67677137** | **Invoice Number** | **42874897** |
| **Sales Order Date** | **05/25/2022** | **Invoice Date** | **05/26/2022** |
| **PO Number** | **05252022MHK** | **Payment Due Date** | **07/25/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$551.37** |

Notes: By doing business with McKesson, Customer acknowledges that it is familiar with McKesson's Terms of Sale and is responsible for reviewing in full the complete Terms of Sale that apply to this purchase, located at https://mms.mckesson.com/content/terms-of-sale-primary-care. McKesson's acceptance of Customer's order was expressly conditioned upon Customer's assent to the complete Terms of Sale.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 724984 | Vendor: BRSDRF Vend Cat#: 07214000674 | OINTMENT, AQUAPHOR HEALING .9G PO LN 26 | 1 | CS | 1 | 506.08 | 506.08 | 45.29 | |

Tracking # 1ZY8E8030321618282
Shipped: 05/26/2022 From: Rogers Via: UPS GROUND

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $32.89 | $5.06 | $7.34 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $506.08 | $0.00 | $45.29 | $551.37 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.
PRICING IS CONFIDENTIAL AND PROPRIETARY.

# Invoice

MCKESSON

RCHE1DPD01

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **42874897** | **Date** | **05/26/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **07/25/2022** | | **$551.37** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.
**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



RCHE1DPD01

Shipped From:
MCKESSON MEDICAL-SURGICAL INC(KANSAS CTY
1405 N. CHOUTEAU
KANSAS CITY,MO 64120
SHIPPED FROM LICENSE: 5-01566

Bill To: 121525

ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To: 56138363
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

Payment / Account Balance Inquires Phone: 1-800-453-5180
Customer Service Phone: 1-800-877-1919

| | | | |
|---|---|---|---|
| **Sales Order Number** | **60263370** | **Invoice Number** | **39034926** |
| **Sales Order Date** | **02/17/2022** | **Invoice Date** | **02/17/2022** |
| **PO Number** | **02.17.22 EMP** | **Payment Due Date** | **04/18/2022** |
| **Sales Rep Name** | **NICHOLS, CHRISTOPHER D** | **Invoice Amount** | **$6,820.30** |

Notes: The complete Terms of Sale that apply to this purchase are located at https://mms.mckesson.com/content/terms-of-sale-primary-care. Customer is responsible for reviewing the Terms of Sale in full.

Please contact us regarding electronic payment options at MMS.Treasury@ McKesson.com

**Invoice Detail**

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 565947 | Vendor: HOSPLG Vend Cat#: & 00409733801 | CEFTRIAXONE, SDV 500MG (10/BX) PO LN 1 | 6 | BX | 6 | 12.82 | 76.92 | .00 | |
| | Tracking # 1Z2R57A30365744226 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 381716 | Vendor: HOSPLG NDC Num: & 00409174910 | MARCAINE HCL +EPI, VL 0.5% 10M PO LN 2 | 6 | BX | 0 | 98.92 | .00 | .00 | |
| 488903 | Vendor: USSUT Vend Cat#: SN-5767G | SUTURE, MONOSOFT BLK 6-0 18" P PO LN 3 | 8 | BX | 0 | 52.09 | .00 | .00 | |
| 153825 | Vendor: ETHCON Vend Cat#: 1915G | SUTURE, GUT PL FAST ABSRB 5-0 PO LN 4 | 4 | BX | 4 | 293.25 | 1173.00 | .00 | |
| | Tracking # 1Z2R57A30365744226 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 2983 | Vendor: ETHCON Vend Cat#: 1644G | SUTURE, GUT PL 4-0 18" P-3 (12 PO LN 5 | 4 | BX | 0 | 288.95 | .00 | .00 | |
| 725645 | Vendor: AMREGT Vend Cat#: & 00517072001 | BETAMETHASONE SOD PHOS/ACE, MD PO LN 6 | 10 | EA | 10 | 40.13 | 401.30 | .00 | |

# Invoice

MCKESSON

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233

RCHE1DPD01

| | | | |
|---|---|---|---|
| **Account Number** | **121525** | | |
| **Document Number** | **39034926** | **Date** | **02/17/2022** |
| **Terms** | | | **AR NET 60** |
| **Pay This Amount Before** | **04/18/2022** | | **$6,820.30** |

ADVANCED DERMATOLOGY, P.A.

2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Please contact us regarding electronic payment options at MMS.Treasury@McKesson.com.

**Please Remit To:**
MCKESSON MEDICAL SURGICAL
PO BOX 933027
ATLANTA GA 31193-3027

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 39034926 | PO Number 02.17.22 EMP | Invoice Date 02/17/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 511699 | Vendor: USSUT<br>Vend Cat#: SL-5691G | SUTURE, POLYSORB 4-0 P-13 (12/<br>PO LN 7 | 4 | BX | 4 | 134.98 | 539.92 | .00 | |
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 403360 | Vendor: ETHSPC<br>Vend Cat#: 1972 | SPONGE, GELATIN SURGIFOAM 2CMX<br>PO LN 8 | 1 | EA | 1 | 7.45 | 7.45 | .63 | |
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 505306 | Vendor: SKLAR<br>Vend Cat#: 20-3090 | NEEDLE HOLDER, WEBSTER HVY 5 1<br>PO LN 9 | 1 | EA | 0 | 100.47 | .00 | .00 | |
| 250325 | Vendor: MILTEX<br>Vend Cat#: 8-7 | NEEDLE HOLDER, WEBSTER 4 3/4"<br>PO LN 10 | 1 | EA | 0 | 79.11 | .00 | .00 | |
| 1002261 | Vendor: STLBMD<br>Vend Cat#: NB0507 | FORMALIN, NEUTRAL BUFFERED PRE<br>PO LN 11 | 1 | CS | 1 | 37.26 | 37.26 | 3.17 | |
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 733529 | Vendor: 9BEIRS<br>Vend Cat#: 10356010140 | AQUAPHOR, OINT 0.7OZ (2/PK)<br>PO LN 12 | 1 | PK | 0 | 7.70 | .00 | .00 | |
| 1003250 | Vendor: BD<br>Vend Cat#: 220235 | SWAB, CULTURE MAXV+ AMIES W/O<br>PO LN 13 | 2 | BX | 0 | 58.91 | .00 | .00 | |
| 862369 | Vendor: MGM22<br>Vend Cat#: 471 | SHEATH, HANDPIECE STR 36" (25/<br>PO LN 14 | 8 | BX | 8 | 73.16 | 585.28 | 49.75 | |
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 1202413 | Vendor: HRPHRM<br>Vend Cat#: 6050B | WIPE, PROTECTIVE BARRIER VITUS<br>PO LN 15 | 8 | CS | 0 | 240.35 | .00 | .00 | |
| 404 | Vendor: BD<br>Vend Cat#: 305156 | NEEDLE, HYPO 22GX1 1/2" (100/B<br>PO LN 16 | 1 | CS | 1 | 49.01 | 49.01 | 4.17 | |
| | Tracking # 1Z2R57A30365744226<br>Shipped: 02/18/2022 From: Kansas City | | | | | | | | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 39034926 | PO Number 02.17.22 EMP | Invoice Date 02/17/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 1065318 | Vendor: SNCAST Vend Cat#: 4209 | TAPE, DRESSING HYPAFIX RETENTI PO LN 17 | 2 | CS | 2 | 345.96 | 691.92 | 58.81 | |
| | Tracking # 1Z2R57A30365742264 1Z2R57A30365742273 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 257803 | Vendor: 9PERSN Vend Cat#: & 00096070737 | DRYSOL, SOL 20% 37.5ML (1/EA) PO LN 19 | 10 | EA | 10 | 11.97 | 119.70 | .00 | |
| | Tracking # 1Z2R57A30365744226 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 194823 | Vendor: USSURG Vend Cat#: E7507 | PAD, GROUNDING PATIENT RETURN PO LN 20 | 4 | CS | 4 | 328.17 | 1312.68 | 111.58 | |
| | Tracking # 1Z2R57A30365742282 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 143490 | Vendor: CONMED Vend Cat#: 130309A | PENCIL, ELECTROSURG HND CNTL W PO LN 21 | 4 | CS | 0 | 158.07 | .00 | .00 | |
| 881681 | Vendor: MGM22 Vend Cat#: 233 | TIP, HYFRECATOR SHARP N/S (100 PO LN 22 | 8 | BX | 8 | 59.72 | 477.76 | 40.61 | |
| | Tracking # 1Z2R57A30365754591 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 691382 | Vendor: ASPNSR Vend Cat#: 2554 | RULER, SURG STR 6" (25/BX) PO LN 23 | 4 | BX | 0 | 22.18 | .00 | .00 | |
| 560284 | Vendor: MGM37 Vend Cat#: 37-6240 | SALINE, IRR SOL STR 100ML (48/ PO LN 24 | 2 | CS | 2 | 32.39 | 64.78 | .00 | |
| | Tracking # 1Z2R57A30365742728 1Z2R57A30365742737 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 864638 | Vendor: MGM138 Vend Cat#: 2201 | DRESSING, XEROFORM 1X8 (50/BX PO LN 25 | 3 | BX | 0 | 36.93 | .00 | .00 | |
| 882991 | Vendor: MGM16 Vend Cat#: 1886 | DRESSING, HYDROCOLLOID FILM-BC PO LN 26 | 3 | BX | 3 | 64.30 | 192.90 | 16.40 | |
| | Tracking # 1Z2R57A30365744226 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 882992 | Vendor: MGM16 Vend Cat#: 1887 | DRESSING, HYDROCOLLOID FILM-BC PO LN 27 | 3 | BX | 3 | 60.81 | 182.43 | 15.51 | |
| | Tracking # 1Z2R57A30365754591 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 307872 | Vendor: MICFLX Vend Cat#: MF-300-M | GLOVE, EXAM LTX MED N/S (100/B PO LN 28 | 1 | CS | 0 | 153.00 | .00 | .00 | |
| 886431 | Vendor: MGM16 Vend Cat#: 4842 | FOAM, ADH SIL W/BORDER 3"X3" ( PO LN 29 | 6 | BX | 6 | 47.10 | 282.60 | 24.02 | |
| | Tracking # 1Z2R57A30365744226 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 1175172 | Vendor: MGM16 Vend Cat#: 16-1311 | PUNCH, BIOPSY DISP STR 3MM (25 PO LN 30 | 2 | BX | 2 | 48.86 | 97.72 | 8.31 | |
| | Tracking # 1Z2R57A30365744226 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 172312 | Vendor: 3M Vend Cat#: 1582 | BANDAGE, COBAN ELAS TAN 2"X5YD PO LN 31 | 1 | BX | 1 | 63.80 | 63.80 | 5.42 | |
| | Tracking # 1Z2R57A30365742433 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 545515 | Vendor: KCLAPC Vend Cat#: 50606 | TOWEL, KLEENEX HRT (600/RL 6RL PO LN 32 | 1 | CS | 1 | 58.31 | 58.31 | 4.96 | |
| | Tracking # 1Z2R57A30365742746 Shipped: 02/18/2022 From: Kansas City | | | | | | | | |
| 495868 | Vendor: JOHCON Vend Cat#: 00300810237895 | POLYSPORIN, OINT 1OZ (24/CS) PO LN 33 | 1 | CS | 0 | 197.92 | .00 | .00 | |

MCKESSON

# Invoice

McKesson Medical-Surgical, Inc
9954 Mayland Drive Suite 4000
Henrico, VA 23233



Bill To: 121525
ADVANCED DERMATOLOGY, P.A.
2735 PEMBROOK PLACE
MANHATTAN KS 66502-2770

Shipped To:
ADVANCED DERMATOLOGY, P.A.
2509 W 18TH AVE
EMPORIA KS 66801
REGULATORY LICENSE: 04-26086

| Invoice Number 39034926 | PO Number 02.17.22 EMP | Invoice Date 02/17/2022 |
|---|---|---|

| Item Number | Vendor / Vendor Cat # | Description | Ordered | Unit | Shipped | Unit Price | Amount | Sales Tax | Codes (*) |
|---|---|---|---|---|---|---|---|---|---|
| 147712 | Vendor: MGM18<br>Vend Cat#: 18-852<br>Tracking # 1Z2R57A30365742433<br>Shipped: 02/18/2022 From: Kansas City | CAPE, EXAM T/P/T F/B OPN BLU 3<br>PO LN 34 | 2 | CS | 2 | 28.00 | 56.00 | 4.76 | |
| | | FUEL SURCHARGE<br>PO LN 35 | 1 | EA | 1 | 1.35 | 1.35 | .11 | |

| TAX STATE | COUNTY | CITY | DISTRICT | OTHER |
|---|---|---|---|---|
| $266.29 | $40.96 | $40.96 | $0.00 | $0.00 |

| SUB TOTAL | FREIGHT | TAX | AMOUNT |
|---|---|---|---|
| $6,472.09 | $0.00 | $348.21 | $6,820.30 |

The prices on this invoice may be subject to rebates, credits and other price adjustments. You are obligated to properly disclose and appropriately reflect all discounts, including rebates, in claims and costs submitted to federal and state government health care programs (including Medicare and Medicaid) and to provide this invoice and other discount documentation to government authorities on request, in accordance with all applicable laws and regulations, including 42 USC 1320a-7b(b) and the discount safe harbor. In addition, the purchase of products hereunder may qualify customer for discounts on certain purchases made under a distribution agreement between customer and McKesson Corporation.

PRICING IS CONFIDENTIAL AND PROPRIETARY.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 744598 | 8/24/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADCC-082421 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 692363 | 0 | 8/24/2021 | 00030347 | FedEx Priority | 8/24/2021 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 282925268716
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2105372-013 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-014 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-015 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-016 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-017 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-018 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-019 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-020 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-021 | 6/1/2026 | 1.00 | | | |
| ES46-P2105372-022 | 6/1/2026 | 1.00 | | | |
| EC-5230 | | 5.0 EA | 0.0 EA | 1,225.00 | 6,125.00 |
| EPICORD 2X3 CM | | | | | |
| Q4187 6 SQ CM | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| LU23-P2105821-004 | 6/1/2026 | 1.00 | | | |
| LU23-P2105821-005 | 6/1/2026 | 1.00 | | | |
| LU23-P2105821-006 | 6/1/2026 | 1.00 | | | |
| LU23-P2105821-007 | 6/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

<u>**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**</u>

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 744598 | 8/24/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADCC-082421 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Lot/Serial | Expires | Quantity | | | |
|---|---|---|---|---|---|
| LU23-P2105821-008 | 6/1/2026 | 1.00 | | | |
| | | | | Line Total | 19,875.00 |
| | | | USD | Total | 19,875.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 748092 | 9/8/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | AD090821 |



MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 695872 | 0 | 9/8/2021 | 00030347 | FedEx Priority | 9/8/2021 |

Salesperson(s) PATRICK ATCHITY | Channel

Credit Terms NET 60 | Bill of Lading 283471851260 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400<br>EPIFIX MESH 4X4.5 CM<br>Q4186 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2106122-020 | 6/1/2026 | 1.00 | | | |
| ES46-P2106129-003 | 6/1/2026 | 1.00 | | | |
| ES46-P2106129-004 | 6/1/2026 | 1.00 | | | |
| ES46-P2106129-005 | 6/1/2026 | 1.00 | | | |
| ES46-P2106129-006 | 6/1/2026 | 1.00 | | | |
| ES46-P2106129-007 | 6/1/2026 | 1.00 | | | |
| ES46-P2106129-008 | 6/1/2026 | 1.00 | | | |
| ES46-P2106129-009 | 6/1/2026 | 1.00 | | | |
| ES46-P2106129-010 | 6/1/2026 | 1.00 | | | |
| ES46-P2106129-014 | 6/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 748092 | | 9/8/2021 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00030347 | AD090821 | |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 752174 | 9/24/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADC-092421 |

Page 1 of 2

# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 699996 | 0 | 9/24/2021 | 00030347 | FedEx Saturday | 9/24/2021 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 284160486919

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2106775-008 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-009 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-010 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-011 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-012 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-013 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-014 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-015 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-016 | 7/1/2026 | 1.00 | | | |
| ES46-P2106775-017 | 7/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 752174 | 9/24/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADC-092421 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions.
MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 755754 | 10/8/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | AD100821 |

Page 1 of 1

# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 703602 | 0 | 10/8/2021 | 00030347 | FedEx Priority | 10/8/2021 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 284689006166

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| EC-5230 | | 5.0 EA | 0.0 EA | 1,225.00 | 6,125.00 |
| EPICORD 2X3 CM | | | | | |
| Q4187 6 SQ CM | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| LU23-P2106718-005 | 7/1/2026 | 1.00 | | | |
| LU23-P2106718-006 | 7/1/2026 | 1.00 | | | |
| LU23-P2106718-007 | 7/1/2026 | 1.00 | | | |
| LU23-P2106722-003 | 7/1/2026 | 1.00 | | | |
| LU23-P2106722-004 | 7/1/2026 | 1.00 | | | |

Line Total 6,125.00

USD Total 6,125.00

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement. Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 756050 | 10/11/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | AD10112021 |

Page 1 of 1

Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 703900 | 0 | 10/11/2021 | 00020219 | FedEx Priority | 10/11/2021 |

Salesperson(s) MARC WATTS
Channel

Credit Terms NET 60
Bill of Lading 284765258900
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| EC-5230<br>EPICORD 2X3 CM<br>Q4187 6 SQ CM<br>Lot/Serial: LU23-P2106760-001 Expires: 7/1/2026 | 1.0 EA<br>Quantity 1.00 | 0.0 EA | 1,295.00 | 1,295.00 |
| | | | Line Total | 1,295.00 |
| | | USD | Total | 1,295.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 761591 | 11/2/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADERM-Carrollton-11-02-21 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 709493 | 0 | 11/2/2021 | 00030347 | FedEx Priority | 11/2/2021 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 285650164499

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2108158-004 | 8/1/2026 | 1.00 | | | |
| ES46-P2108158-005 | 8/1/2026 | 1.00 | | | |
| ES46-P2108158-006 | 8/1/2026 | 1.00 | | | |
| ES46-P2108158-007 | 8/1/2026 | 1.00 | | | |
| ES46-P2108158-008 | 8/1/2026 | 1.00 | | | |
| ES46-P2108158-009 | 8/1/2026 | 1.00 | | | |
| ES46-P2108158-010 | 8/1/2026 | 1.00 | | | |
| ES46-P2108158-011 | 8/1/2026 | 1.00 | | | |
| ES46-P2108158-012 | 8/1/2026 | 1.00 | | | |
| ES46-P2108158-013 | 8/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 761591 | 11/2/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADERM-Carrollton-11-02-21 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | |
|---|---|---|
| | Line Total | 13,750.00 |
| USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 766059 | 11/18/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 111821 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 713991 | 0 | 11/18/2021 | 00030347 | FedEx Priority | 11/18/2021 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 286313962918
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| ES-4400 | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | |
| Q4186 | | | | |

| Lot/Serial | Expires | Quantity |
|---|---|---|
| ES46-P2108661-004 | 8/1/2026 | 1.00 |
| ES46-P2108661-005 | 8/1/2026 | 1.00 |
| ES46-P2108661-006 | 8/1/2026 | 1.00 |
| ES46-P2108661-007 | 8/1/2026 | 1.00 |
| ES46-P2108661-008 | 8/1/2026 | 1.00 |
| ES46-P2108661-009 | 8/1/2026 | 1.00 |
| ES46-P2108661-010 | 8/1/2026 | 1.00 |
| ES46-P2108661-011 | 8/1/2026 | 1.00 |
| ES46-P2108661-012 | 8/1/2026 | 1.00 |
| ES46-P2108661-013 | 8/1/2026 | 1.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 766059 | 11/18/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 111821 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 769150 | 12/2/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 120221 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 717088 | 0 | 12/2/2021 | 00030347 | FedEx Priority | 12/2/2021 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 286975545080
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2109056-004 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-005 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-006 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-007 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-008 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-009 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-010 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-011 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-012 | 9/1/2026 | 1.00 | | | |
| ES46-P2109056-013 | 9/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 769150 | 12/2/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 120221 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 774918 | 12/28/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADRM-122721 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 722863 | 0 | 12/27/2021 | 00030347 | FedEx Priority | 12/28/2021 |

Salesperson(s) PATRICK ATCHITY | Channel

Credit Terms NET 60 | Bill of Lading 288126068220 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2109763-013 | 9/1/2026 | 1.00 | | | |
| ES46-P2109763-014 | 9/1/2026 | 1.00 | | | |
| ES46-P2109763-015 | 9/1/2026 | 1.00 | | | |
| ES46-P2109763-016 | 9/1/2026 | 1.00 | | | |
| ES46-P2109763-017 | 9/1/2026 | 1.00 | | | |
| ES46-P2109763-018 | 9/1/2026 | 1.00 | | | |
| ES46-P2109763-019 | 9/1/2026 | 1.00 | | | |
| ES46-P2109763-020 | 9/1/2026 | 1.00 | | | |
| ES46-P2109763-021 | 9/1/2026 | 1.00 | | | |
| ES46-P2109763-022 | 9/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 774918 | 12/28/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADRM-122721 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 775283 | 12/28/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | ADERM-MHK122821 |

Page 1 of 1

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 723238 | 0 | 12/28/2021 | 00020219 | FedEx First Over | 12/28/2021 |

Salesperson(s) MARC WATTS
Channel

Credit Terms NET 60
Bill of Lading 288148338920
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 5.0 EA | 0.0 EA | 1,390.00 | 6,950.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2109814-006 | 9/1/2026 | 1.00 | | | |
| ES46-P2109814-007 | 9/1/2026 | 1.00 | | | |
| ES46-P2109814-008 | 9/1/2026 | 1.00 | | | |
| ES46-P2109814-009 | 9/1/2026 | 1.00 | | | |
| ES46-P2109814-010 | 9/1/2026 | 1.00 | | | |

Line Total 6,950.00

USD Total 6,950.00

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 775286 | 12/28/2021 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030993 | ADH-122821 |

Page 1 of 1

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
PREMIER DERMATOLOGY & MOHS S
747 N BURLINGTON AVENUE
SUITE 312
HASTINGS, NE 68901
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 723241 | 0 | 12/28/2021 | 00030993 | FedEx First Over | 12/28/2021 |

Salesperson(s) KEVIN MAR | Channel

Credit Terms NET 60 | Bill of Lading 288148379264 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 3.0 EA | 0.0 EA | 1,395.00 | 4,185.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2109814-011 | 9/1/2026 | 1.00 | | | |
| ES46-P2109814-012 | 9/1/2026 | 1.00 | | | |
| ES46-P2109814-013 | 9/1/2026 | 1.00 | | | |
| | | | | Line Total | 4,185.00 |
| | | | USD | Total | 4,185.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 778561 | 1/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 1132022 |



MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 726550 | 0 | 1/13/2022 | 00030347 | FedEx Priority | 1/13/2022 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 288706268390

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| ES-4400 | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | |
| Q4186 | | | | |

| Lot/Serial | Expires | Quantity |
|---|---|---|
| ES46-P2110220-005 | 10/1/2026 | 1.00 |
| ES46-P2110220-006 | 10/1/2026 | 1.00 |
| ES46-P2110220-007 | 10/1/2026 | 1.00 |
| ES46-P2110220-008 | 10/1/2026 | 1.00 |
| ES46-P2110220-009 | 10/1/2026 | 1.00 |
| ES46-P2110220-010 | 10/1/2026 | 1.00 |
| ES46-P2110220-011 | 10/1/2026 | 1.00 |
| ES46-P2110220-012 | 10/1/2026 | 1.00 |
| ES46-P2110220-013 | 10/1/2026 | 1.00 |
| ES46-P2110220-014 | 10/1/2026 | 1.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 778561 | 1/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 1132022 |

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 778600 | 1/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030993 | 02132022 |

Page 1 of 1

# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

PREMIER DERMATOLOGY & MOHS S
747 N BURLINGTON AVENUE
SUITE 312
HASTINGS, NE 68901
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 726589 | 0 | 1/13/2022 | 00030993 | FedEx First Over | 1/13/2022 |

Salesperson(s) KEVIN MAR

Channel

Credit Terms NET 60

Bill of Lading 288711913108

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| ES-4400<br>EPIFIX MESH 4X4.5 CM<br>Q4186 | 4.0 EA | 0.0 EA | 1,395.00 | 5,580.00 |

| Lot/Serial | Expires | Quantity |
|---|---|---|
| ES46-P2110229-003 | 10/1/2026 | 1.00 |
| ES46-P2110229-004 | 10/1/2026 | 1.00 |
| ES46-P2110229-005 | 10/1/2026 | 1.00 |
| ES46-P2110229-006 | 10/1/2026 | 1.00 |

Line Total 5,580.00

USD Total 5,580.00

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 780328 | 1/21/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 012122 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 728336 | 0 | 1/21/2022 | 00020219 | FedEx Priority | 1/21/2022 |

Salesperson(s) MARC WATTS

Channel

Credit Terms NET 60

Bill of Lading 289014765437 FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2110385-013 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-014 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-015 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-016 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-017 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-018 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-019 | 10/1/2026 | 1.00 | | | |
| ES46-P2110385-020 | 10/1/2026 | 1.00 | | | |
| ES46-P2110386-003 | 10/1/2026 | 1.00 | | | |
| ES46-P2110386-004 | 10/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 780328 | 1/21/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 012122 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 781312 | 1/26/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 01262022 |



MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 729328 | 0 | 1/26/2022 | 00030347 | FedEx Priority | 1/26/2022 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 289174147186

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2110495-015 | 10/1/2026 | 1.00 | | | |
| ES46-P2110495-016 | 10/1/2026 | 1.00 | | | |
| ES46-P2110495-017 | 10/1/2026 | 1.00 | | | |
| ES46-P2110495-018 | 10/1/2026 | 1.00 | | | |
| ES46-P2110495-019 | 10/1/2026 | 1.00 | | | |
| ES46-P2110495-020 | 10/1/2026 | 1.00 | | | |
| ES46-P2110499-003 | 10/1/2026 | 1.00 | | | |
| ES46-P2110499-004 | 10/1/2026 | 1.00 | | | |
| ES46-P2110499-005 | 10/1/2026 | 1.00 | | | |
| ES46-P2110499-006 | 10/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 781312 | 1/26/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 01262022 |



MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 783525 | 2/4/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 2/4/2022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 731549 | 0 | 2/4/2022 | 00020219 | FedEx Priority | 2/4/2022 |

Salesperson(s) MARC WATTS | Channel

Credit Terms NET 60 | Bill of Lading 289490105427 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2110866-011 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-012 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-013 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-014 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-015 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-016 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-017 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-018 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-019 | 10/1/2026 | 1.00 | | | |
| ES46-P2110866-020 | 10/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 783525 | | 2/4/2022 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00020219 | 2/4/2022 | |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| | | |
|---|---|---|
| | Line Total | 13,750.00 |
| USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 784920 | 2/10/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 02102022 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 732938 | 0 | 2/10/2022 | 00030347 | FedEx Priority | 2/10/2022 |

Salesperson(s) PATRICK ATCHITY | Channel

Credit Terms NET 60 | Bill of Lading 289713914250 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400<br>EPIFIX MESH 4X4.5 CM<br>Q4186 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2111033-011 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-012 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-013 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-014 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-015 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-016 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-017 | 11/1/2026 | 1.00 | | | |
| ES46-P2111033-018 | 11/1/2026 | 1.00 | | | |
| ES46-P2111039-003 | 11/1/2026 | 1.00 | | | |
| ES46-P2111039-004 | 11/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 784920 | | 2/10/2022 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00030347 | 02102022 | |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 786237 | 2/16/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030993 | 02162022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
PREMIER DERMATOLOGY & MOHS S
747 N BURLINGTON AVENUE
SUITE 312
HASTINGS, NE 68901
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 734288 | 0 | 2/16/2022 | 00030993 | FedEx Priority | 2/16/2022 |

Salesperson(s) KEVIN MAR
Channel

Credit Terms NET 60
Bill of Lading 289915752633
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2111259-006 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-007 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-008 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-009 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-010 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-011 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-012 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-013 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-015 | 11/1/2026 | 1.00 | | | |
| ES46-P2111259-016 | 11/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 786237 | 2/16/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030993 | 02162022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

PREMIER DERMATOLOGY & MOHS S
747 N BURLINGTON AVENUE
SUITE 312
HASTINGS, NE 68901
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 13,750.00 |
| | USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 787599 | 2/22/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADerm-022222 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 735638 | 0 | 2/22/2022 | 00030347 | FedEx Priority | 2/22/2022 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 270126984804
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,375.00 | 13,750.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2111553-012 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-013 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-014 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-015 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-016 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-017 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-018 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-019 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-020 | 11/1/2026 | 1.00 | | | |
| ES46-P2111553-021 | 11/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 787599 | 2/22/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADerm-022222 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | |
|---|---|---|
| | Line Total | 13,750.00 |
| USD | Total | 13,750.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 789180 | 3/1/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 03012022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 737224 | 0 | 3/1/2022 | 00030347 | FedEx Priority | 3/1/2022 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 270364116893

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2110451-009 | 10/1/2026 | 1.00 | | | |
| ES46-P2110451-010 | 10/1/2026 | 1.00 | | | |
| ES46-P2110451-011 | 10/1/2026 | 1.00 | | | |
| ES46-P2110451-012 | 10/1/2026 | 1.00 | | | |
| ES46-P2110451-013 | 10/1/2026 | 1.00 | | | |
| ES46-P2110451-014 | 10/1/2026 | 1.00 | | | |
| ES46-P2110451-015 | 10/1/2026 | 1.00 | | | |
| ES46-P2110451-016 | 10/1/2026 | 1.00 | | | |
| ES46-P2112139-016 | 12/1/2026 | 1.00 | | | |
| ES46-P2112139-017 | 12/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 789180 | 3/1/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 03012022 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 791508 | 3/10/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 03102022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 739558 | 0 | 3/10/2022 | 00030347 | FedEx Priority | 3/10/2022 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 270728466822
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2112411-024 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-025 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-026 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-027 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-028 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-029 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-030 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-031 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-032 | 12/1/2026 | 1.00 | | | |
| ES46-P2112411-033 | 12/1/2026 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 791508 | 3/10/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 03102022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 793553 | 3/18/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 03182022 |

Page 1 of 2

Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 741610 | 0 | 3/18/2022 | 00020219 | FedEx First Over | 3/18/2022 |

Salesperson(s) MARC WATTS

Channel

Credit Terms NET 60

Bill of Lading 271029111935

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 20.0 EA | 0.0 EA | 1,150.00 | 23,000.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2200151-008 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-009 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-010 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-011 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-012 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-013 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-014 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-015 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-016 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-017 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-018 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-019 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-020 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-021 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-022 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-023 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-024 | 1/1/2027 | 1.00 | | | |
| ES46-P2200151-025 | 1/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 793553 | 3/18/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 03182022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Lot/Serial | Expires | Quantity |
|---|---|---|
| ES46-P2200151-026 | 1/1/2027 | 1.00 |
| ES46-P2200151-027 | 1/1/2027 | 1.00 |

| | | |
|---|---|---|
| | Line Total | 23,000.00 |
| USD | Total | 23,000.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 795958 | 3/29/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 32922 |

Page 1 of 2

# Invoice

Bill To:
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To:
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 744026 | 0 | 3/29/2022 | 00030347 | FedEx Priority | 3/29/2022 |

Salesperson(s): PATRICK ATCHITY
Channel:

Credit Terms: NET 60
Bill of Lading: 271409135596
FOB Point: Marietta

Message:

Remarks:

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 20.0 EA | 0.0 EA | 1,150.00 | 23,000.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2200582-009 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-011 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-012 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-013 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-015 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-016 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-017 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-018 | 1/1/2027 | 1.00 | | | |
| ES46-P2200582-019 | 1/1/2027 | 1.00 | | | |
| ES46-P2200635-020 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-003 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-004 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-005 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-006 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-007 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-008 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-009 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-010 | 1/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 795958 | 3/29/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 32922 |

Page 2 of 2

Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Lot/Serial | Expires | Quantity | | | |
|---|---|---|---|---|---|
| ES46-P2200638-011 | 1/1/2027 | 1.00 | | | |
| ES46-P2200638-012 | 1/1/2027 | 1.00 | | | |
| | | | | Line Total | 23,000.00 |
| | | | USD | Total | 23,000.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 799856 | 4/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 04132022 |

Page 1 of 2

# Invoice

Bill To:
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To:
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 747964 | 0 | 4/13/2022 | 00030347 | FedEx Priority | 4/13/2022 |

Salesperson(s) PATRICK ATCHITY — Channel

Credit Terms NET 60 — Bill of Lading 271993639522 — FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2201127-024 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-025 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-026 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-027 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-028 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-029 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-030 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-031 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-032 | 2/1/2027 | 1.00 | | | |
| ES46-P2201127-033 | 2/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 799856 | 4/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 04132022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 801754 | 4/21/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 4/21/2022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 749877 | 0 | 4/21/2022 | 00030347 | FedEx Priority | 4/21/2022 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 272275620198
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2201477-035 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-003 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-004 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-005 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-006 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-007 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-008 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-009 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-010 | 2/1/2027 | 1.00 | | | |
| ES46-P2201483-011 | 2/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 801754 | 4/21/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 4/21/2022 |



Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 802717 | 4/25/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 042522 |



# Invoice

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 750846 | 0 | 4/25/2022 | 00030347 | FedEx Priority | 4/25/2022 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 272404477058

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2201602-003 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-004 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-005 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-006 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-007 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-008 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-009 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-010 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-011 | 2/1/2027 | 1.00 | | | |
| ES46-P2201602-012 | 2/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 802717 | 4/25/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 042522 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 805749 | 5/5/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 05052022 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 753890 | 0 | 5/5/2022 | 00030347 | FedEx Priority | 5/5/2022 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 272820604283

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2201021-039 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-040 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-041 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-042 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-043 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-044 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-045 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-046 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-047 | 2/1/2027 | 1.00 | | | |
| ES46-P2201021-048 | 2/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 805749 | 5/5/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 05052022 |

Page 2 of 2

# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 808342 | 5/16/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 05162022 |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 756494 | 0 | 5/16/2022 | 00030347 | FedEx Priority | 5/16/2022 |

Salesperson(s) PATRICK ATCHITY

Channel

Credit Terms NET 60

Bill of Lading 273203587056

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2202414-020 | 3/1/2027 | 1.00 | | | |
| ES46-P2202414-021 | 3/1/2027 | 1.00 | | | |
| ES46-P2202414-022 | 3/1/2027 | 1.00 | | | |
| ES46-P2202414-023 | 3/1/2027 | 1.00 | | | |
| ES46-P2202414-024 | 3/1/2027 | 1.00 | | | |
| ES46-P2202419-003 | 3/1/2027 | 1.00 | | | |
| ES46-P2202419-004 | 3/1/2027 | 1.00 | | | |
| ES46-P2202419-005 | 3/1/2027 | 1.00 | | | |
| ES46-P2202419-006 | 3/1/2027 | 1.00 | | | |
| ES46-P2202419-007 | 3/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 808342 | 5/16/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 05162022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 808569 | 5/17/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 05172022 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 756714 | 0 | 5/17/2022 | 00020219 | FedEx Priority | 5/17/2022 |

Salesperson(s) MARC WATTS
Channel

Credit Terms NET 60
Bill of Lading 273239140106
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2202121-025 | 3/1/2027 | 1.00 | | | |
| ES46-P2202121-026 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-003 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-004 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-005 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-006 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-007 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-008 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-009 | 3/1/2027 | 1.00 | | | |
| ES46-P2202294-010 | 3/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 808569 | 5/17/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 05172022 |



Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 811362 | 5/26/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 5/26/2022 |

Page 1 of 2

Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 759504 | 0 | 5/26/2022 | 00030347 | FedEx Priority | 5/26/2022 |

Salesperson(s) PATRICK ATCHITY | Channel

Credit Terms NET 60 | Bill of Lading 273601968910 | FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| ES-4400 | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | |
| Q4186 | | | | |

| Lot/Serial | Expires | Quantity |
|---|---|---|
| ES46-P2202666-020 | 3/1/2027 | 1.00 |
| ES46-P2202666-021 | 3/1/2027 | 1.00 |
| ES46-P2202666-022 | 3/1/2027 | 1.00 |
| ES46-P2202666-023 | 3/1/2027 | 1.00 |
| ES46-P2202666-024 | 3/1/2027 | 1.00 |
| ES46-P2202676-003 | 3/1/2027 | 1.00 |
| ES46-P2202676-004 | 3/1/2027 | 1.00 |
| ES46-P2202676-005 | 3/1/2027 | 1.00 |
| ES46-P2202676-006 | 3/1/2027 | 1.00 |
| ES46-P2202676-007 | 3/1/2027 | 1.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 811362 | 5/26/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | 5/26/2022 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 812087 | 5/31/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 05312022 |

Page 1 of 2

# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 760238 | 0 | 5/31/2022 | 00020219 | FedEx Priority | 5/31/2022 |

Salesperson(s) MARC WATTS

Channel

Credit Terms NET 60

Bill of Lading 273754277305

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|
| ES-4400 | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | |
| Q4186 | | | | |

| Lot/Serial | Expires | Quantity |
|---|---|---|
| ES46-P2202816-012 | 3/1/2027 | 1.00 |
| ES46-P2202816-013 | 3/1/2027 | 1.00 |
| ES46-P2202816-014 | 3/1/2027 | 1.00 |
| ES46-P2202816-015 | 3/1/2027 | 1.00 |
| ES46-P2202816-016 | 3/1/2027 | 1.00 |
| ES46-P2202816-017 | 3/1/2027 | 1.00 |
| ES46-P2202816-018 | 3/1/2027 | 1.00 |
| ES46-P2202816-019 | 3/1/2027 | 1.00 |
| ES46-P2202816-020 | 3/1/2027 | 1.00 |
| ES46-P2202824-003 | 3/1/2027 | 1.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 812087 | 5/31/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | 05312022 |



MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.
**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**
Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 813531 | 6/6/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | AD-050622 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 761685 | 0 | 6/6/2022 | 00030347 | FedEx Priority | 6/6/2022 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 60
Bill of Lading 274004553011
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 20.0 EA | 0.0 EA | 1,150.00 | 23,000.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2202962-017 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-018 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-019 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-020 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-021 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-022 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-023 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-024 | 4/1/2027 | 1.00 | | | |
| ES46-P2202962-025 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-003 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-004 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-005 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-006 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-007 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-008 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-009 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-010 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-011 | 4/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 813531 | | 6/6/2022 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00030347 | AD-060622 | |



# Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Lot/Serial | Expires | Quantity | | | |
|---|---|---|---|---|---|
| ES46-P2202963-012 | 4/1/2027 | 1.00 | | | |
| ES46-P2202963-013 | 4/1/2027 | 1.00 | | | |
| | | | | Line Total | 23,000.00 |
| | | | USD | Total | 23,000.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 815218 | 6/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADERM-061322 |

Page 1 of 2

# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 763384 | 0 | 6/13/2022 | 00030347 | FedEx Priority | 6/13/2022 |

Salesperson(s) PATRICK ATCHITY
Channel

Credit Terms NET 30
Bill of Lading 274287958830
FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 20.0 EA | 0.0 EA | 1,150.00 | 23,000.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2203228-004 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-005 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-006 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-007 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-008 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-009 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-010 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-011 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-012 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-013 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-014 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-015 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-016 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-017 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-018 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-019 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-020 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-021 | 4/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 815218 | 6/13/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00030347 | ADERM-061322 |



Invoice

Bill To

ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To

ADVANCED DERM - CARROLLTON
1502 N JEFFERSON ST
CARROLLTON, MO 64633
UNITED STATES

| Lot/Serial | Expires | Quantity | | | |
|---|---|---|---|---|---|
| ES46-P2203228-022 | 4/1/2027 | 1.00 | | | |
| ES46-P2203228-023 | 4/1/2027 | 1.00 | | | |
| | | | | Line Total | 23,000.00 |
| | | | USD | Total | 23,000.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | Invoice Date | Print Date |
|---|---|---|
| 820756 | 7/7/2022 | 7/20/2022 |

| Bill To | Sold To | Purchase Order |
|---|---|---|
| 00020219 | 00020219 | AD07072022 |



# Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| Sales Order | Rev | Order Date | Ship To | Ship Via | Ship Date |
|---|---|---|---|---|---|
| 768943 | 0 | 7/7/2022 | 00020219 | FedEx Priority | 7/7/2022 |

Salesperson(s) MARC WATTS

Channel

Credit Terms NET 30

Bill of Lading 275253751070

FOB Point Marietta

Message

Remarks

FOR INQUIRIES REGARDING THIS INVOICE, PLEASE CALL 855-722-5164 OR EMAIL US AT accountsreceivable@mimedx.com. PLEASE REMIT FUNDS BY US CHECK TO THE ADDRESS ABOVE, OR VIA ELECTRONIC TRANSFER TO: BANK OF AMERICA, ACCOUNT NO. 3340-3708-8085, ABA: 0260-0959-3 (WIRE) 0610-0005-2 (ACH), SWIFT: BOFAUS3N

| Item Number | | Invoice Quantity | Backord Qty | Price | Extended Price |
|---|---|---|---|---|---|
| ES-4400 | | 10.0 EA | 0.0 EA | 1,150.00 | 11,500.00 |
| EPIFIX MESH 4X4.5 CM | | | | | |
| Q4186 | | | | | |
| Lot/Serial | Expires | Quantity | | | |
| ES46-P2204385-021 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-022 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-023 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-024 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-025 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-026 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-027 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-028 | 5/1/2027 | 1.00 | | | |
| ES46-P2204385-029 | 5/1/2027 | 1.00 | | | |
| ES46-P2204387-003 | 5/1/2027 | 1.00 | | | |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

MIMEDX

MIMEDX GROUP, INC.
**P.O. Box 744853**
**Atlanta, GA 30374-4853**
UNITED STATES
Phone: (855) 722-5164
accountsreceivable@mimedx.com

| Invoice Number | | Invoice Date | Print Date |
|---|---|---|---|
| 820756 | | 7/7/2022 | 7/20/2022 |
| Bill To | Sold To | Purchase Order | |
| 00020219 | 00020219 | AD07072022 | |



Invoice

Bill To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

Attn: ACCOUNTS PAYABLE

Ship To
ADVANCED DERM & SKIN CARE
2735 PEMBROOK PLACE
MANHATTAN, KS 66502
UNITED STATES

| | | | |
|---|---|---|---|
| | | Line Total | 11,500.00 |
| | USD | Total | 11,500.00 |

Customer agrees to pay the amount in full in accordance with the MiMedx Terms and Conditions or applicable purchase agreement.
Customer is hereby informed that it may have received a discount. The price net of that discount is as stated on this invoice. Customer agrees that it shall fully and accurately report such discount on any claims or cost reports that it may submit to Medicare or any State Medicaid program.

**Customer acknowledges and agrees that due to state and federal laws, payment to MiMedx is due in full and is not contingent upon insurance coverage nor reimbursement amounts paid to Customer.**

Customer agrees to purchase and accept MiMedx Products in accordance with the terms and conditions contained at http://www.mimedx.com/product/terms-and-conditions. MiMedx objects to and rejects any and all terms proposed by Customer, whether contained in Customer's purchase order or elsewhere. If MiMedx and Customer have signed a separate, written agreement governing Customer's purchase of MiMedx products, then the terms of that agreement shall govern.

**Medical Policy**

BlueCross BlueShield Kansas
An Independent licensee of the Blue Cross Blue Shield Association

# Title: Amniotic Membrane and Amniotic Fluid

| | |
|---|---|
| Related Policies: | ▪ *Bio-Engineered Skin and Soft Tissue Substitutes*<br>▪ *Orthopedic Applications of Stem Cell Therapy (Including Allografts and Bone Substitutes Used With Autologous Bone Marrow)*<br>▪ *Recombinant and Autologous Platelet-Derived Growth Factors for Wound Healing and Other Non–Orthopedic Conditions* |

| **Professional** | **Institutional** |
|---|---|
| Original Effective Date: March 20, 2017 | Original Effective Date: March 20, 2017 |
| Revision Date(s): March 20, 2017; January 1, 2019; February 18, 2019; March 27, 2019; May 21, 2019; September 27, 2019; October 1, 2019; July 1, 2020; July 16, 2021; October 8, 2021; January 3, 2022; April 1, 2022; April 8, 2022 | Revision Date(s): March 20, 2017; January 1, 2019; February 18, 2019; March 27, 2019; May 21, 2019; September 27, 2019; October 1, 2019; July 1, 2020; July 16, 2021; October 8, 2021; January 3, 2022; April 1, 2022; April 8, 2022 |
| Current Effective Date: July 16, 2021 | Current Effective Date: July 16, 2021 |

**State and Federal mandates and health plan member contract language, including specific provisions/exclusions, take precedence over Medical Policy and must be considered first in determining eligibility for coverage. To verify a member's benefits, contact Blue Cross and Blue Shield of Kansas Customer Service.**

**The BCBSKS Medical Policies contained herein are for informational purposes and apply only to members who have health insurance through BCBSKS or who are covered by a self-insured group plan administered by BCBSKS. Medical Policy for FEP members is subject to FEP medical policy which may differ from BCBSKS Medical Policy.**

**The medical policies do not constitute medical advice or medical care. Treating health care providers are independent contractors and are neither employees nor agents of Blue Cross and Blue Shield of Kansas and are solely responsible for diagnosis, treatment and medical advice.**

**If your patient is covered under a different Blue Cross and Blue Shield plan, please refer to the Medical Policies of that plan.**

| Populations | Interventions | Comparators | Outcomes |
|---|---|---|---|
| Individuals: | Interventions of interest are: | Comparators of interest are:<br>• Standard wound care | Relevant outcomes include:<br>• Symptoms |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Populations | Interventions | Comparators | Outcomes |
|---|---|---|---|
| • With nonhealing diabetic lower-extremity ulcers | • Patch or flowable formulation of human amniotic membrane | • Advanced wound therapies | • Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With lower-extremity ulcers due to venous insufficiency | Interventions of interest are:<br>• Patch or flowable formulation of human amniotic membrane | Comparators of interest are:<br>• Compression therapy<br>• Advanced wound therapies | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With knee osteoarthritis | Interventions of interest are:<br>• Injection of suspension or particulate formulation of human amniotic membrane or amniotic fluid | Comparators of interest are:<br>• Conservative therapy<br>• Corticosteroid injections | Relevant outcomes include:<br>• Symptoms<br>• Functional outcomes<br>• Quality of life<br>• Treatment-related morbidity |
| Individuals:<br>• With plantar fasciitis | Interventions of interest are:<br>• Injection of suspension or particulate formulation of human amniotic membrane or amniotic fluid | Comparators of interest are:<br>• Conservative therapy<br>• Corticosteroid injections | Relevant outcomes include:<br>• Symptoms<br>• Functional outcomes<br>• Quality of life<br>• Treatment-related morbidity |
| Individuals:<br>• With neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative treatment | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With corneal ulcers or melts that do not respond to initial medical therapy | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With bullous keratopathy as a palliative measure in patients who are not candidates for a | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Populations | Interventions | Comparators | Outcomes |
|---|---|---|---|
| curative treatment (e.g., endothelial or penetrating keratoplasty) | | | |
| Individuals:<br>• With partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With moderate or severe Stevens-Johnson syndrome | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With persistent epithelial defects that do not respond to conservative therapy | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With severe dry eye with ocular surface damage and inflammation that does not respond to conservative therapy | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With moderate or severe acute ocular chemical burn | Interventions of interest are:<br>• Sutured or self-retained human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With corneal perforation when corneal tissue is not immediately available | Interventions of interest are:<br>• Sutured human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |
| Individuals:<br>• With pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft | Interventions of interest are:<br>• Sutured or glued human amniotic membrane | Comparators of interest are:<br>• Medical therapy<br>• Bandage contact lens | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Populations | Interventions | Comparators | Outcomes |
|---|---|---|---|
| Individuals:<br>• Who have undergone Mohs micrographic surgery for skin cancer on the face, head, neck, or dorsal hand | Interventions of interest are:<br>• Human amniotic membrane | Comparators of interest are:<br>• Autologous tissue-based surgical repair (full-thickness skin grafts and flaps)<br>• Non-surgical treatment (e.g., secondary intention healing) | Relevant outcomes include:<br>• Symptoms<br>• Morbid events<br>• Functional outcomes<br>• Quality of life |

## DESCRIPTION

Several commercially available forms of human amniotic membrane (HAM) and amniotic fluid can be administered by patches, topical application, or injection. Amniotic membrane and amniotic fluid are being evaluated for the treatment of a variety of conditions, including chronic full-thickness diabetic lower-extremity ulcers, venous ulcers, knee osteoarthritis, plantar fasciitis, and ophthalmic conditions.

## OBJECTIVE

The objective of this evidence review is to evaluate whether various human amniotic membrane products improve the net health outcome for patients with various diabetic and venous ulcers, osteoarthritis, plantar fasciitis, and ophthalmic conditions.

## BACKGROUND

### Human Amniotic Membrane

Human amniotic membrane (HAM) consists of 2 conjoined layers, the amnion, and chorion, and forms the innermost lining of the amniotic sac or placenta. When prepared for use as an allograft, the membrane is harvested immediately after birth, cleaned, sterilized, and either cryopreserved or dehydrated. Many products available using amnion, chorion, amniotic fluid, and umbilical cord are being studied for the treatment of a variety of conditions, including chronic full-thickness diabetic lower-extremity ulcers, venous ulcers, knee osteoarthritis, plantar fasciitis, and ophthalmic conditions. The products are formulated either as patches, which can be applied as wound covers, or as suspensions or particulates, or connective tissue extractions, which can be injected or applied topically.

Fresh amniotic membrane contains collagen, fibronectin, and hyaluronic acid, along with a combination of growth factors, cytokines, and anti-inflammatory proteins such as interleukin-1 receptor antagonist.[1,] There is evidence that the tissue has anti-inflammatory, antifibroblastic, and antimicrobial properties. HAM is considered nonimmunogenic and has not been observed to cause a substantial immune response. It is believed that these properties are retained in cryopreserved HAM and HAM products, resulting in a readily available tissue with regenerative potential. In support, 1 HAM product has been shown to elute growth factors into saline and stimulate the migration of mesenchymal stem cells, both in vitro and in vivo.[2,]

Use of a HAM graft, which is fixated by sutures, is an established treatment for disorders of the corneal surface, including neurotrophic keratitis, corneal ulcers and melts, following pterygium

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

repair, Stevens-Johnson syndrome, and persistent epithelial defects. Amniotic membrane products that are inserted like a contact lens have more recently been investigated for the treatment of corneal and ocular surface disorders. Amniotic membrane patches are also being evaluated for the treatment of various other conditions, including skin wounds, burns, leg ulcers, and prevention of tissue adhesion in surgical procedures.[1,] Additional indications studied in preclinical models include tendonitis, tendon repair, and nerve repair. The availability of HAM opens the possibility of regenerative medicine for an array of conditions.

**Amniotic Fluid**

Amniotic fluid surrounds the fetus during pregnancy and provides protection and nourishment. In the second half of gestation, most of the fluid is a result of micturition and secretion from the respiratory tract and gastrointestinal tract of the fetus, along with urea.[1,] The fluid contains proteins, carbohydrates, peptides, fats, amino acids, enzymes, hormones, pigments, and fetal cells. Use of human and bovine amniotic fluid for orthopedic conditions was first reported in 1927.[3,] Amniotic fluid has been compared with synovial fluid, containing hyaluronan, lubricant, cholesterol, and cytokines. Injection of amniotic fluid or amniotic fluid-derived cells is currently being evaluated for the treatment of osteoarthritis and plantar fasciitis.

- Amniotic membrane and amniotic fluid are also being investigated as sources of pluripotent stem cells.[1,] Pluripotent stem cells can be cultured and are capable of differentiation toward any cell type. The use of stem cells in orthopedic applications is addressed in BCBSKS medical policy *Orthopedic Applications of Stem Cell Therapy (Including Allografts and Bone Substitutes Used With Autologous Bone Marrow).*

**REGULATORY STATUS**

The U.S. Food and Drug Administration (FDA) regulates human cells and tissues intended for implantation, transplantation, or infusion through the Center for Biologics Evaluation and Research, under Code of Federal Regulation, Title 21, parts 1270 and 1271. In 2017, the FDA published clarification of what is considered minimal manipulation and homologous use for human cells, tissues, and cellular and tissue-based products (HCT/Ps).[4,]

HCT/Ps are defined as human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient. If an HCT/P does not meet the criteria below and does not qualify for any of the stated exceptions, the HCT/P will be regulated as a drug, device, and/or biological product and applicable regulations and premarket review will be required.

An HCT/P is regulated solely under section 361 of the PHS Act and 21 CFR Part 1271 if it meets all of the following criteria:

1. "The HCT/P is minimally manipulated;
2. The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
3. The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
4. Either:

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

i. The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
ii. The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
    a. Is for autologous use;
    b. Is for allogeneic use in a first-degree or second-degree blood relative; or
    c. Is for reproductive use."

The guidance provides the following specific examples of homologous and non-homologous use for amniotic membrane:

a. "Amniotic membrane is used for bone tissue replacement to support bone regeneration following surgery to repair or replace bone defects. This is not a homologous use because bone regeneration is not a basic function of amniotic membrane.
b. An amniotic membrane product is used for wound healing and/or to reduce scarring and inflammation. This is not homologous use because wound healing and reduction of scarring and inflammation are not basic functions of amniotic membrane.
c. An amniotic membrane product is applied to the surface of the eye to cover or offer protection from the surrounding environment in ocular repair and reconstruction procedures. This is homologous use because serving as a covering and offering protection from the surrounding environment are basic functions of amniotic membrane."

The FDA noted the intention to exercise enforcement discretion for the next 36 months after publication of the guidance.

In 2003, Prokera was cleared for marketing by the FDA through the 510(k) process for the ophthalmic conformer that incorporates amniotic membrane (K032104). The FDA determined that this device was substantially equivalent to the Symblepharon Ring. The Prokera device is intended "for use in eyes in which the ocular surface cells have been damaged, or underlying stroma is inflamed and scarred."[5,] The development of Prokera, a commercially available product, was supported in part by the National Institute of Health and the National Eye Institute.

AmnioClip (FORTECH GmbH) is a ring designed to hold the amniotic membrane in the eye without sutures or glue fixation. A mounting device is used to secure the amniotic membrane within the AmnioClip. The AmnioClip currently has CE approval in Europe.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## POLICY

A. Treatment of nonhealing diabetic lower-extremity ulcers using the following human amniotic membrane products may be considered **medically necessary**.
   1. Affinity (Q4159)
   2. AmnioBand Membrane (Q4151)
   3. Biovance (Q4154)
   4. EpiCord (Q4187)
   5. Epifix (Q4186)
   6. Grafix (Q4132, Q4133)

B. Human amniotic membrane grafts with or without suture (Prokera®, AmbioDisk™) or glue, may be considered **medically necessary** for the treatment of the following ophthalmic indications:

   1. Neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative therapy;
   2. Corneal ulcers and melts that do not respond to initial conservative therapy;
   3. Corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment;
   4. Bullous keratopathy as a palliative measure in patients who are not candidates for curative treatment (e.g., endothelial or penetrating keratoplasty);
   5. Partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient;
   6. Moderate or severe Stevens-Johnson syndrome;
   7. Persistent epithelial defects that do not respond as stated in policy guidelines.
   8. Severe dry eye (DEWS 3 or 4) with ocular surface damage and inflammation that remains symptomatic after Steps 1, 2, and 3 of the dry eye disease management algorithm (see Policy Guidelines);
   9. Moderate or severe acute ocular chemical burn.
   10. Corneal perforation when corneal tissue is not immediately available; or
   11. Pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft

C. Human amniotic membrane grafts with or without suture are considered **experimental / investigational** for all ophthalmic indications not outlined above.

D. Injection of micronized or particulated human amniotic membrane is considered **experimental / investigational** for all indications, including, but not limited to, treatment of osteoarthritis and plantar fasciitis.

E. Injection of human amniotic fluid is considered **experimental / investigational** for all indications.

F. All other human amniotic products (e.g., derived from amnion, chorion, amniotic fluid, umbilical cord, or Wharton's jelly) not listed above are considered **experimental / investigational** (see policy guidelines).

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

G. All other indications not listed above are considered **experimental / investigational**, including, but not limited to, treatment of lower-extremity ulcers due to venous insufficiency and repair following Mohs micrographic surgery.

## POLICY GUIDELINES

A. Nonhealing of diabetic wounds is defined as less than a 20% decrease in wound area with standard wound care for at least 2 weeks based on the entry criteria for clinical trials (e.g., Zelen et al, 2015).

B. A persistent epithelial defect is one that failed to close completely after 5 days of conservative treatment or has failed to demonstrate a decrease in size after 2 days of conservative treatment.

C. Conservative treatment is defined as use of topical lubricants and/or topical antibiotics and/or therapeutic contact lens and/or patching. Failure of multiple modalities should not be required prior to moving to human amniotic membrane grafts. An amniotic membrane graft requires less effort on the part of the patient to adhere to a treatment regimen and has a significant advantage in regard to treatments requiring multiple drops per day.

Tables PG1 and PG2 list the medically necessary and investigational amniotic products that have an HCPCS code.

**Table PG1 Amniotic Products Listed in the Policy Statements**

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| Affinity® | Organogenesis (previously NuTech Medical) | Q4159 |
| AmnioBand® Membrane | MTF Wound Care | Q4151 |
| Biovance® | Celularity | Q4154 |
| Epifix® | MiMedx | Q4186 |
| Epicord® | MiMedx | Q4187 |
| Grafix® | Osiris | Q4132, Q4133 |

**Table PG2 Other Amniotic Products with HCPCS Codes**

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| Allogen | Vivex Biomedical | Q4212 |
| AlloWrap™ | AlloSource | Q4150 |
| AmnioAMP-MP | Stratus BioSystems | Q4250 |
| Amnioarmor™ | Tissue Transplant Technology | Q4188 |
| AmnioBand® Particulate | MTF Wound Care | Q4168 |
| AmnioExcel® | Derma Sciences | Q4137 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| Amnio-maxx or Manio-maxx lite | Royal Biologics | Q4239 |
| Amniotext | Regenerative Labs | Q4245 |
| Amniowound | Alpha Tissue | Q4181 |
| Amnion bio or Axomembrane | Axolotl Biologix | Q4211 |
| Amniocore™ | Stability Biologics | Q4227 |
| Amniocyte | Predictive Biotech | Q4242 |
| AmnioMatrix® | Integra Life Sciences | Q4139 |
| Amniply | International Tissue | Q4249 |
| Amniorepair or AltiPly | Zimmer Biomet | Q4235 |
| Amniotext patch | Regenerative Labs | Q4247 |
| AmnioWrap2™ | Direct Biologics | Q4221 |
| Articent ac (flowable) | Tides Medical | Q4189 |
| Artacent ac (patch) | Tides Medical | Q4190 |
| Artacent® Wound | Tides Medical | Q4169 |
| Artacent® Cord | Tides Medical | Q4126 |
| Ascent | StimLabs | Q4213 |
| Axolotl ambien or Axolotl Cryo | Axolotl Biology | Q4215 |
| BioDDryFlex® | BioD | Q4138 |
| BioDfence™ | Integra Life Science | Q4140 |
| BioNextPATCH | BioNext Solutions | Q4228 |
| BioWound, BioWound Plus™, BioWound XPlus™ | HRT[a] | Q4217 |
| carePATCH | Extremity Care | Q4236 |
| Cellesta/Cellesta duo | Ventris Medical | Q4184 |
| Cellesta Cord | Ventris Medical | Q4214 |
| Cellesta flowable | Ventris Medical | Q4185 |
| Clarix® | Amniox Medical | Q4156 |
| Clarix® Flo | Amniox Medical | Q4155 |
| Cogenex flowable amnion | Ventris Medical | Q4230 |
| Cogenex amniotic membrane | Ventris Medical | Q4229 |
| Corecyte | Predictive Biotech | Q4240 |
| Corplex | StimLabs | Q4232 |
| Corplex P | StimLabs | Q4231 |
| Coretext or Protext | Regenerative Labs | Q4246 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| Cryo-cord | Royal Biologics | Q4237 |
| Cygnus | Vivex Biomedical | Q4170 |
| Dermacyte | Merakris Therapeutics | Q4248 |
| Dermavest™ or Plurivest | AediCell[a] | Q4153 |
| Derm-maxx | Royal Biologics | Q4238 |
| Epifix Injectable | MiMedx | Q4145 |
| Floweramnioflo | Flower Orthopedics | Q4177 |
| Floweramniopatch | Flower Orthopedics | Q4178 |
| Fluid flow or Fluid GF | BioLab Sciences | Q4206 |
| Genesis | Genesis Biologics | Q4198 |
| Guardian/AmnioBand® | MTF Wound Care | Q4151 |
| Interfyl® | Celularity | Q4171 |
| Matrion | LifeNet Health | Q4201 |
| Neopatch or Therion | CryoLife | Q4176 |
| Neox® Cord | Amniox Medical | Q4148 |
| Neox® Flo | Amniox Medical | Q4155 |
| Neox® Wound | Amniox Medical | Q4156 |
| Novachor | Organogenisis | Q4191 |
| Novafix® | Triad Life Sciences | Q4208 |
| Novafix DL | Triad Life Sciences | Q4254 |
| NuShield | Organogenesis | Q4160 |
| PalinGen® Membrane | Amnio ReGen Solutions | Q4173 |
| PalinGen® SportFlow | Amnio ReGen Solutions | Q4174 |
| Plurivest™ | AediCell | Q4153 |
| Polycyte | Predictive Biotech | Q4241 |
| Procenta | Lucina BioSciences | Q4244 |
| Reguard | New Life Medical | Q4255 |
| Restorigin | UMTB Biomedical | Q4191 |
| Restorigin Injectable | UMTB Biomedical | Q4192 |
| Revita | StimLabs | Q4180 |
| Revitalon™ | Medline Industries | Q4157 |
| Surgenex, Surfactor, and Nudyn | Surgenex | Q4233 |
| Surgicord | Synergy Biologics | Q4218 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Trade Name | Supplier | HCPCS Code |
|---|---|---|
| SurgiGRAFT™ | Synergy Biologics | Q4183 |
| WoundEx® | Skye Biologics[a] | Q4163 |
| WoundEx® Flow | Skye Biologics[a] | Q4162 |
| Woundfix, Woundfix Plus, Wounfix XPlus (see BioWound above) | HRT | Q4217 |
| Xcellerate | Precise Bioscience | Q4234 |
| Xwrap | Applied Biologics | Q4204 |

HRT: Human Regenerative Technologies; MTF: Musculoskeletal Transplant Foundation
[a] Processed by HRT and marketed under different tradename

Tear Film and Ocular Surface Society staged management for dry eye disease (Jones et al, 2017)
Step 1:
- Education regarding the condition, its management, treatment and prognosis
- Modification of local environment
- Education regarding potential dietary modifications (including oral essential fatty acid supplementation)
- Identification and potential modification/elimination of offending systemic and topical medications
- Ocular lubricants of various types (if meibomian gland dysfunction is present, then consider lipid containing supplements)
- Lid hygiene and warm compresses of various types

Step 2:
If above options are inadequate consider:
- Non-preserved ocular lubricants to minimize preservative-induced toxicity
- Tea tree oil treatment for Demodex (if present)
- Tear conservation
- Punctal occlusion
- Moisture chamber spectacles/goggles
- Overnight treatments (such as ointment or moisture chamber devices)
- In-office, physical heating and expression of the meibomian glands
- In-office intense pulsed light therapy for meibomian gland dysfunction
- Prescription drugs to manage dry eye disease
- Topical antibiotic or antibiotic/steroid combination applied to the lid margins for anterior blepharitis (if present)
- Topical corticosteroid (limited-duration)
- Topical secretagogues
- Topical non-glucocorticoid immunomodulatory drugs (such as cyclosporine)
- Topical LFA-1 antagonist drugs (such as lifitegrast)
- Oral macrolide or tetracycline antibiotics

Step 3:
If above options are inadequate consider:
- Oral secretagogues
- Autologous/allogeneic serum eye drops

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

- Therapeutic contact lens options
- Soft bandage lenses
- Rigid scleral lenses

Step 4:
If above options are inadequate consider:
- Topical corticosteroid for longer duration
- Amniotic membrane grafts
- Surgical punctal occlusion
- Other surgical approaches (e.g. tarsorrhaphy, salivary gland transplantation)

Dry eye severity level DEWS 3 to 4
- Discomfort, severity, and frequency - Severe frequent or constant
- Visual symptoms - chronic and/or constant, limiting to disabling
- Conjunctival Injection - +/- or +/+
- Conjunctive Staining - moderate to marked
- Corneal Staining - marked central or severe punctate erosions
- Corneal/tear signs - Filamentary keratitis, mucus clumping, increase in tear debris
- Lid/meibomian glands - Frequent
- Tear film breakup time - < 5
- Schirmer score (mm/5 min) - < 5

**Please refer to the member's contract benefits in effect at the time of service to determine coverage or non-coverage of these services as it applies to an individual member.**

## RATIONALE

This evidence review has been updated regularly with searches of the PubMed database. The most recent literature update was performed through January 3, 2022.

Evidence reviews assess the clinical evidence to determine whether the use of technology improves the net health outcome. Broadly defined, health outcomes are the length of life, quality of life (quality of life), and ability to function, including benefits and harms. Every clinical condition has specific outcomes that are important to patients and managing the course of that condition. Validated outcome measures are necessary to ascertain whether a condition improves or worsens; and whether the magnitude of that change is clinically significant. The net health outcome is a balance of benefits and harms.

To assess whether the evidence is sufficient to draw conclusions about the net health outcome of technology, 2 domains are examined: the relevance, and quality and credibility. To be relevant, studies must represent one or more intended clinical use of the technology in the intended population and compare an effective and appropriate alternative at a comparable intensity. For some conditions, the alternative will be supportive care or surveillance. The quality and credibility of the evidence depend on study design and conduct, minimizing bias and confounding that can generate incorrect findings. The randomized controlled trial (RCT) is preferred to assess efficacy; however, in some circumstances, nonrandomized studies may be adequate. RCTs are rarely large enough or long enough to capture less common adverse events

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

and long-term effects. Other types of studies can be used for these purposes and to assess generalizability to broader clinical populations and settings of clinical practice.

## DIABETIC LOWER-EXTREMITY ULCERS

### Patch or Flowable Amniotic Membrane or Placental Membrane

### Clinical Context and Therapy Purpose

The purpose of patch or flowable amniotic membrane or placental membrane in patients who have diabetic lower-extremity ulcers is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does amniotic membrane or placental membrane improve the net health outcome in patients with diabetic lower-extremity ulcers?

The following PICO was used to select literature to inform this review.

#### *Populations*

The relevant population of interest is patients with diabetic lower-extremity ulcers that have failed to heal with the standard of care (SOC) therapy.

#### *Interventions*

The therapy being considered is an amniotic membrane or placental membrane applied every 1 to 2 weeks. It is applied in addition to the SOC.

#### *Comparators*

The following therapies are currently being used to make decisions about the healing of diabetic lower-extremity ulcers: SOC, which involves moist dressing, dry dressing, compression therapy, and offloading.

#### *Outcomes*

The primary endpoints of interest for trials of wound closure are as follows, consistent with guidance from the U.S. Food and Drug Administration (FDA) for the industry in developing products for the treatment of chronic cutaneous ulcer and burn wounds:

- Incidence of complete wound closure.
- Time to complete wound closure (reflecting accelerated wound closure).
- Incidence of complete wound closure following surgical wound closure.
- Pain control.
- Complete ulcer healing with advanced wound therapies may be measured at 6 to 12 weeks.

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**

At least 7 RCTs have evaluated rates of healing with amniotic membrane grafts or placental membrane graft compared to SOC or an advanced wound therapy in patients with chronic diabetic foot ulcers (see Table 1). The number of patients in these studies ranged from 25 to 155. Human amniotic membrane (HAM) or placental membrane grafts improved healing compared to SOC by 22% (EpiCord vs. Alginate dressing) to 60% (EpiFix) in the intention-to-treat (ITT) analysis (see Table 2). In a 2018 trial, the cryopreserved placental membrane Grafix was found to be non-inferior to an advanced fibroblast-derived wound therapy (Dermagraft).

**Table 1. Summary of Key RCT Characteristics**

| Study; Trial | Countries | Sites | Dates | Participants | Active Intervention | Comparator |
|---|---|---|---|---|---|---|
| Serena et al (2020)[6,] | U.S. | 14 | | 76 patients with chronic (> 4 weeks) non-healing diabetic foot ulcers unresponsive to SOC and extending into dermis, subcutaneous tissue, muscle, or tendon | n=38, Affinity | n=38, SOC |
| Ananian et al (2018)[7,] | U.S. | 7 | 2016-2017 | 75 patients with chronic (> 4 weeks) non-healing diabetic foot ulcers between 1 cm2 and 15 cm2 | n=38, Grafix weekly for up to 8 weeks | n=37, Dermagraft (fibroblast-derived) weekly for up to 8 weeks |
| Tettelbach et al (2018)[8,] | U.S. | 11 | 2016-2018 | 155 patients with chronic (> 4 weeks) non-healing diabetic foot ulcers | n=101 EpiCord plus SOC | n=54 SOC with alginate dressing |
| DiDomenico et al (2018)[9,] | | | | 80 patients with non-healing (4 weeks) diabetic foot ulcers | AmnioBand Membrane plus SOC | SOC |
| Snyder et al (2016)[10,] | | | | 29 patients with non-healing diabetic foot ulcers | AmnioExcel plus SOC | SOC |
| Zelen et al (2015, 2016)[11,12,] | | 4 | | 60 patients with less than 20% wound healing in a 2 week run-in period | EpiFix | Apligraf or SOC with collagen-alginate dressing |
| Tettelbach et al (2019)[13,] | U.S. | 14 | | 110 patients with non-healing (4 weeks) lower extremity ulcers | EpiFix | SOC with alginate dressing |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Study; Trial | Countries | Sites | Dates | Participants | Active Intervention | Comparator |
|---|---|---|---|---|---|---|
| Lavery et al (2014)[14,] | | | | 97 patients with chronic diabetic foot ulcers | Grafix Weekly | SOC |

RCT: randomized controlled trial; SOC: standard of care including debridement, nonadherent dressing, moisture dressing, a compression dressing and offloading.

**Table 2. Summary of Key RCT Results**

| Study | Wounds Healed | Wounds Healed | Time to Complete Healing | Adverse Events and Number of Treatments |
|---|---|---|---|---|
| Serena et al (2020)[6,] | 12 Weeks (ITT) (%) | 16 Weeks (ITT) (%) | Median | |
| N | 76 | 76 | 76 | |
| Affinity | 55% | 58% | 11 weeks | |
| SOC | 29% | 29% | not attained by 16 weeks | |
| p-value | .02 | .01 | | |
| HR (95% CI) | | 1.75 (1.16 to 2.70) | | |
| Ananian et al (2018)[7,] | 8 Weeks (PP) n (%) | | | Patients with Index Ulcer Related Adverse Events n (%) |
| N | 62 | | | 75 |
| Grafix | 15 (48.4%) | | | 1 (5.9%) |
| Dermagraft | 12 (38.7%) | | | 4 (16.7%) |
| Diff (95% CI) | 9.68% (−10.7 to 28.9) | | | |
| Lower bound for non-inferiority | -15% | | | |
| Tettlebach et al (2018)[8,] | 12 Weeks (PP) n (%) | 12 Weeks (ITT) n (%) | | Patients with Adverse Events (% of total) |
| N | 134 | 155 | | 155 |
| EpiCord | 81 (81%) | 71 (70%) | | 42 (42%) |
| SOC | 29 (54%) | 26 (48%) | | 33 (61%) |
| p-value | .001 | .009 | | |
| DiDomenico et al (2018)[9,] | 6 Weeks (ITT) n (%) | 12 weeks ITT n (%) | Mean Days (95% CI) | |
| N | 80 | 80 | 80 | |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| **Study** | **Wounds Healed** | **Wounds Healed** | **Time to Complete Healing** | **Adverse Events and Number of Treatments** |
|---|---|---|---|---|
| AmnioBand | 27 (68) | 34 (85) | 37.0 (29.5 to 44.4) | |
| SOC | 8 (20) | 13 (33) | 67.3 (59.0 to 79.6) | |
| HR (95% CI) | | 4.25 (0.44 to 0.79) | | |
| p-value | <.001 | <.001 | <.001 | |
| Snyder et al. (2016)[10,] | **6 Weeks (PP) Mean (95% CI)** | | | |
| N | 21 | | | |
| AmnioExcel | 45.5% (32.9% to 58.0%) | | | |
| SOC | 0% | | | |
| p-value | .014 | | | |
| Zelen et al (2015, 2016)[11,12,] | 6 Weeks ITT n (%) | Wounds Healed at 12 Weeks | | Weekly Treatments |
| N | 60 | 100 | | |
| EpiFix | 19 (95%) | NR | | 3.4 |
| Apligraf | 9 (45%) | NR | | 5.9 |
| SOC | 7 (35%) | NR | | |
| HR (95% CI) | | 5.66; (3.03 to 10.57) | | |
| p-value | .003 | <.001 vs. SOC | | .003 |
| Tettelbach et al (2019)[13,] | | Wounds Healed at 12 Weeks (ITT) n(%) | | |
| N | | 110 | | 110 |
| EpiFix | | 38 (81) | | |
| SOC | | 28 (55) | | |
| p-value | | | | |
| Lavery et al (2014)[14,] | | Wounds Healed at 12 Weeks | | Patients With Adverse Events |
| N | | 97a | 97 | 97 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Study | Wounds Healed | Wounds Healed | Time to Complete Healing | Adverse Events and Number of Treatments |
|---|---|---|---|---|
| Grafix | | 62.0% | 42.0 | 44.0% |
| SOC | | 21.3% | 69.5 | 66.0% |
| p-value | | <.001 | .019 | .031 |
| Difference in wounds healed between amniotic or placental membrane and SOC | Affinity 26% AmnioBand 55% AmnioExcel 33% EpiFix 60% | Affinity 28% EpiCord 22% Grafix 41% | | |

CI: confidence interval; DIFF: difference; HR: hazard ratio; ITT: intention-to-treat; NR: not reported; PP: per-protocol; RCT: randomized controlled trial; SOC: standard of care.
a. Power analysis indicated that 94 patients per arm would be needed. However, after a prespecified interim analysis at 50% enrollment, the blinded review committee recommended the trial is stopped due to the efficacy of the treatment.

Limitations in study design and conduct are shown in Table 3. Studies without notable limitations reported power analysis, blinded assessment of wound healing, evaluation of wound closure as the primary outcome measure, and ITT analysis. Limitations from the RCT with AmnioExcel (Snyder et al, 2016) [10,] preclude conclusions for this product.

**Table 3. Study Design and Conduct Limitations**

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| Serena et al (2020)[6,] | 3. The randomization process and allocation concealment were not described | 1, 2. No blinding of patients or investigators. Assessors were blinded | | 1. Although ITT analysis, there was substantial missing data for depth and volume with the digital analysis system. | | |
| Ananian et al (2018)[7,] | | 2, 3. No blinding for outcomes assessment | | | | |
| Tettelbach et al (2018)[8,] | | 1, 2, 3. No blinding | | | | |
| DiDomenico et al (2018)[9,] | | | | | | |
| Snyder et al (2016)[10,] | | | | 1. There was high loss to follow-up with discontinuation of 8 of 29 participants | 1. Power analysis | |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| | | | | | was not reported | |
| Zelen et al (2015, 2016)[11,12,] | | | | 1. Thirteen of 35 patients in the SOC group exited the study at 6 weeks due to less than 50% healing, which may have affected the 12-week results. | | |
| Tettelbach et al (2019)[13,] | | 1, 2. No blinding of patients or investigators. Assessors were blinded | | | | |
| Lavery et al (2014)[14,] | | | | | | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
ITT: intention to treat; SOC: standard of care.
a Allocation key: 1. Participants not randomly allocated; 2. Allocation not concealed; 3. Allocation concealment unclear; 4. Inadequate control for selection bias.
b Blinding key: 1. Not blinded to treatment assignment; 2. Not blinded outcome assessment; 3. Outcome assessed by treating physician.
c Selective Reporting key: 1. Not registered; 2. Evidence of selective reporting; 3. Evidence of selective publication.
d Data Completeness key: 1. High loss to follow-up or missing data; 2. Inadequate handling of missing data; 3. High number of crossovers; 4. Inadequate handling of crossovers; 5. Inappropriate exclusions; 6. Not intent to treat analysis (per protocol for noninferiority trials).
e Power key: 1. Power calculations not reported; 2. Power not calculated for primary outcome; 3. Power not based on clinically important difference.
f Statistical key: 1. Analysis is not appropriate for outcome type: (a) continuous; (b) binary; (c) time to event; 2. Analysis is not appropriate for multiple observations per patient; 3. Confidence intervals and/or p values not reported; 4. Comparative treatment effects not calculated.

## Prospective Single-arm or Registry Studies

Prospective single-arm or registry studies are described in Tables 4 and 5.

Smiell et al (2015) reported on an industry-sponsored, multicenter registry study of Biovance d-HAM for the treatment of various chronic wound types; about a third (n=47) were diabetic foot wounds.[15,] Of those treated, 28 ulcers had failed prior treatment with advanced biologic therapies. For all wound types, 41.6% closed within a mean time of 8 weeks and a mean of 2.4 amniotic membrane applications.

In 2016, Frykberg et al reported treatment of complex chronic wounds (exposed tendon or bone) with Grafix. With the cryopreserved placental membrane applied weekly for up to 16 weeks, 59% of wounds closed with a mean time to closure of 9 weeks.[16,]

Current Procedural Terminology © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 4. Summary of Prospective Single-arm Studies or Registry Characteristics**

| Study | Study Design | Participants | Treatment Delivery |
|---|---|---|---|
| Smiell et al (2015)[15,] | Multicenter Registry | Various chronic wounds: 47 diabetic foot wounds, 20 pressure ulcers, and 89 venous ulcers; 28 had failed prior treatment with advanced biologic therapies (Apligraf, Dermagraft, or Regranex) | Biovance |
| Frykberg et al (2016)[16,] | Prospective multi-center single-arm study | 31 patients with chronic complex diabetic foot wounds with exposed tendon or bone | Grafix weekly until closure or 16 weeks |

**Table 5. Summary of Prospective Single-arm Studies or Registry Results**

| Study | Treatment | Wounds Closed | Mean Time to Closure | Number of Applications |
|---|---|---|---|---|
| Smiell et al (2015)[15,] | Biovance | 41.6% | 8 weeks | 2.4 |
| Frykberg et al (2016)[16,] | Grafix | 59.3% | 9 weeks | 9 |

**Section Summary: Diabetic Lower-Extremity Ulcers**

For individuals who have non-healing diabetic lower-extremity ulcers who receive a patch or flowable formulation of HAM or placental membrane (i.e., Affinity, AmnioBand Membrane, AmnioExcel, Biovance, EpiCord, EpiFix, Grafix), the evidence includes RCTs. The RCTs evaluating amniotic and placental membrane products for the treatment of non-healing (<20% healing with ≥2 weeks of standard care) diabetic lower-extremity ulcers have compared HAM with standard care or with an established advanced wound care product. These trials used wound closure as the primary outcome measure, and some included power analysis, blinded assessment of wound healing, and ITT analysis. For the HAM products that have been sufficiently evaluated (i.e., Affinity, AmnioBand Membrane, Biovance, EpiCord, EpiFix, Grafix), results have shown improved outcomes compared with standard care, and outcomes that are at least as good as an established advanced wound care product. Improved health outcomes in the RCTs are supported by multicenter registries. No studies were identified that compared different amniotic or placental products, and indirect comparison between products is limited by variations in the patient populations.

## LOWER-EXTREMITY ULCERS DUE TO VENOUS INSUFFICIENCY

### Amniotic Membrane

### Clinical Context and Therapy Purpose

The purpose of amniotic membrane or placental membrane in patients who have lower-extremity ulcers due to venous insufficiency is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does amniotic membrane or placental membrane improve the net health outcome in patients with venous ulcers?

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The following PICO was used to select literature to inform this review.

### *Populations*
The relevant population of interest is patients with lower-extremity venous ulcers that have failed to heal with SOC therapy.

### *Interventions*
The therapy being considered is amniotic membrane or placental membrane applied every 1 to 2 weeks. It is applied in addition to the SOC.

### *Comparators*
The following therapies are currently being used to make decisions about the healing of venous ulcers: SOC, which involves moist dressing, dry dressing, and compression therapy.

### *Outcomes*
The primary endpoints of interest for trials of wound closure are as follows, consistent with guidance from the FDA for the industry in developing products for the treatment of chronic cutaneous ulcer and burn wounds:

- Incidence of complete wound closure.
- Time to complete wound closure (reflecting accelerated wound closure).
- Incidence of complete wound closure following surgical wound closure.
- Pain control.
- Complete ulcer healing with advanced wound therapies may be measured at 6 to 12 weeks.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence
Two RCTs, both with EpiFix, were identified on HAM for venous leg ulcers. Serena et al (2014) reported on an industry-sponsored multicenter open-label RCT that compared EpiFix d-HAM plus compression therapy with compression therapy alone for venous leg ulcers (see Tables 6 and 7).[17,] The primary outcome in this trial was the proportion of patients with 40% wound closure at 4 weeks, which was achieved by about twice as many patients in the combined EpiFix group compared with the control group (see Table 8). However, a similar percentage of patients in the combined EpiFix group and the control group achieved complete wound closure during the 4-week study. There was no significant difference in healing for wounds given 1 versus 2 applications of amniotic membrane (62% vs. 63%, respectively). Strengths of this trial included

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

adequate power and ITT analysis with last observation carried forward. Limitations included the lack of blinding for wound evaluation and use of 40% closure rather than complete closure. A 2015 retrospective study of 44 patients from this RCT (31 treated with amniotic membrane) found that wounds with at least 40% closure at 4 weeks (n=20) had a closure rate of 80% by 24 weeks; however, this analysis did not take into account additional treatments after the 4-week randomized trial period.

A second industry-sponsored, multicenter, open-label RCT (Bianchi et al [2018; 2019]) evaluated the time to complete ulcer healing following weekly treatment with EpiFix d-HAM plus compression therapy or compression wound therapy alone (see Tables 6 and 7).[18,19,] Patients treated with EpiFix had a higher probability of complete healing by 12 weeks, as adjudicated by blinded outcome assessors (hazard ratio, 2.26; 95% CI, 1.25 to 4.10; p=.01), and improved time to complete healing, as assessed by Kaplan-Meier analysis. In per-protocol analysis, healing within 12 weeks was reported for 60% of patients in the EpiFix group and 35% of patients in the control group (p<.013) (see Table 8). Intent-to-treat analysis found complete healing in 50% of patients in the EpiFix group compared to 31% of patients in the control group (p=.0473). There were several limitations of this trial (see Tables 8 and 9). In the per-protocol analysis, 19 (15%) patients were excluded from the analysis, and the proportion of patients excluded differed between groups (19% from the EpiFix group vs. 11% from the control group). There was also a difference between the groups in how treatment failures at 8 weeks were handled. Patients in the control group who did not have a 40% decrease in wound area at 8 weeks were considered study failures and treated with advanced wound therapies. The ITT analysis used last-observation-carried-forward for these patients and sensitivity analysis was not performed to determine how alternative methods of handling the missing data would affect results. Kaplan-Meier analysis suggested a modest improvement in the time to heal when measured by ITT analysis, but may be subject to the same methodological limitations.

Two additional studies, one with Amnioband and a second with Artacent, are listed on clinicaltrials.gov as completed in 2018, but results have not been published (see Table 14)

**Table 6. Summary of Key RCT Characteristics**

| | | | | | Interventions | |
|---|---|---|---|---|---|---|
| **Study** | **Countries** | **Sites** | **Dates** | **Participants** | **Active** | **Comparator** |
| Serena et al (2014)[17,] | U.S. | 8 | 2012-2014 | 84 patients with a full-thickness chronic VLU between 2 and 20 cm2 treated for at least 14 d | 1 (n=26) or 2 (n=27) applications of EpiFix plus standard wound therapy (n=53) | Standard wound therapy (debridement with alginate dressing and compression) (n=31) |
| Bianchi et al (2018, 2019)[18,19,] | U.S. | 15 | 2015-2017 | 128 patients with a full-thickness VLU of at least 30-d duration | Weekly EpiFix plus moist wound therapy plus compression (n=64 ITT; 52 PP) | Moist wound therapy plus compression (n=64 ITT; 57 PP) |

ITT: Intent-to-treat; PP: per-protocol; RCT: randomized controlled trial; VLU: venous leg ulcer.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

### Table 7. Summary of Key RCT Results

| Study | Percent With 40% Wound Closure at 4 Weeks | Percent With Complete Wound Closure at 4 Weeks | Complete Wound Closure at 12 Weeks n (%) | | Complete Wound Closure at 16 Weeks n (%) | |
|---|---|---|---|---|---|---|
| | | | PP | ITT | PP | ITT |
| Serena et al (2014)[17,] | | | | | | |
| EpiFix | 62 | 11.3 | | | | |
| Control | 32 | 12.9 | | | | |
| p-Value | .005 | | | | | |
| Bianchi et al (2018, 2019 )[18,19,] | | | | | | |
| EpiFix | | | 31 (60) | 32 (50) | 37 (71) | 38 (59) |
| Control | | | 20 (35) | 20 (31) | 25 (44) | 25 (39) |
| p-Value | | | .013 | .047 | .007 | .034 |

ITT: Intent-to-treat; PP: per protocol; RCT: randomized controlled trial.

### Table 8. Study Relevance Limitations

| Study | Population[a] | Intervention[b] | Comparator[c] | Outcomes[d] | Follow-Up[e] |
|---|---|---|---|---|---|
| Serena et al (2014)[17,] | | | | | |
| Bianchi et al (2018, 2019 )[18,19,] | | | | | 1. Advanced wound therapy was allowed in the control group before the primary endpoint was reached. |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.

[a] Population key: 1. Intended use population unclear; 2. Clinical context is unclear; 3. Study population is unclear; 4. Study population not representative of intended use.

[b] Intervention key: 1. Not clearly defined; 2. Version used unclear; 3. Delivery not similar intensity as comparator; 4.Not the intervention of interest.

[c] Comparator key: 1. Not clearly defined; 2. Not standard or optimal; 3. Delivery not similar intensity as intervention; 4. Not delivered effectively.

[d] Outcomes key: 1. Key health outcomes not addressed; 2. Physiologic measures, not validated surrogates; 3. No CONSORT reporting of harms; 4. Not establish and validated measurements; 5. Clinical significant difference not prespecified; 6. Clinical significant difference not supported.

[e] Follow-Up key: 1. Not sufficient duration for benefit; 2. Not sufficient duration for harms.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 9. Study Design and Conduct Limitations**

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| Serena et al (2014)[17,] | | | | | | |
| Bianchi et al (2018, 2019 )[18,19,] | | 1. Open-label with blinded assessors | | 1. Unequal exclusion of patients in the 2 groups in the per-protocol analysis.3. Advanced wound therapy was allowed in the control group before the primary endpoint was reached | | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
[a] Allocation key: 1. Participants not randomly allocated; 2. Allocation not concealed; 3. Allocation concealment unclear; 4. Inadequate control for selection bias.
[b] Blinding key: 1. Not blinded to treatment assignment; 2. Not blinded outcome assessment; 3. Outcome assessed by treating physician.
[c] Selective Reporting key: 1. Not registered; 2. Evidence of selective reporting; 3. Evidence of selective publication.
[d] Data Completeness key: 1. High loss to follow-up or missing data; 2. Inadequate handling of missing data; 3. High number of crossovers; 4. Inadequate handling of crossovers; 5. Inappropriate exclusions; 6. Not intent to treat analysis (per protocol for noninferiority trials).
[e] Power key: 1. Power calculations not reported; 2. Power not calculated for primary outcome; 3. Power not based on clinically important difference.
[f] Statistical key: 1. Analysis is not appropriate for outcome type: (a) continuous; (b) binary; (c) time to event; 2. Analysis is not appropriate for multiple observations per patient; 3. Confidence intervals and/or p values not reported; 4. Comparative treatment effects not calculated.

### Biovance

As described above, Smiell et al (2015) reported on an industry-sponsored, multicenter registry study of Biovance d-HAM for the treatment of various chronic wound types; about half (n=89) were venous ulcers.[15,] Of the 179 treated, 28 (16%) ulcers had failed prior treatment with advanced biologic therapies. For all wound types, 41.6% closed within a mean time of 8 weeks and a mean of 2.4 amniotic membrane applications. However, without a control group, the percentage of wounds that would have healed with SOC is unknown.

### Section Summary: Lower-Extremity Ulcers Due to Venous Insufficiency

The evidence on HAM for the treatment of venous leg ulcers includes 2 multicenter RCTs with EpiFix. One RCT reported a larger percent wound closure at 4 weeks, but the percentage of patients with complete wound closure at 4 weeks did not differ between EpiFix and the SOC. A second RCT evaluated complete wound closure at 12 weeks after weekly application of EpiFix or standard dressings with compression. Although a significant difference in complete healing was reported, interpretation is limited by the differential loss to follow-up and exclusions between

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

groups. Although a subsequent publication reported ITT analysis, the handling of missing data differed between the groups and sensitivity analysis was not performed. The methodological flaws in the design, execution, and reporting of both of these RCTs limit inference that can be drawn from the results. Two additional studies with other HAM products have been completed but not published, raising further questions about the efficacy of HAM for lower-extremity ulcers due to venous insufficiency. Therefore, corroboration with well-designed and well-conducted RCTs evaluating wound healing in patients with venous leg ulcers is needed to demonstrate efficacy. The corroborating RCTs should report ITT and sensitivity analysis, with analysis of all patients, including those who were off treatment or had protocol deviations and exclusions.

## OSTEOARTHRITIS

### ReNu™ Knee Injection in Patients with Osteoarthritis

In 2016, a feasibility study (N=6) was reported of cryopreserved human amniotic membrane (c-HAM) suspension with amniotic fluid-derived cells for the treatment of knee osteoarthritis.[20,] A single intra-articular injection of the suspension was used, with follow-up at 1 and 2 weeks and at 3, 6, and 12 months posttreatment. Outcomes included the Knee Injury and Osteoarthritis Outcome Score, International Knee Documentation Committee scale, and a numeric pain scale. Statistical analyses were not performed for this small sample. No adverse events, aside from a transient increase in pain, were noted. RCTs are in progress.

A trial with 200 participants was completed in February 2019 (see Table 14). No publications from this trial have been identified.

### Section Summary: Osteoarthritis

Current evidence is insufficient to support definitive conclusions on the utility of c-HAM in the treatment of knee osteoarthritis.

## PLANTAR FASCIITIS

### Clinical Context and Therapy Purpose

The purpose of micronized amniotic membrane in patients who have plantar fasciitis is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does injectable amniotic membrane improve the net health outcome in patients with plantar fasciitis?

The following PICO was used to select literature to inform this review.

#### *Populations*

The relevant population of interest is patients with plantar fasciitis that has failed to heal with SOC therapy.

#### *Interventions*

The therapy being considered is micronized amniotic membrane. It is applied in addition to the SOC.

#### *Comparators*

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The following therapies are currently being used to make decisions about the healing of plantar fasciitis: corticosteroid injections and SOC, which involves offloading, night-splinting, stretching, and orthotics.

### *Outcomes*

The primary endpoints of interest for trials of plantar fasciitis are as follows: Visual Analog Score (VAS) for pain and function measured by the Foot Functional Index.

Acute effects of HAM injection may be measured at 2 to 4 weeks. The durability of treatment would be assessed at 6 to 12 months.

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence

One systematic review and 2 randomized pilot studies were identified on the treatment of plantar fasciitis using an injection of micronized HAM.

### Systematic Review

A 2016 network meta-analysis of 22 RCTs (total N=1216 patients) compared injection therapies for plantar fasciitis.[21,] In addition to c-HAM and micronized d-HAM/chorionic membrane, treatments included corticosteroids, botulinum toxin type A, autologous whole blood, platelet-rich plasma, nonsteroidal anti-inflammatory drugs, dry needling, dextrose prolotherapy, and polydeoxyribonucleotide. Placebo arms included normal saline, local anesthetic, sham dry needling, and tibial nerve block. Analysis indicated d-HAM had the highest probability for improvement in pain and composite outcomes in the short-term, however, this finding was based only on a single RCT. Outcomes at 2 to 6 months (7 RCTs) favored botulinum toxin for pain and patient recovery plan for composite outcomes.

### Randomized Controlled Trials

Zelen et al (2013) reported a preliminary study with 15 patients per group (placebo, 0.5 cc, and 1.25 cc) and 8-week follow-up.[22,] A subsequent RCT by Cazell et al (2018) enrolled 145 patients and reported 3-month follow-up (see Table 10).[23,] In Cazzell et al (2018) amniotic membrane injection led to greater improvements in the VAS for pain and the Foot Functional Index between baseline and 3 months (see Table 11) compared to controls. VAS at 3 months had decreased to 17.1 in the AmnioFix group compared to 38.8 in the placebo control group, which would be considered a clinically significant difference.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

### Table 10. Summary of Key RCT Characteristics

| Study; Trial | Countries | Sites | Dates | Participants | Active Intervention | Comparator Intervention |
|---|---|---|---|---|---|---|
| Cazzell et al (2018)[23,];AIPF004 (NCT02427191) | U.S. | 14 | 2015-2018 | Adult patients with plantar fasciitis with VAS for pain > 45 | n=73; Single injection of AmnioFix 40 mg/ml | n = 72; Single injection of saline |

NCT02427191: Micronized dHACM Injection as Compared to the Saline Placebo Injection in the Treatment of Plantar Fasciitis; RCT: randomized controlled trial; VAS: visual analog score.

### Table 11. Summary of Key RCT Results

| Study | Change in VAS-Pain Between Baseline and 3 mo (95% CI) | Change in FFI-R Between Baseline and 3mo (95% CI) | Patients with Adverse Events up to 3 mo n(%) | Patients with Serious Adverse Events up to 3 mo n(%) |
|---|---|---|---|---|
| Cazzell et al (2018)[23,]; AIPF004 | N=145 | N=145 | N=145 | N=145 |
| AmnioFix | 54.1 (48.3 to 59.9) | 35.7 (30.5 to 41.0) | 30 (41.1%) | 1 (0.6%) |
| Placebo | 31.9 (24.8 to 39.1) | 22.2 (17.1 to 27.4) | 39 (54.2%) | 3 (1.8%) |
| Diff (95% CI) | 22.2 (13.1 to 31.3) | 13.5 (6.2 to 20.8) | | |
| p-Value | <.001 | <.001 | | |

CI: confidence interval; FFI-R: Foot Function Index; RCT: randomized controlled trial; VAS: visual analog score.

Limitations in relevance and design and conduct of this publication are described in Tables 12 and 13. The major limitation of the study is the short-term follow-up, which the authors note is continuing to 12 months. The extended follow-up will be reported in a separate publication.

### Table 12. Study Relevance Limitations

| Study | Population[a] | Intervention[b] | Comparator[c] | Outcomes[d] | Follow-Up[e] |
|---|---|---|---|---|---|
| Cazzell et al (2018)[23,]; AIPF004 | | | 3. Placebo injections were used. A control delivered at a similar intensity as the investigational treatment would be corticosteroid injections. | | 1, 2. Follow-up to 12 mo will be reported in a subsequent publication. |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
a Population key: 1. Intended use population unclear; 2. Clinical context is unclear; 3. Study population is unclear; 4. Study population not representative of intended use.
b Intervention key: 1. Not clearly defined; 2. Version used unclear; 3. Delivery not similar intensity as comparator; 4. the intervention of interest.
c Comparator key: 1. Not clearly defined; 2. Not standard or optimal; 3. Delivery not similar intensity as intervention; 4. Not delivered effectively.
d Outcomes key: 1. Key health outcomes not addressed; 2. Physiologic measures, not validated surrogates; 3. No

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

CONSORT reporting of harms; 4. Not establish and validated measurements; 5. Clinically significant difference not prespecified; 6. Clinically significant difference not supported.
e Follow-Up key: 1. Not sufficient duration for benefit; 2. Not sufficient duration for harms.

**Table 13. Study Design and Conduct Limitations**

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| Cazzell et al (2018)[23,]; AIPF004 | | 1. Single blinded trial, although outcomes were self-reported by blinded patients | | 1. Only the first 3 months of 12-month follow-up were reported. | | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
a Allocation key: 1. Participants not randomly allocated; 2. Allocation not concealed; 3. Allocation concealment unclear; 4. Inadequate control for selection bias.
b Blinding key: 1. Not blinded to treatment assignment; 2. Not blinded outcome assessment; 3. Outcome assessed by treating physician.
c Selective Reporting key: 1. Not registered; 2. Evidence of selective reporting; 3. Evidence of selective publication.
d Data Completeness key: 1. High loss to follow-up or missing data; 2. Inadequate handling of missing data; 3. High number of crossovers; 4. Inadequate handling of crossovers; 5. Inappropriate exclusions; 6. Not intent to treat analysis (per protocol for noninferiority trials).
e Power key: 1. Power calculations not reported; 2. Power not calculated for primary outcome; 3. Power not based on clinically important difference.
f Statistical key: 1. Analysis is not appropriate for outcome type: (a) continuous; (b) binary; (c) time to event; 2. Analysis is not appropriate for multiple observations per patient; 3. Confidence intervals and/or p values not reported; 4. Comparative treatment effects not calculated.

### Section Summary: Plantar Fasciitis

The evidence on injection of amniotic membrane for the treatment of plantar fasciitis includes preliminary studies and a larger (N =145) patient-blinded comparison of micronized injectable-HAM and placebo control. Injection of micronized amniotic membrane resulted in greater improvements in VAS for pain and the Foot Functional Index compared to placebo controls. The primary limitation of the study is this is an interim report of 3 months' results. The authors noted that 12-month follow-up will be reported in a subsequent publication. No additional publications have been identified as of the latest update.

### Human Amniotic Membrane for Ophthalmologic Conditions

Sutured and self-retained HAM has been evaluated for a variety of ophthalmologic conditions. Traditionally, the amniotic membrane has been fixed onto the eye with sutures or glue or placed under a bandage contact lens for a variety of ocular surface disorders. Several devices have been reported that use a ring around a HAM allograft that allows it to be inserted under topical anesthesia similar to insertion of a contact lens. Sutured HAM transplant has been used for many years for the treatment of ophthalmic conditions. Many of these conditions are rare, leading to difficulty in conducting RCTs. The rarity, severity, and variability of the ophthalmic condition was taken into consideration in evaluating the evidence. The following indications apply to both sutured and self-retained HAM unless specifically noted.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## NEUROTROPHIC KERATITIS WITH OCULAR SURFACE DAMAGE OR INFLAMMATION THAT DOES NOT RESPOND TO CONSERVATIVE TREATMENT

### Clinical Context and Therapy Purpose

The purpose of HAM in patients who have neurotrophic keratitis is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have neurotrophic keratitis?

The following PICO was used to select literature to inform this review.

#### *Populations*

The relevant population of interest is patients who have neurotrophic keratitis with ocular surface damage or inflammation that does not respond to conservative treatment.

#### *Interventions*

The therapy being considered is sutured or non-sutured HAM.

#### *Comparators*

The following therapies are currently being used: tarsorrhaphy or bandage contact lens.

#### *Outcomes*

The general outcomes of interest are eye pain and epithelial healing.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence

Khokhar et al (2005) reported on an RCT of 30 patients (30 eyes) with refractory neurotrophic corneal ulcers who were randomized to HAM transplantation (n=15) or conventional treatment with tarsorrhaphy or bandage contact lens. At the 3-month follow-up, 11 (73%) of 15 patients in the HAM group showed complete epithelialization compared with 10 (67%) of 15 patients in the conventional group. This difference was not significantly significant.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Suri et al (2013) reported on 11 eyes of 11 patients with neurotrophic keratopathy that had not responded to conventional treatment.[24,] The mean duration of treatment prior to ProKera insertion was 51 days. Five of the 11 patients (45.5%) were considered to have had a successful outcome.

**Section Summary: Neurotrophic Keratitis with Ocular Surface Damage and Inflammation that Does Not Respond to Conservative Therapy**

An RCT of 30 patients showed no benefit of sutured HAM graft compared to tarsorrhaphy or bandage contact lens.

**Corneal Ulcers and Melts That D o Not Respond to Initial Medical Therapy**

**Clinical Context and Therapy Purpose**

The purpose of HAM in patients who have corneal ulcers and melts is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net heath outcome in patients who have corneal ulcers and melts?

The following PICO was used to select literature to inform this review.

***Populations***

The relevant population of interest is patients who have corneal ulcers and melts that do not respond to initial medical therapy.

***Interventions***

The therapy being considered is sutured or non-sutured HAM.

***Comparators***

The following therapies are currently being used: tarsorrhaphy and bandage soft contact lens.

***Outcomes***

The general outcomes of interest are eye discomfort and epithelial healing.

Changes in symptoms may be measured in days, while changes in ocular surface would be measured at 1 to 3 months.

**Study Selection Criteria**

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Review of Evidence**
Liu et al (2019) conducted a systematic review of 17 studies (390 eyes) of amniotic membrane for corneal ulcers.[25] All but 1 of the studies was conducted outside of the U.S. There was 1 RCT with 30 patients, the remainder of the studies were prospective or retrospective case series. Corneal healing was obtained in 97% (95% CI: 0.94 to 0.99, p=.089) of patients evaluated. In the 12 studies (222 eyes) that reported on vision, the vision improvement rate was improved in 113 eyes (53%, 95% CI: 0.42 to 0.65, p<.001).

Yin et al (2020) compared epithelialization and visual outcomes of 24 patients with corneal infectious ulcers and visual acuity of less than 20/200 who were treated with (n=11) or without (n=13) self-retained amniotic membrane.[26] Utilization of amniotic membrane was initiated in their institution in 2018, allowing a retrospective comparison of the 2 treatment groups. Complete epithelialization occurred more rapidly (3.56± 1.78 weeks vs. 5.87 ± 2.20 weeks, p=.01) and was reached in significantly more patients (72.7% vs. 23.1%, p=.04). The group treated with amniotic membrane plus the standard therapy had more patients with clinically significant (> 3 lines) improvement in visual acuity (81.8% vs 38.4%, p=.047) and greater total improvement in visual acuity (log MAR 0.7 ± 0.6 vs 1.6 ± 0.9, p=.016).

Suri et al (2013) reported on a series of 35 eyes of 33 patients who were treated with the self-retained ProKera HAM for a variety of ocular surface disorders.[24] Nine of the eyes had non-healing corneal ulcers. Complete or partial success was seen in 2 of 9 (22%) patients with this indication.

**Section Summary: Corneal Ulcers and Melts That Do Not Respond to Initial Medical Therapy**
Corneal ulcers and melts are uncommon and variable and additional RCTs are not expected. A systematic review of 1 RCT and case series showed healing in 97% of patients with an improvement of vision in 53% of eyes. One retrospective comparative study with 22 patients found more rapid and complete epithelialization and more patients with a clinically significant improvement in visual acuity following early treatment with self-retained amniotic membrane when compared to historical controls. These results support the use of non-sutured amniotic membrane for corneal ulcers and melts that do not respond to initial medical therapy.

**CORNEAL PERFORATION WHEN THERE IS ACTIVE INFLAMMATION AFTER CORNEAL TRANSPLANT REQUIRING ADJUNCTIVE TREATMENT**

**Clinical Context and Therapy Purpose**
The purpose of HAM in patients who have active inflammation after a corneal transplant is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have corneal perforation when there is active inflammation after corneal transplant?

The following PICO was used to select literature to inform this review.

***Populations***

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The relevant population of interest is patients who have corneal perforation when there is active inflammation after a corneal transplant.

### *Interventions*
The therapy being considered is sutured or non-sutured HAM.

### *Comparators*
The following therapies are currently being used: medical therapy.

### *Outcomes*
The general outcomes of interest are eye discomfort and reduction in inflammation.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence
No evidence was identified for this indication.

### Section Summary: Corneal Perforation When There is Active Inflammation After Corneal Transplant Requiring Adjunctive Treatment

No evidence was identified for this indication.

## BULLOUS KERATOPATHY IN PATIENTS WHO ARE NOT CANDIDATES FOR A CURATIVE TREATMENT (EG, ENDOTHELIAL OR PENETRATING KERATOPLASTY)

### Clinical Context and Therapy Purpose
The purpose of HAM in patients who have bullous keratopathy is to provide a treatment option that is an alternative to or an improvement on existing therapies. Bullous keratopathy is characterized by stromal edema and epithelial and subepithelial bulla formation.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have bullous keratopathy and are not candidates for a curative treatment?

The following PICO was used to select literature to inform this review.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

***Populations***
The relevant population of interest is patients who have bullous keratopathy who are not candidates for curative treatment.

***Interventions***
The therapy being considered is sutured or non-sutured HAM.

***Comparators***
The following therapies are currently being used: stromal puncture.

***Outcomes***
The general outcomes of interest are eye discomfort and epithelial healing.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

**Study Selection Criteria**
Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**
Dos Santos Paris et al (2013) published an RCT that compared fresh HAM with stromal puncture for the management of pain in patients with bullous keratopathy.[27,] Forty patients with pain from bullous keratopathy who were either waiting for a corneal transplant or had no potential for sight in the affected eye were randomized to the 2 treatments. Symptoms had been present for approximately 2 years. HAM resulted in a more regular epithelial surface at up to 180 days follow-up, but there was no difference between the treatments related to the presence of bullae or the severity or duration of pain. Because of the similar effects on pain, the authors recommended initial use of the simpler stromal puncture procedure, with use of HAM only if the pain did not resolve.

**Section Summary: Bullous Keratopathy in Patients Who are Not Candidates for a Curative Treatment and Who are Unable to Remain Still for Stromal Puncture**
An RCT found no advantage of sutured HAM over the simpler stromal puncture procedure for the treatment of pain from bullous keratopathy.

**PARTIAL LIMBAL STEM CELL DEFICIENCY WITH EXTENSIVE DISEASED TISSUE WHERE SELECTIVE REMOVAL ALONE IS NOT SUFFICIENT**

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

### Clinical Context and Therapy Purpose

The purpose of HAM in patients who have partial limbal stem cell deficiency is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have partial limbal stem cell deficiency?

The following PICO was used to select literature to inform this review.

#### *Populations*

The relevant population of interest is patients who have limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient.

#### *Interventions*

The therapy being considered is sutured or non-sutured HAM.

#### *Comparators*

The following therapies are currently being used: limbal stem cell transplants.

#### *Outcomes*

The general outcomes of interest are visual acuity and corneal epithelial healing.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence

No RCTs were identified on HAM for limbal stem cell deficiency.

Keirkhah et al (2008) reported on the use of HAM in 11 eyes of 9 patients who had limbal stem cell deficiency.[28,] Patients underwent superficial keratectomy to remove the conjunctivalized pannus followed by HAM transplantation using fibrin glue. An additional ProKera patch was used in 7 patients. An improvement in visual acuity was observed in all but 2 patients. Pachigolla et al (2009) reported a series of 20 patients who received a ProKera implant for ocular surface disorders; 6 of the patients had limbal stem cell deficiency with a history of chemical burn.[29,] Following treatment with ProKera, 3 of the 6 patients had a smooth corneal surface and

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

improved vision to 20/40.[29] The other 3 patients had final visual acuity of 20/400, counting fingers, or light perception.

**Section Summary: Partial Limbal Stem Cell Deficiency with Extensive Diseased Tissue Where Selective Removal Alone is Not Sufficient**

No RCTs were identified on HAM for partial limbal stem cell deficiency. Improvement in visual acuity has been reported for some patients who have received HAM in conjunction with removal of the diseased limbus.

## MODERATE OR SEVERE STEVENS-JOHNSON SYNDROME

### Clinical Context and Therapy Purpose

The purpose of HAM in patients who have Stevens-Johnson syndrome is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have moderate or severe SJS?

The following PICO was used to select literature to inform this review.

#### *Populations*

The relevant population of interest is patients who have moderate or severe Stevens-Johnson syndrome.

#### *Interventions*

The therapy being considered is sutured or non-sutured HAM.

#### *Comparators*

The following therapies are currently being used: medical therapy alone (antibiotics, steroids, or lubricants).

#### *Outcomes*

The general outcomes of interest are visual acuity, tear function, and corneal clarity.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Review of Evidence

One RCT from India by Sharma et al (2016) assigned 25 patients (50 eyes) with acute ocular Stevens-Johnson syndrome to c-HAM plus medical therapy (antibiotics, steroids, or lubricants) or medical therapy alone.[30] The c-HAM was prepared locally and applied with fibrin glue rather than sutures. Application of c-HAM in the early stages of SJS resulted in improved visual acuity (p=.042), better tear breakup time (p=.015), improved Schirmer test results (p<.001), and less conjunctival congestion (p=.03). In the c-HAM group at 180 days, there were no cases of corneal haze, limbal stem cell deficiency, symblepharon, ankyloblepharon, or lid-related complications. These outcomes are dramatically better than those in the medical therapy alone group, which had 11 (44%) cases with corneal haze (p=.001), 6 (24%) cases of corneal vascularization and conjunctivalization (p=.03), and 6 (24%) cases of trichiasis and metaplastic lashes.

**Section Summary: Moderate or Severe Stevens-Johnson Syndrome**
The evidence on HAM for the treatment of SJ Syndrome includes 1 RCT with 25 patients (50 eyes) that found improved symptoms and function with HAM compared to medical therapy alone.

## PERSISTENT EPITHELIAL DEFECTS AND ULCERATIONS THAT DO NOT RESPOND TO CONSERVATIVE THERAPY

### Clinical Context and Therapy Purpose
The purpose of HAM in patients who have persistent epithelial defects and ulcerations is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have persistent epithelial defects and ulcerations that do not respond to conservative therapy?

The following PICO was used to select literature to inform this review.

#### *Populations*
The relevant population of interest is patients who have persistent epithelial defects that do not respond to conservative therapy.

#### *Interventions*
The therapy being considered is sutured or non-sutured HAM.

#### *Comparators*
The following therapies are currently being used for persistent epithelial defects and ulceration: medical therapy alone (e.g., topical lubricants, topical antibiotics, therapeutic contact lens, or patching).

#### *Outcomes*
The general outcomes of interest are epithelial closure.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence

Bouchard and John (2004) reviewed the use of amniotic membrane transplantation in the management of severe ocular surface disease.[31,] They noted that c-HAM has been available since 1995, and has become an established treatment for persistent epithelial defects and ulceration refractory to conventional therapy. However, there was a lack of controlled studies due to the rarity of the diseases and the absence of standard therapy. They identified 661 reported cases in the peer-reviewed literature. Most cases reported assessed the conjunctival indications of pterygium, scars and symblepharon, and corneal indications of acute chemical injury and postinfectious keratitis.

### Section Summary: Persistent Epithelial Defects and Ulceration that Do Not Respond to Conservative Therapy

No RCTs were identified on persistent epithelial defects and ulceration.

## SEVERE DRY EYE DISEASE WITH OCULAR SURFACE DAMAGE AND INFLAMMATION THAT DOES NOT RESPOND TO CONSERVATIVE THERAPY

### Clinical Context and Therapy Purpose

The purpose of HAM in patients who have severe dry eye is to provide a treatment option that is an alternative to or an improvement on existing therapies. Dry eye disease involves tear film insufficiency with the involvement of the corneal epithelium. Inflammation is common in dry eye disease, which causes additional damage to the corneal epithelium.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have severe dry eye with ocular surface damage and inflammation?

The following PICO was used to select literature to inform this review.

#### *Populations*

The relevant population of interest is patients who have severe dry eye with ocular surface damage and inflammation.

#### *Interventions*

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The therapy being considered is sutured or non-sutured HAM.

### *Comparators*

The following therapies are currently being used: medical management consisting of artificial tears, cyclosporine A, serum tears, antibiotics, steroids, and nonsteroidal anti-inflammatory medications.

### *Outcomes*

The general outcomes of interest are the pain, corneal surface regularity, and vision, which may be measured by the Report of the International Dry Eye WorkShop score (DEWS). The DEWS assess 9 domains with a score of 1 to 4 including discomfort, visual symptoms, tear breakup time, corneal signs and corneal staining. Corneal staining with fluorescein or Rose Bengal indicates damaged cell membranes or gaps in the epithelial cell surface. A DEWS of 2 to 4 indicates moderate-to-severe dry eye disease.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria

Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence

John et al (2017) reported on an RCT with 20 patients with moderate-to-severe dry eye disease who were treated with Prokera c-HAM or maximal conventional treatment.[32,] The c-HAM was applied for an average of 3.4 days (range, 3-5 days), while the control group continued treatment with artificial tears, cyclosporine A, serum tears, antibiotics, steroids, and nonsteroidal anti-inflammatory medications. The primary outcome was an increase in corneal nerve density. Signs and symptoms of dry eye disease improved at both 1-month and 3-month follow-ups in the c-HAM group but not in the conventional treatment group. For example, pain scores decreased from 7.1 at baseline to 2.2 at 1 month and 1.0 at 3 months in the c-HAM group. In vivo confocal microscopy, reviewed by masked readers, showed a significant increase in corneal nerve density in the study group at 3 months, with no change in nerve density in the controls. Corneal sensitivity was similarly increased in the c-HAM group but not in controls.

The treatment outcomes in the Dry Eye Amniotic Membrane (DREAM) study (McDonald et al [2018]) was a retrospective series of 84 patients (97 eyes) with severe dry eye despite maximal medical therapy who were treated with Prokera self-retained c-HAM.[33,] A majority of patients (86%) had superficial punctate keratitis. Other patients had filamentary keratitis (13%), exposure keratitis (19%), neurotrophic keratitis (2%), and corneal epithelial defect (7%). Treatment with

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Prokera for a mean of 5.4 days (range, 2 to 11) resulted in an improved ocular surface and reduction in the DEWS score from 3.25 at baseline to 1.44 at 1 week, 1.45 at 1 month and 1.47 at 3 months (p=.001). Ten percent of eyes required repeated treatment. There was no significant difference in the number of topical medications following c-HAM treatment.

**Section Summary: Severe Dry Eye with Ocular Surface Damage and Inflammation that Does Not Respond to Conservative Therapy**
The evidence on HAM for severe dry eye with ocular surface damage and inflammation includes an RCT with 20 patients and a retrospective series of 84 patients (97 eyes). Placement of self-retained HAM for 2 to 11 days reduced symptoms and restored a smooth corneal surface and corneal nerve density for as long as 3 months.

## MODERATE OR SEVERE ACUTE OCULAR CHEMICAL BURNS

### Clinical Context and Therapy Purpose
The purpose of HAM in patients who have acute ocular burns is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or self-retained HAM improve the net health outcome in patients who have moderate or severe acute ocular chemical burns?

The following PICO was used to select literature to inform this review.

***Populations***
The relevant population of interest is patients who have moderate or severe acute ocular chemical burn.

***Interventions***
The therapy being considered is sutured or non-sutured HAM.

***Comparators***
The following therapies are currently being used: medical therapy (e.g., topical antibiotics, lubricants, steroids and cycloplegics, oral vitamin C, doxycycline).

***Outcomes***
The general outcomes of interest are visual acuity, corneal epithelialization, corneal clarity, and corneal vascularization.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:
- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**

An RCT of 100 patients with chemical or thermal ocular burns was published by Tandon et al (2011).[34,] Half of the patients (n=50) had moderate ocular burns and the remainder (n=50) had severe ocular burns. All but 8 of the patients had alkali or acid burns. Patients were randomized to HAM transplantation plus medical therapy or medical therapy alone. Epithelial healing, which was the primary outcome, was improved in the group treated with HAM, but there was no significant difference between the 2 groups for final visual outcome, symblepharon formation, corneal clarity or vascularization.

A second RCT that compared amniotic membrane plus medical therapy (30 eyes) to medical therapy alone (30 eyes) for grade IV ocular burn was reported by Eslani et al (2018).[35,] Medical therapy at this tertiary referral hospital included topical preservative-free lubricating gel and drops, chloramphenicol, betamethasone, homatropine, oral vitamin C, and doxycycline. There was no significant difference in the time to epithelial healing (amniotic membrane: 75.8 vs. 72.6 days) or in visual acuity between the 2 groups (2.06 logMAR for both groups). There was a trend for a decrease in corneal neovascularization (p=.108); the study was not powered for this outcome.

A third RCT by Tamhane et al (2005) found no difference between amniotic membrane and medical therapy groups in an RCT of 37 patients with severe ocular burns.[36,]

**Section Summary: Moderate or Severe Acute Ocular Chemical Burns**

Evidence includes 3 RCTs with a total of 197 patients with acute ocular chemical burns who were treated with HAM transplantation plus medical therapy or medical therapy alone. Patients in the HAM group had a faster rate of epithelial healing in 1 of the 3 trials, without a significant benefit for other outcomes. The other 2 trials did not find an increase in the rate of epithelial healing in patients with severe burns.

**CORNEAL PERFORATION WHEN CORNEAL TISSUE IS NOT IMMEDIATELY AVAILABLE**

**Clinical Context and Therapy Purpose**

The purpose of HAM in patients who have corneal perforation when corneal tissue is not immediately available is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured HAM improve the net health outcome in patients who have corneal perforation?

The following PICO was used to select literature to inform this review.

***Populations***

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The relevant population of interest is patients who have corneal perforation when corneal tissue is not immediately available.

***Interventions***
The therapy being considered is sutured HAM.

***Comparators***
The following therapies are currently being used: conservative management.

***Outcomes***
The general outcomes of interest are eye pain.

Changes in symptoms may be measured in days, while changes in the ocular surface would be measured at 1 to 3 months.

**Study Selection Criteria**
Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

**Review of Evidence**
No RCTs were identified on corneal perforation.

**Section Summary: Corneal Perforation When Corneal Tissue is Not Immediately Available**
The standard treatment for corneal perforation is corneal transplantation, however, sutured HAM may be used as a temporary covering for this severe defect when corneal tissue is not immediately available.

**FOLLOWING PTERYGIUM REPAIR WHEN THERE IS INSUFFICIENT HEALTHY TISSUE TO CREATE A CONJUNCTIVAL AUTOGRAFT**

**Clinical Context and Therapy Purpose**
The purpose of HAM in patients who have pterygium repair is to provide a treatment option that is an alternative to or an improvement on existing therapies.

The question addressed in this evidence review is: Does the use of sutured or glued HAM improve the net health outcome in patients who have pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft (e.g., extensive, double, or recurrent pterygium)?

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The following PICO was used to select literature to inform this review.

### *Populations*
The relevant population of interest is patients who have pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft.

### *Interventions*
The therapy being considered is sutured or glued HAM.

### *Comparators*
The following therapies are currently being used: conjunctival autograft.

### *Outcomes*
The general outcomes of interest are a recurrence of pterygium.

Pterygium recurrence would be measured at 1 to 3 months.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

### Review of Evidence
RCTs have been reported on the use of amniotic membrane following pterygium repair. In 2013, the American Academy of Ophthalmology published a technology assessment on options and adjuvants for pterygium surgery.[37] Reviewers identified 4 RCTs comparing conjunctival or limbal autograft procedure with amniotic membrane graft, finding that conjunctival or limbal autograft was more effective than HAM graft in reducing the rate of pterygium recurrence. A 2016 Cochrane review of 20 RCTs (total N=1866 patients) arrived at the same conclusion.[38]

### Section Summary: Following Pterygium Repair When There is Insufficient Healthy Tissue to Create a Conjunctival Autograft
Systematic reviews of RCTs have been published that found that conjunctival or limbal autograft is more effective than HAM graft in reducing the rate of pterygium recurrence.

## REPAIR FOLLOWING MOHS MICROSCOPIC SURGERY

### Clinical Context and Therapy Purpose
The purpose of repair with human amniotic membrane in patients who have undergone Mohs microsurgery for skin cancer is to provide a treatment option that is an alternative to or an improvement on existing procedures.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

The question addressed in this evidence review is: Does amniotic membrane improve the net health outcome in patients requiring repair following Mohs microsurgery?

The following PICO was used to select literature to inform this review.

### *Populations*
The relevant population of interest is patients who require reconstruction following Mohs microsurgery for skin cancer on the head, neck, face, or dorsal hand.

### *Interventions*
The therapy being considered is repair following Mohs microsurgery with human amniotic membrane. It is proposed as a nonsurgical alternative to cutaneous repair in cosmetically sensitive areas such as the head, neck, face, or dorsal hand.

### *Comparators*
Comparators of interest include surgical repair using autologous tissue (e.g., local flaps and full-thickness skin grafts) and healing without surgery. Second intention healing (i.e., the wound is left open to heal by granulation, contraction, and epithelialization) is a nonsurgical option for certain defects.

### *Outcomes*
The primary endpoints of interest for trials of wound closure are as follows, consistent with guidance from the U.S. Food and Drug Administration (FDA) for the industry in developing products for the treatment of chronic cutaneous ulcer and burn wounds:

- Incidence of complete wound closure.
- Time to complete wound closure (reflecting accelerated wound closure).
- Incidence of complete wound closure following surgical wound closure.
- Pain control.
- Complete ulcer healing with advanced wound therapies may be measured at 6 to 12 weeks.

In trials comparing human amniotic membrane to surgical repair in patients post-Mohs microscopic surgery, other important outcomes are post-procedure morbidity and mortality, surgical complications, development of a non-healing wound, and quality of life.

### Study Selection Criteria
Methodologically credible studies were selected using the following principles:

- To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for RCTs;
- In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
- To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
- Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
- Studies with duplicative or overlapping populations were excluded.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Review of Evidence**
No RCTs were identified for this indication.

**Nonrandomized Studies**
Toman et al (2022) conducted an observational study that compared repair using a dehydrated human amnion/chorion membrane product (Epifix) with surgical repair using autologous tissue in patients who underwent same-day repair following Mohs microsurgery for removal of skin cancer on the face, head, or neck (Table 14).[39,] Propensity-score matching using retrospective data from medical records was used to identify 143 matched pairs. The primary endpoint was the incidence of postoperative morbidity, including the rate of infection, bleeding/hematoma, dehiscence, surgical reintervention, or development of a nonhealing wound. Postoperative cosmetic outcomes were assessed at 9 months or later and included documentation of suboptimal scarring, scar revision treatment, and patient satisfaction.

Results are summarized in Table 15, and study limitations in Tables 16 and 17. A greater proportion of patients who received dHACM repair experienced zero complications (97.9% vs. 71.3%; p<.0001; relative risk 13.67; 95% CI 4.33 to 43.12). Placental allograft reconstructions developed less infection (p=.004) and were less likely to experience poor scar cosmesis (P <.0001). Confidence in these findings is limited, however, by the study's retrospective design and potential for bias due to missing data. Additionally, the study's relevance is limited due to a lack of diversity in the study population and no comparison to non-surgical treatment options.

**Table 14. Nonrandomized Study of Dehydrated Human Amnion/Chorion Membrane for Repair Following Mohs Microsurgery - Characteristics**

| Study | Study Type | Country | Dates | Participants | Repair using dHACM | Repair using autologous tissue | Follow-Up |
|---|---|---|---|---|---|---|---|
| Toman et al (2022)[39,] | Retrospective, observational<br><br>Propensity-score matching used to identify matched pairs | US | 2014-2018 | Patients who underwent Mohs microsurgery for removal of a basal or squamous cell carcinoma and required same day repair for moderate- to high-risk defects on the face, head, and neck.<br><br>Mean age 78.0 years;<br>76.9% male<br>100% white | n = 143 | n = 143 | Unclear; 9 months or later for postoperative cosmetic outcomes. |

dHACM: dehydrated human amnionic/chorionic membrane.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 15. Nonrandomized Study of Dehydrated Human Amnion/Chorion Membrane for Repair Following Mohs Microsurgery- Results**

| Study | dHACM repair n = 143 | Autogolous tissue Repair n = 143 | P |
|---|---|---|---|
| Toman et al (2022)[39,] | | | |
| Experienced no complications, n (%) | 140 (97.9) | 102 (71.3) | <.0001 |
| Infection, n (%) | 3 (2.0) | 15 (10.0) | .004 |
| Bleeding or hematoma, n (%) | 0 (0.0) | 7 (5.0) | .015 |
| Wound dehiscence, n (%) | 0 (0.0) | 4 (3.0) | .122 |
| Surgical reintervention, n (%) | 0 (0.0) | 11 (8.0) | .0007 |
| Nonhealing wound, n (%) | 0 (0.0) | 5 (3.5) | .060 |
| Poor scar cosmesis, n (%) | 0 (0.0) | 21 (15.0) | <.0001 |
| Scar revision, n (%) | 0 (0.0) | 14 (9.8) | <.0001 |
| Follow-up visits, mean (SD) | 3.4 (1.6) | 2.5 (1.1) | <.0001 |
| Days to discharge, mean (SD) | 30.7 (16.9) | 30.3 (22.9) | .840 |

SD: standard deviation; dHACM: dehydrated human amnionic/chorionic membrane.

**Table 16. Study Relevance Limitations**

| Study | Population[a] | Intervention[b] | Comparator[c] | Outcomes[d] | Duration of Follow-up[e] |
|---|---|---|---|---|---|
| Toman et al (2022)[39,] | 4. Study participants were 100% white, over two-thirds male | | 2. No comparison to non-surgical options (e.g., second intention healing) | 1. Not all outcomes mentioned in methods had results reported (e.g., patient satisfaction with scar appearance) | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.

[a] Population key: 1. Intended use population unclear; 2. Study population is unclear; 3. Study population not representative of intended use; 4, Enrolled populations do not reflect relevant diversity; 5. Other.

[b] Intervention key: 1. Not clearly defined; 2. Version used unclear; 3. Delivery not similar intensity as comparator; 4. Not the intervention of interest (e.g., proposed as an adjunct but not tested as such); 5: Other.

[c] Comparator key: 1. Not clearly defined; 2. Not standard or optimal; 3. Delivery not similar intensity as intervention; 4. Not delivered effectively; 5. Other.

[d] Outcomes key: 1. Key health outcomes not addressed; 2. Physiologic measures, not validated surrogates; 3. Incomplete reporting of harms; 4. Not establish and validated measurements; 5. Clinically significant difference not prespecified; 6. Clinically significant difference not supported; 7. Other.

[e] Follow-Up key: 1. Not sufficient duration for benefit; 2. Not sufficient duration for harms; 3. Other.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 17. Study Design and Conduct Limitations**

| Study | Allocation[a] | Blinding[b] | Selective Reporting[c] | Data Completeness[d] | Power[e] | Statistical[f] |
|---|---|---|---|---|---|---|
| Toman et al (2022)[39,] | 1. Not randomized | 1, 2. Not blinded | | 7. Data extracted from medical records could be incomplete/ inaccurate; 10 of 153 patients excluded because no match identified | | |

The study limitations stated in this table are those notable in the current review; this is not a comprehensive gaps assessment.
[a] Allocation key: 1. Participants not randomly allocated; 2. Allocation not concealed; 3. Allocation concealment unclear; 4. Inadequate control for selection bias; 5. Other.
[b] Blinding key: 1. Participants or study staff not blinded; 2. Outcome assessors not blinded; 3. Outcome assessed by treating physician; 4. Other.
[c] Selective Reporting key: 1. Not registered; 2. Evidence of selective reporting; 3. Evidence of selective publication; 4. Other.
[d] Data Completeness key: 1. High loss to follow-up or missing data; 2. Inadequate handling of missing data; 3. High number of crossovers; 4. Inadequate handling of crossovers; 5. Inappropriate exclusions; 6. Not intent to treat analysis (per protocol for noninferiority trials); 7. Other.
[e] Power key: 1. Power calculations not reported; 2. Power not calculated for primary outcome; 3. Power not based on clinically important difference; 4. Other.
[f] Statistical key: 1. Analysis is not appropriate for outcome type: (a) continuous; (b) binary; (c) time to event; 2. Analysis is not appropriate for multiple observations per patient; 3. Confidence intervals and/or p values not reported; 4. Comparative treatment effects not calculated; 5. Other.

### Section Summary: Repair Following Mohs Microscopic Surgery

A retrospective observational study found a higher complication-free rate in 143 propensity score-matched pairs of patients who had received autologous tissue or dHACM repair following Mohs microsurgery for skin cancer on the face, head, or neck. This study was limited by its retrospective design. Additional evidence from well-designed and conducted prospective studies is needed.

## SUMMARY OF EVIDENCE

### Diabetic Lower-Extremity Ulcers

For individuals who have non-healing diabetic lower-extremity ulcers who receive a patch or flowable formulation of HAM or placental membrane (i.e., Affinity, AmnioBand Membrane, AmnioExcel, Biovance, EpiCord, EpiFix, Grafix), the evidence includes randomized controlled trials (RCTs). Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. The RCTs evaluating amniotic and placental membrane products for the treatment of non-healing (<20% healing with ≥2 weeks of standard care) diabetic lower-extremity ulcers have compared HAM with standard care or with an established advanced wound care product. These trials used wound closure as the primary outcome measure, and some used power analysis, blinded assessment of wound healing, and intention-to-treat analysis. For the HAM products that have been sufficiently evaluated (i.e., Affinity, AmnioBand Membrane, Biovance, EpiCord, EpiFix,

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Grafix), results have shown improved outcomes compared with standard care, and outcomes that are at least as good as an established advanced wound care product. Improved health outcomes in the RCTs are supported by multicenter registries. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

**Lower-Extremity Ulcers due to Venous Insufficiency**
For individuals who have lower-extremity ulcers due to venous insufficiency who receive a patch or flowable formulation of HAM, the evidence includes 2 RCTs. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. The published evidence on HAM for the treatment of venous leg ulcers includes 2 multicenter RCTs with EpiFix. One RCT reported a larger percent wound closure at 4 weeks, but the percentage of patients with complete wound closure at 4 weeks did not differ between EpiFix and the standard of care. A second RCT evaluated complete wound closure at 12 weeks after weekly application of EpiFix or standard dressings with compression, but interpretation is limited by methodologic concerns. Two additional studies with other HAM products have been completed but not published, raising further questions about the efficacy of HAM for venous insufficiency ulcers. Therefore, corroboration with well-designed and well-conducted RCTs evaluating wound healing is needed to demonstrate efficacy for this indication. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Osteoarthritis**
For individuals who have knee osteoarthritis who receive an injection of suspension or particulate formulation of HAM or amniotic fluid, the evidence includes a feasibility study. Relevant outcomes are symptoms, functional outcomes, quality of life, and treatment-related morbidity. The pilot study assessed the feasibility of a larger RCT evaluating HAM injection. Additional trials, which will have a larger sample size and longer follow-up, are needed to permit conclusions on the effect of this treatment. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Plantar Fasciitis**
The evidence on injection of amniotic membrane for the treatment of plantar fasciitis includes preliminary studies and a larger (N =145) patient-blinded comparison of micronized injectable-HAM and placebo control. Injection of micronized amniotic membrane resulted in greater improvements in the visual analog score for pain and the Foot Functional Index compared to placebo controls. The primary limitation of the study is that this is an interim report with 12-month results pending. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Ophthalmic Conditions**
Sutured HAM transplant has been used for many years for the treatment of ophthalmic conditions. Many of these conditions are rare, leading to difficulty in conducting RCTs. The rarity, severity, and variability of the ophthalmic condition was taken into consideration in evaluating the evidence.

**Neurotrophic Keratitis with Ocular Surface Damage and Inflammation That Does Not Respond to Conservative Therapy**
For individuals who have neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative therapy who receive HAM, the evidence includes an RCT.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. An RCT of 30 patients showed no benefit of sutured HAM graft compared to tarsorrhaphy or bandage contact lens. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Corneal Ulcers and Melts That Do Not Respond to Initial Medical Therapy**
For individuals who have corneal ulcers and melts, that do not respond to initial medical therapy who receive HAM, the evidence includes a systematic review of primarily case series and a non-randomized comparative study. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. Corneal ulcers and melts are uncommon and variable and additional RCTs are not expected. The systematic review showed healing in 97% of patients with an improvement of vision in 53% of eyes. One retrospective comparative study with 22 patients found more rapid and complete epithelialization and more patients with a clinically significant improvement in visual acuity following early treatment with self-retained amniotic membrane when compared to historical controls. Corneal ulcers and melts are uncommon and variable and RCTs are not expected. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

**Corneal Perforation When There is Active Inflammation After Corneal Transplant Requiring Adjunctive Treatment**
For individuals who have corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment who receive HAM, the evidence is limited. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. No comparative evidence was identified for this indication. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Bullous Keratopathy as a Palliative Measure in Patients Who are Not Candidates for a Curative Treatment (e.g., Endothelial or Penetrating Keratoplasty)**
For individuals who have bullous keratopathy and who are not candidates for curative treatment (e.g., endothelial or penetrating keratoplasty) who receive HAM, the evidence includes an RCT. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. An RCT found no advantage of sutured HAM over the simpler stromal puncture procedure for the treatment of pain from bullous keratopathy. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Partial Limbal Stem Cell Deficiency with Extensive Diseased Tissue Where Selective Removal Alone is Not Sufficient**
For individuals who have partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient who receive HAM, the evidence is limited. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. No comparative trials were identified on HAM for limbal stem cell deficiency. Improvement in visual acuity has been reported for some patients who have received HAM in conjunction with removal of the diseased limbus. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Moderate or Severe Stevens-Johnson Syndrome**
For individuals who have moderate or severe Stevens-Johnson syndrome who receive HAM, the evidence includes an RCT. Relevant outcomes are symptoms, morbid events, functional

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

outcomes, and quality of life. The evidence on HAM for the treatment of Stevens-Johnson syndrome (includes 1 RCT with 25 patients [ 50 eyes]) found improved symptoms and function with HAM compared to medical therapy alone. Large RCTs are unlikely due to the severity and rarity of the disease. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

**Persistent Epithelial Defects and Ulceration That Do Not Respond to Conservative Therapy**

For individuals who have persistent epithelial defects that do not respond to conservative therapy who receive HAM, the evidence is limited. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. No comparative trials were identified on persistent epithelial defects and ulceration. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Severe Dry Eye with Ocular Surface Damage and Inflammation That Does Not Respond to Conservative Therapy**

For individuals who have severe dry eye with ocular surface damage and inflammation that does not respond to conservative therapy, who receive HAM, the evidence includes an RCT and a large case series. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. The evidence on HAM for severe dry eye with ocular surface damage and inflammation includes an RCT with 20 patients and a retrospective series of 84 patients (97 eyes). Placement of self-retained HAM for 2 to 11 days reduced symptoms and restored a smooth corneal surface and corneal nerve density for as long as 3 months. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

**Moderate or Severe Acute Ocular Chemical Burns**

For individuals who have moderate or severe acute ocular chemical burn who receive HAM, the evidence includes 3 RCTs. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. Evidence includes a total of 197 patients with acute ocular chemical burns who were treated with HAM transplantation plus medical therapy or medical therapy alone. Two of the 3 RCTs did not show a faster rate of epithelial healing, and there was no significant benefit for other outcomes. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Corneal Perforation When Corneal Tissue is Not Immediately Available**

For individuals who have corneal perforation when corneal tissue is not immediately available who receive sutured HAM, the evidence is limited. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. The standard treatment for corneal perforation is corneal transplantation, however, HAM may provide temporary coverage of the severe defect when corneal tissue is not immediately available. The evidence is sufficient to determine that the technology results in an improvement in the net health outcome.

**Pterygium Repair When There is Insufficient Healthy Tissue to Create a Conjunctival Autograft**

For individuals who have pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft who receive HAM, the evidence includes RCTs and systematic reviews of RCTs. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. Systematic reviews of RCTs have been published that found that conjunctival or limbal autograft

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

is more effective than HAM graft in reducing the rate of pterygium recurrence. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

**Repair Following Mohs Micrographic Surgery**
For individuals who have undergone Mohs micrographic surgery for skin cancer on the face, head, neck, or dorsal hand who receive human amniotic/chorionic membrane, the evidence includes a nonrandomized, comparative study and no RCTs. Relevant outcomes are symptoms, morbid events, functional outcomes, and quality of life. A retrospective analysis using data from medical records compared a dehydrated human amnionic/chorionic membrane product (dHACM, Epifix) to repair using autologous surgery in 143 propensity-score matched pairs of patients requiring same-day reconstruction after Mohs microsurgery for skin cancer on the head, face, or neck. A greater proportion of patients who received dHACM repair experienced zero complications (97.9% vs. 71.3%; p<.0001; relative risk 13.67; 95% CI 4.33 to 43.12). Placental allograft reconstructions developed less infection (p=.004) and were less likely to experience poor scar cosmesis (p<.0001). This study is limited by its retrospective observational design. Well-designed and conducted prospective studies are lacking. The evidence is insufficient to determine that the technology results in an improvement in the net health outcome.

## SUPPLEMENTAL INFORMATION
The purpose of the following information is to provide reference material. Inclusion does not imply endorsement or alignment with the evidence review conclusions.

**Clinical Input From Physician Specialty Societies and Academic Medical Centers**
While the various physician specialty societies and academic medical centers may collaborate with and make recommendations during this process, through the provision of appropriate reviewers, input received does not represent an endorsement or position statement by the physician specialty societies or academic medical centers, unless otherwise noted.

**2019 Input**
Clinical input was sought to help determine whether the use of human amniotic membrane graft either without or with suture fixation for several ophthalmic conditions would provide a clinically meaningful improvement in net health outcome and whether the use is consistent with generally accepted medical practice. In response to requests, clinical input was received from 2 respondents, including 1 specialty society-level response and 1 physician-level response identified through specialty societies including physicians with academic medical center affiliations.

Clinical input supported the use of amniotic membrane in individuals with the following indications:

- Neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative therapy. Non-sutured HAM in an office setting would be preferred to avoid a delay in treatment associated with scheduling a surgical treatment.
- Corneal ulcers and melts that do not respond to initial medical therapy. Non-sutured HAM in an office setting would be preferred to avoid a delay in treatment associated with scheduling a surgical treatment.
- Corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

- Bullous keratopathy and who are not candidates for curative treatment (e.g., endothelial or penetrating keratoplasty) as an alternative to stromal puncture.
- Partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient.
- Persistent epithelial defects and ulcerations that do not respond to conservative therapy.
- Severe dry eye with ocular surface damage and inflammation that does not respond to conservative therapy.
- Moderate or severe acute ocular chemical burn.
- Corneal perforation when corneal tissue is not immediately available.
- Pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft.

Further details from clinical input are included in the Appendix.

**Practice Guidelines and Position Statements**
Guidelines or position statements will be considered for inclusion in 'Supplemental Information' if they were issued by, or jointly by, a US professional society, an international society with US representation, or National Institute for Health and Care Excellence (NICE). Priority will be given to guidelines that are informed by a systematic review, include strength of evidence ratings, and include a description of management of conflict of interest.

**Society for Vascular Surgery et al.**
In 2016, the Society for Vascular Surgery in collaboration with the American Podiatric Medical Association and the Society for Vascular Medicine made the following recommendation: "For DFUs [diabetic foot ulcers] that fail to demonstrate improvement (>50% wound area reduction) after a minimum of 4 weeks of standard wound therapy, we recommend adjunctive wound therapy options. These include negative pressure therapy, biologics (platelet-derived growth factor [PDGF], living cellular therapy, extracellular matrix products, amnionic membrane products), and hyperbaric oxygen therapy. Choice of adjuvant therapy is based on clinical findings, availability of therapy, and cost-effectiveness; there is no recommendation on ordering of therapy choice."[40,]

**Tear Film and Ocular Surface Society**
In 2017, the Tear Film and Ocular Surface Society published the Dry Eye Workshop II (DEWS) management and therapy report.[23,] The report evaluated the evidence on treatments for dry eye and provided the following treatment algorithm for dry eye disease management:

Step 1:
- Education regarding the condition, its management, treatment, and prognosis
- Modification of local environment
- Education regarding potential dietary modifications (including oral essential fatty acid supplementation)
- Identification and potential modification/elimination of offending systemic and topical medications
- Ocular lubricants of various types (if meibomian gland dysfunction is present, then consider lipid containing supplements)
- Lid hygiene and warm compresses of various types

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Step 2:
If above options are inadequate consider:

- Non-preserved ocular lubricants to minimize preservative-induced toxicity
- Tea tree oil treatment for Demodex (if present)
- Tear conservation
- Punctal occlusion
- Moisture chamber spectacles/goggles
- Overnight treatments (such as ointment or moisture chamber devices)
- In-office, physical heating and expression of the meibomian glands
- In-office intense pulsed light therapy for meibomian gland dysfunction
- Prescription drugs to manage dry eye disease
- Topical antibiotic or antibiotic/steroid combination applied to the lid margins for anterior blepharitis (if present)
- Topical corticosteroid (limited-duration)
- Topical secretagogues
- Topical non-glucocorticoid immunomodulatory drugs (such as cyclosporine)
- Topical LFA-1 antagonist drugs (such as lifitegrast)
- Oral macrolide or tetracycline antibiotics

Step 3:
If above options are inadequate consider:

- Oral secretagogues
- Autologous/allogeneic serum eye drops
- Therapeutic contact lens options
- Soft bandage lenses
- Rigid scleral lenses

Step 4:
If above options are inadequate consider:

- Topical corticosteroid for longer duration
- Amniotic membrane grafts
- Surgical punctal occlusion
- Other surgical approaches (e.g. tarsorrhaphy, salivary gland transplantation)

**Wound Healing Society**
In 2016, the Wound Healing Society updated their guidelines on diabetic foot ulcer treatment.[41,] The Society concluded that there was level 1 evidence that cellular and acellular skin equivalents improve diabetic foot ulcer healing, noting that, "healthy living skin cells assist in healing DFUs [diabetic foot ulcers] by releasing therapeutic amounts of growth factors, cytokines, and other proteins that stimulate the wound bed." References from 2 randomized controlled trials on amniotic membrane were included with references on living and acellular bioengineered skin substitutes.

**U.S. Preventive Services Task Force Recommendations**
Not applicable.

**Ongoing and Unpublished Clinical Trials**
Some currently unpublished trials that might influence this review are listed in Table 18.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

**Table 18. Summary of Key Trials**

| NCT No. | Trial Name | Planned Enrollment | Completion Date |
|---|---|---|---|
| ***Ongoing*** | | | |
| NCT04457752[a] | A Randomized Controlled Multicentre Clinical Trial, Evaluating the Efficacy of Dual Layer Amniotic Membrane (Artacent®) and Standard of Care Versus Standard of Care Alone in the Healing of Chronic Diabetic Foot Ulcers | 124 | Dec 2022 |
| NCT03390920[a] | Evaluation of Outcomes With Amniotic Fluid for Musculoskeletal Conditions | 200 | Jun 2030 |
| NCT04612023 | A Prospective, Double-Blinded, Randomized Controlled Trial of an Amniotic Membrane Allograft Injection Comparing Two Doses (1 mL and 2 mL Injection) and a Placebo (Sterile Saline) in the Treatment of Osteoarthritis of the Knee | 90 | Jul 2022 |
| NCT04553432[a] | Dry Eye OmniLenz Application of Omnigen Research Study | 70 | Jul 2022 |
| NCT04599673 | Prospective Analysis of Intraoperative AMNIOGEN® Injection in Patients With Rotator Cuff Tear | 100 | Sep 2022 |
| NCT04636229[a] | A Phase 3 Prospective, Multicenter, Double-blind, Randomized, Placebo-controlled Study to Evaluate the Efficacy of Amniotic Suspension Allograft (ASA) in Patients With Osteoarthritis of the Knee | 474 | Dec 2023 |
| NCT03864939 | Randomized Pilot Study to Improve Postprostatectomy Incontinence and Potency by Application of Dried Human Amnion Graft | 328 | Apr 2025 |
| NCT03855514[a] | A Prospective, Multicenter, Randomized, Controlled Clinical Study Of NuShield® and Standard of Care (SOC) Compared to SOC Alone For The Management Of Diabetic Foot Ulcers | 200 | Dec 2021 |
| ***Unpublished*** | | | |
| NCT02609594[a] | A Multi-center Randomized Controlled Clinical Trial Evaluating Two Application Regimens of Amnioband Human Amniotic Membrane and Standard of Care vs. Standard of Care Alone in the Treatment of Venous Leg Ulcers | 240 | Dec 2018 (status unknown) |
| NCT02838784[a] | The Efficacy and Safety of Artacent™ for Treatment Resistant Lower Extremity Venous and Diabetic Ulcers: A Prospective Randomized Study | 134 | Dec 2018 (status unknown) |
| NCT03441607[a] | Safety & Efficacy of Micronized Human Amnion Chorion Membrane Biologic (mHACMb) FloGraft (Micronized Human Amnion Chorion Membrane)® in Adults With Pain Due to Osteoarthritis of the Knee | 320 | Mar 2019 (status unknown) |
| NCT02318511[a] | An Investigation of ReNu™ Knee Injection: Monitoring the Response of Knee Function and Pain in Patients With Osteoarthritis | 200 | Feb 2019 (completed) |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| NCT No. | Trial Name | Planned Enrollment | Completion Date |
|---|---|---|---|
| NCT03379324[a] | A Prospective, Randomized Study Comparing Outcomes Following Arthroscopic Double-row Rotator Cuff Repair With and Without the Addition of a Cryopreserved, Liquid, Injectable Amnion Allograft | 260 | Sep 2019 (status unknown) |
| NCT03414268[a] | A Phase 3, Prospective, Double-Blinded, Randomized Controlled Trial of the Micronized dHACM Injection As Compared To Saline Placebo Injection In The Treatment Of Plantar Fasciitis | 276 | Apr 2021 (active, not recruiting) |
| NCT02982226[a] | A Comparative Study of Injectable Human Amniotic Allograft (ReNu™) Versus Corticosteroids for Plantar Fasciitis: A Prospective, Randomized, Blinded Study | 150 | Apr 2021 (active, not recruiting) |
| NCT03414255[a] | A Phase 3, Prospective, Double-Blinded, Randomized Controlled Trial Of The Micronized dHACM Injection As Compared To Saline Placebo Injection In The Treatment Of Achilles Tendonitis | 158 | May 2021 (active, not recruiting) |
| NCT03485157[a] | A Phase 2B, Prospective, Double-blinded, Randomized Controlled Trial of the Micronized Human Amnion Chorion Membrane Injection as Compared to Saline Placebo Injection in the Treatment of Osteoarthritis of the Knee | 466 | Oct 2021 |

NCT: national clinical trial.
[a] Denotes industry-sponsored or cosponsored trial.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## CODING

**The following codes for treatment and procedures applicable to this policy are included below for informational purposes. This may not be a comprehensive list of procedure codes applicable to this policy.**

**Inclusion or exclusion of a procedure, diagnosis or device code(s) does not constitute or imply member coverage or provider reimbursement. Please refer to the member's contract benefits in effect at the time of service to determine coverage or non-coverage of these services as it applies to an individual member.**

**The code(s) listed below are medically necessary ONLY if the procedure is performed according to the "Policy" section of this document.**

| **CPT/HCPCS** | |
|---|---|
| 65778 | Placement of amniotic membrane on the ocular surface; without sutures |
| 65779 | Placement of amniotic membrane on the ocular surface; single layer, sutured |
| A2001 | Innovamatrix ac, per square centimeter (effective 01-01-2022) |
| Q4132 | Grafix Core and GrafixPL Core, per sq cm |
| Q4133 | Grafix PRIME, GrafixPL PRIME, Stravix and StravixPL, per sq cm |
| Q4137 | AmnioExcel, AmnioExcel Plus or BioDExcel, per sq cm |
| Q4138 | BioDFence DryFlex, per sq cm |
| Q4139 | AmnioMatrix or BioDMatrix, injectable, 1 cc |
| Q4140 | BioDFence, per sq cm |
| Q4145 | EpiFix, injectable, 1 mg |
| Q4148 | Neox Cord 1K, Neox Cord RT, or Clarix Cord 1K, per sq cm |
| Q4150 | AlloWrap DS or dry, per sq cm |
| Q4151 | AmnioBand or Guardian, per sq cm |
| Q4153 | Dermavest and Plurivest, per sq cm |
| Q4154 | Biovance, per sq cm |
| Q4155 | Neox Flo or Clarix Flo 1 mg |
| Q4156 | Neox 100 or Clarix 100, per sq cm |
| Q4157 | Revitalon, per sq cm |
| Q4159 | Affinity, per sq cm |
| Q4160 | Nushield, per sq cm |
| Q4162 | WoundEx Flow, BioSkin Flow, 0.5 cc |
| Q4163 | WoundEx, BioSkin, per sq cm |
| Q4168 | AmnioBand, 1 mg |
| Q4169 | Artacent wound, per sq cm |
| Q4170 | Cygnus, per sq cm |
| Q4171 | Interfyl, 1 mg |
| Q4173 | PalinGen or PalinGen XPlus, per sq cm |
| Q4174 | PalinGen or ProMatrX, 0.36 mg per 0.25 cc |
| Q4176 | NeoPatch or Therion per sq. cm |
| Q4177 | FlowerAmnioFlo, 0.1 cc |
| Q4178 | FlowerAmnioPatch, per sq cm |
| Q4180 | Revita, per square centimeter |
| Q4181 | Amnio Wound, per sq cm |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| **CPT/HCPCS** | |
|---|---|
| Q4183 | Surgigraft, per sq cm |
| Q4184 | Cellesta, per sq cm |
| Q4185 | Cellesta flowable amnion (25 mg per cc); per 0.5 cc |
| Q4186 | Epifix, per sq cm |
| Q4187 | Epicord, per sq cm |
| Q4188 | AmnioArmor, per sq cm |
| Q4189 | Artacent AC, 1 mg |
| Q4190 | Artacent AC, per sq cm |
| Q4191 | Restorigin, per sq cm |
| Q4192 | Restorigin, 1 cc |
| Q4194 | Novachor, per sq cm |
| Q4198 | Genesis Amniotic Membrane, per sq cm |
| Q4199 | Cygnus matrix, per square centimeter |
| Q4201 | Matrion, per sq cm |
| Q4204 | XWRAP, per sq cm |
| Q4205 | Membrane graft or membrane wrap, per square centimeter |
| Q4206 | Fluid flow or fluid GF, 1 cc |
| Q4208 | Novafix, per square centimeter |
| Q4209 | Surgraft, per square centimeter |
| Q4210 | Axolotl graft or axolotl dualgraft, per square centimeter |
| Q4211 | Amnion bio or Axobiomembrane, per square centimeter |
| Q4212 | Allogen, per cc |
| Q4213 | Ascent, 0.5 mg |
| Q4214 | Cellesta cord, per square centimeter |
| Q4215 | Axolotl ambient or axolotl cryo, 0.1 mg |
| Q4216 | Artacent cord, per square centimeter |
| Q4217 | Woundfix, BioWound, Woundfix Plus, BioWound Plus, Woundfix Xplus or BioWound Xplus, per square centimeter |
| Q4218 | Surgicord, per square centimeter |
| Q4219 | Surgigraft-dual, per square centimeter |
| Q4220 | BellaCell HD or Surederm, per square centimeter |
| Q4221 | Amniowrap2, per square centimeter |
| Q4227 | Corplex, per square centimeter |
| Q4229 | Cogenex Amniotic Membrane |
| Q4230 | Cogenex Flowable Amnion, per 0.5 cc |
| Q4231 | Corplex P, per cubic centimeter |
| Q4232 | Corplex, per square centimeter |
| Q4233 | SurFactor or NuDyn, per 0.5 cc |
| Q4234 | XCellerate, per square centimeter |
| Q4235 | Amniorepair, altiply, per square centimeter |
| Q4237 | Cryo-Cord, per square centimeter |
| Q4238 | Derm-maxx, per square centimeter |
| Q4239 | Amnio-Maxx, Amnio-Maxx Lite, per square centimeter |
| Q4240 | Amniotext patch, per square centimeter |
| Q4241 | PolyCyte, per 0.5 mL |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

Contains Public Information

| CPT/HCPCS | |
|---|---|
| Q4242 | AmnioCyte Plus, per 0.5 mL |
| Q4244 | Procenta 200 mg, 1-6 square centimeter |
| Q4245 | AmnioText, per square centimeter |
| Q4246 | CoreText, ProText, per cc |
| Q4247 | Amniotext patch, per square centimeter |
| Q4248 | Dermacyte Matrix, per sq cm |
| Q4249 | Amniply, for topical use only, per square centimeter |
| Q4250 | Amnioamp-mp, per square centimeter |
| Q4251 | Vim, per square centimeter Effective 10-01-2021 |
| Q4252 | Vendaje, per square centimeter Effective 10-01-2021 |
| Q4253 | Zenith amniotic membrane, per square centimeter. Effective 10-01-2021 |
| Q4254 | Novafix dl, per square centimeter |
| Q4255 | Reguard, for topical use only, per square centimeter |

| ICD-10 DIAGNOSES | |
|---|---|
| E08.621-E08.622; E09.621-E09.622; E10.621-E10.622; E11.621-E11.622: E13.621-E13.622 | Diabetes codes with foot ulcer or other skin ulcer |
| H04.121-H04.129 | Dry eye syndrome code range |
| H11.001-H11.069 | Pterygium of eye code range |
| H16.001-H16.079 | Corneal ulcer code range (includes perforation) |
| H16.231-H16.239 | Neurotrophic keratoconjunctivitis code range |
| H18.10-H18.13 | Bullous Keratopathy code range |
| H18.30 | Unspecified Corneal Membrane Change |
| H18.52 | Epithelial (Juvenile) Corneal Dystrophy |
| H18.831-H18.839 | Recurrent erosion of cornea code range |
| H18.891-H18.899 | Other specified disorders of the cornea code range (includes limbal stem cell deficiency) |
| I87.2 | Venous Insufficiency (Chronic) (Peripheral) |
| L51.1 | Stevens-Johnson Syndrome |
| M17.10-M17.9 | Osteoarthritis of the knee code range |
| M72.2 | Plantar fasciitis |
| T26.10-T26.12 | Burn of cornea and conjunctival sac code range |
| T26.50-T26.52 | Corrosion of cornea and conjunctival sac code rang |

| REVISIONS | |
|---|---|
| 03-20-2017 | Policy added to the bcbsks.com web site. |
| 01-01-2019 | Updated Description section. |
| | In Policy section:<br>▪ In Item A 1, added "Q4168".<br>▪ In Item A 3, removed "Q4131" and added "Q4145, Q4186". |

| REVISIONS | |
|---|---|
| | ▪ Added new Item B, "FDA-approved sutured and non-sutured human amniotic membrane grafts may be considered medically necessary for the treatment of the following ophthalmic indications: 1. Neurotrophic keratitis 2. Corneal ulcers and melts 3. Pterygium repair 4. Stevens-Johnson syndrome 5. Persistent epithelial defects (with documented pain for ≥5 days) 6. Acid or alkaline burn.<br>▪ Added new Item C, "FDA-approved sutured and non-sutured human amniotic membrane grafts are considered experimental / investigational for the treatment of all other ophthalmic conditions including but not limited to dry eye syndrome, corneal perforation, bullous keratopathy, limbus stem cell deficiency, and after photorefractive keratectomy."<br>▪ In Item D (previous Item B), added "including but not limited to treatment of osteoarthritis and plantar fasciitis" to read "Injection of micronized or particulated human amniotic membrane is considered experimental / investigational for all indications, including but not limited to treatment of osteoarthritis and plantar fasciitis."<br>▪ In Item F (previous Item D), removed "human amniotic membrane products and" and added "including but not limited to treatment of lower-extremity ulcers due to venous insufficiency" to read "All other human amniotic membrane products and indications not listed above are considered experimental / investigational, including but not limited to treatment of lower-extremity ulcers due to venous insufficiency."<br>▪ Updated Policy Guidelines. |
| | Updated Rationale section. |
| | In Coding section:<br>▪ Added CPT codes: 65778, 65779.<br>▪ Added new HCPCS codes: Q4183, Q4184, Q4185, Q4186, Q4187, Q4188, Q4189, Q4190, Q4191, Q4192, Q4194, Q4198, Q4201, Q4204.<br>▪ Removed deleted HCPCS code: Q4131.<br>▪ Revised nomenclature to HCPCS codes: Q4132, Q4133, Q4137, Q4148, Q4156, Q4162, Q4163.<br>▪ Added ICD-10 codes: H11.001, H11.002, H11.003, H11.011, H11.012, H11.013, H11.021, H11.022, H11.023, H11.031, H11.032, H11.033, H11.041, H11.042, H11.043, H11.051, H11.052, H11.053, H11.061, H11.062, H11.063, H16.011, H16.012, H16.013, H16.021, H16.022, H16.023, H16.031, H16.032, H16.033, H16.041, H16.042, H16.043, H16.051, H16.052, H16.053, H16.061, H16.062, H16.063, H16.121, H16.122, H16.123, H16.231, H16.232, H16.233, H18.831, H18.832, H18.833, T26.11XA, T26.11XD, T26.11XS, T26.12XA, T26.12XD, T26.12XS, T26.31XA, T26.31XD, T26.31XS, T26.32XA, T26.32XD, T26.32XS, T26.51XA, T26.51XD, T26.51XS, T26.52XA, T26.52XD, T26.52XS, T26.61XA, T26.61XD, T26.61XS, T26.62XA, T26.62XD, T26.62XS, T26.81XA, T26.81XD, T26.81XS, T26.82XA, T26.82XD, T26.82XS. |
| | Updated References section. |
| 02-18-2019 | In Policy section:<br>▪ In Item A 3, removed "Q4145". |
| 03-27-2019 | Updated Description section. |
| | In Policy section:<br>▪ In Item A, added new Item A 3, "Epicord (Q4187)". |
| | Updated Rationale section. |
| | In Coding section:<br>▪ Removed ICD-10 codes: T26.51XA, T26.51XD, T26.51XS, T26.52XA, T26,52XD, T26.52XS. |
| | Updated References section. |
| 05-21-2019 | In Policy section:<br>▪ In Item A 1, removed HCPCS code Q4168. |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| **REVISIONS** | |
|---|---|
| 09-27-2019 | Policy published to the bcbsks.com website on 08-28-2019 with an effective date of 09-27-2019. |
| | In Coding section:<br>▪ Added ICD-10 codes: H18.891, H18.892, H18.893. |
| | Updated References section. |
| 10-01-2019 | In Coding section:<br>▪ Added HCPCS Codes: Q4205, Q4206, Q4208, Q4209, Q4210, Q4211, Q4212, Q4213, Q4214, Q4215, Q4216, Q4217, Q4218, Q4219, Q4221 |
| 07-01-2020 | In Coding section:<br>▪ Added HCPCS Codes: Q4176, Q4177, Q4178, Q4181, Q4227, Q4228, Q4229, Q4230, Q4231, Q4232, Q4233, Q4234, Q4235, Q4236, Q4237, Q4239, Q4240, Q4241, Q4242, Q4244, Q4245, Q4246, Q4247, Q4248 |
| 07-16-2021 | Updated Description section |
| | **In Policy section**<br>Added item A.1<br>In Item B<br>• Removed: "FDA-approved sutured and non-sutured human amniotic membrane grafts may be considered medically necessary for the treatment of the following ophthalmic indications:<br>1. Neurotrophic keratitis<br>2. Corneal ulcers and melts<br>3. Pterygium repair<br>4. Stevens-Johnson syndrome<br>5. Persistent epithelial defects (with documented pain for ≥5 days)<br>6. Acid or alkaline burn"<br>• Added: "Human amniotic membrane grafts with or without suture (Prokera®, AmbioDisk™) or glue may be considered medically necessary for the treatment of the following ophthalmic indications:<br>1. Neurotrophic keratitis with ocular surface damage and inflammation that does not respond to conservative therapy;<br>2. Corneal ulcers and melts that do not respond to initial conservative therapy;<br>3. Corneal perforation when there is active inflammation after corneal transplant requiring adjunctive treatment;<br>4. Bullous keratopathy as a palliative measure in patients who are not candidates for curative treatment (e.g., endothelial or penetrating keratoplasty);<br>5. Partial limbal stem cell deficiency with extensive diseased tissue where selective removal alone is not sufficient;<br>6. Moderate or severe Stevens-Johnson syndrome;<br>7. Persistent epithelial defects that do not respond as stated in policy guideline #2;<br>8. Severe dry eye (DEWS 3 or 4) with ocular surface damage and inflammation that remains symptomatic after Steps 1, 2, and 3 of the dry eye disease management algorithm (see Policy Guidelines); or<br>9. Moderate or severe acute ocular chemical burn."<br>10. Corneal perforation when corneal tissue is not immediately available; or<br>11. Pterygium repair when there is insufficient healthy tissue to create a conjunctival autograft<br>In Item C<br>• Removed: "FDA approved sutured and non-sutured human amniotic membrane grafts are considered **experimental / investigational** for the treatment of all other ophthalmic conditions including, but not limited to, dry eye syndrome, corneal |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| REVISIONS | |
|---|---|
| | perforation, bullous keratopathy, limbus stem cell deficiency, and after photorefractive keratectomy."<br>• Added: "Human amniotic membrane grafts with or without suture are considered **experimental / investigational** for all ophthalmic indications not outlined above."<br>Added<br>• Item F<br>• Policy Guidelines |
| | Updated Rationale section |
| | In Coding section:<br>• Added HCPCS Codes: Q4180, Q4220, Q4238, Q4249, Q4250, Q4254, Q4255<br>• Added ICD 10 Diagnosis codes: H18.11, H18.12, H18.13, H18.30, H18.52, I87.2, L51.1, T26.50XA, T26.50XD, T26.50XS, T26.51XA, T26.51XD, T26.51XS, T26.52XA, T26.52XD, T26.52XS<br>• Removed ICD 10 Diagnosis codes: H16.121, H16.122, H16.123, L97.212, L97.213, L97.214, L97.222, L97.223, L97.224, L97.312, L97.313, L97.314, L97.322, L97.323, L97.324, L97.412, L97.413, L97.414, L97.422, L97.423, L97.424, L97.512, L97.513, L97.514, L97.522, L97.523, L97.524, L97.812, L97.813, L97.814, L97.822, L97.823, L97.824, T26.31XA, T26.31XD, T26.31XS, T26.32XA, T26.32XD, T26.32XS, T26.61XA, T26.61XD, T26.61XS, T26.62XA, T26.62XD, T26.62XS, T26.81XA, T26.81XD, T26.81XS, T26.82XA, T26.82XD, T26.82XS |
| | Updated Reference section |
| | Added Appendix |
| 10-08-2021 | In Coding section: Effective 10-01-2021<br>Added HCPCS codes: Q4251, Q4252, Q4253<br>Deleted HCPCS codes: Q4228, Q4236 (no longer being manufactured) |
| 01-03-2022 | In Coding Section<br>Added HCPCS code A2001, Q4199 (effective 01-01-2022) |
| 04-01-2022 | In Coding Section Added:<br>Q4225, Q4256, Q4257, Q4258 (new codes 04-01-2022) |
| 04-08-2022 | Updated Description Section |
| | Updated Policy Section<br>▪ Section G "All other indications not listed above are considered experimental / investigational, including, but not limited to, treatment of lower-extremity ulcers due to venous insufficiency." added "and repair following Mohs micrographic surgery" to the end of the statement. |
| | Updated Rationale Section |
| | Updated Coding Section<br>▪ Removed coding bullets<br>• There are specific HCPCS codes for some of these products. If no specific HCPCS code exists for the product, an unlisted code such as Q4100 would be used.<br>• There are no specific codes for AmnioFix or OrthoFlo. It might be reported using the code for another MiMedx product such as Q4145 or the not otherwise specified code Q4100.<br>• There is no specific code for this type of injection. It might be reported with one of the musculoskeletal system injection codes (e.g., 20550), the unlisted general musculoskeletal system code (20999), or if subcutaneous or intramuscular, the therapeutic injection code (96372).<br>• There are codes for the placement of amniotic membrane on the ocular surface: 65778, 65779<br>▪ Removed Code: Q4100 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| REVISIONS | |
|---|---|
| | ▪ Added ICD-10 Codes: H04.121-H04.129, M17.10-M17.9 and M72.2<br>▪ Converted ICD-10 codes to ranges |
| | Updated References Section |

## REFERENCES

1. Parolini O, Soncini M, Evangelista M, et al. Amniotic membrane and amniotic fluid-derived cells: potential tools for regenerative medicine?. Regen Med. Mar 2009; 4(2): 275-91. PMID 19317646
2. Koob TJ, Rennert R, Zabek N, et al. Biological properties of dehydrated human amnion/chorion composite graft: implications for chronic wound healing. Int Wound J. Oct 2013; 10(5): 493-500. PMID 23902526
3. Shimberg M, Wadsworth K. The use of amniotic-fluid concentrate in orthopaedic conditions. J Bone Joint Surg. 1938;20(I):167-177.
4. U.S. Food and Drug Administration. Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use Guidance for Industry and Food and Drug Administration Staff. 2017 https://www.regulations.gov/document?D=FDA-2017-D-6146-0003 Accessed January 10, 2022
5. Food and Drug Administration. 510(k) Summary: ProKeraTM Bio-Tissue Inc. (K032104). 2003; https://www.accessdata.fda.gov/cdrh_docs/pdf3/K032104.pdf. Accessed January 10, 2022.
6. Serena TE, Yaakov R, Moore S, et al. A randomized controlled clinical trial of a hypothermically stored amniotic membrane for use in diabetic foot ulcers. J Comp Eff Res. Jan 2020; 9(1): 23-34. PMID 31691579
7. Ananian CE, Dhillon YS, Van Gils CC, et al. A multicenter, randomized, single-blind trial comparing the efficacy of viable cryopreserved placental membrane to human fibroblast-derived dermal substitute for the treatment of chronic diabetic foot ulcers. Wound Repair Regen. May 2018; 26(3): 274-283. PMID 30098272
8. Tettelbach W, Cazzell S, Sigal F, et al. A multicentre prospective randomized controlled comparative parallel study of dehydrated human umbilical cord (EpiCord) allograft for the treatment of diabetic foot ulcers. Int Wound J. Feb 2019; 16(1): 122-130. PMID 30246926
9. DiDomenico LA, Orgill DP, Galiano RD, et al. Use of an aseptically processed, dehydrated human amnion and chorion membrane improves likelihood and rate of healing in chronic diabetic foot ulcers: A prospective, randomized, multi-centre clinical trial in 80 patients. Int Wound J. Dec 2018; 15(6): 950-957. PMID 30019528
10. Snyder RJ, Shimozaki K, Tallis A, et al. A Prospective, Randomized, Multicenter, Controlled Evaluation of the Use of Dehydrated Amniotic Membrane Allograft Compared to Standard of Care for the Closure of Chronic Diabetic Foot Ulcer. Wounds. Mar 2016; 28(3): 70-7. PMID 26978860
11. Zelen CM, Gould L, Serena TE, et al. A prospective, randomized, controlled, multi-centre comparative effectiveness study of healing using dehydrated human amnion/chorion membrane allograft, bioengineered skin substitute or standard of care for treatment of chronic lower extremity diabetic ulcers. Int Wound J. Dec 2015; 12(6): 724-32. PMID 25424146

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

12. Zelen CM, Serena TE, Gould L, et al. Treatment of chronic diabetic lower extremity ulcers with advanced therapies: a prospective, randomized, controlled, multi-centre comparative study examining clinical efficacy and cost. Int Wound J. Apr 2016; 13(2): 272-82. PMID 26695998
13. Tettelbach W, Cazzell S, Reyzelman AM, et al. A confirmatory study on the efficacy of dehydrated human amnion/chorion membrane dHACM allograft in the management of diabetic foot ulcers: A prospective, multicentre, randomized, controlled study of 110 patients from 14 wound clinics. Int Wound J. Feb 2019; 16(1): 19-29. PMID 30136445
14. Lavery LA, Fulmer J, Shebetka KA, et al. The efficacy and safety of Grafix((R)) for the treatment of chronic diabetic foot ulcers: results of a multi-centre, controlled, randomized, blinded, clinical trial. Int Wound J. Oct 2014; 11(5): 554-60. PMID 25048468
15. Smiell JM, Treadwell T, Hahn HD, et al. Real-world Experience With a Decellularized Dehydrated Human Amniotic Membrane Allograft. Wounds. Jun 2015; 27(6): 158-69. PMID 26061491
16. Frykberg RG, Gibbons GW, Walters JL, et al. A prospective, multicentre, open-label, single-arm clinical trial for treatment of chronic complex diabetic foot wounds with exposed tendon and/or bone: positive clinical outcomes of viable cryopreserved human placental membrane. Int Wound J. Jun 2017; 14(3): 569-577. PMID 27489115
17. Serena TE, Carter MJ, Le LT, et al. A multicenter, randomized, controlled clinical trial evaluating the use of dehydrated human amnion/chorion membrane allografts and multilayer compression therapy vs. multilayer compression therapy alone in the treatment of venous leg ulcers. Wound Repair Regen. Nov-Dec 2014; 22(6): 688-93. PMID 25224019
18. Bianchi C, Cazzell S, Vayser D, et al. A multicentre randomized controlled trial evaluating the efficacy of dehydrated human amnion/chorion membrane (EpiFix (R) ) allograft for the treatment of venous leg ulcers. Int Wound J. Feb 2018; 15(1): 114-122. PMID 29024419
19. Bianchi C, Tettelbach W, Istwan N, et al. Variations in study outcomes relative to intention-to-treat and per-protocol data analysis techniques in the evaluation of efficacy for treatment of venous leg ulcers with dehydrated human amnion/chorion membrane allograft. Int Wound J. Jun 2019; 16(3): 761-767. PMID 30864259
20. Vines JB, Aliprantis AO, Gomoll AH, et al. Cryopreserved Amniotic Suspension for the Treatment of Knee Osteoarthritis. J Knee Surg. Aug 2016; 29(6): 443-50. PMID 26683979
21. Tsikopoulos K, Vasiliadis HS, Mavridis D. Injection therapies for plantar fasciopathy ('plantar fasciitis'): a systematic review and network meta-analysis of 22 randomized controlled trials. Br J Sports Med. Nov 2016; 50(22): 1367-1375. PMID 27143138
22. Zelen CM, Poka A, Andrews J. Prospective, randomized, blinded, comparative study of injectable micronized dehydrated amniotic/chorionic membrane allograft for plantar fasciitis--a feasibility study. Foot Ankle Int. Oct 2013; 34(10): 1332-9. PMID 23945520
23. Cazzell S, Stewart J, Agnew PS, et al. Randomized Controlled Trial of Micronized Dehydrated Human Amnion/Chorion Membrane (dHACM) Injection Compared to Placebo for the Treatment of Plantar Fasciitis. Foot Ankle Int. Oct 2018; 39(10): 1151-1161. PMID 30058377
24. Suri K, Kosker M, Raber IM, et al. Sutureless amniotic membrane ProKera for ocular surface disorders: short-term results. Eye Contact Lens. Sep 2013; 39(5): 341-7. PMID 23945524
25. Liu J, Li L, Li X. Effectiveness of Cryopreserved Amniotic Membrane Transplantation in Corneal Ulceration: A Meta-Analysis. Cornea. Apr 2019; 38(4): 454-462. PMID 30702468

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

26. Yin HY, Cheng AMS, Tighe S, et al. Self-retained cryopreserved amniotic membrane for treating severe corneal ulcers: a comparative, retrospective control study. Sci Rep. Oct 12 2020; 10(1): 17008. PMID 33046729
27. Paris Fdos S, Goncalves ED, Campos MS, et al. Amniotic membrane transplantation versus anterior stromal puncture in bullous keratopathy: a comparative study. Br J Ophthalmol. Aug 2013; 97(8): 980-4. PMID 23723410
28. Kheirkhah A, Casas V, Raju VK, et al. Sutureless amniotic membrane transplantation for partial limbal stem cell deficiency. Am J Ophthalmol. May 2008; 145(5): 787-94. PMID 18329626
29. Pachigolla G, Prasher P, Di Pascuale MA, et al. Evaluation of the role of ProKera in the management of ocular surface and orbital disorders. Eye Contact Lens. Jul 2009; 35(4): 172-5. PMID 19474753
30. Sharma N, Thenarasun SA, Kaur M, et al. Adjuvant Role of Amniotic Membrane Transplantation in Acute Ocular Stevens-Johnson Syndrome: A Randomized Control Trial. Ophthalmology. Mar 2016; 123(3): 484-91. PMID 26686968
31. Bouchard CS, John T. Amniotic membrane transplantation in the management of severe ocular surface disease: indications and outcomes. Ocul Surf. Jul 2004; 2(3): 201-11. PMID 17216092
32. John T, Tighe S, Sheha H, et al. Corneal Nerve Regeneration after Self-Retained Cryopreserved Amniotic Membrane in Dry Eye Disease. J Ophthalmol. 2017; 2017: 6404918. PMID 28894606
33. McDonald MB, Sheha H, Tighe S, et al. Treatment outcomes in the DRy Eye Amniotic Membrane (DREAM) study. Clin Ophthalmol. 2018; 12: 677-681. PMID 29670328
34. Tandon R, Gupta N, Kalaivani M, et al. Amniotic membrane transplantation as an adjunct to medical therapy in acute ocular burns. Br J Ophthalmol. Feb 2011; 95(2): 199-204. PMID 20675729
35. Eslani M, Baradaran-Rafii A, Cheung AY, et al. Amniotic Membrane Transplantation in Acute Severe Ocular Chemical Injury: A Randomized Clinical Trial. Am J Ophthalmol. Mar 2019; 199: 209-215. PMID 30419194
36. Tamhane A, Vajpayee RB, Biswas NR, et al. Evaluation of amniotic membrane transplantation as an adjunct to medical therapy as compared with medical therapy alone in acute ocular burns. Ophthalmology. Nov 2005; 112(11): 1963-9. PMID 16198422
37. Kaufman SC, Jacobs DS, Lee WB, et al. Options and adjuvants in surgery for pterygium: a report by the American Academy of Ophthalmology. Ophthalmology. Jan 2013; 120(1): 201-8. PMID 23062647
38. Clearfield E, Muthappan V, Wang X, et al. Conjunctival autograft for pterygium. Cochrane Database Syst Rev. Feb 11 2016; 2: CD011349. PMID 26867004
39. Toman J, Michael GM, Wisco OJ, et al. Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane. Facial Plast Surg Aesthet Med. Jan-Feb 2022; 24(1): 48-53. PMID 34714143
40. Hingorani A, LaMuraglia GM, Henke P, et al. The management of diabetic foot: A clinical practice guideline by the Society for Vascular Surgery in collaboration with the American Podiatric Medical Association and the Society for Vascular Medicine. J Vasc Surg. Feb 2016; 63(2 Suppl): 3S-21S. PMID 26804367
41. Lavery LA, Davis KE, Berriman SJ, et al. WHS guidelines update: Diabetic foot ulcer treatment guidelines. Wound Repair Regen. Jan-Feb 2016; 24(1): 112-26. PMID 26663430

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## OTHER REFERENCES

1. Blue Cross and Blue Shield of Kansas Ophthalmology / Optometry Liaison Committee Consent Ballot, November 2018, May 2021.
2. Blue Cross and Blue Shield of Kansas Ophthalmology / Optometry Liaison Committee, May 2011, May 2012, May 2018; August 2019, May 2021.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Appendix

### 2019 Clinical Input

Clinical input was sought to help determine whether the use of human amniotic membrane graft either without or with suture fixation for several ophthalmic conditions would provide a clinically meaningful improvement in net health outcome and whether the use is consistent with generally accepted medical practice. In response to requests, clinical input was received from 2 respondents, including 1 specialty society-level response and 1 physician-level response identified through specialty societies including physicians with academic medical center affiliations.

### Respondents

Clinical input was provided by the following specialty societies and physician members identified by a specialty society or clinical health system:

- American Academy of Ophthalmology (AAO)
- Mark Latina, MD, Ophthalmology, Tufts University School of Medicine, identified by Massachusetts Society of Eye Physicians and Surgeons

Clinical input provided by the specialty society at an aggregate level is attributed to the specialty society. Clinical input provided by a physician member designated by a specialty society or health system is attributed to the individual physician and is not a statement from the specialty society or health system. Specialty society and physician respondents participating in the Evidence Street® clinical input process provide a review, input, and feedback on topics being evaluated by Evidence Street. However, participation in the clinical input process by a specialty society and/or physician member designated by a specialty society or health system does not imply an endorsement or explicit agreement with the Evidence Opinion published by BCBSA nor any Blue Plan.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

## Clinical Input Ratings

| Use of human amniotic membrane for following indications | Type of HAM | Respondent | Identified by | Confidence Level That Clinical Use Expected to Provide Clinically Meaningful Improvement in Net Health Outcome: Yes or No | Low 5 | Low 4 | Low 3 | Low 2 | Low 1 | High 1 | High 2 | High 3 | High 4 | High 5 | Confidence Level that Clinical Use is Consistent with Generally Accepted Medical Practice: Yes or No | Low 5 | Low 4 | Low 3 | Low 2 | Low 1 | High 1 | High 2 | High 3 | High 4 | High 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Neurotrophic keratitis | With suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | X | | Yes | | | | | | | | | X | |
| | Without suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | X | |
| Corneal ulcers and melts | With suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | No | | X | | | | | | | | |
| | Without suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| Corneal perforation | With suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | Without suture | AAO | | No | X | | | | | | | | | | No | X | | | | | | | | | |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | No | | X | | | | | | | | | No | | X | | | | | | | | |
| Bullous keratopathy | With suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | X | | No | | X | | | | | | | | |
| | Without suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | X | |
| Pterygium repair | With suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | Without suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | X | | | No | | X | | | | | | | | |
| Limbal stem cell deficiency | With suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | X | |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | X | | Yes | | | | | | | | | | X |
| | Without suture | AAO | | Yes | | | | | | | | | X | | Yes | | | | | | | | | X | |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | X | |
| Stevens Johnson | With suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | Without suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| Persistent epithelial defects | With suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | No | | X | | | | | | | | |
| | Without suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | X | |
| Severe dry eye | With suture | AAO | | Yes | | | | | | | | | X | | Yes | | | | | | | | | X | |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | X | | No | X | | | | | | | | | |
| | Without suture | AAO | | Yes | | | | | | | | | X | | Yes | | | | | | | | | X | |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| Acute ocular chemical burn | With suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | Without suture | AAO | | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |
| | | Dr. Latina | Mass Soc Eye Phys & Surgeons | Yes | | | | | | | | | | X | Yes | | | | | | | | | | X |

## Respondent Profile

| | Specialty Society | |
|---|---|---|
| **#** | **Name of Organization** | **Clinical Specialty** |
| **1** | American Academy of Ophthalmology | Ophthalmology |
| | **Physician** | |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Name | Degree | Institutional Affiliation | Clinical Specialty | Board Certification and Fellowship Training |
|---|---|---|---|---|---|
| **Identified by Mass Society of Eye Physicians and Surgeons** | | | | | |
| **2** | Mark Latina | MD | Tufts University School of Medicine | Ophthalmology | Ophthalmology, Glaucoma Fellowship trained |

**Respondent Conflict of Interest Disclosure**

| # | 1) Research support related to the topic where clinical input is being sought | | 2) Positions, paid or unpaid, related to the topic where clinical input is being sought | | 3) Reportable, more than $1,000, health care related assets or sources of income for myself, my spouse, or my dependent children related to the topic where clinical input is being sought | | 4) Reportable, more than $350, gifts or travel reimbursements for myself, my spouse, or my dependent children related to the topic where clinical input is being sought | |
|---|---|---|---|---|---|---|---|---|
| | YES/NO | Explanation | YES/NO | Explanation | YES/NO | Explanation | YES/NO | Explanation |
| **1** | No | | No | | No | | No | |
| **2** | No | | No | | No | | No | |

Individual physician respondents answered at individual level. Specialty Society respondents provided aggregate information that may be relevant to the group of clinicians who provided input to the Society-level response. NR = not reported

**Responses**

- We are seeking your opinion on whether using human amniotic membrane graft either without or with suture fixation for the below indications provide a clinically meaningful improvement in net health outcome. Please respond based on the evidence and your clinical experience. Please address these points in your response:
  - Relevant clinical scenarios (e.g., a chain of evidence) where the technology is expected to provide a clinically meaningful improvement in net health outcome;
  - Any relevant patient inclusion/exclusion criteria or clinical context important to consider in identifying individuals who may be appropriate for human amniotic membrane graft with versus without suture fixation for this indication;
  - Supporting evidence from the authoritative scientific literature (please include PMID).

| # | Indications | Rationale |
|---|---|---|
| **1** | Neurothrophic keratitis | Sutured and non-sutured human amniotic membrane HAM are both accepted and effective treatments for neurotrophic keratopathy that does not respond to conservative therapy in patients with corneal staining or an epithelial defect that (1) has failed to completely close after 5 days of conservative treatment, or (2) has failed to demonstrate a decrease in size after 2 days of conservative |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | treatment. Conservative treatment is defined as use of topical lubricants and/or topical antibiotics and/or therapeutic contact lens and/or patching. Failure of multiple modalities should not be required prior to moving to HAM. HAM requires less effort on the part of the patient to adhere to a treatment regimen and has a significant advantage in that regard over treatments that require multiple drops per day. Non-sutured HAM is the preferred initial treatment because it can be performed rapidly in an office setting, bypassing the delay associated with scheduling a procedure in an outpatient facility. It also avoids the facility fees associated with the sutured HAM procedure. Patients that are responding to non-sutured HAM may need a second or third application if healing is not yet complete. Those who show a poor response or poorly tolerate a non-sutured HAM device are candidates for sutured HAM.<br><br>Khokhar (Cornea 2005;24:654. PMID 16015082) found an increased but nonsignificant rate of epithelial healing with sutured HAM compared to more invasive interventions such as tarsorrhaphy for neurotrophic corneal ulceration in a small randomized clinical trial (RCT). A larger trial might have demonstrated a significant difference but the disease is uncommon enough to make such a trial difficult to perform. For the same reason, there have been no trials directly comparing sutured and non-sutured HAM for neurotrophic keratopathy. This reflects not only the uncommon nature of the disease but also the lack of interest in subjecting patients to the more invasive and expensive sutured HAM procedure when clinical experience indicates that non-sutured HAM is effective in a significant number of patients.<br><br>Other uncontrolled series and case reports supporting effectiveness of HAM for neurotrophic keratopathy:<br>Chen HJ. Br J Ophthalmol 2000;84:63. PMID 10906085<br>Ivekovic B. Coll Anthropol 2002;26:47. PMID 12137322<br>Suri K. Eye Contact Lens 2013;39:341. PMID 23945524<br>Uhlig CE. Acta Ophthalmol 2015;93:e481. PMID 25773445 |
| 2 | Neurothrophic keratitis | Neurotrophic keratitis is a degenerative corneal disease induced by an impairment of corneal innervation and often manifested by corneal persistent epithelial defects (PED). Neurotrophic PED is characterized by painless epithelial breakdown, inflammation of the underlying stroma, and poor healing. The disease progression often leads to spontaneous corneal melting and perforation. In my practice, conventional treatments including topical medications, bandage contact lens, eye patching, and tarsorrhaphy usually fail to promote healing. If delayed healing was achieved, there is still a high risk of corneal scarring.<br><br>Cryopreserved amniotic membrane (AM) has successfully been used to enhance healing in patients with Neurotrophic keratitis. [1-8] Besides the known actions of the AM in controlling inflammation and promoting healing, it is also rich in nerve growth factors that facilitate the recovery of the corneal nerves and enhancement of corneal wound healing.<br><br>In my opinion and based on the literature, the use of AM (with or without sutures) for treating neurotrophic keratoconjunctivitis is medically necessary when the standard therapy fails. It interrupts the disease process by controlling inflammation, preventing further damage and restoring ocular surface integrity. |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Chen H-J, Pires RTF, Tseng SCG. Amniotic membrane transplantation for severe neurotrophic corneal ulcers. Br. J. Ophthalmol. 2000; 84:826–833. [PubMed: 10906085]<br>2. IvekoviÄ‡ B, Tedeschi-Reiner E, Petric I, et al. Amniotic membrane transplantation for ocular surface reconstruction in neurotrophic corneal ulcer a. Coll Antropol. 2002;26(1):47-54. [PMID: 12137322]<br>3. Khokhar S, Natung T, Sony P, et al. Amniotic membrane transplantation in refractory neurotrophic corneal ulcers: a randomized, controlled clinical trial. Cornea. 2005;24:654–660. [PMID: 16015082]<br>4. Pachigolla G, Prasher P, Di Pascuale MA, et al. Evaluation of the role of ProKera in the management of ocular surface and orbital disorders. Eye Contact Lens. 2009; 35(4):172-175 [PMID: 19474753]<br>5. Suri K, Kosker M, Raber I, et al. Sutureless Amniotic Membrane ProKera for Ocular Surface Disorders. Short-Term Results. Eye Contact Lens. 2013;39:341-347 [PMID: 23945524]<br>6. Uhlig CE, Frings C, Rohloff N, et al. Long-term efficacy of glycerine-processed amniotic membrane transplantation in patients with corneal ulcer. Acta Ophthalmol. 2015;93(6):e481-7. [PMID:25773445]<br>7. Röck T, Bartz-Schmidt KU, Röck D. Management of a neurotrophic deep corneal ulcer with amniotic membrane transplantation in a patient with functional monocular vision: A case report. Medicine (Baltimore). 2017;96(50):e8997. [PMID: 29390295]<br>8. Morkin, M. I. and P. Hamrah. "Efficacy of self-retained cryopreserved amniotic membrane for treatment of neuropathic corneal pain." Ocul Surf 2018, 16(1): 132-138. [PMID: 29032001] |
| **1** | Corneal ulcers and melts | Corneal ulcers and melts comprise a wide range of disorders with varying etiologies. Common to many of these are an underlying inflammatory component. HAM has been shown to reduce inflammation and promote epithelial healing. These properties make HAM an effective adjunct in treating these conditions while the primary etiology is addressed with targeted therapy (e.g. corticosteroids, antibiotics, biologic immunomodulators). HAM is typically employed when there is a lack of response to initial medical treatment or where HAM can offer some degree of tectonic support in cases where there is significant stromal tissue loss.<br><br>The varied and uncommon nature of the etiology of ulcers and melts makes it unlikely that there will ever be significantly-sized RCTs comparing HAM to conventional therapy or sutured vs. non-sutured HAM. There are numerous small series and case reports without controls showing improvement after HAM placement in cases that were not responding to conventional therapy. A number of these were summarized in a review by Bouchard (Ocul Surf 2004;2:201. PMID 17216092).<br><br>Cited below are selected reports supporting the efficacy of HAM for the treatment of corneal ulcers and melts, including several published since Bouchard's review:<br>Kruse FE. Ophthalmology 1999;106:1504. PMID: 10442895<br>Hanada K. Am J Ophthalmol 2001;131:324. PMID 11239864<br>Chen HC. Cornea 2006;25:564. PMID 16783145 |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | Sheha H. Cornea 2009;28:1118. PMID 19770726<br>Tok OY. Int J Ophthalmol 2015;18:938. PMID 26558205<br>Sharma N. Indian J Ophthalmol 2018;66:816. PMID 29785990<br>Prabhasawat P. Br J Ophthalmol 2001;85:1455. PMID 11734521<br>Solomon A. Ophthalmology 2002;109:694. PMID 11927426<br>Uhlig CE. Am J Ophthalmol Case Rep 2018;10:296. PMID 29780958 |
| **2** | Corneal ulcers and melts | Cryopreserved amniotic membrane (AM) has successfully been used to control inflammation and promote healing in corneal ulcers of varying etiology. [1-9] Based on my experience, the use of AM at an early stage of the disease would prevent any unexpected complications such as infection, scarring, melt and perforation. Particularly, using AM without suture for this indication provides the advantage of in-office treatment without any delay. Furthermore, it avoids potential sight-threatening complications and achieves a clinically meaningful improvement in net visual outcome.<br>1. Kruse FE, Rohrschneider K, Völcker HE. Multilayer amniotic membrane transplantation for reconstruction of deep corneal ulcers. Ophthalmology. 1999;106(8):1504-10; discussion 1511. [PMID: 10442895]<br>2. Hanada K, Shimazaki J, Shimmura S, et al. Multilayered amniotic membrane transplantation for severe ulceration of the cornea and sclera. Am. J. Ophthalmol. 2001; 131(3):324–331. [PubMed: 11239864]<br>3. Chen HC, Tan HY, Hsiao CH, et al. Amniotic membrane transplantation for persistent corneal ulcers and perforations in acute fungal keratitis. Cornea. 2006 Jun;25(5):564-72. [PMID: 16783145]<br>4. Barequet IS, Habot-Wilner Z, Keller N, Smollan G, Ziv H, Belkin M, Rosner M. Effect of amniotic membrane transplantation on the healing of bacterial keratitis. Invest Ophthalmol Vis Sci. 2008 Jan;49(1):163-7. [PMID: 18172088]<br>5. Sheha H, Liang L, Li J, et al. Sutureless amniotic membrane transplantation for severe bacterial keratitis. Cornea 2009; 28(10): 1118-1123. [PMID: 19770726]<br>6. Tok OY, Tok L, Atay IM, et al. Toxic keratopathy associated with abuse of topical anesthetics and amniotic membrane transplantation for treatment. Int J Ophthalmol. 2015; 18;8(5):938-44. [PMID: 26558205]<br>7. Sheha H, Tighe S, Cheng AMS, et al. A stepping stone in treating dendritic keratitis. Am J Ophthalmol Case Rep. 2017; 6(7):55-58. [PMID: 29260079]<br>8. Zhong J, Wang B, Li S, et al. Full-thickness conjunctival flap covering surgery combined with amniotic membrane transplantation for severe fungal keratitis. Exp Ther Med. 2018;15(3):2711-2718. [PMID: 29456673]<br>9. Sharma N, Singhal D, Maharana PK, et al. Continuous intraoperative optical coherence tomography-guided shield ulcer debridement with tuck in multilayered amniotic membrane transplantation. Indian J Ophthalmol. 2018;66(6):816-819. [PMID: 29785990] |
| **1** | Corneal perforation | Multilayered sutured HAM has been performed in some cases of corneal perforation. While it offers some tectonic support, corneal tissue is the preferred graft material in these cases. HAM alone may be a reasonable temporizing alternative when corneal tissue is not immediately available. Non-sutured HAM would not offer significant tectonic support in these cases.<br><br>Both sutured and non-sutured HAM reduces inflammation and promotes epithelial healing. It is therefore a useful adjunct in addition to corneal |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | transplantation in those patients with active inflammation and perforation.<br><br>The rare nature of these cases guarantees that there will be no large RCTs performed for this indication. A number of clinical series and case reports supporting the efficacy of HAM for corneal perforation are cited here:<br><br>Prabhasawat P. Br J Ophthalmol 2001;85:1455. PMID 11734521<br>Solomon A. Ophthalmology 2002;109:694. PMID 11927426<br>Rodriguez-Ares MT. Cornea 2004;23:577. PMID 15256996<br>Hick S. Cornea 2005;24:369. PMID 15829790<br>Uhlig CE. Am J Ophthalmol Case Rep 2018;10:296. PMID 29780958 |
| 2 | Corneal perforation | Depending on the size and location of the corneal perforation, treatment options include gluing, amniotic membrane transplantation, and corneal transplantation. The success rate of using AM to repair corneal perforation is reported to be as high as 93%. [1-7] Kim et al [7] used multiple layers of AM with tissue glue in 10 patients with large corneal perforations up to 5 mm and noted 90% success in complete closure of perforation. AM offers the advantage of avoiding potential corneal graft rejection and postoperative astigmatism of tectonic corneal grafts. I personally did not use AM for this indication, but based on the literature, multiple layers of AM for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Prabhasawat P, Tesavibul N, Komolsuradej W. Single and multilayer amniotic membrane transplantation for persistent corneal epithelial defect with and without stromal thinning and perforation. Br J Ophthalmol. 2001;85(12):1455-63. [PMID: 11734521]<br>2. Solomon A, Meller D, Prabhasawat P, et al. Amniotic membrane grafts for nontraumatic corneal perforations, descemetoceles, and deep ulcers. Ophthalmology. 2002; 109(4):694–703. [PubMed: 11927426]<br>3. Rodriguez-Ares MT, Tourino R, Lopez-Valladares MJ, et al. Multilayer amniotic membrane transplantation in the treatment of corneal perforations. Cornea. 2004; 23(6):577–583. [PubMed: 15256996]<br>4. Hick S, Demers PE, Brunette I, et al. Amniotic membrane transplantation and fibrin glue in the management of corneal ulcers and perforations: a review of 33 cases. Cornea. 2005; 24(4):369–377. [PubMed: 15829790]<br>5. Xie HT, Zhao D, Liu Y, et al. Umbilical Cord Patch Transplantation for Corneal Perforations and Descemetoceles. J Ophthalmol. 2017;2017:2767053. [PMID: 28660079]<br>6. Uhlig CE, Müller VC. Resorbable and running suture for stable fixation of amniotic membrane multilayers: A useful modification in deep or perforating sterile corneal ulcers. Am J Ophthalmol Case Rep. 2018; 19 (10):296-299. [PMID: 29780958]<br>7. Kim HK, Park HS. Fibrin glue-assisted augmented amniotic membrane transplantation for the treatment of large noninfectious corneal perforations. Cornea 2009; 28(2), 170–176.[PMID: 19158560] |
| 1 | Bullous keratopathy | HAM is one of several modalities for treatment of bullous keratopathy due to corneal endothelial dysfunction. HAM does not address the underlying endothelial disease, so it is considered palliative rather than curative therapy. It is a reasonable alternative for patients who are not candidates for curative endothelial or penetrating keratoplasty. Sutured HAM has been shown to be as effective for bullous keratopathy as anterior stromal puncture (Paris F. Br J |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | Ophthalmol 2013;97:980. PMID 23723410) and phototherapeutic keratectomy (Chawla B. Cornea 2010;29:976. PMID 20517149). Non-sutured HAM is a reasonable alternative to anterior stromal puncture as it is faster and simpler to perform. Sutured HAM in an operating room setting and non-sutured HAM in the office are of particular value in patients who have difficulty holding still for office procedures such as anterior stromal puncture in which there is a risk of increased corneal scarring or globe perforation with patient movement. HAM typically offers long-lasting pain relief in these cases, obviating the need for corneal transplantation with its associated increased risks (rejection, infection) and costs.<br><br>There are additional reports demonstrating the efficacy of HAM for bullous keratopathy:<br><br>Pires RTF. Arch Ophthalmol 1999;117:1291. PMID 10532436<br>Espana EM. J Cataract Refract Surg 2003;29:279. PMID 12648638<br>Chansanti O. J Med Assoc Thai 2005;9:S57. PMID 16681053<br>Srinivas S. Eur J Ophthalmol 2007;17:7. PMID 17294377<br>Georgiadis NS. Clin Exp Ophthalmol 2008;36:130. PMID 18352868<br>Chawla B. Eur J Ophthalmol 2008;18:998. PMID 18988175<br>Altiparmak UE. Am J Ophthalmol 2009;147:442. PMID 19019342<br>Stefaniu GI. J Med Life 2014;7:88. PMID 25870682<br>Siu GD. Int Ophthalmol 2015;35:777. PMID: 255866 |
| 2 | Bullous keratopathy | Cryopreserved amniotic membrane (AM) is recommended for Bullous keratopathy with poor visual potential. AM achieves immediate pain relief, reduced inflammation, and complete healing. [1-12] Chansanti et al [4] noted postoperative relief of pain in 14 eyes (82.4%) and complete corneal epithelial healing in 15 eyes (88.2%) after AMT. Sonmez et al. [5] performed anterior stromal micropuncture and AMT in 5 eyes with painful bullous keratopathy [40]. All showed an intact, smooth corneal epithelial surface 1 month after the procedure, and there were no patients that developed recurrent bullae formation during an average follow-up period of 21 months. Siu et al [12] reported a long term symptomatic relief of bullous keratopathy with amniotic membrane transplant in a total of 21 eyes of 20 patients. The majority of eyes experienced pain reduction (94 %), with a significant mean pain score difference of 6.8 ± 2.6, 2-tail $p < 0.001$ (99 % CI 4.9-8.7). The mean preoperative and postoperative pain scores were 7.3 ± 2.9 and 0.5 ± 1.0, respectively. 16 eyes (76 %) were completely pain free, and 10 eyes (47 %) remained symptom free after a mean follow-up of 39.0 ± 36.3 months (range 5-171 months). The median epithelial healing time was 2 weeks (range 1-20 weeks). Based on the literature, AM is considered as a longer-term treatment for bullous keratopathy patients with poorer visual prognosis. AM without sutures may also be used as an interim measure for patients awaiting corneal transplant. Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Pires RTF, Tseng SCG, Prabhasawat P et al. Amniotic membrane transplantation for symptomatic bullous keratopathy. Arch.Ophthalmol. 1999; 117, 1291-1297.[PMID: 10532436] |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 2. Mrukwa-Kominek E, Gierek-Ciaciura S, Rokita-Wala I, et al. Use of amniotic membrane transplantation for treating bullous keratopathy. Klin Oczna. 2002;104(1):41-6. Polish. [PMID: 12046309]<br>3. Espana EM, Grueterich M, Sandoval H et al. Amniotic membrane transplantation for bullous keratopathy in eyes with poor visual potential. J.Cat.Refract.Surg. 2003; 29, 279-284.<br>4. Chansanti O, Horatanaruang O. The results of amniotic membrane transplantation for symptomatic bullous keratopathy. J Med.Assoc.Thai. 88 Suppl 2005; 9, S57-S62.<br>5. Sonmez B, Kim BT, Aldave AJ. Amniotic membrane transplantation with anterior stromal micropuncture for treatment of painful bullous keratopathy in eyes with poor visual potential. Cornea 26(2), 227–229 (2007).<br>6. Srinivas S, Mavrikakis E, Jenkins C. Amniotic membrane transplantation for painful bullous keratopathy. Eur J Ophthalmol. 2007;17(1):7-10. [PMID: 17294377]<br>7. Georgiadis NS, Ziakas NG, Boboridis KG, et al. Cryopreserved amniotic membrane transplantation for the management of symptomatic bullous keratopathy. Clin Exp Ophthalmol. 2008;36(2):130-5. [PMID: 18352868]<br>8. Chawla B, Tandon R. Sutureless amniotic membrane fixation with fibrin glue in symptomatic bullous keratopathy with poor visual potential. Eur J Ophthalmol. 2008;18(6):998-1001. [PMID: 18988175]<br>9. Altiparmak UE, Oflu Y, Yildiz EH, et al. Prospective comparison of two suturing techniques of amniotic membrane transplantation for symptomatic bullous keratopathy. Am J Ophthalmol. 2009;147(3):442-446.e1. [PMID:19019342]<br>10. Gregory ME, Spiteri-Cornish K, Hegarty B, et al. Combined amniotic membrane transplant and anterior stromal puncture in painful bullous keratopathy: clinical outcome and confocal microscopy. Can J Ophthalmol. 2011;46(2):169-74. [PMID: 21708086]<br>11. Stefaniu GI, Chiotoroiu SM, Secureanu FA, et al. Use of amniotic membrane in bullous keratopathy palliative care. J Med Life. 2014;7 Spec No. 2:88-91. [PMID: 25870682]<br>12. Siu GD, Young AL, Cheng LL. Long-term symptomatic relief of bullous keratopathy with amniotic membrane transplant. Int Ophthalmol. 2015;35(6):777-83. [PMID: 25586624] |
| 1 | Pterygium repair | Sutured HAM has been fairly extensively studied as an alternative to conjunctival autograft or bare sclera technique in pterygium surgery (Kaufman SC. Ophthalmology 2013;120:201. PMID 23062647. Clearfield, Cochrane Database Syst Rev 2016;2:CD011349. PMID 26867004). While HAM is more effective at preventing recurrences than bare sclera technique, and subject to fewer serious complications than mitomycin C, conjunctival autograft has been shown to be more effective than HAM in terms of reducing recurrences. However, there are patients with extensive, double, or recurrent pterygia in which there is insufficient healthy tissue to create a conjunctival autograft. In these patients, sutured or non-sutured (glued) HAM is the material of choice for covering the conjunctival defect left after removal of the pterygium as the recurrence rate is lower than if the sclera is left bare. Sutured and glued HAM should be covered for these cases.<br><br>Non-sutured HAM is effective at promoting epithelial healing in patients who |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | have persistent epithelial defects (see below) after pterygium surgery and should be covered in these cases. |
| 2 | Pterygium repair | The most daunting challenge of pterygium surgery is the high rate of recurrence, as high as 88%. Surgical techniques in more recent years, in which scleral defects are covered with conjunctival autograft or cryopreserved amniotic membrane (AM) with or without mitomycin C (MMC), have resulted in much better outcomes, with less recurrence rates and minimal complications. [1-16] However, some debate still continues regarding which graft offers the better outcome. In a prospective study, Prabhasawat et al [1] first reported a recurrence rate of 10.9% in primary pterygium (n = 54) after excision and AMT. Solomon et al [2] subsequently modified the technique of AMT and achieved a low recurrence rate of 3% in 33 cases of primary pterygium. Another surgical parameter is the use of MMC. Rosen et al [16] reported a considerably low recurrence rate (3.6%) when used AM graft without sutures along with reduced exposure to MMC. In my opinion, AM is as effective as conjunctival autograft in preventing pterygium recurrence and can be considered as a preferred grafting procedure for pterygium repair. The use of AM provides the following benefits: save donor conjunctiva, minimize surgical trauma, reduce surgery time, reduce postoperative pain, reduce inflammation, facilitate faster recovery and healing. Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Prabhasawat P, Barton K, Burkett G, et al. Comparison of conjunctival autografts, amniotic membrane grafts and primary closure for pterygium excision. Ophthalmology 1997; 104, 974-985. [PMID: 9186439]<br>2. Ma DH-K, See L-C, Liau S-B, et al. Amniotic membrane graft for primary pterygium: comparison with conjunctival autograft and topical mitomycin C treatment. Br.J.Ophthalmol. 2000; 84, 973-978.[PMID: 10966947]<br>3. Solomon A, Espana EM, Tseng SCG. Amniotic membrane transplantation for reconstruction of the conjunctival fornices. Ophthalmology. 2003; 110:93–100. [PubMed: 12511352]<br>4. Jain S, Rastogi A. Evaluation of the outcome of amniotic membrane transplantation for ocular surface reconstruction in symblepharon. Eye. 2004; 18(12):1251–1257. [PubMed: 15184952]<br>5. Zhou SY, Chen JQ, Chen LS, et al. Long-term results of amniotic membrane transplantation for conjunctival surface reconstruction. Zhonghua Yan. Ke. Za Zhi. 2004; 40(11):745–749. [PubMed: 15634481]<br>6. Keklikci U, Celik Y, Cakmak SS, et al. Conjunctival-limbal autograft, amniotic membrane transplantation, and intraoperative mitomycin C for primary pterygium. Ann Ophthalmol (Skokie). 2007;39(4):296-301. [PMID: 18025649]<br>7. Kucukerdonmez C, Akova YA, Altinors DD. Comparison of conjunctival autograft with amniotic membrane transplantation for pterygium surgery: surgical and cosmetic outcome. Cornea. 2007:26(4):407-413. [PMID: 17457187]<br>8. Kucukerdonmez C, Akova YA, Altinors DD. Vascularization is more delayed in amniotic membrane graft than conjunctival autograft after pterygium excision. Am.J.Ophthalmol 2007; 143(2), 245-249. [PMID: 17173849]<br>9. Fallah MR, Golabdar MR, Amozadeh J, et al. Transplantation of conjunctival limbal autograft and amniotic membrane vs mitomycin C and amniotic |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | membrane in treatment of recurrent pterygium. Eye 2008; 22(3), 420-424. [PMID: 17159974]<br>10. Kheirkhah A, Casas V, Sheha H, et al. Role of conjunctival inflammation in surgical outcome after amniotic membrane transplantation with or without fibrin glue for pterygium. Cornea 2008; 27(1), 56-63. [PMID: 18245968]<br>11. Kheirkhah A, Blanco G, Casas V, et al. Surgical strategies for fornix reconstruction based on symblepharon severity. Am. J. Ophthalmol. 2008; 146(2):266– 275. [PubMed: 18514608]<br>12. Park JH, Jeoung JW, Wee WR, et al. Clinical efficacy of amniotic membrane transplantation in the treatment of various ocular surface diseases. Cont Lens Anterior Eye. 2008 Apr;31(2):73-80. [PMID: 18249149]<br>13. KatÄ±rcÄ±oglu YA, Altiparmak U, Engur Goktas S, et al. Comparison of Two Techniques for the Treatment of Recurrent Pterygium: Amniotic Membrane vs Conjunctival Autograft Combined with Mitomycin C. Semin Ophthalmol. 2015;30(5-6):321-7. [PMID: 24506693]<br>14. Zhao D, Yin HY, Cheng A, et al. Sealing of the gap between the conjunctiva and tenon capsule to improve symblepharon surgery. Am J Ophthalmol. 2015;160(3):438-446.e1. [PMID: 26093286]<br>15. Tanaka TS, Demirci H. Cryopreserved Ultra-Thick Human Amniotic Membrane for Conjunctival Surface Reconstruction After Excision of Conjunctival Tumors. Cornea. 2016;35(4):445-50. [PMID: 26807897]<br>16. Rosen R. Amniotic Membrane Grafts to Reduce Pterygium Recurrence. Cornea. 2018;37(2):189-193. [PMID: 28976415] |
| **1** | Limbal stem cell deficiency | Limbal stem cell deficiency is an uncommon, serious disorder leading to conjunctivalization, irregularity, and opacity of the corneal surface. Total limbal stem cell deficiency typically requires a limbal stem cell transplant to restore the ocular surface. These vascularized transplants require prolonged systemic immunosuppression and the attendant risks to support graft survival and prevent recurrence of the disease. Partial limbal stem cell deficiency may respond to selective removal of the diseased tissue without a transplant when a limited portion of the ocular surface is involved. In more extensive cases where selective removal alone is not sufficient, HAM in conjunction with superficial keratectomy to remove the diseased tissue can provide long-term restoration of a smooth and transparent ocular surface and improved visual acuity without having to resort to a transplant (Kheirkhah AV. Am J Ophthalmol 2008;145:787. PMID 18329626). Due to the rarity of this disease, it is unlikely that RCTs will ever be performed. Comparisons to limbal stem cell transplants are unlikely to be performed because of the risks of systemic immune suppression.<br>HAM should be covered in conjunction with superficial keratectomy for cases of limbal stem cell deficiency. |
| **2** | Limbal stem cell deficiency | Patients with Limbal stem cell deficiency (LSCD) suffer from severe loss of vision due to vascularized cornea scarring and non-healing epithelial defect. Their vision cannot be corrected by conventional penetrating keratoplasty. Previous studies have shown that in eyes with partial LSCD, AM promotes expansion of remaining limbal epithelial stem cells [1-4]. To avoid suture-related disadvantages and complications, Kheirkhah et al. [5] recently reported successful reconstruction of the corneal surface in nine patients with nearly total LSCD using fibrin glue. Kheirkhah et al. [56] further reported successful use of minimal conjunctival limbal autograft in conjunction with AM for total limbal stem cell deficiency. |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 1. Tseng SCG, Prabhasawat P, Barton K, et al. Amniotic membrane transplantation with or without limbal allografts for corneal surface reconstruction in patients with limbal stem cell deficiency. Arch. Ophthalmol. 1998;116, 431–441. [PMID: 9565039]<br>2. Anderson DF, Ellies P, Pires RT, et al. Amniotic membrane transplantation for partial limbal stem cell deficiency. Br. J. Ophthalmol. 2001; 85(5), 567–575. [PMID: 11316719 ]<br>3. Gomes JA, dos Santos MS, Cunha MC, et al. Amniotic membrane transplantation for partial and total limbal stem cell deficiency secondary to chemical burn. Ophthalmology 2003; 110(3), 466–473. [PMID: 12623806]<br>4. Sangwan VS, Matalia HP, Vemuganti GK, et al. Amniotic membrane transplantation for reconstruction of corneal epithelial surface in cases of partial limbal stem cell deficiency. Indian J. Ophthalmol. 2004; 52(4), 281–285. [PMID: 15693318]<br>5. Kheirkhah A, V. Casas V. Raju K et al. Sutureless amniotic membrane transplantation for partial limbal stem cell deficiency. Am.J.Ophthalmol. 2008; 145(5): 787-794. [PMID: 18329626]<br>6. Kheirkhah, A., Raju VK and S. C. Tseng. "Minimal conjunctival limbal autograft for total limbal stem cell deficiency." Cornea 2008; 27(6): 730-733. [PMID: 18580269] |
| **1** | Stevens-Johnson | Sutureless HAM plus medical therapy has been demonstrated in a small RCT to be more effective than medical therapy alone in treatment of Stevens-Johnson syndrome (Sharma N. Ophthalmology 2016;123:484. PMID 26686968). Sutureless or sutured HAM, depending on the severity of the disease, in conjunction with medical therapy has become the accepted management technique for the treatment of moderate or severe Stevens-Johnson. Both should be covered for this indication. The severity of the disease and its infrequency makes it unlikely that a large RCT will be performed. Additional literature demonstrating good visual outcomes with both sutured and sutureless HAM in a disease that prior to introduction of HAM was typically blinding includes:<br><br>Shammas MC. Am J Ophthalmol 2010;149:203. PMID 20005508<br>Gregory DM. Ocular Surf 2008;6:40. PMID 18418506<br>Shay E. Surv Ophthalmol 2009;54:686. PMID 19699503<br>Gregory DM. Ophthalmology 2011;118:908. PMID 21440941<br>Shay E. Cornea 2010;29:359. PMID 20098313<br>Tomlins PJ. Cornea 2013;32:365. PMID 22677638<br>Kolomeyer AM. Eye Contact Lens 2013;39:e7. PMID 22683916<br>Ma KN. Ocular Surf 2016;14:31. PMID 26387869 |
| **2** | Stevens-Johnson | Amniotic membrane with sutures has been used to suppress inflammation, promote healing, and prevent scarring in patients with acute Stevens Johnson Syndrome (SJS) with or without toxic epidermal necrolysis (TEN) [1-6]. The conventional management at intensive care and burn units are usually reserved for life-threatening problems, and thus are frequently inadequate to address ocular inflammation and ulceration. As a result, patients suffering are frequently left with a blinding disease owing to scarring-induced late complications. Gregory et al. [7] and Shay et al. [8] have reviewed the literature and found that AMT performed within 2 weeks after the onset of disease effectively aborts inflammation and facilitates rapid healing in AM-covered areas, thus preventing pathogenic cicatricial complications at the chronic stage in 12 eyes. Several case |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | reports and case series [6-12] demonstrated the effectiveness of AM without sutures (ProKera) at the acute stage of SJS/ TEN, and noted restoration of normal vision. Gregory et al [9] further reported restoration of vision in 10 consecutive cases using AM with and without sutures. However, because this devastating ocular surface disease usually elicits inflammation and ulceration in such hidden areas as the lid margin, the tarsus, and the fornix, AM extended to cover the entire ocular surface is necessary.[10] Ma et al [13] developed a novel technique for using large AM graft without suture to cover the entire ocular surface in patients with acute SJS. In my opinion, and based on the literature, the use of AM with sutures is preferred to prevent long term lid related complications. The use of AM without suture is still helpful in emergency settings when the patient condition does not allow for surgical intervention. Collectively, the use of AM for this indication provides a clinically meaningful improvement in net health outcome.<br>1. John T, Foulks GN, John ME, et al. Amniotic membrane in the surgical management of acute toxic epidermal necrolysis. Ophthalmology 2002; 109(2), 351–360. [PMID: 11825823]<br>2. Kobayashi A, Yoshita T, Sugiyama K et al. Amniotic membrane transplantation in acute phase of toxic epidermal necrolysis with severe corneal involvement. Ophthalmology 2006; 113(1), 126–132. [PMID: 16324747]<br>3. Di Pascuale MA, Espana EM, Liu DT et al. Correlation of corneal complications with eyelid cicatricial pathologies in patients with Steven-Johnson syndrome and toxic epidermal necrolysi syndrome. Ophthalmology 2005; 112(5), 904–912. [PMID: 15878074]<br>4. Muqit MM, Ellingham RB, Daniel C. Technique of amniotic membrane transplant dressing in the management of acute Stevens–Johnson syndrome. Br. J. Ophthalmol. 2007; 91(11), 1536. [PMID: 17947270]<br>5. Tandon A, Cackett P, Mulvihill A, et al. Amniotic membrane grafting for conjunctival and lid surface disease in the acute phase of toxic epidermal necrolysis. J. AAPOS 2007; 11(6), 612–613. [PMID: 17681814]<br>6. Shammas MC, Lai EC, Sarkar JS, et al. Management of acute Stevens–Johnson syndrome and toxic epidermal necrolysis utilizing amniotic membrane and topical corticosteroids. Am. J. Ophthalmol. 2010; 149(2), 203–213. [PMID: 20005508]<br>7. Gregory DG. The ophthalmologic management of acute Stevens–Johnson syndrome. Ocul. Surf. 2008; 6(2), 87–95. [PMID: 18418506]<br>8. Shay E, Kheirkhah A, Liang L, et al. Amniotic membrane transplantation as a new therapy for the acute ocular manifestations of Stevens–Johnson syndrome and toxic epidermal necrolysis. Surv. Ophthalmol. 2009; 54(6), 686–696. [PMID: 19699503]<br>9. Gregory, DG. Treatment of Acute Stevens–Johnson Syndrome and Toxic Epidermal Necrolysis Using Amniotic Membrane: A Review of 10 Consecutive Cases. Ophthalmology 2011; 118:908–914. [PMID: 21440941]<br>10. Shay E, Khadem JJ and Tseng SC. Efficacy and limitation of sutureless amniotic membrane transplantation for acute toxic epidermal necrolysis. Cornea 2010; 29(3): 359-361. [PMID: 20098313]<br>11. Tomlins, PJ., Parulekar MV, and Rauz S. ""Triple-TEN" in the Treatment of Acute Ocular Complications From Toxic Epidermal Necrolysis." Cornea 2013; 32(3): 365-369. [PMID: 22677638] |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 12. Kolomeyer AM, Do BK, Tu Y, et al. Placement of ProKera in the management of ocular manifestations of acute Stevens-Johnson syndrome in an outpatient. Eye Contact Lens. 2013;39: e7-11. [PMID: 22683916]<br>13. Ma KN, Thanos A, Chodosh J, et al. A Novel Technique for Amniotic Membrane Transplantation in Patients with Acute Stevens-Johnson Syndrome. Ocul Surf. 2016;14(1):31-6. [PMID: 26387869] |
| **1** | Persistent epithelial defects | HAM is an effective treatment for persistent epithelial defects due to a number of underlying causes. While not a first-line treatment, both sutured and non-sutured HAM are appropriate in patients with epithelial defects that fail to show a response within 2 days of initiation of conservative therapy. Conservative therapy is considered to be any one or more of the following: topical lubricants and/or antibiotics, therapeutic contact lens, or patching. If there is a failure to respond to any one of these modalities, HAM is an appropriate second step.<br><br>Persistent epithelial defects are often a precursor to corneal stromal melting and ulceration. Many of the comments and citations in the above "Section b. corneal ulcers and melts" are applicable here. The uncommon nature of the diseases associated with persistent epithelial defects and the lack of a standard therapeutic regimen account for the lack of RCTs. However, the following publications demonstrate the effectiveness of HAM for this indication.<br><br>Prabhasawat P. Br J Ophthalmol 2001;85:1455. PMID 11734521<br>Lee SH. Am J Ophthalmol 97;123:303. PMID 9063239<br>Letko E. Arch Ophthalmol 2001;119:659. PMID 11346392<br>Gris O. Cornea 2002;21:22. PMID 11805502<br>Seitz B. Eye (London) 2009;23:840. PMID 18535612<br>Dekaris I. Coll Antropol 2010;34 Suppl 2:15. PMID 21305721 |
| **2** | Persistent epithelial defects | Persistent epithelial defect (PED) is often caused by microtrauma, neurotrophic keratopathy and exposure. Conventional treatment includes correcting the underlying condition, suppressing the inflammation, and promoting the healing process using tears. If conventional treatment fails after 2 weeks, these patients are prone to further complications and corneal scarring and haze. Because PED also be 'neurotrophic', please refer to Neurotrophic keratitis indication. As stated above, conventional treatments usually fail to promote prompt healing in these conditions and the eyes are prone to delayed healing, corneal ulceration, scarring, and infection. These complications in turn result in poor patient outcomes, visual detriment, and a greater frequency of office visits and associated costs. The following publications [1-6] show the effectiveness of AM with and without sutures in promoting healing in PEDs. Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Lee SH, Tseng SC. Amniotic membrane transplantation for persistent epithelial defects with ulceration. Am J Ophthalmol. 1997;123(3):303-12. [PMID:9063239]<br>2. Letko E, Stechschulte SU, Kenyon KR, et al. Amniotic membrane inlay and overlay grafting for corneal epithelial defects and stromal ulcers. Arch Ophthalmol. 2001;119(5):659-63. [PMID: 11346392]<br>3. Gris O, del Campo Z, Wolley-Dod C, et al. Amniotic membrane implantation as a therapeutic contact lens for the treatment of epithelial disorders. Cornea. 2002;21(1):22-7. [PMID: 11805502] |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 4. Seitz B, Das S, Sauer R, et al. Amniotic membrane transplantation for persistent corneal epithelial defects in eyes after penetrating keratoplasty. Eye (Lond). 2009;23(4):840-8. [PMID: 18535612]<br>5. Dekaris I, MraviciÄ‡ I, BarisiÄ‡ A, et al. Amniotic membrane transplantation in the treatment of persistent epithelial defect on the corneal graft. Coll Antropol. 2010;34 Suppl 2:15-9. [PMID: 21305721]<br>6. Nguyen, P., K. Rue, M. Heur, et al. "Ocular surface rehabilitation: Application of human amniotic membrane in high-risk penetrating keratoplasties." Saudi J Ophthalmol 2014; 28(3): 198-202. [PMID: 25278797] |
| **1** | Severe dry eye | As noted in the BCBS review, non-sutured HAM has been demonstrated in an RCT to be more effective than conservative therapy in patients with moderate to severe dry eye disease (John T. J Ophthalmol 2017;2017:6404918. PMID 28894606). Also noted in the review was a small series of 10 patients with moderate to severe dry eye that were non-responsive to conventional therapy (Cheng AM. Ocul Surf 2016;14:56. PMID 26387870). These patients improved with placement of non-sutured HAM. A more recent, larger retrospective review of patients with severe dry eye disease unresponsive to traditional therapy and then treated with non-sutured HAM showed that 88% of subjects demonstrated significant improvement of symptoms extending beyond the period of treatment with HAM (McDonald MD. Clin Ophthalmol 2018;12:677. PMID 29670328).<br><br>Traditional dry eye therapy typically consists of frequent application of lubricants, hot compresses, and environmental controls to increase humidity. Patients may not respond to traditional dry eye therapy due to the severity of the disease or due to inability to control the environment or administer drops frequently. Topical drugs such as cyclosporine and lifitegrast may be helpful in these cases but they may take months to take effect. If the patient's daily activities are significantly affected by dry eye signs and symptoms, HAM may provide rapid relief while waiting for long-term medications to take effect. HAM is unlikely to be of benefit for mild dry eye disease or disease that responds to conservative therapy. Because HAM limits acuity it is only viable as a short-term therapy. Sutured HAM is not typically used for severe dry eye alone, but may be necessary in the face of one or more concomitant diseases discussed in the other sections.<br><br>Our recommendation is that non-sutured HAM be covered in patients with persistent symptoms or persistent corneal staining that does not respond to traditional dry eye therapy. |
| **2** | Severe dry eye | Dry eye disease (DED) is a multifactorial disease comprised of tear film insufficiency and associated ocular surface disorder such as superficial epithelial defect. Treatment of DED depends on the etiology and the level of severity. Although artificial tears, immunosuppressants, and punctal occlusion are commonly used for tear film insufficiency, ocular surface involvement with a defect are usually refractory and may require eye protection devices and/ or surgical intervention.<br><br>In fact, Prokera has been reported to manage ocular signs and symptoms of DED. In a retrospective study by Cheng et al,[1] Prokera was placed for 5 days (Range: 2-8 days) in 15 eyes of 10 patients with moderate to severe DED. The dry eye severity ranged from Grade 1 to 4 according to the Report of the International Dry Eye Work Shop (DEWS) 2007.[2] All patients experienced |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | symptomatic relief for a mean period of 4.2 months (Range: 0.3-6.8). Such improvement was accompanied by reduction of Ocular Surface Disease Index (OSDI) symptom scores, the use of topical medications, conjunctival hyperemia, and corneal staining as well as improvement in the quality of vision.11 In a single site prospective, randomized, and controlled study conducted by John et al [3], Prokera together with standard of care was placed in 10 patients for 3.4 ± 0.7 days (Range: 3-5 days) while standard of care was instituted in another 10 patients as the control. All 20 patients presented with moderate to severe DED with DEWS Grade 2-4. Compared to the control arm of 10 patients receiving standard of care, the treatment arm of 10 patients receiving Prokera together with standard of care resulted in reduction of symptoms based on SPEED score and signs such as superficial punctate keratitis (SPK) measured by fluorescein staining, leading to an overall reduction of the mean DEWS severity score from 2.9 ± 0.3 at baseline to 1.1 ± 0.3 at 1 month and 1.0 ± 0.0 at 3 months, respectively (both p ≤ 0 001).These palliative benefits are correlated with an increase of corneal nerve density measured by in vivo confocal microscopy from 12,241 ± 5,083 µm/mm2 at baseline to 16,364 ±3,734 µm/mm2 at 1 month, and 18,827 ±5,453 µm/mm2 at 3 months(both p=0.015). The increase of corneal nerve density is also correlated with an increase of corneal sensitivity measured by a monofilament in the Bonnet-Crochet esthesiometer. A lasting benefit for more than 3 months after one placement of Prokera was also demonstrated in a retrospective study by McDonald et al [4] in 97 eyes of 84 of patients with moderate to severe DED (DEWS 2-4), of which the majority presented with symptoms of ocular discomfort, blurry vision, ocular pain, redness, and light sensitivity. Most of the cases manifested the ocular sign of SPK due to exposure keratitis, filamentary keratitis, epithelial defect, and neurotrophic keratitis. A single placement of Prokera for 5.4 ± 2.8 days leads to notable improvement of DED symptoms and reduction of ocular signs in 74 subjects (88%) as evidenced by notable reduction of the mean DEWS severity score from 3.25 to 1.44 at 1 week, 1.45 at 1 month, and 1.47 at 3 months.<br><br>In my practice, a single placement of Amniotic Membrane (non-sutured) was also effective in reducing signs and symptoms of DED for a period lasting more than three months. Therefore, amniotic membrane without sutures should be considered for severe dry eye with ocular surface damage and inflammation.<br>1. Cheng AM, Zhao D, Chen R, et al. Accelerated Restoration of Ocular Surface Health in Dry Eye Disease by Self-Retained Cryopreserved Amniotic Membrane. Ocul Surf. 2016 Jan;14(1):56-63. [PMID: 26387870]<br>2. The definition and classification of dry eye disease: report of the Definition and Classification Subcommittee of the International Dry Eye WorkShop (2007). Ocul Surf. 2007; 5: 75-92.<br>3. John T, Tighe S, Sheha H, et al. Corneal Nerve Regeneration after Self-Retained Cryopreserved Amniotic Membrane in Dry Eye Disease. J Ophthalmol. 2017;6404918. [PMC5574308]<br>4. McDonald MB, Sheha H, Tighe S, et al. Treatment outcomes in the Dry Eye Amniotic Membrane (DREAM) study. Clin Ophthalmol. 2018 Apr 9;12:677-681. [PMID: 29670328] |
| 1 | Acute ocular chemical burn | Ocular chemical burns represent a diverse array of clinical conditions and severity, making high quality RCTs difficult or impossible to perform. The Cochrane review cited in the BCBS review (Clare G. Cochrane Database Syst Rev |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 2012;9:CD009379. PMID 22972141) reflects this difficulty. However, it is clear that there are subsets of patients that respond to either sutured or non-sutured HAM based in its ability to reduce inflammation and promote epithelial healing. Particularly in moderate and severe burns where the prognosis with traditional therapy is poor, sutured and non-sutured HAM are important alternatives that should be covered. There are multiple reports of good outcomes in these cases. Though control groups are lacking, several of these reports are fairly large series and were not addressed directly in the BCBS review:<br><br>Westekemper H. Br J Ophthalmol 2017;101:103. PMID 27150827<br>Meller D. Ophthalmology 2000;107:980. PMID 10811094<br>Ucakhan OO. Cornea 2002;21:169. PMID 11862088<br>Arora R. Eye 2005;19:273. PMID 15286672<br>Tamhane A. Ophthalmology 2005;112:1963. PMID: 16198422<br>Tejwani S. Cornea 2007;26:21. PMID 17198009<br>Prabhasawat P. J Med Assoc Thai 2007;90:319. PMID 17375638<br>Kheirkhah A. Arch Ophthalmol 2008;126:1059. PMID 18695099<br>Tandon R. Br J Ophthalmol 2011;95:199. PMID: 20675729 |
| **2** | Acute ocular chemical burn | Previous studies have demonstrated the importance of early intervention with cryopreserved amniotic membrane (AM) in mild and moderate chemical burns.[1-10] Specifically, Miller et al [7] used AM as a patch graft with sutures in 13 eyes of patients with acute chemical burn grade II-IV (within 2 weeks of the injury) and epithelial healing occurred within 2-5 weeks. Prabhasawat et al [8] also showed that AM as a patch graft performed within 5 days of grades II and III chemical burns promoted faster epithelial healing and less corneal haze than if performed after 5 days. These results were confirmed by Tandon et al [9] who demonstrated the efficacy of sutured AM in eyes with acute ocular burns in a prospective, randomized, controlled clinical trial of 100 patients with grade II to IV acute ocular burns. Patients were randomized to receive AM or conventional medical treatment. The rate of epithelial healing was significantly better in the AM group than the group with standard medical therapy alone. Kheirkhah et al [10] noted a similar positive outcome when AM without sutures (Prokera) was used within 8 days of chemical burn injury. Based on the above, the use of AM with or without sutures in acute chemical burn is considered a medical necessity to control inflammation, prevent further damage, reduce scarring and restore visual function. In my opinion, and based on the literature, the use of AM without sutures is preferred to prevent surgical trauma and suture related complications in such compromised eyes. Therefore, using AM either without or with suture fixation for this indication provides a clinically meaningful improvement in net health outcome.<br>1. Kim JS, Kim JC, Na BK, et al. Amniotic membrane patching promotes healing and inhibits protease activity on wound healing following acute corneal alkali burns. Exp Eye Res. 2000;70:329Y337. [PMID: 10712819]<br>2. Sridhar MS, Bansal AK, Sangwan VS, et al. Amniotic membrane transplantation in acute chemical and thermal injury. Am J Ophthalmol. 2000;130:134Y137. [PMID: 10712819]<br>3. Ucakhan OO, Koklu G, Firat E. Nonpreserved human amniotic membrane transplantation in acute and chronic chemical eye injuries. Cornea. 2002;21:169Y172. |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | Rationale |
|---|---|---|
| | | 4. Arora R, Mehta D, Jain V. Amniotic membrane transplantation in acute chemical burns. Eye. 2005;19:273Y278. [PMID: 11862088]<br>5. Tamhane A, Vajpayee RB, Biswas NR, et al. Evaluation of amniotic membrane transplantation as an adjunct to medical therapy as compared with medical therapy alone in acute ocular burns. Ophthalmology. 2005;112:1963Y1969. [PMID: 16198422]<br>6. Tejwani S, Kolari RS, Sangwan VS, et al. Role of amniotic membrane graft for ocular chemical and thermal injuries. Cornea. 2007;26:21Y26. [PMID: 17198009]<br>7. Meller D, Pires RTF, Mack RJS, et al. Amniotic membrane transplantation for acute chemical or thermal burns. Ophthalmology. 2000;107:980Y990. [PMID: 10811094]<br>8. Prabhasawat P, Tesavibul N, Prakairungthong N, et al. Efficacy of amniotic membrane patching for acute chemical and thermal ocular burns. J Med Assoc Thai. 2007;90:319Y326. PMID: [17375638]<br>9. Tandon R, Gupta N, Kalaivani M, et al. Amniotic Membrane Transplantation as an Adjunct to Medical Therapy in Acute Ocular Burns. Br J Ophthalmol. 2011;95(2):199-204. [PMID: 20675729]<br>10. Kheirkhah A, Johnson DA, Paranjpe DR, et al. Temporary sutureless amniotic membrane patch for acute alkaline burns. Arch Ophthalmol. 2008;126:1059Y1066. [PMID: 18695099] |

NR = not reported

- Based on the evidence and your clinical experience for using **human amniotic membrane with suture fixation** for the clinical indications described below:
  - Respond YES or NO for each clinical indication whether the intervention would be expected to provide a clinically meaningful improvement in net health outcome; AND
  - Rate your level of confidence in your YES or NO response using the 1 to 5 scale outlined below.

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 |
| **1** | Neurothrophic keratitis | Yes | | | | | X |
| **2** | Neurothrophic keratitis | Yes | | | | X | |
| **1** | Corneal ulcers and melts | Yes | | | | | X |
| **2** | Corneal ulcers and melts | Yes | | | | | X |
| **1** | Corneal perforation | Yes | | | | | X |
| **2** | Corneal perforation | Yes | | | | | X |
| **1** | Bullous keratopathy | Yes | | | | | X |
| **2** | Bullous keratopathy | Yes | | | | X | |
| **1** | Pterygium repair | Yes | | | | | X |
| **2** | Pterygium repair | Yes | | | | | X |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| 1 | Limbal stem cell deficiency | Yes | | | | | X |
| 2 | Limbal stem cell deficiency | Yes | | | | X | |
| 1 | Stevens-Johnson | Yes | | | | | X |
| 2 | Stevens-Johnson | Yes | | | | | X |
| 1 | Persistent epithelial defects | Yes | | | | | X |
| 2 | Persistent epithelial defects | Yes | | | | | X |
| 1 | Severe dry eye | Yes | | | | X | |
| 2 | Severe dry eye | Yes | | | | X | |
| 1 | Acute ocular chemical burn | Yes | | | | | X |
| 2 | Acute ocular chemical burn | Yes | | | | | X |

NR = not reported

- Based on the evidence and your clinical experience for using **human amniotic membrane with suture fixation** for the clinical indications described below:
  - Respond YES or NO for each clinical indication whether this intervention is consistent with generally accepted medical practice; AND
  - Rate your level of confidence in your YES or NO response using the 1 to 5 scale outlined below.

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 |
| 1 | Neurothrophic keratitis | Yes | | | | | X |
| 2 | Neurothrophic keratitis | Yes | | | | X | |
| 1 | Corneal ulcers and melts | Yes | | | | | X |
| 2 | Corneal ulcers and melts | No | | | | X | |
| 1 | Corneal perforation | Yes | | | | | X |
| 2 | Corneal perforation | Yes | | | | | X |
| 1 | Bullous keratopathy | Yes | | | | | X |
| 2 | Bullous keratopathy | No | | | | X | |
| 1 | Pterygium repair | Yes | | | | | X |
| 2 | Pterygium repair | Yes | | | | | X |
| 1 | Limbal stem cell deficiency | Yes | | | | X | |
| 2 | Limbal stem cell deficiency | Yes | | | | | X |
| 1 | Stevens-Johnson | Yes | | | | | X |
| 2 | Stevens-Johnson | Yes | | | | | X |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| 1 | Persistent epithelial defects | Yes | | | | | X |
| 2 | Persistent epithelial defects | No | | | | X | |
| 1 | Severe dry eye | Yes | | | | X | |
| 2 | Severe dry eye | No | | | | | X |
| 1 | Acute ocular chemical burn | Yes | | | | | X |
| 2 | Acute ocular chemical burn | Yes | | | | | X |

NR = not reported

- Based on the evidence and your clinical experience for using **human amniotic membrane without suture fixation** for the clinical indications described below:
  - Respond YES or NO for each clinical indication whether the intervention would be expected to provide a clinically meaningful improvement in net health outcome; AND
  - Rate your level of confidence in your YES or NO response using the 1 to 5 scale outlined below.

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 |
| 1 | Neurothrophic keratitis | Yes | | | | | X |
| 2 | Neurothrophic keratitis | Yes | | | | | X |
| 1 | Corneal ulcers and melts | Yes | | | | | X |
| 2 | Corneal ulcers and melts | Yes | | | | | X |
| 1 | Corneal perforation | No | | | | | X |
| 2 | Corneal perforation | No | | | | X | |
| 1 | Bullous keratopathy | Yes | | | | | X |
| 2 | Bullous keratopathy | Yes | | | | | X |
| 1 | Pterygium repair | Yes | | | | | X |
| 2 | Pterygium repair | Yes | | | X | | |
| 1 | Limbal stem cell deficiency | Yes | | | | X | |
| 2 | Limbal stem cell deficiency | Yes | | | | | X |
| 1 | Stevens-Johnson | Yes | | | | | X |
| 2 | Stevens-Johnson | Yes | | | | | X |
| 1 | Persistent epithelial defects | Yes | | | | | X |
| 2 | Persistent epithelial defects | Yes | | | | | X |
| 1 | Severe dry eye | Yes | | | | X | |
| 2 | Severe dry eye | Yes | | | | | X |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| 1 | Acute ocular chemical burn | Yes | | | | | X |
| 2 | Acute ocular chemical burn | Yes | | | | | X |

NR = not reported

- Based on the evidence and your clinical experience for using human amniotic membrane without suture fixation for the clinical indications described below:
  - Respond YES or NO for each clinical indication whether this intervention is consistent with generally accepted medical practice; AND
  - Rate your level of confidence in your YES or NO response using the 1 to 5 scale outlined below.

| # | Indications | YES / NO | Low Confidence | | Intermediate Confidence | | High Confidence |
|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 |
| 1 | Neurothrophic keratitis | Yes | | | | | X |
| 2 | Neurothrophic keratitis | Yes | | | | X | |
| 1 | Corneal ulcers and melts | Yes | | | | | X |
| 2 | Corneal ulcers and melts | Yes | | | | | X |
| 1 | Corneal perforation | No | | | | | X |
| 2 | Corneal perforation | No | | | | X | |
| 1 | Bullous keratopathy | Yes | | | | | X |
| 2 | Bullous keratopathy | Yes | | | | X | |
| 1 | Pterygium repair | Yes | | | | | X |
| 2 | Pterygium repair | No | | | | X | |
| 1 | Limbal stem cell deficiency | Yes | | | | X | |
| 2 | Limbal stem cell deficiency | Yes | | | | X | |
| 1 | Stevens-Johnson | Yes | | | | | X |
| 2 | Stevens-Johnson | Yes | | | | | X |
| 1 | Persistent epithelial defects | Yes | | | | | X |
| 2 | Persistent epithelial defects | Yes | | | | X | |
| 1 | Severe dry eye | Yes | | | | X | |
| 2 | Severe dry eye | Yes | | | | | X |
| 1 | Acute ocular chemical burn | Yes | | | | | X |
| 2 | Acute ocular chemical burn | Yes | | | | | X |

NR = not reported

- Additional narrative rationale or comments regarding clinical pathway and/or any relevant scientific citations (including the PMID) supporting your clinical input on this topic.

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

| # | Additional Comments |
|---|---|
| 1 | Specific citations are included above in the comments for each of the individual indications. |
| 2 | Amniotic Membrane is available either as an outpatient clinic based only protective bandage contact lens AM patch, or as an ASC or hospital based operating room surgical inlay tissue substitute and is an established treatment for several severe ocular surface diseases. It is most commonly used in patients whose condition is refractory to conventional therapies, such as Corneal Ulcers and Melts, Neurotrophic Keratitis, severe anterior basement membrane dystrophy, and especially difficult-to-heal Persistent Epithelial Defects (PED).<br><br>I use Prokera (BioTissue) to treat ocular surface diseases because based on the clinical presentation and the failure of conventional therapy, it is medically necessary in order to achieve the best clinical outcome. Prokera is a cryopreserved (not dehydrated) sutureless AM and is the only such AM cleared by the FDA (2003). It is indicated for use "where the ocular surface is damaged, or the underlying corneal stroma is inflamed." The Prokera self-retaining ring makes it possible to non-surgically insert AM into the eye like a very large contact lens and thereby secure the membrane in place. As such, Prokera represents a significant improvement over the use of AM grafts that require the more invasive, time consuming, and costly suturing procedure.<br><br>Clinically, use of amniotic membranes serve two primary roles: reduction of inflammation and promotion of wound healing. These are critical functions to accelerating and facilitating optimal clinical outcomes for the patient. Other therapies that provide these mechanisms do exist but either come with drawbacks (side effects such as thinning of the conjunctiva, time to effect) or address one function but not the other (in some cases, therapies may be counterproductive for the other critical clinical need). |

NR = not reported

- Is there any evidence missing from the attached draft review of evidence that demonstrates clinically meaningful improvement in net health outcome?

| # | YES / NO | Citations of Missing Evidence |
|---|---|---|
| 1 | Yes | See specific citations in above comments on each of the individual indications. |
| 2 | No | In general- amniotic membrane is an important Therapy for ocular surface disease which is unresponsive to conventional therapies. In my experience Amniotic membrane grafts have significantly improved the clinical course of many patients, that would have otherwise resulted in vision loss and saved patients from more extensive surgical procedures. |

*Current Procedural Terminology* © American Medical Association. All Rights Reserved.
Blue Cross and Blue Shield Kansas is an independent licensee of the Blue Cross Blue Shield Association

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 3134-3157

MiMedx Health Policy Medicare Update

# WPS - Wisconsin Physicians Service MAC - Retired Date: 03/01/2016

LCD L34593: **"Application of Bioengineered Skin Substitutes"** Effective Date: **10/01/2015**

**States: Alaska, Alabama, Arkansas, Arizona, Connecticut, Florida, Georgia, Iowa, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Massachusetts Maine, Michigan, Minnesota, Missouri, Mississippi, Montana, North Carolina, North Dakota, Nebraska, New Hampshire, New Jersey, Ohio, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Virginia, Vermont, Washington, Wisconsin, West Virginia, and Wyoming**

---

**EpiFix Tissue Uses:** EpiFix (Q4131) is intended for homologous use in the treatment of acute and chronic partial and full-thickness wounds for the reduction of scar tissue formation, modulation of inflammation, and enhancement of soft tissue healing.

**Indications or Limitations of Coverage and/or Medical Necessity:** All products must be provided in accordance with the material's Food and Drug Administration (FDA) approved package label. Applied to partial- or full-thickness wounds (see individual product information for labeled indications) not involving tendon, muscle, joint capsule, exposed bone or sinus tracts. Applied in a frequency supported either by FDA product labeling or clearly supported by documentation showing the medical reasonable and necessary indications.

**Documentation Requirements**: The ulcer must be measured at the beginning of conservative treatment, following cessation of conservative treatment and at the beginning of the skin substitute treatment. Clearly, if during treatment the ulcer shows obvious signs of worsening or lack of treatment response, continuing skin substitute treatment would be inappropriate absent documentation of an appropriate rationale for doing so. There must be a documented plan of care with documented goals and provider follow-up in the medical record. Documentation to include current wound size, wound depth, presence and extent of or absence of obvious signs of infection, presence and extent of or absence of necrotic, devitalized or non-viable tissue, or other material in the wound that is expected to inhibit healing or promote adjacent tissue breakdown. When the documentation does not meet the criteria for the service rendered or does not establish the medical necessity for the service, such service will be denied as not reasonable and necessary under Section 1862(a)(1) of the Social Security Act.

**Utilization Guidelines:** Medicare expects skin substitutes to be applied according to the manufacturers' instructions. Any utilization above these parameters is subject to medical review. Exceptions with more frequent timing (every seven days) should be documented with appropriate narrative. Surgical Wound Preparation (CPT 15002-15005): Medicare does not expect to be billed for codes 15002-15005 in conjunction with routine, simple and/or repeat application of skin substitutes/replacements. These codes describe burn and wound preparation or incisional or excisional release of scar contracture resulting in an open wound requiring a skin graft. An operative report is required and must be available upon request. If this procedure is performed in an office the claim can be resubmitted with a request for a redetermination and the medical staff will give the claim individual consideration.

**Limitations:** Reimbursement may be made only when the medical record clearly documents that these products have been used in a comprehensive, organized wound management program. For venous stasis ulcers, there should be no fewer than two (2) weeks between applications and for diabetic ulcers there should be no fewer than three (3) weeks between applications, except when more frequent applications are either a part of the FDA product specific labeling instructions or are clearly supported by medical record documentation of medically reasonable and necessary indications.

**NOTE: All claims are subject to medical review. Medical record documentation is critical to ensure proper payment of claims. Per WPS, with the retirement of the LCD, "there are established billing, coding and documentation guidelines that should be followed in these circumstances."**

**Disclaimer: The coverage information provided is gathered from third party sources for informational purposes only and has not been verified with any entity responsible for policy, such as the CMS, or any payer. It does not represent a statement, promise or guarantee from MiMedx Group, Inc. concerning coverage. MiMedx® makes no guarantee that any private or government payer will guarantee coverage. Health policies change frequently and can vary considerably from one payer to another. MiMedx® strongly recommends that you consult your payer for interpretation of local coverage and/or policy. The ultimate responsibility for policy interpretation and related claims submission lies with the physician, clinician, hospital or other facility.**

tidesmedical.

More Application Info

# Artacent® Wound

Artacent Wound is the only wound-specific amniotic patch that can be applied with either side facing the wound. Amniotic tissues are safe, natural biologic barriers delivering essential growth factors on a structural collagen matrix. The unique design of Artacent Wound allows for easy manipulation and repositioning, making it a flexible, dependable option for a variety of wound covering applications.



## Wound covering for patients with these types of chronic wounds

- Diabetic Ulcers
- Pressure Ulcers

- Venous Stasis Ulcers
- Burns
- Mohs Surgery

## Key Benefits of Artacent Wound

- Dual layering of amniotic tissue.
- Ability to place either side facing the wound.
- Stores dry at room temperature rather than cryopreservation.
- Readily adheres to wound surface without requiring sutures.
- Repositionable design reverts to original shape when placed in saline.
- Excellent handling – maintains shape when placed on moist wound bed.

## Tides Medical Offers Reimbursement Services for Artacent Wound:

- Coding Help
- Benefits Verification
- Pre-authorization
- Pre-certification

FIND OUT MORE ABOUT REIMBURSEMENT FOR ARTACENT WOUND




BIOLOGICS • AmnioHeal® Plus • Artacent® Flex • Artacent® Wound • Artacent® Ocular • Artacleanse® Process

Copyright © 2021 Tides Medical | All Rights Reserved | Licensures and Certifications | Employee Portal

# What is Mohs Surgery?

Mohs surgery is considered the most effective technique for treating many basal cell carcinomas (BCCs) and squamous cell carcinomas (SCCs), the two most common types of skin cancer. Sometimes called Mohs micrographic surgery, the procedure is done in stages, including lab work, while the patient waits. This allows the removal of all cancerous cells for the highest cure rate while sparing healthy tissue and leaving the smallest possible scar.

*Definition provided by The Skin Cancer Foundation*[2]

## A Patient Story




Scan with camera app to watch video

*Cynthia's physician performed Mohs surgery to remove her skin cancer. He applied EPIFIX to the area to help support the wound healing cascade. Scan the QR code to hear more about her story.*

All placental tissue is donated by pre-screened, consenting mothers undergoing scheduled Caesarean sections of live births in the U.S. Placental tissue is typically discarded after the baby is born. The recovery of the placental tissue does not affect the baby or the delivery process.

All tissue donors are tested for infectious diseases, similar to the testing done for blood donation. The amniotic membranes then undergo a validated process to thoroughly clean and preserve the tissue, called the PURION® process. The steps of the PURION process include: preservation, cleansing, drying, and sterilization of the tissue. The facility where EPIFIX is processed is regulated by the Food and Drug Administration and accredited by the American Association of Tissue Banks.

**To learn more about EPIFIX please visit:**

**www.mimedx.com/EPIFIX**

*MIMEDX Tissues Services, LLC. is American Association of Tissue Banks (AATB) Accredited*

MIMEDX

1. BioMedGPS ---- SmartTRAK 2021 US Amniotic Tissue Market -- Revenues/Shares. Accessed May 15, 2022. https://www.smarttrak.com. 2. Mohs Surgery. Skincancer.org. Accessed June 29, 2022. https://www.skincancer.org/treatment-resources/mohs-surgery/

Patents and patents pending: www.mimedx.com/patents. EPIFIX, PURION, and MIMEDX are trademarks of MIMEDX Group, Inc. ©2022 MIMEDX Group, Inc. All Rights Reserved www.mimedx.com US-65-2200031 v1.0



# Ask Your Dermatologist About Advanced Treatments for Mohs Surgery

EPIFIX®




## What is EPIFIX?

EPIFIX is a placental-based tissue product that acts as a barrier to promote closure of wound defects.



## Is EPIFIX Right For Me?

Placental-based allografts can be helpful in supporting defect closure for patients who are not good candidates for traditional methods of tissue reconstruction. Mohs closures can be challenging and EPIFIX provides an alternative for patients to help support healing.

## Treatment Information

**How will my doctor apply EPIFIX?**

After completing the Mohs surgery, your physician will apply the graft and may secure it with a non-adherent dressing and then a bandage to keep the wound moist.

**How do I care for my graft site?**

Your doctor will provide you with instructions on how to care for your wound. It is extremely important to follow these instructions and not to disturb the graft. If you have questions, please consult your doctor.

## Discuss EPIFIX With Your Dermatologist

US-GS-2200031 v1.0

## Options For EPIFIX Use

- Secondary intention wound closure
- An alternative for patients that are not candidates for skin grafts or flaps
- Location of wound in high tension area or highly visible
- Patients who decline surgery

**Many factors may complicate healing in Mohs procedures.**

PATIENT FACTORS

- Thin Skin
- Poor Vasculature/Tissue Quality
- Comorbidities such as Diabetes or Heart Disease
- Advanced Age

LOCATION

- Scalp
- Ears
- Face/Visible Areas
- Shin or Lower Extremity
- Dorsal Hand



MIMEDX



# MOHS CLOSURES CAN BE CHALLENGING

## MIMEDX PLACENTAL-BASED ALLOGRAFT SOLUTIONS IN CHALLENGING SOFT TISSUE DEFICITS

## KEY CHALLENGES:

# Many factors may complicate healing in Mohs procedures and other dermal excisions and closures.

Patients may have the simultaneous presence of two or more chronic diseases or conditions which can affect wound healing. Compromised healing can lead to costly complications such as infection, dehiscence, or delayed healing.[1-3] In certain patient populations, studies have shown that the greater the number of comorbidities, the higher the risk of complications.[1-4]




### (A) PATIENT FACTORS

- Thin Skin
- Poor Vasculature/ Tissue Quality
- Comorbidities
- Advanced Age

### (B) LOCATION

- Scalp
- Ears
- Face/Visible Areas
- Shin or Lower Extremity
- Dorsal Hand

### POTENTIAL OPTIONS WITH EPIFIX®

- Secondary intention wound closure
- An alternative for patients that are not candidates for skin grafts or flaps
- Multiple co-morbidities and/or age
- Location of wound in high tension area or highly visible
- Patients who refuse surgery

## NEW PEER-REVIEWED STUDY IN FACIAL PLASTIC SURGERY & AESTHETIC MEDICINE

# Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane[4]

Julia Toman, MD, Georgina Michael, MSN, FNP-BC, Oliver Wisco, DO, FAA, FACMS, John Adams, MD, and Brandon Hubbs, MS, MA

In a new retrospective study, researchers compared outcomes in patients that received placental-based allografts to those that received autoglous flaps and full-thickness skin grafts (FTSG).

| | |
|---|---|
| 1550 Eligible Patients | • Diagnosis of basal or squamous cell carcinoma<br>• MMS defect located in a moderate to high risk area (face, head, neck, or dorsal hand)<br>• Same-day reconstruction necessary |
| GROUPS | • Flaps/FTSG n=1397<br>• Placental-based allograft n=153 |
| PROPENSITY MATCHED | • 286 total patients<br>• 143 case-controlled pairs |

Mohs patient with large cutaneous defect involving upper eyelid and medial canthus right eye and right upper bridge of nose





Complete closure to Mohs defect without complication to surrounding structures, postop day 42

## RESULTS

## ANALYSIS OF SEVERAL OUTCOMES IN CASE-CONTROL COMPARISONS BETWEEN AUTOLOGOUS FLAP/FTSG GROUPS AND PLACENTAL ALLOGRAFTS:

KEY: Autologous Flap/ FTSG Group; Placental-Based Allograft Group

**EXPERIENCED COMPLICATIONS** ($p<0.0001$): 28.7% / 2.1%

PATIENTS WERE **19X** MORE LIKELY TO EXPERIENCE POOR COSMESIS OR REVISIONS[4]

**POOR COSMESIS** ($p<0.0001$): 15% / 0%

**REVISIONS** ($p<0.0001$): 9.8% / 0%

PATIENTS WERE **12X** MORE LIKELY TO HAVE INFECTIONS OR SURGICAL REINTERVENTION

**INFECTIONS** ($p=0.004$): 10% / 2%

**SURGICAL REINTERVENTION** ($p=0.0007$): 8% / 0%

## CONCLUSION

Placental-based allografts can be a safe and effective tool for repairing MMS defects of the face, head, neck, and dorsal hand in a subset of patients who are not good candidates for traditional methods of autologous tissue reconstruction.

# MARKET LEADER:
# PLACENTAL-BASED ALLOGRAFTS

#1 Amniotic Skin Substitute[5]

7 RCTs: Demonstrated Clinical Data[6-16]

50+ Clinical and Scientific Publications

90+% Complete Wound Closure

Observed 90+% Complete Wound Closure in DFUs at 6 Weeks[6,10,11]

2.5

Average Number of Treatments to Closure[6]

## PRODUCT ADVANTAGES:

- Terminally sterilized for additional level of safety
- Easy to apply
- Room temperature storage
- 5-year shelf life

## BACKED BY:

- 300M+ lives covered by insurance for MIMEDX products
- Reimbursement team that provides information and education on coverage and insurance verification for MIMEDX products

To find out more about MIMEDX products or to start an evaluation:

Customer Service: 866.477.4219

Email: customerservice@mimedx.com

Patient Insurance Verification Team: 855.882.8480


**REFERENCES**

**1.** Guo S, DiPietro LA. Factors Affecting Wound Healing. J Dent Res. 2010;89(3):219-229. **2.** Thombs BD, Singh VA, Halonen J, Diallo A, Milner SM. The effects of preexisting medical comorbidities on mortality and length of hospital stay in acute burn injury: evidence from a national sample of 31,338 adult patients. Ann Surg. 2007 Apr;245(4):629-34. **3.** Everhart JS, Altneu E, Calhoun JH. Medical comorbidities are independent preoperative risk factors for surgical infection after total joint arthroplasty. Clin Orthop Relat Res. 2013;471(10):3112-3119. **4.** Toman J, Michael G, Wisco O, Adams J, Hubbs B. Mohs defect repair with dehydrated human amnion/chorion membrane. Facial Plastic Surgery & Aesthetic Medicine. ahead of print. **5.** BioMedGPS ---- SmartTRAK. 2019 US Amniotic Tissue Market -- Revenues/ Shares. Accessed October 18, 2021. https://www.smarttrak.com. **6.** Zelen CM, Serena TE, Denoziere G, Fetterolf DE. A prospective randomised comparative parallel study of amniotic membrane wound graft in the management of diabetic foot ulcers. Int Wound J. 2013;10(5):502-507. **7.** Zelen CM. An evaluation of dehydrated human amniotic membrane allografts in patients with DFUs. J Wound Care. 2013;22(7):347-351. **8.** Zelen CM, Serena TE, Fetterolf DE. Dehydrated human amnion/chorion membrane allografts in patients with chronic diabetic foot ulcers: A long-term follow-up study. Wound Medicine. 2014;4:1-4. **9.** Zelen CM, Serena TE, Snyder RJ. A prospective, randomised comparative study of weekly versus biweekly application of dehydrated human amnion/chorion membrane allograft in the management of diabetic foot ulcers. Int Wound J. 2014;11(2):122-128. **10.** Zelen CM, Gould L, Serena TE, Carter MJ, Keller J, Li WW. A prospective, randomised, controlled, multi-centre comparative effectiveness study of healing using dehydrated human amnion/chorion membrane allograft, bioengineered skin substitute or standard of care for treatment of chronic lower extremity diabetic ulcers. Int Wound J. 2015;12(6):724-732. **11.** Zelen CM, Serena TE, Gould L, et al. Treatment of chronic diabetic lower extremity ulcers with advanced therapies: a prospective, randomised, controlled, multi-centre comparative study examining clinical efficacy and cost. Int Wound J. 2016;13(2):272-282. **12.** Tettelbach W, Cazzell S, Reyzelman AM, Sigal F, Caporusso JM, Agnew PS. A confirmatory study on the efficacy of dehydrated human amnion/chorion membrane dHACM allograft in the management of diabetic foot ulcers: A prospective, multicentre, randomised, controlled study of 110 patients from 14 wound clinics. Int Wound J. 2019;16(1):19-29. **13.** Tettelbach W, Cazzell S, Sigal F, et al. A multicentre prospective randomised controlled comparative parallel study of dehydrated human umbilical cord (EpiCord) allograft for the treatment of diabetic foot ulcers. Int Wound J. 2019;16(1):122-130. **14.** Serena TE, Carter MJ, Le LT, Sabo MJ, DiMarco DT; EpiFix VLU Study Group. A multicenter, randomized, controlled clinical trial evaluating the use of dehydrated human amnion/chorion membrane allografts and multilayer compression therapy vs. multilayer compression therapy alone in the treatment of venous leg ulcers. Wound Repair Regen. 2014;22(6):688-693. **15.** Bianchi C, Cazzell S, Vayser D, et al. A multicentre randomised controlled trial evaluating the efficacy of dehydrated human amnion/chorion membrane (EpiFix®) allograft for the treatment of venous leg ulcers. Int Wound J. 2018;15(1):114-122. **16.** Bianchi C, Tettelbach W, Istwan N, et al. Variations in study outcomes relative to intention-to-treat and per-protocol data analysis techniques in the evaluation of efficacy for treatment of venous leg ulcers with dehydrated human amnion/chorion membrane allograft. Int Wound J. 2019;16(3):761-767.


SMR²T Purion

Patents and patents pending see: www.mimedx.com/patents. EPIFIX, PURION, SMR²T, and MIMEDX are trademarks of MIMEDX Group, Inc. ©2021 MIMEDX Group, Inc. All Rights Reserved. www.mimedx.com EP611 001

MIMEDX

ARTACENT™ WOUND
PACKAGE INSERT
AND INSTRUCTIONS FOR USE

Description:

This human tissue allograft is supplied and processed by Tides Medical. This allograft is derived from voluntarily DONATED HUMAN TISSUES. Artacent is a dual-layer, dehydrated amniotic membrane allograft. Human amniotic membrane is a thin collagenous membrane derived from the submucosa of the placenta, the organ that connects the developing fetus to the mother's uterus. Human amniotic membrane consists of multiple layers including epithelial cells, a basement membrane, and a stromal matrix.

This allograft is supplied sterile.

Regulatory Classification:

This allograft is a human tissue product for transplantation. It is processed and distributed in accordance with FDA requirements for Human Cellular and Tissue-based Products (HCT/P) (21 CFR Part 1271), State regulations, and the guidelines of the American Association of Tissue Banks (AATB).
Caution: Federal Law restricts this product to sale by or on the order of a licensed medical professional, not for veterinary use.

Applications and Directions for Use:

This allograft may be used as a wound covering in various surgical procedures. It may be used independently or in combination with autologous tissue or other forms of allograft tissue.

Preparation of Allograft for Use:

Once a package seal has been compromised, the tissue shall be either transplanted, if appropriate, or properly discarded. Used allograft containers should be disposed of in accordance with recognized procedures for discarding medical waste material.

Prepare the allograft for use in accordance with the following procedures:

1. Open the 1st peel pouch and deliver the innermost sterile sealed pouch containing the allograft material to a sterile field.
2. Open the sterile sealed pouch and carefully deliver the graft to a sterile field for transplantation. PLEASE USE CAUTION WHEN REMOVING ALLOGRAFT FROM POUCH AS THE ALLOGRAFT IS THIN AND LIGHTWEIGHT
3. The allograft may be cut and shaped to the appropriate size required prior to placement
4. The allograft should then be placed onto the surgical site
5. Absorbable/non-absorbable suture material and/or tissue adhesives may be used to apply the graft to the surgical site, if necessary.
6. Once applied to the surgical site, the allograft can be hydrated with sterile saline or other sterile solution, if needed.

If for any reason the graft is opened and not used, it should be disposed of properly or returned to Tides Medical by contacting Customer Service and following appropriate return procedures. Document the reason for the non-use of the graft and indicate the disposition of the tissue on the enclosed Transplant Record and return the record to Tides Medical.

Donor Recovery, Screening and Processing:

After authorization for donation is obtained (represented by the mothers of the newborn children), collection of the donor tissue is performed in an aseptic manner by appropriately licensed tissue establishments. Donor eligibility is carefully evaluated as required by the US FDA and in accordance with AATB Standards and applicable State guidelines. Tissue donors are evaluated for high-risk behaviors and relevant communicable diseases. Screening includes a review of the donor medical and social history, a physical assessment, serological screening, and tissue collection microbiology.
Each donor is tested and shown to be negative or nonreactive for the following:

| | | | |
|---|---|---|---|
| HIV-1&2 Antibody | Hepatitis B Surface Antigen | Syphilis Rapid Plasma Reagin or Treponemal Specific Assay | Human T-Cell Lymphotropic Virus Type I Antibody (not required) |
| Hepatitis C Virus Antibody | Hepatitis B Core Antibody (total) | HIV1/HCV/HBV Nucleic Acid Test (NAT) | Human T-Cell Lymphotropic Virus Type II Antibody (not required) |
| West Nile Virus (WNV NAT) | | | |

This testing is performed by a laboratory registered with FDA to perform donor testing and certified to perform such testing on human specimens under the Clinical Laboratory Improvement Amendments of 1988 (CLIA) and 42 CFR part 493, or that has met equivalent requirements as determined by the Centers for Medicare and Medicaid Services (CMS). Test kits used are approved by the FDA.

Tides Medical's Medical Director has determined this donor tissue to be eligible for transplantation. The testing and medical release records are maintained by Tides Medical

Allograft tissues are processed in a controlled environment using methods designed to prevent contamination and cross contamination. Proprietary physiological buffers and surfactants are used during processing. Allograft tissue may contain traces of these processing agents. Final products are sized and packaged according to approved specifications and procedures and are sterilized using electron beam irradiation.

Note: Allograft tissues will naturally vary in color. Occasional dark spots or localized discoloration is a normal occurrence.

Warnings and Contraindications:

Careful donor screening, laboratory testing, tissue processing, and gamma irradiation have been utilized to minimize the risk of transmission of relevant communicable diseases to the patient. As with any processed human donor tissue, this graft cannot be guaranteed to be free of all pathogens.

This allograft is intended for single patient use only.
Do NOT reuse or re-sterilize.

Prior to Usage: Examine Allograft Packaging – Do Not Use This Allograft If:

Any part of the package or product elements appear to be missing, tampered with or damaged.
The product label or identifying bar code is severely damaged, illegible or missing.
The expiration date shown on the package label has passed.

If any of the above conditions exist or are suspected, this allograft should NOT be used.

Contraindications:

Dehydrated amnion allografts should not be implanted into: (1) areas of active or latent infection; and/or (2) into a patient with a disorder that would create an unacceptable risk of post-operative complications. Additional contraindications for the use of this allograft shall be determined by a licensed practitioner.

Packaging and Labeling:

Each allograft distributed by Tides Medical is identified by its own unique serial number. The allograft is packaged in a pouch. Each pouch features a peel back seal and is also heat sealed to provide a sterile barrier. The package label includes graft details such as dimensions. Contents of the package are sterile unless the package is opened or damaged.

Recommended Storage and Expiration:

Maintain allograft in a clean, dry environment at ambient temperature (15°C to 30°C). No refrigeration is necessary, protect from freezing.

See package label for expiration dating.

It is the responsibility of the Tissue Dispensing Service, Tissue Distribution Intermediary, and/or End-User clinician to maintain tissue intended for transplantation in appropriate storage conditions prior to further Distribution or transplant and that Recipient records must be maintained for the purpose of tracing tissue post-transplantation.

Returns:

If for any reason tissue must be returned, a return authorization is required from Tides Medical prior to shipping. It is the responsibility of the health care institution returning the tissue to adequately package and label the tissue for return shipment.

Recipient Tracking:

The F.D.A. requires that recipient records be maintained for the purpose of tracking the allograft following surgical transplantation. The surgeon or operating staff member must complete the enclosed Allograft Utilization Record, attach a peal-off allograft-tracking label and patient label, and mail it to Tides Medical. Please use the remaining peel-off, allograft-tracking labels for patient and hospital records.

Adverse Effects and Reporting:

As allografts are composed of proteins such as collagen, the potential for hypersensitivity, allergic reactions or other immune responses may exist. All adverse outcomes potentially attributed to this allograft must be promptly reported to Tides Medical.

Possible complications can occur with any surgical procedure including, but not limited to pain, infection, hematoma, and/or immune rejection of the introduced tissue.

Disease screening methods are limited; therefore, certain diseases may not be detected.

The following complications of tissue transplantation may occur:
Transmission of diseases of unknown etiology;
Transmission of known infectious agents including, but not limited to viruses, bacteria, and fungi.

Any adverse reactions, including the suspected transmission of disease attributable to this allograft should be immediately reported to Tides Medical.

Disposal:

Allograft disposal shall be in accordance with local, state, and federal regulations for human tissue.

Inquiries:

For additional information, to place an order, or to report adverse reactions, contact: Tides Medical Customer Service at:

Phone: 888-494-4441
Fax: 781-823-0321
customerservice@tidesmedical.com

tidesmedical

Donor eligibility determination and processed by Tides Medical
1819 W. Pinhook Road
Suite 206
Lafayette, LA 70508
(888) 494-4441
FDA Registration FEI: 3010125671

| Title: | ARTACENT™ WOUND PACKAGE INSERT AND INSTRUCTIONS FOR USE | Number: | LBL-078 | Revision:<br>Date: | 03<br>02/14/2020 |
|---|---|---|---|---|---|

Facial Plastic Surgery & Aesthetic Medicine
Volume 0, Number 0, 2021
American Academy of Facial Plastic and Reconstructive Surgery, Inc.
DOI: 10.1089/fpsam.2021.0167

Facial Plastic Surgery & Aesthetic Medicine

# Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane

Julia Toman, MD,[1] Georgina M. Michael, MSN, FNP-BC,[2,*,i] Oliver J. Wisco, DO, FAAD, FACMS,[3,4] John R. Adams, MD,[5,6] and Brandon S. Hubbs, MS, MA[7]

**Abstract**

**Importance:** Reconstructing cosmetically sensitive defects in an aging population undergoing multiple Mohs micrographic surgeries (MMS) may be addressed with alternatives to surgery.

**Objective:** Patients undergoing MMS with defect reconstruction in visually prominent areas receiving placental allograft were compared with traditional autologous tissue-based procedures—flaps and full-thickness skin grafts (FTSG).

**Design, Setting, and Participants:** This retrospective case–control study evaluated patients who underwent MMS for removal of a basal or squamous cell carcinoma with same-day repair.

**Main Outcomes and Measures:** The primary endpoint was the incidence and comparison of postoperative morbidity. Risk for developing medical or cosmetic sequelae was determined through multivariate logistic regression.

**Results:** The study population consisted of 143 propensity score-matched pairs ($n = 286$) with moderate- to high-risk defects on the face, head, and neck. Compared with autologous tissue, placental allograft cases were associated with significantly lower risk for infection ($p = 0.004$), poor scar cosmesis ($p < 0.0001$), scar revision ($p < 0.0001$), or reoperation ($p = 0.0007$).

**Conclusions and Relevance:** Postoperative complication rates for placental reconstructions did not exceed those demonstrated by autologous tissue counterparts, indicating this is a safe alternative to flap and FTSG in cosmetically sensitive repairs.

## Introduction

Epidemiological estimates indicate a disproportionate surge of nonmelanoma skin cancer (NMSC) in the elderly, with 80% of all new cases occurring in persons >65 years.[1,2] As a result of longer life expectancy and the cumulative impact of ultraviolet radiation and sun exposure on anatomically vulnerable sites such as the face, head, and neck, older individuals may develop multiple tumors in localized regions.[3,4] This necessitates repeat surgical management that maintains a delicate balance between adequate excision, aesthetics, and function.[5–7]

Incisional repair utilizing autologous tissue such as local flaps and full-thickness skin grafts (FTSG) represent the mainstay of reconstructive techniques after Mohs micrographic surgery (MMS).[8,9] However, postoperative morbidity increases after the age of 60 years by as much

[1]Division of Facial Plastics and Reconstructive Surgery, Department of Otolaryngology Head and Neck Surgery, University of South Florida, Tampa, Florida, USA.
[2]Department of Clinical Research, MiMedx Group, Inc., Marietta, Georgia, USA.
[3]Dermatology Health Specialists, Bend, Oregon, USA.
[4]Department of Dermatology, The Warren Alpert Medical School of Brown University, Providence, Rhode Island, USA.
[5]Advanced Dermatology and Skin Cancer Center, Manhattan, Kansas, USA.
[6]Division of Dermatology, Department of Internal Medicine, University of Kansas School of Medicine, Wichita, Kansas, USA.
[7]Biostatistics Consulting, Alpharetta, GA, USA.
[i]ORCID ID (https://orcid.org/0000-0002-1797-9839).

*Address correspondence to: Julia Toman, MD, Assistant Professor, Department of Otolaryngology Head and Neck Surgery, Division of Facial Plastics and Reconstructive Surgery, University of South Florida, 2901 Bruce B. Downs Boulevard, MDC2, Tampa, FL 33602, USA. Email: juliatoman@usf.edu

© Julia Toman et al. 2021; Published by Mary Ann Liebert, Inc. This Open Access article is distributed under the terms of the Creative Commons License [CC-BY] (http://creativecommons.org/licenses/by/4.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

> **KEY POINTS**
>
> **Question:** Is the use of a placental allograft a feasible alternative to incisional methods of repair for cosmetically sensitive defects in select patient cases after Mohs surgery?
>
> **Findings:** Larger cutaneous Mohs-related defects of the face, head, and hands were effectively reconstructed with a placental allograft in a population of older adults.
>
> **Meaning:** This study suggests that surgical reconstruction after skin cancer removal from the face may be avoided in some cases when treated with a placental-derived material.

as 25% due to a greater depth of tumor invasion and extensive defects with higher demands for donor tissues.[10,11] Age and previous surgery alter characteristics of surrounding tissues and complicate the aesthetic and functional success of flaps and FTSG.[12,13] Medically fragile patients or those who are ineligible for incisional repair may be limited to second intention healing, a method typically reserved for smaller concave surfaces.[14]

Larger MMS defects that do not receive definitive reconstruction have been associated with increased recovery time, delayed healing, wound retraction, unpredictable scarring, and poor cosmesis.[15] This can lead to an altered appearance or impairment, causing patients to feel a sense of disfigurement, emotional distress, social isolation, or diminished quality of life.[16–18]

In situations where incisional repair options are limited, an ideal alternative would be a nonsurgical approach capable of yielding outcomes comparable with autologous tissue techniques. Placental tissues may offer a novel solution to address this emerging clinical need in cutaneous reconstruction. These commercially available allografts retain the three-dimensional collagen-rich (types I, III, IV, V, and VII) extracellular matrix, growth factors (bFGF, basic fibroblast growth factor; VEGF, vascular endothelial growth factor; PDGF, platelet-derived growth factor; EGF, epidermal growth factor; SDF-1, stromal cell-derived factor-1; and TGF$\beta$-3, transforming growth factor beta-3), cytokines (IL-10, interleukin 10; IL-1Ra, interleukin-1 receptor antagonist; and TIMPs, tissue inhibitors of metalloproteinases), antimicrobial peptides (NGAL, neutrophil gelatinase associated lipocalin; LL-37, human cationic antibacterial protein of 18 kDA; and RNase7, ribonuclease 7), and endogenous cells—epithelial cells, fibroblasts, and mesenchymal stem cells—native to human placental tissues.[19,20] Nearly all Level 1 randomized clinical trial placental allograft data exist in the chronic wound care space.[21] Low immunogenicity, ease of transplantation, and anti-inflammatory, antiangiogenic, and antiscarring properties suggest that this biomaterial is particularly well suited for a variety of clinical applications.[22–24]

To date, no controlled study has investigated placental allografts in the reconstructive management of moderate- and high-risk MMS defects in cosmetically sensitive areas. The primary purpose of this analysis is to assess the safety and utility of a dehydrated human amnion/chorion membrane (dHACM) (EpiFix®; MiMedx Group Inc., Marietta, GA) as a nonsurgical approach to cutaneous reconstruction. When compared in equivalent cases, we hypothesized that postoperative outcomes would be statistically similar to those achieved with flap and FTSG.

## Methods

### Study design

To ensure accurate and transparent reporting, this retrospective case–control study was conducted according to the Strengthening the Reporting of Observational Studies in Epidemiology guidelines.[25] Institutional Review Board approval and waiver of informed consent (Pro0031033) was granted before review of electronic medical records and extraction of deidentified data between January 2014 and December 2018. Patients were included if their diagnosis was basal or squamous cell carcinoma, and if the MMS defect was located in a moderate- to high-risk area (face, head, neck, or dorsal hand), and necessitated same-day reconstruction. The American Academy of Dermatology Mohs Appropriate Use Criteria was used to assign reconstructive complexity and stratify defects according to location and aesthetic subunit.[26]

After exclusions, a total of 1550 eligible patients were identified. Cases were categorized based on the modality of same-day reconstruction. In this study, reconstructions were dichotomized into two groups, defined as either autologous tissue ($n = 1397$)—flaps and FTSG—or placental allograft (dHACM) ($n = 153$). To avoid selection bias and ensure a balanced comparison, propensity scores were constructed for each patient. Cases without an equivalent match were discarded. The final study population consisted of 286 patients that could be propensity score-matched at a 1:1 ratio, generating 143 case–control pairs.

### Outcome measures

All MMS and reconstructions were managed with the same postoperative protocol. Prophylactic antibiotics were not prescribed. Patients were evaluated every 5–7 days and received appropriate site care and dressing changes. Placental allograft applications were repeated if the previous graft material was no longer visible in the wound bed (Fig. 1A–C). Subjects were discharged from care once reconstruction sites were healed and free from complication (Fig. 1D).

The primary endpoint was the incidence of postoperative morbidity. Comparisons included the rate of medical complications for the index site: (1) infection, (2) bleeding/hematoma, (3) dehiscence, (4) surgical reintervention, or (5) development of a nonhealing wound. Postoperative cosmetic outcomes were assessed at ≥9 months. These

measures included documentation of (1) suboptimal scarring (per the International Classification of Diseases, Tenth Revision, Clinical Modification; ICD-10-CM-L90.5 cicatrix descriptors: adherent, painful, hypertrophic, contracted, fibrotic, or ectropion), (2) scar revision/treatment (excision, debulking, intralesional injection, laser, and dermabrasion), and (3) patient satisfaction with scar appearance. The length of time (days) and total number of visits required before discharge (determined by complete wound closure), and the billed costs associated with the MMS and primary reconstruction were also evaluated.

### Statistical analysis

The statistical software program SAS/STAT® v9.4 (SAS Institute Inc., Cary, NC) analyzed deidentified study data. Descriptive statistics for continuous variables were expressed as means and standard deviations (SDs). Frequencies ($n$) and percentages summarized dichotomous variables and categorical observations. Differences were compared with Student's $t$-test, Fisher's exact test, or Pearson's $\chi^2$ test. Use of nonparametric Mann–Whitney test or Wilcoxon rank-sum methods depended on the distribution of data. All statistical tests were two-sided and results were regarded as statistically significant at $p < 0.05$.

Propensity scores for matched case–controls were estimated using a logistic regression model to correct for differences in covariates: gender, age in years, medical history, tumor size, tumor location, histopathology, and other MMS characteristics. The goodness of propensity score-matched pairs was evaluated using signed-rank sum for continuous data and McNemar's test for binary data. Adjusted multivariate odds ratio (OR; 95% confidence interval [CI]) determined predictors of significant postoperative morbidity and relative risk ratios (RR; 95% CI) were used to assess the strength of associations in univariate comparisons.

### Results

Baseline characteristics for unmatched and matched patients are summarized in Table 1. Significant covariate imbalances were corrected in the matched case–control sample ($n = 286$). Males represented the majority gender in both groups ($p = 0.161$). The mean (SD) ages ranged from 78.0 to 78.8 years ($p = 0.454$). There were no significant differences in medical history, tumor size, tumor type, moderate- versus high-risk defect location, or operative time ($p > 0.05$).

### Univariate analysis

The univariate comparison of outcomes is summarized in Table 2. The mean (SD) size of MMS defects reconstructed with placental allograft were similar to autologous tissue, 3.5 (3.7) versus 3.3 (3.1) cm$^2$, respectively ($p = 0.531$). A significantly greater proportion of placental allograft patients (97.9%) experienced zero postoperative complications compared with autologous tissue (71.3%), $p \leq 0.0001$ (Supplementary Figs. 1–3); strength of association was confirmed by relative risk measures (RR = 13.67; 95% CI = 4.33–43.12).

**Table 1. Patient, tumor, and Mohs micrographic surgery characteristics for entire sample and matched sample**

| | *Entire sample* | | | *Matched sample* | | |
|---|---|---|---|---|---|---|
| | *Placental allograft (n = 153)* | *Autologous flap/FTSG (n = 1397)* | *p* | *Placental allograft (n = 143)* | *Autologous flap/FTSG (n = 143)* | *p* |
| White | 153 (100.0) | 1397 (100.0) | — | 143 (100.0) | 143 (100.0) | — |
| Male, *n* | 122 (79.7) | 1038 (74.3) | 0.141 | 115 (80.4) | 105 (73.4) | 0.160 |
| Age, years | 78.4 (9.5) | 76.0 (9.4) | 0.003 | 78.0 (9.6) | 78.8 (9.1) | 0.454 |
| Immunocompromised, *n* | 33 (21.6) | 286 (20.5) | 0.750 | 32 (22.4) | 23 (16.1) | 0.177 |
| Anticoagulation, *n* | 36 (23.5) | 344 (24.6) | 0.765 | 34 (23.8) | 39 (27.3) | 0.497 |
| Current smoker, *n* | 16 (10.5) | 131 (9.4) | 0.868 | 16 (11.2) | 17 (11.9) | 0.600 |
| Tumor type (NMSC), *n* | | | 0.408 | | | 0.233 |
| Basal cell | 38 (24.8) | 392 (28.1) | | 35 (24.5) | 39 (27.3) | |
| Squamous cell | 115 (75.2) | 996 (71.3) | | 108 (75.5) | 104 (72.7) | |
| Other | 0 (0.0) | 9 (0.6) | | 0 (0.0) | 0 (0.0) | |
| Tumor length, cm | 1.3 (0.7) | 1.4 (0.7) | 0.027 | 1.3 (7.0) | 1.3 (6.0) | 0.692 |
| Tumor width, cm | 1.0 (0.4) | 1.1 (0.5) | <0.001 | 1.0 (4.0) | 1.0 (3.0) | 0.929 |
| MMS AUC area | | | 0.213 | | | 0.233 |
| Area M | 33 (21.6) | 366 (26.2) | | 32 (22.4) | 24 (16.8) | |
| Area H | 120 (78.4) | 1031 (73.8) | | 111 (77.6) | 119 (83.2) | |
| MMS time, minutes | 195.8 (62.4) | 237.6 (50.1) | <0.001 | 197.4 (57.5) | 199.9 (44.4) | 0.677 |

Data are expressed as absolute number ($n$) and percent (%) or mean and standard deviation (SD); statistical significance at $p < 0.05$.

Allograft, placental (dHACM, dehydrated human amnion/chorion membrane); Autologous tissue, flap and full-thickness skin graft (FTSG); NMSC, non-melanoma skin cancers; AUC, Appropriate Use Criteria per American Academy of Dermatology; Area H (high risk), central face, eyelids [including inner/outer canthi], eyebrows, nose, lips [including cutaneous surround, mucosal area, vermillion border], chin, ear [including periauricular skin/sulci], temple, and hands; Area M (moderate risk), cheeks, forehead, scalp, neck, and jawline; MMS time, length of Mohs procedure in minutes; NMSC, non-melanoma skin cancers.

**Table 2. Univariate analysis for outcomes in case–control comparisons**

| | *Placental allograft (n = 143)* | *Autologous flap/FTSG (n = 143)* | *p* |
|---|---|---|---|
| Size of MMS defect, cm$^2$ | 3.5 (3.7) | 3.3 (3.1) | 0.531 |
| Stages for tumor clearance | 2.0 (1.2) | 2.1 (1.1) | 0.605 |
| Experienced no complications | 140.0 (97.9) | 102.0 (71.3) | <0.0001 |
| Postoperative sequelae | | | |
| Infection | 3.0 (2.0) | 15.0 (10.0) | 0.004 |
| Bleeding or hematoma | 0.0 (0.0) | 7.0 (5.0) | 0.015 |
| Wound dehiscence | 0.0 (0.0) | 4.0 (3.0) | 0.122 |
| Surgical reintervention | 0.0 (0.0) | 11.0 (8.0) | 0.0007 |
| Nonhealing wound | 0.0 (0.0) | 5.0 (3.5) | 0.060 |
| Poor scar cosmesis | 0.0 (0.0) | 21.0 (15.0) | <0.0001 |
| Scar revision | 0.0 (0.0) | 14.0 (9.8) | <0.0001 |
| Follow-up visits | 3.4 (1.6) | 2.5 (1.1) | <0.0001 |
| Time to discharge, days | 30.7 (16.9) | 30.3 (22.9) | 0.840 |
| Cost of reconstruction, dollars | 4463 (2272) | 3904 (951) | 0.007 |

Data are expressed as absolute number (*n*) and percent (%) or mean and standard deviation (SD); statistical significance at $p < 0.05$.

Placental allograft reconstructions developed less infection ($p = 0.004$) and were less likely to experience poor scar cosmesis ($p < 0.0001$) (Supplementary Figs. 4 and 5), scar revision ($p < 0.0001$), or surgical reintervention at the index site ($p = 0.0007$). Autologous tissue reconstructions required fewer mean (SD) follow-up visits (2.5 [1.1] versus 3.4 [1.6] visits; $p < 0.0001$) and cost less (3,904 [951] versus 4,463 [2,272] dollars; $p = 0.007$). The number of days to discharge were not significantly different between groups 30.7 (16.9) versus 30.3 (22.9) days ($p = 0.840$).

### Multivariate analysis

Logistic regression model results are depicted in Table 3. When controlling for defect surface area, operation time, age, medical history, and gender, autologous tissue reconstruction remained an independent significant risk factor for infection or additional operation (OR = 11.71; 95% CI = 3.35–40.99; $p < 0.0001$). In a separate model that included cosmetic outcomes, the odds of infection, additional operation, poor scar cosmesis, or scar revision were 19 times higher in the autologous tissue group (OR = 18.76; 95% CI = 5.56–63.34; $p < 0.0001$). Being female was also associated with three times greater odds of having a cosmetic complication (OR = 2.84; 95% CI = 1.29–6.23; $p = 0.010$).

## Discussion

This propensity score-matched case–control is the first to compare the outcomes for placental allograft with the gold standard of management in complex MMS defect reconstruction, flaps, and FTSG. This study presented a unique opportunity to address a practice gap with evidence that is currently missing from the literature. The key findings of this investigation are the incidence of infection and all-cause postoperative morbidity in placental allograft repairs was significantly lower than observed with autologous tissue; and the use of placental allograft was independently associated with a lower risk of infection, repeat operation, poor scar cosmesis, and scar revision. Even after controlling for covariates, patients receiving autologous tissue reconstruction were 12 times more likely to have infections or surgical reintervention and 19 times more likely to experience poor scar cosmesis or scar revision. Although female patients were at a greater risk of having postoperative scar-related issues, such outcomes coincide consistent with previous studies in which females experienced more psychosocial distress and scar concerns after MMS in a visually prominent area.[18]

Our study findings are consistent with long-standing reports in the scientific and medical literature, which recognize the placental membrane as a safe and effective surgical material.[19–24] Considerable research supports its use for tissue engineering as a biocompatible scaffold

**Table 3. Multivariate logistic regression analysis for the risk of medical and cosmetic postoperative complications**

| | *Infection or surgical reintervention* | | *Poor scar cosmesis or scar revision* | |
|---|---|---|---|---|
| | *OR (95% CI)* | *p* | *OR (95% CI)* | *p* |
| Female gender | 1.68 (0.68–4.15) | 0.260 | 2.84 (1.29–6.23) | 0.009 |
| Age | 0.98 (0.94–1.03) | 0.481 | 1.00 (0.96–1.05) | 0.861 |
| Tumor size, cm$^2$ | 1.27 (0.82–1.97) | 0.279 | 1.06 (0.74–1.52) | 0.755 |
| Defect size, cm$^2$ | 0.91 (0.71–1.17) | 0.470 | 0.97 (0.82–1.14) | 0.683 |
| Central face defect location | 0.45 (0.17–1.24) | 0.123 | 0.77 (0.30–2.01) | 0.593 |
| Autologous tissue vs. placental allograft | 11.71 (3.35–40.99) | 0.0001 | 18.76 (5.56–63.34) | <0.0001 |
| Current smoker | 0.74 (0.17–3.14) | 0.677 | 0.92 (0.27–3.08) | 0.886 |
| Anticoagulation | 1.00 (0.39–2.61) | 0.997 | 0.98 (0.43–2.23) | 0.953 |
| Immunocompromised | 1.32 (0.45–3.85) | 0.618 | 0.92 (0.33–2.56) | 0.873 |
| No. stages to extirpation | 1.04 (0.71–1.53) | 0.846 | 1.16 (0.84–1.61) | 0.363 |
| Length of surgery | 1.00 (1.00–1.01) | 0.447 | 1.00 (1.00–1.01) | 0.419 |

Statistical significance at $p < 0.05$.
CI, confidence interval; OR, odds ratio.

with capacity to promote re-epithelialization while reducing wound fibrosis and scar formation.[20] The successful closure of chronic wounds, management of orthopedic injury, prevention of surgical tissue adhesions, ocular surface reconstruction, reduced pain and infection in burn treatment, and prevention of postoperative hematoma and serous fluid collections are evidenced through various levels of research.[21,22]

In the dermatologic surgery setting, placental allografts may optimize clinical results in a variety of circumstances where a combination of patient, anatomical, and tissue-related factors are a concern: individual refuses incisional repair or presents with a medical contraindication; the quality/availability of local donor tissues are challenged; underlying structures are exposed and require a protective barrier; free skin margin contraction may lead to impaired cosmesis/altered function; or, the area cannot be immobilized to maintain autograft survival.[23]

The treatment algorithm for placental allograft use would supplement, not substitute for, levels in the reconstructive ladder. In this study, defects managed with placental allograft were characterized by exposed muscle, bone, and cartilage. These large complex wounds required one additional visit and cost an average $560 more than autologous tissue techniques. This can be attributed to repeat application of the placental tissue and cost of the graft. Despite increased health care utilization concerns, this nonsurgical method became an option—when due to a combination of patient, anatomical, and tissue-related factors—the optimal reconstruction method could not be pursued.



**Fig. 1.** **(A)** Placental allograft (dHACM) out of package before implantation (additional detail regarding product application is provided in the manufacturer's instructions for use [IFU], provided as Supplemental Data). **(B)** Mohs patient with large cutaneous defect involving upper eyelid and medial canthus right eye and right upper bridge of nose. **(C)** Placental allograft in situ, remains visible in situ at postoperative day 7. **(D)** Complete closure of Mohs defect without complication to surrounding structures, postoperative day 42. dHACM, dehydrated human amnion/chorion membrane.

## Limitations

As with all observational data, these study findings must be interpreted in the context of the retrospective study design. Results are limited by the accuracy and thoroughness of medical records. Given the resources available, this investigation made extensive efforts to increase internal validity and limit the confounding of results. Although propensity score-matching reduced baseline covariate imbalances, it does not substitute for randomization. A demographically homogenous cohort also constrains the generalizability of findings. The inherent risks associated with each reconstructive modality, incisional repair versus allograft tissue transplantation, present another limitation. The aim of this study was to compare defects distinguished by equivalent reconstructive demands in terms of complexity, location, and size. Smaller MMS defects managed with second intention were distinctly different (shallow depth, concave surfaces, and low-risk location) and, therefore, a case–control match with a population of dissimilar wounds was not applicable.

## Conclusion

Placental allograft can be a safe and effective tool for repairing MMS defects of the face, head, neck, and dorsal hand in a subset of patients who are not good candidates for traditional methods of autologous tissue reconstruction. In the authors' experience, this includes older adults with moderate- to high-risk defects >3 $cm^2$ and medically comorbid individuals with wound bed concerns making them ineligible for incisional repair. Further investigation into the efficacy of placental allograft for MMS reconstruction among racially diverse groups needs to be addressed in future studies.

## Authors' Contributions

All authors made substantial contributions to the conception and design of the study, including the acquisition, analysis, and interpretation of data, preparation of content, and critical review of the article. All authors performed a final review and provided their approval to submit the article for publication.

## Acknowledgments

The authors thank Dave Mason, MD, and Don Fetterolf, MD, MBA, for assisting with the critical review and revision of the study manuscript.

## Author Disclosure Statement

This study was initiated by the Primary Investigator (PI), J.R.A. Third-party data analysis and open-access publication fees were supported in part by the company, MiMedx Group, Inc., through the Clinical Research Agreement, AFSUR008. J.T and O.J.W are academic physician/surgeon collaborators. G.M.M is a clinical researcher for the company and B.S.H is an independently contracted biostatistician. The company, MiMedx Group, Inc., did not pay for, gift, contribute, or provide free of charge, any of the tissues used in this study. Additionally, J.R.A received no financial incentives for conducting this research. The surgical care rendered—including but not limited to the Mohs, reconstruction, and placental allografts—were all billed through patient insurance as covered services.

## Funding Information

The publication of this study was supported with funding from MiMedx Group, Inc.

## Supplementary Material

Supplementary Data
Supplementary Figure S1
Supplementary Figure S2
Supplementary Figure S3
Supplementary Figure S4
Supplementary Figure S5

## References

1. Siegel RL, Miller KD, Jemal A. Cancer statistics, 2019. *CA Cancer J Clin.* 2019;69(1):7–34.
2. Lenzi TCR, Reis CMS, Novaes MRCG. Epidemiological profile of elderly patients with non-melanoma skin cancer seen at the dermatology outpatient clinic of a public hospital. *An Bras Dermatol.* 2017;92(6):882–884.
3. Linos E, Chren MM, Stijacic Cenzer I, Covinsky KE. Skin cancer in the U.S. elderly adults: does life expectancy play a role in treatment decisions. *J Am Geriatr Soc.* 2016;64(8):1610–1615.
4. Nestor MS, Zarraga MB. The incidence of nonmelanoma skin cancers and acitinic keratoses in South Florida. *J Clin Aesthet Dermatol.* 2012;5(4):20–24.
5. Sclafani AP, Sclafani JA, Sclafani AM. Successes, revisions, and postoperative complications in 466 Mohs defect repairs. *Facial Plast Surg.* 2012;28(3):358–366.
6. Johnson AR, Egeler SA, Wu WW, et al. Facial reconstruction after Mohs surgery: a critical review of defects involving the cheek, forehead, and perioral region. *J Craniofac Surg.* 2019;30(2):400–407.
7. Egler S, Johnson AR, Ibrahim AMS, et al. Reconstruction of Mohs defects located in the head and neck. *J Craniofac Surg.* 2019;30:412–417.
8. Tokede O, Jadotte YT, Nkemjika S, et al. Effectiveness of Mohs micrographic surgery for nonmelanoma skin cancer: a systematic review protocol. *JBI Database System Rev Implement Rep.* 2017;15(3): 666–675.
9. Meaike JDF, Dickey RM, Killion E, Bartlett EL, Brown RH. Facial skin cancer reconstruction. *Semin Plast Surg.* 2016;30(3):108–121.
10. Grosfeld EC, Smit JM, Krekels GA, van Rappard JH, Hoogbergen MM. Facial reconstruction following Mohs Micrographic surgery: a report of 622 cases. *J Cutan Med Surg.* 2014;18(4):265–270.
11. Renzi M, Schimmel J, Decker A, Lawrence N. Management of skin cancer in the elderly. *Dermatol Clin.* 2019;37(3):279–286.
12. van Leeuwen AC, The A, Moolenburgh SE, de Haas ERM, et al. A retrospective review of reconstructive options and outcomes of 202 cases large facial Mohs micrographic surgical defects, based on aesthetic unit involved. *J Cutan Med Surg.* 2015;19(6):580–587.
13. Ibrahim AM, Rabie AN, Borud L, et al. Common patterns of reconstruction for Mohs defects in the head and neck. *J Craniofac Surg.* 2014;25(1):87–92.
14. Schwartzman G, Carton AM, Khachemoune A. Review and appraisal of assessment parameters of second intention healing after Mohs micrographic surgery. *Arch Dermatol Res.* [Epub ahead of print]; 10.1007/s00403-021-02209-y.
15. Patel SA, Liu JJ, Murakami CS, Berg D, Akkina SR, Bhrany AD. Complication rates in delayed reconstruction of the head and neck after Mohs micrographic surgery. *JAMA Facial Plast Surg.* 2016;18(5):340–346.
16. Brown BC, Moss TP, McGrouther DA, Bayat A. Skin scar perceptions must be challenged: importance of self-perception in skin scarring. *J Plast Reconstr Aesthet Surg.* 2010;63:1022–1029.
17. Hughley BB, Schmalbach CE. Cutaneous head and neck malignancies in the elderly. *Clin Geriatr Med.* 2018;34(2):245–258.
18. Sabanko JF, Sarwer DB, Zvargulis Z, Miller CJ. Importance of physical appearance in patients with skin cancer. *Dermatol Surg.* 2015;41(2):183–188.
19. Niknejad H, Peirovi H, Jorjani M, Ahmadiani A, Ghanavi J, Seifalian A. Properties of the amniotic membrane for potential use in tissue engineering. *Eur Cell Mater.* 2008;15;88–99.
20. Mamede AC, Carvalho MJ, Abrantes AM, Laranjo M, Maia CJ, Botelho MF. Amniotic membrane: from structure and functions to clinical applications. *Cell Tissue Res.* 2012;339:447–458.
21. Koob TJ, Lim JJ, Massee M, Zabek N, Denozière G. Properties of dehydrated human amnion/chorion composite grafts: implications for wound repair and soft tissue regeneration. *J Biomed Mater Res B Appl Biomater.* 2014;102(6):1353–1362.
22. Lim JJ, Koob TJ. Placental cells and tissues: The transformative rise in advanced wound care. In: Fonseca C, ed. *Worldwide Wound Healing—Innovation in Natural and Conventional Methods*. Rijeka, Croatia: InTech; 2016, pp. 121–151.
23. Lo V, Pope, E. Amniotic membrane in dermatology. *Int J Dermatol.* 2009;48(9):935–940.
24. Silini AR, Cargnoni A, Magatti M, et al. The long path of human placenta and its derivatives, in regenerative medicine. *Front Bioeng Biotechnol.* 2015;3:162.
25. von Elm E, Altman DG, Egger M, Pocock SJ, Gotzsche PC, Vandenbroucke JP. The Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) statement: guidelines for reporting observational studies. *J Clin Epidemiol.* 2007;61:344–349.
26. Ad Hoc Task Force, Connolly SM, Baker DR, et al. AAD/ACMS/ASDSA/ASMS 2012 appropriate use criteria for Mohs micrographic surgery: a report of the American Academy of Dermatology, American College of Mohs Surgery, American Society for Dermatologic Surgery Association, and the American Society for Mohs Surgery. *J Am Acad Dermatol.* 2012;67(4):531–550.

# EpiFix®



## An Amnion/Chorion Membrane Allograft for Homologous Use in Acute and Chronic Wound Care

- Enhances Healing
- Modulates Inflammation
- Reduces Scar Tissue Formation
- Provides a Barrier

APPROVED AMERICAN PODIATRIC MEDICAL ASSOCIATION

The EpiFix® dehydrated Human Amnion/Chorion Membrane (dHACM) Allograft is a minimally manipulated natural membrane that provides a scaffold for cellular ingrowth, modulates inflammation, and reduces scar tissue formation for enhanced healing.

purion®

EpiFix is processed using the PURION® process, a unique approach that provides an easy to use allograft stored at ambient conditions.

MiMedx



# EpiFix®

EpiFix is composed of human amnion and chorion membranes that line the amniotic cavity. EpiFix has multiple layers including a single layer of epithelial cells, a basement membrane and an avascular connective tissue matrix.

## Growth factors present in EpiFix:

285 regulatory proteins including growth factors, specialized cytokines, and enzyme inhibitors have been identified in EpiFix.[1-3] The following are some of the growth factors that help enhance healing:

- **Epidermal Growth Factor (EGF)** - Promotes proliferation of epithelial cells
- **Transforming Growth Factor β(TGF-β)** - Anti-inflammatory, and promotes normal wound healing and reduced scar formation
- **Fibroblast Growth Factor (FGF)** - Promotes cellular proliferation & important for collagen matrix formation
- **Platelet Derived Growth Factor A & B (PDGF A & B)** - Promotes cell proliferation in connective tissue and enhances soft tissue healing

## How to apply EpiFix:

- **Cut to fit**
- **Apply to the wound**
- **Cover to maintain a moist wound environment**

## Extracellular Components:

**The Extracellular Matrix of amniotic membrane is composed of 3 major classes of biomolecules:**

- **Structural proteins:** collagen types I, III, IV, V and VII, and elastin
- **Specialized proteins:** fibronectin, TIMPs[†], and laminins
- **Proteoglycans:** formed when GAGs are linked to core proteins

[†]Tissue inhibitors of Metalloproteinases

## Product Offering:

- **Multiple sizes available to reduce graft wastage**
- **Available in a variety of configurations**

## Shelf Life: 5 years at ambient conditions

**Ordering Information:**

Customer Service: 866.477.4219

Email: customerservice@mimedx.com

**1.** MiMedx Research Report: MM-RD-00072, Proteome Characterization of MiMedx Placental Tissue Products. **2.** Koob TJ, Lim JJ, Massee M, Zabek N, Denozière G. Properties of dehydrated human amnion/chorion composite grafts: implications for wound repair and soft tissue regeneration. J Biomed Mater Res B Appl Biomater. 2014 Aug;102(6):1353-62. **3.** Lei J, Priddy LB, Lim JJ, Massee M, Koob TJ. Identification of Extracellular Matrix Components and Biological Factors in Micronized Dehydrated Human Amnion/Chorion Membrane. Adv Wound Care (New Rochelle). 2017 Feb 1;6(2):43-53.

Patents and patents pending see: www.mimedx.com/patents. EpiFix®, PURION®, and MiMedx® are registered U.S. trademarks of MiMedx Group, Inc. 1775 West Oak Commons Court NE, Marietta, GA 30062 ©2018 MiMedx Group, Inc. All Rights Reserved. www.mimedx.com EP408.002

## EpiFix® Description

EpiFix is a minimally manipulated, dehydrated, non-viable cellular allograft derived from human amniotic membrane. Amniotic membrane is a thin, collagenous membrane composed of multiple layers that surrounds the fetus within the mother's uterus.

EpiFix preserves multiple extracellular matrix components and other proteins present in amniotic tissue.

EpiFix is a human tissue product and appearance may vary between donors. Variations in color (tan to light brown), opacity, and thickness are normal due to the nature of human tissue.

### Tissue Uses

EpiFix is a barrier intended for use in the treatment of acute and chronic wounds, providing a protective environment to support the healing process.

### Contraindications

EpiFix should not be used on (1) areas with active or latent infection and/or (2) a patient with a disorder that would create an unacceptable risk of post-operative complications.

### Precautions/Warnings

- EpiFix allografts remain suitable for transplantation in an unopened, undamaged package, under proper storage conditions.
- Please inspect the integrity of the package upon receipt. If package and contents appear defective or damaged in any way, immediately contact the distributor.
- This allograft is intended for single-patient use only. Discard all unused material.
- The procedure should be performed by an authorized medical professional.
- Strict donor screening and laboratory testing, along with dedicated processing and sterilization methods, are employed to reduce the risk of any disease transmission. However, as with all biological implants, an absolute guarantee of tissue safety is not possible. This allograft has the potential to transmit infectious disease to the recipient.
- The reaction of the body to any biological implant is not completely understood.
- Caution should be used when treating patients with a known sensitivity to aminoglycoside antibiotics.
- Discard all damaged, mishandled or potentially contaminated tissue.
- This product has not been tested in combination with other products.
- DO NOT RE-STERILIZE.

### Preparation, Reconstitution and Use

Prior to implantation, carefully follow the EpiFix allograft preparation steps below using aseptic technique:

**Wound Bed Preparation**

- Ensure the wound is free from clinical signs of infection.
- Prepare wound bed as needed.

**Removing EpiFix from Packaging**

- The outer peel pouch is NOT sterile. The inner pouch that contains EpiFix is sterile (unless the pouches are damaged or compromised).
- Carefully open the peelable corner of the outer pouch and extract the inner pouch using aseptic technique. Ensure the inner pouch does not come in contact with any portions of non-sterile surface of the outer pouch.
- Using aseptic technique, SLOWLY peel a corner of the inner peel pouch and grasp EpiFix with fingers or non-toothed, sterile forceps.
- Use EpiFix promptly after opening the inner, sterile pouch.

**PLEASE TAKE GREAT CARE WHEN REMOVING EpiFix FROM THE INTERNAL POUCH. EpiFix IS THIN AND EXTREMELY LIGHTWEIGHT.**

**EpiFix Preparation**

1. In a dry state, use sterile dry scissors to cut EpiFix to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix by 1mm.
2. EpiFix can be applied wet or dry.
3. EpiFix can be hydrated while on the wound site with sterile saline solution. Simply apply several drops of sterile solution to EpiFix. During and following hydration, the embossment on EpiFix will begin to fade.

**EpiFix Orientation & Application**

EpiFix should be placed on the wound site, using the orientation of the embossment lettering as a guide. Proper orientation of EpiFix can be noted when the embossment nomenclature reads correctly from left to right. If the mesh process has diminished the ability to clearly read the embossment, the following two alternate methods may be used for placement:

1. An elongated, horizontal perforation is located in the top left area of the graft connecting two adjacent perforations. Proper orientation can be noted when the graft is placed on the wound site such that this horizontal perforation remains visually in the top left area of the graft.
2. The clear side of the inner pouch is indicative of the UP side of the graft orientation. Proper placement can be achieved by removing the graft from the pouch with the clear side up and moving to the wound site with that same orientation.

Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix to the wound site, if desired.

**Primary Dressing**

- EpiFix should be covered with a non-adherent contact layer.
- EpiFix should NOT be disturbed, if possible, for several days or before the next application, if needed.
- If an infection occurs at the graft site, treat infection per institution's protocol.

**Secondary Dressing**

- EpiFix requires a moist wound environment. Use appropriate moisture management dressings for the wound type and treatment ideology.

**Support Therapies**

- EpiFix is compatible with offloading/compression/negative pressure therapies.
- EpiFix can be used in conjunction with hyperbaric oxygen therapy.

**Re-application of EpiFix**

- It is recommended that EpiFix grafts are applied weekly until wound epithelialization is achieved. However, clinician discretion should be used based on patient and wound condition/progress. It is clinically acceptable to apply EpiFix on a biweekly basis if desired.

### Adverse Effects & Reporting

- As with any procedure, the possibility of infection exists.
- Proprietary processing and validated sterilization methods are employed to eliminate potential deleterious components of the allograft. However, as with all biological implants, the possibility of rejection exists.
- Any adverse reactions, including the suspected transmission of disease attributable to this allograft, should be reported immediately to MiMedx®.

### Acceptable Storage

It is the responsibility of the distributor and/or end-user clinician to store EpiFix allografts in a clean, dry environment between 2-30°C prior to further distribution or transplant. EpiFix allografts have a 5-year shelf life. Check the label for the expiration date.

### Recovery & Quality Control

All tissue recovered meets stringent specifications during donor screening and laboratory testing to reduce the risk of transmitting infectious disease. EpiFix allografts are procured and processed in the United States according to standards and/or regulations established by the American Association of Tissue Banks (AATB) and the United States Food & Drug Administration (FDA). All tissues are recovered under full informed consent of the donors (mothers of the newborn children). The donors have consented to the transfer of the allografts to third parties. A thorough medical and social history of the donor is also obtained.

# EpiFix®

Dehydrated Human Amnion/Chorion
Membrane Allograft
Information/Instructions for Use

MiMedx

1775 West Oak Commons Court NE
Marietta, GA 30062

**866.477.4219**

www.mimedx.com

## EpiFix® Description

Human amniotic membrane is a thin, collagenous membrane derived from the placenta, the area in which the human fetus grows and develops within the mother's uterus. Human amniotic membrane consists of multiple layers.

EpiFix is a minimally manipulated, dehydrated, non-viable cellular amniotic membrane allograft that contains multiple extracellular matrix proteins, growth factors, cytokines and other specialty proteins present in amniotic tissue to provide a barrier membrane that enhances healing.

EpiFix allografts are human tissue products and appearance may vary between donors. Variations in color (tan to light brown), opacity, and thickness are normal due to the nature of human tissue.

### Tissue Uses

EpiFix Amniotic Membrane Allograft is intended for homologous use in the treatment of acute and chronic wounds to reduce scar tissue formation, modulate inflammation, provide a barrier, and enhance healing.

### Contraindications

EpiFix should not be used on (1) areas with active or latent infection and/or (2) a patient with a disorder that would create an unacceptable risk of post-operative complications.

### Precautions/Warnings

- EpiFix allografts remain suitable for transplantation in an unopened, undamaged package, under proper storage conditions.
- Please inspect the integrity of the package upon receipt. If package and contents appear defective or damaged in any way, immediately contact the distributor.
- This allograft is intended for single-patient use only. Discard all unused material.
- The procedure should be performed by an authorized medical professional.
- Strict donor screening and laboratory testing, along with dedicated processing and sterilization methods, are employed to reduce the risk of any disease transmission. However, as with all biological implants, an absolute guarantee of tissue safety is not possible. This allograft has the potential to transmit infectious disease to the recipient.
- The reaction of the body to any biological implant is not completely understood.
- Caution should be used when treating patients with a known sensitivity to aminoglycoside antibiotics.
- Discard all damaged, mishandled or potentially contaminated tissue.
- This product has not been tested in combination with other products.
- DO NOT RE-STERILIZE.

### Preparation, Reconstitution and Use

Prior to implantation, carefully follow the EpiFix allograft preparation steps below using aseptic technique:

**Wound Bed Preparation**

- Ensure the wound is free from clinical signs of infection.
- Prepare wound bed as needed.

**Removing EpiFix from Packaging**

- The outer peel pouch is NOT sterile. The inner pouch that contains EpiFix is sterile (unless the pouches are damaged or compromised).
- Carefully open the peelable corner of the outer pouch and extract the inner pouch using aseptic technique. Ensure the inner pouch does not come in contact with any portions of non-sterile surface of the outer pouch.
- Using aseptic technique, SLOWLY peel a corner of the inner peel pouch and grasp EpiFix with fingers or non-toothed, sterile forceps.
- Use EpiFix promptly after opening the inner, sterile pouch.

**PLEASE TAKE GREAT CARE WHEN REMOVING EpiFix FROM THE INTERNAL POUCH. EpiFix IS THIN AND EXTREMELY LIGHTWEIGHT.**

**EpiFix Preparation**

1. In a dry state, use sterile dry scissors to cut EpiFix to fit within the wound margins. It is acceptable to overlap the wound margins with EpiFix by 1mm.
2. EpiFix can be applied wet or dry.
3. EpiFix can be hydrated while on the wound site with sterile saline solution. Simply apply several drops of sterile solution to EpiFix. During and following hydration, the embossment on EpiFix will begin to fade.

**EpiFix Orientation & Application**

EpiFix should be placed on the wound site, using the orientation of the embossment lettering as a guide. Proper orientation of EpiFix can be noted when the embossment nomenclature reads correctly from left to right. If the mesh process has diminished the ability to clearly read the embossment, the following two alternate methods may be used for placement:

1. An elongated, horizontal perforation is located in the top left area of the graft connecting two adjacent perforations. Proper orientation can be noted when the graft is placed on the wound site such that this horizontal perforation remains visually in the top left area of the graft.
2. The clear side of the inner pouch is indicative of the UP side of the graft orientation. Proper placement can be achieved by removing the graft from the pouch with the clear side up and moving to the wound site with that same orientation.

Absorbable, non-absorbable suture material and/or tissue adhesives can be used to fixate EpiFix to the wound site, if desired.

**Primary Dressing**

- EpiFix should be covered with a non-adherent contact layer.
- EpiFix should NOT be disturbed, if possible, for several days or before the next application, if needed.
- If an infection occurs at the graft site, treat infection per institution's protocol.

**Secondary Dressing**

- EpiFix requires a moist wound environment. Use appropriate moisture management dressings for the wound type and treatment ideology.

**Support Therapies**

- EpiFix is compatible with offloading/compression/negative pressure therapies.
- EpiFix can be used in conjunction with hyperbaric oxygen therapy.

**Re-application of EpiFix**

- It is recommended that EpiFix grafts are applied weekly until wound epithelialization is achieved. However, clinician discretion should be used based on patient and wound condition/progress. It is clinically acceptable to apply EpiFix on a biweekly basis if desired.

## Adverse Effects & Reporting

- As with any procedure, the possibility of infection exists.
- Proprietary processing and validated sterilization methods are employed to eliminate potential deleterious components of the allograft. However, as with all biological implants, the possibility of rejection exists.
- Any adverse reactions, including the suspected transmission of disease attributable to this allograft, should be reported immediately to MiMedx®.

## Acceptable Storage

EpiFix allografts should be stored in a clean, dry environment at ambient conditions. EpiFix allografts have a 5 year shelf life. Check the label for the expiration date.

## Recovery & Quality Control

All tissue recovered meets stringent specifications during donor screening and laboratory testing to reduce the risk of transmitting infectious disease. EpiFix allografts are procured and processed in the United States according to standards and/or regulations established by the American Association of Tissue Banks (AATB) and the United States Food & Drug Administration (FDA). All tissues are recovered under full informed consent of the donors (mothers of the newborn children). The donors have consented to the transfer of the allografts to third parties. A thorough medical and social history of the donor is also obtained.

## Recovery & Quality Control (cont.)

The listed communicable disease testing was performed by a laboratory registered with FDA to perform donor testing and certified to perform such testing on human specimens in accordance with the Clinical Laboratory Improvement Amendments of 1988 (CLIA) and 42 CFR part 493, or that has met equivalent requirements as determined by the Centers for Medicare and Medicaid Services (CMS).

The donor is screened for:

| | |
|---|---|
| HIV-1&2 Plus O Antibody | Hepatitis B Surface Antigen |
| HIV Type 1 (Nucleic Acid Test (NAT)) | Hepatitis C Antibody |
| HTLV-1&2 Antibody | Hepatitis C Virus (Nucleic Acid Test (NAT)) |
| Syphilis (Serologic Test) | Hepatitis B Virus (Nucleic Acid Test (NAT)) |
| Hepatitis B Core Antibody | West Nile Virus (Nucleic Acid Test (NAT))* |

**WNV NAT screening conducted on donors recovered beginning February 1, 2017.*

All tests produced negative results and were reviewed prior to the release of the tissue. Only tissue from donors with acceptable test results, according to the standards of MiMedx Tissue Services, LLC, as well as the standards and/or regulations of all state and federal regulatory bodies, are released.

The infectious disease test results, consent documents, donor medical history, behavior risk assessment according to current public health services guidelines, physical assessment, available relevant medical records, as well as information from other sources or records that may pertain to donor suitability, and tissue procurement test results, have been evaluated by the MiMedx Medical Director and are sufficient to indicate that the donor suitability criteria current at the time of tissue recovery have been met.

The names and addresses of the testing laboratories, the listing and interpretation of all required infectious disease tests, a listing of the documents reviewed as part of the relevant medical records, and the name of the person or establishment determining the suitability of this allograft are on file and available upon request.

**Donated Human Tissue. This allograft has been determined to be suitable for transplantation.**

## Allograft Processing/Preservation/Sterilization

EpiFix allografts are processed based upon strict, quality-controlled protocols that have demonstrated bioburden control. An additional assurance of safety is achieved by terminally sterilizing each allograft. Based upon validations, each graft has been effectively sterilized using e-beam irradiation. The allografts are processed with aminoglycoside antibiotics.

## Recipient Tracking

The FDA requires that recipient records be maintained for the purpose of tracking the allograft following transplantation. The authorized medical professional must complete the enclosed Tissue Utilization Record, attach a peel-off, allograft-tracking label provided, and mail to the distributor (postage-paid). Please use the remaining peel-off, allograft-tracking labels for patient and hospital records.

**Caution: This product must be administered by an authorized medical professional.**

The user shall be solely responsible for determining the adequacy and appropriateness of the allograft for any and all uses to which the user shall apply the allograft.

MiMedx's dehydrated Human Amnion/Chorion Membrane (dHACM) allografts are now described in an official U.S. Pharmacopeia – National Formulary monograph with the publication of USP 40 - NF 35.

Processed with:

purion process

VOL. IV

Processing and donor suitability performed by MiMedx Tissue Services, LLC
Patents and patents pending see: www.mimedx.com/patents
EpiFix®, PURION®, and MiMedx® are registered trademarks of MiMedx Group, Inc. 1775 West Oak Commons Court NE, Marietta, GA 30062
©2017 MiMedx Group, Inc.
All Rights Reserved. mimedx.com

3181

ES101.004

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re: **Post Payment Medical Records Request (Nebraska)**
**Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
**Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion—
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that—

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- ✓ **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- ✓ Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- ✓ Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***

***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 3188

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that ______________________________ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

______________________________
Custodian of records and Job Title (Print)

______________________________ ______________
Custodian of records (Signature) (Date)

______________________________
Physician/Supplier (Print)

______________________________ ______________
Physician/Supplier (Signature) (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS, M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 3193-3442

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re: **Post Payment Medical Records Request (Nebraska)**
**Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
**Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion—
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that—

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 3449

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that ______________________ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

______________________________
Custodian of records and Job Title (Print)

______________________________ ______________
Custodian of records (Signature) (Date)

______________________________
Physician/Supplier (Print)

______________________________ ______________
Physician/Supplier (Signature) (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS, M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 3454-3474

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

**MR#: 2022_188_534244943**

Re: **Post Payment Medical Records Request (Nebraska)**
**Provider/Supplier Medicare ID Number(s): NA3713, NA3713001, and NA3713002**
**Provider/Supplier NPI: 1124094867, 1891798245, and 1891222691**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion—
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986…

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that—

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- ✓ **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- ✓ Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- ✓ Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (her), compleherEHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***

***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

LaTonya Johnston
Program Integrity Analyst
CoventBridge Group
UPIC Midwestern

AT# 2022_144_334243646

Enclosure: (Beneficiary List and Acknowledgement of Completion)

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 3481

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that ______________________ provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

______________________________
Custodian of records and Job Title (Print)

______________________________ ______________
Custodian of records (Signature) (Date)

______________________________
Physician/Supplier (Print)

______________________________ ______________
Physician/Supplier (Signature) (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)
-

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 3486-3724

COVENTBRIDGE GROUP
THINK TRUTH

CMS

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 3730

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS, M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 3734-4224

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
THINK TRUTH
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
>
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 4230

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature) 8/19/2022 (Date)

JOHN R. ADAMS M.D
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature) 8/19/2022 (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 4234-4630

COVENTBRIDGE GROUP
THINK TRUTH

CMS

July 8, 2022

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
>
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 4636

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-Office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 4640-5130

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
THINK TRUTH
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
>
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 5136

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS, M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**<u>For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.</u>**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 5140-5464

COVENTBRIDGE GROUP
THINK TRUTH

CMS

July 8, 2022

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 5740

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-Office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 5474-5964

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
THINK TRUTH
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 5970

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-Office Manager
Custodian of records and Job Title (Print)

[signature] 8/19/2022
Custodian of records (Signature) (Date)

JOHN R. ADAMS M.D.
Physician/Supplier (Print)

[signature] 8/19/2022
Physician/Supplier (Signature) (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 5974-6464

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
THINK TRUTH
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
>
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***

***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 6470

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

Elizabeth Robledo
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 6474-6964

COVENTBRIDGE GROUP THINK TRUTH

CMS

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
>
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 6970

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS, M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 6974-7464

COVENTBRIDGE GROUP
THINK TRUTH

CMS
CENTERS FOR MEDICARE & MEDICAID SERVICES

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
THINK TRUTH
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
>
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***

***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 7470

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS, M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**<u>For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.</u>**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 7474-7964

COVENTBRIDGE GROUP
THINK TRUTH

CMS

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
AUG 2 4 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943

Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

2118 Southwest Boulevard | Grove City, Ohio 43123
ph 614.801.0495 | fax 614.801.2361 | http://coventbridge.com

Contract HHSM-500-2016-00079I/HHSM-500-T0001
UPIC Midwestern Jurisdiction

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

> ***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 7970

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-Office Manager
Custodian of records and Job Title (Print)

[signature]
Custodian of records (Signature)

8/19/2022
(Date)

JOHN R. ADAMS M.D.
Physician/Supplier (Print)

[signature]
Physician/Supplier (Signature)

8/19/2022
(Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 7974-8464

COVENTBRIDGE GROUP
THINK TRUTH

CMS

July 8, 2022

Advanced Dermatology and Skin Cancer Center PA
Attention: John Adams MD, Owner
2735 Pembrook PL
Manhattan, KS 66502-7482

COVENTBRIDGE
AUG 24 2022
RECEIVED
GROVE CITY

MR#: 2022_188_534244943
Re: **Post Payment Medical Records Request (Kansas)**
**Provider/Supplier Medicare ID Number(s): 110568, 058601, 110568008, 110568009, and 110568010**
**Provider/Supplier NPI: 1124094867, 1891798245, 1548750912, 1609468396, and 1174102719**
**Reference Number: CSE-220330-00013**

To Dr. Adams:

This letter is a request for medical documentation associated with the reopening of Medicare claims you previously submitted for payment. We are requesting additional information to properly evaluate these claims. Please review the directions and information in this letter. **It is critically important that you include the MR#, referenced in the header of this letter, with any records you submit to us.**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPICs) to perform these functions. CoventBridge (USA) Inc. (hereinafter, "CoventBridge") is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, CoventBridge performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

CoventBridge must adhere to the rules for reopening initial determinations and redeterminations initiated by a contractor, as set forth at 42 C.F.R. § 405.980(b). Regarding timeframes, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion--
>
> 1) Within one year from the date of the initial determination or redetermination for any reason.
>
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986...

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here:

a) Establishing good cause. Good cause may be established when-

1) There is new and material evidence that--

i) Was not available or known at the time of the determination or decision; and

ii) May result in a different conclusion …

CoventBridge is reopening the claims associated with the beneficiaries referenced on the enclosed list for good cause. The reopening is based on credible evidence regarding data analysis findings. We are requesting additional information to properly evaluate the Medicare claims submitted for payment.

Please contact us prior to the submission of records if you are an authorized participant in a CMS Innovation Model.

We are requesting that you provide copies of the items and records listed below, as well as any documentation not listed that supports the services billed for the beneficiaries referenced on the enclosed list. Please include the following:

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**
- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
    - **Consent forms**
    - **Intra-operative or Intra-procedural notes**
    - **Anesthesia notes**
    - **Nursing notes**
    - **Post-anesthesia care notes**
    - **Operative or procedural reports**
    - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record

- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

As a UPIC, CoventBridge may request that a provider produce the relevant records in order to accurately conduct a post-payment audit. CoventBridge is not obligated to reimburse the provider for the cost of producing the requested records. Chapter 3 of the CMS Program Integrity Manual (Pub. 100-08), section 3.2.3.6, provides the guidance for reimbursement for requested records. In addition:

> A participating Medicare provider is required under §1815 of the Act to furnish information needed to determine the amounts due. Consequently, where the amount of payment due is directly affected, the program does not recognize a specific charge by the provider for furnishing a copy of a medical record. Any cost incurred by the provider in making this information available to a contractor is a payable provider administrative cost.

Similarly, Medicare does not reimburse for the use of a copy service to copy medical records. If you use a copying service, please be aware that Medicare will not reimburse for their services.

**Directions for esMD Submission: please read carefully**

***CoventBridge accepts documentation from providers via CMS's Electronic Submission of Medical Documentation (esMD) system. For more information, see http://www.cms.gov/esMD. Please ensure that any documents submitted through esMD are routed to CoventBridge, and not to your Medicare Administrative Contractor (MAC).***

> ***If you choose to submit medical records via CMS's esMD system, you must provide the Medical Record number (MR#) 2022_188_534244943 under the ESMD CASEID field, and the CCN number under the ESMD CLAIMID field.***
>
> ***If you enter any other type of information, or leave one of the fields blank, the system will not be able to identify the record automatically which will result in additional processing time.***

***If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, CoventBridge prefers these submissions in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name and HICN/MBI number. Due to the HIPAA regulations, please password-protect the CD prior to forwarding to CoventBridge and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]***

The HIPAA Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. CoventBridge is a Unified Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Please note that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [see §1815(a) of the Social Security Act]. Section 1833(e) of the Act states that no payment shall be made to any provider of services unless there has been furnished such information as may be necessary in order to determine the amounts due such provider and §1862(a)(1)(A) of the Act states that no payment may be made under part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Additionally, failure to submit the requested records by the due date may result in penalties taken against you, including revocation of your Medicare billing privileges, pursuant to 42 C.F.R. § 424.535(a)(10).

a) *Reasons for revocation.* CMS may revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement or supplier agreement for the following reasons:

10) *Failure to document or provide CMS access to documentation.* (i) The provider or supplier did not comply with the documentation or CMS access requirements specified in §424.516(f) of this subpart.

The regulation addressing documentation or CMS access requirements is found at 42 C.F.R. § 424.516(f)(2)(i)-(ii) and, as applicable here:

(f) *Maintaining and providing access to documentation.* (1)(i) A provider or a supplier that furnishes covered ordered, certified, referred, or prescribed Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(1)(ii) of this section) for 7 years from the date of service; and

(B) Upon the request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(1)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions, and requests for payments for Part A or B services, items or drugs.

(2)(i) A physician or, when permitted, an eligible professional who orders, certifies, refers, or prescribes Part A or B services, items or drugs is required to—

(A) Maintain documentation (as described in paragraph (f)(2)(ii) of this section) for 7 years from the date of the service; and

(B) Upon request of CMS or a Medicare contractor, to provide access to that documentation (as described in paragraph (f)(2)(ii) of this section).

(ii) The documentation includes written and electronic documents (including the NPI of the physician or, when permitted, other eligible professional who ordered, certified, referred, or prescribed the Part A or B service, item, or drug) relating to written orders, certifications, referrals, prescriptions or requests for payments for Part A or B services, items, or drugs.

Please send the requested documentation, along with a copy of this letter, within **30 calendar days** from the date of this letter, to the following address:

CoventBridge
UPIC Midwestern
2118 Southwest Boulevard
Grove City, Ohio 43123

Your cooperation and prompt reply is requested. If you have any questions, please contact me at (614) - 782-6071 and/or LaTonya.Johnston@us.coventbridge.com.

Sincerely,

*LaTonya Johnston*

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGE 8470

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that Advanced Dermatology and Skin Cancer Center PA provided all existing medical records and supporting documentation to substantiate payment of the Medicare claims within the list attached to this request by CoventBridge.

Elizabeth Robledo Co-Office Manager
Custodian of records and Job Title (Print)

[signature] 8/19/2022
Custodian of records (Signature) (Date)

JOHN R. ADAMS M.D
Physician/Supplier (Print)

[signature] 8/19/2022
Physician/Supplier (Signature) (Date)

Please acknowledge any and all documentation submitted by your office for the purpose of the Post Payment Medical Records Request.

- **Physician/Mid-level practitioner office/progress notes**
- **Physician/Mid-level practitioner order(s)**
- **History and Physical Examination**
- **Current and previous treatments received to include dates, diagnosis for treatment, treatment, and progress/response to treatment**
- **Consultation reports, if applicable**
- **All progress notes, including wound measurements**
- **Surgical reports, if applicable**
- **Pathology reports, if applicable**
- **Radiology reports, if applicable**

- **Laboratory test results, if applicable**
- **All documentation related to operative procedures performed, including:**
  - **Consent forms**
  - **Intra-operative or Intra-procedural notes**
  - **Anesthesia notes**
  - **Nursing notes**
  - **Post-anesthesia care notes**
  - **Operative or procedural reports**
  - **Medication administration records**
- Copy of the face sheet, including the beneficiary contact information, telephone number(s), address, and emergency contact information
- Copy of Medicare card and state identification card (driver's license or state identification)
- Consent for treatment, authorizing service
- Advanced Beneficiary Notice (ABNs)
- Legends, keys, or acronym lists to assist with understanding documentation
- Signature card/sheet, including the printed names and signatures of all personnel documenting in the beneficiary's record
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's record and/or performing services
- If electronic signatures used, documentation to verify the entries are appropriately authenticated/dated, the system has safeguards to prevent unauthorized access, and a process is in place for reconstruction.
- If electronic health records (EHR), complete EHR audit trails
- Staff list, with signature attestations (if available), of the personnel employed in the office on the date of service requested
- Any and all medical findings and any other documentation to support the claim(s) and medical necessity of the billed service(s)

**<u>For all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord.</u>**

- Copy of all inventory logs, including lot numbers, for skin substitutes and wound care products in the last 12 months.
- Copy of all Invoices for skin substitutes and wound care products in the last 12 months
- Copy of all order forms for skin substitutes and wound care products in the last 12 months
- Copy of any rebates for skin substitutes and wound care products in the last 12 months
- Copy of any rebate agreements for skin substitutes and wound care products between the provider and any distributor/manufacturer
- Any marketing material presented to you the provider, or your patients for skin substitutes and wound care products

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 8474-8980

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

OMHA Cleveland Field Office
ALJ **Mendelson** Team
1 Denver Federal Center, Bldg 25
PO Box 25167
Lakewood, CO 80225
866-236-5089 (Toll Free)
216-615-4000 (Main #)
216-462-4171 (Direct)
303-231-5164 (FAX)

September 19, 2023

FOULSTON SIEFKIN LLP
7500 COLLEGE BLVD STE 1400
OVERLAND PARK, KS 66210

Subject: ALJ Appeal No. **3-12683356911**– Passphrase Instructions for Opening an Encrypted File

Dear Ms. Lucas:

Per your request for a copy of your ALJ file; an encrypted file was recently sent to your attention at the above address.

Attached to this letter, please find general instructions for opening the encrypted file, which requires a passphrase.

**The passphrase required to open this file is as follows:**

- **The first part of your firm's name followed with the appeal number, no spaces.**
- **For example: If your name is Law Firm of ND and your appeal number is 3-12345678900, the passphrase would be Law3-12345678900.**
- **Passphrases are case-sensitive.**

If you have difficulty opening the encrypted file, please contact me at the phone number or address listed above for further assistance.

Sincerely,

Dione Slapnicker

Dione Slapnicker
Legal Assistant

OMHA-110 (rev. 05/09)

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Office of Medicare Hearings and Appeals

# RESPONSE TO NOTICE OF HEARING

**Instructions:** Complete sections 2 through 8 below, as applicable, and return this form to the assigned Administrative Law Judge (ALJ) **within 5 days of receiving the notice of hearing**. For expedited Part D hearings, contact the ALJ at the telephone number provided at the top of the notice of hearing or complete and return this form to the assigned ALJ **within 2 days of receiving the notice of hearing.** The return mailing address and fax number are at the top of the notice of hearing. You do not need to include the notice of hearing with your response.

Please note that only a party to the hearing may call witnesses; object to the time, place, or type of hearing; object to the statement of issues to be decided at the hearing; or object to the assigned ALJ (sections 4 through 6 below). Non-party participants are not permitted to call witnesses and may not file objections.

**Section 1: Hearing information. [TO BE COMPLETED BY THE OFFICE OF MEDICARE HEARINGS AND APPEALS]**

| OMHA Appeal Number | Appellant |
|---|---|
| 3-12683356911 | ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA |

| Type of Hearing | Assigned ALJ |
|---|---|
| ☒ Telephone ☐ Video-Teleconference (VTC) ☐ In-Person | Mendelson |

| Hearing Day of Week | Hearing Date | Hearing Time |
|---|---|---|
| WEDNESDAY | 10/11/2023 | 09:30 AM Mountain Time |

| Telephone Hearing Call-in Number (*if applicable*) | Passcode or Collaboration Code (*for telephone hearing*) |
|---|---|
| (833) 419-1926 | 1995 33 8559 |

| VTC or In-Person Hearing Address (*if applicable*) | City | State | ZIP Code |
|---|---|---|---|
| | | | |

**Section 2: What is the responding party's or participant's information?** (*Representative information in next section*)

| Name (*First, Middle initial, Last*) | Firm or Organization (*if applicable*) | Telephone Number |
|---|---|---|
| | Advanced Dermatology and Skin Cancer Center, PA | 785-537-4990 |

| Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| 2735 Pembrook PL | Manhattan | KS | 66502 |

If the respondent is an entity or organization, please list all individuals who plan to attend the hearing and the capacity in which they are attending *(attach a continuation sheet if necessary)*:

Dr. John Adams, practice owner and treating physician

**Section 3 : What is the representative's information?** (*Skip if you do not have a representative*)

| Name | Firm or Organization (*if applicable*) | Telephone Number |
|---|---|---|
| Amanda M. Wilwert | Foulston Siefkin LLP | 913-253-2181 |

| Mailing Address | City | State | ZIP Code |
|---|---|---|---|
| 7500 College Blvd. Suite 1400 | Overland Park | KS | 66210 |

**Section 4: Will you be present at the time and place shown above?** (*Check one*)

☒ **I will be present at the time and place shown on the notice of hearing.** If an emergency arises after I submit this response and I cannot be present, I will notify the ALJ at the telephone number shown at the top of the notice of hearing as soon as possible.

☐ **I cannot be present at the time and place shown on the notice of hearing and would like to request that my hearing be rescheduled.** I understand that the ALJ has the discretion to change the time and place of the hearing as long as my explanation for my request to reschedule meets the good cause standard for changing the time and place of the hearing. (For example, good cause may be found due to an inability to attend the hearing because of a serious physical or mental condition, incapacitating injury, or death in the family or if severe weather conditions make it impossible to travel to the hearing. *See* 42 C.F.R. sections 405.1020(f) and (g), and 42 C.F.R. sections 423.2020(f) and (g) for additional circumstances that may establish good cause.) I understand that if I am the appellant and the hearing is postponed at my request, the time between the originally scheduled hearing date and the new hearing date is not counted toward any applicable adjudication period.

I would like to reschedule my hearing for the following date and time, and I have good cause to reschedule my hearing because:

☐ **I want to waive my right to appear at the ALJ hearing.** (*Please complete form OMHA-104 and attach it to this response.*)

**Section 5: Do you intend to call any witnesses to provide testimony at the hearing?**

☐ No.

☒ Yes, I intend to call the following witnesses *(attach a continuation sheet if necessary)*:

Dr. John Adams

**Section 6: Do you object to any of the following conditions?** (*Check all that apply*)

☐ **I object to the type of hearing scheduled.** If you are an unrepresented beneficiary or enrollee, and a telephone hearing is scheduled, you have the right to request that a VTC hearing be held instead if VTC technology is available. For all other parties, if a telephone hearing is scheduled, the ALJ may find good cause for an appearance by VTC if he or she determines that VTC is necessary to examine the facts or issues involved in the appeal.

If a telephone or VTC hearing is scheduled and the party, including an unrepresented beneficiary or enrollee, requests that an in-person hearing be held instead, the ALJ, with the agreement of the Chief ALJ or designee, may find good cause for an in-person hearing if VTC or telephone technology is not available, or if special or extraordinary circumstances exist.

I object to the type of hearing scheduled and request a (*check one*) ☐ VTC ***or*** ☐ in-person hearing because:

**Note**: No explanation is required if you are an unrepresented beneficiary or enrollee requesting a VTC hearing.

☐ **I object to the issues described in the notice of hearing.** I understand that I must send a copy of my objection to the issues to all the other parties who were sent a copy of the notice of hearing, and to CMS or a CMS contractor that elected to be a party to the hearing (if you do not have these addresses, please contact the ALJ's adjudication team at the telephone number shown in the letterhead of the notice of hearing). I understand that the ALJ will make a decision on my objection either in writing, at a prehearing conference, or at the hearing.

I object to the issues described in the notice of hearing because:

☐ **I object to the ALJ assigned to my appeal.** I understand that an ALJ cannot adjudicate an appeal if he or she is prejudiced or partial with respect to any party or has an interest in the matter pending for decision, and that I may object to the ALJ assigned to my appeal for these reasons. I understand that the ALJ will consider my objection and decide whether to proceed with the appeal or withdraw. I understand that if I object to the ALJ assigned to my appeal, and the ALJ subsequently withdraws from the appeal, another ALJ will be assigned, and any applicable adjudication time frame will be extended by 14 calendar days.

I object to the assigned ALJ because:

**Section 7: If you are the appellant, do you want to waive or extend the time frame to decide your appeal?** (*If yes, check one*)

☐ **I want to waive the time frame for the ALJ to decide my appeal.** I understand that by waiving this time frame, the ALJ does not have to decide my appeal within any applicable adjudication period that would otherwise apply.

☐ **I want to extend the time frame for the ALJ to decide my appeal.** I want the time frame to be extended ______ calendar days beyond any applicable adjudication period.

**Section 8: Sign and date this form.**

| Party, Participant or Representative Signature | Date |
|---|---|
| [signature] | 9/19/23 |

**Privacy Act Statement**

The legal authority for the collection of information on this form is authorized by the Social Security Act (section 1155 of Title XI and sections 1852(g)(5), 1860D-4(h)(1), 1869(b)(1), and 1876 of Title XVIII). The information provided will be used to further document your appeal. Submission of the information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your appeal. Information you furnish on this form may be disclosed by the Office of Medicare Hearings and Appeals to another person or governmental agency only with respect to the Medicare Program and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services and other agencies.

**If you need large print or assistance, please call 1-855-556-8475**

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 8984-8985

**Skin Substitutes/Medical Necessity:**
The provider applied products defined by the manufacturer and the FDA as products that are wound coverings and ”not a “graft”. FDA states there are many products cleared by the FDA as wound dressings via the 510(k) pathway which are not intended to treat wounds but only to cover wounds so that the natural healing process can take place. The provider is using amniotic products for wound healing/coverings, which is not homologous use. Medicare was billed for human cellular and tissue products (HCT/P), which is approved as a wound covering, but not as a skin substitute graft as defined per the CPT Codebook and FDA.

The product inserts and manufacturers website indicate the products are “protective wound coverings/barriers” that protects the wound bed until healed and not a “graft” as indicated. There are several sizes available to reduce wastage. These products are regulated as a human cells, tissues, and cellular and tissue-based product (HCT/P) as defined by 21 CFR Part 1271. The 21 CFR Section 1271 states HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer’s objective intent.

FDA’s regulatory considerations states, “An amniotic membrane product is used for wound healing and/or to reduce scarring and inflammation. This is not homologous use because wound healing and reduction of scarring and inflammation are not basic functions of amniotic membrane.” An amniotic membrane product is applied to the surface of wounds.

While uses outside of homologous use may be allowed, they are effectively “off label” and require specific approval by the Medicare Administrative Contractor (MAC). For this MAC, Wisconsin Physicians Services, there is no LCD or NCD for this situation. However, IOM 100-8 Chapter 3 Section 3.6.2.2 states the UPIC will utilize the following criteria (in relevant part) to determine if a service or item is reasonable and necessary: it is safe/effective, it is not experimental/investigational, it is furnished in accordance with accepted standards of medical practice, and it meets, but does not exceed, the beneficiary’s medical need.

The provider had the patients return sometimes week after week to have another application of skin substitute placed, which is further confirmation that this product was not the type of item or service covered under codes billed. Documentation supported ‘grafts’ were being used for wound healing and regeneration of skin growth which is not the product’s homologous use per the Food and Drug Administration (FDA)/Code of Federal Regulations (CFR).

Amniotic skin substitute allografts are denied as not medically reasonable and necessary under Section 1862(a)(1)(A) of the Act and the MPIM, Chapter 3, Section 3.6.2.2, as these products cannot be used for wound healing per the CFR and FDA.

**Overutilization:**
Documentation showed the provider billed for excessive amount of the products when the wounds were measuring much less and other sizes for the products were available. The provider documents that skin substitutes were the most appropriate for these wounds; however, the documentation did not support why a less expensive dressing couldn’t be utilized and why these products were more reasonable and necessary over other dressings. Medicare Program Integrity Manual, Chapter 4, Section 4.7.4, the UPIC shall determine if patterns and/or trends exist in the medical record that may indicate potential fraud, waste, and abuse. Medicare’s

Program Integrity Manual, Chapter 3, Billing excessive amounts of product without documenting waste would maximize the payment for the provider which is a concern for potential Fraud, Waste, and Abuse.

**Cloned Documentation:**
When Epifix or Artacent were used, the documentation contained the same entries which state, "Amniotic skin substitute allograft is medically indicated due to the relatively large size and nature of the wound/defect and that the defect is not amendable to Primary side to side repair. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated as the patient declined to accept the risks, complications and trauma associated with incisional types of repairs associated with "true reconstruction" (flaps & grafts) of the Primary defect. Amniotic skin substitute allograft is the most appropriate choice, required and medically indicated for repair and wound healing of the wound/defect in order to: avoid the risks, complications and trauma associated with incisional reconstruction; and optimize skin function and cosmesis; create a natural barrier with a skin substitute allograft, minimize scar tissue formation, minimize pain, minimize disfigurement and dysfunction associated with unwanted contraction; reduce the risk of infection and to decrease the time and demands which the patient is required to devote to wound care."

**Services Related to Non-covered charges:**
Both the Epifix and Artacent dressings were being applied using codes 15271 and 15275 (application of skin substitute graft). These codes are associated with the application/implantation of skin, or a biological substance intended to remain in the person for the purpose of helping the person's own skin cells to grow back. The CPT Codebook specifically states, "[a]pplication of non-graft [i.e., something intended to be removed] wound dressings is not separately reportable." As a result, any billed service(s) associated with the denied service(s) are also denied. If the purpose of a treatment is for a non-covered service, other services rendered that are related to the non-covered services are also non-covered.

**CPT Modifier "-25" - Significant E/M Service by Same Physician on Date of Global Procedure**

The National Correct Coding Initiative (NCCI) policy manual states, E&M services on the same date of service as the minor surgical procedure are included in the payment for the procedure. The decision to perform a minor surgical procedure is included in the payment for the minor surgical procedure and shall not be reported separately as an E&M service. Medicare requires that CPT modifier -25 should be used with the service is for a significant, separately identifiable E/M service that is above and beyond the usual pre- and post-operative work of the procedure.

Medicare requires that CPT modifier -25 should only be used on claims for E/M services, and only when these services are provided by the same physician (or same qualified nonphysician practitioner [NPP]) to the same patient on the same day as another procedure or other service. A/B MACs (B) pay for an E/M service provided on the day of a procedure with a global fee period if the physician indicates that the service is for a significant, separately identifiable E/M service that is above and beyond the usual pre- and post-operative work of the procedure. In other words, billing for an E&M service on the same day as a procedure is only allowed if there is a "significant and separately identifiable" service performed that is "medically necessary." The

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 8988-8993

closest graft in terms of size which was in stock which would allow for complete wound coverage, to include the vertical aspect, was utilized." The provider documented this statement for the Artacent application notes. This is a concern for waste and abuse.

****See the attached document for the remaining claims under appeal.**

## Citations Utilized:

Title XVIII Social Security Act (SSA), Sections 1156(a), 1815(a), 1833(e), and 1862(a)(1)(A);

21 Code of Federal Regulations 1271

42 Code of Federal Regulations 410.38(d)(1), 411.15(k)(1), 42 CFR 424.5(a)(6), and 42 CFR 424.57;

Centers for Medicare and Medicaid Services (CMS), Internet Only Manuals (IOM) 100-02 Medicare Benefit Policy Manual (MBPM), Chapter 15, Section 100 and 110, and Chapter 16, Sections 20;

Centers for Medicare and Medicaid Services (CMS), Internet Only Manual (IOM) System, Publication (Pub.)100-04, Medicare Claims Processing Manual, Chapter 20, Section 200;

Centers for Medicare and Medicaid Services (CMS), Internet Only Manual (IOM) System, Publication (Pub.)100-08,Program Integrity Manual, Chapter 3, Section 3.3.1.1, 3.3.2.1, 3.3.2.4, 3.6.2.1 and 3.6.2.2, and Chapter 4, Section 4.7.4;

2022 National Correct Coding Initiative (NCCI) Manual, Chapter 12, Section B;

Food and Drug Administration (FDA) Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products.July 2020;

Food and Drug Administration (FDA) Label, Ceftriaxone.

Joint DME MAC Article: CMS Issues Interim Final Rules with Comment (CMS-1744-IFC & CMS-5531-IFC) – COVID-19 Public Health Emergency – Revised 6/29/2020

American Medical Association, Current Procedural Terminology Manual

Healthcare Common Procedure Coding System Manual

Tides Medical (Artacent) Website, https://www.tidesmedical.com/
MIMEDX (Epifix) Website, https://www.mimedx.com/products/epifix/

***Submitted by:*** Angie Opfer, RN, CPC

***Date:*** September 13, 2023

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 8995-9398

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Denver, CO

| | | | |
|---|---|---|---|
| Appeal of: | ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA | OMHA Appeal No.: | 3-12683356911 |
| Beneficiary: | Multiple (See Attachment A) | Medicare Part: | B |
| Medicare No.: | Multiple (See Attachment A) | Before: | Jamie Mendelson<br>Administrative Law Judge |

## DECISION

After considering the evidence and arguments presented in the record, I enter a **PARTIALLY FAVORABLE** decision. The one unit of Negative Pressure Wound Therapy (NPWT) (CPT® code 97608) billed in claim number 3322320900392 for beneficiary M.F. with a date of service of April 1, 2022, is covered by Medicare. However, the remainder of all other line items and claims at issue, which include the application of skin substitute grafts (Current Procedural Terminology® (CPT®) codes 15271, 15272, 15275, and 15276), outpatient office visits (CPT® code 99212), ceftriaxone sodium injection (HCPCS[1] code J0696), and amniotic allografts (HCPCS codes Q4186 and Q4169), provided to multiple beneficiaries with dates of service from January 21, 2022 through May 23, 2022, are not covered by Medicare. The appellant is responsible for the non-covered costs.

## PROCEDURAL HISTORY

The appellant submitted 55 claims to Medicare for physician's services it furnished to 22 beneficiaries on the dates of service at issue. (File 13, pp. 95-102). The claims were initially reimbursed by the Medicare Administrative Contractor (MAC) as billed by the appellant. (*Id.*) However, CoventBridge Group, a Unified Program Integrity Contractor (UPIC), later performed a post-payment review of the claims and determined the claims had been improperly reimbursed by Medicare because the record did not support the services at issue were medically reasonable and necessary for the beneficiaries' treatment. (File 13, pp. 95-102; File 24). The MAC then sought to recoup the overpayment from the appellant. (*Id.* at 49-93).

The appellant, through an appointed representative, requested redetermination from the MAC. (File 14, pp. 8-10). The MAC issued an unfavorable redetermination. (File 13, pp. 16-23). In its redetermination, the MAC denied reimbursement for the amniotic allografts (HCPCS codes Q4186 and Q4169) at issue because it found the amniotic allografts were provided in a manner not explicitly approved by the FDA, and because the medical record did not support the services

[1] The Healthcare Common Procedure Coding System (HCPCS) has been developed by the Centers for Medicare and Medicaid Servicees (CMS) for processing, screening, identifying, and paying Medicare claims. See 42 C.F.R. § 414.2 and 414.40.

were medically reasonable and necessary for the beneficiaries' treatment. (*Id*. at 20). The MAC denied reimbursement for the outpatient office visits (CPT® code 99212) because it found the medical record did not support additional medical services, separately billable from the allograft procedures at issue, were performed by the treating practitioner. (*Id*. at 20-21). The MAC denied reimbursement for one claim for NPWT (CPT® code 97608) because it found Medicare's coverage requirements for NPWT had not been satisfied. (*Id*. at 21). Finally, the MAC found that the application of skin substitute grafts and ceftriaxone sodium injections at issue (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696) were not covered because those services were related to the amniotic allografts at issue in this appeal, which the MAC had determined were not medically reasonable and necessary. (*Id*. at 21).

The appellant's appointed representative then requested reconsideration from the Qualified Independent Contractor (QIC). (File 13, pp. 1-15, 33-44). In its request for reconsideration, the appellant argued that the amniotic allografts and related services were provided in a manner consistent with FDA approval and Medicare coverage criteria, that the application of amniotic allografts to repair surgical wounds is supported by medical studies, and the applications of the amniotic allografts at issue in this appeal were medically reasonable and necessary for the individual beneficiaries' treatment. (*Id*.) The QIC performed an independent review of the claims and issued an unfavorable reconsideration on June 9, 2023. (File 3). In its reconsideration, the QIC found the claims at issue were not covered by Medicare on the same bases articulated by the MAC at redetermination. (*Id*.) The QIC further found the appellant was liable for the non-covered costs. (*Id*.)

On August 8, 2023, the appellant's representative filed a request for a hearing before an Administrative Law Judge (ALJ). (File 4). With its request for hearing, the appellant submitted a prehearing brief outlining its arguments on appeal, which was added to the record. (*Id*. at 28-33). The appellant also appended other records, including procedural documents from the lower levels of review and ALJ decisions from other Medicare claims appeals involving the appellant. (*Id*. at 34-163). Because these documents are not considered new evidence, as they have no evidentiary value in this appeal, the documents were admitted to the record without a finding of good cause. *See* 42 C.F.R. § 405.1028 (requiring, as a general matter, a finding of good cause before new evidence may be submitted at the ALJ level of review). Prior to hearing, the UPIC notified my office of its intent to participate by submitting a position paper, which was also added to the record. (File 9; File 21; File 24).

I conducted a telephone hearing on October 11, 2023. (Hearing Recording (Oct. 11, 2023)). The following individuals appeared on behalf of the appellant: Amanda Willwert, attorney and the appellant's appointed representative; Dr. John Adams, owner of the appellant professional corporation and the treating practitioner; and Nancy Neusick, who appeared in an observational capacity only.

## ISSUES

Whether there is Medicare coverage and reimbursement for the physician's services, CPT® codes 15271, 15272, 15275, 15276, 97608, 99212, and HCPCs codes J0696, Q4186, Q4169, the appellant provided to the beneficiaries on the dates of service at issue. If the services are not covered, and an overpayment remains, who is responsible for the non-covered costs.

## APPLICABLE LAW AND POLICY

Section 1832(a)(2)(B) of Title XVIII of the Social Security Act (the Act) allows Medicare to pay for "medical and other services" under Part B. Section 1861(s)(1) of the Act defines "medical and other services" to include "physician's services," which is further defined under section 1861(q) of the Act as professional services performed by a physician.

An ALJ conducts a *de novo* review and issues a decision based on the administrative record, including any hearing record. 42 C.F.R. § 405.1000(d). The issues before an ALJ on appeal "include all the issues for the claims or appealed matter specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's favor." 42 C.F.R. § 405.1032(a).

The provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment. 42. C.F.R. § 424.5(a)(6).

Guidance for determining whether a service or item is reasonable and medically necessary in the absence of official guidance, such as a National Coverage Determination (NCD) or Local Coverage Determination (LCD), are outlined in chapter three, section 3.6.2.2 of the *Medicare Program Integrity Manual (MPIM)*.

Medicare does not cover "services 'related to' non-covered services. . .including services related to follow-up care and complications of non-covered services which require treatment." *MBPM*, ch. 16, § 180.

The MAC with jurisdiction has issued Local Coverage Determinations (LCDs), which are determinations on whether a particular item or service is medically reasonable and necessary and covered by Medicare. Act § 1869(f)(2)(B). Relevant here, the MAC with jurisdiction issued LCD L37228: Wound Care (LCD L37228) (effective Feb. 2022) with respect to Medicare coverage of NPWT. LCD L35494: Mohs Micrographic Surgery (LCD L35494) (effective Dec. 2020), and Local Coverage Article A57477: Billing and Coding: Mohs Micrographic Surgery (Article A57477) (effective Dec. 2020) provide Medicare coverage criteria and billing guidelines for Mohs surgery. An ALJ must give substantial deference to the guidance in an LCD. 42 C.F.R § 405.1062.

Notwithstanding any other provision of the Act, no payment may be made by Medicare for any expenses incurred for items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Act § 1862(a)(1)(A). If a medical service or item is denied coverage based on section 1862(a)(1)(A) of the Act, the limitations on liability provisions, set forth in section 1879 of the Act, may be applied to potentially limit a party's liability for the costs of the non-covered claim. Where there is an overpayment, section 1870 of the Act also provides for waiver of the overpayment only where an individual is "without fault" and where such recoupment "would be against equity."

## FINDINGS OF FACT AND ANALYSIS

The appellant seeks Medicare coverage and reimbursement for the physician's services it furnished to 22 beneficiaries on the dates of service at issue. (File 4, pp. 18-22, 28-33; Hearing

Recording). At the lower levels of review, the Medicare contractors found the amniotic allografts (HCPCS codes Q4186 and Q4169) at issue were not covered by Medicare because the allografts were provided in a manner not explicitly approved by the FDA and the medical record did not support the allografts, as administered by the appellant, were medically reasonable and necessary for the beneficiaries' treatment. (File 3; File 13, pp. 16-23; File 21; File 24). The Medicare contractors denied coverage and reimbursement for the outpatient office visits (CPT® code 99212) because they found the medical record did not support additional medical services, separately billable from the allograft procedures at issue, were performed by the treating practitioner. (*Id.*) The Medicare contactors denied coverage and reimbursement for one claim for NPWT (CPT® code 97608) because they found Medicare's coverage requirements for NPWT had not been satisfied. (*Id.*) Finally, the Medicare contractors found that the application of skin substitute grafts and ceftriaxone sodium injections at issue (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696) were not covered because those services were billed in conjunction with the amniotic allografts at issue in this appeal, which the Medicare contractors had determined were not medically reasonable and necessary. (*Id.*)

The Medicare contractors' bases for denying coverage and reimbursement for the amniotic allografts at issue, and the services related to the application of those allografts, were not beneficiary specific. In other words, the contractors did not deny coverage of those services for reasons that were specific to each beneficiary. The remaining services at issue, outpatient offices visits, and one claim for NPWT require an individual consideration of the relevant beneficiaries' medical records, as the Medicare contractors' bases of denial for those claims were specific to the individual claims filed by the appellant.

Because the Medicare contractors' bases of denial for the amniotic allografts and related services were of general applicability, this decision will first address whether those services are covered by Medicare. The remaining services at issue will then be addressed separately.

## I. Global Discussion Pertaining to Medicare Coverage of the Amniotic Allografts and Related Services (HCPCS codes Q4186, Q4169, J0696, and CPT® codes 15271, 15272, 15275, and 15276)

The appellant performs Mohs surgery, "a complex excision technique for the removal of high risk for recurrence skin cancers." (File 4, p. 29). The appellant states Mohs surgery provides a very high cure rate while also preserving the maximum amount of non-cancerous tissue possible. (File 4, p. 29; Hearing Recording). The appellant further states that, for each beneficiary in this appeal, the beneficiary required repair with amniotic allograft of a wound created during the performance of Mohs surgery. (*Id.*)

The Medicare contractors found the appellant's use of amniotic allografts to repair surgical incisions secondary to the treatment of skin lesions was not medically necessary under Medicare coverage criteria as outlined in section 3.6.2.2 of the *MPIM*. (*Id.*) The contractors also found that the appellant's medical records, as a general matter, demonstrated the appellant billed for excessive amounts of amniotic allograft, and that the appellant used cloned records, *i.e.* the same language, to justify the use of the amniotic allografts for each beneficiary. (*Id.*) Finally, the Medicare contractors found the physician's applications of the amniotic allografts were not reimbursable by Medicare because the amniotic allografts themselves were not reimbursable by Medicare. (*Id.*)

For Medicare to cover any item or service, it must be medically reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body

member. Act § 1862(a)(1)(A). When there is no controlling national coverage determination (NCD) or LCD, a medical service or procedure is considered medically reasonable and necessary only if the coverage criteria outlined in chapter 3, section 3.6.2.2 of the *MPIM* has been satisfied.

First, the appellant argues that the generalized coverage criteria contained in chapter 3, section 3.6.2.2 of the *MPIM* is not applicable in this appeal, as it contends the Medicare coverage criteria outlined in LCD L35494 and Article A57477, which provide coverage criteria for Mohs surgery, also encompass the amniotic allografts administered by the appellant. (File 4, pp. 29-31). Specifically, the appellant points to certain language in Article A57477 pertaining to documentation requirements, which state a provider's documentation in support of coverage for Mohs surgery should include:

11. Measurement of the primary lesion necessitating [Mohs surgery (MMS)] and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the MMS procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:
    - Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).
    - Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
    - It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.
12. When the surgical defect created by MMS requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve functional capabilities and to restore physical appearance.

Article A57477; (File 4, pp. 29-30).

However, LCD L35494 and Article A57477 deal with Medicare's coverage criteria for Mohs surgery, which, although the procedure that created the beneficiaries' wounds that were repaired by the appellant with amniotic allograft, is not among the services denied reimbursement by the Medicare contractors at the lower levels of review. LCD L35494 and Article A57477 do not explicitly address coverage criteria for any specific type of reconstructive technique. Although the guidance in Article A57477 states that providers should include sufficient documentation to support that the reconstructive technique performed by the provider was an appropriate choice, it does not provide any guidance on the use of the amniotic allografts utilized by the appellant, or any other type of reconstructive technique performed after Mohs surgery.

LCD L35494 and Article A57477, therefore, are not controlling in this appeal. Even if they were, however, it would remain necessary to determine whether the amniotic allografts used by the appellant would be considered an "appropriate choice to preserve [the beneficiaries'] functional capabilities and to restore [the beneficiaries'] physical appearance." Article A57477. Thus, it would still be necessary to determine whether the amniotic allografts were medically reasonable

and necessary for the beneficiaries' treatment. Because there is no published NCD or LCD providing coverage criteria for amniotic allografts, I find that the general Medicare coverage criteria outlined in chapter 3, section 3.6.2.2 of the *MPIM* is applicable in this appeal.

At the lower levels of review, the Medicare contractors found that the amniotic allografts did not satisfy the generalized coverage criteria contained in chapter 3, section 3.6.2.2 of the *MPIM* primarily on the basis that the FDA has approved amniotic membrane products, such as the amniotic allografts at issue, only for homologous use; and using an amniotic allograft to promote wound healing, as opposed to solely creating a permeable wound barrier, is not homologous use as defined by the FDA.[2] (File 3; File 13, pp. 16-23; File 21; File 24).

However, as pointed out by the appellant in its position paper and at oral argument, the FDA does not have authority to regulate how a physician practices medicine. (File 4, pp. 28-33; Hearing Recording). Furthermore, there is no statute, regulation, or sub-regulatory guidance that prohibits Medicare from covering a drug, biological, or other FDA regulated product administered by a physician for a purpose that has not been explicitly approved by the FDA.

Indeed, the UPIC acknowledges in its position paper that non-homologous use of amniotic allograft may be covered and reimbursed by Medicare when the coverage criteria outlined in chapter 3, section 3.6.2.2 of the *MPIM* has been satisfied. (File 21, p. 3). Thus, the Medicare contractors' reliance on the FDA's regulatory classification and approved uses of amniotic allograft is not dispositive in this appeal. Nor is it persuasive, as it is an almost meaningless distinction from a clinical perspective to differentiate between when an amniotic allograft is administered solely to provide a wound barrier (which necessarily promotes wound healing), and when it has been administered solely to promote wound healing irrespective of its capacity to provide a protective barrier between the wound and the outside environment.

Notwithstanding the above discussion, the Medicare contractors ultimately determined that the amniotic allografts at issue in this appeal where not reimbursable by Medicare because the coverage criteria contained in chapter 3, section 3.6.2.2 were not satisfied. (File 3; File 13, pp. 16-23; File 21; File 24). Thus, it remains necessary to determine whether the record supports that the amniotic allografts, in the manner they were administered by the appellant, were:

1. safe and effective;
2. not experimental or investigational; and
3. appropriate, including the duration and frequency in terms of whether the service or item is:
    - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
    - Furnished in a setting appropriate to the beneficiary's medical needs and condition;
    - Ordered and furnished by qualified personnel; and,
    - One that meets, but does not exceed, the beneficiary's medical need.

*MPIM*, ch. 3, § 3.6.2.2.

[2] *See* Regulatory Considerations for Human Cells, Tissues, and Cellular and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use, U.S. Department of Health and Human Services Food and Drug Administration, July 2020, https://www.fda.gov/media/109176/download (outlining FDAs nonbinding recommendations on homologous use of amniotic allografts).

In support of coverage, the appellant argues that the applications of the amniotic allografts at issue in this appeal were "based on established clinical criteria, community standards of care, guidelines from peer-reviewed medical journals, and internal review processes," and the use of amniotic allografts to treat the beneficiaries' wounds was, therefore, medically "reasonable and necessary and appropriately documented." (File 4, p. 28).

The appellant states there are generally three different options for wound repair after Mohs surgery: (1) leaving the wound open to heal without sutures or dressings (secondary intention); (2) primary side-to-side repair with sutures; or (3) reconstructive surgery, which includes grafts and flaps, and which may or may not involve sutures depending on the type of graft or flap used. (File 4, p. 29; Hearing Recording). When performing reconstructive repair of a patient that requires a graft, Dr. Adams testified that he only uses amniotic allografts to perform the repair due to the fact that amniotic allografts are superior to autografts (using a patients own skin), or other types of allografts. (Hearing Recording). Dr. Adams further testified that application of amniotic allographs is considered the standard of care in Kansas, where Dr. Adams practices medicine. (*Id.*)

The appellant cites to a peer reviewed study, as well as the coverage policy of a private insurance company, it argues establish the amniotic allografts at issue were not experimental or investigational as applied, and demonstrate the allografts were furnished in accordance with accepted standards of medical practice. (Hearing Recording; File 4, pp. 28-33; File 13, pp. 157-162, 169-253).

The peer reviewed study: Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane, published in the journal of Facial Plastic Surgery and Aesthetic Medicine in 2021, was coauthored by Dr. Adams himself. (File 13, pp. 157-162; Hearing Recording). Dr. Adams testified at hearing that all the participants included in the study were treated by him in his practice. (Hearing Recording). Notably, the study acknowledges that incisional repair utilizing autologous tissue such as local flaps and full-thickness skin grafts is the "mainstay of reconstructive techniques" after Mohs surgery. (File 13, p. 157). The purpose of the study was to demonstrate that placental allografts are a feasible alternative to incisional repair post-Mohs surgery. (*Id.* at 158).

The study population consisted of 286 individuals who were sorted into 143 matched pairs based upon propensity score. (File 13, pp.158-162). One half of the matched pairs received a full thickness autograft or flap repair after undergoing Mohs surgery, the other received a placental allograft. (*Id.*) Only three of the patients who received a placental allograft suffered from a post-operative complication, which under the study's design included infection, bleeding or hematoma, wound dehiscence, surgical reintervention, nonhealing wound, poor scar cosmesis, and scar revision. (*Id.* 158-159). Forty-one of the patients who received a full thickness autograft or flap repair experienced some type of complication as defined by the study, though the severity of the individual complications is not noted. (*Id.*)

Ultimately, the study found that placental allografts are a "safe and effective tool for repairing [Mohs surgery] defects of candidates who are not good candidates for traditional methods of autologous tissue reconstruction." (*Id.* at 161). However, the reliability of the study is limited by the fact that it was a retrospective study, composed of a relatively small and demographically homologous sample, where the results relied entirely upon the accuracy and thoroughness of the participant patient's medical records, which consisted entirely of patients of Dr. Adams, the owner of the appellant corporation. (*Id.* at 161; Hearing Recording). Thus, the results of the

study were dependent largely upon the professional judgment of one treating practitioner, who is also the appellant in this case. The study also does not attempt to compare the clinical benefit of amniotic allografts to other standard treatments, such as secondary intention, primary side-to-side repair, or other types of skin substitutes.

When read in a light most favorable to the appellant, the study appears to demonstrate that amniotic allografts can provide a superior clinical outcome to incisional repair. However, the results of one study does not establish that the amniotic allografts at issue were not experimental or investigational as defined under chapter 3, section 3.6.2.2 of the *MPIM*. The study explicitly acknowledges that amniotic allografts are not a standard of medical practice for the treatment of Mohs surgery defects as a general matter. (*See id*. at 157 (local flaps and full-thickness skin grafts are the "mainstay of reconstructive techniques")). The study also fails to demonstrate that amniotic allografts meet, but do not exceed, a patient's medical need, as the study does not compare the effectiveness of amniotic allografts against other types of skin substitutes or other types of non-incisional repairs.

The insurance coverage policy cited by the appellant was published by a private medical insurance provider, BlueCross BlueShield of Kansas, which is the state where the appellant is located. (*Id*. at 169-253). The policy outlines the provider's coverage policy for amniotic membrane and amniotic fluid. (*Id*.) The policy states that BlueCross BlueShield will cover amniotic grafts only for certain ophthalmic indications and non-healing diabetic lower extremity ulcers, and states that the use amniotic allografts for any other purpose is considered experimental or investigational and not covered by the insurer. (*Id*. at 174-175). The policy discusses the use of amniotic membranes for repair following Mohs surgery and cites to the study authored by Dr. Adams. (*Id*. at 209-213). However, BlueCross BlueShield determined the study was flawed for many of the reasons discussed in the previous paragraphs and found that additional evidence from well-designed prospective studies were required before there would be sufficient evidence to support that amniotic allografts for wound repair following Mohs surgery were medically reasonable and necessary and would be covered by the insurer. (*Id*.) Thus, the insurance coverage policy cited by the appellant fails to substantiate that the use of amniotic allographs to repair Mohs surgery defects is not experimental or investigational, or that it is appropriate, as described in chapter 3, section 3.6.2.2 of the *MPIM*.

The Medicare contractors also found that the appellant's medical records, as a general matter, demonstrated the appellant billed for excessive amounts of amniotic allograft, and that the appellant used cloned records, *i.e*. the same language, to justify the use of the amniotic allografts for the beneficiaries. (File 3; File 13, pp. 16-23; File 21; File 24). For those reasons, the Medicare contractors found that the appellant's medical records did not support that the amniotic allografts at issue were administered in an appropriate manner as defined in chapter 3, section 3.6.2.2 of the *MPIM*. (*Id*.) I concur with the contractors' finding that the appellant's medical records are replete with boilerplate language that should not be afforded significant weight, as the language does not specifically address the unique circumstances of the individual beneficiaries. (*See* File 13, pp. 387-2526). Dr. Adams also testified at hearing that he frequently uses and bills for more amniotic allograft than necessary to treat a patient because he is only able to obtain the allografts in certain sizes, and so it is Dr. Adams' practice to use and bill for all allograft contained in a package in the size he has on hand, even if the amount of allograft in the package is more than required to treat a particular wound. (Hearing Recording).

Based on the foregoing discussion, I find that the record available for my review does not establish that Medicare's generalized coverage criteria, as outlined in chapter 3, section 3.6.2.2 of the *MPIM*, has been satisfied. The use of amniotic allografts to repair Mohs surgery defects

has not been adequately studied. Thus, the use of amniotic allografts as administered by the appellant is still experimental or investigational. The record also does not support that the use of amniotic allografts to repair Mohs surgery defects is appropriate, as the record does not establish the use is in accordance with accepted standards of medical practice or one that meets, but does not exceed, a patient's medical need. Thus, the record does not support the amniotic allografts at issue were administered in a manner that was reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member as required under section 1862(a)(1)(A) of the Act, and the allografts are not covered or reimbursable by Medicare. Because the allografts (HCPCS codes Q4186 and Q4169) are not covered by Medicare, the appellant's application of those allografts and the ceftriaxone sodium injections (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696), are also not covered or reimbursable be Medicare. *MBPM*, ch. 16, § 180.

## II. Individual Claim Discussion Pertaining to Medicare Coverage for NPWT (CPT® code 97608) and Outpatient Office Visits (CPT® code 99212).

The Medicare contractors denied coverage and reimbursement for certain outpatient office visits billed by the appellant because the contractors found the medical record did not support that additional medical services, separately billable from the allograft procedures at issue, were performed by Dr. Adams. (File 3; File 13, pp. 16-23; File 21; File 24). The Medicare contactors denied coverage and reimbursement for one unit of NPWT because they found Medicare's coverage requirements for NPWT had not been satisfied. (*Id*)

### A. NPWT

The Medicare contractors denied one unit of NPWT, billed in claim number 3322320900392, which was provided to beneficiary M.F. with a date of service of April 1, 2022. (File 3, p. 14). The appellant did not provide any argument as to why the Medicare contractors' unfavorable determination was erroneous in its written brief or at the oral hearing. (File 4, pp. 28-33; Hearing Recording).

The MAC with jurisdiction offers limited coverage criteria for the application of NPWT by a physician during an office visit. LCD L37228 states, in relevant part, that:

> [NPWT] utilizing either durable or disposable medical equipment, involves the application of controlled or intermittent negative pressure to a properly dressed wound cavity. Suction (negative pressure) is applied under airtight wound dressings to promote the healing of open wounds **resistant to prior treatments**;

and

> There is moderate evidence in the peer-reviewed published literature to indicate that NPWT using a powered device approved by the U.S. Food and Drug Administration (FDA) is effective for a specific subgroup of patients who have failed a comprehensive, conventional wound therapy program that includes all reasonable, well-established alternative medical treatments. There is also moderate evidence to support the use of this therapy as an alternative to surgery. There is insufficient evidence to support the routine use of NPWT.

*Id*. (emphasis in original).

Beneficiary M.F. first began being treated by the appellant on October 1, 2021, for skin lesions on the beneficiary's scalp. (File 13, pp. 2089-2244). At that time, the beneficiary was diagnosed with squamous cell carcinoma on three separate locations on the

beneficiary's scalp. (*Id*. at 2089-2100). On January 7, 2022, Mohs surgery was performed by the appellant to remove two of the cancerous lesions. (*Id*. at 2104-2116). The appellant then provided wound care, consisting of the application of amniotic allografts through February 4, 2022. (*Id*. at 2117-2137). On that date, another Mohs procedure was performed to excise the third cancerous lesion, which was located on the beneficiary's right central frontal scalp. (*Id*. at 2141-2153).

The appellant then continued to treat the beneficiary's wounds with amniotic allograft on a weekly basis through the date of service at issue. (*Id*. at 2154-2224). On April 1, 2022, NPWT was used to help close the Mohs defect from the Mohs procedure previously performed on February 4, 2022. (*Id*. at 2225). At the time NPWT was initiated, the beneficiary's wound measured 6.5cm long, 5.7cm wide, and .3cm deep. (*Id*. at 2225). The wound measured 6.5cm deep, 5.5cm wide, and .8cm deep immediately after Mohs surgery was performed on February 4, 2022. (*Id*. at 2144).

Thus, contrary to the Medicare contractors' determinations at the lower levels of review, I find that the record supports that the NPWT was appropriate for the beneficiary. The medical record establishes the beneficiary's wounds had been resistant to previous treatment as required under LCD L37228. Although the record does not support that the beneficiary failed a "conventional wound therapy regime" when treating the wound, as the appellant exclusively used amniotic allografts to dress the wound prior to implementing NPWT, I find that that large size of the wound and the delayed wound healing as documented in the record warranted NPWT in this specific case. (*Id*.) Thus, the medical record supports that the NPWT provided to the beneficiary was medically reasonable and necessary pursuant to section 1862(a)(1)(A) of the Act, and the one unit of NPWT (CPT® code 97608), billed in claim number 3322320900392 with a date of service of April 1, 2022, is covered and reimbursable by Medicare.

**B. Outpatient Office Visits**

The Medicare contractors found that four outpatient office visits (CPT® code 99212) rendered to three separate beneficiaries did not satisfy Medicare coverage criteria. (File 3; File 13, pp. 16-23; File 21; File 24). Specifically, the Medicare contractors found that two outpatient office visits provided to beneficiary W.C. on April 4, 2022, and May 2, 2022, one office visit provided to beneficiary L.T. on May 17, 2022, and one office visit provided to beneficiary W.H. on Mar 23, 2022, were not covered by Medicare. (*Id*.)

The Medicare contractors denied coverage and reimbursement for these office visits because the contractors found the medical record did not support additional medical services, separately billable from the allograft procedures at issue, were performed by the treating practitioner. (*Id*.) However, Dr. Adams testified at hearing that it is his practice to assess other lesions, as appropriate, when his patients are being seen during Mohs surgery follow-up appointments. (Hearing Recording). Dr. Adams stated that it is his practice to bill separately for the periodic assessment of skin lesions, that these assessments are distinct and separate medical services from the application of amniotic allografts, and the documentation contained in the beneficiaries' medical records establish that he performed assessments of the beneficiary that were separately billable to Medicare. (*Id*.)

However, the medical records from the dates of service at issue do not substantiate that Dr. Adams performed any assessment services that would warrant additional payment from Medicare. (*See* File 13, pp. 659-688, 736-755, 1877-1883, 2000-2008). For example, the exam notes for beneficiary W.C. on May 2, 2022, state that the beneficiary was being seen by Dr. Adams only for a follow-up encounter for postoperative wound closure. (*Id*. at 736-755). The notes indicate that a general examination of the beneficiary's "scalp (including hair inspection), head (including face), neck, right upper extremity, left upper extremity, right lower extremity, and left lower extremity" was performed by Dr. Adams. (*Id*.) However, this cursory examination, or one very similar, was performed each time Dr. Adams assessed and dressed the beneficiary's surgical wounds. (*Id*. at 605-773). The record does not include any notation Dr. Adams was assessing any new skin lesions or was performing any medical services outside of post-operative wound care. (*Id*. at 736-755). The medical records from the other beneficiaries on the relevant dates of service at issue also fail to substantiate that Dr. Adams rendered assessment or evaluation services that were not included in the wound care services also billed by Dr. Adams. (*Id*. at 659-688, 1877-1883, 2000-2008).

The provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment. 42. C.F.R. § 424.5(a)(6). In light of the foregoing discussion, I find that the appellant has failed to provide sufficient documentation establishing that medically reasonable and necessary, and separately billable, assessment services were provided by Dr. Adams on the dates of service at issue. Thus, the record does not support the office visits at issue are covered by Medicare pursuant to section 1862(a)(1)(A) of the Act.

## III. Liability and Waiver of Overpayment

Since Medicare does not cover the denied services because the record does not establish that the services satisfied Medicare coverage criteria pursuant to section 1862(a)(1)(A) of the Act, I must now address who is liable for the non-covered costs. Where Medicare coverage requirements have not been met, waiver of liability pursuant to section 1879 of the Act may apply. The record contains no evidence that the beneficiary knew, or reasonably should have been expected to know, that Medicare would not cover the claim at issue. However, as a provider of Medicare services, the appellant is presumed to have had notice of the applicable statutes, regulations, and CMS coverage guidelines prior to billing for the services at issue. *See* 42 C.F.R. § 411.406(e). I find no evidence in the record to rebut that presumption. As a result, there is no limitation of liability for appellant under section 1879 of the Act, and the appellant is responsible for the non-covered costs.

The issue still remains whether waiver of the overpayment is appropriate. Where there is an overpayment, such as the case here, section 1870 of the Act prohibits recovery of Medicare overpayment from an individual who is without fault and when recovery would be against equity. Here, the appellant is a supplier of health care services, and as a participant in the Medicare program, had access to pertinent statutes, laws, rules, local coverage determinations, coding rules, and Medicare manuals, which contain the requirements for reimbursement under the Medicare program. I find the appellant is not without fault in causing or accepting the overpayment as the appellant should have known the services it provided were excluded from Medicare coverage. Medicare may, therefore, recoup the overpayment. Accordingly, pursuant to section 1870(b) of the Act, recovery of the overpayment from the appellant is not waived, and the appellant is financially liable for the overpayments at issue in this appeal.

## CONCLUSIONS OF LAW

I enter a **PARTIALLY FAVORABLE** decision. The one unit of Negative Pressure Wound Therapy (NPWT) (CPT® code 97608) billed in claim number 3322320900392 for beneficiary M.F. with a date of service of April 1, 2022, is covered by Medicare. However, the remainder of all other line items and claims at issue, which include the application of skin substitute grafts (Current Procedural Terminology® (CPT®) codes 15271, 15272, 15275, and 15276), outpatient office visits (CPT® code 99212), ceftriaxone sodium injection (HCPCS code J0696), and amniotic allografts (HCPCS codes Q4186 and Q4169), provided to multiple beneficiaries with dates of service from January 21, 2022 through May 23, 2022, are not covered by Medicare. The appellant is responsible for the non-covered costs.

## ORDER

For the reasons discussed above, this decision is **PARTIALLY FAVORABLE**. I direct the MAC to process the claims in accordance with this decision.

**SO ORDERED**



Jamie Mendelson
Administrative Law Judge

# PLACEHOLDER FOR PAGES FILED UNDER SEAL

## VOL. IV, PAGES 9411-9814

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**OFFICE OF MEDICARE HEARING AND APPEALS**

**DEPARTMENTAL APPEALS BOARD**

**MEDICARE OPERATIONS DIVISION**

| | |
|---|---|
| In the Matter of:<br><br>**ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA**<br><br>Appellant,<br>v.<br><br>**CENTERS FOR MEDICARE & MEDICAID SERVICES,**<br><br>Respondent. | Docket No. **M-24-1294**<br>Appeal No. **3-12683356911** |

The above-entitled matter came on for hearing pursuant to notice before **JAMIE LYNN MENDELSON**, Administrative Law Judge, at the **Office of Medicare Hearings via tele-conference, Wednesday, October 11, 2023, 9:32 a.m. Mountain Standard Time.**

# A P P E A R A N C E S

**On Behalf of the Appellant:**

AMANDA WILERT, ESQ
Attorney

Observer:

NANCY MUSICK

**I N D E X**



| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| John Adams | 9 | -- | -- | -- |

## E by H I B I T S

| EXHIBITS | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| Exhibits | 7 | 7 |

1

**P R O C E E D I N G S**

**(Time Noted: 9:32 a.m. MST)**

JUDGE MENDELSON: All right. We are on the record now in case number 3-12683356911. The appellant is Advanced Dermatology and Skin Cancer Center, PA. My name is Jamie Mendelson and I'm the administrative law judge assigned to hear this case for the Office of Medicare Hearings and Appeals.

Today is October 11, 2023, at 9:32 a.m. Mountain Time. This hearing is being conducted by telephone. On the phone line are three individuals. I'm going to have each of you please introduce yourselves for the record by stating and spelling your full name and, if relevant, briefly stating credentials. And we'll start with the appointed representative for the appellant.

MS. WILWERT: Thank you, Judge Mendelson. This is Amanda Wilwert, A-M-A-N-D-A, last name's W-I-L-W-E-R-T. I'm a licensed attorney in the state of Kansas and I represent Advanced Dermatology and Skin Cancer Center, PA. In the room with me is Dr. Adams, and I will let him introduce himself and spell his name.

DR. ADAMS: Hello. My name is John Adams. It's J-O-H-N A-D-A-M-S, and I'm a licensed physician in the state of Kansas.

MS. WILWERT: And the state of Nebraska.

DR. ADAMS: And Nebraska as well, yes.

JUDGE MENDELSON: And what is your position with Advanced

Dermatology, are you --

DR. ADAMS: I'm the owner.

JUDGE MENDELSON: Owner. Okay. Thank you.

DR. ADAMS: Yes, ma'am.

JUDGE MENDELSON: All right. And then I know we have one other individual who's only on the line to observe, but just for the record, please state and spell your full name.

MS. MUSICK: Yes, Judge. My name is Nancy, N-A-N-C-Y, last name Musick, M-U-S-I-C-K.

JUDGE MENDELSON: All right. Thank you. Today's hearing is being digitally recorded, and the recording will be made part of the complete record. Because this is being recorded, we do need to be careful not to speak over each other, and please be sure to speak loudly and clearly.

Because this hearing involves claims for multiple beneficiaries in order to protect personally identifiable information, please do not state any beneficiary's name during this hearing. In order to refer to an individual beneficiary, please do so by initials only. Let the record reflect that the Medicare contractors were also notified of this hearing, however they did not elect to attend the hearing. The UPIC CoventBridge did file a position paper.

This is a de novo hearing, which means I'm not bound by any of the prior decisions that have been made in this matter, and I'm conducting a reexamination of the facts. My decision

will be based on the exhibits that are entered into evidence as well as the testimony provided at this hearing. The burden of proof is on the appellant by a preponderance of the evidence. It appears from my review of the record that the jurisdictional prerequisites of timely filing and the amount in controversy have been met.

The issue that is before me on appeal is whether Medicare Part B covers the claims for the placement of amniotic membrane allografts and related procedures that were provided to the 22 beneficiaries on the dates of service between January 21, 2022, and May 23, 2022. And if it's not covered by Medicare, the next issue is who is then financially responsible for the non-covered charges and may any overpayment be waived. Counsel, do you have any objection to the issue statement?

MS. WILWERT: We do not have any objection.

JUDGE MENDELSON: All right. An index of the administrative record was distributed with the notice of hearing. Do you have any objection to entering the evidence into the record?

MS. WILWERT: No objection to the evidence.

JUDGE MENDELSON: Okay. Without objection, I hereby admit the evidence.

**(Exhibits admitted to the administrative record.)**

JUDGE MENDELSON: Before we proceed further, I'll place the testifying witness under oath, Dr. Adams.

DR. ADAMS: Yes.

**(Witness sworn.)**

JUDGE MENDELSON: So, counsel, I'll turn it over to you shortly. And I guess my suggestion, since all of these claims do involve similar facts and the same issue, I would suggest that you can address a lot of this through a global argument. I don't think we need to go through each and every individual claim. I think you can pick some representative ones if you want to go through the medical records. But I don't think it's going to be necessary to go through all of them.

But I will turn it over to you now to present your case. If I have questions along the way, I might interrupt. Sometimes it's a little difficult to interrupt, there seems to be a little bit of a delay, but I might interrupt with questions or I might have some questions at the end.

MS. WILWERT: Thank you, Judge. And that sounds good. For your, I guess, knowledge we have prepared, essentially, a global kind of argument, if you will, addressing the global issues. And then our plan was after kind of doing the global issues was to talk about or briefly address each beneficiary kind of quickly based on their individual comorbidities and circumstances in those situations.

The other thing I will advise to the Judge is that for file referencing purposes we did receive a copy of the appeal file. I requested one and it was delivered to our offices, and

I've reviewed those files. And file 13 has the most comprehensive set of records that we will be referring to today, both supporting documents as well as color medical records which, in our opinion, the color medical records are the most appropriate to look at because the photos are an important part of the medical record, and file 13 has color photos.

While the medical records are contained in other file numbers they are in black and white. And a black and white photo is not quite as telling as color. But throughout the day I will -- or throughout the testimony I will provide file page numbers and references for your convenience.

JUDGE MENDELSON: All right. Thank you.

(Whereupon,

**JOHN ADAMS**

was called as a witness and, after having been previously duly sworn, was examined and testified as follows:)

**DIRECT EXAMINATION**

BY MS. WILWERT:

Q. So I'll start. Dr. Adams, we've already done a full spelling and name -- of your name. Can you provide a brief overview of your educational background?

A. Certainly, I was -- excuse me. I was trained in Los Angeles, California at the DOC Medical School and did my residency in dermatology in Los Angeles as well, and then came

out to the Midwest and started practicing in dermatology and have been practicing Mohs surgery since 1993. And I've done -- been utilizing allografts since about 2016. And I have a practice in Nebraska and in Kansas and that's about it. Okay.

Q. And you are a published author on allografts; is that correct?

A. Yes.

Q. And can you please tell us what the name of that article is and the journal it was published in?

A. Sure. It was -- the name is the article Mohs Defect Repair with Dehydrated Human Amnion Chorion Membrane. And it was published at a peer-reviewed journal, Facial Plastic Surgery and Aesthetic Medicine. I think it was October 2021, I believe.

JUDGE MENDELSON: Okay. Wait. So let me just --

MS. WILWERT: And a copy of that --

JUDGE MENDELSON: Okay. Let me just clarify because I actually didn't realize that when I was reviewing the records in preparation for this hearing. So the study that was the journal article that was submitted, this Mohs Defect Repair with Dehydrated Human Amnion Chorion Membrane, so I guess I reviewed that, but I didn't pick up on the fact. So you were the author of this article?

DR. ADAMS: Yes.

JUDGE MENDELSON: Okay.

DR. ADAMS: I was listed as the fourth author, but it was actually at the end of the article. It just says, you know, I was the primary investigator. All the patients, all the data came from our office, and so. So I guess I was the --

JUDGE MENDELSON: Oh.

DR. ADAMS: -- primary investigator, but not the lead author, yeah.

JUDGE MENDELSON: Okay. So the -- because I -- okay. So the patients -- the retrospective study, the patient records that were used, they were all patients from your office?

DR. ADAMS: That's correct.

JUDGE MENDELSON: Okay.

DR. ADAMS: And at the end, I think it says I'm the primary investigator right there on the -- right there, author disclosure statement.

MS. WILWERT: Yeah. And that's -- so it was a -- what I'm looking at, Judge, is file 13 page 162. There is an author disclosure statement in which it talks about JRA, I think --

DR. ADAMS: Yes.

MS. WILWERT: -- which is Dr. Adams.

DR. ADAMS: Yeah.

JUDGE MENDELSON: Oh, okay.

DR. ADAMS: And then I'm the source. Up in --

JUDGE MENDELSON: Okay.

DR. ADAMS: -- up in front I'm the fourth author. I'm

listed as the fourth author there up in front.
MS. WILWERT: Yeah.
DR. ADAMS: Yeah.
MS. WILWERT: John R. Adams, MD on the first page starting on page 157. That John R. Adams is Dr. Adams.
DR. ADAMS: Yes.
JUDGE MENDELSON: Okay.
MS. WILWERT: And actually --
JUDGE MENDELSON: Thank you for the clarification.
MS. WILWERT: Yeah, I think, Dr. Adams can correct me if I'm wrong, but the patient is --
DR. ADAMS: Yeah.
MS. WILWERT: -- one of the patients in the --
DR. ADAMS: Yeah, actually the patient in the article is one of the patients in our audit.
MS. WILWERT: In his audit, yeah.
DR. ADAMS: I think those pictures are from the first audit though.
MS. WILWERT: Yeah.
DR. ADAMS: And but it's in the second audit also, yes.
MS. WILWERT: Yeah. But we'll talk more about that particular patient, JD, later today, so. But anyway, it's very good article. I'm glad to hear that you've already reviewed it.
BY MS. WILWERT:

Q. Getting back, I guess, into the overview of kind of the claims involved in this case, Dr. Adams, they're all -- every claim involves the repair and reconstruction of a post-Mohs surgery wound; is that correct?
A. Yeah, the vast majority by far. Yes.
Q. And so can you just briefly describe what post-Mohs surgery is?
A. Certainly. Certainly. You know, overall it's a specialized excision method for removal of skin cancer that yields the smallest wound with the highest -- excuse me, the lowest rate of recurrence, so the highest cure rate. The cure rate's over 99 percent, and you get the smallest wound. And this is done because Dr. Mohs just kind of was a great innovator and he just decided let's cut the tissue.
It's just -- all it is cutting the tissue horizontally. All tissue in medicine generally is cut vertically and they bread loaf it, so they just get samples. So you can't really tell for sure it's statistically clear because we take larger margins when we do that vertical sectioning. Kind of standard, the way most physicians remove skin and then it's processed in a vertical fashion.
But you really -- when you get that, the news that the margin is clear, it's clear based upon what they can see. But the problem is they're only looking at less than 1 percent of the margin, actually. So it's just by statistical analysis

throughout, you know, many, many years they've said, okay, we need six millimeters on this type of cancer margin-wise. We need 10 millimeters on this type of cancer margin-wise.

Now, Mohs surgery on the other -- Mohs surgery on the other hand, all those, you don't need to do those. You just take the tissue out with minimal margins, like 2 millimeter margins, tiny margins, and then under the microscope you get to see 100 percent of the cut edge margin. And that's why we can take small margins yet have the highest cure rate. It's a fantastic procedure. Thank you, Dr. Mohs.

And that's -- in a nutshell, that's what it is. It's just cutting the tissue horizontally, then when you look at it in a microscope you get to look at the entire cutting edge margin where you know every margin you get to see, and there's nothing that you don't get to see. It's a hundred percent right there in front of you.

So it makes it -- and then if there's a -- if there's cancer in an area like in, say, two -- and we orient everything on the face of a clock from the patient to the processing to the microscope on the slide. So when we look at it and we see, oh, there's cancer at two o'clock on the face of a -- at two o'clock on a slide, then we go back to the patient who's also oriented, we put a little check mark at 12 o'clock and then we go to two o'clock. And if there's cancer there, just take that.

So you don't have to take tissue from all the other areas, just specifically at that location. That's why in Mohs surgery it's, you know, an absolute requirement that the person who removes the cancer is also the person who reads the slides. And it's very important because there's times when the cancer's a little bit there, take a little bit, but there's a lot and take more. That's it.

Q. And so Mohs surgical wounds --

A. Yes.

Q. -- can be quite extensive --

A. Yes.

Q. -- is that correct?

A. Yes. Yes, because we're actually tracking the cancer. So the cancer's going someplace. We're going to -- we're going to continue. Because oftentimes there's what's called subclinical cancer growth, and you can't see it on top on the skin's surface. You can only see it once you get into the tissue.

And on the microscope you can tell which way it's tracking. Oftentimes we'll track, you know, four or five stages later, but all in one direction, say between two and three o'clock, just tracking in that direction. So again, it's tissue sparing in that we're not taking tissue from everywhere, just in that -- just where the cancer's at.

Q. And so when they're Mohs -- post-surgical Mohs wounds --

A. Yes, ma'am.

Q. -- they're generally accepted three different options for repair; is that correct?
A. Yes. Yes. It's either generally and historically secondary tension where you leave the wound open to heal, primary side to side repairs where you -- there's a hole and then you make an ellipse. You just take two little triangles, one from each side, remove those, they're called Burow's triangles, remove those and then suture it side to side, you know, and then you get a straight line.
And then the third option will be true reconstructive repair, which is generally flaps and grafts and variations of flaps and variations of grafts, and that's, you know, to include allograft in there too. So that's the third option, true reconstructive repair.
Q. And that true reconstructive repair or the graft repairs, that's typically the stage in which you're using an allograft, correct?
A. Yes. Yes, exclusively. Yes.
Q. And so can you walk me through, you know, an allograft repair, the types of allografts, when that's indicated, when you use it?
A. Sure. We --
JUDGE MENDELSON: Let me interrupt with a question here before we get into that. Can you just define for me and for the record what an allograft is?

DR. ADAMS: Yeah. Yes. An allograft is a -- well, the allograft that we use are amniotic allografts --

JUDGE MENDELSON: Well, I guess -- no, I first want to just start with the basic definition when the term allograft is used in --

DR. ADAMS: Oh, okay. Oh, I see. I see.

JUDGE MENDELSON: -- medical practice.

DR. ADAMS: It's used on the --

JUDGE MENDELSON: What does allograft mean?

DR. ADAMS: Yeah. It's an allograft -- well, an allograft is when you use a graft, it's from a different person of the same species, that's an allograft versus an autograft. And then were you wanting to know specifically what an allograft -- what it is as well, or -- okay. Yes. It's from -- it's a amniotic membrane derived human allograft. It's from the amnion and chorion, and then it's processed by the manufacturers of them. They get it from a donor.

You know, it's not part of any -- it's just part of the amnion and chorion of the sac, if you will, around the baby and the cord. And they process that tissue and they make sure that there's no infectious, you know, diseases or, you know, the patient has not had a history of hepatitis or AIDS or anything of that nature. And then they test the tissue as well, and then they process it to make these sheets of allograft from that amniotic tissue. And that's what it is.

JUDGE MENDELSON: Okay. But just to be clear, there are a multitude of other types of allografts that are not --

DR. ADAMS: Yes.

JUDGE MENDELSON: -- specifically these amniotic derived allografts that are at issue in this case.

DR. ADAMS: You know, I don't know about -- I'm not familiar with all the other types of allografts, you know. I really don't know about the other allografts, like, specifically. I know about the allografts that are utilized in most wound care centers and in Mohs surgery. There are different types. Well, I'm looking what do we have that would be an autograft. So I think for our purposes that's the only type of allograft that we utilize is the amniotic membrane derived amniotic membrane.

JUDGE MENDELSON: So in your practice you only use the amniotic derived --

DR. ADAMS: Absolutely.

JUDGE MENDELSON: -- allografts.

DR. ADAMS: Yes, ma'am. Yes, ma'am.

JUDGE MENDELSON: But there are other types of allografts; is that correct?

DR. ADAMS: I don't know. I don't know --

JUDGE MENDELSON: So in your training --

DR. ADAMS: -- any other.

JUDGE MENDELSON: -- in your training and years of -- I

mean, you said you started using these in -- I think you testified in 2016.

DR. ADAMS: Yeah, 2016. Right.

JUDGE MENDELSON: So before you started using the amniotic allografts, what were you using for repair and for Mohs surgery.

DR. ADAMS: Oh, just flaps, grafts, secondary tension. And that's all we had --

MS. WILWERT: And --

DR. ADAMS: -- historically, yeah.

BY MS. WILWERT:

Q. And so from a graft perspective historically the graft might be taken from the patient's skin there?

A. Oh, yeah. Yes. Yes. Those would be autografts taken from the patient themselves. And then, you know, like a donor area, say for instance, would be maybe if we had a spot on a patient's eyelid, you could take a piece of tissue from the other eyelid on the other side and place that onto the allograft, the area that needs the graft, or let's say, you could take right from the front of the ear. That's a good donor area where we would take tissue from there and perhaps put a graft on the ear or on the nose. That's a good donor area.

Also, the neck is a good donor area, and the inside portion of the non-hairy -- on the man, the non-hairy portion

of the forearm, the inside medial aspect or volar aspect. Those are donor areas and not from autograft.

Q. And so then prior to really allograft coming on the market, there wasn't an alternative, if you will?

A. Not that I'm aware of. I mean, no, not that I'm aware of.

Q. And at least in your practice and in your training and experience the amniotic allografts are the standard?

A. Yeah. Yeah, that's all that Mohs surgeons use. There's a product called Integra that I know that they use, but they don't use it in physician's offices. I believe it's only for hospital based or ambulatory surgery center based. And I would only get -- I couldn't say for sure what that was made of.

Q. And part of that is because, Dr. Adams, you -- all of your Mohs repairs are conducted in the office. You don't go to --

A. Yes, that's correct. That's correct.

Q. And so for your practice, you generally use two different types of allografts; is that correct?

A. Yeah, two manufacturers currently.

Q. And what are those manufacturers?

A. MiMedx, which produces EpiFix, and then Tides Medical, which produces Artacent.

MS. WILWERT: And, Judge, for your reference, we've provided the package inserts for both Artacent and EpiFix and they're in the file several times.

JUDGE MENDELSON: Yep, I've seen that.

MS. WILWERT: I have --

JUDGE MENDELSON: Nope, I've got it.

MS. WILWERT: Yes. Okay.

BY MS. WILWERT:

Q. And so are those -- are Artacent and EpiFix allografts recognized as standard of care in certain situations for dermatology services?

A. Yeah, they're the most used by anybody in the state of Kansas. I don't know of anybody in the state of Kansas that uses any other than those two brands. That's what everybody that I know of uses.

Q. And using those amniotic allografts is a technique that, in your professional opinion, is an appropriate choice to preserve the functional capabilities and restore physical appearance?

A. Absolutely. It's been a great asset.

Q. And in your professional experience, utilization of those allografts are safe and effective?

A. Yes.

Q. And also in your experience, those allografts are not experimental or investigational, are they?

A. No, they're not. They've been used for a long time, yes.

JUDGE MENDELSON: I'm sorry. Dr. Adams, you're coming across kind of mumbling. I need to make sure we're getting a good audio recording for the record, so if you could just --

DR. ADAMS: Okay.
JUDGE MENDELSON: -- maybe try to --
DR. ADAMS: Yes, ma'am.
JUDGE MENDELSON: -- speak up a little bit more.
DR. ADAMS: Yes, ma'am.
JUDGE MENDELSON: Thank you.
DR. ADAMS: Okay.
BY MS. WILWERT:
Q. And so then, again, in your professional opinion utilization of the Artacent and the EpiFix products are furnished in accordance with accepted standards of medical practice for treatment in Mohs surgical --
A. Yes, I believe almost all -- I only know of one Mohs surgeon in the state of Kansas that doesn't use it.
Q. Do they use -- do you know, do they use something else or --
A. Yeah, Artacent or EpiFix. Most people are using Artacent now. Most people are using Artacent now though.
Q. And so in your experience the LCD 35494 for Mohs surgery is the premier guidance on documentation and billing, is that correct, for Mohs procedures?
A. That's correct, and in conjunction with the LCA.
Q. And the LCA you just referenced, is the LCA 57477; is that correct?
A. Correct.

JUDGE MENDELSON: Wait. Can you -- wait. Hold on. Hold on. Repeat the LCA number please.

MS. WILWERT: It is 57477.

JUDGE MENDELSON: Okay. Just want to make sure.

MS. WILWERT: And a copy can be found in file 13, starting on page 268.

JUDGE MENDELSON: Thank you.

BY MS. WILWERT:

Q. And, Dr. Adams, that LCA is governing or is relevant to the local MAC contractor that you fall under, Wisconsin Physician Service; is that correct?

A. That is correct.

Q. And it addresses the Mohs procedure as well as the repair; is that correct?

A. Yeah, that is correct.

Q. And it also outlines the documentation requirements for repairs in paragraphs 11 and 12; is that correct?

A. That is correct.

Q. And let's talk about those documentation requirements quickly. So it requires measurement of the primary lesion; is that correct --

A. That is correct.

Q. -- to support the repair selected, such as secondary intention or use of flaps and grafts, and requires that documentation be included in the medical record?

A. Yes, that is correct.
Q. It also mentions postoperative photography; is that correct?
A. Yes.
Q. And having that postoperative photograph document the defect to be considered?
A. Yes, it supports your -- it supports your metrics and the location and the nature of the wound, where exactly is it. And, you know, there's an eye, but there's various parts of the eye or ear. And when you take a photo, that really gives you a much greater assessment of the situation.
Q. And the last kind of requirement from the LCA is that the surgical defect created, it should be clear in the documentation that the reconstructive technique performed, the secondary intention, grafts, use of allograft, that the technique chosen was performed as an appropriate choice to preserve functional capabilities and restore physical appearance; is that correct?
A. That is correct.
Q. And so you at Advanced Dermatology kind of formed your documentation practices around those requirements?
A. Absolutely, yes.
Q. And that includes photos; is that correct?
A. Photos, measurements of the -- preoperative measurements, preoperative photos, postoperative photos of the defect and

frequently of the wound assuming -- of the repair, and then as well as metrics, measurements of the defects as well.

Q. And you developed and changed, if you will, your documentation as time has gone on; is that correct?

A. Yes. We're constantly trying to make it better.

Q. And that includes making adjustments to the documentation in response to audits that you've received?

A. Oh, yes. Also, yeah, I think they're supposed to be educational and I take that seriously. And so whenever we're, you know, advised of stuff or someone -- even if I may not agree with it, I'll try to work around it and try to find something that I can get -- make positive about that and have to improve our notes to make them better for everyone.

Q. And so CoventBridge started auditing your use of amniotic allografts in 2021; is that correct?

A. Yes, the summer -- yeah, it's the summer of 2021.

Q. And so there's a different or I'll say a different audit that occurred in 2021, in which you submitted records and CoventBridge provided feedback. And based on some of that feedback you did make adjustments to the way you described the use of allografts in your medical record?

A. Yeah, I tried to -- I tried to clarify that and really include -- utilize documentation-type language more like directly out of the package insert -- the FDA preapproved package insert. And also there was some situations where I

felt it would be good to try to educate more. So we added an extra paragraph regarding what constitutes a unit in terms of allografts and that -- and the field of allograft treatment, and also to discuss more about how to calculate for a total wound service area and just the need for depth to -- not just a length and a width, if you will, because you need depth as well.

It's like if you are going to line your pool, say for instance, and you just took a length and a width of your pool, well, when you went through to put your new liner on to protect your cement, all you're going to have is the bottom covered and you're not going to have the sides covered. So therefore, depth has to come into play if you're going to provide for total wound surface area coverage, which is what we're supposed to be trying to do.

Q. And just so we're all clear about it, you did appeal CoventBridge's audit of those 2021 records; is that correct?

A. That is correct.

Q. And you took that all the way to ALJ hearing; is that correct?

A. That's correct.

Q. And have received decisions from an ALJ --

A. That's correct.

Q. -- on those items; is that correct?

A. That's correct. That's correct.

Q. And those were partially favorable or fully favorable to you; is that correct?
A. Yes. Yes, I think primarily.
MS. WILWERT: And, Judge, for your reference, if you haven't seen those decisions --
JUDGE MENDELSON: Some.
MS. WILWERT: -- they're in file 4.
JUDGE MENDELSON: I got them. Thank you.
MS. WILWERT: Yes, just double checking.
BY MS. WILWERT:
Q. So let's talk about the audit here quick.
A. Yes.
Q. So CoventBridge requested records again in July 8th of 2022?
A. Correct.
Q. And they were not favorable to you?
A. That is correct.
Q. And you appealed that decision to the MAC?
A. Yes.
Q. And then the QIC as well?
A. Yes.
Q. And we, for all intents and purposes, find ourselves here today; is that correct?
A. Yes.
Q. So let's talk, I guess, about the underlying decisions in

denying the services, which the denials focused on essentially whether or not Artacent and EpiFix were wound coverings or qualifying grafts; is that correct?

A. Yes.

Q. And the UPIC submitted a position paper in this case which you reviewed; is that correct?

A. Yes.

Q. And briefly it has several errors in it; is that correct?

A. Yes.

Q. Can you describe those errors for me?

A. Can you pull them up?

Q. Yep.

A. Okay. Oh, yeah. Okay. Got this here. And, well, the -- yeah, well, one of the patients in there is on page 6 is John Adams. And, you know, I think that's a typo. I mean, the -- and then I see -- because that's, I think, me. And then the CCN number goes to a patient EA in this audit, and that's her date of service as well.

And then the notes, and I assume these are the UPIC's comments to this somebody. And those are for -- the note is from a lower, what's called a lower extremity wound care clinic it appears to me. So I just -- I don't -- I'm not sure where that came from. I'm so lost.

JUDGE MENDELSON: I'm sorry. I was following that the name John Adams is a typo and you're saying that. I believe

you testified it --

DR. ADAMS: Yes.

JUDGE MENDELSON: -- seems to correspond to patient EA --

DR. ADAMS: Yeah. Yeah.

JUDGE MENDELSON: -- because of the date of service. But I'm not following what you said after that. Are you saying that it doesn't appear that they're reviewing the relevant progress note?

DR. ADAMS: That would be -- well, yes, this looks like a note from another office. That's not our note. I should say that's not our note or the UPIC police who they're referring to is not our office. We don't have any of that type of language. This looks like, to me, looking at this where it says the submitted documentation included progress note dated 2018. So it looks like this note was actually from 2018, so it's not the right year. And also this is beneficiary presented with two lower extremity ulcers. That's I don't treat those. And then they go on with --

JUDGE MENDELSON: You don't treat --

DR. ADAMS: Yeah.

JUDGE MENDELSON: -- lower extremity ulcers?

DR. ADAMS: Not in general, like a wound care center. I mean, I can, but this is a wound care center note is what I'm trying to say.

JUDGE MENDELSON: Okay. All right. Did you -- okay. And

I --

DR. ADAMS: And what I meant was --

JUDGE MENDELSON: I did make a note --

DR. ADAMS: Yeah, sorry.

JUDGE MENDELSON: -- that that beneficiary name did not exist in the list of beneficiaries at issue, so.

DR. ADAMS: Yeah.

JUDGE MENDELSON: Did you note any other incorrect --

DR. ADAMS: Yes.

JUDGE MENDELSON: -- beneficiary names or that they seemed to be reviewing a different note?

DR. ADAMS: Yeah, only -- the only thing they did was they just -- like on page 7, the next patient, REDACTED (ph.), they just copied and pasted that note again after they did the first one. So REDACTED that note and his everything, that's just a pasted note.

JUDGE MENDELSON: Okay. And, I'm sorry, because I mean, I said your name, which is not actually a beneficiary name at issue, John Adams, but for the actual beneficiaries at issue let's please just stick to initials only and not state any beneficiary's name.

DR. ADAMS: Oh yes, of course. Oh, yes. I'm so sorry. Yes. Okay.

JUDGE MENDELSON: And I guess for beneficiary we'll say --

DR. ADAMS: GP.

JUDGE MENDELSON: -- GP. I guess I'm not following --
DR. ADAMS: Yes.
JUDGE MENDELSON: -- what you mean when you say that looked like a cut and paste.
DR. ADAMS: Oh yeah, the --
JUDGE MENDELSON: From what?
DR. ADAMS: On page 7 it's listed. On page 7 it's listed, and then on page -- it's that same note -- exact note is also copied of GP's on page 9. They're the same.
JUDGE MENDELSON: Oh, I see. Okay. So then --
DR. ADAMS: Yeah, that's all.
JUDGE MENDELSON: -- on GP --
DR. ADAMS: Yeah, that's all. Yeah.
JUDGE MENDELSON: -- it's a redundance. It's a duplicate. They have GP twice.
DR. ADAMS: Correct. Correct.
JUDGE MENDELSON: Okay.
DR. ADAMS: Correct. Correct.
JUDGE MENDELSON: Okay.
BY MS. WILWERT:
Q. Now, let's -- I think we could go round and round about the individual beneficiaries, but for the purpose of our kind of overarching discussion here, let's start with kind of the broad overview denial reasons that the UPIC and the subsequent decisions the MAC and the --

A. Of course.
Q. -- QIC focused on in denying the claims at issue here. And so the first -- well, the first and second are that the products were not used in a homologous fashion and did not apply a graft as defined, which are verily related.
A. Yes.
Q. Can you please --
A. Certainly.
Q. -- describe why products not used in homologous fashion, why that is an incorrect conclusion or not a valid reason for denial of the services that you provided?
A. Yeah, the very first section of 1271 -- CFR 1271.1 of that part, the whole -- the entire document of CFR 1271, section 1271.1 deals with scope and purpose. And right there in scope and purpose it's just that this document only applies to manufacturers of allografts. And actually it's like the human tissue products which allografts comes under is what it's speaking to.
And in the first section it says this these allografts are -- this section only applies to those who manufacture the allografts. And then in section 1215.3(d), I think -- are we at (d), yeah, it expressly -- those are people that who does this document not apply to.
And (d), I think section (d) -- is it (d), yeah, 1215(d). Yeah, it expressly states that if you do not -- if you do not

-- well, what it says if you don't -- not manufacture this and you only, you know, I'm not reading it, but I'm paraphrasing, and if you're only procuring it and storing it and implanting the allograft, this document does not apply to you. So kind of both it tells the manufacturer is that this applies to you and it says this doesn't apply to and it doesn't apply to anyone who doesn't manufacture the product.

Q. And I guess just to be clear, you're not a manufacturer?

A. That's correct.

Q. And you're a provider that may store certain types of allografts, but --

A. Yes. Yes.

Q. -- do not distribute them?

A. That's correct.

Q. And so --

JUDGE MENDELSON: I'm just going to interrupt here with, it's not exactly on topic, but just because we are talking about the manufacturer of the product. I do just want to clarify, the manufacturer for the two types that you use, the EpiFix and the Artacent, do you have any relationship with that manufacturer or with those manufacturers?

DR. ADAMS: I don't -- well --

JUDGE MENDELSON: I'm sorry. I couldn't understand your answer.

DR. ADAMS: Professional relationship, sorry, yes. I have

professional relationship --

JUDGE MENDELSON: What does that mean?

DR. ADAMS: -- and whatnot. I've worked with -- I've done a, what do you call it, a -- well, the article itself was -- that we produced, that was paid for by my MiMedx and -- or subsidized by it. I didn't get any money for it, but I know the article and all the work that went into it, my understanding, that's who paid for it.

MS. WILWERT: Right. You don't have any ownership in --

DR. ADAMS: No. No.

JUDGE MENDELSON: And do you have --

DR. ADAMS: Oh.

JUDGE MENDELSON: -- any financial --

MS. WILWERT: And --

JUDGE MENDELSON: -- agreement with the manufacturers of these products?

DR. ADAMS: Not ongoing. I was paid to produce a webinar with MiMedx. Oh, that was about a year or two ago, but I have no ongoing financial relationship with them.

JUDGE MENDELSON: Okay. It was just for a webinar.

DR. ADAMS: Yes, ma'am.

JUDGE MENDELSON: Okay.

MS. WILWERT: It was like an educational little --

DR. ADAMS: Yes. Yes.

JUDGE MENDELSON: Okay. Sorry to go a little off topic --

DR. ADAMS: Oh, no problem.
JUDGE MENDELSON: -- but I just -- I wanted to --
DR. ADAMS: Oh, no.
JUDGE MENDELSON: -- ask that question and since we were discussing --
DR. ADAMS: Of course. Of course.
JUDGE MENDELSON: -- who manufactures it.
DR. ADAMS: Yes.
JUDGE MENDELSON: I just wanted to interrupt there. But counsel, please proceed.
DR. ADAMS: Of course.
BY MS. WILWERT:
Q. Thank you, Judge. And I guess a little bit related to that, you do have, like I said, professional relationships with these manufacturers; is that correct?
A. Yes. Yes.
Q. And so you have conversations with them about the products that they provide?
A. Oh, any question -- yeah, any question I have, I talk to them all the time. Yeah.
Q. Okay. Including this morning.
A. Yes. Yes.
Q. But from a financial perspective --
A. No. No.
Q. -- outside of -- I mean, you would submit a purchase order

to get the product --
A. Correct.
Q. -- but that's --
A. That's it. Strictly business, yes.
Q. And in, I guess, the collegial relationships that you've had with these manufacturers, you went to them when CoventBridge started conducting these post-payment audits?
A. Yes.
Q. And they even, at one point in time through this process, provided -- at least Artacent provided a support letter to help justify the use and the payment and, frankly, to address the homologous use allegation; is that correct?
A. Yes. Yes.
MS. WILWERT: And, Judge, it sounds like you're verily well versed in the record, so you may have caught this already, but that support letter, including a message or a letter from the FDA to Artacent, is in file 13, page 145 to 150, just talking about homologous use in these products.
DR. ADAMS: Correct. Correct.
JUDGE MENDELSON: Wait. Hold on. So this is from -- sorry. Let me back up. This is from --
MS. WILWERT: No, that's all right.
JUDGE MENDELSON: I got a little distracted typing some notes. So this is -- this letter is from Tides Medical. And who's Tides Medical?

MS. WILWERT: Tides Medical is the manufacturer of the Artacent allograft.

JUDGE MENDELSON: Okay.

MS. WILWERT: And as we were, I guess, addressing or trying to figure out how to respond to the homologous use allegations from the auditors, Dr. Adams reached out to his reps at the manufacturers and because again, the homologous use in the citation 221 CFR 1271.3 and .27 and various other citations to that part are really applicable to manufacturers. We looked to the manufacturers to help. And one of the things that the manufacturers provided us with and gave us authority to include in this audit was -- is that support letter.

BY MS. WILWERT:

Q. And EpiFix provided one as well; is that correct?

A. Yes, they did. Uh-huh. I mean, MiMedx. MiMedx who produces EpiFix, yes.

Q. Yeah.

A. Yes.

Q. So maybe just really quick, so we're all clear and on the same page, there's the EpiFix allograft?

A. Correct.

Q. And that is owned or manufactured by MiMedx?

A. That is correct.

Q. And you use that allograft?

A. Yes.

Q. And then there is the Artacent allograft?
A. Correct.
Q. And that is owned by Tides Medical?
A. That is correct.
Q. And you utilize that allograft?
A. That is correct.
Q. In addition to the citation to the CFR, the UPIC and QIC often rely on an FDA guidance document; is that correct?
A. Yes.
Q. Why is it not appropriate for them to rely on that guidance document?
A. Because that guidance document primarily relies on CFR 1271, which does not apply. It only applies to manufacturers of the product.
Q. And isn't it true as well that at least in other ALJ decisions, they have concluded that the FDA is not authorized to regulate the practice of medicine?
A. That's correct.
Q. And so as far as the allegations related to homologous use, we -- you utilized the products. I guess, I -- can you describe to me how you utilized the products both as a wound covering and otherwise?
A. The specific?
Q. Uh-huh.
A. After the post Mohs defect we assess things. And through

our kind of our algorithm of assessment and the solo assessment of the lesion where it's at, also the patient's medical indications or also their whole health history, we -- that's when we make a decision to use an allograft or not. And then we use it. We use it as a barrier/cover to cover the area and to protect it and to help with wound healing.

JUDGE MENDELSON: Let me interrupt with a question here. Obviously, all of the claims at issue before me you made the decision to use the allograft because that's what's at issue.

DR. ADAMS: Correct. Correct.

JUDGE MENDELSON: But do you perform Mohs surgeries in some instances where you assess the situation and make a decision to use a different form of repair, such as the secondary intention or the flaps or grafts?

DR. ADAMS: Yes, on -- virtually on all cases, yes. Yes, absolutely.

BY MS. WILWERT:

Q. And I guess to play off of that question a little bit, you know, when a patient walks in the door and you do the Mohs surgery, you don't always know what type of repair --

A. Yeah, with Mohs -- oh, I see. Yes. Yes, I understand. With Mohs surgery, like we were talking about before, after the first stage when we -- we see the lesion clinically, which you can kind of -- it's what you can see on the skin that you would think oh, that's where it's at. And so you remove that and so

that's your first stage.

And in Mohs surgery there's situations where clinically the lesion looks terrible, you think it's going to be five stages or something and you're one and done. Then sometimes it's a tiny little lesion, five millimeter, the size of a pea, five stages later you go -- it's very unpredictable. A good way to kind of think about it sometimes some of these tumors are like the tip of an iceberg, so you just know it doesn't -- there doesn't seem to be very much evident clinically on top and you go and do a stage, wow, it's completely cancerous at the base.

And then you go and take another stage, and so. And it continues on and it continue on -- it can continue on. Just it could be 100 percent spread or it could take off in a direction like I expressed earlier, like it could take off between the two and three o'clock points and just go. And you never know if they're going to be one or seven stages or more. So to answer your question, in Mohs surgery we never know what the outcome's going to be. We never know.

Q. And so once you're done with the Mohs surgery --

A. Yes.

Q. -- you assess the wound?

A. That's when, yes. That's when we assess it, yes.

Q. And if it looks like or in your professional opinion, it can heal on its own --

A. Yeah.
Q. -- you will do a secondary intention?
A. Yes. We go through all options generally.
Q. Right. And so then if it's a little bit larger, but you might be able to pull the sides together, you would do a secondary repair --
A. Correct.
Q. -- or primary side by side repair?
A. Correct. Correct.
Q. And then when we get into flaps and grafts --
A. Those are situations where we test the tissue and we assess the situation and if we cannot feasibly close that side to side, then we step up to true reconstructive repairs. And those were the grafts and flaps that we were speaking of prior. That's what that is.
JUDGE MENDELSON: So let me --
MS. WILWERT: And this might be the place --
JUDGE MENDELSON: -- interrupt here.
DR. ADAMS: Please.
JUDGE MENDELSON: So explain to me what criteria you use, what criteria you apply in deciding to go with the allograft versus the other options of repair. Is it a fact -- for example, is it a factor of the incision size, or I don't know if it's correct.
DR. ADAMS: Understand, yes.

JUDGE MENDELSON: Is it correct to call it a wound? Is it an incision --

DR. ADAMS: Yes.

JUDGE MENDELSON: -- or a wound?

DR. ADAMS: Yeah.

JUDGE MENDELSON: Okay. Is it a factor of the wound size? What --

DR. ADAMS: Right.

JUDGE MENDELSON: What --

DR. ADAMS: Yeah. Certainly.

JUDGE MENDELSON: -- are the factors that you're weighing in making this decision?

DR. ADAMS: Certainly. And just to step back for a second, just defect and wound totally synonymous, just to say that. And then, but what we're looking at is generally a size of a wound. I would say -- I would make a general statement that if a wound is two centimeters or less, we're not going to use an allograft. That's a general statement. But then you go to locations where --

JUDGE MENDELSON: When you say two centimeters, are you talking about two square centimeters, like area?

DR. ADAMS: No. No.

JUDGE MENDELSON: Are you talking --

DR. ADAMS: Well, yeah, I was speaking about --

JUDGE MENDELSON: When you say two centimeters what are

you measuring? Because is this --

DR. ADAMS: Certainly.

JUDGE MENDELSON: -- the area of the wound --

DR. ADAMS: Certainly.

JUDGE MENDELSON: -- centimeter squared or volume or what are you referring to when you say two centimeters?

DR. ADAMS: Literally just the flap -- and it's a great question because these surface areas are different, but because the -- literally what we're measuring is the skin surface area. Although there's no skin there, we when we are initially evaluating a wound for side by side repairs or flaps and grafts, we are taking two dimensions, and that does not take depth into account.

We take depth into account when we use an allograft, because an allograft, you have to cover the total wound surface area, not the skin surface area that's flat, but the total wound surface area that is depression. And like, that's why I give the analogy of a swimming pool changing your pool liner, I should say.

And so with, when we're doing that initial assessment, when I say a two centimeter region, I am talking about a 2 by 2 centimeter region, yeah, something that would have a width of say two centimeters or something like that. Yeah. Yeah. Yeah. Yes.

JUDGE MENDELSON: So --

DR. ADAMS: So like a width --
JUDGE MENDELSON: -- you're saying if --
DR. ADAMS: -- and a length. Please.
JUDGE MENDELSON: If we're going to look at it, if we were going to pretend that it was a perfectly flat surface area, you're saying --
DR. ADAMS: Yes. Yes.
JUDGE MENDELSON: -- if that surface area of the wound is 2 centimeters by 2 centimeters, so I guess that would be four square centimeters --
DR. ADAMS: Yeah.
JUDGE MENDELSON: -- or less --
DR. ADAMS: Yeah. Yeah.
JUDGE MENDELSON: -- you wouldn't even consider an allograft?
DR. ADAMS: Right. Like if we have a lesion on the back or chest or abdomen that was two centimeters, you can close those always, yeah. Yeah. And but now when we go to an area -- that's why I use the term relative in much of my documentation because it's so important. Two centimeters on your eyelid, your eyelid is -- that would -- 2 square centimeters, which you get 4 centimeters square, is about the entire amount of your eyelid.
So when I say -- when I say generally 2 centimeters, I'm not going to specific areas and certainly not on the face. But

on the -- like on the chest or abdomen or legs 2 centimeters or less, you can close, except for these lower legs. The shin area, you can't. That's you can't do that there. There's not enough --

JUDGE MENDELSON: Okay. So --

DR. ADAMS: -- you can even feel over your --

JUDGE MENDELSON: I just want to make sure I --

DR. ADAMS: Yes.

JUDGE MENDELSON: I just want to make sure I understand the testimony. So you're saying generally, and by generally you mean in certain areas of the body --

DR. ADAMS: Yeah. Yeah.

JUDGE MENDELSON: -- if it's 4 square centimeters or less, you wouldn't even consider an allograft. But then it sounds to me like you're saying there are exceptions based on --

DR. ADAMS: Yeah.

JUDGE MENDELSON: -- where your --

DR. ADAMS; That would be for --

JUDGE MENDELSON: -- wound is located.

DR. ADAMS: Yeah.

JUDGE MENDELSON: So like, explain to me what are the areas that would be exceptions to what you described as the general rule?

DR. ADAMS: Certainly. The areas around the eyelids, anywhere around the eyes, the ears, the lips, the nose. I

would -- if it wasn't greater than 2 centimeters on the cheeks, we would just close that with a flap or whatever we need to do -- a regular flap, or 2 centimeters on the forehead, we can do that, but on the areas of the eyes and -- eyes, temple, ears, this central facial area, excluding the mid portion of the cheek.

The mid portion of the cheek is the one area we could still close with 2 centimeters, not a problem, and we would need allografts. But on the eyelids, that's a 2 centimeter defect on the eyelid would be considered a huge defect. And I would certainly -- and even though a 1 centimeter defect on the eyelid, I would certainly use an allograft without question, or on the ear or on the nose or on the lip, the back of the hands, yeah. So those are -- or the, what we call the shin.

What's interesting about this is it's all -- it's almost exactly correlating to the Mohs areas. Mohs surgery -- and I didn't explain this before, but I will now. Mohs surgery, in general, is for the head, neck, hands, and feet, and also the shin. And those areas are the areas where it's more difficult to close. That's why with -- that's why Mohs surgery is indicated for those areas because those are areas that where tissue sparing is of paramount importance.

So in those areas, pretty much I consider, you know, all repairs, but in the areas of where you can close it, and I know I can, you know, the chest, abdomen, back is 2 centimeters, we

can close those, so that's not an issue. I wouldn't use an allograft in those situations.

BY MS. WILWERT:

Q. You also, in addition to considering size, location, you -- there's also comorbidities.

A. Oh, comorbidities are huge. Comorbidities are huge because with comorbidities, so many of them cause hypoxia, such as, you know, chronic obstructive pulmonary disease. And a lot of these patients need supplemental oxygen. They're on CPAPs. Their oxygenation is low. The area of the tissue itself is scarred up from prior surgeries because a lot of these patients that we do use allografts on have a lot of scar tissue.

When you have scar tissue, it really impairs your ability to do flaps and grafts. The tissue is inflexible and when you go to put it -- when you utilize it as a flapper graft, you have -- certainly with a graft, you have a much greater chance risk for necrosis, i.e., that not taking. And then with the flap you have a lot -- you have a higher risk but flaps are more robust, so you can expect some necrosis. But scar tissue is terrible to work in, and a lot of these patients have tremendous amount of scar tissue from previous surgeries. And it's evident in all the photos.

Q. And I think I'm --

JUDGE MENDELSON: Okay. So let me just -- let me just sort of bookmark this for when you get to going through an

example of the beneficiaries' medical records. And I will reiterate again --

DR. ADAMS: Certainly.

JUDGE MENDELSON: -- I don't think it's necessary to go through all of them. But when I reviewed the medical records, I was looking for documentation of comorbidities and I wasn't seeing that. So we'll just bookmark that for when you get to testimony going through --

DR. ADAMS: Okay.

JUDGE MENDELSON: -- a sample medical record.

DR. ADAMS: Certainly.

JUDGE MENDELSON: And frankly, the records look very similar in each case. It would be helpful for me to understand, at that point, if you could point out where you've documented the comorbidities that you're considering in making this assessment.

DR. ADAMS: Oh, absolutely. Absolutely. Yes, ma'am.

JUDGE MENDELSON: Okay. Thank you.

BY MS. WILWERT:

Q. And, yeah, so I think examples will be good there. So let's go back maybe briefly to the position paper and talk briefly about overutilization.

A. Okay. Certainly.

Q. There were allegations made related to overutilization. Can you address and describe our position related to the

overutilization?

A. Yeah, I think it -- I think there's some little bit of background that I -- quite frankly, I don't know that anybody would be familiar with unless they were in the industry. I have only just recently become familiar with it. And I saw it with the UPIC, is that what you -- yeah, the UPIC. When he cited some other grafts that could have been utilized, like a three -- a 2 by 3 centimeter allograft. This is for EpiFix by the way. He cited that we could utilize a 2 by 3, also a 3 by 3 allograft.

The problem is -- and those would be good to use it if they were available. What the situation is though, the 2 by -- let's see, the 2 by 3 centimeter allograft, that is only available, and this is in their brochures as well, that's only available to wound care centers and hospital-based wound care. It's not available for physician's offices. So that's the 2 by 3 centimeter EpiFix product.

Then the 3 by 3 EpiFix product, that one is -- what it is is it's underwater. It has not been sold to anybody in Kansas or Missouri for at least ten years. And, yeah, what I've come to find is that, you know, what's the history of this, because I was like, well, why on earth would a company make a product they don't sell?

And the background history of this that I just got this morning, quite frankly, was just that a lot of times, I guess

when they would make a product -- the manufacturing company would make a product, they would make it based upon certain criteria, whether a person was in a, you know, physician's office or a wound care center or a hospital-based situation, and it'd depend on their region too, that Medicare would set up pricing and it would fit this.

And I'm not expert here. I'm just trying to relay what I understand of it, why this occurs. And then with time, the Medicare standards change in terms of reimbursement or I think that's what it is. And then they will change what product they use, but they still have that product. And there's also another product that they do the same thing with. It's the 3 by 5.5 mesh allograft product. That one is 10 units, and they do the exact -- they did the exact same thing with that. They still have it on board, but it's underwater. And what I mean by that is if you purchase that product --

JUDGE MENDELSON: What do mean by underwater?

DR. ADAMS: Yep, going to go with that right now. Yes, ma'am. If you purchase that product, you -- the reimbursement is less than the purchase price. So if you purchase the product, when you go to apply it, you're going to lose money when you apply it, and you're going to also lose money in terms of the overhead cost to you too. So that's why no one has purchased it. And I don't think it's even been presented to any physician in the past, at least -- for sure ten years. I

can state that for sure.

And so that's why that occurs where they have these -- and I found out too that MiMedx EpiFix is changing the number of allografts they have because of this problem that they know they have. They have all these products listed, but they're underwater, yeah. And so I tried to find out why would someone do that, you know. And this is -- that was the explanation I was given. And then --

JUDGE MENDELSON: Let me --

DR. ADAMS: -- yes. And so now --

JUDGE MENDELSON: I just want to make sure I am -- I just want to make sure I'm understanding. So you're saying --

DR. ADAMS: Yes, ma'am.

JUDGE MENDELSON: -- if I'm following, you're saying there are some of these other sizes available. And, you know, one --

DR. ADAMS: Yes.

JUDGE MENDELSON: -- I think you said the 2 by 3 is not actually --

DR. ADAMS: Correct.

JUDGE MENDELSON: -- made available to physicians' offices. So its sounds like --

DR. ADAMS: That's correct. That's correct.

JUDGE MENDELSON: -- you're testifying you can't actually order that product.

DR. ADAMS: Of course.

JUDGE MENDELSON: But there are also --

DR. ADAMS: Correct.

JUDGE MENDELSON: -- other sizes that are available --

DR. ADAMS: Yes.

JUDGE MENDELSON: -- that, if I'm understanding, you could order it and purchase it, but you're saying the Medicare reimbursement amount, if Medicare covers your claim for that product, that you would get reimbursed a lesser amount of money than you paid to purchase the product from the manufacturer?

DR. ADAMS: That's correct. That's correct. And also that no one has purchased that product in the past ten years.

JUDGE MENDELSON: Okay. So what are the -- I mean, I guess it sounds like you're specifically talking about the EpiFix at the moment. What are the different sizes of the EpiFix that, you know, cost aside, could be made -- you could order?

DR. ADAMS: Cost aside?

JUDGE MENDELSON: Yeah, cost aside.

DR. ADAMS: You could order -- you could order any -- you could order anything on that list, I think. I don't -- you know, I think that's true. I don't know that that's true, but I think it's true because they have a list. I didn't ask them if I could actually buy it or if anybody could actually buy it, even if they -- no one did or no one wanted it. I don't know the answer to that.

JUDGE MENDELSON: Okay. And when you say the list, I'm sorry, is -- counsel, do we have this list in the record, the EpiFix list?

DR. ADAMS: It's in the brochure.

MS. WILWERT: Yeah, it's in the brochures.

JUDGE MENDELSON: Okay.

MS. WILWERT: So each of the Artacent and the EpiFix brochures list, you know, the wound sizes that you can buy. So like, I'm -- right now I'm looking on page -- file 13, page 138, which lists all the Artacent size numbers you could theoretically buy, you know, a 2 by 2 and 2 by 3. And so there's also one, you know, EpiFix's brochure, if I can get to it --

JUDGE MENDELSON: Okay. I see.

MS. WILWERT: -- with the size.

DR. ADAMS: Yeah, it's right on the brochures.

JUDGE MENDELSON: Okay. I see what you're saying.

DR. ADAMS: There it is. That's the brochure. That's it.

JUDGE MENDELSON: Okay. So tell me -- okay. So I think I'm following. In the claims that I have before me, let me just actually take a look at something. Okay. So the Artacent in the -- it looks like the codes billed for the Artacent and the EpiFix, it says per square centimeter. What --

DR. ADAMS: That's correct.

JUDGE MENDELSON: And so I guess the -- is it correct that

the units billed for these codes would represent the square centimeter?

DR. ADAMS: Generally, yes. The only issue is when there's a disc. The discs don't have corners. So although it's five units, it only provides for 4.5. So the smallest EpiFix product, and that's the one that -- that's the one that is available that people do use, is a 5 millimeter -- that's going to be a five unit, 24-millimeter disc, but that only provides for 4.5 centimeters square coverage because it's a disc. It's round, so it doesn't have the corners, if you will. That's the only kind that a 1 centimeter --

JUDGE MENDELSON: Okay. Because it's not a square. It's a circle. Okay. I think I understand that.

DR. ADAMS: Exactly. Exactly.

JUDGE MENDELSON: Okay. Think I can follow the geometry of that. Okay. But --

DR. ADAMS: Okay. It took me a while to figure it out, I tell you.

JUDGE MENDELSON: In your practice when you are ordering EpiFix or Artacent, is there one size that you're always ordering? Like what size are you ordering?

DR. ADAMS: With the EpiFix, I take the two smallest sizes of that. As I said, that's what everybody else does too. It's a 5 millimeter disc. The 5 millimeter -- excuse me. The five unit, 24 millimeter disc.

JUDGE MENDELSON: Wait. Wait. I'm sorry. With EpiFix you ordered the 5 millimeter disc and then a --

DR. ADAMS: Five unit. I order the five unit, 24 millimeter disc, and I order the 11 -- excuse me, the 4.0 by 4.5 centimeter mesh. That's an 11 unit product, 11 unit 4.0 by 4.5 centimeter mesh. And that one doesn't -- the meshes don't correlate with that 1 centimeter to one unit rule either because they're meshes, they have holes, and those, they were primarily made for lower leg wound ulcers.

And the holes in them were for drainage purposes because the lower leg wound, of course, needs to drain and drainage always needs to be documented. And you need to allow those wounds to drain because that helps them to heal. And the drainage would be impaired by the allografts, so you just you -- they have fenestrations in them, holes in them, so that it can drain.

And because of those fenestrations, it's almost half of the allograft is not a sheet because it's just punctured with holes. And so therefore it's 4 by 4 -- 4-1/2 which would equal, I think it's 18 square centimeters, but it's actually only 10.2 square centimeters of actual coverage because of the holes.

JUDGE MENDELSON: Okay. Give me a second.

DR. ADAMS: And that is in their -- that's in their literature as well, so, yes.

JUDGE MENDELSON: Okay. So when you say, like, the five unit, 24 millimeter disc and the 11 unit --

DR. ADAMS: Yes, ma'am.

JUDGE MENDELSON: -- 4 by 4.5 centimeter, I'm imagining -- does that mean, for example, the 4 by 4.5 centimeter mesh comes in a package of 11? Is that what you mean by 11 units?

DR. ADAMS: Yeah, they -- yes, 11 units. That's correct. It's 11 units are in that package. Exactly. That's correct.

JUDGE MENDELSON: Okay. And are they --

DR. ADAMS: And it's like --

JUDGE MENDELSON: This is, I mean, I'm not a doctor, right, so these might be dumb questions.

DR. ADAMS: No problem.

JUDGE MENDELSON: But does --

DR. ADAMS: No. No.

JUDGE MENDELSON: If you order an 11 unit 4 by 4-1/2 centimeter mesh, for example, can you --

DR. ADAMS: Yes.

JUDGE MENDELSON: -- open just one and use just one of the 11 units?

DR. ADAMS: Yes.

JUDGE MENDELSON: Okay.

DR. ADAMS: Yes.

JUDGE MENDELSON: Okay. And then give me a second because I want to look at something. Give me a moment here please.

DR. ADAMS: Sure.

JUDGE MENDELSON: Okay. So when you're -- if you're using -- like hypothetically, if you're using one 4 by 4-1/2 centimeter mesh, how many units are you billing for that then, for the code for, say, EpiFix?

DR. ADAMS: Oh. Sure. Sure. Whenever you open an allograft package and you utilize that, regardless of how much you don't, you know, use or whatever, if you were discarded or whatever you, you're reimbursed for that same amount. That's in the LCD (indiscernible) as well, yeah.

JUDGE MENDELSON: Okay. So --

DR. ADAMS: They kind of explain that carefully. So whatever you open up you --

JUDGE MENDELSON: I'm trying to understand is you're saying if you have an 11 unit 4 by 4-1/2 centimeter mesh package and --

DR. ADAMS: Yes.

JUDGE MENDELSON: -- the repair requires one of these units --

DR. ADAMS: Yes.

JUDGE MENDELSON: -- are you saying you bill all 11 units because you opened a package?

DR. ADAMS: That is how it's done, yes. That's the billing, yes.

JUDGE MENDELSON: Okay. I guess I'm trying to understand

because I just asked previously if you want to just use one, you could still -- you're not ruining the other ten. You can literally just open one.

DR. ADAMS: Oh. So --

MS. WILWERT: Yeah.

DR. ADAMS: No. No.

MS. WILWERT: So, Dr. Adams, maybe to clarify on that point, once you open a package, per guidance from the manufacturer and the LCDs and all that, you can't utilize any else of that package on another patient?

DR. ADAMS: That is correct. You cannot use it on anybody else and you have to document that you applied it.

JUDGE MENDELSON: Okay. So once you open a package and you use less than all of it, you -- are you saying you have to discard the rest of the package?

DR. ADAMS: Yes. Yeah. If you did -- yeah. If you didn't -- if you don't utilize it on that patient, you need to discard it.

JUDGE MENDELSON: If you don't utilize it at that time on that patient.

DR. ADAMS: That's correct.

JUDGE MENDELSON: The rest is discarded.

DR. ADAMS: And it's something I wish they would change so we could use it on that patient every time they come in on that same patient.

JUDGE MENDELSON: Okay.

DR. ADAMS: Yeah.

JUDGE MENDELSON: But could you order -- could you order for example, hypothetically, these 4 by 4-1/2 mesh allografts, can you order them in smaller unit amounts? Like why is it an 11 unit package?

DR. ADAMS: Yeah. The two smallest EpiFix packages, that's what we order, is the five that are available -- I mean, I should say that are economically, feasibly available are the five unit 24 millimeter disc, and the 11 -- the 4 by 4-1/2 unit mesh. So it's, if you look at the units, those are the two smallest sizes. Those other sizes between are not the 3 by 3 -- excuse me, yeah, the 3 by 3. And the one mesh that I discovered, they're not economically feasible. You can buy it, but you're going to be underwater and that's why no one's done it in over ten years.

And also I did want to mention too, that we always document -- we document how much was opened, how much was applied, and how much was discarded on every patient. We are a little different than lower extremity wounds where you have to allow for drainage and stuff. And that's why we even went to the point of putting fenestrations through the sheets of the allograft.

What I have found is that, you know, these allografts how they really work, although it's stated that they're a cover and

a barrier, yeah, you can do that, but you know, any of the literature will tell you that what are they really dynamic about, these things are full of stem cells and so therefore if you could put more allograft in there, you're going to get more stem cell in there.

The problem with the lower legs is that they need drainage, so they can only apply that much. And even with fenestrations, it's even better. For us, what I have found is I just have put more and more of the allograft to the point where I just use all the allografts to the product in general. That's what I do. I generally do not discard allograft, and I document that. I say what was opened, what was applied, and what was discarded.

JUDGE MENDELSON: So in terms --

DR. ADAMS: Sometimes it'd be discard it --

JUDGE MENDELSON: -- in terms of --

DR. ADAMS: -- yes, please.

JUDGE MENDELSON: -- billing then, are you -- if you are billing for the 11 units, are you --

DR. ADAMS: Yes.

JUDGE MENDELSON: -- does the billing identify how much of that was discarded?

DR. ADAMS: Yeah, well, if we did discard it, it would, but as I said, generally we don't discard it.

JUDGE MENDELSON: Wait. Okay. I'm sorry. I'm getting

lost because --

DR. ADAMS: That's okay.

JUDGE MENDELSON: -- I thought you were just talking about what you can't use at that moment on that patient you have to discard. And so explain to me again how you are not discarding.

MS. WILWERT: Let me ask a question here, Dr. Adams.

DR. ADAMS: Yeah. Yeah.

BY MS. WILWERT:

Q. So when a patient comes in and you do the Mohs procedure --

A. Yes.

Q. -- and you have the wound --

A. Yes.

Q. -- and you've gone through the analysis of the size and the location and all their comorbidities, you then look for essentially the smallest --

A. Yeah, size of a --

Q. -- I guess, right. So you try and then find, based on what is in your supply closet, the smallest size of allograft, correct?

A. Right.

Q. Along with -- which would inherently be the smaller the size is the fewer the units taken.

A. That is correct. Yes. Yes.

Q. And so in one circumstance you might have a wound size, for example, where you might need two packages of the four unit 24 millimeter to cover the area, correct?
A. Okay.
Q. And you would choose that over the 11 unit 4 by 4-1/2 if you didn't need all 11 units of the 4 by 4-1/2?
A. Yes, generally speaking, if it was in stock, absolutely.
JUDGE MENDELSON: Okay. So I --
DR. ADAMS: You go with the lowest possible, yes. Yes.
JUDGE MENDELSON: I'm following that. That all makes sense. You use, you know, the smallest that you can, you know, that you can choose from that's in your supply closet.
DR. ADAMS: Yeah.
JUDGE MENDELSON: But there's no way that it just magically happens to always equal the right amount that you need for that particular wound. So that's where I'm getting confused about your statement that you don't ever discard any. It seems mathematically impossible that it would always be exactly the right size.
DR. ADAMS: Oh, I think I see what you're saying. Yeah, we just put the rest of the allograft in there, into the wound. We pack it in. Yeah, because, you know --
JUDGE MENDELSON: So are you --
DR. ADAMS: -- you could take --
JUDGE MENDELSON: But does that mean --

DR. ADAMS: Yeah.

JUDGE MENDELSON: -- there's more allograft being placed than what is absolutely necessary because you're just -- you could have done a smaller amount, but because you opened a package, you're just going to use it all?

DR. ADAMS: Oh. You know, if we have more, if there's additional allograft, I, in my practice, I have found, again, this is not lower extremity wounds, I have found that putting as much of that allograft as we have -- if we have an allograft, if we have a wound and it's smaller than the allograft that we apply, the residual allograft that's left, instead of discarding it, we apply it additionally into that same wound.

MS. WILWERT: Right.

DR. ADAMS: Because the allograft is -- the allograft tissue, I think I need to explain this, is tissue paper thin. It is so thin that even in the package insert it says watch when you open it because it might float away. I mean, they go. I think it's in caps and bolden. This allograft material is like imagine a piece of tissue paper that you put water on and put that on a wound. It's like, wow, it's so transparent. It's so light. It's so very light.

So what we do -- and it's just full of stem cells. And so what we do is we just put the rest of the -- any residual allograft, we put it right into that same wound on that same

patient on that day. And that's why when we document amount opened 11 units, amount applied 11 units, amount discarded zero. Sometimes we do -- sometimes we don't apply everything. I generally apply -- or generally, I apply everything.

Q. BY MS. WILWERT: Let me ask a couple of questions here --

A. Certainly.

Q. -- to try and provide some clarification. So for Mohs wounds, where we're more regularly, I guess, using allografts on kind of the face is incredibly important that the wound stays hydrated to heal appropriately.

A. Yeah, and we have -- we actually have to add some hydrogel stuff while we're applying the allograft to keep the area -- we keep the area moist. That's why I say it just melts. It just literally melts. So therefore I could discard the rest and do that, but I have found that I think I get better results just keeping it in there. And just, you know, more stem cells, the better, honestly, because there's no negative, where there may be a negative on lower wounds that need to drain.

And then also, I think to the point, I do recall now in the supplemental letter the UPIC making some remark about if I am -- that I am not documenting the discard so that I can get more money. That is a very -- that's just wrong. You get the same amount of money whether you discard it or you don't. You just need to document where you put it. Hello?

JUDGE MENDELSON: Yes. Yes.

DR. ADAMS: Oh, sorry. Yes.
BY MS. WILWERT:
Q. So again, in your practice, this is not, I guess for the sake of comparison, applying one unit of an allograft is not really equal applying like a bandage to a wound.
A. That is correct.
Q. And so --
A. Because it has so many more active ingredients, and also it's not thick like a Band-aid, it's tissue paper thin. And I'm not exaggerating. On the package insert, it literally says that when you open it, be careful because these will float. It's so very thin and lightweight.
Q. And is there any guidance out there for how many, and I hate to say units of an allograft to use on certain wounds?
A. No. No, not that I've ever seen.
Q. And again the thickness of an allograft is not something that you can control or --
A. No. No, it's for -- it's paper thin but more delicate -- but more -- much more delicate.
Q. And I think, also maybe for the point of clarification as well, when you order grafts, do they come in, like, a box of multiple packages?
A. No, each one has its own box and everything. So, you know, any one of these specific allografts that we're speaking of has its own sovereign box.

JUDGE MENDELSON: Okay. So the --
MS. WILWERT: And --
JUDGE MENDELSON: So, like, the 11 units, each individual unit is separately sealed?
DR. ADAMS: No.
JUDGE MENDELSON: No.
DR. ADAMS: No, it comes in an 11 unit package.
JUDGE MENDELSON: Okay.
DR. ADAMS: 11 unit package.
JUDGE MENDELSON: The 11 units --
DR. ADAMS: Yep.
JUDGE MENDELSON: -- are sealed together in one package?
DR. ADAMS: Yeah. Yeah. And it's all -- it's -- what they do is the sheet where, you know, it comes from the amniotic membrane, the sheet contains -- so if you look at that, 11 units would indicate that that sheet that's in there is generally going to be -- if it's 11 units, it should be 11 centimeters square, but since this is a mesh, it's only 10.2. So that mesh is kind of a bad example.
But if we use another example say like a disc -- the 5-millimeter disc, if -- when you get that 5-millimeter disc it's a 5-millimeter disc that contains five units in it. And even with the 4 by 4-1/2 of mesh, that thing is 4 by 4-1/2 centimeters. It's a square like that, but it's got multiple holes, I mean, it's just fenestrated throughout and that

package has 11 units in it. So that 4 by 4-1/2 mesh has 11 units in it, contains 11 units of allograft product. And a 5 millimeter disc has --

JUDGE MENDELSON: So 11 squares of mesh? 11 different squares of mesh or rectangles?

DR. ADAMS: No. No. No, it's just 11 units. It's stays in its 11 units and it's a 4 by 4-1/2 centimeter mesh that contains 11 units of allograft. So that allograft is just that one 4 by 4-1/2 mesh. It's 11 units. And it's one little square. It's like a --

JUDGE MENDELSON: Okay. I was --

DR. ADAMS: -- almost like an alcohol --

JUDGE MENDELSON: I was misunderstanding then. I thought --

DR. ADAMS: I'm sorry. I thought we just explained it.

JUDGE MENDELSON: I thought when you were saying -- no, you probably did, but I didn't understand it correctly, so.

DR. ADAMS: Well, you know, this was -- yeah.

JUDGE MENDELSON: I thought when you were saying units, you know, say there's a disc, I thought it, you know, if there -- a five unit, 24 millimeter disc, I think you said earlier is one of the sizes --

DR. ADAMS: Right. Correct.

JUDGE MENDELSON: -- I, in my mind, was thinking that would be five different discs that were 24 millimeters in size.

DR. ADAMS: And that's exactly what happened to us in the first audit because it's very -- and I thought about it when he said it. I go, God, you know, if I didn't know this field --

JUDGE MENDELSON: Wait. Hold on.

DR. ADAMS: -- I'd think so too.

JUDGE MENDELSON: Hold on.

DR. ADAMS: Please.

JUDGE MENDELSON: I just want to clarify --

MS. WILWERT: Why don't you let her finish, please. Let her finish.

JUDGE MENDELSON: Wait. Hold on.

MS. WILWERT: Go ahead, Your Honor.

JUDGE MENDELSON: I couldn't hear what you just said, but Dr. Adams, when you say five unit --

DR. ADAMS: Okay.

JUDGE MENDELSON: -- 24-millimeter disc, is it you are saying that does not mean that there are five discs?

DR. ADAMS: That's correct.

JUDGE MENDELSON: Okay. So it means that the package is one 24-millimeter disc and that one 24-millimeter disc gets billed as five units?

DR. ADAMS: Because it contains five units, yes.

JUDGE MENDELSON: What is the unit then? Is it unit a -- what is the measurement of a unit? Maybe that's what I'm misunderstanding.

DR. ADAMS: Generally -- yeah, almost -- except for the discs and the meshes, because they have this, you know, the circle and the mesh in them, the general rule of thumb is 1 square centimeter of area would be covered by one unit of allograft, and therefore one unit of allograft is defined as 1 centimeter square. That's the size of it. That's what it'll cover.

MS. WILWERT: So I think -- I mean, maybe correct me if I'm wrong, if you --

DR. ADAMS: Please. Please.

JUDGE MENDELSON: Okay. So unit is a measurement of area and you're saying it's a 1 square centimeter area?

DR. ADAMS: That's correct. Yes. Yes.

JUDGE MENDELSON: Okay. I was missing that in my head and that's why I was getting confused. Okay. So --

MS. WILWERT: I think -- yeah. Oh, sorry, Judge.

JUDGE MENDELSON: No. Go ahead.

MS. WILWERT: I was going to say I think the way I had to understand it, and so Dr. Adams can correct me if I'm wrong, is I had to draw out like the 4 by 4-1/2 square and then essentially realize that each centimeter in that square, so to speak, contained the unit.

DR. ADAMS: Yes.

MS. WILWERT: And so that's how you got to 11 units in the 4 by 4 is you had to take the square and like draw out, almost

like playing a game of --

DR. ADAMS: Yeah.

MS. WILWERT: -- chess or Pictionary or something to find each centimeter or -- yeah, each centimeter unit --

DR. ADAMS: Yeah.

MS. WILWERT: -- to equal the 11.

DR. ADAMS: May I?

MS. WILWERT: Yes.

DR. ADAMS: If I -- if we may, I think because it's a mesh and a disc is the same concept as it's identical concept, but if we look at, like, the Artacent 2 by 2, it's the only one that's actually -- it's the only normal allograft in that those that are the two smallest in both companies. And if you look at that Artacent, the Artacent is a 2 by 2 centimeter mesh. It's not a disc. And it's not a -- excuse me, it's not a mesh. It's a solid allograft sheet.

JUDGE MENDELSON: Okay.

DR. ADAMS: So that 2 by 2 centimeter allograft, within it, you know, so if we do a 2 by 2 centimeters, we're going to say, now that equals 4 centimeters squared --

JUDGE MENDELSON: So that would be --

DR. ADAMS: -- and that equals four units.

JUDGE MENDELSON: -- four units then?

DR. ADAMS: Exactly.

JUDGE MENDELSON: Okay. Then I am following.

DR. ADAMS: Yes. Yes.

JUDGE MENDELSON: I am following now.

DR. ADAMS: And now if I might --

JUDGE MENDELSON: So the ones that are mesh, you're basically, you're taking what the square centimeters would be, I don't know what that is, maybe 18 square centimeters, and then you're subtracting out, well, there are all these holes. And so if you were doing --

DR. ADAMS: Yes. Yes.

JUDGE MENDELSON: -- the math problem --

DR. ADAMS: That's how you do it.

JUDGE MENDELSON: -- subtracting out the area of the holes you would get to it actually contains 11 square centimeters.

DR. ADAMS: Yeah, it's 11 square centimeters. That's exactly right.

JUDGE MENDELSON: Okay. I am following now.

DR. ADAMS: And as far as these examples, I go these are bad examples because it's a mesh and a disc, that's a bad example of -- to explain this concept.

JUDGE MENDELSON: Well, yeah.

DR. ADAMS: And so sorry about that.

JUDGE MENDELSON: I'm trying to remember the surface area of a circle. Is it 2 pi/r or something like that? I probably have that wrong. I shouldn't have said it out loud.

DR. ADAMS: No.

MS. WILWERT: No, there are plenty of times in this where I have said I went to law school so I wouldn't have to do this type of math, and here I am doing this type of math again. So again I think we've finally got all --

DR. ADAMS: Yeah. Yeah.

MS. WILWERT: -- on the same page here on the over utilization because again, we wanted to -- it gets confusing and we understand that, Judge. But it's been our impression from reading the auditor's decisions and findings that they misunderstood how the product comes, what a unit equals, and kind of how, you know, he might apply the full disc in a situation and not discard units.

DR. ADAMS: Oh, and I think that's -- if I may, Judge, I think that's what you were thinking, perhaps that we'd applied one unit up at 11, but I'd have 11 -- 10 other little boxes where it's an option for me to apply or not, yes. No, it's one little -- it's like an alcohol swab -- alcohol little packet. You just open that and that's where the allograft is. So yeah, that would have all the 11 units in it.

BY MS. WILWERT:

Q. Okay. So are there any other questions on that?

A. Yeah.

Q. Yeah, what else would you like to add, Dr. Adams, on that?

A. Okay. Yeah. Just on the overutilization issue, there was the -- there were the sizes that were not available to us --

well, not -- well, one size wasn't available, the 2 by 3, and then the 3 by 3 was not -- as I said, it was underwater. And oh, and also I just wanted to mention the discs. Those are a little smaller than they seem. Five units, five unit discs only equals 4-1/2 centimeters because it's square. And the Artacent has a 15-millimeter disc that is a two unit 50 millimeter disc, but only covers 1.77 centimeters squared of area.

And I think the other -- and the unit concept and the size, the different sizes, and then finally, the last thing on the overutilization was he's taking an area of length times width and utilizing that. And fine, that gives you, it's literally the skin surface area, but it doesn't give you the depth. If you don't include the depth in the equation, then you're not going to have enough allograft to cover the lining of your pool. So that was it. I'm done with that.

MS. WILWERT: Judge, did you have any other questions on the overutilization in the units and stuff? I know it's --

JUDGE MENDELSON: No, you can continue.

MS. WILWERT: -- been complicated.

JUDGE MENDELSON: Oh, I think I've got it straight now, so you can continue.

MS. WILWERT: Thank you. Okay.

BY MS. WILWERT:

Q. So one of the last or another kind of allegation is

related to clones documentation. Can you please, I guess, give your response to the allegation of cloning?

A. Yes. Well, as I said, we try to improve our notes all the time and add whatever we can and make things clearer or more concise, whatever. And what -- just in the issue of cloning, you know, we -- just overall it is so specific. These notes are the toughest notes for us to go through. They go through three processes because of all the math and equations that we use. And so I think that, you know, it's very -- it's our best note.

And so, but that being said, in terms of specifically about cloning, there's an Artacent note, there's an EpiFix note. And as I said, we, throughout the audit -- the prior audit, I saw what they said. I tried to make notes. We added a paragraph on what defines a unit, just kind of the discussion we had, so that it would help with anybody reviewing it.

That paragraph, I don't think it's in the -- I changed the notes so much during this audit period. There are so many various renditions of it. That's why cloning is hard for me to comprehend with that situation. And then also in May, in virtually almost in the midpoint of the of the period from which the charts were selected from, we vastly changed our note and added so much more to it. And we have, you know, it's like literally over a page difference and it's highlighted.

We actually have examples of that that we can provide, you

know, the names for you too -- not the names, but the initials and so forth. And so the allograft the procedure of how we apply the allograft is so much more extensive and detailed, yet they're very -- even the group of notes they have over and above that they're, in my opinion, not cloned generally, they are so varied in their changes in rendition, so many renditions of them, there's much more than just two changes. Oh my God.

I would say seven/eight different renditions in that six month period, because I was doing the changes, you know, thinking, okay, well they're talking about this, let me get that, so we have everything there for them to look at. And we put in the extra -- three extra paragraphs we put specifically for them, plus we put the article, the article that we -- that was published, and then we put the explanation of the units concept because in that first one he thought that exactly, yeah, a unit -- 11 units meant 11 packages. And so that's where I think he said 14 over utilizations on the last one and none of them came to be, so.

And then the last paragraph, we also added a full paragraph in depth on just the topic of depth in terms of its importance to understand how much allograft actually needs to be applied. Because it's not just the top, it's not just the surface area, it's the wound surface area. And that's what it says in the CPT, 15-275 CPT.

It says total wound surface area -- total wound surface

area, not total skin surface area or not, you know. That's what says total wound surface area. It says that about 17 times in two pages, so I think that's what they meant. And so to actually calculate the real total wound surface area you have to use depth in your equation. And we use a very simple equation. It's very simple, as I said.

It's just, you know, I think I said at the beginning that that equation is basically you're just getting the bottom of your pool, that area, and you're adding the length sidewall, the two sidewalls, and the sidewalls at the ends of your pools as well, and that's it. And that, so you add those three areas together and that's how you get total wound surface area.

Q. And so again, information in the medical record -- in the complete medical record for a patient would be changed each visit?

A. Oh, yes. There's so many different. Its name -- I don't have a chart in front of me, but there's so many different name, location, size of the wound, the type of allograft utilized, the comorbidity thing. And of course, we will go over those with you and show you. And we have a lot of comorbidities. And they really explain why we're using an allograft in lieu of using a flapper graft -- a standard flapper graft.

Q. And that even goes to as far as through subsequent visits. You were --

A. Oh, absolutely different, yes.

Q. -- tracking -- you were tracking the size of the wound.

A. Yeah.

Q. So the size of the wound would change --

A. Yeah. Yeah.

Q. -- from visit to visit, so you could track the healing process.

A. Yeah. Yeah, we track the wound via depth. And depth is something that everybody knows they need to do. Length times, width times -- that's our volume is what we track. And it's length times width times depth gives you your volume. And that's pretty standard in wound care of any sort.

That kind of shows you your progression of wound. Because oftentimes the top, the very top surface area or the, what do you call the skin surface area, that doesn't change much for our wounds until later because our wounds are kind of deep in most surgery. They're very focal. They're not the entire leg. It's just that area where the cancer was.

Q. And you also went so far as to individualize each patient's medical record by including photographs?

A. Oh, yes. Yes, photographs. Every visit we do photographs and we take the metrics of every visit. Yeah, that's essentially it. That's really it. The metrics of the wound, how it's doing that day --

Q. And --

A. -- and well, yeah. I don't have the note in front of me, but they're hard to do, so.
Q. We'll go through a couple of notes --
A. Great. Great.
Q. -- later today.
A. Great.
Q. So, you know, but again, typically, or at least in your experience, when you're utilizing allografts and you don't utilize them all the time --
A. No. No.
Q. -- but when you're utilizing them, the patients tend to have some of the same comorbidities; is that correct?
A. Yeah, absolutely. Absolutely. And a lot of it's like what we talked about earlier about oxygenation, scar tissue, and location. Those are really, really big issues.
Q. And I think going through some examples will help. So we'll move on to the next denial reason, which gets into the E&M service, the modifier 25. There were only, I believe, four patients where a modifier 25 service was identified and denied. Can you --
JUDGE MENDELSON: Wait. What are we --
MS. WILWERT: I think it's best that --
JUDGE MENDELSON: -- talking about with the -- what are we talking about with the modifier 25? What is that?
MS. WILWERT: So it's an evaluation of management code.

JUDGE MENDELSON: Oh, it's the E&M?
MS. WILWERT: -- where -- the E&M --
JUDGE MENDELSON: E&M codes.
MS. WILWERT: -- the E&M codes.
JUDGE MENDELSON: Okay. Thank you. I'm following now.
BY MS. WILWERT:
Q. Yep. So I think, Dr. Adams, it's best understood globally these E&M -- the E&M denials. If you kind of walk us through when a patient --
A. Sure.
Q. -- is in your office chair in a five hour Mohs procedure because they last for forever, kind of how that happens and how you document it.
A. Sure. Generally, you know, we have the patient scheduled for Mohs. And during that procedure, you know, they're in there for a long time. So on various times I'll come in there and say hey, you know, Doc, what about this one over here on my left temple or whatever. And I'll assess and say oh, that's whatever. You know, maybe it's something that we need to biopsy at some point or it's a benign lesion or something of that nature, and we document that.
And the thing with the E&M visits with the modifier 25 is, you know, as you know, it's a separate and significant identifiable problem, significant. You know, most of the time modifier 25 is utilized, from my understanding, is when, like,

a situation like where somebody has a cut on their forehead and they come in to the office. They need to have -- it's a young boy, eight years old, fell on his head, has a cut on his forehead. You're going to have to stitch that up, but you absolutely better do a neurological examination to make sure he's not having any intracranial bleeding, of course.

So in that situation, this is where it's separate, significant in terms of this neurological examination is more than just suturing up that forehead because you're doing a separate neurological examination as well, and that's significant. And those -- that's where most of these modifier 25 are. And I think that's where it gets to be a judgment call somewhat.

In our situation, and this is the only way that I use the modifier 24 -- 25, is when there's a separate problem. I don't do the significant because I think it's too gray of an area. We have a separate diagnosis that has nothing to do with the procedure that we're working on, A.K. such as Mohs surgery, or maybe we're applying another allograft to somebody and -- but this site is clearing. We're not -- we decided, okay, that's healed up enough and we're not going to -- we're not going to pursue and apply another allograft.

In those situations that -- those two diagnoses, they're the same diagnosis, but they're not on the same person. I mean, it's not the same -- it's not the same body part. It's

not the same wound. It's not the same care. So in that situation that actually is -- well, that is one -- no, it's not because they're absolutely separate. They're not separate significant. It's actually two entities.

Because one, you know, let's say we were doing an allograft on an arm and one on a forehead, and so the one on the -- they come in one day and I say, okay, the one on an arm is okay, but that one on your eyelid, we -- or wherever, that needs to be on there a little more because I don't want that to contract. And so in that situation, the one on the forearm would just go out as an E&M visit, post op check and the one on the temple would go out as an allograft or -- yeah, in that situation we would apply allograft.

The most common situation that I have is with -- and that was actually in this audit. That was one of the situations with WC. That's his situation where there's he had multiple allograft applications and as they were going down, like, one would be okay. So, like, that one I didn't feel needed any more allograft, but the others did. We did a modifier 25 on that and billed that as an office visit because we had all the elements there that were necessary. We had the exam, the plan of action, what we're going to do right there.

And then the other situation was, as Ms. Wilwert was speaking of, was when we have a Mohs case and the patient says hey, what about this? And that's where you have a separate

diagnosis in a separate location. In both cases, they're totally separate and -- but one has a different diagnosis as well. And that those are the situations for the E&Ms. And they're very clear. They're very well documented. I've reviewed those very, very closely, so.

MS. WILWERT: All right.

JUDGE MENDELSON: All right. This is a --

MS. WILWERT: I think -- yes, Your Honor.

JUDGE MENDELSON: I'm just going to take this breaking point, counsel, to just -- I'll give you two options. So I have a mandatory meeting scheduled from 12:15 to 1:15 p.m. Mountain Time. So option A is if you want to wrap up before my meeting starts. Option B is we'll break at the time I have to go to my meeting and we'll reconvene at 1:30 p.m. Mountain Time. So I just want to give you a heads up on the schedule here.

MS. WILWERT: I appreciate the heads up. I think we'll be hard pressed to finish in an hour. We can certainly try, but because we're at the point where we will, you know, kind of dive into the beneficiaries. And so I'm guessing we're going to have to do option B just so we can ensure that we present our case as thoroughly and accurately as possible.

JUDGE MENDELSON: Okay. So we'll go until 12:10 p.m. Mountain Time. Sorry, I don't know what time zone you're in.

MS. WILWERT: Right. Central.

JUDGE MENDELSON: And then we'll take a break then until 1:30 p.m. Mountain Time.

MS. WILWERT: Okay. And so with that then, Judge, I think we've reached the point were talking through the beneficiary to provide some examples would be good. And so we will start with beneficiary EA. And again, their full color medical record can be found in file 13, starting on page 388.

JUDGE MENDELSON: 388. Okay. I'm going to follow along in the medical records, so that is helpful. Thank you.

MS. WILWERT: And again, Judge, for your knowledge, based on the length of time the medical records were requested, you'll see some notes that span prior to, say, January 2022. And that's because that note may contain the actual Mohs procedure.

And so when we were responding to the medical record request we felt it was relevant to provide the actual Mohs note for the auditor to see that, you know, Mohs procedure was performed. And so that can sometimes -- I just wanted to make sure that it was clear why at times there were notes from -- that preceded the audit.

JUDGE MENDELSON: Okay. Understood. And so for this bene, EA, the two dates of service at issue are 5/2/22 and 5/16/22, correct?

MS. WILWERT: That is correct, yes.

JUDGE MENDELSON: Okay.

MS. WILWERT: And the 5/2/22 has the denial code -- or the procedure codes denied is -- now I'm going to get the numbers mixed up.

JUDGE MENDELSON: I've got all of that in the chart.

MS. WILWERT: Okay.

JUDGE MENDELSON: I think it was -- now, I can't -- I don't know if I pulled this chart from the redetermination or the reconsideration, but it lists all of the procedure codes at issue for each date of service.

BY MS. WILWERT:

Q. Great. And so, Dr. Adams, on 5/2/22, what type of services were going on with this particular beneficiary, and --

A. Sure.

Q. -- what justified the services provided?

A. Sure. Well, let's see here. So the 5/22, so the left -- we'll can do the left distal pretibial region first. And --

JUDGE MENDELSON: And that's the leg, correct?

DR. ADAMS: That's correct.

JUDGE MENDELSON: Okay.

DR. ADAMS: That's the part that I was talking about. It's hard -- be difficult to close that side to side. Anyway, it's a -- it is a small wound, but there's not a lot of skin there. It's very difficult to move. The suture will probably just shred right through that if you try to pull that together.

Anyway she's got -- oh, thank you very much. She's got

significant scarring in the area and, of course, she's greater than -- she's over 60 years old.

JUDGE MENDELSON: Well, so where are you? So I'm at the note, file 13, page 417, the visit --

DR. ADAMS: Oh, okay.

JUDGE MENDELSON: -- note for May 2nd, 2022. And so I want to follow along with what's documented in the note.

DR. ADAMS: Okay.

JUDGE MENDELSON: So when you say she has significant scar tissue, please tell me where I'll find that in the medical record.

DR. ADAMS: Certainly. Okay. And we'll go to the -- we'll keep on going and go to the page on -- I'll go to the Mohs. Okay. Go to the Mohs page.

MS. WILWERT: And just to clarify --

DR. ADAMS: Yes.

MS. WILWERT: -- here first, let's walk the Judge through this now.

DR. ADAMS: Oh, right. So she has --

BY MS. WILWERT:

Q. So starting on page 417, we have the impression and the plan. And this starts with the description of the Mohs procedure that was performed that day; is that correct?

A. Yes, it does. Uh-huh.

Q. And so it kind of walks us through the indications for the

Mohs surgery --
A. Correct.
Q. -- at the bottom of page 417. And following into all of your justification for the Mohs procedure, which again, there's no issue with the Mohs procedure, correct?
A. Right. Yeah.
Q. Or there's no denial of the Mohs procedure?
A. Right.
Q. And so the Mohs procedure and the documentation related to it goes on for several pages; is that correct?
A. Yes.
Q. And so now we're at the bottom of page 419 where there's bolding in stage one --
A. Right.
Q. -- and it gives us --
A. That's Mohs. Uh-huh.
Q. -- the final defect size of the Mohs.
A. Correct. That's correct.
Q. And that final defect size is 1.2 centimeter by 1. -- by 1 centimeter, correct?
A. Correct.
Q. And so then we get into --
A. The allograft.
Q. -- the allograft note, which is really starts on page 420. And there's the two encounter for planned postoperative wound

closure plan, Artacent application; is that correct?
A. Yes. Yes, that's correct.
Q. And so this -- walk us through --
A. Yeah, I will. I will.
Q. -- that note.
A. So I will. That's wonderful. So as you can see, we, in terms of details, we have the detail of the location. We have the detail of -- and I'm speaking towards the allegation of Mohs cloning which, yes, which was made before on the Mohs notes as well in the first audit. But that was thought not to be.
So anyway -- but anyway, we have the assistant, the location, the type of repair. We have the defect size. These are all specific to this patient, what size allograft we're using, the blood loss. And then looking up here, let's see here, and then the allograft application number, which allograft application number it is. That's not required, but we put it in there. I think it's a good idea. And then we have the number units open.
JUDGE MENDELSON: So just wait. So application number just means this is the first time you're applying to this wound because you just performed the procedure?
DR. ADAMS: Yeah. That's correct.
JUDGE MENDELSON: Okay.
DR. ADAMS: I just find it helpful to me when I go back

and look at one note so I don't have to look at, okay, which application is this, so we added that. And --

BY MS. WILWERT:

Q. And can I pause for a second?

A. Please.

Q. At times you need multiple applications.

A. Oh, yeah. Yes. Yes, absolutely. And that's per the package insert too. It's to be for the package insert for both it's just to apply weekly as indicated. And then we have the units and then we have the ID number, the expiration number. These are all individual. And then we have the volume, because we multiply that up and that's where you get the -- that's how you can see progression.

And then the previous visits volume was not applicable because we didn't have a previous. And then we have the examination, reveal the clean, fresh postoperative wound bed with no signs of infection, and there you go. And if we did have an infection we, in lieu of doing this note, we would switch to another note. We wouldn't even use this note if it was an infection. If there's anything wrong with the wound bed or anything, we use a different note.

So that's something that I just wanted to say, so good. And then here we're going through the consent. And then, okay. Go back up please. The consent and then --

JUDGE MENDELSON: Well, while we're on the --

DR. ADAMS: And this is where we have --

JUDGE MENDELSON: -- while we're on the consent --

DR. ADAMS: Yes.

JUDGE MENDELSON: -- you know, it appears that this is -- this wording is the same in all of the notes, or maybe there were permutations of it if you changed it over time, but --

DR. ADAMS: Right. Yep. Yep.

JUDGE MENDELSON: -- the consent part, the way it reads to me is that you -- I'm assuming this happens before the Mohs surgery, but you inform the patient that there are different options for --

DR. ADAMS: Correct.

JUDGE MENDELSON: -- the defect repair or wound repair.

DR. ADAMS: Correct.

JUDGE MENDELSON: And you inform them of the three options that you testified about kind of early on in this hearing, right? The --

DR. ADAMS: Correct.

JUDGE MENDELSON: -- I might get this wrong, this very --

DR. ADAMS: That healing tension, right?

JUDGE MENDELSON: Yeah. So either just leave it to heal on its own, suture it up, the side by side, or do some sort of --

DR. ADAMS: Reconstruction, yeah.

JUDGE MENDELSON: -- type of graft, some sort of

reconstruction. So you inform them of all three options and then --

DR. ADAMS: Yes.

JUDGE MENDELSON: -- they elect to go with the third option. Is that what this consent paragraph means?

DR. ADAMS: Yes. I mean --

BY MS. WILWERT:

Q. So, Dr. Adams, you inform them of all the options. You would also inform them of your recommendations.

A. Oh, yeah, too. Yes.

Q. And then -- and again that recommendation may be primary indication if it's small enough --

A. Yeah. Yeah.

Q. -- or flapping graft if it's not based on the comorbidities. And then they consent to --

JUDGE MENDELSON: Well, where is that recommendation documented then?

DR. ADAMS: There is no recommendation documented. It's just when they do the options we go through them and we discuss them, you know, what will be best for this patient, and we discuss with the patient. And then he says, you know, well, what would you recommend or whatever you think. That's frequently what happens. That's the truth.

And with that being said, we give them all the options. Some people will say oh, I just want to have secondary

intention. They leave. They go out the door. That's what we do. If they want to have a flap or allograft, we discuss all options and in the end it's between the patient and me, but it's really, he has the, you know, the ultimate decision.

BY MS. WILWERT:

Q. And from an informed consent standpoint, which is the purpose of this --

A. Yeah.

Q. -- note, you are required to advise a patient of the risks and benefits of various types --

A. Yeah. Yeah, sometimes they'll want to do something. Like I've had patients with -- and let's say we're working on somebody's ear and they want to do secondary intention, I say that's not a good idea because this ear is going to necrose and it's going to be -- it's going to be painful, it's going to get infected, and you're going to be back in two days. And so when they pick an option that's not going -- that's going to potentially harm them, I will intervene.

Q. And document that it's just not --

A. Yeah. No, it's just -- it's I tell them. And still, even though after I talk to them, I just say, you know, look, you know, it still is their option. I've had that situation occur, that exact situation on a Friday. And I told him don't call me on Sunday, and he called me on Sunday with the ear, that exact situation. So I can only advise them. Of course, I'm not

going to force anybody to do anything. That's not appropriate.
Q. And so the --
A. And I do want to make another point with that.
JUDGE MENDELSON: Okay. So my next question is -- and this is what I sort of -- this is what I alluded to earlier because you had testified earlier about sort of the factors that you weigh in deciding that an allograft is the way to go, right?
DR. ADAMS: Correct.
JUDGE MENDELSON: And you talked about wound size; you talked about comorbidities. So I see, you know, it's very clear that wound size is documented. You talked about comorbidities and you talked about other issues like oxygenation or scar tissue.
And so what I want to understand in looking at what's documented in the medical record, like, so this particular patient that we're looking at at this moment, where have you documented the sort of risk factors of comorbidities or any issues that would cause or any conditions that would cause problems with oxygenation or the presence -- or whether there was the presence of any scar tissue? Like where is that documented in the record?
MS. WILWERT: Yes, Judge. So if we keep walking through this note, we'll address several of those items.
DR. ADAMS: Yeah, on this --

JUDGE MENDELSON: Okay. And I'll just let you know, what I'm looking for is what is specific to this patient, not boilerplate language about, you know, these things --

DR. ADAMS: Of course. Of course.

JUDGE MENDELSON: -- can complicate. I want the specific you know, observations or characteristics that are documented about this patient.

DR. ADAMS: Okay. And then on the next page, then, in terms of that, you know, like -- well, just to go over the goals and plans, those are pretty standard. And then the -- and if you go up there. And then we get to, and I will get to your point, the product description of homologous use. That's just what -- it's just describing the product, so that doesn't change from patient to patient that entire area. But when we get to the next page --

MS. WILWERT: Then we're starting on -- Judge, for your convenience, we are starting -- or where he's starting to point out is at the top of page 422.

JUDGE MENDELSON: Okay.

MS. WILWERT: And it starts with, they're bolded, atrophic skin --

JUDGE MENDELSON: Starts with what?

MS. WILWERT: Atrophic skin. Am I saying --

DR. ADAMS: Yeah, atrophic skin.

MS. WILWERT: Atrophic skin, it's all capped language.

JUDGE MENDELSON: Okay. Yep, I'm there.

DR. ADAMS: That's specific language there. Now, these are her comorbidities and I think they're reflected well in the photograph. They're supported well in the photograph. She has atrophic scarred skin. It's on her leg and her age. And then it gets into what are the problems when you have these situations and what can be the outcomes when you apply a flap or a graft in these situations. And that just goes on from there. And that's --

MS. WILWERT: And --

DR. ADAMS: -- these are the additional -- these are the additional comorbidities of this patient that qualify her for allograft in my opinion.

MS. WILWERT: So, Judge, I think as you'll see, if we go to a different patient once we get into the goals and the plan, those different items will change. Atrophic skin, leg, scar tissue, the age, they will change from patient to patient. So, when you're kind of looking through the records that those comorbidities that we talk about, it's usually, or there's always all cap letters in the goal and plan that identify the various comorbidities as well as the complications that come with those comorbidities for this particular patient.

DR. ADAMS: Yeah. So I think we read the --

JUDGE MENDELSON: Okay. So I just want to break this down a little bit more because when I read these paragraphs they

don't give me specific details about this patient. They're more like boilerplate language that I'm going to guess if I look at another record that lists scar tissue, it's going to have the same paragraph of language below scar tissue.

But if I'm understanding what you're saying, in creating this record you're basically saying, all right, this patient has atrophic skin, has scar tissue, it's located on the leg, and their age is greater than 60 years old. So basically checking those boxes, which then generates these boilerplate paragraphs about why those conditions make it, I guess, more complex.

DR. ADAMS: You know, I -- okay? Yeah, I think that what is specific to her are those NCs, the atrophic skin --

JUDGE MENDELSON: Like for example, where is the scar tissue?

DR. ADAMS: Yeah. Yeah.

JUDGE MENDELSON: Like how much scar tissue is it, where is it located?

DR. ADAMS: In the wound?

JUDGE MENDELSON: Yeah. If I'm looking at --

DR. ADAMS: In the wound?

JUDGE MENDELSON: -- this record I don't see -- there's no description of the scar tissue. It's just there's just a paragraph about how scar tissue is basically an indication of using the allograft.

DR. ADAMS: She has scar tissue and then -- and it is on her leg. And those entities there, she has those entities, and all I'm doing is describing what those entities will do. Well, if you have that comorbidity and you try a flap or a graft in that situation, that's what will occur. What's specific to her is just that she has atrophic skin. She doesn't have COPD. She's not immunosuppressed. She's not diabetic. This wound isn't on her eye. This wound isn't on a free margin.

There's a -- I have a number of reasons why to apply an allograft. And then it's just the -- it gives the reason, but then it explains the effect that this would have on any situation where that is applied.

You know, anytime you have a hypoxic leak -- any type of low oxygen, you try a flap or a graft, you have a very much higher risk of that flap or graft, necrosing. And then I just tell the consequences of kind of the story of what would occur in that situation if you were to do that. Anyway, that's what I'm trying to get across there.

JUDGE MENDELSON: Okay. Understood. Thank you for the clarification.

DR. ADAMS: Okay. Sure. Certainly.

BY MS. WILWERT:

Q. And so for REDACTED, you identified the comorbidities.

A. Correct.

Q. And then, based on her consent, went on with the procedure

of applying the allograft?
A. Correct.
Q. And she tolerated that well?
A. Oh, yeah. And it's documented as well. Here's all the documentation on that. Here's the entire procedure at the end, and then that's how she tolerated it. And even on the next one --
JUDGE MENDELSON: Dr. Adams, I'm sorry, but you're coming across as --
DR. ADAMS: Mumbled?
JUDGE MENDELSON: Yes. I don't mean to be --
DR. ADAMS: Oh, sorry.
JUDGE MENDELSON: -- rude in saying that. It's just I don't know how else to describe it. I just want to --
DR. ADAMS: Of course. Of course.
JUDGE MENDELSON: -- make sure we get a good recording.
DR. ADAMS: Of course. I understand.
BY MS. WILWERT:
Q. And so she also had another procedure on that day; is that correct?
A. That is correct, on her hand. Can you see the comorbidities there? It'll be all the way at the end. So keep on going. Keep going. Oh, there they are. So the --
Q. The bottom of page 427.
A. Yeah, so here there's not a leg listed.

JUDGE MENDELSON: 427?

MS. WILWERT: Yes.

JUDGE MENDELSON: Okay. I'm tracking.

DR. ADAMS: Here we have at the bottom there, just as you can see, it's a hand digit. You know, she's had significant sun damage, so she had atrophic scarring up on her hand, but -- atrophic skin, but I didn't note too much in the way of the scarring.

So this location was on the hand or digit and it tells specifically what happens when you apply a flap or graft to those areas in there in general on the hand. And then the atrophic skin, she does have significantly damaged skin. She just does. But I didn't find that it was very scarred up there, so I didn't put that down here. And also -- and she's over 60 and I can't change that.

BY MS. WILWERT:

Q. And then again, what you use for helping to identify the scar tissue and the skin and everything else is the pictures --

A. Correct.

Q. -- which can be found on page 431 for this patient?

A. Correct.

Q. And so again, not being a trained medical professional, I don't necessarily notice everything that's identified in the pictures.

A. Right.

Q. And I think in her leg, I think, you know, you can -- it's hard to assess, but they're good pictures. There's significant scar tissue on the leg and significantly accidentally damaged skin is very, very visible in the hand, extremely. And that's where you're at. And you can see the size of the lesion and everything, I think.

Q. And if my memory serves me correctly, it's not exactly clear from the procedure codes that were denied whether or not they're denying the procedure related to the leg or to the hand; is that correct?

A. Yeah, I think they're just denying both. Yeah, there's denying it.

JUDGE MENDELSON: Well, did they -- I don't think any line item for -- let's see. So we're looking at 5/2?

DR. ADAMS: Correct.

JUDGE MENDELSON: Yeah. So I don't -- I guess it depends on how -- I don't know if what was billed for the allograft, the Q4169, how many units. I mean, I don't know, maybe that was billed for --

DR. ADAMS: Oh.

JUDGE MENDELSON: -- the units used for both the leg and the hand together. I don't know. I have to look at the --

DR. ADAMS: Yeah.

JUDGE MENDELSON: -- units number.

DR. ADAMS: So is that just the 5/2 date?

JUDGE MENDELSON: Because it's one line item of Q4169, but what I don't have in front of me right now is how many units were billed for that one-line item?

DR. ADAMS: For what date, this one? Oh, just four units? Well, altogether eight units because we used four.

JUDGE MENDELSON: Eight units.

DR. ADAMS: It should be eight. It should be eight for both on 5/2 because we opened two of the four unit 2 by 2s. We got this one for this one.

MS. WILWERT: Yes.

DR. ADAMS: And then where's the next one? Sorry. Yes, that's correct. We opened two of the 2-by-2 four unit Artacents.

JUDGE MENDELSON: Well, just for this one, let me just go through this --

DR. ADAMS: Oh, okay.

JUDGE MENDELSON: -- little exercise here just because I want to -- I'm curious --

DR. ADAMS: Sure. Okay.

JUDGE MENDELSON: -- if that lines up. So give me a moment. I'm logging into a system where I'm going to look up the number of units that were billed for that line item.

DR. ADAMS: Certainly.

JUDGE MENDELSON: It's going to take me a moment. Okay. Okay. So I'm looking name, here we go. And we're looking at

the 5/2 claim line item, it says 2652. Well, I don't even see what was billed for. Okay. I'm going to guess it's this line item.

Okay. Yeah, here's the Q4169 line item and the number of units billed are -- wait, I just saw that and lost it. Give me a second. How did I just -- units, here we go. Sorry. Eight units, and that's what you just said would be for both the -- both wounds?

DR. ADAMS: Correct.

JUDGE MENDELSON: Okay. All right.

MS. WILWERT: So then the other date of service denied was May 16th, which she came in for a couple of other wound check, I would say, visits between then.

DR. ADAMS: Correct. Correct.

MS. WILWERT: So the May 6 note -- May 16th, excuse me, note starts on page 455.

JUDGE MENDELSON: Okay.

BY MS. WILWERT:

Q. And so again, we're dealing with the allograft application post Mohs surgery.

A. Yes. Right.

Q. And this time you used --

A. We used EpiFix.

Q. -- EpiFix.

A. Yes. And this time we took one of the 4 by 4-1/2 --- one

of the 4 by 4-1/2 unit EpiFix allografts and utilized it on both wounds. She had it there, so I -- yeah. Yeah.

JUDGE MENDELSON: Do you use --

DR. ADAMS: She had Mohs sentinel (ph.), what that did, yeah.

JUDGE MENDELSON: The EpiFix and the Artacent, do you use them interchangeably or is there a reason why you would use EpiFix over Artacent or vice versa?

DR. ADAMS: I think the reason we used it here was because we didn't have the Artacent.

MS. WILWERT: You didn't have the Artacent in stock?

DR. ADAMS: Right. Right.

JUDGE MENDELSON: So it sounds like you use them interchangeably, whatever is in stock in the right size; is that how you decide?

DR. ADAMS: Yes.

JUDGE MENDELSON: Okay.

DR. ADAMS: Yes.

BY MS. WILWERT:

Q. Now, I do want to point out that this is at least the third allograft application.

A. Okay. Yeah. And also in terms of the notes, I think we should document that is specific and was documented.

Q. Please explain --

A. Oh yeah.

Q. -- and stop mumbling.

JUDGE MENDELSON: I'm sorry. I could not hear what you just said, Dr. Adams.

DR. ADAMS: Yeah. Yeah.

MS. WILWERT: I just told him to stop mumbling.

DR. ADAMS: She told -- she corrected me again. I'm sorry, ma'am. But like in this particular case, this is something that's different, so we have to -- you know, when there is some -- whenever there's something different, we document it. So in this case, like, I use a term called the splitter meaning I'm splitting the allograft. That's not documented. That's my clinic term -- my own clinic term.

So in this particular situation, we go through some pretty good detail on that we split the allograft, what units went to which allograft and kind of the rationale as to why we do it. You know, it's just more cost effective than, you know, opening two allograft packages. Sorry.

JUDGE MENDELSON: Okay. So you opened --

MS. WILWERT: Yeah, for this record.

JUDGE MENDELSON: -- one 11-unit package and you used --

DR. ADAMS: Exactly. Uh-huh. Yes.

JUDGE MENDELSON: -- a little less than half of it on one wound and the remainder of it on the other wound, so that you were using --

DR. ADAMS: That is correct. That is correct.

JUDGE MENDELSON: -- utilizing all of it over the two wounds.

DR. ADAMS: That is correct. And we document that we're doing this to repair this in a efficient fashion by utilizing one allograft which total 11 units for both repairs. Allografts are applied based on wound size, depth. And if the appropriate size is not the stock, then we apply. That I have in there, but the top part is different, the first half of that paragraph.

BY MS. WILWERT:

Q. And so again, kind of in this paragraph under impression and plan encounter on page 455, you've got this paragraph that says, you know, these side units of the 11 units total were utilized. And that's you talking about how five units were utilized for the leg wounds. And then I suspect when we scroll down to the hand wound, you'll see the other six.

A. Yeah, and we documented here, but it is -- it's I reversed that language on the next note.

Q. And so then again, at the top of page 456 --

A. So that allograft unit's discarded in there, that's six. It's not really discarded. It's not really discarded. It's applied to the other wound.

Q. And you're also documenting the progress --

A. Correct.

Q. -- of the wound healing?

A. Yes. From its previous visit, uh-huh.

JUDGE MENDELSON: I'm sorry where's the --

MS. WILWERT: And --

JUDGE MENDELSON: Wait. I'm sorry. I was typing. Give me a second here. Applied to the other wound.

MS. WILWERT: That's all right.

JUDGE MENDELSON: Where are you documenting, like, that your observations of the current wound characteristics?

MS. WILWERT: So we're at the top of page 456.

JUDGE MENDELSON: Okay.

MS. WILWERT: And you've got kind of the allograft units open pieces, but then right after that you've got the defect length, defect width, defect depth, today's volume, and then he also includes the previous visit's volume, so they can track the progress --

DR. ADAMS: Yeah.

MS. WILWERT: -- of the volume of the wound. That's where we're -- that's where we're at.

JUDGE MENDELSON: Okay. And so I see under reapplications there's some notes of the observation of the wound status. So this is the -- what application number are we on?

MS. WILWERT: Third.

JUDGE MENDELSON: Third application.

MS. WILWERT: Third.

JUDGE MENDELSON: So I guess a question I have for you,

because when I look at what you documented about the wound, you know, there's granulation tissue, no obvious signs of infection. It's not painful. There's no evidence of adjacent tissue breakdown, nothing -- only a negligible amount of any necrotic tissue. Clinically the wound appears to be healing well and progressing towards the stated goals.

So I guess, can you just explain to me if -- I mean, this sounds to me like this is a well-healing wound. Why is it necessary to continue to have reapplications when the wound is documented to be healing well?

DR. ADAMS: Yes, that's my documentation that it's healing well considering -- you know, along with the allograft. Yeah.

BY MS. WILWERT:

Q. I think what her question is leaning to --

A. Oh, sorry.

Q. -- is at time -- I mean, you have to keep a applying an allograft. What goes into your determination as to whether or not to reapply an allograft or to be like, look, this wound is healed enough?

A. Oh, okay. Okay. Sure.

Q. You know, it's time to stop applying the allograft.

A. Sure. Sure.

Q. Like where does that line fall?

A. Sure.

Q. Like, it looks like it's healing, why do we have to keep

applying an allograft?

A. I see. I understand. I understand. So it's progressing towards its goal. And, you know, per the package insert, you know, we -- it says to go ahead and proceed till re-epithelialization, which would mean when their skin --

JUDGE MENDELSON: Wait. To proceed until what? What's the word?

DR. ADAMS: To proceed to re-epithelialization which, of course, is when the --

JUDGE MENDELSON: Re-epithelialization. Okay.

DR. ADAMS: Oh, I hate spelling that word. But anyway, it -- and that's where the literally the skin is coming over the top. And so, that's our goal as well, just as it is in the package insert. That being said, when the patient comes in, there's a number of things that can happen. One, the patient may very well -- and this is not uncommon. The patient says hey, you know what, I'm good with -- I'm good with it now and I want to -- I want to stop. We go over the options every time with every patient.

So a lot of times patients say I'm good with it. I say okay, except if it's in a situation where stopping the application is going to cause a problem. Then I'm going to talk to them more and we'll talk more in depth. Like, if it was around an eyelid, ears, those extra areas that I'm talking about, the eyelids, ears, nose, where really you need to let

this thing fully heal before we stop application. And I go into that more. And generally there's no problem. They understand once I explain, so, what potentially could happen, not good.

So there's that situation where they may say that they want to stop and that's one way we stop. Also, when -- if this -- if the wounds are healing, and let's say they're pretty flush with the skin surface area and they're not in an area that full re-epithelialization will -- if they don't have it, it will not be detrimental to the patient, then I'll say okay, that one's okay, let that go.

Let's say if it was on -- let's say somebody has -- it's really doing well and -- but it's not on an ear or an eye where I need full re-epithelialization. In those cases, if it's flush with the skin surface I'll say, you know, I think it's good. It's heal -- it heals up okay, you know, that's we can let that go.

Or let's say if in a situation where, kind of two scenarios, one, a patient comes in and they have a lesion on their ear that requires allograft because you have the cartage issue. That patient, even if we didn't have the right size, I'd say, you know, apply with what we have because we have to.

Let's say a patient comes in and it's, oh, on their -- oh, you know, like on their arm or something like that where we don't need -- we don't -- it's not critical that we apply right

then, then I'd say okay, well let's skip it for a week. Let's just hold for a week and see him back another week and see how he's doing at that time, because it's not critical that he received that application on that day, on that time.

So there's two situations, one, I'll say go ahead and apply, one I -- one I'll say okay, hold up, we're good. And also sometimes there's situations where I feel that it's healed up enough. I mean, the package insert to go to re-epithelialization, sometimes I feel that it's healed up enough that you don't necessarily have to. And I think I have the experience to know in those situations what that is.

And to express, articulate that in particular, it's areas around the eyes, ears, nose, lips, hands and shins. Kind of, as we discussed earlier, the high risk locations in terms of Mohs surgery correlate with the high risk locations in terms of allograft and not continuing with the application. That was a lot. Sorry. But that was all of it, I think. Okay.

Q. And so maybe for this particular patient --

A. Yes.

Q. -- the wound is healing fine. What triggered you to determining reapplication was appropriate in this circumstance?

A. The patient. The one, of course, the patient consented to it. And two, we could -- let me see where this one's at.

Q. This is the same.

A. Which patient is this?

Q. This is that one today.
A. Oh, yeah. Yeah, the legs. A lot of times the leg lesions, if you leave a leg lesion open, the risk of secondary infection is very high. It's over ten percent if you leave a leg lesion open, so therefore I would -- I wouldn't recommend not reapplying in that situation, and I would recommend apply to full re-epithelialization.
So that's one reason in here, but in general if the wound is -- if we're progressing well, well, the progressing well is based upon the allograft's effect on the wound. So if we take that allograft out of this equation, I probably -- I don't know that I'd be saying that, I really don't, especially on a lesion on a leg, so --
JUDGE MENDELSON: Do you --
DR. ADAMS: -- with a ten percent chance of recurrence. Yes, please.
JUDGE MENDELSON: Thank you. In terms of -- and I'm not going to say -- I'm probably going to mispronounce and stumble over this word, but the degree --
DR. ADAMS: No.
JUDGE MENDELSON: -- of re-epithelialization --
DR. ADAMS: Yes.
JUDGE MENDELSON: -- so, you know, I've seen before. I realize this is not the same as a wound care clinic, but I'm used to seeing in, say, that context, there's usually

documentation of the percentage of the re-epithelialization.

DR. ADAMS: Okay.

JUDGE MENDELSON: Do you -- does your note give any indication of, you know, how far they've gotten towards -- you know, how much progress has been made towards the point of re-epithelialization?

DR. ADAMS: Well, kind of the -- as I said, you know, earlier, was just that our wounds -- and this is why the length times the width doesn't work well in documentation, because it doesn't show any progression until the very end. That's why we use volume. So the re-epithelialization is really the last step.

And that at that time when it's re-epithelialized, and your question was is there a percentage, our wounds in Mohs surgery, I think they heal more rapidly and it would make sense to versus a wound care situation. Because those wounds are all -- when we talk about hypoxia in that situation, as you know, for wound care, hypoxia is so severe that it caused the skin to spontaneously necrose and ulcerate. Okay. So we're not in that situation.

Our hypoxia, there's definitely hypoxia where if you need a flap or a graft, the chance for necrosis are high. You do a flap or a graft on a person that's has a venous leg ulcer, nobody would do it. I would be shocked if anybody would do it because all it would do is necrose. Because there's not enough

oxygen down there for the normal skin or tissues to heal to even sustain their life. They're ulcerating obviously. Their hypoxia level is so great, so. I don't know if that answered the question. Well --

MS. WILWERT: Well, I mean, so --

JUDGE MENDELSON: Well, I mean, it sounds to me like you're saying that you're really looking at the volume and that the last step of healing is the --

DR. ADAMS: Yeah, and you can --

JUDGE MENDELSON: -- re-epithelialization.

DR. ADAMS: -- tell from our photos in our -- yeah. Go ahead.

JUDGE MENDELSON: But this volume has -- I mean it's half the size, right, because it says today's volume, I think I'm on the right page, is .099 cubic centimeters --

DR. ADAMS: Correct.

JUDGE MENDELSON: -- and the previous volume --

DR. ADAMS: Correct.

JUDGE MENDELSON: -- was .198.

DR. ADAMS: Correct.

JUDGE MENDELSON: I mean, so are you saying the wound volume would say zero when total re-epithelialization has happened?

DR. ADAMS: Yes, because at that point -- and we do that in our notes too. At that point, that's when length and width

are telling you the area of the wound surface area. That's exactly correct. So in those -- in that situation, we can't document volume. So once it's at the top, it's getting ready to re-epithelialize, we move the depth off of our notes and we just have area, because there is no depth. And that your -- that's your point. That's exactly -- yes.

BY MS. WILWERT:

Q. And then, so I guess the question -- a follow up question would be in determining when to discontinue an allograft application, you're really watching kind of the volume because you want to get to almost a --

A. Yeah.

Q. -- zero volume before you --

A. Yeah, zero volume is when it's flush. So yeah, that's when you're just talking about a -- that's when the wound surface area equals the skin surface area, obviously. And that's why the calculations are such as they are, without depth is not quite right.

MS. WILWERT: So going back -- go ahead, Judge.

JUDGE MENDELSON: No. I'm sorry. It just got so silent for a second, I thought I had lost your connection.

BY MS. WILWERT:

Q. Well, I was trying to figure out what question to ask next since we got a little off track there, but that's all right. So this is the reapplication for the leg -- the third

reapplication for the leg. And again, we're making progress, but not fully there yet. And so the note goes through a lot of the procedure related to that. And then we also had, again, starting on page 459 the third allograft application for the hand.
A. Okay.
Q. Is that correct?
A. Okay. Yes.
Q. And so again here we talk about the six as opposed to the five are applied to the hand.
A. Right.
Q. And this one we're not -- I guess, maybe you can talk a little bit. It doesn't look like from the volume listed and the previous volume listed --
A. There was no change.
Q. There was no change.
A. Yeah. And that can happen, certainly. And, you know, our protocol in our office, I think, is what everybody does in wound care too. It's just that if it hasn't changed after four treatments, you know, should maybe consider adding a wound vac or trying something else because it's not working, so.
Q. And so she -- I mean she, while not necessarily denied, she did come back for subsequent applications; is that correct?
A. Yes. Yes.
Q. And do you still see EA?

A. EA.
Q. Is she still a patient?
A. Oh, yeah.
Q. And so from a --
A. I just saw her last week. Well, I did.
Q. So for this -- for EA with related to at least this Mohs procedure that was conducted on May 2nd, 2022, the wounds were ultimately healed, and functional capability and restoring physical appearance was achieved.
A. Oh, yeah. And we have photos to that effect as well.
Q. And as essentially, I hate to say required, but the documentation standard set forth in the LCA.
A. Yes. Yes.
Q. And so --
A. And oh, I was just going to mention when you have a note like this, you know, just a -- that's our post-op note. So this note could have been an allograft note if we were going to reapply, but it's not. We just -- we said, okay, we're good here. It's re-epithelialized or healed up well, and so we put this note in where it's just impression plan, post-operative wound check versus the whole big allograft note.
MS. WILWERT: And you're talking -- right now, he's -- Judge, for your convenience, he's looking at the June 6th visit note on page 470.
JUDGE MENDELSON: Okay.

MS. WILWERT: And so in your professional opinion, the application of the allografts on May 2, 2022 and May 16, 2022, and frankly, all of the allograft applications for this particular patient were medically necessary?

DR. ADAMS: Yes.

MS. WILWERT: Judge, did you have any questions about EA before we move on to another beneficiary?

JUDGE MENDELSON: I do not. I'm not sure if we have time --

MS. WILWERT: I was going to say --

JUDGE MENDELSON: -- for the next beneficiary, but we have about ten minutes.

MS. WILWERT: Would it make sense to -- would it make sense to just break now and that would give you time for a quick break before your next call and allow you to get ready for that instead of trying to get into another beneficiary.

JUDGE MENDELSON: Yes. Let's go ahead and break now. And I will say that walking through this first one has answered a lot of my questions. I think I now understand how the notes work and what they're documenting. So again, I would encourage you to, you know, pick maybe a handful more. But I think once we go -- you know, having gone through one, I can now, you know, understand the formatting and what's being documented in all of the notes. I catch on kind of quickly that way, so.

DR. ADAMS: Yes, Judge.

MS. WILWERT: Thank you, Judge. And I think maybe, too, using this break to figure out, because we were prepared to talk about all of them, but you know, we'll use the break to examine maybe the patients that we'll hit on when we come back.

JUDGE MENDELSON: Perfect. All right. So at 1:30 p.m. Mountain Time just call back in, same number, same passcode, and we'll resume then.

MS. WILWERT: Will do. Thank you, Judge.

DR. ADAMS: Thank you.

JUDGE MENDELSON: Okay. Thank you. Bye.

**(Off the record.)**

**(On the record.)**

JUDGE MENDELSON: All right. We are back on the record now in case number 3-12683356911. Back on the record is the attorney representative, Amanda Wilwert, and also Dr. John Adams. Okay. So counsel, I'll turn it back over to you to continue.

MS. WILWERT: Thank you, Judge. And I believe we had concluded our discussion regarding beneficiary EA. And we'll move on to another, I guess, representative beneficiary or one that we believe is important to talk about, which happens to be the next in alphabetical order by last name, CB. And we've got date of service denial dates of January 21st of 2022, January 29th of 2022, February 5th of 2022, and February 12th of 2022.

JUDGE MENDELSON: Okay. Thank you.

MS. WILWERT: And for your reference, I lost my thought here, oh, this beneficiary is a beneficiary from the Nebraska clinic. So his records fall at the very end of file 13 starting on page 2043.

JUDGE MENDELSON: 2043. Okay.

BY MS. WILWERT:

Q. And of course, that starts with various, oh, other documents. But, Dr. Adams, why don't you talk to us or walk us through CB and his Mohs procedure and the visit note that starts on page 2057 for January 21st, 2022.

A. Let me see where we're at here. Okay. Good.

Q. Make sure to speak loudly.

A. Oh, yes. Yes, of course. Yep. Okay. And so on that day the patient had a Mohs surgery procedure to the ear, the helix there. And yep, that's it there. And then we have the allograft note here. And it looks like on this date of service, we did not have the 4 by 4 -- excuse me, the 2 by 2 Artacent allograft in stock, so we had to use a smaller two unit, 15-millimeter disc. And then we went ahead and, let's see, as far as the documentation should we go on further or --

Q. Yes.

A. Oh. Oh, yeah. Yeah.

Q. Well, here, let me ask you a couple of questions. So with respect to the Mohs procedure --

A. Yes.

Q. -- you know, that was completed. And then related to the LCA, you know, there was requirements to document the closure, correct?
A. That's correct. That's correct.
Q. And one of those documentation requirements is to document the size of the --
A. Right. The defect. Right.
Q. -- primary defect.
A. So we need to document the size of primary defect, which we did, and it was 1.5 by 1.3. We also took a photograph of the wound as per the LCA and we -- and then we also took, of course, the pre-op -- the pre-op photo and the pre-op metrics as well. And let's wrap there.
Q. So let's talk about --
A. Yeah.
Q. -- CBs comorbidities.
A. Certainly. Yeah. Yeah.
Q. Start on page 2,061.
A. Okay. So --
Q. And go ahead.
A. Yeah, certainly. So it was a free margin of the ear. And in those situations if they're allowed to heal secondarily, of course, as we talked about before with cartilage, you can have necrosis develop, and also with a free margin, you can have disfigurement as well.

So when it -- if there's any necrosis and contraction of the area, the ear will be disfigured in that location. And then it was atrophic skin from sun exposure. And again, what's below these titles is just an explanation of what occurs in skin of that nature when you perform flaps or grafts and why you may not want to do them.

Scar -- or that's actually the justification as to why you would need to use allograft. And then the scar tissue is there. This patient's on blood thinners. The patient's, also the cartilage exposure as we spoke about, and then age greater than 60 years old.

And yeah, we were -- and I know we were talking about these entities here with the explanations below them, but there are over 30 comorbidities that we work with -- that I work with when I'm -- that I'm considering when utilizing allografts. So it's a pretty -- it's a broad subject matter. It really is, so. Okay.

And then we have the pages of their age is over 60. And of course, there's about 25 percent increase in complications when the patient's age is over 60 postoperatively. And then just the documentation of the application and -- yeah, and then the application just keeps on going with as you see different notes, we'll probably see different types of applications, so.

Q. And so just to reiterate, you know, one of the documentation items in the LCA is that the technique selected

was an appropriate choice to preserve functional capabilities and to restore physical appearance.
A. That is correct.
Q. And so when you have some of this documentation such as the free margin in the ear --
A. Yes.
Q. -- or the cartilage, you're really explaining how the allograft satisfies or is appropriate to preserve those functional capabilities.
A. That is exactly correct.
Q. And so then moving on to the next denied date. And as we keep scrolling, you see the photos -- the pre and post-op photos. We have the next denied date of January 29th.
A. Correct.
Q. It starts on page 2065. And so again, here it's just the next allograft application. So, Dr. Adams, why don't you walk us through the --
A. Certainly. So with the documentation there, we have the date, 1/21/2022. And it's -- it is after Mohs surgery. And it's application number two, defect is 1.5 by 1.1 and depth is 0.1. The volume is 0.165. The volume was 0.39, so there's been a good progress that's been made. And then this was another situation where we could have applied the four -- the two -- the 2.0 by 2.0 four unit Artacent allograft, however, we did not have it in stock and we applied a smaller two unit, 15

millimeter of the, yeah, 15 millimeter disc.
Q. And --
A. And yeah.
Q. -- so then we've got the picture for that visit note.
A. Correct.
Q. And then the next date denied is February 5th which starts on page 2070. And this is the third application; is that correct?
A. Yes, that's correct.
Q. And, you know, walk us through, again, the documentation of the size and the progress. But also, you know, it seems like there's some issue was taken with the fact that we went from the two-unit millimeter disc to the four-unit.
A. That's correct.
Q. And explain the difference there.
A. Yeah. And what the problem was was that I think the reviewer had a question of why are we going with a larger disc now when the lesion was getting smaller. And the answer is this is the appropriate size at this point and we had it in stock.
Prior to that, the prior two applications, we did not have the larger size, the 2-by-2 by -- four unit 2-by-2 in stock, and so we applied what we had which was the 15 unit disc -- excuse me five unit 24-millimeter disc. And so -- excuse me. Gosh. These discs are getting my -- that's incorrect. It was

the two unit 15-millimeter disc, okay, that we did apply prior to this on two -- the two prior occasions.

However, on this situation right here, we did have the two -- the four unit, 2-by-2 disc in stock, and we applied it and that was the disc that was appropriate for that size at that time. And then the rest, yeah.

Q. And so then again, consistent with documentation standards, we've got, you know, the photos --

A. Right.

Q. -- documenting the progress on page 2074, and then the final denied date of service for this beneficiary of February 12, 2022, which can be found on page 2075. And again, walk us through the progress.

A. Certainly. And this is the last one and the last -- that was the last encounter with them -- with CB?

Q. I would have to get to the next --

A. Yeah, because he's healed up there already.

Q. Yeah, I believe.

A. Yeah. Yeah.

Q. I believe this is the last application.

A. Right. Like that, right. My computer went out, that's why. So anyway, in this situation here this was -- this situation was different in that we had the -- let's see, again from the ear, it's on 1/21/2022. And this is application number four, and the defect length is 1.4 by -- and width is

0.5, depth 0.1, volume 0.07, and progress from the prior date of service is seen below at 0.4 -- 0.14 centimeters cubed.

And on this date we applied a four unit when the two unit was optimal. So although there was medical necessity to apply, we applied what we had and so therefore, in my opinion, we were -- two units to the -- over the optimal situation of two. So we were two units over the optimal application here.

Q. And I guess I want to make clear because you do document in here that, you know, the appropriate size was not in stock, but --

A. Correct.

Q. -- you can't always predict what -- how a wound's going to be healing or whatnot and so it's not easy to just order and have in stock certain sizes?

A. That's correct. Absolutely. And I think that's one of the reasons that my understanding is that EpiFix is going to three sizes instead of the nine sizes they have listed to try to eliminate some of these problems.

Q. And so then again, once this last application was done, he had healed up and we had discharged him from that particular --

A. Right. And --

Q. -- allograft application.

A. Yeah. So once the -- when we see the patient and they fully re-epithelialized, then the patient's -- we use a different type of note, a post-op note, and we document that

now along with photos as we always do.

MS. WILWERT: Judge, do you have any questions about beneficiary CB or the difference between the different units utilized?

JUDGE MENDELSON: I do not.

MS. WILWERT: Okay. Then we're going to move on to beneficiary C -- or WC, excuse me. And that beneficiary medical records can be found on -- starting on page 606 of file 13.

JUDGE MENDELSON: You said page 606?

MS. WILWERT: 606, yes.

JUDGE MENDELSON: Okay.

BY MS. WILWERT:

Q. 606. And we've got two dates of service denied, April 4th of 2022 and May 2nd of 2022. And so just there for you, Dr. Adams. And so April 4th, Judge, for your convenience starts on page 662. And, Dr. Adams, can you please walk us through what was going on with this beneficiary?

A. Okay. This is WC; is that right?

Q. Yes.

A. Okay. And let's see. This gentleman, he -- known him for a long time and he requested to have all of his Mohs surgeries done on one day, and so we scheduled him as such. And so it's kind of complicated note, so, but anyway, we'll proceed. We've got the Mohs notes there and we have our, you know, our -- all

of our -- the metrics of the primary defect from the Mohs site, which gives evidence as to the need for reconstructive repair.

And then also the metrics and the location are key because as we talked about earlier, you know, a size of 2.0 by 2.0 on the abdomen or the back, that's not a big deal. But if that's your face or you know, all the area areas that are critical for Mohs surgery, that's usually where tissue sparing is paramount importance. That's where that comes into play.

And so we have here, he's got a size -- this is on his thigh, yep, and this was 3.2 by 2.4. And we applied the 2 by 2 -- four unit, 2 by 2 Artacent. We applied two of them for a total of eight units, which is appropriate. And here we go. And then we had just all the -- so in his case he has -- he's on blood thinners. He's diabetic. His is on his leg. He's over 60. So all of those comorbidities, the details of what those comorbidities would entail are -- that's what's written underneath there. And there's our procedure note.

And then for the next one, this one he's, let's see, okay, the left distal pretibial region. And this lesion is 4.0 by 3.2 by 0.5 in depth. And we applied again two of the four unit, 2 by 2 Artacents, which is eight units, which would be appropriate here. And we also took photos of the area. We documented our primary defect. We photo'd our primary defect and fulfilled all the requirements of the LCA.

Q. And let's see, then he had another Mohs surgery?

A. Correct.
Q. We're now on page 672 and on the third Mohs surgery --
A. Okay.
Q. -- of that day. And this was --
A. This was extensive here. This was on the right superior helix.
Q. What is a superior helix?
A. Oh, I'm so sorry. Yes, it is -- the helix is the outermost portion of the ear. It's kind of the part that curves, makes a little cup, if you will. And it's the outermost portion that curves around, the helix. It goes all the way around the external aspect of the ear and it's depicted well in the photo, you know. And here's where 2.8 by 1.4 on the ear is relatively large as you can see on the photo.
And so that is -- his primary defect metrics were measured. His length was 2.8, width was 1.4, depth was 0.3. Photographic evidence was taken of the post-op defect. And that's where we're at there. And then this, the application was one of the 2 by 2 -- four unit 2 by 2s was applied, and that would be appropriate. Actually, probably in this case we applied more, but we were running out, so I don't know if we had enough.
Q. And so again, going to page 673, we talk about the --
A. Yeah. Oh yeah, all the comorbidities.
Q. -- comorbidities --

A. Right.
Q. -- identifying the ear and --
A. Yes, free margin, atrophic skin, scar tissue, and blood thinners, cartilage, et cetera. As I said, there's -- and diabetes. As I said we look at over 30 these comorbidities when we're assessing the situation.
Q. And then another event that occurred on this visit is a third application of an Artacent to a scalp post Mohs surgical wound; is that correct?
A. That is correct.
Q. And why don't you walk us through --
A. Sure.
Q. -- the documentation related to that service.
A. Sure. So this lesion was -- this defect was noted to be on the right superior parietal scalp, and it was on 3/22/2022. And this was his third application. The defect measured 1.9 in length by 1.6 in width, 0.4 in depth. The volume -- the progression was zero at this point and four units were applied -- four units of the 2 by 2 Artacent allograft were applied, and that would be appropriate here. And, okay.
JUDGE MENDELSON: Let me ask what -- can you repeat what page you're on?
MS. WILWERT: So we are on page 677.
JUDGE MENDELSON: 677.
MS. WILWERT: Yes.

JUDGE MENDELSON: And so you said -- maybe I misheard, but I thought I heard you say the volume was zero?
MS. WILWERT: The change in volume was zero, so.
JUDGE MENDELSON: Oh, the change in volume was zero. Okay.
MS. WILWERT: Yeah. Today the -- yeah, the today's volume was 1.216 and the previous visit's volume was 1.216, so that there was no change, zero change.
JUDGE MENDELSON: Okay.
DR. ADAMS: That's correct. Yep. Okay. And then this lesion here -- okay.
BY MS. WILWERT:
Q. And I guess bouncing off of that, are there times when there's no change, but that's not a bad sign?
A. Oh, yeah. No. No, not necessarily at all. I think, you know, we can do what we can do with metrics and measurements until we get the computers. I think there probably is a change, but probably that we cannot measure it with what we're -- with hand measurements. They're so small, yes, less than a millimeter, so.
Q. And so it's not uncommon for certain wounds to maybe plateau at a certain point and take maybe slower to protect.
A. Yeah, we -- no, I think that's really for the lower wound extremities. They have that problem a lot. We get it, but not often. And we just don't get it often because, you know, as I

said the hypoxia of those leg lesions can't even support thorough skin. So yeah, we don't get that too much, so.

Q. And I guess in your professional opinion, you don't start to have concern until maybe this third visit, whether you're not seeing anything?

A. Yeah. Yeah. And certainly by if something is not -- you know, we're -- you know, if we spot it at the third visit, we wonder what's going on here and think about things and consider it and apply if we felt we can -- it's going well, but maybe the metrics just aren't showing it, and then -- but maybe the photo is more. I don't know. And then we -- but at four weeks, we'd stop and we'll take it, whatever, something else.

Q. And so then going into page 678 and 679, we're talking about the comorbidities for that location?

A. Correct. That blood -- again, scar tissue, blood thinners, diabetes, you know. And it's not surprising that some of the same comorbidities are going to show up on a patient because this is the same patient that we're seeing over and over again. So we can't change his comorbidities, however if there is a -- if there -- if it's a location, let's say it's on a leg or the ear and cartilage, you can see that those comorbidities do change appropriately though, yes.

Q. And so then continuing on to page 679, the bottom, we're dealing with another third application of an Artacent for a different area; is that correct?

A. Correct. Yes. Here we're on the left superior preauricular cheek, and the size of the defect is 2.0 by 1.5 by 0.3 and the volume is 0.9, and there is progression from the prior application of 1.02. And on this date we applied four units of the 2 by 2 allograft, and that was appropriate in this situation.

And going on with their comorbidities, we're down here. And again, here's the difference. So since that area was on the free margin of the ear, the comorbidity is listed as free margin of the ear, and it's only listed if it's there. And so we have atrophic skin and scar tissue.

So many -- these patients that -- I just want to reiterate and make this point. These patients that we're reviewing are my worst patients in terms of they're good people, but they have had a lot of surgery and you can see that from the photos. So most of the areas that we're working in we're frequently working in areas that have had previous surgery and a lot of scar tissue in the area, which again, makes it very difficult to work. Certainly, we would prefer to work with flaps and grafts and not de novo tissue that has not been disturbed as opposed to the scar tissue, which does not take as well with flaps or grafts. Yeah, it's good.

Q. And I guess maybe to bounce off of that a little bit is again, this is a very select and minimal population of --

A. Yes.

Q. -- patients that we're looking at, so unfortunately some of the comorbidities are consistent through across the board.
A. Right and these, you know, they make up roughly 10 to 15 percent of my repairs in Mohs surgery. And they are just -- you know, as we discussed in that article, they are the most severe cases, so I think this gentleman is an example.
Q. And so then the photos for this, what I expect was a very lengthy visit --
A. Yeah, all day.
Q. -- can be found on page 686 for the various -- and 687 for all the various locations that he received either the Mohs procedure and allograft placement or the subsequent allograft placement.
And so then he had a couple of other visits in between the next date of service denial date, which was May 5th. And so then on May 5th, we start with the, I believe, reapplication of the various -- or May 5th -- May 2nd. I apologize, Judge. May 2nd is the other denied date. And that starts on 736. And again, this is pretty much just complete wound checks related to --
A. Right.
Q. -- the procedure or the application.
A. Right. Right.
Q. So again, we're on the bottom of page 130 -- or 736 to 737. We are talking about the -- what is actually the fourth

application.
A. Correct.
Q. There's been two other applications of the allograft.
A. Correct.
Q. And so we're now on the fourth application. And to be clear, there were no issues with the fourth or the second or the third application. The CoventBridge didn't deny those applications, did they?
A. No.
Q. And so on the fourth application for the distal thigh, Dr. Adams, can you walk me through the volume --
A. Oh, absolutely. Yep. It's, well, the fourth application. The size, length is 1.7, width is 1.3, depth 0.1. And we had some go up. I mean, I think it looks like we went up on the metric here, 0.21 -- oh, no, we went down. Okay. Good. I think that's a typo on the volume. It should be 2.21, I think. I'm not sure. There is a -- there's an error on that volume, looks like at least the previous versus the other because it's not a -- can't be that big of a difference right there.
Q. But it --
A. Yes, but the medical indication and reasonability are here. And let's see here.
Q. And then on page 379 we talk about the reapplication for the distal --
A. Pretibial.

Q. -- pretibial region.
A. Right. And that measured 3.4 by -- excuse me, 3.4 by 2.4 centimeters. And we applied, let's see, two of the four -- two of the four unit 2 by 2s, which would equal a total of two eight units. And this was appropriate. And, yeah. Yeah. You go through the same information because it's the same patient. That's part of it too, yeah.
Q. And then on page 742, we start addressing the fourth application for the right superior helix.
A. Correct.
Q. And walk me through the documentation there.
A. Sure. It's a 1.4 by 0.8 in length and width. And then we apply four units of the 2 by 2 allograft. And let's see. Good. Good. All right.
Q. And then page 745 addresses the now sixth application to the scalp, which is a bit of a gruesome wound, but can you please walk us through the requirements for that or the documentation?
A. Sure. It's the length is 1.6, the width is 1.1, and the depth is 0.1, and the volume is 0.76. And there has been improvement, 1.7 section, yes, much improvement in volume. Good. And then we applied four units of the four unit 2 by 2 allograft in total, and that's it. Good. And then we had a couple of wounds that were healing from application. So once they're healed adequately, then there's no more need to apply

the allograft. The allograft is complete as was documented and on both of those sites, both, yes.
Q. And so then we get into some drawings. And then all the pictures documenting the progress --
A. Right.
Q. -- start on page 753 to 754. And so in your professional opinion, you know, looking at the LCA and the requirements related to the LCA for beneficiary WC, you've got the measurements each time we apply the allograft?
A. Yes. Yeah. We have primary -- you know, we have all the required documentation for the repair. We have the primary defect metrics, length and width. We have the photograph, pre-op photo, post-op photo, and as well as the pre-op metrics. And that's really the -- and the explanation as to why we're utilizing true reconstructive technique.
Q. And the explanation again is as required under the Mohs LCA to preserve functional capabilities and restore physical appearance?
A. That is correct.
Q. And I don't know that I've asked you this, so I'm going to ask it kind of globally related to all the beneficiaries. You know, in the application of the allograft in these cases, was it safe and effective?
A. Yes.
Q. It's not experimental or investigative?

A. No, it's not.
Q. It's furnished in accordance with the accepted standards of care?
A. Yes.
Q. It's furnished in the setting that's appropriate to their medical needs?
A. Yes.
Q. It's ordered and furnished by yourself who's a qualified physician?
A. Yes.
Q. And it meets but does not exceed the beneficiary's needs?
A. Correct.
MS. WILWERT: And so, Judge, do you have any questions on WC and all of the allograft location applications for that beneficiary?
JUDGE MENDELSON: I do not have any questions.
MS. WILWERT: Okay. Then we will also address beneficiary MF.
JUDGE MENDELSON: Are you saying S as in Sam or F as in Frank?
MS. WILWERT: F as in Frank.
JUDGE MENDELSON: Okay. Thank you.
MS. WILWERT: And his medical records -- he's another Nebraska patient. And so his medical records are on file 13 and they are kind of towards the back and start on page 2091.

JUDGE MENDELSON: Okay.

BY MS. WILWERT:

Q. And we have several denied services again for this beneficiary of January 28th, February 4th, February 11th, February 17th, March 2nd, March 9th, March 16th, March 23rd, and April 1st. That's a lot of denied dates of service. Dr. Adams, do you want to tell us what's going on with this patient?

A. Sure. REDACTED -- MF is very, very ill. He's immunosuppressed. He's got -- he's on blood thinners. He has severely scarred tissue and the lesion extended down to the bone.

Q. And so this was a Mohs procedure that occurred on January 28th --

A. Okay.

Q. -- is that correct?

A. Yes. Yes.

Q. And what happened, or I guess, where are we at with this first denied date of service of January 28th?

A. Am I just running this down here?

Q. Yeah, just run it. Run it. Yeah. Run it down.

A. Okay. Yeah. Well, he had a lesion. Let's see.

Q. Where was his lesion located?

A. Yeah, his lesion was on the left occipital, left occiput, which is the back of the head. And his -- this was his third

application and the length was 2.2 by 2 point -- and the width was 2.1, depth 0.5, volume was 2.31. Improvement was noted from prior application.

Here we -- here, what we did was that what I call the splitter. We took the allograft and we applied -- we took the four by -- excuse me, 11 unit 4 by 4-1/2 centimeter EpiFix mesh allograft and applied seven units to this area. And then we applied four units to the mid crown. That's how we residual discarded -- you know, it's like, yeah. And we put in our note instead of some -- and the so called residual discarded four units were utilized to repair the wound on the mid crown, which was also repaired today.

So these entries are very specific because when we do the splitter, we want to be very -- you know, tell them, okay, what happened to this tissue because people would wonder, you know. And I think that may have been some question prior, but it was in the note and I think it was clear. But I think that brought up some question from the reviewers past.

And let's look at his comorbidities. Yeah, his comorbidities, again, we will look at the photos. And we can't help, but it's atrophic skin, scar tissue, extremely immunosuppressed. The bleeding was he had a lot of bleeding during the procedure also, and that's, you know, secondary to probably the blood thinners that he had. And then his bone was exposed, which we can see in the photo, and he is greater than

60 years old. And yeah. Yeah. And now we go to the EpiFix -- the actual allograft note. And this is application number three. Are we going there?

Q. Yep. Yep.

A. Yep. Now, this is the -- again, on the the mid crown, it's allograft application number three on 1/7/2022.

Q. Well, that's ones that were questioned --

A. Oh, it was the Mohs. I'm sorry, yeah.

Q. -- is the Mohs procedure.

A. Yeah. Yeah. He was there from a MOS procedure on 1/7/2022 which all repair. You know, the Mohs LCA requirements for repair are even included in this note, length, width metrics of the defect as well as the photo, and which were 2.0 by 1.5 for length and width. And we have good progression from today's volume to the previous application of 1.2. down from 1.575.

We used the 11 unit for -- well, actually this is extending from the -- this this allograft right here is the same -- this is the other, let's see how many units, four units that were applied from that prior allograft. So that was not discarded, but it was residual and it was applied to this patient on that same date of service in an effort to conserve -- yeah, one sec here.

And again, atrophic skin, and it is on the same exact location, so they're not exact, but similar location on the

scalp, atrophic scan, scar tissue, immunocompromised, blood thinners, and you see the bone exposure. Excuse me. And --

Q. And so again, then the photos are on page 2132 that show the progress for both applications.

A. Correct. Well, I think that might have been an amendment.

Q. Yeah, and I think this is -- might be where you fixed.

A. Oh, okay. Yeah.

Q. But the bottom of page 2132 is where they fixed the previous visit's volume.

A. Oh, that. Oh, they did it. Okay. They put an amendment on that one. Okay. Great. Great.

Q. So then, and again, we had several denials, the next one is February 4th, which starts on page 2141. And this one included another Mohs surgery or surgery for the low left -- which location?

A. This one was right central frontal scalp. And yep, any more from here.

Q. And so then the --

A. Then when we did it, I think that --

Q. -- allograft application starts on page 2144.

A. That's right. And of course, we photo'd the post Mohs surgeries site. We obtained the length and the width of the area, and of course the length and the width, and within the photographs going to show us the exact location and the nature of the wound which is important. And then we applied two of

the 4 by 4-1/2 unit allografts to this wound because of its size. And so we ended up applying 22 units. 22 units were opened, 22 units were applied.

Q. And the volume of that one was 28.6 centimeters?

A. Yeah, the volume was 28.6 centimes, and that's pretty large. And that's where the, you know, you can really see the depth taking quite an effect on the volume and the total wound service area.

Q. And so getting into the comorbidities for this location.

A. Right.

Q. Starting on page 2145, walk us through the comorbidities.

A. Certainly. He had atrophic skin, scar tissue, again, which is really immunosuppressed, very difficult to control bleeding. He's on blood thinners, a bone exposed.

Q. And then in addition to doing the Mohs and the application of -- the first application of the Artacent --

A. Right.

Q. -- or the EpiFix for that Mohs procedure, you also did the fourth application for the left --

A. Occipital.

Q. Thank you.

A. Occipital. That's correct. And that was on 1/7/2022. The fourth application to the left occipital. The defect measured 2.1 and width was 2.0, depth 0.4, volume was 1.68, and that shows progression from the prior visit of 2.31. This

patient, again, we split the allografts. We opened a four -- excuse me, a 11 unit 4 by 4.5 centimeter EpiFix allograft. And we took those 11 units and divided them between the two areas of the -- excuse me. We had the left, yep.
Q. Yeah, you divided it between that and the --
A. Right, the mid crown and between the mid crown. And then for the mid crown, also on 1/7/2022, we have allograft application number four. And the defect length was 2.1, width 1.6, depth 0.4, and we can see the volume is 1.344, which is -- looks like an increase from the last visit. And again, we're having -- there can be inter -- yeah, you know, we're measuring by hand, so we try our best. And sometimes that happens where it looks like a wound's larger, but it's not, you know.
Q. And so then consistent with the LCA requirements, we've got the pictures on page 2153 of the Mohs procedure, so the post-op -- or the pre-op and the post-op for the right frontal scalp and then the post-op wounds, their progress and application under that.
A Correct. Yep.
Q. And then he came back a few days later, February 11th, for wound checks. So again, we've got on page 2154, the second allograft application for the central frontal scalp.
A. Yes. And I just wanted to say something. I had previous said, well, you know, with measurements something could seem larger. Also, if the wound is not -- if there's evidence of

something going awry with the wound, that could be why -- that could be why it's not -- it may get larger, but we generally don't see that with our wounds. But that could be a case, but I didn't believe that was the case with the one that I spoke of.

Okay. This was on February 4th, 2022. Length and width are documented, five nine and five eight. The volume's 13.688, so we've had very good improvement from the last visit. And here again, two of the 11 unit, 4 by 4-1/2 allograft units were applied. So a total of 22 units were applied.

Q. And again, the note then walked through the comorbidities --
A. Yes.
Q. -- to be clear.
A. Correct.
Q. And then we go on the bottom of page 2157 to the top of the page 2156, the --
A. Correct.
Q. -- fifth allograft application for the left occipital.
A. Occipital.
Q. I'll get there.
A. That's okay.
Q. Why don't you walk us through --
A. Certainly.
Q. -- the documentation requirements.

A. So that, what was the fifth application, was on 1/7/2022. And the length was 2.5, width 2.0, depth 0.4. And on 2.0 -- no, on -- yes, the volume went up on this one in this lesion. And again, we split the allograft, 11, 7. We opened 11 and we applied seven to this wound and then we applied four to the other.
Q. And so then the repair for the mid crown can be found on page 2159.
A. Yeah. And this is where we -- this was his fifth application also. And this is the mid crown and we applied. Excuse me. The length was 2.1 by 1.5 and the volume was 1.2, and there was good progress on this note. And also we -- this is where we applied the residual four units from the prior application to the other site.
Q. And then the post -- or the continuing the photographs as required by the LCA --
A. Correct.
Q. -- can be found on 2163 to show the progress or lack thereof in some cases.
A. Yes. Yes. He was quite ill.
Q. And so then February 17th, we get into the third application for the right central frontal scalp on 2164.
A. Okay. Yes. And that -- and there we have the defect measured 5.5 by 5.5 in width and the volume was 12.1, and that was good progress from the prior visit. We applied, let's see,

again, we applied two of the 4 by 4-1/2 EpiFix allografts and for a total of 22 units. And we have our comorbidities listed, so, and --

Q. None.

A. And then we have a -- on the date of -- for the left occipital region on 1/7/2022, we have the sixth application. The defect measured 2.5 by 2.0 and the volume is 1.5. A good progress from the prior 2.0 volume. And here we applied -- here was a splitter again where we took one allograft of the 11 unit 4 by 4-1/2, and we split it between the left occiput -- left occipital region and the mid crown. Good. And so seven went to the mid crown and four to the -- actually --

Q. Seven went to the left occipital and four --

A. Okay.

Q. -- went to the mid crown.

A. Thank you. Thank you. Seven went to the left occipital and four went to the mid crown.

Q. I also want to --

A. Yeah, please.

Q. -- just quickly correct. You mentioned 1/7/2022. That was the date of the Mohs surgery, correct?

A. Correct. Oh, sorry. Yes. Thank you.

Q. And so then the mid crown application can be found on page 2169 where we document the length, width, depth, volume, and have the previous visit's volume for you to prepare?

A. Correct. And they're appropriate, and we applied the 11 units, yes.
Q. Along with then the six -- the pictures --
A. Correct.
Q. -- for the progress for both on page 2174.
A. Yep. Correct.
Q. And so I think it's a little safe to say we go through this process every time he came in for a new -- right, in some cases even just a wound check. For example, on February 25, 2022, which is not a denied date of service, he was in for wound check.
A. Yeah, just -- yeah, and so at that time, let's see, we applied lidocaine, covered. The wound was crusted and sore to the touch, so we did not apply on that day. And we're just going to -- we just tried to -- it was the crust was so hard we applied the Aquaphor, which is it's like a very -- it's like Vaseline and that's to help liquefy the scab, if you will. And that's what we're doing there to try to get that off there when we see him at the next visit. That usually works well to get most of that scab off there in most cases.
Q. And so then he came back on another day, March 2nd, for then the fourth allograft application --
A. Correct.
Q. -- for the front scalp where we documented the size of the wound and the seventh application for the left occipital and

the mid crown, again, documenting the size, for example, of the left occipital on page 2182 and the mid crown on page 2184 with then the photographs related to that allograft application on page 2180.

A. That is correct. That is correct. And we can see that a lot of that scab did come off there, so we were able to apply.

Q. Now, can you reapply an allograft on top of a scab?

A. You could, but it's not going to effective because the scab's there. Yeah, so you try to get that off there if you can.

Q. And so some of his complications were, you know, the size and trying to manage the scabs and --

A. This is that patient bled so much. It was very difficult to control his bleeding at any point, even during the Mohs procedure. So that's what led to that scab development. And, yeah, and in some of the photos you can see is still bleeding quite a bit. So yes, difficult to control, which is a big reason why, especially at this age, to try an autograft would be not a good idea, and the size too.

Q. And so, I guess, let's talk about that for a quick minute.

A. Sure.

Q. You know, because you mentioned a --

A. Certainly.

Q. -- different type of reconstructive surgery. You know, this particular wound, both of them, I think if you look at the

pictures --
A. Yeah. Sure.
Q. -- you can tell it needs reconstructive surgery. You can't just let it heal on its own. You can't let it --
A. Right.
Q. -- do a side by side repair on it.
A. Right. Right.
Q. And so this patient then, based on some of the comorbidities, I want you to walk me through why you didn't want to take a graft from somewhere else.
A. Certainly. Certainly. You know, when -- first of all, the size of these lesions. Whenever there's a defect of greater than three centimeters, it's grafts are known not to do well beyond three centimeters, full, thickened skin grafts. Split thickened skin grafts, you're going to apply is very, very large, but full thickened skin grafts, I think three centimeters is kind of a limit. And the same with flaps.
Although flaps are much more hardier because they can -- they maintain a partial blood supply of their own direct. Once you reach the three centimeter mark they can also be compromised because of the size of the lesion. Excuse me. And with this patient also the bleeding that he's having, it's very likely that if we try to do any type of autograft or flap, that he would develop a hematoma underneath the skin that would need to be evacuated. And the flap and the -- or the graft that we

applied would've probably necrosed.

And also he is very immunosuppressed and we have bone exposure, therefore, secondary intention would be out of the question. I mean, I just, you know, I would not recommend that at all. And this is a situation where the -- this is what -- where I think allograft -- there's no question allograft has a place in Mohs surgery.

And this is a really good example of what else could you do is really the question. And there's not a lot. And you could, you know, apply -- you could do wound vac, but I think the way it would go would be let's try the allograft and then try wound vac, which we actually did in this patient. And so, it's a tough situation.

Q. And you, I guess, read where my mind was going, which is this is a patient that ultimately after several --

A. Oh, we had stopped, yes.

Q. -- allograft applications we stopped and --

A. Went to wound vac.

Q. -- went to --

A Went to wound vac, yes.

Q. And so I guess describe for me -- and that occurred on April 1st; is that correct?

A. Yes. Uh-huh. And then one of the things too -- one of the things, I believe this was denied, and they said there was no examination. The examination is the third line down where

it says granulation tissue with bio burden located in the right central scalp. There's your examination. And so --

Q. And just for the Judge's reference, we are -- that April 1st note starts on page 2225. And the examination that he's going to can be found kind of under -- there's one encounter for planned postoperative wound closure, and that's where he -- Dr. Adams is reading from at the moment.

A. Right. And right there where it says impression plan, encounter for plan, postoperative wound closure, Z48.1, granulation tissue with mild burden located on the right central frontal scalp. And then it goes on about the wound vac documentation and how that's done with documentation about that.

Q. And then also on that day we had subsequent allograft application --

A. Correct. Correct.

Q. -- for the last --

A. On other wounds, correct.

Q. Yeah, the other wounds, which is why you'll --

A. Yeah, they were progressing, so we continue with the allografts on them.

Q. And so that's why for this particular patient there's a wound vac code service as well as allograft services documentation?

A. Correct. And I believe it was the only wound vac service

in the audit, I believe.
Q. Yeah, I think. And no dates of service were not denied for this patient subsequent to this April 1st; is that correct?
A. Yes. Yes.
Q. And, but he did continue to receive wound vac services?
A. Uh-huh.
Q. And I believe the allograft applications were completed on the next date of service?
A. Correct.
Q. So for this beneficiary, the progress during the entire time services were provided from the date the allografts were provided to the date when at least one of the types of allograft had to be transitioned to a wound vac --
A. Wound care.
Q. -- wound care procedure.
A. Move that together. Right. Yeah.
Q. The services provided in your professional opinion were medically necessary?
A. Absolutely.
Q. And they met all the documentation requirements of the LCA?
A. As far as I know.
MS. WILWERT: Judge, we'll pause to see if you have any questions on beneficiary MF.
JUDGE MENDELSON: I do not have any questions. I'm going

to conclude this hearing by 3:00 p.m. Mountain Time.

MS. WILWERT: Judge, we just had one more beneficiary we wanted to cover that we thought was complex and would be useful to you in with respect to your analysis.

JUDGE MENDELSON: Okay.

MS. WILWERT: And that beneficiary is TT, and his medical records start on page 1775.

JUDGE MENDELSON: Okay.

BY MS. WILWERT:

Q. And we've got several dates of service at issue with beneficiary TT. Dr. Adams, why don't you -- beneficiary TT is well known to you. Why don't you tell me a little bit about beneficiary TT?

A. So when we -- it's important to step back a little bit because it's the same wound that we worked on currently in the current audit here. The lesion on the right ear, it was a very large lesion. It took up most of the superior half of his right ear. This patient smokes two packs of cigarettes per day.

Now, we didn't attempt a very large complex, what's called an interpolation flap over this area where we take skin from the scalp region right behind the ear and then drape it, lift a finger of the skin still attached at the base so that we get a blood supply, because a full thickened skin graft on a wound like this with somebody smoking would probably not take. I

have a strong suspicion wouldn't take and a strong feeling.

Anyway, we put that graft up there. And these interpolation flaps are generally very, very robust, but on him it totally necrosed. And the reason that we did not -- because we considered him for an allograft, but he was not approved for allograft at the time we did the Mohs surgery per his insurance. So we went ahead and did the interpolation flap because that's all we could do at that point and it necrosed. It totally necrosed black.

And so we ended up, about a month later, we saw him and we took that flap off and we -- it just so happens that his insurance changed. I don't know the details of it, but he was approved for allograft then. I want to say it's like a month or so later he was -- from the Mohs surgery date he was approved for allograft. So then we commenced with allograft utilization and it worked very well for him and it preserved his ear, which we were concerned he was going to lose.

Q. And so just to be clear, and I can't remember if I said it or not, Judge, TT's medical records start on page 2377 of file 13. Again, we have several dates of service starting with February 22nd, 2022, which was the first application of the allograft for this individual, and that starts on page 2445. And again, I guess in the interest of time, why don't you talk me through some of doctor -- or of TT's comorbidities.

A. Oh, sure. Okay. Yeah, well, we discussed that this

lesion is on the ear. He had roughly greater than 30 percent of his cartilage of his ear exposed. He also, as we said, he had a two pack of cigarette smoker per day. The skin was very atrophic and also scarred and he was on blood thinners. We spoke of the cartilage. And then he was over 60 years old as well.

And those are the primary -- you know, and kind of the -- if you look at the those comorbidities and you look at his prior history, it makes good sense why those -- why I document those, because it shows what will happen. It's the evidence to the effect of when I put stuff down here or, you know, these comorbidities there, it's these are serious.

These are -- and so, these situations require something additional. And oftentimes if you try something else, you're going to have a negative outcome as we did. But fortunately, he is -- his insurance approved his allografts some about a month or so later, and we were able to preserve his ear. Okay.

Q. And --

A. And we took all the photos, you know, with the Mohs of course, of the defect and so forth, as we did with the allografts.

Q. And so the photos, for example, for the February 22nd visit dates can be found on 2452. And with each subsequent visit, Dr. Adams, did you document the measurements of the lesion?

A. Oh, we always document the measurements as well as take photos of the area. Again, because that gives you the nature of the wound too, where it's at, how does it sit. That's very important. And also documented why we're doing the procedure.
Q. And so, I guess again, to try and bring some of this all together for each beneficiary, all of these beneficiaries, the repairs in which we were utilizing the EpiFix or the Artacent, they were all post Mohs surgical repairs, correct?
A. That's correct.
Q. And so in your opinion, or at least as far as you are aware, the LCA dealing with Mohs surgery provides the most authority with respect to the documentation requirements to evidence medical necessity, correct?
A. Correct. Correct.
Q. And that includes the requirement of measurements of the lesion?
A. That's correct.
Q. Photos?
A. That's correct.
Q. The fact that it required reconstruction?
A. Correct. And --
Q. And that the reconstructive technique was an appropriate choice to preserve functional capabilities and to restore physical appearance?
A. Right. And the language to give the rationale as to why

you're performing it as well.
Q. And it's your professional opinion that all of your medical records meet those documentation requirements?
A. Yes.
Q. And provide information related to why Mohs -- well, the allograft application was the most appropriate?
A. Yes.
Q. And again, in your professional opinion, the Mohs procedures or the allograft applications in this post Mohs surgical wound was medically necessary?
A. Yes.
MS. WILWERT: I'll pause to see if the Judge has any further questions, but otherwise conclude our position at this time.
JUDGE MENDELSON: I do not have any further questions.
MS. WILWERT: All right. Then we would thank you for your time today. And if there is anything else that we can assist as you get into the medical records and review them if you have any further questions, we would be happy to schedule another hearing or provide written documentation to address those questions.
JUDGE MENDELSON: Thank you. There being no further evidence or argument the record is closed. I'm going to take everything into consideration and I will enter a written decision as soon as possible. If it turns out that you

disagree with my decision, your further appeal rights will be included in the notice of decision that you receive. This now concludes the hearing in this matter. I very much appreciate your time in participating in this hearing and your testimony, which I found very helpful, so thank you.

MS. WILWERT: Thank you, Judge.

DR. ADAMS: Thank you as well.

JUDGE MENDELSON: All right. Goodbye.

DR. ADAMS: Okay. Bye.

**(Whereupon, the hearing in the above-entitled matter was adjourned.)**

**<u>CERTIFICATION</u>**

This is to certify that the attached proceedings before the Office of Medicare Hearings and Appeals, in the matter of **ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, PA v. CENTERS FOR MEDICARE AND MEDICAID SERVICES**, Docket No. M-24-1294, Appeal No. 3-12683356911, convened at tele-conference, on October 11th, 2023, 9:32 a.m. Mountain Standard Time, before JAMIE LYNN MENDELSON, Administrative Law Judge, were held and recorded as herein appears, and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.

Debbi L. Zasada
__________________________
DEBBI ZASADA
Transcriber