# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ADVANCED DERMATOLOGY AND
SKIN CANCER CENTER, P.A.,

     *Plaintiff*,

     v.

ROBERT F. KENNEDY, JR., in his
official capacity as Secretary, United States
Department of Health and Human
Services,

     *Defendant*.

Case No. 2:25-cv-02250

MAC Docket No.: M-24-1294
ALJ Appeal No.: 3-12683356911

## PLAINTIFF'S OPENING BRIEF

## TABLE OF CONTENTS

**Introduction** ................................................................................................................ **1**

**Statement of Facts** ...................................................................................................... **2**

    I.   Mohs Micrographic Surgery and Surgical Wound Repair. ................................ 2

    II.   Lower-level contractors deny Advanced Dermatology's skin-substitute claims under non-controlling Food & Drug Administration regulations. ........................................... 10

    III.  The ALJ decides Advanced Dermatology's appeal on a basis not raised by lower-level contractors. ......................................................................................................... 16

**Standard of Review** .................................................................................................. **23**

**Argument** .................................................................................................................. **24**

    I.   The ALJ incorrectly decided Advanced Dermatology's appeal on a new issue without proper notice. .................................................................................................... 24

    II.   The ALJ applied the "experimental or investigational" standard to Advanced Dermatology's claims arbitrarily and capriciously. ................................................ 28

    III.  The ALJ's decision is otherwise not supported by substantial evidence. ......................... 34

        A.   The ALJ's global finding that allografts are experimental or investigational is not supported by substantial evidence. ......................................................... 34

        B.   The ALJ's alternative global rulings are not supported by substantial evidence. ......... 35

**Conclusion** ............................................................................................................... **36**

**Introduction**

This is an appeal of the United States Department of Health and Human Services' (the Secretary's) denial of claims that Advanced Dermatology submitted to the Secretary in connection with services it provided 22 Medicare beneficiaries in early 2022. The primary issue is whether, when a Medicare appeal reaches its third level of appeal before an administrative-law judge (ALJ), the ALJ may deny a claim for reimbursement on a basis that the lower-level contractors never articulated. The answer is no. At the ALJ stage of review, ALJs only have jurisdiction to review the issues brought out before the ALJ stage of review "that were not decided entirely in a party's favor." 42 C.F.R. § 405.1032(a). If the ALJ intends to introduce a new issue, it must give the parties notice and an opportunity to present evidence on the new issue. *Id.* § 405.1032(b).

In this case, the ALJ agreed that the lower-level reviewers erred in their reasoning for denying Advanced Dermatology's claims and therefore should have entered a decision favorable to Advanced Dermatology. Nonetheless, the ALJ went on to decide, *sua sponte*, that the skin substitutes Advanced Dermatology applied to its patients' post-surgical wounds were not covered by Medicare because they were experimental and investigational, an issue that the lower-level contractors never questioned. Because the ALJ decided an issue not before her without notice to Advanced Dermatology, the ALJ erred. Further, because the ALJ decided the sole issue properly before her in Advanced Dermatology's favor, the remedy here is judgment in Advanced Dermatology's favor.

Even if the ALJ's procedure was not error—though it was—the ALJ's application of the experimental and investigational standard to its review of the products at issue was also arbitrary and capricious. As the Tenth Circuit has remarked, the words "experimental and investigational"

do not "have definite meanings in the medical community." *TMJ Implants, Inc. v. Aetna*, 498 F.3d 1175, 1190-91 (10th Cir. 2007). Nor has the Secretary published guidance to determine whether a product is experimental or investigational. As proof, the ALJ's opinion does not cite any objective factors to determine how to apply the standard and therefore could not have accounted for all the relevant factors in her decision, whatever those factors may be.

Finally, to the extent objective factors and metrics exist, the ALJ's decision is unsupported by them. Because the ALJ did not give Advanced Dermatology notice that the question whether the products were experimental or investigational was even at issue, she could not have accounted for the wealth of evidence that otherwise establishes the products' wide use and acceptance in the medical community or its proven advantage to the Medicare beneficiaries in this case.

For each reason, this Court should reverse the Secretary's final decision and enter judgment in Advanced Dermatology's favor. In the alternative, and at a minimum, this Court should remand the action to the Secretary and the ALJ for additional fact finding.

## Statement of Facts

### I.    Mohs Micrographic Surgery and Surgical Wound Repair.

1.      Advanced Dermatology is a dermatology practice that "focuses on Mohs Micrographic Surgery" (Mohs surgery) in Kansas and Nebraska. R. Vol. 1 at 68, ECF No. 14 at 49.

2.      Advanced Dermatology's founder, Dr. John Adams, is a board-certified dermatologist and accredited Mohs surgeon who has served on the Board of Directors for the American Society of Mohs Surgery; as a Clinical Professor at the University of Kansas School of Medicine; as the President of the Kansas Society for Dermatology and Dermatologic Surgery;

and has been recognized for his contributions to dermatology through the 2017 American

Academy of Dermatology's Presidential Citation Award. R. Vol. 1 at 68, ECF No. 14 at 49. He

has practiced Mohs surgery since 1993. R. Vol. 4 at 9823:20-9824:4, ECF No. 14-3 at 1283:20-

1284:4.

3.      Mohs surgery is "a complex excision technique for the removal of high risk for

recurrence skin cancers." R. Vol. 1 at 68, ECF No. 14 at 49. The procedure's cure rate is over

99% and involves a Mohs surgeon removing small margins of a patient's cancerous skin tissue in

stages and analyzing the removed tissue for cancerous cells under a microscope at each stage.

*See* R. Vol. 1 at 68-69, ECF No. 14 at 49-50; R. Vol. 4 at 9827:6-9829:7, ECF No. 14-3 at

1287:6-1289:7 (describing this procedure).

4.      Mohs surgery is a procedure that primarily removes cancerous skin tissue on a

patient's head, neck, hands, feet, and shin—"areas where it's more difficult to close" wounds and

"tissue sparing is of paramount importance." R. Vol. 4 at 9860:15-22, ECF No. 14-3 at 1320:15-

22.

5.      Though the procedure is designed to create the smallest possible surgical wound,

Mohs surgery can result in extensive wounds when a surgeon must track cancerous tissue on a

patient's body that has spread over a larger area in multiple steps. R. Vol. 4 at 9829:8-23, ECF

No. 14-3 at 1289:8-23.

6.      Surgeons have three options to repair a Mohs surgical wound: (1) secondary

intension, where the surgeon leaves the wound open to heal; (2) side-to-side repairs, where the

surgeon sutures the wound together; and (3) true reconstructive repair, where the surgeon uses a

graft or flap of skin to cover the wound. R. Vol. 4 at 9830:1-14, ECF No. 14-3 at 1290:1-14.

7.      The method a surgeon chooses to repair a wound depends on the wound's size and location on the patient's body. R. Vol. 4 at 9858:8-9861:2, ECF No. 14-3 at 1318:8-1321:2 (distinguishing the need for allografts in various wound sizes from a patient's "eyes, temple, [and] ears" and the "mid portion of the cheek"). In most cases, the Mohs surgical wound is small enough for secondary intention or a side-to-side repair. R. Vol. 4 at 9853:11-16, ECF No. 14-3 at 1313:11-16. But in the fraction of cases where the surgeon "cannot feasibly close" the wound from side to side, flaps or grafts are necessary. R. Vol. 4 at 9855:10-15, ECF No. 14-3 at 1315:10-15.

8.      In addition to a wound's size and location in making a repair decision, Mohs surgeons must also account for a patient's comorbidities. R. Vol. 4 at 9861:4-22, ECF No. 14-3 at 1321:4-22. Many of Advanced Dermatology's patients, for example, "have a tremendous amount of scar tissue from previous surgeries" that is "inflexible" and creates a risk of additional complications like necrosis, where the skin graft does not "tak[e]." R. Vol. 4 at 9861:4-22, ECF No. 14-3 at 1321:4-22. Other patients commonly have comorbidities that cause hypoxia, where a patient's "oxygenation is low." R. Vol. 4 at 9861:4-22, ECF No. 14-3 at 1321:4-22.

9.      When a graft or flap is necessary, a surgeon may use either an "autograft"—taken from the patient's own skin, *see* R. Vol. 4 at 9833:12-15, ECF No. 14-3 at 1293:12-15; or an "allograft"—a product that is derived from donated amniotic membranes, *see* R. Vol. 4 at 9831:9-25, ECF No. 14-3 at 1291:9-25. When a surgeon uses an autograft, the patient has a "much greater . . . risk for necrosis, *i.e.*, [the graft] not taking." R. Vol. 4 at 9861:13-22, ECF No. 14-3 at 1321:13-22; *see also* R. Vol. 1 at 80, ECF No. 14 at 61 (noting that "secondary intention has a significantly higher rate of infection when compared to repair via flap or grafts").

