**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, P.A., Plaintiff, | ) | |
| v. | ) | Case No. 2:25-cv-02250 |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary, United States Department of Health and Human Services, Defendant. | ) | |

**CENTERS FOR MEDICAID & MEDICARE SERVICES' RESPONSE TO PLAINTIFF'S OPENING BRIEF**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

I. INTRODUCTION ........ 1

II. STATUTORY FRAMEWORK ........ 2

A. Medicare Overview ........ 2

B. Medicare Coverage Limited to Items and Procedures that are Reasonable and Medically Necessary ........ 2

C. Reimbursement of Providers and Post-Payment Review ........ 3

D. Medicare Administrative Appeals Process ........ 4

III. STATEMENT OF FACTS ........ 4

IV. STANDARD OF REVIEW ........ 10

V. ARGUMENTS AND AUTHORITIES ........ 11

A. The ALJ correctly applied the "reasonable and necessary" standard, which includes analysis of whether an item or service is experimental or investigational ........ 11

B. The ALJ's application of the MPIM standard was a reasoned, evidence-based determination guided by a clear regulatory framework ........ 17

C. The ALJ's analysis is supported by substantial evidence ........ 19

VI. CONCLUSION ........ 22

## TABLE OF AUTHORITIES

### Cases

*Almy v. Sebelius*,
679 F.3d 297 (4th Cir. 2012) ....................20

*Banks v. Sec'y HHS,*
38 F.4th 86 (11th Cir. 2022) ....................12

*Biestek v. Berryhill*,
587 U.S. 97 (2019) ....................11

*Chipman v. Shalala*,
90 F.3d 421 (10th Cir. 1996) ....................10

*Greiner Orthopedics, LLC. v. Kennedy*,
2026 U.S. Dist. LEXIS 3500 (D.D.C. Jan. 8, 2026) ....................13

*Heckler v. Ringer*,
466 U.S. 602 (1984) ....................12

*Int'l Rehab. Sci., Inc. v. Sebelius*,
688 F.3d 994 (9th Cir. 2012) ....................20

*In the Case of Caris MPI, Inc.*,
M-12-648 (2012) ....................13

*John Balko & Assocs., Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*,
555 F. App'x 188 (3d Cir. 2014) ....................3

*Lucinda S. v. Kijakazi,*
2022 U.S. Dist. LEXIS 127112 (D. Kan. 2022) ....................20

*Peterson v. Comm'r of Soc. Sec.*,
552 Fed. Appx. 533 (6th Cir. 2014) ....................20

*Richardson v. Perales*,
402 U.S. 389 (1971) ....................20

*Schink v. Comm'r of Soc. Sec.*,
935 F.3d 1245 (11th Cir. 2019) ....................20

*Via Christi Regional Med. Ctr, Inc., v. Leavitt*,
509 F.3d 1259 (10th Cir. 2007) ....................10

**Statutes**

42 U.S.C. § 405 ....................10, 20

42 U.S.C. § 1395 et seq. ....................2

42 U.S.C. § 1395j ....................2

42 U.S.C. § 1395u ....................2

42 U.S.C. § 1395w-5 ....................2

42 U.S.C. § 1395y ....................2, 4, 12

42 U.S.C. § 1395ff ....................3, 10, 12

42 U.S.C. § 1395hh ....................2

42 U.S.C. § 1395kk-1 ....................2

42 U.S.C. § 1395ddd ....................2, 4

**Other Authorities**

Eyal Hariton & Joseph J. Locascio, *Randomized Controlled Trials—the Gold Standard for Effectiveness Research*, 125 BJOG (Int'l Journal of Obstetrics and Gynecology) 1716 (2018)...21

Local Coverage Article A57477 ....................13

Local Coverage Determination (LCD) L35494 ....................13

Local Coverage Determination (LCD) L36690 ....................12

Medicare Program Integrity Manual, Ch. 3, 13 .................... 8, 9, 11, 13-19, 22

**Regulations**

42 C.F.R. Part 405, Subpart I....................4

42 C.F.R. § 405.201....................17

42 C.F.R. § 405.940 et seq.....................4

42 C.F.R. § 405.980....................3

42 C.F.R. Part 405.1000 et seq. ....................4

42 C.F.R. Part 405.1060....................3

42 C.F.R. Part 405.1102....................4

42 C.F.R. Part 405.1132....................10

42 C.F.R. Part 405.1136....................4

42 C.F.R. Part 410....................2

42 C.F.R. § 411.15....................2

42 C.F.R. § 424.32....................3

Defendant Robert F. Kennedy, Jr., the Secretary of the United States Department of Health and Human Services, by and through Ryan A. Kriegshauser, United States Attorney for the District of Kansas, and Michelle A. Jacobs, Assistant United States Attorney, hereby submits this response to Plaintiff's request to reverse the Secretary's decision or remand for a new hearing.

## I. Introduction

Plaintiff, Advanced Dermatology and Skin Cancer Center, P.A. ("Advanced Dermatology"), seeks judicial review of the final administrative decision of the Secretary of the Department of Health and Human Services ("Secretary"), denying Medicare Part B coverage for 54 claims involving amniotic allografts[1] (wound healing/covering) and related application services that Plaintiff furnished to 22 beneficiaries. Plaintiff ordered the allografts after Mohs surgery removed skin cancer, and the grafts were applied to open wounds on each of the beneficiaries.

