**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

ADVANCED DERMATOLOGY AND SKIN CANCER CENTER, P.A.,

*Plaintiff*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary, United States Department of Health and Human Services,

*Defendant*.

Case No. 2:25-cv-02250

MAC Docket No.: M-24-1294
ALJ Appeal No.: 3-12683356911

**PLAINTIFF'S REPLY BRIEF**

## Introduction

Notwithstanding the Secretary's response, the controlling regulation at issue here "means what it means." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019). In an appeal of a Medicare-claim denial, the issues before the administrative-law judge (ALJ) are "all the issues for the claims or appealed matter *specified in the request for hearing* that were brought out in the initial determination, redetermination, or reconsideration *that were not decided entirely in a party's favor*." 42 C.F.R. § 405.1032(a) (emphasis added). The request for hearing in this case did not raise the question whether the allografts at issue were experimental or investigational, and the issue was not decided against Advanced Dermatology. To the contrary, at the reconsideration stage, C2C Innovative Solutions decided that issue entirely *in* Advanced Dermatology's favor. The ALJ thus erred when she revisited the issue after the hearing, *sua sponte*, and compounded her error by applying that standard—whatever it is—in an arbitrary and capricious way and against the substantial evidence before her. Because the ALJ otherwise decided the dispositive, homologous-use issue that was properly before her in Advanced Dermatology's favor, this Court should reverse the ALJ's adverse determination and enter judgment for Advanced Dermatology.

## Argument

### I. The ALJ erred in reaching the experimental-or-investigational issue.

Contrary to the Secretary's argument, the ALJ here did not "correctly appl[y] the 'reasonable and necessary' standard," Centers for Medicaid & Medicare Services Resp. to Pl.'s Opening Br., ECF No. 49 at 11 (hereinafter Secretary's Resp."), because the overarching reasonable-and-necessary question was not the ALJ's to raise, let alone answer.

In asserting otherwise, the Secretary's analysis skips the key distinction that CMS's regulations draw between: (1) the issues for review at the lower stages of administrative appeal; and (2) the issues before the ALJ. At the first stage, Medicare Administrative Contractors may "raise and develop new issues that are relevant to the claims in the particular case." 42 C.F.R. § 405.948. At the second stage, a Qualified Independent Contractor reviews "all issues related to payment of the claim." 42 C.F.R. § 405.968(a)(1). At the ALJ stage, however, ALJs do *not* review "all issues related to payment of the claim," *id.*, as the ALJ did below. Rather, the issues before the ALJ are only those "specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's favor." 42 C.F.R. § 405.1032(a).

The Secretary's argument to the contrary—that the "ultimate issue before the ALJ was not limited to whether the contractors' rationale was correct"—has no purchase in the plain text of these regulations. *See* Secretary's Resp. at 14. As above, the regulation governing the scope of the ALJ's review does not say the ALJ may review any "ultimate issue." *Id.* Nor does it say that the ALJ must review all the "core components of the reasonable and necessary analysis." *Id.* Likewise, the regulation does not say that if the ALJ disagrees with the lower-level contractors, it must "still . . . determine if the [products or services] were reasonable and necessary." *Id.* at 15. The regulation says the ALJ's review is cabined to those issues brought out at the lower levels of appeal "specified in the request for hearing . . . that were not decided entirely in a party's favor." 42 C.F.R. § 405.1032(a). This regulation "means what it means—and the court must give it effect, as the court would any law." *Kisor*, 588 U.S. at 575.

The Secretary's position here also contradicts CMS's explanation of 42 C.F.R. § 405.1032 in the Federal Register. "For example," CMS said, "if in the request for hearing an

appellant raises an issue with the methodology used to sample claims and extrapolate an overpayment, and that *issue* had not been brought out in the initial determination, redetermination, or reconsideration, the *issue* would be a new issue . . ." Medicare Program: Changes to the Medicare Claims and Entitlement, Medicare Advantage Organization, and Medicare Prescription Drug Coverage Determination Appeals Procedures, 82 Fed. Reg. 4974, 5052 (Jan. 17, 2017) (emphasis added). Thus, the regulation itself confirms that a "new issue" includes "a favorable *portion* of a determination on a claim or appealed matter specified in the request for hearing[.]" 42 C.F.R. § 405.1032(b)(1) (emphasis added).