4

10.     For example, Advanced Dermatology performed Mohs surgery on Beneficiary T.T.'s right ear on January 21, 2022. *See* R. Vol. 1 at 100-01, ECF No. 14 at 81-82 (summarizing Advanced Dermatology's care of T.T.); R. Vol. 2 at 2467-2617, ECF No. 16-1 at 30-180 (reflecting T.T.'s treatment). The beneficiary had a long history of skin cancer and smoked two packs of cigarettes a day, making secondary intention contraindicated. R. Vol. 1 at 101, ECF No. 14 at 82. The beneficiary also had a history of taking blood thinners, which increased the risk of post-operative hematoma from an incisional repair. R. Vol. 1 at 101, ECF No. 14 at 82.

11.     Even so, before T.T. obtained Medicare, T.T.'s insurer refused to authorize the use of an allograft. R. Vol. 1 at 101, ECF No. 14 at 82. As a result, Advanced Dermatology performed a complex procedure that applied a flap to the post-Mohs surgical wound. R. Vol. 1 at 101, ECF No. 14 at 82. Shortly thereafter, the flap fully necrosed. R. Vol. 1 at 101, ECF No. 14 at 82; *see, e.g.*, R. Vol. 2 at 2501, ECF No. 16-1 at 64.

12.     When T.T. changed insurers, the new insurer authorized an allograft. R. Vol. 101-02, ECF No. 14 at 82-83. Advanced Dermatology then applied allografts to T.T.'s post-Mohs surgical wound seven times and documented consistent improvement without infection or necrosis. R. Vol. 1 at 102, ECF No. 14 at 83.

13.     Allografts "are the standard" product "that Mohs surgeons use." R. Vol. 4 at 9834:6-12, ECF No. 14-3 at 1294:6-12.

14.     At issue here, when Advanced Dermatology must use an allograft to repair a post-Mohs surgical wound, it used either an EpiFix or an Artacent product. R. Vol. 4 at 9834:16-21, ECF No. 14-3 at 1294:16-21. The products are "the most used by [Mohs surgeons] in the state of Kansas." R. Vol. 4 at 9835:8-11, ECF No. 14-3 at 1295:8-11.

15.    The Healthcare Common Procedure Coding System (HCPCS) code for EpiFix is Q4186; the HCPCS Code for Artacent is Q4169. *E.g.*, R. Vol. 2 at 2643, ECF No. 14-1 at 427. These codes are "reported separately [but] in conjunction with" Current Procedural Terminology, Fourth Edition (CPT-4). Codes that identify the procedure for their application, that range from 15271 to 15278. R. Vol. 2 at 347, ECF No. 14-1 at 292.[1]

16.    The American Medical Association established CPT Code 15271, for the "[a]pplication of skin substitute graft to trunk, arms, [and] legs," on January 1, 2012. R. Vol. 2 at 348, ECF No. 14-1 at 294 ("First Appearance: 20120101").

17.    Advanced Dermatology has used allografts to repair post-Mohs surgical wounds since 2016. R. Vol. 4 at 9823:20-9824:4, ECF No. 14-3 at 1283:20-1284:4.

18.    The manufacturers of Artacent and EpiFix sell the products in pre-sized packaging that will not always match the size of a post-Mohs surgical wound. R. Vol. 4 at 9867:7-16, ECF No. 14-3 at 1327:7-16; R. Vol. 4 at 9876:14-22, ECF No. 14-3 at 14-22; *see also* R. Vol. 2 at 229, ECF No. 14-1 at 175 (listing Artacent product sizes).

19.    Once an allograft package is opened, surgeons cannot reuse the excess. *See* R. Vol. 2 at 233, ECF No. 14-1 at 179 (for EpiFix: "This allograft is intended for single-patient use only. Discard all unused material."); R. Vol. 2 at 225, ECF No. 14-1 at 171 (for Artacent: "Once a package seal has been compromised, the tissue shall be either transplanted, if appropriate, or properly discarded.").

20.    In light of surgeons' inability to reuse excess allograft, surgeons bill and Medicare ordinarily reimburses the entire package. R. Vol. 4 at 9871:2-10, ECF No. 14-3 at 2-10.

---

[1] HCPCS and CPT codes identify the "physician services and other healthcare services" at issue when a provider bills Medicare for services that the provider rendered to the Medicare beneficiary. 42 C.F.R. § 162.1002(a)(5); *see id.* § 162.1002(c)(1) (making § 162.1002(a)(5) applicable "after October 1, 2015").

21.     When Advanced Dermatology selects a package size, it accounts for the size of the patient's wound and comorbidities and then chooses the smallest package it has in stock. R. Vol. 4 at 9875:10-25, ECF No. 14-3 at 1335:10-25.

22.     When Advanced Dermatology considers the size of the wound in applying a skin substitute, it must account for the length, width, *and depth* of the wound. R. Vol. 4 at 9886:23-9887:16, ECF No. 14-3 at 1347:23-1348:16; *see also* R. Vol. 2 at 347, ECF No. 14-1 at 293 (referring, under CPT Code 15271 for reporting of skin substitutes, to the "location and size of the defect" itself); R. Vol. 4 at 9857:14-19, ECF No. 14-3 at 1317:14-19 ("We take depth into account when we use allograft, because . . . you have to cover the total wound surface area that is depression. And . . . that's why I give the analogy of a swimming pool changing your pool liner[.]").

23.     Each manufacturer recommends that skin substitutes be re-applied on a weekly or bi-weekly basis, subject to the surgeon's discretion. R. Vol. 2 at 230, ECF No. 14-1 at 176 (EpiFix: "It is recommended that EpiFix grafts are applied weekly until wound epithelialization is achieved. . . . It is clinically acceptable to apply EpiFix on a biweekly basis."); R. Vol. 2 at 225, ECF No. 14-1 at 171 (Artacent: "This allograft may be applied weekly or at the discretion of the health care provider.").

24.     Each time Advanced Dermatology re-applies the products, it tracks and records the wound's progression with measurements and the patient's individualized photographs. R. Vol. 4 at 9891:4-24, ECF No. 14-3 at 1351:4-24; *see, e.g.*, R. Vol. 2 at 2467-2617, ECF No. 16-1

at 30-180 (reflecting T.T.'s treatment). The goal is for the skin to re-epithelialize, "where . . . the skin is coming over the top" of the wound.[2] R. Vol. 4 at 9921:8-13, ECF No. 14-3 at 1381:8-13.

25.     Advanced Dermatology determines whether to continue re-applying the allografts based on the wound's progression, location, and the patient's input. *See* R. Vol. 4 at 9920:25-9923:17, ECF No. 14-3 at 1380:25-1383:17 (describing this process).

26.     Many of Advanced Dermatology's Medicare patients who need allografts have the same or similar comorbidities. R. Vol. 4 at 9892:11-15, ECF No. 14-3 at 1352:11-15.

27.     Under the then-prevailing Medicare reimbursement policy, the Center for Medicaid and Medicare Services (CMS) reimbursed surgeons by reference to the average sales price of the allograft and on a per-unit basis. *See* 42 U.S.C. § 1395u(o)(1)(C); *id.* § 1395w-3a(b)(1)(B).[3] A "unit" of an allograft is a square centimeter. R. Vol. 4 at 9882:23-9883:13, ECF No. 14-3 at 1342:23-1343:13.

28.     As to EpiFix, Advanced Dermatology generally orders the smallest sizes that the manufacturer makes available, including a "five unit, 24-millimeter disc," and an "11 unit 4.0 by 4.5 centimeter mesh." R. Vol. 4 at 9869:1-22, ECF No. 14-3 at 1329:1-22. Though EpiFix advertises smaller products, they are either not available to Advanced Dermatology or CMS's reimbursement rate for the product is lower than the product's actual cost, making the product cost prohibitive. R. Vol. 4 at 9862:24-9865:8, ECF No. 14-3 at 1322:24-1325:8 (explaining that EpiFix's "2 by 3 centimeter allograft . . . [is] only available to wound care centers and hospital-

---

[2] *See also Reepithelialization*, Merriam Webster's Online Dictionary, https://www.merriam-webster.com/medical/reepithelialization (defining reepithelialization as "restoration of epithelium over a denued area (as a burn site) by natural growth or plastic surgery").

[3] Effective January 1, 2026, CMS changed its reimbursement policy for skin substitutes. *See* Medicare Program: Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems, 90 Fed. Reg. 53448, 53725-29 (Nov. 25, 2025).

based wound care," and the 3 x 3 EpiFix product's "reimbursement is less than the purchase price").