The Medicare program only provides reimbursement for services that are deemed medically reasonable and necessary. Following a hearing on the merits, an Administrative Law Judge ("ALJ") for the Office of Medicare Hearings and Appeals ("OMHA") properly determined that the treatments were not reasonable and necessary because Plaintiff failed to demonstrate that the amniotic allografts were safe and effective, not experimental or investigational, and appropriate for treatment of the beneficiaries' conditions. In reaching its decision, the ALJ carefully examined the entire record, including the medical literature submitted by Plaintiff, and applied the correct Medicare authorities. Because the ALJ's decision is consistent with the

[1] Amniotic allografts refer to human tissue-based skin substitute products derived from the amniotic membrane. AR Vol. 2 at 198 (EpiFix® description). Plaintiff applied these grafts following Mohs micrographic surgery to aid in wound closure, using them as an alternative to traditional reconstructive techniques like skin flaps or autografts

applicable authorities and is supported by substantial evidence in the Administrative Record, this Court should not re-weigh the evidence. The Court should, therefore, affirm the decision and enter judgment in Defendant's favor.

## II. Statutory Framework

### A. Medicare Overview

The Medicare program was established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq, and is a federal health insurance program that provides subsidized coverage to its recipients. The Secretary has overall responsibility for the Medicare program.[2] However, the Centers for Medicare & Medicaid Services ("CMS") is the agency within HHS that is charged with administering the Medicare program. On the Secretary's behalf, CMS enters into contracts with private contractors that assist in performing different Medicare program activities.[3]

Medicare Part B, the relevant part of Medicare in this case, is a "supplementary medical insurance program for the aged and disabled" which is financed through monthly fee charges to the beneficiaries and funding from the government.[4]

### B. Medicare Coverage Limited to Items and Procedures that are Reasonable and Medically Necessary

The Medicare statute provides that "no payment may be made . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."[5]

---

[2] 42 U.S.C. § 1395hh(a)(1).
[3] 42 U.S.C. §§ 1395u(a), 1395kk-1(a), 1395ddd.
[4] 42 U.S.C. §§ 1395j-1395w-5; 42 C.F.R. Part 410 (supp. medical insurance benefits).
[5] 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1).

Congress has delegated to the Secretary the responsibility for deciding whether a particular medical service is medically reasonable and necessary under the Medicare program.[6]

Medicare utilizes two types of coverage determinations to determine if medical services are reasonable and necessary: (1) national coverage determinations ("NCD"), 42 C.F.R. §405.1060(a)(1), which are binding decisions issued by the Secretary, and (2) local coverage determinations ("LCD"), 42 U.S.C. §1395ff(b)(2), which are non-binding decisions issued by Medicare Administrative Contractors to guide the application of the "reasonable and necessary" standard in particular claim adjudications.

**C. Reimbursement of Providers and Post-Payment Review**

To expedite claims processing, Medicare contractors generally reimburse providers for services before reviewing the medical records relating to the claims and verifying the claims are valid.[7] In practice, Medicare Administrative Contractors pay claims that appear regular on their face, subject to later verification or adjustment, since claims for Medicare reimbursement must normally be made *via* computerized electronic billing submissions which do not permit the Medicare Administrative Contractor to verify first-hand the validity of the claim.[8]

To ensure accuracy and to detect fraud and abuse, Medicare contractors continue to work on claims even after payment. Consequently, a Medicare claim remains subject to post-payment review and to reopening.[9] Post-payment review allows a Medicare contractor to review an already-paid claim to determine whether the provider received an overpayment or an underpayment.[10] Post-payment review verifies that the services provided were reasonable,

---

[6] 42 U.S.C. § 1395ff(a).
[7] *John Balko & Assocs., Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 555 F. App'x 188, 190 (3d Cir. 2014).
[8] 42 C.F.R. § 424.32(d)(2) (requiring electronic billing).
[9] 42 U.S.C. § 1395ff(b)(1)(G).
[10] 42 C.F.R. § 405.980.

medically necessary, and not excessive.[11] If, through the process of that review, the Medicare contractor concludes that an overpayment was made, Medicare can seek to recoup the amount of the overpayment.[12]

**D. Medicare Administrative Appeals Process**

If a provider's claim is denied as not meeting the requirements of Medicare coverage, the provider can follow the five-step appeal process established by the Secretary through regulations.[13] The first level of appeal is redetermination, which is an examination of the initial claim decision by the Medicare Administrative Contractor.[14] The second level of appeal is reconsideration, which is an independent review performed by a Qualified Independent Contractor ("QIC"). The third level is an ALJ hearing, in which a provider may request a hearing before an administrative law judge.[15] The fourth level of appeal is reviewed by the HHS Departmental Appeals Board, Medicare Appeals Council.[16] Finally, the fifth level of appeal, and the one this case has reached, is judicial review.[17]