Dispositive here, Wisconsin Physician Services' redetermination concluded that Advanced Dermatology's allograft claims "did not contain medical literature," raising an oblique-at-best question about the allografts' experimental or investigational nature. R. Vol. 2 at 50, ECF No. 14-1 at 46. But even if Wisconsin Physician Services did raise the experimental-or-investigational issue, Advanced Dermatology responded at the next level of appeal by presenting a study supporting the effectiveness of allografts in post-Mohs surgery to C2C Innovative Solutions at the reconsideration stage. R. Vol. 2 at 41, ECF No. 14-1 at 37.

C2C Innovative Solutions' reconsideration then "cured" any issue with Wisconsin Physician Services' medical-literature finding, only to deny Advanced Dermatology's claims for a different reason—that the FDA approved allografts for homologous use only. R. Vol. 1 at 9475, ECF No. 14 at 1483. Thus, to the extent anyone questioned the experimental or investigational nature of allografts before the ALJ's review, the issue was raised and decided entirely *in* Advanced Dermatology's favor. Accordingly, if the ALJ intended to consider this new issue—the then-"favorable portion of a determination on a claim," 42 C.F.R. § 405.1032(b)—the ALJ had to give Advanced Dermatology notice and an opportunity to respond.

Nor does Advanced Dermatology "misapprehend[] the nature of *de novo* review." Secretary's Resp. at 11. If the Secretary intended for ALJs to review all the reasonable-and-necessary requirements for each claim anew, it would have said that ALJs may "review all issues related to payment of the claim." 42 C.F.R. § 405.968(a)(1). That scope of review, however, is reserved for Qualified Independent Contractors at the reconsideration stage of appeal. *See id.* In stark contrast, CMS limited ALJ review of Medicare claim denials to issues raised in the request for hearing "that were not decided entirely in a party's favor." 42 C.F.R. § 405.1032(a). Read together, ALJs exercise de novo review under 42 C.F.R. § 405.1000(d), but only as to those issues subject to the ALJ's review under 42 C.F.R. § 405.1032(a).

The Secretary is thus incorrect that, once "the ALJ determined that the QIC's 'homologous use' rationale was flawed, her analysis did not, and in fact could not, end there." Secretary's Resp. at 14-15. Advanced Dermatology is not aware of any authority to this effect, and the Secretary does not cite any. *See id.* at 15. But as above, once the ALJ resolved the issues before her, her analysis *had* to "end there" under CMS's own controlling regulations. *See KLC Farm v. Perdue*, 426 F. Supp. 3d 837, 851 (D. Kan. 2019) (noting an agency must "adhere to the policy and regulations it promulgates" (alteration omitted)); *cf. Ruiz v. Apfel*, 24 F. Supp. 2d 1045, 1050 (C.D. Cal. 1998) ("There was, accordingly, no basis for the ALJ to review issues that had been determined in plaintiff's favor." (construing analogous 20 C.F.R. § 404.946(a)).