29.     Wisconsin Physician Services, the Medicare Administrative Contractor[4] for Kansas and Nebraska, has issued a Local Coverage Article[5] for Mohs surgery. R. Vol. 2 at 359-75, ECF No. 14-1 at 305-21. As to a surgeon's repair of post-Mohs surgical wounds, the article says only that the provider should document the "measurements in support of repair" and that the documentation should make clear that the "reconstructive technique performed was an appropriate choice":

> 11. Measurement from the primary lesion necessitating [Mohs surgery] and measurements in support of repair or related procedures (such as but not limited to adjacent tissue transfer/rearrangements, grafts/flaps) completing the [Mohs surgery] procedure and confirming the primary defect measurement or other relevant measurements should be verifiable. Documentation of the clinical tumor border definition may be accomplished by:
>
> - Preoperative photography with the skin stretched to delineate the visible clinical borders with or without debulking curettage (using a centimeter ruler or relation of size by another anatomic structure).
>
> - Postoperative photography to document the defect may also be considered, especially for small lesions that have a significant subepithelial component (i.e., tip of the iceberg phenomenon).
>
> - It is understood that photographic documentation may not be possible in a small percentage of cases because of technical difficulties.
>
> 12. When the surgical defect created by [Mohs surgery] requires reconstruction, it should be clear in the documentation that the reconstructive technique performed *was an appropriate choice* to preserve functional capabilities and to restore physical appearance.

---

[4] Under 42 U.S.C. § 1395kk-1, Congress authorized the Secretary to enter contracts with eligible entities to administer the Medicare program.

[5] Under 42 U.S.C. § 1395y(l)(5), Medicare Administrative Contractors have authority to promulgate Local Coverage Determinations. A Local Coverage Determination is "a determination by a fiscal intermediary . . . respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis under such parts." 42 U.S.C. § 1395ff(f)(2)(B). The Local Coverage Article provides "billing and coding information" for the "associated LCD 35494 Mohs Micrographic Surgery." R. Vol. 2 at 360, ECF No. 14-1 at 306.

R. Vol. 2 at 363, ECF No. 14-1 at 309 (emphasis added).

27.    Advanced Dermatology follows this Local Coverage Article's guidance when it performs repairs on a post-Mohs surgical wound. R. Vol. 4 at 9836:23-9839:13, ECF No. 14-3 at 1296:23-1299:13 (discussing Local Coverage Article A57477 and Advanced Dermatology's efforts to comply).

## II.    Lower-level contractors deny Advanced Dermatology's skin-substitute claims under non-controlling Food & Drug Administration regulations.

30.    Each claim at issue in this appeal relates to Advanced Dermatology's use of an EpiFix or Artacent skin substitute to repair a post-Mohs surgical wound. R. Vol. 1 at 62-65, ECF No. 15 at 28-31 (listing claims).

31.    On July 8, 2022, CoventBridge, a Unified Program Integrity Contractor,[6] sent Advanced Dermatology a request for records "associated with the reopening of Medicare claims" that Advanced Dermatology submitted to Medicare for 17 Kansas patients. R. Vol. 1 at 224-29, ECF No. 14 at 138-42, ECF No. 15 at 102. Advanced Dermatology complied with CoventBridge's request. R. Vol. 1 at 230, ECF No. 14 at 230. The dates of service for which CoventBridge sought records was January 1, 2022, through June 30, 2022. R. Vol. 1 at 229, ECF No. 15 at 102.[7]

---

[6] Under 42 C.F.R. § 421.304, CMS contracts with integrity program contractors to audit providers' claims, among other functions.

[7] Medicare-claims appeals have five stages of review: (1) initial determinations, 42 C.F.R. § 405.920, *et seq.*; (2) redeterminations, *id.* § 405.940, *et seq.*; (3) reconsiderations, *id.* § 405.960, *et seq.*; (4) ALJ hearings, *id.* § 405.1000, *et seq.*; and (5) Medicare Appeals Council review, *id.* § 405.1100, *et seq.* The Secretary does not issue a "final decision" for federal judicial review until an "individual claimant has pressed his claim through all designated levels of administrative review." *Heckler v. Ringer*, 466 U.S. 602, 606 (1984). As described below, Advanced Dermatology followed this "Byzantine . . . appeals process" before filing this appeal. *Family Rehab. Inc. v. Azar*, 886 F.3d 496, 498 (5th Cir. 2018).

32.     The same day, CoventBridge sent Advanced Dermatology a request for records associated with Advanced Dermatology's submission of claims to Medicare for five Nebraska patients. R. Vol. 1 at 724-28, ECF No. 14 at 148-52, ECF No. 15 at 594. Advanced Dermatology also complied with this request. R. Vol. 1 at 730, ECF No. 14 at 154. As above, the dates of service for which CoventBridge sought records was January 1, 2022, through June 30, 2022. R. Vol. 1 at 730, ECF No. 15 at 594.

33.     Each request sought records "[f]or all skin substitutes and wound care products, including but not limited to Artacent, Epifix, and Epicord." R. Vol. 1 at 226, ECF No. 14 at 140; R. Vol. 1 at 726, ECF No. 14 at 150 (emphasis omitted).

34.     On November 10, 2022, CoventBridge denied "80.37% of claim lines reviewed . . . as not reasonable and necessary," R. Vol. 2 at 187, ECF No. 14-1 at 141, and a further "41.72% of claims lines reviewed . . . as services related to non-covered/denied primary services," R. Vol. 2 at 188, ECF No. 14-1 at 142. CoventBridge denied the claims because it determined Advanced Dermatology was "[u]sing amniotic products for wound healing, which is not their homologous use." R. Vol. 2 at 188, ECF No. 14-1 at 142.

35.     In explaining its denial, CoventBridge referred to Food & Drug Administration (FDA) regulations that defined "homologous use" as "clearly the same in the recipient as the way they were used in the donor." *E.g.*, R. Vol. 4 at 9007, ECF No. 18-3 at 1350; R. Vol. 4 at 9016, ECF No. 18-3 at 1359; R. Vol. 4 at 9020, ECF No. 18-3 at 1363. Because Advanced Dermatology's records also referred to the skin substitutes' use for "tissue healing," CoventBridge asserted Advanced Dermatology's use of the products was inconsistent with the "FDA" and the FDA's regulations. R. Vol. 4 at 9007, ECF No. 18-3 at 1350; R. Vol. 4 at 9016, ECF No. 18-3 at 1359; R. Vol. 4 at 9020, ECF No. 18-3 at 1363.

36.    The FDA regulation CoventBridge cited governs the manufacture of allograft products, not their provision by providers. *See, e.g.*, R. Vol. 4 at 9007, ECF No. 18-3 at 1350 (citing 21 C.F.R. § 1271.1); *but see* 21 C.F.R. § 1271.1(a) (regulating "establishments that manufacture human cells, tissues, and cellular and tissue-based products (HCT/P's)"). The FDA cannot regulate the practice of medicine. *See* 21 U.S.C. § 396.

37.    Though CoventBridge noted that the skin substitutes could be used "off label," it referred to chapter 3, § 3.6.2.2 of the Medicare Program Integrity Manual (the Manual) to determine whether the skin substitutes were reasonable and necessary. R. Vol. 4 at 9007, ECF No. 18-3 at 1350; R. Vol. 4 at 9016, ECF No. 18-3 at 1359; R. Vol. 4 at 9020, ECF No. 18-3 at 1363. CoventBridge, however, determined that the products "exceeded the beneficiary's medical need and was outside the accepted standards of medical practice for a small surgical wound." R. Vol. 4 at 9007, ECF No. 18-3 at 1350; R. Vol. 4 at 9016, ECF No. 18-3 at 1359; R. Vol. 4 at 9020, ECF No. 18-3 at 1363. It did not determine that the products themselves or their use was experimental or investigational. R. Vol. 4 at 9007, ECF No. 18-3 at 1350; R. Vol. 4 at 9016, ECF No. 18-3 at 1359; R. Vol. 4 at 9020, ECF No. 18-3 at 1363.

38.    Between November 21 and 23, 2022, Wisconsin Physician Services sent Advanced Dermatology four further letters to explain that it had determined Advanced Dermatology had received an overpayment from its use and application of skin substitutes. R. Vol. 2 at 140, ECF No. 14-1 at 111; R. Vol. 2 at 155, ECF No. 14-1 at 118; R. Vol. 2 at 164, ECF No. 14-1 at 125; R. Vol. 2 at 178, ECF No. 14-1 at 132.

39. As to each claim, the letters said:

> Based on Medicare guidelines, the service(s) on the original claim was not considered medically necessary. This decision is based on either the documentation that was submitted or the failure by the physician/supplier to furnish information that was requested to support the claim. Therefore, payment was made to you in error.

R. Vol. 2 at 146-54, ECF No. 16 at 39-47; R. Vol. 2 at 161-63, ECF No. 16 at 48-50; R. Vol. 2 at 170-77, ECF No. 16 at 51-58; R. Vol. 2 at 184, ECF No. 16 at 59.