## III. Statement of Facts

The essential underlying facts in this matter are not in dispute. Plaintiff's opening brief, paragraphs 1-27, provides a detailed clinical narrative of Mohs surgery and the use of amniotic allografts. While these facts provide general background, they are largely immaterial to the dispositive legal question before this Court. The standard of review requires this Court to determine whether the ALJ's decision is supported by substantial evidence. As to the

[11] *See* 42 U.S.C. §§ 1395ddd, 1395g(a), 1395y(a)(1)(C).
[12] *See* 42 U.S.C. § 1395ddd(f)(2).
[13] See 42 U.S.C. § 405, Subpart I (Determinations, Redeterminations, Reconsiderations, and Appeals under original Medicare (Parts A and B)).
[14] 42 C.F.R. § 405.940 et seq.
[15] 42 C.F.R. § 405.1000 et seq.
[16] 42 C.F.R. § 405.1102.
[17] 42 U.S.C. § 1395ff(b)(1); 42 C.F.R. § 405.1136.

remaining facts, Plaintiff describes the appeal process as it applied to Advanced Dermatology. The relevant facts are not the details of the post-surgery procedures, but rather the evidence presented in the administrative record and whether the ALJ reasonably concluded that Appellant failed to meet its burden of proving these services were reasonable and necessary under applicable Medicare law.

**Facts Related to Underlying Claims**

1. Between January 21, 2022, and May 23, 2022, Advanced Dermatology performed Mohs micrographic surgery to remove cancerous skin tissue on each of the 22 beneficiaries at issue in this appeal. (Compl. at ¶ 53).

2. In each case, Advanced Dermatology applied either Artacent® or EpiFix® skin-substitute or amniotic allografts to repair the Mohs surgical wounds. (Compl. at ¶ 54; AR Vol. 1 at 69 (Advanced Dermatology Prehearing Brief before ALJ)).

3. The visit notes for many beneficiaries include the following statement "If the appropriate size of allograft is not in stock, it is in the patient's best interest that we apply the next largest allograft which is in stock. Today, the closest graft in terms of size which was in stock which would allow for complete wound coverage, to include the vertical aspect, was utilized." (AR Vol. 2 at 218, 511, 583, 648, 720, 886, 1106, 1160, 153 (UPIC Medical Records)).

4. Advanced Dermatology submitted 55 claims for reimbursement under Medicare Part B, which included, in relevant part, the amniotic allografts (HCPCS Q4186 (EpiFix) and Q4169 (Artacent)), application of the grafts (CPT codes 15271, 15272, 15275, 15276), outpatient office visits (CPT 99212), and ceftriaxone sodium injections (HCPCS J0696), and negative pressure wound therapy ("NPWT") (CPT 97608). (AR Vol. 1 at 160 (ALJ Decision)).

5. CMS's Medicare contractor, Wisconsin Physicians Service ("WPS") initially paid all the Medicare Part B claims as submitted. (Compl. at ¶ 56; AR Vol. 1 at 160 (ALJ Decision)).

6. In July 2022, CoventBridge (USA) Inc., Medicare's Unified Program Integrity Contractor ("UPIC") initiated a post-payment review of Advanced Dermatology's claims due to "credible evidence regarding data analysis findings." (AR Vol. 1 at 224-225 (UPIC Medical Records Request)).

7. Based on the post-payment medical review of Advanced Dermatology's 55 claims, which included 163 services, the UPIC found Medicare had overpaid Advanced Dermatology in the amount of $116,450.65. (AR Vol. 2 at 186-189 (UPIC Overpayment Determination)).

8. Specifically, the UPIC found 131 claim lines or 80.37% of claim lines reviewed were denied as services not reasonable and necessary; 73 claim lines or 44.79% of claim lines reviewed were denied as services not rendered but billed; 68 claim lines or 41.72% of claim lines reviewed were denied as services related to non-covered/denied primary services. Additionally, the UPIC noted several trends that persisted throughout the medical review, including: provider use of amniotic products for wound healing, which the UPIC found was not their homologous use; provider did not apply a true graft, provider billed and used larger sized products than necessary; and provider cloned medical records involving the reasons for graft placement. (AR Vol. 2 at 187-189 (UPIC Overpayment Determination)).

**Facts Related to Administrative Review**

9. After the overpayment determination, Advanced Dermatology pursued multiple levels of administrative appeal.

10. The first level of administrative review included a Request for Redetermination, which included:

a. Advanced Dermatology appealed the overpayment determination by requesting Redetermination from WPS. (AR Vol. 2 at 2625-2627 (Redetermination Request)).

b. WPS denied the claims for the amniotic allografts (HCPCS codes Q4186 and Q4169) because it found the medical records did not contain medical literature to support the medical necessity of the services billed and, therefore, did not support the services were medically reasonable and necessary for the beneficiaries' treatment. (AR Vol. 2 at 2645). WPS denied payment for the outpatient office visits (CPT code 99212) because it found the medical record did not support the visits involved a separate service from the allograft procedures billed. (*Id*. at 2645-2646). WPS upheld the denial for one claim for NPWT (CPT code 97608) because it found Medicare's coverage requirements for NPWT had not been satisfied. (*Id*. at 2646). Finally, WPS found that the application of skin substitute grafts and ceftriaxone sodium injections at issue (CPT® codes 15271, 15272, 15275, and 15276, and HCPCS code J0696) were not covered because those services were related to the amniotic allografts, which WPS deemed not medically reasonable and necessary. (*Id*.).