The ALJ was further incorrect when she wrote that "the Medicare contractors ultimately determined that the amniotic allografts at issue in this appeal were not reimbursable by Medicare because the coverage criteria contained in chapter 3, section 3.6.2.2 were not satisfied." R. Vol. 1 at 25, ECF No. 14 at 32. In full, C2C Innovative Solutions said at the reconsideration stage that "[t]he QIC has determined that the amniotic skin substitute allografts are denied as not medically

reasonable and necessary under . . . the MPIM, Chapter 3, Section 3.6.2.2, *as these products cannot be used for wound healing per the CFR and FDA*." R. Vol. 1 at 9476, ECF No. 14 at 1484 (emphasis added). Because that decision also purported to "cure" any flawed rationale from a lower-level contractor, R. Vol. 1 at 9475, ECF No. 14 at 143, the only relevant issue "not decided entirely in [Advanced Dermatology's] favor," 42 C.F.R. § 405.1032(a), was whether allografts could be used for wound healing in addition to their homologous use. Once the ALJ decided that issue in Advanced Dermatology's favor, her analysis should have ended in a ruling that Advanced Dermatology's allograft claims were reasonable and necessary.

The Secretary is further wrong to assert that Advanced Dermatology "proactively submitted evidence and made arguments aimed squarely at satisfying all the core components of the 'reasonable and necessary' standard." Secretary's Resp. at 15. Rather, Advanced Dermatology submitted evidence regarding the two issues it raised in its request for hearing that were properly before the ALJ: (1) whether Local Coverage Article 57477 applied to Advanced Dermatology's claims; and (2) whether C2C Innovative Solutions erred in applying a homologous-use requirement to Advanced Dermatology's claims. R. Vol. 1 at 9514-18, ECF No. 14 at 1514-18.

As Advanced Dermatology's request for ALJ review further makes clear, Advanced Dermatology submitted the journal article and medical policy in support of its position that Local Coverage Article 57477 applied and that Advanced Dermatology's documentation met that Local Coverage Article's requirements. *See* R. Vol. 1 at 9514-16, ECF No. 14 at 1514-16. On that point, Advanced Dermatology argued that the journal article showed allografts were "an appropriate choice to preserve functional capabilities and to restore physical appearance," consistent with Local Coverage Article 57477's requirements. R. Vol. 1 at 1915, ECF No. 14 at

1515. Though Advanced Dermatology mentioned that flaps and autografts were the "mainstay of reconstructive techniques," Secretary's Resp. at 21, it did so because it uses allografts only in the "most complex cases in terms of cancer size, location and patient co-morbidities," where flap and graft repair are *not* appropriate. R. Vol. 1 at 9516, ECF No. 14 at 1516. The article thus provided "evidence that repairs via allograft, *in cases such as those in this audit*"—an audit of complex cases involving individuals over the age of 65 with numerous comorbidities—were an appropriate option for allograft Mohs surgery repair. R. Vol. 1 at 9516, ECF No. 14 at 1516 (emphasis added).

Advanced Dermatology then presented the Blue Cross Blue Shield medical policy because it cited the very journal "article and its findings for its policy guidance." R. Vol. 1 at 9516, ECF No. 14 at 1516. The policy served only to show the article's validity and further prove that allografts were an appropriate repair technique under Local Coverage Article 57477. *See* R. Vol. 1 at 9516, ECF No. 14 at 1516 ("In early April 2022, Blue Cross Blue Shield of Kansas issued a medical policy update for Amniotic Membrane and Amniotic Fluid which cites this . . . article and its findings *for its policy guidance*." (emphasis added)). Blue Cross Blue Shield cited the article specifically because the article, among other available articles, best satisfied the following "Study Selection Criteria":

> Methodologically credible studies were selected using the following principles:
>
> - To assess efficacy outcomes, comparative controlled prospective trials were sought, with a preference for [Randomized Controlled Trials];
> - In the absence of such trials, comparative observational studies were sought, with a preference for prospective studies.
> - To assess long-term outcomes and adverse events, single-arm studies that capture longer periods of follow-up and/or larger populations were sought.
> - Consistent with a 'best available evidence approach,' within each category of study design, studies with larger sample sizes and longer durations were sought.
> - Studies with duplicative or overlapping populations were excluded.