40.     Advanced Dermatology sought a redetermination of Wisconsin Physician Services' finding on December 13, 2022. R. Vol. 2 at 2625, ECF No. 14-1 at 411. Along with Advanced Dermatology's request for reconsideration, Advanced Dermatology included a letter explaining its use of skin substitutes for post-Mohs Surgery Repair. R. Vol. 2 at 2637-40, ECF No. 14-1 at 421-24. Among other things, the letter explained that: (1) Advanced Dermatology "offers allografts to carefully selected patients with relatively large wounds and additional medical indications," particularly in "high-risk (sensitive head, neck, hands, feet and pretibial region) locations, which are medically indicated for reconstructive surgery"; and (2) by reference to numerous published articles, that the use of skin substitutes "is scientifically supported," R. Vol. 2 at 2639, ECF No. 14-1 at 422.

41.     On February 6, 2023, Wisconsin Physician Services denied Advanced Dermatology's request for redetermination. R. Vol. 2 at 46, ECF No. 14-1 at 42. As to the skin substitutes at issue—"18 lines of service of Q4169 and 39 lines of service of Q4186"—Wisconsin Physician Services characterized their use as "off label," said the records "did not contain medical literature to support the medical necessity of the services billed," and denied the claims because "the submitted medical records did not meet guidelines requirements to demonstrate the medical necessity of the services." R. Vol. 2 at 50, ECF No. 14-1 at 46.

13

42.     As to the reconstructive techniques at issue—"eight lines of services billed with CPT Code 15271, one line of service billed with CPT code 15272, 52 lines of services billed with CPT code 15275 and seven lines of services billed with CPT code 15726"— Wisconsin Physician Services determined that the services were "denied as they were billed in conjunction with services that were denied as not medically reasonable and necessary." R. Vol. 2 at 51, ECF No. 14-1 at 47.

43.     On April 11, 2023, the Qualified Independent Contractor, C2C Innovative Solutions (C2C) received Advanced Dermatology's request for reconsideration. R. Vol. 2 at 35-43, ECF No. 14-1 at 31-39.

44.     Along with Advanced Dermatology's request for reconsideration, Advanced Dermatology again included a letter explaining both the Mohs surgical procedure and its post-surgical wound repair techniques. R. Vol. 2 at 38-43, ECF No. 14-1 at 34-43. Advanced Dermatology further explained that the Mohs surgical procedure—and its concomitant wound-repair process—was covered by Local Coverage Article A57477 (Mohs Micrographic Surgery), that provides, in relevant part, that "the reconstructive technique performed was an *appropriate choice to preserve functional capabilities and to restore physical appearance*." R. Vol. 2 at 40, ECF No. 14-1 at 36 (emphasis added); *see also* R. Vol. 2 at 363, ECF No. 14-1 at 309. Finally, because Wisconsin Physician Services referenced a need for "medical literature," Advanced Dermatology enclosed and described a published article on the use of allografts for post-Mohs surgical wounds. R. Vol. 2 at 41, ECF No. 14-1 at 37.

45.     On June 9, 2023, C2C Innovative Solutions entered an unfavorable finding regarding Advanced Dermatology's claims. R. Vol. 1 at 9467, ECF No. 14 at 1475. Of note, despite ultimately denying Advanced Dermatology's claims, C2C itself found "that any flawed

rationale used by the UPIC [CoventBridge] or MAC [Wisconsin Physician Services] in the redetermination decision is *cured* by the QIC reconsideration." R. Vol. 1 at 9475, ECF No. 14 at 1483 (emphasis added).

46.    As to the claims at issue in this case, C2C relied on an FDA regulation, 21 C.F.R. § 1271.10(a), that again applies only to manufacturers of skin substitutes, not providers. R. Vol. 1 at 9471-72, ECF No. 14 at 1480-81; *see* 21 C.F.R. § 1271.1(a) (making part applicable to "establishments that manufacturer . . . HCT/P's"). In relevant part, the regulation provides that human cells, tissues, or cellular or tissue-based products (HCT/Ps) are regulated "solely under section 361 of the [Public Health Service] Act if it is, among other requirements, "intended for homologous use only." R. Vol. 1 at 9471, ECF No. 14 at 1479 (quoting 21 C.F.R. § 1271.10(a)). "Homologous use," it recited, includes the "repair . . . of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as the donor." R. Vol. 1 at 9472, ECF No. 14 at 1480 (quoting 21 C.F.R. § 1271.3(c)).

47.    C2C applied this regulation to decide that Advanced Dermatology's use of skin substitutes was not reasonable and necessary because "wound healing and reduction of scarring and inflammation are not basic functions of amniotic membrane." R. Vol. 1 at 9476, ECF No. 14 at 1484. Rather, in its view, amniotic membranes are only "applied to the surface of the eye to cover or offer protection from the surrounding environment in-ocular repair and reconstruction procedures." R. Vol. 1 at 9476, ECF No. 14 at 1484.

48.    After deciding that the skin substitutes did not meet the FDA's "homologous use" requirement, C2C then reasoned that "the amniotic skin substitute allografts are denied as not medically reasonable and necessary under Section 1862(a)(1)(A) of the Act and the MPIM,

Chapter 3, § 3.6.2.2, as these products cannot be used for wound healing per the CFR and FDA." R. Vol. 1 at 9476, ECF No. 14 at 1484.

49.     Nowhere in C2C's denial of Advanced Dermatology's skin substitute claims did it refer to the skin-substitute products themselves as "experimental or investigational." *See generally* R. Vol. 1 at 9467-77, ECF No. 14 at 1475-85. Thus, where C2C asserted that any "flaws" with Wisconsin Physician Services' findings arose, C2C necessarily accepted the medical literature that Advanced Dermatology produced. R. Vol. 1 at 9475, ECF No. 14 at 1483.

## III.    The ALJ decides Advanced Dermatology's appeal on a basis not raised by lower-level contractors.

50.     Advanced Dermatology timely requested ALJ review of C2C's denial. R. Vol. 1 at 11-13, ECF No. 14 at 18-20.

51.     Along with Advanced Dermatology's request for review of C2C's denial, Advanced Dermatology attached: (1) a letter explaining C2C's errors; and (2) three recent ALJ decisions finding in favor of Advanced Dermatology's use of the same skin substitutes. R. Vol. 1 at 9513-9518 (letter), ECF No. 14 at 1512-1518; R. Vol. 1 at 9519-9647, ECF No. 14 at 1519-1614 (ALJ decisions).

52.     In the request for review, Advanced Dermatology argued that it followed the Local Coverage Article governing Mohs surgery, R. Vol. 1 at 9514-16, ECF No. 14 at 1514-16, and that C2C erred in relying on non-controlling FDA guidance, R. Vol. 1 at 9517-18, ECF No. 1517-18.

53.     In addition, the decisions that Advanced Dermatology attached to its request for ALJ review included at least four beneficiaries—whose later claims are also at issue here—for whom an ALJ determined that Advanced Dermatology's use of skin substitutes was reasonable and necessary and therefore covered by Medicare. The beneficiaries included:

a.     C. Barnes. *See* R. Vol. 1 at 9503, ECF No. 15-3 at 1988 (listing appeal of unfavorable C2C determinations in this action as to use of allograft for "C. Barnes" with dates of service from January 21, 2022, through February 12, 2022); R. Vol. 1 at 9580 (identifying C.B. as "C. Barnes" in earlier action).

b.     B. Bidwell. *See* R. Vol. 1 at 9503, ECF No. 15-3 at 1988 (listing appeal of unfavorable C2C determinations in this action as to use of allografts for "B. Bidwell" with dates of service from January 24, 2022, through February 16, 2022); R. Vol. 1 at 9600-01 (making favorable finding in separate action as to use of Artacent allograft for "B.B." in March 2021); R. Vol. 1 at 9631, ECF No. 15-3 at 2008 (identifying "B. Bidwell" as beneficiary in earlier action).

c.     E. Anderson. *See* R. Vol. 1 at 9503, ECF No. 15-3 at 1988 (listing appeal of unfavorable C2C determinations in this action as to use of allografts for "E. Anderson" with dates of service from May 2, 2022, through May 16, 2022); R. Vol. 1 at 9634, ECF No. 15-3 at 2011 (identifying E.A. as "E. Anderson" in earlier action).

d.     J. Gruber. *See* R. Vol. 1 at 9505, ECF No. 15-3 at 1988 (listing appeal of unfavorable C2C determinations in this action as to use of allografts for "J. Gruber" with dates of service of February 23, 2022, and May 9, 2022); R. Vol. 1 at 9637, ECF No. 15-3 at 2014 (identifying J.G. as "J. Gruber").