11. The second level of administrative review included a Request for Reconsideration, which included:

a. Advanced Dermatology appealed the adverse Redetermination decision by requesting Reconsideration from the Qualified Independent Contractor, C2C

Innovative Solutions, Inc. ("QIC"). (AR Vol. 2 at 38-45 (Reconsideration Request)).

b. The QIC issued an unfavorable Reconsideration decision on June 9, 2023, upholding the overpayment based on the same rationale set forth in the redetermination decision. (AR Vol. 2 at 73, 83-84 (Reconsideration Decision)). The QIC concluded the "amniotic skin substitute allografts are denied as not medically reasonable and necessary under Section 1862(a)(1)(A) of the Act and the Medicare Program Integrity Manual (MPIM), Chapter 3, Section 3.6.2.2."[18] because the application of the amniotic allografts did not meet the FDA's regulatory definition of "homologous use" under 21 C.F.R. § 1271.3(c). (*Id*. at 82-83).

12. The third level of administrative review, included a hearing before an ALJ, which included:

a. In August 2023, Advanced Dermatology requested an OMHA ALJ Hearing. (AR Vol. 1 at 9487-9488, 9513-9518). The ALJ Hearing was held on October 11, 2023, before ALJ Jamie Mendelson. (AR Vol. 4 at 9815-9972).

b. The ALJ issued a partially favorable decision on October 30, 2023. (AR Vol. 1 at 154-171). While the ALJ reversed the lower-level contractor's decision regarding the single claim of NWPT, the ALJ ultimately upheld the denial of all claims related to the application of amniotic skin substitute allografts. (*Id.* at 168-169, 171). The ALJ explicitly rejected the rationale used by the lower-

[18] MPIM *available at*: *https://www.cms.gov/regulations-and-guidance/guidance/manuals/internet-only-manuals-ioms-items/cms019033* (accessed on April 16, 2026) [https://perma.cc/55SV-MFPW].

level Medicare contractors, who had denied the claims on the grounds that the use of the allografts was not for a "homologous use" as defined by the FDA. The ALJ found this reasoning unpersuasive because it relied on an "almost meaningless distinction" if used to differentiate between an amniotic allograft administered solely to provide a wound barrier (which necessarily promotes wound healing), and one administered solely to promote wound healing. (AR Vol. 1 at 165).

c. The ALJ then continued her analysis of the fundamental Medicare coverage standard: whether the services were "reasonable and necessary" under § 1862(a)(1)(A) of the Social Security Act, using the coverage criteria outlined in chapter 3, section 3.6.2.2 of the MPIM. After finding the clinical and medical evidence submitted by Plaintiff inadequate and unpersuasive, the ALJ found that Advanced Dermatology failed to meet its burden of proving the amniotic allografts were safe, effective, and generally accepted because their use to repair surgical defects following Mohs surgery as administered in this case is "still experimental or investigational." (AR Vol. 1 at 167-168).

d. Finally, the ALJ held Advanced Dermatology was financially liable for the non-covered services and was not entitled to a waiver of the overpayments under section 1870(b) of the Social Security Act. (AR Vol. 1 at 170-171).

13. The fourth level of administrative review included review before the Medicare Appeals Council ("Council"), which included:

a. Advanced Dermatology filed a request for review by the Council on January 3, 2024. (AR Vol. 1 at 60-67). On March 5, 2025, Advanced Dermatology

requested escalation to federal district court under 42 C.F.R. § 405.1132 because the case had been pending for more than 90 days. (*Id*. at 8).

b. On March 7, 2025, the Council issued an order granting Plaintiff's request for escalation to federal court. (AR Vol. 1 at 5-6). Because the Council granted Advanced Dermatology's escalation request, the OMHA ALJ decision issued on October 30, 2023, constitutes the Secretary's final administrative decision for purposes of 42 U.S.C. § 1395ff(b)(1)(A).

14. Having exhausted the administrative review process, on May 6, 2025, Plaintiff filed this suit seeking judicial review of the ALJ's decision as the final decision of the Secretary. Doc. 1.

## IV. Standard of Review

This action is brought under 42 U.S.C. § 1395ff(b)(1), which incorporates 42 U.S.C. § 405(g), the judicial review provision of the Social Security Act. Under Section 405(g), "a district court's review of the Secretary's finding that a claimant is not entitled to Medicare benefits, is limited to whether the Secretary's finding is supported by substantial evidence."[19] Substantial evidence is "something more than a mere scintilla but something less than the weight of the evidence."[20] The Supreme Court has defined it as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[21] In conducting its review, the court " looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations."[22]

---

[19] *Chipman v. Shalala*, 90 F.3d 421, 422 (10th Cir. 1996).
[20] *Via Christi Regional Med. Ctr, Inc., v. Leavitt*, 509 F.3d 1259, 1271 (10th Cir. 2007).
[21] *Biestek v. Berryhill*, 587 U.S. 97, 102, 139 S.Ct. 1148 (2019) (citations omitted).
[22] *Id*. at 103.