R. Vol. 2 at 301, ECF No. 14-1 at 247.

As a result, to the extent Advanced Dermatology argued "the merits of the allografts' medical necessity," Secretary's Resp. at 16, it was only doing so to show its compliance with what Advanced Dermatology asserted was the applicable Local Coverage Article, not to satisfy each requirement of chapter 3, section 3.6.2.2 of the Medicare Program Integrity Manual. Critical here, a Medicare Administrative Contractor could not have issued the Mohs Surgery Local Coverage Determination—or its accompanying Local Coverage Article 57477—unless it believed the procedure *already met* Medicare's reasonable-and-necessary criteria, including the experimental or investigational nature of the service.[1] Because C2C Innovative Solutions did not otherwise question the allografts' experimental or investigational nature, Advanced Dermatology proceeded on the assumption that they were not.

Rather, on the merits of the reasonable-and-necessary question, the only issue was whether Advanced Dermatology could use the allografts both in a homologous way *and* to encourage wound healing. R. Vol. 1 at 9476, ECF No. 14 at 1484. On that point, Advanced Dermatology showed in its request for review that C2C Innovative Solutions was incorrect, R. Vol. 1 at 9517, ECF No. 14 at 1517, and the ALJ agreed, R. Vol. 1 at 165, ECF No. 14 at 123.

As above, the dispositive point is that once the ALJ decided that Local Coverage Article 57477 did not apply, the only remaining issue to resolve was whether Advance Dermatology's claims satisfied Chapter 3, Section 3.6.2.2 of the Medicare Program Integrity Manual *because they were used in both homologous and non-homologous ways*, not whether the allografts were experimental or investigational. And once the ALJ decided that issue in Advanced Dermatology's

[1] *See* Medicare Program Integrity Manual, ch. 13, § 13.5.4 (Eff. Oct. 10, 2018) ("An item or service may be covered by a contractor LCD if: [] It is reasonable and necessary under 1862(a)(1)(A) of The Act. Only reasonable and necessary provisions are considered part of the LCD."), *available at* https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/pim83c13.pdf.

favor, her analysis also should have ended with a determination in Advanced Dermatology's favor.

## II. The ALJ's application of the experimental-or-investigational standard was arbitrary and capricious.

The Secretary is also incorrect that the standard the ALJ applied involved an "established framework." Secretary's Resp. at 17.

First, the Secretary cites to standards set forth in 42 C.F.R. § 405.201, Secretary's Resp. at 17, but those standards relate to "FDA categorization of a device as a factor in making Medicare coverage decisions," 42 C.F.R. § 405.201(a), and there is no evidence in the record that the FDA has ever categorized the allografts at issue as experimental or nonexperimental devices. Thus, the ALJ never referenced these regulations in her analysis of the allografts that Advanced Dermatology applied.

Second, the Secretary says the Medicare Program Integrity Manual "instructs adjudicators to weigh evidence from a variety of sources to determine medical necessity, including:

- Published, peer-reviewed medical literature;
- Consensus statements and guidelines from major physician organizations and professional societies; and
- The general opinion of the medical community."

Secretary's Resp. at 16-17.

But the closest the Medicare Program Integrity Manual comes to this language is in Chapter 13, Section 13.5.3, a section that governs the "Evidentiary Content" for Local Coverage Determinations. Here, however, no one is challenging the evidentiary content for a Local Coverage Determination.

Nor, by the Medicare Program Integrity Manual's terms, does Chapter 13, Section 13.5.3's guidance bear on the question whether a service or product is experimental or investigational under Chapter 3, Section 3.6.2.2. As Advanced Dermatology showed in its opening brief—and the Secretary does not address—the determination whether a service is reasonable and necessary incorporates only "chapters 13, § 5.1 and 7.1."[2] Yet neither section 5.1 nor 7.1 of chapter 13 in the Medicare Program Integrity Manual address the question whether a service is experimental or investigational—section 5.1 governs the "General Requirements" for a Local Coverage Determination, and section 7.1 does not exist.