54.    The ALJ in this action scheduled and held a hearing on Advanced Dermatology's claims for October 11, 2023. R. Vol. 2 at 11, ECF No. 14-1 at 10; R. Vol. 4 at 9815-9972, ECF No. 14-3 at 1275-1432 (transcript). The notice said: "The issues before the Administrative Law Judge include all of the issues brought out in the initial determination . . .; redetermination; or

17

reconsideration that were not decided entirely in a party's favor, for the claims or other appealed matters specified in the request for hearing." R. Vol. 2 at 14, ECF No. 14-1 at 13.

55.     Ahead of the ALJ hearing on Advanced Dermatology's appeal, the original auditor, CoventBridge, filed a position paper. R. Vol. 4 at 8985-94, ECF No. 14-3 at 1256-61, ECF No. 18-3 at 1330-37. The reasons CoventBridge asserted for the denials were: "products were not used in a homologous fashion, did not apply a graft as defined, billed and used a larger sized product than necessary, cloned documentation, and application of the products . . . were related to non-covered services." R. Vol. 4 at 8985, ECF No. 14-3 at 1256. CoventBridge did not assert that the products themselves were experimental or investigational. *See generally* R. Vol. 4 at 8985-94, ECF No. 14-3 at 1256-61, ECF No. 18-3 at 1330-37.

56.     At the hearing, aside from a series of questions about an article that Dr. Adams co-authored in a published, peer-reviewed journal on the use of allografts, *see* R. Vol. 4 at 9824:8-9826:24, ECF No. 14-3 at 1284:8-1286:24, the ALJ did not substantively question whether EpiFix or Artacent were experimental or investigational.

57.     In addition, counsel for Advanced Dermatology and Dr. Adams attempted to show, on a beneficiary-by-beneficiary basis, why Advanced Dermatology's use of skin substitutes was reasonable and necessary. *See* R. Vol. 4 at 9897:3-9930:9, ECF No. 14-3 at 1357:3-1390:9 (Beneficiary E.A.); R. Vol. 4 at 9931:18-9939:5, ECF No. 14-3 at 1391:18-1399:5 (Beneficiary C.B.); R. Vol. 4 at 9939:6-9950:16, ECF No. 14-3 at 1399:6-1410:16 (Beneficiary W.C.); R. Vol. 4 at 9950:17-9966:1, ECF No. 14-3 at 1410:17-1426:1 (Beneficiary M.F.); R. Vol. 4 at 9966:2-9970:15, ECF No. 14-3 at 1426:2-1430:2 (Beneficiary T.T.).

58.    Once Advanced Dermatology finished explaining beneficiary M.F.'s medical treatment, however, the ALJ announced that she was "going to conclude this hearing by 3:00 p.m. Mountain Time." R. Vol. 4 at 9965:25-9966:1, ECF No. 14-3 at 1425:25-1426:1.

59.    On October 30, 2023, the ALJ entered a written decision that denied Advanced Dermatology's skin-substitute claims. R. Vol. 1 at 108-25, ECF No. 14 at 89-106.

60.    Rather than reviewing Advanced Dermatology's treatment of each Medicare beneficiary, the ALJ gave a "Global Discussion Pertaining to Medicare Coverage of the Amniotic Allografts and Related Services." R. Vol. 1 at 23, ECF No. 14 at 30.

61.    First, contrary to Advanced Dermatology's argument, the ALJ ruled that the coverage criteria for Mohs surgery in Local Coverage Determination L35494 and Local Coverage Article A57477 did not "also encompass the amniotic allografts" at issue. R. Vol. 1 at 24, ECF No. 14 at 31. Instead, the ALJ applied the reasonable-and-necessary criteria in "chapter 3, section 3.6.2.2" of the Manual. R. Vol. 1 at 23-24, ECF No. 14 at 31-32.

62. Under § 3.6.2.2 of the Manual, Medicare covers services when they are:

1.  Safe and effective;

2.  Not experimental or investigational; and

3.  Appropriate, including the duration and frequency in terms of whether the service or item is:

    • Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;

    • Furnished in a setting appropriate to the beneficiary's medical needs and condition;

    • Ordered and furnished by qualified personnel; and

    • One that meets, but does not exceed, the beneficiary's medical need.

R. Vol. 1 at 25, ECF No. 14 at 32 (quoting Manual, ch. 3 § 3.6.2.2).

19

63.     Second, the ALJ agreed with Advanced Dermatology that "the Medicare contractors' reliance on the FDA's regulatory classification and approved uses of amniotic allograft is not dispositive in this appeal," nor was it "persuasive." R. Vol. 1 at 25, ECF No. 14 at 32.

64.     Third, however, the ALJ went on to decide whether Advanced Dermatology's use of the allografts was "experimental or investigational under chapter 3, section 3.6.2.2" of the Manual. R. Vol. 1 at 27, ECF No. 14 at 34. Then, by reference to the study Dr. Adams discussed at the hearing and a Blue Cross Blue Shield of Kansas policy, the ALJ held: "The use of amniotic allografts to repair Mohs surgery defects has not been adequately studied," and "the use of amniotic allografts administered by the appellant is still experimental or investigational." R. Vol. 1 at 27-28, ECF No. 14 at 34-35.

65.     Finally, the ALJ noted that she agreed with the lower-level findings that Advanced Dermatology used "boilerplate language that should not be afforded significant weight." R. Vol. 1 at 27, ECF No. 14 at 34. The ALJ also noted that "Dr. Adams also testified at the hearing that he frequently uses and bills for more amniotic allograft than necessary . . ." R. Vol. 1 at 27, ECF No. 14 at 34. The ALJ ignored Dr. Adams' testimony that: (1) smaller package sizes are not available, R. Vol. 4 at 9869:1-22, ECF No. 14-3 at 1329:1-22; R. Vol. 4 at 9862:24-9865:8, ECF No. 14-3 at 1322:24-1325:8; (2) the package will not always match the size of a wound, R. Vol. 4 at 9867:7-16, ECF No. 14-3 at 1327:7-16; R. Vol. 4 at 9876:14-22, ECF No. 14-3 at 1336:14-22; (3) surgeons must otherwise discard any excess, R. Vol. 4 at 9872:7-11, ECF No. 14-3 at 1332:7-11; (4) Medicare reimburses providers for the entire package, R. Vol. 4 at 9871:2-10, ECF No. 14-3 at 1331:2-10; and (5) surgeons must account for the depth of the wound, R. Vol. 4 at

20

9886:23-9887:16, ECF No. 14-3 at 1346:23-1347:16; R. Vol. 4 at 9857:14-19, ECF No. 14-3 at 1317:14-19.

66.    In addition, the ALJ failed to articulate a standard for what constituted "excess" and failed to identify any particular beneficiary for whom Dr. Adams applied excess allograft. R. Vol. 1 at 27, ECF No. 14 at 34.

67.    Because the ALJ found the Artacent and EpiFix products experimental and investigational, she upheld the lower-level contractors' denials of Advanced Dermatology's claims for the skin substitutes themselves (HCPCS codes Q4186 and Q4169), as well as Advanced Dermatology's claims for the application of the skin substitutes (CPT Codes 15271, 15272, 15275, and 15276, and HCPCS Code J0696). R. Vol. 1 at 27-28, ECF No. 14 at 34-35.

68.    On January 3, 2024, Advanced Dermatology timely appealed the ALJ's decision to the Medicare Appeals Council. R. Vol. 1 at 66, ECF No. 14 at 47.

69.    In its appeal to the Council, Advanced Dermatology enclosed a letter asserting: (1) the ALJ decided an issue not before her; (2) the ALJ wrongfully cut Advanced Dermatology's presentation of evidence off at the hearing; and (3) Advanced Dermatology's care for the beneficiaries was reasonable and necessary because: (a) amnionic allografts are safe and effective; (b) amnionic allografts are not experimental or investigational; and (c) Advanced Dermatology used the allografts appropriately in terms of duration and frequency. R. Vol. 1 at 71-75, ECF No. 14 at 52-56.

70.    Advanced Dermatology further enclosed a beneficiary-by-beneficiary analysis of Advanced Dermatology's care, with pinpoint citations to the administrative record. R. Vol. 1 at 77-105, ECF No. 14 at 58-86.