## V. Arguments and Authorities

The Secretary's decision upholding the overpayment for the amniotic allografts and related services should be upheld for three broad reasons. First, the ALJ correctly applied the governing medical necessity standard without introducing any new issues. Second, the medical necessity standards used by the ALJ are not ambiguous or arbitrary, but are explicitly defined by the MPIM's evidentiary framework, which provided Plaintiff with fair notice of its burden to prove the procedure was safe, effective, and generally accepted. Finally, the ALJ's decision is overwhelmingly supported by substantial evidence, as she reasonably found Plaintiff's own clinical evidence to be insufficient, its medical documentation to be deficient, and its reliance on an external policy to be contradicted by the policy itself.

### A. The ALJ correctly applied the "reasonable and necessary" standard, which includes analysis of whether an item or service is experimental or investigational.

Plaintiff's central argument is that the ALJ erred by deciding the appeal on a "new issue" without proper notice when she determined that the Plaintiff had not met its burden to show that the allografts were safe and effective and not experimental and investigational. This argument misapprehends the nature of *de novo* review and the statutory and regulatory elements of the "reasonable and necessary" requirement under the Medicare program.

The overarching issue in this case has always been whether the amniotic allografts provided by Plaintiff were "reasonable and necessary" as required by § 1862(a)(1)(A) of the Social Security Act.[23] Medical reasonableness and necessity have always been the touchstone of Medicare payment decisions. Since its enactment in 1965, the Medicare Act has provided,

[23] Section 1862 codified at 42 U.S.C. § 1395y.

> Notwithstanding any other provision of this title, no payment may be made under Part A or Part B for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness . . . .[24]

Congress has vested final authority in the Secretary to determine what items or services are reasonable and necessary:

> The determination of whether an individual is entitled to benefits under part A or part B of this subchapter, and the determination of the amount of benefits under [Medicare] . . . shall be made by the Secretary in accordance with regulations prescribed by him.[25]

The Secretary's discretion extends to decisions about whether a particular item or service is medically reasonable and necessary.[26] However, "there is no hard-and-fast rule for determining whether a particular medical service is reasonable and necessary."[27]

The use of skin substitute allografts may be reasonable and necessary under the right conditions and when used for certain purposes. Local Coverage Determination (LCD) L36690, titled Wound Application of Cellular and/or Tissue Based Products (CTPs), Lower Extremities, generally covers skin substitute allografts for the treatment of chronic, non-healing wounds in the lower extremities, such as diabetic foot ulcers and venous leg ulcers that have failed to respond to standard conservative wound care for at least 4 weeks. However, Advanced Dermatology billed Medicare for applying these allografts to acute surgical wounds—specifically, the immediate surgical wounds created right after the removal of skin cancer via Mohs micrographic surgery. Thus, although the LCD does generally cover the use of skin substitute allografts in certain circumstances, it does not apply to the claims submitted by Plaintiff.

---

[24] 42 U.S.C. § 1395y(a)(1)(A).
[25] 42 U.S.C. § 1395ff(a).
[26] *Heckler v. Ringer*, 466 U.S. 602, 617 (1984).
[27] *Banks v. Sec'y, HHS, 38 F.4th 86, 90* (11th Cir. 2022).

Plaintiff relies extensively on LCD 35494: Mohs Micrographic surgery and Local Coverage Article A57477. Specifically, Plaintiff argued throughout the appeals process that this LCD and Article apply to the allografts in this case, citing paragraph 12 of Article A57477, which states "[w]hen the surgical defect created by [Mohs surgery] requires reconstruction, it should be clear in the documentation that the reconstructive technique performed was an appropriate choice to preserve the functional capabilities and to restore physical appearance." The ALJ, however, rejected this contention because neither the LCD nor the Article "explicitly address coverage criteria for any specific type of reconstructive technique" or "guidance on the use of the amniotic allografts utilized" by Plaintiff.

Absent an applicable NCD or LCD, as the ALJ determined here, the ALJ must make "reasonable and necessary" determinations using a step-by-step analysis based on the MPIM criteria applied by Medicare administrative contractors.[28] In this context, MPIM section 3.6.2.2 sets forth the following criteria for determining whether an item or service is reasonable and necessary:

> If no local coverage determination (LCD) exists for a particular item or service, the MACs . . . shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:
>
> • It is safe and effective;
> • It is not experimental or investigational; and
> • It is appropriate, including the duration and frequency in terms of whether the service or item is:
> ○ Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
> ○ Furnished in a setting appropriate to the beneficiary's medical needs and condition;
> ○ Ordered and furnished by qualified personnel; and,

---

[28] MPIM Ch. 13, § 13.5.4; *Greiner Orthopedics, LLC. v. Kennedy*, 2026 U.S. Dist. LEXIS 3500, *7 (D.D.C. Jan. 8, 2026); *In the Case of Caris MPI, Inc.*, M-12-648 (2012).

○ One that meets, but does not exceed, the beneficiary's medical need.