Yet even if chapter 13, section 13.5.3, had any bearing on the issue, that section says Medicare Administrative Contractors should "use the available evidence of general acceptance by the medical community," and then lists examples "such as published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines."[3] As before, nowhere does this section define an objective metric of evidence necessary to establish "general acceptance by the medical community," let alone a metric specific to the question whether a service is experimental or investigational.

For multiple reasons that the Secretary does not address, the standard that a service requires "general acceptance in the medical community" lends itself to precisely the kind of arbitrary application that the ALJ applied in this case. Among other examples, this case includes four beneficiaries for whom an earlier ALJ held Advanced Dermatology's allograft claims were reasonable and necessary. *See* Pl.'s Opening Br., ECF No. 26 at 16-17 (citing beneficiaries).

---

[2] Medicare Program Integrity Manual, Ch. 3, § 3.6.2.2 (Eff. Aug. 27, 2020), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c03.pdf.

[3] Medicare Program Integrity Manual, Ch. 3, § 13.5.3 (Eff. Oct. 3, 2018), *available at* https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/pim83c13.pdf.

Likewise, one study sufficed for an earlier ALJ, but not for the ALJ in this action. R. Vol. 1 at 9519-9647, ECF No. 14 at 1519-1614. And even when Wisconsin Physician Services adopted its own Local Coverage Determination for Mohs Surgery—necessarily applying the same experimental-or-investigational standard—a single study also sufficed.[4]

Rather than identify and defend an existing definition of experimental or investigational, the Secretary thus fashions a new definition—midstream in litigation—to say that the "practical implication" of the ALJ's own ad hoc application of the phrase means a service is experimental or investigational when:

- It lacks sufficient evidence of safety and effectiveness for a particular clinical condition;
- It is still in the phase of clinical trials or is the subject of only limited, preliminary studies; or
- It is not generally accepted as standard [of] care by the relevant medical community.

Secretary's Resp. at 18-19.

The Secretary's position, however, is the very kind of interpretation that "is nothing more than a convenient litigating position," or a "*post hoc* rationalization advanced by an agency seeking to defend past agency action against attack" that the Supreme Court warned against in *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (quotations and alterations omitted); *see also Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 974 (10th Cir.

[4] Centers for Medicaid & Medicare Services, Local Coverage Determination (LCD) Mohs Micrographic Surgery L35494, *available at* https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdid=35494&ver=28&keyword=Mohs%20Micrographic%20Surgery&keywordType=starts&areaId=all&docType=NCA,CAL,NCD,MEDCAC,TA,MCD,6,3,5,1,F,P&contractOption=all&sortBy=relevance&bc=1 (last accessed May 7, 2026) (citing only "Ad Hoc Task Force, Connolly SM, Baker DR, et al. AAD/ACMS/ASDSA/ASMS 2012 appropriate use criteria for Mohs micrographic surgery: a report of the American Academy of Dermatology, American College of Mohs Surgery, American Society for Dermatologic Surgery Association, and the American Society for Mohs Surgery [published correction appears in J Am Acad Dermatol. 2015 Apr;72(4):748]. *J Am Acad Dermatol*. 2012;67(4):531-550. doi:10.1016/j.jaad.2012.06.009" as its Source of Information).

2016) ("And of course in administrative law the post-hoc rationalizations of counsel may not provide grounds for sustaining an agency decision, only those grounds cited in the agency's order may."). Here, as in *Christopher*, "[t]o defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide fair warning of the conduct a regulation prohibits or requires." *Id.* at 156 (quotations and alterations omitted).

Yet even on the substance of this proposed definition, the Tenth Circuit has already warned against standards like these as "matter[s] of individual taste." *See TMJ Implants*, 498 F.3d at 1195 ("[T]o say that there 'inadequate evidence' supporting the device's safety and effectiveness . . . is a matter of individual taste."); *id.* ("Different people will make different judgments on whether a product 'has been shown to be as effective as' another. Some may require only one study; others may require the gold standard of a double-blind study, or even multiple such studies."); *id.* at 1196 ("[W]hether there is a 'lack of clinical data' is a statement of opinion. Reasonable people may differ on how much data from clinical studies they require before they are satisfied that such data are no longer wanting or deficient.").