71.    Advanced Dermatology also attached a list of published journal articles and case studies on the use of skin-substitute allografts, three of which it included in the administrative record before the ALJ, two of which the ALJ ignored. R. Vol. 1 at 106, ECF No. 14 at 87. The list included:

| Title | Authors | Publish Date |
|---|---|---|
| Case Series: The use of a dehydrated human amnion/chorion membrane allograft to enhance healing in the repair of lower eyelid defects after Mohs micrographic surgery | Oliver J. Wisco, DO, FAAD, FACMS | July 2016 |
| https://pubmed.ncbi.nlm.nih.gov/27504483/ | | |
| Dehydrated human amnion/chorion membrane allograft as an aid for wound healing in patients with full-thickness scalp defects after Mohs micrographic surgery | Alexis B. Lyons, MD, Lisa K. Chipps MD, FAAD, Ronald L. May MD, Jennifer L. Herrmann MD, FAAD | August 2018 |
| https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6098201/#:~:text=Dehydrated%20human%20amnion%2Fchorion%20membrane%20(dHACM)%20allografts%20are%20skin,need%20for%20meticulous%20wound%20care. | | |
| Incidence of Surgical Site Infections in Second Intention Healing After Dermatologic Surgery | Joshua Schimmel, BS; Matthew Belcher, MD; Carlos Vieira, BS; Naomi Lawrence, MD; and Ashley Decker, MD. | 2020 |
| •     File 13 at 151-156 [R. Vol. 2 at 242-47] | | |
| Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane | Julia Toman, MD; Georgina M. Michael, MSN, FNP-BC, Oliver J. Wisco, DO, FAAD, FACMS; John R. Adams, MD; and Brandon S. Hubbs, MS, MA. | 2021 |
| •     File 13 at 157-162 [R. Vol. 2 at 248-53] | | |
| Use of Amniotic Tissue-Derived Allografts Post-Mohs Micrographic Surgery:  A Preliminary Study Assessing Wound Closure Rate | Kayleen Seaton, Dustin Mullens, Jason Barr, Elizabeth Hull, Richard Averitte | July 2021 |
| https://www.hmpgloballearningnetwork.com/site/wounds/original-research/use-amniotic-tissue-derived-allografts-post-mohs-micrographic-surgery#:~:text=Amniotic%20tissue%E2%80%93derived%20allograft%20(ATDA,have%20undergone%20Mohs%20micrographic%20surgery. | | |
| Wound Grafts | Anna Elseth; Omar Nunez Lopez. | October 2022 |
| •     File 13 at 163-168 [R. Vol. 2 at 254-59] | | |
| Dehydrated Human Amnion/Chorion Membrane Allograft for Postoperative Wounds Following Mohs Micrographic | Sadaf Moradi, BS; Ana Ormaza, MD; and Navid Ezra, MD. | July 2023 |

22

| Surgery: A Retrospective Comparative Evaluation | | |
| --- | --- | --- |
| https://www.hmpglobpallearningnetwork.com/site/wounds/original-research/dehydrated-human-amnionchorion-membrane-allograft-postoperative | | |

R. Vol. 1 at 106, ECF No. 14 at 87.

72.     After the time for the Medicare Appeals Council to act on Advanced Dermatology's appeal passed, Advanced Dermatology requested permission to appeal to a federal district court. R. Vol. 1 at 8. The Medicare Appeals Council granted Advanced Dermatology's request, R. Vol. 1 at 2, ECF No. 14 at 9, and this appeal followed.

## Standard of Review

Judicial review of the Secretary's decision over Medicare coverage is for competent substantial evidence. 42 U.S.C. § 405(g); *see id.* § 1395ff(a)(1)(A). Under this section, courts look "to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005)). When an "agency's decision is not supported by substantial evidence in the record," the decision is "arbitrary and capricious." *Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1120 (10th Cir. 2021).

In this case, the Medicare Appeals Council granted Advanced Dermatology's request to escalate its appeal to federal district court. R. Vol. 1 at 2, ECF No. 14 at 9. As a result, the ALJ's decision is the final agency action for review. *See* 42 C.F.R. § 405.1048(a)(1) (making ALJ decisions "binding" unless "the appeal is escalated to Federal district court . . . and the Federal district court issues a decision"); *see also Fla. Med. Ctr. of Clearwater, Inc. v. Sebelius*, 614 F.3d

23

1276, 1280 (11th Cir. 2010) (holding ALJ decision the "final decision of the Secretary" where the Medicare Appeals Council denied the provider's appeal).

**Argument**

**I.    The ALJ incorrectly decided Advanced Dermatology's appeal on a new issue without proper notice.**

In this case, the ALJ failed to apply the "correct legal standards" when she impermissibly decided Advanced Dermatology's claims on an issue that was not decided against Advanced Dermatology by a lower-level contractor. *Lax*, 489 F.3d at 1084.

Specifically, under 42 C.F.R. § 405.1032(a), the only "issues before the ALJ" are the "issues for the claims or appealed matter specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration *that were not decided entirely in a party's favor*." (emphasis added). Under the plain language of this regulation, the "issues" are the specific reasons that the lower-level contractors gave "for the claims . . . that were not decided entirely in a party's favor," not the overarching fact that the lower-level contractors denied Advanced Dermatology's claims. *Id.* Thus, § 405.1032(b) confirms that a "new issue" is a specific "new issue *relating to* a claim or appealed matter specified in the request for hearing[.]" (emphasis added).

As it relates to the claims here, the relevant issues decided against Advanced Dermatology were:

(1) *Initial determination*: "Therefore, the claim . . . is denied as not reasonable and necessary as Artacent both exceeded the beneficiary's medical need and was outside the accepted standards of medical practice for a small surgical wound." *E.g.*, R. Vol. 4 at 9026, ECF No. 18-3 at 1369.

(2) *Redetermination*: "The documentation supported the services were provided as billed. However, the records did support off-label use and did not contain medical literature to support the medical necessity of the services billed." R. Vol. 2 at 50, ECF No. 14-1 at 46.

24

(3) *Reconsideration*: "[t]he provider is not utilizing the products in a homologous manner . . . . Specifically, the documentation supports that the amniotic skin substitute allografts are being utilized for wound healing which is not homologous use." R. Vol. 1 at 9476, ECF No. 14 at 1484.

Importantly, C2C's reconsideration decision: (1) found "that any flawed rationale used by [CoventBridge] or [Wisconsin Physician Services] in the redetermination decision is *cured* by [C2C's] reconsideration,"; (2) applied "Chapter 3, Section 3.6.2.2" of the Manual in full to analyze Advanced Dermatology's claims; and (3) said only that the "products cannot be used for wound healing per the CFR and FDA."  R. Vol. 1 at 9476, ECF No. 14 at 1484 (emphasis added). Accordingly, the ALJ similarly characterized the lower-level denials as "primarily on the basis that the FDA has approved amniotic membrane products, such as the amniotic allografts at issue, only for homologous use[.]" R. Vol. 1 at 25, ECF No. 14 at 25. Thus, at the ALJ stage, the only "issue" that was "not decided entirely in [Advanced Dermatology's] favor" was the question whether Medicare covered EpiFix and Artacent when they are also used for wound healing.

To be sure, contrast the regulatory framework for redeterminations and reconsiderations—the first and second levels of appeal—with the regulatory framework for hearings before an ALJ. At the redetermination stage, contractors may "raise and develop new issues that are relevant to the claims in the particular case." 42 C.F.R. § 405.948. Likewise, at the reconsideration stage, contractors review "all issues related to payment of the claim." 42 C.F.R. § 405.968(a)(1). But once an appeal reaches the ALJ stage, the issues are limited to those "specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's favor." 42 C.F.R. § 405.1032(a).

Further, an ALJ can "only consider a new issue . . . if its resolution could have a material impact on the claim or appealed matter" *and* (1) new evidence impacts the decision or the evidence considered shows an error, *id.* § 405.1032(b)(1)(i), (ii); (2) the ALJ gives the parties notice of the new issue "before the start of the hearing," *id.* § 405.1032(b)(2); *and* (3) the parties have "at least 10 calendar days after receiving notice of the new issue to submit evidence regarding the issue," *id.* § 405.1032(b)(3). CMS has explained that the purpose of this rule is to give parties "notice of any new issues of which the ALJ is aware at the time the notice of hearing is sent, and can prepare for the hearing accordingly." Medicare Program: Changes to the Medicare Claims and Entitlement, Medicare Advantage Organization Determination, and Medicare Prescription Drug Coverage Determination Appeals Procedures, 82 Fed. Reg. 4974, 5052 (Jan. 17, 2017). For example:

> [I]f in the request for hearing an appellant raises an issue with the methodology used to sample claims and extrapolate an overpayment, and that issue had not been brought out in the initial determination, redetermination, or reconsideration, the issue would be a new issue and the specific issue would be identified in the notice of hearing.

*Id.*

Here, however, the question whether EpiFix and Artacent skin substitutes are experimental or investigational was not brought out in the initial determination, redetermination, or reconsideration, and was never decided against Advanced Dermatology. Nor did the ALJ give Advanced Dermatology proper notice that she was going to consider the experimental-or-investigational issue. Advanced Dermatology thus could not "prepare for the hearing accordingly," *id.*, and the ALJ erred, as a matter of law, in deciding the issue *sua sponte*.