Regarding the evidence that may be considered in this analysis, MPIM guidance instructs that the Medicare contractors "shall use the available evidence of general acceptance by the medical community, such as published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines."[29] The MPIM clarifies that "[a]cceptance by individual health care providers, or even a limited group of health care providers, does not indicate general acceptance of the item or service by the medical community."[30]

Plaintiff argues the ALJ's analysis raised a "new issue" not decided by the lower-level contractors, when the ALJ determined that the use of the allografts by Advanced Dermatology was not safe and effective, and was experimental or investigational. Under this framework, contrary to Plaintiff's argument, the ALJ's analysis of whether the allografts were safe and effective and not "experimental or investigational" was not a "new issue." Instead, those issues represent core components of the reasonable and necessary analysis itself.

The ultimate issue before the ALJ was not limited to whether the contractors' rationale was correct, but whether Plaintiff had met its burden of proving the claims were reasonable and necessary. This is because an ALJ hearing is a *de novo* proceeding, meaning the ALJ must conduct a fresh review of the evidence and is not bound by the decisions of the Medicare contractors.[31] The ALJ considers "all the issues brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's favor."[32] In this case, after the ALJ determined the QIC's "homologous use" rationale was flawed, her analysis

[29] MPIM, Ch. 13, § 13.5.3.
[30] *Id.* § 13.2.3.
[31] 42 C.F.R. § 405.1000(d).
[32] 42 C.F.R. § 405.1032(a).

did not, and in fact could not, end there. She still had to determine if the amniotic allografts were reasonable and necessary under the MPIM coverage criteria.

Plaintiff's assertion that it was unfairly surprised by the ALJ's "experimental and investigational" analysis is directly contradicted by the evidence and arguments it presented throughout the administrative appeals process. A review of Plaintiff's submissions, including its Request for Reconsideration, demonstrates that while it contested the contractors' narrow "homologous use" rationale, it was fully aware that its ultimate burden was to prove the broader issue of medical necessity and reasonableness.

From the earlier stages of appeal, Plaintiff did not merely argue that the Medicare contractors misapplied the FDA's definition of "homologous use." Instead, it proactively submitted evidence and made arguments aimed squarely at satisfying all the core components of the "reasonable and necessary" standard—by demonstrating that the amniotic allografts were accepted by the medical community. Specifically, in its Reconsideration Request, Plaintiff presented two key pieces of evidence that are unnecessary if it believed the only issue was homologous use.

First, Plaintiff submitted a medical journal article, co-authored by its own owner, Dr. Adams, for the purpose of demonstrating the clinical efficacy of using amniotic allografts for post-Mohs wound repair. The submission of a clinical study is the type of evidence the MPIM explicitly states may be considered to prove that an item or service is safe, effective, and accepted by the medical community—the very essence of the "reasonable and necessary" standard. This evidence would be entirely irrelevant if Plaintiff believed the only issue was a technical FDA definition of homologous use. Its inclusion indicates that Plaintiff understood that

it had to prove the procedure satisfied all the requirements of being medically necessary and reasonable.

Second, Plaintiff submitted a medical policy from Florida Blue Cross, which it argued supported coverage for the procedure. The purpose of submitting evidence of another insurer's coverage policy is to support general acceptance in the medical community of the item or service, a pillar of the "reasonable and necessary" analysis. This was a clear attempt to show that its billing practices were in line with those of other major payors, thereby bolstering its claim of medical appropriateness.

Third, at the hearing before the ALJ, Dr. Adams was directly questioned, on more than one occasion, by his attorney about whether the use of the allografts in the manner in which he used them was safe and effective, and whether they were experimental or investigational.[33] Given that Dr. Adams provided direct testimony on this issue clearly demonstrates that Plaintiff recognized that this was an issue to be decided by the ALJ.

By presenting this specific evidence, Plaintiff was arguing the merits of the allografts' medical necessity. It was attempting to build a case that the service was safe, effective, clinically appropriate, and generally accepted—i.e., that it was reasonable and necessary. Plaintiff's assertion that it was not on notice that the "experimental or investigational" nature of the service could be at issue is hollow. Indeed, Plaintiff put the clinical efficacy and general acceptance of the procedure at the heart of the appeal through the evidence it submitted. The ALJ did not introduce a new issue; she simply evaluated the evidence Plaintiff itself provided and found it wanting.

---

[33] AR Vol. 4 at 9835, 9949-50 (Hearing Transcript).

### B. The ALJ's application of the MPIM standard was a reasoned, evidence-based determination guided by a clear regulatory framework.

Plaintiff's contention that the Administrative Law Judge (ALJ) applied the "experimental or investigational" standard arbitrarily and capriciously is without merit and fails to acknowledge the clear evidentiary roadmap provided by the Medicare Program Integrity Manual (MPIM). Far from being ambiguous, the standard is well-understood in the medical community and is defined within the MPIM by the very list of evidence required to satisfy it. The ALJ did not act arbitrarily; she methodically assessed the evidence Plaintiff provided against this established framework and found the evidence insufficient to meet Plaintiff's burden.

First, the "experimental or investigational" standard is not an abstract or undefined concept unfamiliar in the context of Medicare coverage. For example, 42 C.F.R. § 405.201(b), defines an experimental device as "a device for which 'absolute risk' of the device type has not been established (that is, initial questions of safety and effectiveness have not been resolved) and the FDA is unsure whether the device type can be safe and effective." In contrast, section 405.201(b) defines a nonexperimental/investigational device as one in which initial questions of safety and effectiveness of that device type have been resolved. While this regulation applies specifically to devices, it codifies the agency's common-sense understanding of these terms. It establishes that when an item's safety and efficacy are still under clinical evaluation, it exists in an investigational, and therefore experimental, state.