This record only proves the Tenth Circuit's wisdom. Though objective definitions of experimental or investigational are possible,[5] the ALJ did not offer or apply one here.

## III. The ALJ's decision is not supported by substantial evidence.

Because the ALJ went on to address an issue not raised by Advanced Dermatology, the Secretary, following the ALJ's lead, fails to correctly apply any objective definition of

[5] *See id.* at 1188 (referring to one example of a definition of "*experimental medical procedure* as a procedure that is (a) not proven in an objective manner to have therapeutic value or benefit, (b) restricted to use at medical facilities capable of carrying out scientific studies; or (c) of questionable medical effectiveness," where a court "found that the definition had not been satisfied because the treatment had achieved partial or complete remission in 80% of patients treated, the treatment was not restricted to medical facilities capable of carrying out scientific studies, and the plaintiff was a good candidate for the treatment") (quotations and citations omitted) (discussing *Leonhardt v. Holden Bus. Forms Co.*, 828 F. Supp. 657 (D. Minn. 1993).

"experimental or investigational" to the evidence in the administrative record. *See* Secretary's Resp. at 19-20.

Most basic, the claims data that Advanced Dermatology cited prove that dermatological use of allografts has moved well beyond the experimental or investigational stage. Thus, in addition to Dr. Adams' testimony, R. Vol. 4 at 9835:5-11, ECF No. 14-3 at 1295:5-11, Advanced Dermatology cited publicly available data that dermatologists billed Medicare for skin substitutes 4,808 times in Kansas and 222,401 times nationally in 2021 alone. Thus, even applying Medicare Program Integrity Manual's chapter 13, section 13.5.3 test of "general acceptance in the medical community," dermatological use of allografts passes it.

Finally, where the Secretary relies on the ALJ's reference to boilerplate language, Secretary's Resp. at 26, that basis, standing alone, is not a reason to deny a Medicare claim.[6] Similarly, the ALJ's point about excessive use still fails to identify any instances of allograft overuse with precision, and the finding cannot support an adverse determination, let alone a global adverse determination.

**Conclusion**

Notwithstanding the Secretary's response, this Court should reverse the Secretary's decision and enter judgment in Advanced Dermatology's favor on all skin-substitute and accompanying claims for skin graft applications, HCPCS codes Q4186 (EpiFix) and Q4169 (Artacent), as well as Advanced Dermatology's claims for the application of the skin substitutes (CPT Codes 15271, 15272, 15275, and 15276, and HCPCS Code J0696). *See* R. Vol. 1 at 62-65, ECF No. 15 at 28-31 (listing claims). In the alternative, and at a minimum, remand is necessary

[6] *See* Medicare Program Integrity Manual, ch. 3, § 3.3.2.1.1 (Eff. Jan. 17, 2025), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c03.pdf ("The CMS does not prohibit the use of templates to facilitate record-keeping.").

for Advanced Dermatology to have an opportunity to present facts on the new issue that the ALJ decided.

Respectfully submitted,

*s/Samuel J. Walenz*
Samuel J. Walenz, KS #29114
FOULSTON SIEFKIN LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
T: 316-291-9713|F: 316-267-6345
swalenz@foulston.com

Amanda M. Wilwert, KS #25075
SPENCER FANE LLP
1233 Twentieth Street, Suite 600
Washington, DC 20036
T: 202-921-0771|F: 202-595-0581
awilwert@spencerfane.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2026, I electronically filed the foregoing with the Clerk of the Court by uploading it to the CM/ECF system which will send a notice of electronic filing to all parties receiving CM/ECF notifications in this case.

*s/Samuel J. Walenz*
Samuel J. Walenz, KS #29114