Rather, once the ALJ decided that FDA regulations were neither "dispositive" nor "persuasive," R. Vol. 1 at 25, ECF No. 14 at 32, she decided the only controlling "issue" before her and should have accordingly held Advanced Dermatology's claims for the skin-substitute products and their accompanying procedures covered. *See Elder v. Hargan*, No. 16-cv-290-FPG, 2018 WL 563831, at *2 (W.D.N.Y. Jan. 26, 2018) (holding ALJ only had "jurisdiction to consider" issues "considered at both the redetermination and reconsideration stages of [the beneficiary's] appeal").

Advanced Dermatology's submission of a journal article and insurance policy did not raise the issue whether EpiFix or Artacent were experimental or investigational. *See* R. Vol. 1 at 26-27, ECF No. 14 at 33-34 (reviewing these documents). Advanced Dermatology submitted the article and policy to show the allografts were "an appropriate choice to preserve functional capabilities and to restore physical appearance" under Local Coverage Article A57477, a separate issue that Advanced Dermatology claimed controlled but C2C and the ALJ rejected. *See* R. Vol. 1 at 9515, ECF No. 14 at 1515 (emphasis omitted); R. Vol. 1 at 9475, ECF No. 14 at 1483 (stating, at the reconsideration stage, "LCA A57477 is not relevant to the services at issue in this appeal").

Likewise, the fact that ALJs apply a de novo standard of review, *see* 42 C.F.R. § 405.1000(d), does not change the analysis because that de novo review is still cabined to the "issues . . . *specified in the request for hearing* that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in that party's favor." *Id.* § 405.1032(a) (emphasis added). And here, the request for hearing specified two issues: (1) the applicability of Local Coverage Article A57477 to the claims; and (2) the *in*applicability of FDA

regulations to Medicare's coverage of skin substitutes and their accompanying procedural codes. R. Vol. 1 at 9514-18, ECF No. 14 at 1514-18.

In the same vein, the fact that Advanced Dermatology did not object to the ALJ's statement of issues in its notice of hearing does not make a difference. *See* 42 C.F.R. § 405.1024(a). Even there, the notice of hearing limited the issues to those "brought out in the . . . coverage determination . . .; redetermination; or reconsideration that were not decided entirely in a party's favor[.]" R. Vol. 2 at 14, ECF No. 14-1 at 13. Because the ALJ did not raise the experimental-or-investigational issue until she rendered her opinion, Advanced Dermatology could not object to an issue for which it had no notice.

\*    \*    \*

"[O]ne thing no agency can do is apply the wrong law to citizens who come before it, especially when the right law would appear to support the citizen and not the agency." *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 976-77 (10th Cir. 2016). The ALJ here decided the substantive issue over which she had jurisdiction in Advanced Dermatology's favor and should have entered a favorable decision on this basis alone.

## II.    The ALJ applied the "experimental or investigational" standard to Advanced Dermatology's claims arbitrarily and capriciously.

In the alternative, the ALJ's *sua sponte* application of the experimental-or-investigational standard was error because her application of the standard itself was arbitrary and capricious.[8]

The bar on coverage for experimental or investigational products and services appears in chapter 3, § 3.6.2.2 of the Manual. But while the ALJ referred to the phrase "experimental or

---

[8] Advanced Dermatology notes that this issue was not briefed below. But when a court "*sua sponte* raises and explicitly resolves an issue of law on the merits, the appellant may challenge that ruling on appeal on the ground addressed by the district court even if he failed to raise the issue in district court." *United States v. Todd*, 446 F.3d 1062, 1066 (10th Cir. 2006).

investigational *as defined* under chapter 3, section 3.6.2.2 of the [Manual]," R. Vol. 1 at 27, ECF No. 14 at 34 (emphasis added), neither the Manual nor the ALJ has attempted to define the phrase. *See* CMS Publication 100-08, *Medicare Program Integrity Manual*, ch. 3, § 3.6.2.2 (Rev. Dec. 18, 2024), *available at* https://www.cms.gov/regulations-and-guidance/guidance/manuals/internet-only-manuals-ioms-items/cms019033. In relevant part, § 3.6.2.2 provides:

> . . . Recovery Auditors shall consider an item to be reasonable and necessary if the item or service meets the following criteria:
>
> - It is safe and effective;
>
> - It is not experimental or investigational; and
>
> - It is appropriate, including the duration and frequency in terms of whether the service or item is:
>
>   - Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
>
>   - Furnished in a setting appropriate to the beneficiary's medical needs and condition;
>
>   - Ordered and furnished by qualified personnel; and,
>
>   - One that meets but does not exceed, the beneficiary's medical need.

Section 3.6.2.2 further includes a "[s]ee also" reference to the Manual's "chapters 13, § 5.1 and 7.1." In chapter 13, § 5.1, the Manual describes "General Requirements" for Local Coverage Determinations and does not further explain the phrase "experimental or investigational." *See* Manual, ch. 13, § 5.1, *available at* https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/pim83c13.pdf. Section 7.1 in chapter 13 no longer exists. *See generally id.*

As the Tenth Circuit has remarked, "[f]or regulations to provide adequate guidance, they must use terms with precision." *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1189 (10th Cir. 2007). And as the Tenth Circuit held in that case, "the terms *experimental* and *investigational* do not have a settled meaning in the insurance coverage context," *id.* at 1190 (emphasis in original, collecting cases); do not "have definite meanings in the medical community," *id.* at 1190-91; and "there is no universally accepted definition for these terms," *id.* at 1191. As a result, the ALJ's application of the experimental-or-investigational standard—without otherwise articulating an objective standard, and without notice to Advanced Dermatology—could not have been "based on a consideration of the relevant factors" because there were no factors or standards to guide the ALJ in the first instance. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020).

The Tenth Circuit's decision in *TMJ Implants* proves the problem. There, the court evaluated various statements in insurance bulletins to determine whether they were subject to being proven true. It held:

**1.** Equating "experimental and investigational" with the phrase "has not been shown to be effective as" another product was not capable of objective verification, because "people will make different judgments on whether a product has been shown to be as effective as another," and "[s]ome may require only one study; others may require the gold standard of a double-blind study, or even multiple such studies." *TMJ Implants*, 498 F.3d at 1195.

**2.** Equating "experimental and investigational" with "inadequate evidence" was not capable of objective verification because "whether one considers evidence to be adequate is a matter of individual taste." *Id.*; *see also id.* at 1199 ("The statement that evidence is 'insufficient,' however . . . is not provably false.").

**3**. Equating "experimental and investigational" with "a lack of clinical data" was not capable of objective verification because "[r]easonable people may differ on how much data from clinical studies they require before they are satisfied." *Id.* at 1195-96.

*TMJ Implants* is a defamation case, but the record here further proves the wisdom of the Tenth Circuit's point. Even if the ALJ below was correct in relying on the article Advanced Dermatology submitted to establish that allografts are not experimental or investigational—though it was not—one article *was* enough for an earlier ALJ but was *not* enough for the ALJ here. *Compare* R. Vol. 1 at 26-27, ECF No. 14 at 33-34 (discussing and rejecting peer-reviewed study as insufficient to show allografts for post-Mohs surgical wounds were not experimental or investigational) *with* R. Vol. 1 at 9565, ECF No. 14 at 1560 (accepting single "peer-reviewed article to support that the use of placental allografts after Mohs surgery is medically reasonable and necessary").

In any event, *TMJ Implants*' holdings show that the ALJ here could not have applied *all* the relevant factors at issue when CMS has not said what the "relevant factors" are, let alone explained how to choose among them and evaluate the quality or degree of evidence necessary to support them. Thus, unremarkably, the ALJ below did not attempt to explain the type or quantum of evidence Advanced Dermatology needed to present to show that EpiFix and Artacent were not experimental or investigational. *See* R. Vol. 1 at 26-27, ECF No. 14 at 33-34. The ALJ's failure to explain the governing standards and how she applied them render the decision arbitrary and capricious. *See Action, Inc. v. Donovan*, 789 F.2d 1453, 1457 (10th Cir. 1986) (reasoning administrative-agency decisions must "consider all relevant factors and articulate a rational connection between the facts and the choices made"; holding Secretary of Labor action arbitrary and capricious for failing to "give reasons for applying" one accounting method over another).

31

The Fourth Circuit's decision in *Almy v. Sebelius*, 679 F.3d 297 (4th Cir. 2012), and the Ninth Circuit's decision in *International Rehabilitative Sciences Inc. v. Sebelius*, 688 F.3d 994 (9th Cir. 2012), are not persuasive here. First, in *Almy*, the court noted that the Manual "made clear that the same criteria that govern LCDs should also govern individual adjudications." 679 F.3d at 304. Now, however, the Manual does not. Today, the Manual's section for individual adjudications, § 3.6.2.2, only incorporates: (1) the general requirements for LCDs in § 13.5.1; and (2) a section of chapter 13, § 13.7.1, that no longer exists.