As a large and sophisticated specialty provider, Plaintiff was undoubtedly aware of this common understanding and the evidentiary threshold required to move a procedure from "experimental" to "generally accepted."

Second, the MPIM itself demystifies this standard by providing an explicit framework for the evidence an adjudicator must consider. MPIM Chapter 13, Section 3.6.2.2 instructs

adjudicators to weigh evidence from a variety of sources to determine medical necessity, including:

- Published, peer-reviewed medical literature;
- Consensus statements and guidelines from major physician organizations and professional societies; and
- The general opinion of the relevant medical community.

This section effectively provides a non-exhaustive "roadmap" for providers. It puts them on notice of exactly what type of evidence is needed to prove that a service is safe, effective and *not* experimental and has crossed the threshold into general medical acceptance. The standard is thus defined by the evidence required to meet it. Plaintiff cannot plausibly claim it did not know what was required when the manual provides a checklist of the very evidence it needed to produce.

Indeed, Plaintiff's own actions demonstrate it was fully aware of this evidentiary roadmap. It submitted a clinical study co-authored by its owner (peer-reviewed literature) and a private insurer's coverage policy (evidence of community acceptance) in an attempt to satisfy this standard. This proves Plaintiff knew the nature of the evidence required. The ALJ's finding was not arbitrary; it was a direct and reasoned evaluation of that very evidence. The ALJ, after examining all the evidence, correctly found that:

1. The biased and limited study provided by Plaintiff was insufficient to meet the "peer-reviewed literature" requirement for establishing broad safety and efficacy.

2. Plaintiff's evidence failed to demonstrate "general acceptance" in the medical community, a failure underscored by its own study's admission that other methods remain the "mainstay" of treatment.

The ALJ's decision was, therefore, a methodical application of the MPIM standards to the facts at hand. The practical implication of this established definition, when applied in the broader

coverage context, means that an item or service is considered experimental or investigational when:

- It lacks sufficient evidence of safety and effectiveness for a particular clinical condition;
- It is still in the phase of clinical trials or is the subject of only limited, preliminary studies; or
- It is not generally accepted as standard care by the relevant medical community.

The standard was not vague, and the path to satisfying it was plainly set forth in the MPIM. Plaintiff's failure was not in navigating an ambiguous rule, but in failing to provide persuasive evidence to meet the standard.

**C. The ALJ's analysis is supported by substantial evidence.**

On judicial review, the factual findings of the Secretary must be affirmed if they are supported by substantial evidence.[34] Substantial evidence refers to the weight, not the amount, of the evidence.[35] Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[36] Critically, this standard is met even if the record could also support a contrary conclusion.[37] Under the substantial evidence standard, the court does "not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Secretary]."[38] When reviewed under this deferential standard, the ALJ's finding that Plaintiff failed to prove its services were reasonable and necessary is overwhelmingly supported by the record.

The ALJ conducted a thorough review of the administrative record and based her conclusion on several key pieces of evidence, which, when taken together, provided a more than

[34] 42 U.S.C. § 405(g).
[35] *Lucinda S. v. Kijakazi, 2022 U.S. Dist. LEXIS 127112, *2* (D. Kan. 2022).
[36] *Richardson v. Perales*, 402 U.S. 389, 401 (1971).
[37] *Peterson v. Comm'r of Soc. Sec.*, 552 Fed. Appx. 533, 538 (6th Cir. 2014) ("findings are not reversible merely because substantial evidence in the record could support a different conclusion").
[38] *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1258 (11th Cir. 2019).

adequate basis for her decision. The ALJ found that the medical literature submitted by Plaintiff failed to support its claims. AR Vol. 1 at 166-167. When reviewing such a determination, a district court does "not . . . tender an independent judgment on the value and validity of the various scientific studies submitted. [The Court] ask[s] only whether the Secretary's assessment was a reasonable one."[39]

Here, the ALJ's careful consideration of the medical literature was thorough and reasoned. Plaintiff submitted a retrospective study co-authored by Plaintiff's owner, Dr. Adams, entitled *Mohs Defect Repair with Dehydrated Human Amnion/Chorion Membrane*. AR Vol. 2 at 248-253.[40] The ALJ analyzed the study and gave it the minimal weight it deserved, identifying its significant limitations:

- Potential for Bias: Because the study was co-authored by the owner of the provider seeking reimbursement, and the results largely depended on Dr. Adams' professional judgment, its objectivity was inherently compromised. AR Vol. 1 at 166-167.

- Weak Study Design: The study was retrospective, not a prospective, randomized controlled trial, which is the gold standard for clinical evidence.[41] The study was composed of a relatively small and demographically homologous sample, where the results relied upon the accuracy and thoroughness of the participant patient's medical records, which consisted entirely of Dr. Adams' patients. It also lacked a control group comparing the allograft to the established standard of care.