Second, when each case was decided, CMS *had* published guidance on the evidence necessary to establish coverage. In *Almy*, the Fourth Circuit pointed to then-existing § 13.7.1 of the Manual that distinguished between "published authoritative evidence such as definitive randomized clinical trials or general acceptance by the medical community" and "acceptance by individual health care providers and limited case studies distributed by sponsors with a financial interest in the outcome." 679 F.3d at 305. The Ninth Circuit pointed to the same language in *International Rehabilitation Services*. 688 F.3d at 1003. Again, however, the Secretary does not incorporate the same guidance today.

Third, even in light of the Secretary's former guidance in *Almy* and *International Rehabilitation Services*, the Tenth Circuit has indicated that even that guidance would be subject to matters of "individual taste," *TMJ Implants*, 498 F.3d at 1195, where the ALJ inevitably and arbitrarily "substituted [her] subjective evaluation" of the evidence for the standard, *Nat'l Parks & Conservation Ass'n v. FAA*, 998 F.2d 1523, 1533 (10th Cir. 1993). The decision does not "provide . . . a 'rational' decision" for this Court to assess. *Id.*

Nor is the ordinary deference to the Secretary's interpretation warranted in these circumstances. *See Downtown Med. Ctr./Comprehensive Health Care Clinic v. Bowen*, 944 F.2d 756, 768 (10th Cir. 1991) (noting Medicare manuals "reflect the Secretary's interpretation of the Medicare Statute and regulations"). As the Manual stands, the Secretary has not issued guidance on what establishes a service or product as not experimental or investigational. And as discussed above, the Manual's experimental-or-investigational standard is precisely the kind of ambiguous statement of policy that has now imposed "massive liability on respondent for conduct that occurred well before that interpretation was announced." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155-56 (2012). Advanced Dermatology has been using and billing the Secretary for allografts since 2016. R. Vol. 4 at 9823:20-9824:4, ECF No. 14-3 at 1283:20-1284:4. Only now, 10 years after the fact, has the Secretary taken the position in an adjudicative proceeding that allografts are experimental and investigational. *See Christopher*, 567 U.S. at 156 (citing *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974), for the proposition that "an agency should not change an interpretation in an adjudicative proceeding where doing so would impose new liability on individuals for past actions which were taken in good-faith reliance on agency pronouncements or in a case involving fines or damages" (alterations, ellipsis, and quotations omitted)); *accord Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (holding a "lack of 'fair warning' outweighed the reasons" to defer to the agency).

Today, the most the Secretary has offered is a standard that relates to the evidentiary content of Local Coverage Determinations in chapter 13, § 13.5.3 of the Manual. But: (1) that standard describes only the type of content to consider—acceptance by the medical community, published research, reviews and meta-analyses, evidenced-based consensus statements and clinical guidelines—without discussing the amount of evidence necessary to meet the standard,

*see id.*; and (2) that section is not incorporated in the Manual's reasonable-and-necessary guidance for coverage when "no local coverage determination . . . exists for a particular item or service," Manual § 3.6.2.2.

As in *Christopher*, "[i]t is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them." 567 U.S. at 158-59.  But "it is quite another to divine the agency's interpretation in advance or else be held liable when the agency announces its interpretation for the first time in an enforcement proceeding and demands deference." *Id.* The ALJ here applied an arbitrary standard—that no one has defined with any level of precision—to Advanced Dermatology's claims without notice, and no deference is due.

### III.    The ALJ's decision is otherwise not supported by substantial evidence.

#### A.    *The ALJ's global finding that allografts are experimental or investigational is not supported by substantial evidence.*

Because the ALJ did not give Advanced Dermatology notice that she would consider the experimental-or-investigational issue or give Advanced Dermatology a chance to build a record on the issue, the Secretary's decision is not supported by substantial evidence.

To the extent an adequate definition of "experimental or investigational" is available, the plain meaning of experimental is "of, relating to, or based on experience or experiment." *Experimental*, Merriam Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/experimental. The term is also defined as "serving the ends of or used as a means of experimentation." *Id.* Likewise, "investigational" means "relating to or being a drug or medical procedure that is not approved for general use but is under investigation in clinical trials regarding its safety and efficacy." *Investigational*, Merriam Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/investigational.

As Advanced Dermatology's brief to the Medicare Appeals Council showed, dermatological medical professionals have established skin substitutes as a generally accepted standard of care. In addition to Dr. Adams' testimony to this effect, R. Vol. 4 at 9835:5-11, ECF No. 14-3 at 1295:5-11, publicly available data shows that dermatologists in Kansas billed for the use of Q-coded skin substitutes accounted for 4,808 Medicare claims in 2021. R. Vol. 1 at 75, ECF No. 14 at 76. Nationally, the figure rises to 222,401 claims from dermatologists alone. R. Vol. 1 at 75, ECF No. 14 at 76. The volume of claims alone shows that dermatological use of skin substitutes is in the mainstream and long past the stage of experimentation or investigation, wherever that tipping point may be. *See TMJ Implants*, 498 F.3d at 1190.

Thus, when given a chance, Advanced Dermatology pointed to a host of studies that have been published on skin substitutes' usage and effectiveness for post-Mohs repair. R. Vol. 1 at 106, ECF No. 14 at 87. The ALJ, however, never considered these studies because she failed to give Advanced Dermatology notice of the issue and the chance to produce them. Her failure rendered her ruling arbitrary, capricious, and not supported by substantial evidence. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1583-84 (10th Cir. 1994) (holding agency action arbitrary and capricious where it "failed to provide [the plaintiff] with a 'full opportunity' to present facts and information relevant to" the agency's action, when the agency refused to let the plaintiff's attorney a chance to question a witness).

**B.  *The ALJ's alternative global rulings are not supported by substantial evidence.***

Separately, the ALJ referred to lower-level findings that Advanced Dermatology used "boilerplate language" in its records and that Dr. Adams testified that he "uses and bills for more amniotic allograft than necessary," R. Vol. 1 at 27, ECF No. 14 at 34, even though: (1) "CMS does not prohibit the use of templates to facilitate record-keeping," Manual, ch. 3, § 3.3.2.1.1.B; and (2) Dr. Adams testified that many of his patients have the same or similar comorbidities, R.

35

Vol. 4 at 9892:11-15, ECF No. 14-3 at 1352:11-15. In addition, in support of her boilerplate-language point, the ALJ cited more than 2,000 pages of the record. R. Vol. 1 at 27, ECF No. 14 at 34 (citing File 13, pp. 387-2526).

In support of her excessive-use point, the ALJ cited the "Hearing Recording" generally and did not bother to review, on a beneficiary-by-beneficiary basis, which claims involved the application of too much allograft. R. Vol. 1 at 27, ECF No. 14 at 34. Had she done so, she would have found substantial evidence to support each claim or, at a minimum, given specific reasons when and why Advanced Dermatology used too much of the products. *But see* R. Vol. 1 at 77-105, ECF No. 14 at 58-86 (detailing, by reference to the record and on a beneficiary-by-beneficiary basis, the evidence the ALJ should have considered).

In short: the ALJ's failures to give "specific reasons" for her determination, link her "conclusions to the evidence," and discuss any "evidence supporting" each claim renders these conclusions unsupported by substantial evidence. *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004).

## Conclusion

For the foregoing reasons, this Court should reverse the Secretary's decision and enter judgment in Advanced Dermatology's favor on all skin-substitute and accompanying claims for skin graft applications, HCPCS codes Q4186 (EpiFix) and Q4169 (Artacent), as well as Advanced Dermatology's claims for the application of the skin substitutes (CPT Codes 15271, 15272, 15275, and 15276, and HCPCS Code J0696). *See* R. Vol. 1 at 62-65, ECF No. 15 at 28-31 (listing claims). In the alternative, and at a minimum, remand is necessary for Advanced Dermatology to have an opportunity to present facts on the new issue that the ALJ decided.

Respectfully submitted,

*s/Samuel J. Walenz*
Samuel J. Walenz, KS #29114
FOULSTON SIEFKIN LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
T: 316-291-9713|F: 316-267-6345
swalenz@foulston.com

Amanda M. Wilwert, KS #25075
SPENCER FANE LLP
1233 Twentieth Street, Suite 600
Washington, DC 20036
T: 202-921-0771|F: 202-595-0581
awilwert@spencerfane.com

*Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2026, I electronically filed the foregoing with the

Clerk of the Court by uploading it to the CM/ECF system which will send a notice of electronic

filing to all parties receiving CM/ECF notifications in this case.

*s/Samuel J. Walenz*
Samuel J. Walenz, KS #29114