---

[39] *Almy v. Sebelius*, 679 F.3d 297, 305-06 (4th Cir. 2012) (finding that the Secretary's determination that plaintiff failed to establish a medical device was safe and effective and not experimental or investigational was supported by substantial evidence); *Int'l Rehab. Sci., Inc. v. Sebelius*, 688 F.3d 994, 1003 (9th Cir. 2012) (noting that the Council had provided "adequate reasons for discounting the studies authored or sponsored by" the medical device manufacturer regarding the safety and non-experimental nature of its device).

[40] Plaintiff submitted two additional articles (AR Vol. 2 at 242-47, 254-59), which were neither cited in the ALJ decision nor discussed in the Plaintiff's request for hearing (AR Vol. 1 at 9513-18).

[41] *See e.g.*, Eyal Hariton & Joseph J. Locascio, *Randomised Controlled Trials—the Gold Standard for Effectiveness Research*, 125 BJOG (Int'l Journal of Obstetrics and Gynaecology) 1716 (2018) (last viewed March 27, 2026, available at *https://obgyn.onlinelibrary.wiley.com/doi/10.1111/1471-0528.15199*).

- Damaging Admission: Most critically, the ALJ noted that the study itself contained the admission that traditional methods—flaps and autografts—remain the "mainstay of reconstructive techniques." AR Vol. 2 at 248. A reasonable mind could conclude, as the ALJ did, that this concession from Plaintiff's own evidence is a strong indicator that the allograft procedure is not yet generally accepted as standard method of care. AR Vol. 1 at 166-167.

In conclusion, the ALJ determined the article failed to demonstrate or support that Plaintiff's use of the amniotic allografts was not experimental or investigational, or appropriate for the beneficiaries' conditions. AR Vol. 1 at 167.

The ALJ's conclusion was further supported by the deficient state of Plaintiff's own medical records. The finding that a service is "experimental" is closely tied to whether it is "appropriate" for the specific patient.[42] The ALJ concurred with the lower-level reviewers' findings that the medical records were filled with "significant amounts of boilerplate language" and documented the use of "excessive" and unsubstantiated quantities of the allograft product. AR Vol. 1 at 167. This pattern of poor documentation provided substantial evidence that the services were not being tailored to individual patient needs, further supporting the conclusion that they were not reasonable and necessary.

Finally, the ALJ reasonably discounted other evidence submitted by Plaintiff. For example, the Blue Cross Blue Shield of Kansas policy (BCBS) Plaintiff submitted did not support its case but reinforced the ALJ's conclusion. AR Vol. 2 at 260, 266. The ALJ noted that the policy expressly limits coverage to specific eye and lower-extremity ulcer conditions, while deeming the use of amniotic allografts for any other purpose—including post-Mohs surgery repair—to be experimental/investigational and thus not covered. AR Vol. 1 at 167 (ALJ's reasoning); AR Vol. 2 at 266-267 (BCBS policy provisions). Crucially, the ALJ pointed out that

[42] MPIM, ch. 3, 3.6.2.2.

BCBS had specifically reviewed the very study co-authored by Dr. Adams that Plaintiff relied upon, only to find it of limited value for some of the same reasons the ALJ identified. AR Vol. 1 at 167 (ALJ's discussion); AR Vol. 2 at 300-304 (BCBS study review). The insurer concluded that additional, well-designed prospective studies were required before the procedure could be considered medically necessary, providing the ALJ with powerful, independent corroboration for her own finding that Plaintiff's evidence was insufficient and that the procedure remained experimental. AR Vol. 2 at 304. The ALJ was entitled to weigh this evidence and conclude that it militated against Plaintiff's position.

In sum, the ALJ was presented with a provider's limited study on one hand, and a record showing boilerplate documentation, excessive billing, and contradictory external evidence on the other. It was reasonable for the ALJ to conclude that Plaintiff had failed to carry its burden of proof that the services in question were reasonable and necessary. The decision was not based on a lack of evidence, but on a well-reasoned rejection of weak evidence presented by Plaintiff to meet its burden of proof. The result is consistent with the substantial evidence standard, and it should be affirmed.

## VI. Conclusion

For the foregoing reasons, the Secretary respectfully requests that this Court affirm the final agency decision and uphold the overpayment. The ALJ correctly applied the reasonable and necessary standard, an analysis that intrinsically requires evaluating whether a treatment is safe and effective and not experimental or investigational. Plaintiff was afforded fair notice of this unambiguous standard, which is clearly defined by CMS guidance, and ultimately failed to meet its burden of proof. The administrative record provides substantial evidence to support the ALJ's conclusion.

Respectfully submitted,

RYAN A. KRIEGSHAUSER
Interim United States Attorney
District of Kansas

*s/ Michelle A. Jacobs*
MICHELLE A. JACOBS
Assistant United States Attorney
Ks. S.Ct. No. 21261
290 Federal Bldg.
444 SE Quincy Street
Topeka, Kansas 66683
PH: (785) 295-2850 | FX: (785) 295-2853
Email: michelle.jacobs@usdoj.gov
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2026, I electronically filed the foregoing with the Clerk of the Court by uploading it to the CM/ECF system which will send a notice of electronic filing to all parties receiving CM/ECF notifications in this case.

*s/ Michelle A. Jacobs*
MICHELLE A. JACOBS
Assistant United States Attorney